

**Via ECF**

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

**Washington**
700 13th Street, NW
10th Floor
Washington, DC 20005-3960
T +1 202 777 4500 (Switchboard)
  +1 202 777 4545 (Direct)
F +1 202 507 5945
E eric.mahr@freshfields.com
www.freshfields.com

September 30, 2021

**Re:** *In re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (PKC); *State of Texas, et al. v. Google LLC*, No. 1:21-cv-06841 (PKC)

Dear Judge Castel:

On behalf of Defendant Google LLC ("Google"), and pursuant to the Court's September 7, 2021 Order in the above-captioned MDL, ECF No. 61, we respectfully submit this pre-motion letter in anticipation of moving to dismiss State Plaintiffs' Second Amended Complaint, ECF No. 81 (the "SAC"). Pursuant to Your Honor's Individual Practices, we note that there is no conference scheduled at this time.

According to State Plaintiffs, their case grew out of an "expansive, 18-month governmental pre-suit investigation" of Google's display advertising business. *See* ECF No. 55, at 2. During that investigation, State Plaintiffs, led by the Office of the Attorney General of Texas, collected "more than two million documents" from Google, "conducted or participated in more than 50 third-party interviews," and received more than 700,000 documents from third parties. *Id.*

With all of that material, Texas and nine other states filed an initial Complaint in December 2020. Three months later, in March 2021, they filed an Amended Complaint that added five states as plaintiffs, significantly revised their allegations, and expanded the number of paragraphs from 357 to 449. In August 2021, State Plaintiffs again sought leave to amend, this time adding two more states as plaintiffs and abandoning their *parens patriae* claim for damages under federal antitrust law.

Despite having amassed a mountain of documents and spending years developing their theories, State Plaintiffs' complaint remains deeply flawed. If the State Plaintiffs' case survives a motion to dismiss, Google will prove that their allegations are false. But there is no need to reach those issues because, even assuming the truth of the allegations, the SAC describes nothing more than a laundry list of complaints about Google that fail to state any antitrust claim. State Plaintiffs insist that the "core" of their case remains their *parens patriae* claim for injunctive relief, ECF No. 52, at 1, but much of the SAC focuses on perfectly legal conduct that has in any event been

occurring openly for many years (including some since before 2010) and that would be inequitable for the Court to enjoin after so much time has passed.

Although the State Plaintiffs invoke antitrust buzzwords—including monopolization, tying, and *per se*—they make no factual allegations showing that those conclusory labels apply to Google's conduct. That is no surprise because Google competes with its many rivals—and succeeds—through innovation and industry. Google created and improved the advertising technologies at the heart of this case, technologies that have been embraced widely because they generate tremendous value by matching publishers and advertisers more efficiently than other alternatives. State Plaintiffs cannot spin that kind of competition on the merits into a Sherman Act violation; Google respectfully requests authorization to file a motion to dismiss the federal antitrust claims in the SAC (Counts I through IV).[1]

**Failure to Allege Plausible Relevant Markets (Counts I to IV).** All of the federal antitrust claims require State Plaintiffs to plead plausible relevant markets. *See Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007). But none of their alleged markets are plausible, as they omit obvious alternatives for advertisers and publishers that significantly constrain Google. Specifically, the SAC provides no facts sufficient to warrant the exclusion of sites like Facebook and Amazon, or in-house supply and direct sales, from their market definitions. Nor could it. Google competes for advertiser spending with social media sites (such as Facebook) and "walled garden" sites that sell their own inventory (such as Amazon), and the SAC recognizes that Google faces competitive pressure from publishers that can choose to build their own ad servers or sell their inventory directly to advertisers. ¶¶ 30, 69, 83. To the extent that State Plaintiffs exclude these competitive constraints, their alleged markets are implausible, and their claims should be dismissed. *See In re Google Digit. Advert. Antitrust Litig.*, 2021 WL 2021990, at *3 (N.D. Cal. May 13, 2021) (holding that alleged markets "improperly exclud[e] other ways for advertisers to reach publishers without using Google's services" and expressing "particular[] concern[] that Plaintiffs' market excludes social-media display advertising and direct negotiations"); *United States v. Aluminum Co.*, 148 F.2d 416, 424 (2d Cir. 1945) (relevant market for aluminum must include Alcoa's in-house production); *United States v. SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172, 186 n.14 (D.D.C. 2001) (similar).[2]

**Failure to Allege Exclusionary Conduct (Counts I and II).** To state a Section 2 claim, State Plaintiffs must allege that Google wilfully acquired or maintained its alleged monopoly power with some form of exclusionary conduct—that is, "conduct without a legitimate business purpose that makes sense only because it eliminates competition." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (internal quotation marks and citations omitted). The SAC identifies essentially three types of allegedly exclusionary conduct, but none suffices to state a Section 2 claim.

