L9oWgooC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In re GOOGLE DIGITAL                    21 MDL 3010 (PKC)
ADVERTISING ANTITRUST LITIGATION
------------------------------x         Conference

                                        New York, N.Y.
                                        September 24, 2021
                                        11:00 a.m.

Before:

                    HON. P. KEVIN CASTEL,

                                        District Judge

                         APPEARANCES

BOIES SCHILLER FLEXNER LLP
        Attorneys for Proposed Publisher Classes Plaintiffs
        The Nation, The Progressive and Genius Media
BY:  DAVID BOIES
     PHILIP C. KOROLOGOS
     -and-
KOREIN TILLERY LLC
BY:  GEORGE A. ZELCS
     -and-
BERGER MONTAGUE PC
BY:  ERIC L. CRAMER
     CAITLIN G. COSLETT

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
        Attorneys for Daily Mail Publisher Plaintiffs
        Associated Newspapers and Mail Media
BY:  JOHN THORNE

HERMAN JONES LLP
        Attorneys for Newspaper Publisher Plaintiffs
        Emmerich, HD Media, Coastal Point, Journal,
        ECENT, Clarksburg, Flag, Eagle, AIM Media Midwest,
        AIM Media Texas, Gale Force,
        AIM Media Indiana and Brown County
BY:  JOHN HERMAN
     SERINA M. VASH

L9oWgooC

1                          APPEARANCES CONTINUED

2

3    W. MARK LANIER
            -and-
4    ASHLEY C. KELLER
            Attorneys for State Attorneys General Plaintiffs

5    COOPER & KIRK, PLLC
            Attorneys for Plaintiff State of Montana
6    BY:   DAVID H. THOMPSON

7    ZWERLING, SCHACHTER & ZWERLING, LLP
            Attorneys for Plaintiffs
8            SPX, SkinnySchool and Mint Rose
     BY:   FREDERICK T. ISQUITH, Sr.
9          FREDERICK T. ISQUITH, Jr.

10   MOGIN RUBIN LLP
            Attorneys for Cliffy Care Plaintiffs
11   BY:   JONATHAN L. RUBIN
            JENNIFER M. OLIVER
12
     GIRARD SHARP LLP
13          Attorneys for Advertiser Class Plaintiffs
            Hanson Law Firm, Surefreight and Lindo
14   BY:   SCOTT M. GRZENCZYK
            -and-
15   ADHOOT & WOLFSON, PC
     BY:   BRADLEY K. KING
16          -and-
     TAUS CEBULASH & LANDAU
17   BY:   ARCHANA TAMOSHUNAS

18   WILSON SONSINI GOODRICH & ROSATI, P.C.
            Attorneys for Defendants Google, Alphabet and YouTube
19   BY:   JUSTINA K. SESSIONS
            JONATHAN M. JACOBSON
20          -and-
     FRESHFIELDS BRUCKHAUS DERINGER LLP
21   BY:   ERIC MAHR
            ROBERT McCALLUM
22          -and-
     AXINN, VELTROP & HARKRIDER LLP
23   BY:   JOHN D. HARKRIDER

24   CRAVATH, SWAINE & MOORE LLP
     Attorneys for Defendant Facebook
25   BY:   KEVIN J. ORSINI

L9oWgooC

```
 1              (Case called)
 2              THE COURT:  All right.  There should be three people
 3    at the front table.
 4              MR. GRZENCZYK:  Your Honor, if I may?
 5              I'm Scott Grzenczyk from Girard Sharp.  We represent
 6    the advertising class.
 7              THE COURT:  That's great.  That's terrific.  This has
 8    nothing to do with who you represent.  This happens to have to
 9    do with the pandemic, so there are three people at the front
10    table.
11              MR. THORNE:  John Thorne for Daily Mail.
12              THE COURT:  Please remain seated.  Again, that's
13    another pandemic condition that we have.  OK?
14              I think I indicated that there should be two
15    representatives of the states and one representative of the
16    publisher classes at the front table.  Did I not?  I think I
17    did.
18              Do you represent the state?
19              MR. THORNE:  Your Honor, I represent Daily Mail, and
20    thank you for taking this case.  I'm going to move to the back,
21    and Mr. Boies will represent the publisher class action at this
22    table.
23              THE COURT:  Thank you.
24              Mr. Boies, who do you represent?
25              Remain seated.
```

L9oWgooC

1              MR. BOIES:  Excuse me.

2              THE COURT:  I know.  It's a bad habit.  We all have to

3    get used to these things.

4              MR. BOIES:  The publisher class.

5              THE COURT:  OK.

6              MR. LANIER:  Mark Lanier.  I represent the states,

7    your Honor.

8              MR. KELLER:  I represent the states as well, your

9    Honor.

10             THE COURT:  Terrific.  That's exactly the way I had it

11   set up for the front table.  Thank you.

12             Now, for the back table, I assume you represent

13   Google.  Is that correct?

14             MR. MAHR:  That's correct, your Honor.  Eric Mahr on

15   behalf of Google.

16             THE COURT:  All right.  Good to see you.

17             MS. SESSIONS:  And Jessica Sessions, your Honor, on

18   behalf of Google.

19             MR. ORSINI:  Good morning, your Honor.  Kevin Orsini

20   on behalf of Facebook.

21             THE COURT:  All right.  Thank you.

22             MR. RUBIN:  Good morning, your Honor.  Jonathan Rubin

23   on behalf of the Cliffy Care plaintiff.

24             THE COURT:  All right.

25             MR. ISQUITH JR.:  Fred Isquith on behalf of the SPX

L9oWgooC

1      plaintiffs.

2                  MS. VASH:  Good morning, Judge.  Serina Vash on behalf

3      of HD Media and 12 additional newspaper plaintiffs.

4                  THE COURT:  All right.  Good to see you, Ms. Vash.

5                  MR. GRZENCZYK:  Your Honor, Scott Grzenczyk on behalf

6      of the advertiser class.  We were not on the initial papers, so

7      we were --

8                  THE COURT:  Understood.  Who is your client?

9                  MR. GRZENCZYK:  The advertiser class.

10                 THE COURT:  Well, which?  There are three advertiser

11     class actions, so which one are you?

12                 MR. GRZENCZYK:  The digital advertising class action

13     from the Northern District of California.

14                 THE COURT:  What is the name of the putative class

15     representative?

16                 MR. GRZENCZYK:  The Hanson Law Firm is one of the

17     class representatives.  The case was styled *In re Digital*

18     *Advertising Antitrust Litigation*.

19                 THE COURT:  No.  The last time I checked, under

20     Federal Rules of Civil Procedure, there must be a plaintiff who

21     is styled as the class representative.  It's not a class action

22     until the class is certified.  Now, there is SPX and Skinny.

