# Exhibit 11

# Exhibit 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

----------------------------x
UNITED STATES, et al., : Civil Action No.:
: 1:23-cv-108
Plaintiffs, :
versus : Tuesday, August 27, 2024
: Alexandria, Virginia
GOOGLE LLC, :
: Pages 1-33
Defendant. :
----------------------------x

The above-entitled motions hearing was heard before the Honorable Leonie M. Brinkema, United States District Judge. This proceeding commenced at 10:04 a.m.

A P P E A R A N C E S:

FOR THE PLAINTIFFS: GERARD MENE, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

JULIA TARVER WOOD, ESQUIRE
KATHERINE CLEMONS, ESQUIRE
AARON TEITELBAUM, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Fifth Street, NW
Washington, D.C. 20530
(202) 894-4266

MATTHEW HUPPERT, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Room 3109
Washington, D.C. 20530
(202) 476-0383

TYLER HENRY, ESQUIRE
OFFICE OF THE ATTORNEY GENERAL
OFFICE OF THE SOLICITOR GENERAL
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704

A P P E A R A N C E S:

FOR THE DEFENDANT:

CRAIG REILLY, ESQUIRE
LAW OFFICE OF CRAIG C. REILLY
209 Madison Street
Suite 501
Alexandria, Virginia 22314
(703) 549-5354

KAREN DUNN, ESQUIRE
JEANNIE RHEE, ESQUIRE
AMY MAUSER, ESQUIRE
WILLIAM ISAACSON, ESQUIRE
ANITA LIU, ESQUIRE
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, D.C. 20006
(202) 223-7300

COURT REPORTER:

STEPHANIE M. AUSTIN, RPR, CRR
Official Court Reporter
United States District Court
401 Courthouse Square
Alexandria, Virginia 22314
(607) 743-1894
S.AustinReporting@gmail.com

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

P R O C E E D I N G S

THE DEPUTY CLERK: Civil Action Number 1:23-cv-108, United States of America, et al. versus Google LLC.

Will counsel please note their appearance for the record, first for the plaintiff.

MR. MENE: Good morning, Your Honor. Gerard Mene with the U.S. Attorney's Office.

THE COURT: Morning.

MS. WOOD: Good morning, Your Honor. Julia Tarver Wood from DOJ for the United States. With me are my colleagues Katherine Clemons, Matthew Huppert and Aaron Teitelbaum.

THE COURT: Good morning.

MR. HENRY: And good morning, Your Honor. Ty Henry from the Virginia Attorney General's Office on behalf of the plaintiff states.

MS. DUNN: Good morning, Your Honor. Karen Dunn on behalf of Google. And with me today are Jeannie Rhee, Amy Mauser, Bill Isaacson, Anita Liu and Craig Reilly.

THE COURT: Good morning. We have a couple of logistical things I want to talk to you about first before we get to the actual motion that's on the docket for today.

Ms. Wood, have you had a chance to consult with the other plaintiffs in this case to be able to give me a

sense as to how many attorneys representing the various states plan to attend the trial?

MS. WOOD: We do not have a definitive number, Your Honor, but we can get that promptly. We can get that by the end of the day, if you would like.

THE COURT: Come up. Do you have a ballpark figure?

MR. HENRY: Yes, Your Honor. I can say the Commonwealth will be here, of course, every day.

THE COURT: Yes.

MR. HENRY: And the states of New York and California plan to attend somewhat regularly. Most other states will not be able to be here on any regular basis.

THE COURT: Because seating in this courtroom may be a bit at a premium. I want to maintain the jury box for -- and I think I had said earlier that I was going to have the jury box available for state attorney generals' counsel.

So if I reserve four seats in that box for representatives of state attorney generals, is that going to be enough?

MR. HENRY: That should be adequate, Your Honor, yes.

THE COURT: Okay. All right. Then how many attorneys are actually going to be participating in this

case on behalf of the plaintiffs, Ms. Wood? How many, over the course of the entire trial, are going to have some speaking part in the trial itself?

