# Exhibit 32

# Exhibit 14

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | **No. 1:21-md-3010 (PKC)** |

*This Document Relates To:*

| | |
|---|---|
| **PENSKE MEDIA CORPORATION and SHEMEDIA, LLC,**<br>*Plaintiffs*,<br>-against-<br>**GOOGLE LLC and ALPHABET INC.,**<br>*Defendants*. | **No. 1:26-cv-00225 (PKC)** |

**DEFENDANTS GOOGLE LLC AND ALPHABET INC.'S**
**FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO**
**PENSKE MEDIA CORPORATION AND SHEMEDIA, LLC**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendants Google LLC and Alphabet Inc. (collectively, "Google"), through their counsel, hereby request that Plaintiffs Penske Media Corporation and SheMedia, LLC (collectively, "Plaintiffs") answer the following document requests (the "Requests") and produce responsive documents. Documents produced must adhere to the Definitions and Instructions set forth below, the Federal Rules, and the Local Rules. Plaintiffs are directed to answer within 30 days of the date these Requests are served.

**INSTRUCTIONS**

1. In addition to the specific instructions set forth below, these Requests incorporate the instructions set forth in Federal Rules 26 and 34, the Local Rules, the Stipulation and Order Regarding Discovery Procedure ("ESI Order") (ECF No. 508), the Modified Confidentiality Order (ECF No. 685), and the Scheduling Order (ECF No. 1502), or the operative version of

those Orders in place at the time production is made. Subject to a valid claim of privilege, please produce the entire document if any part of that document is responsive.

2. Please produce all requested documents in Your possession, custody, or control, or available to You, or to which You may gain access through reasonable effort, including information in the possession of Your past and present attorneys, accountants, investigators, consultants, agents, or other persons directly or indirectly employed or retained by You, or anyone else otherwise subject to Your control who maintains records on Your behalf, in Your name, or otherwise under Your control.

3. Pursuant to Federal Rule 34, documents must be produced either: (a) as they are kept in the usual course of business (in which case they must be produced in such fashion as to identify the department, branch, or office in whose possession the document was found or the server or central file in which it was found, and the address of each document's custodian(s)), or (b) segregated as responsive to a specific Request enumerated herein, with such specific Request identified.

4. If any portion of any document is responsive to any Request, a legible version of the entire document must be produced, together with all non-identical copies, versions, and drafts of that document, including all attachments and enclosures.

5. You must retain all of the original documents for inspection or copying throughout the pendency of this Action, any appeal(s), and any related proceedings.

6. You must produce all documents and associated metadata according to the Federal Rules, Local Rules, and the governing ESI Order for this Action. Provide instructions and all other materials necessary to use or interpret Your data compilations, such as a data dictionary, with Your production.

7. Data and materials that are stored electronically or in machine-readable form should be produced in electronic form with sufficient information to allow counsel to readily access or read such data or materials.

8. If You object to all or any portion of any of the below Requests, You must identify the objectionable Request or portion thereof, and the nature and basis of the objection. Notwithstanding any objection to any portion of any Request, You must produce all documents and information to which such objection does not apply.

9. If any document responsive to a particular Request no longer exists for reasons other than Your document retention policy, describe the circumstances under which it was lost or destroyed, describe the information lost or destroyed, list the Request to which it was responsive, and list persons with knowledge of the document.

10. If You are unable to produce a document that is responsive to a Request, describe the document, state why it cannot be produced and, if applicable, state the whereabouts of such document when last in Your possession, custody, or control.

11. If there are no documents or information responsive to all or any portion of any Request, so state in writing.

12. Other than redactions of privileged information, documents are to be produced in full. If any requested document cannot be produced in full, or if You withhold production of any document or portion of any document responsive to these Requests based upon any privilege, protection, or immunity, produce it to the extent possible and provide the privilege log information set forth in the governing ESI Order.

13. In construing the Requests herein:

a. Terms not specifically defined shall be given their ordinary meaning as You understand them to be used in the trade;

b. The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all other tenses, moods, or voices, whenever necessary, to bring within the scope of any Request all information that might otherwise be construed to be outside its scope;

c. The use of the singular form of any word includes the plural and vice versa;

d. Words in the masculine, feminine, or neutral gender shall include each of the other genders;

e. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope;

f. The terms "all," "any," and "each" shall each be construed as encompassing any and all.

14. None of the Definitions or Requests set forth herein shall be construed as an admission relating to the existence of any evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in the Definitions or the Requests.

15. These Requests are continuing in nature. In the event that You become aware of responsive documents or information in addition to, or in any way inconsistent with, that which You previously have produced, prompt supplementation of Your responses is required.

16. Google specifically reserves the right to seek supplementary responses and the additional supplementary production of documents before trial.

17. Unless otherwise stated, the Requests call for the production of documents from the Relevant Period.

**DEFINITIONS**

1. To the extent the terms defined below are used in the Requests, they should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules and the Local Rules. These Definitions are provided solely for the purposes of these Requests.

2. The term **"Action"** refers to all lawsuits consolidated in the above-captioned multidistrict litigation, *In re: Google Digital Advertising Antitrust Litigation*, No. 21-md-3010 (S.D.N.Y.).

3. The term **"Ad Buying Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including DSPs and Ad Networks) through which an Advertiser Purchased or can Purchase Inventory.

4. The terms **"Ad Exchange," "Supply-Side Platform,"** or **"SSP"** shall mean a third-party or In-House product or service through which two or more Ad Buying Tools (at least one of which is not owned or controlled by the entity operating the Ad Exchange) placed or can place Bids in real-time auctions for Inventory offered for sale by or on behalf of two or more Publishers (at least one of which is not owned or controlled by the entity operating the Ad Exchange).

5. The term **"AdMob"** shall mean Google's mobile app monetization product described on https://admob.google.com/home/.

6. The term **"Ad Network"** shall mean a third-party or In-House product or service (other than an Ad Exchange) through which two or more Advertisers (at least one of which is

unaffiliated with the entity operating the Ad Network) Purchased or can Purchase Inventory offered for sale by two or more Publishers (at least one of which is unaffiliated with the entity operating the Ad Network).

7. The term **"Ad Selling Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including Publisher Ad Servers, Ad Exchanges, Ad Networks, SSPs, Header Bidding, or Header Bidding Wrappers) through which a Publisher sold or can sell Inventory.

8. The term **"Ad Spam"** shall mean Display Advertisements of poor quality (e.g., ads that are popups or have flashing or other unpleasant audiovisual aspects) or objectionable content (e.g., ads that are sexually suggestive or related to illicit activities).

9. The terms **"Ad Tech"** or **"Ad Tech Product"** shall mean a product, service, application, tool, solution or other interface that facilitates or is involved in the Purchase or sale of Inventory, including but not limited to a Publisher Ad Server, Ad Exchange, Ad Network, Header Bidding, Header Bidding Wrapper, DSP, SSP, other Ad Buying Tool, or other Ad Selling Tool. For the avoidance of doubt, this term includes In-House Ad Tech Products, as well as products or services offered by social media outlets (including but not limited to, for example, Facebook.com and Twitter.com) and certain other Publishers that enable the Purchase of Inventory on their Properties via their own In-House Ad Tech Products. This term does not include general-purpose software or systems on which an Ad Tech Product relies.

10. The term **"Ad Tech Provider"** shall mean a person, firm, association, or other entity selling, reselling, licensing, or otherwise providing at least one Ad Tech Product, whether or not for a fee or other compensation.

11. The term **"Advertiser"** shall mean a person or entity that, directly or through one or more intermediaries, places one or more Display Advertisements intended to advertise or promote a good or service offered by that person or entity, or otherwise convey such person or entity's desired message, on a Publisher's Property so that it is viewed by at least one User visiting such Property. For the avoidance of doubt, Advertisers typically, but need not, pay for the placement of such Display Advertisements.

12. The term **"AdX"** shall mean Google's Ad Exchange that was marketed as DoubleClick Ad Exchange, inclusive of all prior and subsequent iterations of the product and all variants thereof, and including, for the avoidance of doubt, the Ad Exchange functionality of Google Ad Manager and Google Ad Manager 360.

13. The term **"Agency"** shall mean an advertising agency or similar consulting firm that is hired by an Advertiser to manage the Purchase of Inventory for one or more Campaigns. For the avoidance of doubt, although an Agency may use DSPs or other tools to manage such Campaigns, an entity operating a DSP shall not, solely on that basis, be deemed an Agency.

14. The term **"Amazon"** shall mean Amazon.com, Inc., any of its current or former parents, subsidiaries, affiliates, divisions, predecessors, successors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

15. The term **"Apple"** shall mean Apple Inc., any of its current or former parents, subsidiaries, affiliates, divisions, predecessors, successors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

16. The term "**Apple Product(s)**" shall mean any current or former products or offerings created, designed, made available, and/or distributed by Apple, including but not limited to Apple News, Apple TV, Apple Watch, iPad, and iPhone.

17. The term **"Attributed Clicks"** shall mean the number of Clicks determined or estimated by an Advertiser, DSP, Ad Network, Ad Exchange, or other person or entity, in the ordinary course of its business, to have resulted from the display of one or more given Impressions to Users.

18. The term **"Attributed Conversions"** shall mean the number of instances in which an Advertiser (or a person or entity acting on behalf of such Advertiser) identifies a specific User action that it has defined as valuable to its business, such as an online purchase or phone call, and determines or estimates that action to have resulted, in whole or in part, from the display of one or more Impressions to such User.

19. The term **"Attributed Sales"** shall mean the total amount of sales of products or services that an Advertiser determines or estimates resulted, in whole or in part, from the display of one or more Impressions to Users.

20. The term **"Bid"** shall mean an offer, made in response to a Query, to pay a specified amount in exchange for the right to render a Display Advertisement in a unit of Inventory.

21. The term **"Bid Data Transfer File"** shall mean the paid Feature on Google Ad Manager 360, the premium version of Google Ad Manager, that provides Publishers with non-aggregated, event-level bid data from Campaigns.

