# Exhibit 39

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES, *et al.*, Plaintiffs, v. GOOGLE LLC, Defendant. | Case 1:23-cv-108<br>Alexandria, Virginia<br>September 1, 2023<br>10:58 a.m.<br>Pages 1 - 88 |

TRANSCRIPT OF MOTIONS HEARING

BEFORE THE HONORABLE JOHN F. ANDERSON

UNITED STATES MAGISTRATE JUDGE

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

APPEARANCES:

FOR THE PLAINTIFFS:

GERARD J. MENE, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3777

AARON TEITELBAUM, ESQUIRE
JULIA T. WOOD, ESQUIRE
KATHERINE E. CLEMONS, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Fifth Street, NW
Washington, D.C. 20530
(202) 894-4266

TYLER T. HENRY, ESQUIRE
OFFICE OF THE ATTORNEY GENERAL
OFFICE OF THE SOLICITOR GENERAL
202 North 9th Street
Richmond, Virginia 23219
(804) 786-7704

FOR THE DEFENDANT:

CRAIG C. REILLY, ESQUIRE
LAW OFFICE OF CRAIG C. REILLY
209 Madison Street, Suite 501
Alexandria, Virginia 22314
(703) 549-5354

KAREN DUNN, ESQUIRE, *PRO HAC VICE*
ERICA SPEVACK, ESQUIRE, *PRO HAC VICE*
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, D.C. 20006
(202) 223-7300

ANDREW J. EWALT, ESQUIRE, *PRO HAC VICE*
JULIE S. ELMER, ESQUIRE, *PRO HAC VICE*
CLAIRE L. LEONARD, ESQUIRE, *PRO HAC VICE*
TYLER A. GARRETT, ESQUIRE, *PRO HAC VICE*
FRESHFIELDS BRUCKHAUS DERINGER, LLP
700 13th Street, NW, 10th Floor
Washington, D.C. 20005
(202) 777-4500

P R O C E E D I N G S

THE COURTROOM DEPUTY: Calling *United States, et al. v. Google LLC*, Civil Action No. 23-cv-108.

MR. MENE: Gerard Mene with the U.S. Attorney's Office, Your Honor.

MR. TEITELBAUM: Good morning, Your Honor. Aaron Teitelbaum for the United States from the Antitrust Division.

MR. HENRY: Good morning, Your Honor. Ty Henry from the Virginia Attorney General's Office on behalf of the plaintiff states.

MS. CLEMONS: Good morning, Your Honor. Katherine Clemons from the Antitrust Division on behalf of the United States.

MS. WOOD: Good morning, Your Honor. Julie Wood from the United States. Ms. Clemons is going to continue argument on the privilege motion, and Mr. Teitelbaum is going to address the other issues before the Court today. Thank you.

THE COURT: Okay. Thank you.

MR. REILLY: Good morning, Your Honor. Craig Reilly here for the defendant, Google, together with my cocounsel, Karen Dunn and Erica Spevack. Ms. Dunn will address the Court on the privilege issue if the Court has questions or it wants further argument. Also,

Andrew Ewalt, Julie Elmer, Claire Leonard, and Tyler Garrett. Mr. Ewalt will address the Court on the other matters before the Court this morning.

THE COURT: Okay. Well, here's the order that I'm going to take them up on so just to let y'all know. I'm going to take up the remaining issue on the plaintiffs' motion for leave to depose very briefly, and I'll take up the Google motion for a protective order, the United States' motion for a protective order, and then I'll end with our final discussions on the motion to compel the claims and the motion for *in camera* review of the documents.

MR. REILLY: Thank you, Your Honor.

THE COURT: Mr. Ewalt, let me hear from you first.

You know, the remaining issue on this motion for need to take depositions -- why don't you come on up. You're handling that one, right?

MR. EWALT: Yes, Your Honor.

THE COURT: Okay. As I understand it, this was a deposition that was noticed in the MDL proceeding for August 3, but the engineering director for Google's Ad Manager product, and the issue is whether that deposition can be considered taken as of September 8 since it was noticed on the 3rd but not really set to

take place until the 21st. And Google has objected to that. Help me understand why and what the real impact of that is. Really, they're not going to be able to ask questions either way, right?

MR. EWALT: Right.

THE COURT: So it's just whether they can use it for impeachment purposes or for any other purposes under the Federal Rules of Evidence; is that right?

MR. EWALT: That's the practical effect of the Court's ruling, yes, Your Honor.

THE COURT: Why shouldn't I allow them to do that?

MR. EWALT: Because the Court has established a process here where there's a limit on ten depositions per side. The United States had notice of the deposition, as Your Honor noted, on August 3. They decided to not use one of their ten depositions to cross-notice this one. As a result, under the coordination order, because they don't have any right then to insist on when the deposition will be taken and then no right to insist on what purposes it would be available for use.

THE COURT: Well, so if it was taken within a month of when it was noticed, we wouldn't be here. Is that right?

MR. EWALT: That's correct. If the deposition was taken before September 8, then that provision of the coordination order would apply.

THE COURT: And if Google delayed in giving dates or coordinating it, then they hadn't taken advantage of a procedural issue that may impact the United States' ability in this case. Is that right or wrong?

MR. EWALT: Well, just to be clear, Google did not delay here. We were trying to find dates that would accommodate everyone. But Your Honor is correct that if the deponent had been available for September 8, then this deposition presumably would have taken place before then.

THE COURT: Well -- and I understand your concerns that there may be a bunch of depositions getting noticed now and they try and bring them in the backdoor going forward. But I think under the facts and circumstances of this particular motion -- that is, it was noticed on August 3. I think the plaintiff -- again, not knowing all what's going on in the MDL proceeding -- had a reasonable expectation that it would have been taken before September 8, decided obviously not to use one of its very precious deposition notices.

I'll just note that, that I said that. And nobody needs to tell me four or five times in the rest of this hearing how little number of depositions you get and those kinds of things. We'll just set the stage for that.

But I am going to go ahead and allow them for that deposition and only that deposition under the facts and circumstances of this case to use that deposition and treat it as if conducted on or before September 8.

Okay. Thank you.

All right. Well, going now to the Google protective order. Have there been any updates since 5:02 last night on this one? And I appreciate the updates on this. So where are we on that one?

MR. EWALT: Well, Your Honor, actually, I do have some good news on that one. So the United States submitted its status report yesterday highlighting that there were remaining disputes at that time related to topics 13 through 16 and topics 25 through 27. I'm pleased to report the parties have continued to meet and confer in good faith, and we have been able to reach agreement as to topics 13 through 16. So the remaining issues relate only to topics 25 through 27.

THE COURT: I guess the topic 26 is only the

definition of "covered employees." Is that what the issue is?

MR. EWALT: Precisely, Your Honor.

And 25 and 27, I think we are also in agreement on as long as we can figure out what we -- what covered employees are in scope here. And so that's really the heart of this remaining issue after all of the negotiations, the good work of both parties from both sides to try and reach agreement. We're down to the definition of "covered employees."

THE COURT: And what is wrong with the definition that they have proposed of all current and former Google employees listed on either side's initial disclosures? And I don't know how many that may be, but that is a defined number of people. And then you subtract from them the Google employees who were noticed for a deposition in this case who have not yet testified. So the precious depositions taken of those people. That wouldn't include them or who previously testified and, I guess, were asked questions about the chats.

So what's wrong with that definition?

MR. EWALT: So just to set some context here, by our estimate, their definition would pull in 70 or so employees.

THE COURT: How many?

MR. EWALT: Seventy.

THE COURT: Seventy.

MR. EWALT: And we have proposed -- I don't think this was in the status report. But Google's proposal was for the plaintiffs to identify ten current employees from either side's initial disclosures, and that would be -- those would be the ten that would be covered employees.

So I think what the dispute at this point is, Your Honor, 10 or 70 or something in the middle.

And so I want to return to Your Honor's question about how do we resolve that remaining disagreement between the parties. And I wanted to start with one important point here, which is what this particular topic is asking is for Google to go out and do many depositions essentially of however many employees are at issue here.

This is very different from what's covered in topic 25, for example, asking about the company's policies, which is more in the heartland of what Rule 30(b)(6) is all about. Going out and requiring us to take this many depositions of 70 or 10 or whatever number of employees is not, in our view, an appropriate use of 30(b)(6) at all. Nevertheless, we have offered

to do it for ten employees as a way to try and bridge the gap here going forward.

THE COURT: They outline for each of the employees whether the employee used chats to discuss matters relevant to this case. So email to these however many employees says, "Did you use chats to discuss matters relevant to this case? And if so, then the employee's chat history setting at times when the employee discussed matters relevant to this case and any nonprivileged direction or statements that Google provided to its employees about conducting chats with history off."

So (c) is Google, and I assume (c) might be subsumed in some respects in 25, right. It asks for any nonprivileged direction or statements that Google provided to its employees about conducting chats with history off.

MR. EWALT: Apologies, Your Honor. There's been a lot of text going back and forth. If you could just tell me what you're reading from.

THE COURT: Yeah. I'm just -- I'm reading from the most recent file. It's the one from last night.

MR. EWALT: Yes. Are you reading from topic 25, Your Honor?

THE COURT: No. I'm reading from topic 26.

MR. EWALT: Okay.

THE COURT: That's the one we're talking about, right?

MR. EWALT: Yes.

THE COURT: Okay. So what they ask is that you provide a written response describing, based on a reasonable inquiry (a) for each of the covered employees whether the employees used chats. Okay. Did they use chats to talk about this case?

