UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**IN RE GOOGLE DIGITAL ADVERTISING
ANTITRUST LITIGATION**

**No. 21-MD-3010 (PKC)**

---

*This Motion Relates To:*

---

**THE STATE OF TEXAS, *et al.*,**

**_Plaintiffs_,**

**- against -**

**No. 21-CV-6841 (PKC)**

**GOOGLE LLC,**

**_Defendant_.**

---

**DEFENDANT GOOGLE LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS COUNTS I THROUGH IV OF STATE PLAINTIFFS'
THIRD AMENDED COMPLAINT**

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Fax: (202) 777-4555

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Fax: (212) 728-2201

WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA  94105
Telephone: (415) 947-2000
Fax: (415) 947-2099

*Counsel for Defendant Google LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

TABLE OF ABBREVIATIONS ........................................................................................... x

INTRODUCTION ............................................................................................................... 1

SUMMARY OF ALLEGATIONS AND PROCEDURAL BACKGROUND ............................ 4

LEGAL STANDARD .......................................................................................................... 11

ARGUMENT ...................................................................................................................... 12

I.     STATE PLAINTIFFS' CLAIMS ARE LARGELY UNTIMELY. .................................... 12

       A.     The Doctrine of Laches Bars Claims Based on Conduct That Began Before
              December 2016. ................................................................................................ 12

       B.     Injunctive Relief Is Not Available for Conduct That Has Ceased. ....................... 15

       C.     Claims Based on Privacy Sandbox Are Not Ripe. .............................................. 16

II.    STATE PLAINTIFFS FAIL TO ALLEGE THAT GOOGLE ENGAGED IN
       ANTICOMPETITIVE CONDUCT. ........................................................................... 16

       A.     Google Has No Duty to Share Data. .................................................................. 17

       B.     Google's Product Design Changes Were Not Anticompetitive. ........................... 20

III.   STATE PLAINTIFFS FAIL TO PLEAD A TYING CLAIM. ........................................ 27

IV.    STATE PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE THAT THE NETWORK
       BIDDING AGREEMENT VIOLATES SECTION 1. ................................................... 30

       A.     State Plaintiffs Fail to Allege That Facebook Agreed Not to Support Header
              Bidding. .......................................................................................................... 31

       B.     The "Win Rate" Provisions Do Not Violate Section 1. ....................................... 35

              1.     The "Win Rate" Provisions Are Not Per Se Illegal. ................................. 35

              2.     The "Win Rate" Provisions Do Not Violate the Rule of Reason. ............. 38

                     a.     State Plaintiffs Fail to Allege That the "Win Rate" Provisions
                            Harm Competition in the In-App Networks Market as a Whole. . 38

                     b.     State Plaintiffs Fail to Allege That Google Has Market Power in
                            the In-App Networks Market. ..................................................... 40

CONCLUSION ................................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*2238 Victory Corp. v. Fjallraven USA Retail, LLC,*
  2021 WL 76334 (S.D.N.Y. Jan. 8, 2021) ............................................................. 36

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,*
  881 F.2d 1396 (7th Cir. 1989) ...................................................................... 33

*Abbott Labs. v. Adelphia Supply USA,*
  2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017) ......................................................... 34

*In re Adderall XR Antitrust Litig.,*
  754 F.3d 128 (2d Cir. 2014) ..................................................................... 17, 18

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
  836 F.3d 1171 (9th Cir. 2016) ...................................................................... 29

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,*
  592 F.3d 991 (9th Cir. 2010) .................................................................. 20, 23

*Anderson News, LLC v. Am. Media, Inc.,*
  680 F.3d 162 (2d Cir. 2012) ........................................................................ 36

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................ 11

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985) ................................................................................ 18

*Bayou Bottling, Inc. v. Dr Pepper Co.,*
  725 F.2d 300 (5th Cir. 1984) ....................................................................... 21

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................ 11, 31, 35

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
  603 F.2d 263 (2d Cir. 1979) ................................................... 14, 19, 20, 22, 24

*Bogan v. Hodgkins,*
  166 F.3d 509 (2d Cir. 1999) ........................................................................ 36

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
  441 U.S. 1 (1979) .................................................................................. 37

*Cenedella v. Metro. Museum of Art,*
  348 F. Supp. 3d 346 (S.D.N.Y. 2018) ............................................................ 34, 35

*Charych v. Siriusware, Inc.*,
   790 F. App'x 299 (2d Cir. 2019) ............................................................. 21, 23

*Christy Sports, LLC v. Deer Valley Resort Co.*,
   555 F.3d 1188 (10th Cir. 2009) .............................................................. 21, 25

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
   261 F. Supp. 2d 188 (E.D.N.Y. 2003) ............................................................. 14

*City of Groton v. Conn. Light & Power Co.*,
   662 F.2d 921 (2d Cir. 1981) ............................................................................. 26

*Conopco, Inc. v. Campbell Soup Co.*,
   95 F.3d 187 (2d Cir. 1996) ............................................................................. 12

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
   903 F. Supp. 2d 198 (S.D.N.Y. 2012) ............................................................. 15

*DiFolco v. MSNBC Cable LLC*,
   622 F.3d 104 (2d Cir. 2010) ............................................................................. 31

*Dreamstime.com, LLC v. Google, LLC*,
   2019 WL 341579 (N.D. Cal. Jan. 28, 2019) ................................................. 19

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
   472 F.3d 23 (2d Cir. 2006) ...................................................................... 27, 35

*Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*,
   486 F. App'x 186 (2d Cir. 2012) ..................................................................... 26

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*,
   129 F.3d 240 (2d Cir. 1997) ............................................................................. 36

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) ................................................... 17, 18, 19, 30

*Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*,
   312 F. Supp. 2d 379 (E.D.N.Y. 2004) ............................................................. 38

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
   703 F.2d 534 (9th Cir. 1983) ............................................................................. 20

*FTC v. Facebook, Inc.*,
   2021 WL 2643627 (D.D.C. June 28, 2021) ................................................. 19

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ............................................................................. 25

*Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*,
   786 F.2d 105 (2d Cir. 1986) ................................................................. 29

*In re Google Digital Advert. Antitrust Litig.*,
   2021 WL 2021990 (N.D. Cal. May 13, 2021) ...................................... 17

*IBM v. Platform Sols., Inc.*,
   658 F. Supp. 2d 603 (S.D.N.Y. 2009) ................................................. 18

*In re Inclusive Access Course Materials Antitrust Litig.*,
   2021 WL 2419528 (S.D.N.Y. June 14, 2021) ...................................... 34

*Int'l Audiotext Network, Inc. v. AT&T Co.*,
   62 F.3d 69 (2d Cir. 1995) .................................................................... 31

*In re Interest Rate Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017) ................................................. 33

*It's My Party, Inc. v. Live Nation, Inc.*,
   811 F.3d 676 (4th Cir. 2016) .............................................................. 28

*Kaufman v. Time Warner*,
   836 F.3d 137 (2d Cir. 2016) ............................................. 27, 28, 29, 40

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ........................................................................... 37

*Levy v. BASF Metals Ltd.*,
   2017 WL 2533501 (S.D.N.Y. June 9, 2017) ...................................... 13

*Liveuniverse, Inc. v. Myspace, Inc.*,
   2007 WL 6865852 (C.D. Cal. June 4, 2007) ................................. 21, 24

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
   2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ............................... 12, 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ........................................................................... 35

*Mayor & Council of Baltimore v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) .......................................................... 31, 33

*MedioStream, Inc. v. Microsoft Corp.*,
   869 F. Supp. 2d 1095 (N.D. Cal. 2012) .............................................. 33

*MiniFrame Ltd. v. Microsoft Corp.*,
   551 F. App'x 1 (2d Cir. 2013) ............................................................ 18

*Monahan's Marine, Inc. v. Bos. Whaler, Inc.*,
   866 F.2d 525 (1st Cir. 1989)............................................................... 35

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015)................................................................ 20

*New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*,
   323 F. Supp. 2d 559 (S.D.N.Y. 2004).................................................. 30

*New York v. Cedar Park Concrete Corp.*,
   1997 WL 306909 (S.D.N.Y. Mar. 21, 1997) ........................................ 15

*New York v. Facebook, Inc.*,
   2021 WL 2643724 (D.D.C. June 28, 2021)....................... 12, 13, 15, 26

*North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*,
   780 F. Supp. 322 (M.D.N.C. 1991) ...................................................... 14

*Northrop Corp. v. McDonnell Douglas Corp.*,
   705 F.2d 1030 (9th Cir. 1983) ............................................................. 38

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ................................................ 17, 23, 33

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
   797 F.2d 370 (7th Cir. 1986) ........................................................ 17, 25

*Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*,
   920 F. Supp. 455 (S.D.N.Y. 1996) ................................................ 28, 30

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009).............................................................................. 30

*PepsiCo, Inc. v. Coca-Cola Co.*,
   315 F.3d 101 (2d Cir. 2002)........................................................... 30, 40

*Planetarium Travel, Inc. v. Altour Int'l, Inc.*,
   97 F. Supp. 3d 424 (S.D.N.Y. 2015)..................................................... 39

*Proctor v. State Farm Mut. Auto. Ins. Co.*,
   675 F.2d 308 (D.C. Cir. 1982) ............................................................. 35

*Rebotix Repair LLC v. Intuitive Surgical, Inc.*,
   2021 WL 1227593 (M.D. Fla. Mar. 8, 2021) ....................................... 29

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)................................................................... 11

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
  661 F. Supp. 2d 218 (E.D.N.Y. 2009) ................................................................ 19

*Simon & Simon, PC v. Align Tech., Inc.*,
  2020 WL 1975139 (D. Del. Apr. 24, 2020) ....................................................... 23

*Smith v. McGinnis*,
  208 F.3d 13 (2d Cir. 2000) ................................................................................ 13

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) .......................................................................................... 16

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) .............................................................................................. 30

*Suburban Propane v. Proctor Gas, Inc.*,
  953 F.2d 780 (2d Cir. 1992) .............................................................................. 28

*Synergetics USA, Inc. v. Alcon Labs., Inc.*,
  2009 WL 435299 (S.D.N.Y. Feb. 23, 2009) ..................................................... 28

*Synopsys, Inc. v. ATopTech, Inc.*,
  2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) .................................................... 29

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) .......................................................................................... 32

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) .............................................................................................. 35

*Thomas v. City of New York*,
  143 F.3d 31 (2d Cir. 1998) ................................................................................ 16

*In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.*,
  2010 WL 882989 (S.D.N.Y. Mar. 5, 2010) ...................................................... 27

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998) .......................................................................... 38, 40

*Unijax, Inc. v. Champion Int'l, Inc.*,
  683 F.2d 678 (2d Cir. 1982) .............................................................................. 27

*United States v. Aluminum Co. of Am.*,
  148 F.2d 416 (2d Cir. 1945) ................................................................................ 1

*United States v. Am. Express Co.*,
  838 F.3d 179 (2d Cir. 2016) .............................................................................. 35

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) ........................................................................................ 17

*United States v. Microsoft Corp.*,
   147 F.3d 935 (D.C. Cir. 1998) ........................................................................ 20

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019) .............................................................................. 14

*Valassis Commc'ns, Inc. v. News Corp.*,
   2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) .................................................. 26

