UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | **No. 1:21-MD-03010 (PKC)** |
| *This document relates to:* <br><br> **THE STATE OF TEXAS, *et al.*,** <br><br> *Plaintiffs,* <br><br> **- against -** <br><br> **GOOGLE LLC,** <br><br> *Defendant.* | **No. 1:21-cv-06841 (PKC)** |

**STATE PLAINTIFFS' OPPOSITION TO DEFENDANT GOOGLE LLC'S
MOTION TO DISMISS COUNTS I THROUGH IV OF STATE PLAINTIFFS'
THIRD AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 3

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT ........................................................................................................................ 6

I.    THE STATES SUFFICIENTLY ALLEGE THAT GOOGLE TIED ITS AD EXCHANGE TO ITS AD SERVER. ........................................................................................................ 6

II.   THE STATES SUFFICIENTLY ALLEGE GOOGLE'S ANTICOMPETITIVE CONDUCT. ....................................................................................................................... 10

    A.    Google Improperly "Reduces" the States' Section 2 Claims............................... 11

        1.  Google improperly reduces the law. ............................................................. 11

        2.  Google improperly reduces the facts. ........................................................... 13

    B.    Google Engaged in Extensive Anticompetitive Conduct. ................................... 14

        1.  Google's ad server interfered in publishers' dealings with non-Google entities and coerced publishers to transact with Google entities. ................................ 15

        2.  Google coerced publishers and advertisers by secretly manipulating exchange auctions. ...................................................................................................... 18

        3.  Google targeted and successfully impeded nascent competition................... 20

        4.  Google deceived its customers...................................................................... 22

III.  THE STATES SUFFICIENTLY ALLEGE THAT GOOGLE'S AGREEMENT WITH FACEBOOK VIOLATED SECTION 1. ............................................................................ 23

    A.    The States Allege an Unlawful Agreement to Kill Header Bidding.................... 23

    B.    The Jedi Blue Contract Is Direct Evidence of an Unlawful Agreement to Allocate Auction Inventory. .......................................................................................... 26

        1.  The Jedi Blue contract is a horizontal agreement. ......................................... 27

        2.  The Jedi Blue contract is a *per se* violation of Section 1............................... 28

        3.  Contractual formalisms cannot salvage an unlawful agreement................... 30

        4.  The States sufficiently plead the rule of reason. ........................................... 31

IV.  THE STATES' CLAIMS ARE TIMELY............................................................................ 33

    A.    Google Cannot Invoke the Doctrine of Laches Against the States...................... 33

    B.    Even If It Could Apply, Laches Would Not Bar Any of the States' Claims. ....... 35

        1.  Unreasonable delay is not clear on the face of the complaint........................ 35

        2.  Prejudice is not clear on the face of the complaint. ....................................... 38

C. Google Cannot Seek Dismissal of the States' Prayer for Injunctive Relief. ........ 38

D. The States' Claims Premised on Privacy Sandbox Are Ripe. ............................. 40

CONCLUSION .................................................................................................................... 40

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) .......................................................................... 9

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
  458 U.S. 592 (1982) ........................................................................................ 34

*Allen v. Dairy Farmers of Am., Inc.*,
  748 F. Supp. 2d 323 (D. Vt. 2010) .................................................................. 37

*Am. Needle, Inc. v. Nat'l. Football League*,
  560 U.S. 183 (2010) ........................................................................................ 30

*Anderson News, LLC v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ............................................................................ 23

*Argus Inc. v. Eastman Kodak Co.*,
  552 F. Supp. 589 (S.D.N.Y. 1982) .................................................................. 38

*Arizona v. Maricopa Cnty. Med. Soc.*,
  457 U.S. 332 (1982) ........................................................................................ 29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................... 6

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ........................................................................................ 13

*Aviva Trucking Special Lines v. Ashe*,
  400 F. Supp. 3d 76 (S.D.N.Y. 2019) ............................................................... 22

*Bayou Bottling, Inc. v. Dr. Pepper Co.*,
  725 F.2d 300 (5th Cir. 1984) .......................................................................... 12

*BBL, Inc. v. City of Angola*,
  809 F.3d 317 (7th Cir. 2015) .......................................................................... 33

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................................... 6

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) ..................................................................... 10, 36

*Brown v. Showtime Networks, Inc.*,
  394 F. Supp. 3d 418 (S.D.N.Y. 2019)................................................................... 38

*Burkina Wear, Inc. v. Campagnolo, S.R.L.*,
  No. 07 CIV. 3610, 2008 WL 1007634 (S.D.N.Y. Apr. 9, 2008)............................... 38

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,
  148 F.3d 1080 (D.C. Cir. 1998) ......................................................................... 10

*Christy Sports LLC v. Deer Valley Resort Co., Ltd.*,
  555 F.3d 1188 (10th Cir. 2009) ......................................................................... 12

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
  817 F.3d 46 (2d Cir. 2016).................................................................................. 6

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)................................................................................... 14, 25

*Conwood Co. v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002) ...................................................................... 12, 15

*Dennis v. JPMorgan Chase & Co.*,
  343 F. Supp. 3d 122 (S.D.N.Y. 2018).................................................................. 36

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)............................................................................... 7, 9, 10

*Esposito v. Mister Softee, Inc.*,
  No. 75 C 555, 1979 WL 1733 (E.D.N.Y. Dec. 14, 1979)......................................... 8

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.*,
  No. 12 CIV. 7372 (AT), 2020 WL 264146 (S.D.N.Y. Jan. 17, 2020)......................... 9

*Ford Motor Co. v. United States*,
  405 U.S. 562 (1972)........................................................................................ 39

*F.T.C. v. Colgate-Palmolive Co.*,
  380 U.S. 374 (1965)........................................................................................ 40

*F.T.C. v. Facebook, Inc.*,
  No. CV 20-3590 (JEB), 2022 WL 103308 (D.D.C. Jan. 11, 2022)........................... 33

*F.T.C. v. Vyera Pharms., LLC*,
  No. 20CV706 (DLC), 2020 WL 4891311 (S.D.N.Y. Aug. 18, 2020)......................... 12

*GEICO Corp. v. Autoliv, Inc.*,
  345 F. Supp. 3d 799 (E.D. Mich. 2018)............................................................... 37

*Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*,
786 F.2d 105 (2d Cir. 1986) ................................................................................ 9

*Geneva Pharm. Tech. Corp. v. Barr Lab'ys Inc.*,
386 F.3d 485 (2d Cir. 2004) .............................................................................. 32

*Gordon v. Amadeus IT Grp., S.A.*,
194 F. Supp. 3d 236 (S.D.N.Y. 2016) .......................................................... 36, 38

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......................................................................................... 35

*Growers 1-7 v. Ocean Spray Cranberries, Inc.*,
No. CV 12-12016-RWZ, 2015 WL 13649090 (D. Mass. May 14, 2015) .............. 18

*Guar. Tr. Co. of N.Y. v. United States*,
304 U.S. 126 (1938) ..................................................................................... 33, 34

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968) .......................................................................................... 37

*Hayden Pub. Co., Inc. v. Cox Broad. Corp.*,
730 F.2d 64 (2d Cir. 1984) ................................................................................ 10

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*,
219 F.3d 104 (2d Cir. 2000) .............................................................................. 36

*Hill v. Thompson*,
564 So. 2d 1 (Miss. 1984) ................................................................................. 38

*Hudson Ry. Co. v. Consol. Rail Corp.*,
654 F. Supp. 1195 (N.D.N.Y. 1987) ................................................................... 37

*IBM v. Platform Sols., Inc.*,
658 F. Supp. 2d 603 (S.D.N.Y. 2009) ................................................................ 16

*IHS Dialysis Inc. v. Davita, Inc.*,
No. 12 CIV. 2468(ER), 2013 WL 1309737 (S.D.N.Y. Mar. 31, 2013) ............ 10, 11

*Illinois v. Kentucky*,
500 U.S. 380 (1991) .......................................................................................... 34

*Ill. Tool Works Inc., v. Indep. Ink., Inc.*,
547 U.S. 28 (2006) ............................................................................................. 6

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
No. 08-CV-2315 (NGG)(RER), 2016 WL 748089 (E.D.N.Y. Jan. 7, 2016) .......... 38

*In re Auction Houses Antitrust Litig.*,
    193 F.R.D. 162 (S.D.N.Y. 2000) ............................................................ 18

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) .................................................................... 16

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................... 10, 13, 14, 23

*In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*,
    517 F. Supp. 2d 662 (S.D.N.Y. 2007) .................................................... 39

*In re Tether & Bitfinex Crypto Asset Litig.*,
    No. 19 CIV. 9236 (KPF), 2021 WL 4452181 (S.D.N.Y. Sept. 28, 2021) .............................. 18

*In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.*,
    No. 08 CIV. 7616 (PKC), 2010 WL 882989 (S.D.N.Y. Mar. 5, 2010) ...................................... 9

*Int'l. Audiotext Network, Inc. v. AT&T Co.*,
    62 F.3d 69 (2d Cir. 1995) ...................................................................... 31

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    340 F. Supp. 3d 285 (S.D.N.Y. 2018) ..................................................... 16

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) .................................................................. 9

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ................................................................................... 6

*KASP, Inc. v. Adesa Lexington, LLC*,
    No. CIV.A. 6:05-394-DCR, 2006 WL 385310 (E.D. Ky. Feb. 17, 2006) .............................. 18

*Kassner v. 2nd Ave. Delicatessen Inc.*,
    496 F.3d 229 (2d Cir. 2007) ................................................................... 6

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016) ................................................................ 7, 8

*King v. Innovation Books*,
    976 F.2d 824 (2d Cir. 1992) ................................................................. 35

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ......................................................................... 36, 37

*Klein v. Facebook, Inc.*,
    No. 20-CV-08570-LHK, 2022 WL 141561 (N.D. Cal. Jan. 14, 2022) .......................... 22, 37

*Lennon v. Seaman*,
  63 F. Supp. 2d 428 (S.D.N.Y. 1999).........................................................................35

*LiveUniverse, Inc. v. Myspace, Inc.*,
  No. CV 06–6994 AHM (RZx), 2007 WL 6865852 (C.D. Cal. June 4, 2007)........................12

*Lorain Journal Co. v. United States*,
  342 U.S. 143 (1951)...............................................................................................12

*Massachusetts ex rel. Bellotti v. Russell Stover Candies, Inc.*,
  541 F. Supp. 143 (D. Mass. 1982)............................................................................34

*Mayor and City Council of Baltimore, Md.v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013)...............................................................................24, 31

*Merced Irrigation Dist. v. Barclays Bank PLC*,
  165 F. Supp. 3d 122 (S.D.N.Y. 2016)..................................................................18, 20

*Moore v. James H. Matthews & Co.*,
  550 F.2d 1207 (9th Cir. 1977) ...................................................................................7

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)...............................................................................................23

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Lab'ys, Div. of/and Am. Home Prod. Corp.*,
  850 F.2d 904 (2d Cir. 1988).....................................................................................22

*Nat'l Collegiate Athletic Ass'n v. Alston*,
  141 S. Ct. 2141 (2021)............................................................................................13

*Nechis v. Oxford Health Plans, Inc.*,
  421 F.3d 96 (2d Cir. 2005).........................................................................................6

*New York v. Facebook, Inc.*,
  No. CV 20-3589 (JEB), 2021 WL 2643724 (D.D.C. June 28, 2021)...............................12, 34

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015).............................................................................13, 14, 23

*New York ex rel. Spitzer v. St. Francis Hosp.*,
  94 F. Supp. 2d 399 (S.D.N.Y. 2000).........................................................................28

*Northrop Corp. v. McDonnell Douglas Corp.*,
  705 F.2d 1030 (9th Cir. 1983) ..................................................................................29

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ..........................................................................12, 21

*N.Y. Medscan LLC v. N.Y. Univ. Sch. of, Med.*,
   430 F. Supp. 2d 140 (S.D.N.Y. 2006).................................................................. 11

*Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*,
   920 F. Supp. 455 (S.D.N.Y. 1996) ...................................................................... 8

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983)......................................................................................... 40

*PepsiCo, Inc. v. Coca-Cola Co.*,
   No. 98 CIV. 3282 (LAP), 1998 WL 547088 (S.D.N.Y. Aug. 27, 1998)................................ 12

*PepsiCo, Inc. v. Coca-Cola Co.*,
   315 F.3d 101 (2d Cir. 2002).............................................................................. 32

*Ross v. Bank of Am., N. Am. (USA)*,
   524 F.3d 217 (2d Cir. 2008).............................................................................. 40

*Samsung Elecs. Co. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) .......................................................................... 36

*Smith v. eBay Corp.*,
   No. C 10-03825 JSW, 2012 WL 27718 (N.D. Cal. Jan. 5, 2012)...................................... 18

*Soc'y of Pro. Eng'rs v. United States*,
   435 U.S. 679 (1978)......................................................................................... 31

