# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ——————————————— | : | |
| IN RE GOOGLE DIGITAL ADVERTISING | : | Case No. 1:21-md-3010 (PKC) |
| ANTITRUST LITIGATION | : | |
| | : | |
| ——————————————— | : | |
| | : | |
| *This Motion relates to:* | : | |
| | : | |
| THE STATE OF TEXAS, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| - against - | : | Case No. 1:21-cv-6841 (PKC) |
| | : | |
| GOOGLE LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| ——————————————— | : | |

## DECLARATION OF PHILIP KOROLOGOS IN SUPPORT OF PUBLISHER PLAINTIFFS' MOTION FOR LEAVE TO FILE JOINT AMICUS BRIEF IN OPPOSITION TO DEFENDANT GOOGLE LLC'S MOTION TO DISMISS THE STATES' THIRD AMENDED COMPLAINT

I, Philip Korologos, hereby declare under penalty of perjury the following:

1.      I am an attorney for Plaintiffs Genius Media Group, Inc., The Nation

Company, L.P., The Progressive, Inc. individually and for those similarly situated (the

"Publisher Class Plaintiffs") in the matter *In re: Google Digital Advertising Antitrust Litig.*, No.

21-md-3010-PKC, and am admitted to practice in the Southern District of New York.

2.      I submit this declaration in support of the Motion by the Publisher Class

Plaintiffs, the Direct Newspaper Plaintiffs,[1] and for Associated Newspapers Ltd. and Mail Media

Inc. (collectively the "Publisher Plaintiffs") for Leave to file a Joint Amicus Brief in Opposition

to Defendant Google LLC's Motion to Dismiss the States' Third Amended Complaint.

3.      Publisher Plaintiffs focus on those issues bearing upon the sufficiency of the

States' claims as they relate to the interests of publishers.

4.      Attached as Exhibit A hereto is a true and correct copy of Publisher Plaintiffs'

Proposed Joint Amicus Brief which we submit at this time to ensure maximum time for Google to

---

[1] The "Direct Newspaper Plaintiffs" consist of AIM Media Indiana Operating, LLC, AIM Media Midwest Operating, LLC, AIM Media Texas Operating, LLC, Brown County Publishing Company, Inc. and Multi Media Channels, LLC, Clarksburg Publishing Company, d/b/a WV News, Coastal Point LLC, Eagle Printing Company, Ecent Corporation, Emmerich Newspapers, Incorporated, J.O. Emmerich & Associates, Inc., Delta Democrat Publishing Company, Commonwealth Publishing Company, Inc., Delta Press Publishing Company, Inc., Newton County Appeal Inc., Marion Publishing, Company, Yazoo Newspaper, Co., Inc., Sunland Publishing, Company, Inc., Simpson Publishing Co., Inc., Montgomery Publishing Co., Inc., Franklinton Publishing Co., Inc., Charleston Publishing Co., Inc., Clarion Publishing Company, Inc., Scott Publishing, Inc., Clarke Publishing, Inc., Hattiesburg Publishing, Inc., Tallulah Publishing, Inc., Louisville Publishing, Inc., Kosciusko Star-Herald, Inc., Enterprise-Tocsin, Inc., Grenada Star, Inc., Tate Record Inc., Flag Publications, Inc., Gale Force Media, LLC, HD Media Company, LLC, Journal Inc., Robinson Communications, Inc., Something Extra Publishing, Inc., Rome News Media, LLC, Times Journal, Inc., Neighbor Newspapers, Savannah Publishing Co., Inc., Gould Enterprises, Inc., Union City Daily Messenger, Inc., Weakley County Press, Inc., and Southern Community Newspapers, Inc.

be able to respond to points raised in the brief as it may so choose without disrupting the current

briefing schedule.

New York, New York.
March 24, 2022

                  By: _____/s/ Philip Korologos_____
                           Philip Korologos

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING | : | Case No. 1:21-md-3010 (PKC) |
| ANTITRUST LITIGATION | : | |
| | : | |
| | : | |
| *This Motion relates to:* | : | |
| | : | |
| THE STATE OF TEXAS, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| - against - | : | Case No. 1:21-cv-6841 (PKC) |
| | : | |
| GOOGLE LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**[PROPOSED] JOINT AMICUS BRIEF OF PUBLISHER PLAINTIFFS
IN OPPOSITION TO DEFENDANT GOOGLE LLC'S MOTION TO DISMISS THE
STATES' THIRD AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

II.   ARGUMENT .................................................................................................................. 1

   A.   Google Obtained and Maintained its Dominant Gatekeeping Position in the Ad
   Server Market Through an Illicit Tie.......................................................................... 1

      1.   The States' TAC alleges a cognizable tie. ........................................................ 2

      2.   The States plead monopoly power in the ad exchange (tying) market. ................. 3

   B.   Once Entrenched as a Gatekeeper, Google Engaged in Further Exclusionary
   Conduct to Exclude and Impair Rival Ad Exchanges ............................................... 5

      1.   By hashing user IDs Google degraded publishers' transactional data. ................. 7

      2.   Google manipulated advertising auctions and then precluded competition from
      header bidding. ..................................................................................................... 9

   C.   Google's Conduct Does Not Constitute Lawful Refusals to Deal ............................ 12

   D.   Google's Conduct to Entrench its Monopoly Power in the Ad Server and Ad
   Exchange Markets Should Be Analyzed as a Single Anticompetitive Scheme ................. 15

III.  CONCLUSION ............................................................................................................. 16

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Other Authorities**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) .................................................................................. 3

*Bayou Bottling, Inc. v. Dr. Pepper Co.*,
725 F.2d 300 (5th Cir. 1984) ................................................................................. 14

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) .................................................................................. 5

*Broadway Delivery Corp. v. United Parcel Service of Am., Inc.*,
651 F.2d 122 (2d Cir. 1981) .................................................................................. 4

