# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

SUMMIT 360, INC.,                                        Case No. 25-CV-2202 (PJS/EMB)

           Plaintiff,

v.                                                                                    ORDER

CISCO SYSTEMS, INC.,

           Defendant.

---

Matthew F. Bruno, Dylan Carson, Amar L. Thakur, and Rebecca A. Finkel, MANATT, PHELPS & PHILLIPS, LLP; and Stephen P. Safranski and Eric P. Barstad, ROBINS KAPLAN LLP, for plaintiff.

Bradley Justus, James K. Hunsberger, Denise L. Plunkett, and Caroline P. Boisvert, AXINN, VELTROP & HARKRIDER LLP; and Todd A. Wind, Joseph T. Dixon, Zachary S. McFarland, and Miriam P. Solomon, FREDRIKSON & BYRON, P.A., for defendant.

Plaintiff Summit 360, Inc. ("Summit") is a "middleman" in the computer-networking equipment market. For the past 30 years, Summit has acquired new and used products manufactured by defendant Cisco Systems, Inc. ("Cisco") and other original equipment manufacturers ("OEMs") and then resold those products to end users. Summit brought this lawsuit against Cisco, asserting antitrust and related tort claims relating to Cisco's efforts to control its distribution channels and combat counterfeiting of its products. This matter is before the Court on Cisco's motion to

dismiss. ECF No. 34. For the reasons that follow, Cisco's motion is granted, and Summit's complaint is dismissed for lack of antitrust standing.

## I. BACKGROUND

Cisco rose to prominence during the "Dot-Com Era" by manufacturing computer-networking equipment that enables computing devices to connect and share data at a distance. Compl. ¶¶ 20–21, ECF No. 1. According to Summit, Cisco's "early entrance into the computer networking industry" enabled Cisco to amass and maintain monopoly power in American and global markets for Ethernet switches and routers. *Id.* ¶ 27; *see also id.* ¶ 1 (describing Cisco as a "quintessential monopolist"). Ethernet switches form a "fundamental building block" of a networking ecosystem by connecting the various "computer components and devices" composing the network. *Id.* ¶¶ 22–23. Routers complement switches by connecting devices across multiple networks. *Id.* ¶ 23. Switches and routers "operate at different logical levels in a network," but both products are indispensable to a networking infrastructure. *Id.*

Summit alleges that "end-users are disinclined to mix-and-match networking devices or make wholesale changes to their network environment," because switching OEMs often requires replacing substantial amounts of hardware and retraining personnel. *Id.* ¶¶ 25, 29, 93. The markets for Ethernet switches and routers are therefore "characterized by high barriers to entry and expansion" for both "potential

new entrants and existing competitors." *Id.* ¶ 34. As a result, Cisco maintains "shares commonly exceeding 50%, and at times above 70%" in each market. *Id.* ¶¶ 31, 33. Summit identifies "just a handful of competing original equipment manufacturers" in the relevant product markets: Hewlett Packard Enterprise Company ("HPE"); Juniper Networks, Inc. ("Juniper"); Arista Networks, Inc. ("Arista"); and Fortinet, Inc. ("Fortinet"). *Id.* ¶ 27.[1]

Cisco primarily sells its products to end users through an "army of contract resellers and sales representatives." *Id.* ¶ 3; *see also id.* ¶¶ 38–40 (describing Cisco's distribution channels). This network of Cisco employees and contractors represents what the parties call the "Authorized Channel." According to Summit, Cisco imposes "onerous restrictions" on sellers in the Authorized Channel, including sales quotas and limitations on the price and availability of products. *Id.* ¶¶ 40–44.

