# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re Google Advertising Antitrust Litigation* | Civil Action No. 21-MD-3010 (PKC) |

## ADVERTISER CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO AMEND

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     LEGAL STANDARD ........................................................................................... 3

III.    ARGUMENT ...................................................................................................... 4

     A.     Two Forms of Combination or Contract Make Google Liable to Its
           Advertiser Customers ............................................................................... 4

          1.     Count III Is Adequately Alleged and Should Be Permitted ...................... 4

               a.     Advertiser Class Plaintiffs' Section 1 Claim Arising from
                    the NBA Was Neither Alleged by the States Nor
                    Adjudicated by the Court. ................................................. 4

               b.     Advertiser Class Plaintiffs' Section 1 Claim Is Likely to
                    Survive a Motion to Dismiss ............................................. 5

          2.     Count V Is Adequately Alleged and Should Be Permitted ........................ 8

               a.     The Unified Pricing Rules Are a Form of Price-Fixing. ................ 9

               b.     The Line-Item Caps Artificially Curtailed Competition
                    with Google's Exchange. ................................................. 11

     B.     The Advertisers Assert Conforming Claims Under California's Unfair
           Competition Law. .................................................................................. 12

IV.     CONCLUSION ................................................................................................... 14

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bale v. Glasgow Tobacco Board of Trade, Inc.*,
    339 F.2d 281 (6th Cir. 1964) ........................................................................... 6, 7

*Bender v. Southland Corp.*,
    749 F.2d 1205 (6th Cir. 1984) ............................................................................. 9

*Board of Trade v. United States*,
    246 U.S. 231 (1917) .......................................................................................... 5, 6

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ....................................................................................... 12

*Foman v. Davis*,
    371 U.S. 178 (1962) .............................................................................................. 9

*Gainesville Oil & Gas Co. v. Farm Credit Bank of Tex.*,
    847 S.W.2d 655 (Tex. App. 1993) ....................................................................... 7

*In re Tether & Bitfinex Crypto Asset Litig.*,
    576 F. Supp. 3d 55 (S.D.N.Y. 2021) ................................................................... 7

*Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*,
    623 F.2d 1255 (8th Cir. 1980) ........................................................................... 14

*Isaksen v. Vermont Castings, Inc.*,
    825 F.2d 1158 (7th Cir. 1987) ............................................................................. 9

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Lab'ys, Div. of/& Am. Home Prod. Corp.*,
    850 F.2d 904 (2d Cir. 1988) .............................................................................. 13

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012) ................................................................................ 3

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ................................................................................................. 8

*United States ex rel. Ladas v. Exelis, Inc.*,
    824 F.3d 16 (2d Cir. 2016) .................................................................................. 3

*United States v. Aiyer*,
    33 F.4th 97 (2d Cir. 2022) ................................................................................... 7

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) .............................................................................. 11

*United States v. Paramount Pictures*,
    334 U.S. 131 (1948) .............................................................................................. 9

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*,
    156 F.3d 535 (4th Cir. 1998) ............................................................................... 9

*Yentsch v. Texaco, Inc.*,
   630 F.2d 46 (2d Cir. 1980) ................................................................. 11

**Statutes**

Cal. Bus. & Prof. Code § 17200 ........................................................... 3, 12

**Other Authorities**

Milgrom, P. R. and Weber, R. J., *A Theory of Auctions and Competitive Bidding*. 50
   Econometrica (5), 1089 (1982) ......................................................... 4

U.S. Department of Justice, *Preventing and Detecting Bid Rigging, Price Fixing, and Market
   Allocation in Post-Disaster Rebuilding Projects*, at 2 .............................. 6

**Rules**

Fed. R. Civ. P. 15(a)(2) ..................................................................... 1, 3

## I.       PRELIMINARY STATEMENT

In accordance with Fed. R. Civ. P. 15(a)(2) and the Court's Pre-Trial Order No. 2 (Doc. 309), the Advertiser Class Plaintiffs respectfully seek leave to file two non-conforming claims (the "Non-Conforming Amendments") in their Proposed Consolidated Advertiser Complaint ("CAC").[1]  The Non-Conforming Amendments consist of causes of action under Section 1 of the Sherman Act (and corresponding claims under California state law) that the Court did not adjudicate because they are not alleged in the States' Third Amended Complaint ("TAC").

