**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GOOGLE ADVERTISING ANTITRUST LITIGATION | Case No. 1:21-md-03010 (PKC)<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO AMEND** |

*This Document Relates To:*

| | |
|---|---|
| ASSOCIATED NEWSPAPERS LTD. and MAIL MEDIA, INC.<br><br>                              *Plaintiffs*,<br><br>     -against-<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>                              *Defendants*. | Case No. 1:21-cv-03446 (PKC) |

Case 1:21-md-03010-PKC   Document 319   Filed 10/05/22   Page 2 of 27


## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ..................................................................................................... 1

ARGUMENT ........................................................................................................... 3

I.       Plaintiffs Should Be Granted Leave To Amend ................................................. 3

         A.       Most of the FAC's New Allegations Are Conforming Amendments ..................... 5

         B.       The FAC's Non-Conforming Amendments State a Plausible
                  Claim for Relief ................................................................................... 6

         C.       Google Cannot Demonstrate Any Other Grounds To Deny
                  Leave To Amend ................................................................................. 15

II.      Plaintiffs May Amend as a Matter of Course ................................................. 19

CONCLUSION ..................................................................................................... 21

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.V.E.L.A., Inc. v. Estate of Monroe*, 34 F. Supp. 3d 311 (S.D.N.Y. 2014) .......................... 17, 19

*Agent Orange Prod. Liability Litig., In re*, 517 F.3d 76 (2d Cir. 2008) ...................................... 21

*Alfes, In re*, 709 F.3d 631 (6th Cir. 2013) ................................................................................... 20

*Allen v. United States*, 164 U.S. 492 (1896) ............................................................................... 11

*Brewer Body Shop, LLC v. State Farm Mut. Auto. Ins. Co.*,
   101 F. Supp. 3d 1256 (M.D. Fla. 2015) ................................................................................. 11

*Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442 (2d Cir. 1985) ............................... 16

*Bensch v. Estate of Umar*, 2 F. 4th 70 (2d Cir. 2021) .................................................................. 15

*Block v. First Blood Assocs.*, 988 F.2d 344 (2d Cir. 1993) ......................................................... 16

*Chartwell Therapeutics Licensing, LLC v. Citron Pharma LLC*,
   2020 WL 7042642 (E.D.N.Y. Nov. 30, 2020) ....................................................................... 20

*City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair
   Holdings PLC*, 2022 WL 4377898 (S.D.N.Y. Sept. 22, 2022) ............................................. 15

*Cohen v. Am. Airlines, Inc.*, 13 F.4th 240 (2d. Cir. 2021) ..................................................... 15, 16

*Contrera v. Langer*, 314 F. Supp. 3d 562 (S.D.N.Y. 2018) .................................................. 16, 17

*Conwood v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) ........................................................ 9

*Doe #1 v. Syracuse Univ.*, 335 F.R.D. 356 (N.D.N.Y. 2020) ...................................................... 21

*Foman v. Davis*, 371 U.S. 178 (1962) ........................................................................................... 4

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986) ............................................................. 11

*Gallegos v. Brandeis Sch.*, 189 F.R.D. 256 (E.D.N.Y. 1999) ....................................................... 7

*Galustian v. Peter*, 591 F.3d 724 (4th Cir. 2010) ....................................................................... 20

*Gaming Mktg. Solutions, Inc. v. Cross*, 528 F. Supp. 2d 403 (S.D.N.Y. 2007) ......................... 19

*Gelboim v. Bank of Am. Corp.*, 574 U.S. 405 (2015) .................................................................. 20

*Intersource, Inc. v. Kidder Peabody & Co.*, 1992 WL 369918 (S.D.N.Y. Nov. 20, 1992) ........ 4, 7

*James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277 (D.C. Cir. 2000) ............................... 20

*Lavoho, LLC v. Apple Inc.*, 71 F. Supp. 3d 395 (S.D.N.Y. 2014) ................................. 18

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)......................................................................... 3, 4, 15

*Monahan v. New York City Dept. of Corrections*, 214 F.3d 275 (2d Cir. 2000) ......................... 17

*Marathon Ashland Petroleum LLC v. Equili Co., L.P.*,
   2002 WL 662900 (S.D.N.Y. Apr. 23, 2002)........................................................... 7

*Nat'l Prescription Opiate Litig., In re*, 956 F.3d 838 (6th Cir. 2020) .......................................... 20

*Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978)............................................... 9

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ........................................... 9, 10

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114 (2d Cir. 2012) .......................... 7

*Pasternack v. Shrader*, 863 F.3d 162 (2d Cir. 2017)................................................... 4, 16, 17, 18

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230 (2d Cir. 1995) .................................... 16

*Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002 (9th Cir. 2015) .......................................... 20

*S.S. Silberblatt, Inc. v. E. Harlem Pilot Block Bldg. 1 Housing Dev. Fund Co.*,
   608 F.2d 28 (2d Cir. 1979)......................................................................................... 17

*Sacerdote v. New York Univ.*, 9 F.4th 95 (2d Cir. 2021) ............................................................. 3

*Savignac v. Jones Day*, 341 F.R.D. 120 (D.D.C. 2022) ............................................................ 19

*Shi-Hsin Chang v. Phoenix Satellite Television (U.S.), Inc.*,
   2014 WL 5017838 (S.D.N.Y. Sept. 22, 2014)........................................................ 17

*State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843 (2d Cir. 1981)............................... 16

*STSG, LLC v. Intralytix, Inc.*, 2019 WL 6717606 (S.D.N.Y. Dec. 10, 2019) .............................. 7

*U.S. ex. rel. Maritime Admin. v. Cont'l Illinois Nat'l Bank and Trust Co.*,
   889 F.2d 1248 (2d Cir. 1989)..................................................................................... 16

*Washington v. New York City Bd. of Estimate*, 709 F.2d 792 (2d Cir. 1983).............................. 20

