# EXHIBIT 6

# REDACTED

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | Case No. 1:21-md-3010 (PKC) |

**EXPERT REPORT OF PAUL R. MILGROM**
**DATE:** December 13, 2024

**HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER**

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................2

I. ASSIGNMENT AND QUALIFICATIONS.................................................11

  A. Qualifications................................................................................ 11

  B. Assignment................................................................................... 14

  C. Compensation............................................................................... 18

II. SUMMARY OF OPINIONS.....................................................................19

  A. Google's Programs Benefited Its Customers................................. 19

  B. Analyses of Google's Programs by Plaintiffs and Their Experts Are Marred by Omissions and Errors.................................................................................25

    1. Plaintiffs and Their Experts Overlook or Understate the Benefits of Google's Programs for Its Customers........................................................................26

    2. Plaintiffs' Experts' Analyses Fail to Take Systematic Account of Incentives............. 34

    3. Plaintiffs' Experts' Analyses Underestimate the Role of Experimentation for Optimizing Returns.................................................................39

    4. Plaintiffs' Experts Ignore the Benefits from Google's Business Model that Balances the Interests of Advertisers and Publishers........................................................44

    5. Plaintiffs' Experts' Empirical Analyses Contain Errors and Exhibit Classic Biases.... 50

III. BACKGROUND AND ECONOMIC FRAMEWORK........................................ 58

  A. The Key Economic Features of Online Display Advertising............................. 58

  B. Intermediation in Online Display Advertising................................................. 61

    1. How Intermediation Can Improve Matching................................................. 61

    2. The Ad Tech "Stack"................................................................. 64

  C. Information, Incentives, and Auctions................................................. 67

    1. Auctions Aggregate Dispersed Information................................................. 67

    2. How Auction Designs Affect Publisher and Advertiser Incentives..............................69

    3. Types of Sealed-Bid Auctions................................................. 73

      a) Second-Price Auctions and Threshold Pricing.............................73

      b) First-Price Auctions.................................................76

      c) Other Auction Formats.................................................78

      d) How Publishers Set Floor Prices................................................. 78

    4. The Industry's Switch from Second-Price Auctions to First-Price Auctions............... 80

  D. Google's Products................................................................. 85

    1. Display & Video 360................................................................. 85

      a) How Advertisers Use DV360................................................. 85

      b) How DV360 Determines Bids and Payments.............................87

    2. Google Ads................................................................. 89

      a) How Advertisers Use Google Ads................................................. 89

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

b) How Google Ads Determines Bids into AdX: The Internal Auction......................90

3. Google Ad Manager.................................................................................................94

    a) How Publishers Use GAM................................................................................. 94

    b) Early Online Display Advertising and the Waterfall..............................................96

    c) AdX Uses Auctions to Match Publishers and Advertisers.....................................98

    d) Dynamic Allocation Benefits Publishers and Improves Efficiency...................... 101

    e) Enhanced Dynamic Allocation Benefits Publishers and Improves Efficiency......104

    f) Emergence of Header Bidding and Integration with DFP.....................................105

    g) Open Bidding Allowed Non-Google Exchanges to Compete in a Unified Auction, Benefiting Publishers and Increasing Platform Thickness.........................................109

    h) Unified First Price Auction and Unified Pricing Rules.........................................111

4. Google Responded to Competition by Improving Its Products...................................114

**IV. GOOGLE ADS BIDDING PROGRAMS: PROMOTING SIMPLE BIDDING AND INCREASING SURPLUS FOR GOOGLE ADS ADVERTISERS.................................... 116**

    A. Overview.............................................................................................................116

    B. Google Ads' Two-Bid Policy for AdX.................................................................. 124

    C. Google Ads' Bid Optimization Programs: Buy-Side DRS, Bernanke, and Alchemist.....127

    1. The Evolution of Google Ads' Bid Optimization Programs....................................130

        a) Buy-Side DRS: Reducing Revenue Shares to Win Additional Impressions......... 130

        b) Project Bernanke: Winning More Impressions with a Fixed Average Revenue Share.................................................................................................................. 131

        c) Alchemist: Updating Bernanke to Optimize Bids for Advertisers in the Unified First Price Auction.............................................................................................. 137

    2. Google Ads' Bid Optimization Programs Benefited Its Advertisers..........................138

        a) Fixing Bids and Floor Prices, Each Bid Optimization Program Increased Advertiser Surplus.................................................................................................. 139

        b) If Google Ads Advertisers Re-Optimize Their Bids While Publisher Floors Remain Constant, Advertiser Surplus Can Only Increase Further..........................................141

        c) Even Accounting for Likely Reactions by Publishers, Analysis of Google Ads Data Shows that Each Optimization Benefited Most Advertisers.....................................141

        d) Evidence from Google's Documents and Experiments Support These Findings, and Suggest Benefits for Publishers................................................................................ 146

    D. Responding to Plaintiffs' Allegations about Google Ads' Bid Optimization Programs.. 148

    1. Bernanke Did Not Alter the AdX Auction Rule and Did Not Deceive Publishers or Advertisers..................................................................................................................... 148

    2. Plaintiffs and Their Experts Omit or Mischaracterize the Benefits of Google Ads' Bid Optimization Programs for Advertisers.......................................................................... 149

    3. Plaintiffs and Their Experts Ignore the Benefits of Google Ads' Bid Optimization Programs for Publishers................................................................................................. 151

    4. Plaintiffs and Their Experts Exaggerate Google Ads' Bid Optimization Programs'

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Impact on non-Google Buyers and Exchanges...................................................160

5. Bernanke and its Variants Were Competitive Bid-Optimization Programs, Not Anticompetitive Bid-Rigging Schemes.........................................................................163

6. Plaintiffs and Their Experts' Claims that Google Ads' Bid Optimizations Decreased "Efficiency" Fail to Account for the Behavior of Other Intermediaries.........................170

7. Confidentiality About Bidding Practices Is Standard, Benefited Google's Customers, and Did Not Deceive Publishers or Advertisers................................................................172

8. Plaintiffs' Experts Incorrectly Claim that Bernanke Relied on Alleged Special Advantages Possessed by Google................................................................................177

9. Dr. Zona's Analysis of Buy-Side DRS is Mistaken....................................................178

10. Bernanke Was Not "A Form of Predatory Pricing".................................................179

11. Bernanke is Google Ads' Response to Incentives Faced by All Ad Buying Tools, Not to "Conflicting Incentives" as Professor Cramton Argues.............................................182

**V. PROJECT BELL: GOOGLE ADS' RESPONSE TO THE HARMFUL PRACTICE OF MULTI-CALLING............................................................................................. 186**

A. Overview.........................................................................................................186

B. Multi-Calls Harm Advertisers, End Users, and Non-Multi-Calling Publishers...............187

C. How Bell Identified Multi-Calling Publishers and Protected Advertisers.....................193

D. Responding to Plaintiffs' and Their Experts' Allegations about Bell.............................197

**VI. PROJECT ELMO: MANAGING ADVERTISER BUDGETS WHILE DISINCENTIVIZING BID DUPLICATION AND MULTI-CALLING.............................202**

A. Overview.........................................................................................................202

B. Background: Budget Throttling As a Tool To Manage Advertiser Budgets....................203

C. How Some Publishers and Exchanges Gamed Budget Throttling..................................206

D. How Elmo Protected Advertisers and Disincentivized Multi-Calling and Bid Duplication.. 210

E. Responding to Plaintiffs' Allegations....................................................................212

**VII. POIROT, MARPLE, AND THE ADX 1P BIDDER: IMPROVING RETURNS FOR ADVERTISERS BY OPTIMIZING BIDS IN NON-SECOND PRICE AUCTIONS.........214**

A. Overview.........................................................................................................214

B. Background: Non-Second-Price Auctions................................................................218

C. All Advertisers Should Maximize Expected Surplus...................................................220

D. Poirot Benefited Advertisers By Optimizing Bids to Auction Formats..........................221

1. Overview of Project Poirot...............................................................................221

2. How Poirot Experimented to Identify Non-Second-Price Auctions and Optimize Bids... 223

3. Poirot Increased Advertiser Surplus...................................................................227

4. How DV360 Updated Poirot to Further Increase Benefits to Advertisers....................229

E. DV360 Transitions to the AdX 1P Bidder after the UFPA............................................232

1. The AdX 1P Bidder was an Architectural Change to Incorporate MBTW on DV360's

Bidding in AdX...........................................................................................232

2. 1P Bidder for Third-Party Exchanges..................................................235

F. Responding to Plaintiffs' Allegations....................................................237

1. Poirot and Marple Benefited Advertisers...........................................237

2. Poirot Targeted Non-Second-Price Auctions, Not Header Bidding As Alleged......... 243

3. Plaintiffs' and Their Experts' Theory of Harm to Publishers and Competing Exchanges Is Based on Faulty Assumptions....................................................244

4. Poirot Applied Equally to AdX, as Well as to Other Exchanges.............................251

5. Plaintiffs' Experts Mischaracterize the 1P Bidder and Professor Li's Data Analysis Contains Errors and Misleading Conclusions....................................................254

6. Professor Cramton's Arguments about "Fixed CPMs" are Unsupported...................261

7. Professor Cramton's Arguments About "Stability" Misclassify Poirot......................263

**VIII. DYNAMIC ALLOCATION: USING AUCTIONS TO INCREASE PUBLISHER REVENUES ON REMNANT IMPRESSIONS........................................................ 264**

A. Overview.........................................................................................264

B. Online Display Advertising Configurations Prior to DA..................................267

C. DA Introduced Auctions for Impressions, Improving Platform Thickness and Increasing Publisher Revenues....................................................270

D. Real-Time Bidding in AdX 2.0 Further Increased Benefits of DA for Publishers and Advertisers on AdX............................................................ 274

E. My Simulation Analysis Concludes that DA Improved Outcomes for Publishers and Advertisers........................................................................279

F. Responding to Plaintiffs' and Their Experts' Allegations..................................290

1. Plaintiffs' and Their Experts' Allegations Lack Historical Context and Ignore the Technical Challenge of Designing Unified Auctions...................................... 290

2. Plaintiffs' and Their Experts' Allegations About AdX's Floor Price And Publisher Use of Average Historical Prices Are Incorrect and Fail to Adequately Account for Incentives. 297

3. Plaintiffs' and Their Experts' Claims About Harms to Other Exchanges Are Overstated 307

4. The Advertiser Class' Allegations that DA Raised Prices Ignore that Second-Price Auctions Lead to Market-Clearing Prices....................................................310

**IX. ENHANCED DYNAMIC ALLOCATION: INCREASING PUBLISHER REVENUES BY FULFILLING GUARANTEED CONTRACTS MORE EFFICIENTLY.....................312**

A. Overview.........................................................................................312

B. How EDA Increased Efficiency and Publisher Revenues.................................316

1. EDA's Optimization Procedure.........................................................316

2. EDA's Benefits for Publishers............................................................ 319

3. How EDA Increased Efficiency...........................................................321

C. Responding to Plaintiffs' and Their Experts' Allegations................................. 322

1. Plaintiffs and Their Experts Err Repeatedly in Their Descriptions and Analyses of EDA ........................................................................................................ 322

2. EDA Does Not Leave Non-Google Ad Buyers with Lower Value Inventory ............. 333

    a) How "Cream-skimming" Might Arise in Theory: Common Values and Adverse Selection ............................................................................................................... 333

    b) Professor Hortaçsu's Empirical Analyses of "Cream Skimming" Are Unreliable ..... 338

        i) Professor Hortaçsu's Analysis of CTRs Emphasizes the Wrong Time Period 338

        ii) Professor Hortaçsu's Use of PG is an Unreliable Proxy for Standard Direct Deals .................................................................................................................. 340

        iii) Professor Hortaçsu's Narrow Focus on CPMs for PG is Misleading ............ 343

    c) My Own Empirical Analysis Finds Little Evidence of Adverse Selection ........... 344

        i) Data ......................................................................................................... 345

        ii) Methodology ............................................................................................ 346

        iii) Main Finding: Differences in Predicted-Engagement Metrics are Less than 1% 347

        iv) Publisher-Level Heterogeneity ................................................................. 348

        v) My Empirical Analysis Undermines Plaintiffs' Experts Conclusions About "High-Value" Ads ............................................................................................ 350

3. Professor Jardin Incorrectly Insinuates that "Fudge Factors" are "Manipulative" ...... 354

**X. HEADER BIDDING AND THE DUBIOUS "LAST LOOK ADVANTAGE" ................ 356**

    A. Overview ....................................................................................................... 356

    B. How the So-Called "Last Look" Arose As a Consequence of Some Publishers' Configuration of Header Bidding in GAM ......................................................... 361

    C. Publishers Benefited from the So-Called "Last Look" ....................................... 365

    D. Responding to Plaintiffs' and Their Experts' Allegations ................................... 366

        1. Plaintiffs and Their Experts Mistakenly Claim that AdX Buyers Benefit from Additional Information Provided by the So-Called Last Look ....................................... 366

        2. Plaintiffs and Their Experts Neglect Publishers' Ability and Incentive to Inflate the Winning Header Bid .................................................................................................. 370

        3. Plaintiffs and Their Experts Exaggerate the Effects of Line Item Caps ................. 385

        4. Plaintiffs and Their Experts Misinterpret Google's Experiments on "Last Look" ...... 391

        5. Plaintiffs and Their Experts References to "Penny Above" Outcomes from "Last Look" are Misleading ............................................................................................... 395

        6. Plaintiffs Neglect Incentives in Their Interpretation of the AdX Terms of Service .... 398

        7. Plaintiffs and Their Experts Ignore the Challenges of Switching to UFPA ................ 399

        8. Professor Elhauge's Claims About DFP First Look Are Wrong ................................. 401

**XI. RESERVE PRICE OPTIMIZATION: INCREASING PUBLISHER REVENUES IN "THIN" AUCTION MARKETS ................................................................... 404**

    A. Overview ....................................................................................................... 404

B. Importance of Floor Prices for Revenue Optimization..........................................406

C. Google's Implementation of RPO..........................................................................409

D. Responding to Plaintiffs' Allegations...................................................................417

    1. Google's Communications About RPO and the AdX Auction Format Were Not Misleading....................................................................................................................417

    2. Publishers and Advertisers' Were Not Harmed by RPO Being Allegedly "Opaque".422

    3. RPO Did Not Prevent Other Exchanges from "Competing on the Merits"................424

**XII. SELL-SIDE DYNAMIC REVENUE SHARING: INCREASING MATCH RATES AND PUBLISHER REVENUES..............................................................................426**

A. Overview................................................................................................................426

B. How Dynamically Adjusting Revenue Shares By Impression Can Create Value By Selling More Impressions and Increasing Publisher Revenues..........................................430

C. DRS Increased Match Rates and Publisher Revenues and Evolved to Simplify Bidding for Advertisers....................................................................................................433

    1. DRS v1 Lowered Per-Impression Revenue Shares to Sell More Impressions...........434

    2. DRS v2: Restoring a Fixed Revenue Share by Averaging.........................................440

    3. Truthful DRS: Simplifying Bidding While Maintaining the Benefits of Dynamic Revenue Sharing............................................................................................................445

D. Responding to Plaintiffs' and Their Experts' Allegations....................................449

    1. Plaintiffs' and Their Experts Provide Misleading Analyses of DRS's Effects...........451

    2. Google Did Not Mislead Buyers and Publishers About DRS...................................458

    3. Non-Google Exchanges Also Dynamically Adjusted Revenue Shares.....................462

    4. DRS Did Not Remove Protections Against Low-Quality Ads..................................463

    5. DRS Did Not "Restrain" Rivals From Competing With AdX.....................................464

    6. DRS Exemptions Were Not Designed To Exempt AdX From Poirot.........................465

    7. Professor Cramton's Expectation Of Conduct For Google Is Not Appropriate..........467

    8. Professor Hortaçsu's Methodology To Simulate DRS Damages Is Flawed...............468

**XIII. OPEN BIDDING AND UNIFIED FIRST PRICE AUCTION: IMPROVING PUBLISHERS' ABILITY TO ACCEPT BIDS FROM NON-GOOGLE EXCHANGES..474**

A. Overview................................................................................................................474

B. Open Bidding: Google's Response to the Flaws of Header Bidding.............................479

C. Meeting the Challenge of an "Auction of Auctions": The Evolution of Open Bidding and the Unified First Price Auction.......................................................................482

    1. "Alpha" Design Highlights Difficulty of Auction of Auctions....................................482

    2. Google Removes the So-Called "Last Look" Over Open Bidding, Challenging Its Second-Price Auction Design.........................................................................................484

    3. Google's Transition to the Unified First Price Auction Further Increased Efficiency 487

D. Responding to Plaintiffs' and Their Experts' Allegations....................................492

    1. Plaintiffs Mischaracterize the Open Bidding Program.............................................492

    2. Header Bidding Adoption Continued Following Open Bidding's Release..................497

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

3. Professor Hortaçsu's Claims Regarding "Deception" are Ahistorical and Overlook Publishers' Alternatives...................................................................................................499

4. Contrary to Plaintiffs' and Their Experts' Claims, MBTW Data is Neither a "Bid Shading Algorithm" nor a "New Last Look Advantage"................................................501

5. Plaintiffs' and Their Experts' Arguments are Ahistorical and Fail to Account for Participants' Alternatives........................................................................................509

6. Professor Li Incorrectly Asserts that the use of "Minimum Bid to Win" Data by Alchemist Harms Publishers...................................................................................511

7. Professor Li Incorrectly Asserts that in the Competitive Counterfactual "Minimum Bid to Win" Data would not be shared...............................................................513

    a) Not sharing MBTW Data can Harm Publishers and is Contrary to Best Practice.513

    b) Sharing MBTW Data has not, nor is likely to, foster Collusive Behavior...........517

8. Plaintiffs' and Their Experts' Bid Data "Redaction" Allegations Are Historically Incomplete and Fail to Account for Publishers' Alternatives.........................................519

9. Professor Li's "Last Look" Allegations Do Not Account for Bid Boosting................522

**XIV. UNIFIED PRICING RULES: PROTECTING ADVERTISERS FROM PRICE-FISHING BY PUBLISHERS USING EXCHANGE-DISCRIMINATORY FLOOR PRICES**.....................................................................................................................**525**

A. Overview..............................................................................................................525

B. Self-Competition and the Problem of Varying Floor Prices Across Exchanges...............530

C. Unified Pricing Rules Protected Advertisers and Benefited Publishers in the UFPA.......535

D. Under UPR, Publishers Could Still Preference Demand Sources...................................538

E. Responding to Plaintiffs' and Their Experts' Allegations...............................................541

1. Plaintiffs and Experts Neglect the Industry-Wide Acceptance of UPR and Its Benefits to Advertisers and Publishers........................................................................541

2. Plaintiffs and Experts Neglect How UFPA Changed Publishers' Incentives to Set Differential Floor Prices..........................................................................................542

3. Plaintiffs and Their Experts Ignore Alternative Ways Publishers Could Favor Non-Google Demand Sources and Incentivize Ad Quality After UPR's Introduction... 545

4. Professor Cramton's Claims on Efficiency and Market Thickness are Mistaken....... 551

5. The Daily Mail Complaint Incorrectly Claims UPR Decreased Daily Mail's Revenues.. 552

6. The Daily Mail Complaint Incorrectly Claims AdX Retained a Last Look Advantage.... 555

7. Professor Li and Professor Hortaçsu Omit Critical Details in their Analysis of Data and Documentation From Confiant...........................................................................556

    a) AdX Produced Higher Quality Ads Than Other Exchanges in the Months Following UPR.................................................................................................. 556

    b) Confiant Data is Inconsistent with Claims that UPR Led to "Lower Quality Ads Across the Market".................................................................................... 560

    c) Changing Market Conditions and Confiant's Product Evolution Complicate the

Evaluation of Long-Term Ad Quality Trends............................................................562

8. Corrections to Professor Hortaçsu's Regression Panel Show No Significant Effect of UPR on Total Impressions...............................................................................................565

    a) Correcting Professor Hortaçsu's Omission of Publisher-Specific Trends Negates His Conclusions...........................................................................................................567

    b) Retaining Dropped Observations from Professor Hortaçsu's Panel Negates His Conclusions...........................................................................................................569

    c) Balancing Hortaçsu's Panel Eliminates Attrition Bias and Negates His Conclusions 570

**XV: TECHNICAL NOTES..........................................................................................574**

A. Technical Notes for Section IV (Google Ads Bidding Programs)...................................574

1. Theorem 1: Statement and Proof.................................................................................574

2. Verifying the DHR Condition of Corollary 1 and Calculating Minimum Advertiser Surplus Using Google Ads Data......................................................................................579

B. Technical Notes for Simulations of Dynamic Allocation in Section VIII.E...................587

1. Data...............................................................................................................................587

2. Selecting the Sample of Data from the GAM Log-Level Dataset..............................589

3. Selecting the Sample from the Google Ads Log-Level Dataset.................................591

4. Modeling Bidder Values..............................................................................................592

    a) Values for AdX......................................................................................................593

    b) Bid Inversion to Estimate Values for Non-Google Demand Sources...................594

5. Simulating Sales of Impressions.................................................................................597

    a) Simulating the Waterfall.......................................................................................598

    b) Simulating DA.......................................................................................................598

    c) Comparing DA and the Waterfall: Two Different Counterfactuals.......................599

6. Calculating Prices and Orders in the Waterfall.........................................................600

7. Simulation Results.......................................................................................................602

8. Robustness Checks......................................................................................................603

C. Technical Notes for Section IX (Enhanced Dynamic Allocation)...................................604

1. Further Details on Calculating the EDA Price to Maximize Publishers' Revenues While Fulfilling Guaranteed Contracts.............................................................................604

2. Theorem 2: Statement and Proof.................................................................................607

3. EDA Revenue Empirical Analysis...............................................................................610

4. Analysis of pCTR Data: Supplemental Figures.........................................................612

D. Technical Notes for Section X (Header Bidding and "Last Look").................................613

1. Theorem 3: Statement and Proof.................................................................................613

E. Technical Notes for Section XII (Sell-side Dynamic Revenue Sharing).........................616

1. Theorem 4: Statement and Proof.................................................................................617

2. Theorem 5: Statement, Proof, and Further Discussion...............................................617

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

3. Theorem 6: Statement and Proof........................................................................... 620

4. Technical Description of DRS v2......................................................................... 621

5. Lemma 1: Statement and Proof............................................................................623

6. Theorem 7: Statement and Proof......................................................................... 623

7. Theorem 8: Statement and Proof......................................................................... 624

8. Technical Description of tDRS............................................................................ 625

9. Theorem 9: Statement, Proof, and Further Discussion....................................... 626

F. Technical Notes for Section XIII (Open Bidding)............................................. 628

1. Example Showing that when Publishers Boost Bids Publisher Revenues are Identical to a Unified Auction and Neither Bidder Has an "Advantage"....................................... 628

2. Example Showing that the So-Called "Last Look" Does Not Inherently Decrease Publisher Revenues, Even When Publishers Do Not Boost Header Bids...................... 630

G. Technical Notes for Section XIV (UPR)............................................................632

1. An Example of Post-Auction Discounts Compared To Exchange-Discriminatory Floor Prices.........................................................................................................................632

2. Robustness of UPR Regression Panel Results to Hortaçsu's Different Timing Specifications for the Effect on Impressions.................................................................. 635

a) 9 Month Ahead Case........................................................................................636

b) 12 Month Ahead Case...................................................................................... 638

c) 15 Month Ahead Case.......................................................................................640

**APPENDIX A: CURRICULUM VITAE**................................................................ **643**

**APPENDIX B: LIST OF MATERIALS REFERRED TO OR RELIED ON**..................... **664**

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

# I.   <u>ASSIGNMENT AND QUALIFICATIONS</u>

## A. *Qualifications*

1.   My name is Paul R. Milgrom. I am the Shirley and Leonard Ely Professor of Humanities and Sciences in the Department of Economics at Stanford University and professor, by courtesy, at both the Department of Management Science and Engineering and the Graduate School of Business. I am also the chairman and co-founder of Auctionomics, which designs and assists bidders in high-stakes auctions.

2.   In 2020, I was the co-recipient, with Professor Robert Wilson, of the Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel, commonly known as the Nobel Prize in Economics, "for improvements to auction theory and inventions of new auction formats." As explained by the Royal Swedish Academy of Sciences: "The new auction formats are a beautiful example of how basic research can subsequently generate inventions that benefit society. The unusual feature of this example is that the same people developed the theory *and* the practical applications. The Laureates' ground-breaking research about auctions has thus been of great benefit, for buyers, sellers and society as a whole."[1]

3.   Earlier in the same year, I was also named a Distinguished Fellow of the American Economic Association. The Distinguished Fellow citation describes me as "the world's leading auction designer, having helped design many of the auctions for radio spectrum conducted around the world in the last thirty years, including those conducted by the US

---

[1] The Royal Swedish Academy of Sciences, "The quest for the perfect auction," Nobelprize.org (2020), https://www.nobelprize.org/uploads/2020/09/popular-economicsciencesprize2020.pdf, accessed Dec. 7, 2024, at pp. 6-7 (emphasis in original).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Federal Communications Commission (ranging from the original simultaneous multiple round auction with activity rules, to the recent incentive auction for repurposing broadcast spectrum for modern uses). His applied work in auction design and consulting has established new ways for economists to interact with the wider world. He is also a theorist of extraordinary breadth, who has provided (and still continues to provide) foundational insights not only into the theory of auctions (including his 1982 paper with Weber), but across the range of modern microeconomic theory."[2]

4.    Continuing, the citation notes that "[h]is work has been widely recognized. He is a member of the National Academy of Sciences and the American Academy of Arts and Sciences. He has received major prizes, including the 2008 Nemmers Prize, the 2012 BBVA Foundation Frontiers of Knowledge Award, the 2014 Golden Goose Award (with McAfee and Wilson), the 2018 CME Group-MSRI Prize in Innovative Quantitative Applications, and the 2018 John J. Carty Award for the Advancement of Science (with Kreps and Wilson). He is the dissertation advisor of many successful economists." In 2024, I received a technical Emmy from the National Academy of Television Arts & Sciences for my work helping the US Federal Communications Commission to design and implement its Broadcast Incentive Auction.[3]

5.    I have been Professor at Stanford University since 1987. My prior academic appointments were at Yale University (from 1982 to 1987) and Northwestern University (from 1979 to 1983). In 2023, I was also a Distinguished Research Professor at the

---

[2] American Economic Association, "Paul Milgrom, Distinguished Fellow 2020" (2020), https://www.aeaweb.org/about-aea/honors-awards/distinguished-fellows/paul-milgrom, accessed Dec. 11, 2024.

[3] National Academy of Television Arts & Sciences, "Tech Emmys, 75th Award Recipients" (2024), https://web.archive.org/web/20240223080842/https://theemmys.tv/tech-75th-award-recipients/, accessed Dec. 11, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Simons Laufer Mathematical Sciences Institute (supported by the Alfred P. Sloan
Foundation). I hold a Ph.D. in Business from Stanford University (conferred in 1979), a
M.S. in Statistics from Stanford University (conferred in 1978), and an A.B. in
Mathematics with high honors from University of Michigan (conferred in 1970).

6.   At Stanford University, I teach undergraduate and graduate courses in microeconomic
theory and market design. *Market design* is a field of research in economics, management
science and computer science, which includes the study of auctions.[4]

7.   My academic research in economics, including on auctions and economic theory, has
been published in a number of peer-reviewed journals in economics, including
*Econometrica, American Economic Review, Journal of Political Economy, Quarterly*
*Journal of Economics, Journal of Financial Economics, Games and Economic Behavior,*

---

[4] The National Bureau of Economics Research (NBER) has a market design working group, which it describes as one that "studies market institutions such as auctions, queues, assignment rules in school systems, clearinghouses, and tradeable permit systems. It emphasizes the role of institutional design in determining market outcomes and the well-being of market participants." National Bureau of Economic Research, "Market Design," https://www.nber.org/programs-projects/programs-working-groups%23Groups/market-design, accessed Dec. 13, 2024.

The Institute for Operations Research and Management Science (INFORMS) has an "Auctions and Market Design Cluster," for which the "[a]pplications include procurement auctions, spectrum auctions, kidney exchanges, labour markets, or digital advertising markets." Institute for Operations Research and Management Science, "About AMD - Auctions and Market Design," http://connect.informs.org/auctionsandmarketdesign/about-us/aboutamd, accessed Dec. 13, 2024.

The Simons Laufer Mathematical Sciences Institute of University of California at Berkeley had a 2023 program entitled "Mathematics and Computer Science of Market and Mechanism Design." It explains that "economists and computer scientists have collaborated with mathematicians, operations research experts, and practitioners to improve the design and operations of real-world marketplaces." Simons Laufer Mathematical Sciences Institute, "Mathematics and Computer Science of Market and Mechanism Design" (2023), https://www.slmath.org/programs/333, accessed Dec. 13, 2024.

At Stanford University, I teach an economics course on market design "ECON 136," which has coverage including "the design of platforms and exchanges, with applications to internet markets." Stanford University, "Stanford Bulletin" (2023), https://explorecourses.stanford.edu/search;jsessionid=zg9iqiunv63g16z0qr48bmb90?q=ECON+136%3a+Market+Design&view=catalog&filter-coursestatus-Active=on&academicYear=20232024, accessed Dec. 13, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

*Journal of Economic Perspectives, Journal of Economic Theory,* and *Journal of Mathematical Economics.*

8.   In the online display advertising industry, I was engaged to give commercial advice to two companies. From 2007 to 2008, I advised Yahoo! Inc., which was a leading online publisher and operator of an ad network. From 2009 to 2017, I occasionally advised OpenX, a supply-side platform, on auction design-related issues. As part of this work, I co-invented an auction design that was patented by OpenX, entitled "*Impression allocation system and methods using an auction that considers losing bids.*"[5]

9.   In 2017-2018, I was a visiting research scholar at Google, studying the economics and pricing of cloud computing.

10.  I attach my curriculum vitae in Appendix A, which provides further biographical details, including details of my work as an expert witness since 2010.

**B. Assignment**

11.  Advertisers, publishers, and platforms (collectively "The Plaintiffs") have filed lawsuits against Google LLC ("Google"). The Plaintiffs comprise several groups: advertiser parties (collectively, "Advertiser Plaintiffs"), which include a class of advertisers ("The Advertiser Class") and an individual plaintiff, Michael Stellman ("Plaintiff Stellman"); publisher parties (collectively, "Publisher Plaintiffs"), which include a class of publishers ("The Publisher Class"), Daily Mail, and Gannett; and Inform, which describes itself as

---

[5] Milgrom, Paul, Cunningham, Stephan, and Beck, Marissa, "United States Patent 11,574,358 Impression Allocation System and Method Using an Auction that Considers Losing Bids," OpenX Technologies, Inc. (Feb 7, 2023), https://patents.google.com/patent/US11574358B2, accessed Dec. 13, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

an "online video platform."[6] The Plaintiffs allege that Google harmed them by

committing "anticompetitive and deceptive acts"[7] and by "manipulat[ing] auctions."[8]

12.    I have been retained on behalf of Google to analyze and assess the economic effects of

Google's online display advertising auction practices and claims made by The Plaintiffs

---

[6] Inform Third Amended Complaint (May 15, 2024), at ¶ 2 ("Plaintiff Inform Inc. ('Inform') is an online video platform ('OLV') company that brought news websites to life with video clips, serving online news publishers, content creators, and online advertisers. Inform's once-highly-successful online video platform matched news publishers' original stories with professionally created video content from content creators, incorporated those videos into stories posted on the publishers' websites, and coordinated the placement of advertisements in those videos targeted to the websites' viewers. For example, Inform might match: (1) a newspaper publisher's website story covering California wildfires with (2) an independent content creator's video of raging west coast wildfires and (3) an advertiser's short lead-in video (or "pre-roll") clip advertising the superior rates and services of a national property insurer.").

[7] Advertiser Class Complaint (Dec. 2, 2022), at ¶ 166 ("Google's set of anticompetitive and deceptive acts described in this Complaint were part of a unified, long-term exclusionary strategy the combined effect of which was to roll back competition, giving Google unchecked power across the ad tech stack connecting advertisers and publishers."); Stellman Complaint, at ¶ 143 ("This made Google's other disclosures about its ad exchange deceptive."); Publisher Class First Amended Complaint (Dec. 5, 2022), at ¶ 409 ("Google's conduct constitutes deceptive, fraudulent, unlawful and/or unfair business acts and practices, including Google's violations of Section 1 and 2 of the Sherman Act [...]"); Daily Mail Second Amended Complaint (May 15, 2024), at ¶ 271 ("Daily Mail, with its U.S. headquarters in New York, has suffered injury in New York as a result of Google's deceptive and other unlawful practices."); Gannett Amended Complaint (May 15, 2024), at ¶ 283 ("Gannett's entire publication portfolio has been injured as a result of billions of deceptive transactions that Google has planned and enforced from New York."); Inform Third Amended Complaint, at Section VIII.A.2 ("Anticompetitive Manipulation of the Ad Auction: Google Impaired and Excluded Competitors and Stole Valuable Ad Inventory Through Auctions Designed to Deceptively and Artificially Preference Its Own Exchange and Decimate Competition on the Merits").

[8] Advertiser Class Complaint, at ¶ 10 ("Moreover, Google secretly manipulated auctions, coerced publishers and advertisers to transact in AdX and coerced advertisers to exclusively use Google's buying tools."); Stellman Complaint, at ¶ 3 ("Google increased its exchange fees by surreptitiously implementing a secret auction-manipulation program known as 'Reserve Price Optimization.'"); Publisher Class First Amended Complaint, at ¶ 206 ("As set forth infra, Google used its Ad Server to manipulate auctions to drive ad impressions to be sold on Google's Ad Exchange, even when publishers configured the Ad Server to seek bids from other Ad Exchanges and/or Ad Networks that would have submitted higher bids but for Google's manipulations. For example, using Act 5, Act 6, and Act 8, Google prevented other Ad Exchanges from even bidding on impressions to the extent Google's AdX could beat the historical average of the other Ad Exchanges and Ad Networks from which publishers configured Google's Ad Server to solicit bids. Even when those Ad Exchanges and Ad Networks were permitted to bid, Google manipulated its bids and take rates to prevent those non-Google Ad Exchanges and Ad Networks from winning publishers' ad impressions and thereby cemented Google's Ad Exchange as the winner."); Daily Mail Second Amended Complaint, at ¶ 247 ("Moreover, Google's myriad auction manipulations significantly reduce competition in the exchange market and drastically reduce Daily Mail's ability to sell foreign and domestic impressions through United States exchanges that remain in business."); Gannett Amended Complaint, at ¶ 13 ("Google's market manipulations have evolved over the years, but the goal has remained the same: Google prohibits publishers from soliciting competitive bids from rival exchanges, while at the same time rigging AdX's bids by trading on inside information from DFP."); Inform Third Amended Complaint, at Section VIII.A2 ("Anticompetitive Manipulation of the Ad Auction: Google Impaired and Excluded Competitors and Stole Valuable Ad Inventory Through Auctions Designed to Deceptively and Artificially Preference Its Own Exchange and Decimate Competition on the Merits").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

and their experts that such auction practices are or were manipulative, deceptive, and/or anticompetitive. Specifically, I studied the economic effects of the following auction practices:

a. *Buy-side DRS*, *Project Bernanke*, *Global Bernanke, Alchemist, and Alph*: Google Ads' bid optimization programs for AdX auctions designed to maximize the value of impressions won by Google Ads, without increasing its overall revenue share.

b. *Project Bell:*[9] Google Ads' practice of reducing bids to publishers that query AdX multiple times for the same impression.

c. *Project Elmo*: a budget management feature on DV360 and Google Ads to ensure that Google made consistent bids on behalf of its advertisers across all bid requests received for a given end user within each minute.

d. *Projects Poirot, Marple, and the AdX 1P Bidder*: Poirot and Marple are DV360's and Google Ads' respective programs to detect ad exchanges using non-second-price auction formats and adjust bids to maximize advertiser profits in those auctions. The AdX 1P Bidder refers to DV360's bidding system for AdX after the transition to the Unified First Price Auction, which was subsequently adapted for bidding on third-party exchanges as well.

e. *Dynamic Allocation (DA)*: a procedure to increase yields on publisher impressions by inserting Google's real-time auctions into publishers' earlier sequential "waterfall" allocation process.

---

[9] In this report, I use "Project Bell" or "Bell" to refer to what Google internally called Bell v.2 (*i.e.*, not the program "Global Bernanke," which was also at times called Bell v.1).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

f.  *Enhanced Dynamic Allocation (EDA)*: a technology that dynamically allocates impressions between guaranteed contracts and an auction process to increase publisher revenues and improve efficiency.

g.  The so-called *"Last Look"*: a side effect of the way that some publishers configured header bidding to integrate with DFP causing bids from AdX bidders to be received after header bids had been received by the publisher.

h.  *Reserve Price Optimization (RPO)*: a DFP feature that automatically increased floor prices for impressions when Google detected that a publisher set a floor below the revenue-maximizing level.

i.  *Sell-side Dynamic Revenue Share (DRS)*: AdX's practice of varying its revenue share on individual impressions to increase the number of impressions it sold, without increasing its overall revenue share.

j.  *Open Bidding*: Google's auction design to integrate real-time bids from other exchanges into the sale of impressions.

k.  *Unified First Price Auction (UFPA)*: Google's auction redesign that compares bids for impressions from all bidders on the same first-price basis.

l.  *Uniform Pricing Rules (UPR)*: a feature that allows publishers to configure and manage floor prices that apply equally to all buyers (*i.e.*, exchanges and other demand sources) participating in its UFPA.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### C. Compensation

13.   I am compensated at the rate of $1,800 per hour for the time I work on this matter, which is my current regular consulting rate. I also receive a share of the profits of Auctionomics Inc., which has, in this matter, provided research support and assisted in the preparation of this report under my direction and supervision. My compensation is not contingent on my findings, the testimony I may give, or the outcome of this case.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## II.   <u>SUMMARY OF OPINIONS</u>

14.   In studying the practices listed in <u>Paragraph 12</u>, I emphasize two overarching

conclusions: each of these practices benefited Google's customers, and Plaintiffs' experts

make systematic errors and omissions in their assessments of these practices.

### A. Google's Programs Benefited Its Customers

15.   The Plaintiffs allege that Google has harmed advertisers and publishers by committing

"anticompetitive and deceptive acts"[10] and by "manipulat[ing] auctions."[11] After

---

[10] Advertiser Class Complaint, at ¶ 166 ("Google's set of anticompetitive and deceptive acts described in this Complaint were part of a unified, long-term exclusionary strategy the combined effect of which was to roll back competition, giving Google unchecked power across the ad tech stack connecting advertisers and publishers."); Stellman Complaint, at ¶ 143 ("This made Google's other disclosures about its ad exchange deceptive."); Publisher Class First Amended Complaint, at ¶ 409 ("Google's conduct constitutes deceptive, fraudulent, unlawful and/or unfair business acts and practices, including Google's violations of Section 1 and 2 of the Sherman Act"); Daily Mail Second Amended Complaint, at ¶ 271 ("Daily Mail, with its U.S. headquarters in New York, has suffered injury in New York as a result of Google's deceptive and other unlawful practices."); Gannett Amended Complaint, at ¶ 277 ("Gannett's entire publication portfolio has been injured as a result of billions of deceptive transactions that Google has planned and enforced from New York."); Inform Third Amended Complaint, at Section VIII.A.2 ("Anticompetitive Manipulation of the Ad Auction: Google Impaired and Excluded Competitors and Stole Valuable Ad Inventory Through Auctions Designed to Deceptively and Artificially Preference Its Own Exchange and Decimate Competition on the Merits").

[11] Advertiser Class Complaint, at ¶ 10 ("Moreover, Google secretly manipulated auctions, coerced publishers and advertisers to transact in AdX and coerced advertisers to exclusively use Google's buying tools."); Stellman Complaint, at ¶ 3 ("Google increased its exchange fees by surreptitiously implementing a secret auction-manipulation program known as 'Reserve Price Optimization.'"); Publisher Class First Amended Complaint, at ¶ 206 ("As set forth infra, Google used its Ad Server to manipulate auctions to drive ad impressions to be sold on Google's Ad Exchange, even when publishers configured the Ad Server to seek bids from other Ad Exchanges and/or Ad Networks that would have submitted higher bids but for Google's manipulations. For example, using Act 5, Act 6, and Act 8, Google prevented other Ad Exchanges from even bidding on impressions to the extent Google's AdX could beat the historical average of the other Ad Exchanges and Ad Networks from which publishers configured Google's Ad Server to solicit bids. Even when those Ad Exchanges and Ad Networks were permitted to bid, Google manipulated its bids and take rates to prevent those non-Google Ad Exchanges and Ad Networks from winning publishers' ad impressions and thereby cemented Google's Ad Exchange as the winner."); Daily Mail Second Amended Complaint, at ¶ 247 ("Moreover, Google's myriad auction manipulations significantly reduce competition in the exchange market and drastically reduce Daily Mail's ability to sell foreign and domestic impressions through United States exchanges that remain in business."); Gannett Amended Complaint, at ¶ 13 ("Google's market manipulations have evolved over the years, but the goal has remained the same: Google prohibits publishers from soliciting competitive bids from rival exchanges, while at the same time rigging AdX's bids by trading on inside information from DFP."); Inform Third Amended Complaint, at Section VIII.A.2 ("Anticompetitive Manipulation of the Ad Auction: Google Impaired and Excluded Competitors and Stole Valuable Ad Inventory Through Auctions Designed to Deceptively and Artificially Preference Its Own Exchange and Decimate Competition on the Merits").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

analyzing the Google practices listed in Paragraph 12, I find that these practices identified by The Plaintiffs represent competition on the merits, providing benefits to Google's customers: its advertisers, publishers, or both.

16.   I now provide brief summaries of my analyses of Google's programs and their effects, with details and supporting evidence to appear in later sections of this report.

a.   Google Ads' bid optimization programs—buy-side DRS, Bernanke, Global Bernanke, Alchemist and Alph—optimized bids into the AdX auction to increase the total value of impressions won by Google Ads advertisers. Whenever these programs increased Google Ads' win rate (increasing the number of impressions won by Google Ads advertisers), they also increased the surplus enjoyed by Google Ads advertisers. Google Ads' experiments suggest that its bid optimization programs also benefited publishers in the form of increased revenues and a reduction in the number of unsold impressions, expanding output. Bernanke was a Google Ads *bidding strategy* and did not affect the auction rules: it could not turn AdX into a "third-price auction," as claimed by several Plaintiffs and their experts.[12] While the specific details of Project Bernanke were not communicated to advertisers or publishers, the strategies of bidders in auctions

---

[12] Expert Report of Dr. Pablo Peña, Ph.D., October 7, 2024 ("Expert Report of P. Peña"), at p. 20 ("Through those projects [Projects Bernanke, Global Bernanke, and Bell], Google selectively imposed third-price auctions on its transactions despite conveying to publishers and advertisers that they were running second-price auctions."); Expert Report of Professor Cary Jardin, October 7, 2024 ("Expert Report of C. Jardin"), at ¶ 47 ("With Project Bernanke, instead of paying publishers for the amount of the second highest bid, Google only paid publishers based on the third-highest bid—running a third-price auction instead of a second-price auction without disclosing this difference to publishers."); Publisher Class First Amended Complaint, at ¶ 280 ("But Google's secret Project Bernanke program was structured as a third-price auction rather than a second-price auction."); Daily Mail Second Amended Complaint, at ¶ 134 ("Bernanke switched AdX to a third-price auction for publishers"); Gannett Amended Complaint, at ¶ 164 ("Bernanke switched AdX to a third-price auction for publishers"); Inform Third Amended Complaint, at ¶ 220 ("Google's secret Project Bernanke program surreptitiously switched AdX from a second-price auction to a third-price auction on billions of impressions per month.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

are routinely kept confidential for the benefit of those bidders. Buy-side tools of other ad tech companies used their own bid optimization programs, and I am not aware of cases in which those bidding strategies were made public.

b.   Project Bell benefited Google Ads advertisers by protecting them from a publisher tactic called multi-calling, which would otherwise reduce their advertiser surplus. Multi-calling involves calling AdX multiple times for the same impression. Project Bell also benefited non-multi-calling publishers who might otherwise have received lower bids from advertisers using other means to protect themselves against multi-calling. Project Bell did not "punish" publishers who partnered with Google's competitors[13] or turn AdX into a "third-price auction," as alleged by Plaintiffs.[14] Buy-side tools of other ad tech companies also modified bids in response to multi-calling.

c.   Projects Poirot and Marple benefited advertisers using DV360 and Google Ads, respectively, by optimizing their bids to prevent advertisers from overpaying when auctions were not second-price auctions. Optimal bids for non-second-price auctions are difficult to compute, so by automating this bid optimization, Poirot

---

[13] "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 16 ("Bell v.2 changed Google Ads' bidding behavior only for the publishers that were understood, based on internal experiments, to be calling AdX multiple times for the same potential ad opportunity ('multi-calling publishers').").

[14] Publisher Class First Amended Complaint, at ¶ 282 ("Bell thus penalized publishers who did not grant AdX preferential access"); Advertiser Class Complaint, at ¶ 224 ("The third version of Bernanke, dubbed 'Bell,' penalized publishers that did not give AdX preferential access to their inventory through Dynamic Allocation"); Inform Third Amended Complaint, at ¶ 222 ("Bell penalized publishers who did not grant AdX preferential access by paying them based upon the third-place bid rather than a second-place bid"); Gannett Amended Complaint, at ¶ 169 ("'Bell,' is the most punitive. For publishers who attempt to counteract AdX's bid rigging or other anticompetitive advantages e.g., by declining to enable Enhanced Dynamic Allocation — Google places deflated bids in third-price auctions"); Daily Mail Second Amended Complaint, at ¶ 138 ("'Bell,' is the most punitive. For publishers who attempt to counteract AdX's bid rigging or other anticompetitive advantages e.g., by declining to enable Enhanced Dynamic Allocation — Google places deflated bids in third-price auctions").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

and Marple made bidding simpler and more profitable for Google's advertiser customers. Buy-side tools of other ad tech companies similarly used automatic bid shading programs for non-second-price auctions.

d.  Project Elmo benefited Google Ads and DV360 advertisers by ensuring that their budgets were not depleted too quickly as a result of multi-calling by publishers and bid duplication by exchanges. Bid duplication can occur when an exchange sends multiple bid requests for the same impression in an attempt to elicit higher bids from one of those calls. By blocking the harmful effects of bid duplication, Elmo reduced spending on exchanges engaged in that practice and increased spending on other exchanges, while benefiting advertisers by spending their budgets more effectively. Project Elmo did not treat exchanges participating in header bidding differently from non-header bidding exchanges, as alleged by Plaintiffs.[15]

e.  Dynamic Allocation (DA) was an improvement over the earlier "waterfall" ad allocation process. It benefited publishers by introducing real-time auctions that allowed publishers to sell impressions on AdX when a bid from an AdX buyer exceeded the floor price. This floor price was at least as high as the highest expected price from any other demand source and could be set higher at the publisher's discretion. By incorporating a second-price auction into the ad

---

[15] Publisher Class First Amended Complaint, at ¶ 319 ("Through Act 12, beginning in 2018 and continuing through the present, Google used its dominance in the Ad Buying Tools for large advertisers to penalize rival Ad Exchanges for participating in Header Bidding."); Advertiser Class Complaint, at ¶ 271 ("Google devised Project Elmo to help DV360 identify when it saw the same bid request across multiple exchanges, and it decreased overall ad spend on any exchange that it suspected meaningfully engaged in header bidding."); Daily Mail Second Amended Complaint, at ¶ 182 ("With Elmo, DV360 reduced its spending on exchanges that were suspected of meaningfully engaging in header bidding."); Gannett Amended Complaint at ¶ 203 ("With Elmo, DV360 reduced its spending on exchanges that were suspected of meaningfully engaging in header bidding.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

allocation process, DA also simplified bidding, allowing buyers to purchase impressions on AdX while paying *only* the amount they needed to bid to win impressions, and not more. Supply-side tools of other ad tech companies developed ad allocation mechanisms similar to DA.

f.  Enhanced Dynamic Allocation (EDA) benefited publishers by unifying competition between direct deals and remnant demand in a way that increased publisher revenues without compromising publishers' ability to fulfill direct contracts with advertisers. EDA also expanded output by reducing the number of unsold impressions and helped advertisers to win the impressions they valued most. Supply-side tools of other ad tech companies implemented similar programs to optimize between direct deals and remnant demand.

g.  The so-called "Last Look" of AdX bidders over header bidding was not a Google-designed program but a side effect of the way that some publishers configured header bidding to integrate with Google's ad server. Publishers that integrated header bidding with Google Ad Manager could take advantage of services offered by the ad server (e.g. managing guaranteed contract delivery with EDA). They could also benefit from offering AdX bidders the chance to bid on inventory because it allowed them to earn higher revenues. The so-called "Last Look" did not create an inherent advantage for AdX bidders, for reasons including publishers' ability and incentive to set the AdX floor price above the highest header bid. Non-Google ad servers also used ad allocation mechanisms resulting in a similar "Last Look."

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

h.  Reserve Price Optimization (RPO) increased publisher revenues and simplified revenue optimization for publishers in the AdX second-price auction. RPO did not alter the auction format, and it never unsealed bids received in an auction to set the floor price for that auction. Because publishers set floor prices on the basis of historical data both before and after the introduction of RPO, a surplus-maximizing bidder needed to account for the possibility that future floor prices would change in response to their bids both when RPO was in place and before.

i.  Sell-side Dynamic Revenue Sharing (DRS) benefited publishers by allowing them to sell more inventory and increase their total revenues from the sale of impressions. Sell-side DRS also expanded output by reducing the number of unsold impressions, allowing advertisers to win more inventory. Google's intention to use auction optimizations like sell-side DRS was transparently communicated to auction participants on Google's Help Center pages. Non-Google exchanges and supply-side intermediaries implemented similar programs to increase the win rates of their advertisers.

j.  Open Bidding benefited publishers by allowing them to incorporate bids from non-Google exchanges into an auction among bids from multiple auctions—an "auction of auctions"—leading to higher auction revenues without drawbacks of alternative approaches, including header bidding. Open Bidding also benefited advertisers on competing exchanges by increasing the total inventory open to competition from non-AdX bidders. Eventually, Google transitioned to a Unified

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

First Price Auction, enabling the auction of auctions to replicate the result of a single first price auction in which all bids are evaluated simultaneously.

k.  Unified Pricing Rules (UPR) allowed publishers to set floor prices natively in Google's supply-side platform (Google Ad Manager), but required those floors to apply uniformly across exchanges and demand sources. UPR protected multi-homing advertisers from price-fishing, a tactic in which some publishers would call bidders on different exchanges using different floor prices to induce them to make an unnecessarily high bid in at least one exchange. Without UPR, publishers would have incentives to engage in price-fishing, making coordinating bids from different channels more difficult for advertisers. Advertisers' likely responses to price-fishing—using fewer channels or reducing all their bids—could reduce efficiency and harm publishers who did not engage in price-fishing. Non-Google ad tech intermediaries also required floor prices to be uniform across bidders.

**B. Analyses of Google's Programs by Plaintiffs and Their Experts Are Marred by Omissions and Errors**

17.  My opinions about Google's auction practices differ from those of Plaintiffs and their experts for five key reasons. *First*, Plaintiffs and their experts systematically overlook or understate the significant benefits that each of Google's auction practices confer on its advertiser and/or publisher customers. *Second*, the analyses of Google's auction conduct by Plaintiffs' experts systematically fail to account for the incentives of industry participants and ignore evidence that they do respond to those incentives. *Third*, the analyses of Plaintiffs and their experts underestimate or understate the prevalence and

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

effectiveness of experimentation by market participants (including intermediaries) for optimizing returns.[16] *Fourth,* Plaintiffs' experts exaggerate the challenge for multi-sided platforms of managing the conflicting interests of buyers and sellers and omit the benefits that Google's integrated structure provided for its advertiser and publisher customers. *Fifth,* Plaintiffs' experts' empirical analyses are unreliable, exhibiting errors and classic biases; they fail several robustness checks that I have conducted.

18.    These omissions and errors lead Plaintiffs and their experts to false conclusions that Google's auction programs were anticompetitive and/or deceptive. Correcting these errors, a unified explanation emerges: each program helped Google compete on the merits for customers by providing greater benefits to advertisers, publishers, or both groups, including by expanding output, that is, increasing the number of matches made between advertisers and ad opportunities.

19.    I now discuss these five categories of omissions and errors individually, with additional details and supporting evidence to appear in later sections of this report.

### 1. Plaintiffs and Their Experts Overlook or Understate the Benefits of Google's Programs for Its Customers

20.    Plaintiffs and their experts often emphasize the supposed effects of Google's programs on competitors but fail to consider the customers who benefited. Each of the Google programs I have studied benefits advertisers, publishers, or both, and, taken together, were output-expanding, contributing to the growth of online display advertising. Designing products that benefit consumers is the essence of competition on the merits,

---

[16] When I say that a participant or intermediary "optimizes," I refer to its process of improving outcomes relative to some objective.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

and the demand for Google's well-designed products contributed to the company's growth.

21.     To assess the effects of Google's auction programs on its advertiser and publisher customers, one must consider those programs in the historical context at the time of their introduction. To assist in that historical assessment, I provide a timeline of the introduction of Google's auction programs in Figure 1. The time period covered by Figure 1 was one marked by rapid technological development and growth of online display advertising. When each new Google program was introduced, it raised advertiser surplus or publisher revenues or both, and sometimes created a standard on which future improvements could be built.

22.     In several cases, Plaintiffs' and their experts' assessments of Google's conduct overlooks this historical context. I provide a non-exhaustive list of examples from Plaintiffs' experts below:

    a.     Plaintiffs' experts allege that publishers were harmed because DA integrated real-time bids only from AdX bidders,[17] but these allegations ignore the fact that

---

[17] Expert Report of Professor Peter Cramton, Ph.D., October 4, 2024 ("Expert Report of P. Cramton"), at ¶ 139 ("Second, before the inception of header bidding, AdX bidders did not have to compete on a level playing field with third-party exchanges regarding winnability. AdX competed by submitting live bids for the impression in question. By contrast, third-party exchanges were competing with their historical averages. This means that even when a third-party exchange would have returned the highest real-time bid for an impression, that bid would never even be returned to the DFP ad server if an AdX bid exceeded that third-party exchange's historical average."); Expert Report of Professor Einer Elhauge, October 4, 2024 ("Expert Report of E. Elhauge"), at ¶ 304 ("Further, by limiting real-time bidding within Dynamic Allocation to only AdX, Google precluded rival ad exchanges from responding with higher real-time bids for that ad inventory, thereby depriving rival ad exchanges of market share and reducing the prices that publishers could have received had rival ad exchanges not been precluded."), ¶ 316 ("However, Google imposed a restraint on Dynamic Allocation auctions by excluding rival auction platforms from participating in this real-time bidding, which would have offered publishers lower rates for the ad auction service and higher net prices."), ¶ 423 ("For example, Google's exclusion of rival ad auction platforms from Dynamic Allocation and EDA prevented advertisers associated with these rival platforms from submitting real-time bids for these ad impressions, thus reducing demand and bids for those impressions in those auctions."); Publisher Class First Amended Complaint, at ¶ 263 ("Google knew that the surest way for publishers to maximize revenue would have been to allow real time bidding by multiple Ad Exchanges at the same time.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

real-time bidding was introduced into DA during the nascency of ad exchanges as a technology. At that time and in that context, industry participants viewed the main challenge not as exchange interoperability but as "driving adoption" of ad exchange technology, because "[t]he exchange represents a rather significant shift in how we typically transact, so adjusting to that for both buyer [and] seller takes some time."[18] DA drove adoption and eased this transition with its backwards-compatible design, allowing publishers to leave their previous ad sales configurations unchanged. Google further drove adoption of the ad exchange technology by integrating demand from Google Ads (then AdWords).[19] By overlooking this historical context, Plaintiffs ignore both the challenges that Google overcame in developing DA and the major benefits DA created for publishers.

b. Plaintiffs and their experts allege that Enhanced Dynamic Allocation (EDA) "harms publishers and benefits Google" by "mov[ing] impressions away from direct deals and towards AdX."[20] But their arguments overlook the fact that, during a period in which real-time bidding was rapidly growing in popularity, EDA helped publishers solve the difficult technical problem of how to allocate display inventory between direct deals and remnant demand channels. EDA

---

[18] Email from S. Spencer to ▮▮▮▮▮▮▮▮▮▮▮▮ "FW: comments from industry players on AdX 2.0 on AdExchanger.com this evening" (Sept. 22, 2009), GOOG-AT-MDL-B-003180112, at -114.

[19] *See, e.g.*, Email from S. Spencer to ▮▮▮▮▮▮▮▮▮▮▮▮ "FW: comments from industry players on AdX 2.0 on AdExchanger.com this evening" (Sept. 22, 2009), GOOG-AT-MDL-B-003180112, at -114 ("This will only work if Google can bring significant demand for display inventory into the system. They can maximize the demand by accepting bids from AdWords and also via networks through the AdX 2.0 channel.").

[20] *See, e.g.*, Expert Report of P. Cramton (Oct. 4, 2024), at Section 7.3.4 ("Enhanced Dynamic Allocation harms publishers and benefits Google"), ¶ 171 ("Enhanced Dynamic Allocation moved impressions away from direct deals and towards AdX or third-party exchanges.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

solved this important problem, making it easier for publishers to monetize their inventory using *both* direct deals and remnant demand. As I discuss in Section IX, contrary to Plaintiffs' experts' claims, EDA's design led to revenue increases for publishers, without reducing the performance of direct deal advertising or compromising the delivery of those deals.

c.  Plaintiffs and their experts allege that Project Bernanke harmed non-Google exchanges and ad buying tools and "decreased allocative efficiency [] by manipulating auctions such that bidders with a lower private valuation for an impression [] frequently beat bidders with a higher valuation."[21] Logically, such a conclusion can be reached only by comparing Google's bidding strategy with those used by non-Google buying tools. Because Plaintiffs' experts fail to do that, the claim is logically invalid. A historical review reveals that when Bernanke was introduced, many buying tools were already bidding strategically and submitting just a single bid into the Google AdX second-price auction. Such a one-bid policy can incentivize the tool's advertisers to submit bids *higher* than their true values for the impression.[22] Given that background, if Google Ads had bid its advertisers' values into the AdX second-price auction, those advertisers would

---

[21] *See, e.g.,* Revised Expert Report of Professor Shengwu Li, Ph. D., October 11, 2024 ("Revised Expert Report of S. Li"), at ¶ 402 ("Bernanke and Global Bernanke also decreased allocative efficiency in the relevant exchange markets by manipulating auctions such that bidders with a lower private valuation for an impression nonetheless frequently beat bidders with a higher valuation.").

[22] For example, if a buying tool submitted a single bid on behalf of a group of advertisers equal to the highest value reported by the advertisers in that group and then charged its advertiser the clearing price of the auction, then that policy would lower each advertiser's expected payment for any bid it submits, and thus would incentivize the advertiser to report higher values to the buying tool (higher than its value for the impression). Alternatively, if the buying tool chose the bid it submits and the price it charged its advertisers to maximize its profit subject to maintaining a fixed revenue share, then it would be incentivized to implement a program similar to Bernanke that increases bids above the highest value reported by the advertiser on some impressions.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

have been *disadvantaged* relative to non-Google Ads advertisers. Without a bid optimization strategy like Bernanke for Google Ads, the allocation of advertising inventory would have been inefficient for the *reverse* reason by Plaintiffs' experts: non-Google Ads advertisers with lower values could win impressions at the expense of Google Ads advertisers with higher values.

d.  Plaintiffs' experts allege "that UPR deprived publishers of the ability to set higher reserve prices for AdX than for rival exchanges,"[23] a practice they claim publishers would otherwise use "to increase yields and to prevent objectionable or otherwise low-quality ads from being served."[24] These claims are misleading for three reasons. First, there are significantly better tools to achieve these objectives in the context of the new unified first-price auction process. Second, at the time UPR was adopted, the introduction of the UFPA eliminated the main incentives to set a higher AdX floor. Third, Plaintiffs' experts omit the fact that UPR provided important benefits by limiting the effectiveness of a damaging publisher tactic called "price fishing." I describe each of these reasons in further detail:

   i.  As discussed in Section XIV, publishers have other means of preferencing exchanges, such as post-auction discounts, which are more effective and less costly than setting differential floor prices for different exchanges. Furthermore, a publisher seeking to improve ad quality has access to tools

---

[23] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1013 ("Most relevant to my analysis in this section is the fact that UPR deprived publishers of the ability to set higher reserve prices for AdX than for rival exchanges.").

[24] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1015 ("Publishers set reserve prices in general for several reasons, including to increase yields and to prevent objectionable or otherwise low-quality ads from being served."). *See* also Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 266 ("Publishers might use multiple pricing floors for various reasons, including managing competitive exclusions, monetizing direct and indirect sales, or preventing low-quality ads from being shown on their websites.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

specifically designed for that purpose. Beyond the tools provided by Google,[25] "some publishers pay for additional safety tools from the likes of Media Trust, GeoEdge, RiskIQ and Confiant, which detect bad ads"[26] with Confiant advertising that it "helps you get rid of bad ads before they cause problems."[27] Publishers attribute the resolution of their ad quality issues to these dedicated tools, with a senior Gannett employee stating "[w]e had experienced increased problems before we implemented the Confiant solution and now most of those issues are resolved"[28] and adding that he "ha[s] not heard complaints from the security team in quite a while."[29]

ii.    To obtain the highest expected revenue in any sale process, a seller must always set its minimum price higher than its best outside option. In the waterfall, the publisher's best outside option declined with each rejection,

---

[25] Beyond its automated quality controls, Google allows publishers to block or set differential floor prices for certain types of ads. *See* Google, "Block general categories," Google Ad Manager Help, https://support.google.com/admanager/answer/2913554?sjid=261789886268128879-EU, accessed Dec. 11, 2024 ("You can block high-level groupings of ads — such as Apparel, Finance, and Health — from appearing on your network or specified inventory."); *see also* Google, "Unified pricing rules," Google Ad Manager Help, https://support.google.com/admanager/answer/9298008?sjid=2354124667482356745-EU#sensitive-categories, accessed Dec. 10, 2024 ("You can set pricing rules that apply only to creatives in selected sensitive categories. Some ads are considered 'sensitive' due to the nature of the business or ad—such as Sensationalism or Significant Skin Exposure. Our system classifies ads automatically, and we don't rely on advertiser-provided categorization.").

[26] *See* Sarah Sluis, "Forced Redirect Ads Cost Publishers Money, But So Does Blocking Them," AdExchanger (Feb. 6, 2018), https://www.adexchanger.com/publishers/forced-redirect-ads-cost-publishers-money-blocking/, accessed Dec. 12, 2024.

[27] *See* Confiant, "Ad Quality Solutions," https://www.confiant.com/solutions/quality, accessed Dec. 10, 2024.

[28] *See* Confiant, "Gannett Works To Eliminate Bad Ads," https://www.confiant.com/case-studies/gannett, accessed Dec. 12, 2024.

[29] *See* Confiant, "Gannett Works To Eliminate Bad Ads," https://www.confiant.com/case-studies/gannett, accessed Dec. 12, 2024 ("I have not heard complaints from the security team in quite a while. - which is always a good thing. I was hearing about issues daily before, so from a monitoring and blocking standpoint it's been a very good relationship.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

leading generally to falling prices for each successive demand source. When header bidding emerged, the highest header bid became an outside option, so the same principle created an incentive to set an AdX floor price higher than the highest header bid. When the Unified First-Price Auction (UFPA) was introduced, the waterfall was replaced by a single auction in which all bids into the auction, including header bids and bids made into AdX, competed at the same time and on the same first-price basis, so this reason for setting unequal floor prices for different buyers disappeared.

iii.   Finally, in the context of the UFPA, UPR served an important positive function: it reduced the harm to advertisers of price-fishing strategies that some publishers might otherwise find to be individually profitable. Price-fishing had threatened to raise costs for advertisers, undermine their trust in the marketplace, and harm publishers who did not adopt this damaging tactic, and UPR helped to defang that threat.

23.   Providing benefits to customers is the essence of competition on the merits. Even when Plaintiffs' experts focus on other objectives, such as the impact of Google's programs on "consumer welfare,"[30] the benefits of Google's programs to its customers must be included in any correct assessment, because Google's customers are "consumers" too.

---

[30] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 18 ("I have been asked to provide an opinion on whether Google's auction practices that the publishers' class has challenged deviate from economically efficient auction design"); Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 9 ("In order to assess Google's conduct, I apply the 'consumer welfare standard,' which is commonly used in the United States to evaluate whether conduct is anticompetitive. In applying this framework, I first consider the extent to which Google's conduct, as outlined in this report, harmed competition in the relevant antitrust markets, which I take from Professor Sibley's report to be the global market for ad exchanges for open display inventory and the global market for ad servers for open display inventory. I then consider the extent to which these conducts harmed participants, i.e., advertisers and publishers.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*



**Figure 1: Timeline of Google's Product Evolution**

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### *2. Plaintiffs' Experts' Analyses Fail to Take Systematic Account of Incentives*

24.   Plaintiffs and their experts fail to systematically analyze the incentives created by changes in platform rules and practices, and how publishers and advertisers would likely respond to those incentives. This is an elementary error in an economic analysis, akin to concluding that an increase in the price of a product increases the seller's revenues without evaluating how the quantity demanded may change at the higher price. It is a crucial omission. Just as buyers' responses can reverse the profitability of a price change, the responses of advertisers and publishers to Google's programs can reverse their alleged effects.

25.   Among the well-known examples of how incentives can reverse a conclusion about auction rules is the standard analysis of the revenues in first-price and second-price auctions. Holding bids constant, the direct effect of setting an auction price equal to the highest bid instead of the second-highest bid is to increase the clearing price in the auction. However, this comparison can be reversed by considering bidders' incentives to bid more in a second-price auction than in a first-price auction. In the widely-used auction model employed by Plaintiffs' experts in their reports,[31] that bid adjustment is so large that it cancels out the direct effect: the two kinds of auctions lead to the *same* average revenues. In my own work, I identified a larger class of cases in which the

---

[31] *See, e.g.,* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1360 ("In the context of exchange auctions, the private values assumption is more plausible than the common values assumption. Bidders in exchange auctions are anonymous to each other at the point of bidding, and are drawn from a diverse set of industries. An advertiser looking to sell car seats and an advertiser looking to sell video games care about different features of the impression. Thus, each bidder is unlikely to make strong inferences about their own value for the impression, based on other bidders' estimates."), ¶ 353 ("Suppose that we have one header bidder and one bidder on AdX, with values drawn independently and identically from some regular distribution F."), ¶ 434 ("For example, suppose there is an equal probability that each bidder's valuation takes on any value between $0 and $100, that its valuations are independent and distributed uniformly between $0 and $100, and that there are three bidders.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

incentive effect is so large that it reverses the direct effect: second-price auctions have prices that are at least as high on average as those of first-price auctions.[32]

26.   This highlights why, in the subfield of economics known as Market Design, it is routine and necessary for academic papers that analyze the effects of marketplace rules, programs, and practices to pay careful attention to how incentives affect the behavior of marketplace participants.[33] Although Plaintiffs' experts acknowledge this standard in their reports[34] and adhere to it in academic work,[35] they frequently fail to apply it throughout the analyses in their reports.

---

[32] Milgrom, Paul, and Weber, Robert, "A theory of auctions and competitive bidding," Econometrica, Vol. 50 (1982), at pp. 1089, 1109-1112.

[33] In the syllabus of my Stanford class on this subject, I explain that "'Market design' is the subfield of economics that studies how best to organize *decentralized* resource allocation systems taking especially careful account of how the rules of the system affect individual *incentives* and *choices*. 'Decentralized' means that the system relies sensitively on information sourced from individual participants." *See* Paul Milgrom, "Market Design Syllabus," Stanford University, https://canvas.stanford.edu/courses/171062, accessed Dec. 13, 2024. Similarly, the course description of Professor Susan Athey's Stanford University course entitled "Topics in Market Design" announces that it "studies the design of organized markets, focusing on efficient organization and *the incentives created by market rules*. Applications include online auction markets […] ." *See* Susan Athey, "Economics 980: Topics in Market Design," Stanford University, https://gsb-faculty.stanford.edu/susan-athey/economics-980-topics-market-design/, accessed Dec. 13, 2024.

[34] *See,* Revised Expert Report of S. Li (Oct. 11, 2024), at Section V.B.1 ("Auction theory is a well-accepted economic framework to analyze auctions in the real world."), ¶ 199 ("In this section, I set out the economic foundations of auction theory as relevant to my opinion. To do so, in subsection a), I provide a background on the standard frameworks used in the discipline and the assumptions commonly made by its practitioners."), ¶ 207 ("Auction theory, in line with expected utility theory in standard economics, starts from the premise that each bidder chooses its bidding strategy to maximize its expected payoff."), ¶ 213 ("Sellers in auctions also have strategies, which most commonly involve setting the rules of an auction. Such rules include the choice over the auction format (e.g., whether the auction is first-price or second-price, see Section V.B.2.b)) below) and the setting of a 'reserve' or 'floor' of the auction."), ¶ 214 ("By studying the equilibria of different auction formats, auction theory provides a framework to analyze how auction features affect equilibrium behavior, which in turn determines the auction's outcome.").

[35] *See, e.g.,* Cramton, Peter, "Competitive bidding behavior in uniform-price auction markets," Proceedings of the Hawaii International Conference on System Sciences (Jan. 2004), at p. 4 ("A cornerstone of markets is independent profit-maximizing behavior. It is precisely this behavior that steers Adam Smith's 'invisible hand' to produce efficient market outcomes: [...] Independent profit-maximizing behavior should not only be expected but encouraged by regulators, provided the behavior is consistent with the market rules.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

27.  For example, Plaintiffs' and their experts' analyses of Google's programs (e.g. DA, EDA, DRS, Bernanke, and Alchemist) repeatedly rely on the assumption that the AdX floor price is always equal to the publisher's opportunity cost–the price or value it could receive outside the AdX auction. That assumption is used to argue that, when Google's programs lead it to win an impression over the floor, the publisher is paid the same price as (or just "a penny"[36] more than) it would receive without Google. But this assumption is entirely unwarranted. Publishers had incentives to set their floor prices higher than their opportunity cost and, in practice, often did so.[37] In fact, in its own complaint, Daily Mail admits that it "set a floor for AdX as some multiple of the highest bid obtained from

---

[36] *See, e.g.*, Second Revised Expert Report of Professor Ali Hortaçsu, Ph.D., October 18, 2024 ("Second Revised Report of A. Hortaçsu"), at ¶ 763 ("Last Look also meant that AdX could bid less than it otherwise would, because it could win the impression by bidding a penny more than the highest bid submitted to DFP.").

[37] *See* Email from H. Thomas to M. Wheatland, et al., "RE: App impression changes recap" (Oct. 23, 2017), DM_GOOG_0146977, at -980 ("We've now multiplied the Amazon cpm in DFP by 3 or 4x to counter act google - seems to have helped us."); "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -506 ("[Some publishers] inflate the value CPM of remnant line items [...] publishers used to do this even before HB was popular."); "Changes to Ad Manager auction" (Jan. 10, 2019), GOOG-DOJ-10924270, at -292 (diagram shows that in 42% of queries won by header bidding, the AdX floor exceeded the header bidding line item price); "First-price bidding" (Aug. 12, 2019), GOOG-DOJ-11406673, at -677 ("How boost works[:] The publisher inflates the HB bid before sending it as a floor to AdX[.] This is done to increase Adwords cost and to provide a better comparison between Adwords and header bidder bids[.]"); Email from R. Srinivasan to B. Bender, et al., "Unified Auction Changes (Sellside) Executive Update - Aug 12, 2019" (Aug. 13, 2019), GOOG-DOJ-09713317, at -319 ("Today, these [publisher-]inflated CPMs are used to provide price pressure for AdX [...] In practice, [...] many publishers [...] apply a boost to Header Bidding bids[.]"); "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -382 ("Plan to educate pubs around strictly negative revenue consequences of HB price inflation"). I interpret this document, authored in the context of the "Migration to 1P auction" (-358), to mean that inflating header bids was common enough that Google would have to "educate pubs" it was no longer necessary; "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -777 ("[Last look] incentivizes pubs to inflate ('boost') the floor sent to AdX"); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Some publishers set Value CPMs higher than their estimates of what CPM a line item would likely generate to increase competitive pressure in the AdX auction or for other reasons."); Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

header bidding."[38] In the forthcoming sections, I explain that Plaintiffs' and their experts' conclusions about DA, EDA, DRS, Bernanke, and the so-called "Last Look" are irretrievably flawed by their reliance on this unwarranted assumption.

28.   Plaintiffs' experts' analyses pertaining to *intermediaries* again overlooks participants' incentives. Almost by definition, *indirect* purchases of impressions are made not by advertisers but by intermediary bidding tools, which evaluate opportunities, optimize, and/or submit offers on behalf of advertisers. In balancing advertisers' objectives along with their own profit motives, contrary to Plaintiffs' experts' hypotheticals,[39] bidding tools do not simply pass the bids of thousands of individual advertisers directly to the AdX auction. Instead, they design and adopt bidding strategies to win valuable impressions for their advertisers and earn profits for themselves.

29.   One early example of such a strategy is CPC-to-CPM bidding. Intermediaries bidding in the AdX auction are required to express bids on a per-impression basis, but many advertisers traditionally express their willingness to pay on a per-click basis. To bridge this gap, bidding tools (including DV360 and Google Ads) developed proprietary strategies to convert per-click offers into per-impression bids.[40] Since these tools paid

---

[38] Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding.").

[39] *See, e.g.*, Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 512 ("Google Ads would pass on bids equal to 0.85*v1 and 0.85v2* (that is 85% of the valuations of the two highest CAT2 bidders) to the AdX auction."); Revised Expert Report of Professor James Mickens, Ph.D., October 11, 2024 ("Revised Expert Report of J. Mickens"), ¶ 12 ("The honest approach for running an auction is for the auctioneer to collect bids from each bidder, and then compare these unaltered bids to determine who the winner is. The auctioneer would then contact the winning bidder, receiving payment from that bidder (as determined by the unaltered winning bid), and then forward the collected money (minus the auctioneer's fee) to the seller, with the seller returning the purchased good in return."), ¶ 13 ("Unfortunately, Google's various auction implementations across the years have not implemented this fair approach to auction operation. In particular, Google adjusted advertiser bids in ways that were not transparently explained to publishers or to advertisers.").

[40] Google, "Determine a bid strategy based on your goals," Google Ads Help, https://support.google.com/google-ads/answer/2472725, accessed Dec. 11, 2024 ("Manual CPC bidding: This lets

publishers for each won impression, but collected payments from advertisers only on

clicked ads, their bidding strategies required careful design to achieve a targeted revenue

share, on average.

30.    Buying tools adopted other bidding strategies as well. For instance, a buying tool bidding

into the AdX second-price auction could choose to omit its second-highest bid entirely,[41]

reducing their costs and allowing them to enjoy increased profits. In competition with

such buying tools, Google Ads adapted its own bidding strategy, which took the form of

bid optimizations like Bernanke and Alchemist. These optimizations modified the bids

that Google Ads submitted into the AdX auction, and–like CPC-to-CPM bidding–were

carefully designed to ensure that Google Ads collected its target revenue share, on

average. This design benefited Google Ads, its advertiser customers, and often publisher

customers, too.

31.    Indeed, as a result of ignoring all of these incentives, Professor Li's "relevant

counterfactuals" for Bernanke[42] and Alchemist[43] are detached from reality. Intermediaries

---

you manage your maximum CPC bids yourself. […] CPM: With this bid strategy, you'll pay based on the number of impressions (times your ads are shown) that you receive").

[41] *See* "Understanding the AdX Auction" (Oct. 2014), GOOG-DOJ-12443562, at -567 ("[O]ther bidders are allowed to [second-price themselves], but often do not").

[42] *See, e.g.*, Revised Expert Report of S. Li (Oct. 11, 2024), at Section VIII.B.3 ("The relevant counterfactual to assess the Global Bernanke conduct is that Global Bernanke is disabled and Google Ads advertisers continue to bid truthfully"), ¶ 511 ("By reducing the number of impressions that rival exchanges won compared to a competitive counterfactual, Global Bernanke has deprived them of the necessary scale they needed to compete with AdX"), ¶ 572 ("As such, the competitive counterfactual during the Bell v2 era is that the Global Bernanke bid manipulations were deactivated and Bell v2 was deactivated."), ¶ 770 ("I find that the competitive counterfactual is one where Google receives no arbitrage rents from Alchemist and Google Ads advertisers submit their valuations truthfully.").

[43] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 860 ("However, I note that, under a scenario where both $\alpha$ and $\beta$ are 1, Google's take rate would be 0% and Google Ads would generate no revenues. As such, I consider a relevant counterfactual to be that Google Ads sets $\alpha$ and $\beta$ equal to 1, but charges the winning advertiser of its CAT2 auction a flat 15% take rate, i.e., the current average take rate of Google Ads.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

did not and had no incentive to operate as described by those counterfactuals, and the evidence confirms just that.[44]

32.    In economic analyses, fully accounting for incentives is a standard and indispensable benchmark for evaluating the effects of Google's auction-related programs on its customers. Nevertheless, it can be useful to supplement that analysis with one that focuses on what happens over short periods of time, when self-interested participants have not yet learned how best to adapt. To study shorter-lasting effects of Google's programs, I also incorporate analyses that assume behavior remains the same for a period after Google makes any change and find benefits for Google's customers with this alternative approach as well.

### 3. Plaintiffs' Experts' Analyses Underestimate the Role of Experimentation for Optimizing Returns

33.    Plaintiffs and their experts claim that the optimization process for publishers and advertisers was compromised and "Google kept much of what it was doing to manipulate auctions secretive."[45] Plaintiffs' experts suggest that this alleged failure to disclose would

---

[44] For example,

[45] *See, e.g.,* Expert Report of P. Peña (Oct. 7, 2024), at p. 21 ("It is revealing that Google kept much of what it was doing to manipulate auctions secretive. If Google believed that the actions described would benefit publishers, it would have made that explicit in the same way that any business publicizes its products and services to its clients when they are receiving additional benefits through them. As an economist, I infer that, if Google did not disclose to publishers what was happening inside the black box of DFP, it was because Google's executives correctly intuited that publishers would not have agreed with it. The reason is that it was destroying value."); Inform Third Amended Complaint, at ¶ 10 ("Google algorithms deceptively manipulated the delivery pattern, frequency, and pace at which

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

mislead advertisers and publishers, keeping them from optimizing their choices effectively.[46] In reality, processes for setting reserve prices and determining bids in auctions are routinely kept secret to prevent other auction participants from gaming these strategic choices. And, even for those programs for which details are not disclosed at all, advertisers' and publishers' routine data analysis and experimentation with bids and floor prices can be sufficient for them to identify optimal strategies. In practice, evidence suggests that ad tech intermediaries, in-house marketing teams, ad agencies, and publishers rely heavily on feedback and experimentation to optimize their performance:

    a.  *Advertisers* leverage key performance indicators to guide their campaign strategies on buy-side tools and bid effectively. Rather than calculating bids themselves, advertisers delegate many of the details of bid optimization to

---

Inform's ads were served; secretive anticompetitive programs promoted cheap Google's ads over Inform's direct ads; and Google even interfered with Inform's ability to bill its own clients.").

[46] *See, e.g.,* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 637 ("However, it is plausible for several reasons that in many cases AdX bidders submitted bids equal to their values under DRS v2. First, Google did little to disclose the existence of DRS or DRS v2 to bidders."). *See also* Expert Report of J. Chandler (Oct. 4, 2024), at ¶ 245 ("The transparency and overall fairness of the programmatic display auction process hinge on the availability and accessibility of critical information. Advertisers require comprehensive data about the auction mechanics, algorithms, audience characteristics, ad placement specifics, intermediary fees, and ad performance to optimize their strategies and platform choices. Similarly, publishers need detailed insights into these areas to maximize their revenues and set effective price floors. Any restriction, unequal access, or misrepresentation of this essential information can significantly impact the fairness and efficiency of the auction process, undermining trust and competitiveness in the market."). As I explain in my report, DRS was in fact disclosed. *See Section XII.D.2, infra.*

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

specialized buy-side tools[47] or agencies,[48] while optimizing their campaign

parameters to achieve higher click-through rates, conversion rates, or return on ad

spend. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████[49]

Similarly, ████████████; the ███████████████ at the global

advertising agency ██████ has testified that "███████████████████

███████████████████████████████████████

█████████████████████████████

██████████"[50]

---

[47] For instance, ███████████████████████████



███████████████████████████ *See also* ███████

██████████████████████████████████████ Jenna Naylon, "Media Planning and Buying Strategies: The
Importance of Test & Learn," MatrixPoint,
https://www.thematrixpoint.com/resources/articles/media-planning-and-buying-strategies-the-importance-of-test-lea
rn, accessed Dec. 13, 2024 ("Applying a systematic approach to 'testing' (running controlled 'what ifs') varying
aspects of media campaigns and 'learning' from the results to refine strategies, drive better results, and maximize
marketing ROI. The core principle is to iterate and optimize based on data and insights gathered from continuous
testing. Successful test and learn strategies include setting clear objectives, selecting appropriate key performance
indicators (KPIs), allocating resources effectively, conducting A/B testing or multivariate testing, and implementing
robust measurement and analysis procedures.")).

[48] Both large and small advertisers consult with specialized agencies to achieve further sophistication. *See, e.g.,*
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

[49] ███████████████████████████████████████

[50] ███████████████████████████████

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

b.  *Buy-side tools* depend on considerable experimentation, employing various learning algorithms to optimize bids on behalf of advertisers. Through experimentation, these algorithms can automatically adapt to changes in the environment. For example, internal Google documents note that some buyers adjusted their bids in response to RPO.[51] Moreover, empirical evidence from online display advertising auctions suggests that bidders learn to respond to auction design changes over time, and eventually come to adopt nearly profit-maximizing strategies.[52]

c.  *Publishers* frequently experiment to decide floor prices. A



[53] while a

[54] There are supply-side intermediaries who assist in this process, as well, including Clickio, which offers floor price optimization tools and other services for publishers to "guarantee maximum revenues."[55]

---

[51] *See* "Display Ads Research Meeting Notes" (June 19, 2017), GOOG-TEX-00831373, at -378 ("For RPO, some buyers are changing their bids"). *See also* "AdX Managed Reserves" (Feb. 10, 2017), GOOG-DOJ-03643284, at -287 ("We also have evidence of third-party buyers bidding lower when we send RPO reserves.").

[52] *See, e.g.*, Goke, S., Weintraub, G. Y., Mastromonaco, R., & Seljan, S., "Bidders' responses to auction format change in internet display advertising auctions" (Jan. 30 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4021221, accessed Dec. 10, 2024.

[53]

[54]

[55] Clickio, "Monetization," https://clickio.com/monetization/, accessed Dec. 12, 2024 ("Automated price floor optimization can boost earnings by 20-120%, while also reducing the number of ads on a page, leading to a better user experience.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

34. These accounts are unsurprising. Many advertisers contract with specialized intermediaries (such as advertising agencies) to perform similar optimizations for them[56] and some advertisers and publishers employ teams of engineers, economists, and marketing experts devoted to maximizing returns.

35. Furthermore, Google's tools make such experimentation easier for its customers. For advertisers using Google Ads, an "Experiments" feature allows advertisers to conduct A/B tests on different campaign settings, to optimize their campaign performance and make more informed decisions.[57] Advertisers using DV360 can use the "Insights" feature to conduct A/B tests on campaigns.[58] Google Ad Manager also contains functionality allowing publishers to experiment with various aspects of their properties, including floor

---

[56] ████████████████████████████████████████████████████████████████████ *see also* Expert Report of J. Zona (Oct. 4, 2024), at ¶ 9 ("Advertiser buying tools set an advertiser's digital marketing strategy and prepare bid responses to publisher's bid requests. In the case of the sale of open web display space in the advertiser buying tools market, the market can be further subdivided into two distinct categories, i) buying tools suitable for use by large advertisers whose digital marketing efforts are assisted by advertising agencies or by a professional in-house marketing staff, and ii) "self-service" buying tools suitable for use by smaller advertisers who do not or cannot depend on the assistance of an ad agency or in-house staff."); Expert Report of J. Chandler (Oct. 4, 2024), at ¶ 144 ("The programmatic purchase and sale of display advertising space involves a complex ecosystem of intermediary "ad tech" platforms and tools that streamline and optimize the process. These intermediaries are fundamentally distinct from one another and play crucial roles in managing inventory, serving ads, and facilitating transactions between buyers and sellers. This system includes several key components: a publisher inventory management system, a publisher ad server, an advertising exchange, an advertiser ad server, and an advertiser buying tool. Each of these elements works in concert to ensure the efficient and effective delivery of digital ads across various platforms.").

[57] *See* Google, "Test Campaigns with Ease with Ads Experiments," Google Ads, https://ads.google.com/intl/en_us/home/tools/experiments, accessed Dec. 11, 2024.

[58] Luke Hedrick, "Get actionable measurement with Display & Video 360's Insights module," Google Marketing Platform (Nov. 15, 2018), https://blog.google/products/marketingplatform/360/get-actionable-measurement-display-video-360s-insights-module/, accessed Dec . 12, 2024.

prices, header bidding, and blocking.[59] Nor is Google alone in offering such tools: other advertising intermediaries also offer experimentation tools for their advertiser and publisher customers.[60]

36.    By ignoring the evidence that publishers and advertisers experiment to optimize their returns from display advertising, Plaintiffs and their experts necessarily *underestimate* the amounts that Google's customers can earn from these programs. Across the wide range of programs I study in this report, I show that correcting this failure by Plaintiffs reveals significant benefits for advertisers and publishers from Google's auction features.

### 4. Plaintiffs' Experts Ignore the Benefits from Google's Business Model that Balances the Interests of Advertisers and Publishers

37.    Plaintiffs' experts criticize Google's dual role in representing customers on the buy-side and sell-side of the display advertising ecosystem as creating "conflicts of interest," with

---

[59] Google, "Run a manual experiment," Google Ad Manager Help, https://support.google.com/admanager/answer/9799933?hl=en#zippy=%2Cuser-messages%2Cnative-ad-style%2Cunified-pricing-rules%2Cyield-groups%2Cheader-bidding-trafficking-for-prebid, accessed Dec. 11, 2024.

[60] *See, e.g.*, Microsoft, "Discover the possibilities with experiments," Microsoft Advertising, https://help.ads.microsoft.com/apex/index/3/en/56908, accessed Dec. 13, 2024; Magnite Team, "Magnite Unveils New Demand Manager Feature Powered by Machine Learning to Help Publishers Earn Incremental Revenue" (Oct. 5, 2023), https://www.magnite.com/press/magnite-unveils-demand-manager-machine-learning-feature/, accessed Dec. 13, 2024; The Trade Desk, "Conversion Lift: What it is, how it works, and best practices" (Aug. 23, 2023), https://www.thetradedesk.com/us/resource-desk/best-practices-for-better-conversion-lift, accessed Dec. 13, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Professor Cramton claiming that "the blurred nature of Google's roles" incentivizes damaging behavior.[61] However, such claims are flawed for several reasons.

38.    *First,* these claims ignore the efficiencies from an intermediary representing both sides in a two-sided marketplace. An intermediary representing both is incentivized to consider any externalities arising among participants. For example, an intermediary working solely for sellers might be motivated to engage in practices like multi-calling–where a publisher solicits bids from the same advertisers multiple times with varying floor prices–even though that behavior harms both advertisers and other publishers and can undermine the integrity of the auction design. In contrast, an operator serving both sides is incentivized to discourage such a practice, as it can reduce buyer participation and the volume of transactions.

39.    *Second,* Google does not "blur" conflicting interests, because increased transactions benefit both buyers and sellers. Google's business model promotes a high transaction volume that jointly benefits all its customers. Google's ad tech products earn almost all of their revenue from matching an advertiser to a publisher, encouraging Google to optimize transaction volumes. By helping advertisers and publishers optimize their returns from

---

[61] Expert Report of P. Cramton (Oct. 4, 2024), at ¶¶ 225 ("However, GDN ran an auction of its own and submitted two bids into AdX, and both bids were manipulated under Bernanke. This shows the blurred nature of Google's roles as buyer's agent, seller's agent, and auctioneer."), ¶ 25 ("The fact that Google codifies explicit favoritism for its products demonstrates its conflict of interest in its roles as intermediary, buyer's agent, and seller's agent."); Expert Report of J. Chandler (Oct. 4, 2024), at ¶¶ 327-328 ("Google's Bernanke, including its various iterations, and Google's Unified Pricing Rules have entailed one or more of the following: (a) failures to adequately or timely disclose changes to the auction's mechanics and purposes; (b) unwarranted restrictions on material information needed by auction participants and intermediaries; (c) denials of equal and fair access to inventory, demand, and functionality to advertisers, publishers, ad servers, exchanges, or ad buying tools; and (d) conflicts of interest […] I have knowledge of conducts at issue in this case, including (a) Unified Pricing Rules (UPR) and (b) Project Bernanke and its related versions. I also have knowledge and information concerning Google's programs and practices as a result of my review of case materials (depositions, production documents, and pleadings) and, in some cases, my personal experience in the ad tech industry and the digital advertising ecosystem. Based on my own knowledge and understanding, I have formulated certain opinions about Google's conduct, programs, and practices. That conduct generally falls into four categories: [...] conflicts of interest and self-dealing [...]").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

display advertising, Google increases transaction volumes and its own profits. When Google improves matching through innovations like DA, EDA, and Open Bidding, it benefits its buyers and sellers and increases its own profits.

40.    *Third,* contrary to claims from Professor Jardin,[62] auction markets are hardly zero-sum games. When a buyer's value for an impression exceeds the value of a seller's cost, *both* parties can benefit from the sale of the impression. Both sides often benefit when a well-designed marketplace improves match quality or facilitates more mutually beneficial transactions.

41.    *Fourth,* Professor Cramton describes the "independent [] operators" of electricity and financial markets[63] and repeatedly compares "Google's behavior" to that of a hypothetical "independent intermediary."[64] But these are misleading comparisons. The reasons for

---

[62] Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 65 ("In addition, as a 'zero-sum game,' an auction has a winner and losers.").

[63] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 91 ("In some markets, equal treatment is achieved by using a market intermediary independent of the buyers and sellers. One example is electricity markets run by independent system operators. Another example is financial exchanges, such as NYSE, NASDAQ, ICE, and CME. This structure is vital in achieving fairness because the market is run by an entity independent of the market participants.").

[64] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 27 ("Section 7 explains how Google's programs of Dynamic Allocation and Enhanced Dynamic Allocation, by providing Google's ad exchange AdX with both first look and last look advantages, gave AdX a significant advantage in the market, allowed AdX to clear more impressions, and allowed Google to benefit further from any program that would direct advertising traffic toward AdX. These programs were contrary to the incentives of the sellers or a theoretical, independent third-party intermediary, who would not want to create preferential rules."), ¶ 29 ("Section 8 explains how Google used Dynamic Revenue Share to expand AdX's volume, providing additional potential benefits to Google via its first and last look advantages. Google's significant sell-side take rate of 20% (ten times that of a wholesale electricity system operator) resulted in some net bids submitted to AdX falling below the reserve price."), ¶ 91 ("In some markets, equal treatment is achieved by using a market intermediary independent of the buyers and sellers. One example is electricity markets run by independent system operators. Another example is financial exchanges, such as NYSE, NASDAQ, ICE, and CME. This structure is vital in achieving fairness because the market is run by an entity independent of the market participants."), ¶ 96 ("The transparency of electricity markets means that any bidder has an equal opportunity to compete. All market participants have access to the market rules, the results from prior auctions, and can compete on nondiscriminatory, open access terms. Transparency encourages competition because it allows bidders to intelligently gauge the opportunity of participation. Market transparency is a desirable attribute of an auction market because it promotes fairness and competition, which promote market value creation."), ¶ 119 ("The take rate is ten times higher than the fee in electricity markets (2%), and more than 150 times higher than in financial exchanges (less than 0.12%)."), ¶ 152 ("The following sections will delve into the strategic advantage of Enhanced Dynamic Allocation, its functionality, and the economic rationale behind Google's implementation. We will also consider the

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

differences in pricing and organization between display advertising marketplaces and "independent operators" of electricity markets and financial markets are many. Here are a few:

a. Display advertising is a matching marketplace, in which value is created by the careful matching of impressions to users. In contrast, homeowners rarely care or even know which producer provides their electrons and retail investors similarly do not care or know about the seller's identity.

b. Each display advertising impression has unique characteristics that the marketplace needs to communicate to buyers, while electricity and stock shares are fungible, requiring much less communication.

c. Display advertising marketplaces operate billions of separate auctions every day to set a different price for each ad opportunity. The number of daily transactions in electricity marketplaces is a tiny fraction of that.

d. Display advertising marketplaces have tens of thousands of potential buyers for each impression, while the numbers of participants in electricity markets are much smaller.

e. Display advertising marketplaces are operated by for-profit intermediaries, many with product features similar to the ones offered by Google and challenged by Plaintiffs, as I list in Table 1. In contrast, many electricity markets are run by

---

benefits it provided Google compared to what an independent auctioneer might design for a similar market mechanism.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

governmental or quasi-governmental agencies that are offered local monopolies, facing no significant competition.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Table 1: Google's Competitors Developed Similar Product Features as Challenged Google Products**

| Feature | Challenged Google Product | Competitor(s) with a Similar Product Feature | Report Section |
|---|---|---|---|
| Buy-side: Bid Optimization Programs Varying Revenue Shares | Buy-side DRS, Bernanke, Alchemist | Meta Audience Network; Criteo | IV |
| Buy-side: Adjusting Bids for Multi-calling | Bell, Elmo | The Trade Desk (TTD); MediaMath (before 2023); Criteo | V, VI |
| Buy-side: Adjusting Bids for Bid Duplication | Elmo | MediaMath; Xandr; Yahoo DSP (formerly Verizon Media) | VI |
| Buy-side: Adjusting Bids to Auction Format | Poirot, Marple | Yahoo DSP; The Trade Desk; MediaMath (before 2023); Xandr; Amazon; Criteo | VII |
| Sell-side: Auctions with Floors Determined by Remnant Line Items | Dynamic Allocation | OpenX; AppLovin (formerly MoPub) | VIII |
| Sell-side: Direct Competition of Guaranteed Contracts and Remnant | Enhanced Dynamic Allocation | Xandr; AppNexus; Disney; Magnite; Comcast's FreeWheel; OpenX; Equativ | IX |
| Sell-side: Line Items Associated with Header Bidding Determining Auction Floors | So-called "Last Look" | Open X; Equativ | X |
| Sell-side: Reserve Price Optimization | RPO | Disney; Magnite (formerly Rubicon); OpenX; Sovrn | XI |
| Sell-side: Varying Revenue Shares by Impression | Sell-Side DRS | OpenX; Xandr | XII |
| Sell-side: Requiring Uniform Reserve Prices by Demand Source | UPR | Disney; Meta (code of conduct for partners); Xandr (best practices) | XIV |

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 5. Plaintiffs' Experts' Empirical Analyses Contain Errors and Exhibit Classic Biases

42.    Reliable empirical research needs to avoid at least three important biases. First, it must avoid *sample selection bias*, such as omitting data that disfavors the researcher's hypothesis or reduces the size of the researcher's estimated effects. Second, it must avoid *misspecification biases*, such as when the researcher relies on a single model or analytical approach, omitting analyses of equally sound models and approaches that could lead to different conclusions. Third, it must avoid *omitted variable bias* by including sufficient controls to distinguish the researcher's hypothesis from its alternatives.

43.    I have examined the empirical studies that Plaintiffs' experts use to support their opinions related to the subject of this report. I find that each suffers from at least one of the three biases described above and sometimes from other errors as well. These studies fail to establish reliable empirical grounds for their conclusions and estimates. Here is a summary of the failings I have identified.

44.    In one empirical analysis, Professor Li attempts to support his claim that DV360's 1P Bidder "direct[ed]" spend "from third-party exchanges [] towards AdX."[65] But Professor Li's interpretation is flawed and unreliable for at least three reasons.

    a.    The figure he relies upon (Figure 46[66]) to identify the divergence between spend on AdX versus third-party exchanges contains a data error, evidenced by an unusual drop in reported spend in 2023. After correcting the data error, I find no such decline in 2023.

---

[65] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 71 ("Poirot's risk aversion parameter undermined competition in the exchange market by directing DV360 spending away from third-party exchanges and towards AdX.").

[66] *See* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1318, Fig. 46.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

b.  Professor Li emphasizes the period "*beginning in 2019*" to note "there was a sharp divergence between the two, with spend on AdX increasing significantly and spend on third-party exchanges declining,"[67] but that time period is irrelevant to his analysis of the 1P bidder. DV360 did not release the AdX 1P bidder until *September* of 2019,[68] before which the divergence he emphasizes had long occurred.

c.  To evaluate Professor Li's claim that the 1P bidder caused DV360's increased spending on AdX,[69] I plot the AdX share of DV360 spending for the same period that he studied. If additional spending by the 1P bidder had driven the increase in total spending by DV360, then the AdX share of DV360 spending should increase over that period. I find that, on the contrary, the share *decreased*, contradicting Professor Li's claim.

45.  In another empirical analysis, Professors Li and Hortaçsu attempt to support their opinion that UPR limited publishers' ability to "weed out objectionable ads with greater

---

[67] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1319 (emphasis added).

[68] "GDN Ads Launches 2020" (Nov. 11, 2020), GOOG-AT-MDL-011725784, at Tab "2020-05," Cell I645 (identifying September 2019 as the launch date); Email from ███████████████████ to Nirmal Jayaram, "[Launch 311348] GDA and DV360 first price bidding on AdX web and bid translation on AdX app and AdMob" (Sept. 17, 2019), GOOG-DOJ-AT-00573072, at -072 (explaining the launch); "Display Ads Quality Launches 2019" (Sept. 16, 2020), GOOG-AT-MDL-003284235, at Tab "2019 Q4 Web & mApps," Cell D20 (identifying several impact metrics). This September launch was then supplemented by a launch in January 2020 to improve the HDMI modeling pipeline. Email from █████████████ to ████████████████████ "[Launch 312287] DV360 Opt - New HDMI for Transparent First Price Auctions" (Sept. 9, 2019), GOOG-DOJ-14429769, at -164 (identifying this launch as accompanying Launch 311348); "Ariane Download Q1 2020" (Dec. 8, 2020), GOOG-AT-MDL-011539513, at Tab "Raw Data," Row 71 (identifying January 20, 2020 as the supplemental launch date).

[69] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1315 ("I conclude that during the 2019-2022 period where Google applied the risk-aversion parameter only to bidding into AdX, win rates (and impressions, value and revenue volumes) were higher on AdX *because* of Poirot.") (emphasis added).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

precision"[70] and increased "the prevalence of bads [sic] ads coming from AdX[.]"[71] The data for their analyses are drawn from published material from Confiant—a third-party firm that specializes in identifying and blocking low-quality ads before they are served.[72] As I describe in [Section XIV.E.7](#), the data used for the two professors' analysis is biased and unsuitable. The data is biased because it omits a key time period and unsuitable because it aggregates monthly data in a way that makes it impossible to distinguish the effects of UPR's launch from contemporaneous external events. Moreover, it disregards significant changes in how Confiant measured ad quality violations during the reporting period, which would cause measured ad quality to fall even in the absence of any negative effects from UPR.

46.  To account for these biases and oversights, I revisit their analysis of the Confiant data, reaching the following four conclusions that contradict and reverse Plaintiffs' experts' opinions:

   a.  The quantity of ad quality violations across the industry was twice as high in the year *before* UPR's launch compared to the year after, suggesting that ad quality *improved* in that period after the launch.

   b.  At the time of UPR's launch and for at least nine months afterward, impressions won through AdX had *better* quality than those won through other SSPs.

---

[70] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1032 ("By establishing more specific price floors tailored to individual exchanges, publishers can weed out objectionable ads with greater precision, thereby improving their ad quality and limiting their reputational costs of serving low-quality ads.").

[71] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 447.

[72] *See* Confiant, "Ad Quality Solutions," https://www.confiant.com/solutions/quality, accessed Dec. 10, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

    c.   Plaintiffs' experts fail to apply sufficient controls to account for the fluctuations in ad quality occurring in later periods. The text of Confiant's report identifies explanations for changes in ad quality that are important alternatives to UPR. These include both the continuing expansion of the types of ads identified as bad and blocked by Confiant and changes due to external events in that period, such as increases in the number of low-quality ads associated with the COVID-19 pandemic and the cryptocurrency boom.

    d.   The Confiant data provide no support for Professor Li's claim that UPR would "creat[e] a race-to-the-bottom" in long-run ad quality.[73]

47.    In addition to his work on the Confiant data, Professor Hortaçsu also conducts a "regression panel" study to support his damages analysis. The study claims to measure the effect of "ad quality" on publisher readership, ultimately concluding that "bad ads [served by AdX] degrade user experiences and thus reduce readership"[74] and result in "$136 million in damages to Daily Mail and $181 million in damages to Gannett."[75]

48.    To evaluate the adequacy of data and controls used in Professor Hortaçsu's estimates, I tested three separate adjustments to his regression analysis:

    a.   I examined sample selection bias by including observations that were inexplicably dropped from his data analysis.

---

[73] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1056 ("Because UPR makes it harder to target the exchange that lowers ad quality, exchanges have more leeway to reduce ad quality, creating a race-to-the-bottom.").

[74] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 418.

[75] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 418.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

b. I included publisher-specific trends, relaxing Professor Hortaçsu's assumption of uniform readership growth rates across all publishers. This controls for the possibility that a changing composition of publishers with different growth rates drives the changes over time in the overall average.

c. I tested composition bias in a second way, using a balanced panel to check whether changes in the composition of publishers over time had distorted the conclusions of Professor Hortaçsu's regression study.

49. Professor Hortaçsu's "regression panel" results are not robust to these changes. Indeed, when any *one* of these three adjustments (a)-(c) is made, the damage estimate falls to *zero*. This finding is consistent with my review of Professor Li's and Hortaçsu's analysis of the Confiant data, in which I found no evidence that UPR resulted in *any* reduction in ad quality.

50. Professor Hortaçsu conducts an additional set of empirical analyses to evaluate an alleged "cream skimming effect of EDA."[76] As part of that analysis, he studies the changes in click-through rates (CTRs) and prices (in CPMs) of guaranteed deals over a period of time. However, his analysis and interpretation are flawed in multiple ways.

51. *First,* Professor Hortaçsu interprets Figure 7 of his report as showing that "as direct deal CTRs decrease, CTRs for impressions sold via Open Auction increase[] over time."[77] He then attributes those trends to EDA, claiming that "Open Auction benefits from taking

---

[76] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 90.

[77] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 94.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

higher value impressions from EDA[.]"[78] Professor Hortaçsu misreads his own figure and omits proper controls.

a.  While he attempts to juxtapose a change in "direct deal CTRs" with the "CTRs for impressions sold via Open Auction," he *misreads* his own figure, which shows that both categories generally trended downwards until mid-2018, nearly *four* years after EDA's release. His conclusion that "CTRs for impressions sold via Open Auction increases over time" is a description only of later trends, not attributable to the introduction of EDA.

b.  Professor Hortaçsu's figures plot no data before 2015, which is significantly later than the April 2014 launch of EDA for standard direct deals,[79] a limitation that he acknowledges in his report.[80] In an attempt to attribute fluctuations that occur nearly four years after EDA's release to "cream skimming," he fails to consider alternative explanations for the time trends. For example, improvements in header bidding and ad-targeting technology could contribute to both reduced CPMs for direct deals and higher CTRs for indirect deals.

52. *Second,* Professor Hortaçsu attempts to overcome the limited time period of his data described by substituting a different category of direct deals, for which data is available both before and after EDA's launch. He seeks to "measure the effect of EDA on CPMs for Programmatic Guaranteed direct deals and use that as a proxy for the effect of EDA

---

[78] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 94.

[79] "DRX Quality update" (March 10th, 2015), GOOG-TEX-00449253, at -264 ("Full rollout in April 2014").

[80] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 98.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

on CPMs for all direct deals."[81] But programmatic guaranteed (PG) deals are a poor proxy for standard direct deals.

a.  When EDA launched for PG deals, PG was a nascent category, representing not even 0.25% of guaranteed ad revenue in March of 2017.[82] In fact, PG deals did not even achieve "General Availability" until a month later.[83] In that early period, PG time series data is deeply influenced by the changing mix of web properties over time.

b.  Moreover, while Professor Hortaçsu attempts to justify his use of PG deals as a proxy for standard direct deals by claiming that the CPMs of "Standard Direct Deals and Programmatic Guaranteed direct deals follow a similar, downward sloping trend across time"[84] and that "[t]he correlation between the two [] is 0.8,"[85] his analysis is incomplete. To check the proxy status of PG deals, I plotted CTRs–the measure of ad quality that Professor Hortaçsu emphasizes–instead of CPMs.[86] I find that the CTRs of standard direct deals and PG deals do not at all follow "similar [...] trend[s]," as demonstrated by their much lower correlation

---

[81] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 99.

[82] My analysis of PG is in code/drx.py of my supporting materials. Output is logged to code/logs/drx.txt.

[83] "Comms Doc - Programmatic Guaranteed" (Apr. 2019), GOOG-DOJ-04447709, at -709; Kurt Spoerer and Roshan Khan, "Bringing programmatic buying to reservation deals everywhere," Google Ad Manager (Apr. 5, 2017), https://blog.google/products/admanager/bringing-programmatic-buying-to/, accessed Dec. 13, 2024.

[84] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 103.

[85] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 103.

[86] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 91 ("Advertisers rely on CTR as a measure of impression quality and performance. In particular, advertisers value impressions with higher click-through rates because it means more customers are visiting advertisers' sites. Advertisers closely track CTR not only on a particular publisher website, but also for particular ad slots on that website.").

coefficient of 0.35[87], which is further evidence of the unsuitability of PG deals as a proxy for standard direct deals.

53.  *Third*, despite Professor Hortaçsu arguing that "impressions with lower CTR are less valuable to advertisers than higher CTR impressions"[88] and having a theory of harm that "EDA lowered the CTR for Direct Deals,"[89] Figures 8 and 9 in his report illustrate CPMs, not CTRs. While volatile, the CTRs of PG deals *increase* in the months immediately following the launch of EDA, contradicting Professor Hortaçsu's claim that "CTRs fall after EDA, leading to lower CPMs."[90]

54.  As demonstrated, Professor Hortaçsu's attempts to support his theory of "cream-skimming" suffer from multiple errors and biases. In my own empirical study to evaluate "cream-skimming," I take a direct approach that avoids these errors and biases. I study the effect of EDA on three *predicted engagement metrics*, which are industry-standard quality measures and the same ones used by Google in the ordinary course of business. In addition, I use relevant, comprehensive data, not just PG deals. Using each of the three metrics, I find no evidence to suggest any economically significant "cream-skimming" effect from EDA.

---

[87] Code for this computation is in my supporting materials in code/drx.py. Outputs are logged to logs/drx.txt.

[88] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 91 ("Advertisers rely on CTR as a measure of impression quality and performance.140 In particular, advertisers value impressions with higher click-through rates because it means more customers are visiting advertisers' sites. Advertisers closely track CTR not only on a particular publisher website, but also for particular ad slots on that website.").

[89] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 98 ("Given that EDA lowered the CTR for Direct Deals, I anticipate that EDA also lowered the CPM of direct deals, reducing publisher revenues.").

[90] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at Section III.A.iv.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## III.    BACKGROUND AND ECONOMIC FRAMEWORK

### A. The Key Economic Features of Online Display Advertising

55.    Marketplaces are meeting places for trade. Buyers with wants and needs meet sellers of goods or services that can fulfill those wants and needs. When a buyer's value for a good or service exceeds a seller's cost, *both* parties can benefit from trade. Marketplaces provide social value when they facilitate additional opportunities for mutually profitable trade among economic agents.

56.    In online display advertising, the key participants include website **publishers**, who sell ads on their websites (also known as **impressions**);[91] the **advertisers**, who buy impressions; and the **end users**, who may view and/or interact with the ads. Publishers use advertising sales to fund their production of internet content, which is often free or subsidized for end users. Advertisers can have many and diverse goals for their advertising campaigns, but they generally seek to increase the probability that an end user engages with their product, service, or message. End users experience benefits and costs from display ads: they may benefit directly from the information conveyed by the ad or indirectly from the ability to consume internet content at a reduced cost (e.g. without facing a paywall), and they may experience costs in the form of the annoyance caused by unwanted advertisements or slower load times for web pages. In this report, because the

---

[91] In this report, I use the word "impression" to refer to an opportunity for a display advertisement that is offered for sale by a web publisher. This is a broader definition than the technical definition of impression typically used in the industry, which requires that the impression opportunity is successfully allocated to an advertiser and the associated advertisement loads successfully on the end user's browser. For example, Google Ads defines an impression as "[h]ow often your ad is shown[:] An impression is counted each time your ad is shown on a search result page or other site on the Google Network." Google, "Impressions: Definition," Google Ads Help, https://support.google.com/google-ads/answer/6320?hl=en, accessed Dec. 11, 2024.

costs and benefits to end users are difficult to measure and are not the main subject of Plaintiffs' allegations, I focus on the costs and benefits to publishers and advertisers.

57.    Occasionally, I will refer to **economic welfare**, by which I will mean the total value to advertisers, minus any costs incurred by publishers and intermediaries. This definition of economic welfare is independent of the prices paid by advertisers for impressions and the fees charged by intermediaries, with these factors determining how economic welfare gets split among advertisers, publishers, and intermediaries.[92] A change in practices is said to **increase efficiency** if it increases economic welfare. For example, a change in matching procedures that leads to assigning impressions to advertisers with higher values increases efficiency and may benefit *both* publishers and advertisers.

58.    One of the key challenges facing an advertiser is to identify the appropriate audience for its advertising campaign. The probability that any single ad successfully influences the end user (for example, to click on the ad, buy a product, sign up to an email list, or vote for a political candidate) is typically low.[93] At the same time, the potential benefits to the advertiser from a successful interaction, called a **conversion**, can be significant.

59.    In economics parlance, online display advertising is a **matching market** because the value of an impression to an advertiser typically depends on various factors, including the ad shown, the identity of the end user, and the context of the ad. Advertisers are willing

---

[92] Economic welfare can equivalently be defined as the sum of the advertiser surplus earned by advertisers (see the definition of advertiser surplus in Paragraph 73), plus the profits earned by publishers, plus the profits earned by any intermediaries.

[93] For example, according to the Google Ad Manager Log-Level Dataset (January 2024), GOOG-AT-EDTX-DATA-000276098 to -001116097, about ██% of US impressions won by bidders with transaction types "Open Bidding" or "Open Auction" resulted in a click. This result was generated using code/misc_queries.py in my supporting materials, and the output is saved in code/logs/misc_queries.txt.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

to pay more to show their ads to end users for whom that ad is more likely to be more relevant. For instance, a restaurant in Manhattan is unlikely to derive much value from advertising its specials to an end user in San Francisco, but may have a high value for advertising them to end users in Manhattan, especially those who dine out frequently or have visited that restaurant in the past. The same restaurant might derive more benefit from an advertisement next to a restaurant review in the New York Times online than from an ad on the sports page. Other advertisers, such as Ticketmaster, might have the opposite preference. Improved matching that places higher value ads for each impression can increase both the price paid to publishers and the profits earned by advertisers.

60. Another key economic feature of online display advertising is that ad impressions on webpages are quickly **perishable**: they must be allocated within fractions of a second of the end user's arrival to maximize the chance that the ad will be noticed. The perishability of impression opportunities distinguishes the matching problem in online display advertising from that faced on other online matching platforms (*e.g.*, real estate platforms like Zillow or dating websites like eHarmony) in which there is typically much more time for counterparties to consider and finalize the details of their matches.

61. These two characteristics—that good matching is key to creating value and that impressions are perishable—distinguish online display advertising platforms from commodity exchanges and from trading platforms for securities like stocks and bonds. In the sale of securities, buyers and sellers often care little about the identity of their trading partners. Partly as a result of that, trading platforms for securities are most often anonymous. In addition, securities are less perishable, with investors sometimes postponing their trading for days or longer if they are unsatisfied with current prices.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### B. Intermediation in Online Display Advertising

#### 1. How Intermediation Can Improve Matching

62. The challenges associated with matching impressions to end users encourage **intermediaries** to offer increasingly effective services. These services may increase economic welfare by allowing advertisers and publishers to quickly identify more and better matches and/or reducing the costs of participation (sometimes called **market frictions** or **transaction costs**). Such intermediaries typically share in the benefits of increased economic welfare by charging fees for their services.

63. Common approaches taken by intermediaries that increase economic welfare include:[94]

    a. *Making it easier for publishers and advertisers to transact:* Intermediaries can make participation easier by performing technical and strategic computations that help publishers manage their inventories or advertisers evaluate and bid on millions of impressions. Without such intermediation, each buyer and seller might incur the costs of developing processes, performing computations, and making the inevitable errors that result from the complexity and frequent changes of an industry that is evolving and growing. In my own auction consulting in this industry and others, I have emphasized the importance of making bidding easier to encourage participation and promote value creation.[95]

---

[94] *See, e.g.*, Roth, Alvin E., *Who Gets What—and Why: The New Economics of Matchmaking and Market Design*, Houghton Mifflin Harcourt (2015), at pp. 8-11.

[95] For example, in my published advice as consultant to the US Federal Communications Commission, I wrote that "the auction process needs to be simple and easy enough to encourage and facilitate the participation of a wide array of broadcasters […] [and] make it very easy for broadcasters to make optimal bids." Auctionomics and Power Auctions, "Incentive Auction Rules Option and Discussion," Federal Communications Commission (Sept. 12, 2012), https://docs.fcc.gov/public/attachments/FCC-12-118A2.pdf, at p. 2.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

b.  *Making participation safer:* Intermediaries often design and enforce rules to protect participants from being taken advantage of by other participants on the platform. A lack of safety can force participants to spend resources monitoring and strategizing to protect against unscrupulous behavior. Such expenses can be wasteful and discourage participation.

c.  *Making the platform thicker:* Matching platforms work better when they are *thicker*, which for online ad platforms means more advertisers, more impressions, and better information.[96] Thicker matching platforms enable advertisers to find more suitable impressions and to spend their budgets more effectively. They may also enable publishers to attract more bidders and higher prices for their impressions. In these ways, thicker matching platforms improve economic welfare. For online advertising, intermediaries can promote thickness and create more valuable matches by exposing each bidder to a larger number of relevant impressions or providing the information that bidders need to evaluate those impressions.

---

[96] I note that this definition of thickness does not explicitly include the number of publishers. In online display advertising, the value of an advertisement is primarily driven by the match between an advertiser and an end user, so the most relevant measure of thickness is of advertisers and the number of impressions, not the number of publishers. Even a single publisher can have many end users and many impressions (*e.g.*, Facebook), so a platform matching many advertisers to a single publisher's impressions could also be thick. Academic research studying online advertising often define thickness by the number of advertisers competing per impression. *See, e.g.*, Levin, Jonathan, and Milgrom, Paul, "Online advertising: Heterogeneity and conflation in market design," American Economic Review: Papers & Proceedings, Vol. 100 (2010), at p. 607; Ye, Z., Zhang, D.J., Zhang, H., Zhang, R., Chen, X., & Xu, Z., "Cold start to improve market thickness on online advertising platforms: Data-driven algorithms and field experiments," Management Science, Vol. 69 (2023), at p. 3839 ("Throughout this paper, we use the market thickness to represent the average number of ads competing for user impressions on an online advertising platform."); D'Annunzio, A., and Russo, A., "Intermediaries in the online advertising market," Marketing Science, Vol. 43 (2024), at p. 34 ("Advertising markets differ in their thickness (*i.e.*, the number of advertisers belonging to that market)").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

d.  *Making processes more efficient:* Fixing the set of participants and the information they receive, intermediaries can increase economic welfare by adopting technologies that enable more offers to be directly compared, so that the allocation process can assign each impression to the participating advertiser who values it most highly.

e.  *Reducing latency:* Intermediaries can reduce transaction costs by eliminating unnecessary and duplicative steps and increasing the speed at which transaction opportunities are identified and processed. This reduces the likelihood that an end user leaves the website before the ad is presented.

64.  The perishability of impressions creates special challenges for intermediaries in online display advertising beyond those faced on other matching platforms. Matching platforms in other industries often help buyers and sellers identify potential matches but leave it to the parties themselves to finalize the details of their transactions (as on, for example, real estate platforms like Zillow, hotel booking platforms like Booking.com, or dating platforms like eHarmony). In contrast, online display advertising intermediaries typically need to automate the entire transaction to allow ads to be shown almost immediately. The advent of **programmatic advertising** was a response to this challenge, in which intermediaries create automated systems to analyze data, compare options, and make decisions to buy or sell impressions for publishers and advertisers, all in a few hundred milliseconds.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 2. The Ad Tech "Stack"

65.  To illustrate the various roles of online display advertising intermediaries, consider the following simplified depiction of one of the pathways in the programmatic advertising supply chain. First, an **end user** arrives at a publisher's website, which has an impression opportunity available to be filled by an ad. While the webpage is loading, a **call** can be made to the **publisher's ad server**, which is an intermediary that helps publishers manage their online display advertising inventory. The publisher's ad server may make an initial decision about the allocation of the impression, based on parameters chosen by the publisher. In some cases, the server might allocate the impression directly to an advertiser who has a pre-arranged contract with the publisher. In other cases, the publisher's ad server might make a call to one or more **ad exchanges** or **supply-side platforms (SSPs)**, which allow publishers to sell inventory using programmatic sales mechanisms, including auctions. These auctions typically involve calls to **demand-side platforms (DSPs)**, which are intermediaries that help advertisers purchase online display advertising inventory.[97] The publisher's ad server or the ad exchange might also make a call to one or more **ad networks**, which buy online display advertising inventory directly from publishers or through other intermediaries on behalf of advertisers in their networks. After the winning advertiser is determined, the advertising content is transmitted to the end user's browser by the **advertiser's ad server**, which is an intermediary that manages and stores advertisers' ads. This entire process is completed within a fraction of a second after the arrival of the end user at the publisher's webpage.

---

[97] I use the terms "buying tool," "buy-side tool," and "DSP" interchangeably in this report.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

66.    Collectively, these intermediaries are sometimes referred to as the **ad tech stack**, depicted graphically in Figure 2.

**Figure 2: Simplified Depiction of the Ad Tech Stack**



67.    I emphasize that the above is a *simplified* description of the allocation process for *some* online display advertising impressions. Different publishers and supply-side platforms may use allocation processes different from the ones I described above, and advertisers may reach end users through different pathways. Advertising technology has evolved considerably over the past two decades and continues to evolve. Other important intermediaries, which may participate in the ad tech stack but are not included in my simplified description above, include **ad agencies**, which assist advertisers in planning and designing their advertising campaigns, and other intermediaries that assist advertisers and publishers, manage payments, and track user engagement. This description also omits **header bidding**, a technology that allows publishers to call demand sources directly, without first calling a publisher ad server. I discuss header bidding in detail in Sections X and XIII.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

68.     Another significant function of online display advertising intermediaries is the collection and management of data used by advertisers to identify end users and assess their values for display advertising inventory. One of the key tools used in this process is the **cookie**, which is a small text file stored in an end user's browser.[98] Cookies come in two main varieties: **first-party cookies**, allowing publishers to track user behavior on their own websites, and **third-party cookies**, allowing intermediaries to track user behavior *across* websites.[99] When a user first loads a website including content from an online display advertising intermediary, a third-party cookie is stored in the user's browser. After that time (or until that cookie is deleted in the end user's browser), the display advertising intermediary can track that user's activity across different websites that also include any content from that intermediary.[100] This allows the intermediary to develop a profile of an end user based on his/her browsing behavior, which can help advertisers assess the value of impressions associated with that cookie.[101] Because different display advertising intermediaries have different cookie information about end users, a process called **cookie**

---

[98] "Declaration of ████████" GOOG-AT-MDL-C-000016753 (Sept. 29, 2023), at ¶ 14 ("In general, cookies are small data files stored on a web browser that can serve different functions.").

[99] Maciej Zawadziński & Mike Sweeney, "What is cookie syncing and how does it work?," Clearcode Blog (May 15, 2024), https://clearcode.cc/blog/cookie-syncing/, accessed Dec. 13, 2024 ("Different Types of Cookies [...] First-party cookies are created by the websites we visit directly. [...] Third-party cookies, also referred to as tracking cookies, are collected not by the website, but by advertisers.").

[100] Maciej Zawadziński & Mike Sweeney, "What is cookie syncing and how does it work?," Clearcode Blog (May 15, 2024), https://clearcode.cc/blog/cookie-syncing/, accessed Dec. 13, 2024 ("Third-party trackers can also track a user's behavior, such as the content they view on that website and the things they click on (e.g. products and ads). The trackers create third-party cookies and use them to display adverts to the user when they visit different websites. [...] Each time a user visits a website that contains ads (or third-party tracking tags), the browser sends an ad request to an advertising technology platform (e.g. a DSP).").

[101] *See, e.g.*, "Declaration of ████████," GOOG-AT-MDL-C-000016753 (Sept. 29, 2023), at ¶¶ 16 ("[Cookie matching] allows an RTB participant, for example, to limit the bid requests they receive to those involving users that they previously interacted with, as determined by the presence of their cookies."), 39 ("Broadly speaking, these settings and controls will determine [...] whether cookies or other pseudonymous identifiers can be included (where they are available) which enables RTB participants to select ads based on information they may have on prior activity associated with the identifier.")).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**matching** (or cookie syncing) is sometimes used to match (often imperfectly) cookies collected by one advertising intermediary to those collected by another, with this process aided by additional intermediaries, called **data management platforms**.[102] Google offers a cookie matching service to allow bidders in its display advertising auctions to match their cookies with Google's proprietary cookies, called Biscotti.[103] Advertisers often supplement data collected via third-party cookies with other first-party information about the end user to determine their value for displaying an ad.[104]

### C. Information, Incentives, and Auctions

#### 1. Auctions Aggregate Dispersed Information

69.    One of the challenges associated with efficient matching and intermediation in online display advertising is that information about the value of an impression to different advertisers is typically dispersed and not directly observed by all advertisers, publishers, and intermediaries. An advertiser does not typically have all the information required to assess its value for showing an ad to the end user and needs to rely on information collected by publishers and intermediaries about the user's characteristics and browsing behavior. Meanwhile, a publisher seeking to sell online display advertising inventory

---

[102] Maciej Zawadziński & Mike Sweeney, "What is cookie syncing and how does it work?," Clearcode Blog (May 15, 2024), https://clearcode.cc/blog/cookie-syncing/, accessed Dec. 13, 2024 ("An example of this would be mapping a user's ID from a demand-side platform (DSP) to a data management platform (DMP). This process is known as cookie syncing. [...] Cookie syncing works when two different advertising systems (aka platforms) map each other's unique IDs and subsequently share information that they have both gathered about the same user.")).

[103] "Declaration of ▇▇▇▇▇▇▇" GOOG-AT-MDL-C-000016753 (Sept. 29, 2023), at ¶ 16 ("RTB participants may utilize their own cookies, in the same way Google uses a Biscotti. 'Cookie matching' allows RTB participants to match their cookies with Google's Biscotti for the same browser.").

[104] *See* "Declaration of ▇▇▇▇▇▇▇" GOOG-AT-MDL-C-000016753 (Sept. 29, 2023), at ¶ 39 ("Broadly speaking, these settings and controls will determine [...] whether cookies or other pseudonymous identifiers can be included (where they are available) which enables RTB participants to select ads based on information they may have on prior activity associated with the identifier.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

typically does not know the value of each impression to each potential buyer, or even the identities of all the potential buyers for a given impression. If advertisers and publishers had all of that information, auctions and many other services offered by intermediaries would be unnecessary because the publisher could simply sell each impression to the highest-value advertiser at a mutually agreeable price. Information processing is key to effective matching and pricing.

70.    Auctions can perform a central role in this process: the auctioneer *distributes* certain information about the item being sold and receives information in the form of **bids** and uses those to allocate the item and determine payments. In this report, I focus on **sealed-bid auctions**, which are auctions in which bidders report their bids to the system just once at the start of each auction.[105] Because they can be resolved so quickly, sealed-bid auctions work well for online display advertising sales, where impressions are rapidly perishable.

71.    In most auctions for a single item, the **winning bidder** is the bidder with the highest bid and only that bidder makes a payment to the auctioneer. The amount it pays to the auctioneer is called the auction's **clearing price**. Many auctions incorporate a **floor price** (also known as a **reserve price**), which is a price below which the seller is unwilling to sell. In an auction with a floor price, only bids that exceed the floor price are considered.

72.    Auctions are popular when different bidders might value an item differently because they allow bidders' information about different goods to be reflected in prices, a process called

---

[105] Other types of auctions may elicit information from the same bidder *multiple* times during the auction: for example, in "open outcry" English auctions (an auction format commonly used for art auctions at, say, Sotheby's), bidders may make multiple sequential bids for an item, each of which must be higher than the current highest bid, and the bidder who makes the final bid wins the auction at a price equal to its bid.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**price discovery**.[106] Sealed-bid auctions are particularly suitable for online display ad impressions because of their ability to discover prices and allocate items rapidly to bidders whose values may be quite different and changing over time.

### 2. How Auction Designs Affect Publisher and Advertiser Incentives

73.    In much of this report, I assume that an advertiser's objective in an auction is its **advertiser surplus** (also known as **advertiser profit**), which is equal to the difference between its value for the impression if it wins it and the price it pays.[107] An advertiser chooses a bid to maximize the *expected* value of this advertiser surplus, given its prediction of the behavior of other bidders. A publisher's objective is its **revenue**, which is equal to the payment it receives for an impression. The publisher chooses its floor price in the auction, which is the minimum payment it is willing to accept for the impression (discussed further in Section III.C.3.d) to maximize its *expected* revenues, given its predictions of the behavior of bidders.[108] If each agent chooses actions to maximize its benefits of participating in the auction, assuming that all other agents also maximize their returns, and if agents' forecasts of others' choices are statistically accurate, then their

---

[106] *See, e.g.*, Milgrom, Paul, *Discovering prices: auction design in markets with complex constraints*, Columbia University Press (2017), at p. 46 ("Even when prices to guide efficient resource allocation exist in theory, the practical problem of finding those prices can still be daunting. […] The best way to find such prices is often an auction of some kind.").

[107] Advertisers may have other campaign objectives, but as I discuss in Section VII.C, *any* rational strategy for an advertiser (*i.e.*, any strategy that purchases a set of impressions in the *least-cost* way) leads to choosing bids for each individual impression that maximize expected advertiser surplus given some value for the impression.

[108] Publishers and advertisers may make decisions other than floor prices and bids, including where to sell or bid for an impression and how many impressions to offer. Where these other decisions are relevant to my analysis, I also assume that publishers and advertisers make these decisions in line with their incentives.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

choices are said to be in **(Bayes-Nash) equilibrium**.[109] Equilibrium analysis is a common basis of theoretical predictions about auctions because it accounts for the incentives of all participants.

74.    In much of this report, I adopt the common approach of assuming that advertisers and publishers respond to the rules and conditions they face to maximize their individual returns from online display advertising. There are several reasons that I believe this to be the relevant standard for this case.

75.    *First*, there are vast sums of money at stake for many of the publishers and advertisers in the industry. Many also have large teams of engineers, economists, and marketing experts devoted to maximizing returns by finding all possible improvements in advertising yields. The largest advertisers and publishers also make up a significant fraction of the online display advertising industry, suggesting that the strategic sophistication of these agents is especially relevant to auction outcomes.[110] Academic research has found that bidders with large stakes in auctions typically behave in line with their incentives, as predicted by equilibrium analysis.[111]

---

[109] Bayes-Nash equilibrium is a standard solution concept of game theory. *See* Harsanyi, J., "Games with incomplete information played by "Bayesian" players, I-III. Part I. The basic model," Management Science, Vol. 14 (1967), at pp. 159-182; Fudenberg, D., and Tirole, J., *Game theory*, MIT Press (1991), at pp. 3, 11-14.

[110] For example, in 2022, more than ▮% of Google Ads' US web spending across AdX, AdSense, and non-Google exchanges was by advertisers spending more than ▮▮▮▮▮ on the platform. For the same criteria, more than ▮% of DV360 spending was by advertisers spending more than ▮▮▮▮ *See* GOOG-AT-MDL-DATA-000486626 to -8277 (Google Ads); GOOG-AT-MDL-DATA-000561263 to -420 (XBridge DV360). This result was generated using code/web_spend.py in my supporting materials, and the output is saved in code/logs/web_spend.txt.

[111] *See, e.g.*, Doraszelski, U., Lewis, G., and Pakes, A., "Just starting out: Learning and equilibrium in a new market," American Economic Review, Vol. 108 (2018), at pp. 565-615; Hortaçsu, Ali, and Puller, Steven, "Understanding strategic bidding in multi‑unit auctions: A case study of the Texas electricity spot market," The RAND Journal of Economics, Vol. 39 (2008), at pp. 86-114; Hortaçsu, A., Luco, F., Puller, S. L., & Zhu, D., "Does strategic ability affect efficiency? Evidence from electricity markets," American Economic Review, Vol. 109 (2019), at pp. 4302-4342.

76.    *Second*, publishers and bidders in online display advertising typically participate in many auctions, with this repeated interaction creating opportunities to experiment, learn, and improve strategies over time. Empirical evidence from online display advertising auctions suggests that agents learn to respond to auction design changes over time, and eventually come to adopt near-profit-maximizing strategies.[112] This research suggests that strategic adaptation is not always immediate and that there is heterogeneity in the speed of learning, which implies that evidence about the impact of new programs gathered over short periods of experimentation must be evaluated with care: it may fail to capture eventual strategic adaptations and heterogeneity in effects over time and across agents.

77.    *Third*, intermediaries that serve publishers and advertisers compete for business by offering optimization tools, so that even smaller advertisers and publishers have access to sophisticated tools to optimize performance. The *stated* objective of many tools therefore offers a window into what they believe their customers—publishers and advertisers—may want. These statements clearly support the hypothesis that publishers and advertisers seek to optimize returns.

78.    Here are some examples. On the supply-side, Microsoft's Xandr offers "yield optimization tools to maximize the value of […] inventory."[113] Pubmatic offers tools to "maximize advertising revenue."[114] Criteo's Commerce Grid SSP gives "media owners

---

[112] *See, e.g.*, Goke, S., Weintraub, G. Y., Mastromonaco, R., & Seljan, S., "Bidders' responses to auction format change in internet display advertising auctions," SSRN (Jan. 30, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4021221.

[113] Xandr, "Publisher Platforms," Microsoft Advertising, https://about.ads.microsoft.com/en-us/solutions/xandr/publisher-platforms-scaled-buying-selling-solutions, accessed Dec. 13, 2024.

[114] Pubmatic, "Pubmatic SSP: Maximize Advertising Revenue and Control How Your Audiences are Accessed," Pubmatic, https://pubmatic.com/products/pubmatic-ssp-for-publishers/, accessed Dec. 13, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

the control to optimize the monetization of their inventory."[115] Google Ad Manager offers "yield management solutions," including to "[m]aximize revenue in the unified first price auction."[116] Clickio offers floor price optimization tools and other services for publishers to "guarantee maximum revenues."[117] On the demand-side, The Trade Desk offers tools to advertisers to "[m]aximize [their] digital investment" by "[r]each[ing] the right audience and spend[ing] [their] budget more efficiently."[118] Xandr's DSP offers optimization tools to allow advertisers "to get the greatest benefit for the money spent on campaigns."[119] Criteo's smart bidding tool for its advertiser customers "ensures a bid placed for any display opportunity offers the highest yield for clients and publishers."[120] Google Ads offers "[t]ools to help [an advertiser] optimize […] bids" and help with "maximizing [its] Google Ads budget."[121] Google's Display & Video 360 (DV360) offers automation tools to "help make optimal bids to help improve campaign

---

[115] Criteo S.A., "Form 10-K," United States Securities and Exchange Commission (2022), https://www.sec.gov/Archives/edgar/data/1576427/000157642723000023/crto-20221231.htm, accessed Dec. 12, 2024.

[116] Google, "Get comprehensive yield management with Google Ad Manager," Google Ad Manager, https://admanager.google.com/home/resources/feature-brief-yield-management/, accessed Dec. 11, 2024.

[117] Clickio, "Monetization," https://clickio.com/monetization/, accessed Dec. 12, 2024.

[118] The Trade Desk, "DFP Features[:] Integrated planning and activation," https://www.thetradedesk.com/us/our-platform/dsp-demand-side-platform/plan-campaigns, accessed Dec. 13, 2024.

[119] Xandr, "Understanding Optimization," Xandr Documentation Center, https://docs.xandr.com/bundle/monetize_monetize-standard/page/topics/understanding-optimization.html, accessed Dec. 13, 2024

[120] Criteo, "What You Need to Know About First-Price Auctions and Criteo," Criteo Updates (Sept. 26, 2023), https://www.criteo.com/blog/first-price-auctions/, accessed Dec. 12, 2024.

[121] Google, "Evaluate and optimize your bids," Google Ads Help, https://support.google.com/google-ads/answer/7085711?hl=en, accessed Dec. 11, 2024; Google, "10 tips for Google Ads budget management," Google Ads Resources (Mar. 20, 2023), https://ads.google.com/intl/en_us/home/resources/articles/stretching-your-google-ads-budget/, accessed Dec. 11, 2024. *See also* Deposition of N. Jayaram (DOJ CID) (Sept. 17, 2021), at 370:6-370:8 ("The goal of predicted highest other bid is to optimize towards the advertiser's surplus."); "AdX/AdMob first price bidder - for perf" (Sept. 26, 2019), GOOG-DOJ-AT-00573492, at -495 ("Surplus maximization to determine the optimal bid: First-price bid is the one that maximizes the advertiser surplus = advertiser value - payout.").

performance."[122,123] The stated objectives of these tools offered by intermediaries suggest that optimizing returns is a leading goal of advertisers and publishers and that their customers outsource many decisions to intermediaries to reduce the burden of understanding all the details of auction rules and optimizations themselves.

### 3. Types of Sealed-Bid Auctions

79.    Auctions can use a variety of rules to determine allocations and payments. Different auction designs create different incentives for auction participants.

### a) Second-Price Auctions and Threshold Pricing

80.    A common auction practice early in the history of the online ad industry was the use of **second-price auctions**, in which the highest bidder for an impression wins and pays a price equal to the larger of the floor price or the second-highest bid. The second-price auction rule is the sealed-bid implementation of the well-known **ascending auction**,[124] in which the auctioneer asks for bids at the floor price and gradually increases the price until just one bidder remains. The winning bidder in an ascending auction pays a price that is determined by the drop-out price of the *second-to-last-remaining* bidder, just as the winning bidder in the second-price sealed-bid auction pays a price determined by the bid of the *second-highest* bidder.

---

[122] Google, "Enhanced automation," Display & Video 360 Help, https://support.google.com/displayvideo/answer/6130826?hl=en, accessed Dec. 11, 2024

[123] The surplus-maximization objective of DV360 is also clearly captured in the design of Poirot, as discussed further in Section VII.

[124] *See* Vickrey, William, "Counterspeculation, auctions, and competitive sealed tenders," Journal of Finance, Vol. 16 (1961), at pp. 8-37.

81. The second-price auction is the canonical member of a class of auctions that uses **threshold pricing**, meaning that the price paid by the winning bidder does not depend on its winning bid but is instead the lowest amount (called the **threshold**) that the winning bidder could have bid to win the auction, holding all other bids fixed. Auctions with threshold pricing can vary in their winner-selection rules: the second-price auction is the auction using threshold pricing in which the highest bid always wins.[125] All auctions with threshold pricing have the following important property: once an advertiser has determined its value for an impression—the maximum price it is willing to pay for that impression—it can maximize its profit in the auction simply by bidding that value.[126, 127] An auction with this property is called **bidder-truthful** (or sometimes **incentive-compatible** or **strategy-proof** or **truthful**).

82. To see why it is always optimal with threshold pricing for the advertiser to bid its value, $v$, there are two cases to consider. First, suppose that the minimum bid needed to win the auction is some amount $x$, which is less than $v$. Then, bidding the advertiser's value $v$ will win the auction and, by the threshold pricing rule, the winner will pay $x$. Any other bid either wins the auction at the same price or loses the auction (guaranteeing zero payoffs), so no other bid can do better: bidding $v$ maximizes the bidder's surplus. Second, suppose

---

[125] As another example, a publisher's online ad auction might specify that some favored bidder wins an impression if its bid plus 25% is higher than any other bid; otherwise, the item goes to the highest other bidder. Using this rule to determine the winner results in the favored bidder, when it wins, paying a discounted threshold price. For example, if the highest bid from a regular customer is 100 and the favored bidder bids more than its threshold of 80, then it wins and pays a price of 80, even if its own bid was, say, 90.

[126] Milgrom, Paul, and Segal, Ilya, "Clock auctions and radio spectrum reallocation," Journal of Political Economy, Vol. 128 (2020), at pp. 16-18 ("Proposition 3. Any threshold auction is strategy-proof. Conversely, any strategy-proof direct auction has a monotonic allocation rule, and if V=R^N_+, it must be a threshold auction.").

[127] Bidder-truthfulness applies to a single auction for an impression. When the same agents interact in multiple auctions, advertisers may have different incentives leading them not to bid their values. For example, an advertiser may not want to reveal that it has a high value for an impression if it anticipates that the publisher will change its floor price in subsequent auctions to take advantage of that information.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

that the minimum bid to win the auction is some amount $y$, which is greater than $v$. Then, bidding the advertiser's value $v$ will lose the auction, but any winning bid would require that the advertiser pay a price $y$, which is more than its value. So, in this second case, too, there is no bid that earns the advertiser more than bidding its value $v$.

83. Bidder-truthful auctions reduce bidding errors and the costs of bidding because they eliminate any need for an advertiser to assess who else might be bidding, how much they might bid, or the publisher's floor price. In non-bidder-truthful auctions, each advertiser's bid depends on all of these factors. I have previously advised auctioneers to adopt bidder-truthful auctions, highlighting the importance of easy bidding.[128]

84. Other auctions using threshold pricing besides the second-price auction were used in several of Google's programs, as described later in this report. Threshold pricing is special not just because it results in bidder-truthful auctions, but also because these are the *only* bidder-truthful auctions. There are no others.[129] Any auction in which a winning bidder pays something other than its threshold price is not bidder-truthful, and as a consequence, incentivizes bidders to choose bids that differ from their values for the good being sold.

---

[128] When the US Federal Communications Commission sought to repurchase certain television broadcast rights, I advised a bidder-truthful auction so that for any television broadcaster, "the hardest part of bidding will be to determine its value of continuing to broadcast. Once it knows that value, the rest is easy. The bidder cannot do better than to agree to accept any price greater than its value of continuing to broadcast and then to exit if its offered price falls lower than that. By bidding in this way, the station will obtain its best possible price[…]." Auctionomics and Power Auctions, "Incentive Auction Rules Option and Discussion," Federal Communications Commission (Sept. 12, 2012), https://docs.fcc.gov/public/attachments/FCC-12-118A2.pdf, accessed Dec. 7, 2024, at p. 3.

[129] For proof, notice that if the price paid by a winning bidder depends on its bid, then instead of bidding truthfully, a bidder prefers to make the winning bid that results in the lowest price. *See* Milgrom, Paul, and Segal, Ilya, "Clock auctions and radio spectrum reallocation," Journal of Political Economy, Vol. 128 (2020), at pp. 16-18.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

85.     Google recognized the advantages of bidder-truthful auctions, explaining them as follows: "It's faster, less costly, and more fair to the less sophisticated advertisers to structure the auction in favor of true value."[130] The lower transaction costs associated with bidding in a bidder-truthful auction encourage advertisers to participate on Google's platform, which increases thickness, tending to improve the efficiency of its allocations and increase the prices paid to publishers.[131]

86.     Second-price auctions have an additional important benefit: if bidders bid truthfully, then the price determined by the auction for each impression is a **market-clearing price**. A market-clearing price is one at which supply equals demand—one bidder is willing to pay the price and no losing bidder is willing to pay more. Whenever an impression is transacted at a market-clearing price, that transaction maximizes the economic welfare that can be created from the sale of the impression. It can be proved mathematically that the second-price auction is the only bidder-truthful auction that always transacts the impression at a market-clearing price.[132]

**b) First-Price Auctions**

87.     In a first-price auction, the bidder with the highest bid wins and pays a price equal to its bid for the item (unless the highest bid is below the floor price, in which case the item is unallocated). In contrast to the second-price auction, *every* bidder in a first-price auction needs to **shade** its bid—that is, choose a bid *less* than its value—in order to stand any

---

[130] "GDN Auction Overview" (Oct. 11, 2014), GOOG-AT-MDL-001094067, at -085.

[131] *See, e.g.*, Vickrey, William, "Counterspeculation, auctions, and competitive sealed tenders," Journal of Finance, Vol. 16 (1961), at pp. 8-37.

[132] *See* Milgrom, Paul, *Putting auction theory to work*, Cambridge University Press (2004), at pp. 71-73.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

chance of making a profit.[133] From a bidder's perspective, its optimal bid shading results from a tradeoff: a higher bid increases the probability of winning an impression, but it also increases the bidder's price for the impression if it wins. The optimal shading calculation depends on the bidder's estimates or guesses about what others might bid: the bidder should reduce its bid more if it expects lower bids from others. Guessing the identities and bids of others for each different impression is a costly and error-prone activity that can lead to inefficiency when bidders' guesses are wrong. In a first-price auction, the winner may be a bidder who does not have the highest value for the impression. Even when the impression is allocated correctly, the winning bid may not be a market-clearing price: after seeing the outcome, some losing bidders may have been willing to pay more than the winning bid for that impression.

88. While second-price auctions are bidder-truthful, first-price auctions have their own advantages. One important benefit of the first-price auction is its transparency. Unlike in a second-price auction, the winning bidder always pays its bid, so it does not need to trust the auctioneer's computations or reports of floor prices and other bids in order to confirm that the price it pays was determined properly. Among sealed-bid auctions, only first-price auctions are what auction theorists have called **credible auctions**, which means that the auctioneer has no profitable way to deviate that is not immediately detectable by the winning bidder.[134] This credibility property is one reason that first-price

---

[133] Bid "shading" is a term of art in the economic theory of auctions, dating back to at least the seminal work of William Vickrey. *See* Vickrey, William, "Counterspeculation, auctions, and competitive sealed tenders," Journal of Finance, Vol. 16 (1961), at pp. 12-13 ("On the other hand, if traders have a fairly confidently held expectation that the equilibrium price will fall within a certain narrow range, there may be an indirect community of interest in shading the reported demand and supply curves outside this range in the direction of greater inelasticity"). The term has also been used to describe bid optimization in the online display advertising industry.

[134] Akbarpour, M., and Li, S., "Credible auctions: A trilemma," Econometrica, Vol. 88 (2020), at p. 427.

auctions have been preferred in some applications. I discuss additional advantages of the first-price auction format for online display advertising in [Section III.C.4](#) below.

### c) Other Auction Formats

89. Other auction formats exist and lead to different incentives for auction participants. One example is the **1.5-price** auction, which charges the winning bidder an amount halfway between its own bid and the second-highest bid. In the 1.5-price auction format, bidders optimize by shading their bids, but to a lesser extent than in the first-price auction. Another example, relevant in online display advertising, is a non-transparent auction, in which the auctioneer might claim to calculate winners and payments according to one rule, but actually charges bidders according to another rule. Because it is so easy to detect the first-price rule, an auctioneer running a non-transparent auction might claim to use a second-price auction but actually use the 1.5-price rule, hoping to confuse bidders into bidding too much, increasing the auctioneer's profit. When non-transparent auctions are possible, optimizing bidders must rely on data about past auction performance and/or on experiments to determine optimal bids into the auction.

### d) How Publishers Set Floor Prices

90. Setting a floor price can help increase publisher revenues by ensuring that no impression is ever sold at a very low price. Determining the optimal floor price, however, requires a subtle strategic computation. Raising the floor price may sometimes increase auction revenue, but if it is set too high, there might be no bidder willing to bid more than the floor price. Then, the impression may remain unsold, leading to zero revenues for the publisher and zero surplus for the advertiser.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

91. To determine a floor price that maximizes the expected revenue on an impression, a publisher must make a probabilistic assessment of the costs and benefits of each possible floor price, trading off the possible benefit of an increased price in the case that the impression sells against the cost of an increased likelihood that the impression is unsold.

92. As an example of this computation, suppose that a publisher is selling an impression to a single bidder using a second-price auction and knows that it is worth either $1, $2, or $3 to that bidder, each with equal probability. If the publisher sets a floor price of $3, it expects to sell the impression for $3 with probability ⅓, yielding an expected revenue of $1. If it sets a floor price of $1, it will always sell the impression for $1. To maximize its expected revenue, the publisher should set a floor price of $2, which sells the impression with probability ⅔, leading to an expected revenue of $1.33.[135]

93. The above example shows that setting a floor price properly can increase revenues for a publisher in a second-price auction. Setting a floor price can also increase revenues for a publisher in a first-price auction, by reducing the extent to which some bidders shade their bids.

94. In practice, in repeated auction settings, publishers often use simulations on recent auction data or experiments (sometimes known as "A/B tests") of different floor prices on live auctions, and choose the floor price that led to the highest revenue in those simulations or experiments.[136] For example, ████████████████████████
████████████████████████████████████████████

---

[135] The publisher could choose floor prices other than $1, $2 or $3, but—by similar calculations to the ones above—any such floor price leads to lower expected revenues than the floor price of $2.

[136] *See, e.g.*, Rhuggenaath, J., Akcay, A., Zhang, Y., & Kaymak, U., "Setting reserve prices in second-price auctions with unobserved bids," INFORMS Journal on Computing, Vol. 34 (2022), at pp. 2950-2967.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*



[137] while a ██████████████████████████████████████████████████████████████████████████████ [138] There are supply-side intermediaries who assist in this process, as well, including Clickio, which offers floor price optimization tools and other services for publishers to "guarantee maximum revenues."[139]

### 4. The Industry's Switch from Second-Price Auctions to First-Price Auctions

95.   Early online ad exchanges used second-price auctions to allocate online display advertising impressions.[140] But as online display advertising evolved, new challenges emerged that threatened to undermine the performance of second-price auctions and eventually led many ad exchanges to switch auction rules.

96.   *First*, a DSP bidding on behalf of multiple advertisers could increase its profits by submitting only one bid into a second-price auction, instead of submitting bids on behalf of all its advertisers,[141] while continuing to charge advertisers the same threshold prices (preserving the bidder-truthfulness of the auction). If a DSP pursues that strategy, then whenever it hosts the two highest bids for an impression, it ends up paying less for the impression than it would if it submitted bids on behalf of all its advertisers. For example, suppose that the DSP's two highest bids are $12 and $10 and the highest bid submitted by

---

[137] ████████████████████████████████████████████████████████████████████████

[138] ████████████████████████████████████████████████████████████████████████

[139] Clickio, "Monetization," https://clickio.com/monetization/," accessed Dec. 12, 2024.

[140] "DV360, Third Party Exchanges, and Outcome-Based Buying" (Oct. 16, 2018), GOOG-DOJ-12038253, at -267 (Figure: "Impression Share (US Ad Inventory)"; "Fair Second-Price Auction": 75% in Dec. 2017, 33% in March 2018).

[141] Submitting bids determined by the values of the two highest-value advertisers would lead to the same outcomes in a second-price auction as submitting bids on behalf of all advertisers.

any other demand source is $8, all higher than the auction's floor price. If the DSP submits both of its bids to the auction, the DSP wins the auction and pays its second bid of $10. If the DSP instead submits just the bid of $12 (and assuming no change in the auction's floor price and the bids of other bidders), then it wins the auction and pays the new second-highest bid of $8. This does not imply, however, that the winning advertiser benefits: by charging the winning advertiser its threshold price, that advertiser pays $10 and the DSP pockets the $2 difference between that amount and the auction's clearing price ($10 - $8), increasing its profits.[142] As in this example, the general result of this DSP's **one-bid strategy** is that the publisher loses revenue. With this strategy, the price paid to the publisher is not a market-clearing price (because at least two advertisers would be willing to pay more than the price of $8), and the DSP can earn an additional profit just by keeping the price difference. Some non-Google DSPs are reported to have done exactly that,[143] and Google observed that many bidders did not submit two bids into the AdX auction.[144]

97.    *Second*, some publishers adopted a tactic called **multi-calling**.[145] Instead of calling the exchange with the floor price that it would set in a single auction, these publishers would first call the exchange with an inflated floor price. If buyers bid truthfully, this first call

---

[142] To see that bidders' incentives are not affected by the DSP strategy, note that the allocations and payments for the bidders are the same under the DSP strategy as in a second-price auction.

[143] *See, e.g.*, Ross Benes, "Ad buyer, beware: How DSPs sometimes play fast and loose," Digiday (May 25, 2017), https://digiday.com/marketing/dsp-squeeze-buyers/, accessed Dec. 12, 2024 ("[S]ome [DSPs] bill based on a clearing price for the auction that occurred within the DSP's platform that can be higher than the price that won the impression on the open exchange, and the DSP will keep the difference.").

[144] "Understanding the AdX Auction" (Oct. 2014), GOOG-DOJ-12443562, at -567 ("[O]ther bidders are allowed to [second-price themselves], but often do not").

[145] "Solving the Multi-Call problem" (Nov. 25, 2019), GOOG-AT-MDL-001397473, at -475 ("Background 2: The multi-call problem").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

might cause a bidder to win the auction at the inflated price. If there was no winner at the high price, the publisher would call the exchange again, offering the same impression with a lower floor price. As a result, if the publisher engages in multi-calling, it is not generally optimal for an advertiser to bid its value: the winning advertiser may be able to buy the impression at a lower price by reducing its bid, letting the impression go unsold in the first auction, and then winning in a later auction at a lower price. Multi-calling destroys the simplicity of threshold pricing and so complicates bidding for advertisers, forcing them to strategize about how best to respond to the publisher's practice and make guesses about the publisher's true floor price and about others' bids. Multi-calling also increases processing costs and adds latency, damaging the end user's online experience and leading to a reduction in advertising effectiveness.[146]

98.   *Third*, as online display advertising platforms evolved to accept more bids from different demand sources in each auction, **self-competition**—which occurs when an advertiser submits multiple bids for the same impression—became a larger concern for advertisers. Self-competition can occur as a result of **advertiser multi-homing**,[147] in which an advertiser uses multiple DSPs to submit bids for an impression, or **DSP multi-homing**,[148]

---

[146] *See, e.g.*, Oded Poncz, "Traffic duplication might be a bigger problem than ad fraud," AdExchanger (Jan. 11, 2016), https://www.adexchanger.com/data-driven-thinking/traffic-duplication-might-even-be-a-bigger-problem-than-ad-fraud/, accessed Dec. 12, 2024 ("Another side effect of bid request duplication is that re-auctioning a bid takes time. In some cases, this could even become apparent to the end user.").

[147] In a 2021 survey, respondent advertisers and ad agencies (who all spent a minimum of $1M annually on digital ads) used an average of 3.4 DSPs and planned to use 5.9 DSPs the following year. *See* Advertiser Perceptions, "DSP Report: Demand-Side Platforms" (2021), GOOG-DOJ-AT-02524665, at -666, -670. *See also, e.g.*, ███████████████████ ████████████████████████████████████████████████████████████████████████████

[148] *See, e.g.*, ███████████████████████████████████████████████████████████████ ███████████

in which a DSP submits bids into multiple exchanges on behalf of a single advertiser. When the same bidder submits multiple bids in a second-price auction, it may wind up making both of the two highest bids, with its own second-highest bid setting its price. In such cases, the advertiser would pay a lower price if its second bid were lower or omitted. Bidders would need to adjust their bids to avoid this possibility, requiring more complicated bidding strategies.

99. *Fourth*, some exchanges tried to increase their profits by using **non-transparent auctions**, claiming to calculate the winner's price using a second-price rule, but actually charging winners a larger amount, for example by using the 1.5-price rule described earlier.[149] Such practices make participation in the auction less safe for advertisers and reduce trust in online display advertising intermediation more generally, harming other exchanges and economic welfare. In order to protect against non-transparent auctions, bidders would need to invest in costly technology to detect exchanges using non-second-price auction rules and to optimize bids into those exchanges.

100. Many intermediaries adopted practices to reduce the potential harms associated with the four challenges I described above,[150] and eventually ad exchanges across the industry responded by switching away from a second-price auction format. Most exchanges,

---

[149] "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -635 ("Dirty [auctions are] called second price, but really more like first price"; "Dirtiness is introduced using a new type of floor called a 'Soft-floor' […] to achieve a continuum of auctions from second price […] to 1st price […], opaque to the advertiser"; "All these auctions [on exchanges United, AdX, AppNexus, OpenX, Pubmatic] are 'second price,' however the auction discount (cost/bid) varies widely.")).

[150] For example, Projects Bell and Poirot at Google were designed to respond to multi-calling and non-transparent non-second-price auctions, respectively. Non-Google display advertising intermediaries also introduced similar products, as demonstrated in Table 1 and discussed below.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

including Google's AdX, made the switch to a first-price format between 2017 and 2019.[151]

101.  The transition to a first-price auction reduced or eliminated the four concerns I listed above. *First*, in a first-price auction, a DSP cannot reduce a publisher's revenue by suppressing its lower bids because each bidder always pays its highest bid. *Second*, bidders that optimize their bids in first-price auctions using experimentation can reverse some of the losses to multi-calling, making it less likely for that tactic to be profitable.[152] *Third*, in a first-price auction, a bidder gains some protection against self-competition, because unlike in a second-price auction, its losing bids do not affect its own price.[153] *Fourth*, no auctioneer can profit from deceiving a bidder about the correct price: the winning bidder can easily check whether its payment equals its bid.

---

[151] *See* "DV360, Third Party Exchanges, and Outcome-Based Buying" (Oct. 16, 2018), GOOG-DOJ-12038253, at -267 (Figure: "Impression Share (US Ad Inventory)"; "First-price auction": 6% in December 2017, 43% in March 2018). These figures would not include AdX's later transition to a first-price auction in 2019. *See also* Email from E. Lipkovitz to ▮▮▮▮▮, et al., "Re: Offering 1st price to publishers?" (Sept. 5, 2017), GOOG-DOJ-05272070, at -075 ("Other exchanges started the migration to 1st price auction recently arguing th[at] it is the best way to integrate it with HB.").

[152] In a first-price auction, bidders typically experiment to identify optimal bids, and—in the face of multi-calling tactics by publishers—such experiments would identify benefits from reducing bids more to multi-calling publishers than non-multi-calling publishers, resulting in similar effects as Project Bell, discussed in Section V below.

[153] A multi-homing advertiser still needs to be mindful of self-competition in first-price auctions, in case one of its buying tools learns to bid more aggressively in response to that same advertiser's higher bids via different buying tools (driving up prices for the advertiser). This is one reason for the emergence of so-called "supply path optimization tools" which help bidders optimize the platforms on which they bid for inventory. *See* Yuyu Chen, "WTF is supply path optimization?," Digiday (May 22, 2023), https://digiday.com/media/what-is-supply-path-optimization/, accessed Dec. 12, 2024 ("[Supply path optimization] is essentially an algorithm used by demand-side platforms to streamline how they interact with supply-side platforms. Each DSP has developed its own strategy for supply path optimization: Some use it to pick up the bids that are most relevant and have the highest chance of winning, while others use it to turn off SSPs that are not implementing second-price auctions, according to Tom Kershaw, CTO for ad exchange Rubicon Project. […] Two major reasons [why it is important for DSPs]: Bid duplication and various auction mechanisms used by SSPs.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### D. Google's Products

102.    Along with many other companies, Google provides a variety of intermediary services in online display advertising. In this report, I study the practices of a number of Google's intermediaries: on the demand-side, **Google Ads** and **Display & Video 360 (DV360)**, and on the supply-side, **Google Ad Manager (GAM)**, which incorporates advertising exchange functionality (formerly known as **AdX**) and publisher ad server functionality (formerly known as **DFP**).

### 1. Display & Video 360

#### a) How Advertisers Use DV360

103.    **DV360** (formerly known as DoubleClick Bid Manager or DBM) is a demand-side platform that offers tools for "planning [display advertising] campaigns, […] designing and managing creative[s], organizing audience data, finding and buying inventory, and measuring and optimizing campaigns,"[154] enabling advertisers to "manage their reservation, programmatic, and programmatic guaranteed campaigns across display, video, TV, audio, and other channels, all in one place."[155] As I described above, DV360 offers automated tools to "help make optimal bids to help improve campaign

---

[154] Google, "Display & Video 360 overview," Display & Video 360 Help, https://support.google.com/displayvideo/answer/9059464?hl=en, accessed Dec. 11, 2024

[155] Google, "Display & Video 360: An integrated solution for end-to-end advertising campaigns," Display & Video 360, https://services.google.com/fh/files/misc/display_and_video_360_product_overview.pdf, accessed Dec. 13, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

performance."[156] DV360 allows advertisers to purchase ads from many sell-side platforms, including AdX, Index Exchange, OpenX, Rubicon, and others.[157]

104.    Advertisers on DV360 can set up their campaigns in multiple ways. In the early days of DV360, most advertisers used DV360 to set up **fixed CPM** campaigns, in which the advertiser would report to DV360 the characteristics of the impressions they would like to purchase with each campaign and a fixed CPM—cost per mille (thousand impressions)—and DV360 would use that CPM to bid in auctions for those impressions.[158] Fixed CPM bidding is still offered as an option on DV360, but between 2017 and 2020, the majority of DV360 advertisers switched to **automated bidding** campaigns,[159] in which the advertiser reports an objective to DV360 (for example, "maximize clicks" or "maximize conversions" subject to a budget) and DV360 applies prediction and optimization algorithms to "dynamically determine the optimal bid price for a given impression for an advertiser."[160] More recently, DV360 introduced **custom**

---

[156] Google, "Enhanced automation," Display & Video 360 Help, https://support.google.com/displayvideo/answer/6130826?hl=en, accessed Dec. 11, 2024.

[157] Sissie Hsiao, "How our display buying platforms share revenue with publishers," Google Ad Manager (June 23, 2020), https://blog.google/products/admanager/display-buying-share-revenue-publishers/, accessed Dec. 11, 2024 ("Using Display & Video 360, these advertisers can buy ads on more than 80 publisher or sell-side platforms including AT&T, Comcast, Index Exchange, OpenX, Rubicon Project, MoPub and others.").

[158] "DV360 optimizations ENG deep dive" (Jan. 24, 2020), GOOG-DOJ-11733552, at -553 ("DV360 three years ago: Mostly fixed CPM manual bidding").

[159] "DV360 optimizations ENG deep dive" (Jan. 24, 2020), GOOG-DOJ-11733552, at -555 ("Impact on auto-bidding adoption: ▮ now").

[160] "Optimized Fixed Bidding in DV360" (Mar. 2019), GOOG-DOJ-05326023, at -023.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**bidding**, which allows advertisers to input their own algorithms to determine bids on an impression-by-impression basis.[161]

### b) How DV360 Determines Bids and Payments

105.   When DV360 receives a bid request from an exchange, it first identifies the advertiser campaigns that are targeting impressions with the characteristics associated with the bid request.[162] As I discuss further in connection to Project Elmo in Section VI below, in order to ensure that advertiser budgets are not depleted too quickly, DV360 then applies its **budget throttling** algorithm to determine a selection of eligible advertisers for participation in the auction for the impression. Among those advertisers, DV360 then determines the advertisers with the highest bids for the impression net of any fees and submits bids to the exchange.[163] Currently, DV360 uses its 1P bidder for bids into AdX and third-party exchanges.[164] Previously, DV360 used Poirot to bid, which first

---

[161] "DV360, Third Party Exchanges, and Outcome-Based Buying" (Oct. 16, 2018), GOOG-DOJ-12038253, at -270 ("Rule based custom bidding is a new bidding strategy that we are building together with the KIR team. It allows our advertisers and agencies to express what they really value in advertising and optimize towards that value. […] Once they know what features and signals they need, they can […] [w]rite a script on how to evaluate the value of a query in the most generic form. Upload the script to us. We take this script and score all of their historical impression data. Then we learn from that data to bid optimally on future received queries."); Google, "Custom bidding overview and limitations," Display & Video 360 Help, https://web.archive.org/web/20230608031805/https://support.google.com/displayvideo/answer/9723477?hl=en, accessed Dec. 11, 2024 ("Custom bidding scripts and goals let you define the value of an impression that aligns with your campaign's goals. Display & Video 360 uses the algorithm from your custom bidding scripts or goals to determine the score it assigns to impressions. The outcome of previously scored impressions helps train the custom bidding model to help optimize your bidding strategy.").

[162] "DV360 product and architecture" (Oct. 31, 2018), GOOG-DOJ-15407321, at -363 ("DBM finds fitting Campaigns").

[163] "DV360 product and architecture" (Oct. 31, 2018), GOOG-DOJ-15407321, at -363 ("Mixers run auctions between campaigns/systems").

[164] "DV3 Unified Bid Lowering model for Non-Transparent auction" (July 2022), GOOG-AT-MDL-009589520, at -520 ("Exchanges (3rd Party Exchanges) which run non-transparent auctions (HOBs unavailable), were excluded in this system. In this launch we build models ███████████████████████████████ ████.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

determined whether an exchange was using a non-second-price auction and, if so, optimized a bid for that auction.[165] I discuss Poirot in detail in Section VII.

106.  If the DV360 bid wins the auction, the advertiser with the highest bid in DV360 is allocated the impression and pays the clearing price of the exchange auction, plus any fees charged by DV360. The fees charged to a given advertiser are determined by contracts negotiated between Google and the advertiser, and they include platform fees that are typically a fixed percentage of the total price of each impression.[166] Prior to August 2023, DV360 advertisers could also elect to be charged for impressions on a "pay per outcome" basis, in which they paid only if the end user engaged with the ad according to some predetermined outcome measure (similar to payments by some Google Ads advertisers, discussed below).[167, 168]

---

[165] "DV360 product and architecture" (Oct. 31, 2018), GOOG-DOJ-15407321, at -363 ("DBM Frontend translates the Bid for the Exchange"); "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -809 ("Over half of DBM bidding goes through third-party exchanges […] Fixed CPM bidders have the same bid in these unclean exchanges as they do in clean exchanges […] The goal of Poirot is to discover the exchanges that deviate from second pricing and bid appropriately on these").

[166] *See* "FY22 - DV360 (DBM) Narrative" (July 12, 2023), GOOG-AT-MDL-008930706, at -713-715 ("DBM Partners (a term used interchangeably with advertisers or customers) must have an Advertising Platform Agreement (APA) or Affiliates Adopting Agreement (AAA) in place with Google in order to use DoubleClick products. […] The standard DBM deal structure is to charge customers a platform fee (*i.e.* license/technology fee) based on transaction type."). Google may also charge advertisers on DV360 ad serving fees for third-party services or technologies, and fees for access to certain types of data from third-party providers.

[167] *See* "Pay per Outcome in DBM" (Feb. 10, 2018), GOOG-AT-MDL-009590288, at -289 ("In this document, we discuss a detailed design to make outcome based buying possible on DBM.").

[168] This service has now been deprecated. *See* Google, "Coming soon: April 17, 2023 edition," Display & Video 360 announcements (Apr. 17, 2023), https://support.google.com/displayvideo/answer/13511229, accessed Dec. 11, 2024 ("Outcome based buying will be deprecated on August 1 (previously communicated as July 1), 2023").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## 2. *Google Ads*

### a) How Advertisers Use Google Ads

107. **Google Ads** (formerly known as AdWords) is a buy-side tool that permits advertisers to create ad campaigns that run across different formats, including search and display ads.[169] In this report, I focus on the online display advertising functions of Google Ads on web properties other than those owned and operated by Google.

108. Advertisers on Google Ads specify campaign goals (*e.g.*, maximizing clicks or conversions) and constraints for a campaign (*e.g.*, types of end users to target, maximum bids or budgets), and Google Ads uses that information to determine bids for impressions.[170] Advertisers can also specify "manual" bids for impressions on a CPC (cost-per-click) or CPM basis.[171] In this report, for simplicity, I use the word "bid" to refer to either the manual bid reported by the Google Ads advertiser or the bid determined by Google Ads as a function of the advertiser's reported campaign goals, whichever is relevant for that advertiser.

109. Originally, beginning in 2003, advertisers could use Google Ads to buy third-party display advertising inventory only from publishers using AdSense, a Google supply-side

---

[169] Google, "Google Ads," https://ads.google.com/intl/en_us/home/, accessed Dec. 11, 2024.

[170] Google, "Determine a bid strategy based on your goals," Google Ads Help, https://support.google.com/google-ads/answer/2472725, accessed Dec. 11, 2024 ("Depending on which networks your campaign is targeting, and whether you want to focus on getting clicks, impressions, conversions, or views you can determine which [bidding] strategy is best for you.").

[171] Google, "Determine a bid strategy based on your goals," Google Ads Help, https://support.google.com/google-ads/answer/2472725, accessed Dec. 11, 2024 ("Manual CPC bidding: This lets you manage your maximum CPC bids yourself. […] CPM: With this bid strategy, you'll pay based on the number of impressions (times your ads are shown) that you receive").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

product.[172] After the acquisition of DoubleClick and the 2009 launch of AdX 2.0, advertisers could also use Google Ads to purchase inventory from AdX.[173] Since the beta launch of **AwBid** in May 2013 and its general launch in June 2015, advertisers have also been able to use Google Ads to purchase some types of inventory through non-Google ad exchanges.[174] Google Ads had its own bid optimization program for non-Google exchanges called **Marple**, which worked similarly to Poirot on DV360, optimizing bids for Google Ads advertisers in non-second price auctions.[175] The AwBid program has grown over time, but the majority of Google Ads' exchange spend occurs on AdX.[176]

### b) How Google Ads Determines Bids into AdX: The Internal Auction

110.    When Google Ads is called to bid on an impression, it uses an internal process which I will call the **Google Ads internal auction** (and which Google employees refer to as the

---

[172] Email from ▮▮▮▮▮▮ to ▮▮▮▮▮▮ "Final Google AdSense press release" (June 8, 2003), GOOG-DOJ-01805208, at -208 ("With Google AdSense, publishers serve text-based Google AdWords ads on their site and Google pays them for clicks on these ads[.]").

[173] Email from ▮▮▮▮ to ▮▮▮▮ "Re: [Adsense-eng-wat] [Adsense-eng] Re: [Ads-engdirs] Doubleclick Ad Exchange 2.0 - Launched!" (Sept. 19, 2009), GOOG-AT-MDL-010836318, at -318 ("The team has done a great job […] to also go beyond in some important areas, *e.g.* […] integration with Adsense and Adwords.").

[174] Email from ▮▮▮▮ to ▮▮▮▮ "Fwd: [adsense-doubleclick-pm] Launch of AWBid: Cross-exchange Buying for AdWords Remarketing" (May 9, 2013), GOOG-DOJ-09916352, at -352 ("I am happy to announce the launch of AWBid in a closed beta in North America. AWBid stands for AdWords Bidder and enables cross-exchange buying for AdWords remarketing campaigns."); Email from ▮▮▮▮▮▮ to E. Lipkovitz, "[Launch 127698] AWBid Cross-exchange Pilot for AdWords Remarketing" (Jan. 26, 2015), GOOG-DOJ-14514871, at -871 ("AWBid (AdWords Bidder) will allow AdWords campaigns to buy inventory on third party exchanges via RTB integration.").

[175] "Poirot for AWBid Design Doc" (Sept. 10, 2018), GOOG-DOJ-AT-02512863, at -863 ("Motivated by project Poirot, project Poirot for AWBid (A.K.A Marple) aims to provide optimal bidding strategy for GDN advertisers to buy on non-second price exchanges.").

[176] As of 2019, AwBid accounted for approximately 10% of Google Display Ads' total remarketing spend. *See* "AWBid Overview" (Sept. 5, 2019), GOOG-DOJ-14298902, at -909 ("10.6% of GDA remarketing revenue is from Awbid.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

"Google Display Network (GDN) Auction," the "CAT2" auction, or the "pre-auction"[177] to determine the bid that Google Ads makes and the advertiser to be allocated the impression if that bid wins.[178] In a first step, Google Ads (like DV360) identifies the advertiser campaigns targeting impressions with the characteristics associated with the bid request and applies its budget throttling algorithm to determine a selection of those campaigns for participation in the auction for the impression.[179] Next, Google Ads converts all of its advertisers' bids into the same **eCPM** basis, which is the expected cost per thousand impressions. For example, to convert an advertiser's value from cost-per-click or cost-per-conversion to eCPM, Google Ads multiplies that advertiser's reported value per click or conversion by a predicted click or conversion rate, which it estimates using a proprietary algorithm.[180] I refer to this eCPM bid as the advertiser's **value** for the impression.[181] Next, Google Ads converts each of these values to a "score,"

---

[177] "Dynamic Revshare for AdWords on AdX" (July 13, 2012), GOOG-DOJ-13605152, at -152 ("Currently, AdWords runs an auction (aka CAT2 auction, pre-auction) to select the highest bidding creative (or bundle of creatives) to compete in the AdX auction.").

[178] "GDN Auction Overview" (Oct. 11, 2014), GOOG-AT-MDL-001094067, at -068 ("The GDN auction decides which ads we serve to users for each query."); *see* "Auction Overview" (Dec. 2019), GOOG-DOJ-13979867, at -872-876.

[179] "GDN Auction Overview" (Oct. 11, 2014), GOOG-AT-MDL-001094067, at -068 ("Prior to the auction, the CAT Mixer also applies other filters such as Budget filtering, and so on."); Email from ████████ to ████████, "[Launch 205617] Cookie-based budget throttling for GDN advertisers" (July 23, 2018), GOOG-DOJ-15116057, at -057 ("Cookie-based throttling means keying the throttling decision on cookie instead of making an independent decision per query (see design doc for more details). [...] We are now following up to launch on GDN as well.").

[180] *See* "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶¶ 4-5 ("Sometimes advertisers use automated bidding products, where instead of providing bids directly, they provide goals (*e.g.*, maximize conversions) and constraints (*e.g.*, budget). Automated bidding systems translate these goals and constraints to an impression value […] To determine which bid Google Ads will submit to AdX, Google computes the impression value for eligible ad candidates so that they can be compared in the same cost units."); "GDN Auction Overview" (Oct. 11, 2014), GOOG-AT-MDL-001094067, at -070 ("The GDN auction uses the CPM cost type in micros as the standard unit. […] For other cost types, the auction multiplies the bid by a prediction of user interaction.").

[181] Google sometimes also internally refers to the eCPM as the advertiser's value. *See* "GDN Auction Overview" (Oct. 11, 2014), GOOG-AT-MDL-001094067, at -073 ("Each auction ranks the participants according to a metric named Advertiser Value. Advertiser Value represents the maximum return that an advertiser expects to earn by winning a particular place in the auction."), -074 ("Within GDN, we use MaxEcpm as a proxy for advertiser value").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

deducting the Google Ads revenue share to obtain a "net" bid and adjusting in some cases by factors representing the ad's quality and relevance to the user.[182] Finally, Google Ads bids for the impression on behalf of the highest-scoring advertiser (hereinafter, for simplicity, the "highest bidder" on Google Ads).[183]

111. By calculating bids on behalf of advertisers, Google Ads makes it easier for advertisers to participate effectively in auctions for impressions. Even though Google Ads bids into auctions on a per-impression basis, it allows advertisers that mainly care about user engagement—clicks or conversions—to specify a budget and/or values per-click or per-conversion, and Google Ads uses this information to compute bids in the auction on their behalf. With threshold pricing, this hybrid process is bidder-truthful: advertisers are incentivized to report their values per click or per conversion truthfully to Google Ads. In addition, as long as Google predicts engagement rates accurately, this process provides a valuable service, placing bids on behalf of advertisers that are just the same as if advertisers could compute value per impression themselves and pay for each impression according to the threshold pricing rule. For this reason, in the remainder of this report, when I talk about a Google Ads advertiser's payment for an impression, I am referring to the price it would pay if it paid on a per-impression basis (which would be the same, on average, as their actual payments to Google Ads).

112. The process used to determine the Google Ads bid into AdX on behalf of the highest-scoring advertiser has been updated and improved multiple times to increase

---

[182] "GDN Auction Overview" (Oct. 11, 2014), GOOG-AT-MDL-001094067, at -071 ("The scoring operation produces the final bid for each candidate by including quality-based adjustments. […] During scoring, the auction calculates bid adjustments and fees, then applies the adjustments to the candidates.").

[183] "GDN Auction Overview" (Oct. 11, 2014), GOOG-AT-MDL-001094067, at -080 ("The bid that we send to AdX is the actual maximum that our advertiser is willing to pay.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

advertiser profits in response to changing auction dynamics. Initially, Google Ads had a **two-bid policy**, in which it submitted two bids equal to its estimates of the two highest eCPMs that it had estimated among its advertisers (net of a fixed Google Ads revenue share).[184, 185] After adjusting for its revenue share, the two-bid policy replicated the outcome of the second-price auction in which each of its advertisers submitted and determined bids individually. In 2013, in response to other bidders "increasingly thinning their margins to win on volume, beating GDN's traditional 14% revshare," Google Ads introduced bid optimization programs, **Dynamic Revenue Share for AdWords** (hereinafter **buy-side DRS**) and its successor, **Project Bernanke**.[186] These programs varied the revenue share charged on a per-impression basis, allowing "GDN [] to reduce the revshare markup on bids into AdX, and be more competitive," thereby allowing Google Ads advertisers to win more impressions and allowing publishers to sell more impressions.[187]

113. In 2016, Google Ads launched **Project Bell** which modified its bidding program to protect its advertisers from the publisher tactic called multi-calling, which would

---

[184] In practice, Google Ads may have submitted one bid with a "minimum payment" field, which specified the least price it would pay if its bid won the auction. All bidders in the AdX auction had the option to use the same field. In practice, the effect of such a field is exactly the same as the effect of submitting two bids, so I do not distinguish them in the remainder of this report. *See* "Call-out-Proxy: 1-bid, 2-bid, and min-bid" (Feb. 24, 2012), GOOG-DOJ-03366145, at -145 ("Engineering suggestion: Each ad-network transfers a single bid, with an added field: a minimum price that needs to be paid if its bid wins."); "RPO Exemption Policy V2 Launch Doc" (Nov. 14, 2017), GOOG-DOJ-13212948, at -948 ("The current policy (b/18573816) exempts a buyer network on a specific ad query if we see either more than one open auction bid submitted by the network, or a single bid that specifies a minimum payment.").

[185] I use the term "two-bid policy" to describe the pre-2013 Google Ads bidding program. I note that Google Ads continued to submit two bids into AdX auctions during its later bid optimization programs, but these bids were calculated differently (and, in Project Bernanke, the low bid was sometimes zero).

[186] Email from ███████ to ███████ "Re: GDN Dynamic Revshare launched today!" (Jan. 17, 2013), GOOG-DOJ-04306227, at -227.

[187] Email from ███████ to ███████ "Re: GDN Dynamic Revshare launched today!" (Jan. 17, 2013), GOOG-DOJ-04306227, at -227.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

otherwise reduce advertisers' surplus. In 2018, Google Ads introduced **Project Elmo**, which is a similar program to ensure consistent determination of bids for impressions in the face of publisher multi-calling and bid duplication tactics from non-Google exchanges.[188]

114.  In 2019, Google Ads further revised its bidding program to make it easier for advertisers to bid in response to AdX's transition to a Unified First Price Auction, with this most recent bidding program called **Alchemist**.

115.  I discuss these Google Ads bidding programs and their benefits for advertisers in detail in <u>Section IV</u>, where I also respond to allegations made by Plaintiffs about these programs.

### 3. Google Ad Manager

#### a) How Publishers Use GAM

116.  **Google Ad Manager (GAM)** is a supply-side platform that includes publisher ad server functionality and the real-time auction capabilities of an ad exchange.[189] The ad server capabilities were previously called **DoubleClick for Publishers (DFP)**, and the ad exchange capabilities were previously called **Ad Exchange (AdX)**. These features were integrated into GAM between 2014 and 2018.[190] In this report, where historically

---

[188] Email from ████████████ to ████████, "[Launch 205617] Cookie-based budget throttling for GDN advertisers" (Dec. 6, 2018), GOOG-AT-MDL-015521456, at -456 ("Launch Date [...] 2018-11-19").

[189] *See* "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at n. 1.

[190] Sridhar Ramaswamy, "Introducing simpler brands and solutions for advertisers and publishers," Google Blog (June 27, 2018), https://blog.google/technology/ads/new-advertising-brands/, accessed Dec. 11, 2024 ("[W]e've been working to bring together DoubleClick for Publishers and DoubleClick Ad Exchange in a complete and unified programmatic platform under a new name—Google Ad Manager."). Originally, this merged entity was internally called DRX (DoubleClick Reservations and Exchange). *See* "The 2015 Unified/Integrated DRX Query Tool (a.k.a Project Brundlefly)" (Feb. 5, 2015), GOOG-TEX-00048091, at -093 ("In July 2014, the DoubleClick for Publishers (DFP) and DoubleClick Ad Exchange ads products were merged to form a new product called DoubleClick

appropriate or where the distinction between the ad server capabilities and real-time auction capabilities of GAM is particularly important, I use the older names, DFP and AdX.

117.  Publishers can include code snippets (called **Google Publisher Tags** or **GPTs**) in their web pages to trigger a **call** or **ad request** to GAM.[191] This ad request contains information about the impression opportunity, including the URL of the website, any available user-related information, and characteristics of the impression opportunity (including its size and location on the page).[192] After an ad request is received, GAM uses decisioning logic to determine which ad to serve.[193] Publishers configure this decisioning logic in the GAM interface using various controls, including **line items**.[194]

118.  Line items are GAM's way of encoding information about sources of advertising demand.[195] **Guaranteed line items** are the line items used for campaigns for which the advertiser and publisher have a directly negotiated contract.[196] Guaranteed line items

---

Reservations & Exchange (DRX). The underlying goal of DRX is to unify the various features offered by both DFP and AdX together to create a more streamlined product experience.").

[191] "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -487 to -488 ("GPT is a Javascript library that publishers use to tag their web pages so they can talk to Google Ad Manager backend.").

[192] "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -488 ("The Ad Request contains information about the impression: URL of the site[,] Browser User Agent[,] Slot parameters (Ad Unit, size, key/value pairs)[,] etc. Ad Request also contains user-related information like Cookies, User IDs, etc, that can be later at the backend matched to user demographics and behavior profiles, audience segments, etc.").

[193] "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -492 ("When AdManager receives an ad request, it goes through an ad selection process to pick the Line Item or Yield Group that will serve.").

[194] "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -490.

[195] *See* "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -490 ("Line Items represent campaigns / campaign elements within AdManager.").

[196] Google, "Line item types and priorities," Google Ad Manager Help, https://support.google.com/admanager/answer/177279?hl=en, accessed Dec. 11, 2024 ("Guaranteed line items […] Standard […] Use this line item type for directly sold campaigns when your buyer wants a specific number of impression[s] to serve.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

contain information about the advertiser's campaign goal (*e.g.*, number of impressions, clicks), campaign duration, campaign priority, frequency, and targeting criteria.[197]

**Non-guaranteed line items** can be used to represent sources of demand for **remnant impressions**, which are impressions not allocated to guaranteed contracts. Those sources of demand include ad networks and non-Google ad exchanges.[198] Until the introduction of EDA in 2014 (see Section III.D.3.e below), guaranteed line items were always prioritized over non-guaranteed line items.[199] Other types of line items can be used to trigger calls to auctions on AdX.[200] Different line items may be relevant for different ad opportunities, depending on publisher decisions in the GAM interface.

### b) Early Online Display Advertising and the Waterfall

119. In the early 2000s, online display advertising impressions were primarily sold via either directly negotiated guaranteed contracts between publishers and advertisers, or non-guaranteed contracts between publishers and **ad networks**.[201] Ad networks typically offered to purchase remnant impressions at a fixed or pre-negotiated price, with no

---

[197] *See* "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -490 ("Line Items define things line [sic]: Campaign goal (how many impressions, clicks, etc)[,] Campaign duration[,] Campaign priority[,] Frequency capping (how often should it appear for one user)[,] Targeting (where and to whom should the campaign serve)").

[198] Google, "Line item types and priorities," Google Ad Manager Help, , https://support.google.com/admanager/answer/177279?hl=en, accessed Dec. 11, 2024 ("Any third-party ad network or exchange that provides an appropriate ad tag can be represented by a non-guaranteed line item").

[199] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 12 ("From the launch of Dynamic Allocation in around 2007 until Google introduced Enhanced Dynamic Allocation in 2014, line items determined to be 'guaranteed' on a request were always served without considering AdX, AdSense, or any line items determined to be 'non-guaranteed' on that request.").

[200] "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -491 ("There are 3 main Line Item types in AdManager with subtypes that differ by campaign goal").

[201] *See* "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -413.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

obligation on the publisher to fill a minimum number of impressions.[202] As compared to direct deals, ad networks typically did not give a publisher as much control over the ads that would be placed on its website, or the prices it received for any individual impression.[203] While direct contracts and ad networks continue to play an important role in online display advertising, over time, more sophisticated technologies emerged to allow publishers and advertisers to identify more valuable matches.

120. One technology that emerged early in the online display advertising industry was the capability of ad networks to "passback" an unwanted impression for which they did not have a relevant advertisement, allowing the publisher to offer the impression to other demand sources.[204] This passback capability led to the **waterfall**, in which a publisher specified (using code snippets called "passback tags") a list of demand sources to be contacted sequentially.[205] In a waterfall, the first demand source was offered the

---

[202] "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -413 ("Publishers usually sell their remaining ad space on a non-guaranteed (or 'pre-emptible') basis through their direct sales channel, as well through their indirect sales channel, which may comprise a handful of ad network partners. […] Non-guaranteed ads […] typically sell at a lower price because of the potential that another buyer will pay a higher price after the initial sale, before the impression is actually delivered; hence the 'non-guaranteed' status. With indirect sales, the CPM is usually fixed, but the number of impressions delivered is not.").

[203] *See* David Kaplan, "On Ad Networks: Pork Bellies, Diamonds, Or The New Direct Marketing?," Forbes (Apr. 8, 2008), https://www.forbes.com/2008/04/08/online-ad-networks-tech-cx_pco_0408paidcontent.html?sh=7414ef02cb8e, accessed Dec. 12, 2024 ("All ad networks are not created equal: If all sides can agree on one thing, it's the need for greater clarity to what's being sold and where it's being placed. […] 'In a lot of cases [in terms of ad nets' handling of remnant, or unsold ad inventory], the buyer doesn't really know what they're getting. And the seller doesn't have any control over price.'"). *See also* AffiliateSeeking.com, "Ad Networks" (captured on Jan. 16, 2008), https://web.archive.org/web/20080116101025/https://www.affiliateseeking.com/list/23000001/1.html, accessed Dec. 12, 2024 (listing some examples of ad network pricing options).

[204] "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -503 ("Passback means that when one ad system cannot fill an ad request it passes it back to a different ad system.").

[205] *See* Maciej Zawadziński and Mike Sweeney, "What is Waterfalling and How Does it Work?," Clearcode Blog (Nov. 28, 2024), https://clearcode.cc/blog/what-is-waterfalling/, accessed Dec. 13, 2024 ("Waterfalling, also known as a daisy chain or waterfall tags, is a process used by a publisher to sell all remnant inventory. […] Waterfalling gets its name from the waterfall-like process for selling inventory—*i.e.* the demand sources are initiated one at a time, one after another."); "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -503.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

opportunity to fill an impression. If that demand source declined to fill the impression (or did not have an eligible ad to serve for the impression), the request was passed back to the next demand source on the publisher's list, with the process repeating until the impression was sold or the publisher's list was exhausted, leaving the impression unsold. The waterfall was a highly configurable process, with publishers free to set the order of consideration and prices for each demand source however they wished.

### c) AdX Uses Auctions to Match Publishers and Advertisers

121. **AdX** (formerly known as DoubleClick Advertising Exchange or DoubleClick AdX) launched in 2007 and was designed to "bring Web publishers and advertising buyers together on a Web site where they can participate in auctions for ad space."[206]

122. When AdX receives a call from DFP, it runs an auction on behalf of a publisher.[207] This call contains information about the impression and a floor price for the auction. Prior to 2009, buyers did not vary bids based on real-time information about impressions: instead, if an ad opportunity with certain criteria matching the buyer's stated criteria became available, AdX would run an auction using each buyer's *pre-determined* bid for that type of impression.[208] Since the launch of AdX 2.0 in September 2009, AdX has supported **real-time bidding**.[209] Under real-time bidding, AdX sends bid requests containing

---

[206] AdX was originally launched by DoubleClick, prior to its acquisition by Google. *See* Louise Story, "DoubleClick to Set Up an Exchange for Buying and Selling Digital Ads," New York Times (Apr. 4, 2007), https://www.nytimes.com/2007/04/04/business/media/04adco.html, accessed Dec. 12, 2024.

[207] "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -513.

[208] *See* "Ad Selection Specifications for Ad Server Version 14.1" (Mar. 27, 2007), GOOG-AT-MDL-007374059, at -136.

[209] Email from ███████ to ███████ "Re: [Adsense-eng-wat] [Adsense-eng] Re: [Ads-engdirs] Doubleclick Ad Exchange 2.0 - Launched!" (Sept. 19, 2009), GOOG-AT-MDL-010836318, at -318 ("The team has done a great job

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

information about the auction to **Authorized Buyers** (previously known as "AdX buyers" and consisting mostly of ad networks and non-Google DSPs), and triggers a request to Google's buy-side products, Google Ads and DV360, to calculate bids.[210] AdX then runs an auction using the bids that it receives, and it then returns the winning ad to DFP, which serves the ad to the publisher's website.[211] Since the launch of Open Bidding, discussed further in [Section III.D.3.g](#) and [Section XIII](#), GAM has also incorporated bids on impressions from non-Google exchanges for publishers that enable it.

123.    From its launch until 2019, AdX used a second-price auction to allocate impressions.[212, 213] The highest bid, net of the AdX revenue share, would win the auction as long as that net bid was above the floor price. AdX would then charge the winning bidder its threshold price, which is equal to the higher of the second-highest bid in AdX or the auction's floor price.[214] In April 2015, DFP introduced a feature called **Reserve Price Optimization (RPO)** (also known as **Optimized Pricing**) which helped publishers set floor prices in the AdX second-price auction by increasing some floor prices in bid requests to buyers when RPO predicted—based on historical data on the distribution of

---

[…] to also go beyond in some important areas, *e.g.* […] Real Time Bidding, and of course integration with Adsense and Adwords.").

[210] "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -500 to -502 ("The buyer facing side of Google Ad Exchange is called Authorized Buyers […] Ad Exchange sends a Bid Request to DSPs with this information asking them to bid on the impression.").

[211] "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -502.

[212] *See* "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 5.

[213] During the period in which DRS v1 and v2 was in effect, AdX would charge the winning bidder a price higher than the second-price in a small minority of auctions. See Section XII below.

[214] As noted above, DRS v1 and v2 could change the price paid by advertisers for some impressions.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

bids—that the higher floor prices would increase publisher revenues.[215] I discuss RPO in detail in Section XI.

124.  In 2019, AdX transitioned to a first-price auction, which I discuss in more detail in Section XIII below.[216]

125.  AdX uses a revenue share model to charge publishers for impressions sold on AdX.[217] AdX keeps a proportion of the total revenue from the sales of the publishers' impressions on AdX in a given calendar month, with this proportion referred to as the **AdX revenue share**. The remaining proportion of the revenue, which is passed on to the publisher, is called the **publisher's revenue share**. In combination with the auction's pricing rule (which determines the price paid by bidders in the auction), the revenue share split determines the total payments AdX makes to each publisher. The baseline AdX revenue share is 20%, but different types of transactions can have different revenue shares, and the revenue share could be changed by contract between AdX and the publisher.[218] Until

---

[215] Email from ▮▮▮▮ to ▮▮▮▮, "Re: [drx-pm] LAUNCHED! Dynamic Pricing (RPO) for AdX sellers" (Nov. 12, 2015), GOOG-DOJ-07235914, at -915 ("Between April and October we launched and improved new systems to dynamically set auction reserve prices for AdX sellers."); "Optimized pricing in the Open Auction Comms" (Mar. 23, 2018), GOOG-DOJ-04937154, at -154 ("Optimized pricing in the Open Auction […] formerly known as Reserve Price Optimization (RPO)").

[216] Sam Cox, "Simplifying programmatic: first price auctions for Google Ad Manager," Google Ad Manager (Mar. 6, 2019), https://blog.google/products/admanager/simplifying-programmatic-first-price-auctions-google-ad-manager/, accessed Dec. 9, 2024 ("in the coming months we'll start to transition publisher inventory to a unified first price auction for Google Ad Manager."); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 7.

[217] "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -514 ("Revenue share is the pricing model for Ad Exchange.").

[218] *See* Google, "Google Platform Services Terms and Conditions," Google, https://www.google.com/google-ad-manager/platform/terms/, accessed Dec. 11, 2024, at Section 4.1.a ("Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -514 ("Baseline revenue share is 80/20 which means that of every dollar an advertiser pays (Gross value), 80 cents go to publisher and 20 cents go to Google. […] Different types of transactions might have a different revenue share and this might be negotiable during contracting phase.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

August 2015, a publisher would receive the same, fixed revenue share on each impression won by AdX.[219] After the introduction of **Dynamic Revenue Share for AdX** (hereinafter **sell-side DRS**) in August 2015, and until AdX transitioned to a Unified First Price Auction in 2019, AdX allowed the revenue share to vary on individual impressions to sell more total impressions and to increase the overall returns to publishers, as I discuss further in Section XII below. AdX does not generally charge fees to advertisers.[220]

126. The revenue share model helps to align the interests of Google and publishers. Each publisher and Google receive a fixed proportion of the publisher's monthly sales revenue on AdX, so that both parties share in any additional revenues when the total volume or the average price per impression of sales on AdX increases. This degree of alignment allows publishers to safely delegate certain decisions to Google and to benefit from Google's efforts to make its marketplace thicker and more efficient.

### d) Dynamic Allocation Benefits Publishers and Improves Efficiency

127. In 2007, DoubleClick introduced **Dynamic Allocation (DA)** in DFP.[221] Using DA, publishers could configure DFP to ensure that the impression was sold on AdX only when an AdX buyer was willing to pay *more* than the amount the publisher expected to

---

[219] "AdX dynamic sell-side rev share (DRS v1) - project description / mini PRD" (Aug. 2014), GOOG-DOJ-03619484, at -484 ("There is a 20% share on all transactions"); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 28.

[220] "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -514 ("Ad Exchange does not impose a buy-side fee").

[221] Dynamic allocation was created by DoubleClick prior to its acquisition by Google. *See* "DoubleClick Advertising Exchange User Guide (Beta)" (Mar. 29, 2007), GOOG-DOJ-AT-01133273, at -277 ("Dynamic allocation for sellers. DoubleClick Advertising Exchange automatically determines how to generate the highest return for every impression by dynamically allocating to the highest paying sales channel.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

receive from any other demand source.[222] In contrast to previous ad allocation technologies (including the waterfall), when impressions were sold to AdX buyers, payments to publishers under DA were determined using an auction process, which ensured that the price of each impression was determined by bidders' demands.

128. DA worked as follows. For each remnant line item in DFP (representing, for example, an ad network), publishers would configure a **value CPM** (sometimes called a **static bid**), which determined how that remnant line item would compete with AdX demand under DA.[223] Publishers could set the value CPM for each remnant line item as they pleased and could create multiple line items with different targeting criteria for the same demand source to allow different value CPMs to be used for different categories of impressions.[224] Given these value CPMs, DA used a two-step process to allocate remnant impressions.[225] First, it would identify the eligible[226] non-guaranteed line item with the highest value CPM, called the **DFP booked price** for the auction. In the second step, AdX would run a second-price auction among its demand partners, with a floor price that was at least as

---

[222] "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -413 ("Instead of randomly rotating other ads into an ad slot, DoubleClick Ad Exchange uses Dynamic Allocation, rotating in higher-paying ads from ad networks and other third-party media buyers when the net CPM they provide to the publisher is higher than what has been booked directly into the ad server.").

[223] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11; Google, "Value CPM," Google Ad Manager, https://support.google.com/admanager/answer/177222?hl=en, accessed Dec. 11, 2024 ("The value CPM (cost per thousand impressions) is an amount you specify to help Google Ad Manager estimate the value of campaigns. The amount entered in the 'Value CPM' field serves two purposes: 1. It's used in revenue calculations for impressions served. 2. When a value CPM is defined for remnant line items, the value CPM is used for competition in dynamic allocation and First Look instead of the 'Rate' value.").

[224] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11.

[225] *See* "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 10.

[226] A line item was "eligible" if the impression met the terms of the non-guaranteed contract between the publisher and the demand source (*e.g.*, based on targeting criteria).

high as the DFP booked price.[227] If a buyer on AdX was willing to pay more than the floor price, it was awarded the impression and paid the auction's clearing price (adjusted for the AdX revenue share); otherwise, the impression was allocated to the best non-guaranteed line item (which might then passback the impression to other demand sources, as in the waterfall).[228]

129. DA benefited publishers and improved efficiency, increasing the total value of online display advertising to advertisers. When DA introduced a publisher to new demand via AdX and that publisher set a value CPM for each line item that was at least as large as the expected return from allocating an impression to that demand source, DA was a *risk-free improvement in their expected revenue*: DA would assign an impression to AdX only if it could pay more than the return the publisher expected from any other demand source. Advertisers also benefited from the ability to make higher bids for impressions they valued highly and lower bids for impressions they valued less in the AdX auction, allowing them to focus their spending on impressions they valued the most. These benefits of DA were amplified when AdX transitioned to real-time bidding in 2009.

130. I provide a more detailed analysis of the benefits of DA in Section VIII.

---

[227] If the publisher had otherwise set a floor price for the impression that was higher than the DFP booked price, that floor price would apply.

[228] "Understanding the AdX Auction" (Oct. 2014), GOOG-DOJ-12443562, at -582 ("If we decide to call other network and they have nothing, they can pass it back"); Vijay Sivasubramanian, "Help me with Waterfall setup and understanding Passback Tags," Google Ad Manager Help (Mar. 6, 2019), https://support.google.com/admanager/thread/2065360/help-me-with-waterfall-setup-and-understanding-passback-tags?hl=en, accessed Dec. 11, 2024 ("You need to give the passback tag which you generated in GAM to the respective network partner. They will place that passback tag as backup ads. So that it will call next ad partner when you target the passback ad unit."); Stack Overflow, "What are advertising passback tags and common implementation" (Feb. 19, 2014), https://stackoverflow.com/questions/19112923/what-are-advertising-passback-tags-and-common-implementation, accessed Dec. 13, 2024 ("When your primary ad-network doesn't have anything to serve (for example, there isn't an advertiser willing to pay a high enough CPM), you can send that impression back to your default advertiser's tags to serve. [...] Passback tags allow you to implement a so-called waterfall model").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### e) Enhanced Dynamic Allocation Benefits Publishers and Improves Efficiency

131. In March 2014, DFP introduced **Enhanced Dynamic Allocation (EDA)**, which selected the impressions that would be used to serve guaranteed line items in a way that could maximize publisher revenue.[229] Prior to EDA, publishers would first determine whether an impression would be used to fulfill a direct contract, without checking on the bid available from AdX and other remnant demand sources. This procedure left money on the table by allowing an impression to be assigned to a guaranteed contract when it could have otherwise attracted a high price from remnant demand, while another eligible impression not assigned to the guaranteed contract either went unsold or attracted only a low price from remnant demand.

132. Google engineered EDA carefully to avoid such losses. It first estimated the distribution of bids using data from past impressions that were eligible to fulfill the guaranteed contract. It used that distribution to compute a **temporary CPM** for each guaranteed line item, which Google described (correctly) as the opportunity cost of not assigning an impression to the guaranteed contract.[230] The temporary CPM of the best eligible guaranteed line item, called the **EDA price**, was factored into the floor price in the AdX auction. Setting the EDA price as the opportunity cost meant that just enough impressions would be set aside to ensure that guaranteed contracts would be fulfilled.[231] If Google's

---

[229] "Enhanced Dynamic Allocation Comms Doc" (Nov. 6, 2017), GOOG-DOJ-06885161, at -161 ("Generally availability roll-out began on 3/3/2014.").

[230] *See* Google, "Delivery basics[:] Ad competition with dynamic allocation," Google Ad Manager Help, https://support.google.com/admanager/answer/3721872?hl=en, accessed Dec. 11, 2024 ("The guaranteed line item competes using a temporary CPM or 'opportunity cost' that Ad Manager calculates automatically.").

[231] *See* "Enhanced Dynamic Allocation Comms Doc" (Nov. 6, 2017), GOOG-DOJ-06885161, at -168 ("Will reservation delivery be affected? Reservation delivery should not be affected. Optimizing revenue while still honoring reservations is the most important goal of this optimization and we've done extensive testing to validate that it works."); "Uniform Treatment for DFP Remnant and AdX under EDA" (Apr. 2019),

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

estimates were exactly correct, remnant demand would buy exactly those impressions for which it was willing to pay the most—all those with remnant bids above the EDA price—and the remaining impressions would be assigned to guaranteed contracts, fulfilling those contracts perfectly. This combination both increases the number of impressions sold and maximizes publisher revenues. EDA also included adaptive procedures to guard against estimation errors. These procedures adjusted the EDA price dynamically over time if too many or too few impressions were being assigned to guaranteed contracts.[232]

133.  EDA benefited publishers by increasing the revenues they received from remnant demand without jeopardizing guaranteed contracts. It also enabled remnant demand advertisers to purchase impressions for which their values were the highest, increasing their match values. I discuss the benefits of EDA in detail in [Section IX]().

### f) Emergence of Header Bidding and Integration with DFP

134.  Beginning around 2014, publishers began to adopt **header bidding**, a technology that allows publishers to solicit and compare real-time bids from their favored sets of ad exchanges and other demand partners before calling an ad server.[233] To implement header

---

GOOG-AT-MDL-011687180, at -180 ("Enhanced Dynamic Allocation introduces competition between guaranteed reservations and other demand including AdX and DFP remnant reservations, by allowing AdX or DFP remnant to win over high priority DFP guaranteed reservations if it has a higher price than the opportunity cost (also called EDA price) set by us. The EDA price is calculated in such a way that the DFP guaranteed reservation's delivery goal would not be compromised.").

[232] *See* Google, "DFP and dynamic allocation," DoubleClick for Publishers Help (captured on Sep. 22, 2015), https://web.archive.org/web/20150922150140/https://support.google.com/dfp_premium/answer/3447903, accessed Dec. 11, 2024 ("The lower a line item's Satisfaction Index (SI) (that is, the more behind schedule it is), the higher the temporary CPM that's passed to Ad Exchange. Therefore, a standard line item that is behind schedule will win often enough to stay on pace to satisfy its goal and pacing settings.").

[233] *See, e.g.*, "Demand Syndication" (Feb. 17, 2016), GOOG-DOJ-09459336, at -338 to -339; "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 13.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

bidding, a publisher inserts a snippet of code in the header of its web page.[234] That code calls participating ad exchanges or other demand partners (either directly or via a server) to submit bids into an auction run on the browser or server, typically in a first-price format.[235] A publisher could directly allocate the impression to the demand source with the highest header bid, but many publishers sought to do better by integrating header bidding with their publisher ad server.[236] Integrating header bidding with DFP allowed publishers to enjoy the benefits of Enhanced Dynamic Allocation and other services on each impression.

135. While DFP was not designed to incorporate real-time bids from non-Google exchanges,[237] publishers incorporated header bidding into DFP by creating separate non-guaranteed line items for each bid value that each header bidding counterparty might provide (*e.g.*, separate line items for "Header Bidding Exchange A" at $1.00, $1.01, $1.02, etc.).[238] I will call those **header bidding line items** for the purpose of this report.

---

[234] *See* "Demand Syndication" (Feb. 17, 2016), GOOG-DOJ-09459336, at -338.

[235] *See* "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 13 ("These Header Bidding auctions are typically first-price auctions."). *See also* "Header Bidding Observatory #1" (Jan. 2017), GOOG-DOJ-AT-01027937, at -943 ("[T]he browser code runs a 1P auction"); Prebid.org, "Prebid.js FAQ" https://docs.prebid.org/dev-docs/faq.html, accessed Dec. 13, 2024 ("Header Bidding is a first-price auction.").

[236] *See* "Header Bidding Observatory #1" (Jan. 2017), GOOG-DOJ-AT-01027937, at -939 ("43% of LPS [Large Partner Solutions] publishers are using header [bidding] tags.").

[237] *See* Deposition of S. Spencer (DOJ CID) (Aug. 12, 2021), at 71:16-71:21 ("So in the original design of the system, it was not designed to put exchanges in as line items. Line items are designed to represent direct deals or network deals."); Deposition of ▮▮▮▮ (DOJ CID) (Nov. 6, 2020), at 50:5-50:20 ("Q: And why was using line items for realtime pricing a risk to Google's AdServer? A: The way the system was built is that line items were always intended to be reservations. There wasn't a concept of using them for realtime pricing. And so we had in mind that publishers would have, you know, possibly thousands of line items and the system was built to scale to that, but with using line items for realtime pricing, which is not what they were designed to be used for, there were ten, sometimes ten times, sometimes 100 times, sometimes 1,000 times more line items than the system was designed to support.").

[238] *See* "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 14 ("Up until at least December 2021, the winning bid from the Header Bidding auction was typically used to trigger a specific line item that the publisher had booked within Google's ad server (most commonly a remnant line item) […] "); Email from ▮

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

After receiving header bids, the publisher's header bidding code would call DFP with the impression and would "trigger" one of the header bidding line items, and, under Dynamic Allocation, the value CPM of that line item could set the floor price in the AdX auction. In that case, if no bid on AdX exceeded that floor price, the impression would be allocated to the header bidder.[239] The value CPMs of header bidding line items—as for all non-guaranteed line items—were determined by publishers, and thus could differ from the winning header bid (and therefore also from the payment the publisher expected to receive for the impression).[240] The huge number of new line items created as a result of

---

[BLACK] to [BLACK] "Re: Ultraprio - Increase the ALI for [BLACK] (Sept. 26, 2018), GOOG-DOJ-11782962, at -962 ("[T]heir HB pricing granularity is in $.01 increments up to $12").

[239] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Under Dynamic Allocation, the Value CPM associated with the best eligible non-guaranteed line item could set the floor price in the AdX auction."), ¶ 14 ("[T]he Value CPM of that line item could represent the winning Header Bidding bid as a floor in the AdX auction (prior to September 2019) or as a competing bid in the Unified First Price Auction (from September 2019 onwards).").

[240] *See* [BLACK] ; "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -506 ("[Some publishers] inflate the value CPM of remnant line items [...] publishers used to do this even before HB was popular."); [BLACK] [BLACK] "Changes to Ad Manager auction" (Jan. 10, 2019), GOOG-DOJ-10924270, at -292 (in which the tree diagram shows that in 42% of queries won by header bidding, the AdX floor exceeded the header bidding line item price); "First-price bidding" (Aug. 12, 2019), GOOG-DOJ-11406673, at -677 ("How boost works[:] The publisher inflates the HB bid before sending it as a floor to AdX[.] This is done to increase Adwords cost and to provide a better comparison between Adwords and header bidder bids[.]"); Email from R. Srinivasan to B. Bender et al., "Unified Auction Changes (Sellside) Executive Update - Aug 12, 2019" (Aug. 13, 2019), GOOG-DOJ-09713317, at -319 ("Today, these [publisher-]inflated CPMs are used to provide price pressure for AdX [...] In practice, [...] many publishers [...] apply a boost to Header Bidding bids[.]"); "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -382 ("Plan to educate pubs around strictly negative revenue consequences of HB price inflation"). I interpret this document, authored in the context of the "Migration to 1P auction" (-358), to mean that inflating header bids was common enough that Google would have to "educate pubs" it was no longer necessary; "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -777 ("Last look [...] incentivizes pubs to inflate ('boost') the floor sent to AdX"); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Some publishers set Value CPMs higher than their estimates of what CPM a line item would likely generate to increase competitive pressure in the AdX auction or for other reasons."); Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

publishers adopting header bidding led to a substantial increase in infrastructure costs for Google.[241]

136.   In this way, if a publisher configured its website to use header bidding before it offered an impression to AdX, the highest AdX bidder could win an impression if its bid beat the value CPM of the header bidding line item that was triggered by the publisher after resolving its header bidding auction.[242] This so-called "**Last Look**" was not a Google program: it arose as a consequence of the way that some publishers integrated header bidding into DFP using the line item capabilities that DFP (like other publisher ad servers) supported at the time header bidding was introduced.[243] In Section X, I examine the so-called "Last Look" and show that it was not a source of advantage for Google, contrary to the allegations made by Plaintiffs.

137.   Header bidding has benefits and costs for publishers. On the benefits side, header bidding could help publishers increase their online display advertising revenues by collecting more real-time bids for impressions. On the costs side, header bidding has at least four disadvantages. First, it is relatively complex to configure.[244] Second, it often increases

---

[241] *See* "PRD/Strat review: Network health" (June 22, 2017), GOOG-DOJ-06875572, at -589 ("Infra abuse a growing problem: 3X increase in ALI [Active Line Items] since Apr 2016 […] Incremental 61K ALIs (2X limit) increases serving cost by 3-5% and variable infra cost by 1-2%").

[242] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 14.

[243] *See* "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 17 ("'[L]ast look' was not designed to give AdX an advantage when competing against Header Bidding. It was simply the result of the Header Bidding auction taking place before the AdX auction ran and the way that publishers configured Header Bidding line items to work with Dynamic Allocation.").

[244] One publisher described the time required to integrate an SSP with a leading header bidding wrapper as "20 hours of work" (versus Open Bidding's "20 minutes"). *See* Sarah Sluis, "Google Ad Manager Builds A Bridge To Prebid—But Don't Call It A Two-Way Street," AdExchanger (Apr. 27, 2022), https://www.adexchanger.com/platforms/google-ad-manager-builds-a-bridge-to-prebid-but-dont-call-it-a-two-way-street/ cached, accessed Dec. 12, 2024. Another industry source compares header bidding to previous ad configurations: "It's not just a little more work, it's probably 100X as much work to traffic for most publishers." *See*

page load latency.[245] Third, it makes it more complicated for advertisers to bid optimally because of the possibility of self-competition, where an advertiser drives up the price it pays by unknowingly bidding against itself for the same impression in multiple places.[246] Fourth, there were reports of payment discrepancies between the bids of header bidding exchanges and eventual payments.[247] I discuss these benefits and costs of header bidding further in [Sections X](#) and [XIII](#).

### g) Open Bidding Allowed Non-Google Exchanges to Compete in a Unified Auction, Benefiting Publishers and Increasing Platform Thickness

138. Google began testing **Open Bidding** (formerly known as Exchange Bidding, demand syndication, and EBDA) in 2016 and officially launched it in April 2018. Open Bidding

---

Ad Ops Insider, "Header Bidding Explained Step-by-Step" (June 8, 2015), https://www.adopsinsider.com/header-bidding/header-bidding-step-by-step/, accessed Dec. 12, 2024.

[245] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 24. *See also* Vishveshwar Jatain, "Understanding Header Bidding And How To Leverage It," Forbes (Sept. 17, 2019), https://www.forbes.com/sites/forbescommunicationscouncil/2019/09/17/understanding-header-bidding-and-how-to-leverage-it/?sh=332097315c18, accessed Dec. 12, 2024 ("Client-side header bidding […] increased page latency because executing auctions takes bandwidth and computing resources."); Pachilakis, M., Papadopoulos, P., Markatos, E. P., & Kourtellis, N., "No more chasing waterfalls: a measurement study of the header bidding ad-ecosystem," Proceedings of the Internet Measurement Conference (2019), at pp. 280-293.

[246] *See* "Optimal AdX in DFP setup: Best practices, and how to traffic RTA/RTP (header bidding) line items" (Sept. 24, 2015), GOOG-TEX-00000001, at -004 ("[H]eader bidding can make buyers bid against themselves running 2 auctions for every impression."); ███████████████████████████████████████████████████████

[247] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 24 ("Header bidding is also not transparent because, although the publisher 'accepts' the impression at a certain price, the header bidder may not actually pay the sum indicated in its bid."); "Header Bidding Observatory #1" (Jan. 2017), GOOG-DOJ-AT-01027937, at -955 ("A comparison of HB reports vs DFP reporting showed significant discrepancies [in revenue]"). *See also* James Curran, "Opinion[:] For Publishers, Header Bidding Discrepancies Can Outweigh Revenue Lift," AdExchanger (July 8, 2016), https://www.adexchanger.com/the-sell-sider/publishers-header-bidding-discrepancies-can-outweigh-revenue-lift/, accessed Dec. 12, 2024 ("Publishers need to create a more realistic calculation of header bidding revenue by factoring discrepancies into their line-item valuations. Some header bidding solutions can cause up to a 50% discrepancy between the publisher ad server impression reports and the impression reports from the programmatic partner. That means a $2 CPM is really a $1 CPM once you account for the adjustments made by the exchange for viewability, verification and performance tracking.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

allowed publishers to run an auction using real-time bids from multiple ad exchanges, including AdX and competing ad exchanges, within GAM. Some Google employees described Open Bidding as Google's "answer to header bidding."[248] Open Bidding allows non-Google exchanges to compete for an impression in an "auction of auctions" in which bids from Authorized Buyers, DV360, Google Ads, and other remnant line items booked by publishers in GAM (which might include header bidding line items) compete head to head.

139. Publishers determine which demand sources are eligible to compete under Open Bidding using the GAM interface. Under Open Bidding, a publisher needs to establish a contractual relationship with an Open Bidding partner in order to allow it to compete for the publisher's impressions.[249] When an impression arrives for which Open Bidding is eligible, GAM sends a request to AdX and participating Open Bidding exchanges. The Open Bidding auction design changed several times during testing, as I discuss in detail in Section XIII.

140. The introduction of Open Bidding benefited publishers and thickened the Google online display advertising platform, by simplifying the process of integrating bids from multiple sources, including competing exchanges. Open Bidding is easier to configure and has lower latency than some header bidding alternatives, although many publishers continue to use header bidding exclusively or in combination with Open Bidding.[250] Among its

---

[248] "Demand Syndication" (Feb. 17, 2016), GOOG-DOJ-09459336, at -337.

[249] Google, "Introduction to Open Bidding," Google Ad Manager Help, https://support.google.com/admanager/answer/7128453?hl=en, accessed Dec. 11, 2024 ("[B]efore a publisher can connect with an Open Bidding yield partner, the publisher must have an established contractual relationship with that partner.").

[250] For a comparison of Open Bidding and header bidding, see "Open Bidding on Ad Manager (fka Exchange Bidding)" (Aug. 2019), GOOG-DOJ-15389438, at -440 to -441. For a comparison of timeouts, see "RTB Timeouts"

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

advantages for publishers are simpler configuration and streamlined payments.[251] The introduction of Open Bidding also benefited some non-Google exchanges by reducing the publishers' costs of integrating with them, allowing them to sell additional impressions.[252] For example, OpenX reported that "[e]xisting OpenX publisher partners who enabled [Open Bidding] through the OpenX Exchange experienced an average 48% increase in programmatic revenue from OpenX."[253] In Section XIII, I discuss in detail the benefits of Open Bidding for publishers and competing exchanges.

### h) Unified First Price Auction and Unified Pricing Rules

141.    As discussed in Section III.C.4 above, most exchanges transitioned to first-price auctions between 2017 and 2019.[254] Heterogeneity in the auction formats used by exchanges during this period complicated the implementation of header bidding and Open Bidding,

---

(Oct. 2019), GOOG-DOJ-15232606, at -609 ("Google's lower bid timeouts should have a slightly better user experience with lower latency"). For usage with header bidding, see Abhilasha, "The Ultimate Guide to Open Bidding for Publishers," headerbidding.co (Dec. 29, 2023), https://headerbidding.co/open-bidding-ultimate-guide/, accessed Dec. 12, 2024 ("[I]t is possible to run Open Bidding alongside Header Bidding."); George Levitte, "Improved header bidding support in Google Ad Manager," Google Ad Manager (Apr. 27, 2022), https://blog.google/products/admanager/improved-header-bidding-support-in-google-ad-manager/, accessed Dec. 13, 2024 ("[M]any [publishers use] a mix of header bidding and server-side solutions like Open Bidding").

[251] *See* "Open Bidding on Ad Manager (fka Exchange Bidding)" (Aug. 2019), GOOG-DOJ-15389438, at -438 ("Eliminate operational inefficiencies such as line item complexity […] Easy to set up, view/analyze reports and unified payments").

[252] *See* "Open Bidding on Ad Manager (fka Exchange Bidding)" (Aug. 2019), GOOG-DOJ-15389438, at -438 ("Easy to set up, view/analyze reports and unified payments […] Allows exchanges to respond to RTB call-outs […] Provides integrated reporting and billing for exchange bidding transactions won by 3rd party exchanges"), -441. *See also* "Exchange Bidding Sell Side Update" (June 14, 2018), GOOG-DOJ-11790760, at -775 (Table, "Win Rate of Total DFP Queries"; "EB Other Exchanges," "-30 to 0 (Month -1)": 0.00%; "120 to 150 (Month 5)": 4.31%").

[253] OpenX, "Google & OpenX Release Study Showing Publisher Partners Experience 48% Revenue Lift Through Google Exchange Bidding Collaboration" (Feb. 15, 2018), https://www.openx.com/press-releases/google-openx-revenue-lift/, accessed Dec. 13, 2024.

[254] *See* "DV360, Third Party Exchanges, and Outcome-Based Buying" (Oct. 16, 2018), GOOG-DOJ-12038253, at -267 (Figure: "Impression Share (US Ad Inventory)"; "First-Price Auction": 6% in December 2017, 43% in March 2018; "Second-Price Auction with Anomalies": 19% in December 2017, 24% in March 2018). These figures would not include AdX's later transition to a first-price auction in 2019. *See also* Email from E. Lipkovitz to ███████ "Re: Offering 1st price to publishers?" (Sept. 13, 2017), GOOG-DOJ-05272070, at -075 ("Other exchanges started the migration to 1st price auction recently arguing th[at] it is the best way to integrate it with HB.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

both of which combine the results of auctions on different exchanges that may use different auction rules to sell the same impression. One unfortunate result of this "auction of auctions" process is that the bidder with the highest bid did not necessarily win the impression.

142. GAM transitioned to the **Unified First Price Auction (UFPA)** in 2019.[255] A Google employee described the reason for the transition to the first-price auction on GAM as follows:

> "Publishers typically use our platforms to work with a variety of demand sources, which used to compete under inconsistent rules, and passing through multiple intermediaries, each of which runs its own auction (some first-price, some second-price, and some apparently running strange hybrid mechanisms), potentially transforms bids, and collects a share of revenue. This led to market confusion and inefficiencies; the move to a unified first-price auction was an attempt to move to a simpler, more transparent and sustainable state, improving outcomes for publishers, advertisers, and other ecosystem participants. Of course, first-price auctions are not incentive-compatible, so this required both Google buyers and external buyers to modify bidding algorithms as well."[256]

---

[255] Sam Cox, "Simplifying programmatic: first price auctions for Google Ad Manager," Google Ad Manager (Mar. 6, 2019), https://blog.google/products/admanager/simplifying-programmatic-first-price-auctions-google-ad-manager/, accessed Dec. 7, 2024 ("[I]n the coming months we'll start to transition publisher inventory to a unified first price auction for Google Ad Manager."); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 37.

[256] Email from ▮▮▮▮▮▮ to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "Fwd: Join Auction Brown Bag Series: (TODAY @ 12pm PT!)" (Nov. 15, 2019), GOOG-DOJ-AT-00070433, at -433.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Under the UFPA, all bidders—including AdX bidders, header bidders, and non-Google exchanges using Open Bidding—compete in the same first-price auction, with no so-called "Last Look." This change ensured that, for each impression, the winner in the UFPA would be the bidder with the highest bid. Google's buy-side tools implemented bid optimization programs on behalf of their advertiser customers to make it easier for them to bid effectively; there was no need for an advertiser to change its campaign parameters in response to the new auction format, as Google's tools did that automatically.[257] I discuss the transition to the UFPA further in Section XIII below.

143. GAM implemented **Unified Pricing Rules (UPR)** at the same time as introducing the UFPA.[258] Under UPR, publishers could set floor prices that varied by properties of the impression and characteristics of the advertiser, but not by the identity of the exchange or demand source of the bidder, ensuring equal treatment of AdX and non-Google SSPs.[259]

---

[257] *See* Alchemist, discussed in Section IV.C.1.c below (for Google Ads), and DV360's AdX 1P Bidder for the UFPA, discussed in Section VII.E. *See also* Sam Cox, "Simplifying programmatic: first price auctions for Google Ad Manager," Google Ad Manager (Mar. 6, 2019), https://blog.google/products/admanager/simplifying-programmatic-first-price-auctions-google-ad-manager/, accessed Dec. 7, 2024 ("[A]dvertisers using Google Ads or Display & Video 360 do not need to take any action.").

[258] Jason Bigler, "An update on first price auctions for Google Ad Manager," Google Ad Manager (May 10, 2019), https://blog.google/products/admanager/update-first-price-auctions-google-ad-manager/, accessed Dec. 11, 2024 ("In addition to impacting how publishers are using floor price rules, changing to a first price auction in Ad Manager requires a change in how our rules function. […] That's why we released a new feature to all publishers globally, called unified pricing rules.").

[259] *See* "Ad Manager Unified 1st Price Auction" (Sept. 27, 2019), GOOG-DOJ-09714662, at -665 ("Unified Pricing rules will not support the following functionalities that were present in Open Auction pricing rules: Buyer-specific floors: ability to set different floors for different buyers/bidders for a given inventory targeting […] publishers will still be able to: Set per-advertiser floors in Unified Pricing rules"); Google, "Unified pricing rules," Google Ad Manager Help, https://support.google.com/admanager/answer/9298008?hl=en, accessed Dec. 11, 2024 ("Advertiser- and brand-specific pricing can be configured in unified pricing rules. They don't apply to remnant line items. Per-buyer and per-bidder pricing are not available."); Jason Bigler, "An update on first price auctions for Google Ad Manager," Google Ad Manager (May 10, 2019), https://blog.google/products/admanager/update-first-price-auctions-google-ad-manager/, accessed Dec. 11, 2024 ("To maintain a fair and transparent auction, these rules will be applied to all partners equally, and cannot be set for individual buying platforms.").

144. As I discuss in Section XIV, UPR benefited advertisers and buying tools bidding into multiple exchanges by making it easier for them to determine their bids on different exchanges. Without UPR, publishers could engage in **price-fishing**, which is a close cousin of multi-calling.[260] Price-fishing is a tactic in which some publishers would call the same bidders on different exchanges using different floor prices in an attempt to induce them to make unnecessarily high bids to win an impression. When publishers engage in price-fishing, bidders need to account for the possibility that the floor price quoted to them at one exchange may be higher than the floor for the same impression quoted to them on another exchange. That possibility adds costs (because more bids must be submitted) and makes bidding optimally more complicated (because a bidder's optimal bid on each exchange depends on the impression's floor prices on other exchanges). To protect themselves against the possibility that some publishers would price-fish, bidders might be incentivized to reduce their bids on all publishers' inventory, a response that would harm publishers (including those not engaged in price-fishing) and reduce efficiency. Thus, UPR prevented harmful externalities that could reduce the profits of advertisers and publishers alike.

### 4. Google Responded to Competition by Improving Its Products

145. Google's online display advertising products evolved over time in response to the emergence of new technologies, changes in the behavior of advertisers and publishers, and evolutions in the broader online display advertising ecosystem. I summarize the key changes in Figure 1 above, with buy-side technologies (Google Ads and DV360) below

---

[260] The main difference between price-fishing and multi-calling is that price-fishing calls the same bidders on different exchanges (with different floor prices), while multi-calling calls the same bidders multiple times (with same or different floor prices). Both tactics can lead to a loss in surplus for an unsuspecting advertiser.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

the timeline and sell-side technologies (DFP and AdX) above. Each of these changes improved efficiency or reduced the costs of participating in Google's online display advertising platform, benefiting advertisers, publishers, or both.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## IV.    GOOGLE ADS BIDDING PROGRAMS: PROMOTING SIMPLE BIDDING AND INCREASING SURPLUS FOR GOOGLE ADS ADVERTISERS

### A. Overview

146.    Since it started bidding on AdX in 2009,[261] Google Ads has updated its bidding program for the AdX auction several times, with each update designed to increase its profits and the surplus of its advertisers and to respond to changes in the strategies of publishers and other bidders. The following are the key evolutions:

    a.    Beginning before 2013, Google Ads submitted two bids for its advertisers in each AdX auction that were equal to the two highest values for the impression among its advertisers, adjusted for Google Ads' revenue share (hereinafter the "**two-bid policy**").[262] This two-bid policy was part of a simple, bidder-truthful auction for Google Ads advertisers.

    b.    In 2013, Google Ads introduced its **bid optimization** programs, **buy-side DRS** and later **Bernanke** to optimize its bidding on AdX, increasing the number and value of impressions won by Google Ads advertisers.[263]

---

[261] Email from ▮▮▮▮ to ▮▮▮▮, "Re: [Adsense-eng-wat] [Adsense-eng] Re: [Ads-engdirs] Doubleclick Ad Exchange 2.0 - Launched!" (Sept. 19, 2009), GOOG-AT-MDL-010836318, at -318 to -319 (noting that "[t]he team has done a great job [with AdX 2.0 launch] […] to also go beyond in some important areas, e.g. […] Real Time Bidding, and of course integration with Adsense and Adwords.").

[262] Email from ▮▮▮▮ to ▮▮▮▮ "Re: GDN Dynamic Revshare launched today!" (Jan. 17, 2013), GOOG-DOJ-04306227, at -227 ("In this case, GDN first holds its own auction and submits the leading 2 bids to the AdX auction. Historically, GDN applied a 14% revshare to these bids and AdX applies a 20% sell-side revshare to all bids in their auction.").

[263] Email from ▮▮▮▮ to ▮▮▮▮ "Re: GDN Dynamic Revshare launched today!" (Jan. 16, 2013), GOOG-DOJ-04306227, at -227 ("Today we launched GDN Dynamic Revshare - a means for GDN to optimize the revshare we apply to AdX bids."), -227 (GDN won "4.6% more impressions" and GDN revenue increased "by 7.6%"); "Launch Details Spreadsheet, Launch 106307" (Aug. 29, 2023), GOOG-AT-MDL-009644018, at cells C1, C2 ("Launch Date [...] 2013-11-11"); Email from ▮▮▮▮ to W. Kim, "[Launch 106307] gTrade: Project Bernanke" (Oct. 18, 2013), GOOG-DOJ-14952787, at -787 ("GDN wins more auctions and generates more revenue at the same average 14% revshare; GDN's advertisers win more auctions and get greater click/conversion volume; and AdX publishers enjoy higher match rate and revenue."); "Project Bernanke: Quantitative Easing on the

---

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

c.  A 2015 update, **Global Bernanke**, further improved the optimization process to increase the number and value of impressions won by Google Ads advertisers by allowing the revenue share collected by Google Ads to vary across different publishers' inventory.[264]

d.  In 2019, as AdX replaced its second-price auction with its Unified First Price Auction, Google Ads updated Bernanke for the revised auction pricing rule and called the new program **Alchemist**.[265]

My analysis of data on Google Ads advertisers' values for impressions shows that each of these bid optimization programs increased advertiser surplus for most Google Ads advertisers.

---

AdExchange" (Oct. 21, 2013), GOOG-DOJ-12700489, at -493 ("Matched Queries +11.8% (0.72B/day) […] AdWBuyers Matched Queries +19.2% (1.07B/day) […] Pub Revenue +8.0% ($108M/year)").

[264] Email from ▮▮▮▮▮▮▮▮▮▮ to ▮▮▮▮▮▮▮▮▮▮ "[Caqengleads] [Launch 133445] Global Bernanke (+$40M revenue)" (May 21, 2015), GOOG-DOJ-15637938, at -938 ("Global Bernanke is an extension of project Bernanke in which GDN retains a 15% margin on AdX as a whole, while deviating from 15% on individual publishers."), -938 (identifying 2.5% and 1.6% increases in GDN win rate and in match rate as well as a 1.82% increase in GDN revenue).

[265] "The Alchemist (AKA First Price Bernanke)" (Mar. 2019), GOOG-DOJ-14550102, at -102 ("Switching to First Price Auctions (FPA) makes GDN's first price bid optimization (for the winner of Adwords Mini Auctions) a unique problem in many ways: Because of the buy-side infrastructure (like HDMI) which was designed for bidding in a Second Price Auctions (SPA), we want to keep the mechanism truthful and individually rational from the buy-side's perspective and at the same time bid in sell-side's FPA. Furthermore, for each sell-side's publisher, we want to hit a specific (15%) margin. In this document we propose Alchemist: a simple mechanism (and a robust framework) that satisfies all these constraints while maximizing welfare and profit."); "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 22 ("Google updated the Bernanke algorithms in 2019 to be compatible with the Unified First Price Auction. The updated version of Bernanke was sometimes referred to within Google as 'Alchemist.' The update was designed to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

147. Plaintiffs' allegations about Google Ads' bidding programs[266] mischaracterize program characteristics, including especially their benefits to Google's customers.[267] In particular:

a. Plaintiffs and their experts claim that these bidding programs harmed or failed to benefit Google Ads' advertiser customers,[268] but (as I will explain in Section IV.C.2.c) for the vast majority of Google Ads advertiser customers, any Google Ads bid optimization program that increased a customer's win rate also increased its surplus.

b. Plaintiffs and their experts argue that that these bidding programs harmed publishers,[269] but this is contradicted by evidence from Google's

---

[266] Professor Li raises additional claims against Program Alph—a Google Ads feature designed to compare bids between advertisers that choose to bid on first-price basis and other advertisers. *See* "Project Alph," GOOG-AT-MDL-019549143 (no date), at -145; Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 816-823. As Professor Li himself acknowledges, "Project Alph operated in essentially the same way as Alchemist," *see* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 818. My analyses of Google's bid optimization programs apply equally to this feature.

[267] Professor Hortaçsu writes that "Google applied Bernanke—then Alchemist—to certain bids submitted by DV360. It did this on a bid type known as 'Pay per outcome' (PPO)." *See* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 794. I note that my analysis of Bernanke applies to those bids as well. Analogously, Professor Li writes that "there is evidence to suggest that Google applies Alchemist multipliers to at least some types of bids from DV360," before noting that "Professor Mickens identified the source code which implements the DV360 PPO bidding mechanism, and verified that this code uses the same Alchemist algorithm that Google applies to other sources of Google-generated bids." See Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 802-803. As such, my analysis of Alchemist applies to those bids as well.

[268] Revised Expert Report of S. Li (Oct. 11, 2024), at Section VIII.B.4 ("Global Bernanke harmed publishers and advertisers, and misallocates ad inventory"); Expert Report of J. Chandler (Oct. 4, 2024), at ¶ 341 ("This undisclosed pooling prevented participants from making optimal decisions and harmed advertisers and other exchanges."); Publisher Class First Amended Complaint, at ¶ 23 ("[...] Project Bernanke, using exclusionary conduct to rig the auctions in AdX in a way that enhanced its monopoly power and thus harmed both publishers and advertisers."); Advertiser Class Complaint, at ¶ 226 ("Bernanke increased the cost of advertisers' campaign and lowered their return on investment"); Daily Mail Second Amended Complaint, at ¶ 140 ("Google deceived both publishers and advertisers by converting second price auctions into third price auctions [...]").

[269] Revised Expert Report of S. Li (Oct. 11, 2024), at Section VIII.B.4 ("Global Bernanke harmed publishers and advertisers, and misallocates ad inventory"); Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 46 ("Google's implementation of Project Bernanke (including the various subsequent versions) was harmful to publishers [...]."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 150 ("Thus, in simple terms, the harm from Bernanke arises because publishers take all of the loss from GDN raising the take rate to 60 percent, and then take only some of the benefit from the subsidies.") (emphasis omitted); Publisher Class First Amended Complaint, at ¶ 23 ("Project Bernanke, using exclusionary conduct to rig the auctions in AdX in a way that enhanced its monopoly power and thus harmed both publishers and advertisers."); Advertiser Class Complaint, at ¶ 220 ("The

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

contemporaneous experiments (see <u>Section IV.C.2.d</u>) and relies on an incomplete

economic analysis that omits nearly all cases in which the programs benefitted

publishers (see <u>Section IV.D.3</u>).

c.  Plaintiffs and their experts claim that Bernanke[270] and Alchemist[271] harmed

non-Google buying tools and exchanges, when, in fact, they were competitive

bidding strategies in an auction among ad buying tools. Indeed ███████████

---

Bernanke-inflated bids increased the number of impressions transacted in AdX and permitted AdX to trade publishers' most valuable impressions while leaving mainly low-value impressions for rival exchanges."); Daily Mail Second Amended Complaint, at ¶ 53 ("Google pockets the difference which amounts to an additional hundreds of millions of dollars stolen from publishers [...]"); Gannett Amended Complaint, at ¶ 130 ("The [Texas] third amended complaint revealed crucial details about how Google's secret programs (including Elmo, Poirot, and Bernanke and its variants) actually worked and for the first time described how those programs harmed a publisher like Gannett."); Inform Third Amended Complaint, at ¶ 221 ("As a result, Inform and publishers were unwittingly paid in amounts that reflected third-place bids rather than second-place bids, and, consequently, suffered revenue declines of as much as 40%").

[270] Revised Expert Report of S. Li (Oct. 11, 2024), at Section VIII.B ("Global Bernanke harmed competition in the exchange market by enabling Google to engage in anticompetitive pricing"); Expert Report of P. Cramton (Oct. 4, 2024), at Section 9.4 ("Bernanke disadvantaged non-GDN buyers on AdX"); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 779 ("As I explain in section IV, Bernanke and Alchemist harmed publishers by deflating bids and by increasing Google's win rate at the expense of third-party bidders."); Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 55 ("[W]hile Google profited from Project Bernanke and its follow-ons, competitors, including Inform, were harmed by Google's assisting its advertisers with artificially 'winning' higher quality, higher-profit inventory such as Inform's, further bolstering Google's buy-side dominance and robbing revenue potential."); Expert Report of J. Zona (Oct. 4, 2024), at ¶ 104 ("It is my opinion that Projects Bernanke and Global Bernanke are anticompetitive, because they achieved their goals by impairing the ability of AdX's rivals to compete in the Ad Exchange Market and Google Ads' rivals to compete in the Self-service Open Web Display Advertising Market."); Expert Report of J. Chandler (Oct. 4, 2024), at ¶ 341 ("This undisclosed pooling prevented participants from making optimal decisions and harmed advertisers and other exchanges."); Publisher Class First Amended Complaint, at ¶ 277 ("Google then added this secretly retained payment into a pool that Google used to supplement the bids of Google's advertiser clients at the expense of rival, non-Google advertiser bidders. In this way, Google augmented winning bids of its advertisers using its Ad Buying Tools (specifically Google Ads) on AdX to the exclusion of advertisers using non-Google buying tools."); Advertiser Class Complaint, at ¶ 220 ("[T]he secret program continued to evolve, because they achieved into a device to artificially boost the number of impressions transacted in AdX—a shift that necessarily came at the expense of competing exchanges and left advertisers with fewer alternatives to AdX."), ¶ 228 ("Bernanke suppressed competition in the markets for ad exchanges and for ad buying tools for small advertisers."); Inform Third Amended Complaint, at ¶ 223 ("Project Bernanke and its iterations were exclusionary and successfully foreclosed competition in the ad server, ad exchange markets and online video advertising markets.").

[271] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 41 ("[Alchemist] also discouraged bidder participation on other exchanges, depressing exchange market competition."), ¶ 775 ("The inflated bids foreclose competition from rival exchanges, depriving them of scale."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 779 ("As I explain in section IV, Bernanke and Alchemist harmed publishers by deflating bids and by increasing Google's win rate at the expense of third-party bidders.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

used similar bid-optimization strategies with "██████████████"[272] Moreover, Professor Li[273] and Dr. Zona's[274] claims that Google Ads' bid optimization programs relied on the so-called "Last Look" and exclusive information about the AdX floor are incorrect. Prior to the Unified First Price Auction (and the contemporaneous removal of the so-called "Last Look"), Google Ads "never used a floor price in an auction for an ad impression to adjust the bid values that they would submit for that same ad impression."[275]

---

[272] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[273] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 454 ("Last Look was critical to the success of the Bernanke and Global Bernanke strategy to inflate the highest Google Ads bid, which was designed to improve the win rate in auctions (where Google Ads would have otherwise lost to a rival exchange).").

[274] Expert Report of J. Zona (Oct. 4, 2024), at ¶ 71 ("Although Google Ads running BS-DRS achieved greater volume and revenue for both Google Ads and AdX, it could do so only by knowing the floor set by the publisher. Thus, manipulating the bids in this way is the product of advantages that AdX bestows upon Google Ads that are not available to Google Ads' rivals, who are not informed of the AdX reserve price before bidding and generally do not submit two bids for the same impression.").

[275] *See* "Declaration of N. Jayaram" (May 1, 2024), GOOG-AT-MDL-C-000017969, at ¶ 3 ("Before Google Ad Manager transitioned to a Unified First-Price Auction in 2019, Google Ads and DV360 never used a floor price in an auction for an ad impression to adjust the bid values that they would submit for that same ad impression.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

    d.    Professor Li and Plaintiffs allege that the Bernanke[276] and Alchemist[277] programs were "cartelist bid-rigging" schemes and Professor Li adds that the programs were also a form of "predatory pricing,"[278] but the programs' designs neither satisfy the definitions of those terms nor exhibit the characteristic effects of those behaviors.

    e.    Professor Cramton argues that "Bernanke provided conflicting incentives for an exchange representing buyers and sellers."[279] That is wrong. Bernanke did not balance "conflicting" incentives: it optimized the value of ads won by Google Ads

---

[276] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1002 (referring to "Google's bid-rigging and auction manipulation, in the forms of, for example, Bernanke, Alchemist, and DRS"), ¶ 1028 ("Differential price floors are also an optimal response to bidding cartels and bid boosting as Bernanke and DRS did, which I explain in a later section."), and Section VIII.B.1.b ("Project Bernanke implemented a collusive bidding ring"), and ¶ 41 ("Alchemist is anticompetitive for the same reasons that Bernanke is anticompetitive: It took the extra money generated by replicating cartelist bid-rigging and used that to boost bids against other exchanges."); Advertiser Class Complaint, at ¶ 329 (describing "auction-rigging programs, including Project[ ] Bernanke"). *See also* Publisher Class First Amended Complaint, at ¶ 23 ("Google used its monopoly power in the Ad Exchange market to implement three successive versions of a program called Project Bernanke, using exclusionary conduct to rig the auctions in AdX in a way that enhanced its monopoly power"); Daily Mail Second Amended Complaint, at ¶ 144 (arguing that "Bernanke allow[s] Google to rig AdX's bids to beat rivals by a penny"); Gannett Amended Complaint, at ¶ 175 (arguing that "Bernanke allow[s] Google to rig AdX's bids to beat rivals by a penny"); Inform Third Amended Complaint, at ¶ 218 ("Through [Bernanke], Google manipulated the prices paid by auction winners").

[277] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1002 ("Google's bid-rigging and auction manipulation, in the forms of, for example, Bernanke, Alchemist, and DRS"), Section XI.B ("Alchemist allows Google to continue its bid-rigging strategy while implementing a first-price auction."), ¶ 831 ("Alchemist, just like Global Bernanke, enables Google to generate outcomes equivalent to the case where bidders formed a bidding ring."), and ¶ 41 ("Alchemist is anticompetitive for the same reasons that Bernanke is anticompetitive: It took the extra money generated by replicating cartelist bid-rigging and used that to boost bids against other exchanges.").

[278] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 469 ("Global Bernanke can be considered not only akin to a bidding ring, but also a form of predatory pricing.").

[279] Expert Report of P. Cramton (Oct. 4, 2024), at Section 9.5 ("Bernanke provided conflicting incentives for an exchange representing buyers and sellers.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

advertisers, benefiting its advertiser customers.[280] Google experiments also found

that publisher revenues increased under Bernanke (see Section IV.C.2.d).

f.  Plaintiffs and their experts allege that Bernanke's confidentiality was harmful[281]

and deceptive.[282] These claims, however, overlook the benefits of keeping bidding

strategies confidential in auctions, which protects Google Ads' advertisers from

exploitation by publishers and other bidders. The deception allegation fails to

analyze how continuous experimentation allows participants to optimize their

---

[280] Initially, the Bernanke objective function was the total dollar value of impressions won by Google Ads, but from August 2015 onwards, Bernanke's objective has been the total value of the impressions won in terms of conversions for advertisers. *See* "Beyond Bernanke" (Aug. 17, 2015), GOOG-DOJ-28385887, at −893-894 ("Global Bernanke solves slightly modified optimization problem: **Maximize** Buy-side **value** (RPM [revenue per mille] * **CPD** [conversions per dollar] * Queries) per day") (emphasis in original).

[281] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 400 ("A key element of Bernanke was secrecy."); Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 226 ("The variable take rate charged under Bernanke was applied through GDN—a buyer-side tool—which would make it more difficult for publishers to observe. Again, proper auction design should involve transparency so that market participants understand how they can compete in a market, what they must pay should they win, and how they will be compensated if they are sellers. Google's Bernanke initiatives obscured this information contrary to appropriate market fundamentals."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at Section IV.B ("Bernanke and Alchemist involved deceptive acts that depressed prices. Google hid its use of Bernanke and Alchemist to deflate bids."); Expert Report of J. Chandler (Oct. 4, 2024), at ¶ 341 ("This undisclosed pooling prevented participants from making optimal decisions and harmed advertisers and other exchanges."); Publisher Class First Amended Complaint, at ¶ 23 ("Bernanke involved selectively and secretly inflating certain select advertiser bids made through its Ad Buying Tools and its Ad Exchange so as to impair competition in the Ad Exchange, Ad Network and Ad Buying Tools markets, and thereby enhance and entrench Google's monopoly power of its AdX, GDN and its Ad Buying Tool"); Advertiser Class Complaint, at ¶ 10 ("Google manipulates auctions with its secret 'Bernanke' programs and technology to increase its take rate and then uses the resulting pool of ill-gotten gains to manipulate subsequent auctions, stifling competition in the exchange market and in the small-advertiser buying tools market."); Gannett Amended Complaint, at ¶ 130 ("The third amended complaint revealed crucial details about how Google's secret programs (including Elmo, Poirot, and Bernanke and its variants) actually worked and for the first time described how those programs harmed a publisher like Gannett.")

[282] Gannett Amended Complaint, at ¶ 285 ("As alleged in this Complaint, Google's conduct is doubly deceptive [...] For example, with Project Bernanke, Google ran billions of price-depressive, third-price auctions in a manner that was undetectable to publishers."); Advertiser Class Complaint, at ¶ 403 ("Among other deceptive and unlawful acts that injured advertisers, [...] (c) Project Bernanke, including the Bell and Global Bernanke variants, to manipulate ad auctions in order to give an unfair advantage to Google Ads and disadvantage advertisers using other ad-buying tools"); Daily Mail Second Amended Complaint, at ¶ 140 ("Google's implementation of Bernanke and its variants was also deceptive."), ¶ 276 ("As alleged in this Complaint, Google's conduct is doubly deceptive [...] For example, with Project Bernanke, Google ran billions of price-depressive, third-price auctions in a manner that was undetectable to publishers."); Inform Third Amended Complaint, at ¶ 223 ("In addition to being fundamentally dishonest and fraudulent, Project Bernanke and its iterations were exclusionary and successfully foreclosed competition in the ad server, ad exchange markets and online video advertising markets.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

strategies regardless of whether strategic details are disclosed. Further, Plaintiffs' claims ignore that it is standard industry practice for companies to maintain confidentiality about their bidding optimizations, a practice also followed by Google's competitors with their own bid optimizations.[283]

g. Professor Jardin and Dr. Peña claim that Bernanke "[ran] a third-price auction instead of a second-price auction."[284] This claim and similar ones are incorrect.[285] Neither AdX nor Google Ads ever operated a third-price auction. Bernanke and its variations were bidding strategies that determined Google Ads' bids into AdX and could never alter the AdX auction format.

---

[283] 

[284] Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 47 ("With Project Bernanke, instead of paying publishers for the amount of the second highest bid, Google only paid publishers based on the third-highest bid—running a third-price auction instead of a second-price auction without disclosing this difference to publishers."); Expert Report of P. Peña (Oct. 7, 2024), at p. 20 ("Through those projects [Projects Bernanke, Global Bernanke, and Bell], Google selectively imposed third-price auctions on its transactions despite conveying to publishers and advertisers that they were running second-price auctions.").

[285] Publisher Class First Amended Complaint, at ¶ 280 ("But Google's secret Project Bernanke program was structured as a third-price auction rather than a second-price auction."); Advertiser Class Complaint, at ¶ 218 ("AdX also dropped or disregarded the second-place bid such the publisher received a payout equal to the third-highest bid or the publisher's floor"); Daily Mail Second Amended Complaint, at ¶ 134 ("Bernanke switched AdX to a third-price auction for publishers"); Gannett Amended Complaint, at ¶ 164 ("Bernanke switched AdX to a third-price auction for publishers"); Inform Third Amended Complaint, at ¶ 220 ("Google's secret Project Bernanke program surreptitiously switched AdX from a second-price auction to a third-price auction on billions of impressions per month.").

h.  Professor Li also argues that Global Bernanke and Alchemist decreased allocative efficiency,[286] but this argument is invalid. Any correct analysis of the effect of one bidder's strategy on efficiency must use information about the other bidders' strategies, which Professor Li's analysis fails to do.

### B. Google Ads' Two-Bid Policy for AdX

148.  Prior to January 2013, Google Ads submitted a **high bid** and a **low bid** into AdX for each impression equal to the values of the highest-scoring advertiser and the second-highest-scoring advertiser in the Google Ads internal auction, adjusted for a fixed Google Ads revenue share (which was typically 14%, and so I assume this to be Google Ads' revenue share in the remainder of this section).[287, 288] If the Google Ads high bid won the AdX auction, the impression would be assigned to the highest-scoring advertiser, and that advertiser would pay its threshold price, equal to the clearing price of the AdX

---

[286] Revised Expert Report of S. Li (Oct. 11, 2024), at Section VIII.B.4.b ("Global Bernanke reduced total welfare") and Section XI.D ("Alchemist was harmful to publishers as it resulted in reduced bids and also decreased allocative efficiency").

[287] In practice, AdX allowed a bidder to quote a "minimum clearing price" in its bid, which was the minimum price it would pay if it won the second-price auction. There is no difference in effect between a minimum clearing price and a second submitted bid, so I do not distinguish the two elsewhere in this report. *See* "Call-out-Proxy: 1-bid, 2-bid, and min-bid" (Feb. 24, 2012), GOOG-DOJ-03366145, at -145, -147 ("Engineering suggestion: Each ad-network transfers a single bid, with an added field: a minimum price that needs to be paid if its bid wins."); "RPO Exemption Policy V2 Launch Doc" (Nov. 14, 2017), GOOG-DOJ-13212948, at -948 ("The current policy (b/18573816) exempts a buyer network on a specific ad query if we see either more than one open auction bid submitted by the network, or a single bid that specifies a minimum payment.").

[288] Email from ███████ to ███████, "Re: GDN Dynamic Revshare launched today!" (Jan. 17, 2013), GOOG-DOJ-04306227, at -227 ("In this case, GDN first holds its own auction and submits the leading 2 bids to the AdX auction. Historically, GDN applied a 14% revshare to these bids and AdX applies a 20% sell-side revshare to all bids in their auction.").

second-price auction, plus the Google Ads revenue share.[289, 290] I call this combination of how bids were submitted and prices set the Google Ads "**two-bid policy**."

149. For example, suppose that Google Ads had two advertisers willing to pay $4.00 and $2.00, respectively, for an impression with a floor price of $1.00. Under the two-bid policy, it would submit to AdX a high bid of $3.44 and a low bid of $1.72, with each bid equal to its advertisers' values net of the 14% Google Ads revenue share. If the $3.44 bid from Google Ads was the highest bid on AdX, the Google Ads advertiser would win the second-price auction, and the auction's clearing price would be the larger of the Google Ads' low bid of $1.72 or the highest bid from another bidder on AdX. For example, if there was another bidder on AdX with a bid of $2.58, the clearing price of the AdX auction would be $2.58 and the winning Google Ads advertiser would be charged $3.00 (equal to $2.58 divided by 86%, to account for the 14% Google Ads revenue share).[291] On the other hand, if the second-highest bid on AdX was the Google Ads low bid of

---

[289] "GDN Auction Overview" (Oct. 11, 2014), GOOG-AT-MDL-001094067, at -076 ("The auction price[:] After the winner is selected, the auction converts the cost to a price for each candidate. For example, to compute the price that a MaxCPC candidate must pay in the event of a click, we divide the total cost by the probability of a click: $CPC_i = Cost_i / (pCTR_i * Position\ Normalize_{[config,\ ij]})$"), -082 ("AdX bills per impression. When GDN submits a CPC bid, we pay the publisher immediately based on eCPM but we charge our advertiser only if the user clicks the ad. In the logs, the cost_type for these impressions is CPC_TO_CPM."), -082 ("We compute our first bid as the sum of maximum bids for the advertisers in the configuration, less our revenue share. We compute our second bid as the price that we calculated for the winners of the configuration in the GDN auction, less our revenue share. AdX charges GDN the greater of the following amounts when we win an AdX auction: • Our second bid • A competing advertiser's bid. If a winning ad receives a click, Google charges the advertiser the AdX bid plus our revenue share.")

[290] To formalize this mathematically, suppose that $v_1$ and $v_2$ are the largest and second-largest values among Google Ads advertisers, and let $b_2$ be the larger of the second-highest bid on AdX and the floor price on AdX. Under the two-bid policy, Google Ads would make a high bid of $0.86v_1$ and a low bid of $0.86v_2$. If Google Ads provided the winning bid in the AdX auction, it would be charged $p = \max(0.86v_2, b_2)$ and the winning Google Ads advertiser would be charged $p/0.86 = \max(v_2, b_2/0.86)$.

[291] In this section, to simplify the description of the two-bid policy, I put aside the fact that many Google Ads advertisers pay only when clicks/conversions occur. As I described in Paragraph 111, as long as Google's estimates of engagement rates are correct, the average price paid under the pay-per-outcome system is the same as the average impression price given the per-impression bids calculated by Google Ads.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

$1.72, the clearing price of the auction would be $1.72, and the winning Google Ads advertiser would be charged $2.00.

150. This two-bid policy had four important effects. *First*, it ensured that Google Ads received a fixed proportion of the revenue generated by the sale of each impression. *Second*, because it charged the advertiser a threshold price (see Section III.C.3.a), it ensured that the combination of the Google Ads internal auction and the subsequent AdX auction was a bidder-truthful process. This meant that advertisers only needed to determine their values for impressions (or their other campaign goals), and could do no better than to allow Google Ads to choose bids on their behalf. *Third*, the two-bid policy resulted in a market-clearing price for both the advertiser and the publisher (that is, a price that the publisher is willing to accept and no other bidder is willing to beat). *Finally*, it replicated the outcomes of direct bidding by Google Ads advertisers, in a sense I now formalize.

151. I define a **direct bidding** policy as follows. Under direct bidding:

  a. each Google Ads advertiser independently submits a bid to Google Ads with access to the same technical expertise and the same historical information on impressions as Google Ads;

  b. Google Ads deducts its revenue share from that bid; and

  c. for each advertiser, Google Ads submits the result of this calculation as a bid in the AdX auction, and charges a winning advertiser the clearing price of the AdX auction (plus the Google Ads revenue share).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

By definition, under direct bidding, no advertiser's bid affects the bid submitted by any other advertiser. The two-bid policy replicates the outcomes that would result from direct bidding.[292]

### C. Google Ads' Bid Optimization Programs: Buy-Side DRS, Bernanke, and Alchemist

152. While a two-bid policy maximizes advertiser surplus among all bidder-truthful bidding policies with the same fixed revenue share on each impression, Google Ads identified that it could further improve outcomes for both itself and its advertisers using a different bidding policy that varied its revenue share on an impression-by-impression basis. I call such a program that selects bids to maximize an objective a **bid optimization program** (also known as a buy-side **dynamic revenue sharing program** because, given the bidder's value, one can choose bids indirectly by varying the buying tool's revenue share). Before I describe the bid optimization programs introduced by Google Ads, I first extend the example from Paragraph 149 to show how a program that fixes its *average revenue share* across a pool of impressions[293] can improve outcomes for Google Ads' customers, while simultaneously increasing Google Ads profits.

153. To illustrate this possibility, suppose that there are *two* impressions being sold on AdX like the ones from Paragraph 149, which have value $4.00 for Advertiser A on Google Ads and value $2.00 for Advertiser B on Google Ads. As I described above, under the Google Ads two-bid policy, Google Ads would calculate its bids by applying its fixed

---

[292] To see this, note that an advertiser bidding some amount under direct bidding has the same probability of winning and the same expected payment as under the two-bid policy, so that its optimal bids are the same under the two policies, leading to the same auction outcomes.

[293] In this report, Google's *average revenue share* from a pool of impressions or over a period of time means Google's revenue divided by the total revenue from that pool or over that period. A publisher's average revenue share is computed similarly.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

14% revenue share to each impression, leading to it submitting bids of $3.44 and $1.72 on AdX. If the best other bid on AdX is $3.80 for the first impression and $1.00 for the second impression, then, under the two-bid policy, the Google Ads bids would only win the second impression at a clearing price of $1.72, which Google Ads would allocate to Advertiser A, charging $2.00, leading to total Google Ads advertiser surplus of $2.00 and Google Ads revenue of $0.28.[294] If instead Google Ads submitted a high bid of $4 and a low bid of $1.00 for both impressions, the Google Ads high bidder would win both impressions, with Google Ads paying $4.80 in total for the two impressions.[295] Google Ads could then charge $5.58 to Advertiser A for the two impressions, leading to increased advertiser surplus of $2.42 (vs. $2.00 under two-bids) and increased revenues for Google Ads of $0.78 (vs. $0.28 under two-bids), while maintaining an average Google Ads revenue share of 14%.[296]

154.   In this simplified example in which publishers and bidders left their floor prices and bids unchanged, the decision by Google Ads to maintain its *average* revenue share across multiple impressions while allowing the share to vary for each individual impression improved Google Ads' profits and the surplus of its advertisers. In general, for *any* fixed set of bids chosen by advertisers and floor prices chosen by publishers, advertisers can

---

[294] To see this, note that for the first impression, the non-Google Ads bid of $3.80 is the highest, so the high Google Ads bid does not win that impression, but on the second impression, the Google Ads bid of $3.44 is the highest and its bid of $1.72 is the second-highest (and thus the auction's clearing price), so that Advertiser A wins the second impression and pays its threshold price of $2.00. Advertiser A's surplus is then its value minus the price it pays, here $4.00 - $2.00 = $2.00. Google Ads' revenue is $2.00 - $1.72 = $0.28.

[295] To see this, note that the Google Ads bid of $4 is the highest for both impressions, and in the first case, the second-highest bid is $3.80 (leading to a clearing price of $3.80), and in the second case, the second-highest bid is $1.00 (leading to a clearing price of $1.00). The total is then $3.80 + $1.00 = $4.80.

[296] Applying the 14% revenue share to the $4.80 cost of impressions to Google Ads gives $4.80 / 0.86, which is approximately $5.58. Advertiser A's surplus is then $8.00 - $5.58 = $2.42. Google Ads' revenue is then $5.58 - $4.80 = $0.78.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

benefit from a program that averages revenue shares over a pool of impressions, without changing the overall average revenue share. While in this example, the increase in impressions won by Google Ads led to an equivalent loss in impressions won by other bidders on AdX, *this need not be true in general*. If the example were changed so that instead of the $3.80 being another advertiser's bid, it were the publisher floor price, then no other AdX bidder is affected at all: instead, an unsold impression is avoided, and publisher revenue is increased.

155. The foregoing discussion assumed that Google Ads knew its advertisers' values for the impressions and could choose its bids without influencing the incentives for advertisers to report their values for those impressions to Google Ads. It also did not consider the effects of its bidding policy on the floor prices chosen by publishers. As I have emphasized elsewhere, for accurate analysis of any bidding program or auction design, it is important to account for the incentives of both advertisers and publishers. Because these incentives depend fundamentally on each program's designs, I now discuss the evolution of Google Ads' bid optimization programs, before I analyze the effects of each program on advertisers and publishers.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 1. The Evolution of Google Ads' Bid Optimization Programs

#### a) Buy-Side DRS: Reducing Revenue Shares to Win Additional Impressions

156. In January 2013, Google Ads introduced **Dynamic Revenue Share for AdWords** (**buy-side DRS**).[297, 298] Buy-side DRS was introduced partially in response to changes in bidding strategies of other bidders on AdX: a Google engineer observed at the time of its launch that "savvy exchange buyers (especially re-marketing players) are increasingly thinning their margins to win on volume."[299] Buy-side DRS allowed Google Ads to regain volume by reducing its revenue shares on some impressions to allow its advertisers to win additional impressions.[300] Unlike its later bid optimization programs, Google Ads did not increase its revenue share on other impressions.[301] Although this had the effect of slightly reducing Google Ads' overall revenue share, in experiments, that was more than offset by an increased volume of inventory won, so that the program led to an overall increase in profits for Google Ads.[302]

---

[297] Email from ▮▮▮▮▮ to ▮▮▮▮▮, "Re: GDN Dynamic Revshare launched today!" (Jan. 17, 2013), GOOG-DOJ-04306227, at -227 ("Today we launched GDN Dynamic Revshare - a means for GDN to optimize the revshare we apply to AdX bids").

[298] Note that Google had other programs with names like "dynamic revenue share," including on AdX ("sell-side DRS"). For clarity, I will refer to the Google Ads program as *buy-side* DRS.

[299] Email from ▮▮▮▮▮ to ▮▮▮▮▮ "Re: GDN Dynamic Revshare launched today!" (Jan. 17, 2013), GOOG-DOJ-04306227, at -227.

[300] "Dynamic Revshare for AdWords on AdX" (July 13, 2012), GOOG-DOJ-13605152, at -152 ("Objective[:] Allow AdWords to dynamically adjust the revenue share it charges its bidders when competing in the AdX auction on a per-query basis […] The goal is to increase match rate of AdWords retargeting ads, while not undercutting Adwords-on-AdX revenue."); "GDN Dynamic Revshare Launch" (Jan. 16, 2013), GOOG-DOJ-02854344, at -350 ("Launch Results […] queries +4.6% […] Adwords effective rev-share: 13.4% (control 14%)").

[301] "Dynamic Revshare for AdWords on AdX" (July 13, 2012), GOOG-DOJ-13605152, at -153 ("In cases with less competition AdWords can keep its current 14% revshare, and in cases where competition is high AdWords can choose to lower its margin.").

[302] Email from ▮▮▮▮▮ to ▮▮▮▮▮ "Re: GDN Dynamic Revshare launched today!" (Jan. 17, 2013), GOOG-DOJ-04306227, at -227 ("As a result the leading bid is higher, and more competitive in the AdX auction - enabling GDN to win 4.6% more impressions. While you might think that using a 0% revshare would eliminate GDN's profit, this is not the case because GDN is only charged the second price in the AdX auction. In fact,

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

157. Buy-side DRS worked as follows. Google Ads continued to submit two bids for each impression on AdX, but instead of determining the Google Ads high bid by deducting a fixed Google Ads revenue share from the highest scoring bidder's value, Google Ads deducted a *smaller* revenue share (as small as 0%) on some impressions.[303] This had the effect of increasing the Google Ads high bid on a subset of impressions, allowing its advertisers to win additional inventory.[304] Google Ads continued to calculate advertiser payments based on the clearing price of the AdX auction, adjusted for the standard 14% revenue share, unless the result was higher than the advertiser's value for the impression, in which case the payment was capped at the bidder's value.[305, 306]

### b) Project Bernanke: Winning More Impressions with a Fixed Average Revenue Share

158. In November 2013, Google Ads replaced buy-side DRS with a more comprehensive bid optimization program called **Project Bernanke**.[307] One of the motivations for Project

---

Dynamic Revshare increases GDN revenue by 7.6% and profit by 4.1% on AdX inventory."); "GDN Dynamic Revshare Launch" (Jan. 16, 2013), GOOG-DOJ-02854344, at -348, -350.

[303] Email from ▇▇▇▇▇ to ▇▇▇▇▇▇▇ "Re: GDN Dynamic Revshare launched today!" (Jan. 17, 2013), GOOG-DOJ-04306227, at -227 ("Dynamic Revshare changes this logic by applying a revshare of 0% to the leading bid. (The 2nd bid still has the 14% revshare applied to it.)"); "GDN Dynamic Revshare Launch" (Jan. 16, 2013), GOOG-DOJ-02854344, at -347.

[304] "GDN Dynamic Revshare Launch" (Jan. 16, 2013), GOOG-DOJ-02854344, at -350 ("Launch Results […] queries +4.6% […] Adwords effective rev-share: 13.4% (control 14%)").

[305] To formalize this mathematically, suppose that $v_1$ and $v_2$ are the largest and second-largest values among Google Ads advertisers, let $b_2$ be the larger of the second-highest bid on AdX and the floor price on AdX. Under buy-side DRS, Google Ads would make a high bid of $v_1$ for some subset of impressions and a low bid of $0.86v_2$. On those impressions, if its high bid won the AdX auction, it would be charged $p = \max(0.86v_2, b_2)$ and would charge a winning Google Ads advertiser $\min(\max(b_2/0.86, v_2), v_1)$.

[306] *See* "Dynamic Revshare for AdWords on AdX" (July 13, 2012), GOOG-DOJ-13605152, at -153; "GDN Dynamic Revshare Launch" (Jan. 16, 2013), GOOG-DOJ-02854344, at -349.

[307] "Launch Details Spreadsheet, Launch 106307" (Aug. 29, 2023), GOOG-AT-MDL-009644018, at cells C1, C2 ("Launch Date [...] 2013-11-11").

Bernanke was to expand output by allowing Google Ads advertisers to purchase otherwise unsold impressions, which was around half of all impressions at the time Bernanke was introduced.[308] At a high level, Bernanke achieved this objective by reducing the price that Google Ads paid for some impressions, allowing it to use the savings to bid more on other impressions, thus winning additional impressions for its advertisers and reducing the number of unsold impressions on AdX.[309] Project Bernanke accomplished this by modifying *both* of the bids that Google Ads submitted into the AdX second-price auction: it increased its high bid to win more impressions (as in buy-side DRS), but also decreased its low bid to reduce the AdX clearing price on some impressions.[310] Like buy-side DRS, Bernanke caused the Google Ads revenue share to vary on individual impressions, but Google Ads calibrated Bernanke to ensure that its average revenue share remained at the 14% target for each publisher.[311]

159. Project Bernanke used an optimization procedure to determine its bidding strategy into AdX. Under Project Bernanke, Google Ads chose **multipliers** for its two bids into AdX. The **high bid multiplier** led to high bids that were *higher* than those that Google Ads

---

[308] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -176 ("The current match rate on AdX (*i.e.*, queries where there is a winning ad) is about 50%. The primary reason for the low match rate are the reserve prices set by the publisher, which need to be beat for an ad to win the auction.").

[309] Email from ███████████████ to W. Kim, "[Launch 106307] gTrade: Project Bernanke" (Oct. 18, 2013), GOOG-DOJ-14952787, at -787 ("GDN wins more auctions and generates more revenue at the same average 14% revshare; GDN's advertisers win more auctions and get greater click/conversion volume; and AdX publishers enjoy higher match rate and revenue.").

[310] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -176 ("Project Bernanke involves reducing the second price and increasing the first price of the two bids submitted by GDN to the AdX auction in such a way that publishers receive fair payout (e.g. GDN margin remains constant) and GDN profit is maximized.").

[311] Email from ███████████████ to W. Kim, "[Launch 106307] gTrade: Project Bernanke" (Oct. 18, 2013), GOOG-DOJ-14952787, at -787 ("GDN wins more auctions and generates more revenue at the same average 14% revshare; GDN's advertisers win more auctions and get greater click/conversion volume; and AdX publishers enjoy higher match rate and revenue.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

used under the two-bid policy, causing Google Ads advertisers to win additional impressions and reduce the number of unmatched impressions, increasing the publisher's revenue from those impressions and ones for which Google Ads' high bid was second-highest in the AdX auction.[312] The **low bid multiplier** led to low bids that were *lower* than those that Google Ads used under the two-bid policy, lowering the AdX clearing price of certain impressions, namely, ones for which Google Ads would otherwise have submitted the two highest bids and both of those exceeded the auction's floor price.[313] The high and low bid adjustments were chosen separately for each publisher to *maximize* the total dollar value of impressions purchased via Google Ads while maintaining an overall Google Ads revenue share target (typically 14%), given the payment rules for Google Ads advertisers.[314]

160. Google Ads performed this optimization procedure weekly using data it obtained from its experiments conducted on a 1% sample of auctions in which it participated in the previous week.[315] It used that data to simulate auctions for different choices of bid

---

[312] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -176 ("As mentioned above, project Bernanke involves reducing the second price and increasing the first price of the two bids submitted by GDN to the AdX auction in such a way that publishers receive fair payout and GDN profit is maximized. […] We pick various bid multipliers between 1 and 4 and evaluate whether GDN will win that query at each of these bid multipliers. On queries won by GDN at any bid multiplier, the payouts to the exchange and the publisher are then computed for various second bid reductions from 0 to 1."); "Project Bernanke: Quantitative Easing on the AdExchange" (Oct. 21, 2013), GOOG-DOJ-12700489, at -493 ("Matched Queries +11.8% (0.72B/day) […] AdWBuyers Matched Queries +19.2% (1.07B/day) […] Pub Revenue +8.0% ($108M/year)").

[313] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -175 to -176 ("As mentioned above, project Bernanke involves reducing the second price and increasing the first price of the two bids submitted by GDN to the AdX auction in such a way that publishers receive fair payout and GDN profit is maximized.").

[314] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -175 ("This is done in such a way that GDN profit is maximized while also ensuring fair GDN payout to the exchange/ publisher. Here, fairness is defined as ensuring the desired margin on the GDN payout. For instance, for non-video requests, this implies retaining only $0.14 on average for every $1 revenue.").

[315] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -176 ("In order to gather data for running the auction simulations, a 1% background experiment is run…").

multipliers and chose multipliers for each publisher's impressions that would maximize the total dollar value of ads won by Google Ads advertisers, subject to maintaining Google Ads' target average revenue share.[316] Google Ads also introduced an "online safety mechanism" to adjust the multiplier chosen in the case its overall revenue share drifted too far from the target.[317] Initially, the Google Ads revenue share target was applied per publisher.[318] In August 2015, Google Ads launched **Global Bernanke**, which applied the Google Ads revenue share target on average across publishers, while allowing the Google Ads revenue share target to vary to an extent for individual publishers.[319, 320] This additional flexibility in the choice of bid multipliers allowed Google Ads to further increase the total number and value of impressions won by its advertisers.

161. The optimization procedures described in Paragraph 160 used information of a kind that was also available to other buying tools. Contrary to the characterization by Daily Mail and Gannett, Bernanke neither relied on an "artificial information advantage" nor "used

---

[316] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -176 ("In order to gather data for running the auction simulations, a 1% background experiment is run where every top GDN bid is quadrupled and the second bid dropped. In this experiment, on queries GDN wins, it can be inferred that the second price is the price that GDN needs to beat in order to win the auction. Now, we can determine, if instead of quadrupling the bid, we could have, for instance, tripled the bid and still won this auction.").

[317] "Project Bernanke: Quantitative Easing on the AdExchange" (Oct. 21, 2013), GOOG-DOJ-12700489, at -492 ("We implemented safety mechanism to fine-tune bid adjustments when margin drifts away from 14% in each supermixer task. Based on E[margin] calculated from eCPM vs payout. E[margin] >> 14% --> stop cutting second bid. E[margin] << 14% --> stop increasing first bid.").

[318] "Project Bernanke: Exchange Profit Optimization" (May 20, 2013), GOOG-DOJ-13625417, at -422 ("14% margin across all pubs or per pub? We suggest per pub. Ensures 'fair' payout to each pub").

[319] "Launch Details Spreadsheet, Launch 133445" (Aug. 25, 2023), GOOG-AT-MDL-009644112, at cells C2 (noting launch date of 2015-8-12), D2 ("Global Bernanke is an extension of project bernanke in which GDN retains a 15% margin on AdX as a whole, while deviating from 15% on individual publishers.").

[320] At the same time, Google Ads updated the Bernanke objective function from total dollar value of impressions won by Google Ads to the total value in terms of conversions for advertisers. *See* "Beyond Bernanke" (Aug. 17, 2015), GOOG-DOJ-28385887, at -894 ("Global Bernanke solves slightly modified optimization problem: **Maximize** Buy-side **value** (RPM [revenue per mille] * **CPD** [conversions per dollar] * Queries) per day") (emphasis in original).

rival bids [] from publishers' ad servers."[321] As a Google engineer noted in a contemporaneous internal document, "[w]e respect GDN-AdX firewall: we only utilize GDN data to optimize bidding strategy. Any AdX buyer can do this."[322] Moreover, access to "unhashed user IDs"[323] were not needed to implement any version of Bernanke: a bidder viewing only encrypted user IDs could still track spending by publisher (as in the version of Bernanke before Global Bernanke). Indeed, other bidders ultimately developed similar bid optimization programs without access to unhashed user IDs.[324]

162.  In the first version of Bernanke, the prices that Google Ads charged a winning advertiser were determined as follows. On all impressions that it won on AdX at a price lower than the winning advertiser's net bid (after deducting Google Ads' standard 14% revenue share), the winning advertiser paid the larger of the second-highest Google Ads bid and

---

[321] Gannett Amended Complaint, at ¶ 164 ("Capitalizing on its artificial information advantage, Google used rival bids and unhashed user IDs from publishers' ad servers to determine precisely how much to inflate Google bids in order to take impressions from competing DSPs and exchanges."); Daily Mail Second Amended Complaint, at ¶ 134 ("Capitalizing on its artificial information advantage, Google used rival bids and unhashed user IDs from publishers' ad servers to determine precisely how much to inflate Google bids in order to take impressions from competing DSPs and exchanges.").

[322] "Project Bernanke: Quantitative Easing on the Ad Exchange gTrade Update" (Oct. 3, 2013), GOOG-DOJ-06842351, at -359.

[323] Gannett Amended Complaint, at ¶ 164 ("Capitalizing on its artificial information advantage, Google used rival bids and unhashed user IDs from publishers' ad servers to determine precisely how much to inflate Google bids in order to take impressions from competing DSPs and exchanges."); Daily Mail Second Amended Complaint, at ¶ 134 ("Capitalizing on its artificial information advantage, Google used rival bids and unhashed user IDs from publishers' ad servers to determine precisely how much to inflate Google bids in order to take impressions from competing DSPs and exchanges.").

[324] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

the auction's clearing price (adjusted for the Google Ads revenue share).[325] This is the same price that the advertiser would pay without Bernanke.[326] On the impressions that Google Ads won on AdX at a price that was higher than the winning advertiser's net bid, the winning advertiser paid its bid for the impression.[327] This pricing rule created an incentive for advertisers to earn additional surplus on the extra impressions transacted by reducing their bids into Google Ads below their values.

163.    In April 2016, Google Ads changed the Bernanke pricing rule for the majority of its advertisers (those using its automated bidding tools) to restore bidder-truthfulness.[328] It did so by charging a winning advertiser its threshold price—that is, an amount equal to the lowest value it could have reported while still winning the impression.[329] This resulted

---

[325] "Project Bernanke: Exchange Profit Optimization" (May 20, 2013), GOOG-DOJ-13625417, at -424 ("Queries GDN was already winning[:] GDN still wins these queries[,] Advertiser cost unchanged, based on second price auction [...] Queries GDN wins because of increased bids[:] Advertiser pays first price (same as dynamic revshare)").

[326] "Project Bernanke: Exchange Profit Optimization" (May 20, 2013), GOOG-DOJ-13625417, at -424 ("Queries GDN was already winning[:] GDN still wins these queries[,] Advertiser cost unchanged, based on second price auction [...] Queries GDN wins because of increased bids[:] Advertiser pays first price (same as dynamic revshare)").

[327] "Project Bernanke: Exchange Profit Optimization" (May 20, 2013), GOOG-DOJ-13625417, at -424 ("Queries GDN was already winning[:] GDN still wins these queries[,] Advertiser cost unchanged, based on second price auction [...] Queries GDN wins because of increased bids[:] Advertiser pays first price (same as dynamic revshare)").To formalize this mathematically, suppose that $v_1$ and $v_2$ are the largest and second-largest values among Google Ads advertisers, and let $b_2$ be the larger of the second-highest bid on AdX and the floor price on AdX. Under Bernanke, Google's high bid was $\beta v_1$ (for some $\beta \geq 0.86$) and its low bid was $\alpha v_2$ (with $\alpha \leq 0.86$). If Google Ads won the AdX auction, it would pay AdX $\max(b_2, \alpha v_2)$, and, under the original Bernanke pricing rule, the winning Google Ads advertiser would be charged $\min(\max(b_2/0.86, v_2), v_1)$.

[328] "Don't First Price CO on AdX & AWBID" (Apr. 6, 2016), GOOG-DOJ-AT-02467209, at -209 ("Launch has two parts: 1) Do not first-price conversion optimizer ads on AWBID and AdX. Instead charge the minimum price needed to win the query. No change for non-CO ads."); Email from ██████████ to W. Kim, "UPCOMING LAUNCH - Please review: [Launch 150218] Removing first pricing in global Bernanke and AWBid DRS + tuning Bernanke thresholds" (Apr. 8, 2016), GOOG-DOJ-15730729, at -729; "Auction Overview" (Dec. 2019), GOOG-DOJ-13979867, at -879 ("Preserving incentive compatibility [...] Most spend on GDA is from auto bidding").

[329] To formalize this mathematically, suppose that $v_1$ and $v_2$ are the largest and second-largest values among Google Ads advertisers, and let $b_2$ be the larger of the second-highest bid on AdX and the floor price on AdX. Under Bernanke, Google's high bid was $\beta v_1$ (for some $\beta \geq 0.86$) and its low bid was $\alpha v_2$ (with $\alpha \leq 0.86$). If Google Ads

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

in a bidder-truthful process for Google Ads advertisers, making it simpler for them to configure their campaigns optimally.

### c) Alchemist: Updating Bernanke to Optimize Bids for Advertisers in the Unified First Price Auction

164.   In September 2019, when AdX completed its transition to the Unified First Price Auction, Bernanke was updated to be compatible with the first-price auction format.[330] The updated program was called **Alchemist**. As I discussed in Section III.C.3.b, in the first-price auction format, it is optimal for a profit-maximizing bidder to shade its bid below its value. Alchemist shades bids into AdX on behalf of advertisers using Google Ads. Those bids determine the prices paid to publishers, but Alchemist charges a winning advertiser its threshold price, which makes the auction process bidder-truthful for advertisers.[331] Like the earlier versions of Bernanke, Alchemist ███████████

███████████████████████████████████

███████████████████████████████████

████████████████.[332] Unlike the original versions of Bernanke, Alchemist

---

won the AdX auction, it would pay AdX $\max(b_2, \alpha v_2)$, and, under Bernanke with the threshold pricing rule, the winning Google Ads advertiser would be charged $\max(b_2/\beta, v_2)$.

[330] "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 22 ("Google updated the Bernanke algorithms in 2019 to be compatible with the Unified First Price Auction. The updated version of Bernanke was sometimes referred to within Google as 'Alchemist.'").

[331] "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 22 ("Since Google has transitioned to a Unified First Price Auction, the amount an advertiser pays Google Ads has been determined in generally the same way as before the transition, except that Google Ads began to use minimum-bid-to-win data to determine the amount that the advertiser would need to bid to win the AdX auction (factoring in the Google Ads margin).").

[332]



optimizes bids for a first-price auction format, rather than a second-price format, selecting bids into the Unified First-Price Auction using experiments similar to those conducted by DV360 in the Poirot program, discussed in detail in Section VII below.[333] This means that under Alchemist, Google Ads shoulders the task of optimizing bids for the first-price auction format—a task that advertisers would otherwise need to attempt to do on their own—while eliminating any need for advertisers to strategize about their reporting to Google Ads.

### 2. Google Ads' Bid Optimization Programs Benefited Its Advertisers

165. In this section, I establish that each of Google Ads' bid optimization programs increased advertiser surplus for most of Google Ads' advertiser-customers, compared to their surplus under direct bidding, as I defined in Paragraph 151 above. In doing so, I fully account for the incentives for publishers to change their floor prices and Google Ads advertisers to change their bids in response to the bid optimization programs. These incentives are overlooked in Plaintiffs' analyses of Project Bernanke.

166. I establish the effects of Google Ads' bid optimization programs on its advertisers in three logical steps. *First*, I consider the effect of each program on advertiser surplus, supposing that the behavior of publishers and Google Ads advertisers remains unchanged by each program. *Second*, I account for the incentive effect of each program on the bids chosen by Google Ads advertisers and show that those effects can only further increase the surplus of Google Ads advertisers. *Third*, I account for the incentives for publishers to

---

[333] "GDN AdX First-Price Bidding Infrastructure" (Sept. 3, 2019), GOOG-DOJ-15254730, at -735 ("Compute the optimal first price bid for Adx with an optimal first price bid calculator. GDN uses the same first price bidding strategy as DBM fixed CPM, which maximizes the advertiser's surplus. Thus, we use the same BayesianFirstPriceBidCalculator class used for DBM fixed CPM to compute the first price bid for GDN.").

increase floor prices, which would tend to offset the increase in advertiser surplus obtained in the first two steps. I use a combination of economic theory and empirical analysis to establish that, for any such program allowing Google Ads advertisers to win more impressions, and even after accounting for publishers' responses, the net effect on Google Ads advertiser surplus (which depends not only on the number of impressions won, but also the prices paid) is positive. Finally, I discuss Google's experimental evidence relating to its bid optimization programs, which support these same conclusions.

### a) Fixing Bids and Floor Prices, Each Bid Optimization Program Increased Advertiser Surplus

167. As I have discussed in Section IV.B above, the Google Ads two-bid policy replicated the outcomes of direct bidding and was bidder-truthful, which means that in any single auction, each Google Ads advertiser was incentivized to report its true value for an impression. In this section, I compare outcomes under the various Google Ads bid optimization programs to those that would be obtained under direct bidding, supposing that the behavior of Google Ads advertisers, publishers and other bidders on AdX was unchanged. The following are the effects of each program:

a. *Buy-side DRS, Bernanke,* and *Global Bernanke with its original pricing rule*: These programs all increased the Google Ads high bid into AdX, so that if publishers and other bidders do not change their behavior, advertisers using Google Ads would win all the impressions that they would have won under the two-bid policy and also additional impressions. Under all three programs, for all impressions that Google Ads advertisers would have won in the absence of the

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

bid optimization program, their payments were unchanged, while on the new impressions won as a result of the bid optimization programs, they would pay no more than their values. Overall, this could not reduce the surplus earned by advertisers.[334]

b. *Global Bernanke with a threshold pricing rule* and *Alchemist*: Fixing the behavior of publishers and other bidders, on the impressions that a Google Ads advertiser would have won in the absence of these programs, the effect of the program is to lower the thresholds that the advertiser must bid to win, and hence to reduce the prices the winning bidder pays, so the surplus it earns on each such impression cannot fall. For any additional impressions the advertiser wins as a consequence of the bid optimization program, the threshold price is never greater than the advertiser's bid, so the additional surplus from those impressions must be positive. This implies that the advertiser earns more surplus with those programs than without them. These programs both have the additional advantage of incentivizing advertisers to bid their value for an impression, making it easier for

---

[334] Note that the logic for Bernanke must be modified slightly for advertisers using automated bidding strategies involving budgets (because if the bids submitted by Google Ads to AdX were unchanged for those advertisers after Bernanke was introduced, the additional impressions won at a price equal to the bid would reduce the budget, without increasing the advertiser's surplus, and potentially reduce the advertiser's ability to win impressions it would have won in the absence of Bernanke). But Bernanke still benefits such advertisers because—if advertisers do not change their campaign objectives—the automated bidding program could choose a value for each impression leading to the same *net bid* with Bernanke as without it, which would lead to no change in impressions bought or prices (and thus no change in the advertiser's surplus). This means that the *optimal* choices of per-impression value chosen by the automated bidding tool can only lead to an increase in the advertiser's campaign objective, and any change in campaign objectives by a rational advertiser could only *further* increase the advertiser's benefits.

On the other hand, buy-side DRS was not applied to budget-constrained advertisers, so that any additional impressions won as a result of buy-side DRS did not reduce the advertiser's ability to win its existing impressions. *See* "Including Budget Constrained Ads in Bernanke" (June 3, 2015), GOOG-AT-MDL-004555239, at -239 ("Originally, with DRS, we did not include budget constrained ads […]").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

advertisers to report their campaign objectives to Google Ads, reducing transaction costs for advertisers.

### b) If Google Ads Advertisers Re-Optimize Their Bids While Publisher Floors Remain Constant, Advertiser Surplus Can Only Increase Further

168. Under buy-side DRS, Bernanke, and Global Bernanke with the original pricing rule, Google Ads advertisers sometimes paid the amounts they bid on some impressions, which created an incentive for advertisers to lower their bids to increase their surplus on the impressions they won. In contrast, Bernanke with threshold pricing and Alchemist both incentivize advertisers to bid their value for an impression. But whatever an advertiser's *optimal* bids were after the introduction of the Google Ads bid optimization programs, these bids can only result in a *higher* expected surplus than the advertiser obtains under the bids it chooses under direct bidding (which I showed in Section IV.C.2.a was *higher* than the expected surplus it obtains in the absence of each optimization program). This means that—after incorporating any changes in Google Ads advertisers' bids caused by those programs (but not changes in publishers' floor prices)—each program must have increased expected advertiser surplus.

### c) Even Accounting for Likely Reactions by Publishers, Analysis of Google Ads Data Shows that Each Optimization Benefited Most Advertisers

169. Each of the Google Ads bid optimization programs increased some bids submitted by Google Ads for impressions. As a result, a revenue-maximizing publisher would be

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

incentivized to set a higher floor price for each impression.[335] These higher floor prices could, in theory, offset the benefits of the optimization programs for Google Ads advertisers by increasing the prices paid on some impressions and reducing the probability that a Google Ads advertiser wins an impression (compared to the absence of a response from publishers). To assess the combined effects of the bid optimization programs and publishers' responses, I conducted a quantitative evaluation using the Google Ads Log-Level Dataset from January 2024.[336]

170. For my computations, I divided the Google Ads data into **slices**, each containing observations of advertiser values for impressions with the same publisher, inventory unit, and other observable characteristics. I study the 121,238 slices with sufficient data to analyze reliably: those with at least 100,000 bids and $1 of advertiser spend.[337] I provide further details about this dataset and the slices analyzed in the Technical Notes in Section XV.B.3.

171. I investigate the data by posing the following question: *is it possible that, in some of these slices, publishers could have adjusted their floor prices so that the combined effect of Google's bid optimization and the publisher's adjustment increased Google Ads' win rate without also increasing the surplus enjoyed by Google Ads' advertisers?* If the answer is no, then any Google Ads bid optimization program that increases its win rate in the AdX auction is necessarily also a program that benefits its advertisers.

---

[335] This follows since—from the perspective of the publisher—each bid optimization program lowers the overall costs of setting a higher floor price (*i.e.*, it is less likely that there will be no bidder that exceeds the floor price).

[336] Google Ads Log-Level Dataset (January 2024), GOOG-AT-EDTX-DATA-000000000 to -000258388.

[337] These slices were generated using code/gads_bid_optimization_data.py and saved in code/gads_bid_optimization_data.json in my supporting materials. The number of slices is logged in code/logs/gads_bid_optimization_data.txt.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

172. In Theorem 1 in Section XV.A.1, I establish that the answer to the above question depends on the shape of the **distribution** of advertiser values for impressions in each slice. A distribution is a curve showing the proportion of time that an advertiser's value is less than any specified dollar amount. I identify a set of distributions—**the Decreasing Hazard Rate (DHR) distributions**—for which I can offer mathematical proof that if all the slices had DHR distributions, then the answer to the italicized question above is indeed "*no, it is not possible* (see Corollary 1 in Section XV.A.1)." I then plot the distributions of advertiser values from the real-world data for each slice and check how closely a DHR distribution **fits** each of those distributions.[338, 339]

173. The distributions in the Google Ads data fit *very closely* to DHR distributions. In Figure 3, I show the distributions in the real-world data and nearby **fitted DHR distributions** (blue and red, respectively) for two slices. The right panel is the slice (among the 121,238 slices) that is *least well-approximated* by a DHR distribution.[340] The left panel is the slice at the 2nd percentile of goodness-of-fit, so that for 98% of slices, the two curves fit more closely than those in the left panel. For the left panel, the difference between the distribution in the data and the fitted distribution is practically imperceptible: the fitted red curve is almost completely covered by the blue empirical distribution. Even for the right panel—the worst slice among thousands of slices in the data—the fit is still very good, but a small difference is visible between the blue empirical distribution and the red fitted DHR distribution.

---

[338] A distribution function $F$ with density $f$ has a decreasing hazard rate (DHR) if $f(x)/(1-F(x))$ is a decreasing function.

[339] These fits were calculated using code/gads_bid_optimization_fit.py in my supporting materials. The figures (including Figure 3) are saved in the code/figures directory, with file names prefixed by gads_bid_optimization.

[340] According to a measure of goodness-of-fit discussed in Section XV.A.2.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*



174. My results in Corollary 1 imply that, for any DHR distribution of advertiser values, any bid optimization program that increases Google Ads' win rate necessarily also increases advertiser surplus. The corresponding statement when the fit with DHR is close, but not perfect, is that if Google Ads' win rate increases noticeably, for example by 2%, then its advertisers must benefit.

175. In Theorem 1, I make the approximation quantitatively precise so that I can apply it to the actual observed distributions in the Google Ads data. I find that advertiser surplus necessarily increases for at least 95% of the data slices under any bid optimization program that, after accounting for publisher responses, added at least 2% to Google Ads' win rate for that slice.[341] Figure 4 summarizes a set of similar findings, with the horizontal axis corresponding to an increase in Google Ads' win rate and the vertical axis showing the corresponding proportion of slices for which my bound establishes that

---

[341] This result was generated using code/gads_bid_optimization_evaluate_surplus.py in my supporting materials. The numerical output is saved in code/logs/gads_bid_optimization_evaluate_surplus.txt and the corresponding Figure 4 is saved as code/figures/gads_bid_optimization_surplus.png.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

advertiser surplus must increase.[342] This figure shows that, if any Google Ads bid optimization program led to 2% more matched queries, then advertiser surplus would increase for more than 95% of slices. To put the 2% threshold in context, experiments conducted in connection with the launch of Project Bernanke found that the *total* number of matched queries increased by around 10%.[343]

**Figure 4: Fraction of Slices in Which Advertiser Surplus Must Increase, as a Function of the Increase in Slice Win Rate**



---

[342] Note that my analysis does not imply that other slices of Google Ads advertisers experienced losses due to the bid optimization programs. The DHR condition is a sufficient *but not necessary* condition for increases in the advertiser surplus (given increases in Google Ads' win rates), and the approximations I obtain are not "tight," meaning it is possible that a *larger* proportion of slices also experienced benefits.

[343] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -175.

176. The main takeaway from Figure 4 is that, given the value distributions on nearly every slice, that any of Google Ads' bid optimization programs that noticeably increased the Google Ads win rate must have benefited the vast majority of Google Ads advertisers. In other words, for Project Bernanke, Global Bernanke, and Alchemist, Google Ads' incentives were closely aligned with those of its advertiser customers: *any benefits of these programs for Google Ads were accompanied by benefits for its advertisers.*

### d) Evidence from Google's Documents and Experiments Support These Findings, and Suggest Benefits for Publishers

177. Google Ads conducted launch experiments related to its bid optimization programs that broadly support my findings and suggest additional benefits to publishers:[344]

   a. *Buy-side DRS:* Google Ads estimated that buy-side DRS increased the volume of impressions won by Google Ads by 4.6%, equivalent to around 200 million additional impressions won each day, and that most of these would have gone unsold in the absence of buy-side DRS because publishers set floor prices too high for those impressions.[345] These additional transactions that cleared as a result of buy-side DRS increased overall efficiency. While Google Ads' overall revenue share was expected to drop from 14% to 13.4%, Google estimated at launch that

---

[344] Note that the theoretical effects of the bid optimization programs on publisher revenues are positive or ambiguous. Buy-side DRS led to higher bids from Google Ads (without decreasing any other bids), which could only benefit publishers. The theoretical effect of Bernanke and Global Bernanke on publisher revenue is ambiguous, because it lowered clearing prices for some impressions sold on AdX while increasing the prices of the extramarginal impressions it won. The theoretical effects of Alchemist on publisher revenue are also ambiguous.

[345] *See* "GDN Dynamic Revshare Launch" (Jan. 16, 2013), GOOG-DOJ-02854344, at -348, -350 ("Adwords […] queries: +4.6%"); "Discussion on improving AdX & AdSense backfill" (Apr. 15, 2014), GOOG-DOJ-03876025, at -043 ("Added another 200m additional queries per day").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

buy-side DRS would increase Google Ads' total revenue by 7.6%.[346] Later analysis suggested that buy-side DRS increased Google Ads' total spend on AdX by 6.5% and led to a 5% increase in publisher revenues.[347]

b.  *Bernanke:* Pre-launch experiments found that Bernanke increased the total volume of matched queries on AdX by 11.8% and increased AdX publisher revenues by 8%, although these effects would have been felt heterogeneously among publishers.[348] Experiments conducted in connection with the launch found that the total number of matched queries increased by around 10%, as did the total payouts to publishers.[349] Only around 10% of publishers, weighted by revenue, experienced reductions in payouts.[350] The number of clicks and conversions on the impressions won by Google Ads advertisers increased by 8.7% and 9.4%, respectively.[351] The updated program, Global Bernanke, further increased publisher payouts (by 0.9%) and the volume of matched queries (by 1.6%).[352]

---

[346] *See* Email from ███████ to ███████ "Re: GDN Dynamic Revshare launched today!" (Jan. 17, 2013), GOOG-DOJ-04306227, at -227 ("Dynamic Revshare increases GDN revenue by 7.6% and profit by 4.1% on AdX inventory"); "GDN Dynamic Revshare Launch" (Jan. 16, 2013), GOOG-DOJ-02854344, at -348, -350 ("Adwords effective rev-share: 13.4% (control 14%)").

[347] "Project Bernanke: Quantitative Easing on the Ad Exchange gTrade Update" (Oct. 3, 2013), GOOG-DOJ-06842351, at -357.

[348] "Project Bernanke: Quantitative Easing on the AdExchange" (Oct. 21, 2013), GOOG-DOJ-12700489, at -493.

[349] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -175.

[350] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -180.

[351] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -181.

[352] Email from ███████ to ███████ "[Caqengleads] [Launch 133445] Global Bernanke (+$40M revenue)" (May 21, 2015), GOOG-DOJ-15637938, at -938 ("Match rate +1.6% […] Publisher payout +0.9%").

    c.  *Alchemist:* I have not analyzed (nor am I presently aware of) experiments related to Alchemist, which was introduced at the same time as other large changes to the Google Ads display advertising platform (namely, the Unified First-Price Auction and UPR), making it difficult to identify the effect of Alchemist in isolation.

### D. Responding to Plaintiffs' Allegations about Google Ads' Bid Optimization Programs

#### 1. Bernanke Did Not Alter the AdX Auction Rule and Did Not Deceive Publishers or Advertisers

178.  Professor Jardin, Dr. Peña, and several Plaintiffs incorrectly assert that Bernanke transformed AdX from a second-price auction into a third-price auction,[353] with Daily Mail and Gannett adding that Bernanke "deceived publishers" by "converting second price auctions into third price auctions."[354] This claim and similar ones are wrong. Bernanke and its variants were bidding *strategies*, not *auction rules*.[355] Google Ads is a

---

[353] Expert Report of P. Peña (Oct. 7, 2024), at p. 20 ("Through those projects [Projects Bernanke, Global Bernanke, and Bell], Google selectively imposed third-price auctions on its transactions despite conveying to publishers and advertisers that they were running second-price auctions."); Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 47 ("With Project Bernanke, instead of paying publishers for the amount of the second highest bid, Google only paid publishers based on the third-highest bid—running a third-price auction instead of a second-price auction without disclosing this difference to publishers."); Publisher Class First Amended Complaint, at ¶ 280 ("But Google's secret Project Bernanke program was structured as a third-price auction rather than a second-price auction."); Daily Mail Second Amended Complaint, at ¶ 134 ("[...] Bernanke switched AdX to a third-price auction for publishers [...]"); Gannett Amended Complaint, at ¶ 164 ("[...] Bernanke switched AdX to a third-price auction for publishers [...]"); Inform Third Amended Complaint, at ¶ 220 ("Google's secret Project Bernanke program surreptitiously switched AdX from a second-price auction to a third-price auction on billions of impressions per month.").

[354] Daily Mail Second Amended Complaint, at ¶ 140 ("In particular, Google deceived both publishers and advertisers by converting second price auctions into third price auctions, and it further deceived publishers — including Daily Mail — into accepting artificially depressed payments. The result to Daily Mail was dramatically decreased revenue, as Google itself has admitted."); Gannett Amended Complaint, at ¶ 172 ("In particular, Google deceived both publishers and advertisers by converting second price auctions into third price auctions, and it further deceived publishers — including Gannett — into accepting artificially depressed payments. The result to Gannett was dramatically decreased revenue, as Google itself has admitted.").

[355] "GDN Core DR 2014 Strategy" (Jan. 13, 2015), GOOG-AT-MDL-004551619, at -622 ("gTrade bidding strategies made GDN more competitive in AdX auctions," identifying "Dynamic Revshare" and "Project Bernanke").

*bidder* in the AdX auction and the bidding rules chosen by individual bidders in the auction do not affect the auction format. Neither Google Ads nor AdX *ever* operated a third-price auction.

179.   With Bernanke in place, publishers continued to be paid the clearing price of the AdX auction (net of the appropriate revenue share), as was the case prior to the launch of Google's bid optimization programs. Moreover, Google experiments found that its total payments to publishers *increased* overall as a result of Project Bernanke, as was logically necessary for Google to benefit from increased revenues from a program that did not alter its average revenue shares.[356]

### 2. Plaintiffs and Their Experts Omit or Mischaracterize the Benefits of Google Ads' Bid Optimization Programs for Advertisers

180.   Professor Li, Dr. Zona, and several Plaintiffs claim that Bernanke harmed advertisers,[357] and Dr. Zona further argues that Bernanke "raised the costs of [] rivals"[358] through "business it did not acquire through competition on the merits."[359] These claims are wrong. As my analysis in Section IV.C.2.c shows, Bernanke did benefit Google's

---

[356] Email from ███████████ to W. Kim, "[Launch 106307] gTrade: Project Bernanke" (Oct. 18, 2013), GOOG-DOJ-14952787, at -787.

[357] Revised Expert Report of S. Li (Oct. 11, 2024), at Section VIII.B.4 ("Global Bernanke harmed publishers and advertisers, and misallocates ad inventory"); Expert Report of J. Zona (Oct. 4, 2024), at ¶ 24 ("This conduct allegedly allowed Google to limit competition and maintain supra-competitive prices, ultimately harming advertisers."); Publisher Class First Amended Complaint, at ¶ 23 ("Project Bernanke, using exclusionary conduct to rig the auctions in AdX in a way that enhanced its monopoly power and thus harmed both publishers and advertisers.").

[358] Expert Report of J. Zona (Oct. 4, 2024), at ¶ 108 ("This advantage raised the costs of Google Ads' rivals in the marketplace").

[359] Expert Report of J. Zona (Oct. 4, 2024), at ¶ 107 ("Bernanke had a significant positive impact on Google's win rate in AdX compared to other bidders and resulted in substantial revenue gains for Google, business it did not acquire through competition on the merits.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

advertiser customers. In fact, any Google Ads bid optimization program that increased the win rates of Google Ads advertisers also increased advertiser surplus for the vast majority of Google Ads advertisers. Therefore, my analysis directly contradicts Professor Li's claim that "whilst Alchemist increased the win rate of Google Ads advertisers [], it [] did not benefit Google Ads advertisers"[360] and Dr. Zona's claim that buy-side DRS "increased Google's win rate" but "caused damage to Google Ads advertisers."[361]

181.    The Advertiser Class adds that Bernanke could "route[] bids to less relevant sites and audiences."[362] But Bernanke was a Google Ads bidding strategy, not a campaign alteration, so it did not influence which sites or audiences advertisers chose to target. Advertisers retained full control over setting their campaign objectives, selecting the websites where their ads could appear and specifying the audience demographics they wished to reach.

---

[360] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 870 ("Just as with Global Bernanke, Alchemist did not benefit advertisers on the Google Ads platform and harmed those on other DSPs. As for Global Bernanke, whilst Alchemist increased the win rate of Google Ads advertisers (as explained in Section XXI.A.1, Alchemist inflates bids via a higher value of $\alpha$), it (i) did not benefit Google Ads advertisers and (ii) made non-Google Ads advertisers worse off.").

[361] Expert Report of J. Zona (Oct. 4, 2024), at ¶¶ 68, 70-71.

[362] Advertiser Class Complaint, at ¶ 226 ("Bernanke could route the doctor's bids to less relevant sites and audiences (e.g., on sports websites), merely so AdX would prevail over other exchanges for the impression. In this way, Bernanke increased the cost of advertisers' campaign[s] and lowered their return on investment.").

### 3. Plaintiffs and Their Experts Ignore the Benefits of Google Ads' Bid Optimization Programs for Publishers

182. Plaintiffs and their experts argue that Bernanke and Alchemist harmed publisher revenue.[363] I provide reasons why their arguments are incorrect, while identifying concrete omissions and errors in their analyses of Bernanke and Alchemist.

183. *First,* these arguments overlook the fact that Google Ads bid optimization programs were *buy-side* optimizations that benefited Google Ads advertisers.

184. *Second,* their arguments overlook experiments conducted after Bernanke's launch finding that total payouts to publishers increased by around 10%[364] and that only around 10% of publishers, weighted by revenue, experienced reductions in payouts.[365] Google estimated that the total payout to publishers increased by an additional 0.9% under Global Bernanke.[366]

---

[363] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 24 ("Thus, Global Bernanke caused a net harm to publisher revenue."), ¶ 43 ("Compared to the counterfactual, Alchemist harmed publisher revenue."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 156 ("I find that Bernanke results in a 29.6 percent decrease in revenues paid to publishers."), ¶ 195 ("[P]ublisher revenues can only be reduced by Alchemist."); Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 46 ("Based on my review of the Parties' documents, deposition testimony, and Google's source code, it is apparent that Google's implementation of Project Bernanke (including the various subsequent versions) was harmful to publishers [...]"); Publisher Class First Amended Complaint, at ¶ 277 ("Bernanke went through at least three iterations over the course of 2013 to the present, but at bottom, had the same objective and result: underpaying publishers after a transaction cleared on its own Ad Exchange, AdX, with Google secretly retaining a portion of the winning bid"); Daily Mail Second Amended Complaint, at ¶ 139 ("AdX's numerous auction manipulations allowed those advertisers to win auctions at sub-competitive prices."); Gannett Amended Complaint, at ¶ 170 ("AdX's numerous auction manipulations allowed those advertisers to win auctions at sub-competitive prices.").

[364] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -175.

[365] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -180.

[366] Email from ██████████ to ██████████ "[Caqengleads] [Launch 133445] Global Bernanke (+$40M revenue)" (May 21, 2015), GOOG-DOJ-15637938, at -938 ("Match rate +1.6% […] Publisher payout +0.9%").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

185. *Third,* while Professors Li and Hortaçsu argue that "publishers received less revenue" from Bernanke[367] and Global Bernanke,[368] their arguments are incorrect and overlook numerous factors that contribute to revenue increases.

186. Professor Li claims that "for at least 49% of impressions on which an inflation would increase the payout from Google Ads (that is[, on] those impressions where the second price comes from branded reserves (28%), anonymous reserves (12%) and the third-party threshold (9%)), publishers would be no better off"[369] and Professor Hortaçsu makes analogous claims.[370] However, for the following reasons, in *all* 49% of the impressions Professor Li identifies, revenues should be expected to increase:

   a. When Bernanke and its variants lead an impression to clear a floor price that would have gone uncleared (as in the case of branded and anonymous reserves above), publisher revenues *increase*: sellers normally set reserve prices to be higher than their opportunity costs, so the revenues on these impressions exceed any opportunity cost.

---

[367] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 402 ("I conclude that the overall effect of Bernanke was that Google excluded rival exchanges from competition in the exchange market, with the result that publishers received less revenue."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 19 ("[...] Google's implementation of Alchemist, Bernanke, DRSv2, tDRS, and Last Look resulted in reduced revenues from AdX for the Plaintiffs.").

[368] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 24 ("Compared to the counterfactual, Global Bernanke harmed publisher revenue. When Global Bernanke deflated bids in internally competitive auctions, publishers lost money because of the depressed clearing price. Publishers did not recoup these losses [sic] the externally competitive auctions in which Global Bernanke subsidized bids, because Google Ads—leveraging Last Look– only boosted bids to the level necessary to defeat out the highest external bidder, whose bid was reflected in AdX's reserve price. Thus, Global Bernanke caused a net harm to publisher revenue.").

[369] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 534.

[370] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 176 ("Specifically, I understand that publishers did not benefit from Bernanke's lower take rates whenever the second-highest price in the auction came from a header bidder or from the publisher's reserve.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

b.  When publishers set floor prices above header bids and Google Ads beats the floor price (as a result of Bernanke optimizations), publisher revenues would also *increase*, for the same reason as in (a). Although both Professors Li[371] and Hortaçsu[372] recognize that publishers can set floor prices to account for their outside options (including, for example, header bids), they incorrectly assume that

---

[371] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 525 (" In essence, Global Bernanke counts its bid inflation as if publishers would have received nothing unless they sold to Google Ads. But in reality, publishers have other ways to monetize that impression, such as selling inventory to other exchanges, to header bidders, or via direct deals. Publishers set reserve prices to account for those outside options. When an inflated bid from Global Bernanke barely beats the publisher's outside option, that publisher is not made materially better off.").

[372] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 176 ("This is because GDN bids are subject to second price rules: in these situations, when the inflated GDN bid wins, the payment will equal to the second highest bid, which would have equaled the header bid, or the publisher's reserve. However, since header bidders are subject to a first-price rule, where they pay their bid if they win the auction, the header bidder would have paid the exact same amount as the winning inflated GDN bidder. Since a publisher's reserve reflects the outside opportunities of the publisher, a payment exactly equaling the publisher's reserve does not provide a net benefit to the publisher -- it merely leaves them indifferent.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

these floor prices are set equal to opportunity costs, contrary to publisher incentives and the common practices of many publishers, including Daily Mail.[373]

187. To concretely demonstrate the errors resulting from these omissions, I revisit an example cited in Professor Li's report.[374] In the example, there are two impressions with floor prices of $0.05 and $2.50, respectively. On both impressions, Google Ads has two advertisers–one that values each impression at $2 and another that values each at $1.

188. Without Bernanke, Google Ads wins the first impression, with Google paying out $1 minus revenue shares of Google Ads and AdX ($0.68), and loses the second impression.

189. With Bernanke, Google Ads wins both, yielding the publisher a payout of $2.55, minus AdX's 20% revenue share ($2.04). Professor Li concludes that Bernanke *decreased* the

---

[373] *See* Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding."). *See also* ███████████████████████████████████████████████████████████████████████████████████████████████████████; "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -506 ("[Some publishers] inflate the value CPM of remnant line items [...] publishers used to do this even before HB was popular."); "First-price bidding" (Aug. 12, 2019), GOOG-DOJ-11406673, at -677 ("How boost works[:] The publisher inflates the HB bid before sending it as a floor to AdX[.] This is done to increase Adwords cost and to provide a better comparison between Adwords and header bidder bids[.]"); Email from R. Srinivasan to B. Bender et al., "Unified Auction Changes (Sellside) Executive Update - Aug 12, 2019" (Aug. 13, 2019), GOOG-DOJ-09713317, at -319 ("Today, these [publisher-]inflated CPMs are used to provide price pressure for AdX [...] In practice, [...] many publishers [...] apply a boost to Header Bidding bids[.]"); "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -382 ("Plan to educate pubs around strictly negative revenue consequences of HB price inflation"). I interpret this document, authored in the context of the "Migration to 1P auction" (-358), to mean that inflating header bids was common enough that Google would have to "educate pubs" it was no longer necessary; "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -777 ("Last look [...] incentivizes pubs to inflate ('boost') the floor sent to AdX"); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Some publishers set Value CPMs higher than their estimates of what CPM a line item would likely generate to increase competitive pressure in the AdX auction or for other reasons."); *See also* Email from H. Thomas to M. Wheatland, et al., "RE: App impression changes recap" (Oct. 23, 2017), DM_GOOG_0146977, at -980 ("We've now multiplied the Amazon cpm in DFP by 3 or 4x to counter act google - seems to have helped us.") ███████████████████████████████████████████████████████ "Changes to Ad Manager auction" (Jan. 10, 2019), GOOG-DOJ-10924270 at -292, in which the tree diagram shows that in 42% of queries won by header bidding, the AdX floor exceeded the header bidding line item price.

[374] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶¶ 413-416.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

publisher's revenue, because the $2.50 floor price represents a "bid from another exchange."[375] But this is misleading in more than one way. Many times the floor price is not set by a header bidding line item, meaning the publisher could have earned *nothing* on the second impression, not $2.50. In such cases, Bernanke would have *tripled* the publisher's revenues from $0.68 to $2.04. In other cases where the floor price was set by a header bidding line item, the example incorrectly calculates the change in revenues under the presumption that the $2.50 floor price was *equal* to the header bid. If, instead, the publisher had received a header bid of $1.25 and, following common practice,[376] set a higher floor such as $2.50, Bernanke *increased* the publisher's revenue from $0.68 + $1.25 = $1.93 to $2.04, rather than decreasing revenue by $1.18 as Professor Li claims.

---

[375] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 416.

[376] *See* Email from H. Thomas to M. Wheatland, et al., "RE: App impression changes recap" (Oct. 23, 2017), DM_GOOG_0146977, at -980 ("We've now multiplied the Amazon cpm in DFP by 3 or 4x to counter act google - seems to have helped us.") ████████████████████████████████ "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -506 ("[Some publishers] inflate the value CPM of remnant line items [...] publishers used to do this even before HB was popular."); ████████████████████████████████ "Changes to Ad Manager auction" (Jan. 10, 2019), GOOG-DOJ-10924270 at -292, in which the tree diagram shows that in 42% of queries won by header bidding, the AdX floor exceeded the header bidding line item price; "First-price bidding" (Aug. 12, 2019), GOOG-DOJ-11406673, at -677 ("How boost works[:] The publisher inflates the HB bid before sending it as a floor to AdX[.] This is done to increase Adwords cost and to provide a better comparison between Adwords and header bidder bids[.]"); Email from R. Srinivasan to B. Bender et al., "Unified Auction Changes (Sellside) Executive Update - Aug 12, 2019" (Aug. 13, 2019), GOOG-DOJ-09713317, at -319 ("Today, these [publisher-]inflated CPMs are used to provide price pressure for AdX [...] In practice, [...] many publishers [...] apply a boost to Header Bidding bids[.]"); "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -382 ("Plan to educate pubs around strictly negative revenue consequences of HB price inflation"). I interpret this document, authored in the context of the "Migration to 1P auction" (-358), to mean that inflating header bids was common enough that Google would have to "educate pubs" it was no longer necessary. *See also* "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -777 ("Last look [...] incentivizes pubs to inflate ('boost') the floor sent to AdX"); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Some publishers set Value CPMs higher than their estimates of what CPM a line item would likely generate to increase competitive pressure in the AdX auction or for other reasons."); Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

190.  In addition to these oversights, Professors Li and Hortaçsu omit yet *another* way that Bernanke and its variants increased publisher revenues: by raising Google Ads' highest bid, these optimizations could increase the clearing price even when Google Ads lost. For instance, suppose that another AdX bidder submits a winning bid of $3 and, in the absence of Bernanke, Google Ads had the second-highest bid of $1. With Bernanke, Google Ads' bid might be raised from $1 to $2. That would not change the winner but would result in an additional dollar of revenue for the publisher.

191.  *Fourth*, Professor Li's and Professor Hortaçsu's analyses of the Bernanke and Global Bernanke "subsidy pool" presume that the increase in publisher revenue is necessarily less than the subsidy.[377] But, as I demonstrate via example, this presumption is incorrect. Suppose that a publisher has two impressions, each with a $1 floor. On the first impression, Google Ads has two bidders with bids of $2 and $1.01, but on the second it has only one bidder with a $0.99 bid. Without Bernanke, if no other bids exceeded the floor, the publisher would sell only the first impression at $1.01. With Bernanke, the first impression would clear and add $0.01 to the "subsidy pool," which could then be used to purchase the second impression, which would otherwise have gone unsold, resulting in total revenue of $2. In this example, just a penny in the "subsidy pool" adds nearly a $1 to the publisher's revenue.[378]

---

[377] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 521 ("Even though Global Bernanke inflated Google Ads' highest bid, this did not outweigh publishers' revenue losses from Global Bernanke's bid deflation. This is because Global Bernanke's pool accounts only for Google Ads's payment to publishers, not payments from other DSPs, including DSPs in other exchanges"); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 150 ("Thus, in simple terms, the harm from Bernanke arises because publishers take all of the loss from GDN raising the take rate to 60 percent, and then take only some of the benefit from the subsidies.") (emphasis omitted).

[378] This error similarly applies to Professor Li's claims that Alchemist's "bid boosts" were used to "barely" beat outside offers. *See* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 43 ("But Alchemist's bid boosts can lead Google Ads to win while just barely beating an outside offer—in which case the publisher gains no revenue compared to the counterfactual. Because Alchemist's internal accounting ignored publishers' outside offers, the boosts from Alchemist were outweighed by publishers' losses from bid suppression, and Alchemist caused net harm

192. Given this oversight and all of the previous ones, Professor Hortaçsu's damages calculation, which explicitly assumes that "publishers gain from Bernanke's subsidization only when the inflated bids are pushed above the next highest bid," is incorrect on many counts.[379]

193. *Fifth*, Professor Li's conclusion that "Alchemist harmed publisher revenue through discounting internal competition" is based on a flawed analysis.[380]



---

to publishers."), ¶ 812 ("The key problem is that, even though Alchemist balances its 'pool,' it ignores the publisher's outside option in its accounting.").

[379] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 162.

[380] Revised Expert Report of S. Li (Oct. 11, 2024), at Section XI.D.1. *See also* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 43 ("Compared to the counterfactual, Alchemist harmed publisher revenue.").

[381] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 864.

[382] "The Alchemist (AKA First Price Bernanke)" (Mar. 2019), GOOG-DOJ-14550102, at -102 (█████████████

[383] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 864.

195. 



[384] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 866, Table 16.

[385] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 867.

[386] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 860

[387] This follows from threshold pricing, which I describe in Section III.C.3.a.

[388] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1556

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*



196. Professor Li relies upon these calculations to conclude that Alchemist was anticompetitive,[391] but as shown above, the foundation of his conclusions is wrong.

197. *Sixth,* Professor Hortaçsu's claims that "publisher revenues can only be reduced by Alchemist"[392] are mistaken. While he argues that "the publisher would have received the highest GDN bid as their payment [] had there been no impact from Alchemist,"[393] any



[390] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 868.

[391] Revised Expert Report of S. Li (Oct. 11, 2024), at Section XI.B.3 ("Alchemist harmed competition in the exchange market by enabling Google to engage in anticompetitive pricing").

[392] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 195.

[393] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 195, n. 252.

suggestion that Google Ads would directly pass along the highest value from its internal auction is incorrect, regardless of Alchemist. As I have described in Section III.C.3.b, it is always optimal to shade bids into a first-price auction.

### 4. Plaintiffs and Their Experts Exaggerate Google Ads' Bid Optimization Programs' Impact on non-Google Buyers and Exchanges

198.  Plaintiffs' experts allege that both Bernanke[394] and Alchemist[395] harmed competition. Plaintiffs additionally claim that Bernanke disadvantaged non-Google ad buying tools,[396]

---

[394] Revised Expert Report of S. Li (Oct. 11, 2024), at Section VIII.B ("Global Bernanke harms competition in the exchange market"); Expert Report of P. Cramton (Oct. 4, 2024), at Section 9.4 ("Bernanke disadvantaged non-GDN buyers on AdX."); Expert Report of P. Peña (Oct. 7, 2024), at p 20 ("That way, it conferred AdX the advantage of paying lower prices than other exchanges would pay while bidding for the same inventory. This is nothing short of sabotaging the auction process and severely limiting competitors' ability to compete for the purpose of securing more transactions for its own exchange."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 779 ("In other auctions, Bernanke would inflate the highest GDN bid to win impressions it otherwise would not, increasing AdX's win rate at the expense of third-party bidders and exchanges."); Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 55 ("And similar to DRS, while Google profited from Project Bernanke and its follow-ons, competitors, including Inform, were harmed by Google's assisting its advertisers with artificially 'winning' higher quality, higher-profit inventory such as Inform's, further bolstering Google's buy-side dominance and robbing revenue potential."); Expert Report of J. Zona (Oct. 4, 2024), at ¶ 104 ("It is my opinion that Projects Bernanke and Global Bernanke are anticompetitive, because they achieved their goals by impairing the ability of AdX's rivals to compete in the Ad Exchange Market and Google Ads' rivals to compete in the Self-service Open Web Display Advertising Market.").

[395] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 41 ("[Alchemist] also discouraged bidder participation on other exchanges, depressing exchange market competition."), 775 ("The inflated bids foreclose competition from rival exchanges, depriving them of scale."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 779 ("As I explain in section IV, Bernanke and Alchemist harmed publishers by deflating bids and by increasing Google's win rate at the expense of third-party bidders.").

[396] *See, e.g.*, Publisher Class First Amended Complaint, at ¶ 277 ("Google then added this secretly retained payment into a pool that Google used to supplement the bids of Google's advertiser clients at the expense of rival, non-Google advertiser bidders. In this way, Google augmented winning bids of its advertisers using its Ad Buying Tools (specifically Google Ads) on AdX to the exclusion of advertisers using non-Google buying tools."); Advertiser Class Complaint, at ¶ 220 ("[T]he secret program continued to evolve, it morphed into a device to artificially boost the number of impressions transacted in AdX—a shift that necessarily came at the expense of competing exchanges and left advertisers with fewer alternatives to AdX."), 228 ("Bernanke suppressed competition in the markets for ad exchanges and for ad buying tools for small advertisers."); Gannett Amended Complaint, at ¶ 164 ("Capitalizing on its artificial information advantage, Google used rival bids and unhashed user IDs from publishers' ad servers to determine precisely how much to inflate Google bids in order to take impressions from competing DSPs and exchanges."); Inform Third Amended Complaint, at ¶ 223 ("Project Bernanke and its iterations were exclusionary and successfully foreclosed competition in the ad server, ad exchange markets and online video advertising markets.").

with both Daily Mail and Gannett writing that "Bernanke, in its various forms, is irrational but for its destruction of competition."[397]

199. These claims conflate harms to *competition* with effects on *competitors*. Google's bidding programs did not "create artificial advantages," "manipulate[] bid prices with no purpose but to exclude [] rival tools"[398] or "harm[] competition,"[399] nor were they "irrational but for [] destruction of competition," as alleged. Instead, the programs exemplified competition on the merits, conferring significant benefits to Google's advertiser-customers while also increasing the buying tool's profits and win rates. Although Dr. Peña claims that Bernanke "conferred AdX the advantage of paying lower prices than other exchanges [] for the same inventory,"[400] other ad buyers could and did respond to the same incentives, implementing bidding optimizations that varied revenue shares.[401] Moreover, even with bid optimizations like Bernanke and Alchemist in effect, Google Ads could only ever win impressions by paying a price *at least as high* as others had bid.

200. The claims also ignore the fact that non-Google buying tools were submitting just a single bid into the AdX auction,[402] and, as a result, advertisers using those tools may have

---

[397] Daily Mail Second Amended Complaint, at ¶ 142; Gannett Amended Complaint, at ¶ 171.

[398] Publisher Class First Amended Complaint, at ¶ 284.

[399] Advertiser Class Complaint, at Section VI.B.3.

[400] Expert Report of P. Peña (Oct. 7, 2024), at p. 20.

[401] ███████████████████████████████

[402] "Understanding the AdX Auction" (Oct. 2014), GOOG-DOJ-12443562, at -567 ("[O]ther bidders are allowed to [second-price themselves], but often do not").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

been incentivized to submit bids higher than their values for the impression.[403] As a consequence, if Google did not pursue a program like Bernanke, its advertisers could have been at a disadvantage compared to advertisers using other buy-side tools.

201. Moreover, Google's bid optimization programs often expanded output by decreasing the number of unsold impressions. Unsold impressions had no winner, so the programs certainly could not disadvantage non-Google buying tools in those cases.

202. In addition to these oversights, Professors Hortaçsu and Jardin employ incorrect characterizations of Bernanke to support their conclusions. Professor Hortaçsu claims that Google Ads would "inflate the highest GDN bids whenever it predicted that there would be a higher bid. Specifically, this would occur whenever GDN predicted that [] the highest bid in the AdX auction would be higher than the highest GDN bid; or [] all the bids in the AdX auction—including the highest GDN bid—would be lower than the reserve price."[404] Professor Jardin adds that Bernanke enabled Google to "choose exactly which auctions it wanted to 'win'—granting it preferential access to the bulk of higher-quality and higher-profit inventory."[405] But Bernanke did not work in this way. Instead, it calibrated its multipliers in advance of the auction, meaning Google Ads could not (and did not) "choose" to win an auction as Professor Jardin claimed.[406] Moreover, at

---

[403] For example, if a buying tool submitted a single bid on behalf of a group of advertisers equal to the highest value reported by the advertisers in that group and then charged its advertiser the clearing price of the auction, then that policy would lower each advertiser's expected payment for any bid it submits, and thus would incentivize the advertiser to report higher values to the buying tool (higher than its value for the impression).

[404] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 144.

[405] Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 54.

[406] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -175 ("Project Bernanke involves reducing the second price and increasing the first price of the two bids submitted by GDN to the AdX auction in such a way that publishers receive fair payout (e.g. GDN margin remains constant) and GDN profit is maximized.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

the time that AdX ran a second-price auction, Google Ads' bidding programs did not use the auction floor price to adjust Google Ads' bids.[407]

### 5. Bernanke and its Variants Were Competitive Bid-Optimization Programs, Not Anticompetitive Bid-Rigging Schemes

203. Professor Li opines and several Plaintiffs allege that Bernanke and Alchemist were "bid rigging" schemes that harmed competition.[408] These claims, including assertions that Bernanke and its variants were collusive or cartel-like, are incorrect.[409]

204. *First,* Google Ads' bid optimization programs do not exhibit the major characteristics of collusion, cartels or bid-rigging. There are many significant differences.

    a. *First,* in a cartel or bidding ring, "collusion" involves communication and agreement among conspiring parties and a commitment not to submit bids

---

The optimal and fair combination of first bid increase and second bid decrease for each publisher is estimated using AdX auction simulations.").

[407] *See* "Declaration of N. Jayaram" (May 1, 2024), GOOG-AT-MDL-C-000017969, at ¶ 3 ("Before Google Ad Manager transitioned to a Unified First-Price Auction in 2019, Google Ads and DV360 never used a floor price in an auction for an ad impression to adjust the bid values that they would submit for that same ad impression.").

[408] *See, e.g.*, Revised Expert Report of S. Li (Oct. 18, 2024), at ¶ 1002 (describing "Google's bid-rigging and auction manipulation, in the forms of, for example, Bernanke, Alchemist, and DRS"), Section XI.B ("Alchemist allows Google to continue its bid-rigging strategy while implementing a first-price auction."), 41 ("Alchemist is anticompetitive for the same reasons that Bernanke is anticompetitive: It took the extra money generated by replicating cartelist bid-rigging and used that to boost bids against other exchanges."); Advertiser Class Complaint, at ¶ 329 (describing "auction-rigging programs, including Projects Bernanke [...]"). *See also* Publisher Class First Amended Complaint, at ¶ 23 ("Google used its monopoly power in the Ad Exchange market to implement three successive versions of a program called Project Bernanke, using exclusionary conduct to rig the auctions in AdX in a way that enhanced its monopoly power [...]"); Daily Mail Second Amended Complaint, at ¶ 144 ("[...] Bernanke allow Google to rig AdX's bids to beat rivals by a penny [...]"); Gannett Amended Complaint, at ¶ 175 ("[...] Bernanke allow Google to rig AdX's bids to beat rivals by a penny [...]"); Inform Third Amended Complaint, at ¶ 218 ("Through [Bernanke], Google manipulated the prices paid by auction winners").

[409] *See, e.g.*, Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 40 ("As with Global Bernanke, Alchemist suppressed internal competition among Google Ads bidders, paying publishers as if the Google Ads bidders were colluding as a cartel [...]").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

through another channel.[410] Bernanke and its variants entailed no communication or agreement among competitors, whether the relevant competitors are advertisers utilizing Google Ads or intermediaries bidding in the AdX auction. Nor did the programs limit advertisers from using other bidding tools besides Google Ads.

b. *Second,* when bidders collude in an auction, the winning bidder pays just enough to beat the bids submitted by *other* bidders outside of the ring, not the higher price needed to also beat the bids of the ring participants. This condition has been included by Professor Cramton as part of his description of collusion in auctions.[411] Under Google Ads' bid optimization programs, in contrast, a winning advertiser on Google Ads paid a price at least as high as the second-highest Google Ads bid, even if that bid was significantly higher than other bids in the AdX auction. Professor Li acknowledges that, writing that "Google charges Google Ads advertisers the clearing price of the internal auction."[412] Moreover, since Google Ads' average revenue share remains fixed, the resulting higher payments by advertisers are passed along to publishers.

---

[410] Cramton, P., and Schwartz, J., "Collusive Bidding: Lessons from the FCC Spectrum Auctions," Journal of Regulatory Economics, Vol. 17 (May 2000), at p. 167 ("Collusion occurs between two bidders if they have overlapping interests on several licenses and if these bidders agree to allocate these licenses such that each bidder wins a license for a price substantially (more than a bid increment) *below what the other bidder is willing to pay*") (emphasis added).

[411] Cramton, P., and Schwartz, J., "Collusive Bidding: Lessons from the FCC Spectrum Auctions," Journal of Regulatory Economics, Vol. 17 (May 2000), at p. 167 ("Collusion occurs between two bidders if they have overlapping interests on several licenses and if these bidders agree to allocate these licenses such that each bidder wins a license for a price substantially (more than a bid increment) *below what the other bidder is willing to pay*") (emphasis added).

[412] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 775 ("Furthermore, just as with Global Bernanke, Google charges Google Ads advertisers the clearing price of the internal auction, which does account for internal competition.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

    c.   *Third*, if Bernanke were like a "conspiracy to restrain trade," it would reduce output. Instead, it increased output by increasing the number of impressions sold.[413]

    d.   *Fourth*, collusion typically harms sellers in auctions, but Bernanke resulted in *higher revenues* for publishers, as confirmed by the same Google experiments[414] that Professor Li cites.[415]

205.  *Second*, Professor Li argues that, in a collusive outcome, "bidders submit a bid equal to what the authors call 'the minimum price,'"[416] but his report provides no evidence of this or any other collusive pattern. On the contrary, my analysis of the Google Ad Manager log-level data reveals the reverse of his prediction: Google Ads has the second-highest median excess of payment over "minimum price" among the eight DSPs with the most won impressions, exceeded only by Google's own DV360, as shown in Figure 5.[417]

---

[413] Email from ▉▉▉▉▉▉▉ to W. Kim, "[Launch 106307] gTrade: Project Bernanke" (Oct. 18, 2013), GOOG-DOJ-14952787, at -787 ("GDN wins more auctions and generates more revenue at the same average 14% revshare; GDN's advertisers win more auctions and get greater click/conversion volume; and AdX publishers enjoy higher match rate and revenue.").

[414] *See, e.g.*, "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -175 ("We see good trends in most important metrics. Matched queries, Google revenue, publisher payout increase by about 10%.").

[415] Professor Li cites "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175. *See, e.g.*, Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 399, n. 620, ¶ 403, n. 624, ¶ 404, n. 629.

[416] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 828 ("Now suppose that some of the group of bidders form a bidding ring. McAfee and McMillan (1992) shows that these bidders can maximize the total profits of the bidding ring by first establishing which bidder in the ring has the highest valuation by holding a prior auction. The winner of this prior auction then submits a bid equal to what the authors call 'the minimum price,' which can be thought of as representing 'the cartel members' shared perception of how low a bid they can get away with, without either causing the seller to refuse to sell or arousing the suspicion of the antitrust authorities.'").

[417] Refer to Paragraph 703 and its accompanying footnote for detailed information about the production of this figure.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*



206.  Moreover, the pertinence of the "collusion" literature that Professor Li cites depends on industry context, which has little application for this industry.[418] Today, Google Ad Manager operates a first-price auction, reaching thousands of advertisers, many of whom multi-home[419] across hundreds of demand sources and various channels (including guaranteed contracts), with advertisers' bids, identities, and strategies kept confidential.[420]

---

[418] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 826 ("Just as it is possible for bidders to collude in second-price auctions, bidders can also collude in first-price ones. There is an expansive economics literature on bidding rings in first-price auctions. For example, both McAfee and McMillan (1992) and Lopomo, Marx, and Sun (2010) analyze bidding rings in a first-price auction. This literature explains how collusion in first-price auctions decreases seller revenues, as I will explain.").

[419] In a 2021 survey, respondent advertisers and ad agencies (who all spent a minimum of $1M annually on digital ads) used an average of 3.4 DSPs and planned to use 5.9 DSPs the following year. *See* Advertiser Perceptions, "DSP Report: Demand-Side Platforms" (2021), GOOG-DOJ-AT-02524665, at -666, -670. *See also, e.g.,*

[420] Mike Sweeney and Paulina Zawiślak, "Top Demand-Side Platform (DSP) Companies," Clearcode (Jan. 31, 2024), https://clearcode.cc/blog/top-demand-side-platforms/, accessed Dec. 113, 2024 ("Nowadays, there are hundreds of demand-side platforms, offering advertisers and agencies access to all types of inventory (e.g. display, native, video, and in-app mobile) across different channels."); *See also, e.g.,*

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

That landscape makes sustainable collusive agreements unlikely, because parties are tempted to cheat on any collusive agreement by submitting a bid through a different channel.[421]

207. *Third,* Professor Li's proposed "relevant counterfactuals" for Bernanke[422] and Alchemist[423] mischaracterize the ad allocation process as a unified auction among *advertisers.* In reality, exchanges auction impressions to *intermediaries*, such as ad networks and demand-side platforms, that supply impressions to the advertisers they serve. Professor Li's counterfactuals make little sense when one understands that the AdX bidders are intermediaries.

208. Bernanke and Alchemist were optimizations that benefited Google Ads' advertisers and increased Google Ads' profits *without* utilizing bid suppression or increasing revenue shares. Google Ads was able to accomplish this because its bidding strategies satisfied two crucial conditions:

---

[421] Skrzypacz, Andrzej, and Hopenhayn, Hugo, "Tacit Collusion in Repeated Auctions," Journal of Economic Theory, Vol. 114 (Jan. 2004), at p. 167 (" In other words, with finite number of players, publicly observing only the identity of the winner is enough to sustain some amount of profitable collusion, but not enough to extract (even approximately) all of the surplus."); Stigler, George, "A Theory of Oligopoly," The Journal Of Political Economy, Vol. 72 (Feb. 1964), at p. 46 ("The literature of collusive agreements, ranging from the pools of the 1880's to the electrical conspiracies of recent times, is replete with instances of the collapse of conspiracies because of "secret" price–cutting.").

[422] *See e.g.*, Revised Expert Report of S. Li (Oct. 11, 2024), at Section VIII.B.3 ("The relevant counterfactual to assess the Global Bernanke conduct is that Global Bernanke is disabled and Google Ads advertisers continue to bid truthfully"), and ¶ 511, 572, and 770.

[423] Revised Expert Report of S. Li (Oct. 11, 2024), at Section XI.C ("The relevant counterfactual to assess Alchemist is one where Google receives no arbitrage rents from Alchemist and Google Ads advertisers report their valuations truthfully"), ¶ 860 ("However, I note that, under a scenario where both $\alpha$ and $\beta$ are 1, Google's take rate would be 0% and Google Ads would generate no revenues. As such, I consider a relevant counterfactual to be that Google Ads sets $\alpha$ and $\beta$ equal to 1, but charges the winning advertiser of its CAT2 auction a flat 15% take rate, i.e., the current average take rate of Google Ads.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

a.  Alchemist was *bidder-truthful* for Google Ads' advertisers, as was Bernanke after its April 2016 update.[424] When the highest value Google Ads advertiser wins an impression, bidder truthfulness ensures that the price the advertiser pays is at least as high as the second-highest value among Google Ads advertisers: there is no "bid suppression." That bidder-truthfulness also makes it easy for advertisers to optimize. Then, as established in Section IV.C.2.c, any increased Google Ads' win rates from its bid optimizations necessarily benefited its advertisers.

b.  Google Ads collected its target *revenue share* from the total payment made by advertisers. The total payment to publishers was equal to the total paid by advertisers minus any revenue shares. Consequently, none of these totals were affected by any "bid suppression."

209.  The bidding strategies selected the multipliers that maximized *Google Ads* advertisers' value in its competition *with other buy-side platforms*, while conditions (a) and (b) above helped align Google Ads' bid optimizations with its customers' (advertisers' and publishers') interests.

210.  Professor Li's counterfactuals are unrealistic, because they fail to account for the fact that other buying tools were incentivized to, and did, bid strategically into AdX to optimize their profits. For example, a buying tool can increase its profits by submitting just its highest bid, rather than its two highest bids, into the AdX auction. Doing so would have

---

[424] "Don't First Price CO on AdX & AWBID" (Apr. 6, 2016), GOOG-DOJ-AT-02467209, at -209 ("Launch has two parts: 1) Do not first-price conversion optimizer ads on AWBID and AdX. Instead charge the minimum price needed to win the query. No change for non-CO ads."); Email from ███████████ to W. Kim, "UPCOMING LAUNCH - Please review: [Launch 150218] Removing first pricing in global Bernanke and AWBid DRS + tuning Bernanke thresholds" (Apr. 8, 2016), GOOG-DOJ-15730729, at -729; "Auction Overview" (Dec. 2019), GOOG-DOJ-13979867, at -879 ("Preserving incentive compatibility […] Most spend on GDA is from auto bidding").

168

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

no effect on the set of impressions it wins, while including the second-highest bid can only raise the price it pays. Unsurprisingly, buying tools commonly submitted just a single bid into the AdX auction.[425]

211.  In light of these bidding incentives, Professor Li's "relevant counterfactual" assumes a world in which Google Ads alone *fails to respond* to the incentives created by the exchange auctions–a strategy that depresses profits or win rates compared to the strategies adopted by its competitors. He does not explain how such a failure to respond could possibly promote a competitive outcome. Contrary to Professor Li's assertions, bidding strategies like Bernanke and Alchemist were strategies to compete effectively against other bidders in exchange auctions.

212.  *Fourth,* Professor Li incorrectly claims that "Alchemist enabled Google Ads to act as a 'bidding ring,'"[426] arguing that "██████ ██████████████████████ ████████████████████████[427] But that is wrong because ████████████ ████████████ ██ ████████████████████████ ████████████████████ If, for some impressions, Google

---

[425] "The case for encouraging buyers to declare two bids" (May 11, 2015), GOOG-DOJ-13201465, at -465 ("AdX provides a feature in which buyers can declare two bids in the auction. Currently, the only buyer who is employing this strategy is GDN."); "Understanding the AdX Auction" (Oct. 2014), GOOG-DOJ-12443562, at -567 ("[O]ther bidders are allowed to [second-price themselves], but often do not").

[426] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 768 ("In this section, I describe how Alchemist enabled Google Ads to act as a 'bidding ring' and adjust bidding behavior and subsidize bids in the AdX auction against external competition—that is, non-Google Ads bidders. Google describes Alchemist as a 'game of arbitrage' where Alchemist enables Google to increase its profits on less competitive auctions and utilize the gains to inflate bids on more externally competitive auctions.").

[427] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 789 ██████████████████████████ ██████████████████████████████████████████████████████████ ██████ ██████████████████

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*



### 6. Plaintiffs and Their Experts' Claims that Google Ads' Bid Optimizations Decreased "Efficiency" Fail to Account for the Behavior of Other Intermediaries

213.  Professor Li argues that Bernanke and Alchemist "decreased allocative efficiency," speculating that "bidders with a lower private valuation for an impression [] frequently beat bidders with a higher valuation."[429] However, any valid conclusion about the efficiency effect of Bernanke must specify the bidding strategies of Google Ads' competitors. Professor Li mentions no such specification and so cannot logically justify his conclusion.

214.  As I explained in Section IV.D.5, *all* buying tools faced the same incentives that led Google Ads to develop Bernanke and Alchemist. Those incentives affected their behavior, as evidenced by their single-bid policies.[430] Indeed, other non-Google buying tools also implemented dynamic margin optimization tools, similar to Bernanke and

---

[428] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 789

[429] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 402 ("Bernanke and Global Bernanke also decreased allocative efficiency in the relevant exchange markets by manipulating auctions such that bidders with a lower private valuation for an impression nonetheless frequently beat bidders with a higher valuation."), ¶ 41 ("Alchemist is anticompetitive for the same reasons that Bernanke is anticompetitive: It took the extra money generated by replicating cartelist bid-rigging and used that to boost bids against other exchanges. This reduced total welfare, because it caused Google Ads bidders to win even when bidders on other exchanges had higher values for those same impressions."), ¶ 392 ("But in reality, a substantial share of AdX bidders were submitting bids that exceeded their values, because the Bernanke bid manipulation scheme would place a bid equal to the highest Google Ads value multiplied by a parameter $\alpha > 1$. This means that Last Look would sometimes cause a Google Ads bidder to win even when that bidder's value was below the highest rival bid. This again increases the range of AdX bidder values such that Last Look inefficiently causes AdX to win over the highest rival bidder.").

[430] "Understanding the AdX Auction" (Oct. 2014), GOOG-DOJ-12443562, at -567 ("[O]ther bidders are allowed to [second-price themselves], but often do not").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Alchemist.[431] As a consequence, Professor Li's conclusion is *reversed*: in the absence of a program like Bernanke or Alchemist, Google Ads would be *disadvantaged* compared to other bidders in the AdX auction. The result would be the very inefficiency that he claims Google Ads bid optimizations had caused, but with the roles reversed: "bidders with a lower private valuation for an impression" (non-Google Ads bidders) could "beat bidders with a higher valuation" (Google Ads bidders).[432]



[431]

[432] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 402 ("Bernanke and Global Bernanke also decreased allocative efficiency in the relevant exchange markets by manipulating auctions such that bidders with a lower private valuation for an impression nonetheless frequently beat bidders with a higher valuation. In this way, Bernanke and its successors harmed overall welfare.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 7. Confidentiality About Bidding Practices Is Standard, Benefited Google's Customers, and Did Not Deceive Publishers or Advertisers

215. Plaintiffs[433] and their experts[434] claim that Bernanke and Alchemist[435] were harmful because they were "secret" or "confidential." However, these claims overlook the need to keep some bidding strategies confidential in auctions with other strategic participants. Protecting bidding strategies prevents publishers and other bidders from exploiting their bidding information at the expense of lower returns for Google customers. It is also standard in the industry: as one Google employee noted, the introduction of Bernanke "is similar to other third party buyers changing their bidding behavio[]r which we never announce and is confidential to the buyer."[436] I am not aware of other buy-side tools that

---

[433] Publisher Class First Amended Complaint, at ¶ 23 ("Bernanke involved selectively and secretly inflating certain select advertiser bids made through its Ad Buying Tools and its Ad Exchange so as to impair competition in the Ad Exchange, Ad Network and Ad Buying Tools markets, and thereby enhance and entrench Google's monopoly power of its AdX, GDN and its Ad Buying Tool"); Advertiser Class Complaint, at ¶ 10 ("Google manipulates auctions with its secret "Bernanke" programs and technology to increase its take rate and then uses the resulting pool of ill-gotten gains to manipulate subsequent auctions, stifling competition in the exchange market and in the small-advertiser buying tools market."); Gannett Amended Complaint, at ¶ 130 ("The third amended complaint revealed crucial details about how Google's secret programs (including Elmo, Poirot, and Bernanke and its variants) actually worked and for the first time described how those programs harmed a publisher like Gannett.").

[434] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 400 ("A key element of Bernanke was secrecy. Google implemented Bernanke without the knowledge of publishers or advertisers: as an internal Google document stated, 'the first rule about Bernanke is we don't talk about Bernanke.'"); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 151 ("Importantly, none of the Bernanke versions were ever communicated to Google Ads customers or the wider public."); Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 226 ("The variable take rate charged under Bernanke was applied through GDN—a buyer-side tool—which would make it more difficult for publishers to observe. Again, proper auction design should involve transparency so that market participants understand how they can compete in a market, what they must pay should they win, and how they will be compensated if they are sellers. Google's Bernanke initiatives obscured this information contrary to appropriate market fundamentals."); Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 54 ("These gradually ramped up versions of Bernanke ensured that the harms resulting from the algorithms were less apparent to publishers and made it more difficult for them to detect the negative effects."); Expert Report of J. Zona (Oct. 4, 2024), at ¶ 105 ("Google recognized that Bernanke was not a clean "optimization" about which it could inform the public. In fact, knowledge of Bernanke's bid-and-profit modification program was largely confined to Google Ads engineering personnel.").

[435] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at Section IX.B.i ("Google hid its use of Bernanke and Alchemist to deflate bids.").

[436] "GDN buying change via Bernanke" (Nov. 1, 2013), GOOG-AT-MDL-003995286, at -286.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

make their bidding algorithms publicly available. Indeed, in all my years of studying auctions, I am not aware of *any* situation where one bidder has been required to disclose its strategies to others. Doing so would put that bidder at a competitive disadvantage and discourage its participation.

216. Professor Cramton claims that Bernanke's confidentiality contradicted "proper auction design" and impeded "market participants[' ability to] understand how they can compete in a market."[437] Dr. Chandler goes further and alleges that Bernanke "made it impossible for auction participants and competing exchanges to understand the rules [...] skewing decision-making and outcomes."[438] These claims are vague and wrong on multiple counts. They are vague by not describing to which "market participants" they are referring. Truthful versions of Bernanke and Alchemist made bidding easy for Google Ads' customers, so the criticism is wrong as it applies to those participants. The non-Google bidders in the AdX auction do not need the details of how Google Ads bids into AdX to optimize their own bidding strategies. Experimentation—a routine part of the bid optimization process in these auctions—can help discover optimal bids without access to detailed information about Google's bidding algorithm. Indeed, as I have noted before, other buy-side tools implemented programs similar to Bernanke: for example,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████[439] ██████████████

---

[437] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 226.

[438] Expert Report of J. Chandler (Oct. 4, 2024), at ¶ 342.

[439] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*



217. Moreover, as I discussed in <u>Section III.D.2</u>, an advertiser on Google Ads did not generally pay for each advertisement Google Ads placed on its behalf: instead, Google Ads advertisers typically paid on a price-per-outcome basis. As a result, even before Project Bernanke was introduced, the price paid by a Google Ads advertiser for an "outcome" (e.g., a click on its ad or a sale on its website) would be determined by the clearing price on AdX only on average across a pool of impressions. Bernanke worked by averaging not only prices paid to publishers but also revenue shares charged to advertisers across pools of impressions, so that—while Bernanke did increase the



*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

clearing price paid to publishers for some impressions—on average, advertisers benefited. As my empirical analysis above demonstrates, Bernanke did not "harm" advertisers, and any resulting increase in their win rate improved advertiser surplus for the vast majority of Google Ads advertisers.

218.    Bernanke was also not "deceptive" to advertisers. As I discussed in Section III.D.2, an advertiser on Google Ads did not generally pay for each advertisement Google Ads placed on its behalf: instead, Google Ads advertisers typically paid on a price-per-outcome basis.[442] As a result, with or without Project Bernanke, the price paid by a Google Ads advertiser for an "outcome" (e.g., a click on its ad or a sale on its website) would be determined by the clearing price on AdX only on average across a pool of impressions. Bernanke worked by averaging not only prices paid to publishers but also revenue shares charged to advertisers across pools of impressions, so that—while Bernanke did increase the clearing price paid to publishers for some impressions—on average, advertisers benefited. As my empirical analysis above demonstrates, Bernanke did not "harm" advertisers, and any resulting increase in their win rate improved advertiser surplus for the vast majority of Google Ads advertisers.

219.    Daily Mail analogously claims that, because Google did not disclose Bernanke, "Daily Mail had no way of knowing about the programs or of detecting their effects."[443]

---

[442] "DBM Optimization" (no date), GOOG-DOJ-03151263, at -68 (Table showing "Bidding Strategy" and "Percent of Total Spend" on GDN: Max CPC 36%, Enhanced CPC 27%, Target CPA 31%).

[443] Daily Mail Second Amended Complaint, at ¶ 143 ("Daily Mail runs numerous experiments to figure out how to maximize revenue, and those experiments depend on a number of assumptions. Critically, Daily Mail took Google at its word that it operated second-price (and eventually first-price) auctions, never third-price auctions. But for the entire period Bernanke and its variants were in effect, Google intentionally hid the program from publishers, meaning Daily Mail had no way of knowing about the programs or of detecting their effects.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

However, it continued to have access to all the information a market participant should expect, including the most relevant information.

220.  *First,* Bernanke, as a Google Ads bidding program, did not change anything about the level of transparency on AdX, which was a supply-side tool.

221.  *Second,* publishers are not entitled to know Google Ads' bidding strategy. Indeed revealing it could harm advertisers' outcomes. Indeed, Google's internal documents explain that Bernanke was not publicly disclosed because "GDN bidding strategies are confidential."[444]

222.  *Third,* publishers continued to have access to the data necessary to assess the performance of AdX, including their total revenues from auctions on the platform. While Professor Jardin claims that Google Ads' gradual introduction of Bernanke was a tactic to "ensure[] that the harms resulting from the algorithms were less apparent to publishers and [...] more difficult [...] to detect,"[445] gradually rolling out new features is a standard industry practice that allows impacts to be carefully monitored. It is hardly evidence of a nefarious motive.

---

[444] "GDN buying change via Bernanke Doc (AdX Pub Side)" (Nov. 1, 2013), GOOG-AT-MDL-003995286, at -286-288.

[445] Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 54 ("These gradually ramped up versions of Bernanke ensured that the harms resulting from the algorithms were less apparent to publishers and made it more difficult for them to detect the negative effects.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 8. Plaintiffs' Experts Incorrectly Claim that Bernanke Relied on Alleged Special Advantages Possessed by Google

223. Dr. Zona alleges that "[t]he Bernanke algorithm could not have been implemented by an equally efficient competitor,"[446] but Bernanke used only data of a kind that was available to other bidders on AdX, namely, the results of experiments conducted by Google Ads on small sets of impressions to optimize bids.[447] There were no barriers preventing non-Google bidders from optimizing their own bidding strategies based on similar experimentation,[448] and other bidders did in fact use experiments to optimize their bids.[449]

224. Additionally, Professor Li contends that "Last Look was critical to the success of the Bernanke and Global Bernanke strategy to inflate the highest Google Ads bid, which was designed to improve the win rate in auctions."[450] However, Bernanke did not adjust

---

[446] Expert Report of J. Zona (Oct. 4, 2024), at ¶ 106.

[447] "Project Bernanke: Quantitative Easing on the Ad Exchange gTrade Update" (Oct. 3, 2013), GOOG-DOJ-06842351, at -359 ("We respect GDN-AdX firewall: we only utilize GDN data to optimize bidding strategy. Any AdX buyer can do this.").

[448] *See* "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -176 ("The optimal combination of first bid increase and second bid decrease for each publisher is estimated using AdX auction simulations. In order to gather data for running the auction simulations, a 1% background experiment is run where every top GDN bid is quadrupled and the second bid dropped. […] It is important to note that in this entire process, we only use information about the GDN bid and the GDN price paid on queries won by GDN. In other words, we do not use any AdX buyer information.").

[449] For instance, Verizon's DSP experimented to evaluate its own bid shading program. *See* Zhang, W., Kitts, B., Han, Y., Zhou, Z., Mao, T., He, H., Pan, S., Flores, A., Gultekin, S., & Weissman, T., "MEOW: A space-efficient nonparametric bid shading algorithm," Proceedings of the 27th ACM SIGKDD Conference on Knowledge Discovery & Data Mining (2021), at p. 3933. *See also* Choi, H., Mela, C. F., Balseiro, S. R., & Leary, A., "Online display advertising markets: A literature review and future directions," Information Systems Research, Vol. 31 (2020) at pp. 562 ("To overcome the econometric issues and to better understand the value of ad spend, both advertisers and researchers are turning attention to randomized field experiments."), 566 ("The evolution of buying and selling practices in display advertising are tightly integrated with the development of intermediaries' enabling technologies (*e.g.*, data collection, data analysis, RTB, real-time ad serving, A/B testing and optimization tools). With such technologies, intermediaries can better match publishers' impressions (consumers) to more relevant advertisers.").

[450] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶¶ 454, 392 ("But in reality, a substantial share of AdX bidders were submitting bids that exceeded their values, because the Bernanke bid manipulation scheme would place a bid equal to the highest Google Ads value multiplied by a parameter $\alpha > 1$. This means that Last Look would sometimes

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

advertisers' bids based on the AdX floor price.[451] Moreover, Professor Li's analysis overlooks publishers' incentives and common practice of setting floor prices *higher* than the highest offer from header bidding. I have adapted Professor Li's own example to demonstrate how addressing this omission reverses his conclusions.[452]

225. If a publisher received a $2 offer from a non-AdX buyer (e.g. a buyer buying through header bidding, a brand advertiser, etc.) but sets the floor price *higher*—say, $2.50—then, when Bernanke "inflates" Google Ads' "highest bid to $3" from $1, it generates an additional 50 cents of revenue for the publisher. Professor Li acknowledges that there is no reason to set floor prices equal to a header bid, writing that "the header bid is money in hand for the publisher; so GDN offering the same price makes publishers no better off."[453]

### 9. Dr. Zona's Analysis of Buy-Side DRS is Mistaken

226. Dr. Zona alleges that buy-side DRS disadvantaged "Google Ads' rivals, who are not informed of the AdX reserve price before bidding and generally [did] not submit two bids

---

cause a Google Ads bidder to win even when that bidder's value was below the highest rival bid. This again increases the range of AdX bidder values such that Last Look inefficiently causes AdX to win over the highest rival bidder.").

[451] *See* "Declaration of N. Jayaram" (May 1, 2024), GOOG-AT-MDL-C-000017969, at ¶ 3 ("Before Google Ad Manager transitioned to a Unified First-Price Auction in 2019, Google Ads and DV360 never used a floor price in an auction for an ad impression to adjust the bid values that they would submit for that same ad impression.").

[452] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 454 ("Last Look was critical to the success of the Bernanke and Global Bernanke strategy to inflate the highest Google Ads bid, which was designed to improve the win rate in auctions (where Google Ads would have otherwise lost to a rival exchange). To see this, consider a case of an externally competitive auction where the highest header bid of $2 is greater than the two highest Google Ads bids ($1 and $0.5) and is passed directly to a publisher's ad server without being the reserve of the AdX auction. Recall that AdX ran a second-price auction when Bernanke and Global Bernanke were in operation. If Google Ads were to inflate its highest bid to $3 and maintain its second-highest bid at $0.5, then the header bid in this instance would still win the impression at $2, because the clearing price of AdX would remain the second-highest bid, i.e., $0.5.").

[453] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 523.

for the same impression,"[454] but this argument is incorrect for multiple reasons. First, there is a logical error: buyers do not need to know the floor price to implement a bidding strategy similar to buy-side DRS, and early Google descriptions of buy-side DRS make no mention of such a requirement.[455] Second, there is a factual error: AdX *did* disclose the floor price to bidders in the auction.[456] Third, there is an attribution error: AdX did not prevent other DSPs from submitting more than one bid.[457]

### 10. Bernanke Was Not "A Form of Predatory Pricing"

227.   Professor Li claims that Global Bernanke was "a form of predatory pricing,"[458] but that claim is wrong.

228.   *First,* Bernanke was *immediately* and *sustainably* profitable to Google Ads. Its immediate profitability did not depend on competitors' long-run strategies. Consequently, Bernanke and its variants do not satisfy standard definitions of predatory pricing, under which

---

[454] Expert Report of J. Zona (Oct. 4, 2024), at ¶ 71.

[455] "Dynamic Revshare for Adwords on AdX" (May 7, 2012), GOOG-DOJ-13605152, at -152-158.

[456] Email from ▮▮▮▮▮▮ to ▮▮▮▮▮▮▮, "Re: [adx-questions:19436] Floor Prices in Bid Requests?" (Oct. 9, 2015), GOOG-DOJ-14507249, at -249 ("[...] I would bet ***most*** tier 1 AdX buyers use the floors we send in the bid request for optimization on their side and knowing what bid prices to submit.").

[457] Email from ▮▮▮▮ to S. Spencer, "Re: [AdX-Services] [adx-questions:11652] Multiple bids from DSPs" (June 28, 2013), GOOG-AT-MDL-014628553, at -553 ("Many DSPs send us many bids based on the number of buyers they represent. […] MediaMath is sending multiple bids, but I do not know how many at once."). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[458] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 469 ("Global Bernanke can be considered not only akin to a bidding ring, but also a form of predatory pricing.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

"predatory objectives are present if a practice would be unprofitable without the exit it causes, but profitable with the exit."[459]

229. Relatedly, one long-run consequence of predatory pricing schemes is "a reduction of current output,"[460] but as I explain in Section IV.C.1.b, Bernanke *expands* output. Its effect is thus the opposite of what is expected from predatory pricing.

230. *Second*, Bernanke and its variants do not meet even the unconventional criterion of "contemporaneous recoupment" that Professor Li discusses. The Ledgerwood and Heath paper cited by Professor Li defines "contemporaneous recoupment" as the ability of a "multiproduct seller [to] lower the prices of a targeted segment of its products below cost to *eliminate a rival* [emphasis added]."[461] This criterion emphasizes the intent to eliminate rivals, but Bernanke's bids were computed to maximize the value of ads won by Google Ads advertisers, without computing the effect on rivals' profits.[462] Moreover,

---

[459] Ordover, Janusz and Willig, Robert, "An Economic Definition of Predation: Pricing and Product Innovation," The Yale Law Journal, Vol. 91 (Nov. 1981), at pp. 9-10 ("It follows that predatory behavior is a response to a rival that sacrifices part of the profit that could be earned under competitive circumstances, were the rival to remain viable, in order to induce exit and gain consequent additional monopoly profit."), 9 ("Assuming that businessmen know how their actions affect their profitability and the profitability of their rivals, predatory objectives are present if a practice would be unprofitable without the exit it causes, but profitable with the exit. Thus, although a practice may cause a rival's exit, it is predatory only if the practice would not be profitable without the additional monopoly power resulting from the exit.").

[460] Ordover, Janusz and Willig, Robert, "An Economic Definition of Predation: Pricing and Product Innovation," The Yale Law Journal, Vol. 91 (Nov. 1981), at p. 13, n. 19 ("In the case of predatory pricing, for example, an alternative action is a reduction of current output by the incumbent firm, and a commensurate increase in price").

[461] Ledgerwood, Shaun D., and Heath, Wesley J., "Rummaging Through the Bottom of Pandora's Box: Funding Predatory Pricing Through Contemporaneous Recoupment," Virginia Law & Business Review, Vol. 6 (Winter 2012), at p. 514.

[462] "Bernanke experiment analysis" (Sept. 3, 2013), GOOG-DOJ-13469175, at -176 ("In order to gather data for running the auction simulations, a 1% background experiment is run where every top GDN bid is quadrupled and the second bid dropped. In this experiment, on queries GDN wins, it can be inferred that the second price is the price that GDN needs to beat in order to win the auction. Now, we can determine, if instead of quadrupling the bid, we could have, for instance, tripled the bid and still won this auction."), -175 ("We see good trends in most important metrics. Matched queries, Google revenue, publisher payout increase by about 10%. Google profit increases by 15%. GDN revenue and GDN profit increase by 17% and 24% respectively.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

in the absence of Bernanke, many of the additional impressions Google Ads won would have gone unsold (see Section IV.C.1.b). That is how Bernanke expanded output.

231. *Third,* Professor Li analogizes Bernanke to a "loss-making scheme with corresponding recoupment,"[463] because it "price[d] below marginal costs for some impressions,"[464] which it then "recouped" on other impressions. But his definition is so broad that it subsumes even celebrated innovations, such as the now-widely-used price-per-click payment arrangement for advertisers. Under that arrangement, when an impression generates no click, the advertiser pays zero, but the intermediary still pays the publisher a positive amount. Google Ads recoups its payments on those impressions with receipts on impressions that generate clicks. Using Professor Li's definition, this is a "loss-making scheme with corresponding recoupment" and "pric[ing] below marginal costs."[465] This example exposes the logical flaw in Professor Li's theory that the intermediary should earn a profit on each impression separately. Bernanke worked by averaging both the prices paid to publishers and *revenue shares* charged to advertisers across pools of impressions. While Bernanke increased the clearing price paid to publishers for some impressions, it also increased advertiser surplus in total (see Section IV.C.2).

---

[463] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 480 ("In addition to the analogies with a loss-making scheme with corresponding recoupment I have explained in the above paragraphs, I further note the following regarding Global Bernanke that is relevant to the question of whether it constituted anticompetitive pricing").

[464] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 473 ("Global Bernanke caused Google to price below marginal cost for some impressions.").

[465] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶¶ 473, 480.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 11. Bernanke is Google Ads' Response to Incentives Faced by All Ad Buying Tools, Not to "Conflicting Incentives" as Professor Cramton Argues

232. Professor Cramton asserts that Bernanke's design reflected "conflicting incentives for an exchange representing buyers and sellers."[466] But Bernanke is a program of Google Ads, not AdX, and Google Ads is a buying tool for advertisers and a bidder in the AdX auction. In any event, Professor Cramton's argument contains several errors.

233. *First,* Professor Cramton argues that "Bernanke illustrates the over-arching importance of maximizing Google profits at the expense of both buyers and sellers."[467] However, as I explain in Section IV.D.2, Bernanke did not harm Google's advertiser customers but instead *increased* their surplus. Contemporaneous experiments by Google Ads found Bernanke optimizations also benefited publishers (see Section IV.D.3).

234. *Second*, as I describe in Section IV.D.5, Bernanke and Alchemist selected bids to increase *Google Ads'* profits. Those bids were not the product of "conflicting incentives," but responses to the same incentives that were faced by *all* ad buying tools. As a consequence, other ad buying tools also developed similar programs.[468]

---

[466] Expert Report of P. Cramton (Oct. 4, 2024), at Section 9.5.

[467] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 224.

[468]

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

235. *Third*, Professor Cramton argues that "AdX relied on [Bernanke] for price discipline since the 'low bid' often priced the 'high bid'" and that "GDN submitted this second bid to provide price support and to ensure that publishers received sufficient revenue to remain within the Google system and continue using the DFP Ad Server."[469] But to suggest that advertisers would pay lower prices if the second highest bid were omitted or set differently is wrong. Google Ads charged advertisers the threshold price, which is the lowest price they would need to become winning and is always at least as high as the second-highest Google Ads bid. The threshold price is never affected by the second highest bid that Google Ads submits to AdX. Additionally, some non-Google DSPs also submitted multiple bids into second-price auctions, even though they had no reason to provide "price support" for AdX publishers.[470]

236. Moreover, Professor Cramton's suggestion that Google Ads should withhold a "low bid" contradicts Professor Li's "relevant counterfactual"[471] in which Google "pass[es] on bids equal to [...] 85% of the valuations of the two highest [] bidders."[472]

---

[469] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 225.

[470] Email from A. Klee to S. Spencer, "Re: [AdX-Services] [adx-questions:11652] Multiple bids from DSPs" (June 27, 2013), GOOG-AT-MDL-014628553, at -553 ("Many DSPs send us many bids based on the number of buyers they represent. [...] MediaMath is sending multiple bids, but I do not know how many at once.").

[471] Revised Expert Report of S. Li (Oct. 11, 2024), at Section VIII.B.3 ("The relevant counterfactual to assess the Global Bernanke conduct is that Global Bernanke is disabled and Google Ads advertisers continue to bid truthfully.")

[472] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 512.a ("Google Ads would pass on bids equal to $0.85v1$ and $0.85v2$ (that is 85% of the valuations of the two highest CAT2 bidders) to the AdX auction.").

237. *Fourth*, the fact that Bernanke's confidentiality made its strategy "difficult for publishers to observe,"[473] does not suggest "conflicting incentives." Rather it demonstrates the opposite: Google Ads' confidentiality guarded the interests of its advertiser customers (see Section IV.D.7). The confidentiality of bidding strategies is standard in the industry[474] and helps to prevent other participants from gaming a DSP's strategy at the expense of lower returns for the DSP and its advertiser customers.

238. *Fifth*, contrary to Professor Cramton's claims, Bernanke did not "ma[k]e the overall auction mechanism more unstable."[475] According to his definition, "[s]tability refers to whether, [] the items in question were assigned to the bidders that bid the most for them."[476] For Google Ads' internal auction, Bernanke marked the winner to be the highest scoring advertiser. For the external AdX auction, the bidders were intermediaries and Bernanke did not affect the AdX rules: the AdX auction continued to allocate the impression to the highest net bid.[477]

---

[473] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 226 ("The variable take rate charged under Bernanke was applied through GDN—a buyer-side tool—which would make it more difficult for publishers to observe.").

[474] "GDN buying change via Bernanke" (Nov. 1, 2013), GOOG-AT-MDL-003995286, at -286 ("The change is similar to other third party buyers changing their bidding behaviour which we never announce and is confidential to the buyer.").

[475] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 227 ("Like Dynamic Revenue Share, Bernanke/Bell made the overall auction mechanism more unstable.").

[476] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 99 ("Stability refers to whether, after the auction, the items in question were assigned to the bidders that bid the most for them.").

[477] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 3 ("Since 2017 (and up to at least December 2021), Google determined the highest bid in AdX auctions by comparing bids to each other on a 'net basis'—that is, after deducting AdX's revenue share from the bids that buyers submitted to AdX. Before 2017, the implementation logic was more complex, but it had an equivalent effect: the highest bid net of take rate would win the AdX auction if it were above the applicable reserve price.") ¶ 12 ("If AdX returned a bid with a lower effective CPM, the best eligible remnant line item won.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

239.  *Sixth*, Professor Cramton suggests that Google Ads should have monitored the impact of Bernanke to "publisher revenue across all sources, including third-party exchanges,"[478] but Bernanke serves Google Ads and its advertisers. It is not the result of balancing any "conflicting incentives" as this suggestion by Professor Cramton appears to advocate. Moreover, contemporaneous experiments by Google Ads found that Bernanke optimizations also benefited publishers (see Section IV.D.3). And publishers and ad buying tools had other tools to optimize their own objectives.

---

[478] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 228 ("Google's documents do not appear to evaluate whether Bernanke increased publisher revenue across all sources, including third-party exchanges.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## V.  **PROJECT BELL: GOOGLE ADS' RESPONSE TO THE HARMFUL PRACTICE OF MULTI-CALLING**

### A. Overview

240.  In October 2016, Google Ads launched **Project Bell** to protect its advertisers from a harmful publisher tactic known as **multi-calling**, in which publishers requested bids from AdX multiple times for the same impression to inflate prices.[479] If unaddressed, multi-calling would lower advertisers' profits and harm other platform participants.

241.  Professors Li, Cramton, and Jardin overlook these harms when they describe multi-calling as a "profitable" publisher strategy.[480] In representing its advertiser customers, Google Ads is motivated to disincentivize tactics that decrease the surplus of those customers.

242.  Publisher Plaintiffs and the Advertiser Class additionally complain that Bell penalized publishers who did not give AdX preferential access.[481] Professor Jardin similarly argues

---

[479] "Display Ads Quality Launches 2016 - Revenue OKR History" (Apr. 19, 2017), GOOG-AT-MDL-003465605, at tab "2016 Q4 Web & mApps," cells D46, J46 (reporting launch date of "2016-10-26"). *See also* "Multiple calls and non-second price auctions: detection and management" (Sept. 23, 2016), GOOG-DOJ-AT-02471119, at -119 ("The objective of this launch is to take steps towards protecting advertisers from price inflation tactics by publishers and exchanges. There are particularly two mechanisms that we try to tackle here (a) multiple call to adwords and (b) unclean auctions on AWBid.").

[480] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 26 ("Multi-calling was often a profitable strategy for publishers."); Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 218 ("Project Bell v2 was used to punish publishers who knowingly or unknowingly exploited Bernanke's peculiarity to increase the price of some impressions."); Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 57 ("This blacklisting of certain publishers served to unfairly punish those, including Inform, who sought to use products outside of the control of Google, further advantaging Google to the detriment of other publishers it was competing against in its auctions.").

[481] Publisher Class First Amended Complaint, at ¶ 282 ("Bell thus penalized publishers who did not grant AdX preferential access"); Advertiser Class Complaint, at ¶ 224 ("The third version of Bernanke, dubbed 'Bell,' penalized publishers that did not give AdX preferential access to their inventory through Dynamic Allocation"); Inform Third Amended Complaint, at ¶ 222 ("In other words, Bell penalized publishers who did not grant AdX preferential access by paying them based upon the third-place bid rather than a second-place bid [...]"); Gannett Amended Complaint, at ¶ 169 ("[...] 'Bell,' is the most punitive. For publishers who attempt to counteract AdX's bid rigging or other anticompetitive advantages e.g., by declining to enable Enhanced Dynamic Allocation — Google places deflated bids in third-price auctions and then withholds all Bernanke pool money in future auctions"); Daily

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

that Bell "unfairly punish[ed] those, including Inform, who sought to use products outside of the control of Google"[482] and Professor Hortaçsu writes that Bell "punished publishers for calling multiple exchanges simultaneously to transact an impression."[483] These claims are wrong. Bell affected only publishers that called AdX multiple times for the same impression, regardless of whether they partnered with competing exchanges.[484]

### B. Multi-Calls Harm Advertisers, End Users, and Non-Multi-Calling Publishers

243.  **Multi-calling** refers to a tactic in which a publisher (or a supply-side tool on its behalf) makes multiple calls to a demand source for the same impression.[485] In 2016, Google found that around 10% of publishers (henceforth **multi-calling publishers**) were multi-calling AdX, leading to an increase in bid requests for Google Ads.[486] Other

---

Mail Second Amended Complaint, at ¶ 138 (" [...] 'Bell,' is the most punitive. For publishers who attempt to counteract AdX's bid rigging or other anticompetitive advantages e.g., by declining to enable Enhanced Dynamic Allocation — Google places deflated bids in third-price auctions and then withholds all Bernanke pool money in future auctions").

[482] Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 57.

[483] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 148 ("I understand from Professor Li's report that Bell v2 was a technical extension to the Bernanke mechanism that punished publishers for calling multiple exchanges simultaneously to transact an impression.").

[484] "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 16 ("Bell v.2 changed Google Ads' bidding behavior only for the publishers that were understood, based on internal experiments, to be calling AdX multiple times for the same potential ad opportunity ('multi-calling publishers').").

[485] A *call* is when a publisher requests that an exchange or DSP bid for an impression. In industry usage, *multi-calling* typically refers to a publisher calling an advertiser multiple times for the same impression. In this section, when I discuss multi-calling, I will focus on the case where a publisher calls AdX multiple times for an impression. Internally, Google also called such publishers "mediating publishers," but this term was *also* used for publishers who called multiple ad networks or exchanges, and so I avoid this term to avoid confusion. *See* "Multiple calls and non-second price auctions: detection and management" (Sept. 23, 2016), GOOG-DOJ-AT-02471119, at -119-120 ("In this doc, the term mediation refers to multiple calls.").

[486] "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶¶ 12-13 ("Some publishers would call an ad exchange, such as AdX, multiple times for the same potential ad opportunity. For simplicity, I will refer to this practice as 'multi-calling.' […] Some publishers employing multi-calls would set a different floor price for each of the multiple calls made from a single ad exchange for the same potential ad opportunity. For example, a publisher could configure an AdX call with a floor price of $5 for a potential ad opportunity and a second AdX call with a floor price of $4.50 for the same potential ad opportunity."). *See also* "Multiple calls and non-second price auctions:

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

demand sources also reported a higher bid request volume due to multi-calls and adopted practices to deter those practices.[487] There are two main reasons that a publisher might choose to multi-call a demand source.

244. *First*, the publisher might hope to use multi-calling with different floor prices to make an unsuspecting advertiser pay more for an impression. This tactic is illustrated in Figure 6 (reproduced from a Google document), and I now describe it using an example of how this tactic can allow a publisher to extract additional revenue from advertisers.

245. Suppose that a publisher knows that an AdX bidder's bid for an impression is $1 for 90% of impressions, and $10 for 10% of impressions (net of AdX's revenue share). However, the publisher does not know which impressions draw the higher bid of $10. If the publisher offers the impression just once using AdX, then its optimal floor price is $1, selling all impressions, but earning no extra revenue on the impressions worth $10. Instead, as illustrated in the internal Google document reproduced as Figure 6, a multi-calling publisher might first call AdX with a floor price of $10, and then, only if the advertiser does not buy the impression on that first call, it could call AdX again with a lower floor price. If the bidder on AdX does not suspect that it will be multi-called and

---

detection and management" (Sept. 23, 2016), GOOG-DOJ-AT-02471119, at -120 ("About 10% of the domains on Adx fall in this category.").

[487] *See, e.g.*, Seb Joseph, "DSPs are cracking down on bid duplication," Digiday (May 12, 2020), https://digiday.com/media/dsps-are-cracking-down-on-bid-duplication/, accessed Dec. 12, 2024 ("Traffic spikes have caused increased costs in processing bid requests, giving already under pressure demand-side platforms extra economic incentive to squash bid duplication. MediaMath is building a new supply chain that doesn't include SSPs that sell duplicated impressions, for example. Last month, The Trade Desk gave all the SSPs it buys impressions from two weeks to stop sending it duplicated requests to take part in the same auction."); Sarah Sluis, "The Trade Desk suppresses bid duplication amid COVID-19 traffic surge," AdExchanger (Apr. 21, 2020), https://www.adexchanger.com/platforms/the-trade-desk-suppresses-bid-duplication-amid-covid-19-traffic-surge/, accessed Dec. 12, 2024 ("Publishers that slot the same six exchanges into multiple header-bidding auctions, such as Prebid, Google open bidding and Amazon Transparent Ad Marketplace, send 18 identical bid requests for the same piece of inventory to The Trade Desk. Currently, DSPs often begrudgingly evaluate them all, and find it hard to tell if the impression is exactly the same.").

bids truthfully on each call, then it will pay higher prices—sometimes $10—due to these multi-calls. In this example, multi-calling allows the publisher to capture the entire surplus that the advertiser would otherwise earn in a second-price auction.

246.  Although Professor Li describes "multi-calling" as a "benefit [] for publishers," because "they are able to extract additional value from the same impression,"[488] any additional revenue for publishers necessarily comes from misleading Google Ads customers, causing them to bid against themselves or to design defenses against multi-calling.

**Figure 6: Multi-calling with decreasing floors**.[489]



247.  Multi-calling with descending floor prices can effectively convert a second-price auction into a **Dutch auction**, in which the seller starts with a high asking price and gradually

---

[488] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1386 ("The benefit of multi-calling for publishers is clear: they get the reward of setting a high floor without bearing the risk of foregoing revenue below the floor. That is, they are able to extract additional value from the same impression without incurring risk of the impression not being filled and thus losing out on the potential revenue from bids below the floor price.").

[489] "Exchange Buying Dynamics" (Aug. 22, 2017), GOOG-DOJ-12848608, at -616.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

reduces the price until a buyer is willing to accept (by offering a high enough bid). If a bidder does not adapt its bids to this multi-calling auction format and instead acts as if it is participating in a second-price auction, it ends up paying higher prices for impressions. Instead of bidding truthfully, the profit-maximizing response to multi-calling may require the advertiser to avoid bidding on some calls from the multi-calling publisher (namely, the ones with the highest floor prices). In the example in Paragraph 245, if the AdX advertiser who bids $10 into a second-price auction anticipates multi-calling, it should withhold its bid when the floor price is high and try to win the impression at a lower price when the publisher calls a second time. Deciding when to bid in the presence of multi-calling is complicated by the fact that the advertiser typically knows neither how many times the publisher will call it to bid on an impression, nor the floor prices of those calls, nor how other bidders may be responding to the publisher's multi-calling. For these reasons, determining a bidder's optimal bidding strategy in this setting resembles the problem of bidding optimally in a first-price auction: in both cases, the bidder needs to guess what other bidders are likely to be willing to pay in order to decide when and how much to bid on the publisher's impression. Because it forces bidders to strategize in a way similar to a first-price auction, Google engineers described this multi-calling strategy as "fishing for [a] first price."[490] But multi-calling is more complex and likely to result in worse outcomes than a first-price auction because the bidder must not only make forecasts about other bidders' behavior, but also the behavior of the publisher.

---

[490] Email from ███████████ to ██████████████████████ "[Launch 300192] Apps Bernanke for non-compliant publishers" (June 18, 2019), GOOG-DOJ-15119015, at -015. While this quote refers to multi-calling in the context of app inventory, the general principle of "fishing for [a] first price" applies equally to other multi-call settings.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

248. *Second,* the publisher may hope that, even with the same floor price, the bidder will change its bid for an impression if called multiple times. Bids for a single impression might change in relatively short intervals of time for a variety of reasons, including the budget pacing or frequency targets that advertisers often employ to govern their bidding.[491] For example, an advertiser may choose not to bid on every impression to avoid depleting its budget in a short period of time or to avoid presenting the same advertisement to the same end user in rapid succession. Multi-calling allows the publisher to undermine these campaign objectives by misrepresenting a single impression as multiple ones. This can allow the publisher to extract higher bids on one of the calls, thwarting the advertiser's campaign goals and reducing efficiency. In response to this tactic, advertisers with frequency caps or budgets are incentivized to bid less or less frequently on impressions in order to achieve their campaign objectives.

249. The net effect is that multi-calling makes bidding more complex and harms efficiency. In the presence of multi-calling, advertisers are unable to tell whether multiple calls from a publisher represent a single advertising opportunity or multiple ones and cannot be sure whether the quoted floor price for an impression is really the lowest bid that the publisher will accept. They need to spend resources to detect and track multi-calling behaviors and adjust their bids strategically, which increases both transaction costs and the likelihood of

---

[491] For example, Google Ads offers a frequency capping feature. *See* Google, "Use frequency capping," Google Ads Help, https://support.google.com/google-ads/answer/6034106, accessed Dec. 11, 2024 ("Frequency capping allows you to limit the number of times ads appear to the same person.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

bidding errors.[492] In the absence of a program that provides these services, the losses caused by multi-calling could lead advertisers to reduce their investments in online display advertising or switch to other buy-side tools that do not bid for impressions offered by multi-calling publishers.[493]

250. Aside from the direct harms caused to advertisers, multi-calling also creates externalities that harm other publishers and users. When advertisers are unsure about which publishers are multi-calling or which calls are duplicates, they are incentivized to reduce their bids into *all* auctions to lower the possible harms of multi-calling. That can reduce efficiency, including by decreasing the overall number of impressions sold, and reduce revenue for other publishers, especially those that are not multi-calling. Furthermore, the additional bid requests created by multi-calling inevitably increase costs and latency, which harms all participants. Increased latency harms users, who face slower page load times; advertisers, whose ads may not be seen as a result of the delay; and publishers, whose websites suffer reduced traffic due to poorer user experience.[494, 495]

---

[492] *See* Sarah Sluis, "The Trade Desk suppresses bid duplication amid COVID-19 traffic surge," AdExchanger (Apr. 21, 2020), https://www.adexchanger.com/platforms/the-trade-desk-suppresses-bid-duplication-amid-covid-19-traffic-surge/, accessed Dec. 12, 2024 ("Publishers […] send 18 identical bid requests for the same piece of inventory to The Trade Desk. Currently, DSPs often begrudgingly evaluate them all, and find it hard to tell if the impression is exactly the same.").

[493] For example, The Trade Desk and MediaMath refused to work with sell-side platforms that made "duplicated requests" for the same impression. Seb Joseph, "DSPs are cracking down on bid duplication," Digiday (May 12, 2020), https://digiday.com/media/dsps-are-cracking-down-on-bid-duplication/, accessed Dec. 12, 2024.

[494] "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 15 ("In addition, multi-calling can increase ad latency because it takes time each time the ad exchange is called, an auction is run, and the ad exchange returns an ad.").

[495] Oded Poncz, "Traffic duplication might be a bigger problem than ad fraud," AdExchanger (Jan. 11, 2016), https://www.adexchanger.com/data-driven-thinking/traffic-duplication-might-even-be-a-bigger-problem-than-ad-fraud/, accessed Dec. 12, 2024 ("Another side effect of bid request duplication is that re-auctioning a bid takes time. In some cases, this could even become apparent to the end user. For example, if an end user is waiting for an interstitial ad to be shown upon opening an application, while behind the scenes there are a few auctions taking place for the same ad space, this will result in the user waiting considerably longer until they're able to access their content. This

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### C. How Bell Identified Multi-Calling Publishers and Protected Advertisers

251. Project Bell identified multi-calling publishers by running experiments on subsets of each publisher's impressions, comparing the number of calls Google Ads received from the publisher if Google Ads bid very high on a subset of impressions (therefore always winning the impression on the first call from a multi-calling publisher) versus the number of calls it received if Google Ads bid very low (therefore always seeing all calls from a multi-calling publisher for an impression).[496] If there is no multi-calling, the number of calls should be the same for both treatments. At the time Bell was introduced, Google Ads' tests revealed that around 10% of publishers on AdX were using multi-calling.[497] Contrary to Plaintiffs' allegations,[498] Project Bell only affected publishers who made

---

doubling of ad requests also adds to the overall latency in the ad ecosystem. If all this duplication means an ad takes five seconds to load, that makes for a poor consumer experience.").

[496] "Multiple calls and non-second price auctions: detection and management" (Sept. 23, 2016), GOOG-DOJ-AT-02471119, at -120 ("In summary, we run two experiments - one where we bid very high and the other where we bid very low. If the query count on Adx drops by over 30% from the low to high bid experiments over a week period, we consider the domain to be a mediating domain.").

[497] "Multiple calls and non-second price auctions: detection and management" (Sept. 23, 2016), GOOG-DOJ-AT-02471119, at -120 ("About 10% of the domains on Adx fall in this category.").

[498] Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 57 ("This blacklisting of certain publishers served to unfairly punish those, including Inform, who sought to use products outside of the control of Google"); Publisher Class First Amended Complaint, at ¶ 282 ("[T]he Bell version of project Bernanke [...] punish[ed] the publisher for not favoring AdX"); Daily Mail Second Amended Complaint, at ¶ 138 ("[...] 'Bell,' is the most punitive. For publishers who attempt to counteract AdX's bid rigging or other anticompetitive advantages e.g., by declining to enable Enhanced Dynamic Allocation [...]"); Gannett Amended Complaint, at ¶ 169 ("[...] 'Bell,' is the most punitive. For publishers who attempt to counteract AdX's bid rigging or other anticompetitive advantages e.g., by declining to enable Enhanced Dynamic Allocation — Google places deflated bids in third-price auctions [...]"), Inform Third Amended Complaint, at ¶ 222 ("In other words, Bell penalized publishers who did not grant AdX preferential access [...]").

multiple calls *to AdX* for an impression. Making multiple calls to different exchanges before calling AdX did not trigger Bell.[499, 500]

252.   Project Bell applied three treatments to protect Google Ads advertisers and discourage multi-calling by publishers.[501] Each treatment increased advertiser surplus by reducing the likelihood that Google Ads would bid above the highest floors chosen by multi-calling publishers.

253.   The first treatment imposed a maximum, or **cap**, on bids to multi-calling publishers.[502] This helped protect Google Ads advertisers from paying too much to acquire these impressions. If an advertiser was aware of the publisher's multi-calling behavior, it could cap its own bid on impressions from that publisher, but it would be difficult for an advertiser to detect that behavior and reduce bids accordingly.[503] Google Ads provided a

---

[499] "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 16 ("Bell v.2 changed Google Ads' bidding behavior only for the publishers that were understood, based on internal experiments, to be calling AdX multiple times for the same potential ad opportunity ('multi-calling publishers'). This launch did not directly change Google Ads' bidding behavior for any other publishers' ad opportunities. For example, Bell v.2 did not affect Google Ads bids on the inventory of publishers that called other exchanges before AdX, but did not call AdX multiple times, even if those other exchanges in turn called Google Ads.").

[500] I have reviewed documents (*e.g.*, "Mediation detection and GDN bidding" (Mar. 2, 2015), GOOG-DOJ-06563186, at -194 to -201) in which Google considered applying these treatments to publishers who used "mediated single-calls," *i.e.*, publishers that called another exchange before AdX. I understand these plans were never implemented. *See* "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 16.

[501] "Mediation and non-second price auction: Detection and treatment" (June 30, 2017), GOOG-DOJ-09875989, at -008-012.

[502] *See* Email from launch@google.com to E. Lipkovitz, "[Launch 188932] More aggressive treatment for mediation publishers" (Apr. 21, 2017), GOOG-DOJ-15208416, at -416 ("The only difference between this launch and ariane/169156 is the treatment for these mediation publishers in Adx. We use more aggressive treatment in this launch, 90% ecpm cap instead of 99% in previous launch."). The level of this cap varied over time.

[503] *See* Seb Joseph, "To reduce auction duplication, buyers start to enforce sellers.json," Digiday (Oct. 16, 2019), https://digiday.com/media/reduce-auction-duplication-buyers-start-enforce-sellers-json/, accessed Dec. 12, 2024 ("The impasse made it hard to spot duplicate bid requests from the same exchange for the same impressions."). *See also* Heymann, B., "How to bid in unified second-price auctions when requests are duplicated," Operations Research Letters, Vol. 48 (2020), at pp. 446-451. ("Bid request duplication is a challenging issue for display advertising buyers. […] We can picture the duplication problem this way: it is possible that several programmatic bidding agents of the same buyer receive a bid request without knowing whether the other agents have received a (duplicated) request and whether they are going to bid. Indeed, the time scale involved to answer the request is so short (less than

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

service to its advertisers that would likely be more accurate and less costly than what many advertisers could implement on their own.

254. The second treatment was to disable Bernanke for multi-calling publishers.[504] By increasing Google Ads' high bids, Bernanke increased the variability of Google Ads' bids and thus the potential profitability of multi-calling for publishers.[505] Consequently, Bell disabled Bernanke for these publishers and reverted to submitting its two highest bids with a standard 14% revenue share to avoid incentivizing multi-calling from publishers and to protect Google Ads advertisers and non-multi-calling publishers.[506]

255. The third treatment was to stop buying from multi-calling publishers through AwBid, the Google Ads feature that allows advertisers to purchase some types of inventory through non-Google exchanges.[507] For a given impression, publishers making multiple calls to AdX might also make duplicated calls to other exchanges, which would be more difficult for Google to detect. If Google Ads continued to bid through AwBid on impressions sold by these multi-calling publishers, it ran the risk of being called additional times through separate exchanges for the same impression. In this case, buying inventory only through

---

100 ms) that it can be technically impossible (or at least very challenging) for the buyer to synchronize the servers' behaviors.").

[504] "Multiple calls and non-second price auctions: detection and management" (Sept. 23, 2016), GOOG-DOJ-AT-02471119, at -119 ("Turn off Bernanke on mediating domains on Adx").

[505] *See* "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 18 ("Disabling Bernanke on multi-calling publishers protected Google Ads and its advertisers by reducing the variance of Google Ads bids (making it less likely for Google Ads to bid more on behalf of its advertisers than would have been needed to win a potential ad opportunity in the absence of multi-calling).").

[506] *See* "Mediation and non-second price auction: Detection and treatment" (June 30, 2017), GOOG-DOJ-09875989, at -009 ("Treatment 1: turn off Bernanke … It's a benefit we should offer on pubs that don't use multiple passbacks").

[507] "Multiple calls and non-second price auctions: detection and management" (Sept. 23, 2016), GOOG-DOJ-AT-02471119, at -119 ("Stop buying on these mediating domains through AWBid").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

AdX (with the additional protections provided by the first two treatments) protected advertisers using AwBid from overpaying for inventory as a result of duplicated calls on other exchanges.

256. These three treatments by Project Bell were designed to protect Google Ads advertisers in the face of publisher multi-calls, avoiding reductions in their online display advertising surplus and avoiding any costs that advertisers would otherwise face to adapt their bids to multi-calling on their own.[508] Google communicated these changes to publishers and encouraged them to end their usage of multi-calls.[509]

257. In a pre-launch experiment, Project Bell was estimated to increase Google Ads advertisers' conversions per dollar spent by 0.3%.[510] This estimate likely underestimated the benefits of the program to advertisers because the experimental window was unlikely to be long enough to capture the effect of publishers reducing their use of multi-calling. A later analysis found that Google's efforts to reduce multi-calling successfully reduced the prevalence of multi-calling on AdX by up to 60%.[511] The overall effect on publishers (and

---

[508] *See* Email from ▮▮▮▮▮▮▮ to E. Lipkovitz, "[Launch 188932] More aggressive treatment for mediation publishers" (Apr. 21, 2017), GOOG-DOJ-15208416, at -416 ("These launches are to protect[] advertisers from price inflation tactics by publishers and exchanges. 1) Background: Some publishers send duplicate calls to adwords in order to obtain revenue as much as possible. This causes price inflation [for] advertisers.").

[509] "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 21 ("To encourage them to reduce usage of multi-calls, Google communicated with multi-calling publishers that Google Ads would be making some changes to how it submitted bids in response to multi-calling.").

[510] "Display Ads Quality Launches 2016 - Revenue OKR History" (Apr. 19, 2017), GOOG-AT-MDL-003465605, at tab "2016 Q4 Web & mApps," cell N46.

[511] *See* "2018 Spring Perf - ▮▮▮▮▮▮▮ (Mar. 26, 2018), GOOG-DOJ-05276941, at -944 (suggesting that Bell's impact on publisher behavior was substantial: "Launched Double call protections - together with sell-side commercialization reduced mediating pubs by 60%.").

Google Ads spending) was expected to be approximately neutral because spending would

be redistributed from multi-calling publishers to those who did not multi-call.[512]

258.  The multi-calling problem was not specific to Google. Major demand sources including

The Trade Desk and MediaMath refused to work with sell-side platforms that made

"duplicated requests" for the same impression.[513] ███████████████████████

█████████████████████████████████████[514] Google Ads used a milder

corrective measure to protect its advertisers and other publishers without completely

eliminating valuable transaction opportunities.

### D. Responding to Plaintiffs' and Their Experts' Allegations about Bell

259.  Dr. Peña, Professor Jardin, and several Plaintiffs claim that Bell "punished" publishers

who did "not favor[] AdX" or who "attempte[ed] to counteract AdX's bid rigging" by

converting AdX into a third-price auction.[515] This is factually incorrect in three ways.

---

[512] "GDN Buying Change for Multiple Calls" (June 7, 2017), GOOG-DOJ-10924698, at -698 ("Overall, the effect for Google is close to $0 as spend is redistributed from publishers doing multiple calls to those who don't."); "Multiple calls and non-second price auctions: detection and management" (Sept. 23, 2016), GOOG-DOJ-AT-02471119, at -122 ("Note from these numbers that these domains are net consumers of pool. So, turning Bernanke off here will cause this extra pool to be automatically reinvested on non-mediating domains.").

[513] Seb Joseph, "DSPs are cracking down on bid duplication," Digiday (May 12, 2020), https://digiday.com/media/dsps-are-cracking-down-on-bid-duplication/, accessed on Dec. 12, 2024 ("MediaMath is building a new supply chain that doesn't include SSPs that sell duplicated impressions, for example. Last month, The Trade Desk gave all the SSPs it buys impressions from two weeks to stop sending it duplicated requests to take part in the same auction.").



[514]

[515] Expert Report of P. Peña (Oct. 7, 2024), at p. 20 ("Through those projects [Projects Bernanke, Global Bernanke, and Bell], Google selectively imposed third-price auctions on its transactions despite conveying to publishers and advertisers that they were running second-price auctions."); Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 57 ("This blacklisting of certain publishers served to unfairly punish those, including Inform, who sought to use products outside of the control of Google, further advantaging Google to the detriment of other publishers it was competing against in its auctions."); Publisher Class First Amended Complaint, at ¶ 282 ("[T]he Bell version of project

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

a. *First*, Bell was a Google Ads program determining how Google Ads bid into AdX, on which Google Ads was a *bidder*: it could not, as a result, change the auction format *for AdX*.

b. *Second*, Google Ads applied Bell's treatments to publishers only when they called AdX multiple times for the same impression, not when they contracted with a non-Google exchange. If a publisher called another exchange before AdX, but did not call AdX more than once for each impression, Project Bell would not affect that publisher.[516, 517] Contrary to Gannett's claims that Bell was "punitive" towards publishers that "declin[ed] to enable Enhanced Dynamic Allocation,"[518] none of the evidence I have reviewed suggests Bell considered whether DA or EDA was enabled. Nirmal Jayaram, Senior Director of Engineering at Google, has declared that "Bell v.2 did not affect Google Ads bids on the inventory of publishers that

Bernanke structured the auction from a second- to third-price auction, thereby punishing the publisher for not favoring AdX"); Daily Mail Second Amended Complaint, at ¶ 138 ("The third variation of Bernanke, known as "Bell," is the most punitive. For publishers who attempt to counteract AdX's bid rigging or other anticompetitive advantages e.g., by declining to enable Enhanced Dynamic Allocation — Google places deflated bids n third-price auctions [...]"); Gannett Amended Complaint, at ¶ 169 ("The third variation of Bernanke, known as "Bell," is the most punitive. For publishers who attempt to counteract AdX's bid rigging or other anticompetitive advantages e.g., by declining to enable Enhanced Dynamic Allocation — Google places deflated bids in third-price auctions [...]"); Inform Third Amended Complaint, at ¶ 222 ("In other words, Bell penalized publishers who did not grant AdX preferential access by paying them based upon the third-place bid rather than a second-place bid, while using the difference to increase the bids made to publishers who allowed preferential access.").

[516] *See* "GDN Buying Change for Multiple Calls" (June 7, 2017), GOOG-DOJ-10924698, at -700 ("Q: Are publishers who work with multiple exchanges impacted by this change? A: If GDN is called multiple times in series for a single query, as the result of any of the implementations mentioned above then the [publisher's] revenue may be negatively impacted."); "Multiple calls and non-second price auctions: detection and management" (Sept. 23, 2016), GOOG-DOJ-AT-02471119, at -119 ("[W]e tackle multiple calls to Adwords on just Adx").

[517] I have reviewed documents (*e.g.*, "Mediation detection and GDN bidding" (Mar. 2, 2015), GOOG-DOJ-06563186, at -194 to -201) in which Google considered applying these treatments to publishers who used "mediated single-calls," in which publishers called another exchange before AdX. I understand these plans were never implemented. *See* "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 16.

[518] Gannett Amended Complaint, at ¶ 169 ("The third variation of Bernanke, known as "Bell," is the most punitive. For publishers who attempt to counteract AdX's bid rigging or other anticompetitive advantages e.g., by declining to enable Enhanced Dynamic Allocation — Google places deflated bids in third-price auctions [...]").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

called other exchanges before AdX, but did not call AdX multiple times, even if those other exchanges in turn called Google Ads."[519]

c. *Third*, contrary to claims from several Plaintiffs[520] and the Publisher Class that Bell "structured the auction from a second- to third-price auction,"[521] neither Google Ads nor AdX ever used third-price auctions. In fact, while their claims mention Bernanke, when Project Bell detected a multi-calling publisher, it reverted to submitting its two highest bids with a standard 14% revenue share, which *increased* Google Ads' low bid.

260. Professor Li argues that disabling Bernanke would "obviate" the need for Bell,[522] but that is false. Even if, as Professors Li and Cramton emphasize, Bernanke altered the extent of profitability from multi-calling,[523] without defenses like Bell, multi-calling would always increase publisher's average revenues from impressions, making it likely that the practice of multi-calling would spread. As Professor Li describes, "[t]he benefit of multi-calling

---

[519] "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 16.

[520] Daily Mail Second Amended Complaint, at ¶ 138 ("The third variation of Bernanke, known as 'Bell,' is the most punitive. For publishers who attempt to counteract AdX's bid rigging or other anticompetitive advantages e.g., by declining to enable Enhanced Dynamic Allocation — Google places deflated bids in third-price auctions [...]"), Gannett Amended Complaint, at ¶ 169 ("The third variation of Bernanke, known as 'Bell,' is the most punitive. For publishers who attempt to counteract AdX's bid rigging or other anticompetitive advantages e.g., by declining to enable Enhanced Dynamic Allocation — Google places deflated bids in third-price auctions [...]").

[521] Publisher Class First Amended Complaint, at ¶ 282 ("[T]he Bell version of project Bernanke structured the auction from a second- to third-price auction, thereby punishing the publisher for not favoring AdX [...]").

[522] Revised Expert Report of S. Li (Oct. 11, 2024), at Section VIII.C.2 ("The relevant counterfactual to assess the Bell v2 conduct is that Global Bernanke's bid manipulations are turned off, reducing the incentives for publishers to multicall, and thus obviating the need for Bell v2").

[523] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 559 ("Multi-calling yields a larger increase in publisher revenue when the publisher faces a bid manipulation scheme such as Global Bernanke, compared to the case when the publisher faces the same number of bidders, bidding separately and competitively."); Expert Report of P. Cramton (Oct. 4, 2024), ¶ 220 ("Bell v2 was implemented to punish publishers that were either knowingly or unknowingly able to increase their revenues on some impressions due to the bid variance Google created through its bid manipulations in the Bernanke scheme.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

for publishers is clear: they get the reward of setting a high floor without bearing the risk of foregoing revenue below the floor."[524] This benefit for publishers, however, necessarily comes from misleading Google Ads customers about the true minimum price for the impression.

261.  Daily Mail and Gannett both allege that Google "encouraged" multi-calling.[525] But, the evidence indicates that Google told publishers that it would change "how it submitted bids in response to multi-calling."[526] Language prohibiting multi-calls remains on Google's Partner Guidelines today: "[p]artners may not make repeated ad calls for Google ads in a manner that attempts to interfere, abuse, or gain an unfair advantage in the ad auction."[527] Internal Google documents also suggest that the company treated multi-calling as a problem.[528] At any rate, evidence suggests that Daily Mail properties

---

[524] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1386.

[525] Daily Mail Second Amended Complaint, at ¶ 139 ("Google also used a modified version Bell, called Bell v.2, to punish publishers who sent multiple calls to AdX for a single impression – a technique that Google itself encouraged publishers to use for years."); Gannett Amended Complaint, at ¶ 170 ("Google also used a modified version Bell, called Bell v.2, to punish publishers who sent multiple calls to AdX for a single impression – a technique that Google itself encouraged publishers to use for years.").

[526] "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 21; "AdX Policy Update to Restrict Multiple Google Ad Calls" (2017), GOOG-AT-MDL-020027387, at -387 ("Adding a sentence to Ad Exchange ad code implementation requirements mirroring the proposed language on AdMob: [...] For a given impression, publishers may not make repeated ad calls for Google ads in a manner that attempts to interfere with, abuse, or gain an unfair advantage in the ad auction.").

[527] "Ad Manager and Ad Exchange program policies: Google Ad Manager Partner Guidelines," Google Ad Manager Help, https://support.google.com/admanager/answer/9059370?hl=en, accessed Dec. 7, 2024 ("Multiple Calls. For a given impression, Partners may not make repeated ad calls for Google ads in a manner that attempts to interfere with, abuse, or gain an unfair advantage in the ad auction."). *See also* "AdX Policy Update to Restrict Multiple Google Ad Calls" (2017), GOOG-AT-MDL-020027387, at -387 ("Adding a sentence to Ad Exchange ad code implementation requirements mirroring the proposed language on AdMob: [...] For a given impression, publishers may not make repeated ad calls for Google ads in a manner that attempts to interfere with, abuse, or gain an unfair advantage in the ad auction.").

[528] "Multiple calls and non-second price auctions: detection and management" (Sept. 23, 2016), GOOG-DOJ-AT-02471119, at -119 ("The objective of this launch is to take steps towards protecting advertisers from price inflation tactics by publishers and exchanges. There are particularly two mechanisms that we try to tackle here (a) multiple call to adwords and (b) unclean auctions on AWBid."); "Exchange Buying Dynamics" (Aug. 22,

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

were not affected by Project Bell[529] and that only one of Gannett's web properties was ever impacted (and only in December 2016).[530]

---

2017), GOOG-DOJ-12848608, at -619 ("Over the last year, we have been improving bidding defenses to [d]iscourage undesirable behavior such as multiple calls.").

[529] *Compare* Plaintiff Associated Newspapers Ltd. and Mail Media Inc.'s Second Supplemental Responses to Defendant Google LLC's First Set Of Interrogatories To Daily Mail, *In Re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (PKC) (Apr. 21, 2023), at pp. 9-10, 12-13 (identifying Daily Mail-owned web properties) *with* Defendant Google LLC's Responses to Plaintiff United States Of America's Fifth Set of Interrogatories to Google, LLC, *United States, et al. v. Google LLC,* No. 1:23-cv-00108-LMB-JFA (Sept. 1, 2023), at pp. 9-10 ("Appendix A provides a list of web domains identified as employing multi-calls for purposes of Bell v.2 from each month Bell v.2 was in operation after launch"), 21-46 (Appendix A).

[530] *Compare* Plaintiff Gannett Co., Inc.'s Third Supplemental Responses to Defendant Google LLC's First Set Of Interrogatories To Gannett, *In Re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (PKC) (June 28, 2024), at pp. 15-29 (identifying Gannett-owned web properties) *with* Defendant Google LLC's Responses to Plaintiff United States Of America's Fifth Set of Interrogatories to Google, LLC, *United States, et al. v. Google LLC,* No. 1:23-cv-00108-LMB-JFA (Sept. 1, 2023), at pp. 9-10 ("Appendix A provides a list of web domains identified as employing multi-calls for purposes of Bell v.2 from each month Bell v.2 was in operation after launch"), 21-46 (Appendix A). The only overlap is for "dispatch.com" in December 2016.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## VI. PROJECT ELMO: MANAGING ADVERTISER BUDGETS WHILE DISINCENTIVIZING BID DUPLICATION AND MULTI-CALLING

### A. Overview

262. Project Elmo is a budget management feature introduced by DV360 in November 2017[531] and Google Ads in November 2018.[532] Elmo ensures that Google's buy-side tools make consistent bids on behalf of an advertiser across all bid requests received for a given end user (as identified by a cookie) within each minute.[533] By bidding consistently on behalf of an advertiser for the same end user within each minute, Elmo helps advertisers control their bidding strategy and their rates of spending—for example, to avoid rapid depletion of their advertising budgets—and disincentives the harmful practices of multi-calling and bid duplication by publishers and exchanges.

263. The Publisher Class alleges that Elmo was a strategy "to reduce advertiser spend on rival Ad Exchanges, [...] undermine the success of Header Bidding and starve rival Ad Exchanges of their primary source of demand."[534] The Advertiser Class, Daily Mail, and

---

[531] "Launch Details Spreadsheet, Launch 209956" (Aug. 29, 2023), GOOG-AT-MDL-009644201, at cells C1, C4 ("Launch Date [...] 2017-11-29").

[532] Email from ███████████ to ██████ "[Launch 205617] Cookie-based budget throttling for GDN advertisers" (Dec. 6, 2018), GOOG-AT-MDL-015521456, at -456 ("Launch Date [...] 2018-11-19").

[533] Email from ███████████ to ████████████ "[Launch 201914] DBM advertiser experiment for cookie-based throttling" (Aug. 29, 2017), GOOG-DOJ-13564564, at -564 ("Cookie-based throttling means keying the throttling decision on cookie instead of making an independent decision per query [...] ."); "Cookie Budget Throttling" (Apr. 19, 2017), GOOG-DOJ-AT-02472888, at -889 ("The goal is to make budget throttling consistent across the multiple queries that result from mediation. [...] To solve this, we use cookie in the throttling decision. [...] Within each one-minute window, every query for the same delivery period on the same cookie gets the same throttling decision.").

[534] Publisher Class First Amended Complaint, at ¶ 322 ("Taken together, Google used Poirot and Elmo, and other strategies to reduce advertiser spend on rival Ad Exchanges, as part of the Scheme, to undermine the success of Header Bidding and starve rival Ad Exchanges of their primary source of demand.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Gannett echo similar claims.[535] In fact, Elmo was designed to ensure Google's budget

management tools worked correctly for its advertiser customers.[536] By blocking the

harmful effects of bid duplication, Elmo reduced spending on exchanges engaged in that

practice and increased spending on exchanges that did not duplicate bids, regardless of

whether those exchanges participated in header bidding.[537] None of The Plaintiffs'

experts conduct substantive analysis of Project Elmo; nor do they provide supporting

evidence for the allegations about its adverse effects.

### B. Background: Budget Throttling As a Tool To Manage Advertiser Budgets

264.    As discussed in Section III.D, advertisers using Google Ads and/or DV360 select

campaign parameters that determine how those buy-side tools bid on their behalf for

display advertising impressions.[538] One frequently used campaign parameter is a **budget**,

which limits the total spending that the buy-side tool can make on behalf of the advertiser

in a designated time period. In 2017, around the time of Elmo's launch on DV360, more

than 80% of DV360's advertiser customers were budget-constrained, meaning that the

---

[535] Advertiser Class Complaint, at ¶ 271 ("Google devised Project Elmo to help DV360 identify when it saw the same bid request across multiple exchanges, and it decreased overall ad spend on any exchange that it suspected meaningfully engaged in header bidding."); Daily Mail Second Amended Complaint, at ¶ 182 ("With Elmo, DV360 reduced its spending on exchanges that were suspected of meaningfully engaging in header bidding."); Gannett Amended Complaint, at ¶ 203 ("With Elmo, DV360 reduced its spending on exchanges that were suspected of meaningfully engaging in header bidding.").

[536] "Cookie Budget Throttling" (Apr. 19, 2017), GOOG-DOJ-AT-02472888, at -889 ("The goal is to make budget throttling consistent across the multiple queries that result from mediation."); "Bidding in Adversarial Auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -633 ("We addressed the following problems for DBM in 2017: [...] Budget allocation where the same query is sent to the bidder multiple times (Elmo)[.]").

[537] "Bidding in Adversarial Auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -650 ("We see a significant drop in exchanges that exploited this mechanism and gains for the cleaner exchanges[.]").

[538] *See, e.g.*, Google, "Create a Display campaign," Google Ads Help, https://support.google.com/google-ads/answer/10759203, accessed Dec. 11, 2024; Google, "Create a campaign," Display & Video 360 Help, https://support.google.com/displayvideo/answer/7205081?hl=en, accessed Dec. 11, 2024.

advertiser had selected a budget and that DV360 could have purchased more impressions if the advertiser had selected a higher budget.[539]

265.  Managing campaign budgets is an essential function of a buy-side tool. If a buy-side tool submits bids for *every* impression based on an advertiser's maximum willingness-to-pay *without* taking its budget into account, that advertiser would often find itself exhausting its budget quickly.[540] There are several reasons why this may be an undesirable outcome for the advertiser. *First*, many advertisers prefer to deliver ads smoothly over a campaign period, rather than very rapidly at the start of the campaign, to expand the set of users reached by the campaign.[541] *Second*, by choosing bids based on the maximum willingness-to-pay for *every* arriving impression, an advertiser might miss out on the opportunity to win later-arriving impressions at lower prices than earlier-arriving ones. *Third*, the budget management strategies of competing bidders can interact to distort pricing patterns. For example, early in the development of search advertising, Google found that cost-per-click spiked at the beginning of the day and decreased over the course of the day as bidders' daily budgets ran out, leading to an end-of-day price 30% lower than at the start of the day.[542] That pricing pattern suggests a failure to manage bidder

---

[539] "Bidding in Adversarial Auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -647 ("DBM is over 80% budget constrained.").

[540] "Introduction to Budget Throttling" (Mar. 1, 2018), GOOG-DOJ-03792729, at -730 ("In practice there are plenty of such campaigns where the potential spend is 100x (or even more) higher than the advertiser's specified budget. In fact, lots of YouTube campaigns can exhaust their daily budget in less than a second.").

[541] Xu, J., Lee, K. C., Li, W., Qi, H., & Lu, Q., "Smart pacing for effective online ad campaign optimization*,"* Proceedings of the 21th ACM SIGKDD International Conference on Knowledge Discovery and Data Mining (2015), at pp. 2217-2226 ("In targeted online advertising, advertisers look for maximizing campaign performance under delivery constraint within budget schedule. Most of the advertisers typically prefer to impose the delivery constraint to spend budget smoothly over the time in order to reach a wider range of audiences and have a sustainable impact.").

[542] "Introduction to Budget Throttling" (Mar. 1, 2018), GOOG-DOJ-03792729, at -731 ("This is exactly how the system worked before probabilistic throttling was introduced in 2006, and was captured in the original probabilistic throttling design doc [...] . Basically, CPC spiked at day start, and kept decreasing, to about 30% lower at day end. In

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

budgets well: in the absence of budget throttling, bidders would spend most of their budgets on impressions at the start of the day when competition for each impression was high, even though they could have spent the same budget to win more impressions later in the day. That would lead to an inefficient outcome whenever advertisers with very high values for later-arriving impressions would fail to win them because they had already exhausted their budgets.

266. **Budget throttling** (also known as budget pacing) is a commonly-used heuristic approach by which bidders manage the rates at which their ads are shown and budgets are spent in online auctions.[543] Under budget throttling, Google would calculate bids for an advertiser for only a fraction of the impressions for which the advertiser was eligible.[544] For example, suppose that an advertiser had a budget of $100 per day to spend on a display advertising campaign, and that Google Ads—if it bid for the advertiser on *each* eligible impression without taking its budget into account—would spend $2,400 per day on eligible impressions for the advertiser. Without budget throttling (and assuming that average impression prices and numbers did not fluctuate over the course of the day), Google Ads might find that the advertiser's budget was exhausted in the first hour of the day. With budget throttling, Google Ads would instead bid on roughly one in every

---

fact, the problem was mitigated by budget curve (which we will discuss later in this doc) or it would have been a lot worse. Today, there is no CPC jump at day boundary").

[543] Gui, G., Nair, H., & Niu, F., "Auction Throttling and Causal Inference of Online Advertising Effects," arXiv preprint arXiv:2112.1515 (Feb. 16, 2022); Balseiro, S R.., Kim, A., Mahdian, M., & Mirrokni, V., "Budget Management Strategies in Repeated Auctions," Proceedings of the 26th International Conference on World Wide Web (2017), at pp. 15-23.

[544] "Introduction to Budget Throttling" (Mar. 1, 2018), GOOG-DOJ-03792729, at -733 ("Probabilistic throttling is the basic layer of throttling. It was first introduced in 2006. The idea is simple: it computes an impression probability (IP) for each campaign, and throttles ad candidates randomly according to IP.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

twenty-four impressions, leading to its budget being more smoothly spent over the course of the day.

267.    Originally, Google implemented budget throttling by randomizing auction participation separately for each bid request it received.[545] In that implementation of budget throttling, Google would adjust the probability of an advertiser bidding on each impression adaptively to target the advertiser's desired daily spend, increasing it if the advertiser had spent less budget than expected over the course of the day, and lowering it if the advertiser had spent more budget than expected.[546]

### C. How Some Publishers and Exchanges Gamed Budget Throttling

268.    By 2017, Google observed that some publishers and exchanges "exploited" Google's implementation of budget throttling to increase Google's spend on their impressions at the expense of other publishers and exchanges.[547] Because Google determined each advertiser's participation using an *independent* coin flip for each bid request, an exchange or a publisher could increase its probability of receiving a bid from a higher-value bidder on Google Ads or DV360 by sending multiple bid requests for the same impression.[548]

---

[545] "Cookie Budget Throttling" (Apr. 19, 2017), GOOG-DOJ-AT-02472888, at -888 ("However, budget throttling works by choosing a random number on each query.").

[546] *See* "Introduction to Budget Throttling" (Mar. 1, 2018), GOOG-DOJ-03792729, at -733 ("How is [Impression Probability] calculated? We use a [Proportional-Integral-Derivative] controller that computes [Impression Probability] by tracking a target spend curve.").

[547] █████ perf Q3 2019 (original structure)" (Sept. 9, 2019), GOOG-DOJ-AT-02218994, at -998 ("When buying on multiple exchanges, our budget controller roughly apportioned budget based on query volume. Some exchanges exploited this by sending the same query multiple times, inflating their share of budget-constrained spend (which is most of DBM).").

[548] "Bidding in Adversarial Auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -647 ("Exchanges send multiple calls for a single query to get multiple shots at budget throttling and land the largest bid [...] Money flows to publishers and exchanges that use repeated calls"); "Cookie Budget Throttling" (Apr. 19, 2017), GOOG-DOJ-AT-02472888, at -888 ("However, budget throttling works by choosing a random number on each query. This means that it can make different decisions for queries that actually represent the same inventory.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

For example, suppose DV360 had five advertisers eligible for an impression, two of whom with value $10 and three of whom with value $1 for the impression. A publisher receiving a bid of $1 from DV360 for the impression might be tempted to send one or more additional bid requests to DV360 for the same impression, hoping that DV360 would bid $10 on one of those requests. In addition to multi-calling AdX (in the way I discussed in Section IV), a publisher might also receive different bids from DV360 if it offered the impression via multiple exchanges. Non-Google exchanges could similarly fish for a higher bid by sending multiple bid requests for the same impression, a tactic known as **bid duplication**.[549] For example, if a non-Google exchange observed that DV360 had a high-value bidder for a certain piece of inventory around half the time it was called to bid, it might call DV360 to bid two or more times for the impression until it observed a high bid. Bid duplication has the effect of transforming the fair coin flip used to determine the advertiser represented by DV360 (and thus the bid received by the exchange) into a *series* of coin flips, repeated until the desired outcome is observed. In the words of one Google engineer, such a strategy "tricks [Google's] budget system into allocating more [...] budget to that exchange than its fair share."[550]

269.  If left unaddressed, multi-calling and bid duplication can have several deleterious effects on the ad tech ecosystem.

---

[549] "Bidding in Adversarial Auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -647 ("Exchanges send multiple calls for a single query to get multiple shots at budget throttling and land the largest bid[.]"); Sarah Sluis, "Attack Of The Clones: Programmatic's Hidden Scourge Of Bid Duplication," AdExchanger (Jan. 17, 2024), https://www.adexchanger.com/platforms/attack-of-the-clones-programmatics-hidden-scourge-of-bid-duplication, accessed Dec. 12, 2024 ("Programmatic auctions are creating so many carbon copies of themselves, it's threatening to topple the entire structure of programmatic. The bid duplication is getting so extreme, buyers are starting to take notice of this strange behavior. Instead of seeing the whole universe of bid opportunities, demand-side platforms see only a small portion of inventory copied many times, which impairs their ability to scale campaigns.").

[550] "Cookie Budget Throttling" (Apr. 19, 2017), GOOG-DOJ-AT-02472888, at -888.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

270. *First*, these strategies undermine the budget-management techniques of buy-side tools, harming their advertiser customers. By calling a buy-side tool to bid multiple times until a desired outcome is achieved, a publisher or exchange can undo the intended effects of budget throttling, leading to bidder budgets being depleted more rapidly than bidders intend.

271. *Second,* multi-calls and bid duplication raise costs for advertisers and their ad tech suppliers. The increased volume of bid requests creates engineering challenges for bidders, including attempts to "deduplicate" bid requests: a costly and imperfect process that seeks to identify when different bid requests correspond to the same impression.[551] Because the process of bid deduplication is imperfect, advertisers may miss out on valuable transaction opportunities or overpay for some impressions. Moreover, each additional call to bid creates additional time for bid requests to be processed and responded to, increasing ad latency.[552]

---

[551] Sarah Sluis, "Attack Of The Clones: Programmatic's Hidden Scourge Of Bid Duplication," AdExchanger (Jan. 17, 2024), https://www.adexchanger.com/platforms/attack-of-the-clones-programmatics-hidden-scourge-of-bid-duplication, accessed Dec. 12, 2024 ("To combat bid duplication, DSPs have turned to traffic shaping, a technique that filters excess bids using a combination of algorithms and manual selection to curate the inventory that buyers evaluate. [...] Processing billions of bid requests is expensive. In the face of skyrocketing cloud bills, SSPs and DSPs alike have implemented traffic-shaping tech as a cost-savings measure."); Sarah Sluis, "The Trade Desk Suppresses Bid Duplication Amid COVID-19 Traffic Surge," AdExchanger (Apr. 21, 2020), https://www.adexchanger.com/platforms/the-trade-desk-suppresses-bid-duplication-amid-covid-19-traffic-surge, accessed Dec. 12, 2024 ("The idea of cutting down on bid duplication predates the coronavirus pandemic. But the extra traffic has added millions in server costs, a burden shouldered largely by DSPs, as well as the agencies and marketers who pay for this cost as part of the ad tech tax.").

[552] Oded Poncz, "Traffic Duplication Might Be A Bigger Problem Than Ad Fraud," AdExchanger Opinion (Jan. 11, 2016), https://www.adexchanger.com/data-driven-thinking/traffic-duplication-might-even-be-a-bigger-problem-than-ad-fraud, accessed Dec. 12, 2024 ("Another side effect of bid request duplication is that re-auctioning a bid takes time. In some cases, this could even become apparent to the end user. For example, if an end user is waiting for an interstitial ad to be shown upon opening an application, while behind the scenes there are a few auctions taking place for the same ad space, this will result in the user waiting considerably longer until they're able to access their content. This doubling of ad requests also adds to the overall latency in the ad ecosystem. If all this duplication means an ad takes five seconds to load, that makes for a poor consumer experience.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

272. *Third*, multi-calling and bid duplication can harm publishers too. Because budgets are reallocated towards the publisher or exchange pursuing a successful multi-calling or bid duplication strategy, these strategies create a negative externality in the form of reduced payments to other publishers and exchanges.[553] This creates an incentive for the publishers and exchanges harmed by those practices to themselves adopt multi-calling and bid duplication, compounding the negative effects for advertisers and other publishers described above.[554] The responses of bidders to bid duplication, which may include reduced or less frequent bids on all impressions, can also reduce publisher revenues.[555]

---

[553] "Cookie Budget Throttling" (Apr. 19, 2017), GOOG-DOJ-AT-02472888, at -888 ("In particular, a single third-party exchange can send multiple queries for the same inventory, which effectively tricks our budget system into allocating more than budget to that exchange than its fair share. This trick works because the random throttling allocates budget according to the share of queries, but this allocation doesn't represent the actual inventory available in the case of multiple requests for the same inventory."); "Bidding in Adversarial Auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -647 ("Money flows to publishers and exchanges that use repeated calls").

[554] *See* Sarah Sluis, "Attack Of The Clones: Programmatic's Hidden Scourge Of Bid Duplication," AdExchanger (Jan. 17, 2024), https://www.adexchanger.com/platforms/attack-of-the-clones-programmatics-hidden-scourge-of-bid-duplication, accessed Dec. 12, 2024 ("The issues caused by bid duplication are no secret. But, as is often the case in ad tech, being proactive is a disadvantage. Any single publisher attempting to fix the issue on their own will experience a decrease in revenue so profound that changing alone isn't an option. Meanwhile, removing waste from bid duplication could squeeze SSPs, who each get a chance to sell everything under the current setup.").

[555] Sarah Sluis, "Attack Of The Clones: Programmatic's Hidden Scourge Of Bid Duplication," AdExchanger (Jan. 17, 2024), https://www.adexchanger.com/platforms/attack-of-the-clones-programmatics-hidden-scourge-of-bid-duplication, accessed Dec. 12, 2024 ("To combat bid duplication, DSPs have turned to traffic shaping, a technique that filters excess bids using a combination of algorithms and manual selection to curate the inventory that buyers evaluate. But the process doesn't actually deduplicate impressions for DSPs, and, paradoxically, the guesses made during traffic shaping can exacerbate the negative effects of duplication. [...] Traffic-shaping algorithms rely on historical data about what inventory has been bid on in the past to determine what to send buyers in the future. The danger in this approach is that buyers end up seeing an increasingly narrow view of what's out there, losing the chance to discover new inventory.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### D. How Elmo Protected Advertisers and Disincentivized Multi-Calling and Bid Duplication

273.  DV360 launched Project Elmo in November 2017[556] and Google Ads launched it in

November 2018[557] to ensure that Google's bid management algorithms worked as

intended despite the onslaught of multi-calling and bid duplication tactics by exchanges

and publishers.[558] Rather than randomizing participation of budget-constrained

advertisers independently for each bid request it received, Elmo ensures that the *same*

budget-constrained advertisers participate in all bid requests associated with a given

cookie within a time period of one minute.[559, 560] This creates consistency in the bids sent

by Google Ads and DV360 across bid requests for a given cookie within the one-minute

time window. The one-minute time window was "long enough so that multiple mediated

queries are likely to fall within the same window, but short enough so that

budget-constrained ad[vertisers] still have a chance to show [an ad] to any given user."[561]

---

[556] "Launch Details Spreadsheet, Launch 209956" (Aug. 29, 2023), GOOG-AT-MDL-009644201, at cells C1, C4 ("Launch Date [:...] 2017-11-29").

[557] Email from ▮▮▮▮▮▮▮▮ to ▮▮▮▮▮, "[Launch 205617] Cookie-based budget throttling for GDN advertisers" (Dec. 6, 2018), GOOG-AT-MDL-015521456, at -456 ("Launch Date [...] 2018-11-19").

[558] "Cookie Budget Throttling" (Apr. 19, 2017), GOOG-DOJ-AT-02472888, at -888 ("Various kinds of publisher mediation (e.g. header bidding, multiple calls) can cause us to see multiple queries for the same inventory. However, budget throttling works by choosing a random number on each query. This means that it can make different decisions for queries that actually represent the same inventory. In particular, a single third-party exchange can send multiple queries for the same inventory, which effectively tricks our budget system into allocating more than budget to that exchange than its fair share. This trick works because the random throttling allocates budget according to the share of queries, but this allocation doesn't represent the actual inventory available in the case of multiple requests for the same inventory. We want to change the budget throttling algorithm so that it makes a consistent decision across those queries, while still achieving the goal of hitting the impression probability overall.").

[559] Similarly, the same set of advertisers are throttled (or *not* participating) in each bid request associated with the cookie in that minute.

[560] "Cookie Budget Throttling" (Apr. 19, 2017), GOOG-DOJ-AT-02472888, at -889 ("Within each one-minute window, every query for the same delivery period on the same cookie gets the same throttling decision."); "Bidding in Adversarial Auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -648 ("We fix the advertisers that can purchase a query from a given cookie during any specific time_bucket (budget throttling based on cookie x time bucket)").

[561] "Cookie Budget Throttling" (Apr. 19, 2017), GOOG-DOJ-AT-02472888, at -889.

274.  Elmo reduces incentives for bid duplication and multi-calling designed to solicit a high bid from Google's buy-side tools. Because Elmo ensures that Google's buy-side tools choose the same sets of participants for bid requests for the same cookie that are received in close succession, an exchange contemplating a bid-duplication strategy or a publisher contemplating a multi-calling strategy can expect to receive the same bids from Google's buy-side tools on each bid request it sends, eliminating much of the benefit of such a strategy.

275.  Meanwhile, Elmo does *not* reduce the average revenues of publishers using header bidding, Open Bidding or alternative mediation techniques to offer a single impression to multiple exchanges. Because Elmo ensures that the same advertisers using Google's buy-side tools are participating in each auction for which they are called to bid, it levels the playing field between exchanges: the winner is not merely the exchange chosen randomly to receive a high bid from Google's buy-side tools, as could happen under the previous budget throttling design. To the extent that Elmo successfully disincentivizes multi-calling and bid duplication, publishers also benefit from the elimination of the harmful externalities that they suffer when other publishers and exchanges adopt those practices.

276.  A Google analysis found that Elmo decreased spending on exchanges employing bid duplication and increased it for "cleaner" exchanges not using those tactics (including AdX, United, and Improve Digital).[562] Non-Google display advertising tools (including

---

[562] "Bidding in Adversarial Auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -650 ("We see a significant drop in exchanges that exploited this mechanism and gains for the cleaner exchanges [...] Revenue [...] Pubmatic[:] -24.5%[,] OpenX[:] -13.5%[,] Adaptv[:] -7.1%[,] Improve Digital[:] 1.7%[,] Adx + Adsense[:] 2.9%, United[:] 3.1%").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

The Trade Desk and Magnite) have also sought to combat bid duplication,[563] with some non-Google buy-side tools ███████████████████████████████ also adjusting bids to account for bid duplication.[564]

### E. Responding to Plaintiffs' Allegations

277. The Publisher Class alleges that "Google devised project Elmo to help DV360 identify when it saw the same bid request across multiple Ad Exchanges, and it decreased DV360's overall ad spend on any Ad Exchange that it suspected of meaningfully engaging in Header Bidding,"[565] and that it was "part of the [s]cheme[] to undermine the success of Header Bidding and starve rival Ad Exchanges of their primary source of demand."[566] These claims and similar ones from other Plaintiffs[567] are incorrect.

---

[563] Sarah Sluis, "Attack Of The Clones: Programmatic's Hidden Scourge Of Bid Duplication," AdExchanger (Jan. 17, 2024), https://www.adexchanger.com/platforms/attack-of-the-clones-programmatics-hidden-scourge-of-bid-duplication, accessed Dec. 12, 2024 ("Processing billions of bid requests is expensive. In the face of skyrocketing cloud bills, SSPs and DSPs alike have implemented traffic-shaping tech as a cost-savings measure. Magnite, for instance, bought nToggle for traffic shaping back in 2017."); Sarah Sluis, "The Trade Desk Suppresses Bid Duplication Amid COVID-19 Traffic Surge," AdExchanger (Apr. 21, 2020), https://www.adexchanger.com/platforms/the-trade-desk-suppresses-bid-duplication-amid-covid-19-traffic-surge, accessed Dec. 12, 2024 ("So two weeks ago, The Trade Desk asked exchanges to stop sending duplicate bid requests for the same ad impression.").

[564] 

[565] Publisher Class First Amended Complaint, at ¶ 320.

[566] Publisher Class First Amended Complaint, at ¶ 322.

[567] Advertiser Class Complaint, at ¶ 271 ("Google devised Project Elmo to help DV360 identify when it saw the same bid request across multiple exchanges, and it decreased overall ad spend on any exchange that it suspected meaningfully engaged in header bidding."); Daily Mail Second Amended Complaint, at ¶ 182 ("With Elmo, DV360 reduced its spending on exchanges that were suspected of meaningfully engaging in header bidding."); Gannett

278. *First*, Elmo was designed to ensure consistent bids both when *multiple* exchanges issue bid requests for the same impression and when *a single* publisher or exchange calls Google's buy-side tools multiple times for the same impression. In this way, Elmo disincentivizes the harmful tactics of multi-calling by publishers and bid duplication by exchanges. Because of Elmo, for each impression, all exchanges are treated equally: winning the impression does not depend on being the "lucky" exchange chosen randomly by the budget-throttling algorithm to receive the high bid from Google's buy-side tools.

279. *Second*, Elmo did not penalize header bidding exchanges: it removed the advantages of bid duplication, regardless of whether the exchange participated in header bidding. Elmo did not "starve" non-Google exchanges of demand from Google's buy-side tools. Several non-Google exchanges—particularly those Google identified as not engaged in bid duplication—saw *increased* spending from Google as a consequence of Elmo.[568]

280. *Finally,* Elmo represented Google's buy-side tools *adapting* to header bidding, rather than undermining it. By protecting Google's advertiser customers from harmful tactics like bid duplication and multi-calling, Elmo ensured that its advertiser customers could safely participate in auctions for impressions on multiple exchanges, encouraging more participation. Advertisers no longer needed to fear that unscrupulous publishers and exchanges would undermine their budget-management strategies.

---

Amended Complaint, at ¶ 203 ("With Elmo, DV360 reduced its spending on exchanges that were suspected of meaningfully engaging in header bidding.").

[568] "Bidding in Adversarial Auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -650 ("We see a significant drop in exchanges that exploited this mechanism and gains for the cleaner exchanges. [...] Revenue [...] Improve Digital[:] 1.7%[,] Adx + Adsense[:] 2.9%, United[:] 3.1%").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## VII.  POIROT, MARPLE, AND THE ADX 1P BIDDER: IMPROVING RETURNS FOR ADVERTISERS BY OPTIMIZING BIDS IN NON-SECOND PRICE AUCTIONS

### A. Overview

281.  Poirot and Marple were bid optimization programs on DV360 and Google Ads, respectively, that were designed to (i) identify exchanges using non-second price auctions and (ii) bid to maximize expected advertiser surplus on those exchanges.[569] After AdX moved to the UFPA, DV360 launched the AdX 1P Bidder to ████████████ ████████████████████████████████████████████████████████████████[570] These programs benefited advertisers by increasing their returns from online display advertising, regardless of advertisers' campaign objectives. The programs made bidding easier for advertisers by automating the experiments and computations that advertisers would otherwise seek to make themselves. In doing so, they improved bidding accuracy, improving matching and reducing costs for advertisers.

---

[569] *See* "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -809 ("The goal of Poirot is to discover the exchanges that deviate from second pricing and bid appropriately on these to improve advertiser performance on these exchanges."), -811 ("Our optimization problem can be stated as follows: For each advertiser, find bidding policy *f(query features, ad features)* that maximizes $\Sigma_i v\text{-}c_i$."); "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 26 ("In July 2017, Google launched Project Poirot, an algorithm designed to protect DV360 advertisers from overbidding on exchanges that deviated from second-price auctions."). *See also* "Poirot Launch Metrics" (Oct. 5, 2021), GOOG-DOJ-AT-02480338, at -341; Email from ████████████ to ████████████████████████ "[Launch 187971] Project Poirot (**DRAFT**)" (Apr. 11, 2017), GOOG-DOJ-14398809, at -810 ("This launch changes bids for fixed CPM DBM advertisers to maximize advertiser surplus."); "DV360 optimizations ENG deep dive" (Jan. 24, 2020), GOOG-DOJ-11733552, at -577.

[570] *See* "DV360 exchange dynamics roadmap 2020," (Mar. 2020), GOOG-AT-MDL-019330098, at -099 ("HOB data is critical for bidding into 1p auctions. Some exchanges provide this directly (e.g., AdX). [S]ome are in the discussion for providing this directly, and some don't."); Email from ████████████████████████████████████████████████████████████████████████████████████████████████████████████████ "DV360 optimizations ENG deep dive" (Jan. 24, 2020), GOOG-DOJ-11733552, at -559 ("Recently, post AdX 1p migration, we have been able to get a full picture of the market because AdX shares HOBs, that has enabled us to make HDMI even more powerful").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

282. Adopting Plaintiffs' emphasis, I focus most of my discussion in this section on Poirot and the AdX 1P Bidder (rather than Marple). Each allegation made by Plaintiffs and their experts about these programs is either incorrect or founded on faulty assumptions:

    a. Plaintiffs claim that Poirot harmed publishers[571] and competition,[572] but their analyses rely on three false assumptions: (i) that advertisers could not otherwise shade bids on their own, (ii) that competing DSPs lacked similar programs, and (iii) that advertiser savings from Poirot would go unspent. Plaintiffs also claim that Poirot failed to benefit advertisers,[573] but Poirot improved bidding and increased advertiser surplus, as verified by Google's internal experiments.[574] Poirot also protected DV360 advertisers from misleading tactics from exchanges

---

[571] *See* Publisher Class First Amended Complaint, at ¶ 317 ("Accordingly, DV360 intentionally bid less on rival Ad Exchanges and increased bids on AdX, ostensibly to avoid optimizations that were bad for advertisers and good for publishers[.]"); Daily Mail Second Amended Complaint, at ¶ 183 ("Poirot was intended to reduce publisher revenue[.]"); Gannett Amended Complaint, at ¶ 203 ("Poirot was intended to reduce publisher revenue[.]").

[572] Publisher Class First Amended Complaint, at ¶ 27 ("Project Poirot thus impaired competition and helped maintain and enhance Google's monopoly power in both the Ad Buying Tools market for large advertisers and the Ad Exchange market."); Advertiser Class Complaint, at ¶ 274 ("Google's Poirot and Elmo initiatives harmed competition in the ad-exchange market and the market for ad tools for large advertisers by obtaining information about rival exchanges, locking advertisers into using DV360, and directing ad spending away from rival exchanges and toward AdX, all without competing on the merits of price or quality."); Daily Mail Second Amended Complaint, at ¶ 184 ("[Poirot and Elmo] made rival exchanges less viable options for publishers and kept client-side header bidding from developing into a competitive threat to Google's ad-server monopoly."); Gannett Amended Complaint, at ¶ 204 ("[Poirot and Elmo] made rival exchanges less viable options for publishers and kept client-side header bidding from developing into a competitive threat to Google's ad-server monopoly.").

[573] Publisher Class First Amended Complaint, at ¶ 317 ("In reality, Google's efforts to 'protect' advertisers did nothing of the kind, but instead directly reallocated advertising dollars to Google's own Ad Exchange with no actual benefit to advertisers."); Advertiser Class Complaint, at Section VI.B.7 ("Project Poirot and Project Elmo Harmed Competition in the Ad Exchange Market and the Market for Ad-Buying Tools for Large Advertisers, and Injured Advertisers"). *See also* Daily Mail Second Amended Complaint, at ¶ 180 ("Thus, Poirot instructed DV360 to return competitive bids only for second-price auctions."); Gannett Amended Complaint, at ¶ 201 ("Thus, Poirot instructed DV360 to return competitive bids only for second-price auctions.").

[574] *See* Email from N. Jayaram to E. Lipkovitz, et al., "Re: Poirot to launch 6/19" (Aug. 20, 2017), GOOG-DOJ-07825115, at -115 ("Through experiments, we measured that […] the surplus increases by 12% in the affected exchanges as a result of this launch."); "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -815 ("The following table shows the impact limited to the non-second price auction exchanges."; "surplus [...] change[:] 15.57%"). Google experiments found that Poirot increased advertiser surplus by 6% on all exchanges, including second-price exchanges. *See* "Bidding in Adversarial Auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -644 ("Advertiser impact […] 6% surplus increase").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

that ran so-called "dirty auctions," in which the exchange claimed to use one auction format to sell an impression, but actually used another.[575]

b. Plaintiffs and Professor Cramton suggest that these benefits were pretext for Google to attack header bidding and divert advertiser spending to AdX,[576] but this narrative is inconsistent with Poirot's design for at least three reasons. *First*, Poirot applied to non-second-price auctions regardless of whether the exchange participated in header bidding. *Second*, Poirot calculated bids to increase advertiser surplus without regard to third-parties.[577] *Third*, contrary to the Publisher Class' claim,[578] Poirot neither changed the bidding formula for AdX nor raised its bidding multiplier above 1.[579]

---

[575] "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -635-636 ("There are roughly three types of auctions[:] Second price (buyer bids truthfully)[,] First price (buyer has to shave bids)[,] Dirty (called second price, but really more like first price) […] Project Poirot ensures advertiser bids are protected").

[576] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 261 ("Poirot was intended to shift impressions to AdX rather than maximize value for advertisers."); ¶ 233 ("Project Poirot was viewed internally as a means of combatting header bidding."); Publisher Class First Amended Complaint, at ¶ 315 ("DV360 is Google's dominant Ad Buying Tools tool for large advertisers. Through Act 11 (called 'Project Poirot'), Google began in 2018 to use this dominance, as part of its overall Scheme to identify which rival Ad Exchanges were likely participating in Header Bidding, and then punish those Ad Exchanges by diverting Google's Ad Buying Tool DV360's ad buys away from those Ad Exchanges to Google's own AdX Ad Exchange."); Advertiser Class Complaint, at ¶ 353 ("Google engag[ed] in a scheme to 'kill' header bidding by diverting ad spend away from rival exchanges that permitted header bidding, including through the processes codenamed Projects Poirot"); Daily Mail Second Amended Complaint, at ¶ 181 ("Ultimately, Poirot accomplished its evident goal, as DV360 spent '7% more on AdX and reduc[ed] spend on most other exchanges.'"); Gannett Amended Complaint, at ¶ 300 ("Google's contracts do not disclose or suggest that Google would cap bids submitted to auctions for Gannett's inventory (e.g., Project Bell) or that Google would divert bids away from Gannett's other demand sources if those sources participated in Header Bidding (e.g., Project Poirot).").

[577] "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -811 ("Our optimization problem can be stated as follows: For each advertiser, find bidding policy *f(query features, ad features)* that maximizes $\Sigma_i v - c_i$.").

[578] Publisher Class First Amended Complaint, at ¶ 317 ("Accordingly, DV360 intentionally bid less on rival Ad Exchanges and increased bids on AdX").

[579] "Optimized Fixed Bidding in DV360" (Mar. 2019), GOOG-DOJ-05326023, at -023 ("For Optimized Fixed CPM Bidding, the inputted CPM value will serve as a maximum CPM bid, as opposed to a fixed CPM bid - we will never bid more than the inputted value.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

    c.   Plaintiffs further argue that Poirot unfairly exempted AdX despite "engaging in the very same auction manipulation" that Poirot targeted.[580] However, from September 2017—just two months after its launch in July 2017—up until the transition to the UFPA in September 2019, Poirot applied the same tests to AdX as to other exchanges.[581, 582]

    d.   Professors Li and Cramton also repeatedly emphasize a "significant discrepancy" in "risk aversion coefficients"[583] between the AdX 1P Bidder and Poirot. They conclude that this discrepancy favored AdX,[584] increased its "dominance in the

---

[580] Publisher Class First Amended Complaint, at ¶ 317 ("Although Google's DV360 team was openly critical of 'greedy' rival Ad Exchanges that claimed to run a true second-price auction while actually running a 'dirty' second-price auction, Google's own Ad Exchange was engaging in the very same auction manipulation."); Advertiser Class Complaint, at ¶ 276 ("Although DV360 was openly critical of 'greedy' rival exchanges that claimed to run a true second-price auction while actually running a 'dirty' second-price auction, Google's own exchange was engaging in the very same auction manipulation, though Reserve Price Optimization, discussed above.").

[581] Publisher Class First Amended Complaint, at ¶ 317 ("[With Poirot,] DV360 was redirecting that ad spend to a marketplace—Google's own—that engaged in exactly the same behavior").

[582] *See* "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶¶ 33, 35-36 ("Since September 2017, Poirot has applied on AdX and on all third-party ad exchanges on which DV360 bids."); Deposition of N. Jayaram (DOJ CID) (Sept. 17, 2021) at 274:9-274:13 ("A. Google's buy side algorithms run across all the traffic. So that—whether it's AdX or third-party exchanges, the algorithm that we are talking about [Poirot] applies on all the traffic for DV360.").

[583] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 256. *See, e.g.*, Revised Expert Report of S. Li (Oct. 11, 2024), ¶ 1302 ("I find that the relevant counterfactual for Poirot is that Google should have applied a consistent risk aversion parameter for all exchanges.").

[584] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 256 ("Indeed, Google maintains that when it finally introduced a risk aversion coefficient for DV360 bidding on third-party exchanges, it used the same risk aversion coefficient on AdX and all third-party exchanges, apparently recognizing (ultimately) that treating DV360 bidders as risk neutral when bidding on third-party exchanges and risk-averse when bidding on AdX would have blatantly favored its own AdX ad exchange.").

exchange market,"[585] deprived rivals of scale,[586] and reduced total welfare.[587] This analysis is inaccurate for two reasons. *First*, it overlooks significant architectural differences between Poirot and the AdX 1P Bidder from 2019 to 2022, which are not accurately characterized by their focus on just the risk aversion parameter. *Second*, I do not interpret the "risk-aversion" parameter to model the *economic* concept of risk-aversion, but to be an *engineering* parameter that accounts for imperfections in the data used by the 1P Bidder.

e.  Plaintiffs further inveigh that "Poirot [was] not competition on the merits; nor [was it] the product of superior skill, foresight, or historical accident," and that "[its] sole purpose was to destroy competition."[588] These conclusions are simply wrong. Poirot, optimized bids to competitive equilibrium and increased advertiser savings, thereby increasing competition for impressions. Poirot enhanced competition and exemplifies competition on the merits.

### B. Background: Non-Second-Price Auctions

283.  As I discussed in Section III.C.4, many ad exchanges switched from using second-price auctions to non-second-price auctions for online display advertising impressions between

---

[585] Revised Expert Report of S. Li (Oct. 11, 2024), at Section XVII.D.1.

[586] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1337 ("As a result, Poirot deprived third-party exchanges of scale relative to AdX during the period when Poirot applied a different risk-aversion parameter to AdX.").

[587] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1346 ("This example illustrates how Poirot's bid distortions harm total welfare: there is an efficient equilibrium when both bidders are risk-neutral, but there is no efficient equilibrium when the DV360 bids are distorted by the risk-aversion coefficient.").

[588] Publisher Class First Amended Complaint, at ¶ 323.

2017 and 2019.[589] During this transitional period, different exchanges used different auction formats, and some exchanges even used different auction formats for different impressions.[590] Some exchanges ran what Google engineers called **dirty auctions**, meaning that they claimed to run a second-price auction but actually tried to extract additional payments from bidders by charging the winner a price between its own bid and the highest losing bid.[591] In this section, I refer to both first-price auctions and dirty auctions as **non-second-price auctions**.

284. To illustrate a dirty auction, suppose an exchange sets a floor price of $4.00, and then observes that the only bid above the floor price is $5.00. In a second-price auction, the bidder would pay $4.00. In a dirty auction, the exchange might charge a higher price, such as $4.60, claiming that was the second-highest bid. From the price and its bid alone, a bidder would be unable to detect that the exchange had charged a price different from the second-highest bid.

285. As I have emphasized (see Section III.C above), a surplus-maximizing bidder must bid differently depending on the auction's pricing rule.[592] This created new challenges for bidders in the transitional period in which exchanges differed in their pricing rules: how to predict the auction format used for a given impression, and how to optimize bids to

---

[589] See "DV360, Third Party Exchanges, and Outcome-Based Buying" (Oct. 16, 2018), GOOG-DOJ-12038253, at -267 (Figure: "Impression Share (US Ad Inventory)," "First-price auction"[:] 6% in December 2017, 43% in March 2018, "Second-price auction with anomalies"[:] 19% in December 2017, 24% in March 2018).

[590] *See* "Poirot with auction type signal" (Nov. 5, 2018), GOOG-DOJ-05283173, at -185 (Figure: "Impression volume per auction type").

[591] "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -635 ("There are roughly three types of auctions[:] Second price (buyer bids truthfully)[,] First price (buyer has to shave bids)[,] Dirty (called second price, but really more like first price)").

[592] *See, e.g.*, Milgrom, Paul R., *Putting Auction Theory to Work*. Cambridge University Press (2004), at pp. 110-16.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

that format. As I have discussed above, second-price auctions are bidder-truthful, meaning that bidders maximize their surplus by bidding their values, whereas first-price auctions are not, so that bidders in these auctions maximize surplus by shading their bids. Dirty auctions also fail to be bidder-truthful and may be even more challenging for bidders, since a bidder may need to monitor its auction performance over time to detect changes in the auction format and adapt bids accordingly. The benefits of bid-shading were widely understood in the online display advertising industry.[593]

## *C. All Advertisers Should Maximize Expected Surplus*

286.  Online display advertising campaigns can have many different objectives, which may involve acquiring a fixed number of impressions in some time period or maximizing clicks subject to a fixed budget or allocating a budget between advertising on the web or other media, and others. Regardless of the advertiser's campaign objective, it can always acquire the same number of impressions at *minimum* cost by adopting a bidding strategy that *maximizes* the expected surplus from each auction opportunity, using a properly

---

[593] S*ee, e.g.*, Jessica Davies, "What to know about Google's implementation of first-price ad auctions," Digiday (Sept. 6, 2019), https://digiday.com/media/buyers-welcome-auction-standardization-as-google-finally-goes-all-in-on-first-price/ accessed Dec. 12, 2024 ("[D]emand-side platforms came up with bid shading as a way to help buyers transition to first-price auctions where they have to be willing to pay what they bid"); Digiday, "In programmatic, buyers sometimes don't know what type of auction they're bidding in," Digiday (June 30, 2017), https://digiday.com/marketing/ad-buyers-programmatic-auction/, accessed Dec. 12, 2024 ("A buyer might think they're buying based on second price but really be in a first-price auction. That can get expensive, since the bid strategies are far different"); Sarah Sluis, "Big Changes Coming To Auctions, As Exchanges Roll The Dice On First-Price," AdExchanger (Sept. 5, 2017), https://www.adexchanger.com/platforms/big-changes-coming-auctions-exchanges-roll-dice-first-price/, accessed Dec. 12, 2024 ("[I]f programmatic traders think they are still playing according to second-price auction rules, they will overpay for inventory. To combat price increases, some buyers have already started shading, or reducing bid prices.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

determined value for each individual impression.[594] A surplus maximization strategy (which is the type of strategy implemented by Poirot) can thus serve the interests of every advertiser, regardless of its campaign objectives, by achieving those objectives at minimum cost.

### D. Poirot Benefited Advertisers By Optimizing Bids to Auction Formats

#### 1. Overview of Project Poirot

287. Poirot was a DV360 program to make it easier for advertisers on DV360 who set up their campaigns using **fixed CPM** bidding (also known as **manual bidding**) to implement optimal bidding strategies.[595] Fixed CPM bidding is an option in DV360 that allows advertisers to specify an amount that DV360 "can spend to win any individual impression for a line item."[596] In 2017, most DV360 advertisers used manual bidding, although automated bidding strategies have since become more popular.[597]

---

[594] This claim relies on the two assumptions that (1) the bidder can win any fraction of similar auctions for an impression by varying its bid from low to high and (2) the bidder (or its DSP) accurately estimates the distributions of bids in the auctions. Let us begin with some arbitrary bidding strategy *B* for the advertiser. Assumption (1) implies that there is some value that it can use with expected-value-maximization bidding that wins the same expected number of impressions as bidding strategy *B*. Assumption (2) implies that the *expected* number of impressions and *expected* surplus are equal to the *realized* numbers. Since both strategy *B* and the new strategy win impressions of the same total value and the expected-surplus-maximizing strategy has a higher surplus, it must have a lower cost.

[595] *See* "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -811 ("Note that this project is only applied to Fixed CPM bidders."). *See also* "Poirot Review" (June 10, 2019), GOOG-DOJ-32261273, at -285 ("To date, fixed bidding in DBM has always bid the the [*sic*] exact inputted CPM/1000 for every impression. Now, in order to ensure advertisers are getting the best possible price for each impression, we are preparing to launch an optimization with the goal of winning the same impression for a lower price. For Optimized Fixed CPM Bidding [Poirot], the inputted CPM value will serve as a maximum CPM bid, as opposed to a fixed CPM bid - we will never bid more than the inputted value.").

[596] "Set a fixed CPM bid for a line item," Display & Video 360 Help, https://support.google.com/displayvideo/answer/2696858?hl=en, accessed Dec. 11, 2024.

[597] *See* "DV360, Third Party Exchanges, and Outcome-Based Buying" (Oct. 16, 2018), GOOG-DOJ-12038253, at -265 ("Auto-bidding Adoption[:] Jan 2017: 17% [,] Sep 2018: 40%").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

288. Before Poirot, fixed CPM bidding used the same bid for each impression, regardless of the auction format being used for a given impression.[598, 599] A built-in functionality to adapt bids to the auction format was not demanded when the vast majority of exchanges used second-price auctions, but its absence became a problem when exchanges started to use different pricing rules because advertisers needed to adapt their bids to the auction format in order to maximize their profits. Project Poirot launched fully in July 2017[600] and replaced fixed CPM bidding with **optimized fixed CPM bidding**, in which DV360 treated the CPM reported by a DV360 advertiser as its value (its optimal bid into a clean second-price auction) and optimized the advertiser's bid to the auction format of the exchange offering the impression.[601]

289. Aptly named after a famous fictional sleuth, Poirot was designed to "discover the exchanges that deviate from second pricing and bid appropriately on these to improve advertiser performance on these exchanges."[602] To discover the exchanges deviating from second-price rules, Poirot conducted experiments to determine whether bidding an advertiser's value on an exchange was an optimal or near-optimal strategy. I describe

---

[598] *See* "DV360 optimizations ENG deep dive" (Jan. 24, 2020), GOOG-DOJ-11733552, at -553 ("DV360 three years ago: Mostly fixed CPM manual bidding").

[599] Advertisers could set up separate line items for different exchanges (assuming they knew the auction formats), but at the time of Poirot's launch, "barely any" advertisers set exchange-specific fixed CPMs. *See* "Poirot Review" (June 10, 2019), GOOG-DOJ-32261273, at -286. Even so, exchange-specific line items would be insufficient to allow advertisers to optimize bids to the "auction type" signals as in Poirot v2 (*see* Paragraph 301 below).

[600] *See* Email from N. Jayaram to ▮▮▮▮ and B. Bender, "Metrics post Poirot launch" (July 24, 2017), GOOG-DOJ-05270417, at -417 ("Poirot was launched fully on July 19, 2017.").

[601] *See* "Poirot Review" (June 10, 2019), GOOG-DOJ-32261273, at -285 for an explanation of fixed CPM bidding and optimized fixed CPM bidding (Poirot) ("To date, fixed bidding in DBM has always bid the the [*sic*] exact inputted CPM/1000 for every impression. Now, in order to ensure advertisers are getting the best possible price for each impression, we are preparing to launch an optimization with the goal of winning the same impression for a lower price. For Optimized Fixed CPM Bidding [Poirot], the inputted CPM value will serve as a maximum CPM bid, as opposed to a fixed CPM bid - we will never bid more than the inputted value[.]").

[602] "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -809.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

these experiments in detail below. Poirot then adjusted advertisers' bids into the exchanges that it found were deviating significantly from second-pricing in order to maximize the expected advertiser surplus.[603] Poirot applied the same experiment-and-optimize algorithm to all non-Google exchanges from its launch in July 2017, and it applied the same algorithm to AdX from September 2017 onwards.[604]

290.    Although DV360 expected that most fixed CPM advertisers would benefit from Poirot, it notified advertisers that they could "opt out" of optimized fixed CPM bidding by unchecking a box in the DV360 user interface.[605] Fewer than 1% of affected advertisers chose to opt out.[606]

## 2. How Poirot Experimented to Identify Non-Second-Price Auctions and Optimize Bids

291.    Poirot used experiments to determine non-second-price auctions and optimize bids. The first version of Poirot performed this experiment-and-optimize process separately for each advertiser and each exchange.[607] Every day, for a subset of the advertiser's traffic to

---

[603] *See* "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -636-637; "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -811 ("Our optimization problem can be stated as follows: For each advertiser, find bidding policy *f(query features, ad features)* that maximizes $\Sigma_i v\text{-}c_i$;").

[604] *See* "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶¶ 33, 36 ("Before Google transitioned to a Unified First Price Auction, Poirot determined that reducing bids into AdX did not increase expected advertiser surplus by more than the 10-percent threshold, so Poirot did not lower DV360 bids into AdX. […] Since September 2017, Poirot has applied on AdX and on all third-party ad exchanges on which DV360 bids."); Deposition of N. Jayaram (DOJ CID) (Sept. 17, 2021), at 274:9-274:13 ("A. Google's buy side algorithms run across all the traffic. So that—whether it's AdX or third-party exchanges, the algorithm that we are talking about [Poirot] applies on all the traffic for DV360.").

[605] *See* "Project Poirot" (Mar. 31, 2017), GOOG-DOJ-11247631, at -631 ("We're proposing to add a checkbox at partner level with per-advertiser option to opt-out"); Email from ▮▮▮▮▮ to ▮▮▮▮, "Re: [Update] Project Poirot stats" (May 4, 2017), GOOG-DOJ-12025827, at -827 ("As part of step 2, we'll communicate to advertisers and they'll have the option to opt out. This will happen before full launch, which is step 3.").

[606] *See* "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -644 ("Very few customers (<1%) opted out.").

[607] *See* "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -812 ("Per-exchange is the minimum requirement […] Customer id is [also] used"); "Poirot Review" (June 10, 2019), GOOG-DOJ-32261273, at -279 ("Surplus Change vs. Bid Multiplier[:] Measured for each advertiser x exchange, from daily background

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

each exchange, Poirot tested bids between 60% and 100% of the advertiser's reported CPM and estimated the advertiser surplus for each multiplier that it tested in that range.[608] It then fit a curve to the results of these experiments, such as the one shown in Figure 7, and identified the bid multiplier that maximized the advertiser's expected surplus.[609] If the exchange was using a second-price auction, economic theory predicts that the multiplier maximizing the advertiser's expected surplus should be 1 (resulting in bids equal to advertiser values), reflecting the fact that the second-price auction incentivizes a bidder to bid its value for an impression. If Poirot found that a different multiplier significantly increased the advertiser's expected surplus, that would suggest that the exchange was likely to be using a non-second-price auction.

---

experiment"). This process was performed unless an advertiser had insufficient traffic to a given exchange to conduct these experiments, as discussed in Paragraph 292.

[608] *See* "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -813 ("We run a nightly data pipeline that gathers the necessary metrics (original bid, cost, impressions) for the relevant slices and use the previous 7 days to optimize."); "Poirot Review" (June 10, 2019), GOOG-DOJ-32261273, at -279 ("Surplus Change vs. Bid Multiplier[:] Measured for each advertiser x exchange, from daily background experiment"); "Poirot v2.0" (Aug. 10, 2018), GOOG-DOJ-12059682, at -682 ("Current Poirot Version […] Methodology: Run background experiments with different bid lowering. Build a model for [surplus S_adv($\alpha$)] for each advertiser x exchange x bid bucket as a function of bid scaling [$\alpha$] and we pick and serve the [$\alpha$] that maximizes surplus for given advertiser on given exchange.").

[609] *See* "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -813 ("Once, [*sic*] the data for surplus are gathered from a series of experiments running at various bid reductions (*x*), we fit the following model for surplus […] Once the above model is fit separately for each exchange, we pick the x that maximizes surplus for each advertiser."); "Poirot Review" (June 10, 2019), GOOG-DOJ-32261273, at -279 ("Surplus Change vs. Bid Multiplier[:] Measured for each advertiser x exchange, from daily background experiment").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Figure 7: Poirot multipliers and advertiser surplus.**[610]



292. Because this process involved daily experiments for each advertiser on each of several

exchanges, the number of experiments created the likelihood of **false positives** in which

random statistical noise might lead the test to wrongly conclude that a second-price

exchange was using a non-second price format. Poirot included two protections to reduce

the likelihood of this error. *First,* if an advertiser had insufficient traffic to a given

exchange to conduct the Poirot experiments with sufficient statistical confidence, DV360

used a default multiplier for that exchange, calculated using an experiment conducted on

DV360's overall traffic to the exchange.[611] As I discuss in Paragraph 301 below, a later

update to Poirot removed advertiser-specific optimizations altogether, opting instead to

use data collected at the exchange level. *Second*, Poirot adjusted bids only if the

experiment found that the optimal multiplier would increase advertiser surplus by at least

---

[610] "Poirot with auction type signal" (Nov. 5, 2018), GOOG-DOJ-05283173, at -175.

[611] *See* "Poirot Review" (June 10, 2019), GOOG-DOJ-32261273, at -289-290 ("Exchange priors (used if insufficient data for given advertiser)").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

10%. Google set the 10% threshold to "avoid changing bids on second-price auctions due to noise in the data" because engineers "want[ed] to be confident [that] an exchange is unclean before lowering bids on it."[612] Based on this threshold, the Poirot algorithm typically chose to submit bids unadjusted into exchanges it predicted to be running second-price auctions, including AdX (then using a second-price auction format) and the Improve Digital and United ad exchanges (and potentially other exchanges, as well).[613]

293. For concreteness, suppose that DV360 experiments on a small subset of an advertiser's bids into an exchange, adjusting the advertiser's bids using bid multipliers between 0.6 and 1, and obtains the data on average advertiser surplus displayed in Table 2 below.

**Table 2: Example Data on Average Advertiser Surplus**

| Bid Multiplier | 0.6 | 0.7 | 0.8 | 0.9 | 1 |
|---|---|---|---|---|---|
| **Average Advertiser Surplus per thousand impressions** | $0.30 | $0.35 | $0.35 | $0.30 | $0.20 |
| **Surplus Relative to Bid Multiplier 1** | 1.5 | 1.75 | 1.75 | 1.5 | 1 |

294. In this data, bid multipliers less than 1, corresponding to bids less than the advertisers' values, improve advertiser surplus. This suggests that this exchange was unlikely to be

---

[612] "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -813 ("If the maximum surplus change is less than 10%, we just select x = 1.0. This is to avoid changing bids on second-price auctions due to noise in the data; we want to be confident than an exchange is unclean before lowering bids on it."). *See also* "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 30 ("If a multiplier increased the expected advertiser surplus by less than 10 percent, then Poirot would not adjust the advertiser's bids into that ad exchange. The purpose of this 10-percent threshold was to avoid adjusting bids on second-price auctions that might erroneously appear to be non-second-price auctions due to noise in the data.").

[613] *See* "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -641-642.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

using a clean second-price auction format because clean second-price auctions have optimal bid multipliers of 1.

295. Under Poirot v1, DV360 would calculate the best-fitting quadratic curve for this data, as illustrated in <u>Figure 8</u>. It would then identify the bid multiplier that maximizes the relative surplus using that curve, which is 0.75 for this data. Poirot would then multiply the advertiser's subsequent bids into that exchange on that day by 0.75.

**Figure 8: Example calculation of Poirot bid multipliers[614]**



### 3. Poirot Increased Advertiser Surplus

296. Google studies confirmed that this first version of Poirot benefited advertisers. Two internal studies estimated that Poirot increased advertiser surplus on non-second-price

---

[614] This figure was created from code/poirotbidmultipliers.xlsx in my supporting materials. The figure is saved in code/figures/poirotbidmultipliers.png.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

exchanges by 12-15%.[615] A similar internal study found that Poirot increased advertiser surplus by 6% in total for all exchanges, including second-price exchanges.[616]

297. Poirot shaded bids only enough to maximize advertiser surplus. If DV360's goal was to reduce spending on competing exchanges, it could have shaded bids beyond the point that Poirot determined to be optimal, but it did not do that. Moreover, the Poirot procedure did not apply differently to exchanges that participated in header bidding.[617] These observations are inconsistent with the interpretation that Poirot was designed to undermine header bidding.

298. Poirot protected advertisers and increased advertiser surplus in two ways. First, its direct effect was to reduce the price of impressions purchased on non-second-price exchanges, including those "dirty" exchanges that were unclear or untruthful in describing their auction formats. Second, the budget saved on those impressions allowed budget-constrained advertisers to bid on and win *more* impressions than previously.[618] Total spending increased on AdX and some non-Google exchanges (including United and

---

[615] *See* Email from N. Jayaram to E. Lipkovitz et al., "Re: Poirot to launch 6/19" (Aug. 20, 2017), GOOG-DOJ-07825115, at -115 ("Through experiments, we measured that […] the surplus increases by 12% in the affected exchanges as a result of this launch."); "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -815 ("The following table shows the impact limited to the non-second price auction exchanges."; "surplus […] change[:] 15.57%").

[616] *See* "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -644 ("Advertiser impacts […] 6% surplus increase ($252M)").

[617] "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 31 ("Poirot's process for calculating multipliers that maximized advertiser surplus did not take into account whether an ad exchange participated in header bidding.").

[618] There may have even been another indirect effect, which is that advertisers may have increased their budgets in response to better value per dollar spent enabled by Poirot.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Improve Digital) but decreased on others.[619] Overall, Google's analysis found that Poirot did not affect advertisers' *total* spend, suggesting that budgets were redistributed.[620] The fact that only 1% of advertisers opted out of Poirot also speaks to advertisers' perceptions of its benefits.[621]

### 4. How DV360 Updated Poirot to Further Increase Benefits to Advertisers

299.  Over time, there were major updates to the Poirot program.

300.  The first, internally called **Poirot with Bid Buckets**, launched in January 2018.[622] This update grouped an advertiser's bids for different impressions into five ranges, known as "bid buckets," depending on the amount of the bid, and calculated different bid multipliers for each (using the same experimentation process described above).[623] This approach helped to implement optimal bid shading in non-second-price auctions, in which auction theory observes that the profit-maximizing bid multiplier can vary depending on the bidder's value. Google's pre-launch experiments anticipated that Poirot

---

[619] *See* "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -644 ("Exchange impact[:] Overall spend neutral[;] Spend and CPM on dirty auction exchanges dropped by ~10%[;] Spend up by 6% on second price auction exchanges").

[620] *See* "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -644 ("Exchange impact[:] Overall spend neutral"); Email from N. Jayaram to E. Lipkovitz et al., "Re: Poirot to launch 6/19" (Aug. 20, 2017), GOOG-DOJ-07825115, at -115 ("Overall DBM spend is neutral, indicating no difficulty in redistributing the budgets. Budget reports also do not show any increase in under-delivery.").

[621] *See* "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -644 ("Very few customers (<1%) opted out.").

[622] Email from ▮▮▮▮▮▮▮▮ to ▮▮▮▮▮ "OVERDUE LAUNCH - Please update: [Launch 215784] Poirot: Bid bucket surplus model" (Jan. 10, 2018), GOOG-DOJ-13579782, at -782 ("Launch Date[:] 2018-01-08").

[623] *See* "Summary of Poirot with Bid Buckets" (Jan. 2018), GOOG-DOJ-13619370, at -370-371 ("In this launch, we are adding 1 extra feature to the Poirot model which predicts advertiser surplus as a function of bidding change. This feature is bid_bucket, and it helps capture non-second-pricing from soft floors.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

with Bid Buckets would improve advertiser surplus for fixed CPM traffic by an additional 1.2% to 1.45%.[624]

301.  The second major update was called **Poirot v2.0**, which launched in September 2018[625] and made four changes to the Poirot algorithm:

    a.  Poirot v2.0 incorporated the auction format reported by an exchange for each impression into its calculation of bid multipliers,[626] which could help improve bids into exchanges that used different auction formats for different impressions;

    b.  Poirot v2.0 reduced the minimum bid multiplier from 0.6 to 0.1, testing a larger range of bid multipliers to more reliably identify the profit-maximizing one;

    c.  Poirot v2.0 changed the procedure for estimating the profit curve, using a family of curves that more accurately fit the historical data; and

    d.  Poirot v2.0 used the same bid multipliers for all DV360 fixed CPM advertisers, instead of computing them separately for each advertiser.[627] This fourth change

---

[624] *See* Email from ▮▮▮▮▮▮▮ to ▮▮▮▮ OVERDUE LAUNCH - Please update: [Launch 215784] Poirot: Bid bucket surplus model" (Jan. 10, 2018), GOOG-DOJ-13579782, at -783 ("From 1% experiments: […] Over fixed CPM DBM traffic on all exchanges Surplus 1.2% […] >From 5% experiment […] Over fixed CPM DBM traffic on all exchanges Surplus 1.45%."); "Summary of Poirot with Bid Buckets" (Jan. 2018), GOOG-DOJ-13619370, at -371 ("Surplus expt/cntl […] Fixed CPM DBM x external exchanges 1.013635").

[625] *See* "Launch Details Spreadsheet, Launch 259738" (Aug. 25, 2023), GOOG-AT-MDL-009644238, at cells C1, C2 ("Launch Date [...] 2018-9-6").

[626] Some exchanges would vary their format on an impression-by-impression basis and report the format to bidders using an "auction type" signal. *See* "Poirot with auction type signal" (Nov. 5, 2018), GOOG-DOJ-05283173, at -176 ("Since January 2018, 3PE have started providing the type of auction they are running using bid_request[]").

[627] *See* "Poirot v2.0" (Aug. 10, 2018), GOOG-DOJ-12059682, at -682-683 ("Lower the floor on bid shaving from 0.6 to 0.1. […] Change the model from log quadratic to linear cubic to improve fits and accuracy. […] Remove customer id. Past experiments have shown surplus gains when customer id is excluded from the model").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

was adopted after Google engineers determined that removing the advertiser ID from the bid multiplier selection algorithm increased advertiser surplus.[628]

Pre-launch experiments of Poirot v2.0 anticipated an increase of surplus for fixed CPM advertisers on non-Google exchanges of 13.6%.[629] By reducing the prices of impressions won on non-second-price exchanges, Poirot v2.0 allowed advertisers with limited budgets to purchase more impressions.

302. In September 2018, Google launched Marple,[630] a program on Google Ads that optimized bids in a similar manner to Poirot. Google Ads (through AWBid) could bid on behalf of advertisers for certain inventory on non-Google exchanges. Marple, initially called "Poirot for AWBid,"[631] performed a similar experiment-and-optimize procedure to increase advertiser surplus for Google Ads advertisers.[632] The initial version of Marple

---

[628] *See* "Poirot v2.0" (Aug. 10, 2018), GOOG-DOJ-12059682, at -683 ("Remove customer id. Past experiments have shown surplus gains when customer id is excluded from the model").

[629] *See* "Poirot v2.0" (Aug. 10, 2018), GOOG-DOJ-12059682, at -682 ("On 3PE (third party exchanges) we see an aggregate surplus increase of 8.8% over all DBM traffic and 13.6% over Fixed CPM DBM traffic.").

[630] *See* "Launch Details Spreadsheet, Launch 258064" (Aug. 25, 2023), GOOG-AT-MDL-009644236, at cells C1, C3 ("Launch Date[…] 2018-9-10").

[631] "Poirot for AWBid Design Doc" (Sept. 10, 2018), GOOG-DOJ-AT-02512863, at -863 ("Motivated by project Poirot, project Poirot for AWBid (A.K.A Marple) aims to provide optimal bidding strategy for GDN advertisers to buy on non-second price exchanges.").

[632] *See* "Poirot for AWBid Design Doc" (Sept. 10, 2018), GOOG-DOJ-AT-02512863, at -864 ("As the first attempt to develop an optimal strategy to adjust the bids for AWBid, we borrow the success of Poirot project and start with the current modeling approach […] of Poirot in production."); Email from ███████████ to ██████ "[Launch 258064] Project Marple" (Aug. 14, 2018), GOOG-DOJ-15264552, at -552 ("We always knew that some external exchanges deviate from second pricing. We developed an algorithmic framework to detect and quantify this deviation using AdWords data. Using this framework, we have built bid optimizations to protect AdWords advertisers against price gouging in these 'unclean' exchanges. In this launch, in response to exchanges running non-second price auctions, we lower bids for AdWords buyers bidding into these exchanges in an algorithmic fashion. The algorithm aims to find the optimal bid decrease that maximizes advertiser surplus.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

chose bid multipliers to maximize advertiser surplus for each bid bucket on each exchange.[633]

## E. DV360 Transitions to the AdX 1P Bidder after the UFPA

### 1. The AdX 1P Bidder was an Architectural Change to Incorporate MBTW on DV360's Bidding in AdX

303.  In 2019, AdX shifted to a first-price auction, creating incentives for its bidders to shade their bids. As I explained previously, bidding in a first-price auction is strategically and computationally harder than bidding in a second-price auction, as it requires bidders to form estimates of competitors' bids and optimize bids accordingly. To assist bidders in this process, after the transition to the UFPA, Google began providing bidders with historical auction information, including the minimum bid to win (MBTW): the smallest amount a bidder needed to bid to win each past auction, holding all other bids in the auction fixed (see Section XIII.C.3).

304.  The MBTW data set AdX apart and, at the time, other exchanges did not generally provide similar information to bidders.[634] For DV360, this presented an opportunity for an improved, specialized algorithm that could incorporate MBTW data when bidding in

---

[633] *See* "Poirot for AWBid Design Doc" (Sept. 10, 2018), GOOG-DOJ-AT-02512863, at -864-865 ("We then adjust the advertiser's bid in order to maximize the surplus[,] *surplus* $= \Sigma_i (v - c_i)$, where the sum is over all won impressions and $c_i$ is the cost of each impression. […] In our first modeling iteration, we use exchange_id and bid_bucket as our features, and within each data segment defined by the selected features, we lower the bids with a constant bid adjustment multiplier α.").

[634] "DV360 exchange dynamics roadmap 2020" (Mar. 2020), GOOG-AT-MDL-019330098, at -099 ("HOB data is critical for bidding into 1p auctions. Some exchanges provide this directly (e.g., AdX), some are in the discussion for providing this directly, and some don't.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

AdX. To that end, DV360 designed and developed a *new* type of bidding algorithm that it called the **AdX 1P Bidder**.[635]

305. 

306.

---

[635] Sometimes this bidding algorithm is referred to as a new version of Poirot, as it represents a DV360 bidding strategy into non-second price auctions. However, in most documents I refer to in this section, this product is called the 1P Bidder for AdX and I follow this terminology instead of the umbrella term "Poirot" for all bidding algorithms used by DV360. *See, e.g.* "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 35 ("Poirot was also updated following Google's shift to a Unified First Price Auction. With the transition to a Unified First Price Auction, Google began providing minimum-bid-to-win data to buyers, and DV360 began to use that minimum-bid-to-win data to inform how Poirot would lower bids into AdX in order to optimize for expected advertiser surplus. Google subsequently updated Poirot to use models built from Google's minimum-bid-to-win data to optimize for expected advertiser surplus on other ad exchanges.").







309. ██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

████████████████████████████[643, 644]███

██████████ ████ █ █ ████ ██ █████████

█████████████████████████████████████

██████████████████████████████[645]███

███████████████████████████████████

██████████████████████████

**2. 1P Bidder for Third-Party Exchanges**

310. ██████████████████████████████████

█████████████████████████████████

█████████████████████████████████

███████████████████[646]███████████████

█████████████████████████████████

---

████████████████████████████████████████
████████

[643] █████████████████████████████
████████████████████████████

[644] For a budget-constrained advertiser, maximizing ROI, subject to expending the budget, is equivalent to maximizing surplus.

[645] ██████████████████████

[646] ████████████████████████████████████
█████████████

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*



311.

648

312.

649



*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### F. Responding to Plaintiffs' Allegations

#### 1. Poirot and Marple Benefited Advertisers

313. Plaintiffs incorrectly assert that Poirot conferred "no actual benefit to advertisers."[650] Poirot benefited advertisers by protecting them from overbidding into "dirty" auctions and other non-second-price auctions. By choosing bids to maximize advertisers' expected surplus on each impression, Poirot helped advertisers pursue *any* campaign objective at the minimum cost. Poirot improved DV360 as a product, performing a bid optimization procedure that advertisers would otherwise want to pursue themselves. Advertisers were given the option to opt out of Poirot, and fewer than 1% of advertisers elected to do so.[651]

314. Publisher and Advertiser Classes also claim that Poirot deprived non-Google exchanges of "meaningful data about DV360's willingness to pay."[652] This, however, is a side-effect of optimal bidding, which competing exchanges should anticipate. If an advertiser ever bids the same amount for an impression in a non-second-price auction as it does for an identical impression in a second-price auction, then it is necessarily a mistake: there is always a way to change its bids to buy the same number of impressions at lower cost. This means that failing to detect a non-second-price auction and to adapt bids is also a mistake.

---

[650] *See* Publisher Class First Amended Complaint, at ¶ 317 ("In reality, Google's efforts to 'protect' advertisers did nothing of the kind, but instead directly reallocated advertising dollars to Google's own Ad Exchange with no actual benefit to advertisers."); Advertiser Class Complaint, at Section VI.B.7 ("Project Poirot and Project Elmo Harmed Competition in the Ad Exchange Market and the Market for Ad-Buying Tools for Large Advertisers, and Injured Advertisers").

[651] *See* "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -644 ("Very few customers (<1%) opted out.").

[652] Publisher Class First Amended Complaint, at ¶ 316; Advertiser Class Complaint, at ¶ 267.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

315. I illustrate how this works for first- and second-price auctions with an example, for which the arithmetic is displayed in Table 3. Suppose some advertiser is bidding $0.50 per thousand impressions in a first-price auction and winning 1.02 million impressions, and that advertiser is bidding the same amount in a second-price auction, winning some other number of similar impressions. Suppose the bidder reduces its bids to win 20,000 fewer impressions in the first-price auction and increases its bids to win 20,000 more in the second-price auction, leaving the total number of impressions it wins unchanged. For simplicity, suppose it accomplishes this by reducing its bid in the first-price auction by, say, $0.01 while increasing its bid in the second-price auction by, say, $0.04. On the one million "unchanged" impressions that it continues to win in the first-price auction, but at a lower price, it saves $0.01 per thousand impressions, or $10.00 in total, as shown in Table 3. On the unchanged impressions that it continues to win in the second-price auction with its new higher bid, its prices do not rise despite its higher bid, because prices paid for any impression won in a second-price auction *do not depend on the winner's bid*. On the 20,000 "switched" impressions for which it formerly paid $0.50 per thousand in the first-price auction, it now pays prices between $0.50 and $0.54, or about $0.52 on average—$0.02 more than it would have previously paid for those impressions. In total, the advertiser pays about $0.40=$0.02×20 more than before for the switched impressions, so its net savings is approximately $9.60.

**Table 3: Example Bidding in First-Price Auctions**

| Impression Category | A Impressions *(in thousands)* | B Savings (loss) *(per thousand)* | C=A×B Money Saved (lost) |
|---|---|---|---|
| Unchanged (1st price) | 1,000 | .01 | $10.00 |
| Unchanged (2nd price) | Any number | 0 | 0 |

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

| | | | |
|---|---|---|---|
| Switched | 20 | (.02) | ($0.40) |
| Total | | | $9.60 |

316. Although the numbers in the example are specific, the conclusions are general: the advertiser saves money by reducing its bid into the non-second-price auction and increasing its bid into the second-price auction while winning the same number of impressions. The money saved on the unchanged impressions in the first-price auction is proportional to the number of those impressions, while the additional cost of the switched impressions is proportional to the number switched. Because the number of unchanged impressions in the first-price auction is so much larger than the number of switched impressions, the advertiser is better off with the revised bids.

317. Plaintiffs also suggest that Poirot was created "ostensibly" to "avoid optimizations that were bad for advertisers."[653] Yet confirming the theory described above, Google's internal studies estimated that Poirot would increase advertiser surplus on impressions purchased through non-second-price exchanges by 12-15%.[654] As I also described above, Poirot further aided advertisers by performing bidding optimizations that advertisers would otherwise seek to perform themselves. In suggesting that increasing advertiser surplus was merely a pretext for launching Poirot, Plaintiffs' narratives ignore Poirot's sizable benefits for advertisers.

---

[653] Publisher Class First Amended Complaint, at ¶ 317; Advertiser Class Complaint, at ¶ 268.

[654] *See* Email from N. Jayaram to E. Lipkovitz et al., "Re: Poirot to launch 6/19" (Aug. 20, 2017), GOOG-DOJ-07825115, at -115 ("Through experiments, we measured that […] the surplus increases by 12% in the affected exchanges as a result of this launch."); "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -815 ("The following table shows the impact limited to the non-second price auction exchanges"; "surplus […] change[:] 15.57%"). Google experiments found that Poirot increased advertiser surplus by 6% on all exchanges, including second-price exchanges. *See* "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -644 ("Advertiser impact […] 6% surplus increase").

318.  Daily Mail and Gannett allege that "no profit-minded DSP would want to deflate its bids."[655] This claim ignores the basic incentives of bidding in first-price auctions: the *only* way for a bidder to profit in a first-price auction is to submit a bid that is strictly lower than the bidder's value for the good being sold. As a result, *any* DSP competing for advertisers' budgets would have incentives to optimize on their behalf by bidding differently into first-price and second-price auctions, and in particular, deflating bids into a first-price auction. Unsurprisingly, many DSPs have programs similar to Poirot, including ███████████████████ The Trade Desk, MediaMath, ██████ ████████████[656]

319.  Daily Mail and Gannett additionally complain that "Poirot instructed DV360 to return competitive bids only for second-price auctions."[657] This is wrong. By optimizing on the behalf of advertisers, Poirot resulted in DV360 offering competitive bids. Daily Mail and

---

[655] Daily Mail Second Amended Complaint, at ¶ 181; Gannett Amended Complaint, at ¶ 202.

[656] *See* 

*See also* Sarah Sluis, "Everything You Need To Know About Bid Shading," AdExchanger (Mar. 15, 2019), https://www.adexchanger.com/online-advertising/everything-you-need-to-know-about-bid-shading/, accessed Dec. 12, 2024 ("The Trade Desk charges a fee for Koa, its bid shading algorithm, where it pockets a percentage of how much buyers save on each impression. MediaMath also developed bid shading capabilities.").

[657] Daily Mail Second Amended Complaint, at ¶ 180 ("Thus, Poirot instructed DV360 to return competitive bids only for second-price auctions."); Gannett Amended Complaint, at ¶ 201 ("Thus, Poirot instructed DV360 to return competitive bids only for second-price auctions.").

Gannett's suggestion to submit full values to non-second-price auctions would have resulted in *excessive* bids that harmed advertisers. Indeed, DV360's bids would be *uncompetitive* without Poirot.

320.  Professor Cramton also argues that "the key metric consistently emphasized in communications was Poirot's impact in driving more [of] DV360's spend to AdX,"[658] citing internal studies to support that claim. However, contrary to his claim, many of these studies show that Google employees emphasized the increases in *advertiser surplus* in their evaluations of Poirot.[659]

321.  Professor Cramton references AWBidDRS[660] and analogizes Marple to Bernanke, writing that "[l]ike Bernanke, Marple was designed to use funds from high-margin impressions GDN could easily acquire to subsidize the acquisition of more valuable impressions where GDN faced more competition"[661] and suggesting that the "algorithm conflicts with Google's explanation that Poirot's purpose was to improve advertiser profit."[662] But as I

---

[658] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 246 ("Google contends that Project Poirot was designed to maximize advertiser surplus. Still, the key metric consistently emphasized in communications was Poirot's impact in driving more DV360's spend to AdX and moving more cleared impressions from third-party exchanges to AdX and AdSense.").

[659] *See* "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -644 ("Advertiser impacts […] 6% surplus increase ($252M)"); Email from N. Jayaram to ███████ "Metrics post Poirot launch" GOOG-DOJ-05270417, at -417 ("Through experiments, we measured that advertiser CPD increases by 14% and the surplus increases by 12% in the affected exchanges as a result of this launch."); "Ecosystem - margins, auction dynamics, supply path opt…" GOOG-DOJ-10733927, (undated) at -947 ("Advertiser Impact … 6% surplus increase ($252M)."); Email from ███████ to ███████ "Re: Project Poirot: what exactly is it? Is it revenue neutral or positive?," GOOG-DOJ-AT-00566466, (Dec. 6, 2018) at -466 ("The goal [of Poirot] was to win impressions cheaper and improve ROI … .").

[660] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 258, n. 267.

[661] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 258 ("Like Bernanke, Marple was designed to use funds from high-margin impressions GDN could easily acquire to subsidize the acquisition of more valuable impressions where GDN faced more competition.").

[662] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 259 ("Once again, this asymmetric application of the Poirot algorithm conflicts with Google's explanation that Poirot's purpose was to improve advertiser profit or value. Instead, Poirot was structured and implemented to shift impressions from third-party exchanges to AdX.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

show in [Section IV.C.2](#), if Google Ads' bid optimization programs allowed advertisers to win more frequently, the programs necessarily also increased the profits of the vast majority of Google Ads' advertiser customers. Moreover, Marple is designed to "adjust the bid submitted to exchanges [...] such that the surplus is maximized," with Google documents explicitly defining the surplus as the sum of the difference between value and cost for all impressions won.[663]

322. Also misleading is Professor Cramton's conclusion that Marple is not "appropriate bid-shading across first-price auctions" because of its "disparate application of Poirot across domains based on Google's perception of their value or competitiveness."[664] When a bidder faces a different competitive landscape across domains, the least cost way to acquire any given set of impressions involves bidding differently in the different domains. Opposite to Professor Cramton's claim, there is no "conflict[] with Google's explanation that Poirot's purpose was to improve advertiser profit."[665]

---

[663] "Poirot for AWBid design doc" (Sept. 10, 2018), GOOG-AT-MDL-C-000010679, at -680 ("The surplus for a given advertiser can be computed by [surplus = sum(MaxCPI - Payout)] where the summation is over all the impressions this advertiser wins.").

[664] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 258 ("The disparate application of Poirot across domains based on Google's perception of their value or competitiveness leads neither to surplus maximization nor to appropriate bid-shading across first-price auctions.").

[665] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 259 ("Once again, this asymmetric application of the Poirot algorithm conflicts with Google's explanation that Poirot's purpose was to improve advertiser profit or value.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 2. *Poirot Targeted Non-Second-Price Auctions, Not Header Bidding As Alleged*

323. Plaintiffs argue that Poirot was designed to "combat" and "kill" header bidding,[666] with Professor Cramton adding that "Poirot was viewed internally as a means of combatting header bidding,"[667] but these arguments are inconsistent with Poirot's design for three reasons.

324. *First*, Poirot lowered bids to *all* exchanges in which bid reductions were sufficiently profitable, regardless of whether the exchange participated in header bidding. Google's bidding behavior on its own AdX exchange is also consistent with this same principle. Before the transition to the Unified First Price Auction, bid reductions on AdX were not sufficiently profitable to trigger Poirot.[668]

325. *Second*, Poirot did not shade bids into exchanges that used second-price rules, regardless of whether they participated in header bidding. Typical Poirot experiments did not find any benefits to altering bids on exchanges such as Improve Digital and United, which appeared to be second-price exchanges.[669] Google's internal study found that Poirot

---

[666] Publisher Class First Amended Complaint, at ¶ 316 ("Project Poirot was devised 'to combat the effects of Header Bidding'"); Advertiser Class Complaint, at ¶ 267 ("'[T]o combat the effects of header bidding,' Google's gTrade cohort first devised project Poirot"); Daily Mail Second Amended Complaint, at ¶ 179 ("In yet another move to kill client-side header bidding, Google designed two secret programs [Poirot and Elmo] to ensure that its DSP for large advertisers, DV360, offered depressed bids on non-Google exchanges when they participated in header bidding."); Gannett Amended Complaint, at ¶ 200 ("In yet another move to kill client-side header bidding, Google designed two secret programs [Poirot and Elmo] to ensure that its DSP for large advertisers, DV360, offered depressed bids on non-Google exchanges when they participated in header bidding.").

[667] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 233.

[668] *See* "Declaration of N. Jayaram" (Aug. 5, 2023), GOOG-AT-MDL-008842383, at ¶ 33 ("Before Google transitioned to a Unified First Price Auction, Poirot determined that reducing bids into AdX did not increase expected advertiser surplus by more than the 10-percent threshold, so Poirot did not lower DV360 bids into AdX.").

[669] *See* "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -641-642. These were either second-price auctions, or sufficiently close to second-price auctions that Poirot did not typically detect a sufficiently large benefit to bid shading.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

would increase spending on such non-Google second-price exchanges by 8.8%.[670] This further suggests that Poirot benefited some competing exchanges.

326.    *Third*, Poirot shaded bids only as much as necessary to maximize advertiser surplus and not more, as an objective to "combat"[671] or "kill"[672] header bidding might predict.[673] Such a program might shade bids below the optimum or choose not to bid on it at all, but that is not the effect that Poirot had. Moreover, if an exchange changes its auction format and bidders adapt to that change by choosing surplus-maximizing bids, there is no reason to expect *a priori* that the exchange's revenue will fall at all.

### 3. Plaintiffs' and Their Experts' Theory of Harm to Publishers and Competing Exchanges Is Based on Faulty Assumptions

327.    Several Plaintiffs and Professor Cramton allege that Poirot harmed competing exchanges and shifted revenue to AdX instead.[674] There are three errors in their theory of harm to

---

[670] *See* "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -815-816 ("Assuming that we continue to spend all budgets, the following table shows the impact once the budget server adapts. […] Clean 3p DBM revenue […] 8.80%").

[671] Publisher Class First Amended Complaint, at ¶ 316 ("Project Poirot was devised 'to combat the effects of Header Bidding.'"); Advertiser Class Complaint, at ¶ 267 ("'[T]o combat the effects of header bidding,' Google's gTrade cohort first devised project Poirot").

[672] Advertiser Class Complaint, at ¶ 353 ("Google [...] engag[ed] in a scheme to 'kill' header bidding by diverting ad spend away from rival exchanges that permitted header bidding, including through the processes codenamed Projects Poirot and Elmo[.]"); Daily Mail Second Amended Complaint, at ¶ 179 ("In yet another move to kill client-side header bidding, Google designed two secret programs [Poirot and Elmo] to ensure that its DSP for large advertisers, DV360, offered depressed bids on non-Google exchanges when they participated in header bidding."); Gannett Amended Complaint, at ¶ 200 ("In yet another move to kill client-side header bidding, Google designed two secret programs [Poirot and Elmo] to ensure that its DSP for large advertisers, DV360, offered depressed bids on non-Google exchanges when they participated in header bidding.").

[673] Publisher Class First Amended Complaint, at ¶ 316 ("Project Poirot was devised 'to combat the effects of Header Bidding.'"); Advertiser Class Complaint, at ¶ 267 ("'[T]o combat the effects of header bidding,' Google's gTrade cohort first devised project Poirot").

[674] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 246 ("Project Poirot's bid reduction on third-party exchanges caused impressions and revenue to move from third-party exchanges to AdX and AdSense"); Publisher Class First Amended Complaint, at ¶ 317 ("Initial experiments regarding the effect of Project Poirot actually showed a negative revenue impact of this conduct to DV360, but Google's main goal was depriving rival Ad Exchanges of sufficient scale to compete with Google's Ad Exchange: 'Non-second price exchanges will see a revenue drop in the range of

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

competing exchanges.

328. *First*, Poirot was not designed to harm competing exchanges: in fact, non-Google exchanges running second-price auctions would expect to see *increased* spending as a result of Poirot. Plaintiffs frequently cite an internal Google document that projected that "non-second price exchanges [would] see a revenue drop in the range of 20-30%" and that DV360 revenue would decline 1.9%.[675] However, Plaintiffs neglect to include the other finding in the document: "[c]lean exchanges overall [would] see 11% revenue increase."[676] This could be expected as a result of the fact that Poirot helped advertisers avoid overpaying for impressions, so that the spending saved by purchasing impressions at a lower price could be spent on other impressions. Google engineers expected this would occur, writing, "we expect the budget server to react quickly to adjust impression

---

20-30% ... Overall [DV360] revenue impact is -1.9%.'"); Advertiser Class Complaint, at ¶ 269 ("Initial experiments regarding the effect of Poirot showed a negative revenue impact of this conduct to DV360, but Google's main goal was depriving rival exchanges of sufficient scale engaged in header bidding to compete with Google's ad exchange: 'Non-second price exchanges will see a revenue drop in the range of 20-30% ... Overall [DV360] revenue impact is -1.9%.'"); Daily Mail Second Amended Complaint, at ¶ 181 ("According to Google, Poirot caused a 'revenue drop in the range of 20-30%' for header bidding exchanges, while DV360 lost 1.9% of its revenue. Ultimately, Poirot accomplished its evident goal, as DV360 spent '7% more on AdX and reduc[ed] spend on most other exchanges.'"); Gannett Amended Complaint, at ¶ 202 ("According to Google, Poirot caused a 'revenue drop in the range of 20-30%' for header bidding exchanges, while DV360 lost 1.9% of its revenue. Ultimately, Poirot accomplished its evident goal, as DV360 spent '7% more on AdX and reduc[ed] spend on most other exchanges.'").

[675] Publisher Class First Amended Complaint, at ¶ 317 ("Initial experiments regarding the effect of Project Poirot actually showed a negative revenue impact of this conduct to DV360, but Google's main goal was depriving rival Ad Exchanges of sufficient scale to compete with Google's Ad Exchange: 'Non-second price exchanges will see a revenue drop in the range of 20-30% ... Overall [DV360] revenue impact is -1.9%.'"); Advertiser Class Complaint, at ¶ 269 ("Initial experiments regarding the effect of Poirot showed a negative revenue impact to DV360, but Google's main goal was depriving rival exchanges of sufficient scale engaged in header bidding to compete with Google's ad exchange: 'Non-second price exchanges will see a revenue drop in the range of 20-30% ... Overall [DV360] revenue impact is -1.9%.'"); Daily Mail Second Amended Complaint, at ¶ 181 ("According to Google, Poirot caused a 'revenue drop in the range of 20-30%' for header bidding exchanges, while DV360 lost 1.9% of its revenue. Ultimately, Poirot accomplished its evident goal, as DV360 spent '7% more on AdX and reduc[ed] spend on most other exchanges.'"); Gannett Amended Complaint, at ¶ 202 ("According to Google, Poirot caused a 'revenue drop in the range of 20-30%' for header bidding exchanges, while DV360 lost 1.9% of its revenue. Ultimately, Poirot accomplished its evident goal, as DV360 spent '7% more on AdX and reduc[ed] spend on most other exchanges.'").

[676] "Project Poirot" (Mar. 31, 2017), GOOG-DOJ-11247631, at -631.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

probabilities and bring [budget-constrained advertisers] back up to spending their budgets."[677] Indeed, post-launch studies found that the projected revenue drop "didn't materialize after launching," which is consistent with advertisers reallocating cost savings to the purchase of additional impressions. After incorporating these changes, Google studies showed that Poirot increased spending on competing second-price exchanges by 8.8%. Even if advertisers chose not to spend the Poirot cost savings in this way, Poirot still increased the average profitability of each impression acquired, resulting in a net increase in total advertiser surplus.

329.  *Second*, Poirot's bid multipliers never increased bids on AdX as the Publisher Class suggests.[678] By design, Poirot's multipliers could only *lower* bids to the level that maximized advertiser surplus. It was impossible for Poirot's multipliers to raise bids submitted on *any* exchange, let alone exclusively on AdX.[679]

330.  *Third,* any harms to non-second-price exchanges rely on Plaintiffs' persistent (but faulty) assumption that advertisers do not change their bids in response to changing incentives. Poirot was a free service to DV360 advertisers and, in its absence, advertisers would be incentivized to pursue their own bid optimization programs and these would most likely be less efficient than the one that DV360 designed. Such self-service is the relevant

---

[677] "Poirot Design Doc" (Apr. 25, 2017), GOOG-DOJ-13627809, at -814. To understand how this effect could occur, imagine that, without Poirot, an advertiser had a $100 budget and won 1000 impressions, for an average cost per impression of $0.10. Optimal bidding under Poirot into an exchange using non-second-price auctions might allow the advertiser to win the same 1000 impressions for a lower average cost per impression of, say, $0.09, leaving $10 left in the advertiser's budget, which could be used to purchase an additional 111 impressions at that same average cost.

[678] Publisher Class First Amended Complaint, at ¶ 317 ("DV360 intentionally bid less on rival Ad Exchanges and increased bids on AdX.").

[679] "Optimized Fixed Bidding in DV360" (Mar. 2019), GOOG-DOJ-05326023, at -023 ("For Optimized Fixed CPM Bidding, the inputted CPM value will serve as a maximum CPM bid, as opposed to a fixed CPM bid - we will never bid more than the inputted value.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

comparison to assess the effects of programs like Poirot, not Plaintiffs' fictitious but-for world in which advertisers do not respond to incentives.

331. In the absence of programs like Poirot, advertisers that continued to report the same fixed CPMs to DV360 despite exchanges transitioning away from second-price auctions would experience large reductions in their profits from online display advertising. For example, an advertiser that used DV360 to bid into an exchange that suddenly transitioned from using a second-price auction to using a first-price auction would notice—in the absence of Poirot—that it suddenly started paying more for impressions than it did before: in particular, a price equal to its bid. If that bid was optimized for a second-price auction, so that it equaled its value for the impression, the advertiser would suddenly find itself earning *zero* advertiser surplus on the impressions it won. Clearly, that advertiser would be incentivized to respond, either by excluding that exchange or by reducing the fixed CPM it reports to DV360 to use for bidding.

332. Additionally, without a service like Poirot, each advertiser would face the complex task of optimizing bids on its own, which would require costly experimentation and engineering resources. Such experimentation was made more complicated by the presence of exchanges using dirty auctions, which sought to obscure their auction rules. Even so, at around the time Poirot was introduced, other buying tools had already started to develop bid optimization programs for non-second price exchanges.[680] Many DSPs

---

[680] *See* Sarah Sluis, "Big Changes Coming To Auctions, As Exchanges Roll The Dice On First-Price," AdExchanger (Sept. 5, 2017), https://www.adexchanger.com/platforms/big-changes-coming-auctions-exchanges-roll-dice-first-price/, accessed Dec. 12, 2024 ("To combat price increases, some buyers have already started shading, or reducing bid prices. But that strategy comes with its own risks: Buyers will lose out on inventory they want if they submit too low a bid and the auction turns out to work with second-price logic.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

including ███████████████████ The Trade Desk, MediaMath, ████ ████████████████ implemented programs similar to Poirot, indicating that bid optimization is perceived as a valuable service for advertisers.[681] Professor Cramton's claim that "Google did not allow buy-side users any control over the amount of bid shading its algorithms applied" cites no evidence that bidders clamored for that functionality and omits the usability benefits of eliminating unhelpful options.[682] An advertiser wanting close control of bid shading could achieve that by disabling Poirot and choosing their own bids.

333. Poirot made bidding easier for DV360 advertisers by performing bid optimizations for them, and more efficiently. DV360 and other DSPs could adapt bids to more information than any single advertiser observes, allowing them to bid more efficiently on behalf of their advertisers than any individual advertiser could do on its own. In this way, Poirot (and similar programs used by other buying DSPs) reduced both the costs to advertisers of optimizing their bids and the likelihood of bidding errors.

---

[681] *See*  *See also* Sarah Sluis, "Everything You Need To Know About Bid Shading," AdExchanger (Mar. 15, 2019), https://www.adexchanger.com/online-advertising/everything-you-need-to-know-about-bid-shading/, accessed Dec. 12, 2024 ("The Trade Desk charges a fee for Koa, its bid shading algorithm, where it pockets a percentage of how much buyers save on each impression. MediaMath also developed bid shading capabilities.").

[682] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 231.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

334.  The Publisher Class writes that, with Poirot, "DV360 intentionally bid less on rival Ad Exchanges and increased bids on AdX, ostensibly to avoid optimizations that benefited publishers."[683] Both Daily Mail and Gannett add that "Poirot was intended to reduce publisher revenue."[684] These claims similarly ignore advertiser incentives to shade their bids or switch DSPs, instead assuming that without Poirot, there would be no response to non-second-price auctions. Unsurprisingly, empirical evidence confirms that advertisers do respond to changes in auction rules.[685] Moreover, when a DSP fails to provide bid shading optimizations to its advertisers, publishers as a class do not necessarily benefit, because advertisers may decide to shade indiscriminately across exchanges or reduce their budgets in response.

335.  To assess any harms of Poirot to publishers and non-second-price exchanges, a more revealing question is whether Poirot caused the payments to exchanges using non-second-price auction rules to fall, on average, below the payments for similar impressions on a second-price exchange. Auction theory suggests that the answer is "no." In the standard independent private values auction model endorsed by Plaintiffs' experts,[686] the **Revenue Equivalence Theorem** implies that the average revenue for publishers and exchanges is the same with profit-maximizing bids (which Poirot was

---

[683] Publisher Class First Amended Complaint, at ¶ 317 ("DV360 intentionally bid less on rival Ad Exchanges and increased bids on AdX, ostensibly to avoid optimizations that were bad for advertisers and good for publishers.").

[684] Daily Mail Second Amended Complaint, at ¶ 183; Gannett Amended Complaint, at ¶ 203.

[685] *See* Goke, S., Weintraub, G. Y., Mastromonaco, R., & Seljan, S., "Bidders' Responses to Auction Format Change in Internet Display Advertising Auctions," Proceedings of the 23rd ACM Conference on Economics and Computation (July 13, 2022).

[686] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶¶ 1358-1360 ("In the context of exchange auctions, the private values assumption is more plausible than the common values assumption."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶¶ 946-948 ("[The independent private values] model provides a suitable setting to study the environment of display ad auctions.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

designed to achieve) in a first-price auction as in a second-price auction.[687] Poirot helps advertisers to bid optimally but would not be expected to reduce other exchanges' average prices below the same market-clearing level that is achieved by second-price auctions.

336. I present an especially simple example to illustrate this *revenue equivalence* idea. Suppose that there are two bidders: Bidder 1 with a value of $1.00 CPM for each impression, and Bidder 2 with a value of $2.00. Each bidder knows its own value but not the other's value. Suppose the publisher floor price is less than $1.00.

337. In a second-price auction, both bidders behave optimally by bidding their values. The seller is paid the value of the second-highest buyer, which is $1.00. In a first-price auction, both bidders could experiment to learn how to bid optimally. Bidder 1 will never experiment by bidding higher than its value of $1.00, because any higher bid can never yield a positive surplus. Bidder 2's experiments will reveal that it always wins the impression when it bids at least $1.00, so it will learn not to bid more than that. It may also experiment with bids less than $1.00 and find that those bids too often lose the auction. This process of experimentation would ultimately result in Bidder 2 learning to bid just above $1.00 to always win the auctions. The resulting per-impression publisher revenue in the first-price auction will be around $1.00, the clearing price in the second-price auction.

---

[687] *See* Milgrom, Paul R, "Putting Auction Theory to Work," Cambridge University Press (2004), at pp. 73-77. *See also* Myerson, Roger B., "Optimal auction design," Mathematics of Operations Research, Vol. 6 (1981), at pp. 58-73; Klemperer, Paul, "Auction theory: A Guide to the Literature," Journal of Economic Surveys, Vol. 13 (July 1999), at pp. 227-86; McAfee, R. Preston, and John McMillan, "Auctions and Bidding." Journal of Economic Literature, Vol. XXV (June 1987), at pp. 699-738.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

338.  For both kinds of auctions, the advertiser with the $2 value eventually learns to bid optimally, winning most of the impressions and paying about $1. Although my example is very simple—it includes only first- and second-price auctions and makes learning easy with its assumption that values do not change from impression to impression—it illustrates a general principle: bid adjustments by optimizing bidders may fully offset the direct effects of changes to auction rules. Omitting bidders' attempts to optimize can mislead, so a full analysis must account for incentives to do so.

### 4. Poirot Applied Equally to AdX, as Well as to Other Exchanges

339.  Professor Cramton claims that Poirot reallocated advertiser spending from dirty auctions to AdX "even where [Google's] data showed that AdX engaged in some first-pricing behavior" and several Plaintiffs make similar arguments.[688] But Poirot applied the same 10% profit threshold to AdX as it did to other exchanges and found that bidding truthfully was an optimal or near-optimal bidding strategy on AdX, and accordingly did not shade its AdX bids. Similarly, Poirot did not adjust bids into non-Google exchanges such as United and Improve Digital, where optimal bid shading was also predicted to

---

[688] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 239 ("Google elected not to shade bids on AdX even where its data showed that AdX engaged in some first-pricing behavior. This would, in expectation, shift volume from third-party exchanges to AdX."); ¶ 234 ("Several Google employees expressed concern before and after the launch of Project Poirot that optimizations, including sell-side Dynamic Revenue Share and Reserve Price Optimization, caused AdX to function as a non-second price auction."); *see also* Expert Report of S. Li (Oct. 11, 2024), at ¶ 1307 ("Although Google acknowledged in various internal documents that AdX did not run a 'clean' second-price auction, Google did not shade DV360 bids into AdX via Poirot. Google determined that the 'optimal bid multiplier' was below 1 for some exchanges, as shown in Figure 45. As Poirot lowered DV360 bids on certain third-party exchanges, but not on AdX, the effect was to shift DV360 spend toward AdX and away from third-party exchanges."); Publisher Class First Amended Complaint, at ¶ 317 ("Although Google's DV360 team was openly critical of 'greedy' rival Ad Exchanges that claimed to run a true second-price auction while actually running a "dirty" second-price auction, Google's own Ad Exchange was engaging in the very same auction manipulation."), Advertiser Class Complaint, at ¶ 267 ("Although DV360 was openly critical of 'greedy' rival exchanges that claimed to run a true second-price auction while actually running a 'dirty' second-price auction, Google's own exchange was engaging in the very same auction manipulation, though Reserve Price Optimization, discussed above.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

increase advertiser surplus by less than 10%.[689] Indeed, Poirot acted as a limit on AdX's designs, with AdX deciding to reject a version of its Reserve Price Optimization program (RPO) in order to avoid triggering "things like Poirot."[690]

340. Figure 9 displays results from "typical" Poirot v1 experiments, which show the gains from bid shading on different exchanges.[691] While DV360 could add more than 50% to advertiser surplus by shading bids into Pubmatic and OpenX, shading bids into AdX and Improve Digital would add less than 10%. Subsequent versions of Poirot made similar findings.[692]

---

[689] *See* typical experiment on these exchanges displayed in Figure 9.

[690] *See* "AdX Dynamic Price Meeting Notes" (Apr. 11, 2018), GOOG-AT-MDL-012701069, at -073 ("Online RPO [:] Three potential less aggressive versions [;] Waiting on gTrade team to let us know which versions are acceptable for Poirot"); -075 ("Online RPO [:] Working on less aggressive version to avoid things like Poirot").

[691] *See* "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -641.

[692] *See* "Poirot v2.0" (Aug. 10, 2018), GOOG-DOJ-12059682, at -683-684 ("The new poirot [sic] model turns out to be a no-op on AdX similar to the prod model.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Figure 9: Bid multipliers and advertiser surplus**[693]



341. Professor Cramton argues that Poirot was designed to "driv[e] more DV360's [*sic*] spend to AdX" due to "Google's significant take rate on AdX."[694] However, the designs of Poirot are consistent with DV360 offering a service to maximize surplus for its advertiser-customers, rather than to preference Google's AdX exchange. As I discussed in Paragraph 292, the statistical threshold used in Poirot made sense as a way to avoid

---

[693] "Bidding in adversarial auctions" (Nov. 27, 2017), GOOG-DOJ-05282625, at -641.

[694] Expert Report of P. Cramton (Oct. 4, 2024), at ¶¶ 246 ("Project Poirot's bid reduction on third-party exchanges caused impressions and revenue to move from third-party exchanges to AdX and AdSense. Google contends that Project Poirot was designed to maximize advertiser surplus. Still, the key metric consistently emphasized in communications was Poirot's impact in driving more DV360's [*sic*] spend to AdX and moving more cleared impressions from third-party exchanges to AdX and AdSense."); 249 ("It is worth noting that Project Poirot's implementation coincided with a larger effort to grow net revenue in display and video advertising. An obvious way to accomplish this is to increase the proportion of the advertiser budget directed at AdX rather than third-party exchanges because of Google's significant take rate on AdX. The Google employees who designed and implemented Poirot understood it to be part of this larger Google initiative. This further explains Poirot's benefits—namely, shifting impressions to AdX, which would improve Google's net and gross revenue.").

reducing bids on genuine second-price auctions, which would reduce advertiser surplus and might inadvertently harm exchanges using a second-price auction.

342.    Professor Cramton postulates that Poirot's 10% threshold was not a "a suitable statistical test" and that Google could have instead used additional data to "void significant data noise."[695] But he provides no criterion by which to evaluate Google's test and no details about how Google might have "increased the sample size."[696] For example, if DV360 had increased sample size by increasing the number of impressions included in its experiments, it would have incurred higher costs and lost valuable opportunities for its advertisers. Alternatively, if DV360 had incorporated older data, its conclusions might have become stale, harming the performance of the bidder.

### 5. Plaintiffs' Experts Mischaracterize the 1P Bidder and Professor Li's Data Analysis Contains Errors and Misleading Conclusions

343.    Professors Li and Cramton criticize DV360 for incorporating a "risk-aversion" coefficient on AdX but not other exchanges, with Professor Li contending that this led DV360 to "bid more aggressively on AdX inventory but not on third-party exchanges"[697]

---

[695] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 237 ("Using 10% because of purported 'noise in the data' is inappropriate. A suitable statistical test should determine the amount of 'noise' or error in the data. Moreover, Google optimized the Poirot experiments using a nightly data pipeline and the previous 7 days of data. If 7 days of data were insufficient to void significant data noise, then Google could have increased the sample size rather than imposing a 10% threshold. Instead, because of this 10% threshold, AdX was exempted from bid reductions through Poirot multipliers.").

[696] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 237 ("Using 10% because of purported 'noise in the data' is inappropriate. A suitable statistical test should determine the amount of "noise" or error in the data. Moreover, Google optimized the Poirot experiments using a nightly data pipeline and the previous 7 days of data. If 7 days of data were insufficient to void significant data noise, then Google could have increased the sample size rather than imposing a 10% threshold. Instead, because of this 10% threshold, AdX was exempted from bid reductions through Poirot multipliers.").

[697] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 69.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

and "direct[]" spend "from third-party exchanges [] towards AdX."[698] However, these conclusions rely on a mischaracterization of the AdX 1P bidder. While it is true that, unlike the AdX 1P bidder, the Poirot algorithm that DV360 used on third-party exchanges incorporated no "risk-aversion" coefficient between 2019 and 2022, that was just one of several significant differences between the two bidding algorithms. As I discussed in Section VII.E, DV360's ███████████████████████████████ █████████████████████████████████████████ Because the analyses of Professors Li and Cramton overlook these major differences, instead basing their conclusions on the false assumption that the "risk aversion" parameter was the single distinction between Poirot and the 1P bidder, their attempt to compare bid levels on purely theoretical grounds is invalid. To assess the impact of the very different bid computations correctly, *all* the differences need to be considered, which is best accomplished through an analysis of data. Professor Li does attempt such an analysis in his report, but this analysis, too, contains critical errors. As I demonstrate with the same data Professor Li uses, the corrected analysis refutes his claim that DV360 "directed" spend "from third-party exchanges [] towards AdX."

344.    Professor Li begins his analysis by arguing that the "risk aversion" parameter is a "feature" of Poirot,[699] but that is wrong: the implementation of Poirot included no such parameter and DV360 did not bid into AdX's first-price auction using that Poirot

---

[698] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 71 ("There is no economic justification for Poirot's risk-aversion parameter."), ¶ 1301 ("Accordingly, as explained below, I conclude that there is no economic justification for Poirot's risk aversion feature. Instead, this served as a means of increasing the number of impressions won by DV360 on AdX, while decreasing the number of impressions won on rival exchanges.").

[699] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1301 ("Accordingly, as explained below, I conclude that there is no economic justification for Poirot's risk aversion feature.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

algorithm. Instead, DV360 developed an entirely new bidding architecture that it called the AdX 1P bidder (see [Section VII.E.1](#) above) which, in contrast to Poirot, ███████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ While Professors Li and Cramton complain that "Google did not apply the risk-aversion parameter to third-party exchanges until 2022,"[700] they do not acknowledge or consider the engineering challenges involved in predicting the highest other bid on third-party exchanges without MBTW information.

345. Although Professors Li and Cramton emphasize a "significant discrepancy" in "risk aversion coefficients" between 2019-2022 to conclude that "AdX [] favored its own [] exchange"[701] and "increas[ed] AdX's dominance in the exchange market,"[702] their failure to properly account for the full set of differences between Poirot and the AdX 1P bidder invalidates that conclusion.

---

[700] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1311 ("Google did not apply the risk-aversion parameter to third-party exchanges until 2022."). *See also* Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 256 ("Thus, for about three years, Google assumed a DV360 bidder was significantly risk averse (with a coefficient of .6) when bidding on the AdX first-price auction and risk-neutral (with a coefficient of 1) when bidding on all third-party exchange auctions. [...] This is a significant discrepancy in risk aversion coefficients, and this practice is not grounded in economic logic.").

[701] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 256 ("Indeed, Google maintains that when it finally introduced a risk aversion coefficient for DV360 bidding on third-party exchanges, it used the same risk aversion coefficient on AdX and all third-party exchanges, apparently recognizing (ultimately) that treating DV360 bidders as risk neutral when bidding on third-party exchanges and risk-averse when bidding on AdX would have blatantly favored its own AdX ad exchange.").

[702] Revised Expert Report of S. Li (Oct. 11, 2024), at Section XVII.D.1 ("Poirot harmed publishers by increasing AdX's dominance in the exchange market").

346.   Professor Li claims that Figure 46 of his report (reproduced below) demonstrates the anti-competitive effect of the 1P bidder.[703] I use the same dataset Professor Li analyzes in Figure 46 of his report to refute his conclusions. I summarize my findings below.

**Figure 46 of Professor Li's Report**[704]



347.   *First,* I find that Professor Li's figure contains an error. For 2023, it incorrectly shows a significant drop in DV360 spend, but after re-running the query on the *complete* DV360 data, I find no such decline in 2023. The correction is shown below in Figure 10.[705]

---

[703] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1320, Fig. 46 ("The two lines in the graph depicted in Figure 46 do not converge again until late 2022. This shows that, consistent with the results in the internal email chain between Google employees referred to above, Google's adoption of a risk-aversion parameter for bidding into only AdX diverted spend toward AdX, to the detriment of other exchanges. This advantage persisted until 2022, when DV360 applied equal risk-aversion parameters to AdX and third-party exchanges.")

[704] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1320, Fig. 46.

[705] This result was generated using code/DV360_rev_share.py in my supporting materials, and the output is saved in code/figures/3PE_vs_adx.png.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Figure 10: DV360 Ad Spend in AdX and Third-Party Exchanges**



348.  *Second,* Professor Li emphasizes the period "*beginning in 2019*" to note "there was a

sharp divergence between the two, with spend on AdX increasing significantly and spend

on third-party exchanges declining."[706] But this divergence cannot be attributed to the 1P

---

[706] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1319 ("The resulting chart shows monthly gross advertiser spend for AdX and third-party exchanges from 2014 to 2024. It shows that although advertiser spend on AdX and third-party exchanges was similar from 2014 to late 2018, *beginning in 2019* there was a sharp divergence between the two, with spend on AdX increasing significantly and spend on third-party exchanges declining.") (emphasis added), ¶ 1320 ("The two lines in the graph depicted in Figure 46 do not converge again until late 2022. This shows that, consistent with the results in the internal email chain between Google employees referred to above, Google's adoption of a risk-aversion parameter for bidding into only AdX diverted spend toward AdX, to the detriment of other exchanges. This advantage persisted until 2022, when DV360 applied equal risk-aversion parameters to AdX and third-party exchanges.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

bidder because DV360 did not release the AdX 1P bidder until *September* of 2019,[707] before which the two curves had already diverged. To evaluate correctly whether and how the 1P bidder affected the AdX share of DV360 spending, I have plotted in Figure 11 the share of spend of DV360 on AdX in the US during the same months.[708]

**Figure 11: AdX share of DV360 spending in the US**



349.  Notice in the figure that in the six months after AdX launched the first-price auction in 2019, the percentage spend of DV360 on AdX *decreased*, which is the opposite of Professor Li's claim. Moreover, the 2022 decreases in relative spend on AdX began

---

[707] "GDN Ads Launches 2020" (Nov. 20, 2020), GOOG-AT-MDL-011725784, at Tab "2020-05," Cell I645 (identifying September 2019 as the launch date); Email from ███████████ to N. Jayaram, "[Launch 311348] GDA and DV360 first price bidding on AdX web and bid translation on AdX app and AdMob" (Sept. 2019) GOOG-DOJ-AT-00573072, at -072 (explaining the launch); "Display Ads Quality Launches 2019" (Sept. 16, 2020), GOOG-AT-MDL-003284235, at Tab "2019 Q4 Web & mApps," Cell D20 (identifying several impact metrics). This September launch was then supplemented by a launch in January 2020 to improve the HDMI modeling pipeline. Email from █████████ to ██████████
"[Launch 312287] DV360 Opt - New HDMI for Transparent First Price Auctions" (Sept. 9, 2019), GOOG-DOJ-14429769, at -164 (identifying this launch as accompanying Launch 311348); "Ariane Download Q1 2020" (Dec. 8, 2020), GOOG-AT-MDL-011539513, at Tab "Raw Data," Row 71 (identifying January 20, 2020 as the supplemental launch date).

[708] This result was generated using code/DV360_rev_share.py in my supporting materials, and the output is saved in code/figures/3PE_vs_adx.png.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

months before the launch of the third-party exchange 1P bidder, refuting any argument that the algorithm caused some change from the pre-existing trend.

350.   Even if introducing the 1P bidder to third-party exchanges would have "shifted" revenues to those exchanges, one cannot attribute the shift to the "risk-aversion" coefficient, which is just an engineering parameter of a complex bidding strategy. While the transition to a unified bidder achieved engineering consistency, an important economic distinction persisted: when DV360 computes a bid for AdX, it predicts the distribution of the highest other bid using AdX's MBTW data, but, by contrast, on any given third-party exchange, DV360 does not use the data of that exchange (either because it is unavailable or possibly unreliable).[709] This difference can lead the *same* bidder to perform differently on AdX than on third-party exchanges, making it incorrect to extrapolate the effects of the 1P bidder's introduction to third-party exchanges back to AdX in 2019.

351.   In addition to his claims that DV360 "diverted" spend to AdX, Professor Li claims that "Poirot also reduced total welfare,"[710] because "risk-aversion [] caused DV360 to bid more aggressively[,] [...] ma[king] it more likely that DV360 advertisers will win, even when advertisers on other DSPs, or on other exchanges, had higher values for the impression."[711] However, this conclusion relies on his incorrect characterization of "risk

---

[709] "DV360 exchange dynamics roadmap 2020" (Mar. 2020), GOOG-AT-MDL-019330098, at -099 ("HOB data is critical for bidding into 1p auctions. Some exchanges provide this directly (e.g., AdX), some are in the discussion for providing this directly, and some don't.").

[710] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1342 ("Poirot also reduced total welfare by harming allocative efficiency in the exchange market. As noted above, an ad auction is allocatively efficient if the impression is won by the bidder with the highest value, net of costs.").

[711] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1343 ("This efficiency result depends on participants bidding in a way that maximizes their expected surplus. But Poirot's risk-aversion parameter caused DV360 to bid more aggressively than that, specifically for impressions offered through AdX. This bid boosting made it more likely that DV360 advertisers will win, even when advertisers on other DSPs, or on other exchanges, had higher values for the impression.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

aversion" as the only difference between Poirot and the 1P bidder. If, without the "risk-aversion" coefficient, the 1P bidder resulted in bids that were too low when DV360 advertisers had "higher values for the impression," introducing a "risk-aversion" coefficient could *increase* advertiser welfare. Indeed, DV360's experiments are consistent with this reasoning, finding that the value of DV360's advertisers increased by applying the "risk-aversion" coefficient.[712]

352. Professor Li adds that it is "implausible" for the "risk-aversion" parameter to represent reasonable levels of economic risk aversion in advertiser agents,[713] and Professor Cramton echoes similar arguments, writing that "[t]he selection of the risk aversion coefficient appears to have nothing to do with advertiser risk aversion."[714] I agree, but as I elaborate above, it is incorrect for economists to interpret the "risk-aversion" parameter as modeling any *economic* concept of risk-aversion; DV360 used it as an *engineering* choice designed to offset imperfections in predicting the distribution of the highest other bid.

### 6. Professor Cramton's Arguments about "Fixed CPMs" are Unsupported

353. Professor Cramton argues that Poirot failed to optimize advertiser surplus because Google assumed "fixed CPM bids" were unshaded.[715] He contends that while Google

---

[712] "Migration to 1st Price Auctions" (Sept. 2019), GOOG-AT-MDL-009709686, at -691 (see Rasta table).

[713] Revised Expert Report of S. Li (Oct. 11, 2024), at Section XVII.B.2 ("Google's stated justification for the risk aversion parameter is an implausible pretext.").

[714] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 254 ("Google structured its transition to a first-price auction for its benefit. It does not appear that Google considered whether advertisers could do better by selecting a risk aversion coefficient different from the one Google chose for them. The selection of the risk aversion coefficient appears to have nothing to do with advertiser risk aversion. The coefficient is selected to manipulate bids for Google's benefit.").

[715] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 235 ("The algorithm underlying Project Poirot is designed to maximize advertiser surplus, defined as the difference between the value of the impression to the advertiser—which

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

knew bidders had an incentive to shade, they "assumed bidders were not bid-shading at all (on third-party exchanges or on AdX) for purposes of Project Poirot."[716] His argument is incorrect in at least three ways.

354.    *First*, Google developed Poirot precisely *because* it recognized advertisers' incentive to shade bids into non-second-price auctions, not in spite of them.

355.    *Second,* an advertiser that wished to manually shade its bids could opt out. If an advertiser enabled Poirot, it entered a number equal to what the interface described as a maximum price or *value*: "[o]ptimize your fixed CPM bids to get impressions at the best price. The price you pay will never be higher than the bid you enter."[717] Conversely, Google's Help Page communicates that the number entered by an advertiser opting out of optimized fixed CPM bidding is a *bid*: "if you need to always bid a specific CPM [] you can opt out of optimized fixed CPM bidding."[718]

---

Google assumes to be the fixed CPM bid amount entered in the user interface—and the amount paid for the impression. This valuation assumption (that advertiser bids equals their valuation) is flawed; bidders understanding they were bidding in 'dirty' auctions may have shaded their bids from their values for the same reason that Google did via Poirot. However, Google assumed that bids reflected values, as would be the case in a second price auction. Therefore, Google's notion of advertiser 'surplus' is initially inaccurate.").

[716] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 235, n. 196 ("Moreover, Google knew the incentives bidders had to bid-shade on 'dirty' auctions, as they noticed third-party ad-buying platforms (like Criteo) doing so on AdX. [...] Despite this, Google still assumed bidders were not bid-shading at all (on third-party exchanges or on AdX) for purposes of Project Poirot (recall that they inferred valuation from the bid price).").

[717] "Optimized Fixed Bidding in DV360" (Mar. 2019), GOOG-DOJ-05326023, at -024.

[718] Display and Video 360 Help, "Opt out of optimized fixed CPM bidding," Google, https://support.google.com/displayvideo/answer/7440660, accessed Dec. 12, 2024 ("By default, Display & Video 360 optimizes your fixed CPM bids so that you'll win impressions for the lowest price possible. However, if you need to always bid a specific CPM, or if you are concerned about accidentally bidding beneath a price floor you've established with sellers, you can opt out of optimized fixed CPM bidding").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

356.  *Third*, fixed CPM bidders bid the same on *every* impression.[719] If a bidder acquires impressions in both first- and second-price auctions, it is *always* advantageous to bid *less* in the first-price auction than the second-price auction, because doing so enables the bidder to acquire the same number and kinds of impressions at a lower total cost. Because this conclusion does not depend on the values used for bidding, Professor Cramton's speculation about the relation between a bidder's actual values and the fixed CPMs it reports is irrelevant for assessing the benefits of Poirot.

### 7. Professor Cramton's Arguments About "Stability" Misclassify Poirot

357.  Professor Cramton claims that "Poirot made auctions more unstable,"[720] where he uses "unstable" to mean the highest bid sometimes lost the auction.[721] However, Poirot, which was a bidding strategy by DV360 in its capacity as a bidder on AdX and third-party exchanges could not possibly alter the rules of any auction, so it cannot logically affect "stability" even by his definition (see Section VIII.F.1).

---

[719] "Optimized Fixed Bidding in DV360" (Mar. 2019), GOOG-DOJ-05326023, at -023 ("Fixed bidding places the same bid on every impression based on a fixed CPM inputted by the user in the Ul regardless of the impression value.") (emphasis omitted).

[720] Expert Report of P. Cramton (Oct. 4, 2024), at Section 10.8 ("Poirot made auctions more unstable").

[721] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 99 ("Stability refers to whether, after the auction, the items in question were assigned to the bidders that bid the most for them [...] In a stable auction for a single good, the highest bid wins.") (emphasis omitted).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## VIII.   DYNAMIC ALLOCATION: USING AUCTIONS TO INCREASE PUBLISHER REVENUES ON REMNANT IMPRESSIONS

### A. Overview

358.  Dynamic Allocation (DA) was an auction design introduced by DoubleClick in 2007 to improve publishers' sales of remnant impressions.[722] At the time of its launch, DA differed from the dominant model used by publishers to allocate remnant impressions (the "waterfall") because it utilized a second-price auction to determine payments to publishers.[723] Under DA, a publisher could configure DFP to sell a non-guaranteed impression to a bidder on AdX only when it would pay more than the publisher's largest expected payment from any other remnant demand source.[724]

359.  As a consequence, on every impression, DA could only increase a publisher's expected revenues compared to a *status quo ante* without bids from AdX. To quantify the effects of DA for publishers and evaluate these effects relative to a wider range of counterfactuals, I conducted a simulation study using GAM and Google Ads auction data from January of 2024. The simulations suggest that average publisher revenues using DA are substantially higher than those obtained using a waterfall, both in the case that AdX is not included in the counterfactual waterfall (a 45.5% increase) and in the case that AdX would otherwise

---

[722] *See* "2008 Strategic Planning DoubleClick Advertising Exchange" (July 26, 2008), GOOG-TEX-00458239, at -247; "Ad Exchange Dynamic Allocation" (Sept. 5, 2013), GOOG-TEX-00054839, at -843. For this reason, Professor Singer's claims that "Google implemented Dynamic Allocation" are ahistorical, *see* Expert Report of H. Singer (Oct. 4, 2024), at ¶ 155.

[723] *See* "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -413-414.

[724] "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -414 ("If [AdX] can provide the publisher with a net CPM value higher than they would have gotten from delivering their directly booked, non-guaranteed ad, [AdX] will deliver an ad.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

have been included in the counterfactual waterfall (a 12.0% increase).[725] In my

simulations, DA also expanded output by reducing the number of unsold impressions.

360. Plaintiffs' and their experts' arguments about DA have significant flaws:

    a. Plaintiffs and their experts allege that DA steered transaction volume towards

       AdX.[726] But DA only accomplished that via competition on the merits, delivering

       what publishers wanted: substantially higher revenues.

    b. Plaintiffs and their experts' allegations lack historical context, comparing DA to

       an ahistorical counterfactual in which other exchanges could make real-time bids

       into DFP.[727] DA improved publisher revenues and allocated impressions more

---

[725] I describe these simulations in detail in <u>Section VIII.E</u> and the technical notes in <u>Section XV.B</u>.

[726] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 141 ("A secondary effect of Dynamic Allocation would be to harm market competition by undermining third-party exchanges. [...] [T]hese exchanges would become less attractive, eroding auction competition and further moving impressions from third-party exchanges to AdX."). *See also* Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 14 ("Google's implementation of DA and EDA was harmful to publishers and other auction participants, including Inform, because these algorithms [...] utilized Google's unique position and level of control to grant itself access to inventory which it would otherwise not have available."); Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 7 ("Dynamic Allocation – Steered waterfall auctions that were not won by Google to Google's AdX real-time auction, while excluding competition from other ad exchanges in that real-time auction."); Publisher Class First Amended Complaint, at ¶ 265 ("This first-in-line privilege, granted by Google's publisher Ad Server, effectively drove advertisers to use Google's AdX at the expense of rival Ad Exchanges."); Advertiser Class Complaint, at ¶ 201 ("Google foreclosed competition in the market for exchanges with a program introduced in 2010 called 'Dynamic Allocation.'"); Inform Third Amended Complaint, at ¶ 193 ("As the concept of real-time bidding began to gain popularity, Google strategized to use its control of the ad server market to inhibit competition among exchanges. Opting to foreclose competition rather than compete on the merits, Google incorporated new decisioning logic—a new program it called Dynamic Allocation—into DFP in 2010.").

[727] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 139 ("Second, before the inception of header bidding, AdX bidders did not have to compete on a level playing field with third-party exchanges regarding winnability. AdX competed by submitting live bids for the impression in question. By contrast, third-party exchanges were competing with their historical averages. This means that even when a third-party exchange would have returned the highest real-time bid for an impression, that bid would never even be returned to the DFP ad server if an AdX bid exceeded that third-party exchange's historical average. [...] The direct benefit to AdX and AdX bidders would be an increase in the impressions won and the ability to pay less for those impressions (not accounting for take rates) than if they were to compete on even terms with third-party exchanges."); Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 40 ("Because Dynamic Allocation did not permit other ad exchanges to respond in real-time with a counter-bid, Google characterized AdX in the context of DFP as 'closed' with respect to competition from non-Google platforms."), ¶ 257 ("In addition, Google leveraged its dominant DFP ad server to disadvantage rival ad exchanges by precluding those rivals from participating in real-time bidding competition against AdX (dynamic and enhanced dynamic allocation)."), ¶ 304 ("Further, by limiting real-time bidding within Dynamic Allocation to only AdX, Google precluded rival ad exchanges from responding with higher real-time bids for that ad inventory, thereby depriving

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

efficiently than the waterfall model that preceded it (which did not make any use of real-time bids).[728] Google introduced the technology to accept real-time bids[729] from AdX bidders in 2009 (after DoubleClick's acquisition by Google[730]) with the launch of "AdX 2.0," improving efficiency and publisher revenues further.[731] Header bidding, a technology to compare real-time bids from multiple exchanges (discussed further in Section X) did not gain popularity until around 2014,[732] years after Dynamic Allocation launched. Designing an "auction of auctions" to

---

rival ad exchanges of market share and reducing the prices that publishers could have received had rival ad exchanges not been precluded."), ¶ 316 ("However, Google imposed a restraint on Dynamic Allocation auctions by excluding rival auction platforms from participating in this real-time bidding, which would have offered publishers lower rates for the ad auction service and higher net prices."), ¶ 317 ("Thus, when a waterfall process was used, AdX could win an auction under Dynamic Allocation even if AdX's real-time bid was lower than the real-time bids that rival ad auction platforms would have made."), ¶ 423 ("For example, Google's exclusion of rival ad auction platforms from Dynamic Allocation and EDA prevented advertisers associated with these rival platforms from submitting real-time bids for these ad impressions, thus reducing demand and bids for those impressions in those auctions."); Publisher Class First Amended Complaint, at ¶ 263 ("Google knew that the surest way for publishers to maximize revenue would have been to allow real time bidding by multiple Ad Exchanges at the same time."); Advertiser Class Complaint, at ¶ 201 ("With Dynamic Allocation enabled, Google only needed only to beat the historical average bid price from competing exchanges (e.g., by $.01) rather than compete against the real-time bid for a given auction.").

[728] *See* "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -413 ("With indirect sales, the CPM is usually fixed, but the number of impressions delivered is not.").

[729] Prior to "AdX 2.0," participating demand sources would enter bids in advance of auctions, with each bid containing targeting criteria that told AdX the types of impressions that the demand source was interested in purchasing at the specified bid amount.

[730] Google, "Google Closes Acquisition of DoubleClick," News from Google (Mar. 11, 2008), http://googlepress.blogspot.com/2008/03/google-closes-acquisition-of_11.html, accessed Dec. 11, 2024.

[731] *See* Email from ██████ to ██████ "Re: [Adsense-eng-wat] [Adsense-eng] Re: [Ads-engdirs] Doubleclick Ad Exchange 2.0 - Launched!" (Sept. 19, 2009), GOOG-AT-MDL-010836318, at -318 ("The team has done a great job […] to also go beyond in some very important areas, e.g. […] Real Time Bidding");"DoubleClick Ad Exchange Impact" (Q4 2010), GOOG-DOJ-13247322, at -322 ("The results of our research showed that when DoubleClick Ad Exchange wins the auction, publishers generate *188% more revenue*, on average, net of revenue sharing and ad serving fees, compared with fixed upfront sales of non-guaranteed display advertising. […] The Ad Exchange fill rate (percentage of offered impressions resulting in a matched transaction, including those with minimum CPMs or restrictions) *increased significantly since the first version of the study, to over 33%.*") (emphasis in original).

[732] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 13 ("Around 2014, web publishers began to adopt Header Bidding."). *See also* Alise Zaiceva, "What is Header Bidding? A Complete Guide for Publishers," Setupad (Apr. 11, 2022), https://setupad.com/blog/what-is-header-bidding/, accessed Dec. 13, 2024 ("Header bidding became an industry standard around 2014 when it replaced another popular technique of selling ad inventory–waterfall.")

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

compare the highest real-time bids from multiple exchanges natively on Google
Ad Manager presented additional challenges, including changing the auction
design and helping bidders adapt to that, and Google solved those problems with
its rollout of a Unified First Price Auction in 2019 (which I discuss further in
Section XIII). Plaintiffs and their experts ignore this evolution of the industry
over more than a decade and make comparisons of DA technology created in
2007 to outcomes that were possible in 2019.

c.   Plaintiffs' and their experts' conclusions fail to sufficiently account for
publishers' incentives to optimize floor prices: when these incentives are properly
accounted for, those conclusions change.

### B. Online Display Advertising Configurations Prior to DA

361.   In the early years of online display advertising, most revenue from online display
advertising inventory was generated via negotiated **guaranteed contracts** that fixed a
price and quantity of certain types of impressions.[733] Publishers monetized their remnant
impressions (impressions not allocated to guaranteed contracts) using **indirect** sales
channels, which in the early years of online display advertising consisted primarily of ad
networks.[734] Ad networks would purchase remnant inventory from publishers and
package it for sale to advertisers. Publishers would sell advertising space to ad networks

---

[733] "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online
Publishers" (2010), GOOG-DOJ-06818412, at -413 ("A typical large publisher generates upward of 80% of its
online advertising revenue from guaranteed ad sales.").

[734] *See* "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for
Online Publishers" (2010), GOOG-DOJ-06818412, at -413 ("To tap additional demand from advertisers,
brand-conscious publishers often sell through indirect channels, including ad networks, exchanges, and other
technology providers").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

on a per-impression basis, with no obligation to fill a minimum number of impressions.[735] Many ad networks paid publishers a fixed price per impression or a fixed proportion of the revenue it earned from advertisers,[736] but did not give publishers control over the ads that would be placed on their websites or the prices they would receive for impressions.[737]

362.  At times, an ad network might not have a relevant ad to fill a publisher's impression. Ad networks developed the capability to **passback** an unwanted impression, allowing the publisher to offer it to other demand sources.[738] This capability led to the **waterfall**, in which a publisher specifies a list of demand sources to be sequentially offered the opportunity to fill an impression.[739] Under a waterfall, the first demand source was offered the opportunity to fill an impression at some minimum price. If that demand

---

[735] *See* "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -413 ("Publishers usually sell their remaining ad space on a non-guaranteed (or 'pre-emptible') basis through their direct sales channel, as well as through their indirect sales channel, which may comprise a handful of ad network partners. […] With indirect sales, the CPM is usually fixed, but the number of impressions delivered is not."); "AFC Partnerships" (Jan. 7, 2008), GOOG-DOJ-03516570, at -575 ("Today, most large publishers […] rely on ad networks like AFC to fill remnant inventory.").

[736] "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -413 ("Ad networks provide revenue to publishers willing to commit, in advance, a large number of impressions at a fixed CPM value.").

[737] *See* David Kaplan, "On Ad Networks: Pork Bellies, Diamonds, Or The New Direct Marketing?," Forbes (Apr. 8, 2008), https://www.forbes.com/2008/04/08/online-ad-networks-tech-cx_pco_0408paidcontent.html?sh=7414ef02cb8e, accessed Dec. 12, 2024 ("All ad networks are not created equal: If all sides can agree on one thing, it's the need for greater clarity to what's being sold and where it's being placed. […] 'In a lot of cases [in terms of ad nets' handling of remnant, or unsold ad inventory], the buyer doesn't really know what they're getting. And the seller doesn't have any control over price.'"). *See also* "Ad Networks," AffiliateSeeking.com (captured on Jan. 16, 2008) https://web.archive.org/web/20080116101025/https://www.affiliateseeking.com/list/23000001/1.html, accessed Dec. 11, 2024 (listing some examples of ad network pricing options).

[738] "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -503.

[739] Maciej Zawadziński and Mike Sweeney, "What is Waterfalling and How Does it Work?," Clearcode Blog (Nov. 28, 2024), https://clearcode.cc/blog/what-is-waterfalling/, accessed Dec. 11, 2024 ("Waterfalling gets its name from the waterfall-like process for selling inventory—i.e. the demand sources are initiated one at a time, one after another. […] the publisher first tries to sell its inventory via direct sales, as these generally offer the highest cost-per mille (CPM). If it is unable to do so, the publisher will then pass the impression down the waterfall to various ad networks until it is sold."); "Ad Manager Ecosystem 101" (June 2019), GOOG-DOJ-AT-02199478, at -503.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

source declined to fill the impression, the request was passed back to the next demand source on the publisher's list, with the process repeating until the impression was sold or the publisher's list was exhausted or a timeout limit was reached, leaving the impression unsold. Demand sources in the waterfall did not "bid" against one another. The waterfall was a highly configurable process, with publishers free to set the order of consideration and floor prices for each demand source however they wished. Because publishers often did not know whether an ad network would have an eligible ad for the given impression, or what the ad network would pay if it did have an eligible ad, a common approach was to prioritize ad networks in the waterfall with the highest historical average payouts per impression.[740]

363. In a waterfall, if a publisher does not know which demand sources are interested in purchasing any particular impression but does know exactly the prices each interested source would pay, then it can maximize its revenue by ordering the waterfall list from the highest price to the lowest and offering to sell to each in turn at its known price. But when the prices from different demand sources are not known, for example because they are set by separate auctions within each ad network, then no waterfall process can guarantee selling to the demand source with the highest offer: the publisher cannot know for certain whether another buyer lower on its list would have paid more. With uncertainty about price offers, the publisher is incentivized to set a higher minimum price

---

[740] *See* Maciej Zawadziński and Mike Sweeney, "What is Waterfalling and How Does it Work?," Clearcode Blog (Nov. 28, 2024), https://clearcode.cc/blog/what-is-waterfalling/, accessed Dec. 11, 2024 ("Publishers, however, started running into problems when their chosen ad network wasn't able to sell all of their remnant inventory, which meant their available ad spaces were being left unfilled, leading to missed revenue opportunities. In an effort to increase fill rates and capitalize on revenue opportunities, a process known as waterfalling started to emerge."); "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -413 ("Some publishers manage yield across this ad space by manually prioritizing which ad networks access it in order of their relative average CPM payout.").

to demand sources near the top of the waterfall, and a lower minimum price to sources near the bottom of the waterfall. The publisher can implement that policy by setting *higher* minimum prices nearer the top of the waterfall.

364.    Even so, by offering each impression *sequentially* to ad networks, the waterfall procedure could leave value on the table. Under the waterfall, an impression might be assigned to an advertiser on Ad Network A with a lower value for the impression than an advertiser on Ad Network B, merely because Ad Network A had a higher priority in the publisher's waterfall. That was in large part because, at that time, the prevailing technology did not permit a quick and efficient "real-time" auction among different demand sources. If the technological limitations that existed at the time could be overcome and standards for interoperability established, then allocating the impression to the advertiser on Ad Network B at some higher price than Ad Network A could increase *both* publisher revenue and advertiser surplus.

## C. DA Introduced Auctions for Impressions, Improving Platform Thickness and Increasing Publisher Revenues

365.    **Dynamic Allocation**, introduced by DoubleClick in 2007,[741] improved the allocation by replacing the *sequential* logic of the waterfall with the *simultaneous* comparison of bids from advertisers, ad agencies and ad networks participating in a real-time auction on AdX. In the version of AdX that existed when DA was introduced, participating demand sources would enter bids in advance of auctions, with each bid containing targeting criteria that told AdX the types of impressions that the demand source was interested in

---

[741] "2008 Strategic Planning DoubleClick Advertising Exchange" (July 26, 2008), GOOG-TEX-00458239, at -247 ("Q3'07 Dynamic Allocation.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

purchasing at the specified bid amount.[742] In DFP, publishers would codify information about their non-AdX sources of remnant demand using non-guaranteed line items, which also contained targeting criteria and a **value CPM** (also known as a **static bid**), which DFP used to represent that source of demand in the DA process.[743]

366. DA used a two-step procedure to allocate remnant impressions. First, it would identify the eligible non-guaranteed line item with the highest value CPM: Google engineers called this static bid the **DFP booked price**.[744] Then, AdX would run a second-price auction using the bids it received from advertisers on AdX with a floor price at least as high as the DFP booked price.[745] The AdX bidder with the highest bid would be allocated the impression, as long as that bid was above the floor price; otherwise, the impression was allocated to the demand source associated with the best non-guaranteed line item. If that demand source had no ad to serve, it might pass the impression back to other demand sources in a waterfall. DA was backward compatible: a publisher could adopt DA without major changes to its existing relationships with ad networks.

---

[742] "Ad Selection Specifications for Ad Server Version 14.1" (Mar. 27, 2007), GOOG-AT-MDL-007374059, at -136 ("Buyers can bid on ad slot inventory by indicating their preferred targeting elements and specifying an associated CPM based bid.").

[743] In the original version of AdX, prior to the acquisition by Google, the terminology was a little different: line items were just 'ads' and value CPMs were just 'bids,' but to avoid confusion with other places in this report, I will adopt Google's terminology. *See* "Ad Selection Specifications for Ad Server Version 14.1" (Mar. 27, 2007), GOOG-AT-MDL-007374059, at -136; DoubleClick for Publishers, "Terminology differences with DART," DoubleClick for Publishers Help, https://web.archive.org/web/20120211164005/http://support.google.com/dfp_premium/bin/answer.py?hl=en&answer=158833, accessed Dec. 13, 2024.

[744] "Ad Exchange Dynamic Allocation" (Sept. 5, 2013), GOOG-TEX-00054839, at -843-854; "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶¶ 10-12.

[745] If the publisher had otherwise set a floor price for the impression that was higher than the DFP booked price, that floor price would apply. *See* "Adx Queries by Pricing Rule" (Sept. 1, 2016), GOOG-DOJ-13470118, at -118 ("For every query in adx, the price can be determined by the following: [...] PUBLISHER_RESERVE: the reserve set by the publishers[.]").

367.  By using a second-price auction to allocate impressions, DA eliminated the possibility of inefficient allocation among the bidders in the AdX auction and ensured that the publisher received a price for the impression that no other AdX bidder was willing to beat. But DA had another important feature in its design in recognition of the fact that publishers had other potential demand sources for their remnant impressions: a floor price for AdX set by the publisher.[746] A publisher would be incentivized to set the AdX floor price for each impression larger than the expected revenue from any non-AdX demand source, ensuring that a bidder on AdX could win only if it paid at least that amount. As long as the publisher did so, DA could increase the expected revenue to the publisher from each impression it sold, but could never reduce it.

368.  A publisher using DA would experience three immediate benefits. *First*, if the publisher was not already calling AdX, then DA allowed it to gain access to a new source of advertising demand. New advertising demand meant new opportunities for publishers to sell remnant impressions, and fewer unsold impressions. *Second*, if AdX had two bidders willing to beat the floor price for DA, then the auction price would exceed the floor, further increasing seller revenues. *Third*, DA gave the publisher a more efficient allocation method to sell display advertising inventory, guaranteed to increase its expected revenues from the sale of remnant impressions compared to using the waterfall with non-Google demand sources alone. By choosing a floor price for each line item that

---

[746] The floor price faced by AdX was the maximum of a publisher-configured floor and the highest publisher-entered value CPM of the eligible line items. It is unimportant for my analysis which of these sets the binding floor price; I therefore simply refer to the binding price as the AdX floor. Professor Li acknowledges the publisher's agency in setting these price floors: "Specifically, for remnant inventory, Dynamic Allocation always called AdX first to run a real-time auction for a given impression. The price floor in AdX would be the highest of the *publisher-set floor* or the highest historical average yield (a 'static' price) calculated for another exchange." Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 119 (emphasis added). *See also* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 902(c) ("If the relevant line item is served by a non-Google exchange, its Value CPM is determined by the historical CPM paid by this exchange to this publisher for similar impressions in the past *or a specific rate set by the publisher*") (emphasis added).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

was higher than the expected payment from alternative demand sources (*i.e.*, any demand sources listed in the waterfall that might be triggered if the impression is not sold on AdX), the publisher would earn a higher expected revenue from each impression sold on AdX. This property made DA a *risk-free revenue improvement* for publishers integrating AdX as a new source of demand. An analysis of the first version of DA found that the combined effects of these three benefits of DA increased the revenues that publishers earned per impression sold via DFP by 136%.[747]

369. DA also benefited the ad buyers participating in the auctions on AdX: in addition to having access to additional inventory from publishers, they could always win an impression by bidding enough for it, rather than relying on the comparatively less predictable and transparent processes used by ad buyers at the time.[748] Moreover, the second-price auction ensured that, on each impression won by AdX bidders, the winning bidder paid *only* the amount needed to beat other bids on AdX and the floor price determined by the publisher, and not more, which as I explained before, made bidding simpler for ad buyers (see Section III.C.3.a).

---

[747] "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -415 ("The results of our research demonstrated that the combined effects of auction pressure and Dynamic Allocation in DoubleClick Ad Exchange resulted in an average CPM lift of 136% compared with fixed, upfront, pre-negotiated sales of non-guaranteed inventory.").

[748] *See* David Kaplan, "On Ad Networks: Pork Bellies, Diamonds, Or The New Direct Marketing?," Forbes (Apr. 8, 2008), https://www.forbes.com/2008/04/08/online-ad-networks-tech-cx_pco_0408paidcontent.html?sh=7414ef02cb8e, accessed Dec. 12, 2024 ("All ad networks are not created equal: If all sides can agree on one thing, it's the need for greater clarity to what's being sold and where it's being placed. […] 'Both buyer and seller require transparency. In a lot of cases [in terms of ad nets' handling of remnant, or unsold ad inventory], the buyer doesn't really know what they're getting. And the seller doesn't have any control over price.'").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### D. Real-Time Bidding in AdX 2.0 Further Increased Benefits of DA for Publishers and Advertisers on AdX

370.   In September 2009, after its acquisition of DoubleClick, Google redesigned the AdX exchange to further increase the benefits of online display advertising auctions for publishers and advertisers. The redesigned **AdX 2.0** incorporated **real-time bidding** from bidders on AdX and Google's buy-side products (originally just AdWords, but later also DV360).[749] Under real-time bidding, AdX would send **bid requests** containing information about the impression and then compare responses from non-Google AdX bidders (later called **Authorized Buyers**) with the bids from Google's ad buying tools. Bidders would use real-time information (such as ad campaign information and cookies) to determine their bids for the impression.[750] After the auction, AdX would return any winning ad to DFP, which served code for the winning ad to the publisher's website. This entire process—from the arrival of the impression to the collection and processing of bids and the presentation of any winning ad—would be completed in the blink of an eye,[751] avoiding slow page load times for end users. Initial reactions from industry players to the launch of AdX 2.0 heralded it as a "watershed moment in the progression towards truly

---

[749] Email from ▓▓▓▓▓ to ▓▓▓▓▓, "Re: [Adsense-eng-wat] [Adsense-eng] Re: [Ads-engdirs] Doubleclick Ad Exchange 2.0 - Launched!" (Sept. 18, 2009), GOOG-AT-MDL-010836318, at -318 ("I am extremely thrilled to see AdX 2.0 launch. The team has done a great job not only getting to parity with AdX 1.0 but to also go beyond in some very important areas, e.g. API support, Real Time Bidding, and of course integration with Adsense and Adwords.").

[750] Maciej Zawadziński, "How Does Real-Time Bidding (RTB) Work?," Clearcode Blog (July 2, 2021), https://clearcode.cc/blog/real-time-bidding/, accessed Dec. 13, 2024 ("The supply-side platform analyzes the information about the user (location, web history, and, if available, age, gender and any other user information) and then sends this information to the ad exchange. Once the ad exchange receives this information, it connects to the demand-side platforms and relays information about the user. The ad exchange starts an auction, and the DSPs then bid on the impression based on what that particular impression is worth to them -determined by predefined parameters set by the advertisers.") (emphasis omitted).

[751] Google, "How Authorized Buyers Work With Google Ad Manager," Google Ad Manager Resources, https://admanager.google.com/home/resources/how_authorized_buyers_work_with_google/, accessed Dec. 11, 2024 ("This all happens within around 100 milliseconds.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

dynamic, demand-driven advertising transactions" and a "positive event for anyone in the exchange space."[752]

371. Real-time bidding improved publisher revenues and the matching of impressions to advertisers. Static bids could leave value on the table for both publishers and advertisers: an advertiser might be willing to pay much more for an impression about which it had accurate real-time information (for example, whether the user had recently visited its website) than what might be offered through static bids determined without real-time information. Real-time bidding also allowed a bidder to develop its own methods for determining bids, using any additional information the bidder might have about the impression that it was unable to incorporate into any static bidding system. For this reason, real-time bidding offered potential benefits to both publishers and advertisers.

372. To illustrate the potential benefits of real-time bidding over payments based on static bids, suppose that a publisher's best offer from an ad network, say Ad Network X, was a fixed $1 CPM, while the highest AdX bidder was willing to pay 70¢ three-quarters of the time and $1.50 otherwise. Under DA, the publisher would be incentivized to choose a floor price for AdX of at least $1.00, its best offer from a competing ad network. If the AdX bidder was not able to make real-time bids for the impression, its optimal static bid

---

[752] Email from S. Spencer to ███████████████ "FW: comments from industry players on AdX 2.0 on AdExchanger.com this evening" (Sept. 22, 2009), GOOG-AT-MDL-B-003180112, at -113 ("I think everyone is excited to see how [Google] can apply their expertise to the next generation of biddable display."), -113 ("The rollout of Google's updated DoubleClick Exchange offering - and the proliferation of other similar real time bidding platforms - marks a watershed moment in the progression towards truly dynamic, demand-driven advertising transactions."), -112 ("I think the launch of AdX 2.0 is an example of growing the pie as opposed to stealing share from a competitor because it's going to bring lots of new sellers (AdSense and DART for Publisher sites) and buyers (anyone who uses AdWords) into the market. As those sellers and buyers get comfortable with the exchange model I think they'll begin trading on the other platforms as well, so I think this is a positive event for anyone in the exchange space.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

would be equal to its average value of 90¢.[753] That bid would never win. If instead the AdX bidder can make real-time bids, it could win the impression when its value was $1.50, while the ad network would win the other three-quarters of the time. Whether the publisher, the AdX bidder, or both parties benefit from real-time bidding in this example depends on the floor price chosen by the publisher as well as any other competing AdX bidders' bids. With any floor price between $1.00 and $1.50, both the publisher and the AdX bidder benefit.[754]

373.    Some of the benefits of real-time bidding can accrue to non-Google demand sources. To show that, consider the following modification of the previous example. Suppose that Ad Network X continues to offer a fixed $1 CPM payment but the highest AdX bidder instead has a value of $1.50 three-quarters of the time and 70¢ otherwise, reversing the previous probabilities. In the absence of real-time bidding, its optimal static bid would be its average value of $1.30[755] for each impression, which would always win the auction over the static bid of $1 from Ad Network X. After real-time bidding is enabled, the AdX bidder would only win impressions when it had the higher value of $1.50 (three quarters of the time). In that case, Ad Network X—the network without real-time bidding—would benefit from the transition to real-time bidding, because it would win the impression in the one quarter of cases when the AdX bidder has a value of 70¢. The publisher can ensure that it also benefits from the transition to real-time bidding in this example by increasing its floor price in the AdX auction above $1.00 (e.g., to $1.50), extracting more

---

[753] Its average value is 3/4 times 70¢ plus 1/4 times $1.50, which equals 90¢.

[754] With a floor price of $1.00, the publisher would make no additional revenue while the AdX bidder earns surplus from the ads it wins when its value is $1.50. With a floor price of $1.50, publisher revenues increase, while the AdX bidder pays its value, leading to no additional profits.

[755] In this case, its average value is 3/4 times $1.50 plus 1/4 times 70¢, which equals $1.30.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

revenues from the AdX bidder when it has a high value for the impression and allocating to Ad Network X otherwise.

374. The preceding examples understate the benefits of DA to publishers since, for simplicity, I have assumed there is only one bidder on AdX. In more realistic examples with multiple AdX bidders, the benefits to publishers would be higher because the AdX winner's price would be the maximum of the floor price and the second-highest bid, which early studies suggest were significantly more than a "penny" above the floor price, on average.[756]

375. To realize the benefits of real-time bidding when many ad networks offered fixed-price payments or revenue sharing to publishers, ad servers needed to adapt their allocation methods to integrate both approaches—a process that was widely understood in the industry to be challenging. OpenX cofounder Jason Fairchild summarized the challenge of unifying live and static demand, saying, "If you think about it, they're two fundamentally different marketplaces. To combine them, you have to rethink even your auction mechanism […] Everything is radically different."[757] DA with AdX 2.0, launched

---

[756] "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -415 ("The results of our research demonstrated that the combined effects of auction pressure and Dynamic Allocation in DoubleClick Ad Exchange resulted in an average CPM lift of 136% compared with fixed, upfront, pre-negotiated sales of non-guaranteed inventory.").

[757] Josh Ong, "Adtech firm OpenX unveils an industry-changing fusion of real-time bidding and ad networks," The Next Web News (June 9, 2014), https://thenextweb.com/news/adtech-firm-openx-unveils-industry-changing-fusion-real-time-bidding-ad-networks, accessed Dec. 12, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

in 2009, was Google's answer to this challenge, and other competing exchanges introduced real-time bidding at around the same time.[758]

376. DA with real-time bidding on AdX was an important innovation offering large benefits for publishers. A Google experiment from 2010 found that DA with real-time bids offered publishers an average revenue increase on impressions sold on AdX of 188% compared to pre-negotiated sales of remnant impressions.[759] On average, the experiment found that DA increased *total* publisher revenues over all remnant impressions by 12.5%.[760] In 2013, Google estimated that DA increased publisher revenues by 86% on each impression it won over an alternative remnant demand source, leading to an overall increase in publisher revenues of 25%.[761]

377. Professor Cramton's claim that "[p]ublishers using DFP could not deactivate Dynamic Allocation without completely turning off AdX"[762] is inaccurate. On the contrary, a publisher that wished to restore its pre-DA configuration could call AdX in the waterfall

---

[758] *See* Mike Nolet, "RTB Part II: Supply supply supply!," Mike On Ads (Sept. 19, 2009), http://www.mikeonads.com/2009/09/19/rtb-part-ii-supply-supply-supply/, accessed Dec. 13, 2024 ("Over the past few months pretty much any aggregator of supply has launched, announced or started work on some sort of RTB capability. All major exchanges — Yahoo's Right Media, Microsoft's AdECN and Google's AdEx have RTB integrations in the works. Of the pub aggregators, AdMeld & PubMatic are live and Rubicon is actively working on a solution. As mentioned, FAN has been live with Myspace inventory for a while and there are a number of other parties, such as ContextWeb, AdBrite and OpenX, entering the space.").

[759] "DoubleClick Ad Exchange Impact" (Q4 2010), GOOG-DOJ-13247322, at -322 ("The results of our research showed that when DoubleClick Ad Exchange wins the auction, publishers generate *188% more revenue*, on average, net of revenue sharing and ad serving fees, compared with fixed upfront sales of non-guaranteed display advertising.").

[760] "DoubleClick Ad Exchange Impact" (Q4 2010), GOOG-DOJ-13247322, at -322 ("Across all pre-emptible inventory, including those instances when the Ad Exchange did not win the auction, *the revenue lift for publishers averaged 12.5%.*").

[761] "Ad Exchange Dynamic Allocation" (Sept. 5, 2013), GOOG-TEX-00054839, at -844 ("In these instances when the Ad Exchange won out over the alternatives, the revenue it achieved for that inventory was on average 86% higher than it would have been if the Ad Exchange not been used. This translates to an average overall revenue lift of 25%.").

[762] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 132.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

by "creating a static line item reflecting AdX and then have that compete in the waterfall."[763] Publishers, such as Genius, did just that.[764] Publishers were never required to disable calls to AdX completely: they could treat different impressions differently.[765]

### E. My Simulation Analysis Concludes that DA Improved Outcomes for Publishers and Advertisers

378. To investigate the effects of DA on publisher revenues and match rates, I simulated the effects of DA on the sale of over 25 billion impressions. I informed my simulations using real-world data collected from auctions on GAM in the month of January 2024.[766, 767] I compared the outcomes from DA to those obtained under a waterfall, which was the dominant model of remnant ad allocation before the introduction of DA.

379. Simulations complement the theoretical analysis of DA presented in previous sections in two ways. *First*, simulations allow me to *quantify* the possible effects of DA, so that I can

---

[763] EDVA Trial Testimony of N. Korula (Sept. 23, 2024) (AM), at 65:6-65:13 ("Q. [...] If a DFP publisher still wanted to use AdX but just didn't want to enable Dynamic Allocation, was that possible? A. Yes, it was possible. It wasn't like a button or something you could turn off to say turn off Dynamic Allocation, but a publisher could achieve that outcome by just creating a static line item reflecting AdX and then have that compete in the waterfall.").

[764] "Pull Request #309 Track passback impressions from AdX" (August 4, 2017), GENIUS-AT-000000100 ("While most of our AdX impressions come directly through dynamic allocation through DFP, we also use AdX tags directly as passbacks for a few waterfall units."); Email from A. Lee to J. Vignone, "Re: Truth Video in Q2 + Pre Roll Avails in general" (May 19, 2021), GENIUS-AT-000116169, at -169 ("If need be, we can turn off dynamic allocation (as we did in Q4 last year).").

[765] *See, e.g.*, Summer Livestream Series (Sept. 2019), GOOG-AT-MDL-B-004582905, at -162 ("You can still exclude specific ad units from dynamic allocation if desired"); "DFP and dynamic allocation" (Nov. 16, 2013), GOOG-DOJ-15416614, at -614 ("Dynamic allocation [...] allows Ad Exchange to compete in real time with line items booked in DFP. [...] Publishers configure settings in DFP and Ad Exchange in order to control which inventory is eligible to compete, and how."). Publishers could always effectively disable DA—while still using DFP to allocate ads to other ad networks—by setting a very high value CPM on the highest line item for DFP to beat (much higher than an AdX bidder would bid).

[766] *See* Google Ads Log-Level Dataset (January 2024), GOOG-AT-EDTX-DATA-000000000 to -000258388; Google Ad Manager Log-Level Dataset (January 2024), GOOG-AT-EDTX-DATA-000276098 to -001116097.

[767] The number of simulated impressions is calculated in code/parse_da_results.py of my supporting materials, with the number saved in code/logs/parse_da_results.txt. Details on each step of the simulation procedure can be found in code/README.md.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

assess not only *whether* DA improved publisher revenues and ad fill rates but also *how much* it could have improved those outcomes. *Second*, simulations allow me to judge the likely qualitative effects of DA on publisher revenues and ad fill rates as compared to a wider range of counterfactuals. For example, the theoretical effects of DA I discuss in Sections VIII.C and VIII.D above compare DA to a counterfactual waterfall in which AdX does not participate. Since DA was launched around the same time as AdX, this comparison is likely to have been relevant at that time.[768] In addition, to assess allegations by several Plaintiffs and Professor Cramton that DA depressed prices and publisher revenue,[769] I have used simulations to compare publisher revenues under DA to a different baseline in which all demand sources, including AdX, compete on the same basis using the waterfall.[770]

380. There are several challenges associated with simulating the waterfall and second-price auctions to draw conclusions about DA at the time it was first launched.

---

[768] The DFP ad server first included DA in July 2007, shortly after DoubleClick launched its ad exchange, AdX, in North America. *See* "2008 Strategic Planning DoubleClick Advertising Exchange" (July 26, 2008), GOOG-TEX-00458239, at -246-247.

[769] *See* Expert Report of P. Cramton (Oct. 4, 2024), at ¶¶ 148-149 ("Without Dynamic Allocation, if AdX participated in the waterfall like other third-party exchanges, publishers would rank AdX on the waterfall according to its historical prices. Assuming no changes to its take rate, AdX would suffer a loss in market share as it now would be accountable to the waterfall. The net effect for publishers would be a higher return on impressions."). *See also* Publisher Class First Amended Complaint, at ¶ 267 ("In the absence of Dynamic Allocation, some of these ad impressions would have transacted on rival Ad Exchanges with terms more favorable to publishers. Thus, Dynamic Allocation depressed prices by inhibiting competition."); Advertiser Class Complaint, at ¶ 201 ("With Dynamic Allocation, Google's DFP ad server terminated impartial exchange order routing and gave Google's AdX exchange a first right of refusal at depressed prices, allowing Google to maintain and profit from its monopoly in the ad exchange market."); Daily Mail Second Amended Complaint, at ¶ 43 ("Dynamic Allocation caused substantial financial harm to publishers, including Daily Mail."); Gannett Amended Complaint, at ¶ 56 ("Dynamic Allocation caused substantial financial harm to publishers, including Gannett."); Inform Third Amended Complaint, at ¶ 190 ("With Dynamic Allocation, Google's DFP ad server terminated impartial exchange order routing and gave Google's AdX exchange a first right of refusal at depressed prices.").

[770] As I discuss in Section XIII, an alternative baseline in which all demand sources compete in a unified auction was not technologically feasible at the time of DA's launch and required additional changes to AdX's auction design. For this reason, I focus on the waterfall. Simulations based on the Open Bidding auction design would have led to even higher publisher revenues, for the reasons discussed in Section XIII.

381.  The first challenge is to obtain data that is informative about advertisers' values at that time. To analyze the effect of introducing DA, it would be best to have bid or valuation data from 2007, but I am not aware of any such data. To assess the effects of DA, I instead estimated bidders' values for impressions using Google Ads data and GAM auction data from January 2024. The GAM dataset contains bids for around 60 billion US impressions.[771] My analysis used a subset of this data, with my selection criteria described in the Technical Notes in Section XIII.B.2.[772] Because this dataset is from 2024, my simulations could only compare the expected effect of introducing DA to a counterfactual scenario in which *contemporary* bidders instead participated in the waterfall. This may be different from what I would find if I could use data from the relevant earlier period of time. However, the heterogeneity among publishers and inventory units ensure that the data encompasses a wide variety of situations varying significantly in the relative bid strengths of various bidders and participation rates of the demand sources (including AdX).[773] Therefore, the dynamics that would have been at play in some scenarios in the relevant time period of the complaint are likely captured in at least some subset of the 2024 data.

---

[771] The number of impressions is calculated in code/misc_queries.py of my supporting materials, with the number saved in code/logs/misc_queries.txt.

[772] As I discuss in Section XV.B.2, I analyze the groups of auctions for which the number of observations is large enough to reliably conduct simulations. The resulting subset of data consists of auctions across 3,505 inventory units and 1,164 publishers, comprising approximately 17% of relevant US publisher real-time bidding revenue in the January 2024 GAM data sample. To evaluate outcomes across a range of publisher inventory units, a separate simulation was conducted for each group of auctions. These statistics are calculated in code/misc_queries.py and saved in code/logs/misc_queries.txt.

[773] For example, for several publishers I simulate, Google Ads makes up a relatively small portion of the revenue coming from the demand sources I simulate: 10% of publishers have no more than 30% of their revenue coming from Google Ads, and about 20% of publishers have no more than 45% coming from Google Ads. These results were computed using code/misc_queries.py in my supporting materials, with the numerical values logged in code/logs/misc_queries.txt.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

382. The second challenge is to estimate the values advertisers used to inform their decisions in the waterfall. For Google Ads bidders, this estimation was relatively straightforward because the Google Ads dataset contains estimates of bidder values (but the data still needed to be cleaned, filtered, and matched to other auction data, as I discuss in the Technical Notes in Section XIII.B.3). For non-Google Ads bidders, however, the problem was harder because the available data contains only their bids in AdX's first-price auctions, rather than the bidders' actual values. As I have emphasized elsewhere in this report, profit-maximizing bids in first-price auctions are always strictly *lower* than advertisers' values.

383. I obtained my estimates for non-Google Ads bidders' values using a state-of-the-art empirical economics technique called **bid inversion**.[774] Any method to estimate advertisers' values from the bid data must incorporate one or more assumptions about how bids and values are related. Bid inversion is based on the assumptions that (i) bidders choose the bids that maximize their expected surplus from each auction and (ii) their expectations about the distributions of others' bids correspond closely to the actual empirical distributions. Bids from Google's own demand sources, Google Ads and DV360, are generated in this way, and I would expect that other buying tools would most often choose bids in such a way.[775] An advantage of bid inversion over some other techniques used to estimate bidder values is that it is "non-parametric," which means that

---

[774] *See* Guerre, E., Perrigne, I., & Vuong, Q., "Optimal nonparametric estimation of first‑price auctions," Econometrica, Vol. 68 (2000), at pp. 525-574; Perrigne, I., & Vuong, Q., "Econometrics of auctions and nonlinear pricing," Annual Review of Economics, Vol. 11 (2019), at pp. 27-54.

[775] *See, e.g.*, Deposition of N. Jayaram (DOJ CID) (Sept. 17, 2021), at 369:18-369:21 ("A: We predict the distribution of highest other bid and then we use that information to optimize for advertiser surplus.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

it does not restrict the shape of the underlying distributions of bids or values.[776] Bid inversion requires data with a sufficient density of bids in the estimation neighborhood, and that requires that I exclude intervals near the very highest bids.[777,778] For this study, I do not make point estimates for the highest 2% of values and restrict publishers to set their floor prices so that each demand source fills an impression at least 2% of the time that it is called to bid. I also varied the 2% threshold to 1% and 5%, to check whether other reasonable thresholds, which could lead to different floor prices, might lead to significantly different effects, and I found my conclusions about the benefits of DA to be substantially the same. Additional technical details about my empirical approach are described in the Technical Notes in Section XIII.B.

384.    The third challenge is to specify which bidders would participate using AdX and which would use other exchanges, and how those participation decisions might have been affected by the emergence of DA. I have seen no data to guide this choice, so for simplicity, I assume that, at the time DA was introduced, the only demand on AdX came from Google Ads bidders. In reality, AdX aggregated bids from many demand sources besides Google Ads, so this assumption underestimates the revenue earned by publishers

---

[776] *See* Guerre, E., Perrigne, I., & Vuong, Q., "Optimal nonparametric estimation of first‑price auctions," Econometrica, Vol. 68 (2000), at pp. 525-574. The empirical data is a collection of discrete bids. Bid inversion assumes that the bidder fills the gaps between bids to create a smooth distribution of bids-to-beat before computing its optimal bid. I discuss this "bid smoothing" further in Section XV.B.4.b.

[777] This necessity is also highlighted by the cited academic studies, which do not apply bid inversion to extreme bids. *See* Guerre, E., Perrigne, I., & Vuong, Q., "Optimal nonparametric estimation of first‑price auctions," Econometrica, Vol. 68 (2000), at pp. 525-574. Perrigne, I., & Vuong, Q., "Econometrics of auctions and nonlinear pricing," Annual Review of Economics, Vol. 11 (2019), at pp. 27-54.

[778] Professor Hortaçsu's methodology also excludes extreme points from his value estimates. *See* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 967 ("I drop the top 5% of the bids (and the corresponding auctions in subsequent steps) from the analysis set, to avoid estimation results being driven by extreme values."). *See also* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 976 ("Drop auctions with top 5% value estimates: I drop auctions with the top 5% of the value estimates to avoid estimation results being driven by extreme values.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

from AdX in each simulation. I also assume that, to limit latency, a publisher's waterfall could use at most three participating non-Google demand sources.

385. While the first three challenges focus on valuation data, bidders, and their bids, a fourth challenge focuses on the behavior of publishers.[779] The revenues earned by publishers under DA and the waterfall depend also on publishers' floor prices and on the order in which demand sources are called. My simulations compare the waterfall's revenue to the revenue of a separately configured waterfall with DA turned on. To ensure that my estimates of DA's benefits are as conservative as possible, I identify the strongest baseline, which is when the initial waterfall is configured to maximize publisher revenue. Identifying those revenue-maximizing waterfall configurations requires finding the optimal ordering and optimal floor prices for the waterfall separately for each publisher, which is a challenging numerical computation. When I simulate DA, I assume (conservatively) that publishers did not optimize floor prices exactly and instead selected the floor AdX would face by experimenting with a small set of heuristics. I describe the numerical procedures I used for this in the Technical Notes in Section XIII.B.6.

386. I measure the effects of DA under two different counterfactuals:

    a. *Counterfactual 1:* In the first counterfactual, I compare calling AdX with DA to a baseline in which the waterfall would *only* call non-Google demand sources. In this counterfactual, enabling DA brings AdX as a new source of demand for publishers. In the waterfall, I include three inverted non-Google demand sources.

---

[779] Determining the optimal behavior of *bidders* in the simulated AdX auction is not challenging: because each auction is conducted in a *second-price* format, the optimal strategy of each bidder in each auction is to bid its true value.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

I compare outcomes under this baseline waterfall to those that would arise if AdX were called with DA and, if AdX did not win the impression, it would be allocated through a waterfall containing just the two best non-Google demand sources.[780] This is a conservative assumption because removing the third non-Google demand source from the waterfall reduces the benefits of DA to publishers. I have seen no evidence suggesting that, in practice, DA required publishers to displace existing demand from their waterfall, so this counterfactual likely understates the actual benefits of DA to publishers.

b. *Counterfactual 2:* In the second counterfactual, I compare calling AdX with DA to a baseline in which the waterfall includes both AdX (not using DA) and non-Google demand sources. In this baseline waterfall, AdX and three non-Google demand sources all participate using publisher-optimal posted prices. I compare this baseline to the outcome of calling AdX with DA, followed by a waterfall with the same three non-Google demand sources. This comparison isolates the effect of DA's introduction of auction-based pricing.

387. I find that DA provides substantial benefits for publishers whether or not they would otherwise have included AdX in their waterfall. DA increases total publisher revenue from remnant inventory by at least 12.0% compared to a counterfactual waterfall containing AdX. Gains in total publisher remnant revenue are even larger (at least 45.5%) when compared to the baseline in which AdX does not otherwise participate in the

---

[780] I reduce the number of non-Google demand sources in the DA simulation to ensure that any increase in publisher revenues caused by DA is not driven by an increase in the total number of demand sources that the publisher accesses. The counterfactual in which the publisher does not displace an existing demand source is covered in Section VIII.C: with an appropriate floor, DA is a *risk-free revenue improvement* for the publisher.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

waterfall. The match rate, which is the percentage of all impressions that are successfully sold by the publisher (to AdX or another demand source) also increased in both counterfactuals, from 30.4% to 63.4% in Counterfactual 1, and from 51.6% to 58.5% in Counterfactual 2. These results are summarized in Table 4 below.

**Table 4: Change in Publisher Outcomes on Remnant Inventory After Moving from the Optimal Waterfall to DA[781]**

| Counterfactual Condition | Change in Publisher Revenue By Using DA | Share of Impressions Matched |
|---|---|---|
| 1. No DA, and Publisher Does Not Call AdX in the Waterfall | **+45.5%** | **30.4% → 63.4%** |
| 2. No DA, and Publisher Calls AdX in the Waterfall | **+12.0%** | **51.6% → 58.5%** |

388.  Revenue effects naturally varied among publishers. For a complete picture of these effects, I plotted the revenues earned by each publisher with and without DA in Figure 12. In this figure, each point corresponds to a publisher. The horizontal axis is a publisher's simulated revenue under the Counterfactual 1 waterfall (in CPM) and the vertical axis is a publisher's revenue with DA enabled. The vast majority (84.1%) of the points in Figure 12 lie above the 45-degree line (plotted as a dashed line), indicating that most publishers in the simulations experienced an overall revenue increase from DA compared to the Counterfactual 1 baseline. For the majority of publishers, the gains are substantial, with the median publisher experiencing a 44.5% increase in remnant revenue.

---

[781] The simulation results are output through code/parse_da_results.py in my supporting materials, with the logs saved in code/logs/parse_da_results.txt. The figures are saved in code/figures/, and the relevant files are prefixed by da_results.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

The gains are also substantial for web properties affiliated with Daily Mail and Gannett; these points are shown in red in Figure 12.[782]

**Figure 12: Publisher revenue increases from DA under Counterfactual 1**



389. Different publishers also experienced differential effects of DA under the second counterfactual of my simulations. To describe the variations by publisher in Counterfactual 2, I plotted their revenues with and without DA in Figure 13. The interpretation of this figure is akin to that of Figure 12 above: the vast majority of the

---

[782] I identified web properties affiliated with Daily Mail and Gannett from a list in Professor Hortaçsu's Oct. 5th, 2024 backup in the file "Analyses/intermediate data/ADX_SUBMISSION_WEBPROPERTY_FILTERED.sql" and present the results for matching publishers in my simulations. In Counterfactual 1, revenue for www.dailymail.co.uk (associated with Daily Mail) increased by 48.8%; revenue for www.49erswebzone.com (associated with Gannett) increased by 53.2%. The simulation results are output through code/parse_da_results.py in my supporting materials, with the logs saved in code/logs/parse_da_results.txt.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

data points (78.8%) lie above the 45-degree line (plotted). This means that, in my simulations, most publishers enjoyed overall revenue increases from DA compared to the Counterfactual 2 baseline, with the median publisher experiencing a 10.2% increase in remnant revenue. Publisher domains affiliated with Daily Mail and Gannett also enjoyed revenue increases under this counterfactual; again, these points are shown in red.[783]

---

[783] In Counterfactual 2, revenue for www.dailymail.co.uk (associated with Daily Mail) increased by 13.3%; revenue for www.49erswebzone.com (associated with Gannett) increased by 15.6%. The simulation results are output through code/parse_da_results.py in my supporting materials, with the logs saved in code/logs/parse_da_results.txt.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Figure 13: Publisher revenue increases from DA under Counterfactual 2**



390. These findings contrast with Professor Cramton's claims that "[w]ithout Dynamic Allocation, if AdX participated in the waterfall like other third-party exchanges, [....] the net effect for publishers would be a higher return on impressions."[784]

391. I provide more details on my data, modeling assumptions, simulation methodology, and results in the Technical Notes in Section XIII.B.

---

[784] Expert Report of P. Cramton (Oct. 4, 2024), at ¶¶ 148-149 ("Without Dynamic Allocation, if AdX participated in the waterfall like other third-party exchanges, publishers would rank AdX on the waterfall according to its historical prices. Assuming no changes to its take rate, AdX would suffer a loss in market share as it now would be accountable to the waterfall. The net effect for publishers would be a higher return on impressions.").

### F. Responding to Plaintiffs' and Their Experts' Allegations

#### 1. Plaintiffs' and Their Experts' Allegations Lack Historical Context and Ignore the Technical Challenge of Designing Unified Auctions

392.  Plaintiffs' experts argue that AdX did not "compete on a level playing field" under DA because "AdX competed by submitting live bids" and "third-party exchanges were competing with their historical averages."[785] The Publisher Class compares DA to a counterfactual with "real time bidding by multiple Ad Exchanges at the same time,"[786] concluding that DA "depressed prices by inhibiting competition."[787] The Advertiser Class, Inform, Daily Mail, and Gannett all make similar comparisons.[788]

---

[785] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 139 ("Second, before the inception of header bidding, AdX bidders did not have to compete on a level playing field with third-party exchanges regarding winnability. AdX competed by submitting live bids for the impression in question. By contrast, third-party exchanges were competing with their historical averages. This means that even when a third-party exchange would have returned the highest real-time bid for an impression, that bid would never even be returned to the DFP ad server if an AdX bid exceeded that third-party exchange's historical average. [...] The direct benefit to AdX and AdX bidders would be an increase in the impressions won and the ability to pay less for those impressions (not accounting for take rates) than if they were to compete on even terms with third-party exchanges."), ¶ 134 ("Moreover, AdX did not have to exceed the bid from the highest ranked exchange; it only had to match or exceed the reserve price typically determined from the historic average CPM of the highest exchange.") (emphasis omitted). *See also* Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 40 ("Because Dynamic Allocation did not permit other ad exchanges to respond in real-time with a counter-bid, Google characterized AdX in the context of DFP as 'closed' with respect to competition from non-Google platforms."), ¶ 257 ("In addition, Google leveraged its dominant DFP ad server to disadvantage rival ad exchanges by precluding those rivals from participating in real-time bidding competition against AdX (dynamic and enhanced dynamic allocation)."), ¶ 304 ("Further, by limiting real-time bidding within Dynamic Allocation to only AdX, Google precluded rival ad exchanges from responding with higher real-time bids for that ad inventory, thereby depriving rival ad exchanges of market share and reducing the prices that publishers could have received had rival ad exchanges not been precluded."), ¶ 316 ("However, Google imposed a restraint on Dynamic Allocation auctions by excluding rival auction platforms from participating in this real-time bidding, which would have offered publishers lower rates for the ad auction service and higher net prices."), ¶ 317 ("Thus, when a waterfall process was used, AdX could win an auction under Dynamic Allocation even if AdX's real-time bid was lower than the real-time bids that rival ad auction platforms would have made."), ¶ 423 ("For example, Google's exclusion of rival ad auction platforms from Dynamic Allocation and EDA prevented advertisers associated with these rival platforms from submitting real-time bids for these ad impressions, thus reducing demand and bids for those impressions in those auctions.").

[786] Publisher Class First Amended Complaint, at ¶ 263.

[787] Publisher Class First Amended Complaint, at ¶ 267.

[788] *See* Advertiser Class Complaint, at ¶ 201 ("Google only needed only to beat the historical average bid price from competing exchanges (e.g., by $.01) rather than compete against the real-time bid for a given auction."). *See also* Daily Mail Second Amended Complaint, at ¶ 43 ("Because Daily Mail could call exchanges only one at a time, it could not compare offers between exchanges. That left Daily Mail to accept AdX's bid even though, had a subsequent exchange been permitted to bid, it would have offered more for the impression."); Gannett Amended

393.  These allegations fail to account for the historical context I've outlined in Sections VII.B to VII.D in several ways.

394.  *First,* DA was a significant improvement when evaluated in the context during which it was created. Contrary to Professor Das' characterization of the waterfall, which shows demand sources as capable of submitting live bids,[789] at the time of DA's launch, it was common for indirect sales channels to offer publishers *fixed* prices.[790] When a publisher's indirect demand sources offer static prices, DA *must* increase publisher revenue and possibly increase the win-rate of remnant demand sources (for an example, see Paragraph 372).[791] Compared to the *status quo ante*, DA allowed real-time competition among

---

Complaint, at ¶ 57 ("Because Gannett could call exchanges only one at a time, it could not compare offers between exchanges. That left Gannett to accept AdX's bid even though, had a subsequent exchange been permitted to bid, it would have offered more for the impression"); Inform Third Amended Complaint, at ¶ 193 ("In this new era, a publisher could put an impression up for sale and have exchanges compete at the same time for the impression by returning live, competitive bids.").

[789] Expert Report of A. Das (Oct. 4, 2024), at ¶ 107 ("To illustrate how the waterfall works, let's assume The Gotham Times configures DFP to call Demand Sources 1, 2, 3, and 4 in order of average historical CPMs, with a $2 floor price. DFP first calls Demand Source 1, but since its $1.90 bid is below the floor, it can't fill the ad slot. DFP then calls Demand Source 2, which bids $2, meeting the floor price, so its ad is served.").

[790] "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -413 ("Ad networks provide revenue to publishers willing to commit, in advance, a large number of impressions at a fixed CPM value."); Revised Expert Report of D. Sibley (Oct. 11, 2024), at ¶ 399 ("[P]ublishers typically sell their inventory to ad networks in bulk for a fixed price and then it is the ad network that commercializes the inventory to advertisers. These ad networks carry the risk of having inventory unsold or sold for a lower price. So, the way they intermediate between publishers and advertisers is crucially different from ad exchanges."). *See also* Professor Singer's citation of the Dynamic Allocation white paper. Expert Report of H. Singer (Oct. 4, 2024), at ¶ 47 ("In a 2010 white paper, Google explained that 'Ad networks provide revenue to publishers willing to commit, in advance, a large number of impressions at a fixed CPM value.'").

[791] Suppose the average historical revenue from the best demand source is given by $H$ and that the publisher sets a Value CPM, $V >= H$, for that demand. After DA, in the case where AdX clears $V$, the publisher must receive at least $H$. In the case where AdX does not clear $V$, the impression is allocated to the best alternative demand source, where the publisher receives at least $H$ in expectation. In both cases, the publisher earns at least as much as they were earning before.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

advertisers, and according to Google's analysis, it *more than doubled* publishers' revenues on non-guaranteed impressions won by AdX.[792]

395.  *Second,* in the period that followed the introduction of DA, incorporating real-time bids from additional indirect demand channels would still have required further *technological* progress, including agreements on applicable industry standards. Such processes would have delayed the transition to a new ad allocation process. When DA was introduced, ad exchanges were still nascent and the technology standard for real-time bidding had not yet been developed.[793] To bring together multiple nascent exchanges would have been an even greater challenge, for even if it were technologically possible (which Plaintiffs' experts have not shown), implementing any unified auction in 2007 would also have been a significant *organizational* challenge. It would require competing demand sources to agree on standards and coordinate the details of implementation.[794] Industry participants

---

[792] "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -415 ("[A] publisher that generates an average CPM of $0.65 for its non-guaranteed ad inventory might expect to see $1.53 by taking advantage of the Ad Exchange.").

[793] Email from S. Spencer to N. Mohan, et al., "Re: ad exchanges" (Apr. 1, 2009), GOOG-TEX-00292925, at -926 ("[V]ery importantly, [Rubicon and other yield managers] do not have Dynamic Allocation [...] Rubicon and none of the other yield managers run a real-time auction. They just make decisions based on historical data. As you know better than almost anyone, auctions are the most efficient way of allocation of impressions"); EDVA Trial Testimony of N. Mohan (Sep. 16, 2024) (AM), at 31:20-32:2 ("Q Okay. Let's move on to a different topic. Going back to the period shortly after the DoubleClick acquisition, there were some ad tech product offerings called yield managers; correct? A Correct. A few years after. Q Okay. And so some examples of yield managers included AdMeld, PubMatic and Rubicon; does that sound familiar? A Yes.").

[794] Efforts to develop a standard began in November 2010 with the launch of the OpenRTB Consortium, and support for header bidding was added to the OpenRTB standard in version 2.5, which was adopted in December 2016. *See* IAB Tech Lab, "OpenRTB" (July 27, 2020), https://iabtechlab.com/standards/openrtb/, accessed Dec. 13, 2024 ("The Real-Time Bidding (RTB) Project, formerly known as the OpenRTB Consortium, assembled by technology leaders from both the Supply and Demand sides in November 2010 to develop a new API specification for companies interested in an open protocol for the automated trading of digital media across a broader range of platforms, devices, and advertising solutions. […] Open RTB 2.5 […] Release highlights include: […] Header Bidding Support - allowing for a signal when a bid request is originated from an upstream decisioning implementation like header bidding").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

at that time were focused instead on "driving adoption" and having "sellers and buyers get comfortable with the exchange model."[795]

396.  To help drive that adoption, DA's backward-compatible design did not displace existing deals between publishers and remnant demand (including demand called by the waterfall). As I previously noted, publishers could also disable DA if they decided it was not to their benefit.[796]

397.  Indeed, redesigning Google's online display advertising platform to accept bids from other exchanges eventually presented challenges, including the need to integrate bids in different auction formats, to avoid self-competition for bidders bidding on multiple exchanges, and to avoid price-fishing tactics by publishers. Responding to these challenges necessitated further innovations, as I discuss in Section XIII. Professor Cramton's comparisons of DA to a hypothetical "independent auctioneer"[797] among exchanges overlook this context entirely.

---

[795] Email from S. Spencer to ████████████ "FW: comments from industry players on AdX 2.0 on AdExchanger.com this evening" (Sept. 22, 2009), GOOG-AT-MDL-B-003180112, at -114 ("Regarding concerns, the biggest challenge for any exchange is driving adoption. It's not always as simple as 'if you build it, they will come'. The exchange represents a rather significant shift in how we typically transact, so adjusting to that for both buyer & seller takes some time."), -112 ("I think the launch of AdX 2.0 is an example of growing the pie as opposed to stealing share from a competitor because it's going to bring lots of new sellers (AdSense and DART for Publisher sites) and buyers (anyone who uses AdWords) into the market. As those sellers and buyers get comfortable with the exchange model I think they'll begin trading on the other platforms as well, so I think this is a positive event for anyone in the exchange space.").

[796] *See, e.g.*, "Summer Livestream Series" (Sept. 2019), GOOG-AT-MDL-B-004582905, at -162 ("You can still exclude specific ad units from dynamic allocation if desired."); "DFP and dynamic allocation" (Nov. 16, 2013), GOOG-DOJ-15416614, at -614 ("Publishers configure settings in DFP and Ad Exchange in order to control which inventory is eligible to compete, and how."). *See also* "Pull Request #309 Track passback impressions from AdX" (Aug. 4, 2017), GENIUS-AT-000000100, at -100 ("While most of our AdX impressions come directly through dynamic allocation through DFP, we also use AdX tags directly as passbacks for a few waterfall units."); Email from A. Lee to J. Vignone, "Re: Truth Video in Q2 + Pre Roll Avails in general" (May 19, 2021), GENIUS-AT-000116169, at -169 ("If need be, we can turn off dynamic allocation (as we did in Q4 last year).").

[797] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 149 ("An independent auctioneer would have no incentives to give preferential rules/treatment to any exchange, as it should want to raise the most money for an impression.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

398. Professor Cramton claims that DA is "unstable," which he defines as occurring "when a losing bidder submits a bid exceeding the price paid by the winner."[798] First and foremost, those claims are unfounded: demand sources in the waterfall at the time did not "submit[] bid[s]," but accepted or rejected impression opportunities.[799] But, if we follow Professor Cramton in interpreting the word "bid" to mean the value CPM,[800] then there is no "instability." Under DA, AdX bidders won only when their value CPMs exceeded those of other line items. If, instead, Professor Cramton uses "bid" to mean the amount that some buyer *would* have been willing to pay more for an impression (if such a real-time bidding process was possible), then this "instability" predates DA and could not be alleviated until it was possible to compare real-time bids from different exchanges, which only occurred many years later.

399. *Third,* Professor Cramton claims "that even when a third-party exchange would have returned the highest real-time bid for an impression, that bid would never even be returned to the DFP ad server if an AdX bid exceeded that third-party exchange's

---

[798] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 27 ("In addition, Google's publisher ad server DFP initially relied on historical average prices rather than real-time bids from third-party exchanges. This means an AdX bid could win an impression when the highest bid was potentially from a third-party exchange because DFP only considered historic third-party bids. This could result in what auction scholars call unstable outcomes, which exist when a losing bidder submits a bid exceeding the price paid by the winner.").

[799] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 27 ("In addition, Google's publisher ad server DFP initially relied on historical average prices rather than real-time bids from third-party exchanges. This means an AdX bid could win an impression when the highest bid was potentially from a third-party exchange because DFP only considered historic third-party bids. This could result in what auction scholars call unstable outcomes, which exist when a losing bidder submits a bid exceeding the price paid by the winner.").

[800] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 117 ("Demand sources within the ad server may be associated with two distinct types of bids: static prices and real-time bids. Static prices are based on the average historical payout from a demand source, typically representing total revenue from the demand source over a given period, divided by the total number of impressions sent by the ad server to that line item during the same period, and expressed in CPM.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

historical average,"[801] and Professor Elhauge adds similar criticisms.[802] But, as I stated above, this kind of issue pre-dated DA: it was inherent in any sequential waterfall-like process that was prevalent at the time. Moreover, as industry media acknowledge, the design of DFP did not *prevent* publishers or other exchanges from using a technology like header bidding to integrate real-time bids.[803]

---

[801] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 139 (emphasis omitted).

[802] Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 40 ("Because Dynamic Allocation did not permit other ad exchanges to respond in real-time with a counter-bid, Google characterized AdX in the context of DFP as 'closed' with respect to competition from non-Google platforms."), ¶ 257 ("In addition, Google leveraged its dominant DFP ad server to disadvantage rival ad exchanges by precluding those rivals from participating in real-time bidding competition against AdX (dynamic and enhanced dynamic allocation)."), ¶ 304 ("Further, by limiting real-time bidding within Dynamic Allocation to only AdX, Google precluded rival ad exchanges from responding with higher real-time bids for that ad inventory, thereby depriving rival ad exchanges of market share and reducing the prices that publishers could have received had rival ad exchanges not been precluded."), ¶ 316 ("However, Google imposed a restraint on Dynamic Allocation auctions by excluding rival auction platforms from participating in this real-time bidding, which would have offered publishers lower rates for the ad auction service and higher net prices."), ¶ 317 ("Thus, when a waterfall process was used, AdX could win an auction under Dynamic Allocation even if AdX's real-time bid was lower than the real-time bids that rival ad auction platforms would have made."), 330 ("As with the exclusion of rival ad exchanges from real-time bidding in Dynamic Allocation prior to Open Bidding [...]"), ¶ 423 ("For example, Google's exclusion of rival ad auction platforms from Dynamic Allocation and EDA prevented advertisers associated with these rival platforms from submitting real-time bids for these ad impressions, thus reducing demand and bids for those impressions in those auctions.").

[803] *See* Tim Cross, "Who Invented What in Ad Tech? – Part Two," VideoWeek (June 26, 2018), https://videoweek.com/2018/06/26/who-invented-what-in-ad-tech-part-two/, accessed Dec. 12, 2024 ("Beeswax's Ari Paparo however backs up Brian O'Kelley's claim that he invented header bidding back in 2009, which AppNexus called 'pre-bid.' O'Kelley says the tech was a direct response to a DoubleClick for Publishers feature called 'Dynamic Allocation.' DFP, now owned by Google, allowed Google's own ad exchange AdX to compete against publishers' directly sold campaigns, while other exchanges were only able to compete for impressions not bought either through direct campaigns or AdX. Header bidding was developed as 'a hack around a feature gap in DFP,' says O'Kelley [...] Header bidding's use spanned beyond simply countering DFP though, as it emerged as a popular alternative to the 'waterfall' system which offers impressions to demand sources one after the other [...] Others however came upon the same idea through different route. Lee Cassingham said that his company Viewex came up with their own header bidding solution as part of a viewability product. Cassingham, having run various businesses within ad tech including an automated programmatic revenue/performance reporting tool, a viewability analytics tool, and an ad ops consultancy, looked for ways to create more value on a publishers' page, and created a 100 percent viewable ad format which appended itself to the bottom of a page. This then inspired a different solution to the viewability problem, where Viewex sought to build a capability for its own ad server whereby it could make viewability-based decisions on a web page before an ad loads. Whilst building the technology Cassingham realised he could capitalise on this pause by adding another step to call a third party to prospect for a higher bid and increase revenues [...] Cassingham doesn't claim to have invented header bidding (Viewex's product came out in 2013), but his story provides an interesting example of how the same sort of technology can evolve independently while being built for completely different purposes.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

400. *Fourth,* Professor Peña alleges that, "[t]o the best of my knowledge [...] [p]ublishers did not know that DFP was not acting in the way they were told it would [...] [s]imilarly, other ad exchanges were deceived because they did not know AdX was being prioritized over them."[804] These allegations are false. DA was not only disclosed, but advertised.[805]

401. *Finally,* I note that other exchanges competed by offering a similar sales mechanism. For example, the OpenX ad server offered the OpenX exchange the opportunity to win an impression when it cleared the value CPM of the most competitive non-guaranteed line

---

[804] Expert Report of P. Peña (Oct. 7, 2024), at pp. 20-21 ("Publishers did not know that DFP was not acting in the way they were told it would—i.e., simply following their orders. Similarly, other ad exchanges were deceived because they did not know AdX was being prioritized over them, the publisher set up its waterfall to prioritize other exchanges.").

[805] *See* "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -414 ("Dynamic allocation passes to the Ad Exchange the CPM value associated with the ad that the primary ad server has selected and is about to serve. The technology then uses this CPM value as the minimum CPM for the auction. If the Ad Exchange can provide the publisher with a net CPM value higher than they would have gotten from delivering their directly booked, non-guaranteed ad, the Ad Exchange will deliver an ad. If, however, the directly booked ad's CPM value is higher, it ignores any bids coming in from the Ad Exchange. As a result of this ad server integration, publishers essentially have a risk-free way to get the highest yield for every non-guaranteed impression they sell through their direct and indirect sales channels."). This white paper was publicly advertised. "DoubleClick Ad Exchange White Paper: The Value of Dynamic Allocation & Auction Pricing" (July 14, 2010), https://doubleclick-publishers.googleblog.com/2010/07/read-doubleclick-ad-exchange-white.html, accessed Dec. 13, 2024 ("In a new white paper, we take a step back to explain how publishers are managing yield across their pool of non-guaranteed inventory today, and what steps they can take to create efficiencies and boost overall revenue."). *See also,* "Maximizing advertising revenues for online publishers" (Feb. 5, 2010), GOOG-AT-MDL-B-003181628.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

item,[806] and ███████████████ also used "███████████████████" to determine competition by third-party line items.[807]

### 2. Plaintiffs' and Their Experts' Allegations About AdX's Floor Price And Publisher Use of Average Historical Prices Are Incorrect and Fail to Adequately Account for Incentives

402.  Publisher Plaintiffs, the Advertiser Class, and their experts repeatedly assert that AdX bidders' real time bids had to be compared to the average historical offers from other exchanges.[808] These assertions are incorrect.

---

[806] *See* OpenX, "Selling rules" (Dec. 12, 2016), https://web.archive.org/web/20170708051049/https://docs.openx.com/Content/publishers/userguide_inventory_realt imeselling.html, accessed Dec. 10, 2024 ("If enabled, you can designate inventory to sell through OpenX Ad Exchange using selling rules […] When OpenX receives an ad request for inventory defined by a selling rule, it proceeds with the selection process and selects an eligible line item for the ad space. If the selected line item is for non-guaranteed delivery, before serving the ad for the selected line item, OpenX will give buyers in the real-time bidding exchange the opportunity to bid on the ad space. If a bid is higher than the selected line item, and it matches or exceeds the floor price set for the selling rule, then OpenX serves the ad of the winning bidder, rather than the ad for the line item originally selected by the ad server.").

[807] *See* 

[808] *See* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 896 ("Specifically, EDA expanded on Google's Dynamic Allocation feature, which originally enabled AdX to submit real-time bids to compete with 'static' or historical average bids from third-party exchanges for DFP publishers' remnant inventory."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 821 ("Google internally recognized that EDA provided AdX an 'unfair advantage,' as AdX was the only exchange that could submit real-time bids into the DFP auction. The real-time bids from AdX competed with the historical average bids from non-Google exchanges."); Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 27 ("In addition, Google's publisher ad server DFP initially relied on historical average prices rather than real-time bids from third-party exchanges. This means an AdX bid could win an impression when the highest bid was potentially from a third-party exchange because DFP only considered historic third-party bids."); Expert Report of A. Das (Oct. 4, 2024), at ¶ 112 ("AdX then had the opportunity to capture the impression if the AdX real time auction could meet or beat the highest remnant line item's average historical CPM price."); Corrected Common Factual Background for Inform Expert Reports (Oct. 29, 2024), at ¶ 56 ("Thus, a rival exchange's bid would be estimated based on historic performance, whereas Google's AdX could decide in real time how much to bid on each individual impression after knowing the price it needed to beat."); Publisher Class First Amended Complaint, at ¶ 206 ("Google prevented other Ad Exchanges from even bidding on impressions to the extent Google's AdX could beat the historical average of the other Ad Exchanges and Ad Networks from which publishers configured Google's Ad Server to solicit bids."), ¶ 264 ("The estimated price of the other Ad Exchanges and Ad Networks was based on the average historical bids placed on rival sources of advertiser demand."), ¶ 266 ("With Dynamic Allocation, Google's AdX got to run an auction that only had to beat rival Ad Exchanges' historical average bid."), ¶ 302 ("[R]eal time bids by Ad Exchanges tend to exceed the historical averages that Google was using through its first look advantage to disadvantage rival Ad Exchanges."); Advertiser Class Complaint, at ¶ 201

403. Publishers could enter *any* value —not just the exchange's historical average price—as a value CPM. For example, a publisher might configure DFP to assign a value CPM of $2 to a demand source, even if its average payment from the demand source was historically $1. If it did so, then it would not be the historical average price that AdX bidders had to beat. Furthermore, as I explain in Paragraph 367, floor prices for AdX's second-price auction could be set separately from line items' value CPMs, so even if these value CPMs were set to be historical averages, the price that AdX bidders needed to clear may have been different.

404. This possibility is not just theoretical: publishers had an *incentive* to set AdX's floor price *higher* than the historical average revenues of demand sources, and there is evidence that many publishers did just that.[809] Since ad revenue is a significant income source for

---

("Dynamic Allocation was a setting available to publishers that allowed AdX to view historical bid data from rival exchanges. With Dynamic Allocation enabled, Google only needed only to beat the historical average bid price from competing exchanges."); Daily Mail Second Amended Complaint, at ¶ 42 ("First, publishers estimated an historical average CPM (a "static bid") for each non-Google exchange it used. [...] AdX would win the impression if its real-time bid was higher (even one penny higher) than the highest static bid."), ¶ 43 ("A static bid is just a publisher's estimate of an exchange's historical, average bidding price."); Gannett Amended Complaint, at ¶ 56 ("Dynamic Allocation required publishers to estimate an historical average CPM [...] for each non-Google exchange it used."), ¶ 57 ("A static bid is just a publisher's estimate of an exchange's historical, average bidding price."); Inform Third Amended Complaint, at ¶ 194 ("Google's Dynamic Allocation program instead had DFP permit AdX to peek at the average historical bids from rival exchanges and then transact the publisher's impression if AdX could return a live bid for just a penny more than the highest of these historical bids."), ¶ 196 ("Google used DFP to allow AdX to swoop in and buy inventory at just a penny more than the depressed average historical bids returned by non-Google exchanges to DFP.").

[809] *See* Email from H. Thomas to M. Wheatland, et al., "RE: App impression changes recap" (Oct. 23, 2017), DM_GOOG_0146977, at -980 ("We've now multiplied the Amazon cpm in DFP by 3 or 4x to counter act google - seems to have helped us."); ████████████████████████████████████████████████████████████████████████████████████████████████████████████ "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -506 ("[Some publishers] inflate the value CPM of remnant line items [...] publishers used to do this even before HB was popular."); ████████████████████████████████████████████████████████████████████████████████ "Changes to Ad Manager auction" (Jan. 10, 2019), GOOG-DOJ-10924270 at -273 (showing that in 42% of queries won by header bidding, the AdX floor exceeded the header bidding line item price); "First-price bidding" (Aug. 12, 2019), GOOG-DOJ-11406673, at -677 ("How boost works[:] The publisher inflates the HB bid before sending it as a floor to AdX[.] This is done to increase Adwords cost and to provide a better comparison between Adwords and header bidder bids[.]"); Email from R. Srinivasan to B. Bender, et al., "Unified Auction Changes

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

publishers, they can be expected to pay attention to their revenue streams and employ sensible pricing strategies, guided either by analysis or by experimentation.

405. Daily Mail, for example, describes how it "found that setting higher prices [sic] floors for AdX caused AdX to return higher bids and ultimately led to higher revenue," and that "Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding."[810] While this particular example is in the context of header bidding, the fact that it is *always* optimal for a seller to set an auction's floor price higher than the price it expects to receive outside the auction is also true in the context of static bids, including the time period prior to header bidding.[811] The example also illustrates that this incentive could be (and was) discovered by publishers. Setting a floor price in that way increases the publisher's average revenues by forcing AdX bidders to pay more on average to win an impression. Thus, contrary to Professor Cramton's claims, DA does not "only increase[] publisher revenue [...] if the second-highest bid in AdX exceeds the winning CPM price point in the waterfall."[812] When floor prices are set in the way just described,

---

(Sellside) Executive Update - Aug 12, 2019" (Aug. 13, 2019), GOOG-DOJ-09713317, at -319 ("Today, these [publisher-]inflated CPMs are used to provide price pressure for AdX [...] In practice, [...] many publishers [...] apply a boost to Header Bidding bids[.]"); "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -382 ("Plan to educate pubs around strictly negative revenue consequences of HB price inflation"). I interpret this document, authored in the context of the "Migration to 1P auction" (-358), to mean that inflating header bids was common enough that Google would have to "educate pubs" it was no longer necessary; "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -777 ("Last look [...] incentivizes pubs to inflate ('boost') the floor sent to AdX"); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Some publishers set Value CPMs higher than their estimates of what CPM a line item would likely generate to increase competitive pressure in the AdX auction or for other reasons."); Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding.").

[810] Daily Mail Second Amended Complaint, at ¶ 198.

[811] *See, e.g.*, Krishna, V., *Auction theory* (2nd ed.), Academic Press (2010), at p. 23 ("[A] revenue maximizing seller should always set a reserve price that exceeds his or her value."). For the purpose of the AdX auction run under DA, the publisher's "value" for the impression is its expected revenue from sale of the impression outside of AdX.

[812] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 144 ("Dynamic Allocation only increases publisher revenue [...] if the second-highest bid in AdX exceeds the winning CPM price point in the waterfall. If AdX only pays the CPM

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

*all* impressions sold on AdX result in revenue improvements over publishers' outside options.

406.  The basic pattern of optimal floor pricing in a sequential mechanism like Dynamic Allocation is not hard for a businessperson to understand. Just as the manager of a clothing store finds it best to set higher prices early in the season and lower prices later in the season to reduce the risk of unsold inventory, a publisher selling impressions finds it best to set a higher price for the first buyer in the waterfall and lower prices for later buyers for the same reason.

407.  Even if a publisher sets suboptimal floor prices, the gains from Dynamic Allocation can still be large because of increased competition between bidders in AdX's second-price auction. In my simulations, when publishers set a floor price *equal* to the historical expected revenue of the waterfall instead of setting them at the optimal, higher level, revenues still increased: by 43.2% in the first and 9.4% in the second counterfactuals.[813]

408.  Publisher Plaintiffs, the Advertiser Class, and their experts rely on the incorrect assumption that AdX bidders' bids were compared to historical average prices for at least four of their claims: (1) AdX's purported "right-of-first refusal,"[814] (2) AdX's purported

---

floor price, Dynamic Allocation moves the impression from a third-party exchange to AdX at the same price to the publisher. Any other efficiency gains in this example are captured entirely by Google and the advertiser.").

[813] The calculation of the revenue comparison can be found in code/parse_da_results.py of my supporting materials, with the logs saved in code/logs/parse_da_results.txt. In both counterfactuals, when floor prices were set in this manner, the total publisher revenue under DA reduced relative to the better-optimized floor prices described in Section XV.B.5.

[814] *See* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 372 ("I have set out how both theoretical and empirical literature predict that a setting with one bidder having a right of first refusal (i.e., AdX having Last Look) and multiple third-party bidders who don't have this right (third-party exchanges without Last Look) decreased the number of third-party bidders compared to a competitive counterfactual."); *see also* Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 135 ("Dynamic Allocation is a right of first refusal or 'first look' because it allows Google to capture impressions through AdX while avoiding competition from live bids submitted via third-party exchanges."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶¶ 274-275 ("I have considered that, in theory, the

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

"first-in-line privilege,"[815] (3) AdX's supposed advantage from "peek[ing]"[816] at value

CPMs, and (4) AdX's alleged payments of a "penny more"[817] than historical prices.

---

header bidders might have placed different bids in a but-for world without Last Look. In Section VII of his report, Professor Li notes that Last Look is equivalent to a right of first refusal ('ROFR') [...] As such, there is no general way to predict how ROFR will change the bidding behavior of the participants who do not benefit from ROFR. In order to consider how header bidders might change their bids in response to the Last Look advantage, I consider empirical papers that have studied the behavior of actual auction participants with and without a ROFR."); Corrected Common Factual Background for Inform Expert Reports (Oct. 29, 2024), at ¶ 55 ("Through Dynamic Allocation, Google prioritized itself over other bidders with a right of first refusal to bid on any programmatic or remnant inventory offered by a publisher that had AdX configured as part of its waterfall, even when third-party exchanges were configured in the waterfall."); Advertiser Class Complaint, at ¶ 7 ("Google implemented a program called Dynamic Allocation, which gave AdX a right of first refusal on auction transactions."); Inform Third Amended Complaint, at ¶ 190 ("With Dynamic Allocation, Google's DFP ad server [...] gave Google's AdX exchange a first right of refusal.").

[815] Publisher Class First Amended Complaint, at ¶ 21 ("Google did this by giving its Ad Exchange both a first-in-line privilege and a last look, thereby maintaining and enhancing Google's monopoly power in the Ad Exchange market.").

[816] Inform Third Amended Complaint, at ¶ 194 ("Google's Dynamic Allocation program instead had DFP permit AdX to peek at the average historical bids from rival exchanges and then transact the publisher's impression if AdX could return a live bid for just a penny more than the highest of these historical bids."), ¶ 196 ("DFP also gave AdX the information it needed to beat out competing exchanges without paying the higher prices it otherwise would have paid because of its information advantages."). *See also* Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 121 ("Dynamic Allocation effectively served as a right of first refusal (or 'first look') and mechanism to peek at bids just before the auction cleared (or 'last look') for AdX, translating into a significant advantage for Google."); Publisher Class First Amended Complaint, at ¶ 266 ("AdX could win high-value inventory by incrementally beating the historical average bid (information AdX had only because of DFP's position as the publisher Ad Server[)]"); Daily Mail Second Amended Complaint, at ¶ 44 ("How DFP operated in practice, with Dynamic Allocation, directly contradicted the representations Google had made to induce publishers to use its ad server. For example, Google agreed with Daily Mail that DFP would not use Daily Mail's data 'for purposes of informing bids' placed by Google through its exchange."); Gannett Amended Complaint, at ¶ 58 ("How DFP operated in practice, with Dynamic Allocation, directly contradicted the representations Google had made to induce publishers to use its ad server. For example, Google agreed with Gannett that DFP would not use Gannett's data 'for purposes of informing bids' placed by Google through its exchange.").

[817] Inform Third Amended Complaint, at ¶ 196 ("With Dynamic Allocation, Google used DFP to allow AdX to swoop in and buy inventory at just a penny more than the depressed average historical bids returned by non-Google exchanges to DFP."). *See also* Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 21 ("This last call was implemented in Google's DFP ad server and afforded Google the opportunity to ultimately 'outbid,' even if only by a penny, virtually any other competing bid–an advantage that became particularly valuable with the rise of header bidding cutting into Google's auction control beginning around 2014."); Corrected Common Factual Background for Inform Expert Reports (Oct. 29, 2024), at ¶ 56 ("Through Dynamic Allocation, DFP gave AdX the highest price competing in the waterfall, which then became the AdX auction floor price. Google's AdX buyers could then compete with real-time pricing by bidding one penny more and winning the auction."); Daily Mail Second Amended Complaint, at ¶ 42 ("First, publishers estimated an historical average CPM (a 'static bid') for each non-Google exchange it used. [...] AdX would win the impression if its real-time bid was higher (even one penny higher) than the highest static bid."); Gannett Amended Complaint, at ¶ 57 ("As a result, competing against static bids only, AdX could buy Gannett's most valuable inventory at one penny above average prices.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

409. *First,* the Advertiser Class, Inform, and their experts allege that DA afforded AdX a "right of first refusal," in which "Google only needed only to beat the historical average bid price from competing exchanges."[818] Professor Li adds that a right of first refusal "deters bidders' entry and reduces seller revenues,"[819] citing four papers from the economics literature.[820]

410. However, the claim that DA created a "right of first refusal" for AdX bidders is wrong. As defined in the sources Professor Li cites,[821] a "right of first refusal" grants a party the

---

[818] Advertiser Class Complaint, at ¶ 201 ("Dynamic Allocation was a setting available to publishers that allowed AdX to view historical bid data from rival exchanges. With Dynamic Allocation enabled, Google only needed only to beat the historical average bid price from competing exchanges. With Dynamic Allocation, Google's DFP ad server terminated impartial exchange order routing and gave Google's AdX exchange a first right of refusal at depressed prices, allowing Google to maintain and profit from its monopoly in the ad exchange market."). *See also* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 372 ("I have set out how both theoretical and empirical literature predict that a setting with one bidder having a right of first refusal (i.e., AdX having Last Look) and multiple third-party bidders who don't have this right (third-party exchanges without Last Look) decreased the number of third-party bidders compared to a competitive counterfactual."); Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 135 ("Dynamic Allocation is a right of first refusal or 'first look' because it allows Google to capture impressions through AdX while avoiding competition from live bids submitted via third-party exchanges."); Expert Report of A. Das (Oct. 4, 2024), at ¶ 111 ("AdX had two distinct advantages over third-party exchanges in the waterfall: (1) a right of first refusal over third-party demand sources ('first look')"); Corrected Common Factual Background for Inform Expert Reports (Oct. 29, 2024), at ¶ 55 ("Through Dynamic Allocation, Google prioritized itself over other bidders with a right of first refusal to bid on any programmatic or remnant inventory offered by a publisher that had AdX configured as part of its waterfall, even when third-party exchanges were configured in the waterfall."); Inform Third Amended Complaint, at ¶ 190 ("With Dynamic Allocation, Google's DFP ad server [...] gave Google's AdX exchange a first right of refusal.").

[819] Revised Expert Report of S. Li (Oct. 11, 2024), at Section VII.B.2.a.

[820] While DA does not constitute a right of first refusal, I note that Professor Hortaçsu's conclusion from his meta-analysis of right of first refusal literature differs from Professor Li's. Professor Hortaçsu writes that "the empirical literature has found negative, or zero or very small positive effects of a ROFR [(right of first refusal)] on the bidding of other participants." Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 276.

[821] Bikhchandani, Sushil, Steven A. Lippman, and Reade Ryan, "On the Right-of-first-refusal," The BE Journal of Theoretical Economics, Vol. 5 (2005), at p. 1 ("When the seller of an asset grants a right-of-first-refusal to a buyer, this special buyer has the opportunity to purchase the asset at the best price the seller can obtain from the other potential buyers"); Chiang, Yao-Min, and Jarjisu Sa-Aadu, "Right of first refusal (ROFR) effects in auctions with reserve price: Empirical evidence from Taiwanese government land auctions" (2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2409599, accessed Dec. 11, 2024, at p. 1 ("The right-of-first-refusal (ROFR) granted by the seller to a buyer that allows the favored buyer to purchase the asset at the highest price the seller can obtain from other competing buyers is common in auctions and other economic transactions."); Isenhardt, Lars, Stefan Seifert, and Silke Hüttel, "Tenant favoritism and right of first refusals in farmland auctions: competition and price effects," Land Economics, Vol. 99 (2023), at p 302 ("Rights of first refusals (RFRs) granted to tenants in land privatization auctions enable them to purchase their leased land by accepting the highest bid"); Leandro Arozamena and Federico Weinschelbaum, "The effect of corruption on bidding behavior in first-price auctions" (Feb. 14, 2005), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=621723,

---

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

right to purchase an item at the best price obtained from other potential buyers.[822] This does *not* describe how DA operates. With DA, AdX runs an auction among its bidders with a publisher-set floor price, and an impression is sold to an AdX bidder if any bid exceeds the floor. Economically, this differs from a right-of-first-refusal in two important respects. First, DA did not grant AdX a right to purchase anything; AdX runs an auction among its buyers but is not itself a purchaser. Second, the AdX auction clearing price exceeds the floor price whenever at least two bidders bid more than the floor, leading to much higher prices on average than the publisher's best alternative.[823] DA did not grant AdX buyers the right to purchase an impression at the best price obtained from other demand sources, but instead gave them the right to bid in an auction. Third, the floor price set by the publisher for the AdX auction can be higher than the best price obtained from other potential buyers. DA is not, as Professor Cramton frames it, "a tie that AdX always won,"[824] nor could AdX buyers "consistently win the impression by bidding the average historic CPM price."[825]

---

accessed Dec. 11, 2024, at p. 5 ("If it is common knowledge that there is a favored bidder and every party to the auction knows who that favored bidder is, that bidder publicly enjoys the right to match the highest bid that any of her rivals may submit. This is exactly the arrangement known as right of first refusal, usually employed, for example, by firms to favor preferred suppliers with whom they have long-term relationships, in the purchase of a partnership by one of the current partners, and in professional sports.").

[822] *See, e.g.*, Kahan, M., Leshem, S., & Sundaram, R. K., "First-Purchase Rights: Rights of First Refusal and Rights of First Offer," American Law and Economics Review, Vol. 14 (2022), at pp. 331–371; Choi, A. H., "A Rent Extraction Theory of Right of First Refusal," The Journal of Industrial Economics, Vol. 57 (2009), at pp. 252–264.

[823] *See* "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -415 ("The results of our research demonstrated that the combined effects of auction pressure and Dynamic Allocation in DoubleClick Ad Exchange resulted in an average CPM lift of 136% compared with fixed, upfront, pre-negotiated sales of non-guaranteed inventory.")

[824] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 150.

[825] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 139.

411.  Professor Cramton describes a related scenario in which the fifth-ranked bidder in the waterfall is willing to bid the most for an impression. He concludes that "assuming take rates are equal, the highest bidder from demand source #5 [...] would have a better chance of winning the impression by bidding on AdX rather than bidding on a third-party exchange."[826] However, when the publisher sets a higher floor price for AdX bidders, a bidder might have a higher chance of winning through the third-party exchange than through AdX.

412.  *Second,* the Publisher Class incorrectly argues that DA afforded AdX a "first-in-line privilege" that provided an advantage to AdX bidders "because advertisers knew that if they submitted the exact same bid on AdX as compared with a competing Ad Exchange, the bid on AdX was more likely to win due to AdX's priority in the waterfall."[827] This argument again fails to account for publishers' incentive and ability to raise AdX's floor price. Consider an impression with a floor for AdX of $2 and a floor for a competing exchange of $1. A buyer bidding between $1 and $2 can *only* win by submitting their bid on the competing exchange.

413.  *Third*, descriptions from Publisher Plaintiffs, the Advertiser Class, and their experts incorrectly suggest that AdX adjusted its bids in response to observing the floor price. Professor Cramton claims that "AdX had better information to tailor its bids"[828] or that it

---

[826] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 145.

[827] Publisher Class First Amended Complaint, at ¶ 265.

[828] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 138. *See also* Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 141 ("[W]ithout the information advantage from AdX, bidders using those exchanges might not know when it would be advantageous for them to bid high because expected competition for an impression might be intense or to bid less aggressively because the competition had, historically, been.").

could use "bid sniping"[829] to capture impressions. There are many similar claims, including Inform's allegations that "Dynamic Allocation [...] permit[ted] AdX to peek at the average historical bids from rival exchanges."[830] However, AdX's many ad buyers —not AdX itself—are the entities that do the bidding. Furthermore, at the time that DA was adopted, AdX used a second-price auction, which is a bidder-truthful auction, as I have explained in Section III.C.3.a. That is, a bidder would be incentivized to bid its own value *regardless* of the floor price. In that case, the ability to observe the floor price does not benefit AdX bidders.[831] Indeed, neither DV360 nor Google Ads ever adjusted their bids in response to the auction's floor price in the AdX second-price auction.[832]

414. *Fourth,* Daily Mail, Gannett, Inform, and their experts misrepresent the operation of DA, suggesting that AdX purchased inventory at only a penny more than historical prices. For

---

[829] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 27 ("Armed with these information advantages, Google allowed AdX to engage in bid sniping, winning an auction before it started or winning an auction at the last millisecond over a competitor.").

[830] Inform Third Amended Complaint, at ¶ 194 ("Google's Dynamic Allocation program instead had DFP permit AdX to peek at the average historical bids from rival exchanges and then transact the publisher's impression if AdX could return a live bid for just a penny more than the highest of these historical bids."), ¶ 196 ("DFP also gave AdX the information it needed to beat out competing exchanges without paying the higher prices it otherwise would have paid because of its information advantages."). *See also* Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 121 ("Dynamic Allocation effectively served as a right of first refusal (or 'first look') and mechanism to peek at bids just before the auction cleared (or 'last look') for AdX, translating into a significant advantage for Google."); Publisher Class First Amended Complaint, at ¶ 266 ("AdX could win high-value inventory by incrementally beating the historical average bid (information AdX had only because of DFP's position as the publisher Ad Server)]."); Daily Mail Second Amended Complaint, at ¶ 44 ("How DFP operated in practice, with Dynamic Allocation, directly contradicted the representations Google had made to induce publishers to use its ad server. For example, Google agreed with Daily Mail that DFP would not use Daily Mail's data 'for purposes of informing bids' placed by Google through its exchange."); Gannett Amended Complaint, at ¶ 58 ("How DFP operated in practice, with Dynamic Allocation, directly contradicted the representations Google had made to induce publishers to use its ad server. For example, Google agreed with Gannett that DFP would not use Gannett's data 'for purposes of informing bids' placed by Google through its exchange.").

[831] The descriptions of Google's buy-side DRS, Bernanke and Poirot programs I have seen (and cited elsewhere in this document) suggest that Google's bidding tools did not adapt its bids to floor prices on AdX, as predicted by this theoretical result.

[832] *See* "Declaration of N. Jayaram" (May 1, 2024), GOOG-AT-MDL-C-000017969, at ¶ 3 ("Before Google Ad Manager transitioned to a Unified First-Price Auction in 2019, Google Ads and DV360 never used a floor price in an auction for an ad impression to adjust the bid values that they would submit for that same ad impression.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

instance, Inform alleges that AdX could "swoop in and buy inventory at just a penny more than the depressed average historical bids returned by non-Google exchanges to DFP."[833] This claim makes several errors. First, AdX does not purchase inventory as a single entity, but runs an auction among many potential purchasers (i.e. AdX buyers). Second, the allegation conflates the floor price, which is the minimum amount that an AdX bidder has to pay to win an impression, with the auction clearing price, which can be higher.[834] Because AdX used a second-price auction, when two or more of its bidders cleared the floor price, the winning bidder would pay the second-highest bid, not a "penny more" than the floor. Third, in a second-price auction, a bidder is incentivized to bid its value and not just a "penny more." A bidder that reduced its bid below its value would only increase the probability of losing to another bidder. Even if the bidder won after reducing its bid, its payment would remain the same. Fourth, as noted above, publishers were incentivized to set floor prices that were strictly higher than the average historical price, so an auction that an AdX bidder won at the floor would result in a payment that was over a "penny more" than the historical price.

---

[833] Inform Third Amended Complaint, at ¶ 196 ("With Dynamic Allocation, Google used DFP to allow AdX to swoop in and buy inventory at just a penny more than the depressed average historical bids returned by non-Google exchanges to DFP."). *See also* Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 21 ("This last call was implemented in Google's DFP ad server and afforded Google the opportunity to ultimately 'outbid,' even if only by a penny, virtually any other competing bid–an advantage that became particularly valuable with the rise of header bidding cutting into Google's auction control beginning around 2014."); Corrected Common Factual Background for Inform Expert Reports (Oct. 29, 2024), at ¶ 56 ("Through Dynamic Allocation, DFP gave AdX the highest price competing in the waterfall, which then became the AdX auction floor price. Google's AdX buyers could then compete with real-time pricing by bidding one penny more and winning the auction."); Daily Mail Second Amended Complaint, at ¶ 42 ("First, publishers estimated an historical average CPM (a 'static bid') for each non-Google exchange it used. [...] AdX would win the impression if its real-time bid was higher (even one penny higher) than the highest static bid."); Gannett Amended Complaint, at ¶ 57 ("As a result, competing against static bids only, AdX could buy Gannett's most valuable inventory at one penny above average prices.").

[834] *See* "Profiting from Non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers" (2010), GOOG-DOJ-06818412, at -415 ("The results of our research demonstrated that the combined effects of auction pressure and Dynamic Allocation in DoubleClick Ad Exchange resulted in an average CPM lift of 136% compared with fixed, upfront, pre-negotiated sales of non-guaranteed inventory.")

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 3. Plaintiffs' and Their Experts' Claims About Harms to Other Exchanges Are Overstated

415.  The Advertiser Class alleges that as a result of DA, "[c]ompeting exchanges were left with lower-quality ad impressions passed on by AdX and deprived of liquidity."[835] Professor Cramton similarly claims that "third-party exchanges did not get to bid on higher quality inventory unless AdX passed."[836] These claims and other similar ones are wrong for several reasons.

416.  *First,* when AdX bidders "pass" on an impression, it does not suggest that the impression has a lesser value to other ad buyers. As Professor Cramton himself remarks, "[n]ot all buyers would have the same ex-post value for an impression."[837] In fact, in the auction model frequently employed by Plaintiffs' experts, each advertiser's value for an impression is *statistically independent* of the values of other advertisers, so, as Professor Li writes, "[a]n advertiser looking to sell car seats and an advertiser looking to sell video games care about different features of the impression."[838]

---

[835] Advertiser Class Complaint, at ¶ 207.

[836] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 139 ("Furthermore, AdX's advantage meant that the historical averages of bids from third-party exchanges were likely suppressed, since the third-party exchanges did not get to bid on higher quality inventory unless AdX passed on it.").

[837] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 293 ("Web display advertising auctions would not be subject to the winner's curse. Not all buyers would have the same ex-post value for an impression because the person creating the impression through their internet browsing would not respond to different ads with the same propensity.").

[838] *See* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1360 ("In the context of exchange auctions, the private values assumption is more plausible than the common values assumption. Bidders in exchange auctions are anonymous to each other at the point of bidding, and are drawn from a diverse set of industries. An advertiser looking to sell car seats and an advertiser looking to sell video games care about different features of the impression. Thus, each bidder is unlikely to make strong inferences about their own value for the impression, based on other bidders' estimates."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 946 ("This type of model is called an 'independent private values' model, since it is assumed that (a) the bidders' values (even of the same type) are potentially different from each other (i.e., private), and (b) one bidder's value does not contain any information about another bidder's value for the auctioned item (i.e., independent). This is one of the most common types of models used in auction theory[]").

417.  *Second,* Daily Mail and Gannett argue that real-time bids "respond to the value of the particular impression and thus are higher than static bids for valuable inventory,"[839] and therefore "AdX could buy box seats at the ballpark for the price of the grandstands."[840] This argument has several flaws (beyond the mistaken premise that AdX is the one buying inventory).

  a.  *First*, just as a stadium charges higher prices for box seats than grandstand seats, a publisher can set higher floor prices for ad slots at the top of the financial section as compared to ads at the bottom of the weather section[841] and needs no "live information" to do so. Indeed, if Daily Mail and Gannett found that AdX bidders systematically paid less for impressions than they suspected the AdX (or other) bidders would be willing to pay, then they could increase their floor prices to extract additional revenues.

  b.  *Second*, even if publishers did not adjust their floor prices upwards, AdX ran a second price auction, so as long as at least two AdX bidders valued a "high

---

[839] Daily Mail Second Amended Complaint, at ¶ 43.

[840] Daily Mail Second Amended Complaint, at ¶ 43; *see also* Gannett Amended Complaint, at ¶ 57 ("A static bid is just a publisher's estimate of an exchange's historical, average bidding price, so it systematically underestimates the exchange's willingness to pay for valuable impressions. Real-time bids, meanwhile, respond to the value of the particular impression and thus are higher than static bids for valuable inventory. As a result, competing against static bids only, AdX could buy Gannett's most valuable inventory at one penny above average prices. Put another way, AdX could buy box seats at the ballpark for the price of the grandstands."); Inform Third Amended Complaint, at ¶ 196 ("Google used its ad server monopoly to let its ad exchange view a publisher's valuable impression—like a box seat at a baseball game—and transact that impression for just a penny more than the average price that a non-Google exchange sold any old impression for—like the average price for any seat in the stadium.").

[841] *See also* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 91 ("An ad slot that ordinarily appears at the top of the page will have a higher CTR than an ad slot that appears at the bottom of the page. Other factors such as page position, seasonality, ad niche, relevance, and the presence of any distracting content around the ad unit also affect the click-through rate of an ad slot.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

quality" impression as a "box seat," auction competition would ensure that the price exceeded that of a "grandstand" seat.

c.  *Third*, Google enabled publishers to include rich targeting criteria in their line items, including "Custom targeting" that would permit the publisher to integrate live information about the end user's recent interactions with its website.[842] And even for cases where publishers are unable to utilize rich targeting information and competition among AdX buyers does not overcome the problem, publishers could still set higher floor prices for AdX to prevent AdX buyers from winning high value impressions at a low price.[843]

418.  *Third,* the Advertiser Class's conclusion that other exchanges are harmed because they win a lower volume of high-value impressions focuses on the wrong measure of harm. It compares the *average value* of the impressions won, rather than the other exchanges' *total profits*. Consider an exchange that collects a flat revenue share from the impressions it sells. When the exchange sells 1,000 impressions that a buyer values at $1.00 per mille at 20¢ CPM, it collects its fixed share from the 20¢ of revenue generated. If it were to instead sell 100 impressions that a buyer values at $5.00 per mille at $1.00 CPM, it would

---

[842] Google, "Targeting types," Google Ad Manager Help, https://support.google.com/admanager/answer/2884033?sjid=5613954590018599404-NC#custom-targeting, accessed Dec. 11, 2024 ("Custom targeting allows you to include key-values, audience segments, or content metadata for video line items if Video Solutions is activated in your network. Key-values in particular can be used for purposes not captured by the built-in targeting in Ad Manager. For instance, you define key-values that identify specific ad inventory on web pages or apps, or they can be used to target ads based on that information you might gather from visitors to your website or app. Key-values, like other targeting, help your advertisers and buyers reach their intended audience or demographic.").

[843] Indeed, Google made this easier for publishers via its implementation of RPO, discussed in Section XI.

collect its fixed share from the 10¢ of revenue generated. While the impressions won in the first case have lower average value, the exchange earns more profits.[844]

419. *Fourth*, it is not a foregone conclusion that DA would deprive other exchanges of liquidity. As a recent published economic analysis demonstrates, when exchanges are called sequentially, the publisher has an incentive to increase the first exchange's floor price, sometimes by so much that its win rate *decreases*.[845]

### 4. The Advertiser Class' Allegations that DA Raised Prices Ignore that Second-Price Auctions Lead to Market-Clearing Prices

420. The Advertiser Class alleges that DA "permitt[ed] Google's AdX exchange to transact a large number of publishers' impressions—and the highest value impressions—at higher prices than those impressions would have traded at, absent Dynamic Allocation."[846] However, because AdX ran a second-price auction in DA, impressions traded at *market-clearing* prices, as I explained in [Section III.C.3.a](#). When the second-highest bid drives the price of an impression, it cannot sell more cheaply without it being the case that some losing advertiser would be willing to pay more than the winning price. Moreover, the Advertiser Class' singular focus on prices neglects how DA improved match quality; it is possible that both advertisers' prices and surplus increased.

---

[844] In the second case, the exchange facilitates ($1 / 1000 * 100) = 10¢ of payments.

[845] Despotakis, S., Ravi, R., & Sayedi, A., " First-price auctions in online display advertising," *Journal of Marketing Research*, Vol. 58 (2021), at p. 11.

[846] Advertiser Class Complaint, at ¶ 207.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

421. Separately, I note that the Advertiser Class' allegations of higher prices are not consistent with other allegations in their complaint (e.g., elsewhere they claim that DA "depressed prices"[847]) and the complaints of the Publisher Class.[848]

---

[847] Advertiser Class Complaint, at ¶ 201 ("With Dynamic Allocation, Google's DFP ad server terminated impartial exchange order routing and gave Google's AdX exchange a first right of refusal at depressed prices, allowing Google to maintain and profit from its monopoly in the ad exchange market.").

[848] Publisher Class First Amended Complaint, at ¶ 267 ("In the absence of Dynamic Allocation, some of these ad impressions would have transacted on rival Ad Exchanges with terms more favorable to publishers. Thus, Dynamic Allocation depressed prices by inhibiting competition.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## IX.    ENHANCED DYNAMIC ALLOCATION: INCREASING PUBLISHER REVENUES BY FULFILLING GUARANTEED CONTRACTS MORE EFFICIENTLY

### A. Overview

422.    **Enhanced Dynamic Allocation (EDA)** was a Google program to increase publishers' revenues and improve efficiency by allowing real-time bids to compete for impressions that, without EDA, would be allocated to guaranteed contracts. EDA expanded the pool of impressions for which remnant demand (including non-Google demand sources) could compete, dynamically allocating impressions between guaranteed campaigns and remnant demand to increase publisher revenues.[849]

423.    At the time of launch, Google described EDA to publishers simply and accurately as a process "designed to increase your Ad Exchange revenue without compromising reservations" by assigning impressions to guaranteed line items "often enough to stay on pace to satisfy its goal."[850] EDA would assign an impression to remnant demand only if it would "pay more than the opportunity cost of not serving the guaranteed line item."[851]

---

[849] *See* "Enhanced Dynamic Allocation Comms Doc" (Nov. 6, 2017), GOOG-DOJ-06885161, at -161 ("Enhanced Dynamic Allocation […] introduces competition between reservations and AdX by allowing AdX (or AdSense) to bid on high priority DFP impressions […] without compromising reservation goals. […] Enhanced Dynamic Allocation increases eCPMs and revenues without compromising reservations.").

[850] "EDA / AdX help articles [...] in need of review: DFP and dynamic allocation" (Apr. 22, 2014), GOOG-DOJ-15417688, at -691-92.

[851] Google, "Delivery basics[:] Ad competition with dynamic allocation," Google Ad Manager Help, https://support.google.com/admanager/answer/3721872?hl=en, accessed Dec. 11, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

424.  Many other ad servers (including ██████████████ Magnite, Comcast's Freewheel, ███████ and OpenX) used technologies with similar functionality to EDA to allocate impressions between guaranteed contracts and remnant demand.[852]

425.  Plaintiffs' and their experts' descriptions of EDA contain various errors. For example:

    a.  Publisher Plaintiffs and their experts assert that EDA offered AdX exclusive access to a new pool of publisher inventory.[853] However, EDA did not expand the



---

[852] <span style="background:black;color:black">████████████████████████████████████</span>); Refinitiv Streetevents, "Q2 2021 Magnite Inc Earnings Call" (Aug. 5, 2021), https://investor.magnite.com/static-files/950ded3e-8953-4cf9-a043-d0e72b1fb856, accessed Dec. 13, 2024 ("Having a tightly integrated ad server allows for the dynamic allocation of programmatic and nonprogrammatic inventory to provide a holistic yield management solution for publishers."); OpenX, "OpenX Transforms Concept of SSP with Industry-First Demand Fusion Technology" (June 9, 2014), https://www.openx.com/press-releases/openx-transforms-concept-of-ssp-with-industry-first-demand-fusion-technology/, accessed Dec. 13, 2024 ("Demand Fusion is a patent-pending technology that effectively fuses RTB and network demand, optimizing pricing through superior competition and maximizing revenue for publishers. This groundbreaking approach instantly evaluates all prices and dynamically selects the highest bid from both RTB and ad network buyers within the user's browser to optimize yield for each and every impression."); Ben Munson, "Comcast's FreeWheel launches unified ad decisioning," StreamTV Insider (Apr. 15, 2020), https://www.streamtvinsider.com/tech/comcast-s-freewheel-launches-unified-ad-decisioning, accessed Dec. 13, 2024 ("Comcast's FreeWheel is launching a unified decisioning capability for buyers and sellers to transact across both direct sold and programmatic advertising.").

[853] Expert Report of P. Peña (Oct. 7, 2024), at p. 22 ("EDA seized the inventory reserved for direct ads and reassigned it to Google's AdX."). *See also* Expert Report of E. Elhauge (Oct. 4, 2024, at ¶ 330 ("[T]he exclusion of rival ad exchanges from real-time bidding in EDA prior to Open Bidding and implementation of First Look auctions."); Publisher Class First Amended Complaint, at ¶ 269 ("In 2014 Google's Scheme enhanced the anticompetitive nature of Dynamic Allocation, further impairing competition in the Ad Exchange market, by implementing 'Enhanced Dynamic Allocation', which channeled a new pool of publishers' most high-value impressions exclusively to AdX, but not to other Ad Exchanges."); Daily Mail Second Amended Complaint, at ¶ 127 ("But in 2017, when Daily Mail entered into a new contract for its U.S. publisher ad server, Google eliminated Daily Mail's ability to sell this high-value inventory to header-bidding exchanges and instead gave *AdX* exclusive access to publishers' direct deal inventory through Enhanced Dynamic Allocation."); Gannett Amended Complaint, at ¶ 149 ("For many years, AdX was the *only* exchange that DFP permitted to compete against a publishers' directly sold inventory."); Inform Third Amended Complaint, at ¶ 207 ("Now operating the only exchange with access to this new pool of ad inventory, Google caused even more harm to competition between exchanges and siphoned even

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

pool for AdX bidders alone: it allowed *any* non-Google source of remnant demand listed as a non-guaranteed line item to win impressions that would previously have been reserved for guaranteed deals.[854]

b.  The Publisher Class asserts that EDA enabled Google to run auctions with "a floor price unilaterally set by Google"[855] and Inform similarly references a "[floor] price Google set for itself."[856] However, as Google told publishers, the EDA price was not an arbitrary computation or one left to Google's judgment: it was computed from publisher-supplied information to ensure that the correct amount of inventory was reserved to fulfill their guaranteed contracts. Moreover, the EDA price was an *additional* floor price, allowing publishers to configure their own floor prices (which could exceed the EDA price) for the AdX auction.[857] Finally, the EDA price also applied to non-Google remnant demand, so it was not a "price Google set for itself."

more advertisers away from rival exchanges; advertisers wishing to purchase from the new pool of high-value impressions through exchanges had to purchase through AdX.").

[854] *See* "Enhanced Dynamic Allocation Comms Doc" (Nov. 6, 2017), GOOG-DOJ-06885161, at -169 ("How does this affect other remnant line items? Remnant line items continue to function according to dynamic allocation rules - if a remnant [Line Item] (say, a network) has a higher eCPM than AdX, it will still get the impression with this optimization turned on."). *See also* "Uniform Treatment for DFP Remnant and AdX under EDA" (Apr. 2019), GOOG-AT-MDL-011687180, at -180-81.

[855] Publisher Class First Amended Complaint, at ¶ 271 ("Under Enhanced Dynamic Allocation, Google's DFP Ad Server allowed AdX to transact an impression if an advertiser submitted a bid that was higher than both (1) a floor price unilaterally set by Google called the EDA Reserve Price, and (2) the average historical bids of rival exchanges.").

[856] Inform Third Amended Complaint, at ¶ 209 ("Google's exchange could transact the impression if an advertiser returned a net bid greater than both (a) the price Google set for itself and called the 'EDA reserve price' and (b) the average historical bids belonging to rival exchanges.").

[857] *See* "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 22 ("Between the launch of Enhanced Dynamic Allocation in 2014 and the launch of the Unified First Price Auction in 2019, the floor price in AdX was the highest of: (i) the publisher-configured floor price; (ii) the Enhanced Dynamic Allocation price set dynamically based on a temporary CPM (the 'EDA price'); (iii) the price of the remnant line item that was selected as a candidate for the impression; and (iv) the price determined by optimization.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

    c.   Daily Mail, Gannett, and Inform claim that Google falsely told publishers that EDA "maximize[s] yield,"[858] but under standard assumptions, EDA *does* maximize publishers' revenues. I have also verified this theoretical conclusion in the actual data.

426.  Publisher Plaintiffs and their experts contend that EDA "cherry-pick[ed]" publishers' most valuable impressions away from direct sales channels.[859] Professor Li relies on an empirical study by Professor Hortaçsu to "[q]uantify[] the harm to publishers of cream skimming."[860] However, as I explain in Section IX.C.2.b, Professor Hortaçsu's analysis is unreliable. Based on my own analysis of Google data on impressions allocated to remnant demand and direct deals, I find no evidence of "cherry-picking" or "cream-skimming." Instead, I expect that EDA's better matching would improve the experience for end users, increase revenues for publishers, and likely increase the surplus of advertisers.

---

[858] Daily Mail Second Amended Complaint, at ¶ 129 ("Google induced publishers, including Daily Mail, to enable Enhanced Dynamic Allocation by falsely telling them it 'maximizes yield.'"). Gannett Amended Complaint, at ¶ 153 ("Google induced publishers, including Gannett, to enable Enhanced Dynamic Allocation by falsely telling them it 'maximizes yield.'"). Inform Third Amended Complaint, at ¶ 206 ("Google[…] attempted to mislead publishers to continue using Enhanced Dynamic Allocation as a purported way for publishers to maximize yield.").

[859] Publisher Class First Amended Complaint, at ¶ 273 ("In practice, Google knew that Enhanced Dynamic Allocation let AdX 'cherry-pick higher revenue impressions' from DFP without any competition from other Ad Exchanges."). *See also* Daily Mail Second Amended Complaint, at ¶ 129 ("Enhanced Dynamic Allocation allowed Google to cherry-pick Daily Mail's best impressions while reducing the value of Daily Mail's current and future direct deals."); Gannett Amended Complaint, at ¶ 155 ("Enhanced Dynamic Allocation allowed Google to cherry-pick Gannett's best impressions while reducing the value of Gannett's current and future direct deals."); Inform Third Amended Complaint, at ¶ 206 ("Internally, however, Google viewed Enhanced Dynamic Allocation as a way for AdX to 'cherry-pick' high-revenue impressions.").

[860] Revised Expert Report of S. Li (Oct. 11, 2024), at Section XII.E.2.b.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### B. How EDA Increased Efficiency and Publisher Revenues

#### 1. EDA's Optimization Procedure

427.  Prior to Google's introduction of Enhanced Dynamic Allocation, if an impression met the eligibility criteria for one or more guaranteed contracts, it would be assigned to one of those without consideration of bids from remnant demand. However, fulfilling guaranteed contracts in this way left money on the table for publishers. As a simple example, suppose that a user had visited Nike's online store, added a pair of shoes to their shopping cart and then left the site before purchasing the shoes. Despite Nike's high willingness-to-pay to show an ad to that user, DFP might assign the user's next impression to the publisher's guaranteed contract with 1-800-Flowers, even though that contract could be fulfilled later with a different impression. In general, a publisher has an incentive to sell an impression to remnant demand sources when they offer the highest price and to fulfill guaranteed contracts with the remaining impressions that meet the contract's criteria. The publisher does not, however, know in advance which impressions will fetch the highest offers from remnant demand sources.

428.  In 2014, Google rolled out Enhanced Dynamic Allocation to help publishers earn more revenue from remnant impressions by optimizing the selection of impressions used to satisfy guaranteed contracts.[861] At a high level, EDA worked as follows. After determining the best eligible guaranteed contract for an impression, the EDA algorithm

---

[861] *See* "Enhanced Dynamic Allocation Comms Doc" (Nov. 6, 2017), GOOG-DOJ-06885161, at -161 ("Generally [*sic*] availability roll-out began on 3/3/2014 […] Enhanced Dynamic Allocation […] introduces competition between reservations and AdX by allowing AdX (or AdSense) to bid on high priority DFP impressions […] without compromising reservation goals. […] Enhanced Dynamic Allocation increases eCPMs and revenues without compromising reservations.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

calculated an **EDA price** to help allocate the impression.[862] Then, the EDA price served as an additional floor price for AdX and non-guaranteed line items.[863, 864] If no remnant buyer cleared the auction floor price, then the impression was assigned to the guaranteed contract. The EDA price was set to ensure that publisher revenues increased without jeopardizing fulfillment of the publisher's guaranteed contracts.[865]

429.　To demonstrate how EDA's optimization procedure works, suppose that, over some period of time, a publisher expects to have 3,000 impressions to allocate, of which 2,000 must be assigned to guaranteed contracts, leaving 1,000 impressions for remnant demand. Suppose that, based on historical data, Google estimates that the publisher will receive bids of at least $1 from remnant demand on one-third of its impressions, and bids less than $1 on the remaining two-thirds. If these projections are accurate, the publisher would maximize its revenues on the 1,000 remnant impressions by only selling when the bid it receives is at least $1 and allocating the remainder of the impressions to the guaranteed contract. EDA achieves this by offering *each* impression to remnant demand with the EDA price of $1 as an additional floor price for the publisher. In that way,

---

[862] "Uniform Treatment for DFP Remnant and AdX under EDA" (Apr. 2019), GOOG-AT-MDL-011687180, at -180 ("Enhanced Dynamic Allocation introduces competition between guaranteed reservations and other demand including AdX and DFP remnant reservations, by allowing AdX or DFP remnant to win over high priority DFP guaranteed reservations if it has a higher price than the *opportunity cost* (also called EDA price) set by us.").

[863] "Uniform Treatment for DFP Remnant and AdX under EDA" (Apr. 2019), GOOG-AT-MDL-011687180, at -180 ("Enhanced Dynamic Allocation introduces competition between guaranteed reservations and other demand including AdX and DFP remnant reservations, by allowing AdX or DFP remnant to win over high priority DFP guaranteed reservations if it has a higher price than the *opportunity cost* (also called EDA price) set by us. [...] DFP then ranks the remnant ads and picks one with highest eCPM. The selected remnant ad will be rejected if its eCPM is lower than the EDA price.").

[864] The EDA price was an additional floor price, and the effective floor price of the auction was set equal to the largest of the applicable floor prices (e.g. the EDA price, publisher-set floor price, etc.). Hence, in some instances, the effective floor could have exceeded the EDA price.

[865] "Uniform Treatment for DFP Remnant and AdX under EDA" (Apr. 2019), GOOG-AT-MDL-011687180, at -180 ("The EDA price is calculated in such a way that the DFP guaranteed reservation's delivery goal would not be compromised.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

remnant demand purchases an impression only if it pays at least $1.[866] This results in the guaranteed contract being fulfilled and the set of impressions assigned to remnant demand being the ones with the highest bids from remnant bidders.

430.    Implementation of this idea involved some subtle engineering details. One important detail arises because the bids that arrive over time can be forecast only imperfectly, so to ensure that all guaranteed contracts are fulfilled, AdX needed to track the rate at which guaranteed contracts were being served and update the EDA price adaptively.[867] Continuing the previous example, if the publisher's guaranteed contract was "behind schedule" at some point during the campaign (meaning that EDA had assigned to that contract fewer than two-thirds of the impressions received up until that point), then the EDA price would be increased above $1 and a larger fraction of the subsequent impressions would be assigned to the guaranteed contract. Conversely, if the guaranteed contract was "ahead of schedule" (meaning that EDA had assigned to that contract more than two-thirds of the impressions received up until that point), the EDA price would be reduced below $1. By carefully increasing and reducing the EDA price, Google could eliminate almost any chance that a guaranteed contract would not be fulfilled. As a second important detail, the proper handling of static bids sometimes required randomizing between serving the static bid or the guaranteed contract. I discuss this randomization in detail in the Technical Notes in Section XV.C.1.

---

[866] *See* Section XV.C.1 for more detail on calculation of the EDA price, based on "Uniform Treatment for DFP Remnant and AdX under EDA" (Apr. 2019), GOOG-AT-MDL-011687180, at -180-81.

[867] *See* Google, "DFP and dynamic allocation," DoubleClick for Publishers Help (captured on Sep. 22, 2015), https://web.archive.org/web/20150922150140/https://support.google.com/dfp_premium/answer/3447903, accessed Dec. 11, 2024 ("The lower a line item's Satisfaction Index (SI) (that is, the more behind schedule it is), the higher the temporary CPM that's passed to Ad Exchange. Therefore, a standard line item that is behind schedule will win often enough to stay on pace to satisfy its goal and pacing settings.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 2. EDA's Benefits for Publishers

431. Professor Cramton asserts that "Enhanced Dynamic Allocation harms publishers and benefits Google."[868] However, the introduction of EDA benefited publishers by increasing their revenues. If Google benefited, that just exemplifies competition on the merits. The scope of the benefit to publishers is formalized in the following theorem.

432. **Theorem 2:** Suppose that publishers' guaranteed contracts are unchanged after the introduction of EDA and Google accurately forecasts the distribution of future bids from AdX. Then (1) EDA increases the publisher's expected revenue relative to the pre-EDA allocation procedure, and (2) if each bidder's value is drawn from a "regular" commonly-known probability distribution,[869] is statistically independent from other bidders' values,[870] and publishers set the optimal floor price for the AdX auction ignoring direct contracts, then the additional floor set by EDA *maximizes* publisher revenue.

---

[868] Expert Report of P. Cramton (Oct. 4, 2024), at Section 7.3.4; *See also* Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 14 ("[I]t is apparent that Google's implementation of DA and EDA was harmful to publishers and other auction participants"), ¶ 33 ("Google's usage of this alternative CPM not only self-preferenced Google to ensure that it had access to even more inventory and could win more auctions, but it also allowed Google to use and manipulate the pacing of a publisher's ad placement to further advantage itself.").

[869] I assume that this probability distribution $G$ with density $g$ satisfies a technical condition called "Myersonian regularity," which requires that the function $v \mapsto v - (1-G(v))/g(v)$ is increasing, and ensures that the optimal mechanism for selling the impression is an auction.

[870] This implies that each bidder and the publisher can make a probabilistic assessment about other bidders' values and estimates of other bidders' values would not be changed upon learning one bidder's value. This type of model is endorsed by Plaintiffs' experts. *See* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶¶ 946-948 ("This type of model is called an 'independent private values' model, since it is assumed that (a) the bidders' values (even of the same type) are potentially different from each other (i.e., private), and (b) one bidder's value does not contain any information about another bidder's value for the auctioned item (i.e., independent). This is one of the most common types of models used in auction theory, and is used in both the seminal work by Guerre, Perrigne, and Vuong in 2000 and in the 2001 and 2011 extensions by Athey, Levin, and Seira. This model provides a suitable setting to study the environment of display ad auctions.") (internal citations omitted). *See also* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1360 ("In the context of exchange auctions, the private values assumption is more plausible than the common values assumption. Bidders in exchange auctions are anonymous to each other at the point of bidding, and are drawn from a diverse set of industries. An advertiser looking to sell car seats and an advertiser looking to sell video games care about different features of the impression. Thus, each bidder is unlikely to make strong inferences about their own value for the impression, based on other bidders' estimates.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

433. The proof of Theorem 2 is in Section XV.C.2.

434. From its assumptions, the theorem demonstrates that EDA increases publisher's revenues. The underlying intuition is captured in the example provided in Paragraph 429 above: under EDA, guaranteed contracts are still fulfilled, but remnant demand wins those impressions for which it has a comparatively high offer.

435. Expanding on these ideas, suppose that a publisher sets its optimal floor price, $p$, ignoring its direct contract guarantees. The EDA floor price is computed to be just sufficient to ensure that the contract guarantees are fulfilled. When the EDA price is less than $p$, EDA has no effect on the allocation, so it remains optimal. When the EDA price exceeds $p$, then setting a floor higher than the EDA price moves the price further from the original optimal price $p$, which for distributions that are not "regular" can sometimes increase publisher revenue, but never does so under the conditions of the theorem and only rarely results in meaningful increases in my conservative empirical tests.[871]

436. In practice, because Google cannot perfectly forecast the bids for all impressions, EDA includes an adaptive procedure (discussed in Paragraph 132 above) to revise the floor price as bids are received during a campaign, but that does not materially change my conclusions.

437. Google experiments confirm that EDA increased publisher revenues. Around the time of EDA's launch, a Google experiment found that "[t]ypically publishers see 10% RPM

---

[871] I investigated whether publishers could gain significant revenue by optimizing the AdX floor price after EDA on the Google Ads dataset. I analyzed the same 121,238 slices I used in my analysis of Bernanke in Section IV.C.2.c. I found that, in most cases, a publisher cannot make significant gains. When I weight slices by revenue, I find that the worst-case (maximum) revenue gains are smaller than 1% for 95.9% of the data. Code can be found in code/eda_analysis.py and logs in code/eda_analysis.txt. See Section XV.C.3 for further details.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

[revenue-per-mille] increase, [with] some ad units seeing [a] 40% increase."[872] In 2017, Google estimated that EDA delivered publishers "on average, a 20%+ uplift in yield."[873] An experiment from 2017 found that EDA increased overall publisher revenue by nearly $1 million per day.[874]

### 3. How EDA Increased Efficiency

438. In addition to increasing publishers' revenue, EDA also improved efficiency by ensuring that fewer impressions went unsold and that the impressions allocated to remnant demand were the impressions for which remnant bidders had the highest values. Because EDA assigned to guaranteed contracts the impressions with the lowest bids from remnant demand (including the ones without bids that exceed the relevant floor price, which could not be sold to remnant demand at all), EDA could often reduce the number of unsold impressions, expanding output. Similarly, the total value of impressions allocated to remnant demand increased because the impressions allocated to remnant bidders were the ones for which they had the highest bids, which are also the impressions for which they had the highest values.

---

[872] "Enhanced Dynamic Allocation Comms Doc" (Nov. 6, 2017), GOOG-DOJ-06885161, at -164.

[873] "DoubleClick's Unified Stack - DFP + AdX" (Sept. 20, 2017), GOOG-DOJ-09163089, at -103.

[874] "Enhanced Dynamic Allocation" (Apr. 3, 2017), GOOG-DOJ-13208758, at -759 ("Publisher revenue increase is ~$950K / day or approximately $347M ARR.").

### C. Responding to Plaintiffs' and Their Experts' Allegations

#### 1. Plaintiffs and Their Experts Err Repeatedly in Their Descriptions and Analyses of EDA

439. Plaintiffs' and their experts' arguments concerning EDA contain more than a dozen errors or factual inaccuracies.

    a. Plaintiffs state that EDA "channeled" an additional "pool" of impressions "*exclusively* to AdX, but not to other Ad Exchanges"[875] and Professor Peña adds that EDA "reassigned" the "inventory reserved for direct ads" to AdX.[876] This is wrong. Whenever EDA allowed AdX to compete for an impression, it also allowed any non-guaranteed line items representing non-Google exchanges (and

---

[875] Publisher Class First Amended Complaint, at ¶ 269 (emphasis added) ("In 2014 Google's Scheme enhanced the anticompetitive nature of Dynamic Allocation, further impairing competition in the Ad Exchange market, by implementing 'Enhanced Dynamic Allocation', which channeled a new pool of publishers' most high-value impressions exclusively to AdX, but not to other Ad Exchanges."), ¶ 273 ("In practice, Google knew that Enhanced Dynamic Allocation let AdX 'cherry-pick higher revenue impressions' from DFP without any competition from other Ad Exchanges. AdX was the only Ad Exchange with this access to inventory, because of Google's ownership of DFP, and AdX buyers were the only ones who could bid in real time for this inventory."), ¶ 274 ("Google used its monopoly power in the Ad Server market to implement Enhanced Dynamic Allocation, which allowed Google to channel publishers' most valuable impressions exclusively to AdX. Google excluded rival Ad Exchanges excluded from access to this high value inventory."). *See also* Advertiser Class Complaint, at ¶ 210 ("EDA had the purpose and effect of funneling an additional pool of publishers' inventory to AdX."); Daily Mail Second Amended Complaint, at ¶ 127 ("But in 2017, when Daily Mail entered into a new contract for its U.S. publisher ad server, Google eliminated Daily Mail's ability to sell this high-value inventory to header-bidding exchanges and instead gave *AdX* exclusive access to publishers' direct deal inventory through Enhanced Dynamic Allocation."). *See also* Gannett Amended Complaint, at ¶ 149 ("For many years, AdX was the *only* exchange that DFP permitted to compete against a publishers' directly sold inventory."), ¶ 150 ("By giving AdX exclusive access to publishers' direct-deal inventory, not only could AdX intermediate transactions that rivals could not reach, but AdX also could do so aided by Last Look. Exchanges participating in header bidding, meanwhile, were not permitted to compete against direct deals for many years. AdX thereby resurrected the pre-header bidding regime for publishers' direct deals — only AdX could bid in real time. That depressed Gannett's revenue and created a new incentive for advertisers to bid through AdX."); Inform Third Amended Complaint, at ¶ 207 ("Now operating the only exchange with access to this new pool of ad inventory, Google caused even more harm to competition between exchanges and siphoned even more advertisers away from rival exchanges; advertisers wishing to purchase from the new pool of high-value impressions through exchanges had to purchase through AdX.").

[876] Expert Report of P. Peña (Oct. 7, 2024), at p. 22 ("EDA seized the inventory reserved for direct ads and reassigned it to Google's AdX.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

other demand sources) to compete for the same impressions.[877] That is, EDA allowed non-Google demand sources to win additional impressions. An analysis of data from 2018-2019 found that around 60-89% of the revenue increase caused by EDA came from remnant line items (rather than from buyers on AdX).[878]

b.  Plaintiffs' experts allege that Google "rigged" the allocation such that "even when other exchanges made higher bids, they would win the [. . .] inventory only with a probability below 100 percent."[879] But applying a probability in that way was appropriate when EDA first launched, because, at that time, third-party demand sources often competed using static bids that applied to pools of inventory.[880]

---

[877] *See* "Enhanced Dynamic Allocation Comms Doc" (Nov. 6, 2017), GOOG-DOJ-06885161, at -169 ("How does this affect other remnant line items? Remnant line items continue to function according to dynamic allocation rules - if a remnant [Line Item] (say, a network) has a higher eCPM than AdX, it will still get the impression with this optimization turned on.").

[878] Emails from R. Ren to N. Korula, "Re: EDA Performance Remnant v.s. AdX" (Oct. 23, 2019), GOOG-AT-MDL-008935836, at -836 (Tables, column "extra remnant rev / extra total").

[879] Expert Report of P. Peña (Oct. 7, 2024), at p. 21 ("As part of this tactic, the allocation was rigged in a way that, even when other exchanges made higher bids, they would win the funneled inventory only with a probability below 100 percent."). *See also* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 928 ("Until 2019, the EDA algorithm involved 'probabilistically throttling' non-Google remnant line items such that a non-Google remnant line item would not always win the impression, even if it had a higher CPM than the temporary CPM. In comparison, if an AdX bid had a higher CPM than the temporary EDA CPM, it would *always* win. This granted AdX an asymmetric advantage as AdX and DFP remnant demand were not treated symmetrically."). Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 166 ("Google probabilistically throttled third-party exchanges' ability to win an impression."), ¶ 167 ("[I]f Google was representing the interests of publishers, then if the maximum remnant price exceeds both the EDA Price and the highest AdX bid, the third-party remnant ad should win the impression. Because this does not happen, Google is not acting in the publisher's best interest or behaving like an independent third-party intermediary."); Corrected Common Factual Background for Inform Expert Reports (Oct. 29, 2024), at ¶ 74 ("Moreover, any third party exchange remnant line items had to beat the EDA price and the AdX price and was only permitted to win probabilistically, that is, that when a third party exchange beat the EDA price and AdX – it won the impression less than 100% of the time.").

[880] "Uniform Treatment for DFP Remnant and AdX under EDA" (Apr. 2019), GOOG-AT-MDL-011687180, at -181 ("The reason for such asymmetric treatment is that when EDA was designed back in 2011 and launched in 2014, header bidding was non-existent and DFP remnant line items were of similar granularity of targeting as guaranteed reservation ads and mostly were either direct-sold non-guaranteed ads with fixed CPM or tags for specific third party networks with the CPM being the average CPM across impressions. Therefore, for a guaranteed reservation ad, the matched competing remnant ad would often be of the same static CPM, and it made sense to simply do a coin-flip decision to make sure that the guaranteed ad can only be replaced at certain probability.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

To illustrate how randomized assignment works with static bids, suppose that there is a group of 3,000 similar impressions, with 2,000 of those needed to serve guaranteed contracts. Each of the 3,000 impressions also receives a static bid of $1.50. Suppose AdX receives 500 bids larger than $1.50. Then, to select the highest 1,000 remnant bids, EDA must allocate to AdX the 500 bids larger than $1.50 and 500 impressions to the static bidder, *rejecting the other static bids*. EDA accomplishes this mix of accepting and rejecting by *randomizing* whenever the highest bid into AdX is less than $1.50. The randomization allocates 2,000 impressions to the guaranteed contract and the remainder to the static bidder. I analyze this randomization procedure in further detail in Section XV.C.1.

Because header bidding was configured by publishers using remnant line items, for a period of time, header bids continued to flow through the same randomized assignment algorithm. As experts acknowledge,[881] Google unified the randomization algorithm for remnant line items and AdX in 2019.[882]

c.   The Publisher Class asserts that EDA "allow[ed] Google to prioritize Google's Ad Exchange even ahead of publishers' direct-sold deals in the waterfall system,"[883]

---

[881] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 81 ("In 2019, Google decided to remove the 'probabilistic throttling' of Header Bidding."); *See also* Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 165 ("[B]efore 2019, remnant demand—whether static CPM or header bidding—could only probabilistically capture the impression even if it beat both the AdX and EDA prices.").

[882] *See* "Uniform Treatment for DFP Remnant and AdX under EDA" (Apr. 2019), GOOG-AT-MDL-011687180, at -180-81. As header bidding became more common, publishers increasingly used value CPMs to represent demand sources bidding in real-time. In this environment, EDA also increased expected publisher revenue compared to the pre-EDA procedure. Google later transitioned to a tie-breaking procedure I call "randomized bid perturbation," which could only increase publisher revenues further. *See* "Uniform Treatment for DFP Remnant and AdX under EDA" (Apr. 2019), GOOG-AT-MDL-011687180, at -182 ("Remove the probablistic [*sic*] replacement logic when DFP remnant is competing against non-remnant reservation ad. Remnant line item should be able to win over non-remnant line item as long as its eCPM is higher than the EDA price for the non-remnant line item.").

[883] Publisher Class First Amended Complaint, at ¶ 270.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

with Gannett going so far as to say that EDA "could supplant direct deals entirely."[884] However, EDA did not "supplant" direct deals. By design, it fulfilled all direct deals.[885] And, as previously explained, EDA also applied to non-Google remnant demand.

d.   Inform claims that EDA allowed Google to "steal an impression that it should never have had access to."[886] Professor Peña similarly alleges that "EDA seized the inventory reserved for direct ads and reassigned it to Google's AdX."[887] EDA did not "steal" or "seize" any impressions. It was designed to ensure that guaranteed contracts remained fulfilled, while maximizing publisher revenues.

e.   Professor Peña argues that "Google funneled inventory originally reserved for direct ads to the exchange market."[888] But EDA did not funnel inventory, it unified the competition between direct and indirect ads, allowing advertisers to compete for more impressions while still ensuring guaranteed contracts were fulfilled.

---

[884] Gannett Amended Complaint, at ¶ 152 ("Even worse, AdX could supplant direct deals entirely, so that publishers would fail to deliver on their commitments to advertisers.").

[885] *See* "Enhanced Dynamic Allocation Comms Doc" (Nov. 6, 2017), GOOG-DOJ-06885161, at -161 ("Enhanced Dynamic Allocation […] introduces competition between reservations and AdX by allowing AdX (or AdSense) to bid on high priority DFP impressions […] without compromising reservation goals. […] Enhanced Dynamic Allocation increases eCPMs and revenues without compromising reservations.").

[886] Inform Third Amended Complaint, at ¶¶ 200 ("Using Enhanced Dynamic Allocation, Google weakened and handicapped Inform and other publishers' direct sales channels and drove more advertisers to programmatic channels, where Google could steal an impression that it should never have had access to and extract profits from that impression."), 198 ("Enhanced dynamic allocation afforded Google's ad exchange a right of first refusal over direct ad inventory regardless of whether Inform or the publisher had yet fulfilled the terms of the direct contract.").

[887] Expert Report of P. Peña (Oct. 7, 2024), at p. 22; *see also* Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 14 ("[EDA] utilized Google's unique position and level of control to grant itself access to inventory which it would otherwise not have available.").

[888] Expert Report of P. Peña (Oct. 7, 2024), at p. 21 ("Through this tactic, Google funneled inventory originally reserved for direct ads to the exchange market.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

f.   Professor Li claims that "[t]hrough EDA, DFP effectively grants AdX the right of first refusal on publishers' premium inventory."[889] But, as discussed in more detail above in Section VIII.F.2 in the context of DA, AdX had no such right. A right of first refusal would require that AdX buyers be able to purchase inventory by matching the highest competing offer. But it was up to publishers what floor price to set for AdX buyers, including ones that would require AdX buyers to pay *more* than both the EDA price and the contracted price.

g.   Daily Mail and Gannett assert that EDA permitted AdX to "beat out" guaranteed contracts "so long as it could bid one penny higher than the [EDA price],"[890] but that is wrong. Bidding higher than the EDA price was merely a necessary condition to win the impression, not a sufficient condition. A winning bid needed to exceed other bids and relevant floor prices in the auction (including the EDA price and publisher-configured floor price). When two or more AdX bidders exceeded the floor price, the winner would pay more than "one penny higher" than the EDA price. Moreover, as I have explained in Section III.C.3.a, the fact that the winning bidder pays the larger of the floor price and the highest competing bid is the *defining* feature of the second-price auction format. In the

---

[889] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 904 ("Through EDA, DFP effectively grants AdX the right of first refusal on publishers' premium inventory as AdX only needs to beat the price floor determined by the tCPM and the highest remnant CPM from rival exchanges and header bidders."). *See also* Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 173 ("Granting AdX what amounted to a right of first refusal would have had significant value for the direct deal demand source because not all impressions are high value.").

[890] Daily Mail Second Amended Complaint, at ¶ 126 ("AdX then could beat out prior, directly negotiated deals so long as it could bid one penny higher than the DFP-assigned temporary CPM."). Gannett Amended Complaint, at ¶ 149 ("AdX then could beat out prior, directly negotiated deals so long as it could bid one penny higher than the DFP- assigned 'temporary' CPM.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

second-price auction, the ability to observe the floor price (or a competitor's bid) offers no advantage to the bidder.

h.  The Publisher Class asserts that "[u]nder Enhanced Dynamic Allocation, Google's DFP Ad Server allowed AdX to transact an impression if an advertiser submitted a bid that was higher than both (1) a floor price unilaterally set by Google called the EDA Reserve Price, and (2) the average historical bids of rival exchanges."[891] However, that description is wrong, ignoring a publisher's freedom to set its own floor price. EDA introduced an *additional* floor price, meaning that winning AdX bidders still needed to exceed any other floor price set by the publisher, in addition to the EDA price and other remnant bids.[892] Moreover, any suggestion that Google used EDA to manipulate the auction's floor price in its own favor is incorrect. As Google told publishers, the EDA price was selected to be the unique price that would (in expectation) exactly fulfill publishers' guaranteed contracts. Furthermore, as previously noted, EDA was not limited to allow only "AdX to transact an impression," but also third-party demand sources.

i.  The Publisher Class contests that Google "coerce[s] publishers to use Enhanced Dynamic Allocation," arguing that "[i]f a publisher turns off Enhanced Dynamic Allocation, then AdX will not return live, competitive bids for the publishers'

---

[891] Publisher Class First Amended Complaint, at ¶ 271. Similarly, Inform asserts that "Google's exchange could transact the impression if an advertiser returned a net bid greater than both (a) the price Google set for itself and called the 'EDA reserve price' and (b) the average historical bids belonging to rival exchanges." Inform Third Amended Complaint, at ¶ 209.

[892] *See* "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 22 ("Between the launch of Enhanced Dynamic Allocation in 2014 and the launch of the Unified First Price Auction in 2019, the floor price in AdX was the highest of: (i) the publisher-configured floor price; (ii) the Enhanced Dynamic Allocation price set dynamically based on a temporary CPM (the 'EDA price'); (iii) the price of the remnant line item that was selected as a candidate for the impression; and (iv) the price determined by optimization.").

impressions."[893] Experts similarly complain that "Publishers could not mitigate the effects of EDA, because publishers could not opt-out of EDA,"[894] but that is wrong for at least three reasons. First, as I explain in Section IX.B.2, EDA increases publisher revenue, eliminating any economic incentive to disable EDA. Second, a publisher could set floor prices to re-establish the pre-EDA process for its inventory.[895] Third, publishers could also assign direct deals to 100% sponsorship line items, to which EDA would not apply.[896]

j.   Inform incorrectly claims that "Google artificially lowered the direct ad sale contracted price in order to permit Google to 'win' the auction."[897] In reality, EDA modified neither the contracted prices of direct ads nor the total quantity of impressions committed to guaranteed contracts. Instead, by introducing an

---

[893] Publisher Class First Amended Complaint, at ¶ 275 ("Today, Google continues to coerce publishers to use Enhanced Dynamic Allocation. If a publisher turns off Enhanced Dynamic Allocation, then AdX will not return live, competitive bids for the publishers' impressions. And as noted herein, without AdX returning live, competitive bids, a publisher would forgo 20%-40% of its ad revenues, which is not an economically feasible option.").

[894] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 88. *See also* Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 173 ("Significantly, the mandatory nature of Enhanced Dynamic Allocation—which could not be turned off without turning off AdX completely—removed the publisher's ability to grant a first look to specific demand sources on pre-negotiated terms."); Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 14 ("EDA was harmful to publishers and other auction participants [...] because these algorithms [] ignored the wishes of the publishers."); Expert Report of P. Peña (Oct. 7, 2024), at p. 23 ("Publishers could not escape the destruction of value resulting from selling for a significantly lower amount premium inventory that was highly valuable.").

[895] In the limit, a publisher could set a high floor price to effectively disregard offers from remnant demand until guaranteed contracts were fulfilled, restoring the pre-EDA functionality.

[896] "Enhanced Dynamic Allocation Comms Doc" (Nov. 6, 2017), GOOG-DOJ-06885161 at -170 ("100% sponsorships are not affected, nor are multiple Sponsorship with same targeting with a goal over 100%, and line items where Ad Exchange competition is not enabled will still not be impacted."). *See also* "Dynamic allocation," Google Ad Manager Help, https://web.archive.org/web/20201111224932/https://support.google.com/admanager/answer/3721872?hl=en, accessed Dec. 12, 2024 ("Lower-priority remnant line items and Ad Exchange line items do not compete when either of the following are eligible to serve: a Sponsorship line item with a goal of 100% or a combination of Sponsorship line items at the same priority with goals that add up to greater than or equal to 100%.").

[897] Inform Third Amended Complaint, at ¶ 199 ("Google artificially lowered the direct ad sale contracted price in order to permit Google to 'win' the auction. For example, Inform would have a contracted price for $24 per CPM and Google would unilaterally devalue Inform's contract to $6.32 and then take the business itself for $6.33.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

*additional* floor price for remnant demand sources, EDA's design *raised* the prices faced by remnant demand while not altering or violating any terms of guaranteed contracts.

k.  Plaintiff's experts fault EDA alleging that "AdX does not even have to beat the negotiated price of the direct deal impression in order to win."[898] But this misinterprets the role of the contracted direct deal price, which was not a bid in an auction. Using the contracted price–or, indeed any price different from the EDA price–as a bid for qualified inventory would have led to a worse outcome for publishers. The EDA price was computed so that exactly the right number of impressions would be allocated to the contract. If a price higher than the EDA

---

[898] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 925 ("However AdX does not even have to beat the negotiated price of the direct deal impression in order to win [...] The temporary CPM did not account for how much the direct deal advertiser was willing to pay for that impression. Therefore, AdX did not even compete with guaranteed line items on price. EDA, then, not only allowed for programmatic bidders to cherry pick the best impressions at the expense of direct deals, but it allowed AdX to purchase those direct deals at a price that was below the amount a direct deal advertiser was willing to pay for the impression. This is because the tCPM was based on the distribution of bids for programmatic ads on AdX, not on a distribution of direct deal negotiated CPMs. Direct ad CPMs are, on average, higher than programmatic ad CPMs. As such, it follows that as tCPM did not account for the price a direct deal advertiser was willing to pay but was based on bids for programmatic ads, it permitted AdX to purchase direct deals at a lower price than a direct deal advertiser would be willing to pay."), ¶ 881 ("AdX does not have to beat the negotiated price-per-impression of the direct deal in order to win. This allowed AdX to cream-skim from direct deal inventory, no matter how high its negotiated price."), ¶ 983 ("One might naively conjecture that EDA would improve the publisher's revenue, because the performance advertisers are sometimes willing to pay more than $1.80 per impression."). *See also* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 77 ("Google does not look at the pre-negotiated price of a direct deal when calculating the temporary CPM."); Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 14 ("Google's implementation of DA and EDA was harmful to publishers and other auction participants, including Inform, because these algorithms [] ignored the wishes of the publishers, including prices (i.e., the contracted-for CPM values associated with the line items), the publishers' priorities of ads and the publisher's pacing settings."), ¶ 25 ("Under EDA, the actual contracted-for CPM was not utilized by Google."); Expert Report of P. Peña (Oct. 7, 2024), at p. 22 ("[EDA] used a simulated bid by Inform dubbed a 'temporary CPM' or 'EDA Price' (which was arbitrarily low with respect to the actual value of the ad as negotiated by Inform)."); Corrected Common Factual Background for Inform Expert Reports (Oct. 29, 2024), at ¶ 67 ("Google ignores the actual contracted-for direct CPM price booked by the publisher. Google disregards both the reservation ad's real CPM and the publishers' expressed intent in the reservation or guaranteed line item."), ¶ 73 ("However, Google's various algorithms, and in particular EDA, overrode and undermined a publisher's direction regarding price, priority and pacing. By ignoring the publisher's actual prices and their stated direction as to pacing, Google captures extremely high value impressions for depressed values and captured for itself the benefits of high news days through their pacing, PID ranker and satisfaction index. [...] In fact, Publishers were not told that EDA ignored the contracted-for CPM prices of their direct deals.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

price were used as a bid, that would result in a publisher discarding remnant offers (and missing out on revenue) that were not needed to fulfill the contract. If a lower price were used, then too few impressions would be reserved for the guaranteed contract. If a publisher were nevertheless intent on doing so, it could also add a floor price at least as high as the contract price.

l.  Professor Cramton further argues that EDA "compromised the stability of the DFP auction process," because "Google could accept a bid from AdX or a third-party exchange that was *less* than the price of the direct deal."[899] First, as I describe in the previous point, treating the contracted price of the direct deal as a bid is wrong. Second, any so-called "instability" would not affect advertisers that purchase through direct deals. These ads are not purchased on a per-impression basis, but are instead purchased in bulk. From that perspective, EDA does not change either contract fulfillment or the way in which contract prices are negotiated.

m.  Professor Cramton argues that EDA "served as a vehicle for Google to compete with header bidding," as prior to EDA, a publisher could bypass Dynamic Allocation by encoding the header bid as a guaranteed line item.[900] But, if a publisher wished to "encode the header bid as a guaranteed line item" to ensure

---

[899] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 170 ("First, under Enhanced Dynamic Allocation, Google could accept a bid from AdX or a third-party exchange that was *less* than the price of the direct deal. This compromised the stability of the DFP auction process, an essential aspect of proper auction design.").

[900] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 155 ("Enhanced Dynamic Allocation also served as a vehicle for Google to compete with header bidding. When publishers first began to adopt header bidding, some entered the header bidding result as a guaranteed line item (default Priority 1-11). Because Dynamic Allocation did not call AdX if a guaranteed line item qualified for an impression, Google was concerned that header bidding results were insulated from any competition by AdX and that Google's GDN demand was denied access to this inventory.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

the delivery of a specified quantity of header bidding impressions, EDA would not affect that functionality. Furthermore, a publisher seeking to favor header bidding demand over AdX could achieve that objective in several ways, including configuring higher floor prices for AdX. Indeed, many publishers did just that.[901]

n.  Professor Jardin claims that Google "exempt[ed] its own DV360 from the impact of EDA."[902] However, Professor Jardin has misinterpreted the evidence for this claim, which consists of a row in a spreadsheet corresponding to ads on Google's own YouTube inventory.[903] When EDA launched, it was not enabled for YouTube because EDA was not compatible with a beta experiment enabled on the site,[904] but Google outlined a plan for EDA to roll out to YouTube after it achieved compatibility in late March 2014.[905] Indeed, all of the evidence I have seen shows

---

[901] "Changes to Ad Manager auction" (Jan. 10, 2019), GOOG-DOJ-10924270, at -292 (showing that in 42% of queries won by header bidding, the AdX floor exceeded the header bidding line item price).

[902] Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 34 ("[Google] ensur[ed] that it won in cases of a 'tie' and exempt[ed] its own DV360 from the impact of EDA and the usage of the associated 'temporary CPM'."). *See also* Corrected Common Factual Background for Inform Expert Reports (Oct. 29, 2024), at ¶ 80 ("Recognizing the damage caused by the EDA algorithm to its own bids, Google exempted its own DV360 inventory from the EDA algorithm so that their bids were not impacted.").

[903] "DRX Segmentation By Region" (Oct. 13, 2014), GOOG-AT-MDL-020026677, at Tab "pub dash data," row 2; Email from ███████ to ███████ et al., "Re: Q4 PG revenue number" (Oct. 12, 2015), GOOG-DOJ-04418304, at -304 ("mDev dash does include YT. Gregoire's dashboard has the DFP network name-4061 | Google Display Ops - DFP (Groundhog). mDev dash has the AdX account name - youtube.com.").

[904] "EDA Enhanced Dynamic Allocation - Temp Opt Out" (Sept. 3, 2014), GOOG-TEX-00055792, at Tab "Conversion VideoOptNetworks (On," Row 1 ("These networks will be excluded from GA rollout because EDA is currently not compatible with these features."); "Proposed Plan for YouTube EDA Rollout" (Apr. 20, 2014), GOOG-DOJ-15417728, at -728 ("Roll out will be managed on XFP backend by Scott and Rita so as to not interfere with other XFP beta experiments that YouTube is part of including Video Engagement Optimization.").

[905] "Enhanced Dynamic Allocation (fka CPR) Rollout Plan" (Feb. 13, 2014), GOOG-AT-MDL-018629608, at -608 ("Any networks that had either/both of these features [including Video Engagement Optimization] enabled on 2/25 will be opted out of EDA until EDA supports them."); Email from ███████ to ███████ et al., "Re: XFP Optimization Settings & EDA Analysis," GOOG-DOJ-14139620, at -620 ("We are aiming for the end of March [to enable EDA with video engagement optimization], but it might be a bit longer."); "Proposed Plan for YouTube EDA Rollout" (Apr. 20, 2014), GOOG-DOJ-15417728, at -728 ("Roll out will be managed on XFP backend using Mendel starting 4/28/2024.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

that, in general, EDA applies to DV360.[906] Moreover, exempting DV360 would not confer it with any advantage, rather, it would do the opposite: it would make DV360 ineligible to compete for the affected inventory.

o. Professor Cramton describes a situation in which "an impression eligible for a single guaranteed line item would first be sent to AdX by Enhanced Dynamic Allocation" and then, if no AdX bidder meets the EDA price, "AdX would again be called through Dynamic Allocation with a potentially lower reserve price than it had faced through Enhanced Dynamic Allocation."[907] But this description is wrong. If no remnant demand source is able to beat the EDA price, the ad would be allocated to a guaranteed contract and no subsequent "Dynamic Allocation" routine would be called in the same request.[908]

---

[906] "Response of 14 September 2022 to CMA Request for Information received on 23 August 2022" (Sept. 14, 2022), GOOG-AT-MDL-B-004015028, at -032 ("Enhanced Dynamic Allocation allows publishers to maximise revenue opportunities where a buyer participating in the Unified First-Price Auction (i.e. an Authorized Buyer, an Open Bidding partner, Google Ads or DV360) or a remnant line item buyer values an impression more highly than the guaranteed buyer - while also protecting the value of their guaranteed inventory/reservations.").

[907] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 151, n. 96 ("[I]t is possible that an impression eligible for a single guaranteed line item would first be sent to AdX by Enhanced Dynamic Allocation. Then, if AdX could not meet the Enhanced Dynamic Allocation reserve price, it would pass on the impression and only DFP remnant line items would remain eligible to serve. DFP would then pass the impression to the best remnant line item, and AdX would again be called through Dynamic Allocation with a potentially lower reserve price than it had faced through Enhanced Dynamic Allocation.").

[908] "Cross-priority ranking of reservation ads + AdX: Problem Definition and Alternative Algorithms" (July 9, 2013), GOOG-DOJ-13951939 at -942 ("If AdX accepted, assign to AdX, otherwise if p*>p, assign to remnant ad, otherwise assign the ad to a*.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### *2. EDA Does Not Leave Non-Google Ad Buyers with Lower Value Inventory*

### a) How "Cream-skimming" *Might* Arise in Theory: Common Values and Adverse Selection

440.   Publisher Plaintiffs allege that EDA allowed Google to "cherry-pick"[909] impressions from their guaranteed contracts, "leaving publishers' direct deals" with "less valuable inventory"[910] and "depress[ing] the prices that publishers can receive"[911] on those contracts. Experts echo these complaints, with Professor Li claiming that "EDA significantly reduced publisher revenues"[912] and that, due to "the cream-skimming problem generated by EDA, advertisers are less willing to pay for direct deals."[913]

---

[909] Daily Mail Second Amended Complaint, at ¶ 129 ("Enhanced Dynamic Allocation allowed Google to cherry-pick Daily Mail's best impressions while reducing the value of Daily Mail's current and future direct deals."). *See also* Publisher Class First Amended Complaint, at ¶ 273 ("In practice, Google knew that Enhanced Dynamic Allocation let AdX 'cherry-pick higher revenue impressions' from DFP without any competition from other Ad Exchanges."). *See also* Gannett Amended Complaint, at ¶ 155 ("Enhanced Dynamic Allocation allowed Google to cherry-pick Gannett's best impressions while reducing the value of Gannett's current and future direct deals."); Inform Third Amended Complaint, at ¶ 206 ("Internally, however, Google viewed Enhanced Dynamic Allocation as a way for AdX to 'cherry-pick' high-revenue impressions.").

[910] Daily Mail Second Amended Complaint, at ¶ 128 ("DFP can allocate to AdX the most valuable impressions while leaving publishers' direct deals, which publishers and advertisers previously had negotiated in good faith, to fill less valuable inventory at higher, previously contracted prices."). *See also* Gannett Amended Complaint, at ¶ 152 ("Moreover, DFP can allocate to AdX the most valuable impressions while leaving publishers' direct deals, which publishers and advertisers previously had negotiated in good faith, to fill less valuable inventory at higher, previously contracted prices.").

[911] Gannett Amended Complaint, at ¶ 152 ("Naturally, over time, AdX's attacks on direct sales depresses the prices that publishers can receive for what used to be their most valuable inventory.").

[912] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 963.

[913] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 882 ("Due to the cream-skimming problem generated by EDA, advertisers are less willing to pay for direct deals. This demand reduction lowers the prices of direct deals, as well as the quantity of direct deals transacted."), ¶ 880 ("When direct deal inventory is instead sold programmatically via EDA, there is a cream-skimming problem, whereby exchanges (particularly AdX) are able to selectively poach high-quality impressions. Cream skimming leads to 'adverse selection'; advertisers contemplating a direct deal understand that they will not get a representative slice of impressions, because the high-quality impressions will be poached by programmatic bidders, leaving only the dregs."). *See also* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 82 ("With EDA, Google can identify the high value impressions for the auction and leave direct deal advertisers with the lower value impressions [...] Thus, EDA enables 'cream skimming' or 'cherry-picking' of publishers' high value impressions, leaving lower value impressions to deliver against the direct deal."), ¶ 85 ("Google can use EDA to take the premium impressions for itself and leave the rotten ones for direct deals, which diminished the value of direct deals overtime.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Professor Li further argues that the alleged cream-skimming makes it impossible for publishers to sell a "representative slice"[914] of their inventory.

441. I interpret these claims to mean that the impressions left to be allocated to other sources of demand were of worse "quality" than the impressions allocated to AdX.

442. To assess these claims, I first describe an example to explain what I mean by "quality" and one way that "scrap" inventory *might* arise in the context of ad allocation. As I discussed in Section III.B, targeting functionalities developed by online display advertising intermediaries increased overall economic welfare. But better information about impressions can create new challenges, too. Some attributes of impressions might be of little value for targeting but great value for most or all advertisers. For example, advertisers generally prefer ads that appear higher on a web page, where they are more often seen and clicked, and many advertisers prefer to target ads to consumers with higher incomes. Attributes like these are known as **common value attributes**, and impressions with better common value attributes might be considered higher "quality" by advertisers.[915]

443. If bidders differ in their abilities to identify common value attributes, then less-skilled bidders may struggle to distinguish more valuable impressions from less valuable ones, resulting in them winning lower "quality" impressions, on average. This possibility is known as **adverse selection** and can reduce advertiser surplus, discouraging their participation in online display advertising and ultimately decreasing publisher revenues.

---

[914] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 976.

[915] For discussion of auctions with common value attributes, *see, e.g.*, Milgrom, Paul and Weber, Robert, "A Theory of Auctions and Competitive Bidding," Econometrica, Vol. 50 (Sept. 1982), at pp. 1089-1122.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

An apocryphal story about adverse selection from the early days of online display advertising at Yahoo concerned a "Happy Contract" with McDonald's that would show ads when the sun is shining and the stock market is up.[916] If Burger King did not adjust its ad buying strategy in response to the McDonald's strategy, this would leave ads for Burger King to show mostly in bad weather or when the stock market is down: exactly when fewer viewers might be interested in their hamburgers. In that example, targeting based on weather and stock prices would cause adverse selection for Burger King: that is, it ends up buying worse-quality ads. A failure of Burger King to adjust its bidding strategy to the weather and stock prices can reduce publisher revenues, too, since it misses out on the higher revenues that would occur if both Burger King and McDonald's competed with high bids on fair weather days.

444. Adverse selection can harm *both* advertisers and publishers. Advertisers offered only low common-value impressions may offer to pay only a low price for impressions or reduce their investments in display advertising. In either case, publishers would lose revenue, and any advertiser who withdraws would cease to enjoy any surplus from showing ads.

445. If impressions differ in common value attributes, publishers and advertisers are incentivized to adopt practices to mitigate or eliminate adverse selection. For advertisers, these might involve collecting better information about impressions to more finely calibrate their bids. Publishers can also help in this process or use floor prices to reduce the harms of adverse selection. For example, in the waterfall, a publisher can mitigate the harms of adverse selection in at least two ways.

---

[916] *See* Levin, Jonathan & Milgrom, Paul, "Online Advertising: Heterogeneity and Conflation in Market Design," American Economic Review: Papers & Proceedings, Vol. 100 (May 2010), at pp. 603-07.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

446. *First*, the publisher can raise the price charged to the first network in the waterfall and reduce prices for other networks, so that all advertisers pay for the average common-value quality that they get. Both publishers and advertisers can benefit from these price adjustments. In principle, price increases can be simple to implement, but can be a blunt instrument: higher prices might make the first-called network even more selective, leaving some degree of adverse selection in place.

447. *Second*, and more importantly, publishers and advertisers can identify processes that allow more information to be incorporated in bids for different impressions, leading to prices that reflect common values. Over the last two decades, various technologies have emerged to allow more information about end users and impressions to be integrated into auctions, including finer contextual targeting,[917] behavioral targeting,[918] location-based targeting,[919] third-party cookies,[920] first-party cookies,[921] and cookie matching.[922] Moreover, ad servers allow publishers to specify eligibility criteria that enable guaranteed contracts to incorporate the most important common value attributes (including ad slot,

---

[917] *See* Zhang, Kaifu and Katona Zsolt, "Contextual Advertising," Marketing Science, Vol. 31 (Nov.-Dec. 2012), at pp. 980-94.

[918] *See* Yan, J., Liu, N., Wang, G., Zhang, W., Jiang, Y., & Chen, Z., "How much can Behavioral Targeting Help Online Advertising?," Proceedings of the 18th International Conference on World Wide Web (Apr. 2009), at pp. 261-70.

[919] *See* Ghose, A., Li, B., & Liu, S., "Mobile Targeting Using Customer Trajectory Patterns," Management Science, Vol. 65 (Nov. 2019), at pp. 5027-5049.

[920] *See* Cahn, A., Alfeld, S., Barford, P., & Muthukrishnan, S., "An Empirical Study of Web Cookies," Proceedings of the 25th International Conference on World Wide Web (2016), at pp. 891-901.

[921] *See* Munir, S., Siby, S., Iqbal, U., Englehardt, S., Shafiq, Z., & Troncoso, C., "CookieGraph: Understanding and Detecting First-Party Tracking Cookies," Proceedings of the 2023 ACM SIGSAC Conference on Computer and Communications Security (Nov. 2023), at pp. 3490-3504.

[922] *See* "Cookie Matching," Google Authorized Buyers Guide, https://developers.google.com/authorized-buyers/rtb/cookie-guide, accessed Dec. 11, 2024.

geography, device category, browser, etc.).[923] Incorporating such information in these ways is what allows adverse selection to be eliminated or reduced to an economically insignificant level, as I will show it is in [Section IX.C.2.c](#).

448. Online display advertising intermediaries are also incentivized to redesign ad allocation processes in ways that reduce adverse selection, increasing overall economic welfare. In my academic research, I have studied the way that adverse selection might arise in online display advertising and how ad allocation processes might be designed to mitigate it.[924] Google was aware of the possibility of adverse selection arising as a consequence of differences in information among bidders, and it identified the importance of "pricing by value," which I understand to mean ensuring that advertisers are not charged more than their true value for the impression (which is not guaranteed in the presence of adverse selection).[925]

449. Given the incentives for intermediaries and platform participants to reduce adverse selection, the question of whether adverse selection remains as a significant factor in Google's ad allocation process is an empirical one. Are the adaptations discussed in the last three paragraphs sufficient to eliminate essentially *all* adverse selection effects on

---

[923] "Key concepts in targeting[:] Targeting types," Google Ad Manager Help, https://support.google.com/admanager/answer/2884033?sjid=5613954590018599404-NC#custom-targeting, accessed Dec. 11, 2024 ("Custom targeting allows you to include key-values, audience segments, or content metadata for video line items if Video Solutions is activated in your network. Key-values in particular can be used for purposes not captured by the built-in targeting in Ad Manager. For instance, you define key-values that identify specific ad inventory on web pages or apps, or they can be used to target ads based on that information you might gather from visitors to your website or app. Key-values, like other targeting, help your advertisers and buyers reach their intended audience or demographic.").

[924] *See, e.g.*, Arnosti, N., Beck, M., and Milgrom, P., "Adverse Selection and Auction Design for Internet Display Advertising," American Economic Review, Vol. 106 (Oct. 2016), at pp. 2852-66.

[925] "The Pricing Paradox and solutions" (May 15, 2012), GOOG-DOJ-03366173, at -198-99 ("Adverse selection is the result of 'cherry-picking' […] Solution space: Pricing by value").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

quality dimensions that Google could potentially identify? If so, that would put to rest any notion that the remaining impressions are "scrap." In the following section, I review some of Professor Hortaçsu's empirical analyses, before presenting my own single, definitive analysis.

### b) Professor Hortaçsu's Empirical Analyses of "Cream Skimming" Are Unreliable

450. Professor Hortaçsu claims that the changes in click-through rates (CTRs) and prices (CPMs) of guaranteed deals in certain periods of time establish a "cream skimming effect of EDA"[926,927] However, his claim is flawed and misleading for several reasons, as I explain below.

### i) Professor Hortaçsu's Analysis of CTRs Emphasizes the Wrong Time Period

451. Professor Hortaçsu's analysis employs several figures,[928] including Figure 7 (which I've attached for reference), to support his claim that "as direct deal CTRs decrease, CTRs for impressions sold via Open Auction increase[] over time."[929] However, these figures plot data no earlier than 2015, which is significantly later than the April 2014 launch of EDA for standard direct deals.[930] Professor Hortaçsu acknowledges this shortcoming, writing

---

[926] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 90.

[927] Professor Hortaçsu's analysis (and my subsequent investigations) use the DRX Internal Stats dataset (GOOG-AT-DOJ-DATA-000066799 to GOOG-AT-DOJ-DATA-000245943), which contains impression, click, and revenue data for web properties' Standard Direct Deals, Programmatic Guaranteed Direct Deals, and Open Auctions between August 2015 and June 2023. My code for this section is in code/drx.py of my supporting materials. Outputs are logged to logs/drx.txt and figures are saved to the figures directory, with "drx_" as a prefix.

[928] *See* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 94, Figs. 6 and 7.

[929] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 94.

[930] "DRX Quality update" (Mar. 10, 2015), GOOG-TEX-00449253, at -264 ("Full rollout in April 2014").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

that "[d]ata for all direct deals is not available before and after the original

implementation of EDA."[931]

**Professor Hortaçsu's Figure 7**



452.  By utilizing data from the wrong time period, Professor Hortaçsu's figure fails to

distinguish explanations that are completely unrelated to "cream skimming" but could

drive the observed changes in click-through rates. For example, if header bidding and

ad-targeting technology improved, that could contribute to increased CTRs on remnant

ads, driving advertisers who sought clicks to shift their ad buying strategy from "Standard

Direct Deals" to "Open Auction" channels. These shifts would be consistent with both

reduced CPMs for direct deals and higher publisher revenues.

453.  Even setting aside alternative explanations, the data Professor Hortaçsu uses does not

support the conclusion that EDA was responsible for a decline in CTRs. His analysis

juxtaposes the change in "direct deal CTRs" with the "CTRs for impressions sold via

---

[931] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 98.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Open Auction,"[932] but both categories generally trend downwards until at least mid-2018, nearly *four* years after EDA's release. Consequently, his conclusion that "CTRs for impressions sold via Open Auction increases over time" is unsupported by the data that he illustrates.[933]

### ii) Professor Hortaçsu's Use of PG is an Unreliable Proxy for Standard Direct Deals

454.  Professor Hortaçsu attempts to overcome the limited time period covered by the data described above by using a different category of direct deals. He seeks to "measure the effect of EDA on CPMs for Programmatic Guaranteed direct deals and use that as a proxy for the effect of EDA on CPMs for all direct deals,"[934] but that analysis is also flawed.

455.  Professor Hortaçsu illustrates the CPMs of programmatic guaranteed (PG) deals in the period preceding and succeeding the March 3, 2017 release of EDA for PG deals. However, PG was a nascent category at the time, representing not even 0.25% of guaranteed ad revenue in March of 2017.[935] In fact, PG deals had not even achieved "General Availability" until a month later.[936] This fact is reflected in the number of web properties using PG deals over time, which rose dramatically in the period following the release, as seen in Figure 14. This alone could lead to changes in the characteristics of PG

---

[932] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 94.

[933] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 94.

[934] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 99.

[935] The relative size of PG is calculated in code/drx.py of my supporting materials and logged to code/logs/drx.txt.

[936] "Google Ad Manager [Comms Doc] - Programmatic Guaranteed" (Apr. 8, 2019), GOOG-DOJ-04447709, at -709 ("Status [. . .] G[eneral]A[vailability] 04/05/2017.").

data, making them (i) unrepresentative as a "proxy" for standard direct deals and (ii) polluted by the important availability changes that occurred at the same time.

**Figure 14: Web Properties Using PG Deals By Month**



456.    Furthermore, I reproduced Figure 8 from Professor Hortaçsu's report[937] and added a vertical line corresponding to the date of EDA's full launch. The result is Figure 15 below. As expected, because the gradual rollout and General Availability launch of PG overlapped the launch of EDA, CPMs in that period were volatile. Before the full EDA launch date, there were significant upward and downward swings in the CPMs for PG that were as large or larger than the purported impact of EDA. With the set of web properties using PG direct deals varying significantly from month to month, fluctuations in CPMs due to these composition effects should be expected.

---

[937] *See* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 102, Fig. 8.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Figure 15: Average CPM for Direct Deals
(Standard vs Programmatic Guaranteed)**



457. Professor Hortaçsu points to these CPM trends in an attempt to justify using PG deals as a proxy for those of Standard Direct Deals. He highlights that the CPMs of "Standard Direct Deals and Programmatic Guaranteed direct deals follow a similar, downward sloping trend across time"[938] and that "[t]he correlation between the two [] is 0.8."[939] But since his theory of harm operates through a lowering of *CTRs*,[940] the comparison of *CPMs* is insufficient. The important comparison is between the time series of CTRs for the two kinds of deals. To check that, I modified Professor Hortaçsu's Figure 7,[941] which plots CTRs for Open Auctions and Standard Direct Deals, to include CTRs for PG deals. The result is shown in Figure 16. The CTRs of PG deals and Standard Direct Deals do

---

[938] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 103.

[939] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 103.

[940] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 98 ("Given that EDA lowered the CTR for Direct Deals, I anticipate that EDA also lowered the CPM of direct deals, reducing publisher revenues.").

[941] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 94, Fig. 7.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

not "closely track"[942]; they behave very differently, especially in the years immediately following the launch of EDA. The CTR correlation 0.35 is much lower than the CPM correlation of 0.8, evidencing the unsuitability of PG deals as a proxy for Standard Direct Deals for this analysis.

**Figure 16: CTRs for Standard Direct Deals
and Programmatic Guaranteed Direct Deals**



*iii) Professor Hortaçsu's Narrow Focus on CPMs for PG is Misleading*

458.  Professor Hortaçsu's figures emphasize a decline in CPMs for PG, but that emphasis is misleading in two ways. Prices can change for reasons unrelated to cream-skimming and those changes can drive offsetting changes in quantity, which his illustrations do not show.

---

[942] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 102.

459. Professor Hortaçsu argues that "impressions with lower CTR are less valuable to advertisers than higher CTR impressions."[943] While the PG CTR series (orange) in [Figure 16](#) suffers from high volatility, if I interpret it on its face as Professor Hortaçsu does, I find that programmatic guaranteed CTRs *increased* in the months immediately following the launch of EDA for PG. This pattern directly contradicts Professor Hortaçsu's claim that "CTRs fall after EDA, leading to lower CPMs."[944]

### c) My Own Empirical Analysis Finds Little Evidence of Adverse Selection

460. Professor Hortaçsu's attempts to measure "cream-skimming" suffer from reliance on inappropriate data, but a more reliable approach is possible. In this section, I revisit the question of potential "cream-skimming" using data that includes *all* guaranteed contract types evaluated using *industry-standard quality measures*.[945, 946] Because the data I analyzed comes from a time in which many non-Google exchanges used real-time bids, allowing them to bid more for higher-quality impressions, that leads my measurement to

---

[943] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 95. *See also* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 91 ("Advertisers rely on CTR as a measure of impression quality and performance. In particular, advertisers value impressions with higher click-through rates because it means more customers are visiting advertisers' sites. Advertisers closely track CTR not only on a particular publisher website, but also for particular ad slots on that website.").

[944] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at Section III.A.iv.

[945] The Google metrics I use below comply with industry standards for measuring clicks, views, and active views. *See* "Minimum Standards for Media Rating Research," Media Rating Council, https://mediaratingcouncil.org/standards-and-guidelines, accessed Dec. 13, 2024.

[946] Letter from D. Pearl to W. Noss, et al., "Re: *In re: Google Digital Advertising Antitrust Litigation,* No. 1:21-md-03010 (PKC); *State of Texas, et al. v. Google LLC*, No. 4:20-cv-00957-SDJ" (Feb. 15, 2024), at pp. 9-10 ("The 'EDA pCTR' dataset includes data on predicted metrics (pCTR, pAVR, and pVTR) for a subset of guaranteed ads and impressions, covering the period from October 30, 2022 to November 5, 2022. These predicted metrics are Google's internal estimates of the likelihood that an ad is clicked, 'actively' viewed, or viewed 'through,' and can be used as proxies of impression quality. The subset is defined to include each guaranteed contract for which at least one predicted metric is computed on 100+ impressions won by the contract and 100+ impressions lost. Each contract entry includes separate averages for each applicable predicted metric and outcome, along with the number of impressions for each.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

be conservative: any adverse selection against guaranteed contracts would likely be worse in this time period than when EDA was first introduced.

461. For the quality of each impression, the industry-standard measures that I use are **predicted engagement metrics**. When there are several guaranteed contracts eligible for an impression, Google uses these to decide which one to serve to maximize predicted engagement, that is, Google's estimate of the fraction of impressions for which a user engages with a particular ad. These metrics are the **predicted Click-Through Rate (pCTR)**,[947] **predicted View-Through Rate (pVTR)**,[948] and **predicted Active View Rate (pAVR)**.[949]

    *i) Data*

462. I received a week of data, from October 30th to November 5th, 2022 corresponding to over 112,000 different guaranteed contracts.[950] The included contracts are all the ones that, on any day, (1) won and served at least 100 impressions under EDA and (2) for at least one of the three predicted-engagement statistics, lost at least 100 impressions under

---

[947] *See* "Ad Manager report metrics," Google Ad Manager Help, https://support.google.com/admanager/table/7568664?hl=en, accessed Dec. 11, 2024 ("Ad Exchange CTR[:] The percentage of impressions served by the Ad Exchange that resulted in users clicking on an ad.").

[948] *See* "Understand Video Solutions report metrics," Google Ad Manager Help, https://support.google.com/admanager/answer/2759433#video-viewership, accessed Dec. 11, 2024 ("View-through rate[:] Percentage of times the ad was viewed.").

[949] *See* "How Active View metrics are calculated," Google Ad Manager Help, https://support.google.com/admanager/answer/6233478?hl=en&ref_topic=7506202, accessed Dec. 11, 2024 ("Active View metrics are calculated by finding the percentage of total impressions served that are actually viewable impressions.").

[950] EDA pCTR Dataset, GOOG-AT-DOJ-DATA-000066771-772. The number of guaranteed contracts was calculated in the file code/pctr.py of my supporting materials. The output is logged to code/logs/pctr.txt.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

EDA.[951] Unlike Professor Hortaçsu's study (discussed in Section IX.C.2.b), my study is not limited to Programmatic Guaranteed Direct Deals.

463.  For each guaranteed contract, the dataset includes the numbers of impressions won and lost by the guaranteed contract and the predicted engagement metrics—pCTR, pVTR and pAVR—as described above. For each guaranteed contract and each engagement metric, I have access to:

   a.  **Field #1:** The average value of the predicted-engagement metric over all impressions that would be eligible to fulfill the guaranteed contract.

   b.  **Field #2:** The average value of the predicted-engagement metric over the impressions allocated to the guaranteed contract.

   *ii) Methodology*

464.  I treat Field #1 as a measure of impression quality in a counterfactual "without EDA" scenario. I expect Field #1 (which contains the average value of the predicted-engagement metric over all eligible impressions) to be equal to the average value of that metric over impressions assigned to guaranteed contracts without EDA. The reason is that, before EDA, the impressions assigned to guaranteed contracts were independent of the offers from remnant demand and, in terms of ad quality, those impressions do not differ systematically from an average impression. Field #2 contains a measure of the quality of impressions that were allocated to guaranteed contracts in the

---

[951] *See* Letter from D. Pearl to M. Freeman, "Re: *United States, et al. v. Google LLC*, No. 1:23-cv-00108-LMB-JFA" (Sept. 8, 2023), GOOG-AT-MDL-C-000012795, at -802-03 ("The subset is defined to include each guaranteed contract for which at least one predicted metric is computed on 100+ impressions won by the contract and 100+ impressions lost."). For some contracts or impressions, Google does not compute any engagement metrics. Those impressions are not included in the dataset.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

actual world "with EDA." I compare values in the two fields to assess how EDA affected the quality delivered to guaranteed contracts. If adverse selection were an economically significant factor, the average measure of quality "without EDA" (Field #1) would be significantly larger than the average measure of quality "with EDA" (Field #2).

> *iii) Main Finding: Differences in Predicted-Engagement Metrics are Less than 1%*

465. I first computed the average predicted engagement metrics with and without EDA across all guaranteed contracts. I display my findings in Table 5.

**Table 5: Change in Engagement Metric With EDA[952]**

| Predicted Engagement Metric | Metric without EDA (%) | Metric with EDA (%) | Absolute Change (ppt) with EDA cf. without EDA | Percent Change with EDA cf. without EDA (%) |
|---|---|---|---|---|
| pCTR | 0.357 | 0.355 | -0.002 | -0.614 |
| pVTR | 1.378 | 1.388 | 0.009 | 0.684 |
| pAVR | 43.016 | 42.930 | -0.086 | -0.201 |

466. The main findings are:

a. *The **predicted click through rates (pCTR)** with and without EDA are nearly the same*. In terms of numbers of clicks, Google predicts 357 clicks per 100,000 impressions without EDA and 355 clicks with EDA. This means that the number of expected clicks for guaranteed contracts with EDA is about 0.6% less than without EDA.

---

[952] These results were calculated in the file code/pctr.py of my supporting materials. The outputs are logged to code/logs/pctr.txt.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

b.  *The **predicted view through rates (pVTR)** with and without EDA are nearly the same.* Impressions allocated to guaranteed contracts via EDA have an approximately 0.01% higher average pVTR, which means that the number of view-throughs for guaranteed contracts is about 0.7% more than before EDA.

c.  *The **predicted active view rates (pAVR)** with and without EDA are nearly the same.* The impressions won by guaranteed contracts under EDA have an approximately 0.09% lower pAVR, which means that the number of active views for guaranteed contracts is about 0.2% less than before EDA.

467. If the effects of "cream-skimming" were economically significant, one would expect the predicted engagement metrics on impressions allocated to guaranteed contracts to be substantially lower than the same metrics on the set of all eligible impressions. But they are not. Instead, the data shows decreases in just two of the three predicted engagement metrics, with all differences just a fraction of one percent.

### *iv) Publisher-Level Heterogeneity*

468. The preceding results are average engagement rates over all publishers and guaranteed contracts. Averaging at this level still leaves open the possibility that some publishers could have suffered a significant loss. To evaluate that possibility, I conducted a similar analysis at the publisher level. I present my findings using a scatterplot in which each point represents a different publisher. On the two axes of the plot are the publisher's engagement metric in the EDA data vs. the same metric in the hypothetical pre-EDA scenario. Figure 17 shows the publisher-level scatterplot for pCTR.[953] If publishers

---

[953] Figure 17 was generated by running the file code/pctr.py in my supporting materials. The figure is located at code/figures/pctr_regression.png.

experienced no selection effects, all points would lie exactly on the 45° line (the black dashed line in <u>Figure 17</u>), indicating that the publisher's pCTR is just the same with or without EDA. Points below the line correspond to publishers with worse pCTR impressions with EDA than without EDA ("adverse selection"), while the points above the line correspond to publishers with better impressions with EDA than without it ("positive selection"). The left panel shows the data for all publishers. The right panel is a zoomed-in version, focused at the range below 0.5% pCTR, where most observations lie. The colors of each point encode the logarithm of the number of impressions allocated to guaranteed contracts in the data. I have also plotted (in red) the line of best fit to those points, using a weighted least-squares regression with zero intercept and with the number of winning impressions as weights.

**Figure 17: Scatterplot of pCTR by publisher**



469. Visually, the line of best fit (in red) and the 45° line (the dashed black line) are nearly indistinguishable, suggesting that EDA had a negligible effect on predicted engagement rates, uniformly across publishers. To express the same finding with a statistic, I calculate

the slope coefficient of the best-fit line (the regression coefficient). If there was no difference in the predicted engagement rates with and without EDA, the regression coefficient would be 1.000. The computed regression coefficient is 0.9956, suggesting that any difference in quality caused by EDA is very small indeed.

470.  The computed regression coefficients for pAVR and pVTR are also suggestive of minor quality differences, with values of 1.001 and 1.014, respectively. The corresponding figures for those predicted engagement metrics can be found in Section XV.C.4 of the Technical Notes.

> *v) My Empirical Analysis Undermines Plaintiffs' Experts Conclusions About "High-Value" Ads*

471.  Together, these findings refute the idea that EDA systematically allocates "low-value" impressions to guaranteed contracts in the way that Plaintiffs and their experts suggest. On the contrary, there is barely any detectable quality difference between the impressions those contracts win or lose. The absence of a material, observed difference in quality in this data suggests that, on the dimensions of impression quality that Google uses for its own purposes, there is no economically important "cream-skimming;" publishers are still able to sell "representative slices" of their inventory.[954] Moreover, since remnant bidders (including header bidders and exchanges in the waterfall) can condition their payments on more information than guaranteed contracts, it is reasonable to expect that, in all or most cases, non-Google bidders suffer even *less* harm than guaranteed contracts from any

---

[954] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 976 ("EDA makes it impossible for publishers to sell a representative slice of their inventory. Inventory that has been cream skimmed by real-time bidders is an adversely selected slice, consisting disproportionately of low-quality impressions.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

hypothetical "cream-skimming" by Google's ad-allocation processes, including DA and EDA.[955]

472.  Professor Li provides a hypothetical in which "performance advertisers" cherry-pick only high-quality impressions. "Brand advertisers," left only with low-quality impressions, are then unable to make a profitable deal with the publisher.[956] Based on my above analysis, his examples[957] are inconsistent with the data, which indicate no significant quality differences between impressions allocated to direct deals compared to the universe of all impressions.

473.  Professor Li additionally argues that "[b]y forcing publishers to accept EDA, Google

---

[955] If "cream-skimming" was a significant factor in any part of the Google ad allocation process, then the residual impressions EDA allocates to guaranteed contracts should be of lower quality than the impressions allocated to either AdX or non-Google exchanges because these residual impressions attracted low bids—below the EDA price—not just by AdX bidders but also by competing exchanges.

[956] *See* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶¶ 978-984 ("Suppose that a publisher has an inventory of impressions, half are low-quality ('bad'), and half are high-quality ('good'). There are two performance advertisers, who bid in real time in a second-price auction. For bad impressions, the performance advertiser's values are independently and uniformly distributed between $0 and $2. For good impressions, those values are independently and uniformly distributed between $1 and $2. There is one brand advertiser, who values bad impressions at $0 and good impressions at $3.60. The brand advertiser wants to purchase 10% of the publisher's inventory. The brand advertiser's goals are hard to quantify [...] so they are unable to bid in real-time for each impression. Suppose that the publisher offers a direct deal to the brand advertiser, selling a representative 10% of its inventory. Half of these are bad impressions (valued at $0), and half are good (valued at $3.60), so the brand advertiser is willing to pay the expected value of these impressions, $1.80 per impression. [...] Suppose that the ad server implements EDA, allowing the performance advertisers to bid in real time for all inventory. The ad server imputes a temporary CPM for the direct deal, calculated so that 10% of inventory goes to the brand advertiser. The resulting temporary CPM is $0.89 (after rounding). The performance advertisers are willing to pay at least $1 for good impressions, so the only impressions available to the brand advertiser are bad impressions, which it values at $0. Thus, the publisher is unable to reach a profitable direct deal with the brand advertiser, and no direct deal occurs.").

[957] *See also* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶¶ 919-921 ("To understand how the reduction in the value of direct deals would come about due to cream skimming, consider an analogy to an apple crate. The 'brand' buyer doesn't care about the color of apples, only their quality, so he is willing to buy the whole crate at a price that reflects their average quality. The 'performance' buyer prefers red apples to green apples, but also higher quality apples to lower quality apples. A performance advertiser values any given green apple less than a brand advertiser, while the reverse is true for red apples. [...] [W]hen the performance buyer picks through the crate, he discriminates not only on color but also quality, taking all the good apples and leaving only bad apples for the brand buyer. Because the brand buyer understands this, he is not willing to pay as much (per apple) for the apples that remain. Indeed, if the reduction in the value of green apples is sufficiently large, then it is possible that the brand advertiser does not buy them at all.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

reduced the incentive of its rivals in the exchange market to engage in innovation that would solve or reduce the cream-skimming problem that potentially arises from selling inventory earmarked as direct deals."[958] However, as my analysis demonstrates, the hypothetical cream skimming problem that Professor Li warns about is empirically unfounded.

474. Professor Li proposes one of my patented auction modifications as a potential alternative to EDA that would "allow real-time bidders to bid on direct-deal inventory without the risk of cream skimming."[959] There were many tools that Google could have used to combat cream skimming if it became a significant issue; Professor Li's suggestion is but one of them. I understand that Google designed a program called "EDA with CTR optimization" intended to make it even more "unlikely that AdX [could] beat a query that would otherwise go to a reservation with a high pCTR."[960] Much like the conclusions of my empirical analysis, Google observed that "[f]or most publishers, this is not a problem,"[961] which is perhaps why Google deprecated "EDA with CTR optimization" by

---

[958] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 942.

[959] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 950 ("A 2011 patent filed by Paul Milgrom, Stephen Cunningham, and Marissa Beck on behalf of Open X, a third-party ad exchange, described a modification to auctions conducted by ad exchanges that would make use of exchange-level data to allow real-time bidders to bid on direct-deal inventory without the risk of cream skimming. Specifically, the modification would exploit the fact that an impression is idiosyncratically valuable only if the highest bid on the ad exchange is much higher than the second-highest bid.").

[960] "Enhanced Dynamic Allocation Comms Doc" (Nov. 6, 2017), GOOG-DOJ-06885161, at -164 ("EDA with CTR improves CTR Optimization performance with EDA by treating both the revenue and click objectives equally, selecting high revenue impressions while not affecting the CTR lift. To do so, EDA uses the pCTR to influence the calculated reserve price, making it unlikely that AdX can beat a query that would otherwise go to a reservation with a high pCTR.").

[961] "Enhanced Dynamic Allocation Comms Doc" (Nov. 6, 2017), GOOG-DOJ-06885161, at -164 ("The launched EDA algorithm slightly favors revenue over CTR - impressions that perform best on AdX are selected in the last stage of ranking ahead of those with high predicted CTR. For most publishers, this is not a problem because CTR and AdX revenue are generally not correlated on the impression level.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

early 2017.[962]

475. Professor Li claims that EDA "exacerbated the cream-skimming problem"[963] because "AdX does not even have to beat the negotiated price of the direct deal impression in order to win."[964] This claim is incorrect for several reasons. First, my data analysis puts to rest any concerns that EDA's method of calculating the floor price "allowed [] cream-skim[ming]."[965] Second, after EDA, publishers retained the ability to configure additional floor prices for AdX that could be equal to or higher than the guaranteed contract price. Overriding the EDA price in this manner would lead to suboptimal revenue, for the reasons I explained in Paragraph 439.k, but any publisher who wished to do so could require AdX bidders to beat the negotiated price of the direct deal impression. Third, if a publisher wished to adjust the EDA price to "mak[e] it unlikely that AdX [could] beat a query that would otherwise go to a reservation with a high

---

[962] Expert Report of Professor Martin Rinard, Ph.D., Dec. 13, 2024 ("Expert Report of M. Rinard"), at Section X ("Enhanced Dynamic Allocation ("EDA") with CTR Optimization was made Ineffective Prior to 2018"), at ¶ 144 ("I reviewed Google's produced source code and determined that EDA with CTR optimization's implementation was potentially operational if the flag was turned on from around January 2015 up to some period before January 15, 2017. In other words, EDA with CTR optimization was inactive and ineffective by January 15, 2017.").

[963] Revised Expert Report of S. Li (Oct. 11, 2024), at Section XII.B.1.c ("The implementation of the temporary CPM exacerbated the cream-skimming problem.").

[964] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 925 ("However AdX does not even have to beat the negotiated price of the direct deal impression in order to win [...] The temporary CPM did not account for how much the direct deal advertiser was willing to pay for that impression. Therefore, AdX did not even compete with guaranteed line items on price. EDA, then, not only allowed for programmatic bidders to cherry pick the best impressions at the expense of direct deals, but it allowed AdX to purchase those direct deals at a price that was below the amount a direct deal advertiser was willing to pay for the impression. This is because the tCPM was based on the distribution of bids for programmatic ads on AdX, not on a distribution of direct deal negotiated CPMs. Direct ad CPMs are, on average, higher than programmatic ad CPMs. As such, it follows that as tCPM did not account for the price a direct deal advertiser was willing to pay but was based on bids for programmatic ads, it permitted AdX to purchase direct deals at a lower price than a direct deal advertiser would be willing to pay."), ¶ 881 ("AdX does not have to beat the negotiated price-per-impression of the direct deal in order to win. This allowed AdX to cream-skim from direct deal inventory, no matter how high its negotiated price.").

[965] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 881.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

pCTR,"[966] Google's EDA with CTR feature was designed to achieve this purpose, though as Google observed and my data analysis confirms, "[f]or most publishers, this is not a problem."[967]

476. My analysis of the predicted-engagement data shows that EDA did not reduce the value of direct deal advertising. But even if it were true that "EDA lowered the value of direct deals,"[968] Professor Li has not shown that any decrease in guaranteed contract revenue would outweigh the increases in revenue from remnant demand sources. Plaintiffs' experts acknowledge that EDA accounted for a significant increase in publisher revenue from AdX.[969]

### 3. Professor Jardin Incorrectly Insinuates that "Fudge Factors" are "Manipulative"

477. Professor Jardin cites internal documents in which engineers use the term "fudge factor" to describe Google's implementation of programs that he claims are "manipulati[ve]."[970]

---

[966] "Enhanced Dynamic Allocation Comms Doc" (Nov. 6, 2017), GOOG-DOJ-06885161, at -164 ("EDA with CTR improves CTR Optimization performance with EDA by treating both the revenue and click objectives equally, selecting high revenue impressions while not affecting the CTR lift. To do so, EDA uses the pCTR to influence the calculated reserve price, making it unlikely that AdX can beat a query that would otherwise go to a reservation with a high pCTR.").

[967] "Enhanced Dynamic Allocation Comms Doc" (Nov. 6, 2017), GOOG-DOJ-06885161, at -164 ("The launched EDA algorithm slightly favors revenue over CTR - impressions that perform best on AdX are selected in the last stage of ranking ahead of those with high predicted CTR. For most publishers, this is not a problem because CTR and AdX revenue are generally not correlated on the impression level.").

[968] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 995.

[969] *See, e.g.*, Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 905 ("By the end of 2014, EDA contributed 485 million incremental queries, and $75 million in incremental revenue for AdX at an annual revenue run rate of $161 million. Nitish Korula, a lead sell-side engineer, estimated that EDA generated $250 million in revenues annually for Google."); Corrected Common Factual Background for Inform Expert Reports (Oct. 29, 2024), at ¶ 97 ("According to Google documents, EDA saw an increase in revenue of 200% from 2014 through 2015. Max Lin claimed EDA increased Google's revenues by $168 million a year. Enhanced Dynamic Allocation grew revenue at a $168 million run rate in 2014. [...] According to Nitish Korula, 'The impact of EDA on Google's gross revenue [is] in excess of $250 million a year.'").

[970] *See* Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 37 ("The sheer number and complexity of Google's various auction manipulation algorithms require Google to engage in mitigation of unforeseen and/or undesired issues when

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

However, the "fudge factors" he emphasizes do not implement "manipulative" or undesirable outcomes, but support features that were advertised to publishers[971] and made DA and EDA work properly.[972] For example, Professor Jardin acknowledges that a "fudge factor" was used to implement "scoring ads," citing a document that states "[f]udge factor: standard and sponsorship line items of priority 7 will actually win against adx line items of priority 8. This is the same through adx line items of priority 12. From 12 onward, priorities are equal during competition."[973] Line item priority is a core feature of the ad allocation process that is advertised to and configurable by publishers, and the "fudge factor" implements exactly the process that was defined in Google's documentation.

---

they result. This is often accomplished with the use of an unfortunately-named 'fudge factor' algorithm and/or value."), ¶¶ 38-39 (citing Google documents and data).

[971] *See, e.g.*, Gannett emails discussing line item priority, from which I can conclude that line item priorities were disclosed to them. Email from A. Shah to C. Pirrone, et al., "RE: 'First Look Ad Exchange Line Item' & 'Edit Line Item Priority' Approval" (Jan. 2, 2013), GANNETT_GOOG_1061578, at -578 ("With this new setting, traffickers would have the ability to modify the priority of line items to a more precise priority than High/Default/Low priority (eg to sponsorship at priority 10, standard at priority 1)."); Email from M. Dinets to M. Dinets, et al., "1st Look Trafficking" (Jan. 24, 2013), GANNETT_GOOG_1014235, at -235 ("By setting this up, the line item can compete against non-remnant ads in DFP (at the priority of your choice) without exposing its inventory to the open auction. If no matching Preferred Deal is booked in the AdExchange, ad selection will continue in your DFP network until a matching ad is found so there's no risk of losing that impression."); Email from T. Wolfe to M. Nolan, "FW: Gannett/Usatoday - Google: product list" (Jan. 24, 2013), GANNETT_GOOG_0049415, at -415 ("We need Gannett to approve enabling the 'edit line item priority feature' in DFP so that AdX can compete more competitively.").

[972] "Team UGS AdX Training" (Mar. 20, 2013), GOOG-AT-MDL-014375348, at -383 ("The importance of delivery type for ads in the non-remnant bucket is reflected by a 'fudge factor' so that goal-based ads have a higher score than ads with no delivery goal. This fudge factor is one of the factors that helps to prevent under-delivery of goal-based ads."). *See also* "EDA (Enhanced dynamic allocation) Q&A" (June 25, 2015), GOOG-TEX-00140206, at -213 ("Question: What is a 'fudge factor'? Answer: The fudge factor is what determines the difference in priority for line items at the same priority.").

[973] Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 38.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## X.  HEADER BIDDING AND THE DUBIOUS "LAST LOOK ADVANTAGE"

### A. Overview

478.  Header bidding is a technology that allows publishers to solicit and compare real-time bids from their selected sets of exchanges and other demand sources.[974] Typically, header bidding used a first-price auction to compare bids from the publisher's chosen demand partners.[975] If a publisher configured its website to run header bidding before offering an impression to AdX, AdX would obtain a so-called "**Last Look**" at each impression. Contrary to Professor Jardin's claims,[976] the so-called "Last Look" was not a Google program, but a consequence of the way that some publishers configured header bidding.[977] Those publishers benefited from offering AdX bidders the chance to bid on inventory (rather than using header bidding alone) because the additional competition for each impression allowed them to earn higher revenues and because it allowed them to enjoy the benefits of the services that GAM provided on each impression.

479.  AdX was not the only exchange that collected bids after header bidding auctions had been resolved: other exchanges with ad servers, such as OpenX, treated header bids

---

[974] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 13 ("When a user visits the publisher's site, the browser calls participating ad exchanges or other demand partners (either directly or via a header bidding server) to submit bids, and runs an auction between those bids before Google's ad server is called.").

[975] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 13 ("These Header Bidding auctions are typically first-price auctions.").

[976] Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 19 ("Based on my review of the Parties' documents, deposition testimony, and Google's source code, it is my opinion that Google's implementation of its Last Look program was harmful to publishers and other auction participants [...] the program does not appear to have any apparent consideration in how it is implemented aside from increasing the auction wins (and associated revenue) for Google.").

[977] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 17 ("'[L]ast look' was not designed to give AdX an advantage when competing against Header Bidding. It was simply the result of the Header Bidding auction taking place before the AdX auction ran and the way that publishers configured Header Bidding line items to work with Dynamic Allocation.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

similarly.[978] As I discuss in Section XIV, when AdX transitioned to the Unified First Price Auction in 2019, AdX bidders and remnant line items (including those representing header bidding) competed simultaneously, eliminating any claimed "Last Look."

480. Publisher Plaintiffs and their experts allege that the so-called "Last Look" gave AdX an advantage over third-party exchanges because "Last Look enabled AdX to engage in bid-rigging behavior"[979] and allowed it to "snipe impressions from [] header bids"[980] by winning "even if only by a penny."[981] However, these allegations are based on flawed analyses that systematically ignore how incentives affect bidder and publisher behavior.

---

[978] OpenX, "Selling Rules" (Dec. 12, 2016), https://web.archive.org/web/20170708051049/https://docs.openx.com/Content/publishers/userguide_inventory_realt imeselling.html, accessed Dec. 10, 2024 ("If the selected line item is for non-guaranteed delivery, before serving the ad for the selected line item, OpenX will give buyers in the real-time bidding exchange the opportunity to bid on the ad space. If a bid is higher than the selected line item, and it matches or exceeds the floor price set for the selling rule, then OpenX serves the ad of the winning bidder, rather than the ad for the line item originally selected by the ad server.").

[979] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 263; Inform Third Amended Complaint, at ¶ 213 ("The DoubleClick ad exchange would wait for other exchanges to submit their bids before making its own, a dynamic that left Google always in a position to outbid its rivals.").

[980] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 140 ("Under header bidding, AdX's 'last look' advantage still allowed it to snipe impressions from winning header bids if it could match or beat the price.").

[981] Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 21 ("This last call was implemented in Google's DFP ad server and afforded Google the opportunity to ultimately 'outbid,' even if only by a penny, virtually any other competing bid–an advantage that became particularly valuable with the rise of header bidding cutting into Google's auction control beginning around 2014."); Daily Mail Second Amended Complaint, at ¶ 47 ("AdX then won the impression if it could outbid the winning header-bidding bid by a penny. Because the header-bidding auction was conducted first, AdX's access to rivals' inside information was called 'Last Look.'"); Gannett Amended Complaint, at ¶ 62 ("AdX then won the impression if it could outbid the winning header-bidding bid by a penny. Because the header-bidding auction was conducted first, AdX's access to rivals' inside information was called 'Last Look.'").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

a. *Bidder incentives*. While Plaintiffs and their experts analogize "Last Look" to "trading on inside information,"[982] "cheat[ing],"[983] "snip[ing],"[984] and "bid-rigging,"[985] the ability to see competing bids in a second-price auction (such as the one AdX used before 2019) does not confer an advantage to the bidder.[986] Indeed, bidders in a second-price auction are incentivized to bid their values regardless of competing bids or the floor price (as described in Section III.C.3.a). Sometimes a winning bid results in trade at the floor price, but—in those cases—*no* alternative bid would lead to a higher price for the publisher. Moreover, Google's own demand sources, Google Ads and DV360, never used bids from header bidding (or the value CPMs of header bidding line items) to adjust the amount they bid on the same impression.[987]

b. *Publisher incentives*. Publishers could maximize their revenues by inflating the header bids that they submitted to AdX (that is, triggering a line item with a

---

[982] Daily Mail Second Amended Complaint, at ¶ 117 ("This Last Look advantage allowed Google to preserve AdX's second-price auction and stabilize its prices only slightly higher than its competitors, rather than submit its highest bid based on the value ascribed to the impression by its DSPs. In that way, Google's trading on inside information depressed publishers' revenue."). *See also* Gannett Amended Complaint, at ¶ 63 ("By contrast, without access to inside information, Google would have offered the highest possible bid so as to maximize its revenue share and minimize the chance of losing the impression. In short, Google traded on inside information and bought Gannett's inventory on the cheap.")

[983] Daily Mail Second Amended Complaint, at ¶ 47 ("AdX instead cheated off its rivals before setting its own bid."). *See also* Gannett Amended Complaint, at ¶ 62 ("AdX instead cheated off its rivals before setting its own bid.").

[984] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 140 ("Under header bidding, AdX's 'last look' advantage still allowed it to snipe impressions from winning header bids if it could match or beat the price.").

[985] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 263 ("Finally, Last Look enabled AdX to engage in bid-rigging behavior that led to substantially depressed revenue for publishers.").

[986] Note that bidders on AdX (and AdX itself) did not observe header bids directly (see Paragraph 483).

[987] "Declaration of N. Jayaram" (May 1, 2024), GOOG-AT-MDL-C-000017969, at ¶ 3 ("Before Google Ad Manager transitioned to a Unified First-Price Auction in 2019, Google Ads and DV360 never used a floor price in an auction for an ad impression to adjust the bid values that they would submit for that same ad impression.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

*higher* value CPM than the winning header bid), leading to higher floor prices on AdX.[988] Even without inflating individual header bids, publishers could set higher floor prices across all impressions to account for the so-called "Last Look" of AdX. The result of either adjustment would be that a bidder on AdX needed to bid (and pay) *more than* a penny above the highest bid made in header bidding in order to win. These higher floor prices reduce or eliminate any advantage that might arise as a result of header bidding being conducted in first-price format (in which bidders optimally bid less than their values, as described in Section III.C.3.b) whereas the AdX auction was conducted in second-price format. In practice, internal Google documents suggest that many publishers, in line with these economic incentives, configured header bidding to trigger line items that set the AdX second-price auction floor *greater* than the highest header bid.[989]

---

[988] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Some publishers set Value CPMs higher than their estimates of what CPM a line item would likely generate to increase competitive pressure in the AdX auction or for other reasons.").

[989] *See* ████████████████████████████████████████████████████████████████████████████████████████████████████████; "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -506 ("[Some publishers] inflate the value CPM of remnant line items [...] publishers used to do this even before HB was popular."); "First-price bidding" (Aug. 12, 2019), GOOG-DOJ-11406673, at -677 ("How boost works[:] The publisher inflates the HB bid before sending it as a floor to AdX[.] This is done to increase Adwords cost and to provide a better comparison between Adwords and header bidder bids[.]"); Email from R. Srinivasan to B. Bender et al., "Unified Auction Changes (Sellside) Executive Update - Aug 12, 2019" (Aug. 13, 2019), GOOG-DOJ-09713317, at -319 ("Today, these [publisher-]inflated CPMs are used to provide price pressure for AdX [...] In practice, [...] many publishers [...] apply a boost to Header Bidding bids[.]"); "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -382 ("Plan to educate pubs around strictly negative revenue consequences of HB price inflation"). I interpret this document, authored in the context of the "Migration to 1P auction" (-358), to mean that inflating header bids was common enough that Google would have to "educate pubs" it was no longer necessary; "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -777 ("Last look [...] incentivizes pubs to inflate ('boost') the floor sent to AdX"); Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

481.  Since 2014, Google's ad server has limited the maximum number of active line items to 61,000[990] in order "to protect the health of the product [and] the performance of [Google's] system."[991] Because some publishers implemented header bidding in GAM using many thousands of line items, several Plaintiffs assert that this "foreclose[d] competition from Header Bidding"[992] However, my analysis of GAM data in Section X.D.3 below finds that publishers rarely approach that threshold in practice, with over 97.5% of publishers utilizing less than 10% of their active line item limit. Although Professor Li opines that "one of the reasons that Google imposed line item restrictions was to curb the adoption of header bidding,"[993] there were legitimate technical reasons to protect its systems from the strain caused by publisher configurations with unusually many line items.[994]

---

[990] "Limits Enforcement" (Feb. 16, 2018), GOOG-DOJ-09494195, at -198 ("Number of active line item limits (please note: Each creative-level targeting criterion counts also toward the active line item limit[:] 61,000").

[991] "Limits Enforcement" (Feb. 16, 2018), GOOG-DOJ-09494195, at -195 ("In 2014, we have started enforcing limits on the creation of certain entities in the DFP UI, e.g. Lls per order, Creatives per LI, Ad units for placements and Targeting attributes in line items. [...] Limits are necessary in order to protect the health of the product, the performance of our system, and are ultimately for the benefit of all publishers and the performance of their UI (unlimited number of entities can affect the UI in terms of load time and serving in some cases). NOTE: Our limits are much higher than those that existed previously in DART.").

[992] Publisher Class First Amended Complaint, at ¶ 305. *See also* Advertiser Class Complaint, at ¶ 281 ("The need to create many line items when interacting with header bidding is problematic because, to foreclose competition from header bidding, Google imposes restrictions on publishers that limit the number of line items a publisher may list."); Daily Mail Second Amended Complaint, at ¶ 192 ("Google documents make it clear that Google's intent was to keep artificial line item caps in place as a 'tool we have to fight [header bidding]'."); Gannett Amended Complaint, at ¶ 212 ("Google documents make it clear that Google's intent was to keep artificial line item caps in place as a 'tool we have to fight [header bidding].'").

[993] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1174.

[994] "Limits Enforcement" (Feb. 16, 2018), GOOG-DOJ-09494195, at -195 ("In 2014, we have started enforcing limits on the creation of certain entities in the DFP UI, e.g. Lls per order, Creatives per LI, Ad units for placements and Targeting attributes in line items. [...] Limits are necessary in order to protect the health of the product, the performance of our system, and are ultimately for the benefit of all publishers and the performance of their UI (unlimited number of entities can affect the UI in terms of load time and serving in some cases). NOTE: Our limits are much higher than those that existed previously in DART."), -197 ("Various events in recent months have underscored the need to put limits in place to protect our customers. These events have led to major performance challenges to diverse aspects of our systems, such as the user interface (UI), forecasting, API, etc. Some of our

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### B. How the So-Called "Last Look" Arose As a Consequence of Some Publishers' Configuration of Header Bidding in GAM

482. **Header bidding** is a technology that allows publishers to request and compare real-time bids from multiple demand sources simultaneously.[995] It began to gain popularity around 2014,[996] years after Dynamic Allocation launched, as a way for publishers to incorporate real-time bids from multiple exchanges.[997] Publishers typically implemented header bidding through snippets of code (in the header of the web page) that sent bid requests from the end user's browser to ad exchanges.[998] Header bidding can be described as an **auction of auctions** because demand sources would typically determine their bids using an internal auction before participating in the header bidding first-price auction.[999]

---

publishers were so adversely impacted that re-implementations of DFP were required."), -202 ("Why this was put in place: We had a client with 8M active LIs that put a huge strain on the system last year").

[995] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 13 ("When a user visits the publisher's site, the browser calls participating ad exchanges or other demand partners (either directly or via a header bidding server) to submit bids, and runs an auction between those bids before Google's ad server is called.").

[996] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 13 ("Around 2014, web publishers began to adopt Header Bidding."). *See also* Alise Zaiceva, "What is Header Bidding? A Complete Guide for Publishers," Setupad (Apr. 11, 2022), https://setupad.com/blog/what-is-header-bidding/, accessed Dec. 13, 2024 ("Header bidding became an industry standard around 2014 when it replaced another popular technique of selling ad inventory–waterfall.").

[997] An internal document describes header bidding as a process motivated by publishers "clamouring" for "per-query bid" functionality from other exchanges, see "Demand Syndication" (Feb. 17, 2016), GOOG-DOJ-09459336, at -337 ("Turns out that getting per-query bids from exchanges dramatically increases yield (auctions more efficient), so pubs are clamouring for this functionality") (emphasis omitted).

[998] My understanding of the configuration of header bidding in DFP is based on "Demand Syndication" (Feb. 17, 2016), GOOG-DOJ-09459336, at -338-339.

[999] *See* "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 13 ("These Header Bidding auctions are typically first-price auctions."). *See also* Prebid.org, "Prebid.js FAQ," https://docs.prebid.org/dev-docs/faq.html, accessed Dec. 13, 2024 ("Header Bidding is a first-price auction [...]").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

483. As described in Section III.D.3.f, header bidding could directly allocate the impression to the highest bidding exchange,[1000] but, for the reasons I discuss in Section X.C below, many publishers sought to integrate header bidding with Google's ad server.[1001] Because line items in DFP were not designed to accept real-time bids from non-Google exchanges,[1002] these publishers used non-guaranteed line items—originally intended to represent static bids from ad networks—to instead represent real-time bids from non-Google exchanges.[1003] To accomplish that, a publisher would configure its header bidding code to select a non-guaranteed line item with an accompanying value CPM in Google's ad server. These value CPMs could be chosen freely by the publisher and, importantly, could differ from the winning header bid. Prebid.js, one of the leading header bidding tools, contains an inbuilt feature to adjust header bids before they are sent to the ad server, with Pubstack, a supply-side tool, detailing how the feature could be used to "giv[e] Prebid an edge in the competition against GAM" by inflating header

---

[1000] *See* Prebid.org, "Running Prebid.js without an ad server," https://docs.prebid.org/dev-docs/examples/no-adserver.html, accessed Dec. 13, 2024 ("This example demonstrates running [a header bidding] auction and rendering without an ad server.").

[1001] *See* "Header Bidding Observatory #1" (Jan. 2017), GOOG-DOJ-AT-01027937, at -939 ("43% of LPS publishers are using header tags").

[1002] Deposition of S. Spencer (DOJ CID) (Aug. 12, 2021), at 71:16-71:21 ("So in the original design of the system, it was not designed to put exchanges in as line items. Line items are designed to represent direct deals or network deals."); Deposition of J. Giles (DOJ CID) (Nov. 6, 2020), at 50:5-52:20 ("The way the system was built is that line items were always intended to be reservations. There wasn't a concept of using them for realtime pricing. And so we had in mind that publishers would have, you know, possibly thousands of line items and the system was built to scale to that, but with using line items for realtime pricing, which is not what they were designed to be used for, there were ten, sometimes ten times, sometimes 100 times, sometimes 1,000 times more line items than the system was designed to support.").

[1003] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 14 ("Up until at least December 2021, the winning bid from the Header Bidding auction was typically used to trigger a specific line item that the publisher had booked within Google's ad server (most commonly a remnant line item), and […] the Value CPM of that line item could represent the winning Header Bidding bid as a floor in the AdX auction (prior to September 2019) or as a competing bid in the Unified First Price Auction (from September 2019 onwards).").

bids.[1004] The actual header bids are not directly observed by GAM or bidders on AdX, contrary to several experts' claims.[1005] GAM would use the value CPM of the header bidding line item in its ad selection process (including DA and EDA). As a result, the highest bid from an AdX bidder would win the impression only if it exceeded the highest value CPM associated with header bidding line items and any other floor prices that might apply to the impression. If there was no such higher bid into AdX and the header bidding line item had the highest value CPM among all the other line items, the impression would be allocated to the winning header bidder.[1006]

484. In each auction, AdX bidders are informed of the highest floor price applying to that impression.[1007] Because a header bidding line item sometimes determines the auction's

[1004] Asmaâ Bentahar, "Bid Adjustments Simplified: Run Fair Auctions with no Hassle," Pubstack (May 2, 2021), https://www.pubstack.io/topics/bid-adjustments-simplified, accessed Dec. 12, 2024 ("Alternatively, this next one will slightly increase all returned CPMs, giving Prebid an edge in the competition against GAM").

[1005] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 286 ("[...] AdX knew the highest other bid before running its auction and returning a bid."), 299 ("The effect is the same as if the AdX bidder was allowed to decrease their offers ex post, with knowledge of their rival's bid."). *See also* Expert Report of P. Peña (Oct. 7, 2024), at p. 20 ("[W]ith Last Look, Google also gave its ad exchange the ability to view the bids of other ad exchanges and meet (without exceeding) the price to appropriate the ad property being auctioned."); Expert Report of A. Das (Oct. 4, 2024), at ¶ 137 ("In either, AdX had a 'last look' at the highest bid from header bidding.").

[1006] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Under Dynamic Allocation, the Value CPM associated with the best eligible non-guaranteed line item could set the floor price in the AdX auction"), ¶ 12 ("If AdX returned a bid with an effective CPM higher than the best eligible remnant line item's CPM, the AdX ad won. If AdX returned a bid with a lower effective CPM, the best eligible remnant line item won"), ¶ 14 ("Up until at least December 2021, the winning bid from the Header Bidding auction was typically used to trigger a specific line item that the publisher had booked within Google's ad server (most commonly a remnant line item), and […] the Value CPM of that line item could represent the winning Header Bidding bid as a floor in the AdX auction (prior to September 2019) or as a competing bid in the Unified First Price Auction (from September 2019 onwards).").

[1007] Before 2016, Authorized Buyers (then "AdX buyers") could only see the highest floor price among the "rule" floor prices set by the publisher and any floor price determined by RPO, but since 2016, all bidders see the highest among all the floor prices, including those determined by the value CPMs of remnant line items. *See* "Including Third-Party Threshold in the Revealed Reserve Prices to AdX Buyers" (Aug. 9, 2016), GOOG-DOJ-13208800, at -800 ("We propose to include third-party threshold in the revealed reserve prices sent to AdX buyers, in support to AdX dynamic revshare v2 launches. Currently we reveal the maximum of rule prices and RPO prices in the RTB as well as JEDI callouts and in the internal RPC to GDN / DBM. With this change we will reveal the maximum of rule prices, RPO prices, as well as third-party threshold (e.g., EDA prices, competing DFP line item prices).").

floor price, critics have sometimes described AdX as having had a "Last Look" over header bids.[1008] However, as just described and as I describe in further detail in Section X.D.1 below, the resulting floor price need not be *equal to* the winning header bid. In fact, publishers had an incentive to, and often did, set the floor price *higher than* the winning header bid, which might allow the header bid to win even when the winning bid on AdX was higher. By setting floor prices in this manner, a bidder on AdX would need to bid (and pay) *more than* a penny above the highest bid from a header bidding exchange in order to win the impression.

485. A 2019 Google presentation[1009] shows, in 42% of queries won by header bidding, the AdX floor exceeded the header bidding line item price. While the experiment cannot account for it, as I described above, the triggered line item *itself* may already represent a boosted header bid. This is direct evidence that publishers understood how to leverage AdX's floor price to seek out a better deal.

486. The so-called "Last Look" was not a Google program: it arose as a consequence of the way that publishers configured header bidding using the line item capabilities that publisher ad servers (including DFP) supported at the time header bidding was introduced.[1010] A system that incorporated non-Google exchanges reporting real-time bids directly to GAM required a major redesign, which Google later initiated with the

---

[1008] "Changes to Ad Manager auction" (Jan. 10, 2019), GOOG-DOJ-10924270, at -273 ("AdX and EB have visibility into remnant price before they submit bids (commonly referred to in market as 'last look')").

[1009] "Changes to Ad Manager auction" (Jan. 10, 2019), GOOG-DOJ-10924270 at -292.

[1010] "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 17 ("'[L]ast look' was not designed to give AdX an advantage when competing against Header Bidding. It was simply the result of the Header Bidding auction taking place before the AdX auction ran and the way that publishers configured Header Bidding line items to work with Dynamic Allocation.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

implementation of Open Bidding and completed with the Unified First Price Auction, which I discuss further in <u>Section XIII</u>. Publishers using ad servers besides DFP employed similar techniques to integrate header bidding. Documentation from OpenX—another company that operated both an ad server[1011] and an ad exchange—indicates that publishers using their ad server and exchange integrated header bidding in a similar way to publishers using GAM: OpenX bidders competed *after* third-party remnant demand, with header bids determining floor prices.[1012] █████████

██████████████████████████████████████████████ [1013]

### C. Publishers Benefited from the So-Called "Last Look"

487. Publishers could use header bidding to sell online display advertising impressions without ever calling GAM or another publisher ad server.[1014] But offering AdX bidders a chance to bid on inventory provided two important benefits for publishers.

---

[1011] OpenX shut down its ad server after 2018. *See* Sarah Sluis, "OpenX Lays Off 100 Employees And Pivots To Video," AdExchanger (Dec. 18, 2018), https://www.adexchanger.com/platforms/openx-lays-off-100-employees-and-pivots-to-video/, accessed Dec. 12, 2024.

[1012] *See* OpenX, "Selling Rules" (Dec. 12, 2016), https://web.archive.org/web/20170708051049/https://docs.openx.com/Content/publishers/userguide_inventory_realtimeselling.html, accessed Dec. 10, 2024 ("If enabled, you can designate inventory to sell through OpenX Ad Exchange using selling rules […] When OpenX receives an ad request for inventory defined by a selling rule, it proceeds with the selection process and selects an eligible line item for the ad space. If the selected line item is for non-guaranteed delivery, before serving the ad for the selected line item, OpenX will give buyers in the real-time bidding exchange the opportunity to bid on the ad space. If a bid is higher than the selected line item, and it matches or exceeds the floor price set for the selling rule, then OpenX serves the ad of the winning bidder, rather than the ad for the line item originally selected by the ad server.").

[1013] ████████████████████████████████████████████

[1014] Prebid.org, "Running Prebid.js without an ad server," https://docs.prebid.org/dev-docs/examples/no-adserver.html, accessed Dec. 13, 2024 ("This example demonstrates running [a header bidding] auction and rendering without an ad server.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

488. *First*, by allowing competition from an additional source of demand, publishers could increase their revenues on each impression. As long as publishers triggered a header bidding line item with a value CPM at least as large as the best header bid (which they had a clear incentive to do), GAM's ad selection process could increase revenue from the impression, but could never reduce it.

489. *Second*, publishers could take advantage of the other services provided by GAM in combination with header bidding. For example, a publisher that used GAM to manage guaranteed contracts could combine the benefits of header bidding and EDA: a publisher could run header bidding on an impression before calling GAM, and EDA could allocate the impression to the guaranteed contract or the header bid (or another line item), depending on which was expected to maximize publisher revenues.

### D. Responding to Plaintiffs' and Their Experts' Allegations

#### 1. Plaintiffs and Their Experts Mistakenly Claim that AdX Buyers Benefit from Additional Information Provided by the So-Called Last Look

490. Daily Mail and Gannett assert that the so-called "Last Look" enabled AdX to "trade[] on inside information"[1015] and "shave[] off the top [of its bid] because it knew the next highest price to beat,"[1016] causing those publishers "significant financial harm."[1017] Inform

---

[1015] Daily Mail Second Amended Complaint, at ¶ 48 ("In short, Google traded on inside information and bought Daily Mail's inventory on the cheap."); *See also* Gannett Amended Complaint, at ¶ 63 ("In short, Google traded on inside information and bought Gannett's inventory on the cheap.").

[1016] Daily Mail Second Amended Complaint, at ¶ 48 ("Rather than AdX submitting the highest bid available from its participating DSPs, based on the value of the impression to those DSPs, AdX shaved off the top because it knew the next highest price to beat."); *See also* Gannett Amended Complaint, at ¶ 63 ("Rather than AdX submitting the highest bid available from its participating DSPs, based on the value of the impression to those DSPs, AdX shaved off the top because it knew the next highest price to beat.").

[1017] Daily Mail Second Amended Complaint, at ¶ 48 ("Last Look caused Daily Mail significant financial harm for several years."); *See also* Gannett Amended Complaint, at ¶ 63 ("Last Look caused Gannett significant financial harm for several years.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

makes similar allegations.[1018] Plaintiffs' experts seemingly agree, with Professor Li introducing "Last Look" as "the advantage AdX had in auctions by nature of being called last by DFP,"[1019] and that "Last Look enabled AdX to engage in bid-rigging behavior that led to substantially depressed revenue for publishers."[1020] This advantage is often referred to as AdX's "Last Look advantage." These allegations are wrong.

491.    AdX ran a *second-price* auction at the time that DA was launched. As I have explained in Section III.C.3.a, observing others' bids does not advantage bidders in a second-price auction. The reason is that a surplus-maximizing bidder in a second-price auction bids *without regard to the floor price and the bids of other bidders*. The bidding programs used by Google's own demand sources in the AdX second-price auction conform to this theoretical prediction; contrary to claims made by Daily Mail, Gannett, and experts,[1021]

---

[1018] Inform Third Amended Complaint, at ¶ 213 ("The DoubleClick ad exchange would wait for other exchanges to submit their bids before making its own, a dynamic that left Google always in a position to outbid its rivals. By having the 'Last Look,' Google's exchange could simply bid $5.01 when the highest bid for a particular user from another exchange was $5.00.").

[1019] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 262 ("In this section, I begin with a description of "Last Look," which was the advantage AdX had in auctions by nature of being called last by DFP, after all other exchanges, excluding those routed through Exchange Bidding.").

[1020] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 263. *See also* Expert Report of A. Das (Oct. 4, 2024), at ¶ 111 ("AdX had two distinct advantages over third-party exchanges in the waterfall [...] (2) a peek at the highest competing value from third-party demand sources ('last look')").

[1021] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 299 ("Last Look insulates AdX bidders from both these risks, by modifying their offers after peeking at rival bids"). *See also* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 763 ("I understand from counsel that the below facts, among others, demonstrate that Google's Last Look conduct was deceptive under New York law: a. Google's contracts with Daily Mail and Gannett include provisions that prohibit using 'Data entered by Company that is not generally shared with buyers for purposes of informing bids made on behalf of Google's AdWords service or the Google Bid Manager service.' b. Google also maintained that it ran a fair and transparent second price auction on AdX. By using publisher data as an informational advantage allowing it to win bids by a penny, Google was not running an actual second price auction much less a fair and transparent one. c. Google's Last Look advantage allowed AdX to beat rival exchanges because Google's ad server let AdX trade on inside information. Last Look also meant that AdX could bid less than it otherwise would, because it could win the impression by bidding a penny more than the highest bid submitted to DFP."); Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 19 ("[...] Google's implementation of its Last Look program was harmful to publishers and other auction participants, including Inform, because it (1) made Google AdX, as an auction participant, privy to bid prices to an extent that all other auction participants were not; (2) it afforded Google AdX the opportunity to utilize this unfair advantage to both bid on the most valuable inventory and to win additional auctions via late-stage bids sent directly to the ad server [...]"); Expert Report of J. Chandler (Oct. 4, 2024), at ¶¶

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Google's bidding programs did not adjust bids based on the floor prices set by header bids.[1022] If bids do not change in response to floor prices, the ability to see floor prices cannot harm publishers' revenues or benefit AdX bidders.

492. This mistake is further evident in an example from Daily Mail and Gannett, where both argue that "if header bidding returned a $4.00 bid, Google could win the impression for $4.01 rather than offer the best price (e.g., $6.00) from its DSPs," before ultimately concluding that "[i]n short, Google traded on inside information and bought [] inventory on the cheap."[1023] However, notice that in a second-price auction, whether the DSP valuing the impression at $6.00 bids $4.01 or $6.00, it still pays $4.01; it gains no benefit from altering this bid or by knowing the floor price triggered by the competing header bidder. Moreover, the example implausibly presumes that (a) contrary to its incentives, the publisher passed the header bid on to AdX without modification, (b) contrary to its incentives, the publisher did not configure a floor price for AdX higher than the header

---

137-140 ("This privileged position allows the entity with the 'last look' to see all the competing bids and then decide whether to outbid the highest bid or let it stand. The 'last look' advantage is significant for several reasons. First, it provides a competitive edge, enabling the privileged participant to always submit the highest bid and consistently win the auction for valuable ad impressions. This competitive edge leads to a higher win rate compared to other bidders who do not have the opportunity to see competing bids before submitting their own. Second, with visibility of all other bids, the 'last look' participant can strategically bid just above the highest competing bid, minimizing their costs while still securing the impression. This optimized bidding allows the 'last look' participant to maximize its return on investment by paying only slightly more than the next highest bidder, rather than potentially overbidding in a blind auction. Third, the 'last look' privilege provides valuable insights into competitors' bidding strategies and market prices. This data can be used to refine their own bidding algorithms, better understand market dynamics, and improve future bidding decisions."); Daily Mail Second Amended Complaint , at ¶ 48 ("Rather than AdX submitting the highest bid available from its participating DSPs, based on the value of the impression to those DSPs, AdX shaved off the top because it knew the next highest price to beat."); Gannett Amended Complaint, at ¶ 63 ("Rather than AdX submitting the highest bid available from its participating DSPs, based on the value of the impression to those DSPs, AdX shaved off the top because it knew the next highest price to beat.").

[1022] *See* "Declaration of N. Jayaram" (May 1, 2024), GOOG-AT-MDL-C-000017969, at ¶ 3 ("Before Google Ad Manager transitioned to a Unified First-Price Auction in 2019, Google Ads and DV360 never used a floor price in an auction for an ad impression to adjust the bid values that they would submit for that same ad impression.").

[1023] Daily Mail Second Amended Complaint, at ¶ 48. *See also* Gannett Amended Complaint, at ¶ 63 ("In short, Google traded on inside information and bought Gannett's inventory on the cheap.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

bidding bid, and (c) AdX only had a single bidder exceeding the floor price. If any of these presumptions were removed, the publisher would receive more than $4 for the impression.

493.    The Publisher Class make a similar economic error in claiming that header bidding "dramatically increased revenues for publishers using Google's Ad Server" because "by 2019 Header Bidding was utilizing first-price auctions in which the publisher receives the amount of the highest bid, as compared with Google's then-prevailing second-price auction in AdX where the highest bidder wins the auction but pays only the amount of the second-highest bid."[1024] This claim disregards bidders' incentives to change their strategies in response to auction rules (notably, to shade bids in a first-price auction). Indeed, in doing so, the claim directly contradicts an economic result known as the Revenue Equivalence Theorem, under which a publisher would expect to receive the same revenue on average under either auction mechanism.[1025]

---

[1024] Publisher Class First Amended Complaint, at ¶ 302 ("Header Bidding dramatically increased revenues for publishers using Google's Ad Server because [...] by 2019 Header Bidding was utilizing first-price auctions in which the publisher receives the amount of the highest bid, as compared with Google's then-prevailing second-price auction in AdX where the highest bidder wins the auction but pays only the amount of the second-highest bid [...].").

[1025] *See* Milgrom, P. R,. *Putting auction theory to work*, Cambridge University Press (2004), at pp. 73-77. *See also* Myerson, R. B., "Optimal auction design," Mathematics of Operations Research, Vol. 6 (1981), at pp. 58-73; Klemperer, P., "Auction theory: A guide to the literature," Journal of Economic Surveys, Vol. 13 (1999), at pp. 227-86; McAfee, R. P., & McMillan, J., "Auctions and bidding," Journal of Economic Literature, Vol. 25 (1987), at pp. 699-738.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### *2. Plaintiffs and Their Experts Neglect Publishers' Ability and Incentive to Inflate the Winning Header Bid*

494. Several Plaintiffs allege that, in letting "AdX [win] the impression if it could outbid the winning header-bidding bid by a penny,"[1026] the so-called "Last Look" gave "AdX a substantial competitive advantage."[1027] Plaintiffs' experts echo this argument, with Professor Li stating that "the AdX bidder never misses a profitable opportunity to win."[1028] But this is wrong.

495. Plaintiffs' and their experts' conclusions are based on an incorrect qualitative analysis. After properly accounting for bidder and publisher incentives, I find that the so-called "Last Look" did not provide AdX bidders with any such inherent advantage.

---

[1026] Daily Mail Second Amended Complaint, at ¶ 47 ("AdX then won the impression if it could outbid the winning header-bidding bid by a penny."). *See also* Gannett Amended Complaint, at ¶ 62 ("AdX then won the impression if it could outbid the winning header-bidding bid by a penny.").

[1027] Daily Mail Second Amended Complaint, at ¶ 122 ("In 2019, Google recognized that Last Look gave AdX a substantial competitive advantage and that moving away from it would promote fairness and transparency for publishers."). *See also* Gannett Amended Complaint, at ¶ 145 ("A Google study confirms that Last Look caused advertisers to migrate from non-Google exchanges to AdX and Google's DSPs. And Google has admitted internally that 'Last Look is inherently unfair.' In 2019, Google internally recognized that Last Look gave AdX a substantial competitive advantage and that moving away from it would promote fairness and transparency for publishers.").

[1028] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 302 ("The second advantage is that the AdX bidder never misses a profitable opportunity to win. That is, whenever the rival bid is below the AdX bidder's value (in this case, $4.00), Last Look ensures that the AdX bidder will win the auction. Thus, the AdX bidder wins whenever it would be profitable for them to do so."), ¶ 321 ("As I have explained in Section VII.B.1, AdX bidders have an advantage over bidders on third-party exchanges due to Last Look. This disadvantages rival exchanges and lowers their bidders' probability to win [...]"), ¶ 326 ("The short-term effect of Last Look, as I have explained in Section VII.A.1, is that AdX wins impressions that it would have otherwise lost to a third-party bidder."), ¶ 382 ("The Last Look advantage significantly reduced the take-rate competition AdX faced. As I explained in Section VII.B.2, Last Look increased the incentive for advertisers to bid through AdX instead of through third-party exchanges. This reduced competition in the exchange market and increased AdX's ability to profitably increase its take rate."); *See also* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 282 ("[I]f the highest bid put forth by a competitor exchange was $1, Last Look enabled AdX to bid just one cent above that, regardless of whether its highest bid was $1.01 or $101."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 763 ("Last Look also meant that AdX could bid less than it otherwise would, because it could win the impression by bidding a penny more than the highest bid submitted to DFP."); Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 140 ("Under header bidding, AdX's 'last look' advantage still allowed it to snipe impressions from winning header bids if it could match or beat the price."); Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 21 ("This last call was implemented in Google's DFP ad server and afforded Google the opportunity to ultimately 'outbid,' even if only by a penny, virtually any other competing bid–an advantage that became particularly valuable with the rise of header bidding cutting into Google's auction control beginning around 2014.").

496. Most importantly, Plaintiffs' and their experts' arguments ignore how publisher

incentives affect their choices of floor prices.[1029] The claim that the so-called "Last Look"

allowed AdX bidders to pay "a penny" more than the header bid requires the assumption

that publishers set the AdX floor price less than or equal to the winning header bid. In

reality, publishers experimented with floor prices[1030] and any floor price determined by

the header bidding line item could be *higher* than the bid itself. Indeed, publishers had an

incentive to set floor prices that way, and there is evidence that publishers did just

that[1031]—including from Daily Mail, which has acknowledged that it "set a floor for AdX

---

[1029] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 276 ("AdX receives information on the highest header bid of $2 as a price floor. This is ranked with the other bids AdX received ($6, $2, $1.5, $1). The $6 still wins, but AdX sets the clearing price as the highest header bid (i.e., the floor), at $2. In other words, AdX has set its clearing price equal to the header bidding clearing price ($2), so it wins the impression over header bidding. The publisher is paid $2. This is depicted below in Figure 13."), ¶ 299 ("The effect is the same as if the AdX bidder was allowed to decrease their offers ex post, with knowledge of their rival's bid."); *see also* Expert Report of P. Peña (Oct. 7, 2024), at p. 20 ("[W]ith Last Look, Google also gave its ad exchange the ability to view the bids of other ad exchanges and meet (without exceeding) the price to appropriate the ad property being auctioned."); Expert Report of A. Das (Oct. 4, 2024), at ¶ 137 ("In effect, AdX had a "last look" at the highest bid from header bidding."); Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 40 ("In the context of header bidding [...] Dynamic Allocation afforded AdX a 'last look' advantage on winning bids based on submitting the winning bid of a previous real-time header bidding auction as the floor price in a separate real-time AdX-only auction held afterward for that impression."), ¶ 318 ("Thus, when a publisher used header bidding, DFP did compare the winning real-time rival bid in header bidding to a real-time AdX bid made afterwards.").

[1030] Professor Li acknowledges that publishers responded to incentives, setting different floor prices for different exchanges. Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 391 ("[P]rior to the introduction of Unified Pricing Rules, publishers set differential floors [...]").

[1031] *See* ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████ "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -506 ("[Some publishers] inflate the value CPM of remnant line items [...] publishers used to do this even before HB was popular."); "First-price bidding" (Aug. 12, 2019), GOOG-DOJ-11406673, at -677 ("How boost works[:] The publisher inflates the HB bid before sending it as a floor to AdX[.] This is done to increase Adwords cost and to provide a better comparison between Adwords and header bidder bids[.]"); Email from R. Srinivasan to B. Bender et al., "Unified Auction Changes (Sellside) Executive Update - Aug 12, 2019" (Aug. 13, 2019), GOOG-DOJ-09713317, at -319 ("Today, these [publisher-]inflated CPMs are used to provide price pressure for AdX [...] In practice, [...] many publishers [...] apply a boost to Header Bidding bids[.]"); "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -382 ("Plan to educate pubs around strictly negative revenue consequences of HB price inflation"). I interpret this document, authored in the context of the "Migration to 1P auction" (-358), to mean that inflating header bids was common enough that Google would have to "educate pubs" it was no longer necessary. *See also* "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -777 ("Last look [...] incentivizes pubs to inflate ('boost') the floor sent to AdX"); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Some publishers set Value CPMs higher than their estimates of what CPM a line item would likely generate to increase competitive pressure in the

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

as some multiple of the highest bid obtained from header bidding."[1032] Below, I correct Plaintiffs' and their experts' analyses by asking and answering three questions.

497.  *First*, does the AdX second-price auction with a floor price based on winning header bids inevitably advantage AdX bidders? *No*.

498.  Header bidding auctions are typically first-price auctions. As I have argued in Section III.C.3.b, in first-price auctions, it is optimal for bidders to shade their bids: that is, an exchange that participates in a header bidding auction will produce a bid less than the value of its highest bidder. For example, it might be optimal for an exchange to produce a $1 bid for an impression in a first-price header-bidding auction when its highest bidder's value is $1.50. *If* the publisher uses that $1 bid as its floor price in AdX's second-price auction, the header bidder would lose the auction to an AdX bidder who truthfully reports a value of $1.10, even though the AdX bidder has the lower value. Professor Li uses a functionally similar example to argue that "the AdX bidder never leaves money on the table when it wins" and "never misses a profitable opportunity to win."[1033] *But* the publisher could (and would have an incentive to) reverse this effect by choosing a higher floor price for the AdX auction, which it can do by triggering a header bidding line item with a value CPM inflated above the header bidding offer. For example, if it triggers a

---

AdX auction or for other reasons."); Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding.").

[1032] Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding.").

[1033] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶¶ 300-302 ("For instance, suppose that a bidder on a rival exchange has a value of $5.00 and shades their bid, submitting a bid of $3.00. The AdX bidder has a value of $4.00, and bids $4.00 because AdX's second-price auction is truthful. Because of Last Look, the rival bid of $3.00 becomes a reserve price on AdX, and the AdX bidder wins the impression at a price of $3.00.As this example illustrates, the AdX bidder receives two advantages from Last Look. The first advantage is that the AdX bidder never leaves money on the table when it wins [...] The second advantage is that the AdX bidder never misses a profitable opportunity to win [...].").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

line item with value CPM equal to $1.50—so that the AdX floor price is $1.50—then the AdX bidder has *no advantage* from the so-called "Last Look": it loses because its bid of $1.10 falls below the floor price. Indeed, with a floor price of $1.50, an AdX bidder can only win if it is willing to pay at least $1.50 for the impression, which is the same as the bid it would need to win a (hypothetical) second-price auction combining bids from header bidders and AdX bidders. If the publisher chose an even higher floor price than $1.50, the AdX bidder would be *disadvantaged*: to win, its bid would need to exceed the header bidder's value. Publishers could readily configure header bidding to more generally implement this bid adjustment procedure.[1034]

499. *Second,* does a publisher using header bidding have an *incentive* to increase AdX floor prices as just described, reducing or reversing the claimed "Last Look" advantage? *Yes.*

---

[1034] *Se* ███████████████████████████████████████████████████████████████████████ "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -506 ("[Some publishers] inflate the value CPM of remnant line items [...] publishers used to do this even before HB was popular."); "First-price bidding" (Aug. 12, 2019), GOOG-DOJ-11406673, at -677 ("How boost works[:] The publisher inflates the HB bid before sending it as a floor to AdX[.] This is done to increase Adwords cost and to provide a better comparison between Adwords and header bidder bids[.]"); Email from R. Srinivasan to B. Bender et al., "Unified Auction Changes (Sellside) Executive Update - Aug 12, 2019" (Aug. 13, 2019), GOOG-DOJ-09713317, at -319 ("Today, these [publisher-]inflated CPMs are used to provide price pressure for AdX [...] In practice, [...] many publishers [...] apply a boost to Header Bidding bids[.]"); "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -382 ("Plan to educate pubs around strictly negative revenue consequences of HB price inflation"). I interpret this document, authored in the context of the "Migration to 1P auction" (-358), to mean that inflating header bids was common enough that Google would have to "educate pubs" it was no longer necessary. *See also* "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -777 ("Last look [...] incentivizes pubs to inflate ('boost') the floor sent to AdX"); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Some publishers set Value CPMs higher than their estimates of what CPM a line item would likely generate to increase competitive pressure in the AdX auction or for other reasons."); Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding."); Asmaâ Bentahar, "Bid Adjustments Simplified: Run Fair Auctions with no Hassle," Pubstack (May 2, 2021), https://www.pubstack.io/topics/bid-adjustments-simplified, accessed Dec. 12, 2024 ("Alternatively, this next one will slightly increase all returned CPMs, giving Prebid an edge in the competition against GAM").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

500.    In a second-price auction, it is always profitable for a publisher to trigger an AdX floor price higher than the highest header bid. Indeed, as Professor Li writes, a "header bid is money in [] hand for the publisher, so [] offering the same price makes publishers no better off."[1035] This is why publishers are incentivized to set the floor price in AdX strictly above the header bid, a fact that aligns with a textbook result in auction theory.[1036] In Professor Li's words, "publishers should set reserves that account for their outside options,"[1037] and it is optimal for them to set them strictly above the value of their outside option.

501.    In the above example, the publisher who has a $1 winning header bid in hand is *guaranteed* to sell the impression for $1 simply by allocating the impression to the winning header bidder. *If* the publisher uses that $1 bid as its floor price in AdX's second-price auction, then the publisher gains only when at least *two* bids in AdX's second-price auction are above $1. *But* the publisher can always do better: for instance, by triggering a header bidding line item with a value CPM of $1.01, the publisher gains when at least *one* bid in AdX's second-price auction is above $1. Of course, the publisher can do even better by setting the *optimal* value CPM based on the publisher's probabilistic assessments about bids in the AdX auction or based on experiments that it may run.

---

[1035] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 523.

[1036] Krishna, V., *Auction theory* (2nd ed.), Academic Press (2010), at p. 23 ("[A] revenue maximizing seller should always set a reserve price that exceeds his or her value.") (emphasis omitted).

[1037] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 527 ("Academic literature suggests that publishers should set reserves that account for their outside options. For instance, the seminal work of Myerson (1981) derives the profit-maximizing reserve price for a seller with a 'personal value estimate for the object, if he were to keep it and not to sell it'. Under Myerson's canonical assumptions, the profit-maximizing reserve is strictly increasing in the seller's outside option.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

502.  *Third*, if a publisher chooses floor prices *optimally* to maximize its average revenues and buyers bid to maximize their profits, are AdX bidders always advantaged compared to header bidders as a consequence of the so-called "Last Look"? *No.*

503.  In Theorem 3 below, I show that, in a standard model of auctions and the same one that Plaintiffs' experts recommend,[1038] when all participants maximize their payoffs, AdX bidders enjoy no advantage over header bidders arising from the so-called "Last Look."

504.  **Theorem 3:** Suppose that (i) a publisher sells an impression to a fixed set of bidders, including bidders on AdX; (ii) the publisher does not know each bidder's value for the impression; (iii) bidders do not know each other's values for the impression; and (iv) all participants understand the rules and have the following information:

    a.  Each bidder knows its own value for the impression.

    b.  Each bidder's value is drawn from a commonly-known probability distribution[1039] and is statistically independent from other bidders' values.[1040]

---

[1038] This "independent private value[s]" assumption is endorsed by Plaintiffs' experts. *See*, e.g., Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1360 ("In the context of exchange auctions, the private values assumption is more plausible than the common values assumption. Bidders in exchange auctions are anonymous to each other at the point of bidding, and are drawn from a diverse set of industries. An advertiser looking to sell car seats and an advertiser looking to sell video games care about different features of the impression. Thus, each bidder is unlikely to make strong inferences about their own value for the impression, based on other bidders' estimates."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶¶ 946-948 ("This type of model is called an 'independent private values' model, since it is assumed that (a) the bidders' values (even of the same type) are potentially different from each other (i.e., private), and (b) one bidder's value does not contain any information about another bidder's value for the auctioned item (i.e., independent). This is one of the most common types of models used in auction theory, and is used in both the seminal work by Guerre, Perrigne, and Vuong in 2000 and in the 2001 and 2011 extensions by Athey, Levin, and Seira. This model provides a suitable setting to study the environment of display ad auctions.") (internal citations omitted).

[1039] I assume that this probability distribution satisfies a technical condition called "Myersonian regularity," described in Section XV.D, which ensures that the optimal mechanism for selling the impression is an auction.

[1040] This implies that each bidder and the publisher can make a probabilistic assessment about other bidders' values and estimates of other bidders' values would not be changed upon learning one bidder's value.

    c.   Each bidder determines a bid as a function of its value to maximize its surplus from the impression, given its probabilistic assessments about the bids of other bidders.

Then, if the publisher chooses revenue-maximizing floor prices, the expected revenues it earns in a single unified first- or second-price auction are exactly the *same* as what is earned under the so-called "Last Look," where a first-price header bidding auction is followed by a second-price auction for AdX.[1041] Moreover, given those optimal floor prices, each header bidder has the same chance of winning and the same expected surplus as an identical bidder on AdX.

505.    These outcomes contradict claims by Daily Mail and Gannett that, relative to a unified first-price auction, the "Last Look" led to "depressed" publisher revenues and increased AdX volume.[1042] And these outcomes contradict claims by Plaintiffs' experts, who argue that the "Last Look" "harmed publisher revenue and harmed allocative efficiency, compared to the counterfactual of all exchanges bidding in a unified first-price auction

---

[1041] More specifically, the theorem considers an auction game in which the publisher moves first, the header bidders second, and AdX bidders last. The publisher selects header bidding floor prices and a function to map each header bid it receives into a floor price for the AdX auction; the header bidders select their bids; and then finally the AdX auction is run.

[1042] Daily Mail Second Amended Complaint, at ¶ 117 ("In that way, Google's trading on inside information depressed publishers' revenue."), ¶ 123 ("Google's Last Look behavior was monopsonistic: rather than bid at competitive prices and compete with rivals for advertiser demand on price and quality of service, Google secured more advertisers bidding in AdX at reduced prices. Thus, Google was able to take exchange volume from rivals and intermediate a higher share of lower-value transactions."). *See also* Gannett Amended Complaint, at ¶ 140 "In that way, Google's trading on inside information depressed publishers' revenue."), ¶ 146 ("Google's Last Look behavior was monopsonistic: rather than bid at competitive prices and compete with rivals for advertiser demand on price and quality of service, Google secured more advertisers bidding in AdX at reduced prices. Thus, Google was able to take exchange volume from rivals and intermediate a higher share of lower-value transactions.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

with no Last Look advantages,"[1043] and that "Last Look disadvantaged bidders on rival exchanges compared to AdX."[1044]

506. A proof of Theorem 3 can be found in Section XV.D. The intuition for the result is that, after receiving the bids from header bidders, publishers can ensure that a bidder on AdX wins only if its value is higher than those of all header bidders, by committing to choose a floor price in the second-price auction that reflects the highest value among header bidders. This means the publisher can ensure that the highest value bidder wins under each auction format, resulting in the efficient allocation above the floor price and—by the Revenue Equivalence Theorem that applies in this setting (see Paragraph 335)—the same profit-maximizing revenues under the two auction formats.

507. Theorem 3 demonstrates that the so-called "Last Look" need not necessarily offer any advantage to AdX (or any other ad exchange) when publishers boost header bids and all parties respond to their incentives. Because ad revenue is a significant source of income

---

[1043] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 345. *See also* Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 22 ("At the same time, [last look] harmed competitors, including Inform, by robbing them of the potential revenue from higher bids—that would have been made but were not because of Last Look—giving Google both the 'last chance' bid and not even requiring it to beat the bids of others.").

[1044] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 309 ("Last Look disadvantaged bidders on rival exchanges compared to AdX. Last Look meant that AdX bidders would always win if their value exceeded the rival bid, whereas rivals would not always win if the situation were reversed. This made it less profitable for advertisers to participate on other exchanges, compared to AdX"). *See also* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 263 ("I find that Last Look harmed competition in the exchange market by distorting bidders' incentives such that they were less likely to use third-party exchanges, but more likely to use AdX. Moreover, Last Look enabled AdX to win impressions it would have otherwise lost to third-party exchanges, which consequently discouraged participation by third-party exchanges and prevented AdX's rivals from gaining the scale they needed to in order to compete with AdX."), ¶ 318 ("Last Look reduced the probability of winning through third-party exchanges, thereby reducing the expected revenue from winning an impression for a given cost of bidding (in simple terms, making it less worthwhile to bid on that impression via third party exchanges)."), ¶ 327 ("The long-term effect of Last Look is that, by bidding on fewer impressions, rival exchanges lose scale, and this makes them less effective competitors against AdX."), ¶ 369 ([...] "Last Look also discouraged the number of bidders in rival exchanges, which further depressed publisher revenues.").

for many publishers, I expect them to reason through and experiment with various sensible pricing strategies.

508. The logic of inflating AdX's floor beyond the winning header bid is neither complicated nor unfamiliar in business settings. It is no different from an owner selling a used car on an online marketplace who already has an offer in-hand from their local dealership. The listing price for the online ad that maximizes the average price always exceeds the local dealership's offer.

509. As I previously noted, documents suggest that publishers *did* "inflate[] the HB bid before sending it as a floor to AdX"[1045] in practice and some of the most popular header bidding tools readily provided publishers with the functionality to boost bids.[1046] In addition, many publishers achieved a similar objective by increasing the AdX specific floor price

---

[1045] *See* Email from H. Thomas to M. Wheatland, et al., "RE: App impression changes recap" (Oct. 23, 2017), DM_GOOG_0146977, at -980 ("We've now multiplied the Amazon cpm in DFP by 3 or 4x to counter act google - seems to have helped us."); ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -506 ("[Some publishers] inflate the value CPM of remnant line items [...] publishers used to do this even before HB was popular."); "First-price bidding" (Aug. 12, 2019), GOOG-DOJ-11406673, at -677 ("How boost works[:] The publisher inflates the HB bid before sending it as a floor to AdX[.] This is done to increase Adwords cost and to provide a better comparison between Adwords and header bidder bids[.]"); Email from R. Srinivasan to B. Bender, et al., "Unified Auction Changes (Sellside) Executive Update - Aug 12, 2019" (Aug. 13, 2019), GOOG-DOJ-09713317, at -319 ("Today, these [publisher-]inflated CPMs are used to provide price pressure for AdX [...] In practice, [...] many publishers [...] apply a boost to Header Bidding bids[.]"); "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -382 ("Plan to educate pubs around strictly negative revenue consequences of HB price inflation"). I interpret this document, authored in the context of the "Migration to 1P auction" (-358), to mean that inflating header bids was common enough that Google would have to "educate pubs" it was no longer necessary; "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -777 ("Last look [...] incentivizes pubs to inflate ('boost') the floor sent to AdX"); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Some publishers set Value CPMs higher than their estimates of what CPM a line item would likely generate to increase competitive pressure in the AdX auction or for other reasons."); Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding.").

[1046] *See* Asmaâ Bentahar, "Bid Adjustments Simplified: Run Fair Auctions with no Hassle," Pubstack (May 2, 2021), https://www.pubstack.io/topics/bid-adjustments-simplified, accessed Dec. 12, 2024 ("Alternatively, this next one will slightly increase all returned CPMs, giving Prebid an edge in the competition against GAM").

or using rebates/post-auction discounts (which I discuss more generally in Section XIV.D).

510. Even when the assumptions of Theorem 3 are not satisfied exactly, publishers can use similar strategies to inflate value CPMs into AdX if they wish, or other strategies that are even more profitable for them. Any residual advantage or disadvantage for AdX then arises as a result of publishers' decisions to maximize profits, rather than from the so-called "Last Look."

511. Many of Plaintiffs' experts' arguments fail to account for publisher incentives to raise floor prices for AdX. I enumerate several below:

   a. Plaintiffs' experts claim that "[p]ublishers were unable to reconfigure how DFP calculated or passed the price floor."[1047] This is misleading. Publishers were free to inflate bids received from header bidding or to set floor prices higher than the bids received from header bidding. As I noted before, Prebid had a built-in functionality to do just that, with an article online detailing how to use that feature.[1048]

   b. Professor Li refers to a paper about government securities markets with a model that "predicts that, when the dealer can see the customer's bid, the dealer will

---

[1047] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 286 ("Bids from rival exchanges—including such exchanges participating in header bidding—were reflected as remnant line items. As a result, AdX knew the highest other bid before running its auction and returning a bid. Publishers were unable to reconfigure how DFP calculated or passed the price floor."). *See also* Revised Expert Report of D. Sibley (Oct. 11, 2024), at ¶ 635 ("Essentially, DFP, rather than the publisher, controlled the reserve prices shared with AdX for RTB.").

[1048] *See* Asmaâ Bentahar, "Bid Adjustments Simplified: Run Fair Auctions with no Hassle," Pubstack (May 2, 2021), https://www.pubstack.io/topics/bid-adjustments-simplified, accessed Dec. 12, 2024 ("Alternatively, this next one will slightly increase all returned CPMs, giving Prebid an edge in the competition against GAM").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

outbid the customer by just an increment,"[1049] implying that "Last Look" similarly allows AdX bidders to outbid other exchanges by a single increment. Professor Li also cites a study by the Securities and Exchange Commission (SEC) in the context of bond markets to show "how Last Look distorts competition in these markets over time,"[1050] with the SEC concluding that "the use of last-look deters aggressive pricing or participation in the auction process by other dealers who fear that the submitting dealer is going to 'step in front of' their winning prices."[1051] These analogies to securities markets are wrong for three reasons. *First,* as discussed above, the AdX auction was a second-price auction, which provided no incentive for an advertiser to base its bid on others' bids in the same auction. *Second,* bidders on AdX did not directly observe the winning header bid. AdX bidders could only observe the header bidding line items chosen by the publisher, which might have been higher than the header bids. *Third,* the publisher may set a higher floor price for AdX than the highest header bid.

c. Professor Li cites an email exchange[1052] from two Google research scientists who analyze a theoretical model in which two bidders with symmetric value distributions—one in AdX and one using a third-party exchange—compete for

---

[1049] Revised Expert Report of S. Li (Oct. 11, 2024, at) ¶ 306.

[1050] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 307.

[1051] Securities and Exchange Commission, "Preliminary Recommendations Regarding the Use of Last-Look in the Corporate and Municipal Bond Markets," https://www.sec.gov/spotlight/fixed-income-advisory-committee/technology-and-electronic-trading-subcommittee-preliminary-recommendation-041519.pdf, accessed Dec. 9, 2024, at p.1.

[1052] Revised Expert Report of S. Li (Oct. 11, 2024) , at ¶ 303 ("Google research scientists internally worked to estimate the extent of the Last Look advantage. In an email exchange with the subject line "Last Look advantage: larger than I thought", Martin Pál and Sergei Vassilvitskii, research scientists at Google, built a simple theoretical model with two identical bidders, one bidder using Exchange [Bidding] ("Jedi bidder") and one AdX bidder, drawing their valuation from a uniform [0,1] distribution"); "RE: Last Look advantage: larger than I thought," (Nov. 4, 2016), GOOG-DOJ-14734790.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

impressions. When applied to the context of header bidding, this analysis again fails to account for the effect of publishers adjusting floor prices in response to the so-called "Last Look."

d.  Professor Li cites a Google internal presentation containing an example in which the bidder with the highest valuation either bids on AdX or into a competing exchange and achieves a higher surplus when bidding through AdX.[1053] In this example, the exchange simply passes the winning header bid on to AdX; if it sets a higher header bidding line item or a higher AdX floor, outcomes could change.

e.  Professor Li relies[1054] on a study conducted by Professor Hortaçsu that "calculate[d] loss to publishers from Last Look bid depression"[1055] in order to show that "the winning bid of the auction was reduced relative to the competitive counterfactual."[1056] A critical flaw in Professor Hortaçsu's study is that he "assume[s] that the bids in the 2024 auction data are the same as the bids would have been in 2014 to 2019 in the but-for world under a first-price auction and with no Last Look advantage for AdX."[1057] This fails to consider that, between 2014 and 2019, publishers had different incentives to boost header bids than

---

[1053] Revised Expert Report of S. Li (Oct. 11, 2024) , at ¶ 314 ("To see this, consider that, in an internal presentation, Google itself articulated why Last Look made header bidding less attractive [...]"); "Last Look Advantage," (undated), GOOG-DOJ-13494286, at -288, 289

[1054] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 364 ("[...] Professor Hortaçsu's report shows that Last Look reduced the prices received by publishers relative to the competitive counterfactual.").

[1055] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 270.

[1056] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 361.

[1057] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 272.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

reflected in the data from 2024. Even without boosting, the auction rules changed after 2019, so the incentives that determined bids changed as well.

f.  Professor Li argues that "Last Look [] harmed revenue compared to the competitive counterfactual,"[1058] by which he means a unified first-price auction.[1059] He contends that in "any equilibrium under Last Look, the header bidder places a bid strictly less than their value when their value is positive. Thus, with positive probability, the AdX bidder wins even when their value is less than the header bidder's."[1060] However, these "equilibria" fail to consider the incentives of the publisher to boost winning header bids or raise floor prices. As [Theorem 3](#) in my report shows, in a standard model of auction theory, if the publisher boosts the header bids optimally, the winner would indeed be the bidder with the highest value.

g.  Elaborating the same point, Professor Li argues that "Last Look caused AdX bidders to win even when other bidders had higher values for the impression."[1061] He provides an example involving a "rival bidder with a value of $5 who shades its bid to $3" and an AdX bidder with a value of $4, claiming that Last Look would "enable[] the AdX bidder to win at a price of $3."[1062] This example omits

---

[1058] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 349.

[1059] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 345 ("I find that Last Look harmed publisher revenue and harmed allocative efficiency, compared to the counterfactual of all exchanges bidding in a unified first-price auction with no Last Look advantages.").

[1060] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 354.

[1061] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 386 ("Last Look caused AdX bidders to win even when other bidders had higher values for the impression. In this way, Last Look caused allocative inefficiency, that is, it reduced total welfare.").

[1062] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 388.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

any publisher incentives to boost the shaded bid before passing it along to AdX. Indeed, when those incentives are accounted for, the allocation is efficient (see Theorem 3).

h.   Professor Hortaçsu poses an example in which "the highest bid from header bidding is $8, the highest bid in AdX is $10, and the second highest bid in AdX is $5."[1063] In the example, the $8 bid sets AdX's floor and the winning AdX bidder pays $8. Professor Hortaçsu concludes that "Last Look resulted in bid depression"[1064] after assuming that the winning AdX buyer would have submitted a bid of $9 in a unified first-price auction and paid the publisher a higher price. This example is misleading and incorrect. *First,* in claiming that the AdX buyer would submit a bid of $9, Professor Hortaçsu assumes his conclusion. The AdX buyer may shade its bid to $8 or less, leaving revenues unchanged from his example. *Second,* this example again omits publishers' incentives to set floor prices higher than the highest header bid.

---

[1063] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024) at ¶¶ 263-264 ("For the first example, consider an ad auction during the Last Look damages period where the highest bid from header bidding is $8, the highest bid in AdX is $10, and the second highest bid in AdX is $5. The $8 bid from header bidding is submitted to AdX as the reserve price. In this auction, AdX sees that the next highest bid is the $8 header bidding bid, so it is able to set the AdX clearing price at $8. Thus, the highest AdX bidder wins the impression, and pays the reserve price—which is the header bidding price of $8.").

[1064] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶¶ 266-268 ("In the but-for world, all bidders—including AdX bidders—would have competed in a first-price auction. In that scenario, AdX bidders would not bid their valuation, but would instead optimally shade their bids. Then the clearing price paid to the publisher would be the shaded bid associated with the highest AdX valuation ($10). For the purpose of this numerical example, I assume that this shaded bid is $9. Since this $9 shaded bid is higher than the Last Look price of $8, Last Look lowered the clearing price that is paid to publishers. Thus, whenever the shaded highest AdX bid was higher than the Last Look price, Last Look resulted in bid depression. In this example, the damage from Last Look is the difference between the clearing price in the first price auction—the $9 shaded bid—and the Last Look price of $8. Thus, the damages would be $1.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

i.   Professor Li suggests that "[t]he reason publisher revenues are harmed is that AdX bidders have a special right of refusal."[1065] As I set out in Paragraph 409, AdX bidders did not have a right of first refusal, because that would require, contrary to reality, that publishers could only set header bidding line items equal to the header bids. Thus, while Professor Li cites an economic paper showing that "under an assumption of independent private values, no auction setting that contains a right-of-first-refusal clause can be allocatively efficient,"[1066] the paper is not relevant because AdX bidders do not have a right of first refusal.

j.   Professor Li argues that "as a result of Last Look, buyers would not bid as frequently through third party exchanges as they would in the competitive counterfactual without Last Look."[1067] To support his argument, he first notes that "[b]uyers (DSPs and advertisers) are often capacity constrained," and may "selectively choose to not bid on a query/impression if the cost of bidding is higher than the expected revenue from winning the impression."[1068] Then, he reasons that "Last Look reduced the probability of winning through third-party exchanges, thereby reducing the expected revenue from winning an impression for a given cost of bidding."[1069] But, with publishers setting higher floor prices for AdX and boosting header bids, the impressive growth of header bidding (which I

---

[1065] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 351.

[1066] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 390. The paper defines a right-of-first-refusal as "contract clause that provides its holder with the right to purchase an object at the highest price the seller is able to get from another buyer." Arozamena, Leandro, and Federico Weinschelbaum, "A note on the suboptimality of right-of-first-refusal clauses," Economics Bulletin, Vol. 4 (2006), at p. 1.

[1067] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 318.

[1068] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 318.

[1069] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 318.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

expand upon in Section XIII.D.2; see especially Figure 20) establishes that the cost of bidding was not prohibitive.

### 3. Plaintiffs and Their Experts Exaggerate the Effects of Line Item Caps

512. Since 2013, Google's ad server has limited the maximum number of active line items to 61,000[1070] in order "to protect the health of the product [and] the performance of [Google's] system."[1071] Several Plaintiffs assert that this limit "artificially cap[s] publishers"[1072] or "purposefully limits publishers' implementation of line items to foreclose competition from Header Bidding."[1073] Professor Li argues that "one of the reasons that Google imposed line item restrictions was to curb the adoption of header bidding."[1074]

---

[1070] "Limits Enforcement" (Feb. 16, 2018), GOOG-DOJ-09494195, at -198 ("Number of active line item limits (please note: Each creative-level targeting criterion counts also toward the active line item limit[:] 61,000").

[1071] "Limits Enforcement" (Feb. 16, 2018), GOOG-DOJ-09494195, at -195 ("In 2014, we have started enforcing limits on the creation of certain entities in the DFP UI, e.g. LIs per order, Creatives per LI, Ad units for placements and Targeting attributes in line items. [...] Limits are necessary in order to protect the health of the product, the performance of our system, and are ultimately for the benefit of all publishers and the performance of their UI (unlimited number of entities can affect the UI in terms of load time and serving in some cases). NOTE: Our limits are much higher than those that existed previously in DART.").

[1072] Publisher Class First Amended Complaint, at ¶ 303. *See also* Advertiser Class Complaint, at ¶ 279 ("Moreover, Google limits publishers' ability to receive bids through header bidding by artificially capping publishers use of 'line items'—an aspect of DFP that publishers must use to receive bids from exchanges in header bidding.").

[1073] Publisher Class First Amended Complaint, at ¶ 305. *See also* Advertiser Class Complaint, at ¶ 281 ("The need to create many line items when interacting with header bidding is problematic because, to foreclose competition from header bidding, Google imposes restrictions on publishers that limit the number of line items a publisher may list."); Daily Mail Second Amended Complaint, at ¶ 192 ("Google documents make it clear that Google's intent was to keep artificial line item caps in place as a 'tool we have to fight [header bidding].'"); Gannett Amended Complaint, at ¶ 212 ("Google documents make it clear that Google's intent was to keep artificial line item caps in place as a 'tool we have to fight [header bidding].'").

[1074] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1174.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

513.    *First,* although Daily Mail claims[1075] that Google denied their and other publishers'
requests for increases on line item limits, their account ignores that Google *did*
sometimes allow Daily Mail and Gannett to set more than the nominal limit of 61,000
line items.[1076] In the data I have reviewed, at least 25 publishers were similarly able to set
more than 61,000 active line items. For example, both ███████████████████ can
set up to 100,000 active line items.[1077]

514.    *Second,* despite several Plaintiffs' and Professor Li's repeated emphasis on the line item
limit, the data I analyze suggests that few publishers approached this threshold in

---

[1075] Daily Mail Second Amended Complaint, at ¶ 192 ("When publishers, including Daily Mail, requested that
Google increase the number of line items so that they could receive actual bids from rival exchanges, Google
rejected their requests or would provide only temporary and limited increases.").

[1076] *See* "[Limits Escalations] Gannett/Gatehouse merger Active Line Item limit increase" (2020),
GOOG-AT-MDL-C-000018419, at -419 ("Gannett network 7103 and Gatehouse network 11564835 just approved a
merger, and they intend to move Gatehouse properties into Gannett's network in Q1 (tentatively). Gannett has
already had an increase from 61,000 to 70,000 ALIs in the past year, however, once this merger happens, they will
likely be over this limit again (22,882 over Gannett's 70,000 limit at a total of 92,882 if they were to merge into one
network today). Once Gannett has more info from Gatehouse and is able to analyze everything, they hope to make
some efforts to consolidate Header Bidding line items across the two, but this will likely still put them over their
limit"), -419 ("Note that Gannett has now estimated that they would need the limit to be 75,000 based on some
clean-up they have done on their end. This is only 5,000 over there current limit now, so would this increase from
70,000 to 75,000 be possible?"), -420 ("Yes - this was approved via email with the ultraprio group"); Deposition of
C. Pirrone (SDNY) (July 10, 2024), at 187:25-188:4 ("Q. Do you recall ever asking anyone at Google to increase the
line items and being told that Google would not do so? . . . The Witness: Not specifically"); Deposition of M.
Wheatland (SDNY) (June 11, 2024), at 216:20-220:22 ("Q. Nonetheless, sitting here today, you cannot recall a time
where Google ever declined to increase the line item limit as a request made by Daily Mail? A. Sitting here today, I
can't recall that. Although it's been an ongoing discussion for quite a long time for, by the looks of it, since 2017 to
at least today and Google has not allowed us the appropriate line item count."); *see also* "DRX Ultra Priority
Tracker" (Feb. 24, 2021), GOOG-DOJ-AT-01980370 (indicating granted requests for ████, Gannett, ████████
Google engaged in proactive outreach to publishers who were close to exceeding (or who had exceeded) the caps.
Email from C. Anderson to S. Davis, "Re: FW: Google docs" (Oct. 17, 2017), DM_GOOG_0148602 at -603 ("Since
our last call we have been working closely with your ad ops and programmatic teams to clean up the DFP UI in the
UK. The team has cleaned up by over 70,000 inactive line items, which brings you closer to the DFP limit of
61,000. Our gTech Account Manager, dedicated some time to create a daily dashboard for the MOL team that
showed the status of the line item clean up, and also brought transparency on the inactive line items in your
network.").

[1077] These findings follow from my analysis of the "GAM Publisher Active Line Items Data" at
GOOG-AT-EDTX-DATA-001116098, in which I logged the number of NetworkIds with a Limit larger than 61,000,
in addition to the Limit for entries named ████████████████████ The relevant code is
in code/line_item_capping.py in my supporting materials, and the output is saved in
code/logs/line_item_capping.txt.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

practice. In October 2016, when Google evaluated the effect of strictly enforcing the line item cap, it found that just four publishers would be affected.[1078] My analysis of GAM data from April of 2024 is consistent with that document and found that over 97.5% of publishers utilize less than 10% of their active line item limit.[1079] If the granularity of line items were as significant an issue as Plaintiffs pose, one would expect the number of publishers near capacity to be substantially higher. Documentation of the popular header bidding wrapper Prebid.js echoes this finding, with the highest built-in price granularity option using just 2,001 line items per exchange.[1080]

515.  *Third,* numerous documents mention Google's concerns about how publisher configurations imposed costs and created a strain on Google's infrastructure, contradicting Plaintiffs' description of the caps as "artificial."[1081] In an email thread, Google employees note that "we h[a]ve seen growth in inventory complexity (steadily) for >2 years. This required us to refactor our serving infrastructure for retrieving LI/CLT. The new infrastructure scales well, all we need to support continued growth is more resources (which itself is an issue...)[.] In the last 6 months we have had 2 new classes of escalations within serving that are linked to these increasingly large and complex pub

---

[1078] "Limits Enforcement" (Feb. 16, 2018), GOOG-DOJ-09494195, at -201 ("Please note that as of Oct 2016, we only have 4 DFP publishers exceeding this limit and those are being closely monitored by Eng to ensure no negative repercussions are happening on our serving infrastructure.").

[1079] These findings follow from my analysis of the "GAM Publisher Active Line Items Data" at GOOG-AT-EDTX-DATA-001116098. I calculate each publisher's percent utilization of its cap by dividing its "Active including creatives" by its "Limit," noting that over 97.5% of values in this list are less than 10%. The relevant code is in code/line_item_capping.py in my supporting materials, and the output is saved in code/logs/line_item_capping.txt.

[1080] Prebid.org, "Prebid.js Ad Ops," https://docs.prebid.org/adops/price-granularity.html#prebid-default-price-granularities, accessed Dec. 13, 2024.

[1081] Publisher Class First Amended Complaint, at ¶ 303. *See also* Advertiser Class Complaint, at ¶ 279 ("Moreover, Google limits publishers' ability to receive bids through header bidding by artificially capping publishers use of "line items"—an aspect of DFP that publishers must use to receive bids from exchanges in header bidding.").

setups. We mitigate and resolve these as they come up -- but it highlights the cost of allowing unrestrained growth. It comes with a cost, and we have to impose limits."[1082] An additional document I reviewed noted a publisher with "8M active [line item]s that put a huge strain on [Google's] system []."[1083]

516. Professor Li's evidence that "engineering limitation[s]"[1084] were not a main concern is a 2018 email exchange concerning a limit increase request from ██ In this exchange, Glenn Berntson, Engineering Director and a Lead of the Google Ad Manager team at Google, wrote that "[f]rom an infrastructure perspective, we [Google] can accommodate this request," concluding that it was "a business decision." However, later in this same email chain, a Google employee replied that they were "[n]ot a fan of allowing this exception" because "exceeding limits puts our system at risk."[1085] Indeed, a separate email from 2017 describes how ██ had over *one million* line items at the time, and says that ██ configuration presented "a real danger for the stability of [Google's] system" that required setting guard-rails to ensure consistently stable performance.[1086]

517. *Fourth,* in 2021, Google began to roll out Header Bidding via Yield Groups (HBYG), which rendered it unnecessary for publishers to set up thousands of line items to call

---

[1082] *See* Email from J. Giles to ██ "Re: Ultraprio - Increase the ALI for ██ (Sept. 26, 2018), GOOG-TEX-00090969, at -970.

[1083] *See* "Limits Enforcement" (Feb. 16, 2018), GOOG-DOJ-09494195, at -202.

[1084] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1182.

[1085] *See* Email from A.Pappu to ██, "Re: Ultra prio request for ██ – May 1st" (May 1, 2018), GOOG-TEX-00209387, at -389.

[1086] Email from ██ o G. Levitte, "Re: [URGENT]: ██ hit their total line item limit" (Mar. 29, 2017), GOOG-DOJ-15442474, at -474 ("██ is right in that this represents a real danger for the stability of our system.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

header bidding exchanges. In April of 2022, HBYG was announced as a public product.[1087]

518. *Fifth,* Plaintiffs' descriptions of how header bidding functions are factually incorrect. Several Plaintiffs pose a hypothetical in which if "a publisher receives a header-bidding exchange bid of $4.29, but only has a pre-existing line item with a price of $4.20, then the ad server rounds down the bid to $4.20."[1088] The Publisher Class alleges that this "round[ing]" advantaged Google's exchange and led publishers to "receive less revenue when a Header Bidding exchange wins but has the value rounded down by Google's Ad Server."[1089] These arguments are incorrect for two reasons.

    i.    Rounding a winning header bid does not affect the payment amount from the exchange. When a header bidding exchange offers $4.29 and wins, the publisher receives $4.29 regardless of whether the publisher triggered a $4.30 or $4.20 line item in GAM.[1090, 1091]

---

[1087] *See* George Levitte, "Improved header bidding support in Google Ad Manager," Google Ad Manager Blog (Apr. 27, 2022), https://blog.google/products/admanager/improved-header-bidding-support-in-google-ad-manager/, accessed Dec. 13, 2024.

[1088] *See, e.g.,* Daily Mail Second Amended Complaint, at ¶ 191; Gannett Amended Complaint, at ¶ 221 ("So, if a publisher receives a header-bidding exchange bid of $4.29, but only has a pre-existing line item with a price of $4.20, then the ad server rounds down the bid to $4.20."); Publisher Class First Amended Complaint, at ¶ 304 ("If a publisher receives a Header Bidding bid of $4.29, but only has a pre-existing line item with a price of $4.20 in Google's Ad Server, then the publisher's Google Ad Server automatically rounds down the Header Bidding bid to the line item with the next closest price, e.g., to the line item with the price of $4.20.").

[1089] Publisher Class First Amended Complaint, at ¶ 308.

[1090] *See, e.g.*, Prebid.org, "Price Granularity," https://docs.prebid.org/adops/price-granularity.html, accessed Dec. 13, 2024 ("Important: Rounding does not impact the price paid, only the auction on the ad server. For example, if your bid for 2.75 is rounded down to 2.50 and wins on the ad server at 2.50, you will be paid 2.75.").

[1091] This example omits the additional issue of payment discrepancies in header bidding. As I discuss further in Section X, there were reports of payment discrepancies, where publishers' expected receipts from header bidders did not match the eventual payments. *See* "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 24 ("Header bidding is also not transparent because, although the publisher 'accepts' the impression at a certain price, the header bidder may not actually pay the sum indicated in its bid.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

ii.   Plaintiffs' allegations again overlook publishers' incentives to increase the AdX floor price above header bids. In the hypothetical described above, *even if* the line item cap required the publisher to use less granular floor prices, Plaintiffs are wrong to assume that the publisher rounds down to $4.20. Instead, as I discussed above, the publisher would be incentivized to *round up* the header bid to $4.30 or to inflate the bid even more. Professor Li provides a similar stylized example in which a publisher's highest line item is $50, the winning header bid is $100, and "the header bidder would compete in the auction with a bid of $50 as opposed to $100."[1092] Because header bidding was a publisher-configured technology, publishers could trigger line items with value CPMs higher than header bids. Additionally, header bidding wrappers such as Prebid.js provided publishers with the functionality to round bids *up* rather than *down*.[1093] As I explain in Section XIII.D.2, configuring header bidding to trigger increased floor prices is consistent with publishers' incentives and can make bids from header bidding exchanges *more* competitive, not "less competitive compared to the bids from Google [...]."[1094] Professor Li's example exhibits a publisher that configures their line items poorly. While Professor Li argues that "line item restrictions result in an allocative inefficiency whereby header bidders with a higher valuation for an

---

[1092] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1191 ("If the winning bid from the header bidding auction were $100, which exceeds $50 (the highest price configured by the publisher through line items), DFP would round down, and the header bidder would compete in the auction with a bid of $50 as opposed to $100.").

[1093] Prebid.org, "Prebid.js Publisher API Reference," https://docs.prebid.org/dev-docs/publisher-api-reference/setConfig.html#setConfig-Cpm-Rounding, accessed Dec. 13, 2024 ("Prebid also allows setting a custom rounding function. This function will be used by Prebid to determine what increment a bid will round to.").

[1094] Advertiser Class Complaint, at ¶ 389 ("Fewer line items cause publishers' bids from header bidding exchanges to be rounded down more often. As a result, the bids from header-bidding exchanges are less competitive compared to the bids from Google's—which also do not trigger an additional fee.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

impression may lose out to an AdX bidder with a lower valuation for it,"[1095] his example assumes two individually improbable events. First, that the incoming header bid exceeds *every* line item in the publisher's configuration. Second, that a $50 bid—the highest line item in the publisher's ad server—was insufficient to win the impression.

### 4. Plaintiffs and Their Experts Misinterpret Google's Experiments on "Last Look"

519. Professor Li claims Google experiments predicted that removing the so-called "Last Look" would have reduced the revenues of AdX, Google Ads, and DV360.[1096] Professor Li's allegations refer to experiments reported in internal presentations during the transition to the Unified First Price Auction.[1097] Professor Li relies incorrectly on these experiments to establish effects in a counterfactual world without "Last Look," making at least two kinds of errors.

520. *First,* the so-called "Last Look" was not a Google program, but a consequence of how publishers configured header bidding. If it *had* been a Google program, it might have been relatively straightforward to test its removal (e.g., by not calling the relevant code).

---

[1095] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1196.

[1096] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶¶ 328-330 ("Evidence from internal Google documents demonstrates the importance of Last Look to AdX revenues and its role in reducing the number of impressions won by header bidders [..] [A] Google RASTA experiment from 2019 estimates that removing Last Look would lead to a 9.4% drop in impressions won by AdX, a 9.6% drop in AdX revenues and a 6% drop in Google profits [...] Similarly, impressions won by Google Ads decrease by 10.4% and impressions won by DV360 decreased by 6% when removing Last Look. The corresponding drop in revenue from Google Ads buyers was 11%, and the drop in Google's profit from Google Ads buyers was 6.1%. Likewise, the corresponding drop in revenue from DV360 buyers was 6.2% and the drop in Google's profit from DV360 buyers is 5%. In other words, Last Look let AdX win fully 9.4% more impressions than it would have otherwise.").

[1097] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶¶ 328-331. *See, e.g.,* "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -765; Email from R. Srinivasan to C. LaSala, et al., "Re: Unified Auction Changes (Sellside) Executive Update - Aug 12, 2019" (Aug. 29, 2019), GOOG-TEX-00682264, at -265.

However, because it was only a property of the combined header bidding and AdX allocation process, there could be multiple different ways to eliminate it. The experiment that Professor Li cites as *the* relevant counterfactual actually evaluates just one way to "remov[e] Last Look"[1098]—the one in which remnant line items no longer set an AdX floor price. Instead, header bids would be compared to the AdX clearing price *after* AdX runs its auction. Among the disadvantages of that change is that it would require AdX to have *two* bids above the header bid for a second-bid clearing price to win the auction.[1099] Alternative ways to eliminate the so-called "Last Look" could have included moving to a unified second-price auction or a unified first-price auction, though testing either of these would have been far more complex, requiring technology to transform first-price bids into second-price bids or vice versa. Ultimately, Google chose to build the required technology and transition to the Unified First Price Auction, avoiding the adverse impacts identified in the experiment.

521. *Second,* Professor Li fails to consider the adverse impact on Google's publisher customers under the counterfactual process he evaluates. That process removes the so-called "Last Look" by removing remnant line items from the calculation of the floor

---

[1098] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 329.

[1099] Professor Li's own example at ¶¶ 275-276 demonstrates why two bids might be needed to beat the header bid, showing how a $6 bid from an AdX bidder could lose to a $2 header bidding bid. Revised Expert Report of S. Li (Oct. 11, 2024), at ¶¶ 275-276 ("Under these assumptions, without Last Look, header bidding would be awarded the impression. AdX receives $6, $1.5, $1 bids and runs a second price auction: the $6 bid wins, and the clearing price is $1.5. The $1.5 is passed to the publisher. A clearing price of $2 (from header bidding) is higher than $1.5 (from AdX). As a result, header bidding is ultimately awarded the impression at $2, the publisher is paid $2. [...] The result is different with Last Look. AdX receives information on the highest header bid of $2 as a price floor. This is ranked with the other bids AdX received ($6, $2, $1.5, $1). The $6 still wins, but AdX sets the clearing price as the highest header bid (i.e., the floor), at $2. In other words, AdX has set its clearing price equal to the header bidding clearing price ($2), so it wins the impression over header bidding. The publisher is paid $2.").

price for the AdX second-price auction,[1100] reducing some clearing prices. And with lower AdX clearing prices being compared to other line items, that would translate into fewer wins for AdX bidders as well as less revenue for publishers.[1101]

522. Professor Li also cites three other documents from 2016 that each mention an experiment that tests the removal of "Last Look" from Jedi (an early name for Open Bidding).[1102] The first document describes a proposal in which AdX runs a second-price auction and submits the clearing price to Open Bidding.[1103] The document reinforces what I stated above. There are "multiple options for changing Jedi auction dynamics that result in giving up last look,"[1104] and each experiment tested just one of many alternatives. The chosen counterfactual compares the clearing price from AdX's second-price auction to the top bids from other exchanges' first-price auctions, which would similarly decrease the AdX floor prices and lead to the same impact described above. The exact

---

[1100] The title of the experiment cited in "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -359, is "RemoveLastLookOverDfpRemnant::GlobalPreventDfpRemnantPriceFromSettingWinnerCostExperiment," which I can determine from the system-generated "Experiment Alert" email for that experiment. *See* Email from ███████████ to ████████████████████ et al., "Experiment Alert for RemoveLastLookOverDfpRemnant::GlobalPreventDfpRemnantPriceFromSettingWinnerCostExperiment: 246003052" (Aug. 11, 2019), GOOG-AT-MDL-009293665, at -665, which is the basis for my understanding that remnant line items were removed from the calculation of the AdX clearing price.

[1101] The publisher would receive strictly less revenue when it had boosted its header bidding line item and that boosted item became winning in the new process.

[1102] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 331 ("Further, internal Google documents estimated that giving up Last Look would lead to a 4–5% AdX revenue loss based on November 2016 Exchange Bidding data. Another document points to a 5–10% impact instead. A 2016 document indicates that removing Last Look would result in a $90m loss to AdX.").

[1103] "Proposal: Jedi No Last Look" (Dec. 5, 2016), GOOG-TEX-00966448, at -448 ("Consider the following proposal to give up last look on Jedi without giving up second-price auction on AdX: [,,,]Jedi auction will be a unified first-price auction across AdX and Jedi Exchanges [...] Jedi auction reserve price will be set by DFP (same as AdX auction) [...] Adx will run a second price auction and submit its closing price into the Jedi auction".).

[1104] "Proposal: Jedi No Last Look" (Dec. 5, 2016), GOOG-TEX-00966448, at -448 ("We have considered multiple options for changing Jedi auction dynamics that result in giving up last look".).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

counterfactual used in the latter two documents is unclear,[1105] so I cannot comment definitively, but assuming they also gave up "Last Look" in a similar fashion, the same arguments would also apply.

523. Professor Li additionally refers to a 2019 Google email exchange which "estimates that Last Look allows Google to win queries that account for 7.8% of AdX revenue."[1106] The email says the counterfactual is "we just gave up last look, and stayed in a 2p auction"[1107] with no other adjustment to floor prices, so my arguments from above again apply: this is one counterfactual of many and it would harm publishers. These same arguments also apply to an experiment cited by Professor Jardin,[1108] again using a counterfactual that gives up "Last Look" while maintaining a second-price auction.

---

[1105] "Jedi++ Header Bidding Response Options" (Oct. 13, 2016), DOJ-ADS-0000052933, at -934 ("[...] Give up last look (currently worth around 5-10% of AdX revenue on Jedi queries)."); "AdX Quality Notes" (Aug. 6, 2020), GOOG-DOJ-15482980, at -986. ("1) remove last look (removes cheating incentive) [] AdX loss: $40m for HB only, $90m for everything".).

[1106] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 329.

[1107] Email from N. Korula to N. Jayaram, "Unified Auction Sellside Exec update" (Aug. 13, 2019), GOOG-DOJ-AT-00571933, at -934.

[1108] Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 22 ("Unsurprisingly, the Last Look feature greatly benefitted Google at the expense of others, with Google estimating that it won 20% more auctions because of the auction manipulation of Last Look."). For this statistic, Professor Jardin cites a design document which explains that the counterfactual is that AdX keeps its second-price auction and uses its clearing price to compete against header bidding line items. "AdX/AdMob first price bidder - for perf" (Sept. 26, 2019), GOOG-DOJ-AT-00573492, at -494 ("This comes from the loss of competitiveness from giving up last-look and having to use the runner-up bids [...]").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

524. Lastly, Professor Li chooses this counterfactual in an example to analyze the effects "without Last Look."[1109,1110] His interpretations of the counterfactual are wrong for the same reasons that apply to the experiments, as I have just described.

### 5. Plaintiffs and Their Experts References to "Penny Above" Outcomes from "Last Look" are Misleading

525. Professor Li references studies from ████████ and ████████ regarding the frequency that AdX bidders win an impression at the floor price or just a penny more.

526. The study from News Corp claims that ████████████████████████████████

███████████████████████████[1111] and Professor Li adds that "based on ███████████████████████████████████████"[1112] The analysis states that "Google would typically pay [...]

---

[1109] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶¶ 275-276 ("Under these assumptions, without Last Look, header bidding would be awarded the impression. AdX receives $6, $1.5, $1 bids and runs a second price auction: the $6 bid wins, and the clearing price is $1.5. The $1.5 is passed to the publisher. A clearing price of $2 (from header bidding) is higher than $1.5 (from AdX). As a result, header bidding is ultimately awarded the impression at $2, the publisher is paid $2. [...] The result is different with Last Look. AdX receives information on the highest header bid of $2 as a price floor. This is ranked with the other bids AdX received ($6, $2, $1.5, $1). The $6 still wins, but AdX sets the clearing price as the highest header bid (i.e., the floor), at $2. In other words, AdX has set its clearing price equal to the header bidding clearing price ($2), so it wins the impression over header bidding. The publisher is paid $2.").

[1110] Furthermore, Professor Li's analysis of the "last look" counterfactual omits publisher's incentives to boost the AdX floor, as described above.

[1111] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 367; Autorité de la concurrence, "Decision 21-D-11 of 7 June 2021 regarding practices implemented in the online advertising sector*" (June 7, 2021), https://www.autoritedelaconcurrence.fr/sites/default/files/attachments/2021-07/21-d-11_ven.pdf, accessed Dec. 10, 2024, at p. 39.

[1112] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 367.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

between one and two pence above what all the header bidding line items would respond."[1113]

527.  Once again, Professor Li assumes both that the header bidding line items are equal to the header bids and that there is no other floor price determining the price paid by AdX. Google's own internal documents show that in 42% of the cases when a header bidding line item wins, AdX has a higher floor price than that header bidding line item.[1114] This is in addition to any boost applied to header bids in determining line items. Evidently, it is common for publishers to set a higher floor price for AdX than any header bid, which casts doubt on Professor Li's conclusions about the prices that AdX bidders pay.

528.  Moreover, Professor Li does not provide a description of what occurs in the other 60-70% of auctions in which AdX bidders may pay much more than the floor price, resulting in a large net benefit for publishers. It is well known that prices in second-price auctions are more highly variable than in first-price auctions.[1115] With second-price auctions, some

---

[1113] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 367, n. 593 ("United States, et. al., v. Google, 1:23-cv-108 (E.D. Va.), Trial Testimony Day 02, AM, Session September 10, 2024, Direct Examination of Stephanie Layser (former Vice President in News Corp's ad tech division), 48:1-24 ("Q Do you have an understanding of whether last look led to more revenue for News Corp? A Yes. Q And what is that understanding based on? A Sure. So we ran an analysis based on our data, and we found that when Prebid or header bidding responded, Google would typically pay -- this was in the UK, so they would typically pay between one and two pence above what all the header bidding line items would respond. Q And so what did you conclude from this analysis that you did about whether last look generated additional revenue for News Corp or not? A So we concluded that there was not a lot of incremental revenue value that was driven by Google for the header bidding line items.'").

[1114] "Changes to Ad Manager auction" (Jan. 10, 2019), GOOG-DOJ-10924270, at -292 (in which the tree diagram shows that in 42% of queries won by header bidding, the AdX floor exceeded the header bidding line item price).

[1115] *See, e.g.,* McAfee, P., Leme, R.P., Sivan, B., & Vassilvitskii, S., Winner-Pays-Bid Auctions Minimize Variance, ArXiv (2024), https://arxiv.org/abs/2403.04856, accessed Dec. 10, 2024, at p.1 ("Any social choice function [...] can be implemented using different payment rules: first price, second price, all-pay, etc. All of these payment rules are guaranteed to have the same expected revenue by the revenue equivalence theorem, but have different distributions of revenue [...] We prove that among all possible payment rules, winner-pays-bid minimizes the variance in revenue and, in fact, minimizes any convex risk measure.").

impressions get lower prices but others get higher prices. Plaintiffs' focus on low prices alone is uninformative about what is most important: total revenues and average prices.

529. Again failing to consider how publishers configure their floor prices, Professor Li incorrectly uses a Facebook document to conclude that "AdX still gave itself an advantage due to Last Look."[1116] While he highlights "that 90% of the impressions that Facebook bid on and AdX won were won via Last Look,"[1117] that is not evidence of an *advantage* for AdX. On the contrary, a publisher setting a high floor price to *disadvantage* AdX would often see only one AdX bidder clearing the floor price in cases where AdX had a winning bidder.

530. Professor Li also repeats his mistake of ignoring the cases besides those in which "AdX won [] via Last Look." ████████████████████████████████████ ████████████████████████████████████████ ████████████████[118] Again, this is contrary to Professor Li's claim and consistent with publishers setting high floor prices to disadvantage AdX.

---

[1116] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 293 ("There is also evidence that advertisers recognized that AdX still gave itself an advantage due to Last Look. An internal Facebook presentation remarked: 'Header bidding has not rid adx of its last look capabilities. As a result, they are still winning 39% of indirect impressions at the low end and 68% percent of impressions at the high end.' That internal presentation indicates that 90% of the impressions that Facebook bid on and AdX won were won via Last Look.").

[1117] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 293.

[1118] *See* ████████████████████████████████████████ ████████████████████████████

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### *6. Plaintiffs Neglect Incentives in Their Interpretation of the AdX Terms of Service*

531.  Professor Elhauge emphasizes that "Google's contracts included a restraint requiring that, whenever a publisher using a rival ad server called AdX Direct, that publisher had to sell the ad impression to the winner of AdX's auction."[1119]

532.  By requiring partners to allow AdX to serve an impression when AdX bidders could beat a minimum floor price, Google protected AdX bidders from publisher tactics similar to multi-calling. For example, suppose that a publisher makes a call to AdX with a floor price of $1, and the highest bid from an AdX bidder is $4. If the publisher was not required to allow AdX to serve the impression, the publisher could make subsequent calls to AdX, offering the same impression with higher floor prices—say $2, $3, and so on, until AdX bidders fail to beat the floor price, then serving the impression based on the highest price it had received. If bidders bid truthfully, the winning bidder would pay as much as its own value for the impression, rather than the second-highest AdX bid. Faced with such publisher tactics, an ad buyer would be forced to strategically reduce its bid and make guesses about the publisher's lowest floor price and about others' bids—as it would in a first-price auction. By preventing such publisher tactics, the AdX terms of service kept bidding simple for ad buyers and avoided increases in processing costs and latency due to multiple calls.

533.  Moreover, in an example, Professor Elhauge posits that if "a publisher using a rival ad server received a real-time bid from a rival ad auction platform for $2.00" and it "called AdX Direct for that same impression, then it would have to sell the impression to AdX's winning bidder, even if AdX's winning bid was less than the $2.00 bid the publisher had

---

[1119] Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 289.

already received from the rival auction."[1120] That is wrong, for if the floor price was $2.00 or more in the AdX Direct interface, this impression would not sell to AdX buyers.[1121]

### 7. Plaintiffs and Their Experts Ignore the Challenges of Switching to UFPA

534.    Professor Li argues that "[i]f Google were unable to manipulate auctions via Last Look and win impressions more easily than it would have otherwise, it would have had an incentive to switch to first-price auctions in order to compete more vigorously with other sources of demand."[1122] This argument is flawed for at least two reasons.

535.    *First,* the "Last Look" did not allow Google to "manipulate auctions" and "win impressions more easily." As I've explained throughout this section, after accounting for how publishers responding to incentives raise AdX floor prices higher than any header bid, the "Last Look" does not result in any inherent advantage for AdX. Indeed, if a publisher selects floor prices optimally (as in Theorem 3), on average, the outcomes under the AdX second-price auction with "Last Look" are *the same* as the outcomes under a unified first-price auction.

---

[1120] Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 289.

[1121] "Response of 6 July 2022 to CMA Request for Information received on 25 May 2022" (July 6, 2022), GOOG-AT-MDL-019716943, at -968 ("Previously, under the AdX Direct Implementation if the third-party ad server passed on the floor price (which could reflect the winning price) that would be shared with buyers."); "Declaration of N. Korula" (May 2, 2024), GOOG-AT-MDL-C-00001791, at ¶ 14 ("To access AdX using AdX Direct, publishers place ad tags on their websites or in apps ("properties"). Ad tags are snippets of code that contain the details of the size, format, and other requirements of the ad unit. When a user visits the publisher's property, the ad tag calls AdX to return an ad meeting these requirements. For publishers using a third-party publisher ad server or an in-house ad server, when a user visits the publisher's property, an ad tag calls the publisher's ad server, and that ad server would then go through its ad selection logic and, if it chooses, call AdX Direct with an appropriate reserve price via the AdX Direct tag").

[1122] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 334 ("Economic literature shows that if Google had given up the Last Look advantage, AdX would have switched to a first-price auction instead of maintaining a second-price auction years after other exchanges moved to a first-price auction. If Google were unable to manipulate auctions via Last Look and win impressions more easily than it would have otherwise, it would have had an incentive to switch to first-price auction in order to compete more vigorously with other sources of demand.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

536.  *Second*, while Professor Li claims that absent "Last Look" Google "would have had an incentive to switch to first-price auctions in order to compete more vigorously with other sources of demand,"[1123] these arguments entirely ignore the challenges associated with switching auction formats. Bidding in a bidder-truthful second-price auction is easy, but bidding a first-price auction is more complicated. To bid well in the new first-price auction of the UFPA, AdX bidders, including Google Ads and DV360, had to develop technology to forecast others' bids and to use those forecasts to guide bid shading.[1124] Transitioning involved significant communication efforts to inform ad buyers about new auction rules and how they affect incentives. These complexities were acknowledged by industry media.[1125] And for Google, it also involved the development of tools to support participants, such as the collection and distribution of minimum bid to win data.

537.  All of these challenges are overlooked by Professor Li when he argues that Google "would have had an incentive to switch to first-price auctions" absent the so-called "Last Look."[1126]

---

[1123] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 334 ("Economic literature shows that if Google had given up the Last Look advantage, AdX would have switched to a first-price auction instead of maintaining a second-price auction years after other exchanges moved to a first-price auction. If Google were unable to manipulate auctions via Last Look and win impressions more easily than it would have otherwise, it would have had an incentive to switch to first-price auctions in order to compete more vigorously with other sources of demand.").

[1124] I elaborate on these technologies in Section VII.E.

[1125] *See* Sarah Sluis, "Big Changes Coming To Auctions, As Exchanges Roll The Dice On First-Price," AdExchanger (Sept. 5, 2017), https://www.adexchanger.com/platforms/big-changes-coming-auctions-exchanges-roll-dice-first-price/, accessed Dec. 12, 2024 ("But the switch [to first-price auctions] comes at a cost: It will force DSPs and buyers to change their buying strategies and build tech for a first-price auction. And with many first-price auctions still nascent and tests conducted in secret, the market is in a state of disarray and confusion, allowing opportunists to realize short-term gains at others' expense. [...] 'DSPs have always been set up to address second-price auctions,' noted Megan Cameron, director of media services at Merkle. 'They haven't built the technology to allows us to bid effectively in a first-price auction.' [...] Criteo, which has had to redesign its algorithms in order to test first-price auctions with SSPs, said they are more difficult to run. [...] Publishers will face the same adjustment challenges as buyers [...]").

[1126] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 334 ("Economic literature shows that if Google had given up the Last Look advantage, AdX would have switched to a first-price auction instead of maintaining a second-price auction years after other exchanges moved to a first-price auction. If Google were unable to manipulate auctions via

### 8. Professor Elhauge's Claims About DFP First Look Are Wrong

538. Professor Elhauge asserts that "Google began in April 2016 to provide a select group of higher valued AdX advertisers the ability to obtain a 'first look' at, and option to purchase, ad inventory made available by DFP publishers that opted into the program, which included publisher inventory reserved for direct sales."[1127] He then claims that several harms arose from the interaction of header bidding and guaranteed contracts with DFP First Look.[1128] Those claims, as described below, are wrong.

539. Professor Elhauge argues that DFP First Look "sometimes resulted in publishers getting a lower price [] than what would have been the winning header bidding price,"[1129] but this is misleading. DFP First Look was not mandatory, it was opt-in.[1130] Consequently, if a publisher had concerns that the feature led to too many lost header bidding opportunities, it could simply forgo the setting, as many publishers did.[1131] Alternatively, the publisher

---

Last Look and win impressions more easily than it would have otherwise, it would have had an incentive to switch to first-price auctions in order to compete more vigorously with other sources of demand.").

[1127] Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 329.

[1128] I note that these allegations refer to an official DFP feature called "First Look" and should not be confused with the "first look" term that critics have used to misleadingly describe AdX's interaction with the waterfall and other demand sources in Dynamic Allocation.

[1129] Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 329.

[1130] "DFP First Look Comms Doc" (July 19, 2017), GOOG-DOJ-13392632 at -944 ("A publisher that wants to increase yield activates DFP First Look (DFL) and selects buyers to expose all inventory to before it is allocated to reservations and other demand. They set up a floor to control the volume and decrease the risk to reservation sales."), -948 ("Publishers can control which buyers are allowed to buy their DFL inventory using DFL Pricing Rules. First Look can also be turned off by removing the First Look pricing rules at any time."). *See also* Google, "Activate First Look," Google Ad Manager Help, https://support.google.com/admanager/answer/9241865?sjid=8092376624026034942-NC, accessed Dec. 11, 2024 ("To activate First Look, you must set the primary linked Ad Exchange account as the "default for Dynamic Allocation" for each inventory type you use in Ad Manager."); Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 329 ("For inventory that was ineligible for EDA, or that AdX was unlikely to win through EDA, Google began in April 2016 to provide a select group of higher valued AdX advertisers the ability to obtain a "first look" at, and option to purchase, ad inventory made available by DFP publishers that opted into the program, which included publisher inventory reserved for direct sales.").

[1131] Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 329 ("At the time of its April 2016 launch, First Look reportedly accounted for approximately 13% of DFP inventory transacted through AdX. Since the beginning of the Class

could raise the DFP First Look floor price.[1132] As Professor Elhauge acknowledges, this "First Look price floor"[1133] was in the publisher's full control.

540. Professor Elhauge then misleadingly asserts that after Google "removed this First Look advantage over header bidding in August 2017"[1134] and incorporated header bids into the "First Look" floor, it "still excluded rival ad exchanges from participating in First Look auctions."[1135] When the DFP First Look floor price was determined using a header bid from a "rival exchange," that exchange certainly influenced the outcome of the "First Look" auction. For example, suppose that a publisher received a single header bidding exchange offer that it used to determine a DFP First Look floor price greater than the bids from *all* AdX buyers.[1136] Then the header bidding exchange would beat out all DFP First Look and AdX buyers. In essence, the header bidding exchange *did* compete with DFP First Look bidders.

---

Period in December 2016, First Look never exceeded 2.2% in any month and averaged 0.7% of transactions over the whole Class Period.").

[1132] "DFP First Look Comms Doc" (July 19, 2017), GOOG-DOJ-13392632 at -944 ("A publisher that wants to increase yield activates DFP First Look (DFL) and selects buyers to expose all inventory to before it is allocated to reservations and other demand. They set up a floor to control the volume and decrease the risk to reservation sales.").

[1133] Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 329 ("Google removed this First Look advantage over header bidding in August 2017 by increasing the First Look floor to the auction price (e.g., from header bidding) if that price were higher, but still excluded rival ad exchanges from participating in First Look auctions.").

[1134] Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 329 ("Google removed this First Look advantage over header bidding in August 2017 by increasing the First Look floor to the auction price (e.g., from header bidding) if that price were higher, but still excluded rival ad exchanges from participating in First Look auctions.").

[1135] Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 329 ("Google removed this First Look advantage over header bidding in August 2017 by increasing the First Look floor to the auction price (e.g., from header bidding) if that price were higher, but still excluded rival ad exchanges from participating in First Look auctions.").

[1136] For this example, I have also assumed that the bid from the header bidding exchange clears all relevant floor prices.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

541. Finally, in writing that "the First Look program [...] provided Google the means of redirecting additional direct reserved ads to AdX advertisers,"[1137] Professor Elhauge again disregards that "First Look" is an optional, opt-in feature that provides publishers with additional flexibility in managing their inventory. Google's support pages describe the feature's intended audience as publishers that wish to "allow [high-CPM bids] to serve ahead of reservation inventory."[1138] In addition to being opt-in, the "First Look" feature also enables publishers to "[e]xpose or block select inventory through granular targeting."[1139]

---

[1137] Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 329 ("Thus, the First Look program (which could only be accessed by DFP publishers) provided Google the means of redirecting additional direct reserved ads to AdX advertisers.").

[1138] Google, "About First Look," Google Ad Manager Help, https://support.google.com/admanager/answer/6300696?hl=en, accessed Dec. 11, 2024. *See also* Alex Shellhammer, "Growing programmatic revenue with First Look," Google Ad Manager (May 5, 2016), https://blog.google/products/admanager/growing-programmatic-revenue-with-firs/, accessed Dec. 10, 2024 ("First Look has been a great compliment to our monetization [strategy] and our ad stack. Since implementing it, Gannett has seen a 15% lift in eCPM of our programmatic channel." - Tim Wolfe, VP of Revenue Operations, Gannett").

[1139] Google, "About First Look," Google Ad Manager Help, https://support.google.com/admanager/answer/6300696?hl=en, accessed Dec. 11, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## XI.    RESERVE PRICE OPTIMIZATION: INCREASING PUBLISHER REVENUES IN "THIN" AUCTION MARKETS

### A. Overview

542.  Reserve Price Optimization (RPO) was an AdX feature designed to help publishers "earn the most money possible, with the least complexity."[1140] Launched as Optimized Pricing in April 2015,[1141] RPO increased the floor price sent to a bidder on AdX when Google predicted—based on historical bid data—that a higher floor price would increase publisher revenues.[1142] By increasing publisher yields, RPO also incentivized publishers to make more inventory available for programmatic auctions.[1143] Google updated its RPO features over time and found that each update increased publisher revenues.[1144] Other

---

[1140] "Optimized pricing in the Open Auction Comms" (Mar. 23, 2018), GOOG-DOJ-04937154, at -154 ("Our goal has always been to help publishers thrive and create sustainable businesses with advertising: to earn the most money possible, with the least complexity, all while providing users the best experience. [...] These new features will help our publisher partners grow their revenue and give programmatic buyers greater access to premium inventory.").

[1141] Email from ███████ to ████████, "Re: [drx-pm] LAUNCHED! Dynamic Pricing (RPO) for AdX sellers" (Nov. 12, 2015), GOOG-DOJ-07235914, at -916 ("In April, we launched a simple pricing model that sets prices based on inventory features such as web property and ad unit.").

[1142] "Optimized pricing in the Open Auction Comms" (Mar. 25, 2016), GOOG-DOJ-04937154, at -158 ("So in recent months, we've been working on optimized pricing technology that algorithmically sets floor prices in the Open Auction to increase publisher revenue. With optimized pricing, we use event level data available from previous auctions to predict what the bids will be on certain queries, and adjust the floor price accordingly on behalf of the publisher, subject to their settings.").

[1143] "Reserve Price Optimization, Optimized Private Auctions & Dynamic Revenue Sharing" (Mar. 23, 2018), GOOG-AT-MDL-004242638, at -639 ("When publishers' programmatic yield grows, they make more inventory available to buyers.").

[1144] "AdX Dynamic Price" (Dec. 11, 2014), GOOG-DOJ-13199910, at -930 ("AdX pubs [...] Total +2% (with GDN opt out)"; "AdX Dynamic Price Optimization V2" (Sept. 16, 2015), GOOG-DOJ-13209957, at -959 ("The cookie model seems to add about 3.8% incremental revenue."); Email from ███████ to ██████ Re: [drx-pm] LAUNCHED! Dynamic Pricing (RPO) for AdX sellers" (Nov. 12, 2015), GOOG-DOJ-07235914, at -915 ("Between April and October we launched and improved new systems to dynamically set auction reserve prices for AdX sellers. After three launches and a three month study of the impact on buyers and sellers, the Reserve Price Optimization (RPO) program now generates a total annual revenue lift of ~$240m, or 2.4% of total network (AdX+AdSense publisher) revenue (rasta)!"); "Online Reserve Price Optimization" (Sept. 14, 2017), GOOG-DOJ-13211589, at -590 ("The launch candidate increases network-wide revenue by +1.11%").

sell-side intermediaries (including ███████████████████████████████ ███████ implemented features similar to RPO.[1145]

543. Plaintiff Stellman alleges that "RPO clearly harmed advertisers" because Google "falsely represent[ed] that its AdX exchange was a second-price auction."[1146] But, a second-price auction *remains* a second-price auction with or without a program like RPO in place. RPO was a service to automate and improve the ordinary publisher task of setting floor prices in a second-price auction; it did not change the format of the AdX auction.

544. Advertiser Plaintiffs allege that advertisers were harmed by Google's "misrepresentations" of RPO.[1147] But, knowledge of RPO was not necessary for buy-side

---

[1145]



[1146] Stellman Complaint, at ¶ 76 ("RPO clearly harmed advertisers by forcing them to pay more than they would have if Google had run a true second-price auction, as it advertised. By falsely representing that its AdX exchange was a second-price auction, Google induced advertisers to bid their true value, only to override publishers' pre-set AdX floors and use advertisers' true value bids against them. This meant that AdX did not function as a second-price auction—a fact that Google employees flagged with concern internally."); *see also* Advertiser Class Complaint, at ¶ 239 ("Google falsely represented that it was running a sealed-bid, second-price auction [...] ."); Advertiser Class Action Complaint, at ¶ 241 ("In 2015, Google's "gTrade" group implemented Reserve Price Optimization ("RPO"), expressly to push up the auction closing price. Google falsely told publishers and advertisers that AdX operated a second-price auction.").

[1147] Stellman Complaint, at ¶ 70 ("They did so because they relied on Google's misrepresentations that AdX ran a second-price auction and that revealing this information would not be used against them."); Stellman Complaint, at ¶ 76 ("RPO clearly harmed advertisers by forcing them to pay more than they would have if Google had run a true second-price auction, as it advertised."); *see also* Advertiser Class Complaint, at ¶ 239 ("Google falsely represented that it was running a sealed-bid, second-price auction, inducing advertisers to reveal their true value bids, then used those bids against advertisers to secretly manipulate exchange floor prices and increase the amount advertisers paid for impressions on AdX."); Advertiser Class Complaint, at ¶ 248 ("Not until over a year after starting RPO, on May 12, 2016, did Google announce it was launching "optimized pricing." Google did not disclose that RPO had been

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

tools to optimize bids: in the absence of RPO, publishers could (and did[1148]) use historical

data to set floor prices,[1149] so that a surplus-maximizing bidder would account for that

possibility *both* when RPO was in place and before. Moreover, Google disclosed RPO

roughly a year after it launched,[1150] so any potential impacts from the alleged lack of

disclosure would have been short-lived.[1151]

### B. Importance of Floor Prices for Revenue Optimization

545. As I discussed in Section III.C.3.d, floor prices can help publishers increase their average

auction revenues.[1152] A publisher contemplating an increase in its floor prices faces a

tradeoff between *increasing* the average price of each impression sold and *reducing* the

---

running for over a year or that it relied on inside information, and misled publishers and advertisers as to how the program worked."); Advertiser Class Complaint, at ¶ 249 ("Even after Google's overdue, partial, and misleading disclosures regarding 'optimized pricing,' Google led advertisers to believe that it was running an honest second-price auction, inducing them to continue submitting their true value bids—which Google continued to exploit against them dishonestly.").

[1148] "Optimized pricing in the Open Auction Comms" (Mar. 23, 2018), GOOG-DOJ-04937154, at -155 ("Optimized pricing in the Open Auction automates the post-auction analysis and floor price updates that publishers are already doing and takes it a step further."); "Buyer incentives and reserve price optimization" (May 14, 2012), GOOG-DOJ-15588979, at -979 ("No expectation of bid privacy: other platforms like yield managers [] already give publishers full buyer bid information and therefore the buyers might not care").

[1149] Indeed, as I discuss in Paragraph 551, in 2011, Google provided a Minimum CPM Recommendation Feature that helped publishers select such floor prices more effectively.

[1150] Jonathan Bellack, "Smarter optimizations to support a healthier programmatic market," Google Ad Manager (May 12, 2016), https://blog.google/products/admanager/smarter-optimizations-to-suppor/, accessed Dec. 11, 2024 ("In our experiments to date, we have applied optimized pricing to about 15% of transactions, creating over 5% lift in revenue for publishers using the Open Auction. As we expand our experiments with optimized pricing, we will monitor its performance to ensure advertisers continue to get great ROI."). *See also* Email from ▮▮▮▮▮▮▮▮▮ to AdX Buy-Side Global Sales et al., "[ANNOUNCED] Smarter optimizations for DoubleClick Ad Exchange" (May 12, 2016), GOOG-DOJ-04934481, at -481 ("On Thursday afternoon we announced new optimizations for DoubleClick Ad Exchange, Optimized Private Auctions and optimized pricing in the Open Auction (aka RPO).").

[1151] Stellman Complaint, at ¶ 80 ("Over a year later, on May 12, 2016, Google announced it was launching 'optimized pricing.' However, Google did not disclose that it had actually launched RPO over a year earlier, did not disclose that RPO relied on inside information, and misled publishers and advertisers as to how the program worked.").

[1152] Note, however, that badly-chosen floor prices (*i.e.*, floor prices chosen too high) can *reduce* average auction revenues.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

probability of a sale because no bidders meet the floor price. Because a publisher typically does not know each advertiser's willingness to pay for an impression or even which advertisers are participating in each auction, publishers can use historical data on the sales of similar items or experimentation (or both) to set floor prices. For example, with historical data on bids received in a second-price auction, a seller can simulate the outcomes of auctions with alternative floor prices and choose the one that those simulations indicate would generate the highest revenue.[1153] Alternatively, a publisher could run an experiment or "A/B test" of different floor prices on live auctions, and choose the floor price that led to the highest revenue in those experiments.[1154]

546. Setting floor prices can be especially important in **thin** auctions, which are auctions with few competitive bidders.[1155] This effect is seen most easily in second-price auctions because, in those types of auctions, a floor price can be effective at increasing the price of an impression *if and only if* there is a *single* bid above the floor price.[1156] This is more likely to occur if there are fewer bidders, which is why floor prices are more important in thinner auctions.[1157] Conversely, in second-price auctions with more bidders, floor prices

---

[1153] *See* Ostrovsky, M., & Schwarz, M., "Reserve Prices in Internet Advertising Auctions: A Field Experiment," Journal of Political Economy, Vol. 131 (Oct. 31, 2023), at pp. 3352-76.

[1154] *See, e.g.*, Rhuggenaath, J., Akcay, A., Zhang, Y., & Kaymak, U, "Setting Reserve Prices in Second-Price Auctions with Unobserved Bids," INFORMS Journal on Computing, Vol. 34 (2022), at pp. 2950-67.

[1155] In this context, "competitive" bidders are those bidders with values for items that are close to the average sale price for the impression.

[1156] The same result is true of first-price auctions, but for a different reason. In a first-price auction, each bidder's optimal bid depends on the number of competitive bidders in the auction and the floor price, with the optimal bid *lower* with *fewer* competitive bidders and *higher* when the floor price is *higher*. This makes the floor price a more important lever in first-price auctions with few competitive bidders.

[1157] *See, e.g.*, Reiley, D. H., "Field Experiments on the Effects of Reserve Prices in Auctions: More Magic on the Internet," The RAND Journal of Economics, Vol. 37 (Spring 2006), at pp. 195-211 ("The gains to setting an optimal reserve price become very small as [the number of bidders] increases.").

are often less important because the price is more often set by the second-highest bid, rather than the floor price.

547. Although there are typically many advertisers participating in online display advertising auctions, there are several possible sources of auction thinness in display advertising.

548. *First*, not all bids from advertisers end up competing in the final auction for an impression. One reason for this is budget throttling, discussed in [Section VI](#) of this report, in which a buy-side tool selects a subset of its eligible advertisers for participation in each auction. Another reason, discussed in [Section III.C.4](#) of this report, is that some buy-side tools submitted only one bid for an impression on behalf of multiple advertisers. Regardless of whether those bidding strategies benefit advertisers, they reduce the overall number of bidders participating for each impression, making it more likely that the publisher's floor price determines the clearing price of the impression.

549. *Second*, auction thinness can arise as a result of finer targeting, a possibility I first discussed in an academic paper in 2010.[1158] Finer targeting allows an advertiser to more accurately identify the end users it seeks to reach with its advertising campaign. As a result, the advertiser's buying tool bids *more* for impressions that meet its targeting criteria but participates in *fewer* auctions overall. Because the price an advertiser pays in an auction depends on the competitive environment (including the total number of advertisers competing for the impression), finer targeting can reduce overall auction revenues, even though the winning advertiser's bid is increased. For example, suppose

---

[1158] Levin, J., & Milgrom, P, "Online Advertising: Heterogeneity and Conflation in Market Design," American Economic Review: Papers & Proceedings, Vol. 100 (May 2010), at pp. 603-07 ("A second hazard of targeting is that it leads to thinner markets, which can create problems for accurate pricing.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

that there are ten gymnasiums running online display ad campaigns in Manhattan but only one operating in Morningside Heights. If an impression opportunity can be associated with someone looking for a gym in Manhattan, all ten might bid for the impression. But if each advertiser can identify that the end user lives in Morningside Heights, only one might be interested in bidding. As a result, the publisher's revenue from the impression can be lower in the second case than the first. This possibility had been discussed internally at Google, where some engineers called it the "Pricing Paradox."[1159] Google engineers identified a "solution" to the "Pricing Paradox": more accurate floor prices.[1160]

## C. Google's Implementation of RPO

550. Over time, Google introduced a number of features to help publishers set floor prices leading to higher revenues in the AdX auction. In addition to improving programmatic revenues for its publisher customers, Google's revenue share model on AdX means that it also had an interest in setting floor prices leading to higher auction revenues.

551. In 2011, Google introduced a Minimum CPM Recommendation feature (internally called AdX Seller Reserve Price Optimization) for publishers.[1161] The Minimum CPM Recommendation feature calculated optimal floor prices for each ad slot based on the previous week's bids on that ad slot and provided those as recommended floor prices in

---

[1159] "The Pricing Paradox and solutions" (May 15, 2012), GOOG-DOJ-03366173, at -179 ("Pricing paradox[:] Targeting may create more value, less revenue").

[1160] "The Pricing Paradox and solutions" (May 15, 2012), GOOG-DOJ-03366173, at -189 ("Solution #2: Auctions with reserve prices [...] Compute revenue-maximizing reserve prices for each query bundle").

[1161] "AdX Seller Reserve Price Optimization" (Nov. 18, 2012), GOOG-DOJ-12439154, at -154 ("AdX Seller Reserve Price Optimization [...] Status: launched on Q2 2011").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

the publisher's AdX user interface, along with a graph of expected revenue for each floor price that the publisher could choose.[1162] The publisher still needed to set the floor price manually in the AdX user interface based on its recommendations.[1163] Google's early experiments found that publisher revenues increased approximately 20% on the ad slots on which its recommended floor prices were adopted.[1164]

552.  Despite its Minimum CPM Recommendation feature and other strategies used by publishers to increase auction clearing prices,[1165] by 2015, Google found that "even with all this effort, there [was] still a wide and persistent price gap between the bid and closing prices in the open auction across all [] publishers."[1166] Some Google engineers referred to that gap as the "auction discount" because (in a second-price auction with optimal bids) it

---

[1162] "AdX Seller Reserve Price Optimization" (Nov. 18, 2012), GOOG-DOJ-12439154, at -156 ("The approach is[:] 1. Process logs (7 day moving window, updated daily) to extract first and second price statistics per ad slot[.] 2. Compute optimized floor prices for the next day"); Nemo Semret, "Introducing Minimum CPM Recommendations on DoubleClick Ad Exchange," DoubleClick Publisher Blog (Nov. 1, 2011), https://doubleclick-publishers.googleblog.com/2011/11/introducing-minimum-cpm-recommendations.html, accessed Dec. 13, 2024 ("Today, we're happy to announce the launch of Minimum CPM Recommendations for DoubleClick Ad Exchange publishers. This feature automatically recommends an optimal minimum cpm for each eligible ad slot in the Ad Exchange auction. It also automatically generates a graph that provides better visibility into how different floor prices might affect a publisher's bottom line.").

[1163] "Dynamic Floor Prices in AdX" (Aug. 20, 2012), GOOG-AT-MDL-010338120, at -120 ("Floor prices in AdX are set manually per ad unit (or, in the brave new adunitless world, per inventory rule). Either way, the min cpm is set by a human entering a number into a text box in the adseller Ul.").

[1164] Nemo Semret, "Introducing Minimum CPM Recommendations on DoubleClick Ad Exchange," DoubleClick Publisher Blog (Nov. 1, 2011), https://doubleclick-publishers.googleblog.com/2011/11/introducing-minimum-cpm-recommendations.html, accessed Dec. 13, 2024 ("Initial results with early beta testers indicate an average 20% revenue lift for adopted recommendations.").

[1165] For example, one Google document notes that "publishers have created complex systems of publisher-set floors to close the gap. Unfortunately, these floors are hard to calculate manually, requiring ad ops teams to spend countless hours gathering data and running post-auction analysis to update pricing and priorities in their system. Some publishers have even resorted to more extreme methods like waterfalls between exchanges, which introduces latency that damages consumer experience and advertiser performance." "Optimized pricing in the Open Auction Comms" (Mar. 23, 2018), GOOG-DOJ-04937154, at -155.

[1166] "Optimized pricing in the Open Auction Comms" (Mar. 23, 2018), GOOG-DOJ-04937154, at -155.

is the difference between the bidders' willingness-to-pay and the price it actually paid.[1167] Google engineers measured the "auction discount" in 2015, and found that a winning bidder paid less than half its bid, on average, and that the "auction discount" was larger for higher bids.[1168]

553.    In April 2015, Google introduced its AdX Dynamic Price feature (later simply called RPO, which is the term I will use for the program).[1169] RPO *automatically* increased floor prices for publishers with the simple goal of helping publishers "earn the most money possible, with the least complexity."[1170] Google engineers noted that RPO could also "encourage publishers to make more inventory accessible to the open auction,"[1171] which would benefit bidders in the auction. RPO also responded to auction "thinness" created by the one-bid policies chosen by some buy-side tools participating in the AdX auction (see Section III.C.4). As one Google engineer noted, "A dynamic RPO floor effectively

---

[1167] "Cookie based Dynamic Reserve Price Optimization (RPO) - mini PRD" (May 1, 2015), GOOG-DOJ-13203511, at -511 ("There is often a large 'auction discount' in the AdX 2nd price auction - a gap between what buyers are bidding and what they end up paying when the auction closes.").

[1168] "Cookie based Dynamic Reserve Price Optimization (RPO) - mini PRD" (May 1, 2015), GOOG-DOJ-13203511, at -511 ("On average buyers pay less than half of what they bid. The discount is especially large for bids on the higher end, for example for $5 bids, the median amount the buyer pays is $1.49.").

[1169] Email from ▓▓▓▓▓▓ to ▓▓▓▓▓▓ "Re: [drx-pm] LAUNCHED! Dynamic Pricing (RPO) for AdX sellers" (Nov. 12, 2015), GOOG-DOJ-07235914, at -916 ("In April, we launched a simple pricing model that sets prices based on inventory features such as web property and ad unit.").

[1170] "Optimized pricing in the Open Auction Comms" (Mar. 23, 2018), GOOG-DOJ-04937154, at -154 ("Our goal has always been to help publishers thrive and create sustainable businesses with advertising: to earn the most money possible, with the least complexity, all while providing users the best experience,"), -155 ("Optimized pricing effectively reduces the gap between the first price and closing price increasing publisher yield. Optimized pricing could encourage publishers to make more inventory accessible to the open auction as well as reduce complex setups with varying ad server priority and floor prices[.]").

[1171] "Optimized pricing in the Open Auction Comms" (Mar. 23, 2018), GOOG-DOJ-04937154, at -155.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

recovers some of the money lost by the fact that some bidders[,] say [C]riteo, aren't sending a second bid, they are just sending [one]."[1172]

554. The first RPO model (sometimes called Per-Buyer RPO) increased floor prices on a per-buyer basis, using data on the buyer's bids on a publisher's ad slot from the previous day to estimate the floor price that maximized the expected auction revenue.[1173] In October 2015, Google added Cookie-Based RPO, which used the previous day's data on a buyer's bids for a given cookie to estimate revenue-maximizing floor prices for impression opportunities associated with that cookie.[1174] Cookie information was included in the RPO model because Google found that "[b]uyers often buy based on cookies, and cookies are an important part of the valuation of every query."[1175] Per-Buyer RPO and Cookie-Based RPO could apply simultaneously to a single impression, in which case the higher of the two estimated floor prices would apply.[1176] Overall, an RPO floor applied to fewer than 20% of impressions.[1177]

---

[1172] "Notes: MTV/LON/CAM Strategy Summit" (Aug. 12, 2015), GOOG-DOJ-10572595, at -603.

[1173] Email from ▮▮▮▮▮▮▮▮ to ▮▮▮▮▮▮▮▮, "[Launch 124105] Per-buyer dynamic reserve price optimization on AdX - full launch (+$90m annual revenue from RTB buyers)" (Nov. 13, 2014), GOOG-DOJ-15419945, at -945; "AdX Dynamic Price" (Dec. 11, 2014), GOOG-DOJ-13199910, at -920 ("Daily pipeline to compute pricing file based on 'yesterday' data), -925 ("Compute bid distributions for 'yesterday'[.] Find 'optimal' reserve prices[...]").

[1174] Email from ▮▮▮▮▮▮▮▮ to ▮▮▮▮▮▮▮▮ "[Launch 132012] Cookie based Dynamic Reserve Price Optimization on AdX - full launch" (Sept. 29, 2015), GOOG-DOJ-15423462, at -462 ("Launch Date 2015-10-05").

[1175] "Cookie based Dynamic Reserve Price Optimization (RPO) - mini PRD" (May 1, 2015), GOOG-DOJ-13203511, at -511.

[1176] "AdX Dynamic Price V2" (May 26, 2015), GOOG-DOJ-14000011, at -012 ("Effective reserve is max of inventory-RPO, cookie-RPO price").

[1177] "Optimized pricing in the Open Auction Comms" (Mar. 23, 2018), GOOG-DOJ-04937154, at -160 ("A: Optimized pricing has no effect on most Open Auction queries - right now it affects the winning price for fewer than 20% of impressions bought by RTB buyers."); "DRS and RPO interaction in Simulation" (Sept. 20, 2016), GOOG-AT-MDL-007375273, at -273 ("Percentage of Impressions" table, "DYNAMIC_RESERVE" row, "Grand Total [...] 17.56%").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

555. RPO only ever increased floor prices. It never set floor prices below the publisher's chosen floor price, even if Google estimated that floor price to be higher than optimal.[1178] RPO increased floor prices to the level that maximized the publisher's predicted profits, subject to a constraint that the publisher's predicted match rate did not decrease by more than a certain amount.[1179, 1180] RPO automatically applied to publishers' Open Auction inventory, and there was no option for a publisher to opt out from RPO.[1181] While Google had flagged as early as 2014 the possibility that a publisher's floor price might be modified on some impressions,[1182] RPO was officially announced to the public on May 12, 2016, as Optimized Pricing.[1183]

---

[1178] "Optimized pricing in the Open Auction Comms," (Mar. 23, 2018), GOOG-DOJ-04937154, at -155 ("Optimized pricing can only increase floors from where the publisher has them currently set. It will never lower a floor.").

[1179] Email from ███████ to ███████ "Re: [drx-pm] LAUNCHED! Dynamic Pricing (RPO) for AdX sellers" (Nov. 12, 2015), GOOG-DOJ-07235914, at -916 ("Pick a reserve price that maximizes predicted revenue, constrained to limit the fraction of bids it eliminates (to preserve match rate).").

[1180] At least initially, the match rate was constrained to dropping by no more than 20%. *See* "Cookie Data in Reserve Price Optimization Pipeline" (Mar. 29, 2015), GOOG-DOJ-13200480, at -482 ("We simulate with the default values of the Dynamic Reserve Price Rule Computation parameters. These values are the ones used in the Inventory RPO that runs daily in production. [...] max_match_rate_loss_fraction = 0.2 (default)") (emphasis omitted).

[1181] "Optimized pricing in the Open Auction Comms," (Mar. 23, 2018), GOOG-DOJ-04937154, at -155 ("The publisher does not get any new controls or and opt out and the feature works only in the background.").

[1182] "Ad Exchange auction model," (Aug. 24, 2014), GOOG-AT-MDL-C-000035250, at -250 ("The Google DoubleClick Ad Exchange may run limited experiments designed to optimize the auction. These experiments may include modifying the standard auction model or mechanics (e.g., a tiered, rather than second price auction); simulating ad calls and auctions; modifying the min CPM set by the publisher for an impression or otherwise adjusting publisher settings; or discounting certain bids submitted by buyers or otherwise modifying the priority of the bids submitted by buyers, in an effort to optimize the auction. Publisher's buyer/advertiser blocks will not be modified.").

[1183] Email from ███████ to AdX Buy-Side Global Sales, et al., "[ANNOUNCED] Smarter optimizations for DoubleClick Ad Exchange" (May 12, 2016), GOOG-DOJ-04934481, at -481 ("On Thursday afternoon we announced new optimizations for DoubleClick Ad Exchange, Optimized Private Auctions and optimized pricing in the Open Auction (aka RPO).").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

556. Initially, RPO exempted buyers that submitted at least two bids into the AdX auction.[1184] Google engineers discussed this exemption internally as a way to "encourage buyers to declare two bids"[1185] in the AdX auction, and it also addressed "concerns" about the interaction of Project Bernanke and RPO.[1186] In November 2017, Google engineers noted that the exemption policy was "easy to circumvent by submitting a nominal (1 cent) minimum payment amount with every bid" and, as a result, changed the RPO exemption policy to exempt bidders that submitted second bids high enough to generate "a certain amount of revenue lift from self-pricing."[1187] In particular, Google exempted buyers for which the calculated increase in revenue from the second bid it submitted (compared to submitting only its high bid) was four times greater than a simulated increase in revenue Google calculated would occur due to RPO (if it submitted only its high bid).[1188] Google Ads was exempt from RPO under both policies.[1189] Both RPO exemption policies are

---

[1184] "AdX Dynamic Price: Sell Side Review fact sheet" (Dec. 2014), GOOG-DOJ-13200158, at -158 ("AdX buyers buying on both AdSense and AdX publishers will be subject to dynamic reserve pricing, subject to a policy [...] to exempt buyers who submit two bids or second price themselves.").

[1185] "The case for encouraging buyers to declare two bids" (May 11, 2015), GOOG-DOJ-13201465, at -465 ("We can encourage buyers to declare 2 bids per auction for three reasons: 1) In the presence of an effective RPO (reserve price optimization for AdX), AdX is in position to give a discount in pricing a buyer who declares two effective bids and price itself. This strategy will directly incentivises buyers to declare their second highest bid.").

[1186] "AdX Dynamic Reserve Price: AFC Launch Review Follow up" (Dec. 1, 2014), GOOG-DOJ-13199603, at -603 ("This will address two major concerns: Interaction of Bernanke and dynamic pricing is eliminated, as GDN always submits two bids and thus is exempt.").

[1187] "RPO Exemption Policy V2 Launch Doc" (Nov. 14, 2017), GOOG-DOJ-13212948, at -948.

[1188] "RPO Exemption Policy V2 Launch Doc" (Nov. 14, 2017), GOOG-DOJ-13212948, at -948 ("We run a simulation pipeline where we remove min cpm payments from buyers and calculate the revenue extracted from each buyer for both the case where min cpm payments are on and off. After that we measure the performance over a week worth of simulations and whitelist for RPO exemptions only those buyers that yield a revenue lift of more than 4 times the lift of RPO (over both AdX and AdSense), or 24%. [...] At serving time in dynamic price producer we set the RPO reserves to 0 if a buyer belongs to this whitelist.").

[1189] "AdX Dynamic Reserve Price: AFC Launch Review Follow up" (Dec. 1, 2014), GOOG-DOJ-13199603, at -603 ("We are exempting bidders (adx 'buyer networks') who submit a second bid to the AdX auction from dynamic pricing which will effectively make all of GDN demand exempt from dynamic pricing."); "Reveal RPO floor to Adwords" (Nov. 11, 2019), GOOG-DOJ-14030931, at -931 ("Previously in second price AdX auctions, Adwords was exempt from RPO floor.").

consistent with RPO being designed in part to respond to auction "thinness" created by buy-side tools' decisions to employ single-bid policies, which (as I discussed above) would otherwise lead to reductions in publisher revenues.

557. In May 2018, Google introduced another version of RPO called Online RPO.[1190] Online RPO was motivated by "buyers' bidding behavior on high value re[]marketing cookies," where Google had observed that most impression opportunities for a given cookie arrived within a period of one hour, making it difficult to use the previous day's data to optimize floor prices.[1191] Online RPO maintained a sliding window of the ten most recent bids for each buyer-cookie pair in the "high bid range" (meaning that bid requests for the cookie had received bids higher than some threshold) and determined an optimal floor price based on bids in that window.[1192] Online RPO operated at the same time as the other RPO models (*i.e.*, Per-Buyer RPO and Cookie-Based RPO), and the maximum of the RPO-computed reserves would apply.[1193]

---

[1190] "2018 Sellside Launches Revenue Evaluation" (July 19, 2019), GOOG-DOJ-13949282, at Tab "Q2 2018," Row 6 (noting launch date of 5.10.18).

[1191] Email from ▮▮▮▮▮▮▮▮▮▮▮ to ▮▮▮▮▮▮▮▮▮▮▮▮ "UPCOMING LAUNCH - Please review: [Launch 225406] Online Reserve Price Optimization" (Feb. 5, 2018), GOOG-DOJ-14421383, at -383 ("The key motivation of online RPO is to use buyers' bidding behavior on high value re-marketing cookies to set reserve prices. While analyzing bidding patterns on cookies, we observed that most queries for a given cookie arrive within a one hour interval and that there is little overlap between the set of cookies for which queries are received across successive days. In other words requests for the same cookie are highly localized in time making it hard to train a model based on historical data.").

[1192] "Online Reserve Price Optimization Launch Doc" (Sept. 14, 2017), GOOG-DOJ-13211589, at -589 ("Online prediction is accomplished by maintaining a sliding window of the N (current[ly] set to 10) most recent bids for each buyer-cookie pair in the high bid range (> 5 USD) and then applying a prediction function on the set of bids in this window in order to determine per-buyer reserve prices for the query at hand.").

[1193] "Online Reserve Price Optimization Launch Doc" (Sept. 14, 2017), GOOG-DOJ-13211589, at -590 ("The maximum of all reserves including those computed via other RPO models is then applied to the buyer's new bid in the auction.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

558.    Google conducted several experiments to assess the impact of its various RPO models. Experiments from around the time of the launch of Per-Buyer RPO found that it increased Google revenue and publisher payouts on the order of 2-5% compared to no RPO.[1194] Later experiments found that the integration of Cookie-Based RPO increased revenues further: on the order of 6-8% compared to no RPO.[1195] The addition of Online RPO was estimated to further increase revenue by 1.11% compared to the revenues obtained under the earlier RPO models.[1196]

559.    RPO was temporarily deactivated when AdX transitioned to the Unified First-Price Auction in September 2019.[1197] Google redesigned RPO for application in the Unified First-Price Auction, including modifications to ensure that the same floor price was applied to each buyer within an auction (including Google Ads).[1198] Optimized Pricing for

---

[1194] Email from ██████████████ to ██████████████ "[Launch 124105] Per-buyer dynamic reserve price optimization on AdX - full launch (+$90M annual revenue from RTB buyers)" (Nov. 13, 2014), GOOG-DOJ-15419945, at -945 ("Experiments show +5.5% revenue for AdX buyers on AdX pubs and +4.0% for AdX buyers on AdSense pubs. Revenue impact on GDN is neutral."); "AdX Dynamic Price: Sell Side Review fact sheet" (Dec. 2014), GOOG-DOJ-13200158, at -158 ("Based on simulations and live experiments, AdX Dynamic Price increases revenue from AdX buyers (RTB + Static) by about 4.3%. GDN revenue and ROI is largely unaffected due to it being exempt. Benefit to publishers. Publishers benefit from this feature by earning increased revenue from AdX. In aggregate, revenue of AdX publishers increases by 2%, and revenue for AdSense publishers increases by 0.4%, for a network-wide increase of 0.9%."); "AdX Dynamic Price" (Dec. 11, 2014), GOOG-DOJ-13199910, at -930 ("AdX pubs [...] Total +2% (with GDN opt out)").

[1195] Email from ██████████████ to ██████████████ "[Launch 132012] Cookie based Dynamic Reserve Price Optimization on AdX - full launch" (Sept. 29, 2015), GOOG-DOJ-15423462, at -462 ("Experiments show +4.7% revenue from AdX buyers across AdX and AdSense publishers incremental to [per-buyer RPO]."); Email from ██████████████ to J. Giles, "Re: RPO rollout schedule" (Sept. 21, 2015), GOOG-DOJ-15423317, at -319 ("The cookie pricing model alone generates about +3.9% increase in adx buyer revenue compared to no dynamic pricing. When used together with the primary ('inventory') model, it generates +3.8% revenue increase on top of the primary model (+8.11% total increase)."); "AdX Dynamic Price V2" (May 26, 2015), GOOG-DOJ-14000011, at -016 ("Inventory RPO impact: +3.3% on AdX buyers [...] Cookie RPO impact: about the same (and less than expected from sim) [...] Combined impact: +6.3% (almost additive) on adx buyers").

[1196] "Online Reserve Price Optimization Launch Doc" (Sept. 14, 2017), GOOG-DOJ-13211589, at -590 ("The launch candidate increases network-wide revenue by +1.11%").

[1197] "Reveal RPO floor to Adwords" (Nov. 11, 2019), GOOG-DOJ-14030931, at -931 ("Note that since moving to first-price auctions, AdX does not have any RPO floor yet (as of 2019/10/31) except small experiment traffic.").

[1198] "Apply Dynamic Reserve Price to DFP Remnant Ads in First Price Auctions" (Jan. 5, 2020), GOOG-DOJ-14029750, at -750 ("And similar to how we are migrating legacy per-buyer publisher floor to unified

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

the First-Price Auction was launched in June 2022, and it was enabled by default for all publishers using GAM (but it also included an opt-out for publishers).[1199] In April 2022, Google also introduced an option (in beta release) for publishers to allow Google to automatically optimize the floor prices for slices of inventory in its Unified Pricing Rules (UPR) feature.[1200]

## D. Responding to Plaintiffs' Allegations

### 1. Google's Communications About RPO and the AdX Auction Format Were Not Misleading

560. Plaintiff Stellman objects to Google's communications about RPO to advertisers, characterizing RPO as a "subversive program" that "secretly manipulated" floor prices.[1201] However, this allegation overlooks the fact that Google had flagged to its

---

pricing rules, we are making dynamic reserve price non-personalized, and applying that to both DFP remnant and backfill demand."); "Reveal RPO floor to Adwords" (Nov. 11, 2019), GOOG-DOJ-14030931, at -931 ("Previously in second price AdX auctions, Adwords was exempt from RPO floor [...]. This is no longer the case after AdX moved to first-price auctions. RPO floor applies to all demand in first-price AdX auctions.").

[1199] "2022 Google Ad Manager releases archive," Google Ad Manager Help, https://support.google.com/admanager/answer/11586212?hl=en#zippy=%2Cjune-optimize-pricing-video-protections-troubleshooting-for-mcm-google-analytics-integration-webview-api-for-ads-updates-to-bid-rejection-reason, accessed Dec. 11, 2024 ("June 6 Optimize pricing [...] Optimize pricing to reflect inventory's value[:] Optimized pricing increases auction floor prices to more accurately reflect and protect your inventory's value. Optimized pricing is enabled by default, but can be disabled via your network settings.").

[1200] "Optimize floor prices in unified pricing rules (Beta)," Google Ad Manager Help, https://support.google.com/admanager/answer/11385824, accessed Dec. 11, 2024 ("Optimized floor prices (Beta) are available as a pricing option within unified pricing rules, in addition to fixed floor prices and target CPM. [...] You specify a slice of inventory in a unified pricing rule where Google will automatically optimize floor prices."); "2022 Google Ad Manager releases archive," Google Ad Manager Help, https://support.google.com/admanager/answer/11586212?sjid=143398333919693691538-NA#zippy=%2Capril-audience-segment-forecasting-optimize-floors-in-uprs-desktop-anchor-ads-linked-account-changes-mediation-chain-update-view-top-pricing-rules-atp-for-lgpd-update, accessed Dec. 11, 2024 ("April 25 [...] Optimize floors in UPRs").

[1201] Stellman Complaint, at ¶ 71 ("Google secretly manipulated the auction through a subversive program: Reserve Price Optimization."); *see also* Advertiser Class Complaint, at ¶ 239 ("Google falsely represented that it was running a sealed-bid, second-price auction, inducing advertisers to reveal their true value bids, then used those bids against advertisers to secretly manipulate exchange floor prices and increase the amount advertisers paid for impressions on AdX."); ¶ 242 ("Under RPO, once advertisers had revealed their true value bids, Google secretly, and unilaterally, overrode publisher floor prices and set customized floor prices based on advertisers' historical bids.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

customers as early as 2014 the possibility of an optimization like RPO that modified a publisher's floor prices on some impressions.[1202] Moreover, RPO was officially announced to the public on May 12, 2016, roughly a year after the program was launched,[1203] so any potential impacts from the alleged "secrecy" of RPO would have been short-lived. Furthermore, even if Google did not disclose the details of RPO, buy-side tools frequently experimented to optimize their bidding strategies, allowing them to react to reserve price strategies, as I describe in Section II.B.3.

561. Plaintiff Stellman alleges Google "falsely represent[ed] that its AdX exchange was a second-price auction," claiming that AdX with RPO "did not function as a second-price auction."[1204] This is wrong. As I discuss in Section III.C.3, a second-price auction is the sealed-bid auction process that assigns the impression to the highest bidder for a price equal to the larger of the second-highest bid or the highest applicable floor price, set

---

[1202] "Ad Exchange auction model," (Aug. 24, 2014), GOOG-AT-MDL-C-000035250, at -250 ("The Google DoubleClick Ad Exchange may run limited experiments designed to optimize the auction. These experiments may include modifying the standard auction model or mechanics (e.g., a tiered, rather than second price auction); simulating ad calls and auctions; modifying the min CPM set by the publisher for an impression or otherwise adjusting publisher settings; or discounting certain bids submitted by buyers or otherwise modifying the priority of the bids submitted by buyers, in an effort to optimize the auction. Publisher's buyer/advertiser blocks will not be modified.").

[1203] Jonathan Bellack, "Smarter optimizations to support a healthier programmatic market," Google Ad Manager (May 12, 2016), https://blog.google/products/admanager/smarter-optimizations-to-suppor/, accessed Dec. 11, 2024 ("In our experiments to date, we have applied optimized pricing to about 15% of transactions, creating over 5% lift in revenue for publishers using the Open Auction. As we expand our experiments with optimized pricing, we will monitor its performance to ensure advertisers continue to get great ROI."). *See also* Email from ████████ to AdX Buy-Side Global Sales et al., "[ANNOUNCED] Smarter optimizations for DoubleClick Ad Exchange" (May 12, 2016), GOOG-DOJ-04934481, at -481 ("On Thursday afternoon we announced new optimizations for DoubleClick Ad Exchange, Optimized Private Auctions and optimized pricing in the Open Auction (aka RPO).").

[1204] Stellman Complaint, at ¶ 76 ("By falsely representing that its AdX exchange was a second-price auction, Google induced advertisers to bid their true value, only to override publishers' pre-set AdX floors and use advertisers' true value bids against them. This meant that AdX did not function as a second-price auction […] ."); Stellman Complaint, at ¶ 66 ("Between 2010 and September 2019, Google led publishers and advertisers to believe that AdX was a second-price auction."). *See also* Advertiser Class Complaint, at ¶ 239 ("Google falsely represented that it was running a sealed-bid, second-price auction, inducing advertisers to reveal their true value bids, then used those bids against advertisers to secretly manipulate exchange floor prices and increase the amount advertisers paid for impressions on AdX.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

before bids are received. With or without a program like RPO in place, a second-price auction remains a second-price auction. RPO never unsealed bids received in an auction to set the floor price for that auction.[1205]

562. Plaintiff Stellman alleges that Google's "misrepresentations" of AdX as a second-price auction led advertisers to "reveal[] the maximum they would be willing to pay for each impression, bidding their true value."[1206] While any second-price auction is bidder-truthful—meaning that the bidder cannot increase its payoff *in that auction* by bidding anything other than its value for the impression—it has long been understood that a bidder might gain by untruthful bidding in a *series* of second-price auction or, indeed, in other larger contexts. For example, I wrote in a 2006 paper referencing a 1990 paper by Rothkopf, Teisberg and Kahn[1207] that "[b]idders [in a second-price auction] may rationally be reluctant to report their true values, fearing that the information they reveal will later be used against them."[1208] This does not change a second-price auction into

---

[1205] "Optimized pricing in the Open Auction Comms" (Mar. 23, 2018), GOOG-DOJ-04937154, at -159 ("[T]he price a buyer pays is not related to the bid in the present auction."), -161 ("[O]nly historical bids are analyzed - we do not use the bids in the auction to set the floor.").

[1206] Stellman Complaint, at ¶ 70 ("Consequently, when bidding into AdX, advertisers revealed the maximum they would be willing to pay for each impression, bidding their true value. They did so because they relied on Google's misrepresentations that AdX ran a second-price auction and that revealing this information would not be used against them."); Stellman Complaint, at ¶ 76 ("By falsely representing that its AdX exchange was a second-price auction, Google induced advertisers to bid their true value, only to override publishers' pre-set AdX floors and use advertisers' true value bids against them."). *See also* Advertiser Class Complaint, at ¶ 245 ("Internal documents demonstrate Google was fully aware that RPO was misleading and driving up prices paid by advertisers."); Advertiser Class Complaint, at ¶ 241 ("Google falsely told publishers and advertisers that AdX operated a second-price auction. Sealed-bid, second-price auctions are designed to allow bidders to safely reveal their true value bids, i.e., the true maximum a bidder is willing to pay, without wasting time and resources trying to guess what others will bid, and without having their true maximum number used against them by sellers, including in future auctions.").

[1207] Rothkopf, M.H., Teisberg, T.J., & Kahn, E.P., "Why are Vickrey Auctions Rare?," Journal of Political Economy, Vol. 98 (Feb. 1990), at pp. 94-109.

[1208] Ausubel, L.M., & Milgrom, P., "The Lovely but Lonely Vickrey Auction," in P. Cramton, Y. Shoham & R. Steinberg (Eds.), *Combinatorial Auctions,* MIT Press (2006).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

something else, but highlights that the possibility of learning is an *unavoidable* complication when auctions are run repeatedly and sellers can learn from experience how to set price floors. Even accounting for such learning, however, using a second-price auction format minimizes the need for bidders to strategically modify their bids. In repeated second-price auctions, the possibility of learning is the *only* reason for a bidder to adjust its bids away from its value for an impression. That possibility of RPO or other floor price adjustments in the context of repeated auctions does not change the basic fact that each individual auction is a second-price auction.

563.  Plaintiff Stellman alleges that Google "misleadingly" told advertisers that RPO "helps advertisers by increasing the amount of inventory available for purchase programmatically."[1209] But incentivizing publishers to make more inventory available to programmatic sales does benefit advertisers by increasing the amount of inventory available for purchase. This is just a restatement of the economic law of supply: all else equal, an increase in the price received by a seller increases the quantity supplied.[1210]

564.  Advertiser Plaintiffs allege that after the launch of RPO, "Google continued to mislead publishers by encouraging them to adjust Google exchange floors […], directly leading

---

[1209] Stellman Complaint, at ¶ 81 ("Google misled advertisers and publishers, and misrepresented how the program worked. In its blog post disclosing RPO, Google claimed that it would 'monitor [optimized pricing's] performance to ensure advertisers continue[d] to get great ROI' and that it would 'give programmatic buyers greater access to premium inventory.' Google also approached select large, sophisticated buyers on a one-on-one basis representing that the dynamic floors were good for them. … Google responded misleadingly by saying that the program helps advertisers by increasing the amount of inventory available for purchase programmatically."). *See also* Advertiser Class Complaint, at ¶ 248 ("Google did not disclose that RPO had been running for over a year or that it relied on inside information, and misled publishers and advertisers as to how the program worked. When approached by advertisers, Google told them that RPO was in their best interest. In one blog post disclosing RPO, Google assured advertisers that "optimized pricing" would provide a great return on their investment and open access to premium inventory. Google also falsely informed larger buyers that the dynamic pricing floors worked to their advantage even though they operated to drive prices up much closer to advertisers' maximum willingness to pay.").

[1210] Mas-Colell, A., Whinston, M.D., & Green, J.R., *Microeconomic theory,* Oxford University Press (1995), at p. 138.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

them to believe that they could control outcomes and optimize yield through floors."[1211]

But publishers could still set effective floor prices when RPO was in place, with the

publisher never receiving a payment lower than the floor price it set. This means that

publishers could always effect a floor price in AdX higher than the RPO floor. Even

before RPO was introduced, EDA or the value CPMs of remnant line items could

increase the effective floor prices for advertisers to be above the floor prices set by

publishers. Moreover, RPO was a program with *very large* benefits to publishers:

Per-Buyer RPO and Cookie-Based RPO together increased publisher revenues on the

order of 6-8%, and Online RPO increased publisher revenues even further.[1212]

---

[1211] Stellman Complaint, at ¶ 79 ("Google continued to mislead publishers by encouraging them to adjust Google exchange floors in their publisher ad server. DFP continued to let publishers pre-set floors for Google's AdX exchange, buying tools, and advertisers, directly leading them to believe that they could control outcomes and optimize yield through floors."). *See also* Advertiser Class Complaint, at ¶ 247 ("At no point did Google correct its false statement that had no plans to use dynamic price floors. Instead, after deploying RPO, Google dissembled by encouraging publishers to adjust their exchange floors, knowing RPO would override these floors.").

[1212] Email from ▆▆▆▆▆▆ to ▆▆▆▆▆▆ "[Launch 124105] Per-buyer dynamic reserve price optimization on AdX - full launch (+$90m annual revenue from RTB buyers)" (Nov. 13, 2014), GOOG-DOJ-15419945, at -945 ("Experiments show +5.5% revenue for AdX buyers on AdX pubs and +4.0% for AdX buyers on AdSense pubs. Revenue impact on GDN is neutral."); "AdX Dynamic Price: Sell Side Review fact sheet" (Dec. 2014), GOOG-DOJ-13200158, at -158 ("Based on simulations and live experiments, AdX Dynamic Price increases revenue from AdX buyers (RTB + Static) by about 4.3%. GDN revenue and ROI is largely unaffected due to it being exempt. Benefit to publishers. Publishers benefit from this feature by earning increased revenue from AdX. In aggregate, revenue of AdX publishers increases by 2%, and revenue for AdSense publishers increases by 0.4%, for a network-wide increase of 0.9%."); "AdX Dynamic Price" (Dec. 11, 2014), GOOG-DOJ-13199910, at -930 ("AdX pubs [...] Total +2% (with GDN opt out)"; Email from ▆▆▆▆▆▆ to ▆▆▆▆▆▆, "[Launch 132012] Cookie based Dynamic Reserve Price Optimization on AdX - full launch" (Sept. 29, 2015), GOOG-DOJ-15423462, at -462 ("We've previously experimented [with per-buyer RPO]. Experiments show +4.7% revenue from AdX buyers across AdX and AdSense publishers incremental to [per-buyer RPO]."); Email from ▆▆▆▆▆▆ to J. Giles, "Re: RPO rollout schedule" (Sept. 21, 2015), GOOG-DOJ-15423317, at -319 ("The cookie pricing model alone generates about +3.9% increase in adx buyer revenue compared to no dynamic pricing. When used together with the primary ('inventory') model, it generates +3.8% revenue increase on top of the primary model (+8.11% total increase)."); "AdX Dynamic Price V2" (May 26, 2015), GOOG-DOJ-14000011, at-012 ("Inventory RPO impact: +3.3% on AdX buyers [...] Cookie RPO impact: about the same (and less than expected from sim) [...] Combined impact: +6.3% (almost additive) on adx buyers"); "Online Reserve Price Optimization Launch Doc" (Sept. 14, 2017), GOOG-DOJ-13211589, at -590 ("The launch candidate increases network-wide revenue by +1.11%").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 2. Publishers and Advertisers' Were Not Harmed by RPO Being Allegedly "Opaque"

565. Advertiser Plaintiffs allege that Google harmed advertisers by keeping the details of RPO "opaque" to publishers and advertisers.[1213] Yet, as explained in <u>Section II.B.3</u> of this report, processes for setting reserve prices, like those for computing bids, are routinely kept secret to avoid other participants exploiting the details of those processes to their own advantage, at the expense of the publisher. The concealment of floor price optimization programs like RPO serves the publisher's interests and should be expected by ad buyers.

566. Plaintiff Stellman further alleges that not revealing the details of RPO "makes it nearly impossible for advertisers and publishers to discover Google's misrepresentations."[1214] But a publisher's incentive to use previous data to optimize floor prices does not change as a consequence of RPO or the many similar programs employed by non-Google supply-side intermediaries.[1215] As noted above, in *any* auction setting involving repeated

---

[1213] Stellman Complaint, at ¶ 86 ("Google compounds its auction manipulation by purposefully keeping its auction mechanics, terms, and pricing, opaque and 'nontransparent' to both advertisers and publishers. This makes it nearly impossible for advertisers and publishers to discover Google's misrepresentations, and even harder for rivals to neutralize or offset."); *see also* Advertiser Class Complaint, at ¶ 239 ("Google falsely represented that it was running a sealed-bid, second-price auction, inducing advertisers to reveal their true value bids, then used those bids against advertisers to secretly manipulate exchange floor prices and increase the amount advertisers paid for impressions on AdX.").

[1214] Stellman Complaint, at ¶ 86 ("Google compounds its auction manipulation by purposefully keeping its auction mechanics, terms, and pricing, opaque and 'nontransparent' to both advertisers and publishers. This makes it nearly impossible for advertisers and publishers to discover Google's misrepresentations, and even harder for rivals to neutralize or offset.").

[1215]



*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

interactions, a buyer or seller needs to account for the possibility that another auction participant might learn from its past behavior and use that information in future interactions.[1216] As expected and as I describe in Section II.B.3, buy-side tools frequently experiment to optimize their bids, reacting to changes in the auction environment such as floor prices. Even before the introduction of Optimized Pricing in April 2015, publishers were already adjusting floor prices based on historical bids,[1217] which suggests that RPO was automating an optimization function that publishers were already doing themselves. Buyers could use experimentation and learning algorithms to optimize accordingly, and, indeed, an internal Google document found that buyers detected RPO, with the author noting, "[f]or RPO, some buyers are changing their bids."[1218] Advertiser Plaintiffs provide no evidence that the disclosure of the program in 2016 led to any change in bidder behavior, as would be expected under their theory, and their suggestion that the alleged concealment of RPO affected advertiser behavior is speculative.

---

[1216] This is sometimes known as the "ratchet effect" in economic theory. *See* Freixas, X., Guesnerie, R., & Tirole, J., "Planning Under Incomplete Information and the Ratchet Effect," The Review of Economic Studies, Vol. 52 (1985), at pp. 173-91; Bergemann, D., & Välimäki, J., "Dynamic Mechanism Design: An Introduction," Journal of Economic Literature, Vol. 57 (2019), at pp. 235-74.

[1217] "Optimized pricing in the Open Auction Comms" (Mar. 23, 2018), GOOG-DOJ-04937154, at -155 ("Optimized pricing in the Open Auction automates the post-auction analysis and floor price updates that publishers are already doing and takes it a step further.").

[1218] *See* "Display Ads Research Meeting Notes" (June 19, 2017), GOOG-TEX-00831373, at -378. *See also* "AdX Managed Reserves" (Feb. 10, 2017), GOOG-DOJ-03643284, at -287 ("We also have evidence of third-party buyers bidding lower when we send RPO reserves.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 3. RPO Did Not Prevent Other Exchanges from "Competing on the Merits"

567.   The Advertiser Class alleges that RPO "prevented rival exchanges from competing on the merits," by obscuring the price that ad buyers paid.[1219] However, these allegations rely on an incorrect understanding of the RPO program.

568.   The Advertiser Class alleges that third-party exchanges cannot compete on the merits if "buyers think they are paying X, when the seller actually is extracting X plus Y."[1220] They allege that RPO operated in this way and so in the presence of RPO, "buyers cannot accurately compare the options available across the exchange market."[1221] This does not describe RPO. Both before and after the launch of RPO, when AdX stated that the floor price was some value X, the floor price was indeed X, not X + Y.[1222]

569.   Advertisers and bidding tools could also still analyze all relevant campaign performance metrics, such as conversion rates and return on ad spend, and traditional KPIs ("key

---

[1219] Advertiser Class Complaint, at ¶ 253 ("Google's RPO program has caused advertisers to suffer substantial harm in the form of artificially increased prices, and prevented rival exchanges from competing on the merits, as a direct result of Google's misleading, predatory conduct."); Advertiser Class Action Complaint, at ¶ 243 ("When buyers think they are paying X, when the seller actually is extracting X plus Y—with Y being the difference between the second price and the actual price charged—the buyers cannot accurately compare the options available across the exchange market. As a result, a rival exchange could be charging X, or X plus a fraction of Y, and still lose to Google. Thus, Google's extraction of a hidden premium gave it a competitive advantage in the exchange market.").

[1220] Advertiser Class Complaint, at ¶ 243 ("When buyers think they are paying X, when the seller actually is extracting X plus Y—with Y being the difference between the second price and the actual price charged—the buyers cannot accurately compare the options available across the exchange market. As a result, a rival exchange could be charging X, or X plus a fraction of Y, and still lose to Google. Thus, Google's extraction of a hidden premium gave it a competitive advantage in the exchange market.").

[1221] Advertiser Class Complaint, at ¶ 243 ("When buyers think they are paying X, when the seller actually is extracting X plus Y—with Y being the difference between the second price and the actual price charged—the buyers cannot accurately compare the options available across the exchange market.").

[1222] "Optimized pricing in the Open Auction Comms" (Mar. 23, 2018), GOOG-DOJ-04937154, at -160 ("Q: We currently send buyers the publishers floor price in the bid request - will we be sending the dynamic floor price? A: We will send out the floor price as usual when an auction floor is set by optimized pricing."); Jonathan Bellack, "Smarter optimizations to support a healthier programmatic market," Google Ad Manager (May 12, 2016), https://blog.google/products/admanager/smarter-optimizations-to-suppor/, accessed Dec. 11, 2024 ("And as we've always done, if there is a floor applied to an impression, whether publisher or algorithmically set, we share it with buyers in our bid requests.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

performance indicators") such as clicks-per-dollar. As a result, RPO did not prevent

buyers from comparing their performance on different exchanges, and thus could not

have prevented competition in the way that the Advertiser Class alleges.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## XII.    SELL-SIDE DYNAMIC REVENUE SHARING: INCREASING MATCH RATES AND PUBLISHER REVENUES

### A. Overview

570. Dynamic Revenue Sharing (DRS) was a sell-side feature on AdX "that increases publisher and Google revenue by dynamically changing the AdX sell-side revenue share so that more auctions end with a winning buyer."[1223] Although DRS evolved over time, each version involved reducing AdX's revenue share applied to some individual impressions to allow publishers to sell more impressions and AdX bidders to win more impressions. While DRS varied AdX's revenue share impression-by-impression, the average revenue share for each publisher in every month remained close to and no lower than the contracted level throughout all three versions.[1224] By maintaining or increasing the average revenue share received by the publisher, DRS could increase Google's profits only when it also increased the total revenues it paid to publishers.

571. Professor Li argues that DRS was "a scheme to manipulate the AdX take rate on a per-impression basis in order to win more competitive impressions, and (in later iterations) to extract more revenue from less competitive impressions."[1225] But in fact DRS applied to competitive impressions in only a minority of cases and more often to

---

[1223] "Dynamic Revenue Share" (Jan. 29, 2020), GOOG-DOJ-15130321, at -321.

[1224] The revenue share was closer to 19% during DRS v1. *See* Email from ████████ to ██████████████ et al., "LAUNCHED! AdX Dynamic Revenue Share (DRS)" (Sept. 2, 2015), GOOG-AT-MDL-B-001391461, at -462 ("AdX margin: 19.0%"); "Dynamic Revenue Share" (Jan. 29, 2020), GOOG-DOJ-15130321, at -324 ("DRS v2 […] maintain[s] a Google share of 20%"); "Truthful DRS Design Doc" (Mar. 24, 2017), GOOG-DOJ-13227256, at -261 ("keep the average AdX revshare at the contracted value (20%).").

[1225] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 579.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

impressions that would otherwise not be sold at all.[1226] Professor Li then adds that "DRS harmed publisher revenues by reducing publisher payouts on impressions Google won" and that "when DRS dynamically increased its take rate, it paid publishers less for these impressions, leading to a net loss of publisher revenue."[1227] This is wrong for at least two reasons. First, it again ignores the impressions that, without DRS, would go unsold, which add to publishers' revenues. Second, the introduction of DRS incentivized publishers to increase floor prices. While even a publisher that did not react to that incentive benefited from having an increased volume of transactions cleared, a publisher that increased its floor prices to the post-DRS optimal levels could increase revenues on additional impressions, benefiting even more. Thus, all publishers from the least to the most responsive would be expected to benefit from DRS. This conclusion is consistent with Google's internal experiments at the time DRS was introduced.[1228]

572.  Professor Li claims that "Google did little to disclose the existence of DRS or DRS v2 to bidders."[1229] Similarly, when referring to DRS, Professor Singer claims that "[t]he record evidence indicates that Google cast a veil of secrecy around various aspects of the

---

[1226] *See* "DRS and RPO interaction in Simulation" (Sept. 20, 2016), GOOG-AT-MDL-007375273, at -273. Internal Google experiments show that, of the impressions on which DRS lowered the AdX revenue share, 26.7% (= 3.25 / 12.18) occurred when the payment was determined by a third-party bid. By contrast, 46.7% (= 5.69 / 12.18) occurred when the payment was determined by a publisher floor price. *See also* "Declaration of N. Korula" (Aug. 04, 2023), GOOG-AT-MDL-008842393, at ¶ 32 ("In most cases when DRS applied, the reserve price was set by the publisher-set floor price.").

[1227] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 585.

[1228] For example, experiments indicate a 2.8% increase in total publisher revenues when comparing pre-DRS to DRS v2."Overall Pub Yield with DRS(v2)" (Apr. 7, 2016), GOOG-DOJ-13235100, at -101-102 ("+2.80% lift in publisher revenue". . . "that is the lift of DRS v2 (half-way with buy/pub side recollection) compared with no-DRS, since all the numbers in the deck are DRSv2 vs no-DRS"). The launch results saw an 11.3% increase in publisher revenues from AdX when comparing pre-DRS to DRS v1. Email from ████████ to ███████████████, et al., "LAUNCHED! AdX Dynamic Revenue Share (DRS)" (Sept. 2, 2015), GOOG-AT-MDL-B-001391461, at -462 ("AdX publisher payout: +11.3%").

[1229] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 637.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Challenged Conduct, leaving advertisers at an informational disadvantage,"[1230] but the foundation of these claims is dubious, for at least two reasons. *First*, starting from at least August 2015—before the launch of DRS v1—Google publicly disclosed on the AdX Help Center page that AdX could adjust its revenue share on individual impressions, which is the plain meaning of the phrase "dynamic revenue share."[1231] *Second*, buyers and publishers that experiment can observe that bids below the floor are sometimes winning, which would put them on notice that DRS reduces its revenue share on bids near the floor price, and can adapt their behavior to improve their own outcomes regardless of what they can infer about the details of the DRS program.

573. Plaintiffs argue that "DRS harmed competition in the exchange market because it allowed AdX to adjust its take rate after peeking at rival bids,"[1232] and Professor Cramton adds that "[t]he last look, which should more accurately be referred to as bid-sniping, allowed

---

[1230] Expert Report of H. Singer (Oct. 4, 2024), at ¶ 158.

[1231] For the Help Center page before the launch of DRS v1, *see* "Ad Exchange auction model" (Aug. 4, 2015), GOOG-AT-MDL-C-000035251, at -251 ("DoubleClick Ad Exchange determines the winning bidder based on the highest net bid submitted. Note that the net bid reflects any adjustments Ad Exchange may, at its discretion, have made to the bid submitted by the buyer for the purpose of optimizing the auction. [...] In some cases, the auction may close at a price lower than the reserve price applied, due to auction optimizations. Sellers are paid the Ad Exchange closing price, net of Google's revenue share, but will receive, subject to the terms governing their use of Ad Exchange, no less than the min CPM applied to the auction."). For the Help Center page before the launch of DRS v2, *see* "Ad Exchange auction model" (June 14, 2016), GOOG-AT-MDL-C-000035252, at -252 ("DoubleClick Ad Exchange determines the winning bidder based on the highest net bid submitted. Note that the net bid reflects any adjustments Ad Exchange may, at its discretion, have made to the bid submitted by the buyer for the purpose of optimizing the auction. [...] To optimize the auction, Google may choose to close an auction at a price lower than the reserve price that would have otherwise been applied. In such cases, the winning buyer may pay a price below the reserve and therefore receive a discount on its bid. A buyer that has received discount(s) on its bid(s) may face higher reserve prices in subsequent transactions to offset such discount(s). Subject to the terms governing their use of Ad Exchange, sellers are paid the Ad Exchange closing price, net of Google's revenue share, but will receive no less than the min CPM they specified for the auction. Unless the 'per-query revenue share' setting is enabled by a Seller, auction optimizations may result in an auction closing at a price lower than the reserve price that would have otherwise been applied. Because the Seller will always be paid at least its specified min CPM, the Seller may receive more than its contracted revenue share on the transaction. In subsequent transactions, the Seller's revenue share may then be reduced to offset the prior earnings in excess of the contracted revenue share, but the Seller will always receive at least its contracted revenue share across all its Ad Exchange transactions in a given month.").

[1232] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 31.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

AdX to capture any impression that could match or beat the winning bid price."[1233]
Professor Li concludes that DRS reduces rivals' scale and that such "scale-depriving
conduct forecloses competition."[1234] These analyses are wrong because they rely on
unwarranted assumptions about the AdX floor price. First, they assume that the floor
price was set by a header bidding line item.[1235] In fact, it was more common for DRS to
reduce the AdX revenue share when the publisher-set floor price exceeded the highest
header bidding line item.[1236] For those cases, the floor price was set by the publisher's
reserve instead of a header bidding line item, so DRS was output-expanding: it resulted in
the sale of impressions that otherwise would not have sold (i.e., because no bid was
above the floor price)[1237] and increased AdX's match rate and publisher revenues without
affecting the win rates or revenues of other exchanges. Second, for the less common case
in which the AdX floor price was determined by a header bidding line item, the analyses
make the dubious assumption that the amounts recorded in each header bidding line items
were equal to the header bid. In fact, publishers had the incentive and ability to set floor
prices for AdX that exceeded the best header bidding offer, and there is evidence that

---

[1233] Expert Report of P. Cramton (Oct. 4, 2024) at ¶ 209; *see also* Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 44.

[1234] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 629.

[1235] See Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 122. ("Once called, DFP would apply Dynamic Allocation and set the winning bid from header bidding as a reserve price for AdX (unless the publisher independently set a higher reserve.)").

[1236] *See* "DRS and RPO interaction in Simulation" (Sept. 20, 2016), GOOG-AT-MDL-007375273, at -273. Internal Google experiments show that, of the impressions on which DRS lowered the AdX revenue share, 26.7% (= 3.25 / 12.18) occurred when the payment was determined by a third-party bid. By contrast, 46.7% (= 5.69 / 12.18) occurred when the payment was determined by a publisher floor price. *See also* "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 32 ("In most cases when DRS applied, the reserve price was set by the publisher-set floor price.").

[1237] Or would have been allocated to remnant line items that paid less than the publisher-set floor price.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

publishers did so.[1238] For impressions where the publisher set a floor price sufficiently higher than the best header bidding offer, the application of DRS would only *increase* the price a publisher received. Contrary to the analyses of Plaintiffs and their experts, DRS was an improvement in AdX's product offering that increased payments to publishers, reduced the number of unsold impressions (expanding output), and increased the total value of impressions won by AdX advertisers.

## B. How Dynamically Adjusting Revenue Shares By Impression Can Create Value By Selling More Impressions and Increasing Publisher Revenues

574. An intermediary, such as AdX, with more accurate predictions than the seller about a buyer's value can sell more impressions and increase seller revenues (along with its own profits) by dynamically adjusting the revenue share it applies to individual impressions.

---

[1238] *See, e.g.,* Email from H. Thomas to M. Wheatland, et al., "RE: App impression changes recap" (Oct. 23, 2017), DM_GOOG_0146977, at -980 ("We've now multiplied the Amazon cpm in DFP by 3 or 4x to counter act google - seems to have helped us[.]"); ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -506 ("[Some publishers] inflate the value CPM of remnant line items [...] publishers used to do this even before HB was popular."); ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ "Changes to Ad Manager auction" (Jan. 10, 2019), GOOG-DOJ-10924270 at -292 (depicting a tree diagram showing that in 42% of queries won by header bidding, the AdX floor exceeded the header bidding line item price); "First-price bidding" (Aug. 12, 2019), GOOG-DOJ-11406673, at -677 ("How boost works[:] The publisher inflates the HB bid before sending it as a floor to AdX[.]"); Email from R. Srinivasan to B. Bender, et al., "Unified Auction Changes (Sellside) Executive Update - Aug 12, 2019" (Aug. 13, 2019), GOOG-DOJ-09713317, at -319 ("Today, these [publisher-]inflated CPMs are used to provide price pressure for AdX [...] In practice, [...] many publishers [...] apply a boost to Header Bidding bids[.]");"Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -382 ("Plan to educate pubs around strictly negative revenue consequences of HB price inflation"). I interpret this document, authored in the context of the "Migration to 1P auction" (-358), to mean that inflating header bids was common enough that Google would have to "educate pubs" it was no longer necessary; *see also* "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -777 ("[Last look ...] incentivizes pubs to inflate ('boost') the floor sent to AdX"); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Some publishers set Value CPMs higher than their estimates of what CPM a line item would likely generate to increase competitive pressure in the AdX auction or for other reasons."); Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Because the minimum bid required to win an impression depends on both the floor price *and* the revenue share applied to the impression, AdX could change the probability that an impression sold by changing its revenue share on an impression. The goal of increasing publisher revenue and enabling the sale of additional impressions is consistent with the description of the objectives for DRS in Google's internal documents: "DRS is an optimization feature that increases publisher and Google revenue by dynamically changing the AdX sell-side revenue share so that more auctions end with a winning buyer."[1239]

575. Here is one example that illustrates how a program like DRS can increase publisher revenues. Suppose a publisher is selling impressions to a potential buyer through an intermediary that charges a 20% revenue share. The buyer's value (in CPM) is $1.00 for 10% of impressions, $1.25 for 80% of impressions, and $1.50 for the remaining 10% of impressions, but the publisher does not know for any given impression what the buyer's value will be.[1240]

576. First, I calculate the publisher's maximum revenues in the absence of a program like DRS. In that case, the publisher can calculate, for each possible floor price, the probability that the impression will sell and use that information to determine the floor price that maximizes its revenue. In the example, if the publisher chooses a floor price of $1, after accounting for the intermediary's 20% revenue share, the buyer must bid at least $1.25 to win the impression, and in that case, the impression sells 90% of the time,

---

[1239] "Dynamic Revenue Share" (Jan. 29, 2020), GOOG-DOJ-15130321, at -321.

[1240] After applying the 20% revenue share, the net CPMs are $0.80, $1.00, and $1.20, respectively.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

leading to an expected revenue of 90¢ for the publisher. This is more than it can expect to earn with any other floor price.[1241]

577. Now, suppose that the intermediary can perfectly predict the values of the advertiser and use that information to increase publisher revenues, while maintaining its 20% revenue share on average. To maximize the publisher's revenue, the intermediary can adjust its revenue share on a per-impression basis. When it predicts that the buyer's CPM is $1, it can set its revenue share at 0%, allowing the impression to sell to the buyer at the publisher's floor price of $1, and when it predicts the buyer has a CPM of $1.50, it can set its revenue share at 33%, selling the impression to the buyer at a price of $1.50 and passing the net revenue of $1 on to the publisher. The result is that the advertiser is able to purchase more impressions (the percentage of impressions sold rises from 90% to 100%), the publisher increases its revenues (from $0.90 to $1 on average per impression), and the intermediary, which still has an average revenue share of 20%, also increases its profits.

578. This example is not contrived. It shows one way in which a better-informed intermediary can dynamically set its per-impression revenue shares to help a publisher sell more impressions, increasing its revenue. Similar effects can be achieved for very general distributions of advertiser values and different qualities of information available to the intermediary.[1242]

---

[1241] If the publisher's floor price is 80¢ (leading to a pre revenue share floor price for buyers of $1), the impression sells 100% of the time, giving the publisher expected revenue of 80¢. If the publisher's floor price is $1.20 (leading to a pre revenue share floor price for buyers of $1.50), the impression sells only 10% of the time, giving the publisher expected revenues of 12¢. Any higher floor price for the publisher never sells the impression and any lower floor price leads to lower revenues.

[1242] This example is inspired by an article published in the American Economic Review. *See* Bergemann, D., Brooks, B., and Morris, S. "The limits of price discrimination," *American Economic Review*, Vol. 105 (March 2015), at pp.

579.  This example is not intended to illustrate the exact operation of any one version of DRS, which used more complicated rules to determine revenue shares than that described in the example. The key properties that the example and DRS have in common is that when DRS observed or predicted that the buyer had a low valuation, it would lower the AdX revenue share on those impressions to allow additional sales, and that, in some versions, it would raise its revenue share on other impressions to maintain a fixed average AdX revenue share. The details of DRS evolved through three versions over time, and the way Google collected payment for its services also varied, but just as in the example, Google designed DRS to increase publisher revenues and the quantity of impressions sold, thereby raising its own revenue.[1243]

### C. DRS Increased Match Rates and Publisher Revenues and Evolved to Simplify Bidding for Advertisers

580.  Google recognized the potential for a program like DRS to increase its profits while helping publishers sell more impressions and increasing their revenues, but it took time to engineer a program that did so effectively while maintaining its fixed average revenue share and simple bidding for advertisers.[1244] As shown in Figure 18, an excerpt from Google's launch documents for DRS v1, Google planned and implemented a gradual introduction of DRS, testing elements of its design, while monitoring the responses of

---

921-957. It deviates from their exact model, in which the better-informed party sets the (floor) price rather than the revenue share.

[1243] *See* "Dynamic Revenue Share" (Jan. 29, 2020), GOOG-DOJ-15130321, at -321 ("DRS is an optimization feature that increases publisher and Google revenue by dynamically changing the AdX sell-side revenue share so that more auctions end with a winning buyer.").

[1244] The final version of DRS (tDRS) employed a bidder-truthful rule in which the price paid by the winning bidder was determined not by its actual bid but by its *threshold price*, which is the lowest amount it could have bid to win the auction. As explained above, bidder-truthfulness is valuable because it dramatically simplifies bidding for the advertiser.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

advertisers and publishers and tracking the impacts of the program on publisher and advertiser outcomes.[1245] Google launched DRS v1 expecting to "learn from a simple version and see responses."[1246]

**Figure 18: Google's planned evolution of DRS[1247]**



### 1. DRS v1 Lowered Per-Impression Revenue Shares to Sell More Impressions

581.   In DRS v1, launched in August 2015, AdX made only one change to its auction rules: it reduced its revenue share on some impressions to allow more impressions to be sold.[1248]

---

[1245] *See* "AdX DRS v1 launch review" (Feb. 13, 2015), GOOG-DOJ-13199952, at -958, -960 ("Holdback plan to assess long term buyer and seller response").

[1246] "AdX DRS v1 launch review" (Feb. 13, 2015), GOOG-DOJ-13199952, at -956.

[1247] "AdX DRS v1 launch review" (Feb. 13, 2015), GOOG-DOJ-13199952, at -958.

[1248] Email from ███████ to ███████████, et al., "LAUNCHED! AdX Dynamic Revenue Share (DRS)" (Sept. 2, 2015), GOOG-AT-MDL-B-001391461, at -461 ("DRS clears queries when the highest bid is above the publisher floor, but not quite enough above the floor to cover the 20% AdX revenue share. In these cases we lower the revenue share per query as needed to increase transaction volume and increase match rate."); "AdX dynamic

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Under DRS v1, AdX would first determine for each impression if the highest bid it had received was in the "dynamic region," meaning that the bid would not clear the floor price if AdX charged its standard revenue share on that impression, but the bid would clear the floor price if AdX selected a 0% share.[1249] On an impression for which the highest bid fell in this dynamic region, AdX would sometimes reduce its revenue share on that impression as needed to allow the bid to clear the floor price. AdX did not reduce its revenue share on each such impression: instead it "throttled" the application of DRS, meaning that it applied it probabilistically, adjusting the probability it applied DRS over time to ensure that the average AdX revenue share on impressions sold by each publisher and to each advertiser both did not drop significantly below the contracted AdX revenue share (for example, for publishers who had contracted an AdX revenue share of 20%, AdX throttled DRS v1 to maintain an average revenue share of at least 19%).[1250]

---

sell-side rev share (DRS v1) - project description / mini PRD" (Aug. 2014), GOOG-DOJ-03619484, at -484 ("Reduce the 20% rev share when there is no winner at 20% and an opportunity to find a winner with a reasonable, lower rev share").

[1249] In its initial design of DRS, Google was agnostic about the source of the floor price that AdX faced. It could have been a floor price set by the publisher, a value CPM from a remnant line item (including header bidding line items), or a floor price GAM had calculated under its Reserve Price Optimization (RPO) program. DRS treated these floor prices the same way, without distinguishing their source. In July 2017, Google updated the DRS algorithm to exclude RPO floor prices, effectively ensuring that a fixed revenue share was applied to impressions for which the floor price was determined by RPO. *See* "Launch Details Spreadsheet, Launch 193573" (Sept. 1, 2023), GOOG-AT-MDL-009644409, at cell B2 ("Disable dynamic revenue sharing for RPO prices").

[1250] Email from ▓▓▓▓▓▓ to ▓▓▓▓▓▓▓ et al., "LAUNCHED! AdX Dynamic Revenue Share (DRS)" (Sept. 2, 2015), GOOG-AT-MDL-B-001391461, at -461 ("DRS clears queries when the highest bid is above the publisher floor, but not quite enough above the floor to cover the 20% AdX revenue share. In these cases we lower the revenue share per query as needed to increase transaction volume and increase match rate. We limit how often we reduce the margin to maintain a >=19% average margin[.]"); "Dynamic Sell-Side Revshare[:] GDN/DRX Summit 2015" (Nov. 2, 2015), GOOG-DOJ-13202659, at -670 ("Probabilistically throttle DRS[:] For an incoming query, we flip a coin to throttle queries (publisher) or winner (advertiser) when AdX margin is squeezed below a predefined threshold. […] Adjust throttling probabilities based on the difference in measured margin and pre-defined threshold.");"AdX DRS v1 launch review" (Feb. 13, 2015), GOOG-DOJ-13199952, at -954 ("Buyers throttled based on whether query will clear using DRS, then checking buyer throttling table for winning buyer[;] Sellers throttled based on lookup of pub throttling state by query (query identifies pub)").

582. Figure 19 displays an example of how DRS v1 could increase publisher revenues and the quantity of impressions transacted. In this example, the publisher sets a floor price of $1.00. Without DRS, AdX collects its contracted revenue share on each impression (in this example, 20%), which means that the impression can only sell if the buyer bids at least $1.25.[1251] This could leave revenue on the table for the publisher: if the buyer bids $1.11, it does not win the impression, even though it is willing to pay more than the publisher's floor price for the impression. Under DRS v1, AdX would sometimes reduce its revenue share on the impression as needed to allow the impression to sell. If DRS v1 was applied to the same impression with a floor price of $1 and bid of $1.11, AdX would reduce its revenue share to 10%, allowing the bidder to win the impression while paying its bid of $1.11, and passing on $1.00 of that to the publisher, leaving 11¢ in revenue for AdX (equivalent to a 10% revenue share on that impression).[1252, 1253]

---

[1251] To calculate the floor price facing the advertiser, divide the publisher's floor price by the publisher's revenue share (which is one minus the AdX revenue share). In this case, this calculation obtains $1.00/(1-0.2)=$1.25.

[1252] Note that Figure 19—reproduced from an internal Google document—incorrectly calculates a 9% revenue share under DRS v1, but the actual clearing revenue share is closer to 10%.

[1253] Note that 11¢ equals 10% of $1.11.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Figure 19: An example of DRS v1 adjusting revenue shares at an impression level to increase impressions transacted.**[1254]



583. After the introduction of DRS v1, if publishers and bidders left their floor prices and bids unchanged, then both sides would benefit from the program: publishers would sell more impressions on AdX, increasing their revenues, and advertisers would win more impressions, increasing their surplus. I formalize this result in the following theorem, proved in Section XV.E.1.

584. **Theorem 4**: If publishers did not change their floor prices and bidders did not change their bids, DRS v1 could only increase the number of impressions sold, publisher revenues, and advertiser surplus.

---

[1254] "AdX DRS v1 launch review" (Feb. 13, 2015), GOOG-DOJ-13199952, at -954.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

585. Theorem 4 assumes that publishers and bidders leave their floors and bids unchanged in response to DRS v1, which may be most relevant for a short-run analysis of the program. But, as I now explain, DRS v1 created new incentives for publishers and bidders to adapt their strategies to further increase their payoffs.

586. Under DRS v1, bidders were incentivized to reduce their bids for impressions. To see this, note that on each additional impression an advertiser won as a consequence of DRS v1, it was charged exactly its bid for the impression. This is not a threshold pricing rule (see Paragraph 81) because a winning bidder could sometimes lower the price it paid by reducing its bid for the impression. At the same time, publishers were incentivized to change their floor prices. Holding bids fixed, DRS v1 made higher floor prices less costly for a publisher, since AdX would sometimes compensate when the publisher set its floor price too high.

587. Incorporating all of these effects in a standard model of auction theory, I show in Theorem 5 that, if bidders and publishers adjust their bids and floor prices optimally, then publisher revenues increase under DRS v1 and advertiser surplus is approximately unchanged compared to the absence of DRS v1. The proof of Theorem 5 is in Section XV.E.2.

588. **Theorem 5:** Suppose that a publisher is selling an impression to a fixed set of bidders on AdX. The publisher does not know each bidder's value for the impression, and bidders do not know each other's values for the impression, but all participants have the following information:

    a. Each bidder knows its own value for the impression.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

b.  Each bidder's value is drawn from a commonly-known probability distribution and is statistically independent from other bidders' values.[1255]

c.  Each bidder determines a bid as a function of its value to maximize its surplus from the impression, given its probabilistic assessments about the bids of other bidders.

Then, if the publisher chooses revenue-maximizing floor prices, it earns a higher expected revenue on an impression to which DRS v1 is applied than it would without the program, and advertisers' surplus is unchanged.[1256]

589. Theorem 5 characterizes outcomes under the "independent private values model," which is a model endorsed by Plaintiffs' experts,[1257] in which DRS v1 increases publisher revenues. Further, as I show in Theorem 6, DRS v1 can only be profitable to AdX if it increases publisher revenues from AdX, because DRS v1 *reduces* AdX's average revenue share. The proof of Theorem 6 is in Section XV.E.3.

590. **Theorem 6**: Revenue for AdX under DRS v1 increases *only if* publisher revenues from impressions sold via AdX also increase. Additionally, every percentage increase in revenue for AdX results in a proportionally larger increase in revenue for publishers.

---

[1255] This implies that each bidder and the publisher can make a probabilistic assessment about other bidders' values and that estimates of other bidders' values would not be changed upon learning one bidder's value.

[1256] A similar result holds if the publisher maximizes expected revenue net of the opportunity cost of selling the impression on AdX. If the opportunity cost is positive, advertisers surplus weakly increases when DRS v1 is applied.

[1257] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶¶ 1358-1360 ("In the context of exchange auctions, the private values assumption is more plausible than the common values assumption."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶¶ 946-948 ("[The independent private values] model provides a suitable setting to study the environment of display ad auctions.").

591. Internal Google experiments confirm the theoretical predictions that DRS v1 increased publisher revenues, finding that publisher revenues from impressions sold via AdX increased by 11% after the introduction of the program.[1258] Google also found that DRS v1 increased the overall AdX match rate by 1.4%.[1259] In the experiment, AdX exactly hit the 19% average revenue share target set in the design of DRS v1.[1260]

### *2. DRS v2: Restoring a Fixed Revenue Share by Averaging*

592. DRS v2, launched in December 2016, restored the average AdX revenue share to the levels that applied prior to DRS.[1261] It accomplished that by tracking the payments by each buyer to each publisher using "debt accounts" to ensure that, while the AdX revenue share applying to an individual impression could be higher or lower, AdX received its standard revenue share on average over all impressions.[1262]

593. These debt accounts worked to maintain the average revenue share as follows.

594. On some impressions for which the highest bid was in the dynamic region, DRS v2 would decrease the AdX revenue share to ensure the impression would sell. Rather than

---

[1258] Email from ▮▮▮▮▮ to ▮▮▮▮▮▮▮, et al., "LAUNCHED! AdX Dynamic Revenue Share (DRS)" (Sept. 2, 2015), GOOG-AT-MDL-B-001391461, at -462 ("AdX publisher payout: +11.3%").

[1259] Email from ▮▮▮▮▮ to ▮▮▮▮▮▮ et al., "LAUNCHED! AdX Dynamic Revenue Share (DRS)" (Sept. 2, 2015), GOOG-AT-MDL-B-001391461, at -461 ("Overall match rate for AdX publishers increases by 1.4%").

[1260] Email from ▮▮▮▮▮ to ▮▮▮▮▮▮ et al., "LAUNCHED! AdX Dynamic Revenue Share (DRS)" (Sept. 2, 2015), GOOG-AT-MDL-B-001391461, at -462 ("AdX margin: 19.0%").

[1261] "AdX Dynamic Revshare v2 Launch Plan" (Aug. 2016), GOOG-DOJ-13208074, at -074 ("Launch DRS v2[:] Launched on 12/7").

[1262] *See* Launch Doc, "AdX Dynamic Revshare v2: Launch Doc" (Jan. 13, 2016), GOOG-DOJ-13207875, at -879 ("In DRS v2, we expand per-query margin range to be [0%, >20%], with an objective to keep average adx margin at 20% over queries."). This average revenue share was a per-publisher and per-buyer average. *Id.* ("DRS v2 is implemented by dynamically expanding the AdX revshare based on the debt accumulated for each buyer and each seller.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

charging each winning buyer its bid on those impressions with a discounted revenue share, DRS v2 charged each winning buyer an amount between its bid and the publisher's chosen floor price. AdX would then add a "debt" to the buyer's debt account, equal to the "discount" it had applied to the buyer's bid to allow that impression to transact, which is the amount that the buyer would need to raise its bid to win with the standard per-impression revenue share.[1263] AdX would also add a "debt" to the publisher's debt account equal to its "discount" on the AdX revenue share, the amount that its floor price would need to be lowered in order to sell the impression with the standard per-impression revenue share.[1264]

595. On some impressions for which the highest bid was above the amount required to win the impression in the absence of DRS, AdX would collect its standard revenue share plus an additional payment to recoup debts previously accrued by publishers and advertisers under DRS v2.[1265] It did so while still charging the winning buyer a total amount less than its bid and paying the publisher more than its floor.[1266] A winning buyer would be charged the standard clearing price for the impression, plus a payment for any debt it had accrued, where this additional payment was chosen so that the total price of the

---

[1263] "Dynamic Revenue Sharing (DRS) V2 Proposal" (Mar. 24, 2015), GOOG-DOJ-13221355, at -356 ("debt [buyer] += reserve / revshare - revenue").

[1264] "Dynamic Revenue Sharing (DRS) V2 Proposal" (Mar. 24, 2015), GOOG-DOJ-13221355, at -356 ("debt [publisher] += payout - revenue * revshare").

[1265] "Dynamic Revenue Sharing (DRS) V2 Proposal" (Mar. 24, 2015), GOOG-DOJ-13221355, at -356 ("We attempt to collect debt in a later query for which bid * revshare > reserve, which we call the non-dynamic region.").

[1266] "Dynamic Revenue Sharing (DRS) V2 Proposal" (Mar. 24, 2015), GOOG-DOJ-13221355, at -357 ("[W]e are careful to pick buyer_collection and publisher_collection to preserve constraints such as […] pay to the publisher at least his reserve[.] […] [T]he revised 2sided DRS never increases the price set above max(2nd bid, reserve).").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

impression was less than the bidder's bid.[1267] If the buyer had set its own clearing price (by submitting a nonzero second bid), any additional payment it made as a consequence of its second bid was deducted from the debt balance as well.[1268] The publisher would be paid the standard payment it would otherwise receive for the impression in the absence of DRS *minus* a share of any debt it had accrued *plus* a fraction of the buyer's repaid debt (with this fraction equal to the publisher's standard revenue share).[1269] I give a more detailed mathematical description of the workings of DRS v2 in Section XV.E.4.

596.    Note that when recouping debts, AdX pays a portion of the recouped buyer debt back to the publisher. These amounts were chosen exactly to ensure that there is no double-charging of debt and, assuming all advertiser debts are recouped, the net debt accruing on average to publishers is zero, as described in Lemma 1, proved in Section XV.E.5.

597.    **Lemma 1:** Suppose that AdX recoups all debts under DRS v2. Then, buyers accrue the full debt on each impression (equal to the difference between the floor price that would apply in the absence of DRS and the price it pays under DRS v2) and, after accounting for the payment of buyer debt to publishers, publishers accrue zero debt on net in expectation.

---

[1267]"Dynamic Revenue Sharing (DRS) V2 Proposal" (Mar. 24, 2015), GOOG-DOJ-13221355, at -356 ("[T]he revised 2sided DRS never increases the price set above max(2nd bid, reserve).").

[1268]"Dynamic Revenue Sharing (DRS) V2 Proposal" (Mar. 24, 2015), GOOG-DOJ-13221355, at -356 ("Finally we consider a second way in which buyers can decrease their debt (equivalently: acquire credit) whenever they declare a 2nd bid which is higher than the max(2nd other bid, reserve) by declaring a min_cpm_payment. We do: debt [ buyer ] -= min_cpm_payment - max(2nd other bid, reserve)[.]").

[1269] "AdX Dynamic Revshare v2: Launch Doc" (Jan. 13, 2016), GOOG-DOJ-13207875, at -879 ("In later auctions where b1 > r / 0.8. [...] Publisher: is paid max(b2 * 0.8, r) + 0.8 buyer_debt - pub_debt.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

598. As Lemma 1 shows, publishers on average accrue *no net debt* on an impression cleared by DRS v2, while buyers pay on average a net debt equal to the difference between the floor price that would apply in the absence of DRS and the price they pay under DRS v2. This means that, after accounting for later debts paid, the effective price of an impression cleared by DRS v2 for the buyer is equal to the floor price that would apply in the absence of DRS v2. Publishers can increase their total revenues as a result of DRS v2 without changing their floor prices, as shown in Theorem 7 and proved in Section XV.E.6.

599. **Theorem 7:** If publishers do not change their floor prices and buyers do not change their bids, then DRS v2 can only increase the total number of impressions sold and total publisher revenues compared to the absence of DRS.[1270]

600. As in DRS v1, the implementation of DRS v2 changed the incentives for publishers and buyers in the auction. In Theorem 8, I show that when buyers and publishers respectively adapt their bids and floor prices to DRS v2, auction theory predicts that buyer surplus and publisher revenues will be the same as in the absence of DRS. This happens because, given the way that debts were recouped under DRS v2, buyers who bid into the dynamic region end up paying the same on average as they would need to bid to win the impression in the absence of DRS. Theorem 8 is proved in Section XV.E.7.

601. **Theorem 8**: If buyers and publishers set bids and floors to maximize their payoffs after the introduction of DRS v2, then buyer surplus and publisher revenues are the same as in the absence of DRS.

---

[1270] I assume that AdX performs enough transactions that all debts in DRS v2 are resolved.

602.   These theoretical results assume that all debts accrued during DRS v2 are collected, or equivalently, that all agents choose bids and floor prices *expecting* that all debts are collected. In their initial internal experiments on DRS v2, Google engineers found that the vast majority of buyers and publishers had very small quantities of uncollected debts (less than 0.1% of their spends or revenues, respectively).[1271] If small amounts of debt were left uncollected under DRS v2, I would expect the results above to be quantitatively similar.

603.   In experiments conducted after the launch of DRS v2, Google found that DRS v2 led to a 2.8% net increase in *total* publisher revenues compared to no DRS, including revenue from remnant demand.[1272] This latter experiment was performed on 1% of impressions, and found that 96 of the top 100 publishers saw an increase in total revenue.[1273] Revenue also increased for publishers that used header bidding.[1274] In pre-launch experiments, Google found that publisher revenues were approximately unchanged between DRS v1 and DRS v2.[1275]

---

[1271] *See* "Two-sided Dynamic Revenue Sharing" (Nov. 28, 2014), GOOG-DOJ-13199584, at -598.

[1272] "Overall Pub Yield with DRS(v2)" (Apr. 7, 2016), GOOG-DOJ-13235100, at -101 ("+2.80% lift in publisher revenue (including remnant)"), -102 ("[T]hat is the lift of DRS v2 (half-way with buy/pub side recollection) compared with no-DRS, since all the numbers in the deck are DRSv2 vs no-DRS").

[1273] "Overall Pub Yield with DRS(v2)" (Apr. 7, 2016), GOOG-DOJ-13235100, at -106 ("Currently running 1% experiment."), -108-110 ("96 / 100 publishers make more money in aggregate.").

[1274] *See* "Overall Pub Yield with DRS(v2)" (Apr. 7, 2016), GOOG-DOJ-13235100, at -114.

[1275] "AdX Dynamic Revshare v2: Launch Doc" (Jan. 13, 2016), GOOG-DOJ-13207875, at -875 ("Compared to v1, we observe […] almost neutral publisher payout").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

604. Starting with the launch of DRS v2, publishers that did not want to participate could opt out and buyers that did not want to participate could choose not to submit bids below the floor price in the bid request from AdX.[1276]

### 3. Truthful DRS: Simplifying Bidding While Maintaining the Benefits of Dynamic Revenue Sharing

605. The final iteration of DRS, called Truthful DRS or tDRS, launched in July 2018.[1277] tDRS maintained the benefits of dynamically adjusting the AdX revenue share by impression, while implementing a threshold pricing rule for buyers, which simplified bidding.[1278] Under tDRS, AdX would choose its base revenue share for each impression (either 0% or its standard revenue share for that publisher) *before* collecting bids from AdX bidders, so that a winning buyer's bid did not affect its price.

---

[1276] Buyers that did not wish to participate in DRS could opt out by not bidding in the dynamic region. Since 2016, all bidders see the highest among all the floor prices, including those determined by the value CPMs of remnant line items. With this information, bidders could decide whether they wanted to submit bids in the dynamic region. *See* "Including Third-Party Threshold in the Revealed Reserve Prices sent to AdX Buyers" (Aug. 9, 2016), GOOG-DOJ-13208800, at -800 ("We propose to include third-party threshold in the revealed reserve prices sent to AdX buyers, in support to AdX dynamic revshare v2 launches. Currently we reveal the maximum of rule prices and RPO prices in the RTB as well as JEDI callouts and in the internal RPC to GDN / DBM. With this change we will reveal the maximum of rule prices, RPO prices, as well as third-party threshold (e.g., EDA prices, competing DFP line item prices)."). Publishers could opt out of DRS in the user interface. *See* "Dynamic Revenue Share" (Jan. 29, 2020), GOOG-DOJ-15130321, at -326 ("You may choose to opt-out of revenue share based optimizations in the AdX UI. If you opt-out we will apply your contracted revenue share to every Open Auction query and you will not benefit from the increased revenue from this optimization.").

[1277] "2018 Sellside Launches Revenue Evaluation" (July 19, 2019), GOOG-DOJ-13949282, at Tab "Q3Q4 2018," Row 7.

[1278] Another source of complexity under the first two versions of DRS was that, to optimize bids, a buyer would need to track performance across many auctions (ones on which revenue shares were discounted and others for which debt were repaid), making experiments by that buyer on subsets of impressions more difficult. This was noted by Google internally as another motivation for the transition to tDRS. *See* "The Future of DRS + RPO" (July 2, 2016), GOOG-DOJ-13205869, at -869 ("[T]his mechanism [DRS] can make it challenging for buyers who adopt sophisticated bidding strategies which rely on learning the smallest bid with which they could have won the auction.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

606. Like DRS v2, tDRS maintained its average revenue share for each publisher. Truthful DRS accomplished this by maintaining debt accounts for each publisher.[1279] Unlike DRS v2, tDRS did not target an average AdX revenue share by buyer. For each impression, AdX chose a revenue share based on its predictions of AdX buyers' bids.[1280] When AdX chose to apply a 0% revenue share to the impression and the impression sold, tDRS would add "debt" to the publisher's account equal to AdX's foregone revenue on that impression.[1281] AdX would recoup this debt later by increasing its revenue share above 20% on other impressions, namely those for which the AdX Reserve Price Optimization program (RPO) had increased the clearing price above the price that the publisher would receive in the absence of RPO.[1282] In short, AdX would discount its per-impression revenue share when it *predicted* that doing so would allow the impression to sell, and AdX would reclaim the discounts on other impressions for which it *knew* that a higher revenue share would not prevent the impression from selling. I provide the mathematical details of the operation of tDRS in Section XV.E.8.

607. There are several important properties of the tDRS program:

---

[1279] This is different from the approach under DRS v2, in which debts were effectively paid by advertisers (see Lemma 1 in Section XV.E.5).

[1280] "Truthful DRS Design Doc" (Mar. 24, 2017), GOOG-DOJ-13227256, at -260 ("[I]f the prediction is below the threshold set by us, we will make the publisher reserve revshare 100% (i.e. decrease adx revshare to 0%); otherwise, we will keep the original publisher reserve revshare of 80%.").

[1281] "Truthful DRS Design Doc" (Mar. 24, 2017), GOOG-DOJ-13227256, at -261 ("When the final publisher sellside revshare is higher than the base_revshare [80%], then we add the amount difference between base revshare and final sellside revshare onto this publisher's account as debt.").

[1282] "Truthful DRS Design Doc" (Mar. 24, 2017), GOOG-DOJ-13227256, at -261 ("When there is an impression where the buyer is priced by RPO and the publisher has debt on balance, we will recollect debt by withholding the price gap from RPO price and next highest pricing source from publisher payment.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

a. *For any fixed floor price, more impressions would be sold with tDRS than without it:* To see this, note that, without tDRS, AdX always applied its contracted revenue share to each impression, whereas with tDRS, AdX discounted its revenue share on some impressions, making it more likely for those impressions to sell. On the other hand, AdX increased its revenue share on impressions only if it already knew there was a sufficiently high bid for that impression, so that this increase in revenue share never reduced the number of impressions sold.

b. *tDRS was bidder-truthful:* tDRS used a threshold pricing rule, meaning that the price paid by a winning bidder was the lowest bid that they could have made to win the impression. In any single auction, that property makes it optimal for a buyer to bid its value, simplifying the bidding problem for buyers.

c. *On average, each publisher would receive its contracted share of the revenue:* The average revenue share on each impression for publishers, after accounting for adjustments to the debt account, was equal to the contracted revenue share: wherever the revenue share on an impression was below the standard rate, the publisher would repay debt on future impressions to restore the contracted average revenue share; wherever the revenue share was higher than the standard rate, the publisher had received an offsetting discount on another impression.

608. If publishers do not change their floor prices in response to tDRS and Google accurately forecasts which impressions would remain unsold using the standard revenue share, these three properties imply that tDRS would *always* increase publisher revenues from AdX compared to no DRS. This follows since bidding incentives were unchanged, more

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

impressions were sold, so that the total revenue collected from bidders must increase, which, since the same *average* revenue share applied to the publisher, means that the publisher's total revenue must also increase.

609.  Similarly to DRS v1, tDRS reduced the cost to publishers associated with setting a higher floor price, creating an incentive for a publisher to increase its floor prices in response to tDRS. If a publisher also used header bidding, tDRS created an incentive for the publisher to further "inflate" the header bid it reported to GAM (that is, to trigger a line item in GAM with a value CPM greater than the header bidding bid, see Section X.D.2). Truthful DRS strengthened the incentive to inflate header bids because, via that strategy, a publisher could ensure that an impression sold on AdX only if the *net* payment it would receive (after accounting for debts it incurred under tDRS) was larger than the publisher's expected payments from header bidding. Google's internal documents suggest that many publishers did inflate header bids, as predicted.[1283]

---

[1283] *See* ██████████████████████████████████ "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -506 ("[Some publishers] inflate the value CPM of remnant line items [...] publishers used to do this even before HB was popular."); "First-price bidding" (Aug. 12, 2019), GOOG-DOJ-11406673, at -677 ("How boost works[:] The publisher inflates the HB bid before sending it as a floor to AdX[.] This is done to increase Adwords cost and to provide a better comparison between Adwords and header bidder bids[.]"); Email from R. Srinivasan to B. Bender, et al., "Unified Auction Changes (Sellside) Executive Update - Aug 12, 2019" (Aug. 13, 2019), GOOG-DOJ-09713317, at -319 ("Today, these [publisher-]inflated CPMs are used to provide price pressure for AdX [...] In practice, [...] many publishers [...] apply a boost to Header Bidding bids[.]"); "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -382 ("Plan to educate pubs around strictly negative revenue consequences of HB price inflation"). I interpret this document, authored in the context of the "Migration to 1P auction" (-358), to mean that inflating header bids was common enough that Google would have to "educate pubs" it was no longer necessary; "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -777 ("Last look [...] incentivizes pubs to inflate ('boost') the floor sent to AdX"); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Some publishers set Value CPMs higher than their estimates of what CPM a line item would likely generate to increase competitive pressure in the AdX auction or for other reasons."); Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

610. After accounting for these incentives to increase floor prices and inflate header bids, I show in Theorem 9 that a publisher can guarantee that tDRS increases its *total* revenues from all sources, including revenue from impressions with a competing header bidding offer. I provide a proof of Theorem 9 in Section XV.E.9.

611. **Theorem 9**: If publishers adjust their floor prices on AdX to maximize profits after the introduction of tDRS and tDRS accurately predicts buyers' bids, total publisher revenues from all demand sources will be higher with tDRS than with a fixed revenue share.

### D. Responding to Plaintiffs' and Their Experts' Allegations

612. The opinions provided by Plaintiffs' experts focus predominantly on initial versions of DRS that were always intended to be improved upon. As I discussed above, Google planned a gradual introduction of DRS, testing elements of its design while monitoring the effects on advertisers and publishers, and some changes in publisher and advertiser outcomes could be expected as Google improved its DRS designs.[1284]

613. Publisher Plaintiffs' experts argue that "DRS harmed competition in the exchange market"[1285] and also "harmed publisher revenues by reducing publisher payouts on impressions Google won"[1286] because in the absence of DRS "they would have been paid an identical rival bid"[1287] for these impressions. To the contrary, DRS primarily affected impressions that would otherwise have remained unsold, unequivocally benefiting

---

[1284] *See, e.g.*, "AdX DRS v1 launch review" (Feb. 13, 2015), GOOG-DOJ-13199952, at -958 ("Start simple, iterate: follow GDN path for rev share optimization" [...] Future plans [...] DRS v3 - Induce right incentives").

[1285] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 31.

[1286] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 585.

[1287] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 34.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

publishers.[1288] In addition to that omission, Plaintiffs' experts repeatedly fail to account for the role of the floor prices, which were set by publishers. Publishers had the ability and incentive to set floor prices for AdX that strictly exceeded the highest bid from any rival source. Publishers could increase floor prices either by adjusting floor prices directly in the GAM interface or by "inflating" their reports of header bids into GAM, and there is evidence they used both methods.[1289] Setting floor prices in this way, when AdX wins an impression on account of DRS, publishers would not be paid "an identical rival bid": they would be paid strictly more than that. Moreover, any publisher that did not wish to increase its floor prices in response to DRS could opt-out under DRS v2 and

---

[1288] *See* "DRS and RPO interaction in Simulation" (Sept. 20, 2016), GOOG-AT-MDL-007375273, at -273. Experimental results show that of the impressions on which DRS lowered the AdX revenue share, 26.7% (= 3.25 / 12.18) occurred when the payment was determined by a third-party bid. By contrast, 46.7% (= 5.69 / 12.18) occurred when the payment was determined by a publisher floor price.

[1289] *See* Email from H. Thomas to M. Wheatland, et al., "RE: App impression changes recap" (Oct. 23, 2017), DM_GOOG_0146977, at -980 ("We've now multiplied the Amazon cpm in DFP by 3 or 4x to counter act google - seems to have helped us."); ███████████████████████████████████████████████████████████ "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -506 ("[Some publishers] inflate the value CPM of remnant line items [...] publishers used to do this even before HB was popular."); ████████████████████████████████████ ████████ "Changes to Ad Manager auction" (Jan. 10, 2019), GOOG-DOJ-10924270 at -292, in which the tree diagram shows that in 42% of queries won by header bidding, the AdX floor exceeded the header bidding line item price; "First-price bidding" (Aug. 12, 2019), GOOG-DOJ-11406673, at -677 ("How boost works[:] The publisher inflates the HB bid before sending it as a floor to AdX[.] This is done to increase Adwords cost and to provide a better comparison between Adwords and header bidder bids[.]"); Email from R. Srinivasan to B. Bender, et al., "Unified Auction Changes (Sellside) Executive Update - Aug 12, 2019" (Aug. 13, 2019), GOOG-DOJ-09713317, at -319 ("Today, these [publisher-]inflated CPMs are used to provide price pressure for AdX [...] In practice, [...] many publishers [...] apply a boost to Header Bidding bids[.]"); "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -382 ("Plan to educate pubs around strictly negative revenue consequences of HB price inflation"). I interpret this document, authored in the context of the "Migration to 1P auction" (-358), to mean that inflating header bids was common enough that Google would have to "educate pubs" it was no longer necessary; "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -777 ("Last look [...] incentivizes pubs to inflate ('boost') the floor sent to AdX"); "Declaration of N. Korula" (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 11 ("Some publishers set Value CPMs higher than their estimates of what CPM a line item would likely generate to increase competitive pressure in the AdX auction or for other reasons."); Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding.").

tDRS, and publishers had no incentive to opt out of DRS v1, which only ever lowered AdX's take rate and could never reduce publisher revenues.

### 1. Plaintiffs' and Their Experts Provide Misleading Analyses of DRS's Effects

614. Plaintiffs' experts allege that DRS harmed non-Google exchanges. Professor Li states that "DRS enabled AdX to maintain a supracompetitive take rate while increasing AdX's win rate at the expense of other rival exchanges in the GAM auction[,]" and that "as rival exchanges win fewer impressions compared to AdX, their ability to gain scale in the exchange market is limited."[1290] Professor Li concludes that "by raising the AdX win rate artificially and [] decreasing the win rate of bidders through rival exchanges, DRS reduced competition in the exchange market."[1291] Similarly, Professor Cramton claims that DRS "gave AdX an enormous advantage, especially over highly-valued impressions: even when competing sources of demand in DFP offered high, competitive prices, AdX had the right of first refusal and last look and could reduce its margins (effectively subsidizing its bidders) and win the impression."[1292] The evidence that I have reviewed suggests that these arguments omit DRS's main effects, which align with the program's stated purpose.

615. Recall that DRS was intended to "[increase] publisher and Google revenue by dynamically changing the AdX sell-side revenue share so that more auctions end with a

---

[1290] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 672.

[1291] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 672. *See also* Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 45 ("Meanwhile, DRS harmed competitors, including Inform, by artificially allowing AdX to beat valuable direct ad inventory at a lower price, thus robbing them of valuable revenue.").

[1292] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 180.

winning buyer" rather than going unsold.[1293] Internal Google experiments show that the most common effect of DRS was to cause an otherwise unmatched impression to be sold, rather than to win additional inventory off other exchanges.[1294] Clearing these unsold impressions would increase overall efficiency, AdX's match rate, and publisher revenues[1295] *without* affecting the match rates or revenues of those other exchanges.

616.  Less often, DRS reduced the AdX per-impression revenue share on impressions where the floor price was determined by a bid from a non-Google demand source.[1296] In those cases, DRS still provided publishers with the opportunity to increase their revenues beyond what non-Google exchanges offered by allowing impressions to sell with "inflated" header bids in GAM.

617.  Plaintiffs' experts allege that DRS harmed publishers by decreasing their revenue, with Professor Li stating that "publishers lost revenues on less competitive auctions where Google increased its take rate, without receiving any corresponding gain from the 'debt' which Google imposed on them in order for AdX to win competitive auctions."[1297] To

---

[1293] "Dynamic Revenue Share" (Jan. 29, 2020), GOOG-DOJ-15130321, at -321.

[1294] *See* "DRS and RPO interaction in Simulation" (Sept. 20, 2016), GOOG-AT-MDL-007375273, at -273. Experimental results show that, of the impressions on which DRS lowered the AdX revenue share, 26.7% (= 3.25 / 12.18) occurred when the payment was determined by a third-party bid. By contrast, 46.7% (= 5.69 / 12.18) occurred when the payment was determined by a publisher floor price. *See id.*

[1295] Thus, Professor Cramton's suggestion that "AdX reaped the volume benefits usually associated with a price cut" is wrong: the price is "cut" to benefit publishers by allowing the impression to be sold. *See* Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 30.

[1296] *See* "DRS and RPO interaction in Simulation" (Sept. 20, 2016), GOOG-AT-MDL-007375273, at -273. Experimental results show that, of the impressions on which DRS lowered the AdX revenue share, 26.7% (= 3.25 / 12.18) occurred when the payment was determined by a third-party bid. By contrast, 46.7% (= 5.69 / 12.18) occurred when the payment was determined by a publisher floor price. *See id.*

[1297] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 635. *See also* Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 199 ("Specifically, AdX could win an auction over a Jedi bid but pay out less to the publisher than if the impression were awarded to the (lower) Jedi bid. This is because of Google's additional take rate on some impressions under Dynamic Revenue Share v2."); Expert Report of C. Jardin (Oct. 7, 2024), at ¶ 41 ("Based on my review of the Parties' documents, deposition testimony, and Google's source code, it is apparent that Google's

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

support his conclusion, he provides an example with two impressions. For impression 1, the publisher sets a floor price of $80 and the two highest gross bids on AdX are $80 and $10. For impression 2, the publisher sets a floor price of $10 and the two highest gross bids on AdX are $120 and $100. Professor Li assumes the floor price equals "a live header bid, net of a 20% take rate for a rival exchange bidding."[1298] Professor Li calculates the revenue with and without DRS as follows:

a. Without DRS, AdX would apply a 20% revenue share, resulting in bids of $64 and $8 net of the revenue share for impression 1 and of $96 and $80 for impression 2. In this case, the header bidder wins the first impression and the highest AdX bidder wins the second impression. The publisher receives $80 for each impression, leading to a total revenue of $160. AdX and the rival exchange each earn revenue of $20.

b. Under DRS v2, AdX would apply a 0% revenue share for the first impression, resulting in a high bid of $80. In this case, AdX wins the impression and the publisher receives $80. However, Professor Li claims the publisher would be worse off because "AdX calculates a publisher 'debt' of $16, even though the publisher is made no better by Google's reduced take rate […] In order to balance its average take rate at 20% and collect on this 'debt', Google then increases its take rate on Impression 2, lowering its net bid from 80 to 64 (but still charging the advertiser 100.) While Google's average take rate remains 20%, its revenue

---

implementation of its Sell-side Dynamic Revenue Share program (including the various subsequent versions) was harmful to publishers and other auction participants, including Inform, because it [...] increased its auction margins for certain winners without disclosure in order to ensure that it did not take any overall loss due to its targeted manipulations.").

[1298] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 605.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

increases from 20 to 36. This increase in revenue comes largely at the expense of the publisher, whose revenue decreases from 160 to 144."[1299]

618.  Professor Li uses a similar example to allege harms from tDRS: "Suppose that Google predicts (based on past data) that it should drop its take rate to 0 in order to win Impression 1. And suppose further that Google sets (via RPO) a reserve price of 80 on Impression [2], which exceeds the highest rival bid of 10. In this scenario, tDRS will similarly win Impression 1 for AdX, calculate a publisher 'debt' of 16, and collect this debt by increasing AdX's take rate on Impression 2. Again, when tDRS enables AdX to win Impression 1, the publisher's revenue has not actually increased by 16, because the publisher already had a rival bid of 80 reflected in the AdX reserve. Therefore, when tDRS 'recovers' the 16 in publisher 'debt' on non-competitive impressions, publisher revenue decreases by 16 overall."[1300]

619.  Professor Li's analysis is flawed on three counts: (1) his calculation of debt under DRS v2 and tDRS are misleading; (2) he omits the more frequent case in which the floor price is one set by the publisher; and (3) he omits the benefits when an optimizing publisher handles header bids correctly. While my discussion of (1) is specific to DRS v2 and tDRS, my discussion of (2) and (3) applies to all three versions of DRS.

620.  *First*, Plaintiffs experts' analyses ignore details of debt recollection under DRS v2 and tDRS. In particular, Professor Li's example and Professor Cramton's analysis of DRS v2 fail to acknowledge that publishers received a share of the debt paid by advertisers.[1301] In

---

[1299] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 607.

[1300] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 649.

[1301] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 649; Expert Report of P. Cramton (Oct. 4, 2024), at ¶¶ 193-194 ("Google implemented Dynamic Revenue Share v2 by introducing "debt accounts" for AdX advertisers and

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Professor Li's example, the advertiser also incurs a debt of $16/0.8 = $20. For simplicity, assume that the buyer who wins the second impression is the same buyer who won the first one and that it submitted a gross bid of $200, so that the buyer and publisher debts are cleared after this impression. Under the debt recollection rules of DRS v2, the buyer pays $100 + $20 = $120.[1302] The publisher receives 0.8*($120) - $16 = $80.[1303] In sum, the publisher receives the *same* revenue from the two impressions under DRS v2 as it would without DRS. More generally, I show in <u>Lemma 1</u> that publishers accrue *zero net debt* in expectation, meaning that even though the publisher incurs $16 of "debt" in Professor Li's example for DRS v2, the publisher receives the same revenue from AdX in expectation as it would receive from the header bidder.

621. Professor Li also makes an error when computing the debt repayment under tDRS. The debt repayment under tDRS can never be greater than the difference between the RPO floor and the highest of the AdX second-highest net bid or the publisher-set floor price.[1304] In Professor Li's example the correct debt repayment for Impression 2 is zero because the RPO floor and the AdX second-highest net bid are both equal to 80. In sum,

---

publishers. These accounts track how much AdX has reduced its take rate to clear auctions in the past and determine how much AdX should increase its take rate in future auctions. Setting aside whether the term "debt account" is appropriate, as publishers were not taking out loans from Google, Google manufactured this "debt" to maintain its overall 20% sell-side take rate. These debt accounts ensured that the average sell-side take rate stayed at 20% per publisher and advertiser. The "dynamic region" reflects auctions with bids exceeding the reserve price but insufficiently high to accommodate Google's standard 20% take rate. When AdX reduced its take rate to clear a bid in the dynamic region, it recorded this as "debt" to be recollected later [...] "debt" is created when Google allows an impression to clear at a take rate less than Google's desired 20%. That debt can only be collected from impressions where Google could impose a take rate exceeding 20%, and the auction would still clear. In later auctions, where a bid cleared the auction reserve above the dynamic region, AdX used this surplus to, at times, recollect what it deemed "debt" from publishers. Like Dynamic Revenue Share v.1, Dynamic Revenue Share v.2 led to auctions clearing at the bid price.").

[1302] The bidder's payment equals the clearing price plus the bidder's debt.

[1303] The publisher's payment equals 0.8 times the bidder's payment, minus the publisher's debt.

[1304] *See* "Truthful DRS Auction Walkthrough" (2018), GOOG-AT-MDL-013306012, at -014 ("debt balance: -((DynamicReserve - max{PublisherReserve, PostRevshareBid2}) *recollection_ratio").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

the publisher receives the *same* revenue from the two impressions under tDRS as it would without DRS.

622. *Second*, as explained above, Professor Li's example applies only when the floor is set by a header bidding line item, but the applicable AdX floor is more frequently higher than the highest such line item, in which case the sale enabled by DRS creates additional revenue for the publishers.[1305] Professor Li does not attempt to weigh the revenue and efficiency gains from the additional transactions DRS enabled against its alleged downsides.

623. *Third*, Professor Li's example would never arise if the publisher adopted a better strategy than directly passing the header bid to AdX. Such a publisher would *boost* the header bid before reporting it to DFP, allowing the publisher to earn strictly more revenue when that line item was the relevant floor for the impression.[1306] In Professor Li's example, if the header bid of the first impression is increased to $101, AdX would only win the impression if it could find a buyer willing to pay more than $101, thereby boosting the publisher's revenue—after accounting for all debt accruals—by *at least* $0.80 over the header bidder's $80.

---

[1305] *See* "DRS and RPO interaction in Simulation" (Sept. 20, 2016), GOOG-AT-MDL-007375273, at -273. Experimental results show that, of the impressions on which DRS lowered the AdX revenue share, 26.7% (= 3.25 / 12.18) occurred when the payment was determined by a third-party bid. By contrast, 46.7% (= 5.69 / 12.18) occurred when the payment was determined by a publisher floor price.

[1306] Recall that boosting means setting a higher floor price than the HB either by inflating the HB line item or directly setting a higher AdX floor price.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

624.  Google's internal experiments also showed that publishers benefited from DRS.[1307] While Professor Li claims "that publishers could see a revenue decrease as a result of DRS,"[1308] the experiment he cites to support his opinion also shows that DRS v2 led to revenue increases for 92 out of 100 publishers. Professor Li focuses on the remaining 8 publishers that experienced minor revenue decreases, but the document itself offers a different explanation of those revenue decreases: they arise "from noise due to the fact that [it] is a small experiment."[1309] Moreover, the revenue losses on those eight publishers are more than offset by the revenue gains from the other 92.[1310] Finally, starting with the launch of DRS v2, publishers that did not want to participate in DRS could opt out and buyers could also avoid DRS by not submitting bids lower than the floor price shared in the bid request.[1311]

---

[1307] "Overall Pub Yield with DRS(v2)" (Apr. 7, 2016), GOOG-DOJ-13235100, at -101 ("+2.80% lift in publisher revenue (including remnant)"), -102 ("[T]hat is the lift of DRS v2 (half-way with buy/pub side recollection) compared with no-DRS, since all the numbers in the deck are DRSv2 vs no-DRS"); Email from ████████ to ████████ et al., "LAUNCHED! AdX Dynamic Revenue Share (DRS)" (Sept. 2, 2015), GOOG-AT-MDL-B-001391461, at -462 (11.3% increase in publisher revenues from AdX when comparing pre-DRS to DRS v1).

[1308] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 651; *See also* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 798.

[1309] "Does DRS make more money for publishers?" (Mar. 17, 2016), GOOG-DOJ-13204346, at -349.

[1310] "Does DRS make more money for publishers?" (Mar. 17, 2016), GOOG-DOJ-13204346, at -350.

[1311] Buyers that did not wish to participate in DRS could opt out by not bidding in the dynamic region. Since 2016, all bidders see the highest among all the floor prices, including those determined by the value CPMs of remnant line items. With this information, bidders could decide whether they wanted to submit bids in the dynamic region. *See* "Including Third-Party Threshold in the Revealed Reserve Prices to AdX Buyers" (Aug. 9, 2016), GOOG-DOJ-13208800, at -800 ("We propose to include third-party threshold in the revealed reserve prices sent to AdX buyers, in support to AdX dynamic revshare v2 launches. Currently we reveal the maximum of rule prices and RPO prices in the RTB as well as JEDI callouts and in the internal RPC to GDN / DBM. With this change we will reveal the maximum of rule prices, RPO prices, as well as third-party threshold (e.g., EDA prices, competing DFP line item prices)."). Publishers could opt out of DRS in the user interface. *See* "Dynamic Revenue Share" (Jan. 29, 2020), GOOG-DOJ-15130321, at -326 ("You may choose to opt-out of revenue share based optimizations in the AdX UI. If you opt-out we will apply your contracted revenue share to every Open Auction query and you will not benefit from the increased revenue from this optimization.").

625. Professor Cramton argues that because of advertisers' budgets, the total amount of advertising spending is constant. Therefore, "each impression that AdX clears via Dynamic Revenue Share that would not have cleared before (in AdX) is an impression that advertisers are now paying Google take rates on that they were not before."[1312] The conclusion is that DRS does not increase efficiency and "it merely increases the slice of overall impressions that clear through AdX and thus are now taxed at Google's take rate."[1313] This argument is misleading for three reasons. *First*, the total amount of advertiser spending is not constant, because some advertisers do not fully spend their budget.[1314] *Second*, it is possible that DRS improved efficiency even if the total expenditure were fixed. For example, efficiency can improve if the same impressions are allocated to buyers who have higher values. *Third*, if advertisers are able to achieve more value for the same budget, they would have incentives to shift their advertising spend from other channels towards display advertising.

### 2. Google Did Not Mislead Buyers and Publishers About DRS

626. Plaintiffs' experts assert that DRS was "deceptive" due to Google's failure to disclose critical information.[1315] Specifically, they argue that Google did not inform publishers about the accumulation of debt and the operation of a modified second-price auction by AdX. Furthermore, the alleged deceptive conduct includes "DRS operat[ing] to exploit its last look advantage" and misleading publishers by stating that "AdX guarantees at least

---

[1312] Expert Report of P. Cramton (Oct. 4, 2024) at ¶ 197.

[1313] Expert Report of P. Cramton (Oct. 4, 2024) at ¶ 197.

[1314] *See* "DV360, Third Party Exchanges, and Outcome-Based Buying" (Oct. 16, 2018), GOOG-DOJ-12038253, at -301 (For GDN, "46% of spend is budget constrained" and for DBM "76% of spend is budget constrained.").

[1315] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 798 ("I understand from counsel that the below facts, among others, demonstrate that Dynamic Revenue Share was deceptive under New York law.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

the contracted revenue share for each ad request query [and that] [disabling DRS] would reduce AdX yield."[1316]

627.   These claims of information concealment are contradicted by disclosures in the AdX Help Center starting from at least August 2015—before the launch of DRS v1. It says, "DoubleClick Ad Exchange determines the winning bidder based on the highest net bid submitted. Note that the net bid reflects any adjustments Ad Exchange may, at its discretion, have made to the bid submitted by the buyer for the purpose of optimizing the auction. [...] In some cases, the auction may close at a price lower than the reserve price applied, due to auction optimizations. Sellers are paid the Ad Exchange closing price, net of Google's revenue share, but will receive, subject to the terms governing their use of Ad Exchange, no less than the min CPM applied to the auction."[1317] Before the launch of DRS v2, the Help Center page was updated to include the possibility that some impressions would close above or below the contracted revenue share, while still

---

[1316] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 798 ("I understand from counsel that the below facts, among others, demonstrate that Dynamic Revenue Share was deceptive under New York law: [...] In order to manipulate bids accurately, DRS operated as 'just yet another way for AdX to exploit the last look advantage.' Without Last [ ] Look, DRS would require 'fairly accurate prediction[s]' of the opponent's bid' [...] Publicly, it told publishers that disabling DRS was not beneficial because 'Ad Exchange pays at least the contracted revenue share for each ad request query. [disabling DRS] reduces Ad Exchange yield.' Google made these statements even though it was well aware that publishers could lose revenue because of DRS.'"). *See* also Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 580 ("With DRS v2, Google surreptitiously placed publishers in "debt" when it lowered its sell-side take rate on competitive impressions, and collected on that "debt" by charging a higher sell-side take rate on impressions that (thanks to Last Look) it knew it was not in danger of losing to a rival bidder."); Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 210 ("The presence of Enhanced Dynamic Allocation means that any purported positive effects for publishers of Dynamic Revenue Share from an increase in transactions were offset not only by Google's implementation of debt accounts to maintain its 20% take rate but also by Google allowing AdX to snipe transactions in the dynamic region when a bidder from a third-party exchange was willing to pay more."); Expert Report of H. Singer (Oct. 4, 2024), at ¶ 158 ("Using AdX DRS, Google manipulated the take rate in the AdX auction. [...] The record evidence indicates that Google cast a veil of secrecy around various aspects of the Challenged Conduct, leaving advertisers at an informational disadvantage").

[1317] *See* "Ad Exchange auction model" (Aug. 4, 2015), GOOG-AT-MDL-C-000035251, at -251.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

ensuring that publishers would receive at least their contracted revenue share in a given month.[1318,1319]

628.   Publishers were also informed about tDRS. The Google Ad Manager Help Page explains that if tDRS is enabled, "Ad Exchange pays a contracted revenue share which is based on an average over the course of the billing period," while if tDRS is disabled, "Ad Exchange pays at least the contracted revenue share for each ad request query," and that disabling tDRS likely "reduces Ad Exchange yield."[1320] Professor Hortaçsu argues that the statement that disabling tDRS reduces Ad Exchange yield is deceptive because Google "was well aware that publishers could lose revenue because of DRS."[1321] As evidence, he cites a concern expressed in an internal communication document that reads "as long as our prediction is doing fairly well, under some scenarios we could in theory result in lower publisher overall revenue from DRS as many stated above," but he takes that quotation out of its context. The next sentence in that communication reads

---

[1318] *See* "Ad Exchange auction model" (June 14, 2016), GOOG-AT-MDL-C-000035252, at -252 ("DoubleClick Ad Exchange determines the winning bidder based on the highest net bid submitted. Note that the net bid reflects any adjustments Ad Exchange may, at its discretion, have made to the bid submitted by the buyer for the purpose of optimizing the auction. [...] [T]o optimize the auction, Google may choose to close an auction at a price lower than the reserve price that would have otherwise been applied. In such cases, the winning buyer may pay a price below the reserve and therefore receive a discount on its bid. A buyer that has received discount(s) on its bid(s) may face higher reserve prices in subsequent transactions to offset such discount(s). Subject to the terms governing their use of Ad Exchange, sellers are paid the Ad Exchange closing price, net of Google's revenue share, but will receive no less than the min CPM they specified for the auction. Unless the 'per-query revenue share' setting is enabled by a Seller, auction optimizations may result in an auction closing at a price lower than the reserve price that would have otherwise been applied. Because the Seller will always be paid at least its specified min CPM, the Seller may receive more than its contracted revenue share on the transaction. In subsequent transactions, the Seller's revenue share may then be reduced to offset the prior earnings in excess of the contracted revenue share, but the Seller will always receive at least its contracted revenue share across all its Ad Exchange transactions in a given month.").

[1319] Note that the Help Center page was updated June 2016 while DRS v2 was launched in December 2016. "AdX Dynamic Revshare v2 Launch Plan" (Aug. 2016), GOOG-DOJ-13208074, at -074.

[1320] "Configure your Ad Exchange Revenue Share," Google Ad Manager Help, https://web.archive.org/web/20220125113539/https://support.google.com/admanager/answer/7031785?hl=en, accessed on Dec. 11, 2024.

[1321] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 798.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

"[b]undling with RPO could help take us to a better position."[1322] This is precisely the action Google undertook, indicating that Google believed that "bundling" RPO with tDRS would increase publisher revenue. Indeed, <u>Theorem 9</u> shows that publishers should have expected their revenues to decrease if they disabled tDRS.

629.   My analysis does not support the claim that DRS "exploited" the so-called "last-look advantage." In fact, <u>Theorem 3</u> demonstrates that "Last Look" offers no advantage to AdX (or any other ad exchange) when publishers inflate header bids and all parties respond optimally to their incentives.

630.   Professor Li claims that "it is plausible for several reasons that in many cases AdX bidders submitted bids equal to their values under DRS v2. First, Google did little to disclose the existence of DRS or DRS v2 to bidders. Second, Google probabilistically throttled DRS to make it harder for bidders to notice that they could profitably shade their bids."[1323] But it is also plausible that bidders submitted bids less than their values because (a) DRS v1 was disclosed, (b) the main bidders in the AdX auction are DSPs and other buying tools who are incentivized to search carefully for opportunities to increase profits of their advertiser customers and themselves, and (c) bidders in the AdX auction would be able to quickly and easily detect some of the effects of a program like DRS. Indeed, every time DRS v1 affected a buyer's outcome, it caused the buyer to win an impression on which it had bid below the floor price and to pay the amount of its bid.[1324] Without

---

[1322] Email from Jim Giles, "Re: GOOGLE INTERNAL Copy of Q1 Programmatic OKR:
margin manipulation investigation - Invitation to Comment" (Aug. 11, 2017), GOOG-DOJ-14162335, at -335.

[1323] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 637.

[1324] DRS v1 lowers AdX's revenue share on impressions in which its highest bid net of the standard 20% revenue share is below the floor price.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

DRS, that outcome was impossible. DRS leaves an unmistakable trace that can be detected every time it reduces AdX's revenue share. A minimally attentive buyer who failed to read Google's disclosure could still discover DRS by noticing when a bid below the floor price was accepted at a price equal to its bid and, by applying logic or just conducting routine experiments, optimize its bidding strategy to account for that possibility. Professor Cramton also notes this possibility, writing that "Dynamic Revenue Share would incentivize bidders to try and guess the auction's clearing price and to shade their bids if they believed that their values were close to the clearing price (i.e., in the 'dynamic region' as described above)."[1325]

### 3. Non-Google Exchanges Also Dynamically Adjusted Revenue Shares

631. Professor Li claims that only AdX had the ability to adjust revenue shares dynamically. He states, "AdX could immediately adjust its take rate in response to changes in other exchanges' take rates, but not vice-versa"[1326] In fact, every exchange had the incentive and ability to adjust their revenue shares and, indeed, non-Google exchanges including OpenX and Xandr implemented similar programs, increasing and decreasing their

---

[1325] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 190. *See also* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 636 ("A caveat to the above analysis is that DRS v2 was not "truthful", so AdX advertisers could sometimes benefit from shading their bids. To the extent that AdX advertisers shaded their bids under DRS v2, they would bid their true valuation in a counterfactual without DRS v2.").

[1326] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 626. *See also* Expert Report of C. Jardin (Oct. 7, 2024), at ¶¶ 41, 45 ("Based on my review of the Parties' documents, deposition testimony, and Google's source code, it is apparent that Google's implementation of its Sell-side Dynamic Revenue Share program (including the various subsequent versions) was harmful to publishers and other auction participants, including Inform, because it (1) manipulated Google's revenue collection margins based on information only it was privy to in order to ensure increased auction win rates and capture additional inventory and business for itself [...] Based on my review of the Parties' documents, deposition testimony, and Google's source code, it is apparent that Google's implementation of its Sell-side Dynamic Revenue Share program (including the various subsequent versions) was harmful to publishers and other auction participants, including Inform, because it (1) manipulated Google's revenue collection margins based on information only it was privy to in order to ensure increased auction win rates and capture additional inventory and business for itself.")

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

revenue shares on individual impressions based on the floor prices and the bids they had received.[1327]

### 4. DRS Did Not Remove Protections Against Low-Quality Ads

632.    Professor Li alleges that "Bernanke and DRS enable low-quality, low-CPM bids to surmount price floors that would have otherwise weeded them out."[1328] But Professor Li provides no evidence that DRS resulted in low-quality ads winning auctions.[1329] Instead, he asserts without support that "[p]ublishers set differential price floors to filter out low-quality ads and promote competition on ad quality in the exchange market."[1330] In reality, if a publisher wishes to exclude some types of ads, it has other tools, including content filters, to achieve that result.[1331] Moreover, if the publisher wishes to show an ad only when the payment it received was sufficiently high, it could increase its floor prices

---

[1327] *See*  *See also* Sarah Sluis, "Explainer: More On The Widespread Fee Practice Behind The Guardian's Lawsuit Vs. Rubicon Project," AdExchanger (Mar. 30, 2017), https://www.adexchanger.com/ad-exchange-news/explainer-widespread-fee-practice-behind-guardians-lawsuit-vs-rubicon-project/, accessed Dec. 12, 2024 ("Exchanges might also vary their fee based on the difference between an advertiser's bid and the clearing price, PubMatic confirmed.").

[1328] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1024.

[1329] In my analysis of Confiant data used by Professor Hortaçsu and Li, I find that AdX had better measured ad quality than third-party exchanges in every month from the start of the dataset in April of 2018 to the launch of the UFPA in September of 2019. *See* Section XIV.E.7 & Figure 29.

[1330] Revised Expert Report of S. Li (Oct. 11, 2024), at Section XIII.B.1.

[1331] *See* Google, "Block sensitive categories," Google Ad Manager Help, https://support.google.com/admanager/answer/2541069?sjid=14973969736947852707-EU#available-sensitive, accessed Dec. 11, 2024 ("You can block groups of ads that are considered 'sensitive' due to the nature of the business or ad [...] Our system classifies ads automatically, and we don't rely on advertiser-provided categorization."). *See also* Section XIII for a detailed discussion of how publishers could filter out low quality ads.

to accomplish that too: DRS allows the ad to transact *only if* the publisher receives at least the floor price for the impression.

### 5. DRS Did Not "Restrain" Rivals From Competing With AdX

633.  Plaintiffs' experts incorrectly argue that DRS would "restrain" rivals from competing with AdX on prices, claiming that, "[b]ecause rival ad auction platforms could not participate in real-time auctions under Dynamic Allocation or EDA, they were restrained from dynamically altering their own rates to compete with DRS in such auctions."[1332] Moreover, Professor Elhauge argues that "the restraints preventing rival ad auction platforms from being able to dynamically alter their own rates to compete with Google's DRS: (1) anticompetitively reduced the publishers' revenues by excluding a form of rival competition that could have offered lower rates for the ad auction service and higher net prices to publishers; and (2) anticompetitively inflated AdX's market share and deflated the market share of rival auction platforms in a way that deprived those rivals of economies of scale and network effects, thus increasing Google's market power and its ability to charge a high rate for its ad auction platform."[1333] Professor Elhauge's analysis of non-Google exchanges' incentives is incorrect. Even with DRS, a decision by a competing exchange to reduce its fees on an impression makes it more difficult or even impossible for AdX to win that impression, so other exchanges have clear incentives to lower their exchange fees when they expect competition to be close. For example, suppose that a competing exchange's highest bid was $1.00 and AdX's highest bid was $0.90. Because DRS never lowered AdX's revenue share below 0% on any impression,

---

[1332] Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 336; *see also* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶¶ 623-625.

[1333] Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 340.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

the non-Google exchange could win the impression under any version of DRS simply by reducing its revenue share to below 10%. In that case, no version of DRS would lead to AdX winning the impression. Moreover, my analysis shows that publishers had incentives to inflate the competing exchange's highest bid. In the preceding example, the publisher could increase its floor price or "inflate" the header bid line item to $1.10, in which case the competing exchange could win the impression under any version of DRS by reducing its revenue share to below 18%. DRS did not reduce competition on revenue shares: it had the opposite effect of intensifying competition on revenue shares, which could benefit both advertisers and publishers.

### 6. DRS Exemptions Were Not Designed To Exempt AdX From Poirot

634. Professor Cramton asserts that AdX exempted Google Ads from DRS v1 and both Google Ads and DV360 from DRS v2, and that the DV360 exemption was implemented to exempt AdX from Poirot.[1334] As I discussed above, the design of the DRS program evolved over time, with Google testing various elements of the DRS design while monitoring the effects of the programs on publishers and advertisers. Exemption from DRS v1, however, was not an advantage. When DRS v2 was rolled out, Google ensured that *all* bidders (not just Google Ads and DV360) could opt out of DRS by choosing not

---

[1334] Expert Report of P. Cramton (Oct. 4, 2024), at ¶¶ 188-189 ("However, it appears that at the launch, GDN opted out of having Dynamic Revenue Share v1 applied when it bid into the AdX auction [...] Also, while DV360 was initially subject to Dynamic Revenue Share in auctions when it bid, an October 2016 launch opted DV360 out. It noted that DV360 planned not to participate in further Dynamic Revenue Share iterations."), 243-244 ("Realizing this, Google insulated AdX from Poirot's impact by exempting DV360 bidders from sell-side Dynamic Revenue Share. Specifically, DV360 data was used to identify "dirty" auctions and calculate Poirot multipliers. While DV360 advertisers were initially opted-in to sell-side Dynamic Revenue Share, Google excluded DV360 advertisers from the operation of sell-side Dynamic Revenue Share before the official Poirot launch [...] DV360 was opted out of Dynamic Revenue Share by November 2016, before Poirot officially launched in July 2017. However, Project Poirot's data to evaluate AdX was limited to DV360 advertiser bids. Therefore, when Google opted for DV360 out of Dynamic Revenue Share, it effectively ensured that AdX would perform more cleanly than other exchanges in the Project Poirot experiments. This would make it more likely that Google could exempt AdX from any bid reductions under Project Poirot.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

to submit bids in the dynamic region.[1335] Under tDRS, Google chose revenue shares in advance of sending bid requests and Google Ads and DV360 were not exempted from that program.[1336]

635. While DRS v2 was in effect,[1337] Google exempted DV360 from DRS on AdX. Although Professor Cramton attributes this exemption to Google's intent to avoid triggering Poirot, documentation[1338,1339] and testimony[1340] indicate that DV360 made the decision not to bid below the reserve price as it was undergoing a resource-intensive infrastructure migration, known as the "Skyray Migration," that prevented DV360 engineers from devoting time to implement the necessary changes in the bidding logic. The DV360 team communicated to the AdX team their request to not submit bids below the reserve price and asked them to manually implement a filter exempting DV360. But the effect of this

---

[1335] Since 2016, all bidders see the highest among all the floor prices, including those determined by the value CPMs of remnant line items. With this information, bidders could decide whether they wanted to submit bids in the dynamic region. *See* "Including Third-Party Threshold in the Revealed Reserve Prices to AdX Buyers" (Aug. 09, 2016), GOOG-DOJ-13208800, at -800 ("We propose to include third-party threshold in the revealed reserve prices sent to AdX buyers, in support to AdX dynamic revshare v2 launches. Currently we reveal the maximum of rule prices and RPO prices in the RTB as well as JEDI callouts and in the internal RPC to GDN / DBM. With this change we will reveal the maximum of rule prices, RPO prices, as well as third-party threshold (*e.g.*, EDA prices, competing DFP line item prices).").

[1336] *See* Email from ████████ to ████████, et al., "Re: DRX Serving, Tagging and Reporting update - August 14th, 2018" (Aug. 15, 2018), GOOG-DOJ-11782270, at -270 ("tDRS (truthful DRS) has fully launched… As a result, we've been able to expand DRS to GDN and DBM.").

[1337] DRS v2 was launched on December 7, 2016. "AdX Dynamic Revshare v2 Launch Plan" (Aug. 2016), GOOG-DOJ-13208074, at -074.

[1338] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 243.

[1339] The Skyray migration was launched on November 16, 2016. "AdX Dynamic Revshare v2 Launch Plan" (Aug. 2016), GOOG-DOJ-13208074, at -074 ("Due to ongoing Skyray migration, resources are tight for DBM to implement the logic of NOT bidding below reveal AdX reserve prices. We thus decide to include a list of DBM buyers (buyers who buy through DBM) in the AdX DRS blacklist temporarily until Skyray migration is complete.").

[1340] *See* Deposition of N. Korula (SDNY) (July 12, 2024) at 93:20-98:9 ("My recollection is that there was a period where DV360 was exempt in the sense that they communicated to us that they were going through an infrastructure migration, and they would prefer to not submit bids below the reserve price. But the specific engineers who would work on it were busy at the time, and so they asked us to manually implement that filter that would provide them an exemption.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

exemption did not require any special treatment for DV360: any buyer could have avoided triggering DRS by never bidding below the reserve price.

### 7. Professor Cramton's Expectation Of Conduct For Google Is Not Appropriate

636. Professor Cramton also alleges that even the final version DRS is "inconsistent with neutral market rules"[1341] and that an "independent auctioneer that had developed a model like Reserve Price Optimization would be more likely to provide estimates to sellers and then allow sellers to use those estimates, at their discretion, when setting their reserve prices."[1342] As I mentioned before, comparing Google's behavior to that of an independent auctioneer or intermediary is not appropriate. A governmental or quasi-governmental entity granted exclusive market operation rights might behave as Professor Cramton suggests. However, Google, as a profit-driven company facing competition, is expected to develop programs that enhance service quality for customers and generate profits for its shareholders. Google's implementation of tDRS and RPO aligns with such objectives. Presumably, similar initiatives by Google competitors such as ███████████████████████████ were also implemented with the same goals.[1343]

---

[1341] Expert Report of P. Cramton (Oct. 4, 2024), at Section 8.2.5.

[1342] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 208.

[1343] *See* ███████████████████████████████████████

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 8. Professor Hortaçsu's Methodology To Simulate DRS Damages Is Flawed

637. Professor Hortaçsu conducted simulation analyses to calculate damages for DRS v2 and tDRS. Before detailing the flaws in his calculations, I provide a brief summary of key details of Professor Hortaçsu's analysis. His methodology involves comparing the revenues and the AdX "effective take rates" with DRS v2 and tDRS against those with DRS v1, using publisher revenues under DRS v1 as a proxy for those under his but-for specification of no DRS. He states that "[t]he goal of these comparisons is to calculate the impact that the conducts had on the effective take rate charged by AdX. When the effective take rate increased, the bids that were passed to publishers were depressed and publisher revenue fell."[1344]

638. Professor Hortaçsu's analysis is flawed for several reasons, including its systematic failure to account for the incentives of publishers and buyers across all versions of DRS.

639. Here are some relevant details of Professor Hortaçsu's method. To calculate what he calls the "effective take rate," Professor Hortaçsu asserts that the increase in AdX transacted volume due to DRS v1 "did not benefit publishers" because, he assumes, "publishers would receive either the same net winning bid from a different exchange or a reserve price that reflected the value to the publishers of leaving the impression unfilled."[1345] He then further assumes that the increases in AdX revenue of DRS v2 and tDRS above those

---

[1344] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 217 (emphasis omitted).

[1345] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 224. ("The reduction in the AdX take rate associated with the DRS conducts did not benefit publishers by increasing their net bids. This is because the take rate was only adjusted down when an AdX bid would otherwise not clear the floor price. This means that if AdX did no adjust its take rate down through DRS, then publishers would receive either the same net winning bid from a different exchange, or a reserve price that reflected the value to the publishers of leaving the impression unfilled—for example, the value of placing a house ad.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

of DRS v1 arise from higher take rates paid by publishers. Combining that assumption with his previous ones, he computes the "effective take rate" as being the nominal 20% revenue share times one plus the percent increase in revenues for each of the programs relative to DRS v1. In formal terms, if DRS v2 increased revenues by R% relative to DRS v1, he computes the "effective take rate" for DRS v2 to be $20\% \times (1+R/100)$.[1346]

640.  Because the increase in revenue associated with DRS v2 relative to DRS v1 was measured in a Google experiment to be 0.73%, Professor Hortaçsu calculates its "effective take rate" as $20\% \times (1.0073) = 20.15\%$. Similarly, because the increase in revenue associated with tDRS relative to DRS v2 is 0.83%, Professor Hortaçsu calculates the "effective take rate" of DRS v2 as $20\% \times (1.0073) \times (1.0083) = 20.31\%$.[1347]

641.  Finally, Professor Hortaçsu computes purported damages by multiplying the additional 0.15 and 0.31 percent points in excess of the contracted rate of 20% by gross revenues in the impressions transacted by Plaintiffs corresponding to damages for DRS v2 and tDRS, respectively.[1348]

642.  Professor Hortaçsu's conclusion that DRS v1 is a proper proxy for no DRS relies on two problematic assumptions included at the beginning of this subsection. The first is that "publishers would receive either the same net winning bid from a different exchange, or a reserve price that reflected the value to the publishers of leaving the impression

---

[1346] Second Revised Expert Report of A. Hortaçsu (Oct. 18,2024), at ¶¶ 228-239.

[1347] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 239 ("To calculate the effective take rate on impressions in which DRSv2 and tDRS inflated the take rate, I scale the AdX take rate—20 percent, as discussed in Section VII—up by 0.73 and 1.57 percent. Note that this is the percentage change, not the change in percentage points. Thus, I multiply the AdX take rate by 1 + (0.73/100) = 1.0073 and 1+(1.57/100)[.] This gives 1.0073 x 20 = 20.15 and 1.0157 x 20 = 20.31.") (emphasis omitted).

[1348] Second Revised Expert Report of A. Hortaçsu (Oct. 18,2024), at ¶¶ 241-251.

unfilled—for example, the value of placing a house ad,"[1349] even though a publisher can *always* benefit by setting a higher floor price than that. Daily Mail did just that.[1350] The second assumption is that buyers always bid their true valuations to the AdX auction with DRS, even when that is contrary to their interests—an assumption that is rejected even by Plaintiffs' own experts.[1351] These two problematic assumptions lead to Professor Hortaçsu's conclusion that DRS v1 does not benefit publishers[1352] and from there to his claim that the publisher's revenue under DRS v1 can proxy properly for the publisher's revenue in a but-for world without DRS.

643.   Under the same two assumptions as above, DRS v2 and tDRS would clear the same set of impressions as DRS v1. Professor Hortaçsu attributes any revenue increase associated with DRS v2 and tDRS relative to DRS v1 to AdX clearing a larger share of a fixed number of impressions sold at a fixed price.

---

[1349] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 224 ("The reduction in the AdX take rate associated with the DRS conducts did not benefit publishers by increasing their net bids. This is because the take rate was only adjusted down when an AdX bid would otherwise not clear the floor price. This means that if AdX did no adjust its take rate down through DRS, then publishers would receive either the same net winning bid from a different exchange, or a reserve price that reflected the value to the publishers of leaving the impression unfilled—for example, the value of placing a house ad.").

[1350] Daily Mail Second Amended Complaint, at ¶ 198 ("Among other approaches, Daily Mail set a floor for AdX as some multiple of the highest bid obtained from header bidding.").

[1351] Expert Report of P. Cramton (Oct. 4, 2024) at ¶ 190 ("*The effect of Dynamic Revenue Share v1 on advertisers is that their optimal bid strategies would change*. A bidder is motivated to bid its value in a pure second-price auction. However, the pricing rule for auctions was changed under Dynamic Revenue Share. Specifically, if the transaction were completed using Dynamic Revenue Share, the winning bidder would pay its bid, consistent with a first-price auction. The first price auction incentivizes a bidder to bid less than its value (called 'bid shading'). Therefore, Dynamic Revenue Share would incentivize bidders to try and guess the auction's clearing price and to shade their bids if they believed that their values were close to the clearing price (i.e., in the "dynamic region" as described above).") (emphasis added).

[1352] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 224 ("The reduction in the AdX take rate associated with the DRS conducts did not benefit publishers by increasing their net bids.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

644. Even if Professor Hortaçsu's claims about DRS v1 were correct and the two assumptions were satisfied, that still would not be sufficient to imply his conclusions about DRS v2 and tDRS. There are two reasons.

   a. *First*, contrary to Professor Hortaçsu's assumption, the total publisher revenues collected from a fixed set of impressions differ under the three versions of DRS. Under DRS v2, ad buyers repay debts, and under tDRS, floor prices were increased for some of the impressions cleared by AdX. Thus, the conclusion that "any increase in Google's profits is attributable solely to increased take rates"[1353] is wrong; it could also be attributed to an increase in *total revenues*.

   b. *Second*, the simulation conducted by Google, on which Professor Hortaçsu relies to assess the effect of tDRS, was based on a set of assumptions that are inconsistent with his view that revenues and transacted impressions are the same for each version of DRS. That simulation yields both an increase in AdX revenues of 0.82% and in impressions cleared by AdX of 2.3%.[1354] To justify Professor Hortaçsu's analysis, the set of impressions transacted by AdX must be the same for all three programs.

645. Standard economic analysis requires careful attention to how auction rules and processes affect the incentives and behavior of all marketplace participants. This is the same standard that Professor Hortaçsu applies in his academic work.[1355] Similar attention is

---

[1353] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 221.

[1354] "Truthful DRS Design Doc" (Mar. 24, 2017), GOOG-DOJ-13227256, at -261 ("Simulation has shown prelimi[n]ary result of [] +0.82% in revenue[] comparing to production DRS v2.").

[1355] *See, e.g.,* Hortaçsu, A. and Perrigne, I., "Empirical perspectives on auctions," in Handbook of Industrial Organization, Elsevier (2021) ("As another example, noting that a small proportion of oil and gas tracts sold through

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

common among commercial teams: Google's sell-side team was aware that the different versions of DRS provided publishers and buyers with different incentives.[1356]

646. For publishers like Daily Mail that, contrary to Professor Hortaçsu's assumption, had set floor prices that exceed the opportunity cost of the impression, the additional impressions sold under DRS v1 would have resulted in *additional revenue* for publishers. Therefore, publishers' revenues under DRS v1 were greater than the publisher revenue in the absence of DRS. This invalidates Professor Hortaçsu's strategy of using the publisher revenue under DRS v1 as a proxy for publisher revenue in the counterfactual of no DRS.

647. Professor Hortaçsu also overestimates the "price effect" of DRS v2. The experiments described in the document cited by Professor Hortaçsu do not measure the net effects of DRS v2. These experiments consist merely of an A/B test that randomly assigns a small fraction of the queries on AdX to the treatment group for which DRS v2 is enabled, while the rest of the queries are assigned to the control group where DRS v1 is enabled.[1357] While A/B tests are effective for evaluating the effect of an intervention with no other changes, they do not capture the long-term responses of participants, which can reduce or even reverse short-term effects. My theoretical analysis establishes that under DRS v2, publishers and buyers have incentives to adapt their behavior to DRS v2 rules, and I would expect that over time, market participants would tend to behave in line with those incentives.

---

auctions is actually drilled, some recent papers question whether the actual system of contingent payments with a royalty rate provides enough incentives to oil firms to explore and drill").

[1356] "Dynamic Sell-Side Revshare" (Nov. 2, 2015), GOOG-DOJ-13202659, at -669 (with Dynamic Revenue Share v1, "[b]uyers have incentive to shade bids" and "[p]ublishers have incentive to raise reserve prices" because the buyer could have paid less and publisher could get paid more).

[1357] "AdX Dynamic Revshare v2: Launch Doc" (Feb. 22, 2017), GOOG-DOJ-13207875, at -875.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

648. Professor Hortaçsu also overestimates the "price effect" of tDRS. As I mentioned before, Google's simulations found that "tDRS increased net profits of AdX transactions by 0.82 percent compared with DRS v2" and that "tDRS increased AdX's win rate by 2.13% compared with DRS v2."[1358] Thus, the increase in AdX revenues was partly the result of an increased win rate rather than a "pure price effect."

649. In my analyses in this section, which allows market participants to adjust their behavior according to their economic incentives, I find that *none* of the three versions of DRS harmed publishers relative to the but-for world of no DRS.

---

[1358] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 225.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## XIII.   OPEN BIDDING AND UNIFIED FIRST PRICE AUCTION: IMPROVING PUBLISHERS' ABILITY TO ACCEPT BIDS FROM NON-GOOGLE EXCHANGES

### A. Overview

650.   Google began testing **Open Bidding** (previously known as Exchange Bidding, and internally also known as Jedi, EBDA, and demand syndication) in 2016[1359] and officially launched the program for general availability in April 2018.[1360] Open Bidding allowed publishers to accept bids for impressions from non-Google exchanges on Google Ad Manager, increasing the thickness of Google's platform. Accepting bids from other exchanges on GAM—in a way that protected the interests of both advertisers and publishers—required careful design and ultimately led to other changes on GAM, including the transition to the Unified First Price Auction (UFPA) in 2019.[1361]

651.   Google described Open Bidding as its "answer to header bidding."[1362] Relative to header bidding, Open Bidding brought many advantages to publishers, including speed, streamlined payments, simpler configuration, and reduced computational burden on end

---

[1359] *See* "Demand Syndication" (Feb. 17, 2016), GOOG-DOJ-09459336, at -348.

[1360] *See* Jonathan Bellack, "Exchange Bidding now available to all customers using DoubleClick for Publishers," Google Ad Manager (Apr. 4, 2018), https://blog.google/products/admanager/exchange-bidding-now-available-to-a/, accessed Dec. 11, 2024 ("Exchange Bidding now available to all customers using DoubleClick for Publishers [...] With Exchange Bidding, publishers can increase revenue by allowing multiple exchanges to compete with each other—and with DoubleClick Ad Exchange—in a unified auction.").

[1361] "Ad Manager Unified 1st Price Auction" (Sept. 27, 2019), GOOG-DOJ-09714662, at -662 ("[W]e are transitioning publisher inventory to a unified, 1st price auction for Google Ad Manager.").

[1362] "Demand Syndication" (Feb. 17, 2016), GOOG-DOJ-09459336, at -337 ("Demand Syndication is our answer to header bidding - a superior product for allowing pubs to get per-query bids from non-AdX exchanges[.]").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

users' browsers.[1363, 1364, 1365] The popularity of Open Bidding among publishers speaks to these benefits.[1366]

652.  Plaintiffs' allegations regarding Open Bidding and the UFPA are factually incorrect and fail to account for the incentives of participants.

653.  *First*, Plaintiffs and their experts allege that Open Bidding was devised to "maintain AdX's ad-server and ad-exchange monopolies"[1367] by "impairing and excluding rival Ad

---

[1363] In this section, I use the term "header bidding" to refer to client-side header bidding. Some use the term "header bidding" to include server-side header bidding tools, including Open Bidding. For a comparison of Open Bidding and header bidding, see "Open Bidding on Ad Manager (fka Exchange Bidding)" (Aug. 2019), GOOG-DOJ-15389438, at -440-442.

[1364] For a comparison of timeouts, see "RTB Timeouts" (Oct. 2019), GOOG-DOJ-15232606, at -609 ("Google's lower bid timeouts should have a slightly better user experience with lower latency[]").

[1365] *See* Declaration of N. Korula (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 24; "Open Bidding on Ad Manager (fka Exchange Bidding)" (Aug. 2019), GOOG-DOJ-15389438, at -438 ("Eliminate operational inefficiencies such as line item complexity and latency that exists with header bidding […] Easy to set up, view/analyze reports and unified payments […] Allows exchanges to respond to RTB call-outs […] Provides integrated reporting and billing for exchange bidding transactions won by 3rd party exchanges"), -441-442.



[1367] Daily Mail Second Amended Complaint, at ¶ 166 ("Exchange Bidding is designed to maintain AdX's ad-server and ad-exchange monopolies."); Gannett Amended Complaint, at ¶ 186 ("Exchange Bidding is designed to maintain AdX's ad-server and ad-exchange monopolies."); *see also* Expert Report of J. Chandler (Oct. 4, 2024), at ¶ 129 ("Critics and competitors worried that Open Bidding was designed to undermine the advantages of header bidding and return control over the ad tech ecosystem to Google."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 50 ("I understand that several of Google's conducts have been implemented in response to header bidding in order to curtail the competitive threat that header bidding poses."); Expert Report of E. Elhauge (Oct. 4, 2024), at ¶ 45 ("Instead, Google adopted various restraints that sought to suppress, and succeeded in suppressing, competition from header bidding.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Exchanges"[1368] is inconsistent with the details of the Open Bidding program. Contrary to Plaintiffs' and their experts' suggestions, publishers and exchanges were not forced to adopt Open Bidding and could maintain existing header bidding configurations to call competing exchanges. The data I have reviewed suggests that the vast majority of publishers using Open Bidding continue to use header bidding. Professor Hortaçsu affirms this when he writes about Prebid, Amazon TAM, and Open Bidding that "publishers often use all three products and consider them comparable. Gannett, for example, uses all three[.]"[1369]

654. *Second*, Plaintiffs and their experts misrepresent the MBTW feature and omit analyses of its benefits. They allege that Google shared "MBTW [(minimum bid to win)] information [] with AdX buyers and Exchange Bidders but [MBTW] was not provided to header bidders"[1370] allowing "Google [to] buy an inflated share of [] ad inventory at artificially depressed prices."[1371] They further claim that "Minimum Bid to Win [] provides functionally the same information as Last Look."[1372] These claims are wrong.

---

[1368] Publisher Class First Amended Complaint, at ¶ 300 ("Google did this in various ways by impairing and excluding rival Ad Exchanges by using its publisher Ad Server to manipulate auction processes to preference Google's Ad Exchange, impairing competition in the Ad Exchange market."); Expert Report of J. Chandler (Oct. 4, 2024), at ¶ 129 ("Critics and competitors worried that Open Bidding was designed to undermine the advantages of header bidding and return control over the ad tech ecosystem to Google.").

[1369] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 843.

[1370] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 694 ("MBTW information was shared with AdX buyers and Exchange Bidders but was not provided to header bidders at its inception in September 2019 and is still not provided to header bidders to date."); Revised Expert Report of D. Sibley (Oct. 11, 2024), at ¶ 316 ("Under MBTW, Google provided information on the winning bid to AdX and Exchange bidders but not to header bidders.").

[1371] Gannett Amended Complaint, at ¶ 67 ("Google can buy an inflated share of Gannett's ad inventory at artificially depressed prices.").

[1372] Gannett Amended Complaint, at ¶ 65; Daily Mail Second Amended Complaint, at ¶ 49 ("But, as part of the Unified Auction, Google created a functionally identical advantage [to Last Look] it now calls "Minimum Bid to Win."); Revised Expert Report of S. Li (Oct. 11, 2024) at ¶ 729 ("While not being an instantaneous signal, MBTW is still highly predictive of future auctions, and therefore provides valuable information about competitors' bids to AdX buyers and Exchange Bidders.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

655. Plaintiffs and their experts' suggestion that AdX buyers could exactly predict competitors' bids and bid just a penny more is incorrect both empirically and conceptually. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████[1373] Conceptually, such perfect prediction is impossible: not only do bidders vary from auction to auction, but their bids typically vary, too, as they strategically consider value for an impression and the competition they anticipate.

656. Moreover, Plaintiffs' alleged harms to header bidders from alleged limited access to MBTW information fail to consider the numerous alternatives available to those bidders to optimize bids. The claims also fail to account for how, in first-price auctions, MBTW information helps bidders reduce bidding mistakes, fostering better matching between advertisers and impressions and encouraging participation.

657. While Professor Li argues that sharing MBTW information enables more effective "collusion,"[1374] and that the "competitive counterfactual is a world in which MBTW data is not shared with any advertiser, rather than being universally shared,"[1375] his counterfactual is disconnected from reality because it disregards the incentives for even non-Google exchanges to provide MBTW information to participants.[1376] Furthermore,

---

[1373] ████████████████████████████████████████████████████

████████████████████████████████████

[1374] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 742 ("Further, providing information about losing bids enables bidders to collude more effectively.").

[1375] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 761.

[1376] Indeed other exchanges provided similar information. "OpenX Launches BIDS, New Solution for Advertisers to Access Log-Level Data and Gain Visibility into Programmatic Media Buys," OpenX (July 23, 2020) https://www.openx.com/press-releases/openx-launches-bids-new-solution-for-advertisers-to-access-log-level-data-and-gain-visibility-into-programmatic-media-buys/, accessed Dec. 13, 2024 ("Marketers can come to OpenX to access BIDS and analyze performance and outcomes across several critical fields including: publisher integration types,

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

his analysis is speculative and incomplete, failing to account for the actual conditions including the large number of bidders, the variation in bids, and the anonymity of MBTW information, which together compromise his conclusions.

658. *Third*, Plaintiffs and their experts claim that, in 2018, Google began redacting fields in auction data shared with publishers to "thwart publishers' ability to evaluate the performance of Ad Exchanges in Header Bidding, and thus reduce publishers' use of Header Bidding."[1377] And, "as a result, [] publishers were harmed by having significantly less transparency in their auction data."[1378] But, these claims ignore the historical context of changes in data-sharing policies, which were introduced in response to demands from buyer-customers and emerging privacy concerns. Plaintiffs and their experts also fail to account for publishers' alternative means to "measure the performance of Google against other exchanges"[1379] such as experimentation and the use of other data fields.

---

loss reasons, people-based IDs (e.g. LiveRamp's IdentityLink), minimum bids to win, and much more."); *see also* "Chocolate Premium Makes Every Bid Request Unique & Valuable With Bid Enrichment." Chocolate Platform https://chocolateplatform.com/wp-content/uploads/2019/08/BidEnrichment.pdf, accessed Dec. 11, 2024 ("If your bid won the auction, this is the second highest bid."); "OpenRTB Version 2.6" IAB (April 2022), at p. 44 ("The minimum price required to tie with the next-closest bid, or the floor if there was only one bid, when your bid won the auction."); "Win Notification & Minimum Bid To Win," Verve, https://developers.verve.com/reference/win-notification-minimum-bid-to-win, accessed Dec. 12, 2024 ("The Minimum Bid To Win macro integrated in the NURL serves to intimate the Demand Partner about the price of the second-highest bid in the auction they dominated.").

[1377] Publisher Class First Amended Complaint, at ¶ 312; Daily Mail Second Amended Complaint, at ¶ 187 ("Google redacted two DFP data fields (known as "KeyPart" and "TimeUsec2") so that publishers no longer can compare impression-level and bid-level data between header-bidding exchanges and Exchange Bidding exchanges, including AdX. The upshot is that publishers now have substantially less insight into client-side header bidding's comparative advantage, and therefore have greater difficulty designing client-side header bidding to maximize revenue.")

[1378] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1202.

[1379] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1226 ("In a counterfactual world, publishers would have a reliable tool to measure the performance of Google against other exchanges using the Bid DT transfer files, that is compatible with the other measurement tools that provide information on the competitiveness of auctions for their impressions").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### B. Open Bidding: Google's Response to the Flaws of Header Bidding

659.    Open Bidding was designed as Google's "answer to header bidding," incorporating more real-time bids from non-Google exchanges into Google's auction.[1380] Although implementations of header bidding also enabled publishers to collect real-time bids from non-Google exchanges, those implementations tended to have several downsides, as described next.

660.    *First, latency.* Common implementations of header bidding increased latency.[1381] An internal Google study found that header bidding increased ad loading times by approximately 20%, and academic researchers found that header bidding latency was around three times that of the waterfall.[1382] Latency not only degrades the end user experience, but in so doing, also harms advertisers and publishers.[1383] By increasing the likelihood that an end user leaves the website before the ad is presented, latency harms

---

[1380] "Demand Syndication" (Feb. 17, 2016), GOOG-DOJ-09459336, at -337 ("Demand Syndication is our answer to header bidding - a superior product for allowing pubs to get per-query bids from non-AdX exchanges.").

[1381] Declaration of N. Korula (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 24 ("Most header bidding has traditionally taken place client-side, meaning the page sends out requests to individual ad exchanges and other demand sources, processes the responses, and then runs an auction, all via Javascript code running on the page. This may introduce latency issues and slow page loads."); *see also* "Header Bidding T1 Impact" (Sept. 24, 2015), GOOG-DOJ-04430492, at -501 ("3. User's browser triggers the buyer's pixel, which communicates with the Header Bidding buyer's server. a. This may result in page load latency as the page will not load until the header script completes […] 4. HB buyer's server returns a decision […] (This results in further latency as the DFP tag is dependent on the Header Bidder's call resolving.)"), -502 ("Cons: Increased latency - especially in mobile and video = decreased user experience."); Vishveshwar Jatain, "Understanding Header Bidding And How To Leverage It," Forbes (Sept. 17, 2019), https://www.forbes.com/sites/forbescommunicationscouncil/2019/09/17/understanding-header-bidding-and-how-to-leverage-it/?sh=332097315c1, accessed Dec. 12, 2024 ("Client-side header bidding […] increased page latency because executing auctions takes bandwidth and computing resources.").

[1382] "Header Bidding Observatory #1" (Jan. 2017), GOOG-DOJ-AT-01027937, at -956 ("All things equal, there is a 20% reduction in ads load speed because of Header Bidding"); Pachilakis, M., Papadopoulos, P., Markatos, E. P., & Kourtellis, N., No More Chasing Waterfalls: A Measurement Study of the Header Bidding Ad-ecosystem, *IMC '19: Proceedings of the Internet Measurement Conference* (2019) at pp. 280-293.

[1383] "Glossary: Digital Media Buying & Planning" *Interactive Advertising Bureau* (Apr. 2016), https://www.iab.com/wp-content/uploads/2016/04/Glossary-Formatted.pdf, at p. 10 ("Latency sometimes leads to the user leaving the site prior to the opportunity to see the ad.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

publishers by potentially preventing a user from viewing an ad for which the publisher would be compensated if the ad had been displayed.[1384] Latency also harms advertisers by reducing the effectiveness of online display advertising campaigns.

661.    *Second, payment discrepancies.* There were reports of payment discrepancies, where publishers' expected receipts from header bidders did not match eventual payments.[1385] In contrast to impressions sold on AdX (where AdX would act as a clearinghouse, collecting payments from bidders on behalf of publishers), publishers needed to manage their own billing and reconciliation for impressions sold via header bidding. Discrepancies of up to 50% could arise because different partners might apply different standards for verifying that impressions were not fraudulent or double-counted.[1386]

---

[1384] *See, e.g.*, "Latency in Digital Advertising: A Guide for Publishers," *DoubleVerify Publisher Insights* (Oct. 21, 2019), https://pub.doubleverify.com/blog/latency-in-digital-advertising-a-guide-for-publishers/, accessed Dec. 13, 2024 ("High latency kills user experience and publisher revenue."); "[UA] Latency and why it impacts Google Ads Clicks and Analytics Sessions," *Google Analytics Help*, https://support.google.com/analytics/answer/4589209?hl=en, accessed Dec. 11, 2024 ("As a general rule, users on the internet are not very patient. This is evident from studies such as the KissMetrics study that elicited some sobering statements like: 'A one-second delay in page response can result in a 7% reduction in conversions.' along with '47% of consumers expect a web page to load in two seconds or less.' What does this mean for you? If your website loads too slowly, then there is a possibility that users are leaving and going to your competitors, especially if competitors are able to deliver the same content quickly.").

[1385] Declaration of N. Korula (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 24 ("Header bidding is also not transparent because, although the publisher 'accepts' the impression at a certain price, the header bidder may not actually pay the sum indicated in its bid."); "Header Bidding Observatory #1" (Jan. 2017), GOOG-DOJ-AT-01027937, at -955 ("A comparison of HB reports vs DFP reporting showed significant discrepancies [in revenue]"); *see also* James Curran, "For Publishers, Header Bidding Discrepancies Can Outweigh Revenue Lift," *AdExchanger Opinion Page* (July 8, 2016), https://www.adexchanger.com/the-sell-sider/publishers-header-bidding-discrepancies-can-outweigh-revenue-lift/, accessed Dec. 12, 2024 ("Publishers need to create a more realistic calculation of header bidding revenue by factoring discrepancies into their line-item valuations. Some header bidding solutions can cause up to a 50% discrepancy between the publisher ad server impression reports and the impression reports from the programmatic partner. That means a $2 CPM is really a $1 CPM once you account for the adjustments made by the exchange for viewability, verification and performance tracking.").

[1386] James Curran, "For Publishers, Header Bidding Discrepancies Can Outweigh Revenue Lift," *AdExchanger Opinion Page* (July 8, 2016), https://www.adexchanger.com/the-sell-sider/publishers-header-bidding-discrepancies-can-outweigh-revenue-lift/, accessed Dec. 12, 2024 ("Publishers need to create a more realistic calculation of header bidding revenue by factoring discrepancies into their line-item valuations. Some header bidding solutions can cause up to a 50% discrepancy between the publisher ad server impression reports and the impression reports from the programmatic

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

662. *Third, complexity.* Header bidding could be challenging for a publisher to configure, requiring it to place code in the header of its website to request, collect, and compare bids before calling the publisher's ad server.[1387] Header bidding also required a publisher to take on many of the tasks that were traditionally performed by ad servers (or pay another publisher tool to do so), including billing, reporting, data security, and ad fraud prevention.[1388]

663. Google found that publishers sought the ability to accept real-time bids directly from other exchanges on Google's platform.[1389] In 2016, as header bidding was growing in popularity with publishers, Google started developing and testing Open Bidding, a

---

partner. That means a $2 CPM is really a $1 CPM once you account for the adjustments made by the exchange for viewability, verification and performance tracking.").

[1387] One publisher described the time required to integrate an SSP with a leading header bidding wrapper as "20 hours of work" (versus Open Bidding's "20 minutes"). Sarah Sluis, "Google Ad Manager Builds A Bridge To Prebid—But Don't Call It A Two-Way Street," *AdExchanger* (Apr. 27, 2022), https://www.adexchanger.com/platforms/google-ad-manager-builds-a-bridge-to-prebid-but-dont-call-it-a-two-way-st reet/, accessed Dec. 12, 2024. Another industry source compared header bidding to previous ad configurations: "It's not just a little more work, it's probably 100X as much work to traffic for most publishers." Ad Ops Insider, "Header Bidding Explained Step-by-Step" (June 8, 2015), https://www.adopsinsider.com/header-bidding/header-bidding-step-by-step/, accessed Dec. 12, 2024.

[1388] *See* James Curran, "For Publishers, Header Bidding Discrepancies Can Outweigh Revenue Lift," *AdExchanger Opinion Page* (July 8, 2016), https://www.adexchanger.com/the-sell-sider/publishers-header-bidding-discrepancies-can-outweigh-revenue-lift/, accessed Dec. 12, 2024 ("Managing header bidding discrepancies, like much of digital ad tech, is complex and time consuming. In order to make these changes, publishers need to recalibrate hundreds if not thousands of line items, which makes header bidding just as manual as a waterfall setup. This manual labor is another costly factor that publishers must include when determining the value of header bidding."); Ross Benes, "Unraveling header bidding's problems with user data," *Digiday* (Mar. 20, 2017), https://digiday.com/media/header-bidding-security/, accessed Dec. 12, 2024 ("[A]n overlooked downside [of header bidding] is that it can expose user data by allowing all bidders to access audience data. Header bidding also makes it easier for fraudsters to hide in the noise created by the vast amount of data points that come from multiple parties bidding on all available impressions. [...] Hlavacek pointed out that with multiple partners bidding on all impressions available in the auction, header bidding significantly increases the amount of data points in the exchanges. Other sources said it's this data deluge that is most problematic when it comes to security.").

[1389] "Demand Syndication" (Feb. 17, 2016), GOOG-DOJ-09459336, at -337 ("Turns out that getting per-query bids from exchanges dramatically increases yield (auctions more efficient), so pubs are clamouring for this functionality") (emphasis omitted).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

product to accept real-time bids in that way—without the drawbacks of header bidding.[1390]

## C. Meeting the Challenge of an "Auction of Auctions": The Evolution of Open Bidding and the Unified First Price Auction

664. Designing an "auction of auctions" to improve on the flaws of header bidding while protecting the interests of both advertisers and publishers was challenging, in part because of differences between the auction formats on AdX and other exchanges. AdX ran a second-price auction, while many other exchanges had transitioned to non-second-price auction formats.[1391] Bids that are optimized for different auction formats are not easily compared: in a first-price auction, bidders optimize by shading their bids below their values to maximize their payoffs, while bidders in a second-price auction find it optimal to bid their values, as I discuss in Section III.C.3. Designing an auction that incorporated bids from auctions run by other exchanges ultimately led to additional changes in the AdX auction design, including the transition to the Unified First Price Auction.

### 1. "Alpha" Design Highlights Difficulty of Auction of Auctions

665. The first "alpha" design of Open Bidding, in June 2016, incorporated bids from authorized exchanges in the AdX second-price auction, which AdX would compare to

---

[1390] *See, e.g.*, "Demand Syndication" (Feb. 17, 2016), GOOG-DOJ-09459336, at -337 ("Demand Syndication is our answer to header bidding - a superior product for allowing pubs to get per-query bids from non-AdX exchanges").

[1391] Between late 2017 and early 2018, during the design phase of Open Bidding, Google estimated that the percentage of all queries conducted in "First-price auction" and "Second-price auction with anomalies" formats increased from 25% to 67%. *See* "DV360, Third Party Exchanges, and Outcome-Based Buying" (Oct. 16, 2018), GOOG-DOJ-12038253, at -298 ("In fact, exchanges are openly moving more and more to first price auctions.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

bids from Google's buy-side tools and Authorized Buyers.[1392] When an auction was won by an Open Bidding buyer, GAM collected a revenue share of 5-10%.[1393]

666. By continuing to receive bids from DSPs and other Authorized Buyers in a second-price auction, the Open Bidding design aligned with the way that those buyers had previously competed in the AdX second-price auction. Even so, this prototype design of Open Bidding was reportedly unpopular with non-Google exchanges because an AdX bidder could win the auction with any bid higher than the bid made by each of the exchanges (and any other floor prices), at a price determined by the second-price auction logic (which could equal the largest bid from the other exchanges).[1394] Although different in nature from the so-called "Last Look" over remnant line items (including header bids),[1395] this Open Bidding design was also characterized as a "Last Look" for AdX.

667. By their nature, "alpha" launches are used to identify problems with a product's design before testing the product on a larger group of users. The challenges associated with the "alpha" launch of Open Bidding highlighted the complication associated with

---

[1392] *See* "Exchange Bidding 'Last Look' leak" (Apr. 5, 2017), GOOG-DOJ-14024199, at -200-201 ("The initial design for exchange bidding in dynamic allocation (EBDA) worked almost exactly like Header Bidding when used with DFP. In the initial EBDA design, the bid submitted by an exchange was treated like a price derived from a line item and could become the floor price in the AdX auction. This part of the process was sometimes referred to as 'last look.'").

[1393] Declaration of N. Korula (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 27 ("Up to at least December 2021, for publishers that utilized Open Bidding, when an auction was won by an Open Bidder, Google Ad Manager's standard charges for web display ads were 5% for GAM360 customers and 10% for other GAM customers, and Google's standard charges for app and instream video ads were 10%.").

[1394] *See* Sarah Sluis, "Google Removes Its 'Last-Look' Auction Advantage," *AdExchanger* (Mar. 31, 2017), https://www.adexchanger.com/platforms/google-removes-last-look-auction-advantage/, accessed Dec. 12, 2024 ("During a Google forum late last year, the biggest concern voiced by publishers and exchanges centered on this last-look advantage.").

[1395] The main difference is that the value CPMs of remnant line items were not really bids for the impression—so that the publisher could choose floors to influence the AdX "last look," as discussed in Section X—whereas the bids made by exchanges under Open Bidding were actual bids for the impression that would later be used as the basis of payments.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

incorporating bids from other exchanges on AdX. Doing that effectively was not as simple as treating the bids from other exchanges in the same ways as other bids in the AdX auction. Instead, incorporating bids from other exchanges required additional changes to the AdX auction design.

### 2. Google Removes the So-Called "Last Look" Over Open Bidding, Challenging Its Second-Price Auction Design

668.  In March 2017, Google responded to feedback and redesigned the Open Bidding auction to remove the so-called "Last Look" of AdX over other exchanges that participated in Open Bidding.[1396] To accomplish that, Google *first* conducted a second-price auction among its AdX bidders with the same floor price it used before Open Bidding, and *then* compared the AdX auction's clearing price to the best Open Bidding exchange bid on a first-price basis.[1397, 1398] A consequence of this procedure is that, for an AdX bidder to win the impression, AdX would need to have *two* bids (or a bid and a floor price) higher than the best first-price bid from other exchanges in Open Bidding.[1399] This design was used

---

[1396] "2018 Sellside Launches Revenue Evaluation" (July 19, 2019), GOOG-DOJ-13226855, at tab "Q1Q2 '17 Launch News," cell R60.

[1397] That is, the AdX clearing price (net of AdX revenue share) would be compared to the best bid from Open Bidding (net of Open Bidding revenue share). If the net AdX clearing price was larger, the AdX bidder would win the impression and the publisher would receive the AdX clearing price; otherwise, the Open Bidding bidder would win and pay its bid.

[1398] *See* "Exchange Bidding 'Last Look' leak" (Apr. 5, 2017), GOOG-DOJ-14024199, at -201 ("AdX and all EBDA SSPs run auctions and submit their bids[.] All bids are compared in a first price auction[.] SSPs are not acting as AdX 2nd price[.] Example[:] AdX highest bid- $5[.] AdX second bid- $2[.] SSP - 4$[.] Result: SSP wins at $4").

[1399] If there were no bids from AdX bidders above the floor price and that floor price was set by a non-guaranteed line item or the EDA price, AdX would submit the floor price as a bid into the first-price auction between exchanges, and would allocate the impression to the relevant non-guaranteed line item or direct deal if that bid won the Open Bidding auction.

for Open Bidding's "open beta" version, through the general release in April 2018, until the transition to the Unified First Price Auction in 2019.[1400]

669.    By maintaining the second-price auction on AdX, this design of Open Bidding was bidder-truthful (as defined in Section III.C.3.a) for bidders on AdX. But because the second-price auction's clearing price was not optimized as a bid into the first-price Open Bidding auction, AdX bidders were disadvantaged. To illustrate this disadvantage, suppose that AdX received two bids for an impression, $5 and $1, and the best first-price bid from another exchange was $1.20 (coming from a bidder with value of, say, $2). The auction outcome is determined by comparing AdX's clearing price from its internal second-price auction (that is, the second-highest bid of $1) to the best Open Bidding exchange bid (that is, $1.20), resulting in the $1.20 bid winning the auction. In this case, however, the AdX bidder willing to pay $5 is disadvantaged: it loses the auction despite having the highest value and bidding more than any other bidder. The publisher may also miss out on possible revenue improvements, because the highest bidder's willingness to pay much more has no effect on the final price in the Open Bidding auction.

670.    A Google document summarized this problem as follows: "The clearing price from the internal AdX 2P auction[] may not always be competitive in the unified auction."[1401] Internally, Google described this complicated auction design as "chaos."[1402]

---

[1400] *See* Declaration of N. Korula (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 26 ("Open Bidding became generally available in April 2018"). Open Bidding's open beta launch was in May 2017. *See* Launch Details Spreadsheet, Launch 181852 (Aug. 31, 2023), GOOG-AT-MDL-009644401, at cell C2.

[1401] "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -505.

[1402] "Welcome to Exchange Partnerships Executive Conference 2019" (May 2019), GOOG-DOJ-13501237, at -243.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

671. Despite these flaws, an internal Google presentation showed that the launch of Open Bidding resulted in approximately 15% in increased revenue for publishers and was approximately revenue neutral for Google.[1403] Impressions sold by Open Bidding did not displace impressions sold by header bidding: instead, a Google analysis found that the share of impressions allocated to header bidding increased somewhat after the launch of Open Bidding.[1404] Google's data showed that the main effect of Open Bidding was to replace impressions sold by *static* remnant bids with impressions sold by *real-time* bids in Open Bidding.[1405] Having more impressions allocated using real-time bids improved platform thickness and efficiency. The introduction of Open Bidding was also celebrated by some competing exchanges, with OpenX reporting that "[e]xisting OpenX publisher partners who enabled [Open Bidding] through the OpenX Exchange experienced an average 48% increase in programmatic revenue from OpenX."[1406]

672. Following the release of Open Bidding (which was still known externally as Exchange Bidding), Google launched Network Bidding in 2019.[1407] Network Bidding offered "mega [ad] networks"[1408] an additional alternative to traditional waterfall mediation, with

---

[1403] "Exchange Bidding Sell Side Update" (June 14, 2018), GOOG-DOJ-11790760, at -761 ("[Open Bidding] was expected to be net revenue negative to neutral, it is indeed neutral"), -771.

[1404] "Exchange Bidding Sell Side Update" (June 14, 2018), GOOG-DOJ-11790760, at -775 ("Median HB Win Rate per publisher moved from 3.9% to 5.05%").

[1405] *See* "Exchange Bidding Sell Side Update" (June 14, 2018), GOOG-DOJ-11790760, at -775 ("Publishers are moving from a waterfall based approach to RTB (EB and Header Bidding)").

[1406] "Google & OpenX Release Study Showing Publisher Partners Experience 48% Revenue Lift Through Google Exchange Bidding Collaboration" *OpenX* (Feb. 15, 2018), https://www.openx.com/press-releases/google-openx-revenue-lift/, accessed Dec. 13, 2024.

[1407] *See* Email from ▮▮▮▮ to ▮▮▮▮ et al., "Re: AppLovin Open Bidding Live with First Beta Publisher!" (Jan. 10, 2019), GOOG-DOJ-AT-00849635, at -636 ("[W]e have AppLovin fully launched as our first Open Bidding network!").

[1408] *See* "FAN DFP & AdMob (Jedi 4 Networks) Opportunity" (Apr. 2017), GOOG-DOJ-09875881, at -889 ("Jedi for Networks [...] Intended for [...] Mega networks like FB & GDN, maybe CRTO & AMZN").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

AppLovin being the first network to participate.[1409] Like Open Bidding, Network Bidding charged participants a 5-10% revenue share.[1410] Bids from Network Bidding buyers competed in real-time against Open Bidding exchanges and AdX on a first-price basis.[1411] If an ad network previously competed for inventory via static prices or the waterfall, I would expect real-time bids and the transition to Network Bidding to increase publisher revenues by the same logic that applies to Open Bidding above.

### 3. Google's Transition to the Unified First Price Auction Further Increased Efficiency

673.  To understand why Google transitioned to a first-price auction, consider the requirements it faced. Suppose that the ad allocation process must (1) employ an "auction of auctions" in which the winning exchange is the one with the highest auction clearing price; (2) ensure that the clearing price in its auction depends only on the bids in its auction and not on the bids in any other auction (avoiding what others have called a "Last Look"); and (3) ensure that the highest net bid by any bidder wins. Applying simple logic to these three requirements implies that the clearing prices in each exchange can depend only on the highest bid in that exchange's auction, and not on the second-highest bid, so the requirements cannot be satisfied if any exchange uses a second-price auction. To achieve these requirements, *all participating exchanges—including AdX—must use first-price*

---

[1409] *See* Email from [ ] to [ ] et al., "Re: AppLovin Open Bidding Live with First Beta Publisher!" (Jan. 10, 2019), GOOG-DOJ-AT-00849635, at -636 ("[W]e have AppLovin fully launched as our first Open Bidding network!").

[1410] *See* "Jedi For Networks" (Jan. 31, 2018), GOOG-DOJ-15226550, at -565 (table showing revenue shares for categories of demand and inventory, showing that Network Bidding had a 5-10% revenue share).

[1411] *See* "PRD: Unified 1P auction and Pricing rules" (July 25, 2018), GOOG-DOJ-03998505, at -505 ("AdX buyers (GDN, DBM and 3P RTB) submit second-price bids to AdX, meaning they compete in a 2P auction in which the winner pays the second-highest eligible bid or the price floor. With the introduction of Jedi (Exchange Bidding and Network Bidding), the winner of the second-price AdX auction submits the clearing price of the second price auction to another auction (unified auction), where it competes with EB and NB bids on a first price basis.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

*auctions*. For AdX, the switch from its historic second-price auction to a first-price auction was a major change that would present new challenges for all its bidders, because they would need to adapt their bidding procedures to the new first-price auction rule.

674. After the eventual migration to the Unified First Price Auction was completed in September 2019, all bidders—including AdX bidders, header bidders, and non-Google exchanges using Open Bidding—competed on the same first-price basis, with the highest bidder paying its bid.[1412, 1413] This change eliminated the inefficiencies and confusions caused by differences in auction formats, and removed the so-called "Last Look" over header bidding. It reduced transaction costs both for both bidders (who no longer needed to bid differently in different exchanges) and publishers (who no longer needed to inflate header bids to set value CPMs for a second-price auction).

675. To ease the transition for its bidder customers to the new auction rules, Google Ads and DV360 introduced new programs to optimize their bids into the Unified First Price Auction. As discussed in Section IV.C.1.e, ███████████████████████

███████████████████████████████████████████

---

[1412] "Ad Manager Unified 1st Price Auction" (Sept. 27, 2019), GOOG-DOJ-09714662, at -663 ("After the transition is complete, all publisher traffic is on 1st auction[.]").

[1413] In (i) eliminating the sequential waterfall and (ii) allowing bidders from Open Bidding, Header Bidding and AdX to compete on the same first-price basis, the UFPA led to different (improved) outcomes compared to what preceded. When the outcomes between two mechanisms are different, the Revenue Equivalence Theorem does not apply. Therefore, Dr. Singer's claim that the average publisher revenue and buyer payments would be unaffected by the transition to UFPA is incorrect. *See* Expert Report of H. Singer (Oct. 4, 2024), at ¶ 93 ("One potential control variable omitted from the regression is Google's near-simultaneous conversion to a first-price auction (from a second-price auction) as it implemented UPR. Based on the Revenue Equivalence Theorem, which is a well-recognized auction theory, switching from a second-price to a first-price auction does not impact the expected revenue of the seller or the expected payments from the buyer.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

█████████[1414] The threshold prices made the Google Ads internal auction bidder-truthful for those advertisers. For DV360 advertisers, bids were optimized using the AdX 1P Bidder–a newly designed bidding architecture that ████████████████████████ ████████████████ (see Section VII.E). In combination, these programs maintained the simplicity of Google's buy-side tools, while allowing the bids from different demand-side platforms to be directly and simply compared.

676. Since the transition to the UFPA, Google has provided real-time bidders—including Authorized Buyers and Open Bidders—with historical auction information to allow non-Google buying tools to optimize their bids into the UFPA.[1415] Among this information is the **minimum bid to win (MBTW)**: the smallest amount a bidder could have bid in order to win an auction, holding all other bids in the auction fixed.[1416] Google

---



[1415] *See* "2019 Google Ad Manager releases archive," *Google Ad Manager Help* (July 1, 2019), https://support.google.com/admanager/answer/9197913?hl=en#expand&expand070119 ("Buyers currently have the ability to access feedback on prior bids they submitted into the auction […] As part of the transition to a first-price auction, buyers will gain access to a similar field (minimum_bid_to_win) that provides feedback on the minimum bid value necessary to have won a prior auction.").

[1416] For the auction winner, this value is the larger of the runner-up bid and the floor price. For auction losers, the value is the larger of the highest bid and the floor price. *See* "UPR/1P for Buyers gTech Resources" (June 24, 2019), GOOG-DOJ-14039426, at -431 ("New signal 'minimum_bid_to_Win' in BidResponseFeedback (all participants eligible) for 1p auctions such that: For the winner, we pass the runner up bid [...] For outbid ads, we pass winning bid").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

shares this MBTW data with *all* real-time bidders with which it shares a direct

communication channel, including third-party DSPs and Open Bidding exchanges.[1417]

677.  In addition to sharing MBTW data with ad buyers, Google has also provided its publisher

customers with auction data via Bid Data Transfer (BDT) files.[1418] Early versions of these

files were implemented prior to the UFPA, with the aim of providing publishers

information about buyers' bids.[1419]



[1420]

[1421] Google addressed these

---

[1417] *See* Declaration of N. Korula (May 2, 2024), GOOG-AT-MDL-C-000017971, at ¶ 11 ("The Unified First-Price Auction sends the minimum-bid-to-win information to real-time bidders that directly bid into the Unified First-Price Auction (as long as their bid was not filtered from the auction), including all third-party exchanges that participate in Open Bidding and all bidders in Google's ad exchange.").

[1418] *See* Declaration of ▆▆▆▆▆ (June 28, 2024), GOOG-AT-MDL-C-000073682, at ¶ 11 ("One type of Data Transfer report file, known as the Bids Data Transfer report file ('BDT file'), contains information about the bids that the publisher received on its inventory.").

[1419] Declaration of ▆▆▆▆ (June 28, 2024), GOOG-AT-MDL-C-000073682, at ¶ 11 ("Prior to September 2019, Google allowed buyers to opt out of including information about their bids in BDT files."); *see also* Launch 199259 (Aug. 29, 2023), GOOG-AT-MDL-009644182, at cells C2, C3 (noting launch date of 2017-9-5 for "Jedi Bid Data Transfer Beta").



*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

███████ by enabling buyers to opt out of sharing bid data with publishers, but that led to ████████████████████████████████████████████.[1422] As Google later transitioned to the UFPA, it sought "to provide publishers more information about the new first-price auction by including a *complete* set of bids from all Authorized Buyers, Open Bidding buyers, Google Ads, and DV360."[1423] With the "inten[tion] to provide publishers more information" in the move to the UFPA,[1424] ███████████████████ ███████████████████████████[1425] while also "remov[ing] the option for bidders to opt out of including information about their bids[.]"[1426] These combined changes ensured that Google fulfilled its contractual commitments, addressed



[1422] *See* Declaration of ████████ (June 28, 2024), GOOG-AT-MDL-C-000073682, at ¶ 11 ██████████████████████████████

[1423] Declaration of ██████ June 28, 2024), GOOG-AT-MDL-C-000073682, at ¶ 12 (emphasis added).

[1424] *See* Declaration of ██████ (June 28, 2024), GOOG-AT-MDL-C-000073682, at ¶ 12.

[1425]

[1426] Declaration of ██████ (June 28, 2024), GOOG-AT-MDL-C-000073682, at ¶ 12 ("When Google transitioned to a Unified First Price Auction in September 2019, Google removed the option for bidders to opt out of including information about their bids in BDT files.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

the privacy concerns of its buyers, and also shared a more complete set of bids with its publisher customers.[1427]

### D. Responding to Plaintiffs' and Their Experts' Allegations

#### 1. Plaintiffs Mischaracterize the Open Bidding Program

678. Daily Mail and Gannett allege that Open Bidding was "designed to maintain AdX's ad-server and ad-exchange monopolies,"[1428] but Plaintiffs' allegations mischaracterize or do not account for relevant details of the Open Bidding program.

679. *First,* while Daily Mail and Gannett claim that "Google has taken steps to coerce publishers to abandon [client-side header bidding] for Exchange Bidding"[1429] and that "its representations about Exchange Bidding leading to higher revenue were false,"[1430] these arguments do not acknowledge that publishers could and did continue calling exchanges via header bidding if they desired.[1431] Indeed, as documented by Professor Hortaçsu, Daily Mail and Gannett used header bidding alongside Open Bidding.[1432]

---

[1427] *See* Declaration of ███████ (June 28, 2024), GOOG-AT-MDL-C-000073682, at ¶ 13.

[1428] Daily Mail Second Amended Complaint, at ¶ 166; *see also* Gannett Amended Complaint, ¶ 186.

[1429] Daily Mail Second Amended Complaint, at ¶ 170; *see also* Gannett Amended Complaint, ¶ 189.

[1430] Daily Mail Second Amended Complaint, at ¶ 171; *see also* Gannett Amended Complaint, ¶ 190.

[1431] *See* Sarah Sluis, "3 Auctions Rule Digital Advertising. Here's A Guide To Navigating Them," AdExchanger (Nov. 20, 2019) https://www.adexchanger.com/platforms/3-auctions-rule-digital-advertising-heres-a-guide-to-navigating-them/, accessed Dec. 12, 2024 ("Three years in, each [Prebid, OB and TAM] has become a leader. Many publishers use two or three of these auction clearinghouses.").

[1432] Second Revised Expert Report of A. Hortaçsu (Oct 18, 2024), at ¶ 843 (discussing the use of Prebid, Amazon's TAM and Open Bidding, and that, "publishers often use all three products and consider them comparable. Gannett, for example, uses all three and even has some overlapping demand partners on each.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

680. Header bidding not only could operate alongside Open Bidding, but publishers also had the flexibility to forgo Google's Open Bidding services entirely.[1433] Exchanges could also choose not to participate in Open Bidding and publishers could still access those exchanges through header bidding. A publisher that finds that it earns more from header bidding has the option to use it instead of or alongside Open Bidding, and, despite its claims of "coercion," Gannett ultimately chose to do just that.[1434]

681. *Second,* Daily Mail and Gannett allege that "[b]ecause Exchange Bidding operates on Google's servers, only AdX has complete insight into the identity of the reader" and that "[o]ther exchanges, meanwhile, are hampered by 'user sync' issues that make it far more difficult to understand who the reader is[.]"[1435] However, Open Bidding buyers "receive broadly the same information in their bid requests" as AdX buyers, with minor differences primarily designed to protect user privacy and to comply with privacy laws.[1436] Google also provided Open Bidding partners with its Cookie Matching Service

---

[1433] *See* Happy Das, "Header Bidding vs Open Bidding – What Should You Know!," *headerbidding.co Blog* (Feb. 23, 2024), https://headerbidding.co/header-bidding-vs-open-bidding/ accessed Dec. 12, 2024 ("There are pros and cons to both Open Bidding and header bidding, so the right solution will ultimately depend on what you're looking for. If you can't seem to decide between the two, consider them both as options, as they can ultimately coexist within your ad server. Fortunately, you're never obligated to choose one over the other—make the call that works best for your setup, even if it's called something different. You can always change course in the future if you find yourself wishing you had picked a different solution from the get-go."); *see also* "Header Bidding vs Open Bidding," *Ad.Plus Blog* (Jan. 6, 2023), https://blog.ad.plus/header-bidding-vs-open-bidding/ accessed Dec. 12, 2024 ("Google Open Bidding is often used in conjunction with header bidding, which allows multiple demand sources to bid on ad inventory simultaneously. It is intended to be a more efficient way for publishers to monetize their ad inventory, as they can potentially receive higher bids from a wider pool of buyers.").

[1434] Gannett Amended Complaint, at ¶ 186 ("In response, Gannett demanded to be removed from the alpha and has proceeded to shut down Exchange Bidding across its inventory.").

[1435] Daily Mail Second Amended Complaint, at ¶ 166; *see also* Gannett Amended Complaint, at ¶ 186.

[1436] Response to Investigative Demand, "Responses and Objections of Alphabet Inc. to the September 9, 2019 Investigative Demand Issued by the Office of the Attorney General of Texas" (Nov. 12, 2019), GOOG-AT-MDL-019056545, at -568 ("[Q.] 69. Identify the sources and types of any information that DFP sends to AdX during or before the Exchange Bidding process, which is not simultaneously available to other Ad Exchanges. [A.] [...] All participating bidders receive broadly the same information in their bid requests. There are, however, some small differences where third parties may receive less granular information. Examples of this include: location data, where to enhance user privacy, Google only sends coarsened location data to third parties, and IP addresses,

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

that enabled exchanges to "match [...] their cookie[s]" for many impressions.[1437] Additionally, publishers and exchanges could continue to use header bidding, leaving any existing implementation of end-user identification unchanged.

682.   *Third*, Gannett states that "Google charges publishers a 10% fee for video ad space sold through Exchange Bidding, and a 5% fee for other kinds of impressions (e.g., text, banners). Either way, that fee is *additional* to Google's ordinary 20% revenue share for AdX."[1438] However, any suggestion that AdX's revenue share applied to impressions sold via Open Bidding is wrong. AdX *did not* charge fees on impressions purchased by third-party exchanges, including those won with Open Bidding. In fact, Google applied no other revenue share on impressions won by Open Bidding buyers, besides the 5-10% share.[1439] Publishers and exchanges who wished to avoid the Open Bidding revenue share could choose to use header bidding instead.

683.   *Fourth*, Professor Hortaçsu claims that "absent Google's deceptive conduct, Exchange Bidding would have charged a revenue share of 0% to publishers,[1440]" reasoning that "[t]his is because Prebid has always been free for publishers and TAM was free until

---

where the last octet is scrubbed before Google sends the data. This reflects the principles of data minimization and proportionality required by multi-jurisdictional privacy laws including GDPR. In certain cases, internal requests may also be structured slightly differently to external requests (in part because some internal request paths existed before industry-standard paths were created), but Google is working to eliminate these small discrepancies.").

[1437] "Cookie Matching," *Google for Developers Real-time Bidding* (accessed Dec. 11, 2024), https://developers.google.com/authorized-buyers/rtb/cookie-guide ("Open Bidding allows exchanges to use bidder initiated [...] and Google initiated [...] cookie matching workflows, to match a Google User ID with their cookie."); *see also* Declaration of ████████ (Redacted) (Sept. 29, 2023), GOOG-AT-MDL-C-000016753, at ¶ 16.

[1438] Gannett Amended Complaint, at ¶ 185.

[1439] Declaration of N. Korula (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 27 ("Up to at least December 2021, for publishers that utilized Open Bidding, when an auction was won by an Open Bidder, Google Ad Manager's standard charges for web display ads were 5% for GAM360 customers and 10% for other GAM customers, and Google's standard charges for app and instream video ads were 10%.").

[1440] Second Revised Expert Report of A. Hortaçsu (Oct 18, 2024), at ¶ 844.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

recently."[1441] But, this is not an apt comparison, because Prebid did not include the full suite of services offered by Open Bidding (e.g. payment processing).[1442] Moreover, it overlooks other costs associated with Prebid, including server costs. As noted by Tom Kershaw, CTO of Rubicon Project and chairman of Prebid.org, "publishers do pay a price in terms of operational complexity and engineering investment to configure and optimize Prebid."[1443]

684. Open Bidding's fees were comparable to other non-Google header bidding services. For example Amazon's UAM deducts a 10% fee from bids into its header bidding service.[1444] Internally, Google employees assessed that other exchange bidding tools charged revenue shares of between 5% and 10%.[1445] Although Professor Hortaçsu compares Open Bidding

---

[1441] Second Revised Expert Report of A. Hortaçsu (Oct 18, 2024), at ¶ 844.

[1442] *See* "Introduction to Open Bidding" *Google Ad Manager Help*, https://support.google.com/admanager/answer/7128453?hl=en&ref_topic=7512060&sjid=509848284721522645-NC, accessed Dec. 11, 2024 ("Open Bidding in Ad Manager also provides simplified trafficking, reporting, and billing.").

[1443] *See* Sarah Sluis, "3 Auctions Rule Digital Advertising. Here's A Guide To Navigating Them," AdExchanger (Nov. 20, 2019) https://www.adexchanger.com/platforms/3-auctions-rule-digital-advertising-heres-a-guide-to-navigating-them/, accessed Dec. 12, 2024.

[1444] *See* "Unified Ad Marketplace," Amazon Publisher Services, https://aps.amazon.com/aps/unified-ad-marketplace/index.html, accessed Dec. 12, 2024 ("UAM charges a 10% transaction fee from SSP and Amazon bid prices prior to conducting a first price auction.").

[1445] "mApp 10% AB" (Mar. 9, 2021), GOOG-DOJ-AT-01502155, at -155 ("Today, other NB/OB solutions in the market are charging 5-10%.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

to Amazon's TAM,[1446] I note that UAM is more comparable, as it includes payment processing services, while TAM does not.[1447]

685. *Fifth,* despite Professors Singer and Li's arguments that "AdX still had a Last Look advantage over Exchange Bidding bidders,"[1448] since March 2017—over one year before the general release of Open Bidding— AdX bidders have not had a "last look" nor "could [] see the other bids"[1449] of Open Bidding exchanges, and the transition to the Unified First-Price Auction eliminated any so-called "last look" over bids from header bidding exchanges. Additionally, before the 2019 transition to a Unified First-Price Auction, neither Google Ads nor DV360 ever used bids from Open Bidding or header bidding to adjust the amount of a bid on the same impression.[1450]

---

[1446] Second Revised Expert Report of A. Hortaçsu (Oct 18, 2024), at ¶ 842. ("I use the take rates from the other two server-side header bidding products as comparables for a competitive take rate. First, Amazon launched the Transparent Ad Marketplace (TAM) in 2016 as a server-side header bidding solution that only needed to be set up once and could integrate with additional demand sources going forward.").

[1447] *See* "Unified Ad Marketplace," Amazon Publisher Services https://aps.amazon.com/aps/unified-ad-marketplace/index.html, accessed Dec. 12, 2024; *see* Sluis S., "3 Auctions Rule Digital Advertising. Here's A Guide To Navigating Them," AdExchanger (Nov. 20, 2019) https://www.adexchanger.com/platforms/3-auctions-rule-digital-advertising-heres-a-guide-to-navigating-them/, accessed Dec. 12, 2024 ("Amazon Publisher Services' TAM charges a one-cent CPM only for impressions it monetizes, but publishers must have a direct relationship with their SSP to access that lower fee. Amazon Unified Ad Marketplace (UAM) runs on the same infrastructure but handles billing and reconciliation for smaller publishers. UAM charges a 10% fee for outside buyers, making it more expensive than open bidding for display inventory.").

[1448] Revised Expert Report of S. Li (Oct 11, 2024), at ¶ 303 ("Further, in 2016, when Exchange Bidding was in beta testing and AdX still had the Last Look advantage over Exchange Bidding bidders.").

[1449] Expert Report H. Singer (Oct 4, 2024), at ¶ 156 ("Google AdX also enjoyed "last look" privileges within [] Open Bidding. Under EBDA, which Google introduced as a response to header bidding, AdX would submit bids to a unified auction along with other third parties. However, Google alone could see the other bids then choose its bid accordingly to beat other third parties.").

[1450] Even if the floor price faced by Google Ads or DV360 was set by a non-Google bidder (such as in header bidding or in the initial release of Open Bidding), neither Google Ads nor DV360 used it to adjust their bids. *See* Declaration of N. Jayaram (May 01, 2024), GOOG-AT-MDL-C-000017969, at ¶¶ 2-3 ("Before the conclusion of an AdX auction for an ad impression, Google Ad Manager has never provided Google Ads or DV360 with any bids that AdX or Open Bidding received from non-Google ad exchanges or non-Google buy-side tools in that auction. Before Google Ad Manager transitioned to a Unified First-Price Auction in 2019, Google Ads and DV360 never used a floor price in an auction for an ad impression to adjust the bid values that they would submit for that same ad impression.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 2. Header Bidding Adoption Continued Following Open Bidding's Release

686. While Daily Mail and Gannett assert that Open Bidding was "designed to maintain AdX's [] ad-exchange monopol[y]"[1451] and that Google "set out to 'kill' client-side header bidding,"[1452] external data reported by eMarketer on the top 1,000 US publishers (reproduced as Figure 20 below) suggests that the proportion of all publishers using header bidding continued to grow after Open Bidding launched in 2018. This is consistent with Google's analysis of its Open Bidding program, which suggested that many publishers increasingly adopted allocation methods incorporating more real-time bids after the introduction of Open Bidding (using either header bidding or Open Bidding or a combination of the two).[1453]

---

[1451] Daily Mail Second Amended Complaint, ¶ 166 ("Exchange Bidding is designed to maintain AdX's ad-server and ad-exchange monopolies."); *see also* Gannett Amended Complaint, ¶ 186.

[1452] Daily Mail Second Amended Complaint, ¶ 168 ("Because client-side header bidding remains a more favorable environment for publishers and rival exchanges, and because Google does not want AdX to compete against header-bidding exchanges (even if aided by Last Look and other bid-rigging schemes), Google has set out to 'kill' client-side header bidding."); *see also* Gannett Amended Complaint, ¶ 187.

[1453] "Exchange Bidding Sell Side Update" (June 14, 2018), GOOG-DOJ-11790760, at -775 ("Publishers are moving from a waterfall based approach to RTB (EB and Header Bidding)").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Figure 20: External data from eMarketer suggests that the adoption of header bidding by publishers was not negatively impacted by introduction of Open Bidding.[1454]**



687. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████[1455]

688. Open Bidding also made it *easier* for publishers to partner with competing exchanges,

allowing exchanges like OpenX and Index Exchange to expand the number of

---

[1454] *See* Benes, R., "Five Charts: The State of Header Bidding," eMarketer Insider Intelligence (May 30, 2019), https://www.insiderintelligence.com/content/five-charts-the-state-of-header-bidding, accessed Dec. 12, 2024.

[1455]



*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

impressions they could serve.[1456] Simplifying payment processing for publishers was seen as one of the key advantages of Open Bidding.[1457] The reduced costs of integrating and processing bids from the non-Google exchanges participating in Open Bidding encouraged more publishers to offer impressions to multiple exchanges, which benefited those exchanges.[1458]

### 3. Professor Hortaçsu's Claims Regarding "Deception" are Ahistorical and Overlook Publishers' Alternatives

689.  Professor Hortaçsu writes that Open Bidding was "deceptive," however, his reasoning is flawed for a number of reasons.[1459]

690.  His primary justification, which emphasizes that "revenue from Exchange Bidding was actually lower than revenue from other header bidding solutions,"[1460] again overlooks that publishers could use header bidding in conjunction with Open Bidding. Publishers choosing to maintain their header bidding setups alongside Open Bidding would access a broader set of demand. Moreover, while Professor Hortaçsu states that "lower CPMs and a higher additional take rate" contributed to lower revenues,[1461] that is wrong, because an

---

[1456] *See* "Exchange Bidding Sell Side Update" (June 14, 2018), GOOG-DOJ-11790760, at -761 ("3 exchanges generate ~90% of revenue: Index, OpenX, Rubicon[]").

[1457] *See* Bhatia, S., "Google Open Bidding (OB) Explained," AdSparc (Apr. 12, 2022), https://web.archive.org/web/20240414200640/https://adsparc.com/google-open-bidding-explained/, accessed Dec. 13, 2024 ("Here are some advantages of Google Open Bidding over header bidding: Payment Management: One of the critical advantages of using OB over header bidding is payment management. For OB, payments are sent directly to publishers via Google, whereas for header bidding, payments are managed by vendors or the publishers themselves […]").

[1458] *See* "Exchange Bidding Sell Side Update" (June 14, 2018), GOOG-DOJ-11790760, at -775 (Table, "Win Rate of Total DFP Queries […] EB Other Exchanges," "-30 to 0 (Month -1)": 0.00%; "120 to 150 (Month 5)": 4.31%").

[1459] Second Revised Expert Report of A. Hortaçsu (Oct 18, 2024), at ¶ 839.

[1460] Second Revised Expert Report of A. Hortaçsu (Oct 18, 2024), at ¶ 839.

[1461] Second Revised Expert Report of A. Hortaçsu (Oct 18, 2024), at ¶ 839.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

exchange bidding through Open Bidding was awarded an impression only if its offer, net of all take rates, exceeded both the floor price and all eligible competing offers from other demand sources, including header bidding.[1462] When properly configured alongside existing demand, Open Bidding always increased publisher revenue.

691. Professor Hortaçsu also attempts to support his argument by writing that Open Bidding "was a 'black box' that made it difficult to evaluate issues with inventory or partners."[1463] However, upon its general release, Open Bidding's functionality was disclosed to publishers.[1464] Additionally, DFP provided publishers with data summarizing the performance of Open Bidding exchanges,[1465] so publishers using both Open Bidding and header bidding could form comparisons regarding the profitability of each channel.[1466] Hence, even if any purported "misinformation" influenced initial adoption, publishers

---

[1462] *See* "How Open Bidding Works," Google Ad Manager Help, https://support.google.com/admanager/answer/7128958?hl=en#, accessed Dec. 11, 2024, ("All participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis. Participating exchanges run their own auction independently and then submit their bid into the unified auction.").

[1463] Second Revised Expert Report of A. Hortaçsu (Oct 18, 2024), at ¶ 839.

[1464] *See* Sam Cox, "Announcing Exchange Bidding open beta" Google Ad Manager (June 8, 2017) https://blog.google/products/admanager/announcing-exchange-bidding-open-beta/, accessed Dec. 12, 2024; *see also* Jonathan Bellack, "Exchange Bidding now available to all customers using DoubleClick for Publishers," Google Ad Manager (Apr. 4, 2018), https://blog.google/products/admanager/exchange-bidding-now-available-to-a/, accessed Dec. 12, 2024.

[1465] *See* Jonathan Bellack, "Exchange Bidding now available to all customers using DoubleClick for Publishers," Google Ad Manager (Apr. 4, 2018), https://blog.google/products/admanager/exchange-bidding-now-available-to-a/ ("For example, Exchange Bidding customers can now generate reports across several new dimensions including demand channel, exchange partner, yield group or advertiser on a per-impression level. With these new insights, publishers can make smarter and faster decisions to ensure they're getting the greatest value from every impression."); *see also* Sam Cox, "Announcing Exchange Bidding open beta" Google Ad Manager (June 8, 2017) https://blog.google/products/admanager/announcing-exchange-bidding-open-beta/, accessed Dec. 12, 2024 ("And instead of spending days collecting reporting and billing information from multiple partners, reconciling discrepancies, and waiting to get paid, Exchange Bidding provides publishers unified reporting and consolidated billing on our standard terms.").

[1466] Second Revised Expert Report of A. Hortaçsu (Oct 18, 2024), at ¶ 843 ("First, publishers often use all three products and consider them comparable. Gannett, for example, uses all three and even has some overlapping demand partners on each.").

could readily assess the incremental value from Open Bidding and discontinue if it proved unprofitable. Professor Hortaçsu's harm calculations ignore this possibility, leading to significant overestimation of any alleged harm.

### 4. Contrary to Plaintiffs' and Their Experts' Claims, MBTW Data is Neither a "Bid Shading Algorithm" nor a "New Last Look Advantage"

692.   The Publisher Class alleges that MBTW data "is, in essence, a bid shading algorithm that allows advertisers to bid confidently knowing that their bid will be no higher than needed to win a first-price auction."[1467] Professor Li seems to agree that MBTW information enabled "AdX bidders and Exchange Bidders"[1468] to "effectively predict rival bids and pay the cheapest price necessary to win the auction[.]"[1469] These claims are incorrect. Although MBTW information can be useful input when a buyer determines its bid, *it is not akin to a bid shading algorithm.* MBTW data provides bidders feedback pertaining to the bids of *past* auctions, not the current auction, and a bidder receiving that data must still determine its own bid.

693.   The Publisher Class, Daily Mail, and Gannett elaborate that a bidder would simply bid a penny above the MBTW it received from a previous auction. For example, the Publisher Class states that the MBTW "from a completed auction for an ad impression at the top of a web page" could "predict the minimum bid necessary to display an ad to the same user viewing another ad slot lower down on the same page,"[1470] while Gannett and Daily Mail

---

[1467] Publisher Class First Amended Complaint, at ¶ 345.

[1468] Revised Expert Report of S. Li (Oct 11, 2024), at ¶ 37.

[1469] Revised Expert Report of S. Li (Oct 11, 2024), at ¶ 723.

[1470] Publisher Class First Amended Complaint, at ¶ 347.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

argue that "[o]nce an auction closes, authorized bidders can use the next-highest price to inform their bids on thousands of immediately following, highly similar auctions."[1471]

694. But these arguments oversimplify how MBTW data tends to be used in practice.

695. *First,* contrary to Gannett's claims, "Minimum Bid to Win" information is not used by AdX to "outbid rivals by a penny."[1472] Rather, it is used by dozens of *participants* in AdX and Open Bidding as they bid against one another.

696. *Second,* bidding algorithms are often trained on large pools of data, rather than the feedback from a single auction that was just "completed." As Professor Li notes himself, when it bids on impressions, "Google uses a 5% sample of HOBs [highest other bids] from the *past seven days* [emphasis added]" to predict the distribution of the highest other bid.[1473] The bid from a just concluded auction does not set Google's estimate of the "next-highest price" on an auction that "immediately follows."

697. *Third,* "because Google did not "kn[ow] [its] competitor's bid exactly," it "need[ed] to predict [the] competitor's bid."[1474] Thus, instead of producing a single *point estimate* of the highest competing bid, Google's bidding algorithms estimate the *distribution* it expects competitors' bids to follow–an estimate that includes a variance parameter.[1475] Google's estimation of a variance parameter reflects the understanding that there is

---

[1471] Daily Mail Second Amended Complaint, at ¶ 175; *see also* Gannett Amended Complaint, ¶ 197.

[1472] Gannett Amended Complaint, at ¶ 198.

[1473] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 705.

[1474] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 707.

[1475] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 710.

variation in bids and participation from impression to impression—even for impressions from the same user.

698. *Fourth,* Plaintiffs entirely omit a number of additional factors that cause price variations across impressions. In general, it is widely recognized that in first-price auctions, bidders must form *probabilistic* assessments of competitors' likely bids to choose their bids,[1476] a process that often requires bidders to incorporate various sources of information beyond MBTW data (*e.g.* cookie information, time of day, impression attributes, etc.). An advertiser might also vary its participation to pace budgets and account for frequency caps, or it might reassess the value of a subsequent impression after learning the end user engaged with a prior one. All of these factors contribute to fluctuations in prices.

699. *Fifth,* these claims also omit bidder's incentives to adapt their bids. For example, Gannett contends that "[t]he effect on competition is functionally the same as Last Look."[1477] It further elaborates "[b]y exploiting Google's access to publishers' user IDs and rivals' historical bids, AdX nearly has perfected its ability to use Minimum Bid to Win to outbid rivals by a penny."[1478] This is conceptually wrong and, as I show below, disproven by data. Consider an auction where the winner had bid $10 and the second highest bid was $8. Then, the first bidder would be told its MBTW was $8 and the second bidder would be told its MBTW is $10. If, in the next auction for an identical impression, the

---

[1476] *See, e.g.*, Vickrey, W. (1961). Counterspeculation, auctions, and competitive sealed tenders. *Journal of Finance*, *16*(1), 8-37, at 21 ("In the top-price method of negotiation, as in the Dutch auction, bidders, in order to maximize their expectation of profit, must concern themselves not only with their own appraisal of the article but also with their estimate of the value that others will place on it and their expectation of the bidding strategy that others will follow. This involves a considerable amount of appraisal of the market situation as a whole[.]").

[1477] Gannett Amended Complaint, at ¶ 197.

[1478] Gannett Amended Complaint, at ¶ 198.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

participants somehow know that the same bidders are participating and if the winning bidder was expected to bid $8.01 as claimed, then, the second-highest bidder might adjust its bid to $8.02 or even $10.02 to win the auction.[1479] Because bidders are bidding simultaneously, even if the set of bidders is not changing, it is still not generally possible to use MBTW information to win "by a penny" as claimed. Relatedly, while Professor Li, emphasizes that "sharing [MBTW] information with the winning bidder may lead to bid lowering,"[1480] his report fails to acknowledge that it can also lead the winning bidder to raise its bid. Suppose that, in the same example, the MBTW had been $9.90. Now, the highest bidder might raise its bid *above* $10 since it understands that the $9.90 bidder might also raise its bid to over $10.

700.   Even if participants, values and bids were stable over many auctions, that still does not imply that the price would become uncompetitive. The winning bidder might learn that it can win "by a penny," but only if the penny is the margin over the second highest bidder's *value*, so the winning bid is a competitive price. Then, no loss of revenue is entailed.

701.   The preceding sort of analysis is echoed in Professor Li's academic work, which recognizes how providing more information can lead to higher offers. In a 2022 paper, he writes that "a firm that gains access to [information will] increas[e] offers that would otherwise be too low and lower[] offers that would otherwise be too high."[1481]

---

[1479] Note that since this is a first price auction the value of the bidder that bid $8 is larger than $8. Assume it is $11. Then, winning at a price of $8.02 or even $10.01 would be profitable.

[1480] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 696.

[1481] Cullen, Zoe B., Li, Shengwu, and Perez-Truglia, Ricardo, "What's My Employee Worth? The Effects of Salary Benchmarking," National Bureau of Economic Research (October 2022, Revised August 2024) at p. 35.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

702. While the Publisher Class portrays MBTW information as "allow[ing]" AdX bidders to shade,[1482] buyers without access to that data still had an economic incentive to shade and could readily learn to do so. For example, such a buyer could experiment to learn optimal bids for the UFPA, as DV360 did for non-Google exchanges under Poirot (see Section VII). As I explained above, the advertiser's incentive to bid less than its value (i.e. bid shading) is widely understood to be a fundamental property of first-price auctions. Therefore, in a but-for-world without MBTW information, bidders still have an incentive to shade and would continue to do so.

703. In addition to the many errors I have outlined, my analysis of GAM log-level data shows that any claim that AdX bidders have "perfected" the ability to use MBTW data to "outbid rivals by a penny"[1483] more effectively than header bidding exchanges is contrary to reality. As illustrated in Figure 21 below, ███████████████████████████ ████████████████████████████████████████████████████[1484]

---

[1482] Publisher Class First Amended Complaint, at ¶ 350 ("Through MBW, Google's bid shading program for advertisers using Google's Ad Buying Tools, allowed Google's advertisers to bid the minimum amount needed to prevail over other bidders.").

[1483] Gannett Amended Complaint, at ¶ 198.

[1484] My price-to-beat analysis used the Google Ad Manager Log-Level Dataset (January 2024), GOOG-AT-EDTX-DATA-000276098 to -001116097.



*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

1485

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*



*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*



*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 5. Plaintiffs' and Their Experts' Arguments are Ahistorical and Fail to Account for Participants' Alternatives

704. The Publisher Class asserts that sharing MBTW data disadvantaged header bidding buyers and "starved" them of "advertising volume,"[1486] but that argument overlooks the technological limitations of "sharing" MBTW data with header bidding exchanges, ignores the alternative methods available for header bidding buyers to obtain this data, and overstates the unique importance of MBTW data.

705. As a publisher-configured technology, header bidding did not provide GAM with a direct communication channel to share information with header bidding exchanges. As noted by a Google engineer, "[h]istorically, there was no basis on which this information could be sent by Ad Manager to header bidders because there is no server-to-server connection between Ad Manager and such bidders[.]"[1487] Instead, GAM enabled publishers to obtain a copy of MBTW information, which they could share directly with header bidding exchanges.[1488]

706. Nevertheless, there were ways for header bidding buyers to obtain some MBTW data:

---

[1486] Publisher Class First Amended Complaint, at ¶ 343 ("Minimum Bid to Win required the cooperation of participating advertisers who supplied their bids knowing that Google would use them to develop the Minimum Bid to Win algorithm, which would starve Header Bidding of advertising volume, while maintaining and enhance Google's monopoly power in its Ad Exchange and Ad Buying Tools.").

[1487] Declaration of N. Korula (May 2, 2024), GOOG-AT-MDL-C-000017971, at ¶ 12.

[1488] Declaration of N. Korula (May 2, 2024), GOOG-AT-MDL-C-000017971, at ¶ 12 ("Historically, there was no basis on which this information could be sent by Ad Manager to header bidders because there is no server-to-server connection between Ad Manager and such bidders and Ad Manager does not know the identify of these exchanges (although publishers could pass that information along to header bidders)."); "Briefing: News Corp Unified Pricing Floors Discussion" (Apr. 18, 2019), GOOG-DOJ-AT-00045716, at -721 ("If you use HB, you can use Data Transfer [files], where you can see all of the bids and the winning bid, and you can share this with anyone you like.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

a. *Open Bidding.* Header bidding exchanges can acquire some MBTW information by submitting bids into Open Bidding.[1489] If the exchange wished to transact impressions only through header bidding, it could do that and still receive this MBTW information by submitting bids through Open Bidding that were lower than its header bids.

b. *Multi-homing DSPs.* Plaintiffs incorrectly presume that *exchanges* submit bids, rather than *DSPs*. DSPs frequently multi-home, submitting bids into numerous exchanges on the same impression opportunity.[1490] A DSP that bids into both a header bidding exchange and AdX receives the MBTW from GAM.[1491] Indeed, Professor Li recognises this possibility.[1492] Yet he incorrectly assumes that "[d]oing so only increases the scale of AdX."[1493] The DSP is not required to purchase any additional impressions through AdX to acquire this information; it can bid lower into AdX as a means to receive MBTW information.

c. *Google Ad Manager.* In June 2022, Google introduced a feature enabling "header bidders who participate in the Ad Manager auction for web inventory" to receive

---

[1489] *See* "Header bidding in yield groups" (May 3, 2022), GOOG-AT-MDL-006196134, at -136 ("Currently [minimum bid to win] information is shared by Ad Manager - after an auction is run - with any Authorized Buyers and Open Bidders that submitted a bid in that auction.").

[1490] *See, e.g.* █████████████████████████████████████████████████████

[1491] Declaration of N. Korula (May 2, 2024), GOOG-AT-MDL-C-000017971, at ¶ 11 ("The Unified First-Price Auction sends the minimum-bid-to-win information to real-time bidders that directly bid into the Unified First-Price Auction (as long as their bid was not filtered from the auction), including all third-party exchanges that participate in Open Bidding and all bidders in Google's ad exchange.").

[1492] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 752. ("This is because in order to access MBTW data, they are likely to, in part, bid via AdX, which is the largest of such exchanges.").

[1493] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 752. ("Doing so only increases the scale of AdX, to the detriment of exchanges participating in header bidding.").

MBTW information directly from GAM.[1494] Therefore, Professor Li's assertion that MBTW information [] is still not provided to header bidders"[1495] is factually incorrect.

### 6. Professor Li Incorrectly Asserts that the use of "Minimum Bid to Win" Data by Alchemist Harms Publishers

707. Professor Li argues against sharing MBTW data, because the data is used as an input into Google's bid optimization algorithms, such as Alchemist.

708. First, as I note in Section IV.D.3, Professor Li does not demonstrate that Alchemist decreases revenues for publishers. Therefore, even if MBTW information were a necessary input for Alchemist, it is unclear why it would come at the detriment of publishers. Second, Professor Li's argument ignores that, even without such data, bidders would have incentives to gather similar information to inform first-price bidding algorithms.

709. As acknowledged by Professor Li, in a first-price setting, advertisers need to find the optimal amount of bid shading by trading-off how much surplus they make when they win versus the probability they win. This is not an easy problem to solve but, even without MBTW data, bidders can experiment. For example, they can implement a strategy similar to that employed by the Poirot program.

---

[1494] Declaration of N. Korula (May 2, 2024), GOOG-AT-MDL-C-000017971, at ¶ 12; s*ee also* "Header bidding in yield groups" (May 3, 2022), GOOG-AT-MDL-006196134, at -136 ("This feature allows header bidding partners to receive [minimum bid to win] information, representing the minimum bid value necessary to have won an auction.").

[1495] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 694 ("MBTW information was shared with AdX buyers and Exchange Bidders but was not provided to header bidders at its inception in September 2019 and is still not provided to header bidders to date.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

710. Better bidding algorithms can reduce bidding errors, improving matching and benefiting both publishers and advertisers. For Alchemist, as Professor Li acknowledges, MBTW data makes bidding simpler for advertisers, because it is needed to compute the Alchemist threshold prices that "produce[s] truthful bidding."[1496] These are *benefits,* not harms. MBTW information makes it easier for *all* DSPs and intermediaries to more accurately optimize bidding on the behalf of their advertiser clients, which can induce advertiser entry and increase publisher revenues. My view is consistent with Professor Chandler's assertions that the "ease and simplicity" of bidding in auctions "can encourage additional participation by advertisers, ultimately driving up the value of the inventory."[1497]

711. *Finally,* MBTW information did not enable Google Ads to "guarantee beating external competition by charging the highest other bid from AdX, which it knows from MBTW data."[1498] Professor Li's claim is contradicted by his own presentation of Alchemist's details,[1499] and I explain why this argument is incorrect more extensively in Section XIII.D.4.

---

[1496] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 838 ("Indeed, the highest other bidder data that MBTW provides is necessary to ensure Alchemist produced truthful bidding.").

[1497] Expert Report J. Chandler (Oct 4, 2024), at ¶ 135 ("The ease and simplicity of sealed-bid second-price auctions can encourage additional participation by advertisers, ultimately driving up the value of the inventory.").

[1498] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 837 ("Google Ads can guarantee beating external competition by charging the highest other bid from AdX, which it knows from MBTW data.").

[1499] ███████████████████████████████████████████████████████████

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 7. Professor Li Incorrectly Asserts that in the Competitive Counterfactual "Minimum Bid to Win" Data would not be shared

#### a) Not sharing MBTW Data can Harm Publishers and is Contrary to Best Practice

712.  Professor Li advocates for a "competitive counterfactual [] in which MBTW data is not shared with any advertiser, rather than being universally shared,"[1500] but his position runs counter to the price transparency that marketplaces have promoted for decades.

   a.  In 2002, the Financial Industry Regulatory Authority (FINRA) introduced the Trade Reporting and Compliance Engine (TRACE), which required timely public dissemination of price and volume information for the $4.4 trillion-a-year U.S. corporate bond market. A study later found that "TRACE causes trading costs to decline significantly for the entire bond market and for both dealers and customers."[1501]

   b.  In the Federal Communication Commission wireless spectrum auctions that I helped design, it is standard practice to reveal demand information after each auction round.

---

[1500] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 761.

[1501] As reported by Asquith, Paul and Covert, Thomas and Pathak, Parag A., The Effects of Mandatory Transparency in Financial Market Design: Evidence from the Corporate Bond Market,  NBER Working Paper No. w19417 (Apr. 2019), https://ssrn.com/abstract=2325791, accessed Dec. 12, 2024 ("Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank) (2010) required that swaps (including credit default swaps, interest rate swaps, collateralized debt obligations, and other derivatives) adopt TRACE-like post-trade transparency beginning in 2011. In addition, FINRA has expanded TRACE to several other asset classes, including Agency-Backed Securities, Asset-Backed Securities, and 144a bonds. TRACE was expanded in March 2010 to include Agency-Backed Securities and in May 2011 to include Asset-Backed Securities. FINRA started publicly disseminating 144A transactions on June 30, 2014. European MiFID II/R regulations mimic TRACE for European corporate bonds and were implemented starting January 3, 2018.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

    c.   Participants in *this* industry have shown support for the transparency of bid data. Several other exchanges provide MBTW information, with OpenX launching the Bidding Intelligence Data Set (BIDS) in 2020, which includes "minimum bids to win, and much more."[1502] Ad buyers have echoed similar sentiments, too; after The Trade Desk decided to share additional bid data with sellers, Will Doherty (VP Inventory Development) wrote, "since when is more data a bad thing? [...] Our buyers will benefit from understanding the true win rate relative to price, and publishers get full transparency into all our demand in order to set their prices."[1503]

713.    The previous examples demonstrate that sharing information about previous transactions can reduce bidding costs and so encourage entry – features that tend to increase revenue. Professor Li's report and published work contain *additional* examples demonstrating that MBTW information could benefit publishers.

    a.   In Figure 29 of his report, Professor Li presents three possible scenarios about the distribution of competitors' highest other bids estimated by a bidder with value

---

[1502] "OpenX Launches BIDS, New Solution for Advertisers to Access Log-Level Data and Gain Visibility into Programmatic Media Buys," OpenX (July 23, 2020), https://www.openx.com/press-releases/openx-launches-bids-new-solution-for-advertisers-to-access-log-level-data-and-gain-visibility-into-programmatic-media-buys/, accessed Dec. 13, 2024 ("Marketers can come to OpenX to access BIDS and analyze performance and outcomes across several critical fields including: publisher integration types, loss reasons, people-based IDs (e.g. LiveRamp's IdentityLink), minimum bids to win, and much more."); *see also* Chocolate Platform, "Chocolate Premium Makes Every Bid Request Unique & Valuable With Bid Enrichment" ("If your bid won the auction, this is the second highest bid."); "OpenRTB Version 2.6," IAB (April, 2022), at p. 44 ("The minimum price required to tie with the next-closest bid, or the floor if there was only one bid, when your bid won the auction."); Verve, "Win Notification & Minimum Bid To Win," https://developers.verve.com/reference/win-notification-minimum-bid-to-win, accessed Dec. 12, 2024 ("The Minimum Bid To Win macro integrated in the NURL serves to intimate the Demand Partner about the price of the second-highest bid in the auction they dominated.").

[1503] Will Doherty, "The door in the floors: Transparency, price discovery, and market efficiency in programmatic," The Current (Nov. 8, 2023), https://www.thecurrent.com/will-doherty-transparency-programmatic-data, accessed Dec. 12, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

$8.[1504] In all three cases the expected highest other bid is $6. The difference is how much uncertainty the bidder has around that estimated value. The first distribution is meant to illustrate a case in which the bidder has an incredibly precise estimate of its competitors' bids; the distribution is so concentrated around its mean of $6 that Professor Li concludes it is optimal for the bidder to bid $6.01. The final panel corresponds to a case in which the bidder is less informed, with its belief of the highest other bid given by a uniform distribution over [0, 12]. In this case the optimal bid is $4.[1505] In those cases, when the bidder was more informed about competitors' bids, it bid *more* than when it was comparatively less informed, increasing seller revenues.

b. A recent academic paper written by Professor Li argues that, in theory, auction prices are "higher under the benchmark [(information sharing)] equilibrium than under the no-benchmark [(no information)] equilibrium."[1506] The paper complements that theoretical analysis with an empirical study of wages that partly validates his conclusions. It finds that increasing information raised wages between 5% and 6.7% for one segment of the population.[1507]

---

[1504] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 713 & Figure 29.

[1505] The bidder must choose its bid 'b' to maximize the difference between his value and the bid multiplied times the probability that its bid is higher than the HOB. This is given by the expression (8-b) * (b / 12) which can be verified to attain its maximal value for b=4.

[1506] Cullen, Zoe B., Li, Shengwu, and Perez-Truglia, Ricardo, "What's My Employee Worth? The Effects of Salary Benchmarking," National Bureau of Economic Research (October 2022, Revised August 2024) at p. 38 ("As a corollary, expected wages are higher under the benchmark equilibrium than under the no-benchmark equilibrium.").

[1507] Cullen, Zoe B., Li, Shengwu, and Perez-Truglia, Ricardo, "What's My Employee Worth? The Effects of Salary Benchmarking," National Bureau of Economic Research (October 2022, Revised August 2024) at p. 4 ("Leveraging the same difference-in-differences design, we measure the effects of salary benchmarking on other outcomes such as the average salary and average retention. The estimated average effect on salary is small and statistically insignificant; on average, salaries change by -0.2% (p-value=0.756) when Non-Searched positions are used as control and by +1.7% (p-value=0.308) when Non-Searchable positions are used as control. For low-skill positions,

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

714.    Aside from his claims pertaining to revenue, Professor Li contends that the "MBTW creates allocative inefficiency"[1508] and that "by reducing the extent to which header bidders participate in auctions, [MBTW] reduced welfare."[1509] His argument is flawed for at least two reasons. First, it is contrary to the evidence. In addition to overlooking alternative ways header bidders could obtain MBTW information, his claim that the information led to decreased participation is unsupported by the continued adoption of header bidding. Second, his analysis overlooks how MBTW information can *promote* allocative efficiency. As described above, optimal bids in a first-price auction depend on the distribution of the MBTW, so in the absence of direct information about that, bidders are more likely to make mistakes. Sharing MBTW information therefore reduces bidding errors, fostering better matching between advertisers and impressions. Industry participants also recognize this effect, with the aforementioned Trade Desk article writing, "[u]ltimately, market efficiency is impossible without this level of price discovery."[1510]

715.    These benefits of sharing MBTW, along with current practice from other exchanges, render Professor Li's proposal to "not share the MBTW with any advertisers"

---

we find a modest increase in the average salary: +5.0% (p-value=0.014) when using Non--Searched as control, and +6.7% (p-value=0.001) when using Non-Searchable as control.").

[1508] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 746 ("Further, similar to Last Look, MBTW creates allocative inefficiency compared to the competitive counterfactual.") Also at ¶222. ("Krishna (2009) states that two of the most important performance criteria are the revenue of the seller and the efficiency of the outcomes of the auction format (i.e., the total welfare generated by the auction).")

[1509] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 755 ("MBTW, then, by reducing the extent to which header bidders participate in auctions, reduced welfare by increasing the probability that a bidder with the highest valuation who would have won an impression in the counterfactual did not even participate in the auction for that impression.")

[1510] Will Doherty, "The door in the floors: Transparency, price discovery, and market efficiency in programmatic," The Current (Nov. 8, 2023), https://www.thecurrent.com/will-doherty-transparency-programmatic-data, accessed Dec. 12, 2024.

unrealistic.[1511] As noted above, competing exchanges already provide MBTW information themselves.[1512]

### b) Sharing MBTW Data has not, nor is likely to, foster Collusive Behavior

716.  To support his argument that bidders should not receive MBTW data, Professor Li claims that "the MBTW bid information provided by Google to [] bidders could be used to facilitate collusion between bidders, which would reduce publisher revenues."[1513] However, Professor Li provides no evidence that MBTW data "facilitate[d]" collusion. Instead, his "review of academic literature" fails to adequately consider the relevant context of *this* industry, a misapplication that undermines the validity of his conclusions. I list some examples below.

717.  *First,* the plausibility and effects of collusion generally depend on the number of participants, and economic literature notes that "[c]ollusion is more difficult when there are more competitors."[1514] In the Unified First Price Auction, hundreds of demand

---

[1511] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 761.

[1512] "OpenX Launches BIDS, New Solution for Advertisers to Access Log-Level Data and Gain Visibility into Programmatic Media Buys," OpenX (July 23, 2020), https://www.openx.com/press-releases/openx-launches-bids-new-solution-for-advertisers-to-access-log-level-data-an d-gain-visibility-into-programmatic-media-buys/, accessed Dec. 13, 2024 ("Marketers can come to OpenX to access BIDS and analyze performance and outcomes across several critical fields including: publisher integration types, loss reasons, people-based IDs (e.g. LiveRamp's IdentityLink), minimum bids to win, and much more."); *see also* Chocolate Platform, "Chocolate Premium Makes Every Bid Request Unique & Valuable With Bid Enrichment" (" If your bid won the auction, this is the second highest bid.").

[1513] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 760.

[1514] Ivaldi, Marc, and Jullien, Bruno, and Rey, Patrick, and Seabright, Paul, and Tirole, Jean "The Economics of Tacit Collusion," Final Report for DG Competition, European Commission, March 2003 p. 13 ("Collusion is more difficult when there are more competitors.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

sources (representing thousands of advertisers) compete for impressions,[1515] making it highly unlikely for participants to sustain collusive bidding behavior.

718.  *Second*, the McAfee and McMillan (1992) paper Professor Li cites states that "competition from [] new entrants then tends to destroy the collusive arrangements,"[1516] yet Professor Li omits this qualification to his argument and neglects to account for advertiser or DSP entry.

719.  *Third,* according to McAfee and McMillan (1992), for cartels in which "members are unable to make transfer payments among themselves," it is the case that "all bidders submit exactly the same bid."[1517] To the contrary, the bids in these auctions exhibit significant variation,[1518] suggesting the absence of such "collusive" behavior.

720.  *Fourth,* Professor Li's own review of the academic literature acknowledges the importance of "punish[ing] deviators"[1519] in a sustainable collusive agreement. But MBTW information excludes bidder *identity* – information that would be needed to "punish deviators."

---

[1515] Mike Sweeney and Paulina Zawiślak, "Top Demand-Side Platform (DSP) Companies," Clearcode (Jan 31, 2024), https://clearcode.cc/blog/top-demand-side-platforms/, accessed Dec. 13, 2024 ("Nowadays, there are hundreds of demand-side platforms, offering advertisers and agencies access to all types of inventory (e.g. display, native, video, and in-app mobile) across different channels.").

[1516] McAfee, R. Preston and McMillan, John, "Bidding Rings," *The American Economic Review* 82, no. 3 (1992) at p. 579.

[1517] McAfee, R. Preston and McMillan, John, "Bidding Rings," *The American Economic Review* 82, no. 3 (1992) at p. 580.

[1518] *See, e.g.,* Second Revised Expert Report of A. Hortaçsu (Oct 18, 2024), at Figure 20.

[1519] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 744. ("Altogether, my review of academic literature shows that universal information sharing in an auction increases the risk of collusion as colluding bidders are able to detect deviations from agreed strategy and punish deviators, and in some situations enables perfect collusion, as if the colluding bidders were one firm.").

721. Professor Li's arguments are also contrary to recent academic research. Banchio and Skrzypacz (2022) find that when bidders in a first-price auction employ learning algorithms, MBTW data can *reduce* tacit collusion between participants. The authors conclude that "providing information about lowest bid to win, as introduced by Google at the time of switch to first-price auctions, increases competitiveness of auctions."[1520]

### 8. Plaintiffs' and Their Experts' Bid Data "Redaction" Allegations Are Historically Incomplete and Fail to Account for Publishers' Alternatives

722. Several Plaintiffs claim that "Google's redactions were designed to thwart publishers' ability to evaluate the performance of Ad Exchanges in Header Bidding, and thus reduce publishers' use of Header Bidding."[1521]

723. *First,* Plaintiffs' and their experts' description is historically incomplete and omits various contractual and privacy considerations. As I summarize in Section XIII.C.3, Google "intended to provide publishers [with] more information about the new first-price auction by including a complete set of bids from all Authorized Buyers, Open Bidding buyers, Google Ads, and DV360"[1522] as "approximately 70% of impressions and 50% of

---

[1520] Martino Banchio and Andrzej Skrzypacz "Artificial Intelligence and Auction Design" In Proceedings of the 23rd ACM Conference on Economics and Computation (EC '22) (2022).

[1521] Publisher Class First Amended Complaint, at ¶ 312; *see also* Advertiser Class Complaint at ¶ 278 ("These actions, implemented only after Google faced competition from header bidding, had no legitimate business purpose and were undertaken to repel competition from header bidding."); ¶ 276 ("When Google redacted these data fields, it eliminated publishers' ability to compare the performance of exchange and header bidding."); Daily Mail Second Amended Complaint at ¶ 189 ("Google's redacting of DFP data is irrational but for its anticompetitive effect, because no publisher ad server in a competitive market would reduce the amount of information available to publishers."); ¶ 187 ("The upshot is that publishers now have substantially less insight into client-side header bidding's comparative advantage, and therefore have greater difficulty designing client-side header bidding to maximize revenue."); Gannett Amended Complaint at ¶ 209 ("Google's redacting of DFP data is irrational but for its anticompetitive effect, because no publisher ad server in a competitive market would reduce the amount of information available to publishers."); ¶ 207 ("The upshot is that publishers now have substantially less insight into client-side header bidding's comparative advantage, and therefore have greater difficulty designing client-side header bidding to maximize revenue.").

[1522] Declaration of ███████ (June 28, 2024), GOOG-AT-MDL-C-000073682, at ¶ 12.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

publisher revenue came from buyers that had opted out" at the time.[1523] Before Google could provide its publisher customers with "a more complete set of bids," it needed to resolve additional privacy and contractual concerns.[1524] Ultimately, modifying certain fields in the BDT files did just that, enabling Google to securely share bid information of more buyers.[1525]

724.   Professor Li disregards the historical context of these changes, undermining his conclusion that "[t]he relevant counterfactual is the world in which Google does not redact or degrade the fields in the Bid DT file."[1526] He fails to acknowledge the privacy and contractual obligations motives for the changes and instead claims that "[i]nternal Google employee discussion reveals that Google did this to prevent publishers from determining advertiser willingness-to-pay across competing exchanges."[1527] Professor Li attempts to support his claims by referencing a single part of a single document, which states "[w]e want to prevent a publisher being able to determine 'these advertisers were willing to pay this much for *that user's* [emphasis added] impression.'"[1528] However,

---

[1523] Declaration of ███████ (June 28, 2024), GOOG-AT-MDL-C-000073682, at ¶ 11.

[1524] *See* Declaration of ███████ (June 28, 2024), GOOG-AT-MDL-C-000073682, at ¶ 13.

[1525] *See* ███████████████████████████████████████████

[1526] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 60.

[1527] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1207.

[1528] Revised Expert Report of S. Li (Oct. 11, 2024), at n. 1878 ("GOOG-AT-MDL-B-001166414, '1P Bid Data Transfer Balancing transparency to publishers, with protecting buyer data and user privacy,' (undated), at -415 'Why

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED][1529]

725. *Second,* Plaintiffs' and their experts' allegations overstate the significance of the "redactions" to the BDT files.

    a.   After the "redactions," publishers could still utilize BDT files to infer whether bids from AdX or Open Bidding had lost to a competing line item, including a header bidding exchange. BDT files contain a field called "BidRejectionReason" which is set to "Outbid" if the bid "lost to another candidate in the auction or [a] competing ad server line item."[1530] Since header bidding was configured using ad server line items, a high-bid marked as "Outbid" could suggest that the impression was sold to a demand source represented by a line item with a high value CPM for the impression, such as a header bidding exchange.

---

do we redact and round this data? How does it protect users? . . . We want to prevent a publisher being able to determine 'these advertisers were willing to pay this much for that user's impression.'").

[1529] "1P Bid Data Transfer" (Aug. 9, 2019), GOOG-DOJ-04602757, at -757 (" [REDACTED] ").

[1530] Google, "Bids data in Ad Manager Data Transfer (Beta)," Google Ad Manager Help, https://support.google.com/admanager/answer/7357436?hl=en, accessed Dec. 11, 2024 ("BidRejectionReason[:] Reason the bid lost or did not participate in the auction. Possible values include: [...] 'Outbid': The bid lost to another candidate in the auction or competing ad server line item.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

b. Furthermore, publishers wishing to "perform[] yield comparisons through header bidding, AdX, and Exchange Bidding" had alternatives to acquire relevant information.[1531] For example, publishers could use A/B tests or experiments to evaluate how key performance indicators would change in the presence of certain header bidding exchanges.

726. BDT files have been a "beta" feature even as recently as 2024,[1532] and, while Daily Mail and Gannett mention that "[a]d server data is an important source of truth for publishers' operations, and almost all revenue-related advertising decisions rely on this data,"[1533] adoption of BDT files among publishers has been relatively low, with just 41 publishers subscribing to receive BDT files as of August 2019.[1534]

### 9. Professor Li's "Last Look" Allegations Do Not Account for Bid Boosting

727. Professor Li argues that "Google decided to extend Last Look over header bidding to all Exchange Bidding bidders, [] to the disadvantage of header bidding."[1535] However, Professor Li understates the possibility that a publisher could engage in "bid boosting,"

---

[1531] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1207.

[1532] Google, "Bids data in Ad Manager Data Transfer (Beta)," Google Ad Manager Help, https://support.google.com/admanager/answer/7357436?hl=en, accessed Dec. 11, 2024 ("This feature is in Beta").

[1533] Daily Mail Second Amended Complaint, at ¶ 189 ("Ad server data is an important source of truth for publishers' operations, and almost all revenue-related advertising decisions rely on this data."); *see also* Gannett Amended Complaint, at ¶ 209 ("Ad-server data is an important source of truth for publishers' operations, and almost all revenue-related advertising decisions rely on this data.").

[1534] Declaration of ▬▬▬▬ (June 28, 2024), GOOG-AT-MDL-C-000073682, at ¶ 17 ("As of August 31, 2019, the 41 publishers listed below subscribed to receive BDT files.").

[1535] Revised Expert Report of S. Li (Nov. 4, 2024), at ¶ 296 ("Google decided to extend Last Look over header bidding to all Exchange Bidding bidders, i.e., DFP shared the highest header bid with AdX and other exchanges participating in Exchange Bidding, to the disadvantage of header bidding."); *see also* Expert Report of H. Singer (Oct. 4, 2024), at ¶ 156.

which means setting the AdX floor price higher than any header bid in the auction. That could reduce or even reverse any purported "advantage."

728. As I discuss in Section X.D.2 of this report, a publisher has incentives to increase ("boost" or "inflate") the header bids it submits in Open Bidding. When it does so, it increases the probability that the header bidding bid will win the impression, which makes it harder for a bidder on AdX or an Open Bidding exchange to win the impression. Depending on the extent of this bid inflation, there can be no "advantage" for AdX and Open Bidding exchanges. In fact, those exchanges could even be at a disadvantage. Consequently, there is no necessary "Last Look" advantage built into the Open Bidding design. In Section XV.F.1 of the Technical Notes, I provide an example that demonstrates this possible effect.

729. Because AdX operated a second-price auction at the time, even if a publisher acts contrary to its incentives and does *not* boost header bids, it can still be better off under the so-called "Last Look" than under a scenario in which header bidders, AdX, and Open Bidding exchanges submit offers in a first-price auction without any "Last Look." If AdX submitted its clearing price without any "Last Look," the winning header bid would only need to exceed the second-highest bid into AdX to win the impression. However, with "Last Look," the header bid must beat *both* the second-highest bid and the *highest* bid into AdX. This comparison would tend to encourage the header bidder to *increase* its bids in the auction with "Last Look" compared to the auction without, and that would increase publisher revenue. Indeed, in Section XV.F.2 of the Technical Notes, I demonstrate how the publisher revenues can be higher under "Last Look."

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

730.  Finally, after the eventual migration to the Unified First Price Auction was completed in September 2019, any supposed "Last Look" over header bidding was removed, along with any related need for bid boosting.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## XIV.    UNIFIED PRICING RULES: PROTECTING ADVERTISERS FROM PRICE-FISHING BY PUBLISHERS USING EXCHANGE-DISCRIMINATORY FLOOR PRICES

### A. Overview

731.  In 2019, at the same time as its transition to a Unified First Price Auction (UFPA), Google introduced Unified Pricing Rules (UPR), which enabled publishers to use a single interface in Google Ad Manager (GAM) to configure and manage floor prices that apply to all exchanges and demand sources.[1536] These floor prices could vary by properties of the impression and advertiser, but not by the identity of the exchange or the buying tool used by the advertiser.[1537]

732.  After UPR, when a publisher set floor prices through GAM's interface, advertisers faced the same floor prices on all bidding channels in the UFPA. Before Google introduced the UFPA, publishers using GAM could improve both efficiency and revenue by setting

---

[1536] *See* Sam Cox, "Simplifying programmatic: first price auctions for Google Ad Manager," Google Ad Manager Blog (Mar. 6, 2019), https://blog.google/products/admanager/simplifying-programmatic-first-price-auctions-google-ad-manager/, accessed Dec. 11, 2024 ("[I]n the coming months we'll start to transition publisher inventory to a unified first price auction for Google Ad Manager."); Jason Bigler, "An update on first price auctions for Google Ad Manager." Google Ad Manager Blog (May 10, 2019), http://blog.google/products/admanager/update-first-price-auctions-google-ad-manager/, accessed Dec. 11, 2024 ("In addition to impacting how publishers are using floor price rules, changing to a first price auction in Ad Manager requires a change in how our rules function. […] That's why we released a new feature to all publishers globally, called unified pricing rules.").

[1537] *See* "Ad Manager Unified 1st Price Auction" (Sept. 27, 2019), GOOG-DOJ-09714662, at -665 ("Unified Pricing rules will not support the following functionalities that were present in Open Auction pricing rules: Buyer-specific floors: ability to set different floors for different buyers/bidders for a given inventory targeting […] publishers will still be able to: Set per-advertiser floors in Unified Pricing rules"); "Unified pricing rules," Google Ad Manager Help, https://support.google.com/admanager/answer/9298008?hl=en, accessed Dec. 11, 2024 ("Advertiser- and brand-specific pricing can be configured in unified pricing rules. They don't apply to remnant line items. Per-buyer and per-bidder pricing are not available."); Jason Bigler, "An update on first price auctions for Google Ad Manager," Google Ad Manager Blog (May 10, 2019), https://blog.google/products/admanager/update-first-price-auctions-google-ad-manager/, accessed Dec. 11, 2024 ("To maintain a fair and transparent auction, these rules will be applied to all partners equally, and cannot be set for individual buying platforms.").

different floor prices for bidders or demand sources depending on the order in which they were called. This justification of setting different floor prices for different exchanges was eliminated in the UFPA, as discussed by Google engineers.[1538]

733.    UPR benefited Google's buyer-customers. Although Google's Open Bidding had addressed some of the flaws of header bidding (as described in Section XIII), advertisers still faced the risk of self-competition, in which an advertiser partners with multiple DSPs or bids into multiple exchanges when those are competing for the same impression. In turn, publishers could exploit this advertiser multi-homing through a tactic known as **price-fishing**: by setting different floor prices for different exchanges, a publisher could increase its revenue at the expense of such advertisers. Internal documents suggest Google was concerned about the possibility of price-fishing after the transition to the UFPA,[1539] and UPR protected advertisers from such tactics. Facing a common floor price also simplified the bidding process for advertisers and DSPs, reducing the costs of evaluating the same impression that might be offered many times at different floor prices and formulating bid responses. Consistent with that, several other market participants, including publishers, intermediaries and ad agencies, have indicated they believe it is better and expect or require floor prices to be uniform across bidders.[1540] For example,

---

[1538] *See* Email from [redacted] to [redacted], "Fwd: First-price & Removing pricing knobs" (May 11, 2019), GOOG-DOJ-06732979, at -980 ("We know that these knobs become less useful/impactful in the first-price auction. So even if we keep them they will become ineffective and the usage should trend down in the coming months.").

[1539] *See, e.g.*, Email from R. Srinivasan to [redacted] et al., "Fwd: 1st Price Changes" (June 10, 2019), GOOG-DOJ-12948968, at -969 ("Having granular control also incentivizes pubs to call the same demand source multiple times through different channels with different floor prices (eg. DBM is called through AdX, EB and HB with different floor prices), to effectively fish for the highest price.").

[1540] *See, e.g.*, Meta, "Code of Conduct," Meta Audience Network, https://www.facebook.com/audiencenetwork/partner-program/code-of-conduct, accessed Dec. 13, 2024 ("When a reserve price is applied as part of the auction, it should apply identically to all demand sources."); *see also* EDVA Trial Testimony of Jay Friedman, (Sept. 10, 2024) (PM), at 38:13-39:14 ("Q. Right. So from a buy-side perspective, you did not like that publishers set variable price floors, right? A Yeah, of course not . . . As a buyer, we want

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*



[1541]

734. UPR also benefited non-price-fishing publishers in two ways. *First*, it simplified the publisher's process of setting floor prices applying to both Google and non-Google buyers using Open Bidding. Instead of setting floor prices separately using each exchange's interface, a publisher needs to set just one UPR floor in GAM. *Second*, it mitigated an externality that would reduce the revenues of all publishers, arising when a multi-homing advertiser faced with price-fishing publishers finds it difficult to coordinate its many bids and is incentivized to reduce its bids or not bid at all on some impressions.

735. Plaintiffs and their experts fail to acknowledge the benefits of UPR to advertisers and publishers. A few months after the introduction of the UFPA and UPR, Google found that both total publisher revenues and the share of impressions allocated to non-Google exchanges increased.[1542] Post-launch experiments found that the combined effect of

---

everything as low priced as possible. And so the fact that there were certain buying paths that might have cost more money was not desirable . . . as a buyer, we prefer less games . . . Q. And variable price floors was a game in your view from the buy side that publishers engaged in? A. It was a way of playing or gaming the system, yes.");

[black redaction] EDVA Trial Testimony of Omni Farber, September 26, 2024 (PM), at 158:16-159:3 ("Q. As of today, Mr. Farber, are there any principles articulated in Meta's code of conduct that relates to floor prices and auctions? A. I'd have to review the doc to say with absolute certainty, but I do believe we do require them to be equal for everyone. Q. And when you say you believe that Meta requires floor prices to be equal for everyone, who is the everyone in that sentence that you're referring to? A. All bidders. Ad requests contain floor prices. If one bidder gets the floor price, all bidders must get the exposure to the floor price, whether or not they choose to use it.").

[1541] [black redaction]

[1542] *See* Jason Bigler, "Rolling out first price auctions to Google Ad Manager partners," Google Ad Manager Blog (Sept. 5, 2019),

UFPA and UPR was approximately neutral on publisher revenues and an improvement in revenues for non-Google DSPs buying via AdX.[1543] Consistent with Google's experimental findings Professor Hortaçsu affirms that "UPR has no impact on publishers who used the "OPG" (online partnerships groups) sale[s] channel,"[1544] thus agreeing that at least 97.6% of the publishers representing 36.9% of impressions in the dataset he employs to assess UPR's effects on publishers were unaffected by UPR.[1545]

736.   The Publisher Class Complaint claims that "variable price floors helped publishers increase revenue and improve the quality of advertisements."[1546] This view is shared by Professors Li and Hortaçsu,[1547] with the latter adding that "[m]y conclusion from this analysis is that UPR removed the ability to screen out bad ads."[1548] These conclusions are incorrect because they overlook the many alternative tools available to publishers for

---

https://blog.google/products/admanager/rolling-out-first-price-auctions-google-ad-manager-partners/, accessed Dec. 12, 2024 ("Over the last few months, we've been testing the performance of this change and the results show that on average, first price auctions have a neutral to positive impact on a publisher's total revenue—revenue from all their advertising sources—when compared to second price auctions. In addition, we found evidence that first price auctions have created a more competitive market, resulting in third parties (Demand Side Platforms and Ad Networks outside of Google) and indirect line items (like those from Header Bidding implementations) winning an increased share of impressions.").

[1543] *See* "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -772 ("[N]eutral publisher payment overall"); "1PA Impact Post Launch" (Nov. 27, 2019), GOOG-DOJ-14566285, at -288 ("One month after launch, holdback experiment comparing 1PA to 2PA shows slightly lower revenues in general, but remains close to neutral across the Sell side"), -293 ("Top 3P Buyers: Positive impact due to lack of adjustment?").

[1544] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 501 ("I exclude those publishers who used the "OPG" (online partnerships groups) sale channel because they are small publishers and less likely to use multiple ad exchanges (i.e., UPR has no impact on them).").

[1545] Code for these statistics are provided in the code/UPR-Panel folder in my supporting materials, with the output saved in "code/UPR-Panel/5. CorrectedOutput/lps_olg_stats.txt".

[1546] Publisher Class First Amended Complaint, at ¶ 327.

[1547] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1015 ("Publishers set reserve prices in general for several reasons, including to increase yields and to prevent objectionable or otherwise low-quality ads from being served."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 441 ("[P]ublishers can use different reserve prices to filter out ad sources which tend to have lower-quality ads.").

[1548] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 440.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

enhancing ad quality or optimizing revenue–tools that generally outperform variable price floors for these purposes. For example:

a.  Contrary to claims from the Advertiser Class,[1549] differential floor prices for different advertisers are still allowed under UPR and may be used to manage yield and filter lower quality ads.[1550]

b.  Publishers can and do use a *more effective* tool than differential floor prices to preference different exchanges, namely, **post-auction discounts**, which are contractual agreements made between publishers and exchanges or ad buyers to rebate a portion of winning bids.[1551]

c.  AdX and GAM provide publishers with several tools to control the quality and screen the type of ads that can be displayed.[1552]

---

[1549] *See, e.g.*, Advertiser Class Complaint, at ¶ 295 ("Nor can a publisher give one bidder a lower price floor than it gives to another bidder.").

[1550] *See* Google, "Unified pricing rules," Google Ad Manager Help (accessed Dec. 11, 2024), https://support.google.com/admanager/answer/9298008?hl=en#details ("Advertiser- and brand-specific pricing can be configured in unified pricing rules.").

[1551] *See* Seb Joseph, "WTF are post-auction discounts?," Digiday (Apr. 2 2020), https://digiday.com/media/post-auction-discounts/, accessed Dec. 12, 2024 ("Post-auction discounts happen when a publisher agrees to [t]ake money off of winning bids for certain impressions from an agency. So if an agency wins an impression in an auction at one price, the actual fee they pay will be lower once the discount kicks in."). Post-auction discounts were in use by publishers using GAM from at least before 2020; *see* "Agency Programmatic Buying Models and Discounts" (June 24, 2020), GOOG-DOJ-AT-00173317, at -318 ("Post-Auction Price Reduction is live with Rubicon, Index & OpenX.").

[1552] *See* "Block sensitive categories," Google Ad Manager Help (accessed Jun. 25, 2024), https://support.google.com/admanager/answer/2541069?hl=en&sjid=14902226251943448609-EU, accessed Dec. 12, 2024 ("You can block groups of ads that are considered 'sensitive' due to the nature of the business or ad […] Our system classifies ads automatically, and we don't rely on advertiser-provided categorization.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

d.   As highlighted in the industry press, "some publishers pay for additional safety tools from the likes of Media Trust, GeoEdge, RiskIQ and Confiant"[1553] to manage and improve ad quality, with Confiant promoting its ability to "get rid of bad ads before they cause problems."[1554]

### B. Self-Competition and the Problem of Varying Floor Prices Across Exchanges

737.   As explained in Section XIII, Open Bidding improved on header bidding by streamlining payments, simplifying configuration, and reducing computational burden on end users' browsers. However, advertisers still faced the risk of **self-competition**: that is, the possibility of competing against themselves for the same impression.

738.   There were at least two ways in which an advertiser might end up competing against itself for the same impression.

739.   *First*, by partnering with a *single* DSP that bid in multiple exchanges. Because DSPs often bid for inventory on multiple exchanges, header bidding could lead to advertisers bidding multiple times for the same impression. For example, if an advertiser partnered with a DSP that bid in the AdX auction and in header bidding auctions, the advertiser could find itself competing for the same impression through AdX and header bidding.[1555]

---

[1553] *See* Sarah Sluis, "Forced Redirect Ads Cost Publishers Money, But So Does Blocking Them," AdExchanger (Feb. 6, 2018), https://www.adexchanger.com/publishers/forced-redirect-ads-cost-publishers-money-blocking/, accessed Dec. 12, 2024.

[1554] *See* "Don't Let Bad Ads Undermine Your User Experience," Confiant, https://www.confiant.com/solutions/quality, accessed Dec. 12, 2024.

[1555] "Optimal AdX in DFP setup: Best practices, and how to traffic RTA/RTP (header bidding) line items" (Sept. 24, 2015), GOOG-TEX-00000001, at -004 ("[H]eader bidding can make buyers bid against themselves running 2 auctions for every impression."); Declaration of N. Korula (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 41;

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

740. *Second*, by partnering with *multiple* DSPs who bid in the same exchange or auction. For instance, an advertiser might use The Trade Desk and Adobe, with each of those DSPs submitting bids on the advertiser's behalf in AdX as well as other exchanges. In situations like that, the same advertiser could end up competing against itself.

741. By itself, self-competition was not necessarily a problem for advertisers. Consider an advertiser who receives two bid requests for an impression—one each from Exchange A and Exchange B—with the same floor price of $1.50 in a unified first-price auction. The bid requests might be for either the *same* impression or *different* impressions that happen to have the same floor price, but the advertiser's bidding strategy is the same regardless: it bids as it would in a standard first-price auction (as analyzed in Section III.C.3.b) with a floor price of $1.50. For example, if the advertiser estimates that there are no other advertisers competing for the impression, then the advertiser would optimally place a bid in each exchange that *just* beats the floor price of $1.50 in either case, which is just the same as if there were no self-competition.

742. But self-competition *in combination* with varying floor prices across exchanges could harm advertisers if they (or their DSPs) fail to identify when their bid requests from different exchanges are competing for the same impression. The effect is similar to that of multi-calling, which was discussed in Section V. To illustrate, consider the same example as before, but now suppose that the floor prices are $1.50 in Exchange A and $2.50 in Exchange B. *If* the advertiser can identify that both bid requests are for the *same* impression, then it would optimally bid $1.50 in *both* Exchange A and Exchange B, winning the impression in the unified first-price auction (through Exchange A) at the lower price of $1.50. *But if* the advertiser incorrectly thinks that the bid requests are for

*different* impressions (when they are actually for the same impression), then it might bid $1.50 in Exchange A and $2.50 in Exchange B. In this case, the advertiser still wins the impression in the unified first-price auction (through Exchange B) but now pays the higher price of $2.50: it is harmed by self-competition.

743. Avoiding self-competition before the introduction of UPR thus required DSPs to assess *many* similar or identical bid requests. One industry source reported that header bidding publishers might "send 18 identical bid requests for the same piece of inventory […] Currently, DSPs often begrudgingly evaluate them all, and find it hard to tell if the impression is exactly the same."[1556] Advertisers "struggle[d]" to de-duplicate impressions and coordinate bids made through different channels.[1557] A Vice President of The Trade Desk commented that "[m]ore problematic is that each identical impression is represented differently to buyers specifically regarding floors. If floors represent a minimum price, why does an identical impression have 26 different floors?"[1558] Google

---

[1556] Sarah Sluis, "The Trade Desk Suppresses Bid Duplication Amid COVID-19 Traffic Surge," AdExchanger (Apr. 21, 2020), https://www.adexchanger.com/platforms/the-trade-desk-suppresses-bid-duplication-amid-covid-19-traffic-surge/, accessed Dec. 12, 2024 ("Publishers that slot the same six exchanges into multiple header-bidding auctions, such as Prebid, Google open bidding and Amazon Transparent Ad Marketplace, send 18 identical bid requests for the same piece of inventory to The Trade Desk. Currently, DSPs often begrudgingly evaluate them all, and find it hard to tell if the impression is exactly the same.").

[1557] *See* "Unified 1st Price Auction" (Mar. 4, 2019), GOOG-DOJ-06525908, at -915 ("Today, buyers struggle to optimize when bidding across different channels due to lack of symmetry: different auction rules and different floor prices can apply for the same impression."); *see also* Sarah Sluis, "Header Bidding Unleashed a Huge Infrastructure Problem and Ad Tech Will Either Sink or Swim,"AdExchanger (Apr. 24, 2017), https://www.adexchanger.com/platforms/header-bidding-unleashed-huge-infrastructure-problem-ad-tech-will-either-sink-swim/, accessed Dec. 12, 2024 ("Though DSPs are seeing a flood of new impressions, many of them are selling the same thing. A publisher with three header bidding partners will have three exchanges sell its inventory, tripling the amount of impressions a DSP must evaluate and tripling the listening cost. […] [M]any DSPs are devoting resources to deduplicating impressions to avoid spending millions in server fees. […] But not all DSPs have the resources to smartly filter out low-value impressions.").

[1558] Will Doherty, "The door in the floors: Transparency, price discovery, and market efficiency in programmatic," The Current (Nov. 8, 2023), https://www.thecurrent.com/will-doherty-transparency-programmatic-data, accessed Dec. 12, 2024 ("The average premium publisher works with approximately 26 different SSPs and exchanges. Our buyers now see every impression at least 26 times, and sometimes many more. More problematic is that each

employees were concerned that the possibility of self-competition could lead to an "[e]ventual loss of advertiser trust in [real-time bidding] auctions,"[1559] and that exchange-discriminatory reserves were a way for publishers to "game[]" the system.[1560]

744. Even though varying price floors across exchanges could harm advertisers, individual publishers had an incentive to do so. By engaging in price-fishing tactics, publishers could benefit at the expense of advertisers who participated on multiple exchanges. To illustrate the possible harms of such tactics, suppose that an advertiser's value for an impression could be either $2.20 or $1.80. In a first-price auction, the advertiser's optimal bids depend on the floor price and on its probabilistic assessments of other bids. When the advertiser's value is *high* ($2.20), it may find it optimal to bid $1.80 if the floor price is $1 and to bid $2 if the floor price is $2. When its value is *low* ($1.80), it might be optimal to bid $1.50 if the floor price is $1 and not bid at all in an auction with a floor price of $2. If the advertiser multi-homes and bids in two exchanges (Exchange A and Exchange B), then a publisher that solicits bids from those two exchanges for a single impression could exploit the advertiser's bidding behavior by setting a floor price of $2 on Exchange A and a lower floor price on Exchange B. If the advertiser is unable to detect that its bid requests from Exchange A and Exchange B are actually for the same impression, then:

---

identical impression is represented differently to buyers specifically regarding floors. If floors represent a minimum price, why does an identical impression have 26 different floors?").

[1559] "Optimal AdX in DFP setup: Best practices, and how to traffic RTA/RTP (header bidding) line items" (Sept. 24, 2015), GOOG-TEX-00000001, at -004.

[1560] *See* Email from J. Bellack to A. Pappu, "Re: article - trial by fire, how 6 header bidders perform" (Jan. 11, 2016), GOOG-DOJ-13364449, at -449 ("[J. Bellack:] pubs can still play soft floor games even with HB or Jedi. They could still put different floors on different exchanges, calling them in parallel will get a similar outcome as waterfall. [...] [A. Pappu:] Do you mean different floors? If yes we need to think the product they [*sic*] should we even allow that.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

a.  When its value is high, it might win the impression on Exchange A with a bid of $2 even when its lower bid of $1.80 on Exchange B would otherwise have won the impression.

b.  When its value is low, the advertiser wins the impression on Exchange B.

The effect is similar to that of multi-calling as discussed in Section V: the publisher extracts more revenue from the advertiser than it could with any fixed floor price.

745.  Gaming floor prices in this way damages the safety and simplicity of Google's platform because the advertiser cannot rely on the floor price reported at an exchange being the publisher's lowest acceptable price for the impression. Although the example above might suggest that price-fishing is a mere transfer of surplus from the advertiser to the publisher, the problem is worse: total surplus can be reduced due to the changes in advertiser behavior that price-fishing incentivizes. If the advertiser is aware of the publisher's tactics, its best response is to bid less in an auction with a higher floor price, understanding that the same impression may be available via a different exchange at a lower price. Indeed, some at Google recognized that as a result of this effect "[i]n the long run, this [would be] probably bad for pubs, because a smart buyer is going to figure out how often they can pass on the high floor calls, and buy the same impression for half price through another SSP."[1561] However, such optimization is difficult, particularly because it is in the publisher's interest to hide from the advertisers that they are being called multiple times. One consequence would be the need for advertisers to invest in

---

[1561] Email from Eisar Lipkovitz to Jonathan Bellack et al. "Re: Display RevForce" (July 21, 2017) GOOG-TEX-00122345, at -346 ("I do believe that multiple calls actually work and make the publisher more money in the short term, given current buyer acceptance of being called multiple times with different floors. In the long run, this is probably bad for pubs, because a smart buyer is going to figure out how often they can pass on the high floor calls, and buy the same impression for half price through another SSP.").

technology to track impressions and floor prices across exchanges to protect against the possibility of self-competition. If that proved too difficult or costly, advertisers might reduce multi-homing, bid less on *all* impressions, or reduce the number of impressions they bid on.[1562] Thus, by preventing price-fishing (and removing an incentive for advertisers to reduce their bids), UPR also benefited the majority of publishers that did not engage in such tactics.

746.    I note that Professors Li and Cramton argue that publishers could bypass uniform pricing by raising floor prices through other exchanges' interfaces.[1563] While I agree that UPR did not enforce how floors were set on third-party exchanges, it still played an important role by preventing publishers from using Google's ad server platform to facilitate price-fishing. Furthermore, the approach described by Professor Li and Cramton requires an exchange to voluntarily accept a floor price greater than those set on other exchanges, and it is unlikely that exchanges have an incentive to do so. Thus, UPR made it harder for publishers to engage in such tactics and set incentives for other exchanges to follow a similar policy.

### C. Unified Pricing Rules Protected Advertisers and Benefited Publishers in the UFPA

747.    Along with its launch of the Unified First Price Auction in 2019, Google introduced Unified Pricing Rules (UPR).[1564] Before the introduction of UPR, publishers could set

---

[1562] *See* Deposition of B. Rowley (SDNY) (July 22, 2021) at 236:15-236:18 ("You know, if there were [multiple] floors being set to artificially raise prices from an auction standpoint, that could scare buyers away.").

[1563] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1001 ("As a result, publishers could set higher price floors on rival exchanges, but they could not set lower price floors on rivals compared to AdX."); Expert Report P. Cramton (Oct. 4, 2024), at ¶ 274. ("It is worth noting that Uniform Pricing Rules did not prevent publishers from setting higher floors for third-party exchanges over AdX.").

[1564] *See* Jason Bigler, "An update on first price auctions for Google Ad Manager," Google Ad Manager Blog (May 10, 2019), https://blog.google/products/admanager/update-first-price-auctions-google-ad-manager/ ("In addition to impacting how publishers are using floor price rules, changing to a first price auction in Ad Manager requires a

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

floor prices in AdX for specific bidders, including Google Ads, DV360, non-Google

DSPs, and ad networks. These floor prices were implemented via "pricing rules," with

publishers able to configure up to 5,000 floor prices in this way.[1565] On the other hand,

publishers could *not* use GAM to set floor prices for Open Bidding exchanges and other

indirect sources of demand: instead, they needed to configure floor prices for each

exchange separately using that exchange's user interface.[1566] The consequence of this

piecemeal system was that "[p]ubs set different floors for the same buyer on different

exchanges,"[1567] and, as a result, multi-homing advertisers—those who bid across multiple

different channels—could face different floor prices for the same impression on different

exchanges. As described above, these advertisers "struggle[d]" to de-duplicate

impressions and coordinate bids made through different channels and, as a result, could

be exposed to price-fishing tactics.[1568]

---

change in how our rules function. […] That's why we released a new feature to all publishers globally, called unified pricing rules.").

[1565] *See* Lucie Laurendon, "Google Unified First Price Auction Explained," Smart Ad Server Blog (captured on Mar. 7, 2022), at http://web.archive.org/web/20220307203150/https://smartadserver.com/articles/google-unified-first-price-auction-explained/, accessed Dec. 13, 2024 ("Publishers will only be able to set UPR with a limit of 200 (vs 5,000 OA rules before).").

[1566] *See* "Ad Manager Unified 1st Price Auction" (Sept. 27, 2019), GOOG-DOJ-09714662, at -664 ("[Publishers] are unable to [set pricing floors in the Ad Manager UI] for Exchange Bidding and other indirect sources of demand trafficked through non-guaranteed line items."); Declaration of N. Korula (Aug. 4, 2023), GOOG-AT-MDL-008842393, at ¶ 40 ("However, publishers were unable to use the Google Ad Manager user interface to set pricing floors for Open Bidding partners and other indirect sources of demand trafficked through non-guaranteed line items. Instead, publishers had to undertake the complex and time-consuming task of configuring pricing floors separately on each exchange and network where their inventory was available.").

[1567] "DRX Unified Yield Management Strategy Review" (July 9, 2018), GOOG-DOJ-11781854, at -869 ("Pubs set different floors for the same buyer on different exchanges to simulate a real-time waterfall and soft floor the buyers (like DBM), and AdX primarily bears the brunt of these higher floors").

[1568] *See* "Unified 1st Price Auction" (Mar. 4, 2019), GOOG-DOJ-06525908, at -915 ("Today, buyers struggle to optimize when bidding across different channels due to lack of symmetry: different auction rules and different floor prices can apply for the same impression."); *see also* Sarah Sluis, "Header Bidding Unleashed a Huge Infrastructure Problem and Ad Tech Will Either Sink or Swim," AdExchanger (Apr. 24, 2017), https://www.adexchanger.com/platforms/header-bidding-unleashed-huge-infrastructure-problem-ad-tech-will-either-sink-swim/, accessed Dec. 12, 2024 ("Though DSPs are seeing a flood of new impressions, many of them are selling the same thing. A publisher with three header bidding partners will have three exchanges sell its inventory, tripling

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

748. Under UPR, the same floor prices publishers set in GAM apply equally to AdX, other participating exchanges, and remnant line items (including any header bidding demand). This protected advertisers from publishers' price-fishing tactics. UPR did not prevent publishers from configuring floor prices based on the advertiser, the ad size, and the inventory type (*e.g.*, display, mobile, and app), with a limit of 200 floor pricing rules at any time.[1569,1570,1571]

749. By protecting advertisers from price-fishing, UPR also benefited publishers. Although individual publishers might be incentivized to engage in price-fishing tactics, advertisers might end up bidding less on *all* impressions, which in turn could end up harming *all* publishers.

750. This is a well-known economic phenomenon akin to the *tragedy of the commons*[1572]: price-fishing publishers impose an *externality* that harms advertisers and other publishers.

---

the amount of impressions a DSP must evaluate and tripling the listening cost. […] [M]any DSPs are devoting resources to deduplicating impressions to avoid spending millions in server fees. […] But not all DSPs have the resources to smartly filter out low-value impressions.").

[1569] *See* "Unified pricing rules," Google Ad Manager Help (accessed Dec. 11, 2024), https://support.google.com/admanager/answer/9298008?hl=en ("You can apply up to 200 unified pricing rules per Ad Manager network.").

[1570] Note that *pricing rules* differ from *price floors*. A publisher can "specify up to 50 advertisers per pricing rule," which in principle allows specific floor prices for up to 10,000 advertisers. *See* "Unified First-Price Auction - Best practices," Google Ad Manager (accessed Dec. 11, 2024), https://services.google.com/fh/files/misc/unified_first-price_auction_best_practices.pdf; *see* "System maximums and limits," Google Ad Manager Help Center (accessed Dec. 11, 2024), https://support.google.com/admanager/answer/1628457?hl=en.

[1571] Google has policies in place to grant extensions beyond the 200 rules. *See* Email from ▮▮▮▮▮▮ to G. Levitte, "Re: UPR 500 rule exceptions" (Nov. 19, 2019), GOOG-DOJ-14028590, at -590 ("Extension requests for < 300 rules -> Lightweight approval [...] Requests for extensions with no rules specified will be capped at 300 [...] Extension requests for > 300 rules -> Needs PM to review business rationale and approve [...] We have generally been granting exceptions whenever a clear reason to justify granular targeting was presented[.]").

[1572] *See, e.g.*, Ostrom, E. (2008). Tragedy of the commons, *The New Palgrave Dictionary of Economics* 2nd. ed., S. N. Durlauf & L. E. Blume (Eds.), Palgrave Macmillan, at pp. 360-363.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

By preventing publishers from engaging in that type of gamesmanship, UPR protected advertisers and publishers that were not price-fishing.

751. A third-party survey of publishers in February 2020, after the introduction of UFPA with UPR, found that only 4% of respondents described UPR as having a negative impact on their business.[1573] Post-launch experiments found that the changes had increased revenues for non-Google DSPs buying via AdX and left total publisher revenues approximately unchanged.[1574]

### D. Under UPR, Publishers Could Still Preference Demand Sources

752. Even though UPR prevented publishers from setting exchange-discriminatory reserves, publishers still had other tools to favor their preferred demand sources.

753. *First*, a publisher could favor a header bidding exchange by modifying the value CPMs on the line items used to represent that exchange's header bid.[1575] Inflating the value CPMs in that way would make the header bidding exchange more likely to be allocated the impression in the UFPA and would not increase the price for the impression paid by

---

[1573] *See* "SSP Report: Part of the Programmatic Intelligence Report" (Apr. 16, 2020), GOOG-DOJ-AT-00608572, at -573 ("Sample: Digital sales and operations contacts from The Advertiser Perceptions Ad Pros proprietary community and trusted third-party partners as needed [...] Fielded 2/3 to 2/14 2020"), -577 (Figure [dark blue bars correspond to "Negative Impact"]). *See also* Sarah Sluis, "Google Ad Manager Policy Changes Don't Hurt Publishers, According to Advertiser Perceptions," AdExchanger (May 5, 2020), https://www.adexchanger.com/platforms/google-ad-manager-policy-changes-dont-hurt-publishers-according-to-advertiser-perceptions/, accessed Dec. 12, 2024 ("Google's recently changed rules around unified pricing only negatively impacted 4% of publishers.").

[1574] *See* "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-14549757, at -772 ("[N]eutral publisher payment overall"); "1PA Impact Post Launch" (Nov. 27, 2019), GOOG-DOJ-14566285, at -288 ("One month after launch, holdback experiment comparing 1PA to 2PA shows slightly lower revenues in general, but remains close to neutral across the Sell side"), -293 ("Top 3P Buyers: Positive impact due to lack of adjustment?").

[1575] *See, e.g.*, Asmaâ Bentahar, "Bid Adjustments Simplified: Run Fair Auctions with no Hassle," Pubstack (May 2, 2021), https://www.pubstack.io/topics/bid-adjustments-simplified, accessed Dec. 12, 2024 ("Alternatively, this next one will slightly increase all returned CPMs, giving Prebid an edge in the competition against GAM").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

the header bidding exchange (because, as discussed in Paragraph 135, the value CPMs reported by publishers do not affect the prices paid by remnant line items). Publishers could also choose to offer some impressions only to their preferred exchanges via header bidding.[1576]

754. *Second*, publishers could also favor certain exchanges or advertisers by offering them post-auction discounts. Post-auction discounts are contractual agreements between publishers and ad buyers and exchanges, in which the publisher agrees to rebate a fraction of the winning bids made by the ad buyer or exchange after the auction has concluded. An ad buyer with such an agreement is incentivized to bid more in each auction for an impression, making it more likely that it wins the impression. As a result, post-auction discounts can be used to increase the share of impressions that are allocated to a given ad buyer or exchange. For example, suppose the publisher agrees to rebate 50% of the winning bids from a certain DSP. If there is a uniform floor price of $3 for an impression and (absent the discount) the DSP would have only been willing to pay $2 for the impression, then *with* the discount, the DSP would be willing to bid $4, which exceeds the floor price. If its bid is the highest bid for the impression, the advertiser bidding using that DSP would be allocated the impression, paying only half its bid to the publisher. As a result, the post-auction discount has a similar effect as a lower floor price for the bidder, but without leading to other harms (such as price-fishing).

---

[1576] *See, e.g.*, Prebid.org, "Running Prebid.js without an ad server," https://docs.prebid.org/dev-docs/examples/no-adserver.html, accessed Dec. 13, 2024 ("This example demonstrates running [a header bidding] auction and rendering without an ad server.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

755. Post-auction discounts are routinely used in the market for display advertising. An internal Google document from June 2020 notes its use by several important players.[1577] As Michael McNeeley, VP of Product at Index Exchange, described in an interview with Digiday, "[p]ost-auction discounts give publishers' sales team the chance to go and incentivize spend with advertisers just like they do for other forms of media," and, as commented by the article's author, "[t]his is actually not a new trend, as bid prioritization and bid modifiers for certain agencies have been used by publishers in SSP platforms for many years."[1578]

756. In an auction, post-auction discounts are usually a better tool for publishers than differential floor prices. In theory, when bidders are asymmetric in their willingness to pay or in their quality, then an optimal handicapping process causes different bidders to be charged different prices when they win.[1579] Appropriately designed post-auction discounts can often approximate the optimal process, while exchange-discriminatory floor prices, which use the same prices for any winning bidder whose bid exceeds its floor, cannot generally approximate the optimal mechanism.[1580] As a result, exchange-discriminatory floor prices are a less effective tool.

---

[1577] "Agency Programmatic Buying Models and Discounts," (June 24, 2020), GOOG-DOJ-AT-00173317, at -318 ("Post-Auction Price Reduction is live with Rubicon, Index & OpenX.").

[1578] Seb Joseph, "Ad-buying agencies are cozying up to SSPs, creating more transparency questions," Digiday (Mar. 31, 2020), https://digiday.com/marketing/ad-buying-agencies-are-cozying-up-to-ssps-creating-more-transparency-questions/, accessed Dec. 12, 2024.

[1579] *See* Milgrom, P. R. (2004). *Putting auction theory to work*. Cambridge University Press, at pp. 24-25, 149-53.

[1580] In the technical notes in Section XV.G, I show using an example that the publisher can obtain strictly higher revenues with post-auction discounts than with differential price floors.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### E. Responding to Plaintiffs' and Their Experts' Allegations

#### 1. Plaintiffs and Experts Neglect the Industry-Wide Acceptance of UPR and Its Benefits to Advertisers and Publishers

757. Dr. Zona claims that "[t]here is no reasonable pro-competitive justification for UPR[.]"[1581] These arguments fail to recognize the benefits of UPR to multi-homing advertisers and non-multi-calling publishers in the UFPA. As I have described above, UPR made it easier for publishers to set floor prices for non-Google exchanges in Open Bidding. Maintaining the ability to set exchange-discriminatory floor prices would likely have both made it more difficult for advertisers to bid optimally on Google's platform and led to externalities from price-fishing that would harm other publishers.

758. While providing no concrete evidence, Plaintiffs suggest that publishers would have benefited from setting higher reserve prices for "Google's Ad Exchange and Ad Buying Tools."[1582] Yet, they neglect the fact that unified pricing rules are now an industry-wide "best practice."[1583] For example, Xandr now recommends—as part of its "Seller Best Practices" listed on its "Industry Reference" Documentation Center—to "[e]stablish consistent price floors for the same inventory in all systems (*i.e.*, ad server unified pricing rules, line item CPMs, deal prices, SSP floors, etc.)."[1584]

---

[1581] Expert Report of J. Zona (Oct. 4, 2024), at ¶ 111.

[1582] Advertiser Class Complaint, at ¶ 256.

[1583] *See* "Seller Best Practices" Xandr (May 5, 2023), https://docs.xandr.com/bundle/industry-reference/page/seller-best-practices.html, accessed Dec. 13, 2024.

[1584] "Seller Best Practices" Xandr (May 5, 2023), https://docs.xandr.com/bundle/industry-reference/page/seller-best-practices.html, accessed Dec. 13, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

759. Other online display advertising intermediaries have similar rules requiring floor prices to be uniform across bidders. For example, Meta enforces a "code of conduct" for the auctions it participates in, requiring that all bidders in each auction face the same floor prices,[1585] and ███████████████████████████████████[1586] As a VP at The Trade Desk expressed, "[i]n a perfect world [...] floor[s] would be consistent and constant" and "would be the same regardless of path."[1587]

## 2. Plaintiffs and Experts Neglect How UFPA Changed Publishers' Incentives to Set Differential Floor Prices

760. Experts and the Publisher Class argue that "[h]istorically, publishers had set hundreds of different price floors, with variations tailored to specific Ad Exchanges and specific buyers,"[1588] and the Advertiser Class adds that "[l]arge publishers often invested considerable resources" to do so.[1589] These historical observations fail to account for the more obvious reasons that optimal floor prices were higher for AdX before the transition

---

[1585] Meta, "Code of Conduct," Meta Audience Network," https://www.facebook.com/audiencenetwork/partner-program/code-of-conduct, accessed Dec. 13, 2024 ("When a reserve price is applied as part of the auction, it should apply identically to all demand sources."); *see also* EDVA Trial Testimony of Omni Farber, September 26, 2024 (PM), at 158:16-159:3 "Q As of today, Mr. Farber, are there any principles articulated in Meta's code of conduct that relates to floor prices and auctions? A I'd have to review the doc to say with absolute certainty, but I do believe we do require them to be equal for everyone. Q And when you say you believe that Meta requires floor prices to be equal for everyone, who is the everyone in that sentence that you're referring to?A. All bidders. Ad requests contain floor prices. If one bidder gets the floor price, all bidders must get the exposure to the floor price, whether or not they choose to use it.").

[1586] *See* ████████████████████████████████████████████ ███████████████████████████████████████

[1587] Will Doherty, "The door in the floors: Transparency, price discovery, and market efficiency in programmatic," The Current (Nov. 8, 2023), https://www.thecurrent.com/will-doherty-transparency-programmatic-data, accessed Dec. 12, 2024.

[1588] Publisher Class First Amended Complaint, at ¶ 327; *see also* Expert Report of P. Cramton, at ¶ 263 ("Before Uniform Pricing Rules, publishers could set customized pricing rules, such as buyer-specific price floors on AdX and other exchanges.").

[1589] Advertiser Class Complaint, ¶ 255.

to the UFPA. With earlier ad allocation processes, bids from different exchanges were evaluated sequentially (as in waterfall and Dynamic Allocation) and, often, AdX was running a second-price auction alongside Header Bidding's first-price auctions (as in Open Bidding). In such cases, it was optimal for publishers to set different floor prices for different exchanges, as I explain below. However, those reasons for different floor prices were eliminated by the introduction of the Unified First Price Auction (UFPA).

761. Let us see how setting exchange-discriminatory floor prices could help publishers maximize revenues in a system where the winning bids from multiple exchanges were evaluated sequentially. For example, consider a publisher that sequentially calls two exchanges in the waterfall: Exchange A before Exchange B. Suppose that the publisher believes that the distributions of advertiser values at both exchanges are identical and that the values of bidders at each exchange are statistically independent.[1590] Then the publisher's revenue-maximizing floor price for Exchange A is *higher* than that for Exchange B.[1591] This is because, by choosing a higher floor price for Exchange A, the publisher can try to extract a higher price from the first exchange, knowing that it can offer the impression to Exchange B if it fails to sell on Exchange A.[1592] Similarly, exchange-specific (and impression-specific) floor prices could improve publisher revenues when header bidding exchanges and AdX were not called simultaneously and used different auction rules, as I discussed in Section X.

---

[1590] That is, knowing the value of a bidder at Exchange A does not change the publisher's beliefs about the values of bidders at Exchange B, and vice versa. This is the "independent private values" class of auction models.

[1591] To illustrate, suppose that each exchange has two bidders whose values are drawn independently and uniformly between $0.00 and $1.00. Then the optimal floor price for Exchange A is $0.71 while that for Exchange A is $0.50. In a Unified First Price Auction, the optimal floor price for both exchanges is $0.50.

[1592] *See, e.g.*, Despotakis, S., Ravi, R., & Sayedi, A. (2021). First-price auctions in online display advertising. *Journal of Marketing Research*, *58*(5), 888-907, at p. 895 ("Example 1").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

762.  These potential benefits of setting floor prices that differ by exchange are eliminated in the UFPA because bids from all exchanges are evaluated *simultaneously* and *uniformly*. In the above example, the publisher maximizes its revenue in the UFPA by setting the same floor price for both exchanges. This is because the optimal floor price for an exchange trades off the *expected benefits* of increasing the auction's clearing price (when that exchange provides the largest bid and that bid is the only one above the floor price) against the *expected costs* of failing to sell the impression (when that exchange provides the largest bid and that bid is below the chosen floor price). This tradeoff is the same for the two identical exchanges, and so the optimal floor price is the same as well.[1593] This was such a significant change in incentives that Google internally recognized it would "need to educate pub[lisher]s" about it.[1594]

763.  Plaintiffs and their experts fail to account for the fact that publishers would be incentivized to set a higher floor price for AdX prior to the introduction of UFPA, even if AdX advertisers had the same quality and distribution of values as other advertisers. For example, while Professor Li claims that "UPR caused publishers to set a reserve on AdX demand that was lower than the counterfactual reserve, and thus reduced publisher revenue,"[1595] he overlooks that moving to the UFPA eliminated an important rationale for setting differential floor prices. Once the transition to UFPA had been completed and

---

[1593] This finding continues to be true if the number of bidders differ by exchange, since the optimal floor price in the independent private values setting does not depend on the number of bidders (only on the distribution of values associated with those bidders). *See* Riley, J. G., & Samuelson, W. F. (1981). Optimal auctions. *American Economic Review*, *71*(3), 381-392.

[1594] "Changes to Ad Manager, AdMob auction" (Sept. 3, 2019), GOOG-DOJ-AT-02204351, at -382 ("Plan to educate pubs around strictly negative revenue consequences of HB price inflation [after removal of last look]"). This appears to mean that inflating header bids was common enough that if Google removed lask look, it would have to "educate pubs" this was no longer necessary.

[1595] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1136.

advertisers and publishers adapted to the new rules, the earlier reasons to set a higher floor price for AdX would be eliminated and publishers could be expected to learn about that over time. This expectation is supported by evidence. When Daily Mail "found a way to only target Google + EB in the UPR flooring system" with a high floor, it concluded that the "test doesn[']t show rev uplift as before UPR."[1596]

764.    Even if differences in perceived quality among demand sources are important to some publishers—as claimed by Professor Hortaçsu[1597]—Plaintiffs and their experts do not explain why the filtering tools and the pricing of sensitive categories available within UPR or the additional monitoring and blocking services available from other companies are not sufficient to manage such concerns.

### 3. Plaintiffs and Their Experts Ignore Alternative Ways Publishers Could Favor Non-Google Demand Sources and Incentivize Ad Quality After UPR's Introduction

765.    Plaintiffs and their experts argue that UPR prevented publishers from using exchange-discriminatory floor prices for various purposes, which they claim included "to prevent objectionable or otherwise low-quality ads from being served," "to respond to and mitigate Google's bid-rigging and auction manipulation," "to reduce their reliance on AdX and Google as a whole," and to respond to "differentials in the costs of different exchanges and demand sources."[1598] Lastly, Professor Cramton claims that "low auction

---

[1596] Email from F. Chen to M. Wheatland "Re: Findings in UPR," (Feb. 11 2020), DM_GOOG_0000106, at -106-108.

[1597] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 441 ("Publishers are sensitive to ads from low-quality advertisers.")

[1598] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶¶ 1002, 1015; *see also* Expert Report of J. Zona (Oct. 4, 2024), at ¶ 110 ("More fundamentally, floor differentials are the only competitive response that publishers have to differentials in the costs of different exchanges and demand sources"); Expert Report of P. Cramton at ¶ 266, ("Publishers might use multiple pricing floors for various reasons, including managing competitive exclusions, monetizing direct and indirect sales, or preventing low-quality ads from being shown on their websites.");

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

density' on AdX may have been one rationale for publishers to want to impose a higher floor for AdX."[1599] Yet, if a publisher wished to favor non-Google demand sources for any of these purported reasons, it had access to more effective tools than exchange-discriminatory floor prices. These alternative tools are overlooked by Plaintiffs and their experts.

766.     A publisher wishing to preference some particular non-Google exchanges could do so by providing them a post-auction discount (as discussed in Section XIV.D) or (for header bidding exchanges) by modifying the value CPMs on the line items used to represent that exchange's header bid. Either of these adjustments would lead the favored demand source to win a larger share of the impressions.

767.     Publishers seeking to address ad quality concerns have even more direct tools. While GAM "block[s] a lot of ads by default," it still allows publishers to add further restrictions on the types of ads that can be displayed on their sites.[1600] Ad content protection features are available to all publishers, allowing them to avoid presenting ads with sensitive content, ads from specific buyers, or ads in general categories such as "Apparel, Finance, and Health."[1601] For example, "[a] publisher could say[] I don't even want ads where there's any kind of significant skin exposure. So you wouldn't see ads of

---

Advertiser Class Complaint, at ¶ 256; Gannett Amended Complaint, at ¶ 227; Daily Mail Second Amended Complaint, at ¶ 206.

[1599] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 277.

[1600] EDVA Trial Testimony of Nitish Korula (Sept. 23, 2024) (AM), at 27:13-28:11.

[1601] *See* "Block general categories," Google Ad Manager Help (accessed Dec. 11, 2024), https://support.google.com/admanager/answer/2913554?sjid=261789886268128879-EU ("You can block high-level groupings of ads — such as Apparel, Finance, and Health — from appearing on your network or specified inventory.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

people on a beach [if it had selected that option]."[1602] Finally, GAM also allows publishers to set category specific floor prices for the sensitive categories.[1603]

768.   In addition to the tools provided by Google, "some publishers pay for additional safety tools from the likes of Media Trust, GeoEdge, RiskIQ and Confiant, which detect bad ads"[1604] with Confiant advertising itself as a company that "helps you get rid of bad ads before they cause problems."[1605] In fact, in 2018, Gannett adopted Confiant. Tim Wolfe, a Senior Vice President at Gannett, was quoted in a Confiant case study stating "[w]e had experienced increased problems before we implemented the Confiant solution and now most of those issues are resolved,"[1606] adding that he "ha[s] not heard complaints from the security team in quite a while."[1607] Wolfe's quotations further suggest that differential floor prices, which could be used before 2018, were not the effective solution for addressing quality issues. Rather, a tool that was specifically targeted for the task largely "resolved" the problem.

---

[1602] EDVA Trial Testimony of Nitish Korula (Sept. 23, 2024) (AM), at 27:13-28:11.

[1603] *See* "Unified pricing rules," Google Ad Manager Help, https://support.google.com/admanager/answer/9298008?sjid=2354124647482356745-EU#sensitive-categories, accessed Dec. 11, 2024 ("You can set pricing rules that apply only to creatives in selected sensitive categories. Some ads are considered 'sensitive' due to the nature of the business or ad—such as Sensationalism or Significant Skin Exposure. Our system classifies ads automatically, and we don't rely on advertiser-provided categorization.").

[1604] *See* Sarah Sluis, "Forced Redirect Ads Cost Publishers Money, But So Does Blocking Them," AdExchanger (Feb. 6, 2018), https://www.adexchanger.com/publishers/forced-redirect-ads-cost-publishers-money-blocking/, accessed Dec. 12, 2024.

[1605] *See* Confiant, Ad Quality Solutions, https://www.confiant.com/solutions/quality, accessed Dec. 12, 2024.

[1606] *See* Confiant, "Gannett Works to Eliminate Bad Ads," https://www.confiant.com/case-studies/gannett, accessed Dec. 12, 2024.

[1607] *See* Confiant, "Gannett Works to Eliminate Bad Ads," https://www.confiant.com/case-studies/gannett, accessed Dec. 12, 2024 ("I have not heard complaints from the security team in quite a while." - which is always a good thing. I was hearing about issues daily before, so from a monitoring and blocking standpoint it's been a very good relationship.").

769.   Using floor prices to moderate quality is a blunt instrument that can come at the cost of revenue. For example, when the highest bidding advertiser seeks to serve a high-quality ad but has a bid below an inflated floor price set to screen for quality, the publisher *loses* revenue from the high-quality ad. Solutions like Confiant offered improvements by enabling publishers to "monetize blocked ads by automatically re-auctioning those vacancies, and optimize ad revenues."[1608]

770.   While Professor Hortaçsu highlights the academic literature documenting the "impact of "heavy ads" on user and publisher outcomes," he fails to note that the tools that Gannett itself used could address this concern and prevent any lost revenue.[1609] Complex, a BuzzFeed subsidiary, also worked with Confiant and its experience is described in another case study. It states that the Confiant tools allowed Complex to set its "own thresholds on quality issues like heavy ads, in-banner video and other parameters that affect site performance." This enabled Complex to "optimize [] site load times without losing revenues and deliver [a] premium user experience."[1610]

771.   GAM also allowed publishers to set advertiser-specific floor prices to address ad quality concerns from specific advertisers.[1611] Advertiser-specific floor prices would be more effective than exchange-discriminatory floor prices due to the prevalence of advertiser

---

[1608] *See* Confiant, "Case Study: Going Inside Insider Inc. Success Against Malvertising," https://www.confiant.com/case-studies/insider-inc, accessed Dec. 12, 2024.

[1609] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 461.

[1610] *See* Confiant, "Case Study: Going Inside Insider Inc. Success Against Malvertising," https://www.confiant.com/case-studies/insider-inc, accessed Dec. 12, 2024 ("the solution allowed our Ad Tech team to set our own thresholds on quality issues like heavy ads, in-banner video and other parameters that affect site performance." In that way, we could optimize our site load times without losing revenues and deliver the premium user experience that our team and the brands we represent expect").

[1611] *See* "Unified pricing rules," Google Ad Manager Help, https://support.google.com/admanager/answer/9298008?hl=en accessed Dec. 11, 2024 ("Advertiser - and brand-specific pricing can be configured in unified pricing rules.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

multi-homing.[1612] When a publisher raises the floor price of a DSP, any low-quality advertisers using that DSP would have an incentive to move their campaigns to another DSP. Only by setting high floor prices for that advertiser *across all exchanges* could a publisher effectively block ads from that advertiser. As discussed in Section XIV.D, publishers could also use post-auction discounts to favor specific exchanges or advertisers with higher-quality ads.

772.   Although Professor Li claims that "without the credible threat of differential price floors[...] exchanges lost the *incentive* [emphasis added] to engage in competition on quality,"[1613] the aforementioned alternatives–including post-auction discounts, boosted header bids, and dedicated ad quality tools–could help publishers incentivize and prioritize exchanges for higher ad quality. For instance, using a tool to block low quality ads before they are displayed provides an additional incentive for advertisers and exchanges to create high quality content. Otherwise, their ads are more likely to be blocked, and a blocked ad generates neither an impression for advertisers nor revenue for the exchange.

773.   Aside from his claims regarding "ad quality," Professor Li argues that Alchemist could contribute to asymmetries in distributions of advertiser value across exchanges, necessitating a higher floor price for AdX.[1614] First, Professor Li fails to account for other

---

[1612] In a 2021 survey, respondent advertisers and ad agencies (who all spent a minimum of $1M annually on digital ads) used an average of 3.4 DSPs and planned to use 5.9 DSPs the following year. *See* "DSP Report: Demand-Side Platforms" (2021), GOOG-DOJ-AT-02524665, at -666, -670; *see also, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[1613] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1061.

[1614] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1083.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

ad buyers' bid-optimization programs,[1615] undermining his conclusion that AdX should have a higher floor price. Second, to support his argument, Professor Li's theoretical analysis concludes that "there exists an optimal auction that sets a higher reserve for" AdX.[1616] However, Professor Li does not show that a *first-price auction* with different floor prices would be optimal. Indeed, that is essentially never the case, and simple post-auction discounts typically work better.[1617] Instead, a first-price auction with properly set post-auction discounts can implement an optimal auction. This is also consistent with my published work, which describes how differences in bidder values can be managed by post-auction discounts, rather than by non-uniform reserves.[1618]

774. While the Advertiser Class and Publisher Class complaints allege that "[u]niform price floors also gave a price advantage to Google because Google charged its publishers fees for transactions made on non-Google Ad Exchanges [...],"[1619] this is incorrect. As I discuss in Section XIII.D.1, no additional fees are charged on ad inventory sold to header bidding exchanges. For exchanges participating in Open Bidding, Google's Open Bidding



---

[1616] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1505 ("Theorem There exists an optimal (i.e. expected revenue maximizing) auction that sets a strictly higher reserve for the cartel than for bidders outside the cartel.").

[1617] In Section XV.G, I provide an example to illustrate how a publisher can obtain strictly higher revenues with post-auction discounts than with differential price floors.

[1618] *See* Milgrom, P. R. (2004). *Putting auction theory to work*. Cambridge University Press, at Section 6.3.2 p. 237.

[1619] Advertiser Class Complaint, at ¶ 329, ¶ 295 ("Google's unlawful agreements also impose a 5 to 10 percent fee for transactions that clear on other exchanges. Google thereby both profits on trades outside its system and handicaps the competition that clears those trades.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

revenue share pays for valuable services, which for publishers include reporting, payment processing, and integration with non-Google exchanges, and for exchanges include real-time processing of the huge number of bids they submit on each impression. Plaintiffs fail to account for these valuable services when assessing any "disadvantage" to non-Google exchanges. Moreover, a publisher seeking to avoid the Open Bidding revenue share could use header bidding to process real-time bids from relevant exchanges. Or, if a publisher wished to account for fee differences in Open Bidding, it could offer a post-auction discount to Open Bidding exchanges to offset the fee differential.

### *4. Professor Cramton's Claims on Efficiency and Market Thickness are Mistaken*

775. In his discussion of UPR, Professor Cramton states, "in a first-price setting, price floors remain 'critically important for revenue' because they allow publishers to prevent bidders from shading their bids too much and encourage higher bids."[1620] In particular, he stresses that "'low auction density' on AdX may have been one rationale for publishers to want to impose a higher floor for AdX,"[1621] before concluding that "it is reasonable to expect publishers to arrive at *more efficient equilibria* [emphasis added] by setting different floors for exchanges."[1622] This is wrong. While higher floor prices might "encourage" higher bids, they also increase the likelihood of leaving impressions unsold, thereby *decreasing* efficiency. On the contrary, achieving an efficient outcome requires setting

---

[1620] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 277.

[1621] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 277.

[1622] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 278.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

floor prices equal to the publisher's opportunity cost, which is the same across *all* exchanges, regardless of their "density."

776.    Professor Cramton also claims that "by artificially thickening the AdX market [UPR] compromised the overall thickness of the market [], as more transactions were now subject to AdX's take rate."[1623] This is mistaken in several ways. First, reducing the AdX floor does not eliminate any demand, it introduces additional AdX demand, which can only improve the "overall thickness of the market." Second, bids in the UFPA are compared net of fees, so any additional impressions won by AdX must increase the publisher's revenues. Finally, the additional AdX demand often provided bids for impressions that would otherwise go unsold.

### 5. The Daily Mail Complaint Incorrectly Claims UPR Decreased Daily Mail's Revenues

777.    Daily Mail claims that "[t]he data prove that UPR has done substantial harm,"[1624] but it presents no direct evidence of impacts on total revenue. In Figure 25, I use available monthly data from Daily Mail to plot the sum of its "US Direct" and "US Indirect" revenues.[1625, 1626] As shown in the figure, revenues continued to increase for months after UPR's introduction, decreasing only in 2020 during the COVID-19 pandemic. Figure 26 is based on the same data, but plotted to highlight deviations from trend and suppresses

---

[1623] Expert Report of P. Cramton (Oct. 4, 2024), at ¶ 271.

[1624] Daily Mail Second Amended Complaint, at ¶ 203.

[1625] This result was generated using code/dailymail_rev.py in my supporting materials, and the output is saved in code/figures/us_direct_indirect_revenue.png.

[1626] Revenues compiled from DMGT_DOJ_0001046 and converted to US dollars using average monthly exchange rates as reported by the Federal Reserve Bank of St. Louis. https://fred.stlouisfed.org/series/EXUSUK, accessed Dec. 13, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

seasonal variations.[1627, 1628] It shows that revenues were above trend for several months after the introduction of UPR, contradicting Daily Mail's claims.

---

[1627] This result was generated using code/dailymail_rev.py in my supporting materials, and the output is saved in code/figures/us_direct_indirect_residuals.png.

[1628] To adjust revenues for seasonality, I fit a regression model that accounts for monthly patterns and a linear trend over time. I plot the residuals from the model, representing deviations from expected revenue after removing seasonal and trend effects.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Figure 25: US Direct + US Indirect Revenues for Daily Mail**



**Figure 26: Deviations from Trend of Seasonality Adjusted Direct + Indirect Revenues**



778.    Moreover, the Daily Mail's complaint and internal communications point to floor prices that are too low, rather than impacts from UPR. If, as claimed, "[a]t AdX's severely depressed prices, it often would be better to serve a house ad or nothing at all,"[1629] the

---

[1629] Daily Mail Second Amended Complaint, at ¶ 204.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Daily Mail could have set floor prices higher than the value from house ads. Then, remnant demand would not win an impression and pay less than the value of the house ad. Instead, their internal communications seem to indicate that they were setting "no floors" after the move to the UFPA.[1630]

### 6. The Daily Mail Complaint Incorrectly Claims AdX Retained a Last Look Advantage

779.  The Daily Mail Complaint incorrectly claims that UPR shut "down publishers' last path of resistance against Last Look."[1631] As a result, they claim AdX is "now better able to outbid rivals by a penny."[1632] These claims are factually incorrect. As I discussed in Section XIII.C.3, when AdX transitioned to the UFPA it entirely removed the so-called "Last Look." Hence, after the transition, AdX did not and could not outbid rivals by bidding a penny more.[1633] As I explained above, the transition to UFPA eliminated a central incentive for publishers to set higher floor prices for AdX and UPR did not prevent the publishers from favoring non-AdX exchanges by other means if they chose to do so.

---

[1630] Feifan Chen, "Re: Findings in UPR," (Feb. 15 2020), DM_GOOG_0000106, at 107 ("Before figuring out how to create this win-win environment, I believe no floors is still the best solution we have in the 1st price auction world.").

[1631] Daily Mail Second Amended Complaint, at ¶ 206.

[1632] Daily Mail Second Amended Complaint, at ¶ 204.

[1633] "Ad Manager Unified 1st Price Auction" (Sept. 27, 2019), GOOG-DOJ-09714662, at -663 ("After the transition is complete, all publisher traffic is on 1st auction").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 7. Professor Li and Professor Hortaçsu Omit Critical Details in their Analysis of Data and Documentation From Confiant

780.  Professor Li claims that UPR limited publishers' ability to "weed out objectionable ads with greater precision"[1634] and that "[p]ublishers set differential floors because AdX produce[d] lower quality ads than other exchanges."[1635] Professor Hortaçsu further asserts that "the prevalence of bads [sic] ads coming from AdX increased after UPR was implemented."[1636] Professors Li and Hortaçsu attempt to support their arguments with an analysis of data and published material from Confiant, a third-party firm that specializes in identifying and blocking low-quality ads before they are served.[1637] After reviewing the data and documents from Confiant, I find their analysis omits critical details, rendering their conclusions demonstrably incorrect in at least three ways.

### a) AdX Produced Higher Quality Ads Than Other Exchanges in the Months Following UPR

781.  Each quarter, Confiant publishes a report containing numerous figures on digital ad quality, security, and privacy. Although Professor Li cites the Q4 2021 report to argue that "Google was the main source of ads with Misleading Claims,"[1638] he omits findings from the most relevant quarters–those immediately following UPR's launch.

---

[1634] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1032 ("By establishing more specific price floors tailored to individual exchanges, publishers can weed out objectionable ads with greater precision, thereby improving their ad quality and limiting their reputational costs of serving low-quality ads.").

[1635] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1026.

[1636] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 447.

[1637] *See* Confiant, "Ad Quality Solutions," https://www.confiant.com/solutions/quality, accessed Dec. 12, 2024.

[1638] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1035 ("One deck also notes that in Q4 of 2021, 'Google was the main source of ads with Misleading Claims (ads that use misleading language or imagery to garner clicks or sell products of dubious quality).'").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

782. In the report published one quarter after UPR's launch (Q1 2020), Confiant included figures on "Quality Violation Rate by SSP" and "Violation Rates by SSP Size"[1639] (see Figure 27 and Figure 28). The figures illustrate that, except for one smaller provider, AdX had the *best* quality rate and *second-best* security rate among SSPs that quarter, with the report remarking that "Google Ad Exchange consistently place[s] among the top performers."[1640]

**Figure 27: Quality Violation Rate by SSP (Confiant Figure)**



---

[1639] Confiant, "Demand Quality Report Q1 2020," at pp. 18-19, accessed Dec. 12, 2024.

[1640] Confiant, "Demand Quality Report Q1 2020," at p. 11, accessed Dec. 12, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Figure 28: Violation Rates by SSP Size (Confiant Figure)**



783. In Figure 29 below, I present a more comprehensive analysis that compares quality violation rates between Google's exchange and non-Google exchanges for each month from April of 2018 to July of 2023, as measured in the Confiant data.[1641]

---

[1641] Figures 29 to 33 and their supporting statistics rely on the same Confiant dataset used by Professors Li and Hortaçsu (GOOG-AT-DOJ-DATA-000066769 to GOOG-AT-DOJ-DATA-000066770) and were generated using code/confiant.py in my supporting materials. The resulting figures are saved in figures/confiant/ and the output is saved in logs/confiant.txt. For these figures, rows are classified as AdX when "ssp_name" is equal to "Google"; all other rows are classified as "Other SSPs".

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Figure 29: Quality Violation Rate AdX vs Other SSPs**



784. If, as claimed by Professors Li and Hortaçsu, "AdX offer[ed] publishers low-quality ads, compared with the largest other exchanges in the market,"[1642] and "differential floors successfully [] weed[ed] out bad ads,"[1643] one would expect the flagged proportion of AdX impressions to increase *immediately* after UPR's introduction. The data, however, does not support that. As [Figure 29](#) illustrates, both before the introduction of UPR and *for nearly a year* afterward, the impressions won by AdX had a lower proportion of ad quality violations than the impressions won by other SSPs. Furthermore, the measured proportion of ad quality violations on AdX remained nearly unchanged between the year prior to the launch of UPR and the year after, differing by just 0.01%.

---

[1642] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1033; *see also* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 449 ("Thus, this data indicates that publishers originally used differential floors successfully to weed out bad ads, only for UPR to erase those gains.").

[1643] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 449 ("Thus, this data indicates that publishers originally used differential floors successfully to weed out bad ads, only for UPR to erase those gains.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

785. Confiant's own reports align with these findings, with its "Demand Quality Report[,] 2020 Year in Review" commending Google as a "standout for good performance."[1644]

### b) Confiant Data is Inconsistent with Claims that UPR Led to "Lower Quality Ads Across the Market"

786. After claiming that "UPR weakened competition on ad quality in the exchange market, leading to lower quality ads across the market,"[1645] Professor Li employs the same data I present in Figure 29 to conclude that UPR led to a "*market-wide* [emphasis added] decrease in ad quality",[1646] with Professor Hortaçsu replicating that analysis.[1647] But Professors Li and Hortaçsu once again omit important details. Rather than plotting all available monthly data–essential for examining trends in the months following UPR's launch–they aggregate data by year and entirely exclude data from 2018. In Figure 30 below, I compare their figure (depicted by the yellow line) to the *complete monthly data* (in blue).

---

[1644] *See* Confiant, "Demand Quality Report 2020 Year in Review," at p. 19, accessed Dec. 12, 2024.

[1645] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1052; *see also* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 450. ("Since UPR led to an increase in the AdX share, this increased the presence of bad ads.").

[1646] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1061 ("The figure shows that following UPR, competition in the exchange market in quality generally worsened. In 2020, just over 0.2% of impressions were flagged for quality violations for the rest of the market. In 2022, over 1% of impressions were flagged for quality violations—approximately a fivefold increase.1675 This is consistent with the fact that, without the credible threat of differential price floors, that would move volume from low-quality exchanges to high-quality exchanges, exchanges lost the incentive to engage in competition on quality. The result is a market-wide decrease in ad quality, to the detriment of publishers and consumers alike.").

[1647] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1061; *see also* Revised Expert Report of S. Li (Oct. 11, 2024), at Fig. 42, Fig. 26.

**Figure 30: Quality Violations Monthly vs Li's Representation of Data**



787. Using monthly data over the full period, a more detailed picture emerges that is at odds with Professor Li's interpretation that following UPR, "ad quality worsened and low-quality ads become more prominent in the market."[1648] As shown in the months omitted by Professors Li and Hortaçsu, the share of quality violations was actually *higher* in the period prior to UPR, when "differential floors" were still in effect. This is emphasized in Figure 31, which illustrates that the proportion of ads marked with a quality violation more than halved in the year following UPR (compared to the year before).

---

[1648] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1062.

**Figure 31: Quality Violations a Year Before and After UPR Release**



788. These omissions reveal that Professors Li and Hortaçsu's analysis of the Confiant data is flawed and does not reliably attribute any "market-wide" effect on ad quality to UPR. While Confiant eventually flagged a larger proportion of impressions as "low-quality," associating those changes with UPR is unreliable, as those increases did not occur until approximately a year after UPR's launch.

*c) Changing Market Conditions and Confiant's Product Evolution Complicate the Evaluation of Long-Term Ad Quality Trends*

789. Although Professor Li claims that "UPR weakened competition on ad quality in the exchange market, leading to lower quality ads across the market and thereby harming publishers,"[1649] the Confiant reports he cites make no mention of UPR – rather, the

---

[1649] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1052 ("In this section, I explain how by removing differential floors, UPR weakened competition on ad quality in the exchange market, leading to lower quality ads across the market and thereby harming publishers.").

reports document *other* factors that more plausibly account for the observed variations in measured quality since 2021.[1650]

790.  *First,* in December 2020 (after UPR), Confiant announced a "beta" feature aimed at detecting and blocking an additional new category of low-quality advertisements that it labeled "misleading claims."[1651] The introduction of a new category increases the number of impressions flagged, making it appear that there is "a market-wide decrease in ad quality."[1652] These changes also obscure comparisons between SSPs; as an in-beta feature, Confiant's algorithms may not have been calibrated consistently across all SSPs or rolled out to them simultaneously.

791.  For a more consistent comparison, in Figure 32, I replicate Figure 29 but exclude impressions flagged as "Misleading Ads" from being counted as a "Quality" violation. After these exclusions, AdX shows a lower proportion of quality violations than other SSPs in 62 out of the 64 months in the dataset.

---

[1650] Dr. Chandler makes a related claim, that "UPR reduced the ability of publishers to operate freely across exchanges, preventing those exchanges from competing effectively." Yet he does not explain his logic nor provides any evidence. *See* Expert Report J. Chandler (Oct. 4, 2024), at ¶ 349.

[1651] David Lim "Confiant detection & blocking of misleading claims: What is it & why it matters" (Dec. 16, 2020), accessed Dec. 12, 2024.

[1652] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1061 ("The figure shows that following UPR, competition in the exchange market in quality generally worsened. In 2020, just over 0.2% of impressions were flagged for quality violations for the rest of the market. In 2022, over 1% of impressions were flagged for quality violations—approximately a fivefold increase. This is consistent with the fact that, without the credible threat of differential price floors, that would move volume from low-quality exchanges to high-quality exchanges, exchanges lost the incentive to engage in competition on quality. The result is a market-wide decrease in ad quality, to the detriment of publishers and consumers alike.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Figure 32: Quality Violations Excluding Misleading Claims**



792. *Second,* Confiant's own reports indicate how external trends can contribute to

fluctuations in ad quality. For example, in Q1 2021, Confiant notes that "health-related

topics represent[ed] nearly one-third of all category blocks – the likely result of

sensitivities related to COVID-19 messaging."[1653] It also notes that the amount of

cryptocurrency ads blocked sometimes depends on the performance of the sector.[1654]

793. *Third,* I have seen no evidence that UPR led to reductions in efforts to control ad quality.

Following UPR, publishers retained the ability to incentivize exchanges and advertisers

to deliver high-quality ads using the tools I outlined in Section XIV.E.3 . Contrary to

Professor Li's prediction, there is no evidence of UPR "creating a race-to-the-bottom" in

---

[1653] Confiant, "Security And Quality Violation Rates Increase Across Digital Advertising In Q1 2021" (June 28, 2021).

[1654] Confiant, Malvertising and Ad Quality Index 2023 Report (Based on 2022 Data) ("Blocks for Cryptocurrency ads declined precipitously in the second half [of 2022], no doubt driven by the implosion in that sector.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

long-run ad quality.[1655] While fluctuations in the data are large, Figure 30 does not support Professor Li's "race-to-the-bottom" prediction, instead showing a 43% decrease in market-wide violations in the last year of available data.

### *8. Corrections to Professor Hortaçsu's Regression Panel Show No Significant Effect of UPR on Total Impressions*

794.  In addition to his analysis of Confiant data, Professor Hortaçsu argues that "there is substantial evidence that UPR worsened ad quality" and that "ad quality impacts user experience and can lead to a reduction in readership,"[1656] which he then aims to quantify with another empirical study. This empirical study employs a panel regression to estimate the effect of "AdX share" after UPR on the total number of impressions (total impressions) a publisher receives six months later.

795.  Professor Hortaçsu summarizes his overall findings by stating, "[i]n my analysis, I show that AdX is responsible for a high share of bad ads, that UPR increased those bad ads, and that bad ads degrade user experiences and thus reduce readership."[1657] Each of these three claims is individually incorrect, entirely invalidating his calculations of "damages." As I elaborate extensively in Section XIV.E.7, evidence from Confiant contradicts his conclusions that AdX was "responsible for a high share of bad ads" and that "UPR increased those bad ads." In this section, I demonstrate that his panel regression, intended to show that UPR "reduce[d] readership," also has multiple shortcomings and lacks robustness: adjusting for any *one* of the shortcomings negates his results.

---

[1655] Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1056 ("Because UPR makes it harder to target the exchange that lowers ad quality, exchanges have more leeway to reduce ad quality, creating a race-to-the-bottom.").

[1656] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 465.

[1657] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 418.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

796. Like Professor Hortaçsu, my analysis focuses on the case of "LPS" publishers, as he agrees that "UPR has no impact on" publishers in the "OPG" channel, which represent 97.6% of the publishers and 36.9% of the total impression volume in the dataset he studies.[1658] I first replicate Professor Hortaçsu's analysis of the following fixed-effect panel regression:

Professor Hortaçsu's Equation 8:[1659]

$$ln(Total\ Impressions_{i,t+6}) = \alpha + \beta_1 AdX\ share_{i,t} + \beta_2 UPR_t + \beta_3 AdX\ share_{i,t} \times UPR_t$$
$$+ Publisher\ FE + \beta_4 t + \varepsilon_{i,t}$$

797. The dependent variable, $ln(Total\ Impressions_{i,t+6})$, is the natural logarithm of the number of impressions for publisher $i$ six months after month $t$, $AdX\ share_{i,t}$ is the share of AdX impressions of publisher $i$ sold through AdX in month $t$, $UPR_t$ is a dummy variable, which takes a value of one if month $t$ is after September 2019 and zero otherwise. $Publisher\ FE$ is a set of publisher fixed effects and $t$ denotes a linear trend.

798. Professor Hortaçsu ascribes the following interpretation to the coefficients:

"The value of $\beta_1$ means that when there is no UPR, one percentage point increase in AdX share leads to [an increase by a factor of $exp(\beta_1)$] in total impressions six months later. The value of $\beta_2$ means that UPR can increase the total impressions by [a factor of $exp(\beta_2)$] percent six months later when AdX share is zero. The value of $\beta_3$ means that one percentage

---

[1658] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 501 ("I exclude those publishers who used the 'OPG' (online partnerships groups) sale channel because they are small publishers and less likely to use multiple ad exchanges (i.e., UPR has no impact on them).").

[1659] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 492.

point increase in AdX share leads to [an increase by a factor of $exp(\beta_3)$] in total impressions six month[s] later when there is UPR."[1660]

799.  Acknowledging that his estimates of $\beta_1$ and $\beta_2$ "are not statistically significant,"[1661] Professor Hortaçsu's harm calculations hinge on finding a negative and statistically significant estimate of $\beta_3$.

800.  After replicating his result, I carry out three modifications to overcome shortcomings with his methodology. As I detail below, addressing any *one* of the shortcomings results reverses his finding, leading instead to the conclusion that *all* coefficients, including $\beta_3$, *fail* to be statistically significant.[1662]

### a) Correcting Professor Hortaçsu's Omission of Publisher-Specific Trends Negates His Conclusions

801.  In practice, some firms that grow rapidly might have a different AdX share relative to firms that are growing more slowly. The failure to account for this might incorrectly attribute the effect on future growth to the introduction of UPR. If Professor Hortaçsu's implicit assumption that there was no systematic correlation between the publisher time trend and AdX share were correct, allowing for publisher-specific trends should not change his results.[1663] However, in Table 6, I demonstrate that this is not the case.

---

[1660] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 504.

[1661] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 505.

[1662] In the Technical Notes Section XV.G.2, I show that the same conclusion is reached when considering any of the alternative specifications of 9, 12 or 15 months for the effect on impressions proposed by Professor Hortaçsu.

[1663] *See* Angrist and Pischke, "Mostly Harmless Econometrics," Princeton University Press, 2008, at p. 238.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Table 6: All LPS Publishers - Original Sample[1664]**

| | (1) | (2) | (3) |
|---|---|---|---|
| | Dependent variable: ln(impressions 6 month later) | | |
| $\beta_1$ | -0.00433 | 0.00160 | 0.00559 |
| | (0.00824) | (0.00434) | (0.00428) |
| $\beta_2$ | 0.41287 | -0.01120 | 0.03554 |
| | (0.28873) | (0.20604) | (0.19726) |
| $\beta_3$ | -0.01427** | -0.00118 | -0.00296 |
| | (0.00716) | (0.00459) | (0.00468) |
| Observations | 7591 | 7591 | 7591 |
| Adjusted R-square | 0.876 | 0.953 | 0.961 |
| Time trend | Common | Publisher | Publisher-UPR |

The first column of <u>Table 6</u> contains the results from Professor Hortaçsu's report.[1665] For the second column, I have modified this regression to incorporate a publisher-specific trend. Rather than imposing a common time trend—that is, a unique $\beta_4$ coefficient for *all* publishers—I allow this coefficient to differ *by* publisher, leading to a publisher-specific coefficient as $\beta_{i,4}$. Incorporating publisher-specific trends effectively eliminates any supposed effect of post-UPR AdX win share on the total number of impressions. Concretely, the estimated coefficient of interest, $\beta_3$, is now *less than a tenth* of Professor Hortaçsu's original estimate, and it is not statistically distinguishable from 0. The third column reports the results of an even more general specification which allows for a structural break in the publisher specific trend when UPR was introduced. In this case the

---

[1664] Code for this regression and all subsequent ones in this section is provided in the code/UPR-Panel folder in my supporting materials, with the output saved in "code/UPR-Panel/5. CorrectedOutput/UPR_Panel_Output.xlsx." AdX share is calculated as the share of impressions from AdX. Standard errors in parenthesis are clustered at the publisher level. I follow Professor Hortaçsu's convention of denoting significance levels with stars: * p <0.1, ** p < 0.05, *** p < 0.01. All specifications include publisher fixed effects, month fixed effects, and dummies for periods under COVID (from March 2020 to March 2021) and the DOJ litigation with Google (from September 2020 to present).

[1665] Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at p. 175, Table 21, column (4).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

coefficient of interest is about a fifth of Professor Hortaçsu's original estimate, and once again is not statistically distinguishable from 0.

### b) Retaining Dropped Observations from Professor Hortaçsu's Panel Negates His Conclusions

802.    The computer program implementing Professor Hortaçsu's analysis excludes some publisher-month pairs with no AdX impressions, but retains others, affecting the analysis.[1666] For example, King Features Syndicate is excluded for September 2019 but included for October 2019, despite clearing over 150,000 impressions in each month.

803.    To correct this inconsistency, I include all such publisher-month pairs with no AdX impressions.[1667] This adjustment increases the observation count in the regression from 7,591 to 8,816. In Table 7, I replicate the results from Table 6, but with this corrected dataset. My estimated coefficients on the AdX share interaction term, $\beta_3$, are less than half of Professor Hortaçsu's estimates and are not statistically significant. In the second and third column, I present the results after resolving the inconsistencies in the dataset *and* adding publisher-specific trends as discussed above. The resulting coefficient $\beta_3$ in the second column is now positive, indicating a *positive*, albeit statistically insignificant, effect from exposure to AdX . The coefficient in the third column is negative but statistically insignificant and about one tenth the original result of Professor Hortaçsu.

---

[1666] This asymmetry seems to be partially attributable to his computer program's treatment of "matched" queries. While the program seems to exclude certain publisher-month pairs where no AdX impressions or matched queries occurred, it appears to retain other publisher-month pairs with no AdX impressions and some matched queries.

[1667] In Professor Hortaçsu's analysis, additional publisher-month pairs are excluded from the analysis because the log is undefined on month-publisher pairs with 0 total impressions six months later. That set of pairs is different from the observations I emphasize here. In the next subsection, however, I discuss how excluding those other month-publisher pairs could introduce additional biases.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Table 7: All LPS Publishers**

| | (1) | (2) | (3) |
|---|---|---|---|
| Dependent variable: ln(impressions 6 month later) | | | |
| $\beta_1$ | -0.00013 | 0.00209 | 0.00420 |
| | (0.00877) | (0.00418) | (0.00397) |
| $\beta_2$ | 0.06765 | -0.06281 | -0.04239 |
| | (0.25385) | (0.18792) | (0.17537) |
| $\beta_3$ | -0.00664 | 0.00015 | -0.00143 |
| | (0.00702) | (0.00454) | (0.00432) |
| Observations | 8816 | 8816 | 8816 |
| Adjusted R-square | 0.884 | 0.953 | 0.963 |
| Time trend | Common | Publisher | Publisher-UPR |

### c) Balancing Hortaçsu's Panel Eliminates Attrition Bias and Negates His Conclusions

804. In panel data analysis, working with an unbalanced panel—where publishers are not observed across all time periods—often requires careful treatment to account for the reasons some observations are missing.[1668] In some cases, the unbalanced nature of the panel does not pose significant problems, particularly when the missing data occur "at random" or in ways uncorrelated with the regression error term. However, if this condition is violated, issues such as selection bias or attrition bias can arise, leading to potentially biased and inconsistent estimates.[1669]

805. Under Professor Hortaçsu's model, publisher-month pairs with no impressions are excluded because the dependent variable (the logarithm of zero) is undefined. However, this exclusion introduces a selection issue: the missing data (zeros) are not missing at

---

[1668] *See* Jeffrey M. Wooldridge, "Econometric Analysis of Cross Section and Panel Data," *The MIT Press*, at Section 10.1, p. 250.

[1669] *See* Jeffrey M. Wooldridge, "Econometric Analysis of Cross Section and Panel Data," *The MIT Press*, at Section 17.1., pp. 551-552.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

random but are systematically excluded for months with no impressions. This creates the risk of sample selection bias, as the missing data is systematically correlated with unobserved factors that cause the number of impressions to be low.

806. Working with a balanced panel—that is, focusing on the subset of publishers for which the number of impressions is positive for every month in the period under analysis—can help mitigate the risk of sample selection bias. These units are less likely to be contaminated by the systematic issues associated with excluding zeros, providing a cleaner and more reliable dataset for analysis. Moreover, this approach is appropriate because, if the assumption of missing at random is satisfied, it is valid to apply a standard fixed effects analysis to any balanced subset of the unbalanced panel.[1670]

807. With these considerations in mind, I use two balanced panels to test whether a methodology that controls for these possible biases changes the results of Hortaçsu's original model. In the first, I balance the original dataset in Professor Hortaçsu's analysis. I only include in the sample publishers with positive impressions in every month in the period June 2018 to May 2022, resulting in 6,048 observations. The first column of Table 8 summarizes the regression on this balanced data; relative to the coefficient in column (4) of Table 21 of Professor Hortaçsu's report, the estimated coefficient on the AdX share interaction term, $\beta_3$, is again less than *half* of Professor Hortaçsu's estimate and not statistically significant. In the second and third columns, I present the results of the balanced dataset, but I account for publisher-specific trends. For these regressions, the

---

[1670] *See* Jeffrey M. Wooldridge, "Econometric Analysis of Cross Section and Panel Data," *The MIT Press*, at Section 17.7.1, p. 581.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

estimated coefficient, $\beta_3$, has a positive sign (which would attribute a positive effect to the total number of impressions from exposure to AdX).

**Table 8: Balanced Panel of LPS Publishers - Original Sample**

| | Dependent variable: ln(impressions 6 month later) | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| $\beta_1$ | -0.01528 | -0.00535 | -0.00343 |
| | (0.00956) | (0.00494) | (0.00445) |
| $\beta_2$ | 0.20842 | -0.03187 | -0.04707 |
| | (0.19252) | (0.21846) | (0.21484) |
| $\beta_3$ | -0.00457 | 0.00196 | 0.00187 |
| | (0.00353) | (0.00522) | (0.00539) |
| Observations | 6048 | 6048 | 6048 |
| Adjusted R-square | 0.824 | 0.922 | 0.936 |
| Time trend | Common | Publisher | Publisher-UPR |

808. For consistency and completeness, I create a second balanced panel shown in Table 9 built from the corrected dataset I describe in Section XIV.E.8.b. In other words, I include publishers that had missing observations not because they had zero impressions but because they had zero AdX share and had been excluded in the original analysis, leaving behind 7,308 observations. In this case, for all specifications, the estimated coefficient on the AdX share interaction term, $\beta_3$, is positive (which would attribute a positive effect to the total number of impressions from exposure to AdX), but not statistically significant.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Table 9: Balanced Panel of LPS Publishers**

| | Dependent variable: ln(impressions 6 month later) | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| $\beta_1$ | -0.00815 | -0.00448 | -0.00376 |
| | (0.01000) | (0.00467) | (0.00385) |
| $\beta_2$ | -0.08147 | -0.08032 | -0.06132 |
| | (0.19149) | (0.19128) | (0.17764) |
| $\beta_3$ | 0.00375 | 0.00349 | 0.00233 |
| | (0.00466) | (0.00529) | (0.00477) |
| Observations | 7308 | 7308 | 7308 |
| Adjusted R-square | 0.875 | 0.948 | 0.959 |
| Time trend | Common | Publisher | Publisher-UPR |

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## XV:    TECHNICAL NOTES

### A. Technical Notes for Section IV (Google Ads Bidding Programs)

#### 1. Theorem 1: Statement and Proof

809. **Theorem 1:** Suppose that Google changes from direct bidding to a bid optimization program, causing its bids to increase and the publisher to revise its floor price.[1671] Further, suppose that the combined effect is that Google Ads' win rate for a given advertiser increases. In addition:

   a. Let $v$ denote the advertiser's value for impressions, assumed to be a random variable with finite mean drawn from a twice continuously differentiable distribution $F$ with a strictly positive probability density function $f$ supported on a closed subset of $[\underline{v}, \infty)$.

   b. Let $\lambda$ denote the inverse hazard rate function for the distribution $F$, defined by $\lambda(v) = \frac{1 - F(v)}{f(v)}$.

   c. Let $M$ denote the change in the Google Ads win rate.

   d. Let $S$ denote the change in the advertiser's *ex ante* expected surplus.

   e. Let $r$ denote the publisher's floor price for Google Ads under direct bidding.

   If $\lambda(v)$ is non-decreasing for all $[r, \widetilde{v}]$ and $M > 1 - F(\widetilde{v})$, then $S > 0$.

---

[1671] For this theorem, I assume that other advertisers' bids are unchanged. The profit-maximizing bids for DSPs submitting one bid in the AdX second-price auction would be unaffected by any changes in Google Ads' bids.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

810. ***Proof.*** I use the Revelation Principle, conducting my analysis in the space of so-called "direct revelation mechanisms," which map from the advertiser's reported value to interim allocations and payments.[1672] Let $x: [\underline{v}, \infty] \to [0, 1]$ be the interim allocation function of the advertiser under direct bidding (*i.e.*, $x(v)$ is the probability that an advertiser with value $v$ wins the auction), and let $x': [\underline{v}, \infty] \to [0, 1]$ be the interim allocation function of the advertiser under the bid optimization program and applying the revised publisher floor price. The increase in the Google Ads win rate after the two changes is then

$$M = \int_{\underline{v}}^{\infty} [x'(v) - x(v)]\, dF(v),$$

which is assumed to be positive for this theorem.

811. By the Milgrom-Segal Envelope Theorem,[1673] for any interim allocation function $y(v) \in [0, 1]$ and interim payment function $t(v)$, the surplus of an advertiser with value $v$ is

$$U(v) = \max_{s \in [\underline{v}, \infty]} \{vy(s) - t(s)\} = \int_{\underline{v}}^{v} y(s)\, ds.$$

To derive this expression, I used the fact that the bidder with the lowest possible value always loses and pays zero, so $t(\underline{v}) = 0$. Note that

$\int_{\underline{v}}^{\infty} U(v) dF(v) \leq \int_{\underline{v}}^{\infty} (v - \underline{v}) dF(v) < \infty$ because the mean of valuation exists. Then the *ex ante* expected surplus of such an advertiser is

---

[1672] *See, e.g.*, Myerson, R. B, "Optimal Auction Design," INFORMS Mathematics of Operations Research, Vol. 6 (Feb. 1981), at pp. 58-73.

[1673] Milgrom, P., and Segal, I., "Envelope Theorems for Arbitrary Choice Sets," *Econometrica*, Vol. 70 (Mar. 2002), at pp. 583-601.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

$$\int_{\underline{v}}^{\infty} U(v)dF(v) = \int_{\underline{v}}^{\infty}\int_{\underline{v}}^{v} y(s)ds\, dF(v) = \int_{\underline{v}}^{\infty}\int_{\underline{v}}^{\infty} 1\{v' < v\}y(v')dv'dF(v) = \int_{\underline{v}}^{\infty} y(v)(1 - F(v))dv.$$

This implies that the change in *ex ante* expected advertiser surplus caused by the bid optimization program is

$$S = \int_{\underline{v}}^{\infty}[x'(v) - x(v)](1 - F(v))dv = \int_{\underline{v}}^{\infty}[x'(v) - x(v)]\lambda(v)\, dF(v)\,.$$

812. Let $r'$ denote the advertiser's *value threshold*, that is, the value that, under the bid optimization program, leads to a bid equal to the publisher's chosen floor price.[1674] There are two cases: either $r' < r$ or $r' \geq r$. That is, the value threshold may be lower or higher than before the changes.

813. In the first case ($r' < r$), since the bid optimization program increases bids, $x'(v) \geq x(v)$ for all $v$, with strict inequality for some open set of values. Hence the advertiser's *ex ante* expected surplus increases as well:

$$S = \int_{\underline{v}}^{\infty}[x'(v) - x(v)](1 - F(v))\, dv > 0.$$

814. In the second case ($r' \geq r$), the interim allocation functions $x$ and $x'$ satisfy

a.  $x'(v) \geq x(v) \geq 0$ for $v \geq r'$, since the bid optimization program increases the bid for an advertiser with value $v$, and for bids above the relevant floor price, that increases the probability its bid beats those of other bidders.

b.  $x'(v) = 0 \leq x(v)$ for $r \leq v < r'$, since all advertisers with values above $r$ had a chance of winning the impression under direct bidding, but only advertisers with

---

[1674] To make this concrete: under Bernanke with a high bid multiplier $\beta v$ and post-Bernanke reserve $R$, the resulting value threshold is $r'=R/\beta$.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

values above $r'$ can win the impression after the optimization program is introduced.

   c.  $x'(v) = 0 = x(v)$ for $v < r \leq r'$, that is, no advertisers with value less than $r$ wins with or without the optimization program.

815. Define the function $\Delta: [\underline{v}, \widetilde{v}] \rightarrow R$ by

$$\Delta(v) = \int_{v}^{\widetilde{v}} [x'(s) - x(s)] dF(s).$$

The previous paragraph implies that $\frac{d\Delta}{dv}(v) = - [x'(v) - x(v)]f(v)$ is nonnegative for $v < r'$ and nonpositive for $v > r'$, so $\Delta(v)$ is quasiconcave in $v$ (that is, the function is nondecreasing and then nonincreasing on its domain).

816. The condition $M \geq 1 - F(\widetilde{v})$ guarantees that:

$$\Delta(v) = \int_{\underline{v}}^{\widetilde{v}} [x'(v) - x(v)] \, dF(v) = M - \int_{\widetilde{v}}^{\infty} [x'(v) - x(v)] \, dF(v) \geq M - [1 - F(\widetilde{v})] > 0,$$

where the first inequality follows because $[x'(v) - x(v)] \leq 1$. Moreover, because $[x'(v) - x(v)] \leq 0$ for $v < r'$.

$$1 - F(\widetilde{v}) < M \leq \int_{r'}^{\infty} [x'(v) - x(v)] \, dF(v) \leq 1 - F(r').$$

Thus, $\widetilde{v} > r'$ which implies that $[x'(v) - x(v)] \geq 0$ for all $v \geq \widetilde{v}$ with strict inequality for an open set of values. Therefore,

$$S > \int_{\underline{v}}^{\widetilde{v}} [x'(v) - x(v)]\lambda(v) \, dF(v).$$

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

817. The final step of the proof is to show that $\int_{\underline{v}}^{\widetilde{v}} [x'(v) - x(v)]\lambda(v)\, dF(v) \geq 0$. To do so, I use the Barlow-Proschan Lemma[1675], stated below

> **Barlow-Proschan Lemma:** Suppose that $W$ is a signed measure on the interval $(a, b)$ with $\int_{v}^{b} dW(s) \geq 0$ for all $s \in (a, b)$ and that $g$ is a nondecreasing, nonnegative function defined on the same interval. Then $\int_{a}^{b} g(s)dW(s) \geq 0$.

I use this lemma with $dW(s) = (x'(s) - x(s))dF(s)$ and $g(s) = \lambda(s)$ for $s \in (\underline{v}, \widetilde{v})$. The condition $\int_{v}^{\widetilde{v}} [x'(s) - x(s)]dF(s) \geq 0$ for $v \in (\underline{v}, \widetilde{v})$ holds because, as shown above, $\Delta(\underline{v}) \geq 0, \Delta(\widetilde{v}) = 0$ and $\Delta(v)$ is quasiconcave. The condition that $g$ is a nondecreasing, nonnegative function holds by the assumption of the Theorem.

818. **Corollary 1:** Suppose that the assumptions of <u>Theorem 1</u> continue to hold, and the distribution of $v$ satisfies DHR for values above $r$.[1676] Then Google Ads' advertiser surplus also increases: $S > 0$.

---

[1675] *See generally* Barlow, R. E., & Proschan, F, "Statistical Theory of Reliability and Life Testing: Probability Models," Holt, Rinehart and Winston, Inc., Vol. 1 (1975).

[1676] That is, that is, the so-called "hazard rate" function $v \mapsto f(v) / [1-F(v)]$ is decreasing in $v$. Equivalently, DHR is equivalent to the property that the logarithm of the survival function (the so-called "log-survival" function) of distribution $F$, which is the function $v \mapsto \log[1-F(v)]$, is convex (*i.e.*, the line drawn between any two distinct points on that function's graph lies above the function's graph).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 2. Verifying the DHR Condition of *Corollary 1* and Calculating Minimum Advertiser Surplus Using Google Ads Data

819.   I now use the **Google Ads Log-Level Dataset**[1677] to assess how closely the distributions of advertiser values in Google Ads fit distributions in the family covered in Corollary 1. If the DHR condition holds exactly, Theorem 1 implies that Google Ads' bid optimization programs increased advertiser surplus if the program also increased Google's Ads' win rate. If the DHR condition holds approximately, I calculate a minimal increase in Google Ads' win rate that also guarantees that Google Ads advertisers gain from the programs.

820.   Each observation in the Google Ads Log-Level Dataset represents an advertiser's bid in the Google Ads auction. The dataset contains all bids from a random 10% sample of internal auctions conducted between January 17, 2024 and January 23, 2024, inclusive. Altogether, this dataset contains bids for around 8 billion US AdX impressions.[1678] For each impression, the dataset contains estimates of the valuations of all bidders in the Google Ads internal auction, stored in the column "original_unadjusted_score_usd".

821.   Because Corollary 1's technical condition applies to the true distribution of advertisers' values—which is not observable using the sample of data I have access to—I compare the *empirical* distributions of advertisers' values in those samples to value distributions that I *know* to be DHR in the relevant domain. To incorporate heterogeneity in advertisers' values for different types of impressions, I examine **slices** of data in the

---

[1677] Google Ads Log-Level Dataset (January 2024), GOOG-AT-EDTX-DATA-000000000 to -000258388.

[1678] This statistic was calculated using code/misc_queries.py in my supporting materials, and the output is saved in code/logs/misc_queries.txt.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Google Ads Log-Level Dataset, consisting of a group of Google Ads advertiser valuations for a given operating system, platform, browser, domain, GFP network ID, inventory unit path and AdX floor price.[1679] A slice is kept if it contains at least 100,000 bids with advertiser valuations and $1 of advertiser spend across those bids. For each slice, I evaluate the empirical distribution at 100 quantiles, so that each quantile has at least 1,000 affiliated observations.[1680]

822. For each slice, I identify a DHR distribution that closely approximates the empirical distribution of advertisers' values on the relevant set of values (namely, those above the publisher's optimal floor price under direct bidding). To do so, I first note that a distribution has decreasing hazard rate if and only if the log-survival function, $\log(1 - F)$, is convex.[1681] Thus, to approximate the empirical distribution, I compute the **convex envelope** of the empirical log-survival function: the pointwise maximum convex function that lower-bounds the empirical log-survival function on the values of interest. I then find the distribution whose log-survival function is equal to this convex envelope.

823. To implement this process computationally, I first find the optimal floor price for the empirical value distribution by computing the revenue a publisher would earn by setting each possible floor price and choosing the one with the highest revenue. I then compute the log-survival function $\log(1 - F)$ of the empirical distribution, keeping only the

---

[1679] Google Ads Log-Level Dataset (January 2024), GOOG-AT-EDTX-DATA-000000000 to -000258388.

[1680] These slices were generated using code/gads_bid_optimization_data.py and saved in code/gads_bid_optimization_data.json in my supporting materials. The number of slices is logged in code/logs/gads_bid_optimization_data.txt.

[1681] This is because the derivative of the log-survival function is the negative of the hazard rate: d/dx log(1-F(x)) = -f(x)/[1 - F(x)].

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

points between the optimal floor price and the 99[1682] percentile. I find the convex hull of these points using a standard algorithm, keeping only the lower portion of the convex hull.[1683] Finally, I invert the transformation $F \mapsto \log(1 - F)$ to obtain a fitted DHR distribution.

824.   To analyze the goodness-of-fit of the fitted DHR distribution, which I denote by $\hat{F}$, I compare it to its empirical counterpart $F$. For every value of $v$, $F(v) \leq \hat{F}(v)$ by construction. The area between the two curves over the support of $v$ is a measure of distance called the Wasserstein metric or the "earth mover's distance." If the area between the two curves is large, the fitted DHR distribution fits the empirical distribution poorly. Conversely, a small area indicates a good fit.

825.   On the vast majority of the data slices, it is possible to identify a DHR distribution that is practically indistinguishable from the empirical distribution of advertisers' values. This means that—for advertisers bidding on those kinds of impressions, which make up the vast majority of Google Ads advertisers—if Google Ads' bid optimization programs increased Google Ads' win rates, they must also have increased the surplus of Google Ads advertisers, even after accounting for the effects on publisher floor prices.

826.   To illustrate how well the vast majority of the data slices on Google Ads' values can be fit to DHR distributions, I ordered each data slice according to my measure of its goodness-of-fit normalized by the optimal floor price under direct bidding.

---

[1682] I exclude the top 1% of values in this analysis because they are sampled too sparsely to accurately assess the shape of the true distribution in this region.

[1683] *See* Scipy, scipy.spatial.ConvexHull, SciPy v1.11.4 Manual, https://docs.scipy.org/doc/scipy/reference/generated/scipy.spatial.ConvexHull.html, accessed Dec. 13, 2024.

827. In Figure 34, I plot the empirical distribution of advertisers' values in the Google Ads Log-Level Dataset (in blue) and its fitted distribution satisfying DHR (in orange) for nine slices at the 2nd percentile of this goodness-of-fit measure. On these slices, the empirical distribution and the fitted distribution are practically indistinguishable (the blue curve hides the orange curve almost completely), and 98% of data slices fit better than those illustrated.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Figure 34: Empirical Distributions and Their Fitted DHR Distributions for Nine**

**Slices at the 2nd Percentile**[1684]



828.  I provide similar plots for the nine *worst*-fit slices in Figure 35, showing that while there

is some discrepancy between the empirical distribution and its fitted distribution and

---

[1684] The code to calculate the fits and generate Figures 34 & 35 can be found in code/gads_bid_optimization_fit.py. The figures can be found in code/figures and are prefixed with gads_bid_optimization_grid.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

although the orange curve is no longer completely hidden by the blue curve in these plots, the fit is still extremely good.



*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

829. For each slice, define $M^*$ as the solution to the following optimization problem:

$$M^* = max_{x(v),x'(v),r'} \int_r^{\bar{v}} [x'(v) - x(v)] \, dF(v),$$

subject to:

   a. $S = \int_r^{\bar{v}} [x'(v) - x(v)]\lambda(v) \, dF(v) \leq 0,$

   b. $x(v)$ and $x'(v)$ are non-decreasing functions,

   c. $x(v) \in [0,1]$ , $x'(v) \in [0,1]$ for all $v \in (r, \bar{v}),$

   d. $x'(v) = 0 = x(v)$ for $v < r \leq r',$

   e. $x'(v) = 0 \leq x(v)$ for $r \leq v < r',$

   f. $x'(v) \geq x(v) \geq 0$ for $v \geq r'.$

830. If the first restriction does not bind, it is possible to attain $M^* = 1 - F(r)$, with $r' = r$, and $x(v) = 0$, $x'(v) = 1$ for all $v \in (r, \bar{v})$. However, $S = \int_r^{\bar{v}} \lambda(v) \, dF(v)$ will be strictly positive unless $F(r) = 1$. Thus, if $F(r) < 1$, the first restriction binds and $M^* < 1 - F(r)$; otherwise, $M^* = 0$.

831. $M^*$ is the minimum change in the Google Ads win rate that guarantees a non-negative change in the advertiser's *ex ante* expected surplus, because for all lower values of $M$ it is feasible to achieve a negative surplus.

832. To approximate $M^*$, I take a grid of $K$ values $v_1, v_2, \dots, v_K$, where $v_k$ corresponds to the $k/K$ quantile of the empirical distribution of valuations in the slice and denote by $\tilde{F}(\cdot)$ the

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

empirical distribution of these $K$ values. Therefore, $F(v_k) = \widetilde{F}(v_k) = k/K$ for all

$k = 1, 2, \dots K$. I define $a = \widetilde{F}(r) \times K$, $b = \widetilde{F}(r') \times K$, and $x(v_k) = \sum_{i=1}^{k} y_i$,

$x'(v_k) = \sum_{i=1}^{k} y'_i$ and $R_k = \sum_{i=k}^{K-1} \lambda_i$, where $\lambda_i = (K - i)(v_{i+1} - v_i)$.[1685] I replace $F(v)$ by

the empirical distribution of the the $K$ values $v_1$, $v_2$, ... , $v_K$ in the formulas for $M$ and $S$,

which yields the following optimization problem:

$$M^* \approx max_{b, y, y'} \sum_{i=b}^{K} \frac{K-i+1}{K} y'_i - \sum_{i=a}^{K} \frac{K-i+1}{K} y_i \,,$$

subject to:

$$\sum_{i=b}^{K} R_i y'_i - \sum_{i=a}^{K} R_i y_i \leq 0,$$

$b \geq a$ , $0 \leq y_i \leq 1$ and $0 \leq y'_i \leq 1$ for all $i$,

$$\sum_{i=a}^{K} y_i \leq 1 \,, \sum_{i=b}^{K} y'_i \leq 1,$$

$$\sum_{i=a}^{h} y_i - \sum_{i=b}^{h} y'_i \text{ for } h \geq b.$$

For a fixed pair $(a, b)$, this is a linear program with inequality constraints.

---

[1685] Note that this expression converges to the inverse hazard rate as the grid of values becomes dense.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

833. To solve the optimization problem for each slice, I set the floor price $r$ to maximize $[1 - F(r)]r$, which is known as the optimal or Myersonian floor price. I set $a = \widetilde{F}(r) \times K$, and solve the program above solving a linear program for a grid of values $b = a, a + 1, ..., K$ and choosing the maximum solution.

834. When we set $K = 100$, in more than 95% of the data slices the increase in win rate that guarantees an increase in advertiser surplus, $M^*$, is less than 2%. This implies that the advertiser surplus in those slices must increase for an increase of 2% in win rate. The results for other values of $M$ and $K$ displayed in <u>Figure 4</u>.

835. This analysis suggests to me that, after accounting for the incentives for advertisers to adjust their bids and for publishers to adjust their floor prices in response to the programs, the vast majority of advertisers using Google Ads would have benefited from any of Google Ads' bid optimization programs that increased the Google Ads win rate.

**B. Technical Notes for Simulations of Dynamic Allocation in <u>Section VIII.E</u>**

    ***1. Data***

836. I use two main datasets in this simulation analysis.

    a. *Google Ads Log-Level Dataset*:[1686] Each observation in this dataset represents an advertiser's bid in the Google Ads auction, which determines the bids that Google Ads will submit to AdX. The dataset contains all bids from a random 10% sample of internal auctions conducted between January 17, 2024 and January 23, 2024, inclusive. After filtering this dataset to observations related to US impressions for

---

[1686] Google Ads Log-Level Dataset (January 2024), GOOG-AT-EDTX-DATA-000000000 to -000258388.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

which a bid was submitted into GAM, this dataset contains bids for around 6 billion auctions.[1687] For each impression, the dataset contains estimates of the valuations of all bidders in the Google Ads internal auction.

b.  *Google Ad Manager Log-Level Dataset*:[1688] Each observation in this dataset represents a demand source's bid for an impression in the GAM Unified First Price Auction. The dataset contains all bids from demand sources in the same time period as the Google Ads Log-Level Dataset, in those auctions with a viewed winning candidate in the GAM UFPA.[1689] Altogether, this dataset contains bids for around 60 billion US impressions.[1690] Each observation includes the *inventory unit* of the impression for sale (which is an identifier of the space on a publisher's website where the ad will be displayed), the amount the publisher would be paid if that bid were to win,[1691] and the floor price that the demand source faced when bidding for that impression. By applying the bid inversion technique with modifications as described in the Technical Notes in Section XV.B.4.b to these data, I estimate these bidders' valuations.

---

[1687] My filtering only includes auctions with bids submitted into GAM (*i.e.*, where publisher_ssp is null and there is an internal auction winner). Of these auctions, 64 of them have multiple internal auction winners; I exclude such auctions from my analysis. Both the number of impressions and this statistic are computed in code/misc_queries.py in the supporting materials and is logged to code/logs/misc_queries.txt.

[1688] Google Ad Manager Log-Level Dataset (January 2024), GOOG-AT-EDTX-DATA-000276098 to -001116097.

[1689] Note the differences in the dataset sampling criteria: 1) the Google Ads dataset is a 10% sample, while the GAM dataset is not, and 2) the GAM dataset contains only auctions with a viewed candidate, while the Google Ads dataset does not have that restriction.

[1690] The number of impressions was calculated using code/misc_queries.py in my supporting materials, and the output is saved in code/logs/misc_queries.txt.

[1691] For remnant line item candidates, this amount may not necessarily be what the publisher is ultimately paid. *See* "Letter from J. Elmer to J. Hogan" (Mar. 31, 2022), GOOG-AT-MDL-007334120, at -121 ("In addition, for remnant line items, data for publisher payout is entered by publishers and does not necessarily correspond to the actual or agreed publisher payout amount, if the remnant line item wins.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 2. Selecting the Sample of Data from the GAM Log-Level Dataset

837. The GAM Log-Level Dataset contains many observations that are not relevant to my study of DA (for example, because they correspond to pre-auction transactions or correspond to impressions served to users outside of the relevant geographical region for this case). To remove irrelevant bids and auctions from my analysis sample, the GAM dataset is filtered as follows:[1692]

    a. Auctions are limited to those where the end user had a country code of "US" and the field "is_youtube" is False.[1693]

    b. All bids with win_loss values other than "Won" or "Lost" are removed, as those were bids rejected from consideration on the basis of price in their respective auction.

    c. Only line items that directly compete in the GAM unified first-price auction are kept, specifically those with transaction_types of "Open Bidding," "Open Auction," and "None".

    d. Any remaining bid that is below its floor is removed. In the rare case that an auction's winning bid does not exceed its own floor, I discard the auction.

838. For each of the auctions remaining in the dataset, the bid associated with each demand source participating in the auction is calculated as p_view * (pub_payout_usd /

---

[1692] The data filtering and sample selection steps described in this section are done in code/gam.py in my supporting materials.

[1693] For this and subsequent references to code fields, I use the interpretations of the data fields in the "Letter from D. Pearl to K. Garcia" (Oct. 6, 2023), GOOG-AT-MDL-C-000012826.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

max(views, 1)) and saved in a new column[1694] and bids are rounded to six decimal places, as is consistent with the precision of bids in GAM.[1695] If a demand source places multiple bids into the auction, only one bid is kept: the winning bid if the one of these bids won, and otherwise the highest of the losing bids.

839.  For each bidder in each remaining auction, its **price-to-beat**—the minimum amount the bidder needed to bid in order to win the auction—is calculated as the maximum of the bidder's floor and the highest bid by an opponent and saved in a new column.

840.  The remaining auctions are grouped by a **triple**, consisting of the publisher domain, inventory unit, and floor price associated with the impression in that auction. In order to ensure that each unit of my analysis is large enough to reliably conduct my simulations, a triple is included in the scope of the study if (i) it contains at least three "eligible" non-Google demand sources[1696] who each participated in at least 100,000 auctions and each accounted for at least 0.33% of the revenue[1697] in that grouping, and (ii) Google Ads

---

[1694] ████████████████████████████████████████████████████████████

[1695] "Letter from D. Pearl to B. Nakamura and M. Freeman" (Dec. 7, 2023), GOOG-AT-MDL-C-000012885, at -893 ("Bids with a difference of one-half-cent CPM or less are considered 'equal' and Google determines the winner by a 'coin flip.'").

[1696] I do not invert the demand sources with advertiser_dsp set equal to "Reservation" or "HBYG".

[1697] In this statistic and others related to total publisher revenue, I exclude impressions won by "Reservation" and "HBYG," as I understand these aliases to potentially represent numerous, distinct sources of demand. Reservation creatives are associated with remnant line items, while HBYG is an alias for any header bids integrated using GAM's "Header Bidding Yield Groups" feature. *See* "Letter from J. Elmer to J. Hogan" (Aug. 19, 2022), GOOG-AT-MDL-007334131, at -134 ("Reservation refers to remnant line items."); *see also* George Levitte, "Improved header bidding support in Google Ad Manager," Google Ad Manager (Apr. 27, 2022), https://blog.google/products/admanager/improved-header-bidding-support-in-google-ad-manager/, accessed Dec. 13, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

participated in at least 100,000 auctions and accounted for at least 1% of the revenue in that grouping

841. Heterogeneity is notable in these data: different publishers and inventory units experience different patterns of demand. In addition, because the auction run by GAM is a first-price auction, the bid for an impression might depend on floor prices, both for strategic reasons and because the floor price may reflect additional factors known to the publisher and bidders. To accommodate heterogeneity without additional assumptions, I obtain separate empirical estimates for each triple. I analyzed 3,505 inventory units across 1,164 publishers, comprising approximately 17% of US publisher real-time bidding revenue in the January 2024 GAM data sample.[1698] I conducted a separate simulation for each of the resulting 5,114 triples (publisher, inventory unit, floor price).

### 3. Selecting the Sample from the Google Ads Log-Level Dataset

842. I collected pairs of highest and second-highest Google Ads values from all Google Ads internal auctions in which the query ID is contained in the GAM Log-Level Dataset and Google Ads bids into GAM (so that I could subsequently match observations between the datasets).

843. I required two values from Google Ads in my analysis: those associated with the winning internal bid and the internal bid with the highest non-winning unadjusted score.

844. For each bid, the advertiser's value is calculated by dividing the column "original_unadjusted_score_usd" by 1,000. If there is no losing unadjusted score, the

---

[1698] These statistics are computed in code/misc_queries.py in the supporting materials and are logged to code/logs/misc_queries.txt.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

value for the highest losing bidder is taken to be zero. I remove all pairs where the highest value exceeds the 99.9[th] percentile value, because the calculated values above that quantile appear to be anomalies in the data.[1699]

### 4. Modeling Bidder Values

845. My model assumes that conditional on the observed triple of characteristics of the impression—the publisher, the inventory unit, and the floor price—bidders' values are statistically independent.[1700] This is a weaker assumption than the "independent private values" assumption made by Professor Hortaçsu:[1701] any model with independent private values must satisfy this conditional independence assumption: This assumption is consistent with standard practice for modeling display advertising auctions in the academic literature.[1702]

---

[1699] For example, some observations in the data have values over $1000 CPM, which seem to be anomalies in the data set of advertisers' values. After applying the filtering described above, no values over $1000 CPM remain. This restriction has the effect of reducing the revenue accruing to publishers from AdX, leading to a conservative estimate of the publisher's revenue from DA.

[1700] While I would not expect bidders' values for an impression to actually depend on the impression's floor price, allowing bidders to condition on the floor price captures some of the characteristics of the impression that are observable by bidders *and* publishers, but not included in the data.

[1701] *See* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶¶ 946-948 ("This type of model is called an 'independent private values' model, since it is assumed that (a) the bidders' values (even of the same type) are potentially different from each other (i.e., private), and (b) one bidder's value does not contain any information about another bidder's value for the auctioned item (i.e., independent). This is one of the most common types of models used in auction theory, and is used in both the seminal work by Guerre, Perrigne, and Vuong in 2000 and in the 2001 and 2011 extensions by Athey, Levin, and Seira. This model provides a suitable setting to study the environment of display ad auctions.") (internal citations omitted). *See also* Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1360 ("In the context of exchange auctions, the private values assumption is more plausible than the common values assumption. Bidders in exchange auctions are anonymous to each other at the point of bidding, and are drawn from a diverse set of industries. An advertiser looking to sell car seats and an advertiser looking to sell video games care about different features of the impression. Thus, each bidder is unlikely to make strong inferences about their own value for the impression, based on other bidders' estimates.").

[1702] *See* Balseiro, S. R., & Gur, Y., "Learning in Repeated Auctions with Budgets: Regret Minimization and Equilibrium," Management Science, Vol. 65 (Sept. 2019), at p. 3956 ("The information provided by the auctioneer heterogeneously affects the value advertisers perceive for the impression on the basis of their targeting criteria. The values advertisers assign to the impression they bid for […] are assumed to be independently distributed across impressions and advertisers"); Choi, H., & Mela, C. F., "Optimizing Reserve Prices in Display Advertising Auctions," SSRN (July 18, 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4523022, accessed Dec. 11,

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### a) Values for AdX

846.  For my simulations, I model bidders on AdX as consisting only of the bidders on Google Ads. In reality, many bids on AdX come from DV360 and Authorized Buyers, but I make this simplifying assumption for two reasons. *First*, I can *directly* observe a distribution of values of Google Ads advertisers, because I have access to these data for a subset of impressions in the sample.[1703] This means that for Google Ads bidders, I have accurate estimates of values without needing to perform the "bid inversion" step that I describe below. *Second*, the Google Ads dataset also allows me to see the *two* highest values among bidders from Google Ads data. The second-highest bid on AdX is needed in order to simulate the second-price auction used with DA on AdX.[1704] Because this assumption omits some bidders, it underestimates the revenue accruing to publishers from AdX in each simulation and hence underestimates the revenues received by publishers under DA. I provide additional details about my approach to simulating AdX values in the Technical Notes in Section XV.B.3.

847.  For each simulation, I first "flip a coin" that is weighted to match the participation probability of Google Ads observed in the log-level data for the corresponding triple of

---

[1703] While the DV360 logs contain advertiser valuations for certain impressions in the data, the advertiser valuations are more sparsely logged than the Google Ads Log Level data. *See* Letter from D. Pearl to M. Freeman, "Re: United States, et al. v. Google LLC, No. 1:23-cv-00108-LMB-JFA" (June 9, 2023), GOOG-AT-MDL-C-000012751, at -752 ("For DV360, data on losing candidates is eligible to be logged for only a random selection of 1% of queries []")

2024, at 10 ("Following the symmetric independent private value assumption commonly adopted in prior work (*e.g.*, Ostrovsky and Schwarz 2011, Balseiro et al. 2015), advertiser valuations are assumed to be drawn independently and identically from the conditional distribution $F_t(v|z)$, where $Z$ are auction specific observed covariates.").

[1704] I do not need data on the second-highest bids on other demand sources, because I do not model the internal auctions that may or may not be run on those demand sources, only the *net* bids they make.

publisher-inventory unit-floor price.[1705] Conditional on the outcome of that coin toss, I draw a random pair of Google Ads valuations from the Google Ads Log-Level Dataset.

### b) Bid Inversion to Estimate Values for Non-Google Demand Sources

848. For non-Google demand sources, I observe bids instead of values in the GAM log-level auction data, so I perform bid inversion to estimate the value distribution of the three largest eligible non-Google demand sources (by revenue) for each inventory unit. I allow the estimated value distributions to vary between demand sources.

849. I assume that demand sources generate most bids in the GAM data by first observing an advertiser's value and then selecting a bid that maximizes the advertiser's surplus, given bids expected for impressions sharing those characteristics. I assume that each demand source bids with a probabilistic assessment of their price-to-beat for the auction, which is the least bid that the bidder needs to make to win the auction. This probabilistic assessment is determined using a **cumulative distribution function** (CDF) $F(\cdot)$ that tells the demand source for each bid $b$ the probability $F(b)$ that the bid wins the auction, with that CDF estimated using data from previous auctions. I assume that $F$ is differentiable except at the floor price (at which there is an atom), so $F(b)$ is the probability that the maximum of the floor price and the highest other bid is less than or equal to $b$. The demand source selects a bid $b$ for an advertiser of value $v$ that maximizes the expression

$$(v - b)\, F(b).$$

---

[1705] I calculate the percentage of auctions in the triple for which Google Ads places a bid. Then, for each auction that I simulate, Google Ads draws a value with this probability.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

850. Together, these assumptions imply that, when a bidder bids $b$, its value $v$ for that impression is equal to $b + F(b)/f(b)$, where $f(b)$ corresponds to the probability density function (PDF) of the demand source's historical price-to-beat distribution.[1706] The distribution of bids observed in the GAM auction data can be used to infer $F(b)$ and $f(b)$, making it possible to recover a value that rationalizes each bid. The resulting estimates of the distribution of values do not rely on assumptions about the shape of the distribution of values and are specific to each demand source.

851. This methodology is standard for the empirical analysis of first-price auctions. However, it is also well known in the literature that this method cannot be applied blindly. To make sure that the results are robust, I need to apply some standard corrections to the inferred distribution of values in order to obtain bid functions that may be rationalized given the data and economic theory. In particular:

   a. *Smoothing*: It is easier to estimate from the data the CDF of bids, $F(b)$, than the PDF, $f(b)$, which is the former function's derivative. In order to estimate this derivative reliably (*i.e.*, without creating spurious data artifacts), it is necessary to "smooth" the observed $F(b)$. I use a standard method for this smoothing called kernel density estimation (KDE).[1707, 1708]

---

[1706] Since I assume that the price-to-beat has a differentiable CDF almost everywhere (with an atom at the floor price), the probability density function (PDF) can be calculated using the derivative of the cumulative density function.

[1707] *See* Guerre, E., Perrigne, I., and Vuong, Q., "Optimal Nonparametric Estimation of First-price Auctions," Econometrica, Vol. 68 (May 2000), at pp. 525-574; Perrigne, I. & Vuong, Q., "Econometrics of Auctions and Nonlinear Pricing," Annual Review of Economics, Vol. 11 (2019), at pp. 27-54.

[1708] Concretely, KDE spreads the probability mass of each data point in the empirical distribution of bids (log-transformed) over a small neighboring region according to a kernel function that integrates to one. I use the Gaussian density as a kernel function to obtain a smooth estimate of the density of the natural logarithm of bids. Then, by changing variables, I obtain the density of bids. The parameters of the Gaussian distribution are chosen using the inbuilt KDE procedure for SciPy (a popular Python library), which uses a heuristic due to Scott (1992) to

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

b. *Truncation*: It is difficult to rationalize the very highest bids observed in the GAM data as surplus-maximizing bids by bidders with reasonable values for an impression.[1709] My interpretation of these very highest bids (the top 2% of bids) is that they are mostly associated with experimentation by bidders (or possibly a result of some bidding mistakes or responses to information I do not observe in my sample),[1710] and so, for the highest 2% of bids, I set the bidder value to be equal to the value inverted for the bid at the 98th percentile of the bid distribution.[1711] The effect of this value-capping procedure on revenues and fill rates in my waterfall simulations is the same as restricting publishers to set their floor prices so that each demand source fills an impression at least 2% of the time it is called to bid.

c. *Enforcing monotonicity*: Economic theory tells us that surplus-maximizing bids must be *increasing* functions of these bidders' values, yet the estimation procedure described above sometimes results in small regions of values on which

---

choose the so-called *bandwidth* (which affects the standard deviation of the Gaussian kernel). *See* SciPy, "scipy.stats.gaussian_kde," SciPy v1.11.4 Manual, https://docs.scipy.org/doc/scipy/reference/generated/scipy.stats.gaussian_kde.html, accessed Dec. 13, 2024; Scott, D.W., "Multivariate Density Estimation: Theory, Practice, and Visualization," John Wiley & Sons, Inc. (1992).

[1709] This is because in first-price auctions, very high bids do not substantially increase the probability of winning an auction but do substantially increase the amount that winning bidders must pay. The only way to rationalize very high bids is then with implausibly high values for impressions or by assuming that these bids are formed differently, for example as a result of experimentation.

[1710] For example, Google Ads experimented in Program Bell with very high bids in order to measure and respond to multi-calling. *See* "Multiple calls and non-second price auctions: detection and management" (Sept. 23, 2016), GOOG-DOJ-AT-02471119, at -120 ("In summary, we run two experiments - one where we bid very high and the other where we bid very low. If the query count on Adx drops by over 30% from the low to high bid experiments over a week period, we consider the domain to be a mediating domain.").

[1711] Professor Hortaçsu's methodology also excludes extreme points from his value estimates. *See* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 967 ("I drop the top 5% of the bids (and the corresponding auctions in subsequent steps) from the analysis set, to avoid estimation results being driven by extreme values."). *See also* Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶ 976 ("Drop auctions with top 5% value estimates: I drop auctions with the top 5% of the value estimates to avoid estimation results being driven by extreme values.").

the estimated bidding function decreases. To deal with this, I use a procedure to impose monotonicity of the bidding function while still ensuring that each bidder's inferred value results in an observed bid that maximizes its expected profits from bidding.[1712]

852.   Upon calculating these values, sampling from a demand source's value distribution is equivalent to first flipping a coin weighted as the participation probability of the demand source in the log-level data, and, conditional on the outcome of that coin, drawing a random value from the estimated values for that demand source.

### 5. Simulating Sales of Impressions

853.   After obtaining distributions of bidder values for each demand source, I then simulate the sales of impressions using both DA and the waterfall. To simulate such a sale, I randomly draw values for each of the non-Google bidders for the inventory unit from the estimated value distributions. I limit my attention to three non-Google demand sources for each auction, both for computational tractability and because the latency associated with calling more than three or four demand sources sequentially makes longer waterfalls impractical.[1713] For AdX, I draw a *pair* of values from the Google Ads value distribution. A pair of values is needed in order for me to simulate the outcome of the second-price

---

[1712] Concretely, for each value $v$ on a grid, I find all bids that satisfy the *first-order* conditions for optimality, $v=b+F(b)/f(b)$, and then among those bids, I find the bid $b(v)$ that is the global maximizer of the expected utility $(v-b)F(b)$. Because $(v-b)F(b)$ exhibits increasing differences in values and bids $(v,b)$ for any *CDF F(b)*, this procedure ensures that $b(v)$ is monotonic according to Topkis's theorem. *See* Milgrom, P., & Shannon, C., Monotone comparative statics. Econometrica, Vol. 62 (1994), at pp. 157-180. I then use piecewise linear interpolation to obtain $b(v)$ for values between points in the grid. Only 3.7% of inferred values are changed by more than 10% as a result of this procedure to enforce monotonicity (logged in code/logs/parse_da_results.txt).

[1713] *See, e.g.*, "A Well Organized Passback Strategy," Bidgear Blog (Aug. 7, 2016), https://bidgear.com/blog/a-well-organized-passback-strategy-24, accessed Dec. 12, 2024 ("You don't want to make your waterfall chain too big because your site latency will suffer and some ads might time out.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

auction used under DA. I adjust those advertisers' values for the Google Ads revenue share to determine bids into AdX. For each triple, I simulate 5,000,000 auctions.

### a) Simulating the Waterfall

854. In the waterfall, the publisher calls a sequence of demand sources. In my simulations, when a demand source is called, it is offered the opportunity to buy the impression at a posted price. These posted prices are chosen separately for each demand source to maximize the publisher's expected revenues. If the value drawn for the demand source in the simulation exceeds the posted price, the demand source purchases the impression and pays the publisher the posted price. Otherwise, the request is passed to the next demand source in the waterfall, with the process repeating until the impression is sold or the list is exhausted (leaving the impression unsold). I select an order of the demand sources and posted prices for each to maximize the publisher's total expected revenues using a dynamic programming procedure described in the Technical Notes in Section XV.B.6. By assuming that publishers set optimal posted prices, my simulation tends to overstate the revenues of the waterfall.

### b) Simulating DA

855. To simulate DA, I assume that AdX first runs a second-price auction with a floor price $R$ set by the publisher. If the highest AdX bidder's value for the impression exceeded the floor, the publisher would receive the larger of $R$ and the second-highest AdX value; otherwise, the impression would be offered to non-Google demand sources using a waterfall. As in the other simulations, I calculate the optimal orderings and posted prices for the waterfall using a dynamic programming procedure described in Section XV.B.6.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Calculating the optimal floor price $R$ for AdX in this way is computationally difficult, so I instead assume (conservatively, as explained below) that publishers experiment to choose the floor price of AdX in DA, selecting the $R$ from the following set of heuristics that leads to the largest average revenue:

a. The floor price AdX had faced in the counterfactual waterfall (if applicable),

b. The expected revenue from the waterfall,

c. 110% of the expected revenue from the waterfall, and

d. 125% of the expected revenue from the waterfall.

The waterfall described in heuristics b, c, and d refers to the procedure used when the highest bid into AdX fails to exceed the floor. I include heuristics c and d because, according to economic theory, the optimal floor price must be larger than the expected revenue from the waterfall. It is unlikely that any of these floor prices is the publisher's revenue-maximizing floor price for AdX, and switching to an optimal floor price would necessarily lead to higher publisher revenues. My reliance on the four heuristics just described tends to underestimate the benefits of DA for publishers.

### *c) Comparing DA and the Waterfall: Two Different Counterfactuals*

856. I measure the effects of DA under two different counterfactuals:

a. *Counterfactual 1:* In the first counterfactual, I compare calling AdX with DA to a baseline in which the waterfall would *only* call three non-Google demand sources. In this counterfactual, enabling DA brings AdX as a new source of demand for

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

publishers. I compare outcomes under this baseline waterfall to those that would have arisen if AdX were called with DA and, if AdX did not win the impression, the impression would be allocated through a waterfall containing just the two best non-Google demand sources.[1714]

b. *Counterfactual 2*: In the second counterfactual, I compare calling AdX with DA to a baseline in which the waterfall includes both AdX (not using DA) and non-Google demand sources. In this baseline waterfall, AdX and three non-Google demand sources all participate using publisher-optimal posted prices. I compare this baseline to the outcome of calling AdX with DA, followed by a waterfall with the same three non-Google demand sources. This comparison isolates the effect of DA's introduction of auction-based pricing. This counterfactual is relevant for assessing whether DA improved outcomes compared to a baseline in which all demand sources competed on the same basis, using the waterfall.

### 6. Calculating Prices and Orders in the Waterfall

857. I calculate the order of each publisher's waterfall list and the prices for each demand source in the waterfall using a combination of search and dynamic programming.

858. Given a fixed ordering, to determine the optimal floor prices, I use dynamic programming. The fundamental challenge is that the optimal floor price for a demand

---

[1714] I reduce the number of non-Google demand sources in the DA simulation to ensure that any increase in publisher revenues caused by DA is not driven by an increase in the total number of demand sources that the publisher accesses. The counterfactual in which the publisher does not displace an existing demand source is covered in Section VIII.C: with an appropriate floor, DA is a *risk-free revenue improvement* for the publisher.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

source in the waterfall depends on the floor prices chosen for subsequent demand source. So, to overcome this challenge, I first determine floor prices for the last demand source, *Z*, and then the second-last demand source, *Y*, and so on. For the last demand source, *Z*, I use a "grid search" to determine the optimal floor price, testing each of a grid of possible floor prices and finding one that maximizes the expected revenue (which equals the product of that floor price and the probability that a demand source has a value for the impression that exceeds that price). The expected revenue becomes the continuation value of not selling the impression to demand source *Y*. I then calculate the optimal floor price for *Y* in the waterfall by conducting another grid search, this time maximizing the publisher's expected revenue from selling the impression to *Y* or *Z*, by incorporating the continuation value.[1715] Similarly, this maximized expected revenue becomes the continuation value of not selling the impression to the demand source before *Y*: demand source *X*. I continue to calculate floor prices in this fashion until I obtain a floor price for each demand source.

859. I consider each possible ordering of demand sources in the waterfall, calculating the optimal prices associated with that ordering (as described above) and the expected revenue for the publisher. For each waterfall, I choose the ordering of demand sources that results in the highest expected revenues for the publisher.

---

[1715] Mathematically, the objective of that grid search is the proposed floor price times the probability that the demand source's value exceeds that floor price *plus* the probability that the demand source's value does *not* exceed the floor price times the continuation value of not selling the impression.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### *7. Simulation Results*

860. I measured auction outcomes according to two metrics. The first is the average *publisher remnant revenue*. The second is the *match rate*, which is the fraction of impressions that are successfully sold before the waterfall is exhausted. Higher match rates mean that fewer impressions go unsold.

861. I first report the effects of DA under Counterfactual 1.[1716] I found that:

   a. 84.1% of simulated publishers experienced revenue increases from DA, with total publisher remnant revenue increasing by 45.5%. The heterogeneity of those effects is plotted in Figure 12 and discussed in Paragraph 388. For the majority of publishers, the gains are substantial, with the median publisher experiencing a 44.5% increase in remnant revenue.

   b. DA lifted the overall remnant match rate from 30.4% to 63.4%, leaving many fewer impressions unmatched.

862. In Counterfactual 2, I find that:

   a. 78.8% of publishers experience revenue increases from DA, with overall publisher remnant revenue increasing by 12.0%. Heterogeneity in these effects is plotted in Figure 13 and discussed in Paragraph 389. The median publisher experienced a remnant revenue increase of 10.2%.

   b. Across all publishers, DA increased overall remnant publisher revenue match rates, from 51.6% to 58.5%.

---

[1716] All simulation results are computed in code/parse_da_results.py in my supporting materials and logged to code/logs/parse_da_results.txt.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 8. Robustness Checks

863.  I ran additional simulations to check the robustness of these results to several of my modeling decisions and data inclusion criteria.

864.  To check the robustness of my results to the value capping procedure described in Paragraph 851, I reran my simulations capping values at the 95th percentile and the 99th percentile. Under Counterfactual 1, the resulting increases in revenues under those alternative assumptions are 51.6% and 37.9%, respectively (compared to 45.5% with the cap at the 98th percentile). Match rates increased from 31.3% to 64.6% and from 29.4% to 62.1% (compared to from 30.4% to 63.4%). Under Counterfactual 2, the resulting increases in revenues are 14.0% and 10.0%, respectively (compared to 12.0% with the cap at the 98th percentile). Match rates increased from 52.3% to 59.6% and from 51.0% to 57.1% (compared to from 51.6% to 58.5%). These results all demonstrate the robustness of the conclusion that DA increases publisher revenues and match rates.[1717]

865.  In my previous analysis, I allowed bids with an "advertiser_dsp" of "Reservation," which represent non-guaranteed line items, to set the price-to-beat for other bidders. I reran my experimental pipeline a second time, excluding these bids. This change decreases the number of auctions considered, as auctions won by Reservation are discarded for having no winner. Without these auctions, the number of eligible triples decreases to 2,187, comprising 14% of US publisher real-time bidding revenue in the GAM log-level data (as compared with 5,114 triples and 17% of revenue).[1718] This change also lowers bidders'

---

[1717] These results were computed using code/parse_da_results.py in my supporting materials, with the numerical values logged in code/logs/parse_da_results.txt.

[1718] The number of impressions is calculated in code/misc_queries.py of my supporting materials, with the number saved in code/logs/misc_queries.txt.

price-to-beat for impressions where it was previously set by "Reservation". Using these new triples, under Counterfactual 1, revenue increases by 32.7% (as compared with 45.5%) and match rates increase from 22.2% to 57.6% (as compared to from 30.4% to 63.4%). Under Counterfactual 2, revenue increases by 8.7% (as compared with 12.0%) and match rates increase from 47.1% to 51.8% (as compared to from 51.6% to 58.5%). Again, these results demonstrate the robustness of the conclusion that DA increases publisher revenues and match rates.[1719]

### C. Technical Notes for Section IX (Enhanced Dynamic Allocation)

#### 1. Further Details on Calculating the EDA Price to Maximize Publishers' Revenues While Fulfilling Guaranteed Contracts

866.  Three major components are key to making EDA work: forecasting, computing the EDA price, and resolving ties between remnant line items. In this section, I focus on the original method EDA used to resolve such ties, called *randomized assignment*.[1720]

867.  I illustrate randomized assignment using an example. Consider a publisher with 3,000 similar impressions to be allocated, of which 2,000 must be reserved for guaranteed contracts. When a publisher receives a bid of, say, $1, then to maximize its revenues, it should accept the bid unless it forecasts that there will be higher bids on at least 1,000

---

[1719] These results were computed using code/parse_da_results.py in my supporting materials, with the numerical values logged in code/logs/parse_da_results.txt.

[1720] *See* "Uniform Treatment for DFP Remnant and AdX under EDA" (Apr. 2019), GOOG-AT-MDL-011687180, at -180-181. As header bidding became more common, publishers increasingly used value CPMs to represent demand sources bidding in real-time. In this environment, EDA also increased expected publisher revenue compared to the pre-EDA procedure. Google later transitioned to a tie-breaking procedure I call "randomized bid perturbation," which could only increase publisher revenues further; s*ee also id*. at -182 ("Remove the probablistic [*sic*] replacement logic when DFP remnant is competing against non-remnant reservation ad. Remnant line item should be able to win over non-remnant line item as long as its eCPM is higher than the EDA price for the non-remnant line item.").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

impressions in the future. Google's EDA program helps publishers to achieve this allocation by first forecasting future remnant bids and then using that forecast to estimate the highest price $p$ such that there are at least 1,000 impressions receiving bids of at least $p$. I will call that $p$ the "opportunity cost of not serving the guaranteed contract" or just the *market-clearing price*.

868.  In auctions with multiple identical or similar items for sale, the total number demanded may exceed supply even at the market-clearing price. For example, suppose there are 950 impressions with bids higher than \$0.50 and 75 with bids equal to \$0.50. At any price higher than \$0.50, there is less demand than the supply of 1,000 impressions for remnant bidders, while at a price equal to \$0.50, there are 1,025 impressions demanded, which is 25 more than the available supply. This example highlights a common challenge for auctions with multiple similar units: the need for *tie-breaking*.

869.  EDA resolved these ties with a procedure called *randomized assignment (RA)*. To illustrate randomized assignment, suppose that there is a group of 3,000 similar impressions and 2,000 of these need to be allocated to guaranteed contracts. Based on historical data, Google forecasts that 1,000 impressions will receive AdX bids larger than \$1, and 500 of those will be larger than \$1.50. Since there are only 1,000 remnant impressions to fill and Google knows that, just from AdX, it will receive at least 1,000 bids larger than \$1, the market-clearing price is no less than \$1. This \$1 minimum, which is computed using AdX bids only, was known as the EDA price.[1721] I denote it by $p_{EDA}$.

---

[1721] *See* "Uniform Treatment for DFP Remnant and AdX under EDA" (Apr. 2019), GOOG-AT-MDL-011687180, at -180 ("A distribution of AdX bids is built for each inventory slice in offline pipeline. Based on p, we look up the (1 - $Pr_{EDA}$) x 100-percentile from the AdX bid distribution, and set this price to be the EDA price").

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

870.  Suppose that the highest remnant line item has a static bid of $1.50. As the bid is static (it is a value CPM), the same bid price is applied to each impression. This means that the market-clearing price of each impression is $max(p_{EDA}, \$1.50)$.

871.  EDA accepts all 500 bids from AdX that are larger than the market-clearing price ($1.50) and must break ties to accept 500 of the 2,500 bids exactly at the price of $1.50 (from the static remnant line item). To accomplish that, for *every* impression where the remnant bid is highest, EDA flips a weighted coin which lands on heads one fifth of the time: on heads, the impression is allocated to the remnant bidder; otherwise, it is allocated to a guaranteed contract.[1722]

872.  The general idea is that EDA accepts the bid received by AdX when it exceeds *both* the remnant bid and $p_{EDA}$. When the remnant bid exceeds the bid received by AdX and $p_{EDA}$, then it wins with *just the right probability so that guaranteed contracts are fulfilled and revenue is maximized (subject to filling all the impressions with some ad).*[1723]

---

[1722] *See* "Uniform Treatment for DFP Remnant and AdX under EDA" (Apr. 2019), GOOG-AT-MDL-011687180, at -180-181.

[1723] Suppose that a remnant line item has a static bid of $1.50 for all of a publisher's impressions in some group, that a fraction $q$ of those must be reserved for guaranteed contracts, and that a fraction $f$ of bids into AdX are forecasted to be less than $1.50. If $f < q$, then there are more than enough AdX bids higher than $1.50 to serve all the non-guaranteed impressions, so no impressions are assigned to remnant demand. In that case, the market-clearing price is more than $1.50. If instead $f > q$, then the publisher can earn more revenue by selling some impressions to the remnant line item: the market-clearing price for the publisher's relevant impressions is $1.50. Bids into AdX greater than $1.50 will win a fraction $1 - f$ of all the impressions. Of the remaining fraction $f$, $q$ will be reserved for guaranteed contracts. So, to accept only the highest bids, $f - q$ should be assigned to the remnant line item with its bid of $1.50 and the remaining such bidders should be rationed. To achieve that, when the remnant line item bids of $1.50 are highest, they must be assigned an impression with probability $(f - q)/f$.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 2. *Theorem 2*: Statement and Proof

873. **Theorem 2:** Suppose that publishers' guaranteed contracts are unchanged after the introduction of EDA and Google accurately forecasts the distribution of future bids from AdX. Then (1) EDA increases the publisher's expected revenue relative to the pre-EDA allocation procedure, and (2) if each bidder's value is drawn from a "regular" commonly-known probability distribution,[1724] is statistically independent from other bidders' values,[1725] and publishers set the optimal floor price for the AdX auction ignoring direct contracts, then the additional floor set by EDA *maximizes* publisher revenue.

874. ***Proof.*** I first prove part (1) of the Theorem.

875. Let $q$ denote the estimated proportion of impressions that must be allocated to guaranteed contracts and $F$ denote the cumulative distribution function of the highest bid from AdX (that is, $F(p)$ is the probability that the highest bid from AdX is less than or equal to $p$). I assume that $F$ is continuous and has bounded density.

876. I use $v$ to denote the value CPM of the most competitive non-guaranteed line item and $\mu$ for the average payment of this line item. Recall from the main text that $\mu \leq v$, as would be optimal for a publisher. Additionally, let $REV_{AdX}(a)$ denote the expected revenue from AdX *conditional* on the highest AdX bid exceeding its floor price $a$.

---

[1724] I assume that this probability distribution $G$ with density $g$ satisfies a technical condition called "Myersonian regularity," which requires that the function $v \mapsto v - (1-G(v))/g(v)$ is increasing, and ensures that the optimal mechanism for selling the impression is an auction.

[1725] This implies that each bidder and the publisher can make a probabilistic assessment about other bidders' values and estimates of other bidders' values would not be changed upon learning one bidder's value.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

877.  The following relevant properties of EDA were true at launch:

    a.  The EDA price, $p_{EDA}$, was set so that $q = F(p_{EDA})$.

    b.  The EDA algorithm was implemented as follows:

        i.  If AdX's bid exceeded the larger of $p_{EDA}$ and $v$, then AdX won the impression.[1726]

        ii.  Otherwise, if $v \geq p_{EDA}$, then the impression was allocated to the non-guaranteed line item with probability $\frac{F(v)-q}{F(v)}$ and to the guaranteed contract otherwise.

        iii.  In any other case, the impression was allocated to the guaranteed contract.

878.  The expected revenue per impression from indirect demand sources without EDA is $R_{pre-EDA} = (1 - q)[F(v) \cdot \mu + (1 - F(v)) \cdot REV_{AdX}(v)]$. In this expression, $(1 - q)$ is the probability that an impression is available to non-guaranteed buyers. It is multiplied by the term $[F(v) \cdot \mu + (1 - F(v)) \cdot REV_{AdX}(v)]$, where $F(v)$ is the probability that the highest AdX bid is less than the value CPM. Hence, $(1 - q)F(v)\mu$ is the expected revenue from remnant demand and $(1 - q)(1 - F(v))REV_{AdX}(v)$ is the expected revenue from AdX.

879.  I now compute the expected revenue with EDA. There are two cases to consider.

---

[1726] To simplify exposition, I assume there is no publisher-set AdX-specific floor price (or that any such floor price is smaller than the EDA price or *v*). The argument is similar if a larger AdX-specific floor price is present and *F* is appropriately adjusted to account for this floor.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

a.  First, consider the case where $v < p_{EDA}$. Then, all remnant impressions are sold to AdX, leading to expected revenues of $R = (1 - F(p_{EDA})) \, REV_{AdX}(p_{EDA})$. Since $q = F(p_{EDA})$, $R$ is equivalent to $(1 - q) \, REV_{AdX}(p_{EDA})$. Also, $REV_{AdX}(p_{EDA})$ is greater than both $v$ (and μ) and $REV_{AdX}(v)$ (since $p_{EDA} > v$), so $R \geq R_{pre-EDA}$ as desired.

b.  Second, consider the opposite case where $v \geq p_{EDA}$. In this case AdX wins each impression with probability $(1 - F(v))$ and generates average revenue $REV_{AdX}(v)$ when it wins. A non-guaranteed line item wins with probability $F(v)\frac{F(v)-q}{F(v)} = F(v) - q$ and generates average revenue μ when it wins. In total, this means the expected revenue in this case is

$R = (1 - F(v))REV_{AdX}(v) + (F(v) - q)μ$, which may be rewritten as

$R = ((1 - F(v))REV_{AdX}(v) + F(v)μ) - qμ$. Now I expand $R_{pre-EDA}$ to obtain

$[(1 - F(v))REV_{AdX}(v) + F(v)μ] - q[F(v)μ + (1 - F(v))REV_{AdX}(v)]$.

Comparing the two expressions, one can observe that $R \geq R_{pre-EDA}$ if and only if $q(F(v)μ + (1 - F(v))REV_{AdX}(v)) \geq qμ$. The latter inequality holds because $REV_{AdX}(v) \geq v \geq μ$ and hence $F(v)μ + (1 - F(v))REV_{AdX}(v) \geq μ$.

Hence, in both cases, the expected revenue from EDA, $R$, is no less than, $R_{pre-EDA}$.

609

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

880. I now show part (2) of the Theorem, assuming further that each bidder's value is drawn from a "regular" commonly-known probability distribution and is statistically independent from other bidders' values.

881. If publishers set the optimal floor price for the AdX auction ignoring direct contracts, the floor set by EDA *maximizes* publisher revenue. Since—by assumption—Google accurately forecasts the distribution of bids from AdX, the EDA price is such that the $1 - q$ fraction of impressions allocated to AdX remnant demand is *exactly* the set of impressions with the highest bids on AdX. This means there is no way to reallocate impressions between remnant demand and direct contracts to increase the bids received on remnant inventory. Additionally, as long as the floor price exceeds the static optimal reserve for that distribution (which is enacted by EDA under the assumption that publishers set the optimal static floor price, since EDA respects that floor as well), there is no way to *increase* the floor price to increase revenues on those impressions (this follows because the expected revenue from the AdX auction is a quasiconcave function of the reserve price as a consequence of the Myersonian regularity assumption). There is no reallocation of impressions that increases bids received for remnant impressions and no change in the floor price that increases the remnant revenues conditional on those bids, so there is no way to increase publisher revenues. This means that EDA maximizes publishers' remnant revenues under the assumptions of [Theorem 2](). ∎

### 3. EDA Revenue Empirical Analysis

882. In the previous section, I used a theoretical analysis to show that the floor set by EDA maximizes publisher revenue under standard assumptions. I now supplement that with an

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

empirical analysis using the **Google Ads Log-Level dataset,**[1727] directly assessing whether the floor set by EDA maximizes publisher revenue on empirical data.

883. Each observation in the Google Ads Log-Level Dataset represents an advertiser's bid in the Google Ads auction. The dataset contains all bids from a random 10% sample of internal auctions conducted between January 17, 2024 and January 23, 2024, inclusive. Altogether, this dataset contains bids for around 8 billion US AdX impressions.[1728] For each impression, the dataset contains estimates of the valuations of bidders in the Google Ads internal auction, stored in the column "original_unadjusted_score_usd".

884. To incorporate heterogeneity in advertisers' values for different types of impressions, I examine slices of data in the Google Ads Log-Level Dataset. I use the same set of slices as I did in [Section XV.A.2](#), with each slice consisting of a group of Google Ads advertiser valuations for a given operating system, platform, browser, domain, GFP network ID, inventory unit path, and AdX floor price. A slice is kept if it contains at least (i) 100,000 bids with advertiser valuations and (ii) $1 of advertiser spend across those bids.

885. For each slice, I first compute the revenue-optimal pre-EDA floor price $p_{pre}$ for the AdX auction. To do so, I compute the revenue for a second-price auction for 100 candidate floor prices on the empirical Google Ads bidder valuations and choose the floor price with the highest empirical revenue. Then, I consider 100 different fractions of impressions that must be allocated to guaranteed contracts, each with an associated EDA price $p_{EDA}$. For each, I compute the AdX auction revenue $R_{EDA}$ using a floor equal to

---

[1727] Google Ads Log-Level Dataset (January 2024), GOOG-AT-EDTX-DATA-000000000 to -000258388.

[1728] This statistic was calculated using code/misc_queries.py in my supporting materials, and the output is saved in code/logs/misc_queries.txt.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

$max(p_{pre}, p_{EDA})$. Then, I compute the maximum AdX revenue $R_{post}$ the publisher could attain by setting an alternative floor price $p_{post}$, using the same 100 candidate floor prices, subject to the constraint that $p_{post} \geq p_{EDA}$ (note that if $p_{pre} > p_{EDA}$, then the optimum is $p_{post} = p_{pre}$). Finally, I compute the maximum relative gain of reoptimization $G = (R_{post} - R_{EDA})/R_{EDA}$, taking the maximum gain over all 100 EDA prices.

886.  I found that, weighted by revenue, 95.9% of slices had a maximum relative gain of less than 1%.[1729] Thus, even for the most pessimistic fraction of impressions that must be allocated to guaranteed contracts, the floor price set by the EDA algorithm would be nearly revenue-optimal in the vast majority of cases.

### 4. Analysis of pCTR Data: Supplemental Figures

887.  Figure 37 and Figure 38 are analogous to Figure 17 and pertain to pAVR and pVTR, respectively.[1730]

**Figure 37: Scatterplot of pAVR by publisher with/without EDA**

---

[1729] Code to compute this result is provided in code/eda_analysis.py in my supporting materials, and the output is saved in code/logs/eda_analysis.txt.

[1730] These figures were generated by running the file code/pctr.py in my supporting materials. The figures are located at code/figures/pAVR_regression.png and code/figures/pVTR_regression.png, respectively.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*



**Figure 38: Scatterplot of pVTR by publisher with/without EDA**



*D. Technical Notes for [Section X](#) (Header Bidding and "Last Look")*

    *1. [Theorem 3](#): Statement and Proof*

888. **Theorem 3:** Suppose that (i) a publisher sells an impression to a fixed set of bidders,

      including bidders on AdX, (ii) the publisher does not know each bidder's value for the

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

impression, (iii) bidders do not know each other's values for the impression, and (iv) all participants understand the rules and have the following information:

a.  Each bidder knows its own value for the impression.

b.  Each bidder's value is drawn from a commonly-known probability distribution[1731] and is statistically independent from other bidders' values.[1732]

c.  Each bidder determines a bid as a function of its value to maximize its surplus from the impression, given its probabilistic assessments about the bids of other bidders.

Then, if the publisher chooses revenue-maximizing floor prices, it earns exactly the *same* expected revenue with a single unified second-price auction with all bidders participating as it would with first-price header bidding auction followed by a second-price auction for AdX.[1733] Moreover, given those optimal floor prices, each header bidder has the same chance of winning and the same expected surplus as an identical bidder on AdX.

889.  ***Proof.*** This theorem is proved as a corollary of a well-known result from auction theory for this model: the *Payoff and Revenue Equivalence Theorem,* a version of which

---

[1731] I assume that this probability distribution $F$ with density $f$ satisfies a technical condition called "Myersonian regularity," which requires that the function $v \mapsto v - (1-F(v))/f(v)$ is increasing, and ensures that the optimal mechanism for selling the impression is an auction.

[1732] This implies that each bidder and the publisher can make a probabilistic assessment about other bidders' values and estimates of other bidders' values would not be changed upon learning one bidder's value.

[1733] More specifically, the theorem considers an auction game in which the publisher moves first, the header bidders second, and AdX bidders last. The publisher selects header bidding floor prices and a function to map each header bid it receives into a floor price for the AdX auction; the header bidders select their bids; and then finally the AdX auction is run.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

states:[1734] *Suppose that bidders' values are independent and let r be any floor price.*[1735] *If bidders bid optimally, all auctions that award an item to the highest value bidder with bid above r lead to the same expected revenue for the seller and the same expected surplus for each bidder.*

890. By the Payoff and Revenue Equivalence Theorem, which applies under the assumptions of <u>Theorem 3</u>, if the publisher configures header bidding and its floor prices to ensure that the highest value bidder with value above the floor price $r$ wins the auction, then its average revenue from that arrangement will be the same as for a unified second-price auction with floor price $r$ and including all the same bidders.

891. To ensure that the highest value bidder with value above the floor price $r$ wins the auction, the publisher could set a floor price of $r$ in the header bidding auction and commit to choosing floor prices in the AdX auction as a function of the header bids received, as follows. Let $\beta(v)$ be the implied optimal bidding rule for header bidders, which determines for a bidder of value $v$ its best bid $\beta(v)$ in the header bidding auction.

---

[1734] *See* Milgrom, P. R., "Putting Auction Theory to Work," Cambridge University Press (1994), at pp. 73-77.

[1735] Roughly, bidders' values are independent if knowing the value of one bidder does not help predict the value of the other bidder. The same result holds if values are independent conditional on commonly observed information about the item. This "independent private value[s]" assumption is endorsed by Plaintiffs' experts. Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1360 ("In the context of exchange auctions, the private values assumption is more plausible than the common values assumption. Bidders in exchange auctions are anonymous to each other at the point of bidding, and are drawn from a diverse set of industries. An advertiser looking to sell car seats and an advertiser looking to sell video games care about different features of the impression. Thus, each bidder is unlikely to make strong inferences about their own value for the impression, based on other bidders' estimates."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶¶ 946-948 ("This type of model is called an 'independent private values' model, since it is assumed that (a) the bidders' values (even of the same type) are potentially different from each other (i.e., private), and (b) one bidder's value does not contain any information about another bidder's value for the auctioned item (i.e., independent). This is one of the most common types of models used in auction theory, and is used in both the seminal work by Guerre, Perrigne, and Vuong in 2000 and in the 2001 and 2011 extensions by Athey, Levin, and Seira. This model provides a suitable setting to study the environment of display ad auctions.") (internal citations omitted).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

It is a standard result that function $\beta$ is increasing and, by the logic of bid shading into a first-price auction, $\beta(v) < v$.

892. There are two possibilities: first, if the highest bid in the header bidding auction is $B > r$, the publisher could estimate that the winning bidder has value $V = \beta^{-1}(B) > B > r$. If the publisher sets a floor price of $V$ in the AdX auction, an AdX bidder wins only if it has the highest value (which is also higher than $r$). The second possibility is that there is no header bid exceeding the floor price $r$. In that case, if the publisher sets the floor price to be $r$ for the AdX auction, a bidder wins only if it has the highest value and that value is larger than $r$.

893. With this floor pricing policy, in both cases, the winning bidder has the highest value among all bidders and that value is above the optimal floor price $r$. By the Payoff and Revenue Equivalence Theorem, this implies that the publisher obtains the same expected revenue and each bidder obtains the same expected surplus as for a unified second-price auction with floor price $r$ (which is optimal among the class of all mechanisms for selling the impression). ∎

### E. Technical Notes for [Section XII](#) (Sell-side Dynamic Revenue Sharing)

894. In the following proofs, I assume that the standard sell-side revenue share of 0.8 is applied, otherwise each argument applies identically, replacing 0.8 with the negotiated revenue share.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### *1. Theorem 4: Statement and Proof*

895.   **Theorem 4:** If publishers did not change their floor prices and bidders did not change their bids, DRS v1 could only increase the number of impressions sold, publisher revenues, and buyer surplus.

896.   ***Proof.*** For each impression, there are three possible scenarios under DRS v1: (1) an AdX bidder does not win the impression, (2) an AdX bidder wins the impression with its standard revenue share, and (3) an AdX bidder wins the impression with a lower revenue share. In the first two scenarios, the winner and their payment are the same with or without DRS v1: buyer surplus and publisher revenues are unchanged. In the third scenario, the impression sells on AdX when it would not have done in the absence of DRS, and the publisher receives revenue equal to the impression's floor price. As long as this floor price is no smaller than any header bidding or remnant demand offer for the impression, this implies that the publisher's revenue weakly increases. In this case, the buyer pays its bid, which can only increase its surplus, because a surplus-maximizing bidder chooses a bid less than its value. If a buyer bids its values—the optimal strategy for a single impression sold via a second-price auction—it would pay its value for the impressions sold by DRS v1, which would lead to a zero effect on buyer surplus.  ∎

### *2. Theorem 5: Statement, Proof, and Further Discussion*

897.   **Theorem 5:** Suppose that a publisher is selling an impression to a fixed set of bidders on AdX. The publisher does not know each bidder's value for the impression, and bidders do not know each other's values for the impression, but all participants have the following information:

a.  Each bidder knows its own value for the impression.

b.  Each bidder's value is drawn from a commonly known probability distribution and is statistically independent from other bidders' values.[1736]

c.  Each bidder determines a bid as a function of its value to maximize its surplus from the impression, given its probabilistic assessments about the bids of other bidders.

Then, if the publisher chooses revenue-maximizing floor prices, it earns a higher expected revenue on an impression to which DRS v1 is applied than it would without the program, and bidder surplus weakly is unchanged.

898.  ***Proof.*** This theorem is proved as a corollary of a well-known result from auction theory for this model: the *Payoff and Revenue Equivalence Theorem,* a version of which states:[1737] *Suppose that bidders' values are independent and let r be any floor price.[1738] If bidders bid optimally, all auctions that award an item to the highest value bidder with bid*

---

[1736] This implies that each bidder and the publisher can make a probabilistic assessment about other bidders' values and estimates of other bidders' values would not be changed upon learning one bidder's value.

[1737] *See* Milgrom, P. R., *Putting auction theory to work*, Cambridge University Press (2004), at pp. 73-77.

[1738] The same result holds if values are independent conditional on commonly observed information about the item. This "independent private value[s]" assumption is endorsed by Plaintiffs' experts. *See*, e.g., Revised Expert Report of S. Li (Oct. 11, 2024), at ¶ 1360 ("In the context of exchange auctions, the private values assumption is more plausible than the common values assumption. Bidders in exchange auctions are anonymous to each other at the point of bidding, and are drawn from a diverse set of industries. An advertiser looking to sell car seats and an advertiser looking to sell video games care about different features of the impression. Thus, each bidder is unlikely to make strong inferences about their own value for the impression, based on other bidders' estimates."); Second Revised Expert Report of A. Hortaçsu (Oct. 18, 2024), at ¶¶ 946-948 ("This type of model is called an 'independent private values' model, since it is assumed that (a) the bidders' values (even of the same type) are potentially different from each other (i.e., private), and (b) one bidder's value does not contain any information about another bidder's value for the auctioned item (i.e., independent). This is one of the most common types of models used in auction theory, and is used in both the seminal work by Guerre, Perrigne, and Vuong in 2000 and in the 2001 and 2011 extensions by Athey, Levin, and Seira. This model provides a suitable setting to study the environment of display ad auctions.") (internal citations omitted).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

*above r lead to the same expected revenue for the seller and the same expected surplus for each bidder.*

899. The Payoff and Revenue Equivalence Theorem implies that the exact method for determining payments (*e.g.*, first-price auction versus second-price auction) does not matter to determine the expected revenue—all that matters is the probability each bidder with a given value wins the impression.

900. Let $r^*$ be the optimal floor price on a publisher's impression before the introduction of DRS. Before DRS, the publisher always earns 80% of the total revenue from sales, so, if the publisher optimizes the floor price, it must be the case that selling to the highest bidder with value greater than $r^*/0.8$ maximizes the *total revenue* from the sales.

901. If the publisher sets a floor price equal to $r^*/0.8$ on an impression for which DRS v1 is active, the impression still sells to the highest bidder with value greater than the $r^*/0.8$. The Payoff and Revenue Equivalence Theorem implies that the expected revenue is unchanged, and that this is the optimal floor price for the impression. Bidder surplus is also unchanged.

902. Since the total revenue is the same and AdX takes a lower revenue share on some impressions, the total revenue and earnings for the publisher *must increase*. ∎

903. The statement and proof of <u>Theorem 5</u> covers the case in which DRS v1 is active on an impression. In practice, AdX used probabilistic throttling to avoid reducing its overall revenue share too much, and as a consequence, buyers and publishers would need to consider the possibility of throttling when determining their optimal bids and floor prices.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

One simple solution for buyers would be to reduce their bids into the dynamic region only so often as to avoid being throttled by AdX. Buyers could monitor when AdX started to throttle their bids into the dynamic region and return to their pre-DRS strategies for some time. Another alternative would be for buyers to shade bids less to reduce their downward influence on revenue shares. Adapting bidding strategies in these ways would improve buyers' outcomes, and similar approaches could be taken by publishers. In either case, I would expect buyers and publishers to learn to adapt their strategies over time to adjust for the possibility of throttling, and that publisher revenues would increase overall as a result of DRS v1, corresponding to Google's experimental results. In practice, AdX used very low throttling probabilities for most buyers.[1739] Throttling may not have been necessary very often if buyers adapted their strategies to the presence of throttling or if many transactions were still cleared with the standard 20% revenue share because at least two bids were above the floor price.

### 3. <u>Theorem 6</u>: Statement and Proof

904. **Theorem 6:** Revenue for AdX under DRS v1 increases *only if* publisher revenues from AdX also increase. Additionally, every percentage increase in revenue for AdX results in a proportionally larger increase in revenue for publishers.

905. ***Proof.*** Let $rev$ be the total revenue from sales before the introduction of DRS and $\widehat{rev}$ be the total revenue from sales after DRS v1. Let $prev = 0.8\,rev$ be publisher revenues from AdX before DRS is introduced and $\widehat{prev} = 0.81\,\widehat{rev}$ be publisher revenues from AdX after DRS v1. Let $AdXRev = 0.2\,rev$ be the AdX revenue before DRS and

---

[1739] *See* "Dynamic Sell-Side Revshare[:] GDN/DRX Summit 2015" (Nov. 2, 2015), GOOG-DOJ-13202659, at -671.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

$\widehat{AdXRev} = 0.19\,\widehat{rev}$ be AdX revenue after DRS v1. Then

$$\frac{\widehat{prev}}{prev} = \frac{0.81\,\widehat{rev}}{0.8\,rev} = \frac{0.2 \times 0.81 \times 0.19\,\widehat{rev}}{0.19 \times 0.8 \times 0.2\,rev} = \frac{0.2 \times 0.81\,\widehat{AdXRev}}{0.19 \times 0.8 \times AdXRev} \approx 1.066\,\frac{\widehat{AdXRev}}{AdXRev}$$ This implies

that for every 1% increase (or decrease) in AdX profits, publishers experience at least a

1.066% increase (respectively, decrease) in revenues from AdX. (As noted above, I focus

in this section on the 20% standard revenue share, but for publishers with different

negotiated revenue shares, the numbers appearing in this calculation would be different,

although the general result remains unchanged.) ∎

### 4. Technical Description of DRS v2

906. Let $v_1$ and $v_2$ respectively denote the highest and second-highest gross bids into AdX,

and let bidder 1 and bidder 2 be the respective buyers submitting these bids. Let $r$ denote

the floor price applying to the impression.

907. The auction allocation and pricing worked as follows under DRS v2:[1740]

   a.  Case 1: $r < v_1 \leq r/0.8$. AdX cannot win the auction with a fixed 20%

       per-impression revenue share, so it reduces its revenue share on the impression.

       i.   Bidder 1 pays $(v_1 + r)/2$ to AdX.

       ii.  AdX pays $r$ to the publisher.

       iii. AdX updates the debt accounts for the publisher and the buyer. Bidder 1's

            debt increases by $\Delta_b = r/0.8 - (v_1 + r)/2$, the amount it would need to

            raise its bid to win with a fixed 20% revenue share. The publisher's debt

---

[1740] *See* "Dynamic Revenue Sharing (DRS) V2 Proposal" (Mar. 24, 2015), GOOG-DOJ-13221355, at -356-358; "AdX Dynamic Revshare v2: Launch Doc" (Jan. 13, 2016), GOOG-DOJ-13207875, at -879-881.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

increases by $\Delta_p = r - 0.8(v_1 + r)/2$, the amount the floor price would need to lower by to sell with a fixed 20% revenue share.

b.  Case 2: $r/0.8 < v_1$. AdX may collect its standard revenue share on the impression and additionally recoup debts previously accrued by publishers and advertisers, while charging Bidder 1 less than its bid and paying the publisher more than the floor.

   i.   Bidder 1 pays the standard price $max(v_2, r/0.8)$ plus a debt payment $\Delta_b$ to AdX. $\Delta_b$ was chosen to ensure that it was never more than the advertiser's outstanding debt balance and the buyer never paid more than its bid $v_1$ (in fact, never more than half of the buyer surplus in the absence of debt reclamation). Moreover, if the buyer set its *own* price (by submitting a second bid or nonzero "minimum payment"), any payment the buyer made in excess of $r/0.8$ would be deducted from its debt. This served as an incentive for buyers to submit second bids.

   ii.  AdX pays the publisher the standard price $max(0.8v_2, r)$ plus a share of the advertiser's debt payment $0.8\Delta_b$ minus a publisher debt payment $\Delta_p$. $\Delta_p$ was never more than the publisher's debt balance and was chosen to ensure that the payment to the publisher was at least the floor $r$.

c.  Case 3: if $v_1 \leq r$, AdX does not win the auction and no payments are made.

### *5. Lemma 1: Statement and Proof*

908. **Lemma 1:** Suppose that AdX recoups all debts under DRS v2. Then, buyers accrue the full debt on each impression (equal to the difference between the floor price that would apply in the absence of DRS and the price it pays under DRS v2) and, after accounting for the payment of buyer debt to publishers, publishers accrue zero debt on net in expectation.

909. *Proof.* If all debts are repaid, the total debts paid by publishers equal the total debts they accrue on impressions sold via DRS v2 minus 0.8 times the total debts paid (and accrued) by buyers. But on each individual impression, the debt accrued by a publisher is equal to 0.8 times the debt accruing to a buyer. Therefore, the net debt paid by publishers on impressions sold due to DRS v2 equals zero. Since buyers are never paid part of the publishers' debts, if all debts are repaid, the buyer pays the full debt it accrues on each impression sold due to DRS v2.  ∎

### *6. Theorem 7: Statement and Proof*

910. **Theorem 7:** If publishers do not change their floor prices and buyers do not change their bids, then DRS v2 can only increase the total number of impressions sold and total publisher revenues compared to the absence of DRS.[1741]

911. *Proof.* Prior to DRS v2, publishers sell exactly the impressions where the highest bid $v_1$ clears the pre-revenue share floor $r/0.8$, and the publisher earns the larger of $r$ and $0.8v_2$ on each such impression. The revenue earned on each such impression is unchanged after the introduction of DRS v2.

---

[1741] I assume that AdX performs enough transactions that all debts in DRS v2 are resolved.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

912. With DRS v2, the publisher also earns a revenue of $r$ from AdX on impressions for which the highest bid $v_1$ is between $r$ and $r/0.8$ (as argued above, the publisher can ignore the debts accrued which cancel out on average). The effect of these additional sales on the publisher's revenue with DRS v2 depends on the nature of the floor $r$. If $r$ is exactly the price at which the publisher would otherwise sell the impression to an alternative exchange, its revenue is unchanged. Otherwise, if $r$ is a publisher-set floor price (so that the impression would be otherwise unsold) or if $r$ reflects the optimal floor price determined by the publisher given the header bids received, the publisher's revenue strictly improves with DRS v2.  ∎

### 7. *Theorem 8*: *Statement and Proof*

913. **Theorem 8**: If buyers and publishers set bids and floors to maximize their payoffs after the introduction of DRS v2, then buyer surplus and publisher revenues are the same as in the absence of DRS.

914. ***Proof.*** As Lemma 1 showed, buyers pay debt on each impression sold by DRS v2 equal to the difference between the pre-revenue share floor ($r/0.8$) and the price paid for the impression. This means that the effective price of an impression cleared by DRS v2 for an advertiser is the pre-revenue share floor $r/0.8$. As a consequence, buyers should only seek to win an impression if they value the impression above $r/0.8$. Because each buyer always pays the larger of the second-highest bid and the floor if its bid is larger than $r/0.8$, the optimal bidding strategy to bid truthfully.[1742] Consequently, for any fixed floor

---

[1742] To see this, suppose that there was any positive probability that a bidder bid into the dynamic region. Then any such bidder could increase its probability of winning without changing the price it paid by increasing its bid to r/0.8. But for bids of r/0.8 or larger, the auction is the same as a second-price auction, which means that each bidder's optimal strategy is to bid truthfully.

price, the auction's outcome is the same in the second-price auction as it is with DRS v2, and thus the optimal floor prices under DRS v2 are the same as in the absence of DRS v2. Therefore, once buyers and publishers fully adapt their strategies to DRS v2, the total publisher revenues and AdX profits should equal those quantities *before* the introduction of DRS. ∎

### 8. Technical Description of tDRS

915. The tDRS program worked as follows:

    a. AdX observed the publisher-set floor price and the value CPMs associated with any remnant demand line items. The maximum of these values was AdX's floor price $r$.

    b. Before offering the impression to buyers, AdX compared the pre-revenue share floor price, $r/0.8$, to the Reserve Price Optimization (RPO) program's reserve $r^*$, which was the floor price that AdX predicted would maximize the publisher's expected revenues from AdX.

    c. If the pre-revenue share floor $r/0.8$ exceeded the RPO reserve $r^*$ for that impression and AdX predicted that it was unlikely for there to be a buyer with value larger than $r/0.8$, then AdX sent a floor of $r$ with a 0% revenue share on the impression to its buyers, increasing the probability that a sale will occur.

        i. If there was a bid above the floor $r$ and the second-highest bid, $v_2$, was less than $r/0.8$, then the publisher was paid the maximum of $r$ and the

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

second-highest bid and accrued a "debt" of $0.2 \times max(r, v_2)$, representing the revenue share foregone by AdX on that impression.

   ii.   If there were two bids above $r/0.8$, then the winning buyer would be charged the second-highest bid and AdX would take its standard 20% revenue share: in this case, payments were the same as in the absence of DRS. No "debt" was accrued.

d.   Otherwise, if $r/0.8$ was larger than the RPO reserve $r^*$ but AdX predicted it to be likely that there was a buyer with a larger value than $r/0.8$, then AdX maintained its 20% per-impression revenue share and the impression transacted per usual.

e.   Finally, if $r/0.8$ was less than the RPO reserve $r^*$, then $r^*$ became AdX's floor price. If the impression sold with this RPO reserve and the publisher had previously accrued debt from a DRS transaction, some debt was repaid on this impression, no larger than the difference between $r^*$ and $r$.

### 9. *Theorem 9*: *Statement, Proof, and Further Discussion*

916.   **Theorem 9:** If publishers adjust their floor prices on AdX to maximize profits after the introduction of tDRS and tDRS accurately predicts buyers' bids, total publisher revenues from all demand sources will be higher with tDRS than with a fixed revenue share.

917.   ***Proof.*** Suppose that in the absence of tDRS, a publisher sets a floor $r$ for AdX. Without DRS, the impression is sold if there is some buyer willing to pay at least the pre-revenue share floor, $r/0.8$.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

918.  Now suppose that tDRS is introduced. I show that the publisher can choose a floor price that guarantees them at least the same revenue as in the absence of DRS. This implies that if the publisher sets its floor prices optimally, its revenue must be even larger.

919.  Suppose that the publisher reports a floor of $r/0.8$ to AdX, which is the pre-revenue share floor in the absence of tDRS. Then there are two possibilities:

    a.  tDRS applies a 20% per-impression revenue share, which means it predicts that there will be a buyer who can beat the new pre-revenue share floor, $r/0.64$. If the tDRS prediction model is accurate, the publisher earns at least $r/0.8$ for these impressions, more than it did in the absence of DRS.

    b.  tDRS predicts that there will not be an AdX buyer who can beat the price $r/0.64$, and applies a 0% per-impression revenue share. In this case, the AdX buyer wins the impression if it bids above the floor price of $r/0.8$, exactly the same as the pre-revenue share for advertisers before DRS. Because tDRS incentivizes truthful bidding, the AdX buyer wins the impression if and only if it would win it without tDRS. In this case, the payment to the publisher for the impression is $r/0.8$ and the publisher accrues a "debt" of $0.2\,r/0.8$ , leading to a net payoff of $r$. The expected publisher revenue is therefore unchanged by tDRS.

920.  Thus, the impression sells with the same probability under tDRS as without DRS, and the publisher earns more revenue than without DRS.[1743] Under the optimal floor price, which may differ from $r/0.8$, the publisher can only receive even higher revenues.  ∎

921.  Although an assumption of Theorem 9 is that AdX is perfectly able to predict whether its buyers will clear a given floor price, the same conclusion holds as long as (1) AdX predicts bids better than publishers and (2) the revenue share under tDRS maximizes Google's expected profits (or, equivalently, the expected revenues of the publishers).

### F. Technical Notes for Section XIII (Open Bidding)

#### 1. Example Showing that when Publishers Boost Bids Publisher Revenues are Identical to a Unified Auction and Neither Bidder Has an "Advantage"

922.  Suppose two bidders, Anne and Bob, have independent values uniformly drawn from [0,10] and compete in a sequential first-price auction. Assume Bob learns Anne's bid before bidding. I show that when the publisher boosts Anne's bids by a factor of two, it achieves the same revenues as it would in a unified auction, while leaving neither bidder with an "advantage."

923.  After Annes's bid is doubled, that boosted bid serves as a floor price in a first-price auction with Bob. Hence, in this example, Bob maximizes his surplus by submitting a bid equal to the boosted bid of Anne when his value exceeds the boosted bid. Anne determines how much to bid by optimizing her expected surplus,

---

[1743] In this analysis, I have fixed the bids of header bidders after the introduction of tDRS. In general, header bidders need to account for the change of format in the AdX auction because it may affect their expected payoff of any given bid. However, because under the posited strategy of reporting floor r/0.8, there is no change in the probability of sale on AdX, the header bidders' bids should not change either. Under the publisher's optimal strategy, however, header bidding advertisers' bids would change, but this does not affect the conclusion of Theorem 9.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

$(v - b)Pr\{v_{Bob} \leq 2b\}$. Maximizing this expression with respect to $b$ implies that she submits bids equal to $b = v/2$.

924. *First,* notice that Anne wins if and only if her value is larger than Bob's value. When combined with the fact that both bidders' valuations are drawn from identical uniform distributions, this implies that each bidder has win probability equal to $\frac{1}{2}$.

925. *Second,* the publisher achieves revenues of

$$E[v_{Anne} \mid v_{Bob} \geq v_{Anne}]\, Pr\{v_{Bob} \geq v_{Anne}\} +$$

$$E[1/2v_{Anne} \mid v_{Anne} > v_{Bob}]\, Pr\{v_{Anne} > v_{Bob}\},$$

as Bob pays Anne's bid when he wins, while Anne pays her own bid when she wins. Simplifying this expression further yields

$$\tfrac{1}{2}E[v_{Anne} \mid v_{Bob} \geq v_{Anne}] + \tfrac{1}{2}E[1/2v_{Anne} \mid v_{Anne} > v_{Bob}] = 3\tfrac{1}{3}\,.$$

926. *Third,* notice that each conditional expectation in the previous expression is equivalent. Namely, that

$$E[v_{Anne} \mid v_{Bob} \geq v_{Anne}] = 3\tfrac{1}{3} = E[1/2v_{Anne} \mid v_{Anne} > v_{Bob}].$$

Hence, the bidders' average payments are the same.

927. This revenue is identical to the expected revenue in the unified auction with the two bidders submitting their bids simultaneously.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### 2. Example Showing that the So-Called "Last Look" Does Not Inherently Decrease Publisher Revenues, Even When Publishers Do Not Boost Header Bids

928. Consider a simple extension of the previous example, with two advertisers in Exchange 1 and one advertiser in Exchange 2:

   a. *E*xchange 1 commits to running a second-price auction and receives bids from two advertisers, each of them with independent and uniform values over [0, 10].

   b. *Exchange 2* has one buyer that has independent and uniform values over [0, 10].

929. *First,* consider the case in which *E*xchange 1 has no "Last Look" and passes its internal clearing price to a first-price auction between *E*xchange 1 and *Exchange 2*. Given that *E*xchange 1 runs a second-price auction, the bid function for each bidder in *E*xchange 1 is $b_{Exchange\ 1,\ Advertiser\ i}(v) = v$. On the other hand, when the buyer in *E*xchange 2 has a valuation of *v*, it best-responds by submitting the bid *b* that maximizes its expected surplus:

$$U_{Exchange\ 2}(v, b) \ = \ (v - b)\,(1 \ - \ Pr\,\{Exchange\ 1\ Wins\})$$

$$= \ (v - b)\,(1 \ - \ Pr\,\{v_{Exchange\ 1,\ Advertiser\ 1} > b,\ v_{Exchange\ 1,\ Advertiser\ 2} > b\})$$

$$= \ (v \ - \ b)(1 - (1 - F(b))^2)$$

$$= \ (v \ - \ b)(1 - (1 - (b/10))^2) \ .$$

For any *v*, the optimal bid for that *v* must satisfy the first-order condition

$\dfrac{\partial U_{Exchange\ 2}(v, b)}{\partial b} = 0$, where

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

$\frac{\partial U_{Exchange\,2}(v,b)}{\partial b} = (v - b)(\frac{1}{5}(1 - \frac{b}{10})) - (1 - (1 - (b/10))^2)$. Solving for

$\frac{\partial U_{Exchange\,2}(v,b)}{\partial b} = 0$ and requiring $b \leq v$ over $v \in [0, 10]$ yields:

$$b_{Exchange\,2}(v) = \frac{1}{3}\left(v + 20 - \sqrt{v^2 - 20v + 400}\right)$$

From these two bidding functions, a simulation of 100,000,000 auctions estimates that the expected publisher revenue is 3.920.[1744]

930. *Next,* consider when the buyer in *E*xchange 2 bids first and that bid serves as the floor price for the bidders of *E*xchange 1. Given that *E*xchange 1 runs a second-price auction, the bid function for each bidder in *E*xchange 1 is $b_{Exchange\,1,\,Advertiser\,i}(v) = v$; the floor price does not change a bidder's optimal bid in a second-price auction. On the other hand, when the buyer in *E*xchange 2 has a valuation of *v*, it best-responds by submitting the bid *b* that maximizes its expected surplus:

$U_{Exchange\,2}(v, b) = (v - b)\,Pr\,\{Exchange\,2\,Wins\}$

$= (v - b)\,(Pr\,\{b > v_{Exchange\,1,\,Advertiser\,1}\,\,b > v_{Exchange\,1,\,Advertiser\,2}\})$

$= (v - b)F(b)^2$

$= (v - b)(b/10)^2$

---

[1744] This result was calculated using code/ob_example_extension.py in my supporting materials, and the output is saved in code/logs/ob_example_extension.txt.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Solving for $\frac{\partial U_{Exchange\,2}(v,\,b)}{\partial b} = \frac{1}{5}\,(v\,-\,b)\frac{b}{10}\,-\,(b/10)^2\,=\,0$ yields

$b_{Exchange\,2}(v)\,=\,\frac{2}{3}v$. From these two bidding functions, a simulation of 100,000,000

auctions estimates that the expected publisher revenue is 4.568, a 16.5% increase over the

former case.[1745]

### G. Technical Notes for [Section XIV](#) (UPR)

#### 1. An Example of Post-Auction Discounts Compared To Exchange-Discriminatory Floor Prices

931. I illustrate that post auction discounts perform better than differential floor prices with the

following example. Suppose there is a single AdX bidder with value $V_{AdX}$ distributed

uniformly between 12 and 16, and a single OpenX bidder with value $V_{OpenX}$ distributed

uniformly between 10 and 12. [1746]

932. The optimal mechanism can be obtained using the standard result of Myerson (1981)

which calls for allocating the impression to the bidder with the highest marginal revenue

as long as it is positive.[1747] The marginal revenues are given by

$MR_{AdX}\,(V_{AdX})\,=\,2V_{AdX}\,-\,16$, and $MR_{OpenX}\,(V_{OpenX})\,=\,2V_{OpenX}\,-\,12$.

933. Note the marginal revenues are always positive in the relevant ranges. Thus, the optimal

mechanism always calls for allocating the impression. Next we compare the marginal

---

[1745] This result was calculated using code/ob_example_extension.py in my supporting materials, and the output is saved in code/logs/ob_example_extension.txt.

[1746] Code for computing the integration steps in this example can be found in code/post_auction_discounts_example.py in my supporting materials, and the output is saved in code/logs/post_auction_discounts_example.txt.

[1747] Myerson, R. B., "Optimal Auction Design," Mathematics of Operations Research, Vol. 6 (Feb. 1981), at pp. 58-73.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

revenues to determine who to allocate the impression to. The marginal revenues are equal when $2V_{AdX} - 16 = 2V_{OpenX} - 12$, or equivalently $V_{AdX} - V_{OpenX} = 2$.

934. This implies that the optimal mechanism allocates the impression to the AdX bidder if and only if its value is at least \$2 higher than the value of the OpenX bidder and to the OpenX bidder otherwise. This allocation can be implemented with a second price auction with a \$2 post-auction discount for the OpenX bidder. In this auction, it is a dominant strategy for the AdX bidder to bid its value and for the OpenX bidder to bid its value + \$2. The expected revenue from this auction can be calculated as

$$\int_{12}^{16}\int_{10}^{12}\Big(max\big\{2V_{AdX} - 16, 2V_{OpenX} - 12\big\}\frac{1}{8}\Big)dV_{OpenX}dV_{AdX} = 12.333.$$

935. The expected revenue that would be attained with the two reserve prices of \$10 for OpenX and \$13 for AdX would be

$$13 * \frac{16-13}{4} + \Big(1 - \frac{16-13}{4}\Big) * 10 = 12.25.$$

936. Thus, publishers would be *strictly* better off using a post-auction discount of \$2 with a common reserve price of \$12 than using two different reserve prices.

937. To adapt this analysis to the context of a first-price auction (as in the UFPA) I will demonstrate that a post-auction discount of \$2 for OpenX (with a uniform reserve price of \$12 or less) continues to deliver a higher expected seller revenue than setting two reserve prices.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

938. The analysis uses the derivation of optimal bidding strategies in the asymmetric first-price auction case found in Kaplan and Zamir (2012).[1748] It is convenient to start by re-writing the values as $V_{AdX} = 12 + Uniform\,[0,4]$ and

$V_{OpenX} + \$2\,discount = 12 + Uniform\,[0,2]$.

939. The bidding strategies can be obtained by inverting equations (20) and (21) in Kaplan and Zamir (2012),[1749] using the distributions $Uniform\,[0,4]$ and $Uniform\,[0,2]$ and then adding $12. Doing that, I obtain

$$b_{AdX}(V) = \frac{1}{3V}\left(4\sqrt{3V^2 + 16} - 16\right) + 12\,,\text{ and}$$

$$b_{OpenX}(V) = \frac{2}{3V}\left(8 - 2\sqrt{16 - 3V^2}\right) + 12\,.$$

The expected gross revenue is then given by the following integral

$$12 + \int_0^2\int_0^4\left(max\left\{\frac{1}{3V_{AdX}}\left(4\sqrt{3V_{AdX}^2 + 16} - 16\right), \frac{2}{3V_{OpenX}}\left(8 - 2\sqrt{16 - 3V_{OpenX}^2}\right)\right\} * \frac{1}{8}\right)dV_{AdX}dV_{OpenX}\,,$$

which when computed, obtains $GR = 12.91801$.

940. The last step is then to subtract the post-auction discounts that need to be rebated to OpenX. For this, we compute the probability of winning for OpenX which is simply the probability that $b_{OpenX} > b_{AdX}$, which can be shown to be $\frac{1}{3}$. Thus, we subtract $\frac{1}{3} * 2$

---

[1748] Kaplan, T. R., & Zamir, S., "Asymmetric First-Price Auctions with Uniform Distributions: Analytic Solutions to the General Case," Economic Theory, Vol. 50 (June 2012), at pp. 269-302.

[1749] Kaplan, T. R., & Zamir, S., "Asymmetric First-Price Auctions with Uniform Distributions: Analytic Solutions to the General Case," Economic Theory, Vol. 50 (June 2012), at pp. 269-302.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

from the gross revenue to obtain the **net revenue** $NR = GR - rebated\ amount$,

which can be calculated as $NR = 12.91801 - \frac{2}{3} = 12.25134$.

### 2. Robustness of UPR Regression Panel Results to Hortaçsu's Different Timing Specifications for the Effect on Impressions

941. In the three subsections below, I test the robustness of my findings, showing that Professor Hortaçsu's results are also negated for the three alternative timing specifications he considers when *any* of his various methodological shortcomings are addressed. In each subsection I replicate, in order, the four tables I presented in Section XIV.E.8 with a different timing specification.[1750]

---

[1750] Code for this regression and all subsequent ones in this section is provided in the code/UPR-Panel folder in my supporting materials, with the output saved in "code/UPR-Panel/5. CorrectedOutput/."

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### a) 9 Month Ahead Case

**All LPS publishers - Original Sample**

| Dependent variable: ln(impressions 9 month later) | | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| $\beta_1$ | -0.00549 | -0.00503 | -0.00046 |
| | (0.00789) | (0.00655) | (0.00606) |
| $\beta_2$ | 0.29398 | -0.29679 | -0.14788 |
| | (0.24670) | (0.22696) | (0.24258) |
| $\beta_3$ | -0.01397* | 0.00038 | 0.00025 |
| | (0.00765) | (0.00561) | (0.00578) |
| Observations | 7036 | 7036 | 7036 |
| Adjusted R-square | 0.888 | 0.956 | 0.965 |
| Time trend | Common | Publisher | Publisher-UPR |

Notes:AdX share is calculated as the share of impressions from AdX. Standard errors in parenthesis are clustered at the publisher level. All specifications include publisher fixed effects, month fixed effects, and dummies for periods under COVID (from March 2020 to March 2021) and the DoJ litigation with Google (from September 2020 to present).

**All LPS publishers**

| Dependent variable: ln(impressions 9 month later) | | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| $\beta_1$ | -0.00103 | -0.00385 | -0.00037 |
| | (0.00819) | (0.00602) | (0.00564) |
| $\beta_2$ | -0.01646 | -0.33442 | -0.22820 |
| | (0.22297) | (0.20523) | (0.21406) |
| $\beta_3$ | -0.00716 | 0.00083 | 0.00052 |
| | (0.00732) | (0.00514) | (0.00516) |
| Observations | 8141 | 8141 | 8141 |
| Adjusted R-square | 0.895 | 0.958 | 0.966 |
| Time trend | Common | Publisher | Publisher-UPR |

Notes:AdX share is calculated as the share of impressions from AdX. Standard errors in parenthesis are clustered at the publisher level. All specifications include publisher fixed effects, month fixed effects, and dummies for periods under COVID (from March 2020 to March 2021) and the DoJ litigation with Google (from September 2020 to present).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Balanced Panel of LPS publishers - Original Sample**

| Dependent variable: ln(impressions 9 month later) | | |
|---|---|---|
| (1) | (2) | (3) |
| $\beta_1$ | | |
| -0.01381 | -0.00578 | -0.00190 |
| (0.00863) | (0.00881) | (0.00495) |
| $\beta_2$ | | |
| 0.03813 | -0.23132 | -0.13629 |
| (0.15133) | (0.16999) | (0.18425) |
| $\beta_3$ | | |
| -0.00323 | 0.00415 | 0.00422 |
| (0.00383) | (0.00375) | (0.00310) |
| Observations | 5616 | 5616 | 5616 |
| Adjusted R-square | 0.837 | 0.930 | 0.949 |
| Time trend | Common | Publisher | Publisher-UPR |

Notes:AdX share is calculated as the share of impressions from AdX. Standard errors in parenthesis are clustered at the publisher level. All specifications include publisher fixed effects, month fixed effects, and dummies for periods under COVID (from March 2020 to March 2021) and the DoJ litigation with Google (from September 2020 to present).

**Balanced Panel of LPS publishers**

| Dependent variable: ln(impressions 9 month later) | | |
|---|---|---|
| (1) | (2) | (3) |
| $\beta_1$ | | |
| -0.00676 | -0.00528 | -0.00257 |
| (0.00918) | (0.00750) | (0.00424) |
| $\beta_2$ | | |
| -0.18296 | -0.21629 | -0.09451 |
| (0.14913) | (0.14761) | (0.14908) |
| $\beta_3$ | | |
| 0.00382 | 0.00486 | 0.00329 |
| (0.00449) | (0.00371) | (0.00255) |
| Observations | 6786 | 6786 | 6786 |
| Adjusted R-square | 0.886 | 0.953 | 0.966 |
| Time trend | Common | Publisher | Publisher-UPR |

Notes:AdX share is calculated as the share of impressions from AdX. Standard errors in parenthesis are clustered at the publisher level. All specifications include publisher fixed effects, month fixed effects, and dummies for periods under COVID (from March 2020 to March 2021) and the DoJ litigation with Google (from September 2020 to present).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### b) 12 Month Ahead Case

**All LPS publishers - Original Sample**

| Dependent variable: ln(impressions 12 month later) | | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| $\beta_1$ | -0.00613 | -0.00362 | 0.00064 |
| | (0.00745) | (0.00570) | (0.00432) |
| $\beta_2$ | 0.39199* | -0.24504 | -0.11240 |
| | (0.23450) | (0.20643) | (0.19930) |
| $\beta_3$ | -0.01381* | 0.00059 | -0.00045 |
| | (0.00753) | (0.00526) | (0.00467) |
| Observations | 6480 | 6480 | 6480 |
| Adjusted R-square | 0.900 | 0.960 | 0.970 |
| Time trend | Common | Publisher | Publisher-UPR |

Notes:AdX share is calculated as the share of impressions from AdX. Standard errors in parenthesis are clustered at the publisher level. All specifications include publisher fixed effects, month fixed effects, and dummies for periods under COVID (from March 2020 to March 2021) and the DoJ litigation with Google (from September 2020 to present).

**All LPS publishers**

| Dependent variable: ln(impressions 12 month later) | | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| $\beta_1$ | -0.00278 | -0.00181 | 0.00046 |
| | (0.00784) | (0.00570) | (0.00406) |
| $\beta_2$ | 0.20263 | -0.17916 | -0.12824 |
| | (0.20677) | (0.19338) | (0.18545) |
| $\beta_3$ | -0.00746 | -0.00017 | -0.00089 |
| | (0.00719) | (0.00489) | (0.00434) |
| Observations | 7493 | 7493 | 7493 |
| Adjusted R-square | 0.906 | 0.962 | 0.972 |
| Time trend | Common | Publisher | Publisher-UPR |

Notes:AdX share is calculated as the share of impressions from AdX. Standard errors in parenthesis are clustered at the publisher level. All specifications include publisher fixed effects, month fixed effects, and dummies for periods under COVID (from March 2020 to March 2021) and the DoJ litigation with Google (from September 2020 to present).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Balanced Panel of LPS publishers - Original Sample**

| Dependent variable: ln(impressions 12 month later) | | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| $\beta_1$ | -0.01250 | -0.00521 | -0.00161 |
| | (0.00786) | (0.00782) | (0.00338) |
| $\beta_2$ | -0.02761 | -0.28248 | -0.17596 |
| | (0.16372) | (0.17239) | (0.15001) |
| $\beta_3$ | -0.00275 | 0.00421 | 0.00347 |
| | (0.00398) | (0.00362) | (0.00262) |
| Observations | 5184 | 5184 | 5184 |
| Adjusted R-square | 0.849 | 0.934 | 0.956 |
| Time trend | Common | Publisher | Publisher-UPR |

Notes:AdX share is calculated as the share of impressions from AdX. Standard errors in parenthesis are clustered at the publisher level. All specifications include publisher fixed effects, month fixed effects, and dummies for periods under COVID (from March 2020 to March 2021) and the DoJ litigation with Google (from September 2020 to present).

**Balanced Panel of LPS publishers**

| Dependent variable: ln(impressions 12 month later) | | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| $\beta_1$ | -0.00588 | -0.00545 | -0.00251 |
| | (0.00847) | (0.00712) | (0.00349) |
| $\beta_2$ | -0.18145 | -0.21340 | -0.07154 |
| | (0.15224) | (0.15141) | (0.13029) |
| $\beta_3$ | 0.00340 | 0.00445 | 0.00183 |
| | (0.00456) | (0.00355) | (0.00253) |
| Observations | 6264 | 6264 | 6264 |
| Adjusted R-square | 0.894 | 0.956 | 0.971 |
| Time trend | Common | Publisher | Publisher-UPR |

Notes:AdX share is calculated as the share of impressions from AdX. Standard errors in parenthesis are clustered at the publisher level. All specifications include publisher fixed effects, month fixed effects, and dummies for periods under COVID (from March 2020 to March 2021) and the DoJ litigation with Google (from September 2020 to present).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### c) 15 Month Ahead Case

**All LPS publishers - Original Sample**

| Dependent variable: ln(impressions 15 month later) | | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| $\beta_1$ | -0.00454 | 0.00015 | 0.00337 |
| | (0.00657) | (0.00460) | (0.00376) |
| $\beta_2$ | 0.44964* | -0.03990 | -0.04419 |
| | (0.23126) | (0.18496) | (0.16712) |
| $\beta_3$ | -0.01286* | -0.00069 | -0.00123 |
| | (0.00684) | (0.00418) | (0.00363) |
| Observations | 5917 | 5917 | 5917 |
| Adjusted R-square | 0.910 | 0.961 | 0.974 |
| Time trend | Common | Publisher | Publisher-UPR |

Notes:AdX share is calculated as the share of impressions from AdX. Standard errors in parenthesis are clustered at the publisher level. All specifications include publisher fixed effects, month fixed effects, and dummies for periods under COVID (from March 2020 to March 2021) and the DoJ litigation with Google (from September 2020 to present).

**All LPS publishers**

| Dependent variable: ln(impressions 15 month later) | | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| $\beta_1$ | -0.00156 | 0.00127 | 0.00382 |
| | (0.00709) | (0.00447) | (0.00345) |
| $\beta_2$ | 0.36565* | 0.06051 | -0.01742 |
| | (0.20073) | (0.17183) | (0.15148) |
| $\beta_3$ | -0.00777 | -0.00094 | -0.00098 |
| | (0.00648) | (0.00401) | (0.00336) |
| Observations | 6825 | 6825 | 6825 |
| Adjusted R-square | 0.913 | 0.963 | 0.975 |
| Time trend | Common | Publisher | Publisher-UPR |

Notes:AdX share is calculated as the share of impressions from AdX. Standard errors in parenthesis are clustered at the publisher level. All specifications include publisher fixed effects, month fixed effects, and dummies for periods under COVID (from March 2020 to March 2021) and the DoJ litigation with Google (from September 2020 to present).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Balanced Panel of LPS publishers - Original Sample**

| Dependent variable: ln(impressions 15 month later) | | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| $\beta_1$ | -0.00912 | 0.00159 | 0.00516 |
| | (0.00714) | (0.00626) | (0.00507) |
| $\beta_2$ | 0.10244 | -0.04023 | 0.00889 |
| | (0.19126) | (0.20993) | (0.19076) |
| $\beta_3$ | -0.00356 | 0.00012 | -0.00095 |
| | (0.00426) | (0.00406) | (0.00337) |
| Observations | 4752 | 4752 | 4752 |
| Adjusted R-square | 0.862 | 0.938 | 0.958 |
| Time trend | Common | Publisher | Publisher-UPR |

Notes:AdX share is calculated as the share of impressions from AdX. Standard errors in parenthesis are clustered at the publisher level. All specifications include publisher fixed effects, month fixed effects, and dummies for periods under COVID (from March 2020 to March 2021) and the DoJ litigation with Google (from September 2020 to present).

**Balanced Panel of LPS publishers**

| Dependent variable: ln(impressions 15 month later) | | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| $\beta_1$ | -0.00211 | 0.00144 | 0.00552 |
| | (0.00815) | (0.00559) | (0.00409) |
| $\beta_2$ | -0.02026 | -0.01838 | 0.08001 |
| | (0.16942) | (0.17360) | (0.15361) |
| $\beta_3$ | 0.00201 | 0.00177 | -0.00102 |
| | (0.00469) | (0.00384) | (0.00279) |
| Observations | 5742 | 5742 | 5742 |
| Adjusted R-square | 0.904 | 0.959 | 0.972 |
| Time trend | Common | Publisher | Publisher-UPR |

Notes:AdX share is calculated as the share of impressions from AdX. Standard errors in parenthesis are clustered at the publisher level. All specifications include publisher fixed effects, month fixed effects, and dummies for periods under COVID (from March 2020 to March 2021) and the DoJ litigation with Google (from September 2020 to present).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Paul R. Milgrom, Ph.D.

December 13, 2024

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## APPENDIX A: CURRICULUM VITAE

# Paul Robert Milgrom

**Shirley and Leonard Ely, Jr. Professor of Humanities and Sciences**

**Department of Economics**

**Stanford University**

579 Jane Stanford Way, Landau Economics Building

Stanford, CA 94305

+1 (650) 723-3397

milgrom@stanford.edu

milgrom.people.stanford.edu

## Personal

Born: April 20, 1948 in Detroit, Michigan

Spouse: Eva Meyersson Milgrom

## Education

Ph.D. in Business, Stanford University, January 1979

M.S. in Statistics, Stanford University, April 1978

A.B. in Mathematics with high honors, University of Michigan, May 1970

## Employment

| | |
|---|---|
| 2007–present | Senior Fellow, SIEPR, Stanford University |
| 1993–present | Shirley and Leonard Ely, Jr. Professor of Humanities and Sciences, Stanford University |
| 1987–present | Professor of Economics, Stanford University |
| | Professor (by courtesy), Graduate School of Business |
| | Professor (by courtesy), Department of Management Science and Engineering |
| 1989–91 | Director, Stanford Institute for Theoretical Economics |

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

| 1985–87 | Williams Brothers Professor of Management Studies and Professor of Economics, Yale University |
| 1983–85 | Professor of Economics and Management, Yale University |
| 1982–83 | Visiting Professor, Yale University |
| | Professor, Department of Managerial Economics and Decision Sciences, Kellogg Graduate School of Management, Northwestern University |
| 1981–82 | Associate Professor, Department of Managerial Economics and Decision Sciences, Kellogg Graduate School of Management, Northwestern University |
| 1979–81 | Assistant Professor, Department of Managerial Economics and Decision Sciences, Kellogg Graduate School of Management, Northwestern University |

## Honors, Awards, Prizes, Fellowships, and Grants

| 2024 | Technical Emmy Award (to *Auctionomics*) from the National Academy of Television Arts and Sciences. |
| | Honorary Doctorate, Charles University |
| 2023 | Distinguished Research Professor at Simons Laufer Mathematical Sciences Institute (supported by the Alfred P. Sloan Foundation) |
| 2020 | Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel |
| | Distinguished Fellow of the American Economics Association |
| 2019 | Robert Rosenthal Memorial Lecture (Boston University), |
| | Aumann Lecture (Israeli Game Theory Society), |
| | Marshall Lectures (Cambridge University) |
| 2018 | John J. Carty Award for the Advancement of Science, U.S. National Academy of Sciences |
| 2017 | CME Group-MSRI prize in Innovative Quantitative Applications, Chicago Mercantile Exchange and Mathematical Sciences Research Institute |
| | McKenzie lecture, University of Rochester |
| | Stanford Humanities and Sciences Dean's Award for Excellence in Graduate Education |
| | Elected Fellow of the Game Theory Society |

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

|      |                                                                                                              |
|------|--------------------------------------------------------------------------------------------------------------|
|      | Elected Fellow of the Finance Theory Group                                                                    |
| 2016 | Nancy Schwartz Memorial Lecture, Northwestern University                                                      |
| 2015 | National Science Foundation Award "Auction Market Design"                                                     |
|      | Simon's Institute Public Lecture, University of California, Berkeley                                           |
|      | WINE (Web and Internet Economics) Keynote Lecture                                                             |
| 2014 | Golden Goose Award                                                                                            |
|      | Keyfitz Lecture, Fields Institute, Toronto                                                                    |
|      | Arrow Lecture, Columbia University                                                                            |
| 2013 | Nomura Lecturer, Institute of Mathematics, Oxford University                                                  |
|      | BBVA Foundation Frontiers of Knowledge Award in Economics, Finance and Management                            |
| 2012 | Elected Vice President of the American Economic Association (term to begin in 2013)                           |
|      | Inaugural lecture on "Incentive Auctions for Radio Spectrum," C.V. Starr Center Distinguished Speaker Series, New York University |
|      | Oskar Morgenstern lecture on "Designing the US 'Incentive Auctions,'" Fourth World Congress of the Game Theory Society |
|      | Becker Friedman Visitor, University of Chicago                                                                |
|      | Intertic Stackelberg Lecture on "Auctions for Online Display Advertising"                                     |
| 2011 | Eitan Berglas Lecture on "The Applied Science of Market Design," Tel Aviv University                          |
| 2010 | NSF-SBIR Phase IB Award for "Incorporating Bidder Budget Constraints in Multi-item Auctions"                  |
| 2009 | NSF-SBIR Phase I Award for "Incorporating Bidder Budget Constraints in Multi-Item Auctions"                   |
|      | Nemmers Lecture, Northwestern University                                                                      |
|      | EARIE (European Association for Research in Industrial Organization) Lecture                                  |
| 2008 | Erwin Plein Nemmers Prize                                                                                     |
|      | W.A. Mackintosh Lecture, Queens University                                                                    |
|      | Simon Newcomb Lecture, Johns Hopkins University                                                               |
| 2007 | President, Western Economic Association International (WEAI)                                                   |
|      | National Science Foundation Grant on "Market Design"                                                          |

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

| | |
|---|---|
| 2006 | Elected to the National Academy of Sciences |
| | Colin Clarke Lecture, Econometric Society Australasian Meeting |
| | Manchot Lecture, University of Bonn |
| 2005 | Elected to the Executive Committee of the Econometric Society |
| | Elected Vice President of the Western Economic Association |
| | Chung-Hua Lecturer, Academia Sinica (Taiwan) |
| | Clarendon Lecturer, Oxford University |
| 2004 | Fischer-Schulz Lecturer, Econometric Society |
| | Koopmans Lecturer, Yale University |
| | National Science Foundation Research Grant to study "Electronic Auction Markets" |
| | Council Member, Econometric Society |
| 2003 | National Science Foundation Research Grant to study "Cumulative Offer Processes" |
| | Landau Economics Teaching Prize, Stanford University |
| | Elected to the Council, Game Theory Society |
| | Distinguished Economist Lecture, Federal Communications Commission |
| 2001 | Honorary Doctorate, Stockholm School of Economics |
| 2000 | Taussig Visiting Research Professor, Harvard University |
| 1999 | Murray S. Johnson Inaugural Lecture, University of Texas |
| | Industry Canada Distinguished Lecture |
| 1998 | Fain Lecture, Brown University |
| | Lawrence Klein Lecture, University of Pennsylvania |
| | Fellow (2nd time), Center for Advanced Study in the Behavioral Sciences |
| 1997 | Alberto Bailleres Founder's Lecture at Instituto Tecnologico Autonomo de Mexico (ITAM) |
| | Plenary Lecturer, Econometric Society Far Eastern Meeting |
| | Plenary Lecturer, Australian Industry Economics Meeting, University of Melbourne |
| 1996 | Nobel Prize Memorial Lecture (honoring deceased Nobel laureate William Vickrey) at the Royal Swedish Academy of Sciences |
| 1995 | Churchill Lectures at Cambridge University |
| | Political Economy Special Lecture at Harvard University |

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

| | |
|---|---|
| 1994 | National Science Foundation Research Grant to study "Comparative Statics, Complementarities, Coordination and Change," (covering 1994 to 1997) |
| | Woytinsky Distinguished Lecturer, University of Michigan |
| 1993 | Senior Research Fellow, Institute for Policy Reform |
| | Shirley R. and Leonard W. Ely, Jr. Professor of Humanities and Sciences, Stanford University |
| 1992 | Fellow, American Academy of Arts and Sciences |
| | International Guest Scholar, Kyoto University |
| 1991 | Fellow, Center for Advanced Study in the Behavioral Sciences |
| | National Science Foundation Research Grant to study "Theories of the Firm 2" (covering 1991 to 1994) |
| 1990 | Center for Economic Policy Research Grant to study "The Economics of Modern Manufacturing" |
| 1989 | National Science Foundation Grant to direct programs for the Stanford Institute for Theoretical Economics |
| | National Academy of Sciences Award to lecture in China on economics of organizations |
| 1988 | Olin Distinguished Lecturer, Princeton University |
| | National Science Foundation Research Grant to study "Theories of the Firm" (covering 1988 to 1991) |
| | Center for Economic Policy Research Grant |
| 1987 | Prize for Best Paper of the Year in the Transactions of the Society of Actuaries |
| 1986 | Ford Visiting Professor of Economics, University of California, Berkeley |
| | John Simon Guggenheim Fellowship to study "Economic Theories of Organization" |
| 1985 | Williams Brothers Chair in Management Studies, Yale University |
| | National Science Foundation Research Grant to study "On the Formal Economic Theory of Organizations" |
| | Fellow of the Institute for Advanced Studies, Hebrew University of Jerusalem |
| | Plenary Lecturer at the Fifth World Congress of the Econometric Society |

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

| | |
|---|---|
| 1984 | Fellow of the Econometric Society |
| | Fellow of Morse College, Yale University |
| 1983 | Research Award, Actuarial Education and Research Fund |
| | Honorary Master of Arts degree, Yale University |
| 1982 | National Science Foundation Research Grant to study "The Structure of Information in a Productive Organization" |
| 1981 | IBM Research Chair at Northwestern University |
| | Visiting Research Associate, Stanford University |
| 1980 | Leonard J. Savage Memorial Thesis Award |
| | National Science Foundation Research Grant to study "Information and Uncertainty in Competitive Bidding" |
| 1976 | Society of Actuaries Triennial Paper Prize for best paper by an actuary within five of membership, for the period 1973–75 |
| 1974 | Fellow of the Society of Actuaries |

### Publications

**Articles**

"Incentive Auction Design Alternatives: A Simulation Study," with Kevin Leyton-Brown, Neil Newman and Ilya Segal. *Management Science,* February 2024.

"Algorithmic Mechanism Design with Investment," with Mohammad Akbarpour, Scott Kominers, Kevin Michael Li, and Shengwu Li. *Econometrica,* November 2023.

"Taming the Communication and Computation Complexity of Combinatorial Auctions: The FUEL Bid Language," with Martin Bichler and Gregor Schwarz. *Management Science*, June 2022.

"When Should Control Be Shared?" with Eva Meyersson Milgrom and Ravi Singh, *Management Science*, March 2022.

"Auction Research Evolving: Theorems and Market Designs," *American Economic Review,* May 2021.

"Extended Proper Equilibrium," with Joshua Mollner, *Journal of Economic Theory*, June 2021.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

"Clock Auctions and Radio Spectrum Reallocation," with Ilya Segal, *Journal of Political Economy*, January 2020.

"Auction Market Design: Recent Innovations," *Annual Reviews*, August 2019.

"Equilibrium Selection in Auctions and High Stakes Games," with Joshua Mollner, *Econometrica*, January 2018.

"Redesigning Spectrum Licenses," with Anthony Zhang and E. Glen Weyl, *Regulation*, Fall 2017.

"Economics and Computer Science of a Radio Spectrum Reallocation," with Kevin Leyton-Brown and Ilya Segal, *Proceedings of the National Academy of Sciences*, July 2017.

"Adverse Selection and Auction Design in Internet Display Advertising," with Nick Arnosti and Marissa Beck, *American Economic Review*, October 2016.

"Ascending Prices and Package Bidding: Further Experimental Analysis," with John Kagel and Yuanchuan Lien, *Games and Economic Behavior*, May 2014.

"Designing Random Allocation Mechanisms: Theory and Applications," with Eric Budish, Yeon-Koo Che and Fuhito Kojima, *American Economic Review*, April 2013.

"Critical Issues in Market Design," *Economic Inquiry*, April 2011.

"Simplified Mechanisms with an Application to Sponsored-Search Auctions," *Games and Economic Behavior*, September 2010.

"Ascending Prices and Package Bidding: A Theoretical and Experimental Analysis," with Yuanchuan Lien and John Kagel, *American Economic Journal: Microeconomics*, August 2010.

"Online Advertising: Heterogeneity and Conflation in Market Design," with Jon Levin, *American Economic Review*, May 2010.

"Assignment Messages and Exchanges," *American Economic Journal: Microeconomics*, August 2009.

"The Limited Influence of Unemployment on the Wage Bargain," with Robert Hall, *American Economic Review*, September 2008. Reprinted in *Political Economy: Critical Concepts*, by Norman Schofield, Dino Falaschetti and Andrew Rutten (eds.), New York: Routledge, 2011.

"Substitute Goods, Auctions and Equilibrium," with Bruno Strulovici, Journal *of Economic Theory*, June 2008

"The Promise of Prediction Markets" (with 22 co-authors), *Science*, May 2008.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

"What the Seller Won't Tell You: Persuasion and Disclosure in Markets," *Journal of Economics Perspectives*, Spring 2008.

"Core-Selecting Package Auctions," with Bob Day, *International Journal of Game Theory*, March 2008. Reprinted in *Handbook of Spectrum Auction Design*, by Martin Bichler and Jacob Goeree (eds.), Cambridge University Press, 2017.

"Package Auctions and Package Exchanges" (2004 Fisher-Schultz lecture), *Econometrica*, July 2007.

"Matching with Contracts," with John Hatfield, *American Economic Review*, September 2005.

"Ascending Auctions with Package Bidding," with Lawrence M. Ausubel, *Frontiers of Theoretical Economics*, August 2002. Republished in *Advances in Theoretical Economics*, 2002.

"Package Bidding: Vickrey vs Ascending Auctions," with Lawrence M. Ausubel, *Revue Economique*, May 2002.

"Envelope Theorems for Arbitrary Choice Sets," with Ilya Segal, *Econometrica*, March 2002.

"Advances in Routing Technologies and Internet Peering Agreements," with Stan Besen, Bridger Mitchell and Padmanabhan Srinagesh, *American Economic Association Papers and Proceedings*, May 2001.

"Putting Auction Theory to Work: The Simultaneous Ascending Auction," *Journal of Political Economy*, April 2000. Reprinted in *Handbook of Spectrum Auction Design*, by Martin Bichler and Jacob Goeree (eds.), Cambridge University Press, 2017.

"Game Theory and the Spectrum Auctions," *European Economic Review*, May 1998.

"Coalition-Proofness and Correlation with Arbitrary Communication Possibilities," with John Roberts, *Games and Economic Behavior*, November 1996.

"The LeChatelier Principle," with John Roberts, *American Economic Review*, March 1996. Reprinted in *Paul Anthony Samuelson, Critical Assessments of Contemporary Economists*, by John Cunningham Wood and Michael McLure (eds.), New York: Routledge, 2004.

"The Economics of Modern Manufacturing: Technology, Strategy and Organization: Reply," *American Economic Review*, September 1995.

"Deterring Predation in Telecommunications: Are Line-of-Business Restraints Needed?" with Susan Gates and John Roberts, *Managerial and Decision Economics*, July 1995. Reprinted in *Deregulating Telecommunications: The Baby*

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

*Bells' Case for Competition*, by R.S. Higgins and P.H. Rubin (eds). Chichester: John Wiley & Sons, 1995.

"Complementarities and Fit: Strategy, Structure and Organizational Change in Manufacturing," with John Roberts, *Journal of Accounting and Economics*, March 1995.

"The Firm as an Incentive System," with Bengt Holmstrom, *American Economic Review*, September 1994. Reprinted in *The Theory of the Firm: Critical Perspectives*, by Nicolai Juul Foss (ed.), New York: Routledge, 2000. Reprinted in *Readings in the Economics of the Division of Labor, Vol 2: Modern Analyses*, by Guang-Zhen Sun (ed.), World Scientific, 2005.

"Coordination, Commitment and Enforcement: The Case of the Merchant Guild," with Avner Greif and Barry Weingast, *Journal of Political Economy*, August 1994. Reprinted in *Explaining Social Institutions*, by Jack Knight and Itai Sened (eds.), Ann Arbor: University of Michigan Press, 1995. Reprinted in *Trust*, by Elias Khalil (ed.), London: Edward Elgar Publishing, 2002. Reprinted in *The Foundations Library of the New Institutional Economics*, by Claude Ménard (ed.), London: Edward Elgar Publishing, 2005. Reprinted in *Social Norms, Non-legal Sanctions, and the Law*, by Eric Posner (ed.), London: Edward Elgar Publishing, 2007. Reprinted in *Customary Law*, by Lisa Bernstein and Francesco Parisi (eds.), London: Edward Elgar Publishing, forthcoming.

"Comparing Equilibria," with John Roberts, *American Economic Review*, June 1994. Reprinted in *Equilibrium*, by Donald Walker (ed.), Edward Elgar Publishing, 2000.

"Comparing Optima: Do Simplifying Assumptions Affect Conclusions?" *Journal of Political Economy*, June 1994.

"Complementarities and Systems: Understanding Japanese Economic Organization," with John Roberts, *Estudios Economicos*, April 1994.

"Monotone Comparative Statics," with Chris Shannon, *Econometrica*, January 1994.

"Organizational Prospects, Influence Costs and Ownership Changes," with Margaret Meyer and John Roberts, *Journal of Economics and Management Strategy*, Spring 1992.

"Pay, Perks and Parachutes: Do They Pay?" with John Roberts, *Stanford Business*, 1992.

"Information and Timing in Repeated Partnerships," with Dilip Abreu and David Pearce, *Econometrica*, November 1991.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

"A Theory of Hierarchies Based on Limited Managerial Attention," with John Geanakoplos, *Journal of Japanese and International Economies*, September 1991. Reprinted in *The Economics of Organization and Bureaucracy*, by Peter Jackson (ed.), London: Edward Elgar Publishing, 2013.

"Complementarities, Momentum, and the Evolution of Modern Manufacturing," with Yingyi Qian and John Roberts, *American Economic Association Papers and Proceedings*, May 1991.

"Multitask Principal-Agent Analyses: Incentive Contracts, Asset Ownership and Job Design," with Bengt Holmstrom, *Journal of Law, Economics and Organization*, Spring 1991. Reprinted in *Transaction Cost Economics*, by Oliver Williamson and Scott Masten (eds.), London: Edward Elgar Publishing, 1994. Reprinted in *The Principal-Agent Model: The Economic Theory of Incentives*, by J-J Laffont (ed.), Cheltenham: Edward Elgar Press, 2003. Reprinted in *The International Library of the New Institutional Economics*, by Claude Ménard (ed.), London: Edward Elgar Publishing, 2005. Reprinted in *The Economic Nature of the Firm*, by Louis Putterman and Randall Kroszner (ed.), Cambridge University Press, 1996. Reprinted in *The Economics of Contracts*, by Patrick Bolton, Barbara and David Zalaznick (eds.), Cheltenham: Edward Elgar Press, 2008. Reprinted in *Institutional Law and Economics*, by Pablo Spiller (ed.), Cheltenham: Edward Elgar Press, forthcoming.

"Adaptive and Sophisticated Learning in Repeated Normal Form Games," with John Roberts, *Games and Economic Behavior*, February 1991. Reprinted in *Recent Developments in Game Theory*, by E. Maskin (ed.), Cheltenham: Edward Elgar, 1998.

"Rationalizability, Learning and Equilibrium in Games with Strategic Complementarities," with John Roberts, *Econometrica*, November 1990. Reprinted in *Recent Developments in Game Theory*, by E. Maskin (ed.), Cheltenham: Edward Elgar, 1998.

"The Economics of Modern Manufacturing: Technology, Strategy and Organization," with John Roberts, *American Economic Review*, June 1990. Reprinted in *Vestnik St. Petersburgskogo Universiteta, Economics Seria* (the Journal of the Economics Faculty of St. Petersburg University), 1993 (in translation). Reprinted in *Economics of the Firm: Lessons in Business Organization*, by Andrei Demin and Valery Katkalo (eds.), St. Petersburg, Russia: 1994. Reprinted in *The Economics of Communications and Information*, by Donald Lamberton (ed.), Cheltenham: Edgar Elgar Publishing, 1996. Reprinted in *Readings in Applied Microeconomic Theory: Market Forces and Solutions*, by Robert E. Kuenne (ed.), Blackwell

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Publishers, 2000. Reprinted in *Fundamentals of Business Strategy*, by Mie Augur and David Teece (eds.), Sage Publications, 2007.

"Short Term Contracts and Long Term Agency Relationships," with Drew Fudenberg and Bengt Holmstrom, *Journal of Economic Theory*, June 1990.

"The Efficiency of Equity in Organizational Decision Processes," with John Roberts, *American Economic Review Papers and Proceedings*, May 1990.

"The Role of Institutions in the Revival of Trade: The Medieval Law Merchant," with Douglass North and Barry Weingast, *Economics and Politics*, March 1990. Reprinted in *Trade in the Pre-Modern Period: 1400-1700*, by Douglas Irwin (ed.), London: Edward Elgar Publishing, 1996. Reprinted in *Reputation: Studies in the Voluntary Elicitation of Good Conduct*, by Daniel B. Klein (ed.), Ann Arbor, University of Michigan Press, 1997. Reprinted in *The Political Economy of Institutions*, by Claude Ménard (ed.), London: Edward Elgar Publishing, 2004. Reprinted in *International Institutions in the New Global Economy*, by Lisa L. Martin (ed.), London: Edward Elgar Publishing, 2005. Reprinted in *Anarchy and the Law*, by Edward Stringham (ed.), New Brunswick, New Jersey: Transaction Publishers, 2006. Reprinted in *Social Norms, Non-Legal Sanctions, and the Law*, by Eric A. Posner (ed.), London: Edward Elgar Publishing, 2007.

"Regulating Trade Among Agents," with Bengt Holmstrom, *Journal of Institutional and Theoretical Economics*, March 1990. Reprinted in *The New Institutional Economics*, by Erik G. Furubotn and Rudolph Richter (eds.), College Station: Texas A&M University Press, 1991.

"Auctions and Bidding: A Primer," *Journal of Economic Perspectives*, Summer 1989. Reprinted in *Readings in Microeconomic Theory*, by Manfredi La Manna (ed.), London: Dryden Press, 1997.

"Communication and Inventories as Substitutes in Organizing Production," with John Roberts, *Scandinavian Journal of Economics*, September 1988.

"Economic Theories of Organization: Past, Present and Future," with John Roberts, *Canadian Journal of Economics*, August 1988. Reprinted in *The Economics of Contracts and Industrial Organization: A Reader*, Peter Buckley and Jonathan Michie (eds.), Oxford University Press, 1996.

"An Economic Approach to Influence Activities and Organizational Responses," with John Roberts, *American Journal of Sociology*, July 1988.

"Employment Contracts, Influence Activities and Efficient Organization Design," *Journal of Political Economy*, February 1988.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

"Job Discrimination, Market Forces, and the Invisibility Hypothesis," with Sharon Oster, *Quarterly Journal of Economics*, August 1987. Reprinted in *Learning in Labour Markets*, by Michael Waldman (ed.), Cheltenham: Edward Elgar Press.

"Informational Asymmetries, Strategic Behavior and Industrial Organization," with John Roberts, *American Economic Association Papers and Proceedings*, May 1987.

"Aggregation and Linearity in the Provision of Intertemporal Incentives," with Bengt Holmstrom, *Econometrica*, March 1987. Reprinted in *The Principal-Agent Model: The Economic Theory of Incentives*, by J-J Laffont (ed.), Cheltenham: Edward Elgar Press. Reprinted in *The Economics of Contracts*, by Patrick Bolton, Barbara and David Zalaznick (eds.), Cheltenham: Edward Elgar Press.

"Price and Advertising Signals of Product Quality," with John Roberts, *Journal of Political Economy*, August 1986. Reprinted in *Antitrust and Competition*, by Andrew Kleit (ed.), Cheltenham: Edward Elgar Publishing, 2005. Reprinted in *The Economics of Marketing, Martin Carter*, by Mark Casson and Vivek Suneja (eds.), Cheltenham: Edgar Elgar Publishing, 1998. Reprinted in *Readings in Industrial Organization*, by Luis M.B. Cabral (ed.), Oxford: Blackwell Publishers, 2000.

"Relying on the Information of Interested Parties," with John Roberts, *Rand Journal of Economics*, April 1986. Reprinted in *Economics of Evidence, Procedure and Litigation*, by Chris William Sanchirico (ed.), Cheltenham: Edward Elgar Publishing, 2007.

"Distributional Strategies for Games with Incomplete Information," with Robert Weber, *Mathematics of Operations Research*, November 1985.

"Bid, Ask and Transactions Prices in a Specialist Market with Heterogeneously Informed Traders," with Lawrence R. Glosten, *Journal of Financial Economics*, March 1985.

"Reply to the Comments on 'Measuring the Interest Rate Risk,'" *Transactions of the Society of Actuaries, XXXVII*, 1985

"Measuring the Interest-Rate Risk," *Transactions of the Society of Actuaries, XXXVII*, 1985.

"Competitive Bidding with Proprietary Information," with Richard Engelbrecht-Wiggans and Robert Weber, *Journal of Mathematical Economics*, April 1983.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

"A Theory of Auctions and Competitive Bidding," with Robert Weber, *Econometrica*, September 1982. Reprinted in *Game Theory in Economics*, by Ariel Rubinstein (ed.), London: Edward Elgar Publishing, 1990. Reprinted in *The Economics of Information*, by Steven A. Lippman and John E. Anderson (eds.), London: Edward Elgar Publishing, 1994. Reprinted in *The Economic Theory of Auctions*, by Paul Klemperer (ed.), London: Edward Elgar Publishing, 1999. Reprinted in *Readings in Applied Microeconomic Theory: Market Forces and Solutions*, by Robert E. Kuenne (ed.), Blackwell Publishers, 2000.

"Predation, Reputation, and Entry Deterrence," with John Roberts, *Journal of Economic Theory*, August 1982. Reprinted in *Antitrust and Competition*, by Andrew Kleit (ed.), Cheltenham: Edward Elgar Publishing, 2005. Reprinted in *The Economics of Reputation*, by Jill J. McCluskey and Jason Winfree (eds.), Edward Elgar Publishing, 2017.

"Rational Cooperation in the Finitely-Repeated Prisoners' Dilemma," with David Kreps, John Roberts and Robert Wilson, *Journal of Economic Theory*, August 1982. Reprinted in *Game Theory in Economics*, by Ariel Rubinstein (ed.), Cheltenham: Edward Elgar Publishing, 1990. Reprinted in *Trust*, by Elias L. Khalil (ed.), Cheltenham: Edward Elgar Publishing, 2003.

"The Value of Information in a Sealed Bid Auction," with Robert Weber, *Journal of Mathematical Economics*, June 1982. Reprinted in *The Economic Theory of Auctions*, by Paul Klemperer (ed.), London: Edward Elgar Publishing, 1999.

"Limit Pricing and Entry Under Incomplete Information: An Equilibrium Analysis," with John Roberts, *Econometrica*, March 1982. Reprinted in *Industrial Organization*, by Oliver Williamson (ed.), London: Edward Elgar Publishing, 1990. Reprinted in *The Economics of Information*, by Steven A. Lippman and John E. Anderson (eds.), London: Edward Elgar Publishing, 1994. Reprinted in *Readings in Industrial Organization*, edited by Luis M.B. Cabral (ed.), Oxford: Blackwell Publishers, 2000. Reprinted in *Pricing*, by Michael Waldman and Justin P. Johnson (ed.), London: Edward Elgar Publishing, 2007.

"Information, Trade and Common Knowledge," with Nancy Stokey, *Journal of Economic Theory*, February 1982.

"Good News and Bad News: Representation Theorems and Applications," *Bell Journal of Economics*, October 1981.

"Rational Expectations, Information Acquisition, and Competitive Bidding," *Econometrica*, July 1981. Reprinted in *The Economic Theory of Auctions*, by Paul Klemperer (ed.), London: Edward Elgar Publishing, 1999.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

"An Axiomatic Characterization of Common Knowledge," *Econometrica*, January 1981.

"A Convergence Theorem for Competitive Bidding with Differential Information," *Econometrica*, May 1979.

"On Understanding the Effects of GAAP Reserve Assumptions," *Transactions of the Society of Actuaries, XXVII*, 1975.


**Books**

*Discovering Prices: Auction Design in Markets with Complex Constraints*. Columbia University Press, 2017.

*Putting Auction Theory to Work*. Cambridge: Cambridge University Press, 2004.


**Contributions to Books and Proceedings**

"Spectrum Auctions from the Perspective of Matching," with Andrew Vogt, *Online and Matching-Based Market Design*, Cambridge University Press, 2023.

"How Artificial Intelligence and Machine Learning Can Impact Market Design," with Steve Tadelis, *The Economics of Artificial Intelligence: An Agenda*, edited by Ajay K. Agrawal, Joshua Gans, and Avi Goldfarb, 2019.

"Winning Play in Spectrum Auctions," with Jeremy Bulow and Jonathan Levin, in *Handbook of Spectrum Auction Design*, by Martin Bichler and Jacob Goeree (eds.), Cambridge University Press, 2017.

"Designing the US Incentive Auction," in *Handbook of Spectrum Auction Design*, by Martin Bichler and Jacob Goeree (eds.), Cambridge University Press, 2017.

"Optimal Incentives in Core-Selecting Auctions," with Bob Day, in *The Handbook of Market Design*, by Zvika Neeman, Al Roth, and Nir Vulkan (eds.), Oxford University Press, 2013.

"Incentive Auction: Rules and Discussion," with Lawrence Ausubel, Jonathan Levin and Ilya Segal, published as Appendix C of the FCC 12-118 (Notice of Proposed Rulemaking on the Incentive Auction, Released October 2, 2012).

"Complementarity in Organizations," with Erik Brynjolfsson, in *The Handbook of Organizational Economics*, by John Roberts and Bob Gibbons (eds.), Princeton University Press, 2012.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

"Multipliers and the LeChatelier Principle," in *Samuelsonian Economics and the Twenty-First Century*, by Michael Szenberg, Lall Ramrattan and Aron Gottesman (eds.), Oxford University Press, 2006.

"The Clock-Proxy Auction: A Practical Combinatorial Design," with Lawrence M. Ausubel and Peter Cramton, in *Combinatorial Auctions*, by Peter Cramton, Richard Steinberg and Yoav Shoham (eds.), MIT Press, 2005. Reprinted in *Handbook of Spectrum Auction Design*, by Martin Bichler and Jacob Goeree (eds.), Cambridge University Press, 2017.

"Ascending Proxy Auctions," with Lawrence M. Ausubel, in *Combinatorial Auctions*, by Peter Cramton, Richard Steinberg and Yoav Shoham (eds.), MIT Press, 2005.

"The Lovely but Lonely Vickrey Auction," with Lawrence M. Ausubel, in *Combinatorial Auctions*, by Peter Cramton, Richard Steinberg and Yoav Shoham (eds.), MIT Press, 2005.

"Competitive Effects of Internet Peering Policies," with Bridger Mitchell and Padmanabhan Srinagesh, in *The Internet Upheaval*, by Ingo Vogelsang and Benjamin Compaine (eds.), Cambridge: MIT Press, 2000.

"A Theory of Auctions and Competitive Bidding, II," with Robert Weber, in *The Economic Theory of Auctions*, by Paul Klemperer (ed.), Edward Elgar Publishing, 1999.

"Combination Bidding in Spectrum Auctions," in *Competition, Regulation and Convergence: Current Trends in Telecommunications Research*, by Sharon Gillett and Ingo Vogelsang (eds.), New Jersey: Lawrence Erlbaum Associates, Publishers, 1999.

"The Internal Politics of the Firm," with John Roberts, in *The Politics of Exchange and the Economics of Power*, by Samuel Bowles, Maurizio Franzini and Ugo Pagano (eds.), New York: Routledge, 1998.

"Procuring Universal Service: Putting Auction Theory to Work," in *Le Prix Nobel: The Nobel Prizes, 1996*, Nobel Foundation, 1997.

"Procuring Universal Telephone Service," in *1997 Industry Economics Conference, Industry Commission (ed.), Conference Proceedings*, 1997, AGPS.

"Complementarities in the Transition from Socialism: A Firm-Level Analysis," with Susan Gates and John Roberts, in *Reforming Asian Socialism: The Growth of Market Institutions*, by John McMillan and Barry Naughton (eds.), Ann Arbor: University of Michigan Press, 1996.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

"Continuous Adjustment and Fundamental Change in Business Strategy and Organization," with John Roberts, in *Trends in Business Organization: Do Participation and Cooperation Increase Competitiveness?*, by Horst Siebert (ed.), Tübingen: J.C.B. Mohr (Paul Siebeck), 1995.

"Johnson Controls, Inc—Automotive Systems Group: The Georgetown Kentucky Plant," with John Roberts, *Case #S-BE-9, Stanford Graduate School of Business*, November 1993.

"Is Sympathy an Economic Value? Philosophy, Economics and the Contingent Valuation Method," in *Contingent Valuation: A Critical Assessment*, by Jerry Hausman (ed.), Elsevier-North Holland, 1993.

"The Real Output of the Stock Exchange," with Timothy F. Bresnahan and Jonathan Paul, in *Output Measurement in the Services Sectors*, by Zvi Griliches (ed.), 1992.

"Bargaining Costs, Influence Costs and the Organization of Economic Activity," with John Roberts, in *Perspectives on Positive Political Economy*, by James E. Alt and Kenneth A. Shepsle (eds.), Cambridge: Cambridge University Press, 1990. Reprinted in *Transaction Cost Economics*, by Oliver Williamson and Scott Masten (eds.), London: Edward Elgar Publishing Co., 1994. Reprinted in *The International Library of the New Institutional Economics*, by Claude Ménard (ed.), London: Edward Elgar Publishing, 2003. Reprinted in *The Economic Nature of the Firm*, by Louis Putterman and Randall Kroszner (eds.), Cambridge University Press, 1996. Reprinted in *The International Library of the New Institutional Economics*, by Claude Ménard (ed.), London: Edward Elgar Publishing, 2005.

"New Theories of Predatory Pricing," with John Roberts, *Industrial Structure in the New Industrial Economics*, by Giacomo Bonanno and Dario Brandolini (eds.), Oxford: Oxford University Press, 1990.

"An Essay on Price Discrimination," in *The Economics of Imperfect Competition and Employment: Joan Robinson and Beyond*, by George Feiwel (ed.), New York: MacMillan and New York: New York University Press, 1989.

"Predatory Pricing," in *The New Palgrave: A Dictionary of Economic Theory and Doctrine*, by J. Eatwell, M. Milgate, and P. Newman (eds.), London: MacMillan Press Ltd., 1988.

"Auction Theory," in *Advances in Economic Theory: Fifth World Congress*, by Truman Bewley (ed.), London: Cambridge University Press, 1987.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

"The Economics of Competitive Bidding: A Selective Survey," in *Social Goals and Social Organization: A Volume in Honor of Elisha Pazner*, by L. Hurwicz, D. Schmeidler and H. Sonnenschein (eds.), London: Cambridge University Press, 1985.

"Private Information in an Auction-Like Securities Market," in *Auctions, Bidding and Contracting: Uses and Theory*, by R. Engelbrecht-Wiggans, M. Shubik and R. Stark (eds.), New York: New York University Press, New York, 1983.

"Topologies on Information and Strategies in Normal-Form Games with Incomplete Information," with Robert Weber, in *Game Theory and Mathematical Economics*, by O. Moeschlin and D. Pallaschke (eds.), New York: North Holland, 1981.

## Patents

Paul Milgrom, Stephan Cunningham, Marissa Beck. "United States Patent 11,574,358 Impression Allocation System and Method Using an Auction that Considers Losing Bids," OpenX Technologies, Inc, Feb 7, 2023

Paul Milgrom, Steve Goldband. "United States Patent 8,788,364 System for Configuration and Implementation of an Assignment Auction or Exchange," Auctionomics, Inc, Jul 22, 2014

Lawrence Ausubel, Peter Cramton, Paul Milgrom. "United States Patent 8,744,924 System and Method for Efficient Clearing of Spectrum Encumbrances," Efficient Auctions, LLC, Jun 3, 2014

Marc Porat, Kevin Surace, Paul Milgrom. "United States Patent 8,738,463 Method, System and Business Model for a Buyer's Auction with Near-Perfect Information Using the Internet," Perfect Commerce, LLC, May 27, 2014

Paul Milgrom, David Salant. "United States Patent 8,577,746 System and Method for a Multi-Product Clock Auction," Auction Technologies, LLC, Nov 5, 2013

Lawrence Ausubel, Paul Milgrom. "United States Patent 8,566,211 System and Method for a Dynamic Auction with Package Bidding," Efficient Auctions, LLC, Oct 22, 2013

Marc Porat, Kevin Surace, Paul Milgrom. "United States Patent 8,341,033 Method, System and Business Model for a Buyer's Auction with Near-Perfect Information Using the Internet," Perfect Commerce, Dec 25, 2012

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Lawrence Ausubel, Peter Cramton, Paul Milgrom. "United States Patent 8,335,738 System and Method for a Hybrid Clock and Proxy Auction," Efficient Auctions, LLC, Dec 18, 2012

Paul Milgrom, Steven Goldband. "United States Patent 8,271,345 System and Method for Incorporating Bidder Budgets in Multi-Item Auctions," Auctionomics, Inc, Sep 18, 2012

Lawrence Ausubel, Peter Cramton, Paul Milgrom. "United States Patent 8,224,743 System and Method for a Hybrid Clock and Proxy Auction," Efficient Auctions, LLC, Jul 17, 2012

**Others**

"The Market Design Community and the Broadcast Incentive Auction: Fact-Checking Glen Weyl's and Stefano Feltri's False Claims," Digitopoly, June 2020.

"Commentary on Effective Allocation of Affordable Housing by Nick Arnosti and Peng Shi" with Mitchell Watt, Management Science Blog, May 2020.

"How Obscure Science Led to Spectrum Auctions That Connected the World," April 2017.

"Ad Exchanges Are Not All The Same: How Better Policed Exchanges Help Premium Publishers," OpenX, 2015.

"The Case for Unlicensed Spectrum," with Jonathan Levin, October 2011.

"Making Carbon Markets Work," SIEPR, May 2009.

"Using Procurement Auctions to Allocate Broadband Stimulus Grants," SIEPR, May 2009.

"The Promise of Prediction Markets," with multiple co-authors, May 2008.

"Economists' Statement on US Broadband Policy," with multiple co-authors, March 2006.

"Promoting Efficient Use of Spectrum Through Elimination of Barriers to Secondary Markets," with multiple co-authors, February 2001.

"An Economist's Vision of the B-to-B Marketplace," Palo Alto: Perfect, 2000.

**Working Papers**

"Kenneth Arrow's Last Theorem," 2024. Forthcoming in Journal of Mechanism and Institutional Design.

"A Walrasian Mechanism with Markups for Nonconvex Economies," with Mitchell Watt, November 2024.

"Fuel for 5g," Auctionomics White Paper, June, 2019.

"The CAF Auction: Design Proposal," with Assaf Eilat, July 2011.

"Adverse Selection without Hidden Information," June 1987.


<u>**Major Professional Activities and Affiliations**</u>

| | |
|---|---|
| 2017-21 | Chair, Economics section (54) of the National Academy of Sciences |
| 2020 | SIGecom Test of Time Award Committee |
| 2019-20 | CME-MSRI Award Committee |
| 2016–17 | National Academy of Sciences: Class Membership Committee |
| | Chair, NAS Temporary Nominating Group |
| 2016 | National Academy of Sciences: Air Force Studies Board Committee |
| 2015–present | Editorial Board, Proceedings of the National Academy of Sciences |
| | Executive Supervisory Committee, CERGE-EI |
| | National Academies' Intelligence Science and Technology Experts Group (ISTEG) |
| 2012–17 | Lead consultant to Federal Communications Commission Incentive Auctions Task Force |
| 2012–14 | Editorial Board of European Journal of Pure and Applied Mathematics |
| 2009–present | Editorial Board of AEJ-Microeconomics |
| 2007–08 | President, Western Economic Association International (WEAI) |
| 2006–07 | Member, National Academy of Sciences |
| | President-Elect, Western Economic Association International (WEAI) |
| 2005–06 | Vice President, Western Economic Association International (WEAI) |
| 2005–08 | Executive Committee of the Econometric Society |
| 2004–06 | Council, Econometric Society |
| 2003–present | Council, Game Theory Society |

661

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

| | |
|---|---|
| 2000–02 | Chief economist, Perfect Commerce |
| 1997–02 | Editorial Consultant, MIT Press |
| 1997–99 | Editorial Board, Journal of Comparative Economics |
| 1996–16 | Founder and Director, Market Design Inc. (Chairman, 1996–02) |
| 1996 | Nemmers Prize Selection Committee, Northwestern University |
| 1996–06 | Advisory Board, Microeconomics Abstracts |
| 1995–05 | Advisory Board, Economics Research Network |
| 1994–95 | Program Committee, 1995 World Congress of the Econometric Society |
| 1993–95 | Senior Research Fellow, Institute for Policy Reform |
| 1993–00 | Associate Editor, American Economic Review |
| 1992–present | Fellow, American Academy of Arts and Sciences |
| 1990–93 | Co-Editor, American Economic Review |
| 1990–present | Associate Editor, Games and Economic Behavior |
| 1989–92 | Associate Editor, Journal of Financial Intermediation |
| 1987–90 | Associate Editor, Econometrica |
| 1985–89 | Associate Editor, Rand Journal of Economics |
| 1983–87 | Associate Editor, Journal of Economic Theory |
| 1984 | Chair, Program Committee, Econometric Society Winter Meetings |
| 1984–present | Fellow, Econometric Society |
| 1980–present | Member, American Economic Association |

## **Expert Reports and Testimony (2010–present)**

1. Marla Tidenberg v. BidZ, Inc, United States District Court, Central District of California, Case No. CV08-05553 PSG (FMOx). (January 2010).

2. Alaska Electrical Pension Fund, et al. v. Bank of America Corp., et al, Civil Action No. 14-cv-7126 (JMF). (January 2018)

3. United States, et al. v. Google LLC, Case 1:23-cv-0108 (LMB/JFA), United States District Court for the Eastern District of Virginia (September 2024).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

4. Rick Woods v. Google LLC, Case 5:11-cv-01263-EJD. United States District Court, Northern District of California, San Jose Division. (2025)

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## APPENDIX B: LIST OF MATERIALS REFERRED TO OR RELIED ON

### A. Complaints, Other Docket Entries, and Discovery Responses

Inform Third Amended Complaint (May 15, 2024).

Advertiser Class Complaint (Dec. 2, 2022).

Publisher Class First Amended Complaint (Dec. 5, 2022).

Daily Mail Second Amended Complaint (May 15, 2024).

Gannett Amended Complaint (May 15, 2024).

Stellman Complaint (Sep. 15, 2022).



Plaintiff Associated Newspapers Ltd. and Mail Media Inc.'s Second Supplemental Responses to Defendant Google LLC's First Set Of Interrogatories To Daily Mail, *In Re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (PKC) (Apr. 21, 2023).

Plaintiff Gannett Co., Inc.'s Third Supplemental Responses to Defendant Google LLC's First Set Of Interrogatories To Gannett, *In Re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (PKC) (June 28, 2024).

Defendant Google LLC's Responses to Plaintiff United States Of America's Fifth Set of Interrogatories to Google, LLC, *United States, et al. v. Google LLC*, No. 1:23-cv-00108-LMB-JFA (Sep. 1, 2023).

### B. Expert Reports

Expert Report of Professor Peter Cramton, Ph.D. (Oct. 4, 2024).

Expert Report of Professor Einer Elhauge (Oct. 4, 2024).

Expert Report of Dr. John Chandler, Ph.D. (Oct. 4, 2024).

Expert Report of Dr. J. Douglas Zona, Ph.D. (Oct. 4, 2024).

Expert Report of Professor Hal Singer, Ph.D. (Oct. 4, 2024).

Expert Report of Professor Anand Das (Oct. 4, 2024).

Expert Report of Dr. Pablo Peña, Ph.D. (Oct.7, 2024).

Expert Report of Professor Cary Jardin (Oct. 7, 2024).

Revised Expert Report of Professor David Sibley, Ph.D. (Oct. 11, 2024).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Revised Expert Report of Professor Shengwu Li, Ph.D. (Oct. 11, 2024).

Revised Expert Report of Professor James Mickens, Ph.D. (Oct. 11, 2024).

Second Revised Expert Report of Professor Ali Hortaçsu, Ph.D. (Oct. 18, 2024).

Corrected Common Factual Background for Inform Expert Reports (Oct. 29, 2024).

Expert Report of Professor Martin Rinard, Ph.D. (Dec. 13, 2024).

### C. Deposition Transcripts and Trial Testimony



Deposition of ██████ (Sep. 8, 2023), ████████████████

Deposition of ██████ (Sep. 29, 2023), ████████████████

Deposition of ██████ (Jul. 22, 2021), GOOG-AT-MDL-007177040.

Deposition of C. Pirrone (July 10, 2024).

Deposition of ██████ (Jul. 28, 2023), ████████████

Deposition of ██████ (Oct. 26, 2023), ████████████

Deposition of ██████ (Nov. 6, 2020), GOOG-AT-MDL-007172126.

Deposition of ██████ (Sep. 29, 2023), ████████████

Deposition of ██████ (Sep. 6, 2023), ██████████████

Deposition of ██████ (Aug. 29, 2023), ████████████

Deposition of ████████ (Aug. 9, 2023), ██████████████

Deposition of M. Wheatland (Jun. 11, 2024).

Deposition of N. Jayaram (Apr. 25, 2024).

Deposition of N. Jayaram (July 10, 2024).

Deposition of N. Jayaram (Sep. 17, 2021), GOOG-AT-MDL-007173084.

Deposition of N. Korula (July 12, 2024).

Deposition of ██████ (Sep. 26, 2023), ████████████

Deposition of S. Spencer (Aug. 12, 2021), GOOG-AT-MDL-007178292.

Deposition of ██████ (Sep. 8, 2023), ████████████

EDVA Trial Testimony of Nitish Korula (Sep. 23, 2024) (AM).

EDVA Trial Testimony of Neal Mohan (Sept. 16, 2024) (AM).

EDVA Trial Testimony of Stephanie Layser (Sept. 10, 2024) (AM).

EDVA Trial Testimony of Jay Friedman (Sept. 10, 2024) (PM).

EDVA Trial Testimony of Omni Farber (Sept. 26, 2024) (PM).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

### D. Produced Google Documents

#### 1. Data and Supporting Material

GOOG-AT-DOJ-DATA-000066771 to GOOG-AT-DOJ-DATA-000066772.
GOOG-AT-EDTX-DATA-000000000 to GOOG-AT-EDTX-DATA-000258388.
GOOG-AT-EDTX-DATA-000276098 to GOOG-AT-EDTX-DATA-001116097.
GOOG-AT-EDTX-DATA-001116098.
GOOG-AT-EDVA-DATA-000000006.
GOOG-AT-MDL-DATA-000486626 to GOOG-AT-MDL-DATA-000488277.
GOOG-AT-MDL-DATA-000561263 to GOOG-AT-MDL-DATA-000561420.
GOOG-AT-DOJ-DATA-000066769 to GOOG-AT-DOJ-DATA-000066770.
GOOG-AT-DOJ-DATA-000066799 to GOOG-AT-DOJ-DATA-000245943.
Letter from J. Elmer to J. Hogan (Mar. 31, 2022), GOOG-AT-MDL-007334120.
Letter from J. Elmer to J. Hogan (Aug. 19, 2022), GOOG-AT-MDL-007334131.
Letter from D. Pearl to M. Freeman (Jun. 9, 2023), GOOG-AT-MDL-C-000012751.
Letter from D. Pearl to M. Freeman (Sep. 8, 2023), GOOG-AT-MDL-C-000012795.
Letter from D. Pearl to K. Garcia (Oct. 6, 2023), GOOG-AT-MDL-C-000012826.
Letter from D. Pearl to B. Nakamura and M. Freeman (Dec. 7, 2023),
    GOOG-AT-MDL-C-000012885.
Letter from D. Pearl to W. Noss, et al., re: *In re: Google Digital Advertising
    Antitrust Litigation,* No. 1:21-md-03010 (PKC); *State of Texas, et al. v. Google
    LLC,* No. 4:20-cv-00957-SDJ (Feb. 15, 2024).

#### 2. Other Documents

DM_GOOG_0000106
DM_GOOG_0146977
DM_GOOG_0148602
DMGT_DOJ_0001046
DOJ-ADS-0000052933
GANNETT_GOOG_0049415
GANNETT_GOOG_1014235
GANNETT_GOOG_1061578
GOOG-AT-MDL-001094067
GOOG-AT-MDL-001397473
GOOG-AT-MDL-003465605
GOOG-AT-MDL-003995286
GOOG-AT-MDL-004242638
GOOG-AT-MDL-004555239
GOOG-AT-MDL-006196134

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

GOOG-AT-MDL-007334120
GOOG-AT-MDL-007374059
GOOG-AT-MDL-007375273
GOOG-AT-MDL-008842383
GOOG-AT-MDL-008842393
GOOG-AT-MDL-008930706
GOOG-AT-MDL-008935836
GOOG-AT-MDL-009293665
GOOG-AT-MDL-009590288
GOOG-AT-MDL-009644018
GOOG-AT-MDL-009644112
GOOG-AT-MDL-009644182
GOOG-AT-MDL-009644201
GOOG-AT-MDL-009644236
GOOG-AT-MDL-009644238
GOOG-AT-MDL-009644401
GOOG-AT-MDL-009644409
GOOG-AT-MDL-010338120
GOOG-AT-MDL-010836318
GOOG-AT-MDL-011234683
GOOG-AT-MDL-011687180
GOOG-AT-MDL-012701069
GOOG-AT-MDL-015521456
GOOG-AT-MDL-B-001391461
GOOG-AT-MDL-B-003180112
GOOG-AT-MDL-B-004582905
GOOG-AT-MDL-C-000017969
GOOG-AT-MDL-C-000017971
GOOG-AT-MDL-C-000016753
GOOG-AT-MDL-C-000035250
GOOG-AT-MDL-C-000035251
GOOG-AT-MDL-C-000035252
GOOG-AT-MDL-C-000073682
GOOG-DOJ-01805208
GOOG-AT-MDL-001284725
GOOG-AT-MDL-014628553
GOOG-AT-MDL-019716943
GOOG-DOJ-02854344
GOOG-DOJ-03366145
GOOG-DOJ-03366173

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

GOOG-DOJ-03516570
GOOG-DOJ-03619484
GOOG-DOJ-03876025
GOOG-DOJ-03998505
GOOG-DOJ-04306227
GOOG-DOJ-04430492
GOOG-DOJ-04937154
GOOG-DOJ-05270417
GOOG-DOJ-05276941
GOOG-DOJ-05282625
GOOG-DOJ-05283173
GOOG-DOJ-05326023
GOOG-DOJ-06525908
GOOG-DOJ-06563186
GOOG-DOJ-06818412
GOOG-DOJ-06842351
GOOG-DOJ-06875572
GOOG-DOJ-06885161
GOOG-DOJ-07235914
GOOG-DOJ-07825115
GOOG-DOJ-09163089
GOOG-DOJ-09457868
GOOG-DOJ-09459336
GOOG-DOJ-09713317
GOOG-AT-MDL-002303984
GOOG-AT-MDL-003284235
GOOG-AT-MDL-009589520
GOOG-AT-MDL-009709686
GOOG-AT-MDL-009709785
GOOG-AT-MDL-011539513
GOOG-AT-MDL-011725784
GOOG-AT-MDL-014375348
GOOG-AT-MDL-018296358
GOOG-AT-MDL-018391366
GOOG-AT-MDL-018629608
GOOG-AT-MDL-019056545
GOOG-AT-MDL-019330098
GOOG-AT-MDL-019549143
GOOG-AT-MDL-020026677
GOOG-AT-MDL-020027387

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

GOOG-AT-MDL-B-001166414
GOOG-AT-MDL-B-003181628
GOOG-AT-MDL-B-004015028
GOOG-AT-MDL-C-000010679
GOOG-AT-MDL-C-000018419
GOOG-DOJ-03643284
GOOG-DOJ-03792729
GOOG-DOJ-04602757
GOOG-DOJ-04934481
GOOG-DOJ-05272070
GOOG-DOJ-06732979
GOOG-DOJ-06882418
GOOG-DOJ-09494195
GOOG-DOJ-09714662
GOOG-DOJ-09875881
GOOG-DOJ-09875989
GOOG-DOJ-09916352
GOOG-DOJ-10572595
GOOG-DOJ-10924270
GOOG-DOJ-10924698
GOOG-DOJ-03151263
GOOG-DOJ-04418304
GOOG-AT-MDL-004551619
GOOG-AT-MDL-013306012
GOOG-DOJ-04447709
GOOG-DOJ-11247631
GOOG-DOJ-11406673
GOOG-DOJ-11733552
GOOG-DOJ-11782962
GOOG-DOJ-11790760
GOOG-DOJ-12038253
GOOG-DOJ-12059682
GOOG-DOJ-12443562
GOOG-DOJ-12700489
GOOG-DOJ-12848608
GOOG-DOJ-13199584
GOOG-DOJ-13199952
GOOG-DOJ-13202659
GOOG-DOJ-13205869
GOOG-DOJ-13207875

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

GOOG-DOJ-13208758
GOOG-DOJ-13208800
GOOG-DOJ-13212948
GOOG-DOJ-13221355
GOOG-DOJ-13226855
GOOG-DOJ-13227256
GOOG-DOJ-13235100
GOOG-DOJ-13247322
GOOG-DOJ-13364449
GOOG-DOJ-13469175
GOOG-DOJ-13501237
GOOG-DOJ-13579782
GOOG-DOJ-13605152
GOOG-DOJ-13619370
GOOG-DOJ-13625417
GOOG-DOJ-13627809
GOOG-DOJ-13949282
GOOG-DOJ-13979867
GOOG-DOJ-14024199
GOOG-DOJ-14298902
GOOG-DOJ-14398809
GOOG-DOJ-14514871
GOOG-DOJ-14549757
GOOG-DOJ-14550102
GOOG-DOJ-10733927
GOOG-DOJ-11781854
GOOG-DOJ-12025827
GOOG-DOJ-12439154
GOOG-DOJ-12948968
GOOG-DOJ-13199603
GOOG-DOJ-13199910
GOOG-DOJ-13200158
GOOG-DOJ-13200480
GOOG-DOJ-13201465
GOOG-DOJ-13203511
GOOG-DOJ-13204346
GOOG-DOJ-13208074
GOOG-DOJ-13209957
GOOG-DOJ-13211589
GOOG-DOJ-13470118

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

GOOG-DOJ-13564564
GOOG-DOJ-11782270
GOOG-DOJ-13392632
GOOG-DOJ-13494286
GOOG-DOJ-14000011
GOOG-DOJ-14028590
GOOG-DOJ-14029750
GOOG-DOJ-14030931
GOOG-DOJ-14039426
GOOG-DOJ-14421383
GOOG-DOJ-14566285
GOOG-DOJ-14952787
GOOG-DOJ-15116057
GOOG-DOJ-15119015
GOOG-DOJ-15130321
GOOG-DOJ-15208416
GOOG-DOJ-15226550
GOOG-DOJ-15232606
GOOG-DOJ-15247796
GOOG-DOJ-15254730
GOOG-DOJ-15264552
GOOG-DOJ-15389438
GOOG-DOJ-15407321
GOOG-DOJ-15416614
GOOG-DOJ-15417688
GOOG-DOJ-15419945
GOOG-DOJ-15423317
GOOG-DOJ-15423462
GOOG-DOJ-15426012
GOOG-DOJ-15442474
GOOG-DOJ-15588979
GOOG-DOJ-15637938
GOOG-DOJ-15730729
GOOG-DOJ-28385887
GOOG-DOJ-32261273
GOOG-DOJ-AT-00045716
GOOG-DOJ-AT-00070433
GOOG-DOJ-AT-00173317
GOOG-DOJ-AT-00573492
GOOG-DOJ-13951939

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

GOOG-DOJ-14139620
GOOG-DOJ-14162335
GOOG-DOJ-14429769
GOOG-DOJ-14507249
GOOG-DOJ-15482980
GOOG-AT-MDL-007040396
GOOG-DOJ-AT-00608572
GOOG-DOJ-AT-01027937
GOOG-DOJ-AT-01133273
GOOG-DOJ-AT-01502155
GOOG-DOJ-AT-02204351
GOOG-DOJ-AT-02467209
GOOG-DOJ-AT-02471119
GOOG-DOJ-AT-02480338
GOOG-DOJ-AT-02512863
GOOG-DOJ-AT-02524665
GOOG-DOJ-AT-01980370
GOOG-TEX-00048091
GOOG-TEX-00054839
GOOG-TEX-00458239
GOOG-DOJ-14734790
GOOG-DOJ-15417728
GOOG-DOJ-AT-00566466
GOOG-DOJ-AT-00571933
GOOG-DOJ-AT-00573072
GOOG-DOJ-AT-00574271
GOOG-DOJ-AT-00608572
GOOG-DOJ-AT-00849635
GOOG-DOJ-AT-01363996
GOOG-DOJ-AT-02199478
GOOG-DOJ-AT-02218994
GOOG-DOJ-AT-02472888
GOOG-TEX-00000001
GOOG-TEX-00090969
GOOG-TEX-00682264
GOOG-TEX-00831373
GOOG-DOJ-AT-00810221
GOOG-DOJ-AT-02368104
GOOG-TEX-00055792
GOOG-TEX-00122346

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

GOOG-TEX-00140206
GOOG-TEX-00209387
GOOG-TEX-00449253
GOOG-TEX-00292925
GOOG-TEX-00682264
GOOG-TEX-00966448
GOOG-TEX-00122345

**E. Produced Third-Party Docs**



GENIUS-AT-000000100
GENIUS-AT-000116169



*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

## F. Publicly Available Sources

### 1. Publications

Angrist and Pischke, Mostly Harmless Econometrics, Princeton University Press, 2008.

Akbarpour, M., & Li, S. (2020). Credible auctions: A trilemma. *Econometrica*, *88*(2), 425-467.

Ausubel, L.M., & Milgrom, P., The Lovely but Lonely Vickrey Auction, in P. Cramton, Y. Shoham & R. Steinberg (Eds.), *Combinatorial Auctions,* MIT Press (2006).

Arnosti, N., Beck, M., & Milgrom, P. (2016). Adverse selection and auction design for internet display advertising. *American Economic Review*, *106*(10), 2852-2866.

Arozamena, Leandro, and Federico Weinschelbaum. A note on the suboptimality of right-of-first-refusal clauses. Economics Bulletin 4, no. 24 (2006): 1-5.

Asquith, Paul and Covert, Thomas and Pathak, Parag A., The Effects of Mandatory Transparency in Financial Market Design: Evidence from the Corporate Bond Market (April 2019).

Balseiro, S. R., & Gur, Y. (2019). Learning in repeated auctions with budgets: Regret minimization and equilibrium. *Management Science*, *65*(9), 3952-3968.

Balseiro, S R.., Kim, A., Mahdian, M., & Mirrokni, V. (2017). Budget management strategies in repeated auctions. In *Proceedings of the 26th International Conference on World Wide Web*, 15-23.

Banchio, M. and Skrzypacz, A., Artificial Intelligence and Auction Design. In Proceedings of the 23rd ACM Conference on Economics and Computation (EC '22) (2022).

Barlow, R. E., & Proschan, F. (1975). *Statistical theory of reliability and life testing: probability models* (Vol. 1). New York: Holt, Rinehart and Winston.

Bergemann, D., Brooks, B., and Morris, S. (2015). The limits of price discrimination. *American Economic Review*, *105*(3), 921-57.

Bergemann, D., & Välimäki, J. (2019). Dynamic mechanism design: An introduction. *Journal of Economic Literature*, *57*(2), 235-274.

Bikhchandani, Sushil, Steven A. Lippman, and Reade Ryan. On the Right-of-first-refusal. The BE Journal of Theoretical Economics 5, no. 1 Article 4 (2005).

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Cahn, A., Alfeld, S., Barford, P., & Muthukrishnan, S. (2016). An empirical study of web cookies. In *Proceedings of the 25th International Conference on World Wide Web*.

Chiang, Yao-Min, and Jarjisu Sa-Aadu. Right of first refusal (ROFR) effects in auctions with reserve price: Empirical evidence from Taiwanese government land auctions. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2409599 (2014).

Choi, A. H. (2009). A Rent Extraction Theory of Right of First Refusal. *The Journal of Industrial Economics*, *57*(2), 252–264.

Choi, H., & Mela, C. F. (2023). Optimizing reserve prices in display advertising auctions. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4523022.

Choi, H., Mela, C. F., Balseiro, S. R., & Leary, A. (2020). Online display advertising markets: A literature review and future directions. *Information Systems Research*, *31*(2), 556-575.

Cramton, P., and Schwartz, J., Collusive Bidding: Lessons from the FCC Spectrum Auctions, Journal of Regulatory Economics, Vol. 17 (May 2000).

Cramton, Peter. Competitive bidding behavior in uniform-price auction markets. 37th Annual Hawaii International Conference on System Sciences, 2004. Proceedings of the. IEEE, 2004.

Cullen, Z. Shengwu Li, and Perez-Truglia, R., What's My Employee Worth? The Effects of Salary Benchmarking, National Bureau of Economic Research, October 2022, Revised August 2024.

D'Annunzio, A., & Russo, A. (2024). Intermediaries in the online advertising market. *Marketing Science*, *43*(1), 33-53.

Despotakis, S., Ravi, R., & Sayedi, A. (2021). First-price auctions in online display advertising. *Journal of Marketing Research*, *58*(5), 888-907.

Doraszelski, U., Lewis, G., & Pakes, A. (2018). Just starting out: Learning and equilibrium in a new market. *American Economic Review*, *108*(3), 565-615.

Freixas, X., Guesnerie, R., & Tirole, J. (1985). Planning under incomplete information and the ratchet effect. *The Review of Economic Studies*, *52*(2), 173-91.

Fudenberg, D., & Tirole, J. (1991). *Game theory.* MIT Press.

Ghose, A., Li, B., & Liu, S. (2019). Mobile targeting using customer trajectory patterns. *Management Science*, *65*(11), 5027-5049.

Goke, S., Weintraub, G. Y., Mastromonaco, R., & Seljan, S. (2022). Bidders' responses to auction format change in internet display advertising auctions. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4021221.

Guerre, E., Perrigne, I., & Vuong, Q. (2000). Optimal nonparametric estimation of first‑price auctions. *Econometrica*, *68*(3), 525-574.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Gui, G., Nair, H., & Niu, F. (2022). Auction throttling and causal inference of online advertising effects. arXiv preprint arXiv:2112.1515.

Harsanyi, J.C. (1967). Games with incomplete information played by Bayesian players, I-III. Part I. The basic model. *Management Science*, *14*(3), 159-182.

Heymann, B. (2020). How to bid in unified second-price auctions when requests are duplicated. *Operations Research Letters*, *48*(4), 446-451.

Hortaçsu, A., Luco, F., Puller, S. L., & Zhu, D. (2019). Does strategic ability affect efficiency? Evidence from electricity markets. *American Economic Review*, *109*(12), 4302-4342.

Hortaçsu, A. and Perrigne, I. (2021). Empirical perspectives on auctions. In Handbook of Industrial Organization, 5 81–175. Elsevier.

Hortaçsu, A., & Puller, S. L. (2008). Understanding strategic bidding in multi‑unit auctions: A case study of the Texas electricity spot market. *The RAND Journal of Economics*, *39*(1), 86-114.

IAB, OpenRTB Version 2.6 (April, 2022).

Isenhardt, L., Seifert, S., and Hüttel, S., Tenant favoritism and right of first refusals in farmland auctions: competition and price effects. Land Economics 99, no. 2 (2023).

Ivaldi, M., Jullien, B., Rey, P., Seabright, P., Tirole, J., The Economics of Tacit Collusion, Final Report for DG Competition, European Commission, March 2003.

Kahan, M., Leshem, S., & Sundaram, R. K. (2012). First-Purchase Rights: Rights of First Refusal and Rights of First Offer. *American Law and Economics Review*, *14*(2), 331–371.

Kaplan, T. R., & Zamir, S. (2012). Asymmetric first-price auctions with uniform distributions: analytic solutions to the general case. *Economic Theory*, *50*(2), 269-302.

Klemperer, P. (1999). Auction theory: A guide to the literature. *Journal of Economic Surveys*, *13*(3), 227-86.

Krishna, V. (2010). *Auction theory* (2nd ed.). Academic Press.

Leandro Arozamena and Federico Weinschelbaum, The effect of corruption on bidding behavior in first-price auctions, Working Paper (February 14, 2005), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=621723.

Ledgerwood, Shaun D., and Heath, Wesley J., Rummaging Through the Bottom of Pandora's Box: Funding Predatory Pricing Through Contemporaneous Recoupment, Virginia Law & Business Review, Vol. 6 (Winter 2012).

Levin, J., & Milgrom, P. (2010). Online advertising: Heterogeneity and conflation in market design. *American Economic Review: Papers & Proceedings*, *100*(2), 603-07.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Mas-Colell, A., Whinston, M. D., & Green, J. R. (1995). *Microeconomic theory.* Oxford University Press.

McAfee, R. P., & McMillan, J. (1987). Auctions and bidding. *Journal of Economic Literature*, *25*(2), 699-738.

McAfee, R. Preston and McMillan, J., Bidding Rings, The American Economic Review 82, no. 3 (1992).

McAfee, P., Leme, R.P., Sivan, B., & Vassilvitskii, S. (2024). Winner-Pays-Bid Auctions Minimize Variance. ArXiv, abs/2403.04856.

Milgrom, P. R., & Weber, R. J. (1982). A theory of auctions and competitive bidding. *Econometrica*, *50*(5), 1089-1122.

Milgrom, P. R. (2017). *Discovering prices: auction design in markets with complex constraints.* Columbia University Press.

Milgrom, P. R. (2004). *Putting auction theory to work.* Cambridge University Press.

Milgrom, P. R., & Segal, I. (2020). Clock auctions and radio spectrum reallocation. *Journal of Political Economy*, *128*(1), 1-31.

Milgrom, P. R., and Segal, I. (2002). Envelope theorems for arbitrary choice sets. *Econometrica*, *70*(2), 583-601.

Milgrom, P. R., & Shannon, C. (1994). Monotone comparative statics. *Econometrica*, *62*(1), 157-180.

Munir, S., Siby, S., Iqbal, U., Englehardt, S., Shafiq, Z., & Troncoso, C. (2023). CookieGraph: Understanding and detecting first-party tracking cookies. In *Proceedings of the 2023 ACM SIGSAC Conference on Computer and Communications Security, 3490-3504.*

Myerson, R. B. (1981). Optimal auction design. *Mathematics of Operations Research*, *6*(1), 58-73.

Ordover, J. and Willig, R., An Economic Definition of Predation: Pricing and Product Innovation, The Yale Law Journal, Vol. 91 (Nov. 1981).

Ostrom, E. (2008). Tragedy of the commons. In *The New Palgrave Dictionary of Economics* (2nd ed.) (S. N. Durlauf & L. E. Blume, Eds.). Palgrave Macmillan.

Ostrovsky, M., & Schwarz, M. (2023). Reserve prices in internet advertising auctions: A field experiment. *Journal of Political Economy*, *131*(12), 3352-3376.

Pachilakis, M., Papadopoulos, P., Markatos, E. P., & Kourtellis, N. (2019). No more chasing waterfalls: a measurement study of the header bidding ad-ecosystem. In *Proceedings of the Internet Measurement Conference*, 280-293.

Perrigne, I., & Vuong, Q. (2019). Econometrics of auctions and nonlinear pricing. *Annual Review of Economics*, *11*, 27-54.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Reiley, D. H. (2006). Field experiments on the effects of reserve prices in auctions: More magic on the internet. *The RAND Journal of Economics*, *37*(1), 195-211.

Rhuggenaath, J., Akcay, A., Zhang, Y., & Kaymak, U. (2022). Setting reserve prices in second-price auctions with unobserved bids. *INFORMS Journal on Computing*, *34*(6), 2950-2967.

Riley, J. G., & Samuelson, W. F. (1981). Optimal auctions. *American Economic Review*, *71*(3), 381-392.

Roth, A.E. (2015). *Who gets what—and why: The new economics of matchmaking and market design.* Houghton Mifflin Harcourt.

Rothkopf, M.H., Teisberg, T.J., & Kahn, E.P. (1990). Why are Vickrey auctions rare? *Journal of Political Economy*, *98*(1), 94-109.

Scott, D. W. (1992). *Multivariate density estimation: Theory, practice, and visualization.* John Wiley & Sons.

Skrzypacz, A. and Hopenhayn, H., Tacit Collusion in Repeated Auctions, Journal of Economic Theory, Vol. 114 (Jan. 2004).

Stigler, G., A Theory of Oligopoly, The Journal Of Political Economy, Vol. 72 (Feb. 1964).

Vickrey, W. (1961). Counterspeculation, auctions, and competitive sealed tenders. *Journal of Finance*, *16*(1), 8-37.

Xu, J., Lee, K. C., Li, W., Qi, H., & Lu, Q. (2015). Smart pacing for effective online ad campaign optimization. In *Proceedings of the 21th ACM SIGKDD International Conference on Knowledge Discovery and Data Mining*, 2217-2226.

Yan, J., Liu, N., Wang, G., Zhang, W., Jiang, Y., & Chen, Z., How much can behavioral targeting help online advertising? In *Proceedings of the 18th International Conference on World Wide Web* (2009).

Ye, Z., Zhang, D.J., Zhang, H., Zhang, R., Chen, X., & Xu, Z. (2023). Cold start to improve market thickness on online advertising platforms: Data-driven algorithms and field experiments. *Management Science*, *69*(7), 3838-60.

Wooldridge, M., Econometric Analysis of Cross Section and Panel Data, The MIT Press.

Zhang, Kaifu and Katona Zsolt, Contextual Advertising, Marketing Science, Vol. 31 (Nov.-Dec. 2012).

Zhang, W., Kitts, B., Han, Y., Zhou, Z., Mao, T., He, H., Pan, S., Flores, A., Gultekin, S., & Weissman, T. (2021). Meow: A space-efficient nonparametric bid shading algorithm. In *Proceedings of the 27th ACM SIGKDD Conference on Knowledge Discovery & Data Mining*, 3928-3936.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

2.  **Google News Articles, Blog, and Help Pages**

Bellack, J., Exchange Bidding now available to all customers using DoubleClick for Publishers, Google Ad Manager (Apr. 4, 2018), https://blog.google/products/admanager/exchange-bidding-now-available-to-a.

Bellack, J., Smarter optimizations to support a healthier programmatic market, Google Ad Manager (May 12, 2016), https://blog.google/products/admanager/smarter-optimizations-to-suppor.

Bigler, J., An update on first price auctions for Google Ad Manager, Google Ad Manager (May 10, 2019), https://blog.google/products/admanager/update-first-price-auctions-google-ad-manager.

Bigler, J. Rolling out first price auctions to Google Ad Manager partners, Google Ad Manager (Sep. 5, 2019), https://blog.google/products/admanager/rolling-out-first-price-auctions-google-ad-manager-partners.

Cox, S., Simplifying programmatic: first price auctions for Google Ad Manager, Google Ad Manager (Mar. 6, 2019), https://blog.google/products/admanager/simplifying-programmatic-first-price-auctions-google-ad-manager.

Google, 10 Tips for Google Ads Budget Management, Google Ads Resources (Mar. 20, 2023), https://ads.google.com/intl/en_us/home/resources/articles/stretching-your-google-ads-budget.

Google, 2019 Google Ad Manager releases archive, Google Ad Manager Help (Jul. 1, 2019), https://support.google.com/admanager/answer/9197913?hl=en#expand&expand070119.

Google, 2022 Google Ad Manager releases archive, Google Ad Manager Help, https://support.google.com/admanager/answer/11586212?hl=en#zippy=%2Cjune-optimize-pricing-video-protections-troubleshooting-for-mcm-google-analytics-integration-webview-api-for-ads-updates-to-bid-rejection-reason.

Google, About First Look, Google Ad Manager Help, https://support.google.com/admanager/answer/6300696?hl=en, accessed Dec. 11, 2024.

Google, Activate First Look, Google Ad Manager Help, https://support.google.com/admanager/answer/9241865?sjid=8092376624026034942-NC, accessed Dec. 11, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Google, Ad Manager report metrics, Google Ad Manager Help, https://support.google.com/admanager/table/7568664?hl=en, accessed Dec. 11, 2024.

Google, Announcing Exchange Bidding open beta, Google Ad Manager (Jun. 8, 2017), https://blog.google/products/admanager/announcing-exchange-bidding-open-beta/, accessed Dec. 12, 2024.

Google, Bids data in Ad Manager Data Transfer (Beta), Google Ad Manager Help, https://support.google.com/admanager/answer/7357436?hl=en, accessed Dec. 11, 2024.

Google, Block general categories, Google Ad Manager Help , https://support.google.com/admanager/answer/2913554?sjid=261789886268128879-EU, accessed Dec. 11, 2024.

Google, Block sensitive categories, Google Ad Manager Help, https://support.google.com/admanager/answer/2541069?sjid=1497396973694785270 7-EU, accessed Dec. 11, 2024.

Google, Coming soon: April 17, 2023 edition, Display & Video 360 announcements (Apr. 17, 2023), https://support.google.com/displayvideo/answer/13511229, accessed Dec. 11, 2024.

Google, Cookie matching, Google Authorized Buyers Guides, https://developers.google.com/authorized-buyers/rtb/cookie-guide, accessed Dec. 11, 2024.

Google, Create a campaign, Display & Video 360 Help, https://support.google.com/displayvideo/answer/7205081?hl=en, accessed Dec. 11, 2024.

Google, Create a Display campaign, Google Ads Help, https://support.google.com/google-ads/answer/10759203, accessed Dec. 11, 2024.

Google, Custom bidding overview and limitations, Display & Video 360 Help, https://support.google.com/displayvideo/answer/9723477?hl=en, accessed Dec. 11, 2024.

Google, Delivery basics: Ad competition with dynamic allocation, Google Ad Manager Help, https://support.google.com/admanager/answer/3721872?hl=en, accessed Dec. 11, 2024.

Google, Determine a bid strategy based on your goals, Google Ads Help, https://support.google.com/google-ads/answer/2472725, accessed Dec. 11, 2024.

Google, DFP and dynamic allocation, DoubleClick for Publishers Help, https://web.archive.org/web/20150922150140/https://support.google.com/dfp_premium/answer/3447903, accessed Dec. 11, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Google, Dynamic allocation, Google Ad Manager Help, https://web.archive.org/web/20201111224932/https://support.google.com/admanager/answer/3721872?hl=en, accessed Dec. 12, 2024.

Google, Display & Video 360: An integrated solution for end-to-end advertising campaigns, Display & Video 360, https://services.google.com/fh/files/misc/display_and_video_360_product_overview.pdf, accessed Dec. 13, 2024.

Google, Display & Video 360 Overview, https://support.google.com/displayvideo/answer/9059464?hl=en, accessed Dec. 11, 2024.

Google, Enhanced Automation, Display & Video 360 Help, https://support.google.com/displayvideo/answer/6130826?hl=en, accessed Dec. 11, 2024.

Google, Evaluate and Optimize Your Bids, Google Ads Help, https://support.google.com/google-ads/answer/7085711?hl=en, accessed Dec. 11, 2024.

Google, Get Comprehensive Yield Management with Google Ad Manager, Google Ad Manager, https://admanager.google.com/home/resources/feature-brief-yield-management, accessed Dec. 11, 2024.

Google, Google Ads, https://ads.google.com/intl/en_us/home, accessed Dec. 11, 2024.

Google, Google Closes Acquisition of DoubleClick, News from Google (Mar. 11, 2008), http://googlepress.blogspot.com/2008/03/google-closes-acquisition-of_11.html.

Google, Google Platform Services Terms and Conditions, Google, https://www.google.com/google-ad-manager/platform/terms, accessed Dec. 11, 2024.

Google, How Active View metrics are calculated, Google Ad Manager Help, https://support.google.com/admanager/answer/6233478?hl=en&ref_topic=7506202, accessed Dec. 11, 2024.

Google, How Authorized Buyers Work With Google Ad Manager, Google Ad Manager Resources, https://admanager.google.com/home/resources/how_authorized_buyers_work_with_google, accessed Dec. 11, 2024.

Google, How Open Bidding Works, Google Ad Manager Help, https://support.google.com/admanager/answer/7128958?hl=en#:~:text=Open%20Bidding%20requests%20are%20handled,your%20inventory%20in%20real%2Dtime, accessed Dec. 11, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Google, Impressions: Definition, Google Ads Help, https://support.google.com/google-ads/answer/6320?hl=en, accessed Dec. 11, 2024.

Google, Improved header bidding support in Google Ad Manager, Google Ad Manager Blog (Apr. 27, 2022), https://blog.google/products/admanager/improved-header-bidding-support-in-google-ad-manager.

Google, Introduction to Open Bidding, Google Ad Manager Help, https://support.google.com/admanager/answer/7128453?hl=en, accessed Dec. 11, 2024.

Google, Line item types and priorities, Google Ad Manager Help, https://support.google.com/admanager/answer/177279?hl=en, accessed Dec. 11, 2024.

Google, Optimize floor prices in unified pricing rules (Beta), Google Ad Manager Help, https://support.google.com/admanager/answer/11385824, accessed Dec. 11, 2024.

Google, Run a Manual Experiment, Google Ad Manager Help, https://support.google.com/admanager/answer/9799933?hl=en#zippy=%2Cuser-messages%2Cnative-ad-style%2Cunified-pricing-rules%2Cyield-groups%2Cheader-bidding-trafficking-for-prebid, accessed Dec. 11, 2024.

Google, Set a fixed CPM bid for a line item, Display & Video 360 Help, https://support.google.com/displayvideo/answer/2696858?hl=en, accessed Dec. 11, 2024.

Google, Display and Video 360 Help, Opt out of optimized fixed CPM bidding, Google, https://support.google.com/displayvideo/answer/7440660, accessed Dec. 12, 2024.

Google, System maximums and limits, Google Ad Manager Help Center, https://support.google.com/admanager/answer/1628457?hl=en, accessed Dec. 11, 2024.

Google, Targeting types, Google Ad Manager Help, https://support.google.com/admanager/answer/2884033?sjid=5613954590018599404-NC#custom-targeting, accessed Dec. 11, 2024.

Google, Test Campaigns with Ease with Ads Experiments, Google Ads, https://ads.google.com/intl/en_us/home/tools/experiments, accessed Dec. 11, 2024.

Google, [UA] Latency and why it impacts Google Ads Clicks and Analytics Sessions, Google Analytics Help, https://support.google.com/analytics/answer/4589209?hl=en, accessed Dec. 11, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Google, Understand Video Solutions report metrics, Google Ad Manager Help, https://support.google.com/admanager/answer/2759433#video-viewership, accessed Dec. 11, 2024.

Google, Unified First-Price Auction - Best practices, Google Ad Manager, https://services.google.com/fh/files/misc/unified_first-price_auction_best_practices, accessed Dec. 11, 2024.

Google, Unified pricing rules, Google Ad Manager Help, https://support.google.com/admanager/answer/9298008, accessed Dec. 11, 2024.

Google, Use frequency capping, Google Ads Help, https://support.google.com/google-ads/answer/6034106, accessed Dec. 11, 2024.

Google, Value CPM, Google Ad Manager, https://support.google.com/admanager/answer/177222?hl=en, accessed Dec. 11, 2024.

Google, Configure your Ad Exchange Revenue Share, Google Ad Manager Help, https://web.archive.org/web/20220125113539/https://support.google.com/admanager/answer/7031785?hl=en, accessed on Dec. 11, 2024.

Hedrick, L., Get Actionable Measurement with Display & Video 360's Insights Module (Nov. 15, 2018), Google Marketing Platform, https://blog.google/products/marketingplatform/360/get-actionable-measurement-display-video-360s-insights-module, accessed Dec. 12, 2024.

Hsiao, S., How our display buying platforms share revenue with publishers, Google Ad Manager (Jun. 23, 2020), https://blog.google/products/admanager/display-buying-share-revenue-publishers, accessed Dec. 11, 2024.

Ramaswamy, S., Introducing simpler brands and solutions for advertisers and publishers, Google Blog (Jun. 27, 2018), https://blog.google/technology/ads/new-advertising-brands, accessed Dec. 11, 2024.

Sivasubramanian, V., Help me with Waterfall setup and understanding Passback Tags, Google Ad Manager Help (Mar. 6, 2019), https://support.google.com/admanager/thread/2065360/help-me-with-waterfall-setup-and-understanding-passback-tags?hl=en, accessed Dec. 11, 2024.

### 3.  News Articles

Benes, R. Ad buyer, beware: How DSPs sometimes play fast and loose, Digiday (May 25, 2017), https://digiday.com/marketing/dsp-squeeze-buyers, accessed Dec. 12, 2024.

Benes, R., Five Charts: The State of Header Bidding, eMarketer Insider Intelligence (May 30, 2019),

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

https://www.insiderintelligence.com/content/five-charts-the-state-of-header-bidding, accessed Dec. 12, 2024.

Benes, R., Unraveling header bidding's problems with user data, Digiday (Mar. 20, 2017), https://digiday.com/media/header-bidding-security, accessed Dec. 12, 2024.

Chen, Y., WTF is supply path optimization?, Digiday (May 22, 2023), https://digiday.com/media/what-is-supply-path-optimization, accessed Dec. 12, 2024.

Cross, T., Who Invented What in Ad Tech? – Part Two, VideoWeek (Jun. 26, 2018), https://videoweek.com/2018/06/26/who-invented-what-in-ad-tech-part-two, accessed Dec. 12, 2024.

Curran, J., Opinion: For Publishers, Header Bidding Discrepancies Can Outweigh Revenue Lift, AdExchanger (Jul. 8, 2016), https://www.adexchanger.com/the-sell-sider/publishers-header-bidding-discrepancies-can-outweigh-revenue-lift.

Davies, J., What to know about Google's implementation of first-price ad auctions, Digiday (Sep. 6, 2019), https://digiday.com/media/buyers-welcome-auction-standardization-as-google-finally-goes-all-in-on-first-price, accessed Dec. 12, 2024.

Digiday, In programmatic, buyers sometimes don't know what type of auction they're bidding in, Digiday (Jun. 30, 2017), https://digiday.com/marketing/ad-buyers-programmatic-auction, accessed Dec. 12, 2024.

Jatain, V., Understanding Header Bidding And How To Leverage It, Forbes (Sep. 17, 2019), https://www.forbes.com/sites/forbescommunicationscouncil/2019/09/17/understanding-header-bidding-and-how-to-leverage-it/?sh=332097315c18, accessed Dec. 12, 2024.

Joseph, S., Ad-buying agencies are cozying up to SSPs, creating more transparency questions, Digiday (Mar. 31, 2020), https://digiday.com/marketing/ad-buying-agencies-are-cozying-up-to-ssps-creating-more-transparency-questions, accessed Dec. 12, 2024.

Joseph, S., DSPs are cracking down on bid duplication, Digiday (May 12, 2020), https://digiday.com/media/dsps-are-cracking-down-on-bid-duplication, accessed Dec. 12, 2024.

Joseph, S., To reduce auction duplication, buyers start to enforce sellers.json, Digiday (Oct. 16, 2019), https://digiday.com/media/reduce-auction-duplication-buyers-start-enforce-sellers-json, accessed Dec. 12, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Joseph, S., WTF are post-auction discounts?, Digiday (Apr. 2 2020), https://digiday.com/media/post-auction-discounts, accessed Dec. 12, 2024.

Kaplan, D., On Ad Networks: Pork Bellies, Diamonds, Or The New Direct Marketing?, Forbes (Apr. 8, 2008), https://www.forbes.com/2008/04/08/online-ad-networks-tech-cx_pco_0408paidconte nt.html?sh=7414ef02cb8e, accessed Dec. 12, 2024.

Ong, J., Adtech firm OpenX unveils an industry-changing fusion of real-time bidding and ad networks, The Next Web News (Jun. 9, 2014), https://thenextweb.com/news/adtech-firm-openx-unveils-industry-changing-fusion-re al-time-bidding-ad-networks.

Poncz, O., Traffic duplication might be a bigger problem than ad fraud, AdExchanger (Jan. 11, 2016), https://www.adexchanger.com/data-driven-thinking/traffic-duplication-might-even-be -a-bigger-problem-than-ad-fraud, accessed Dec. 12, 2024.

Sluis, S., 3 Auctions Rule Digital Advertising. Here's A Guide To Navigating Them, AdExchanger (Nov. 20, 2019), https://www.adexchanger.com/platforms/3-auctions-rule-digital-advertising-heres-a-g uide-to-navigating-them/.

Sluis, S., Attack Of The Clones: Programmatic's Hidden Scourge Of Bid Duplication, AdExchanger (Jan. 17, 2024), https://www.adexchanger.com/platforms/attack-of-the-clones-programmatics-hidden- scourge-of-bid-duplication, accessed Dec. 12, 2024.

Sluis, S., Big Changes Coming To Auctions, As Exchanges Roll The Dice On First-Price, AdExchanger (Sep. 5, 2017), https://www.adexchanger.com/platforms/big-changes-coming-auctions-exchanges-rol l-dice-first-price, accessed Dec. 12, 2024.

Sluis, S., Everything You Need To Know About Bid Shading, AdExchanger (Mar. 15, 2019), https://www.adexchanger.com/online-advertising/everything-you-need-to-know-about -bid-shading, accessed Dec. 12, 2024.

Sluis, S., Explainer: More On The Widespread Fee Practice Behind The Guardian's Lawsuit Vs. Rubicon Project, AdExchanger (Mar. 30, 2017),https://www.adexchanger.com/ad-exchange-news/explainer-widespread-fee-pra ctice- behind-guardians-lawsuit-vs-rubicon-project, accessed Dec. 12, 2024.

Sluis, S., Forced Redirect Ads Cost Publishers Money, But So Does Blocking Them, AdExchanger (Feb. 6, 2018), https://www.adexchanger.com/publishers/forced-redirect-ads-cost-publishers-money- blocking/, accessed Dec. 12, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Sluis, S., Google Ad Manager Builds A Bridge To Prebid—But Don't Call It A Two-Way Street, AdExchanger (Apr. 27, 2022), https://www.adexchanger.com/platforms/google-ad-manager-builds-a-bridge-to-prebid-but-dont-call-it-a-two-way-street, accessed Dec. 12, 2024.

Sluis, S., Google Ad Manager Policy Changes Don't Hurt Publishers, According to Advertiser Perceptions, AdExchanger (May 5, 2020), https://www.adexchanger.com/platforms/google-ad-manager-policy-changes-dont-hurt-publishers-according-to-advertiser-perceptions, accessed Dec. 12, 2024.

Sluis, S., Google Removes Its 'Last-Look' Auction Advantage, AdExchanger (Mar. 31, 2017), https://www.adexchanger.com/platforms/google-removes-last-look-auction-advantage, accessed Dec. 12, 2024.

Sluis, S., Header Bidding Unleashed a Huge Infrastructure Problem and Ad Tech Will Either Sink or Swim, AdExchanger (Apr. 24, 2017), https://www.adexchanger.com/platforms/header-bidding-unleashed-huge-infrastructure-problem-ad-tech-will-either-sink-swim, accessed Dec. 12, 2024.

Sluis, S., OpenX Lays Off 100 Employees And Pivots To Video, AdExchanger (Dec. 18, 2018), https://www.adexchanger.com/platforms/openx-lays-off-100-employees-and-pivots-to-video, accessed Dec. 12, 2024.

Sluis, S., The Trade Desk suppresses bid duplication amid COVID-19 traffic surge, AdExchanger (Apr. 21, 2020), https://www.adexchanger.com/platforms/the-trade-desk-suppresses-bid-duplication-amid-covid-19-traffic-surge.

Kurt Spoerer and Roshan Khan, Bringing programmatic buying to reservation deals everywhere, Google Ad Manager (Apr. 5, 2017), https://blog.google/products/admanager/bringing-programmatic-buying-to/, accessed Dec. 13, 2024.

Story, L., DoubleClick to Set Up an Exchange for Buying and Selling Digital Ads, New York Times (Apr. 4, 2007), https://www.nytimes.com/2007/04/04/business/media/04adco.html, accessed Dec. 12, 2024.

**4. Other Websites and Material**

Abhilasha, The Ultimate Guide to Open Bidding for Publishers, headerbidding.co (Dec. 29, 2023), https://headerbidding.co/open-bidding-ultimate-guide, accessed Dec. 12, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Ad Ops Insider, Header Bidding Explained Step-by-Step (Jun. 8, 2015), https://www.adopsinsider.com/header-bidding/header-bidding-step-by-step, accessed Dec. 12, 2024.

Ad.Plus, Header Bidding vs Open Bidding, Ad.Plus Blog (Jan. 6, 2023), https://blog.ad.plus/header-bidding-vs-open-bidding, accessed Dec. 12, 2024.

Alise Zaiceva, What is Header Bidding? A Complete Guide for Publishers, Setupad (Apr. 11, 2022), https://setupad.com/blog/what-is-header-bidding/, accessed Dec. 13, 2024

AffiliateSeeking.com, Ad Networks, https://web.archive.org/web/20080116101025/https://www.affiliateseeking.com/list/23000001/1, accessed Dec. 12, 2024.

Amazon, Unified Ad Marketplace, Amazon Publisher Services, https://aps.amazon.com/aps/unified-ad-marketplace/index, accessed Dec. 12, 2024.

American Economic Association, Paul Milgrom, Distinguished Fellow 2020, American Economic Association (2020), https://www.aeaweb.org/about-aea/honors-awards/distinguished-fellows/paul-milgrom, accessed Dec. 10, 2024.

API Reference, Verve Win Notification & Minimum Bid To Win, https://developers.verve.com/reference/win-notification-minimum-bid-to-win, accessed Dec. 12, 2024.

Autorité de la concurrence, Decision 21-D-11 of 7 June 2021 regarding practices implemented in the online advertising sector *., June 7, 2021, https://www.autoritedelaconcurrence.fr/sites/default/files/attachments/2021-07/21-d-11_ven.pdf.

Athey, S., Economics 980: Topics in Market Design, Stanford University, https://gsb-faculty.stanford.edu/susan-athey/economics-980-topics-market-design, accessed Dec. 13, 2024.

Auctionomics and Power Auctions, Incentive Auction Rules Option and Discussion, FCC (Sep. 12, 2012), https://docs.fcc.gov/public/attachments/FCC-12-118A2.

Bentahar, A., Bid Adjustments Simplified: Run Fair Auctions with no Hassle, Pubstack (May 2, 2021), https://www.pubstack.io/topics/bid-adjustments-simplified, accessed Dec. 12, 2024.

Bhatia, S., Google Open Bidding (OB) Explained, AdSparc (Apr. 12, 2022), https://web.archive.org/web/20240414200640/https://adsparc.com/google-open-bidding-explained/, accessed Dec. 13, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Bidgear, A Well Organized Passback Strategy (Aug. 7, 2016), https://bidgear.com/blog/a-well-organized-passback-strategy-24, accessed Dec, 12, 2024.

Clickio, Monetization, https://clickio.com/monetization, accessed Dec. 12, 2024.

Chocolate Platform, Chocolate Premium Makes Every Bid Request Unique & Valuable With Bid Enrichment, https://chocolateplatform.com/wp-content/uploads/2019/08/BidEnrichment.pdf, accessed Dec. 11, 2024.

Confiant Ad Quality Solutions, https://www.confiant.com/solutions/quality accessed Dec. 12, 2024.

Confiant Case Study: Gannett Works to Eliminate Bad Ads https://www.confiant.com/case-studies/gannett, accessed Dec. 12, 2024.

Confiant Case Study: Going Inside Insider Inc. Success Against Malvertising https://www.confiant.com/case-studies/insider-inc, accessed Dec. 12, 2024.

Confiant Demand Quality Report 2020 Year in Review.

Confiant Demand Quality Report Q1 2020.

Confiant Malvertising and Ad Quality Index 2023 Report (Based on 2022 Data.

Confiant, Don't Let Bad Ads Undermine Your User Experience, Confiant, https://www.confiant.com/solutions/quality, accessed Dec. 12, 2024.

Confiant Press Release Security And Quality Violation Rates Increase Across Digital Advertising In Q1 2021 (Jun 28, 2021).

Criteo S.A., Form 10-K, United States Securities and Exchange Commission (2022), https://www.sec.gov/Archives/edgar/data/1576427/000157642723000023/crto-20221231, accessed Dec. 12, 2024.

Criteo, What You Need to Know About First-Price Auctions and Criteo, Criteo Updates (Sep. 26, 2023), https://www.criteo.com/blog/first-price-auctions, accessed Dec. 12, 2024.

Das, H., Header Bidding vs Open Bidding – What Should You Know!, headerbidding.co Blog (Feb. 23, 2024), https://headerbidding.co/header-bidding-vs-open-bidding, accessed Dec. 12, 2024.

Doherty, W., The door in the floors: Transparency, price discovery, and market efficiency in programmatic, The Current (Nov. 8, 2023), https://www.thecurrent.com/will-doherty-transparency-programmatic-data., accessed Dec. 12, 2024.

DoubleClick for Publishers, Terminology differences with DART, DoubleClick for Publishers Help, https://web.archive.org/web/20120211164005/http://support.google.com/dfp_premium/bin/answer.py?hl=n&answer=158833, accessed Dec. 13, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

DoubleClick Ad Exchange White Paper: The Value of Dynamic Allocation & Auction Pricing (Jul. 14, 2010), https://doubleclick-publishers.googleblog.com/2010/07/read-doubleclick-ad-exchange-white.html, accessed Dec. 13, 2024.

DoubleVerify, Latency in Digital Advertising: A Guide for Publishers, DV Publisher Insights (Oct. 21, 2019), https://pub.doubleverify.com/blog/latency-in-digital-advertising-a-guide-for-publishers, accessed Dec. 13, 2024.

FRED, U.S. Dollars to U.K. Pound Sterling Spot Exchange Rate, https://fred.stlouisfed.org/series/EXUSUK, accessed Dec. 13, 2024.

INFORMS, About AMD - Auctions and Market Design, http://connect.informs.org/auctionsandmarketdesign/about-us/aboutamd, accessed Dec. 13, 2024.

IAB Tech Lab, OpenRTB (Jul. 27, 2020), https://iabtechlab.com/standards/openrtb, accessed Dec. 13, 2024.

Interactive Advertising Bureau, Glossary: Digital Media Buying & Planning (Apr. 2016), https://www.iab.com/wp-content/uploads/2016/04/Glossary-Formatted.

Laurendon, L., Google Unified First Price Auction Explained, Smart Ad Server Blog, http://web.archive.org/web/20220307203150/https://smartadserver.com/articles/google-unified-first-price-auction-explained, accessed Dec. 13, 2024.

Lim, D., Confiant detection & blocking of misleading claims: What is it & why it matters (Dec 16, 2020).

Magnite Team, Magnite Unveils New Demand Manager Feature Powered by Machine Learning to Help Publishers Earn Incremental Revenue, Magnite (Oct. 5, 2023), https://www.magnite.com/press/magnite-unveils-demand-manager-machine-learning-feature, accessed Dec. 13, 2024.

Media Rating Council, Minimum Standards for Media Rating Research, Media Rating Council, https://mediaratingcouncil.org/standards-and-guidelines, accessed Dec. 13, 2024.

Meta, Code of Conduct, Meta Audience Network, https://www.facebook.com/audiencenetwork/partner-program/code-of-conduct, accessed Dec. 13, 2024.

Microsoft, Discover the possibilities with experiments, Microsoft Advertising, https://help.ads.microsoft.com/apex/index/3/en/56908, accessed Dec. 13, 2024.

Milgrom, P., Market Design Syllabus, Stanford University, https://canvas.stanford.edu/courses/171062, accessed Dec. 13, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Milgrom, Paul, Cunningham, Stephan, and Beck, Marissa, United States Patent 11,574,358 Impression Allocation System and Method Using an Auction that Considers Losing Bids, OpenX Technologies, Inc. (Feb 7, 2023), https://patents.google.com/patent/US11574358B2/, accessed Dec. 13, 2024

Munson, B., Comcast's FreeWheel launches unified ad decisioning, StreamTV Insider (Apr. 15, 2020), https://www.streamtvinsider.com/tech/comcast-s-freewheel-launches-unified-ad-decisioning, accessed Dec. 13, 2024.

National Academy of Television Arts & Sciences, Tech Emmys, 75th Award Recipients (2024), https://web.archive.org/web/20240223080842/https://theemmys.tv/tech-75th-award-recipients/, accessed Dec. 11, 2024.

Naylon, Jenna, Media Planning and Buying Strategies: The Importance of Test & Learn, MatrixPoint, https://www.thematrixpoint.com/resources/articles/media-planning-and-buying-strategies-the-importance-of-test-learn, accessed Dec. 13, 2024.

NBER, Market Design (2023), https://www.nber.org/programs-projects/programs-working-groups%23Groups/market-design, accessed Dec. 13, 2024.

Nolet, M., RTB Part II: Supply supply supply!, Mike On Ads (Sep. 19, 2009), http://www.mikeonads.com/2009/09/19/rtb-part-ii-supply-supply-supply, accessed Dec. 13, 2024.

OpenX, Google & OpenX Release Study Showing Publisher Partners Experience 48% Revenue Lift Through Google Exchange Bidding Collaboration (Feb. 15, 2018), https://www.openx.com/press-releases/google-openx-revenue-lift, accessed Dec. 13, 2024.

OpenX, Selling rules (Dec. 12, 2016), https://web.archive.org/web/20170708051049/https://docs.openx.com/Content/publishers/userguide_inventory_realtimeselling, accessed Dec. 10, 2024.

OpenX, OpenX Launches BIDS, New Solution for Advertisers to Access Log-Level Data and Gain Visibility into Programmatic Media Buys, July 23, 2020, https://www.openx.com/press-releases/openx-launches-bids-new-solution-for-advertisers-to-access-log-level-data-and-gain-visibility-into-programmatic-media-buys/, accessed Dec. 13, 2024.

OpenX, OpenX transforms concept of SSP with industry-first demand fusion technology (Jun. 9, 2014), https://www.openx.com/press-releases/openx-transforms-concept-of-ssp-with-industry-first-demand-fusion-technology, accessed Dec. 13, 2024.

Prebid.org, Prebid.js Ad Ops, https://docs.prebid.org/adops/price-granularity.html#prebid-default-price-granularities, accessed Dec. 13, 2024.

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

Prebid.org, Prebid.js FAQ, https://docs.prebid.org/dev-docs/faq, accessed Dec. 13, 2024.

Prebid.org, Prebid.js Publisher API Reference, https://docs.prebid.org/dev-docs/publisher-api-reference/setConfig.html#setConfig-Cpm-Rounding, accessed Dec. 13, 2024.

Prebid.org, Price Granularity, https://docs.prebid.org/adops/price-granularity, accessed Dec. 13, 2024.

Prebid.org, Running Prebid.js without an ad server, https://docs.prebid.org/dev-docs/examples/no-adserver, accessed Dec. 13, 2024.

Pubmatic, Pubmatic SSP: Maximize Advertising Revenue and Control How Your Audiences are Accessed, Pubmatic, https://pubmatic.com/products/pubmatic-ssp-for-publishers, accessed Dec. 13, 2024.

Refinitiv Streetevents, Q2 2021 Magnite Inc Earnings Call (Aug. 5, 2021), https://investor.magnite.com/static-files/950ded3e-8953-4cf9-a043-d0e72b1fb856, accessed Dec. 13, 2024.

Scipy, scipy.spatial.ConvexHull, SciPy v1.11.4 Manual, https://docs.scipy.org/doc/scipy/reference/generated/scipy.spatial.ConvexHull.html, accessed Dec, 13, 2024.

SciPy, scipy.stats.gaussian_kde, SciPy v1.11.4 Manual, https://docs.scipy.org/doc/scipy/reference/generated/scipy.stats.gaussian_kde, accessed Dec, 13, 2024.

Securities and Exchange Commission, Preliminary Recommendations Regarding the Use of Last-Look in the Corporate and Municipal Bond Markets, https://www.sec.gov/spotlight/fixed-income-advisory-committee/technology-andelectronictradingsubcommittee-preliminary-recommendation-041519.pdf, accessed Dec. 9, 2024.

Semret, N., Introducing Minimum CPM Recommendations on DoubleClick Ad Exchange, DoubleClick Publisher Blog (Nov. 1, 2011), https://doubleclick-publishers.googleblog.com/2011/11/introducing-minimum-cpm-recommendations.html, accessed Dec. 13, 2024.

SLMath, Mathematics and Computer Science of Market and Mechanism Design (2023), https://www.slmath.org/programs/333, accessed Dec. 13, 2024.

Stack Overflow, What are advertising passback tags and common implementation (Feb. 19, 2014), https://stackoverflow.com/questions/19112923/what-are-advertising-passback-tags-and-common-implementation, accessed Dec. 13, 2024.

Stanford University, Stanford Bulletin (2023), https://explorecourses.stanford.edu/search;jsessionid=zg9iqiunv63g16z0qr48bmb90?

*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

q=ECON+136%3a+Market+Design&view=catalog&filter-coursestatus-Active=on&a cademicYear=20232024, accessed Dec. 13, 2024.

Sweeney, M. and Zawiślak, P., Top Demand-Side Platform (DSP) Companies, Clearcode, Jan. 31, 2024, https://clearcode.cc/blog/top-demand-side-platforms/, accessed Dec. 13, 2024.

The Royal Swedish Academy of Sciences, The quest for the perfect auction, Nobelprize.org (2020), https://www.nobelprize.org/uploads/2020/09/popular-economicsciencesprize2020.

The Trade Desk, DFP Features: Integrated planning and activation, https://www.thetradedesk.com/us/our-platform/dsp-demand-side-platform/ plan-campaigns, accessed Dec. 13, 2024.

The Trade Desk, Conversion Lift: What it is, how it works, and best practices (Aug. 23, 2023), https://www.thetradedesk.com/us/resource-desk/best-practices-for-better-conversion-lift, accessed Dec. 13, 2024.

Xandr, Publisher Platforms, Microsoft Advertising,, https://about.ads.microsoft.com/en-us/solutions/xandr/publisher-platforms-scaled-buy ing-selling-solutions, accessed Dec. 13, 2024.

Xandr, Seller Best Practices (May 5, 2023), https://docs.xandr.com/bundle/industry-reference/page/seller-best-practices accessed Dec. 13, 2024.

Xandr, Understanding Optimization, Xandr Documentation Center, https://docs.xandr.com/bundle/monetize_monetize-standard/page/topics/understandin g-optimization, accessed Dec. 13, 2024.

Yahoo, Verizon Media Is Now Yahoo (Sep. 1, 2021), https://www.advertising.yahooinc.com/post/verizon-media-is-now-yahoo, accessed Dec. 13, 2024.

Zawadziński, M., How Does Real-Time Bidding (RTB) Work?, Clearcode Blog (Jul. 2, 2021), https://clearcode.cc/blog/real-time-bidding, accessed Dec. 13, 2024.

Zawadziński, M. & Sweeney, M., What is cookie syncing and how does it work?, Clearcode Blog (May 15, 2024), https://clearcode.cc/blog/cookie-syncing, accessed Dec. 13, 2024.

Zawadziński, M. & Sweeney, M., What is Waterfalling and How Does it Work?, Clearcode Blog (Aug. 20, 2021), https://clearcode.cc/blog/what-is-waterfalling, accessed Dec. 13, 2024.