# EXHIBIT 71
# REDACTED

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | Case No. 1:21-MD-3010 (PKC) |

*This Document Relates To:*

| | |
|---|---|
| IN RE GOOGLE DIGITAL PUBLISHER LITIGATION | Case No. 1:21-cv-7034 (PKC) |

**Declaration of Judith A. Chevalier**
**January 23, 2026**

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1.      I understand that the Court has certified a "class consisting of all persons or entities in the United States that directly paid Google, through payment of fees directly to Google or reductions in advertising revenue received directly from Google, for services associated with selling advertising impressions on websites via Google's AdX Ad Exchange from December 15, 2016 through March 31, 2024, with the exception of any claim arising from instream video transactions."[1] Plaintiffs' expert, Prof. Einer Elhauge, submitted an opening report, rebuttal report, and supplemental declaration calculating damages allegedly incurred by a putative class of publishers selling inventory via Google's AdX ad exchange (the "AdX Class").[2] Prof. Elhauge's calculations include AdX sales of inventory of certain publishers located outside of the United States. I understand Google contends that, as a legal matter, Plaintiffs cannot recover damages associated with AdX sales of publishers located outside of the U.S. and seeks summary judgment on the claimed damages attributable to those publishers. In this declaration, I have been asked to adjust Prof. Elhauge's damages calculations to exclude AdX sales of inventory of publishers located outside of the United States.[3]

---

[1] Opinion and Order, *In re Google Digital Advertising Antitrust Litigation*, Case No. 1:21-md-3010, December 12, 2025, pp. 76-77.

[2] Expert Report of Professor Einer Elhauge, October 4, 2024 ("Elhauge Opening Report"), § XII; Corrected Expert Rebuttal Report of Professor Einer Elhauge, March 9, 2025 ("Corrected Elhauge Rebuttal Report"), §§ VII.I, VIII; Expert Declaration of Professor Einer Elhauge, July 10, 2025 ("Elhauge Declaration").  In addition to Prof. Elhauge's primary calculation of damages, which he describes as his "original" or "default" methodology, Prof. Elhauge also calculated damages in his rebuttal report "under various alternative assumptions."  Corrected Elhauge Rebuttal Report, ¶ 736 and § VII.I.  Prof. Elhauge used the same process to calculate damages under each set of assumptions ("scenarios").  Scenarios in which Prof. Elhauge includes AdX sales made under Multi-Customer Management arrangements in his calculation of damages reflect aggregate damages that are equivalent to his primary calculation, differing only in the entities to which Prof. Elhauge allocates damages.

[3] As described in my report, Prof. Elhauge's damages analysis suffers from other flaws that render his calculations invalid. Expert Report of Judith A. Chevalier, December 13, 2024, ¶¶ 20, 55-105.

1

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

2.      In his opening and rebuttal expert reports, Prof. Elhauge calculated damages of ▬▬▬▬ for the AdX Class using a three-step methodology.[4] First, he calculated AdX gross revenues from the sale of ad inventory on publishers' websites (i.e., AdX sales) from December 16, 2016, to March 31, 2024.[5] Second, he calculated the claimed percentage by which Google allegedly overcharged publishers as the difference between (a) the actual fee charged by AdX (which varies across transactions and averages approximately 19.67 percent of AdX gross revenues over the period[6]); and (b) a purportedly "competitive" but-for benchmark fee of 10 percent that remains constant for the entire period.[7] Third, he multiplied AdX sales (from the first step, totaling ▬▬▬▬ over the period) by his claimed percentage overcharge (from the second step, which averages approximately 9.67 percent of AdX gross revenues throughout the period) to calculate damages of ▬▬▬▬.[8]

3.      On July 10, 2025, Prof. Elhauge filed a supplemental declaration adjusting his damages calculations to exclude instream video transactions.[9] As reported in his declaration and

---

[4] Elhauge Opening Report, ¶ 455; *see also* Corrected Elhauge Rebuttal Report, Table 8 and ¶ 765.

[5] AdX sales reflect AdX "sell-side" gross revenue (revenue before deducting for payments to publishers, but net of "buyside" fees charged by advertisers' buying tools, such as Google Ads or DV360) of "open-web display ads." Corrected Elhauge Rebuttal Report, ¶ 3. Prof. Elhauge prorated December 2016 AdX sales (and, by doing so, damages) by the share of days in the month between December 16, 2016 and December 31, 2016 (i.e., 17/31). *See* Elhauge Opening and Rebuttal Report Workpapers.

[6] The average actual AdX fee remained stable over time. Over the entire class period, monthly average actual AdX fees varied only slightly, from 19.40 percent to 19.90 percent. *See* Chevalier Declaration Workpapers.

[7] Elhauge Opening Report, ¶¶ 71, 455.

[8] Elhauge Opening Report, ¶ 455.

[9] Elhauge Declaration, ¶ 7.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

in his workpapers, excluding instream video transactions results in total AdX sales of ▇▇▇▇ in step one of his calculations and damages of ▇▇▇▇.[10]

4. Prof. Elhauge's damages calculations are based on sales corresponding to AdX accounts with a billing address located in the United States.[11] However, his methodology includes AdX sales of inventory of certain publishers located outside the United States. This occurs when the AdX account belongs to a third-party service provider who manages advertising inventory for publishers located outside the United States.

