# EXHIBIT 81

## REDACTED

**SEALED VERSION**

May 8, 2025

**VIA ECF**

Hon. P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

*In re Google Digital Advertising Antitrust Litigation*
Case No. 1:21-md-03010 (PKC)

*In re Google Digital Publisher Antitrust Litigation*
Case No. 1:21-cv-07034 (PKC)

Dear Judge Castel:

We write on behalf of the Publisher Class Plaintiffs ("Publishers") in response to Google's May 2, 2025, pre-motion letter seeking leave to move for summary judgment. ECF 949 ("Ltr."). The claims and issues on which Google seeks to move involve genuine disputes of material fact that preclude summary judgment in Google's favor. As noted in Publishers' May 2 pre-motion letter concerning collateral estoppel (ECF 953), summary judgment should be entered *against* Google with respect to many issues based on the post-trial opinion of the Eastern District of Virginia (the "EDVA Court"). *See United States v. Google LLC*, 2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ("EDVA Op."). It does not serve judicial economy to delay proceedings where Google's proposed motion lacks a valid basis, particularly because the EDVA Court decided many key issues against Google. To the extent Google's proposed motion is permitted, it should be briefed with the Court's standard page limits on the following schedule: opening briefs due July 1, opposition briefs due August 15, and replies due September 15.

## I. Google's anticompetitive scheme foreclosed competition, maintained and enhanced its market power, and enabled it to charge artificially inflated prices in the ad auction platform markets.

Through an exclusionary scheme of tying arrangements and anticompetitive auction conduct, Google willfully acquired and maintained market power that foreclosed competition on the merits. Despite offering comparable (or higher quality) products at lower prices, other ad server providers and auction platforms were unable to gain the market share and scale necessary to compete effectively. Destroying competition in those markets enabled Google to charge a nearly uniform and supracompetitive 20% take rate on its auction platforms.

Google's anticompetitive conduct injured Publishers, causing damages that can be measured by reference to a "yardstick" of auctions for mobile app ads that were not subject to the anticompetitive tie to the ad server equivalent that Google imposed on its similar products for display ads. As Google's executives recognized: if Google's auction platforms for open-web



display ads were not protected by its scheme of ties and other exclusionary conduct, competition would have forced Google to cut its auction take rate by at least half.

This very conduct was fully tried before the EDVA Court, which just weeks ago found that Google's scheme violated the antitrust laws. The EDVA Court's findings preclude granting summary judgment in Google's favor as set forth in Publishers' May 2, 2025, pre-motion letter (ECF 953) showing why partial summary judgment on a variety of issues should be entered *against* Google. The same evidence underlying the EDVA Court's decision is before this Court, and additional evidence of wrongdoing will be submitted, making clear that the only summary judgment that should be entered is against Google, not in its favor.

## II. Google's arguments fail to support a summary judgment motion.

Google's pre-motion letter contends that Publishers: (A) raise "new" arguments; (B) lack evidence supporting certain acts that were part of Google's anticompetitive scheme; (C) raise time-barred claims; (D) lack standing; (E) seek to impose a duty for Google to deal with its rivals; and (F) cannot sustain their requested damages and remedies.

Google's arguments lack merit, are contradicted by substantial record evidence, and in many cases are contrary to preclusive rulings by the EDVA Court.

### A. None of Publishers' claims are "new."

Offering little, if any, support, Google asserts that several tying restraints described by Publishers are "new" (enumerating them Acts 17-21), and that it is prejudiced by having to respond to them. Ltr. at 2-3. The restraints pursued by Publishers are not new allegations; Google suffers no prejudice from the commonplace introduction of facts developed in discovery. *Cf. In re Google Digital Advert. Antitrust Litig.* ("*Google I*"), 627 F. Supp. 3d 346, 398 (S.D.N.Y. 2022) ("the record may look very different at the summary judgment or trial stage"). And to the extent the Court determines amendment is required to conform to the evidence, the Rules are clear that the Court "should freely give leave when justice so requires." *See* Fed. R. Civ. P. 15(a)(2); *In re: Tether and Bitfinex Crypto Asset Litigation*, 2024 WL 3520363, at *11 (S.D.N.Y. 2024) (Failla, J.) (permitting amendment after the close of discovery to "realign the allegations of the complaint to facts adduced during discovery" because "doing so will support a more efficient resolution of the issues on the merits").

#### *1. The Google Ads ties are not "new."*

Publishers' Complaint repeatedly alleges that Google's auction platforms are an exclusive source of "unique" and "must-have" advertising demand from advertisers using its Google Ads buying tool and that this restraint reinforces Google's market power. *See* First Amended Consolidated Class Action Complaint, ECF 408 ("Compl.") ¶¶16, 165-67, 202, 236. Both this Court and the EDVA Court have recognized that exclusive demand is integral to Google's restraints in ad auction platform markets. *See Google I*, 627 F. Supp. 3d at 368 ("publishers depend on AdX to access hundreds of thousands of small advertisers that purchase ad space through Google's ad-buying tool for small advertisers and transact exclusively on

AdX"); EDVA Op. *12-13, *40. There is thus no reasonable basis to argue that Publishers identify "new" ties—which Google enumerates as Acts 19-21—between Google's basic ad buying tool (Google Ads) and its basic and advanced auction platforms. Ltr. at 2-3.

The analysis of Publishers' expert economist, Prof. Einer Elhauge, is consistent with the allegations in the Complaint. Prof. Elhauge simply uses different terminology to describe the evidence compiled in the case and his economic analysis of Google's restraints. He reviewed the evidence and concluded, as an economic matter, that by making its Google Ads ad buying tool buy nearly exclusively into Google's auction platforms, Google had engaged in conduct with the characteristics of an anticompetitive tie. Elhauge Dep. 178:19-179:13 (ECF 959-4)[1]; Elhauge Rpt. ¶¶276, 302 (ECF 959-1); Elhauge Reb. Rpt. ¶366 (ECF 959-3). This evidence is also consistent with the Complaint's factual allegations and the analyses of this Court and the EDVA Court. *See* EDVA Op. *12-13. Google cannot claim surprise or prejudice, or that further discovery is warranted, because the facts at issue were the subject of discovery in multiple related cases and because Google controls the relevant evidence.

