**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE: GOOGLE DIGITAL ADVERTISING
ANTITRUST LITIGATION

No. 1:21-md-03010 (PKC)

**META PLATFORMS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO
ADVERTISER CLASS PLAINTIFFS' MOTION TO AMEND**

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Meta Platforms, Inc.,*

October 26, 2022

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................... II

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 3

LEGAL STANDARD .......................................................................................................... 8

ARGUMENT ........................................................................................................................ 8

I.      THE COURT'S RULING DISMISSING THE STATES' NBA CLAIM IS
        FATAL TO ADVERTISERS' PROPOSED NBA CLAIM. .................................. 8

II.     ADVERTISERS' PROPOSED NBA CLAIM IS FUTILE EVEN
        WITHOUT REGARD TO THE COURT'S ORDER ........................................... 12

        A.      This Court Has Already Held that the Rule of Reason Governs
                Advertisers' Section 1 Claim. ................................................................... 12

        B.      Advertisers Have Not Stated a Rule of Reason Claim. ............................ 15

        C.      Advertisers Have Not Plausibly Alleged Article III Standing To
                Pursue Their NBA Claim. ......................................................................... 21

III.    ADVERTISERS' PROPOSED CALIFORNIA LAW AMENDMENT IS
        ALSO FUTILE. ..................................................................................................... 23

CONCLUSION .................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)....................................17, 20

*Bale v. Glasgow Tobacco Board of Trade, Inc.*, 339 F.2d 281 (6th Cir. 1964)...........14, 21

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................10, 18

*Bhanusali v. Orange Reg'l Med. Ctr.*, No. 10-cv-6694 CS, 2013 WL 4828657
    (S.D.N.Y. Aug. 12, 2013) ..........................................................................................18

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406
    (7th Cir. 1995)............................................................................................................19

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612
    (S.D.N.Y. 2013) ........................................................................................................16

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed
    Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007) ...............................................................22

*Chapman v. New York State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008).......................15

*Chicago Board of Trade v. United States*, 246 U.S. 231 (1918) ...............................14, 21

*City of New York v. Grp. Health Inc.*, 649 F.3d 151 (2d Cir. 2011).................................15

*Dutra v. BFI Waste Mgmt. Sys. of N. Am., Inc.*, No. 14-CV-04623-NC,
    2015 WL 2251203 (N.D. Cal. May 13, 2015) ...........................................................23

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240
    (2d Cir. 1997)............................................................................................................16

*Gainesville Oil & Gas Co. v. Farm Credit Bank of Tex.*, 847 S.W.2d 655
    (Tex. App. 1993)........................................................................................................14, 21

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004)...........16, 17

*Harrison Aire, Inc. v. Aerostar Intern., Inc.*, 423 F.3d 374 (3d Cir. 2005) ......................19

*IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. Royal Bank
    of Scotland Group, PLC*, 783 F.3d 383 (2d Cir. 2015)............................................8, 24

*In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510 (S.D.N.Y. Aug.
    29, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016)........................................................15, 16

*In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55 (S.D.N.Y. 2021)......14, 21

ii

*Jain Irrigation, Inc. v. Netafim Irrigation, Inc.*, 386 F. Supp. 3d 1308
(E.D. Cal. 2019)..........................................................................................23

*Linzer Prod. Corp. v. Sekar*, 499 F. Supp. 2d 540 (S.D.N.Y. 2007) .................................20

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23
(2d Cir. 2015)..............................................................................................16

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129
(2d Cir. 2013).........................................................................................5, 11

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525 (1st Cir. 1989)..........11, 20

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998).........................................................14

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ............................................................19

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114 (2d Cir. 2012)............8, 24

*Sage Realty Corp. v. ISS Cleaning Servs. Group, Inc.*, 936 F. Supp. 130
(S.D.N.Y. 1996)..........................................................................................18

*Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160 (N.D. Cal. 2013)...........................................23

*Spinelli v. Nat'l Football League*, 903 F.3d 185 (2d Cir. 2018)...........................17, 18, 19

*Spokeo, Inc. v Robins*, 136 S. Ct. 1540 (2016) .................................................................22

*Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90 (2d Cir. 1998)........................16

*United States v. Aiyer*, 33 F.4th 97 (2d Cir. 2022).....................................................14, 21

*United States v. Koppers Co.*, 652 F.2d 290 (2d Cir. 1981) .............................................14

**Statutes & Rules**

Fed. R. Civ. P. 12(b)(6)..............................................................................................8, 24

**Other Authorities**

1 Newberg and Rubenstein on Class Actions § 2:5 (6th ed.) .............................................22

**INTRODUCTION**

On September 13, 2022, this Court issued an 87-page Opinion and Order (Op. & Order ("Order"), Dkt. No. 308) dismissing the States' claim that the Network Bidding Agreement (the "NBA") between Google and Meta violates Section 1 of the Sherman Act.[1]  The Court's dismissal was based on its review of the States' 702-paragraph Third Amended Complaint ("States' TAC") and more than 125 pages of briefing on Google's motion to dismiss, as well as extensive oral argument.  The Court also had before it the full terms of the NBA, and devoted fourteen pages of the Order to parsing those terms and explaining why the NBA could not plausibly be alleged to constitute a violation of the Sherman Act.

