# WILSON SONSINI

Wilson Sonsini Goodrich & Rosati
Professional Corporation

One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105

O: 415-947-2000

JUSTINA K. SESSIONS
Email: jsessions@wsgr.com
Direct dial: (415) 947-2197

November 4, 2022

**VIA CM/ECF**

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:        *In re Google Digital Advertising Litigation*, 1:21-md-03010 (PKC)

Dear Judge Castel:

On behalf of Defendants Google LLC ("Google"), Alphabet Inc., and YouTube LLC, we respectfully submit this pre-motion letter in anticipation of moving to dismiss multiple federal and state law claims under Federal Rule of Civil Procedure 12(b)(6) in the amended complaints filed by the Putative Publisher Class (ECF No. 322-1), Putative Advertiser Class (ECF No. 317-1), Newspaper Plaintiffs (ECF No. 328-1), and Associated Newspapers Ltd. and Mail Media, Inc. ("Daily Mail") (ECF No. 319-1), as well as certain initial underlying complaints that those plaintiffs chose not to amend[1] (collectively, the "Private Plaintiff Complaints").  Google also anticipates moving to dismiss the Putative Advertiser Class Complaint and Organic Panaceas Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(3) for reasons given below.  Pursuant to Your Honor's Individual Practices, we note that there is no conference scheduled at this time.

---

[1] The remaining, un-amended underlying complaints are: Compl., *SPX Total Body Fitness LLC v. Google,* 21-cv-00801 (N.D. Cal. Feb. 1, 2021), ECF No. 1; Compl., *SkinnySchool LLC v. Google,* 21-cv-06011 (N.D. Cal. Aug. 3, 2021), ECF No. 1 (together, the "SPX Complaints") and Compl., *Organic Panaceas, LLC v. Google,* 21-cv-02629 (N.D. Cal. Apr. 12, 2021), ECF No. 1, consolidated into *In re Google Digital Advertising Antitrust Litig.*, 20-cv-03556 (N.D. Cal. May 27, 2020).  The substantive allegations in the SPX complaints are "identical," *see* ECF No. 48, and involve a single-count challenge to the Network Bidding Agreement on behalf of Facebook advertisers.  *Organic Panaceas* appears to combine allegations from various other lawsuits against Google and complains that Google suspended the plaintiff's AdWords account for violating advertising policies.

**WILSON SONSINI**

November 4, 2022
Page 2

## I.    Arguments regarding all Private Plaintiff Complaints

**Claims dismissed from the States' case.**  Multiple claims in each of the Private Plaintiff Complaints should be dismissed for seeking to reintroduce claims that Your Honor has already held do not plausibly allege an antitrust violation.  (*See* ECF No. 308.)

The Advertiser Plaintiffs seek to revive the argument that Google's Network Bidding Agreement with Meta Platforms, Inc. ("Meta," formerly known as Facebook, Inc.) harmed competition under the Sherman Act (and Cartwright Act) by pleading (without supporting facts) a new "market for open display and in-app ad inventory traded in Google's Final Clearinghouse Auctions." (Ads. Compl. ¶ 294.)  While the Advertiser Plaintiffs assert that Meta and Google had a "side agreement" to grant Meta longer timeouts, they fail to allege any facts to support that naked assertion.  This Court already concluded that an alleged agreement by Google to grant Meta attractive contract terms reflects competition to secure the business of a large customer and cannot support a Section 1 claim.  (ECF No. 308, at 20-34.)  Placing the same agreement in a different alleged market does not alter the legal analysis or the conclusion.  The Newspaper Plaintiffs make a similar attempt to bring the Network Bidding Agreement claim back by pleading additional, ultimately inconsequential, allegations.  (Newsp. Compl. ¶¶ 267-321.)  None of these newly pleaded allegations resuscitates the claim.  The SPX Complaints also repeat the same, flawed, allegations and theories of the Network Bidding Agreement that the Court already dismissed.

