# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re Google Advertising Antitrust Litigation* | Civil Action No. 21-MD-3010 (PKC) |

## ADVERTISER CLASS PLAINTIFFS' REPLY TO
## <u>META PLATFORMS, INC.'S OPPOSITION TO MOTION TO AMEND</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................................... 1

II.     ARGUMENT ................................................................................................................. 2

     A.      The Advertiser Class Plaintiffs' Section 1 Claim Is Distinct. ............................... 2

         1.      The TAC Does Not Allege Harm to Competition in Google's
             Final Clearinghouse Auctions. ...................................................................... 2

         2.      The TAC Does Not Allege Anticompetitive Harm to the
             Competitive Auction Process. ....................................................................... 3

     B.      The Advertiser Class Plaintiffs Plausibly Allege a Section 1 Violation. ................ 6

         1.      The Relevant Market Is Google's Final Auction. ....................................... 6

         2.      Market Power Is Not a Necessary Element of a Section 1 Claim. ............ 7

         3.      The Anticompetitive Effect of Asymmetric Information in
             Auction Markets Has Been Empirically Confirmed in the Field of
             Economics. .................................................................................................... 8

     C.      The Advertiser Class Plaintiffs Have Article III Standing. ................................. 10

III.    CONCLUSION ............................................................................................................. 10

# TABLE OF AUTHORITIES

**Page**

**Cases**

*(Chicago) Board of Trade v. United States*,
  246 U.S. 231 (1917)...........................................................................................6

*Adams v. Watson*,
  10 F.3d 915 (1st Cir. 1993)..........................................................................9, 10

*Bale v. Glasgow Tobacco Board of Trade, Inc.*,
  339 F.2d 281 (6th Cir. 1964) ...........................................................................6

*Bowling Transp., Inc. v. Gregg*,
  103 Ohio App. 3d 539 (1995) ...........................................................................9

*California Dental Ass'n v. FTC*,
  526 U.S. 756 (1999)...........................................................................................7

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984)...........................................................................................9

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
  637 F.3d 435 (4th Cir. 2011) ............................................................................7

*FTC v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986)...................................................................................7, 8, 9

*FTC v. Superior Court Trial Lawyers Ass'n*,
  493 U.S. 411 (1990)...........................................................................................6

*In re Aluminum Warehousing Antitrust Litig.*,
  2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014)...................................................7

*In re Tether & Bitfinex Crypto Asset Litig.*,
  576 F. Supp. 3d 55 (S.D.N.Y. 2021) ................................................................6

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014).........................................................................................10

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).........................................................................................10

*New York v. Mnuchin*,
  408 F. Supp. 3d 399 (S.D.N.Y. 2019) ..............................................................8

*Osborn v. Visa*,
  797 F.3d 1057 (D.C. Cir. 2015).........................................................................9

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) .........................................................................7, 8

*Toys "R" Us, Inc. v. F.T.C.*,
  221 F.3d 928 (7th Cir. 2000) ............................................................................8

*United Transportation Union v. ICC,*
   891 F.2d 908 (D.C. Cir. 1989) ................................................................................ 8

**Other Authorities**

Bork, *The Antitrust Paradox* (1978) ....................................................................... 6

Milgrom, P. R. and Weber, R. J., *A Theory of Auctions and Competitive Bidding.*
   50 ECONOMETRICA (5) (1982) ............................................................................... 9

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 3

Fed. R. Civ. P. 8 ...................................................................................................... 6

## I.     INTRODUCTION

Neither of Meta's two challenges to Counts III and IV of the proposed Consolidated Advertiser Class Action Complaint, Doc. 317-1 ("CAC"), survives scrutiny. Meta first contends that the CAC merely realleges the "back-up" theory pleaded in the States' Third Amended Complaint ("TAC") which the Court dismissed in its September 13, 2022 Opinion and Order, Doc. 308 ("Order"). That is incorrect. To the extent the TAC alleged a discrete Section 1 claim apart from its theory that Google and Meta conspired to "kill" header bidding, such a claim was premised upon purported collusion between Meta and Google as bidders. *See* Order at 32. The Advertiser Class Plaintiffs allege that through the Network Bidding Agreement ("NBA"), Google, as auctioneer (and thus sponsor of the relevant market), agreed to provide special advantages to Meta that improved Meta's competitive bidding position vis-à-vis all other bidders. Significantly, the Advertiser Class Plaintiffs allege that the NBA injured non-Meta advertisers "by forcing them to place supra-competitive bids to win auctions against Meta's advertising customers for open display web and in-app inventory." CAC ¶ 370. This claim was not asserted in the States' TAC or adjudicated by the Court.

