

November 10, 2022

<u>VIA ECF</u>
The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

*In re Google Digital Advertising Litigation*, **1:21-md-03010 (PKC);**
*This document relates to: In re Google Digital Publisher Antitrust Litigation*,
**1:21-cv-7034 (PKC)**

Dear Judge Castel:

    The "Publisher Class Plaintiffs"[1] respectfully submit this letter response to Google's letter of November 4, 2022, No. 1:21-md-3010, ECF 367 (the "Letter"), seeking leave to file a motion to dismiss the Publisher Class Plaintiffs' First Amended Consolidated Class Action Complaint (the "Amended Complaint" or "AC"), No. 1:21-md-3010, ECF 322-1. We note that there is no conference scheduled at this time.

    Google did not oppose the Publisher Class Plaintiffs' Motion for Leave to Amend Their Consolidated Class Action Complaint. *See* Letter, No. 1:21-md-3010, ECF 354 (Oct. 26, 2022). The Court has not yet granted that Motion. Google's Letter treats the proposed Amended Complaint as the operative complaint toward which its proposed Motion to Dismiss is targeted. Publisher Class Plaintiffs respond here treating the Amended Complaint the same way. Pursuant to Your Honor's Individual Practices, Publisher Class Plaintiffs state that they do not propose further to amend the Amended Complaint based on the arguments raised in Google's Letter. We note that pursuant to Your Honor's Individual Practices 3.A.ii & iv, a pre-motion letter "shall set forth in detail the legal and factual basis for the anticipated motion" so that it and the response may be "taken into account in deciding whether further leave to amend will be granted in the event the motion to dismiss is granted." Indiv. Pract. 3(A)(iv). Publisher Class Plaintiffs therefore reserve the right to seek leave to amend their Amended Complaint if arguments are raised in any permitted motion that differ materially from those contained in the Letter.

    The Amended Complaint sets forth four counts: (1) Unlawful Tying in Violation of Sections 1 and 2 of the Sherman Act; (2) Multiple Acts of Monopolization in Violation of Section 2 of the Sherman Act; (3) Multiple Acts in Violation of California's Unfair Competition law; and (4) Multiple Acts in Violation of California's Cartwright Act. *See* AC at pp.125-29. These four counts are, together, based on allegations of sixteen enumerated courses of conduct or

---

    [1] Publisher Class Plaintiffs are Genius Media Group (k/n/a MediaLab AI, Inc.), Sterling International Consulting Group, The Nation Company, L.P., The Progressive, Inc., JLaSalle Enterprises LLC, and Mikula Web Solutions, Inc., individually and as proposed class representatives in *In re Google Digital Publisher Litigation*, No. 1:21-cv-7034 (PKC) (S.D.N.Y.).

"Acts" that together form what Publisher Class Plaintiffs allege comprise Google's "Exclusionary Scheme." *See, e.g.*, AC ¶195 & Tables 1-3. The sixteen Acts consist of: (1) four illegal ties, including one that the Court explicitly upheld in its Order denying Google's Motion to Dismiss the State Attorneys General's Third Amended Complaint ("State MTD Order," No. 1:21-md-3010, ECF 308), *see* AC at Table 1; (2) nine Acts that the Court ruled were each individually sufficient to state an antitrust violation in the State MTD Order, *see* AC at Table 2; and (3) three additional Acts that the Court did not consider or otherwise rule on in the State MTD Order, *see* AC at Table 3. Google seeks leave to move to dismiss only these three additional Acts.[2]

