UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| In re GOOGLE ADVERTISING ANTITRUST LITIGATION | : : | No. 21-md-3010 (PKC) |
| | x | P. Kevin Castel District Judge |
| This Document Relates To: | : : : | AMENDED COMPLAINT AND JURY DEMAND |
| *AIM Media Ind. Operating, LLC v. Google, LLC*, No. 1:21-cv-06912-PKC (S.D.N.Y.) | : : | **[REDACTED]** |
| *AIM Media Midwest Operating, LLC v. Google, LLC*, No. 1:21-cv-06884-PKC (S.D.N.Y.) | : : | |
| *AIM Media Tex. Operating, LLC v. Google, LLC*, No. 1:21-cv-06888-PKC (S.D.N.Y.) | : : | |
| *Appen Media Group, Inc. v. Google LLC*, No. 1:22-cv-09810-PKC (S.D.N.Y.) | : : | |
| *Brown Cnty. Publ'g Co., Inc. v. Google, LLC*, No. 1:21-cv-06915-PKC (S.D.N.Y.) | : : | |
| *Capital Region Indep. Media LLC v. Google LLC*, No. 1:22-cv-06997-PKC (S.D.N.Y.) | : : | |
| *Clarksburg Publ'g Co., d/b/a WV News v. Google, LLC*, No. 1:21-cv-06840-PKC (S.D.N.Y.) | : : : | |
| *Coastal Point LLC v. Google, LLC*, No. 1:21-cv-06824-PKC (S.D.N.Y.) | : : | |
| *Eagle Printing Co. v. Google, LLC*, No. 1:21-cv-06881-PKC (S.D.N.Y.) | : : | |
| *ECENT Corp. v. Google, LLC*, No. 1:21-cv-06817-PKC (S.D.N.Y.) | : : | |
| *Emmerich Newspapers, Inc. v. Google, LLC*, No. 1:21-cv-06794-PKC (S.D.N.Y.) | : : | |
| | x | |

[Caption continued on following page.]

*Flag Publ'ns, Inc. v. Google, LLC*, No. 1:21-cv-06871-PKC (S.D.N.Y.)

*Gale Force Media, LLC v. Google, LLC*, No. 1:21-cv-06909-PKC (S.D.N.Y.)

*Gould Enters., Inc. v. Google, LLC*, No. 1:22-cv-01705-PKC (S.D.N.Y.)

*HD Media Co., LLC v. Google, LLC*, No. 1:21-cv-06796-PKC (S.D.N.Y.)

*Journal Inc. v. Google, LLC*, No. 1:21-cv-06828-PKC (S.D.N.Y.)

*Neighborhood Newspapers, Inc. v. Google LLC*, No. 1:21-cv-10188-PKC (S.D.N.Y.)

*Robinson Commc'ns, Inc. v. Google, LLC*, No. 1:21-cv-08032-PKC (S.D.N.Y.)

*Rome News Media, LLC v. Google LLC*, No. 1:21-cv-10186-PKC (S.D.N.Y.)

*Savannah Publ'g Co. v. Google, LLC*, No. 1:22-cv-01693-PKC (S.D.N.Y.)

*Something Extra Publ'g, Inc. v. Google, LLC*, No. 1:21-cv-09523-PKC (S.D.N.Y.)

*Southern Cmty. Newspapers, Inc. v. Google, LLC*, No. 1:22-cv-01971-PKC (S.D.N.Y.)

*Times Journal, Inc. v. Google LLC*, No. 1:21-cv-10187-PKC (S.D.N.Y.)

*Union City Daily Messenger, Inc. v. Google, LLC*, No. 1:22-cv-01704-PKC (S.D.N.Y.)

*Weakley Cnty. Press, Inc. v. Google, LLC*, No. 1:22-cv-01701-PKC (S.D.N.Y.)

## INTRODUCTION

1.      "[T]he basis of our governments being the opinion of the people, the very first object should be to keep that right; and were it left to me to decide whether we should have a government without newspapers, or newspapers without a government, I should not hesitate a moment to prefer the latter."  Thomas Jefferson, Letter to Edward Carrington, Paris, Jan. 16, 1787, PrC (DLC), Published in PTJ, 11:48-50.

2.      The U.S. House Judiciary Committee, Subcommittee on Antitrust, Commercial, and Administrative Law ("House Antitrust Subcommittee"), recently concluded its antitrust investigation into the ***digital advertising market*** with a 450-page report entitled "Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations" ("House Judiciary Report") on October 6, 2020. *See also* Hearing, *Stacking the Tech: Has Google Harmed Competition in Online Advertising?*, U.S. Senate Judiciary Committee, Antitrust, Competition Policy, and Consumer Rights Subcommittee (Sept. 15, 2020).

3.      As set forth in the House Judiciary Report, Defendants' anticompetitive and monopolistic practices have had a profound effect upon our country's free and diverse press, particularly the newspaper industry. Since 2006, newspaper advertising revenue, which is critical for funding high-quality journalism, fell by over 50%. Newspaper advertising has declined from $49 billion in 2006 to $16.5 billion in 2017.  As a result of these falling revenues, the existence of the newspaper industry is threatened. Nearly 30,000 newspaper jobs disappeared – a 60% industry-wide decline – from 1990 to 2016, according to the Bureau of Labor Statistics. And almost 20% of all newspapers have closed in the past 15 years, and "countless others have become shells – or 'ghosts' – of themselves," according to the recent report by the University of North Carolina. The

reduction in revenues to newspapers across the country, including Plaintiff, were directly caused by Defendants' conduct as set forth herein and went directly into Google's coffers:



*See* David Chavern, Written Statement, *Online Platforms and Market Power, Part 1: The Free and Diverse Press*, Committee on the Judiciary Subcommittee on Antitrust, Commercial and Administrative Law, U.S. House of Representatives (June 11, 2019).

4.      These hearings launched antitrust complaints filed by the Federal Trade Commission, the U.S. Department of Justice, and more than 40 State Attorneys General (the "States Attorneys General") against Google LLC and Meta Platforms, Inc. f/k/a/ Facebook, Inc. *See United States v. Google LLC*, No. 1:20-cv-03010) (D.D.C. Oct. 20, 2020), ECF No. 1-1 ("*DOJ v. Google* case"); *Texas v. Google LLC*, No. 4:20-cv-00957 (E.D. Tex. Dec. 16, 2020), ECF No. 1 ("*AGs v. Google* case"); *New York v. Facebook, Inc.*, No. 1:20-cv-03589-JEB (D.D.C. Dec. 9, 2020), ECF No. 7 ("*AGs v. Facebook* case"); *FTC v. Meta Platforms, Inc.,, Inc.*, No. 1:20-cv-03590-JEB (D.D.C. Dec. 9, 2020), ECF No. 3.

5.      Google's breathtaking monopoly power has been amassed and maintained by illegal anticompetitive practices for many years, using its market dominance in several related

2

markets to drive online advertising dollars.  Specifically, Google has monopoly power in the ad exchange, ad server, and general search markets.  Google uses its dominance in these markets to wipe out competition, drive its online ad sales, and charge supra-competitive prices. Google is the largest monopoly in United States history.

6.      As detailed below, Google has used its dominance in the ad server market to become the dominant ad exchange, which connects advertisers looking to buy ad space, or "inventory," on websites and mobile apps with publishers selling inventory. With intermediaries that route, buy, and sell orders, the structure of the digital advertising market is similar to the structure of electronically traded financial markets. In digital advertising, a single company, Google, simultaneously operates the leading trading venue, as well as the leading intermediaries that buyers and sellers go through to trade. At the same time, Google itself is one of the largest sellers of ad space globally. Google ***monopolizes*** advertising markets by engaging in conduct that lawmakers prohibit in other electronic trading markets.[1]  Because Google performs every function in the digital advertising chain that connects publishers and advertisers, it is nearly impossible for publishers to do business with advertisers except through Google. And when competing ad exchanges and ad servers have tried to do so, Google has promptly stamped out those efforts and prevented any real competition on the merits.  Using these pressure points, Google has affected the prices paid by advertisers and the amount ultimately received by the publishers for their valuable inventory, keeping a supra-competitive portion for itself.

---

[1]      Dina Srinivasan, *Why Google Dominates Advertising Markets: Competition Policy Should Lean on the Principles of Financial Market Regulation*, 24 Stan. Tech. L. Rev. 55, 58 (2020).

7.      If proven to be true, Google, LLC and Meta Platforms, Inc. f/k/a Facebook, Inc.[2] have monopolized the numerous markets within the digital advertising space, thereby hijacking the primary source of revenue for newspapers and financially strangling them across the country. This antitrust action is brought to seek all remedies afforded under the law.

## PARTIES

### A.    AIM MEDIA INDIANA OPERATING, LLC

8.      Plaintiff AIM Media Indiana Operating, LLC ("AIM Media Indiana") is a Delaware limited liability company with its principal office address at 2980 North National Rd., Columbus, Indiana. AIM Media Indiana owns and operates several newspapers in Indiana, including The Republic in Columbus, the Daily Journal in Franklin, The Tribune in Seymour, the Daily Reporter in Greenfield, the Brown County Democrat in Nashville, the Jackson County Banner in Brownstown, and The Times Post in Pendleton.

9.      AIM Media Indiana's newspapers have roots in Indiana dating back to the 1870s are the leading source, and in some cases the only source, of local news and information for the citizens of the communities they serve. AIM Media Indiana's newspapers seek to provide the news their community needs, reported faithfully and fully, with respect for all and favor to none.

10.     AIM Media Indiana's newspapers provide an important and integral function of reporting and publishing news to the citizens of Indiana.

11.     AIM Media Indiana also digitally publishes its stories, articles, information and content on the internet and worldwide web at the following domains: www.therepublic.com, www.dailyjournal.net, www.tribtown.com, www.greenfieldreporter.com, www.bcdemocrat.com,

---

[2]      On April 14, 2022 the Court granted Defendant Meta Platform, Inc.'s Motion to Change Party Name on Docket to reflect Defendant's name change from Facebook, Inc. to Meta Platforms, Inc. f//k/a Facebook, Inc. ECF 283.

www.thebanner.com, and www.pendletontimespost.com.   At all times material herein, AIM Media Indiana sold and/or attempted to sell digital advertisements on the aforementioned domains and competed with Google and Facebook.   AIM Media Indiana paid for and used Google's digital publishing products, including DoubleClick, Ad Manager, and Ad Sense.

### B.   AIM MEDIA MIDWEST OPERATING, LLC

12.   Plaintiff AIM Media Midwest Operating, LLC ("AIM Media Midwest") is a Delaware limited liability company whose principal place of business is in the State of Ohio.

13.   AIM Media Midwest owns and operates nearly 32 local and community newspapers that serve the State of Ohio, including the Delaware Gazette in Delaware, Delaware County; the Record Herald in Washington Court House, Fayette County; the Gallipolis Daily Tribune in Gallipolis, Gallia County; the Daily Sentinel in Pomeroy, Meigs County; the Galion Inquirer in Mount Gilead, Morrow County; and the Morrow County Sentinel in Mount Gilead, Morrow County.

14.   AIM Media Midwest's newspapers have roots in Ohio dating back to the 1850s and have won a Pulitzer Prize for their local and community reporting. AIM Media Midwest's newspapers often serve as the leading source of local news and information for their communities seeking to provide the news their community needs, reported faithfully and fully, with respect for all and favor to none.

15.   AIM Media Midwest's newspapers provide an important and integral function of reporting and publishing news to the citizens of Ohio.

16.   AIM Media Midwest also digitally publishes its stories, articles, information and content on the internet and worldwide web at the following domains: www.delgazette.com, www.recordherald.com,          www.mydailytribune.com,          www.mydailysentinel.com,

www.galioninquirer.com, and www.morrowcountysentinel.com.   At all times material herein, AIM Media Midwest sold and/or attempted to sell digital advertisements on the aforementioned domains and competed with Google and Facebook.   AIM Media Midwest paid for and used Google's digital publishing products, including AdX, Ad Manager, and Google Display Network.

### C.   AIM MEDIA TEXAS OPERATING, LLC

17.   Plaintiff AIM Media Texas Operating, LLC ("AIM Media Texas") is a Delaware limited liability company with its principal office address at 1400 E Nolana Ave., McAllen, Texas.

18.   AIM Media Texas owns and operates several newspapers primarily in the Rio Grande Valley of Texas including The Monitor in McAllen, the Valley Morning Star in Harlingen; the Brownsville Herald in Brownsville, the El Nuevo Heraldo in Brownsville, the Odessa American in Odessa, the Mid-Valley Town Crier is Weslaco, and the Coastal Current in South Padre/Port Isabel.

19.   AIM Media Texas' newspapers are the leading source, and in some cases the only source, of local news and information for the citizens of the communities they serve. AIM Media Texas' newspapers focus on local news, content and journalism, including periodic enterprise projects of importance to the local communities its newspapers serve such as immigration in the Rio Grande Valley.

20.   AIM Media Texas also digitally publishes its stories, articles, information and content on the internet and worldwide web at the following domains: www.texasmonitor.org, www.myrgv.com, www.elnuevoheraldo.com, www.oaoa.com, www.midvalleytowncrier.com, and www.coastalcurrent.com. At all times material herein, AIM Media Texas sold and/or attempted to sell digital advertisements on the aforementioned domains and competed with Google

and Facebook. AIM Media Texas paid for and used Google's digital publishing products, including AdX, Ad Manager, and Google Display Network.

### D.   BROWN COUNTY PUBLISHING COMPANY, INC. and MULTI MEDIA CHANNELS, LLC

21.     Plaintiff Multi Media Channels, LLC, a Wisconsin limited liability company, is a subsidiary of Brown County Publishing Company, Inc., a Wisconsin corporation (collectively, "Multi Media"). Multi Media's principal office is at N2919 County Road QQ, Waupaca, Wisconsin, 54981-9126. Multi Media owns and operates several newspapers and publications in Wisconsin, including The Press Times in Green Bay, Waupaca County Post, Portage County Gazette in Stevens Point, Stevens Point City Times, Marshfield Hub City Times, Antigo Times, Merrill Foto News, Wausau Times, Rhinelander Hodag Star Journal in Rhinelander, Wisconsin Rapids City Times, New London Press Star, Clintonville Tribune Gazette, Picture Post, Lake View, Clintonsville Shoppers Guide, New London Buyers' Guide, Waupaca Buyers' Guide, Tomahawk Leader Extra, Tomahawk Leader, Dodge County Pionier, Campbellsport News, Kewaskum Statesman, Wisconsin Wheels, and City Pages.

22.     Multi Media's newspapers are locally owned, operated, and written. Many have served their local communities for well over 100 years, telling the stories of their people, places, struggles, and joys. They provide an important function of reporting and publishing news to the citizens of eastern, central, and northern Wisconsin.  In many instances, Multi Media's papers are the major source of news for the Wisconsin citizens they serve and are a primary source of community news and commentary.

23.     Multi Media also digitally publishes their stories, articles, information and content on the internet and worldwide web at the following domains: www.gopresstimes.com,

www.hubcitytimes.com,          www.StevensPoint.News,          www.merrillfotonews.com,

www.antigotimes.com,           www.starjournalnow.com,          www.wrcitytimes.com,

www.waupacanow.com,            www.tomahawkleader.com,          www.wausautimes.com,

www.silentsports.net,          www.waupacapicturepost.com,          www.packerlandpride.com,

www.thecitypages.com,  www.dodgecountypionier.com,  www.thecampbellsportnews.com,  and

www.kstatesman.com.  At all times material herein, Multi Media sold and/or attempted to sell

digital advertisements on the aforementioned domains and competed with Google and Facebook.

### E.    CAPITAL REGION INDEPENDENT MEDIA LLC

24.    Plaintiff Capital Region Independent Media LLC (hereinafter "Capital Region") is

a New York corporation with its principal office address at 11 Augusta Ct., Clifton Park, NY,

12065.

25.    Capital Region owns and operates several newspapers in the states of New York

and Vermont. Capital Region publishes *Ravena News Herald* (Albany County, NY), *Greenville*

*Pioneer* (Greene County, NY), *The Whitehall Times* (Washington County, NY), *Granville Sentinel*

(Washington County, NY), *Washington County Free Press* (Washington County, NY), *Lakes*

*Region Free Press* (Rutland County, VT), *InPlayCapitalRegion.com* (New York capital region),

*NYVTmedia.com* (Washington County, NY and Rutland County, VT), and *TheUpstater.com*

(Albany and Greene Counties, NY).

26.    Capital Region's newspapers have strong roots in New York and the communities

they serve, acting as true "town squares" to welcome various views and agendas with respectful

dialogue. The *Ravena News Herald*, for instance, has been published weekly since 1907, providing

residents with the news they need that impacts them most—from coverage of critical

environmental issues related to a local cement plant, to local taxes, education, school sports, and

8

upcoming events. *InPlayCapitalRegion.com* is a web-based publication that is the centralized source of information about the rich community theatre scene in the capital area.

27.     Capital Region's newspapers focus on local and community content and editorial quality. Capital Region's newspapers provide an important and integral function of reporting and publishing news to the citizens of New York and Vermont and the numerous communities they serve.  Capital Region's papers are a major—and in some instances the only—source of local and community news, information, and content for the citizens they serve.  Capital Region paid for and used Google's digital publishing products, including Google's Ad Manager and Display Network.

### F.     CLARKSBURG PUBLISHING COMPANY, d.b.a. WV NEWS

28.     Plaintiff Clarksburg Publishing Company, d.b.a. WV News ( "WV News") is a West Virginia corporation with its principal office address at 324 Hewes Avenue, Clarksburg, Harrison County, West Virginia, 26301. WV News owns and operates several newspapers in West Virginia, including The Exponent Telegram, The Fairmont News, The Bridgeport News, The Preston County News & Journal, and The Weston Democrat. In addition, WV News owns and operates various other print publications including NCWV Life magazine, The State Journal (West Virginia's only business journal), Blue & Gold News (a state-wide sports magazine), and Your Bulletin Board (a regional community bulletin board for classified advertisements).

29.     The Exponent Telegram's roots date back to the 1860s, that is, from before West Virginia's statehood. It serves as one of the primary sources of news journalism throughout many communities in this District, including Clarksburg, Bridgeport, Salem, Shinnston, Nutter Fort, Stonewood, Anmoore, West Milford, Weston, Jane Lew, Buckhannon, Philippi, and surrounding communities. The Exponent Telegram circulates to 12,500 households on Sundays and 10,000

households Tuesday through Saturday, with a total readership of 50,000 among those households. In addition, WV News' weekly newspapers reach between 3,000 and 7,500 households each.

30.     WV News' newspapers provide an important and integral function of reporting and publishing news to the citizens of West Virginia.  In many instances, WV News' papers are the major source of news for the citizens they serve and are a primary source of community news and commentary.

31.     WV News also digitally publishes its stories, articles, information and content on the internet and worldwide web at the following domains: www.wvnews.com, www.bluegoldnews.com, and www.ybb.com. At all times material herein, WV News sold and/or attempted to sell digital advertisements on the aforementioned domains and competed with Google and Facebook.  WV News paid for and used Google's digital publishing products, including DoubleClick, Ad Manager, and Ad Sense.

### G.     COASTAL POINT LLC

32.     Plaintiff Coastal Point LLC ("Coastal Point") is a Delaware limited liability company whose principal place of business at P.O. Box 1324, Ocean View, Delaware.

33.     Coastal Point owns and publishes The Coastal Point which was founded in 2003. The Coastal Point is an independent local and community newspaper distributed in the Bethany Beach, South Bethany, Fenwick Island, Ocean View, Millville, Dagsboro, Frankford, Selbyville, Millsboro, Long Neck and Georgetown areas of Delaware.

34.     With an award-winning team of reporters, designers, editors, photographers and columnists, Coastal Point's newspaper provides in-depth, locally-focused coverage of events, information, and experiences for the residents and visitors of the communities it serves.

35.     Coastal Point's newspapers provide an important and integral function of reporting and publishing news to the citizens of Delaware.

36.     Coastal Point also digitally publishes its stories, articles, information, and content on the internet and worldwide web at the following domain: www.coastalpoint.com.  At all times material herein, Coastal Point sold and/or attempted to sell digital advertisements on the aforementioned domain and competed with Google and Facebook. Coastal Point paid for and used Google's digital publishing products, including DoubleClick and Ad Sense.

### H.     EAGLE PRINTING COMPANY

37.     Plaintiff Eagle Printing Company ( "Eagle Printing") is a Pennsylvania corporation with its principal place of business at 514 West Wayne Street, Butler, PA.  Eagle Printing owns and publishes The Butler Eagle which is recognized as the longtime newspaper of record in Butler County, Pennsylvania.

38.     The Butler Eagle has been serving the people of Butler County (nearly 188,000 residents) for over 150 years. The first edition of The Butler Eagle was distributed on March 2, 1870 after it was started by a handful of local Civil War veterans who were dedicated to advancing the principals of an 1883 book entitled "The History of Butler County." Over the course of its 150 year history, The Butler Eagle has not only chronicled the daily news in Butler County, but it has also recorded and memorialized personal, family, and community history for the residents and community. Today, The Butler Eagle has an audience that exceeds 30,000 daily readers.

39.     Eagle Printing and The Butler Eagle focus on local and community news, information, and content and strive to inform the citizens of Butler County about what is going on in the community to ensure readers have the knowledge they need to make informed choices about public affairs.

11

40. The Butler Eagle is one of only a handful of family-owned newspapers in Western Pennsylvania and today is on its fifth generation of family ownership.

41. Eagle Printing also owns and operates The Cranberry Eagle which supplies news to residents of Southwestern Butler County.

42. In addition to the news service it provides to the citizens of Butler County, Eagle Printing employs 88 full-time and 23 part time workers and is invested in the community. Local charities and community needs are reported, promoted, and supported by The Butler Eagle.

43. Eagle Printing's newspapers provide an important and integral function of reporting and publishing local and community news, information, and content to the citizens of Pennsylvania and Butler County.

44. Eagle Printing also digitally publishes its stories, articles, information, and content on the internet and worldwide web at the following domains: www.butlereagle.com and www.thecranberryeagle.com. At all times material herein, Eagle Printing sold and/or attempted to sell digital advertisements on the aforementioned domains and competed with Google and Facebook. Eagle Printing paid for and used Google's digital publishing products, including Ad Manager and Ad Sense.

## I. ECENT CORPORATION

45. Plaintiff ECENT Corporation ("ECENT") is a West Virginia Corporation with its principal office address at 188 W. Foster Street, Lewisburg, Greenbrier County, WV 24901. ECENT owns and operates multiple newspapers in West Virginia and Virginia, including The West Virginia Daily News and the White Sulphur Springs Star in Greenbrier and Monroe Counties; The West Virginian in Greenbrier, Monroe, Summers and Pocahontas Counties; the

Hinton News in Summers County; and the Virginian Review in Alleghany, Botetourt, and Bath Counties in Virginia. Combined, the newspapers employ more than seventy staff and carriers.

46.     These newspapers have roots dating back to 1859 and have served as the primary source of news journalism for the southeast region of West Virginia and Western Virginia for more than one and a half centuries. They have covered events from the Civil War, first and second World Wars, the Spanish Flu, Greenbrier Hotel, the State Fair of West Virginia, and the tragic floods of White Sulphur Spring (2016).

47.     ECENT has one of the largest geographical area news coverages in the state, delivering 50,000 newspapers every week to households in two states. In many instances, ECENT's papers are the major source of news for the citizens in Southeastern West Virginia and Western Virginia and are the primary source of community news and commentary.

48.     ECENT also digitally publishes its stories, articles, information, and content on the internet and worldwide web at the following domains: www.wvdn.com, www.hintonnews.com, and www.thevirginianreview.com. At all times material herein, ECENT sold and/or attempted to sell digital advertisements on the aforementioned domains and competed with Google and Facebook. ECENT paid for and used Google's digital publishing products, including DoubleClick, AdX, Ad Manager, Ad Sense and Display Network.

**J.      EMMERICH NEWSPAPERS**

49.     Plaintiff Emmerich Newspapers, Incorporated("Emmerich Newspapers") is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, Mississippi.

