UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

IN RE: GOOGLE DIGITAL ADVERTISING
ANTITRUST LITIGATION

    21-md-3010 (PKC)

------------------------------------------------------- x

THIS DOCUMENT RELATES TO:

SPX Total Body Fitness LLC, d/b/a The
Studio Empower, on behalf of itself and all
others similarly situated,

    1:21-cv-06870-PKC

        Plaintiff,

    vs.

GOOGLE LLC,

    1:21-cv-07045-PKC

        Defendant.

SKINNYSCHOOL LLC d/b/a MARIA
MARQUES FITNESS and MINT ROSE DAY
SPA LLC, on behalf of themselves and all
others similarly situated,

    **JURY TRIAL DEMANDED**

        Plaintiffs,

    vs.

GOOGLE LLC,

        Defendant.

------------------------------------------------------- x

## <u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

TABLE OF CONTENTS

I.   NATURE OF THE CASE ................................................................................ 1

II.   PARTIES ........................................................................................................ 4

III.   JURISDICTION ............................................................................................. 5

IV.   VENUE .......................................................................................................... 6

V.   INDUSTRY BACKGROUND ....................................................................... 6

   A.   Market Participants ............................................................................... 6
   B.   Online Display Advertising Markets ..................................................... 8

VI.   GOOGLE'S MARKET POWER .................................................................. 16

VII.   ANTICOMPETITIVE CONDUCT ............................................................. 16

   A.   Google forces publishers to trade in Google's Exchange .................... 16
   B.   Header Bidding: A threat to Google's dominance which Google eliminated by
        the Facebook Agreement ...................................................................... 18
   C.   Facebook is A Direct Competitor and Threat to Google's Dominance in the Ad
        Exchange Market ................................................................................. 22
   D.   The Facebook Agreement ..................................................................... 27
   E.   Google gives Facebook a leg up in publishers' and developers' auctions in ...... 29
   F.   Google and Facebook agree to limit their competitive bidding. ........................... 34

VIII.   ANTICOMPETITIVE EFFECTS ................................................................. 41

IX.   CLASS ACTION ALLEGATIONS ............................................................. 43

1.      Pursuant to the Court's Pre-Trial Order No. 4 (ECF No. 392), Plaintiffs SPX Total Body Fitness LLC, d/b/a The Studio Empower, Mint Rose Day Spa LLC and SkinnySchool LLC., d/b/a Maria Marques Fitness (together, the "Plaintiffs"), individually and on behalf of all other persons similarly situated, alleges the following against Google LLC ("Google" or the "Defendant") upon information and belief based on  the investigation conducted by Plaintiffs' counsel, which included, among other things, the Complaint filed by the Attorney General of the State of Texas and nine other States Attorneys General (the "AGs") in the United States District Court for the Eastern District of Texas (4:20cv957) on or about December 16, 2020, the AGs' Third Amended Complaint filed in this district, Defendant's own internal documents, the House of Representatives' Subcommittee on Antitrust, Commercial and Administrative Law report on the Investigation on Competition in Digital Markets, and reports in the press including The Wall Street Journal, The New York Times, and industry journals.

2.      Plaintiffs file this Consolidated Amended Class Action Complaint ("Complaint") against Google under federal antitrust laws and allege as follows:

## I.      NATURE OF THE CASE

3.      Google has achieved dominance by control over the overwhelming amount of digital advertising sold through its ad exchange – AdX ("Exchange" or "Google's Exchange," defined further herein) – and sought to suppress competition and protect its position through a multitude of exclusionary tactics, including an agreement with Facebook, Inc. ("Facebook Agreement"), now known as Meta Platforms, Inc. ("Facebook"), with whom Google was a direct competitor for advertising.

4.      Plaintiffs file this Complaint as a class action on behalf themselves and those similarly situated who placed advertising on Facebook ("Facebook Advertisers") from September 1, 2018 to the present (the "Class").

1

5.     Google is responsible for all damages incurred by Facebook Advertisers as alleged herein because the Facebook Agreement constitutes an illegal contract or combination in restraint of trade prohibited by Section 1 of the Sherman Act, for which all conspirators are joint and severally liable, and the fact Google maintains non-competitive pricing on digital ads placed on Facebook.

6.     The Facebook Agreement, also referred to as "Jedi Blue," facilitated Google's ability to manipulate advertising auctions on Google's Exchange, as further detailed herein.

7.     Google and Facebook are, among other things, advertising companies, each of which makes billions of dollars a year by using individuals' personal information to sell targeted digital advertising to their clients and compete for the advertising directed at these overlapping users of its sites.

8.     Prior to, and throughout the period from September 1, 2018 to the present (the "Class Period") Google has had a dominant position in internet advertising placement on Google services and on other internet platforms.

9.     As such, it was, and is, imperative that most internet publishers and advertisers use Google and its system, described in this Complaint (the "Google System"). The method by which Google acquired this market dominance and maintains it, and whether that market position and maintenance is an unlawful monopoly under the United States antitrust laws, is the subject of lawsuits before this Court brought by the Attorney Generals of 16 States and Puerto Rico as well as in private lawsuits brought by publishers on Google and using the Google System and advertisers on Google using the Google System.

10.     This action is brought by Plaintiffs for themselves and the Class of similarly situated on Facebook Advertisers who, this action alleges, where injured and continue to be injured

by the Facebook Agreement, an agreement between enormous corporate enterprises that were and are competitors for advertisers and advertising dollars over the internet.

11.     The antitrust impact of the Facebook Agreement on Facebook Advertisers, as well as the mechanisms of the Google System, is set forth herein. For the reason set forth, the challenge to Google's dominance through Facebook's support and development by Facebook of a competitive product, called Header Bidding, can be placed in the context of benefits obtained by Google (and Facebook) through the withdrawal of Facebook's support and development of Header Bidding (discussed below) as a consequence, and as part of the consideration for, the Facebook Agreement.

12.     One of Google's primary sources of revenue was, and is, from advertising on its search platform. Google has extended that revenue source to dominate the online advertising landscape for image-based web display ads, including the Google Exchange.

13.     The purchase and sale of advertising on the web is among the most complicated markets. Publishers and advertisers trade display inventory through a variety of intermediaries on electronic exchanges at lightning speed.

14.     In 2021, Google generated more than $250 billion in revenue from the digital advertising business, approximately 81% of its total revenue.[1]

15.     Facebook's primary source of revenue was, at all times relevant to this Complaint, derived from advertising.

16.     Facebook's advertising revenue can be measured in the billions of dollars, making $55 billon in advertising revenue in 2018, $69.7 billion in 2019, $84.2 billion in 2020 and finally

---

[1] *See* https://www.globaldata.com/data-insights/technology-media-and-telecom/googles-revenue/ (last accessed Dec. 1, 2022).

eclipsing the $100 billion mark with $114.9 billion in 2021.[2]

17.     Nearly all persons or entities that have space to sell for advertising online (referred to in this Complaint as "publishers"), regardless of their size, depended and do depend on Google to sell their online display ad space in the Google Exchange.

18.     Conversely, nearly every consumer goods company, e-commerce entity, and small business depended and do depend on Google as its middleman for purchasing display ads from Google's Exchange to market its goods and services to consumers whether published by Google or another internet platform such as Facebook.

19.     In addition to representing both the buyers and the sellers of online display advertising, Google also operates the largest electronic advertising market, the Google Exchange.

20.     Google uses its powerful position on every side of the online display market to exclude competition.

21.     When Google's market power was threatened, it cut off innovation and competition through the Facebook Agreement, as described in these allegations.

