UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | No. 1:21-MD-3010 (PKC) |

*This Motion Relates To:*

| | |
|---|---|
| **IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | No. 1:21-CV-07001 (PKC) |

**DEFENDANTS GOOGLE LLC AND ALPHABET INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS
ADVERTISERS' CONSOLIDATED CLASS ACTION COMPLAINT**

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Fax: (202) 777-4555

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Fax: (212) 728-2201

WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Fax: (415) 947-2099

*Counsel for Defendants Google LLC
and Alphabet Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

TABLE OF ABBREVIATIONS ............................................................................... viii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ........................................................................................................ 3

LEGAL STANDARDS .............................................................................................. 4

ARGUMENT ............................................................................................................. 5

I.     ALL ADVERTISERS LACK ANTITRUST STANDING TO BRING THEIR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION CLAIMS. ........................................................... 5

     A.    Advertisers Lack Standing In an Ad Exchange Market ............................... 7

     B.    Advertisers Lack Standing In a Large-Advertiser Tools Market .............. 10

     C.    Advertisers Lack Standing in a Small-Advertiser Tools Market ............. 11

II.    COUNT V SHOULD BE DISMISSED FOR LACK OF ANTITRUST STANDING OR FOR FAILURE TO PLEAD AN AGREEMENT. ................... 13

III.   THE NBA CLAIMS LARGELY REHASH STATE PLAINTIFFS' DEFICIENT ALLEGATIONS AND SHOULD LIKEWISE BE DISMISSED ...................................................................................................... 16

     A.    Advertisers' New Spin on the NBA Does Not Escape the Court's Prior Order. .......................................................................................... 16

     B.    Advertisers Fail to Plausibly Allege a Market for Google's Final Clearinghouse Auctions. ........................................................................ 17

IV.   ALLEGATIONS REGARDING CONDUCT THAT "CREATED THE CONDITIONS" FOR GOOGLE'S MONOPOLIZATION SHOULD BE DISREGARDED. ................................................................................. 19

     A.    Leveraging Claims Involving Google's Search Business Fail as a Matter of Law. ..................................................................................... 20

     B.    Claims Based on Google's Acquisitions are Time-Barred. ...................... 22

V.    HANSON LACKS STANDING TO CHALLENGE CONDUCT THAT OCCURRED AFTER SEPTEMBER 2016 AND LACKS STANDING TO PURSUE INJUNCTIVE RELIEF .................................................................. 23

VI.   ALL BUT ONE OF THE NAMED ADVERTISER PLAINTIFFS ARE BOUND TO ARBITRATE ..................................................................................... 24

A.     The Court May Consider the Shadd Declaration and Google's
Terms of Service Evidencing Advertiser Plaintiffs' Agreement to
Arbitrate. ...................................................................................................24

B.     The Federal Arbitration Act Requires Arbitration Here. ...........................26

1.     Five of the Named Advertiser Plaintiffs Agreed to a Valid
and Enforceable Arbitration Agreement in Google's Terms
of Service. ....................................................................................27

2.     Advertisers' Claims Fall Within Scope of the Broad
Arbitration Agreement. .................................................................28

C.     No Exception or Exclusion Applies to California-Law Injunctive-
Relief Claims as Advertisers Do Not Seek "Public Injunctive
Relief." ......................................................................................................29

D.     Advertisers Must Arbitrate with Alphabet as Well as With Google. ........30

CONCLUSION..................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*105 Mt. Kisco Assocs. LLC v. Carozza*,
   2017 WL 1194700 (S.D.N.Y. Mar. 30, 2017) ...................................................................5

*A.I.B. Express, Inc. v. FedEx Corp.*,
   358 F. Supp. 2d 239 (S.D.N.Y. 2004)..............................................................................20

*Alvater Gessler v. Sobieski Destylarnia*,
   572 F.3d 86 (2d Cir. 2009)...............................................................................................25

*Am. Ad Mgmt. Inc. v. Gen. Tel. Co.*,
   190 F.3d 1051 (9th Cir. 1999) ...........................................................................................6

*Am. Express Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013)........................................................................................................26

*Am. Tobacco Co. v. United States*,
   328 U.S. 781 (1946)........................................................................................................14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).........................................................................................................4

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011)........................................................................................................26

*Bale v. Glasgow Tobacco Bd. of Trade, Inc.*,
   223 F. Supp. 739 (W.D. Ky. 1963)..................................................................................17

*Bale v. Glasgow Tobacco Bd. of Trade, Inc.*,
   339 F.2d 281 (6th Cir. 1964) ...........................................................................................17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................................................4, 14

*Blue Shield of Va. v. McCready*,
   457 U.S. 465 (1982)................................................................................................6, 8, 10

*Broder v. Cablevision Sys. Corp.*,
   418 F.3d 187 (2d Cir. 2005).............................................................................................25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)..........................................................................................................6

*Bus. Casual Holdings, LLC v. YouTube, LLC*,
   2022 WL 837596 (S.D.N.Y. Mar. 21, 2022) ..................................................................26

*Cal. Crane Sch., Inc. v. Google LLC*,
   2022 WL 3348425 (N.D. Cal. Aug. 12, 2022) ..................................................25, 26, 27,
                                                                 28, 29, 30

*Cascade Health Sols. v. PeaceHealth,*
   515 F.3d 883 (9th Cir. 2008) ...................................................................20

*Cenedella v. Metro. Museum of Art,*
   348 F. Supp. 3d 346 (S.D.N.Y. 2018).....................................................18

*Chapman v. N.Y. State Div. for Youth,*
   546 F.3d 230 (2d Cir. 2008).............................................................18, 19

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ...................................................................................24

*Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.,*
   58 F.3d 16 (2d Cir. 1995).........................................................................30

*Concord Assocs., L.P. v. Ent. Props. Tr.,*
   817 F.3d 46 (2d Cir. 2016).......................................................................18

*Copperweld Corp. v. Indep. Tube Corp.,*
   467 U.S. 752 (1984) .................................................................................14

*Daniel v. Am. Bd. of Emergency Med.,*
   428 F.3d 408 (2d Cir. 2005).......................................................................6

*Figueroa v. Garland,*
   2022 WL 17539114 (S.D.N.Y. Dec. 6, 2022) .........................................26

*Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,*
   602 F.2d 1025 (2d Cir. 1979).............................................................14, 15

*Gainesville Oil & Gas Co. Farm Credit Bank of Tex.,*
   847 S.W.2d 655 (Tex. App. 1993)............................................................17

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,*
   711 F.3d 68 (2d Cir. 2013).........................................................................5

*Go N.Y. Tours, Inc. v. Gray Line N.Y. Tours, Inc.,*
   2019 WL 8435369 (S.D.N.Y. Nov. 7, 2019).............................................15

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.,*
   2016 WL 6110565 (S.D.N.Y. Aug. 4, 2016) (Castel, J.)............................4

*Harry v. Total Gas & Power N. Am., Inc.,*
   889 F.3d 104 (2d Cir. 2018)...................................................................5, 6

*Hodges v. Comcast Cable Commc'ns, LLC,*
   21 F.4th 535 (9th Cir. 2021) ....................................................................29

*Illinois Brick Co. v. Illinois,*
   431 U.S. 720 (1977) ...................................................................................8

*In re Aluminum Warehousing Antitrust Litig.,*
   833 F.3d 151 (2d Cir. 2016)...............................................................5, 6, 8

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
    433 F. Supp. 3d 395 (E.D.N.Y. 2020) ............................................................9

*In re Google Digital Advertising Litig.*,
    No. 20-cv-03556-BLF, ECF No. 143 (N.D. Cal. May 13, 2021) ....................3

*In re Tether & Bitfinex Crypto Asset Litig.*,
    576 F. Supp. 3d 55 (S.D.N.Y. 2021)............................................................17

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
    924 F.3d 57 (2d Cir. 2019)...........................................................................9

*Laydon v. Mizuho Bank, Ltd.*,
    2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) .............................................14

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*,
    252 F.3d 218 (2d Cir. 2001)........................................................................28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ....................................................................................11

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013).........................................................................15

*McGill v. Citibank, N.A.*,
    393 P.3d 85 (Cal. 2017) ..............................................................................29

*Meridian Autonomous Inc. v. Coast Autonomous LLC*,
    2020 WL 496078 (S.D.N.Y. Jan. 30, 2020) ................................................30

*Meridian Autonomous Inc. v. Coast Autonomous LLC*,
    2018 WL 4759754 (S.D.N.Y. Sept. 30, 2018) .............................................30

*Meyer v. Uber Techs.*,
    868 F.3d 66 (2d Cir. 2017)..........................................................................26

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ......................................................................23

*Mohamed v. Uber Techs., Inc.*,
    848 F.3d 1201 (9th Cir. 2016) ....................................................................27

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*,
    866 F.2d 525 (1st Cir. 1989) .......................................................................17

*Mooney v. AXA Advisors, L.L.C.*,
    19 F. Supp. 3d 486 (S.D.N.Y. 2014)......................................................17, 19

