UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | No. 21-MD-3010 (PKC) |

*This Document Relates To:*

| | |
|---|---|
| **IN RE GOOGLE DIGITAL PUBLISHER LITIGATION** | No. 1:21-cv-7034 (PKC) |

## DEFENDANTS GOOGLE LLC, ALPHABET INC., AND YOUTUBE LLC'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PUBLISHERS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Fax: (202) 777-4555

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Fax: (212) 728-2201

*Counsel for Defendants Google LLC,
Alphabet Inc., and YouTube LLC*

WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Fax: (415) 947-2099

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

TABLE OF ABBREVIATIONS .............................................................................................. v

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

LEGAL STANDARD .............................................................................................................. 3

ARGUMENT .......................................................................................................................... 4

      I.      GOOGLE'S MINIMUM BID TO WIN SERVICE IS NOT
             ANTICOMPETITIVE. ................................................................................ 4

      II.     PUBLISHERS FAIL TO ALLEGE THAT GOOGLE "POLICING
             MALICIOUS CODE" HARMED COMPETITION. ............................................ 7

      III.    PUBLISHERS CANNOT REVIVE A CLAIM REGARDING
             ENCRYPTING USER IDS BY LABELING THE PRACTICE A
             "TIE." ......................................................................................................... 10

      IV.    PUBLISHERS' TYING CLAIMS INVOLVING GOOGLE'S
             SEARCH BUSINESS FAIL AS A MATTER OF LAW. ................................... 11

      V.     PARTIAL DISMISSAL OF PUBLISHERS' CLAIMS IS
             APPROPRIATE ......................................................................................... 13

CONCLUSION ...................................................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................................................3

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................................3

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) ..............................................................................4

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
    996 F.2d 537 (2d Cir. 1993) ..............................................................................8

*Charych v. Siriusware, Inc.*,
    790 Fed. App'x 299 (2d Cir. 2019) ...................................................................6

*City of Long Beach v. Total Gas & Power N. Am., Inc.*,
    465 F. Supp. 3d 416 (S.D.N.Y. 2020) ..............................................................4

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) ...........................................................................................5

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
    36 F.3d 1147 (1st Cir. 1994) .............................................................................9

*E & L Consulting, Ltd. v. Doman Indus.*,
    472 F.3d 23 (2d Cir. 2006) ...........................................................................8, 12

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*,
    129 F.3d 240 (2d Cir. 1997) ..............................................................................8

*FTC v. Facebook, Inc.*,
    560 F. Supp. 3d 1 (D.D.C. 2021) ......................................................................6

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*,
    2016 WL 6110565 (S.D.N.Y. Aug. 4, 2016) (Castel, J.) ..................................3

*IBM Corp. v. Platform Sols., Inc.*,
    658 F. Supp. 2d 603 (S.D.N.Y. 2009) ..............................................................6

*In re Adderall XR Antitrust Litig.*,
    754 F.3d 128 (2d Cir. 2014) ...........................................................................6, 9

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
    343 F. Supp. 3d 94 (E.D.N.Y. 2018) ..........................................................13, 14

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) ................................................................................6

iii

*In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.*,
    2010 WL 882989 (S.D.N.Y. Mar. 5, 2010) (Castel, J.)................................12

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ................................................................12

*John's Insulation, Inc. v. Siska Constr. Co.*,
    774 F. Supp. 156 (S.D.N.Y. 1991) ........................................................9

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d. Cir. 2016)..........................................................10, 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..............................................................................5

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ............................................................9

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998)..........................................................................8, 9

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007) ................................................................9

*Rebotix Repair LLC v. Intuitive Surgical, Inc.*,
    2021 WL 1227593 (M.D. Fla. Mar. 8, 2021) .......................................11

*Schwartz v. Eaton*,
    264 F.2d 195 (2d Cir. 1959).................................................................13

*Spinelli v. NFL*,
    903 F.3d 185 (2d Cir. 2018)...............................................................8, 9

*Unijax, Inc. v. Champion Int'l*,
    683 F.2d 678 (2d Cir. 1982) ...............................................................11

*United States v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016) ...............................................................13

*Valassis Commc'ns, Inc. v. News Corp.*,
    2019 WL 802093 (S.D.N.Y. Feb. 21, 2019)........................................14

