UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**IN RE: GOOGLE DIGITAL ADVERTISING
ANTITRUST LITIGATION**

**No. 1:21-MD-3010 (PKC)**

---

*This Motion Relates To:*

---

AIM Media Ind. Operating, LLC v. Google, LLC,
No. 1:21-cv-06912-PKC (S.D.N.Y.)

AIM Media Midwest Operating, LLC v. Google,
LLC, No. 1:21-cv-06884-PKC (S.D.N.Y.)

AIM Media Tex. Operating, LLC v. Google, LLC,
No. 1:21-cv-06888-PKC (S.D.N.Y.)

Appen Media Group, Inc. v. Google LLC, No.
1:22-cv-09810-PKC (S.D.N.Y.)

Brown Cnty. Publ'g Co., Inc. v. Google, LLC, No.
1:21-cv-06915-PKC (S.D.N.Y.)

Capital Region Indep. Media LLC v. Google LLC,
No. 1:22-cv-06997-PKC (S.D.N.Y.)

Clarksburg Publ'g Co., d/b/a WV News v.
Google, LLC, No. 1:21-cv-06840-PKC
(S.D.N.Y.)

Coastal Point LLC v. Google, LLC, No. 1:21-cv-
06824-PKC (S.D.N.Y.)

Eagle Printing Co. v. Google, LLC, No. 1:21-cv-
06881-PKC (S.D.N.Y.)

ECENT Corp. v. Google, LLC, No. 1:21-cv-
06817-PKC (S.D.N.Y.)

---

[Caption continued on following page]

Emmerich Newspapers, Inc. v. Google, LLC, No. 1:21-cv-06794-PKC (S.D.N.Y.)

Flag Publ'ns, Inc. v. Google, LLC, No. 1:21-cv-06871-PKC (S.D.N.Y.)

Gale Force Media, LLC v. Google, LLC, No. 1:21-cv-06909-PKC (S.D.N.Y.)

Gould Enters., Inc. v. Google, LLC, No. 1:22-cv-01705-PKC (S.D.N.Y.)

HD Media Co., LLC v. Google, LLC, No. 1:21-cv-06796-PKC (S.D.N.Y.)

Journal Inc. v. Google, LLC, No. 1:21-cv-06828-PKC (S.D.N.Y.)

Neighborhood Newspapers, Inc. v. Google LLC, No. 1:21-cv-10188-PKC (S.D.N.Y.)

Robinson Commc'ns, Inc. v. Google, LLC, No. 1:21-cv-08032-PKC (S.D.N.Y.)

Rome News Media, LLC v. Google LLC, No. 1:21-cv-10186-PKC (S.D.N.Y.)

Savannah Publ'g Co. v. Google, LLC, No. 1:22-cv-01693-PKC (S.D.N.Y.)

Something Extra Publ'g, Inc. v. Google, LLC, No. 1:21-cv-09523-PKC (S.D.N.Y.)

Southern Cmty. Newspapers, Inc. v. Google, LLC, No. 1:22-cv-01971-PKC (S.D.N.Y.)

Times Journal, Inc. v. Google LLC, No. 1:21-cv-10187-PKC (S.D.N.Y.)

Union City Daily Messenger, Inc. v. Google, LLC, No. 1:22-cv-01704-PKC (S.D.N.Y.)

[Caption continued on following page]

Weakley Cnty. Press, Inc. v. Google, LLC, No. 1:22-cv-01701-PKC (S.D.N.Y.)

*Plaintiffs,*

-against-

GOOGLE LLC,

*Defendant.*

## DEFENDANT GOOGLE LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS NEWSPAPER PLAINTIFFS' <u>AMENDED COMPLAINT</u>

FRESHFIELDS BRUCKHAUS DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Fax: (202) 777-4555

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Fax: (415) 947-2099

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Fax: (212) 728-2201

*Counsel for Defendants Google LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

TABLE OF ABBREVIATIONS ........................................................................................ iv

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD .......................................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.      NEWSPAPERS' NETWORK BIDDING AGREEMENT CLAIMS SHOULD BE DISMISSED ON THE SAME GROUNDS AS STATES' SIMILAR CLAIMS. .............. 3

      A.     Newspapers Fail to Plausibly Allege That Meta Agreed Not to Support Header Bidding. ....................................................................... 3

      B.     Newspapers Fail to Plausibly Allege A Per Se Bid-Rigging Agreement. ................................................................................................ 5

