UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | No. 1:21-MD-3010 (PKC) |

*This Motion Relates To:*

| | |
|---|---|
| **ASSOCIATED NEWSPAPERS LTD. and MAIL MEDIA, INC.** | No. 1:21-cv-03446 (PKC) |
| *Plaintiffs,* | |
| -against- | |
| **GOOGLE LLC and ALPHABET INC.,** | |
| *Defendants.* | |

**DEFENDANTS GOOGLE LLC AND ALPHABET INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS DAILY MAIL'S AMENDED COMPLAINT**

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Fax: (212) 728-2201

*Counsel for Defendants Google LLC and Alphabet Inc.*

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Fax: (415) 947-2099

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

TABLE OF ABBREVIATIONS ......................................................................................... iv

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

LEGAL STANDARD....................................................................................................... 2

ARGUMENT ................................................................................................................... 3

I.      DAILY MAIL BRINGS SECTION 2 CLAIMS THAT HAVE ALREADY BEEN DISMISSED FROM THE STATES' CASE. ................................................... 3

      A.    Google's Introduction of Exchange Bidding Did Not Coerce Publishers to Abandon Header Bidding. ..................................................... 3

      B.    Google's Encrypting User IDs Is Not Anticompetitive. ......................................... 6

II.     MONOPOLY LEVERAGING CLAIMS INVOLVING GOOGLE'S SEARCH BUSINESS FAIL AS A MATTER OF LAW. ................................................... 9

      A.    Accelerated Mobile Pages Is Not Exclusionary Conduct .................................... 10

      B.    Alleged Manipulation of Search Results Is Not Exclusionary Conduct............... 12

III.    A 12(B)(6) MOTION IS A PROPER VEHICLE TO DISMISS SOME OF DAILY MAIL'S ANTITRUST CLAIMS. .................................................... 15

CONCLUSION................................................................................................................ 16

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*A.I.B. Express, Inc. v. FedEx Corp.*,
  358 F. Supp. 2d 239 (S.D.N.Y. 2004)..................................................................9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................2, 3

*Balaklaw v. Lovell*,
  14 F.3d 793 (2d Cir. 1994)..............................................................................13

*BBL, Inc. v. City of Angola*,
  809 F.3d 317 (7th Cir. 2015) ..........................................................................16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................2, 3

*Bob Maxfield, Inc. v. American Motors Corp.*,
  637 F.2d 1033 (5th Cir. 1981) ..........................................................................5

*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) ............................................................................6

*Charych v. Siriusware, Inc.*,
  790 Fed. App'x 299 (2d Cir. 2019)..............................................................7, 11

*Dreamstime.com LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) ............................................................................8

*Dreamstime.com, LLC v. Google LLC*,
  470 F. Supp. 3d 1082 (N.D. Cal. 2020) ..........................................................14

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
  472 F.3d 23 (2d Cir. 2006)..............................................................................11

*FTC v. Qualcomm Inc.*,
  969 F. 3d 974 (9th Cir. 2020) ............................................................................9

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*,
  2016 WL 6110565 (S.D.N.Y. Aug. 4, 2016)....................................................3

*In re Adderall XR Antitrust Litig.*,
  754 F.3d 128 (2d Cir. 2014)..............................................................................9

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  343 F. Supp. 3d 94 (E.D.N.Y. 2018) ..........................................................15, 16

*It's My Party, Inc. v. Live Nation, Inc.*,
  811 F.3d 676 (4th Cir. 2016) ..........................................................................12

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016)..........................................................................11

*Lavoho, LLC v. Apple, Inc.*,
    232 F. Supp. 3d 513 (S.D.N.Y. 2016)............................................................13

*Manuel v. Pepsi-Cola Co.*,
    2018 WL 2269247 (S.D.N.Y. May 17, 2018) ...............................................14

*N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*,
    323 F. Supp. 2d 559 (S.D.N.Y. 2004)............................................................10

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015)..........................................................................12

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ...............................................................8, 11

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998)......................................................................................12

*Schwartz v. Eaton*,
    264 F.2d 195 (2d Cir. 1959)..........................................................................15

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
    964 F.2d 186 (2d Cir. 1992)............................................................................5

*Unijax, Inc. v. Champion Int'l*,
    683 F.2d 678 (2d Cir. 1982).................................................................5, 11, 12

*United States v. Microsoft Corp.*,
    147 F.3d 935 (D.C. Cir. 1998) ......................................................................12

