**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | No. 1:21-md-03010 (PKC) |

**META PLATFORMS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COUNTS III AND IV IN ADVERTISERS' CONSOLIDATED AMENDED COMPLAINT**

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Meta Platforms, Inc.,*

February 3, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ............................................................................................................................. 1

FACTUAL BACKGROUND ........................................................................................................... 3

LEGAL STANDARD ....................................................................................................................... 7

ARGUMENT .................................................................................................................................... 8

I.      THE COURT'S RULING DISMISSING THE STATES' NBA CLAIM IS
FATAL TO ADVERTISERS' NBA CLAIM ........................................................................ 8

      A.     The Advertisers' NBA Theory Is Substantively the Same as the
States' NBA Theory ................................................................................................. 8

      B.     The Reasoning Behind the Court's Ruling Dismissing the States'
NBA Claim Applies Equally to the Advertisers' NBA Claim. ................. 12

II.     ADVERTISERS DO NOT STATE A CLAIM UNDER SECTION 1 OF
THE SHERMAN ACT. ....................................................................................................... 14

      A.     This Court Has Already Held that the Rule of Reason Governs
Advertisers' Section 1 Claim. ............................................................................... 14

      B.     Advertisers Have Not Plausibly Stated a Rule of Reason Claim .............. 17

            i.     Advertisers Have Not Plausibly Pleaded A Relevant
Market. ........................................................................................................ 17

            ii.     Advertisers Have Not Alleged Market Power. ............................... 20

            iii.    Advertisers Have Not Plausibly Pleaded Market-Wide
Harm. .......................................................................................................... 21

      C.     Advertisers Have Not Plausibly Alleged Article III Standing To
Pursue Their NBA Claim. ...................................................................................... 26

III.    ADVERTISERS' STATE LAW NBA CLAIM FAILS FOR THE SAME
REASONS AS THEIR FEDERAL ANTITRUST CLAIM. ................................ 28

IV.    ADVERTISERS' NBA CLAIMS SHOULD BE DISMISSED WITH
PREJUDICE. ......................................................................................................................... 30

CONCLUSION ............................................................................................................................... 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..........................................................................7, 8

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)....................................21, 24

*Bale v. Glasgow Tobacco Board of Trade, Inc.*, 339 F.2d 281 (6th Cir. 1964)...............26

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................7, 8, 12, 23

*Bhanusali v. Orange Reg'l Med. Ctr.*, No. 10-cv-6694-CS,
2013 WL 4828657 (S.D.N.Y. Aug. 12, 2013) ............................................................22

*Board of Trade of City of Chicago v. United States*, 246 U.S. 231 (1918) ......................26

*Budhani v. Monster Energy Co.*, No. 20-CV-1409-LJL, 2021 WL 5761902
(S.D.N.Y. Dec. 3, 2021).................................................................................................19

*Cangemi v. United States*, 13 F.4th 115 (2d Cir. 2021)......................................................7

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco
Managed Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007) ...................................................27

*Chapman v. New York State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008)........................17

*Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018) .........................................7

*City of New York v. Grp. Health Inc.*, 649 F.3d 151 (2d Cir. 2011).................................17

*Dutra v. BFI Waste Mgmt. Sys. of N. Am., Inc.*, No. 14-CV-04623-NC,
2015 WL 2251203 (N.D. Cal. May 13, 2015) .............................................................28

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240
(2d Cir. 1997)................................................................................................................21

*F.T.C. v. Superior Court Trial Lawyers Association*, 493 U.S. 411 (1990) .....................18

*F.T.C v. Indiana Federation of Dentists*, 476 U.S. 447 (1986) .........................................17

*Gainesville Oil & Gas Co. v. Farm Credit Bank of Tex.*, 847 S.W.2d 655
(Tex. App. 1993)...........................................................................................................26

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004)...............21

*Harrison Aire, Inc. v. Aerostar Intern., Inc.*, 423 F.3d 374 (3d Cir. 2005) .....................24

ii

*IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26 (2d Cir. 2014) ................................19

*In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481-KBR,
    2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) ........................................................18, 20

*In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55
    (S.D.N.Y. 2021) ....................................................................................................................26

*Jain Irrigation, Inc. v. Netafim Irrigation, Inc.*, 386 F. Supp. 3d 1308
    (E.D. Cal. 2019) ..................................................................................................................28

*Keepers, Inc. v. City of Milford*, 807 F.3d 24 (2d Cir. 2015) .............................................27

*Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250 (S.D.N.Y. 1995) .........................20

*Linzer Prod. Corp. v. Sekar*, 499 F. Supp. 2d 540 (S.D.N.Y. 2007) .................................24

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................26, 27

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23
    (2d Cir. 2015) ......................................................................................................................19

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129
    (2d Cir. 2013) .................................................................................................................5, 12

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525 (1st Cir. 1989) .........12, 24

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998) ...........................................................16

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ........................................................17, 24

*Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79 (2d Cir. 2014) ................................28

*Rosner v. Star Gas Partners, L.P.*, 344 F. App'x 642 (2d Cir. 2009) ...............................30

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) .................................................................8

*Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160 (N.D. Cal. 2013) ...........................................28

*Spinelli v. Nat'l Football League*, 903 F.3d 185 (2d Cir. 2018) ..................................22, 24

*State of Texas et al. v. Google LLC*, No. 21-cv-06841 (E.D. Tex.) .....................................3

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) .........................................................................14

*Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90 (2d Cir. 1998) .........................20

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ........................................................26

*United States v. Aiyer*, 33 F.4th 97 (2d Cir. 2022)........................................................16, 26

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015)................................................15

*United States v. Koppers Co.*, 652 F.2d 290 (2d Cir. 1981) .............................................16

**Statutes & Rules**

15 U.S.C. § 1............................................................................................................ passim

Cal. Bus. & Prof. Code § 16720 ......................................................................................28

Fed. R. Civ. P. 12(b)(6).....................................................................................................7

**Other Authorities**

European Commission, Daily News 19/12/22,
    https://ec.europa.eu/commission/presscorner/detail/en/mex_22_7832..........................7

l Newberg and Rubenstein on Class Actions § 2:5 (6th ed.) ............................................27

## INTRODUCTION

On September 13, 2022, this Court issued an 87-page Opinion and Order ("Order", Dkt. No. 308) dismissing the States' claim that the Network Bidding Agreement (the "NBA") between Google and Meta violates Section 1 of the Sherman Act.  The Court's dismissal was based on its review of the States' 702-paragraph Third Amended Complaint ("States' TAC", Dkt. No. 195) and more than 125 pages of briefing on Google's motion to dismiss, as well as extensive oral argument.  The Court also had before it the full terms of the NBA, and devoted fourteen pages of the Order to parsing those terms and explaining why the NBA could not plausibly be alleged to constitute a violation of the Sherman Act.

