# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

IN RE: GOOGLE DIGITAL ADVERTISING
ANTITRUST LITIGATION

This Document Relates to:

*AIM Media Ind. Operating, LLC v. Google, LLC*,
No. 1:21-cv-06912-PKC (S.D.N.Y.)

*AIM Media Midwest Operating, LLC v. Google,
LLC*, No. 1:21-cv-06884-PKC (S.D.N.Y.)

*AIM Media Tex. Operating, LLC v. Google, LLC*,
No. 1:21-cv-06888-PKC (S.D.N.Y.)

*Appen Media Group, Inc. v. Google, LLC, et al.*,
Case No. 1:22-cv-9810-PKC (S.D.N.Y.)

*Brown Cnty. Publ'g Co., Inc. v. Google, LLC*, No.
1:21-cv-06915-PKC (S.D.N.Y.)

*Capital Region Indep. Media LLC v. Google LLC*,
No. 1:22-cv-06997-PKC (S.D.N.Y.)

*Clarksburg Publ'g Co., d/b/a WV News v. Google,
LLC*, No. 1:21-cv-06840-PKC (S.D.N.Y.)

*Coastal Point LLC v. Google, LLC*, No. 1:21- cv-
06824-PKC (S.D.N.Y.)

*Eagle Printing Co. v. Google, LLC*, No. 1:21- cv-
06881-PKC (S.D.N.Y.)

*ECENT Corp. v. Google, LLC*, No. 1:21-cv- 06817-
PKC (S.D.N.Y.)

*Emmerich Newspapers, Inc. v. Google, LLC*, No.
1:21-cv-06794-PKC (S.D.N.Y.)

*Flag Publ'ns, Inc. v. Google, LLC*, No. 1:21-cv-
06871-PKC (S.D.N.Y.)

*Gale Force Media, LLC v. Google, LLC*, No. 1:21-
cv-06909-PKC (S.D.N.Y.)

*Gould Enters., Inc. v. Google, LLC*, No. 1:22-cv-
01705-PKC (S.D.N.Y.)

*HD Media Co., LLC v. Google, LLC*, No. 1:21-cv-
06796-PKC (S.D.N.Y.)

*Journal Inc. v. Google, LLC*, No. 1:21-cv-06828-
PKC (S.D.N.Y.)

Case No. 1:21-md-03010 (PKC)

**META PLATFORMS, INC.'S
MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO
DISMISS COUNT II OF
NEWSPAPERS'
CONSOLIDATED AMENDED
COMPLAINT**

*Neighborhood Newspapers, Inc. v. Google LLC*, No. 1:21-cv-10188-PKC (S.D.N.Y.)

*Robinson Commc'ns, Inc. v. Google, LLC*, No. 1:21-cv-08032-PKC (S.D.N.Y.)

*Rome News Media, LLC v. Google LLC*, No. 1:21-cv-10186-PKC (S.D.N.Y.)

*Savannah Publ'g Co. v. Google, LLC*, No. 1:22- cv-01693-PKC (S.D.N.Y.)

*Something Extra Publ'g, Inc. v. Google, LLC*, No. 1:21-cv-09523-PKC (S.D.N.Y.)

*Southern Cmty. Newspapers, Inc. v. Google, LLC*, No. 1:22-cv-01971-PKC (S.D.N.Y.)

*Times Journal, Inc. v. Google LLC*, No. 1:21-cv-10187-PKC (S.D.N.Y.)

*Union City Daily Messenger, Inc. v. Google, LLC*, No. 1:22-cv-01704-PKC (S.D.N.Y.)

*Weakley Cnty. Press, Inc. v. Google, LLC*, No. 1:22-cv-01701-PKC (S.D.N.Y.)

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Meta Platforms, Inc.*

February 3, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 3

LEGAL STANDARD ......................................................................................................... 3

ARGUMENT ...................................................................................................................... 4

I.      THE NEWSPAPERS' HEADER BIDDING THEORY IS
IMPLAUSIBLE. .................................................................................................... 4

II.     THE NEWSPAPERS' AUCTION MANIPULATION THEORY IS
IMPLAUSIBLE. .................................................................................................. 10

      A.      The Newspapers' Auction Manipulation Theory Is Premised On
The Failed Notion That The NBA Is *Per Se* Unlawful ............................ 12

      B.      The Newspapers Have Not Stated a Rule of Reason Claim. ..................... 14

III.    THE NEWSPAPERS' NBA CLAIM SHOULD BE DISMISSED WITH
PREJUDICE. ........................................................................................................ 17

CONCLUSION ................................................................................................................. 18

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AD/SAT v. Associated Press*, 920 F. Supp. 1287 (S.D.N.Y. 1996) ....................................9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................3, 4, 8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................3, 4, 9

