N2MGgooC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE GOOGLE DIGITAL
ADVERTISING ANTITRUST
LITIGATION

                              21 md 3010 (PKC)

                              Conference

------------------------------x

                              New York, N.Y.
                              February 22, 2023
                              11:00 a.m.

Before:

                    HON. P. KEVIN CASTEL,

                              District Judge

                    APPEARANCES

LANIER LAW FIRM
    Attorney for State Plaintiffs
ZEKE DeROSE III

GIRARD SHARP LLP
    Attorneys for Plaintiff Advertisers
JORDAN ELIAS

KELLOG HANSEN TODD FIGEL & FREDERICK PLLC
    Attorneys for Associated Newspapers
JOHN THORNE

HERMAN JONES LLP
    Attorneys for Direct Action Newpaper Plaintiffs
SERINA MARIE VASH

BOIES SCHILLER & FLEXNER
    Attorneys for Publisher Plaintiffs
DAVID BOIES

N2MGgooC

1   APPEARANCES CONTINUED:

2   CRAVATH SWAINE & MOORE LLP
        Attorneys for Defendant Meta
3   MARTHA REISER
    BRITTANY L. SUKIENNIK
4
    FRESHFIELDS BRUCKHAUS DERINGER US LLP
5       Attorneys for Defendant Google LLC
    ERIC MAHR
6   ROBERT JOHN McCALLUM

7   WILSON SONSINI GOODRICH & ROSATI
        Attorneys for Defendant Google LLC
8   BY:  JUSTINA K. SESSIONS
        VADIM EGOUL

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N2MGgooC

```
 1              (Case called)

 2              THE DEPUTY CLERK:  For the plaintiffs.

 3              MR. BOIES:  Good morning, your Honor.  David Boies,

 4    Boies Schiller and Flexner, representing the plaintiff

 5    publisher class.

 6              THE COURT:  Good morning.

 7              MR. DEROSE:  Good morning, your Honor.  Zeke DeRose,

 8    Lanier Law Firm, on behalf of the state plaintiffs.

 9              MS. VASH:  Good morning, your Honor.  Serina Vash,

10    Herman Jones, on behalf of the direct action newspaper

11    plaintiffs.

12              MR. THORNE:  Judge, John Thorne, Kellogg, Hansen,

13    representing plaintiffs.

14              THE COURT:  Anyone else making an appearance?

15              MR. ELIAS:  Good morning, your Honor.  Jordan Elias

16    for the advertiser class plaintiffs.

17              THE DEPUTY CLERK:  For the defendants.

18              MS. SESSIONS:  Good morning, your Honor.  Justina

19    Sessions, Wilson Sonsini, for Google.  I'm joined today by my

20    colleague, Vadim Egoul.

21              MR. MCCALLUM:  Good morning, your Honor.  Robert

22    McCallum, Freshfields.

23              MR. MAHR:  Good morning, your Honor.  Eric Mahr from

24    Freshfields also.

25              MS. SUKIENNIK:  Good morning, your Honor.  Brittany
```

N2MGgooC

1   Sukiennik, Cravath, Swaine & Moore, for Meta joined by my

2   colleague Martha Reiser.

3            THE COURT:  Well, I was so looking forward to an

4   erudite discussion of whether MD5 hash values alone are

5   sufficient for deduplication or whether you also need, RD

6   underscore duplicate to accomplish the task.  But alas, at

7   11:46 last night, a submission came in.

8            So let me hear first from the plaintiffs on the first

9   point, which arises in paragraph 3(i).  And this is the

10  geographic scope of -- I guess paragraph 3 declares what is not

11  reasonably accessible and it declares ad log files concerning

12  ads viewed outside the US, Canada, the UK, Australia and New

13  Zealand to be such ESI that's not reasonably accessible.

14  Google is prepared to add Ireland.  And the plaintiffs want the

15  entire European Union, and they want a footnote.

16           So whoever wants to speak for the plaintiffs on this,

17  I'd be happy to hear them.  Ms. Vash, are you going to do the

18  honors?

19           MS. VASH:  Yes, sir.

20           Judge, with respect to this issue, this is a

21  preservation issue.  And your Honor has properly set forth that

22  there's two issues here; whether or not to include the European

23  Union and whether or not to include in the footnote, footnote,

24  plaintiffs' reservation of their rights that this evidence is

25  relevant and that Google should not be permitted to destroy it.

N2MGgooC

1        So it's important, Judge, to look at what is an ad log

2   and why do we need it.  The ad logs are transaction data.  They

3   are the transaction details.  They give the publishers,

4   advertisers and their experts visibility into what's happening.

5   The publisher can see exactly what's occurring in the digital

6   ad supply chain.

7        What does that mean?  That means they can see how much

8   a bid was, what was the winning bid, what was the losing bid,

9   what was the take rate, what was the fee that each vendor paid,

10  was a cheap programmatic ad for $5, did that somehow jump over

11  a more expensive $25 direct ad.

12       THE COURT:  And the geographic scope of the carve-out

13  was expanded to include, I think, Daily Mail, was the first to

14  seek an expansion, and it was also expanded because I think of

15  the publishers class action allegations.

16       So really, the question is why the EU and why not Asia

17  and Africa?  What is it about the EU that the plaintiffs

18  believe is particularly relevant to this case?

19       MS. VASH:  And that's the question, that's a great

20  question.  In the first instance, Judge, the first three times

21  we saw this ESI odder, we struck it entirely, and we said there

22  should be no carve-out.  We agreed there could be a carve-out

23  if it included these countries other than the European Union,

24  otherwise, there's no reason for that carve-out at all.  If

25  it's relevant evidence and it speaks to anticompetitive conduct

N2MGgooC

1   and damages, we should be preserving it.

