**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | : : : : : | Case No. 1:21-md-3010 (PKC) |
| *This Document relates to:* | : : : : : | |
| IN RE GOOGLE DIGITAL PUBLISHER LITIGATION | : : : : | Case No. 1:21-cv-7034 (PKC) |

**PUBLISHERS PLAINTIFFS' OPPOSITION TO DEFENDANTS GOOGLE LLC, AL-
PHABET INC., AND YOUTUBE LLC'S MOTION TO DISMISS PUBLISHERS'
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

## GLOSSARY OF ABBREVIATIONS

For the convenience of the Court and efficiency, Publishers use the following abbreviations in this Opposition to Defendants' Motion to Dismiss.

| Abbreviation | Docketed Items | Docket Location[1] |
|---|---|---|
| Additional Acts | Complaint Section IV.A and IV.C, specifying Acts 2 and 14-16, respectively | |
| Complaint or Compl. | First Amended Consolidated Class Action Complaint | ECF 408 |
| Defendants or Google | Google LLC, Alphabet Inc., and YouTube, LLC | |
| MBW | Minimum Bid To Win, Complaint Section IV.C.2, specifying Act 15 | |
| Motion or Mot. | Defendants Google LLC, Alphabet Inc., and YouTube, LLC's Memorandum of Law in Support of Their Motion To Dismiss Publishers' Amended Consolidated Class Action Complaint | ECF 450 |
| Publishers | Genius Media Group (k/n/a MediaLab AI, Inc.), Sterling International Consulting Group, The Nation Company, L.P., The Progressive, Inc., JLaSalle Enterprises LLC, and Mikula Web Solutions, Inc. | |
| State Op. | Opinion and Order re States' Motion To Dismiss | ECF 308 |
| UPF | Uniform Price Floor, Compl. Section IV.B.9, specifying Act 13 | |

---

[1]     MDL Case No. 1:21-md-2010.

<u>**TABLE OF CONTENTS**</u>

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  LEGAL STANDARD ......................................................................................... 5

III.  ARGUMENT ...................................................................................................... 6

    A.  The Complaint Plausibly Alleges That Google Tied Its Ad Server and Its Ad Exchange (Act 2) ................................................................................... 6

        1.  The Act 2 Tie Is Well Pled ......................................................... 6

        2.  Google Seeks To Re-Write Publishers' Complaint ..................................... 8

        3.  Google Misuses the Term of Art "Refusal To Deal" ................................ 10

    B.  Minimum Bid to Win (Act 15) Constitutes an Unlawful Exclusionary Act......... 11

    C.  Publishers Plausibly Allege That Google Exploits Monopoly Power in Search Advertising to Entrench its Monopoly Power in the Ad Network, Ad Exchange, and Ad Server Markets (Act 14) ........................................................ 15

    D.  Publishers Sufficiently Plead That Google's Impairment of Rival Ad Networks Under the Guise of Policing Malicious Code (Act 16) is Exclusionary .............. 17

    E.  Publishers Sufficiently Plead That the Interconnected Prongs of Google's Anti-Competitive Course of Conduct Constitutes an Unlawful Scheme ............. 20

IV.  CONCLUSION ................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Labs. v. Teva Pharm. USA, Inc.*,
   432 F. Supp. 2d 408 (D. Del. 2006) ........................................................................... 21

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ............................................................................... 5, 6

*Castro v. Sanofi Pasteur Inc.*,
   134 F. Supp. 3d 820 (D.N.J. 2015) ......................................................................... 14

*City of Groton v. Conn. Light & Power Co.*,
   662 F.2d 921 (2d Cir. 1981) ................................................................................... 20

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ............................................................................................... 20

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ........................................................................................... 3, 12

*Hack v. President & Fellows of Yale Coll.*,
   237 F.3d 81 (2d Cir. 2000) ..................................................................................... 10

*In re Adderall XR Antitrust Litig.*,
   754 F.3d 128 (2d Cir. 2014) ................................................................................... 19

*Intuniv. Antitrus, Litig.*,
   496 F. Supp. 3d 639 (D. Mass. 2020) ................................................................... 21

*Jefferson Parish Hosp. Dist. No. 2. v. Hyde*,
   466 U.S. 2 (1984) ............................................................................................... 7, 12

*Kaufman v. Time Warner*,
   836 F.3d 137 (2d Cir. 2016) ................................................................................... 10

*Klein v. Meta Platforms, Inc.*,
   2022 WL 17477101 (N.D. Cal. December 6, 2022) ............................................... 21

*Merced Irrigation Dist. v. Barclays Bank PLC*,
   165 F. Supp. 3d 122 (S.D.N.Y. 2016) ................................................................... 19

*Meredith Corp. v. SESAC, LLC*,
   2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) ............................................................. 3

*N. Pac. Ry. Co. v. United States*,
   356 U.S. 1 (1958) .......................................................................................... *passim*

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
  262 F.R.D. 58 (D. Mass. 2008) ............................................................... 14

*Nathitoches Parish Hosp. Serv. Dist. v. Tyco Int'l Ltd.*,
  247 F.R.D. 253 (D. Mass. 2008) .............................................................. 14

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015) ............................................... 4, 10, 13, 19

*Peretti v. Authentic Brands Grp. LLC*,
  33 F.4th 131 (2d. Cir. 2022) ..................................................................... 5, 10

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
  507 F.3d 117 (2d Cir. 2007) ..................................................................... 19

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506 (2002) .................................................................................. 10

*TechReserves Inc. v. Delta Controls Inc.*,
  2014 WL 1325914 (S.D.N.Y. Mar. 31, 2014) ........................................ 10

*Tele Atlas N.V. v. NAVTEQ Corp.*,
  2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) ........................................ 21

*TSI Prod., Inc. v. Armor All/STP Prod. Co.*,
  2019 WL 4600310 (D. Conn. Sept. 23, 2019) ........................................ 18

*Tucker v. Apple Computer, Inc.*,
  493 F. Supp. 2d 1090 (N.D. Cal. 2006) .................................................. 10

*U.S. Steel Corp. v. Fortner Enters., Inc.*,
  429 U.S. 610 (1977) .................................................................................. 9

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) .................................................................................. 11

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ........................................................... passim

*United States v. Microsoft Corp.*,
  84 F. Supp. 2d 9 (D.D.C. 1999) ............................................................... 4

*Valassis Comm'ons Inc. v. News Corp.*,
  2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) ........................................... 20

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
  257 F.3d 256 (2d Cir. 2001) ..................................................................... 18

iv

**<u>Rules</u>**

Fed. R. Civ. P. 8 .................................................................................................................. 17

## I.       INTRODUCTION

This case is about the past harm and future viability of Publishers who produce the web-sites that are now the driving source of information throughout our society. Google has exploited its monopoly power through a course of exclusionary conduct (the "Scheme") designed to ensure that Google and only Google—not Publishers, not Advertisers, not consumers, and not the competitive process—always wins. The Publishers' Consolidated Class Action Complaint ("Complaint") explains that Google's monopolization Scheme consists of interconnected practices that complement and build on one another. This Court has already held that ten of those practices harm competition. ECF No. 308 ("State Op."). The Complaint adds six categories of practices that the Court has not yet addressed (the "Additional Acts").

