UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

IN RE: GOOGLE DIGITAL ADVERTISING
ANTITRUST LITIGATION

21-md-3010 (PKC)

------------------------------------------------------- x

THIS DOCUMENT RELATES TO:

SPX Total Body Fitness LLC, d/b/a The
Studio Empower, on behalf of itself and all
others similarly situated,

1:21-cv-06870-PKC

  Plaintiff,
vs.

GOOGLE LLC,

  Defendant.

1:21-cv-07045-PKC

SKINNYSCHOOL LLC d/b/a MARIA
MARQUES FITNESS and MINT ROSE DAY
SPA LLC, on behalf of themselves and all
others similarly situated,

**JURY TRIAL DEMANDED**

  Plaintiffs,

  vs.

GOOGLE LLC,

  Defendant.
------------------------------------------------------- x

**SPX PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
GOOGLE LLC'S MOTION TO DISMISS SPX'S CONSOLIDATED AMENDED CLASS
COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

FACTUAL ALLEGATIONS ............................................................................................... 2

    I.    The Competition ........................................................................................................ 2

    II.   The Agreement........................................................................................................... 4

ARGUMENT ....................................................................................................................... 6

    I.    Legal Standard .......................................................................................................... 6

    II.   SPX Plaintiffs Allege an Anticompetitive Agreement Between Google and Facebook that Violated Section 1 of the Sherman Act. ................................................................ 7

        A.   SPX Has Sufficiently Alleged Direct Evidence of an Unlawful Agreement Between Google and Facebook. ................................................................................ 8

        B.   SPX Plaintiffs' Allegations Include Corroborate Direct Evidence and Circumstantial Evidence of an Unlawful Agreement. ...................................................................... 9

        C.   Google's Explanations for its Conduct Create a Factual Dispute Which Requires a Denial of a Motion to Dismiss.......................................................................... 11

        i.    The Agreement Resulted in Inflated Pricing of Advertising on Facebook. ................... 12

        ii.   Defendant's Assertion of a Different Market than what SPX Plaintiffs Allege Fails the Plausibility Standard and Is Irrelevant.................................................................. 13

        iii.    SPX Plaintiffs Adequately Allege Antitrust Standing and Injury. ............................ 15

        D.   The SPX Plaintiffs Were Injured by Google's Conduct. ............................................... 16

        E.   SPX Plaintiffs Are Proper Parties to the Action. ........................................................ 18

CONCLUSION................................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Electrical Pension Fund v. Bank of America Corp.*,
    306 F. Supp. 3d 610 (S.D.N.Y. 2018) ..................................................................................14

*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d 151 (2d Cir. 2016) ...............................................................................................16

*Anderson News LLC v. Am. Media Inc.*,
    680 F.3d 162 (2d Cir. 2012) ...............................................................................................10

*Anderson v. City of Bessemer City, N.C.*,
    470 U.S. 564 (1985) ............................................................................................................11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................................................6

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) .......................................................................................................6, 18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................................6, 7, 11, 12

*Concord Assocs., L.P. v. Ent. Properties Tr.*,
    No. 12 CIV. 1667 ER, 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817
    F.3d 46 (2d Cir. 2016) ..........................................................................................................6

*DNAML PTY, Ltd. v. Apple Inc.*,
    25 F. Supp. 3d 422 (S.D.N.Y. 2014) ...............................................................15, 16, 18, 19

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016) .......................................................................................*passim*

*In re Juul Labs, Inc., Antitrust Litig.*,
    555 F. Supp. 3d 932 (N.D. Cal. 2021) ................................................................................13

*Klein v. Meta Platforms, Inc.*,
    No. 3:20-CV-08570-JD, 2022 WL 17477101 (N.D. Cal. Dec. 6, 2022) ...............................9

*In re Magnesium Oxide Antitrust Litig.*,
    Civ. No. 10-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) .............................................19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .....................................................................................................16, 19

*Monsanto Co. v. Spray-Rite Service Corp.*,
    465 U.S. 752 (1984)............................................................................................................11, 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)....................................................................................................................11

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990)......................................................................................................................17

*Peretti v. Authentic Brands Grp. LLC*,
    33 F.4th 131 (2d Cir. 2022) .........................................................................................................9

*In re Platinum and Palladium Antitrust Litig.*
    No. 20-1458, ___ F. 4th ___, 2023 WL 2229364 (2d. Cir. Feb. 27, 2023) ..............................15

*Steel Co v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)........................................................................................................................6

*Theatre Enterprises Inc. v. Paramount Film Dist. Corp*,
    346 U.S. 537 (1954)....................................................................................................................11

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)...................................................................................................12, 13

*US v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015)......................................................................................................7, 8

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 2d 337 (S.D.N.Y. 2016)......................................................................................8, 10

**Statutes**

15 U.S.C. § 1 .................................................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)................................................................................................................12

SPX Plaintiffs respectfully submit this Memorandum of Law in Opposition to the Defendant Google LLC's Motion to Dismiss their Consolidated Amended Class Action Complaint.[1] ECF No. 456 (the "Motion").