---

[1] Pursuant to Pretrial Order No. 1, ECF No. 4 ¶ 11, and the Court's statements at the September 24, 2021 conference, Google does not address the state claims (Counts V and VI) here, but reserves all rights in connection with those claims.

[2] The SAC also fails to address whether the ad tech products here in issue are two-sided transaction platforms. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280-81 (2018); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 56-57 (2d Cir. 2019).

September 30, 2021
Page 3

First, the SAC faults Google for not giving certain data to rivals. *See, e.g.*, ¶¶ 142-54, 242, 253. Those allegations fail to state a claim, however, "because plaintiffs do not allege that [Google] terminated any prior course of dealing—the sole exception to the broad right of a firm to refuse to deal with its competitors." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007); *see also Dreamstime.com, LLC v. Google, LLC*, 2019 WL 341579, at *8 (N.D. Cal. Jan. 28, 2019) ("Although the data collection likely gives Google an advantage . . . over its rivals, a monopolist utilizing its competitive advantage does not equate to anticompetitive conduct.") (internal citations omitted).

Second, State Plaintiffs complain about a host of ways in which Google has chosen to design its own products. *See, e.g.*, ¶¶ 132-41, 176-83, 196-200, 236-37. But courts are "very skeptical about claims that competition has been harmed by . . . product design changes" and require plaintiffs to show that changes were made "to coerce consumers rather than persuade them on the merits." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652-54 (2d Cir. 2015) (internal citations omitted). The SAC falls short because it contains no allegations that Google designed any product in a way that deprived customers of the option to instead use a rival's product. *Cf. id.* at 654-55 (finding coercion when product redesign prevented rivals from participating in the relevant market).

Third, while State Plaintiffs claim that Google "deceive[d] publishers to encourage them to disable header bidding," ¶¶ 311, 320, allegedly "[d]eceptive conduct—like any other kind—must have an anticompetitive effect in order to form the basis of a monopolization claim." *Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir. 2008); *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1080 (10th Cir. 2013) ("To prevail, a private party must establish some link between the defendant's alleged anticompetitive conduct, on the one hand, and its injuries and the consumer's, on the other."). To establish that causal link, State Plaintiffs must overcome the presumption that deception has only a de minimis effect on competition. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 288 n.41 (2d Cir. 1979). But the SAC fails to identify any facts indicating that the alleged deception caused publishers to stop using header bidding or otherwise impacted competition, much less the particularized facts that must be pled to state antitrust claims sounding in fraud. *See Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, 795 F. Supp. 639, 649 (S.D.N.Y. 1992).

**Failure to Allege Tying (Count III).** To state a tying claim, State Plaintiffs would have to "allege facts plausibly showing that: (i) the sale of one product (the tying product) is conditioned on the purchase of a separate product (the tied product); (ii) the seller uses actual coercion to force buyers to purchase the tied product; (iii) the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product; (iv) the tie-in has anticompetitive effects in the tied market; and (v) a not insubstantial amount of interstate commerce is involved in the tied market." *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016) (internal citations omitted). Although the SAC sketches three distinct tying theories, none plausibly alleges facts supporting all of the required elements.

The first theory—tying Google's ad exchange and ad network to its buying tool for small advertisers, ¶¶ 336-39—fails at the outset because the SAC concedes that there is no tie at all. ¶ 129 ("In 2016, Google started routing the bids of small advertisers from Google's buying tool to non-Google exchanges."). Additionally, the SAC lacks any factual allegations indicating that

September 30, 2021
Page 4

advertisers' demand for buying tools is separate from their demand for ad exchanges or ad networks. *See Kaufman*, 836 F.3d at 143-45.

As to the second theory—tying Google's publisher ad server to its ad exchange, ¶¶ 327-31—the SAC fails to allege facts showing that Google actually coerces publishers to use its ad server in order to transact on its ad exchange. *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product."); *see also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 685 (4th Cir. 2016) ("Without coercion . . . selling products A and B as a unit is simply one strategy for gaining an edge in a free marketplace.").