23     There's Cliffy Care, and there's Surefreight.  Are you any of

24     those?

25                 MR. GRZENCZYK:  Surefreight is part of our class.

L9oWgooC

1           THE COURT:  All right.

2           MR. GRZENCZYK:  Surefreight is one of our main class

3   representatives along with the Hanson Law Firm.

4           THE COURT:  The Hanson Law Firm is a named class

5   representative.

6           MR. GRZENCZYK:  Yes.  Judge Freeman in the Northern

7   District of California previously consolidated several class

8   actions, styled them *In re Digital Advertising Antitrust*

9   *Litigation*.  Hanson Law Firm, Surefreight are among the named

10  plaintiffs in that class action.

11          THE COURT:  All right.  So a law firm is one of the

12  class representatives.

13          MR. GRZENCZYK:  Yes, your Honor.

14          THE COURT:  OK.  So it's the Hanson Law Firm,

15  Surefreight.  And who is the other class representative?

16          MR. GRZENCZYK:  Those are the two primary class

17  representatives.

18          THE COURT:  All right.  Surefreight and Hanson.

19          Sir.

20          MR. KING:  I'm with Mr. Grzenczyk.  Bradley King,

21  Adhoot Wolfson, also for the advertiser class case.  Vitor

22  Lindo is the third named plaintiff in the class.

23          THE COURT:  Lindo.  OK.  For today's purposes, I'm

24  going to refer to that case as the Surefreight case.

25          MR. GRZENCZYK:  Thank you, your Honor.

L9oWgooC

```
 1              THE COURT:  OK.

 2              MR. KOROLOGOS:  Good morning, your Honor.  Phil

 3    Korologos of Boies Schiller Flexner for the publishers.

 4              THE COURT:  OK.

 5              MR. ZELCS:  Good morning, your Honor.  George Zelcs of

 6    Korein Tillery for the publishers.

 7              THE COURT:  All right.

 8              MR. THORNE:  Good morning again, your Honor.  John

 9    Thorne for the Associated Newspapers a/k/a Daily Mail.

10              THE COURT:  All right.

11              Anyone else representing a party?  Raise your hand,

12    and we'll call on you if you're representing a party and making

13    an appearance today.

14              Yes, sir.

15              MR. THOMPSON:  Good morning, your Honor.  David

16    Thompson for the state of Montana.

17              THE COURT:  Thank you, Mr. Thompson.

18              In the front row.

19              MR. CRAMER:  Good morning, your Honor.  Eric Cramer

20    from Berger Montague for the publisher class.

21              THE COURT:  OK.

22              Yes, ma'am.

23              MS. COSLETT:  Caitlin Coslett, Berger Montague, also

24    for the publisher class.

25              THE COURT:  All right.  Just say your name again.  I
```

L9oWgooC

| | |
|---|---|
| 1 | didn't quite hear it. |
| 2 | MS. COSLETT:  Caitlin Coslett. |
| 3 | THE COURT:  All right.  Thank you. |
| 4 | Yes, ma'am. |
| 5 | MS. OLIVER:  Jennifer Oliver, Mogin Rubin, for the |
| 6 | Cliffy Care plaintiffs, your Honor. |
| 7 | THE COURT:  OK.  Cliffy Care.  Yes. |
| 8 | And, yes. |
| 9 | MS. TAMOSHUNAS:  Your Honor, Archana Tamoshunas, also |
| 10 | with the Surefreight plaintiffs. |
| 11 | THE COURT:  All right.  We're not picking up your |
| 12 | name.  Who do you represent? |
| 13 | MS. TAMOSHUNAS:  I'm with Mr. Grzenczyk, the |
| 14 | Surefreight plaintiffs. |
| 15 | THE COURT:  All right. |
| 16 | Could you say the name, sir, because we're having an |
| 17 | audibility issues with the masks. |
| 18 | MR. GRZENCZYK:  Archana Tamoshunas. |
| 19 | THE COURT:  All right.  Thank you. |
| 20 | Anyone else representing a party making an appearance? |
| 21 | I see in the back of the courtroom, yes, sir.  Hand |
| 22 | raised high.  Remain seated. |
| 23 | MR. JACOBSON:  Jonathan Jacobson, Wilson Sonsini, |
| 24 | cocounsel for Google. |
| 25 | THE COURT:  All right. |

L9oWgooC

1          Yes, sir.

2          MR. HARKRIDER:  John Harkrider, representing Google.

3          THE COURT:  Representing.

4          MR. HARKRIDER:  Google.

5          THE COURT:  Thank you.

6          MR. McCALLUM:  Rob McCallum, Freshfields, cocounsel

7    for Google.

8          THE COURT:  All right.  Excellent.

9          Anyone else making an appearance on the record here

10   today?

11          Wonderful.

12          Well, I think with the exception of the Associated

13   Newspapers lawyer, no one else in this courtroom expected to be

14   before me, and I didn't expect to have you before me.  From

15   what I can tell from the filings before the MDL, I was not

16   anybody's first choice, and I don't feel at all insulted

17   whatsoever.  I was sitting there looking at the filings and

18   saying, Well, I don't have to worry about this case, because

19   this is obviously going elsewhere.  And if it's any

20   consolation, I was rooting for you all.  But that's not the

21   hand of cards that were dealt you or me, so we're together.

22          I have something of an agenda, and I'll tell you what

23   the agenda is so that you'll know that your issue is at some

24   point going to be addressed, or you'll tell me it's not.

25          First, we're going to talk about pleadings and motions

L9oWgooC

1     to dismiss.  Then we're going to talk about discovery: stay, no

2     stay; whether there's access to some portion or all of the CID

3     discovery.  And then we'll talk about organizational issues.

4     In that context, I will have you talk about the issues

5     associated with Associated Newspapers, the Daily Mail, of which

6     there are some unique issues that have to be aired in this

7     case.  We'll talk about structure, organization, leadership, so

8     on and so forth.

9              Then on my agenda, there is the issue of what I'll

10    call the *Lugosch* issue, the redactions from the second amended

11    complaint.  We'll talk about that as well.

12             That's the agenda.

13             With regard to pleadings and motions, some of this

14    I've already set in motion and is on a path.  The state

15    plaintiffs have now filed their second amended complaint.

16    Google has until September 30 to file their premotion letter,

17    and Google's time -- I'll say this for the sake of good

18    order -- to respond to Counts Five and Six, which are state law

19    claims in the state complaint, are stayed pending further

20    order.