MS. WOOD: I would anticipate that number somewhere between 10 and 12 attorneys.

THE COURT: All right.

MS. WOOD: But over the course of a trial, obviously not on any given day.

THE COURT: So they could sit as well in this box?

MS. WOOD: Yes, Your Honor.

THE COURT: And they're coming to trial every day?

MS. WOOD: Not all of them will be in the courtroom all day every day. Some will be assisting with preparations outside the courtroom throughout the trial.

THE COURT: All right. On an average, how many of them will be here, do you think?

MS. WOOD: I would estimate that if we had five to six slots dedicated for DOJ attorneys each day, that would be sufficient.

THE COURT: All right. That's fine. That gives me a sense of what's going on here.

We've had a request from Mr. Mene, as I understand it, to reserve a certain number of rows in the courtroom for Department of Justice antitrust attorneys who have worked in the background on this case who would like to be present.

Mr. Mene, is that correct?

MR. MENE: Yes, Your Honor. We would like to reserve two to three rows there, those benches, so they could sit there every day and not sort of be -- you know, lose them to the public or the press.

THE COURT: All right. And you're going to be able to police that?

MR. MENE: Yes, Your Honor.

THE COURT: All right. I will direct that the first two rows on my left be reserved for DOJ staff, as well as any overflow seats in the jury box. It sounds as though -- we have 18 seats in that box. So it sounds as though we're not going to be using all 18 for state attorney generals and actual trial participants. All right.

MR. MENE: Yes, Your Honor.

THE COURT: So you'll fill those two rows first, and if there's a few extra people who didn't get a seat and there's space in the box, then they can sit in the jury box; all right?

MR. MENE: Thank you, Your Honor.

THE COURT: All right. If there are any folks here from the media, I am going to do something similar for properly-credentialed media folks, on the right side of the courtroom, so you have access to the witness and the witness box and you'll be able to see the screen for evidence

presentation. I haven't decided yet how we're going to do credentialing.

Again, the rest of the courtroom is going to be open, you know, to anybody for any reason, and the courtroom right across the hall, 701, is also going to be set up so that anybody -- any overflow can be accommodated in that courtroom. So that's how we're going to accommodate. And anything beyond that, the seating capacity is what it is. That will be it. Okay.

Number 2, I had talked with you some weeks ago, might have been months ago at this point, on whether or not the case was going to start with a tutorial. And, remember, the guidelines on that was if both sides could completely agree, if you can't agree, then, you know, we'll just not do one.

Have you agreed on one or not?

MS. WOOD: Your Honor, I believe I raised this at the hearing at which the trial was officially converted to a bench trial, and, at that time, I understood Your Honor's inclination to be just to proceed with a tutorial through witnesses but not a separate tutorial.

THE COURT: All right.

MS. WOOD: So we've not made further efforts in that regard, but we would be happy to do so if that's Your Honor's preference.

THE COURT: That's fine. I just want to make sure, because that affects then, to some degree, possibly the opening statements.

Have you and your -- I assume you're going to open for the government?

MS. WOOD: Yes, Your Honor.

THE COURT: Ms. Rhee, are you going to open, or Ms. Dunn?

MS. RHEE: Ms. Dunn.

THE COURT: All right. Ms. Dunn, have you two talked about how much time you would like? Of course I listen to what lawyers would like, and if it's reasonable, they often get it; and if it's unreasonable, then I cut it down. But anyway, have you talked about how much you would like for an opening statement?

MS. WOOD: Your Honor, you had previously indicated that both sides would be afforded 30 minutes per side, and the government is fine with that and appreciative of the opportunity to open, even in a bench trial. I think Ms. Dunn may have a request.

THE COURT: Yes, ma'am.

MS. DUNN: Your Honor, we're hoping to have a very reasonable 45 minutes for both sides.

THE COURT: Thirty for each side.

MS. DUNN: Thank you, Your Honor.