22. The terms **"Bidder"** or **"Buyer"** shall mean an Advertiser submitting a Bid directly to an Ad Exchange or Publisher Ad Server (without an intermediary), or shall mean a DSP, Ad Network, or other person or entity submitting a Bid to an Ad Exchange or Publisher Ad Server on behalf of an Advertiser, whether known at the time or to be subsequently determined.

For the avoidance of doubt, an Ad Exchange shall not be deemed a Buyer even if it forwards a Bid it received on to another Ad Exchange or Publisher Ad Server.

23. The term **"Brand Protection"** shall mean measures taken by Ad Tech Products to avoid or limit the display of advertisements next to objectionable content or other ads, including without limitation displaying ads next to those of a competitor, next to sexually suggestive content, or next to content related to illicit drugs.

24. The term **"Campaign"** shall mean one or more Display Advertisements that are targeted to particular types of Inventory, Users, or objectives.

25. The term **"Click"** shall mean an instance of a User clicking on a Display Advertisement, thereby causing the rendering of the associated landing page, but excluding instances in which the click was deemed fraudulent, inadvertent, spam, a bot, or otherwise non-genuine.

26. The terms "**Click-Through Rate**" or "**CTR**" shall mean the frequency with which Users shown an ad click on it, calculated as Clicks divided by Impressions.

27. The term **"Client-Side Header Bidding"** shall mean an implementation of Header Bidding in which the Queries are sent, and responsive Bids are evaluated, by code running at least in part within the User's web browser.

28. The term **"communication"** shall have the meaning provided in Local Rule 26.3, namely, the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

29. The term **"concerning"** shall have the meaning provided in Local Rule 26.3, namely, relating to, referring to, describing, evidencing or constituting.

30. The term **"Connected Television"** shall mean devices or services that allow Users to watch television content served over the internet on a television screen, such as smart

TVs (e.g., Samsung, TCL, Sony), media streaming devices (e.g., Roku Streaming Stick, Apple TV, Chromecast), or video game consoles (e.g., Xbox, PlayStation).

31. The term **"Cost Type"** shall refer to the basis on which an Advertiser pays for Display Advertising, such as, but not limited to, cost-per-thousand Impressions ("CPM"), cost-per-Click ("CPC"), or cost-per-action ("CPA").

32. The terms **"Demand-Side Platform"** or **"DSP"** shall mean an Ad Buying Tool, that enables an Advertiser to automatically buy Inventory sold via Ad Selling Tools in real-time on an Impression-by-Impression basis. For the avoidance of doubt, an Agency trading desk shall be deemed a DSP for purposes of this definition.

33. The term **"Device Type"** shall mean the electronic device by which the Impression was served, including mobile devices, desktop or laptop computers, tablets, and Connected Televisions.

34. The term **"Direct Transaction"** shall mean a sale or placement of Display Advertising the price of which was determined through a contractual agreement between an Advertiser (or an Agency acting on an Advertiser's behalf) and a Publisher (without an intervening Ad Exchange), including for the avoidance of doubt an agreement to set such price through an auction conducted by the Publisher itself or an affiliate thereof.

35. The terms **"Display Advertisement"** or **"Display Advertising"** shall mean Online Advertising other than Search Advertising, and shall include Native Advertising, as well as banner, in-app, and video advertising, whether social or non-social.

36. The terms **"Display & Video 360"** or **"DV360"** shall mean Google's DSP described at https://support.google.com/displayvideo/answer/9059464?hl=en, inclusive of all iterations of this product or naming conventions, including DoubleClick Bid Manager.

37. The term **"document"** shall have the meaning provided in Local Rule 26.3, namely, that the term shall be synonymous in meaning and equal in scope to the usage of the phrase "documents or electronically stored information" in Federal Rule 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

38. The term **"documents sufficient to show"** means documents sufficient to provide a true and correct disclosure of the factual matter requested.

39. The term **"Domain Spoofing"** shall mean a practice in which Inventory is misrepresented as being from a different web domain than it actually is.

40. The terms **"DoubleClick for Publishers"** or **"DFP"** shall mean Google's Publisher Ad Server that was marketed as DoubleClick for Publishers, inclusive of all prior and subsequent iterations of the product and all variants thereof (e.g., Small Business, Enterprise editions, etc.), and including for the avoidance of doubt the ad server functionality of Google Ad Manager and Google Ad Manager 360.

41. The term **"Dynamic Allocation"** shall mean the DFP Feature that enabled demand from AdX to compete in real-time with demand from third-party Ad Exchanges, Ad Networks, and Ad Buying Tools via a price floor for AdX in DFP.

42. The terms **"Dynamic Revenue Share"** or **"Revenue Based Share Optimizations"** shall mean the Google Feature that dynamically adjusted the Fees Google charged Publishers to transact via AdX (sometimes referred to as "Dynamic Revenue Sharing," "sell-side Dynamic Revenue Sharing," "DRS," or "sell-side DRS").

43. The term **"Enhanced Dynamic Allocation"** shall mean the modification to Dynamic Allocation first introduced in or about 2014, which enabled guaranteed and non-guaranteed Line Items to compete on a per-Impression basis.

44. The term **"Environment"** shall mean the electronic environment in which an Impression is served, meaning in a desktop web browser, in a mobile web browser, in a mobile app (other than a mobile web browser), or via Connected Television.

45. The term **"Express Fees"** shall mean Fees that are charged to a customer by an Ad Tech Provider, as opposed to merely being retained as a revenue share or retained profit. For example, a DSP fee calculated as a percentage of an Advertiser's gross spend and charged to the Advertiser in addition to such gross spend would be an Express Fee, but a profit or buyside margin earned by a DSP as the difference between what it charges the Advertiser (e.g. on a cost-per-click basis) and what it pays to Ad Selling Tools or Publishers to purchase such Impressions would not be an Express Fee. Similarly, a CPM fee charged by a Publisher Ad Server (e.g. x cents per thousand impressions served) would be an Express Fee, whereas the revenue share retained by an Ad Exchange (e.g. if the Ad Exchange remits 80% of gross revenue to the Publisher and retains a 20% revenue share) would not be an Express Fee.

46. The term **"Feature"** shall mean any design, feature, limitation, policy, mechanism, innovation, improvement, optimization, or strategy related to how Ad Tech Products buy, sell, price, bid for, or auction Inventory, how Ad Tech Products improve ad quality or Match Quality, how Ad Tech Products measure, or report on the effectiveness of Display Advertising, or how Ad Tech Products integrate or interoperate with other Ad Tech Products, whether owned or operated by the same entity or different entities.

47. The term **"Fees"** shall mean any money retained by a provider of Ad Tech Products, including via Take Rates, for services related to the Purchase of Display Advertisements.

48. The term **"First-Party Data"** shall mean information a company collects directly from its own sources—such as websites, apps, or surveys—based on direct interactions with customers.

49. The term **"Floor Price"** shall mean the limitation on how low an Advertiser or Ad Buying Tool can bid for Inventory while still being eligible to win the Impression.

50. The term **"Format"** shall mean the general makeup or layout of an ad. Different types of Display Advertising Formats include Native Advertising, Instream Video Advertising, Outstream Video Advertising, and Static Advertising.

51. The term **"Google"** shall mean Google LLC, any current or former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

52. The term **"Google Ads"** shall mean Google's Ad Buying Tool described on https://ads.google.com/home/, inclusive of all prior iterations or naming conventions, including AdWords.

53. The terms **"Google Ad Manager"** or **"GAM"** shall mean the product introduced by Google on June 27, 2018, which brought together DFP and AdX into a unified programmatic platform.

54. The term **"Gross Revenue"** shall mean revenue received from, or on behalf of, the Advertiser Purchasing the Inventory, before the deduction of any and all related Fees and/or revenue share.

55. The term **"Guaranteed Transaction"** shall mean a transaction where a specified amount of inventory is purchased.

56. The term **"Header Bidding"** shall mean the use by a Publisher of code that is directly or indirectly called during the web browser's processing or rendering of the HTML header of a webpage (and prior to the invocation of a Publisher Ad Server) and that causes Queries to be sent to one or more Ad Exchanges, Ad Networks, DSPs, or other sources of demand.

57. The term **"Header Bidding Wrapper"** shall mean a Header Bidding management system.

58. The term **"identify,"** when referring to a person, shall have the meaning provided in Local Rule 26.3, namely, to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

59. The term **"identify,"** when referring to documents, shall have the meaning provided in Local Rule 26.3, namely, to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

60. The terms **"impact"** and **"effect"** shall include both qualitative and quantitative, direct and indirect meanings of those terms.

61. The term **"Impression"** shall mean the service of a single Display Advertisement to a single User.

62. The term **"In-House"** shall describe an Ad Tech Product created for a Publisher's, Advertiser's, or Agency's internal use.

63. The term **"including"** shall mean including but not limited to.

64. The term **"Indirect Transaction"** shall mean a sale or placement of Display Advertising other than a Direct Transaction, including an Open Auction Transaction or Private Auction Transaction conducted by an Ad Exchange or a Purchase of Inventory by an Ad Network for resale to one or more Advertisers.

65. The term **"Instream Video Advertising"** shall mean Online Advertising in which the advertisement is displayed within a stream of video content that the User is viewing, e.g., before, in the middle of, or after the video content.

66. The term **"Inventory"** shall mean space offered by Publishers for the sale or placement of Display Advertising.

67. The term **"Line Item"** shall mean the Feature of a Publisher Ad Server that contains parameters for how a given Display Advertisement is intended to be served on a Publisher's Property, along with pricing and other delivery details.

68. The term **"Match Quality"** shall mean the effectiveness of matching customer information parameters to a website event.

69. The term **"Meta"** shall mean Meta Platforms, Inc., including Facebook, Inc., any current or former parents, subsidiaries (including but not limited to Facebook, Instagram, WhatsApp, and Threads), affiliates, divisions, predecessors, successors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

70. The term **"Minimum Bid to Win"** shall mean the data that a Bidder receives after an auction is complete that includes the lowest value such Bidder could have bid to win that particular auction.