And if so, the employee's chat history setting at times when the employee discussed matters relevant to this case.

So one, did they do it? If they did it, the timing of when they did it.

And then (b) is nonprivileged direction or statements that Google provided to its employees about conducting chats with history off.

So the (b) part is really not having to reach out to whatever number of employees. It's just what was Google's statements or directions about, you know, conducting chats with history off.

MR. EWALT: Yes, Your Honor, we agree. The definition of "covered employees" we read is only implicated for part (a) of topic 26 and not for part

(b).

THE COURT: And why do you think going and getting (a)(i) and (ii) require many depositions as opposed to just contacting them and asking them those questions?

MR. EWALT: So we do think -- I would think that it does require going and contacting everyone that we're talking about in this universe, asking those questions, pulling it all together, and packaging it up. And we think that that is not an appropriate use of 30(b)(6) discovery for that.

There is also some practicalities involved here. In particular, we'd note that the definition proposed by plaintiffs includes current and former Google employees and is obviously much more difficult for us to conduct such an inquiry of former employees who we don't have any obligation -- they don't have any obligation to take our calls, for example, certainly not on --

THE COURT: Upon a reasonable inquiry. If you make an inquiry and can't get a response, so be it.

I think I understand your point. Let me hear from the plaintiffs as to why some number less than 70 would be appropriate, whether it be 10 or some other number, why each and every one needs to be inquired

into.

MR. TEITELBAUM: Thank you, Your Honor.

I think it might be worth just providing a little bit of context for why the plaintiffs care about chats first of all.

THE COURT: I think I know. I've read a lot of stuff about that in this case and other cases. So I understand the issue.

MR. TEITELBAUM: Okay.

THE COURT: Why every employee?

MR. TEITELBAUM: So I think, really, from the plaintiffs' perspective -- there are over 160 document custodians in this case where -- who by definition have evidence that's relevant to the plaintiffs' claims.

And so from the plaintiffs' perspective, we have already agreed for the purposes -- in the spirit of compromise and to try to reach a resolution, to reduce that number from a body of people that we know have relevant documents in this case down to the 60 or 70 people who are on each side's initial disclosures, which would be, you know, a narrow universe of people with relevant information.

And I think we are in a position where we do not know who Google is going to call as a trial witness at this point. And so what we need is to have an

understanding of what the chat preservation was for the universe of people who could show up as trial witnesses. Either the plaintiffs' call --

Oh, I'm sorry.

THE COURT: I mean, (b) is not defined necessarily to covered employees. (b) says "nonprivileged direction or statements that Google provided to its employees." So you're going to get what Google says with their chat history in response to (b).

The question is, did Sally or Joe or Sam use chats to talk to Google? I'm not trying to undo it, but I'm just saying it's a little hard to talk about "matters relevant to this case," what that really means and what makes a reasonable inquiry into somebody talking about matters relevant to this case.

MR. TEITELBAUM: I think advertising technology matters, you know, related to Google's business in the ad tech space.

THE COURT: Well, I mean, I think you have probably become familiar enough with the 70 people that maybe on the initial disclosures, that you know that some may be more important than others in that space. Some are finance people or some may be this or some may be that. So, again, I'm just trying to understand why

there wouldn't be some ability to at least decrease the number. Seventy people is not earth shattering, but it does seem to be -- you would get a sense as to what's going on. You're going to get what Google's directions are for all of its employees.

MR. TEITELBAUM: I think the reason that we're in this situation is because of the nature of the directions that Google -- that we know Google gave to its employees, which was basically, "We are trusting individual employees to implement litigation holds based on their own judgment." As a result, we need an individualized inquiry for each person.

I do want to emphasize that, really, if we were trying to provide ourselves with full coverage, I do think that the document custodian number is the number, which is 160 plus. And so we have come down by more than 50 percent in an effort to be reasonable.

And I agree with what the Court said earlier, that this is not a mini deposition. It is one or two phone calls about the nature of chat usage for each employee. And not all of these people on the initial disclosures are former employees. Some of them are. But the current employees, it should be even easier to accomplish that.

THE COURT: Well, that's difficult. These

are less difficult than the current employees.

MR. TEITELBAUM: I can accept the less difficult characterization as well, Your Honor.

THE COURT: Okay. Well, I think I understand the issues there. Again, there's no rocket science to this. I'll just have to make a decision that you-all have to live with. I think giving a number of 35 -- pick 35 off the initial disclosure list, submit it to them. There will need to be an inquiry for those 35 people as to topics 26(a)(i), little I.

Again, to the extent that they reach out to former employees who are not being cooperative or providing information, they've made a reasonable inquiry. Try to contact them and get the information. So you may want to keep that in mind. Obviously, they can control their covered employees. So you may want to skew it a little bit more towards covered than noncovered when picking your precious 35. Okay.

MR. TEITELBAUM: Understood, Your Honor.

THE COURT: Thank you.

All right. So let's take up the United States' motion for a protective order as to the -- where I read this, we're talking about two hours of deposition for the United States. Is that right? You carved out the 30(b)(6), that they're going to be --

the agency is going to be deposed for one-and-a-half hours each for the 12 hours and then 2 hours reserved for any deposition for the United States requisite.

MR. TEITELBAUM: There's been some movement on that, Your Honor. It's now up to 3 hours per federal agency advertiser, and it's for a total of 14 hours, all of those federal agency advertisers together.

And in an effort to try to narrow the areas of dispute here, the United States has actually agreed that if it does not prevail on this motion and the Court orders that the deposition needs to go forward, then we would agree to sit a United States DOJ designee for three-and-a-half hours standalone.

THE COURT: All right. So the notice was sent to the United States. The United States is the one who is obligated to pick a representative to testify on information known to the United States.

You say throughout your papers that they're trying to depose attorneys. How do you get to the United States gets to pick a representative who comes in and testifies on the binding information to the United States where they're actually trying to depose an attorney?

MR. TEITELBAUM: The way that this notice

started out was that the definition of "you" included all the federal agency advertisers and the Department of Justice. But through discussions with Google, we've learned that there are specific topics that are, in fact, directed to not just the United States but the United States Department of Justice's Antitrust Division, which is --

THE COURT: They're part of the United States, right?

MR. TEITELBAUM: It is, but as a practical matter, the United States Department of Justice's Antitrust Division is the law firm for this case, and it's run by lawyers. The business of the Antitrust Division is lawyer led and lawyer conducted. And so this is the functional equivalent for those topics where Google is seeking deposition testimony from the Antitrust Division asking for a 30(b)(6) deposition of opposing counsel.

THE COURT: Well, they're asking for information that may be maintained at the Antitrust Division, collected, processed, all of that. But all of that was done on behalf of the United States, right.

So going back to the law firm, client and law firm. You have a client. You've got a law firm. The law firm does a lot of work for the client in a case,

right. It may be handing off a lot of work. When you depose the client, the client has to pick a representative that is able to testify and bind the client as to information within the client's possession, custody, or control.

And they get to pick who it is. It could be somebody within the client, or it could be somewhere not within the client. It's not someone who has to have personal information, personal knowledge of information. It just has to be somebody who can give testimony that is binding on behalf of the party.

So the idea that they're trying to depose -- and I think you're right when you talk about who is you. You is also the Department of Justice's Antitrust Division, DOJ, or whatever. But the notice is really to the United States. So the United States has to, you know, put up a representative.

MR. TEITELBAUM: What I want to emphasize, Your Honor, is we've -- with respect to the federal agency advertisers who are part of the United States, we've done that and agreed to do that. Those depositions are in progress. We've provided 30(b)(6) designees from all of the federal agency advertisers, agreed to sit those people, and provide testimony that binds the United States.

So the United States is not trying to say that we're not subject to 30(b)(6) testimony. All of those other disputes really have been resolved without the Court's intervention.

The dispute -- the only remaining dispute here is whether Google should also get to depose either the United States' actual trial or litigation counsel or the practical equivalent of that. Because anyone -- even if we found somebody without a law degree who is going to be the designee, that person is going to have to be endued with all of the knowledge collectively of the United States' trial and litigation counsel because --

THE COURT: Isn't that the same in any context where you have a client and a law firm? The law firm does work for the client preparing information for the client to get and have to support its case. When the client gets deposed -- just because the law firm has, you know, developed a case, that doesn't mean that the client doesn't have to at least testify in some respects as to what it is, the facts and circumstances supporting your claim.

MR. TEITELBAUM: So to take the client and law firm analogy, the FAA are -- in this instance are the client, and the DOJ's Antitrust is the law firm.

And so I think --

THE COURT: The client is the United States. The lawsuit is the *United States v. Google*, right?

MR. TEITELBAUM: Absolutely.

And so one of the points that I'd like to make is that there's a reason why the framework in *Shelton v. American Motors Corporation* exists, which is that we have produced the information that Google is looking for in those topics that are directed at the Department of Justice. And any additional testimony that they are seeking through these topics would necessarily invade our primarily opinion work product, but also fact work product. That's why this proposed deposition of the United States' counsel is so problematic. Because we have produced third-party communications and third-party documents.

THE COURT: Well, *Shelton* really applies to when you're noticing a deposition of a lawyer, not of an entity, right?

MR. TEITELBAUM: Well, I think that the cases are mostly dealing with SEC 30(b)(6) depositions say is that when you are noticing a deposition of an attorney-run investigative agency, like the Department of Justice's Antitrust Division, then noticing a deposition of that entity is the functional equivalent

of noticing a deposition of opposing counsel.