*Value Drug Co. v. Takeda Pharm., U.S.A., Inc.*,
   2021 WL 6200907 (E.D. Pa. Dec. 29, 2021) ........................................... 31, 34

*Varner v. Peterson Farms*,
   371 F.3d 1011 (8th Cir. 2004) ........................................................................ 14

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ................................................................... 16, 17, 18, 25

*Vitale v. Marlborough Gallery*,
   1994 WL 654494 (S.D.N.Y. July 5, 1994) .................................................... 14

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
   857 F.2d 55 (2d Cir. 1988) .............................................................................. 16

*Walgreen Co. v. AstraZeneca Pharms. L.P.*,
   534 F. Supp. 2d 146 (D.D.C. 2008) ............................................................... 20

*Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.*,
   516 F. Supp. 2d 270 (S.D.N.Y. 2007) ................................................. 32, 38, 39

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   395 U.S. 100 (1969) ........................................................................................ 15

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*,
   513 F. Supp. 1100 (E.D. Pa. 1981) ................................................................ 37

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337 (S.D.N.Y. 2016) ...................................................... 34, 37

**Statutes**

15 U.S.C. § 1 ............................................................................................... 11, 30

15 U.S.C. § 2 ...................................................................................................... 11

15 U.S.C. § 15b .................................................................................................. 12

15 U.S.C. § 26 ................................................................................................................... 12

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ................................................................ 1, 11

## TABLE OF ABBREVIATIONS

| Term | Definition |
|------|------------|
| AdX | Google's Ad Exchange |
| AMP | Accelerated Mobile Pages |
| DSP | Demand-Side Platform |
| DFP | DoubleClick for Publishers |
| DA | Dynamic Allocation |
| DRS | Dynamic Revenue Share |
| EB | Exchange Bidding |
| EDA | Enhanced Dynamic Allocation |
| Ex. A | Ewalt Declaration, Exhibit A, GOOG-TEX-00144513 |
| FAN | Facebook Audience Network |
| GAM | Google Ad Manager |
| Google | Google LLC |
| MDL | *In re Google Digital Advertising Antitrust Litigation*, No. 21-MD-3010 (PKC) |
| NBA | 2018 Network Bidding Agreement between Google and Facebook |
| OAG | Office of the Attorney General |
| RPO | Reserve Price Optimization |
| State Plaintiffs | States of Texas, Alaska, Arkansas, Florida, Idaho, Indiana, Louisiana, Mississippi, Missouri, Montana, Nevada, North Dakota, South Carolina, South Dakota, and Utah, and the Commonwealths of Kentucky and Puerto Rico |
| TAC | State Plaintiffs' Third Amended Complaint, MDL ECF No. 195 |
| *Texas* | *Texas v. Google LLC*, No. 21-CV-6841 (PKC) |
| UPR | Unified Pricing Rules |

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Google LLC ("Google") moves for an order dismissing the federal antitrust claims (Counts I through IV) of the Third Amended Complaint ("TAC") filed by the States of Texas, Alaska, Arkansas, Florida, Idaho, Indiana, Louisiana, Mississippi, Missouri, Montana, Nevada, North Dakota, South Carolina, South Dakota, and Utah, and the Commonwealths of Kentucky and Puerto Rico (together, "State Plaintiffs"). Consistent with the stay of the state law claims (Counts V and VI) ordered at the September 24, 2021 conference, *see* MDL ECF No. 142, at 10:13-22, Google does not currently move to dismiss those claims and reserves all rights with respect to them.

## INTRODUCTION

> "The successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945) (Hand, J.).

While the digital advertising marketplace does not stand still long enough for any single company to "win," Google, over the past 10-plus years, has clearly been a successful competitor. Google has achieved that success by developing effective digital display advertising tools ("ad tech") that have attracted publishers seeking to monetize their online advertising space and advertisers seeking the best return on their advertising dollars. U.S. antitrust laws encourage, reward, and protect that success—success earned through relentless innovation, early and extensive investment in research and development, vigorous competition, and hard work—even if the Texas Attorney General and his allies do not.

Key to Google's ad tech success has been how it considers the interests of publishers, advertisers, and internet users. In doing so, Google seeks to generate the highest-quality matches between publishers and advertisers and to provide the most relevant and safest digital advertising experience for users. Google has strong incentives to pursue this balanced—and successful— approach. Supporting an open, sustainable, ad-supported internet is central to Google's overall

1

mission to organize the world's information and make it universally accessible and useful, and is critical to its core business interests as an internet search engine.

State Plaintiffs respond to Google's success by seeking to compel Google to share with its competitors the fruits of its investments and innovation. They criticize Google for not designing its products to better suit its rivals' needs and for making improvements to those products that leave its competitors too far behind. They see the "solution" to Google's success as holding Google back, rather than letting market forces urge its competitors forward. But U.S. antitrust law does not permit State Plaintiffs' proposed intervention into the free market. Instead, the Supreme Court has recognized repeatedly that compelling rivals to deal with one another—much less to share their competitive advantages—is at odds with the purpose of the Sherman Act. The kinds of compulsory sharing and coerced cooperation sought by the State Plaintiffs undermine our market economy's incentives for investment and innovation, force courts to act as central economic planners, and risk collusion among companies that ought to be left to compete. Given the fundamentally misguided aim of State Plaintiffs' complaint, it is not surprising that they are unable to state a plausible claim under the Sherman Act.

In their search for a federal antitrust claim, State Plaintiffs reach back as far as 2009. The TAC admits that much of that conduct is not only out-of-date but, at the time it occurred, was well-publicized to and well-known by Google's publisher and advertiser customers and its competitors. Although these stale allegations consume much of the TAC, any claims based on them are barred under the doctrine of laches. Moreover, State Plaintiffs admit that some of the alleged conduct ceased years ago, making the injunction that State Plaintiffs seek unnecessary as a matter of fact and unavailable as a matter of law. Additionally, the TAC's allegations concerning conduct that has not yet occurred are not ripe for adjudication now.

State Plaintiffs' makeweight allegations concerning bygone conduct add no heft to their federal antitrust claims, all of which should be dismissed for independent deficiencies.

The monopolization and attempted monopolization claims (Counts I and II) fail because State Plaintiffs have not alleged facts plausibly showing that Google has engaged in anticompetitive conduct. Despite amassing a lengthy collection of grievances, each one comes down to a plea for Google to share its data or to design its products in ways that would help its rivals. The Sherman Act requires no such thing. None of the conduct alleged in the TAC falls into the narrow exception to the general rule that any firm may choose with whom it will deal, and courts are rightly skeptical of challenges to how a company designs its own products, especially when innovation creates more choices for consumers.

State Plaintiffs' claim that Google tied its ad server to its ad exchange (Count III) should be dismissed because the TAC fails to allege facts showing that Google coerced the publishers that use Google's ad exchange to purchase its ad server as well. At its core, the tying claim is just another plea for Google to lend its competitors a helping hand.

In Count IV, State Plaintiffs argue that it was unlawful for Google and Facebook to enter into a Network Bidding Agreement ("NBA") that enabled Facebook to bid against Google and other buyers in Google's auctions. While State Plaintiffs suggest that Facebook agreed not to support header bidding when it signed the NBA, they have not (and cannot) cite any provision in the NBA to that effect, and other provisions explicitly preserve Facebook's freedom to deal with Google's competitors. Moreover, the TAC itself describes why it was in Facebook's independent self-interest to bid using Google's tools and why it was in Google's interest to have Facebook join its auctions, regardless of whether Facebook also used header bidding. State Plaintiffs also claim that the "Win Rate" provisions in the NBA were an illegal market allocation agreement. In doing

so, they mischaracterize the provisions (which do not promise Facebook anything), gloss over how the NBA increased competition between Facebook and Google, concede that the "Win Rate" provisions cover less than 7.2 percent of the alleged market (too little to have the requisite effect on the market as a whole), and fail to allege that Facebook and Google have market power.

State Plaintiffs have tried four times to portray Google's success, innovation, and competitiveness as a federal antitrust violation.  In this latest effort, rather than "winnow" or "clarify" their claims, as they promised to do, State Plaintiffs double down on inapt labels, purple prose, and flawed analogies, increasing the length of their already sprawling complaint by 68 pages and 220 paragraphs.  But merely adding to State Plaintiffs' collection of grievances cannot disguise the lack of a plausible cause of action under the Sherman Act.  Google's ad tech products benefit publishers and advertisers, while helping keep the internet free and open for everyone.  State Plaintiffs' complaint—cheered on by a handful of Google's rivals who have failed to invest properly, compete successfully, or innovate consistently—might serve the narrow interests of those rivals, but it also threatens to stifle the dynamism that drives Google and other firms to deliver the products on which businesses and consumers depend every day.

Accordingly, and for all of the reasons set forth herein, Google respectfully requests that the Court dismiss Counts I through IV of the TAC in their entirety and with prejudice.

### SUMMARY OF ALLEGATIONS AND PROCEDURAL BACKGROUND[1]

 Businesses have long used a variety of types of advertising—including print, radio, and television—to inform and entice consumers.  TAC ¶ 38.  The internet revolutionized the advertising industry, ushering in innovative advertising formats, including "search advertising"

---

[1] For purposes of this motion to dismiss, Google assumes the truth of the well-pleaded allegations in the TAC.  Google expects to contest many of those allegations, including (among many others) the alleged market definitions, should the case proceed.

(digital ads presented in response to user queries) and "display advertising" (digital ads shown elsewhere).  *Id.* ¶¶ 38-39.  Publishers of websites use the revenue from selling their display advertising inventory to offer users free or subsidized content.  *Id.* ¶ 511.  In this way, display advertising helps make the "free and open internet" possible and prevents internet content from disappearing behind subscription paywalls that many users cannot afford.  *See id.* ¶¶ 9, 511.

This lawsuit focuses primarily on a narrow sliver of display advertising (which is itself only a part of the broader advertising landscape).  Digital display advertising tools, or "ad tech," can be used to buy and sell many types of display advertising, including "[i]mage-based ads presented to a user when a webpage is displayed on the open internet," "shareable ads on social media," and "video ads shown before or during video content."  TAC ¶ 38.  But State Plaintiffs concentrate on image-based display ads for what they call the "open internet" and exclude display ads sold by Google's largest competitors (including the social media site Facebook and the e-commerce site Amazon), the in-app ads that appear in smartphone applications, and other types of digital advertising.  *Id.*; *see also id.* ¶¶ 15, 39, 41, 173-77, 191.

State Plaintiffs allege that there are three links in the ad tech chain connecting advertisers to publishers.  At one end of the chain, they allege that advertisers use **ad buying tools** to purchase publisher "inventory"—the space on websites where ads are shown.  These ad buying tools let advertisers specify how much they are willing to pay for inventory and the audiences that they want their ads to reach.  TAC ¶ 72.  Some ad buying tools are demand-side platforms ("DSPs") that "offer robust and complex bidding and trading options" for advertisers.  *Id.* ¶ 73.  DSPs include Google's DV360, as well as competing offerings from The Trade Desk and Amazon.  *Id.* ¶¶ 71, 73, 76, 204.  Other ad buying tools, like Google Ads, provide an "easy to use" interface for advertisers that do not require all the features of a DSP.  *Id.* ¶¶ 168-69.  State Plaintiffs allege that

some advertisers may use only one buying tool, but they also concede that others "multi-home"—that is, some advertisers use multiple ad buying tools in parallel.  *See id.* ¶ 192.