*Sossamon v. Texas*,
   563 U.S. 277 (2011)......................................................................................... 34

*Starr v. Sony BMG Music Ent.*,
   592 F.3d 314 (2d Cir. 2010).............................................................................. 25

*State v. Durham*,
   860 S.W.2d 63 (Tex. 1993)............................................................................... 38

*Sturm v. Rasmussen*,
   No. 18-CV-01689-W-BLM, 2019 WL 626167 (S.D. Cal. Feb. 14, 2019)............................ 39

*Synopsys, Inc. v. ATopTech, Inc.*,
   No. C 13–2965 MMC, 2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) ................................. 8

*Teladoc, Inc. v. Tex. Med. Bd.*,
   No. 1-15-CV-343 RP, 2015 WL 8773509 (W.D. Tex. Dec. 14, 2015) ................................ 37

*Toshiba Am. Consumer Prods., Inc.*,
   129 F.3d 240 (2d Cir. 1997).............................................................................. 27

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ................................................................................................. 40

*Tromblee v. New York*,
  No. 1:19-CV-0638 (LEK/CFH), 2021 WL 981847 (N.D.N.Y. Mar. 16, 2021) ...................... 33

*trueEX, LLC v. MarkitSERV Ltd.*,
  266 F. Supp. 3d 705 (S.D.N.Y. 2017) ............................................................................. 16

*Unijax, Inc. v. Champion Int'l, Inc.*,
  683 F.2d 678 (2d Cir. 1982) ......................................................................................... 7, 8

*United Shoe Mach. Corp. v. United States*,
  258 U.S. 451 (1922) ...................................................................................................... 12

*United States v. Andreas*,
  216 F.3d 645 (7th Cir. 2000) .................................................................................... 30, 31

*United States v. Apple Inc.*,
  952 F. Supp. 2d 638 (S.D.N.Y. 2013) ............................................................................ 26

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) ............................................................................... 25, 28, 32

*United States v. Bensinger Co.*,
  430 F.2d 584 (8th Cir. 1970) ........................................................................................ 29

*United States v. Blue Cross Blue Shield of Michigan*,
  809 F. Supp. 2d 665 (E.D. Mich. 2011) ......................................................................... 18

*United States v. Concentrated Phosphate Exp. Ass'n*,
  393 U.S. 199 (1968) ................................................................................................ 30, 31

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ...................................................................................................... 10

*United States v. Joyce*,
  895 F.3d 673 (9th Cir. 2018) ........................................................................................ 29

*United States v. Letter from Alexander Hamilton to the Marquis de Lafayette
  Dated July 21, 1780*,
  15 F.4th 515 (1st Cir. 2021) ......................................................................................... 34

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ............................................................................. 13, 14, 22

*United States v. Mottolo*,
  605 F. Supp. 898 (D.N.H. 1985) ................................................................................... 34

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940) ........................................................................................... 28

*United States v. Suntar Roofing, Inc.*,
   897 F.2d 469 (10th Cir. 1990) ...................................................................... 30, 31

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972) ...................................................................................... 29, 30

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978) ........................................................................................... 13

*United States v. United Shoe Mach. Corp.*,
   391 U.S. 244 (1968) ........................................................................................... 39

*Valassis Commc'ns, Inc. v. News Corp.*,
   No. 17-CV-7378 (PKC), 2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) ................... 14

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) .................................................................................... 11, 16

*Viamedia, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020) ........................................................................ 7, 9

*Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*,
   857 F.2d 55 (2d Cir. 1988) ................................................................................. 40

*Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.*,
   516 F. Supp. 2d 270 (S.D.N.Y. 2007) ................................................................ 32

*Yentsch v. Texaco, Inc.*,
   630 F.2d 46 (2d Cir. 1980) ............................................................................ 7, 8

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) ........................................................................................... 39

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321 (1971) ........................................................................................... 36

**Statutes**

15 U.S.C. § 1 ..................................................................................................... 6

15 U.S.C. § 2 ..................................................................................................... 6

15 U.S.C. § 15b ................................................................................................ 35

15 U.S.C. § 26 .................................................................................................. 34

**Rules**

Fed. R. Civ. P. 54(c) ................................................................................................... 39

**Other Authorities**

Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction*
  (8th ed. 2021) .......................................................................................................... 35

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
  Their Application* (5th ed. 2020) ......................................................................... passim

The States of Texas, Alaska, Arkansas, Florida, Idaho, Indiana, Louisiana, Mississippi, Missouri, Montana, Nevada, North Dakota, South Carolina, South Dakota, and Utah, and the Commonwealths of Kentucky and Puerto Rico (together, "the States") hereby oppose Google LLC's Motion to Dismiss Counts I through IV of the Third Amended Complaint ("TAC").

## INTRODUCTION

Google is one of the largest and most powerful companies in human history. But it did not reach its vaunted position through superior innovation or honest competition. Over the last decade, Google has deceived its own customers, scuttled threatening new technology, suppressed consumer choice, and conspired with its largest competitor, all with the aims of obtaining and cementing its monopolies and decimating its rivals in advertising technology markets. The States bring claims under federal and state law to hold Google accountable and restore competition.

Google's response to these claims is remarkable. It leads with laches, arguing that, after a monopolist has continued some of its anticompetitive practices for more than four years, even sovereign states are powerless to stop it. Laches, however, cannot be invoked against states suing to vindicate public rights and protect the free market. And even if it could, the fact-intensive elements of this equitable affirmative defense are certainly not clear from the face of the TAC. Google also cannot seek dismissal of the States' prayer for injunctive relief, since Rule 12 is a vehicle for contesting claims, not remedies. Regardless, Google's argument would not apply to the States' request for forward-looking equitable and structural relief. Nor can Google excise from this case the next installment in its anticompetitive scheme to wall off the open web—the announcement of which is already harming competition and consumers.

When Google turns to substantive antitrust law, its arguments fare no better. Google seeks dismissal of the States' Section 2 monopolization and attempted-monopolization claims (Counts I and II) by trying to force the sweeping variety of anticompetitive conduct catalogued in the TAC

into two inapt doctrinal categories. First, Google pretends that it is accused of straightforward refusals to deal with rivals when the States have, in fact, alleged that Google prevented its *customers* from dealing with its rivals. Second, Google labels all of its anticompetitive business decisions, policies, and programs "product design," as if harm to competition implemented through lines of code were immune from judicial scrutiny. That is not the law, and the States have more than sufficiently alleged Google's relentless litany of competition-harming conduct.

As for its Jedi Blue conspiracy with Facebook, Google does not challenge the States' allegations that the conduct implementing that agreement violated Section 2 (Counts I and II). With respect to the States' allegations under Section 1 (Count IV), Google does not dispute that an agreement between these behemoths to kill a nascent competitive threat would constitute a *per se* violation. Instead, it invites the Court to find, as a matter of fact, that the parties did not intend that unlawful purpose. Google's supposed proof? That no provision of the written contract formalizes Facebook's agreement to abandon header bidding. If that kind of express, let's-destroy-competition-in-exchange-for-money clause was required to find a contract in restraint of trade, Section 1 would be a dead letter. The States have alleged more than sufficient facts to support the plausible inference of an unlawful agreement, including that Google schemed to destroy header bidding, that Facebook had previously supported header bidding, and that Facebook ceased supporting header bidding only after entering Jedi Blue—which gifted Facebook lucrative economic terms that Google had no other reason to concede.

Google also seeks to excuse the *per se* auction allocation scheme for in-app inventory established by the Jedi Blue contract, noting that the companies agreed only to "commercially reasonable efforts" to restrain trade. That contractual formalism has no effect on the economic substance of the agreement, which allocates wins to Facebook in auctions in which Google and

Facebook directly compete for the same impressions. And rather than engage with the States' alternative theory of liability under the rule of reason, Google simply mischaracterizes the States' allegations about the share of in-app inventory affected by the agreement.

Finally, Google attempts to evade the States' tying claim (Count III), once again faulting the States for not identifying a specific unlawful contract provision. As with horizontal restraints, however, coercive tying arrangements need not be reduced to writing. In this case, Google coerced publishers by, first, making it economically untenable for them to transact in Google's exchange without licensing Google's ad server, and, later, threatening termination if publishers did not sign a combined ad server-exchange contract. This tie was so successful that it seized for Google near-complete control of the ad server market—a monopoly that Google exploited and maintained through much of the coercive and deceptive conduct that was to follow.

Google's Motion repeatedly rewrites the States' allegations, ignores inconvenient facts, relies on unsupported assumptions, and draws inferences in Google's favor. But neither the Sherman Act nor the Federal Rules of Civil Procedure permit Google to wish away its egregious misconduct. The States' claims lie at the core of what the antitrust laws seek to prevent, and the Motion should be denied.

## FACTUAL BACKGROUND

"Display ads are the currency of the free and open internet." TAC ¶ 9. Every time an internet user visits a webpage, the display advertising impressions on that page are sold by the publisher of the webpage, purchased by an advertiser, and filled with an advertisement in a fraction of a second. *Id*. The scale and complexity of the markets that effectuate these transactions between publishers and advertisers "resemble the most complicated financial markets." *Id*. ¶ 3. The TAC

describes, in detail, the structure of these markets and how Google has used its dominant position on every side of them to unlawfully exclude competition.

In sum, Google wields an "interlocking web of monopolies." *Id*. ¶ 7. "In addition to representing both the buyers and the sellers of online display ads, Google also operates the largest exchange." *Id*. ¶ 4. Google represents publishers through its ad server, which "holistically manage[s] and sell[s] their web display inventory." *Id*. ¶ 93. Google represents advertisers through its ad buying tools for small and large advertisers, which they use "to purchase inventory that suits their purposes at the lowest prices." *Id*. ¶¶ 161–62. Through their ad server and buying tool agents, publishers and advertisers connect in ad exchanges, which are "real time auction marketplaces that match publishers' web display impressions with bids from purchasers." *Id*. ¶ 128.[1] Google's ad server (DFP), its small advertiser buying tool (Google Ads), and its exchange (AdX) all have monopoly power in their respective markets. *Id.* ¶¶ 113–27, 187–95, 145–60.

Google has used its monopoly power to "perpetuate a series of mutually reinforcing anticompetitive acts." *Id*. ¶ 7. To start, Google tied its ad server to its exchange, thereby gaining near-complete control of the ad server market. *Id*. ¶¶ 245–52. Google then used its ad server chokehold to funnel publishers' impressions to its exchange by blocking publishers from sharing information about their own inventory with non-Google exchanges and buying tools, *id*. ¶¶ 254–66, and through coercive programs like Dynamic Allocation, *id*. ¶¶ 267–81, and Enhanced Dynamic Allocation, *id*. ¶¶ 282–96. Google compounded its ad server coercion by secretly manipulating exchange auctions themselves through programs including Project Bernanke, *id*. ¶¶ 298–317, Dynamic Revenue Share, *id*. ¶¶ 318–30, and Reserve Price Optimization, *id*. ¶¶ 331–51, which prevented publishers and advertisers from making free and informed choices.

---

[1] For purposes of its Motion, Google does not contest the States' market definitions. Mot. at 4 n.1.

When an innovation called header bidding began counteracting the effects of Google's anticompetitive conduct in the ad server and exchange markets and promoting real-time competition between exchanges, Google successfully schemed to "kill" it. *Id*. ¶¶ 252–436. Google targeted header bidding with a variety of anticompetitive measures, including using its ad server monopoly to interfere in publishers' auctions with header bidding exchanges, *id*. ¶¶ 376–85, 387–94; diverting advertiser spend away from exchanges using header bidding, *id*. ¶¶ 395–405; and punishing publishers that used header bidding by demoting them in Google search rankings, *id*. ¶¶ 406–12. Google then enlisted the aid of a formidable Big Tech rival: through an agreement codenamed "Jedi Blue," Google induced Facebook to abandon its support of header bidding by giving Facebook advantages in auctions, including non-public information and speed. *Id*. ¶¶ 413–36. As an additional inducement, this agreement allocated to Facebook a pre-determined share of auction wins for in-app impressions in the auctions that Google conducts on behalf of app developers. *Id*. ¶¶ 437–50.

After scheming to keep header bidding at bay, Google implemented Unified Pricing Rules through its ad server, which further force publishers and advertisers to trade in its exchange by preventing publishers from using price floors to direct their impressions to non-Google exchanges and buying tools. *Id*. ¶¶ 451–60. Now, after years of harvesting and exploiting user data to entrench its control of display advertising, Google plans to build a wall around the remainder of the open web through its "Privacy Sandbox," which will eliminate the existing mechanisms that publishers and advertisers use to target ads, forcing them to rely exclusively on Google. *Id*. ¶¶ 473–81.