*Caldera, Inc. v. Microsoft Corp.*,
87 F. Supp. 2d 1244 (D. Utah 1999) ..................................................................... 13

*Christy Sports LLC v. Deer Valley Resort Co., Ltd.*,
555 F.3d 1188 (10th Cir. 2009) ............................................................................ 14

*Church & Dwight Co., Inc. v. Mayer Labs. Inc.*,
2011 WL 1225912 (N.D. Cal. Apr. 1, 2011) ........................................................ 7

*City of Groton v. Conn. Light & Power Co.*,
662 F.2d 921 (2d Cir. 1981) ............................................................................ 15, 16

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
611 F.3d 495 (9th Cir. 2010) ................................................................................. 5

*Continental Ore v. Union Carbide & Carbon*,
370 U.S. 690 (1962) .............................................................................................. 15

*Conwood v. U.S. Tobacco Co.*,
290 F.3d 768 (6th Cir. 2002) ......................................................................... 6, 7, 8

*Dial Corp. v. News Corp.*,
165 F. Supp. 3d 25 (S.D.N.Y. 2016) ...................................................................... 8

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1991) ......................................................................................... 4, 13

*Eatoni Ergonomics, Inc. v. Research in Motion Corp.*,
486 F. App'x 186 (2d Cir. 2012) .......................................................................... 16

*F.T.C. v. Facebook, Inc.*,
2021 WL 2643627 (D.D.C. June 28, 2021) .......................................................... 14

*Frame-Wilson v. Amazon.com, Inc.*,
  2022 WL 741878 (W.D. Wash. Mar. 11, 2022).................................................. 12

*FTC v. Mylan Labs., Inc.*,
  62 F. Supp. 2d 25 (D.D.C. 1999) ............................................................................ 9

*General Motors Corp. v. Gibson Chemical & Oil Corp.*,
  786 F.2d 105 (2d Cir. 1986)..................................................................................... 3

*Hack v. President & Fellows of Yale College*,
  237 F.3d 81 (2d Cir. 2000)........................................................................................ 5

*Hayden Publishing Co. v. Cox Broadcasting Corp.*,
  730 F.2d 64 (2d Cir. 1984)........................................................................................ 4

*In re Buspirone Patent Litig.*,
  185 F. Supp. 2d 363 (S.D.N.Y. 2002)..................................................................... 6

*In re Credit Default Swaps Antitrust Litig.*,
  2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) ................................................... 9, 10

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009)...................................................................................... 6

*In re Interest Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017).................................................................... 10

*In re Intuniv Antitrust Litigation*,
  496 F. Supp. 3d 639 (D. Mass. 2020) ................................................................... 16

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019).................................................................... 8

*In re Lipitor Antitrust Litig.*,
  868 F.3d 231 (3d Cir. 2017)...................................................................................... 6

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
  562 F. Supp. 2d 392 (E.D.N.Y. 2008).................................................................... 4

*In re Time Warner Inc. Set-Top Cable Television Antitrust Litig.*,
  2010 WL 882989 (S.D.N.Y. Mar. 5, 2010) .......................................................... 2

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  340 F. Supp. 3d 285 (S.D.N.Y. 2018).................................................................... 9

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ........................................................................................................ 8

*Kaufman v. Time Warner*,
  836 F.3d 137 (2d Cir. 2016) ................................................................................. 3, 4

*Le v. Zuffa, LLC*,
  216 F. Supp. 3d 1154 (D. Nev. 2016) ........................................................................ 9

*Live Universe, Inc. v. MySpace, Inc.*,
  304 F. Appx. 554 (9th Cir. 2008) ............................................................................ 14

*Lorain Journal Co. v. United States*,
  342 U.S. 143 (1951) ............................................................................................... 13

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
  247 F.R.D. 253 (D. Mass. 2008) ............................................................................... 7

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015) ............................................................................... 6, 12

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) .............................................................................. 12

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
  555 U.S. 438 (2009) ............................................................................................... 14

*PepsiCo Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) ..................................................................................... 4

*Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*,
  351 F. Supp. 462 (E.D. Pa. 1972) ............................................................................. 9

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*,
  814 F.2d 358 (7th Cir. 1987) .................................................................................. 14

*Rebotix Repair LLC v. Intuitive Surgical, Inc.*,
  2021 WL 1227593 (M.D. Fla. Mar. 8, 2021) ............................................................ 3

Similarly, in *In re Lantus Direct Purchaser Antitrust Litig.*,
  950 F.3d 1 (1st Cir. 2020) ......................................................................................... 6

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506 (2002) ................................................................................................. 5

*Synopsys, Inc. v. AtopTech, Inc.*,
  2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) ............................................................ 3

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ................................................................................................. 8

*Tops Markets, Inc. v. Quality Markets, Inc.*,
142 F.3d 90 (2d Cir. 1998) ........................................................................ 4

*U.S. Steel Corp. v. Fortner Enterprises, Inc.,*
*("Fortner II")*, 429 U.S. 610 (1977) .......................................................... 5

*Unijax, Inc. v. Champion Int'l, Inc.*,
683 F.2d 678 (2d Cir. 1982) ...................................................................... 3

*United Shoe Machinery Corp. v. United States*,
258 U.S. 451 (1922) ................................................................................ 13

*United States v. Container Corp.*,
393 U.S. 333 (1969) ................................................................................ 10

*United States v. Microsoft*,
253 F.3d 34 (D.C. Cir. 2001) .................................................................... 6

*Valassis Communications Inc. v. News Corp.*,
2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) .......................................... 15

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko LLP*,
540 U.S. 398 (2004) ........................................................................... 14, 15

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) .................................................................... 3

*Yentsch v. Texaco, Inc.*,
630 F.2d 46 (2d Cir. 1980) ....................................................................... 3

I.     **INTRODUCTION**

The private Publisher Plaintiffs in this MDL respectfully submit this Amicus Brief to provide a publisher-specific perspective on the issues raised by Google's Motion to Dismiss (ECF 218, the "Br.") the States' Third Amended Complaint (ECF 195, the "TAC"). We focus on those issues bearing upon the sufficiency of the States' claims as they relate to the interests of publishers.