Alongside the Authorized Channel, independent resellers such as Summit have emerged as an alternative source of supply that "fits customer needs and budgets." *Id.* ¶ 3. This network of independent resellers represents what the parties call the

---

[1]HPE and Juniper merged in summer 2025, after Summit filed its complaint. Press Release, Dep't of Just.: Off. of Pub. Affs., Justice Department Requires Divestitures and Licensing Commitments in HPE's Acquisition of Juniper Networks (June 28, 2025), https://www.justice.gov/opa/pr/justice-department-requires-divestitures-and-licensing-commitments-hpes-acquisition-juniper; *see also* Compl. ¶ 28; ECF No. 36 at 3 n.2.

"Independent Channel."[2]  The Independent Channel acquires networking products through secondary markets and then resells those products to end users—often fulfilling orders more quickly and "at far lower prices" than Cisco's Authorized Channel.  *Id.* ¶ 7; *see also* Mot. Hr'g Tr. 12:3–13:20, ECF No. 57 (Dec. 3, 2025) ("Tr.") (providing an example of how Summit sources equipment for resale).  Independent resellers are "manufacturer agnostic," meaning that they offer products to meet their customers' needs without regard to who manufactured those products.  Tr. 22:20–23:13; *see also* Compl. ¶¶ 3–7, 44.

Summit alleges that Cisco has engaged in a "systemic anticompetitive scheme designed to eliminate independent networking equipment resellers" like itself.  *Id.* ¶ 3. The complaint describes coercive tactics such as "disruptive and costly audits, expensive hardware recertifications, suspended services and support, unavailable software updates, and even threatened legal action."  *Id.* ¶ 94.  Specifically, Summit identifies four "categories" of anticompetitive conduct:  (1) spreading fear, uncertainty, and doubt about Cisco products sold outside the Authorized Channel, including warning that such products may be counterfeit or unsupported (*id.* ¶¶ 49–56); (2) auditing customer networks to identify and penalize end-users who purchased Cisco products from the Independent Channel and to "lock end-users into purchasing

---

[2]The Court uses the terms "Independent Channel" and "independent resellers" interchangeably.

exclusively through Cisco's Authorized Channel" in the future (*id.* ¶¶ 57–65);

(3) offering maintenance services, software updates, and subscription packages only for

Cisco equipment purchased through the Authorized Channel (*id.* ¶¶ 66–77); and

(4) leveraging concerns about counterfeit equipment to dissuade end users from

purchasing products from the Independent Channel (*id.* ¶¶ 78–86).

Summit contends that Cisco's practices constitute a "concerted effort by a

monopolist" to "eliminate a channel that is selling both [Cisco] products as well as other

products"—harming both *inter*brand competition (Cisco products vs. non-Cisco

products) and *intra*brand competition (Cisco products vs. Cisco products).[3]  Tr. 9:2–6.

Summit brings claims for monopolization and attempted monopolization under § 2 of

the Sherman Act and Minn. Stat. § 325D.52 (Counts I–III), as well as a claim for tortious

interference with prospective economic advantage arising from the same conduct

(Count IV).  *See* Compl. ¶¶ 101–129.

---

[3]"Interbrand competition is the competition among the manufacturers of the same generic product . . . .  In contrast, intrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer."  *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 52 n.19 (1977).

## II. ANALYSIS

### A. Standard of Review

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 445–46 (8th Cir. 2023). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.

Prior to the landmark decisions of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) (itself an antitrust case), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), courts were sometimes "hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery." *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998). More recently, however, the Eighth Circuit has endorsed a "reasonably aggressive" approach to "weeding out meritless antitrust claims at the pleading stage." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007)); *see also Little Rock Cardiology Clinic, PA v. Baptist Health*, 591 F.3d 591, 601 (8th Cir. 2009)

-6-

(affirming dismissal where plaintiff could not "establish the necessary predicate for [its] antitrust claims" and discovery "could not cure the defects in [plaintiff's] legal theory").