The first Non-Conforming Amendment alleges a claim against Google and Meta, jointly and severally, for harm to competition in Google's Open Bidding and mobile clearinghouse auctions for digital display inventory that resulted from these Defendants' Network Bidding Agreement ("NBA") and related "side agreement" to allow longer timeouts for Meta to transmit a bid response.  The Court ruled that the States' TAC (Doc. 195) did not plausibly allege a Section 1 cause of action based on the NBA (September 13 Opinion & Order, Doc. 308 at 20-34).  The Advertiser Class Plaintiffs' NBA claim, however, is different.  The facts pleaded in the CAC plausibly allege that, within Google's final clearinghouse auction itself (Open Bidding for web, the AdMob auction for in-app), the NBA distorted competition by providing Meta, a horizontal competitor and a large bidder with access to a high volume of advertising demand, with superior information and additional time to bid relative to competing bidders.  As a result, advertisers that bid against Meta in Google's auctions were disadvantaged and could not compete for ad impressions on a level playing field.

---

[1] Copies of the CAC are appended as Exhibits A and B.  The marked copy, Exhibit B, shows a comparison of the CAC to the Advertiser Class Plaintiffs' previously operative complaint in the Northern District of California, filed December 4, 2020 (1:21-cv-07001-PKC, Doc. 52). Aside from the Non-Conforming Amendments, the redlines reflected in Exhibit B are to conform the CAC to the Court's motion to dismiss order.

Antitrust has long recognized that a restraint of this type—where an auctioneer gives special advantages to some, but not all, bidders—violates Section 1.  Moreover, the affected market definition, *i.e.*, Google's final clearinghouse auction for programmatic digital ad impressions (*see, e.g.*, Ex. A at ¶ 294), is significantly different than that originally asserted by the States.

The second Non-Conforming Amendment alleges a Section 1 claim, to go along with the Section 2 claim, against Google for the anticompetitive restraints it included in its agreements with publishers, by which Google (a) prevented publishers from varying price floors and imposed a 5-10% fee for transacting on non-Google exchanges, artificially driving business to Google's AdX exchange, and (b) curtailed competition from header bidding by limiting the number of line items publishers can use in responding to bids.  As a condition of publishers' continued use of Google's monopoly ad server, its Unified Pricing Rules prohibit publishers from setting different threshold bids on rival exchanges or offering advertisers different prices than publishers offer Google and advertisers using its properties.  As the Court stated, Google's "unified rates give a price advantage to Google due to the fees that it charges for transactions made on a non-Google exchange."  September 13 Opinion & Order at 75.  The fixed floor prices and the tax on transactions with Google's rivals coerced publishers from transacting off of AdX.

Google also exercised rights under its contracts with publishers to impede competition in the exchange market by limiting their ability to set line items calibrated to bids placed through header bidding.  Publishers who continued to use DoubleClick for Publishers ("DFP") assented to the Unified Pricing and line-item restrictions under their agreements with Google.  As the Court found both of these types of conduct are plausible manifestations of anticompetitive conduct under Section 2, these same restraints, effected through Google's combinations with

2

publishers, unreasonably restrain trade in violation of Section 1 in the exchange market (for

Unified Pricing and line-item limits) and the markets for buying tools for small and large

advertisers (for Unified Pricing).

Neither Section 1 claim, and neither of the corresponding state law claims (which

constitute "Conforming Amendments" as defined by Paragraph 2(b) of Pre-Trial Order No. 2), in

the CAC is futile.  Each logically flows from, but is distinct from, the TAC allegations.  In

addition, the CAC includes a third Conforming Amendment in the form of a claim under

California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, which is discussed

in Section III.D below.  The Court should allow this proposed filing in its entirety.

## II.   LEGAL STANDARD

Leave to amend should be "freely give[n] . . . when justice so requires," Fed. R. Civ. P.

15(a)(2), except "generally . . . in instances of futility, undue delay, bad faith or dilatory motive,

repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to

the non-moving party."  *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir.

2016) (citation omitted).  "Futility is a determination, as a matter of law, that proposed

amendments would fail to cure prior deficiencies or to state a claim" and the Court "consider[s]

'the proposed amendment[s] . . . along with the remainder of the complaint,' accept[ing] as true

all non-conclusory factual allegations . . . and draw[ing] all reasonable inferences in plaintiff's

favor[.]"  *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)

(internal citations omitted).