*Williams v. Citigroup Inc.*, 659 F.3d 208 (2d Cir. 2011) (per curium).......................................... 4

**STATUTES**

N.Y. General Business Law § 349 (2014) ..................................................................... 1

**RULES**

Fed. R. Civ. P. 12(b) .................................................................................................. 19

Fed. R. Civ. P. 12(e) .................................................................................................. 19

Fed. R. Civ. P. 12(f) ................................................................................................... 19

Fed. R. Civ. P. 15(a)(1) ......................................................................................... 1, 19

Fed. R. Civ. P. 15(a)(1)(B) ........................................................................................ 19

Fed. R. Civ. P. 15(a)(2) ............................................................................... 1, 3, 19, 21

**OTHER AUTHORITIES**

6 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. (3d ed. 2014) ..................... 21

## INTRODUCTION

Plaintiffs Associated Newspapers Ltd. and Mail Media, Inc. (collectively "Daily Mail") seek leave to amend their complaint pursuant to Federal Rule of Civil Procedure 15(a)(2). Alternatively, Daily Mail is entitled to amend its complaint as a matter of course pursuant to Federal Rule of Civil Procedure 15(a)(1).  A copy of the proposed First Amended Complaint ("FAC") is attached as Exhibit A, and a redline version of the FAC showing proposed changes from Daily Mail's original complaint is attached as Exhibit B.  Attached as Exhibit C is a table describing Daily Mail's proposed amendments.  Daily Mail seeks to file the FAC in order to:

1. Make Conforming Amendments as defined in Paragraph 2 of Pre-Trial Order No. 2 (MDL Doc. 309), including amendments to add or remove allegations and claims in light of this Court's September 13 Opinion and Order (MDL Doc. 308), as well as amendments specific to Daily Mail and the individual harm it suffers;

2. Make three non-conforming amendments to develop and clarify the nature of Daily Mail's allegations regarding (a) Google's interference with publisher data by hashing user IDs; (b) Google's coercing publishers to use Exchange Bidding; and (c) Google's use of its dominant position in the market for general search services to prevent competition for inventory sold on mobile webpages; and

3. Make other revisions as deemed advisable and appropriate by counsel, including stylistic and other technical changes.

## BACKGROUND

Daily Mail filed its complaint against Defendants Google LLC and Alphabet, Inc. (collectively "Google") in this Court on April 20, 2021.  The complaint alleges violations of Section 2 of the Sherman Act, violations of New York General Business Law § 349, and

common-law fraud.  Compl., Doc. 1.[1]  Google did not answer or otherwise respond to Daily

Mail's complaint.  Instead, on April 29, 2021, Google requested a 60-day extension of its

deadline to respond and this Court granted that request.  Docs. 13, 19.  On June 28, 2021, Google

again moved to delay its response to Daily Mail's complaint, this time indefinitely, and Daily

Mail opposed.  Docs. 20-23.  This Court extended Google's time to answer to September 17,

2021.  Google neither answered nor moved to dismiss Daily Mail's complaint on that date.

On August 10, 2021, the Judicial Panel on Multidistrict Litigation agreed with Daily Mail

that this district court is best suited to handle the publisher cases alleging Google's

monopolization of display advertising markets, and centralized the various such cases (including

advertiser cases and the case filed by the State Attorneys General[2]) in this Court for coordinated

pretrial proceedings.  MDL Doc. 1.  On September 24, 2021, the Court stayed Google's deadline

to answer or respond to Daily Mail's complaint pending resolution of Google's motion to

dismiss the complaint filed by the State Attorneys General in *Texas v. Google LLC*, No. 1:21-cv-

06841 (S.D.N.Y.).  Order ¶ 2 (Sept. 24, 2021), MDL Doc. 129.

On September 13, 2022, the Court largely denied Google's motion to dismiss the State

Plaintiffs' Third Amended Complaint ("TAC").  The Court held that the State Plaintiffs plausibly

alleged that Google unlawfully (1) ties its advertising exchange to its publisher ad server in

violation of both Sections 1 and 2 of the Sherman Act; (2) monopolized the markets for publisher

ad servers, ad exchanges, and ad buying tools for small advertisers; and (3) attempted to

---

[1] References to the docket for Case Number 1:21-cv-03446 are indicated by "Doc.";
references to the docket for Case Number 1:21-md-03010 are indicated by "MDL Doc."

[2] The Senate unanimously passed a bill that would take State AG actions enforcing
federal antitrust law out of the JPML's ambit for centralizing cases in MDLs.  The House passed
a similar bill that included the identical provision.  President Biden indicated that he would sign
the bill.  Until such a bill is enacted, the State AG case seeking injunctive relief is centralized
with the private cases seeking both injunctive relief and damages.

monopolize the markets for ad exchanges, ad buying tools for small advertisers, and ad buying tools for large advertisers.  *In re Google Digital Advert. Antitrust Litig.*, 2022 WL 4226932 ("MTD Op.") (S.D.N.Y. Sept. 13, 2022).  The Court dismissed the State Plaintiffs' claim that an agreement between Meta, Inc. and Google violated Section 1 of the Sherman Act.[3]

Following its denial of Google's motion to dismiss, the Court directed all other plaintiffs in these centralized actions to either submit a proposed amended complaint containing only Conforming Amendments or file a motion to amend by October 5, 2022, should they wish to amend.  Pre-Trial Order No. 2 ¶¶ 1-4, MDL Doc. 309; Pre-Trial Order No. 3 ¶ 1, MDL Doc. 311. The Court defined Conforming Amendments as those that (1) add "claims or allegations of anticompetitive conduct" made in the TAC that survived the Court's order denying Google's motion to dismiss, (2) "amend the allegations of individual harm to the plaintiffs, allegations specific to the named plaintiffs, . . . the state law claims, the damages and relief sought," or (3) are necessitated by "the party or counsel's obligations under Rule 11."  The vast majority of amendments Daily Mail proposes are Conforming Amendments.  But because Daily Mail also seeks to make three non-conforming amendments, it now files this motion to amend its complaint.