5. Specifically, some publishers are part of Multi-Customer Management ("MCM") arrangements and Scaled Partner Management ("SPM") arrangements (the predecessor to MCM arrangements[12]), in which the publisher (the "child") contracts with a third-party service partner (the "parent") "to manage ad inventory and accounts for child publishers."[13] Some of the AdX accounts included in Prof. Elhauge's damages calculations correspond to parents located in the United States that sell inventory, under these arrangements, of both child publishers located inside the United States ("U.S. child publishers") and child publishers located outside the United

---

[10] Elhauge Declaration, ¶ 7, Table 1, and Workpapers; Chevalier Declaration workpapers. ▇▇▇▇ in total AdX sales calculated from Elhauge Declaration Workpapers. *See* Chevalier Declaration workpapers.

[11] Specifically, Prof. Elhauge's calculation of damages limits AdX sales to those associated with an AdX account (denoted by "gfp_network_id") with a U.S. billing location (denoted by "gfp_network_billing_country_code"). Elhauge Workpapers, at adx-semi-agg-case Rebuttal.py.

[12] SPM was originally launched in 2013 under the name Network Partner Management ("NPM") and rebranded as SPM in 2018. GOOG-DOJ-15232193, at -195-196. *See also,* Expert Report of Dr. Gregory K. Leonard, December 13, 2024 ("Leonard Report"), ¶ 48 n. 64; Corrected Elhauge Rebuttal Report, Table 6 n. 1854.

[13] "About Multiple Customer Management," *Google Ad Manager Help*, available at https://support.google.com/admanager/answer/11130475?hl=en. *See also,* Leonard Report, ¶¶ 43-44. Prof. Elhauge acknowledges that approximately 25% of the AdX sales on which he calculates damages are attributable to inventory sold under MCM arrangements, and another 26% of AdX sales are attributable to inventory sold under predecessor SPM arrangements. *See,* Corrected Elhauge Rebuttal Report, Table 6. Google produced a dataset containing details of publishers' MCM arrangements (*see* MCM data (GOOG-AT-DOJ-DATA-000066792)) and a dataset containing details of publishers' SPM arrangements (*see* SPM data (GOOG-AT-DOJ-DATA-000066795)).

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

States ("ex-U.S. child publishers").[14] Thus, Prof. Elhauge's calculations include AdX sales of inventory of publishers located outside the United States.

6.  I illustrate the issue of U.S. parents managing inventory for child publishers located outside the U.S. using the example of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As acknowledged by Prof. Elhauge, the share of AdX net earnings can be used to approximate the portion of ▮▮▮▮▮▮▮▮▮ AdX sales attributable to a given child publisher each month.[17] Thus, consistent with Prof. Elhauge, I assume that the share of AdX sales

---

[14] *See, e.g.*, MCM data (GOOG-AT-DOJ-DATA-000066792). *See also* AdX data (GOOG-AT-MDLDATA-000066537 to 000481994, GOOG-AT-MDL-DATA-000508827 to 000558882, GOOG-AT-MDL-DATA-000561536 to 000564882, GOOG-AT-MDL-DATA-000606366 to 000653766); Elhauge workpapers.

[15] Specifically, Prof. Elhauge's calculations include revenues from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and the MCM dataset includes arrangements between ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Chevalier Declaration workpapers.

[16] *See* Chevalier Declaration workpapers; Elhauge workpapers; AdX data (GOOG-AT-MDL-DATA-000066537 to 000481994, GOOG-AT-MDL-DATA-000508827 to 000558882, GOOG-AT-MDL-DATA-000561536 to 000564882, GOOG-AT-MDL-DATA-000606366 to 000653766). The data used by Prof. Elhauge does not contain instream video transactions for ▮▮▮▮▮▮▮▮.

[17] Prof. Elhauge himself uses this methodology to allocate damages to child publishers in MCM arrangements. Corrected Elhauge Rebuttal Report, §§ VII.I.2-VII.I.3; Elhauge workpapers.

4

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

attributable to each child publisher in a given month is the same as its share of aggregate AdX net earnings associated with arrangements that were active in that month. As shown in **Figure 1**, based on arrangements that were active in August 2023, ██████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████. This same issue exists for all U.S. parents that sell inventory of ex-U.S. child publishers.