***2. The AdSense Ties are not "new."***

Record evidence showing that Google has tied its AdSense basic ad server and AdSense basic auction platform is consistent with the Complaint's allegations asserting a tie between AdSense and the Google Display Network. *See, e.g.*, Compl. ¶¶231-39. Publishers allege that AdSense provides ad server functionality. *Compare id.* ¶233 ("AdSense . . . provides Ad Server services")*, with* Elhauge Rpt. ¶22 ("Google operates . . . a basic ad server called AdSense"). Fact discovery has clarified that, although Publishers correctly pled the product functions (AdSense operates as an *ad server* that connects to *a separate intermediary product* that identifies which advertiser's ad will win an impression, *see* Compl. ¶¶18-19, 237, 354), the auction function was misidentified in the Complaint (based on pre-discovery information) as the Google Display Network ("GDN"). Fact discovery later revealed that beginning at least in 2012, Google has used a separate basic auction platform with the same technical infrastructure as AdX to identify which advertiser's ad will win an impression—the very function the Complaint describes the tied product as serving. *See, e.g.*, Elhauge Rpt. ¶6 nn.11 & 13; [REDACTED] 6/28/2024 Dep. 49:24-52:15 (Ex. 1) ("there is some degree of shared infrastructure" between AdX and the AdSense auction platform).

Thus, the core allegations of the Complaint remain the same, only the terminology has changed. In Publishers' alleged Act 3, Google conditioned access to the AdSense auction platform, and its exclusive access to "must have" demand from advertisers using the Google Ads ad buying tool, on the use of its AdSense ad server. Elhauge Rpt. ¶¶276, 311; Compl. ¶¶235-36. In Publishers' alleged Act 4, Google conditioned use of the AdSense ad server on the requirement that Publishers make their impressions available to the AdSense auction platform and to the Google Ads advertisers that bid into those auctions. Elhauge Rpt. ¶312; Compl. ¶237. And even if the Court were to determine that amendment is needed, Google suffers no prejudice

[1] Where supporting documents have been previously filed, their ECF docket number is provided. Supporting documents not previously filed by Publishers are identified by exhibit numbers—Ex. __—and are attached to the declaration of Izaak Earnhardt, filed contemporaneously with this letter.


in responding to facts developed in discovery and leave to amend should be freely given.[2] *See, e.g.*, *In re Tether*, 2024 WL 3520363, at *11.

**B. The evidence reveals Google's anticompetitive scheme and its constituent parts.**

As Publishers pled and laid out in their class certification motion, and as Publishers' experts established in their reports, Google employed interrelated tying and non-tying restraints as part of its scheme to impair rivals and enhance and maintain its market power in ad auction platform markets, enabling it to injure Publishers by charging artificially inflated and near-uniform take rates for over a decade. *See* ECF 956 at 3-7, 33-35; Elhauge Rpt. ¶¶260, 262, 442; Elhauge Reb. Rpt. ¶¶709-710; *see also* EDVA Op. *33-34, 41-42. This conduct, taken together, and working synergistically, violated Section 2 of the Sherman Act. *See* Elhauge Rpt. ¶¶230, 259-60, 262, 265-66, 302, 309, 330, 340-41, 367, 375; Elhauge Reb. Rpt. ¶¶333, 491, 508, 623, 626, 629, 710, 712 n.1807; EDVA Op. *41, 46-47. As this Court observed in *Google I*, the trier of fact "must avoid 'tightly compartmentalizing the various factual components' of a plaintiff's claims and 'wiping the slate clean after scrutiny of each.'" *Google I*, 627 F. Supp. 3d at 381 (quoting *Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *9 (S.D.N.Y. Feb. 21, 2019))*; see* also EDVA Op. *35 (collecting cases). Google's proposed motion would have this Court do just that, viewing each aspect of its conduct in isolation rather than assessing the synergistic effects of Google's conduct in maintaining its market power.[3]

***1. AdSense Ties of Separate Products (Act 3 & 4)***

Publishers have adduced record evidence showing that the AdSense ad server and auction platform are two separate products that Google tied together, even if Google never offered them for sale separately. In the Second Circuit, to determine whether two products are separate for the purposes of an alleged tying restraint, courts consider whether there is sufficient "consumer demand" for the products separately. *See AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 306-07 (N.D.N.Y. 2021); *see also Google I*, 627 F. Supp. 3d at 368.

Here, there is evidence that a material number of publishers would purchase the AdSense ad server and auction platform separately absent Google's tying. Google's internal documents establish that publishers have an interest in offering their impressions to multiple auction platforms simultaneously. *See* Elhauge Rpt. ¶¶96-97.[4] Indeed, Google explored proposals to unbundle the AdSense ad server and auction platform, but decided against offering them

[2] Publishers have diligently developed evidence regarding AdSense in discovery. *E.g.*, Topics 6-10, Plaintiffs' Third Amended Rule 30(b)(6) Notice to Google LLC, ECF 840-1; Woojin Kim 6/24/2024 Dep. 27:11-28:1 (Ex. 2).

[3] Publishers are no longer pursuing certain claims and conduct described in the Complaint. Acts 14 and 16 were dismissed, ECF 701 at 37-43. Publishers will not pursue Acts 7, 9, 10, 12, and 15 as anticompetitive acts at trial. Publishers will also not pursue Counts III and IV under California's Unfair Competition Law and Cartwright Act.