The key holdings in the Court's Order concerning the NBA were:  (1) the terms in the NBA are "entirely consistent with competition" (Order at 25), (2) the States had not plausibly alleged the existence of any collusive bidding agreements related to bidding for in-app impressions (Order at 32) and (3) the NBA "promotes competition" by introducing a competing bidder.  (*Id.*)  Notwithstanding this Court's Order, the putative class of advertisers (the "Advertisers") seek leave to assert a Section 1 claim (and a corresponding claim under California state law) arising out of the NBA even though two of the six Advertisers never asserted a claim related to the NBA prior to the Order.[2]  (*See*

---

[1] The Court otherwise denied Google's motion to dismiss the States' complaint.  (*See generally* Order.)

[2] The Advertisers also seek leave to file a cause of action alleged only against Google that relates to alleged anticompetitive restraints in Google's agreements with publishers.  Meta takes no position on this proposed amendment.

Advertiser Class Pls.' Mot. to Amend ("Mot.") 1-2, Dkt. 317.)  Meta respectfully submits that leave should be denied.

*First*, Advertisers' NBA claim is not "distinguishable" from the States' NBA claim and is futile for that reason alone.  While the Advertisers do not propose to repeat the States' failed theory that the NBA was somehow tied to an effort to "kill" header bidding, their remaining theory is indistinguishable from the States' back-up claim—also rejected by the Court—that particular terms of the NBA gave Meta an unlawful competitive advantage.  Notably, in support of their request for leave to amend, the Advertisers do not challenge a single one of the Court's findings dismissing the States' NBA claim.  (*See* Section I.)

*Second*, even if the Advertisers' NBA claim were factually distinguishable from the States' claim—and it is not—the proposed amendment would still be futile for a host of obvious reasons.  To begin, the Advertisers utterly fail to allege a plausible relevant market, relegating their entire discussion of the supposed relevant market to a single paragraph (Proposed Consolidated Advertiser Complaint ("CAC") ¶ 294, Dkt. No. 317-1), which itself fails to even explain what the market is (never mind why it is viable).  Not surprisingly, the Advertisers also fail to allege *any* facts concerning market power and fail to provide any cogent explanation as to how provisions of the NBA that allegedly permit Meta to better achieve value for its advertiser-customers could somehow harm competition and advertisers.  Finally, the Advertisers have no standing to assert their failed claims anyway; their allegation is that the NBA caused competitive harm to advertisers who had to use non-Meta and non-Google demand side networks, but each Advertiser alleges that it dealt directly only with Google.  (*See* Section II.)

*Third*, the Advertisers' proposed state law claim concerning the NBA rises—or more accurately, falls—with their Sherman Act NBA claim.  Thus, for each of the reasons above, that claim is also futile.[3]  (*See* Section III.)

## FACTUAL BACKGROUND

On December 16, 2020, a group of 15 state attorneys general ("the States") filed a complaint against Google in the Eastern District of Texas alleging a range of anticompetitive conduct related to digital advertising.  (*State of Texas v. Google*, 21-cv-06841 (E.D. Tex.), Dkt. No. 1.)  The majority of the States' allegations related to conduct involving only Google.  The States also alleged a Sherman Act Section 1 claim (against only Google) based on the September 2018 commercial agreement between Meta and Google related to digital advertising—the NBA.

The States' action was centralized with 18 other actions brought by private plaintiffs in a multidistrict litigation before this Court.[4]  The factual allegations in the complaints that challenged the NBA were substantively the same as the factual allegations lifted from the States' complaint.  On August 13, 2021, this Court ordered that it would proceed with any motions to dismiss the States' complaint prior to addressing motions to dismiss or amend the complaints in the private cases.  (*See* Pre-Trial Order No. 1 ¶¶ 7-10, Dkt. No. 4.)  This procedure would allow the private plaintiffs to "tak[e] account of the rulings on the motion to dismiss in the state case" when proposing amendments to their own pleadings.  (*Id.* ¶ 9.)  Proceeding in this way would be in the

---

[3] To the extent the Court grants Advertisers leave to assert their NBA claims in an amended complaint, Meta anticipates moving to dismiss those claims and reserves any and all arguments for such motion if necessary.

[4] After the MDL was created, 11 actions were subsequently transferred to the MDL.

interest of "efficiency" as it would avoid a "tennis match of rulings on motions followed

by amendments followed by further motions and further rulings".  (Sept. 24, 2021 Conf.

Tr. 11:05-15, Dkt. 142.)  The Court permitted the States to further amend their

complaint—including in response to deficiencies identified in a pre-motion letter to

dismiss filed by Google—so that the "strongest and best pleading" would be before the

Court when it ruled on Google's motion to dismiss the States' complaint.  (Oct. 13, 2021

Order, Dkt. No. 144.)

        In their Third Amended Complaint (States' TAC, Dkt. No. 195), the States

alleged that Google and Meta entered into an agreement in which Meta curtailed its use

of header bidding in return for Google providing Meta with "a leg up . . . in ad auctions,

allocating a portion of the wins to [Meta], and helping [Meta's] ad network [MAN] beat

the competition".  (States' TAC ¶ 413.)  The States alleged that this amounted to an

agreement "to allocate markets, manipulate publisher auctions, depress prices paid to

publishers, and exclude rival ad networks", which the States claimed was *per se* unlawful

as well as unlawful under the rule of reason under Section 1 of the Sherman Act.  (*Id.*

¶¶ 544-555.)