Other since-dismissed claims that the Private Plaintiffs seek to reintroduce involve Google's Reserve Price Optimization (Ads. Compl. § VI.B.5), "hashing" of User IDs (Pubs. Compl. ¶¶ 219-225; DM Compl. § III.B.1), Accelerated Mobile Pages ("AMPs") (Newsp. Compl. ¶ 282; DM Compl. § III.C.1), and Exchange Bidding (Newsp. Compl. ¶¶ 222, 226; DM Compl. § III.B.7). Each of these claims, as re-alleged, fails under Rule 12(b)(6)—both because they are inconsistent with this Court's rulings[2] and because the claims fail on the merits in any event.  These claims should be dismissed, again.

**Tying and bundling claims involving Google's search business.**  Broadly, much of the conduct that Plaintiffs assail is a variety of either alleged tying or bundling involving some aspect of Google Search.  (Pubs. Compl. ¶ 332, 338; Ads. Compl. ¶¶ 167, 181, 186; Newsp. Compl. ¶¶ 324-36; DM Compl. ¶¶ 92, 201, 210, 213-16.)  But bundling requires proof of a type of below-cost pricing under a "discount attribution" test, *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 906-07 (9th Cir. 2008); *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 467-69 (S.D.N.Y. 1996), the elements of which Plaintiffs have not even made an effort to allege.  And tying requires non-conclusory allegations of coercion.  As the Second Circuit has long held, "Actual coercion by the seller that in fact forces the buyer to

---

[2] Your Honor has already held that each of the aforementioned claims do not plausibly allege an antitrust violation.  *See* ECF No. 308 at 40-44 ("hashing" of User IDs), 57-61 (Reserve Price Optimization), 61-66 (Exchange Bidding), 70-72 (AMPs).

WILSON
SONSINI

November 4, 2022
Page 3

purchase the tied product is an indispensable element of a tying violation.  A manufacturer's use of 'strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce [its] retailer to buy its full line of products' does not, however, amount to actual coercion." *Unijax, Inc. v. Champion Int'l*, 683 F.2d 678, 685 (2d Cir. 1982) (citations omitted); *see also Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016).  Without actual coercion, a tying claim fails.

The decision in *It's My Party, Inc. v. Live Nation, Inc*. illustrates the coercion point as relevant here.  811 F.3d 676, 684-88 (4th Cir. 2016).  There, an allegedly dominant concert promoter offered national tours with favorable compensation for performers if they performed concerts at the promoter's own venues—allegedly making it more difficult for independent local venues to secure the concert rights.  *Id*. at 684.  But "Plaintiff's own analysis reveals that the tying product was sometimes sold without the tied product.  Artists on [defendant]-promoted national tours, the very artists who were supposedly strong-armed into performing at Nissan [defendant's venue], in fact chose [plaintiff]-owned Merriwether fourteen percent of the time." *Id.* at 685.

Putative Publisher Class. Publisher Plaintiffs allege that Google diverted unused portions of the advertising budgets of "search-only" advertisers to buy display ads on the Google Display Network, essentially bundling its search and display advertising.  (Pubs. Compl. ¶ 336.)  Plaintiffs discuss Google programs such as Search+, through which "Google provided bundled automatic spend on display ads for all Google advertisers who wanted to create new search campaigns."  (*Id.* ¶ 338.)  They assert that "Google used this control to restrict these advertisers' display advertising purchases exclusively to publishers using Google's Ad Network and Ad Exchange."  (*Id.* ¶ 336.)  They also allege that Google's alleged bundling "created and locked in a new and significant pool of advertiser demand," which Google channeled "exclusively to publishers using Google's Ad Network and Ad Exchange," *i.e.*, Publisher Plaintiffs.  (*Id.* ¶ 336.)  But Plaintiffs concede that these programs were voluntary for advertisers.  (*Id.* ¶¶ 339, 341.)  Publishers' claim should be dismissed, not only for this admitted voluntariness and their failure to allege the elements of a "bundling" claim, *Ortho*, 920 F. Supp. at 467-69, but also because it fails to plausibly describe any harm to competition in the alleged Ad Network or Ad Server markets.  *See, e.g.*, *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29-31 (2d Cir. 2006).  Plaintiffs' allegations amount to stating that Google's conduct enhanced output in the claimed markets and made Google's Ad Server more valuable to publishers who wished to access additional advertiser demand, actions that increased quality and competition.