Meta also contests the CAC's allegations regarding the relevant market, the anticompetitive effects of the NBA's restraints, and Advertiser Class Plaintiffs' Article III standing. But Plaintiffs plausibly define a product market consisting of the market for digital ad impressions sold in Google's final clearinghouse auctions—the market specified in the NBA itself. Meta reads Section 1 jurisprudence too narrowly while spinning this Court's Opinion as a "seal of approval" for the NBA in any and all circumstances, regardless of the nature of any allegations concerning it. For the reasons explained below and in the Memorandum supporting their Motion, Plaintiffs' CAC plausibly alleges the elements of a Section 1 violation that harms advertisers and competition in Google's final clearinghouse auctions. Leave to amend should be allowed.

## II.     ARGUMENT

### A.     The Advertiser Class Plaintiffs' Section 1 Claim Is Distinct.

Meta concedes that "the Advertisers do not propose to repeat the States' failed theory that the NBA was somehow tied to an effort to 'kill' header bidding." Doc. 355, at 2 ("Opp."). Meta instead wrongly deems Counts III and IV "indistinguishable from the States' back-up claim—also rejected by the court—that particular terms of the NBA gave Meta an unlawful advantage." *Id*. But the Court assessed the States' claims "in the context of the entirety of the [TAC]'s allegations[.]" Order at 28. The TAC, unlike the CAC, does *not* include a claim that the NBA injured non-Meta advertisers "by forcing them to place supra-competitive bids to win auctions against Meta's advertising customers." CAC ¶ 370.

Meta's argument does not come to terms with two obvious and significant distinctions between the two pleadings. *First*, the markets in which competition is alleged to be harmed by the NBA are different. *Second*, the nature of the competitive harm alleged by the Advertisers is unique to auction markets, in which unreasonable rules or conditions that impair competitive bidding have long been condemned.

### 1.     The TAC Does Not Allege Harm to Competition in Google's Final Clearinghouse Auctions.

None of the six markets analyzed by the Court included Google's own auction markets. Order at 5. And the only market that the States alleged experienced anticompetitive effects due to the NBA was the "in-app network" market. *Id*. at 32.

The States alleged, first and foremost, that Google entered the NBA "in return for Facebook backing off from header bidding." TAC § VII.E.1; Order at 20. The States also alleged that "Google and Facebook have not only given themselves special advantages unavailable to other buyers, but also have agreed to limit their competitive bidding as *between* each other" in auctions "on behalf of developers to sell their in-app inventory." TAC ¶ 437 (emphasis added). Google and Meta therefore

2

gained "the power to exclude rival networks and raise the prices at which [they] resold in-app impressions to advertisers." *Id.* ¶ 445. The Court quoted TAC paragraph 519, in which the States described the harm they alleged resulted from the lack of competition among in-app networks fostered by the NBA: "Google's foreclosure of competition in the in-app network market has permitted its in-app networks to pay less for developers' impressions and resell those impressions to advertisers at higher prices." Order at 33. The alleged "overall effect," the Court observed, was to "depress prices paid to developers." *Id.*

Whatever the merits of this secondary theory, it cannot fairly be read to encompass the same Section 1 cause of action stated in the CAC, which alleges that the "NBA places advertisers who bid in Google's Final Clearinghouse Auctions, but who do not bid through Meta's MAN intermediary, at a competitive disadvantage and renders them worse off than they would be in the absence of the NBA." CAC ¶ 369. As a result, the NBA causes prices paid by non-Meta advertisers in Google's auctions to increase above the levels that would have obtained in the but-for world where auctioneer and bidder did not enter this agreement. *Id.* ¶ 370. The Advertisers do *not* allege that the NBA foreclosed competition among in-app networks, or that it lowered prices paid to app developers, as the States alleged. Meta is wrong when it claims that the Court, in evaluating the States' allegations regarding foreclosure of competition in the market for in-app networks, somehow concluded that the NBA was "procompetitive" *within* Google's Final Clearinghouse Auctions. Opp. at 10.