Publisher Class Plaintiffs' structure their claims as follows. Google engaged in two sets of two-way ties (Acts 1-4), tying its Ad Servers to its Ad Exchange and Ad Network, respectively, and *vice versa*. AC ¶¶196-247. Publisher Class Plaintiffs allege that these four tying Acts (alone and as enhanced by other Acts) violate Sections 1 and 2 of the Sherman Act. AC ¶¶392-401. Google does not assert that Publisher Class Plaintiffs fail to state a claim as to any of these tying claims.[3] The Amended Complaint also alleges that Google engaged in a series of other Acts—twelve in total—each individually actionable but each also with synergistic anticompetitive effects as between each other and with the two-way ties. AC ¶¶248-356. These sixteen Acts (the four ties plus the twelve other Acts) form Google's Exclusionary Scheme. The Court has already found that no fewer than ten of the sixteen Acts that make up Publisher Class Plaintiffs' alleged Exclusionary Scheme are sufficiently alleged to be antitrust violations standing alone (Act 1 and Acts 5-13), and Google does not challenge whether the three other Acts of tying (Acts 2-4)—totaling thirteen Acts in the Amended Complaint that are not challenged—are sufficiently alleged to be antitrust violations standing alone. Thus, the principal question Google proposes to raise by a Rule 12(b)(6) motion is whether three out of the sixteen Acts (Acts 14-16) alleged by Publisher Class Plaintiffs are properly alleged as stand-alone antitrust violations *and* that they may be included in Google's alleged Exclusionary Scheme.

---

[2] Google urges dismissal of Publisher Class Plaintiffs' "claims that Google illegally acquired certain rivals (Ads. Compl. ¶ 167; Pubs. Compl. ¶¶ 97-98)." Letter at 5. Publisher Class Plaintiffs make no such "claims" and do not seek any relief associated with the allegations concerning Google's acquisitions, but instead provide information about those acquisitions as background and context relating to the anticompetitive conduct and scheme alleged in the Amended Complaint. There is nothing about these contextual allegations to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

[3] Google does challenge whether Publisher Class Plaintiffs' allegation that Google's encryption or "hashing" of User IDs states a claim. But nowhere does Google suggest that, even if the "hashing" allegations were stricken from the Complaint, the Publisher Class Plaintiffs would fail to state a claim in Count I (Tying), much less Count II (Monopolization). Nor could it, given that Google's hashing-related conduct is alleged as one monopoly power-fueled coercive tactic among many, not as a fact that alone gives rise to a stand-alone claim. Indeed, there are many more allegations of conduct in support of the Publisher Class Plaintiffs' tying and monopolization claims that the Court already upheld in its State MTD Order, and which Google does not challenge, rendering a motion to dismiss against those claims moot.

At the pleading stage, Google cannot overcome its burden of showing that these Acts should be stricken from the case for three primary reasons.

First, Google does not challenge whether the Amended Complaint states a claim for relief on any of the four Counts, and thus each Count would survive *even if, arguendo, Google's proposed Motion were granted in full*.  Because Google attacks *allegations* of specific conduct and not the *claims* Publisher Class Plaintiffs assert, a Rule 12(b)(6) motion would be inappropriate.  *See, e.g., Agerbrink v. Model Service LLC,* 2015 WL 3750674, at *6 (S.D.N.Y. June 16, 2015) (comparing Fed. R. Civ. P. 12(b)(6) and 12(f) and concluding that the "proper manner to" dismiss particular factual allegations, rather than legal claims "would be to move to strike these allegations under Rule 12(f), not through a motion to dismiss claims under Rule 12(b)(6)"); *Tomasino v. Estee Lauder Cos., Inc.*, 2015 WL 1470177 (E.D.N.Y. Mar. 31, 2015) (declining to grant defendants' motion to dismiss or strike allegations because the court already "concluded that the plaintiff's causes of action . . . are sufficient" and that "causes of action—and not allegations in the complaint—are subject to dismissal" while the striking of allegations is performed under the Rule 12(f) rubric).[4]

Second, Google's Letter indicates that it erroneously proposes to analyze specific components of conduct standing alone, and not as they are alleged as part of an overarching scheme violating the antitrust laws.  *See, e.g., Valassis Communications Inc.  v.  News Corp.*, 2019 WL 802093, at *9 (S.D.N.Y.  Feb.  21, 2019) (Castel, J.) (quoting *Continental Ore*, 370 U.S.  at 699)) (courts must "avoid 'tightly compart-mentalizing the various factual components' of a plaintiff's claims and 'wiping the slate clean after scrutiny of each'").