50.     Emmerich Newspapers is a parent and holding company which owns 100% of the stock in 22 subsidiary companies, including:

13

a)      J.O. Emmerich & Associates, Inc., which is a Mississippi corporation with its principal office address at 2112 Oliver Emmerich Dr., McComb, Mississippi that publishes the five-day-a-week Enterprise-Journal in McComb;

b)      Delta-Democrat Publishing Company which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, Mississippi that publishes the twice-weekly Delta Democrat Times in Greenville;

c)      Commonwealth Publishing Company, Inc. which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, Mississippi that publishes the five-day-a-week Greenwood Commonwealth;

d)      Delta Press Publishing Company, Inc. which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, Mississippi that publishes the weekly Clarksdale Press Register;

e)      Newton County Appeal Inc. which is a Mississippi corporation with its principal office address at 105 Main Street, Union, Mississippi that publishes the weekly Newton County Appeal;

f)      Marion Publishing Company which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, Mississippi that publishes the twice-weekly Columbian-Progress;

g)      Yazoo Newspaper Co., Inc. which is a Mississippi corporation with its principal office address at 1035 Grand Avenue, Yazoo City, Mississippi that publishes the weekly Yazoo Herald;

h)      Sunland Publishing Company, Inc. which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, Mississippi that publishes the weekly Northside Sun;

i)      Simpson Publishing Co., Inc. which is a Mississippi corporation with its principal office address at 206 N. Main Street, Magee, Mississippi that publishes the weekly Magee Courier and the weekly Simpson County News in Jackson;

j)      Montgomery Publishing Co., Inc. which is a Mississippi corporation with its principal office address at 321 Summit Street, Winona, Mississippi that publishes the weekly Winona Times and the weekly Carrollton Conservative;

k)      Franklinton Publishing Co., Inc. which is a Louisiana corporation with its principal office address at 21137 Main Street, Franklinton, Louisiana that publishes the weekly Era-Leader in Franklinton, Louisiana;

14

l)       Charleston Publishing Co., Inc. which is a Mississippi corporation with its principal office address at South Court Square, Charleston, Mississippi that publishes the weekly Charleston Sun-Sentinel;

m)      Clarion Publishing Company, Inc. which is an Arkansas corporation with its principal office address at 136 E. Waterman Street, Dumas, Arkansas that publishes the weekly Dumas Clarion in Dumas, Arkansas;

n)       Scott Publishing, Inc. which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, Mississippi that publishes the weekly Scott County Times;

o)       Clarke Publishing, Inc. which is a Mississippi corporation with its principal office address at 101 Main Street, Quitman, Mississippi that publishes the weekly Clarke County Tribune;

p)       Hattiesburg Publishing, Inc. which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, Mississippi that publishes the weekly Pine Belt News;

q)       Tallulah Publishing, Inc. which is a Louisiana corporation with its principal office address at 300 S. Chestnut Street, Tallulah, Louisiana that publishes the weekly Madison Journal in Tallulah, Louisiana;

r)       Louisville Publishing, Inc. which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, Mississippi that publishes the weekly Winston County Journal, the weekly Webster Progress-Times and the weekly Choctaw Plain Dealer;

s)       Kosciusko Star-Herald, Inc. which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, Mississippi that publishes the weekly Kociusko Star-Herald;

t)       Enterprise-Tocsin, Inc. which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, Mississippi that publishes the weekly Enterprise-Tocsin in Indianola;

u)       Grenada Star, Inc. which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, Mississippi that publishes the weekly Grenada Star; and

v)       Tate Record Inc. which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, Mississippi that publishes the weekly Tate Record in Senatobia.

51.     Emmerich Newspapers, by and through its subsidiary companies and newspapers named and identified above, competes directly with Google and Facebook in the digital advertising market across multiple geographic markets.

52.     Emmerich Newspapers; J.O. Emmerich & Associates, Inc.; Delta-Democrat Publishing Company; Commonwealth Publishing Company, Inc.; Delta Press Publishing Company, Inc.; Newton County Appeal, Inc.; Marion Publishing Company; Yazoo Newspaper Co., Inc.; Sunland Publishing Company, Inc.; Simpson Publishing Co., Inc.; Montgomery Publishing Co., Inc.; Franklinton Publishing Co., Inc.; Charleston Publishing Co., Inc.; Clarion Publishing Company, Inc.; Scott Publishing, Inc.; Clarke Publishing, Inc.; Hattiesburg Publishing, Inc.; Tallulah Publishing, Inc.; Louisville Publishing, Inc.; Kosciusko Star-Herald, Inc.; Enterprise-Tocsin, Inc.; Grenada Star, Inc; and Tate Record Inc. are  referred to collectively as "Emmerich."

53.     Emmerich's newspapers consist of 2 daily and 23 weekly newspapers in 18 Mississippi markets, 2 markets in Louisiana and 1 market in Arkansas. Emmerich's newspapers have a total paid circulation of over 87,000 and a readership of 200,000. Emmerich also operates the dominant local websites in all of their markets.

54.     Emmerich's newspapers have roots in Mississippi dating back to 1923 when John Oliver Emmerich Sr. bought a weekly newspaper called the Enterprise in McComb, Mississippi. Oliver Emmerich later purchased a competing weekly, the Journal, and combined the two publications into a daily. By the 1960s, the McComb Enterprise-Journal was the dominant newspaper in southwest Mississippi.

16

55.     Emmerich's founder, J. Oliver Emmerich, was a renowned journalist and state leader who won countless civic and journalism awards. The most prestigious journalism award in the state — the John Oliver Emmerich Award for Editorial Excellence — is named in his honor.

56.     Oliver's son, John O. Emmerich Jr., followed Oliver's footsteps. He graduated in journalism from Ole Miss, served as an Army officer in the Korean War, studied in Paris and attended Harvard on a Nieman Fellowship — the most prestigious journalism scholarship in the country.  John worked in top editorial positions at the Minneapolis Star, the Baltimore Sun and the Houston Chronicle. In 1973, he returned to Mississippi, purchased the Greenwood Commonwealth and expanded the company from 1 to 13 newspapers. In 1978, Oliver died at 81 and John took over the reins of the company. Over the next 17 years, John built the family company from 1 to 13 newspapers. Like his father Oliver, John won countless civic and journalism awards. He was vice chairman of the Associated Press, the largest news gathering organization in the world. Despite his excellent physical condition, John died unexpectedly at age 65 in 1995 from a heart attack.

57.     Wyatt Emmerich succeeded John as president of the Emmerich Newspapers, following as did John in his father's footsteps. Wyatt attended Harvard University where he was editor of the Harvard Crimson. He then worked at the Philadelphia Inquirer, Florida Today, and the Dallas Times Herald before attending business school at UCLA. Wyatt worked for the New York Times Company and Merrill Lynch, where he was an investment banker to the newspaper industry. He returned to the family business in 1990 and worked with his father learning the ropes of the business.

58.     Oliver Emmerich often published his creed in the Enterprise-Journal. Today, Emmerich and their newspapers still stand by the original Oliver Emmerich creed:

17

> A newspaper is an instrument of public trust, privately owned but solemnly dedicated to the common weal; the crystal mirror of our daily trials and triumphs; the editorial obligation to be as just with men and measures as human imperfection will permit; a crusading force which accepts with courage the challenge of controversy, greeting hostile ideas with hospitality, understanding well that public debate is a factor in public progress; the sacred pledge to promulgate the civic, cultural and spiritual well being; the covenant to study, investigate, analyze so as to place reason and logic ahead of emotionalism and hysteria; the duty to interpret constitutional 'Freedom of the Press' as meaning the freedom of information to all, a torch to the many, not the flame for the few; and above all the will to be sympathetic, understanding and sincere.

59.    Emmerich's newspapers focus on local and community content and editorial quality. Emmerich's newspapers provide an important and integral function of reporting and publishing news to the citizens of Mississippi and the numerous Mississippi communities they serve. Emmerich's papers are a major—and in some instances the only—source of local and community news, information, and content for the citizens they serve.

60.    Emmerich also digitally publish their stories, articles, information, and content on the internet and worldwide web at the following domains: www.enterprise-journal.com, www.ddtonline.com, www.gwcommonwealth.com, www.pressregister.com, www.newtoncountyappeal.com, www.columbianprogress.com, www.yazooherald.net, www.northsidesun.com, www.simpsoncounty.ms, www.winonatimes.com, www.era-leader.com, www.tallahatchienews.ms, www.dumasclarion.com, www.sctonline.net, www.clarkecountytrib.com, www.hubcityspokes.com, www.madisonjournal.com, www.redhillsmsnews.com, www.starherald.net, www.enterprise-tocsin.com, www.grenadastar.com, and www.taterecord.com.  At all times material herein, Emmerich sold and/or attempted to sell digital advertisements on the aforementioned domains and competed with

Google and Facebook. Emmerich paid for and used Google's digital publishing products, including Double Click, Ad Manager, and Ad Sense.

### K.    FLAG PUBLICATIONS, INC.

61.    Plaintiff Flag Publications, Inc. ("Flag Publications") is a Maryland corporation with its principal place of business at 8200 Coastal Highway, Ocean City, Maryland.

62.    Flag Publications owns and operates two local and community newspapers that serve the State of Maryland,  Ocean City Today, and Bayside Gazette.

63.    Ocean City Today was established in 1993 and is the official paper for record in the town of Ocean City, Worcester County, and the northern county communities. The Bayside Gazette serves the residents and citizens of Ocean Pines. Flag Publications' newspapers are dedicated to providing coverage of events and useful information for residents and visitors of Ocean City, Ocean Pines, Berlin, and other northern Worcester County communities. The guiding principles of Flag Publications' newspapers are to be fair, ethical, and service-oriented.

64.    Flag Publications' newspapers provide an important and integral function of reporting and publishing local and community news, information, and content to the citizens of Maryland..

65.    Flag Publications also digitally publishes its stories, articles, information, and content on the internet and worldwide web at the following domains: www.oceancitytoday.com and www.baysideoc.com. At all times material herein, Flag Publications sold and/or attempted to sell digital advertisements on the aforementioned domains and competed with Google and Facebook.  Flag Publications paid for and used Google's digital publishing products, including DoubleClick and Ad Manager.

### L.    GALE FORCE MEDIA, LLC

66.    Plaintiff Gale Force Media, Llc ( "Gale Force") is a privately-owned New Jersey family business which publishes The Westfield Leader and The Scotch Plains-Fanwood Times newspapers. Its principal place of business is located at 425 North Avenue, East, Westfield, NJ 07090.

67.    The Westfield Leader has been published since 1890 and The Scotch Plains-Fanwood Times has been published since 1959. The Westfield Leader is proudly in its 49th year of annually publishing "This is Westfield," an informational reference for residents and visitors of the Westfield area.

68.    The Westfield Leader and The Scotch Plains-Fanwood Times are and have been primary sources of news journalism in Westfield, New Jersey, with a population of over 30,000 residents, and surrounding areas. These newspapers provide important and integral functions of reporting and publishing news, specifically including local news in New Jersey.

69.    Gale Force also digitally publishes its stories, articles, information, and content on the internet and worldwide web at the following domain: www.goleader.com. At all times material herein, Gale Force sold and/or attempted to sell digital advertisements on the aforementioned domain and competed with Google and Facebook.

### M.    GOULD ENTERPRISES, INC.

70.    Plaintiff Gould Enterprises, Inc. ( "Gould") is a Tennessee corporation with its principal place of business at 2138 Gorden Xing, Gallatin, Tennessee, 37066.

71.    Gould owns and operates a number of local newspapers which it circulates in and around the Nashville, Tennessee area. These newspapers are: Main Street Nashville, Murfreesboro Post, Wilson Post, Gallatin News, Hendersonville Standard, Portland Sun, Robertson County

Connection, Cheatham County Exchange, Dickson Post, Main Street Fairview, Main Street Clarksville, Main Street Davidson and Main Street Maury. It also operates the website following domains where it sells digital advertising: www.mainstreet-nashville.com, www.murfreesboropost.com, www.wilsonpost.com, www.gallatinnews.com, www.hendersonvillestandard.com, www.theportlandsun.com, www.robertscountyconnection.com, www.cheathamcountyexchange.com, www.dicksonpost.com, www.mainstreetfairview.com, www.mainstreetclarksville.com, www.bargainbrowser.com, www.titaninsider.com, www.mainstreetpreps.com, and www.mainstreetmaury.com.

72.     Gould has spent the last nine years building a local news and information company in the greater Nashville area. Gould started with ten employees publishing three weekly newspapers which reached three thousand print subscribers. Through several start-ups, acquisitions and a focus on new media, Gould now publishes thirteen local newspapers, seventeen websites, e-newsletters, social media pages, and podcasts. Gould now employs 60 people, and its publications now reach more than 1.5 million people a month. Gould's intense focus on hyper-local news, local government, local people, high school sports, etc. has allowed it to grow during what has been a very uncertain time for media in general.

73.     Gould's newspaper focuses on local and community content and editorial quality. Gould's newspaper provides an important and integral function of reporting and publishing news to the citizens of Tennessee and the numerous communities it serves. Gould's paper is a major—and in some instances the only—source of local and community news, information, and content for the citizens it serves.  Gould paid for and used Google's digital publishing products, including Ad Manager and AdSense.

### N.   HD MEDIA COMPANY, LLC

74.     Plaintiff HD Media Company LLC ("HD Media") is a West Virginia limited liability company with its principal office address at 946 Fifth Avenue, Huntington, Cabell County, WV 25701.  HD Media owns and operates several newspapers in West Virginia, including The Herald-Dispatch in Huntington and Cabell County, the Charleston Gazette-Mail, The Wayne County News, The Putnam Herald, the Williamson Daily News, The Logan Banner, the Coal Valley News in Boone County, and The Independent Herald in Pineville.

75.     These newspapers have roots dating back to the 1870s and serve as the primary source of news journalism throughout West Virginia covering such events as the Monongah coal mine disaster (1909) (the deadliest in America), Mother Jones and the coal wars including the Matewan Massacre and Battle of Blair Mountain, the Great Flood of the Ohio River (1937), the Marshall University plane crash (1970), the Buffalo Creek Disaster (1971), and the Sago Mine disaster (2006), as well as the statewide opioid epidemic which won The Pulitzer Prize for Investigative Journalism (2017).

76.     HD Media has the largest newspaper circulation in the State of West Virginia under one ownership. HD Media's newspapers provide an important and integral function of reporting and publishing news to the citizens of West Virginia.  In many instances, HD Media's papers are the major source of news for the West Virginia citizens they serve and are a primary source of community news and commentary. HD Media paid for and used Google's digital publishing products, including DoubleClick, Ad Manager, and AdSense.

### O.   JOURNAL, INC.

77.     Plaintiff Journal, Inc. ("Journal") is a Mississippi corporation with its principal office address at 1242 South Green St., Tupelo, Mississippi 38801.

78.     Journal owns and operates seven newspapers in Northeast Mississippi including the Northeast Mississippi Daily Journal (Tupelo), the Monroe Journal, the Itawamba County Times, the Pontotoc Progress, the New Albany Gazette, the Chickasaw Journal in Houston, the Southern Sentinel and Advocate serving Ripley and Ashland. Journal also owns the Mississippi Business Journal in Jackson.

79.     Journal's newspapers have roots dating back to the 1870s. Since its founding, Journal has worked to bring news and editorials of high moral value to the citizens of Northeast Mississippi. Journal's policy has been to reflect community life in its highest aspects. Its first motto, "Be just, fear not," was adopted in 1872. Later, under the ownership of George A. McLean, a second motto, "A locally-owned newspaper dedicated to the service of God and Mankind," was added. George McLean owner established the oldest and currently largest community foundation in the State of Mississippi.  The CREATE foundation serves more than 17 counties in Northeast Mississippi. All newspapers serve the foundation through donation of profits.  The newspapers have contributed millions of dollars through the foundation back to Northeast Mississippi.

80.     Journal has also been heavily involved in local charitable projects and works in the communities of Northeast Mississippi. For example, Journal established the Rural Community Development Council (RCDC) program in the 1940's, helped establish the Community Development foundation (CDF) in 1948, has been a pioneer in the field of education through a $1 million investment initiating the Lee County Reading Aide Program, and was instrumental in the founding of the Northeast Mississippi Habitat for Humanity. Journal has performed services relating to education, economic development, and human achievement within Northeast Mississippi while also taking seriously its commitment to journalistic integrity.

81.     Journal's newspapers focus on local and community news, content, and information so the communities served by Journal's newspapers can be informed about public life around them to assist them in making better decisions for the future of Northeast Mississippi. Journal's newspapers provide an important and integral function of reporting and publishing news to the citizens of Mississippi and the numerous Mississippi communities they serve. Journal's papers are a major—and in some instances the only—source of local and community news, information, and content for the citizens they serve.

82.     Journal also digitally publishes its stories, articles, information, and content on the internet and worldwide web at the following domain: www.djournal.com. At all times material herein, Journal sold and/or attempted to sell digital advertisements on the aforementioned domain and competed with Google and Facebook.  Journal paid for and used Google's digital publishing products, including Ad Manager and Display Network.

P.     **NEIGHBOR NEWSPAPERS, INC.**

83.     Plaintiff Neighbor Newspapers, Inc. ("Neighbor") is a Georgia corporation with its principal place of business in Marietta, Georgia. Neighbor Newspapers, Inc., owns and operates a number of free weekly newspapers in Georgia: the Northside Neighbor, the Roswell Neighbor, the Alpharetta Neighbor, the Milton Neighbor, the East Cobb Neighbor, the North Cobb Neighbor, the South Cobb Neighbor, the Paulding Neighbor, the Dekalb Neighbor, the Bartow Neighbor, the South Fulton Neighbor, the Sandy Springs Neighbor, and the Vinings Neighbor.

84.     Neighbor's newspapers are locally owned, operated, and written. Neighbor News, Inc., was formed in 1970 for the primary purpose of publishing and distributing weekly newspapers in suburban Atlanta, Georgia. Neighbor's newspapers provide an important function of reporting and publishing news to the citizens of the communities it serves. In some instances,

Neighbor's newspapers are the major source of news for the citizens of these communities, and a primary source of community news and commentary.

85.     Neighbor also digitally publishes stories, articles, information, and content on the internet and worldwide web at the domain www.NeighborNewspapers.com. At all times material herein, Neighbor sold and/or attempted to sell digital advertisements on the aforementioned domain and competed with Google and Facebook.

### Q.     ROBINSON COMMUNICATIONS, INC.

86.     Plaintiff Robinson Communications, Inc. ("Robinson") is a Washington corporation, with a principal office at 32220 7th Avenue SW, Federal Way, Washington, 98023-5523.  For nearly 70 years, the Robinson family has owned and operated several newspapers and publications, including White Center News, Federal Way News, the Des Moines News, Highline Times, West Seattle Herald, Ballard News Tribune, the Robinson Newspapers, Westside Weekly, Westside Seattle, and the SeaTac News.

87.     Robinson's newspapers are locally owned, operated, and written.  Many have served their local communities for decades, telling the stories of their people, places, struggles, and joys. They provide an important function of reporting and publishing news to the citizens of Washington.  In many instances, Robinson's papers are a major source of news for the Washington citizens they serve and are a primary source of community news and commentary.

88.     Robinson has also digitally published its stories, articles, information, and content on the internet and worldwide web at the following domains:

- westsideseattle.com
- ballardnewstribune.com
- westseattleherald.com
- highlinetimes.com

- seatacnews.com
- desmoinesnews.com
- federalwaynews.com
- monroemonitor.com

89.     At all times material herein, Robinson sold and/or attempted to sell digital advertisements on the aforementioned domains and competed with Google and Facebook. Robinson paid for and used Google's digital publishing products, including DoubleClick, Ad Manager, and AdSense.

90.     At one time, Robinson had over 400 employees and a circulation of well over 100,000, printing three editions each week.  As a result of the conduct alleged herein, however, in April of 2021, Robinson was forced to cease all print editions of its newspapers.

**R.     ROME NEWS MEDIA, LLC**

91.     Plaintiff Rome News Media, LLC ("Rome Media") is a Georgia limited liability company with its principal place of business in Marietta, Georgia. The sole member of Rome News Media, LLC, is Times Journal, Inc., a Georgia S corporation. Rome News Media, LLC, owns and operates newspapers in Georgia: the Rome News Tribune, the Polk Standard Journal, the Calhoun Times, the Walker County Messenger, and the Catoosa County News.

92.     Rome Media's newspapers are locally owned, operated, and written. Rome News Media, LLC, was formed in 2015 for the primary purpose of publishing daily and weekly newspapers. Rome Media's newspapers provide an important function of reporting and publishing news to the citizens of the communities it serves, which include Floyd, Polk, Gordon, Walker, and Catoosa Counties in Georgia. In some instances, Rome Media's newspapers are the major source of news for the citizens of these Counties, and a primary source of community news and commentary.

93.     Rome Media also digitally publishes stories, articles, information, and content on the internet and worldwide web at the domain www.NorthwestGANews.com. At all times material herein, Rome Media sold and/or attempted to sell digital advertisements on the aforementioned domain and competed with Google and Facebook. Rome Media paid for and used Google's digital advertising products, including DoubleClick, Ad Manager, and AdSense.

### S.     SAVANNAH PUBLISHING CO., INC.

94.     Plaintiff Savannah Publishing Co., Inc. ( "Savannah"), is a Tennessee corporation with its principal office address at 375 Main Street (P.O. Box 340), Savannah, Tennessee, 38372.

95.     Savannah owns and operates a locally owned newspaper, The Courier, which it circulates in the State of Tennessee (Hardin, McNairy, Henderson, Decatur, and Waynesboro counties), as well as in Tishomingo County, Mississippi and Lauderdale County, Alabama. It also prints ten magazines per year and operates the website domain www.courieranywhere.com, where is sells digital advertising.

96.     Savannah's newspaper has strong roots in Tennessee and the communities it serves. The Courier was founded in 1884. When the current owners bought the newspaper in January 1957, 1,200 newspapers were printed each week. In 2008, that number had increased to 9,400 papers each week. Today, it prints roughly 4,900 papers each week.

97.     Savannah's newspaper focuses on local and community content and editorial quality.  Savannah's newspaper provides an important and integral function of reporting and publishing news to the citizens of Tennessee and the numerous communities it serves. Savannah's paper is a major—and in some instances the only—source of local and community news, information, and content for the citizens it serves.  Savannah participated in the digital advertising market.

T.    **SOMETHING EXTRA PUBLISHING, INC.**

98.    Plaintiff Something Extra Publishing, Inc. ( "Something Extra"), is an Alabama corporation with its principal office address at 704 Government Street, Mobile, Alabama, 36602.

99.    Something Extra owns and operates Mobile's only independently owned newspaper and the largest weekly newspaper in the State of Alabama, Lagniappe Weekly. Something Extra's newspaper serves Mobile and Baldwin counties and has circulation of roughly 30,000 newspapers weekly. Something Extra also operates three websites, www.lagniappemobile.com, www.votenappies.com, and www.mobilebayrestaurantweek.com, on which it sells digital advertising.

100.    Something Extra's newspaper has strong roots in Alabama and the communities it serves. It was first published in 2002 with a bi-weekly circulation and a primary focus on arts and entertainment coverage. In 2014, after Mobile's daily newspaper announced it would no longer be published daily and would move most of its operations 300 miles north to Birmingham, Alabama, Lagniappe Weekly's publishers decided to transition into a weekly newspaper, increase circulation, and focus on news and investigative reporting. The newspaper has won numerous national, regional, and state press awards and, as a result of its reporting, has effected real change in various civil, governmental, social, and community areas.

101.    Something Extra's newspaper focuses on local and community content and editorial quality.  Something Extra's newspaper provides an important and integral function of reporting and publishing news to the citizens of Alabama and the numerous Alabama communities it serves. Something Extra's paper is a major—and in some instances the only—source of local and community news, information, and content for the citizens it serves.

U.   **SOUTHERN COMMUNITY NEWSPAPERS, INC.**

102.   Plaintiff Southern Community Newspapers, Inc. ("Southern Community") is a Delaware corporation with its principal place of business in Lawrenceville, Georgia. Southern Community owns and operates newspapers in Georgia: the Albany Herald, the Gwinnett Daily Post, the Henry Herald, the Clayton News, the Rockdale Citizen, the Newton Citizen, and the Jackson Progress-Argus.

103.   Southern Community's newspapers are locally owned, operated, and written. Three of Southern Community's newspapers, the Albany Herald, the Henry Herald and the Jackson Progress-Argus, have served their respective local communities for well over 100 years, telling the stories of its people, places, struggles, and joys.  Southern Community's newspapers provide an important function of reporting and publishing news to the citizens of the communities it serves, which include Gwinnett, Barrow, Fulton, Henry, Clayton, Newton, Butts, Rockdale, Dougherty, Lee, Sumter, Baker, Crisp, Calhoun, Mitchell, Randolph, Terrell, Tift, Webster, Hall, and Worth Counties in Georgia. In some instances, Southern Community's newspapers are the major source of news for the citizens of these Counties, and a primary source of community news and commentary. Southern Community also owns and operates other publications which it distributes in these Counties.

104.   Southern Community also digitally publishes stories, articles, information, and content on the internet and worldwide web at the domains www.albanyherald.com, www.gajobsource.com, www.generationsexpo.com, www.goodtastegwinnett.com, www.gwinnettdailypost.com, www.gwinnettprepsports.com, www.henryherald.com, www.jacksonprogress-argus.com, www.news-daily.com, www.rockdalenewtoncitizen.com, www.scnievents.com, www.southerncommunitynewspapers.com and

29

www.thewellnessexpo.com. At all times material herein, Southern Community sold and/or attempted to sell digital advertisements on the aforementioned domains and competed with Google and Facebook.

## V.   TIMES JOURNAL, INC.

105.    Plaintiff Times Journal, Inc. ("Times Journal") is a Georgia S corporation with its principal place of business in Marietta, Georgia. Times Journal, Inc., owns and operates newspapers in Georgia: the Marietta Daily Journal, the Cherokee Tribune, the Cherokee Tribune & Ledger News, and the Morgan County Citizen.