22.     Through Google's anticompetitive conduct and its agreement with Facebook, Google has violated and continues to violate Section 1 of the Sherman Act,  15 U.S.C. §§ 1, *et seq.*

## II.     PARTIES

23.     Mint Rose Day Spa LLC ("Mint Rose") is organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business in Billerica, Massachusetts. Mint Rose purchased display advertisements on Facebook during the Class Period.

24.     SkinnySchool LLC., d/b/a Maria Marques Fitness SkinnySchool ("SkinnySchool"), is organized and existing under the laws of the Commonwealth of

---

[2] *See* Meta Form 10-K for relevant years, available at https://investor.fb.com/financials/default.aspx (last accessed Dec. 1, 2022).

Massachusetts, with its principal place of business in North Billerica Massachusetts. SkinnySchool purchased display advertisements on Facebook during the Class Period.

25.     SPX Total Body Fitness LLC, d/b/a The Studio Empower ("SPX"), is organized and existing under the laws of the Commonwealth of Massachusetts, with its principal places of business in Burlington, Massachusetts. SPX purchased display advertisements on Facebook during the Class Period.

26.     Google is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Mountain View, California.

27.     Google is a wholly owned subsidiary of Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California.

28.     Google is an online advertising technology company best known for its popular search engine. Google additionally offers many internet-related products, including various online advertising technologies, directly and through subsidiaries and business units under its ownership and control.

### III.     JURISDICTION

29.     Plaintiffs bring this class action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to: (a) recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; (b) enjoin Defendants' anticompetitive conduct; and (c) obtain any other relief afforded under the antitrust laws of the United States for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

31.     This Court has personal jurisdiction over Google pursuant to Fed. R. Civ. P. 4(k)

and 15 U.S.C. § 22.

## IV.    VENUE

32.    Venue is proper in the Northern District of California (where this action was commenced), as well as in this District, under Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26) and 28 U.S.C. §§ 1391. At all times relevant to the Complaint, Google has been headquartered in and has its principal place of business in the Northern District of California and a substantial part of the conduct giving rise to this action occurred in this the Northern District of California.

33.    Plaintiffs' lawsuits in the Northern District of California were transferred to the Southern District of New York by the Judicial Panel on Multidistrict Litigation for centralization on August 10, 2021. (ECF No. 1).

## V.    INDUSTRY BACKGROUND

34.    Display ads, audio ads, and video ads in the online world have largely supplanted their traditional print, radio, and television counterparts.

35.    The internet ushered in completely new advertising formats, including targeted text-based ads on search engines, shareable ads on social media, and specialized ads inside mobile phone applications. With those new formats came new opportunities to efficiently reach customers with targeted digital advertising.

### A.    Market Participants

36.    Broadly speaking, digital advertising can be divided primarily into the distinct categories of search, display, and video advertising.

37.    Search advertising refers to ads which appear among the results of an internet search. Because advertisers choose to display their ads for certain keywords, search ads can be targeted to consumers likely to purchase the goods or services advertised.

38.    Display advertising refers to ads which appear on websites or apps alongside content. The ads may take a variety of forms, including banners and sponsored content. For example, the *New York Times* runs banner ads at the top of their homepage and atop and within articles.

39.    Video advertising is closely related to display advertising, and at times a form of display advertising.

40.    For online publishers and advertisers alike, the different online advertising formats are not interchangeable. For example, online media companies that operate websites and mobile applications are restricted by their platform's coding on the types of ad formats they can sell.

41.    At the same time, advertisers (looking to place ads on the publisher's platform) purchase advertising space in one format or another to serve their distinct goals.

42.    Search advertising allows companies to reach consumers who have demonstrated a likelihood of interest in their products or services, not only by their use of keywords but also through their previous browsing history, demographic information, or location.

43.    Advertisers and ad agencies regard search advertising as a tool to directly lead to sales, while they intend display advertising as a tool for gaining exposure to new consumers and brand building. In other words, search and display advertising fulfill different functions, and neither is a substitute for the other.

44.    In addition to introducing new advertising formats, the internet changed how publishers sell their advertising inventory. Online publishers sell their inventory to advertisers either directly or indirectly through ad exchanges.

45.    The "direct" sales method refers to campaigns that the publisher itself sells directly to advertisers.

46.     The reality of most digital advertising transactions is more complex, with an array of intermediaries facilitating the placement of ads.

47.      Publishers use a specialized distribution channel to sell their ad inventory *indirectly* to advertisers.

48.     "Indirect" sales occur through centralized electronic trading venues called "ad exchanges."

49.     Publishers use ad exchanges to auction their inventory in real time on their behalf and keep a portion of advertising proceeds in return.

50.     Because publishers can target ads to specific users in real time, online publishers manage highly varied inventory.

51.     Since publishers can target ads to a specific user instead of buying and selling just one advertisement of a specific webpage, they can buy and sell tens of thousands of advertisements.

52.     For example, if a webpage has three available spots for an advertisement there are not three spots available but three times "x" spots available, where "x" is the number of unique individuals viewing the website. This allows for tens of thousands or hundreds of thousands of unique advertisements per webpage.

**B.      Online Display Advertising Markets**

53.     Online publishers and advertisers depend on different and distinct products to sell their display inventory.

54.     These products include (a) the ad server, which acts as the publisher's inventory management system and helps the publisher sell its inventory, (b) the marketplaces that match buyers and sellers of display ads), and (c) the ad buying tools that advertisers must use as their

middleman to buy display inventory from exchanges.

55.     These products conduct the complex tasks associated with pricing, clearing, executing, and settling billions of display impressions every month in the United States.

56.     Google possesses market power in each of these distinct areas.

*Ad Servers*

57.     Publishers depend on sophisticated inventory management systems called ad servers to manage their online display inventory.

58.     Ad servers keep track of publishers' heterogeneous ad inventory and help publishers sell that inventory, with the stated goal of maximizing publishers' advertising revenue.

59.     Publishers typically use a single ad server to manage all their display inventory; using multiple ad servers would substantially frustrate a publisher's ability to effectively optimize management of their inventory and maximize revenue.

60.     The ad server performs critical tasks related to selling ad space, including identifying the users visiting the publisher's webpage to manage the publisher's inventory and maximize its yield by allowing the advertiser to know the ad space targeted to that user is high value. As the middleman between a publisher and exchange, the ad server controls how different exchanges, and even networks, can access and compete for a publisher's inventory.

61.     Because the ad server is between a publisher and the publisher's sales channel, the ad server can obstruct competition between the multiple exchanges competing for publishers' impressions in multiple ways.

62.     Despite the relative complexity of ad servers, prior to Google's entrance into the publisher ad server market, ad servers were "a commodity good." They charged publishers a low cost-per-impression rate or a monthly subscription price for the total number of ad impressions managed and served.

63.     In 2008, for $3.1 billion, Google acquired DoubleClick, the leading provider of the ad server tools that online publishers, including newspapers and other media companies, used to sell their graphical display-advertising inventory on exchanges.

64.     As the intermediary between publishers and exchanges, Google quickly began to use its new position to exert leverage.

65.     Google was able to demand that it represent the buy-side, where it extracted one fee, as well as the sell-side, where it extracted a second fee, and it was able to force transactions to clear in its Exchange, where it extracted a third, even larger, fee.

66.     Google has successfully controlled the publisher ad server market and grown its Exchange to the largest in the United States, despite having entered this market much later than the competition. Now, in part because of its purchase of DoubleClick, Google controls the publishers' ad server market for display inventory through its Google Ad Manager ("GAM") product.

*Electronic Marketplaces for Display Advertising: Exchange and Networks*

67.     Most online publishers in the United States sell at least some of their inventory to advertisers ███████████████████████: ad exchanges and, similarly but on a smaller scale, ad networks, such as Google's Ad Manager ("GAM") product.