*N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*,
    323 F. Supp. 2d 559 (S.D.N.Y. 2004)..........................................................20

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016)..........................................................24, 25, 29

*Ortho Diagnostic Sys., Inc. v. Abbott Lab'ys., Inc.*,
   920 F. Supp. 455 (S.D.N.Y. 1996) ...........................................................................20

*Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*,
   282 P.3d 1217 (Cal. 2012) .......................................................................................28

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020) ....................................................................23

*Roby v. Corp. of Lloyd's*,
   996 F.2d 1353 (2d Cir. 1993) ....................................................................................5

*Simon J. Burchett Photography, Inc. v. Maersk Line Ltd.*,
   2020 WL 8261580 (S.D.N.Y. Dec. 30, 2020) ...........................................................5

*Smith v. Ullman*,
   58 Md. 183 (Md. App. Ct. 1882) .............................................................................17

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*,
   198 F.3d 88 (2d Cir. 1999) .......................................................................................30

*Sonic-Calabasas A, Inc. v. Moreno*,
   311 P.3d 184 (Cal. 2013) .........................................................................................27

*Spinelli v. NFL*,
   96 F. Supp. 3d 81 (S.D.N.Y. 2015) .........................................................................28

*Tarrant Serv. Agency, Inc.* v. *Am. Standard, Inc.*,
   12 F.3d 609 (6th Cir. 1993) ......................................................................................15

*Toscano v. Pro. Golfers' Ass'n*,
   258 F.3d 978 (9th Cir. 2001) ....................................................................................15

*TradeComet.com LLC v. Google, Inc.*,
   435 F. App'x 31 (2d Cir. 2011) ...........................................................................5, 28

*TradeComet.com LLC v. Google, Inc.*,
   693 F. Supp. 2d 370 (S.D.N.Y. 2010).....................................................................25

*Trudeau v. Google LLC*,
   349 F. Supp. 3d 869 (N.D. Cal. 2018) ...............................................................26, 27

*United States v. Aiyer*,
   33 F.4th 97 (2d Cir. 2022) ........................................................................................17

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) .................................................................................................15

*United States v. Google LLC*,
   1:23-cv-00108 (E.D. Va. Jan. 24, 2023), ECF No. 1 ...............................................16

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019)......................................................................................23

*Veliz v. Collins Bldg. Servs., Inc.,*
   2011 WL 4444498 (S.D.N.Y. Sept. 26, 2011)..................................................5

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004)...........................................................................................20

*Z Techs. Corp. v. Lubrizol Corp.,*
   753 F.3d 594 (6th Cir. 2014) ............................................................................23

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
   401 U.S. 321 (1971)...........................................................................................22

## Statutes

9 U.S.C. § 2 ................................................................................................................26

15 U.S.C. § 1 ...........................................................................13, 14, 15, 16, 17, 18

15 U.S.C. § 2 .....................................................................................................21, 23

15 U.S.C. § 15b .........................................................................................................22

California Unfair Competition Law ..........................................................................29

Federal Arbitration Act .............................................................................................26

## Other Authorities

Fed. R. Evid. 201 ......................................................................................................26

Federal Rules of Civil Procedure 12(b)(3).................................................1, 5, 24, 25

Federal Rules of Civil Procedure 12(b)(6)..............................................1, 4, 5, 24, 25

**TABLE OF ABBREVIATIONS**

| Term | Definition |
|---|---|
| AdX | Google's Ad Exchange |
| Complaint | Consolidated Advertiser Class Action Complaint, ECF No. 399 |
| DFP | DoubleClick for Publishers |
| FAA | Federal Arbitration Act |
| FAN | Facebook Audience Network |
| FCA | Google's final clearinghouse auctions |
| Google | Google LLC and Alphabet Inc. |
| MBW | Minimum Bid to Win |
| MTD Op. | Opinion and Order, ECF No. 308 |
| NBA | 2018 Network Bidding Agreement between Google and Facebook |
| RPO | Reserve Price Optimization |
| Search | Google Search |
| Shadd Decl. | Declaration of Courtney Shadd |
| States | State Plaintiffs' |
| States' TAC | State Plaintiffs' Third Amended Complaint, ECF No. 195 |
| Terms or Terms of Service | Google's Advertising Program Terms of Service |
| UPRs | Unified Pricing Rules |

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Google LLC and Alphabet Inc. move for an order dismissing the federal antitrust claims (Counts I through III and V) in the Consolidated Advertiser Class Action Complaint ("Complaint"), ECF No. 399, in their entirety.  Pursuant to Federal Rules of Civil Procedure 12(b)(3) and 12(b)(6), Google also moves to dismiss all claims by five of the six named Advertiser Plaintiffs on the grounds that five named Plaintiffs are bound by valid and enforceable arbitration agreements with Google.  In the alternative, Google moves for an order compelling those five Advertisers to arbitrate their claims as they agreed.  Consistent with the stay of the state law claims (Counts IV, VI, and VII) ordered on November 18, 2022, ECF No. 392, ¶¶ 4-5, Google does not move to dismiss those claims except on grounds of arbitration and reserves all rights with respect to them.

## INTRODUCTION

Google has been, and continues to be, an innovator in digital advertising.  It has developed products that facilitate high-quality matches between publishers and advertisers.  Google develops these ad tech products for the benefit of its customers and users, and to help the open web flourish.  Its products provide a safe and secure environment for publishers, advertisers, and users to achieve their end-goals.  Antitrust law does not, and should not, hinder those efforts.

Google's advertiser-facing ad tech products help advertisers run effective digital advertising campaigns.  Through the years, Google has worked to improve those products, making bidding safer, easier, and more efficient.  Although Google's advertiser customers took advantage of and benefited from Google's innovations, a small group of advertisers now purports to represent a putative class that would undo those improvements and force Google to redesign its products to benefit Google's competitors and those competitors' customers.

This is Advertisers' third attempt at a complaint in this matter.  Advertisers chose, this time around, to adopt many of the allegations made in the State Plaintiffs' and publishers' complaints in this MDL.  Advertisers face three insurmountable bars to joining the chorus of ad tech complainants, however.

*First*, Advertisers do not have antitrust standing for any of their claims.  Many of their claims concern alleged harm in alleged markets for ad exchanges or buying tools for large advertisers.  But the named Advertiser Plaintiffs did not use those products and cannot claim any direct harm from the alleged anticompetitive effects in those markets.  The only product at issue that they did use is a buying tool that they allege is designed for small advertisers, namely Google Ads.  But their small-advertiser-tool-oriented claims also fail because the conduct that allegedly harmed the small-tool market actually *benefited* advertisers who used Google Ads. Advertisers lack antitrust standing to complain about conduct that advantaged them.

*Second*, Advertisers' attempts to recycle or repackage others' failed allegations regarding the Network Bidding Agreement and Google product designs fall flat.  Advertisers cannot avoid this Court's prior reasoning and conclusions by attempting to dress up old allegations with new labels.

*Third*, all but one of the named Advertiser Plaintiffs agreed to arbitrate any claims concerning their use of Google's advertising products.  This arbitration agreement is valid and enforceable, and clearly covers the claims at issue.  The remaining Advertiser Plaintiff spent $487.78 with Google on third-party display advertising during three months in 2016.  In addition to lacking standing for the reasons provided above, that Plaintiff also cannot challenge conduct that occurred after he stopped buying advertising, and he cannot seek injunctive relief.

## BACKGROUND[1]

Advertisers' prior amended complaint was dismissed without prejudice.  Order Granting Motion to Dismiss with Leave to Amend, *In re Google Digital Advertising Litig.*, No. 20-cv-03556-BLF, ECF No. 143 (N.D. Cal. May 13, 2021).  In their Amended Complaint, Advertisers added Meta Platforms, Inc. as a defendant.  Advertisers seek to represent a putative class of advertisers who "placed a display ad . . . via a transaction in which the impression was sold, brokered, exchanged or auctioned by Google."  Compl. ¶ 339.

**Named Plaintiffs.**  The six named Advertiser Plaintiffs allegedly "purchased display and in-app advertising through Google Ads," which they characterize as Google's buying tool for small advertisers, or who "paid Google for AdWords advertising." (AdWords was Google Ads' predecessor.)  *Id.* ¶¶ 6, 17, 22, 75.  Five of the six named Advertiser Plaintiffs (all except Hanson Law Office) agreed to Google's Advertising Program Terms of Service that accompany the use of Google's advertising services.[2]  Shadd Decl. ¶¶ 14-19.  These Terms are presented to advertisers using Google's services and available online for anyone to review.  *Id.* ¶¶ 3, 5, 11, 12.  The Terms explain, in the first paragraph, that "[t]hey require the use of binding individual arbitration to resolve disputes rather than jury trials or class actions."  Shadd Decl., Exs. A, D, & E at 1; *see also id.* at § 13(A).  Google provided named Advertiser Plaintiffs the opportunity to opt out of this arbitration provision.  Shadd Decl. ¶¶ 6-12; *see also id.*, Exs. A, D, & E at § 13(F) (explaining opt out process).  Google has no record of any named Advertiser Plaintiff opting out of arbitration.  Shadd Decl. ¶¶ 13, 15-19.