**Statutes**

15 U.S.C. § 1 ................................................................................................8

15 U.S.C. § 2 ...................................................................................4, 5, 6, 7,
    8, 14

**Other Authorities**

Federal Rules of Civil Procedure 12(b)(6)................................................1, 3

## TABLE OF ABBREVIATIONS

| Term | Definition |
|------|------------|
| AdX | Google's Ad Exchange |
| Complaint | First Amended Consolidated Class Action Complaint, ECF No. 408 |
| DFP | DoubleClick for Publishers |
| GDN | Google Display Network |
| Google | Google LLC, Alphabet Inc., and YouTube LLC |
| MBW | Minimum Bid to Win |
| MTD Op. | Opinion and Order, ECF No. 308 |
| Search | Google Search |
| States | State Plaintiffs |
| States' TAC | State Plaintiffs' Third Amended Complaint, ECF No. 195 |

Pursuant to Federal Rules of Civil Procedure 12(b)(6), Defendants Alphabet Inc., Google LLC, and YouTube LLC move for an order dismissing certain of the federal antitrust claims in Counts I and II of the Publishers' First Amended Consolidated Class Action Complaint ("Complaint"), ECF No. 408.  Consistent with the stay of the state law claims (Counts III and IV) ordered on November 18, 2022, *see* ECF No. 392, ¶¶ 4-5, Google does not currently move to dismiss those claims and reserves all rights with respect to them.

## INTRODUCTION

Google has been, and continues to be, an innovator in digital advertising.  It has developed products that facilitate high-quality matches between publishers and advertisers.  Google develops these ad tech products for the benefit of its customers and to help the open web flourish.  Its products provide a safe and secure environment for publishers, advertisers, and users to achieve their end-goals.  Antitrust law does not, and should not, hinder those efforts.

Nonetheless, a putative class of publishers have jumped onto a bandwagon of lawsuits seeking to capitalize on skepticism of Google's advertising technology and animus towards tech generally.  Publishers criticize Google for developing products and policies that benefit its customers and users, rather than its rivals.  They pretend that Google is obligated to allow its rivals to use malicious code on its platform.  They believe that Google should not be allowed to offer customers that buy search ads the option of also buying display ads.  They also believe that Google should avoid protecting users' privacy when doing so impacts Publishers' bottom line.  The Sherman Act imposes no such obligations on Google, nor does it raise concerns about the type of conduct Publishers assail.

Publishers' allegations largely recycle those comprising the States' claims, including those which have been already dismissed by this Court.  Hoping to escape this Court's clear rulings on Google's motion to dismiss the States' federal antitrust claims, Publishers insist that their new allegations "clarify" Google's allegedly anticompetitive behavior.  ECF No. 321, at 7-8.  But reframing the same conduct under a different label does not transform legitimate behavior into actionable behavior.

Publishers' new claims (claims which the States chose not to assert) should also be dismissed.  They attack Google's Minimum Bid to Win service, but that conduct is not exclusionary—it simply makes advertisers better informed, which Publishers assert means they make less money.  Publishers also criticize Google's attempts to prevent malicious code on its ad server, but fail to allege that this legitimate safety practice had any effect on competition.  Finally, they challenge various programs making it easier for Google's search ad customers to also buy display ads but again fail to show that these product features affect competition in any relevant market.

## BACKGROUND[1]

The six named plaintiffs are publishers that sell space on their websites for advertisers to place digital display ads.  Compl. ¶ 6.  Plaintiffs use Google's publisher *ad server* products.  *Id.* ¶¶ 46-51.  Some plaintiffs, like The Nation Company, LLC, Sterling International Consulting Group, The Progressive, Inc., JLaSalle Enterprises LLC, and Mikula Web Solutions, Inc., also participate in the Google Display Network ("GDN"), which Publishers characterize as Google's *ad network*.  *Id.* ¶¶ 47-51.

---

[1] For purposes of this motion to dismiss, Google assumes the truth of the well-pleaded allegations in the Amended Complaint.  Google expects to contest many of those allegations in the future.