      C.     Newspapers Fail to Plausibly Allege That Meta Agreed Not to Provide Ad Networks or Publisher Ad Servers for Web Advertising. .............................................................................................. 6

      D.     Newspapers Fail to Plausibly Allege that Meta Agreed Not to Develop an In-App Ad Mediation Tool. ..................................................... 8

      E.     Newspapers' Failed Conspiracy Theories Cannot Support a Section 2 Claim. .................................................................................... 8

II.     NEWSPAPERS FAIL TO ALLEGE THAT AD MANAGER'S FEE STRUCTURE IS ANTICOMPETITIVE. .............................................................. 9

III.    NEWSPAPERS FAIL TO ALLEGE THAT SO-CALLED "BYPASSING" HARMS COMPETITION. ............................................................................... 11

IV.    NEWSPAPERS' LEVERAGING CLAIMS INVOLVING GOOGLE'S SEARCH BUSINESS FAIL AS A MATTER OF LAW. ................................................. 11

      A.     Accelerated Mobile Pages Is Not Exclusionary Conduct. ..................... 12

      B.     Conduct Involving Google's Chrome Browser Is Not Exclusionary. ....................................................................................... 13

V.     NEWSPAPERS FAIL TO ALLEGE THAT GOOGLE'S CONDUCT HARMED COMPETITION IN MARKETS FOR PUBLISHER AD SERVERS OR GENERAL SEARCH SERVICES. ..................................................................... 13

CONCLUSION ................................................................................................................ 14

i

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*A.I.B. Express, Inc. v. FedEx Corp.*,
    358 F. Supp. 2d 239 (S.D.N.Y. 2004)...................................................................13

*Anderson News, L.L.C. v. American Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)..............................................................................4

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................2, 3

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................2

*Dreamstime.com, LLC v. Google LLC*,
    54 F.4th 1130 (9th Cir. 2022) .........................................................................13

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
    472 F.3d 23 (2d Cir. 2006)............................................................................9, 11

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*,
    129 F.3d 240 (2d Cir. 1997)...........................................................................9

*FTC v. Qualcomm*,
    969 F.3d 974 (9th Cir. 2020) .......................................................................10, 11

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*,
    2016 WL 6110565 (S.D.N.Y. Aug. 4, 2016) (Castel, J.)...................................2

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016).............................................................13

*Lavoho, LLC v. Apple, Inc.*,
    232 F. Supp. 3d 513 (S.D.N.Y. 2016)..............................................................7

*Mayor & Council of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)..........................................................................4, 5

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*,
    866 F.2d 525 (1st Cir. 1989)..........................................................................5

*Pac. Bell Tel. Co. v. linkLine Commc'ns., Inc.*,
    555 U.S. 438 (2009)....................................................................................10

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
    782 F. Supp. 2d 1059 (E.D. Cal. 2011)............................................................8

*U.S. Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988).........................................................................10

ii

*United States v. Google LLC,*
    1:23-cv-00108 (E.D. Va. Jan. 24, 2023), ECF No. 1 ......................................................3, 9

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004)..............................................................................................12, 13

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC,*
    257 F.3d 256 (2d Cir. 2001)..........................................................................................12

**Statutes**

15 U.S.C. § 1 ............................................................................................................................3, 9

15 U.S.C. § 2 ...............................................................................................................3, 9, 10, 11

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ...............................................................................1, 2

## TABLE OF ABBREVIATIONS

| Term | Definition |
| --- | --- |
| AdX | Google's Ad Exchange |
| AMP | Accelerated Mobile Pages |
| Audience fee | Google Ad Manager's fee structure |
| Chrome | Google's Chrome browser |
| Complaint | Newspaper Plaintiffs' Amended Complaint, ECF No. 401 |
| DFP | DoubleClick for Publishers |
| EDA | Enhanced Dynamic Allocation |
| FAN | Facebook Audience Network |
| Google | Google LLC |
| MTD Op. | Opinion and Order, ECF No. 308 |
| NBA | 2018 Network Bidding Agreement between Google and Facebook |
| Search | Google Search |
| States | State Plaintiffs |
| States' TAC | State Plaintiffs' Third Amended Complaint, ECF No. 195 |
| CPM | Cost per 1000 impressions |

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Google LLC moves for an order dismissing the federal antitrust claims in Counts I, II, IV, and V of the Amended Complaint filed by Newspaper Plaintiffs, ECF No. 401 ("Complaint").  Consistent with the stay of the state law claims (Count III) ordered on November 18, 2022, ECF No. 392, ¶¶ 4-5, Google does not currently move to dismiss those claims and reserves all rights with respect to them.