*Verizon Commc'ns v. Law Offices of Curtis v. Trinko, LLP*,
    540 U.S. 398 (2004)...................................................................4, 6, 7, 9, 10

*W.P. v. Anthem Ins. Cos.*,
    2017 WL 605079 (S.D. Ind. Feb. 15, 2017) .................................................16

**Statutes**

15 U.S.C. § 2...............................................................................4, 5, 7, 8, 14

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) .............................................1, 2, 15

## TABLE OF ABBREVIATIONS

| Term | Definition |
| --- | --- |
| AdX | Google's Ad Exchange |
| AMP | Accelerated Mobile Pages |
| Complaint | Amended Complaint, ECF No. 400 |
| Daily Mail | Associated Newspapers Ltd. and Mail Media, Inc |
| DFP | DoubleClick for Publishers |
| EB | Google's Exchange Bidding |
| Google | Google LLC and Alphabet Inc. |
| MTD Op. | Opinion and Order, ECF No. 308 |
| Search | Google Search |
| States | State Plaintiffs |
| States' TAC | State Plaintiffs' Third Amended Complaint, ECF No. 195 |
| UPRs | Unified Pricing Rules |

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Google LLC and

Alphabet Inc. move for an order dismissing certain federal antitrust claims in Count II of the

Amended Complaint ("Complaint"), ECF No. 400, filed by Associated Newspapers Ltd. and

Mail Media, Inc. ("Daily Mail").  Consistent with the stay of the state law claims (Counts V and

VI) ordered on November 18, 2022, ECF No. 392, ¶¶ 4-5, Google does not currently move to

dismiss those claims and reserves all rights with respect to them.

### INTRODUCTION

Reports of header bidding's death were greatly exaggerated.


Much of Daily Mail's complaint is devoted to outlining an alleged campaign for Google

to "kill" header bidding, a method of bidding on publishers' ad impressions.  Daily Mail asserts

that Google should have agreed to participate in header bidding, and criticizes Google for trying

to compete with it.  Daily Mail goes so far as to say that Google "defeated" header bidding.

Compl. ¶ 102.  But, by Daily Mail's own allegations, header bidding is alive and well.

Notwithstanding Google's alleged campaign, Daily Mail has used client-side header bidding

since 2016, and "continues to this day[.]"  *Id.* ¶¶ 46, 224.

Daily Mail's basic challenge is to Google's introduction of a new product, Exchange

Bidding, *id.* ¶¶ 158-70; it also complains about hashing (*i.e.*, encrypting) user IDs, *id.* ¶¶ 108-13;

and that, through Accelerated Mobile Pages ("AMP") and search results, Google "leveraged" an

alleged monopoly in a general search market to bolster its ad exchange, *id.* ¶¶ 202-25, 92.  Daily

Mail alleges that Google did all of this to thwart header bidding.  This Court has already

dismissed claims from the States' case regarding Exchange Bidding, hashed user IDs, and AMP.

*See* MTD Op., ECF No. 308 ("MTD Op."), at 61-66, 40-44, 70-72.  With respect to each of those

1

product developments, Daily Mail's allegations add nothing material to the States' dismissed claims and therefore should be dismissed here too.  The Court should also dismiss Daily Mail's "leveraging" claim because Daily Mail fails to sufficiently allege anticompetitive conduct with respect to AMP or Google's search results.

## BACKGROUND[1]

Google operates digital display advertising tools, including an ad exchange, sometimes referred to as "AdX," and an ad server used by publishers, sometimes referred to as "DoubleClick for Publishers" or "DFP."  Plaintiffs publish the print and online newspaper "Daily Mail."  Daily Mail sells space on its website for display ads—images, text, and videos alongside publisher content—to generate revenue.  Compl. ¶¶ 22-23.  Daily Mail has chosen to use Google's DFP as its ad server and uses AdX as its "primary exchange."  *Id.* ¶ 36.  In addition to soliciting bids through DFP, Daily Mail also uses a technique called client-side header bidding.  According to Daily Mail, in client-side header bidding, "[p]ublishers . . . configure an auction in the reader's browser where multiple exchanges bid on a per-impression basis in real time."  *Id.* ¶ 45.  This "occurred before the publisher called DFP to fill the impression[.]"  *Id.*  Daily Mail has used client-side header bidding since 2016, and "continues to this day[.]"  *Id.* ¶¶ 46, 224.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To do so, the complaint must make factual allegations sufficient to "raise a reasonable expectation that discovery will reveal evidence," *Twombly*, 550 U.S. at 556, that would "allow[]