The key holdings in the Court's Order concerning the NBA were:  (1) the terms in the NBA are "entirely consistent with competition" (Order at 25), (2) the States had not plausibly alleged the existence of any collusive bidding agreements related to bidding for in-app impressions (Order at 32) and (3) the NBA "promotes competition" by introducing a competing bidder.  (*Id.*)  Notwithstanding this Court's Order, the putative class of advertisers (the "Advertisers") continue to assert a substantively identical Section 1 claim (and a corresponding claim under California state law) arising out of the NBA.[1] (*See* Consolidated Advertiser Complaint ("CAC"), Dkt. No. 399.)  Advertisers' NBA claims fail for the same reason as the States' claims.

*First*, Advertisers' theory as to why the NBA is anticompetitive is indistinguishable from the States' theory.  While the Advertisers do not repeat the States'

---

[1] The Advertisers also assert additional causes of action against only Google.  Meta takes no position on the viability of any of those claims.

failed theory that the NBA was somehow tied to an effort to "kill" header bidding, their remaining theory is indistinguishable from the States' back-up claim—also rejected by the Court—that particular terms of the NBA gave Meta an unlawful competitive advantage.  (*See* Section I.)

*Second*, even if the Advertisers' NBA claim were factually distinguishable from the States' claim—and it is not—Advertisers' NBA claim still fails to state a claim under the antitrust laws for a host of obvious reasons.  To begin, the Advertisers utterly fail to allege a plausible relevant market, relegating their entire discussion of the supposed relevant market to a single paragraph (CAC ¶ 294), which itself fails to even explain what the market is (never mind why it is viable).  Not surprisingly, the Advertisers also fail to allege *any* facts concerning market power and fail to provide any cogent explanation as to how provisions of the NBA that allegedly permit Meta to better achieve value for its advertiser-customers could somehow harm competition and advertisers.  Finally, the Advertisers have no standing to assert their failed claims anyway; their theory of harm is based on the premise that Google harmed its own customers in order to benefit Meta, a theory that is implausible and unsupported by the allegations.  (*See* Section II.)

*Third*, the Advertisers' proposed state law claim concerning the NBA rises—or more accurately, falls—with their Sherman Act NBA claim.  Thus, for each of the reasons above, that claim should also be dismissed.  (*See* Section III.)  Given the extensive opportunities Advertisers have had to refine their NBA theory (specifically, multiple opportunities prior to the centralization of this MDL and two opportunities *after* the Court ruled on the substantively identical theory advanced by the States), any further

amendment would be futile, and as such, Advertisers' NBA claims should be dismissed with prejudice.  (*See* Section IV.)

## FACTUAL BACKGROUND

On December 16, 2020, a group of 10 state attorneys general ("the States") filed a complaint against Google in the Eastern District of Texas alleging a range of anticompetitive conduct related to digital advertising.  (*State of Texas et al. v. Google LLC*, No. 21-cv-06841 (E.D. Tex.), Dkt. No. 1.)  The majority of the States' allegations related to conduct involving only Google.  The States also alleged a Sherman Act Section 1 claim (against only Google) based on the September 2018 commercial agreement between Meta and Google related to digital advertising—the NBA.

The States' action was centralized with 18 other actions brought by private plaintiffs in a multidistrict litigation before this Court.[2]  The factual allegations in the complaints that challenged the NBA were substantively the same as the factual allegations in the States' complaint.  On August 13, 2021, this Court ordered that it would proceed with any motions to dismiss the States' complaint prior to addressing motions to dismiss or amend the complaints in the private cases.  (*See* PTO No. 1 ¶¶ 7-10, Dkt. No. 4.)  This procedure would allow the private plaintiffs to "tak[e] account of the rulings on the motion to dismiss in the state case" when proposing amendments to their own pleadings.  (*Id.* ¶ 9.)  The Court permitted the States to further amend their complaint—including in response to deficiencies identified in a pre-motion letter to dismiss filed by Google—so that the "strongest and best pleading" would be before the Court when it ruled on Google's motion to dismiss the States' complaint.  (Dkt. No. 144.)

---

[2] After the MDL was created, 13 actions were subsequently transferred to the MDL.

In their Third Amended Complaint, the States alleged that Google and Meta entered into an agreement in which Meta curtailed its use of header bidding in return for Google providing Meta with "a leg up . . . in ad auctions, allocating a portion of the wins to [Meta], and helping [Meta's] ad network [MAN] beat the competition". (States' TAC ¶ 413.)  The States alleged that this amounted to an agreement "to allocate markets, manipulate publisher auctions, depress prices paid to publishers, and exclude rival ad networks", which the States claimed was *per se* unlawful as well as unlawful under the rule of reason under Section 1 of the Sherman Act.  (*Id.* ¶¶ 544-555.)

The States focused on several specific provisions of the NBA that they contended gave Meta "special advantages".  (*Id.* ¶ 427.)  Those provisions included:  (i) volume-based price concessions off the 10% fee Google charged other networks (*id.* ¶ 428); (ii) the so-called "win rate provision", under which Meta agreed to endeavor to win at least 10 percent of all auctions in which it bid (*id.* ¶ 438); (iii) the "timeout provision", under which Google gave Meta a 300 millisecond timeout (as opposed to 160 millisecond timeout) in Google's ad auctions (*id.* ¶ 429); (iv) the ability to contract directly with publishers (*id.* ¶ 430); (v) the "information provision", under which Google agreed to inform Meta which impressions were likely targeted to bots rather than humans (*id.* ¶ 431); (vi) the "match rate provision", under which Google committed to improve the percentage of users that Meta would be able to identify in auctions (*id.* at ¶¶ 432-33); and (vii) provisions restricting Google's use of Meta's bid data (*id.* ¶ 434).

With respect to the auctions Google conducts on behalf of developers to sell their in-app inventory, the States alleged an "auction manipulation scheme", whereby the terms of the NBA gave Google and Meta "special advantages unavailable to other

buyers" and Meta and Google agreed to limit their competitive bidding between each other by fixing a minimum share of impressions that Meta would win in developers' auctions. (*See id.* ¶¶ 437-438.)

On September 13, 2022, this Court dismissed the States' Section 1 claim arising out of the NBA. (Order at 3.) *First*, the Court found the States had not plausibly pled an agreement between Meta and Google in which Meta would drop its support for header bidding in exchange for special advantages in Google's ad auctions. (*Id.* at 21-22.) As the Court noted, "the 48-page NBA does not touch upon or purport to restrict Facebook's use of header bidding". (*Id.* at 24.) Moreover, the fact that the agreement contained commercial benefits for both Google and Meta—including but not limited to the match rate provision, the timeout provision and the information provision (*id.* at 24-25)—did not support an inference of conspiracy, as "[a]n inference of conspiracy is not supported by acts that 'made perfect business sense.'" (*id.* at 22 (citing *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 138 (2d Cir. 2013)).) Ultimately, the Court explained that the States had failed to account for "Facebook's motivation to use its economic clout as an advertiser to drive the hardest bargain it could with Google" as well as Google's "legitimate, pro-competitive desire to obtain as much business as possible from Facebook." (*Id.* at 22.)