*Best v. City of New York*, No. 12-cv-7874-RJS, 2014 WL 163899
    (S.D.N.Y. Jan. 15, 2014) ...........................................................................................18

*Cangemi v. United States*, 13 F.4th 115 (2d Cir. 2021) ..................................................2

*Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008) ..............................14

*Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018) .......................................4

*City of New York v. Grp. Health Inc.*, 649 F.3d 151 (2d Cir. 2011) ................................14

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240
    (2d Cir. 1997) ............................................................................................................16

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485
    (2d Cir. 2004) ............................................................................................................15

*In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481-KBF,
    2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) ............................................................15

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) ................................14

*Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129
    (2d Cir. 2013) ....................................................................................................5, 9, 16

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525 (1st Cir. 1989) ...............16

*Rosner v. Star Gas Partners, L.P.*, 344 F. App'x 642 (2d Cir. 2009) ..............................18

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ..........................................................4

*Spinelli v. Nat'l Football League*, 903 F.3d 185 (2d Cir. 2018) .......................................8

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ...............................................................12, 13

*Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998) ................................15

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) ..............................................13

*United States v. eBay, Inc.*, 968 F. Supp. 2d 1030 (N.D. Cal. 2013)................................14

**Statutes & Rules**

Fed. R. Civ. P. 12(b)(6)..................................................................................................3, 4

15 U.S.C. § 1 ............................................................................................................ passim

**Other Authorities**

European Commission, Daily News 19/12/22,
    https://ec.europa.eu/commission/presscorner/detail/en/mex_22_7832...........................2

## INTRODUCTION

After the States filed a complaint against Google in which they asserted a Sherman Act Section 1 claim premised on the Google/Meta Network Bidding Agreement (the so-called "NBA"), more than twenty newspapers filed copycat lawsuits around the country asserting the same claim (as well as others against Google).  In support of their NBA claims, the various newspaper plaintiffs (collectively, the "Newspapers")[1] largely copied and pasted the States' allegations.  They added nothing new of substance.

On September 13, 2022, this Court issued its Opinion and Order ("Order", Dkt. No. 308) dismissing the States' claim that the NBA violates Section 1 of the Sherman Act.  The Court's dismissal was based on its review of the States' Third Amended Complaint ("States' TAC", Dkt. No. 195), extensive briefing, oral argument and the full terms of the NBA.  The Court devoted fourteen pages of the Order to parsing

---

[1] The plaintiffs in the individual newspaper actions include the plaintiffs in the following actions: *AIM Media Ind. Operating, LLC v. Google, LLC*, No. 1:21-cv-06912-PKC (S.D.N.Y.); *AIM Media Midwest Operating, LLC v. Google, LLC*, No. 1:21-cv-06884-PKC (S.D.N.Y.); *AIM Media Tex. Operating, LLC v. Google, LLC*, No. 1:21-cv-06888-PKC (S.D.N.Y.); *Appen Media Group, Inc. v. Google, LLC, et al.*, No. 1:22-cv-9810-PKC (S.D.N.Y.); *Brown Cnty. Publ'g Co., Inc. v. Google, LLC*, No. 1:21-cv-06915-PKC (S.D.N.Y.); *Capital Region Indep. Media LLC v. Google LLC*, No. 1:22-cv-06997-PKC (S.D.N.Y.); *Clarksburg Publ'g Co., d.b.a. WV News v. Google, LLC*, No. 1:21-cv-06840-PKC (S.D.N.Y.); *Coastal Point LLC v. Google LLC*, No. 1:21-cv-06824-PKC (S.D.N.Y.); *Eagle Printing Co. v. Google, LLC*, No. 1:21-cv-06881-PKC (S.D.N.Y.); *ECENT Corp. v. Google, LLC*, No. 1:21-cv-06817-PKC (S.D.N.Y.); *Emmerich Newspapers, Inc. v. Google, LLC*, No. 1:21-cv-06794-PKC (S.D.N.Y.); *Flag Publ'ns, Inc. v. Google, LLC*, No. 1:21-cv-06871-PKC (S.D.N.Y.); *Gale Force Media, LLC v. Google, LLC*, No. 1:21-cv-06909-PKC (S.D.N.Y.); *Gould Enters., Inc. v. Google, LLC*, No. 1:22-cv-01705-PKC (S.D.N.Y.); *HD Media Co., LLC v. Google, LLC*, No. 1:21-cv-06796-PKC (S.D.N.Y.); *Journal, Inc. v. Google, LLC*, No. 1:21-cv-06828-PKC (S.D.N.Y.); *Neighborhood Newspapers, Inc. v. Google, LLC*, No. 1:21-cv-10188-PKC (S.D.N.Y.); *Robinson Commc'ns, Inc. v. Google, LLC*, No. 1:21-cv-08032-PKC (S.D.N.Y.); *Rome News Media, LLC v. Google, LLC*, No. 1:21-cv-10186-PKC (S.D.N.Y.); *Savannah Publ'g Co. v. Google, LLC*, No. 1:22-cv-01693-PKC (S.D.N.Y.); *Something Extra Publ'g, Inc. v. Google, LLC*, No. 1:21-cv-09523-PKC (S.D.N.Y.); *Southern Cmty. Newspapers, Inc. v. Google, LLC*, No. 1:22-cv-01971-PKC (S.D.N.Y.); *Times Journal, Inc. v. Google, LLC*, No. 1:21-cv-10187-PKC (S.D.N.Y.); *Union City Daily Messenger, Inc. v. Google, LLC*, No. 1:22-cv-01704-PKC (S.D.N.Y.); and *Weakley Cnty. Press, Inc. v. Google, LLC*, No. 1:22-cv-01701-PKC (S.D.N.Y.).