2          THE COURT:  Well, that's not entirely true.  You

3   subscribe not just to the Sedona principles, but also to

4   Rule 26.  So proportionality is front and center here.

5          MS. VASH:  Exactly right, Judge.  And so let's take a

6   look at some of the anticompetitive conduct that was alleged in

7   the complaint and that survived the motion to dismiss.

8          Specifically, let's take a look at Project Bernanke.

9   I know there's a lot of different project names.  I am sure

10  your Honor keeps good track of them.  For myself, I call this

11  one skimming the spread.  So essentially, Project Bernanke went

12  from a second price auction to a third price auction.  That

13  means if there was a $5 bid and a $3 bid and $1 bid, the winner

14  would be the one who bid $5.  The winner would pay the second

15  price, which is the $3, and the publisher would get a dollar.

16  So there's a spread in there of $2 that Google was reserving

17  and not paying to publishers, and then taking that pool of

18  money and is subsidizing other Google customers.

19         Now, our plaintiffs need to be able to see the

20  entirety of that transaction.  And we believe that some of that

21  occurred in the European Union, pieces of that transaction

22  occurred in the European Union; either the part of it where the

23  auction is being pooled or the part of it where it is later

24  being spent.  And we have spoken to Google about the

25  possibility of -- there's three parts in our footnote.  One is

N2MGgooC

1      that we meet-and-confer -- you preserve it in the first

2      instance; secondly, we meet-and-confer to figure out a sample

3      of what is and is not relevant so that it is not too burdensome

4      with respect to Google; but the third piece of it, Judge, is

5      that the plaintiffs want to reserve their rights so, at the end

6      of the day, if Google destroys it, that we have the right to

7      come back and say, this was relevant in the European Union, we

8      have evidence here that you had evidence to show what happened

9      to this pool of money and now you don't have it because you

10     didn't preserve it.

11             THE COURT:  Well, doesn't that undercut all of

12     paragraph 3?  Why don't you say that as to everything?  The

13     following categories are not reasonably accessible, but you act

14     at your peril if you don't preserve it; how does that

15     accomplish anything?

16             MS. VASH:  Well, because, your Honor, we believe

17     that --

18             THE COURT:  And why don't you have that as to the

19     other categories of paragraph 3?  So you don't reserve rights

20     as to the other categories?  You abandon any argument that

21     there was something malicious in their deleting (a) through (h)

22     and (j) and (k)?

23             MS. VASH:  No, sir.

24             Google is making a representation that things are or

25     are not reasonably accessible.  And on some level, plaintiffs

N2MGgooC

1    and the Court have to rely on Google.  The Sedona principles,

2    they know what they have, we don't know what they have.  They

3    are saying these are the things that are reasonably accessible

4    and these are the things that are not reasonably accessible.

5    And we are agreeing with them as respect certain provisions in

6    paragraph 3.

7            THE COURT:  So your reservation in this footnote

8    actually applies to all of paragraph 3 or it only applies to

9    (i)?

10           I mean, are you going to come back in a year and

11   argue, well, voice mail messages were readily accessible and

12   reasonably accessible, and they destroyed them and there should

13   be an adverse inference because they destroyed them?

14           MS. VASH:  Judge, under Sedona principle number 7, the

15   requesting party has a burden on a motion to compel to show

16   that the responding party, there are steps to preserve and

17   produce relevant electronically stored information was

18   inadequate.

19           We believe that they need to preserve information in

20   the EU.  And yes, as respects information in the EU for Project

21   Bernanke and other anticompetitive conduct and damages, we want

22   to be able at the end of the day to say that they did not take

23   reasonable steps to preserve it.  And that's why we're making

24   the record before the Court.

25           THE COURT:  That's why I'm saying, what's the

1    difference between that category, (i), and (a) through (h)?

2    Are you going to argue that?  Are you going to come back here

3    in a year and argue that, I've changed my mind, it's not

4    reasonably accessible, I know more now, it never was not

5    reasonably accessible, and therefore, you should draw an

6    adverse inference as to (a) through (h)?

7              MS. VASH:  Judge, the ad logs are the heart and soul

8    of the case.  The ad logs are the anticompetitive conduct and

9    they demonstrate the damages, and they're necessary here as

10   respects these countries because this is where our plaintiffs

11   do business.

12             THE COURT:  And they don't do business in Africa or

13   Asia?

14             MS. VASH:  Some of them do, Judge, but this is the

15   heart of the case.  And as respects --

16             THE COURT:  The European Union is the heart of the

17   case?

18             MS. VASH:  The United States is the heart of the case,

19   Judge.  But it also is relevant with respect to the European

20   Union, Ireland, New Zealand, Australia, all of these

21   jurisdictions that Google agreed to preserve information in.

22             This is a preservation, your Honor, it's not a

23   production, and this is why we suggest that it's preserved in

24   the first instance, that we meet-and-confer so that Google --

25   Google, who is asking for us operating in the dark -- they have

N2MGgooC

1    the information, they want us at this juncture to insulate them

2    from destroying and agree to destroy evidence.  And this is not

3    hypothetical, Judge.  This has actually happened for some of

4    our plaintiffs sitting here who can speak to it better than I

5    can because they're in the case; Mr. Boies is one of those

6    lawyers, in the *Brown v. Google* case.  Google said, this is not

7    reasonably accessible, and so they did not preserve it.  And at

8    the end of the day, it was necessary.  And they were just

9    sanctioned in the *Brown v. Google* case in California because of

10   it.