Google now seeks to insulate four of the six Additional Acts from liability by carving them out of the Scheme now, at the pleading stage. ECF No. 450 ("Motion" or "Mot."). The four Additional Acts are: (i) coercing Publishers to use Google Ad Server (tying product) and AdX (tied product) through multiple means already held by this Court to state a claim (separate and apart from their role in coercing a tie), including the active concealment of Publishers' own data (one aspect of Act 2, Compl. Sec. IV.A); (ii) Google's minimum-bid-to-win ("MBW") practices (Act 15, Compl. Sec. IV.C.2); (iii) tying search and display advertising to restrain competition in the Ad Server, Ad Network, and Ad Exchange markets (Act 14, Compl. Sec. IV.C.1); and (iv) Google's use of malicious code as a pretext to block rivals (Act 16, Compl. IV.C.3). Google's Motion should be denied because, as set forth below, Publishers plausibly allege that each challenged Act violated the antitrust laws.

*First*, Google points to this Court's analysis of the States' allegations concerning Google's concealment of Publisher's own data from them (part of Act 2). Mot. at 2, 10. Google

treats the concealment as if it were the only conduct alleged in Act, and wrongly equates Publishers' allegations with the States' different allegations. *Id.* Critically, the States asserted this concealment as a stand-alone antitrust violation. State Op. at 40-44. This Court held that certain concealment practices involving encryption, without more, constituted a justifiable refusal to deal. *Id.* But Publishers' allegations are different: As the Complaint explains, Google's data concealment was one of several acts contributing to Google's ability to coerce Publishers into accepting a tie between its Ad Server and Ad Exchange. Google does not contest any of the other conduct alleged that constituted tying of its Ad Server to its Ad Exchange under Act 2, most of which this Court has already held to state a claim standing alone. State Op., Section VI.D. Thus, litigation concerning Act 2 will proceed regardless of the outcome of Google's Motion. The real issue is whether Google can strike specific coercive practices from Act 2, at the pleading stage, by ignoring the context of the Scheme and the reasonable inferences therefrom. It cannot. Section III.A., below.

*Second*, Google attempts to re-characterize Publishers' MBW (Act 15) allegations as challenging a new-and-improved product or, alternatively, as constituting a disfavored form of refusal to deal. Mot. at 4-7. Google's new-product argument is a red herring. According to Google, conduct that can be recast as a new product feature is immune from antitrust challenge. No such immunity exists. MBW is a set of market-distorting auction-related practices, not new features on a widget. It simply makes no difference that Google's conduct takes place through software rather than in an auction house: Under MBW, Google took Publishers' highly sensitive bidding information and gave it to the Publishers' *counterparties*—advertisers using Google's Ad Buying Tools and bidding through Google's Ad Exchange (but not advertisers bidding

through rival Ad Exchanges)—enabling Google's advertiser customers to win ad auctions at artificially low prices. Compl. ¶¶343-47. Google was like an auctioneer who represents both bidders and sellers, but whispers sellers' confidential information about the lowest prices they would be willing to accept to bidders. Only in a monopolized market would parties do business with such an inherently conflicted and faithless intermediary. *See Meredith Corp. v. SESAC, LLC*, 2011 WL 856266, at *15 (S.D.N.Y. Mar. 9, 2011) (defining market power as the power "to force a purchaser to do something that he would not do in a competitive market") (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992)).

Moreover, Google implemented MBW as part of its Scheme to thwart Header Bidding— a bidding system enabled by software technology that posed what Google saw as a competitive "existential threat" (Compl. ¶¶36, 300)—by depriving Header Bidding of advertiser bidding volume. *Id.* ¶¶32, 343, 348. That context explains why MBW was not merely a set of "product improvements" designed to make "advertisers better informed" and thereby win business by "building a better mousetrap." Mot. at 4-5. It was a specific practice designed to counter a serious competitive threat facing Google. Compl. ¶¶343-52. MBW harmed Publishers and excluded Google's rivals, not on the merits, but because Google had the market power to do so by manipulating the bidding system. *Id.*

Google's product-improvement theory is, at most, a fact issue that cannot be resolved on a motion to dismiss. *See* Mot. at 4-5. Microsoft took the same approach when it faced antitrust liability for its Windows and Internet Explorer misconduct. There, the United States challenged certain changes in the Windows and Internet Explorer code as anticompetitive, and argued that Microsoft's justifications for those changes were pretextual. *United States v. Microsoft Corp.*,

253 F.3d 34, 47, 58-59 (D.C. Cir. 2001). Where Microsoft offered any justification at all, it countered that those product changes were technologically justified and pro-consumer. *Id.* at 66-67. Microsoft's defenses were factual in nature—and they were intensely litigated at the fact stage. *Id.*; *see also id.* at 47, 60-62; *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 53-58 (D.D.C. 1999). The Second Circuit has expressly adopted and endorsed the *Microsoft* approach, in which the pro-competitive justification is the defendant's burden after the plaintiff establishes the *prima facie* elements. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652-53 (2d Cir. 2015). Because the Publishers' Complaint establishes the *prima facie* elements, Google's factual assertions that its conduct was justified as "product improvement" (Mot. at 4-5) cannot be heard on this Motion to Dismiss. After all, it is black letter law that at the pleading stage factual allegations must be taken as true.

Nor do Publishers rely on any refusal to deal claim in concerning MBW. *Contra* Mot. at 5-6. Publishers do not contend that Google selectively refused to share Publishers' data with advertisers bidding through rivals. On the contrary, Publishers contend that Google should not have shared confidential data with bidders at all. Section II.B, below.

*Third*, Google challenges Publishers' claim that through "Search+" and related programs, Google unlawfully tied its monopoly-controlled search advertising with display advertising for small to medium-sized advertisers (Act 14). Mot. at 11. The Motion asserts that Publishers purportedly fail to allege coercion or how the alleged conduct was anticompetitive. *Id*. In fact, Publishers specifically allege that the tie became mandatory in 2017 for all new, small advertiser accounts ("AdWords"). Compl. ¶¶341-42. Google engaged in exclusionary conduct, implemented through its Search+ and Smart Campaign programs, whereby Google uses its monopoly power in the search advertising and small advertiser Ad Buying Tool markets to distort competition in the

4

Ad Server and Ad Network markets—to the detriment of Publishers and the competitive process. Section III.C, below.