## INTRODUCTION

Defendant's argument boils down to conceding that Google entered into an agreement with third-party Meta Platforms Inc. ("Facebook"),[2] and observing that the Court has already issued a ruling regarding the Agreement, dismissing a portion the State Plaintiffs' Third Amended Complaint (ECF No. 195) ("TAC"). Therefore, Google argues, the Complaint in this entirely different action brought by the SPX Plaintiffs should also be dismissed.

In order to reach that conclusion, Google asks that the Court not read the SPX Complaint, but instead assume the same allegations exist in the SPX Complaint and the TAC, and further assume that the alleged relevant market in the TAC is identical to the alleged relevant market in the SPX Complaint. As a result, to reach Google's conclusion that the SPX Complaint should be dismissed, the Court would have to overlook the SPX Plaintiffs' factual allegations (not alleged in the TAC) demonstrating that the two entities were **horizontal competitors** for advertising dollars and treated each other as such in the display advertising market. These allegations demonstrate that the Agreement had the effect of ensuring that there would be an inflated price floor for direct advertising on the Facebook platform. Upon reading the Complaint, the Court should determine it is quite different from the TAC. SPX Plaintiffs allege facts plausibly pleading that Facebook and Google were horizontal competitors in a market different from that alleged by the States, and that

---

[1] Plaintiffs' Consolidated Amended Class Action Complaint, ECF No. 406 ("SPX Complaint" or "Complaint"); *see also* PTO 4, ECF No. 392 (Nov 18, 2022) (granting SPX Plaintiffs permission to file an amended pleading).

[2] The "Agreement." Also called the "Network Bidding Agreement," Motion at 1, "Facebook Agreement," or "Jedi Blue." Complaint ¶¶ 3, 6.

1

the competition between Facebook and Google in that distinct market was adversely affected by the Agreement's restriction on competition. Once Google's assumptions are removed, its arguments fail.

The SPX Plaintiffs respectfully submit that the Motion should be denied. Indeed, a sister United States District Court has interpreted the Agreement just as the SPX Plaintiffs urge the Court to do so here. *See infra* at 12.

## FACTUAL ALLEGATIONS

### I.      The Competition

Google and Facebook are two of the largest ad operators and networks in the United States, combining at the time of the Agreement and now for over 90% of the digital advertising market. Complaint ¶¶ 171-172. Prior to the alleged Agreement between the two competitors, Google treated Facebook as their number one competitor in the digital advertising market. Complaint ¶ 174.



Complaint ¶ 180. These lower prices set on the exchanges would act as the price floor for advertising in other digital advertising markets—such as the placement of ads made by the SPX Plaintiffs. To ensure that Google would continue to reap monopoly profits in digital display advertising, Google was determined to and did take steps necessary to forestall any competition to its advertising revenue.

There was no tactic (including anticompetitive actions) that was off limits.

Google attempted to use its immense monopoly power to block Facebook from gathering

data and other technology advancements Facebook needed to complete for advertisers' (including SPX Plaintiffs') advertising dollars. Complaint ¶¶ 192-93. Unfortunately for Google, that tactic did not work. Facebook, instead, became and was becoming an even larger competitive threat. Google concluded that despite its efforts, Facebook posed a ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████

Competition, on the other hand, would be an economic benefit for advertisers (and publishers) as it would ensure that advertisers, such as SPX Plaintiffs, would ultimately pay a lower price for their advertising, regardless of how the advertisement was placed. Complaint ¶¶ 129 (competition promotes price competition), 149 (healthy competition for inventory is beneficial to advertisers), 178 (with competition advertisers on Facebook would bypass substantial fees), 205 (prior to the agreement competition was helping publishers and advertisers). Facebook acknowledged that competition would benefit advertisers, as advertising costs in general would start to decrease because advertisers would be able to bypass fees and other costs associated with being forced to advertise through an entity operated under illegal monopolistic tactics. Complaint ¶¶ 202-04. All-in-all until September 2018, it was generally agreed unless competition was restricted with the two behemoths competing for advertisers would see a decrease in advertising prices.

## II.        The Agreement

In 2018, instead of competing for advertising dollars, the two largest internet advertisers decided to "build a moat" and work together. Complaint ¶¶ 218-22.

The Agreement was intended to shift Facebook's business to Google, and to motivate Facebook (successfully) to abandon the years of research and development attempting to compete with Google. Complaint ¶ 228, 230. In exchange for abandoning its attempt to compete with Google, and ensuring advertisers such as the SPX Plaintiffs would experience lower advertising prices, Facebook received several inducements. Complaint ¶¶ 233-57. The Agreement significantly hurt advertisers in the display advertising market who were no longer going to get the price benefits of having two of the largest tech companies competing with each other.