The third theory—tying Google's ad buying tools to its instream online video advertising inventory, ¶¶ 332-35—should be dismissed because the SAC fails to allege that advertisers have separate demand for instream online video advertising inventory and the tools that they use to purchase that inventory. To the contrary, the SAC indicates that advertisers buy instream online video advertising inventory together with ad-buying-tool services. *See* ¶¶ 284-85; *cf. Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 235 (S.D.N.Y. 1988) (concluding that a database and a method of accessing that database were not separate products). Once recognized as involving a single product, the allegations that Google withheld YouTube inventory from competing ad buying tools boil down to yet another refusal-to-deal claim. And that claim fails as well because, in alleging that Google sought a larger share of "advertisers' budgets," ¶ 287, the SAC effectively concedes that Google's decision involved no profit sacrifice. *See Adderall XR Antitrust Litig.*, 754 F.3d at 135 (affirming dismissal for failure to allege facts "suggesting a willingness to forsake short-term profits to achieve an anticompetitive end") (simplified); *see also Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 376 (7th Cir. 1986) (Posner, J.) ("If a monopolist does extend a helping hand, though not required to do so, and later withdraws it . . . , does he incur antitrust liability? We think not.").

In addition, all three of the tying theories are barred by the doctrine of laches, under which courts use the four-year statute of limitations for antitrust damages claims as a guideline for determining how promptly plaintiffs must bring claims for injunctive relief. *See Madison Square Garden, L.P. v. Nat'l Hockey League*, 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008). According to the SAC, the conduct at the heart of the first and second tying theories began in 2009, more than a decade before State Plaintiffs filed their first complaint, ¶ 119, and the only facts alleged in connection with the third tying theory date from 2013 and 2014, ¶¶ 286-87. These allegations of old conduct cannot support a claim for injunctive relief so many years later.[3]

**Failure to Allege a *Per Se* Unlawful Agreement (Count IV).** Although State Plaintiffs assert that Google's 2018 agreement with Facebook (the "Agreement") violates Section 1, they make no rule-of-reason claim and allege only a "*per se* violation." ¶ 342-43. The *per se* rule cannot apply because the Agreement establishes a vertical relationship—namely, Facebook's "bid[ding] through Google's ad server." ¶ 218; *see Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc*., 129 F.3d 240, 243-44 (2d Cir. 1997) (recognizing that rule of reason applies to agreement between manufacturer and distributor, even when manufacturer also competes at the

---

[3] The doctrine of laches also bars claims based on allegations unrelated to tying, including those concerning "hashing or encrypting publishers ad server user IDs" (which, according to the SAC, started in 2009). ¶ 142.

distribution level); *2238 Victory Corp. v. Fjallraven USA Retail, LLC*, 2021 WL 76334, at *3-5 (S.D.N.Y. Jan. 8, 2021) (similar).  Further, "to justify a *per se* prohibition a restraint must have manifestly anticompetitive effects and lack any redeeming virtue," *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (internal citations, quotation marks, and alterations omitted), but the Agreement did the opposite: it increased competition for publisher inventory by adding Facebook to the group of bidders participating in Google auctions.  *See* ¶¶ 226-27.

\* \* \*

For all of these reasons, Google respectfully requests authorization to move to dismiss the SAC.  If State Plaintiffs choose not to attempt a fourth iteration of their pleading, and the Court grants leave to file the motion, Google proposes to file within 30 days of the Court's order.  On the other hand, if State Plaintiffs seek leave to file a third amended complaint, the Court should require them to file that complaint by October 29, 2021 (three weeks after they respond to this letter) and allow Google to answer or otherwise respond to that pleading by December 24, 2021 (fewer than 60 days later, including the Thanksgiving holiday).  In either scenario, Google proposes a briefing schedule that would provide State Plaintiffs with 60 days to oppose Google's motion to dismiss and Google with 30 days to reply.  In light of the sheer breadth of the SAC (comprising 482 paragraphs and spanning 150 pages), Google also respectfully requests a limit of 40 pages for its moving brief, 40 pages for State Plaintiffs' response, and 20 pages for Google's reply.

Respectfully Submitted,

 */s/ Eric Mahr*
Eric Mahr
FRESHFIELDS BRUCKHAUS DERINGER US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4545
Email: eric.mahr@freshfields.com

*/s/ Justina K. Sessions (by consent)*
Justina K. Sessions
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2197
Email: jsessions@wsgr.com

*Counsel for Google LLC*

CC:  Counsel of Record