21             Any objection, Mr. Lanier?

22             MR. LANIER:  No objection, your Honor.

23             THE COURT:  All right.  And then what will happen next

24    is the state plaintiffs will respond.  I'm kind of guessing

25    there's going to be a premotion letter.

L9oWgooC

1          Am I guessing right?

2          MR. LANIER:  You are, your Honor.

3          THE COURT:  All right.  It was a good guess.

4          Then the plaintiffs will respond on October 8,

5     indicating if there are any amendments they wish to make.  The

6     idea is to get the strongest and best pleading in front of the

7     Court so Google can make its motions and so that we don't have

8     this tennis match of rulings on motions followed by amendments

9     followed by further motions and further rulings, etc.  This

10    should be the plaintiffs' strongest and best pleading.

11         Now, the defendants' time to answer or move with

12    regard to all other complaints I propose to stay.  The thought

13    here, just so all cards are faceup on the table -- this is not

14    gamesmanship or anything; it's my view of efficiency -- is we

15    take one of the several complaints.  I could have taken the

16    publishers class action, I could have taken the Associated

17    Newspapers, but I've taken the states' complaint because it

18    seems to cover not all of the waterfront but much of the

19    waterfront.  And if we know that it does state a claim or

20    doesn't state a claim or states a claim on one of your federal

21    antitrust claims but not on others, we'll know where we are.

22         Other plaintiffs -- in class actions, in individual

23    actions -- will have time to seek an amendment, not a lot of

24    time but time after you have in hand a decision on the motion

25    to dismiss in the state case, to then say, Well, gee, I want to

L9oWgooC

1    amend to add an allegation that was upheld in the state case,

2    or the like.  So you'll have a chance.  You're looking at each

3    other's pleadings.

4              I am not putting a lot of stock in the fact that today

5    someone raises only a Jedi Blue claim but not another claim,

6    because these things may change over time.

7              That's the process.  So what I envision is 21 days

8    after the decision on the motion to dismiss, there will be an

9    opportunity for amendments and when I say amendments, move to

10   amend.  I'll have you submit a proposed pleading so everybody

11   knows what the amendment is.  I expect that there should be

12   consent to the amendments.  Maybe there won't be, in which

13   event I'll rule, but we'll then have the pleadings in the other

14   cases fixed, and I'll fix a motion schedule.

15             As I indicated in, I think, pretrial order No. 1, I

16   likely will continue a stay as to state claims.  It's a

17   question of prioritization of work; it is not the case that

18   multiple motions going on at the same time lead to faster or

19   more efficient results.  You're dealing with one judge, one

20   chambers, and I could be a bottleneck if I were trying to

21   resolve every pleading in every case and every state law claim.

22   Let's find out whether we have a federal antitrust claim before

23   we get into the state law claim.

24             With regard to discovery, I'll say this.  My present

25   thinking is that if I find that one or more of the claims in

L9oWgooC

1    the complaint states a claim for relief, the antitrust claims,

2    I will likely allow discovery to commence.  I will not wait for

3    the briefing on the various motions to dismiss.  If I have a

4    pleading, the state pleading, that passes muster, that gives me

5    the confidence that there will be other pleadings that pass

6    muster.  Therefore, the stay of discovery can at that point be

7    dissolved, which means that plaintiffs' counsel in the various

8    cases need to be thinking soon about how to organize all that

9    discovery.

10          The reality is everything is integrating with

11    everything else here.  I started off telling you about motions

12    to dismiss, but that blends into the stay, which blends into

13    organization and the plaintiffs' bar getting their act together

14    with differing interests to figure out an organized plan,

15    because it's no surprise that we're not going to take or have

16    the depositions taken of the same executives seriatim in a raft

17    of cases, certainly not 19 cases but not even four cases.

18          There can be instances where a lead counsel overlooked

19    or failed to examine on a very key point and there's some need

20    for supplemental examination of a witness.  I get it.  We'll

21    deal with that when that arises, but there will be one time for

22    general document production -- I'm putting aside the CID issue,

23    which I'll talk about in a minute -- one time for document

24    production and one set of depositions.

25          Now, there may be witnesses that the publisher class

L9oWgooC

1    or the state says I have no interest whatsoever in this witness

2    because it really relates only to advertiser claims and only

3    the advertisers are interested in this deposition.  There's

4    room for that in any good schedule, but there's certainly

5    plenty of overlap.  And the overlap exists even if the legal

6    theories are not perfectly aligned.  There is enough factual

7    common matter.

8              So let's just take it, with regard to pleadings and

9    stay of discovery but not including CID, because I need to get

10   some more information from you this morning.  But on those two

11   subjects, are there any comments, objections, questions?

12             MR. RUBIN:  Thank you, your Honor.

13             We appreciate the amount of time and thought that your

14   Honor obviously has put into a complex matter.  And also, to

15   the extent the Court was referring to Cliffy Care in stating

16   that it doesn't really matter if there's only a specific claim

17   in the complaint, I think that the important thing is not the

18   absence of other claims, as far as our case is concerned, but

19   the specificity of the claim that we do have, and we agree that

20   the states' case largely covers the waterfront, but it does not

21   cover the specifics of the Section 1 claim that is alleged in

22   Cliffy Care.

23             There is a Section 1 claim that is related to

24   monopolization, a Section 1 claim in a larger collusion case,

25   but none of the other complaints are seeking specific damages

L9oWgooC

1    for the injured class related to the operation of the agreement

2    itself.

3              THE COURT:  The network bidding agreement.

4              MR. RUBIN:  Correct.  Yes, your Honor.

5              THE COURT:  All right.  But that may change, right?

6              MR. RUBIN:  It's a bit unsatisfactory if we wait for

7    the pleadings from the state case because it does not shed any

8    light on our pleadings, which go into greater specificity on

9    the damages claim related to the network bidding agreement.

10              THE COURT:  But that may change, right?

11              MR. RUBIN:  That may change.

12              THE COURT:  Because other plaintiffs may incorporate

13    some aspect of your claim.