THE COURT: Okay. That's more generous than I normally allow. But again it's a bench trial, and so I think that's going to be okay. All right? Okay. Took care of that.

And I do want to commend both sides that you're beginning to send through stipulations, so we're not going to waste time on, you know, foundational issues, which are not necessary.

All right. So then that brings us to the actual motion that is on the docket today, the motion for an adverse inference to be taken from the way in which chats were preserved or not preserved, and basically the way in which, frankly, the litigation hold was enforced by Google. I've read your papers, so I don't need to hear a repeat of what's in your arguments, but I do have some questions. And so, Ms. Wood, I'll ask you first.

You know, one of the main arguments Google is making is that this motion for spoliation is filed late in the game, and that you've been on notice for several years now about this policy, which was reflected in this email from counsel of, what, 2008, frankly, it's been the policy in terms of how they're maintaining the chats, and that there was never any -- as far as I can tell from the record, any request that they change their policy as to the chats.

Do you want to address that issue?

MS. WOOD: Yes, Your Honor.

First, to be clear, the email that you're referring to from 2008 was an email that was produced in discovery in this case, or in the investigation; it was not an email that was produced.

What the United States was told -- and I would refer Your Honor to Exhibit 15 -- is first the United States was told that auto deletion was suspended, as one would presume in a normal case, auto deletion should be suspended in any circumstance where material evidence could be relevant to a future anticipated litigation.

However, there were numerous factors that the United States did not become aware of over time, including, for example, that chats were deleted after 24 hours, and that all default chats were set to delete automatically for -- delete automatically after 24 hours.

The United States did not learn until much, much later that employees had to manually toggle chats to history on, a very cumbersome process that the evidence we've established for the Court shows that employees didn't know how to do and weren't trained how to do. That literally, for every chat they received, they had to stop, think in that moment, is this chat relevant to a litigation hold, if so, before I respond, I need to go into the system and toggle the history on so the chat would be preserved. And

we have voluminous evidence that not only was that not complied with, indeed, Google concedes that for the nine employees who admitted to using chats, eight of them, eight out of nine, failed to turn the toggle on to preserve the chats. So there was not compliance with this purported basis to preserve even chats that were otherwise going to be automatically deleted.

And, in fact, the evidence shows that Google -- the employees were repeatedly deliberately moving communications to off-the-record chats so that they wouldn't be discovered. Indeed, we have one instance we've cited to the Court involving one of the trial witnesses, Mr. Korula, who was literally instructed by a Google attorney to turn his history off when discussing substantive matters.

So this was essentially part of a three-prong process that Google implemented, not all of which was made clear to the United States, and certainly wasn't made clear during the investigation or the early days of this case.

So the United States brought this motion at the appropriate time, at the time for pretrial motions. This is not a motion that seeks further discovery, it doesn't seek enforcement of the specific discovery order, and it is a motion designed to deal with how this evidence will be treated at trial, and so it was appropriately brought, in the United States' estimation, at the pretrial phase.

The Court will recall that up until May of this year, this case was intended to proceed by jury trial, and the United States was prepared to file a motion for jury instructions for an adverse inference on these issues, but prudentially wanted to gather evidence about exactly how these missing chats were going to impact the trial of this case. The United States anticipated the Court would have questions about the specific and concrete prejudice that the United States has suffered, and so the Court -- the United States has waited until the exhibit lists were produced, the witness lists were produced, so that we can put the scope of this conduct into appropriate context.

So this was not a situation where any kind of delay was tactical on the United States' part; it was a prudential judgment we made to give the Court complete context and the complete picture before raising this serious motion.

THE COURT: Wait. Can you tell me, when do you think the government first became aware of the Walker memo?

MS. WOOD: The Walker memo I believe was produced during discovery. Whether it was produced during the investigation or during the litigation, I can't say specifically. But the Walker memo was not produced, you know, in the first days of discovery.

THE COURT: Well, once it was produced, it clearly

would have put you on notice that there was this policy about deleting most chats. In fact, in particular, that the default was being set such that the chats were automatically going to be deleted.