71. The term **"Native Advertising"** shall mean Online Advertising that follows the natural form and function of the User experience in which it is placed (such as sponsored ads within a User's Facebook feed).

72. The term **"Net Revenue"** shall mean revenue received from, or on behalf of, the Advertiser purchasing the Impressions, excluding any and all Fees paid to Ad Tech Providers for the transaction.

73. The terms **"Online Advertisement"** or **"Online Advertising"** shall mean advertising via the internet, including on websites, apps, and Connected Television. For example, both Display Advertising and Search Advertising are forms of Online Advertising.

74. The term **"Open Auction Transaction"** shall mean an Indirect Transaction for which all, or substantially all, of the Buyers eligible to bid on the relevant Ad Exchange are or were eligible to submit Bids.

75. The term **"Open Bidding"** shall mean the Google product or Feature, also known as "Exchange Bidding," on DFP, GAM and AdMob that enables Google and third-party Ad Networks and Ad Exchanges to compete in Google-run real-time auctions for Publisher Inventory.

76. The term **"Other Direct Transaction"** shall mean a Direct Transaction other than a Programmatic Guaranteed Transaction, Preferred Deal Transaction, or Publisher-Automated Transaction.

77. The term **"Other Indirect Transaction"** shall mean an Indirect Transaction other than an Open Auction Transaction or a Private Auction Transaction.

78. The term **"Outstream Video Advertising"** shall mean Online Advertising, other than Instream Video Advertising, that includes a video or animation.

79. The term **“Paid Advertising”** shall mean an advertising model whereby Advertisers pay Publishers to display their ads on a Property.

80. The term **“person”** shall have the meaning provided in Local Rule 26.3, namely, any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

81. The terms **“Plaintiff”** and **“Defendant”** as well as a party’s full or abbreviated name or a pronoun referring to a party shall have the meaning provided in Local Rule 26.3, namely, the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the Action.

82. The term **“Preferred Deal Transaction”** shall mean a Programmatic Direct Transaction where the Inventory is not guaranteed. For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Preferred Deal Transaction.

83. The term **“Private Auction Transaction”** shall mean an Indirect Transaction for which only a set of Buyers expressly identified by the Publisher (or an agent or employee thereof) are or were eligible to submit Bids.

84. The term **“Programmatic Direct Transaction”** shall mean a Direct Transaction (other than a Publisher-Automated Transaction) that is or was negotiated, transacted, or finalized through an Ad Tech Product, provided that, for the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such

transaction a Programmatic Direct Transaction if such transaction was not otherwise negotiated through such Publisher Ad Server.

85. The term **"Programmatic Guaranteed Transaction"** shall mean a Programmatic Direct Transaction where the Inventory is guaranteed. For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Programmatic Guaranteed Transaction.

86. The term **"Property"** shall mean a website, mobile application, or other product or service containing space that is sold or offered for sale for the placement of Display Advertising.

87. The term **"Publisher"** shall mean a person or entity operating a Property. For the avoidance of doubt, the owner of the Property shall be deemed the Publisher, even if it has out-sourced the sale of its associated Inventory, in whole or in part, to a third party.

88. The term **"Publisher Ad Server"** shall mean a third-party or In-House product, service, or system that is responsible for selecting (or attempting to select), on behalf of a Publisher, the Display Advertisement (or source from which such Display Advertisement shall be obtained) for a unit of Inventory. For the avoidance of doubt, a Publisher Ad Server may be owned and/or operated by a third-party Ad Tech Provider, or may be owned, developed, or operated by the Publisher or by a third party on behalf of or under contract with the Publisher. For the further avoidance of doubt, a system that creates or manages mediation chains constitutes a Publisher Ad Server for purposes of these Requests.

89. The term **"Publisher-Automated Transaction"** shall mean a Direct Transaction that is or was negotiated, transacted, or finalized through one or more automated services,

whether or not auction-based, that is controlled by the Publisher or an affiliate thereof (other than an Ad Network, Ad Exchange, or SSP). This would include, for example, the Publisher's self-service website for Advertisers to create Campaigns or place advertisements, such as that described at https://facebook.com/business/ads. For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server (including one operated by the Publisher) shall not be sufficient to render such transaction a Publisher-Automated Transaction.

90. The term **"Purchase,"** when used in connection with Inventory or Impressions, shall mean to obtain, directly or indirectly through one or more intermediaries, the right to render or display a Display Advertisement in a unit of Inventory, typically but not necessarily in exchange for a monetary payment.

91. The term **"Query"** shall mean a request to provide, or Bid to provide, a Display Advertisement to be rendered in a unit of Inventory, whether denominated as an "ad request," "bid request," or otherwise. A Query may, but need not, request a Bid that will be considered before awarding the right to actually display a Display Advertisement to a particular Advertiser.

92. The term **"reflecting"** shall mean illustrating or describing.

93. The term **"Relevant Period"** shall mean January 1, 2013 to present.

94. The term **"Search Advertising"** shall mean Online Advertising that is displayed in response to a User's search intent or search terms.

95. The terms **"Self-Competition"** or **"Bid Duplication"** shall mean a situation in which Bids from the same Campaign, same Advertiser, or same Ad Buying Tool compete against each other in the same auction or same chain of auctions.

96. The term **"Server-Side Header Bidding"** shall mean an implementation of Header Bidding in which the Queries are sent, and responsive Bids are evaluated, by code running on a server (even if such server code is invoked from a call from the User's web browser).

97. The term **"Static Advertising"** shall mean Online Advertising consisting solely of static (i.e., non-moving or -changing) text, images, or graphics.

98. The term **"Supply Path Optimization"** shall mean practices of Ad Tech Products that connect Advertisers with Publishers' Inventory in the most efficient manner (for example, buying Inventory in a way that reduces the number of Ad Tech Products required for the transaction).

99. The term **"Take Rate"** shall mean the proportion of total revenue generated from Purchased Inventory that an Ad Tech Provider collects as part of its fee arrangement in connection with the Purchased Inventory.

100. The term **"Transaction Type"** shall mean Programmatic Guaranteed Transaction, Preferred Deal Transaction, Publisher-Automated Transaction, Other Direct Transaction, Open Auction Transaction, Private Auction Transaction, or Other Indirect Transaction.

101. The term **"User"** shall mean an end user visiting or using a Property, or a proxy for that end user (including, but not limited to, cookie identifiers or mobile ad identifiers).

102. The term **"Winning Bid"** shall mean the Bid in an auction that ultimately succeeded in Purchasing the relevant Inventory.

103. The terms **"You"** or **"Your"** refer to Penske Media Corporation and SheMedia, LLC, including their parents, predecessors, successors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives

of the foregoing. "You" and "Your" includes each of Penske Media Corporation and SheMedia, LLC's brands or Properties, including any brand, magazine, newspaper, entity, Property, or service on whose behalf Plaintiffs claim damages in this Action.

104. The term **"Your Clients"** refers to content creators and other owners of websites or other Properties on whose behalf SheMedia, LLC monetizes Inventory and provides other services, as alleged in Paragraphs 5, 6, 33-37, 46, and 50 in Your Complaint.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1

Documents and data sufficient to show for all Display Advertising shown on Your (or Your Clients') Properties, separately for each unique combination of parameters (a)-(n) below, the (i) total Queries sent, (ii) total Bids received, (iii) total Impressions, (iv) total Clicks generated, (v) total Gross Revenue earned, (vi) total Fees paid, and (vii) total Net Revenue earned:

a. The identity of Your Client (if applicable);
b. The month and year in which the Impressions were sold;
c. The Property on which the Impressions were displayed;
d. The Publisher Ad Server that served the Impressions;
e. Each source from which a Query was sent in connection with such Impression (whether or not such Query actually resulted in a Winning Bid) (if any);
f. The SSP, Ad Exchange, Ad Network, or Ad Selling Tool (including, if applicable, any In-House Ad Tech Products) to which a Query was sent in connection with such Impression (whether or not such Query actually resulted in a Winning Bid) (if any);

g. The Agencies or other third-party service providers (if any) responsible for Your monetization of such Impressions hired to manage and monetize Your (or Your Clients') Inventory;

h. The Bidder (e.g., DSP) that submitted the Winning Bid for Impressions;

i. The Advertiser for the Impressions;

j. The Cost Type that was specified for sale of the Impressions;

k. The Transaction Type through which the Impressions were sold;

l. The Format of the resulting Impressions, including, in the case of video, whether for Instream Video Advertising or Outstream Video Advertising;

m. The Environment in which the Impressions were displayed; and

n. The Device Type on which the Impressions were displayed.

Data and documents produced in response to this Request should include all jurisdictions for which You claim damages or impact. For any data and documents which You are unable to restrict by geography (for example, the geography is ambiguous or unknown), such data and documents shall be treated as responsive to this Request.

**REQUEST FOR PRODUCTION NO. 2**

Documents and data sufficient to show on a monthly basis, for Impressions rendered to Users on Your (or Your Clients') Properties, (i) total Queries, (ii) total Bids, (iii) total Impressions, (iv) total Clicks, (v) total Gross Revenue earned, (vi) total Fees paid, and (vii) total Net Revenue earned, separately for each unique combination of (1) the Header Bidding Wrapper which won the Impression, (2) the Ad Selling Tool used to transact the Impression, (3) the Format of the Impression, and (4) the Environment in which the Impression was displayed, and separately for each of the following types of Impressions (a)-(e) below:

a. Impressions for which Server-Side Header Bidding was used, called, or otherwise eligible to run an auction or auctions for the particular Impression;

b. Impressions for which Server-Side Header Bidding was the Winning Bid;

c. Impressions for which Client-Side Header Bidding was used, called, or otherwise eligible to run an auction or auctions for the particular Impression;

d. Impressions for which Client-Side Header Bidding was the Winning Bid; and

e. Impressions for which Header Bidding was not used, called, or otherwise eligible to run an auction or auctions for the particular Impression.