And Google really has not -- you know, even going to sort of a nuts-and-bolts discussion of how this deposition would play out without immediately sparking 35 additional privilege or work product disputes, Google has still not articulated how it would propose to conduct a deposition of the Antitrust Division's 30(b)(6) designee without having any potentially relevant question be an opinion work product question.

Because the Department of Justice's recollections about an interview that occurred three years ago would necessarily be coming from some attorney's recollection of what was important and what was material and what was that attorney's impression about what was said during that interview. And so it's really -- it's going to be a work product --

THE COURT: The fact of the interview would not be privileged, right?

MR. TEITELBAUM: That's correct.

THE COURT: And did you meet with anybody there? Yes.

MR. TEITELBAUM: And the Antitrust Division has produced its investigative file, which includes 120,000-plus pages of third-party communications, which

includes calendar invites and the like indicating when or whether a meeting occurred.

And so given that this is the functional equivalent of trying to depose opposing counsel, I think that the consensus within this district and within the Fourth Circuit says that trying to depose the Antitrust Division is a deposition of opposing counsel. Google would have to explain why the fact that we've already produced our investigative file, including third-party communications, over a million pages of third-party documents in addition to those communications is not somehow a sufficient means for them to get this information.

Just because they feel that speaking to the other side's lawyers would be helpful to them, that's not enough in this instance.

THE COURT: And, again, to parse through, I really do appreciate y'all working things out as best you can. Sometimes I start off with reading names, and then it gets narrowed and narrowed. Am I right that we're really talking about possibly six topics that are still in dispute, three of which may have gotten resolved before today or not?

MR. TEITELBAUM: So I want to emphasize that the United States very much believes it's nine topics

because the three topics, 31, 37, and 38, Google's position is that because we've separately moved for a protective order in front of the district judge that could potentially affect those topics, that this Court should somehow not consider that. But really, it's two completely separate issues. We view nine topics as still being in dispute because they are all an attempted deposition of opposing counsel.

THE COURT: Well, I'm going to let Judge Brinkema deal with 31, 37, and 38, and if necessary, she can bring that back to me when she makes a decision on the substantive part having to do with that. So she will deal with all of those issues next week. But for my purposes, I'm at this point going to deal with 29, 33, 34, 36, 39, and 40.

MR. TEITELBAUM: Could I ask for clarification just briefly on what the Court just said?

THE COURT: Well, you have a motion pending in front of Judge Brinkema, a partial summary judgment or a protective order to individuals from being deposed, correct?

MR. TEITELBAUM: The fact that it may -- I think I want to clarify that. If the United States prevails on its motion for partial judgment on the pleadings or a protective order that's in front of

Judge Brinkema, one of the collateral consequences of that would be that those depositions do not go forward. And similarly, one of the collateral consequences would be that Google could not depose anyone about topics 31, 37, or 38.

But that motion does not address the separate issue that's before this Court, which is whether or not Google should also be precluded from taking a deposition on those three topics because it's a deposition of opposing counsel.

And so, for instance, if the United States only partially prevailed or didn't prevail before Judge Brinkema, that question would land right back here with respect to those three topics. So that's why we'd urge the Court to take up all nine here. Because there's no risk of overlapping or contradictory rulings with what we've asked Judge Brinkema to decide.

THE COURT: All right. Well, what about 33, 34, the responses to interrogatories and responses to request for admissions and the remedies sought?

MR. TEITELBAUM: So the interrogatories and request for admissions, I think -- first of all, it would be Google's burden to explain why it's necessary to ask opposing counsel about those questions.

THE COURT: It's asking a client, the party

in the lawsuit, to provide information as to, you know, their answer to an interrogatory or their denial or admission of a request for admissions.

MR. TEITELBAUM: Well, I think a federal agency advertiser 30(b)(6) witness would absolutely be happy to answer those questions. That's -- but the problem is that what Google is asking to do is asking the United States' litigation counsel about its -- necessarily, it would have to be its preparation, its thought process, the reasons behind why it responded to request for admissions and interrogatories in the manner that it did.

As I said before, the United States is not suggesting that it's immune from 30(b)(6) testimony. All of the federal agency advertisers stand ready to answer those questions. It's just that to ask the other side's lawyer about their request for admission response that Google already has in its possession, there's no way to conduct that examination without it being about opinion work product.

THE COURT: Okay. What else would you like to say for the record?

MR. TEITELBAUM: Well, with respect to remedies, once again, the remedies that the United States is seeking to ask the Antitrust Division lawyers

or other personnel, those questions necessarily go to what our legal strategy and our legal theories are. There's no way for someone from the Antitrust Division to answer that question without it being opinion work product.

Now, of course, once again, Google is free to ask FAA witnesses those questions. And --

THE COURT: Well, is any agency making a decision in the overall remedy that's going to be sought by the United States?

MR. TEITELBAUM: I think it would be -- I don't think, as I stand here, I can answer that question partly because --

THE COURT: The postal service isn't going to ask for something and another agency not ask for something. A decision is going to be made on behalf of the United States collectively as to what the United States wants to do as far as a remedy goes.

MR. TEITELBAUM: I think, as a practical matter, that's probably correct.

THE COURT: So why can't they ask the United States -- and, again, whether we defer that or not -- which I thought was what everybody had sort of agreed to -- they're going to defer the whole thing with remedies.

But, you know, Google should be entitled to ask the United States: What is it you want out of this lawsuit? And somebody needs to tell them what they want out of this lawsuit. What are the damages sought? What are the remedies, equitable remedies? So come in and tell them.

MR. TEITELBAUM: I think, first of all, the United States agrees that the most efficient way of addressing that particular topic on remedies would be to defer it based on the Court's prior ruling about addressing certain remedies issues if there's been a finding of liability.

But otherwise, I think the Court used the word "decision" about remedies, and I think that goes exactly to why asking the Antitrust Division about its decision-making or thought processes about a remedy is -- that is a core legal theory, legal strategy question.

THE COURT: Well, again, they're going to take eight FAA depositions, and none of them are going to be able to say what the United States is going to be seeking in this lawsuit as far as equitable remedies, right? I'm just trying to be realistic here. They're looking out for their intents and purposes. They will testify what they do, but they're not -- you know,

they're not going to be deep into the weeds in this case. And so I'm, again, trying to understand how Google, who is entitled to that kind of information, is going to get that information through these eight agency depositions.

MR. TEITELBAUM: I think the answer is it resides in the *Shelton* test also, which is that there are many written discovery tools that are open to Google to ask those questions of the United States. But the one thing that they cannot do is ask that the United States' lawyers sit for a deposition and answer questions about our legal strategy, legal theories, plans for a remedy. They can ask those questions in another format just as they would with all of the other written discovery that the United States has responded to thus far.

THE COURT: Okay. I understand your position.

Mr. Ewalt.

MR. EWALT: If I could begin just with the point that my friend for the plaintiffs made about -- a couple of times he indicated that it was Google's burden to explain exactly what questions might be asked at a deposition, provide them essentially a preview of our deposition outline.

You know, this -- this is sort of the wrong way to frame it, as Your Honor sort of recognized already with your questions. The United States is subject to discovery like any other party. They're subject to 30(b)(6) discovery just like any other party in the litigation. The *Shelton* test is an extremely narrow exception when one party notices a deposition of a lawyer, which is not what happened here.

The questions and the topics that we intend to ask are about facts. We don't intend to ask about litigation strategy. Those are not covered by the topics. We don't intend to ask about opinion work product.

I can't guarantee that someone might not ask an unartful question during the deposition. If that happens, the proper way to address it would be for the plaintiffs' lawyers to object to it. We can go forward at that point.

But it is our intention only to try to get at the facts here that are just proper discovery for any other party, and the United States shouldn't be excused from providing that discovery because of the fact that the Antitrust Division is run by lawyers.

THE COURT: All right. Well, what's your position on whether 31, 37, and 38 are part of this

motion or not?

MR. EWALT: I would say that we agree that a decision on those should be deferred until we have the benefit of Judge Brinkema's ruling and that those issues would be much more easily decided at that point.

THE COURT: Obviously, if she decides one way, they don't have to have any further discussion. If she decides another way, she may deal with them directly in the motion, or I would have to deal with it.

All right. Thank you.

MR. TEITELBAUM: I think I would just emphasize, Your Honor, that the United States is not trying to say that it isn't subject to 30(b)(6) discovery. It's just that it's -- it is and should be entitled to the same protections that any other litigant in a civil lawsuit has, which is that its lawyers do not have to sit for depositions absent extraordinary circumstances. And a deposition cannot just be noticed directed at the United States' lawyers and then it's our burden to try to explain why that shouldn't happen in a particular case.

THE COURT: Well, again, this is -- I appreciate the briefing on this and the argument.

I'm coming at this as, you know -- and the

United States has talked about the law firm-client relationship. And, one, even if you have in-house counsel as a client that does certain work and the client gets deposed, factual information relating to the claims and defenses in the case need to be produced, what they're relying on in the case, what they're going to be asking for in the case, those kinds of things.

You know, as you read the notice of deposition itself, it was to the United States. I do feel that the United States has an obligation to respond to certain questions. The agencies play a substantial part in this case. I understand that, but that's not the whole picture.

Under the record before me today, I cannot find that these topics that are being sought -- again, I'm going to defer on 31, 37, and 38 to Judge Brinkema. The other topics that we're talking about, you know, I can't make a finding that these topics seek information that wouldn't be relevant to a claim or defense and not protected.

Google has made representations that they're not seeking opinion work product, only factual information relating to the claims being asserted, which treating just like any other party, they're

entitled to get.