At the other end of the chain, State Plaintiffs allege that publishers use **ad servers** to "manage and sell their web display inventory" by specifying where advertisers can purchase that inventory and the minimum prices that publishers will accept for it, among other functions.  TAC ¶ 93; *see also id.* ¶¶ 52, 268.  According to the TAC, publisher ad servers manage both the inventory that publishers sell to advertisers with which they have direct relationships and the inventory that publishers sell indirectly through "centralized electronic trading venues" that match them with advertisers.  *See id.* ¶¶ 42-43, 53.  Some publishers turn to Google or other ad tech providers for ad serving functionality, but other publishers have built their own ad servers.  *Id.* ¶¶ 97, 101.  Google's publisher ad server is known as DFP.  *Id.* ¶ 97.[2]  Competing ad servers include Xandr and Sizmek.  *Id.* ¶¶ 104, 107.

In the middle, State Plaintiffs allege that **ad exchanges** are the links that typically connect advertisers' buying tools and publishers' ad servers.  TAC ¶ 128.  Ad exchanges conduct real-time auctions in which advertisers (through ad buying tools) bid on publisher inventory.  *Id.* ¶ 58.  Google's ad exchange is known as AdX; rival ad exchanges include Rubicon, Xandr, and Index Exchange.  *Id.* ¶ 153.  Like ad exchanges, **ad networks** also provide an electronic forum where "publishers and advertisers trade display inventory . . . at lightning speed."  *Id.* ¶ 3.

With the proliferation of smartphones, specialized tools have emerged to facilitate app developers' sale of ad space within their apps ("in-app inventory").  TAC ¶ 15.  State Plaintiffs allege that, like web publishers using ad servers, app developers use **in-app mediation tools** to

---

[2] State Plaintiffs allege that Google offers publisher ad server functionality as part of a "product" now called "Google Ad Manager" ("GAM"), TAC ¶ 97, and GAM also includes ad exchange functionality (formerly known as "AdX"). Because the TAC uses the older names ("DFP" and "AdX"), this motion does the same.

manage and sell the ads displayed in their mobile apps.  *Id.* ¶¶ 216-17.  According to the TAC, Google offers two mediation tools for app developers—AdMob and GAM.  *Id.* ¶ 217.  Developers can also use mediation tools from competitors like MoPub, AppLovin, ironSource, Unity, and others, or they may elect not to use any mediation tool.  *Id.* ¶¶ 217, 228.  And like ad networks for web-based ads, **in-app networks** allegedly act as intermediaries that facilitate sales of in-app inventory.  *Id.* ¶¶ 232-33.  Google's in-app network is known as the AdMob network.  *Id.* ¶ 232. Facebook offers its own Facebook Audience Network ("FAN"), and Unity, ironSource, Vungle, and other firms operate competing in-app networks.  *Id.*

Google's products interoperate with one another and with products offered by competitors.  For example, Google's ad buying tools (DV360 and Google Ads) allow advertisers to submit bids into third-party exchanges as well as Google's exchange (AdX).  TAC ¶¶ 250, 395, 397.  Google's ad server (DFP) allows publishers to connect to third-party exchanges in addition to AdX.  *Id.* ¶ 366.  Likewise, publisher ad servers other than DFP can offer their inventory through AdX, *see id.* ¶¶ 246-47, 251, and AdX accepts bids from buyers other than DV360 and Google Ads, *see id.* ¶ 428.

The ad tech industry has evolved—and continues to evolve—and Google has evolved along with it.  According to the TAC, before 2009, publisher inventory that did not sell through directly negotiated deals was generally relegated to a "waterfall" process in which ad servers contacted (or "called") ad networks and exchanges one-by-one until the inventory was sold.  TAC ¶¶ 268, 270.  Because the waterfall made calls in a fixed sequence and "call[ed] each subsequent exchange only if all prior higher-ranked exchanges failed to clear the impression," *id.* ¶ 268, a buyer could win an impression even if another buyer (later in the sequence) would pay more.  As

a result, the waterfall failed to maximize publisher revenue and to allow advertisers who valued inventory most highly to win it.

Google developed programs to reduce these inefficiencies. State Plaintiffs allege that, in 2010, Google introduced Dynamic Allocation, a DFP innovation that allowed the winning bidder in an AdX auction to compete against winning bidders from other exchanges and ad networks. TAC ¶ 271. While State Plaintiffs allege that Dynamic Allocation gave Google's AdX a so-called "last look" or a "right of first refusal," they concede that it allowed AdX buyers to win only if they submitted higher bids than publishers would have received through the waterfall. *Id.* ¶¶ 271, 377. When the waterfall generated higher returns, the AdX buyer would lose. By 2014, Google allegedly expanded this program with Enhanced Dynamic Allocation, adding "high-value impressions" to the "pool of publishers' inventory" for which buyers could compete. *Id.* ¶¶ 282, 284.

For many years, AdX ran as a second-price auction. *See* TAC ¶ 300. In that type of auction, the winning bidder does not pay its own bid, but instead pays the higher of either the second-highest bid or the reserve price ("price floor"), and the auction will not clear unless there is at least one bid above the price floor. *See id.* ¶¶ 299, 302. Between 2014 and 2015, Google developed optimizations that could allow more AdX auctions to clear by adjusting Google's fees, *see id.* ¶ 318 (Dynamic Revenue Share), and that could increase publisher revenues by adjusting price floors, *id.* ¶¶ 331, 335, 344 (Reserve Price Optimization).

Over time, some publishers began to use "header bidding," a technology that allowed them to run real-time auctions among multiple exchanges. TAC ¶ 22. Although DFP was not designed to support header bidding, publishers could use "'line items' . . . an existing feature in DFP," *id.* ¶ 389, to replicate "a live, competitive bid coming in from a header bidding exchange,"

*id.* ¶ 390.  Google's competitive response to header bidding's "wild[] popular[ity]" was Exchange Bidding, *id.* ¶¶ 355, 366, a new feature that allowed publishers to "route their inventory to more than one exchange at a time to mimic the multi-exchange competition fostered by header bidding," *id.* ¶ 366.  Exchange Bidding was later renamed Open Bidding when Google improved it to allow ad networks as well as ad exchanges to compete in real time for publisher inventory.  *Id.* ¶ 425.

In 2018, Facebook and Google entered a Network Bidding Agreement (the "NBA") that enabled Facebook's network, FAN, to compete in Open Bidding against Google and other exchanges and networks.  TAC ¶¶ 425, 436, 446.  Although the NBA covered both web and in-app inventory, *id.* ¶ 413, Facebook decided to buy only in-app inventory in Open Bidding, *id.* ¶ 437.  FAN is only one of the many participants in Open Bidding, *id.* ¶ 425, and Open Bidding is only one of the many places where FAN buys in-app inventory, *id.* ¶ 446.

As with AdX and DFP, Google also has introduced a number of product improvements for ad buying tools.  For example, Google helped advertisers using Google Ads win more impressions by optimizing the bids submitted on their behalf into the AdX auction.  TAC ¶¶ 303, 306-07 (Project Bernanke).  Google protected advertisers using DV360 from "overpaying for an impression" by adjusting bids made on their behalf into exchanges that were not running true second-price auctions.  *Id.* ¶ 400 (Project Poirot).  And Google helped advertisers avoid bidding against themselves for the same impression with an optimization that could "identify . . . the same bid request across multiple exchanges."  *Id.* ¶ 403 (Project Elmo).

In 2019, Google's AdX migrated to a first-price auction, TAC ¶ 346, allegedly matching the type of auctions used by header bidding exchanges, *id.* ¶ 402.[3]  Google made other changes around the same time, including creating a "unified auction" in which directly-negotiated offers

---

[3] In a first-price auction, the winner "pays the amount of their own winning bid."  TAC ¶ 299.

from advertisers competed against offers that advertisers submitted through AdX and through the exchanges and networks that participated in Open Bidding, *id.* ¶ 379, thus eliminating what State Plaintiffs call the "last look" "advantage," *id.* ¶¶ 381-82.  Google also implemented new pricing rules so that all exchanges and buyers would be treated equally, *id.* ¶ 460, and retired features designed for second-price auctions, including Dynamic Revenue Share, *see id.* heading VII.C.2.

Some changes in the ad tech industry were designed to strengthen protections for user privacy.  TAC ¶¶ 480, 488.  According to State Plaintiffs, a "cookie-based user ID[]" was historically the primary way for ad servers to identify the users visiting a publisher's site.  *Id.* ¶ 172; *see also id.* ¶¶ 51, 476.  Google's DFP allegedly began encrypting the cookie-based user IDs that it shared with publishers as far back as 2009, *id.* ¶ 257, with Google "publicly tout[ing]" the change "in terms of protecting user privacy," *id.* ¶ 263.  Certain browsers, like Apple's Safari and browsers on Apple devices, block those cookies altogether.  *Id.* ¶ 433.  "As regulatory scrutiny around Google and other Big Tech firms increased globally," *id.* ¶ 473, Google allegedly planned to do the same in Google's Chrome browser "in a set of proposals that Google has dubbed 'Privacy Sandbox,'" *id.* ¶ 474; *see also id.* ¶ 480.  Google, however, has deferred implementation of the proposals as it gathers more input from stakeholders.  *See id.* ¶¶ 470, 474.

In 2019, around when Google was moving to a first-price auction, a group of states led by Texas Attorney General Ken Paxton began investigating Google's ad tech business.  *See* MDL ECF No. 55, at 2.  In response to civil investigative demands, Google gave the Texas Office of the Attorney General ("OAG") access to hundreds of thousands of internal Google documents, and the Texas OAG collected additional evidence from dozens of third parties.  *See id.*

On December 16, 2020, Texas and nine other states filed suit in the U.S. District Court for the Eastern District of Texas.  *Texas* ECF No. 1.  Three months later, in March 2021, they filed

an Amended Complaint that substantially revised their allegations and added four states and Puerto Rico as plaintiffs.  *Texas* ECF No. 77.  On August 10, 2021, the Judicial Panel on Multidistrict Litigation transferred this case and 18 private cases to this Court for coordinated or consolidated proceedings.  MDL ECF No. 1.  Soon thereafter, State Plaintiffs again sought leave to amend their pleadings, this time to add two more states as plaintiffs and to abandon their damages claims under federal antitrust law.  *Texas* ECF No. 136.  And in November 2021, State Plaintiffs lodged the fourth iteration of their complaint, a document that has now ballooned to 702 paragraphs, despite State Plaintiffs dropping a number of claims.