Google's conduct "has caused a wide range of anticompetitive effects, including higher prices, reduced output, lower quality services, reduced innovation, the exit of rival firms, and foreclosed entry in the relevant antitrust markets (despite the significant profits enjoyed by Google

in those markets)." *Id.* ¶ 502; *see generally id.* Sec. VII. The States bring claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, as well as state antitrust and consumer protection laws, seeking to "put an end to Google's anticompetitive abuses in online advertising markets" and "restore free and fair competition to these markets." TAC ¶ 30; *see generally id.* Sec. X.

## LEGAL STANDARD

"[T]here is no heightened pleading standard in antitrust cases." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016). The TAC is not subject to dismissal if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In considering Google's Motion, "the court is to accept as true all facts alleged in the complaint" and "draw all reasonable inferences in favor of the [States]." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). "The appropriate inquiry is not whether [the States are] likely to prevail, but whether [they are] entitled to offer evidence to support [their] claims." *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005).

## ARGUMENT

### I.   THE STATES SUFFICIENTLY ALLEGE THAT GOOGLE TIED ITS AD EXCHANGE TO ITS AD SERVER.

Google established its control of the ad server market and laid the groundwork for much of its subsequent anticompetitive conduct by tying its ad exchange to its ad server in violation of Sections 1 and 2 of the Sherman Act. "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

6

In this case, Google exploited its control over its exchange—the only exchange with access to the "must-have" demand from Google Ads advertisers—to force publishers to license Google's ad server, which they would not have done absent the tie. TAC ¶¶ 246–52. As a result, Google's share of the ad server market skyrocketed to over 90 percent and all meaningful competitors exited the market. *Id.* ¶ 249.

Google requests dismissal of the States' tying claim for failure to allege "actual coercion" because publishers could "contract for its ad exchange without taking its ad server." Mot. at 27. This argument misapplies the standard for actual coercion, which does not require that a defendant reduce its coercive tactics to a contract. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 473 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2877 (2021) ("[A] plaintiff does not need an express, written declaration of a proposed tying arrangement."); *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1217 (9th Cir. 1977) ("A showing of an onerous effect on an appreciable number of buyers coupled with a demonstration of sufficient economic power in the tying market is sufficient to demonstrate coercion."). Rather, a seller crosses the line when it "'goes beyond persuasion and *conditions* [the buyer's] purchase of one product on the purchase of another product.'" Mot. at 27 (quoting *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685 (2d Cir. 1982) (italics added in Motion)).

A defendant can effectuate this conditioning in many ways. It can "exercise [its] economic muscle." *Id.* at 686. It can levy verbal threats. *See Yentsch v. Texaco, Inc.*, 630 F.2d 46, 57 (2d Cir. 1980). It can implement a "restrictive [ ] policy." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 (1992). Ultimately, tying proscriptions "care more about economic substance than about form." *Viamedia*, 951 F.3d at 473. As the Second Circuit has explained, actual coercion falls along a "spectrum" containing "a range of plentiful close cases." *Kaufman v. Time Warner*,

836 F.3d 137, 142 (2d Cir. 2016). Thus, whether consumers were actually coerced is an inherently factual inquiry into whether "the bundling of separate products is due to consumer demand" or an illicit exercise of the defendant's market power. *Id.*; *see also* 10 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1752e (5th ed. 2021) (noting that "'coercion' . . . invit[es] a specific factual inquiry about whether the defendant has illegitimately constrained buyer choices").

Here, Google "exercise[d] [its] economic muscle," *Unijax*, 683 F.2d at 685, to coerce publishers by "only allow[ing] publishers that license Google's ad server to receive live, competitive bids from its exchange," thereby "condition[ing] receipt of competitive bids from the enormous and unrivaled roster of advertisers it represents on publishers using both its ad server and its exchange." TAC ¶¶ 246, 248. Although publishers "would prefer to use an ad server other than Google's," losing competitive bids from AdX would have been an "untenable" economic blow—20 to 40 percent of their total revenue. *Id.* ¶ 247.[2] And in 2018, Google reinforced its tie by requiring that every single publisher either sign a combined contract or face termination. *Id.* ¶ 251; *cf. Yentsch*, 630 F.2d at 57 (finding coercion based on evidence that one buyer was "threatened with [contract] termination"). Thus, the tying of Google's exchange and ad server was not "due to [publisher] demand," but instead resulted from Google's abuse of market power—the very definition of coercion in the Second Circuit. *Kaufman*, 836 F.3d at 142; *see also Esposito v. Mister Softee, Inc.*, No. 75 C 555, 1979 WL 1733, at *10 (E.D.N.Y. Dec. 14, 1979) (explaining that coercion occurs if consumers "are forced by the economic dominance of the seller, or by the tying product's uniqueness or desirability to forego certain sources of supply in favor of those thrust upon them by the seller").

---

[2] The States do not allege that Google coerced publishers through bundled discounts, so the pricing structure cases cited by Google as its only argument against the alleged economic coercion, Mot. at 28-29, have no bearing here. *See Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 471 (S.D.N.Y. 1996) (plaintiff brought claim based on bundled discounts); *Synopsys, Inc. v. ATopTech, Inc.*, 2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) (same).

None of Google's cited cases support a contrary conclusion. The States have not alleged that Google "simply recommend[ed]" its ad server, *Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 110 (2d Cir. 1986); that Google won customers through "aggressive salesmanship," *In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.*, No. 08 CIV. 7616 (PKC), 2010 WL 882989, at *6 (S.D.N.Y. Mar. 5, 2010); that Google just made other ad servers "less desirable to purchase," *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1177–80 (9th Cir. 2016); or that Google "merely offer[ed] two products in a single package," *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684–85 (4th Cir. 2016). Google's attempt to rewrite the alleged facts is not a basis to dismiss a well-pleaded tying claim. *See Viamedia*, 951 F.3d at 471 ("A seller is not immunized from a tying claim if there is a factual dispute as to whether the buyer wished to purchase the tied service."). Google's attempt to recast its tie as a refusal-to-deal claim is likewise unavailing, as "a tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." *Id*. at 471; *see also Eastman Kodak*, 504 U.S. at 463 n.8 ("Assuming, *arguendo*, that [defendant's] refusal to sell parts to any company providing service can be characterized as a unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from [defendant] is not."). Google's factual arguments must be deferred to a later juncture.

Finally, in a last-ditch effort to jettison the Section 2 claim, Google raises a half-hearted challenge to the States' market-power allegations. Mot. at 30 n.9. Google waived this argument by raising it in a footnote. *See Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, No. 12 CIV. 7372 (AT), 2020 WL 264146, at *2 (S.D.N.Y. Jan. 17, 2020). Regardless, Google ignores the many allegations supporting exchange monopoly power, including direct evidence of market power, TAC ¶¶ 156-60, and the driving force behind that power—exclusive access to a "must have" source of

advertiser demand. *Id*. ¶¶ 146–49; *cf. Eastman Kodak*, 504 U.S. at 464. And in any event, allegations of over 60% market share are more than sufficient at the pleading stage. *See Hayden Pub. Co., Inc. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984).

## II.   THE STATES SUFFICIENTLY ALLEGE GOOGLE'S ANTICOMPETITIVE CONDUCT.

Section 2 prohibits "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). "A monopolist's conduct violates Section 2 if it (1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019) (alteration in original) (internal quotation marks omitted). Thus, "to avoid the proscriptions of s[ection] 2, [a] firm must refrain at all times from conduct directed at smothering competition." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979).

"'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998); *see also IHS Dialysis Inc. v. Davita, Inc.*, No. 12 CIV. 2468(ER), 2013 WL 1309737, at *7 (S.D.N.Y. Mar. 31, 2013) ("There is no simple rule for determining when behavior is anticompetitive.") For this reason, the "metes and bounds" of the anticompetitive conduct inquiry are "highly contextual," with proffered procompetitive justifications not appropriately weighed on a motion to dismiss. *Keurig*, 383 F. Supp. 3d at 229.

Google does not dispute that the States' have plausibly alleged conduct that "smother[ed] competition." *Berkey*, 603 F.2d at 275. Instead, Google attacks strawman legal theories, armed

with cherry-picked phrases from the TAC and unsupported procompetitive justifications that cannot be considered on a motion to dismiss. None of those distractions change the bottom line: taken as true, the facts in the TAC show that Google intentionally, repeatedly, and unlawfully impaired both its rivals and the competitive process across the relevant markets.

### A.       Google Improperly "Reduces" the States' Section 2 Claims.

In its own words, Google seeks to "reduce" the States' Section 2 claims to two ill-fitting doctrinal categories. Mot. at 17. This reduction is no basis for dismissal. *See N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 149 (S.D.N.Y. 2006) (denying motion to dismiss Section 2 claims where "defendants selectively refer[red] to allegations in the complaint, ignoring the complete picture painted by plaintiffs"); *IHS Dialysis*, 2013 WL 1309737, at *7 (denying motion to dismiss Section 2 claims where defendant argued against specific theories but "none of Plaintiffs' causes of action [were] based on just one particular category of conduct").

### 1.       Google improperly reduces the law.

**Google's conduct cannot be recast as mere refusals to deal.** Google first invokes *Trinko* and its progeny, arguing that its conduct is beyond the reach of antitrust law because it has no "duty to share data" with rivals. Mot. at 17–19 (citing *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)). But as Google itself acknowledges, the States do not allege such conduct. Mot. at 18 ("[T]he allegations concerning encrypted user IDs and redacted reports involve Google's treatment of *customers*—publishers and advertisers.") (emphasis added). Rather, the States allege that Google's ad server commandeered information belonging to its *customers* in order to prevent *them* from dealing with lower-cost and higher-quality exchanges. *See, e.g.*, TAC ¶ 294.

Google's sleight of hand conflates a company's refusal to give proprietary information to a rival with affirmative acts that interfere with customers' use of their *own information* to transact with rival firms. *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013) (Gorsuch, J.) (noting that the "discrete category" of refusal-to-deal cases "doesn't seek to displace doctrines that address a monopolist's more direct interference with rivals"); *New York v. Facebook, Inc.*, No. CV 20-3589 (JEB), 2021 WL 2643724, at *15 (D.D.C. June 28, 2021) (explaining how conduct that "interferes with the relationship between rivals and third parties" is not "a standard refusal to deal").[3] Impeding a customer's ability to deal with rivals has long supported a Section 2 claim. *See, e.g.*, *Lorain Journal Co. v. United States*, 342 U.S. 143, 152–53 (1951) (anticompetitive for newspaper to refuse to sell ad space to advertisers who ran ads on rival radio station); *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 456–58 (1922) (anticompetitive for shoe machinery manufacturer to impose financial penalties on customers for using rival's machinery); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002) (anticompetitive for intermediary to block rivals from retail shelf space).[4]

**Google's conduct cannot be recast as mere product redesign.** Google next attempts to shield "the bulk" of its misconduct at the pleading stage by incanting "product design," as if those were magic words that defeat otherwise valid antitrust claims. Mot. at 20. But a monopolist cannot skirt the Sherman Act merely because it achieves anticompetitive effects through lines of code rather than terms in a contract. Such a rule would swallow modern monopolization claims and

---

[3] None of Google's cited refusal-to-deal cases address this kind of affirmative interference. *See, e.g.*, *Christy Sports LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188 (10th Cir. 2009) (monopolist not required to rent retail space to rival at own resort); *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir. 1984) (monopolist not required to put rival's products in own vending machines); *LiveUniverse, Inc. v. Myspace, Inc.*, No. CV 06–6994 AHM (RZx), 2007 WL 6865852, at *14 (C.D. Cal. June 4, 2007) (monopolist not required to link to rival's website on own website).

[4] *See also, e.g.*, *F.T.C. v. Vyera Pharms., LLC*, No. 20CV706 (DLC), 2020 WL 4891311 (S.D.N.Y. Aug. 18, 2020) (anticompetitive for pharmaceutical company to block sales to generic pharmaceutical rivals); *PepsiCo, Inc. v. Coca-Cola Co.*, No. 98 CIV. 3282 (LAP), 1998 WL 547088, at *18 (S.D.N.Y. Aug. 27, 1998) (anticompetitive for Coca-Cola to prohibit customers from distributing PepsiCo).

immunize anticompetitive conduct anytime software is involved. *Cf. Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2163 (2021) (explaining that defendants cannot "relabel a restraint as a product feature and declare it immune from [antitrust laws]").