The States allege an anticompetitive scheme beginning with Google tying its ad exchange to its ad server to secure Google's dominant position in setting the rules governing ad auctions and the selection of winning bids. TAC ¶¶19, 148, 246-52. Google's tie coerced publishers to use its ad server even though Google repeatedly degraded its quality, causing the ad server to serve *Google's* interests at the expense of publishers. *Id.* Google then used its dominance in the ad server market to engage in additional exclusionary, anticompetitive acts as part of a scheme to maintain and entrench its monopoly power in the ad exchange market. *See* TAC, Sec. VII. Google thus used its power in one market to reinforce its power in the other, and *vice versa*.

II.     **ARGUMENT**

    A.     **Google Obtained and Maintained its Dominant Gatekeeping Position in the Ad Server Market Through an Illicit Tie**

Ad servers are critically important to publishers because they, *inter alia*, select the winning bid from multiple "demand sources." TAC ¶¶20, 54, 64, 252-53. Google used an anticompetitive tie to bolster and maintain its dominant position as auction overseer—requiring publishers seeking unimpaired access to AdX (Google's ad exchange) to use Google's ad server. *See id.* ¶¶4, 8, 19-27, 245-52. As part of its anticompetitive scheme, Google used its illegally bolstered monopoly power in the ad server market to exclude competition in the ad exchange market in violation of Sherman Act Sections 1 and 2. *Id.* ¶¶19-27, 119-120, 244-412, 451-69.

1.        **The States' TAC alleges a cognizable tie.**

The TAC alleges that Google tied its ad server to its exchange by allowing only

publishers using Google's ad server to have unimpeded access to "must have" advertiser demand

available through Google's ad exchange. TAC ¶¶ 245–52; *id*. ¶246 ("since 2010, Google has

deliberately restricted the ability of publishers using a non-Google ad server to trade through

AdX, only allowing publishers that license Google's ad server to receive live, competitive bids

from its exchange"). The tie became even more restrictive in 2018 when "Google began

renegotiating publisher contracts to eliminate the few remaining exchange-only contracts in

existence, requiring publishers to sign a combined contract that included both Google's DFP ad

server and Google's AdX exchange." *Id*. ¶251.

Google argues (at 27) the absence of a cognizable tie, arguing that "where the buyer is

free to take either product by itself there is no tying problem." *In re Time Warner Inc. Set-Top

Cable Television Antitrust Litig*., 2010 WL 882989, at *5 (S.D.N.Y. Mar. 5, 2010) (Castel, J.).

However, publishers understood that if they did not use Google's ad server, they would be

deprived of access to "must have" "live, competitive bids" from Google's exchange. TAC

¶¶246-52. *See Set-Top Cable*, 2010 WL 882989 at *8 ("The absence of a viable alternative to"

the tying product except through the tied product creates "a viable claim of actual coercion").[1]

Courts have repeatedly found that market actors' *understanding* that the tied and tying

products must be purchased together to function appropriately is sufficiently coercive to

---

[1] Google's reliance on *Set-Top Cable* overlooks a key fact in the Court's analysis: plaintiffs
therein had an *alternative means* of obtaining the purported tying product (premium cable
services) – they could purchase a third party CableCARD without purchasing the tied product
(Time Warner's cable boxes). 2010 WL 882989 at *6. The TAC clearly asserts that the *only* way
to receive live competitive bids from its exchange was for the publisher to license Google's ad
server. TAC ¶246.

constitute tying.[2] *See, e.g.*, *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 57 (2d Cir. 1980) (gas station franchisees understood their franchise agreements would be terminated if they refused to carry a specific product). For example, in *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), the defendant controlled access to platforms on which retail cable TV providers sold targeted advertising, and also offered "advertising representation services" that assisted in selling cable providers' ads. As with publishers here, providers in *Viamedia* understood that they were required to purchase the defendant's representation services to access the targeting platform. *Id.* at 446. The court found such understanding by the affected parties was sufficient. *Id.* at 470.

### 2. The States plead monopoly power in the ad exchange (tying) market.

The States adequately allege Google's monopoly power in the ad exchange market by alleging (1) Google had over 60 percent market share, TAC ¶¶151-53, along with (2) high barriers to entry, small and fragmented competition, and substantial exit of firms from the market, *id.* ¶¶153, 159-60; (3) unique advantages in the ad exchange market not shared by competitors, *id.* ¶¶146, 148; as well as (4) Google's power to inflate price profitably, *id.* ¶¶61,

---

[2] Google's cited cases, Br. at 27, 29, do not support a contrary view. *See Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685-86 (2d Cir. 1982) (no tying claim where no evidence defendant "ever required, or even threatened to require" the retailer to purchase any particular product); *Synopsys, Inc. v. AtopTech, Inc.*, 2015 WL 4719048, at *7-8 (N.D. Cal. Aug. 7, 2015) (no tying claim in absence of allegation buyer was obligated (or understood it was obligated) to purchase tied product to buy the tying product); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) (no tying claim because buyer did not understand that the seller required buyer to purchase tied services in order to access the tying products); *General Motors Corp. v. Gibson Chemical & Oil Corp.*, 786 F.2d 105 (2d Cir. 1986) (no tying claim where defendant did not sell the allegedly tied product); *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, 2021 WL 1227593, at *8 (M.D. Fla. Mar. 8, 2021) (no tying claim between sale of robot "arms" and the market for arm repair where defendant did not compete in or sell to any market for robot arm repair; it merely designed the product to have limited uses ). Google's reliance (Br. at 29) on *Kaufman v. Time Warner*, 836 F.3d 137, 144-46 (2d Cir. 2016), fails because plaintiffs there did not allege that the tying and tied products were in distinct product markets, unlike the distinct ad exchange and ad server markets at issue here.