### B. Sherman Act Claims

Summit brings claims for monopolization and attempted monopolization under § 2 of the Sherman Act. 15 U.S.C. § 2. Cisco contends that those claims must be dismissed because (among other reasons) Summit has not plausibly alleged that it has suffered an antitrust injury—"a threshold issue that plaintiffs must establish in order to have standing to sue under the antitrust laws." *Fischer v. NWA, Inc.*, 883 F.2d 594, 597 n.5 (8th Cir. 1989); *see also Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 809 (8th Cir. 1987) (noting that statutory standing in an antitrust action "goes beyond the constitutional standard of injury in fact"). Because antitrust standing is generally "limited to a consumer or competitor that proximately suffers antitrust injury," *Gen. Indus. Corp.*, 810 F.2d at 809 (quotation omitted), the court must determine at the outset whether a plaintiff is the "proper party to bring a private antitrust action," *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983).

In *Associated General Contractors of California, Inc. v. California State Council of Carpenters* ("*AGC*"), the Supreme Court directed that, in determining whether a private plaintiff has antitrust standing, courts should "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." 459 U.S. 519, 535

-7-

(1983).[4]  Within the *AGC* framework, the Eighth Circuit has "recognized a potentially dispositive point:  a federal antitrust plaintiff who has not suffered an 'antitrust injury' lacks standing."  *Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 520 (8th Cir. 1992); *see also Midwest Commc'ns, Inc. v. Minn. Twins, Inc.*, 779 F.2d 444, 450 (8th Cir. 1985) ("Although the Supreme Court has developed a multifactor balancing test to determine whether a plaintiff has standing to sue under the antitrust laws, the threshold inquiry must focus on the plaintiff's alleged injury.").

To have antitrust standing, a plaintiff must "prove more than injury causally linked to an illegal presence in the market."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Rather, an antitrust plaintiff "must prove *antitrust injury*"—that is, *competitive* injury (1) "of the type the antitrust laws were intended to prevent" and (2) "that flows from that which makes defendants' acts unlawful."  *Id.*

---

[4]The Eighth Circuit distilled the *AGC* test into six factors:

> (1) The causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) Improper motive; (3) Whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) The directness between the injury and the market restraint; (5) The speculative nature of the damages; [and] (6) The risk of duplicate recoveries or complex damage apportionment.

*McDonald*, 722 F.2d at 1374 (citing *AGC*, 459 U.S. at 537–45).  The first and third factors correspond to the "antitrust injury" requirement.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

(emphasis added). Where "the injury alleged or proven is not an 'antitrust injury,' the plaintiff does not have a claim cognizable under the antitrust laws." *Midwest Commc'ns*, 779 F.2d at 450.

The Court finds that, because Summit does not pleaded an antitrust injury, Summit does not have standing to bring its Sherman Act claims.[5]

### 1. Injury to Competition in the Relevant Market

Summit's alleged injuries are not "of a type that Congress sought to redress with the antitrust laws." *McDonald*, 722 F.2d at 1374. The Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993); *see also AGC*, 459 U.S. at 538 (noting the Sherman Act's "central interest in protecting the economic freedom of participants in the relevant market"). Standing is therefore "generally limited to the actual participants in the relevant market: competitors and consumers." *South Dakota v. Kan. City S. Indus., Inc.*, 880 F.2d 40, 47

---

[5]Summit seeks both treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. The same antitrust injury requirement applies to both remedies, although the threshold showing differs slightly. *See, e.g., Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110–12 (1986); *Midwest Commc'ns*, 779 F.2d at 450, 452. To recover damages, Summit must allege an *actual* antitrust injury, whereas to obtain injunctive relief, Summit need only allege a *threatened* antitrust injury. *Cargill*, 479 U.S. at 111–13. For the reasons explained above, Summit lacks standing to pursue either remedy.

(8th Cir. 1989), *abrogated on other grounds by In re Fed. Fountain*, 165 F.3d 600 (8th Cir. 1999).  Summit is neither.