3

III.    **ARGUMENT**

    A.    **Two Forms of Combination or Contract Make Google Liable to Its Advertiser Customers.**

        1.    **Count III Is Adequately Alleged and Should Be Permitted.**

            a.    **Advertiser Class Plaintiffs' Section 1 Claim Arising from the NBA Was Neither Alleged by the States Nor Adjudicated by the Court.**

Advertiser Class Plaintiffs, having carefully studied the Court's analysis of the NBA, respectfully request the Court grant leave to file their targeted Count III, which is factually and legally distinguishable from the Section 1 claim pleaded in the States' TAC.

First, the claim alleged in Count III (as well as its state law analogue in Count IV) concerns the NBA terms that affect the competitive relationship between Meta and other bidders in the Final Clearinghouse Auctions maintained by Google.  These terms require Google to provide information on bid requests that assists the Meta Audience Network ("MAN," formerly the Facebook Audience Network) in identifying the end users generating bid requests— information not available to other bidders competing with MAN for the placement of digital ads. Bidders forced to bid against a competing bidder that possesses superior private information will bid higher to win a given auction than would otherwise be necessary to win in an auction that does not have a competing bidder with this consistently superior information.[2]

Second, focusing on markets in which firms may attempt to compete against Google to provide digital advertising services, the States' TAC did not suggest that the final auctions conducted by Google are themselves markets subject to antitrust scrutiny.  The CAC alleges that the NBA violates Section 1 due to the restraining effects of certain of its terms upon horizontal

---

[2] *See*, *e.g.*, Milgrom, P. R. and Weber, R. J., *A Theory of Auctions and Competitive Bidding*. 50 ECONOMETRICA (5), 1089 (1982).

competition between bidders for the placement of ads, competition that is presumed to occur in the market that exists inside Google-conducted auctions but which is distorted because of the advantages given to Meta under the NBA.  *See, e.g.*, Ex. A at ¶ 294.

Third, Meta's agreement to a minimum "win rate," minimum spend, and the fees to be paid to Google—the NBA terms giving rise to States' Section 1 theory—do not necessarily restrain horizontal competition between Meta and its competing bidders in Google auctions.  In contrast, the allegations in the proposed CAC focus on the anticompetitive effects of Meta's superior information regarding bid requests, Google's commitment that minimum percentages of the bid requests sent to MAN would come from identifiable end users, and the parties' related side agreement to allot additional time to Meta to transmit a bid response.  The latter set of terms do not concern Meta's commercial relationship with Google; they govern Meta's position relative to its *competing bidders*.  The benefits granted to Meta by these terms are economically distinct from a discount or concession given by a supplier to a customer—in fact, by following these terms Meta necessarily makes bidders not using MAN to bid in Google's auctions worse off.

### b.      Advertiser Class Plaintiffs' Section 1 Claim Is Likely to Survive a Motion to Dismiss.

Antitrust scrutiny of competition in private auction markets has a long history, reaching back at least to 1917, when the Supreme Court decided *(Chicago) Board of Trade v. United States*, 246 U.S. 231 (1917).  There, the Board of Trade, operators of the largest grain market in the world, had established a rule prohibiting its members from trading grain while the trading session was closed.  The government contended this after-hours rule was an unreasonable restraint in violation of Section 1.  Although the Court disagreed, it subjected the rule to antitrust scrutiny, holding that "[t]he true test of legality is whether the restraint is such as merely

regulates, and perhaps thereby promotes, competition, or whether it is such as may suppress or even destroy competition."  *Id.* at 244.

In the century since *Board of Trade*, rigging of auction markets became one of the most common violations of antitrust law prosecuted by the Antitrust Division of the Department of Justice.[3]  Not all violations in auction markets, however, involve collusion among bidders. Auction rules and procedures, such as the rule challenged in *Board of Trade*, may also form the basis of an agreement that unreasonably restrains trade by impairing competition in the conduct of the auction.  For example, *Bale v. Glasgow Tobacco Board of Trade, Inc.*, 339 F.2d 281 (6th Cir. 1964), involved an auction market in Kentucky where tobacco warehouses competed to sell harvested, loose-leaf tobacco to buyers' bidding agents.  Given the need to process and store the tobacco, the selling time and physical capacity of the Glasgow market was limited.  As a consequence, the "crucial element of tobacco sales on the market is the selling time allocated to each warehouse."  *Id.* at 284.  The Tobacco Board of Trade adopted regulations governing the conduct of this auction market, allocating selling time and selling space based on the proportion of each warehouse's floor space to the warehouse's total available floor space.  The plaintiff, a warehouseman with plans to build a new warehouse on the Glasgow market, requested an allocation of selling time and space in the same proportion that its new space bore to the total available floor space.  But another board regulation limited the allocation of selling time and space to a *new* warehouse to 20% of what it otherwise would have received.  The court held that the limitation was an unreasonable restraint that distorted the playing field for bidding: "It is not