## ARGUMENT

### I.     Plaintiffs Should Be Granted Leave To Amend

Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave" to amend "when justice so requires."  This standard is " 'liberal' and 'permissive.' "  *Sacerdote v. New York Univ.*, 9 F.4th 95, 115 (2d Cir. 2021) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells*

---

[3] The State Plaintiffs also brought numerous claims under various state laws, but the Court stayed Google's deadline to respond to those claims "pending further order."  Hr'g. Tr. 10:13-22 (Sept. 24, 2022), MDL Doc. 142.

*Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015)).  "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (quotation marks and citations omitted).  The Court also may deny leave if an amendment is unduly delayed or would be futile. *Loreley Fin.*, 797 F.3d at 190.  But so long as the "facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Loreley Fin.*, 797 F.3d at 190 (describing this Circuit's "strong preference for resolving disputes on the merits" (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam)).

The Court should grant Daily Mail's motion to amend its complaint.  Apart from stylistic and technical edits, all but three of Daily Mail's amendments are "Conforming Amendments" as defined in this Court's Order.  See Ex. C.  Daily Mail seeks to "amend [its] allegations of individual harm" and "add claims or allegations of anticompetitive conduct that were asserted in the TAC and survived the Court's September 13 Opinion and Order."  Pre-Trial Order No. 2 ¶ 2, MDL Doc. 309.  This Court already has expressed that it "anticipates granting leave to amend" for Conforming Amendments.  *Ibid*.  As to Daily Mail's three non-conforming amendments – which span only 8 of the FAC's 275 paragraphs – the FAC pleads clarifying allegations to respond to three points made by the Court in its order denying Google's motion to dismiss. *Compare* FAC ¶¶ 113, 158-64, 210, *with* MTD Op. at *22-24, *32-34, *36-37.  With these amendments, Daily Mail's revised allegations state "at least colorable grounds for relief," such that "justice . . . require[s]" granting leave to amend. *Intersource, Inc. v. Kidder Peabody & Co.*, 1992 WL 369918, at *2 (S.D.N.Y. Nov. 20, 1992) (Leisure, J.).  Finally, Google cannot

4

demonstrate any other grounds – whether prejudice or otherwise – that leave to file the FAC should be denied.

### A.    Most of the FAC's New Allegations Are Conforming Amendments

In accordance with the process set out by this Court, Daily Mail seeks primarily to align its complaint with those portions of the TAC that this Court found to state a claim.  Daily Mail also seeks to remove allegations that did not survive that Order, add allegations of individual harm to Daily Mail, and plead facts that are otherwise specific to Daily Mail.  *See* Ex. C.  This Court already indicated that Conforming Amendments are presumptively proper, *see* Pre-Trial Order No. 2 ¶ 1, MDL Doc. 309, and the Court thus should grant Daily Mail leave to make these amendments.

Daily Mail seeks to add several allegations that survived this Court's September 13 Order and remove two allegations that did not.  These amendments:

- Add a claim that Google is violating Section 1 of the Sherman Act by tying its ad exchange, AdX, to its publisher ad server, DFP, *compare* MTD Op. at *10-12.  In its original complaint Daily Mail pled Google's tying conduct as a Section 2 violation. By the proposed amendment, Daily Mail asserts violations of both Section 1 and Section 2;

- Add allegations from the TAC regarding definitions of the relevant markets, *compare* MTD Op. at *5-7;

- Add allegations regarding Enhanced Dynamic Allocation, *compare* MTD Op. at *26-27.  In its original complaint Daily Mail pled Google forced publishers to use Enhanced Dynamic Allocation to seize publishers' most valuable impressions and harm ad exchange competition.  The proposed amendment further describes this conduct;

- Add allegations regarding Project Bernanke, *compare* MTD Op. at *27-29;

- Add allegations regarding Dynamic Revenue Share, *compare* MTD Op. at *29-30;

- Add allegations regarding projects Poirot and Elmo, *compare* MTD Op. at *35-36;

- Add allegations regarding Google's redaction of auction data and capping of publisher line items, *compare* MTD Op. at *34-35; and

- Alter or add allegations regarding Unified Pricing Rules, *compare* MTD Op. at *38-39.

In compliance with the Court's order, Daily Mail also removes allegations related to Reserve Price Optimization and Privacy Sandbox.  *Compare* MTD Op. at *30-32, 37-38.  In total, these Conforming Amendments properly align Daily Mail's complaint with the allegations in the TAC that are proceeding to discovery.  Their addition thus could not conceivably prejudice Google, who will face coordinated discovery on these topics regardless of Daily Mail's amendments. They should be permitted.

Daily Mail also seeks to add allegations specific to it, including allegations of individual harm.  These amendments update certain facts about Daily Mail and clarify how Daily Mail interacts with Google's products.  *See*, *e.g.*, FAC ¶ 28 (Daily Mail uses Google's publisher ad server to serve its mobile application inventory).  Daily Mail also has included several details from its contracts with Google.  *See*, *e.g.*, *id.* ¶¶ 44, 109.  And Daily Mail pleads additional facts or clarifying allegations addressing the effect of Google's anticompetitive conduct on its operations.  For example, Daily Mail has determined that nearly 90% of the revenue it obtains from buyers using Google's DV360 comes from auctions conducted in AdX.  *Id.* ¶ 94.  Daily Mail also pleads that Google's unlawful conduct in the U.S. harms its foreign operations.  *See id.* ¶¶ 232-33, 239-40; *see also* Pre-Trial Order No. 2 ¶ 2, MDL Doc. 309 (amendments regarding "damages" are Conforming Amendments).  These allegations come from Daily Mail's first-hand experience and most buttress allegations and claims approved by this Court's September 13 Order.