**Figure 1**

[Figure redacted]

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

7.  To further adjust Prof. Elhauge's July 2025 damages calculations to exclude AdX sales associated with ex-U.S. child publishers, I estimate the magnitude of AdX sales attributable to non-instream-video inventory of ex-U.S. child publishers in MCM and SPM arrangements.[18] For MCM arrangements, I use the same methodology described in paragraph 6 to estimate the monthly percentage of each MCM parent's AdX sales attributable to inventory of ex-U.S. child publishers and apply this percentage to the parent's monthly non-instream-video AdX sales to estimate monthly AdX sales attributable to non-instream-video inventory of ex-U.S. child publishers.[19] As shown in **Figure 2**, I find that approximately ▮▮▮▮▮▮ in AdX sales are attributable to non-instream-video inventory of ex-U.S. child publishers in MCM arrangements, which corresponds to approximately ▮▮▮▮▮▮ of total non-instream-video MCM-related AdX sales included in Prof. Elhauge's damages calculations.[20] Excluding these MCM-related AdX sales reduces Prof. Elhauge's damages figures by $74.30 million.[21]

8.  For SPM arrangements, the available data do not distinguish U.S. child publishers from ex-U.S. child publishers and thus do not allow me to directly estimate the share of AdX sales for SPM parents attributable to inventory of ex-U.S. child publishers.[22] Thus, I assume that

---

[18] In my analysis, I follow Prof. Elhauge's methodology and assumptions regarding the identification of MCM-related AdX sales and SPM-related AdX sales wherever possible and adjust these calculations only to exclude AdX sales associated with ex-U.S. child publishers.

[19] Google's data detailing MCM arrangements do not provide information by inventory type. Thus, my calculations assume that the distribution of non-instream-video AdX sales across U.S. and ex-U.S. child publishers is the same as the distribution of total AdX sales across U.S. and ex-U.S. child publishers. *See* Chevalier Declaration workpapers.

[20] Calculated as ▮▮▮▮▮▮ attributable to non-instream-video AdX sales of MCM ex-U.S. child publishers divided by ▮▮▮▮▮▮ in total non-instream-video MCM-related AdX sales. *See* Chevalier Declaration workpapers.

[21] *See* **Figure 2**.

[22] Google's data detailing SPM arrangements do not provide information regarding geographic location for child publishers. SPM data (GOOG-AT-DOJ-DATA-000066795).

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

the percentage of non-instream-video AdX sales attributable to ex-U.S. child publishers with U.S. parents for SPM-related AdX sales is the same as the average percentage of MCM-related AdX sales attributable to ex-U.S. child publishers with U.S. parents (i.e. ▊▊▊▊▊ to estimate an additional ▊▊▊▊▊ in AdX sales attributable to non-instream-video inventory of ex-U.S. child publishers in SPM arrangements (out of a total of ▊▊▊▊▊ in SPM-related AdX sales[23]).[24] As shown in **Figure 2**, excluding these SPM-related AdX sales reduces Prof. Elhauge's damages figures by $77.75 million.[25]

---

[23] Even though SPM was the predecessor program for MCM, the data contain SPM arrangements that started after the first MCM arrangement observed in the MCM data. Thus, I follow Prof. Elhauge's methodology and assume that SPM arrangements are active until February 1, 2022 when calculating total SPM-related AdX sales. SPM data (GOOG-AT-DOJ-DATA-000066795); Elhauge Rebuttal Report and Declaration Workpapers; Chevalier Declaration workpapers.

[24] Calculated as ▊▊▊▊▊ attributable to SPM-related AdX sales times 18.98 percent. *See* Chevalier Declaration workpapers.

[25] I assume the alleged overcharge for SPM ex-U.S. child publishers is the same as the alleged overcharge for all SPM-related AdX sales. *See* **Figure 2**.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Figure 2**
**Summary of Adjustments to Prof. Elhauge's Alleged Damages Methodology**
(in $ millions)



```
                                                                           Alleged
                                                              AdX Sales    Damages

[1] Total Using Prof. Elhauge's Methodology, Excluding Instream Video      $1,573.17
[2]     Amount Attributable to MCM ex-U.S. Children                          $74.30
[3]     Amount Attributable to SPM ex-U.S. Children                          $77.75
[4]     Amount Attributable to ex-U.S. Children                             $152.05
[5]     As a % of Total Using Prof. Elhauge's Methodology, Excluding Instream Video   9.67%
[6] Total Using Prof. Elhauge's Methodology, Excluding Instream Video and ex-U.S. Children   $14,705.75   $1,421.11
```

Notes:
[3] AdX Sales calculated as: 18.98 percent of MCM-related gross sales attributable to ex-U.S. children with U.S. parents *multiplied by* ▮▮▮▮ SPM-related gross sales. Alleged damages calculated assuming that the alleged overcharge for U.S. SPM related gross sales is the same as the alleged overcharge for all SPM-related gross sales. *See* Chevalier Declaration Workpapers.
[4] = [2] + [3].
[5] = [4] / [1].
[6] = [1] - [4].

Source:
Chevalier Declaration Workpapers.

9. Together, these calculations suggest that ▮▮▮▮ in AdX sales and $152.05 million of Prof. Elhauge's estimated damages are attributable to non-instream-video inventory of ex-U.S. child publishers in MCM or SPM arrangements.[26] As shown in **Figure 2**, excluding AdX sales attributable to ex-U.S. child publishers in MCM or SPM arrangements from the calculations presented in Prof. Elhauge's July 2025 declaration reduces total AdX sales in step one of his methodology to ▮▮▮▮ (a reduction of ▮▮▮▮ and reduces damages to ▮▮▮▮ (a reduction of $152.05 million or 9.67 percent).

---

[26] *See* **Figure 2**.

8

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

*Judith A Chevalier*
_____

Judith A. Chevalier