[4] GOOG-AT-MDL-019853631 at -632 (Ex. 3) (in "choosing sellside products," publishers value "interoperability (the ability to connect to all possible demand sources including effective direct sales, since that leads to the highest overall revenue performance)."); GOOG-DOJ-05252842 at -842 (Ex. 4) ("Over time, publishers have discovered that working with more than one exchange / SSP / network provides incremental revenue.").

separately because it would invite competition—not because of a lack of demand.[5] *See AngioDynamics*, 537 F. Supp. 3d at 307 (finding that two products could be separate based on documents and admissions showing "that some customers have inquired about the possibility of purchasing" the products separately); *see* Elhauge Rpt. ¶¶97-98; Anand Das 3/20/2025 Dep. 123:4-123:5 (ECF 959-7).[6]

The separateness of the AdSense basic ad server and basic auction platform is also reflected in the fact that advanced ad servers and ad auction platforms are offered "separately in similar markets." *AngioDynamics*, 537 F. Supp. 3d at 307; *see Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016); *see also* EDVA Op. *38 ("publisher ad servers and ad exchanges are 'two separate products' that are not reasonably interchangeable"). Indeed, Google managed them as separate products: different Google employees were responsible for the AdSense ad server operations than the employees charged with operating the AdSense auction platform.[7] Elhauge Rpt. ¶99. Google's documents also treat the AdSense auction platform and ad server functions as distinct. Das Reb. Rpt.¶¶ 26, 43 (ECF 959-6). And finally, Google's suggestion that its products are "integrated" (Ltr. at 3-4) is simply a restatement of Publishers' tying allegations and does not defeat Publishers' showing. Elhauge Rpt. ¶¶310-15; Elhauge Reb. Rpt. ¶¶71, 322-23, 411, 414-17, 664-70.

Record evidence also shows that Google maintained the requisite economic power in both the basic ad server and basic auction platform markets.[8] Prof. Elhauge identifies both direct and indirect evidence of Google's market power in the basic ad server and ad auction platform markets. *See* Elhauge Rpt. ¶¶176-77, 204-05, 207, 234-35, 238, 241. In addition to its high market shares in these markets, coupled with high barriers to entry and expansion, Google's internal documents and testimony reflect the lack of meaningful competition to AdSense, and the absence of constraints in Google's pricing of these products. *See* Elhauge Rpt. ¶176-77, 241.[9]

---

[5] GOOG-DOJ-12929689 at -691 (Ex. 5) (proposing an "automated yield management [function] across several demand sources w/ real time AdSense bids"); *id.* at 701 (expressing concern that through the proposal, if implemented, "Publishers that have not used other ad networks in the past are now encouraged to do so"); *see also* GOOG-AT-MDL-000915757 (Ex. 6) (describing proposal to open up the AdSense ad server to multiple auction platforms by introducing Open Bidding ("OB")).

[6] Anand Das is Publishers' industry expert. *See* ECF 956 at 3 n.5.

[7] One indication of the separateness of the two products was the objection of Google's attorney during the Rule 30(b)(6) deposition of [REDACTED], who was designated to testify about AdSense, that questions concerning Google's basic auction platform were outside the scope of the deposition. [REDACTED] 6/28/2024 Dep. 43:7-18.

[8] Google argues that Publishers cannot show that it has "market or monopoly power" in the market for basic ad servers (Ltr. at 3-4) but that is not the standard. Publishers need only show that Google had "economic power" within this market. *See* EDVA Op. *40 (citing *U.S. Steel Corp. v. Fortner Enters.*, 429 U.S. 610, 620 (1977)); *id.* (Google's "monopoly power" in advanced auction platforms sufficient to meet "economic power" standard).

[9] *See, e.g.*, GOOG-DOJ-02852767 (ECF 959-44) ("one of the reasons cited as keeping the [AdSense] margin at 32% was . . . that we can . . . Smaller pubs don't have alternative revenue sources"); GOOG-AT-MDL-019853631 at -632 (Ex. 3) (AdSense has "not historically faced price pressure on their 32% revenue share."); GOOG-AT-MDL-019586925 at -930 (Ex. 7) ("there's no real competitor to either AdSense or Ad Manager. Nobody else monetizes long-tail websites like AdSense"); Eisar Lipkovitz 11/10/2023 Dep. 424:6-425:3 (ECF 959-14) (on AdSense, "we weren't competing with anybody"); [REDACTED] 6/28/2024 Dep. 52:2-6, 95:2-96:6 (Google's 30(b)(6) witness testifying that Google does not track competitive offerings in making pricing decisions on AdSense); Anand Das Dep. 82:11-12 ("AdSense is the only game in town for small publishers").



AdSense's economic power is also reflected in its exclusive access to "must have" demand from Google Ads advertisers, an "advantage not shared by . . . competitors in the market." *Fortner Enters.*, 429 U.S. at 620; *see Yentsch v. Texaco, Inc.*, 630 F.2d 46, 58 (2d Cir. 1980); Elhauge Rpt. ¶276.

Finally, record evidence demonstrates the anticompetitive effects that resulted from Google tying the AdSense basic ad server and auction platform, contrary to Google's assertion. *See* Ltr. at 4. For example, Prof. Elhauge demonstrates that absent the ties, "rival basic ad servers could have competed to provide small and medium-sized publishers access to ad auction platforms," spurring the development of "rival ad auction platforms that could provide real-time bid competition to the AdSense ad auction platform," which in turn "would provide pressure on the AdSense ad auction platform to moderate the high revenue share it charges publishers selling through it." Elhauge Rpt. ¶¶311-12.[10]

### 2. *Google forced use of its tied products.*

Substantial record evidence regarding Google's contractual bundle of its products and mandatory bundling through Google Ad Manager ("GAM"),[11] as well as the post-trial factual findings of the EDVA Court, shows that Google forced Publishers to use the tied products to obtain access to the tying products, contrary to Google's assertion otherwise at page 4 in its Letter. *See* EDVA Op. *41-42 (explaining how "first look" and "last look" features of Dynamic Allocation, Dynamic Revenue Share, and Unified Pricing Rules each forced DFP users to offer their impressions to AdX); *id.* *8 n.11. Google's contention (Ltr. at 4) that the Act 2 tie is negated because "publishers using DFP frequently use non-Google ad exchanges" ignores the restrictions on and disadvantages to third-party exchanges from that tie. *See* Elhauge Rpt. ¶¶259-309; *see also* EDVA Op. *41.