        The States focused on several specific provisions of the NBA that they

contended gave Meta "special advantages".  (*Id.* ¶ 427.)  Those provisions included:  (i)

volume-based price concessions off the 10% fee Google charged other networks (*id.*

¶ 428); (ii) the so-called "win rate provision", under which Meta agreed to endeavor to

win at least 10 percent of all auctions in which it bid (*id.* ¶ 438); (iii) the "timeout

provision", under which Google gave Meta a 300 millisecond timeout (as opposed to 160

millisecond timeout) in Google's ad auctions (*id.* ¶ 429); (iv) the ability to contract

4

directly with publishers (*id.* ¶ 430); (v) the "information provision", under which Google agreed to inform Meta which impressions were likely targeted to bots rather than humans (*id.* ¶ 431); (vi) the "match rate provision", under which Google committed to improve the percentage of users that Meta would be able to identify in auctions (*id.* at ¶¶ 432-33); and (vii) provisions restricting Google's use of Meta's bid data (*id.* ¶ 434).

With respect to the auctions Google conducts on behalf of developers to sell their in-app inventory, the States alleged an "auction manipulation scheme", whereby the terms of the NBA gave Google and Meta "special advantages unavailable to other buyers" and Meta and Google agreed to limit their competitive bidding between each other by fixing a minimum share of impressions that Meta would win in developers' auctions.  (*See id.* ¶¶ 437-438.)

On September 13, 2022, this Court dismissed the States' Section 1 claim arising out of the NBA.  (Order at 3.)  In dismissing the States' NBA claim, the Court reached several key conclusions.  *First*, the Court found the States had not plausibly pled an agreement between Meta and Google in which Meta would drop its support for header bidding in exchange for special advantages in Google's ad auctions.  (*Id.* at 21-22.)  As the Court noted, "the 48-page NBA does not touch upon or purport to restrict Facebook's use of header bidding".  (*Id.* at 24.)  Moreover, the fact that the agreement contained commercial benefits for both Google and Meta—including but not limited to the match rate provision, the timeout provision and the information provision (*id.* at 24-25)—did not support an inference of conspiracy, as "[a]n inference of conspiracy is not supported by acts that 'made perfect business sense.'"  (*id.* at 22 (citing *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 138 (2d Cir. 2013)).)  Ultimately, the

5

Court explained that the States had failed to account for "Facebook's motivation to use its economic clout as an advertiser to drive the hardest bargain it could with Google" as well as Google's "legitimate, pro-competitive desire to obtain as much business as possible from Facebook."  (*Id.* at 22.)

Second, the Court found the States had not plausibly pled that the specific terms of the NBA—which were before the Court—harmed competition in bidding for in-app ad inventory through auctions run by in-app mediation tools, including Google-run auctions.  (*Id.* at 26.)  The Court declined to apply the *per se* rule to the NBA, reasoning that the NBA was properly understood as a vertical agreement and should therefore be analyzed under the rule of reason.  (*Id.* at 28-29.)  Applying the rule of reason, the Court concluded that the NBA provisions at issue—*i.e.*, those provisions that allegedly provide Meta more favorable terms than other bidders received and that are at the core of the Advertisers' proposed amendment—were "consistent with competition".  (*See id.* at 28 ("Taking the NBA as a whole and in the context of the entirety of the Complaint's allegations, Google, the auctioneer, provided pricing and other incentives to Facebook, the in-app network, to participate in the auctions that Google offered on behalf of developers."); *id.* at 25 ("Google's actions are consistent with a firm seeking to secure the business of a very large potential customer by offering it favorable terms.  In the absence of an allegation of predatory pricing or other exclusionary or improper conduct, these actions are entirely consistent with competition.").)

Overall, the Court concluded that even if Meta received alleged special benefits under the agreement, the NBA did "not dictate which impressions [Meta] may bid on or at what price".  (*Id.* at 32.)  Instead of limiting competition, the Court found that

the NBA "promote[d] competition with Google's in-app network by bringing in a new competing bidder". (*Id.* at 32.)  Any alleged anticompetitive effects in the in-app network market were therefore implausible.[5]

Following its Order on Google's motion to dismiss the States' TAC, the Court issued Pre-Trial Order No. 2 ("PTO No. 2", Dkt. No. 309), setting forth a procedure by which private plaintiffs could seek to amend their pleadings in light of the Court's Order.  (PTO No. 2 ¶¶ 1-3.)  The Court distinguished between "Conforming Amendments" and all other amendments; "Conforming Amendments" include only amendments that "(a) add claims or allegations of anticompetitive conduct that were asserted in the TAC and survived the Court's September 13 Opinion & Order or remove claims or allegations of anticompetitive conduct asserted in the TAC that did not survive the September 13 Opinion & Order; (b) amend the allegations of individual harm to the plaintiffs, allegations specific to the named plaintiffs, the class definitions, the state law claims, the damages and relief sought; or (c) are necessitated by the party or counsel's obligations under Rule 11." (PTO No. 2 ¶ 2.)  Pursuant to the Court's order, plaintiffs wishing to submit non-conforming amendments must seek leave to amend.  (*Id.* ¶ 3.)  Because the Advertisers seek to amend two claims (Counts III and IV) concerning the NBA, those are non-conforming amendments for which the Court has held leave is required.[6]

---

[5] The Court also found that the States had not plausibly pled that Google had market power in the in-app network market.  (Order at 32.)

[6] Meta takes no position on whether this Court should permit Advertisers to amend their complaint concerning any claim asserted only against Google.

7

**LEGAL STANDARD**

As the Advertisers concede, leave to amend should be denied if their proposed claims would be futile.  (Mot. at 3.)  Claims are futile if they do not state a claim or otherwise would not survive a motion to dismiss.  *IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. Royal Bank of Scotland Group, PLC*, 783 F.3d 383, 389 (2d Cir. 2015) ("Proposed amendments are futile if they 'would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.' Thus, the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss.") (quoting *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)) (internal citation omitted).