Putative Advertiser Class. Advertiser Plaintiffs allege that advertisers could not access Google's search data without using Google's display advertising tools, *i.e.*, that Google was tying the tools to search.  (*See* Ads. Compl. ¶ 181.)  But they do not allege any relevant search data market, and the allegation that search and display ads were offered in a single user interface (*id.*) adds nothing because a single interface does not force users to use both products; it just makes it more convenient for advertisers who choose to use Google for both search and display

WILSON
SONSINI

November 4, 2022
Page 4

advertising.  Advertiser Plaintiffs assert that Google limits its web search data to its own products, so advertisers must rely on Google Ads to track performance of their search ads, and that the web traffic from Google Search allowed Google to encrypt user IDs and restrict data access for advertisers using non-Google products.  (*Id*.)  They allege that this restrains competition because advertisers cannot advertise both on Google platforms and other publisher websites "without experiencing significant costs and inefficiencies."  (*Id.* ¶ 186.)  But given the absence here of any allegation that search data is a relevant market and, thus, qualifies as a tying product, *Illinois Tool Works v. Independent Ink*, 547 U.S. 28, 42-43 (2006), the claim necessarily fails.  Moreover, similar claims pertaining to Google's hashing of user IDs were already dismissed by the Court, ECF No. 308 at 30-34.  And advertisers do not claim any sort of requirement to use Google's products or offer any facts to suggest financial coercion to use Google's advertising technology.  *See It's My Party*, 811 F.3d at 684-85; *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992) (tying arrangement can be shown if buying both products together is the "only viable economic option") (citation omitted); *Unijax*, 683 F.2d at 685; *Ortho*, 920 F. Supp. at 467-69.

Daily Mail.  Daily Mail claims that Google wielded its alleged search monopoly to "lock advertiser demand for display inventory into AdX."  (DM Compl. ¶ 92.)  It alleges that Google "required" advertisers to use AdWords to purchase Google's search ad inventory.  (*Id.*)  But Plaintiff provides no facts at all to explain how Google "required" advertisers to use AdWords and in fact concedes this was only "usually" an advertiser's choice for DSP.  (*Id.*)  This is simply not enough for such a claim.  *It's My Party*, 811 F.3d at 685.  Plaintiff also alleges that Google "force[d] publishers to sell growing shares of their ad inventory through AdX."  (*Id.* ¶ 201.)  It claims that due to AMP, "publishers can sell inventory only in environments that favor Google and limit the number of exchanges available to bid."  (*Id*. ¶ 210.)  As discussed above, however, the Court has already dismissed similar claims regarding AMP in this case.  (ECF No. 308, at 70-72.)  Plaintiff also argues that Google "punished" it by changing its search algorithm, causing a significant decline in Daily Mail's search traffic. (*Id*. ¶ 213-16.)  But it nowhere explains what it was supposedly "punished" for doing.[3]  Google's broadly applicable updates to its search engine and any concomitant effect on Daily Mail's search traffic do not amount to the level of coercion or conditioning necessary to maintain a claim of harm to competition.  And even if these fatal defects were cured, Daily Mail's allegations do not explain how any search-related "punishment" of the Daily Mail could affect marketwide competition in either display or search advertising.  *See NYNEX Corp. v. Discon, Inc*., 525 U.S. 128, 139 (1998); *Balaklaw v. Lovell*, 14 F.3d 793, 797-98 (2d Cir. 1994).

---

[3] The one purported example given is an allegation that (unnamed) publishers were punished for "declining to enable Enhanced Dynamic Allocation" (DM Compl. ¶ 136), but the complaint nowhere suggests that any such punishment affected their search results.  And, for the Daily Mail itself, the specific allegation is that the Daily Mail *did* enable Enhanced Dynamic Allocation.  (*Id*. ¶¶ 128-29.)