### 2. The TAC Does Not Allege Anticompetitive Harm to the Competitive Auction Process.

Meta over-reads the Court's ruling rejecting the States' Section 1 theory as a plenary analysis considering and rejecting all possible anticompetitive consequences of the NBA, including its effect on non-Meta bidders in Google's final auctions. But in analyzing the States' allegations the Court in no way concluded that the NBA is procompetitive in every respect, with regard to all

parties, and based on all possible antitrust theories. The Court only ever referred to the NBA as "procompetitive" (Opp. at 10) in construing the States' allegations that the NBA was part of Google's effort to "kill header bidding." Order at 21-22. In that context, the Court viewed the NBA as reflecting Google's "desire to obtain as much business as possible from Facebook" but not as supporting an "inference of conspiracy" as to header bidding. *Id.* at 22.

As to the States' allegations concerning rival in-app networks, the Court noted that "[t]he NBA's favorable terms to Facebook are most naturally understood as an inducement" to participate in auctions conducted through Google's mediation tool. Order at 28. "Google, the auctioneer, provided pricing and other incentives to Facebook, the in-app network, to participate in the auctions that Google offered on behalf of developers." *Id*. In the context of the States' allegations, the Court understood Google's involvement with the NBA as "consistent with a firm seeking to secure the business of a very large potential customer by offering it favorable terms." *Id.* at 25.

Characterizing the NBA as an inducement to Meta to participate in Google's auctions in return for a "discount" factored into the Court's assessment of the States' theory of competitive harm, but this comparison does not address the NBA's alteration of competitive conditions for all *other* advertisers bidding in Google's auctions. Advertisers adequately allege the NBA was a secret set of auction rules, devised by Google and Meta in concert, designed to bake Meta's competitive success into the auction market relative to other bidders.

The NBA differs economically from a supplier's discount in several important respects. *First*, the economic benefit of a legitimate discount can be replicated by a lump-sum payment at the end of the period. For the right amount, a supplier will be indifferent between offering the discount or paying the equivalent lump-sum to the customer. In contrast, the NBA's benefits cannot simply be paid to Meta by Google. Plaintiffs are not aware of any evidence that the auctioneers' fee that Google charges Meta is discounted or different in nature from the fee Google charges other bidders.

But the NBA provides a set of procedures and information-sharing agreements between Google, as auctioneer, and Meta, as one of several bidders, to provide Meta with unique bidding advantages not provided to other bidders. There is no lump sum Google can pay to replicate the NBA's benefits to Meta, because the economic value of the NBA to Meta is absorbed by Meta's rival bidders, not by Google. Unlike a legitimate discount, it costs Google nothing to "tilt" its final clearinghouse auctions in Meta's favor.

*Second*, the NBA's value depends on withholding the same information and bidding advantages from Meta's rival bidders. Meta argues the NBA does not rule out giving such competitors the same favorable terms (Opp. at 20), but it is common sense that if Google were to offer the same or similar advantages to other bidders, the value of those advantages to Meta would decrease. For each additional bidder similarly advantaged, the value of Meta's advantage declines, and so on, until every bidder gets the same advantages, at which point bidders would be on a level playing field and the NBA would be worthless to Meta. A legitimate discount does not hinge on the supplier *withholding* the same discount from the recipient's rivals.

*Third*, unlike a legitimate discount, the NBA does not result in equal competitive opportunities for equally efficient competitors. Being the most efficient bidder is not enough to optimize ad placements in Google's final auctions—doing so also requires favoritism by the auctioneer. The NBA thus creates anticompetitive market conditions because it impairs the relative opportunities of equally efficient competitors.

Because the States' TAC does not articulate how the NBA affects the competitive conditions within Google's final auctions, consideration of these economic effects was not at issue in the Court's analysis concerning the States' claims. But these effects *are* relevant to the mechanism of competitive harm giving rise to Counts III and IV of the CAC.[1]

---

[1] These effects also plausibly explain why no fewer than 17 paragraphs of the NBA (¶¶ 1.7, 1.19, 1.37, 1.38, 7.1(a)-(e), 7.2, 7.3, 7.4, 18.4(a)-(e)) concern regulatory intervention or antitrust scrutiny of the contracting parties' agreement—terms seldom if ever found in discount agreements between suppliers and their customers.