Third, the three challenged Acts that are part of the alleged Exclusionary Scheme also constitute antitrust violations when analyzed standing alone.

In short, for the reasons elaborated more fully below, Google's desire to move to dismiss the Amended Complaint is misplaced and any such motion should fail.

**Google Does Not Contest That Publisher Class Plaintiffs State a Claim as to Each Cause of Action Based on an Alleged Exclusionary Scheme.**  Google's Letter does not assert that Publisher Class Plaintiffs fail to state a claim as to any of the four antitrust claims in the Amended Complaint.  Instead, Google challenges whether certain Acts or courses of conduct form antitrust violations standing alone.  In other words, Google does not contest that, irrespective of the disposition of Google's proposed Motion to Dismiss, Publisher Class Plaintiffs have sufficiently alleged: (1) Illegal tying under Sections 1 and 2 of the Sherman Act; (2) Monopolization in violation of Section 2 of the Sherman Act; (3) Violation of California's Unfair Competition Law; or (4) Violation of California's Cartwright Act.  By not challenging whether Publisher Class Plaintiffs' causes of action are sufficiently pleaded even if Google prevails on its proposed Motion, Google concedes that Publisher Class Plaintiffs state a claim as to each Count.  This concession is fatal to Google's proposed Motion to Dismiss because once a plaintiff establishes one or more unlawful acts in an exclusionary scheme, the other acts need not be unlawful standing alone if they have synergistic effects with the unlawful acts.  *See, e.g.,* State MTD Order at 40 ("In assessing whether conduct is anticompetitive, it is often necessary to

---

[4] Notably, Fed. R. Civ. P. 12(f) applies only in the narrow circumstances where the allegations are "redundant, immaterial, impertinent, or scandalous."  Google does not suggest it can meet that standard here.

examine other market conduct, *including practices that are perfectly lawful*." (emphasis added)); *see also Valassis*, 2019 WL 802093, at *9 ("The proper inquiry" in scheme cases "is whether, qualitatively, there is a 'synergistic effect.'" (quoting *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981))).

Publisher Class Plaintiffs contend that sixteen Acts form Google's Exclusionary Scheme including pleading that the Acts have synergistic anticompetitive effects. *See, e.g.*, AC ¶¶11, 34-35, 248, 300. For example, Publisher Class Plaintiffs' Section 2 claim (Count II) explicitly includes an allegation that, "Using the Scheme alleged herein, Google has willfully maintained and/or enhanced its monopoly power in the publisher Ad Server, Ad Exchange, and Ad Network markets." AC ¶405. Because Google does not contest that the Amended Complaint's allegations as to the other thirteen Acts remaining in the alleged Exclusionary Scheme are sufficient to state a claim under Section 2, Publisher Class Plaintiffs can allege conduct that, even if not illegal when analyzed standing alone, is properly considered part of an exclusionary scheme to the extent it has synergistic effects with other alleged anticompetitive conduct.

Thus, even if Google were correct—and it is not—that each of Acts 14-16 pertaining to Search+, Minimum Bid to Win, and Malicious Code, respectively, is somehow insufficient as a matter of law standing alone, each has alleged synergistic effects with, *inter alia*, the unlawful tying claims and/or Uniform Price Floors that are also part of Google's Exclusionary Scheme. *See, e.g.*, AC ¶¶334-42 (describing how Search+ increased the coercive effect of Google's illegal ties by making Google's Ad Exchange and Ad Network "must have" products that Google used to coerce the purchase of Google's Ad Server); *id.* ¶¶343-52 (describing how Minimum Bid to Win worked with Google's Uniform Price Floors—Act 13 in the Amended Complaint, and conduct the Court has held to state a claim, State MTD Order at 75-7—to enhance the ability of Google to steer impressions through Google's Ad Exchange); *id.* ¶¶353-56 (describing how Google used the pretext of policing malicious code to steer impressions through Google's Ad Network which, in turn, enhanced Google's market power in the Ad Network market and which, necessarily increases the coercive power of Google's illegal ties, Acts 3 and 4).