106.    Times Journal's newspapers are locally owned, operated, and written. Times Journal, Inc., was formed in 1948 for the primary purpose of publishing daily and weekly newspapers. Its largest publication, the Marietta Daily Journal, was first published in 1866 and has served its local community for well over 100 years, telling the stories of its people, places, struggles, and joys.  Times Journal's newspapers provide an important function of reporting and publishing news to the citizens of the communities it serves, which include Cobb, Cherokee, and Morgan Counties in Georgia. In some instances, Times Journal's newspapers are the major source of news for the citizens of these Counties, and a primary source of community news and commentary.

107.    Times Journal also digitally publishes stories, articles, information, and content on the internet and worldwide web at the domains www.MDJonline.com, www.TribuneLedgerNews.com and www.MorganCountyCitizen.com. At all times material herein, Times Journal sold and/or attempted to sell digital advertisements on the aforementioned domains and competed with Google and Facebook.  Times Journal paid for and used Google's digital advertising products, including DoubleClick, Ad Manager, and AdSense.

### W.    UNION CITY DAILY MESSENGER, INC.

108.    Plaintiff Union City Daily Messenger, Inc. ("Union City") is a Tennessee corporation with its principal office address at 613 E. Jackson Street, Union City, Tennessee.

109.    For the past 91 years, Union City's newspaper has served Obion County, Tennessee, in addition to nearby counties of Lake, Dyer, Weakley, and Gibon in Tennessee and Fulton and Hickman counties in Kentucky. The newspaper also has dozens of subscriptions from across the United States.

110.    Union City's newspaper has strong roots in Tennessee and the communities it serves.  For 81 of its 91 years of publication, Union City's newspaper has been owned by the same family. It is currently run by the third generation of Critchlows, brothers David Critchlow, Jr. and E. Scott Critchlow, who have directed and owned the newspaper for thirty years.

111.    Union City's newspaper focuses on local and community content and editorial quality.  Union City's newspaper provides an important and integral function of reporting and publishing news to the citizens of Tennessee and the numerous communities it serves. Union City's paper is a major—and in some instances the only—source of local and community news, information, and content for the citizens it serves.  Union City participated in the digital advertising market.

### X.    WEAKLEY COUNTY PRESS, INC.

112.    Plaintiff Weakley County Press, Inc. ("Weakley") is a Tennessee corporation with its principal office address at 235 Lindell Street, Martin, Tennessee.

113.    Weakley's newspaper, the Weakley County Press, and its forerunner, the Martin Mail, have printed continuously for more than 135 years, beginning on Dec. 11, 1884. It serves Weakley County, Tennessee, in addition to nearby counties of Obion, Lake, Henry, and Carroll in

31

Tennessee and Fulton and Hickman counties in Kentucky. The newspaper also has dozens of subscriptions from across the United States.

114.    Weakley's newspaper has strong roots in Tennessee and the communities it serves. It has been owned by the same family for three generations.

115.    Weakley's newspaper focuses on local and community content and editorial quality.  Weakley's newspaper provides an important and integral function of reporting and publishing news to the citizens of Tennessee and the numerous communities it serves. Weakley's paper is a major—and in some instances the only—source of local and community news, information, and content for the citizens it serves.  Weakley participated in the digital advertising market.

### Y.    APPEN MEDIA GROUP

116.    Plaintiff Appen Media Group ("Appen Media") is a Georgia corporation with its principal office address at 319 North Main Street, Alpharetta, Georgia, 30009.

117.    Appen Media owns and operates several newspapers in the state of Georgia.  Appen Media publishes Alpharetta-Roswell Herald (Fulton County); Johns Creek Herald (Fulton County); Forsyth Herald (Forsyth County); Milton Herald (Fulton County); and Dunwoody Crier (DeKalb County).   Appen Media also sells digital advertising on its website domain, www.appenmedia.com.  In addition to local newspapers, Appen Media's assets include lifestyle magazines, websites, a network of podcasts, community guides, community events, event management, newsletters, custom publications, video content management and production, and full service brand development/creative design and production.  Appen Media paid for and used Google's digital publishing products, including Google Ad Manager.

118.    Founded in 1990, Appen Media is family owned and operated, with a core focus on professionally produced local journalism – local news ranging from government, schools, business, and crime, to lifestyle news reporting and features.

119.    Appen Media's newspapers have strong roots in Georgia and the communities they serve and have won numerous awards from the Association of Free Community Papers, Independent Free Papers of America, Georgia Press Association, and Georgia Sports Writers Association.

120.    Appen Media's newspapers focus on local and community content and editorial quality.  Appen Media's newspapers provide an important and integral function of reporting and publishing news to the citizens of Georgia and the numerous communities they serve.  Appen Media's papers are a major – and in some instances the only – source of local and community news, information, and content for the citizens they serve.

121.    As a direct result of Defendants' antitrust violations described herein, and as set forth in more detail below, newspapers in New York and Vermont, including Plaintiffs' newspapers, together with newspapers throughout this country, are currently under a very real threat to their existence. Without redress, these newspapers, and hence the citizens of New York and Vermont may well end up in a "news desert" as described below.

122.    Defendant Google LLC ("Google") is a limited liability company organized and existing under the laws of the State of Delaware, and is headquartered in Mountain View, California. Google is an online advertising technology company providing internet-related products, including various online advertising technologies, directly and through subsidiaries and business units it owns and controls. Google is owned by Alphabet Inc., a publicly traded company

incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California.[3]

123.    Defendant Meta Platforms, Inc. F/K/A Facebook, Inc. ("Facebook") (and collectively with Google, "Defendants") ("Facebook") is a Delaware corporation with its principal office or place of business situated in Menlo Park, California. At all times relevant to this Complaint, Facebook has operated its social-networking service through its website, www.facebook.com, and mobile applications that connect users with friends on Facebook.[4]

## NATURE OF THIS ACTION

124.    Plaintiffs, and other newspapers across the country, compete for revenue in the *digital advertising market*. As explained below, for years Google has used its monopoly power and/or attempted to monopolize numerous markets within the digital advertising marketplace to such extent that it threatens the extinction of local newspapers across the country. There is no longer a competitive market in which newspapers can fairly compete for online advertising revenue. Google has vertically integrated itself, through hundreds of mergers and acquisitions, to enable dominion over all sellers, buyers, and middlemen in the marketplace. It has absorbed the market internally and consumed most of the revenue. Google's unlawful anticompetitive conduct is directly stripping newspapers across the country, including Plaintiff, of their primary revenue source.

125.    The freedom of the press is not at stake; the press itself is at stake. Plaintiffs have suffered antitrust injury under Sections 1 and 2 of the Sherman Act of 1890 ("Sherman Act"). 15 U.S.C. §§1, 2.

---

[3]    *See DOJ v. Google* case at ¶18; *AGs v. Google* case at ¶32.
[4]    *See AGs v. Facebook* case at ¶21; *Complaint, United States v. Facebook Inc.*, No. 1:19-cv-02184-TJK (D.D.C. July 24, 2019), ECF No. 1 at ¶2.

126.     Through a campaign of anticompetitive conduct, which is detailed below, Google has achieved and maintained its monopoly power in numerous markets within digital advertising. This conduct includes: (i) impairing and excluding competitors through auctions designed to preference its own exchange and server; (ii) manipulating the prices paid by auction winners; (iii) designing auction processes that cement its own power and raise rivals' costs; (iv) illegally tying and bundling its products and service together: (v) manipulating, excluding, or downgrading competitors' products and services; (vi) unilaterally and surreptitiously setting or altering technological standards by which competitors' products and services of competitors can be accessed and used; (vii) technological disablement of competitors' products and services and technological disablement of publisher-set parameters for the sale of their inventory; and (viii) leveraging its control over the ad tech stack and general search to weaken competitive sources of advertising supply for publishers and competitors and to penalize publishers who do not utilize their products or services as directed by Google.

127.     In addition, Google and Facebook, one of Google's largest big tech rivals, conspired to further their worldwide dominance of the ad exchange and ad server and in-app network ad mediation markets in a secret agreement codenamed "Jedi Blue."  The two archrivals, who are sometimes referenced as operating a duopoly in the market, unlawfully conspired to manipulate online auctions which generate digital advertising revenue.  Facebook and Google agreed to avoid competing with one another in September 2018.  The *quid pro quo* was as follows—Facebook would abandon header bidding, which is an advanced method of display ad buying which allows publishers to offer their inventory to multiple ad exchanges simultaneously, and would instead bid through Google's ad server.  In exchange, Google agreed to give Facebook

preferential treatment in certain auction markets and allowed Facebook into its anticompetitive conduct.

128.    This agreement blocked a growing threat to Google's primacy and further cemented its stranglehold on the marketplace. These actions are illegal and directly caused newspapers across the country, including Plaintiff, enormous financial harm in the form of loss of revenue sources. This is a *per se* violation of Section 1 of the Sherman Act, which declares "[e]very . . . conspiracy, in restraint of trade or commerce among the several States" to be illegal.  15 U.S.C. §1.

129.    The Clayton Antitrust Act of 1914 ("Clayton Act"), 15 U.S.C §12, *et seq*., operates in conjunction with the Sherman Act to create private causes of action for violations of federal antitrust laws.  *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 471 (1982); *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 311-13 (1978).

130.    There is a direct causal connection between these antitrust violations and the harm to Plaintiff. The harm was intentional and intended. The harm is of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws. The loss of revenue streams can be directly tied to the antitrust conduct of Defendants. Plaintiffs are direct victims of the alleged antitrust injury as a participant and competitor in the digital advertising marketplace and its component markets. Damages can be quantified and apportioned among those directly and indirectly harmed.

131.    In their Complaints, Plaintiffs do not allege a breach of any contract, nor a dispute regarding the performance of a contractual term, with Defendants.  Rather, Plaintiffs allege four distinct antitrust causes of action: (a) Google unlawfully exercised monopoly power of the ad exchange, ad server, and general search markets which is a Sherman Act §2 violation; and (b)

Google and Facebook unlawfully conspired to engage in anticompetitive conduct which is a *per se* Sherman Act §1 violation (including the sealed Jedi Blue agreement (Count II); (c) Google leveraged its monopoly in the general search market to gain monopoly power and further dominance in the ad exchange and ad server markets (Count IV); and (d) Google has attempted to monopolize the markets for online search market and the ad exchange and ad server markets (Count V))). Nothing herein should be construed to allege a breach of, nor arise out of, any terms of use governing any contractual agreement between Plaintiffs and Defendants.

## JURISDICTION AND VENUE

132.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1337; Section 2 of the Sherman Act, 15 U.S.C. §2, *et seq.*; and Sections 3, 4, and 16 of the Clayton Act, 15 U.S.C. §§14, 15, and 26, because Plaintiffs allege violations of federal law. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367 because those claims are so related to Plaintiffs' claims under federal law that they form part of the same case or controversy.

133.    Venue and jurisdiction are proper in this District pursuant to 15 U.S.C. §22 because Defendants transact business in this District.

(a)    At all times material herein, Google engaged in regular, practical, everyday business of a substantial character in this District. Upon information and belief, Google is the largest provider of digital advertising in this District, and Google regularly directs commercial activity to this District by targeting and supplying consumers within this District with directed advertisements. Google operates its products within this District on a regular and everyday basis, which are used by thousands and thousands of consumers within this District each day. These products include Google Search, Chrome, YouTube, Gmail, Android, Google Maps, Google

Drive, and Google Play Store. Google is ubiquitous across the digital economy in this District. Its contacts with this district are regular and continuous; they are not isolated and sporadic. Google also derives substantial revenue from the operation and use of its products within this District.

(b)     Facebook is the largest social networking platform in this District. Each day, thousands and thousands of consumers within this District access Facebook and its family of products, including Facebook, Instagram, Messenger, and WhatsApp.  Facebook also regularly directs commercial activity to this District by serving directed and targeted advertisements to consumers within this District. Facebook derives substantial revenue from its commercial activities in this District. Its contacts in this District are regular, constant, and of a substantial character. Facebook's activities are not isolated or sporadic.

134.    Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) in that a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

135.    This Court also has personal jurisdiction over each of these Defendants in that, at all times material herein, they each transacted business in New York; contracted to supply services or things in New York; and/or committed acts and/or omissions in or outside New York which caused tortious injury to Plaintiffs.

136.    Defendants' conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.  At all material times, Google and Facebook participated in the conduct set forth herein in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

## FACTUAL ALLEGATIONS

**A.    The Importance of a Free and Diverse Press and the Decline of Local Newspapers**

137.    A free and diverse press is essential to a vibrant democracy. Whether exposing corruption in government, informing citizens, or holding power to account, independent journalism sustains our democracy by facilitating public discourse.

138.    Newspapers have played a key role in our democracy since its founding. "'Journalism is said to be the first rough draft of history. . . . *The Federalist Papers* were first published in newspapers in New York in 1787-88 to promote the ratification of the United States Constitution. The fact that policy debates today are informed by the public forum offered by newspapers in the past is a reminder that the media have been intertwined with and integral to democracy since the founding.'"[5]

139.    "The liberty of the press ought not to be restrained." Alexander Hamilton, THE FEDERALIST PAPERS: NO. 84 (1791).

140.    Congress has declared:

In the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States, it is hereby declared to be the public policy of the United States to preserve the publication of newspapers in any city, community, or metropolitan area where a joint operating arrangement has been heretofore entered into because of economic distress or is hereafter effected in accordance with the provisions of this chapter.

15 U.S.C. §1801, *et seq.*

141.    In 1995, Microsoft CEO Bill Gates circulated an internal memorandum to executive staff which concluded: "The Internet is a tidal wave. It changes the rules. It is an incredible

---

[5]    Sandra Feder, *Stanford Report*, Interview with James Hamilton, Hearst Professor of Communication at Stanford University's School of Humanities and Sciences, Feb. 27, 2020 (citation omitted), https://news.stanford.edu/2020/02/27/journalism-and-democracy/.

opportunity as well as incredible challenge[.]"[6]  As a result of the rise of the internet, newspapers have seen a steady decline in physical circulation.[7] According to the Pew Research Center, U.S. newspaper circulation fell in 2018 to its lowest level since 1940, the first year with available data.[8]

142.     Since 2006, newspaper advertising revenue, which is critical for funding high-quality journalism, fell by over 50%. Despite significant growth in online traffic among the nation's leading newspapers, print and digital newsrooms across the country are laying off reporters or folding altogether. As a result, communities throughout the United States are increasingly going without sources for local news. The emergence of platform gatekeepers—and the market power wielded by Google and Facebook—has contributed to the decline of trustworthy sources of news.

143.     Since 2006, the news industry has been in economic freefall, primarily due to a massive decrease in advertising revenue caused by Defendants' anticompetitive and unlawful conduct. Both print and broadcast news organizations rely heavily on advertising revenue to support their operations, and as the market has shifted to digital platforms, news organizations have seen the value of their advertising space plummet steeply. For newspapers, advertising has

---

[6]     https://www.justice.gov/sites/default/files/atr/legacy/2006/03/03/20.pdf.  Microsoft proceeded to monopolize internet access resulting in a consent decree with the U.S. Department of Justice to resolve antitrust claims. *United States v. Microsoft Corp.*, 231 F. Supp. 2d 144, 149 (D.D.C. 2002).

[7]     Penelope Muse Abernathy, *News Deserts and Ghost Newspapers: Will Local News Survive?*, The Center for Innovation and Sustainability in Local Media, Hussman School of Journalism and Media, University of North Carolina at Chapel Hill (2020), https://www.usnewsdeserts.com/wp-content/uploads/2020/06/2020_News_Deserts_and_Ghost_Newspapers.pdf.

[8]     Pew Research Center is a nonpartisan fact tank that informs the public about the issues, attitudes, and trends shaping the world. It does not take policy positions. The Center conducts public opinion polling, demographic research, content analysis, and other data-driven social science research. It studies U.S. politics and policy; journalism and media; internet, science, and technology; religion and public life; Hispanic trends; global attitudes and trends; and U.S. social demographics and trends. All of the Center's reports are available at www.pewresearch.org.  Pew Research Center is a subsidiary of The Pew Charitable Trusts, its primary funder.

declined from $49 billion in 2006 to $16.5 billion in 2017. National and local news sources alike have felt this decrease.

144.    As a result of falling revenues, newspapers are steadily losing the ability to financially support their newsrooms, which are costly to maintain but provide immense value to their communities. A robust local newsroom requires the financial freedom to support in-depth, sometimes years-long reporting, as well as the ability to hire and retain journalists with expertise in fundamentally local issues, such as coverage of state government.

145.    Budget cuts have also led to a dramatic number of newsroom job losses. This decline has been primarily driven by a reduction in newspaper employees, who have seen employment fall by half over a recent 8-year period, from 71,000 in 2008 to 35,000 in 2019.  In 2019 alone, 7,800 media industry employees were laid off. The Bureau of Labor Statistics estimates that the total employment of reporters, correspondents, and broadcast news analysts will continue to decline by about 11% between 2019 and 2029.

146.    Researchers at the University of North Carolina School of Media and Journalism found that the United States has lost nearly 1,800 newspapers since 2004 either to closure or merger, 70% of which were in metropolitan areas. As a result, the majority of counties in America no longer have more than one publisher of local news, and 200 are without any paper.

147.    According to a recent article published by the University of North Carolina, many citizens across the country now live in a "news desert" as a result of these closures and layoffs:



148.    In order to survive in the digital marketplace, newspapers were forced to transition revenue sources from traditional print advertisements to digital advertising. Unfortunately, the illegal monopolization of digital advertising by Google, along with illegal private agreements with Facebook, have prevented them from competing on the merits in the digital advertising market.

149.    Local journalism is essential for healthy communities, competitive marketplaces, and a thriving democracy.  Unfortunately, the local news industry is being decimated in the digital age.  This is due both to the rapid proliferation of online news content as well as unfair market practices by some of the world's largest technology companies that reuse local news' content, data, customers, and advertisers.  Report, *Local Journalism: America's Most Trusted News Sources Threatened*, U.S. Senate Committee on Commerce, Science, and Transportation (Oct. 2020).

**B.    Digital Advertising**

150.    There are two principal forms of digital advertising: search advertising and display advertising.

151.    "*Search advertising*" refers to digital ads on desktop or mobile search engines, such as the Google.com homepage, displayed via "search ad tech" alongside search engine results. Search advertising is often bought and sold via real-time bidding ("RTB") auctions among

advertisers, where advertisers set the price they are willing to pay for a specific keyword in a query. Search advertising is not a substitute for display advertising, as the two kinds of advertisements serve different functions. Search advertising is generally used for direct response advertising, which is intended to elicit a response from a consumer, such as the purchase of a product or signing up for a service.

152. "*Display advertising*" refers to the delivery of digital ad content to ad space on websites (desktop and mobile "web display") and mobile apps ("in-app display"), which is referred to as inventory. Within display advertising, there are two separate "ad tech" market platforms: first-party and third-party. Display advertisements are images or videos shown to people as they browse websites, apps, social media, and devices such as TVs connected to the internet. They can be static, animated, or video-based. In contrast to search advertising, display advertisements are generally used for brand advertising. Brand advertising is advertising that increases awareness of, or reinforces the image associated with, a product or service, and advertisers are interested primarily in presenting the ad to consumers rather than having them act on it.

153. "*First-party display ad tech platforms*" sell ad space on their own platforms directly to advertisers. For example, Facebook sells ad space on its platform to advertisers. Google sells display ads on its own properties such as YouTube.

154. "*Third-party display ad tech platforms*" are run by intermediary vendors and facilitate the transaction between third-party advertisers and third-party publishers. Here, specialized software automates the buying and selling of digital ads through an ad exchange.

## C.     The Third-Party Ad Tech Suite



155.    Sell-side software includes publisher ad servers. The primary function of a publisher ad server is to fill ad space on a publisher's website that is personalized to the interests of a specific website viewer. Sell-side software also includes ad networks, which aggregate ad inventory from many different publishers and divide that inventory based on user characteristics—such as age or location.  Ad networks sell the pool of inventory through ad exchanges or demand-side platforms ("DSPs").

156.    Buy-side software includes advertiser ad servers, that is, software that stores, maintains, and delivers digital ads to the available inventory.  Advertiser ad servers facilitate the programmatic process that makes instantaneous decisions about which advertisements to display on which websites to which users and displays the ad on that site.  Ad servers collect and report data, such as ad impressions and clicks, for advertisers to monitor ad performance and track conversion metrics.  Buy-side software also includes demand-side platforms, software that allows advertisers to buy advertising inventory from a range of publishers.  DSPs use data to create targeted ad audiences and engage in purchasing and bidding.

157.    Approximately 86% of online display advertising space in the United States is bought and sold in real-time on electronic trading venues, which the industry calls "advertising

44

exchanges."[9]  Ad exchanges refer to the ad trafficking system that connects advertisers looking to buy inventory with publishers selling inventory.  Sales on ad exchanges occur primarily through: (a) open real-time bidding auctions; (b) closed real-time bidding auctions; or (c) programmatic direct deals.  The ad tech suite also includes analytics tools that allow advertisers and publishers to measure ad campaign efficiency, including consumers' interactions with an ad.  Similarly, data management platforms aggregate and store consumer data from various sources and process the data for analysis.  Advertisers and publishers use data management platforms to track, partition, and target consumer audiences across websites.

158.    Over the last decade, the digital advertising market has experienced double-digit year-over-year growth. The market, however, has become increasingly concentrated since the advent of programmatic trading. In 2017, *Business Insider* reported that Google and Facebook accounted for 99% of year-over-year growth in U.S. digital advertising revenue. Today, advertisers and publishers alike have few options when deciding how to buy and sell online ad space.

159.    This concentration likely exists in part due to high barriers to entry. Google and Facebook both have a significant lead in the market due to their significant collection of behavioral data online, which can be used in targeted advertising. Additionally, Google and Facebook do not provide access to this unique data in open data exchanges. Advertisers' only access to this information is indirect—through engagement with Google and Facebook's ad tech suite.

160.    This significant level of concentration in the online advertising market—commonly referred to as the digital ad duopoly—has harmed the quality and availability of journalism.  As a result of this dominance, there has been a significant decline in advertising revenue to news

---

[9]    Dina Srinivasan, *Why Google Dominates Advertising Markets: Competition Policy Should Lean on the Principles of Financial Market Regulation*, 24 Stan. Tech. L. Rev. 55, 58 (2020).

publishers, undermining publishers' ability to deliver valuable reporting and "'siphon[ing] revenue away from news organizations.'"  House Judiciary Report at 70 (citation omitted).

161.    There is a clear correlation between layoffs and buyouts in the newspaper industry with the growth in market share for the duopoly—Google and Facebook.  The internet distribution systems distort the flow of economic value derived from good reporting.  The effects of this revenue decline are most severe at the local level, where the decimation of local news sources is giving rise to local news deserts.

### D.    Google's Growth to Digital Advertising Dominance

162.    All roads lead through Google.  *See* Fiona Scott Morton & David Dinielli, *Roadmap for a Digital Advertising Monopolization Case Against Google* (May 2020); Fiona Scott Morton & David Dinielli, *Roadmap for a Monopolization Case Against Google Regarding the Search Market* (June 2020).  These two papers together show how Google monopolized general search and used that dominance as a springboard to build and maintain dominance in the digital display advertising market as well.

163.    Google was launched in 1998 as a general online search engine.  Founded by Larry Page and Sergey Brin, Google got its start by serving users web results in response to online queries. Google's key innovation was its PageRank algorithm, which ranked the relevance of a webpage by assessing how many other webpages linked to it.  In contrast with the technology used by rival search engines, PageRank enabled Google to improve the quality of its search results even as the web rapidly grew.  While Google had entered a crowded field, by 2000 it had become the world's largest search engine.  Later that year Google launched AdWords, an online advertising service that let businesses purchase keywords advertising to appear on Google's search results page—an offering that would evolve to become the heart of Google's business model.

164.    Today, Google is ubiquitous across the digital economy, serving as the infrastructure for core products and services online.  It has grown and maintained its search engine dominance, such that "Googling" something is now synonymous with online search itself.  The company is now also the largest provider of digital advertising, the dominant web browser, a dominant mobile operating system, and a major provider of digital mapping, email, cloud computing, and voice assistant services, alongside dozens of other offerings.  Nine of Google's products—Android, Chrome, Gmail, Google Search, Google Drive, Google Maps, Google Photos, Google Play Store, and YouTube—have more than a billion users each.

165.    Google established its position in the digital ecosystem through acquisition, buying up successful technologies that other businesses had developed. In a span of 20 years, Google purchased well over 260 companies.  Google has established this position willfully, as distinguished from growth or development as a consequence of any superior product, business acumen or historic accident.

166.    Google is now one of the world's largest corporations.  For 2019, Google's parent company, Alphabet,  reported total revenues of $160.7 billion—up 45% from 2017—and more than $33 billion in net income.  For 2021, Alphabet reported total revenues of $257.6 billion and more than doubled its 2019 net income to $76 billion.

167.    Although Google has diversified its offerings, it generates the vast majority of its money through digital ads, which accounted for over 83% of Google's revenues in 2019.