68.     GAM controls over 90 percent of commerce on ad exchanges in the United States.

69.     Display ad exchanges are real time auction marketplaces that match multiple buyers and multiple sellers on an impression-by-impression basis.

70.     A publisher's ad server can route the publisher's inventory to such exchanges in real time as users load webpages.

71.     Google compares the Exchange to financial exchanges like the NYSE and NASDAQ.

72.     Exchanges for web display inventory in the United States constitute a relevant antitrust product market.

73.     Exchanges are real time auction marketplaces that match publishers' web display impressions with bids from purchasers (whether submitted by an ad network on its own behalf or by a buying tool on behalf of an advertiser).

74.     Exchanges generally connect to a publisher's inventory through the publisher's ad server (*e.g*., Google's Exchange).

75.     Conversely, exchanges bring advertisers to the table by interfacing with and accepting live bids from networks and buying tools on behalf of advertisers.

76.     Advertisers cannot bid directly into an exchange.

77.     Exchanges have unique customers and exhibit unique features, pricing, and entry and usage requirements.

78.     Exchanges connect a publisher's available impression with an immediate willing buyer who has returned a live bid.

79.     When it comes to pricing, exchanges charge a percentage of transaction value. Exchanges also typically impose eligibility requirements; most exchanges require publishers to meet minimum monthly requirements for impression volume and/or revenue in order to sell directly on the exchange. As such, large publishers are usually the only ones able to have direct relationships with exchanges, which are generally out of reach for smaller publishers.

80.     Many large advertisers purchase advertisements indirectly through exchanges.

81.     To sell to advertisers, publishers must make their inventory available on exchanges.

82.     Trading on exchanges provides large publishers and advertisers with significant (and unique) controls to reduce problems of adverse selection. For instance, publishers can

increase price floors on informed traders. This encourages advertisers to bid for their inventory and increases the prices at which publishers' inventory ultimately clears at auction.

83.     On the buy-side, advertisers can bid on and purchase individual impressions to reduce waste and target more effectively. Together, these features reduce instances of information asymmetry that lead to adverse selection problems, thereby resulting in increased market output and improved overall welfare.

84.     There are no reasonable substitutes for exchanges.

85.     A hypothetical monopolist imposing a small but significant and non-transitory increase in the price of exchanges from a competitive level would not cause a sufficient number of customers to switch to other means of selling and buying display inventory such that the price increase would be unprofitable.

86.     Similarly, a hypothetical monopolist imposing a small but significant and non-transitory decrease in the quality of an exchange from a competitive level would not cause a sufficient number of customers to switch to other means of selling and buying display inventory such that the quality decrease would be unprofitable.

87.     Exchanges are unique and not interchangeable with ad servers, web networks, and in-app mediation tools, in-app networks, buying tools for large advertisers, or buying tools for small advertisers. Those products have vastly different sets of features and price points. None of these products allow an advertiser to buy an impression from a publisher without use of an exchange.

88.     Selling an impression to a network without using an exchange would result in a significant loss of publisher revenue, given that the retail margin of most networks is much higher than the take rate of a typical exchange.

89.    Google itself recognizes exchanges are not interchangeable with the direct sales channel.

90.    Selling directly requires substantial additional on-going investment, different expertise, and a unique skillset from both publishers and advertisers.

91.    For example, publishers and advertisers typically must hire and maintain internal staff to manage one-to-one relationships.

92.    As a result, the direct sales channel tends to be reserved for very high-value publisher-advertiser transactions. For instance, a large online publisher like *The Wall Street Journal* would generally not transact with a local Ford dealership directly because the dealership's monthly spend would fall far below the publisher's minimum monthly commitment for direct-sale transactions, which are typically thousands of dollars per month. The same publisher would, however, gladly transact with that dealership indirectly through an exchange, even if the total value of monthly transactions was just a few dollars.

93.    Competition authorities worldwide have similarly concluded that the direct sales channel is noninterchangeable with indirect sales.

94.    In its statement regarding Google's acquisition of DoubleClick, the FTC concluded that intermediaries placing ads indirectly do not significantly constrain the pricing or quality of ads placed directly: "The evidence shows that ad intermediation is not a substitute for publishers and advertisers who place display ads into directly acquired ad inventory or vice versa."

95.    In its 2021 settlement with Google concerning anticompetitive practices in the exchange market, the French Competition Authority found that Google's Exchange "is not restricted by the competitive pressure exerted by direct sales."[3]

---

[3] *See* https://www.ftc.gov/system/files/documents/
public statements/418081/07122/googledc-commstmt.pdf. (last accessed Dec. 1, 2022).

13

96.     Selling a different form of advertising is not a feasible alternative to trading in an ad exchange.

97.     The format of the ads a publisher can sell depends on the format of that publisher's content. Other forms of online advertising (*e.g.*, in-stream video, social media, search, and in-app) are not substitutes for web display advertising, and the ability sell ads of these various forms requires distinct and substantial investments in content and technology.

98.     A publisher in the business of selling web display ads could not sell in-stream video, social media, search, or in-app ads as a substitute for trading in an exchange.

99.     Purchasing a different form of advertising (*e.g.*, in-stream video, social media, search, and in-app) would not be a viable substitute for advertisers.

100.    Advertisers regard each of these ad formats as distinct and noninterchangeable, typically choosing the appropriate format depending on the goals of a particular ad campaign.

101.    An advertiser requiring display advertising would not switch to in-stream video, social media, search, or in-app ads in response to an increase in the price of purchasing display advertising through an exchange.

102.    Industry participants define exchange as facilitators of real-time auctions and as noninterchangeable with networks.

103.    Google's internal documents demonstrate that exchanges are a distinct product market. Google analyzes market share with reference only to other exchanges (instead of accounting for ad servers, networks, or types of buying tool). Google measures its Exchange market share in terms of share by exchange market revenue or exchange impression volume.

104.    In documents dating back to 2011, Google identifies only other exchanges as "key

competitors" to its Exchange.

105.    Google continues to recognize that direct sales, exchanges, and networks are distinct.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

*Ad Networks for Display and Ad Networks for Mobile In-App Inventory*

107.    Facebook also has a significant online presence, where more than 3 billion users regularly engage with Facebook for various purposes.

108.    Facebook's advertising revenue can be measured in the billions of dollars, making $55 billon in advertising revenue in 2018, $69.7 billion in 2019, $84.2 billion in 2020 and finally eclipsing the $100 billion mark with $114.9 billion in 2021.[4]

109.    Publishers and advertisers can also advertise on the Facebook platform as a means of directing advertisements to Facebook users.

110.    As the two largest online advertisers in the United States, Google and Facebook are direct competitors for advertisers and advertising dollars, particularly since their users overlap.

---

[4] *See supra* note 2.

15

111.    Every major website and almost every mobile application sells their inventory in the Google Exchange.

112.    As a result, competition on the buy-side among the intermediaries that serve advertisers depends on access Google's Exchange.

113.    Google is the conduit between publishers and advertisers. Google operates the largest buy-side intermediaries for advertisers, *i.e.*, the ad buying tools for both small and large advertisers

## VI.    GOOGLE'S MARKET POWER

114.    Google has market power in the ad server market in the United States. According to published reports, more than 90 percent of large publishers use Google's publisher ad server, GAM.

115.    Google's documents also measured that GAM served the vast majority of all online display ad impressions in the United States.

116.    Google also has market power in the United States in the display market.

117.    Google's Exchange has the largest amount of commerce in the United States since at least 2013.

## VII.    ANTICOMPETITIVE CONDUCT

### A.    Google forces publishers to trade in Google's Exchange

118.    Google has pursued and executed a strategy to dominate the ad display market by developing Google's Exchange.

119.    Prior to 2009, Google operated an ad-buying tool for small advertisers.

120.    Advertisers, including restaurants, clothing stores, doctors, and electricians across the country used Google's ad buying tool for small advertisers to bid on display ad space.