---

[1] For purposes of this motion to dismiss, Google assumes the truth of the well-pleaded allegations in the Complaint.  Should any part of Advertisers' case survive this motion, Google expects to contest many of those allegations in the future.

[2] Google has so far been unable to locate a record of a California-based Hanson Law Firm or Christopher Hanson accepting a version of Google's Terms of Service that includes an arbitration agreement.  *See* Shadd Decl. ¶ 21.  As explained further below, Hanson fails to state any federal-law claims for relief, and Google will move to dismiss Hanson's surviving state-law claims when permitted to do so.

Plaintiff Christopher Hanson (d/b/a Hanson Law Office) is the alleged "successor in interest" to the now-dissolved Hanson Law Firm.  Compl. ¶ 14.  Hanson Law Firm allegedly spent $487.78 with Google on third-party display advertising from June 1 to September 6, 2016. *Id.* ¶¶ 15-16.

Advertisers challenge a range of Google's ad tech products and practices to support their federal antitrust claims in Counts I, II, III, and V, some of which this Court has already dismissed from the States' case.  *See* MTD Op., ECF No. 308 ("MTD Op.").  The claims relevant to this motion are summarized in each argument section, below.

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To do so, the complaint must make factual allegations sufficient to "raise a reasonable expectation that discovery will reveal evidence," *Twombly*, 550 U.S. at 556, that would "allow[] the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678.  It is "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (citations omitted).  "In assessing the sufficiency of the complaint, a court must disregard legal conclusions, because they are not entitled to the presumption of truth." *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, 2016 WL 6110565, at *4 (S.D.N.Y. Aug. 4, 2016) (Castel, J.).  Rather, the Court "must examine the well-pleaded factual allegations 'and then determine whether they plausibly give rise to an entitlement to relief.'" *Id.*  (quoting *Iqbal*, 556 U.S. at 679).

"[A]n arbitration clause is merely a specialized type of forum selection clause." *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1363 n.2 (2d Cir. 1993). In determining whether to dismiss a claim based on a forum-selection clause, the court must view all the facts in the light most favorable to the party claiming that venue is proper, while "no disputed fact should be resolved against that party until it has had an opportunity to be heard." *TradeComet.com LLC v. Google, Inc.*, 435 F. App'x 31, 33 (2d Cir. 2011). Courts in this District have considered motions to dismiss in favor of arbitration under both Rule 12(b)(3) and 12(b)(6). *See 105 Mt. Kisco Assocs. LLC v. Carozza*, 2017 WL 1194700, at *15-17 (S.D.N.Y. Mar. 30, 2017) (dismissing claims subject to arbitration agreement under Rule 12(b)(3)); *Veliz v. Collins Bldg. Servs., Inc.*, 2011 WL 4444498, at *4 (S.D.N.Y. Sept. 26, 2011) (dismissing under Rule 12(b)(6)); *Simon J. Burchett Photography, Inc. v. Maersk Line Ltd.*, 2020 WL 8261580, at *5 (S.D.N.Y. Dec. 30, 2020) (considering motion to dismiss in favor of arbitration under Rule 12(b)(6)).

## ARGUMENT

### I.   ALL ADVERTISERS LACK ANTITRUST STANDING TO BRING THEIR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION CLAIMS.

Antitrust standing is a threshold inquiry appropriate for resolution at the pleading stage. *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013). "[W]hen a complaint by its terms fails to establish this requirement," it must be dismissed "as a matter of law." *Id.* To show antitrust standing, a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) is an acceptable plaintiff (*i.e.*, "efficient enforcer") to pursue the alleged antitrust violations. *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016); *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018).

To establish antitrust injury, a plaintiff must show its injury is "of the type the antitrust laws were intended to prevent" and "flows from that which makes defendants' acts unlawful."

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  This requires a court to "compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges."  *Harry*, 889 F.3d at 115.  Generally, only participants in the defendants' alleged market suffer antitrust injury.  *See In re Aluminum Warehousing*, 833 F.3d at 158.  The Supreme Court carved out a "narrow exception" for non-market-participant plaintiffs whose injuries are "inextricably intertwined" with the injuries of market participants.  *Harry*, 889 F.3d at 115-16 (quoting *Am. Ad Mgmt. Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1057 n.5 (9th Cir. 1999)); *see also Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982).  "An injury is inextricably intertwined when the defendants use the plaintiff's injury as the means, fulcrum, conduit, or market force to realize their illegal ends, or when they corrupt a separate market [in which a plaintiff is a participant] in order to achieve [their] illegal ends."  *Harry*, 889 F.3d at 115-16.

A plaintiff must also be an "efficient enforcer" of the claims pursued, a four-factor inquiry as discussed below.  *In re Aluminum Warehousing*, 833 F.3d at 157-58 (citing *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005)).

Here, Advertisers have not plausibly alleged that they have suffered antitrust injury, or that they are "efficient enforcer[s]" of their federal antitrust claims (Counts I and II).  Advertisers lack standing for their claims based on alleged harm in markets for **ad exchanges** and **ad-buying tools for large advertisers** because the named Plaintiffs do not purport to participate in either of these markets, do not satisfy the *McCready* exception, and are not "efficient enforcers" of these claims.  As to claims based on alleged harm in a market for **ad-buying tools for small advertisers**, even assuming market participation, Plaintiffs still fail to allege antitrust injury because they *benefited* from the challenged practices.  Advertisers are also not "efficient enforcers" of these claims.  Instead of identifying concrete and direct injury, Advertisers attempt

to bootstrap conduct that allegedly harmed Google's rivals or *publishers* into some indirect harm to *advertisers*.  Advertisers' alleged injury here is too remote to support standing.  Moreover, as described in Section V, Plaintiff Hanson further lacks standing to assert claims based on conduct that occurred after September 2016, including line-item caps, redaction of auction data, UPRs, and the Network Bidding Agreement.  He also cannot pursue injunctive relief.

## A.  Advertisers Lack Standing In an Ad Exchange Market.

Advertisers allege that Google harmed competition in an ad exchange market through (i) Dynamic Allocation, (ii) Enhanced Dynamic Allocation, (iii) Dynamic Revenue Sharing, (iv) Reserve Price Optimization ("RPO"),[3] (v) Unified Pricing Rules ("UPRs"), (vi) Projects Poirot and Elmo, (vii) Line-Item Caps, and (viii) Redaction of Auction Data.  *See* Compl. Part VI.B. Yet Advertisers cannot allege they suffered antitrust injury in a market for ad exchanges because they do not participate in it.  No named Advertiser Plaintiff alleges it transacted directly with ad exchanges, or that it paid any ad exchange fees.  Compl. ¶¶ 14-32 (alleging only that each named Plaintiff used Google Ads, which Advertisers describe as an ad-buying tool for small advertisers).  Advertisers allege that they *do not* directly interface with ad exchanges: "exchanges deal with advertisers by interfacing with and accepting live bids from networks and buying tools on behalf of advertisers (e.g., Google's DV360); *advertisers cannot directly bid on an exchange*."  Compl. ¶ 57 (emphasis added).  Notably, Advertisers avoid stating who ultimately pays the fees to the ad exchanges, and do not claim to have paid supra-competitive ad exchange fees or any ad exchange fees at all.  Instead, Advertisers vaguely assert that the ad exchange "take-rate" is "borne in part by advertisers."  *Id.* ¶ 310.  To the extent that Advertisers mean to

---

[3] Advertisers repeat allegations of harm in the ad exchange market caused by RPO that the Court found not plausible.  Compl. ¶¶ 239-53; MTD Op., at 60 ("The Complaint does not plausibly allege that Reserve Price Optimization was anticompetitive conduct in the ad-exchange market.").  Advertisers' allegations regarding RPO, Compl. ¶¶ 239-53, can be dismissed on that basis as well.

allege that publishers pay ad exchanges and then incorporate some part of ad-exchange take rate into the prices they charge advertisers for ad impressions, this allegation would make advertisers indirect purchasers at best, and unable to state a claim for damages under federal antitrust law. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 731-32 (1977).