Publishers challenge a range of Google's practices related to its ad tech products, on behalf of themselves and a putative class of publishers.  Some of their claims relate to Google's practices that have already been dismissed from the States' case.  *See* MTD Op., ECF No. 308 ("MTD Op.").  This motion addresses claims regarding: (1) Google's Minimum Bid to Win service; (2) Google policing of problematic code; (3) Google's encryption of user IDs; and (4) alleged "bundling" or "tying" involving Google's Search business.  Publishers' conduct allegations are summarized in each relevant argument section, below.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To do so, the complaint must make factual allegations sufficient to "raise a reasonable expectation that discovery will reveal evidence," *Twombly*, 550 U.S. at 556, that would "allow[] the court to draw the reasonable inference that the defendant is liable."  *Iqbal*, 556 U.S. at 678.  It is "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration in original) (citations omitted).  "In assessing the sufficiency of the complaint, a court must disregard legal conclusions, because they are not entitled to the presumption of truth."  *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, 2016 WL 6110565, at *4 (S.D.N.Y. Aug. 4, 2016) (Castel, J.).  Rather, the Court "must examine the well-pleaded factual allegations 'and then determine whether they plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).

## ARGUMENT

### I.   GOOGLE'S MINIMUM BID TO WIN SERVICE IS NOT ANTICOMPETITIVE.

Publishers criticize Google's Minimum Bid to Win ("MBW") service because it allegedly makes Google's advertising customers better informed.  This, according to Publishers, allowed advertisers bidding through Google's ad exchange ("AdX") to win impressions with the lowest bid possible.  Compl. ¶ 343.  According to Publishers, advertisers voluntarily submitted their bids to Google for use in developing the MBW algorithm.  *Id.*  Google "amass[ed] bidding data on all Ad Exchanges and then shared that data through its Ad Buying Tools with Google's advertisers to inform Google's advertisers' bidding."  *Id.* ¶ 346.  Google (or advertisers) could then "predict the minimum bid necessary" to win an auction for an impression.  *Id.* ¶ 347.  Publishers allege that Google's MBW service was popular: "[t]he informational advantage conveyed by Minimum Bid to Win drove advertisers to use Google's Ad Exchange and Ad Buying Tools . . . [and] deprived Header Bidding auctions of advertiser bidders."  Compl. ¶ 348. These allegations describe legitimate competition, not anticompetitive exclusion, and therefore cannot sustain a Section 2 claim.

Publishers' MBW allegations amount to a complaint that Google's product improvements benefitted its customers and led to more advertisers using its products.  They allege that Google's MBW service "optimiz[ed] results for Google's advertiser clients," Compl. ¶ 346, by "allow[ing] advertisers to bid confidently knowing that their bid will be no higher than needed to win a first-price auction."  *Id.*  ¶ 345.  But an "attempt to develop superior products is . . . an essential element of lawful competition" and "any firm, even a monopolist, may generally bring its products to market whenever and however it chooses."  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979); *see also City of Long Beach v. Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416, 446 (S.D.N.Y. 2020) ("Section 2 is not intended to punish 'the

proverbial inventor of the better mousetrap' or one who succeeds by virtue of a superior product or business acumen.  If it were, the statute would stifle legitimate business competition – the opposite of its goal."), *aff'd*, 2021 WL 5754295 (2d Cir. Dec. 3, 2021).  Publishers complain that Google's MBW service made Google's ad exchange and ad buying tools attractive as compared to header bidding.  Compl. ¶¶ 343, 348.  But that simply describes how Google competed against and gained sales from header bidding by offering a superior product to advertisers that lowered prices for them, something the antitrust laws are supposed to promote.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594 (1986) ("[C]utting prices in order to increase business often is the very essence of competition"); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 (1984) ("[A]n efficient firm may capture unsatisfied customers from an inefficient rival . . . This is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster."); MTD Op., at 37 ("Anticompetitive conduct must represent something more than business activity that occurs in the normal competitive process or fosters commercial success.").

Publishers also complain that advertisers can benefit from Google's MBW data only if they "place[] their bids on Google's Ad Exchange."  Compl. ¶ 343.  Since MBW is a Google service, that is hardly surprising, much less anticompetitive.  To the extent Publishers mean to suggest that Google has violated Section 2 by not sharing MBW data with header bidding rivals, they have failed to allege any facts that would support such an extraordinary refusal-to-deal claim.  "The Supreme Court has warned against a reading of section 2 that would require a monopolist to provide information or assistance to its competitors."  MTD Op., at 42.  In its rejection of States' attempt to require Google to share unencrypted user IDs with rivals, *see id.* at 42-44, this Court set out the limited facts under which a refusal to deal is actionable: "Following

*Trinko*, the Second Circuit has scrutinized refusal-to-deal claims by looking to whether the purported monopolist unilaterally terminated a voluntary and profitable course of dealing, as well as whether it chose to forsake short-term profits to achieve an anticompetitive end." *Id.* at 42-43 (citing *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014)); *see also Charych v. Siriusware, Inc.*, 790 Fed. App'x 299, 302 (2d Cir. 2019); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 53 (2d Cir. 2007).  No such facts are alleged here.