## INTRODUCTION

Twenty-five Newspaper Plaintiffs bring this antitrust action against Google and Meta Platforms, Inc. (formerly known as Facebook, Inc.), claiming they can no longer "fairly compete for online advertising revenue."  Compl. ¶¶ 3, 124.  They argue "[t]he press . . . is at stake" because Google used its "monopoly power" to "threaten[] the extinction of local newspapers across the country."  *Id.* ¶ 124-25.  They blame Google (not radio, television, the Internet, online classified ads services like Craigslist, or social media) for layoffs, buyouts, and diminished profits in the newspaper industry.  *Id.* ¶¶ 3, 161.  Newspaper Plaintiffs' claims are nothing more than an effort to scapegoat Google and wedge into a pile of others complaining about Google's ad tech products.  None of these supposed harms is attributable to any alleged lessening of competition in ad tech, one of the most intensely innovative and competitive industries across the country and the world.

Dramatic pronouncements and the mantle of a bygone news era aside, Newspapers' Complaint is deficient in many respects.  Despite having over a year to examine and revise their complaint, Newspapers' amended complaint liberally copy-and-pastes from other complaints and includes paragraphs of conclusory, non-sequitur pronouncements on antitrust law.  Much of the Newspapers' pleading fails to state valid antitrust claims.  Indeed, all of the claims that were not

copied from the State Plaintiffs' complaint fail, as well as Newspapers' attempt to revive a Network Bidding Agreement ("NBA") claim.

In this Motion, Google moves to dismiss those allegations that the Court has previously ruled do not support a claim and Newspapers' claims that differ from those made in the State Plaintiffs' Third Amended Complaint, ECF No. 195 ("States' TAC").   In particular, Google moves to dismiss: (1) claims relating to the Network Bidding Agreement between Google and Meta, Compl. ¶¶ 272-326; (2) newly pled claims based on certain audience fees charged by Google and Google's alleged bypassing of direct-sold impressions, *id.* ¶¶ 257, 269-71; (3) newly pled leveraging claims involving Google Search, *id.* ¶¶ 327-42; and (4) all claims predicated on alleged harm in alleged publisher ad server or general search services markets.[1]

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To do so, the complaint must make factual allegations sufficient to "raise a reasonable expectation that discovery will reveal evidence," *Twombly*, 550 U.S. at 556, that would "allow[] the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678.  It is "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (citations omitted).  "In assessing the sufficiency of the complaint, a court must disregard legal conclusions, because they are not entitled to the presumption of truth." *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, No.

---

[1] For purposes of this motion to dismiss, Google assumes the truth of the well-pleaded allegations in the Complaint. Google expects to contest many of those allegations in the future.

15-CV-3784 (PKC), 2016 WL 6110565, at *4 (S.D.N.Y. Aug. 4, 2016) (Castel, J.).  Rather, the

Court "must examine the well-pleaded factual allegations 'and then determine whether they

plausibly give rise to an entitlement to relief.'"  *Id.*  (quoting *Iqbal*, 556 U.S. at 679).

## ARGUMENT

### I.   NEWSPAPERS' NETWORK BIDDING AGREEMENT CLAIMS SHOULD BE DISMISSED ON THE SAME GROUNDS AS STATES' SIMILAR CLAIMS.

Newspapers rehash the States' already rejected header-bidding-conspiracy and bid-

rigging theories and assert two additional, similarly unsupported, market-allocation-conspiracy

theories based on the NBA.[2]  Newspapers assert that all of the conspiracies they allege were *per*

*se* antitrust violations; unlike the States, they do not challenge the NBA under the rule of reason.

*See* Compl. ¶¶ 128, 377.  Their two additional market-allocation-conspiracy theories concern (1)

ad networks and publisher ad servers for web ads, and (2) ad networks and mediation tools for

in-app ads, and each relies on very similar allegations as the States' failed NBA claims.  None of

Newspapers' conspiracy theories states a claim under Section 1 or 2 of the Sherman Act because

none includes facts that plausibly could prove the existence of any conspiracy.  Newspapers'

NBA claims in Counts I, II, and V therefore should be dismissed.