---

[1] For purposes of this motion to dismiss, Google assumes the truth of the well-pleaded allegations in the Complaint.  Google expects to contest many of those allegations should the case proceed.

the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678.  It

is "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" which

"requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (citations omitted).  "In

assessing the sufficiency of the complaint, a court must disregard legal conclusions, because they

are not entitled to the presumption of truth." *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd*., 2016

WL 6110565, at *4 (S.D.N.Y. Aug. 4, 2016) (Castel, J.).  Rather, the Court "must examine the

well-pleaded factual allegations 'and then determine whether they plausibly give rise to an

entitlement to relief.'"  *Id*.  (quoting *Iqbal*, 556 U.S. at 679).

## ARGUMENT

## I.   DAILY MAIL BRINGS SECTION 2 CLAIMS THAT HAVE ALREADY BEEN DISMISSED FROM THE STATES' CASE.

Daily Mail asserts Section 2 claims that this Court has already dismissed in the States'

case.  The Court has already held that (1) Google's introduction of Exchange Bidding and (2)

Google's encrypting user IDs cannot support a Section 2 claim.  In support of Count II of its

amended complaint, Daily Mail tacks on some additional assertions in the hope of resuscitating

these claims.  But none of its added allegations transform Google's product designs into antitrust

violations.  Like the States' failed attempts to characterize these product features as

anticompetitive, Daily Mail's allegations fall short.  In accordance with the Court's previous

ruling, both of these claims should be dismissed.

### A.  Google's Introduction of Exchange Bidding Did Not Coerce Publishers to Abandon Header Bidding.

Daily Mail alleges that Google's Exchange Bidding ("EB") product was an attempt to

"kill" header bidding, *e.g.* Compl. ¶ 161-62, a claim that was previously dismissed by this Court.

*See* MTD Op., at 65; *see also* State Plaintiffs' Third Amended Complaint ("States' TAC"), ECF

No. 195, ¶ 374.  Daily Mail's EB claim is substantially the same as the one made by the States.

Developing new products to win sales from rivals is the essence of competition.  *See Verizon*

*Commc'ns v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("To safeguard the

incentive to innovate, the possession of monopoly power will not be found unlawful unless it is

accompanied by an element of anticompetitive *conduct*.") (emphasis in original).  So Daily

Mail's claim does not even get off the ground.  But even if it could avoid that fatal defect, at a

minimum Daily Mail would have to allege *facts* demonstrating that Google coerced customers to

use EB instead of header bidding alternatives, as well as a plausible and cognizable exclusionary

effect on competition in a relevant market.  It has not.

Despite the States' assertions, the Court determined that participating in EB was in fact a

"voluntary venture[.]"  MTD Op., at 63.  As the Court explained, there must be a sufficient

allegation that Google "improperly compelled [a participant] to participate in Exchange

Bidding."  *Id.* at 64.  Publishers could choose whether to use EB or header bidding.  *See id*.  And

EB would certainly be a plausible choice.  Daily Mail concedes that EB allowed non-Google

exchanges to participate and compete for publisher inventory, thereby benefiting publishers.  *See*

Compl. ¶¶ 45, 158.

Daily Mail argues that its complaint differs from the States' because Daily Mail

supposedly describes how Google "used technical limitations and deception to coerce publishers

to abandon client-side header bidding in favor of Google's Exchange Bidding."  Daily Mail's

Response to Google's Pre-Motion Letter, ECF No. 377, at 2; *see also* Compl. ¶ 163.  But Daily

Mail's own actions contradict any suggestion of coercion, since "Daily Mail continued—and

continues to this day—to use client-side header bidding at higher rates than Exchange Bidding,

and for an increasing number of non-Google exchanges."  Compl. ¶ 224.  If Daily Mail currently

uses client-side header bidding *more* than it uses EB, it could not have been coerced to abandon client-side header bidding in favor of EB.  Nor does the complaint identify even one publisher who in fact abandoned client-side header bidding for EB.