*Second*, the Court found the States had not plausibly pled that the specific terms of the NBA—which were before the Court—harmed competition in bidding for in-app ad inventory through auctions run by in-app mediation tools, including Google-run auctions. (*Id.* at 26.) The Court declined to apply the *per se* rule to the NBA, reasoning that the NBA was properly understood as a vertical agreement and should therefore be

analyzed under the rule of reason.  (*Id.* at 28-29.)  Applying the rule of reason, the Court

concluded that the NBA provisions at issue—*i.e.*, those provisions that allegedly provide

Meta more favorable terms than other bidders received and that are at the core of the

Advertisers' allegations—were "consistent with competition".  (*See id.* at 28 ("Taking the

NBA as a whole and in the context of the entirety of the Complaint's allegations, Google,

the auctioneer, provided pricing and other incentives to Facebook, the in-app network, to

participate in the auctions that Google offered on behalf of developers."); *id.* at 25

("Google's actions are consistent with a firm seeking to secure the business of a very

large potential customer by offering it favorable terms.  In the absence of an allegation of

predatory pricing or other exclusionary or improper conduct, these actions are entirely

consistent with competition.").)

Overall, the Court concluded that even if Meta received alleged special

benefits under the agreement, the NBA did "not dictate which impressions [Meta] may

bid on or at what price".  (*Id.* at 32.)  Instead of limiting competition, the Court found that

the NBA "promote[d] competition with Google's in-app network by bringing in a new

competing bidder".  (*Id.* at 32.)  Any alleged anticompetitive effects in the in-app

network market were therefore implausible.[3]

Following its Order on Google's motion to dismiss the States' TAC, the

Court issued Pre-Trial Order No. 2 (PTO No. 2, Dkt. No. 309), setting forth a procedure

by which private plaintiffs could seek to amend their pleadings in light of the Court's

Order.  (*Id.* ¶¶ 1-3.)  The Advertisers submitted a proposed amended complaint that

---

[3] The Court also found that the States had not plausibly pled that Google had market power in the in-app network market.  (Order at 32.)

6

included, *inter alia*, claims that the NBA was anticompetitive.  (*See generally* CAC.)

Meta opposed amendment on the grounds that the proposed amendments related to the

NBA were futile in light of the Court's ruling regarding the States' NBA claim, (Opp.

Mot. Amend, Dkt. No. 355), which the Advertisers contested (Mot. Amend, Dkt. No.

317; Reply Mot. Amend, Dkt. No. 376).  Without adjudicating the issue of futility, the

Court granted the Advertisers leave to amend, subject to the right of Google and Meta to

move to dismiss the amended pleading.[4]  (PTO No. 4, Dkt. No. 392.)  Meta now moves

to dismiss the NBA claims in the Advertisers' CAC with prejudice.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must

plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.

Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  For a plaintiff to "'nudge[] their claim[]

across the line from conceivable to plausible,' they must 'raise a reasonable expectation

that discovery will reveal evidence' of the wrongdoing alleged."  *Citizens United v.

Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 570).  If

the facts in the complaint are "merely consistent with" the alleged wrongdoing, the

complaint "stops short of the line between possibility and plausibility" and is subject to

---

[4] Shortly thereafter, on December 19, 2022, the European Commission announced that it was closing an investigation it had been conducting into the NBA without filing any charges after "a careful assessment of all relevant evidence, including information received from Google, Meta and other companies active in the tech sector".  The Commission explained that the "evidence did not confirm [the Commission's] initial concerns" with the agreement.  *See* European Commission, Daily News 19/12/22, https://ec.europa.eu/commission/presscorner/detail/en/mex_22_7832 (last visited February 2, 2023).  The Court may take judicial notice of the Commission's announcement on its official website regarding its conclusion of the investigation.  *See Cangemi v. United States*, 13 F.4th 115, 124 n.4 (2d Cir. 2021) (taking judicial notice of information on a government website).

dismissal under Rule 12(b)(6).  *Twombly*, 550 U.S. at 557.  A court is "not required to credit conclusory allegations or legal conclusion couched as factual . . . allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).  Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555.).

## ARGUMENT

## I.  THE COURT'S RULING DISMISSING THE STATES' NBA CLAIM IS FATAL TO ADVERTISERS' NBA CLAIM.

Although Advertisers attempt to distinguish their NBA claim from the States' failed NBA claim, the distinctions Advertisers draw are only superficial:  both the Advertisers' and the States' NBA claims are based upon the same theory that certain terms of the NBA distorted competition in Google-run ad auctions, which allegedly benefitted Meta and caused Meta's rival bidders to pay higher prices.  This Court has already considered this theory and rejected it as implausible.  It should do so again.

### A.  The Advertisers' NBA Theory Is Substantively the Same as the States' NBA Theory.

The core theory of the Advertisers' NBA claim is that Google provided Meta with certain favorable terms that disadvantaged other bidders in auctions for web and in-app impressions.  (*See* CAC ¶¶ 285-294, 365-372, 373-377.)  That is precisely how the States described at least one of their failed theories.  (*See* States' TAC ¶¶ 443-445 (alleging that the "auction manipulation scheme" between Meta and Google benefitted Meta at the expense of other bidders).)  It is also precisely how the Court understood at least one of the States' failed theories.  As the Court explained in the Order, the States alleged that "Google has effectively excluded rival bidders because the NBA

8

contains terms more favorable to Facebook than those offered to others".  (*See* Order at 26 (citing States' TAC ¶ 441).)

These substantively identical theories are also premised on the very same contract terms:  the NBA's match rate provision,[5] the timeout provision[6] and the information provision.[7]  (*See* States' TAC ¶ 441 ("the auction house can take steps to disadvantage outside bidders by withholding information, giving them less time to bid, or charging them higher bidder fees—precisely as Google has done to other prospective bidders").)  Advertisers do not rely upon any provisions of the NBA to support their theory that were not already relied upon by the States and analyzed by the Court.

Although Advertisers attempt to distinguish their NBA claim from the States' NBA claim by making a number of superficial changes, none of the alleged differences substantively distinguish their theory from the States'.  For example, the Advertisers allege that the harm to competition occurred in a different market than the States,[8] but that is of no moment.  As explained in Section II.B., Advertisers' single-paragraph market definition does not allege a plausible antitrust market, but even if it did, naming an alternative market does not change the fact that the alleged anticompetitive harm is the exact alleged harm the Court already found implausible.

---

[5] *Compare* States' TAC ¶¶ 432-433, *with* CAC ¶ 287.

[6] *Compare* States' TAC ¶ 429, *with* CAC ¶ 288.

[7] *Compare* States' TAC ¶ 431, *with* CAC ¶¶ 286-287, 290.  The Advertisers also cite to the NBA's minimum spend, win-rate and bid response commitment provisions, all of which also supported the States' NBA claim.  *Compare* States' TAC ¶ 426, *with* CAC ¶ 287 (minimum spend); States' TAC ¶ 438, *with* CAC ¶ 287 (win rate); States' TAC ¶ 438, *with* CAC ¶ 287 (bid response commitment).