the NBA's terms and explaining why the NBA could not plausibly be alleged to constitute a violation of the Sherman Act.

Faced with the inevitable dismissal of their original copycat NBA claims, the Newspapers sought leave to amend their NBA claim in a last-ditch effort to salvage a claim against Meta in this MDL that is primarily about Google.  ("Mot. Amend", Dkt. No. 328.)[2]  But a review of the Consolidated Amended Complaint ("CAC", Dkt. No. 401) establishes that the Newspapers do not come any closer to stating a claim based on the NBA than did the States.

As set forth below, the Newspapers' NBA claim (Count II) remains substantively identical to the States' NBA claim and should be dismissed with prejudice. The Newspapers still advance the same hollow theories:  (1) that Google and Meta entered into an agreement to thwart header bidding; and (2) that the terms of the NBA are themselves anticompetitive.  (*See* CAC ¶¶ 272-326.)  The Newspapers' CAC contains no plausible allegations establishing that Meta agreed with Google that it would abandon header bidding and the terms of the NBA remain the same as the ones this Court analyzed

---

[2] Meta opposed the Newspapers' proposed amendments on the grounds that the amendments were futile in light of the Court's ruling regarding the States' NBA claim.  ("Opp. Mot. Amend", Dkt. No. 356.) The Court, without adjudicating the issue of futility, granted the Newspapers leave to amend their complaint, subject to the right of Google and Meta to move to dismiss the amended pleading.  (PTO No. 4, Dkt. No. 392.)

Shortly thereafter, on December 19, 2022, the European Commission announced that it was closing an investigation it had been conducting into the NBA without filing any charges after "a careful assessment of all relevant evidence, including information received from Google, Meta and other companies active in the tech sector".  The Commission explained that the "evidence did not confirm [the Commission's] initial concerns" with the agreement.  *See* European Commission, Daily News 19/12/22, https://ec.europa.eu/commission/presscorner/detail/en/mex_22_7832 (last visited February 2, 2023).  The Court may take judicial notice of the Commission's announcement on its official website regarding its conclusion of the investigation.  *See Cangemi v. United States*, 13 F.4th 115, 124 n.4 (2d Cir. 2021) (taking judicial notice of information on a government website).

and found to be consistent with competition.  Their NBA claim should be dismissed with prejudice.[3]

## FACTUAL BACKGROUND[4]

The Newspaper actions consist of 25 complaints that were originally filed in 18 judicial districts across the country.  The complaints were filed by common counsel and are nearly identical in substance.  Each of the original complaints advances the same core claims:  (1) Google unlawfully monopolized the digital advertising market in violation of Section 2 of the Sherman Act; (2) Google and Meta entered into an agreement—the NBA—that unlawfully restrained trade in violation of Section 1 of the Sherman Act; and (3) Google was unjustly enriched by its conduct.

For the Court's convenience, rather than repeat information fully briefed elsewhere, Meta respectfully refers the Court to the Factual Background section of its Memorandum of Law in Support In Support of Motion To Dismiss Counts III and IV of Advertisers' Consolidated Complaint for a detailed discussion of Google's motion to dismiss the States' TAC and the Court's Order on that motion.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  For a plaintiff to "'nudge[] their claim[]

---

[3] Meta takes no position on whether the Newspapers' claims that are asserted only against Google state a claim under Federal Rule of Civil Procedure 12(b)(6).

[4] All defined terms used herein shall have the same meaning as ascribed to those terms in Meta Platforms, Inc.'s Memorandum of Law in Support of Motion to Dismiss Counts III and IV of Advertisers' Consolidated Amended Complaint.

across the line from conceivable to plausible,' they must 'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged." *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 570).  If the facts in the complaint are "merely consistent with" the alleged wrongdoing, the complaint "stops short of the line between possibility and plausibility" and is subject to dismissal under Rule 12(b)(6).  *Twombly*, 550 U.S. at 557.  A court is "not required to credit conclusory allegations or legal conclusion couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).  Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555.).