11           And we want to be able to be in a position, Judge, to

12   be able to both move to compel and also to demonstrate under

13   Sedona principle number 14, Judge, the breach of the duty to

14   preserve electronically stored information may be addressed by

15   remedial measures, sanctions or both.  We believe that the

16   information in the EU, the ad logs for the EU and the ad logs

17   for the jurisdictions that are set forth in 3(i) are relevant

18   to this case, will show anticompetitive conduct, will also show

19   our damages, and therefore, we believe they should be

20   preserved.

21           THE COURT:  Thank you.

22           MS. VASH:  Thank you.

23           THE COURT:  For Google.

24           MS. SESSIONS:  Thank you, your Honor.

25           I think your Honor hit the nail on the head here when

N2MGgooC

1    you mentioned proportionality.  The issue here is

2    proportionality.  And what we're trying to do in this part of

3    the ESI stipulation is take certain preservation issues off the

4    table so that we can agree that we're not in fact going to

5    fight about them later and that Google does not need to

6    preserve certain data for the purposes of this case.  And so

7    what we're --

8           THE COURT:  What's the burden on Google in preserving

9    EU data?

10          MS. SESSIONS:  It's a phenomenal amount of data, your

11   Honor.  So the data for ad logs, for ads shown in the EU -- and

12   excluding Ireland, because we could agree to Ireland -- is

13   measured in exabytes, which is a term that I actually didn't

14   know until we got into this negotiation, but it is an

15   unbelievable amount of data.

16          THE COURT:  I mean, we'll all in this courtroom be

17   dazzled by exabytes.  But I'm asking practically speaking,

18   what's the cost to Google?

19          I don't know.  And that's really what governs or

20   informs, to a great measure, proportionality.

21          MS. SESSIONS:  So some measure of the cost to Google,

22   Google publicly accomplishes the cost of Google cloud storage

23   for companies that want to use Google to store data on the

24   cloud, to store an exabyte of data on Google cloud, it would

25   cost over $14 million a year to store the data.

N2MGgooC

| | |
|---|---|
| 1 | THE COURT:  But that's what Google charges the rest of |
| 2 | the world. |
| 3 | MS. SESSIONS:  That's right, your Honor. |
| 4 | But there's an opportunity cost to storing that data. |
| 5 | Because if Google has to make a copy of this data and store it |
| 6 | for the purposes of this litigation, that's storage that's not |
| 7 | available for other purposes, and it's storage that's not |
| 8 | available for Google to charge cloud customers to use it. |
| 9 | And your Honor, this volume of data is not usable by |
| 10 | the plaintiffs.  It would take years to even transfer this |
| 11 | volume of data to anyone.  So it can't be produced. |
| 12 | THE COURT:  With all these lawyers here rolling up |
| 13 | their sleeves, maybe they could do it a little faster. |
| 14 | MS. SESSIONS:  Your Honor, the actual computing |
| 15 | resources that it takes to transfer this volume of data, our |
| 16 | engineers are telling us it really would take years.  If you |
| 17 | want, your Honor, an exabyte worth of movies would take 2,500 |
| 18 | years to watch. |
| 19 | And your Honor, I have heard no reason why the EU log |
| 20 | data is particularly relevant.  We kept hearing about damages. |
| 21 | Ms. Vash represents newspapers that are located in the United |
| 22 | States.  The classes in these cases are United States |
| 23 | plaintiffs.  And the individual plaintiffs are located in the |
| 24 | United States. |
| 25 | THE COURT:  But Ms. Vash made the argument that, yes, |

N2MGgooC

1    they're in the United States, but some of the auction data

2    could have traveled through the EU and would be located in the

3    EU.  That's basically what I heard from Ms. Vash.  Is that true

4    or not true?

5         MS. SESSIONS:  Frankly, your Honor, I don't really

6    understand that argument.  So if the plaintiffs are trying to

7    determine the impact to publishers or advertisers located in

8    the United States or even in the broadest market that they

9    allege, which are limited to the United States, Canada,

10   Australia, they need to look at transactions that occurred with

11   respect to users or advertisers or publishers located in the

12   United States or, at the very broadest, located within their

13   relevant markets.  And none of that includes Greece and Latvia

14   and Luxembourg and all of these other countries for which they

15   are insisting that transaction data be preserved.

16        Your Honor, with respect to understanding the workings

17   of the products or how the auction worked, that evidence is

18   located in the documentation and in other places, not in the

19   log data that is being disputed right now.

20        THE COURT:  I clearly do not understand -- nor do I

21   need to understand -- how the data travels in real time.  But I

22   could imagine that you could have a transaction between a Greek

23   shipping company and an Egyptian shipping company that would be

24   routed through a New York banking institution.  So if I was

25   understanding the argument presented by plaintiff, that they

N2MGgooC

1    are asserting that that could occur with regard to a US-based

2    transaction, that it somehow is routed through the EU -- I'm

3    going to ask more questions of the plaintiff about that -- but

4    what is your take on that?

5          MS. SESSIONS:  So, your Honor, I don't think that the

6    routing of the transactions, which servers it might have hit or

7    something like that, matters for this discussion.  Because what

8    we're talking about is the data on, for instance, what a bid

9    might have been, was there a click on the ad that was shown as

10   a result of an impression that was auctioned off.  And we've

11   agreed that records relating to ads that were shown to users in

12   the United States and in some of these other jurisdictions

13   would be retained.

14         So all we're talking about now is do we need to

15   preserve records for ads that were shown to a user in Greece,

16   for example.

17         THE COURT:  So what you're representing is that Google

18   intends to preserve ad log data for all ads viewed within the

19   United States, Canada, the United Kingdom, Australia, New

20   Zealand and Ireland; is that what you are representing?

21         MS. SESSIONS:  The proposal is, yes, that we retain

22   our obligation to preserve records for ads viewed in the United

23   States, Canada, the UK, Australia, New Zealand and Ireland.

24         THE COURT:  Regardless of what server they were routed

25   through?