*Fourth*, Google complains that Publishers' allegations regarding Google's exclusion of rival Ad Networks (Act 16) through the pretext of controlling malicious code do not allege a harm to competition. Mot. at 7-9. But Publishers allege that this practice impaired competition in the Ad Network market, and that is enough. Compl. ¶¶355-56. Google's contentions are factual quarrels about the extent of harm: Google contends that Publishers' malicious code allegations were not sufficiently long-lived, or did not "recur" enough, or are simply not as detailed as Google would like. Mot. at 7-9. Such arguments are not appropriate at the pleading stage. Section III.D, below.

*Finally*, Google misstates the law regarding monopoly scheme allegations. Mot. at 13-14. The law is clear that so long as at least one element of the Scheme is unlawful on a standalone basis, other acts, not necessarily unlawful by themselves, can constitute a part of such an unlawful Scheme. In fact, as demonstrated herein, Publishers more than meet this test at the pleading stage: each of six Additional Acts states a claim, and in combination these sixteen Acts operate synergistically to create mutually "reinforcing feedback loops that augment the impact of each individual anticompetitive act." Compl. ¶¶11, 14-41, 244-45, 265, 281. For this reason, the Motion's central conceit—treating each conduct allegation as if it were an isolated incident to be rationalized piecemeal—is wrong. Section III.E, below.

## II.   LEGAL STANDARD

On a motion to dismiss, courts must "accept factual allegations in the complaint as true and draw all reasonable inferences" in the plaintiff's favor. *Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 137 (2d. Cir. 2022) (quoting precedents). A claim survives if, "in light of the factual allegations," that claim is at least "plausible.'" *Anderson News, L.L.C. v. Am. Media, Inc.*,

680 F.3d 162, 182 (2d Cir. 2012). "Fact-specific questions cannot be resolved on the pleadings." *Id.* at 185.

## III.    ARGUMENT

### A.    The Complaint Plausibly Alleges That Google Tied Its Ad Server and Its Ad Exchange (Act 2)

The Publishers allege that Google coerces the tie of its Publisher Ad Server with its Ad Exchange (Act 2) through several means. Compl. ¶¶15, 17. One factor contributing to that coercion is that Google conceals Publishers' own customer data from them. *Id.* ¶15 ("Act 2 is based *in part* on Google's encrypting Publishers' IDs" (emphasis added)); ¶¶207-25. Google does not seek to have the Act 2 tying dismissed in total; it seeks only to strike the concealment allegations, which Google admits are just "[o]ne of the alleged acts" constituting the Act 2 tie. Mot. at 10. Google goes on to treat the concealment-by-encryption component as if it were a standalone refusal-to-deal theory. Mot. at 10-11. Google's gambits—conflating a piece of a course of conduct with a claim that can be dismissed and equating tying with a disfavored form of refusal-to-deal theory—should fail.

### 1.    The Act 2 Tie Is Well Pled

An unlawful tying arrangement exists when a defendant sells one product only on the condition the buyer purchase a separate product. *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958). A plaintiff asserting an illegal tie "must allege facts plausibly showing that: (i) the sale of one product (the tying product) is conditioned on the purchase of a separate product (the tied product); (ii) the seller uses the actual coercion to force buyers to purchase the tied product; (iii) the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product; (iv) the tie-in has anticompetitive effects in the tied market; and (v) a not

6

insubstantial amount of interstate commerce is involved in the tied market." State Op. at 16 (citations omitted).

The Publishers' Complaint, like the States' Complaint, alleges that Google has tied its Ad Server (DFP) (tied product) to Google's Ad Exchange, AdX (tying product) (Act 1). The Court has already upheld that Act 1 tying theory. State Op. at 20. Unlike the States' Complaint, Publishers allege that Google also engaged in the converse tie, with AdX as the tied product and DFP as the tying product (Act 2). Compl. ¶¶199-230. As the Publishers' Complaint explains, no matter which tie came first, the tie ultimately works reciprocally because of network effects—the "feedback loop," whereby platforms with more buyers attract more sellers, and *vice versa*— because, when Google consolidates its market power over advertisers it increases its market power over Publishers. *Id.* ¶¶11, 244-45, 265, 281.

In concluding that the Ad Exchange-to-Ad Server tie (Act 1) states a claim, the Court found publisher Ad Servers and Ad Exchanges are separate products and that the Plaintiff States "plausibly alleged that Google had monopoly power in both the markets for ad servers and for ad exchanges, and that its actions have had anticompetitive effects in both markets." State Op. at 17, 19. The Court also held, "If monopoly power in the tying market is alleged and proven, the tying arrangement may be unlawful *per se* without the need to prove anticompetitive effects or other markets conditions." State Op. at 17 (citing *Jefferson Parish Hosp. Dist. No. 2. v. Hyde,* 466 U.S. 2, 15, 17 (1984)). The Court further found the States plausibly alleged a substantial effect on commerce. State Op. at 19. Those holdings apply to Publishers' Act 2, resolving four of the five elements. Google does not assert otherwise. Thus, only coercion remains as to Act 2.

Regarding coercion, the Court found that Google's requirement, beginning in 2018, that Publishers purchase the combination of its Ad Server and Ad Exchange products, Google Ad

Manager ("GAM"), plausibly stated a claim for an unlawful tie running from AdX (the tying product) to its DFP Ad Server (the tied product). State Op. at 18-19. That is the tie that Publishers allege as Act 1 in the Complaint. Compl. ¶¶199-204. By the same logic, GAM also constitutes a tie running in the other direction, from the DFP Ad Server (the tying product) to AdX (the tied product), identified as Act 2 in the Complaint. Google nowhere contests this point or this logic, and that is enough to support the Act 2 tie. *See*, *e.g*., *N. Pac. Ry.,* 356 U.S. at 3, 11-12 (railway lease contracts requiring use of the railroad for shipping established coercion for an illegal tie).

Publishers go further, alleging a variety of additional Acts and factors that increase Google's coercive power over the Act 2 tie, each of which this Court has already held to state a claim on a stand-alone basis. In addition to the concealment-by-encryption conduct, the Complaint explains how Google's Dynamic Allocation (Act 5), Enhanced Dynamic Allocation (Act 6), and its take-rate manipulation through Dynamic Revenue Share (Act 8), contributed to its coercive power to implement the Act 2 tie. Compl. ¶¶17, 21-22, 24, 262-68, 272-76, 295; *see also* State Op. at 44-50, 55-57 (addressing these Acts). The Complaint adds that Google restricted valuable repeat customers and other transaction information only to Advertisers bidding through AdX. Compl. ¶¶17, 215-19.