The deal was designed so that it limited Google and Facebook's competition: Google agreed to provide proprietary information to Facebook, while Facebook gave up some of its advertising revenue margin. Complaint ¶ 266. The Agreement is such that the benefits granted to Facebook disadvantaged any other competitor's bid in the Exchange relative to Facebook. Complaint ¶ 270.

The Agreement secured Google its core objective: the end of Facebook's active support for header bidding. Google ensured that Facebook would not—and, economically, could not—return to support header bidding by imposing significant minimum spend requirements running up to hundreds of millions of dollars a year. Complaint ¶ 319. As a result of the Agreement, according to internal Facebook documents, both Google and Facebook gained pricing power and increased take rates to the economic detriment of advertisers' purchasing inventory. Complaint ¶ 321. While the Court determined that these actions were entirely consistent with competition within the exchanges, the Court did not rule on the chilling anti-competitive effect *outside* the exchange where the two companies also compete. *Compare* Motion at 24-25 (header bidding market), 26-

27 (in-app market) *to* Complaint ¶ 359 (online display advertising markets).

The harm was done. No longer would advertisers, such as the SPX Plaintiffs, gain the advantages they would reap from seeing the two behemoths compete. They would no longer see improved quality, improved technology greater transparency in the advertising market, increased output, and most importantly lower prices for the advertising. Complaint ¶ 341. The combination of Google and Facebook set an that an inflated advertising price floor for advertising.

### III.     The Market

Both Google and the States want the Court to focus on a very narrow aspect of the anticompetitive Agreement: the advertisement exchanges. *See* Motion *passim*; *see also* TAC ¶¶ 93, 145. However, that is not the same market as alleged in the Complaint. As alleged by the SPX Plaintiffs, when two companies dominate the internet advertising market like Facebook and Google (who both already individually had overwhelming market power in the digital advertising area), their anticompetitive agreement is going to have an impact outside the narrow exchange band. In fact, Google acknowledged this by breaking down the advertising market into direct sales, exchanges, and networks. Complaint ¶ 106. The anticompetitive Agreement between Google and Facebook, both individually and certainly together with overwhelming market power in the digital advertising area, cannot but have an economic impact outside of the narrower exchange band. Each area of advertising has its own characteristics, but the pricing is interconnected. *Id*. SPX Plaintiffs allege there is an impact on the digital advertising market for direct transactions between the advertisers (such as SPX Plaintiffs) and Facebook. Complaint ¶¶ 4, 23-25, 343. SPX Plaintiffs allege that the Agreement between Facebook and Google established an anticompetitive price floor on their direct purchases. Complaint ¶¶ 321, 338, 342. Facebook obtained support for its digital advertising pricing secured through the inflated prices on the Google exchange, which set this

5

price floor.

ARGUMENT

I.      **Legal Standard**

The Supreme Court has addressed issue of pleading standard regarding a plaintiff's claims under Section 1 of the Sherman Act, 15 U.S.C. § 1. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). The Court determined that while the complaint "does not need detailed factual allegations . . . labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555. "[F]actual allegations must be enough to raise a right to relief above the speculative level." *Id*; *see also Concord Assocs., L.P. v. Ent. Properties Tr*., No. 12 CIV. 1667 ER, 2014 WL 1396524, at *9 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016) (antitrust actions are subject to a generous approach to pleading and there are "no heighted pleading requirements in antitrust cases") (quoting *In re Crude Oil Commodity Futures Litig*., 913 F. Supp. 2d 41, 54 (S.D.N.Y. 2012) (internal quotation marks omitted)).

SPX Plaintiffs provided the Court with "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The Court should examine only the well-pleaded factual allegations "and then determine whether they **plausibly** give rise to an entitlement to relief." *Id*. at 679 (emphasis added). The complaint must include non-conclusory factual allegations that "nudge[]" the pleaded claims "across the line from conceivable to plausible." *Id*. at 680 (quoting *Twombly*, 550 U.S. at 570) (internal quotation marks omitted). A court must draw all reasonable inferences in favor of the plaintiff. *Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 137 (2d Cir. 2022).

This same standard applies to allegations of standing. *See Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983) ("[W]e must assume that the [plaintiff] can prove the facts alleged in its amended complaint."); *Steel Co v. Citizens for a Better*

6

*Env't*, 523 U.S. 83, 104 (1998) (at the pleadings stage, a plaintiff need only show that the facts alleged, if proved, would confer standing).