14              MR. RUBIN:  Well, that's right, your Honor.

15              THE COURT:  And you may choose to bring your claim.

16              MR. RUBIN:  Indeed, but if we're going to cover the

17    waterfront, and I think that's very logical, with respect to

18    pleadings, then it should be a complete set of issues.  And if

19    the state proceeds on its own, I think there's a little gap,

20    and that's basically our point.  We would like to --

21              THE COURT:  Well, thank you.

22              MR. RUBIN:  Yes.

23              THE COURT:  But there's a big gap.  I disagree with

24    you.  There's not a little gap, but there's a big gap.  So one

25    of the elements on a monopolization claim, I believe, is in

L9oWgooC

| | |
|---|---|
| 1 | addition to antitrust injury or harm to competition, there must |
| 2 | also -- not in the state case but in the private cases -- be |
| 3 | harm to the competitor. |
| 4 | What I've set up here does not encompass that.  You |
| 5 | will not know when you get a decision on the state case whether |
| 6 | or not any of you have successfully alleged harm to a |
| 7 | competitor.  That's a big gap.  I realize that, and there may |
| 8 | be a gap as to your pleadings.  I know the Jedi Blue or the |
| 9 | network bidding agreement is referred to in the state's |
| 10 | complaint. |
| 11 | Is that correct, Mr. Lanier? |
| 12 | MR. LANIER:  Yes, your Honor, it is. |
| 13 | THE COURT:  And what do you say about it or how does |
| 14 | that factor into your case, briefly? |
| 15 | MR. LANIER:  Your Honor, basically, it is our |
| 16 | contention that the Facebook agreement on Jedi Blue was one |
| 17 | which allowed Google's plan to, in a sense, go unchallenged. |
| 18 | THE COURT:  All right. |
| 19 | MR. LANIER:  And we have not chosen to sue, at this |
| 20 | point, Facebook.  But we certainly make all of the same |
| 21 | allegations.  We're just going after Google for that end. |
| 22 | THE COURT:  Right.  Did you allege it's *per se* |
| 23 | violation? |
| 24 | MR. RUBIN:  Well, we don't specifically characterize |
| 25 | it, but your Honor, our allegation is that the operation of the |

L9oWgooC

1      agreement has caused money damages to a particular class.

2                  THE COURT:  Understood.

3                  MR. RUBIN:  Which is considerably distant from the

4      idea that the agreement was a contribution to collusion in a

5      larger industrial context.

6                  THE COURT:  Understood.

7                  MR. RUBIN:  So our request would be that we be

8      allowed, along with the states, on the pleadings, since our

9      pleadings are at least at this point extremely narrow on this

10     one count, on this one theory, that the states' case, in

11     essence, be supplemented with the Cliffy Care allegations so

12     that indeed there is a complete covering of the waterfront.

13                 THE COURT:  Thank you.

14                 MR. RUBIN:  Thank you, your Honor.

15                 THE COURT:  Yes, sir.

16                 MR. ISQUITH JR.:  Your Honor, my comment is on the

17     discovery plan and the discovery stay.  Given your process that

18     you would like to proceed with, the states going forward and

19     then an amended pleading by the plaintiffs' group afterwards,

20     it's our thought that at least for the discovery that has been

21     provided, we know that Google --

22                 THE COURT:  The CID stuff.

23                 MR. ISQUITH JR.:  But there's also -- according to

24     some of these letters, there's been discovery outside of the

25     CID that Google has provided -- I believe it's outside the CID,

L9oWgooC

1     that Google has provided to the advertisers class as well as

2     the publishers class, that that be provided to all the private

3     plaintiffs' groups so we can start our review to ensure that

4     those documents get into everyone.

5           THE COURT:  Thank you.  I'm going to ask Google about

6     that and I'll ask you some further questions, Mr. Isquith,

7     because I failed to appreciate that that was the case.  I

8     thought it was just the CID.  I didn't realize that there was a

9     production to the advertiser class.

10           I see Google wanting to respond there.

11           MS. SESSIONS:  Your Honor, I'm happy to also address

12    that at the point that you ask us questions.

13           THE COURT:  OK.

14           MS. SESSIONS:  Google has not made a production to the

15    advertiser or plaintiff classes of any materials outside of the

16    CID in this case.

17           THE COURT:  OK.  All right.  Thank you.

18           I heard that representation, Mr. Isquith.

19           MR. ISQUITH JR.:  Thank you, your Honor.  I was taking

20    it from the letters, and I was not aware that it was just the

21    CID.

22           THE COURT:  OK.  That's fine.  Thank you.

23           Yes, sir.

24           MR. GRZENCZYK:  With respect to the Surefreight

25    plaintiffs, just commenting briefly on something your Honor

L9oWgooC

1    mentioned, which is that for other plaintiffs, other than

2    Cliffy Care, people are evaluating the Jedi Blue agreement, how

3    that fits into their case.  Your Honor's assessment is

4    accurate.

5         The posture of our case when the (inaudible) happened

6    is we were in the process of looking to amend our complaint,

7    and certainly how Jedi Blue fits in was one of the things that

8    we were considering.  So just noting for your Honor that your

9    characterization is right, that there are plaintiffs out there

10   looking to amend their complaints and what exactly those

11   amendments will include is an ongoing process.

12        THE COURT:  All right.  Thank you.

13        Mr. Boies.

14        MR. BOIES:  Your Honor, I think that with respect to

15   the documents, I think there is CID documents, but I also think

16   there has been production to the states that's in addition to

17   the CID documents.

18        THE COURT:  I'm going to find out about that.  That's

19   an interesting point as well.  I'm going to find out about

20   that.  I know that the production -- I'm viewing it as the CID

21   production -- is some 700,000 documents.  There were 20 third

22   parties, I understand, and something like 54 examinations.

23   Now, if there is more than that, we're going to find that out

24   this morning and deal with it.

25        MR. BOIES:  OK.

L9oWgooC

1          THE COURT:  I don't know what the answer's going to

2     be, but we'll find out if that's the case.

3          Thank you.

4          Mr. Lanier.

5          MR. LANIER:  Yes, your Honor.

6          You've already nailed the numbers.  I was going to

7     throw the numbers out there, but you've got them.  In addition

8     to that, we have been provided over 2 million documents from

9     Google.  That's in addition to the 700,000 you were referencing

10    as the CIDs with the third-party interviews.  We did have a

11    protective order basically in place with Google and, if the

12    Court should decide it's OK to do, we can certainly issue those

13    documents to others.

14          In addition, there's a tranche of documents that the

15    DOJ has in the DOJ case, and our hope would be, if the Court

16    deems it appropriate, that in light of the protective order in

17    place, if we could have access to those documents even while

18    the briefing's going on, it would enable us if Google could

19    just, like, click a button, cut and paste and give us the same

20    production it gave the DOJ, it would enable us to be going

21    through those documents and investing our time and energy.  And

22    of course, if we wind up with no claim, we've wasted our time

23    and energy, but not anyone else's.

24          THE COURT:  All right.  OK.  Thank you, Mr. Lanier.

25    I'm going to get into that as well.

L9oWgooC

1          Right now I'm principally concerned, is there any

2     other comment on the approach on pleadings and the tentative

3     view that there will be, or at least I'll say the view that

4     there will be a stay of general discovery, carving out what we

5     just discussed about documents that have already been

6     produced -- for discussion; I haven't made any decision -- but

7     that general discovery would be stayed until after the motion

8     to dismiss on the state plaintiffs' complaint is decided.