MS. WOOD: I believe that information first came to light in the context of the proceeding in the Northern District of California in January of 2023. And while that predated the litigation here, what we didn't know was, A, how it impacts our witnesses in particular; and B, and perhaps more importantly, the difficulty and cumbersome process that was required to convert history-on chats to history -- or history-off chats to history-on chats.

That is a pivotal distinction in our mind, because if it were a simple process of employees being able to, once they're on a litigation hold, go into their system and for all their chats from today for the next five years just toggle history on, I think we would be in a very different situation, Your Honor. And that we did not learn until much later through the course of discovery.

And remember also that many of the chats that were produced that we've cited as evidence here were produced well after the original fact discovery cutoff, and some were produced even more recently than that, as Google has continued to comply with their discovery obligations by producing documents later and later.

And so it is a question, if we had had full and complete information at a different time, we would be in a very different situation, although I still believe that in that context it would still be prudential to bring the motion at an appropriate pretrial phase, either in connection with a motion for an adverse inference to be charged to the jury or with respect to the Court. But the case law is clear, that when the spoliation conduct is serous, that outweighs any concern about purported timeliness.

I'll also offer to Your Honor that Google has been unable to articulate any form of prejudice or harm due to the timing of this motion, and there is none. Because any arguments they would have had back in October, November, December about the timing, if the motion had been filed then, could easily be made now. They have not lost any arguments in the interim. We are not seeking a delay in the trial, we are not seeking additional discovery, we are not seeking to supplement the evidentiary record in any way. What we are seeking is a trial-related relief, and that, we believe, comports with the case law about the appropriate timing for motions such as these, and we believe it was -- in our view, we were mindful of the Court's admonition to focus on the merits, to proceed with the case accordingly, and to give concrete examples and context for any alleged

prejudice. And so that is the reason why we determined it to be most prudential to see what witnesses were on both sides of the witness list, what exhibits were on the exhibit list, and exactly how Google's conduct has threatened a fair trial in this case.

THE COURT: All right. Thank you. All right, Ms. Rhee.

MS. RHEE: Thank you, Your Honor.

THE COURT: There are a whole bunch of problems with how Google approached the preservation of evidence in this case. I mean, the Walker memo of course goes back to before litigation was actually started, but there's incredible smoking guns within that document. I mean, there's a clear recognition, you know, "as you know, Google continues to be in the midst of several significant legal and regulatory matters, including government review of our deal with Yahoo." And then it goes on. And then -- you know, so it sets the setting for an argument that there was definitely a very clever approach to try to hide relevant information going back to 2008.

And then my concern from the record of this case -- and I'm looking at Appendix B that was attached to the government's motion -- which talks about the litigation hold and the incredible delay in which various witnesses were notified about that litigation hold. Because that has

a huge impact, given the fact that there was this automatic deletion as to chat messages that just indicates that an awful lot of evidence has likely been destroyed.

You need to address those issues.

MS. RHEE: Thank you, Your Honor.

So we think that the Court is right to focus on timeliness here.

With respect to the Walker memo, the date of that is 2008, as the Court rightly noted. That was well before the --

THE COURT: Well, it's before this case was filed, but it recognizes that even back then, Google was being looked at by regulators. All right.

And so, you know, is it wise to tell your people, hey, the government's going to be looking at us, we want to make sure that sensitive information is not kept, because if it's kept, then we might have -- in fact, it says that in the memo, our discovery obligations, we have to turn it over.

So, you know, it's not saying to them directly, destroy any relevant evidence; it's sort of a wink and a nod. But, I mean, it's clearly giving a message to employees that there are different ways of communicating this particular way through chats we can kind of control.

And corporation-wide, there was this default put

in, as I understand it. So if you were involved in a chat and you're a Google employee, there was automatically a default that that conversation would be destroyed within a few hours unless the employee did something. So you put the burden on the ordinary employee to decide whether or not that particular chat needed to be preserved, and, even then, the length of preservation, as I understand it, the max was, what, 18 months.