Data and documents produced in response to this Request should include all jurisdictions for which You claim damages or impact. For any data and documents which You are unable to restrict by geography (for example, the geography is ambiguous or unknown), such data and documents shall be treated as responsive to this Request.

**REQUEST FOR PRODUCTION NO. 3**

For all Display Advertising transactions involving each Ad Tech Product that You operate or have operated, documents and data sufficient to show on a monthly basis the (i) total Queries, (ii) total Bids, (iii) total Impressions, (iv) total Clicks, (v) total Gross Revenue earned, (vi) total Buyer payments received, (vii) total Net Revenue earned, (viii) total Express Fees paid, and (ix) total Fees paid, detailed to separately show for each unique combination of (1) the Header Bidding Wrapper which won the Impression, (2) the Ad Selling Tool used to transact the Impression, (3) the Format of the Impression, and (4) the Environment in which the Impression was displayed, and separately for each of the following types of Impressions (a)-(e) below:

a. Impressions for which Server-Side Header Bidding was used, called, or otherwise eligible to run an auction or auctions for the particular Impression;

b. Impressions for which Server-Side Header Bidding was the Winning Bid;

c. Impressions for which Client-Side Header Bidding was used, called, or otherwise eligible to run an auction or auctions for the particular Impression;

d. Impressions for which Client-Side Header Bidding was the Winning Bid;

e. and Impressions for which Header Bidding was not used, called, or otherwise eligible to run an auction or auctions for the particular Impression.

Data and documents produced in response to this Request should include all jurisdictions for which You claim damages or impact. For any data and documents which You are unable to restrict by geography (for example, the geography is ambiguous or unknown), such data and documents shall be treated as responsive to this Request.

**REQUEST FOR PRODUCTION NO. 4**

Documents and data sufficient to show by month and by Publisher Ad Server used, Your (i) total Impressions served, and (ii) total Fees for ad serving.

**REQUEST FOR PRODUCTION NO. 5**

For each Ad Buying Tool that You operate or have operated, documents and data sufficient to show on a monthly basis, for all Display Advertising transactions involving such Ad Buying Tool, the (i) total Impressions purchased; (ii) total Attributed Clicks (or Clicks, if Attributed Clicks are not known) for such Impressions; (iii) total Attributed Conversions for such Impressions; (iv) total Attributed Sales for such Impressions; (v) total Gross Revenue that You received from Advertisers for such Impressions (or Clicks thereon); (vi) total Buyer payments that You made for such Impressions; (vii) total Express Fees that You collected on such Impressions; and (viii) total Fees that You collected on such Impressions. The foregoing should be aggregated at a monthly level, separately for each unique combination of the following

parameters:

a. Ad Buying Tool that You operate or have operated at any point since January 1, 2013;

b. Advertiser and Ad Agency (if used) that Purchased the Impressions through such Ad Buying Tool;

c. Ad Exchange, Header Bidding Wrapper, or other Ad Selling Tool from which You received the Query that led to the Purchase of such Impressions (or otherwise through which the Impressions were purchased);

d. Publisher Ad Server that served the Impressions;

e. Transaction Type through which the Impressions were purchased;

f. Publisher of the Inventory on which the Impressions were displayed;

g. Environment in which the Impressions were displayed;

h. Format of the Impressions, including in the case of video, whether for Instream Video Advertising or Outstream Video Advertising;

i. Cost Type that was specified for purchasing the Impressions; and

j. whether the Impressions were displayed on social media.

Data and documents produced in response to this Request should include all jurisdictions for which You claim damages or impact. For any data and documents which You are unable to restrict by geography (for example, the geography is ambiguous or unknown), such data and documents shall be treated as responsive to this Request.

**REQUEST FOR PRODUCTION NO. 6**

For each Ad Buying Tool that You operate or have operated, documents and data sufficient to show for each month since January 1, 2013, for all Display Advertising transactions

involving such Ad Buying Tool, the (i) total Queries You received; (ii) total responses submitted; and (iii) total Impressions You won.

**REQUEST FOR PRODUCTION NO. 7**

All documents analyzing the competition You face in selling Your Ad Tech Products, including documents analyzing the strengths, weaknesses, Features, Fees and effectiveness of Ad Tech Products or Ad Tech Providers, market size and shares, competitor entry and expansion, pricing, network effects, and Your competition with Google.

**REQUEST FOR PRODUCTION NO. 8**

Documents reflecting Your analyses of Your customer satisfaction and/or retention (i.e., churn), including Your wins and losses of customer accounts, spending, or sales; customers' response to changes in Your Fees or the cost-effectiveness of their Display Advertising while using Your Ad Tech Product(s); actual or perceived differences between Your customers and Your competitors' customers; and customer compliments and complaints regarding Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 9**

All documents and data analyzing the extent to which customers multi-home among Ad Tech Products of the same type.

**REQUEST FOR PRODUCTION NO. 10**

Documents reflecting how You promote or market Your Ad Tech Products, or any Features of Your Ad Tech Products, to customers, including how you promote benefits or advantages related to:

a. access to Inventory, including any unique Inventory available on Your platform but not on rival platforms;

b. access to demand from Advertisers and Ad Buying Tools, including any demand that is accessible only through Your Ad Tech Product(s);

c. success in delivering on customers' commercial objectives, including return on investment, return on Advertiser spend, and/or Publisher yield;

d. ad latency and page latency caused by ads;

e. enhancement of the User experience;

f. automated Bidding;

g. Brand Protection;

h. ad quality, including Ad Spam;

i. Match Quality;

j. Advertiser quality;

k. Publisher website quality;

l. quality of Publishers' visitors;

m. Ad Tech Product quality;

n. fraudulent inventory, including Domain Spoofing;

o. privacy;

p. use or management of First-Party Data;

q. customers' ability to switch between ad Formats;

r. customers' ability to switch among ad Environments; and

s. proprietary ad Formats.

**REQUEST FOR PRODUCTION NO. 11**

Documents sufficient to identify all of Your Ad Tech Products and to describe their Features, policies, and restrictions on types of content and/or customer behavior.

**REQUEST FOR PRODUCTION NO. 12**

Documents sufficient to show the Fees You charge for Your Ad Tech Products, the factors you consider in pricing each of Your Ad Tech Products, and how the pricing of Your Ad Tech Products has changed over time or differed across customers or based on other factors.

**REQUEST FOR PRODUCTION NO. 13**

Documents reflecting any actual or considered interoperability between Your Ad Tech Products and Ad Tech Products offered by other Ad Tech Providers.

**REQUEST FOR PRODUCTION NO. 14**

All documents analyzing Your strategies and decisions concerning integration or interoperability between Your Ad Tech products and any Header Bidding offering or technology (such as those available from Amazon, PreBid, or other sources), including the impacts of such offering or technology on revenue, latency, Bid Duplication or Self-Competition, privacy concerns, billing issues, ad quality or Ad Spam, and fraudulent Inventory.

**REQUEST FOR PRODUCTION NO. 15**

Documents sufficient to show, separately for each of Your Ad Tech Products and for each year from January 1, 2013 to the present, the costs that You have incurred to develop and/or improve each of Your Ad Tech Products, including documents identifying Your costs related to research and development of Ad Tech Products and documents describing how Your total costs are allocated among Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 16**

Your regularly prepared financial statements for the last 10 years for each of Your divisions and/or subsidiaries operating Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 17**

Documents reflecting Your analysis of which Ad Exchanges to bid on for each Ad Buying Tool that You operate or have operated, including documents (a) identifying the factors that You consider; (b) identifying how many Ad Exchanges to bid on; (c) comparing Ad Exchanges to each other; and (d) discussing how changes to Ad Exchanges or Your Ad Tech Products affect Your selection of Ad Exchanges.

**REQUEST FOR PRODUCTION NO. 18**

All documents, data, and communications discussing or analyzing the factors (e.g., cost, effectiveness, targeting, yield) that You (or Your Clients) consider in deciding to sell Display Advertising (i) for a particular Format or Environment; (ii) through Direct Transactions or Indirect Transactions; (iii) through different Transaction Types; (iv) through an Ad Exchange, Ad Network, other type of intermediary, or Publisher-Automated Transactions; (v) to a particular Advertiser type; (vi) through multiple different Ad Selling Tools, including how You choose to allocate Inventory to each of these Ad Selling Tools; and (vii) any associated negotiations or costs involved with each sales channel.

**REQUEST FOR PRODUCTION NO. 19**

All documents analyzing the factors that Advertisers consider in deciding to buy Display Advertising (i) in different Formats and Environments; (ii) between Direct and Indirect Transactions; (iii) among different Transaction Types; (iv) between social media and non-social media Properties; (v) between Inventory purchased using Agencies and not using Agencies; and (vi) from or through different DSPs, Ad Networks, Ad Exchanges, SSPs, Publisher Ad Servers, or Publishers.

**REQUEST FOR PRODUCTION NO. 20**

All documents analyzing how revenues, costs, profits, return on investment, return on advertiser spend, or any other commercial objectives are impacted by Advertisers' decisions to buy Display Advertising (i) in different Formats and Environments; (ii) through Direct and Indirect Transactions; (iii) with different Transaction Types; (iv) on social media and non-social media Properties; (v) using Agencies and not using Agencies; (v) from or through different Ad Exchanges, SSPs, Publisher Ad Servers, or Publishers, and (vi) through multiple or a combination of different Ad Buying Tools.

**REQUEST FOR PRODUCTION NO. 21**

All documents analyzing how revenues, costs, profits, return on investment, or any other commercial objectives are impacted by Your (or Your Clients') decisions to sell Display Advertising (i) in different Formats and Environments; (ii) through Direct and Indirect Transactions; (iii) with different Transaction Types; (iv) from or through different Advertisers, DSPs, Ad Selling Tools; and (v) through multiple or a combination of different Ad Selling Tools.

**REQUEST FOR PRODUCTION NO. 22**

All Your strategic plans, executive presentations, and financial statements relating in any way to Display Advertising.