So I'm going to deny the motion for a protective order. I think that the United States -- it can be a lawyer that they put up, or it can be somebody else. The Antitrust Division has a lot of nonlawyers, bright nonlawyers. Pick a representative, and he or she has to be prepared to the best they can be.

And, again, I think every side knows that topics on 30(b)(6) notices are often not worded precisely. You have to be reasonable. This is not an I-got-you game where you can get somebody on there and they can't answer some, you know, very esoteric issue that could be covered by a topic.

You've just got to work it out. There's a lot of topics. The parties have worked and narrowed it down. There are a lot of things to be done. Overall, I mean, the motion is the United States doesn't need to produce a witness. I assume the United States needs to produce a witness over and above the advertising agencies' eight witnesses.

Okay. Thank you.

All right. So I guess that leaves the last motion. You know, I was true to my word that privilege issues always give me a pause, and it takes me a while to understand them, to refresh my recollection on the

law relating to them, and how -- and this one is a little bit different than the typical privilege issue reviewed that I run across fairly routinely. And then getting a reply brief several hundred pages to look at even before sort of threw me off.

I've had a chance to review everything now and, thankfully, the transcript that came in too. But I do have some questions that I just want to pose to both sides first.

I'm going to ask the United States first to respond to a few questions. Okay. And, again, you did this a little bit last week. But I just want to make sure I understand the role of the Antitrust Division's counsel and how that is to the United States and to the agencies.

MS. CLEMONS: Yes, Your Honor. The Antitrust Division under 28 C.F.R. 0.40 has been delegated authority from the attorney general, who is lead counsel to the United States, to enforce the antitrust laws, including civil actions to recover forfeitures or damages for injuries sustained by the United States as a result of antitrust law violations.

So with respect to claims for damages for injury to the United States, the Antitrust Division is the attorney for the United States in determining

whether and when to file claims for such injuries. And the only way the United States can be injured in its business or property is by injury to the components of the United States, which include its federal agencies.

And so when the United States is -- when the United States' counsel, the Antitrust Division, is advising the United States with respect to whether and to what extent it has been injured and can seek damages for those injuries, it is necessary for that counsel to communicate with the parts of the United States that may or may not have been injured in order to scope out those claims. And that is the situation that is the case for all of the documents, all of the different categories of documents that Google is seeking in its motion.

THE COURT: Is it your position that you have an attorney-client relationship with individual agencies or with the United States?

MS. CLEMONS: In this case, both because we do have an attorney-client relationship with the United States, and we have --

THE COURT: That's statutory. I mean, that's in the regulations as set out.

MS. CLEMONS: Exactly.

And then we have a relationship with the

components of the United States, the agencies of the United States that are involved in these claims for the purpose of this lawsuit.

And that includes agencies that may have been involved and there was a strategic decision on behalf of the United States not to involve those particular agencies with respect to the damages claims. Right.

And I think it is important to make clear that we're not talking about the -- you know, the three-year investigation into Google's conduct. This is really a two-week period leading up to the filing of the complaint where the United States' counsel was talking to parts of the United States that may have been injured about the scope of those injuries and the claims that could be brought.

THE COURT: A four-week period, right?

MS. CLEMONS: Yeah, I think it was roughly four, December --

THE COURT: December 23 to January 24 was when the lawsuit got filed?

MS. CLEMONS: Right.

The vast majority of the communications were in the two-week period leading up to the filing of the complaint. In either event, there was a draft complaint already put together. The United States was

determining whether and to what extent to bring damages claims as a part of that much larger draft complaint, and these communications took place for the purpose of counsel providing legal advice to the United States and to the agencies that may or may not have been injured.

THE COURT: And, again, Google makes a lot of the idea that the agencies didn't know anything about the lawsuit or they were not asking for legal advice. Help me understand that, at least during the time period in December and January that these agencies weren't seeking legal advice. Somehow that plays an important role in determining whether the work product or attorney-client privilege protections apply.

MS. CLEMONS: The agencies do not need to come to the United States and say, "We think we might have a claim," precisely because the United States has counsel statutorily on retainer to look for and put together claims for damages to the United States and its injury or property.

So the Clayton Act, Section 4(a), specifically states that whenever the United States is injured in its business or property by reason of anything forbidden in the antitrust laws, it may sue there -- for and shall recover the damages by him sustained and the cost of suit.

If the United States' counsel charged with bringing those claims were not able to talk to the components of the United States that may have those claims, that may be the subject of the injury that underlie those claims, then that would essentially be a statement that the United States is not entitled to counsel with respect to these claims because those injuries can only happen to agencies of the United States.

THE COURT: So I take it your argument is it's the United States that is seeking the legal advice, not the agency that's seeking the legal advice.

MS. CLEMONS: In that four-week period leading up to the filing of the complaint, we, the Antitrust Division, are the ones who decide whether or not to bring those claims.

And so, yes, we were advising the United States. We were also advising the -- counsel to -- or counsel and the employees for those agencies with respect to those claims, not because they independently sought to bring the claims. They don't have the authority or the ability to decide to bring those claims. That is charged to the Antitrust Division.

And so once there was a potential claim and the United States and its component agencies that may

have been injured needed advice with respect to that potential claim, at the very least, then there was definitely an attorney-client relationship. And all of the communications that are the subject of this motion were within that very specific attorney-client relationship and purpose.

THE COURT: Well, in the main claim that I understand that you're making is work product for the ones that were in the privilege log related to the communication with the agencies, the 57 documents in that privilege log. Is that right?

MS. CLEMONS: Yeah, there are 57 documents in that privilege log. There are other documents as well. Everything in that privilege log is work product. Much of it is also attorney-client communications.

And then there are other documents that Google is seeking outside of those 57 -- I actually think all of those were attorney-client communications in the 57. Apologies. But Google is seeking --

THE COURT: I think the -- at least confirm my understanding of that. I thought the privilege log -- I guess it does include attorney-client work product and deliberative process nomenclatures. But I thought that that had gotten narrowed down to where you were really focused more on work product protection for

those documents as having been asked for by an attorney providing legal advice.

I was just trying to look out because the various components of DOJ, the Antitrust Division being the lawyer, the individuals perceived as being the part of a client, a client of the United States, asking for them to provide you information so that you can provide legal advice to the United States.

MS. CLEMONS: Yes, Your Honor. But also to those agencies, to the extent they are involved or might have been involved in this lawsuit -- because it is not the agency's decision when a matter has been sent to the Department of Justice's Antitrust Division by the United States, right. It is not those agencies' decision whether and which lawyers to hire. Their lawyers for the purposes of this litigation are the Antitrust Division, and that's a decision made by the United States.

This idea that the agencies are somehow completely separate, right -- they argue that we were a plaintiffs' firm in search of a plaintiff. It just doesn't square with the way that the United States is structured with the statutes and with the necessity of the agencies being involved any time there might be a claim for damages.

Any other decision would render the United States without counsel until after it's already filed a complaint and the strategic decision surrounding whether and to what extent to file those damages claims have already been made.

And to be clear, we have not taken -- narrowed any of the claims of attorney work product or of attorney-client privilege. There are separate sets of documents. One set of documents we're only claiming attorney work product for, and the other set of documents are -- we are stating the basis for privilege for attorney-client privilege, attorney work product, and deliberative process privilege.

THE COURT: Well, Google makes the argument that the things that you're claiming privilege on now are the same as many documents that you've produced in the investigative file. Why should these documents be treated when the millions of documents which you have produced in the investigative -- this is information being, you know, sought by the United States to provide legal advice to its client. So why isn't everything in the investigative file work product?

MS. CLEMONS: It has been the practice of the Antitrust Division to turn over all of those communications with third parties to defendants in

litigation as part of the investigatory file, communications with third parties and documents produced by third parties.

But it has never been the practice of the Antitrust Division to turn over its attorney work product created through the investigation. While there may be an argument that the entire investigatory file is work product, that is not -- that's not what's before the Court right now, which is that the communications with third parties, right --

Google has made this analogy between an email three years ago to a market participant saying "We'd like to speak to somebody about these issues," to an email to a federal agency saying, "We need to speak with somebody who has expertise in this area." Those emails may look alike, but the circumstances under which they were communicated are vastly different. And those circumstances are the key to the analysis under both attorney-client privilege and the work product doctrine.

THE COURT: Well, is there a time period where that isn't necessarily so? So let's say three years ago, trying to decide how to define the market, let's say, and you ask clearly third parties, people who were no relationship to -- nongovernmental entities

information about how to use Google market. And you asked the same kind of information to others in the market, the United States' agencies, about what are their views before there was any decision made to pursue this case or not.

Why would a communication to the agency be any different than you were just seeking information from people who are part of the market as to how they view the market?

MS. CLEMONS: I think in the event that that were to be the case, there would probably be a similar analysis looking at all of the different facts. I can't, standing here today, tell you whether that hypothetical would be attorney-client privilege or not. But that's -- what we do know is that is not the case here.

THE COURT: I'm just trying to understand. Was part of this -- and I know you have the obligations to produce the investigative file and nonprivileged information. I don't think anybody has told me -- and you may have and I overlooked it -- as to whether information that was produced in the investigative file included communications with agencies that predated December 22, 2022, that is, what do you know about so-and-so? What do you know about this, or can I talk

to somebody about that? Is it then hands off with any communication to any agency throughout the entire investigation, or are parts of the investigation produced having to do with communications with agencies?