In the TAC, State Plaintiffs seek only injunctive relief for alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  TAC ¶ 683.  They claim that Google has monopolized or attempted to monopolize various markets (Counts I and II), tied its ad server to its ad exchange (Count III), and entered into an unlawful agreement with Facebook (Count IV).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To do so, the TAC must make factual allegations sufficient to "raise a reasonable expectation that discovery will reveal evidence," *Twombly*, 550 U.S. at 556, that would "allow[] the court to draw the reasonable inference that the defendant is liable," *Iqbal*, 556 U.S. at 678.  It is "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (citations omitted).  The Court should treat the allegations in the TAC as true, but it is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

11

**ARGUMENT**

## I.    STATE PLAINTIFFS' CLAIMS ARE LARGELY UNTIMELY.

The untimeliness of State Plaintiffs' claims reveals the depths that they have had to plumb to try to dredge up a claim against Google.  Having abandoned claims for damages under federal law, *see Texas* ECF No. 136, at 2, State Plaintiffs seek only injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26; *see also* TAC ¶¶ 31, 33, 683.  But the doctrine of laches precludes entry of an injunction based on much of the conduct described in Counts I, II, and III because that conduct began more than four years before the filing of State Plaintiffs' original complaint, in some cases more than a decade before.  In addition, State Plaintiffs concede that some of the alleged conduct has already ceased and fail to provide any basis for seeking to enjoin completed conduct.  Finally, State Plaintiffs fail to show that their Privacy Sandbox claims are ripe because their allegations refer only to proposals that are still subject to change.  These are not mere technicalities, but symptoms of even deeper flaws in State Plaintiffs' case.  *See infra* Parts II-IV.

### A.    The Doctrine of Laches Bars Claims Based on Conduct That Began Before December 2016.

"Laches may be decided on the pleadings if unreasonable delay and prejudice are clear on the face of the complaint."  *Madison Square Garden, L.P. v. Nat'l Hockey League*, 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008).  In assessing the unreasonableness of delay in antitrust cases, courts look to the Clayton Act's four-year statute of limitation on damages actions as a guideline for computing the laches period.  *See, e.g., id.*; *New York v. Facebook, Inc.*, 2021 WL 2643724, at *17, *20-22 (D.D.C. June 28, 2021); *see also* 15 U.S.C. § 15b.  And "once the analogous statute has run, a presumption of laches will apply and plaintiff must show why the laches defense ought not be applied in the case."  *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996).  Accordingly, laches presumptively bars claims based on conduct that

12

began before December 16, 2016 (i.e., four years before State Plaintiffs filed their original complaint). *See Texas* ECF No. 1.[4]

Much of the conduct identified in Counts I, II, and III allegedly began well before December 2016. According to the TAC, Google:

- Began hashing or encrypting user IDs in 2009, TAC ¶ 257;

- Has "tied" DFP to AdX since 2010, *id.* ¶ 246;

- Incorporated Dynamic Allocation into DFP in 2010, *id.* ¶ 271;

- Launched Dynamic Revenue Share in 2014, *id.* ¶ 318;

- Introduced Enhanced Dynamic Allocation in 2014, *id.* ¶ 282;

- Implemented Reserve Price Optimization in 2015, *id.* ¶ 331; and

- Modified DFP to support Exchange Bidding in April 2016, *id.* ¶ 366.

State Plaintiffs have failed to plead the "'rare and exceptional circumstances'" required to apply the doctrine of equitable tolling to any of this conduct. *See Levy v. BASF Metals Ltd.*, 2017 WL 2533501, at *8 (S.D.N.Y. June 9, 2017) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)), *aff'd*, 917 F.3d 106 (2d Cir. 2019). Indeed, their own allegations describe practices that were either publicly announced or of which advertisers and publishers necessarily must have been aware. *See* TAC ¶¶ 257-58, 263 (advertisers "unable to receive and utilize . . . raw user IDs" after 2009, with Google "publicly tout[ing]" the change); *id.* ¶ 246 (only publishers that licensed Google's ad server would "receive live, competitive bids from its exchange" from 2010); *id.* ¶ 291 (Google "coaxed" publishers into leaving Enhanced Dynamic Allocation turned on); *id.* ¶ 327 ("Google told publishers it was launching" Dynamic Revenue Share in the summer of 2016); *id.* ¶ 343 ("Google announced it was launching" Reserve Price Optimization in May 2016).

---

[4] Laches applies to State Plaintiffs' suit under Section 16 of the Clayton Act, just as it does to private plaintiff actions. *See Facebook*, 2021 WL 2643724, at *20-22; *see also* TAC ¶ 31.

For a "continuing violation" theory to apply, State Plaintiffs would need to plead some "new and independent act that is not merely a reaffirmation of a previous act" and which "must inflict new and accumulating injury." *Madison Square Garden*, 2008 WL 4547518, at *10; *see also In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 228 (E.D.N.Y. 2003) (distinguishing independent predicate acts committed during the limitations period from mere reaffirmations of an initial act). But for each of the practices listed above, the TAC fails to allege facts showing that Google did anything other than continue to engage in the same conduct that began more than four years before this case was filed. *See Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004) (dismissing tying claim where plaintiffs "failed to allege any new overt acts, other than enforcement of the initial contracts, that would toll the four-year statutes of limitations"); *Vitale v. Marlborough Gallery*, 1994 WL 654494, at *5 (S.D.N.Y. July 5, 1994) ("If an initial refusal to deal with a party is final, the statute of limitations begins to run and does not restart when the plaintiff makes subsequent unsuccessful efforts to deal with the defendant."). And while private plaintiffs seeking to recover overcharge damages may sometimes bring claims more than four years after the challenged conduct began (for overcharges they paid during the limitations period), that is only when their cause of action did not "accrue" until they paid the overcharge. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295-96 (2d Cir. 1979). By contrast, State Plaintiffs have dropped their federal damages claims, so their cause of action accrued when the alleged conduct started.[5]

---

[5] *See also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019) (concluding that "each supracompetitive price charged to US Airways by Sabre pursuant to the 2006 contract was not an overt act of its own, but a manifestation of the prior overt act of entering into the 2006 contract"); *North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*, 780 F. Supp. 322, 330-31 (M.D.N.C. 1991) (distinguishing *Berkey Photo* because plaintiffs were rivals alleging "[e]xclusion from [the] market" and were "injured at the time anticompetitive conduct occur[ed]" (internal quotation marks omitted)).

In light of State Plaintiffs' unreasonable delay and the prejudice to Google from allowing it to invest in continually improving its digital advertising tools over the past decade, only to have some of the core functionality of those tools challenged now, Counts I and II should be dismissed to the extent that they are based on the allegations identified above, and Count III should be dismissed in its entirety.

### B.   Injunctive Relief Is Not Available for Conduct That Has Ceased.

To obtain injunctive relief on a federal antitrust claim, State Plaintiffs must "demonstrate a significant threat of injury from an impending violation . . . or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969). The TAC concedes that Dynamic Allocation and Dynamic Revenue Share ceased in 2019. TAC heading VII.B.2 (alleging period of 2010 to 2019 for Dynamic Allocation), heading VII.C.2 (alleging period of 2014 to 2019 for Dynamic Revenue Share), ¶¶ 281, 330 (describing programs' alleged effects in the past tense). And there are no allegations that Google is likely to re-institute either program. In the absence of any such allegations, all claims based on those programs should be dismissed. *See In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 210 (S.D.N.Y. 2012) ("[C]laims for an injunction fail where they do not demonstrate a threat of future injury"); *see also Facebook*, 2021 WL 2643724, at *14 (dismissing claim for injunctive relief where defendant already "discontinued the relevant Platform policies"); *New York v. Cedar Park Concrete Corp.*, 1997 WL 306909, at *17 (S.D.N.Y. Mar. 21, 1997) (no injunctive relief where "'violation of the antitrust laws ha[s] terminated'" and "'the threat to [plaintiff] inherent in the conduct' has ceased" (alterations in original)), *aff'd in part on other grounds sub nom. New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82 (2d Cir. 2000).

### C. Claims Based on Privacy Sandbox Are Not Ripe.

State Plaintiffs' claims concerning Privacy Sandbox relate not to ongoing conduct, but instead to alleged "proposals" for the future.  *See* TAC ¶ 474.  An Article III court, however, "cannot entertain a claim which is based upon contingent future events that may not occur as anticipated, or indeed may not occur at all," and "when resolution of an issue turns on whether there are nebulous future events so contingent in nature that there is no certainty they will ever occur, the case is not ripe for adjudication." *Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir. 1998) (internal quotation marks and citations omitted).  The vagueness of State Plaintiffs' allegations—that Google will offer publishers and advertisers unspecified "new and alternative tracking mechanisms" that will somehow "exclude competition," TAC ¶ 474—reflects their uncertainty about if or how Privacy Sandbox will be implemented.  Until those details come into focus, it will be "difficult to predict" the effects of Privacy Sandbox, and any claims based on that program should be dismissed.  *See Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 64-65 (2d Cir. 1988) (dismissing claims based on certain proposed rules when it was "difficult to predict how [defendants] will choose to employ" them).

## II.   STATE PLAINTIFFS FAIL TO ALLEGE THAT GOOGLE ENGAGED IN ANTICOMPETITIVE CONDUCT.

State Plaintiffs' claims for monopolization and attempted monopolization (Counts I and II) should be dismissed in their entirety for failing to allege that Google engaged in any anticompetitive conduct.  "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (requiring showing of "predatory or anticompetitive conduct" for attempted monopolization claim).  Conduct is

anticompetitive if it occurs "without a legitimate business purpose" and "makes sense only because it eliminates competition."  *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (internal quotation marks omitted).  Although the TAC describes a variety of practices, all of State Plaintiffs' allegations reduce to claims that Google must share data with others or design its products in ways that help its rivals.  The Sherman Act requires neither.

### A.      Google Has No Duty to Share Data.

As "a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"  *Trinko*, 540 U.S. at 408 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (recognizing that "a refusal to deal with competitors does not typically violate § 2").  The Supreme Court has explained that "[c]ompelling . . . firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law" because it "may lessen the incentive for the monopolist, the rival, or both to invest in . . . economically beneficial facilities"; courts are "ill suited" to act as "central planners" enforcing required dealing; and compelling cooperation between competitors "may facilitate the supreme evil of antitrust: collusion."  *Trinko*, 540 U.S. at 407-08.  For all of these reasons, firms generally have no duty to extend a helping hand to their rivals.  *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.) ("Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival."); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375-76 (7th Cir. 1986) (Posner, J.) ("Today it is clear that a firm with lawful monopoly power has no general duty to help its competitors" and thus no duty "to extend a helping hand to new entrants . . . [or] help [rivals] . . . survive or expand."); *see also In re Google*

17

*Digital Advert. Antitrust Litig.*, 2021 WL 2021990, at *5 (N.D. Cal. May 13, 2021) (expressing "serious concerns that some . . . allegations rely on a 'duty to deal' theory of antitrust").

Courts have recognized a "limited exception," grounded in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), where "'[t]he unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end.'" *In re Elevator Antitrust Litig.*, 502 F.3d at 53 (quoting *Trinko*, 540 U.S. at 409). State Plaintiffs suggest that the *Aspen Skiing* exception applies to two ways in which Google allegedly refuses to share data. First, they claim that, since 2009, Google has encrypted certain user IDs that it previously provided to publishers and advertisers without encryption. TAC ¶¶ 257-58. Second, they assert that Google redacts certain data from publisher auction reports and splits the data in ways that make it less useful for publishers. *Id.* ¶¶ 387-88.

Neither set of allegations fits within the *Aspen Skiing* exception. The TAC alleges no facts showing that Google sacrificed profits by encrypting user IDs or redacting auction reports. To the contrary, the TAC alleges that Google hoped to bring more "spend . . . toward Google's buying tools and exchange." TAC ¶ 266; *see In re Adderall XR Antitrust Litig.*, 754 F.3d at 134-35 (affirming dismissal where plaintiff failed to allege facts suggesting defendant sacrificed short-term profits); *IBM v. Platform Sols., Inc.*, 658 F. Supp. 2d 603, 613-14 (S.D.N.Y. 2009) (concluding that refusal to deal did "not constitute anticompetitive conduct" when plaintiff failed to demonstrate that defendant "ha[d] foregone short term profits").