The Section 2 inquiry—regardless of the market or technology involved—remains tethered to conduct that "harm[s] the competitive *process* and thereby harm[s] consumers." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001); *see also Keurig*, 383 F. Supp. 3d at 230 (finding product design claims sufficient where alleged redesign was "not intended to benefit consumers, but rather … to harm competition"). For that reason, it is uncontroversial that "neither product withdrawal nor product improvement alone is anticompetitive." Mot. at 20 (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 653–54 (2d Cir. 2015)). But the States do not plead such innocuous conduct. Rather, the States allege that Google pursued a strategy with the "overall effect" of "coerc[ing] consumers rather than persuad[ing] them on the merits." *Actavis*, 787 F.3d at 655. While Google may improve its products to outcompete its rivals, it has no license to prevent "its victims from making free choices between market alternatives." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983). Such impediments to consumer choice are "inherently destructive of competitive conditions." *Id.*

### 2.      Google improperly reduces the facts.

Just as problematic as its reduction of the law is Google's reduction of the facts. For example, among the many factual allegations omitted from Google's argument are those reflecting Google's explicit intent to eliminate competition. Although not an element of a monopolization claim, intent "play[s] an important role in divining the actual nature and effect of the alleged anticompetitive conduct." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436 n.13 (1978); *see also* 3 Areeda, *supra*, at ¶ 651c2 ("[C]onsiderations of subjective intent are sometimes essential."). At this stage, the Court must credit the well-supported allegations that Google's conduct was "not

intended to benefit consumers, but rather w[as] intended to harm competition." *Keurig*, 383 F. Supp. 3d at 231. The TAC is replete with such allegations. *See, e.g.*, TAC ¶¶ 248, 251, 259, 263–64, 279, 292, 308, 324, 347, 361–65, 391–92, 399–401, 410, 415, 418, 425, 456, 466–67.

In addition to its wholesale omission of facts, Google also isolates the various, interrelated conduct alleged in the TAC by treating each policy, program, and business decision as "completely separate and unrelated lawsuits." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962). Google's piecemeal approach contravenes well-settled law: "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Id; see also* Areeda, *supra*, ¶ 310c7 (explaining that "[a] monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices," which "gives increased plausibility to [a Section 2] claim"). Here, although each category of alleged conduct is anticompetitive on its own—and not protected by either of the doctrines that Google invokes—the magnitude of the effect on competition and consumers is most evident when considering the "synergistic effect" of Google's course of conduct. *See, e.g.*, TAC ¶¶ 294, 350, 412; *cf. Valassis Commc'ns, Inc. v. News Corp.*, No. 17-CV-7378 (PKC), 2019 WL 802093, at *9 (S.D.N.Y. Feb. 21, 2019) (explaining that, unless lawful under an established doctrinal test, the synergistic effect of alleged anticompetitive conduct "depends on the strength of the evidence underlying that conduct").

### B.    Google Engaged in Extensive Anticompetitive Conduct.

At this stage, the States have more than satisfied their burden to allege conduct that plausibly "harm[s] the competitive *process* and thereby harm[s] consumers." *Microsoft*, 253 F.3d at 58; *accord Actavis*, 787 F.3d at 652 (adopting the *Microsoft* balancing framework). But even if the States' Section 2 claims were funneled into Google's self-selected pigeonholes, the TAC sufficiently alleges Google's anticompetitive conduct.

1.    **Google's ad server interfered in publishers' dealings with non-Google entities and coerced publishers to transact with Google entities.**

After coercing publishers to license its ad server, *see supra* Sec. I, Google exploited its near-complete control over ad serving to force publishers to transact in its exchange and sell to advertisers using its buying tools. Such direct interference in customers' dealings has long supported Section 2 claims. *See supra*, Sec. II.A.1. For example, in *Conwood*, U.S. Tobacco violated Section 2 by abusing its position as "category manager"—a trusted intermediary between retailers and moist snuff tobacco manufacturers—to systematically "bury" rivals' products by excluding them from retail shelf space. 290 F.3d at 783. U.S. Tobacco's conduct resulted in "higher prices and reduced consumer choice, both of which are harmful to competition." *Id*. Likewise, Google has abused its position as publishers' ad server intermediary to bury rival exchanges and buying tools, thereby decreasing publisher yield and reducing publishers' choices about the sale of their inventory. TAC ¶¶ 253–96. Publishers rely on Google's ad server to maximize their inventory yield, *id*. ¶ 49, but after Google launched its exchange, it began engaging in coercive and deceptive ad server tactics that serve only its own interests.

Specifically, the States allege that Google's ad server began restricting publishers from accessing and sharing information about their own inventory with non-Google exchanges and buying tools. *Id*. ¶¶ 254–66. Although Google dubs this conduct "a refusal to share information with rivals," the States allege that Google affirmatively interfered in *publishers'* dealings with non-Google exchanges and buying tools by encrypting their user ID data such that "the only way for publishers and advertisers to always know that two different user IDs related to the same individual was to use *Google's* ad buying tools *and* trade in *Google's* exchange." *Id*. ¶ 261. In this way, much like broker-dealers that conspire to unlawfully harm financial trading competition, Google used its position as publishers' intermediary to restrict access to publishers' information, which obstructed

rivals from valuing publishers' impressions, reduced publisher yield, and suppressed competition in the exchange and buying tools markets. *Id*. ¶¶ 258–60; *cf. Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018) (agreeing that "restrictions limiting the distribution of pricing data were not pro-competitive"). Moreover, even viewed through Google's ill-fitting refusal-to-deal lens, the States allege that Google previously allowed publishers to share their user ID data with non-Google exchanges and buying tools. TAC ¶ 256.[5] Google's publisher ID interference advanced Google's subsequent anticompetitive conduct and compounded its anticompetitive effects. *Id*. ¶¶ 275, 292, 294, 297, 307, 337, 349, 381.

Next, through a program called Dynamic Allocation, Google forced publishers to trade impressions in Google's exchange that would have otherwise traded in rival exchanges. *Id*. ¶¶ 271, 275. Google attempts to rewrite these allegations by arguing that Dynamic Allocation "did not prevent publishers from transacting with other exchanges." Mot. at 21. But that is exactly what the program did: it forced publishers to transact impressions through AdX by suppressing live bids from rival exchanges. *Id*. ¶ 273. Although Google told publishers that Dynamic Allocation maximized their yield, *id*. ¶¶ 278–79, in reality it "shield[ed] AdX from real-time competition and [ ] permit[ted] AdX to transact impressions at depressed prices." *Id*. ¶ 274. Dynamic Allocation also exacerbated the anticompetitive effects of Google's coercive auction manipulation programs. *Id*. ¶¶ 294, 310–11, 320; *see infra* Sec. II.B.2.

Through another program called Enhanced Dynamic Allocation ("EDA"), Google's ad server forced publishers to transact their most high-value impressions through Google's exchange

---

[5] Google incorrectly asserts that the TAC "alleges no facts showing that Google sacrificed profits by encrypting user IDs or redacting auction reports." Mot. at 18. At the pleading stage, however, plaintiffs need only allege that a defendant "terminated a prior relationship," which in and of itself, "could evince monopolistic motives." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 54 (2d Cir. 2007); *see also trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 720 (S.D.N.Y. 2017). Indeed, if a prior course of dealing is "voluntary," it is "presumably profitable." *Trinko*, 540 U.S. at 409. Google cites no cases to the contrary, and cases decided at summary judgment on a full factual record do not alter the pleading standard. *See IBM v. Platform Sols., Inc.*, 658 F. Supp. 2d 603, 613-14 (S.D.N.Y. 2009).

by offering those impressions to only Google's exchange. TAC ¶¶ 284–86. EDA reduced publisher yield "by foreclosing competition from exchanges," *id*. ¶ 288, and "permitting AdX to transact publishers' impressions for depressed prices." *Id*. ¶ 289. And although Google would prefer to rebrand EDA as a "new opportunity" that it "offered" to publishers, Mot. at 21, those are not the facts alleged. Rather, the TAC alleges that Google coerced publisher participation by automatically turning on EDA in DFP, deceptively representing that EDA would maximize publisher yield, and refusing to return live, competitive bids if EDA was not turned on. *Id*. ¶¶ 291–93.

Finally, in 2019, through Unified Pricing Rules, Google's ad server eliminated one of the last remaining free choices publishers could make: setting differentiated price floors for different exchanges and buyers. *Id*. ¶¶ 451–69. Price floors were an important mechanism by which publishers exercised control over their own auctions and resisted the effects of Google's interference in those auctions. *Id*. ¶¶ 453–55. Without the ability to set tailored price floors, publishers are forced to transact individual impressions through Google's exchange that they otherwise would have transacted through a different exchange. *Id*. ¶¶ 468–69.

Unified Pricing Rules harm competition because, contrary to Google's argument, they do not merely demand "equal treatment" for Google products. Mot. at 25. "They ensure that rival exchanges and buying tools are at a *price disadvantage*. Because Google's publisher ad server imposes extra fees to serve ad inventory sold on non-Google exchanges . . . Google's exchange can win an impression by returning a bid 5 to 10 percent lower than a rival exchange." TAC ¶ 461. Google appears to recognize that this fact defeats its "equal treatment" argument and responds only by noting that monopolists are permitted to charge monopoly prices. Mot. at 25 n.8. That argument says nothing about how Unified Pricing Rules prevent Google's customers from allocating their business to rivals. *See* Areeda, *supra*, ¶ 1807b (noting that "it is difficult to produce

a procompetitive rationale" for "requir[ing] a price that is lower than the price offered to [rivals]");

*cf. United States v. Blue Cross Blue Shield of Michigan*, 809 F. Supp. 2d 665, 674 (E.D. Mich. 2011) (finding that agreements imposed by a dominant insurer requiring hospitals to charge rival insurers more could plausibly "establish anticompetitive effects as to other health insurers and the cost of health services"). None of Google's cited cases condone such conduct by a monopolist.

### 2. Google coerced publishers and advertisers by secretly manipulating exchange auctions.

In addition to using its ad server monopoly to foreclose competition among exchanges, Google also foreclosed competition by manipulating exchange auctions themselves. Google's auction manipulations have "distorted ordinary forces of supply and demand"—quintessential anticompetitive conduct. *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 141 (S.D.N.Y. 2016) (plaintiffs stated Section 2 claim with allegations that defendants' conduct was intended to "constrain the market for other buyers and sellers"); *see also In re Tether & Bitfinex Crypto Asset Litig.*, No. 19 CIV. 9236 (KPF), 2021 WL 4452181, at *25 (S.D.N.Y. Sept. 28, 2021) (plaintiffs stated Section 2 claim with allegations that defendants' manipulations caused anticompetitive effects "divorced from any legitimate market forces").

Google contends that its auctions—and all the ways in which it has manipulated them—should receive "product design" deference. Mot. at 22. But, of course, auctioneers that are charged with violating the Sherman Act do not get a free pass simply because they designed the machinations of their auctions.[6] Regardless, even if auction manipulation schemes could be

---

[6] *See, e.g.*, *Growers 1-7 v. Ocean Spray Cranberries, Inc.*, No. CV 12-12016-RWZ, 2015 WL 13649090, at *6 (D. Mass. May 14, 2015) (no deference to cranberry auctioneer); *Smith v. eBay Corp.*, No. C 10-03825 JSW, 2012 WL 27718, at *9 (N.D. Cal. Jan. 5, 2012) (no deference to online auctioneer); *KASP, Inc. v. Adesa Lexington, LLC*, No. CIV.A. 6:05-394-DCR, 2006 WL 385310, at *1 (E.D. Ky. Feb. 17, 2006) (no deference to auto auctioneer); *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 163 (S.D.N.Y. 2000) (no deference to fine arts auctioneers).

rebranded as "product features," the States have alleged that Google's manipulations overrode the free choices of publishers and advertisers and impeded competition in the exchange market.

Specifically, the States allege that Google coerced publishers and advertisers with Project Bernanke by "surreptitiously switch[ing] AdX from a second-price auction to a third-price auction on billions of impressions per month." TAC ¶¶ 303, 312. Through this program, Google dropped the second-highest Google advertiser bid from certain auctions but charged the winning advertiser as if that bid had remained in the auction, *id*. ¶¶ 306, 315; manipulated and inflated advertiser bids so that Google's exchange would beat out other exchanges, *id*. ¶ 315; overrode publisher price floors for Google buyers, *id*. ¶ 314; and decreased publisher yield by up to 40%, *id*. ¶ 305.

Then, through Dynamic Revenue Share, Google "dynamically adjusted [its] exchange fee on an impression-per-impression basis *after* soliciting bids in the auction to let Google's AdX exchange win impressions it would have otherwise lost." *Id*. ¶ 318. These dynamic adjustments upended publishers' quality-adjusted price floor determinations and coerced publishers and advertisers to transact impressions in AdX that would have fallen below publisher pre-set price floors and transacted through another exchange charging a lower fee. *Id*. ¶¶ 323–25.

Finally, with Reserve Price Optimization, Google coerced publishers and advertisers by "overr[iding] publishers' AdX exchange floors (which Google induced publishers to pre-set in their DFP ad server) and generat[ing] unique and custom per-buyer floors depending on what a buyer had bid in the past." *Id.* ¶ 335. This program caused advertisers to pay more on individual impressions and reduced overall publisher inventory yield—a result that Google acknowledged was undesirable for both publishers and advertisers in the long term. *Id*. ¶ 347.