156-60. These allegations suffice.

The Second Circuit considers direct evidence of the power to inflate prices or restrict output to be a superior method of demonstrating market power as compared with evidence of high market shares. *See Kaufman*, 836 F.3d at 143 ("best way to plead market power is to allege facts that, if proven, establish directly that the price of the of the tied package is higher than the price of components sold in competitive markets" (internal quote marks omitted)).[3] Further, a market share of 50% or lower can show monopoly power if other factors support such an inference, making sufficient the States' allegations of more than 60% market share when accompanied by allegations of market characteristics consistent with monopoly power. *See, e.g., Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984) ("a party may have monopoly power in a particular market, even though its market share is less than 50%"); *Broadway Delivery*, 651 F.2d at 130 (reversing jury instructions that "preclud[ed] a finding of monopoly power if the defendants' market share was less than 50%"); *see also Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) (same); TAC ¶¶151-53, 159-60. Indeed, there is no bright line rule as to the market share required to infer monopoly power.[4] *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1991).

---

[3] *See also Broadway Delivery Corp. v. United Parcel Service of Am., Inc.*, 651 F.2d 122, 129-30 (2d Cir. 1981) (even with relatively low market share, a Section 2 plaintiff may prevail based on evidence "that the defendant has the power to control prices or exclude competition"); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 562 F. Supp. 2d 392, 399 (E.D.N.Y. 2008); *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001)("Where evidence indicates that a firm has in fact [controlled prices or exclude competition] the existence of monopoly power is clear.").

[4] Google's argument is premised on an incomplete quotation and misreading reading of *PepsiCo Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002). Br. at 30, n.9. The Second Circuit did not impose a bright-line 65% market share requirement. Instead, *PepsiCo* held that market shares below 65% could satisfy Section 2 if the plaintiff can show other evidence of monopoly power, including "an ability to control prices or exclude competition." 315 F.3d at 109.

Likewise, courts have long recognized that plaintiffs can demonstrate economic power in a tying market by showing that the tying product has "some advantage not shared by . . . competitors in the market for the tying product," that requires purchasers to "accept burdensome terms that could not be exacted in a completely competitive market." *U.S. Steel Corp. v. Fortner Enterprises, Inc. ("Fortner II")*, 429 U.S. 610, 620 (1977); *Hack v. President & Fellows of Yale College*, 237 F.3d 81, 86 (2d Cir. 2000), *abrogated in part on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). The States meet this standard by alleging that Google's AdX provides publishers with exclusive access to *unique*, "must have" advertising demand, such that publishers see "substantial decreases" in bids, impressions sold, and revenues, making Google's AdX a "must have" product for publishers. *See* TAC ¶¶146, 148; *see also id.* ¶¶157, 247.

> **B.      Once Entrenched as a Gatekeeper, Google Engaged in Further Exclusionary Conduct to Exclude and Impair Rival Ad Exchanges**

Having cemented its dominance in ad serving, Google used the gatekeeping power acquired through the tie to impair rival ad exchanges by rigging auctions so that its advertising clients won with lower bids, *e.g.*, TAC ¶¶298-330, 376-84, and by punishing publishers and advertisers who dealt with rivals. As the Second Circuit noted, "We tolerate the existence of monopoly power . . . only insofar as necessary to preserve competitive incentives and to be fair to the firm that has attained its power innocently. There is no reason to allow the exercise of such power to the detriment of competition, in either the controlled market or any other." *Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263, 275 (2d Cir. 1979).

Multiple courts have held that exploiting improperly obtained or maintained monopoly power to harm rivals constitutes unlawful exclusionary conduct even where the conduct might be legal had that power been obtained lawfully. In *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc*., 611 F.3d 495, 505-07 (9th Cir. 2010), the Ninth Circuit held a company that had

improperly coerced an oversight body to extend it as the exclusive regulator of the .com domain name market, could not use that power to refuse to license services to rivals on fair terms. Similarly, in *In re Lantus Direct Purchaser Antitrust Litig.*, 950 F.3d 1 (1st Cir. 2020), the First Circuit held a firm that had gained monopoly power by falsely listing a patent in the FDA's "Orange Book," could not impose anticompetitive royalty agreements on rivals. In both *ICANN* and *Lantus*, courts thus condemned conduct that might otherwise have constituted lawful refusals to deal because the companies had obtained their gatekeeping power illicitly.

The Second Circuit followed this reasoning in *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 683, 694 (2d Cir. 2009) (defendants used illicitly obtained regulatory gatekeeping powers to exclude generic competition). *Accord In re Buspirone Patent Litig.,* 185 F. Supp. 2d 363, 373-75 (S.D.N.Y. 2002); *see also In re Lipitor Antitrust Litig.*, 868 F.3d 231, 239 (3d Cir. 2017) (misuse of fraudulently procured patent). Put simply, having secured its gatekeeping position as the dominant ad server through an illicit tie, antitrust law bars Google from using even theoretically lawful refusals to deal to impair rivals.

Google used its power over the ad server to undercut publisher interests and exclude rival exchanges to the benefit of Google and the detriment of Google's customers. *See, e.g.,* TAC ¶¶119-121. Courts have repeatedly condemned such exclusionary conduct by dominant players with monopoly power. *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015) (key is to "distinguish 'between conduct that defeats a competitor because of efficiency and consumer satisfaction'" from conduct that "coerces consumers and impedes competition.") (citation omitted); *United States v. Microsoft*, 253 F.3d 34, 62, 65 (D.C. Cir. 2001) (condemning conduct that reduced rivals' sales "not by improving its own product" but by preventing market participants from promoting rivals' products); *Conwood v. U.S. Tobacco Co.*,

290 F.3d 768, 785-86, 788 (6th Cir. 2002) (defendants abused gatekeeping power by destroying

rival's store displays and otherwise undermining customer access to rival products); *Church &*

*Dwight Co., Inc. v. Mayer Labs. Inc.*, 2011 WL 1225912, at \*3, 14-16 (N.D. Cal. Apr. 1, 2011)

(monopolist used role as "category captain" at retail outlets to exclude rivals from customer

displays). Google has wielded its gatekeeping power over the ad server in precisely this manner.