Summit's complaint alleges a campaign by Cisco "to foreclose or otherwise eliminate the Independent Channel through which customers can (i) purchase equipment from manufacturers that compete with Cisco and (ii) secure Cisco products for a lower price."  Compl. ¶ 96.  According to Summit, Cisco's conduct harms competition by "forcing customers into more expensive, contracted channels," *id.* ¶ 99, and harms Summit by causing it to lose "customers, sales, revenues, and profits," *id.* ¶ 96, and by damaging "its goodwill and reputation in the networking industry," *id.* ¶ 100.  At bottom, Summit alleges direct harm to customers and only derivative harm to itself.  What the complaint fails to plausibly allege, however, is harm to competition in the relevant market.

Summit was the master of its own complaint, and Summit chose to define the relevant market at the *interbrand* level—that is, competition among manufacturers of Ethernet switches and routers.  *See* Compl. ¶ 27–37.  (Summit's choice was no doubt strategic, as there are likely hundreds—if not thousands—of sellers and resellers of Cisco equipment worldwide, and thus, a claim that Cisco exercises monopoly power in the sellers/resellers market would be a nonstarter.)  Summit was, of course, free to define the relevant market in this manner.  *See, e.g., Royal Canin U.S.A., Inc. v.*

-10-

*Wullschleger*, 604 U.S. 22, 35 (2025) (noting that, as the "master of the complaint," a plaintiff "controls much about her suit") (quotation omitted); *Energy Conversion Devices Liquidation Tr. v. Trina Solar Ltd.*, 833 F.3d 680, 688 (6th Cir. 2016) ("As the master of the complaint, the plaintiff may decide what claims to bring and how to prove them. But it cannot avoid responsibility for dealing with each aspect of the claim at each phase of the case."). But having done so, Summit must plausibly allege harm to competition *within* that market. *See, e.g.*, *Deere & Co. v. Kinze Mfg.*, No. 4:20-CV-0389-RGE-SHL, 2022 WL 22933709, at *8 (S.D. Iowa Feb. 16, 2022) (dismissing complaint because plaintiff had failed to allege "facts demonstrating a harm to competition in the [relevant] market").

According to Summit, the relevant (interbrand) market contains five and only five participants: Cisco, HPE, Juniper, Arista, and Fortinet. Compl. ¶ 27. In other words, Summit itself does not even participate in the relevant market. Putting that aside, the anticompetitive conduct in which Cisco allegedly engages does not in any way harm competition *in the relevant market*. Indeed, if Summit is correct, Cisco's conduct makes its products *less* competitive with the products manufactured by the other OEMs—by making Cisco products more expensive and more difficult for end users to purchase. *See generally id.* ¶¶ 49–86; *id.* ¶ 48 (alleging that "Cisco's unlawful and anticompetitive practices directly impact Summit," but stating in the next sentence the ways in which Summit's *"customers* have encountered Cisco's anticompetitive

tactics") (emphasis added).  Put differently, those injured by Cisco's "anticompetitive" conduct are not Cisco's OEM competitors in the relevant market, but instead end users and those who sell to them—entirely different markets.

Again, Summit does not manufacture switches, routers, or other networking equipment.  Summit only sells such equipment.  According to Summit, Cisco's conduct makes it more difficult for Summit to compete with other sellers and resellers of Cisco equipment.  What Cisco describes, then, is harm to *intra*brand competition among those who sell or resell Cisco networking products, not harm to the competing manufacturers who participate in the *inter*brand market that Summit has identified as relevant.

This mismatch is fatal.  Admittedly, antitrust protection is not confined "solely to consumers, competitors, buyers, and sellers," but "the fact that a party is not a participant in the relevant market must be weighed heavily against a grant of standing." *Kan. City S. Indus.*, 880 F.2d at 46 n.16; *see also Alpha Shoe Serv. v. Fleming Cos., Inc.*, 849 F.2d 352, 354 (8th Cir. 1988) (concluding that plaintiffs lacked standing because their "injury did not arise from anticompetitive activity in an economic market in which plaintiffs participated"); *Midwest Commc'ns*, 779 F.2d at 451 (affirming district court's conclusion that plaintiff lacked standing because it was not an "actual or potential competitor[] foreclosed from the applicable market" or a "buyer[] hurt by the [anticompetitive conduct]").