---

[3] *See*, *e.g.*, U.S. Department of Justice, *Preventing and Detecting Bid Rigging, Price Fixing, and Market Allocation in Post-Disaster Rebuilding Projects*, at 2 ("One of the most common violations the [Antitrust] Division prosecutes is bid rigging.  In simple terms, bid rigging is fraud which involves bidding."), available at:
https://www.justice.gov/sites/default/files/atr/legacy/2013/01/31/disaster_primer.pdf

the purpose of the Sherman Act to guarantee an investor a profit," the court explained, "but it is concerned that he not be handicapped by unnatural market restraints," *id.* at 287, such as the allocation restrictions imposed by the Tobacco Board of Trade.

*Bale* applies the settled antitrust principle that "any act of an auctioneer, or the party selling, or of third parties as purchasers which prevents a fair, free and open sale, or which diminishes competition and stifles or chills the sale, is contrary to public policy and vitiates the sale." *Gainesville Oil & Gas Co. v. Farm Credit Bank of Tex.*, 847 S.W.2d 655, 659-60 (Tex. App. 1993) (citations omitted).  Indeed, private agreements that secretly affect the submission or contents of bids are customarily prosecuted as criminal violations of the antitrust laws, without proof of the actual economic effects of the conduct.  *See*, *e.g.*, *United States v. Aiyer*, 33 F.4th 97 (2d Cir. 2022) (affirming conviction for rigging bids on foreign exchange market).

Similarly, last year in *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55 (S.D.N.Y. 2021), the court denied a motion to dismiss a Section 1 claim arising from an alleged conspiracy among two crypto-commodity exchanges, Poloniex and Bittrex, and a trader, Bitfinex, by which the exchanges accepted stablecoins as trade settlement from Bitfinex that the exchanges knew or should have known were worthless because they were not backed by U.S. dollars.  In upholding the Section 1 count against the exchanges and the trader, the court stated that the "scheme purportedly aimed to and succeeded in intentionally creating an anticompetitive market" by simulating demand to artificially inflate prices.  *Id.* at 94.  The losses claimed by the plaintiffs constituted antitrust injury, the court added, because they "stem from a competition-reducing aspect or effect of Defendants' behavior."  *Id.* (internal quotations omitted).  The court further suggested the defendants' alleged agreement could be unreasonable *per se* due to its direct effect on market prices.  *Id.* at 104.

7

Analogously, the Section 1 claim in the CAC's Count III and the Cartwright Act claim in Count IV arise out of an agreement between Google, which conducts the Final Clearinghouse Auctions described in the NBA, and Meta, a particular bidder in those auctions.  That agreement systematically inflates the prices that must be paid by winners who have bid against Meta by providing Meta with information about bid requests not available to other bidders and affording it more time than is available to other bidders to submit bids.  These concessions are not like legitimate "discounts" offered to favored customers because they are not Google's to give.  Their value to Meta arises from the relative *disadvantage* they visit upon the other auction participants that must bid against Meta and its superior private information and extra time to bid.  Meta's systematic advantage has required its rivals to bid higher than they would otherwise bid in a truly competitive auction in which Meta is not endowed with additional bid request information and additional time to bid.

Nor are these terms in the NBA in any way necessary or ancillary to a legitimate business collaboration, as in *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006).  It is not a necessary element of Google's digital advertising enterprise, or Meta's participation in it, to rig the auction in such a way as to give Meta a competitive advantage over other auction participants.  Google's agreement with Meta contradicts Google's publicly stated offer to conduct impartial and competitive auctions.  The NBA itself expresses concern about antitrust.

The Court should, accordingly, grant leave to file this Non-Conforming Amendment.