**B.    The FAC's Non-Conforming Amendments State a Plausible Claim for Relief**

Daily Mail's three non-conforming amendments address conduct that this Court's September 13 Order found, as pled in the States' Third Amended Complaint, not to state a claim

under the Sherman Act.  Daily Mail seeks leave to amend its allegations regarding 1) hashing

user IDs; 2) Google's coercing of publishers to use Exchange Bidding; and 3) Google's use of its

monopoly position in general search services to disable client-side header bidding on mobile

pages.  *See* Ex. C.  Daily Mail's original complaint pleaded allegations regarding each of these

topics, but Daily Mail now seeks to make targeted amendments to address deficiencies this Court

identified in its September 13 Order.

The Court should grant leave to amend.  "[T]he Second Circuit repeatedly has held that

if" an amendment states " 'at least colorable grounds for relief, justice . . . require[s]' " granting

leave to amend.  *Intersource, Inc*, 1992 WL 369918, at *2.  A court must consider "the proposed

amendment[s] . . . along with the remainder of the complaint, accept as true all non-conclusory

factual allegations therein, and draw all reasonable inferences in plaintiff's favor to determine

whether the allegations plausibly give rise to an entitlement to relief."  *Panther Partners Inc. v.

Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).  While courts have discretion to deny

a motion for leave to amend if the proposed amendment would be futile, they "should exercise

caution in deciding that a claim is futile."  *Marathon Ashland Petroleum LLC v. Equili Co., L.P.*,

2002 WL 662900, at *5 (S.D.N.Y. Apr. 23, 2002) (Fox., M.J.) (citing *Gallegos v. Brandeis Sch.*,

189 F.R.D. 256, 258-59 (E.D.N.Y. 1999)).  "[A] proposed claim may be found futile only where

it is clearly frivolous or legally insufficient on its face."  *STSG, LLC v. Intralytix, Inc.*, 2019 WL

6717606, at *3 (S.D.N.Y. Dec. 10, 2019) (Buchwald, J.) (citation omitted).  Daily Mail's

proposed allegations state a claim and therefore amendment is proper.

**1.**  In 2009, Google began affirmatively interfering with publishers' ability to do business

with Google's exchange rivals by " 'hashing' (*i.e.*, encrypting) the user IDs that publishers had

been using to solicit targeted ads from advertisers."  FAC ¶ 110.  Those user IDs allowed buyers

to, among other things, "understand the value of inventory, cap the number of times users see the same ad, and effectively target and track online advertising campaigns." *Id*. ¶ 111.  Without the ability to identify users, "the prices of impressions fall by 50%." *Id*.  Google's hashing of user IDs has deprived publishers of the ability to solicit competitive offers for their inventory.  All the while, Google "permit[s] *itself* to use the very same user IDs when setting its own bids" through Google's exchange (AdX) and Google's ad-buying tools.  FAC ¶ 110.

In its September 13 Order, this Court held that the TAC did not plausibly allege that the hashing of user IDs was anticompetitive.  MTD Op. at *22-23.  The Court described that the States pleaded a unilateral refusal to deal by alleging that Google failed "to provide information or assistance to its competitors." *Id.* at *22.  Those allegations did not state a claim because they did not plead "why it would have been in Google's economic self-interest to share encrypted user IDs that Google itself generated." *Id.* at *23.

Daily Mail does not allege that Google's hashing of user IDs was a unilateral refusal to deal.  Rather, user IDs belong to publishers (not to Google), and so hashing amounts to interference with publishers' ability to communicate their information about their inventory.  Daily Mail's FAC alleges that Google's contracts with Daily Mail provided that "publishers 'own[ed]' all data 'derived from the use of'" Google's ad server and ad exchange.  FAC ¶ 109.  Further, "it remains the responsibility of the publisher, and not Google, to obtain the right for Google to use any data – including data on readers – in connection with providing ad-serving and exchange services." *Id.*  Where Google's contracts expressly provided that publishers own user data, and where its contracts require publishers to acquire consent from users to collect that data, the fair inference is that user IDs belong to publishers.  Daily Mail thus does not allege that

Google refuses to "provide information or assistance to its competitors," MTD Op. at *22, but rather that Google interferes with publishers' ability to share their own data with Google's rivals.

Such affirmative interference with customers' ability to deal with rivals is a recognized antitrust violation.  The Supreme Court long has condemned efforts to "deprive[ ] the customer of the ability to utilize and compare prices" among rival services.  *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692-93 (1978) (quotation marks omitted).  Similarly, in *Conwood v. U.S. Tobacco Co.*, the Sixth Circuit upheld a jury verdict and found that U.S. Tobacco had abused its position as category captain to "bury" its rivals' products under the "ruse" of efficiently managing retailers' shelf space.  290 F.3d 768, 776-778, 783, 786 (6th Cir. 2002); *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013) (Gorsuch, J.) (citing *Conwood* and explaining that "a rival is always free to bring a section 2 claim for affirmatively interfering with its business activities in the marketplace").  As category captain for "moist snuff" tobacco, U.S. Tobacco advised retailers regarding which moist snuff products they should sell.  To exclude rival moist snuff producers, U.S. Tobacco "provid[ed] misleading information to retailers in an effort to dupe retailers into believing, among other things, that USTC products were better selling." *Conwood*, 290 F.3d at 783.  U.S. Tobacco took other steps to interfere with retailers' ability to do business with rivals, including physically removing or destroying rivals' products or placing them on shelves that customers would be less likely to see. *Id*.

Google's encrypting publisher data for all exchanges besides its own is analogous. Google, with its publisher ad server, serves as the "category captain" for publishers' ad space.  It helps publishers pick which exchange should return an ad to fill the virtual "shelf space" of its ad inventory.  At the same time, Google competes for that ad space by operating AdX, much like U.S. Tobacco competed for retail shelf space as the largest seller of moist snuff tobacco.