### 3. *Google's restraints harmed competition.*

Contrary to Google's assertions (Ltr. at 4), Publishers and their experts have adduced substantial record evidence that each of the ties harmed competition and facilitated Google's enhancement or maintenance of its substantial market power in multiple markets, including the ad auction platform markets.[12] *See* Elhauge Rpt. ¶411; Elhauge Reb. Rpt. ¶¶392, 399-402, 453-54; EDVA Op. *40.

---

[10] Google also coerced publishers to use the AdSense ad server and auction platform together through its "unremitting policy" of offering the products together. *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976); *AngioDynamics*, 537 F. Supp. 3d at 310 ("Thus, when the seller has a policy of never offering the tying product separately from the tied product, allegations of individual coercion are unnecessary.") (cleaned up).

[11] *See, e.g.*, Elhauge Rpt. ¶¶294-300, 302, 308; Elhauge Reb. Rpt. ¶¶345-47, 386-87; GOOG-DOJ-14257049 (Ex. 8) (internal Google chat criticizing plan to "hard bundle contractually" DFP and AdX); GOOG-DOJ-10671724 at -729 (Ex. 9) ("100% of AdX-only accounts to sign DRX contract, or be terminated by May '18").

[12] *See, e.g.*, Elhauge Rpt. ¶¶263-68, 272-74, 283-86, 302-03, 309, 311-12, 375, 396, 398-99, 442; Elhauge Reb. Rpt. ¶¶267, 294-95, 314, 333, 340, 371, 709-10; GOOG-DOJ-05247075 at -083 (Ex. 10) ("we are artificially handicapping our buyside (GDN) to boost the attractiveness of our sellside (AdX). Specifically, we have chosen to limit GDN to buying only on AdX, an exclusivity that makes AdX more attractive to sellers."); GOOG-DOJ-


Further, Publishers' additional "non-tying" Acts (referred to by Google at pages 6-7) are anticompetitive restraints that individually and collectively are components of and reinforced the tying restraints. *See* Elhauge Reb. Rpt. ¶¶458-461; *see, e.g.*, EDVA Op. *41, *45 (discussing Dynamic Allocation).

For Acts 5, 6, 8, 11,[13] and 13, Google incorrectly asserts that Publishers "have failed to demonstrate that any of those Acts were anticompetitive." Ltr. at 7. There is at least a disputed issue of fact whether this conduct deprecated Google's products or imposed costly restraints on the use of Google's products that made them less attractive or useful to publishers, advertisers, and consumers.[14] *See* EDVA Op. *44-47. And in the absence of procompetitive justifications, all the conduct is fairly characterized as designed solely to eliminate competition. *See Google I*, 627 F. Supp. 3d at 379. As explained further in Section E, below, Publishers allege tying and other restraints, which do not rest on the explicit or implicit assertion that Google had a duty to deal with rivals. *See* Elhauge Reb. Rpt. ¶¶687-691. But even if Google were correct (and it is not) that portions of the conduct alleged involve refusals to deal, Judge Brinkema held that, as in *Aspen Skiing*, the available evidence here supports the conclusion that "Google sacrificed short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor[s]." EDVA Op. *43 (cleaned up).[15]

#### ***4. The relevant market definitions and market power are supported by evidence.***

Publishers have not abandoned any geographic market definition broader than the United States. *See* Ltr. at 6. As Google knows, Prof. Elhauge testified, "I think the evidence supports defining a geographic market that is at least as large as the United States, but there is other evidence that supports defining a worldwide market and that we ultimately don't have to choose between the two of them." Elhauge Dep. 50:13-18; *see also* Elhauge Rpt. ¶¶186-87 (describing evidence supporting worldwide market). Publishers' forensic accounting expert, Elizabeth Kroger, found that Google did not generate any U.S.-specific financial information for any of its business segments or products related to display advertising. Because "Google's documents and statements indicate that" it "operates its business on a global basis," Ms. Kroger analyzed "the

---

10948271 (Ex. 11) ("AdX/AFC value proposition is diluted / compromised if 3rd party exchanges have access to GDN's 2m+ advertisers and targeting capabilities."); GOOG-DOJ-12762188 (Ex. 12) ("we agreed with regulator that we would not make changes that forced partners to use AdX just because they were a DFP partner. We need to follow up to see if this term has an expiration date.").

[13] Beginning in September 2019, Google applied its DV360 Poirot bidding algorithm principles to the AdX first price auction but treated the same DV360 bidders as risk averse when bidding on AdX and risk neutral when bidding on competing third-party exchanges. This risk aversion coefficient disparity, which continued until September 2022, increased bids on AdX relative to competing exchanges, favoring AdX and reinforcing the tie. Elhauge Rpt. ¶¶368-371; Cramton Reb. Rpt. ¶¶113-121 (ECF 959-9).

[14] *See* Elhauge Reb. Rpt. ¶¶307, 384, 392, 399-402, 411, 453-54, 458, 470, 480-87, 502, 575, 694-96, 699, 701; Elhauge Dep. 186:14-187:25.

[15] *See* GOOG-DOJ-02148005 at -005-06 (ECF 959-46); GOOG-DOJ-15627703 at -703 (Ex. 13); GOOG-DOJ-05247075 at -083 (Ex. 10); GOOG-DOJ-04992716 at -717 (Ex. 14); GOOG-DOJ-28517565 at -565 (Ex. 15); Woojin Kim 6/24/2024 Dep. 170:3-14; Elhauge Rpt. ¶275; *see also* EDVA Op. *33.



financial performance of Google's ads business on a global basis, as Google does." Kroger Rpt. ¶80 (Ex. 19).