**ARGUMENT**

**I.     THE COURT'S RULING DISMISSING THE STATES' NBA CLAIM IS FATAL TO ADVERTISERS' PROPOSED NBA CLAIM.**

Advertisers argue that they should be permitted to pursue their amended NBA theory because—they claim—it was neither alleged by the States nor adjudicated by this Court.  (Mot. at 4.)  That is simply not true.

The core theory of the Advertisers' proposed NBA claim is that Google provided Meta with certain favorable terms that disadvantaged other bidders in auctions for web and in-app impressions.  (*See* CAC ¶¶ 285-294, 365-372, 373-377.)  That is precisely how the Court described at least one of the States' failed theories.  As the Court explained in the Order, the States alleged that "Google has effectively excluded rival bidders because the NBA contains terms more favorable to Facebook than those offered to others".  (*See* Order at 26 (citing States' TAC ¶ 441).)

8

These substantively identical theories were premised on the very same terms agreed upon between Google and Meta:  the NBA's match rate provision,[7] the timeout provision[8] and the information provision.[9]  (*See* States' TAC ¶ 441 ("the auction house can take steps to disadvantage outside bidders by withholding information, giving them less time to bid, or charging them higher bidder fees—precisely as Google has done to other prospective bidders").)  Thus, there is no merit to the Advertisers' argument that their NBA claim is novel because it "concerns the NBA terms that affect the competitive relationship between Meta and other bidders" (Mot. at 4), or because it is premised on the notion that those terms make bidders not using Meta's Audience Network "worse off" (Mot. at 5).

The supposed differences in alleged markets between the Advertisers' NBA claim and the dismissed States' claim, (Mot. at 4-5), is also of no moment.  Indeed, the sum total of the Advertisers' market allegations relevant to the NBA is contained in a single paragraph in which they allege a "market for open display and in-app ad inventory traded in Google's Final Clearinghouse Auctions, in which Meta competes with other demand-side intermediaries for publishers' and developers' inventory".  (CAC ¶ 294.)  Whatever the precise contours of this ill-defined market may be, Advertisers appear to be saying that there is competition between rival bidders (*i.e.*, Meta Audience Network and

---

[7] *Compare* States' TAC ¶¶ 432-433, *with* CAC ¶ 287.

[8] *Compare* States' TAC ¶ 429, *with* CAC ¶ 288.

[9] *Compare* States' TAC ¶ 431, *with* CAC ¶¶ 286-287, 290.  The Advertisers also cite to the NBA's minimum spend, win-rate and bid response commitment provisions, all of which also supported the States NBA claim.  *Compare* States' TAC ¶ 426, *with* CAC ¶ 287 (minimum spend); States' TAC ¶ 438, *with* CAC ¶ 287 (win rate); States' TAC ¶ 438, *with* CAC ¶ 287 (bid response commitment).

other competing networks seeking to place ads for advertisers) that has been harmed by specific terms of the NBA.  That was the precise harm claimed by the States and rejected by this Court.  (Order at 26 ("They also assert that Google has effectively excluded rival bidders because the NBA contains terms more favorable to Facebook than those offered to others"); *id.* at 32-34 (noting that the States' alleged harm to an "in-app network market", which was defined by the States[10] to include Meta's and Google's demand-side ad networks and other competing bidders in Google-run auctions, was implausible).)

Moreover, any minor purported "distinctions" between the States' and Advertisers' NBA claims do nothing to alter this Court's key holdings that (1) the terms of the NBA reflect reasonable business decisions that were "consistent with competition" (Order at 25-26) and (2) the effect of the NBA was procompetitive (*id.* at 32).

*First*, in holding that the States' allegations "do not plausibly allege joint or concerted action between Google and Facebook", the Court explained that the States "fail to adequately account for Facebook's motivation to use its economic clout as an advertiser to drive the hardest bargain it could with Google, and that Google was motivated by the legitimate, pro-competitive desire to obtain as much business as possible from Facebook."  (Order at 22 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 566 (2007) ("there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway . . . .")).)

After analyzing the terms of the NBA—including the same terms upon which the Advertisers premise their proposed NBA claim (Order at 24-25)—the Court

---

[10] *See* States' TAC ¶¶ 232-243.

further reasoned:  "Offering favorable terms to a large potential customer, such as Facebook, undoubtedly had the effect of diverting business from a competing service [header bidding], but this does not convert the agreement into an unreasonable restraint of trade."  (*Id.* at 26 (citing *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 529 (1st Cir. 1989) ("nothing anticompetitive in the simple fact that a seller selectively cuts its prices, or offers other favorable terms, to some of its dealers, even though such discrimination harms the non-favored dealers") (Breyer, J.)).)  Instead, as the Court explained, the terms of the NBA "'made perfect business sense.'"  (*Id.* at 22 (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 138).)

These holdings apply with equal force—and are equally fatal—to the Advertisers' proposed claim.  As this Court previously noted, the NBA is expressly "not an exclusive agreement",  (Order at 21 (citing NBA ¶ 19.10)), and nothing in the NBA prevents Google from offering the same favorable terms to other auction participants. Thus, the Advertisers' proposed CAC contains no allegations to undermine the Court's conclusion that the NBA was "*entirely consistent with competition*".  (*Id.* at 25-26 (emphasis added).)