WILSON
SONSINI

November 4, 2022
Page 5

  <u>Other Newspaper Plaintiffs</u>. Newspaper Plaintiffs' monopolization claim should be dismissed for relying almost entirely on allegations of Google "all but requiring" publishers to use AMP and thwarting header bidding (Newsp. Compl. ¶¶ 324-35), a claim that was already held to not plausibly allege an antitrust violation.[4]

  **Acquisitions.**  The Advertiser Plaintiffs' and Publisher Plaintiffs' claims that Google illegally acquired certain rivals (Ads. Compl. ¶ 167; Pubs. Compl. ¶¶ 97-98) should be dismissed because the acquisitions and alleged harm occurred well outside the four-year statute of limitations.  *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 67-69 (2d Cir. 2019)*; Midwestern Mach. Co. v. Northwest Airlines*, 392 F.3d 265, 270-71 (8th Cir. 2004) (finding that the statute of limitations barred a private antitrust action for damages based on acquisition occurring outside the four-year period); *In re Google Digit. Advert. Antitrust Litig.*, No. 20-cv-03556-BLF, 2021 WL 2021990, at *4 (N.D. Cal. May 13, 2021) (finding "the statute of limitations poses a significant problem to Plaintiffs' acquisition-based allegations").  Advertiser Plaintiffs allege that Google acquired multiple companies to achieve its dominance in the relevant markets, beginning as early as 2007 and with the latest acquisition occurring in 2014.  (Ads. Compl. ¶ 171.)  Publisher Plaintiffs allege acquisitions in 2009 and 2011 that "created and/or solidified Google's product offerings throughout all Relevant Markets and Adjacent Relevant Markets."  (Pubs. Compl. ¶¶ 97-98.)  These allegations are all time-barred.  Neither Plaintiff alleges that any purported continuing violations occurred with respect to allegedly anticompetitive acquisitions, and even if they had, the continuing violation doctrine does not apply to challenges to acquisitions.  *See, e.g.*, *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 994 (N.D. Cal. 2020), *aff'd in relevant part*, No. 21-15863, 2022 WL 595696, at *2 (9th Cir. Feb. 28, 2022); *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599 (6th Cir. 2014).  Likewise, neither Plaintiff alleges, nor could they plausibly allege, that they could not easily discover Google's publicly-disclosed acquisitions or that Google somehow fraudulently concealed the nature of such acquisitions.

## II.  <u>Arguments regarding individual Private Plaintiff Complaints</u>

  Below, we explain why the following additional claims in each of the Private Plaintiff Complaints should also be dismissed.   We also explain that the Advertiser Plaintiffs and Organic Panaceas are bound to arbitrate and so the entirety of their claims should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6).

---

[4] In a single paragraph, Newspaper Plaintiffs argue "Google also leveraged its monopoly in online search to require default installation and global dissemination of its Chrome Browser."  (Newsp. Compl. ¶ 336.)  Newspaper Plaintiffs make no allegations as to how Google leveraged its dominance in online search, how that supposed dominance required anyone anywhere to install Chrome, how such leveraging affected any of the relevant markets for display advertising, or how Plaintiffs could possibly be injured as a result.

**WILSON SONSINI**

November 4, 2022
Page 6

| Plaintiff | Claim |
|---|---|
| Putative Advertiser Class | All claims, pursuant to arbitration agreement<br><br>Claims based on alleged conduct in the markets for ad exchanges or buying tools for large advertisers as to Counts I, II, V, VI and VII |
| Organic Panaceas | All claims, pursuant to arbitration agreement and Fed. R. Civ. P. 12(b)(6) |
| SPX Complaints | All claims |
| Putative Publisher Class | Act 15: Google used its market dominant ad server to thwart header bidding by its "Minimum Bid to Win" program (Pubs. Compl. § IV.C.2, ¶¶ 343-52)<br><br>Act 16: Google excludes rival ad exchanges under the guise of policing malicious code (Pubs. Compl. § IV.C.3, ¶¶ 353-56) |
| Newspaper Plaintiffs | Count III: Google has been unjustly enriched<br><br>Unlawful conduct § A.8: Audience fee (Newsp. Compl. ¶ 252)<br><br>Unlawful conduct § A.10: Bypassing of direct ad campaigns on high news days (Newsp. Compl. ¶¶ 264-66) |
| Daily Mail | Count 5: Unlawful deceptive acts or practices in violation of New York General Business Law § 349<br><br>Count 6: Common law fraud |