5

**B.     The Advertiser Class Plaintiffs Plausibly Allege a Section 1 Violation.**

Meta argues that the facts alleged in the CAC do not plausibly establish a relevant market, Google's market power, or "actual" adverse effects (which Meta interprets as some empirical showing of price increases). Meta is incorrect in all respects.

**1.     The Relevant Market Is Google's Final Auction.**

Advertiser Class Plaintiffs allege that the NBA unreasonably restrains trade in "the market for open display and in-app ad inventory traded in Google's Final Clearinghouse Auctions, in which Meta competes with other demand-side intermediaries for publishers' and developers' inventory." CAC ¶ 294. Meta's argument incorrectly presumes that Rule 8 requires a more detailed economic analysis of the substitutability of open display and in-app ad impressions and of Google-run auctions and auctions run by others. Opp. at 15. However, because the NBA *itself* specifies the final clearinghouse auction market in which its provisions operate, the NBA presents a situation where "the fact of agreement defines the market." Bork, *The Antitrust Paradox* 269 (1978) (quoted in, *e.g.*, *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 435 n.18 (1990)).[2] Moreover, the elasticity of substitution between open display and in-app ad impressions would make no difference to how the NBA-restrained market is defined. Auctions are run individually for each impression, whether it is a display or an in-app advertisement.

Nor is the substitutability between auctions run by Google and its rivals relevant. A participant in a Google auction is no longer shopping for an auction venue, but, having made its choice, is in the market for the ad impression itself. A bid placed in a Google auction is a commitment to transact in that market if the bid is successful, to the exclusion of transacting

---

[2] Notably, in the "auction rule" cases cited by Plaintiffs, none of the auction markets subject to antitrust analysis was defined more extensively than simply being "named" as the relevant market in which competition was allegedly impaired. *See (Chicago) Board of Trade v. United States*, 246 U.S. 231 (1917) (commodities exchange); *Bale v. Glasgow Tobacco Board of Trade, Inc.*, 339 F.2d 281 (6th Cir. 1964) (tobacco auction market); *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55 (S.D.N.Y. 2021) (Bittrex and Poloniex crypto-asset exchanges).

elsewhere. It makes no sense to inquire into the substitutability of auction markets run by different auctioneers if the harm occurs in the auctions run by Google.

Meta also demands a far more detailed market analysis than is necessary. The Supreme Court has held that formal market definition is not a requirement for a Section 1 claim under the rule of reason. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986). The Court further held that "there is generally no categorical line to be drawn between restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment. What is required, rather, is an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint." *California Dental Ass'n v. FTC*, 526 U.S. 756, 780-81 (1999). In addition, "[b]ecause market definition is a deeply fact intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001).[3] The alleged restraint here points to an "intuitively obvious" market definition and anticompetitive effect, and the CAC's allegations defining this market are well tailored "for the case." *California Dental Ass'n*, 526 U.S. at 781.

## 2. Market Power Is Not a Necessary Element of a Section 1 Claim.

While market power is central to Section 2 monopolization cases, it is not a necessary showing under Section 1 if the plaintiff can demonstrate actual adverse effects on competition. *Todd*, 275 F.3d at 206. Unlike Section 2 cases, which focus on the acquisition of market power by individual firms through means other than competition on the merits, the crux of a Section 1 case is the effect of firms combining to act in concert. And because the exercise of market power

---

[3] As such, dismissals based on market definition are "relatively rare and . . . generally limited to certain types of glaring deficiencies, such as failing to allege a relevant market." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011) (internal quotation marks and citation omitted). Meta's citation to *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *37 (S.D.N.Y. Aug. 29, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016) is inapt. Rather than alleging "a plausible market in which defendants restrained trade," plaintiffs in that case "alleged numerous potential 'relevant markets.' However, there [we]re no allegations supporting who the players are in such markets or how defendants' conduct caused unreasonable restraints of trade in those specific markets." *Id.* at *32. Here, Advertiser Class Plaintiffs have alleged not only a plausible market but also how the "NBA places advertisers who bid in Google's Final Clearinghouse Auctions, but who do not bid through Meta's MAN intermediary, at a competitive disadvantage and renders them worse off . . . ." CAC ¶¶ 369, 376.

in Section 1 cases often stems from the *joint* conduct of market actors, a showing that an individual firm possesses market power is unnecessary where the anticompetitive effect of the concerted conduct is established. "Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" *Indiana Fed'n of Dentists*, 476 U.S. at 460-61 (citation omitted); *see also Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000) (concluding upon "sufficient proof of actual anticompetitive effects that no more elaborate market analysis was necessary"). Moreover, "[t]he use of anticompetitive effects to demonstrate market power . . . is not limited to 'quick look' or 'truncated' rule of reason cases." *Todd*, 275 F.3d at 206.