Moreover, Publisher Class Plaintiffs are entitled to allege relevant context and conduct that contributes to reasonable inferences. For example, the conduct alleged under Acts 14-16 form part of Google's overall course of conduct and provides context for Google's acts that form that overall course of conduct as well as Google's intent. Similarly, Publisher Class Plaintiffs' allegations concerning the "hashing" of User IDs are alleged as merely one element of Google's effort to coerce publishers to use Google's Ad Exchange and Ad Network in connection with Google's unlawful ties (Act 2 and Act 4). *See* AC ¶¶206-225, 238. However, the Amended Complaint also lists other alleged conduct that this Court has allowed to go forward (and that Google does not challenge) alleging that Google coerced publishers to use its Ad Exchange and Ad Network as part of the ties. *See, e.g.*, AC ¶¶252-76, 286-95 (describing other conduct that Google used to coerce purchase of the tied services); State MTD Order at 44-47, 48-49, 55-57 (upholding those Acts as sufficient to state a claim).

Google's hashing of User IDs, as alleged in the Amended Complaint, has synergistic effects with the other alleged coercive Acts (including Acts 5, 6, and 8)—all of which this Court has allowed to go forward—to further tighten the tie between Google's Ad Server (the tying product) and Google's Ad Exchange and Ad Network (the tied products), precluding Publishers and Advertisers from subsequently transacting on rival Ad Exchanges or Ad Networks with

respect to mutually-recognized users.  User ID hashing also impairs rival Ad Exchanges' and Ad Networks' ability to submit competitive bids by restricting the information available to those competitors.

Thus, at bottom, Google's proposed Motion to Dismiss only seeks to challenge individual components of conduct and Google thus does not challenge whether the Amended Complaint *states a claim to relief on each of the four Counts*.  Google thus concedes that the four claims are adequately pleaded and will survive in full or in substantial form, mooting its proposed Motion to Dismiss.

**Publisher Class Plaintiffs' allegations concerning the "hashing" of User IDs should not be stricken or otherwise dismissed.**  Google mischaracterizes the Amended Complaint's allegations of Google's encryption or hashing of User IDs as being the same as the States' allegations that this Court rejected in its State MTD Order.  *See* State MTD Order at 40-44.  Publisher Class Plaintiffs plead Google's encryption of User IDs not as the independent exclusionary act that the Court found to be tantamount to a lawful refusal to deal, but instead as a part of how Google coerces publishers in two unlawful *tying* arrangements: DoubleClick For Publishers ("DFP") as the tying product and AdX as the tied product (Act 2) and DFP/Ad Sense as the tying products and Google Display Network ("GDN") as the tied product (Act 4).

The Amended Complaint alleges that one of the most important functions of any publisher Ad Server is optimizing revenues from the sale of display advertising.  AC ¶215.  Yet by encrypting User IDs and making them unavailable to rival Ad Exchanges and Ad Networks, Google "degraded" that functionality because Google impaired its publisher Ad Server clients' ability to optimize bids coming from all Ad Exchanges and Ad Networks in order to bias transactions in favor of Google's Ad Exchange and Ad Network.  Without User IDs, non-Google Ad Exchanges and Ad Networks submit lower-valued bids for publishers' ad impressions.  As a result, publishers are forced into choosing either to use Google's Ad Exchange and Ad Network or lose 38-60% of their revenues.  AC ¶¶218, 238.  The loss of this revenue should they choose to use only non-Google Ad Exchanges or non-Google Ad Networks is an "economically untenable" outcome for publishers, thereby coercing them to use Google's Ad Exchange and Ad Network.  *Id.*

The Court has already held that similar allegations in the context of a tying claim are sufficient to state a claim.  *See* State MTD Order at 18.  Google's encryption of user IDs is just as coercive as the conduct the Court has already upheld in connection with the States' tying claim and thus the allegations of coercion caused by Google's hashing of User IDs as one part of unlawful arrangements (Act 2 and Act 4) should be upheld here.