168.    Google makes the vast majority of its revenue by selling advertising placement across the internet.  In 2019, Google's ad revenue accounted for approximately 83.3% of its overall sales.  Google is a prominent player in both search advertising and display advertising, and it captures over 50% of the market across the ad tech stack, or the set of intermediaries that advertisers and publishers must use to buy, sell, and place advertisements.  Specifically, Google runs the leading ad exchange, while also running buy-side and sell-side intermediary platforms on the exchange.  Reports as recent as February 2022 suggest that digital advertising accounts for 81% of Alphabet's revenue and 98% of Meta's revenue.

169.    Publicly available data suggests Google captured around 73% of the search advertising market in 2019.  Search advertising, in particular, is critical to Google, accounting for approximately 61% of its total sales.  Google overwhelmingly dominates the market for general online search.  Publicly available data suggest the firm captures over 87% of U.S. search and over 92% of queries worldwide.

170.    For businesses that depend on Google to reach users, these trends amount to a toll hike, as traffic that firms could previously draw through organic listings is now increasingly pay-for-play.  Instead of competing for users by offering high-quality webpages and services that should lead to better organic search listings, these businesses must now compete for users based on how much money they pay Google.

171.    In September 2020, the Senate Judiciary Committee held a hearing on the effects of Google's dominance in digital ads, where members expressed bipartisan concern that Google's market power across the ad tech stack was enabling anticompetitive conduct and harming publishers and advertisers alike.

172.    One key factor that market participants and industry experts cite when accounting for why Google is likely to maintain its dominance in digital ads is its conflict of interest.  With a sizable share in the ad exchange market and ad intermediary market, and as a leading supplier of ad space, Google simultaneously acts on behalf of publishers and advertisers, while also trading for itself.  This demonstrates a set of conflicting interests that market participants say enable Google to favor itself and create significant information asymmetries from which Google benefits.  In this electronically traded market, Google is pitcher, batter, and umpire, all at the same time.

173.    In June 2020, the News Media Alliance published a white paper examining the relationship between news publishers and Google based on interviews with its members over the course of more than a year.  As it notes, "Google has exercised control over news publishers to force them into several relationships that benefit Google at the publishers' expense."

174.    The House Judiciary Report concludes:

Google has a monopoly in the markets for general online search and search advertising. Google's dominance is protected by high entry barriers, including its click-and-query data and the extensive default positions that Google has obtained

across most of the world's devices and browsers.   A significant number of entities—spanning major public corporations, small businesses, and entrepreneurs—depend on Google for traffic, and no alternate search engine serves as a substitute.

House Judiciary Report at 14.

175.   Google maintained its monopoly over general search through a series of anticompetitive tactics. These include an aggressive campaign to undermine vertical search providers, which Google viewed as a significant threat. Documents show that Google used its search monopoly to misappropriate content from third parties and to boost Google's own inferior vertical offerings, while imposing search penalties to demote third-party vertical providers. Since capturing a monopoly over general search, Google has steadily proliferated its search results page with advertisements and with Google's own content, while also blurring the distinction between paid advertisements and organic results.   As a result of these tactics, Google appears to be siphoning off traffic from the rest of the web, while entities seeking to reach users must pay Google steadily increasing sums for advertisements.   Numerous market participants analogized Google to a gatekeeper that is extorting users for access to its critical distribution channel, even as its search page shows users less relevant results.

## THE RELEVANT MARKETS AND GOOGLE'S MARKET POWER

### A.   The Relevant Markets and Google's Market Power

176.   A relevant market is comprised of a relevant product market and a relevant geographic market.  This case involves at least three antitrust product markets: (1) the market for publisher ad servers; (2) the market for ad exchanges; and (3) the market for general search services.  Also implicated in the Jedi Blue agreement, described below, are the markets for in-app display ad networks and mediation tools for in-app inventory. As explained herein, Google has

harmed competition in and across all of these markets. The United States is the relevant geographic market for the markets defined below.

### 1. Publisher Ad Servers

#### (a) Relevant Market

177. To manage their inventory of display ads, publishers license a software product called an ad server. An ad server allocates and routes available display ad space between direct sales per pre-arranged agreements with advertisers and indirect sales conducted through exchanges. The ad server directly connects to the ad exchange.

178. Ad servers are used for both direct and indirect sales of display ads. Publishers typically use a single ad server to manage all of their web display inventory served on desktop and mobile websites (known as "single homing"). Using multiple ad servers would substantially frustrate a publisher's ability to effectively optimize management of their inventory and maximize revenue.

179. Ad servers have unique customers and exhibit unique product characteristics, pricing, and entry and usage requirements. In terms of product characteristics, ad servers provide publishers with specialized features such as: (1) reservation-based sales technology to support a publisher's direct sales efforts; (2) inventory forecasting technology to help a publisher determine what inventory will be available to sell; (3) a user interface through which a publisher's sales team can input ad requirements and parameters; (4) management capabilities for direct and indirect sales channels; (5) report generation technology for inventory performance; (6) invoicing capabilities for a publisher's direct sales; (7) a decision engine for determining when and how to route a publisher's impressions between direct and indirect sales channels; (8) a decision engine for choosing between different networks and exchanges for indirect sales; (9) a decision engine for

determining what ad from the direct and indirect channels will ultimately serve on the publisher's page; and (10) yield management technology.

180.    In the market for publisher ad servers, publishers purchase the ad server services from providers, such as Google.   No other service is substitutable for, or reasonably interchangeable with, an ad server from the perspective of publishers.   In other words, if a hypothetical entity with monopoly power in the ad server market imposed a small but significant non-transitory increase in price for its publisher ad server, sufficient publishers would not replace the ad server function with another product or service so as to make the price increase unprofitable. Moreover, as discussed further herein, the publisher ad server market and ad exchange markets each represent a different service provided at a different level of the ad technology stack.   For example, a publisher ad server helps publishers track users, manage inventory and make the final decision about how to fill available inventory, while an ad exchange acts as an intermediary, matching publishers and advertisers.   These are separate functions, and thus are not substitutes for each other.

181.    Internally, Google has recognized ad servers as a distinct market.   In 2020, Google's documents delineate between ad servers, exchanges, networks, and buying tools, detailing how each product performs unique functions. So it comes as no surprise that Google routinely calculates its share of the ad server market without accounting for exchanges or networks. Indeed, Google identifies only competing ad servers (such as AppNexus and Sizmek) and the invention of header bidding as competing with and putting pricing pressure on Google's ad server. Google does not consider exchanges to be competitive threats to its ad server. Instead, Google compares its ad server to other ad servers and monitors other ad servers as competitive threats.

182.    Government agencies around the world recognize ad servers as a distinct product market. In 2007, the FTC accepted Google's proposed definition of ad servers as a distinct product market in approving Google's acquisition of DoubleClick.  In connection with its efforts to avoid a challenge by the FTC of its acquisition of DoubleClick, Google represented to the FTC that its existing network (then called AdSense) and the ad server it sought to (and ultimately did) acquire DoubleClick for Publishers ("DFP") "are not direct substitutes," explaining that "[i]f the price of DFP were increased by a small but significant amount, customers would switch to other publisher-side ad serving products, such as those provided by 24/7 Real Media, Atlas/aQuantive." Moreover, Google went even further, characterizing any suggestion that ad servers and networks are interchangeable as "seriously flawed and utterly divorced from commercial reality." In other words, Google has long acknowledged that while ad servers are substitutes for each other, networks and other advertising marketplaces are not.

183.    The U.S. House Subcommittee on Antitrust, Commercial, and Administrative Law conducted an investigation of digital markets and released an accompanying 2020 report titled "Investigation of Competition in Digital Markets," which recognizes the functions performed by ad servers as distinct from exchanges, networks, and ad buying tools.  Furthermore, the British and Australian competition authorities—the United Kingdom's Competition and Markets Authority ("UK CMA") and the Australian Competition and Consumer Commission – recently ("ACCC")— recently conducted substantial investigations into competition in digital markets and published reports recognizing ad servers as a distinct product market. In early 2022, the French Competition Authority identified ad servers as a distinct market, comprising products that "allow publishers to manage their ad inventories by evaluating their [ad inventory] availability, based on their historical

properties, and automatically select the most relevant and profitable ads available," distinct from networks, exchanges, and ad buying tools for advertisers.

184.    Market participants, standard-setting organizations, and industry trade journals also recognize ad servers as a distinct product market. The Interactive Advertising Bureau, a prominent industry standard-setting organization for display advertising, defines a publisher ad server as "[a] computer application that enables the delivery, tracking and management of advertising content on publisher inventory."  A 2017 internal Facebook document identifies a market consisting only of ad servers and describes the competitive landscape for ad servers.  Likewise, an internal strategy deck prepared by competitor Xandr (owed by AT&T) in July 2020 describes an ad server as a stand-alone product that provides publishers with "ad decisioning, delivery, and reporting."

### (b)    Google Has Monopoly Power In the Ad Server Market

185.    Google has monopoly power in the ad server market, where it controls approximately 90% of the market.  Google's dominance of the publisher ad server market began in 2008, when Google purchased DoubleClick, which then gave Google control of over 50% of the publisher ad server market.  By 2012, Google's internal documents indicate that approximately 85% of publishers in the United States licensed its ad server.  In 2018, Google measured the "breadth" of its ad server (i.e., the number of publishers using the ad server) as 84% of publishers globally and a staggering 99% of large publishers in the United States.  In a 2020 report, the UK CMA found that Google had between 90% and 100% of the publisher ad server market, as measured by the total impressions served in the U.K.  Google's ad server for publishers has been known at various times as DoubleClick for Publishers or "DFP" and Google Ad Manager or "GAM."

186.    Other providers of publisher ad servers are small and fragmented.  Indeed, the number of alternative providers has decreased recently with sellers such as OpenX, Open Ad Stream, and Verizon Media deciding to stop providing a publisher ad server product, and other sellers relegated to negligible market shares.

### 2.    Ad Exchanges

### (a)    Relevant Market

187.    Ad exchanges are real-time auction marketplaces that match advertisers looking to buy inventory with publishers selling inventory on an impression-by-impression basis.  Ad exchanges are typically used by large publishers and have minimum-impression requirements.

188.    Ad exchanges do not hold an inventory of display ads but act as a go-between, and charge publishers a "take-rate" or exchange fee as a commission on the clearing price of the transaction. An ad exchange auctions a publisher's inventory, as routed through an ad server, and advertisers submit bids through an ad-buying tool.

189.    No reasonable substitutes for exchanges exist. A hypothetical monopolist imposing a small but significant and non-transitory increase in the price of exchanges from a competitive level would not cause a sufficient number of customers to switch to other means of selling and buying display inventory such that the price increase would be unprofitable. Similarly, a hypothetical monopolist imposing a small but significant and non-transitory decrease in the quality of exchanges from a competitive level would not cause a sufficient number of customers to switch to other means of selling and buying display inventory such that the quality decrease would be unprofitable.

190.    Ad exchanges are unique and not interchangeable with ad servers. Ad servers and exchanges products have vastly different sets of features and price points.  In addition, ad networks

offer fewer services than ad exchanges and are a separate product market serving a different group of customers (smaller publishers with lower web traffic).  Rather than providing all the targeting and bidding features of ad exchanges, ad network placements are made based on a pool of advertising inventory.  Because they do not have the sophisticated targeting and bidding features inherent in ad exchanges, ad networks largely cater to smaller publishers and smaller advertisers as compared with ad exchanges.

191.    Google internally recognizes that exchanges are a distinct product market. Google analyzes market share with reference only to other exchanges (instead of accounting for ad servers or ad networks). Google measures its exchange market share in terms of share by exchange market revenue or exchange impression volume.  In documents dating back to 2011, Google identifies only other exchanges as "key competitors" to its exchange.  Internally, Google continues to recognize that direct sales, exchanges, and networks are distinct.  A 2020 Google presentation titled "Display Business Overview" refers separately therein to the direct sales channel ("Reservations"), exchanges ("RTB"), and networks, stating: "Conceptually, there are 3 ways Display transacts between adv[ertiser]s and pub[lisher]s: Reservations, RTB, and Network." The document further explained that "[d]isplay is not a monolithic business: within it, there are three paths for transactions, each with distinct characteristics. Reservation: Direct transactions between advertisers and publishers … RTB: Auction connecting advertisers and publishers (primarily large, sophisticated ones), and giving them significant controls. Demand and supply are disaggregated … Network: Closed demand-supply loop, primarily between smaller advertisers and publishers; high degree of automation."

### (b)   Google Has Monopoly Power in the Ad Exchange Market

192.    Google's ad exchange is known as AdX.  "By 2015, Google's internal documents demonstrate that 80% of the publishers using Google's ad server also contracted with Google's exchange. Since 90% of publishers were using Google's ad server, this means that the large majority of available publisher customers were using Google's exchange . . . ."  In the four quarters preceding October 2019, AdX transacted over 60% of all display inventory sold through exchanges in the United States.  Recent industry estimates show Google's market share continuing to surge, as it now has more than 70% of the ad exchange market.

193.    The few rivals to Google's ad exchange—such as Rubicon, Xandr and Index Exchange —have small shares of the market.

194.    Google's exchange is also insulated from competition. In 2016, following widespread adoption of header bidding (described below), a price war between exchanges began, and non-Google exchanges began cutting their prices. In 2017, several exchanges revealed their recent price cuts to industry publication AdExchanger: "Less than a week after Rubicon Project slashed its take rate in half, to 10% to 12% . . . AppNexus [now Xandr] said its fees are even lower. The company revealed it charges an 8.5% average to the sellers on its platform."  Despite these significant price cuts, these rival exchanges were unable to materially increase their market share. In March 2018, Rubicon Project also reported: "The ad tech market is demanding more efficiency and lower cost from intermediaries like us. In an effort to be more competitive in attracting demand and capturing inventory supply, we made a strategic decision in mid-2017 to reduce the fees we charged buyers in OMP [open marketplace] transactions. In addition, in 2017 our business mix shifted to a higher proportion of header bidding transactions, and we charged lower buyer fees for header bidding transactions in order to pass higher bids to the downstream decisioning process.

Finally, in response to increasing market pressure and in an effort to be more competitive, on November 1, 2017, we eliminated our buyer transaction fees altogether." Historically, buyer transaction fees had represented approximately 51% of Rubicon's revenue in 2016 and 49% of Rubicon's revenue for the first ten months of 2017.

195.    Meanwhile, Google's exchange maintained or even increased prices, yet still increased its market share.  In an internal November 2017 email, a Google employee thought exchange "margins will stabilize at around 5%. Maybe it will happen by this time next year or in early 2019. This creates an obvious dilemma for us. AdX is the lifeblood of our programmatic business. . . .  What do we do?" Google's 2018 internal documents observed that "[r]ecent market dynamics  . . . are putting pressure on the 20% fee and it is becoming more clear that the market bears the fee primarily because of the exclusive access to our [Google Ads] demand."  Despite this, Google did not reduce its average exchange take rate from 2017 to 2020.  In fact, by 2019, Google had increased its exchange take rate for third-party buyers by one to two percentage points, which was a six to ten percent price increase relative to those rates in 2017. The fact that Google did not lower its exchange take rates during this time—and instead increased them without losing market share—demonstrates that Google's exchange has pricing power and is insulated from competitive market dynamics.

196.    Moreover, Google's exchange does not lose market share even though its customers perceive its exchange to be of lower quality than other exchanges on key dimensions. A 2018 survey asked publishers to evaluate exchanges across various dimensions of quality. Google trailed competing exchanges in all five of the key quality dimensions and ranked last in two of the five key dimensions.  Notably, Google ranked last in the measure of "alignment with publisher goals and needs." In 2019, a column in AdExchanger observed that publishers continue to use Google's

exchange not because of superior quality, but because of "the demand that Google brings through its buy-side and exchange-related dominance." According to a survey of publishers by Advertiser Perspectives (an advertising industry business intelligence agency), Google's exchange is the "dominant gateway for online advertising," Google's exchange is "always No. 1," and it has "real dominance."

### 3.   General Search Services

#### (a)   Relevant Market

197.   General search services in the United States is a relevant antitrust market.  General search services allow consumers to find responsive information on the internet by entering keyword queries in a general search engine such as Google, Bing, or DuckDuckGo.

198.   General search services are unique because they offer consumers the convenience of a "one-stop shop" to access an extremely large and diverse volume of information across the internet. Consumers use general search services to perform several types of searches, including navigational queries (seeking a specific website), informational queries (seeking knowledge or answers to questions), and commercial queries (seeking to make a purchase).

199.   Other search tools, platforms, and sources of information are not reasonable substitutes for general search services. Offline and online resources, such as books, publisher websites, social media platforms, and specialized search providers such as Amazon, Expedia, or Yelp, do not offer consumers the same breadth of information or convenience. These resources are not "one-stop shops" and cannot respond to all types of consumer queries, particularly navigational queries. Few consumers would find alternative sources a suitable substitute for general search services. Thus, there are no reasonable substitutes for general search services, and a general search

service monopolist would be able to maintain quality below the level that would prevail in a competitive market.

200.    The United States is a relevant geographic market for general search services. Google offers users in the United States a local domain website with search results optimized based on the user's location in the United States. General search services available in other countries are not reasonable substitutes for general search services offered in the United States.

201.    Google analyzes general search market shares by country, including the United States. Therefore, the United States is a relevant geographic market.

### (b)    Monopoly Power

202.    Google has monopoly power in the United States general search services market. There are currently only four meaningful general search providers in this market: Google, Bing, Yahoo!, and DuckDuckGo.  According to public data sources, Google today dominates the market with approximately 90% market share, followed far behind by Bing with about 3% and Yahoo! with less than 2%.

### UNLAWFUL CONDUCT

### A.    Google Wields Its Monopoly Power in Multiple Markets to Impair Competition

203.    Google is a monopolist in the publisher ad servers, ad exchanges, and general search services markets.  Google aggressively uses its monopoly positions, and the money that flows from them, to continuously foreclose rivals and protect its monopolies.  As described below, Google has willfully maintained and extended its monopolies through a wide variety of anticompetitive conduct, including excluding and preventing entry by competitors, raising its

rivals' costs, and forcing publishers and advertisers to rely on Google's intermediation services to effectuate sales.

**1.    Google Impaired and Excluded Competitors Through Auctions Designed to Preference Its Own Exchange**

**(a)    Dynamic Allocation**

204.    Traditionally, bidding for impressions was done sequentially in a "waterfall" auction–that is, a publisher passes its inventory from ad exchange to ad exchange in descending order of importance (as ranked by the publisher) until all impressions are (hopefully) sold.  The ad exchanges are usually ranked according to the average historic yield they have produced for the publisher.  This means that an ad exchange where premium inventory has been sold in the past (for a higher price) will then get first chance on further impressions from the same publisher.  Waterfall auctions worked to the relative disadvantage of Google, as publishers gave Google's ad exchange a lower ranking because other exchanges offered higher prices.

205.    Through its DFP ad server, Google foreclosed competition in the market for ad exchanges, with the 2010 introduction of a program called "Dynamic Allocation." With Dynamic Allocation, Google's DFP ad server terminated impartial exchange order routing and gave Google's AdX exchange a first right of refusal at depressed prices, all the while deceiving publishers.

206.    Before 2009, a publisher using Google's DFP ad server that wanted to sell its impressions through multiple exchanges needed to determine which exchanges would be called in which order. When a publisher's impression became available for sale, Google's ad server would offer the impression through the exchange the publisher wanted to call first; the impression would then pass to subsequent exchanges in sequential order, calling each subsequent exchange only if

all prior higher-ranked exchanges failed to clear the impression. As noted, the industry referred to this practice as "waterfalling."

207.    This system of allocation of publisher's inventory across multiple exchanges did not favor one exchange over another. Once a publisher established the sequence for the relevant exchanges, Google's ad server ostensibly carried out those instructions. If an exchange performed well for a publisher (e.g., because it attracted advertisers willing to bid top dollar for impressions on that publisher's site, or because the publisher wanted to be associated with advertisers on that exchange), then the publisher would be incentivized to reward it with a higher place in their waterfall. Conversely, if an exchange's bid prices or quality performance failed to justify its place in the waterfall, the publisher would be incentivized to demote it. Publishers benefited from exchanges competing over time to earn their place in each waterfall.

208.    Starting around 2009, however, the industry began to evolve away from waterfalling, with exchanges starting to compete with each other by submitting real-time bids for publishers inventory. In this new era, a publisher could put an impression up for sale and have exchanges compete at the same time for the impression by returning live, competitive bids. Simultaneous real-time bidding by exchanges results in higher inventory yield for publishers. As the concept of real-time bidding began to gain popularity, Google strategized to use its control of the ad server market to inhibit competition among exchanges. Opting to foreclose competition rather than compete on the merits, Google incorporated new decisioning logic—a new program it called Dynamic Allocation—into DFP in 2010. Dynamic Allocation marked an end to DFP ad server order-routing impartiality. Under this program, Google used the dominance it held with its DFP ad server to impart a substantial new unearned and anticompetitive advantage to its own AdX exchange: a right of first refusal. Rather than sequentially calling a publisher's preferred exchanges

and allocating the impression to the first exchange able to clear its respective price floor, Google's Dynamic Allocation program instead had DFP permit AdX to peek at the average historical bids from rival exchanges and then transact the publisher's impression if AdX could return a live bid for just a penny more than the highest of these historical bids. Of course, Google's AdX was the only exchange with such an unprecedented backdoor right of first refusal on publishers' inventory in DFP.

209.    Dynamic Allocation ultimately reduced publishers' yield by shielding AdX from realtime competition and by permitting AdX to transact impressions at depressed prices. Publishers ranked exchanges to reflect the historical average prices paid by each exchange. But those very prices were artificially depressed by Google. Shortly before introducing Dynamic Allocation, Google cut off much of publishers' ability to share information about their inventory with the advertisers using non-Google products, which led to a less-informed pool of advertisers using non-Google products, which in turn led to lower bids from that pool of advertisers.

210.    Google seized the opportunity it created. With Dynamic Allocation, Google used DFP to allow AdX to swoop in and buy inventory at just a penny more than the depressed average historical bids returned by non-Google exchanges to DFP. Indeed, at the very moment DFP was giving AdX an unparalleled right to bid ahead of the publisher's established waterfall, DFP also gave AdX the information it needed to beat out competing exchanges without paying the higher prices it otherwise would have paid because of its information advantages. In other words, Google used its ad server monopoly to let its ad exchange view a publisher's valuable impression—like a box seat at a baseball game—and transact that impression for just a penny more than the average price that a non-Google exchange sold any old impression for—like the average price for any seat

in the stadium. That is not competition on the merits, and it was certainly not in the best interest of publishers.

211.     Because publishers license ad servers for the express purpose of maximizing their inventory yield, Dynamic Allocation did not serve the interests Google's DFP customers (i.e., publishers), and but for Google's dominance in ad serving, publishers would have switched to a rival ad server. Google's deliberate steps to degrade the quality of its ad server—in particular by giving its own AdX exchange preferred access to publishers' inventory and information—furthered Google's aspirations for monopolization.

212.     Dynamic Allocation was exclusionary and successfully foreclosed competition in the exchange market. The scheme exacerbated problems of adverse selection in the exchange market, permitting Google's exchange to transact a large number of publishers' impressions and cream skim publishers' high-value impressions; competing exchanges were left with the ad impressions passed over by AdX and starved of liquidity. Despite entering a competitive market just a few years earlier, Dynamic Allocation propelled Google's AdX exchange to the top of the market by 2013.

213.     In or around 2009, Google's publisher Ad Server began using a system called "Dynamic Allocation" as a supplement to the waterfall system.  With Dynamic Allocation, Google's publisher ad server gave Google's own ad exchange an advantage through a two-step process. Initially, the publisher ad server conducted a Google ad exchange auction using the highest estimated bid from any ad source in the waterfall system as the reserve price.  If Google's ad exchange beat that highest estimated price, Google placed the ad from its ad exchange auction as the winner, with no other ad source even given the opportunity to bid.  Rival ad exchanges were permitted to compete in a secondary waterfall if, and only if, Google's ad exchange failed to beat

the reserve price.  The Dynamic Allocation system thus gave Google's ad exchange a privileged position as the default first ad source in the waterfall system.  This first-in-line privilege, granted by Google's publisher ad server, effectively drove advertisers to use Google's ad exchange, at the expense of Google's ad exchange rivals, because advertisers knew that if they submitted the same bid on Google's ad exchange and on a competing exchange, the bid on Google's ad exchange was more likely to win due to Google ad exchange's priority in the waterfall.

**(b)**     **Enhanced Dynamic Allocation**

214.    Five years later, in 2014, Google implemented "Enhanced Dynamic Allocation" (EDA) through its ad server, which conferred an even greater advantage on Google's own ad exchange than the earlier version of Dynamic Allocation.  With Enhanced Dynamic Allocation, Google exploited its monopoly in the ad server market to harm competition in the markets for ad exchanges and ad servers, by channeling the most high-value inventory of Google's publisher clients to its ad exchange, which starved rival exchanges of scale and liquidity.  Google automatically enrolled its publisher clients into Enhanced Dynamic Allocation and attempted to mislead publishers to continue using Enhanced Dynamic Allocation as a purported way for publishers to maximize yield; internally, however, Google viewed Enhanced Dynamic Allocation as a way for AdX to "cherry-pick" high-revenue impressions.