121.    Immediately after acquiring a publisher ad server and launching the Exchange in

2009, Google forced the small advertisers bidding through their exchange to transact in both Google's ad network and Google's Exchange.

122.     Google also forced large publishers desiring bids from the advertisers who used Google's ad buying tool to trade in Google's Exchange.

123.     Google demanded that it represent the buy-side, where it extracted one fee, as well as the sell-side, where it extracted a second fee, and forced transactions to clear in Google's Exchange, where Google extracted a third fee.

124.     Google effectively required publishers to use its publisher ad server to work with its Exchange.

125.     Since publishers only use a single ad server at a time to manage inventory, they had to either forgo the use of any competing ad server or forgo access to the enormous pool of advertisers bidding through Google's Exchange.

126.     Google's conduct successfully foreclosed competition in the publisher ad server and exchange markets.

127.     Google used its control over publishers' inventory and its status as publishers' agent to foreclose exchange competition through a pattern of anticompetitive conduct.

128.     Google restricted publishers from selling their inventory in more than one exchange at a time, started routing publishers' inventory to Google's Exchange, and blocked publishers from accessing and sharing information about their heterogeneous inventory with other exchanges.

129.     Competition among exchanges promotes price competition.

130.     To circumvent competitions, Google impeded real-time competition between marketplaces by forcing publishers (sellers) to route their ad space to its Exchange, one at a time, rather than all at once – a practice known as "waterfalling."

131. In addition to blocking real-time competition between exchanges, Google's Exchange foreclosed exchange competition by preferentially routing publishers' inventory to Google's Exchange through a process it called "dynamic allocation."

132. Dynamic allocation granted Google's Exchange a superior right of first refusal on all of a publisher's impressions made available to other exchanges.

133. Google used waterfalling to block other exchanges from competing simultaneously for impressions.

134. Through dynamic allocation, Google's Exchange obtained information and permitted Google's Exchange to purchase valuable impressions at artificially depressed prices.

135. Publishers and advertisers were deprived of competitive bids and competing exchanges, leaving them with the low-value impressions passed over by Google's Exchange.

**B.    Header Bidding: A threat to Google's dominance which Google eliminated by the Facebook Agreement**

136. To reinject competition and to bypass Google in the marketplace, in 2014, other technology companies, with the assistance of publishers, devised an innovation called header bidding.

137. To return the highest bid for the inventory, header bidding routed ad inventory to multiple neutral exchanges each time a user visited a web page.

138. Publishers, advertisers, and exchanges adopted the method to facilitate exchange competition.

139. Some of the biggest tech companies participated in header bidding and, by 2015, publishers and advertisers were rapidly adopting the innovation.

140. By 2016, about 70 percent of major online publishers in the United States had adopted header bidding.

141.    Advertisers also migrated to header bidding in vast numbers because it helped them to optimize the purchase of inventory through the most cost-effective exchange.

142.    Header bidding was a creative piece of code that publishers could insert into the header section of their webpages to facilitate competition between exchanges.

143.    When a user visited a page, the code enabled publishers to direct a user's browser to solicit real-time bids from multiple exchanges before Google's Exchange could prevent them from doing so.

144.    Header bidding shifted routing from the ad server to the browser so that bidding would not be subject to the control of Google's Exchange. Publishers then sent the highest exchange bid in header bidding into their exchange.

145.    Facebook knew that, contrary to Google's Exchange, its Header Bidder system would bring changes and be the "right technology to create an open and transparent marketplace and are excited to see others moving in this direction."[5]

146.    Header bidding would allow "publishers to access a request before AdX can get to it. Facebook, and its billion-dollar Audience Network competing against Google for programmatic ad spend, **could unseat Google from its monopolistic throne"** (emphasis added).[6]

147.    Header bidding created a win-win for both advertisers and publishers by connecting the two together, and put Google in a difficult position, with another swipe being taken at its dominance of ad inventory." *Id.*

148.     By developing its own exchange Facebook was "throwing down their gauntlet, they are competing for a slice of the programmatic ad spend pie." *Id.*

---

[5] *See* https://www.facebook.com/audiencenetwork/resources/blog/introducing-bidding-for-app-publishers-and-developers. (last accessed December 1, 2022).

[6] *See* https://www.exchangewire.com/blog/2016/09/07/hack-becomes-mainstream-facebook-trial-header-bidding/ (last accessed December 1, 2022).

149.    This created healthy competition for inventory which could only have been beneficial to advertisers.

150.    In short, header bidding created a technical workaround for publishers to circumvent Google's efforts to foreclose competition in the exchange market.

151.    Publishers and advertisers adopted the protocol because they came to realize what Google already knew. Waterfalling, dynamic allocation, and enhanced dynamic allocation did not actually maximize publishers' yield.

152.    Header bidding was also a positive development for advertisers and consumers.

153.    Header bidding allowed advertisers to transact through an exchange of their choosing, including those that charged less than Google.

154.    The adoption of header bidding threatened Google's margins on its Exchange and disrupted Google's practice of front running and trading on "inside" information. The competition in ad servers threatened Google's market power.

---

[7] These references are to documents produced Google

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

158.    In response to header bidding, Google introduced an alternative that secretly routed publishers' inventory back to Google's Exchange, even though another exchange had returned a higher bid.

159.    By inserting its own Exchange into the process, Google was able to charge participants a 5-10% fee on winning bids.

160.    Google's goal was to destroy header bidding entirely.

161.    Beginning in 2018, Google's ad server started redacting various data fields from the consolidated auction records that it shares with publishers.

162.    The redactions made it nearly impossible for publishers to compare the performance of the exchanges in header bidding with the performance of Google's Exchange.

163.    Consequently, Google rendered the entire reason publishers use header bidding (to increase yield through head-to-head exchange competition) unobservable and unmeasurable.

164.    Google also limited the use of header bidding by capping the number of permissible "line items"—a technical ad server line of code that publishers need to use in order to run header-bidding auctions.

165.    Header bidding is only possible if publishers can insert JavaScript code into the header section of their webpages.

166.    To respond to the threat of header bidding, Google created Accelerated Mobile Pages ("AMP"), a framework for developing mobile web pages, and made AMP essentially

incompatible with JavaScript and header bidding.

**C. Facebook is A Direct Competitor and Threat to Google's Dominance in the Ad Exchange Market**

167.    Google and Facebook operate the largest ad networks for display and in-app mobile inventory in the United States.

168.    The companies compete head-to-head in publishers' ad auctions to purchase inventory for, ultimately, their advertisers.

169.    Between 2015 and 2018, prior to the Facebook Agreement, Facebook's Advertising Network ("FAN") vigorously competed with Google's Display Network ("GDN").

170.    Specifically, these two networks were the two largest competitors in the ad network market.

171.    Upon information and belief, Google was by far the dominant ad network, with approximately 25% share, while Facebook was the second largest ad network, with an approximately 10% share. The remainder of the network market was fragmented.

172.    Together both Facebook and Google had about 99% of every new digital advertising dollar.

173.    In the industry, there was no doubt that Facebook's header bidding integration was a direct swipe at Google's Exchange.[8]

█████████████████████████████████████████████████

███

175.    Google was eager to "kill" header bidding competition and feared its secret exchange bidding scheme would fall short of its end-goal.

176.    In 2017, Facebook announced that it would submit bids from FAN to open web

---

[8] *See* https://digiday.com/media/winners-losers-facebooks-dive-header-bidding (last accessed December 1, 2022).

publishers using header bidding, via partnerships with technology providers such as Amazon Publisher Services, Amazon's header bidding code library that facilitated implementation of header bidding by open web publishers.