The *McCready* exception to the "market participant" requirement does not apply here because Advertisers do not and cannot allege that their injury was "inextricably intertwined" with any supposed injury Google inflicted in the alleged ad exchange market. In *McCready*, the plaintiff was a patient whose insurance claims were denied specifically because of the alleged anticompetitive practice—the insurers' practice of refusing to reimburse patients for therapy performed by psychologists. 457 U.S. at 479, 484. Thus, while McCready did not participate in the psychotherapy market, the Court found she had antitrust standing because the injury she suffered was "inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id*. at 484. McCready's injury was the "very means by which" conspirators harmed psychologists and the psychotherapy market. *Id.* at 479. Here, Advertisers are not the "means by which" publishers or anyone else is allegedly harmed in an ad exchange market. With the exception of Poirot and Elmo, the ad-exchange related conduct allegedly involved Google charging ad exchange fees (which advertisers do not pay) or changing publishers' settings. Poirot and Elmo concerned DV360, a buying tool that none of the named Plaintiffs allegedly used. Thus, none of this conduct involved using small advertisers as a "conduit." *See also In re Aluminum Warehousing*, 833 F.3d at 163 ("Most of the time, conspirators effectuate an anticompetitive outcome without reliance on some 'fulcrum' or 'conduit,' and without need to corrupt some separate market."). Advertisers do not have standing to recover for alleged reduction in competition among ad exchanges.

8

For similar reasons, Advertisers are not *efficient enforcers* of claims in the alleged ad exchange market.  In considering whether a plaintiff is an efficient enforcer, courts analyze (1) whether the alleged violation was a direct or remote cause of the alleged injury, (2) "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," (3) "the speculativeness of the alleged injury," and (4) "the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries."  *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 65 (2d Cir. 2019).  Advertisers fail on all these factors.

Advertisers' injuries relating to the alleged ad exchange market are necessarily indirect because Advertisers are not ad exchanges and do not directly use ad exchanges.  "[A]s a general matter, those entities most directly injured by anticompetitive conduct are customers or competitors of the defendant."  *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 433 F. Supp. 3d 395, 408 (E.D.N.Y. 2020), *aff'd*, 19 F.4th 127 (2d Cir. 2021).  And here, the customers who pay the ad exchange fee—the publishers—are an identifiable class of persons who are not only motivated to vindicate, but are currently suing to vindicate, their own interests.  Thus, there are better-suited plaintiffs to pursue ad exchange-related claims.  Finally, any damages would be difficult to apportion between publishers and advertisers.  On the one hand, publishers allege that they received less money for their impressions on account of ad exchange conduct, and that they paid supra-competitive rates to use ad exchanges.  Advertisers, on the other hand, argue that they paid too much and that they bore "in part" supra-competitive rates.  Compl. ¶ 310.  Parsing this would require a court to apportion out which impressions were priced too low and which too high, and to untangle what portion of ad exchange fees were supposedly borne by advertisers versus publishers.

**B.  Advertisers Lack Standing In a Large-Advertiser Tools Market.**

Advertisers allege that (i) UPRs and (ii) Projects Poirot and Elmo affected competition in a market for ad-buying tools for large advertisers.  *See* Compl. Part VI.B.6 & 7.  Yet Advertisers do not allege any named Plaintiff participated in a market for ad-buying tools for large advertisers.  Instead, the Complaint describes each using only Google Ads, which they allege is a buying tool for *small* advertisers.  Compl. ¶¶ 14-15, 17 (Hanson Law Office), ¶¶ 20-22 (Lindo), ¶ 26 (Cliffy Care), ¶ 28 (Kinin), ¶ 30 (Raintree Medical), ¶ 32 (Rodrock).  Advertisers allege buying tools for small advertisers are distinct tools used by different advertisers, outside a large-advertiser-tool market.  *E.g., id.* ¶¶ 90, 93, 131.  No Advertiser Plaintiff alleges that it ever used a "large buyer" tool, that it would in the future, or that it even qualifies to use such a tool.

Advertisers also cannot allege that any injury they suffered was "inextricably intertwined" with any alleged injury Google inflicted in a market for ad-buying tools for large advertisers.  Their allegations of harm in the large-buying tool market do not mention small advertisers or small-advertiser tools, let alone suggest that small advertisers were the means by which any harm was accomplished.  Indeed, Advertisers' allegations that the two types of tools are distinct undercuts any suggestion that injury in the two separate markets would be intertwined.  They thus fail to satisfy the *McCready* "necessary predicate" standard here, too.

Nor are the Named Advertiser Plaintiffs efficient enforcers of claims for harm to a market they do not participate in.  Here, they fail all the efficient-enforcer factors.  They fail the first (remoteness) and third (speculativeness) because they do not allege even *indirect* harm to themselves from conduct affecting large-buyer tools.  While they claim that UPRs "caused them to pay more to place ads through Google," they do not allege that they paid more as a result of anything that happened in relation to large buying tools or large buying tool customers.  Compl. ¶ 266.  With respect to Poirot and Elmo, they claim that advertisers were "lock[ed] into using

DV360," *id.* ¶ 274, but no Named Plaintiff used DV360 and therefore was never "locked in." The fourth factor (difficulty of apportionment) implicitly cuts against Advertisers because they have no damages to apportion.  And, finally, they fail the second factor (more suitable plaintiffs) because advertisers that actually used DV360 (or another large advertiser tool) are obviously better-suited to pursue claims relating to the alleged large advertiser tool market.  The named Plaintiffs—none of whom used buying tools for large advertisers—are not well-suited to pursue claims relating to the alleged large-advertiser tool market.

### C. Advertisers Lack Standing in a Small-Advertiser Tools Market.

While the named Advertiser Plaintiffs allege that they used Google's ad-buying tools for small advertisers, they lack standing to assert claims based on harm in that alleged market because they have not plausibly alleged antitrust injury and are not efficient enforcers. Advertisers have asserted that only two categories of conduct allegedly affected this market— UPRs and Project Bernanke.  Compl. ¶¶ 214, 254.  They are not suitable plaintiffs to bring claims based on either category of conduct.

**Unified Pricing Rules.**  Advertisers have not plausibly alleged antitrust injury caused by UPRs because UPRs benefitted them, rather than hurt them.  There can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582-83 (1986) (finding plaintiffs lacked injury and a cognizable claim because they actually "st[ood] to gain" from alleged anticompetitive conduct). Advertisers claim UPRs advantaged Google's buying tools and consequently the advertisers that used them (or prevented publishers from disadvantaging them).  Compl. ¶¶ 259-61.  According to Advertisers, UPRs *benefited* Google Ads buyers because they gave advertisers bidding through Google's ad exchange ("AdX") a pricing advantage.  *Id.* ¶ 259; *see also* ¶ 264 ("Unified Pricing resulted in AdX winning nearly double the number of impressions it used to—but paying

11

roughly half as much.").  The named Plaintiffs are the very advertisers who were allegedly artificially advantaged: they only used Google Ads (or its predecessor, AdWords) and, according to Advertisers, Google Ads bids into AdX exclusively, *id.* ¶ 75.  Named Plaintiffs do not claim to have used any of the other buying tools or bid through any other ad exchanges that UPRs supposedly hurt.  Because the named Plaintiffs benefited from UPRs as Google Ads buyers, their complaint fails to allege facts showing that they have suffered antitrust injury (or any injury).

Nor are Advertisers efficient enforcers of UPR-based claims.  Advertisers' alleged injury is speculative and, if existent at all, too indirect.  UPRs allegedly harmed publishers primarily, and rival ad exchanges second.  *See, e.g.*, Compl. ¶ 262 (UPRs "disrupt[s] publishers' routine use of floors to increase competition and yield" over their impressions).  To the extent Advertisers mean to allege that UPRs caused ad exchange fees to rise, publishers pay those ad exchange fees and any passing-on of those costs to advertisers is indirect harm.  For this reason, there are also persons better-suited to pursue these claims: the publishers who are, in fact, pursuing them.

**Project Bernanke.**  Based on their allegations, Advertisers also benefited from Bernanke, and therefore suffered no antitrust injury on account of it.  According to Advertisers, "Google successfully used Bernanke to manipulate ad auctions to give an unfair advantage to its own ad-buying tool, Google Ads."  Compl. ¶ 228.  Again, because named Plaintiffs allege that they used Google Ads and do not claim to have used any other ad buying tool, their bids were the ones that Bernanke allegedly "inflated" and caused to win more frequently.  Advertisers suggest they were harmed because Bernanke "caus[ed] them to pay the price of the actual second-highest bid instead of the third-highest bid."  Compl. ¶ 226.  But this is not a harm that Bernanke caused: Advertisers paid the price of the second-highest bid whether or not Bernanke was used.  *See id.* ¶ 218 (alleging that Bernanke "changed AdX from a second-price auction to a third-price auction,

*from the publisher's standpoint*" (emphasis added)).  Advertisers' other allegation that Bernanke harmed advertisers by routing ads to "less relevant sites and audiences" is entirely speculative and unexplained.  *Id.* ¶ 226.  Advertisers have not alleged any facts showing how Project Bernanke would result in an ad being placed on a website the small advertiser did not want.  According to Advertisers' allegations, Bernanke operates only if an advertiser bids, and they do not allege that Google caused them to bid on websites on which they did not want to advertise.  Moreover, Advertisers acknowledge that Bernanke helped Google Ads advertisers bid more competitively on "valuable" and "high-quality" impressions (*i.e.*, impressions on "relevant" sites and audiences).  *Id.* ¶ 225-26.  And since no named Plaintiff alleges that it used "buying tools other than Google Ads[,]" Advertisers' claim that Bernanke "render[ed] those tools less effective on AdX" fails to establish that *they* suffered any antitrust injury.  *Id.* ¶ 227.