First, Publishers do not allege that Google has ever shared MBW data with header bidding rivals.  Rather, they allege that Google shared MBW data only with "Google's advertisers bidding in AdX (including where AdX participates in Exchange/Open Bidding auctions)"—in other words, "Google's advertiser clients."  Compl. ¶¶ 345-46.  "[B]ecause plaintiffs do not allege that defendants terminated any prior course of dealing—the sole exception to the broad right of a firm to refuse to deal with its competitors—the allegations are insufficient to state a unilateral-monopolization claim."  *In re Elevator Antitrust Litig.*, 502 F.3d at 52; *see also FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 24 (D.D.C. 2021) ("Facebook's general policy of withholding . . . access from competitors . . . was plainly lawful to the extent it covered rivals with which it had no previous, voluntary course of dealing.").

Second, Publishers do not allege that Google sacrificed short-term profits in favor of long-term monopoly profits by sharing MBW data only with Google's customers and not rivals.  To the contrary, they allege that "Google itself is among the buyers that benefit from the deflationary effect on publisher auction prices" from MBW.  Compl. ¶ 349; *see also In re Adderall XR Antitrust Litig.*, 754 F.3d at 134-35 (affirming dismissal where plaintiff failed to allege facts suggesting defendant sacrificed short-term profits); *IBM Corp. v. Platform Sols., Inc.*, 658 F. Supp. 2d 603, 613-14 (S.D.N.Y. 2009) (concluding that refusal to deal did "not

constitute anticompetitive conduct" when plaintiff failed to demonstrate that defendant "ha[d] foregone short term profits"). This Court concluded on similar grounds that States' allegations regarding Google's encryption of user IDs could not support a Section 2 claim. *See* MTD Op., at 43 ("The Complaint does not assert that Google has sacrificed short-term profits by refusing to share Google-encrypted user IDs with those not doing business with Google.").

## II.   PUBLISHERS FAIL TO ALLEGE THAT GOOGLE "POLICING MALICIOUS CODE" HARMED COMPETITION.

In addition to seeking to prevent Google from using or sharing historical bid data to help its advertiser customers, Publishers would like to second-guess Google's efforts to protect users and publishers from malicious code. With a committed "no good deed goes unpunished" approach, Publishers allege Google used "problematic code" as a pretext to exclude rival ad networks. Compl. ¶ 355. Publishers claim that Google would alert a publisher and a rival ad network that there were security issues with the rival ad network's code. *Id.* ¶ 355. Google's publisher ad server, DoubleClick for Publishers ("DFP"), would remove the code, which temporarily prevented the rival ad network from competing for impressions until the code was fixed. *Id.* Google provided the opportunity for the rival ad network to resubmit the code, but this required "work" and "labor" by the rival ad network and the Publishers. *Id.* Publishers claim this was a "recurring practice." *Id.* ¶ 356.

This claim fails because Publishers do not allege any facts showing harm to the alleged ad network market, the only market in which Publishers claim harm.[2] *See id.* ¶¶ 355-356. A viable claim under Section 2 must demonstrate "proof of harm to the whole market" because antitrust law was "enacted to ensure competition in general, not narrowly focused to protect

---

[2] Publishers' heading for this section mentions exclusion of ad exchanges, *see* Compl. heading IV.C.3, but the body of this section of the complaint discusses ad networks only and not ad exchanges.

individual competitors." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (affirming dismissal of Section 1 and 2 claims for failure to allege harm to competition); *E & L Consulting, Ltd. v. Doman Indus.*, 472 F.3d 23, 31 (2d Cir. 2006) ("A viable claim under Section 2 [] must []show a harm to competition."); MTD Op., at 37 ("Harm to competition is different than harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.").