### A.   Newspapers Fail to Plausibly Allege That Meta Agreed Not to Support Header Bidding.

Like the States, Newspapers allege that the NBA was part of a conspiracy whereby Meta

agreed to withdraw support for header bidding in exchange for favorable contract terms under

the NBA, placing Meta's ad network (then known as "Facebook Audience Network" or "FAN")

---

[2] On December 19, 2022, the European Commission announced that it closed an investigation it had been conducting into the NBA without filing any charges after "a careful assessment of all relevant evidence, including information received from Google, Meta and other companies active in the tech sector," finding that the "evidence did not confirm [the Commission's] initial concerns" with the agreement.  *See* European Commission, Daily News 19/12/22, https://ec.europa.eu/commission/presscorner/detail/en/mex_22_7832 (last accessed February 1, 2022). Additionally, the Department of Justice's recent complaint against Google does not include any claims for relief based on the NBA.  Compl., *United States v. Google LLC*, 1:23-cv-00108 (E.D. Va. Jan. 24, 2023), ECF No. 1.

in a more advantageous position than other bidders in Google's auctions.  *Compare* Compl. ¶¶ 293, 305, 312-13, 325-26, *with* States' TAC ¶¶ 413, 426-29, 431, 435, 437-40.  Newspapers focus on the exact same terms in the NBA as did the States.  *Compare* Compl. ¶¶ 313-14, 325-26, *with* States' TAC ¶¶ 426-35.

"In order to establish a conspiracy in violation of [section] 1, whether horizontal, vertical, or both, proof of joint or concerted action is required; proof of unilateral action does not suffice." MTD Op., ECF No. 308, at 21 (quoting *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012)).  A plaintiff may provide direct proof of an agreement or allege circumstantial facts supporting the inference that an agreement existed.  *Mayor & Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Newspapers fail to allege either direct or circumstantial evidence of an agreement that Meta would withdraw from header bidding.

This Court already rejected the States' parallel conspiracy claim for failing to show direct or circumstantial evidence of an agreement beyond the terms of the NBA, MTD Op., at 24, concluding that the terms of the NBA "made perfect business sense" for both parties absent any conspiracy.  *See id.* at 22 (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 138). Newspapers' Amended Complaint does not cure these issues.

Newspapers do not allege any direct evidence that Google and Meta agreed that Meta would stop supporting header bidding.  The NBA contains no provision requiring Meta to withdraw its support for header bidding.  To the contrary, the NBA is non-exclusive, NBA § 19.10, and expressly allows Meta to offer and develop competing products.  *See* NBA, ECF No. 221-1, at § 2.4(e) ("[T]he foregoing does not restrict Facebook from developing or enhancing a product or service that competes with DoubleClick for Publishers, AdX, or AdMob . . . .").  For

those reasons, this Court has already observed that "[t]he terms of the NBA do not expressly or by reasonable implication refer to or restrict Facebook's use of header bidding."  MTD Op., at 21.

Nor do Newspapers allege any circumstantial evidence from which the Court could plausibly infer that there was an agreement between Google and Meta outside the explicit terms of the NBA.  As the Court observed in response to the States' identical theory, such theories are implausible given the allegations showing that Meta and Google both had a unilateral self-interest to enter the NBA.  *See* MTD Op., at. 21, 25-26.  Meta allegedly received advantages under the NBA when bidding in Google auctions.  *See* Compl. ¶ 326.  This Court concluded that granting Meta these favorable terms was "consistent with a firm seeking to secure the business of a very large potential customer" and "does not convert the agreement into an unreasonable restraint of trade."  MTD Op., at. 25-26 (citing *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 529 (1st Cir. 1989)).  And Google allegedly benefitted by securing a guarantee that Meta would spend $500 million per year in Google's auctions.  *See* Compl. ¶ 325.  As this Court already concluded when analyzing similar allegations in the States' complaint, States' TAC ¶¶ 426-34, 438-40, it "made perfect business sense" for Google and Meta to agree to the terms of the NBA absent any conspiracy for Meta to withdraw support for header bidding.  *See* MTD Op., at. 22 (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 138); *see also id*. at 25-26.  There is no such conspiracy.