Daily Mail also alleges that Google tried to "cajole" publishers into abandoning header bidding by representing to "at least one publisher" that limiting header bidding would improve the ad server and publisher yield.  Compl. ¶ 163.  Such a representation to a single customer is not coercive.  As the Court acknowledged, "actual coercion . . . is present only if the manufacturer goes beyond persuasion[.]"  MTD Op., at 18 (quoting *Unijax, Inc. v. Champion Int'l*, 683 F.2d 678, 685 (2d Cir. 1982)).  Taking Daily Mail's allegations as true, these statements are merely sales representations.  The bar for coercion is high, as even "strong persuasion, encouragement, or cajolery to the point of obnoxiousness"—none of which Daily Mail adequately alleges—"does not . . . amount to actual coercion." *See Unijax,* 683 F.2d at 685 (quoting *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981)); *see also Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 192 (2d Cir. 1992) (finding no evidence that dealers "felt compelled" or "deliberately force[d]" to purchase certain products).

Instead of actual coercion, and without any allegation that anyone was prevented from using it, Daily Mail points to actions that Google supposedly took to make client-side header bidding unattractive.  (As just discussed, these supposed efforts were unsuccessful in at least Daily Mail's case.)  The argument fails because none of these actions had anything to do with EB.  Daily Mail's complaints about DFP's acceptance of header bidding bids and redacting DFP datasets, Compl. ¶ 163, concern DFP's operation, not EB's.  They have nothing to do with the introduction or design of EB.  Moreover, Daily Mail fails to allege how making client-side

5

header bidding less attractive would necessarily result in publishers using EB, as opposed to a different server-side header bidding option or no header bidding at all. *See* Compl. ¶ 45 (noting that multiple "firms have introduced 'server-side' header bidding").

Daily Mail also fails to make any fact-based allegation that the introduction or design of EB harmed competition in any relevant market, an essential element to a Section 2 claim. *See Trinko*, 540 U.S. at 407 (requiring for a monopolization claim that the defendant undertook "anticompetitive conduct"); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) ("Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way."). Again, Daily Mail's allegations of effects on header bidding or on other exchanges result from other alleged features or functions of DFP, not EB, and in any event are not remotely anticompetitive.

### B.  Google's Encrypting User IDs Is Not Anticompetitive.

Daily Mail's allegations about user IDs—that Google prevented publishers from accessing and sharing Google user IDs with non-Google exchanges and permitted itself access for its own exchange—are no different from the States' claim already dismissed by the Court. The States and Daily Mail claim that Google advantaged itself by refusing to share un-encrypted user IDs with publisher-customers. Both allege that Google encrypted user IDs to exclude competition.

The Court ruled that, as alleged by the States, Google's encryption of user IDs did not amount to anticompetitive conduct. MTD Op., at 40-44. First, it reasoned that nothing in the States' complaint plausibly suggested that encrypting user IDs was a pretext for gaining monopoly profits. *Id.* at 41. Second, it explained that, because there is no duty to deal with rivals, the States failed to allege that Google foreclosed competition. *Id.* at 42-43. Third, the

Court found the States failed to show that Google's decision to encrypt user IDs was anything more than "an immediately profitable business strategy that also presented the perception or reality of enhanced consumer privacy." *Id.* at 44.  Daily Mail's allegations do not alter the analysis or require a different conclusion.

Like the States, Daily Mail acknowledges that Google provided a valid business reason for encrypting user IDs:  protecting user privacy.  Compl. ¶ 112.  Daily Mail argues that Google's sharing of unencrypted IDs *within Google* belies this privacy justification because, as Daily Mail would have it, Google is a greater threat to privacy than any publisher.  *Id.*  Daily Mail's apparent disagreement, and its musing that it could appropriately handle and protect unencrypted user IDs, does not render Google's stated reasoning for encryption false.  Daily Mail argues (with absolutely no facts) that because Google supposedly somehow misuses user data for its own algorithms, Google cannot properly state a privacy justification for encrypting user IDs.  Compl. ¶ 112.  This argument does not seriously contend with Google's plausible aim to protect user information by not sharing it outside the company or with unknown third parties.

Nor does Daily Mail offer any new or different allegations that would impose on Google a duty to share its data with rivals.  Daily Mail argues that Google encrypting user IDs is exclusionary because it "interferes with publishers' ability to do business with Google's rivals."  ECF No. 377, at 2.  Like the States, Daily Mail takes issue with Google's refusal to give Google data to publishers so those publishers can use it to help Google's rivals.  It is well established that even a monopolist typically is not required to assist competitors by sharing data with them or making it easier for customers to use rival products.  *See Trinko*, 540 U.S. at 407-08 ("Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law . . . .");  *Charych v. Siriusware, Inc.*, 790 Fed. App'x 299, 302

(2d Cir. 2019) ("[D]efendants were under no obligation to develop an interface that was compatible with plaintiffs' product."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.) ("Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival."); *Dreamstime.com LLC v. Google LLC*, 54 F.4th 1130, 1142 (9th Cir. 2022) (Google's "captur[ing]" of user and advertiser data reflects its lawful competitive advantage).