[8] *Compare* CAC ¶ 294 ("Google's Final Clearinghouse Auctions" market), *with* States' TAC ¶¶ 518-519 ("in-app network" market).

Specifically, Advertisers allege competition was harmed because "Meta's superior information, match rates, and lengthened timeouts inflated the bids for Meta's rivals to win in Google's auctions". (CAC ¶ 292.) This is the precise harm claimed by the States and rejected by this Court. (Order at 26 ("[The States] also assert that Google has effectively excluded rival bidders because the NBA contains terms more favorable to Facebook than those offered to others"); *id.* at 32-34 (noting that the States' alleged harm to an "in-app network market", which was defined by the States[9] to include Meta's and Google's demand-side ad networks and other competing bidders in Google-run auctions, was implausible.) That harm is implausible in the Advertisers' CAC for the same reasons it was in the States' TAC. As the Court explained, "inducing Facebook to actively participate in the Google-run auctions" arguably "promote[s] rather than harm[s] competition in the in-app network market". (*Id.* at 31.)

Any other purported minor distinctions between the NBA claims are also irrelevant. For example, the Advertisers suggested in the motion to amend briefing that their claim is different from the States' claim because the Advertisers are focused on an alleged harm to advertisers whereas the States were purportedly focused on an alleged harm to non-Meta in-app ad networks. This is a red herring. Ad networks serve as intermediaries between advertisers and publishers, meaning that both the States and Advertisers have alleged harm on the demand (*i.e.* advertiser) side of Google's ad auctions. The States explained in the TAC that the alleged harm felt by ad networks was passed on to advertisers. (*See* States' TAC ¶ 445 (alleging that the NBA gave Google

---

[9] *See* States' TAC ¶¶ 232-243.

and Meta's ad networks the power to "raise the prices at which [they] resold in-app impressions to advertisers").)[10]  In other words, both the States and the Advertisers allege a harm—reduced competition on the demand (*i.e.* advertiser) side of auctions—that the Court has already found implausible in light of the fact that bringing an additional ad network, such as Meta's Audience Network, into the fold (as the NBA did) would arguably *increase* competition rather than decrease it.  (Order at 31.)

Advertisers' repeated invocation of language related to Google's role as "auctioneer" (*see* Reply Mot. Amend. at 1) also does not substantively distinguish their NBA claim from the States', which also focused on Google's role as auctioneer.  (*See* States' TAC ¶ 441 (alleging that the NBA was the equivalent of "[b]ringing the auction house itself into the scheme" since it allowed Google, "the auction house [to] take steps to disadvantage outside bidders by withholding information, giving them less time to bid, or charging them higher bidder fees").)  Finally, the fact that the States' theory is broader than the Advertisers' theory and includes, for example, allegations that the NBA was part of a *quid pro quo* agreement to kill header bidding, does nothing to change the conclusions this Court reached regarding the States' auction manipulation theory, which the Court considered on a standalone basis separate from the States' header bidding theory.  (Order at 30-34.)

---

[10] The Advertisers also acknowledge in the CAC that the harm advertisers allegedly experienced was first experienced by ad network intermediaries.  (*See* CAC ¶ 290 ("[T]he terms of the NBA that restrain trade are those governing the horizontal relationship between Meta's MAN and the other competing advertiser intermediaries against whom MAN bids at auction").)

In short, none of the purported distinctions between the Advertisers' NBA claim and the States' NBA claim have significance; the Advertisers' NBA claim is based on the same failed theory as the States' NBA claim.

**B.     The Reasoning Behind the Court's Ruling Dismissing the States' NBA Claim Applies Equally to the Advertisers' NBA Claim.**

Because Advertisers' theory as to why the NBA is anticompetitive is substantively the same as one of the States' failed theories, the Court's reasoning dismissing the States' theory is equally fatal to the Advertisers' NBA claim.  In particular, the two key holdings from the Court's order that are fatal to Advertisers' theory are:  (1) the terms of the NBA reflect reasonable business decisions that were "consistent with competition" (Order at 25-26) and (2) the effect of the NBA was procompetitive (*id.* at 32).

*First*, in holding that the States' allegations "do not plausibly allege joint or concerted action between Google and Facebook", the Court explained that the States "fail to adequately account for Facebook's motivation to use its economic clout as an advertiser to drive the hardest bargain it could with Google, and that Google was motivated by the legitimate, pro-competitive desire to obtain as much business as possible from Facebook."  (Order at 22 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 566 (2007) ("there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway . . . .")).)

After analyzing the terms of the NBA—including the same terms upon which the Advertisers premise their proposed NBA claim (Order at 24-25)—the Court further reasoned:  "Offering favorable terms to a large potential customer, such as Facebook, undoubtedly had the effect of diverting business from a competing service

[header bidding], but this does not convert the agreement into an unreasonable restraint of trade." (*Id.* at 26 (citing *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 529 (1st Cir. 1989) ("nothing anticompetitive in the simple fact that a seller selectively cuts its prices, or offers other favorable terms, to some of its dealers, even though such discrimination harms the non-favored dealers") (Breyer, J.)).)  Instead, as the Court explained, the terms of the NBA "'made perfect business sense.'" (*Id.* at 22 (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 138).)

These holdings apply with equal force to Advertisers' NBA claim.  As this Court previously noted, the NBA is expressly "not an exclusive agreement", (Order at 21 (citing NBA ¶ 19.10)), and nothing in the NBA prevents Google from offering the same favorable terms to other auction participants.  Thus, Advertisers' CAC contains no allegations to undermine the Court's conclusion that the NBA was "*entirely consistent with competition*".[11] (*Id.* at 25-26 (emphasis added).)

*Second*, the Court found that the States "do not adequately explain why inducing Facebook to actively participate in the Google-run auctions . . . does not promote rather than harm competition in the in-app network market." (*Id.* at 31; *see also id.* at 32 (holding "[the NBA] promote[d] competition with Google's in-app network by bringing in a new competing bidder").)  Advertisers allege that Meta's purported information advantage "inflated the bids for Meta's rivals to win in Google's auctions

---

[11] In the motion to amend briefing, in an effort to overcome the Court's conclusion that the NBA reflected a legitimate effort to obtain the business of a large potential customer, Advertisers made a series of assertions about what constitutes a "legitimate" discount.  Specifically, Advertisers contended a discount can only be "legitimate" if:  (1) the discount can be replicated in a lump sum payment, (2) the discount does not involve giving some customers benefits that are withheld from other customers and (3) the discount provides "equal competitive opportunities" for customers.  (Mot. Amend Reply at 4-5.)  The Advertisers do not cite any authority to support these criteria—which unsurprisingly mirror the allegations in the CAC about the favorable terms offered to Meta in the NBA.

above what those bids would have been had Meta not had access to such superior

information or been offered these secret advantages". (CAC ¶ 292.) But, similar to the

defects found in the States' theory, Advertisers do not allege that those supposed

anticompetitive effects outweigh the procompetitive benefits that flowed from Meta's

participation as a competing bidder in Google-run auctions. Nor do Advertisers even

bother to allege what rivals would have had to pay to win in Google's auctions absent

Meta's entry.