## ARGUMENT

Like the States, the Newspapers advance two theories as to why the NBA was anticompetitive:  (1) it amounted to a *quid pro quo* agreement in which Meta agreed to drop its support for header bidding in exchange for certain benefits in Google's ad auctions and (2) it amounted to unlawful auction manipulation.  Neither theory is plausible and the Newspapers' NBA claim (Count II) should be dismissed with prejudice.

## I.   THE NEWSPAPERS' HEADER BIDDING THEORY IS IMPLAUSIBLE.

At its core, the Newspapers' header bidding theory is the same as the States':  both allege the NBA amounted to a *quid pro quo* agreement in which Meta agreed not to challenge Google's dominance in exchange for Meta obtaining certain benefits in Google's ad auctions.  (*Compare, e.g.*, CAC ¶ 282 ("Facebook decided to dangle the threat of competition [through header bidding] in Google's face and then cut a deal to manipulate the auction."), *with* States' TAC ¶ 413 ("Facebook substantially

4

curtailed its use of header bidding in return for Google giving Facebook a leg up" in ad auctions).)  Just as the States (after four attempts) failed to plead plausibly a Section 1 claim based on this theory, the Newspapers do as well.

In order to overcome a motion to dismiss in a Section 1 case, a plaintiff must "allege enough facts to support the inference that a conspiracy actually existed." *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). There are two ways to do so:  "First, a plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws." *Id.*  Second, "a complaint may . . . present circumstantial facts supporting the *inference* that a conspiracy existed." *Id.*  The Newspapers have done neither.

To begin, the Newspapers do not allege any direct evidence of a conspiracy.  Indeed, as the Court noted in its Order, "the 48-page NBA does not touch upon or purport to restrict Facebook's use of header bidding".  (Order at 24.)  The terms of the NBA obviously have not changed and this defect remains with the Newspapers' NBA claim.  Moreover, as the Court noted in its Order, none of the internal Meta documents cited by the States contained even "a hint that Facebook was offering a commitment to substantially curtail use of header bidding or that Google was insisting on such a commitment".  (*Id.*)  This remains true; despite extensive discovery and multiple rounds of briefing by multiple sets of plaintiffs, the Newspapers do not cite any additional internal documents nor identify any new facts (nor could they) that purport to establish direct evidence of a conspiracy.

Instead, the Newspapers attempt to present circumstantial evidence of a conspiracy, but the Newspapers do nothing more than repackage the same basic story that

has already been presented to the Court in the hope that they can somehow get to a different result.  None of their purportedly new factual allegations render an inference of conspiracy any more plausible than did the States' allegations.

For example, the Newspapers add allegations that Meta was participating in Google ad auctions prior to entering into the NBA (*see* CAC ¶ 299), likely in an attempt to overcome the Court's conclusion that the NBA is consistent with a firm trying to secure the business of a potential new customer (rather than the product of an unlawful conspiracy) (Order at 25).  But the fact that Meta was participating in Google auctions prior to the NBA is not new.  As the States alleged and the Court explained, Facebook Audience Network ("FAN") would submit bids that ultimately got routed through Google's exchanges via header bidding or direct agreements with publishers.  (*See* States' TAC ¶ 414 (noting Meta "announced it would submit bids from FAN to open web publishers using header bidding" via Amazon's "header bidding code library"); *id.* ¶ 354 (alleging that publishers using header bidding "continued to license DFP" in order to route and solicit bids from AdX); Order at 22 (explaining that "[i]t was called 'header bidding' because a publisher could insert a piece of code into the 'header' section of a publisher's webpage, which then collected information . . . and used that information to bid on multiple ad exchanges" and it "enabled publishers, including those who used Google's DFP ad server, to solicit live, competitive bids from multiple exchanges").)  That Meta was participating in Google ad auctions via header bidding prior to the NBA does not in any way undermine the Court's conclusion that the NBA was consistent with Google attempting to secure the business of a large potential customer for its *Exchange Bidding program*.

The Newspapers' purportedly new allegations regarding the ways Google and Meta compete with each other (*see, e.g.*, CAC ¶¶ 295-300) are also not substantively new, nor do they render any potential inference of a conspiracy more plausible.  While the Newspapers are absolutely right that Meta and Google competed as ad networks prior to the NBA, they also correctly allege that the two companies *continued* to compete as ad networks well *after* the NBA was signed.  (*Id.* ¶¶ 307-308, 311-313.)  This was apparent from the States' TAC and recognized by the Court in its Order; as the Court explained, Google acts at various levels in the relevant distribution chain, including in its "capacity as the operator of an in-app network, and, in that context, it competed with Facebook for impressions offered at auction."  (Order at 28.)