1          MS. SESSIONS:  In my understanding, your Honor, the

2     servers that these things were routed through has no bearing on

3     where the ad was viewed.

4          THE COURT:  Listen, you are an attorney.  But each

5     side is really making a representation on behalf of their

6     clients.  Now, if you want to come back this afternoon or

7     tomorrow morning and say, I overstated the representation,

8     that's a different story.  But what I'm asking is:  Is Google,

9     the defendant in this case, representing that if the ad was

10    viewed by a user in the United States, Canada, UK, Australia,

11    New Zealand or Ireland that the ad log files will be preserved?

12         MS. SESSIONS:  Yes, your Honor.  We are willing to

13    preserve the log files for ads viewed by users in those

14    jurisdictions.

15         THE COURT:  Listen, there's always some possibility of

16    human error someplace in any human activity.  But putting that

17    aside, we're not going to find out a year from now that there

18    were ads or category of ads that were not preserved because

19    unfortunately they were stored in Brussels and that they

20    weren't preserved.

21         MS. SESSIONS:  Your Honor, I am unaware of any such

22    issue.  I didn't go and investigate the storage location.

23         THE COURT:  Right.

24         MS. SESSIONS:  Because that's irrelevant to this

25    issue.  Because we're talking about where the ads were viewed.

N2MGgooC

1    And the relevant markets are defined by where publishers or

2    advertisers are aiming the ads at.  The market has been

3    alleged -- that have been alleged by the plaintiffs in this

4    case are either the US -- or the publisher plaintiffs allege an

5    alternative broader market -- and they say that publishers and

6    advertisers want to use products that are geared towards their

7    geographic target audience, which is one reason why their

8    markets are limited to the United States and why it's eminently

9    reasonable to limit preservation obligations to ads viewed in

10   those relevant jurisdictions.

11           THE COURT:  Let me hear from Ms. Vash again to expand

12   on what is your concern relative to the EU.  Why is the

13   representation made on this record here today now sufficient

14   that Google, the entity, is representing that if the ad was

15   viewed in the listed countries, then the ad log file will be

16   preserved, regardless of whether it was routed through Portugal

17   or Brussels or wherever, why isn't that sufficient?

18           MS. VASH:  Thank you.

19           And I will agree -- I think I will agree -- with

20   Ms. Sessions that routing, where it's routed is not necessarily

21   what we're concerned about.  What we're concerned about is that

22   the viewing of these ads generates dollars -- as I had said,

23   the $5, the $3, the $1 -- generates dollars and a pool of money

24   that Google keeps and spends elsewhere.

25           THE COURT:  I understand that's the allegation.

N2MGgooC

1          Now, you maintain, based on that what they do in the

2     EU to consumers in the EU, to advertisers and publishers in the

3     EU, is relevant to this case.

4          MS. VASH:  We should be able to see both sides of the

5     transaction.  If they pool the money here, we want to follow

6     the money to see where it goes so that we can calculate our

7     damages.

8          THE COURT:  Well, how would an ad log help you?

9          MS. VASH:  Because the ad logs show us both -- it will

10    enable us to match them up to see where the money came from and

11    how the money was later spent.

12         THE COURT:  I understand where the money came from.

13    How does the ad log show you where the money was later spent?

14         MS. VASH:  It would enable us to match it up and see

15    how Google subsidized Google customers in making additional

16    bids.

17         THE COURT:  Are you talking about subsidizing European

18    customers; is that what you are talking about?

19         MS. VASH:  Your Honor has asked what Google's

20    representation would be.  We would like to see a representation

21    that the pooled money didn't get spent elsewhere; it got spent

22    here.

23         THE COURT:  I assume the pooled money is fungible.  I

24    assume pooled money is fungible.  That's the way it usually

25    works; right?

1          MS. VASH:  It would assist our experts in determining

2     what those damages are and how it got spent and how the

3     anticompetitive conduct occurred, Judge.

4          THE COURT:  I understand the conclusion that it would

5     assist the expert.  Money is fungible, and if Google extracted

6     money from your clients in violation of the US antitrust laws,

7     who cares whether they spent it in Europe or not?

8          And how would you trace it?  How would you be able to?

9     Because money is fungible, how would you be able to trace

10    from -- you are starting with the ad log from the ad that was

11    viewed in the United States; right?  That's what you are

12    starting with, you are looking at that.  And you are saying, in

13    this auction, money that you believe should have gone to your

14    clients, the advertiser class, instead went to subsidize

15    somebody else?

16         MS. VASH:  Correct.

17         THE COURT:  The injury to you is on your not getting

18    that money; right?  Isn't that what you claim?

19         MS. VASH:  Correct, or on advertisers that they spent

20    too much.

21         THE COURT:  Now, whether or not Google dividended that

22    money to its shareholders or bought another corporate jet or

23    built a plant in Europe or subsidized a customer in Europe,

24    what difference does that make to your case?

25         MS. VASH:  Judge, at this juncture, when we're talking

1    about, with respect to this information, preservation, we're

2    asking them to preserve it.  We're asking them to preserve the

3    information.  And I just want to state, I heard Ms. Sessions

4    say that this is a phenomenal amount of data, and it is.  But

5    consider that by 2025, 463 exabytes of data are going to be

6    generated globally daily, daily.  So one exabyte is three

7    minutes of data.  That's where we're going.  Google is a data

8    company.  They're the biggest monopoly that this world has ever

9    seen.  And we're talking about data in this case.  And what we

10   don't want to be in a position, Judge -- and we don't want the

11   Court to be in a position -- is the position that Mr. Boies has

12   in *Brown v. Google* where Google says to the Court, you told us

13   we didn't have to preserve this data; it turns out it's

14   relevant, but you told us we don't have to preserve it.  And

15   they pointed to the ESI document saying, plaintiffs said we

16   didn't have to preserve it, the Court said we didn't have to

17   preserve it.