### 2.    Google Seeks To Re-Write Publishers' Complaint

Ignoring all of the above—the real issues on whether the Act 2 tie states a tying claim—Google attacks only the concealment allegations, which are one piece of conduct subsumed within Act 2. *Compare* Mot. at 10-11, *with* Compl. ¶¶15, 17. Google does so primarily by mischaracterizing the concealment allegations as a standalone refusal-to-deal claim, then analogizing those allegations to the States' Complaint. Mot. at 10-11 (citing State Op. at 43-44). But the

Publishers' Complaint is not the States' Complaint. Unlike the Publishers, the States pled the concealment as a stand-alone antitrust violation. State Op. at 41.

Publishers do not assert Google's concealment of Publisher data as a standalone act. Instead, Publishers allege that Google coerced users of its Ad Server to also use its Ad Exchange— thus tying the two together—using multiple means, including contractually tying them together in 2018 (Compl. ¶¶226-30)—as well as by forcing Publishers who wanted the benefit of their own data also to use AdX. *Id.* ¶¶205-25. That is, Publishers do not contend that the concealment was exclusionary in and of itself—as the States alleged—but rather that this conduct was one part of the multiple ways in which Google coerced the Act 2 tie. *Id.* ¶¶17, 215-19.

As the Complaint explains, Google's encryption of Publishers' data (User IDs) impairs the ability of advertisers using non-Google Ad Exchanges to identify users, thereby suppressing those advertisers' bids, and thus coerces publishers to use both Google's Ad Server and its Ad Exchange, AdX. Compl. ¶¶217-18. As Publishers allege, a properly functioning Ad Server seeks to maximize revenues for Publishers by providing as much information as possible about the user to advertisers bidding on the impressions. *Id.* ¶¶208-15. And user identity is a critical piece of data. *Id.* ¶212. But, following its acquisition of Doubleclick, Google artificially restricted the distribution of user information to Google advertisers who bid through Google's AdX or AdSense Ad Network. *Id.* ¶207. A 2018 Google study showed that when advertisers do not know the identity of the user, ad prices drop by 50+%. *Id.* ¶216. That drop in ad prices (i.e., Publisher revenue) exceeds the 20 to 40% revenue loss the Court's reasoning suggested was coercive when sustaining the Act 1 tie. State Op. at 18.

Google therefore succeeded in imposing "burdensome terms that could not be exacted in a completely competitive market." *U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 620

(1977). That is enough for conduct to be relevant to a tying claim. *Tucker v. Apple Computer, Inc.*, 493 F. Supp. 2d 1090, 1097 (N.D. Cal. 2006) (addressing an alleged technological tie); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000), *abrogated in part on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

### 3. Google Misuses the Term of Art "Refusal To Deal"

Moreover, Google seeks to upend a century of tying law by equating the concealment allegations with a form of disfavored "refusal-to-deal claim." Mot. at 10-11 (citing and quoting *Kaufman v. Time Warner*, 836 F.3d 137, 144 (2d Cir. 2016)). But *Kaufman*'s refusal-to-deal *dicta* has nothing to do with that case's straightforward analysis of the tying claim. 144 F.3d144-45. That *dicta* appears to relate to rights that defendant Time Warner had under FCC regulations. *Id.* at 145-46. Of course, there is always a "refusal to deal," in a colloquial sense, involved with a tie. *TechReserves Inc. v. Delta Controls Inc.*, 2014 WL 1325914, at *9 (S.D.N.Y. Mar. 31, 2014) ("A tying arrangement exists when a seller refuses to sell a product unless the buyer also purchases a tied, or linked, product.") (citing *N. Pac. Ry.*, 356 U.S. at 5-6). Applying the description does not convert a customer's tying claim into the *Aspen Skiing*-type theory Google suggests. *See* Mot. at 5-6.

In any event, the antitrust refusal-to-deal doctrine could not be implicated in the manner that the Court discussed in its analysis of the States' encryption claim because the gravamen of the States' encryption allegations was that failure to share data with Google's competitors was anticompetitive in and of itself. State Op. at 40-41. Here, Publishers allege that Google's concealment-by-encryption "has the effect of significantly reducing the usage of rivals' products" and protects the defendant's monopoly." *Actavis*, 787 F.3d at 655. That is enough for a monopolist's conduct to be relevant to the competitive effects analysis. *Id.* Therefore, even if the Com-

plaint were read to allege concealment as an anticompetitive act (as opposed to a factor enhancing coercion), Google still would not be able to sever the concealment allegations from the rest of the Act 2 tie.

### B.     Minimum Bid to Win (Act 15) Constitutes an Unlawful Exclusionary Act

Publishers allege that Google responded to the "existential threat" of competition from Header Bidding through multiple types of mutually reinforcing anticompetitive conduct. Compl. ¶¶36, 300. Google's MBW was a prime example. *Id.* ¶346. When Google needed to take volume away from Header Bidding and other competitors and would-be competitors in the short term, it used MBW to make its service more attractive to advertisers (than rivals)—at least in the short term—by giving advertisers bidding through Google's tools the ability to win bids at the lowest possible levels. *Id.* ¶¶343-46. Google's analysis stops here, at the purported benefits to advertisers (*see* Mot. at 5-6), avoiding the key allegations about *how* and *why* MBW was successful. Those allegations—the ones about Google's conduct, not just that conduct's purported effect on advertisers alone—show why MBW was anticompetitive. *Cf. United States v. Grinnell Corp.*, 384 U.S. 563, 570,71 (1966) (monopolization liability turns on the means of acquiring and using monopoly power).