II.     **SPX Plaintiffs Allege an Anticompetitive Agreement Between Google and Facebook that Violated Section 1 of the Sherman Act.**

To state a claim under Section 1 of the Sherman Act, SPX Plaintiffs are not required to plead "detailed factual allegations"; the allegations should simply set forth sufficient facts (taken as true) to suggest that an express or tacit agreement was made. *Twombly*, 550 U.S. at 553, 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely.") (quotation omitted).

To adequately plead a conspiracy under Section 1 of the Sherman Act, a plaintiff must allege facts from which it can be inferred that the anticompetitive conduct "stem[s] from ... an agreement, tacit or express" and not from "independent decision." *Mayor & City Council of Baltimore*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Twombly*, 550 U.S. at 553). Here, Google concedes the direct evidence of an agreement. SPX Plaintiffs allege that this Agreement created a relationship between the two heavyweights that in effect ensured that Facebook would withdraw from the advertising exchange for the financial support provided by the Agreement and create an inflated advertising price on the advertising placed on Facebook. There is no need to rely on circumstantial evidence or other conduct as allowed in *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016), or "plus factors." *See Mayor & City Council of Baltimore*, 709 F.3d at 136 ("'Plus factors:' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications.").

Horizontal price fixing conspiracies, such as the one alleged by SPX Plaintiffs, traditionally have been, and remain, the "archetypal example" of a *per se* unlawful restraint of trade. *US v.*

*Apple, Inc.*, 791 F.3d 290, 321 (2d Cir. 2015) (citing *Catalano, Inc. v. Target Sales Inc.*, 446 U.S. 643, 647 (1980)). As the court in *Apple* determined, "[a] horizontal conspiracy can use vertical agreements to facilitate coordination without the other parties to those agreements knowing about, or agreeing to, the horizontal conspiracy's goals." *Id.* at 324. Further, despite Defendant's contention that the Agreement had nothing to do with advertisement pricing, "it is well established that *per se* condemnation is not limited to agreements that literally set or restrict prices. Instead, any conspiracy 'formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity is illegal *per se* ,' and the precise 'machinery employed is immaterial.'" *Id.* at 327-28 (quoting *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)).

### A. SPX Has Sufficiently Alleged Direct Evidence of an Unlawful Agreement Between Google and Facebook.

Direct evidence is evidence that establishes, without requiring any inferences, that a defendant participated in an alleged conspiracy. When a complaint includes non-conclusory allegations of direct evidence of an agreement, the Court need not go further on the question of whether an agreement was adequately plead. *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 366 (S.D.N.Y. 2016) (citing *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010)).

Google admits to entering into an agreement with Facebook which they call the Network Bidding Agreement. Motion at 1. The two companies negotiated the Agreement in secret—to the detriment of those advertising across the internet. Google wants the Court to overlook the Agreement, claiming that SPX Plaintiffs' Section 1 arguments have already been rejected by the Court. *Id.* However, those arguments were for claims alleged in a different complaint by a different set of plaintiffs, with a different set of facts.

Recently, a United States District Court in California has found that allegations about this

very Agreement were more than sufficient to sustain the complaint against a motion to dismiss by Facebook in *Klein v. Meta Platforms Inc.*—in a case similarly involving plaintiffs who purchased advertising directly on Facebook. *Compare Klein v. Meta Platforms, Inc.*, No. 3:20-CV-08570-JD, ECF No. 391 ¶ 842 (N.D. Cal. Dec. 5, 2022)[3] *with* SPX Complaint ¶ 343. The *Klein* plaintiffs allege a Sherman Act Section 1 claim based on the Agreement Facebook entered with Google codenamed "Jedi Blue." Ex. 1 ¶¶ 645-56, 874-79. In *Klein*, the court denied the defendants' motion to dismiss, holding that plaintiffs who purchased advertising on Facebook had standing to bring claims under Section 1 for advertising purchased after April 3, 2018. *Klein v. Meta Platforms, Inc.*, No. 3:20-CV-08570-JD, 2022 WL 17477101, at *3 (N.D. Cal. Dec. 6, 2022). The SPX Plaintiffs respectfully submit that this Court should follow that finding to ensure equitable outcomes across the country.

The SPX Plaintiffs have alleged facts that Google and Facebook were direct competitors for on-line advertising dollars, and that together, both companies control a vast majority where online digital advertising dollars are spent in the United States. Complaint ¶¶ 14-20, 107-08, 114, 170-73, 181-83, 201 (internal document executing a long-term strategy to capture market share from Google), 206. This, coupled directly with the admitted Agreement, is enough direct evidence of an agreement that the court need not go further, and should deny Google's motion to dismiss.

### B. SPX Plaintiffs' Allegations Include Corroborate Direct Evidence and Circumstantial Evidence of an Unlawful Agreement.