9          Yes, Ms. Vash.

10          MS. VASH:  Thank you, your Honor.

11          I just want to clarify with respect to some of the

12     other comments that were made.  There is a subset of documents,

13     is our understanding, that have been produced to the publisher

14     class action and the advertiser class action.  And as respects

15     the direct actions, the newspaper plaintiffs in some of the

16     other cases, we have reached out to counsel for Google and

17     asked that they also provide that to us so that we are all on

18     the level playing field as we move forward.

19          Google's declined to do that, and we would request

20     that of the Court as we go forward today.

21          THE COURT:  Thank you, Ms. Vash.

22          MS. VASH:  Thank you, your Honor.

23          MR. GRZENCZYK:  We understand the Court's position on

24     the overall discovery stay with respect to document productions

25     and depositions.  What we've found effective in other cases

L9oWgooC

where that type of discovery is stayed is for the Court to

nonetheless authorize or suggest to the parties that they

commence with negotiating discovery-related pretrial orders.

Protective order is an example.  ESI protocol is an example.  I

think there's a lot we can accomplish if the Court's inclined

to say actual document productions that will allow us to really

hit the ground running once that discovery stay is lifted.

So our suggestion, respectfully, would be that the

Court have the parties go forward, meet and confer and

negotiate, and if we have disputes about the terms of pretrial

orders related to discovery, we can present those in advance of

the discovery stage to you.

THE COURT:  All right.  That's a very good idea, but

I'm going to have that idea implemented when we get a little

bit of an organizational structure in place, and maybe there

will be something tentative in that direction before we break

today.

MR. GRZENCZYK:  And just to advise the Court, some of

those discussions among some of the counsel have already

started.  So we've already begun making progress and are happy

to do that with an organization in place.

THE COURT:  All right.

Anything else?

Now, let me hear from Google in the first instance.

I have heard about the 700,000 documents that are part

L9oWgooC

1    of the CID production, which I gather is not all Google

2    documents.  I would assume that's the universe of everybody who

3    produced documents.  I've heard about 2 million documents

4    produced by Google.  I've heard about possible productions to

5    the advertiser class and to the publisher class.  So let me ask

6    you to tell me what has happened, first of all, so I understand

7    what Google has produced and to whom.

8              MR. MAHR:  Thank you, your Honor.

9              Ms. Sessions and I both represent Google -- I in the

10   Texas case and Ms. Sessions in the private cases.  We're now

11   combined, obviously.  I have the easier job of talking about

12   our views on the pleadings.  We agree with your proposal on the

13   pleadings, and I haven't heard anyone disagree with it.

14             Ms. Sessions will handle our position on the stay.

15             But counsel in the Texas case, just so it's clear,

16   there were 2 million documents produced by Google in that

17   investigation.  The 700,000 documents are from a third party in

18   that investigation.

19             THE COURT:  I see.

20             MR. MAHR:  And then some 50 some interviews of third

21   parties.

22             THE COURT:  All right.  Thank you.

23             Now, let me hear about what has been produced in any

24   of the other cases.

25             MS. SESSIONS:  Yes.  Thank you, your Honor.

L9oWgooC

1          Before the cases were transferred to your Honor, Judge

2     Freeman, in the Northern District, ordered that Google

3     re-produce the 2 million documents that were part of the

4     investigative production to Texas to counsel for the advertiser

5     and plaintiff classes in those cases, and Google has done that.

6     So that's the full scope of document production that Google has

7     made.

8          THE COURT:  And that's in the advertiser --

9          MR. LANIER:  Both the publisher and the advertiser

10     class cases.

11          THE COURT:  All right.  OK.

12          Now, in olden times, which some of you may remember,

13     when there were situations like this, there were document rooms

14     set up and there was one set of paper files and counsel could

15     come in and tag what they wanted copied, maybe send out to be

16     copied, etc., and a judge would be concerned and the producing

17     party would be concerned that there be one location where folks

18     could go for the production.

19          Now, with electronic production, those concerns are

20     not quite the same, but why should it not be the case that,

21     subject to a protective order in this case, an expanded

22     protective order, why ought I not order Google to produce that

23     which has been produced to the publisher and advertiser classes

24     in Judge Freeman's case to all of the plaintiffs?

25          Now, I have to be guided on how that's done so as not

L9oWgooC

1    to burden you.  I know you won't be copying 2 million pieces of

2    paper 20 times, but that's basically the question I have.  Why

3    should you not be ordered to have a repository, maybe a

4    website, secure website where folks can go and get the

5    documents now?

6            MS. SESSIONS:  Your Honor, I'll take on the substance

7    first, and then we can talk a little bit, I guess, about what

8    procedural --

9            THE COURT:  Right.

10           MR. LANIER:  -- what procedures might be in place.

11           The civil investigative demand that was issued to

12   Google by the states was broad.  There were a lot of documents

13   produced in response, and Google does not want to or feel that

14   it should have to have those confidential documents spread

15   around -- more fruits of Google's customers and in many cases

16   its competitors -- before those complaints have been tested,

17   and at least tested with respect to the common allegations in

18   the Texas complaint, because if there are certain categories of

19   claims that are not going to go forward, Google should not have

20   to provide the documents that are relevant solely to those

21   claims that are not going forward.

22           So that's why we don't think that we should have to

23   turn over that entire set of documents at this time.  However,

24   if there are some claims that do end up going forward after

25   your Honor rules on the motions to dismiss, that production

L9oWgooC

1    could be done reasonably quickly if discovery were to be open,

2    because as your Honor observed, these things are done

3    electronically these days.  And so we could get other folks up

4    to speed as appropriate reasonably quickly if there are claims

5    that are going to go forward.

6            THE COURT:  All right.

7            Anyone want to be heard on why the Court should order

8    the production made to the state and to the publisher and

9    advertiser class actions, at least in the Northern District of

10   California, at this time?

11           Ms. Vash, then Mr. Boies.

12           Go ahead.

13           MS. VASH:  Thank you, your Honor.

14           As an initial matter, it's our understanding that

15   there is a subset of documents that has been produced to the

16   publisher and advertiser class actions.

17           THE COURT:  Pause.

18           I thought I heard that the universe was produced.

19           MS. SESSIONS:  Your Honor, the universe of documents

20   that Google produced has been re-produced.  Google did not

21   produce any third-party documents.

22           THE COURT:  Understood.  Understood.  I didn't think

23   you did.  OK.