And the other thing that's strange in this case -- and someone has to explain exactly how this would operate in a chat conversation -- is that even if I, the Google employee, took off the default and so now I wanted it preserved, the recipient, the other member of that chat also had to do something; right?

MS. RHEE: No, Your Honor. Any one of the participants who had a history on would preserve that particular conversation or thread.

THE COURT: Both sides of it?

MS. RHEE: Yes, both sides of it. Because it's instantaneous, equivalent of text messaging. So unlike emails, you're not going to have both sides of it. So with respect to the way that it functioned, if one of the participants had a history on, then it would be a history-on conversation.

THE COURT: And so that the other -- what if the

other side hit history off, if there was another Google employee?

MS. DUNN: Even if they had a history off, at least for the custodian with the history on, that would be preserved, and the entirety of that text exchange would be preserved.

THE COURT: Right. Now, how do you respond to Appendix B? And that is that the length of time between the time that the litigation hold was requested and the time in which the litigation hold was actually communicated to the particular employee?

MS. RHEE: Yeah. I mean, I think there what you can see in Google's filing and response, Your Honor, is a corrected Appendix B, because upon review of all of the underlying hold notices, what was properly reflected was not always the earliest time hold notice that those recipients actually got in connection with the topics of this investigation.

And so, again, when you actually look at the attachments to Google's reply to the government's motion, the corrected dates of the very first-in-time hold notices that were issued reflect that actually there wasn't an undue delay on the company's part to issue the hold notices.

Of course, the government continues to contend that those hold notices and the processes around them were

less than ideal, certainly, but at least with respect to the Appendix B and the allegation that there was undue and unreasonable delay in the issuance of the hold notices to the custodians, I think that the correction does actually correct that.

THE COURT: Ms. Wood, do you want to respond to that?

MS. WOOD: Yes, Your Honor. May I respond briefly to both points.

First of all, my understanding is that any participant in a chat, if one participant turns the chat on, the chat is on, but if the next participant turns it off, it's off. So I can't understate -- or overstate, rather, how critical this is that for every single chat, this has to be manually done on a chat-by-chat basis.

THE COURT: I understand.

MS. WOOD: And I think that's a fundamental problem.

With respect to the corrected Appendix B, again, it's unfortunate that we got discovery responses from Google itself that were just incorrect and that Google didn't notice the error. I think they corrected some 90 different custodians' lit hold date. But the problem for Google is that doesn't solve the issue, because while the lit holds may have been provided earlier than we were told during

discovery, what that means is that many additional custodians who actually were under a lit hold, we have clear evidence that they were seeking to move their chats to history off. As we indicated, there are -- you know, the Google employees somewhat reveled in this. They referred to these off-the-record chats as Vegas. What happens in Vegas stays in Vegas.

So though these multiple custodians were on lit holds going back further than we were led to believe during discovery, what we know is that those very same employees were still saying let's take this to a history-off chat. Indeed, we have one custodian who was told by a Google attorney: Let's move this to a history-off chat.

So, you know, I don't -- I think in context the three steps that Google took to implement this overall scheme was one, to have all chats auto deleted; two, to train employees to speak about sensitive matters that might hurt the company in off-the-record chats; and then three, as Your Honor said, with a wink and a nod, tell employees that they need to manually, chat-by-chat, day-by-day, hour-by-hour, change their chat setting to preserve litigation documents. And Google well knew, as any reasonable corporate body would know, that its employees were either unwilling or uncapable of complying with those cumbersome instructions. And that's why we are where we

are, where the vast majority of custodians, including witnesses who will sit in that box over there at trial, did not turn history on for their chats.

And, in fact, it's remarkable that we actually have evidence of them doing the precise opposite. It's not just the evidence that we're missing; it's the evidence we've gathered that says, hey, let's not talk about this here, let's go talk about this over here in Vegas where we can be sure that our regulators and litigants will never know about it.