**REQUEST FOR PRODUCTION NO. 23**

All Your studies of revenue for Display Advertising by Format, Environment, or Publisher type, and Ad Tech Product, including but not limited to all internal studies, analyses, and communications comparing Display Advertising against all other forms of advertising, including print advertising and advertising in connection with podcasts.

**REQUEST FOR PRODUCTION NO. 24**

Documents or data sufficient to show Your (or Your Clients') "output" by month, as "output" is used at Paragraphs 241, 248, 255, 258, 263, and 275 in Your Complaint.

**REQUEST FOR PRODUCTION NO. 25**

Documents or data sufficient to show the amount or quantity of content You (or Your Clients) publish and the number of Impressions You (or Your Clients) made available for sale on both a monthly and annual basis.

**REQUEST FOR PRODUCTION NO. 26**

All analyses, studies, or presentations regarding readership, viewership, and traffic to all Your (or Your Clients') ad-supported Properties, including documents or data sufficient to show the number of visits and page views on a monthly basis.

**REQUEST FOR PRODUCTION NO. 27**

All Your communications, studies, analyses, reports, presentations, and records on Programmatic Direct Transactions.

**REQUEST FOR PRODUCTION NO. 28**

All Your communications, studies, analyses, reports, presentations, and records on remnant sales.

**REQUEST FOR PRODUCTION NO. 29**

Documents or data sufficient to show Your expenses associated with Programmatic Direct Transactions, by month.

**REQUEST FOR PRODUCTION NO. 30**

Documents or data sufficient to show Your expenses associated with remnant sales, by month.

**REQUEST FOR PRODUCTION NO. 31**

Documents sufficient to show any restrictions on or exclusions from the type or content of Advertising allowed on Your (or Your Clients') Properties.

**REQUEST FOR PRODUCTION NO. 32**

All documents and communications concerning Your (or Your Clients') choice of Ad Tech Products, including documents concerning (a) Ad Tech Products that You (or Your Clients) considered using; (b) other products or technology that You (or Your Clients) considered using instead of Ad Tech Products; and (c) Your (or Your Clients') assessment of the Ad Tech Products offered by Google compared to any other product or technology considered as a possible alternative, including documents describing the rationale for selecting, not selecting, and/or discontinuing use of an Ad Tech Product offered by Google or any other company, and any cost-benefit analyses conducted by You.

**REQUEST FOR PRODUCTION NO. 33**

All documents and communications relating to Header Bidding's effect, if any, on Your (or Your Clients') Display Advertising decisions or revenue, including any analysis, experiments, or A/B studies (whether done by You, Your Clients, or a third party) of Header Bidding's impact on You.

**REQUEST FOR PRODUCTION NO. 34**

All documents, data, and communications discussing or analyzing the costs of Header Bidding to You (or Your Clients) including both monetary as well as non-monetary costs (e.g., latency, or website issues).

**REQUEST FOR PRODUCTION NO. 35**

All documents, data, and communications discussing or analyzing the impacts of Header Bidding (including integrations of Your Publisher Ad Server with Header Bidding), including documents discussing (a) latency from Header Bidding; (b) Bid Duplication or Self-Competition from Header Bidding; (c) the presence or absence of Brand Protection in Header Bidding; (d) the presence or absence of User privacy protections in Header Bidding; (e) billing issues with Header Bidding, including Your not receiving payment for Winning Bids; (f) fraudulent Inventory relating to Header Bidding; (g) malware related to Header Bidding; and/or (h) setup and ongoing operational costs of Header Bidding.

**REQUEST FOR PRODUCTION NO. 36**

All documents, data, and communications relating to the Header Bidding implementations You have used.

**REQUEST FOR PRODUCTION NO. 37**

All documents, data, and communications relating to Your use or consideration of Client-Side versus Server-Side Header Bidding.

**REQUEST FOR PRODUCTION NO. 38**

Documents and communications discussing or analyzing Your (or Your Clients') revenue, costs, profitability, gross profit margins, and operating profit margins for Display Advertising.

**REQUEST FOR PRODUCTION NO. 39**

Documents and communications discussing or analyzing Your (or Your Clients') revenue, costs, profitability, gross profit margins, and operating profit margins for all forms of advertising other than Display Advertising, including print advertising, classified advertising, and advertising in connection with podcasts.

**REQUEST FOR PRODUCTION NO. 40**

All documents, data, and communications relating to the impact of COVID-19 on Your (or Your Clients') digital advertising and performance marketing revenue.

**REQUEST FOR PRODUCTION NO. 41**

All documents, data, and communications discussing or analyzing the relationship between the revenue that You receive from subscribers and Your creation, procurement, and publishing of content.

**REQUEST FOR PRODUCTION NO. 42**

Documents and data for the period January 1, 2008 to present sufficient to show the number of Your print and digital subscribers by month and the monthly revenues You received from (i) print subscriptions and (ii) digital subscriptions.

**REQUEST FOR PRODUCTION NO. 43**

All documents and communications concerning any changes or trends in the number of subscriptions for Your print and digital offerings.

**REQUEST FOR PRODUCTION NO. 44**

All documents and communications relating to Your ability or strategy to compete with Meta, Twitter (n/k/a X), LinkedIn, TikTok, other social media websites or applications, Amazon, online classified platforms, such as Craigslist, or artificial intelligence products. This Request includes all documents and communications concerning the effect of any of these social media websites, applications, or products on Your (or Your Clients') revenues from Online Advertising.

**REQUEST FOR PRODUCTION NO. 45**

All documents and communications relating to Your commercial arrangements relating to content that You (or Your Clients) make available: (i) on Meta, Twitter (n/k/a X), LinkedIn, Amazon, or Apple Products, or (ii) via artificial intelligence products.

**REQUEST FOR PRODUCTION NO. 46**

All documents and communications relating to Your consideration or use of vendors providing Ad Tech services, including without limitation Your contracts with those vendors. Examples of third-party vendors providing Ad Tech services include firms providing advertising protection solutions, artificial intelligence ("AI")-related services, data brokers, providers of floor management services, and parent publishers using the Multiple Customer Management Feature of Google Ad Manager (or similar Features offered by other Ad Tech Providers).

**REQUEST FOR PRODUCTION NO. 47**

All documents and communications discussing or analyzing different monetization models for Your (or Your Clients') content, including documents discussing Your (or Your Clients') consideration of using Paid Advertising or a paywall (including but not limited to in-app purchases) for some or all of Your (or Your Clients') content.

**REQUEST FOR PRODUCTION NO. 48**

All documents and communications relating to Your decision process on the allocation of Your (or Your Clients') advertising Inventory, including Your objectives when deciding the allocation; all evaluations of potential factors, characteristics, parameters, or variables (e.g., expected or minimum prices, revenues, and profits, and risks, uncertainties, and variations in advertising revenues and profits, etc.) when deciding the allocation; and evaluations of how allocating Inventories to one channel of sales can affect allocation of Inventory to and

performance of advertising sales through another channel of sales.

**REQUEST FOR PRODUCTION NO. 49**

Documents sufficient to describe all Direct Transactions You entered into or considered entering into and revenues generated from Your Direct Transactions.

**REQUEST FOR PRODUCTION NO. 50**

All documents and communications concerning any actual or potential In-House Ad Tech Products You have developed, purchased, or considered developing or purchasing, including: (a) Your rationale for developing, purchasing, or considering developing such In-House Ad Tech Products instead of sourcing them from third parties; (b) Your rationale for sourcing Ad Tech Products from third parties instead of developing, purchasing, or considering developing or purchasing them in-house; (c) the vendors of In-House Ad Tech Product solutions that you considered; (d) the actual or perceived benefits and disadvantages of partnering with any particular Ad Tech Provider or vendor of In-House Ad Tech Product solutions; (e) the time, costs, and resources required to develop or Purchase such In-House Ad Tech Products and/or to move to In-House Ad Tech Products from third-party Ad Tech Products; and (f) any comparison of Your In-House Ad Tech Products and third-party Ad Tech Products or Ad Tech Providers, and their Features, effectiveness, and pricing.

**REQUEST FOR PRODUCTION NO. 51**

All documents reflecting Your actual or considered plans to make Inventory on Your (or Your Clients') Properties available only through Your In-House Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 52**

Documents and data reflecting Your consideration, evaluation, or comparison of Ad Tech Providers or Ad Tech Products (including In-House Ad Tech Products), and their Features,

effectiveness, and pricing, including Inventory performance metrics such as total Clicks generated, CTR, viewability, conversions, and invalid traffic rates.

**REQUEST FOR PRODUCTION NO. 53**

All documents, data, and communications concerning Your actual or considered switching from any Ad Tech Product to another advertising alternative (including other Ad Tech Products or In-House Ad Tech Products), including:

a. the reasons for switching (or not doing so);

b. the costs, staffing, and time involved in such switching; and

c. the potential impact from such switching on Your (or Your Clients') revenues, Your (or Your Clients') profits, Your customers' return on investment, or Your customers' return on advertising spend.

**REQUEST FOR PRODUCTION NO. 54**

Documents sufficient to show: (i) the method(s) through which Your Ad Tech Products have determined the winning bidder in auctions they conduct (e.g., first-price auctions, second-price auctions, hybrid auctions); (ii) how (if at all) and when those methods have changed from January 1, 2013 to the present; and (iii) the reasons for making those changes (if any).

**REQUEST FOR PRODUCTION NO. 55**

Documents sufficient to show how demand sources are ranked or compared with one another in Your Ad Tech Product's process of choosing an ad to serve in response to a Query, how an ad is selected to serve as a result of such ranking or comparison, and any changes You made to this process over time.

**REQUEST FOR PRODUCTION NO. 56**

All documents, data, and communications concerning the list or negotiated pricing, Fees, or discounts of any Ad Tech Products that You use or have considered using, including documents concerning the transparency of, and the Ad Tech Provider's representations concerning, such pricing, Fees, Take Rates, or discounts. This Request includes all documents, data, and communications concerning any negotiated pricing, Fees, or discounts of which You are a beneficiary.