MS. CLEMONS: Your Honor, to my understanding, no communications with agencies took place during the investigatory period, and I -- you know, there are no documents in the investigatory file and there are no logged documents in the privilege log for the investigatory file reflecting communications with federal agencies.

THE COURT: So the Antitrust Division investigated this for three years and didn't communicate with their constituent parts of the United States, the agencies, about these claims up until December of 2022?

MS. CLEMONS: Not to my knowledge, Your Honor, and that is -- it makes sense because the damages claims don't arise until --

THE COURT: Damages is only one part of this. Defining the market is a very big part of this case as well, right?

MS. CLEMONS: It is, Your Honor. It is a very fact-intensive inquiry, defining the market. And

it typically is the practice of the Antitrust Division to talk to participants in the market that have the most knowledge about how the market works, the business realities, and that is not individual federal agency advertisers.

But even if Your Honor -- you know, we were talking. If you look at the *Booz Allen Hamilton* case that Google wants to rely on, that judge made a very clear distinction and made it clear that once the litigation -- once the decision had been made to litigate, then the communications to provide legal advice to the NSA were communications made within the attorney-client relationship.

THE COURT: I mean, it does say, again, at the time in which the DOJ decided to file the present lawsuit. It's not when the lawsuit was filed. It was when it had been decided to file the lawsuit.

MS. CLEMONS: Right, exactly. The United States had decided to file a lawsuit. The only issue was whether and to what extent there may be damages to the United States included in that lawsuit, and those communications were to provide legal advice to both those agencies that may or may not have been injured and the United States writ large.

THE COURT: All right. I think that's the

questions I had for that.

MS. CLEMONS: Thank you, Your Honor.

THE COURT: Ms. Dunn, let me ask you a few. First of all, 26(b)(3)(A), looking at the language of that, "A party may not discover documents and tangible things that are prepared in anticipation of litigation." The language isn't during or while litigating. It's in anticipation of litigation. I'm trying to get a better understanding as to why it's Google's position that the lawsuit gets filed and it's work product. But the day before the lawsuit gets filed, it's not work product. The rule particularly says "in anticipation of litigation."

MS. DUNN: Yes, Your Honor. So the way that the case is put in anticipation of litigation is that the document has to be prepared in anticipation of litigation and that the preparer of the document has to be anticipating litigation.

So the inquiry that is most important for the Court under the precedents, including *National Union* and *RLI*, is whether the document itself is prepared in anticipation of litigation. So that's one thing that goes to this point.

The reason that this distinction -- and we posit that with regard to these documents, none of them

can fall into that category because the preparers, including at the time of the preparation of the document, were not anticipating litigation, and there's no record evidence to the contrary.

THE COURT: Why do they need to anticipate litigation? The United States is the one who's anticipating litigation, and they are arguably part of -- they're employees of the United States government.

MS. DUNN: Right. So the reason is, Your Honor, that the entire work product doctrine is -- which is supposed to be very narrow, is designed to make sure that an opposing party doesn't have access to the attorney's mental impressions.

So if an attorney from the United States knows that a litigation will be brought or thinks it might -- and I want to get back to this dividing line in a second. But if an attorney for the United States is anticipating litigation but does not convey that -- and there's no evidence here that anybody ever did convey that -- then the person who is preparing the work product or rather preparing -- I won't even call it work product because we don't think it is -- preparing the communication, the document, the item that the Court must rule upon doesn't have the benefit

of the attorney's mental impressions.

And so there's --

THE COURT: It depends on what they're asking for. Doesn't asking for certain information provide an avenue as to what the attorneys are -- let me just take this up now. Someone within a large organization, like Google, is involved in a lawsuit, and they ask someone down the totem pole to gather information and prepare that information and send it to me.

You're saying to me that when I ask that person to do that for me, I have to tell them that, "I want you to prepare A, B, and C because this is in anticipation of litigation," or is it just, "I want you to prepare this and provide it to me because my lawyer wants me to give him the information"?

MS. DUNN: I understand Your Honor's question. The first distinction is you have an express attorney-client relationship in that circumstance where you have an in-house lawyer communicating with an employee.

The second thing that you don't have is the DOJ's Antitrust Division requirement that it produce documents in the investigatory file, which the Department of Justice has taken the position, both in this litigation and last year in the *Booz Allen* case,

that the investigative file continues up until the date of filing. And in this case, Your Honor, they have produced documents all the way up until the date of filing, and so they don't embrace that dividing line themselves.

The other distinction here, Your Honor -- and I just -- I want to go through it because it's probably my failure, but I didn't do this systematically last time. The privilege log -- and I'm talking about the June privilege log which goes to category 1, the communications between the Department of Justice and the agencies. The subject lines in that privilege log are all inquiry from the Department of Justice, requests for information of the Department of Justice. And so if we accept the government's position, any time they send an inquiry for information during this investigative period, whatever they get back is work product. So that is not the case.

In the depositions, as you know, Your Honor, every single agency witness has testified it didn't anticipate --

THE COURT: Every single person who testified who is an agency employee -- and we need to be very specific about that. I've got to tell you that when you represent that these are 30(b)(6) depositions and

they are not -- a deposition of an employee is completely different than a deposition of an agency.

MS. DUNN: I agree, and that was my fault, Your Honor. I'll explain it. Thank you for the opportunity.

The same employees are being deposed as 30(b)(1)'s and 30(b)(6)'s. So that was my confusion. They were selected as 30(b)(6)'s because they are the managing agents in charge of the market. All of their titles are senior titles, senior director, chief of marketing, all the way down to agencies. They are not just random employees, and they are the 30(b)(6) and the 30(b)(1).

Just yesterday there was testimony from the VA 30(b)(6) that there was no anticipation of litigation until February after the litigation was filed.

Another employee has testified that there was no anticipated anticipation of litigation even until March, which obviously is after litigation was filed.

So I appreciate Your Honor raising this, and I felt very badly last time because that was my mistake. But these are the 30(b)(6) witnesses. They're testifying as both.

The Wolin declaration, that's the other piece

of evidence. It doesn't say they conveyed any litigation purpose to the agencies or that the agencies, to their knowledge, anticipated litigation.

Even the complaint -- by the time of filing, the complaint says only U.S. departments and agencies. The only agency it names at that point is the Army.

The press release DOJ issued does not specify any agencies, and DOJ didn't identify these FAAs to Google until sometime in March.

So the idea that somehow these documents prepared by the FAA -- these particular FAA employees are somehow in anticipation of a litigation that they had no idea about, Your Honor, is just not plausible.

And I will say that this also is a real wrinkle for the idea of the dividing line of which there is also no evidence that the department is now trying to advance at the Court. First of all, there is public reporting as of the summer that they were going to file a lawsuit. So the idea that somehow they decided on the day before they started reaching out to agencies that they were going to file a lawsuit is also not plausible.

In any event, they have specifically taken the position that this whole period is a period of time where they are required to hand over their

investigative file.

And I will also say, if you look at the DOJ manual, it cites a House report provision, which is called Our Right to Discover CID Information. It is a right. And the DOJ Antitrust Division manual expressly says that defendants are thus able to be able to fully protect their rights at trial by interrogating, cross-examining, and impeaching CID witnesses.

Because the other thing that's going on here, Your Honor, is these agency employees, who are both 30(b)(6) and 30(b)(1)'s, they are witnesses at trial. They are not -- this is what I was talking to Your Honor about last time. They are not deployed litigation agents in anticipation of litigation. They are witnesses.

The Wolin declaration acknowledges that they are witnesses, and we are entitled to the communications of these witnesses that would allow us to impeach them and cross-examine them, for example, on the idea of relevant market.

THE COURT: So your position is that that regulation or House whatever completely does away with attorney-client or work product privileges?

MS. DUNN: That's not our position, Your Honor.

THE COURT: It sure sounds like it from what you just said.

MS. DUNN: Your Honor --

THE COURT: They're required to produce the file but not privileged information within that file. And if they can establish a privilege, then it doesn't have to be produced.

MS. DUNN: I agree with that, Your Honor.

The manual goes to this point of the dividing line. Two things we're talking about. One is attorney-client privilege, and the other is work product. So with respect to attorney-client privilege, we referred Your Honor in the last hearing to the *Cayuga Nation* case.

THE COURT: Yes, let's talk about that case.

MS. DUNN: Great.

THE COURT: This is where the U.S. Attorney goes in and has a meeting in a FOIA case, right?

MS. DUNN: Yes, Your Honor.

THE COURT: It's a FOIA case, and they are trying to keep it excluded from the FOIA case, and there's no information presented that the U.S. Attorney was providing the agency with advice or guidance.

In this case, we have a declaration from the United States saying that, "I was sending this

information out to these agency employees asking them for information for me to provide legal advice to the United States."

So that's a completely different scenario than, you know, the U.S. Attorney or former U.S. Attorney, I guess, at the time going and meeting with people and then trying to do a FOIA request and saying, you know, "This was to provide legal advice." There's no relationship whatsoever.

MS. DUNN: The reason we highlight this case, Your Honor, is to demonstrate that the attorney-client relationship between the Department of Justice and the agencies is not automatic. And the statute that Judge Berman Jackson relies on is 28 U.S.C. 517.

Similarly, in the *Stonehill* case, which is -- it says that the DOJ -- this is about the Tax Division -- may be the lawyer but still needs to satisfy the standard for attorney-client relationship.

THE COURT: So in that case, it says, "Although the Court could assume that the DOJ Tax attorneys on the email were members of the bar, there is nothing indicating that the IRS employee was a client or the attorneys were acting in their capacity as lawyers, or that the communication was confidential or even legal in nature."