In addition, the allegations concerning encrypted user IDs and redacted reports involve Google's treatment of customers—publishers and advertisers—not rivals, *see* TAC ¶¶ 257-58, 387, and thus do not present the same situation as *Aspen Skiing*, a case "at or near the "outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409; *see also MiniFrame Ltd. v. Microsoft Corp.*,

551 F. App'x 1, 2 (2d Cir. 2013) (affirming dismissal where defendant allegedly refused to deal with customers, not competitors); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 228-29 (E.D.N.Y. 2009) (only prior dealing with rivals can create a duty to deal), *aff'd*, 391 F. App'x 59 (2d Cir. 2010).

State Plaintiffs claim that the alleged refusals to deal with *customers* affect Google's *competitors* because they leave Google with an "information advantage in a manner that adversely harms less informed parties"—a phenomenon they term "adverse selection." *See* TAC ¶ 260; *see also, e.g., id.* ¶¶ 276, 281, 316, 344, 464, 514. But the TAC contains no allegations that Google ever previously shared its supposed "information advantages" with rivals, and "because plaintiffs do not allege that defendants terminated any prior course of dealing—the sole exception to the broad right of a firm to refuse to deal with its competitors—the allegations are insufficient to state a unilateral-monopolization claim." *See In re Elevator Antitrust Litig.*, 502 F.3d at 52; *see also FTC v. Facebook, Inc.*, 2021 WL 2643627, at *17 (D.D.C. June 28, 2021) ("Facebook's general policy of withholding . . . access from competitors . . . was plainly lawful to the extent it covered rivals with which it had no previous, voluntary course of dealing.").[6] Moreover, to the extent that State Plaintiffs challenge Google's own use of "information . . . to accurately predict the amount to bid," TAC ¶ 381, Google's use of "data collection . . . [to] its competitive advantage does not equate to anticompetitive conduct." *Dreamstime.com, LLC v. Google, LLC*, 2019 WL 341579, at *8 (N.D. Cal. Jan. 28, 2019); *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 276 (2d Cir. 1979) (an integrated business must be allowed "to seek the competitive advantages of its broad-based activity").

---

[6] State Plaintiffs complain that Google shares "Minimum Bid to Win" data with rival exchanges using Exchange Bidding and assert that rival exchanges using header bidding do not receive the same data. *See* TAC ¶ 380. But State Plaintiffs cannot show that limiting the availability of this data is anticompetitive because they do not allege that Google previously provided it to header bidding exchanges.

### B.      Google's Product Design Changes Were Not Anticompetitive.

The bulk of the conduct challenged in the TAC concerns ways in which Google designed its own products, but "any firm, even a monopolist, may generally bring its products to market whenever and however it chooses." *Berkey Photo*, 603 F.2d at 286; *see also Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999 (9th Cir. 2010) ("[A] monopolist has 'the right to redesign its products to make them more attractive to buyers.'" (quoting *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983))).  That principle reflects "the undesirability of having courts oversee product design" and is grounded in judicial recognition that "any dampening of technological innovation would be at cross-purposes with antitrust law." *United States v. Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998).  Because "product innovation generally benefits consumers," courts are "very skeptical about claims that competition has been harmed by . . . product design changes," and "neither product withdrawal nor product improvement alone is anticompetitive." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652, 653-54 (2d Cir. 2015) (internal quotation marks and citation omitted); *see also Berkey Photo*, 603 F.2d at 286 ("The attempt to develop superior products is . . . an essential element of lawful competition.").

To avoid chilling procompetitive innovation, courts refuse to impose Section 2 liability unless a challenged product design—combined with some other associated conduct—had "the overall effect of . . . coerc[ing] consumers rather than persuad[ing] them on the merits." *Actavis*, 787 F.3d at 654.  Product design changes are not coercive as long as alternatives to the redesigned product remain available and consumers are free to use them. *See, e.g.*, *Berkey Photo*, 603 F.2d at 287 (no coercion because "Kodak did not remove any other films from the market when it introduced the new one"); *Allied Orthopedic*, 592 F.3d at 1002 (no coercion where alternatives existed and rivals were "effectively competing"); *Walgreen Co. v. AstraZeneca Pharms. L.P.*, 534

F. Supp. 2d 146, 151-52 (D.D.C. 2008) (no coercion where redesign "added choices" and rivals remained "free to compete"); *Liveuniverse, Inc. v. Myspace, Inc.*, 2007 WL 6865852, at *14 (C.D. Cal. June 4, 2007) (no coercion because design change "in no way prevents consumers from accessing the [rival] site"), *aff'd*, 304 F. App'x 554 (9th Cir. 2008).   Because the TAC fails to allege that any of the challenged design changes involved the required coercion, the monopolization and attempted monopolization claims should be dismissed in their entirety.

**Dynamic Allocation.**   State Plaintiffs assail Dynamic Allocation ("DA"), which they claim to be a 2010 change to DFP that "impart[ed] a substantial new . . . advantage to [Google's] own AdX exchange: a right of first refusal," or what some called a "Last Look."  TAC ¶¶ 271, 377. But even if the claim were timely, *see supra* Part I.A-B, the TAC makes clear that DA did not prevent publishers from transacting with other exchanges.  DA allowed AdX to win an impression only if it bid "more" than rival exchanges.  TAC ¶ 271.

**Enhanced Dynamic Allocation.**   According to State Plaintiffs, Enhanced Dynamic Allocation ("EDA") was "a new decisioning logic that Google incorporated into DFP" in 2014 to "open[] up a new additional pool of publishers' inventory to exactly one exchange: AdX."  TAC ¶ 284; *see also id.* ¶ 282.  Any such claim is barred by laches.  *See supra* Part I.A.  Even so, the allegations make clear that Google did not reduce publishers' options, but instead offered publishers a new opportunity to allow DFP and AdX to handle more of their inventory.  Google had no obligation to design EDA to help its competitors win more of that business.  *See Charych v. Siriusware, Inc.*, 790 F. App'x 299, 302 (2d Cir. 2019) (refusal to design compatible product was not anticompetitive); *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1196 (10th Cir. 2009) ("[I]it is not anticompetitive to refuse to grant access to competitors."); *Bayou*

*Bottling, Inc. v. Dr Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984) (concluding that antitrust laws did not require defendant to stock its vending machines with competitor's products).

**Auction Optimizations.**   Despite their conclusory assertion that Google "coerc[ed]" publishers and advertisers to use its products by manipulating auctions with Project Bernanke, Dynamic Revenue Share ("DRS"), and Reserve Price Optimization ("RPO"), TAC ¶ 297; *see also id.* ¶¶ 298-351, State Plaintiffs fail to allege facts that would establish such coercion.  For instance, the TAC does not claim that any of those programs prevented publishers or advertisers from using rival exchanges or ad buying tools.  Rather than coercion, the TAC describes how the programs benefited Google's customers, encouraging them to choose Google on the merits:

- Project Bernanke was intended to help Google Ads advertisers win more auctions, *id.* ¶ 308, and sometimes allowed them to pay less for impressions, *id.* ¶ 304;

- DRS helped publishers make more money in some AdX auctions by "lower[ing] Google's exchange fee," *id.* ¶ 320; and

- RPO helped publishers achieve "increased price[s]" for their inventory on AdX auctions, *id.* ¶ 336.

Even if Google delivered these benefits using "inside information," *see id.* ¶¶ 297, 307, 316, 337, 344, the antitrust laws do not require Google to share its competitive advantages with rivals, *see supra* Part II.A.  In addition, the claims based on DRS and RPO are barred by laches, and no injunction can address DRS because that program has already concluded.  *See supra* Part I.A-B.

**Exchange Bidding.**   The TAC alleges that Google introduced Exchange Bidding ("EB") in April 2016 in response to a "threat from header bidding," TAC ¶ 366, but introducing new products generally does not violate antitrust law.  *See Berkey Photo*, 603 F.2d at 286 (explaining that plaintiff "cannot complain of a product introduction Simpliciter" because "any firm . . . may generally bring its products to market whenever and however it chooses").  And the TAC does not allege facts showing that introducing EB coerced publishers to use Google's products or deprived

them of any options.  To the contrary, it concedes that EB gave publishers an additional way of transacting on rival exchanges by allowing them to "select which non-Google exchanges to route their impressions to."  *See* TAC ¶ 370; *see also id.* ¶ 366 (EB "permit[ted] non-Google exchanges to return live, competitive bids for publishers' impressions, alongside AdX").

Although State Plaintiffs contend that Google should have designed EB to make it even easier for rivals to compete, antitrust law does not require Google to assist its competitors at all, much less to help competitors identify Google's customers, *id.* ¶ 367, to create a tool that makes it easier for customers to bypass Google entirely, *id.* ¶ 370, to forego using information that Google has lawfully obtained, *id.* ¶ 371, or to build and maintain systems benefitting competitors free of charge, *id.* ¶ 369.  *See Charych*, 790 F. App'x at 302 ("[D]efendants were under no obligation to develop an interface that was compatible with plaintiffs' product."); *Novell*, 731 F.3d at 1072 (no duty to "lend smaller rivals a helping hand"); *Allied Orthopedic*, 592 F.3d at 1002 ("no duty to help . . . competitors survive or expand when introducing an improved product design").  And once again, laches bars any claims based on EB in any event.  *See supra* Part I.A.

**Capping Line Items.**  State Plaintiffs allege that Google "capp[ed] publishers['] use of 'line items'" in ways that made it more difficult for header bidding "to capture a live, competitive bid."  TAC ¶¶ 389-90.  These allegations fail to allege anticompetitive conduct for two reasons.  First, as just explained, Google had no obligation to design its products in ways that help header bidding work better.  Second, the TAC fails to allege that Google changed its "existing" approach to line items.  *Id.* ¶ 389.  To the contrary, it admits that Google elected to "keep" that approach "in place," *id.* ¶ 391, and fails to allege that Google made any change to coerce publishers to use its tools rather than header bidding.  *See Simon & Simon, PC v. Align Tech., Inc.*, 2020 WL 1975139, at *7 n.7 (D. Del. Apr. 24, 2020) ("The Complaint does not allege that the design of Align's iTero

23

Element scanner has ever changed.  The Court is therefore not confronted with an allegation of anticompetitive product redesign.").

**Projects Poirot and Elmo.**  State Plaintiffs allege that Projects Poirot and Elmo changed how DV360 bid into rival exchanges.  TAC ¶¶ 400, 403.  But they fail to allege that those changes coercively limited advertisers' choices, and any such allegation would be implausible.  The TAC describes the alleged market as so competitive that Google was at risk of "losing ad spend and market share to rival DSPs," *id.* ¶ 397, and recognizes that it is "unlikely that large advertisers would continue to use DV360" if Google restricted their options, *id.* ¶ 395.  These dynamics make clear that any attempts to coerce advertisers would have only "invite[d] a loss of sales and an increase of competition."  *Berkey Photo*, 603 F.2d at 287.