Google contends that none of these programs "prevented publishers or advertisers from using rival ad exchanges or ad buying tools." Mot. at 22. That "narrow definition of

19

anticompetitive or exclusionary conduct is not supported by Second Circuit law." *Merced*, 165 F. Supp. 3d at 142 (rejecting defendant's argument that "no competing traders were excluded from accessing or trading on the [relevant] platform"). Moreover, by concealing and misrepresenting its auction tampering and purposefully keeping its auction rules opaque, Google prevented publishers and advertisers from discovering its manipulations. TAC ¶¶ 312–13, 326–29, 340–48, 351. And Google used its small advertiser buying tool and ad server monopolies to make its manipulations unavoidable: Google Ads prohibited advertisers from transacting with non-Google exchanges, *id*. ¶¶ 146, 193, 248, and DFP significantly restricted publishers from doing so, *see supra* Sec. II.B.1.

### 3.     Google targeted and successfully impeded nascent competition.

As noted above, Google stretches the concept of "product design" well past any limits found in precedent or common sense. But even Google seems to recognize that its multi-year campaign to "kill" header bidding—a disruptive technology that threatened Google's monopolies—cannot be reimagined as a redesign of its products. *See* TAC ¶¶ 353–60. Indeed, Google completely ignores the States' Section 2 claims based on this scheme. *See id*. ¶¶ 529, 534.

Google deployed an array of anticompetitive weapons from its monopolist arsenal to kill header bidding. First, after representing that it would "run a fair and transparent market," *id*. ¶ 379, Google used its ad server monopoly to interfere with publishers' attempts to use header bidding with rival exchanges. For example, Google prevents publishers from sharing pricing information with rival exchanges using header bidding, allowing them to share this data only with exchanges participating in Google's Exchange Bidding program. *Id*. ¶¶ 379–82. Google also hides from publishers information about the performance of header bidding exchanges, which it previously provided in publishers' auction reports. *Id*. ¶¶ 387–88. As with its hashing of user IDs, this information interference is not a mere refusal to deal with rivals; it is an "assay" into the

marketplace that prevents publishers from dealing with header bidding exchanges. *Novell,* 731 F.3d at 1072.

Google's ad server also interfered with publishers' ability to receive bids from header bidding exchanges by artificially limiting the "line items" publishers used to capture competitive bids coming from header bidding exchanges. TAC ¶¶ 389–94. Indeed, although its ad server could accommodate more line items, Google recognized that artificial caps were a "tool" to fight header bidding and intentionally "impos[ed] more limits" to "push [the] pubs to using Jedi," *i.e.*, Google's Exchange Bidding. *Id*. ¶¶ 391–93.

Google's "multi-pronged" strategy to kill header bidding also included using its ad buying tool for large advertisers to punish exchanges that participated in header bidding. *Id*. ¶¶ 395–405. With projects Poirot and Elmo, Google reallocated advertisers' spend to Google's exchange and away from rival exchanges, without any benefit to advertisers. *Id*. ¶¶ 400–03. Together, these programs successfully coerced advertisers to trade in Google's exchange at the expense of header bidding exchanges. *Id*. ¶¶ 404–05.

Google did not stop at auction-level coercion. It "also used the importance of search traffic to strongarm publishers to stop using header bidding." *Id*. ¶ 406. Specifically, Google coerced publishers to use a mobile webpage framework called AMP that Google made incompatible with header bidding. *Id*. ¶¶ 406–10. Google accomplished this coercion by demoting in Google search results the pages of publishers that did not adopt AMP, causing them to lose traffic and user engagement and decreasing their monetization by over 40 percent. *Id*. ¶ 408.

Finally, Google ensured that header bidding did not gain the scale necessary to "disintermediate" (*i.e.*, bypass) Google's ad server by enticing Facebook into an unlawful agreement to end its support of header bidding. *Id*. ¶¶ 413–26. Google does not address the States'

Section 2 claims directed at this agreement, and even in its Section 1 arguments, Google disputes only the allegations regarding *Facebook's* motivations. Mot. at 31–35.

Ultimately, Google's attacks on header bidding each independently impeded this competition-enhancing innovation and, together, worked synergistically to exclude exchange competition and maintain Google's monopolies. TAC ¶¶ 375, 412. This conduct falls squarely within the purview of Section 2, and Google does not argue otherwise. *See Microsoft*, 253 F.3d at 79 ("[I]t would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will—particularly in industries marked by rapid technological advance and frequent paradigm shifts."); 3 Areeda, *supra*, at ¶ 704 ("Restraints on innovation are very likely even more harmful than traditional price cartels, which we usually consider to be the most harmful anticompetitive practice.").

### 4.    Google deceived its customers.

Google's willful deception of publishers and advertisers permeated its conduct. TAC ¶¶ 278–79, 291, 313, 327–28, 338, 341–47, 385–86, 466. Although Google's pre-motion letter stated its intent to challenge these allegations, ECF No. 136 at 3, Google's Motion categorically ignores them.[7] Thus, Google does not dispute that the States have sufficiently alleged anticompetitive deceptive conduct. *See Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Lab'ys, Div. of/and Am. Home Prod. Corp.*, 850 F.2d 904, 916 (2d Cir. 1988); *Klein v. Facebook, Inc.*, No. 20-CV-08570-LHK, 2022 WL 141561, at *38 (N.D. Cal. Jan. 14, 2022). Nor has it confronted how its deception bears on the anticompetitive nature of its other conduct by preventing "the free choice

---

[7] Should Google attempt to change course, the "court should not consider arguments that are raised for the first time in a reply brief." *Aviva Trucking Special Lines v. Ashe*, 400 F. Supp. 3d 76, 80 (S.D.N.Y. 2019). In any event, "at the motion to dismiss stage, an allegation that the representation was 'false and misleading in certain respects' [is] sufficient 'to go forward with the discovery process . . . .'" *Keurig*, 383 F. Supp. 3d at 240 (quoting *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Lab'ys, Div. of/and Am. Home Prod. Corp.*, 850 F.2d 904, 916 (2d Cir. 1988)).

of consumers." *Actavis*, 787 F.3d at 655. If Google obtained its dominance by building a better mousetrap, why would it need to misrepresent the features of its offerings? That Google felt impelled to mislead its own customers yields a strong inference that it was obtaining and maintaining ill-gotten monopolies, not furthering "competition on the merits." *Keurig*, 383 F. Supp. 3d at 231. Google does not bother to disagree.

## III. THE STATES SUFFICIENTLY ALLEGE THAT GOOGLE'S AGREEMENT WITH FACEBOOK VIOLATED SECTION 1.

### A. The States Allege an Unlawful Agreement to Kill Header Bidding.

The States have alleged that Google and Facebook conspired to kill header bidding, with Google offering substantial financial inducements in exchange for Facebook abandoning the technology that threatened Google's monopolies. TAC ¶ 426. Google does not dispute that such an agreement would constitute a *per se* violation of Section 1, arguing only that the States have not sufficiently pleaded the existence of this agreement. Mot. at 31–34.

"[C]onspiracies are rarely evidenced by explicit agreements, but nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (internal quotation marks omitted). For this reason, an antitrust plaintiff may prevail *at trial* with "circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation marks omitted). At the pleading stage, "the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action." *Anderson News*, 680 F.3d at 184.

The allegations in the TAC are more than adequate to support the inference of an agreement. Among other relevant facts, the States have alleged that:

- Facebook publicly announced support for header bidding, invested in the technology, and published metrics showing how it was using header bidding to drastically improve publishers' yield. TAC ¶¶ 414, 417.

- Google's senior management recognized header bidding as an "existential threat," and explicitly made ending Facebook's support of header bidding a "personal #1 priority." *Id*. ¶ 415.

- Google internally proposed a "more aggressive" strategy to get Facebook to abandon header bidding. *Id*. ¶ 418.

- Google and Facebook entered negotiations shortly thereafter. *Id*. ¶ 420.

- While negotiations were ongoing, senior Facebook executives understood that Google's goal in making a deal with Facebook would be "to kill header bidding." *Id*.

- Google internally justified the deal by explaining that if Google could not "avoid competing with [Facebook]," it was better to collaborate to "build a moat." *Id*. ¶ 421.

- Following protracted negotiations involving extensive contact between senior executives from each company, Google offered Facebook bidding advantages unmatched by anything Google had offered to other bidders. *Id*. ¶¶ 424–36.

- Facebook abandoned header bidding following these Google concessions. *Id*. ¶¶ 413, 436.

In short, the TAC alleges that both Google and Facebook understood what Google wanted from the deal. Google offered Facebook auction advantages and price cuts. In return, Facebook gave Google exactly what it wanted: abandonment of a disruptive technology that could upset Google's monopolies. Unlike in *Mayor and City Council of Baltimore, Maryland. v. Citigroup, Inc.*, this was not mere "parallel conduct." 709 F.3d 129, 136 (2d Cir. 2013). Rather, it was a classic quid pro quo, with Google's most important concessions even memorialized in the Jedi Blue contract.

Google makes much of the fact that the Jedi Blue contract itself did not include a formal written promise that Facebook would abandon header bidding. But it is irrelevant that the contracting parties were not foolish enough to document a term that Google now concedes would trigger *per se* liability. After all, Google and Facebook anticipated that antitrust authorities might

someday come calling, even agreeing in writing to mutually assist each other in responding to government investigations. TAC ¶ 449.

Google insists that all of this has a perfectly innocent explanation—that the deal would make "perfect business sense" even without an agreement. Mot. at 33. But Google ignores that both parties took actions against their own self interests. *See Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 327 (2d Cir. 2010) (holding that plaintiffs stated a claim under *Twombly* by "alleg[ing] behavior that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals") (internal quotation marks omitted). For Facebook, this included abandoning a technology that it had already invested in and very publicly promised to support just a year earlier. TAC ¶¶ 414, 417. This was such a significant reversal that the decision was taken to the CEO of Facebook, with the COO advising him, "[t]his is a big deal strategically." *Id*. ¶ 423.[8]

For its part, Google offered bidding advantages and price cuts that would be puzzling without a return concession from Facebook to avoid header bidding. *Id*. ¶¶ 424–36. Google now suggests that perhaps this was just price cutting for a "bigger customer." Mot. at 34. But this mischaracterizes the relevant market structure and ignores that Google and Facebook typically bid *against* each other in these auctions. TAC ¶ 439. It is beyond suspicious that Google would use its market power in ad servers and mediation tools to disadvantage every competing ad network *except* for the networks that Google considered its greatest competitive threat. *See id*. ¶¶ 90, 436.

Even if Google's rationalizations did not contradict the alleged facts, "'[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" *United States v. Apple, Inc.*, 791 F.3d 290, 319 (2d Cir. 2015) (quoting *Cont'l Ore*, 370 U.S. at 699). In this case, both parties understood that Google's goal was

---

[8] These allegations also refute Google's unsupported suggestion that "Facebook never seriously considered partnering with header bidding exchanges." Mot. at 33.

to entice Facebook to abandon header bidding. Indeed, this was an express goal of Google's senior management. TAC ¶ 415. Having achieved that goal, it strains credulity for Google to claim this was merely a happy accident. "Just as a conspiracy's failure to achieve its ends after an intended period may be strong evidence that the conspiracy did not in fact exist, the success of the conspiracy in achieving its goals may confirm the very existence of the conspiracy." *United v. Apple Inc.*, 952 F. Supp. 2d 638, 689 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015) (internal quotation marks and citations omitted).

**B.     The Jedi Blue Contract Is Direct Evidence of an Unlawful Agreement to Allocate Auction Inventory.**

The Jedi Blue contract was not just Google's side of an unlawful quid pro quo for Facebook to abandon header bidding. The contract also includes naked restraints on the share of in-app impressions that Google and Facebook will win in auctions in which the two companies directly compete for those impressions—a *per se* violation of Section 1.[9]

Google repeatedly claims that the States have mischaracterized the Jedi Blue agreement and even takes the unusual step of submitting an outdated version of the contract to the Court.[10] But for all its rhetoric, Google nowhere rebuts the States' central allegation: that the terms of Jedi Blue establish an agreement that Facebook will win at least 7.2 percent of all in-app impressions sold by developers in Google-run auctions. TAC ¶ 438. Google's arguments come down to 1) factual disagreements about market structure, 2) obstinance about well-established rules of *per se*

---

[9] Although the Jedi Blue contract originally contemplated that Facebook would bid on impressions for both web and in-app display, as operative today, the agreement primarily applies to the auctions that Google conducts on behalf of developers to sell their in-app inventory. TAC ¶ 437.

[10] *Compare* Ewalt Declaration, Ex. A (attaching a copy of the original Network Bidding Agreement) *with* Mot. at 31 n.10 (admitting that the contract has since been amended). Having taken the initiative to submit the agreement, it is curious that Google would not present the Court with the currently operative version, when the States' claim is not limited to any particular version of the paper contract. *See* TAC ¶ 450.

liability, and 3) a misguided belief that contractual formalisms can be used to evade the Sherman
Act. None of these is a proper basis for dismissal.