### 1.    By hashing user IDs Google degraded publishers' transactional data.

When Google launched its ad exchange in 2009, Google forced publishers using its ad

server to grant Google and only Google broad access to publishers' own user information, which

Google used to its own advantage and to the detriment of publishers. TAC ¶¶255-66.[5] As part of

its scheme, Google programmed its ad server to restrict publishers from sharing the identities of

publishers' own website visitors with non-Google exchanges and ad buying tools. "The ability to

identify the user associated with an ad impression has a direct and substantial relationship to the

price advertisers will be willing to pay for the impression." *Id.* ¶255. "Sharing [user] IDs with

exchanges and ad buying tools increase[s] publishers' inventory yield—the most basic goal of a

publisher ad server." *Id.* ¶256. Thus, Google uses its ad server to prevent publishers from sharing

their own transactional data with Google's rivals and any advertisers dealing with those rivals.

Affirmative interference with customers' ability to deal with rivals is a recognized

antitrust violation. In *Conwood*, 290 F.3d 768, the Sixth Circuit found that U.S. Tobacco had

abused its position as category captain to exclude rivals from retail shelf space in order to "bury"

its rivals' products under the "ruse" of efficiently managing retailers' shelf space. *Id.* at 776-778,

783, 786. The result was "higher prices and reduced consumer choice, both of which are harmful

---

[5] *See, e.g.*, *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 272 (D. Mass. 2008) ("buyers have incentives to agree to exclusionary contracts even when they have an anticompetitive effect because most of the harm of individual agreements is *externalized* onto those who are not party to that particular agreement") (citations omitted).

to competition." *Id.* at 789. Google, likewise exploits its near-complete control over ad serving to coerce publishers to transact in its exchange and the TAC plausibly alleges that Google began hashing User IDs only when Google was incentivized to reduce competition for publishers' inventory. TAC ¶¶257-59. The removal of the ability of rivals' advertisers to adequately assess the value of publisher inventory because of the hashing of User IDs leads to less valuable impressions—the precise analog of the competitive harms identified and condemned in *Conwood*. 290 F.3d at 789.

That monopolists may not unreasonably restrict rivals' access to key inputs is also illustrated by cases involving exclusive dealing, which is unlawful under the Sherman Act where, as alleged here, its "probable effect" is to substantially lessen competition in the relevant market. *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 29 (S.D.N.Y. 2016) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-29 (1961)).[6] Complete foreclosure is not required; instead, "the requisite [substantial] foreclosure may be found even if only a segment of the market is foreclosed…." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d at 187, 239 (S.D. N.Y. 2019). "Exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods." *Dial*, 165 F. Supp. 3d at 29 (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring)), *abrogated on other grounds* by *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

---

[6] Even "if alternative means of reaching consumers are 'viable,' that is not the test: the question is whether any alternative channels provide 'effective means of competition' and whether those alternative channels 'pose a real threat to defendant's monopoly." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019).

Consistent with such authority, courts regularly condemn schemes by firms with monopoly power to lock up a key input—as Google has done here with publishers' *own* transactional data. *See, e.g.*, *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1167-68 (D. Nev. 2016) (finding series of exclusive deals with UFC fighters deprived rival promoters of a critical input, namely the fighters themselves); *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.,* 351 F. Supp. 462, 509 (E.D. Pa. 1972) (locking up professional hockey players into exclusive deals was anticompetitive because it deprived rival leagues of "iron ore" needed to compete); *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25 (D.D.C. 1999) (drug company's exclusive licensing agreements violated antitrust laws).

Google's restrictions on the sharing of user IDs is not a "refusal to deal" because Google does not own these user IDs—they are generated from the publishers' interaction with users through their web pages. TAC ¶51. And prior to the launch of AdX, publishers shared these user IDs with rival exchanges and with their advertiser customers to help publishers increase their bid yields. *Id.* ¶257. Google's affirmative interference with publishers' ability to share their data with rivals is therefore classic exclusionary behavior by a dominant player.

## 2. Google manipulated advertising auctions and then precluded competition from header bidding.

Google used its control over the ad server market and publisher data to drive down the prices its exchange and buying tools paid for publisher inventory. Decisions from the Southern District of New York finding antitrust liability for manipulating securities markets provide a useful parallel. Broker-dealers sought to purchase securities on the cheap by restricting investors' ability to compare offers in real time. *See In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, at *2 (S.D.N.Y. Sept. 4, 2014) (the dealers "restricted pre- and post-transaction price transparency" so investors could not compare offers or ascertain the prevailing price); *Iowa Pub.*

*Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 300
(S.D.N.Y. 2018) (dealers kept "data about the prices and volume of trades hidden from the
market"). Notably, the dealers declined to disclose offers made to other investors, and prohibited
investors to disclose the terms of their deals once completed. *See Credit Default Swaps*, 2014
WL 4379112, at *2. The goal was to keep traders in the dark about the next best price.
Meanwhile, the dealers constructed an inter-dealer market where only they could access real-
time price information when buying and selling their own securities. *See id.* at *3; *In re Interest
Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 444 (S.D.N.Y. 2017)*.

Much like securities traders, publishers have no time to host multiple rounds of bidding
before a page loads on the reader's screen. Thus, real-time competition among exchanges, where
a publisher quickly can compare offers, is indispensable. Yet, that is precisely the kind of
competition that Google has thwarted. The waterfall precluded publisher comparison of real-time
offers. TAC ¶¶268-70. Last Look allowed Google to bid *second* and trade on inside information.
*Id.* ¶377. Minimum Bid to Win permits Google to trade on rivals' *bid* information (*i.e.*, the next
highest offer), *id.* ¶¶380-84, the kind of information that depresses prices below competitive
levels. *Cf. United States v. Container Corp.*, 393 U.S. 333, 337 (1969) (bid sharing drives the
market "toward price uniformity").