Summit invokes the Supreme Court's decision in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977), and the Eleventh Circuit's decision in *Graphic Products Distributors, Inc. v. Itek Corp.*, 717 F.2d 1560 (11th Cir. 1983), in support of its decision to define the relevant market by the "end product." *See* Tr. 6:13–9:6, 70:15–72:22 (arguing that the "product markets are the proper markets because [they are] end user and consumer centric"). Summit claims that defining the market in this way conforms with the primary goal of antitrust law to promote consumer welfare. *Id.* at 72:4–22.

But neither case addressed the threshold defect present here: an *inter*brand market coupled with only *intra*brand injury. *Graphic Products* addressed the sufficiency of the evidence after a full jury trial, not pleading-stage questions of antitrust standing. *See* 717 F.2d at 1575. In that case, the evidence showed that the defendant's "system of territorial restraints" had "totally foreclosed intrabrand competition." *Id.* Under such circumstances, the Eleventh Circuit held that "intrabrand restrictions . . . can have a substantial adverse effect on consumer welfare." *Id.* at 1572 n.20. Likewise, *Sylvania* merely emphasized that interbrand competition is "the primary concern of antitrust law" and noted that "the degree of intrabrand competition is wholly independent of the level of interbrand competition confronting the manufacturer." 433 U.S. 52 n.19. An impact on intrabrand competition may indeed support antitrust standing in cases in which *the intrabrand market is relevant* (apples and injury to apples), but here Cisco

-13-

pleads an *inter*brand market and then relies solely on harm to *intra*brand competition (apples and injury to oranges).

Summit also cites a recent decision from this District that denied a motion to dismiss claims that were supposedly "based on similar allegations of harm."  ECF No. 39 at 37–38 (citing *Toyota Motor Sales, U.S.A., Inc. v. Allen Interchange LLC*, No. 22-CV-1681 (KMM/JFD), 2023 WL 5206884, at *5 (D. Minn. Aug. 14, 2023)).  In *Toyota Motor Sales, U.S.A.*, an independent distributor of Toyota replacement parts alleged antitrust violations arising from Toyota USA's efforts to reduce the sale of "gray market" Toyota parts in the United States.  2023 WL 5206884, at *1, 5.  In that case, however, the plaintiff was asserting claims against its "*direct competitor*, Toyota USA," not "the manufacturer, Toyota Japan."  *Id.* at *5 (emphasis added).  Apples and injury to apples.  *Toyota* therefore does not present this case's mismatch between a pleaded interbrand market and an alleged intrabrand injury.

Finally, Summit relies heavily on a series of decisions against Cisco out of the Eastern District of Texas where the court purportedly "rejected nearly identical arguments . . . that an independent reseller failed to show antitrust injury."  ECF No. 39 at 38; *see also* Compl. ¶ 89 n.14; Tr. 25:22–26:17, 31:9–15, 73:8–75:19.  In *Dexon Computer, Inc. v. Cisco Systems, Inc.*, the court distinguished "antitrust injury" in the standing context from the "injury-to-competition" element of a substantive Sherman Act claim.

No. 5:22-CV-0053-RWS-JBB, 2023 WL 2941414, at *36–40 (E.D. Tex. Feb. 7, 2023), *report and recommendation adopted*, 2023 WL 2730656, at *25 (E.D. Tex. Mar. 31, 2023) ("[I]njury to competition, while often a necessary component to substantive liability, need not be pleaded as an element of standing for a plaintiff's antitrust claim to survive a motion to dismiss."); *see also Walker v. U-Haul Co. of Miss.*, 747 F.2d 1011, 1015 (5th Cir. 1984) ("The requirement of antitrust inquiry is not inconsistent with the presumption of injury to competition in Section 2 cases."). But in the Eighth Circuit, courts "largely conflate" the two concepts, "incorporat[ing] an injury-to-competition requirement into the analysis of antitrust standing." *TheMLSonline.com, Inc. v. Reg'l Multiple Listing Serv. of Minn., Inc.*, 840 F. Supp. 2d 1174, 1180 (D. Minn. 2012) (collecting cases); *see also Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1136 (D. Minn. 2016) (noting that "the interplay between injury-to-competition and direct injury to a plaintiff when evaluating antitrust standing is not always clear").