### 2.      Count V Is Adequately Alleged and Should Be Permitted.

The CAC also pleads a Section 1 claim in Count V—along with a parallel Cartwright Act claim in Count VI—based upon the restraints imposed by Google when it entered into combinations with publishers enforcing fixed or "Unified Pricing" rules and limiting publisher line items—restraints this Court concluded were plausibly alleged by the States to be

anticompetitive.  *See* September 13 Opinion & Order at 66-68, 74-77 (Doc. 309).  Though

grounded in facts set forth in the States' complaint, Advertiser Class Plaintiffs' cause of action is

distinct.  It arises from two forms of anticompetitive conduct that Google imposed by exercising

discretion under its agreements with publishers to change how its DFP ad server operated.  This

claim is not found in any previous complaint in the MDL and has not yet been considered by this

or any other Court.  Previous claims based on the Unified Pricing Rules and Google's limitations

on publisher line items asserted monopolization and attempted monopolization in violation of

Section 2.  *See* September 13 Opinion & Order at 74-77.  Plaintiffs' Section 1 claim "may be a

proper subject of relief," *Foman v. Davis*, 371 U.S. 178, 182 (1962), and should proceed in

tandem with Plaintiffs' Section 2 claims arising in part from the same conduct.

a.     **The Unified Pricing Rules Are a Form of Price-Fixing.**

Google presented the Unified Pricing Rules as a condition of publishers' continued use of

its monopoly ad server.  These vertical combinations may be actionable where Google coercively

imposed them.  *See Isaksen v. Vermont Castings, Inc*., 825 F.2d 1158, 1163 (7th Cir. 1987)

(reversing j.n.o.v. for defendant and holding that "an agreement procured by threats is still an

agreement for purposes of section 1."); *Bender v. Southland Corp*., 749 F.2d 1205, 1213 (6th Cir.

1984) (reversing summary judgment in vertical price-fixing case based on evidence of coercion);

*United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948) ("[A]cquiescence in an illegal

scheme is as much a violation of the Sherman Act as the creation and promotion of one."); *Va.

Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*, 156 F.3d 535, 541 (4th Cir. 1998) ("[I]t is

sufficient that HGSI, regardless of its own motive, merely acquiesced in the restraint with the

knowledge that it would have anticompetitive effects.").

By preventing publishers from varying price floors and by imposing a 5-10% fee for

transacting on non-Google exchanges, Google choked off competition and caused a spike in the

volume of transactions on its own AdX exchange.  Publishers historically set different price floors on different exchanges, permitting competition between Google and non-Google exchanges and ad-buying tools.  But Google's "Unified Pricing Rules"—introduced with the 2019 revision of Google Ad Manager's pricing rules—ended that competition.  Fewer line items cause publishers' bids on header-bidding exchanges to be rounded down more often, preventing publishers from capturing a live, competitive bid placed through such a competing exchange.  Hence, as Google intended, capping line items artificially induced publishers to transact on Google's exchange and shielded Google from competition by foreclosing discounts and other deals that could pit Google against its rivals.

Google admitted in its Answer in *State of Texas v. Google LLC* that, "as a result of the unified pricing rules, publishers can no longer set different floors for different buyers in Google Ad Manager's unified auction, including exchanges participating via Open Bidding, when bidding on the same inventory on behalf of the same advertiser; that a publisher can no longer use Google Ad Manager to set different price floors for two bidders in the same auction (*e.g.*, Google Ads and The Trade Desk) if they are bidding on behalf of the same advertiser[.]"  No. 4:20-cv-00957-SDJ, Doc. 67, ¶ 230 (E.D. Tex. Feb. 22, 2021).  As Advertiser Class Plaintiffs allege, these restrictions, imposed with the inescapable consequences of Google's market power, have prevented publishers from routing their ad space to another exchange at a price floor different than the floor they give to Google's exchange, and from giving one bidder a lower price floor than another bidder.

Compounding the squeeze, Google imposes a 5 to 10 percent fee for transactions that clear on other exchanges.  As admitted in its Answer in *State of Texas v. Google*, Google "retains a revenue share of 5-10% for transactions matched through Open Bidding" and it thereby both

profits on trades outside its system and handicaps the competition that clears those trades.  No. 4:20-cv-00957-SDJ, Doc. 67, ¶ 166 (E.D. Tex. Feb. 22, 2021).  Thus, the tax imposed by Unified Pricing restrains competition by coercing transactions on Google's exchange.  Further, "[b]ecause the pricing rules are enforced through the DFP ad server, they also affect competition even where AdX and Google's buying tools are not participants."  September 13 Opinion & Order at 75.