Capitalizing on its position of trust, Google's hashing of user IDs prevents rival exchanges (but not AdX) from accurately identifying the end user, such that rival exchanges return artificially lower bids for inventory.  In that way, Google "dupes" publishers into believing that AdX offers publishers the better deal, when, in actuality, rivals could offer even higher bids if only Google did not interfere with publishers' ability to communicate information about their own inventory. Thus, like U.S. Tobacco, Google has abused its relationship with its publisher customers to block the flow of accurate information between those customers and Google's exchange rivals.

As Daily Mail's FAC plausibly alleges, Google's hashing of user IDs is "irrational but for its anticompetitive effect."  MTD Op. at *23.  The FAC explains that a "profit-oriented operator of a publisher ad server would want to maximize the volume and value of impressions that are served," because "[s]erving more, higher value impressions means more money for the ad server."  FAC ¶ 113.  But, by hashing user IDs, Google "depresses the price for publishers' inventory, undermines investment in additional online content, and thereby reduces the number of impressions available for sale."  *Id.*  That sacrifice of short-term profits in the ad-serving market makes sense only if Google seeks to "handicap its exchange rivals."  *Id.*  Ordinarily, an exchange wants to return the highest possible bid because its fee is a percentage of that price. *See id.* ¶ 33.  So, when competing against rivals, an exchange should have one incentive:  bid higher.  Google, however, has taken a different approach:  force rivals to bid lower.  That is classic monopolist behavior.  As the FAC alleges, by "depress[ing] prices for [publisher] inventory[] and reduc[ing] the number of impressions available," Google "takes a growing share of that shrinking pie."  *Id.* ¶ 107.  Google's conduct thus has "little or no value beyond the capacity to protect [its] market power."  *Novell*, 731 F.3d at 1072.

Finally, though this Court held that the TAC had not adequately described why Google's asserted privacy justification for degrading publisher data was pretextual, MTD Op. at \*22, Daily Mail's FAC plausibly pleads pretext. First, as discussed, when a publisher can communicate its user IDs, that makes ad servers and ad exchanges (and the buying tools in those exchanges) more valuable. *See* FAC ¶¶ 111, 113. Again, no rational ad server would degrade the amount of information publishers can share with ad buyers. *See id.* ¶ 113. That Google does so anyway proves it has a different motive – its internal documents show it knew that user IDs would depress its rivals' bids for publisher inventory by as much as 50%. *Id.* ¶ 111. It is well accepted that a party is "presumed to intend the natural and probable consequences of his own act." *Allen v. United States*, 164 U.S. 492, 496 (1896); *see also Brewer Body Shop, LLC v. State Farm Mut. Auto. Ins. Co.*, 101 F. Supp. 3d 1256, 1265-66 (M.D. Fla. 2015) (holding it is "plausible to infer" an antitrust defendant "intends . . . the usual and natural consequences of his acts"). Thus, by design, Google's supposed privacy justification does nothing to make its ad-tech tools more competitive – which is the only kind of justification that the antitrust laws accept. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 463 (1986) ("noncompetitive quality-of-service justifications are inadmissible"). Second, both Daily Mail's original and proposed amended complaints explain that Google's privacy rationale is "belied by" its "self-dealing" – Google leverages detailed information about website users while preventing rivals from doing the same. FAC ¶ 112. And Google's troves of personal data collected from its other products mean that Google poses "a far greater threat to personal privacy than any publisher." *Id.*

**2.** Daily Mail's amendments likewise clarify the anticompetitive nature of Exchange Bidding. Exchange Bidding nominally facilitates live competition between a limited number of exchanges, but, as Daily Mail alleges, the auctions are tilted heavily in favor of AdX by design.

*See* FAC ¶¶ 159-60.  This Court held that the TAC's allegations described Exchange Bidding as "a voluntary venture," and concluded that because no "participant was improperly compelled to participate in Exchange Bidding," and because "participants in the online ad market remain free to participate in" Exchange Bidding alternatives like client-side header bidding, Exchange Bidding does not constitute anticompetitive conduct.  MTD Op. at *33-34.

Daily Mail's amended complaint clarifies that publishers do not "remain free" to use client-side header bidding.  Rather, as amended, the FAC describes how Google "has taken steps to coerce publishers to abandon" client-side header bidding "for Exchange Bidding."  FAC ¶ 163.  For example, as described more fully below, Google eliminated publishers' ability to use client-side header bidding on mobile web pages that "appear at the top of Google search results." *Id*.  These mobile webpages represent "the most important source of [website] traffic."  *Id*.  This means that if a publisher wants to facilitate real-time competition between exchanges on these vital mobile pages, it must use Google's Exchange Bidding (or a similarly manipulated Google alternative called "Real Time Config").  *See id.* ¶ 208.  To reiterate, client-side header bidding is totally unavailable on these pages.

Other Google conduct – including conduct this Court held plausibly anticompetitive – similarly compels publishers to adopt Exchange Bidding.  Notably, by limiting publishers' ability to accept bids from client-side header bidding through artificial line-item caps, MTD Op. at *34, and by redacting data necessary to compare the effectiveness of Exchange Bidding and client-side header bidding, *id.* at *35, Google has "manufactured a fait accompli:  take Exchange Bidding or use a now-degraded client-side alternative," FAC ¶ 163.  Daily Mail alleges that Google cajoled publishers into using Exchange Bidding by falsely telling them, among other things, that Exchange Bidding does not benefit from "Last Look," and that publishers need to

"limit [their] participation in client-side header bidding" in order to avoid putting a "strain" on their ad servers, FAC ¶ 163-64.  Google's first representation is at best misleading, *see id.* ¶ 164, and its latter is (in Daily Mail's experience) outright false.  Before Google imposed line-item caps, Daily Mail ran "over 300,000 line items within its publisher ad server and encountered no technical issues."  *Id.* ¶ 186.