Accordingly, although Publishers did not specifically allege a worldwide geographic market in their Complaint,[16] the evidence clearly supports one. And because Google litigated the issue openly in the EDVA—with Judge Brinkema finding a world-wide market—it would suffer no prejudice from amendment to conform to the evidence. *See* EDVA at *28-29.

Regardless of geographic scope, sufficient evidence exists for a jury to find that Google possesses monopoly power in the market for ad auction platforms (*i.e.*, "Ad Exchanges"), contrary to Google's assertion. *See* Ltr. at 6. Working from a worldwide market definition, Judge Brinkema held that Google possessed market power based on direct evidence—namely, the fact that Google has charged a durable 20% take rate for well over a decade (and continues to do so). EDVA Op. *32-34; *see* Elhauge Rpt. ¶¶239-44; *see also* Elhauge Reb. Rpt. ¶¶201, 245. And Google's own executives confirmed that Google "continu[es] to extract irrationally high rent" from AdX despite its 20% take rate being "not long term defensible."[17] This "irrationally high rent", which Google charged globally to U.S. and foreign publishers alike with virtually no discounting,[18] is direct evidence of market power without regard to the market's geographic scope. Record evidence also reveals that those market shares were well above 60%, contrary to Google's assertion (Ltr. at 6) that AdX's market shares in the United States ranged from 36% to 44%. Elhauge Rpt. ¶¶206, 208-09; Elhauge Reb. Rpt. ¶228.

Google's assertion that Publishers do not attempt to define an "Ad Network" market (Ltr. at 6) ignores developments of the record. *See supra* § II.A.2, II.B.1. Fact and expert discovery revealed that modern ad networks—including Google's own—operate as basic ad buying tools for advertisers. Das Rpt. ¶¶55-58 (ECF 959-5); Das Reb. Rpt. ¶44; Elhauge Rpt. ¶30. Google's AdSense offering, which its experts call an ad network,[19] consists of two distinct products: a basic ad server tag and a basic auction platform.[20] Publishers will prove Google's market power in the basic ad server and basic auction platform submarkets with both direct (Google charged durable 20% or 32% take rates for 15 years)[21] and indirect evidence (Google

[16] The market alleged in the Complaint was "the United States, or in the alternative, predominantly English-speaking countries of the United States, Canada, the United Kingdom, and Australia." Compl. ¶121.

[17] GOOG-DOJ-11781035 (Ex. 16) ("One might ask why the market continues to bear 20%.").

[18] GOOG-AT-MDL-016626308 at -308 (Ex. 17) [redacted]

[19] *See* Israel Rpt. ¶¶51, 149, 364 (Ex. 18).

[20] Google's help pages show that the AdSense package includes a basic ad server function and a basic auction platform. *See How AdSense Works*, Google AdSense Help, https://support.google.com/adsense/answer/6242051 ("You make your ad spaces available by pasting ad code on your site"); *About the Ad Auction*, Google AdSense Help, https://support.google.com/adsense/answer/160525 ("AdSense uses an auction to select the ads that appear on your site and determine how much you earn from those ads.").

[21] Elhauge Rpt. ¶¶16, 67-69, 445-46; Elhauge Reb. Rpt. ¶¶309, 706, 707; *see also* GOOG-DOJ-02852767 at -767-68 ("one of the reasons cited as keeping the margin at 32 was … that we can. . . . [S]maller pubs don't have alternative revenue sources"); GOOG-DOJ-AT-00198548 at -552 (ECF 959-41) (other auction platforms "very explicitly don't work with small publishers").


had market shares of 89-100%).[22] Publishers have thus properly pursued a relevant market for basic ad buying tools even if the nomenclature in their Complaint referred to an "Ad Network market."

**C. Publishers' claims are timely.**

Publishers' challenged tying and non-tying restraints are collectively part of an ongoing scheme that must be viewed as a whole without "tightly compartmentalizing the various factual components."[23] *Google I*, 627 F. Supp. 3d at 381; *see* EDVA Op. *35 (collecting cases); *Louisiana Health Serv. & Indem. Co. v. Celgene Corp.*, 2025 WL 1056668, at *17 (S.D.N.Y. Apr. 8, 2025) (same). In scheme cases, each overt act that furthers the scheme restarts the statute of limitations. *See, e.g.*, *Allen v. Dairy Farmers of Am., Inc.*, 2014 WL 2610613, at *26 (D. Vt. June 11, 2014) ("Continuing violations restart the statute of limitations when there is an ongoing scheme") (cleaned up). Indeed, it is well settled that each time a Publisher class member pays Google an artificially inflated price for ad platform services—which occurred continuously throughout the Class Period—the statute of limitations begins anew. *See, e.g.*, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (statute of limitations begins to run with "each sale to the plaintiff"); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295-96 (2d Cir. 1979) ("a purchaser suing a monopolist for overcharges paid within the previous four years" may base its claim on "anticompetitive actions taken before the limitations period"); *id.* ("cause of action, therefore, accrues only on the date damages are 'suffered'"); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *48 (E.D.N.Y. Jan. 4, 2011); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002).[24] It is thus unsurprising that Google does not assert that Publishers' Section 2 claim is time-barred. Instead, Google does exactly what this Court and others considering scheme cases has said it cannot do—parse the scheme act-by-act to attempt to argue that each tying act and its statute of limitations must be "tightly compartmentalized."[25]

Google cannot rely on *US Airways v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019), to support its argument that the alleged ties making up a portion of the alleged scheme are time-barred. *See* Ltr. at 4-5. In *Sabre*, the plaintiff challenged "certain provisions" of its own contract with defendant entered prior to the limitations period as anticompetitive, and alleged that the defendant was able to charge a supracompetitive fee laid out in that specific contract. *See id.* at 52, 67. Here, however, Publishers' claims do not arise out of the contracts that each of them has with Google. Rather, Publishers allege that Google engaged in a scheme to monopolize the

---

[22] Elhauge Rpt. ¶¶204, 207-09; Elhauge Reb. Rpt. ¶¶226; *see also* Eisar Lipkovitz Dep. 348:20-349:19 ("it was a small market, and possibly AdSense was the major only player").