*Second*, the Court found that the States "do not adequately explain why inducing Facebook to actively participate in the Google-run auctions . . . does not promote rather than harm competition in the in-app network market."  (*Id.* at 31; *see also id.* at 32 (holding "[the NBA] promote[d] competition with Google's in-app network by bringing in a new competing bidder").)  Advertisers allege that Meta's purported informational advantage "inflated the bids for Meta's rivals to win in Google's auctions above what those bids would have been had Meta not had access to such superior

information or been offered these secret advantages".  (CAC ¶ 292.)  But, similar to the defects found in the States' theory, Advertisers do not allege that those allegedly anticompetitive effects outweigh the procompetitive benefits that flowed from Meta's participation as a competing bidder in Google-run auctions.  Nor do Advertisers even bother to allege what rivals would have had to pay to win in Google's auctions absent Meta's entry.

In short, there are no material distinctions between the Advertisers' proposed amended NBA claim and the States' failed claim.  Leave to amend should be denied for that reason alone.

## II.   ADVERTISERS' PROPOSED NBA CLAIM IS FUTILE EVEN WITHOUT REGARD TO THE COURT'S ORDER.

Even if the Court were to conclude that there are material differences between the Advertisers' proposed NBA claim and the States' dismissed NBA claim, the proposed amendment would still be futile because the Advertisers fail to state a claim under Section 1 of the Sherman Act.

### A.   This Court Has Already Held that the Rule of Reason Governs Advertisers' Section 1 Claim.

Advertisers' proposed CAC is silent on whether the NBA claims should be treated as *per se* unlawful or instead analyzed under the rule of reason.  (*See generally* Mot. at 4-8.)

This Court, however, has already resolved that question, explaining that the NBA is "properly scrutinized" under the rule of reason.  (*See* Order at 27-29.)[11]  The Court reasoned as follows:

> Taking the NBA as a whole and in the context of the entirety of the Complaint's allegations, Google, the auctioneer, provided pricing *and other incentives* to Facebook, the in-app network, to participate in the auctions that Google offered on behalf of developers.  Facebook is not alleged to be a participant in the market for in-app mediation tools that Google uses to conduct auctions of developers' inventory of impressions. . . . Read as such, it is principally a vertical agreement, with potential horizontal consequences.

(*Id.* at 28 (emphasis added).)  That reasoning applies with equal force here.

Advertisers' claim is based precisely on the "other incentives" the Court was referring to in the Order—the match rate, timeout and information provisions—that Google (the auctioneer) provided to Facebook (the in-app network bidder) in a vertical relationship.  Nowhere in the proposed CAC do Advertisers allege that the NBA was a predominantly horizontal agreement between Google's in-app network that bids against Facebook's in-app network in Google-run auctions, nor could they.  (*See generally* CAC ¶¶ 285-294, 365-372, 373-377.)  To the contrary, Advertisers concede that the "favorable terms" provided to Meta as part of the NBA were not provided by Google as an in-app network (horizontal competitor), but rather by Google as auctioneer (vertical supplier).  (*See* Mot. at 6 ("Not all violations in auction markets, however, involve collusion among

---

[11] The Court also concluded that "[t]he Court's conclusion that the States have not plausibly alleged an unlawful agreement between Google and Facebook to substantially curtail Facebook's use of header bidding dispenses with the need to decide whether such an agreement should be an analyzed as a horizontal or vertical agreement."  (Order at 21 n.12.)  Here, Advertisers do not allege an agreement between Google and Facebook to "substantially curtail Facebook's use of header bidding".  More importantly, that the NBA's terms may purportedly "restrain horizontal competition" does *not* transform the NBA into a horizontal agreement between competitors.  Indeed, the Court already held that the NBA was "principally a *vertical agreement*, with potential *horizontal consequences*".  (Order at 28 (emphasis added).)

bidders."); *id.* at 8 ("[T]he Section 1 claim in the CAC's Count III and the Cartwright Act claim in Count IV arise out of an agreement between Google, which conducts the Final Clearinghouse Auctions described in the NBA, and Meta, a particular bidder in those auctions.").)

That Advertisers style their claim as a "bid rigging" claim (Mot. at 6) does not compel a different result.  Bid rigging schemes subject to *per se* condemnation must occur between horizontal competitors.  *United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022) ("[B]id rigging—which is simply another 'form of horizontal price fixing'—is a *per se* violation of the Sherman Act."); *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir. 1981) ("In cases involving behavior such as bid rigging, . . . the Sherman Act will be read as simply saying: An agreement among competitors to rig bids is illegal." (internal quotation marks omitted)).  In contrast, "[a] vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels."  (Order at 27 (citing *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998).)  None of the cases cited by Advertisers stand for the proposition that a vertical agreement between an auctioneer and bidder (absent an agreement to fix prices) is subject to *per se* treatment.[12]

---

[12] *See Chicago Board of Trade v. United States*, 246 U.S. 231, 240 (1918) (applying rule of reason and finding Board's rule governing grain auctions "improve[d] market conditions" and "had no appreciable effect on general market prices"); *Bale v. Glasgow Tobacco Board of Trade, Inc.*, 339 F.2d 281, 286 (6th Cir. 1964) (noting *per se* rule was "not here applicable"); *Gainesville Oil & Gas Co. v. Farm Credit Bank of Tex.*, 847 S.W.2d 655, 659-60 (Tex. App. 1993) (case does not involve claims under state or federal antitrust laws); *Aiyer*, 33 F.4th at 115 (alleged horizontal conspiracy between FX traders at competing dealer banks to fix prices and rig bids in FX market properly subject to *per se* rule); *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 104-105 (S.D.N.Y. 2021) (per se rule properly applied where Plaintiffs plausibly alleged agreement between two competing exchanges and trader was formed with intent to engage in price fixing).