<u>Putative Advertiser Class</u>

All the named Advertiser Plaintiffs are bound to arbitrate and so their claims should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6).  Each accepted Google's Advertising Program Terms of Service and declined to opt out of arbitration.  Google's advertiser terms of service includes a valid arbitration clause, and Plaintiffs cannot invoke any exception or exclusion for their California-law injunctive-relief claims because they do not seek "public injunctive relief."  *See California Crane School, Inc. v. Google LLC*, No. 21-cv-10001-HSG, 2022 WL 3348425, at *2-5 (N.D. Cal. Aug. 12, 2022) (applying

**WILSON
SONSINI**

November 4, 2022
Page 7

Google's Advertising Program Terms of Service to antitrust complaint by a putative class of AdWords advertisers, and rejecting "public injunctive relief" arguments).[5]

Several of the Advertiser Plaintiffs' claims depend on alleged harm in the markets for buying tools for large advertisers or ad exchanges.  For these claims, the Advertiser Plaintiffs fail to plead sufficient facts to state a plausible antitrust injury.  The named plaintiffs do not even purport to participate in either of these markets.  *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) ("Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury.").  *First*, none alleges that it used buying tools for large advertisers.  Instead, each describes having used only buying tools for *small* advertisers, which Plaintiffs allege are distinct tools used by different advertisers, and a separate relevant market.  Plaintiffs allege that "Google refers to the customers of its ad-buying tool for large advertisers (DV360) as 'large buyers' including agencies and trading desks, as well as the large advertisers who are a 'good fit' for DV360."  (Ads. Compl. ¶ 91.)  No named plaintiff qualifies as such a "large buyer."  *Second*, no named plaintiff alleges that it transacted directly with ad exchanges or that it paid any ad exchange fees.  Plaintiffs allege that "exchanges deal with advertisers by interfacing with and accepting live bids from networks and buying tools on behalf of advertisers (*e.g.*, Google's DV360); advertisers cannot directly bid on an exchange."  (*Id.* ¶ 57.)  Notably, Advertiser Plaintiffs avoid alleging who ultimately pays the fees to the exchanges, and do not claim to have paid supra-competitive exchange fees.  Instead, Plaintiffs vaguely assert that the exchange take-rate is "borne in part by advertisers."  (*Id.* ¶ 310).  This alleged injury is too vague and remote to support antitrust standing for a claim based on reduction in ad-exchange competition.[6]  *See In re Aluminum Warehousing*, 833 F.3d at 159 (citation omitted); *see also Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983).  Advertiser Plaintiffs' newly pled Section 1 claim (and related Cartwright Act claim) focusing on Google's agreements allegedly imposed on *publishers* fails for similar reasons.  (Ads. Compl. Counts V & VI, ¶¶ 380-90, 393-94.)

<u>Organic Panaceas</u>

Like the advertiser named plaintiffs, Organic Panaceas also must arbitrate its claims against Google.  The complaint should therefore be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6).  The complaint also fails on the merits.  Although

---

[5] Two named plaintiffs also lack standing to seek injunctive relief because they ceased using Google products long ago and do not allege they might begin again.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("[P]ast injuries . . . do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983))).

[6] To the extent that Advertiser Plaintiffs mean to allege that publishers incorporate the exchange take rate into the prices they charge advertisers, this allegation would make advertisers indirect purchasers at best, and unable to state a claim for damages under federal antitrust law.  *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 731-32 (1977).

WILSON
SONSINI

November 4, 2022
Page 8

Organic Panaceas borrows liberally from a grab-bag of allegations made in other antitrust cases against Google, the only harm alleged is that Organic Panaceas was unable to advertise on Google's search engine results page because Google suspended Organic Panaceas' AdWords account for policy violations. (OP Compl. ¶¶ 44-45.) Organic Panaceas attempted to advertise cannabidiol products in 2017. (OP Compl. ¶ 48.) This has nothing to do with the only claim in the complaint, which is alleged monopolization of a "market for digital display advertising and its component subparts." (OP Compl. ¶¶ 144-46.)