### 3. The Anticompetitive Effect of Asymmetric Information in Auction Markets Has Been Empirically Confirmed in the Field of Economics.

Meta demands too much at the pleading stage when it complains that Advertisers' allegations of anticompetitive effects are "conclusory" and bereft of "examples, data or other facts to support their assertion that Meta's rivals must place inflated bids to win Google-run auctions after the NBA." Opp. at 17. It is enough that the CAC's allegations of anticompetitive harm track basic laws of economics. *See United Transportation Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989); *New York v. Mnuchin*, 408 F. Supp. 3d 399, 410 (S.D.N.Y. 2019) (crediting allegations based on "basic economic logic").

It is a well-established principle of auction economics that bidders forced to bid against a competing bidder who possesses superior, private information will need to bid higher to win than would otherwise be necessary against a competing bidder without such superior information. A classic citation for this principle is the research by Professors Milgrom and Weber cited in

8

Plaintiffs' supporting memorandum, which Meta failed to address.[4] The competitive harm to Google's final clearinghouse auction market caused by Meta's superior end-user matching information and additional time to bid is firmly rooted in economic theory, and such allegations of economic harm "based on standard principles" are "routinely credited by courts in a variety of contexts." *Osborn v. Visa*, 797 F.3d 1057, 1065 (D.C. Cir. 2015) (quoting *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993)).

Further, by insisting at this stage of the litigation on "examples and data" showing that the NBA caused non-Meta bidders to bid higher to win impressions, Meta would require *proof* of harm to competition now, before discovery, even though all that is required is the plausible allegation that such harm occurred. Meta suggests that evidence of such harm, had it occurred, would exist somewhere among the two million documents that Google re-produced in the MDL. Opp. at 17. But there is nothing to suggest that Google (or Meta) produced or will produce the evidence that ultimately may be used to prove the anticompetitive effects of the NBA on Google's final auctions. Transactional data and expert evidence must fulfill that role.[5]

"Concerted activity inherently is fraught with anticompetitive risk," *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984), and "an auctioneer must conduct a sale openly and fairly, so as to provide 'full and free competition among all prospective bidders.'" *Bowling Transp., Inc. v. Gregg*, 103 Ohio App. 3d 539, 544 (1995) (citation omitted). In this case, the companies operate "[i]n a novel marketplace with rapidly changing technology that can alter the nature of relationships between market participants[.]" Order at 29. Under these circumstances the Court should be reluctant to adjudge, without a developed record, the lawfulness of concerted

---

[4] *E.g.*, Milgrom, P. R. and Weber, R. J., *A Theory of Auctions and Competitive Bidding*. 50 ECONOMETRICA (5), 1089 (1982). Even without reference to basic auction economics, agreements such as the NBA that regulate the flow of information to market participants are facially suspect. *See Indiana Federation of Dentists*, 476 U.S. at 461-62.

[5] For example, one possible method of proof that Plaintiffs could pursue after discovery is a "before-and-after" comparison of clearing prices before the NBA took effect and after. Such an analysis would require a reliable and complete transactional database of final auction clearing prices and other data over the relevant time periods. Empirical evidence of the anticompetitive effects of the NBA on Google's auctions, *i.e.*, the transactional data required to confirm Plaintiffs' economic theory at trial, is not found in the two million Google documents.

conduct by two powerful firms that agreed to regulate the flow of material information to agents competing on behalf of advertisers and the procedural rules (such as time to bid) applied to them.

### C.    The Advertiser Class Plaintiffs Have Article III Standing.

Finally, there is no merit to Meta's claim that only advertisers "who purchased impressions through a Google auction using a demand network *other than* Google or Meta" could suffer "an injury in fact." Opp. at 22. To the contrary, Meta's timing and informational advantages in bidding disadvantaged and harmed all advertisers—including the Advertiser Class Plaintiffs—"who do not bid through Meta's MAN intermediary." CAC ¶¶ 369, 376.