**The Three Acts Alleged that the Court Has Yet to Rule on Are Anticompetitive Standing Alone and as Part of Google's Exclusionary Scheme.**  Google now challenges whether only three of the Acts in the Amended Complaint on which the Court has yet to rule state a claim standing alone: (i) Search+ (Act 14); (ii) Minimum Bid to Win (Act 15); and (iii) Malicious Code (Act 16).  To be individually unlawful, Publisher Class Plaintiffs need only show that (1) Google has monopoly power, *United Food and Commercial Workers Local 1776 and Participating Health and Welfare Fund v. Takeda Pharmaceutical Co, Ltd.,* 11 F. 4th 118, 137 (2d. Cir. 2021), and that (2) it has "engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition", *PepsiCo Inc. v. Coca-Cola Co.,* 315 F.3d 101, 108 (2d Cir. 2002).  Google does not assert that the Amended Complaint fails

sufficiently to allege monopoly power.  Instead, Google only contests whether Acts 14-16 are "improper conduct that has . . .  the effect of controlling prices or excluding competition." *PepsiCo*, 315 F.3d at 108.  Each Act meets that standard.

**Search+ (Act 14)**.  Through Act 14, Google's Search+ and related initiatives, Google "used portions of the advertising budgets of 'search-only' advertisers to automatically buy display ads on the Google Display Network ('GDN')."  Google then used this mechanism "to restrict these advertisers' display advertising purchases exclusively to publishers using Google's Ad Network and Ad Exchange," impairing competition in both the Ad Network and Ad Exchange markets.  In addition, "Google's Ad Server became a must-have product for publishers because Google required the use of its Ad Server to sell impressions through the Google Display Network and access this significant and unique advertiser demand," entrenching its monopoly power in the Ad Server market.  AC ¶342.

Google misstates the law when it asserts that Publisher Class Plaintiffs must satisfy the "discount attribution" test for below-cost price test for bundling claims, citing *Cascade Health Solutions v. PeaceHealth,* 515 F.3d 883, 906-07 (9th Cir. 2008); *Ortho Diagnostic Sys., Inc. v. Abbott Labs.*, Inc., 920 F. Supp. 455, 467-69 (S.D.N.Y. 1996).  This law and those cases are inapposite because Publisher Class Plaintiffs do not allege that their Search+ allegations concern any discount Google offers through its Search+ bundle, which is what the law Google cites addresses.  Instead, the Search+ bundle is akin to the contractual tie that Google created when it bundled its DFP Ad Server with its AdX Ad Exchange.  *See* AC ¶¶226-30 (describing how Google cemented its Act 1 and Act 2 ties by bundling the products together).  In other words, Google tied its search advertising services to its display advertising services without the opportunity to opt out; Google tied its search advertising services (the tying product) with its display advertising services for small- to medium-sized advertisers (the tied product) so that Google could, and did, control those advertisers' display advertising buying decisions and withhold such buying from non-Google Ad Networks.  *Id.*  ¶¶334-42.  Through this *tie* Google harmed competition in the Ad Network, Ad Exchange, and Ad Server markets.  *Id.* ¶342.

Google claims that advertisers' participation in Search+ was voluntary.  Letter at 3.  That assertion, however, is not found in the Amended Complaint.  To the contrary, when Search+ debuted, Google automatically opted existing search advertisers into the program and made participation the default for new advertisers.  AC ¶339.  In 2017, when Google introduced its Smart Campaign as an extension of Search+, the "Smart Campaigns *precluded* new AdWord advertisers from opting out of display advertising.  AC ¶341 (emphasis added).  Making Search+ the default and precluding advertisers from opting out is anything but voluntary.  Moreover, Google must at this stage proceed from the allegations in the Amended Complaint, not seek to interject its responsive factual assertions which it will have the opportunity to do in discovery.