215.    Like Dynamic Allocation, EDA was a new decisioning logic that Google incorporated into DFP. EDA had the purpose and effect of opening up a new additional pool of publishers' inventory to exactly one exchange: AdX. Moreover, this new pool contained publishers' most high-value impressions (e.g., impressions displayed in the most prominent positions of a webpage, impressions targeted to users likely to make a purchase, etc.).To do so, Google's ad exchange used an adjusted price from the highest value direct deal the publisher had

arranged as the reserve price for its own auction. A non-Google ad exchange would only have an opportunity to bid if: (1) Google's ad exchanges failed to meet the reserve; (2) there was no direct deal qualifying for the space; and (3) the publisher ad server reached the other ad exchanges in the waterfall system. This process weakened publishers' direct sales channels and drove more advertisers to programmatic channels, where Google could extract more profits.

216. So, in addition to blindfolding and cutting in line ahead of competing exchanges, Google gave itself access to particularly valuable inventory and the ability to close off that inventory from all other exchanges, thus further starving rival exchanges of scale and liquidity.

217. EDA was exclusionary and successfully foreclosed competition in the exchange. Now operating the only exchange with access to this new pool of ad inventory, Google caused even more harm to competition between exchanges and siphoned even more advertisers away from rival exchanges; advertisers wishing to purchase from the new pool of high-value impressions through exchanges had to purchase through AdX. This foreclosed competition in the exchange market, especially because the vast majority—80%—of web publishers' ad revenue is generated from a much smaller percent—just 20%—of impressions, according to Google's review of revenue and impressions on AdX in the United States. Google refers to this dynamic as "cookie concentration."

218. Google accomplished this through its ad server (DFP)—a product publishers reasonably expected to further their interests in maximizing yield—but none of it was in the interests of Google's DFP customers. Rather, EDA hurt publishers' yield by foreclosing competition from exchanges (most particularly, exchanges that charged lower take rates than AdX). A $10.00 transaction in AdX would cost the publisher a ~20% exchange fee. The same transaction clearing through a non-Google exchange could cut that cost in half.

219.     Moreover, EDA hurt publishers' yield by permitting AdX to transact publishers' impressions for depressed prices. DFP permitted AdX to transact high-value impressions for one penny more than a price floor that Google set for itself—despite Google's obvious conflicts of interest. Google's exchange could transact the impression if an advertiser returned a net bid greater than both (a) the price Google set for itself and called the "EDA reserve price" and (b) the average historical bids belonging to rival exchanges.

220.     These steps to deliberately degrade the ad server make sense only through the lens of Google's power in the ad server market and desire to advantage its own exchange. Publishers license an ad server to maximize their inventory yield, but Google continued to move in the opposite direction. The company had a clear goal in mind: further monopolization.

221.     Google automatically turned EDA on for publishers then coaxed publishers into leaving EDA turned on under a false pretense. Wearing its publisher ad server hat, Google falsely told publishers that EDA "maximizes yield." Publishers relied upon Google's misrepresentations to enable EDA, thinking it would maximize yield.

222.     Google knew EDA did not and would not actually maximize publishers' yield. Internally, Google understood that EDA was a scheme to let its own AdX exchange simply "cherry-pick [publishers'] higher-revenue impressions," earning Google's exchange an additional $150 million per year. Moreover, Google concealed the true nature of its conduct by hashing publishers' ad server user IDs – which hid its anticomepetive conduct and shielded it from being discovered.

223.     Today, publishers have no choice but to leave EDA turned on in DFP; if a publisher turns off EDA, then AdX will not return live, competitive bids for their impressions.

224.     In summary, Google's conduct at issue—including overriding publisher control of exchange routing through Dynamic Allocation, and terminating publishers' ability to make their inventory pools available to an exchange of their choosing through EDA—constituted an exclusionary and unlawful scheme to exclude competition. Each set of conduct standing alone foreclosed exchange competition. However, the combined effect of this conduct was even more powerful. Indeed, the synergistic effect of Google's anticompetitive conduct in the ad server market significantly increased the number of transactions flowing through Google's exchange. As a result of Google's behavior, non-Google exchanges could not as effectively compete on quality (valuable impressions), liquidity (volume), or take rate. As a result, even otherwise large and powerful companies such as Microsoft and Yahoo!, which Google identified internally as offering better-quality and lower-priced exchanges, exited the exchange market in 2011 and 2015 respectively. By foreclosing competition, Google's exchange can charge a supracompetitive 19% to 22% commission on transactions.

### (c)     Other Self Preferencing Measures

225.     Also in 2014, Google introduced another feature, called "Last Look," that adjusted the way in which bids were accepted and further distorted the ad auction process.  Last Look was a feature that allowed Google the opportunity to bid on every impression and consequently always outbid other publishers.  The DoubleClick ad exchange would wait for other exchanges to submit their bids before making its own, a dynamic that left Google always in a position to outbid its rivals. By having the "Last Look," Google's exchange could simply bid $5.01 when the highest bid for a particular user from another exchange was $5.00. Google would effectively be first in line and would assess whether the impression was a valuable user or instead a low-value impression.  This has been enabled by Google's monopoly control over publisher ad servers,

artificially and anticompetitively distorted the ad server's bid selection process with the intent to exclude rival ad exchanges as a means to maintain and expand Google's dominance in the ad exchange market. After intense criticism, and years of economic harm to publishers, Google eventually relinquished the feature in 2019.

226.    As a potential work-around to these measures, publishers responded by developing header bidding.  This gave every ad buyer an equal chance to bid on the same inventory at the same time, leading to greater competition between bidders and more ad revenue for publishers, fostering competition among ad exchanges and creating rivals to Google.  Following the adoption of header bidding, publisher revenue increased significantly–cost per thousand impressions increased by 25% to 50%.

227.    In response to this competitive threat, Google took aim at header bidding, introducing an alternative it called "Open Bidding," which was integrated into its ad tech stack. Open Bidding is a server side auction between bidders on rival ad exchanges.   Each time inventory is for sale: Google conducts an internal second-price auction among advertisers using its Google Ads tool to select the highest bidder; then the winning Google ads bid competes with other ad sources in a second-price auction within Google's ad exchange; finally, Google conducts the Open Bidding auction, a final first-price auction where Google's ad exchange competes against rival ad exchanges.  In that final auction, however, if the winning bidder of the Exchange Bidding auction uses a non-Google ad exchange, Google imposes an explicit 5% through 15% surcharge or tax on the winning bid.  The surcharge both drives more wins towards Google's ad exchange (and away from rivals) and suppresses the revenues publishers earn from winning bids.  Yet again, Google's response was designed to suppress competition on the merits and favor itself over its rivals, as Open Bidding allowed Google to impose a tax on its competitors in an effort to raise their costs.

### 2.   Project Bernanke

228.   In 2013, Google's gTrade team devised and launched a secret program, which they codenamed "Project Bernanke" (after the quantitative easing policy of the former Federal Reserve Chairman Ben Bernanke).

229.   Through this program, Google manipulated the prices paid by auction winners. Auctions are sometimes structured as "first-price," "second-price" or "third-price" auctions.  In a first-price auction, the winning advertiser pays the exact price they bid on the impression.  In a second-price auction, the winning advertiser-bidder is the bidder who bid the highest price, but, instead of paying the amount of its bid, it pays the amount of the second-highest bid.  For instance, if the two highest bids are $15.00 and $12.00, the advertiser with the $15.00 bid will win, but will pay only $12.00.  Bidders remain incentivized to submit the highest bid, but they do not know the precise amount that they will pay.  In a "third-price" auction, the winning advertiser pays the amount of the third-highest bid.

230.   In a second-price auction, publishers also are permitted to set a price floor, reflecting the minimum amount that they will accept for a transaction.  If only the highest bid exceeds the price floor, the price floor acts as the second-highest bid, and the winner will pay an amount equal to the price floor.  Many type of auctions let a publisher set different price floors for different exchanges.

231.   Google's secret Project Bernanke program surreptitiously switched AdX from a second-price auction to a third-price auction on billions of impressions per month.  Project Bernanke dropped the second-highest bid from the AdX auction when the two highest bids were above the floor and from Google Ads advertisers. The price to be paid, then, was the lower third-place bid. With Project Bernanke, AdX ran third-price auctions rather than second-price auctions.

232.     As a result, publishers were unwittingly paid in amounts that reflected third-place bids rather than second-place bids, and, consequently, suffered revenue declines of as much as 40%.  At the same time, Google Ads, its ad-buying tool for small advertisers, continued to charge the winning advertiser as if it had won a second-price auction.  Google retained the difference between the second- and third-place bids.  In other words, under Project Bernanke, the advertiser with the winning bid paid the price of the second-highest bid, but the publisher would receive a payout equal to the third-highest bid, with Google retaining the difference. Google then placed the price differential into a pool, which it used to increase the bids of client advertisers using Google Ads in order to help those advertisers win impressions on AdX that might have gone to advertisers that used non-Google ad-buying tools.  The implementation of Project Bernanke increased the number of impressions transacted through AdX and the win rate of Google ad-buying tools.

233.     Google later implemented two other iterations of Project Bernanke: Global Bernanke and Bell.  In a version called Bell, Google pre-determined whether a publisher provided AdX with an opportunity to bid on inventory prior to other exchanges, such as permitting Google to sell impressions using Dynamic Allocation or EDA.   If the publisher did not give preferential access, the Bell version of Project Bernanke switched the auction from a second- to third-price auction, thereby decreasing the publisher's AdX revenue.   Bell then used the differential to inflate the bids returned to publishers who gave preferential access to AdX.  In other words, Bell penalized publishers who did not grant AdX preferential access by paying them based upon the third-place bid rather than a second-place bid, while using the difference to increase the bids made to publishers who allowed preferential access.  In short, Google coercively used its power in the ad-server market to reward publishers that granted it a special priority and punish publishers that did not.

71

234.    Project Bernanke increased Google's annual AdX revenue by $230 million, with the Bell version generating an additional $140 million.

### 3.    Dynamic Revenue Sharing

235.    In 2014, Google launched a program called Dynamic Revenue Sharing.  Dynamic Revenue Sharing dynamically adjusted Google's exchange fee on an impression-per-impression basis after soliciting bids in the auction to let Google's AdX exchange win impressions it would have otherwise lost.

236.    In "a true second-price auction," AdX could transact an impression only if a bid cleared the publisher's pre-set floor after accounting for Google's exchange fee.  For instance, if a publisher set a $10.00 bid floor, a bid would clear only if the amount of the bid, minus Google's exchange fee, exceeded $10.00.  A $12.00 bid with a 20% exchange fee would net $9.60 to a publisher, thus failing to clear the $10.00 floor.  In this situation, however, Google would then make a downward adjustment to its own exchange fee in order to clear the publisher's bid floor.  For instance, in the above-discussed example, instead of charging a 20% fee on a $12.00 bid, Google would charge a lower fee in order to clear the publisher's $10.00 floor.  At the same time, Dynamic Revenue Sharing would secretly increase AdX's publisher fees on impressions where an advertiser bid was significantly above the publisher's floor.

237.    By overriding the floors publishers had set to maximize yield and return high quality advertisements, Dynamic Revenue Sharing harmed publishers.  Dynamic Revenue Sharing allowed lower quality advertisements to win through the Google auctions, when a higher quality advertisement should have won through a competitor's exchange.

238.    Not surprisingly, Google concealed Dynamic Revenue Sharing from publishers. Google started opting publishers into Dynamic Revenue Sharing starting in 2014 without

disclosing anything about the program to publishers.  By the fall of 2015, Google had opted all publishers into Dynamic Revenue Sharing, still without disclosing the program.  In the summer of 2016, without referring to the program's real name, Google told publishers it was launching a "revenue share-based optimization" that increased a publisher's yield.  Google was referring to Dynamic Revenue Sharing, which plainly did not increase publisher yield.

239.    The Complaint alleges that Dynamic Revenue Sharing manipulated Google's exchange fee after soliciting auction bids and "peeking" at bids on rival exchanges.

### 4.    Redaction of Auction Date

240.    Google undertook additional, coordinated steps for the purpose of impeding or preventing publishers from participating in header bidding – namely, withholding bid information from publishers to render header bidding less effective than bids submitted through Exchange Bidding.

241.    In 2018, Google, through its ad server, began to redact auction records that showed the relative success of header bidding compared to the performance of Exchange Bidding. Publishers relied on data fields called KeyPart and TimeUsec2 in order to compare the relative performance of exchanges in header bidding and Exchange Bidding, and to adjust their use accordingly.  By redacting the two data fields, Google prevented publishers from measuring the performance of different exchanges and foreclosed the competition brought by header bidding. Google also splits data in a way that makes it impossible for publishers to track auction results and limits information about the bids submitted for an impression.  This left publishers unable to track the source of winning impressions, and even to see whether the highest bidder won at auction.

### 5.     Limitation on Publisher Line Items

242.     Additionally, Google's ad server limits publishers' ability to receive bids through header bidding.

243.     Through line items, publishers are able to set a to-the-penny price for bids that they will accept through header bidding.  For instance, a publisher can list a line item with the price of $4.29.  If, instead, the publisher has entered a line item of $4.20, and received a bid of $4.29, Google's ad server would round down the $4.29 bid to the nearest line item, and the publisher would be paid $4.20.  To keep this from happening, publishers must create separate line items ($4.20, $4.21, $4.22 and so on) to fully capture a competitive bid.  Google purposely limits the number of line items available to publishers in order to foreclose competition from header bidding.  Indeed, Google has internally described its caps on the number of line items as a "tool" to fight header bidding and "push[ ]" publishers toward Exchange Bidding.  By contrast, a rival ad server named OpenX allowed publishers to capture bids on header bidding through a single line item.  OpenX was unable to compete with Google's monopoly power and exited the ad server market in 2019.  Google's limit on publishers' line items has driven down publishers' yields and made bids from header-bidding exchanges less competitive than those made through AdX.

### 6.     Projects Poirot and Elmo

244.     As noted above, to avoid being completely at Google's mercy, and seeking to preserve at least some level of competition, publishers and other market participants implemented header bidding –as a more competitive means of selling their inventory. Header bidding allowed publishers to secure higher bids from rival, non-Google ad exchanges, thereby circumventing the sequential bidding process that Google had rigged in its favor.

74

245.     Google reacted to header bidding by implementing, among other measures, two projects, Projects Poirot and Elmo, to detect and reduce spending on rival exchanges, to reassert control over publishers' inventory, to protect its control over the ad exchange market and ultimately, starve rival exchanges of demand.  "[T]o combat the effects of header bidding," gTrade first devised Project Poirot, which was initially designed to identify when a rival exchange wasn't running a true second-price auction.  The algorithm relied on inputs from DV360's own bid data to detect and quantify any deviations from second-price auctions.  Once detected, Project Poirot would typically adjust DV360's bid to avoid overpaying for an impression or providing the rival exchange with meaningful data about DV360's willingness to pay.

246.     Accordingly, DV360 intentionally bid less on rival exchanges and increased bids on its own ad exchange, ostensibly to avoid optimizations that were bad for advertisers, when DV360 was actually redirecting that ad spend to a marketplace that engaged in exactly the same behavior.  DV360 initially suffered a -1.9% revenue drop as a result of the Project Poirot algorithm.  Google then expanded Project Poirot to optimize its bidding in first-price auctions, such as those used in header-bidding exchanges.  Internal Google documents stated that, following this expansion of Project Poirot, large ad buyers utilizing DV360 were spending 7% more on AdX and had reduced their spending on most other exchanges.

247.     Google also launched a separate project called "Elmo," under which DV360 could discern whether a bid request had been made across multiple exchanges, thereby indicating that the bid had been placed through header bidding.  Under Project Elmo, DV360 decreased ad spending on exchanges that it suspected of engaging in header bidding.  By March 2018, Project Elmo decreased DV360 ad spending through header bidding by 25% while adding approximately $220 million in spending to AdX.

248.    Projects Poirot and Elmo successfully reduced spending on rival exchanges and starved them of the primary source of demand.   One Google employee concluded that the combined effect of Projects Poirot and Elmo caused an average 21% revenue decrease on affected exchanges and a $300 million increase on AdX.

### 7.    Unified Pricing Policy

249.    In early 2019, Google began to implement a requirement that publishers using its ad server set uniform price floors across multiple ad exchanges, which undermined publishers' ability to set their own prices by preferencing ad exchanges and purchasers based upon higher yield to publishers.

250.    Historically, a publisher would set hundreds of different price floors, with variations tailored to specific ad exchanges and purchasers.   These variable price floors helped publishers increase revenue and improve the quality of ads run on their sites.   The floors exist as a way for publishers to protect the minimum value of their impressions in an auction environment, optimize yield and the quality of ads displayed on their website, and improve competition for their inventory.   If the floor is set too high, it can result in an increase in unsold inventories and have a significant impact on total advertising revenue.   If it is too low, the publisher does not maximize the value of their inventory and can result in lower quality ads being displayed.   Higher price floors were particularly important to publishers using Google's AdX and ad server, as it allowed them to combat (but not solve) the problem of adverse selection caused by Google, thereby encouraging exchange and buyer participation (including those engaged in header bidding) and increasing overall yield – which Google internally understood.   Publishers also set high floors for Google's exchange and buying tools to diversify the sources of demand for their inventory.

251.    Google perceived publishers' higher price floors for AdX and Google's buying tools as an impediment to growing those products' market share.  Results of a Google survey indicated that publishers were setting higher price floors on Google products in order to improve ad quality, increase yield, and increase competition.

252.    Google began to adopt and enforced unified pricing floors in order to foreclose competition and channel transactions to AdX.  An internal Google document stated that a unified pricing rule would cause more DV360 transactions on AdX at a higher margin: differentiated floors "drive DV360 to spend more on third party exchanges" and that a unified floor could achieve the "desired state" that "DV360 wins on AdX at higher margin."  Publishers' use of floors to disadvantage Google became something Google needed to "fix": "We [Google] should look at all real issues that we are aware of which incentivizes publishers to use other platforms (header bidding and pricing floors cutting off access etc.) that we should try to fix as soon as possible."

253.    Rather than trying to attract publishers by offering an improved product, Google began to punish publishers that set higher floors on Google, and eventually eliminated publishers' ability to set variable floors.  Google's unified price floors blocked publishers from setting price floors that varied between exchanges and ad purchasers.

254.    Unified rates give a price advantage to Google due to the fees that it charges for transactions made on a non-Google exchange.  Google's Unified Pricing rules ensure that rival exchanges and buying tools are at a price disadvantage. Because Google's publisher ad server imposes extra fees to serve ad inventory sold on non-Google exchanges, Google's exchange can win an impression by returning a bid 5% to 10% lower than a rival exchange. Thus, rather than a level playing field, Google's pricing rules guarantee that Google's exchange has a pricing advantage to win a publisher's impression. For example, if a publisher sets a $10.00 floor, an

advertiser bidding through Google's exchange can win that impression so long as its bid, after Google takes its cut, is at least $10.00. An advertiser bidding through a non-Google exchange can win the impression only if its bid, after paying the non-Google exchange fee, is at least $10.53 ($10.53 minus Google's 5% Exchange Bidding fee = $10.00).

255.    Google's Unified Pricing rules interfere with a publisher's ability to set prices in transactions in which Google has no interest as a buyer. Google's Unified Pricing rules are imposed by Google's publisher ad server, and not by Google's exchange or buying tools, and thus, publishers using Google's ad server are restricted from setting exchange-specific or buyer-specific price floors whether Google's buying tools or exchange participate in the auction or not. In other words, even when Google is not an auction participant, publishers are still prohibited from making tradeoffs between price and quality or otherwise increasing yield from non-Google buying tools and exchanges by setting different floors. The inability to set a variable pricing floor for Google products enhanced the anticompetitive effects of Google's other auction-related activities, described herein.

256.    While Google falsely told publishers that price floors were being implemented for their benefit, internally Google acknowledged that the practice was "extremely self-serving." Indeed, the uniform price floor rules precluded publishers from generating competition from non-Google bidders that lack Google's information advantages and disrupted the investments and expectations of publishers. AdX's share of impressions grew "drastically" after the rules were implemented, with Google winning nearly twice as many impressions even though it was "paying roughly half as much" to publishers.

### 8. Audience Fee

257.     Google imposes unnecessary additional costs on rivals through its rate structure on Google Ad Manager, which lowers publishers' revenues if an advertisement is placed using a rival ad network or ad exchange under certain circumstances.  For instance, Google's publisher ad server may impose an "Audience" fee that is as much as 100% higher when advertisements are placed through a non-Google or ad exchange (e.g., a $0.05 fee for a certain number of Google-placed advertisements, but a $0.10 fee for the same number of competitor-placed advertisements). Google deploys other fee structures that achieve a similar economic effect by "including" a certain number of Google placed advertisements at certain price tiers, while "excluding" non-Google-placed advertisements so that publishers incur additional fees when they do business with a competitor.

### 9. Illegal Tying and Bundling of Services

258.     Google has engaged in illegal tying or bundling, including technological tying, of Google products and services, in a way that reduces its customers' willingness and ability to switch to rival products.

259.     Google has bundled and illegally tied the use of Google's DoubleClick Ad Server with the real-time bids from Google's AdX marketplace.

260.     Prior to Google's entrance into the ad server market, publishers controlled how ad servers routed publishers' inventory to exchanges and networks. Ad servers charged a low cost per impression rate or monthly subscription fee. As addressed below, Google's conduct substantially changed this market, making its ad server the only alternative to gain advantages in the exchange market.

261.     Google entered the publisher ad server market by acquiring DoubleClick in 2008. DFP is Google's ad server that enabled advertisers to upload advertiser/ad network creative

79

advertisements and tags (HTML codes that call other ad networks and exchanges for ads). When there is an opportunity (or an ad call), DFP selects which ad will be served based upon the accumulated data and preferences of the individual user. Thus, through DFP, Google instantaneously controls the vast majority of how, when, where, and which ads are served to users on the Internet. At the time of the acquisition, DoubleClick's share of the publisher ad server market was between 48% and 57%.

262.    For years, Google's ad servers and ad exchanges were sold separately. Beginning in 2010, however, Google restricted the ability of publishers using a non-Google ad server to trade through AdX, only allowing publishers that license Google's ad server to receive live, competitive bids from AdX.

263.    Because Google controls such a dominant pool of advertisers through its dominant ad exchange, AdX, publishers had no choice but to do business with Google, as they depend on Google's exchange for access to the hundreds of thousands of small advertisers purchasing advertising through Google Ads and transacting exclusively on Google's exchange. While many publishers would prefer to use an ad server other than Google's, they cannot afford to lose the significant income generated from the large volume of small advertisers trading through Google's exchange. According to a study Google performed in 2013, receiving static bids instead of live, competitive bids from Google's exchange could decrease publisher's advertising revenue by a factor of 20% to 40%. Publishers themselves have reached similar conclusions. A large publisher, for example, may lose several million dollars per year by switching from Google's ad server to a server offered by a competitor and is thus economically formed to use the Google ad server.

264.    In 2018, Google undertook further efforts to further consolidate and build its power in both the ad server and exchange markets through the express and blatant trying of its ad server

80

and ad exchange products.  It underwent a major "rebranding" of its ad platform, combining its ad server and ad exchange functionality into a single product: Google Ad Manager, and began renegotiating agreements with publishers, "requiring publishers to sign a combined contract that included both Google's DFP ad server and Google's AdX exchange."  According to internal documents, Google decided to contractually "jam[] DFP and AdX together to ensure that we take the best of both worlds."  This tie was not optional but was required and coercive, forcing publishers to use Google's DFP ad server in order to receive live bids from Google's AdX exchange.  By 2019, Google's share of the ad server market had grown to 90%.

265.    Google's unlawful tying of the ad server to its dominant ad exchange AdX, led to monopoly power in the ad server market and, in turn, enabled a host of anticompetitive conduct across markets, as set forth above.

266.    Moreover, Google's DFP ad server was both inferior to competing ad servers and more expensive to use.  By way of example, Google's ad server provided for certain primary parameters that it collected for all publishers' customers, and publishers could then also set secondary or customary parameters for visitors to their specific website.  Other ad servers provided publishers access to all of those parameters and thus all of their data at no additional cost.  However, Google restricted publishers to viewing only a limited number of parameters at a time (generally 2 of dozens), making it difficult for publishers to understand the metrics of their own website visitors.  Other ad servers provided all of that data to publishers at no additional cost.

267.    Thus the illegal tying of Google's AdX with the ad server enabled Google's  ad server to rise to dominance, entrenched its monopoly power, and furthered the anticompetitive conduct set forth herein that has further entrenched Google's control of the digital ad space.

268.    Obtaining monopoly power in the ad server market was a lynchpin to the anticompetitive conduct that followed.  It is the ad server that controls, among other things: (1) the insertion of ads/promoted content into publishers' websites, including direct-sold ads, programmatic ads, and house (internal) ads; (2) the storage and management of the ads that will appear; (3) the setting of rules to determine what ads appear when and where (including targeting, priorities, and pacing); (4) the selection of the best ad to show using an ad decision engine; and (5) the tracking and reporting of the campaigns for billing, monetization and strategic decision-making.