177.    In the announcement Facebook made it clear that it would be competing with Google and that there would be a distinct benefit for their advertisers:

> With the way ad bidding happens in programmatic advertising, publishers are consistently losing margins to third party middlemen who make the rules and obfuscate the truth. These are well-known issues, and they are being combatted through new technologies like header bidding. Header bidding is a more transparent bidding process where publishers see what every advertiser or technology provider is willing to pay for every impression. . . .
>
> * * *
>
> We believe that header bidding and the principles behind it are better for publishers, advertisers, and people . . . . In our tests, publishers who integrated Audience Network header bidding reported increases in revenue of 10%-30%.[9]

178.    By doing so, Facebook would enable publishers and advertisers to bypass substantial fees imposed by Google's Exchange. Thus, Facebook's use of header bidding promised to increase revenue paid to publishers and lower prices ultimately paid by advertisers.

179.    Header bidding was not just a threat to Google's fees in the short term. Google also feared that Facebook's support of header bidding posed a longer-term threat to Google's publisher ad server monopoly.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[9] Available at https://www.facebook.com/audiencenetwork/news-and-insights/header-bidding-through-partnerships (last view Dec. 2, 2022)

███████████████████████████████████████████████████████████

181.    The wider industry also thought Facebook was prepared to challenge Google's ad server monopoly.

182.    The same day as Facebook's March 2017 header bidding announcement, industry publication *AdAge* wrote that Facebook was poised to execute a "digital advertising coup against rival Google and its DoubleClick empire."

183.    A *Business Insider* headline the same day read: "Facebook made an unprecedented move to partner with ad tech companies – including Amazon – to take on Google."

184.    Google started monitoring Facebook's initiative in header bidding as a competitive threat.

185.    According to metrics posted in Facebook's public blog, Facebook was helping publishers use header bidding to achieve two to three times more yield per impression and increase some third-party publishers' revenue by as much as 10 to 30 percent. As part of its internal monitoring efforts, Google referenced this blog post in an email circulated amongst the management team.

186.    Internal Google documents show that one of Google's strategies for killing header bidding was to induce Facebook, Amazon, and other industry participants to end their support for the new technology.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████



194.

(Emphasis added).

195.    In short, Google was seeking a way to access the over 1-billion Facebook members and those publishers and advertisers that advertised to them, while maintaining its supra-competive profits, instead of passing on competitive prices to the advertisers.

196.    Google hoped to deprive header bidding of scale and industry adoption, for the express purpose of protecting its own monopolistic position.

███████████████████████████████████████████████████

████████████████████████████████████████

198.    Facebook understood these stakes as well.

199.    Internal Facebook communications indicate that Facebook's March 2017 announcement was intended to signal Facebook's willingness to support header bidding.

200.    Facebook knew that Google would see its participation in header bidding as a major threat.

201.    Evidently, Facebook was executing a planned long-term strategy— "18 month 'header bidding' strategy to minimize "[the Exchange Bidding] tax"—by threatening to expose the hidden costs Google charges publishers.

202.    By 2017, Facebook was well positioned to compete with Google's Exchange. Without control over publishers' inventory, Google would lose the ability to block exchange competition.

203.    In March 2017, Facebook announced it would support header bidding. By doing so, Facebook would enable web and mobile app publishers and advertisers to bypass the fees associated with transacting through Google's Exchange.

204.    Because header bidding cost nothing, Facebook would let web publishers, mobile app publishers, and advertisers save on these fees altogether.

205.   In short, prior to the Facebook Agreement, Facebook was prepared to challenge Google's monopoly, internal documents and the industry identified Facebook and Google as competitors, and the competition was helping both publishers and advertisers.

206.   With the Facebook Agreement, this challenge was dropped.

207.   To advance its desire to eliminate the competition, Google entered into the unlawful Facebook Agreement in 2018, which gave Facebook an advantage over other competitors.

208.   Contemporaneously with the Facebook Agreement, Facebook substantially curtailed its use of header bidding.

### D.   The Facebook Agreement

209.   Google approached Facebook about modifying its new program. According to internal Facebook communications, within months of Facebook's official header bidding announcement, Google and Facebook began formal negotiations.

210.   According to an internal Google November 2017 presentation, Facebook was interested in a successful outcome to these negotiations between horizontal competitors.

211.   Google and Facebook entered formal negotiations shortly thereafter.

212.   Both sides recognized that Facebook's leverage came from its critical role in supporting header bidding.

213.   As a Facebook document from February 2, 2017, memorialized, "What Google wants: To kill header bidding (us baptizing their product will help significantly)."

214.   Facebook employees summarized an earlier meeting between Google and Facebook discussing header bidding and Exchange Bidding ("EBDA"), "We discussed the EBDA product they're building. Both parties (FB and G) were candid about why header bidding exists and that EBDA's sole reason for existence is to kill it."

215.   In an October 30, 2017, email, senior Facebook executive ███████ discussed the

proposed Google-Facebook Agreement and explained to another Facebook executive, Director of Product Management ████████████████, "they want this deal to kill header bidding."

216.    Google was equally frank, explaining internally in 2017 that the goal of partnering with Facebook would be to "protect" Google's "leadership position in 3P [third party] ad buying/selling." To that end, the endgame with Facebook was to "collaborate when necessary to maintain status quo." The "status quo," in this case, was an unlawful obtained ad server monopoly and the Exchange charging many multiples over the competition.

217.    As negotiations proceeded, Google began to accept that Facebook's price for abandoning header bidding would require Google to share some of the auction advantages it had previously taken for itself.

218.    In an August 9, 2018, internal Google presentation, one slide averred that if Google could not "avoid competing with FAN" in the trade for third-party inventory, then it would instead collaborate with Facebook to "build a moat."

219.    Google thus preferred to share a slice of its monopoly profits with a potential entrant rather than risk reducing its monopoly power.

220.    The prospect of cooperating rather than competing with Google was enticing for Facebook too.

████ As internal Facebook documents reveal, Facebook believed that partnering with



223.    Compared to the time and expense of building a new technology and competing on

28

the merits, entering a Facebook deal with Google not to do those things was an attractive option.

███████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

226.    The outcome of the negotiations was the Facebook Agreement.

**E.    Google gives Facebook a leg up in publishers' and developers' auctions in return for Facebook backing off from header bidding.**

227.    Google promised Facebook several special advantages in publishers' and developers' auctions.

228.    The Facebook Agreement was intended to, and did, induce Facebook to shift from routing bids through header bidding to routing bids through Google's Exchange.

229.    While not embodied within the language of the Facebook Agreement, it is clear from the documents that the motivation of Google was to create a shift to Google's Exchange and to incentivize Facebook to abandon header bidding.

230.    By making this agreement, at the harm of advertisers, Facebook would disband years of research and development, and forgo making their own profit on a header bidding advertising exchange, in order to share profits and data with their competitor, Google.

231.    In short, the Facebook Agreement was the *quid pro quo*.

232.    Traditionally, Google only permitted networks to buy on the Exchange for a 20 percent fee.

233.    But in the Facebook Agreement, Google gave Facebook another significant concession.

234.    The fee owed to Google depended on the volume of impressions Facebook purchases from publishers, but Facebook expected its volume would trigger the lowest possible rate.

235.    Internally, Facebook treated the deal as offering a five percent fee—a 50 percent discount.

236.    Because auction winners are selected based on the highest bid after fees, this special, Facebook-only discount allows Facebook to win auctions even when it submits a lower gross bid than its competitors.

237.    Google also provided Facebook with a speed advantage.

238.    Google subjects other marketplaces competing for publishers' inventory in the Exchange to 160 millisecond timeouts.