The named Plaintiffs are not efficient enforcers of Bernanke claims, failing at least the first and second factors.  Any injury to advertisers is indirect.  Under Advertisers' own theory of harm, publishers would be better situated and more motivated to pursue claims premised on Bernanke, as they were the ones who supposedly overpaid on account of it.  And publishers are pursuing those claims.  *See* Publisher Plaintiffs' First Amended Consolidated Class Action Complaint at IV.B.3, ECF No. 408.

Advertisers lack antitrust standing to challenge the only two categories of conduct that they claim affected a market for ad-buying tools for small advertisers.

## II.   COUNT V SHOULD BE DISMISSED FOR LACK OF ANTITRUST STANDING OR FOR FAILURE TO PLEAD AN AGREEMENT.

In a new Section 1 claim, Advertisers allege Google's UPRs and Line-Item Caps were "price-fixing terms" "imposed on publishers" that constitute an agreement in violation of Section 1 of the Sherman Act.  Compl. ¶¶ 295-96, 383.  As an initial matter, and for the reasons

explained above, Advertisers lack antitrust standing to pursue claims based on UPR and Line-Item Caps, *see above* Section I.  Reframing those allegations as part of a Section 1 claim does not excuse Advertisers' failure to allege antitrust injury from such conduct nor change the efficient-enforcer analysis.  Section 1 claims also require antitrust injury and an efficient enforcer.  *See Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at *7 (S.D.N.Y. Mar. 28, 2014), *aff'd sub nom. Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86 (2d Cir. 2022).

Advertisers' new Section 1 claims may also be dismissed for the alternate reason that Advertisers fail to plausibly allege an agreement.  To survive a motion to dismiss, a claim brought under Section 1 of the Sherman Act must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal *agreement*."  *Twombly*, 550 U.S. at 556 (emphasis added).  For purposes of Section 1 of the Sherman Act, "'agreement'" means a "'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'"  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)).  Advertisers fail to allege any meeting of minds or common design between Google and publishers on either UPRs or Line-Item Caps.

To be clear, Advertisers do not allege that publishers signed any agreement or contract that required UPRs or Line-Item Caps.  Instead, Advertisers attempt to plead an agreement based exclusively on an allegation that publishers assented to Google's policies by using Google's products.  In particular, they allege that publishers "agreed and assented to" UPRs by "continuing to use DFP" (DoubleClick for Publishers) and abiding by its "rules and restrictions," Compl. ¶¶ 382-83, and were obligated to accept Line-Item Caps as a condition of using DFP.  *Id.* ¶ 388.  But mere acquiescence to a unilaterally established policy is not sufficient to make out an "agreement" under Section 1.  *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025,

14

1030-31 (2d Cir. 1979); *see also, e.g.*, *United States v. Colgate & Co.,* 250 U.S. 300, 304-07

(1919) (an indictment charging that a manufacturer specified the terms on which it will deal did

not allege an unlawful agreement under Section 1); *Toscano v. Pro. Golfers' Ass'n,* 258 F.3d

978, 984 (9th Cir. 2001) (rejecting Section 1 claim because local golf sponsors purchasing

packages under the terms independently set by the PGA Tour did not constitute "evidence of

concerted action" between sponsors and PGA Tour); *Tarrant Serv. Agency, Inc.* v. *Am. Standard,*

*Inc.,* 12 F.3d 609, 617-18 (6th Cir. 1993) (holding that unilateral imposition of a policy to which

other actors acquiesce does not establish an agreement under Section 1).

　　In *Fuchs Sugars & Syrups*, the Second Circuit held that there was no evidence of a

Section 1 conspiracy where distributors accepted the new terms of a sugar refiner's unilateral

decision to change its distribution system.  602 F.2d at 1030-31.  Similarly, here, Advertisers do

not allege that Google's policies regarding UPR and line items were the result of anything more

than unilateral action by Google.  Advertisers do not allege any facts suggesting that publishers

reached an agreement with Google regarding UPRs or Line-Item Caps.  To the contrary,

Advertisers' allegations suggest that publishers would not have been motivated to enter into any

such agreement, since UPRs purportedly "interfere with a publisher's ability to set prices,"

Compl. ¶ 260, and line-item restrictions supposedly "undercut [publishers'] profits."  *Id.* ¶ 282.

　　Advertisers ignore the "logical and permissive business reasons" for publishers' use of

DFP: DFP was a popular and useful product.  *See Go N.Y. Tours, Inc. v. Gray Line N.Y. Tours,*

*Inc.*, 2019 WL 8435369, at *2 (S.D.N.Y. Nov. 7, 2019), *aff'd*, 831 F. App'x 584, 586 (2d Cir.

2020), *cert. denied*, 141 S. Ct. 2571 (2021).  Advertisers allege that DFP gave publishers access

to "demand produced by hundreds of thousands of advertisers," Compl. ¶ 7, so it makes "perfect

business sense" that publishers would use the product as Google designed it.  *See Mayor & City*

*Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 138 (2d Cir. 2013) (holding there was no agreement where defendants' actions "made perfect business sense" absent an agreement). Count V of the Complaint should be dismissed.

## III.   THE NBA CLAIMS LARGELY REHASH STATE PLAINTIFFS' DEFICIENT ALLEGATIONS AND SHOULD LIKEWISE BE DISMISSED

In Count III, Advertisers try to put a new spin on the same allegations related to the 2018 Network Bidding Agreement between Google and Meta (the "NBA") that the Court already dismissed as insufficient to support State Plaintiffs' Section 1 claims.[4]  *See* MTD Op., at 20-34. They tack on additional, conclusory allegations of a new affected relevant market, but those allegations are insufficient.  Advertisers' claims fare no better than State Plaintiffs'.

### A.   Advertisers' New Spin on the NBA Does Not Escape the Court's Prior Order.

Advertisers attempt to distinguish their NBA claims from the States' by arguing that the special advantages Google allegedly granted Meta under the NBA are not benefits conferred to secure the business of a large customer, as the Court held, *id.* at 25-26, but instead served to disadvantage other bidders in Google's auctions.  Compl. ¶ 291.  The alleged special advantages with which Advertisers take issue—match rate commitments, longer timeouts, and unique data access, *id.* ¶¶ 287-88—are the same ones State Plaintiffs alleged and the Court previously considered.  *See* MTD Op., at 24-25, 31-32.  And, just like Advertisers do here, State Plaintiffs asserted that by granting Meta these alleged special advantages, Google gave Meta a "leg up" in its auctions, "help[ed] Facebook's FAN ad network beat the competition," and effectively

---

[4] On December 19, 2022, the European Commission announced that it closed an investigation it had been conducting into the NBA without filing any charges after "a careful assessment of all relevant evidence, including information received from Google, Meta and other companies active in the tech sector," finding that the "evidence did not confirm [the Commission's] initial concerns" with the agreement.  *See* European Commission, *Daily News 19/12/22* (Dec. 19, 2022), https://ec.europa.eu/commission/presscorner/detail/en/mex_22_7832 (last accessed February 1, 2023).  Additionally, the United States Department of Justice's recent complaint against Google does not include any claims for relief based on the NBA.  Compl., *United States v. Google LLC*, 1:23-cv-00108 (E.D. Va. Jan. 24, 2023), ECF No. 1.

"exclud[ed] rival bidders."  *Compare* State Plaintiffs' Third Amended Complaint, ECF No. 195

("States' TAC") ¶¶ 413, 441, *with* Compl. ¶¶ 286-89.

The Court already has held that "offering favorable terms to a large potential customer,

such as Facebook . . . does not convert the agreement into an unreasonable restraint of trade," but

instead, is "entirely consistent with competition."  MTD Op., at 25-26.  Advertisers' focus on

how allegedly favorable terms for Meta impacted rival bidders does not correct any of the

shortcomings that the Court identified in State Plaintiffs' claim or make Advertisers' claim any

more viable.  As the Court pointed out, there is "'nothing anticompetitive in the simple fact that a

seller selectively cuts its prices, or offers other favorable terms, to some of its dealers, *even*

*though such discrimination harms the non-favored dealers*.'"  MTD Op., at 26 (emphasis added)

(quoting *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 529 (1st Cir. 1989)).[5]

### B. Advertisers Fail to Plausibly Allege a Market for Google's Final Clearinghouse Auctions.

Advertisers do not allege that any NBA-related agreements are *per se* unlawful, so Count

III should be analyzed under the rule of reason.  *See Mooney v. AXA Advisors, L.L.C.*, 19 F.