Publishers' scant allegations are insufficient to demonstrate an effect on competition in an ad network market. Publishers claim that Google alerted an unidentified publisher and an unidentified rival ad network that there was a problem with the ad network's code. Compl. ¶ 355. The rival ad network was then provided an opportunity to submit the fixed code. *Id.* Publishers allege that resubmitting the code required "extensive work and hours of labor" by the ad network and the publisher, which jeopardized the business relationship between the ad network and the affected publisher. *Id.* However, Publishers must demonstrate harm "not just to a single competitor, but to the competitive process." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998).

Publishers state, without any supporting facts, that this was a "recurring" practice, Compl. ¶ 356, but they do not allege how often it occurred or how long rival ad networks were unable to compete for impressions as a result of malicious-code flagging. Even if this conclusory allegation could be credited, it remains insufficient. *See Spinelli v. NFL*, 903 F.3d 185, 212 (2d Cir. 2018) (finding allegation of a price increase insufficient to show anticompetitive effect where plaintiffs "cite no examples, data, or other facts to support their assertion"). Given that the malicious-code issue was admittedly temporary and publishers could

fix it, Publishers do not explain how this conduct could cause harm to the ad network market as a whole.  *See NYNEX Corp.*, 525 U.S. at 135; *see also Spinelli*, 903 F.3d at 212 (deciding that it was "too speculative to infer" an effect on the market as a whole from two incidents).

Moreover, Google had an obvious legitimate business reason to flag malicious code and ask ad networks to fix it: doing so protects users, publishers, and the integrity of Google's services.  *See In re Adderall XR Antitrust Litig.*, 754 F.3d at135 ("[A]nticompetitive conduct is 'conduct without a legitimate business purpose that makes sense only because it eliminates competition.'") (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007)); *see also Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1183 (1st Cir. 1994) ("In general, a business justification is valid if it relates directly or indirectly to the enhancement of consumer welfare."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) ("Put simply, the monopolist's conduct must be irrational but for its anticompetitive effect.").  Publishers allege that this was a "false pretext," but provide no facts to support this bare conclusion.  Compl. ¶ 355.  "[C]onclusory allegations which merely recite the litany of antitrust will not suffice."  *John's Insulation, Inc. v. Siska Constr. Co.*, 774 F. Supp. 156, 163 (S.D.N.Y. 1991)  And the idea that Google should just have allowed the bad code to harm its users and advertisers is preposterous on its face.  Publishers' attempt to impugn Google's motives falls flat where they admit that Google allowed networks to resubmit their code and do not allege that Google banned any rival network outright or for any significant period of time.

III.   **PUBLISHERS CANNOT REVIVE A CLAIM REGARDING ENCRYPTING USER IDS BY LABELING THE PRACTICE A "TIE."**

Publishers allege four "Acts" that they claim constitute tying.[3]  "Act 2," an alleged tie of the DFP ad server to Google's ad exchange, AdX, in fact consists of several different challenged practices.  *See* Compl. ¶ 205.  One of the alleged acts of tying DFP to AdX is Google's encryption of the user IDs "that [DFP] assigned to publishers' users."  *Id.*  ¶ 207.  Publishers allege nearly the same facts as the States did regarding encryption of user IDs.  *Compare* Compl. ¶ 217 (describing encrypting user IDs as Google "refus[ing] to share" data with rivals), and *id.* ¶ 216 (encrypting user IDs had "a massive deleterious effect on the ability of non-Google Ad Exchanges to submit bids that compete with Google's AdX"), *with* State Plaintiffs' Third Amended Complaint, ECF No. 195 ¶ 257 (describing encrypting user IDs as Google "restricting publishers from . . . shar[ing]" data with rivals), and *id.* ¶ 367 (encrypting user IDs caused non-Google exchanges "to bid lower and less often than they otherwise would").  The Court held that the States did not "plausibly allege that Google's refusal to share unencrypted user IDs amounted to anticompetitive conduct."  MTD Op., at 44.

Publishers cannot revive a failed duty-to-deal claim regarding user IDs by labeling it a "tie."  The crux of Publishers' claim remains that Google should have shared unencrypted user IDs generated by its DFP ad server with rival ad exchanges and networks.  Google had no duty to do so.  MTD Op., at 43-44.  When confronted with similar attempts to repackage a refusal-to-deal claim as tying, courts have applied the correct standards.  *See Kaufman v. Time Warner*, 836 F.3d 137, 144-45 (2d. Cir. 2016) (dismissing tying claim and observing that, even though "plaintiffs frame their claim as a tie-in, the core issue is a cable provider's right to refuse to

---

[3] Google disputes Publishers' allegations and disagrees that they state valid tying claims.  Google will challenge Publishers' other alleged ties at the appropriate time.

enable cable boxes it does not control to unscramble its coded signal"); *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, 2021 WL 1227593, at *8 (M.D. Fla. Mar. 8, 2021) (dismissing tying claim that was "in essence a refusal to deal claim").