**B.      Newspapers Fail to Plausibly Allege A Per Se Bid-Rigging Agreement.**

Newspapers' suggestion that certain terms of the NBA amounted to per se unlawful bid-rigging, Compl. ¶¶ 325-26, also fails for the same reasons as the States' parallel claim.

*First*, there is no evidence of an agreement to rig bids.  Newspapers point to the so-called "win-rate" provisions but this Court already held that "[t]he win-rate provision cannot be

reasonably read to require collusive bidding or any other form of distorted bidding by Google or Facebook."  MTD Op., at 31.  *Second*, the agreement is "predominately vertical" and therefore "properly scrutinized under the rule of reason."  *Id.* at 29.  Newspapers make no attempt to argue a rule-of-reason claim, nor would one fare any better.

    **C.**    **Newspapers Fail to Plausibly Allege That Meta Agreed Not to Provide Ad Networks or Publisher Ad Servers for Web Advertising.**

Doubling down on one of their already rejected conspiracy theories, Newspapers also claim that Google and Meta agreed that Meta would exit or not enter alleged ad network and publisher ad server markets for web advertising.  *See* Compl. ¶¶ 291-93, 307.

Newspapers allege no direct evidence of an agreement by Meta to exit or not enter ad network or publisher ad server markets.  And, as discussed above, the NBA expressly allows Meta to offer and develop competing products, such as ad networks and publisher ad servers.  *See* NBA, ECF No. 221-1, at § 2.4(e).  In addition, the NBA by its express terms contemplated that Meta's ad network would buy web display ad inventory in Google's auctions, *see*, *e.g.*, *id.* at Ex. A §3 (match rate obligations differ for web and app inventory), which directly undercuts Newspapers' theory that Meta and Google agreed that Meta's ad network would stop buying and selling web display advertising.  Compl. ¶¶ 291-92, 307.

Newspapers also fail to allege any circumstantial evidence of an agreement by Meta to exit or forego entry into ad network or publisher ad server markets for web display advertising.  They primarily rely on the same purported evidence of a conspiracy outside the NBA that the States alleged and the Court already rejected, *i.e.*, the allegation that FAN received favorable business terms.  *Compare* Compl. ¶¶ 313-18 (alleging that NBA terms providing speed and data advantages to FAN "made no economic sense beyond stifling competition"), *with* MTD Op., at 20-21, 24-26 (holding that "Google's actions are consistent with a firm seeking to secure the

business of a very large potential customer by offering it favorable terms," which is "entirely consistent with competition").

Newspapers make much of the fact that Meta decided to have its ad network exit web display advertising in April 2020 and that this occurred after the NBA was signed.  *See* Compl. ¶¶ 304-06.  However, Newspapers' own allegations show that Meta had an obvious independent economic interest in having its ad network exit the web display advertising business (regardless of any agreement with Google), because "[w]eb markets [were] mature, but in-app was where the real game was happening," *id.* ¶ 291, and the web display business was allegedly "entrenched and occupied" while the in-app display business "was open to competition and experiencing explosive growth."  Compl. ¶ 296.

The mere fact that the NBA preceded Meta's ad network exit from web display advertising cannot support an inference that the latter was a result of the former, much less support allegations that there was a conspiracy to that end.  *See, e.g., Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513, 530 (S.D.N.Y. 2016) (rejecting plaintiff's argument that an alleged conspiracy caused an anticompetitive result where plaintiff relied on the timing of the result to show causation), *aff'd sub nom. Diesel eBooks, LLC v. Simon & Schuster, Inc.*, 869 F.3d 55 (2d Cir. 2017).  If anything, the fact that Meta's ad network exited web display advertising in April 2020, more than a year and a half after the NBA was executed in September 2018, contradicts that theory, especially given the allegations in the Complaint that web display advertising was an unattractive business.  *See* Compl. ¶ 291; *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1075 (E.D. Cal. 2011) (finding a conspiracy to allocate markets was insufficiently pled, in part because the alleged conspirators did not raise their prices until three years after the alleged agreement).