Daily Mail also attempts to resuscitate the argument that DFP user IDs are the publishers' data and not Google's.  Compl. ¶ 108.  Here, Daily Mail simply repeats the same incomplete and out-of-context quotations that the States relied on, *see id.*; *see also* Reply in Supp. of Mot. to Dismiss, ECF No. 293, at n. 18; MTD Op., at 44 (describing "user IDs that Google itself generated"), and adds an allegation that Daily Mail "'own[ed]' all data 'derived from the use of' DFP and AdX[,]" Compl. ¶ 109 (providing incomplete quotations from unidentified contracts). Those do not establish that the user IDs that Google's ad server generates and encrypts are somehow the publisher's or that Google must share them despite its privacy concerns.  The Court accordingly rejected the States' similar claim based on similar allegations about who owns the data.  MTD Op., at 44.

Finally, Daily Mail fails to allege that encrypting user IDs involves profit sacrifice by Google or is otherwise not a rational business strategy absent anticompetitive objectives.  Daily Mail states that Google's encrypting user IDs is "irrational" because it somehow prevents an ad server from serving higher value impressions and therefore sacrifices ad revenue.  Compl. ¶ 113; *see also* MTD Op., at 44.  Yet Daily Mail acknowledges the rational privacy purpose for this practice, and its arguments that it is pretextual do not demonstrate that encrypting user IDs would be irrational absent an adverse effect on competition.  *See Novell*, 731 F.3d at 1075, 1078 n.4

("Put simply, the monopolist's conduct must be irrational but for its anticompetitive effect."); *see also In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (finding conduct to be anticompetitive if it occurs "without a legitimate business purpose" and "makes sense only because it eliminates competition" (internal quotation marks omitted)).  It is entirely legitimate for Google to protect user information from non-Google entities due to privacy concerns. Moreover, taking Daily Mail's allegations as true, Google's unparalleled access to, and use of, unencrypted user IDs would be an advantage for Google and allow AdX to increase profits.  For the same reasons, this conduct is clearly not irrational but for anticompetitive effect.  *See FTC v. Qualcomm Inc.*, 969 F. 3d 974, 993-94 (9th Cir. 2020) (finding no plausible allegation of profit sacrifice because the defendant's conduct was "lucrative" both in the short and long terms).

## II.  MONOPOLY LEVERAGING CLAIMS INVOLVING GOOGLE'S SEARCH BUSINESS FAIL AS A MATTER OF LAW.

Section III.C of Daily Mail's complaint should be dismissed for failing to state a claim and largely restating arguments that were already dismissed by this Court.  Compl. ¶¶ 201-225. Daily Mail claims that Google "wields its monopoly in general search services to force publishers to sell growing shares of their ad inventory through AdX[,]" namely by punishing publishers on mobile and desktop search rankings if they do not meet Google's "sales quotas[.]" Compl. ¶ 201.  In effect, Daily Mail argues that Google leverages a monopoly in an alleged search market to increase its supposed power in the alleged ad exchange market.  *See* ECF No. 377, at 2-3.  In making this leveraging claim, Daily Mail challenges two types of conduct: (1) the introduction of AMP, Compl. ¶¶ 202-12; and (2) Google's purported manipulation of its search results, *id.* at ¶¶ 213-25.

A "monopoly leveraging" claim requires, at the bare minimum, allegations of anticompetitive conduct.  *Trinko*, 540 U.S. at 415 n.4 ("[L]everaging presupposes

anticompetitive conduct[.]"); *see also A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 250 (S.D.N.Y. 2004) ("[A]nticompetitive conduct . . . is a necessary element of a monopoly leveraging claim.").  This anticompetitive conduct must involve taking (i) monopoly power in one market; (ii) to create a dangerous probability of monopolizing a second market; and (iii) antitrust injury.  *N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.,* 323 F. Supp. 2d 559, 572-73 (S.D.N.Y. 2004).

### A.  Accelerated Mobile Pages Is Not Exclusionary Conduct.

Daily Mail's allegations regarding AMP do not amount to anticompetitive conduct and, like the States' nearly identical allegations, should be dismissed by the Court for failure to state a claim.  *See* MTD Op., at 70-72.