       In sum, Advertisers' theory as to why the NBA is anticompetitive is

substantively the same as the States' theory and the Court's reasoning dismissing the

States' claim applies equally here.

## II.   ADVERTISERS DO NOT STATE A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT.

       Even if the Court were to conclude that there are material differences

between the Advertisers' NBA claim and the States' dismissed NBA claim, Advertisers'

claim still must be dismissed because they have not plausibly stated a claim under

Section 1 of the Sherman Act.

### A.   This Court Has Already Held that the Rule of Reason Governs Advertisers' Section 1 Claim.

       Section 1 of the Sherman Act prohibits "[e]very contract, combination in

the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

15 U.S.C. § 1. For alleged Sherman Act violations, courts "presumptively appl[y] [the]

rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular

contract or combination is in fact unreasonable and anticompetitive before it will be

found unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Although certain

14

horizontal agreements are considered *per se* unlawful under the antitrust laws, vertical

restraints "should generally be subject to the rule of reason."  *United States v. Apple, Inc.*,

791 F.3d 290, 321 (2d Cir. 2015).

      This Court has already ruled that the NBA is "properly scrutinized" under

the rule of reason, stating that:

> Taking the NBA as a whole and in the context of the
> entirety of the Complaint's allegations, Google, the
> auctioneer, provided pricing and other incentives to
> Facebook, the in-app network, to participate in the auctions
> that Google offered on behalf of developers. Facebook is
> not alleged to be a participant in the market for in-app
> mediation tools that Google uses to conduct auctions of
> developers' inventory of impressions . . . . Read as such, it
> is principally a vertical agreement, with potential horizontal
> consequences.

(Order at 28 (emphasis added).)[12]  That reasoning applies with equal force here.

      Although Advertisers do not expressly concede that the rule of reason

applies, they also do not attempt to contend anywhere in the CAC or in the motion to

amend briefing that the NBA warrants *per se* treatment.  That is because there is no

plausible argument that the Advertisers' NBA claim warrants *per se* treatment.

Advertisers' NBA claim is based precisely on the "other incentives" the Court was

referring to in the Order—the match rate, timeout and information provisions—that

Google (the auctioneer) provided to Meta (the in-app network bidder) in a vertical

relationship.  Nowhere in the CAC do Advertisers allege that the NBA was a

---

[12] The Court also determined that its "conclusion that the States have not plausibly alleged an unlawful agreement between Google and Facebook to substantially curtail Facebook's use of header bidding dispenses with the need to decide whether such an agreement should be an analyzed as a horizontal or vertical agreement."  (Order at 21 n.12.)  Here, Advertisers do not allege an agreement between Google and Meta to "substantially curtail Meta's use of header bidding".

predominantly horizontal agreement between Google's in-app network that bids against Meta's in-app network in Google-run auctions, nor could they.  (*See generally* CAC ¶¶ 285-294, 365-372, 373-377.)[13]  Moreover, that the NBA's terms may purportedly restrain competition in the "horizontal relationship between Meta's MAN and the competing advertiser intermediaries against whom MAN bids at [Google's] auction" further confirms the vertical relationship between Google and Meta, without transforming the NBA into a horizontal agreement between competitors.  (CAC ¶ 290.)  Indeed, the Court already held that the NBA was "principally a *vertical agreement*, with potential *horizontal consequences*".  (Order at 28 (emphasis added).)

Finally, that Advertisers style their claim as a "bid rigging" claim (Mot. Amend at 6) does not compel a different result.  Bid rigging schemes subject to *per se* condemnation must occur between horizontal competitors.  *See United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022) ("[B]id rigging—which is simply another 'form of horizontal price fixing'—is a *per se* violation of the Sherman Act."); *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir. 1981) ("In cases involving behavior such as bid rigging, . . . the Sherman Act will be read as simply saying: An agreement among competitors to rig bids is illegal." (internal quotation marks omitted)).  In contrast, "[a] vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels."  (Order at 27 (citing *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998).)

---

[13] Moreover, in the motion to amend briefing, Advertisers conceded that the "favorable terms" provided to Meta as part of the NBA were not provided by Google as an in-app network (horizontal competitor), but rather by Google as auctioneer (vertical supplier).  (*See* Mot. Amend at 6 ("Not all violations in auction markets, however, involve collusion among bidders."); *id.* at 8 ("[T]he Section 1 claim in the CAC's Count III and the Cartwright Act claim in Count IV arise out of an agreement between Google, which conducts the Final Clearinghouse Auctions described in the NBA, and Meta, a particular bidder in those auctions.").)

### B.      Advertisers Have Not Plausibly Stated a Rule of Reason Claim.

Advertisers do not plausibly plead any of the elements that would allow them to state a claim for anticompetitive conduct under the rule of reason.

### i.      Advertisers Have Not Plausibly Pleaded A Relevant Market.

"To state a claim under [Section 1 of the Sherman Act], a plaintiff must allege a plausible relevant market in which competition will be impaired." *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011).  "[W]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008).

Advertisers argued in their motion to amend briefing that they are not required to plead a relevant market for a Section 1 claim.  (*See* Reply Mot. Amend at 7.) That is false.  Advertisers rely on *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460 (1986) to support their position.  (*Id.*)  However, as the Supreme Court subsequently explained in *Ohio v. American Express*, a plaintiff asserting a Section 1 claim is required to plead—and, ultimately, prove—a relevant market regardless of whether the plaintiff alleges direct harm to competition.  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018).  In doing so, the Supreme Court rejected the very argument Advertisers make here and explained that *FTC v. Indiana Federation of Dentists* merely stands for the proposition that in cases involving horizontal agreements between competitors, a "finding

17

of actual, sustained adverse effects on competition . . . is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis".  476 U.S. at 460.  That holding is inapplicable to the alleged vertical agreement at issue in this case.  Similarly, Advertisers' conclusory assertion that they do not need to define a relevant market because "the fact of agreement defines the market" is also incorrect.  (*See* Mot. Amend Reply at 6.)  Advertisers rely on *F.T.C. v. Superior Court Trial Lawyers Association*, 493 U.S. 411, 434 (1990) to support their position, but that case addresses the applicability of *per se* rules in boycott and price fixing cases, not the requirements for pleading a relevant antitrust market in a case involving a vertical agreement subject to the rule of reason.