Equally unavailing are the Newspapers' new allegations regarding Meta's alleged available spend for header bidding after the NBA.  (CAC ¶ 320.)  Specifically, the Newspapers allege that "FAN had little to no spend left to use header bidding or non-Google mediation tools" as a result of "the closure of FAN for web display, a commitment to acquire $1.5 billion from Google DFP in-app/AdMob, take rates . . . on top of Google's fee, and inventory from about 20% of developers that do not use mediation".  (*Id.*)  The Newspapers appear to have added these allegations in an attempt to overcome the Court's observation that the States' TAC did "not purport to describe the NBA's effect on Facebook's use of header bidding".  (Order at 25.)  But the Newspapers' allegation that Meta had "little to no spend left" to use for header bidding or non-Google mediation tools is conclusory; the Newspapers do not allege what Meta's total annual ad spend was.  That is the necessary information to evaluate whether the Newspapers' assertion that Meta had "little to no spend left" to use for header bidding is actually

7

plausible.  The Court identified this deficiency with the States' claim (*see id.*) and the Newspapers have not addressed it.

The Newspapers' allegations that the alleged conspiracy embodied in the NBA was even *broader* than the conspiracy alleged by the States only renders the Newspapers' theory even *less* plausible than the States'.  Specifically, the Newspapers allege that the NBA included an agreement to thwart hearing bidding and *also* an agreement by Meta to abandon entry "in the publisher ad server market and mediation tool market" (*id.* ¶ 302) and "cede[] web markets to Google" (*id.* ¶ 291).  But even as to these expanded allegations of a purported conspiracy, the Newspapers fail to offer any new facts, and instead resort to unsupported assertions such as the statement that, prior to the NBA, "Facebook was actively trying to enter and compete in the publisher ad server market and mediation tool market by building or acquiring a competitive product".  (*Id.* ¶ 302.)  But conclusory assertions such as this cannot defeat a motion to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. at 681 (conclusory allegations "not entitled to be assumed true"); *Spinelli v. Nat'l Football League*, 903 F.3d 185, 212 (2d Cir. 2018) (same).  These conclusory allegations are also not new; even though the States alleged a narrower conspiracy, they still included allegations in their TAC that Meta was considering building or buying its own ad tech tool (States' TAC ¶ 422) and that Meta left the market for web advertising in 2020 (*id.* ¶ 437).  Despite these allegations, the Court nonetheless dismissed the States' NBA claim.

The Newspapers' allegations of the purportedly broader conspiracy also lack any foundation in the text of the NBA.  Specifically, there is nothing in the NBA suggesting it encompassed any agreement by Meta not to build or operate its own ad

server or in-app mediation tool.  Nor does the NBA say anything about Meta "ceding the web market"; to the contrary, it goes on at length about how the NBA would *apply* in the web market.  (*See* NBA ¶¶ 2.2(d), 2.4(b), Ex. A ¶ 1(a), Ex. A ¶ 3, Dkt. No. 221-1.)  The NBA's integration clause—which confirms that the "Agreement sets out all terms agreed between the Parties . . . relating to its subject matter" (*id.* ¶ 19.2)—also undermines the notion that the NBA included any of the purported conspiratorial side commitments alleged by the Newspapers.  Like the States, the Newspapers have thus failed to allege any facts that permit the plausible inference that unilateral actions by Meta (*i.e.*, the decision not to build its own ad server or in-app mediation tool and the deprecation of FAN for web display) were the product of an agreement with Google rather than independent business determinations.  (*See* Order at 21-22 (citing *Twombly*, 550 U.S. at 566 ("there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway. . . ."); *Mayor & City Council of Baltimore*, 709 F.3d at 138 ("An inference of conspiracy is not supported by acts that 'made perfect business sense.'")).)

In fact, the timing of the relevant events only underscores how *implausible* the Newspapers' broader alleged conspiracy is.  For example, according to the Newspapers themselves, Google and Meta entered into the NBA in September 2018 and Meta did not announce the deprecation of its Audience Network web business until February 2020.  (CAC ¶¶ 291, 306).  This significant gap in the timing of events renders implausible the allegation that the decision to deprecate Audience Network's web business was part of a *quid pro quo* agreement related to the NBA.  *See AD/SAT v. Associated Press*, 920 F. Supp. 1287, 1315 (S.D.N.Y. 1996) (finding that the facts would

9

not allow a reasonable juror to conclude that a defendant was a member of an alleged conspiracy in part because its agreement with an alleged co-conspirator occurred eight months after its termination of an agreement with the plaintiff).[5]

Finally, the Newspapers seem to suggest that there must have been a conspiracy because the terms of the NBA allegedly made "no economic sense" absent an intent to harm competition.  (*Id.* ¶ 317.)  But, as described in more detail below, these assertions are fundamentally—and incorrectly—premised on the notion that there must have been a conspiracy if Google was willing to give Meta favorable business terms. That is not the law, and as the Court explained in its Order, this flawed logic fails to take into account "Facebook's motivation to use its economic clout as an advertiser to drive the hardest bargain it could with Google" as well as Google's "legitimate, pro-competitive desire to obtain as much business as possible from Facebook."  (Order at 22.) For the numerous reasons explained above, none of the Newspapers' purportedly new allegations undermine this conclusion or otherwise suggest the NBA was anything other than a legitimate business agreement that was consistent with competition.