18          THE COURT:  So why am I bothering with any of

19   paragraph 3?  Your argument proves too much, I guess is what

20   I'm saying.  Because if that's true, that would be true for

21   logs of calls made from cellular phones, that would be true for

22   data stored in RAM and temporary files.  You could later find

23   out it has gold in there.

24          MS. VASH:  Except, your Honor, that as respect to

25   those particular provisions, we're not going to come back.

N2MGgooC

|    |                                                                              |
|----|------------------------------------------------------------------------------|
| 1  | This is the heart and the soul of our case, the ad log data.                 |
| 2  | And that's why we're here, that's why we focused it here and                  |
| 3  | that's why we're before this court on this particular issue.                 |
| 4  | THE COURT:  I'll give you one more shot at how does it                        |
| 5  | matter where the money went.  You will be able to determine                  |
| 6  | with some exactitude or your expert will be able to determine                |
| 7  | how much your damages are.  But what does it matter, to use my               |
| 8  | example, whether Google dividended it to shareholders or bought              |
| 9  | another company jet or spent it in Europe?                                   |
| 10 | MS. VASH:  It matters, Judge, because at this                                |
| 11 | juncture, the plaintiffs are being asked to bless the                        |
| 12 | destruction of data and we're operating in the dark at the                   |
| 13 | beginning of a case.  And simply, we can't do it and we won't                |
| 14 | do it.  And we'll make the argument -- most respectfully, your               |
| 15 | Honor -- we'll make the argument, at the end of the day, that                |
| 16 | we said this data needs to be preserved.  And if it's not                    |
| 17 | preserved and it turns out to be critical to this case, we will              |
| 18 | be making motions for sanctions in this case, very                           |
| 19 | respectfully, Judge.                                                         |
| 20 | THE COURT:  Thank you.                                                        |
| 21 | MR. BOIES:  Your Honor, would you entertain just a                           |
| 22 | thought from second counsel.                                                 |
| 23 | THE COURT:  Well, Ms. Vash did a characteristically                          |
| 24 | excellent job.                                                               |
| 25 | MR. BOIES:  She did.                                                          |

N2MGgooC

<pre>
 1              THE COURT:  But if you feel that you want to

 2    supplement, I'm not going to stop you.

 3              MR. BOIES:  She did an excellent job.  I really don't

 4    have anything to add, except the issue that she raised, which

 5    this is right at the beginning.  And the footnote that we're

 6    talking about says we're going to have a good faith

 7    meet-and-confer, we're going to sample the logs, and we're

 8    going to decide what's relevant and what's not relevant.

 9              If we got from Google a representation that they're

10    going to preserve all of the logs that are in any way relevant

11    to ads that are viewed in the United States, that would be

12    sufficient.

13              THE COURT:  How do you do that?  We could write a book

14    on relevance as it relates to this case.

15              MR. BOIES:  The problem is they know and we don't, at

16    this stage, what those logs show.  We haven't had the 30(b)(6)

17    deposition of them, we haven't even had the meet-and-confer, we

18    haven't had the samples.  We're operating in the dark.  And

19    I've just been through this in the *Brown* case.

20              THE COURT:  Well, in the meet-and-confers -- now, this

21    has been going on a long time; I can't tell you how long -- how

22    long has the negotiation of the ESI order been going on?

23              MR. BOIES:  Weeks, your Honor, months.

24              THE COURT:  I think it goes back to an earlier point

25    in time.
</pre>

1          Ms. Sessions, do you want to enlighten us?

2          MS. SESSIONS:  Your Honor, it goes back to at least

3     April, because it took seven months for the plaintiffs to even

4     send us the first draft.

5          THE COURT:  Now, here's the problem, Ms. Sessions,

6     you're on your feet, so you're going to get another question.

7          So why haven't you come forward with a sample of the

8     ad logs saying, look, this is what the ad log data looks like,

9     this is why it's not going to make any difference to you?

10         MS. SESSIONS:  Your Honor, two reasons.  First, we

11    only recently received requests for production from the

12    plaintiffs.  Despite your Honor suggesting that they might want

13    to get to work on drafting requests for production early in the

14    case, they waited until the last day to everybody us with their

15    requests for production.  And so that's the first time that

16    we've heard from them about the data that they want Google to

17    produce.  And we will have a discussion with them about the

18    data that they want and what we can reasonably provide.  And as

19    a part of that, we will have a discussion about what, if any,

20    log level data is usable or appropriate.

21         The second reason why we haven't just provided a

22    sample of the ad log data is that the data itself is not

23    comprehensible or usable for the plaintiffs.  The ad logs are

24    not --

25         THE COURT:  But that's the very reason why you would

N2MGgooC

1    show them a sample.

2              MS. SESSIONS:  Your Honor, we provided, during the

3    Department of Justice's pre-suit investigation, before the suit

4    that they recently filed, we provided them with one week of log

5    level data from Google ad manager.  And we are prepared to

6    provide that same data to the plaintiffs here.  But even that

7    data, your Honor, that's not just dumping the logs into a

8    spreadsheet.  That took months and months and months of

9    programming and extraction on Google's part to make that data

10   comprehensible to anyone.  Because these logs are not just sort

11   of sitting around and somebody goes and looks at them at

12   Google.  It's sort of raw, underlying data that feeds up into

13   other systems or aggregations that actually make it usable.  So

14   respectfully, a sample of the ad log data is actually just

15   going to create more questions than it would answer because no

16   one is going to understand what it means.  It needs to be

17   processed and it needs to be extracted in order to be

18   comprehensible at all.  But your Honor, they will get the one

19   week of data.  Which for one week of the US transaction level

20   data was 24 terabytes itself and took days to even transfer

21   because the volume of that data was so great.