MBW worked to "starve Header Bidding of advertising volume" by taking *Publishers'* bidding data—which it had exclusive access to through Google's monopoly Ad Servers—and then gave that inside information to advertisers using Google's Ad Buying Tools. Compl. ¶343. MBW gave Google's advertisers with data from Publishers' Ad Server reflecting the winning bid or second-highest bid for an ad shown on the same page to the same user just milliseconds earlier. *Id.* ¶¶344-46. This enabled individual advertisers to win impressions through lower bids on AdX than they could have submitted through rival exchanges that did not have MBW (and which did not control monopoly Publisher Ad Servers). *Id.*

11

In other words, Google deployed the informational advantage conveyed by MBW to drive advertisers to forego rival Ad Exchanges and Ad Buying Tools, foreclosing competition in those markets. MBW specifically harmed Header Bidding (Compl. ¶348) and on that score it was part of a course of conduct that included several other Acts. *Id.* ¶¶ 25-28. Publishers further allege that MBW worked together with Google's Uniform Price Floors ("UPF"), a practice also challenged by the States and held to state a claim. State Op. at 55-57. Through MBW and UPF, Google used its monopoly power to distort competition and take advertising volume away from rivals. Compl. ¶¶350-51. Because of the UPF policies, Publishers could no longer use their Ad Servers to set a higher price floor on Google's Ad Exchange to undo the unfair advantage Google had been giving to its advertisers through MBW. *Id.* Combined, the practices lowered Publishers' advertising income and drove more advertisers to use Google Ad Exchange and Ad Buying Tools—and, therefore, away from Header Bidding and other competitive technologies. *Id.* ¶¶34, 379.

Google's behavior—intentionally harming one set of customers in order to exclude rival products from the market—would not be tolerated in an efficient and competitive market. Buyers and sellers at auction do not rationally use conflicted intermediaries who pass *their* confidential information to allow their counterparties to harm them. Google got away with it because Publishers had no choice but to accept MBW's auction manipulation. *Eastman Kodak Co.*, 504 U.S. at 464 ("Market power is the power 'to force a purchaser to do something that he would not do in a competitive market.'") (quoting *Jefferson Par.*, 466 U.S. at 14); *N. Pac. Ry.*, 356 U.S. at 6 (describing part of the evil of illegal tying arrangements as "buyers forced to forego their free choice between competing products").

12

In response, Google asserts that MBW should be dismissed because it simply reflects the launch of a purported product improvement and thus is legitimate competition. Mot. at 4-5. Google also attempts to re-characterize the MBW allegations as asserting a disfavored refusal-to-deal theory. *Id*. at 5-6. Google is wrong on both points. In any event, Google's product-improvement theory is a factual defense that cannot succeed on the pleadings.

Google's product-improvement argument amounts to an attempt to create immunity for supposed new, or newly improved products. Mot. at 4-5. But Google ignores well-established law "that product redesign is anticompetitive when it coerces consumers and impedes competition." *Actavis*, 787 F.3d at 652. That's precisely what Publishers allege Google did with MBW: coerce Publishers to divulge their own confidential bidding data; make that data available exclusively through Google's advertiser bidding tools; and thereby economically force advertisers to bid through Google, and shun Google's rivals to the detriment of Publishers and advertisers.

At best, Google's product improvement theory is a factual defense in the style of *Microsoft*. Among other conduct, Microsoft was condemned for technologically tying its monopoly operating system to its Internet browser to force consumers to install, load, and use Microsoft's Internet Explorer ("IE") browser instead of a rival. *Microsoft*, 253 F.3d at 47, 65-66. Microsoft, like Google, made *factual* arguments that the Windows-IE tie was merely a product improvement or a product design decision that benefitted consumers. *Id.* at 64-67. The government contended that those justifications were pretextual. *Id.* In the end, Microsoft's "general claims countered that the benefits of integrating" Windows and Internet Explorer fell short. *Id.* at 66-67. Microsoft was permitted to present its justification that one of its changes was not pretextual at the fact stage, after the government's "*prima facie* case of harm to competition." *Id*. Similarly, the

13

Motion's general—and vague—assertions of "benefits" from MBW must await factual development. *See* Mot. at 6-7.

The fact is, MBW was not a product improvement. It was auction conduct that systematically harmed Publishers and excluded rivals without legitimate justification. Google's approach cheats Publishers by facilitating Advertisers in depressing bids. If Google ran a casino, MBW would be a way for high-rollers to peek at the cards of other patrons. The experience might be "improved" for one set of customers by disclosing the secrets of another. That is not a "better mousetrap." It is cheating and deception, not competition on the merits. Google can try to argue otherwise, but the place for that argument is on the factual merits, not the pleadings. *See Microsoft*, 253 F.3d at 66-67.[2]

Google also mischaracterizes Publishers' allegations concerning MBW as a refusal to deal. Mot. at 7. It is not. Publishers do not complain that Google has refused to share exclusive publisher data from its Ad Servers with rivals. On the contrary, Publishers allege that Google

---

[2]     Unlike a cheating casino, MBW did not benefit advertisers overall or in the long term. First, MBW achieved its goal of consolidating Google's market power. Second, buyers as a group can be harmed by exclusionary conduct even though individual buyers may believe they are benefitting. That is because of a "collective action" problem in which each individual buyer, acting in its own self-interest, accepts exclusionary behavior that is detrimental to all buyers. *See Nathitoches Parish Hosp. Serv. Dist. v. Tyco Int'l Ltd.*, 247 F.R.D. 253, 266-73 (D. Mass. 2008) (emphasis added) ("[A]s a matter of standard antitrust economics, 'buyers have incentives to agree to exclusionary contracts even when they have an anticompetitive effect because most of the harm of individual agreements is externalized onto those who are not party to that particular agreement"). Multiple courts have concluded, in analogous exclusionary conduct cases that, though the monopolist's conduct that may superficially appear to benefit one group relative to another, it can in fact harm both groups by enhancing the monopolist's power. *See, e.g.*, *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847-49 (D.N.J. 2015) (finding common evidence established that defendant's bundling of products, which divided market into "loyal" and "non-loyal" customers, suppressed competition, and raised prices for all customers, including "loyal" customers); *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 262 F.R.D. 58, 70 (D. Mass. 2008) (citing "compelling evidence that a more competitive market would likely bring down the negotiating range for all purchasers") (emphasis added)).

should not share Publishers' own data with Publishers' counterparties to depress bids as part of Google's Scheme to harm rivals and enhance its own monopoly power.[3]

### C. Publishers Plausibly Allege That Google Exploits Monopoly Power in Search Advertising to Entrench its Monopoly Power in the Ad Network, Ad Exchange, and Ad Server Markets (Act 14)

Publishers allege that Google unlawfully gained and entrenched monopoly power in the Publisher Ad Server, Ad Exchange, and Ad Network markets by utilizing its dominance in its monopoly search business to force advertisers to purchase display ads on Google's Ad Network (GDN). Compl. ¶¶334-42 (Act 14). Publishers allege that the Act 14 conduct constitutes an unlawful tie, between Google's monopoly in search advertising and its monopoly in Ad Networks. *Id.* ¶¶30-31, 335-36. Because GDN is an exclusive source of demand for AdSense (a Google Ad Server for small and mid-size publishers) and a significant purchaser through Google's AdX, (*id.* ¶336), Google's tying of its search business with GDN enhanced Google's monopoly power in the Ad Server, Ad Exchange, and Ad Networks markets. *Id.* ¶342.