Despite establishing the direct evidence of a conspiracy, SPX Plaintiffs have taken extra steps and also allege circumstantial evidence of the unlawful Agreement between Facebook and

---

[3] For ease of the Court, a copy of the publicly-filed complaint in the *Klein* action is attached to the Declaration of Fred T. Isquith Jr. in Support of SPX Plaintiffs' Memorandum of Law in Opposition to Defendant Google LLC's Motion to Dismiss SPX's Consolidated Amended Class Complaint, filed contemporaneously herewith, as Exhibit 1.

Google. Courts have recognized that "conspiracies are rarely evidenced by explicit agreements but nearly always proven through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'" *Anderson News LLC v. Am. Media Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (quoting *Michelman v. Clark–Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir. 1976)); *see also Mayor & City Council of Balt.*, 709 F.3d at 136-37 (in many antitrust cases, "smoking gun" evidence can be hard to come by, and thus a complaint must set forth sufficient circumstantial facts supporting an inference of conspiracy). Circumstantial evidence includes various plus factors including a "common motive to conspire, actions taken against economic self-interest, and a high level of inter-firm communications." *Zinc*, 155 F. Supp. 2d at 367.

Along with the direct evidence of the anticompetitive agreement the SPX Plaintiffs have alleged other circumstantial evidence to plausibly allege an agreement in restraint of trade. For example, by making this Agreement, Facebook disbanded years of research and development. *Compare* Complaint ¶¶ 230, 266 *with In re Juul Labs, Inc. Antitrust Litig.*, 555 F. Supp. 3d 932, 960 (N.D. Cal. 2021) (spending on research and development right up the entering of an agreement tends to exclude the possibility of an alternative explanation). The Agreement ensured that instead of making their own profit and collecting their own propriety data, Facebook and Google would now have to split profits and data—a move certainly not in their individual interest as competitors. Complaint ¶¶ 230, 266. Further ██████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████ There is also numerous of allegations which show communication between the two companies. For example, a meeting between Google and Facebook employees where they discussed the advantages of being able to set an advertising price floor. Complaint ¶ 316.

10

Along with the direct evidence and "plus factor" factual allegations, the SPX Plaintiffs have plausible alleged a restraint of trade based on the Agreement. As such, the Motion should be denied.

### C.   Google's Explanations for its Conduct Create a Factual Dispute Which Requires a Denial of a Motion to Dismiss.

To present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as summary judgment or trial. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597-98 (1986) (summary judgment); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 593-95 (1984) (trial); *Theatre Enterprises Inc. v. Paramount Film Dist. Corp*, 346 U.S. 537, 540-41 (1954) (trial). "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. A given set of actions may well be subject to diverging interpretations, each of which is plausible, or even more likely to be ultimately determined. However, that is not the test for a complaint to pass through the fire of the inevitable motion to dismiss. *See generally Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) ("[T]wo or more witnesses" may tell mutually inconsistent but "coherent and facially plausible stor[ies]."). The choice between or among plausible inferences or scenarios is one for the fact finder. *See id.*; *Monsanto*, 465 U.S. at 766-767 & nn.11-12 (1984) (holding that the meaning of documents that are "subject to" divergent "reasonable . . . interpret[ations]" either as "referring to an agreement or understanding that distributors and retailers would maintain prices" or instead as referring to unilateral and independent actions, is

"properly . . . left to the jury" because "the choice between two reasonable interpretations of . . .

testimony properly . . . [i]s left for the jury").

"[F]act-specific question[s] cannot be resolved on the pleadings." *Todd v. Exxon*

*Corp.*, 275 F.3d 191, 203 (2d Cir. 2001). A court ruling on such a motion may not properly dismiss

a complaint that states a plausible version of the events merely because the court finds a different

version more probable. Rather, in determining whether a complaint states a claim that is plausible,

the court is required to proceed "on the assumption that all the [factual] allegations in the complaint

are true." *Twombly*, 550 U.S. at 555. Even if their truth seems doubtful, "Rule 12(b)(6) does not

countenance dismissals based on a judge's disbelief of a complaint's factual allegations." *Id.* at

556 (internal quotation and quotation marks omitted). Given that the plausibility requirement

"does not impose a probability requirement at the pleading stage," *id.*, Defendant's Motion should

be denied.

### i.   The Agreement Resulted in Inflated Pricing of Advertising on Facebook.

SPX Plaintiffs plausibly allege that the Agreement included the curtailment of the

advanced development of the header bidding exchange, and as a result supported the inflated

pricing of advertising on Facebook. Motion at 5. While the language of the Agreement did not

explicitly state that Facebook was required to curtail its competitive exchange, the Agreement in

essence had the chilling effect of eliminating the competition.