24           Go ahead, Ms. Vash.

25           MS. VASH:  Those documents would be and are subject to

L9oWgooC

1     a protective order that any plaintiff in this case would also

2     be subject to, Judge.  And pursuant to this Court's order, the

3     August 13 order where you requested that we work together in

4     doing things such as discovery and serving of motion practice

5     and expert witnesses, etc., it would be most efficient, Judge,

6     and in line with this Court's order to assure that all

7     plaintiffs are on a level playing field and have access to

8     those documents at this time, your Honor.

9                THE COURT:  Thank you.

10               Mr. Boies.

11               MR. BOIES:  From our perspective, your Honor, we would

12    like to have access to all of the documents that the state has,

13    whether they were produced by third parties or by Google.

14    We're prepared to take them pursuant to a protective order.  If

15    there are documents that raise particular confidentiality

16    concerns, we are prepared to take them on an attorney's eyes

17    only basis at this point, but we think that it would be

18    appropriate for us to, at this stage, at least get the

19    documents that are already in the possession of the state

20    plaintiffs.

21               THE COURT:  Thank you.

22               Let me hear from Ms. Sessions on another topic that

23    was raised.

24               There is said to be some set of documents that were

25    produced to DOJ.  What are they, and how do they differ from

L9oWgooC

what's been produced to the state and certain plaintiffs so
far?

MS. SESSIONS:  Your Honor, the United States
Department of Justice has publicly announced a broad-ranging
investigation into Google that culminated in the filing of a
lawsuit that's now pending in the District of Columbia.  That
primarily concerns Google's search business and not the display
advertising business that is at issue in these cases.  So it is
our view that any documents that were produced to the
Department of Justice as a part of that broad investigation are
not necessarily or even probably relevant to this case, and we
should address any future document productions after discovery
actually gets underway and with properly targeted requests for
production rather than a request for wholesale re-production of
materials that were produced in an investigation that
culminated in a lawsuit that is different than this one.

THE COURT:  OK.

Sir.

MR. THORNE:  Your Honor, there is actually an
additional DOJ investigation of (inaudible) going on now and
CIDs from DOJ to third parties -- and I don't know if it's
Google or not, because they're third parties -- separate teams
beyond the search team that filed the existing case.  If DOJ
has collected useful things that would make this MDL more
efficient and go faster and have already been produced, I would

L9oWgooC

1    include those in the bucket of things to be accessed.

2              I'll also say that Daily Mail was one of the third

3    parties that provided documents to Texas, and therefore, Daily

4    Mail's documents have been marked which are confidential or not

5    confidential and turned over to Google.  There is a universe of

6    potentially useful third-party information that ought be part

7    of the access bucket.

8              THE COURT:  Thank you.

9              All right.  Anyone else?

10             Yes, sir.

11             MR. ORSINI:  Good morning, your Honor.

12             Facebook, as your Honor knows, is a relative newcomer

13   to some of these actions, not quite as new as your Honor but a

14   relative newcomer.

15             We completely support the Court's proposal on the

16   schedule and briefings and all those issues.  I just wanted to

17   respond briefly to the point Mr. Boies made and Mr. Thorne has

18   repeated about third-party productions to Texas as part of the

19   investigation.  We have not produced any documents in any of

20   these litigations.  Facebook was one of the third parties who

21   produced documents as part of the CID, and I think for many of

22   the reasons that Ms. Sessions noted, including the fact that

23   Facebook has not had any of the complaints against it subject

24   to any test yet by this Court or any other, that it would be

25   premature to have Facebook's third-party documents produced in

L9oWgooC

1    front of Texas and the CID now produced to all these plaintiffs

2    at this time.

3              THE COURT:  Thank you.

4              MR. ORSINI:  Thank you.

5              THE COURT:  All right.  Let me tell you what I'm going

6    to do.

7              I start from some experience, having done things a

8    different way and allowing discovery to go forward during a

9    motion to dismiss.  Occasionally there's good reason to do

10   that, and there are serious downsides at times in doing that.

11   It's not just even prejudice to the defendants, but the

12   pleadings become moving targets.  If I were writing on a clean

13   slate, which I'm not, I might be thinking about a stay pending

14   a decision on the states' motion to dismiss, but that's not the

15   status quo I have here.  So I am going to order the parties to

16   negotiate a protective order and I'm going to require Google to

17   produce, subject to that protective order, the documents that

18   have been produced by Google to the state of Texas and to

19   certain class action plaintiffs in this case, and that it be

20   done in -- certainly it should be done within 30 days of the

21   entry of a protective order.  So it behooves folks to negotiate

22   that protective order, and we'll talk about organization in a

23   little while.

24             I am not going to order the production of third-party

25   documents, examinations conducted by the state plaintiffs,

L9oWgooC

1   documents produced by Google to DOJ.  It's restricted to what

2   I've said at this stage of the game.  And when you all finish

3   reading the 2 million documents, come back to me and I'll see

4   about letting you read some more.  OK?  That should keep

5   everyone occupied for a while.

6          MS. SESSIONS:  Your Honor, if I may?

7          THE COURT:  Yes.

8          MS. SESSIONS:  Just one point of clarification.  We

9   appreciate and understand your Honor's guidance on this

10  subject.  Google may have defenses to some of the private

11  complaints that are pleading defenses, and I just want to make

12  sure that Google's production of documents pursuant to your

13  Honor's order will not be construed as a waiver of any of those

14  defenses that we may have at the time that we would move to

15  dismiss those.

16         THE COURT:  They are not a waiver.

17         MS. SESSIONS:  Thank you, your Honor.

18         THE COURT:  OK.  Thank you for that.

19         Anyway, defendants' time to answer on all other

20  complaints is stayed.  Having heard Cliffy Care on this, I'm

21  going to proceed in the fashion which I outlined on the motions

22  to dismiss and have the stay of discovery, except for that

23  which I ordered.  And as I indicated, even though Google and

24  Facebook may have unique defenses to individual actions, I will

25  likely allow general discovery to go forward a reasonable

L9oWgooC

1    period of time after the decision on the motion to dismiss.

2              Now, with regard to organization, I can't get you

3    organized entirely on my own.  I probably could; you wouldn't

4    like it very much.  So it does seem to me that what we need to

5    have happen is, in the short term, a meeting at which a

6    reasonable number of representatives, maybe two from the state,

7    and representatives from the publisher class action --

8              There's only one publisher class action, is that

9    right, Mr. Boies?

10             MR. BOIES:  Yes.  One publisher class action, two

11   classes within it.

12             THE COURT:  Two classes within it.  Got it.

13             And then we have 13 of the 14 individual publisher

14   actions represented by the Herman Jones firm.  Is the 14th the

15   Associated Newspapers case?

16             MS. VASH:  Yes, sir, it is.

17             THE COURT:  All right.  Well, we'll talk about that in

18   a moment.