Here, prejudice, as Your Honor is aware, is not required once you have an intent to deprive. But I think we have established, through the evidence that we've presented to the Court, that there is prejudice, and that these chats reflected unusually candid, unsanitized versions of the truth from key witnesses at this trial.

THE COURT: All right. The other -- you can stay there, Ms. Wood.

The other exhibit that you attached that certainly got my attention, and I'm curious as to whether there was much -- and I didn't get a chance to talk to Judge Anderson about this.

Did you have issues with the Vaughn index or any problems with the invoking of the attorney/client privilege in obtaining documents in this case?

MS. WOOD: We did, Your Honor. We have had repeated problems throughout with Google employees, again, under the exact same Communicate-with-Care policy, being instructed that when they want to talk about sensitive matters that relate in any way to antitrust or competition concerns, they should slap a privileged and confidential label on it and copy an attorney, even when the attorney is not being asked for legal advice, and even when the record shows the attorney doesn't provide legal advice.

THE COURT: So am I correct, your Exhibit 25, which is this screenshot of Communicate with Care --

MS. WOOD: Yes, Your Honor.

THE COURT: -- and it has three bullets. It says "lawyer" in the To field. "Mark attorney/client privileged. Asked the lawyer a question." And then it says underneath: "If you're dealing with a sensitive matter, it's important to communicate with care over email." And there's no problem with that. "You can follow these steps to ensure your email communication is privileged in these situations." And then you've got some examples here of where that heading was put on, I think the president of Google, some of his emails, that absolutely would not be calling for a legal opinion.

Did Judge Anderson do anything with that during the course of discovery?

MS. WOOD: Your Honor, no. We had sought different forms of relief, but he did not.

THE COURT: Okay.

MS. RHEE: Your Honor, if I can have the opportunity to address what happened before Judge Anderson.

THE COURT: Yes.

MS. RHEE: I mean, there are just a number of things to be clarified here.

Before Judge Anderson, throughout the very extensive period of discovery and the many times that the parties appeared before Judge Anderson, there was only one privilege motion filed and it was for a very discrete set of documents. Judge Anderson did an in-camera review of those, and for the most part, Google prevailed on that.

The things that are being cited by Ms. Wood today, and they were cited in the government's papers, really are, you know, policies, practices, procedures, processes, really, that are from long ago, including the Walker memo in 2008.

A lot of the things that are being talked about back and forth have nothing to do with the issue here, which is, after there was an obligation to preserve, which by the earliest date is October 2019, did the government have timely and sufficient notice about the practices. As the Court rightly knows, it's not as if the Walker memo was a

secret. It did not all of a sudden magically appear in 2023. All of that was produced well before there was this actual complaint.

Moreover, during the CID period, as is articulated in the papers, as well as in the attachments, both the Government's Plaintiff Exhibit 21 and Google's Exhibit 2, in 2019, after the launch of the CID, there was a prompt disclosure of the hold practices, as well as an attachment and a compendium of the preservation policy that talks about history on with respect to chats.

If that's not enough, in the summer of 2021, while DOJ was engaged in its investigative phase, it got discovery with respect to chats, noticed that there were chats on versus discussion of chats off, asked questions about the chats off, asked for a breakdown with respect to specified custodians, how much was produced on chats versus other documentary formats like emails. That was all promptly responded to in the summer of 2021.

Again, then fast-forward after the initiation of this complaint, before the repeated appearances in front of Judge Anderson, none of these other issues were raised. And on the issue of privilege, which is really a lot of what is informing this back-and-forth discussion in the court today, there were no privilege issues other than that discrete in-camera review that were brought before this Court, in

this proceeding, and in this matter.

Now, I think as the Court is aware, there were lots of additional and supplemental productions of materials that had initially been marked as privileged, but consistent with the party's obligation to do a careful review of the materials and to make sure that there were proper assertions of privilege, that was actually undertaken by the company, and that is the reason why all of these materials are in the various productions because privilege was not asserted.