**REQUEST FOR PRODUCTION NO. 57**

All Requests for Proposal (RFPs) that You have sent to Ad Tech Providers and responses received to those RFPs.

**REQUEST FOR PRODUCTION NO. 58**

All contracts with Ad Tech Providers, including documents and communications relating to the negotiations of the contracts.

**REQUEST FOR PRODUCTION NO. 59**

All documents and communications discussing or analyzing the use or potential use of Ad Selling Tools to sell Display Advertising Inventory, including (a) documents and communications sufficient to show the Ad Selling Tools that You have used; (b) documents and communications discussing the reasons why You use each Ad Selling Tool; (c) documents and communications discussing whether there are advantages or disadvantages of using different Ad Selling Tools from different suppliers (including factors such as security, Fees, transparency, yield, Brand Protection, fraud protection, audience targeting, or vertical integration); and (d) documents and communications discussing the scope, prevalence, manner, viability, and cost of using multiple Ad Selling Tools.

**REQUEST FOR PRODUCTION NO. 60**

All documents and communications relating to Google's role in Display Advertising including but not limited to (a) all Your contracts with Google that are or have been in effect during the Relevant Period; (b) all communications from or with Google; (c) any internal or external feedback or commentary about Google's conduct or Ad Tech Products; (d) all communications with any governmental agency or any of Your Clients concerning Google; and (e) financial, technical, or other support that Google provides to You, including but not limited to free ad serving tools, pilot or beta programs related to new Features of Ad Tech Products, requests You made to Google regarding potential Features of Ad Tech Products, or other services.

**REQUEST FOR PRODUCTION NO. 61**

All documents and communications, whether prepared by You, any of Your Clients, or a third party, evaluating or discussing the quality (including factors such as security, Fees, transparency, yield, Brand Protection, fraud protection, audience targeting, or vertical integration) of any Ad Tech Product.

**REQUEST FOR PRODUCTION NO. 62**

All documents and communications relating to Your allegation that "Google continued to represent to publishers that it was running a fair, transparent, second-price auction (until 2019) and then a fair, transparent first-price auction (through the present)" as stated in Paragraph 148 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 63**

All documents and communications for the time period January 1, 2010 to present relating to when You first learned of Dynamic Allocation, Enhanced Dynamic Allocation (including any extension to apply to sponsorship Line Items), Optimized Competition, Project Bernanke, Dynamic Revenue Share, Viewable CPMs, Project Poirot, Project Elmo, Redaction of Auction Data, Line Items (or caps or limitations thereof), Unified Pricing Rules, Open Bidding, Bid Data Transfer File (or redactions thereto), Minimum Bid To Win, and tying between DFP and AdX.

**REQUEST FOR PRODUCTION NO. 64**

All documents and communications for the time period January 1, 2010 to present concerning Your use or consideration of Dynamic Allocation, Enhanced Dynamic Allocation (including any extension to apply to sponsorship Line Items), Optimized Competition, Project Bernanke, Dynamic Revenue Share, Viewable CPMs, Project Poirot, Project Elmo, Redaction of Auction Data, Line Items (or caps or limitations thereof), Unified Pricing Rules, Open Bidding, Bid Data Transfer File (or redactions thereto), Minimum Bid To Win, and tying between DFP and AdX, including the associated timeframe in which each of these designs or features were in use by You.

**REQUEST FOR PRODUCTION NO. 65**

All documents and communications for the time period January 1, 2010 to present concerning the effects of Dynamic Allocation, Enhanced Dynamic Allocation (including any extension to apply to sponsorship Line Items), Optimized Competition, Project Bernanke, Dynamic Revenue Share, Viewable CPMs, Project Poirot, Project Elmo, Redaction of Auction Data, Line Items (or caps or limitations thereof), Unified Pricing Rules, Open Bidding, Bid Data

Transfer File (or redactions thereto), Minimum Bid To Win, and tying between DFP and AdX on Your (or Your Clients') revenue, CPM, Impressions, and Clicks, including any of Your internal studies or analyses.

**REQUEST FOR PRODUCTION NO. 66**

All documents and communications relating to Your consideration of, participation in the development of, or use of Ad Selling Tools or other Ad Tech tools offered or developed by Prebid or Amazon. This Request includes documents and communications relating to Your consideration of, participation in the development of, or use of any Header Bidding Wrappers.

**REQUEST FOR PRODUCTION NO. 67**

All documents and communications relating to Your consideration, use of, or participation in Apple News Format or Facebook Instant Articles.

**REQUEST FOR PRODUCTION NO. 68**

Documents sufficient to show all tags, pixels, or related markers placed on Your (or Your Clients') website(s) for tracking, advertising, or remarketing purposes and how these tags, pixels, or related markers have changed over time, if at all.

**REQUEST FOR PRODUCTION NO. 69**

All documents and communications relating to User privacy in the context of Display Advertising.

**REQUEST FOR PRODUCTION NO. 70**

All documents and communications relating to Your use of web-tracking or other technology to collect the personal data of Users visiting Your (or Your Clients') digital Properties, including but not limited to documents and communications sufficient to show what personal data is collected and how it is used by You, by Your Clients, or by a third party.

**REQUEST FOR PRODUCTION NO. 71**

All documents and communications concerning complaints or feedback received by You about personal data collection, personal data usage, data privacy, and User tracking.

**REQUEST FOR PRODUCTION NO. 72**

All documents and communications relating to Your relationship with any third-party vendors that collect the personal data of Users visiting Your (or Your Clients') digital Properties, including but not limited to documents and communications sufficient to show what personal data is collected and how it is used by the third party.

**REQUEST FOR PRODUCTION NO. 73**

All documents and communications discussing or analyzing the integration of AdX and Google's Publisher Ad Server or any other Ad Tech Providers' efforts to integrate Publisher Ad Servers with Ad Exchanges, including any impact, advantages, or disadvantages of such integrations.

**REQUEST FOR PRODUCTION NO. 74**

All documents and communications for the period January 1, 2008 to present relating to Your use of AdX without DFP and use of DFP without AdX.

**REQUEST FOR PRODUCTION NO. 75**

All documents and communications discussing or analyzing (a) the amount of content on Your (or Your Clients') Properties (including the number of web pages, the number of apps, and the amount of content per web page/app); or (b) whether the amount of content is impacted by the advertising revenue You (or Your Clients) receive or the Ad Tech Fees that You (or Your Clients) pay.

**REQUEST FOR PRODUCTION NO. 76**

Documents sufficient to describe Your (or Your Clients') advertising business model, including but not limited to documents sufficient to show the percentage of Your (or Your Clients') revenue attributable to advertising revenue as compared to other revenue sources.

**REQUEST FOR PRODUCTION NO. 77**

All documents, data, and communications relating to Your (or Your Clients') advertising Inventory, including but not limited to documents and data discussing, analyzing, calculating, or describing the value of Your (or Your Clients') advertising Inventory.

**REQUEST FOR PRODUCTION NO. 78**

All documents and communications relating to any in-app advertising Inventory that You sell or have sold.

**REQUEST FOR PRODUCTION NO. 79**

All documents, data, and communications relating to demand drivers for advertising on Your (or Your Clients') Properties, including all studies, analyses, reports, presentations, and records on the drivers of demand (in terms of, for example, breadth of potential audience, audience targeting, Advertiser budget, and Advertiser return on investment ("ROI") or return on ad spend ("ROAS"), etc.) for advertising sold through Programmatic Direct Transactions, remnant sales or real-time bidding ("RTB"), and any other form of transactions, and including all communications regarding what Advertisers like or dislike about Your (or Your Clients') Properties.

**REQUEST FOR PRODUCTION NO. 80**

All records, reports, data, analytics, and metrics relating to advertising provided to You by Google or by any other Ad Tech Provider that You used.

**REQUEST FOR PRODUCTION NO. 81**

All documents and communications relating to information on Your (or Your Clients') audience and visits to Your (or Your Clients') Properties that are made available to prospective Advertisers, including all communications, studies, analyses, reports, presentations, and records that reflect the characteristics of the visitors and visits and any and all information collected through cookies at the time of the visits to Your (or Your Clients') Properties.

**REQUEST FOR PRODUCTION NO. 82**

All documents and communications relating to information on subscribers to Your print media in circulation, if any, that are made available to prospective Advertisers.

**REQUEST FOR PRODUCTION NO. 83**

All documents and communications, including but not limited to studies, analyses, reports, presentations, and records, for the time period of January 1, 2008 to present, relating or referring to magazine or newspaper advertising revenue or readership.

**REQUEST FOR PRODUCTION NO. 84**

All documents and communications, including but not limited to studies, analyses, reports, presentations, and records, for the time period of January 1, 2008 to present, relating or referring to Your (or Your Clients') advertising revenue, readership, or viewership.

**REQUEST FOR PRODUCTION NO. 85**

All documents and communications relating to Your contracts and negotiations with and evaluations of the participants (and their products) in the "ad tech stack" (including Publisher Ad Servers, DSPs, SSPs, Ad Exchanges, and Ad Networks).

**REQUEST FOR PRODUCTION NO. 86**

All documents and communications (including any and all studies, analyses, reports, presentations, and records) shared by You with advertising consultants or Agencies and any and all information shared by advertising consultants or Agencies with You.

**REQUEST FOR PRODUCTION NO. 87**

All documents and communications (including any and all studies, analyses, reports, presentations, and records) relating to any form, rule, or mechanism of auctions in which You can sell Your (or Your Clients') Inventories.

**REQUEST FOR PRODUCTION NO. 88**

All communications with the American Society of Magazine Editors, the News/Media Alliance (including its predecessor organizations the News Media Alliance, the Newspaper Association of America, MPA – The Association of Magazine Media, and Magazine Publishers of America), and the American Press Institute regarding the Publishers Information Bureau ("PIB"), the subject of this Action, Ad Tech, and/or Google.

**REQUEST FOR PRODUCTION NO. 89**

Without regard to any time period, documents summarizing, describing, or referring to Your calculation of, and the factual basis for, any overcharge You contend You paid to Google.