In this case, we've got a privilege log that indicates that this information was requested for legal advice, issued by legal, and the United States is the person who was authorizing that action.

MS. DUNN: But just because a lawyer asks a question -- Your Honor, I think we're talking about two different things. One is attorney-client privilege, and the other is work product.

THE COURT: Right.

MS. DUNN: So attorney-client privilege, I point to these two cases, *Cayuga Nation* and *Stonehill*, only for the proposition that there's not an automatic attorney-client relationship between the United States and the agencies. That's important. That's just one point.

*Stonehill* makes clear -- and I'm just going to stay on attorney-client privilege at this time. *Stonehill* makes clear -- which I don't think there would be disagreement about -- that the standard for attorney-client privilege still needs to be satisfied.

Okay. So if we look at that standard, it has to be the communication or leads to a fact which the attorney was informed by his client without the presence of strangers for the purpose of securing primarily an opinion on law or legal services or

assistance in some legal proceeding and the privilege has been claimed and not waived by the client.

The agencies at this point are not informing the lawyer of any facts because they are seeking assistance in some legal proceeding or legal services. That's not how these -- why these facts are being conveyed, and there's testimony to this fact, that these agencies get requests from other agencies all the time. It's a request for information.

At this point -- and there's testimony to this fact too -- they don't think they're in a client relationship. And if you don't think -- the cases of attorney-client privilege well establish it's the client's privilege. The client has to believe it is in an attorney-client relationship, and they have to be making a confidential communication for precisely that purpose.

So just staying with attorney-client, what we are saying is that when DOJ in an investigative stage reaches out to -- sometimes lawyers and sometimes nonlawyers, by the way, at agencies and says "request for information," "inquiry for information," that does not establish an attorney-client relationship. And no such relationship is automatic. That's just attorney-client --

THE COURT: Let me just question this.

MS. DUNN: Yes.

THE COURT: So the United States, who has the authority to bring the claims on behalf of the agency, has people going out and looking to investigate whether the United States is going to bring a claim on behalf of an agency. You're saying that there is no attorney-client relationship involved in any way whatsoever because the agency hasn't signed a retainer agreement or agreed that they're seeking legal advice, that only the United States is seeking legal advice on a claim that it is going to bring on behalf of the agency?

MS. DUNN: Your Honor, I'm not saying a retainer agreement is required obviously. But what I am saying is that on this record where there is no evidence that satisfies the standard of attorney-client privilege, it is not sufficient just that the government -- that the DOJ is the government that represents the United States when a claim needs to be brought and the agencies are agencies of the United States government. There has to be -- there has to be something, evidence in the record -- and, again, their burden where they have to show that there is an attorney-client relationship.

Now, also I should mention: Some of these agencies are not -- are not even parties in the case. They are --

THE COURT: They're parts of the United States though.

MS. DUNN: I agree with that.

My only point, Your Honor, is it's not automatic. There has to be something that establishes an attorney-client relationship between the DOJ's Antitrust Division and the agencies, and here at this time there is nothing at all other than the --

THE COURT: You don't think that the United States investing its enormous resources behind the investigation in this case is different than a situation in which as to whether to pursue a case, an entity, is different than a U.S. Attorney showing up at a meeting on an Indian reservation where an email being sent to a tax person --

MS. DUNN: Your Honor, obviously, those are different circumstances, but the --

THE COURT: Well, I know, but you're talking about an attorney-client relationship.

MS. DUNN: Right.

THE COURT: The United States is the client, right? They're the ones who brought the lawsuit, and

their lawyers are the Antitrust Division of the United States. On the face of the complaint, that's what it says, right?

MS. DUNN: Right. But what we're actually talking about is the documents. So the Court's inquiry in all of these cases -- and by the way, I feel like it's a rare case. I may have come across one where the documents were not reviewed *in camera*, which we believe we've met the standard for that.

But this is about the documents, and the question is are these documents documents shared by a client to a lawyer where the client believes that they're seeking legal advice and assistance in a legal proceeding, and the testimony shows they're not. The privilege log shows they're not. There's nothing --

THE COURT: What in the privilege log shows that they're not? The privilege log says they are. That's what the privilege log says, attorney-client privilege, work product.

MS. DUNN: I agree they're asserting those things. But all it really says is request for information, and there's -- we haven't gotten to category 2 yet. That's obviously the communications between the FAA employees, often nonlawyers, and the ad agencies. That's a whole separate thing that we can

get to.

But in the privilege log that I'm talking about, which is the June privilege log, they just say request for information. They don't say anything that would indicate that there's an attorney-client relationship where the agency that's the client is asking for information or asking for legal advice.

THE COURT: I think I understand your distinction in that regard.

MS. DUNN: Okay.

THE COURT: I mean, if it said request for information relating to a lawsuit or a potential lawsuit, then it would be different. Is that what you're saying?

MS. DUNN: Yeah, perhaps. Because then the preparer of the document, which is what *National Union* and *RLI* and all the cases are concerned about would potentially -- under the Court's review, potentially include an indication of the attorney's mental impressions.

But here there is no -- there is no suggestion that these documents are being prepared -- that they would reveal the attorney's mental impressions.

I mean, the way that the case law puts this

is the burden on the government is exacting and heavy. Those are the words that the Fourth Circuit has used, and the point is that it's supposed to protect the way that the attorney is thinking about the case. So if the preparer of the document does not know that there's going to be a claim, then that does not -- then it is not work product.

The separate -- the second category, I think, maybe even easier to talk about though, is, first of all, the nonFAAs. They never -- I guess the DOJ would probably say they're automatically clients, but they're not parties to this case. The DOJ does not say they're bringing the suit on behalf of them for damages. Many of the communications on that June 26 log are for nonFAAs. They're not even part of our --

THE COURT: They're agencies of the United States government that the United States government was communicating with to determine whether to include them as parties or involved in this lawsuit.

MS. DUNN: Well -- but from their perspective, they were -- and we think the documents will bear this out and, again, urging *in camera* review. We think from their perspective, as preparers of the responses to the DOJ, they are agencies where the DOJ is reaching out for information.

THE COURT: In relation to legal advice to the United States as to who to include and not to include in the United States' lawsuit against Google.

MS. DUNN: That would make -- every time that a DOJ lawyer reaches out to any employee of a federal agency, that would make it work product, and it is our position that that cannot possibly be.

Category 2, communications between the FAAs and the ad agencies, third parties. The government here is simultaneously saying that these ad agencies are independent, not under their control, industry actors. And yet in asserting work product, they are also saying they were the litigation agents of the attorney who originally asked the question.

THE COURT: Or a representative providing information in response to a client request for information that was directed from a lawyer that the specifics of that information could disclose what the lawyer was thinking about in the case. That's their real involvement, right?

MS. DUNN: How? How could it possibly --

THE COURT: When a lawyer asks a client, "I need to know A, B and C -- and A, B, and C is what the lawyer is looking into and investigating in the case -- and the client says, "I don't have that information.

I've got to get that from my accountant, advertising firm, banker, some third party." And so the client reaches out to their representative, this third party, and says either directly or indirectly, "My lawyer wants A, B, and C. Can you send it to him?" And the representative then prepares A, B, and C, sends it to the client who then sends it to the lawyer.

MS. DUNN: So, Your Honor --

THE COURT: Not done in the normal course of business, one off. It's not routine monthly reports. It's not, you know, things that would be done in the normal course of events. It is a lawyer asking the client for information, the client reaching out to its representative to ask for that information so that the client can then provide it back to the lawyer.

MS. DUNN: Your Honor, let me just take this step by step. First of all, there's no -- there's nothing in the record that suggests that the request to the ad agency, who is previously retained for a nonlitigation purpose and is -- actually answers questions from these marketing directors all the time, that they --

THE COURT: Well, where is that in the record?

MS. DUNN: It's in the depositions.

THE COURT: You talk about what is in the record.

MS. DUNN: Well, I was trying not to bring up our inability to depose all the ad agencies, but there are 20 of them. And the -- but the marketing directors, who are representatives of the agencies, have an ongoing relationship with the ad agencies.

THE COURT: Right.

MS. DUNN: And we cite in the papers the *In re Grand Jury* proceedings case where the employee was a nonlawyer hired previously for an entirely different purpose.

Now, I don't want to have -- to just rely on the formalism of that case. Although, I think that case is right, and I think the application of the rule is right. But the reason I think in these cases that it is correct is because the point is is the information that they're preparing, is that something that is in anticipation of litigation.

And this ad agency, who is just responding to requests, doesn't know about the litigation because the FAA doesn't know about the litigation, may not even know it was a lawyer who made the request. They are just getting a request for information from the person they worked with at the agency.

And I think we're getting to a universe of sort of *ad absurdum* where just a lawyer request for information by the DOJ has this *seriatim* effect where anything it triggers is all of a sudden work product.

And I will also say, Your Honor, that, you know, some of these documents -- in particular this category of documents between the FAA and the ad agency, these have been clawed back during depositions. Thirteen of them were clawed back yesterday. These are documents with no lawyers on them, nothing --

THE COURT: That doesn't make a difference.

MS. DUNN: Well --

THE COURT: There's no requirement that a lawyer be on a document for it to either be protected by attorney work product or attorney-client privilege if it's done at the direction of a lawyer.

MS. DUNN: Right. But there's nothing to indicate that the information that's being prepared is at the direction of a lawyer.

We would submit to Your Honor even if you want to look at a narrow slice --

THE COURT: This is at least the third, if not more times, you've raised this *in camera* review.