**Accelerated Mobile Pages.**  State Plaintiffs describe Accelerated Mobile Pages ("AMP") as a "framework for developing mobile webpages [that] . . . substantially hindered compatibility with header bidding," TAC ¶ 407, and they claim that Google redesigned its Search algorithm so that publishers' "pages would be displayed lower in Google Search results" unless they used AMP, *id.* ¶ 408.  But State Plaintiffs do not allege that AMP prevented publishers from using header bidding and, indeed, admit that AMP allowed publishers to receive bids from at least "a few exchanges at a time."  *Id.* ¶ 407.  Because AMP did not preclude publishers from using header bidding or non-Google exchanges, it was not coercive.[7]

**Unified Pricing Rules.**  According to the TAC, publishers used DFP to "disadvantage" Google by "[s]etting higher price floors for AdX and Google's buying tools" than for other exchanges and buying tools.  TAC ¶¶ 453, 456-57.  For example, if a publisher set price floors of

---

[7] State Plaintiffs cannot allege actionable coercion with claims that publishers experienced a "40+ percent decrease in monetization" from the change to Google's Search algorithm.  TAC ¶ 408.  Product design changes are not coercive if consumers retain access to competitive products.  *See, e.g.*, *Liveuniverse*, 2007 WL 6865852 at *14 (dismissing claim based on blocking access to competitor's website because consumers had other ways to access it).

$1.20 for AdX and $1.00 for other exchanges, a buyer could win the impression on another exchange for $1.01, but would have to pay $1.21 to win the same impression on AdX.  State Plaintiffs allege that, in response to Google's customers using its own DFP product against it, Google introduced Unified Pricing Rules ("UPR") requiring publishers to "set the same price floor for different exchanges and . . . different buyers."  *Id.* ¶ 460.  They fail to allege, however, that UPR prevented publishers from using other exchanges or excluded rival buying tools from participating in AdX auctions.  That failure alone suffices to dismiss any claim based on UPR, and there are other flaws as well.  First, State Plaintiffs fault Google for treating all exchanges and buying tools the "same," *see id.*, even though equal treatment cannot harm competition.  *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 1002-03 (9th Cir. 2020) (policy that applies regardless of whether customer deals with defendant or rivals was not anticompetitive because it "by definition does not distort the 'area of effective competition'").[8]  Second, although State Plaintiffs would require Google to leave unaltered the parts of DFP that allowed publishers to "disadvantage" Google, *see* TAC ¶ 457, firms have no obligation to aid their competitors in perpetuity.  *Christy Sports*, 555 F.3d at 1196 ("[W]e do not see why an initial decision to adopt one business model would lock the [defendant] into that approach and preclude adoption of [another lawful business model] at a later time."); *Olympia Equip. Leasing Co.*, 797 F.2d at 376 ("If a monopolist does extend a helping hand, though not required to do so, and later withdraws it as happened in this case, does he incur antitrust liability?  We think not.").

**Privacy Sandbox.**  State Plaintiffs assail Google's alleged proposals to modify its Chrome web browser to "block publishers and advertisers from using the type of cookies they rely on to

---

[8] State Plaintiffs try to cast UPR as imposing a "price disadvantage" on rivals, TAC ¶ 461, but the alleged disadvantage stems from Google's fee to participate in EB, and thus reduces to a complaint that Google charges too much for EB, *id.* ¶ 369.  Charging high prices, however, is not illegal.  *See Trinko*, 540 U.S. at 407 ("[C]harging of monopoly prices . . . is not only not unlawful[,] it is an important element of the free-market system.").

track users and target ads" and to offer "new and alternative tracking mechanisms" instead.  TAC ¶ 474.  Notwithstanding their conjecture that Privacy Sandbox will "coerce[] advertisers to shift spend to Google's ad buying tools," *id.* ¶ 475, State Plaintiffs allege no facts explaining how Privacy Sandbox would prevent advertisers from using competing products.  Nor can they.  According to the TAC, Privacy Sandbox would affect cookie-based targeting only in Chrome.  *Id.* ¶¶ 473-74.  And State Plaintiffs do not allege facts showing that Privacy Sandbox would diminish advertisers' ability to use cookies to target users of other browsers, that Chrome would support only Google's cookie alternative (and not cookie alternatives offered by others), or that Google would block rival ad buying tools from using its new cookie alternative.  *Cf. id.* ¶ 477 (alleging that "Chrome is set to disable the *primary* cookie-tracking technology that *almost* all non-Google publishers currently use") (emphases added).  Without such factual allegations, State Plaintiffs' speculation about the future impact of Privacy Sandbox cannot support a Section 2 claim (even if such a claim were ripe, *see supra* Part I.C).

**Monopoly Broth.**   Finally, State Plaintiffs cannot rely on purported "combined" or "synergistic" effects of the conduct discussed above.  TAC ¶¶ 294, 412.  Because none was individually anticompetitive, "they are not cumulatively anti-competitive either."   *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 486 F. App'x 186, 191 (2d Cir. 2012); *see City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981) ("[W]e reject the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of . . . the Sherman Act."); *Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *10 (S.D.N.Y. Feb. 21, 2019) (Castel, J.) (lawful conduct "cannot properly be considered an ingredient of a plaintiff's monopoly broth claim"); *New York v.*

*Facebook, Inc.*, 2021 WL 2643724, at *26-28 (D.D.C. June 28, 2021) (excluding lawful refusals to deal from "monopoly broth" analysis).

## III. STATE PLAINTIFFS FAIL TO PLEAD A TYING CLAIM.

In Count III, the TAC alleges that, since 2010, Google violated Sections 1 and 2 of the Sherman Act by tying its DFP ad server to its AdX exchange, "thereby coercing publishers to enter contracts to license its DFP ad server." TAC ¶¶ 246, 537, 542. In addition to being time barred, *see supra* Part I.A, this claim should be dismissed because State Plaintiffs fail to allege facts establishing a critical element of any tying claim—that "the seller uses actual coercion to force buyers to purchase the tied product." *See Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016) (describing elements of Section 1 tying claim); *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 27, 31-32 (2d Cir. 2006) (describing elements of Section 2 tying claim).

An actionable tie exists only if the seller "goes beyond persuasion and *conditions* [the buyer's] purchase of one product on the purchase of another product." *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685 (2d Cir. 1982) (emphasis added). In admitting that Google offered "exchange-only contracts" until 2018, TAC ¶ 251, State Plaintiffs concede that Google allowed publishers to contract for its ad exchange without taking its ad server and, thus, that there was no tie during that period. *See In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.*, 2010 WL 882989, at *5 (S.D.N.Y. Mar. 5, 2010) (Castel, J.) ("[W]here the buyer is free to take either product by itself there is no tying problem." (internal quotation marks omitted)).

State Plaintiffs likewise fail to allege a tie in the later period. While the TAC alleges that, in early 2018, Google began "requiring publishers to sign a combined contract that included both Google's DFP ad server and Google's AdX exchange," TAC ¶ 251, that allegation fails to show the requisite coercion. The TAC concedes that, even after allegedly insisting on the "combined contract," *id.*, Google still does not tie DFP to AdX because it "continues its policy" of allowing

27

publishers trading through AdX to "choose[] not to license Google's ad server," *id.* ¶ 250.  *See Synergetics USA, Inc. v. Alcon Labs., Inc.*, 2009 WL 435299, at *4 (S.D.N.Y. Feb. 23, 2009) ("Where . . . the defendant also sells the allegedly tied items separately, general claims that [defendant] has refused to sell two supposedly tied products individually do not allege actual coercion of the buyer."); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992) (finding "no showing of coercion" despite contract covering two products because there was no indication counterclaimant "was forced to take a product it did not want").

In addition, while State Plaintiffs vaguely allege that Google's "combined contract . . . *included*" both DFP and AdX, TAC ¶ 251 (emphasis added), they do not claim that the contract actually *required* publishers to purchase both products.  Without such an allegation, the TAC fails to show that the "combined contract" was anything other than a convenient way of formalizing the terms governing use of the two products so that publishers would have the *option* to purchase both of them when desired.  *See It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684-85 (4th Cir. 2016) ("[M]erely offering two products in a single package, allowing each to enhance the appeal of the other, is not itself coercive."); *see also Kaufman*, 836 F.3d at 142 (recognizing that "consumers often benefit from the bundling of separate products").

Unable to plead contractual coercion, State Plaintiffs allege that publishers were economically coerced into using DFP because they would "los[e] 20 to 40 percent" of their revenue if they chose another ad server that did not have "the ability to receive live, competitive bids" from AdX.  TAC ¶ 247.  That allegation underscores the value that publishers receive from Google's products and does not support a tying theory based on economic coercion.  Such a theory requires that the defendant's "pricing structure make[] purchase of the tying and tied products together the only viable economic option."  *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455,

471 (S.D.N.Y. 1996). But State Plaintiffs have failed to plead any facts about how DFP and AdX are priced together. *See Synopsys, Inc. v. ATopTech, Inc.*, 2015 WL 4719048, at *7-8 (N.D. Cal. Aug. 7, 2015) (dismissing tying claim for failure to allege facts showing coercive pricing). While the TAC asserts that publishers would earn 20 to 40 percent less *revenue* if they used an ad server other than DFP, TAC ¶ 247, it says nothing about how Google prices its products, and courts have not found economic coercion whenever products are offered in an attractive package. For example, the Ninth Circuit rejected a theory of implied coercion where the "economic imperative" allegedly arose not from how the products were priced, but "simply because [the defendant's conduct] ma[de] it less desirable to purchase from the third party." *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1179-80 (9th Cir. 2016); *see also Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 110 (2d Cir. 1986) (concluding that risk of voided automobile warranty for customers using rivals' transmission fluid was not coercive).

The alleged reason why DFP performed so much better than its competitors—it was the only ad server with "the ability to receive live, competitive bids" from Google's AdX exchange, TAC ¶ 247—reveals that, at bottom, State Plaintiffs' tying claim boils down to an assertion that Google should be required to give competing ad servers access to live AdX bids. When confronted with similar attempts to repackage a refusal-to-deal claim as tying, courts have applied the correct standards. *See Kaufman*, 836 F.3d at 144-45 (dismissing tying claim and observing that, even though "plaintiffs frame their claim as a tie-in, the core issue is a cable provider's right to refuse to enable cable boxes it does not control to unscramble its coded signal"); *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, 2021 WL 1227593, at *8 (M.D. Fla. Mar. 8, 2021) (dismissing tying claim that was "in essence a refusal to deal claim").

29

Applying those standards here, State Plaintiffs have failed to plead that Google was required to allow AdX to return live bids to rival ad servers because they do not allege that Google has ever done so previously. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) ("[B]ecause plaintiffs do not allege that defendants terminated any prior course of dealing—the sole exception to the broad right of a firm to refuse to deal with its competitors—the allegations are insufficient to state a unilateral-monopolization claim."); *see also Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009) ("*Trinko* holds that a defendant with no antitrust duty to deal with its rivals has no duty to deal under the terms and conditions preferred by those rivals."); *New York Mercantile Exch., Inc. v. Intercontinental Exch.*, *Inc.*, 323 F. Supp. 2d 559, 571 (S.D.N.Y. 2004) (dismissing claim premised on alleged failure by exchange to allow rivals to use real-time bid data for competitive purposes where there was no "history of cooperation" between defendant and competitor); *see also supra* Part II.A.[9]

## IV.   STATE PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE THAT THE NETWORK BIDDING AGREEMENT VIOLATES SECTION 1.