### 1.     The Jedi Blue contract is a horizontal agreement.

"Restraints imposed by agreement between competitors have traditionally been
denominated as horizontal restraints, and those imposed by agreement between firms at different
levels of distribution as vertical restraints." *Elecs. Commc'ns. Corp. v. Toshiba Am. Consumer
Prods., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997). Google and Facebook are direct competitors in the
market to purchase in-app impressions from developers, TAC ¶ 439, and in the market to resell
these impressions to advertisers, *id*. ¶ 444. The companies internally recognize each other as direct
competitors for both inventory purchase and resale of in-app impressions; in fact, they are the two
largest bidders in the auctions for in-app impressions affected by the Jedi Blue agreement. *Id*.
¶¶ 439, 444. A term limiting their bidding against each other is plainly a horizontal restraint.

Hoping to avoid these facts, Google observes that agreements between manufacturers and
distributors are often treated as vertical restraints. Mot. at 36. This observation is irrelevant because
Google and Facebook do not manufacture or own any of the impressions for sale in the affected
auctions. By its own terms, the Jedi Blue contract applies only to inventory offered by third-party
developers and *excludes* impressions for sale on Google's or Facebook's own properties. *See* TAC
¶ 442; Mot. at Ex. A (Network Bidding Agreement) § 1.55. Thus, unlike the dual distribution cases
cited by Google, Mot. at 36 n.12—all of which involve manufacturers competing with their own
distributors—Google and Facebook sit at the same level of the market structure. They are both
distributors, competing directly for the inventory offered by third-party "manufacturers" (here,
developers), with a common economic interest in minimizing the prices they pay. *See* TAC ¶¶ 439,
441–42. That is the very essence of a horizontal business relationship.

Google attempts to muddy the water with selective quotes from the TAC, suggesting that phrases like "bid through Google's tools," "bidders," and "auction house" imply a vertical relationship. Mot. at 36. But the TAC is clear that Google does not sell to Facebook: "Although Google's mediation tool oversees the process necessary to conduct these auctions, Google itself does not sell in them. . . . Prior to an auction, Google does not take title or otherwise bear the risk of a particular impression going unsold. Rather, it conducts these auctions *on behalf of* developers, who are sellers in both substance and form." TAC ¶ 442. Google's technical role in determining who can bid in developers' auctions does not change the fact that Google and Facebook compete directly for inventory in those auctions and does not change Google's economic interest in minimizing the prices it pays for inventory. Google cannot point to any facts in the TAC that would convert its relationship with Facebook into a vertical one.

### 2.    The Jedi Blue contract is a *per se* violation of Section 1.

"Horizontal price-fixing conspiracies traditionally have been, and remain, the archetypal example of a *per se* unlawful restraint on trade." *Apple, Inc.*, 791 F.3d at 321 (internal quotation marks omitted). This condemnation is not limited to agreements that "literally set or restrict prices," but applies to any conspiracy "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing [ ] price." *Id.* at 327; *see also New York ex rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 399, 412 (S.D.N.Y. 2000) ("[C]ourts must look at the challenged horizontal agreement's practical effect on price and competition.").

In the Jedi Blue contract, Google and Facebook "tamper[ed] with price structures" and "directly interfer[ed] with the free play of market forces." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940). Specifically, the agreement decouples the basic relationship between price and value, providing that Facebook will win a predetermined percentage of developers' auctions regardless of the outcomes a competitive market would have produced. TAC

¶ 440. This inventory allocation scheme reduces the firms' incentives to bid aggressively against each other, thereby suppressing prices paid to the developers who sell in these auctions. Compared to bidders unprotected by collusion, Google and Facebook can submit lower bids, knowing that the other will follow the move to achieve their pre-agreed market share targets. *Id*. Such a scheme is a *per se* violation of Section 1 for the same reasons that apply whenever bidders suppress or inflate prices by manipulating auctions. *See United States v. Joyce*, 895 F.3d 673, 679 (9th Cir. 2018); *United States v. Bensinger Co.*, 430 F.2d 584, 589 (8th Cir. 1970).

The Jedi Blue contract also fixes market share on the output side by effectively establishing a minimum share of sales volume that 'belongs' to Facebook. TAC ¶¶ 444–45. This downstream allocation excludes competitors and reduces the firms' incentives to underprice each other in resale, raising prices paid by the advertisers who purchase the resold impressions. That too is a *per se* violation of Section 1 for the same reasons that apply when retailers agree to allocate territory or customers. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972).

Nonetheless, Google insists that there is something "novel" about Jedi Blue that bars application of the *per se* rule. Mot. at 37. But a horizontal agreement allocating market share receives *per se* treatment for the same reason as price-fixing and bid-rotation schemes: they all allow horizontal competitors to reduce output and increase profit margins. *See* 12 Areeda, *supra*, at ¶ 2006. And a new technological backdrop is not a basis for escaping *per se* liability. *See Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 349 (1982) ("[T]he Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike.").[11]

---

[11] The sole case Google cites to the contrary is inapposite because, unlike the States' allegations here, the evidence at summary judgment showed that "there would be no competition but for the agreements." Mot. at 38 (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1050–54 (9th Cir. 1983)). By contrast, the States have alleged a naked restraint that is unnecessary to bring about competition between the co-conspirators. *See* TAC ¶ 446.

Finally, Google suggests that the auction allocation scheme has "obviously procompetitive effects." Mot. at 37. At bottom, however, Google contrives only one "benefit" specific to the challenged terms—they "ensured that Facebook would bid high enough to win at least some auctions." *Id*. at 38 (internal quotation marks omitted). Every bid-rigger in history could say the same thing. That is not a "benefit" over a collusion-free world in which Facebook bids high enough to win *without* protection from Google. And whether a *per se* violation may be "well intended" or "allegedly developed to increase competition" is irrelevant. *Topco*, 405 U.S. at 610.

### 3.    Contractual formalisms cannot salvage an unlawful agreement.

Unable to defend its naked horizontal restraint on the merits, Google points to the fine print of its contract, which was carefully drafted in anticipation of antitrust scrutiny. But Section 1 cannot be evaded through clever contracting. As the Supreme Court has explained, "[i]n interpreting the antitrust laws, we are not bound by formal conceptions of contract law." *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 208 (1968). Rather, "[w]e must look at the economic reality of the relevant transactions." *Id.; see also Am. Needle, Inc. v. Nat'l. Football League*, 560 U.S. 183, 195 (2010) ("[S]ubstance, not form, should determine whether a[n] . . . entity is capable of conspiring under § 1.") (alterations in original). None of the contractual technicalities invoked by Google alters the economic substance of its agreement.

First, Google notes that the contract now requires only "commercially reasonable efforts" to abide by the auction-allocation scheme, as if these three words could foil the Sherman Act. Mot. at 36. By this logic, Google would excuse conspiring CEOs who promised to use only "commercially reasonable efforts" to avoid entering each other's territory, or "commercially reasonable efforts" not to sell below $5. *Cf. United States v. Andreas*, 216 F.3d 645, 650 (7th Cir. 2000); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 476 (10th Cir. 1990). Those words

would not have saved the CEOs in those cases from prison, and they cannot save Google from the *per se* rule here.

Second, Google claims that the contractual obligation to achieve the win rate runs only to Facebook, with Google free to bid however it wants. Mot. at 36. However, "other provisions in the agreement penalized *Google* if Facebook failed to obtain its promised win rate," an inconvenient fact that Google ignores. TAC ¶ 450 (emphasis added); Mot. at Ex. A (Network Bidding Agreement) § 6.10. And to the extent that Google now hopes to read its own contract differently, any ambiguities must be construed in favor of the States. *See Int'l. Audiotext Network, Inc. v. AT&T Co.*, 62 F.3d 69, 72 (2d Cir. 1995). In any event, Section 1 is concerned with restraints on competition, not contract-law formalities. *See Concentrated Phosphate*, 393 U.S. at 208. It is irrelevant which party technically holds the contractual obligation to carry out the unlawful scheme; indeed, an agreement can violate Section 1 without being enforceable in court at all. *See Andreas*, 216 F.3d at 650; *Suntar Roofing*, 897 F.2d at 476; *Citigroup*, 709 F.3d at 136.

### 4.    The States sufficiently plead the rule of reason.

As established above, Google and Facebook's agreement should be condemned under the *per se* rule. In the alternative, the States have also alleged that the Jedi Blue agreement is unlawful under the rule of reason. TAC ¶ 545. Whether ultimately evaluated by a quick look or full rule of reason analysis, *see Nat'l. Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692–93 (1978), the alleged facts state a claim upon which relief may be granted.

The TAC alleges a straightforward mechanism by which the Jedi Blue agreement suppresses prices paid to developers. When two buyers set boundaries on their respective shares of inventory, each can bid less aggressively, knowing that the other will follow. TAC ¶ 440. Compared to a bidder unprotected by collusion, a participant in a buying cartel can submit lower

bids without the same risk of losing share. *Id*. ¶ 441. Likewise, a guaranteed share of inventory excludes rivals and allows the conspiring firms to raise prices on resale. *Id*. ¶ 445. This is basic cartel economics, and Google does not argue otherwise. *See* 12 Areeda, *supra*, at ¶ 2011a.

Instead, Google rehashes many of the same formalistic arguments discussed above, suggesting that a contractual agreement that Facebook will win at least 7.2 percent of all auctions "do[es] not address—much less limit—Google's bidding." Mot. at 39. However, because an impression won by Facebook cannot be won by Google, TAC ¶ 439, such an agreement unquestionably addresses—and necessarily limits—Google's bidding. By simple arithmetic, these competitors planned that Facebook would not win fewer than 7.2 percent of developers' auctions and Google would not win more than 92.8 percent. *Id*. ¶ 440.

Google next suggests that the claim should fail because the agreement restrains competition and depresses bidding in auctions where "only" 50–60 percent of all in-app impressions are sold. Mot. at 39. But that share is more than sufficient to affect prices. *See* TAC ¶¶ 440, 445; *Apple, Inc.*, 791 F.3d at 327 (holding that publishers' collective shares of 48.8 percent of ebook sales gave them "sufficient clout to demand control over pricing"). Google also suggests that the market-wide effect of the scheme would be small because Jedi Blue allocated "just" 7.2 percent of covered auctions. Mot. at 39. This argument fundamentally mischaracterizes the States' theory. Pre-allocating a fixed share of auction victories will soften bidding and reduce prices across *every* auction—not just the ones Facebook was assured of winning. TAC ¶ 440.[12]

As Google recognizes, allegations of actual adverse effects on competition make it unnecessary to reach the question of market power. *See* Mot. at 38; *Geneva Pharm. Tech. Corp. v.*

---

[12] The two cases cited by Google are inapposite. In *Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*, the plaintiff made "no allegation . . . that the agreements . . . effected price, output or quality of services in the overall market for advertising space." 516 F. Supp. 2d 270, 293 (S.D.N.Y. 2007). And *PepsiCo, Inc. v. Coca-Cola Co.*, involved the sufficiency of the evidence at summary judgment. 315 F.3d 101, 111 (2d Cir. 2002).

*Barr Lab'ys Inc.*, 386 F.3d 485, 509 (2d Cir. 2004). But for the avoidance of doubt, the States *have* alleged that Google possesses power in the market for in-app mediation tools, TAC ¶¶ 227–31, and that the combined force of Google's and Facebook's in-app networks allowed them to exclude competitors, raise prices charged to advertisers, and depress prices paid to developers. *Id*. ¶ 445. That is the very definition of market power, should such proof ultimately be necessary.

## IV.    THE STATES' CLAIMS ARE TIMELY.

Google's timeliness arguments are baseless and have no place in this sovereign enforcement action involving years of continuous, interrelated anticompetitive conduct in complex and opaque markets—much of which Google intentionally concealed and misrepresented. Moreover, because Google's arguments are not directed to the entirety of the States' Section 2 claims (Counts I and II), they are not a basis for dismissal of those claims. *See Tromblee v. New York*, No. 1:19-CV-0638 (LEK/CFH), 2021 WL 981847, at *11 (N.D.N.Y. Mar. 16, 2021) (a defendant must move to dismiss "*claims*," not "theories" or "specific allegations"); *F.T.C. v. Facebook, Inc.*, No. CV 20-3590 (JEB), 2022 WL 103308, at *17 (D.D.C. Jan. 11, 2022) ("A 'motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims.'") (quoting *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) and collecting cases).