When publishers and advertisers developed a way to avoid Google's manipulated
auctions, Google smothered it. Header bidding dramatically increased publisher revenues by
allowing rival exchanges to bid head-to-head synchronously. TAC ¶157. As one Google internal
document noted: "RISK: If header bidding consolidates all non-Google demand, we could lose
our must-call status and be disintermediated." *Id.* ¶362. Google's internal documents reflect
Google's intention to quash header bidding in order to maintain its ad server monopoly, thereby

allowing Google to preference AdX and avoid price competition in ad exchange. *Id.* ¶361.

Google engaged in a course of conduct between 2016 and 2019 aimed at destroying header bidding, including, (1) developing an alternative platform ("Exchange Bidding") that Google operated and monetized, *id.* ¶¶366-84, 451-69; (2) starving header bidding of advertiser demand through agreements with demand sources like Facebook, *id.* ¶¶413-50, and limiting Google's ad buying tools from purchasing impressions through ad exchanges that participate in header bidding, *id*. ¶¶395-405; and (3) using its monopoly power to limit publishers' ability to utilize header bidding in multiple ways, *see, e.g., id*. ¶¶385-86, 389-94, 406-11.

Google ramped up its efforts in 2019 to exploit its monopoly power in various markets to cause advertisers to purchase publisher ad impressions through Exchange Bidding instead of header bidding. Specifically, Google moved from its second-price auction to a unified first price auction, *id.* ¶346; Google required publishers to set a single floor price for all sources of advertiser demand, *id.* ¶¶451-69, precluding publishers from setting a higher floor for AdX; and through Minimum Bid to Win, Google shared information with Exchange Bidding advertisers to ensure they did not bid any higher than necessary to win the first price auction, *id.* ¶380.

 Google's move to first price auctions created a need among advertisers for bidding tools that were better able to identify appropriate bidding levels.[7] Through Minimum Bid to Win, Google again used its position as the ad server gatekeeper to usurp publishers' transactional information—the bids submitted by rival ad exchanges and supply side tools—to induce Google's favored advertisers to shade their bids, *i.e.*, to bid an amount in a first price auction as

---

[7] Historically, Google relied heavily on second-price auctions, whereby the winner would pay the second-highest bid. When Google moved to first price auctions in Exchange Bidding, it created a problem for Google's advertisers that second-price exchanges were meant to avoid: first price auctions result in a "winner's curse," meaning that the winner may pay more than it has to in order to win the auction. *Id.* ¶259.

close to the second price as possible without losing. *Id.* ¶380. Moreover, by combining Minimum

Bid to Win with unified price floors, Google prevented publishers from combatting advertiser

bid shading. To do that Google blocked publishers from imposing a higher floor price on AdX's

bids as compared with other sources of demand. *See id.* ¶465. Pricing provisions imposed by a

monopolist that raise the cost of products on rival platforms charging lower fees both suppresses

competition and results in higher prices. *Frame-Wilson v. Amazon.com, Inc.,* 2022 WL 741878

(W.D. Wash. Mar. 11, 2022) (denying dismissal of Sherman Act claims based on Amazon's

uniform pricing rules). Thus, Google ensured that its Minimum Bid to Win program impaired

Google's exchange rivals by using its dominance in the ad server market to confer an unfair

advantage to Google's AdX advertisers that publishers could not circumvent or mitigate.

### C.      Google's Conduct Does Not Constitute Lawful Refusals to Deal

Throughout its motion to dismiss, Google characterizes various components of its

conduct as mere lawful "refusals to deal." *See, e.g.*, Br. at 2, 17-19, 29-30. Google is wrong for

several reasons. First, the States do not allege refusals to deal. They allege tying and other

traditional exclusionary conduct under *Actavis*, 787 F.3d at 652 (conduct that harms rivals and

"impedes competition through means other than competition on the merits."). Exclusive dealing

and tying involve "some assay by the monopolist into the marketplace—to limit the abilities of

third parties to deal with rivals (exclusive dealing), [or] to require third parties to purchase a

bundle of goods rather than just the ones they really want (tying)[.]" *Novell, Inc. v. Microsoft

Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch). Antitrust liability for these "common

forms of alleged misconduct" is appropriate because the monopolist is "failing to leave its rivals

alone." *Id.* Cases like *linkLine* and *Trinko*, by contrast, involve complaints by downstream rivals

that the upstream monopolist is "failing to come to their aid." *Id.*

Supreme Court precedent also refutes Google's attempt to characterize its tie as a refusal to deal. *Image Tech. Servs.,* 504 U.S. at 463 n.8 (it was not "a unilateral refusal to deal" where Kodak sold "parts to third parties on condition that they buy service from Kodak"); s*ee also* United States Br. at 21-23, *Comcast v. Viamedia*, 20-319 (brief filed May 25, 2021) ("Nothing in *linkLine* suggests that an otherwise meritorious antitrust claim can be rejected simply because it involves a course of conduct that includes a refusal to deal.").

Second, Google's conduct undermines rivals *by punishing rivals' customers and Google's customers.* The States allege that Google used the ad server to preclude publishers from (a) accessing vital information about their own users, and (b) sharing that data with advertisers using non-Google ad exchanges, leading to an artificial reduction in publishers' ad yields. *Id.* ¶¶20, 24, 255-57. This conduct punished Google's publisher customers and the advertiser customers of Google's exchange through rival exchanges. Google also imposed punitive fees on advertisers bidding through non-Google ad exchanges, impairing those advertisers' ability to win auctions, and thereby lowering the overall yield to publishers. TAC ¶461. And, through its Project Bernanke, Google punished advertisers bidding through rival exchanges by allowing its own AdX advertisers to win auctions with lower bids by displacing the highest bid when it was placed by an advertiser bidding through a rival exchange. *Id.* ¶¶298-312.