Further, the *Dexon* reasoning relies on Fifth Circuit precedent "holding that 'injury to competition is presumed to follow from the conduct proscribed by § 2.'" *Dexon Comput.*, 2023 WL 2730656, at *30 (quoting *Walker*, 747 F.2d at 1013). The Eighth Circuit, by contrast, indulges no such presumption and treats antitrust injury as a threshold inquiry, properly resolved at the outset of the case before consideration of the merits. *Compare Walker* (arguing that "[t]he inquiry into antitrust injury . . . does not even begin until the court finds that a violation has been alleged and that the plaintiff

-15-

has been injured by it") (quoting William H. Page, *Antitrust Damages and Economic Efficiency: An Approach to Antitrust Injury*, 47 U. CHI. L. REV. 467, 488 (1980)), *with Fischer*, 883 F.2d at 597 n.5 ("[A]ntitrust injury is a threshold issue that plaintiffs must establish in order to have standing to sue under the antitrust laws."); *Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 416–18 (2004) (Stevens, J., concurring) (describing the antitrust standing inquiry as "the first step" and stating a preference for deciding the case on standing grounds rather than the "merits of the § 2 claim"). In other words, the Fifth Circuit precedent applied in the Eastern District of Texas differs from the Eighth Circuit precedent applied by this Court.

Finally, none of the *Dexon* decisions cited by Summit meaningfully address the interbrand/intrabrand mismatch problem. The issue surfaces only in a passing footnote, in which the court said that it would *not* address the issue because Cisco had not "sufficiently develop[ed]" its argument. *Dexon Comput.*, 2024 WL 180775, at *4 n.3 (E.D. Tex. Jan. 17, 2024).

In sum, Summit has alleged only intrabrand injuries within an interbrand market. *See AGC*, 459 U.S. at 539–40 & n.40 (concluding that "the *Brunswick* test is not satisfied" when the plaintiff was "neither a consumer nor a competitor in the market" and the "allegedly unlawful conduct involve[d] predatory behavior directed at 'certain' parties, rather than a claim that output ha[d] been curtailed or prices enhanced throughout an entire competitive market"). Because such injuries do not reflect the type

-16-

of competitive harm that the antitrust laws were enacted to prevent, Summit cannot satisfy the first prong of the antitrust-injury requirement.

### 2. Causation

Even if the mismatch were not fatal to Summit's claims, Summit would still need to allege injuries that "flow[] from that which makes [Cisco's] acts unlawful." *Brunswick*, 429 U.S. at 489. Summit claims that its "losses are a direct byproduct" of Cisco's "coercion, deception, technological barriers, and other anticompetitive conduct." Compl. ¶ 99. But Summit's alleged injuries—lost sales, lost customers, and reputational harm—flow from conduct that Cisco directs at end-users, not at sellers or resellers in the Independent Channel. *See* Compl. ¶ 96 (alleging that Summit's injury "flows from Cisco's efforts to raise prices, reduce quality, lower output, and eliminate competition"); *see also id.* ¶¶ 97–100.