The price-setting rules Google imposed upon publishers, combined with the fees Google charges for transactions that occur off its exchange, impede the ability of competing exchanges to deliver impressions at lower prices.  Advertisers were harmed because the restrictions resulted in declining business for formerly competing exchanges and higher volumes of bids that Google intermediated.  The ad-buying tools that Google monopolized illegitimately steered commerce to the exchange and buying-tool markets it monopolized and caused advertisers to pay higher prices to place ads.  These combinations are plausibly anticompetitive.  *See, e.g.*, *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) (upholding verdict of liability based on Apple's pricing restrictions imposed on publishers); *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 52 (2d Cir. 1980) (reaffirming "basic proposition that use of coercion that achieves actual price-fixing is illegal.").

**b.  The Line-Item Caps Artificially Curtailed Competition with Google's Exchange.**

Also accomplished through Google's exercise of discretion under its agreements with publishers, Google's restrictions on publishers' ability to offer line items constrained the delivery of impressions at lower prices.  This Court described how a line item allows a publisher to set a to-the-penny price for bids that it will accept through header bidding.  *See* September 13 Opinion & Order at 66-67.  If a line item is lower than a bid made by an advertiser, the bid is rounded down to the lower line-item price.  So by limiting the number of line items available to

11

publishers, Google reduces publishers' financial incentive to participate in header bidding and, in turn, causes advertisers to bear higher prices by reducing price competition in the exchange market. *Id*. at 67. These restrictions were carried out in combination with publishers, who, after having particularized line-items for bids, relinquished that competitive activity.

The Court found Google's Unified Pricing and line-item limitations plausibly anticompetitive; these restraints effected in combination with publishers also offend Section 1.

**B.      The Advertisers Assert Conforming Claims Under California's Unfair Competition Law.**

Finally, Plaintiffs' CAC asserts Count VII for unfair or deceptive practices under California's Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq.* ("UCL"). The Advertiser Class Plaintiffs' previously operative complaint also brought a UCL claim against Google. (1:21-cv-07001-PKC, Doc. 52, ¶¶ 245-251.) Likewise, the States' TAC brought state law claims, including for unfair or deceptive trade practices (Doc. 195, ¶¶ 603-682), to which the Court stayed Google's response deadlines in favor of an initial focus upon the federal antitrust claims. (Doc. 308 at 1 n.1.) The Court's PTO No. 2 permits Conforming Amendments in the form of amendments to state law claims of private Plaintiffs. (Doc. 309, ¶ 2(b).)

The UCL is well suited to hold Google accountable for the range of contrivances it used to consolidate these markets under its control. The UCL "was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable 'new schemes which the fertility of man's invention would contrive.'" *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 181 (1999). The CAC maintains Plaintiffs' UCL cause of action and further bolsters it with additional allegations of Google's unfair or deceptive practices that provide new and independent bases to sustain the claim. Advertiser Class Plaintiffs allege Google violated the UCL by rigging ad auctions in contravention not only of

12

advertisers' reasonable expectations but also of Google's own representations about how these auctions worked.

Advertisers paid higher ad rates and were coerced into using only Google's ad-buying tools and exchange because, among other unfair trade practices, Google used: (1) Reserve Price Optimization to deceptively increase the amounts advertisers paid on AdX; (2) Dynamic Revenue Sharing to secretly increase the fees advertisers paid when they bid significantly above a publisher's floor; (c) Project Bernanke, including the Bell and Global Bernanke variants, to manipulate ad auctions by giving an unfair advantage to Google Ads and disadvantaging advertisers using other ad-buying tools; (d) Projects Poirot and Elmo to restrict the ability of advertisers using DV360 to bid on non-Google exchanges that allowed header bidding; and (e) Unified Pricing Rules which, as discussed, barred publishers from setting differential price floors for advertisers using non-Google ad-buying tools, causing advertisers to pay higher rates.