**3.**  Finally, both Daily Mail's original and amended allegations regarding Accelerated Mobile Pages ("AMP") describe how that program exploited Google's power in the market for general search services to cut off publishers' ability to use client-side header bidding on a vital segment of webpages.  *See* FAC ¶¶ 202-12.  This Court rejected the State Plaintiffs' allegations regarding AMP because they were "sweeping and vague" and "remote from the product markets and claims in this case."  MTD Op. at *36-37.

Daily Mail's FAC does not betray the same flaws.  Google's power in the market for general search services always has been central to Daily Mail's complaint.  *See* Compl. ¶¶ 71-78, 160-83 (defining market for general search services and describing how Google wields its power in that market to depress competition in ad-tech markets).  Even without AMP, Daily Mail pleads at length that Google manipulates its organic search results – *i.e.*, search results on *all* pages – to punish publishers that attempt to counteract Google's exchange monopoly.  *See* FAC ¶¶ 213-25.  Accordingly, Daily Mail's complaint always has contained a detailed description of "the mechanics of Google's search engine," including "how it ranks results from non-AMP enabled sites," MTD Op. at *37, to the detriment of client-side header bidding and exchange rivals.

As relevant here, in 2016, Google introduced a "News Carousel" at the top of its mobile search results pages, which is a banner that "features news stories in response to a user's search."

FAC ¶ 203.  That banner moves links to non-AMP pages lower down the search results page, and users rarely scroll down past the News Carousel.  *Id.*  If Daily Mail's pages are demoted from their natural ranking in the Carousel, Daily Mail loses a "significant slice" of search-derived traffic.  *Id.*; *see also* ¶ 202 (alleging 20% of mobile visitors to Daily Mail sites come from a Google page).  But Google limits the kinds of pages that can be included in its News Carousel (and other search products) to pages that have adopted the AMP format, even though that format provides "no significant technological benefit" and "degrades the user experience."  *Id.* ¶¶ 204-05.  Additionally, AMP is "completely incompatible with client-side header bidding," *id.* ¶ 210, which cuts the number of exchanges available to compete by half, and even those that remain cannot (by Google's design) operate at "full capacity."  *Id.* ¶ 209.  Daily Mail must accept reduced competition on its mobile pages because it cannot forgo a "significant slice of Google-referred readers."  *Id.* ¶ 203.

As described in the FAC, Google's AMP conduct is analogous to other conduct this Court held is anticompetitive.  Specifically, the Court held that Google's capping the number of line-items a publisher may use to accept bids from header-bidding exchanges is anticompetitive because it "constrain[s] publishers' participation in header bidding, while also constraining competition on the exchange market."  MTD Op. at *35.  AMP is even worse.  While line-item caps serve to depress the value of bids entered by header bidders, *see* FAC ¶¶ 183-84, AMP knocks out client-side header bidding entirely, *see* FAC ¶ 210.  Through AMP, Google has driven inventory away from client-side header bidding not by competing for that inventory, but instead by "using its dominant position in general search services to force publishers to adopt a webpage format that limits competition."  *Id.*  AMP, like Google's capping of line items, is thus

not "a product innovation" but instead a "'tool' against header bidding and a way to direct more transactions" toward Google's exchange.  MTD Op. at *35.

C.      **Google Cannot Demonstrate Any Other Grounds To Deny Leave To Amend**

Apart from the legal merits of Daily Mail's FAC, Google cannot show that granting leave to amend would be inconsistent with the appropriate management of this litigation.

1.      Daily Mail has not "undu[ly] delay[ed]" in seeking amendment.  *Loreley Fin.*, 797 F.3d at 190.  Daily Mail seeks leave to amend in accordance with the Court's schedule and consistently has sought expedition in this case – including by opposing Google's request last year to delay indefinitely its time to file a responsive pleading.  *See* Doc. 21.  Google, meanwhile, still has not responded in Daily Mail's case, instead litigating its motion to dismiss the States' TAC.  The Court stayed Daily Mail's case (and all others in this MDL proceeding) during that time.  *See* Order ¶ 2 (Sept. 24, 2021), MDL Doc. 129.  Now that the Court largely has denied Google's motion to dismiss, Daily Mail's litigation should proceed in the usual manner, including with an ordinary-course FAC that Daily Mail seeks to file at the earliest opportunity.

2.      Google cannot show that Daily Mail has acted in bad faith, whether by "invent[ing] non-existent 'facts' for which there was no good faith basis," *Bensch v. Estate of Umar*, 2 F. 4th 70, 81 (2d Cir. 2021), engaging in gamesmanship, *see Cohen v. Am. Airlines, Inc.*, 13 F.4th 240, 247 (2d. Cir. 2021), or "convey[ing] a misleading impression" that it did not intend to amend, *City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings PLC*, 2022 WL 4377898, at *2 (S.D.N.Y. Sept. 22, 2022) (Oetken, J.).  As discussed, most of Daily Mail's amendments relate to conduct that this Court has found to state an antitrust claim. Moreover, many of those allegations came to light only after the States filed the TAC (*e.g.*, the details of Project Bernanke), which was seven months after Daily Mail filed its original complaint.  Finally, the remaining, non-conforming amendments – addressing user IDs,

15

Exchange Bidding, and AMP – include targeted allegations already known to Google that respond to points raised less than a month ago by the Court in its order denying Google's motion to dismiss. Daily Mail's proposed FAC therefore does not allege "an entirely new set of operative facts" such that Google lacks "fair notice" of Daily Mail's claims. *Cohen*, 13 F.4th at 247 (quoting *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985)).