[23] *See* Elhauge Reb. Rpt. ¶¶709-10; EDVA Op. *41-42, *46 (describing the ways in which Google's anticompetitive acts "reinforced . . . the exclusionary effect" of other acts); *see also* GOOG-DOJ-14162335 at -335 (ECF 959-28) ("dynamic revshare is just yet another way for AdX to exploit the last look advantage").

[24] *See also In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1065-66 (8th Cir. 2017); *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014); *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999).

[25] Google's undeveloped suggestion that non-tying conduct that supported Google's monopolization scheme is also time-barred (Ltr. at 5 n.3) fails for the same reason.



markets for ad servers and ad auction platforms including by tying the purchases of ad server and auction platform services together. *See* Elhauge Rpt. ¶¶709-10. Record evidence shows that these ties (together with the other challenged conduct in the scheme) foreclosed competitors in these markets and their submarkets and enabled Google to charge supracompetitive prices to Publishers. *See id.*

And independent of the separate transactions, Google engaged in multiple overt acts after December 2016 that reinforced the alleged ties and the effects of the scheme as a whole. Google reinforced the DFP-AdX ties in 2017 and 2018 when it forced publishers to sign bundled contracts for DFP and AdX together and in 2018 when it publicly launched its GAM product formally marketing DFP and AdX as one bundled product.[26] Elhauge Rpt. ¶308; *see also Google I*, 627 F. Supp. 3d at 369 ("the states have plausibly alleged that in 2018, Google began *requiring* publishers to sign a combined contract that included both Google's DFP ad server and Google's AdX exchange."); EDVA Op. *33 ("Google combined DFP and AdX under a single publisher-facing product, Google Ad Manager, which further intertwined DFP and AdX."); *id.* at *41 ("Google's bundling of its AdX and DFP products reinforced the exclusionary effect of [Dynamic Allocation].") (cleaned up).

And Google also reinforced its DFP-AdX ties when it launched Unified Pricing Rules in 2019. Elhauge Rpt. ¶367 ("Thus, the Uniform Pricing Rules restraint along with the Dynamic Allocation and Dynamic Revenue Sharing restraints worked together to maintain over time a reinforcing effect on the anticompetitive effects already created by the ties."); EDVA Op. *42 ("Unified Pricing Rules is another example of Google exploiting its monopoly power and tying arrangement to restrict its customers' ability to deal with its rivals, thereby reducing its rivals' scale, limiting their ability to compete, and further compounding the harm to customers."). Each of these acts independently reinforced the anticompetitive effects of ties between DFP and AdX and thereby restarted the limitations period.

**D. Publishers have antitrust standing.**

Google's new suggestion that Publishers lack antitrust standing on their tying claims (Ltr. at 4) is without merit. As detailed in their motion for class certification, ECF 956, Publishers have adduced evidence that Google's tying and non-tying restraints collectively reinforced and maintained Google's market power in the markets for basic and advanced ad auction platforms. Elhauge Rpt. ¶¶372-95; EDVA Op. *41. As a result of this conduct, Prof. Elhauge shows that Google was able to charge Publishers artificially inflated prices for Google's auction platform services. Elhauge Rpt. ¶¶396-459. This Court has already held that is sufficient to establish antitrust standing. *See In re Google Digital Advert. Antitrust Litig.*, 721 F. Supp. 3d 230, 247

[26] As to AdSense, Google's terms of service make clear that its AdSense contracts with Publishers are continuously renewing. For instance, these terms reflect that the services provided are "constantly changing" and that Google may "modify the AdSense Terms at any time." Moreover, because Google's conduct in the advanced ad server and auction platform markets caused anticompetitive harm in the basic ad server and auction platform markets, Google's overt acts with respect to the advanced ad auction submarket likewise restarted the AdSense claim limitations period with each new act and each new overcharge. *See* Elhauge Reb. Rpt. ¶716; Elhauge Dep. 177:11-178:5; 241:19-242:7.


(S.D.N.Y. 2024) (finding antitrust injury was plausibly pled with allegations that plaintiffs "paid supracompetitive prices for transactions that occurred on AdX").[27]

And even though Publishers need not show "how much Google would charge for DFP in the absence of the alleged ties" (Ltr. at 5) to have standing to pursue their antitrust claims, they have adduced evidence showing that Google's prices for DFP were artificially inflated by the scheme and would decrease in the absence of the tying restraints. *See* Elhauge Reb. Rpt. ¶¶399-403; *see also* Elhauge Rpt. ¶411.

Google's undeveloped arguments that certain class members lack standing to pursue certain claims are also without merit. *See* Ltr. at 8. Contrary to Google's suggestion, members of each proposed class seek overcharge damages only for sales on the auction platform they used to make them members of that class. Members of the proposed AdX Class "only seek[] damages associated with [their] AdX sales." ECF 955. And members of the proposed AdSense Class "only seek[] damages associated with [their] AdSense sales." ECF 955. And separately, Google's argument that its Multi-Customer Management ("MCM") program creates standing problems is also wrong. Publishers' proposed Classes include MCM entities but only to the extent they are direct purchasers of Google's auction platform services—all of whom were injured by paying overcharges to Google. ECF 956 at 12-15.

**E. Publishers' claims do not rely on a duty to deal with rivals.**

None of Publishers' "tying claims seek[s] to impose on Google a duty to deal with its rivals" in contravention of *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). *See* Ltr. at 5. Rather, Google's tying restraints deployed its market power in ad servers and ad buying tools to prevent its *customers*—including publishers and advertisers—from transacting through rival auction platforms even if they wanted to and would benefit financially from doing so. As Judge Brinkema noted in rejecting Google's identical argument in the EDVA case, courts "have declined to 'extend a refusal-to-deal-with-rivals analysis' to anticompetitive restraints that a monopolist places on its customers, as opposed to its competitors." EDVA Op. *43 (alterations omitted) (quoting *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023)).