B.      **Advertisers Have Not Stated a Rule of Reason Claim.**

Advertisers fail to plausibly allege the necessary predicates of a rule of reason claim.  As such, their proposed NBA claim is futile.

*Market Definition.*  Advertisers fail to allege a plausible relevant market to support their NBA claim.  "To state a claim under [Section 1 of the Sherman Act], a plaintiff must allege a plausible relevant market in which competition will be impaired." *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011).  "[W]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."  *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008).

As described above, the sum total of Advertisers' relevant market allegations is found in paragraph 294 of the proposed CAC, where they do nothing more than name the alleged market.  But "simply naming a potential market is only the first step in defining the relevant market".  *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *37 (S.D.N.Y. Aug. 29, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016). Advertisers' CAC contains no allegations concerning (1) why the auctions for open display and in-app ad impressions are substitutable (and should therefore be in the same relevant product market); (2) why final clearinghouse auctions run by Google are not substitutable with non-Google final clearinghouse auctions; or (3) the geographic boundaries of Advertisers' proposed relevant market.  Plaintiffs' market allegations

15

cannot therefore survive a motion to dismiss.  *See id.* at \*14, \*32 (plaintiffs failed to "allege a plausible market" where purported market definitions were not "accompanied by allegations regarding product interchangeability, elasticities, or geographic boundaries").[13]

        ***Market Power.***  As the Court explained in the Order, a "plaintiff alleging harm to competition may, in lieu of showing actual harm, allege that defendants possess 'market power' in the relevant market".  (Order at 30 (quoting *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97 (2d Cir. 1998)).)  Advertisers do not even try to do so with respect to whatever market or markets they allege exist(s) in paragraph 294 of the proposed CAC.[14]

        ***Anticompetitive Effect.***  As this Court held, "[u]nder the rule of reason, the plaintiff must show that 'defendants' challenged behavior had an *actual* adverse effect on competition as a whole in the relevant market.'"  (Order at 30 (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 507 (2d Cir. 2004)).)  "Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief can be granted."  (*Id.* (quoting *Elecs. Commc'ns Corp. v.*

---

[13] *See also Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 29 (2d Cir. 2015) (plaintiff's "attempt to carve up the New York City hotel labor market into an artificially small 'Marriott-only' submarket is sufficiently 'implausible,' to render dismissal appropriate at the pleading stage"); *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 621 (S.D.N.Y. 2013) (Section 1 claim failed where plaintiffs "allege[d] harm not to the U.S. e-book market as a whole, but only to the portion of that market that is controlled by plaintiffs' competitor Amazon").

[14] Elsewhere in the proposed amended complaint, Advertisers allege a series of other purported markets with corresponding market power allegations.  For example, Advertisers allege that Google has monopoly power in the Exchange market in the United States (CAC ¶¶ 57-89), monopoly power in the market for buying tools for small advertisers in the United States (CAC ¶¶ 93-124), and market power in the market for buying tools for large advertisers in the United States (CAC ¶¶ 125-145).  For purposes of this Opposition, Meta takes no position on whether those relevant markets or allegations of power are plausibly alleged.  The critical point is that Advertisers expressly *disclaim* that any of these relevant markets is relevant to their NBA claims.  (CAC ¶ 54 n.1).

*Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997)).)  "Because the antitrust laws protect competition as a whole, evidence that plaintiffs have been harmed as individual competitors will not suffice."  *Geneva Pharms. Tech.*, 386 F.3d at 507 (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343-44 (1990)).

Advertisers do not plausibly allege harm to market-wide competition.  As explained above, Advertisers' claim is that the favorable terms granted to Meta via the NBA "distort[ed] competition" in Google-run auctions "by placing advertisers bidding against Meta at an informational and procedural disadvantage".  (CAC ¶ 289.) Advertisers further allege that this "competitive advantage" "inflated the bids for Meta's rivals to win in Google's auctions above what those bids would have been had Meta not had access" to the favorable terms offered in the NBA.  (*Id.* ¶ 292.)  These allegations suffer from several fatal flaws.

*First*, Advertisers' allegations are conclusory.  Advertisers allege no examples, data or other facts to support their assertion that Meta's rivals must place inflated bids to win Google-run auctions after the NBA, notwithstanding the fact that Advertisers have had access to more than 2 million documents that Google has produced in the MDL.  Nor do Advertisers allege any facts or economic theory to explain the connection between any favorable terms Meta receives as a result of the NBA and the bids Meta's rivals must submit to win Google-run auctions.  Such conclusory allegations are insufficient to survive a motion to dismiss.  *See e.g.*, *Spinelli v. Nat'l Football League*, 903 F.3d 185, 212 (2d Cir. 2018) (where plaintiff "cite[s] no examples, data, or

17

other facts to support their assertion, [] a conclusory allegation that prices have increased will not suffice to state anticompetitive effect").[15]

Second, Advertisers do not provide an explanation as to why their conclusory assertions of harm even make sense, never mind why they are plausible. See Twombly, 550 U.S. at 547 ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed"); Spinelli, 903 F.3d at 213 (affirming dismissal for failure to "plausibly allege an adverse effect on competition in [a relevant market]"). For example, Advertisers allege that, as a result of the additional time and superior information Meta receives, Meta's competitors are forced to bid higher in order to win the auction. (CAC ¶ 289.) But according to Advertisers' allegations, other "[b]idders in Google's final ad auctions had no knowledge of the superior information that Google secretly provided to Meta". (Id. ¶ 292.) If the other bidders had no idea that Meta had additional information in a particular auction, how would they know they have to bid higher than they otherwise would? Advertisers also do not explain how Meta having additional time (CAC ¶ 288) would lead Meta or other bidders to inflate bids in any circumstance, never mind how that would happen when the other bidders had no idea that Meta even had that additional time. (CAC ¶ 292 (referring to Meta's "secret advantages")).