<u>SPX Complaints</u>

The SPX Complaints each include a single Section 1 count based on the Network Bidding Agreement. (SPX Compl. ¶ 145; Skin. Compl. ¶ 146.) These claims should be dismissed for the reasons provided in Section I, above. The SPX Complaints fail for an additional reason: lack of standing. Unlike all other advertiser plaintiffs, the SPX plaintiffs did not use Google ad buying tools. Instead, they allege that they bought advertisements *on Facebook's owned-and-operated properties*. (SPX Compl. ¶¶ 14, 151; Skin. Compl. ¶¶ 14-15, 152.) The SPX plaintiffs do not explain how they could possibly have been harmed by the Network Bidding Agreement. According to the SPX Complaints, the Network Bidding Agreement concerned the ad network known as Facebook Audience Network (FAN). (SPX Compl. ¶ 93; Skin. Compl. ¶ 94.) FAN facilitates ad placement *on third-party properties, not on Facebook.com*. (Ads. Compl. ¶¶ 118, 152; *see* SPX Compl. ¶ 105.) While the SPX plaintiffs allege that the Network Bidding Agreement's terms were "to the detriment of other auction participants," they do not allege that they participated in any affected auction. (SPX Compl. ¶ 114; Skin. Compl. ¶ 115.) The SPX plaintiffs make no allegation that the Network Bidding Agreement had any effect on the advertising that they purchased from Facebook. Thus, the SPX plaintiffs allege no harm from, or connection to, the Network Bidding Agreement.

<u>Putative Publisher Class</u>

The Publisher Plaintiffs claim that "Google used monopoly power in the Ad Server market to assemble bidding data from advertisers to develop and deploy" its "Minimum Bid to Win" (MBW) program. (Pubs. Compl. ¶ 343.) They allege this program "enabled advertisers bidding through AdX to bid no more than needed to win an impression." (*Id.*) This "informational advantage" allegedly made Google's bidding tools more popular and consequently reduced the volume of header bidding transactions (because Google's bidding tools did not participate in header bidding). (*Id.* ¶ 348.) These allegations, taken as true, describe legitimate competition, not anticompetitive exclusion. Nowhere do Plaintiffs allege that the bidding data used in MBW was inappropriately shared or used by Google; on the contrary, they state MBW "required the cooperation of participating advertisers who supplied their bids knowing that Google would use them to develop the MBW algorithm." (*Id.* ¶ 343.)

WILSON
SONSINI

November 4, 2022
Page 9

Nor do Plaintiffs allege an actionable refusal to deal.  Plaintiffs do not assert that Google has ever shared MBW data with rivals, that Google sacrificed short-term profits by refusing to share MBW data, or that such refusal was against Google's economic self-interest but-for the alleged exclusion.  (*See* ECF No. 308, at 42-44.)  To the contrary, Plaintiffs acknowledge that "Google itself is among the buyers that benefit from the deflationary effect on publisher auction prices" from MBW.  (Pubs. Compl. ¶ 349.)

Even if we assume that the "informational advantage conveyed by [MBW] drove advertisers to use Google's Ad Exchange and Ad Buying Tools" over non-Google exchanges and ad-buying tools (*id.* ¶ 348), that does not constitute foreclosure—it is plainly competition.  Google may share information with its own customers and has no obligation to share it with anyone else.  *Trinko*, 540 U.S. at 408 ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919))).  Google's use of its alleged competitive advantage simply does not equate to anticompetitive conduct.  *See Dreamstime.com v. Google, LLC*, No. C 18-01910 WHA, 2019 WL 341579, at *8 (N.D. Cal. Jan. 28, 2019).  Publisher Plaintiffs' claim fails as a matter of law and should be dismissed.

The Publisher Plaintiffs also claim that Google "excludes rival ad exchanges under the guise of policing malicious code."  (Pubs. Compl. § IV.C.3.)  Plaintiffs are correct that Google's publisher ad server does not accept submissions that contain malware or other undesirable code.  But Plaintiffs cannot claim that protecting user safety is anticompetitive.  *See, e.g., HDC Med. v. Minntech Corp.*, 474 F.3d 543, 550 (8th Cir. 2007) (upholding a design change designed to protect patient safety); *Cont'l Airlines, Inc. v. United Airlines*, 277 F.3d 499, 514 (4th Cir. 2002) (recognizing that safety concerns may be a justification for carry-on baggage restrictions).  Publisher Plaintiffs call this a "false pretext" (Pubs. Compl. ¶ 355), but allege no facts to suggest any falsity and fail to provide even a single example of Google flagging code that was not in fact malicious.  Ensuring the stability and safety of its ad network cannot reasonably be attacked as an antitrust violation.