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Article III standing may be supported by "allegations of 'imminent' injury-in-fact based on the laws of economics," *Adams*, 10 F.3d at 922-23, and requires "only that the plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014).

It is altogether plausible that competitive conditions in the final auctions run by Google would be altered by the NBA, which vests Meta with information and time-to-bid advantages not provided to other bidders in these auctions. The appropriate inquiry into the Advertisers' injuries is whether they paid more for impressions through Google's auctions than they would have in the absence of the NBA. This holds true for advertiser-customers of Google just as much as it holds true for any other bidding agent. Although Meta may resist the notion of Google disadvantaging its own customers, that is the nature of the NBA, the value of which, as discussed above, derives from non-Meta bidders being *dis*advantaged as a result of Meta's advantages.

The CAC plausibly alleges injury in fact fairly traceable to the NBA.

### III.    CONCLUSION

Advertiser Class Plaintiffs thus respectfully request that the Court grant leave to amend.

10

Dated: November 9, 2022                    Respectfully submitted,

                                            /s/ *Dena C. Sharp*
                                            Dena C. Sharp (*pro hac vice*)
                                            Jordan Elias (*pro hac vice*)
                                            Scott M. Grzenczyk (*pro hac vice*)
                                            **GIRARD SHARP LLP**
                                            601 California Street, Suite 1400
                                            San Francisco, CA 94108
                                            Tel: (415) 981-4800
                                            Fax: (415) 981-4846
                                            dsharp@girardsharp.com
                                            jelias@girardsharp.com
                                            scottg@girardsharp.com

                                            Tina Wolfson (TW-1016)
                                            Theodore W. Maya (*pro hac vice*)
                                            Bradley K. King (BK-1971)
                                            **AHDOOT & WOLFSON, PC**
                                            2600 West Olive Ave., Suite 500
                                            Burbank, California 91505
                                            Tel.: (310) 474-9111
                                            Fax: (310) 474-8585
                                            twolfson@ahdootwolfson.com
                                            tmaya@ahdootwolfson.com
                                            bking@ahdootwolfson.com

                                            *Interim Co-Lead Counsel for Advertiser
                                             Plaintiffs and the Proposed Advertiser Class*

                                            Jonathan L. Rubin (*pro hac vice*)
                                            **MOGINRUBIN LLP**
                                            1615 M Street, NW, Third Floor Washington,
                                            D.C. 20036
                                            (202) 630-0616
                                            jrubin@moginrubin.com

                                            Daniel J. Mogin (*pro hac vice*)
                                            Jennifer M. Oliver (*pro hac vice*)
                                            Timothy Z. LaComb (*pro hac vice*)
                                            **MOGINRUBIN LLP**
                                            600 West Broadway, Suite 3300
                                            San Diego, CA 92101
                                            (619) 687-6611

dmogin@moginrubin.com
joliver@moginrubin.com
tlacomb@moginrubin.com

*Counsel for Plaintiffs Cliffy Care, Kinin,*
*Rodrock, and Raintree*

Archana Tamoshunas (AT-3935)
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, NY 10038
Tel.: (212) 931-0704
Fax: (212) 931-0703
atamoshunas@tcllaw.com

April D. Lambert (*pro hac vice*)
John D. Radice (JR 9033)
**RADICE LAW FIRM, PC**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
alambert@radicelawfirm.com
jradice@radicelawfirm.com

*Counsel for Plaintiff Hanson Law Office, as*
*successor in-interest to Hanson Law Firm, PC*

Richard F. Lombardo (*pro hac vice*)
Peter F. Rottgers (*pro hac vice*)
**SHAFFER LOMBARDO SHURIN**
2001 Wyandotte Street
Kansas City, MO 64108
(816) 931-0500
rlombardo@sls-law.com
prottgers@sls-law.com

*Counsel for Plaintiffs Cliffy Care, Rodrock,*
*and Raintree*

Jason S. Hartley (*pro hac vice* forthcoming)
Jason M. Lindner (*pro hac vice* forthcoming)
**HARTLEY LLP**
101 W. Broadway, Ste 820
San Diego, CA 92101
(619) 400-5822
hartley@hartleyllp.com

12

lindner@hartleyllp.com

*Counsel for Plaintiff Kinin*