**Minimum Bid to Win (Act 15)**.  Through Act 15, Google used its monopoly power in the Ad Server market to suppress winning advertiser prices when advertisers bid through Google's own Ad Exchange and used Google's Ad Buying Tools.  Minimum Bid to Win thus had the exclusionary effect of artificially disadvantaging Google's rivals in each of the Ad Exchange and Ad Buying Tools markets.  AC ¶¶ 32, 348, 351.

Google claims that the "informational advantage" conferred by Minimum Bid to Win was fair competition or otherwise a lawful refusal to deal. Letter at 8. But these arguments miss the point: Google used Minimum Bid to Win as an *exclusionary device* to divert advertisers toward Google's own Ad Exchange and Ad Buying Tools. Minimum Bid to Win is not competition on the merits, but instead represented the abuse of monopoly power in the Ad Server market to harm rivals.

**Malicious Code (Act 16).** Through Act 16, Google used its monopoly in the Ad Server market to "to inhibit use by small-to-medium sized publishers of rival Ad Networks through the false pretext of controlling problematic code, excluding rival Ad Networks from competing for ad impressions" and thus artificially impaired competition in the Ad Network market. AC ¶¶33, 353-56. Google claims that its Ad Server weeds out malicious code to protect user safety and disputes Publisher Class Plaintiffs' allegation that this justification is pretextual. Letter at 9. Google's contrary assertions are again the stuff of discovery and litigation and precisely why they cannot be resolved at the pleading stage. *See, e.g.*, *Kelly-Brown v. Winfrey*, 717 F.3d 295, 313 (2d Cir. 2013) (court's role "in considering a motion to dismiss is not to resolve … factual disputes").

**Google's proposed briefing schedule injects needless delay into these proceedings.** Google requests 90 days to file its motion, with a 90-day response timeline for Publisher Class Plaintiffs' opposition, followed by an additional 45 days for Google's reply brief. Letter at 11. Suggesting 225 days to complete briefing given the extensive history of this case is by itself concerning; it is all the more so as Google has remained steadfast in objecting to proceeding with discovery on matters that it seeks to challenge through this proposed briefing. *See* Letter from Google Re CMO & Scheduling Order, ECF 371 (November 7, 2022).

Publisher Class Plaintiffs filed the Amended Complaint on October 5, 2022, over a month ago. Google has had ample time to consider the Amended Complaint and Google's arguments in response. Imposing a further *seven-and-a half month delay* for briefing a motion to dismiss concerning discrete components of conduct that Google concedes has no bearing on Publisher Class Plaintiffs' causes of action is inappropriate. Nevertheless, Publisher Class Plaintiffs believe that allowing 30 days for Google to file its motion, 30 days for Publisher Class Plaintiffs' response, and two weeks for Google's reply should be sufficient to brief these limited issues. Moreover, Google's implicit concession that the Publisher Class Plaintiffs' causes of action will proceed substantially (if not completely) as contained in the Amended Complaint lays bare the inappropriateness of delaying discovery or limiting the scope of permitted discovery.

**Google's proposed page limits are excessive.** While Publisher Class Plaintiffs leave any change of the page limits to the Court's discretion and believe that any extension of the limits for Google's motion should be matched for Publisher Class Plaintiffs' opposition, Publisher Class Plaintiffs do not see why a motion to dismiss limited to the four discrete issues raised in Google's Letter as to the Amended Complaint should require 40-pages to brief, particularly where Google is cabined to the arguments and challenges asserted in its Letter.

\*          \*          \*

       For the foregoing reasons, the Publisher Class Plaintiffs respectfully suggest that the request by Defendants to move to dismiss the Amended Complaint should be denied as misplaced as it will not narrow the case before the Court.  The Publisher Class Plaintiffs instead suggest that the issues Defendants seek to raise can be dealt with appropriately during discovery and subsequent proceedings, all of which should proceed without further delay.

                                          Respectfully,

                                          _/s/ Philip Korologos_____
                                          Philip Korologos

copy to: all counsel via ECF