### 10.    Bypassing of Direct Ad Campaigns on High News Days

269.    Google's DFP ad server controlled the pacing, forecasting, and delivery of ads. While the Google DFP ad server delivers both direct ads and indirect ads, it is Google's algorithms that are responsible for the delivery pattern, frequency and pace at which the ads or creatives are served. Google's DFP ad server also tracks the impressions, click through rate, completion rates and other delivery metrics for publishers' billing. Additionally, Google's algorithms forecast the inventory and choose whether to fill additional inventory with one of the publisher's directly sold ads or one of Google's own less expensive AdX ads, for which Google garners a large profit.

270.    On high traffic news days, Google would capitalize on and profit from publishers' news content.  An increase in web traffic on high news days meant more ad space for newspaper publishers to fill.  Google's AdX would capitalize on the increased number of daily impressions generated because of the higher traffic on the news publisher's website by overdelivering lower CPM ads from AdX in place of directly sold high CPM ads.

271.    Website publishers want their directly sold ad campaigns to be pacing at 100% – meaning that by the end of the month 100% of the impression goal would be met and 100% of the

contracted for campaign would be delivered.  However, on high traffic news days, campaigns that were pacing as low as 13% (meaning that they were on track to fill only 13% of the contracted for impression goal by the end of the month) would be bypassed by Google's DFP ad server in favor of cheaper AdX ads. Rather than properly pacing the campaigns at 100%, Google's ad server would serve cheaper AdX ads in place of the higher CPM directly sold ads.  Thus, high news days saw impressions worth significantly more to publishers get bypassed in favor of cheaper AdX ads for which Google would take a cut.  By way of example, a directly sold ad worth $25 to the publisher (as respects which Google got no cut) would be bypassed for an $6 or $8 programmatic ad for which Google would  take a fee of upwards of between 20% and 40%.  Moreover, under-delivery was a death knell for publishers and resulted in loss of direct ad sales for direct ad campaigns that did not deliver; all of which was controlled by Google's DFP.

### B.      Google Conspires with Facebook to Further Its Monopolization of the Ad Exchange Market

272.    The U.S. House Judiciary Committee has determined that "Facebook has monopoly power in the market for social networking" holding "an unassailable position in the social network market for nearly a decade, demonstrating its monopoly power."  House Judiciary Report, p. 133.

273.    Facebook's monopoly power is firmly entrenched and unlikely to be eroded by competitive pressure from new entrants or existing firms. The House Judiciary Report concludes that "[m]ore recent documents produced during the investigation by Facebook show that it has tipped the social networking market toward a monopoly, and now considers competition within its own family of products to be more considerable than competition from any other firm."  House Judiciary Report, p. 13.

274.    Facebook has also maintained its monopoly through a series of anticompetitive business practices.  The company used its data advantage to create superior market intelligence to identify nascent competitive threats and then acquire, copy, or kill these firms. Once dominant, Facebook selectively enforced its platform policies based on whether it perceived other companies as competitive threats.  In doing so, it advantaged its own services while weakening other firms.

275.    Facebook has also maintained and expanded its dominance through a series of acquisitions of companies it viewed as competitive threats, and selectively excluded competitors from using its platform to insulate itself from competitive pressure. Together, these factors have tipped the social networking market toward a monopoly.

276.    In July 2020, the UK CMA found that Facebook is dominant in the markets for social networks and digital display ads, and that its market power "derives in large part from strong network effects stemming from its large network of connected users and the limited interoperability it allows to other social media platforms."  In July 2019, Germany's Federal Cartel Office, Bundeskartellamt, found that "Facebook is the dominant company in the market for social networks," and that in Germany's social network market, "Facebook has a market share of more than 95% (daily active users)."   And in June 2019, the ACCC found that "Facebook [has] substantial market power in a number of markets . . . and that this market power is unlikely to erode in the short to medium term."  The conduct of Facebook as set forth in these international reports is consistent with Facebook's actions here in the United States.

277.    Since its founding in 2004, Facebook has acquired at least 63 companies. Facebook's internal documents indicate that the company acquired firms it viewed as competitive threats to protect and expand its dominance in the social networking market.

278.    Facebook monetizes its platform through the sales of digital advertising.  Facebook garnered over $70 billion in revenue in 2019, a nearly 27% increase from 2018.  It generates over 98% of this revenue from selling digital advertisements.

279.    Facebook has monopoly power in online advertising in the social networking market.  Notwithstanding Google's dominance, Facebook also has a significant share of revenue and growth in online advertising with many market participants referring to them as duopolies in this broad market.

280.    The House Judiciary Report concludes that digital markets tend to be characterized by strong network effects, making them prone to concentration and monopolization. As for Google, the value of online platforms that facilitate advertising increases with the number of users, as advertisers gain access to a larger consumer base and, therefore, to a larger trove of consumer data. Facebook exhibits powerful direct network effects because it becomes more valuable as more users engage with the social network—no person wants to be on a social network without other users.  Strong network effects serve as a powerful barrier to entry for new firms to enter a market and displace the incumbent.  When combined with other entry barriers such as restrictions on consumers or businesses easily switching services, network effects all but ensure not just market concentration but durable market power.

281.    According to the Attorneys General for the States of Texas, Arkansas, Idaho, Indiana, Kentucky, Mississippi, Missouri, North Dakota, South Dakota, and Utah, Google and Facebook entered into an illegal agreement to preserve and protect their respective positions in the digital advertising market.  *See* AGs v. Google case at ¶26.

282.    In March 2017, Facebook—Google's largest Big Tech rival—announced that it would throw its weight behind header bidding.  Like Google, Facebook brought millions of

advertisers on board to reach the users on its social network.  In light of Facebook's deep knowledge of its users, Facebook could use header bidding to operate an electronic marketplace for online ads in competition with Google. Facebook's marketplace for online ads is known as Facebook Audience Network. Google understood the severity of the threat to its position if Facebook were to enter the market and support header bidding.  To diffuse this threat, Google made overtures to Facebook.  Facebook decided to dangle the threat of competition in Google's face and then cut a deal to manipulate the auction.  The details of the secret agreement are under seal.

283.    According to the States Attorneys General, Google unlawfully excluded competition from header bidding by getting its largest rival, Facebook, to stop supporting the header bidding technology.  After months of signaling, then drawn out negotiations, the two giants reached an illegal agreement.  As the complaint filed by the States Attorneys General explains:

> Ultimately, Google and Facebook struck a deal executed at the highest levels; Google codenamed it "Jedi Blue," i.e., a combination of their own Star Wars reference and the color of Facebook's logo. Following the agreement, Facebook curtailed its involvement with header bidding in return for Google giving Facebook information, speed, and other advantages. The parties also agreed up front on quotas for how often Facebook would win publishers' auctions—literally manipulating the auction with minimum spends and quotas for how often Facebook would bid and win.

*See* AGs v. Google case at ¶14.

### 1.    Header Bidding

284.    As discussed above, header bidding created a clever technical workaround for publishers to circumvent Google's anticompetitive ad server programs. Header bidding involves a simple and innovative piece of code that publishers could insert into the header section of their HTML webpages to facilitate competition between exchanges. When a user visited a page, the

code enabled publishers to direct a user's browser to solicit live, competitive bids from multiple exchanges before DFP could prevent them from doing so by running Dynamic Allocation. Competition from header bidding also decreased the anticompetitive effects of Enhanced Dynamic Allocation and Google's auction manipulation programs, including, but not limited to Project Bernanke and other programs.  Header bidding was a procompetitive innovation that benefitted publishers and thus became extremely popular. By 2015, publishers and advertisers alike were rapidly adopting the innovation. For their part, advertisers were more than willing to bid through a marketplace where publishers made their ad inventory available for purchase – particularly when that inventory could be purchased from a different exchange at a lower take rate than through AdX, which meant higher, better, and more competitive bids for publishers. By 2016, approximately 70% of major publishers in the United States were using header bidding to route their inventory to multiple exchanges.

285.    Publishers were quick to adopt the header bidding protocol because it fostered price competition, which resulted in higher profits for publishers. Before header bidding, and under Dynamic Allocation, AdX could clear a publisher's particularly valuable impression for one penny more than a rival exchange's average historic bid. With header bidding, AdX was forced to compete with other exchanges' live, competitive bids for particular impressions. Header bidding forced AdX to clear impressions at more competitive prices.

286.    Publishers saw their ad revenue jump overnight simply because exchanges could compete on the merits. Google's own analysis in 2017 found that, between January of 2016 and February of 2017, the average price publishers received for impressions sold through exchanges in header bidding were 80% higher than the average price publishers received for impressions sold through AdX. Internally, Google conceded that header bidding caused the ad revenues of one

publisher, Weather.com, to jump by 30%. Some publishers' revenue jumped by 40%, while other publishers saw even larger revenue increases – as high as 70%.

287.    Rather than compete with header bidding on the merits, Google pursued a multi-front effort to diminish competition by engaging in anticompetitive conduct designed to thwart competition on the merits, including but not limited to: technologically disabling header bidding with accelerated mobile pages ("AMPs") and punishing publishers who did not migrate to AMPs, providing last look advantages to Exchange Bidding participants, and striking a deal with its biggest competitor to exit certain markets and to depress competition in others at the expense of publishers, advertisers and internet users.

### 2.    Background on Jedi Blue

288.    In 2017, Facebook's Audience Network ("FAN") very publicly announced that Facebook would be supporting header bidding and excoriated Google (without naming Google) for manipulating the digital advertising space:

> With the way ad bidding happens in programmatic advertising, publishers are consistently losing margins to third party middlemen who make the rules and obfuscate the truth. These are well-known issues, and they are being combatted through new technologies like header bidding. Header bidding is a more transparent bidding process where publishers see what every advertiser or technology provider is willing to pay for every impression. . . .
>
> *          *          *
>
> We believe that header bidding and the principles behind it are better for publishers, advertisers, and people . . . . In our tests, publishers who integrated Audience Network header bidding reported increases in revenue of 10%-30%.

289.    The wider industry also recognized that Facebook was prepared to challenge Google's ad server monopoly. The same day as Facebook's March 2017 header bidding announcement, industry publication AdAge wrote that Facebook was poised to execute a "digital

advertising coup against rival Google and its DoubleClick empire." A Business Insider headline the same day read: "Facebook made an unprecedented move to partner with ad tech companies – including Amazon – to take on Google." Facebook's endorsement of header bidding promised to be a force multiplier for competition in the digital ad space.

290.    For its part, Google started monitoring Facebook's initiative in header bidding. As part of its internal monitoring efforts, Google referenced Facebook's March 22, 2017 blog post in an email circulated amongst the management team.

### 3.    The Jedi Blue Agreement

291.    In or around September 2018, Google and Facebook entered into a network bidding agreement ("NBA"). In effect, Google and Facebook's network bidding agreement functioned like a market allocation agreement. Web markets are mature, but in-app was where the real game was happening. So, Facebook ceded web markets to Google and the two companies struck a deal in the real market that was up for grabs: in-app.

292.    Before the agreement, with respect to web display, Facebook was considering entry in publisher ad servers and was competing in the ad network market. After the agreement, Facebook stopped entry, withdrew support of non-Google competition (header bidding), and then exited the web network market entirely, ceding the network market to dominant the Google Display Network ("GDN"). As a result of less network competition, publishers' web CPMs dropped drastically in 2020, from 2019, by approximately 34%.

293.    With regards to in-app, before the agreement, Facebook was considering entry in the mediation tool market and was supporting in-app header bidding, and FAN was competing against the AdMob network in the app markets. After the agreement, Facebook withdrew support for in-app header bidding and withdrew consideration of entry in the mediation tool market, ceding

that market to Google AdMob and Google Ad Manager ("GAM") in-app. In return, Google helped FAN corner a portion of the in-app network market: giving FAN terms (at the expense of publishers/developers) that helped FAN win more in their auctions, despite paying less. As a result of less competition, publishers' in-app CPMs dropped drastically in 2020, from 2019, by ~33%.

294.    Notably the NBA executed between Facebook and Google thwarted the very key principles of header bidding that promoted competition and were touted by Facebook as being "better for publishers, advertisers, and people" – thwarted, that is, for everyone but FAN and Google:

| Header Bidding According to Facebook Blog | Network Bidding Agreement |
|---|---|
| • All demand sources get the same information at the same time | • FAN bought inside information from Google, including: which ads were worthless bot ads; FAN also bought a timing advantage to integrate inside information |
| • The ad space goes to the source willing to pay the most | • FAN paid less and won more with less money going to the publisher and fewer competitive bids |
| • There is no arbitrage, no "averaged" waterfall and no secret auction manipulations by a demand source | • Secret auction manipulations now inure to benefit of both Google and FAN; Unified Pricing stymies publishers' ability to set price floors; Google agrees not to trade on data scraped from FAN |
| • A diversification and stability of revenue for publishers | • Revenue for publishers plummets by 33% |

### 4.    Before and After Jedi Blue

#### (a)    Before Jedi Blue

295.    Between 2015 and 2018, prior to the NBA, Facebook's FAN vigorously competed with Google's GDN. Specifically these two networks were the two largest competitors in the ad network market. Upon information and belief, Google was by far the dominant ad network with approximately 25% share while Facebook was the second largest ad network with an

approximately 10% share.  The remainder of the network market was very fragmented and no other ad network came close to these two largest competitors.

296.   In and around 2017 through 2018, the web advertising market in the United States was entrenched and occupied largely by Google and Google-owned products and services, while the in-app market was open to competition and experiencing explosive growth. Google's in-app network AdMob network was the number-one network in the market by far. AdMob network's largest competitor was FAN for in-app. The remainder of the in-app network market was very fragmented and no other in-app ad network came close to these two largest competitors.

297.   As the companies themselves recognize, Google and Facebook are direct, horizontal competitors in the in-app network market and compete to purchase in-app inventory from publishers and developers.  An impression bought by Google's ad network is one that cannot be bought by Facebook's ad network, and vice versa.  And Google and Facebook are the two largest bidders in this market.  When publishers/developers sell their in-app impressions in auctions run by Google, Google's own AdMob network wins more impressions than anyone else – over 50% around the time Google signed the Jedi-Blue agreement. Facebook's FAN is number-two, winning more impressions than any other non-Google buyer. As Google described its counterparty internally, "FAN is the largest competitive network across formats."

298.   Moreover, these ad network markets are characterized by strong network effects: each new user improves the value of the product/service for both new and existing users alike.

299.   Prior to the NBA, Facebook and Google (the two largest ad networks) in fact competed with one another.  At that time, FAN participated in auctions hosted by Google's DFP and AdMob mediation on behalf of publishers and developers. FAN was in fact returning bids through Google's DFP and AdMob ad server.  This occurred in two ways: (1) directly through

Google's DFP ad server or AdMob when publishers coded Facebook's FAN into a line item; and (2) indirectly, as FAN returned a bid back to publishers, first through web/in-app header bidding, then to DFP/Admob mediation. Google's DFP/AdMob would then generate a fee.  Simply put, Facebook was participating and Google was making money.

300.    As set forth herein, however, DFP/AdMob mediation restricted FAN's ability to compete by, for example, restricting FAN's ability to access inventory (*e.g.*, Enhanced Dynamic Allocation) or win using a highest bid (e.g., DA and line item caps). At the time, FAN was both a web network and in-app network.

301.    As discussed above, to more vigorously compete in the web and in-app network markets, Facebook's FAN was thus actively supporting header bidding which it touted as "better for publishers, advertisers, and people" and more transparent than bidding through Google's DFP and AdX. Routing bids indirectly to DFP/AdMob auctions with header bidding permitted FAN to work around some of DFP/AdMob mediation's anticompetitive restrictions, and return more competitive bids 10% to 30% higher to publishers.  Higher bids permitted FAN to better compete and win in publishers' auctions (hosted by Google).

302.    Additionally, prior to the NBA between Google and Facebook, Facebook was actively trying to enter and compete in the publisher ad server market and mediation tool market by building or acquiring a competitive product. The reason for this was because Facebook wanted their FAN ad network to be able to actively compete against GDN.

303.    In addition, Facebook was supporting competition in both sell-side markets by routing FAN bids through web- and in-app header bidding, which were competing non-Google technologies.

### (b)    After Jedi Blue in Web Display Markets

304.    Following the execution of the NBA, Facebook did a complete about-face, both abandoning its attempts to enter the ad server market and exiting the ad network market in which it had previously competed with Google.

305.    Facebook then substantially curtailed its use and support of header bidding as an emerging technology and competitor to Google's DFP product, even though Facebook had reported that returning bids through header bidding as opposed to DFP resulted in FAN being a better and more efficient product for publishers.  FAN went from returning bids to DFP publishers indirectly through header bidding to directly bidding through Google's DFP.

306.    Then, in or around February 2020, Facebook announced that it was shutting down the web display arm of FAN entirely.  Shortly thereafter, in April 2020, Facebook exited entirely by shutting down FAN for web display.

307.    To be clear, in addition to ceding the publisher ad server market to Google, Facebook exited the ad network market by shutting down FAN for web and mobile display, the largest competitor to Google's GDN.  The exit of FAN from the business of selling third-party publishers' display inventory (through its ad network) meant that Facebook would thereafter have no incentive to support header bidding and no incentive to challenge Google's ad server monopoly.

308.    Because FAN was GDN's largest competitor and no other competitor came close to their market shares, ad network competition was substantially reduced by FAN's exit from the market resulting in financial harm to publishers as a result of the reduced competition.  GDN no longer had to compete against FAN bids in publishers' display auctions, which resulted in lower CPMs to publishers.  Additionally, Facebook's about-face on header bidding further weakened header bidding as a competitive threat to Google's DFP.

309.     By way of an analogy, if at a Sotheby's auction house there were two billionaires bidding in the room and one of them left, competition and prices bid for inventory would plummet. This is what happened to publishers' inventory prices. Indeed, according to a major study by the industry's leading association, the Internet Advertising Bureau, U.S. publishers CPM's for display Inventory dropped drastically in 2020 from the prior year, by 33%.  The year-over-year decrease in CPM's was widespread and experienced by two-thirds of publishers in the market.

310.     With respect to the newspaper publishers, the Jedi Blue agreement meant decreased competition to Google's dominant ad server, and decreased competition in publishers' web-display auctions from networks. Additionally, advertisers using networks to purchase advertising faced drastically reduced network competition.

### (c)      After Jedi Blue in the In-App Market

311.     Google secretly helped FAN win market share in the in-app network market, which was experiencing explosive growth and not yet locked in by network effects, despite harm to DFP in-app and AdMob customers.

312.     As a result of exiting the ad networks space and dropping its bid to pursue a competing ad server, the *quid pro quo* to Facebook was for DFP in-app, and AdMob to secretly let FAN bid less money and win more of publishers'/developers' auctions – not at Google's expense, but at the expense of publishers.

313.     Under the NBA, DFP in-app and AdMob as auctioneer provide FAN with a number of secret terms that allow FAN to beat non-Google networks and exchanges, and win more despite paying less. By way of example, Google ensures that rival networks to FAN are at a price disadvantage. DFP in-app and AdMob impose fees of 10% on non-Google exchanges/networks, while secretly imposing a lower fee of 5% on FAN. Thus, FAN can win a developer's impression

by returning a bid 5% lower than non-Google exchanges/networks.  FAN was also provided with a (1) speed advantage, where Google nearly doubled timeouts for FAN, extending them to 300 milliseconds to enable FAN to win more auctions; and (2) information advantage – telling FAN which impressions were valuable and which were likely targeted to bots, rather than humans and therefore worthless.

314.    The NBA also restricted Google's use of FAN bid data, thereby promising not to use FAN's inside information to manipulate auctions against FAN, which was a stark departure from Google's usual practices of spying and trading based on other bidders' past behavior.

315.    When a publisher/developer's auction has participants (like FAN here) that have information, speed, and other advantages over other participants in the same auction and who are patently at a price disadvantage, the result is less competition from rivals (less bid density and lower bids) and lower auction clearing prices. These anticompetitive terms to FAN depressed competition, resulting in less money in the pockets of publishers.

316.    As a whole, the NBA resulted in: (1) Facebook entirely exiting certain markets – reducing competition in fact in those markets; and (2) Facebook receiving the same loaded dice in the in-app network market that Google had been winning with for years – reducing competition on the merits in those markets.

317.    The agreement made no economic sense beyond stifling competition. The terms provided by Google's DFP and AdMob as auctioneer do not make business sense because the customers of their products are publishers/developers who use the products for the purpose of managing their inventory to maximize their yield. Before the Agreement, Google DFP and AdMob mediation were soliciting high, competitive bids from FAN for their publishers/developer

customers. After the agreement, Google DFP, and AdMob as auctioneers solicited lower, weakened bids for their customers.

318.    The terms accepted by FAN likewise do not make business sense because FAN competes for publishers'/developers business by paying more, not less.  Indeed, in the March 22, 2017 blog post, Facebook explained that the reason for FAN returning bids indirectly through header bidding first, then to DFP, was because header bidding did not "obfuscate the truth" and provided all "demand sources [] the same information at the same time," which resulted in higher bids back to publishers.

319.    Google DFP, AdMob, and FAN, each had to keep the terms of their agreement secret from publishers/developers precisely because the terms did not make economic sense in the light of each party's relationship with publishers/developers. Indeed, according to internal Facebook documents, after the NBA, FAN gained pricing power and increased take rates from ▮ to (▮ + Google's fee), also harming advertisers purchasing in-app inventory.

320.    According to internal Facebook documents, including emails sent to Facebook's highest executives, Facebook planned to purchase $1.5 billion worth of inventory per year through DFP/AdMob mediation and within 24 months of signing the agreement to trigger the agreement's lowest 5% flat rate DFP/AdMob mediation fee. With the closure of FAN for web display, a commitment to acquire $1.5 billion from Google DFP in-app/AdMob, take rates of ▮ on top of Google's fee, and inventory from about 20% of developers that do not use mediation, FAN had little to no spend left to use header bidding or non-Google mediation tools.

321.    Effectively, Google and Facebook coupled Google's sell-side (DFP in-app and AdMob mediation) with FAN, with resulting anticompetitive effects in the Mediation Tool market.

Publishers/Developers must use DFP in-app or AdMob to access FAN bids, just as publishers had to use DFP to access bids from GDN.

322.     Google's other anticompetitive conduct likewise inured to the benefit of Facebook after the agreement. By way of example, before the implementation of the uniform pricing rules ("UPR"), publishers would have been able to observe that FAN was bidding less and winning more often under the NBA. After the NBA deal publishers could have adjusted the floor price at which it agreed to transact with FAN.

323.     Regular meetings between direct competitors in publisher/developer's auctions provided the groundwork for further anticompetitive schemes. The NBA set the groundwork for Google and Facebook employee teams to meet on a regular basis to monitor progress and enforce the terms of their agreement, including the Bid and Win Rates provisions. In one such meeting, Facebook expressed that they would like it if DFP and AdMob as auctioneer did not continue to provide publishers/developers with the option of setting higher floors for FAN, despite FAN's auction advantages, and despite the fact that DFP and AdMob's job was to manage publishers/developers' auctions for the purpose of maximizing yield. Removing floors would have the effect of letting FAN win even more by paying even less. Put another way, UPR guaranteed that Google and FAN had a price advantage to win a publisher/developer's impression. Removing floors would have the additional effect of coercing publisher/developer's to transact with FAN– higher floors could no longer operate to exclude FAN from publisher/developer's auctions.

324.     Google's implementation of UPR robbed publishers of the ability to increase floor prices, thereby forcing publishers/developers to accept Google and FAN's artificially depressed bids. Thus, because of the NBA, Google's implementation of Unified Pricing inured to the benefit

of both Google and FAN. All of the anticompetitive effects of UPR flowed not only to Google but also to FAN.

325.    As part of the agreement, Google and Facebook agreed to cooperate and assist one another if either were to ever face an investigation into the agreement.  As part of the deal, Facebook would spend at least $500 million per year in Google-run auctions, and Google agreed that Facebook would win a fixed percentage of those auctions.  Facebook believed the deal was "relatively cheap" as compared with direct competition.

326.    This bid-rigging agreement allowed Google to further manipulate auctions.  Google already manipulates publishers' ad auctions by giving Google bidders information and speed advantages.  In 2019, these advantages helped them to win the overwhelming majority of publishers' ad auctions.  Now, Google offered Facebook information advantages, speed advantages, and other preferential treatment, conduct constituting harm to other auction participants.  And yet Google falsely claims that all bidders in publishers' auctions compete on an equal footing: "All participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis."  *AGs v. Google* case at ¶195.  As alleged above and herein, that statement is incorrect.

### C.    Monopolistic Leveraging

327.    Not only has it abused its monopoly power in the ad exchange and ad server markets, Google has leveraged its monopoly power in adjacent markets to suppress competition and harm publishers.

328.    Monopolistic leveraging is the use of monopoly power in one market to strengthen or gain a monopoly share in another market. Leveraging may be achieved through many anticompetitive practices, including, but not limited to, contractual and/or technological tying

bundling, exclusive dealing, and predatory or below-cost pricing.  Monopolistic leveraging is often used to describe the way in which a monopolist in one market uses its power to monopolize or attempt to monopolize a second market. In digital markets, the DOJ has noted that monopolistic leveraging and relationships between markets is as important as dynamics within the market, such as barriers to entry and market power.