239.    Competitors complained that 160ms is not enough time to recognize users in auctions and return bids before they are excluded.

240.    By comparison, Google nearly doubled timeouts for Facebook, extending them to 300 milliseconds. These longer timeouts granted by Google were designed to aid FAN in winning more auctions.

241.    Another advantage was direct billing. Google further induced Facebook to help Google "kill HB" by letting Facebook have direct billing and contractual relationships with publishers.

242.    This term was advantageous to Facebook because Google prohibits other exchanges and networks from direct billing.

243.    In fact, Google's policies with other exchanges and networks are so strict that Google has prohibited marketplaces from even discussing pricing with web publishers.

244.    The inability to discuss pricing and terms constrains marketplaces' ability to operate and compete.

245.    Another advantage was more information. On top of special pricing, longer timeouts, and a direct billing relationship exception, Google further induced Facebook to help it shut down competition from header bidding by informing Facebook which impressions are likely targeted to spam (e.g., impressions targeted to bots, rather than humans). Facebook does not have to pay for those impressions.

246.    Other networks have asked Google for the same information, but Google has refused.

247.    Facebook now had a further leg up over the competition in Google-run auctions: Facebook knows which impressions sold through Google are fake and worthless.

248.    Another advantage was improved match rates.

249.    In the Facebook Agreement, Google promised to use "commercially reasonable efforts" to help Facebook's network recognize the identity of users in publishers' and developers' auctions.

250.    Google and Facebook agreed to benchmark "match rate" commitments, *i.e.*, the percent of users Facebook could identify in auctions over the percent of bid requests received.

251.    Google promised Facebook an 80 percent match rate in auctions for in-app inventory and a 60 percent match rate in auctions for web inventory (excluding users browsing with Safari).

252.    Indeed, since signing the Facebook Agreement, Google and Facebook have been working closely in an ongoing manner to help Facebook recognize users in auctions and bid and win more often.

253.    For example, Google and Facebook have integrated their software development kits so that Google can pass Facebook data for user ID cookie matching. They also have been working together to improve Facebook's ability to recognize users using browsers with blocked cookies, on Apple devices, and on Apple's Safari browser.

254.    For instance, according to an April 2, 2019, discussion among Facebook employees, Facebook was having trouble matching users of Apple's Safari browser.

255.    Google shared that Facebook's match rates were about the same that Google saw for other auction participants.

256.    Facebook employees noted, however, that Google was ready to "initiate a detailed discussion with Product and Legal to allow FB to collect signals on the client (using a JavaScript) and G passing it to the bid request."

257.    These efforts gave Facebook an information advantage over all other auction participants, unparalleled except for the information advantages of Google itself.

258.    Another advantage was restricting Google's use of Facebook bid data.

259.    Google provided Facebook special treatment when it came to Google using Facebook's inside information to beat Facebook in auctions.

260.    Facebook was wary that Google would use information about Facebook's bids to manipulate auctions.

261.    As a result, Facebook was explicit in demanding that Google be prohibited from using Facebook's bid data for the purpose of advantaging itself.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

263.    Google not only kept these special advantages for Facebook secret, but also continues to actively misrepresent the terms on which it conducts publishers' auctions.

264.    Google publicly markets on its website that "All participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis." That is patently false, at least because Google gave all these undisclosed advantages to Facebook through the Facebook Agreement.

265.    By threatening to disrupt and then cutting a deal with Google, Facebook was able to achieve what others could not: an opportunity to compete against Google for publishers' and developers' inventory on equal terms.

266.    The terms of the Facebook Agreement were against the Google and Facebooks competitive interests *vis-a-vis* each other, in that Google was going to give up proprietary information to Facebook, while Facebook gave up some of its advertising revenue margin.

267.    Google uses its ad server monopoly to withhold relevant information about inventory from rival buyers, while using the same monopoly to copiously gather information about those buyers' behavior so that Google can trade ahead.

268.    But in the Facebook Agreement, Google agreed to put these tactics aside for the benefit of the one tech behemoth—Facebook—which was poised to seriously challenge Google's power.

269.    As consideration for Facebook ending its support of header bidding, Google gave Facebook the kind of access to publishers' inventory that header bidding promised to give to everyone.

270.    The competition distorting effect of the Facebook Agreement is such that the

benefits granted to Facebook disadvantaged any other competitor's bid in the Exchange relative to Facebook

271.    Google does not itself pay for these benefits, but instead extracts them from Facebook's competing bidders and advertisers by getting a supracompetitve price for the advertising.

272.    By its terms, the Facebook Agreement creates an unreasonable restraint of trade in the market for open display and in-app ad inventory traded in Google's Exchange, in which Facebook competes with other demand-side intermediaries for publishers' and developers' inventory.

### F.    Google and Facebook agree to limit their competitive bidding.

273.    Although the Facebook Agreement originally contemplated that FAN would bid on impressions for both web and in-app display, FAN effectively left the market for web display advertising in 2020.

274.    Now, the Facebook Agreement primarily applies to the auctions Google conducts on behalf of developers to sell their in-app inventory.

275.    Within these auctions, Google and Facebook have not only given themselves special advantages unavailable to other buyers, but also have agreed to limit their competitive bidding as between each other.

276.    They have done this by fixing a minimum share of impressions that Facebook will win in developers' auctions. This hard limit on contractually acceptable auction outcomes predictably increases Google's monopsony power and depresses prices paid to developers.

277.    The auction manipulation scheme turns on three, interrelated provisions of the Facebook Agreement.

278.    First, Google and Facebook agreed to work together so that Facebook could identify the end user for at least 80 percent of auctions conducted by Google.

279.    Second, Google and Facebook agreed that Facebook would use "commercially reasonable efforts" to bid on at least 90 percent of those auctions in which Facebook recognizes the end user.

280.    Third, Google and Facebook agreed that Facebook would win at least 10 percent of all such auctions in which Facebook bid.

281.    In combination, these terms established an agreement for Facebook to win at least 7.2 percent of all in-app impressions sold by developers in Google-run auctions. And Facebook could take its contractually agreed share of auction wins up to 10 percent, simply by identifying more users or submitting more frequent bids.

282.    These terms set boundaries on the extent of Google and Facebook's competition, akin to a traditional buying cartel.

283.    As Google and Facebook recognize, they are direct, horizontal competitors in the in-app network market and compete to purchase in-app inventory from developers.

284.    An impression bought by Google's ad network is one that cannot be bought by Facebook's ad network, and vice versa.

285.    Google and Facebook are the two largest bidders in this market. When developers sell their in-app impressions in auctions run by Google, Google's own network wins more impressions than anyone else—over 50 percent around the time Google signed the Facebook Agreement. ████FAN is number two, winning more impressions than any other non-Google buyer. As Google described its counterparty internally, █████████████████████████

███████████████████████

287.    Despite competing directly to purchase in-app impressions from developers, Google and Facebook agreed to limit their competition by an agreement establishing the minimum share of developers' auctions that were to be won by Facebook and, implicitly, the maximum share of developers' auctions that were to be won by Google.

288.    The expected effect of a side-deal like this between rival buyers is to depress the prices paid to developers.

289.    To achieve this goal, it is irrelevant whether the colluding buyers set a minimum, a maximum, or a precise target; any such agreement between rivals interferes with the usual price-setting and inventory allocation mechanisms of the free market.

290.    Compared to a bidder unprotected by collusion, a participant in a buying cartel can bid less aggressively without the same risk of losing share.

291.    Google and Facebook can each bid low, knowing that the other will follow the move, lowering prices for the colluding buyers while preserving their pre-agreed allocation of auction victories.

292.    The Facebook Agreement terms assure that Facebook will bid high enough to win the minimum percent quota, irrespective of how high or low others might bid.