Supp. 3d 486, 498 (S.D.N.Y. 2014) (analyzing claims under rule of reason where plaintiff "was

---

[5] In their motion for leave to amend, Advertisers attempt to characterize the terms of the NBA as anticompetitive "[a]uction rules and procedures," ECF No. 317 at 5-8, invoking case law that has little bearing on their claims and allegations. For example, Advertisers' reliance on *Bale v. Glasgow Tobacco Bd. of Trade, Inc.*, 339 F.2d 281 (6th Cir. 1964) is misplaced. *Glasgow* involved what effectively was a horizontal restraint regarding how much new entrants could sell in competition with incumbent providers in tobacco auctions.  *Id.* at 284-86, 288 n.3; *see also Bale v. Glasgow Tobacco Bd. of Trade, Inc.*, 223 F. Supp. 739, 745-46 (W.D. Ky. 1963), *aff'd*, 339 F.2d 281 (6th Cir. 1964) ("[T]he Board and its members have sought to place impediments and hazards in the way of persons who might seek to become new business competitors.").  By contrast, Advertisers are challenging what this Court has already held is a predominantly vertical agreement between an auctioneer and bidder that promotes competition by enabling and committing the bidder to bid aggressively.  MTD Op., at 28-29.  Unlike the restrictions in *Glasgow*, 339 F.2d at 284, 286-87, none of the terms of the NBA highlighted by Advertisers restrain how much other bidders can participate or how much they can bid in Google's auctions.  The other cases Advertisers cite likewise do not support their Section 1 claim. *See, e.g.*, *Smith v. Ullman*, 58 Md. 183 (Md. App. Ct. 1882) (question of state contract law); *Gainesville Oil & Gas Co. Farm Credit Bank of Tex.*, 847 S.W.2d 655 (Tex. App. 1993) (question of state property law); *United States v. Aiyer*, 33 F.4th 97 (2d Cir. 2022) (horizontal price fixing and bid rigging; *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55 (S.D.N.Y. 2021) (horizontal price fixing).

17

not pursuing a per se theory"); Compl. ¶¶ 286-94, 365-72.  Under that standard, Advertisers have the burden to define a relevant market and show an adverse effect on competition in that market. *See Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 360 (S.D.N.Y. 2018).

Advertisers attempt to distinguish their Section 1 NBA claims from the ones the Court already dismissed by alleging that the NBA harmed a different market than the one State Plaintiffs identified.  While the States alleged the harmed market was one for "in-app networks," Advertisers claim the harmed market is "open display and in-app ad impressions traded in Google's final clearinghouse auctions" ("FCA").  *Compare* MTD Op., at 33, *with* Compl. ¶¶ 54 n.1, 294.  Adding this new relevant market does not salvage their claims because, as discussed above, the Court already rejected these claims on the grounds that differential treatment is not anticompetitive, a ruling grounded in bedrock antitrust principles that apply in any market.

In addition, Advertisers' market definition fails.  Advertisers allege no facts regarding reasonable interchangeability, substitutability, or cross-elasticity of demand to support their Google FCA market definition.  *See Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (explaining that an alleged market is "legally insufficient" where the plaintiff fails to define the market with reference to "reasonable interchangeability" and "cross-elasticity of demand," or omits "interchangeable substitute products."); *see also Concord Assocs., L.P. v. Ent. Props. Tr.,* 817 F.3d 46, 55 (2d Cir. 2016) (similar).  Indeed, advertisers mention the purported Google FCA "market" only twice in their factual allegations.  *See* Compl. ¶¶ 54 n.1, 294.  They fail to explain why the relevant market excludes any non-Google auctions or other avenues of buying web or in-app ad impressions, despite acknowledging that there are several other ways (including header bidding auctions) to buy display web or in-app ad inventory beyond Google's auctions.  *See, e.g.*, Compl. ¶ 282 (describing Google's Open Bidding auctions as taking market

18

share from header bidding).  They also concede that auctions occur on non-Google mediation platforms like ironSource, Pubmatic, or Applovin.  *See id.* ¶ 52 (noting that app developers use "one or more in-app mediation services").  Advertisers fail to explain why advertisers could not turn to these alternatives to Google's FCA to buy web and in-app ad impressions, and that failure dooms their proposed market definition.  *See, e.g.*, *Chapman*, 546 F.3d at 238 ("[W]here the plaintiff . . . alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products . . . the relevant market is legally insufficient.").  Single-brand markets are inherently suspect, *see Mooney*, 19 F. Supp. 3d at 500 ("[A]bsent allegations explaining why such a [single-brand] market definition is plausible, courts in this district consistently reject single-brand markets."), and this one fails.

## IV. ALLEGATIONS REGARDING CONDUCT THAT "CREATED THE CONDITIONS" FOR GOOGLE'S MONOPOLIZATION SHOULD BE DISREGARDED.

Advertisers plead a laundry list of alleged "anticompetitive and deceptive acts."  This includes the allegation that Google "laid the groundwork for the more recent conduct in its monopolization scheme" by "leveraging its dominance in search advertising."  Compl. ¶ 167.  The list also includes long-ago acquisitions.  Although Advertisers do not specifically name this conduct in their monopolization and attempted-monopolization counts, those counts are based on "the conduct alleged herein, including [specified conduct]." *Id.* ¶¶ 353, 361.  To the extent that Advertisers intend this so-called leveraging or Google's acquisitions to form a basis for liability (*i.e.*, "conduct alleged herein"), such claims should be dismissed.[6]

---

[6] If Advertisers do not assert liability based on this conduct, they should not be permitted to expand the case by insulating non-actionable conduct with the label "background" and then insisting they are entitled to discovery on it.

A. **Leveraging Claims Involving Google's Search Business Fail as a Matter of Law.**

Advertisers allege that Google leverages its Search business through two types of conduct: (1) providing a single user interface for search and display advertising, *id.* ¶ 181; and (2) preventing advertisers from exporting Search data to non-Google ad-buying tools, *id.* ¶¶ 177, 181.  Advertisers also allege that Google "leverages" "other data" by hashing user IDs.  *Id.* ¶¶ 184-86.  Taking these alleged acts together or separately, Advertisers fail to make a plausible claim of monopoly leveraging.

A "monopoly leveraging" claim requires, at the bare minimum, allegations of anticompetitive conduct.  *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004) ("[L]everaging presupposes anticompetitive conduct."); *see also A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 250 (S.D.N.Y. 2004) (("[A]nticompetitive conduct . . . is a necessary element of a monopoly leveraging claim.").  This anticompetitive conduct must involve taking (i) monopoly power in one market; (ii) to create a dangerous probability of monopolizing a second market; and (iii) injury.  *N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.,* 323 F. Supp. 2d 559, 572-73 (S.D.N.Y. 2004).  No alleged leveraging act is anticompetitive, and so the claims must fail.

**Providing a Single User Interface For Search and Display Advertising.**  Advertisers allege that, "[w]hen an advertiser establishes a Google Ads account to use in placing search advertisements, Google Ads is set as the default account for placing both search *and* display advertisements."  Compl. ¶ 181 (emphasis in original).  This is not anticompetitive activity. Providing two products at the same time, without allegations of below-cost pricing, is not anticompetitive and can indeed be procompetitive. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 906-07 (9th Cir. 2008); *Ortho Diagnostic Sys., Inc. v. Abbott Lab'ys., Inc.*, 920 F.

20

Supp. 455, 467-69 (S.D.N.Y. 1996).  Offering search and display ads in a single user interface, even as a "default," Compl. ¶ 181, does not force anyone to actually use Google Ads for display advertising.  Thus, providing a single user interface through which a user may purchase either search or display advertising, or both if it so chooses, does not amount to anticompetitive activity on a bundling, pricing, or tying theory.

**Failure to Give Data to Others.**  Advertisers also complain that Google "leveraged" its Search business because Google "restricts access to data relating to web searches performed on Google Search" from advertisers using rival service providers for their display advertising.  *Id*. They also allege that Google does not allow advertisers to export data regarding Google Search advertising to other platforms, "prevent[ing] advertisers from switching away from Google Ads." *Id.*  This conduct cannot support a leveraging claim because it is not anticompetitive: Google is under no obligation to share Search data with anyone else, and its failure to do so does not amount to an anticompetitive refusal to deal.  As this Court stated, "the Supreme Court has warned against a reading of Section 2 that would require a monopolist to provide information or assistance to its competitors."  MTD Op. at 42.

**Allegations Regarding Encrypting User IDs Repeat Claims Already Dismissed by This Court.**  Advertisers' list of alleged "anticompetitive and deceptive acts" also includes allegations that Google encrypts its user IDs.  Compl. ¶¶ 166, 184-85.  These mimic the claims that were already dismissed by this Court, MTD Op. at 40-44, and should be dismissed here as well.  The Court concluded that, as alleged by the States, Google's encryption of user IDs is not an antitrust violation.  *See id*.  First, it reasoned that nothing in the States' complaint suggested encrypting user IDs was a pretext for gaining monopoly profits.  *Id.* at 41.  Second, it explained that, because there is no duty to deal with rivals, the States failed to allege that Google foreclosed

competition. *Id.* at 42-43.  Third, the Court found the States failed to show that Google's decision to encrypt user IDs was anything more than "an immediately profitable business strategy that also presented the perception or reality of enhanced consumer privacy." *Id*. at 44.