## IV.   PUBLISHERS' TYING CLAIMS INVOLVING GOOGLE'S SEARCH BUSINESS FAIL AS A MATTER OF LAW.

Publishers allege that Google directed unused portions of the advertising budgets of "search-only" advertisers to automatically buy display ads on GDN, and that this somehow constituted a tie of Google's display advertising on GDN to its online search advertising service. Compl. ¶ 336.  Despite explicitly pleading this conduct as "bundling," *id.*, Publishers now claim Google enacted a contractual tie.  ECF No. 379, at 6.

Regardless of how they describe it, Publishers' Search+ claim (Act 14) fails for two reasons.  *First*, Publishers fail to allege the coercion required for a tying claim.  *Second*, Publishers fail to allege any adverse effect on competition.  Their allegations demonstrate only that Google's conduct enhanced output.

**Failure to Allege Coercion.**   Tying requires non-conclusory allegations of coercion.  As the Second Circuit has long held: "Actual coercion by the seller that in fact forces the buyer to purchase the tied product is an indispensable element of a tying violation.  A manufacturer's use of 'strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce [its] retailer to buy its full line of products' does not, however, amount to actual coercion."  *Unijax, Inc. v. Champion Int'l*, 683 F.2d 678, 685 (2d Cir. 1982) (citations omitted); *see also Kaufman*, 836 F.3d at 141.

Although Publishers now claim Google's alleged Search+ tie was "contractual," ECF No. 379, at 6, their complaint nowhere alludes to any sort of contract.  Publishers allege that Google made Search + or Smart Campaigns "default-on" for Search advertisers, but they do not plead

that advertisers actually needed to purchase any quota of display advertising through Google as a condition of buying Google search ads or that advertisers were in any way prevented from buying display advertising on non-Google services if they purchased Google Search ads. Compl. ¶¶ 339. The most they allege is that Google gave advertisers who purchased Google Search ads an *option* also to buy display ads through Google, an option they could decline by changing their settings from the default. Compl. ¶ 341 ("While AdWords accounts could 'escape' to see other campaign accounts, they initially saw only Smart Campaign."). There can be no coercion for a tying claim where "Plaintiff's own analysis reveals that the tying product was sometimes sold without the tied product." *It's My Party, Inc. v. Live Nation, Inc*., 811 F.3d 676, 685 (4th Cir. 2016); *see also In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig*., 2010 WL 882989, at *5-6 (S.D.N.Y. Mar. 5, 2010) (Castel, J.) (dismissing tying claim where customers could purchase tying product (Premium Cable Services) without also purchasing tied product (cable box)).

**Failure to Allege Harm to Competition.**  Publishers' claim also should be dismissed because Publishers do not plausibly allege potential foreclosure or any other harm to competition in any relevant markets resulting from Google's alleged tying of display advertising to its search advertising. *See, e.g.*, *E & L Consulting, Ltd.*, 472 F.3d at 29-31.

Publishers allege that Google, through its Search+ program, spent unused portions of Search advertising budgets on display ads through GDN. Without Search+, these advertisers might not have spent these unused portions of their Google Search advertising budgets on display advertising at all (*i.e.*, it would remain unspent, rather than "diverted"). Compl. ¶ 338. Publishers nowhere allege that advertisers' unspent *Google Search advertising budgets* would have otherwise been spent on display advertising sold through *competing ad networks, ad*

*exchanges, or ad servers*.  In other words, Publishers plead no facts to suggest that Search+ caused any display advertising rival to lose out on any dollars it would have had if Google had not offered Search+ to advertisers.  Thus, Publishers' tying claim fails because, while Publishers allege that Google increased demand for its ad network, *id.* ¶ 342, nowhere do they explain how Google excluded competitors.[4]

Rather than harming competition, Publishers' allegations suggest that Google's conduct caused money that otherwise would not have been spent at all instead to be spent on display advertising.  In other words, Publishers' theory implies that the alleged conduct enhanced output in the relevant markets *to the benefit of Publishers themselves*, and that is not anticompetitive. *United States v. Am. Express Co.*, 838 F.3d 179, 206 (2d Cir. 2016) (finding increased output suggests conduct "*increased* rather than *decreased* competition" in the relevant market), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018).