In a further attempt to show a conspiracy, Newspapers emphasize the allegedly "secret" nature of the NBA, Compl. ¶¶ 127, 282, 313, and falsely claim the "details" of the NBA are "under seal."  Compl. ¶ 282.  Google has already provided to this Court a copy of the executed NBA.  *See* ECF No. 221 & 221-1 (Ex. A).  This document is available to the public, with minor redactions of the names and job titles of Google and Meta employees.  *See id.*  None of the deal terms have been redacted.  *See id.*

### D. Newspapers Fail to Plausibly Allege that Meta Agreed Not to Develop an In-App Ad Mediation Tool.

Newspapers assert that Meta considered introducing an in-app ad mediation tool that would compete with AdMob, but agreed not to do so in return for the favorable terms that it received in the NBA.  Compl. ¶ 293.  Newspapers do not allege that there are any provisions in the NBA memorializing such an agreement, and there are none.  In fact, the express terms of the NBA provide that Meta is free to support or develop competing technologies.  *See* NBA § 2.4(e).  And Newspapers do not offer any factual allegations that could plausibly prove an agreement outside the NBA that Meta would forego entry into an in-app ad mediation tool market.

Given Newspapers' failure to allege any facts that make their conspiracy theories plausible, this Court should dismiss Newspapers' Section 1 claims concerning the NBA as it did the States' similar claims.  *See* MTD Op., at 24-26.

### E. Newspapers' Failed Conspiracy Theories Cannot Support a Section 2 Claim.

Newspapers apparently intend for their NBA-related conspiracy theories also to support certain of the Section 2 monopolization claims in Count I and possibly Count V of their Complaint.  Compl. ¶¶ 359, 395.  Their NBA-related allegations cannot support these Section 2 claims because they make no plausible allegation that *Google* did anything anticompetitive.  To the extent Newspapers claim that entering into an agreement is sufficient to support a Section 2

claim, that theory fails for the same reasons as the conspiracy claim.  Without any plausible allegations that Google and Meta agreed for Meta to exit or not enter any market, Newspapers are left with allegations that Meta unilaterally decided to do things that made perfect business sense.  Meta's business decisions cannot create a claim that Google excluded competition.

To the extent Newspapers mean to base their Section 2 claims on the terms of the NBA itself, those Section 2 claims also fail because this Court already held that the terms of the NBA discussed in Newspapers' amended complaint do not support a Section 1 claim under a *per se* or rule-of-reason framework and therefore do not support a Section 2 claim either.  MTD Op., at 26-34.  *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*, 129 F.3d 240, 246 (2d Cir. 1997) (affirming dismissal of Section 1 and 2 claims for failure to allege harm to competition); *see also E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006) (same).  In sum, as was the case with the States' NBA-related claims, Newspapers' NBA-related claims fail under Section 2 for the same reasons as they fail under Section 1 and therefore likewise should be dismissed.

Newspapers' Section 2 claim also fails because they failed to define the allegedly monopolized market.  Newspapers effectively concede that the terms of the NBA only affect in-app advertising since Meta's ad network exited web display advertising.  Compl. ¶ 306.  Yet, Newspapers have not even attempted to define any markets, let alone plead monopoly power, related to in-app ad networks or mediation tools.  *See id.*  ¶¶ 176-202.

## II.   NEWSPAPERS FAIL TO ALLEGE THAT AD MANAGER'S FEE STRUCTURE IS ANTICOMPETITIVE.

In a single paragraph comprising three sentences, Newspapers complain that Google charges publishers higher ad serving fees when they transact through non-Google exchanges than

when they transact through Google's exchange, AdX.  Compl. ¶ 257.  This claim fails for the fundamental reason that Google is entitled to charge others when they use its auction platform.

Charging others for the use of one's technology is not anticompetitive as a matter of law. *Pac. Bell Tel. Co. v. linkLine Commc'ns., Inc.*, 555 U.S. 438, 452 (2009).  Even an alleged monopolist has no duty to deal with its rivals and may set the terms on which it deals with them, including by setting prices as it sees fit.  *Id.* at 450 ("[I]f a firm has no antitrust duty to deal with its competitors at wholesale, it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous.").[3]  The decision in *FTC v. Qualcomm*, 969 F.3d 974, 998-1001 (9th Cir. 2020), demonstrates this point.  There, the FTC argued that Qualcomm's fee structure was anticompetitive because Qualcomm charged a patent royalty when phone makers used rivals' modem chips but did not charge the royalty when customers bought chips from Qualcomm.  *Id.* at 998.  The *Qualcomm* court rejected this position: "the FTC suggests that Qualcomm's royalty rates impose an anticompetitive surcharge on its rivals' sales . . . [b]ut this [theory] was rejected as a basis for antitrust liability in *linkLine*."  *Id.* at 1000-01.  This Court likewise rejected the States' similar claim concerning Google's Exchange Bidding fee.  *See* MTD Op., at 65.  Google is entitled to charge for the use of Ad Manager.