As with the States, the crux of Daily Mail's claim is that AMP is incompatible with header bidding.  Compl. ¶ 206; States' TAC ¶ 407.  Daily Mail alleges that AMP was designed to render websites on mobile devices in a way that is incompatible with header bidding by restricting the use of the JavaScript code that publishers rely on for header bidding and by restricting publishers' use of a so-called "remote.html" workaround on Google's ad exchange. Compl. ¶¶ 205, 208; States' TAC ¶ 407.  It alleges that Google manipulated search-engine traffic on mobile webpages to force publishers not to use header bidding, harming rival ad exchanges. Compl. ¶ 206, ¶ 212; States' TAC ¶¶ 406-12.  And finally, it alleges that because of Google's conduct, publishers who did not use AMP lost site traffic and ad revenue.  Compl. ¶¶ 206, 211; States' TAC ¶ 408-09.

Any monopoly leveraging claim falls short because Daily Mail fails to allege that AMP is exclusionary.  Google has no obligation to design AMP to include third-party scripts.  Nor does Google have any obligation to allow non-AMP sites into its News Carousel.  Even a monopolist is not required to develop a product that is compatible with rival products.  *See Trinko*, 540 U.S.

at 407-08; *Charych*, 790 Fed. App'x at 302; *Novell*, 731 F.3d at 1072 (reasoning that there is no duty to "lend smaller rivals a helping hand").

To the extent that Daily Mail asserts that this conduct is akin to tying, it fails because Daily Mail does not allege that AMP was coercive.  To state a valid tying claim, a plaintiff must allege facts plausibly showing that, among other things, "the seller uses actual coercion to force buyers to purchase the tied product[.]"  *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016); *see also E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006) (same coercion element required for Section 2 tying claim).  "Actual coercion . . . is present only if the manufacturer goes beyond persuasion and conditions [the] purchase of one product on the purchase of another product."  *Unijax*, 683 F.2d at 685.  Daily Mail alleges no such coercion.  Daily Mail could not have been coerced into fully adopting AMP, since it uses client-side header bidding and has non-AMP mobile pages.  *See* Compl. ¶¶ 206, 224.

By Daily Mail's allegations, Google's decisions to restrict third-party scripts in the AMP format and to show only AMP-compatible content in its News Carousel is a legitimate, rational business decision.  AMP helps improve web page load speeds on mobile devices, including web pages showing Google search results.  Compl. ¶ 212.  Daily Mail claims Google's justification is pretextual and that AMP pages load faster on a Google search results page only because Google pre-loads AMP pages once a user runs a Google search, yet Google does not offer such pre-loading for non-AMP pages.  *Id.*  Moreover, Daily Mail claims Google offers pre-loading for AMP pages only so Google can require publishers to adopt AMP.  *Id.*  But Google has no obligation to pre-load any page that any publisher might design.  Because "[p]roduct innovation generally benefits consumers[,]" courts are "very skeptical about claims that competition has been harmed by . . . product design changes," and "neither product withdrawal nor product

11

improvement alone is anticompetitive." *New York ex rel. Schneiderman v. Actavis PLC,* 787 F.3d 638, 652, 653-54 (2d Cir. 2015). Courts are reluctant to oversee product design, as "any dampening of technological innovation would be at cross-purposes with antitrust law." *United States v. Microsoft Corp.,* 147 F.3d 935, 948 (D.C. Cir. 1998).

Daily Mail also fails to allege a dangerous probability of monopolizing a second market because it does not offer any sense of the magnitude of AMP's alleged effect on an exchange market. Even if Google's News Carousel caused some portion of mobile web pages to be AMP-formatted, Daily Mail does not allege that such portion is substantial enough to affect the alleged exchange market as a whole. As discussed above, Daily Mail has web pages that are not AMP-formatted. Daily Mail fails to allege facts to plausibly support its assertion that the News Carousel or AMP itself created a dangerous probability of monopolization because it fails to explain what proportion of pages, impressions, and auctions would be covered by AMP.