Advertisers' allegations fall well short of plausibly pleading a relevant market.  The sum total of Advertisers' relevant market allegations is found in paragraph 294 of the CAC, in which Advertisers allege that the relevant market consists of "Google's Final Clearinghouse Auctions".  Meta understands the alleged market to include all of the ad auctions Google runs on its platform.  (CAC ¶ 294.)  But "simply naming a potential market is only the first step in defining the relevant market".  *In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481-KBR, 2014 WL 4277510, at *37 (S.D.N.Y. Aug. 29, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016).  Advertisers' CAC contains no allegations concerning (1) why the auctions for open display and in-app ad impressions are substitutable (and should therefore be in the same relevant product market); (2) why the relevant product market should not also include non-Google final clearinghouse auctions; or (3) the geographic boundaries of Advertisers' proposed relevant market.  Advertisers' market allegations cannot therefore survive a motion to

dismiss.  *See id.* at *14, *32 (plaintiffs failed to "allege a plausible market" where purported market definitions were not "accompanied by allegations regarding product interchangeability, elasticities, or geographic boundaries"); *Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 29 (2d Cir. 2015) (plaintiff's "attempt to carve up the New York City hotel labor market into an artificially small 'Marriott-only' submarket is sufficiently 'implausible,' to render dismissal appropriate at the pleading stage").

In response to Meta's opposition to Advertisers' motion to amend, Advertisers appear to assert that what paragraph 294 of the CAC is saying is that each individual Google Final Clearinghouse Auction is its own relevant product market.  (Mot. Amend Reply at 6-7.)  But that is not plausibly alleged in paragraph 294 of the CAC and Advertisers cannot "amend [their] complaint through their briefing."  *See Budhani v. Monster Energy Co.*, No. 20-CV-1409 (LJL), 2021 WL 5761902, at *3 (S.D.N.Y. Dec. 3, 2021); *see also IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 28 (2d Cir. 2014) (rejecting an allegation argued in briefing that "appear[ed] nowhere in [the] complaint").[14]  Moreover, even if the allegations in paragraph 294 could be construed as alleging that each individual Google Final Clearinghouse Auction is its own relevant product market (they cannot), the allegations still would not come close to alleging plausibly a relevant antitrust market.

---

[14]  After the Court granted Advertisers' motion to amend on November 18, 2022, the Court gave Advertisers until December 21, 2022 to seek leave to further amend their complaint.  (*See* Dkt. No. 394.) Despite being given additional time and opportunity, the Advertisers did not clarify, amend, or supplement their single-paragraph market definition allegation.

For example, Advertisers do not include any allegations as to why one Google-run ad auction is not substitutable with another Google-run ad auction, nor, as is the case with the broader iteration of the market, why auctions for open display and in-app ad impressions are substitutable or what the geographic boundaries of the alleged relevant market is. The fact that Advertisers have alleged harm with respect to particular auctions does not somehow excuse them from the requirement that they must define their alleged market with allegations regarding product interchangeability and elasticities. Indeed, courts have made clear in auction cases that the standard market definition rules still apply. *See Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 254-55 (S.D.N.Y. 1995) (applying the principles of substitutability in an auction case and dismissing plaintiff's claim because the alleged market—"offering and sale *at auction* of paintings"—failed to take into account available substitutes, such as private purchasing). Because Advertisers have not included any allegations regarding product interchangeability or elasticities, they have not pleaded a relevant antitrust market. *See In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *14, *32 (plaintiffs failed to "allege a plausible market" where purported market definitions were not "accompanied by allegations regarding product interchangeability, elasticities, or geographic boundaries").

### ii. Advertisers Have Not Alleged Market Power.

As the Court explained in the Order, a "plaintiff alleging harm to competition may, in lieu of showing actual harm, allege that defendants possess 'market power' in the relevant market". (Order at 30 (quoting *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97 (2d Cir. 1998)).) Advertisers do not even try to do so with

20

respect to whatever market or markets they allege exist(s) in paragraph 294 of the CAC.[15]
Because Advertisers do not include any market power allegations related to the NBA, nor
do they plausibly plead any market-wide harm, as explained in Section II.B.iii below,
their claims must be dismissed.  (*See* Order at 33-34 (dismissing the States' NBA claim
because the States did not include any allegations related to Defendants' market share in
the in-app network market nor did the States plausibly plead a harm to competition in that
market).

>            **iii.    Advertisers Have Not Plausibly Pleaded Market-Wide Harm.**

As this Court held, "[u]nder the rule of reason, the plaintiff must show that
'defendants' challenged behavior had an *actual* adverse effect on competition as a whole
in the relevant market.'"  (Order at 30 (quoting *Geneva Pharms. Tech. Corp. v. Barr
Labs. Inc.*, 386 F.3d 485, 507 (2d Cir. 2004)).)  "Without any allegation as to how
market-wide competition will be affected, the complaint fails to allege a claim on which
relief can be granted."  (*Id.* (quoting *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer
Prod., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997)).)  "Because the antitrust laws protect
competition as a whole, evidence that plaintiffs have been harmed as individual
competitors will not suffice."  *Geneva Pharms. Tech.*, 386 F.3d at 507 (citing *Atl.
Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343-44 (1990)).

Advertisers do not plausibly allege harm to market-wide competition.  As
explained above, Advertisers' claim is that the favorable terms granted to Meta via the

---

[15] Elsewhere in the CAC, Advertisers allege a series of other purported markets with corresponding
market power allegations.  (*See* CAC ¶¶ 57-89, 93-145).  Meta takes no position on whether those relevant
markets or allegations of power are plausibly alleged, but the critical point is that Advertisers expressly
*disclaim* that any of those relevant markets is relevant to their NBA claims.  (*Id.* ¶ 54 n.1.)

NBA "distort[ed] competition" in Google-run auctions "by placing advertisers bidding against Meta at an informational and procedural disadvantage".  (CAC ¶ 289.) Advertisers further allege that this "competitive advantage" "inflated the bids *for Meta's rivals* to win in Google's auctions above what those bids would have been had Meta not had access" to the favorable terms offered in the NBA.  (*Id.* ¶ 292 (emphasis added).) These allegations suffer from several fatal flaws.

> *First*, Advertisers' allegations are conclusory.  Advertisers allege no examples, data or other facts to support their assertion that Meta's rivals must place inflated bids to win Google-run auctions after the NBA, notwithstanding the fact that Advertisers have had access to more than 2 million documents that Google has produced in the MDL.  Nor do Advertisers allege any facts or economic theory to explain the connection between any favorable terms Meta receives as a result of the NBA and the bids Meta's rivals must submit to win Google-run auctions.  Such conclusory allegations are insufficient to survive a motion to dismiss.  *See, e.g.*, *Spinelli v. Nat'l Football League*, 903 F.3d 185, 212 (2d Cir. 2018) (where plaintiff "cite[s] no examples, data, or other facts to support their assertion, [] a conclusory allegation that prices have increased will not suffice to state anticompetitive effect"); *Bhanusali v. Orange Reg'l Med. Ctr.*, No. 10-cv-6694 CS, 2013 WL 4828657, at *10 (S.D.N.Y. Aug. 12, 2013), *aff'd in part, vacated in part*, 572 F. App'x 62 (2d Cir. 2014) ("conclusory allegation (unsupported by a single fact or example) that the price of orthopedic surgical services has increased by the elimination of a *single* orthopedic surgeon from the relevant market is likewise implausible").