## II.    THE NEWSPAPERS' AUCTION MANIPULATION THEORY IS IMPLAUSIBLE.

Like the States, as a back-up to their *quid pro quo* theory regarding header bidding, the Newspapers also advance an auction manipulation theory, under which Google allegedly provided Meta with certain favorable terms that disadvantaged other

---

[5] In certain instances, the Newspapers also expand upon certain allegations made by the States, but none of these allegations strengthen the Newspapers' claim.  For example, the Newspapers prominently add references to a March 2017 Facebook blog post publicly announcing Facebook's support for header bidding, (*see* CAC ¶¶ 288, 294), but that same blog post was incorporated by reference in the States' TAC, (*see, e.g.*, States' TAC ¶¶ 414, 417).  The same is true for the multiple paragraphs that purport to marshal evidence that Meta supported header bidding and Google did not.  (*See, e.g.*, CAC ¶¶ 284-285, 289-290.) These allegations do not render the Newspapers' theory any more plausible than the States' theory.

bidders in auctions for in-app impressions.  (CAC ¶¶ 311-326; States' TAC ¶¶ 427-450). This theory fails to state a claim for a multitude of reasons.

As an initial matter, the Newspapers' "auction manipulation" theory is fundamentally the same as the States' auction manipulation theory.  Both the Newspapers and the States rely on the same underlying provisions of the NBA to support their identical theory:  the volume-based price concessions off Google's standard fee,[6] the timeout provision[7] and the information provision.[8]  The Newspapers and the States also contend these provisions resulted in the same purported anticompetitive harm. Specifically, the Newspapers contend the NBA was a "bid-rigging agreement" that allowed "FAN to beat non-Google networks and exchanges, and win more despite paying less".  (CAC ¶¶ 313, 326.)  They further contend that this resulted in "less competition from rivals (less bid density and lower bids) and lower auction clearing prices . . . resulting in less money in the pockets of publishers".  (*Id*. ¶ 315.)  Likewise, the States alleged that Google and Meta agreed to "limit[] the terms of competition between each other . . . [and] insulate[] their scheme from outside competition" through an "auction manipulation" scheme.  (States' TAC ¶¶ 441, 443.)  The States further contended the overall effect of the alleged auction manipulation scheme was to "depress[] prices paid to developers."[9]  (*Id.* ¶ 437.)

---

[6] *Compare* CAC ¶ 313, *with* States' TAC ¶ 428.

[7] *Compare* CAC ¶ 313, *with* States' TAC ¶ 429.

[8] *Compare* CAC ¶ 313, *with* States' TAC ¶ 431.  The Newspapers also cite to the NBA's provisions restricting Google's use of Meta's bid data, which was consistent with the States' NBA claim.  *Compare* CAC ¶ 314, *with* States' TAC ¶ 434.

[9] The States also alleged that the NBA resulted in higher prices on the demand (*i.e.* advertiser) side of ad auctions.  (*See* States' TAC ¶ 445.)  The fact that the States' theory was broader than the Newspapers'

These substantively identical auction manipulation theories fail for the reasons the Court already articulated—in particular, that the NBA does not dictate which impressions Meta may bid on or at what price nor is there anything anticompetitive about inducing Meta to participate in Google's actions.  (*See* Order at 31-32.)  The Newspapers therefore cannot state a claim on this theory.

Even if the Newspapers' auction manipulation theory were somehow distinguishable from the States', however, it would still fail for the numerous reasons explained below.

### A.   The Newspapers' Auction Manipulation Theory Is Premised On The Failed Notion That The NBA Is *Per Se* Unlawful.

For alleged violations of the Sherman Act, courts "presumptively appl[y] [the] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful."  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).  Although certain horizontal agreements are considered *per se* unlawful under the antitrust laws, vertical restraints "should generally be subject to the rule of reason."  *United States v. Apple, Inc.*, 791 F.3d 290, 321 (2d Cir. 2015).