22             THE COURT:  In other words, from the unreadable raw

23   data to something comprehensible by a user?

24             MS. SESSIONS:  No, your Honor.  To take the raw data

25   and make it into data that was usable and that the Department

N2MGgooC

1    of Justice could understand, that took many, many months of

2    programming by Google, because Google had to write custom

3    programs to extract and join up that data.  And then it had to

4    be checked and validated.  And then every time there was a bug,

5    we had to redo it.

6           When I said transferred, I meant just the extracted

7    data that we worked hard to get.  It's so voluminous that it

8    took days to just get it onto the hard drives to be able to get

9    it over to DOJ.  So even the one week is not at all a trivial

10   amount of data, which is why we are trying to get some clarity

11   on just not having to preserve this data for countries in the

12   EU outside of Ireland.

13           THE COURT:  I understand.

14           Let's turn our attention to DOC LINK and appendix J.

15           Who is going to tee up that issue for the plaintiffs?

16           MR. BOIES:  Ms. Vash will.

17           THE COURT:  Okay.

18           MS. VASH:  Thank you, Judge.

19           So our second issue is a production issue.

20   Plaintiffs' position is reasonable, and there's very little

21   burden on Google, and I hope this will be a lot shorter.

22           We have confirmed, Google has confirmed that they have

23   a tool, an automated tool for identifying links, searching for

24   and producing documents associated with those links.  So

25   plaintiffs are suggesting that Google use -- it's an automated

1      tool -- and produce to us linked documents that are relevant

2      and responsive, and then make available reasonably and

3      proportionate, we would request -- if we found a link that we

4      wanted in documents that have already been produced, documents

5      where the link tool didn't work, we would make a reasonable and

6      proportionate request for that.

7             THE COURT:  Just help me out, before I hear more,

8      because I'm a little lost.

9             So DOC LINK is part of the metadata that exists with

10     respect to a document?

11            MS. VASH:  Yes.

12            THE COURT:  In its native condition, there is the DOC

13     LINK included in the metadata, and so you are not asking Google

14     to create anything; is that right?  You are just asking if the

15     document has DOC LINK data, DOC LINK metadata that it be

16     produced, that it not be extracted from the document?

17            MS. VASH:  That's right, Judge.  And also links,

18     Judge, are like attachments.  And if there's an attachment, we

19     need to match the original document with the attachment that is

20     relevant to the production.

21            THE COURT:  Is that what they are, attachments?  Is

22     that what we're talking about, or are we talking about URLs or

23     are we talking about some other kind of link between documents?

24     That's what I don't have an understanding of.

25            MS. VASH:  We're talking, essentially, Judge, if I

1   send you a document, and I send a PDF --

2              THE COURT:  Attached.

3              MS. VASH:  -- I have now attached.  If I insert a

4   link, I've attached sort of the digital document.

5              THE COURT:  Well, how is that different than attaching

6   the PDF?

7              MS. VASH:  We think it's not, Judge.  And we think,

8   since Google has a tool to find those links and search for --

9   to identify links, search for them and produce those documents,

10  to the extent they have a tool and it's easy for them, they

11  should do that.

12             THE COURT:  Now, this is a comprehension issue for me.

13  Does that literally apply to your example of the PDF or would

14  that be something different?  Would the metadata on a

15  document -- maybe an email -- be the DOC LINK that you refer to

16  on page 19 that would identify the Adobe PDF?

17             MS. VASH:  I believe it is, Judge.  And I would invite

18  any of the plaintiffs lawyers to correct me if I'm not right

19  about that.

20             THE COURT:  So you are saying that you need the

21  wherewithal to know what the attachment to a document is?

22             MS. VASH:  Yes.

23             THE COURT:  And that without this, you don't know what

24  the attachment to a document is?

25             MS. VASH:  That's right.

N2MGgooC

|    | |
|----|-|
| 1  | And I have a good example, if your Honor doesn't mind. |
| 2  | THE COURT:  Sure, go ahead. |
| 3  | MS. VASH:  So by way of example, Google rolls out a |
| 4  | new product that plaintiff alleges is created for |
| 5  | anticompetitive purposes and carried out in an anticompetitive |
| 6  | manner.  And Google says, no, it's not anticompetitive, it |
| 7  | helps with latency, it helps with how quickly the customer gets |
| 8  | the website, what he's looking for.  And so the document that |
| 9  | rolls out this new program internally links to what's called a |
| 10 | latency review and a latency policy team and the latency team's |
| 11 | notes.  And so we want to be able to get those links and see -- |
| 12 | THE COURT:  Well, that doesn't sound like an |
| 13 | attachment. |
| 14 | MS. VASH:  That's a link, Judge. |
| 15 | THE COURT:  It doesn't sound like an attachment.  It |
| 16 | does not sound as if, to me, based on the description, if I am |
| 17 | sending you an email with an Adobe PDF attached, I want you to |
| 18 | have that Adobe PDF, that's what I want you to have.  If there |
| 19 | is metadata that can categorize Castel to Vash emails, it's |
| 20 | capable of doing that, I would not call that an attachment; I |
| 21 | would call that some kind of a search task or all documents |
| 22 | written by some task force or group within Google.  That's not |
| 23 | anything like an attachment. |
| 24 | MS. VASH:  So in my example, your Honor, these notes, |
| 25 | this policy review, this survey, these are in fact linked in |

N2MGgooC

1    the documents.  Like we're going to roll it out, here's the

2    link that shows what it says about latency, here's the link

3    that is our notes from the prior --

4                THE COURT:  So there's like a hyperlink?

5                MS. VASH:  It's a hyperlink, Judge, exactly.

6                THE COURT:  From a document to another document?

7                MS. VASH:  Yes, sir.  To a digital document.

8                THE COURT:  So this was intentionally put into the

9    document --

10               MS. VASH:  Yes, sir.

11               THE COURT:  -- by the author of the document so that

12   the reader of the document could make sense of the document by

13   looking at the policy or other document to which the main

14   document refers?