Specifically, Publishers allege that "Google's Ad Buying Tools used portions of the advertising budgets of 'search-only' advertisers to *automatically buy* display ads on the Google Display Network ("GDN")." *Id.* ¶336 (emphasis added). Google first implemented Search+ by unilaterally diverting the unspent portions of the budgets of *search-only advertisers* to display advertising on GDN. *Id.* ¶¶336, 338. In 2017, when Google introduced its Smart Campaigns as an extension of Search+, the "Smart Campaigns *precluded* new advertiser accounts using AdWord (a Google Ad Buying Tool) from opting out of display advertising." *Id*. ¶341 (emphasis

---

[3]     Google also dedicates a paragraph to the point that Act 15 does not involve below-cost pricing theory. Mot. at 6-7. That is correct, and Google's invocation of below-cost pricing is a rhetorical distraction.

added). By the fourth quarter of 2018, Search+ was the default-on for all advertisers, causing advertisers to spend over $300 million on GDN. *Id.* ¶339.

Google argues that the Act 14 claim should be dismissed because Publishers do not allege (1) coercion required for a tying claim or (2) anticompetitive effects from Act 14 in isolation. Mot. at 11-12. Publishers plausibly allege coercion. When Search+ debuted, Google automatically opted existing search advertisers into the program and made participation the default for new advertisers. Compl. ¶339. By 2017, Google "*precluded* new AdWord advertisers from opting out of display advertising." *Id.* ¶341 (emphasis added). These allegations—that Google made Search+ the default and Smart Campaigns precluded advertisers from opting out of display— plead coercion.

Publishers also plausibly plead that Act 14 conduct had anticompetitive effects. By forcing advertisers to buy exclusively through its own GDN, Google used its monopoly power in search and Ad Buying Tools to drive market share to its own Ad Network at the exclusion of rivals. Plaintiffs allege these advertisers do not "multi-home," *i.e.*, use multiple Ad Buying Tools. *Id.* ¶336. Accordingly, Google, through its search monopoly power, locked these advertisers into Google's Ad Buying Tools, which operated exclusively through GDN. *Id.* ¶336. In short, Plaintiffs' Complaint plausibly alleges that Google's anticompetitive conduct harmed competition. *Id.* ¶342. Should the Court have any remaining concerns, Publishers seek leave to amend to detail some of Google's internal admissions and communications that confirm the Act 14 allegations in the Complaint.[4]

---

[4]     Google strengthened its tie through a campaign designed to prevent small advertisers from realizing their budgets were being spent on display ads. An employee cautioned, "Q4 is focused on the migration [to Search+] and making sure we don't increase churn as a result of the increased awareness of Display (a major concern)." GOOG-DOJ-11813566 at 3587. Internal documents indicate Google was successful. GOOG-DOJ-11565492 at 5520 ("large% don't know

### D.    Publishers Sufficiently Plead That Google's Impairment of Rival Ad Networks Under the Guise of Policing Malicious Code (Act 16) is Exclusionary

Publishers plausibly allege that Google abused its monopoly power in the Publisher Ad Server market by engaging in a recurring practice of excluding competing Ad Networks under the pretext of patrolling problematic code (Act 16).[5] Compl. ¶¶353-56. None of Google's critiques of these allegations warrants its dismissal, either as a standalone anticompetitive act, or as part of the alleged anticompetitive Scheme.

Google first criticizes Publishers for narrowly focusing on a single "unidentified rival network," and therefore purportedly showing no generalized harm to competition in the ad network market. Mot. at 8. This argument mischaracterizes Publishers' allegations and ignores that Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Publishers allege that small and mid-sized publishers, who cannot meet Ad Exchanges' high monthly impression requirements, must sell ads through Ad Networks. Compl. ¶¶119, 354. In a competitive market, Google's Ad Network would compete with its rivals on the merits, for example through better pricing, for publishers' impressions. Instead of competing, Google abused its monopoly power in the Ad Server market by falsely flagging rival ad networks' codes as malicious and then removing the rivals' bids from the Ad Server. *Id*. ¶355. This anticompeti-

---

they're on display"); GOOG-TEX-00703704 at 3756 ("80% of the campaigns do not even know they are on it."). One advertiser complained, "My campaign is called 'Google Search.' Why are you putting my ads on random websites." GOOG-DOJ-09875036 at 5062. Plaintiffs respectfully request leave to amend their complaint to add these and additional facts should the Court decide that the Act 14 allegations in the Complaint fail to state a claim.

[5]    Google is correct that the Complaint heading description of this allegation mistakenly referred to Ad Exchanges when it should have stated Ad Networks, Mot. at 7, n.2, as was clear from the text following the heading. Compl. ¶¶353-56.

tive practice interrupted rival Ad Networks' business relationships with Publishers because revising the allegedly malicious code required extensive work by staff at both the rival Ad Networks and the Publishers. *Id.* Moreover, while this work was in process, the affected rival Ad Networks were not permitted to compete for the Publishers' impressions in the Google Ad Server with bids by any advertiser. *Id.* This use of the Ad Server to preclude bids from rival networks necessarily drove even more business to Google's Ad Network, which controlled 70-80% of the Ad Network market. *Id.* ¶178. Google's recurring practice reduced Publishers' choice, reduced output in the Ad Network market, and diminished Publishers' revenues because impaired rival Ad Networks would have paid more for the same inventory than Google's Ad Network. *Id.* ¶356.

Publishers' Act 16 allegations are cognizable under well-established antitrust precedent. State Op. at 30 ("Harm to competition may be inferred through facts such as 'reduced output, increased prices and decreased quality' in the relevant market.") (quoting *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001)); *TSI Prod., Inc. v. Armor All/STP Prod. Co.*, 2019 WL 4600310, at *13 (D. Conn. Sept. 23, 2019) ("Second Amended Complaint alleges other harms to competition such as reduced consumer choice and reduced product quality.").

Google also argues that Publishers' allegations are insufficient because the malicious-code issue was purportedly "temporary," and Google did not ban any rival network outright. Mot. at 8, 9. Google frames the issue as one of antitrust injury, saying that the allegations are too "scant" to "demonstrate an effect on competition." Mot. at 8. The Complaint alleges that Act 16 excluded competitors. Compl. ¶¶354-55. Through Act 16, Google "removed the rival Ad Network's code," thereby preventing its competitors from competing for impressions *at all* until they completed an arduous process and obtained Google's blessing. *Id.* Those allegations show

18

what they must—that Google exercised sufficient market control to exclude rivals and control competition. *See Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 142 (S.D.N.Y. 2016). Google's actual quarrel is with the extent of harm to competition—and that dispute must await a fact stage. *See id.* at 142-43.