The SPX Complaint alleges specific Google internal memos which demonstrate that the

intentions and expectations of the parties to the Agreement was exactly that. *See* Complaint ¶ 157

(top priority is to fight off the threat posed by the Header Bidding and FAN); ¶ 190 (the

goal/mandate was to [f]orstall major industry investment in HB & HB wrapper infrastructure"); ¶

222 (Facebook was investing infrastructure to enter the market); ¶ 319 (the deal ensured Facebook

could not return to header bidding by imposing significant minimum spending requirements); ¶ 320 (internal memo stating FAN requires special deal terms but it is worth it to cement our value). The Complaint is quite different that the States' TAC and demonstrates that "quid pro quo" nature of the Agreement and the agreed expectation of the parties that Facebook would remove itself from competition through development of header bidding among other things. *Compare* Motion at 5 *to* Complaint *passim.*

The allegations throughout the Complaint, some of which are highlighted above, are not mere labels or conclusions, but facts taken from internal documents and other publicly available information. At this stage these facts are taken as true, and any difference of interpretation cannot be resolved on the pleadings.

### ii. Defendant's Assertion of a Different Market than what SPX Plaintiffs Allege Fails the Plausibility Standard and Is Irrelevant.

Google argues that regardless of the factual allegations of the Complaint, the Court should conclude that the relationship between Google and Facebook was vertical (as those in a vertical line of commerce as supplier and purchaser) as the Court concluded that the allegations in the TAC required it to conclude. However, the SPX Complaint contains entirely different factual allegations showing that the relationship was that of the horizontal competitors for digital advertising. *See* Motion at 5-7 (asserting an analysis should be done for vertical competitors). The SPX Plaintiffs factually allege that the economic reality in the market of online display digital advertising markets, including the sell-side market for ad servers in the United States, which includes the advertisements purchased on Facebook. Complaint ¶ 359. When the relevant market is contested at the motion to dismiss stage, courts are hesitant to grant a motion to dismiss because market definition is a deeply fact intensive inquiry. *Todd*, 275 F.3d at 200 (collecting cases).

SPX Plaintiffs allege that Google and Facebook are direct horizontal competitors, both

13

competing for advertising dollars directed to their respective websites. Complaint ¶¶ 7, 10, 110. As such, Google's is not correct in its assertion that SPX Plaintiffs did not "cure defects in market-power and competitive allegations that doomed the State's claims" are irrelevant and false. *See* Motion at 8. In fact, SPX Plaintiffs allege that together both Facebook and Google capture a vast majority of every new digital advertising dollar. So, unlike the States, the SPX Plaintiffs have alleged that Facebook and Google were in fact horizontal competitors for online display advertising markets, including the sell-side market for ad servers in the United States. *See* Complaint ¶ 359; *see also id.* ¶ 93 ("authorities worldwide have similarly concluded that the direct sales channels is noninterchangeable with indirect sales."). SPX Plaintiffs describe this relevant online display advertising markets, distinguishing them from search advertising markets or video advertising markets. Complaint ¶¶ 36-40. Similar to how this Court decided *In re Set-Top Cable Television Box Antitrust Litigation*, at the pleading stages courts have often concluded that narrow market definitions within a multifaceted industry are plausible and adequately plead. 08-cv-7616, 2011 WL 1432036 *8-10 (S.D.N.Y. 2011) (differentiating premium cable markets) (*citing Arista Records*, 532 F. Supp. 2d 556, 576 (S.D.N.Y. 2007) (distinguish markets in the music distribution industry)); *see also Alaska Electrical Pension Fund v. Bank of America Corp.*, 306 F. Supp. 3d 610, 620-21 (S.D.N.Y. 2018) (plaintiffs had standing to Sherman Act Section 1 claims against the Defendants for manipulation on a separate market than the ones the Defendant's conspired in when the allegations demonstrate price sensitivity and the Defendants participated in both markets).

As horizontal competitors, Google and Facebook entered into an Agreement to limit competition and allocate the market for display advertisements. The fact that the Agreement only explicitly concerned Google's exchanged-based advertising does not mean that the pricing on Facebook's own ad network was unaffected. Quite the contrary: the anticompetitive affect the

14

Agreement was intended to (and did) have had a direct adverse effect on advertisers directly advertising on Facebook—advertising for which both Facebook and Google actively competed.

Nothing could be further from the truth than Defendant's statements that SPX Plaintiffs' allegations are stale and have been decided by the Court. The SPX allegations are factually different from the allegations in the TAC ruled on by the Court. Moreover, in a complaint that parallels much of the original SPX complaint, which has now been enhanced by further specific allegations, a sister court has sustained that complaint as stating a claim for relief. *See* Ex. 1. SPX Plaintiffs' allegations describe a different market where Facebook and Google's Agreement ensured that a display advertising cost floor would be established at an inflated priced instead of at a competitive level. As such, the Court should follow in the footsteps of its sister court and deny Google's Motion.