19             So it would be representatives from the state case,

20   the publisher class, the Herman Jones law firm and, for the

21   moment, from the three advertiser class actions.

22             The three advertiser class action counsel don't have

23   to be happy about anything that's gone on so far in this case,

24   but they need to be accepting of where they are, and the

25   advertiser class actions need to get together in a room and

L9oWgooC

1    talk, because what happens is, ultimately, if you're not able

2    to speak with approximately one voice on issues, I will have to

3    put some sort of a structure in place.  I would rather you work

4    on that on your own, but there should also be representatives

5    of the advertiser class actions.

6              That is not the most unmanageable sized group I've

7    ever heard of in an MDL kind of a context.  You should be able

8    to sit around a reasonably sized conference table and talk.

9    And yes, I think it's fair for you to work up ESI protocols,

10   even a Rule 34 demand.  I'm not opposed to your having to seek

11   leave from me.  If there is a consolidated Rule 34 demand that

12   you want to serve, the time to respond is going to be stayed,

13   but the clock will be ticking so that Google will not be able

14   to say, My God, I just got this on Tuesday and it's going to

15   take me months to figure out what's within the scope of this,

16   etc.  But it will at least enable you to start the process of

17   negotiating the scope of a Rule 34 demand and to discuss that.

18             Now, I didn't give you permission to serve a Rule 34

19   demand.  I'm encouraging you to discuss it and see whether you

20   can come to an agreement.  And if you come back and say:

21   Judge, we're all on board.  We have 19 Rule 34 demands that

22   each of us wants to serve, and there might be a little overlap

23   here or there, that's not going to happen.  So it behooves you

24   to try and get on the same page so we can make progress on

25   that.

L9oWgooC

1          I'm going to deputize Mr. Lanier and Mr. Boies to

2   figure out when and where, whether you do it in person or by

3   Zoom, or however and report back.

4          Mr. Lanier is sub-designating Mr. Boies.  In any

5   event --

6          MR. LANIER:  We will see to it, your Honor.

7          THE COURT:  OK.

8          MR. RUBIN:  Your Honor, a point of clarification?

9          THE COURT:  Yes.

10          MR. RUBIN:  With respect to the meeting that your

11   Honor is encouraging of the advertiser class, do you mean to

12   include the Surefreight in re consolidated cases together with

13   all the other cases that have advertiser class plaintiffs?  Do

14   I understand that correctly, your Honor?

15          THE COURT:  Yes.  Well, there are three of them.

16   There's SPX and Skinny with one counsel for that.  There's

17   Cliffy Care and there's Surefreight.  That's three, so it's not

18   yet a totally unmanageable number.  All right?

19          MR. RUBIN:  Thank you, your Honor.

20          THE COURT:  But wholly apart from the big meeting, I'm

21   charging counsel in the three advertiser class actions to meet

22   and confer.

23          Yes, sir.

24          MR. GRZENCZYK:  For the Surefreight class, your Honor,

25   that sounds great to us.  I think it's been conveyed in our

L9oWgooC

| | |
|---|---|
| 1 | letter response to PTO1, we're happy to try and work with and |
| 2 | create a consolidated group along with the other advertiser |
| 3 | classes. |
| 4 | I would note that in the Surefreight case we've |
| 5 | previously served Rule 34 requests, so we'll distribute those |
| 6 | to everyone else -- |
| 7 | THE COURT:  That's great. |
| 8 | MR. GRZENCZYK:  -- to try and facilitate this |
| 9 | discussion of how this might get revised, reflected, and |
| 10 | received and used. |
| 11 | THE COURT:  That's great.  That sounds terrific. |
| 12 | Mr. Isquith. |
| 13 | MR. ISQUITH JR.:  For SPX, your Honor, we're happy to |
| 14 | meet and confer with our colleagues and hopefully work out the |
| 15 | differences in our classes because we do note there are some |
| 16 | significant differences in the classes and we'll do our best to |
| 17 | work together. |
| 18 | THE COURT:  Yes.  You might all have noticed that it's |
| 19 | not often that there are overlapping classes certified by the |
| 20 | same judge. |
| 21 | MR. GRZENCZYK:  This is not the first time we've been |
| 22 | in this situation and we've been able to work it out in past |
| 23 | cases. |
| 24 | THE COURT:  Right. |
| 25 | MR. GRZENCZYK:  I'm sure we can figure it out here. |

L9oWgooC

1          THE COURT:  Well, that's what I'm hoping.  That's good

2     news.

3          Now, I have to talk about Associated Newspapers.

4          This is not directed to any individual personally.

5     This is tough stuff, but there is a real issue here in that

6     counsel for Associated Newspapers has a complaint filed against

7     Google.  It was the one case that I had at the outset, and I

8     happen to have read your complaint.  All right?

9          And it's not your fault, but it takes some time to get

10    through it.  It's not easy stuff to pick up on the first read,

11    and I assume that will be true with most of the other

12    complaints just because it's unfamiliar technology to me.

13          But from the submissions I have, it is the case that

14    right now, today, the law firm represents Facebook in a matter

15    involving the FTC, and this is not something that gets

16    evaluated under the rules of professional responsibility as a

17    former client under Judge Weinfeld's substantial relationship

18    test.  This is a present representation, and there may be

19    serious issues on duty of loyalty.

20          Duty of loyalty to the Daily Mail or Associated

21    Newspapers, whatever it's called, may require you to recommend

22    asserting a claim against Facebook, but you can't do that

23    because that's your present client.  There may be discovery

24    sought of Facebook.  There may be joint prosecution meetings in

25    which strategy is discussed about how to most effectively build

L9oWgooC

 1    a case against Facebook.  And I just don't see how this can

 2    happen with the presence of a law firm that, as we speak,

 3    represents Facebook.

 4              Care to comment?

 5              MR. THORNE:  Yes, your Honor.  Thank you, Judge.

 6              To start with the premise you start with, we do

 7    represent -- my partner, Mark Hansen, represents Facebook in

 8    the -- (inaudible)

 9              THE COURT:  I'll tell you what.  I'm going to have you

10    come down and I'm going to invite you go to the podium there.

11    There's a microphone, and I'll be able to hear you.

12              Go ahead.

13              MR. THORNE:  Thank you, your Honor.

14              Can you hear me now?

15              THE COURT:  Yes, but you still have to keep your voice

16    up.

17              MR. THORNE:  Got it.

18              THE COURT:  You can take your mask off inside.

19              Thank you.

20              MR. THORNE:  That's the best news I've had this

21    morning, your Honor.