THE COURT: All right.

MS. WOOD: Your Honor, may I respond briefly --

THE COURT: Yes, Ms. Wood.

MS. WOOD: -- just to correct the record?

First, with respect to the privilege issues, privilege has been a recurring problem between the Department of Justice and Google's counsel throughout the investigation and litigation. In June of 2024, two months ago, 40,000 deprivileged documents were produced.

We are not running into court to claim a delay in the trial. We want to see justice done, and we want to see justice done expeditiously. But these problems that have been created by Google's Communicate-with-Care policies have subjected significant hardship on the United States in dealing with constant claims of a document's produced, then it's clawed back, then it's produced again, it's used in a

deposition, it's quoted in the complaint, then it's clawed back. There have been multiple, multiple rounds of these privilege issues.

It is true that we brought this issue to Judge Anderson during discovery in this matter, and when we did, we cited 20 documents and requested that Judge Anderson review those 20 documents in camera. And Google, in their opposition, removed the privilege for approximately 18 of the 20. There were two documents left. Which proves the point, frankly, that it was not until we raised the issue with the Court that they backed down from the privilege assertion.

So we then requested from Judge Anderson the opportunity to bring -- to supplement 18 more to see if the Court would be willing to see them in camera, and he viewed the matter as resolved because Google was withdrawing the privilege assertion. And I understand why he did that. That's efficient if Google's no longer pressing the assertion, but it fundamentally left us in a situation where, until we are able to bring the matter to a court, we have difficulty getting the other side to properly assert privilege and properly not assert privilege. But the only reason we've raised privilege in this context is we believe it is consistent with the broader intent, to withhold relevant information from the trial.

Thank you, Your Honor.

THE COURT: Well, obviously if this case were a jury trial, this would be completely appropriate to be raising this pretrial because it would absolutely affect the jury instructions. I also find, even as a bench trial, it's a very appropriate issue to have been raised before we actually start taking evidence.

I've looked at the record of this case. I've also looked at the California-related litigation where there was a clear finding by the judge there. But that was a jury trial, and he needed to make a decision as to how to instruct the jury. He did give the jury a spoliation instruction. And of course Judge Mehta also had the issue presented, also made, you know, obviously some findings but did not actually have to use a spoliation decision in reaching the decision ultimately that he reached.

And I'm going to take an approach somewhat similar to Judge Mehta's in the sense that I certainly do not mind saying right now from the bench that the policy -- the Communicate-with-Care policy, in my mind, is not the way in which a responsible corporate entity should function. Slapping on the -- you know, attorney on email -- in many cases routine email messages just to be able to throw up a smoke screen of, you know, attorney-client privilege is, in my view, a clear abuse of the privilege.

And as I once told you at an earlier proceeding, when I do that kind of a review -- I've been doing it, to some degree, under sealing motions as well -- if I find that a privilege is being abused, I stop looking at all the other ones. So there might be a couple of meritorious ones, but I wouldn't give that party the benefit of the privilege if I see it being abused. I think it clearly -- this approach, putting the attorney communication business on almost all communications that are at all sensitive is absolutely inappropriate and improper, and I would draw inferences from that.

I do not understand, frankly, why the history-on/history-off default concept was not changed as soon as Google realized that it was going to be truly under the gun. I mean, I understand why they did it, but it was a foolish decision. I think that should have been changed quickly. And that would have avoided this whole problem, frankly, that we have now, because then the government could see with a particular chat, oh, this one, the delete was put on. And if the default was it's always historically preserved, but in this particular case somebody deleted it, then you could focus on why was that deleted. You've lost that ability in this case because everything is deleted unless it's saved.

So certainly, as you call your witnesses, this

will be an issue that the Court will take into consideration in evaluating the credibility of that witness. Whether I have to make a formal spoliation decision at the end of the day, I'll wait and see how all the evidence comes in, but I think this was very serious -- this record creates a very serious problem for Google in terms of how much credibility the Court will be able to apply. Intent is a serious issue in this case, and I think it's going to be a problem given this history.