**REQUEST FOR PRODUCTION NO. 90**

Without regard to any time period, documents summarizing, describing, or referring to Your calculation of, and the factual basis for, any reduction in advertising revenue You contend You received as a result of Google's alleged conduct.

**REQUEST FOR PRODUCTION NO. 91**

Without regard to any time period, any documents and communications relating to the conduct You allege in Your Complaint and/or Your understanding, knowledge, and contentions regarding the Complaint's alleged conduct, including, but not limited to: (a) Google's alleged conduct, including when You first became aware or otherwise were put on notice of the conduct alleged in Your Complaint or any aspect thereof; (b) the relevant antitrust markets You allege; (c) Google's alleged monopoly power or market power in the alleged relevant markets; (d) the alleged anticompetitive effects of Google's alleged conduct; (e) all relief You are seeking, whether monetary, injunctive, and/or structural; and (f) Your claims under New York law (including Your claims for common-law fraud and unjust enrichment).

**REQUEST FOR PRODUCTION NO. 92**

All documents and communications You provided to or received from any entity in response to subpoenas, informal discovery requests or other means in preparation for or connection with this Action, including any declarations You received. This Request includes all documents You provided to or received prior to the filing of Your Complaint from other plaintiffs in *In Re: Google Digital Advertising Antitrust Litig.*, No. 1:21-md-3010 (PKC), and persons or entities named as plaintiffs in prior complaints that are part of or have been a part of *In Re: Google Digital Advertising Antitrust Litig.*, No. 1:21-md-3010 (PKC).

**REQUEST FOR PRODUCTION NO. 93**

Without regard to any time period, all documents and communications that You relied upon for the allegations in Your Complaint.

**REQUEST FOR PRODUCTION NO. 94**

All documents and communications that relate or refer to damages or harm that You contend You suffered.

**REQUEST FOR PRODUCTION NO. 95**

All documents and communications that relate or refer to the diligence, if any, You exercised in investigating the claims You assert in this case prior to commencing the Action.

**REQUEST FOR PRODUCTION NO. 96**

Without regard to any time period, all documents and communications known to You that weigh against or tend to refute any of Your allegations in the Complaint.

**REQUEST FOR PRODUCTION NO. 97**

All non-privileged documents and communications that relate or refer to any steps You took to discover the facts alleged in the Complaint that You contend support any of the claims You asserted in this Action.

**REQUEST FOR PRODUCTION NO. 98**

Without regard to any time period, all affidavits or declarations given or signed by You, or given to You, that relate to the subject of this Action.

**REQUEST FOR PRODUCTION NO. 99**

All documents and communications reflecting, relating, or referring to the actual or potential financing or funding of the prosecution of this Action by any individual or entity that is not a party to this Action.

**REQUEST FOR PRODUCTION NO. 100**

Documents reflecting Your document retention policies.

**REQUEST FOR PRODUCTION NO. 101**

All documents and communications concerning Your retention policies or practices for electronic chat, instant messaging, or direct messaging applications used by Your employees.

**REQUEST FOR PRODUCTION NO. 102**

All documents and communications relating to Your allegation that in 2022 "Google made $30 billion from manipulating auctions for ad space across the Internet" as stated in Paragraph 15 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 103**

All documents and communications relating to Your allegation that "[i]nternally, Google recognizes that the market for ad servers is distinct from markets for other ad-tech products" as stated in Paragraph 89 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 104**

All documents and communications relating to Your allegation that "in 2023, Google announced that Google Ads no longer would bid if a publisher used a third-party ad server to call AdX" and "Google made a similar announcement regarding DV360 in 2024" as stated in Paragraph 132 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 105**

All documents and communications relating to Your allegation that "Google also assured PMC that a certain subset of the most valuable direct deals, called 'sponsorships,' would be completely immune from Enhanced Dynamic Allocation" as stated in Paragraph 169 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 106**

All documents and communications You or Your agents or attorneys provided to or received from any third parties, including but not limited to Your Clients or other plaintiffs who have brought suit against Google, concerning the subject of this Action.

**REQUEST FOR PRODUCTION NO. 107**

All communications with any publication, reporter, blogger, or commentator, including Adweek, AdExchanger, and Digiday, regarding the subject of this Action, Ad Tech, and/or Google.

**REQUEST FOR PRODUCTION NO. 108**

All communications with Jason Kint, Ari Paparo, Timothy Wolfe, Andrew Casale, Joshua Lowcock, James Avery, Stephanie Layser, Jay Friedman, John "Jed" Dederick, Tom Kershaw, Luke Lambert, Arnaud Creput, Brian Boland, Brian O'Kelley, Tim Cadogan, and Matthew Wheatland regarding the subject of this Action, Ad Tech, and/or Google.

**REQUEST FOR PRODUCTION NO. 109**

For any expert that You intend to offer as a witness in this Action, all documents, data, or information that the expert could use, will use, or has used to support the expert's opinions.

**REQUEST FOR PRODUCTION NO. 110**

Documents sufficient to show each of Your (or Your Clients') Properties that are currently operating or have operated during the Relevant Period.

**REQUEST FOR PRODUCTION NO. 111**

Documents, data, or communications sufficient to show any changes to the payment model associated with accessing content on Your (or Your Clients') digital Properties.

**REQUEST FOR PRODUCTION NO. 112**

All documents and communications concerning complaints or feedback received by You about costs associated with accessing content on (or Your Clients') Your digital Properties.

**REQUEST FOR PRODUCTION NO. 113**

All communications between You and any non-party, including but not limited to recipients of subpoenas or voluntary requests for production, concerning the subject matter of this Action or any investigations by governmental entities regarding Ad Tech.

**REQUEST FOR PRODUCTION NO. 114**

All documents, data, and communications reflecting Your knowledge about pricing, Fees, and discounts offered to other Publishers for Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 115**

All documents and communications about Your working relationship with Google, including without limitation: (a) any documents and communications reflecting potential projects or initiatives with Google, regardless of whether they actually happened; and (b) any documents, communications, and data showing any and all resources received from Google beyond the contractual provision of Ad Tech Products to You.

**REQUEST FOR PRODUCTION NO. 116**

Documents sufficient to show each of Your (or Your Clients') Google digital advertising accounts including, for each: any account IDs associated with the account, including Google customer IDs; the identity of the business entity or entities that owned or have owned the account; and the time period associated with each business entity's ownership of the account.

**REQUEST FOR PRODUCTION NO. 117**

All documents and communications relating to management decisions alleged to have had an impact on Your (or Your Clients') advertising revenue or financial position, including without limitation documents and communications relating to management decisions that were raised by (a) labor unions whose members include Your employees or (b) Your employees.

**REQUEST FOR PRODUCTION NO. 118**

All documents and communications concerning complaints or feedback received by You about clickbait, rage bait, deceptive news, and "fake news" on or related to Your (or Your Clients') Properties.

**REQUEST FOR PRODUCTION NO. 119**

All documents and communications concerning complaints or feedback received by You about political bias in the content provided on or by Your (or Your Clients') Properties.

**REQUEST FOR PRODUCTION NO. 120**

All documents and communications concerning complaints or feedback received by You about crashes or other glitches on Your (or Your Clients') digital Properties.

**REQUEST FOR PRODUCTION NO. 121**

All documents and communications concerning complaints or feedback received by You about Your customer service.

**REQUEST FOR PRODUCTION NO. 122**

All documents, data, and communications relating to Your profits and losses, including without limitation documents, data, and communications addressing potential or actual impediments to Your profitability, including without limitation impediments based on (a) labor

issues; (b) management issues; or (c) issues affecting the quality of Your (or Your Clients') publications.

**REQUEST FOR PRODUCTION NO. 123**

All documents and communications You provided to or received from any entity in connection with any of the following actions: (i) *United States v. Google LLC*, No. 1:20-cv-03010 (D.D.C.), (ii) *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.), (iii) *The State of Texas v. Google LLC*, No. 4:20-cv-00957 (E.D. Tex.), (iv) *In re: Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (S.D.N.Y.) (including any of its current or former member cases), and (v) any other case against Google alleging antitrust violations related to Ad Tech. This Request includes all documents You produced in any action included in the foregoing list.

**REQUEST FOR PRODUCTION NO. 124**

Organizational charts, personnel directories, and other documents sufficient to show Your organizational structure and employees, including:

a. The organization of any division, department, unit, or subdivision of Your company that has responsibilities concerning advertising, including but not limited to Display Advertising;

b. The identity of any officers, directors, employees, committees, subcommittees, or working groups that have responsibilities concerning advertising, including but not limited to Display Advertising; and

c. Any other employee with management or supervisory authority over Your advertising business, as well as any involved in supporting such efforts, including any secretaries or administrative assistants assigned to them.

**REQUEST FOR PRODUCTION NO. 125**

All documents, data, and communications concerning resources, trainings, initiatives, or programs provided by Google to You, including but not limited to The Google News Initiative, Google Trends data access, digitization of news archives, and Google News Labs.

**REQUEST FOR PRODUCTION NO. 126**

All documents and communications relating to (a) Your actual or considered use of artificial intelligence (AI) in the the sale of digital advertising and/or the selection, monitoring, management, configuration, and/or use of Ad Tech tools and (b) Your existing, planned, contemplated, or future AI customer offerings, including but not limited to Your use of artificial intelligence (AI) to facilitate Direct Transactions and/or bypass Ad Tech intermediaries.

**REQUEST FOR PRODUCTION NO. 127**

All documents, data, and communications relating to the effect of the external use by Your Clients, customers, or other companies of artificial intelligence (AI) on Your (or Your Clients') Display Advertising decisions or revenue.