My question was -- and really, the only question I've really been able to ask, at least

initially, was anticipation of litigation and why something other than the date the lawsuit was filed wouldn't fall within the zone of anticipation.

There has to be a reason for me to want to look at these documents. When a privilege log has a lot of communication from lawyer to client and then soon thereafter client to third party, you know, it doesn't take rocket science to figure out that that document or that communication from lawyer to client, client to third party, is related to the conversation that the lawyer had.

You know, the United States or any party has an obligation to look at documents and only withhold them for a basis. I assume that if you depose and, you know, subpoena an advertising firm, that you will get a lot of documents from them that are not privilege-related documents or protected documents. If they're providing their monthly reports, they have to provide their monthly reports if they do those kinds of things. But it's only a communication that is directed by or instituted by a lawyer providing legal advice relating to a matter that is anticipated at the time.

MS. DUNN: Your Honor, respectfully, the document has to be at the lawyer's direction, and by the time you're getting to the agency, I think there

can be no argument that the lawyer has directed that.

THE COURT: Okay. Lawyer says, "Provide me a list. I want a list of something."

The client says, "Okay, I'll provide you a list."

The client then asks a representative to provide me a list.

How do you say that can't be at the direction of the lawyer?

MS. DUNN: Well, first of all, there's no evidence that that's what happened here. The Wolin declaration doesn't even say at his direction.

So they have a problem at time one, which there's nothing in this record that says this was at their direction.

The second qualification is that the preparer had to anticipate litigation. There's nothing in the record to say that they anticipated litigation either at the FAA or at the ad agency, and all testimony is to the contrary.

THE COURT: Again, how specific is the preparer? So does everybody who is preparing information in response to attorney's requests have to know that it's for an attorney?

MS. DUNN: I think that's a great question.

Let me --

THE COURT: Answer yes or no, and then explain it.

MS. DUNN: Does everybody need to know --

THE COURT: Right. So you ask someone down the totem pole to get a piece of information that's going to go into a puzzle that I'm then going to put together and give to the lawyer. Does the person who is preparing that small piece of the puzzle, preparing information, have to know that this is at the direction of a lawyer in anticipation of litigation? The answer is no.

MS. DUNN: Have to know for --

THE COURT: What you're saying and just what you said, that the preparer, that is, the person who is putting the information together, has to know that it's in anticipation of litigation and at the direction of a lawyer.

MS. DUNN: It's that the document has to reflect that it's for use in litigation, and the reason is -- this is where this concept in substantially similar form comes in irrespective of litigation. So what the cases are trying to prevent against is unfair revelation to the other side of the attorney's mental impressions.

So if the person down the totem pole is just pulling together a list and that's now in the attorney's custody and control but it's just a list, then it may well be not work product. Alternatively, it could be fact work product, and then I would like to discuss also with Your Honor --

THE COURT: We talked a lot about that. That's not one of the questions I've got, whether there's substantial need. We had a long discussion about that last time. This isn't a reargument. This is responding to my questions. Okay. You had your shot last week on that.

You mentioned this. Why should I look at these documents?

MS. DUNN: That does go to substantial need, but I don't want to overstep my bounds, Your Honor.

THE COURT: Well, I kind of opened the door a little bit.

MS. DUNN: You did?

THE COURT: I did.

MS. DUNN: Okay. Here's why. I mentioned Interrogatory 14 yesterday -- or last week where we've asked a question that goes directly to information and data re the FAA purchasers. We have gotten a response. It doesn't identify the purchases, the fees paid,

whether the fees were paid directly, and if not directly, how they were paid. We've asked for that to be supplemented four times. No response.

THE COURT: File a motion to compel. That's your remedy for that. Filing a motion to compel, right?

MS. DUNN: Yes, Your Honor.

In the depositions, we asked for -- I am just going to give a couple of examples. When we asked the deponent from the Navy about his communications with the ad agencies, he said an ad agency had provided him with data. We asked the United States to produce the data. We followed up twice in writing. No response, and that's obviously responsive.

Yesterday, one day before the Army 30(b)(6) and (1) depositions, the DOJ clawed back 13 documents saying they reflected request for information, ad agency personnel and Army personnel responsible just for day-to-day ad work, nothing to indicate these documents would reflect any attorney mental impressions.

Similarly, there's been clawbacks of unobjected to testimony in the Navy and postal service depositions.

We've been unable to get a direct response to

our RFA 1, which is about direct purchasing. We asked the question whether the FAAs purchased open web display advertising directly from Google, and the department responded that that's impossible even though that's the exact language they use in their own complaint. Because Google doesn't sell open web display. Advertising publishers do. So we've been unable to get that.

And then when asked -- when we asked about this at the deposition, there have been objections on the basis of calls for a legal conclusion and other objections and instructions not to answer.

There are many examples in the depositions that I can get the Court about witnesses not remembering how the agency buys display ads, including in the postal service deposition, the Navy deposition, and the CMS deposition.

So one of the reasons we are urging you, Your Honor, to look at the documents is because we think you will see that they are not privileged and because they are going to fill the gaps where we have not been able to get the discovery to which we are entitled.

Two other things. The HTR manual does say that we are entitled to the material in the investigative file to cross-examine witnesses. These

are witnesses in the case. Again, this is the difference between hiring an investigator or an accountant or something. These are witnesses in the case.

And so if when the DOJ reached out to them requesting information they said, "We look at the market in a totally different way," that is, under the DOJ's manual, something that we are entitled to have. If the DOJ asked that very same question to another company or some other third party, we would be getting that information about the market reality. And counsel was correct. Prior to the time where these communications start in December '22, there's no other communications from these agencies about how they experienced the market.

So we have seen over the course of these depositions the testimony evolve. In the first couple of depositions about the market, we had witnesses answer the questions, and now the witnesses are giving answers that are more coached. So we believe that we are entitled to these documents that don't reflect the attorneys' views. They reflect the agencies and the ad agency's views of how they view the market, which, as Your Honor said, is going to be incredibly important. Now Your Honor last week raised the contracts, and I

took that to heart. We looked at the contracts. They don't help here. They are multiyear indefinite delivery, indefinite quantity contracts. They don't set price. They don't talk about any type of advertising, let alone open web display advertising, and they don't budget out ad types to buy, which would give you some indicator of the market.

So I appreciate Your Honor opening up the door to this, but there are numerous important issues in this case having to do with direct purchase under *Illinois Brick*, damages, relevant market, all of which is really, as we discussed last time, core to the case where we are not getting any information, including not getting information in depositions for a whole host of reasons and because of the clawbacks.

The other point that I will make is there are some agencies that are not parties. So they're -- you know, JSA and HSS and OMB. There are 18 ad agencies and other FAAs. And so we just can't depose all of them as discussed.

So that's -- this is why I think Your Honor should look at the documents. Because even if they are fact work product -- which obviously we don't think that they are -- we do think we've established a standard for substantial need. And maybe Your Honor

will look at the documents and disagree with us. But at least the clawback documents that we saw and thought were not privileged, we would commend to the Court to look at.

The government just simply has not met its very exacting burden to show Your Honor that these documents are work product and privileged. And I think if you look at the Wolin declaration, as I said last time -- but I think it bears repeating -- it is most notable for what it doesn't say. It doesn't say he directed these agencies to prepare litigation work product. It says he was gathering facts about the nature and extent of ad purchases. He does not say that the witnesses acted at his direction, and many instructions not to answer have been given during the depositions about that. He does not say that he gave the agencies any reason to anticipate litigation, and they all say they didn't. And he doesn't say that any agency ever came to him for assistance in a legal proceeding or seeking legal advice. In fact, all the testimony in the record is to the contrary.

THE COURT: Thank you.

MS. DUNN: Thank you.

THE COURT: There's one remaining issue having to do with the deposition transcripts that were

provided to me for *in camera* review. That motion is still pending. You know, I looked at -- there were several items put out in the Karpenko deposition for me to look at and two parts of the Owens deposition transcript.

What was indicated to me in the Owens deposition transcript -- that is page 47, line 13, to page 250, line 10, and 254, line 9, to page 255, line 5. I don't understand why that clawback is appropriate. Anybody prepared to address that?

MS. CLEMONS: I don't have the transcript with me today, Your Honor, but I'm happy to -- I was at -- I was virtually at the deposition, and I'm happy to provide additional answers if you have questions.

THE COURT: Obviously, I've got that motion here from last week, and it's got the exhibits that were filed under seal. It's got those specific requests for me to look at those areas, which I've tried to do. But one of them -- and I'm pretty sure I'm not exposing any real -- it's talking about -- and this was in the Owens deposition -- about the Google marketing live event and attending the Google marketing live event and speaking to people at the event.

MS. CLEMONS: Yeah. I apologize, Your Honor. I don't believe that that is part of what we intended

to claw back at least, and if that's an error, I will definitely look back and check.

The section that we -- the clawback had to do with Mr. Owens was being asked about interrogatories without the benefit of a document in front of him, and he did not understand the interrogatory is not just a word for questions but that it actually refers to a specific document in a legal proceeding. And so he was answering with respect to communications that had been directed by counsel, but counsel did not realize that he wasn't speaking about the interrogatory response preparation at that time.

THE COURT: Well, just dealing with that issue, I mean, I guess I need to -- in fact, there's going to be an issue as to my upcoming ruling as to these snippets of the depositions. Again, I looked at the ones that are on page 2 of Google's memorandum in support of its motion for *in camera* review. It specifically asks for *in camera* review of those things. I have looked at the ones of Karpenko. The reasons I'll state a little bit, and I think they're appropriate.