Although Section 1 of the Sherman Act by its terms prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade," 15 U.S.C. § 1, the Supreme Court has "long recognized that Congress intended to outlaw only *unreasonable* restraints," *see State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (emphasis added). According to State Plaintiffs, the Network Bidding Agreement between Google and Facebook (the "NBA") is such an unreasonable agreement for two reasons. First, they suggest that the NBA is an agreement to

---

[9] State Plaintiffs' Section 2 tying claim suffers from an additional defect: it fails to allege that Google possessed monopoly power in the alleged market for the tying product (ad exchanges). *See Ortho Diagnostic*, 920 F. Supp. at 465, 472-73, 472 n.26 (recognizing that Section 2 claims, including a Section 2 tying claim, require proof "that the defendant possessed monopoly power"—"a higher level of market power than [required for] the Section 1" tying claim). State Plaintiffs assert that Google's share of the alleged exchange market was over 60 percent, TAC ¶¶ 151-153, but market shares below 65 percent cannot support a Section 2 claim. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) (finding that "a 64 percent market share is insufficient to infer monopoly power").

"kill" header bidding.  *See* TAC ¶ 413.  Second, they allege that the NBA "established an agreement for Facebook to win at least 7.2 percent of all in-app impressions sold by developers in Google run-auctions."  *Id.* ¶ 438.  Because the TAC lacks factual allegations supporting either theory, the Section 1 claim (Count IV) should be dismissed.

### A.   State Plaintiffs Fail to Allege That Facebook Agreed Not to Support Header Bidding.

To survive a motion to dismiss, a complaint must provide "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of *illegal* agreement."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (emphasis added).  There are two ways to do so.  "First, a plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws."  *Mayor & Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Second, "a complaint may . . . present circumstantial facts supporting the *inference* that a conspiracy existed."  *Id.*  Under either approach, State Plaintiffs have failed to allege facts showing that Facebook agreed with Google not to support header bidding.

**No Direct Allegations.**  Despite relying on the written NBA, State Plaintiffs do not allege that the document itself memorialized an agreement that Facebook would not support header bidding.  They cite nothing in the NBA that precludes Facebook from working with header bidding exchanges or other Google rivals.  Nor could they:  the NBA explicitly "does not restrict Facebook from developing or enhancing a product or service that competes with" Google's products and services.  Ewalt Declaration, Exhibit A, GOOG-TEX-00144513 ("Ex. A"), at -526-27 (§ 2.4(e)); *id.* at -542 (§ 19.10) ("For clarity, this is not an exclusive agreement.")[10]; *see also Value Drug Co.*

---

[10] The Court may consider the NBA, which is quoted and excerpted at length in the TAC, *see* TAC ¶¶ 425, 434, 449, because State Plaintiffs "rel[y] heavily upon its terms and effect," making it "integral" to their complaint.  *See Int'l Audiotext Network, Inc. v. AT&T Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *see also DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (allowing consideration on motion to dismiss of documents "incorporated by reference in the complaint" and "integral to the complaint") (internal quotation marks omitted).  After it was originally executed in September 2018, the NBA has been amended in ways that are not material to or reflected in the claims in the TAC.

*v. Takeda Pharm., U.S.A., Inc.*, 2021 WL 6200907, at *14 (E.D. Pa. Dec. 29, 2021) (finding no direct evidence of alleged "overarching" conspiracy to restrict output despite other written agreements).   State Plaintiffs admit that Facebook has taken advantage of that freedom by "enter[ing] a number of network bidding agreements."  TAC ¶ 446.

Despite asserting that the NBA's "significant minimum spend requirements running to hundreds of millions of dollars a year . . . ensured that Facebook would not—and, economically, could not—return to support header bidding," TAC ¶ 426, State Plaintiffs allege no facts to support that conclusory allegation.   To the contrary, they allege that Facebook is a digital advertising "behemoth," *see id.* ¶ 436, so it cannot be assumed that the NBA's spending requirements tie up a significant enough percentage of Facebook's total spending to preclude Facebook from using both header bidding and Open Bidding at the same time.   *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961) ("mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence" in determining whether it improperly forecloses competition); *Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.*, 516 F. Supp. 2d 270, 295 n.8 (S.D.N.Y. 2007) (Castel, J.) (dismissing Section 1 claim that lacked "allegations from which significant foreclosure could be reasonably inferred").   Indeed, the TAC concedes that Facebook has agreements with other mediation tools and that the NBA is not the only one to "include dollar-denominated minimum spending requirements."  TAC ¶ 446.

State Plaintiffs do not cite any other direct evidence that Facebook agreed not to support header bidding.   Despite having years to review mountains of Facebook and Google documents, *see* MDL ECF No. 55, at 2 (describing State Plaintiffs' "expansive, 18-month governmental pre-suit investigation . . . entailing the production of around three million documents"), State Plaintiffs quote just a handful of emails allegedly reflecting Facebook's belief that Google wanted to "kill"

header bidding and Google's desire to "protect" its "leadership position," *see* TAC ¶ 420.  But "a desire to extinguish one's rivals is entirely consistent with, often is the motive behind, competition." *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir. 1989); *see also Novell*, 731 F.3d at 1078 ("Were intent to harm a competitor alone the marker of antitrust liability, the law would risk retarding consumer welfare by deterring vigorous competition.").  Moreover, the TAC's quotations from emails are silent as to Facebook's motivations and thus fail to show that Facebook *agreed* to help Google realize its supposed goals. These emails are hardly "smoking gun" evidence that Facebook agreed not to support header bidding.  *See Citigroup*, 709 F.3d at 136; *see also MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1105 (N.D. Cal. 2012) (dismissing claim and finding "lack of specificity particularly troubling" when plaintiff had access to "large volumes of relevant information").

**No Circumstantial Allegations.**  The TAC also lacks any factual allegations to support an inference that Facebook agreed not to support header bidding.  No inference of collusion arises when a company's conduct "made perfect business sense, there are obvious alternative explanations for the facts alleged, or the alleged facts suggest competition at least as plausibly as they suggest anticompetitive conspiracy." *In re Interest Rate Antitrust Litig.*, 261 F. Supp. 3d 430, 462 (S.D.N.Y. 2017) (internal citations and alterations omitted).

Here, the TAC admits that Facebook had its own independent reasons to partner with Google—namely, to avoid the "huge [engineering] and services investment" and "time and expense of building a new technology."  TAC ¶ 422 (alteration in original).  In addition, the TAC concedes that Facebook never seriously considered partnering with header bidding exchanges and that its contrary public announcements were part of a "planned long-term strategy . . . to minimize" how much it would pay Google to participate in Open Bidding.  *Id.* ¶ 419.  The TAC likewise

33

explains that Google had its own reasons to encourage Facebook to use Open Bidding, regardless of whether Facebook committed not to support header bidding.  Facebook's participation in Open Bidding not only generates fees for Google, *id.* ¶ 428, it also helps Google attract app developers by allowing it to "advertise[] the ability to accept Facebook bids as a feature of its mediation tool," *id.* ¶ 448.  These "obvious alternative explanation[s]" for why Facebook and Google would enter the NBA cannot give rise to an inference that Facebook agreed not to support header bidding.  *See Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358-59 (S.D.N.Y. 2018); *see also In re Inclusive Access Course Materials Antitrust Litig.*, 2021 WL 2419528, at *9-10 (S.D.N.Y. June 14, 2021) (dismissing Section 1 claim where alleged conduct was "in accordance with [each defendant's] own self-interest"); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 371 (S.D.N.Y. 2016) (dismissing Section 1 claim where alleged conduct was "equally consistent with rational economic decision-makers acting independently").

State Plaintiffs also contend that Facebook was "induce[d] . . . to shift" its bids from header bidding to Google's tools because it received "a number of special advantages" in Open Bidding.  TAC ¶ 427; *see also id.* ¶¶ 428-34.  But State Plaintiffs allege no facts suggesting that Facebook received the alleged "special advantages" *in exchange for a supposed agreement not to support header bidding*.  Indeed, the NBA itself refutes this theory because it explicitly allows Facebook to "develop[] or enhanc[e] a product or service that competes with [Google's] Program."  Ex. A, at -526-27 (§ 2.4(e)); *see Value Drug*, 2021 WL 6200907, at *17 (finding conspiracy implausible where agreements themselves undermined allegations of parties' motives).  And there is also an obvious alternative explanation for why Google would give Facebook so-called "special advantages":  bigger customers often get better terms.  *See Abbott Labs. v. Adelphia Supply USA*, 2017 WL 5992355, at *10 (E.D.N.Y. Aug. 10, 2017) ("[A]llegations of conspiracy will fail on a

motion to dismiss where there are 'obvious alternative explanation[s]' for the facts alleged."

(quoting *Twombly*, 550 U.S. at 567)); *Cenedella*, 348 F. Supp. 3d at 359 (dismissing claim due to

"an obvious alternative explanation to the alleged conspiratorial conduct").[11]

### B.   The "Win Rate" Provisions Do Not Violate Section 1.

In addition to their baseless innuendo concerning an agreement not to support header

bidding, State Plaintiffs mischaracterize the "Win Rate" provisions in the NBA as "establish[ing]

an agreement for Facebook to win at least 7.2 percent of all in-app impressions sold by developers

in Google run-auctions."  TAC ¶ 438.  But the NBA's actual terms reveal that Google never agreed

to let Facebook win any auction.  As properly understood, the "Win Rate" provisions do not violate

Section 1, whether analyzed through a per se or rule of reason framework.

### 1.   The "Win Rate" Provisions Are Not Per Se Illegal.

State Plaintiffs assert that the "Win Rate" provisions are illegal per se.  TAC ¶ 544.  But

the categories of activity that qualify for per se treatment are "narrow."  *See Texaco Inc. v. Dagher*,

547 U.S. 1, 8 (2006); *see also E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d

Cir. 2006) (explaining that per se violations are reserved for "small class of actions").  And there

are several reasons why the "Win Rate" provisions do not fit the bill.

First, the per se rule does not apply to vertical agreements.  *See United States v. Am.*

*Express Co.*, 838 F.3d 179, 194 n.41 (2d Cir. 2016) ("[B]oth vertical price restraints and vertical

non-price restraints are analyzed under the rule of reason."), *aff'd sub nom. Ohio v. Am. Express*

---

[11] To the extent that State Plaintiffs contend that the alleged "special advantages" themselves violate Section 1, their position—that companies should be barred from offering discounts and other favorable terms to important customers—would impede the very competition on the merits that the antitrust laws are meant to encourage.  *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) ("[C]utting prices in order to increase business often is the very essence of competition."); *Monahan's Marine, Inc. v. Bos. Whaler, Inc.*, 866 F.2d 525, 529 (1st Cir. 1989) (noting that many circuits have "found nothing anticompetitive in the simple fact that a seller selectively cuts its prices, or offers other favorable terms, to some of its dealers, even though such discrimination harms the non-favored dealers"); *Proctor v. State Farm Mut. Auto. Ins. Co.*, 675 F.2d 308, 338 (D.C. Cir. 1982) ("[T]he Sherman Act was not designed to disallow discounts or other preferential treatment for volume customers.").