### A.    Google Cannot Invoke the Doctrine of Laches Against the States.

Google's laches defense fails at the outset because the States, as sovereign law enforcers suing to vindicate public rights, are "exempt from the consequences of [their] laches." *Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 132 (1938). This rule applies for "the public benefit," *id*., because, even as sovereign enforcers work diligently to protect their citizens and economies, resource constraints and the difficulty of detecting unlawful conduct will render some delays unavoidable. The public should not suffer, and wrongdoers should not profit, from these unavoidable delays. For this reason, courts consistently hold that laches and other time bars are

inapplicable to States suing under federal laws.[13] This rule is particularly important in antitrust cases, where "there may be good reason not to sue unlawful monopolies until they prove resistant to self-correcting natural market forces." 2 Areeda, *supra*, at ¶ 320g; *see also Massachusetts ex rel. Bellotti v. Russell Stover Candies, Inc*., 541 F. Supp. 143, 144–45 (D. Mass. 1982) ("The defense of laches is no bar to a suit brought by the government to vindicate a public right, particularly one so important as the enforcement of the antitrust laws.").

Google cites a single, out-of-circuit district court opinion, currently on appeal, to support application of laches to the States. Mot. at 13 n.4. That opinion is not only factually inapposite but also legally unsound. *Facebook*, 2021 WL 2643724, at *20. Specifically, the court in that case reasoned that sovereign states should be treated the same as private litigants because they sought relief under Section 16 of the Clayton Act. *Id*. Section 16, however, entitles plaintiffs to relief "under the same conditions and principles" as relief "granted by courts of equity," 15 U.S.C. § 26, and under well-settled principles of equity, laches can apply against private litigants but not against sovereign law enforcers—"state or national." *Guaranty Tr.*, 304 U.S. at 132–33. This immunity predates and exists independently of any statute, arising instead from the capacity in which the sovereign sues, *i.e.*, as *parens patriae* to enforce the law and protect public rights. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982) (explaining that states suing as *parens patriae* "articulate an interest apart from the interests of particular private parties"). Accordingly, Congress must include an "unequivocal statement" in any statute that will deprive states of this traditional sovereign protection. *Sossamon v. Texas*, 563 U.S. 277, 290 (2011); *see also Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) ("This plain statement rule is nothing more

---

[13] *See, e.g.*, *Illinois v. Kentucky*, 500 U.S. 380, 388 (1991) (federal common law); *United States v. Letter from Alexander Hamilton to the Marquis de Lafayette Dated July 21, 1780*, 15 F.4th 515, 526 (1st Cir. 2021) (federal civil forfeiture); *United States v. Mottolo*, 605 F. Supp. 898, 909 (D.N.H. 1985) (federal environmental law).

than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere."). Congress did precisely this in expressly subjecting states' antitrust claims *for damages* (under Section 4c) to a four-year limitations period. *See* 15 U.S.C. § 15b. Conversely, Congress has not used any language—much less unequivocal language—with respect to claims for injunctive relief under Section 16. *Cf.* 3 Sutherland Statutory Construction § 62:1 (8th ed.) ("Courts strictly, or narrowly, construe statutes in derogation of sovereignty.").

### B.   Even If It Could Apply, Laches Would Not Bar Any of the States' Claims.

Even if laches could, in theory, apply against the States, the affirmative defense "is generally not appropriately raised in a motion to dismiss" because it "involve[s] a fact-intensive analysis and balancing of equities." *Lennon v. Seaman*, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999). To prevail, Google would need to "establish both plaintiff's unreasonable lack of diligence under the circumstances in initiating an action, as well as prejudice from such a delay." *King v. Innovation Books*, 976 F.2d 824, 832 (2d Cir. 1992). Dismissal based on laches is appropriate only where these elements are "clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar." *Lennon*, 63 F. Supp. 2d at 439. Here, neither element is present, much less clear, on the face of the TAC.

### 1.   Unreasonable delay is not clear on the face of the complaint.

Google relies exclusively on the Clayton Act's four-year statute of limitations for damages as a stand-in for unreasonable delay, arguing that the States cannot seek relief for conduct that "began more than four years before the filing of [the States'] original complaint." Mot. at 12–13. But the limitations provision Google invokes says something distinctly different: actions for damages are barred "unless commenced within four years *after the cause of action accrued*." 15 U.S.C. § 15b (emphasis added). Accrual should not be confused with the date the defendant took its first

unlawful action. *See Berkey*, 603 F.2d at 296 ("Untoward consequences would follow were we to hold that the anticompetitive conduct itself triggered the running of the limitations period."). Rather, a claim accrues when the "plaintiff feels the adverse impact" of the unlawful conduct. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). Unlike the merger cases on which Google relies—where the earliest date of injury is nearly certain—the harm resulting from monopolization and tying conduct often materializes long after the conduct began, making accrual a fact-intensive analysis that Google has not, and cannot, satisfy based on the TAC alone.

Even if Google could make a showing of delay, that delay would not be unreasonable for at least two reasons. First, the TAC alleges that Google repeatedly concealed and misrepresented its conduct. TAC ¶¶ 278–79, 291, 313, 327–28, 338, 341–47, 385–86, 466. This fraudulent concealment precludes the application of laches. *See Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000). Accordingly, the States are "entitled to an opportunity to prove fraudulent concealment at trial or, at least, adduce a fuller record on a motion for summary judgment." *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 195–96 (S.D.N.Y. 2018).[14]

Second, the conduct that Google argues is barred by laches falls under the continuing violation exception, which tolls any limitations period when a defendant continues to commit "overt acts" within the limitations period. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). The overt act requirement weeds out cases "where all of the harm occurred at the time of the initial violation." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014). For example, a defendant commits an overt act with each sale resulting from a price fixing conspiracy,

---

[14] "[U]nlike the application of fraudulent concealment to toll a statute of limitations, specific elements need not be pleaded when asserting a defendant's wrongdoing to counter the affirmative defense of laches." *Gordon v. Amadeus IT Grp., S.A.*, 194 F. Supp. 3d 236, 251–52 (S.D.N.Y. 2016).

*Klehr*, 521 U.S. at 189, and with each refusal to sell in furtherance of a monopolization scheme, *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968).

For each category of conduct identified in the Motion, Google committed overt acts every time it interfered with or manipulated the purchase or sale of an impression. *See, e.g.*, TAC ¶ 261 (continues encrypting user IDs through today), ¶ 251 (reinforced its tie over time), ¶ 271 (continued Dynamic Allocation interference through 2019), ¶ 293 (continues EDA interference through today), ¶ 318 (continued DRS auction manipulations though 2019), ¶¶ 331, 348 (launched new version of RPO and continues auction manipulations through today). Moreover, conduct that began before December 2016 furthered Google's overarching monopolization scheme, *see supra* Sec. II.A.2, rendering "piecemeal dismissal" improper, as the more recent acts may well "have contributed to the damages associated with pre-limitations acts." *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 654 F. Supp. 1195, 1204–05 (N.D.N.Y. 1987).[15]

None of Google's arguments support a contrary conclusion. Google's contention that "the TAC fails to allege facts showing that Google did anything other than continue to engage in the same conduct" misses the point. Mot. at 14. An act is still "overt" even if the defendant "previously committed the same type of act as part of a unified anticompetitive strategy." *Klein*, 2022 WL 141561, at *33–34. Google's invocation of cases involving anticompetitive contracts—where the overt act is the imposition of agreed-to contract terms—is even further afield. Mot. at 14. And Google's suggestion that the States should be treated less favorably than private plaintiffs because they do not seek federal damages defies both law and logic. *Cf.* 2 Areeda, *supra*, at ¶ 320g ("[T]he delayed government suit is more likely to be addressed to significant public harms than the private

---

[15] *See also Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 353–54 (D. Vt. 2010) (denying motion to dismiss on laches grounds where plaintiff alleged an overarching monopolization scheme); *Teladoc, Inc. v. Tex. Med. Bd.*, No. 1-15-CV-343 RP, 2015 WL 8773509, at *5 (W.D. Tex. Dec. 14, 2015) (same); *GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 836–37 (E.D. Mich. 2018) (same).

and more selfishly motivated suit."). State enforcers often rely on industry participants to learn about potential violations, especially for markets involving complex technology, and applying laches would discourage measured investigation and encourage a "sue first, ask later" approach.

### 2.     Prejudice is not clear on the face of the complaint.

Google's laches defense independently fails because Google has not demonstrated prejudice resulting from any delay. *See Argus Inc. v. Eastman Kodak Co.*, 552 F. Supp. 589, 600 (S.D.N.Y. 1982). Google's passing reference to "continually improving its digital advertising tools," Mot. at 15, is not only unsupported by the TAC but also insufficient to establish prejudice. *See Gordon v. Amadeus IT Grp., S.A.*, 194 F. Supp. 3d 236, 251–52 (S.D.N.Y. 2016) ("[T]he axiomatic observation that an injunction will change the status quo is not an identification of prejudice sufficient to equitably bar Plaintiffs' claims.").[16] Moreover, it is difficult to discern how Google could be prejudiced by facing federal antitrust claims when it must answer for the same misconduct against parallel state law antitrust claims, TAC ¶¶ 546–602, to which laches does not apply. *See, e.g.*, *State v. Durham*, 860 S.W.2d 63 (Tex. 1993); *Hill v. Thompson*, 564 So. 2d 1 (Miss. 1989).

### C.     Google Cannot Seek Dismissal of the States' Prayer for Injunctive Relief.

The Court can readily dispense with Google's arguments regarding injunctive relief because "the availability of the specific relief requested pursuant to any given count of the Complaint is not relevant to the question of whether [a plaintiff] has stated a claim." *Burkina Wear, Inc. v. Campagnolo, S.R.L.*, No. 07 CIV. 3610, 2008 WL 1007634, at *3 (S.D.N.Y. Apr. 9, 2008). Thus, because "injunctions are remedies, not claims," *Brown v. Showtime Networks, Inc.*, 394 F.

---

[16] *See also In re Am. Express Anti-Steering Rules Antitrust Litig.*, No. 08-CV-2315 (NGG)(RER), 2016 WL 748089, at *14–15 (E.D.N.Y. Jan. 7, 2016) (explaining that no prejudice results from "[t]he mere continuation of the very conduct challenged by the plaintiff"); 2 Areeda, *supra*, at ¶ 320g ("[T]he right to engage in ongoing anticompetitive conduct should not ordinarily be acquired by prescription.").

Supp. 3d 418, 444 (S.D.N.Y. 2019), they cannot be dismissed under Rule 12(b)(6). *See In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 517 F. Supp. 2d 662, 666 (S.D.N.Y. 2007) (holding that a dispositive motion "as to a particular *remedy*—is outside the contemplation of the Federal Rules"); *Sturm v. Rasmussen*, No. 18-CV-01689-W-BLM, 2019 WL 626167, at *3 (S.D. Cal. Feb. 14, 2019) (holding that a prayer for relief could not be challenged under 12(b)(6) and collecting cases). Indeed, when a plaintiff prevails on a claim, the court has wide latitude to fashion relief that will address "the special needs of the individual case," *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972), even if that relief is not demanded in the pleadings. Fed. R. Civ. P. 54(c).

Procedural propriety aside, Google's argument ignores that the States seek relief beyond retrospective injunctive relief, including prospective injunctive and structural relief to remedy the ongoing harm from Google's anticompetitive conduct. TAC ¶ 683. Google's proposed rule—that equitable relief is categorically unavailable once some anticompetitive conduct has ceased—would prevent courts from remedying ongoing anticompetitive effects and persistent market distortions and allow companies to maintain ill-gotten monopolies simply by abandoning illegal practices when they are caught. For Section 2 violations, however, "it is the duty of the court to prescribe relief which will terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 133 (1969) ("[W]hen one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts."). Here, holistic consideration of the entirety of Google's ongoing anticompetitive scheme will ensure that the relief awarded is "effective to redress the violations and to restore competition" to advertising technology markets. *Ford*, 405 U.S. at 573 (internal quotation marks omitted).

### D.      The States' Claims Premised on Privacy Sandbox Are Ripe.

Finally, the States' allegations regarding the "actual and imminent" harm resulting from Google's Privacy Sandbox rollout are ripe for judicial review. *Ross v. Bank of Am., N. Am. (USA)*, 524 F.3d 217, 225–26 (2d Cir. 2008). The States allege that "[b]y the end of 2022, Google plans to modify Chrome to block publishers and advertisers from using the type of cookies they rely on to track users and target ads" and then provide new tracking mechanisms available only through Google's ad buying tools. TAC ¶¶ 474, 479. Advertisers have not taken this announcement as a speculative threat: "some advertisers are already preparing to shift their spend from competing ad buying tools to Google's." *Id.* ¶ 523. Thus, Privacy Sandbox "may have a real impact on present affairs." *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 64 (2d Cir. 1988) ("In the antitrust context in particular, a rule that has yet to be enacted or enforced may be ripe for review if its mere proposal is likely to inhibit competition.").