Courts have condemned monopolists for conduct that impairs rivals by punishing their customers. *See, e.g.*, *Lorain Journal Co. v. United States*, 342 U.S. 143, 152-53 (1951) (exclusionary for dominant newspaper to try to destroy radio station by refusing to sell ad space to advertisers that ran ads on the station); *United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 456-58 (1922) (condemning manufacturer that imposed financial penalties on customers for using its machines with competitor's machinery); *Caldera, Inc. v. Microsoft Corp.*,

87 F. Supp. 2d 1244, 1249-51 (D. Utah 1999) (Microsoft's taxing of customers for purchasing from rivals was exclusionary). *Cf. F.T.C. v. Facebook, Inc.*, 2021 WL 2643627, at \*20 (D.D.C. June 28, 2021) (conduct that "interferes with the relationship between rivals and third parties" is not a "standard refusal to deal"). By punishing the customers of its rivals, Google effectively raises its rivals' costs, which has long been deemed anticompetitive. *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n,* 814 F.2d 358, 368 (7th Cir. 1987) (Easterbrook, J.) (by raising its rivals' costs, defendant "raised the market price to its own advantage," in violation of antitrust's "principal purpose"—lowering prices).

Third, because Google is alleged to have maintained its monopoly power in the ad server market illicitly—*i.e.*, through a tie—it may not use that power to exclude rivals. The facts here are thus unlike those of the cases Google cites, Br. at 20-22, in which courts have refused to require entities with *lawfully* maintained monopoly power to *help* rivals. *See Christy Sports LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1190 (10th Cir. 2009) (declining to force a lawful monopolist to rent retail space to a rival at its own resort); *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984) (or put a rival's products in its own vending machines); *Live Universe, Inc. v. MySpace, Inc.*, 304 F. Appx. 554, 556-57 (9th Cir. 2008) (or link to a rival's website). Similarly, in *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438, 442, 450 (2009), the defendant was alleged to have used *lawfully* maintained power in the wholesale market to charge its competitor in the retail market a high price, while charging customers in the retail market a low price. Unlike here, the defendant in *linkLine* did not engage in any exclusionary acts, punish customers for dealing with rivals, or entrench its monopoly power through coercion, deceit, or tying. So too, in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398 (2004), Verizon was accused of "alleged

14

insufficient assistance in the provision of service to rivals," *id.* at 410, by failing to "interconnect" its phone network monopoly. Unlike here, there was no suggestion that Verizon had acquired or maintained its dominance through anything other than its own ingenuity and investments, nor that it had used tying or other conduct affirmatively to destroy competitive outlets as is alleged in the TAC. *See Trinko*, 540 U.S. at 410 (Verizon accused of refusing to undertake "considerable expense and effort" to create new systems required "simply to make [rival] access possible").

**D.   Google's Conduct to Entrench its Monopoly Power in the Ad Server and Ad Exchange Markets Should Be Analyzed as a Single Anticompetitive Scheme**

The foregoing courses of conduct illustrate how Google engaged in an anticompetitive scheme involving a series of related acts that together have allowed it to acquire and maintain monopoly power in both the ad server and ad exchange markets. Google improperly suggests, Br. at 26, that the Court treat each act as if it were part of a "completely separate and unrelated lawsuit", citing *Continental Ore v. Union Carbide & Carbon*, 370 U.S. 690, 698 (1962). But, in considering anticompetitive scheme claims, courts must "avoid 'tightly compart-mentalizing the various factual components' of a plaintiff's claims and 'wiping the slate clean after scrutiny of each.'" *Valassis Communications Inc. v. News Corp.*, 2019 WL 802093, at *9 (S.D.N.Y. Feb. 21, 2019) (Castel, J.) (quoting *Continental Ore*, 370 U.S. at 699)).[8] "The proper inquiry is whether, qualitatively, there is a 'synergistic effect.'" *Id.* (quoting *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981)); *see also Continental Ore*, 370 U.S. at 699.

Because the various strands of Google's alleged misconduct, each of which is

---

[8] Google misstates the holding of *Valassis*, arguing it suggests that "lawful conduct 'cannot properly be considered an ingredient of a plaintiff's monopoly broth claim.'" Br. at 26. *Valassis* held that claims relating to various "contracting practices," which together with other alleged conduct, had synergistic effects. 2019 WL 802093, at *12-14, could indeed be considered as part of an anticompetitive scheme. *See also id.* at *3 (describing the "contracting practices").

independently actionable, present such synergistic effects, *see generally* TAC Section VII, they are appropriately part of a single strand of conduct with cumulative anticompetitive effects.

*Cf. Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 486 F. App'x 186, 191 (2d Cir. 2012) (cited at Br. 26) (related conduct with synergistic, anticompetitive effects can be the basis of a single Sherman Act claim and dismissing claims because no unlawful conduct was alleged); *City of Groton*, 662 F. 2d at 928-29) (same); *see also In re Intuniv Antitrust Litigation* 496 F. Supp. 3d 639, 680 (D. Mass. 2020) (distinguishing *Eatoni Ergonomics* as only standing for the proposition that "a plaintiff need only effectively plead one instance of anticompetitive behavior" and only schemes with no anticompetitive conduct are not actionable). Dismembering Google's scheme would be particularly inappropriate here given that Google's power in the two markets at issue is mutually reinforcing and is necessarily "synergistic." *City of Groton*, 662 F.2d at 929.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, and those set forth in the States' opposition brief, Google's Motion to Dismiss should be denied.