The Eighth Circuit routinely finds causation of antitrust injury lacking when a plaintiff has alleged only derivative harm. *See, e.g.*, *Midwest Commc'ns*, 779 F.2d at 451 ("To have standing to sue under the antitrust laws, the plaintiff must be the target of the anticompetitive activity, not one who has merely suffered indirect, secondary, or remote injury.") (quotation omitted); *Lovett*, 975 F.2d at 521 ("In short, consequential injury is not an antitrust injury."); *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1145 (8th Cir. 2011) ("[A] plaintiff may be targeted [by an effort to monopolize the market] and found to have not suffered an antitrust injury that is cognizable under the antitrust

-17-

laws."). Because Summit alleges only an "indirect," "secondary," or "consequential" injury—the existence and extent of which depends entirely on the decisions of its customers—Summit has not pleaded a cognizable antitrust injury. Summit's Sherman Act claims are accordingly dismissed.

### B. *Minnesota Antitrust Claim*

Cisco asks the Court to dismiss Summit's Minnesota antitrust claim for the same reason that the Court is dismissing the Sherman Act claims. *See* ECF No. 36 at 13; ECF No. 40 at 3. "Minnesota antitrust law is generally interpreted consistently with federal antitrust law," although the two are not identical. *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) ("The desire for harmony between federal and state antitrust law relates more to prohibited conduct than to who can bring a lawsuit."). For instance, "Minnesota antitrust law permits indirect purchasers to recover" damages for antitrust violations, while federal law does not. *Id.* at 626–27 (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)); *see also Insulate SB*, 797 F.3d at 547 n.8 (noting that "Minnesota law differs from federal law" with respect to standing, but the state statute "still imposes some 'prudential limits' on antitrust plaintiffs, including a showing of proximate cause") (quoting *Lorix*, 736 N.W.2d at 631).

Although there are a few circumstances under which a plaintiff may have antitrust standing under Minnesota law but not federal law, Summit has not suggested that such circumstances exist here. Instead, Summit treats its state and federal antitrust

claims as coextensive. *See* ECF No. 39 at 10 n.2. Because Summit lacks standing to bring its federal antitrust claims—and because the parties do not identify any material differences between Minnesota and federal law—Summit's Minnesota antitrust claim is also dismissed. *See, e.g., Insulate SB*, 797 F.3d at 547 (affirming dismissal of Minnesota antitrust claim where the plaintiff "agree[d] our analysis of its federal claims also applie[d] to its Minnesota claim"); *Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 886–87 (D. Minn. 2017) ("[W]here the federal antitrust claims fail, the Minnesota antitrust claims must fail as well."), *aff'd on other grounds*, 999 F.3d 589 (8th Cir. 2021).

### C. Tortious Interference with Prospective Economic Advantage

Summit's final claim fares no better. To state a claim for tortious interference with prospective economic advantage under Minnesota law, a plaintiff must allege "that the defendant's tortious interference was intentional and either independently tortious or in violation of a state or federal statute or regulation." *Gieseke ex rel. Diversified Water Diversion, Inc. v. ICDA, Inc.*, 844 N.W.2d 210, 219–20 (Minn. 2014).

The "independently tortious or unlawful" conduct pleaded in Summit's complaint is closely tied to its failed antitrust claims. *Id.* at 218; *see also* Compl. ¶ 125 (alleging that Cisco engaged in "various, independent, tortious acts, including acts in contravention with Section 2 of the Sherman Act"). Because Summit has not identified any other reason why Cisco's conduct is tortious or unlawful, Cisco's

tortious-interference claim falls with its antitrust claims. *See, e.g., Engelhardt v. Qwest Corp.*, 918 F.3d 974, 982 (8th Cir. 2019) ("Because [defendants] have not violated federal or state law, and because their interference was not independently tortious, [plaintiff's] tortious interference with prospective business relations claim fails as well."); *see also Toyota Motor Sales, U.S.A.*, 2023 WL 5206884, at \*11 (denying motion to dismiss tortious-interference claim because plaintiff had "plausibly alleged violation of antitrust laws").

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.    Defendant's motion to dismiss [ECF No. 34] is GRANTED.

2.    Plaintiff's complaint [ECF No. 1] is DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: March 30, 2026                    /s/ Patrick J. Schiltz
                                         Patrick J. Schiltz, Chief Judge
                                         United States District Court