Other than Reserve Price Optimization, the Court already found most of these rigging mechanisms plausibly anticompetitive. *See* September 13 Opinion & Order at 50-54 (Project Bernanke), 55-57 (Dynamic Revenue Sharing), 68-70 (Projects Poirot and Elmo), 74-77 (Unified Pricing Rules). And while the Court determined that the States did not plausibly allege that Reserve Price Optimization was anticompetitive (September 13 Opinion & Order at 57-61), the Court found that the allegations describe "a secretive process that misled . . . advertisers and increased publishers' price floors[.]" September 13 Opinion & Order at 61. The Court's analysis demonstrates that Google's conduct satisfies the standards of *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Lab'ys, Div. of/& Am. Home Prod. Corp.*, 850 F.2d 904, 907-08 (2d Cir. 1988) (reversing dismissal of an unfair competition claim that concerned an allegedly deceptive communication to pharmacists) and *Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*, 623 F.2d

1255, 1266-68 (8th Cir. 1980) (affirming a judgment of antitrust liability based on the defendant airline's campaign to prevent travel group charters from becoming a competitive threat to its regularly scheduled air service, where the means "sought to achieve this end was not fair competition, but rather an organized full frontal attack which (1) used false, misleading and deceptive advertising and (2) was directed at (a) consumers and (b) travel agents.").

Advertiser Class Plaintiffs' amended claim for unfair competition therefore alleges colorable violations.

## IV.    CONCLUSION

For the foregoing reasons, Advertiser Class Plaintiffs respectfully request that the Court grant leave to file their proposed Consolidated Advertiser Complaint.

Dated: October 5, 2022                Respectfully submitted,

/s/ *Dena C. Sharp*
Dena C. Sharp (*pro hac vice*)
Jordan Elias (*pro hac vice*)
Scott M. Grzenczyk (*pro hac vice*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
scottg@girardsharp.com

Tina Wolfson (TW-1016)
Theodore W. Maya (*pro hac vice*)
Bradley K. King (BK-1971)
**AHDOOT & WOLFSON, PC**
2600 West Olive Ave., Suite 500
Burbank, California 91505
Tel.: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com

14

bking@ahdootwolfson.com

*Interim Co-Lead Counsel for Advertiser
 Plaintiffs and the Proposed Advertiser Class*

Jonathan L. Rubin (*pro hac vice*)
**MOGINRUBIN LLP**
1615 M Street, NW, Third Floor Washington,
D.C. 20036
(202) 630-0616
jrubin@moginrubin.com

Daniel J. Mogin (*pro hac vice*)
Jennifer M. Oliver (*pro hac vice*)
Timothy Z. LaComb (*pro hac vice*)
**MOGINRUBIN LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
(619) 687-6611
dmogin@moginrubin.com
joliver@moginrubin.com
tlacomb@moginrubin.com
*Counsel for Plaintiffs Cliffy Care, Kinin,
 Rodrock, and Raintree*

Archana Tamoshunas (AT-3935)
**TAUS, CEBULASH & LANDAU, LLP**
123 William Street, Suite 1900A
New York, NY 10038
Tel.: (212) 931-0704
Fax: (212) 931-0703
atamoshunas@tcllaw.com

April D. Lambert (*pro hac vice*)
John D. Radice (JR 9033)
**RADICE LAW FIRM, PC**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
alambert@radicelawfirm.com
jradice@radicelawfirm.com

*Counsel for Plaintiff Hanson Law Office, as
 successor in-interest to Hanson Law Firm, PC*

15

Richard F. Lombardo (*pro hac vice*)
Peter F. Rottgers (*pro hac vice*)
**SHAFFER LOMBARDO SHURIN**
2001 Wyandotte Street
Kansas City, MO 64108
(816) 931-0500
rlombardo@sls-law.com
prottgers@sls-law.com

*Counsel for Plaintiffs Cliffy Care, Rodrock,*
*and Raintree*

Jason S. Hartley (*pro hac vice* forthcoming)
Jason M. Lindner (*pro hac vice* forthcoming)
**HARTLEY LLP**
101 W. Broadway, Ste 820
San Diego, CA 92101
(619) 400-5822
hartley@hartleyllp.com
lindner@hartleyllp.com

*Counsel for Plaintiff Kinin*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2022, I served the foregoing document via electronic mail in accordance with the Federal Rules of Civil Procedure, and/or the Southern District's Local Rules.

/s/ *Dena C. Sharp*