**3.** Google will not be prejudiced by Daily Mail's proposed amendments. *See State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (prejudice is "most important" factor); *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 235 (2d Cir. 1995) (holding that 4-year delay in amending was permissible absent prejudice). To assess prejudice, courts in this Circuit consider whether the new allegations would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial," or would "significantly delay the resolution of the dispute." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993). "[C]omplaints of 'the time, effort and money'" spent litigating a case, however, cannot, "without more, constitute prejudice sufficient to warrant denial of leave to amend." *Pasternack*, 863 F.3d at 174 (quoting *Block*, 988 F.2d at 351); *see also U.S. ex. rel. Maritime Admin. v. Cont'l Illinois Nat'l Bank and Trust Co.*, 889 F.2d 1248, 1255 (2d Cir. 1989) ("[T]he adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading."). Rather, the opposing party must show, for instance, that allowing amendment will result in additional costs that could have been avoided had the allegations been pleaded initially. *See Contrera v. Langer*, 314 F. Supp. 3d 562, 575-76 (S.D.N.Y. 2018) (Gorenstein, M.J.) (finding no prejudice when "there [was] no suggestion that any discovery already performed . . . would need to be redone" and "it appear[ed] that the additional discovery engendered by the amendment would have been conducted in the same

manner had the claims been asserted initially"). Ultimately, whether the non-movant "had prior notice" of the allegations and whether they "arise[ ] from the same transaction as the claims in the original pleading are central" to the determination of prejudice. *A.V.E.L.A., Inc. v. Estate of Monroe*, 34 F. Supp. 3d 311, 317 (S.D.N.Y. 2014) (Francis IV, M.J.) (citing *Monahan v. New York City Dept. of Corrections*, 214 F.3d 275, 284 (2d Cir. 2000)).

Google cannot show that granting leave to amend will unduly complicate or delay this litigation. The Court has ordered the parties to amend their complaints now because the centralized cases remain at the starting gate, and so additional allegations do not threaten to disrupt scheduled discovery or other deadlines. *See S.S. Silberblatt, Inc. v. E. Harlem Pilot Block Bldg. 1 Housing Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir. 1979) (finding no prejudice even though amendment would require parties to spend "several months" analyzing "discovery material," "particularly when trial ha[d] not yet commenced and [was] not likely to do so for some time"). This Court previously has granted leave to amend when "fact discovery [was] still ongoing," because "[e]xpenses that would be incurred in the ordinary course of litigation" do not "give rise to an inference of prejudice." *Shi-Hsin Chang v. Phoenix Satellite Television (U.S.), Inc.*, 2014 WL 5017838, at *9 (S.D.N.Y. Sept. 22, 2014) (Castel, J.). Where discovery has yet to start, and the Court has invited amendment after deciding a bellwether motion to dismiss, any case for prejudice is even weaker. *See Contrera*, 314 F. Supp. 3d at 575-76. Thus, in *Pasternack*, the Second Circuit ordered the district court to permit amendment, despite years of delay, because "essentially no discovery ha[d] been undertaken," the proposed amended complaint "would be the first complaint to be considered after the district court decided a motion to dismiss," and there was no "allegation of untimeliness based on a scheduling order." 863 F.3d at 174. Much the same is true here.

17

Compared to *Pasternack* – where the plaintiff sought to add new claims after final judgment had been entered against them – Daily Mail's proposed amendments are more modest. The FAC primarily adds allegations raised in the States' TAC, for which coordinated discovery will continue apace regardless of Daily Mail's involvement.  *See supra* § I.A.  Daily Mail's few proposed allegations of individual harm likewise will not delay litigation.  Many are included for the Court's (and Google's) benefit to explain how Daily Mail uses the various products at issue in this case, *see*, *e.g.*, FAC ¶¶ 28, 126; others plead yet more specific statistics about the harm of Google's practices to Daily Mail's revenue, *see*, *e.g.*, *id.* ¶¶ 24, 94, 195; and others include terms from Google contracts with publishers that are likely to be included within the scope of discovery anyway, *see*, *e.g.*, *id.* ¶¶ 44, 109, 123.  Daily Mail also now clarifies that its foreign operations were injured by Google's anticompetitive conduct in the United States.  *See id.* ¶¶ 232-33, 239-40.  Such damages were plain from the original complaint – Daily Mail is British-owned with a substantial U.S. presence – and, as discussed, Google cannot cite the desire to avoid litigating this issue as grounds for opposing amendment.  Moreover, amendments related to "damages" are Conforming Amendments that this Court has already indicated are proper.  Pre-Trial Order No. 2 ¶ 2, MDL Doc. 309.  Even years into litigation, this Court has permitted plaintiffs to "amend their complaints to allege damages stemming from foreign sales." *Lavoho, LLC v. Apple Inc.*, 71 F. Supp. 3d 395, 398 (S.D.N.Y. 2014) (Cote, J.).

Similarly, litigating the FAC's 8 paragraphs of non-conforming amendments presents no prejudice to Google.  They include allegations regarding hashing user IDs, Exchange Bidding, and AMP, all of which were addressed in Daily Mail's original complaint, *see* Compl. ¶¶ 101-04; 161-70, Doc. 1, and which the States raised at least in some respect in each iteration of their complaint, *see* Compl. ¶¶ 125-29; 164-70; 206-13, *Texas v. Google, LLC*, No. 1:21-cv-06841

(S.D.N.Y.), Doc. 1; Am. Compl. ¶¶ 142-46; 196-202; 245-52, *Texas v. Google, LLC*, No. 1:21-cv-06841 (S.D.N.Y.), Doc. 77.  Any claim that Google will be prejudiced by engaging in discovery on those topics is dubious; only one year ago, Google answered the State Plaintiffs' complaint – twice – and by doing so signaled it was prepared to begin discovery on all three topics addressed by Daily Mail's non-conforming amendments.  *See* Answer, *Texas v. Google, LLC*, No. 1:21-cv-06841 (S.D.N.Y.), Doc. 67; Answer to Am. Compl., *Texas v. Google, LLC*, No. 1:21-cv-06841 (S.D.N.Y.), Doc. 96; Scheduling Order, *Texas v. Google LLC*, No. 1:21-cv-06841 (S.D.N.Y. May 21, 2021) (Scheduling order originally entered in E.D. Tex. starting discovery), Doc. 123.  Google thus cannot claim to lack "prior notice" of Daily Mail's targeted amendments on these discrete topics.  *A.V.E.L.A., Inc.*, 34 F. Supp. 3d at 317.  And, as with the remainder of the FAC, Google cannot invoke litigation expense and duration to avoid litigation of colorable claims.