Courts have also specifically "'contrasted' the 'refusal to deal doctrine' from a monopolist's more direct interference with rivals,' such as . . . 'requiring third parties to purchase a bundle of goods rather than just the ones they really want (tying).'" EDVA Op. *43 (alterations omitted) (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072, 1076 (10th Cir. 2013)); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 463 n.8 (1992). "Although such tying, like other anticompetitive and restrictive conditions on customers, can be conceptualized as a 'conditional refusal to deal,' that does not mean it should be assessed as a 'simple refusal to deal' with rivals, which was the alleged harm in *Trinko*." EDVA Op. *43

---

[27] Google's own expert concedes this point. *See* Gregory K. Leonard, *The Illinois Brick Damages Edifice: Demolition or Deconstruction?* ("*Illinois Brick Damages Edifice*"), 84 Antitrust L.J. 315, 335 (2022) ("Under the current legal framework, the incidence of an overcharge is sufficient to establish standing and, relatedly, antitrust injury for a direct purchaser.").


(alterations omitted) (quoting *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020)); *see also United States v. Live Nation Entm't, Inc.*, 2025 WL 835961, at *2 (S.D.N.Y. Mar. 14, 2025) (rejecting refusal-to-deal defense where complaint alleged that defendant "targeted artists, not just rival promoters").

In light of the full factual record supporting Google's anticompetitive tying restraints on Publishers—which "increased Google's scale, decreased rivals' scale, caused some rivals to exit the publisher ad server market, and harmed competition, customers, and Internet users"—the same analysis Judge Brinkema applied in the EDVA case establishes that the "refusal to deal doctrine in *Trinko* does not apply to Google's conduct at issue." EDVA Op. *43. As one of Google's "primary legal defenses" that it had a full and fair opportunity to litigate in the EDVA case, *id.* at *42, this Court should apply collateral estoppel to prevent Google from re-litigating the same defense here. *See* ECF 953 at 5-6. But even without collateral estoppel, summary judgment on a duty to deal defense in favor of Google would be inappropriate because Publishers have marshalled the same evidence (and more) to defeat the defense or at least raise genuine issues of material fact relevant to its resolution.

**F. Google's damages and remedies arguments are without merit.**

Google errs as a matter of fact and law in asserting that, "if summary judgment is granted on *any* of Publishers' tying claims, then summary judgment should be granted on *all* of their damages claims because they have not calculated the damages from each tie individually." Ltr. at 5. Google is wrong. First, Publishers are not alleging a series of atomized individual ties and restraints. As set forth above, Publishers allege an evolving scheme, involving multiple challenged acts—each of which worked synergistically to cause the challenged harm. *See supra* at 4. As this Court has held, an exclusionary scheme can include individual acts that would not have been anticompetitive standing alone as long as (a) the scheme includes at least one act that would have been illegal on its own, and (b) the acts all work synergistically to cause harm. The law is well settled that an exclusionary scheme can include individual acts that would not have been anticompetitive standing alone. *See Google I*, 627 F. Supp. 3d at 381 ("In assessing whether conduct is anticompetitive, it is often necessary to examine other market conduct, including practices that are perfectly lawful."); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 (2d Cir. 2015) (a monopolist violates Section 2 when it "combines [a lawful act] with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits, and to impede competition") (citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274-75, 287 (2d Cir. 1979)); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.* ("*Keurig I*"), 383 F. Supp. 3d 187, 230 (S.D.N.Y. 2019).[28]

[28] *See also Blue Cross & Blue Shield of Vermont v. Teva Pharm. Indus., Ltd.*, 712 F. Supp. 3d 499, 538 (D. Vt. 2024); *Klein v. Meta Platforms, Inc.*, 2022 WL 17477101, at *2 (N.D. Cal. Dec. 6, 2022) ("a plaintiff can state a Section 2 claim by alleging a series of practices that are anticompetitive, even if some of the activities would be lawful if viewed in isolation"); *Tele Atlas N.V. v. NAVTEQ Corp.*, 2008 WL 4911230, at *3-4 (N.D. Cal. Nov. 13, 2008) (allowing jury to consider tying alongside exclusive dealing even though court had already held that tying conduct was not unlawful because defendant lacked market power in the tying market).


Second, as Prof. Elhauge has explained, the but-for cause of all the harm measured by the yardstick was the ad server-ad auction platform two-way ties. If those key ties are removed, the damages are eliminated. As Professor Elhauge made clear at his deposition, the "yardstick would continue to be valid as long as the ad server, ad auction platform ties were illegal," whereas any tie involving ad buying tools "would simply affect the degree of market power in the ad auction platform market . . . regardless of whether it was illegal." Elhauge Dep. 180:1-14. As further support for this point, Prof. Elhauge observes that Google's take rate decreased from 20% to 10% (and eventually to 5%) shortly after Google eliminated the tie between the auction platform and the ad server equivalent in the yardstick market. Elhauge Rpt. ¶¶404-05.

Third, independent of establishing illegal ties, the same conduct that comprises the ties satisfies all of the characteristics of a monopolist's exclusionary behavior without procompetitive justification. Such acts violate Section 2 because they "coerce[] consumers and impede[] competition," EDVA Op. *46 (quoting *New York ex rel. Schneiderman*, 787 F.3d at 654), even if certain of them are not found formally to be ties. *See also Keurig I*, 383 F. Supp. 3d at 230 (a Section 2 violation may include "anticompetitive product design" combined with "'associated conduct'—including, for example, allegations of exclusive dealing, tying agreements, and product disparagement—the overall effect of which is to coerce customers to purchase [the defendant's product], rather than to compete on the merits"); *Blue Cross & Blue Shield of Vermont v. Teva Pharm. Indus., Ltd.*, 712 F. Supp. 3d 499, 538 (D. Vt. 2024).