---

[15] See also Bhanusali v. Orange Reg'l Med. Ctr., No. 10-cv-6694 CS, 2013 WL 4828657, at *10 (S.D.N.Y. Aug. 12, 2013), aff'd in part, vacated in part, 572 F. App'x 62 (2d Cir. 2014) ("conclusory allegation (unsupported by a single fact or example) that the price of orthopedic surgical services has increased by the elimination of a single orthopedic surgeon from the relevant market is likewise implausible, particularly given the absence of allegations of decrease in the 'output of patient care' in the field of orthopedics, the absence of any factually-supported economic theory, and the numerous other factors that affect the cost of medical services") (internal citation omitted); Sage Realty Corp. v. ISS Cleaning Servs. Group, Inc., 936 F. Supp. 130, 135 (S.D.N.Y. 1996) ("[A]n antitrust complaint is insufficient if it simply contains conclusory allegations which merely recite the litany of antitrust.") (internal quotations omitted).

In fact, Advertisers' entire theory is inconsistent with a claim that competition was harmed rather than enhanced.  Advertisers admit that the key alleged anticompetitive term—the additional information Google supplied to Meta to identify the user—was information that is "*valuable to advertisers* because identifying the user allows for more accurate targeting and reduces the chances of serving an ad to a 'bot'"". (CAC ¶ 287 (emphasis added).)  In other words, Advertisers complain that Meta was able to secure information from Google that was valuable to Meta's own customers—who are *advertisers*—so that those customers could get more value for each ad they placed.  It would turn the antitrust laws on their head if an agreement to provide information that makes a product *more valuable* to customers somehow constituted harm to competition. And, even if that additional valuable information did lead Meta's advertiser customers to pay higher prices, the fact that a bidder might be willing to pay a higher price for a better product hardly raises even an inference of anticompetitive effects.  *See Spinelli*, 903 F.3d at 212 ("conclusory allegation that prices have increased will not suffice to state anticompetitive effect"); *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (explaining that courts will "not infer competitive injury" from increased prices "absent some evidence that tends to prove . . . prices were above a competitive level"); *cf. Harrison Aire, Inc. v. Aerostar Intern., Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("Competitive markets are characterized by both price and quality competition, and a firm's comparatively high price may simply reflect a superior product."); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995) ("Generally you must pay more for higher quality.").

19

*Third*, as this Court has already recognized, there is "nothing anticompetitive in the simple fact that a seller selectively cuts its prices, or offers other favorable terms, to some of its dealers, even though such discrimination harms the non-favored dealers".  (Order at 26 (quoting *Monahan's Marine*, 866 F.2d at 529).)  As discussed in further detail above, that is precisely Advertisers' claim here, and Advertisers' allegations do nothing to undermine this Court's holding that the terms of the NBA are "consistent with competition".[16]  Advertisers also do not allege—because they cannot—that there was anything about the NBA that precluded Google from providing the same alleged "favorable" terms to each and every other advertiser network that participated in the Google-run auctions.

*Fourth*, Advertisers do not allege how market-wide competition was affected by the terms of the NBA.  Advertisers merely allege that one or more rival bidders paid inflated bids to win Google-run auctions.  (CAC ¶ 292.)  But "the antitrust laws were enacted for the protection of *competition*, not *competitors*."  *Atl. Richfield*, 495 U.S. at 338 (internal citations and quotation marks omitted).  And per Advertisers' own allegations, neither Meta nor Google, both of whom participate as competing bidders in the relevant market, are subject to the alleged informational disadvantage that, according to Advertisers, causes other bidders to have to pay inflated bids to win Google-run auctions.  (*See, e.g.*, CAC ¶ 286 (referring to "proprietary data known only to Google"); ¶ 287 (Google would help Meta identify end users); ¶ 291 ("Google must make competing bidders worse off . . . .").)  *See Linzer Prod. Corp. v. Sekar*, 499 F. Supp. 2d

---

[16] *See supra* Section I.

20

540, 555 (S.D.N.Y. 2007) (no plausible allegation of market-wide anticompetitive effect where alleged anticompetitive conduct—raising license fees on alleged monopolist's licensees—would only raise costs for two of four competitors in relevant market).

Advertisers argue that their NBA claims are likely to succeed on a motion to dismiss because "[a]uction rules and procedures . . . may also form the basis of an agreement that unreasonably restrains trade by impairing competition in the conduct of the auction."  (Mot. at 6.)  But the cases cited by Advertisers are inapposite.[17]  Indeed, the only case cited by Advertisers where an "auction rule" was found to violate the Sherman Act is *Bale v. Glasgow Tobacco Board of Trade, Inc.*, 339 F.2d 281 (6th Cir. 1964), where the court held that the "purpose and intent of the twenty percent rule was to preserve the status quo and suppress competition."  The court reasoned that the rule denied new entrants like plaintiff "equality of opportunity to compete with the other warehouse operators for the business of the market" and that as a result "[a] substantial part of the market was foreclosed to [new entrants]."  *Id.* at 287.  Here, Advertisers have not alleged that the NBA resulted in *any* foreclosure.