<u>Newspaper Plaintiffs</u>

Newspaper Plaintiffs' Count III, claiming that Google has been unjustly enriched by their original content, should be dismissed.  (*See* Newsp. Compl. ¶¶ 374-381.)  To prevail on a claim for unjust enrichment in New York, a plaintiff must show "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that 'equity and good conscience' require restitution."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citing *Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983)).  Newspaper Plaintiffs claim that Google "benefits" from their original news content yet does not "pay Plaintiffs for their original content or share with Plaintiffs the profits it generates from Plaintiffs' original content."  (Newsp. Compl. ¶ 376.)  Newspaper Plaintiffs talk about hiring their own journalists, creating their own content, and paying for the

WILSON
SONSINI

November 4, 2022
Page 10

infrastructure to run their own businesses, complaining that despite all of that effort undertaken by the newspaper companies, Google "maintains no responsibility or liability for the accuracy or quality of Plaintiffs' content." (*Id.* ¶ 378.)  Plaintiffs fail as to both the "unjust" and the "enrichment" parts of their claim.  They do not allege any "specific and direct" benefit to Google that stems from their content, nor do they explain how Google's purported benefit from content that Plaintiffs voluntarily placed on the Internet and made available to others, as their businesses see fit, could somehow be unjust.  *Kaye*, 202 F.3d at 616; *see also Michele Pommier Models, Inc. v. Men Women NY Model Management, Inc.*, 14 F. Supp. 2d 331, 338 (S.D.N.Y. 1998) ("A defendant is not unjustly enriched by a plaintiff unless its services were performed for the defendant's benefit.").  Plaintiffs further fail to demonstrate that equity requires restitution, making no allegations that they reasonably expected to be paid by Google for their content.  *See Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 740-41 (S.D.N.Y. 2012) (dismissing unjust enrichment claim where unpaid content providers "entered into their transactions with the [Huffington Post and AOL] with full knowledge of the facts and no expectation of compensation other than exposure").

Newspaper Plaintiffs' claim that Google's ad server "may impose an 'Audience' fee" that is higher when advertisements are placed through a non-Google ad exchange should be dismissed.  (*See* Newsp. Compl. ¶ 252.)  Plaintiffs' allegations are conclusory and fail to amount to anticompetitive conduct.  There is no explanation as to why Google is not entitled to some remuneration when its services are used but rival ad exchanges get the revenue.  Nor do Plaintiffs explain why such "additional costs on rivals" are "unnecessary" or how such costs harm competition in any market.  Absent predatory pricing (which Plaintiffs do not allege), Google may charge for use of its own technology as it sees fit.  *See Pac. Bell Tele. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

Newspaper Plaintiffs' claim regarding "overdelivery of AdX ads" should also be dismissed.  Newspaper Plaintiffs allege that on "high traffic news days," Google's ad server "overdeliver[s] lower CPM ads from AdX in place of directly sold high CPM ads," such that "high news days saw impressions worth significantly more to publishers get bypassed in favor of cheaper AdX ads for which Google would take a cut."  (Newsp. Compl. ¶¶ 265-66.)  Plaintiffs do not explain how filling high-news-day impressions through AdX rather than with direct sales impacted competition in any alleged relevant market.  Indeed, Plaintiffs allege that direct sales are "distinct" from, and do not compete with, exchanges.  (*Id.* ¶ 186).  Nor do Plaintiffs allege any harm from this practice (let alone harm resulting from a reduction in competition).  High news days provide "more ad space for newspaper publishers to fill" (*id.* ¶ 265) than on other days, so it is reasonable to infer that the relative pacing of direct versus indirect ad sales might vary on high news days versus other days.  And Newspaper Plaintiffs do not allege that any higher-CPM direct ads ultimately went unsold as a result of "underdelivery" on some unidentified fraction of days, nor do they complain that any direct sales contractual commitments were not fulfilled.  Finally, Plaintiffs make no claims of fraud or deceptive

WILSON
SONSINI

November 4, 2022
Page 11

practices and no allegation that publishers are prevented from bypassing AdX and shutting off indirect sales altogether.