329.    Google leverages its power in the general search market to coerce publishers of mobile ads to use the AMP format.

330.    As noted above, Google faced an emerging threat to its dominance in the ad exchange and ad server markets through the widespread adoption of header bidding.

331.    In an attempt to reinject competition in the marketplace, publishers devised header bidding. As discussed above, header bidding routed ad inventory to multiple neutral exchanges each time a user visited a web page in order to return the highest bid for the inventory. At first, header bidding bypassed Google's stranglehold. By 2016, about 70% of major online publishers in the United States had adopted the innovation, increasing competition on the merits. Advertisers also migrated to header bidding in droves because it helped them to optimize the purchase of inventory through the most cost-effective exchanges.

332.    Google quickly realized that this innovation substantially threatened its exchange's ability to demand a very large cut on all advertising transactions.  Header bidding also undermined Google's ability to trade on inside and non-public information from one side of the market to advantage itself on the other—a practice that in other markets would be considered insider trading or front running.  As a result, and as Google's internal communications make clear, Google viewed header bidding's promotion of genuine competition as a major threat.

333.     Google responded to this threat of competition through a series of anticompetitive tactics – most notably, all but requiring publishers to use a new software development framework, AMP.  Google developed and launched AMP in 2015, as a format sometimes described as a "website on a diet."  AMP makes use of a stripped-down version of HTML that purportedly prioritizes loading speed simultaneously with dozens of proprietary extensions.

334.     AMP, however, was designed to render websites built on the framework with header bidding incompatible with its applications, which created a de facto requirement for publishers to use AMP and forgo the more competitive header bidding.  AMP restricts the use of JavaScript, the code publishers rely on to route their ad space to multiple exchanges for header bidding.

335.     To coerce publishers to adopt AMP, Google conditioned premium treatment in Google search – where it has 90% market share – on publishers' migration to AMP.  Google purposefully dropped the PageRank of sites that did not adopt AMP, maliciously rendering such sites nearly invisible to Google searches and starving publishers of the web traffic needed to create ad revenue and sustain their ad business.  As a result, publishers could not utilize header bidding without being penalized for doing so (both financially and through the inability of users to see/reach their sites), which substantially removed the financial benefit of competition on the merits that header bidding had provided to publishers.  Despite not being paid for their content, no news publisher can afford to remove itself from Google News for fear of falling in its Google Search rankings – in part because of their interoperability – and Google has used this power to advance its ends at the news media's expense.  As one publisher explained the relationship generally, Google "sucks you into the vortex one step at a time without any visibility into its

eventual plans, leading to a clear dependency on Google, and only at the last minute do you realize you've given away the farm."

336.    By forcing publishers to route their space only to Google, Google further starved rival ad exchanges of valuable inventory and forced publishers into Google ad servers.

337.    Newspapers have complained that Google's use of articles in the AMP format has significantly hurt their ability to convert consumers into subscribers – a key and increasingly important source of revenue.  One major newspaper, for example, did a study comparing subscriber conversion rates for mobile traffic to its regular website as compared to traffic to its AMP URL. The number of subscribers per million users was 39% lower for AMP traffic. Another major news publisher has likewise compared AMP traffic with the rest of search traffic and found that the conversion rate to subscribers is significantly lower with the AMP articles – a mere fraction of "vanilla" search traffic.

338.    Google's technical disablement of header bidding struck at the heart of competition on the merits and thwarted publishers' ability to garner the highest bid for their inventory and thus to fairly compete for online advertising revenue.  Google's imposition of AMP undermined publishers' ability to offer their inventory to multiple ad exchanges simultaneously before making calls to their ad servers, disallowing and disabling  multiple demand sources from bidding on the publishers' inventory at the same time.   This resulted in decreased control by publishers, decrease in yield or fill rate, and significantly decreased revenue to publishers.

339.    Moreover, the businesses providing header services to publishers, such as rival ad exchanges and ad servers, were ultimately foreclosed in these markets, thereby directly injuring competition.   Several large advertising technology firms offered publisher ad server with header bidding solutions, including AppNexus and OpenX.  But today, few of these competitors remain in the United States.

340.   Whereas header bidding had allowed publishers to bypass the favorable relationship that Google had set up between its own ad server and ad exchange, technological disabling of header bidding through AMPs placed publishers back at the mercy of Google.  The natural result was that advertisers and publishers were driven away from rival ad exchanges, thereby strengthening Google's hold on the ad exchange market.

341.   Google has also leveraged its monopoly in online search to require default installation and global dissemination of its Chrome Browser.  In turn, Chrome Browser now serves as a way for Google to control the entry points for its advertising products. Both Chrome Browser and Google's ad server control the delivery, functioning and operability of online advertising.

342.   The House Antitrust Subcommittee found that Google repeatedly leveraged its monopoly power to maintain and gain dominance across related markets. Specifically, the House Antitrust Subcommittee found that:

> Google used its search engine dominance and control over the Android operating system to grow its share of the web browser market and favor its other lines of business. Reciprocally, Chrome's dominance in the browser market gives it significant gatekeeper power over managing and monitoring users' browsing activity – power Google can wield to shape outcomes across markets for search, mobile operating systems, and digital advertising. These advantages across markets feed back into and reinforce one another, advantages that [competitors] lack.

House Judiciary Report, p. 225.  Indeed, Google has not just used its monopoly power in other markets such as general search, it has used that power to keep – and often gain – monopoly power in the ad server and ad exchange markets.  Google's conduct demonstrates specific intent to abuse its monopoly power in the ad server and ad exchange markets.

## ANTICOMPETITIVE HARM

343.   Google's conduct goes far beyond aggressive competition. Google's anticompetitive actions intend to, and in fact do, exclude, substantially foreclose, impair rivals,

and harm the competitive process. The conduct is not competition on the merits or otherwise privileged.  Worse yet, the conduct has been systematically planned and thoroughly executed over many years; it is willful.

344.    Defendants' conduct harms consumers by depriving customers of valid competitive choice, degrading consumer privacy, degrading quality and variety of products and services offered to consumers, stifling innovation, and ultimately raising the prices of goods and services in the marketplace.

345.    Defendants' conduct harms competition, by artificially and unlawfully reducing and foreclosing competition, foreclosing competitors from meaningfully participating in purportedly neutral and unbiased competitive processes, including the ad auction and bidding processes, which are in fact skewed and rigged to favor Google and Google products and services; and surreptitiously altering algorithms and compatibilities.

346.    Through the actions alleged above, Google has substantially foreclosed competition in each of the three alleged relevant markets.

347.    Google's conduct adversely affects competition and innovation in each of the relevant markets, including by, *inter alia*:

- Raising the prices paid by publishers for Google's ad server products;

- Enabling Google to charge supracompetitive prices and overcharge publishers by artificially inflating the commission and/or fees extracted from publisher ad sales and otherwise artificially and anti-competitively reducing the revenue Google remits to them from ad sales to advertisers;

- Degrading or failing to deliver publishers' direct sold ads, particularly on high news days, which garner a significantly higher price for publishers and for which Google receives no take rate, and instead delivering cheaper AdX impressions resulting in the loss of revenue and the loss of direct ad campaigns for purposeful underdelivery and failure to properly serve of direct sold campaigns;

- Impairing the incentive of Google's competitors and potential competitors to undertake research and development, because they know that Google will be able to limit the rewards from any resulting innovation;

- Inhibiting Google's competitors that nevertheless succeed in developing promising innovations from effectively marketing their improved products to customers;

- Reducing the incentive and ability of advertising platforms, and other competitors to innovate and differentiate their products in ways that will appeal to customers;

- Reducing competition and the spur to innovation by Google and others that only competition can provide;

- Impairing and excluding rivals from the three main relevant markets alleged herein by raising rivals' costs, blocking entry and expansion, and through other anticompetitive means; and

- Reducing the quality of ad exchange and ad server services available to market participants.

348.    In the ad server market, Google has foreclosed competition by tying its DFP ad server to its ad exchange and steering auctions to Google's services and away from the other service providers.  Google's practices have allowed it to charge supracompetitive prices for its ad servers, even though the servers are of lower quality than ad servers offered by competitors, as Google itself has recognized.  "Right now we are the . . .ad server . . . for 90% of publishers . . . . Unlike our competitors, pub[lisher]s have been viewing us as a necessary evil, instead of a responsive, innovative partner.... Google simply isn't leading, and we aren't giving customers confidence that they can and should trust in us to build the right things and solve the right problems."  Indeed, as noted above, Google has frequently degraded its ad server by limiting publishers' flexibility in how to set up their ad stack.  Google has also stifled innovation by, for

instance, blocking competition from other exchanges and killing header bidding, which had substantially increased publishers' yields.

349.    In the ad exchange market, Google's practices have increased the commission rate/fees publishers are paid in the ad exchange market.  While Google's exchange competitors have lowered their take rates in response to competitive pressure, Google's has maintained or increased its take rate over time.  Some of Google's competitors lowered their prices to 25% of what Google charged; meanwhile, Google increased its take rate from 20% in 2017 to 22% in 2019.  Google's closest competitors charge between 5% and 15%.

350.    It is not just publishers who have been fleeced by Google; Google's practices have also allowed it to take more money from advertisers.  Advertisers have paid higher prices to Google for its brokering services.

351.    A 2018 study by eMarketer, which focused on programmatically purchased ads across the open internet, found that programmatic ad prices have risen meaningfully across all major display categories: desktop, mobile, mobile app, and video. In 2018, the average digital advertisement sold for 12% more than it did in 2016, an increase approximately five times the prevailing rate of inflation. These price increases resulted in substantial part from Google's consolidation of the intermediation services market and Google's price increases for those services, and were largely borne by advertisers who paid Google for those services to broker the placement of their display ads.

352.    Bloomberg also reported that as of 2019, Google had increased the price of search ads by about 5% annually, a rate more than three times greater than the 1.6% inflation rate during the same time period.  In 2021, on average Google ads costs experienced a 15% to 25% rise.

353.    Google's practices have also degraded the quality of the services in the ad exchange market, by allowing its own exchange to win more high-value impressions and lowering the quality of matches that competing exchanges can provide.  What was once a highly competitive market over a decade ago has now become a market dominated by one firm.  As a direct result of Google's anticompetitive conduct, several ad exchanges have left the ad exchange business, including adBrite, Yahoo!, and the ADSDAQ exchange.  Among the remaining major competitors, Rubicon has consistently lost money and been barely profitable. Rubicon has attempted to remain alive in the ad exchange business by sharply cutting its fees to percentages in the low teens or lower, a strategy which the company itself admitted may not succeed. The financial condition of OpenX, another competing privately owned ad exchange, is not publicly reported and therefore unknown, although it was reported to have laid off approximately 20% of its staff at the end of 2018, and added more layoffs earlier this year.

## COUNT I

### Section 2 of the Sherman Act: 15 U.S.C. §2
### (Monopolization as to Google)

354.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations set forth in this Complaint.

355.    Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. §2.

356.    The offense of monopolization has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as

distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

357.    Whether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition can be difficult to discern: the means of illicit exclusion, like the means of legitimate competition, are myriad. The challenge for an antitrust court lies in stating a general rule for distinguishing between exclusionary acts, which reduce social welfare, and competitive acts, which increase it. *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001).

358.    The relevant markets defined above are valid antitrust markets.  As detailed in ¶¶171-197 above, Google has monopoly power in the relevant markets

359.    Through the anticompetitive restraints described in ¶¶198-337 above, Google willfully maintained and extended, and unless restrained by the Court will continue to willfully maintain and extend, that power by anticompetitive, illegal, deceptive and exclusionary conduct. Google has acted with the intent to illegally maintain and extend their monopoly power in each of the relevant markets, and their illegal conduct has enabled them to do so in violation of §2 of the Sherman Act, 15 U.S.C. §2.

360.    There is no valid procompetitive business justification for Google's anticompetitive conduct, and to the extent Google offers one, it is pre-textual and not cognizable. Any procompetitive benefits of Google's conduct do not outweigh the anticompetitive harms.

361.    As a direct and proximate result of Google's anticompetitive restraints, Plaintiffs have suffered injury to their business and property. The precise amount of damages Plaintiffs are

entitled to recover as a result of the foregoing injury is substantial and will be fully ascertained at trial.

362.    Section 4 of the Clayton Act permits parties to recover injuries to their "business or property" resulting from violations of the antitrust laws. 15 U.S.C. §15(a).   In *Hawaii v. Standard Oil Co.*, the Supreme Court explicitly interpreted "business or property" under Section 4 to limit recoverable injury to "commercial interests or enterprises."  405 U.S. 251, 264 (1972). A Section 4 injury must be caused "by reason of" conduct that violates the antitrust laws. 15 U.S.C. §15(a).  Courts have interpreted this language as imposing a standing requirement, incorporating notions of proximate causation, for recovery of antitrust damages.  *Blue Shield*, 457 U.S. at 476-77.   Here, Plaintiffs' injury is a direct result of Google's antitrust violations as set forth by the House Judiciary Report at 57-73.

363.    Newspapers across the country are dependent upon display advertising for revenue and economic viability.  However, as a result of Google's anticompetitive conduct, newspapers, such as those operated by Plaintiffs, have been foreclosed from competing on the merits for advertising revenue.  As a direct and proximate result of the anticompetitive conduct alleged herein, Plaintiffs suffered monetary harm and substantial losses to their business or property, including paying higher prices for using Google's ad servers and paying higher commission rates to Google for the ads they showed.  As a result, Plaintiffs realized substantially less advertising revenue that they would have absent Google's misconduct selling digital advertising space. Google was able to extract a supracompetitive share of Plaintiffs' advertising revenues.  This reduction in advertising revenues reduces news output and affects the quality and content of the products that Plaintiffs can offer to consumers, which, in turn, causes further reductions in revenue. Had Google not engaged in the misconduct detailed herein, Plaintiffs would have been able to

serve more advertisements, since Plaintiffs could have passed on the savings in commission rates to advertisers (resulting in lower ad prices). In addition, Google would have diverted fewer ads to its own properties, where Plaintiffs were paid depressed advertising fees for their inventory. Moreover, the reduction in revenues siphoned away from Plaintiffs went directly into Google coffers.[10]

364.    The successful transition from print media to online media is necessary for the survival of newspapers. Fair competition on the merits in the digital advertising market is not possible given the market power exercised by Google. As a result, newspapers are attempting to adapt by placing content behind a paywall with access only through a digital subscription. This is an insufficient revenue replacement resulting in increased costs to the consumer which, in turn, results in fewer readers. Fewer readers result in diminished digital advertising revenue in the search engine marketplace. Google's dominance of the digital advertising marketplace threatens the extinction of local news journalism across the country and has resulted in harm to Plaintiff's commercial interests, the decimation of local news sources giving rise to news deserts, and a profoundly negative effect on American democracy and civic life.

365.    Google's anticompetitive and unlawful conduct as described herein has also harmed Plaintiffs' ability to effectively monetize their original content and fund new content.

366.    With the advent of the internet, the news industry underwent a shift toward online and mobile news consumption, and newspapers have rapidly evolved from providing content solely in print to offering digital access across a range of mediums and devices. In doing so, newspapers have reimagined the ways in which they report news and distribute content. However,

---

[10]    *See* David Chavern, Written Statement, *Online Platforms and Market Power, Part 1: The Free and Diverse Press*, Committee on the Judiciary Subcommittee on Antitrust, Commercial and Administrative Law, U.S. House of Representatives (June 11, 2019).

these major shifts in the news industry have allowed for increasing engagement of emerging technology players at the expense of newspapers who had traditionally relied on news subscriptions and print advertisement to subsist.

367.   Google is the dominant gateway for consumers to access news digitally and has positioned itself as a monopolistic intermediary between newspapers and their online readers.  In 2011, Google Search, combined with Google News, accounted for the majority (approximately 75%) of referral traffic to top news sites.  Since January 2017, traffic from Google Search to news publisher sites has risen by more than 25% to approximately 1.6 billion visits per week in January 2018.

368.   Google relies and depends upon the original content created and published by newspapers and benefits significantly by this content.  By way of example:

a)   Google News was founded in 2002 and was officially released in January 2006, with the goal to "encourage readers to get a broader perspective by reading ten articles instead of one."  Google News was one of the first products that Google launched beyond its core search engine product, implying the significance of news to Google even in the early stage of the company.  Google News collects news from various sources including newspapers and provides an aggregated view of news from around the world.  At its inception, Google News was crawling information from 4,000 news sources worldwide.  The number had grown significantly to 50,000 news sources by 2012. As of May 2018, Google News had approximately 150 million unique monthly visitors in the United States, surpassing top news publisher sites such as *The New York Times* (70 million).  Google News and the distribution of news content on Google's platforms has provided tremendous

financial benefits to Google.   In 2008, Google estimated that Google News, a product without ads, brought in $100 million in yearly revenue.   A 2019 economic study conducted by the News Media Alliance concluded that news content generated approximately $4.7 billion for Google in annual revenue.  Degrading or failing to deliver publishers' direct sold ads, particularly on high news days, which garner a significantly higher price for publishers and for which Google receives no take rate, and instead delivering cheaper AdX impressions resulting in the loss of revenue and the loss of direct ad campaigns for purposeful underdelivery and failure to properly serve of direct sold campaigns;

b)      Original news content from newspapers also provides significant value to Google by enabling Google Search to drive greater user engagement.  News content from newspapers such as those operated by Plaintiffs not only contributes to Google Search's freshness and quality of the search results, but also helps inform the emerging keywords that were not previously searched on Google.   As new search queries continue to emerge, Google continuously improves its Google Search to return fresher and more relevant search results in response to the trending queries. News content plays an irreplaceable role in informing improvement areas for Google Search, which ultimately helps Google build trust in its products from users and thus keep users within Google's ecosystem of products.  Indeed, according to a study conducted by the News Media Alliance, approximately 40% of clicks on "Trending Queries" and 16% on high-volume queries in Google Search are news content;

111

     c)     Google extracts, mines, and captures unique user data and information of online readers of newspapers' content, which it then uses to offer targeted and directed ads to the newspapers' online readers and customers, thereby directly competing with newspapers for digital advertising; and

     d)     Google Alerts, which default suggestions to users include "News Sections," heavily uses news content to engage users and enables Google to proactively reach out to users when publishers' news content may be of interest to them.

369.    As a result of Google's monopoly in the relevant markets and its actions described herein, Google has significantly monetized the content produced by newspapers, including Plaintiffs, while impeding newspapers' ability to effectively monetize their own original content and/or effectively excluding newspapers from the digital advertising market. Google's practice of appropriating content from newspapers impedes rivals and deters innovation, as it removes any incentive for the newspapers to continue to develop their product (the delivery of news and information in an up-to-date factual manner), therefore harming competition. At bottom, Google is driving newspapers' customers to itself, using the newspapers' investment, without incurring the costs necessary to gain those customers. This strategy harms competition rather than benefitting consumers.

370.    Google's monopoly power in the relevant markets creates a fundamental bargaining power imbalance between newspapers and Google that has prevented newspapers from being able to effectively bargain for fair compensation for the utilization and/or distribution of their original content and/or has otherwise forced newspapers to accept less-favorable terms for the inclusion of news on Google's platforms and the distribution of their content than they would otherwise agree.

## COUNT II

### Section 1 of the Sherman Act: 15 U.S.C. §1
### (Agreement or Conspiracy to Restraint as to Google and Facebook)

371.   Section 1 of the Sherman Act outlaws "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce." 15 U.S.C. §1.   Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which "unreasonably" restrain competition.   *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958); *accord Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).

372.   Restraints subject to this prohibition are generally categorized as "horizontal" or "vertical." Horizontal restraints are imposed by agreements between actual or potential "competitors on the way in which they will compete with one another."   *NCAA v. Bd. of Regents*, 468 U.S. 85, 99 (1984); *accord Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986).   To determine whether a challenged agreement is a horizontal restraint, a court should evaluate whether the agreement (a) is among participants who are "either actual or potential rivals at the time the agreement is made," and (b) "eliminates some avenue of rivalry among them."   Phillip E. Areeda (late) & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ("ANTITRUST LAW") ¶1901b1; *accord, e.g., Rothery Storage*, 792 F.2d at 229 ("All horizontal restraints . . . eliminate some degree of rivalry between persons or firms who are actual or potential competitors.").   "Horizontal agreements . . . as a class provoke harder looks than any other arrangement" because "they pose the most significant dangers of competitive harm."   ANTITRUST LAW ¶1902a.

373.   Concerted action may be adequately alleged –and later proved – either through direct or indirect evidence. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

As detailed above, Google and Facebook unlawfully entered into an agreement(s) to unreasonably restrain trade.

374.    Section 1 encompasses two different analyses for determining whether a particular restraint is illegal: per se violations and the "rule of reason."

375.    The "*per se* rule" recognizes that some types of restraints are illegal in and of themselves "because of their actual or potential threat to the central nervous system of the economy."  United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224 n.59 (1940).  Examples of per se illegal restraints include agreements among actual or potential competitors to:  fix prices, *e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980); rig bids, *e.g.*, *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir. 1981); or divide or allocate markets, *e.g.*, *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).

376.    "The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work."  *Leegin*, 551 U.S. at 886.  It condemns a category of conduct without an "elaborate inquiry as to the precise harm [agreements or practices] have caused or the business excuse for their use."  *N. Pac. Ry.*, 356 U.S. at 5 (explaining that the per se rule "avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved").

377.    Plaintiffs allege, as described *supra*, that Google and Facebook engaged in *per se* violations of Section 1 by entering into a *quid-pro-quo* scheme wherein Facebook agreed not to challenge Google's advertising business in return for very special treatment in Google's ad auctions advantages and both parties agreed to curtail their competitive bidding for web display inventory.

114

378.    The elimination of the rivalry between the two leviathans of the digital advertising market directly resulted in the strangulation of the market to the detriment of the newspaper industry and Plaintiffs.

**COUNT III**

**Unjust Enrichment**
**(Google Has Been Unjustly Enriched)**

379.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations set forth in this Complaint.

380.    The original news content created by Plaintiffs and other newspapers across the country provides a significant benefit to Google as detailed above, including ¶¶357-365.  In a 2019 economic study, the News Media Alliance found that news content generated an estimated $4.7 billion in annual revenue for Google in 2019.  Plaintiffs' original content further benefits Google, *inter alia*, by improving Google's search results and algorithms thereby creating trust in its products; causing users to stay longer within Google's ecosystem of products; and enabling Google to extract user data and information which it utilizes to deliver targeted ads.

381.    Despite the benefits conferred upon Google by Plaintiffs, Google does not pay Plaintiffs for their original content or share with Plaintiffs the profits it generates from Plaintiffs' original content.  This result is intended by Google and has been caused by Google's unlawful and tortious conduct described herein.

382.    Plaintiffs have incurred substantial costs; hired journalists; paid for infrastructure; and invested time, money, and resources to create its content.

383.    Despite benefitting from Plaintiffs' content, Google maintains no responsibility or liability for the accuracy or quality of Plaintiffs' content, whereas Plaintiffs maintains full responsibility and liability.

384.    Google has knowingly accepted the benefits conferred upon it by Plaintiffs to which it is not entitled and has been unjustly enriched by its monopolistic and unlawful practices.

385.    Google's acceptance and retention of these benefits under these circumstances is unjust, inequitable, and against good conscious.

386.    As a matter of equity and New York common law, Google should be disgorged of all unjust enrichment and Plaintiffs should be made whole by the application of the doctrine of unjust enrichment.

### COUNT IV

### For Violation of Section 2 of the Sherman Act: 15 U.S.C. §2
### (Monopoly Leveraging as to Google)

387.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations set forth in this Complaint.

388.    Google has monopoly power in each the general search market as set forth above. Through the anticompetitive conduct described herein, Google has leveraged its power in this market in an effort to gain monopoly power and further dominance in the ad exchange and ad server markets. Google has done so willfully, and unless restrained by the Court, it will continue to willfully leverage that power by further anticompetitive, illegal, deceptive, and unreasonably exclusionary conduct as described above. Google has acted with the intent to illegally  maintain and gain monopoly power in each of these markets, and its illegal conduct has enabled it to do so in violation of §2 of the Sherman Act, 15 U.S.C. §2.

389.    As a direct and proximate result of Google's anticompetitive restraints set forth above, Plaintiffs have suffered injury to their business and property.

390.    Google's illegal conduct has directly caused significant monetary damages to Plaintiffs.  The precise amount of damages Plaintiffs are entitled to recover as a result of the foregoing injury is substantial and will be fully ascertained at trial.

391.    In addition, Google's monopolization of the relevant markets and monopoly leveraging are ongoing violations that cause incalculable and irreparable injury for which there is no adequate remedy at law.  Unless Google is enjoined by an appropriate order of this Court, the asserted harm will continue unabated.

## COUNT V

### For Violation of Section 2 of the Sherman Act: 15 U.S.C §2
### (Attempted Monopolization as to Google)

392.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations set forth in this Complaint.

393.    As detailed above, Google has monopoly power in the relevant markets.

394.    Google has attempted to monopolize multiple markets, including the online search, ad exchange and ad server markets, in violation of §2 of the Sherman Act, 15 U.S.C. §2.