293.    The fact that Google's mediation tool is trusted to run these auctions on behalf of developers does not change the horizontal nature of this agreement to limit competition.

294.    It only makes the scheme more robust. Ordinarily, when two bidders conspire to manipulate auction outcomes, they face a risk that some third, non-conspiring bidder will spoil the scheme by submitting a truly competitive bid. Bringing the auction house itself into the scheme reduces that risk, since the auction house can take steps to disadvantage outside bidders by

withholding information, giving them less time to bid, or charging them higher bidder fees—precisely as Google has done to other prospective bidders.

295.    In this way, the anticompetitive terms of the Facebook Agreement are mutually reinforcing. By setting a win rate and excluding rival bidders, Google and Facebook not only limited the terms of competition between each other, but also insulated their scheme from outside competition.

296.    Although Google's mediation tool oversees the process necessary to conduct these auctions, Google itself does not sell in them. The Facebook Agreement applies only to third-party developer inventory—thereby excluding any impressions that would be displayed on Google or Facebook's own properties.

297.    Google's mediation tool does not function as a wholesaler or market-maker. Prior to an auction, Google does not take title or otherwise bear the risk of a particular impression going unsold. Rather, it conducts these auctions on behalf of developers, who are sellers in both substance and form.

298.    It is developers—not Google—who stand to receive a direct economic benefit from higher auction prices. Google and Facebook's ad networks are buyers in these auctions. They stand to receive a direct economic benefit from lower auction prices. The predictable effect of an agreement fixing share between them is to lower prices paid to developers, compared to a world in which the auction's two largest bidders compete without restraint.

299.    Internal Facebook documents suggest that the auction manipulation terms of the Facebook Agreement have yielded precisely this result. For example, one Facebook study in 2019 found that Facebook's bids for in-app impressions won more frequently in Google-run auctions than they did on any other platform.

300.    The average price Facebook paid per in-app impression was lower in Google-run auctions than it was on any other platform. A strange result, if Facebook faced the same competition for inventory across auction houses. But it is an entirely predictable result when a buying cartel is depressing prices and allocating the inventory within Google-run auctions.

301.    In addition to suppressing prices paid to developers, the auction manipulation terms of the Facebook Agreement can reduce competition on the output side too—that is, the market in which in-app ad networks resell impressions to advertisers. After all, Google and Facebook do not typically bid in developers' auctions to promote their own products and services. Rather, their primary reason for bidding in these auctions is to resell the resulting inventory to advertisers, usually at undisclosed margins. Google acknowledged this head-to-head resale competition at the time it entered the Facebook Agreement, noting that a downside of giving Facebook preferential treatment in Google-run auctions was "cannibalization" of Google's own ad network because advertisers would be more tempted to "buy the same inventory via FB."

302.    Google and Facebook's coordinated buying reduces competition in this downstream market by simultaneously guaranteeing Facebook a minimum share of the resale business and insulating both from effective competition by rival ad networks.

303.    Without access to the in-app impressions sold by developers, a competing ad network would have nothing to resell to advertisers. And because Google and Facebook did not manipulate the outcomes of some backwater auction house, but the auction house in which more than 60 percent of all indirect in-app impressions are sold, their collusive scheme gave them the power to exclude rival networks and raise the prices at which Google and Facebook resold in-app impressions to advertisers.

304.    Enabling Facebook to bid in Google-run auctions did not require a secret agreement

to pre-determine the outcomes of those auctions. It would have been straightforward to write a network bidding agreement without minimum bid and win rate terms, thereby leaving auction outcomes to be determined by competition rather than collusion.

305.    Indeed, Facebook itself has entered into several network bidding agreements with other mediation tools without such terms. Though some of these agreements include dollar-denominated minimum spending requirements (as does the Facebook Agreement), none of them promise Facebook an ongoing, specified share of developers' impressions. And while Google and Facebook surely prefer the reduced prices paid to publishers because of their collusion, a naked auction manipulation scheme such as this can offer no pro-competitive benefits.

306.    Given the choice, no rational developer would choose to have its auctions rigged by the market's two largest buyers. So, Google and Facebook swore themselves to secrecy about the terms of their agreement and have not generally disclosed their secret match-rate, bid-rate, or win-rate agreements to either developers or other auction participants.

307.    Google and Facebook have had plenty of opportunity to do so: implementing the Facebook Agreement requires both Google and Facebook to update and re-execute their respective agreements with the app developers whose advertising inventory they hope to purchase.

308.    When encouraging developers to update to the latest version of their respective bidding agreements, Google and Facebook obfuscate the true motive for the contract changes, which say nothing about the auction manipulation terms of the Facebook Agreement.

309.    Google uses the promise of competitive bidding between Google and Facebook's ad networks as an inducement for developers to sign new contracts, when in fact the Facebook Agreement secretly limits the terms of the competition between those two bidders.

310.    Google also advertises the ability to accept Facebook bids as a feature of its

mediation tool and has used the promise of competitive bidding by rival ad networks as a lure to further increase its share of the in-app mediation market. But this is a classic bait and switch.

311.    Rather than robust competition between Google and Facebook's ad networks, an app developer adopting Google's mediation tool gets a form of sham competition between those supposed rivals, one that is constrained by secret terms in the Facebook Agreement.

312.    Once a developer has adopted Google's mediation tool, the costs of switching to a different tool are substantial.

313.    Doing so would require rewriting source code, implementing a new tool, and testing that tool's compatibility with various ad networks. For the very large number of developers who have adopted Google's mediation tool— representing more than half of all applications featuring any advertising—Google now has an ability to impose anticompetitive and collusive terms that developers never would have accepted in advance.

314.    Google's internal documents also reveal that Unified Pricing rules furthered its conspiracy with Facebook.

315.    In one communication, Google wrote that the true objective with its Unified Pricing rules was to allow "Google buyside and Facebook (after FAN integrates through Exchange Bidding) to get access to the same 1st Price auction dynamics."

316.    According to an internal Google memorandum summarizing a May 2, 2019, meeting between Google and Facebook, discussions of publisher pricing floors led Facebook to advise Google it would rather publishers not have the ability to set price floors.

317.    These discussions helped Google later decide to prohibit publishers from setting lower price floors for non-Google (or non-Facebook) exchanges, networks, and ad buying tools. The Unified Pricing rules furthered the collusion between Google and Facebook.

318.    The ultimate outcome of the negotiations was that, in September 2018, Google and Facebook entered into the Facebook Agreement, in which Facebook agreed stop competing through FAN, in return for preferred treatment in the Google advertising business system.

319.    In the end, with the Facebook Agreement Google secured its core objective—the end of Facebook's active support for header bidding. Google ensured that Facebook would not—and, economically, could not—return to support header bidding by imposing significant minimum spend requirements running to hundreds of millions of dollars a year.

320.    As a result of the agreement, Facebook curtailed its header bidding initiatives and instead bid through Google's tools. In return, Google agreed to give Facebook a leg up in the web and in-app auctions it conducted on behalf of publishers and developers. In an internal Google memo titled "FAN deal discussion," Google memorialized that "FAN requires special deal terms, but it is worth it to cement our value."

321.    As a result of the agreement, according to internal Facebook documents, both Google and Facebook gained pricing power and increased take rates to the economic detriment of advertisers purchasing inventory.

## VIII.   ANTICOMPETITIVE EFFECTS

322.    Google and Facebook restricted the innovation of header bidding to their benefit and in direct hindrance of competition in violation of Section 1 of the Sherman Act.

323.    Through the Facebook Agreement, Facebook agreed with Google to strengthen Google's market dominance in the online advertising industry.