Advertisers merely reiterate portions of the States' dismissed claims pertaining to encryption of user IDs, addressing none of the issues in the Court's Opinion & Order.  Like the States, Advertisers fail to allege any harm to competition as a result of Google encrypting user IDs.  Advertisers' only pleaded harm is limited to a hypothetical risk that advertisers using multiple buying tools will inadvertently bid against themselves in ad exchange transactions. Compl. ¶ 185.  They plead no elements of an actionable refusal to deal.  And they say absolutely nothing about Google's motivation to promote privacy interests by encrypting user IDs or about Google's desire to engage in a profitable business strategy. *See* MTD Op., at 41 (discussing how the States had not explained why encryption of user IDs "was not an innovation that consumers rightly or wrongly preferred").

### B.  Claims Based on Google's Acquisitions are Time-Barred.

Advertisers also allege that several acquisitions by Google between 2007 and 2014 were "instrumental to the first part of Google's monopolistic scheme."  Compl. ¶¶ 167, 171.  These allegations are time-barred and, to the extent Advertisers intend to base liability on these acquisitions, should be dismissed.

Advertisers filed suit on May 27, 2020, Compl. ¶ 321, and thus may only seek damages for a cause of action that accrued after May 27, 2016.  *See* 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  Advertisers allege no theory to extend the limitations period as to these acquisitions, only asserting vaguely that "for each category of conduct described, Google's conduct continued into and throughout the limitations period." Compl. ¶ 321.  This comes nowhere near the pleading standard for a "continuing violation,"

which requires Advertisers to plead some "new and independent act that is not merely a reaffirmation of a previous act" and which "inflict[s a] new and accumulating injury."  *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 67-69 (2d Cir. 2019).  The combination and continued operation of products is not a new and independent act because "the continued existence of [a] merged entity is not a continuing violation: It is simply the natural unabated inertial consequence of the merger."  *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004); *see also Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599 (6th Cir. 2014); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 995 (N.D. Cal. 2020) (finding it "not appropriate to apply the continuing violation doctrine" in the context of plaintiffs' Section 2 claim).

## V.   HANSON LACKS STANDING TO CHALLENGE CONDUCT THAT OCCURRED AFTER SEPTEMBER 2016 AND LACKS STANDING TO PURSUE INJUNCTIVE RELIEF

Named Plaintiff Christopher Hanson further lacks standing to assert claims based on any alleged conduct that occurred after Hanson Law Firm stopped "pay[ing] Google to broker the placement of its display advertisements" on September 6, 2016.  Compl. ¶¶ 14-15.  Hanson does not allege that the dissolved law firm or its assignee Mr. Hanson paid for or used any allegedly affected products, services, or advertisements after this date.

Hanson alleges that line-item caps, redaction of auction data, UPRs, and the NBA all occurred *after* Hanson Law Firm's ad purchases.  *See* Compl. ¶ 275 (line-item caps and auction data redaction began in 2018); ¶ 254 (UPRs began in 2019); ¶ 286 (NBA became effective in September 2018).  Hanson Law Firm cannot possibly have been injured by practices that post-date its use of ad tech.

Nor does Hanson have standing to seek injunctive relief against any conduct because it has no threat of any future injury.  "Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury.'"  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Past injuries "do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way."  *Nicosia,* 834 F.3d at 239. Mr. Hanson cannot make this showing, because (i) the entity that was allegedly harmed, Hanson Law Firm, no longer exists (*see* Compl. ¶ 14); and (ii) there is no allegation that anyone affiliated with Hanson Law Firm, Hanson Law Office, or Christopher Hanson is likely to buy any affected product or service again.  *See Nicosia*, 834 F.3d at 239 (finding no likelihood of future or continuing harm from Amazon's practices where plaintiff failed to allege that it would use Amazon to buy any products again in the future).

## VI.   ALL BUT ONE OF THE NAMED ADVERTISER PLAINTIFFS ARE BOUND TO ARBITRATE.

Even were Advertisers to state a claim, five of the six named Advertiser Plaintiffs—Vitor Lindo, Cliffy Care Landscaping, Kinin, Raintree Medical and Chiropractic Center, and Rodrock Chiropractic—"agree[d] to arbitrate all disputes and claims . . . that arise out of or relate in any way to" Google's advertising programs, and each declined to opt out of arbitration.  Shadd Decl., Exs. A, D, & E at § 13(A) & (F); Shadd Decl. ¶¶ 13, 15-19.  These valid agreements cover the entire dispute here.  The Court should therefore dismiss those Advertiser Plaintiffs' claims in their entirety pursuant to Rules 12(b)(3) and 12(b)(6).  In the alternative, Google moves for an order compelling those Plaintiffs to arbitrate their claims as agreed.

### A.   The Court May Consider the Shadd Declaration and Google's Terms of Service Evidencing Advertiser Plaintiffs' Agreement to Arbitrate.

Whether proceeding under Rule 12(b)(3) or 12(b)(6), the Court may consider Google's Advertising Program Terms of Service in deciding this motion.[7]  On a Rule 12(b)(3) motion, the Court may consider facts outside the pleadings.  *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 375 (S.D.N.Y. 2010), *aff'd on other issues*, 647 F.3d 472 (2d Cir. 2011)); *see also Alvater Gessler v. Sobieski Destylarnia*, 572 F.3d 86, 89 (2d Cir. 2009).  On a Rule 12(b)(6) motion, the Court may consider documents integral to and relied upon in the complaint, even if not attached or incorporated by reference.  *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005).  For example, in *Nicosia v. Amazon.com*, the plaintiff sued under the Consumer Product Safety Act after purchasing a weight-loss product from Amazon.  834 F.3d at 227.  The Second Circuit found the district court properly considered Amazon's Order Page and Conditions of Use (in the form used at the time of purchase), because they were "an embodiment of the contract made between Nicosia and Amazon" when the plaintiff purchased the disputed product, "and thus integral to the complaint."  *Id.* at 234.

The Terms of Service here too are an "embodiment" of the contract between the named Advertiser Plaintiffs and Google.  Specifically, the Complaint alleges that each named Plaintiff purchased display advertising inventory through Google Ads or "paid Google directly to broker the placement of . . . display advertisements on third-party websites[.]"  Compl. ¶¶ 14-32, 355, 362, 370, 376, 387, 389, 390.  The Terms of Service govern those purchases, and an advertiser cannot purchase display advertising through Google unless and until it has agreed to Google's Terms of Service.  Shadd Decl. ¶ 3.  In this way, the Terms are integral to the Complaint.

---

[7] To the extent the Court has concerns about considering the Terms on a motion to dismiss, it can surely consider them on a motion to compel arbitration, which Google seeks in the alternative here.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (noting courts apply a standard similar to summary judgment in deciding motions to compel arbitration and consider "all relevant, admissible evidence submitted by the parties"); *Cal. Crane Sch., Inc. v. Google LLC*, 2022 WL 3348425, at *3 (N.D. Cal. Aug. 12, 2022) (considering Google's Terms of Service and accompanying declaration in deciding Google's motion to compel arbitration).

In addition to documents "integral" to the complaint, the Court may consider matters of which judicial notice may be taken, including facts not subject to reasonable dispute which can be accurately and readily determined from sources whose accuracy cannot be questioned. *Figueroa v. Garland*, 2022 WL 17539114, at *6 (S.D.N.Y. Dec. 6, 2022).  Several courts have found Google's Terms of Service, and related documents, meet this standard.  *Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 876 (N.D. Cal. 2018) (citing Fed. R. Evid. 201), *aff'd*, 816 F. App'x 68 (9th Cir. 2020); *Cal. Crane Sch.*, 2022 WL 3348425, at *1 n.1.  Recently, another court in this district determined that YouTube's terms of service were subject to judicial notice when resolving a motion to dismiss.  *Bus. Casual Holdings, LLC v. YouTube, LLC*, 2022 WL 837596, at *1 n.2 (S.D.N.Y. Mar. 21, 2022).  Google requests this Court do so as well and take judicial notice of the Terms of Service authenticated by the attached Declaration of Courtney Shadd.

### B.  The Federal Arbitration Act Requires Arbitration Here.

The Federal Arbitration Act ("FAA") reflects a "liberal federal policy favoring arbitration."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  It creates a presumption of arbitrability, providing that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "[C]ourts must rigorously enforce arbitration agreements according to their terms."  *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013).  A dispute is arbitrable under the FAA if (1) a valid and enforceable agreement exists between the parties, and (2) the dispute falls within the scope of the arbitration agreement. *Meyer v. Uber Techs.*, 868 F.3d 66, 73 (2d Cir. 2017).