## V.     PARTIAL DISMISSAL OF PUBLISHERS' CLAIMS IS APPROPRIATE.

Publishers argue that Google cannot attack the specific Acts as alleged by Publishers because they are all part of omnibus "counts."  ECF No. 379, at 3.  Publishers further argue that their claims should not be analyzed alone; instead, the individual Acts should be considered as part of an "overarching scheme."  *Id*.  Publishers are incorrect.

A claim is "a set of facts giving rise to one or more legal rights," *Schwartz v. Eaton*, 264 F.2d 195, 196 (2d Cir. 1959), not a series of facts lumped into one omnibus "count."  *See also In re Am. Express Anti-Steering Rules Antitrust Litig.*, 343 F. Supp. 3d 94, 100 (E.D.N.Y. 2018) (defining claim as a "set of facts that can support liability for the defendant under a cause of

---

[4] Publishers also allege that Search+ had follow-on effects in an ad server market, flowing from the effects in an ad network market.  Compl. ¶¶ 335, 342.  As Publishers have failed to properly allege any effects in the alleged ad network market, their allegations of effects in an ad server market necessarily fail as well.

action.").  Courts analyze motions to dismiss based on the alleged sets of facts and the relief

sought, not formal distinctions of "counts" or "causes of action."  *Id.* at 100.  This Court

followed that approach in its Opinion & Order dismissing some of the States' Section 2 claims.

*See* MTD Op. (dismissing States' Section 2 claims to the extent they relied on the alleged use of

encrypted user IDs, reserve price optimization, and exchange bidding, but maintaining other acts

in the Section 2 claim).

Here, Google seeks to dismiss individual alleged "Acts" or discrete conduct allegations,

each of which is based on a clear set of differentiated facts that, if actionable, would give rise to

their own claims.  These individual Acts cannot be combined into "one central 'count,' thereby

proofing [the] complaint from a partial motion to dismiss."  *In re Am. Express*, 343 F. Supp. 3d

at 100.  Nor do Publishers' conclusory allegations that all conduct was part of a "scheme"

insulate their individual claims from scrutiny.  Conduct that is not actionable may be excluded

from consideration in a monopolization allegation, despite bare invocation of the term "scheme"

or the phrase "synergistic effects."  *See Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL

802093, at *10 (S.D.N.Y. Feb. 21, 2019) (granting summary judgment as to predatory pricing

claim despite allegation that pricing had synergistic effects with other conduct).

It is therefore appropriate for Google to seek dismissal of Publishers' claims based on

encrypted user IDs and Acts 14, 15, and 16, even if Google is not seeking dismissal of Count I or

II as a whole.

## CONCLUSION

For the foregoing reasons, Google respectfully requests that this Court dismiss Publishers'

claim regarding encrypted user IDs and Acts 14, 15, and 16 with prejudice.

Dated: February 3, 2023

Respectfully Submitted,

*/s/ Justina K. Sessions*
Justina K. Sessions
Jonathan Jacobson
Jessica Lonergan
Mikaela Evans-Aziz (admitted *pro hac vice*)
Vadim Egoul
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
(415) 947-2000
jsessions@wsgr.com
jjacobson@wsgr.com
jlonergan@wsgr.com
mevansaziz@wsgr.com
vegoul@wsgr.com

Eric Mahr
Julie Elmer
Andrew J. Ewalt (admitted *pro hac vice*)
Jan Rybnicek (admitted *pro hac vice*)
Lauren Kaplin
Robert J. McCallum
FRESHFIELDS BRUCKHAUS DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
julie.elmer@freshfields.com
andrew.ewalt@freshfields.com
jan.rybnicek@freshfields.com
lauren.kaplin@freshfields.com
rob.mccallum@freshfields.com

John Harkrider
Daniel Bitton
Bradley Justus (admitted *pro hac vice*)
Koren Wong-Ervin (admitted *pro hac vice*)

15

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
jharkrider@axinn.com
dbitton@axinn.com
bjustus@axinn.com
kwongervin@axinn.com

*Counsel for Defendants Google LLC,*
*Alphabet Inc., and YouTube, LLC*

16