Newspapers' audience-fee allegations do not plausibly allege anticompetitive conduct and therefore should be dismissed.

---

[3] Newspapers' allegation that the fee is "unjustified" is another way of saying it is higher than they would like.  The antitrust laws do not condemn charging high prices; indeed, high prices invite competition.  *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1361 (2d Cir. 1988) (charging monopoly prices presents "no better way for [a monopolist] to guarantee that its dominance will be challenged").

III.    **NEWSPAPERS FAIL TO ALLEGE THAT SO-CALLED "BYPASSING" HARMS COMPETITION.**

Newspapers allege that on "high traffic news days," when Newspapers have more inventory to sell, Google's ad server "overdeliver[s] lower CPM ads from AdX in place of directly sold high CPM ads" to earn a larger profit from Google-placed advertisements.  Compl. ¶¶ 270-71.

Newspapers' "bypassing" claim fails because they allege no harm to competition in any relevant market.  *See E & L Consulting*, 472 F.3d at 31 (a viable claim under Section 2 must show a harm to competition).  Newspapers do not even attempt to explain how this alleged practice has excluded rivals or otherwise had any adverse effect on competition whatsoever.  The most they allege is harm to themselves as customers, which is insufficient as a matter of law. *See Qualcomm*, 969 F.3d at 992 (economic harm to customers is not anticompetitive when it does not involve unreasonable restraints on trade or exclusionary conduct).

IV.    **NEWSPAPERS' LEVERAGING CLAIMS INVOLVING GOOGLE'S SEARCH BUSINESS FAIL AS A MATTER OF LAW.**

Count IV should be dismissed in its entirety.  Newspapers allege Google has "leveraged" monopoly power in a "general search market" in an effort to gain monopoly power in ad exchange and ad server markets.  Compl. ¶ 388.  Although Count IV does not reference any specific conduct, it appears to be based on: (1) Google's alleged coercion of mobile website publishers to use the Accelerated Mobile Pages ("AMP") format; and (2) Google's alleged requirement of default installation and dissemination of its Chrome Browser ("Chrome") in some contexts.  *Id.* ¶¶ 329-43; *see also id.* p. 98, Heading C (grouping this conduct under "Monopolistic Leveraging.").

A monopoly leveraging claim requires showing four elements: that the defendant (1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage

over the plaintiff in another distinct market; (3) caused injury by such anticompetitive conduct; and (4) has a dangerous probability of success in monopolizing a second market.  *See Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 272 (2d Cir. 2001) (first three elements); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 415 n. 4 (2004) (fourth element).  Newspapers have not pled all four elements with respect to either their AMP claim or their Chrome claim.

> **A.      Accelerated Mobile Pages Is Not Exclusionary Conduct.**

This Court dismissed the States' claims that Google used AMP as a tool to coerce publishers not to use header bidding or to exclude rival ad exchanges.  MTD Op., at 70-72. Newspapers' allegations regarding AMP are similarly deficient.  Like the States, Newspapers fail to allege that AMP had any significant effect on header bidding or exchange competition, because they do not allege the proportion of websites or publishers that were supposedly coerced into using AMP and foregoing header bidding.  Newspapers concede that AMP applied to "publishers of mobile ads" only, and not to publishers of desktop-format ads.  Compl. ¶ 329. They allege that "Google purposefully dropped the PageRank of sites that did not adopt AMP" but they do not allege to what extent this occurred.  Comp. ¶ 335.  As with the States' TAC, "[t]he statement in context does not enable the reader to definitively discern its meaning.  If true, it would mean that all publishers—or at least all publishers using DFP who did not adopt AMP— would have all or some Google search rankings suppressed."  MTD Op. at 71.  Thus, Newspapers' AMP claim should be dismissed because it similarly "does not provide details that plausibly explain why or how search results would direct traffic away from sites that facilitated header bidding, as opposed to some other reason."  MTD Op., at 72.

B.      **Conduct Involving Google's Chrome Browser Is Not Exclusionary.**

Newspapers allege that "Google also leveraged its monopoly in online search to require default installation and global dissemination of its Chrome Browser," by which the Chrome Browser "serves as a way for Google to control the entry points for its advertising products." Compl. ¶ 341.