### B. Alleged Manipulation of Search Results Is Not Exclusionary Conduct.

As part of its leveraging claim, Daily Mail also alleges that Google manipulated its Search algorithm, causing a significant decline in Daily Mail's traffic from Google Search, in order to coerce Daily Mail to use AdX. Compl. ¶¶ 213-14. Even if true (and they are not), Daily Mail's allegations about Google's broadly applicable updates to its search engine and any concomitant effect on Daily Mail's search traffic do not amount to the level of coercion or conditioning necessary to maintain a claim of harm to competition. *See Unijax,* 683 F.2d at 685-86; *It's My Party, Inc. v. Live Nation, Inc.,* 811 F.3d 676, 684-88 (4th Cir. 2016). Moreover, Daily Mail's allegations simply do not explain how any search-related "punish[ment]" of Daily Mail or the handful of other publishers mentioned in their complaint, Compl. ¶ 216, could foreclose rivals and harm marketwide competition in display advertising. *See NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 139 (1998) (finding that a "simple allegation of harm" to the plaintiff

12

"does not automatically show injury to competition"); *Balaklaw v. Lovell*, 14 F.3d 793, 797-99 (2d Cir. 1994) (injury to plaintiff alone does not state a claim; there must be injury to the relevant market as a whole).  As to the non-Daily Mail publishers (Conde Nast, Prevention Magazine, the New York Times, and NFL.com), Daily Mail offers nothing but a conclusion that they "saw significant drops in visibility and traffic."  Compl. ¶ 216.  But this is all there is, and an impact on five publishers does not amount to an effect on marketwide competition.

Daily Mail does not acknowledge any reason for its decline in traffic other than an implausible inference that Google punished it for using header bidding or engaging in a price flooring strategy in just the one week before Google implemented uniform price floors ("Unified Pricing Rules" or "UPRs").  It asks the Court to infer that Google made a change to its entire search results algorithm simply to temporarily punish Daily Mail for conduct that Daily Mail had long engaged in.  This is utterly unsupported and implausible.  Daily Mail had consistently used header bidding both before and after Google allegedly leveraged its search algorithm.  Indeed, Daily Mail claims that "Google restored Daily Mail's search traffic as quickly as it disappeared[,]" while Daily Mail continued to use header bidding.  *Id.* ¶ 217, Figure 2.  Daily Mail fails to explain any sort of causal connection between its alleged decline in traffic and header bidding or UPRs.  Mere timing of events is insufficient to show causation.  *See, e.g.*, *Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513, 530 (S.D.N.Y. 2016) (rejecting plaintiff's argument that an alleged conspiracy caused an anticompetitive result where plaintiff relied on the timing of the result to show causation), *aff'd sub nom. Diesel eBooks, LLC v. Simon & Schuster, Inc.*, 869 F.3d 55 (2d Cir. 2017).

With respect to UPRs, Daily Mail claims that, for the one week immediately before UPRs were effective, "Google punished Daily Mail on its search results because Daily Mail's pages

were less profitable to Google than other websites[,]" but that search traffic was restored once UPRs were implemented.  Compl. ¶ 222.  Daily Mail had set differential price floors "[f]or a while" before Google allegedly punished Daily Mail.  *See id.* ¶ 190.  It is not clear why Google would suddenly "punish" Daily Mail for this practice for just one week while Google was rolling out UPRs.  The loose coincidence in timing between Google implementing UPRs and Daily Mail's "restored" search traffic is insufficient to support an inference of causation.  *See Manuel v. Pepsi-Cola Co.*, 2018 WL 2269247, at *11 (S.D.N.Y. May 17, 2018) ("In law, as in science, correlation is not causation." (internal quotation marks and alterations omitted)).

Daily Mail's insinuation that Google punished other publishers is worse than speculation.  Daily Mail does not allege that those publishers used any ad tech tools, let alone that they used header bidding or UPRs.  Daily Mail provides no facts whatsoever to support the accusation that Google punished those publishers for anything, let alone something having to do with ad tech.

Nor does Daily Mail allege any effect on competition in a relevant market from this supposed "punishment."  Indeed, it appears that Daily Mail did not change its behavior at all as a result of these search engine updates; for example, it continued to use rather than abandon client-side header bidding.  And even if it had changed behavior, Daily Mail does not allege that its activities alone can affect market-wide competition among ad exchanges or publisher ad servers.

Google's implementation of Internet-wide updates to its search algorithm simply does not equate to the coercion necessary to maintain any sort of claim for monopoly leveraging.  A nearly identical claim was rejected in *Dreamstime.com, LLC v. Google LLC*, 470 F. Supp. 3d 1082, 1085-86, 1094-95 (N.D. Cal. 2020) (citing Google's "honest results policy," which precludes use of search results to affect ad costs or placement), *aff'd*, 54 F.4th 1130 (9th Cir. 2022).

Because Daily Mail does not plausibly allege any anticompetitive conduct, its monopoly leveraging claim with respect to AMP or Google's alleged manipulation of search results necessarily fails.