*Second*, Advertisers do not provide any explanation as to why their conclusory assertions of harm even make sense.  *See Twombly*, 550 U.S. at 547 ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed"); *Spinelli*, 903 F.3d at 213 (affirming dismissal for failure to "plausibly allege an adverse effect on competition in [a relevant market]").  For example, Advertisers allege that, as a result of the additional time and superior information Meta receives, Meta's competitors are forced to bid higher in order to win the auction.  (CAC ¶¶ 289, 292.)  But according to Advertisers' allegations, other "[b]idders in Google's final ad auctions had no knowledge of the superior information that Google secretly provided to Meta".  (*Id.* ¶ 292.)  If the other bidders had no idea that Meta had additional information in a particular auction, how would they know they have to bid higher than they otherwise would?  Advertisers also do not explain how Meta having additional time would lead Meta or other bidders to inflate bids in any circumstance, never mind how that would happen when the other bidders had no idea that Meta even had that additional time.  (*Id.* ¶ 292 (referring to Meta's "secret advantages").)

In fact, Advertisers' entire theory is inconsistent with a claim that competition was harmed rather than enhanced.  Advertisers admit that the key alleged anticompetitive term—the additional information Google supplied to Meta to identify the user—was information that is "*valuable to advertisers* because identifying the user allows for more accurate targeting and reduces the chances of serving an ad to a 'bot'".  (CAC ¶ 287 (emphasis added).)  In other words, Advertisers complain that Meta was able to secure information from Google that was valuable to Meta's own customers—who are *advertisers*—so that those customers could get more value for each ad they placed.  It

would turn the antitrust laws on their head if an agreement to provide information that makes a product *more valuable* to customers somehow constituted harm to competition. And, even if that additional valuable information did lead Meta's advertiser customers to pay higher prices, the fact that a bidder might be willing to pay a higher price for a better product hardly raises even an inference of anticompetitive effects.  *See Spinelli*, 903 F.3d at 212 ("conclusory allegation that prices have increased will not suffice to state anticompetitive effect"); *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (explaining that courts will "not infer competitive injury" from increased prices "absent some evidence that tends to prove . . . prices were above a competitive level"); *c.f. Harrison Aire, Inc. v. Aerostar Intern., Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("Competitive markets are characterized by both price and quality competition, and a firm's comparatively high price may simply reflect a superior product.").

*Third*, as this Court has already recognized, there is "nothing anticompetitive in the simple fact that a seller selectively cuts its prices, or offers other favorable terms, to some of its dealers, even though such discrimination harms the non-favored dealers".  (Order at 26 (quoting *Monahan's Marine*, 866 F.2d at 529).)  As discussed in further detail above, that is precisely Advertisers' claim here, and Advertisers' allegations do nothing to undermine this Court's holding that the terms of the NBA are "consistent with competition".[16]  Advertisers also do not allege—because they cannot—that there was anything about the NBA that precluded Google from

---

[16] *See supra* Section I.

providing the same alleged "favorable" terms to each and every other advertiser network that participated in the Google-run auctions.

*Fourth*, Advertisers do not allege how market-wide competition was affected by the terms of the NBA.  Advertisers merely allege that one or more rival bidders paid inflated bids to win Google-run auctions.  (CAC ¶ 292.)  But "the antitrust laws were enacted for the protection of *competition*, not *competitors*."  *Atl. Richfield*, 495 U.S. at 338 (internal citations and quotation marks omitted).  And per Advertisers' own allegations, neither Meta nor Google, both of whom participate as competing bidders in the relevant market, are subject to the alleged informational disadvantage that, according to Advertisers, causes other bidders to have to pay inflated bids to win Google-run auctions.  (*See, e.g.*, CAC ¶ 286 (referring to "proprietary data known only to Google"); ¶ 287 (Google would help Meta identify end users); ¶ 291 ("Google must make competing bidders worse off . . . .").)  *See Linzer Prod. Corp. v. Sekar*, 499 F. Supp. 2d 540, 555 (S.D.N.Y. 2007) (no plausible allegation of market-wide anticompetitive effect where alleged anticompetitive conduct—raising license fees on alleged monopolist's licensees—would only raise costs for two of four competitors in relevant market).  This problem persists regardless of whether the Court interprets Advertisers' market allegations as alleging that all of Google's ad auctions constitute a relevant market or if each individual ad auction is its own relevant market.  Under either theory, Advertisers have alleged nothing more than harm to competitors, as opposed to harm to competition.

To the extent Advertisers contend that the NBA caused market-wide harm because it amounted to a distortion of "auction rules", their theory also fails.  Advertisers advanced this theory in the motion to amend briefing (Mot. Amend at 6), but the cases

cited by Advertisers are inapposite.[17]  Indeed, the only case cited by Advertisers where an

"auction rule" was found to violate the Sherman Act is *Bale v. Glasgow Tobacco Board*

*of Trade, Inc.*, where the court held that the "purpose and intent" of a rule that restricted

new auction participants' access to selling time "was to preserve the status quo and

suppress competition."  339 F.2d 281, 287 (6th Cir. 1964).  The court reasoned that the

rule denied new entrants like plaintiff "equality of opportunity to compete with the other

warehouse operators for the business of the market" and that as a result "[a] substantial

part of the market was foreclosed to [new entrants]."  *Id.*  While auction rules that

foreclose competition like those in *Bale* may result in a market-wide harm to competition,

Advertisers have not alleged that the NBA resulted in *any* foreclosure.

### C.   Advertisers Have Not Plausibly Alleged Article III Standing To Pursue Their NBA Claim.

Article III standing requires a plaintiff to plead "(i) that [they] suffered an

injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury

was likely caused by the defendant; and (iii) that the injury would likely be redressed by

judicial relief."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).  It is axiomatic that a named

plaintiff must have Article III standing and that in order to pursue a claim on behalf of a

class, at least one of the named plaintiffs must have Article III standing with respect to

---

[17] *See Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 240 (1918) (Board's rule governing grain auctions "improve[d] market conditions" and "had no appreciable effect on general market prices"); *Gainesville Oil & Gas Co. v. Farm Credit Bank of Tex.*, 847 S.W.2d 655, 659-60 (Tex. App. 1993) (case does not involve claims under state or federal antitrust laws); *United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022) (alleged horizontal conspiracy between foreign exchange currency traders at competing dealer banks to fix prices and rig bids in foreign currency exchange market); *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 104-105 (S.D.N.Y. 2021) (agreement between two competing exchanges and trader was formed with intent to engage in price fixing).

the class claim(s).  *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007); *see also* l Newberg and Rubenstein on Class Actions § 2:5 (6th ed.) ("[I]n a class action suit with multiple claims, at least one named class representative must have standing with respect to each claim.").