In their complaint, the Newspapers allege that the NBA is unlawful *per se* and do not even attempt to allege that the agreement is unlawful under the rule of reason. (*See* CAC ¶¶ 371-378.)  But this Court has already concluded that the rule of reason applies to the NBA because it was "principally a vertical agreement" given that Google

---

and alleged anticompetitive harm on the demand side as well as the supply (*i.e.*, publisher) side does not change the fact, however, that the States and the Newspapers have alleged the same core theory with respect to the alleged anticompetitive harm felt by publishers.

and Meta did not enter into that agreement as horizontal competitors but instead as part of a vertical relationship in which Google was the auctioneer and Meta was the bidder. (Order at 28.)  The Newspapers do not add any allegations that would suggest otherwise (nor could they).  Notwithstanding the fact that Meta identified the Newspapers' misplaced reliance on a *per se* theory in the motion to amend briefing (*see* Opp. Mot. Amend at 10, Dkt. No. 356), the Newspapers elected not to try to remedy this deficiency by amending their complaint further, even though they had the opportunity to do so (*see* PTO No. 5, Dkt. No. 394 ¶ 1).

Because the Newspapers elected to pursue their claim exclusively under a *per se* theory (rather than a rule of reason theory), their claim should be dismissed if the Court concludes that the NBA still does not merit *per se* treatment.  Specifically, the Newspapers elected to proceed only on a *per se* theory even though the Court made clear in its Order that the NBA was subject to the rule of reason and even though the Newspapers had multiple opportunities to amend their claim in light of the Court's ruling. Dismissal is appropriate in these circumstances.  *See Texaco Inc. v. Dagher,* 547 U.S. 1, 7 n. 2 (2006) (declining to conduct a rule of reason analysis where plaintiffs "ha[d] not put forth a rule of reason claim"); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir. 2010) ("While pleading exclusively per se violations can lighten a plaintiff's litigation burdens, it is not a riskless strategy.  If the court determines that the restraint at issue is sufficiently different from the per se archetypes to require application of the rule of reason, the plaintiff's claims will be dismissed."); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038 (N.D. Cal. 2013) ("[T]he [plaintiff] must abide by the consequences of its pleading decisions. Should the court ultimately find that the [plaintiff] cannot

maintain a per se or quick look claim, the [plaintiff] will then be without recourse to the rule of reason and its case will be dismissed.").

**B.    The Newspapers Have Not Stated a Rule of Reason Claim.**

Even if the Newspapers had alleged the NBA was unlawful under the rule of reason—and they have not—their claim must still be dismissed because they failed to plead the facts.

***Market definition***.  "To state a claim under [Section 1 of the Sherman Act], a plaintiff must allege a plausible relevant market in which competition will be impaired."  *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011). "[W]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."  *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (citation omitted).

Here, the Newspapers assert that the markets relevant to their NBA claim "are the markets for in-app display ad networks and mediation tools for in-app inventory" (CAC ¶ 176), but nowhere attempt to define the geographic boundaries of those markets or the parameters of those markets by reference to any reasonable substitutes.[10]  For

---

[10] Indeed, the Newspapers' bare bones allegations with respect to the alleged markets related to their NBA claim pale in comparison to the numerous pages the Newspapers devote to the markets they contend are relevant to their non-NBA claims.  (*See* CAC ¶¶ 176-202.)  Although Meta takes no position on the plausibility of any markets that are not relevant to the Newspapers' NBA claim, a comparison of the allegations underscores the deficiencies with the Newspapers' allegations with respect to the markets allegedly relevant to their NBA claim.

example, the Newspapers do not include any allegations as to why the alleged market for "in-app display ad networks" does not include ad networks that place ads on the web, or why the alleged market for "mediation tools for in-app inventory" does not include mediation tools for web inventory.  Absent these necessary allegations regarding substitutability (or any allegations regarding the geographic boundaries of the alleged markets), the Newspapers' market allegations cannot survive a motion to dismiss.  *See In re Aluminum Warehousing Antitrust Litig*., No. 13-md-2481-KBF, 2014 WL 4277510, at *14, *32 (S.D.N.Y. Aug. 29, 2014) (plaintiffs failed to "allege a plausible market" where purported market definitions were not "accompanied by allegations regarding product interchangeability, elasticities, or geographic boundaries").

        ***Market power***.  "A plaintiff alleging harm to competition may, in lieu of showing actual harm, allege that defendants possess 'market power' in the relevant market."  (Order at 30 (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998).)  The Newspapers do not attempt to allege that Google or Meta has market power in either of the alleged relevant markets.  Because the Newspapers do not include any market power allegations, they cannot use market power in lieu of establishing market-wide anticompetitive harm, which as discussed below, they have not plausibly pleaded.

        ***Market-wide harm***.  "Under the rule of reason, the plaintiff must show that defendants' challenged behavior had an *actual* adverse effect on competition as a whole in the relevant market."  (Order at 30 (quoting *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 507 (2d Cir. 2004) (internal quotation marks omitted)).)  "Without any allegation as to how market-wide competition will be affected, [a]

complaint fails to allege a claim on which relief can be granted." (*Id.* (quoting *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997)).)