15               MS. VASH:  Exactly.  And it was important enough to

16   the writer of the email to include the link, essentially,

17   Judge, in lieu of a PDF attachment, because this is Google.

18               THE COURT:  That's fine.  Now I understand that.

19               Let me hear from Ms. Sessions.  Is that what we're

20   talking about with regard to DOC LINK?

21               MS. SESSIONS:  I don't think so, your Honor.  So I

22   want to clarify.

23               So attachments, an attachment to an email, if I send

24   an email and I attach a PDF to it, I would call that an

25   attachment.  We have agreed to produce attachments to relevant,

N2MGgooC

| | |
|---|---|
| 1 | responsive emails and we have agreed to produce metadata that |
| 2 | provides correspondence between a parent email and its |
| 3 | attachments.  There are metadata fields agreed to called |
| 4 | attachment name and attachment ID.  The DOC LINK -- |
| 5 | THE COURT:  I think I understood from -- my initial |
| 6 | understanding was we were talking about attachments.  That, I |
| 7 | think, was corrected by Ms. Vash, and what she's talking about |
| 8 | are hyperlinks to other documents. |
| 9 | MS. SESSIONS:  Right.  And so -- |
| 10 | THE COURT:  Is that what we're talking about? |
| 11 | MS. SESSIONS:  The dispute is over a subset of |
| 12 | hyperlinked documents. |
| 13 | So I think it might help, first, for me to clarify the |
| 14 | record on the tool at issue and then talk about exactly what |
| 15 | plaintiffs are asking.  So the tool that plaintiffs identified, |
| 16 | the tool can identify emails that have hyperlinks in them.  The |
| 17 | tool cannot automatically go out and then find all of those |
| 18 | hyperlinks. |
| 19 | THE COURT:  Back that up again.  Just repeat it. |
| 20 | MS. SESSIONS:  So there is a tool that can essentially |
| 21 | scan through emails and attempt to identify when there are |
| 22 | hyperlinks embedded in an email.  And that's what the tool |
| 23 | does. |
| 24 | Then what plaintiffs are asking is for Google to then |
| 25 | go out and manually find every single one of those hyperlinked |

1   documents that's hyperlinked in an email.  The tool doesn't go

2   out and automatically find them; somebody has to go and follow

3   the link, see where it goes and pull in the document.  And

4   then, your Honor --

5          THE COURT:  Are you in any way objecting to producing

6   the hyperlinked document to a document that you concede is

7   otherwise relevant?  If the main document is relevant, are you

8   objecting to the production of the hyperlinked document?

9          MS. SESSIONS:  In the case, your Honor, where the

10  hyperlinked document is not otherwise in our database or pulled

11  in by the searches that we're doing.

12         So for context, right, Google has already produced

13  over 2 million documents in this case, and we expect that we're

14  going to end up producing a fair amount more as we

15  meet-and-confer with the plaintiffs about their requests for

16  production.  We're going to agree on custodians, and we're

17  going to agree on search terms.  And we're going to search the

18  custodians' custodial files that hit on the search terms, and

19  then we'll review those for responsiveness.

20         So if a hyperlinked document is in someone's custodial

21  file and hits on the search terms, then that is going to get

22  produced.  What the plaintiffs are asking --

23         THE COURT:  My question is directed to something else.

24         You do not have a principled objection on any ground

25  to producing a nonprivileged, non-work product hyperlinked

N2MGgooC

1      document that is referred to in a document that you otherwise

2      concede is relevant?

3            MS. SESSIONS:  The objection, your Honor, is to adding

4      to our burden by forcing us to go out --

5            THE COURT:  It's the searching for the --

6            MS. SESSIONS:  It's the searching for them and then

7      reviewing them, because we're only talking about documents that

8      are otherwise outside of the agreed upon review population.  So

9      we're talking about the case where the hyperlinked document is

10     not in someone's custodial file and doesn't hit on the search

11     terms.  So it's pretty unlikely to be relevant.  And what

12     plaintiffs are asking us to do --

13           THE COURT:  If I come to you and I say, I have this

14     document and on page 36 there's a hyperlink to the manual on

15     such and such and we have searched, we don't have that, what

16     happens then?

17           MS. SESSIONS:  We have agreed to meet-and-confer and

18     entertain requests for hyperlinked documents.  So if the

19     plaintiffs say, we have this email, we can't find these links,

20     these links are really important, can you, Google, go out and

21     get them.  If there's a reasonable number of those requests and

22     they're relevant and proportional, we have agreed from day one

23     to do that.

24           What we are objecting to --

25           THE COURT:  But are you going to turn around and say,

N2MGgooC

1   why do you need that, why do you want that, or are you just

2   going to --

3            MS. SESSIONS:  Your Honor --

4            THE COURT:  What's the argument?

5            MS. SESSIONS:  Your Honor, if it's a reasonable number

6   of them, then we'll give them to the plaintiffs.