Finally, Google's argument, Mot. at 9, that it had a legitimate business reason for policing malicious code, misses the point. Publishers do not allege that Google cannot block malicious advertising. Instead, Publishers plead that Google used malicious code *as a pretext* to exclude rival Ad Networks from competing. Compl. ¶353. Pretextual conduct lacks a legitimate business purpose and is anticompetitive. *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014), as corrected (June 19, 2014) (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007)). That is all that is necessary for Publishers to establish a *prima facie* claim. *Microsoft*, 253 F.3d at 58-59, 64-65. Google may attempt to argue that its justifications were not a pretext—but that is a defense, and it is Google's burden to be taken up at a fact stage. *See Schneiderman*, 787 F.3d at 652-63 ("once a plaintiff establishes that a monopolist's conduct is anticompetitive or exclusionary, the monopolist may proffer 'nonpretextual' procompetitive justifications for its conduct. The plaintiff may then either rebut those justifications or demonstrate that the anticompetitive harm outweighs the procompetitive benefit.").[6]

---

[6]   Google's defense will fail. Rival networks repeatedly challenged Google's conduct of flagging their codes as malicious. GOOG-DOJ-13324400, at 4402, *see also* GOOG-DOJ-13474103, at 4105 (Oath, the ad tech product owned by Google's major competitor Yahoo, complaining that their code was blocked by Google as malicious. Googles itself acknowledged that the same code was not flagged by Yahoo's own scanning system and was served on AppNexus, owned by another Google competitor AT&T). These facts strongly indicate Google lacked legitimate business reasons but excluded rivals from competing under the pretext of policing malicious code. Plaintiffs respectfully request leave to amend their Complaint to add these and

additional facts should the Court decide that the Act 16 allegations in the Complaint fail to state a claim.

E.      **Publishers Sufficiently Plead That the Interconnected Prongs of Google's Anti-Competitive Course of Conduct Constitutes an Unlawful Scheme**

Google's Motion mis-states the law on scheme allegations, attempting to isolate and con-sider each Additional Act in a vacuum. Mot. at 13-14. But this Court has recognized that courts must "avoid 'tightly compart-mentalizing the various factual components' of a plaintiff's claims and 'wiping the slate clean after scrutiny of each.'" State Op. at 39-40 (citation omitted); *see Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *Valassis Comm'ons Inc. v. News Corp.*, 2019 WL 802093, at *9 (S.D.N.Y. Feb. 21, 2019). "The proper inquiry is whether, qualitatively, there is a synergistic effect." *Valassis*, 2019 WL 802093, at *9 (internal quotation marks omitted) (quoting *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 929 (2d Cir. 1981)).

The Additional Acts, which are mutually reinforcing work "synergistic[ly]," are part-and-parcel of Google's Scheme. *City of Groton*, 662 F.2d at 929. Publishers are, therefore, entitled to the full benefit of inferences that cut across the Act distinctions. For example, as noted above, one effect of Google's Uniform Price Floor policies was to prevent Publishers from working around (and ameliorating) some competitive consequences of the MBW. MBW impaired rival Ad Exchanges by giving advertisers the ability to cheat the auctions—but only if they bid through Google's tools. Publishers responded—to counteract the cheating—by increasing the ac-ceptable price floors on Google exchanges. This helped restore an even playing field between the Exchanges. So Google reacted by making Publishers' responses impossible through UPF. Compl. ¶¶350-51. These Acts thus worked together to harm competition and cannot be viewed in isolation. Similarly, the two-way tie (Act 2) is strengthened by the feedback loop between

Google's other misconduct, such as the Act 1 tie, in part because of the feedback loop between the two sides of the Ad Tech Stack. *Id.* ¶¶11, 244-45, 265, 281. Moreover, Publishers allege in detail how the multiple prongs of Google's conduct act together to cause harm, and indeed how Google intended those Acts to work in synergistic fashion. Compl. *Id.* ¶¶11, 357.

In the State Order, the Court expressed concern about that proposition "that multiple independently lawful acts can come together to create" an actionable claim. State Op. at 39 (citation omitted). But that is not the situation here, where this Court has already held that ten alleged acts of anticompetitive conduct by Google state a claim. Thus, regardless of whether each of the four alleged Additional Acts at issue here state an antitrust violation on a standalone basis, all of four of them can be included with other alleged anticompetitive conduct, as part of an unlawful Scheme that violates Section 2. *See Klein v. Meta Platforms, Inc.*, 2022 WL 17477101, at *2 (N.D. Cal. December 6, 2022) ("Under a 'monopoly broth" theory of liability, a plaintiff 'can state a Section 2 claim by alleging a series of practices that are anticompetitive, even if some of the activities would be lawful if viewed in isolation.'"); *Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408, 428 (D. Del. 2006) ("Plaintiffs are entitled to claim that individual acts are antitrust violations, as well as claiming that those acts as a group have an anticompetitive effect even if the acts taken separately do not."); *Intuniv. Antitrust Litig.*, 496 F. Supp. 3d 639, 680 (D. Mass. 2020) ("a plaintiff can allege a series of actions that when taken together make out antitrust liability even though some of the individual actions, when viewed independently, are not all actionable") (citation omitted); *Tele Atlas N.V. v. NAVTEQ Corp.*, 2008 WL 4911230, at *3-4 (N.D. Cal. Nov. 13, 2008) (allowing jury to consider tying alongside exclusive dealing even though court had already held that tying conduct was not unlawful because defendant lacked market power in the tying market).

Publishers therefore respectfully request that any granting-in-part of Google's Motion be clear that the Acts are relevant to the overall Scheme and course of conduct and are, therefore, legitimate topics for discovery, even if the Court concludes that certain Acts cannot survive, standing alone, as the basis for an antitrust claim.

## IV.     CONCLUSION

For all the foregoing reasons, Google's Motion to Dismiss should be denied. Should the Court dismiss any portion of the Complaint, Publisher Plaintiffs respectively request leave to amend their Complaint.