### iii.   SPX Plaintiffs Adequately Allege Antitrust Standing and Injury.

Antitrust standing requires plaintiffs to adequately allege "antitrust injury" and that plaintiffs are "efficient enforcers" of the antitrust laws. *Gelboim*, 823 F.3d at 772. When evaluating "efficient enforcers," courts consider (1) the directness of the injury, (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation, (3) whether the injury was speculative, and (4) the difficulty in identifying and apportioning damages. *Id*; *see also In re Platinum and Palladium Antitrust Litig*. No. 20-1458, ___ F. 4th ___, 2023 WL 2229364, at *9 (2d. Cir. Feb. 27, 2023) (antitrust harm does not depend on the relationship between the plaintiff and the defendant but the efficient-enforcer test). A court need not find in favor of the plaintiff on each factor: the third and fourth factors are "problematic" and the "potential difficulty in ascertaining and apportioning damages is not an independent basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects and other relief might be available."

*DNAML PTY, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 430 (S.D.N.Y. 2014) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014) (internal quotation marks and alterations omitted)). SPX Plaintiffs adequately allege both antitrust standing and antitrust injury here.

### D.   The SPX Plaintiffs Were Injured by Google's Conduct.

Google's restraint of competition in the online display advertising markets increased prices above competitive levels, forcing SPX Plaintiffs to pay supracompetitive prices when purchasing directly from Facebook in that restrained market. This is an established antitrust injury. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) ("[C]onsumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury.") (citation omitted); *Gelboim*, 823 F.3d at 777 (by "alleging that they paid artificially higher prices" as a result of defendants' conduct, plaintiffs sustained their burden of pleading an antitrust injury).

Google claims that SPX Plaintiffs neither participated in any relevant market nor suffered injuries "inextricably intertwined" with injuries of market participants. Motion at 10. But SPX Plaintiffs reference "the relevant online display advertising markets, including the sell-side market for ad servers in the United States." Complaint ¶ 359. SPX Plaintiffs describe these relevant online display advertising markets, distinguishing them from search advertising markets or video advertising markets. Complaint ¶¶ 36-40.[4] SPX Plaintiffs participated in online display advertising markets.

---

[4] Online display advertising markets are described in more detail in a subsection in the Complaint. Complaint ¶¶ 53-106.

Google appears to be arguing that since the Agreement concerned the ad network FAN[5]—which facilitates ad placement on third-party properties—and SPX Plaintiffs purchased advertising directly through Facebook and not through FAN, there is no injury. Motion at 10. Google mistakenly claims that SPX Plaintiffs "allege no facts indicating that they were harmed by the [Agreement]." *Id.* But SPX Plaintiffs have, in fact, alleged just that. *See, e.g.*, Complaint ¶¶ 3, 5, 7, 10-11, 21-22, 195, 205-208, 275-276, 288-291, 311, 320-342. It is immaterial that SPX Plaintiffs did not purchase advertising through FAN, third-party properties, an exchange, or an auction involving Google's ad exchange. SPX Plaintiffs still paid supracompetitive prices by purchasing advertising from Facebook directly as a result of the Agreement and conduct of Google (and Facebook). As horizontal competitors, Google and Facebook entered into an Agreement to limit competition and allocate the market. *See Palmer v. BRG of Georgia, Inc*., 498 U.S. 46, 49-50 (1990) (market allocation "agreements are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."). The fact that the Agreement only explicitly concerned Google's exchanged-based advertising does not mean that Facebook's own ad network was unaffected.

In this case, multiple markets were impacted. *See id.* at 610-11 (explaining anticompetitive impact of horizontal market allocation across multiple markets). Facebook and Google directly competed for advertisers and advertising. The Agreement gave special advantages to Google and Facebook, *see, e.g.*, Complaint ¶¶ 273-321, allowing Google to charge supracompetitive prices on its ad exchange, while also allowing Facebook to charge supracompetitive prices in its own ad network. The Agreement had a direct adverse effect on advertisers directly advertising on Facebook—advertising for which both Facebook and Google actively competed. The SPX

---

[5] Facebook's Advertising Network ("FAN"). Complaint ¶ 169.

Plaintiffs have plausibly alleged antitrust injury. *See Gelboim*, 823 F.3d at 775 (plaintiffs identified an "illegal anticompetitive practice," claimed an actual injury placing appellants in a "'worse position' as a consequence" of the Defendants' conduct, and demonstrated that their injury is one the antitrust laws were designed to prevent) (citation omitted).

### E.   SPX Plaintiffs Are Proper Parties to the Action.

Google argues that SPX Plaintiffs are not "efficient enforcers" to bring the antitrust action. Motion at 12. But Google's arguments regarding "efficient enforcers"—that SPX Plaintiffs' injuries are too remote from the alleged conspiracy, that SPX Plaintiffs' injuries are too speculative, and that SPX Plaintiffs do not have the motivation to identify damages—relate back to Google's misunderstanding regarding antitrust injury.