22              We do represent Facebook.  My partner, Mark Hansen,

23    represents Facebook vis-à-vis the Federal Trade Commission in

24    different claims.  Daily Mail did an extensive pre-complaint

25    investigation of its claims.  Facebook is actually a good

L9oWgooC

1    partner of Daily Mail's in the sense that it's the way Daily

2    Mail gets advertising and content out.

3            Daily Mail has made a choice to bring a case against

4    Google, and that's what we're pursuing.  We have a different

5    level of investment in this case than some of the other

6    parties.  Daily Mail is not going to be satisfied, and I think

7    the other large publishers that will likely be filing

8    separately will not want to be represented by the very small

9    publishers because the large and small publishers have

10   different issues.

11           If we ever got to a point where Daily Mail wanted to

12   bring a case against Facebook, I would not be a part of that.

13   But as a deeply invested party in this thing, we've spent close

14   to a million dollars on expert fees, so we have huge legal fees

15   investigating and developing this case, working with Texas,

16   working with the Department of Justice in the cases that they

17   have brought or are developing.  We really can't sit still or

18   go on the sidelines.  For Daily Mail once the arrangement is

19   got, it has no claim against Facebook.

20           THE COURT:  Well, should I let you into a joint

21   prosecution meeting to discuss how to nail Facebook?

22           MR. THORNE:  Your Honor, if there's a joint

23   prosecution meeting that can be run like a board meeting, where

24   one board member sometimes steps out for the parts that are

25   going to be conflicted, I think this could still work.  I would

L9oWgooC

1    actually invite Mr. Lanier, Mr. Boies, others to comment

2    whether they think -- to date we have done a lot of work

3    together.  This is not like two people that you're marrying for

4    the first time in a blind marriage.  This has been a

5    relationship bringing these cases over the last few years.

6            THE COURT:  This is what I'm going to require you to

7    do, to brief why there is not, in your view, a present conflict

8    and why it would not be a conflict for you to participate in

9    group meetings.  It's very unwieldy in cases in which both

10   Google and Facebook are both defendants -- and there are a

11   number of cases pending before me -- to have you, as Facebook's

12   lawyer, sit in the room.  I don't know how that would work, but

13   I'm going to give you an opportunity to lay that out, and I

14   would want your letter in -- would it be convenient to do it in

15   a week?

16           MR. THORNE:  Yes, your Honor.

17           THE COURT:  OK.  And I'll give anybody else who wants

18   to comment, including specifically Facebook, as well as members

19   of the plaintiffs' side here an opportunity to respond.

20           Now, it wouldn't surprise me if Facebook said, We

21   think it's a great idea for them to stay in the case, two

22   thumbs up for Associated Newspapers' counsel staying in the

23   case.  I'm not accusing anybody of acting in bad faith or being

24   cute here, but it is an odd lineup.  It's a tough situation,

25   and I don't have the solution or answer as to how you get

L9oWgooC

```
 1  walled off in meetings.
 2           MR. THORNE:  All right.  Well, thank you, your Honor.
 3           THE COURT:  Thank you.
 4           All right.  The final issue I have is what I'll call
 5  the redaction issue.  I have the briefing from Google.  There
 6  are two affidavits or declarations that have been submitted,
 7  and while anybody else has the opportunity to be heard, I know
 8  there have been, I guess if you want to call them sort of amici
 9  who have weighed in, and the state has weighed in, but if
10  anybody has any substantive arguments, this is the time to get
11  me a letter brief, because I'm going to rule on that shortly.
12           Sir.
13           MR. KOROLOGOS:  Your Honor, I would ask that
14  regardless of what redactions might be made public in the final
15  ruling that your Honor's considering, that the parties here,
16  all of the plaintiffs, be permitted to see the state's case in
17  its entirety.
18           THE COURT:  That will happen when the protective order
19  is entered, in all events.  In all events, once the protective
20  order is entered -- it may be that you'll see it before then on
21  the docket.  But to the extent you don't or you don't see all
22  of it, that's a reasonable request, and I'm going to do that.
23           MR. KOROLOGOS:  Thank you, your Honor.
24           THE COURT:  All right.  And now I ask what else?
25           Mr. Lanier.
```

L9oWgooC

1          MR. LANIER:  Your Honor, I'm remiss if I don't

2    appreciate the Court and your staff because you all jettisoned

3    this forward because I'm in trial right now in Cleveland, and I

4    appreciate it very much, that I could be here.  Thank you very

5    much.

6          THE COURT:  All right.  Happy to do that.

7          MR. GRZENCZYK:  Your Honor, in the case before Judge

8    Freeman with the publishers and the advertiser class there, we

9    had entered a time and expense protocol, which mostly applies

10   to the class action reports.

11         THE COURT:  I saw it.  That's going to remain in place

12   except for one unusual modification.  You need not file reports

13   with the Court.

14         MR. GRZENCZYK:  Understood.

15         THE COURT:  But you should hold on to your reports,

16   because I sure will be asking for them if there is someday a

17   fee application.  If there is ever a fee application, I will

18   say you were ordered to compile these reports, now where are

19   they?

20         MR. GRZENCZYK:  In the event that day happens, we will

21   be prepared to provide the Court with whatever -- would you

22   like us to submit a revised proposed order for this action and

23   with this case's docket for your Honor to sign off on?

24         THE COURT:  That would be fine.  That would be great.

25         MR. GRZENCZYK:  OK.

L9oWgooC

```
 1              THE COURT:  Thank you.  Anything else, sir?

 2              MR. GRZENCZYK:  No.  That's all, your Honor.

 3              THE COURT:  Thank you.

 4              MR. GRZENCZYK:  Just that housekeeping.

 5              THE COURT:  Ma'am.

 6              MS. COSLETT:  Your Honor, I was just going to say

 7    that, you know, we think we will work with the other class

 8    plaintiffs, but we might revise slightly the time and expense

 9    report, protocol expense.

10              THE COURT:  On the time.

11              MS. COSLETT:  Yes, your Honor.

12              THE COURT:  That's fine.  Talk to each other.

13              MS. COSLETT:  Yes.  Yes, your Honor.

14              THE COURT:  Circulate it and submit it, and when you

15    submit it, I'll let it sit on my desk for a few days to see if

16    I get any comments from anyone.

17              MS. COSLETT:  Thank you, your Honor.

18              THE COURT:  What else?

19              That's remarkable.  Nothing else to talk about?  All

20    right.  That's a good start.

21              I appreciate everybody coming in.  There's a lot of

22    work to be done all around, and I thank you.

23              We are adjourned.

24              (Adjourned)

25
```