So that's how I'm sort of resolving this matter, much like Judge Mehta. I've heard it, I don't like what I've heard. I'm going to see how it plays into the final evaluation of the case. All right.

All right. So what we next have on the line for this case for next week, as I understand it, is we have various motions from third parties in terms of subpoenas, and we also have the motions in limine. And that's what's on the calendar for next week; correct?

MS. WOOD: Yes, Your Honor. We also would ask the Court's indulgence. We have a list of housekeeping items that we thought might be helpful to discuss at that final conference, or today at your Court's pleasure. But we thought we might submit something in writing to the Court so we could tee those up for discussion on the 4th as well.

THE COURT: Well, both sides should do that --

MS. WOOD: Both sides, yes.

THE COURT: -- so we can get as much of this resolved as possible.

MS. WOOD: Yes.

THE COURT: And the only other thing I need to alert you to, because this is not the only case I have over the next several weeks. I'm trying to give you as much time as I can, and I'm trying to give you as structured a week as I can. Tuesdays are my normal criminal docket day. I am going to try to start my criminal docket at 8:30 on Tuesday mornings, and hopefully have all that cleared so that we can start Tuesdays, you know, as close to a 9:00 start. But I think on Tuesdays I may just tell you a 9:30 start so you can plan accordingly. And hopefully I will have finished the criminal docket and don't have to delay you all.

It is necessary, however, that whenever I have other matters, you have to clear your tables, so that adds a little extra time at the end of the trial day. So Monday is our first trial day. You'll have to clear your desks; I do have a Tuesday morning docket. But Tuesday we'll start at 9:30 rather than 9:00. All right. And there may be a couple of days where we have to stop a little bit early. There's a bar function that I have to attend later on in September. Some of the attorneys here may also -- Mr. Reilly, I think you're going to that as well. So I'll

keep you posted.

And, remember, I do want -- and I think we talked about this before -- certainly no later than the end of each trial day, you need to give a list of the witnesses in the order you're planning to call them so I know and opposing counsel knows.

MS. WOOD: We've actually agreed to provide them two weeks' notice. So we've already given them two weeks' notice of our first week's worth of witnesses and the order they'll be called in.

THE COURT: Remember, right now COVID is around. We've had several court matters that actually, for other judges, have been postponed. So there may obviously -- for a trial that's going to go a couple of weeks, there will probably be some rearranging of schedules. We also haven't gotten through all these third-party motions to quash. That may affect some things as well.

But I commend you for doing that, but you will be forgiven if you have to make -- both sides, if you have to amend those matters.

MS. WOOD: Thank you, Your Honor.

THE COURT: All right. So get your list of housekeeping matters to us as quickly as you can so we can be looking at them in advance.

Is there anything else, though, while I have you

here today that either side wants to address?

MS. RHEE: Your Honor, I would just ask, based on the conversation at the start of this proceeding with respect to some reservation --

THE COURT: Ms. Rhee, you really want to be right there. That's where the microphone is.

MS. RHEE: Okay. Sorry about that, Your Honor.

Just with respect to some available seating for the defense team, I just want to understand --

THE COURT: Okay. How many lawyers are you planning to have?

MS. RHEE: I think very similar to the plaintiffs' side. There will be a core set who are here in the courtroom every day, but then depending on the witness, some supplemental/subbing in as needed. I think we don't need two rows here, but if we could at least have one dedicated so that the team can appropriately support.

THE COURT: All right. We'll probably use some tape. I'll give you a few areas in the center section on your side of the courtroom so they would have relatively quick access. All right. And we'll see how that works. All right.

Anything else at this point?

MS. WOOD: No thank you, Your Honor.

THE COURT: No. All right. We'll recess court

for the day.

MS. RHEE: Thank you.

(Proceedings adjourned at 10:44 a.m.)

-----------------------------------

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

Stephanie Austin

Stephanie M. Austin, RPR, CRR