**REQUEST FOR PRODUCTION NO. 128**

All documents, data, and communications relating to Your views on the effect of artificial intelligence (AI) on the competitive landscape for Ad Exchanges or Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 129**

All documents and communications relating to Your allegation that "Google had assured publishers that DFP would serve their interests and that Dynamic Allocation in particular would 'maximize yield'" as stated in Paragraph 72 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 130**

All documents, data, and communications relating to Your allegation that "PMC has observed that it receives higher bids when multiple exchanges compete through header bidding" as stated in Paragraph 75 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 131**

All documents and communications relating to Your allegation that "Google makes many of the features in DV360 (for example, the ability to use Chrome browsing history to target ads to readers) unavailable to advertisers if they participate in exchanges other than AdX" as stated in Paragraph 129 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 132**

All documents and communications relating to Your allegation that "the full slate of AdX demand is *not* available if a publisher uses a different publisher ad server" as stated in Paragraph 132 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 133**

All documents, data, and communications relating to Your allegation that "DFP causes [You] significant and ongoing financial injury" as stated in Paragraph 133 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 134**

All documents, data, and communications relating to Your allegation that "AdX's attacks on direct sales depressed the prices that publishers, including PMC, could receive for what used to be their most valuable inventory" as stated in Paragraph 167 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 135**

All documents and communications relating to Your allegation that "Google represented to PMC and told publishers publicly that Exchange Bidding would lead to higher revenue" as stated in Paragraph 204 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 136**

All documents, data, and communications relating to Your allegation that AdX is "a significant source of low-quality advertising" for You, "in substantial part because of low-quality ads from Google Ads" as stated in Paragraph 236 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 137**

All documents and communications relating to Your allegation that "Google represented that applying multipliers to non-Google bids — one potential workaround to the unified price floors — would not 'maximize yield'" as stated in Paragraph 238 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 138**

All documents and communications relating to Your use or consideration of Supply Path Optimization, including but not limited to documents and communications relating to the impact of Supply Path Optimization on Your (or Your Clients') Display Advertising revenue.

**REQUEST FOR PRODUCTION NO. 139**

All documents and communications relating to Your allegation that "Google for years told publishers that multi-calling was an appropriate auction strategy" as stated in Paragraph 285(h) of Your Complaint.

**REQUEST FOR PRODUCTION NO. 140**

All documents and communications relating to Facebook Pixel, including but not limited to documents and communications sufficient to show the User information disclosed to, sold to, leased to, or shared in any capacity with Facebook or Meta when a User visits Your (or Your Clients') digital Properties.

**REQUEST FOR PRODUCTION NO. 141**

All documents and communications concerning complaints or feedback received by You regarding deceptive practices by Your employees.

**REQUEST FOR PRODUCTION NO. 142**

All documents and communications concerning complaints or feedback received by You about subscriptions and billing, including but not limited to complaints or feedback relating to automatic subscription renewals and difficulty canceling subscriptions.

**REQUEST FOR PRODUCTION NO. 143**

All documents and communications concerning Your partnership and licensing agreement with 10up and Your use of its ClassifAI AI integration toolkit that are related to Ad Tech or digital advertising.

**REQUEST FOR PRODUCTION NO. 144**

All documents, data, and communications concerning how You (or Your Clients) configured Your (or Your Clients') Publisher Ad Server, including but not limited to all documents and communications concerning (i) how You (or Your Clients) configured Your Publisher Ad Server to work with other Ad Tech Products (including but not limited to any Header Bidding Wrappers) that You (or Your Clients) use or have used, (ii) how You (or Your Clients) configured the Floor Prices for individual sources of demand, and (iii) how You (or Your Clients) set the prices, value CPMs, and/or priorities of individual Line Items.

**REQUEST FOR PRODUCTION NO. 145**

All documents, data, and communications relating to how You use and/or have used Bid Data Transfer Files. This Request includes documents, data, and communications reflecting how Google's alleged "redaction" of fields in Bid Data Transfer Files has (i) restricted or altered Your

use of Bid Data Transfer Files and/or (ii) impaired the revenue You (or Your Clients) could receive for Your (or Your Clients') Inventory.

**REQUEST FOR PRODUCTION NO. 146**

All documents and communications related to layoffs You have conducted.

**REQUEST FOR PRODUCTION NO. 147**

All documents and communications relating to experiments conducted by Ad Tech Providers on Your (or Your Clients') Properties.

**REQUEST FOR PRODUCTION NO. 148**

All documents and communications reflecting Your or Your employees' reliance on the representations by Google that You allege in Your Complaint, including the documents and blog posts cited in footnotes in Your Complaint.

**REQUEST FOR PRODUCTION NO. 149**

All documents and communications reflecting Your evaluation or decision whether or not to use any Feature of Google's Ad Tech Products, including but not limited to Bid Data Transfer Files, Open Bidding, Optimized Competition, Minimum Bid to Win, Enhanced Dynamic Allocation, and Dynamic Revenue Share.

**REQUEST FOR PRODUCTION NO. 150**

All documents, data, and communications relating to how You set "differential price floors," as that term is used in Paragraph 231 of Your Complaint. This Request includes documents, data, and communications reflecting (i) any of Your reasons for setting "differential price floors," including any attempts to limit or eliminate the presence of low-quality ads, and/or (ii) how you configured "differential price floors" on each of the Ad Exchanges and Ad Buying Tools used to transact Your (or Your Clients') Inventory.

**REQUEST FOR PRODUCTION NO. 151**

All documents, data, and communications relating to Your use and/or monitoring of sponsorship Line Items.

**REQUEST FOR PRODUCTION NO. 152**

All documents and communications related to any alleged misrepresentations or omissions by Google, as stated in Paragraphs 285 and 292 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 153**

All documents reflecting Your employees' non-privileged communications about this Action or (i) *United States v. Google LLC*, No. 1:20-cv-03010 (D.D.C.), (ii) *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.), (iii) *The State of Texas v. Google LLC*, No. 4:20-cv-00957 (E.D. Tex.), (iv) *In re: Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (S.D.N.Y.) (including any of its current or former member cases), or (v) any other case against Google alleging antitrust violations related to Ad Tech.

**REQUEST FOR PRODUCTION NO. 154**

All documents, data, and communications concerning any reduction in the value of Your Inventory sold via a Direct Transaction as a result of any alleged conduct undertaken by Google.

**REQUEST FOR PRODUCTION NO. 155**

All documents concerning any reduction in auction participation by any Ad Tech Product or by Header Bidding or any Header Bidding Wrapper as a result of any alleged conduct undertaken by Google.

**REQUEST FOR PRODUCTION NO. 156**

All documents and communications relating to Your allegation that "Google represented to PMC that Enhanced Dynamic Allocation would increase its programmatic revenue without

harming its direct deals, and that it would protect PMC from underdelivering on its direct deals with advertisers" as stated in Paragraph 169 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 157**

All documents, data, and communications relating to Your allegation that "Enhanced Dynamic Allocation has also caused PMC, at times, to under deliver on its direct deals" as stated in Paragraph 170 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 158**

All documents, data, and communications related to "PMC's complaints to Google" concerning Enhanced Dynamic Allocation as alleged in Paragraph 172 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 159**

All documents, data, and communications related to Your allegation that "Google Ads demand (and therefore AdX) is particularly important for PMC" as stated in Paragraph 128 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 160**

All documents and communications related to Your allegation that "Google also has represented that AdX, as a participant in Exchange Bidding, no longer benefits from Last Look" as stated in Paragraph 206 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 161**

All documents and communications related to Your allegation that "Google represented to publishers, including PMC, that it had eliminated Last Look advantages in 2019" as stated in Paragraph 285(i) of Your Complaint.

**REQUEST FOR PRODUCTION NO. 162**

All documents, data, and communications related to “PMC’s requests” to Google concerning “the data necessary to determine … whether Enhanced Dynamic Allocation was in fact beneficial or not” as alleged in Paragraph 171 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 163**

All documents and communications relating to Your allegation that “Google told PMC — in a June 2009 slide deck titled ‘double click ad exchange’ — that Dynamic Allocation ‘mak[es] AdX a no-risk channel’ because the ‘impression is sold to the buyer that offers the highest yield,’ and the ‘[h]ighest bidder wins – every time’” as stated in Paragraph 72 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 164**

All documents and communications related to the “written assignment agreements” that You have executed as stated in Paragraph 19 of Your Complaint, including copies of those agreements.

**REQUEST FOR PRODUCTION NO. 165**

All documents, data, and communications concerning the different tiers of services that SheMedia, LLC provides to Your Clients, including but not limited to documents sufficient to show the offerings SheMedia, LLC provides as part of each tier of services.

**REQUEST FOR PRODUCTION NO. 166**

All contracts with Your Clients, including documents and communications relating to the negotiations of the contracts.

**REQUEST FOR PRODUCTION NO. 167**

All documents and communications relating to Your allegation that “SheMedia controls the entire ad sale process” as stated in Paragraph 36 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 168**

All documents and communications relating to any settings (including but not limited to Floor Prices) that Your Clients can configure regarding the sale of their Inventory.

**REQUEST FOR PRODUCTION NO. 169**

All documents, data, and communications concerning Your participation in Google's Multiple Customer Management ("MCM") program or its predecessor program, Scaled Partner Management ("SPM"). This Request includes all documents, data, and communications concerning Your use of Manage Inventory or Manage Account delegation types.

**REQUEST FOR PRODUCTION NO. 170**

All documents, data, and communications concerning Your participation in Google's Certified Publishing Partner ("GCPP") program.

**REQUEST FOR PRODUCTION NO. 171**

All documents, data, and communications relating to the process for joining Your network, including but not limited to documents, data, and communications concerning Your review process, the number of applicants that are accepted, and the requirements for acceptance.

Dated: March 13, 2026

*/s/ Justina K. Sessions*
Justina K. Sessions
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
justina.sessions@freshfields.com

Eric Mahr
Andrew J. Ewalt
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500

eric.mahr@freshfields.com
andrew.ewalt@freshfields.com

Craig M. Reiser
AXINN VELTROP & HARKRIDER LLP
630 Fifth Avenue
New York, NY 10111
Telephone: (212) 728-2218
creiser@axinn.com

*Counsel for Defendants Google LLC and Alphabet, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2026, I caused the foregoing to be served on all counsel of record for Plaintiffs via email.

*/s/ Justina K. Sessions*
Justina K. Sessions
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
justina.sessions@freshfields.com