The Owens ones, I may have not been able to translate the page numbers right. You-all need to look at that and see if you can't get that resolved.

MS. CLEMONS: We will definitely do that, Your Honor. It may be a reconciliation issue between a rough transcript and a final transcript based on when the motion was filed.

THE COURT: All right. So on the request to produce the privileged information, again, we've had about two rounds of argument and substantial briefing on the issue. You know, my questions today, I think you can see why I was doing -- 26(b)(3)(A) talks about "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative, including, but not limited to, but including the other party's attorney, consultant, surety, indemnitor, insurer, or agent."

You know, again, it's anticipation of litigation. It's not during. I understand the Antitrust Division at the Department of Justice has certain obligations to turn over an investigative file. I think that is limited to information that's in the file that is not otherwise protected client privileged or attorney work product.

I think under the facts and circumstances that have been presented to me in this motion, that the plaintiff, the United States, is entitled to claim work

product protection for documents that were created prior to the filing of the lawsuit. It just doesn't seem to be that hard to understand that "in anticipation of litigation" doesn't mean after the litigation is filed. I think including up to the time period of December 23, 2022, is appropriate.

I have a declaration saying that at that point in time, the lawsuit was imminent, not just anticipated but imminent. It's also supported by some other information that, you know, litigation hold letters were being sent out in early January before the lawsuit got filed and those kinds of things.

So, you know, taking that into consideration, that there is no hard and fast deadline from -- it's only from the lawsuit. Anything before the lawsuit is fair game. Anything afterwards is to be protected. I think it's not a valid argument.

The privilege logs that have been provided to me and reviewed state -- again, lawyers have obligations to provide accurate information -- you know, that the communications were done in anticipation of litigation and for the purpose of providing legal advice.

Again, this is unusual in that you have the United States, who is seeking the legal advice. It's

the ultimate decider as to whether to bring this case or not. And so they're asking for information in anticipation of this litigation as to whether to pursue claims against Google in this case.

I do find that those communications have been supported sufficiently in the privilege log and in the declarations. The privilege log outlines that, the information. The Wolin declaration I think supports that, and the United States has the obligation to assert it in certain circumstances. And I think under the facts and circumstances they've done so.

I also find -- and, again, I appreciate the argument about communications to the client and the client going out to someone else to get specific information that has been requested by the lawyer. You know, there are a lot of cases out there that have to do with a lawyer hires an investigative firm or the client hires him or this or that.

But this is a situation -- and I think what you can tell from the privilege log and the timing of the information is that this is an avenue in which a lawyer on behalf of the United States and its relevant agencies is asking people in agencies to prepare information to provide to the lawyer to provide legal advice to the United States whether to bring a claim on

behalf of the United States and its agencies.

When that client agency personnel reaches out and asks for specific advice as directed or as requested by an attorney to an advertising agency, I think that discloses the attorney request. And the information itself is producible, that is, if you ask in another form: I want the same kind of information as asked by the lawyer. You're entitled to get it, but you're just not entitled to get it as a result of a lawyer asking.

So, again, circle around this back to substantial need. Obviously, work product is not absolute. If you show a substantial need, you can at least get the facts.

While you may still be trying to get it, you're entitled to that information. If you're not getting it, you file a motion to compel. You know, give me the document that you sent in response to a lawyer's request. But if you want information about how advertising is purchased, obtained, however it's done, about the facts and circumstances of how it's directed and those types of things, that's information that you're entitled to. It's just not at the direction of a lawyer providing advice from the client to the lawyer about specifics relating to that lawyer's

investigation.

So I really can't find that, based on the record before me and the understanding that I have provided to the United States, that that information is obtainable through discovery whether -- it's the facts in that information but not in relationship of having been directly asked for by a lawyer.

So at this point in time -- and the same, not just the damages, but it also goes to the extent to what the agency's view is on -- their view of open web display advertising and what -- that that standalone kind of question and asking them, you know, well, what does it mean to you or those kinds of things is appropriate. But not what did you tell your lawyer when you first met with your lawyer what it meant to you. It really isn't.

So I'm going to deny the motion to produce the privileged information. I think in this case the law is adequate. I think they have asserted a privilege. They have supported the privilege.

You know, just because somebody wants me to look at documents and thinks I should look at documents and they think it's going to be helpful if I look at documents, there has to be a reason. That's the way the rules have been set up. You assert a privilege.

You support a privilege. The lawyers have obligations to do it in a responsible manner. So I'm not going to look at all the documents *in camera*.

I will look, again, to the extent Karpenko testimony was clawed back or whatever you want to call it. In those instances, I think, given the documents, that those are appropriate.

The Owens one I'm unclear about. So that can't get resolved.

Okay. Thank you.

MS. DUNN: Your Honor, I apologize.

I appreciate Your Honor's ruling and obviously the time we had to argue. Would it be possible, if you're willing to look at the documents that were clawed back in those depositions, whether you would look at the documents clawed back in other depositions, for example, the one yesterday where there are 13 of them?

THE COURT: Well, I haven't seen to see whether the log is appropriate and the reasons why for clawing them back. I don't know. You're asking me to look at something that I have no factual basis to think that there's a reason to go behind what the asserter of the privilege has said other than, you know, like -- it's got to be more than that.

MS. DUNN: All right. We will hope to --

THE COURT: If you want to file a motion on that, you can file a motion on that, and I'll look at it and see.

But, again, you know, it just doesn't work for you to every time you think someone has been asserting a privilege that they shouldn't assert that you ask a judicial officer to look at it. There have to be reasons for a judicial officer to go behind them and do that other than, "We think it's wrong."

MS. DUNN: Understood, Your Honor.

THE COURT: They're entitled to assert privileges in certain time frames and in certain circumstances. You know, if for some reason you think the ones they're asserting now go beyond that, you're free to raise that issue. Hopefully, I've provided some guidance.

I do want to say that in these depositions, there have been questions asked that, I think, are too restrictive in dealing with whether there was a communication with a lawyer. I think, you know, in the light of day instead of in the heat of the deposition, we all understand that. Did you have a conversation? Yes.

It's probably an appropriate question. What

was the conversation about, depending on was it legal advice or something? Maybe.

Was it about X, Y, Z?

There are zones in which -- and, again, you know, I hope that people who are defending these depositions and taking them understand that just because it may have to do with a communication that may or may not involve the lawyer, you shut it all down. There has to be some ability for Google to probe it to some extent.

I don't say there was a lot, but there were a few instances. And obviously, Google has a right to get some basic information about communications, not the substance of it, but whether there was, in fact, a communication, who was involved in it, and those kinds of things may or may not be. So try and be a little bit more understanding as to only doing it for time periods. Okay.

MS. DUNN: Thank you, Your Honor.

THE COURT: Okay. Thank you.

We'll be adjourned.

MR. EWALT: Your Honor, if I may. With the Court's indulgence. I really appreciate the time that you've given both sides to present their position. My partner, Julie Elmer, has one item she would like to

bring to the Court's attention.

MS. ELMER: With your indulgence, Your Honor --

THE COURT: What is it?

MS. ELMER: -- I'll be brief.

This is an issue that I've shared with plaintiffs' counsel, but I think it's important enough to raise it to the attention of the Court. We've recently become aware of an issue with Google's document production that, we believe, is going to impact our ability to complete the production of all of our documents by the close of fact discovery.

And so I wanted to share this with the Court. Obviously, we'll be meeting and conferring about this issue with plaintiffs' counsel over the next several days. But we do believe that Google will be producing a substantial number of additional documents in this case. Google, of course, agreed to apply search terms to agreed-upon custodians over an agreed-upon time period.

What Google does is when it collects information from custodians, it stores that information in ingestion sites. And because of how long Google has been under investigation for the last four years, there are multiple ingestion sites where the custodians'

documents are stored. And it has come to our attention that the search terms that Google agreed to use for this litigation were mistakenly not run over all of the ingestion sites where the custodians' documents are stored.

So we are working as fast as we can to get our arms around how big the problem is and to produce the documents to the plaintiffs as soon as possible. We are prioritizing the deponents' productions right now, and there are two depositions that could be impacted.

There is one that is scheduled for Tuesday. We've let plaintiffs know that we expect to make another production from that custodian's files. We expect to do so on Sunday. We expect that production to be about 10,000 documents.

There is another deposition that is scheduled for Friday, and we expect to make a production of documents for that custodian.

The other two depositions that are forthcoming next week we do not expect to be materially impacted by this issue.

But I thought it was important to bring it to Your Honor's attention because of the potential impact on discovery deadlines.

THE COURT: Well, it's very unfortunate.

MS. ELMER: I agree. We'll do our best to work with --

THE COURT: Again, I don't understand how mistakenly so-and-so wasn't done. You know, we'll try and figure that out at some point and what the consequences of that will be.

Obviously, if the United States wants to proceed with the deposition, it would have to reopen the deposition at a later time due to Google's inability to do what the Court ordered it to do.

I'll consider requiring -- or if they want to delay it and take the deposition after the discovery, it has to be after discovery for me to consider that.

Obviously, that's an unfortunate situation Google has gotten itself into. We'll deal with it as appropriate.

You can agree on what you want me to do. I'll deal with that issue later this month.

MS. ELMER: I understand, Your Honor. Thank you for your indulgence in letting me share this issue.

THE COURT: Okay. Thank you.

We'll be adjourned.

----------------------------------

Time: 12:58 p.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

/s/
Rhonda F. Montgomery, CCR, RPR