*Co.*, 138 S. Ct. 2274 (2018).  Vertical agreements are "combinations of persons at different levels of the market structure, *e.g.*, manufacturers and distributors," *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (internal quotation marks omitted), and the NBA is precisely that.  The TAC recognizes that the agreement enabled Facebook to "bid through Google's tools," TAC ¶ 426, and describes Facebook as one of the "bidders" in Google's "auction house," *id.* ¶ 441. These allegations confirm that the NBA governs the vertical relationship between Facebook as a bidder and Google as the auctioneer.[12]

Second, State Plaintiffs fail to allege facts showing that the challenged activity "fit[s] into any of the established *per se* categories." *Bogan v. Hodgkins*, 166 F.3d 509, 514-15 (2d Cir. 1999). Struggling to allege a per se market allocation agreement, *see* TAC ¶ 544, State Plaintiffs mischaracterize the "Win Rate" provisions as an "agreement for Facebook to win at least 7.2 percent of all in-app impressions," *id.* ¶ 438, or as one that "pre-determine[d] the outcomes" of Google's auctions, *id.* ¶ 446.  In fact, the applicable "Win Rate" provisions require only that Facebook "use commercially reasonable efforts" to win at least a specified percentage of impressions.  Ex. A, at -545 (Ex. A § 5).[13]  As these provisions apply only to Facebook, they do not require Google to let Facebook win anything, as State Plaintiffs grudgingly concede.  *See* TAC ¶ 450 ("Google and Facebook drafted Jedi Blue to suggest that their agreed bid and win rates were

---

[12] Although State Plaintiffs note that Google and Facebook also "compet[e] directly to purchase in-app impressions from developers," TAC ¶ 440, and to "resell impressions to advertisers," *id.* ¶ 444, "[a]n allegation that defendants' conduct was a 'horizontal conspiracy' amounting to a *per se* violation of the Sherman Act 'is a legal conclusion that the Court does not accept as true on a motion to dismiss.'" *2238 Victory Corp. v. Fjallraven USA Retail, LLC*, 2021 WL 76334, at *3 (S.D.N.Y. Jan. 8, 2021) (Castel, J.).  And courts apply the rule of reason to agreements like the NBA that involve parties with a mixed relationship including both vertical and horizontal elements. *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 243-44 (2d Cir. 1997) (collecting cases recognizing that rule of reason applies to agreements between manufacturers and distributors, even when the manufacturer also competes at the distribution level); *2238 Victory Corp.*, 2021 WL 76334, at *5-6 (dismissing per se Section 1 claim when complaint alleged a mixed horizontal and vertical relationship).

[13] For a limited period after the NBA went into effect (Phases 1 and 2), the "Win Rate" provisions obligated Facebook to "ensure" that it won at least a specified percentage of impressions, Ex. A, at -545 (Ex. A § 5), but Google never promised not to compete with Facebook for those impressions.

duties owed by Facebook, not Google."). And it makes sense that Google would want assurances that Facebook would actually participate in Open Bidding auctions if Google were going to make the investment required to expand the program to enable Facebook's participation. *See* Ex. A, at -525 (§ 2.2(c)) (agreement to "build a product solution"). Because Google did not agree to allocate anything to Facebook, the TAC fails to state a claim for per se illegal market allocation. *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d at 375 (dismissing market allocation claim where plaintiffs "do not directly allege that defendants *agreed* to allocate the markets"); *see also Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1147 (E.D. Pa. 1981) (reasoning that agreement to charge "'whatever price was necessary to make the sale' . . . would merely be an agreement to compete"), *aff'd in part, rev'd in part on other grounds sub nom. In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

Third, courts do not apply the per se rule to novel arrangements with obviously procompetitive effects. Rather, "it is only after considerable experience with certain business relationships that courts classify them as *per se* violations," and only then if "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9, 19-20 (1979) (internal alteration and citation omitted); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (explaining that per se rule applies only to restraints that have "manifestly anticompetitive effects and lack any redeeming virtue") (internal quotation marks and citations omitted). The NBA, however, did not reduce competition; as the TAC concedes, it opened a new competitive front by enabling Facebook to bid against Google and others in Open Bidding. *See* TAC ¶ 436 (explaining that the NBA allowed Facebook "to compete against Google for

publishers' and developers' inventory on equal terms"); *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1050-54 (9th Cir. 1983) (declining to apply per se rule against market allocation in a "novel context" and when "there would be no competition but for the agreements"). The "Win Rate" provisions were particularly procompetitive because they ensured that Facebook would "bid high enough to win" at least some of the auctions, without stopping Google from bidding just as aggressively. TAC ¶ 440. Because "there exists a compelling procompetitive reason" for the NBA, State Plaintiffs' per se theory should be dismissed. *See Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 386 (E.D.N.Y. 2004).

> **2.    The "Win Rate" Provisions Do Not Violate the Rule of Reason.**

After Google highlighted how State Plaintiffs' prior pleading challenged the NBA purely on a per se theory, MDL ECF No. 136, at 4-5, the TAC added the "alternative" theory that the agreement violates the rule of reason, *see* TAC ¶ 545. "Under the rule of reason, the plaintiff[s] must show that defendants' challenged behavior had an *actual* adverse effect on competition as a whole in the relevant market." *Wellnx Life Scis.*, 516 F. Supp. 2d at 293 (internal quotation marks omitted). That showing can be made directly (with allegations of effects "such as reduced output") or indirectly (with allegations of "market power, plus some other ground for believing that the challenged behavior could harm competition"). *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96-97 (2d Cir. 1998). But the TAC fails to allege facts showing that the "Win Rate" provisions harm competition under either path.

> **a.    State Plaintiffs Fail to Allege That the "Win Rate" Provisions Harm Competition in the In-App Networks Market as a Whole.**

Although State Plaintiffs allege that the NBA "depresses prices paid to developers," their theory depends on a fundamentally inaccurate premise: that Google and Facebook "agreed to limit their competitive bidding as between each other." *See* TAC ¶ 437. As the text of the NBA reveals,

the "Win Rate" provisions do not address—much less limit—Google's bidding, and they do not prevent Facebook from trying to win even more than the minimum number of auctions for which it committed to use "commercially reasonable efforts" to win.  *See* Ex. A, at -545 (Ex. A § 5); *see also* TAC ¶ 440 (NBA "assure[s] that Facebook will bid high enough to win the minimum percent quota").  Because State Plaintiffs mischaracterize the NBA's terms, their allegations about how those terms affected pricing lack plausibility and should not be credited.  *See Planetarium Travel, Inc. v. Altour Int'l, Inc.*, 97 F. Supp. 3d 424, 432 (S.D.N.Y. 2015) (dismissing Section 1 claim when the complaint "fail[ed] to offer a plausible theory of anticompetitive harm"), *aff'd*, 622 F. App'x 40 (2d Cir. 2015); *see also Wellnx Life Scis.*, 516 F. Supp. 2d at 294-95 (dismissing Section 1 claim when supracompetitive pricing was "not plausibly supported by the factual allegations").

Even if State Plaintiffs had accurately described the NBA's terms, their own allegations demonstrate that the NBA would not affect pricing in the alleged in-app networks market as a whole.[14]  The agreement governs only auctions occurring in Google's in-app mediation tool, and only about 50 to 60 percent of ad-containing apps allegedly use that tool.  TAC ¶¶ 228, 437, 441.  The other half—those using mediation tools offered by competitors like MoPub, ironSource, and AppLovin, *id.* ¶ 228—remain untouched by the NBA.  In addition, the "Win Rate" provisions cover just 7.2 percent of in-app impressions sold in Google's mediation tool, *id.* ¶ 438, which is equivalent to at most 4.32 percent (= 7.2% x 60%) of all in-app impressions, *id.* ¶ 228.  With an effect on less than 5 percent of all in-app impressions, the "Win Rate" provisions cannot harm the in-app networks market as a whole, so State Plaintiffs have failed to allege the requisite anticompetitive harm directly.  *See Wellnx Life Scis.*, 516 F. Supp. 2d at 293-94 (finding allegations

---

[14] For purposes of Count IV, State Plaintiffs appear to believe that the relevant market is for "in-app networks."  *See* TAC ¶ 232 ("In-app networks are the intermediaries that purchase in-app display ad inventory from developers and resell those impressions to advertisers."), ¶ 437 (stating that "[a]s operative today," the NBA "primarily applies to the auctions Google conducts on behalf of developers to sell their in-app inventory").

insufficient to show marketwide effect when agreement affected 40 percent of the market but the other 60 percent remained "free to compete"); *see also PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 111 (2d Cir. 2002) (affirming summary judgment for inability to show marketwide effect where defendant had "agreements with only 377 out of more than 2000" customers).

>           **b.    State Plaintiffs Fail to Allege That Google Has Market Power in the In-App Networks Market.**

Absent allegations of actual marketwide harm, a plaintiff "must show market power, plus some other ground for believing that the challenged behavior could harm competition in the market." *Tops Mkts.*, 142 F.3d at 97.  Although courts sometimes use market shares as a "proxy for market power," *see Kaufman v. Time Warner*, 836 F.3d 137, 143 (2d Cir. 2016), the TAC lacks any allegations about the market shares of Google or Facebook in the alleged in-app networks market.  To the extent that the TAC discusses market structure at all, it paints a picture of vibrant competition among Google, Facebook, Unity, ironSource, Vungle, and others.  TAC ¶ 232; *see also id.* ¶ 89 (recognizing that 25 in-app networks can compete in Google's mediation tool).  Indeed, State Plaintiffs do not make even a conclusory allegation of market power in the in-app networks market.  *See Kaufman*, 836 F.3d at 148 (affirming dismissal and rejecting "inference of market power" where no facts were alleged about defendant's market share or "how the presence of . . . competitors affect[ed defendant's] power over price").  Coupled with the other deficiencies discussed above, State Plaintiffs' failure to allege market power in the in-app networks market requires dismissal of Count IV.

>                                    **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that this Court dismiss Counts I through IV of State Plaintiffs' Third Amended Complaint in full and with prejudice.

Dated: January 21, 2022                                    Respectfully Submitted,

_/s/ Eric Mahr_

Eric Mahr
Julie Elmer
Andrew J. Ewalt (admitted _pro hac vice_)
Jan Rybnicek (admitted _pro hac vice_)
Lauren Kaplin
Robert J. McCallum
FRESHFIELDS BRUCKHAUS
    DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
julie.elmer@freshfields.com
andrew.ewalt@freshfields.com
jan.rybnicek@freshfields.com
lauren.kaplin@freshfields.com
rob.mccallum@freshfields.com

Justina Sessions
Jonathan Jacobson
Jessica Lonergan
Mikaela Evans-Aziz (_pro hac vice_ motion
forthcoming)
WILSON SONSINI GOODRICH &
    ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
(415) 947-2000
jsessions@wsgr.com
jjacobson@wsgr.com
jlonergan@wsgr.com
mevansaziz@wsgr.com

John Harkrider
Daniel Bitton
Bradley Justus (admitted _pro hac vice_)
Koren Wong-Ervin (pending _pro hac vice_)
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200
jharkrider@axinn.com

41

dbitton@axinn.com
bjustus@axinn.com
kwongervin@axinn.com

*Counsel for Defendant Google LLC*