Google would have the States "await the consummation of threatened injury to obtain preventive relief." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201–02 (1983). That is neither required by law nor reasonable in these circumstances. Rather, the "risk of future harm" from Privacy Sandbox calls for "forward-looking, injunctive relief to prevent the harm from occurring," especially since the States seek relief for ongoing misconduct in the same markets. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021); *see also F.T.C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965). The Court need not turn a blind eye to Google's near-term plans as it considers how to restore the competitive market conditions that Google has destroyed.

### CONCLUSION

For these reasons, the States respectfully request that the Court deny Google's Motion. If the Court finds the TAC deficient in any respect, the States respectfully request leave to amend.

Dated: March 22, 2022                                    Respectfully Submitted,

FOR PLAINTIFF STATES OF TEXAS, IDAHO, INDIANA, LOUISIANA (THE LANIER LAW FIRM ONLY), MISSISSIPPI, NORTH DAKOTA, SOUTH CAROLINA, AND SOUTH DAKOTA:

*/s/ Ashley Keller*                                   */s/ Mark Lanier*
Ashley Keller                                         W. Mark Lanier (*lead counsel*)
Admitted Pro Hac Vice                                 Texas Bar No. 11934600
ack@kellerlenkner.com                                 Mark.Lanier@LanierLawFirm.com
Jason Zweig                                           Alex J. Brown
jaz@kellerlenkner.com                                 Alex.Brown@LanierLawFirm.com
Brooke Clason Smith                                   Zeke DeRose III
brooke.smith@kellerlenkner.com                        Zeke.DeRose@LanierLawFirm.com
150 N. Riverside Plaza, Suite 4100                    10940 W. Sam Houston Parkway N. Suite 100
Chicago, Illinois 60606                               Houston, Texas 77064
(312) 741-5220                                        Telephone: (713) 659-5200
Zina Bash                                             Facsimile: (713) 659-2204
zina.bash@kellerlenkner.com                           **THE LANIER LAW FIRM, P.C.**
111 Congress Avenue, Suite 500
Austin, TX 78701
(501) 690-0990
**KELLER LENKNER LLC**

*Attorneys for Plaintiff States of Texas, Idaho, Indiana, Louisiana (The Lanier Law Firm only), Mississippi, North Dakota, South Carolina, and South Dakota*

FOR PLAINTIFF STATE OF TEXAS:

KEN PAXTON
Attorney General


*/s/ Shawn E. Cowles*
Brent Webster, First Assistant Attorney
General of Texas
Brent.Webster@oag.texas.gov
Grant Dorfman, Deputy First Assistant
Attorney General
Grant.Dorfman@oag.texas.gov
Aaron Reitz, Deputy Attorney General for
Legal Strategy
Aaron.Reitz@oag.texas.gov
Shawn E. Cowles, Deputy Attorney
General for Civil Litigation
Shawn.Cowles@oag.texas.gov
Nanette DiNunzio, Associate Deputy
Attorney
General for Civil Litigation
Nanette.Dinunzio@oag.texas.gov

James R. Lloyd, Chief,
Antitrust Division
James.Lloyd@oag.texas.gov
Bret Fulkerson, Deputy Chief,
Antitrust Division
Bret.Fulkerson@oag.texas.gov
Nicholas G. Grimmer, Assistant Attorney
General, Antitrust Division
Nick.Grimmer@oag.texas.gov
Trevor Young, Assistant Attorney General,
Antitrust Division
Trevor.Young@oag.texas.gov
Gabriella Gonzalez, Assistant Attorney
General, Antitrust Division
Gabriella.Gonzalez@oag.texas.gov
Margaret Sharp, Assistant Attorney General,
Antitrust Division
Margaret.Sharp@oag.texas.gov
Kelsey Paine, Assistant Attorney General,
Antitrust Division
Kelsey.Paine@oag.texas.gov
William Shieber, Assistant Attorney
General, Antitrust Division
William.Shieber@oag.texas.gov
Matthew Levinton, Assistant Attorney
General, Antitrust Division
Matthew.Levinton@oag.texas.gov


Ralph Molina, Assistant Attorney General,
General Litigation Division
Ralph.Molina@oag.texas.gov


**OFFICE OF THE ATTORNEY GENERAL OF TEXAS**
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674

*Attorneys for Plaintiff State of Texas*

FOR PLAINTIFF STATE OF ALASKA:


TREG R. TAYLOR
Attorney General


By :     */s/ Jeff Pickett*
         Jeff Pickett
         Senior Assistant Attorney General, Special Litigation Section
         jeff.pickett@alaska.gov

         *Attorney for Plaintiff State of Alaska*

FOR PLAINTIFF STATE OF ARKANSAS:


LESLIE RUTLEDGE
ATTORNEY GENERAL

By:      */s/ Johnathan R. Carter*
         Johnathan R. Carter – AR Bar # 2007105
         Assistant Attorney General
         Office of the Arkansas Attorney General
         323 Center Street, Suite 200
         Little Rock, AR 72201
         Phone: 501.682.8063
         Fax: 501.682.8118
         Email: Johnathan.Carter@Arkansasag.gov

         *Attorney for Plaintiff State of Arkansas*

FOR PLAINTIFF STATE OF FLORIDA:

ASHLEY MOODY, Attorney General

*/s/ R. Scott Palmer*
R. SCOTT PALMER, Interim Co-Director, Antitrust Division
FL Bar No. 220353
JOHN GUARD, Chief Deputy Attorney General
LEE ISTRAIL, Assistant Attorney General
CHRISTOPHER KNIGHT, Assistant Attorney General
ANDREW BUTLER, Assistant Attorney General

Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Phone: 850-414-3300
Email: scott.palmer@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

FOR PLAINTIFF STATE OF IDAHO:

LAWRENCE G. WASDEN
Attorney General

*/s/ Brett T. DeLange*
Brett T. DeLange, Division Chief, Consumer Protection Division
John K. Olson, Deputy Attorney General

Consumer Protection Division
Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone: (208) 334-2424
brett.delange@ag.idaho.gov
john.olson@ag.idaho.gov

*Attorneys for Plaintiff State of Idaho*

FOR PLAINTIFF STATE OF INDIANA:

THEODORE E. ROKITA
Attorney General

The Office of the Indiana Attorney General

By: _____
       Scott Barnhart
       Chief Counsel and Director of Consumer Protection
       Indiana Atty. No. 25474-82
       Indiana Government Center South – 5th Fl.
       302 W. Washington Street
       Indianapolis, IN 46204-2770
       Phone: (317) 232-6309
       Fax: (317) 232-7979
       Email: scott.barnhart@atg.in.gov


_____
Matthew Michaloski
Deputy Attorney General
Indiana Atty. No. 35313-49
Indiana Government Center South – 5th Fl.
302 W. Washington Street
Indianapolis, IN 46204-2770
Phone: (317) 234-1479
Fax: (317) 232-7979
Email: matthew.michaloski@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

FOR PLAINTIFF COMMONWEALTH OF KENTUCKY:

DANIEL CAMERON
Attorney General

J. Christian Lewis
Executive Director of Consumer Protection


Christian.Lewis@ky.gov
Philip R. Heleringer, Deputy Director of Consumer Protection
Philip.Heleringer@ky.gov
Jonathan E. Farmer, Assistant Attorney General
Jonathan.Farmer@ky.gov
Office of the Attorney General,
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Tel: 502-696-5300

*Attorneys for Commonwealth of Kentucky*

FOR PLAINTIFF STATE OF LOUISIANA:

HON. JEFF LANDRY
ATTORNEY GENERAL, STATE OF LOUISIANA
Michael Dupree
Christopher J. Alderman
1885 N. 3rd Street
Baton Rouge, LA 70802

*s/ James R. Dugan, II*
James R. Dugan, II (*pro hac vice*)
TerriAnne Benedetto (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
PH:   (504) 648-0180
FX:   (504) 649-0181
EM:   jdugan@dugan-lawfirm.com
        tbenedetto@dugan-lawfirm.com

James Williams
CHEHARDY SHERMAN WILLIAM, LLP
Galleria Boulevard, Suite 1100
Metairie, LA 70001
PH:   (504) 833-5600
FX:   (504) 833-8080
EM:   jmw@chehardy.com

*Attorneys for the State of Louisiana*

FOR PLAINTIFF STATE OF MISSISSIPPI:

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By:    */s/ Hart Martin*
      Hart Martin
      Consumer Protection Division
      Mississippi Attorney General's Office
      Post Office Box 220
      Jackson, Mississippi 39205
      Telephone: 601-359-4223
      Fax: 601-359-4231
      Hart.martin@ago.ms.gov

      *Attorney for Plaintiff State of Mississippi*

FOR PLAINTIFF STATE OF MISSOURI:

Eric Schmitt
Attorney General

Amy.Haywood@ago.mo.gov
Missouri Attorney General's Office
P.O. Box 899
Jefferson City, Missouri 65102
Tel: 816-889-3090

*Attorneys for Plaintiff State of Missouri*

FOR PLAINTIFF STATE OF MONTANA:

AUSTIN KNUDSEN
Montana Attorney General


*/s/ David M.S. Dewhirst*
DAVID M.S. DEWHIRST
Solicitor General
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: (406) 442-1894
david.dewhirst@mt.gov
mmattioli@mt.gov

*/s/ Charles J. Cooper*
Charles J. Cooper
ccooper@cooperkirk.com
David H. Thompson
dthompson@cooperkirk.com
Brian W. Barnes
bbarnes@cooperkirk.com
Harold S. Reeves
hreeves@cooperkirk.com
COOPER & KIRK PLLC
1523 New Hampshire Avenue, NW
Washington DC 20036
Phone: (202) 220-9620
Fax: (202) 220-9601

*Attorneys for Plaintiff State of Montana*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General
ERNEST D. FIGUEROA
Consumer Advocate


*/s/ Marie W.L. Martin*
Marie W.L. Martin (NV Bar No. 7808)
Senior Deputy Attorney General
MWMartin@ag.nv.gov
Lucas J. Tucker (NV Bar No. 10252)
Senior Deputy Attorney General
LTucker@ag.nv.gov
Office of the Nevada Attorney General
Senior Deputy Attorney General
Michelle Newman (NV Bar No. 13206)
mnewman@ag.nv.gov
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100

*Attorneys for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NORTH DAKOTA:


**STATE OF NORTH DAKOTA**
Drew H. Wrigley
Attorney General


By:     */s/ Elin S. Alm*
        Parrell D. Grossman, ND ID 04684
        Elin S. Alm, ND ID 05924
        Assistant Attorneys General
        Consumer Protection & Antitrust Division
        Office of Attorney General of North Dakota
        1720 Burlington Drive, Suite C, Bismarck, ND 58503-7736
        (701) 328-5570
        (701) 328-5568 (fax)
        pgrossman@nd.gov
        ealm@nd.gov

        *Attorneys for Plaintiff State of North Dakota*

FOR PLAINTIFF COMMONWEALTH OF PUERTO RICO:

*/s/ Domingo Emanuelli-Hernández*
Domingo Emanuelli-Hernández
Attorney General
Thaizza Rodríguez Pagán
Assistant Attorney General
PR Bar No. 17177
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, ext. 1201, 1204
trodriguez@justicia.pr.gov

*Attorneys for Plaintiff Commonwealth of Puerto Rico*

FOR PLAINTIFF STATE OF SOUTH CAROLINA:

ALAN WILSON
Attorney General


/s/ *Rebecca M. Hartner*
Rebecca M. Hartner (S.C. Bar No. 101302)
Assistant Attorney General
W. Jeffrey Young
Chief Deputy Attorney General
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
Mary Frances Jowers
Assistant Deputy Attorney General
South Carolina Attorney General's Office
P.O. Box 11549
Columbia, South Carolina 29211-1549
Phone: 803-734-3970
Email: rhartner@scag.gov

Charlie Condon
Charlie Condon Law Firm, LLC
880 Johnnie Dodds Blvd, Suite 1
Mount Pleasant, SC 29464
Phone: 843-884-8146
Email: charlie@charliecondon.com

James R. Dugan, II (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
Phone: (504) 648-0180
Email: jdugan@dugan-lawfirm.com


*Attorneys for Plaintiff State of South Carolina*

FOR PLAINTIFF STATE OF SOUTH DAKOTA:

JASON R. RAVNSBORG
Attorney General


*/s/ Yvette K. Lafrentz*
Yvette K. Lafrentz
Assistant Attorney General
Consumer Protection Division
South Dakota Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501
P: 605.773.3215 F:605.773.4106
Yvette.lafrentz@state.sd.us

*Attorney for Plaintiff State of South Dakota*

FOR PLAINTIFF STATE OF UTAH:

Sean D. Reyes
Utah Attorney General

*/s/ Tara Pincock*
Tara Pincock
Assistant Attorney General, Antitrust Section
Office of the Utah Attorney General
160 E 300 S, 5th Floor
PO Box 140874
Salt Lake City, UT 84114-0872
Telephone: 385-881-3958
Fax: 801-366-0315

*Attorneys for Plaintiff State of Utah and as counsel for the Utah Division of Consumer Protection*