**<u>For the Publisher Class Plaintiffs</u>**

/s/ Philip C. Korologos
**BOIES SCHILLER FLEXNER LLP**
Philip C. Korologos
pkorologos@bsfllp.com
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350

David Boies
dboies@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200
Fax: (914) 749-8300

Jesse Panuccio
jpanuccio@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
1401 New York Avenue, NW
Washington, DC 20005
Tel.: (202) 895-7580
Fax: (202) 237-6131

Mark C. Mao
mmao@bsfllp.com
srodriguez@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6820
Fax: (415) 293-6899

Sabria A. McElroy
smcelroy@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel.: (954) 377 4216
Fax: (954) 356-0022

/s/ George A. Zelcs
KOREIN TILLERY LLC
George A. Zelcs
gzelcs@koreintillery.com
Randall P. Ewing
rewing@koreintillery.com
Marc A. Wallenstein
mwallenstein@koreintillery.com
Jonathon D. Byrer
jbyrer@koreintillery.com
Ryan A. Cortazar
rcortazar@koreintillery.com
**KOREIN TILLERY LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Tel.: (312) 641-9750
Fax: (312) 641-9751

Stephen M. Tillery
stillery@koreintillery.com
Michael E. Klenov
mklenov@koreintillery.com
Carol L. O'Keefe
cokeefe@koreintillery.com
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Tel.: (314) 241-4844
Fax: (314) 241-3525

*Counsel for Publisher Plaintiffs Genius Media Group, Inc., The Nation Company, L.P., and The Progressive, Inc.*

18

/s/ Eric L. Cramer
BERGER MONTAGUE PC
Eric L. Cramer
ecramer@bm.net
Michael C. Dell'Angelo
mdellangelo@bm.net
Caitlin G. Coslett
ccoslett@bm.net
Patrick F. Madden
pmadden@bm.net
Robert Litan
rlitan@bm.net
**BERGER MONTAGUE PC**
1818 Market St., Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
Fax: (215) 875-4604

Sophia M. Rios
srios@bm.net
**BERGER MONTAGUE PC**
401 B Street, Suite 2000
San Diego, CA 92101
Tel.: (619) 489-0300
Fax: (215) 875-4604

Daniel J. Walker
dwalker@bm.net
**BERGER MONTAGUE PC**
2001 Pennsylvania Ave., NW Suite 300
Washington DC 20006
Tel.: (202) 559-9745

Michael K. Yarnoff
myarnoff@kehoelawfirm.com
KEHOE LAW FIRM, P.C.
Two Penn Center Plaza
1500 JFK Blvd., Suite 1020
Philadelphia, PA 19102
Telephone: (215) 792-6676

*Counsel for Publisher Plaintiff Sterling
International Consulting Group*

19

**For the Direct Newspaper Publishers**

/s/ Serina M. Vash
Serina M. Vash
New York Bar No.: 2773448
svash@hermanjones.com
**HERMAN JONES LLP**
153 Central Avenue, # 131
Westfield, NJ 07090
(404) 504-6516

John C. Herman
jherman@hermanjones.com
**HERMAN JONES LLP**
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA 30326
(404) 504-6500

Paul J. Geller
pgeller@rgrdlaw.com
Stuart A. Davidson
sdavidson@rgrdlaw.com
Alexander C. Cohen
Maxwell H. Sawyer
**ROBBINS GELLER RUDMAN & DOWD LLP**
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
(561) 750-3000

David W. Mitchell
davidm@rgrdlaw.com
Steven M. Jodlowski
sjodlowski@rgrdlaw.com
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

Paul T. Farrell, Jr.
paul@farrellfuller.com
Michael J. Fuller, Jr.
mike@farrellfuller.com
**FARRELL & FULLER, LLC**
1311 Ponce De Leon, Suite 202
San Juan, PR 00907
(939) 293-8244

Robert P. Fitzsimmons
bob@fitzsimmonsfirm.com
Clayton J. Fitzsimmons
clayton@fitzsimmonsfirm.com
Mark A. Colantonio
mark@fitzsimmonsfirm.com
**FITZSIMMONS LAW FIRM PLLC**
1609 Warwood Avenue
Wheeling, WV 26003
(304) 277-1700

*Co-Counsel for AIM Media Indiana Operating, LLC, AIM Media Midwest Operating, LLC, AIM Media Texas Operating, LLC, Brown County Publishing Company, Inc. and Multi Media Channels, LLC, Clarksburg Publishing Company, d/b/a WV News, Coastal Point LLC, Eagle Printing Company, Ecent Corporation, Emmerich Newspapers, Incorporated, J.O. Emmerich & Associates, Inc., Delta Democrat Publishing Company, Commonwealth Publishing Company, Inc., Delta Press Publishing Company, Inc., Newton County Appeal Inc., Marion Publishing, Company, Yazoo Newspaper, Co., Inc., Sunland Publishing, Company, Inc., Simpson Publishing Co., Inc., Montgomery Publishing Co., Inc., Franklinton Publishing Co., Inc., Charleston Publishing Co., Inc., Clarion Publishing Company, Inc., Scott Publishing, Inc., Clarke Publishing, Inc., Hattiesburg Publishing, Inc., Tallulah Publishing, Inc., Louisville Publishing, Inc., Kosciusko Star-Herald, Inc., Enterprise-Tocsin, Inc., Grenada Star, Inc., Tate Record Inc., Flag Publications, Inc., Gale Force Media, LLC, HD Media Company, LLC, Journal Inc., Robinson Communications, Inc., Something Extra Publishing, Inc., Rome News Media, LLC, Times Journal, Inc., Neighbor Newspapers, Savannah Publishing Co., Inc., Gould Enterprises, Inc., Union City Daily Messenger, Inc., Weakley County Press, Inc., and Southern Community Newspapers, Inc..*

**For Associated Newspapers Ltd.**

/s/ John Thorne
John Thorne
**KELLOGG, HANSEN, TODD, FIGEL &**
**FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, DC 20036
202 326-7900
jthorne@kellogghansen.com

*Counsel for Associated Newspapers Ltd. and Mail*
*Media, Inc.*