## II.     Plaintiffs May Amend as a Matter of Course

Even if this Court determines that Daily Mail's FAC fails to meet the liberal and permissive amendment standard of Federal Rule of Civil Procedure 15(a)(2) – it does not – Daily Mail's amendment must nevertheless be permitted under Federal Rule of Civil Procedure 15(a)(1).  That rule allows a plaintiff to amend its complaint "once as a matter of course within" "21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(1)(B); *see also Savignac v. Jones Day*, 341 F.R.D. 120, 121-22 (D.D.C. 2022) (collecting cases and explaining plaintiff may amend as a matter of course "anytime" between filing of the complaint and 21 days after a response is served).  Courts inside and outside this Circuit have repeatedly held that a plaintiff has an "absolute" right to amend once as a matter of course, so long as the amendment is timely. *Gaming Mktg. Solutions, Inc. v. Cross*, 528 F. Supp. 2d 403, 406 (S.D.N.Y. 2007) (Sullivan, J.);

*see Chartwell Therapeutics Licensing, LLC v. Citron Pharma LLC*, 2020 WL 7042642, at \*6

(E.D.N.Y. Nov. 30, 2020); *Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002, 1007-08 (9th

Cir. 2015); *In re Alfes*, 709 F.3d 631, 639 (6th Cir. 2013); *Galustian v. Peter*, 591 F.3d 724, 730

(4th Cir. 2010); *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 282 (D.C. Cir. 2000);

*see also Washington v. New York City Bd. of Estimate*, 709 F.2d 792, 795-96 (2d Cir. 1983)

(holding plaintiff has "a right" to timely amend as a matter of course).

       Because Google has neither answered nor moved to dismiss Daily Mail's complaint,

Daily Mail's right to amend is absolute.  In this regard, Daily Mail is in a different position than

many of the other plaintiffs in this MDL.  While some of those plaintiffs have had (and taken) an

opportunity to amend their complaints, *see* Am. Compl., *Texas v. Google, LLC*, No. 1:21-cv-

06841 (S.D.N.Y.), Doc. 77; Am. Compl., *In re Google Digit. Publisher Antitrust Litig.*, No.

1:21-cv-07034 (S.D.N.Y.), Doc. 64; Am. Compl., *In re Google Digit. Advert. Antitrust Litig.*,

No. 1:21-cv-07001 (S.D.N.Y.), Doc. 35, Daily Mail has yet to make a single amendment.  Daily

Mail, unlike other participants in this MDL, may thus still make a timely amendment as a matter

of course.

       Daily Mail's right to amend is not diminished by the fact that this action has been

centralized with other actions in which other plaintiffs have exhausted their right to amend as a

matter of course.  Cases centralized for multidistrict litigation "retain their separate identities."

*Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015).  "That means a district court's

decision" on amendment "depends on the record in" the case in which amendment is sought, not

the record in other centralized actions.  *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 845

(6th Cir. 2020); *see also id.* ("[A] party's rights in one case" may not "be impinged to create

efficiencies in the MDL generally.").

Finally, the filing of this motion does not affect Daily Mail's absolute entitlement to amend as a matter of course.  *See In re Agent Orange Prod. Liability Litig.*, 517 F.3d 76, 103-04 (2d Cir. 2008) (holding it was error to deny motion to amend while amendment as a matter of course would still be timely); 6 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1482 (3d ed. 2014) (When a party "moves for leave to amend before the time for amending as of course has expired, several courts have held that the amendment" is not a matter of "discretion but should be allowed as of right.").  Indeed, courts in this Circuit have held that an amendment as a matter of course is proper even *after* a plaintiff has already amended his complaint with leave of court.  *See*, *e.g.*, *Doe #1 v. Syracuse Univ.*, 335 F.R.D. 356, 360 (N.D.N.Y. 2020).

## CONCLUSION

Daily Mail's Proposed Amended Complaint should be permitted under the liberal and permissive amendment standard of Rule 15(a)(2).  But, in all events, Daily Mail should be permitted to exercise its absolute right to amend as a matter of course.  The Court should grant Daily Mail's motion to amend.

Dated:  October 5, 2021

Jeffrey A. Lamken
Caleb Hayes-Deats
MOLOLAMKEN LLP
600 New Hampshire Avenue NW
Washington, DC 20037
Tel: (202) 556-2000
Fax: (202) 556-2001
Email:  jlamken@mololamken.com
        chayes-deats@mololamken.com

Respectfully submitted,

/s/ *John Thorne*

John Thorne
Daniel G. Bird
Bethan R. Jones
Christopher C. Goodnow
    (*pro hac vice* forthcoming)
Mark P. Hirschboeck
Eliana Margo Pfeffer
Eric J. Maier
KELLOGG, HANSEN, TODD, FIGEL
 & FREDERICK, P.L.L.C.
1615 M Street NW
Suite 400
Washington, DC 20036
Tel.:  (202) 326-7900
Fax:  (202) 326-7999
Email:  jthorne@kellogghansen.com
    dbird@kellogghansen.com
    bjones@kellogghansen.com
    cgoodnow@kellogghansen.com
    mhirschboeck@kellogghansen.com
    epfeffer@kellogghansen.com
    emaier@kellogghansen.com

*Counsel for Plaintiffs Associated*
*Newspapers Ltd. and Mail Media, Inc.*