Fourth, Google's reliance (Ltr. at 5) on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), is misplaced. *Comcast* stands only for the proposition that where there are multiple *distinct* avenues that caused antitrust injury but only one remains in the case, a proposed model that measures damages for all of those distinct avenues combined cannot be used to establish damages on a class-wide basis. *Comcast*, 569 U.S. at 36-38. As the Second Circuit has noted, *Comcast* means that "plaintiffs cannot identify damages that are not the result of the wrong." *Sykes v. Me. S. Harris & Assocs. LLC,* 780 F.3d 70, 82 (2d Cir. 2015) (cleaned up); *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 105-06 (2d Cir. 2017); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 406-07 (2d Cir. 2015). Whether all of Google's tying restraints, or only ties between the ad server and auction platform, are found illegal, Prof. Elhauge's model only measures damages that are the result of the wrong. In the former scenario, the model may not measure *all* such damages, but in that event, the model's damages estimates are conservative. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.* ("*Keurig II*"), 2025 WL 354671, at *34 (S.D.N.Y. Jan. 30, 2025) (yardstick need not be a "perfect clone" but only be "sufficiently comparable to permit a degree of reliable comparison"); *Comcast*, 569 U.S. at 35 (where defendant creates uncertainty with its misconduct, damages calculations "need not be exact"); *see* Elhauge Reb. Rpt. ¶¶599-601.

Fifth, Google disregards applicable law to claim that other challenged restraints cannot support a damages award because Publishers supposedly "have not calculated any damages attributable to the non-tying conduct." Ltr. at 7. The other challenged restraints, like the tying restraints, are part of a synergistic anticompetitive scheme that forms the basis of Publishers' monopolization claims under Section 2. *See supra* at 4. "It is not . . . necessary for a damages model to fully disaggregate the damages associated with each unlawful act, particularly where


the various unlawful acts are interconnected." *Keurig II*, 2025 WL 354671, at *12; *see Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *23 (S.D.N.Y. Jan. 26, 2021) (finding no requirement that a damages model disaggregate damages for each anticompetitive act); *Waggoner*, 875 F.3d at 106 (finding no *Comcast* issues notwithstanding failure to disaggregate harms associated with a range of factors encompassed within the plaintiffs' theory of liability). The possibility that Prof. Elhauge's yardstick model conservatively understates damages on Publishers' Section 2 claims does not support summary judgment.

## III. The Court should adopt Publishers' briefing proposal.

While the Court should defer deciding summary judgment until class certification has been ruled upon and notice and the opportunity to opt out given to members of classes that are certified, there is no good reason to delay briefing on summary judgment that will give the Court the benefit of time to evaluate the factual issues in this case. Publishers' proposed motion for partial summary judgment based on issue preclusion due to the EDVA opinion raises primarily legal issues that are straightforward and can be briefed expeditiously and concisely. Publishers thus proposed that opening briefs be due June 13, oppositions be due July 14 and replies be due August 1 using the Court's standard page limits. *See* ECF 953.

In contrast, Google's proposed motion, which covers clearly disputed factual issues and issues decided against it by the EDVA Court, warrants neither delay nor the voluminous briefing that Google proposes. Google has briefed motions for summary judgment on similar antitrust claims using the same evidence in both the EDVA and Texas cases within the past year. It does not need many additional months to brief a motion here. Because Google's proposed grounds for summary judgment are invalid, months of delay and voluminous briefing are not warranted. Accordingly, the Court's standard page limits should apply, and the motion should be briefed on the following schedule: opening briefs due July 1, opposition briefs due August 15, and replies due September 15.

* * *



Google's proposed summary judgment motion is fatally undermined by numerous material disputes of fact and conclusive rulings from the EDVA Court. Any motion that is permitted should utilize Publishers' proposed briefing schedule and page limits. Publishers are available for a conference if one would assist the Court in addressing the scope and timing of summary judgment briefing.

Respectfully submitted,

David Boies
dboies@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200

*Lead Counsel for the Publisher Class*

/s/ *Philip C. Korologos*
Philip C. Korologos
pkorologos@bsfllp.com
Robert J. Dwyer
rdwyer@bsfllp.com
James Keyte
jkeyte@bsfllp.com
Luke Williams
lwilliams@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone: (212) 446-2300

Mark C. Mao
mmao@bsfllp.com
Sean P. Rodriguez
srodriguez@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293-6820



Sabria A. McElroy
smcelroy@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 377-4216

Izaak Earnhardt
iearnhardt@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave NW, 11th Floor
Washington, DC 2005
Telephone: (202) 237-2727

George A. Zelcs
gzelcs@koreintillery.com
Randall P. Ewing
rewing@koreintillery.com
Marc A. Wallenstein
mwallenstein@koreintillery.com
Ryan A. Cortazar
rcortazar@koreintillery.com
**KOREIN TILLERY LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Fax: (312) 641-9751

Stephen M. Tillery
stillery@koreintillery.com
Michael E. Klenov
mklenov@koreintillery.com
Carol L. O'Keefe
cokeefe@koreintillery.com
Andrew M. Ellis
aellis@koreintillery.com
Ian Moody
imoody@koreintillery.com
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Fax: (314) 241-3525



Eric L. Cramer
ecramer@bm.net
Michael C. Dell'Angelo
mdellangelo@bm.net
Caitlin G. Coslett
ccoslett@bm.net
Patrick F. Madden
pmadden@bm.net
Jeremy Gradwohl
jgradwohl@bm.net
**BERGER MONTAGUE PC**
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000

Robert E. Litan
rlitan@bm.net
**BERGER MONTAGUE PC**
1001 G Street, NW
Suite 400 East
Washington, DC 20001
Telephone: (202) 559-9740

*Interim Co-Lead Counsel for the Publisher Class*

Copies to: All Counsel (via ECF)