### C.    Advertisers Have Not Plausibly Alleged Article III Standing To Pursue Their NBA Claim.

It is axiomatic that a named plaintiff must have Article III standing and that in order to pursue a claim on behalf of a class, at least one of the named plaintiffs

---

[17] *See Chicago Board of Trade v. United States*, 246 U.S. 231, 240 (1918) (Board's rule governing grain auctions "improve[d] market conditions" and "had no appreciable effect on general market prices"); *Gainesville Oil & Gas Co. v. Farm Credit Bank of Tex.*, 847 S.W.2d 655, 659-60 (Tex. App. 1993) (case does not involve claims under state or federal antitrust laws); *United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022) (alleged horizontal conspiracy between FX traders at competing dealer banks to fix prices and rig bids in FX market); *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 104-105 (S.D.N.Y. 2021) (agreement between two competing exchanges and trader was formed with intent to engage in price fixing).

must have Article III standing with respect to the class claim(s).  *See Cent. States Se. &*
*Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229,
241 (2d Cir. 2007); *see also* 1 Newberg and Rubenstein on Class Actions § 2:5 (6th ed.)
("[I]n a class action suit with multiple claims, at least one named class representative
must have standing with respect to each claim.").  Article III standing requires a plaintiff
to plausibly allege that it "(1) suffered an injury in fact, (2) that is fairly traceable to the
challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable
judicial decision."  *Spokeo, Inc. v Robins*, 136 S. Ct. 1540, 1547 (2016).  Advertisers fail
to allege injury in fact that is traceable to their NBA claim.

As described above, Advertisers' theory of harm is that Google's
agreement to provide Meta with allegedly favorable information led *other* bidders (*i.e.*,
other demand-side networks) that did not have that same information to place supra-
competitive bids to win auctions.  (*See* CAC ¶¶ 286-292.)  Advertisers also allege that the
same "enhanced and proprietary data" was known by Google (which makes sense, of
course, since Google was the one giving that data to Meta).  (*Id.* ¶ 286.)  In standing
terms, the Advertisers' claim is therefore that an advertiser who purchased impressions
through a Google auction using a demand network *other than* Google or Meta suffered an
injury in fact by paying a supra-competitive price for those impressions.  (*Id.* ¶¶ 368-370,
376.)

This presents one significant problem for *these* plaintiffs:  every single one
of them alleges that they purchased display ads and/or in-app advertising directly from
Google.  (*See id.* ¶¶ 14-32.)  Because no Named Plaintiff is alleged to have participated
(or purchased ads from a rival bidder who participated) in a Google-run auction at the

"competitive disadvantage" Advertisers allege was caused by the NBA, there is no

Named Plaintiff whose purported injury is "fairly traceable" to the NBA.  Plaintiffs

therefore fail to plead Article III standing.

## III.   ADVERTISERS' PROPOSED CALIFORNIA LAW AMENDMENT IS ALSO FUTILE.

Where a plaintiff challenges the same conduct under Section 1 of the

Sherman Act and the Cartwright Act, courts have found that "Cartwright Act claims rise

or fall depending on the success of its Sherman Act claim".  *See, e.g.*, *Jain Irrigation,*

*Inc. v. Netafim Irrigation, Inc.*, 386 F. Supp. 3d 1308, 1316 (E.D. Cal. 2019) (dismissing

plaintiffs' claims under Section 1 of the Sherman Act and the Cartwright Act where the

plaintiffs' allegations of conspiracy failed); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160,

1181 (N.D. Cal. 2013) ("Plaintiffs fail to state a Cartwright Act claim for the same

reasons they failed to state claims under section 1 of the Sherman Act"); *see also Dutra v.*

*BFI Waste Mgmt. Sys. of N. Am., Inc.*, No. 14-CV-04623-NC, 2015 WL 2251203, at *3-4

(N.D. Cal. May 13, 2015) (granting a motion to dismiss and finding that "[b]ecause

plaintiff's Sherman Antitrust Act claims lack merit, so too does his Cartwright Antitrust

Act claim").  Here, Advertisers' Cartwright Act claim arising out of the NBA (Count IV)

is virtually identical to their Sherman Act Section 1 claim arising out of the NBA

(Count III).  (*Compare* CAC ¶¶ 365-372, *with* CAC ¶¶ 373-377.)  It is therefore futile for

the same reasons described above.

Advertisers assert (Mot. at 3) that the proposed amendment to add their

Cartwright Act claim is a "Conforming Amendment".  (PTO No. 2 ¶¶ 1-2.)  Even if that

were true—and Meta submits that it is not since the proposed state law claim is identical

to the now-dismissed Federal NBA claim from the States' TAC—the Court indicated in

PTO No. 2 only that it "anticipates" granting leave for Conforming Amendments.  The Court did not rule that such amendments were permissible as of right, and as Advertisers have conceded, leave to amend shall be denied when the proposed amendment would be futile.  *IBEW Local Union*, 783 F.3d at 389 ("Proposed amendments are futile if they 'would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.' Thus, the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss.") (quoting *Panther Partners*, 681 F.3d at 119) (internal citation omitted).  Leave to amend Count IV should therefore also be denied.

## CONCLUSION

For the foregoing reasons, Meta requests that the Advertisers' motion to amend the complaint be denied with respect to the NBA claims (Counts III and IV).

Dated: October 26, 2022

CRAVATH, SWAINE & MOORE, LLP

by _____/s/ *Kevin J. Orsini*_____
Kevin Orsini
Brittany Sukiennik

Worldwide Plaza
825 Eighth Avenue
New York, NY
(212) 474-1000
korsini@cravath.com
bsukiennik@cravath.com

*Attorneys for Meta Platforms, Inc.*

24