<u>Daily Mail</u>

Counts 5 and 6 of the Daily Mail's amended complaint should be dismissed.  In Count 5, Daily Mail alleges that Google knowingly engaged in deceptive practices in violation of New York General Business Law Section 349 ("Section 349").  To prove deception under Section 349, a plaintiff must show: (1) "that the challenged act or practice was consumer-oriented"; (2), "that it was misleading in a material way"; and (3) "that the plaintiff suffered injury as a result of the deceptive act." *Tomasino v. Estee Lauder Cos*., 44 F. Supp. 3d 251, 257 (E.D.N.Y. 2014) (quoting *Stutman v. Chem. Bank*, 95 N.Y.2d 24 (N.Y. 2000)).  Daily Mail makes claims like, Google represented that its publisher ad server "maximizes the yield" for publishers' inventory while other, different, implementations might have resulted in higher prices to publishers.  (*See* DM Compl. ¶¶ 41, 145.)  Such statements are not objectively or "materially" misleading, and are not "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Estee Lauder*, 44 F. Supp. 3d at 257; *Segovia v. Vitamin Shoppe, Inc.*, 14-CV-7061 (NSR), 2017 U.S. Dist. LEXIS 204828, at *8-9 (S.D.N.Y. Dec. 12, 2017) (explaining courts look not to whether the individual plaintiff relied on the disputed statement, but rather whether the conduct was likely to deceive a reasonable consumer).  If anything, Google's alleged statements amounted to mere puffery, which is not actionable under Section 349.  *MacNaughten v. Young Living Essential Oils, LC*, 575 F. Supp. 3d 315, 326 (N.D.N.Y. 2021).

Daily Mail's common law fraud claim (Count 6), based upon Google's representations to Daily Mail regarding DFP, should also be dismissed.  A plaintiff alleging common law fraud in New York must prove "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC (Loreley I)*, 797 F.3d 160, 170 (2d Cir. 2015).  "[C]ommon law fraud claims are subject to the particularity requirements of Rule 9(b)." *Filler v. Hanvit Bank*,  156 Fed. Appx. 413, 416 (2d. Cir. 2005).  Daily Mail does nothing more than make cursory statements about Google's allegedly false representations, falling well below the heightened pleading standards required under Rule 9(b).

*     *     *

For all of these reasons, Google respectfully requests authorization to file six motions to dismiss, one for each of the Private Plaintiff Complaints.  If the Court grants leave for the motions, Google proposes that it be allowed to file its motions within 90 days of the Court's order, that Private Plaintiffs respond 90 days later, and that Google reply 45 days after that.  Google requests this timeline in light of the breadth of the six sets of pleadings, in total comprising 1954 paragraphs (with Private Plaintiffs collectively adding over 650 paragraphs in their recently amended complaints) and spanning 523 pages.  With the exception of the SPX

**WILSON
SONSINI**

November 4, 2022
Page 12


Complaints and Organic Panaceas, Google also respectfully requests a limit of 40 pages for each of its moving briefs, 40 pages for each of the responses by the Putative Advertiser Class, Putative Publisher Class, Newspaper Plaintiffs and Daily Mail, and 20 pages for each of Google's replies.  For the SPX Complaints and Organic Panaceas, Google requests the page limits set forth in Your Honor's Individual Practices.


Respectfully submitted,


*/s/ Justina K. Sessions*
Justina K. Sessions
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2197
Email: jsessions@wsgr.com

Eric Mahr
FRESHFIELDS BRUCKHAUS DERINGER
     US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4545
Email: eric.mahr@freshfields.com

*Counsel for Defendants Google LLC, Alphabet
     Inc., and YouTube LLC*


cc:  All Counsel of Record (via ECF)