395.    Google is violating §2 of the Sherman Act by attempting to implement the anticompetitive scheme, as described in above.  There is a dangerous probability that Google will succeed in monopolizing the relevant product markets through its anticompetitive scheme.

396.    Google has the power to exclude competition in the relevant markets and has used that power, including by way of its unlawful practices in restraint of trade and monopoly leveraging

117

as described above, in an attempt to monopolize these relevant markets.  Google has the specific intent to achieve monopoly power in the relevant markets.

397.    There is no business necessity or other procompetitive justification for Google's conduct.

398.    Plaintiffs have been injured, and will continue to be injured, in their business and property by way of Google's conduct, including by depriving Plaintiffs of revenue and advertising fees.

## PRAYER

**WHEREFORE**, Plaintiffs request the Court to enter judgment in their favor against Defendants, jointly and severally, awarding all such relief as the Court deems appropriate and just, including:

A.    That the Court enter an order declaring that Defendants' actions, as alleged herein, violate the law;

B.    That the Court award Plaintiffs damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

C.    That the Court permanently enjoin Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof from continuing, maintaining, or renewing the conduct alleged herein, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.    That the Court award Plaintiffs pre- and post-judgment interest;

E.    That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses; and

F.    That the Court award any and all such other relief as it may deem proper.

118

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues herein.

DATED:  December 2, 2022                    Respectfully submitted,

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            DAVID W. MITCHELL (admitted *pro hac vice*)
                                            STEVEN M. JODLOWSKI (admitted *pro hac vice*)


                                            _____
                                                    s/ David W. Mitchell
                                                   DAVID W. MITCHELL

                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            PAUL J. GELLER (admitted *pro hac vice*)
                                            STUART A. DAVIDSON (admitted *pro hac vice*)
                                            120 East Palmetto Park Road, Suite 500
                                            Boca Raton, FL  33432
                                            Telephone:  561/750-3000
                                            561/750-3364 (fax)

                                            FITZSIMMONS LAW FIRM PLLC
                                            ROBERT P. FITZSIMMONS (admitted *pro hac vice*)
                                            CLAYTON J. FITZSIMMONS (admitted *pro hac vice*)

Dated:  December 2, 2022

                                            _____
                                                  s/ Clayton J. Fitzsimmons
                                                 CLAYTON J. FITZSIMMONS

                                            1609 Warwood Avenue
                                            Wheeling, WV 26003
                                            Telephone: 304/277-1700
                                            304/277-1705 (fax)

119

Dated:  December 2, 2022          HERMAN JONES LLP
                                  JOHN C. HERMAN (admitted *pro hac vice*)
                                  SERINA M. VASH


                                  _____
                                          s/ Serina M. Vash
                                          SERINA M. VASH

                                  3424 Peachtree Road, N.E., Suite 1650
                                  Atlanta, GA  30326
                                  Telephone:  404/504-6555
                                  404/504-6501 (fax)

                                  FARRELL & FULLER, LLC
                                  PAUL T. FARRELL, JR. (admitted *pro hac vice*)
                                  MICHAEL J. FULLER, JR. (admitted *pro hac vice*)
                                  1311 Ponce De Leon, Suite 202
                                  San Juan, PR 00907
                                  Telephone: 939/293-8244
                                  939/293-8245 (fax)

Attorneys for Plaintiffs HD Media Company LLC, AIM Media Indiana Operating, LLC, AIM Media Midwest Operating, LLC, AIM Media Texas Operating, LLC, Clarksburg Publishing Company, d.b.a. WV News, Coastal Point LLC, Eagle Printing Company, ECENT Corp., Emmerich Newspapers, Inc., J.O. Emmerich & Associates, Inc., Delta-Democrat Publishing Company, Commonwealth Publishing Company, Inc., Delta Press Publishing Company, Inc., Newton County Appeal Inc., Marion Publishing, Company, Yazoo Newspaper, Co., Inc., Sunland Publishing, Company, Inc., Simpson Publishing Co., Inc., Montgomery Publishing Co., Inc., Franklinton Publishing Co., Inc., Charleston Publishing Co., Inc., Clarion Publishing Company, Inc., Scott Publishing, Inc., Clarke Publishing, Inc., Hattiesburg Publishing, Inc., Tallulah Publishing, Inc., Louisville Publishing, Inc., Kosciusko Star-Herald, Inc., Enterprise-Tocsin, Inc., Grenada Star, Inc.,  Tate Record Inc., Flag Publications, Inc., Gale Force Media, LLC, Journal Inc., Brown County Publishing Company, Inc., Multi Media Channels, LLC, Robinson Communication, Inc., Something Extra Publishing, Inc., Rome News Media, LLC, Neighborhood Newspapers, Inc., Times Journal, Inc., Savannah Publishing Co., Inc., Weakley County Press, Inc., Union City Daily Messenger, Inc.,  Gould Enterprises, Inc., Southern Community Newspapers, Inc., Appen Media Group, Inc., Capital Region Independent Media LLC

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 2, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ David W. Mitchell
DAVID W. MITCHELL

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  davidm@rgrdlaw.com

**Mailing Information for a Case 1:21-md-03010-PKC In re: Google Digital Advertising Antitrust Litigation**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Aden Martin Allen**
  aallen@wsgr.com

- **Elin S Alm**
  ealm@nd.gov,lemoch@nd.gov

- **Peter T Barbur**
  pbarbur@cravath.com

- **Brian W Barnes**
  bbarnes@cooperkirk.com

- **Scott Leroy Barnhart**
  scott.barnhart@atg.in.gov

- **Patrick Montgomery Barrett , III**
  pbarrett@barrettlawofficetn.com

- **Zina Bash**
  zina.bash@kellerpostman.com

- **Kate M. Baxter-Kauf**
  kmbaxter-kauf@locklaw.com,atajagbusi@locklaw.com,lgn-kmbaxter-kauf@ecf.courtdrive.com

- **TerriAnne Benedetto**
  tbenedetto@dugan-lawfirm.com,cbarnes@seegerweiss.com,klaukaitis@seegerweiss.com,cchoe@seegerweiss.com

- **Daniel G Bird**
  dbird@kellogghansen.com,hwallace@kellogghansen.com,etripodi@kellogghansen.com,ecf-d43d0fc62774@ecf.pacerpro.com

- **Daniel S. Bitton**
  dbitton@axinn.com

- **David Boies**
  dboies@bsfllp.com

- **Kip T. Bollin**
  kip.bollin@thompsonhine.com,ECFDocket@thompsonhine.com

- **Jamie L Boyer**
  jboyer@koreintillery.com

- **Alex Jerome Brown**
  alex.brown@lanierlawfirm.com,3511928420@filings.docketbird.com,audrey.moore@lanierlawfirm.com

- **Joseph M. Bruno**
  jbruno@brunobrunolaw.com

- **Bryce L Callahan**
  bcallahan@yettercoleman.com

- **Johnathan R Carter**
  johnathan.carter@arkansasag.gov

- **Solomon B. Cera**
  scera@cerallp.com,jrl@cerallp.com,cdirksen@cerallp.com,kgantan@cerallp.com

- **Mark A. Colantonio**
  mark@fitzsimmonsfirm.com

- **Mark A. Colantonio**
  mark@fitzsimmonsfirm.com,jaclyn@fitzsimmonsfirm.com,mark_096@ecf.courtdrive.com,leslie@fitzsimmonsfirm.com

- **Timothy Patrick Conroy**
  timothypconroy@gmail.com

- **Charles J Cooper**
  ccooper@cooperkirk.com,johlendorf@cooperkirk.com,ccarroll@cooperkirk.com,ktroilo@cooperkirk.com

- **Andrew Dieter Cordo**
  acordo@wsgr.com

- **Ryan Z. Cortazar**
  rcortazar@koreintillery.com

- **Caitlin G. Coslett**
  ccoslett@bm.net,sleo@bm.net

- **Caitlin Goldwater Coslett**
  ccoslett@bm.net

- **Shawn Cowles**
  shawn.cowles@oag.texas.gov

- **Eric L. Cramer**
  ecramer@bm.net,sleo@bm.net,dgiovanetti@bm.net,emagnus@bm.net

- **Mary Csarny**
  Mary.Csarny@ThompsonHine.com

- **Stuart A. Davidson**
  sdavidson@rgrdlaw.com,jdennis@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com,sdavidson@ecf.courtdrive.com,khanson@rgrdlaw.com

- **Brett Talmage DeLange**
  brett.delange@ag.idaho.gov,lynn.mize@ag.idaho.gov,oscar.klaas@ag.idaho.gov

- **Zeke DeRose , III**
  zeke.derose@lanierlawfirm.com

- **Michael C Dell'Angelo , IV**
  mdellangelo@bm.net,csimon@bm.net,jgionnette@bm.net

- **Michael C. Dell'Angelo**
  mdellangelo@bm.net,eyork@bm.net,clozano@bm.net,csimon@bm.net,jgionnette@bm.net

- **James Peter Denvir , III**
  jdenvir@bsfllp.com

- **James R. Dugan , II**
  jdugan@dugan-lawfirm.com,dscalia@dugan-lawfirm.com,dplymale@dugan-lawfirm.com,bonnie@dugan-lawfirm.com

- **Marc Howard Edelson**
  medelson@edelson-law.com

- **Vadim Egoul**
  vegoul@wsgr.com

- **Kara A. Elgersma**
  kae@wbe-llp.com,wbe-ecf@ecf.courtdrive.com

- **Jordan Elias**
  jelias@girardsharp.com,5261237420@filings.docketbird.com,avongoetz@girardsharp.com

- **Julie Elmer**
  julie.elmer@freshfields.com

- **Julie S Elmer**
  julie.elmer@freshfields.com,6188914420@filings.docketbird.com

- **Mikaela Elizabeth Evans-Aziz**
  mevansaziz@wsgr.com,ageritano@wsgr.com

- **Andrew Ewalt**
  andrew.ewalt@freshfields.com,Nicholas.Vockrodt@freshfields.com

- **Randall P. Ewing , Jr**
  REwing@KoreinTillery.com,gkaminsky@koreintillery.com

- **Paul T. Farrell , Jr**
  paul@farrellfuller.com,andrea@farrellfuller.com,lora@farrell.law

- **Paul T. Farrell, Jr**
  paul@farrellfuller.com

- **Andrew William Ferich**
  aferich@ahdootwolfson.com

- **Clayton J. Fitzsimmons**
  clayton@fitzsimmonsfirm.com,kendra@fitzsimmonsfirm.com,kait@fitzsimmonsfirm.com,christy@fitzsimmonsfirm.com,leslie@fitzsimmonsfirm.com

- **Robert Patrick Fitzsimmons**
  bob@fitzsimmonsfirm.com,kendra@fitzsimmonsfirm.com,kait@fitzsimmonsfirm.com,christy@fitzsimmonsfirm.com,leslie@fitzsimmonsfirm.com

- **Isaac Ralston Forman**
  iforman@hfdrlaw.com

- **Michael Jay Fuller**
  mike@farrellfuller.com

- **Michael Jay Fuller , Jr**
  mike@farrellfuller.com,edna@mchughfuller.com

- **Michael Jay Fuller , Jr**
  mike@farrellfuller.com

- **Paul J Geller**
  pgeller@rgrdlaw.com

- **Paul Jeffrey Geller**
  pgeller@rgrdlaw.com

- **Christopher Goodnow**
  cgoodnow@kelloghansen.com

- **Max C. Gottlieb**
  mgottlieb@hfdrlaw.com

- **Joshua H. Grabar**
  jgrabar@grabarlaw.com

- **Robert J. Gralewski , Jr**
  bgralewski@kmllp.com

- **Robert Gralewski, Jr**
  bgralewski@kmllp.com

- **Benjamin M. Greenblum**
  bgreenblum@wc.com

- **Philip Lawrence Gregory**
  pgregory@gregorylawgroup.com

- **Parrell D Grossman**
  pgrossman@nd.gov

- **Scott M Grzenczyk**
  scottg@girardsharp.com,7488696420@filings.docketbird.com,avongoetz@girardsharp.com

- **Daniel E. Gustafson**
  dgustafson@gustafsongluek.com

- **John David Harkrider**
  jharkrider@axinn.com

- **Jason S. Hartley**
  hartley@hartleyllp.com

- **Rebecca M Hartner**
  rhartner@scag.gov

- **Caleb Hayes-Deats**
  chayes-deats@mololamken.com,caleb.hayes-deats@usdoj.gov

- **Daniel C. Hedlund**
  dhedlund@gustafsongluek.com,jholzer@gustafsongluek.com

- **Philip R Heleringer**
  philip.heleringer@ky.gov,sarah.telle@ky.gov

- **John C. Herman**
  jherman@hermanjones.com

- **Brianna S. Hills**
  bhills@bsfllp.com

- **Mark Hirschboeck**
  mhirschboeck@kelloghansen.com

- **Michael B. Hissam**
  mhissam@hfdrlaw.com

- **Stephen M. Hoeplinger**
  stephen.hoeplinger@ago.mo.gov

- **Stephen Mark Hoeplinger**
  stephen.hoeplinger@ago.mo.gov

- **Fred Taylor Isquith**
  fisquith@zsz.com,isquithlaw@gmail.com

- **Frederick Taylor Isquith , Sr**
  ftisquith@zsz.com

- **Lee Istrail**
  lee.istrail@myfloridalegal.com

- **Jonathan M. Jacobson**
  jjacobson@wsgr.com,ageritano@wsgr.com,lalmeida@wsgr.com,cstavros@wsgr.com

- **Rachel Annie Jarvis**
  jarvislawgroup@gmail.com

- **Steven M Jodlowski**
  sjodlowski@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christopher Chad Johnson**
  chadj@rgrdlaw.com,e_file_ny@rgrdlaw.com,chadj@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,dwatts@rgrdlaw.com,ckopko@rgrdlaw.com

- **Bethan R Jones**
  bjones@kelloghansen.com

- **Mary Gibson Jowers**
  mfjowers@scag.gov

- **Bradley Justus**
  bjustus@axinn.com,gteamaxinn@axinn.com

- **Lauren Kaplin**
  lauren.kaplin@freshfields.com

- **Ashley C. Keller**
  ack@kellerpostman.com,docket@kellerlenkner.com

- **Bradley K. King**
  bking@ahdootwolfson.com,twolfson@ahdootwolfson.com,rahdoot@ahdootwolfson.com,filings@ahdootwolfson.com,1946088420@filings.docketbird.com

- **Michael E. Klenov**
  mklenov@koreintillery.com,ldunn@koreintillery.com

- **Philip C. Korologos**
  pkorologos@bsfllp.com,jkramer@bsfllp.com,eresnicow@bsfllp.com,NYC_Managing_Clerk@bsfllp.com,tshort@bsfllp.com,mlebron@bsfllp.com,philip-korologos-7041@ecf.pacerpro.com

- **David H. Kramer**
  dkramer@wsgr.com,dgrubbs@wsgr.com

- **Tim LaComb**
  tlacomb@moginrubin.com

- **Benjamin Labow**
  blabow@wsgr.com

- **Yvette K Lafrentz**
  yvette.lafrentz@state.sd.us

- **April D Lambert**
  alambert@radicelawfirm.com

- **April Dawn Lambert**
  alambert@radicelawfirm.com

- **Jeffrey A. Lamken**
  jlamken@mololamken.com

- **W Mark Lanier**
  jrm@lanierlawfirm.com

- **W. Mark Lanier**
  mark.lanier@lanierlawfirm.com,cristina.delise@lanierlawfirm.com,catherine.heacox@lanierlawfirm.com,audrey.moore@lanierlawfirm.com,sadie.turner@lanierlawfirm.com

- **Vanessa Allen Lavely**
  vlavely@cravath.com,abahri@cravath.com,mamiller@cravath.com,dphillips@cravath.com

- **Karen M. Lerner**
  klerner@kmllp.com,karen-lerner-7246@ecf.pacerpro.com

- **Matthew Levinton**
  Matthew.Levinton@oag.texas.gov

- **Chelsea C. Lewis**
  chelsea.lewis@formanwatkins.com

- **John Christian Lewis**
  christian.lewis@ky.gov

- **Jason M Lindner**
  lindner@hartleyllp.com

- **Robert E Litan**
  rlitan@bm.net,csimon@bm.net

- **Richard Lombardo**
  rlombardo@sls-law.com,jwelker@sls-law.com,bwilmoth@sls-law.com

- **Jessica Lonergan**
  jlonergan@wsgr.com,ageritano@wsgr.com

- **Patrick Fanning Madden**
  pmadden@bm.net,jgionnette@bm.net

- **Eric Mahr**
  eric.mahr@freshfields.com

- **Eric J. Mahr**
  eric.mahr@freshfields.com

- **Eric J. Maier**
  emaier@kelloghansen.com

- **Hsiao C. Mao**
  mmao@bsfllp.com

- **Mark C. Mao**
  mmao@bsfllp.com

- **Sara Ellen Margolis**
  smargolis@mololamken.com

- **Pamela A. Markert**
  pmarkert@cerallp.com

- **Hart Martin**
  hart.martin@ago.ms.gov

- **Marie W.L. Martin**
  mwmartin@agutah.gov,dpotnar@ag.nv.gov,mhodges@ag.nv.gov

- **Steven A. Martino**
  stevemartino@taylormartino.com

- **Mark W Mattioli**
  mmattioli@mt.gov,edoj@mt.gov

- **Theodore W. Maya**
  tmaya@ahdootwolfson.com

- **Robert John McCallum**
  rob.mccallum@freshfields.com,6188914420@filings.docketbird.com,Tyler.CLARKSON@freshfields.com,mark.goldberg@freshfields.com

- **Derriel Carlton McCorvey**
  derriel@mccorveylaw.com

- **David A.F. McCoy**
  david.mccoy@arkansasag.gov,matilda.benson@arkansasag.gov

- **Sabria McElroy**
  smcelroy@bsfllp.com

- **Sabria McElroy**
  smcelroy@bsfllp.com

- **Matthew Alan Michaloski**
  matthew.michaloski@atg.in.gov

- **Mint Rose Day Spa LLC**
  Mintrosedayspa@gmail.com

- **David W. Mitchell**
  davidm@rgrdlaw.com,slandry@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David W. Mitchell - PHV**
  davidm@rgrdlaw.com

- **Daniel Jay Mogin**
  dmogin@moginrubin.com,jchatfield@moginrubin.com,sbuack@moginrubin.com,ngeraci@moginrubin.com,jsidhwa@moginrubin.com,carmijo@moginrubin.com

- **Jason Blake Mollick**
  jmollick@wsgr.com,ageritano@wsgr.com

- **Dianne M. Nast**
  dnast@nastlaw.com

- **Michelle C Newman**
  mnewman@ag.nv.gov,dpotnar@ag.nv.gov,mhodges@ag.nv.gov

- **Daniel Jay Nordin**
  dnordin@gustafsongluek.com

- **Carol L. O'Keefe**
  cokeefe@koreintillery.com

- **Carol Lee O'Keefe**
  cokeefe@koreintillery.com,jwitteried@koreintillery.com,llucas@koreintillery.com

- **John K Olson**
  john.olson@ag.idaho.gov

- **Kevin J. Orsini**
  korsini@cravath.com,mao@cravath.com,FBADTechAssociates@cravath.com,pbarbur@cravath.com,Antitrust_Paralegals@cravath.com

- **Jesse Michael Panuccio**
  jpanuccio@bsfllp.com

- **Eliana M. Pfeffer**
  epfeffer@kellogghansen.com,edawson@kellogghansen.com

- **Daniel J. Pfefferbaum**
  dpfefferbaum@rgrdlaw.com,dpfefferbaumRGRD@ecf.courtdrive.com

**Jeffery G Pickett**
jeff.pickett@alaska.gov

**Tara W Pincock**
tpincock@agutah.gov

**Adam E Polk**
apolk@girardsharp.com,avongoetz@girardsharp.com,3768906420@filings.docketbird.com

**Warren D Postman**
wdp@kellerlenkner.com

**John D. Radice**
jradice@radicelawfirm.com

**Tiffany Ray**
tiffany@taylormartino.com

**Tiffany N. Ray**
tiffany@taylormartino.com

**Harold S. Reeves**
hreeves@cooperkirk.com

**Martha Reiser**
mreiser@cravath.com

**Sophia Marie Rios**
srios@bm.net

**Sophia Marie Rios**
srios@bm.net

**Sean P. Rodriguez**
srodriguez@bsfllp.com,sphan@bsfllp.com,sean-rodriguez-4625@ecf.pacerpro.com

**Thaizza M Rodriguez**
trodriguez@justicia.pr.gov

**David Evan Ross**
dross@seitzross.com

**Peter Frederic Rottgers**
prottgers@sls-law.com,ctraffis@sls-law.com

**Jonathan Rubin**
jrubin@moginrubin.com,jchatfield@moginrubin.com,sbuack@moginrubin.com,tlacomb@moginrubin.com,ngeraci@moginrubin.com,jsidhwa@moginrubin.com,dmogin@mo

**Jonathan Laurence Rubin**
jrubin@moginrubin.com

**Franklin M Rubinstein**
frubinstein@wsgr.com

**Jan Rybnicek**
jan.rybnicek@freshfields.com

**John E. Schmidtlein**
jschmidtlein@wc.com,john-schmidtlein-5892@ecf.pacerpro.com

**Justina K. Sessions**
jsessions@wsgr.com,ageritano@wsgr.com

**Justina Kahn Sessions**
jsessions@wsgr.com

**Dena C. Sharp**
dsharp@girardsharp.com,avongoetz@girardsharp.com,8388361420@filings.docketbird.com

**Dena C. Sharp**
dsharp@girardsharp.com

**Heidi M. Silton**
hmsilton@locklaw.com,lgn-hmsilton@ecf.courtdrive.com,hnpotteiger@locklaw.com,sljuell@locklaw.com

**William Nelson Sinclair**
bsinclair@mdattorney.com

**SkinnySchool LLC**
info@mariamarquesfitness.com

**Brooke Clason Smith**
brooke.smith@kellerlenkner.com

**Michael S Sommer**
msommer@wsgr.com,ageritano@wsgr.com

**Dennis Stewart**
dstewart@gustafsongluek.com

- **Christopher Eric Stiner**
  cstiner@ahdootwolfson.com

- **Daniel Strunk**
  daniel.strunk@kellerpostman.com

- **Michael E. Sumner**
  sumnerpc@numail.org

- **Archana Tamoshunas**
  atamoshunas@tcllaw.com

- **David H Thompson**
  dthompson@cooperkirk.com,elizza@cooperkirk.com,abailey@cooperkirk.com,ktroilo@cooperkirk.com

- **John Thorne**
  jthorne@kellogghansen.com,awhite@kellogghansen.com,sthorne@kellogghansen.com,csella@kellogghansen.com

- **Stephen M. Tillery**
  stillery@koreintillery.com,ldunn@koreintillery.com,leckhardt@koreintillery.com

- **Katielynn Boyd Townsend**
  ktownsend@rcfp.org

- **Lucas J Tucker**
  ltucker@ag.nv.gov,dpotnar@ag.nv.gov,mhodges@ag.nv.gov

- **Serina M. Vash**
  svash@hermanjones.com

- **Serina Marie Vash**
  svash@hermanjones.com

- **Jeffrey M. Wakefield**
  jwakefield@fsblaw.com

- **Daniel John Walker**
  dwalker@bm.net

- **Marc Alfred Wallenstein**
  mwallenstein@koreintillery.com

- **Michaela Wallin**
  mwallin@bm.net

- **Clarence Webster , III**
  cwebster@babc.com

- **Gregory F Wesner**
  gwesner@hermanjones.com

- **Kenneth A. Wexler**
  kaw@wbe-llp.com,wbe-ecf@ecf.courtdrive.com

- **James A. Wilson**
  jawilson@vorys.com

- **Tina Wolfson**
  twolfson@ahdootwolfson.com,bking@ahdootwolfson.com,filings@ahdootwolfson.com,hkelston@ahdootwolfson.com,hliivamagi@ahdootwolfson.com,rahdoot@ahdootwolfso

- **Koren Wong-Ervin**
  kwongervin@axinn.com

- **Stephen Yelderman**
  stephen.yelderman@kellerlenkner.com

- **R Paul Yetter**
  pyetter@yettercoleman.com

- **Trevor Young**
  trevor.young@oag.texas.gov,stephen.craig@oag.texas.gov

- **George A. Zelcs**
  gzelcs@koreintillery.com,ldunn@koreintillery.com,7556444420@filings.docketbird.com,leckhardt@koreintillery.com,gkaminsky@koreintillery.com,mbannester@koreintillery

- **Jason Allen Zweig**
  jaz@kellerpostman.com,docket@kellerlenkner.com

- **Peter Bradford deLeeuw**
  brad@deleeuwlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

Erin          K Dickinson
Crueger Dickinson LLC
4532 N Oakland Ave

Whitefish Bay, WI 53211

**Paul        T. Farrell**
Greene, Ketchum, Farrell, Bailey & Tweel, LLP
P.O. Box 2389
419 - 11th Street
Huntington, WV 25724-2389

**Steven        A. Martino**
Taylor Martino & Hedge
61 St. Joseph Street
1600 SouthTrust Bank Building
Mobile, AL 36602