324.    Facebook curtailed its header bidding initiatives and instead bid through Google's Exchange.

325.    Google provided Facebook information advantages, speed advantages, and other

prioritizations, to the detriment of other auction participants.

326.     The Facebook Agreement allocated a portion of publishers' auction wins to Facebook, subverting the free operation of supply and demand.

327.     Google has charged supra-competitive fees and degraded quality in the ad exchange market.

328.     Google abuses its scale in advertiser demand and information arising from its market power to create asymmetric advantages that benefit its Exchange over rival exchanges. In doing so, Google harms competition in the exchange market.

329.     For example, Google implements Last Look (a feature of the publisher ad server) to the benefit of Google's Exchange over rival exchanges.

330.     Google uses data from the publisher ad server to benefit its Exchange over rival exchanges.

331.     The artificial advantages created by Google's integration and asymmetric treatment drive scale for Google's Exchange over rivals.

332.     As Google wins additional share, it gains access to bid and win data at scale used to develop features that benefit the Exchange over rival exchanges.

333.     Google's conduct reduces rival exchanges' ability to compete on quality, since they are deprived of scale and are foreclosed from the information necessary to build similar features.

334.     Competition in the exchange market is harmed because Google's auction programs steer impressions to its own Exchange.

335.     Competitors cannot effectively compete by lowering their take rate, since Google will use its information advantage to adjust its margin when needed to win an impression and recoup its subsidy on other impressions.

336.     By doing so, Google generates inefficiency in the allocation of impressions. This means that Google's average take rate does not reflect the inefficiency introduced because of Google's conduct.

337.     Google's anticompetitive conduct reduces the efficiency of matching impressions and ads, reducing the potential benefits of online display advertising for publishers, advertisers, and consumers.

338.     This fee shifting and early access might have been good for Facebook's profits and ability to gather even more data, however it hurt the advertisers by keeping the cost of advertising high, and further limiting access to information.

339.     Given the scope and extensive nature of cooperation between Google and Facebook, they were highly aware that their activities could trigger antitrust violations.

340.     Evidence of the anticompetitive effects from Google's conduct includes the exit of rivals and limited and declining entry rates (despite significant profits enjoyed by Google).

341.     The harm to competition deprives advertisers, publishers and consumers of improved quality, greater transparency, increased output, and/or lower prices.

342.     Plaintiffs and the Class have sustained antitrust injury as a direct and proximate cause of Google's conduct, which has increased advertisers' costs to advertise and reduced the effectiveness of their advertising, thereby harming businesses' return on investment in delivering their products and services and reducing output.

## IX.     CLASS ACTION ALLEGATIONS

343.     Plaintiffs bring this action as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a class defined as "all persons and entities who, during the Class Period, purchased advertising on or over Facebook."

344.     The action seeks damages pursuant to the antitrust laws of the United States,

43

specifically Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act during the Class Period.

345.    Excluded from the Class are Google, Facebook, and their respective parent companies, subsidiaries, affiliates and any co-conspirators, federal government entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities and persons who purchased advertisements on or over Facebook.

346.    While Plaintiffs do not know the exact number of members of the Class, Plaintiffs believe there are tens of thousands of members of the Class.

347.    Common questions of law and fact exist as to all members of the Class. This is particularly true because of the Facebook Agreement, which is applicable to all members of the Class, thereby making appropriate injunctive relief with respect to the Class as a whole.

348.    Questions of law and fact common to the Class include, but are not limited to:

    a.    Whether Google engaged in a combination and conspiracy between itself and Facebook to restrict or destroy header bidding.

    b.    The legality of the Facebook Agreement.

    c.    The duration of the Facebook Agreement.

    d.    Whether the Facebook Agreement violated Section 1 of the Sherman Act.

    e.    Whether the conduct resulting from the Facebook Agreement caused injury to the business or property of Plaintiffs and the members of the Class.

    f.    The damages to be awarded to Plaintiffs and the Class.

349.    The questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

350.    Class adjudication is the superior method of resolving this matter. Class

adjudication will promote judicial efficiency by eliminating the need for numerous and redundant proceedings. The amount of damages suffered by many advertisers may be so small as to make individual adjudication impracticable.

351.     The Plaintiffs do not know of any likely difficulties in managing the proposed class action.

352.     Plaintiffs' claims are typical of the claims of members of the Class and Plaintiffs will fairly and adequately protect the interests of the Class.

353.     Plaintiffs and all members of the Class are similarly affected by Google's wrongful conduct in that they paid artificially inflated prices for advertising on Facebook.

354.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.

355.     Plaintiffs' interests are coincident with and not antagonistic to, those of the other members of the Class.

356.     Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

➢     **COUNT I**

➢
➢     **THE FACEBOOK AGREEMENT VIOLATES SECTION I OF THE SHERMAN ACT, 15 U.S.C. § 1**

357.     Plaintiffs repeat and reallege every preceding allegation as if fully set forth herein.

358.     Google and Facebook unreasonably restrained trade and harmed competition through the Facebook Agreement to allocate auction wins and to fix prices in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

359.     Google wrongfully acquired and maintained monopoly power in the relevant online display advertising markets, including the sell-side market for ad servers in the United States.

360.    The Facebook Agreement is a contract, combination and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

361.    Google's anticompetitive acts have substantially and adversely affected interstate commerce.

362.    Google's anticompetitive acts have had harmful effects on competition and consumers.

363.    By reason of the foregoing Plaintiffs and the Class have been damaged in amount to be determined at trial.

### PRAYER FOR RELIEF

Accordingly, the Plaintiffs request that the Court:

    a)    Adjudge and decree that Google has committed violations of Section 1 of the Sherman Act, 15 U.S.C. § 1;

    b)    Order equitable relief as the Court deems necessary to enjoin and restrain Google and all of Google's agents or successors from engaging in the unlawful conduct set forth in this Complaint;

    c)    Order monetary damages for violations committed of Section 1 of the Sherman Act, 15 U.S.C. § 1 by Google, including costs and attorney's fees;

    d)    Certify a class of all persons who purchased advertisements on or over Facebook during the Class Period; and

    e)    Award any other relief as it may deem proper.

### ➢ DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all

issues properly triable by a jury in this case.

Dated: December 2, 2022                    Respectfully submitted,


By:    */s/ Fred T. Isquith Sr.*
             Fred T. Isquith Sr

Fred T. Isquith, Sr. (FI 6482)
Robert S. Schachter (RS 7243)
Jessica Hermes (JH 9075)
**ZWERLING, SCHACHTER
 & ZWERLING, LLP**
41 Madison Avenue, 32nd Floor
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969
ftisquith@zsz.com
rschachter@zsz.com
jhermes@zsz.com

Fred T. Isquith, Jr. (*FI-1064*)
**ISQUITH LAW**
220 East 80th Street
New York, NY 10075
Tel: (607) 277-6513
isquithlaw@gmail.com


Solomon B. Cera (admitted pro hac)
Pamela A. Markert (admitted pro hac)
**CERA LLP**
201 California Street, Ste 1240
San Francisco, CA 94111
Telephone: (415) 977-2228
Email: scera@cerallp.com
Email: pmarkert@cerallp.com

Kate Baxter-Kauf (admitted pro hac)
Heidi M. Silton (admitted pro hac)
**LOCKRIDGE GRINDAL NAUEN
P.L.L.P**
100 Washington Ave S, Suite 2200
Minneapolis, MN 55401
Tel: (612) 596-4007

Email: kmbaxter-kauf@locklaw.com
Email: hmsilton@locklaw.com

Richard Vita
**VITA LAW OFFICES, P.C.**
100 State Street, Suite 900
Boston, MA 02109
Tel: (617) 426-6566
rjv@vitalaw.com

*Attorneys for Plaintiffs and the Class*