**1. Five of the Named Advertiser Plaintiffs Agreed to a Valid and Enforceable Arbitration Agreement in Google's Terms of Service.**

Five of six named Plaintiffs agreed to Google's Terms of Service and, in doing so, "agree[d] to arbitrate all disputes and claims . . . that arise out of or relate in any way to" Google's advertising programs.  Shadd Decl., Exs. A, D, & E at § 13(A).

This arbitration agreement is valid, enforceable, and not unconscionable.  Under California law,[8] "a contractual clause is unenforceable only if it is both procedurally and substantively unconscionable." *Trudeau*, 349 F. Supp. 3d at 877.  The party opposing arbitration has the burden of establishing unconscionability.  *Sonic-Calabasas A, Inc. v. Moreno*, 311 P.3d 184, 205 (Cal. 2013).  The "threshold inquiry in California's unconscionability analysis is whether the arbitration agreement is adhesive." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016).  An "arbitration agreement is not adhesive if there is an opportunity to opt out of it." *Id.*  Here, Google's Terms allow advertisers to opt out of the arbitration provision within 30 days, and provide a mechanism for doing so.  Shadd Decl., Exs. A, D, & E at § 13(F).  The five named Plaintiffs did not avail themselves of this opportunity.  Shadd Decl. ¶¶ 13, 15-19.  Because of this voluntary opt-out procedure, the arbitration clause in Google's Terms has been found to be "not procedurally unconscionable and thus not unconscionable." *See, e.g.*, *Trudeau*, 349 F. Supp. 3d at 877; *Cal. Crane Sch.*, 2022 WL 3348425, at *3.  Because the arbitration agreement is not procedurally unconscionable, the Court need not reach the issue of whether the agreement is also substantively unconscionable.  *See Mohamed*, 848 F.3d 1211 ("Because the agreements were not procedurally unconscionable, and because both procedural and substantive unconscionability must be present in order for an agreement to be unenforceable, we need not

---

[8] The Terms provide that "all claims arising out of or relating to" the terms or Google's advertising programs "will be governed by California Law[.]"  Shadd Decl., Exs. A, D, & E at § 14 (emphasis omitted).

reach the question whether the agreements here were substantively unconscionable.").  But, even if it did, the agreement is not "so one-sided as to shock the conscience."  *See Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217, 1232 (Cal. 2012) ("A contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be so one-sided as to shock the conscience." (internal quotation marks omitted)).

### 2. Advertisers' Claims Fall Within Scope of the Broad Arbitration Agreement.

The arbitration agreement here is "broad," creating a "presumption of arbitrability." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 224 (2d Cir. 2001); *See* Shadd. Decl., Exs. A, D, & E at § 13(A) ("This agreement to arbitrate . . . is intended to be broadly interpreted[.]").  With exceptions not applicable here, the arbitration agreement in the Terms applies to "all disputes and claims" under "any legal theory" that "arise out of or relate in any way" to Google's advertising programs.  Shadd. Decl., Exs. A, D, & E at § 13(A). Advertisers' claims are clearly within the scope of the agreement because the injury each Advertiser purportedly suffered flowed from their use of Google's advertising programs.  *See* Compl. ¶¶ 14-32, 355, 362, 370, 376, 387, 389, 390; *see also Spinelli v. NFL*, 96 F. Supp. 3d 81, 104 (S.D.N.Y. 2015) (finding that, because the alleged damages "flowed" from agreements with Defendants, "any assertion that the antitrust claims are not sufficiently connected to the [agreements] to be arbitrable must fail"); *Cal. Crane Sch.*, 2022 WL 3348425, at *2-3 (finding the same arbitration clause encompassed plaintiffs' antitrust claims); *TradeComet.com*, 435 F. App'x at 35 (affirming that antitrust claims were subject to Google Terms' forum selection clause with similarly broad language because the claims arose out of or related to Google's AdWords program).

### C.  No Exception or Exclusion Applies to California-Law Injunctive-Relief Claims as Advertisers Do Not Seek "Public Injunctive Relief."

Some Advertiser Plaintiffs previously invoked their prayer for injunctive relief as a means to avoid arbitration of their California Unfair Competition Law claims.  Under California law, an arbitration provision that purports to waive the right to request "public injunctive relief" in any forum is invalid and unenforceable.  *Cal. Crane Sch.*, 2022 WL 3348425, at *3 (citing *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017)).  "Public injunctive relief" is "prospective injunctive relief that aims to restrain future violations of law for the benefit of the general public as a whole, rather than a discrete subset of similarly situated persons." *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 548 (9th Cir. 2021)).  "Relief that incidentally benefits the public does not suffice to convert private relief to public relief." *Id.* at 549. (citing *McGill*, 393 P.3d at 89-90).

Advertisers do not seek "public injunctive relief" via their Unfair Competition Law claim.[9]  As in *California Crane School*, Advertisers' claims primarily seek relief "on behalf of themselves and all others similarly situated[,]" Compl. ¶ 1, on the grounds that they "pa[id] anticompetitive overcharges as a result of Defendants' conduct." *Id.* ¶¶ 370, 376.  Conclusory allegations about harm to American citizens, *id.* ¶¶ 319-20, and tacked-on claims seeking injunctive relief to "benefit the public," *id.* ¶¶ 356, 405, do not transform otherwise "paradigmatic 'representative claims' that would primarily benefit a discrete set of similarly-situated persons—namely, individuals or entities that have paid to advertise on Google's services." *Cal. Crane Sch.*, 2022 WL 3348425, at *4.  Advertisers "cannot evade [their] plainly

---

[9] Named Plaintiff Vitor Lindo (as well as Hanson Law Office) also lacks standing to seek injunctive relief—public or otherwise—because he ceased using Google products long ago and does not allege he might begin again. *See Nicosia*, 834 F.3d at 239. Thus, his claim should be dismissed in favor of arbitration even if other Plaintiffs plausibly sought public injunctive relief (which they do not).

valid arbitration agreement[s] by tacking on the label of 'public injunctive relief.'"  *Id.*

Moreover, even if the Court found certain claims under California law non-arbitrable, the

appropriate remedy is to sever those claims rather than invalidate the entire arbitration

agreement.  *See Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995).

### D.  Advertisers Must Arbitrate with Alphabet as Well as With Google.

To the extent Advertisers maintain claims against Alphabet Inc., those claims must also

be arbitrated.  The arbitration agreement expressly applies to claims brought against "Google" as

well as "Google parent companies[.]"  Shadd Decl., Exs. A & E at § 13(A)(4); *id.*, Ex. D at §

13(A)(iv).  Further, Advertisers' Complaint refers to Google LLC and Alphabet Inc. together

collectively as "Google" and makes no attempt to differentiate between the functions of Google

LLC and Alphabet Inc.  Compl.  ¶ 35.  Advertisers are therefore estopped from arguing they are

not obligated to arbitrate claims against Alphabet Inc.  As this Court found in *Meridian*

*Autonomous Inc. v. Coast Autonomous LLC*, "where a plaintiff treats the defendants, some of

which are signatories and some of which are non-signatories, 'as a single unit in its complaint[,

the plaintiff] is estopped from claiming that the current signatories [to the arbitration clause] are

distinct from the [non-signatory] defendants.'"  2018 WL 4759754, at *4 (S.D.N.Y. Sept. 30,

2018) (quoting *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198

F.3d 88, 98 (2d Cir. 1999)) (alterations in original); *see also Meridian Autonomous Inc. v. Coast*

*Autonomous LLC*, 2020 WL 496078, at *2 (S.D.N.Y. Jan. 30, 2020).

### CONCLUSION

For the foregoing reasons, Google respectfully requests that this Court dismiss the federal

antitrust claims (Counts I through III and V) in the Consolidated Advertiser Class Action

Complaint, as well as all claims by five of the six named Advertiser Plaintiffs who agreed to

arbitrate such claims.

Dated: February 3, 2023

Respectfully Submitted,

*/s/ Justina K. Sessions*
Justina K. Sessions
Jonathan Jacobson
Jessica Lonergan
Mikaela Evans-Aziz (admitted *pro hac vice*)
Vadim Egoul
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
(415) 947-2000
jsessions@wsgr.com
jjacobson@wsgr.com
jlonergan@wsgr.com
mevansaziz@wsgr.com
vegoul@wsgr.com

Eric Mahr
Julie Elmer
Andrew J. Ewalt (admitted *pro hac vice*)
Jan Rybnicek (admitted *pro hac vice*)
Lauren Kaplin
Robert J. McCallum
FRESHFIELDS BRUCKHAUS DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
julie.elmer@freshfields.com
andrew.ewalt@freshfields.com
jan.rybnicek@freshfields.com
lauren.kaplin@freshfields.com
rob.mccallum@freshfields.com

John Harkrider
Daniel Bitton
Bradley Justus (admitted *pro hac vice*)
Koren Wong-Ervin (admitted *pro hac vice*)

AXINN, VELTROP & HARKRIDER
LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
jharkrider@axinn.com
dbitton@axinn.com
bjustus@axinn.com
kwongervin@axinn.com

*Counsel for Defendants Google LLC and
Alphabet Inc.*