This conclusory allegation does not state a leveraging claim.  The assertion that Google's conduct affected competition among browsers has nothing to do with any alleged relevant market here, and it does not come close to alleging a dangerous probability that any relevant market will be monopolized.  *See Trinko*, 540 U.S. at 415 n.4.  In addition, Newspapers never explain how *they* could be injured by an alleged requirement that Chrome be installed on unidentified devices.

V.      **NEWSPAPERS FAIL TO ALLEGE THAT GOOGLE'S CONDUCT HARMED COMPETITION IN MARKETS FOR PUBLISHER AD SERVERS OR GENERAL SEARCH SERVICES.**

In Counts I and V, Newspapers allege that Google monopolized and attempted to monopolize the "relevant markets," Compl. ¶¶ 358-59, 393-94, which they identify elsewhere as "(1) the market for publisher ad servers; (2) the market for ad exchanges; and (3) the market for general search services," *id.* ¶ 176.  All claims related to the first and third of those markets should be dismissed because Newspapers have failed to allege conduct that has plausible anticompetitive effects in those markets.  *See Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1143 (9th Cir. 2022) (affirming dismissal where conduct did not plausibly harm competition in the market that was allegedly monopolized); *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 249 (S.D.N.Y. 2004) (dismissing monopolization claim because "anticompetitive conduct alleged by [plaintiff] is not relevant to the market [defendant] is accused of monopolizing"); *cf. In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 380 (S.D.N.Y.

2016) (dismissing claim where "plaintiffs' alleged injury does not arise directly from [defendant's] dominance of the market allegedly monopolized").

As conduct allegedly harming a market for publisher ad servers, Newspapers point only to Enhanced Dynamic Allocation ("EDA"), the NBA, and AMP.  *See* Compl. ¶¶ 214, 304-10, 336.[4]  But they make only one conclusory claim that EDA caused "harm to competition in the market[] for . . . ad servers," *id.* ¶ 214, and provide no specific factual allegations describing how EDA could have caused that supposed harm.  In addition, the Court has already ruled that State Plaintiffs' nearly identical allegations failed to "plausibly allege that EDA caused competitive harm in the market for publisher ad servers."  MTD Op., at 49; *compare* Compl. ¶¶ 215-24, *with* States' TAC ¶¶ 284-94.  Newspapers' claims relating to the NBA and AMP fail to state claims for the reasons explained above.

As for an alleged market for general search services, Newspapers fail to allege that *any* specific conduct affected competition in that market.  Having failed to allege anticompetitive conduct affecting markets for general search services or publisher ad servers, Newspapers' claims in Counts I and V should be dismissed to the extent they purport to allege monopolization or attempted monopolization of those markets.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court dismiss Counts II and IV in their entirety, and the claims in Counts I and V predicated on the NBA.

---

[4] Newspapers also claim that an alleged tie harmed a publisher ad server market.  *See* Compl. ¶¶ 258-67.  In light of the Court's prior Opinion, MTD Op. at 77-78, Google does not move to dismiss Newspapers' tying claim but anticipates challenging it at a later stage of the case.

Dated: February 3, 2023

Respectfully Submitted,

*/s/ Justina K. Sessions*
Justina K. Sessions
Jonathan Jacobson
Jessica Lonergan
Mikaela Evans-Aziz (admitted *pro hac vice*)
Vadim Egoul
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
(415) 947-2000
jsessions@wsgr.com
jjacobson@wsgr.com
jlonergan@wsgr.com
mevansaziz@wsgr.com
vegoul@wsgr.com

Eric Mahr
Julie Elmer
Andrew J. Ewalt (admitted *pro hac vice*)
Jan Rybnicek (admitted *pro hac vice*)
Lauren Kaplin
Robert J. McCallum
FRESHFIELDS BRUCKHAUS DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
julie.elmer@freshfields.com
andrew.ewalt@freshfields.com
jan.rybnicek@freshfields.com
lauren.kaplin@freshfields.com
rob.mccallum@freshfields.com

John Harkrider
Daniel Bitton
Bradley Justus (admitted *pro hac vice*)
Koren Wong-Ervin (admitted *pro hac vice*)

AXINN, VELTROP & HARKRIDER
LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
jharkrider@axinn.com
dbitton@axinn.com
bjustus@axinn.com
kwongervin@axinn.com

*Counsel for Defendant Google LLC*

16