### III.   A 12(B)(6) MOTION IS A PROPER VEHICLE TO DISMISS SOME OF DAILY MAIL'S ANTITRUST CLAIMS.

Google properly seeks a 12(b)(6) motion to dismiss entire claims—not, as Daily Mail suggests, parts of claims.  Daily Mail mischaracterizes Google's motion as an attempt to "slice and dice Daily Mail's antitrust claims."  ECF No. 377, at 3.  Rather, Google is using a procedural mechanism that is entirely appropriate for dismissing inadequately pleaded claims.

Rule 12(b)(6) may be used to challenge claims for relief, whether labeled as "counts," "conduct," or something else.  A claim is "a set of facts giving rise to one or more legal rights[.]" *Schwartz v. Eaton*, 264 F.2d 195, 196 (2d Cir. 1959); *see also In re Am. Express Anti-Steering Rules Antitrust Litig*., 343 F. Supp. 3d 94, 100 (E.D.N.Y. 2018) (defining claim as a "set of facts that can support liability for the defendant under a cause of action").  Courts should analyze motions to dismiss based on the alleged sets of facts and the relief sought, not formal distinctions of "counts" or "causes of action."  *In re Am. Express*, 343 F. Supp. 3d at 100.   Indeed, the Court followed this very approach when evaluating Google's motion to dismiss the States' case.  *See* MTD Op., at 44, 66, 72.

Each claim challenged by Google rests on a distinct set of facts that each would give rise to its own claim for relief if valid.  Google opposes Daily Mail's claims about Exchange Bidding, hashed user IDs, and Google's alleged abuse of its Search monopoly to monopolize ad exchanges.  Although Daily Mail groups each feature under Count II, a plaintiff cannot "collapse all of his distinct claims into one central 'count,' thereby proofing his complaint from a partial motion to dismiss."  *In re Am. Express*, 343 F. Supp. 3d at 100.

Daily Mail's reliance on *BBL, Inc. v. City of Angola* and *American Express* is misplaced. *See* ECF No. 377, at 3.  In *BBL*, the defendant sought to challenge *certain elements* of a First Amendment claim, not an entire set of facts giving rise to a cause of action.  809 F.3d 317, 324-25 (7th Cir. 2015) (stating defendant's "motion for judgment on the pleadings *on parts* of the First Amendment claim may have been improper" because the parties and district court "split a single claim into multiple components based on the elements of the applicable constitutional test");  *see also W.P. v. Anthem Ins. Cos.*, 2017 WL 605079, at *4 (S.D. Ind. Feb. 15, 2017) (distinguishing *BBL* because the defendant "seeks judgment on stand-alone claims rather than on a single element of one claim").  And in *American Express*, the court ultimately denied the defendant's motion to dismiss because it sought dismissal of the two-sided market ***theory***, which is not in itself a "claim."  *In re Am. Express*, 343 F. Supp. 3d at 101.  Here, however, Google seeks dismissal of four distinct sets of factual allegations—which, using the very definition from *American Express*, constitute stand-alone claims.

Finally, Google is not challenging one legal theory while ignoring another.  Rather, Google is challenging Daily Mail's monopolization theory with respect to four sets of factual allegations—those related to Exchange Bidding, AMP, hashed user IDs, and monopoly leveraging of Google's Search business.  Because Google seeks dismissal of entire claims, its motion to dismiss is procedurally proper, and would spare the parties the cost and burden of extensive but ultimately irrelevant discovery.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court dismiss the claims in Count II regarding Exchange Bidding, hashed user IDs, AMP, and alleged leveraging of search monopoly of Daily Mail's Amended Complaint in full and with prejudice.

Dated: February 3, 2023

Respectfully Submitted,

*/s/ Justina K. Sessions*
Justina K. Sessions
Jonathan Jacobson
Jessica Lonergan
Mikaela Evans-Aziz (admitted *pro hac vice*)
Vadim Egoul
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
(415) 947-2000
jsessions@wsgr.com
jjacobson@wsgr.com
jlonergan@wsgr.com
mevansaziz@wsgr.com
vegoul@wsgr.com

John Harkrider
Daniel Bitton
Bradley Justus (admitted *pro hac vice*)
Koren Wong-Ervin (admitted *pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
jharkrider@axinn.com
dbitton@axinn.com
bjustus@axinn.com
kwongervin@axinn.com

*Counsel for Defendants Google LLC and Alphabet Inc.*