Advertisers fail to allege a concrete, particularized and actual or imminent injury in fact that is traceable to their NBA claim.  As described above, Advertisers' theory of harm is that Google's agreement to provide Meta with allegedly favorable information led other bidders that did not have that same information to pay a supra-competitive price to win auctions.  (*See* CAC ¶¶ 286-292.)  Advertisers, however, also allege that the same "enhanced and proprietary data" that benefitted Meta was known by Google (which makes sense, of course, since Google was the one giving that data to Meta).  (*Id.* ¶ 286.)  This presents one significant problem for these plaintiffs:  every single one of them alleges that they purchased display ads and/or in-app advertising directly from Google.  (*See id.* ¶¶ 14-32.)  Because no Named Plaintiff participated (or purchased ads from a rival bidder who participated) in a Google-run auction at the "competitive disadvantage" that non-Meta and non-Google bidders allegedly suffered as a result of the NBA, there is no Named Plaintiff whose purported injury is "fairly traceable" to the NBA.  *See Keepers, Inc. v. City of Milford*, 807 F.3d 24, 42 (2d Cir. 2015) ("The injury-in-fact requirement demands not only the existence of a legally cognizable injury, but also that the plaintiff itself be 'among the injured.'" (quoting *Lujan*, 504 U.S. at 563 (internal quotation marks and citation omitted))).

To the extent Advertisers are contending that the Named Plaintiffs suffered harm because Google did not provide the benefits to its own customers that it

provided to Meta, Advertisers' injury theory is not plausible.  (*See* Reply Mot. Amend at 10 ("Meta may resist the notion of Google disadvantaging its own customers, [but] that is the nature of the NBA").)  As an initial matter, Advertisers do not allege anywhere in the CAC that Google harmed its own customers as a result of the NBA.  (*See* CAC ¶¶ 286-294.)  Even if they did, Advertisers offer no explanation in the CAC as to *why* Google would voluntarily harm its own customers to benefit Meta.  This implausible injury theory is therefore insufficient to confer Article III standing.  *See Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79, 85 (2d Cir. 2014) (affirming the district court's decision to dismiss a complaint alleging injuries that were "highly implausible").

## III.   ADVERTISERS' STATE LAW NBA CLAIM FAILS FOR THE SAME REASONS AS THEIR FEDERAL ANTITRUST CLAIM.

In addition to asserting a federal antitrust claim based on the NBA (Count III), Advertisers also assert a companion California state law claim based on the NBA (Count IV).  The claims are virtually identical.  (*Compare* CAC ¶¶ 365-372, *with* ¶¶ 373-377.)  Although Advertisers' state law claim is technically stayed,[18] Meta respectfully submits that it is in the interests of efficiency and fairness to resolve in tandem whether Advertisers' virtually identical state and federal NBA claims state a claim for relief.

*First*, there is nothing to be gained by delaying ruling on Advertisers' state law NBA claim.  Where, as here, a plaintiff challenges the same conduct under Section 1 of the Sherman Act and California's Cartwright Act, courts have found that "Cartwright Act claims rise or fall depending on the success of its Sherman Act claim".  *See Jain*

---

[18] In Pre-Trial Order No. 4, the Court stayed the state law claims alleged in the MDL member complaints without prejudice of any party to apply to the Court to dissolve the stay ninety days after November 18, 2022.  (PTO No. 4 ¶¶ 4-5.)  Those ninety days have not yet passed.

*Irrigation, Inc. v. Netafim Irrigation, Inc.*, 386 F. Supp. 3d 1308, 1316 (E.D. Cal. 2019) (dismissing plaintiffs' claims under Section 1 of the Sherman Act and the Cartwright Act where the plaintiffs' allegations of conspiracy failed); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1181 (N.D. Cal. 2013) (same); *Dutra v. BFI Waste Mgmt. Sys. of N. Am., Inc.*, No. 14-CV-04623-NC, 2015 WL 2251203, at *3-4 (N.D. Cal. May 13, 2015) (same).

*Second*, resolving the status of Advertisers' state law claim based on the NBA now would simplify this complex MDL.  For example, if the Court were to find that Advertisers have failed to state a federal antitrust claim under Section 1 of the Sherman Act, disposing of the companion state law claim at the same time would result in Meta no longer being a party to this case.  Eliminating an issue and a defendant would significantly streamline the litigation.

*Third*, resolving the status of the state law claim now would also be consistent with the procedures already ordered by the Court with respect to the States' claims.  There, Google and the States stipulated, and the Court so-ordered, that any state law antitrust claims are deemed dismissed to the extent they are based on conduct alleged to serve as a basis for a federal antitrust claim that the Court's Order dismissed.  (Dkt. No. 417.)  In practice, this means that because the States' federal antitrust claim based on the NBA was dismissed, the States' state law antitrust claims based on the NBA are also deemed dismissed.[19]

_____

[19] The Court has ordered Google and the States to submit an additional stipulation by February 24, 2023 describing with particularity which state law antitrust claims alleged in the States' TAC are dismissed as a result of the Court's Order on Google's Motion to Dismiss.  (Dkt. No. 417.)

## IV.   ADVERTISERS' NBA CLAIMS SHOULD BE DISMISSED WITH PREJUDICE.

The Court should dismiss Advertisers' NBA claims (Counts III and IV) with prejudice.  Advertisers have had extensive opportunity to refine their NBA claims. They have amended multiple times, they have been able to review the briefing on the motion to dismiss the States' NBA claim and they have had the opportunity to amend after the Court's decision dismissing that claim.  They also were given—and declined— the opportunity to amend yet again after seeing Meta's arguments against the Advertisers' claims in the recent motion to amend briefing.  (*See* PTO No. 5 ¶ 1, Dkt. No. 394.)  Moreover, unlike the vast majority of plaintiffs at the pleading stage, Advertisers have had access to extensive discovery, including approximately 2 million documents that Google produced in this MDL.  Nonetheless, Advertisers still have failed to state a claim for relief based on the NBA and any further amendment would be futile.  *See Rosner v. Star Gas Partners, L.P.*, 344 F. App'x 642, 644 (2d Cir. 2009) (affirming dismissal with prejudice where plaintiff had prior opportunity to amend after being informed of defendants' arguments in favor of dismissal).

## CONCLUSION

For the foregoing reasons, Meta respectfully requests that the Court grant Meta's motion to dismiss the NBA claims in the Advertisers' consolidated amended complaint (Counts III and IV) with prejudice.

Dated: February 3, 2023

CRAVATH, SWAINE & MOORE, LLP

by    _____ /s/ *Kevin J. Orsini* _____
Kevin J. Orsini

Worldwide Plaza
825 Eighth Avenue
New York, NY
(212) 474-1000
korsini@cravath.com

*Attorneys for Meta Platforms, Inc.*

31