The Newspapers do not plausibly plead any such harm here. The Newspapers attempt to allege harm to competition by claiming that the terms of the NBA made no independent economic sense (presumably to Google) because—they claim—it allowed Meta to "bid less money". (CAC ¶¶ 312, 313.) But the premise of this "bid less money" statement is the allegation that Google gave Meta a price concession in return for Meta agreeing to a minimum spend threshold through Google's auctions. (*See, e.g.*, *id.* ¶ 320 ("Facebook planned to purchase $1.5 billion worth of inventory per year through DFP/AdMob mediation and within 24 months of signing the agreement to trigger the agreement's lowest 5% flat rate DFP/AdMob mediation fee.") The Court already rejected this argument, holding that "[o]ffering favorable terms to a large potential customer, such as Facebook, undoubtedly had the effect of diverting business from a competing service, but this does not convert the agreement into an unreasonable restraint of trade." (Order at 26 (citing *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 529 (1st Cir. 1989) (explaining that courts have found "nothing anticompetitive in the simple fact that a seller selectively cuts its prices, or offers other favorable terms, to some of its dealers, even though such discrimination harms the non-favored dealers") (Breyer, J.)).) Instead, as the Court explained, these terms of the NBA "made perfect business sense." (*Id.* at 22 (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 138).)

16

The notion that the NBA's terms made no independent business sense for Meta is also completely contradicted by the Newspapers' other allegations.  In particular, the Newspapers claim that the NBA gave Meta "information, speed and other advantages" over other participants in the market.  (CAC ¶ 315.)  Or, as the Court put it in the Order, the NBA allowed Facebook to achieve "an opportunity to compete against Google for publishers' and developers' inventory on equal terms".  (Order at 32.)  That makes obvious business sense for Meta, and promotes rather than hinders competition.

Finally, as this Court previously noted, the NBA is expressly "not an exclusive agreement" (*id*. at 21 (citing NBA ¶ 19.10)), and nothing in the NBA prevents Google from offering the same favorable terms to other auction participants.  Thus, while the Newspapers complain that "Facebook receiv[ed] the same loaded dice in the in-app network market that Google had been winning for years" (CAC ¶ 316), they cannot shake the Court's conclusion that an agreement allowing Meta to better compete with Google— without limiting the ability of any other competitor to do the same—was "*entirely consistent with competition*".  (Order at 25 (emphasis added).)

## III.    THE NEWSPAPERS' NBA CLAIM SHOULD BE DISMISSED WITH PREJUDICE.

The Court should dismiss the Newspapers' NBA claim (Count II) with prejudice.  The Newspapers have had extensive opportunity to refine their NBA claim.  Specifically, they have had the benefit of analyzing the States' allegations concerning the NBA, Google's arguments as to why the States' NBA claim should be dismissed, and the Court's Order identifying the deficiencies with the States' NBA theory.  The Newspapers also had the benefit of analyzing Meta's Opposition to Newspapers' Motion to Amend, which detailed the shortcomings with Newspapers' NBA claim in the CAC.  (*See*

17

*generally* Opp. Mot Amend.)  Notwithstanding the numerous deficiencies Meta identified

in the motion to amend briefing, the Newspapers elected not to amend their complaint

further to attempt to address those deficiencies, even though the Court gave them the

opportunity to do so in Pre-Trial Order No. 5.  (*See* PTO No. 5 ¶ 1.)  Moreover, unlike

the vast majority of plaintiffs at the pleading stage, the Newspapers have also had access

to extensive discovery during the pleading stage, including approximately 2 million

documents that Google produced in this MDL.

       With all of these considerations in their favor, the Newspapers still have

failed to state a plausible claim for relief based on the NBA and any further amendment

would be futile.  Therefore, Meta respectfully submits that the Newspapers' NBA claim

should be dismissed with prejudice.  *See Rosner v. Star Gas Partners, L.P.*, 344 F. App'x

642, 644 (2d Cir. 2009) (affirming district court's decision to dismiss with prejudice

where plaintiff had prior opportunity to amend pleading after being informed of the

defendants' arguments in favor of dismissal); *Best v. City of New York*, No. 12-cv-7874-

RJS, 2014 WL 163899, at *11 (S.D.N.Y. Jan. 15, 2014) (noting that a court may dismiss

a claim with prejudice when "a plaintiff has already been given notice of a claim's

deficiencies and the opportunity to amend [his] complaint") (citation omitted).

## CONCLUSION

       For the foregoing reasons, Meta respectfully requests that the Court

dismiss the Newspapers' Section 1 claim based on the NBA (Count II) with prejudice.

Dated: February 3, 2023

CRAVATH, SWAINE & MOORE, LLP

by      /s/ *Kevin J. Orsini*
Kevin J. Orsini

Worldwide Plaza
825 Eighth Avenue
New York, NY
(212) 474-1000
korsini@cravath.com

*Attorneys for Meta Platforms, Inc.*

19