7            What we're objecting to is a process by which we have

8   to automatically and proactively go out, reach beyond the

9   database and go get documents that are otherwise outside of the

10  review population and add those to our review simply because

11  they were hyperlinked.  If they want to ask us for specific

12  links, we're of course willing to do that.  But what we're

13  objecting to is some unknown expansion of the review that we

14  already have to do.

15           THE COURT:  Well, the unknown expansion is an

16  interesting point.  It would seem to me that there's a way to

17  test it.  And again, it's a catch-22 for you because if you

18  take -- I don't know what a good number here would be -- a

19  million documents, which sounds like a really small number

20  here, okay, that's why I used a million, and you searched them

21  for hyperlinks and you found out that only four of them have

22  hyperlinks, well, it kind of undermines your burden argument.

23  And if you found out that 500,000 of them had hyperlinks, it

24  enhances the plaintiffs' argument why they need it.  If the

25  document was relevant, why isn't it really effectively the same

N2MGgooC

1    as being part of the document that was produced as relevant?

2              MS. SESSIONS:  Your Honor, I think, given the scope of

3    the review that we're being asked to do, chances are the

4    relevant documents are going to be pulled in in the document

5    review.  And everybody knows that the relevant documents in a

6    case are not the full 2 million that we've produced or however

7    many million more that we produce.

8              THE COURT:  Right.

9              MS. SESSIONS:  So if there are a couple of links that

10   the plaintiffs need, we can work that out and we can talk about

11   it.  But it's just adding documents that are not presumed to be

12   relevant or responsive because they're not in a custodial file

13   and they don't hit on search terms and just adding that onto

14   the review population simply because they were hyperlinked.

15             THE COURT:  Listen, I realize that until quite

16   recently there were more issues at stake than there are at this

17   moment.  So I don't mean to be too critical with this

18   observation.  I realize your first and the foremost answer is

19   yesterday there was 20 issues; now there are 2.  But it would

20   seem to me that having an example to give to the plaintiff and

21   therefore an example to give to the judge would be more

22   persuasive.  So there are a lot of hyperlinks in documents or

23   they're rare occurrences.  The hyperlinked documents are

24   largely in the 2 million produced or they're not largely in the

25   2 million produced.

1           I'm the person who is most in the dark, the plaintiffs

2      are next in line, you may personally be not informed on that

3      issue, but you can get to that.  That would seem to me to be a

4      way that I would go about trying to break the tie on this, so

5      to speak.

6           MS. SESSIONS:  Well, your Honor, I appreciate that you

7      are in the dark about this.  I would submit the plaintiffs are

8      not in the dark about this, because they have our document

9      production of the 2 million documents, and so they can also

10     examine that for themselves.  I mean, I can't prove a negative,

11     I can't tell you that there isn't a relevant document sitting

12     outside that population, but 2 million is pretty good and --

13          THE COURT:  But I guess what I'm getting at is:

14     Wouldn't it be great if the judge knew, we did a sampling -- we

15     didn't do it for all 2 million documents -- and 5 percent of

16     the documents have a link, 20 percent of the documents have a

17     link, 50 percent of the documents have a link in that sample,

18     and then, we check to see whether the linked documents in that

19     sample were in the universe of previously produced documents,

20     and we found out that 87.3 percent of them were and 13 percent

21     were not.  And if this comes up, we'll get them their

22     13 percent.  This whole thing would go more smoothly if we had

23     that kind of information.

24          MS. SESSIONS:  Your Honor, we would be happy to

25     meet-and-confer with the plaintiffs about that.  And our offer,

N2MGgooC

which we made at the beginning, still stands, which is we are

always willing to entertain reasonable requests for linked

documents.  But with your Honor's guidance, I think we could go

back, and we would be happy to try to do some of that sampling

and see if we can't work this out with the plaintiffs.

                    THE COURT:  Ms. Vash.

                    MS. VASH:  Thank you, Judge.

            I think, fundamentally, we disagree on whether the

linked documents are relevant and should be produced in the

first instance.  And your Honor hit right on that, when you

said, why isn't this effectively -- I'm paraphrasing, Judge --

why isn't this effectively the same as being part of the

document review in the first instance; we agree.

            And I think an easy way to do the sampling is to run

the tool on the 2 million documents -- they have the tool --

run the tool on the documents and see how many of those hit

upon linked documents.

                    THE COURT:  No, that's the relief you want in the

order.

                    MS. VASH:  Or on some sample of it, your Honor.

                    THE COURT:  So this is what I'm going to do.  I'm

going to do nothing for 14 days and encourage a further

meet-and-confer.  And then if it results in nothing, I have the

order that was transmitted last night, I have it in Microsoft

Word, and I'll issue it.  I'll issue it.  Somebody will win;

N2MGgooC

1   somebody will lose.  Or maybe you'll both win or both lose,

2   depending on what language I put in.  That's the danger when

3   you kick these to the judge.  And I don't say that that the

4   judge is trying to scheme something up, but it's why it was

5   wise of the parties to resolve what you could resolve, because

6   it doesn't necessarily mean that you're going to get a

7   desirable result out of the judge.  So I try to work hard on

8   these things, but you are better off trying to negotiate this

9   out.

10              So how does that sound to the plaintiffs?

11              MR. BOIES:  Yes, your Honor.

12              MS. VASH:  Thank you, Judge.  That sounds good.

13              THE COURT:  Ms. Sessions, how does that sound?

14              MS. SESSIONS:  Very good, your Honor.  Thank you.

15              THE COURT:  Wonderful.  Thank you all for being here.

16   And unless there's something else, we're adjourned.

17              (Adjourned)

18

19

20

21

22

23

24

25