Dated: March 3, 2023                           Respectfully submitted,

                                               BOIES SCHILLER FLEXNER LLP

                                               By: */s/Philip C. Korologos*

                                               David Boies
                                               dboies@bsfllp.com
                                               BOIES SCHILLER FLEXNER LLP
                                               333 Main Street
                                               Armonk, NY 10504
                                               Tel.: (914) 749-8200 / Fax: (914) 749-8300

                                               Philip C. Korologos
                                               pkorologos@bsfllp.com
                                               BOIES SCHILLER FLEXNER LLP
                                               55 Hudson Yards, 20th Floor
                                               New York, NY 10001
                                               Tel.: (212) 446-2300 / Fax: (212) 446-2350

                                               Mark C. Mao*
                                               mmao@bsfllp.com
                                               Sean P. Rodriguez*
                                               srodriguez@bsfllp.com
                                               BOIES SCHILLER FLEXNER LLP
                                               44 Montgomery Street, 41st Floor
                                               San Francisco, CA 94104
                                               Tel.: (415) 293-6820 / Fax: (415) 293-6899

James P. Denvir III*
jdenvir@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
Tel.: (202) 895-7580 / Fax: (202) 237-6131

Sabria A. McElroy*
smcelroy@bsfllp.com
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel.: (954) 377 4216 / Fax: (954) 356-0022

*Lead Counsel for the Publisher Class*

KOREIN TILLERY LLC

By: */s/George A. Zelcs*
George A. Zelcs*
gzelcs@koreintillery.com
Marc A. Wallenstein*
mwallenstein@koreintillery.com
Randall P. Ewing*
rewing@koreintillery.com
Ryan A. Cortazar*
rcortazar@koreintillery.com
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Tel.: (312) 641-9750 / Fax: (312) 641-9751

Stephen M. Tillery*
stillery@koreintillery.com
Michael E. Klenov
mklenov@koreintillery.com
Carol L. O'Keefe
cokeefe@koreintillery.com
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Tel.: (314) 241-4844 / Fax: (314) 241-3525

Christopher M. Burke
cburke@koreintillery.com
Walter W. Noss
wnoss@koreintillery.com
Kate Lv
klv@koreintillery.com
KOREIN TILLERY, PC
707 Broadway, Suite 1410
San Diego, CA  92101
Tel.: (619) 625-5621 / Fax: (314) 241-3525

*Counsel for Genius Media Group, Inc. (n/k/a MediaLab.AI, Inc.), The Nation Company, LLC, and The Progressive, Inc.*


BERGER MONTAGUE PC

By: */s/Eric L. Cramer*
Eric L. Cramer*
ecramer@bm.net
Michael C. Dell'Angelo*
mdellangelo@bm.net
Caitlin G. Coslett*
ccoslett@bm.net
Patrick F. Madden*
pmadden@bm.net
Michaela Wallin
mwallin@bm.net
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000 / Fax: (215) 875-4604


Sophia M. Rios*
srios@bm.net
BERGER MONTAGUE PC
401 B Street, Suite 2000
San Diego, CA 92101
Tel.: (619) 489-0300 / Fax: (215) 875-4604

Robert E. Litan*
rlitan@bm.net
Daniel J. Walker
dwalker@bm.net
BERGER MONTAGUE PC
2001 Pennsylvania Ave., NW
Suite 300
Washington DC 20006
Tel.: (202) 559-9745

Michael K. Yarnoff*
myarnoff@kehoelawfirm.com
KEHOE LAW FIRM, P.C.
Two Penn Center Plaza
1500 JFK Blvd., Suite 1020
Philadelphia, PA 19102
Telephone: (215) 792-6676

*Counsel for Sterling International Consulting Group*


KIRBY McINERNEY LLP

By: */s/Karen Lerner*　　　　　　　　　

Karen Lerner
klerner@kmllp.com
Daniel Hume
dhume@kmllp.com
David Bishop
dbishop@kmllp.com
Andrew McNeela
amcneela@kmllp.com
KIRBY McINERNEY LLP
250 Park Avenue, Suite 820
New York, New York 10177
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

Robert J. Gralewski, Jr.*
bgralewski@kmllp.com
KIRBY McINERNEY LLP
600 B Street, Suite 2110
San Diego, CA 92101
Telephone: (619) 784-1442

Thomas M. Hnasko
thnasko@hinklelawfirm.com
Michael E. Jacobs
mjacobs@hinklelawfirm.com
HINKLE SHANOR LLP
218 Montezuma Avenue
Sante Fe, NM 87501
Telephone: (505) 982-4554

Kent Williams
williamslawmn@gmail.com
WILLIAMS LAW FIRM
1632 Homestead Trail
Long Lake, MN 55356
Tel.: (612) 940-4452 / Fax: (952) 283-1525

*Counsel for JLaSalle Enterprises LLC*


GUSTAFSON GLUEK PLLC

By: */s/ Dennis Stewart*
Dennis Stewart*
dstewart@gustafsongluek.com
GUSTAFSON GLUEK PLLC
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299

Daniel E. Gustafson*
dgustafson@gustafsongluek.com
Daniel C. Hedlund
dhedlund@gustafsongluek.com
Daniel J. Nordin*
dnordin@gustafsongluek.com
Frances Mahoney-Mosedale
fmahoneymosedale@gustafsongluek.com
Shashi K. Gowda
sgowda@gustafsongluek.com
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844

26

Marc H. Edelson, Esq*
medelson@edelson-law.com
EDELSON LECHTZIN LLP
411 S. State Street, Suite N-300
Newtown, PA 18940
Tel.: (215) 867-2399 / Fax: (267) 685-0676

Joshua H. Grabar*
jgrabar@grabarlaw.com
GRABAR LAW OFFICE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (267) 507-6085 / Fax: (267) 507-6048

E. Powell Miller*
epm@millerlawpc.com
Sharon S. Almonrode*
ssa@millerlawpc.com
Emily E. Hughes*
eeh@millerlawpc.com
THE MILLER LAW FIRM, P.C.
950 West University Drive, Suite 300
Rochester, MI 48307
Tel.: (248) 841-2200 / Fax: (248) 652-2852

Simon Bahne Paris, Esquire
sparis@smbb.com
Patrick Howard, Esquire
phoward@smbb.com
SALTZ, MONGELUZZI & BENDESKY, P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel.: (215) 496-8282 / Fax: (215) 496-0999

Kenneth A. Wexler*
kaw@wbe-llp.com
Kara A. Elgersma*
kae@wbe-llp.com
WEXLER BOLEY & ELGERSMA LLP
311 S. Wacker Drive, Suite 5450
Chicago, IL 60606

27

Dianne M. Nast*
dnast@nastlaw.com
Daniel N. Gallucci*
dgallucci@nastlaw.com
Joseph N. Roda*
jnroda@nastlaw.com
NASTLAWLLC
1101 Market Street, Suite 2801
Philadelphia, PA 19106

*Counsel for Mikula Web Solutions, Inc.*

*\*Pro Hac Vice*