As explained above, SPX Plaintiffs were direct purchasers from Facebook, which made the anti-competitive Agreement with Google, and are thus efficient enforcers under *Associated General Contractors. See Assoc. Gen. Contractors of Cal.*, 459 U.S. at 526. SPX plaintiffs were *directly* injured by Google's conduct. They thus have standing to bring their Section 1 claim. *See Gelboim*, 823 F.3d at 775. As direct purchasers of advertising on Facebook, SPX Plaintiffs have standing to assert claims under the federal antitrust laws regarding transactions with Facebook that were impacted by the Agreement.[6]

With respect to the first "efficient enforcer" factor, "directness" is satisfied where, as alleged here, plaintiffs allege an injury that was proximately caused by the violation of the antitrust laws. *See DNAML*, 25 F. Supp. 3d at 430 (plaintiffs were directly impacted even though they were not the "immediate victims;" because the injury was proximately caused by the violation of the

---

[6] The plaintiffs in the proposed Google Advertisers Complaint (ECF No. 317-1) alleged direct contracts with Google. That complaint purports to represent only those who advertised on Google. SPX Plaintiffs seek to represent those who advertised on Facebook.

antitrust laws, "their injuries were not 'too remote' from the defendants' unlawful conduct") (quoting *Lexmark*, 572 U.S. at 133).

As to the second factor, the class definition as described in the SPX Complaint[7] is an identifiable class of plaintiffs motivated to vindicate the public interest in antitrust enforcement. SPX Plaintiffs are seeking to recover damages from the supracompetitive prices paid for advertising; their interests align with the public's interest in promoting price competition. *See DNAML*, 25 F. Supp. 3d at 431.

Finally, as to the "third and fourth factors," though Google argues that SPX Plaintiffs do not have the ability to identify damages, Motion at 12, SPX Plaintiffs' damages are directly caused by Google's conduct, and are not "highly speculative." *See Gelboim*, 823 F.3d at 780. SPX Plaintiffs' damages may be complex to calculate, but SPX Plaintiffs' injuries have quantifiable components. There is no requirement that SPX Plaintiffs identify the method of calculating damages at this stage; the fact that SPX Plaintiffs were injured is enough. *See In re Magnesium Oxide Antitrust Litig.*, Civ. No. 10-5943, 2011 WL 5008090, at *6 (D.N.J. Oct. 20, 2011) (allegation that plaintiffs "injured by having paid more for MgO6 than they otherwise would have paid absent defendants' unlawful conduct is sufficient to establish antitrust standing) (internal citation omitted).

The Complaint contains numerous allegations that Google's anticompetitive conduct resulted in supracompetitive prices to purchasers generally and that SPX Plaintiffs specifically paid those supracompetitive prices. *See, e.g.*, Complaint ¶¶ 3, 5, 7, 10-11, 21-22, 195, 205-08, 275-76, 288-91, 311, 320-42. For these reasons, SPX Plaintiffs are proper parties to the action and are "efficient enforcers" to bring the action. SPX Plaintiffs adequately allege antitrust standing.

---

[7] "[A]ll persons and entities who, during the Class Period, purchased advertising on or over Facebook." Complaint ¶ 343.

## CONCLUSION

For the foregoing reasons, the SPX Plaintiffs respectfully request that the Court deny the

Motion.

Dated: March 3, 2023                                   Respectfully submitted,

By:   */s/ Fred T. Isquith Sr.*
Fred T. Isquith Sr
Robert S. Schachter (RS 7243)
Jessica Hermes
**ZWERLING, SCHACHTER &**
**ZWERLING, LLP**
41 Madison Avenue, 32nd Floor
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969
ftisquith@zsz.com
rschachter@zsz.com
jhermes@zsz.com

Fred T. Isquith, Jr. (*FI-1064*)
**ISQUITH LAW**
220 East 80th Street
New York, NY 10075
Tel: (607) 277-6513
isquithlaw@gmail.com

Solomon B. Cera (admitted pro hac)
Pamela A. Markert (admitted pro hac)
**CERA LLP**
201 California Street, Ste 1240
San Francisco, CA 94111
Telephone: (415) 977-2228
Email: scera@cerallp.com
Email: pmarkert@cerallp.com

Kate Baxter-Kauf (admitted pro hac)
Heidi M. Silton (admitted pro hac)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P**
100 Washington Ave S, Suite 2200
Minneapolis, MN 55401
Tel: (612) 596-4007
Email: kmbaxter-kauf@locklaw.com
Email: hmsilton@locklaw.com

20

Richard Vita
**VITA LAW OFFICES, P.C.**
100 State Street, Suite 900
Boston, MA 02109
Tel: (617) 426-6566
rjv@vitalaw.com

*Attorneys for SPX Plaintiffs and the Class*

4860-8029-0132, v. 2