# EXHIBIT 1

**FILED UNDER SEAL**

**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
Andrew C. Wolinsky
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
Tel.: (213) 462-2772

*Interim Co-Lead Counsel for the
Advertiser Class*

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**
Kristen M. Anderson (CA 246108)
kanderson@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 223-6444

Christopher M. Burke (CA 214799)
cburke@scott-scott.com
David H. Goldberger (CA 225869)
dgoldberger@scott-scott.com
Kate Lv (CA 302704)
klv@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565

Patrick J. McGahan (*pro hac vice*)
pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537

(Additional counsel on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>META PLATFORMS, INC.,<br><br>      Defendant. | Case No. 20-cv-08570-JD<br><br>The Hon. James Donato<br><br>**FIRST AMENDED CONSOLIDATED ADVERTISER CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION** |

**FILED UNDER SEAL**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

PARTIES ....................................................................................................................................5

I.     PLAINTIFFS ..................................................................................................................5

II.    DEFENDANT ................................................................................................................6

JURISDICTION AND VENUE ...................................................................................................8

INTRADISTRICT ASSIGNMENT ............................................................................................9

FACTS .......................................................................................................................................9

I.     FACEBOOK EMERGES AS THE DOMINANT SOCIAL NETWORK.....................9

       A.    The Last Social Network Standing..................................................................9

       B.    A New Market of Its Own Creation ...............................................................11

       C.    The Data Targeting Barrier to Entry..............................................................13

       D.    Google's Failed Entry into the Social Advertising Market ............................16

II.    A THREAT TO FACEBOOK'S MONOPOLY: THE RISE OF SMARTPHONES AND MOBILE APPS .............................................................................................19

       A.    The Mobile App Revolution..........................................................................19

       B.    Facebook Recognizes the Looming Threat Presented by Mobile Applications...............22

       C.    The Facebook Platform .................................................................................23

       D.    The Profitable Open Graph Platform and Mobile Install Business .................26

III.   FACEBOOK WEAPONIZES ITS PLATFORM TO DESTROY COMPETITION ....................28

       A.    Facebook Makes Plans to Remove Vital Platform Functionality and Refuses to Sell Social Data to Competing Application Developers.........................................28

       B.    Facebook's Social Data Heist........................................................................31

       C.    Facebook Targets Its Competitors for Reciprocity or Denial of API Access ..................35

       D.    Facebook Decides to Add the Events API to Its Reciprocity Scheme .............................39

       E.    The Decision to Remove Developer Access to the Friends, News Feed, Events, and Other Crucial APIs Lacked Any Legitimate Justification...................................41

       F.    Facebook Prepares to Announce Removal of the APIs....................................45

       G.    The Announcement at F8 ...............................................................................49

IV.   THE SURVEILLANCE AND ACQUISITION OF COMPETITIVE THREATS ....................50

       A.    Facebook Relies on Onavo's Surveillance of Facebook's Competitors, and Acquires and Uses Onavo's Assets.............................................................51

       B.    Facebook Identifies Instagram as a Threat and Acquires the Company ...........................55

**FILED UNDER SEAL**

C.     Facebook Acquires WhatsApp ...................................................................... 63

V.    FACEBOOK CONTINUES TO ENTER INTO EXTENDED API AGREEMENTS AFTER THE APRIL 2015 PLATFORM CHANGES.............................................................. 69

     A.     Facebook Continues to Enter Into Whitelist Agreements for Events API Functionality.......................................................................................................... 69

     B.     Facebook Continues to Enter Into Whitelist Agreements for Friends API Functionality.......................................................................................................... 71

VI.    FACEBOOK'S NEED FOR "SIGNAL" FROM WITHIN ITS WALLED GARDEN AND ITS EXPANSION INTO NEW SOURCES OF SOCIAL DATA. ...................................... 72

     A.     The Aftermath of the Platform Change and the App Vacuum. ......................... 72

     B.     Facebook Relies on User Identity and Engagement to Derive Critical User Intent Data.......................................................................................................................... 73

     C.     Facebook Ventures into E-Commerce to Obtain Signals ................................... 75

     D.     Facebook Moves into Location-Based Services................................................. 84

     E.     Streaming Video and Facebook Watch .............................................................. 88

VII.    FACEBOOK'S ENTRY AND DATA CAPTURE CONDUCT ..................................... 92

     A.     Facebook Enters Markets to Leverage Agreements that Maintain and Fortify Its Social Advertising Monopoly............................................................................... 92

     B.     Facebook Enters into an Anticompetitive Data Agreement with Foursquare .................. 97

     C.     Facebook Enters into an Agreement with eBay to Preserve Its Social Advertising Monopoly and to Strengthen the Data Targeting Barrier to Entry ................................. 100

         1.     Facebook's Announcement of Marketplace Causes Concern for eBay, and eBay Threatens to Pull Ad Revenue Unless Facebook Siloed Data from eBay Ads. ..100

         2.     The Facebook and eBay Agreement Not to Compete with Each Other.............. 110

         3.     Facebook's Agreement with eBay Impaired Its Marketplace Product and Strengthened Its Core Ad Business ...................................................................... 112

     D.     Facebook Enters into an Anticompetitive Data Sharing Agreement with Netflix .......... 113

         1.     Reed Hastings and the Facebook-Netflix Relationship...................................... 113

         2.     Facebook's Entry at Scale Threatens Competition with Netflix ........................ 119

         3.     Facebook and Netflix Enter into Amended Agreements..................................... 121

         4.     Facebook and Netflix Agree Not to Compete in Each Other's Market.............. 125

VIII.    FACEBOOK ANTICOMPETITIVELY USED ONAVO DATA TO BUILD A MASSIVE, MACHINE-LEARNING-DRIVEN SURVEILLANCE SYSTEM AND TO SPY ON FACEBOOK USERS EVEN WHEN USING NON-FACEBOOK APPS. ............................... 130

     A.     Onavo's Spyware Secretly Shuttles Sensitive User Data to Facebook for Its Internal Machine Learning Models.............................................................................................. 131

**FILED UNDER SEAL**

B.    Facebook Used Stolen Onavo Data Together with User Data from Its Own Apps to Build a Granular and Real-time Competitive Surveillance System. ...............................135

C.    Facebook Matched the Onavo Data It Collected from Users on Other Apps with their Facebook IDs and Stored User Data in Its "Hive" Database. .........................................136

IX.   THE THREAT BEYOND FACEBOOK'S WALLED GARDEN ............................................138

A.    Facebook Audience Network .................................................................................138

B.    Facebook Acquires Atlas.......................................................................................140

C.    Facebook Positions Itself Against Google by Combining Atlas, Audience Network, and Other Technology ...........................................................................................144

D.    Shadow Profiles and Identifying Users Outside of Facebook's Apps............................146

X.    FACEBOOK AND GOOGLE AGREE NOT TO COMPETE AND TO FORTIFY THE FACEBOOK-DOMINATED SOCIAL ADVERTISING MARKET .........................................147

A.    Google's Dominance Over Ad Exchanges and Ad Servers and the Looming Facebook Threat .....................................................................................................................147

B.    Google's AI Dominance ..........................................................................................149

C.    The Rise of Header Bidding and Facebook's Threat to Compete with Google .............151

D.    Google Agrees to Help Facebook Identify Facebook's Own Users Outside of Its Walled Garden, and Facebook Backs Off of Programmatic and Exchange-Trade Advertising ...............................................................................................................153

XI.   FACEBOOK ANTICOMPETITIVELY INTEGRATES THE BACKENDS OF INSTAGRAM, WHATSAPP, MESSENGER, AND ITS CORE FACEBOOK PRODUCT ...........................155

A.    Facebook's Social Data Refinement, Signal Extraction, Data Structuring, and Feature Creation Process. ....................................................................................................156

B.    Facebook and Identity .............................................................................................163

C.    Facebook Begins a Rapid Back-End Integration Effort in Response to Antitrust Scrutiny....................................................................................................................165

D.    The Call to Break Up Facebook, WhatsApp, and Instagram .........................................167

E.    Zuckerberg Decides to Integrate Facebook, Instagram, and WhatsApp, and Plans a Pretextual Smokescreen to Avoid Backlash from Antitrust Regulators.........................168

F.    Facebook Anticompetitively Integrates Its Products' Back Ends, Creating Unified Data Stores and AI/ML Systems ...............................................................................173

1.    Facebook Forces Its Products to Use Features Instead of Signals and Raw Social Data to Build AI and ML Models, Making the Company's Social Data Impossible Disaggregate by Source or Line of Business.....................................................174

2.    Facebook Centralizes AI and ML Model Architectures and Testing.................177

G.    Zuckerberg's End-to-End Encryption Smokescreen Was Pretextual and Lacked a Legitimate Technical Justification............................................................................178

**FILED UNDER SEAL**

| | | | |
|---|---|---|---|
| XII. | | THE RELEVANT MARKET | 181 |
| | A. | The Social Advertising Market | 181 |
| | B. | Barriers to Entry | 188 |
| | C. | Relevant Geographic Market | 190 |
| XIII. | | HARM TO COMPETITION AND ANTITRUST INJURY | 191 |
| CLASS ACTION ALLEGATIONS | | | 195 |
| CLAIMS FOR RELIEF | | | 201 |
| PRAYER FOR RELIEF | | | 204 |
| JURY DEMAND | | | 205 |

**FILED UNDER SEAL**

## INTRODUCTION

1.     This Complaint is brought on behalf of people and companies—including each of the named Plaintiffs—who bought advertising from Defendant Meta Platforms, Inc.[1] ("Facebook") at anticompetitively inflated prices. Over the course of the past decade, Facebook devised, executed, and reaped the benefits of a scheme to unlawfully monopolize the market for social advertising. As a direct result, Facebook was able to (and in fact, did) charge supracompetitive prices for social advertisements to thousands of people and businesses, including Plaintiffs Affilious, Inc., Jessyca Frederick, Mark Young, Joshua Jeon, 406 Property Services, PLLC, Mark Berney, and Katherine Looper.

2.     Facebook acquired the power to raise prices through the anticompetitive scheme described below and did so year after year with no competitive check.

\*          \*          \*

3.     By the end of 2010, Facebook had emerged the victor among social networks and had begun monetizing its product through targeted advertising. Facebook had obtained a monopoly in a form of online advertising that was distinct from others—social advertising. This form of advertising relied on a particular form of data, called social data, to power machine learning and AI models used for advertising and content targeting.

4.     Facebook had acquired a critical mass of social data and targeting infrastructure, giving rise to a Data Targeting Barrier to Entry ("DTBE")—a network-driven barrier to entry that protected Facebook's monopoly share of the Social Advertising Market.

5.     Facebook's dominance was threatened in 2012, and to fend off this threat Facebook's CEO Mark Zuckerberg and his senior lieutenants planned and executed a scheme between 2012 and 2015 that leveraged Facebook's developer Platform to extract social data and advertising revenue from third-party apps, some of which posed a competitive threat to Facebook. During this period, Facebook overtly destroyed its actual and potential competition, and acquired two then-nascent threats to its business, Instagram and WhatsApp.

---

[1] Originally-named Defendant Facebook, Inc. changed its name to Meta Platforms, Inc., during the pendency of this case.

6.     By April 2015, Facebook had expelled third-party apps from its Platform, including by purporting to deprecate core functionality such as traversing a user's Facebook friends, news feed, or Events functionality. Before this move, Facebook had been able to harvest social data from apps built on its Platform. Afterwards, however, Facebook faced a social data vacuum. Facebook entered into a series of data sharing and whitelist agreements to obtain vital data and advertising revenue, including throughout 2017, 2018, and the first half of 2019.

7.     Yet Facebook was still in need of what it called "signals"—refined social data that could be used as part of its AI and ML models. To obtain those signals, Facebook needed access to data harvested by what Facebook internally referred to as "sub-vertical" apps, such as video, location, and e-commerce apps. Data from these apps was close to the point of conversion (*i.e.*, customer sales) and was closely guarded by leaders in each sub-vertical.

8.     To obtain data from these companies, from 2016 to 2018 Facebook entered targeted sub-verticals, threatening ruinous competition and then withdrawing in exchange for an agreement by a leader in that sub-vertical to hand over signal-rich social data to Facebook, strengthening its dominant position in the Social Advertising Market and the DTBE.

9.     Thus, Facebook entered the streaming video business with a product called Watch, extracted data (and several hundred million dollars in advertising commitments) from the then-leader, Netflix—whose CEO sat on Facebook's board—then systematically withdrew from the business, hindering the data-driven brains behind its new video product and scuttling its investment in original content.

10.     Facebook executed the same maneuver with eBay, developing a Facebook Marketplace product, then crippling it in exchange for social data and ad purchases from the e-commerce giant.

11.     Facebook also entered into an agreement with its direct competitor, Foursquare, to capture location data that Foursquare had painstakingly collected from its users. Facebook extracted this deal after having entered the location-based social networking business, putting pressure on Foursquare to capitulate.

**FILED UNDER SEAL**

12.     Facebook also expanded its Onavo spyware apparatus—which it had used from 2011 to 2015 as part of its Platform scheme—to subvert competition in the years thereafter.

13.     From 2016 through 2019, Facebook expanded its collection of user data from smartphones and devices around the world by offering spyware—sham VPN programs and app-locking programs that secretly captured Internet traffic from mobile devices, including messaging, battery, and third-party app usage information, then relayed this information to Facebook for use in its internal models.

14.     Facebook paired the data it stole from users using Onavo with its newly acquired Instagram and WhatsApp properties in order to validate its AI and ML models, which in turn provided Facebook with a real-time view of all of its competitors. Facebook also matched users it surveilled with internal Facebook IDs, allowing Facebook to obtain granular demographic and targeting information and AI/ML-derived inferences for its business. Put simply, Facebook used stolen user data, deceptively obtained through spyware, to spy on users as they interacted with non-Facebook apps, such as Snapchat and YouTube. Using that same user data, Facebook built the largest real-time surveillance system to ever exist—an infrastructure unavailable to any of Facebook's competitors.

15.     As the 2010s wore on, technological developments in header bidding and Google's acquisition and deployment of powerful machine learning tools across its growing data collection ecosystem threatened to erode Facebook's identity-based targeting advantage—and perhaps even superset the Social Advertising Market. Facebook responded by acquiring and expanding powerful cross-site and cross-device tracking tools, deploying its own machine learning tools outside its walled garden, and laying the groundwork to enter programmatic advertising and other Google-dominated online ad markets. By 2018, the two online advertising titans—each with its own long-running sphere of dominance—were headed for a direct clash.

16.     Except that instead of competing, Facebook and Google actually cut an anticompetitive deal. Codenamed "Jedi Blue," this September 2018 agreement between Facebook and Google divided markets between the two companies and not only reinforced but bolstered Facebook's dominant position in the Social Advertising Market.

FILED UNDER SEAL

17. Pursuant to the Jedi Blue agreement, Facebook dropped its support for header bidding, effectively ceding the programmatic and exchange-based ad markets to Google. At the same time, Google agreed to provide Facebook powerful tools to identify, target, and monetize Facebook's own users on the web and across third-party mobile applications, then give Facebook priority over 90% of advertisements to these users and twice the amount of time to bid on advertising to them.

18. The net effect was that Facebook remained the dominant—and only—source of granularly targeted advertising to its social-networking user base. In exchange, Facebook backed away from Google's advertising exchange business, including by forgoing the adoption of "header bidding."

19. As a result of the conduct set forth above, Facebook became and remained for nearly a decade the dominant (and in many respects, sole) source for highly valuable advertising that could precisely target networks of users in a social network. Facebook has used this market power to repeatedly raise advertising prices every year since it began its scheme.

20. Finally, with Google watching Facebook's flank, Facebook turned to fortifying its Social Advertising monopoly, particularly from regulators. As calls to break up and/or regulate Facebook strengthened, Facebook rushed to force its organization to adopt a common "feature" framework, called the Facebook Feature Framework, for its AI/ML systems, reducing the flexibility of the systems yet inextricably intertwining the data obtained from Facebook's properties. Facebook also forced its organization to adopt pre-trained ML models, further reducing the flexibility of each of its busines units to devise AI and ML suited for their particular tasks.

21. Internally, Mark Zuckerberg and his highest-level PR executives devised a smokescreen to mask the above integration conduct from regulators: end-to-end encryption. Whether or not Facebook encrypted its apps, however, had nothing to do with the integration—and indeed, Facebook had already implemented end-to-end encryption years prior in its WhatsApp product. Nonetheless, Facebook took to the press with its carefully-planned pretext, claiming that the company's massive integration of the backend of its products was about end-to-end encryption (it was not), rather than an attempt to prevent regulators from effectively divesting or otherwise disaggregating Facebook's products and data.

**FILED UNDER SEAL**

22.     Over the course of nearly a decade, Facebook has faced no meaningful competitive check on social advertising prices—and it has extracted supracompetitive revenues from advertisers like Plaintiffs throughout this period.

23.     Plaintiffs are advertisers on Facebook's advertising platform that were injured by paying supracompetitive prices for social advertising. The prices they paid would have been lower if Facebook had not unlawfully monopolized the Social Advertising Market and taken unlawful acts (including an express anticompetitive agreement with Google) to maintain that monopoly, as those prices would have been subject to competitive forces that would otherwise exist as a check on Facebook's market power and monopoly.

**PARTIES**

**I.     PLAINTIFFS**

24.     Plaintiff Affilious, Inc. ("Affilious") is a California corporation with its principal place of business in La Quinta, California. Affilious is an internet publisher firm that operates several websites, including WineClubReviews.net. In late 2016 and in August 2017, Affilious purchased advertising on Facebook's self-service advertising platform to promote WineClubReviews.net. Until no earlier than November 6, 2019, Affilious did not know, and could not reasonably have known, the truth about Facebook's anticompetitive conduct, including its purpose and intent to engage in anticompetitive conduct, nor could it have known that it had been injured by paying supracompetitive prices for advertising.

25.     Plaintiff Jessyca Frederick is a citizen of the State of California. Frederick was the sole proprietor of ClubsAndGifts.com, a promotional website, and a founder and CEO of Affilious. At various times from April 4, 2009, through August 2017, Frederick purchased advertising on Facebook's self-service advertising platform to promote her businesses.

26.     Plaintiff Mark Young is a citizen of the State of New York. Young is the sole proprietor of Dinkum Hair, a hair salon located in Buchanan, New York. Young d/b/a Dinkum Hair purchased advertising on Facebook's self-service advertising platform to promote the business between June 2017 and April 2019.

5

First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

FILED UNDER SEAL

27.     Plaintiff Joshua Jeon is a citizen of the State of Texas. He is a pastor at Dwell Church in Austin, Texas. In April 2016, Jeon purchased advertising on Facebook's self-service advertising platform to promote Dwell Church. Jeon did not receive reimbursement from Dwell Church for the purchase.

28.     Plaintiff 406 Property Services, PLLC ("406 Property Services") is a Montana professional limited liability company with its principal place of business in Whitefish, Montana. 406 Property Services is a real estate property services company. From approximately June 8, 2017, until approximately October 20, 2017, 406 Property Services purchased advertising on Facebook's self-service advertising platform to promote its business.

29.     Plaintiff Mark Berney is a citizen of the State of Montana. From in or about 2016 into December 2018, Berney purchased advertising on Facebook's self-service advertising platform to promote his personal musical work.

30.     Plaintiff Katherine Looper is a citizen of the State of California. From in or about 2013 through March 2020, Looper purchased advertising on Facebook's self-service advertising platform to promote free musical concerts at the Cadillac Hotel, a residential hotel for low-income persons in San Francisco operated by Looper's nonprofit organization, Reality House West.

31.     Plaintiffs all paid prices for advertising that were higher than they would have been absent Facebook's anticompetitive conduct and unlawfully acquired and/or maintained monopoly. Facebook caused Plaintiffs to pay supracompetitive prices for advertising as a result of the market power it obtained and/or maintained as a result of the anticompetitive scheme described in this Complaint.

## II.     DEFENDANT

32.     Defendant Meta Platforms, Inc., is a publicly traded company, incorporated in Delaware. Meta Platforms, Inc. was formerly known as Facebook, Inc., and changed its name to Meta Platforms, Inc. on October 28, 2021. Facebook's principal place of business and headquarters is located at 1601 Willow Road in Menlo Park, California.

33.     Founded in 2004 by Mark Zuckerberg, Facebook is a social media company that provides online services to billions of users around the world. In exchange for providing services, Facebook

**FILED UNDER SEAL**

collects user data, which it uses to create and sell targeted advertising services. Facebook's principal revenue is from targeted social media advertising that it provides to advertisers as a data broker.

34.    Facebook also operates as a platform for third-party applications and hardware, and owns and operates several business divisions:

- *Facebook*. Facebook's core application, which bears the company's name, is, according to Facebook's filing with shareholders, designed to enable "people to connect, share, discover, and communicate with each other on mobile devices and personal computers." The Facebook core product contains a "News Feed" that displays an algorithmically ranked series of stories and advertisements individualized for each person.

- *Instagram*. Instagram is a photo-sharing application that allows users to share photos, videos, and messages on mobile devices. Instagram was acquired in April 2012, and at present, Facebook operates Instagram as a separate application from its core Facebook product.

- *Messenger*. Facebook's Messenger application is a multimedia messaging application, allowing messages that include photos and videos to be sent from person to person across platforms and devices.

- *WhatsApp*. WhatsApp is a secure messaging application used by individuals and businesses. WhatsApp was acquired by Facebook in 2014 for $21.8 billion, and at the time had approximately 450 million users worldwide.

- *Oculus*. Oculus is Facebook's virtual reality hardware line of business, which Facebook acquired in March 2014 for approximately $2 billion.

35.    Facebook's revenue as of year-end 2019 was $70.70 billion (up 27% from the previous year), with net income from operations of $23.99 billion. Almost all of this revenue came from advertising, particularly mobile advertising. As of year-end 2019, Facebook maintained $54.86 billion in cash and cash-equivalent securities. Facebook employed 44,942 people around the world at the end of 2019 (up 26% from the previous year). Facebook's revenue as of year-end 2020 was $85.97 billion (a 22% increase from the previous year), with net income from operations of $32.67 billion. Again, almost

**FILED UNDER SEAL**

all of that revenue came from mobile advertising. As of year-end 2020, Facebook maintained $61.95 billion in cash and cash-equivalent securities. Facebook employed 58,604 people around the world at the end of 2020 (up 30% from the previous year). In 2021, Facebook / Meta earned $117.93 billion in revenue, of which $114.93 billion came from advertising. The company's 2021 total income from operations was $46.753 billion. Disregarding Facebook / Meta's Reality Labs division (which operated at a substantial loss), Facebook / Meta's total income from operations in 2021 was $56.95 billion. Facebook / Meta's net income from operations (including Reality Labs) in 2021 was $39.37 billion

36.     For the 2019 fiscal year, Facebook reported to investors that on average it had 1.66 billion daily active users of Facebook and Messenger ("DAUs") (up 9% from the previous year) and 2.50 billion monthly active users ("MAUs") (up 8% from the previous year). Facebook also reported that on average it had 2.26 billion daily active people ("DAP") who used any Facebook product (up 11% from the previous year) and 2.89 billion monthly active people ("MAP") (up 9% from the previous year). For the 2020 fiscal year, Facebook reported to investors that on average it had 1.84 billion DAUs (up 11% from the previous year) and 2.80 billion MAUs (up 12% from the previous year). Facebook also reported that on average it had 2.60 billion DAP who used any Facebook product (up 15% from the previous year). For the 2021 fiscal year, Facebook / Meta reported to investors that on average it had 1.91 billion DAUs, 2.89 billion MAUs, 2.78 billion DAP, and 3.53 billion MAP, across its family of products—an increase from 2020 in all four categories.

**JURISDICTION AND VENUE**

37.     This action arises under Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26). The action seeks to recover treble damages, interest, costs of suit, equitable relief, and reasonable attorneys' fees for damages to Plaintiffs and members of the Classes resulting from Defendant's restraints of trade and monopolization of the Social Advertising Market described herein.

38.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1332 (class action diversity jurisdiction), and 1337(a) (antitrust); and under 15 U.S.C. § 15 (antitrust).

**FILED UNDER SEAL**

39.     Venue is appropriate in this district under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision). Facebook transacts business within this district, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this district.

40.     The Court has personal jurisdiction over Facebook as it is subject to general jurisdiction in the State of California, where it maintains its headquarters and its principal place of business. The scheme, conspiracy, and monopolization alleged in this Complaint was targeted at individuals throughout the United States, causing injury to persons in the United States, including in this district.

## INTRADISTRICT ASSIGNMENT

41.     This action has been assigned to the Hon. James Donato of the San Francisco Division of this judicial district.

## FACTS

### I. FACEBOOK EMERGES AS THE DOMINANT SOCIAL NETWORK

#### A.     The Last Social Network Standing

42.     Facebook's meteoric rise since its founding in 2004 is well documented. The company—started in the dorm room of its CEO Mark Zuckerberg as "the facebook"—rose to prominence in the face of fierce competition from several social networks. Initially an exclusive service for elite universities throughout the United States, Facebook eventually expanded its network to encompass a general audience of users throughout the United States and worldwide.

43.     Between 2004 and 2010, Facebook vanquished a number of rivals, emerging as the dominant social network in the United States.

44.     Facebook's first chief competitor was MySpace. Founded in 2003 (a year before Facebook), MySpace targeted the same audience, provided largely the same services, and rapidly attracted an enormous number of users. By 2005, MySpace had 25 million active users, and was acquired by NewsCorp for $580 million. In 2006, MySpace registered 100 million users, passing Google as the most visited website in the United States.

**FILED UNDER SEAL**

45.     However, the next three years featured a steady downward spiral for MySpace—and countervailing growth by Facebook. In 2008, Facebook passed MySpace in worldwide active users and continued to grow, reaching 307 million active users across the globe by April 2009. In May 2009, Facebook passed MySpace in United States, 70.28 million to 70.26 million monthly active users.

46.     MySpace never came close to Facebook again. By 2010, MySpace had mostly exited the market, leaving the business of social media for good. MySpace's CEO capitulated in November of 2010: "MySpace is not a social network anymore. It is now a social entertainment destination." In September 2010, MySpace reported that it had lost $126 million, and in June 2011, NewsCorp sold the company for $35 million—$545 million less than it had paid just six years earlier. By then, its user base had dwindled to just 3 million monthly visitors.

47.     During the same time period, several other social networks also met their demise, including Google's Orkut, AOL's Bebo, and Friendster, which failed to scale rapidly enough to compete with MySpace and Facebook.

48.     By 2009 and through 2010, Facebook emerged as the only peer-to-peer social media network to exist at scale, and no other network or company rivaled Facebook's massive user base. On March 2, 2010, *Adweek* reported that Facebook had booked revenues of up to $700 million in 2009 and was on track for $1.1 billion in 2010—almost all from advertising to its newly won users. Facebook had been roughly doubling its revenues every year up until that point—$150 million in 2007, $280-300 million in 2008, and $700 million in 2009.

First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

**FILED UNDER SEAL**

49.     *Time* magazine heralded Zuckerberg as its 2010 Person of the Year.



50.     *Time*'s cover story set out the stakes—the scope of the newly assembled social network was unprecedented and staggering:

> What just happened? In less than seven years, Zuckerberg wired together a twelfth of humanity into a single network, thereby creating a social entity almost twice as large as the U.S. If Facebook were a country it would be the third largest, behind only China and India. It started out as a lark, a diversion, but it has turned into something real, something that has changed the way human beings relate to one another on a species-wide scale. We are now running our social lives through a for-profit network that, on paper at least, has made Zuckerberg a billionaire six times over.

51.     By 2010, Facebook was unrivaled and dominant in a way no company since Microsoft had been in post-personal-computer history. And it had done so by riding the currents of powerful network effects.

**B.      A New Market of Its Own Creation**

52.     By the beginning of the millennium's second decade, Facebook was the indisputable king of an entirely new market—a market built not on hardware or operating system dominance, but one built on a network of people, with its power and value directly derived from their engagement with that

First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

**FILED UNDER SEAL**

network. The more data users fed into Facebook by communicating and interacting with each other, posting their pictures, and publishing their content, the more valuable the Facebook network became to third parties, who could advertise to Facebook's users by targeting them using the very information they provided to Facebook's network.

53.     Data about what information users shared on their personal pages; the photos and profiles they viewed; their connections to others; what they shared with others; and even what they put in messages to other users all allowed targeted advertising on a scale that had never before existed. Unlike search advertising, Facebook's advertising platform allowed advertisers to target Facebook's user base by their attributes and behavior, not by a query entered into a search box. More importantly, unlike in search, user identity was not only discoverable, it was willingly provided by users—as was the identity of those users' closest friends and family members. These identities could be tracked and targeted throughout the Internet.

54.     This social data created by Facebook's network of engaged users could be monetized in a number of ways. The data could be resold for targeted advertising and machine learning; Facebook's machine learning algorithms mined patterns in the data for advertisers, which allowed advertisers to reach precisely the right audience to convert into sales, user sign-ups, or the generation of sales leads. The data also could be sold by commercializing access—for example, by providing application developers, content generators, and advertisers with direct access to the information embedded in Facebook's network, such as the interconnection between users, user attributes, and user behavior. That data then could be mined by these third parties.

55.     All the methods of monetizing social data were based on selling that data, but such data could be packaged, structured, or mined differently depending on the application for which it was being sold. For advertisers, Facebook's network presented advertisers and Facebook itself with entirely new social signals, such as relationships, events, friendships, and granular interests. Movies, music, and books were inherent parts of a user's profile. The amount of information in Facebook's network that could be mined as social data was unprecedented—and Facebook received all that data daily from its millions of users in the United States and worldwide.

FILED UNDER SEAL

56.     The data Facebook collected was uniquely social, derived from the engaged interactions and strong identity of Facebook's users. Twitter, a public-facing social network, loosely enforced identity and never required users to disclose granular details about themselves. Facebook stood alone in this regard, with a clear product emphasis on individuals and their connections to others. In 2010, Google, Yahoo, and the other major online advertising sources competed in an entirely different market—one based on search data. The data Facebook had at its disposal was not fungible with search data—it was actionable data about individual users, with their identities fully ascertainable.

57.     By 2010, Facebook stood alone as the dominant player in the newly emergent market for social advertising—a market in which Facebook's own users provided Facebook with a constant stream of uniquely valuable information, which Facebook in turn monetized through the sale of advertising. Advertisers, finding no substitute from any other company, paid top dollar for Facebook's powerful targeting and actionable data, and some of those advertisers—wittingly or not—even fed crucial data about themselves, their products, and the efficacy of their targeting back to Facebook's network.

58.     As Facebook itself explained to third-party developers in May 2007, Facebook's core value proposition and business model was (a) "providing access to a new kind of data—social data, which enables you to build applications that are relevant to users." With respect to that data, Facebook told developers: "You are on a level playing field with us. You can build robust apps, not just widgets. Complete integration into the Facebook site." By 2010, it was clear that Facebook's entire business was selling this new form of "social data" (and machine-learning-driven user targeting based on that data) and that it would do so by selling access to developers and selling advertisements targeting Facebook's network of engaged and active users.

## C.     The Data Targeting Barrier to Entry

59.     As Facebook's dominant position emerged in 2010, powerful network effects and feedback loops took hold and solidified that position. Data provided by users, and user targeting based on that data, made Facebook's network more valuable, thereby attracting more users to the network. As a typical use case, a Facebook user would invite his closest friends and family, who would then invite

**FILED UNDER SEAL**

and engage with other friends and family members who existed on the network. A familiar feedback loop—a virtuous circle—emerged, rapidly growing Facebook's user base.

60. The content generated by this user base, in turn, increased the value of the Facebook network. With each photograph, relationship status, check-in, or post by a Facebook user, the Facebook network became more valuable, not just as a means of communicating with directly connected acquaintances, but as a means of learning about more remotely connected ones.

61. As Samuel Lessin, then Facebook's VP of Product Management, explained to Mark Zuckerberg in an internal email on October 26, 2012, the data Facebook collects makes Facebook progressively more proficient at collecting and monetizing data:

> One of the things that puts us currently in a very defensible place is the relationship we have created between the people using Facebook all the time, and us having the information we need to make Facebook a better product. This is the fundamental insight in something like coefficient. *We know more about what people want to see because people look at more stuff on our platform.* In this respect, while there are other ways to get close, it feels viscerally correct that there is an ROS dynamic at play, *the more people that use the system, the more information we have on how to make more people use the system*.

(emphasis added).

62. A barrier to entry emerged from this feedback loop. To compete with Facebook, a new entrant would have to rapidly replicate both the breadth and value of the Facebook network—a task a mere clone of that network could not accomplish. Indeed, to compete with Facebook, a competitor would not only have to build its own vast network but would have to draw active social engagement on a massive scale—which likely would require drawing a vast quantity of Facebook users away from that platform.

63. The costs to switch would be massive: an entrant-competitor would have to present an overall value proposition to users that not only exceeded that of Facebook's entrenched network, but did so handily. Moreover, to compete with Facebook's virtuous circle, the value delivered by an entrant-competitor platform would have to facilitate social data mining, including through machine learning and artificial intelligence, that would create even more value for users, developers, and advertisers. This barrier to entry is referred to throughout this Complaint as the Data Targeting Barrier to Entry ("DTBE").

FILED UNDER SEAL

64.     The DTBE protects Facebook's ability to control and increase prices in the Social Advertising Market without the pressures of price competition from existing competitors or new entrants. Because of its monopoly power in the Social Advertising Market and the DTBE, Facebook has been able



Figure 1: Retail Facebook CPM, Q4 2012 – Q4 2013

to consistently increase the price it charges for social advertising. And this is exactly what Facebook has done since it obtained its dominant position in 2010.

65.     From 2011 to 2012, for example, Facebook massively increased the prices it charged for its advertisements—one of the primary sales channels for its social data. That year, costs per thousand impressions (CPM) on Facebook increased by 41%, with a 15% increase in the last quarter of 2011 alone. Cost per click (CPC), which is a measure of advertising costs paid on a by-click basis, rose 23% that same year. Facebook increased prices for social advertising as it also grew the number of advertisements it displayed on its site, indicating monopoly power in the Social Advertising Market.

66.     Facebook maintained that power over its prices through 2013, with a 2.9x increase in CPMs year over year. The increase came as overall advertising revenues increased yet again—that year by a staggering 83% over the last.

67.     These price increases would not be possible without the DTBE. If a rival network existed with comparable social data available for sale through advertising, Facebook's price increases would have been met with customer migration to the comparable rival. But Facebook had no such rival and was unfettered in its ability to increase prices, even while rapidly increasing its supply of data for sale through advertisement.

**FILED UNDER SEAL**

68.     Once Facebook had achieved dominance in the Social Advertising Market, its position only improved—and became more entrenched. The more advertising Facebook sold, and the more social data Facebook collected and packaged for sale, the more effective Facebook became at selling advertising, targeting users, and commercializing direct access to its users' social data (*e.g.*, through APIs). This, in turn, made entry by a new rival impossible or prohibitively costly, thereby allowing Facebook to increase prices and make additional investments that deepened the DTBE moat surrounding its business.

### D.     Google's Failed Entry into the Social Advertising Market

69.     In 2010, Google became desperate to enter the Social Advertising Market. It had tried several times to do so before, but each foray was met with failure. Google's Orkut social network, which was launched days before Facebook, was quickly overtaken. Wave, Google's social communication platform, never achieved any traction with users. And Google's Buzz social network—built on the back of its highly successful Gmail product—imploded quickly in early 2010.

70.     Google's next attempt to enter the market attacked Facebook's functionality head-on, which meant attempting to penetrate the powerful DTBE protecting Facebook's business. Google made a massive, unprecedented investment of resources into building a product with enough value to lure users away from Facebook's broad, highly engaged social network.

71.     In 2010, Google's Vic Gundotra became the company's Chief Architect. Gundotra pitched a new social network to Larry Page, Google's cofounder, who returned as CEO of the company in 2011. Gundotra repeated an ominous refrain, "Facebook is going to kill us. Facebook is going to kill us," which frightened Page into action.

72.     Page greenlit a new product, Google+. Initially, Google+ sought to leverage Google's YouTube product to build its social network, requiring a Google+ account for access to certain key features of YouTube. In the face of significant user resistance, Google backed away from that requirement. Nonetheless, Google attempted, through Google+, to build out a "social graph" that would leverage a common user identity across Google products, including YouTube and Gmail.

73.     In early 2011, Google began what insiders now refer to as "the 100-day march" toward launch of Google+. The product Google planned to deliver was, by any fair account, uncannily similar to what Facebook offered in terms of product features and functionality. By the summer of 2011, the planned features for Google+ included a continuous scroll product called the "stream" (a clone of Facebook's "feed" product); a companion feature called "sparks," which related the "stream" to users' individual interests; and a sharing app called "Circles," a purportedly improved way to share information with one's friends, family, contacts, and the public at large.

74.     Unlike Google's past products, Google+ was not designed to organically grow and scale from small beginnings. From the outset, Google invested massive amounts of resources to bring a finished, full-scale social network to market. Calling the project "Emerald Sea," Google conscripted almost all of the company's products to help build Google+. Hundreds of engineers were involved in the effort, which remained a flagship project for Page, who had recently reassumed the Google CEO role. Google's Gundotra was quoted explaining that the product that would become Google+ was a transformation of Google itself: "We're transforming Google itself into a social destination at a level and scale that we've never attempted—orders of magnitude more investment, in terms of people, than any previous project."

75.     The amount of resources Google brought to bear stood in stark contrast to its previous attempts at penetrating the Social Advertising Market. Google had dedicated barely a dozen staff members to its previous failed social network product, Buzz. At its peak, Google+ involved 1,000 employees from divisions across the country. Google, for example, ripped out its elaborate internal video conferencing system and forced employees to use the Google+ Hangouts video chat feature, which one internal employee described as "janky." Employee bonuses were tied to the success of Google+. And the entire project was confined to a level of secrecy never before seen at Google.

76.     Google+ was released on June 28, 2011. The product included the "stream," the "Circles" app, the "Hangout" video chat and messaging product, and a photo sharing product. The resemblance to Facebook was striking. As one internal Google employee commented: "this looks just like Facebook. What was the big deal? It's just a social network." Another Google employee was quoted as saying, "All

**FILED UNDER SEAL**

this fanfare and then we developed something that in the end was quite ordinary." One thing was indisputable: with the release of Google+, Google had challenged Facebook head-on by effectively cloning Facebook's product.

77.     Because Google's user base was already massive, the Google+ product attracted millions of users shortly after launch. But though these users signed up for Google+, Google quickly found out they were not using the product. As one former Google employee explained:

> It was clear if you looked at the per user metrics, people weren't posting, weren't returning and weren't really engaging with the product. Six months in, there started to be a feeling that this isn't really working.

78.     The problem for Google+ was the powerful network effect that reinforced the DTBE that protected Facebook. Google's clone of Facebook did not present enough new value to overcome massive network-based switching costs—the cost to Facebook users of shifting away from an existing networked product in which the users had actively invested their social data for years.

79.     Paul Adams, a former Google+ user-experience team member, summed it up succinctly when asked why Google+ had failed:

> What people failed to understand was Facebook and network effects. . . . It's like you have this grungy night club and people are having a good time and you build something next door that's shiny and new, and technically better in some ways, but who wants to leave? People didn't need another version of Facebook.

80.     By 2014, Google+ was declared a failure and Gundotra, its founder, eventually left Google. Within just a few years, Google—with all of its resources, developers, and existing user base—failed entirely to overcome the DTBE protecting Facebook. As long as Facebook controlled the data derived from an engaged and active user base, it could continue to keep that user base active and engaged.

81.     The only way to disrupt this virtuous circle was with a rival product that provided significantly more or different value than Facebook, and that itself was propelled to scale by powerful network effects.

<u>**FILED UNDER SEAL**</u>

**II.   A THREAT TO FACEBOOK'S MONOPOLY: THE RISE OF SMARTPHONES AND MOBILE APPS**

**A.   The Mobile App Revolution**

82.   In 2009 and 2010, as Facebook emerged the undisputed winner of the social media wars, another new market had begun to take hold. The launch of the Apple iPhone in 2007 created a market for a new type of cellular phone: one with a user interface capable of robust Internet connectivity and messaging. No longer constrained by numeric keypads for texting—or clunky, permanent alphanumeric keyboards attached to phones, such as with the Treo or Sidekick cellular phones—the iPhone dynamically displayed a multi-touch keyboard and came equipped with a full-featured web browser that rendered complete web pages.

83.   By the summer of 2008, Apple's newest iPhone, the iPhone 3G, was released with onboard GPS and other hardware upgrades. Accompanying the release of the new iPhone was a new store for third-party applications that would run natively on the iPhone: the Apple App Store, which opened for business on July 10, 2008, the day before the release of the iPhone 3G.

84.   Developers who launched their third-party applications via the App Store reaped huge rewards. There were approximately 500 apps available at the App Store's initial launch. Games using the iPhones accelerometer became immediate successes, some quickly earning hundreds of thousands of dollars by selling downloads for just a few dollars each. Applications that exploited the new GPS functionality in the iPhone also quickly became popular. By September 2008, the Apple App Store had racked up 100 million downloads, and by 2009, it hit 1 billion. iPhone apps had become a new means to deliver scaled value to countless users. Google also launched what became its Play Store (initially known as Android Market) in 2008. It soon overtook Apple's App Store in terms of overall volume, with 82% growth. The mobile app revolution had begun.

85.   Mobile apps rapidly proliferated, with huge opportunities for further growth—as the lion's share of cell phone activity by 2010 had become something other than making phone calls. For example, a 2010 Pew Research survey showed that taking pictures and sending text messages had become the most common uses for cellular phones among adults, with more than a third of adult cell phone users accessing

**FILED UNDER SEAL**

the Internet, playing games, emailing, recording video, or playing music through their cell phones. At the same time, 29% of adult cell phone users had used a downloaded app.

86.     A 2010 Nielsen survey showed that games, news/weather, maps and navigation, and social networking were the most popular apps on cellular phones.

87.     Notably, mobile apps resonated most strongly with the demographics that had recently adopted social media and were providing their data to Facebook in droves. App users among cell phone



*% of adult cell phone users who do each of the following on their phone...*

| | |
|---|---|
| Take a picture | 76% |
| Send or receive text messages | 72 |
| Access the internet | 38 |
| Play a game | 34 |
| Send or receive email | 34 |
| Record a video | 34 |
| Play music | 33 |
| Send or receive instant messages | 30 |
| **Use an app** | **29** |

Source: Pew Research Center's Internet & American Life Project, April 29-May 30, 2010 Tracking Survey. N=1,917 adult cell phone users.



Source: Surveys conducted 2005-2019.

PEW RESEARCH CENTER

| | |
|---|---|
| Entertainment/Food | 34% |
| Banking/Finance | 28% |
| Sports | 27% |
| Productivity | 26% |
| Shopping/Retail | 24% |
| Video/Movies | 22% |
| Communication | 21% |
| Travel/Lifestyle | 18% |
| Other | 3% |

Source: The Nielsen App Playbook, December 2009. N=3,962 adults who have downloaded an app in the 30 days prior to the survey.

**FILED UNDER SEAL**

owners were disproportionately younger, with 44% of app users in 2010 under the age of 20 and another 41% between the ages of 30 and 49. These were the same demographics that were rapidly adopting social media as part of their lives and providing Facebook with the social data that built and maintained the DTBE that protected its business.

88.     Many of the mobile apps that were rapidly attracting users were doing so because they presented their own specialized value propositions. These apps had to be specialized because cellular phone screens were smaller, particularly in 2010, and mobile traffic was driven by specialty software, often designed for a single purpose. Users signed up for these apps with their e-mail addresses and personal information and interacted directly with the apps.

89.     As *Wired* magazine described in 2010, a typical user moved from app to app, each with some specialized use:

> You wake up and check your email on your bedside iPad—that's one app. During breakfast you browse Facebook, Twitter, and the New York Times—three more apps. On the way to the office you listen to a podcast on your smartphone. Another app. At work, you scroll through RSS feeds in a reader and have Skype and IM conversations. More apps. At the end of the day, you come home, make dinner while listening to Pandora, play some games on Xbox Live, and watch a movie on Netflix's streaming service.

90.     In 2010, Morgan Stanley projected that within five years, the number of users who accessed the Internet from mobile devices would surpass the number who accessed it from PCs. The Internet was at an inflection point—the World Wide Web was no longer the dominant way to access information. Users were obtaining their information from specialized walled gardens, and Facebook's own walled garden was one app away from being superseded.

91.     The years leading up to 2010 saw the rise of streaming apps, such as Netflix and Pandora, and e-book readers, such as Kindle and iBooks. Apple's 2010 list of top-grossing iPhone apps included mobile games such as Angry Birds, Doodle Jump, Skee-Ball, Bejeweled 2 + Blitz, Fruit Ninja, Cut the Rope, All-in-1 GameBox, the Moron Test, Plants vs. Zombies, and Pocket God. Facebook's mobile app

FILED UNDER SEAL

topped the list of free downloads in the App Store, along with Words with Friends, Skype, and the Weather Channel App.

**B.    Facebook Recognizes the Looming Threat Presented by Mobile Applications**

92.    By 2011, Facebook realized that it had fallen behind. Facebook had just debuted its new "Timeline" product, a controversial modification of the Facebook feed that generated dynamic content for each user rather than a static series of posts visible to the user. Facebook had spent the last eight months prioritizing its desktop experience and its new Timeline product. But while it did so, mobile applications continued their meteoric rise.

93.    Facebook's own mobile application was built on a technology called HTML5, which at the time was good for building web pages but not for building mobile apps native to iOS and Android smartphones. As a result, Facebook's mobile app was buggy, prone to crashes, and painfully slow. As Zuckerberg would lament years later about HTML5, "We took a bad bet."

94.    Zuckerberg reflected in 2018 that Facebook had fallen behind when mobile apps emerged:

> One of my great regrets in how we've run the company so far is I feel like we didn't get to shape the way that mobile platforms developed as much as would be good, because they were developed contemporaneously with Facebook early on. I mean, iOS and Android, they came out around 2007, we were a really small company at that point—so that just wasn't a thing that we were working on.

95.    As mobile apps rose, Facebook's desktop product acquired users at a slower pace. All of this occurred as Facebook was planning its initial public offering. Facebook knew that its position was eroding and that if mobile growth continued, its IPO debut would be in the midst of material changes to its business, undermining Facebook's financial and qualitative disclosures to public investors.

96.    But there was no avoiding the issue. Facebook held its IPO on May 18, 2012. By the time Facebook released its first annual report, the trend was unmistakable—the transition to mobile devices from desktop web-based applications posed an existential threat to Facebook's business. In its 2012 Form 10-K, Facebook disclosed this risk to shareholders as one of the factors that affected its bottom line:

FILED UNDER SEAL

*Growth in the use of Facebook through our mobile products as a substitute for use on personal computers may negatively affect our revenue and financial results.*

We had 680 million mobile MAUs in December 2012. While most of our mobile users also access Facebook through personal computers, we anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future and that the usage through personal computers may decline or continue to decline in certain markets, in part due to our focus on developing mobile products to encourage mobile usage of Facebook. For example, during the fourth quarter of 2012, the number of daily active users (DAUs) using personal computers declined modestly compared to the third quarter of 2012, including declines in key markets such as the United States, while mobile DAUs continued to increase. While we began showing ads in users' mobile News Feeds in early 2012, we have generated only a small portion of our revenue from the use of Facebook mobile products to date. In addition, we do not currently offer our Payments infrastructure to applications on mobile devices. If users increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to continue to grow mobile revenues, or if we incur excessive expenses in this effort, our financial performance and ability to grow revenue would be negatively affected.

## C.  The Facebook Platform

97.  Although Facebook faced a looming threat from mobile applications, it maintained an important source of leverage: its social data. Facebook possessed (and continued to receive) vast quantities of information about its massive user base, including how each user was connected to others. This information was valuable to both new and existing mobile applications, which could leverage Facebook's social data to obtain new users and to build novel social features, functions, and apps.

98.  Facebook referred to its network as its "Graph," coined after a mathematical construct that models connections between individual nodes. The Facebook Graph contained user "nodes," with connections and information exchanged among nodes as "edges." Facebook coined the term "Open Graph" to describe a set of tools developers could use to traverse Facebook's network of users, including the social data that resulted from user engagement.

**FILED UNDER SEAL**

99.     Importantly, Open Graph contained a set of application programming interfaces ("APIs") that allowed those creating their own social applications to query the Facebook network for information. As Facebook explained in its 2012 Form 10-K:

> ***Open Graph.*** Our underlying Platform is a set of APIs that developers can use to build apps and websites that enable users to share their activities with friends on Facebook. As Open Graph connected apps and websites become an important part of how users express themselves, activities such as the books people are reading, the movies people want to watch and the songs they are listening to are more prominently displayed throughout Facebook's Timeline and News Feed. This enables developer apps and websites to become a key part of the Facebook experience for users and can increase growth and engagement for developers.

100.    Open Graph, along with other Facebook products, such as its NEKO advertising and Payments products, comprised Facebook's Platform. The Platform was vital to Facebook's business because it ensured that engagement continued on Facebook. Without the Platform, Facebook would be required to build applications that increased the value of its network itself—meaning that Facebook would have to try to predict what applications users wanted; design, code, and scale those applications across its user base and network; and bear the risk and resource drain of guessing wrong and making mistakes.

101.    Facebook did not have the resources to do this, so it decided instead to allow third parties to build applications for the Platform. As Mark Zuckerberg observed in a February 2008 email to Facebook's VP Engineering for Platform Michael Vernal, a senior Zuckerberg lieutenant who was in part responsible for creating Open Graph:

> Platform is a key to our strategy because we believe that there will be a lot of different social applications . . . . And we believe we can't develop all of them ourselves. Therefore . . . . It's important for us to focus on it because the company that defines this social platform will be in the best position to offer the most good ways for people to communicate and succeed in the long term.

102.    Put simply, Facebook could either speculate on new social applications by building them itself or it could provide a platform for others to do so. For years, Facebook opted to provide a platform until it was able to develop its own social applications.

103.    But Facebook also recognized that developers on its Platform could potentially pose a competitive threat. In its 2012 annual report, Facebook disclosed the following significant risk factor to its operations:

> In addition, Platform partners may use information shared by our users through the Facebook Platform in order to develop products or features that compete with us. . . . As a result, our competitors may acquire and engage users at the expense of the growth or engagement of our user base, which may negatively affect our business and financial results.

104.    Thus, Facebook knew that competition could come from its own third-party application developers. But Facebook nevertheless actively sought developers to build applications on its Platform because of the potential to extract profits from the applications these developers built and the users they attracted to, and engaged on, Facebook's network.

105.    As Facebook explained to its investors in 2012, maintaining a Platform on which developers could build applications meant more engagement and therefore greater ad revenues for Facebook:

> Engagement with our Platform developers' apps and websites can create value for Facebook in multiple ways: our Platform supports our advertising business because apps on Facebook create engagement that enables us to show ads; our Platform developers may purchase advertising on Facebook to drive traffic to their apps and websites; Platform developers use our Payment infrastructure to facilitate transactions with users on personal computers; Platform apps share content with Facebook that makes our products more engaging; and engagement with Platform apps and websites contributes to our understanding of people's interests and preferences, improving our ability to personalize content. We continue to invest in tools and APIs that enhance the ability of Platform developers to deliver products that are more social and personalized and better engage people on Facebook, on mobile devices and across the web.

106.    Facebook's Platform was valuable to Facebook in several important ways.

107.    First, the Platform meant that new applications would be built on Facebook's network, increasing the value of Facebook's network as the applications became more popular. The increased engagement with Facebook as a result of these new applications translated to better-targeted content and higher advertising revenues.

108.    Second, Facebook would not need to spend significant resources to develop new applications or test new business models—third parties would do that instead. Facebook could merely wait for an application built for its Platform to gain widespread adoption, then either build a competing application or passively glean the benefits of that popular application's user engagement, including valuable new social data for Facebook and its network.

109.    Third, access to Facebook's network was itself valuable to third-party developers, so Facebook could charge developers—most notably, through API access and advertising purchases—to access Facebook's Platform and the social data it collected from Facebook's massive number of engaged users.

### D.    The Profitable Open Graph Platform and Mobile Install Business

110.    Facebook continued to struggle to catch up with the new onslaught of mobile applications, but it recognized that the new apps required aggressive user growth to be profitable. Among other things, Facebook's APIs allowed mobile app developers to query the friends of a person's friends, which allowed mobile applications to find other users who might be interested in using their apps.

111.    Mobile apps also could use Facebook to communicate across Facebook's network, either directly with a user's friends or with others not directly connected with the user. A mobile payment application, for example, could enable two strangers to pay each other, even if they were not directly connected on Facebook—so long as both of them existed somewhere on Facebook's Platform. A user of a dating application, such as Tinder, could use Facebook's APIs to find a compatible date, either in the extended network of one's friends or beyond—anywhere on Facebook's Platform.

112.    Facebook quickly realized it could monetize the value of its network through third-party mobile applications, and it moved aggressively to do so, beginning with games built to run on Facebook's Platform. Those games, many of which were social games that allowed users to play with and against each other, sought above all else new users to increase their adoption. Facebook's Vernal sought to obtain a beachhead with these applications, monetizing each additional game install that resulted from the use of Facebook's Platform or from Facebook's advertising product, NEKO.

**FILED UNDER SEAL**

113.     For example, Facebook included ads as "stories" on user timelines that indicated whether the user knew other users who were playing a particular game. Facebook then monetized such advertisements when the game obtained new users from them. As Vernal explained in a May 2012 e-mail:

> The biggest/most efficient market segment for advertising on mobile today is driving app installs. This is at least partly because it's the most measurable—if you know that you get $0.70 from every game you sell, then in theory you can afford to pay up to $0.69/install. This kind of measurability allows for maximal bidding.
>
> So, what we're trying to do is kickstart our sponsored stories business on mobile by focusing on one particular type of story (is-playing stories) and one market segment (games), make that work really well, and then expand from there.

114.     Facebook thus leveraged its most valuable asset—the information it had about its users, their interests, and most importantly, their friends—to make money from the proliferation of mobile games.

115.     Games like Farmville, a mobile application that allowed players to create their own simulated farms, quickly took off because of Facebook's Platform. Facebook increasingly recognized that it could obtain engagement from users through the game itself.

116.     This strategy led to a broader one, in which Facebook drove app installs by allowing developers to advertise to its user base and traverse Facebook's social network through the Facebook APIs. Facebook collected a fee for each app install that resulted from its network. Vernal outlined the plan in detail:

> **Roughly, the plan:**
>
> 1/ Create new iOS + Android SDKs, because the current ones are terrible. Ship Thunderhill so we get even broader adoption of our stuff.
>
> 2/ Wire them up to make sure we know when you're playing a game (so we can generate the same kind of is-playing stories we can on canvas).
>
> 3/ Generate a bunch of effective, organic distribution for these games via our existing channels (news feed, net ego on both desktop + mobile). Ship

**FILED UNDER SEAL**

send-to-mobile, which allows us to leverage our desktop audience to drive mobile app traffic.

4/ Create an even better app store than the native app stores (our app center) and make a lot of noise about it, so developers know that they should be thinking about us to get traffic to their mobile apps.

5/ Introduce a paid offering, probably cost-per-install (CPI) based, where you can pay us to get installs from your mobile app. Primary channels for this paid distribution are News Feed and App Center (on desktop + mobile) as well as RHC on desktop.

117.    The strategy was clear, not just for gaming, but for mobile apps. Facebook would make money by allowing app developers to leverage its user base. Facebook would advertise social games to its users by plumbing their social data—including data about when they played games and which of their friends played them—and in exchange, Facebook would receive some amount of money per install, which would be the app developer's cost-per-install (CPI). The same plan would work for mobile applications generally.

118.    By the end of 2011 and the beginning of 2012, Facebook began discussing other ways to monetize its Platform, including its Open Graph APIs. One way was to sell API access based on usage. Zuckerberg and top executives at Facebook extensively debated a tiered approach to API access. Facebook deliberated over a pricing model for API access, and internally decided that it would be possible to sell API access to third-party developers. Facebook also decided that it could bundle API access with the ability to advertise on Facebook. However, as explained below, Facebook gave up the profits it could glean from API access for the chance to dominate the Social Advertising Market entirely, excluding competitors (both actual and potential) and leveraging network effects to achieve and maintain monopoly power.

### III.    FACEBOOK WEAPONIZES ITS PLATFORM TO DESTROY COMPETITION

#### A.    Facebook Makes Plans to Remove Vital Platform Functionality and Refuses to Sell Social Data to Competing Application Developers

119.    Although Facebook had made significant amounts of revenue and profit selling access to its social data through its APIs and its NEKO advertising system and had planned to expand that business, it chose not to, sacrificing those significant profits.

**FILED UNDER SEAL**

120.    By the end of 2011 and the beginning of 2012, Zuckerberg along with Facebook's Vice President of Growth, Javier Olivan, its VP of Product Management, Samuel Lessin, and Michael Vernal internally debated a plan to prevent third-party developers from building their own competing social networks that could be capable of generating engagement and social data independent of Facebook's Platform.

121.    Emerging mobile applications such as Line, WeChat, and Instagram were creating their own vast user bases with identity and login features separate from the Facebook Platform. Their increasing ubiquity posed an existential threat to Facebook's core business, which relied heavily on engagement from its user base. These applications provided quintessentially social applications, such as image sharing, messaging, and payments—a direct threat to Facebook's own applications, including Facebook's own fledgling Messenger application.

122.    Mobile applications were rapidly eating away at Facebook's dominance, which relied heavily on its web-based desktop product. Zuckerberg openly acknowledged that its desktop applications were not the future and that native phone apps would dominate the mobile web in the future.

123.    Zuckerberg therefore sought to consolidate core applications into its own centralized Facebook application, noting in a March 2012 Q&A with employees that Facebook was "building towards social Facebook versions where you can use the individual app or the Facebook version." That is, users could "replace whole parts of your phone with these Facebook apps and [they] will be a whole package for people."

124.    Beginning in the fall of 2011 and well into 2012, Mark Zuckerberg and his chief lieutenants, Lessin and Vernal, planned to address the looming mobile applications threat. Their solution was a scheme to disrupt the massive growth of mobile applications by attracting third-party developers to build for Facebook's Platform and then remove their access to the APIs that were most central to their applications. They would accomplish this by leveraging Facebook's "Friends" and "Timeline" APIs, as well as other vital APIs, including those relating to messaging.

125.    The Friends APIs let third-party developers traverse the Facebook Graph, searching through a user's friends as well as the friends of their friends. Zuckerberg and his executives proposed

First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

**FILED UNDER SEAL**

modifying the APIs to deny third-party developers access to information about a user's friends (and the friends of their friends) unless that developer's application was already installed by a user's friends to begin with. This ensured that new applications could not obtain new users or use Facebook's social data to increase the value of their application.

126. Facebook also foreclosed developers from continuing to extract information about a user's friends from their timeline or news feed. Thus, third-party applications that relied on the stream of information that flowed through a user's news feed, such as a post about a friend of the user getting engaged or sharing a news article, would be abruptly left with none of the social data they needed to function.

127. In 2013, Facebook extended its API "reciprocity" plan to encompass its Events API, a group of endpoints and permissions relating to live events and ticketing that were being actively used by 5,300 applications on the Facebook Platform.

128. Removing access to these APIs halted the growth of tens of thousands of third-party applications that relied on these essential APIs and were, in Facebook's view, threatening Facebook's dominance by eroding the DTBE that protected Facebook's business.

129. Facebook's plan prevented any competitive third-party application from buying social data from Facebook, either through its Platform APIs or through its advertising Platform. As Vernal explained to Lessin in August of 2012, Facebook would "not allow things which are at all competitive to 'buy' this data from us."

130. Facebook thus refused to sell its social data to any competitive third-party developer, sacrificing significant short-term profits in exchange for a competitive advantage in the Social Advertising Market. If not for the prospect of driving these competitors out of the markets in which Facebook competed, the decision to refuse to sell social data to third-party developers made no economic, technical, or business sense.

131. Third-party developers with successful applications increased the value of Facebook's overall network by increasing engagement and generating the very social data Facebook sold through its targeted advertising channels, including to developers. As Zuckerberg had observed years earlier,

**FILED UNDER SEAL**

Facebook itself could not broadly develop new third-party apps or anticipate what apps would be successful, so it relied on third parties to do so. Refusing API and social data access to third parties meant that they could not develop the applications that were vital to Facebook's growth, engagement, and advertising revenue. Facebook decided to deliberately sacrifice the value its third-party developers provided to secure dominance in the Social Advertising Market.

### B. Facebook's Social Data Heist

132. In May 2012, Zuckerberg decided to use the threat of blacklisting from its Platform to extract precious social data from some of Facebook's competitors. He instructed his executives to quietly require "reciprocity" from major competitors that used Facebook's Platform. The reciprocity Zuckerberg demanded was the very lifeblood of these competitors' businesses—the social data harvested from user engagement on their competing networks.

133. By the middle of 2012, Facebook began to block some of its competitors from using its Platform and thereby obtaining Facebook's social data. Facebook had already blocked Google, including its competing social network Google+, from access to Facebook's APIs and advertising platform. With respect to Twitter, Instagram, Pinterest, and Foursquare, Facebook would demand "reciprocity" or blacklist them. Reciprocity, of course, meant that these competing social networks would have to hand over their most valuable asset—their social data—to their rival Facebook.

134. If rivals did not comply with Zuckerberg's demands to hand over their social data to Facebook, Facebook would simply take it. In May 2012, Vernal directed his subordinates, Douglas Purdy (Director of Engineering for Platform) and Justin Osofsky (VP of Global Operations), to build "our own hacky scraper" and a "bunch of scrapers" to crawl rival sites like Twitter and Instagram and harvest their social data—with or without their consent. If Twitter or Instagram refused to agree to Zuckerberg's "reciprocity" proposition, Facebook would use the scrapers to obtain the data instead.

135. In August 2012, Facebook considered broadening its list of companies to shake down for social data—or to block entirely from Facebook's Platform. That month, Facebook's then VP of Business and Marketing Partnerships, David Fischer identified other potential product categories and competitive companies in each category to block:

FILED UNDER SEAL

I'd expect that a large part of the market for our network will come from current and potential competitors. Here's the list that Jud worked up of what we'd likely prohibit if we were to adopt a ban on "competitors" using a broad definition:

- Social network apps (Google+, Twitter, Path, etc.)

- Photo sharing apps (Picasa, Flickr, LiveShare, Shutterfly, etc.)

- Messaging apps (WhatsApp, Viber, Imo, KakaoTalk, etc.)

- Local apps (Google+ local, Google Offers, Yelp, yp, etc.)

- Social search apps (HeyStaks, Wajam, etc.)

- Platforms (Google Play, Amazon, etc.)

136. Facebook thus identified its direct, horizontal competitors for social data, including those competitors that had, or could create, rival social advertising platforms. These categories of competing applications, particularly on mobile platforms, threatened Facebook's business because they created social networks independent of Facebook, each capable of generating their own valuable social data. If Facebook lost control over these companies, it would lose access to the social data they generated, which meant Facebook's own product could not drive engagement and sell advertising. This was because Facebook's machine-learning algorithms—used to target users for advertising and content, including by granular demographics—required social data to function.

137. In August 2012, Facebook gave a presentation to its Board of Directors that included various revenue models to monetize its Platform, including its APIs. The Board understood that Facebook could monetize its Platform by charging per company, per application, per user, or per API call.

138. But Facebook opted to do none of those things. Instead, it decided to sacrifice those profits in the short term to obtain complete control over the growing mobile application and advertising markets, thereby maintaining and furthering its dominance of social data and the Social Advertising Market.

139. Facebook's plan was to instead block competitors from using its Platform, thereby preventing them from eroding the DTBE that protected Facebook's business. In the case of a select few companies with social data that Facebook needed to maintain and grow its own business, however, Facebook would coerce them into agreements to share their most valuable social data with Facebook. If

FILED UNDER SEAL

they refused, Facebook would blacklist them and take it from them anyway with its own crawling software that would scrape their public-facing site for information.

140.    In September 2012, Zuckerberg formalized his order to shut down the Friends and News Feed/Timeline APIs and to coerce rivals into providing their valuable data to Facebook on pain of blacklisting. On October 30, 2012, Vernal notified his subordinates of Zuckerberg's decision:

> We are going to dramatically reduce the data we expose via the Read API . . . . We are going to change friends.get to only return friends that are also using the app . . . . Since friends.get will only return other TOSed users' data [data from users that agreed to an application's terms of service], that means we no longer need the friends_* permissions. We are going to remove/whitelist access to the Stream APIs [the News Feed API]. We are going to limit the ability for competitive networks to use our platform without a formal deal in place . . . . We are going to require that all platform partners agree to data reciprocity.

141.    This decision meant several things: (1) when a third-party application called the Friends APIs, it could not obtain information about a user's other friends unless those friends already had installed the application; (2) the News Feed APIs would no longer provide information about a user's connections; (3) access to those API could be "whitelisted" for third-party developers that were offered—and agreed to—data reciprocity; and (4) reciprocity would be required for any access to the APIs.

142.    In November 2012, Osofsky, who was then head of Facebook's Platform, summarized the policy changes required by the decision:

> Policy changes: define competitive networks + require they have a deal with us, regardless of size. Maintain size-based thresholds for all other developers to force business deals. Require data reciprocity for user extended info to ensure we have richest identity.

143.    Facebook knew that these changes would eliminate the "growth channel used by 23% of all Facebook apps" and that 89% of the top 1,000 iPhone apps relied on the full friends list API, with 75% of the top 1,000 iPhone apps relying on the Friends permissions APIs. Facebook determined that popular applications on its platform with millions of customers would break as a result of the decision, including FarmVille, ChefVille, CityVille, Skype, Spotify, Xobni, Texas Holdem, Yahoo, Trip Advisor, Microsoft's Birthday Reminders, Samsung's clients, Glassdoor and dozens of others.

**FILED UNDER SEAL**

144.    On November 19, 2012, Zuckerberg broadly announced his decision to block competitors or require full data reciprocity for continued access. Facebook's COO Sheryl Sandberg immediately ratified the decision, adding that "we are trying to maximize sharing on Facebook, not just sharing in the world," with the note that the distinction was a "critical one" and the "heart of why."

145.    Facebook began preparing its 2013 plan for its mobile advertising business, which included the launch of a new version of its Platform, version 3.0. Platform 3.0 would (according to Facebook) facilitate Facebook's transition from its desktop advertising business to a mobile advertising business. A central element of the transition plan was the implementation of Zuckerberg's decision to remove the Friends and News Feed APIs.

146.    Vernal explained Zuckerberg's decision to other Facebook employees in November 2012, noting that he believed the amount of data that Facebook required from competitors was "crazy":

> [A company must share] every piece of content by that user that can be seen by another user. What Mark is saying is he wants certain partners (I assume not all) to give us news feeds on behalf of their users, which is kind of crazy.

147.    Facebook continued to formalize its plan to require the right to crawl the sites of its competitors as a condition of access to its Platform. In November 2012, Facebook's Group Product Manager, Rose Yao explained the scheme:

> We also reserve the right to crawl a partner website for the user's data. Partners cannot blacklist or block Facebook from crawling your site or using the API. If they do, Facebook reserves the right to block the partner from using our APIs . . . . The theory behind Action Importers was that we needed to balance the leverage. You can call our APIs and access our data, as long as we can call your APIs (if you have them) or crawl your web site (if not) and access your data. It's one thing to drag your heels, but if we're the ones doing the work then we force you to make a decision—either you allow us access to your data, or you block us. If you block us, then it's really easy/straightforward for us to decide to block you. What's changed? ***When we first started discussing this, we were talking about doing this only for top partners. I think a lot of folks interpreted this as just a negotiation tactic—we'd just threaten to do this if they didn't cooperate. What's changed between then and now is that this is now very clearly not a negotiation tactic—this is literally the strategy for the read-side platform.***

FILED UNDER SEAL

(emphasis added).

148.     Thus, what began as a negotiation strategy to extract social data from rivals became the foundation of Facebook's Platform strategy. For competitors that posed enough of a threat to create their own rival network, Facebook required them to hand over the only leverage they had—the social data they derived from their users' engagement.

149.     For some rivals that directly competed, no amount of data would justify access to Facebook's Platform, and for nascent threats that relied on Facebook's platform that did not have any useful data to extract, Facebook's decision was to simply cut off their access to the Friends and News Feed APIs, killing their businesses almost immediately.

150.     Vernal expressed concern about the strategy to Zuckerberg in November 2012, noting that he was skeptical that competitors such as Pinterest would allow Facebook to take their social data. If they, as well as others, did, Facebook would become a central exchange for data collected among competitors. That is, competitors would share the data to Facebook and Facebook would then share that data back to the competitors that participated in the scheme. ***Facebook would become a data-passthrough mechanism***.

151.     In December 2012, despite recognizing that API access, particularly when bundled with Facebook's NEKO advertising platform, was profitable, Facebook decided not to charge for API access and began full implementation of Zuckerberg's decision.

152.     Although Facebook had planned to announce its decision not to allow access to Friends data through its Friends and News Feed APIs in a public blog post, Zuckerberg vetoed that decision in December 2012. Instead, Zuckerberg decided to enforce the decision selectively and covertly after deliberately analyzing Facebook's competitors. Some competitors would be blocked entirely from the APIs, while some select few would be blocked only if they did not provide their own social data to Facebook.

**C.     Facebook Targets Its Competitors for Reciprocity or Denial of API Access**

153.     Beginning in January 2013, Facebook began an internal audit of all of the applications that relied on its Platform. It immediately identified competitors to shutdown entirely from accessing

**FILED UNDER SEAL**

Facebook's APIs or advertising platform. Specifically, Zuckerberg ordered that WeChat, Kakao, and Line be restricted from using the Friends and News Feed APIs and even from advertising on Facebook's NEKO and other platforms.

154.    Facebook's David Fischer balked at the decision, noting that blocking competitors even from the advertising platform was irrational and unworkable:

> I continue to believe we should allow ads from competitors for several reasons: We should be secure enough in the quality of our products to enable them to compete effectively in the open marketplace . . . . It looks weak to be so defensive. This will be a challenge to enforce. We have many competitors and the list will grow in time. How will we judge retailers and e-commerce sites as we grow Gifts, since they arguably are competitors too?

155.    Fischer was right. The decision made no rational economic or business sense. The sole purpose of refusing to sell social data as part of the Facebook Platform or through advertising was to shut out competition and allow Facebook to dominate the Social Advertising Market. Aside from that anticompetitive purpose, the decision to refuse to sell social data or advertisements even at full price was so facially irrational that Facebook's own employees who may not have been fully privy to the anticompetitive scheme protested at the irrationality of the decision.

156.    That same month Facebook's Osofsky pleaded with Vernal to make an announcement that would send a clear signal to developers, but Vernal responded that Zuckerberg had already rejected that approach. As Vernal explained, telling developers about the decision means bearing the "very real cost" of "changing the rules," including the "PR cost" of betraying developers that Facebook had induced to build for Facebook's APIs and Platform.

157.    That same month, Facebook continued to implement Zuckerberg's decision to blacklist competitors. He ordered that Facebook competitor Vine be "shut down" from Facebook's API and Platform, including from advertising. Facebook had again sacrificed the profits it would glean from increased engagement and advertising revenue as a result of Vine's use of Facebook's Platform in exchange for the exclusion of Vine from the competitive landscape.

FILED UNDER SEAL

158.    Indeed, Facebook's mobile advertising platform was growing rapidly, and blocking large companies from using it made no economic sense other than to effectuate Zuckerberg's scheme to prevent rivals from competing with Facebook. In a January 20, 2013 email, Facebook's then-Director of Product Management and Platform Monetization team, Deborah Liu reported: "Neko grew another 50% this week! Hit a high of $725k Friday (see charge below). We are now 5% of total Ads revenue and 21% of mobile ads revenue."

159.    Lessin responded to the news: "The neko growth is just freaking awesome. Completely exceeding my expectations re what is possible re ramping up paid products."

160.    Liu was clear, however, that the increased revenues occurred notwithstanding the blacklisting of formerly large spenders, such as WeChat: "WeChat and other competitive networks are no longer advertising on Neko based on policy."

161.    In February of 2013, Facebook shut down Yahoo!'s access to key APIs, resulting in direct negotiations between Yahoo!'s Marissa Mayer and Facebook's Sheryl Sandberg in order to restore Yahoo!'s access to the Facebook Platform.

162.    In March 2013, Facebook's key Platform employees began to voice concern that the approach taken by Facebook of shutting down access and then coercing "data reciprocity" was problematic. They instead encouraged making an upfront announcement that the APIs would be unavailable and then negotiating a deal for access to Facebook's Platform. In an e-mail that month from Purdy to other Facebook employees and executives, he wrote:

> I have been thinking about the challenges around reciprocity and competitive enforcement (friends.get, etc.) and fact that *it is all post facto*. The way we are structured today, you build an app on FB and then launch and then we may just shut you down, harming users and the developer. I wonder if we should move as quickly as possible to a model in product where all you get from platform is login (basic info) and sharing without approval. All other APIs are available in development, but have to be approved before the app launches to real users (basically all apps using friends.get have to have that capability approved). We are roughly on course to deliver this as part of unified review, save for the more granular approval for things like friends.get? What I love about this too is we could make our whitelists so much cleaner by making each capability an approval thing. Marie: I think makes your "deprecations" much easier. Thoughts?

163.    Although Facebook moved towards full deprecation of the APIs with the exception of those with whitelisting agreements, it continued its campaign of quietly shutting down competitors' access to the APIs and then asking them to make a reciprocity deal. Indeed, Facebook soon thereafter shut down three competing Amazon apps, resulting in Amazon protesting that the decision "will break 3 of our live integrations."

164.    That same March in 2013, Facebook used API and Platform access as leverage to acquire rival Refresh.io. Facebook internally decided that it would threaten Refresh.io with denial of access to the APIs unless it sold its business to Facebook. That same form of leverage would be used to acquire other rivals—either they sold to Facebook or they saw their business ejected from Facebook's Platform.

165.    In 2013, Facebook also began using mobile spyware company Onavo to secretly track application usage on customers' phones. Onavo, through deceptive terms of service, tracked app usage in real time, and Facebook used that data to target specific competitors. By April 2013, Olivan was using Onavo to track Snapchat, Pinterest, WhatsApp, Tumblr, Foursquare, Google, Path, vine, Kik, Voxer, MessageMe, Viber, GroupMe, Skype, Line, and Tango. One internal Olivan presentation contained detailed usage data for these applications from August 2012 to March 2013.

166.    By July 2013, Onavo data was providing detailed intelligence to Facebook on 30 million Onavo users. Among all of the apps, the data showed the meteoric rise of WhatsApp, a direct competitor to Facebook's own fledgling product, Messenger.

167.    Armed with detailed intelligence about its competitors—both on and off the Facebook Platform—Facebook ordered a detailed audit of Facebook applications that relied on the Friends and News Feed APIs.

168.    Facebook's Director of Developer Platforms & Programs, Konstantinos Papamiltiadis, reported back that there were 40,000 apps using the APIs that were to be restricted, with 7% of them being photo or video sharing apps.

169.    Facebook then began to categorize these third-party applications into three general categories: (1) developers that "may cause negative press" if their access to APIs were shut down; (2) applications that "provide strategic value"; and (3) applications that were "competitive" or "not useful to

FB. Application developers that would experience "a Major Business Disruption/Kill" as a result of the restriction of API access received a "PR flag."

170.    In response to the categorization, Lessin immediately ordered his subordinates to "shut down access to friends on lifestyle apps . . . because *we are ultimately competitive with all of them*." (emphasis added).

171.    As Facebook continued its analysis of the applications that relied on the Friends and News Feed APIs, it became clear that Facebook's plan would result in the deprecation of the "majority of the API surface"—namely, the APIs that were the most essential parts of the Facebook Platform.

### D.    Facebook Decides to Add the Events API to Its Reciprocity Scheme

172.    In February 2013, Facebook internally decided to begin "Scaling Event Advertising." However, in order to target social advertising in this area, Facebook's systems would need to ingest large quantities of accurate events and ticketing data. (*See* PALM-004809292; PALM-001336845.)

173.    By Summer 2013, Facebook was ready to move forward with a plan to supplement identity information and scale events-focused social advertising by using location, intent, and transaction data typically within the hands of live ticketing and events aggregators and merchants. (PALM-010304019.)

174.    A team of Facebook Platform Partnership employees including Rob Daniel, Jackie Chang, Simon Cross, and Ime Archibong initially attempted to acquire this data straightforwardly from various brokers and ticket vendors, includng TMS, SongKick, and EventSource. However, Facebook's efforts were rebuffed or met with prohibitively expensive monetary demands. (*See, e.g.*, PALM-010304019 (five thousand dollars a month just for "movie time and location data" from TMS).)

175.    In Autumn of 2013, Facebook settled upon a new tactic to acquire events-related social data: expanding its reciprocity scheme to encompass the Events API.

176.    The Events API comprised a collection of endpoints, groups, and permissions in Graph, Rest, and FQL that allowed Platform developers to publish events to Facebook, to view Event Pages on Facebook, and to view a list of Facebook Events joined by an application's users and that user's friends (among other things). On October 8, 2013, Facebook Product Manager Eddie O'Neil reached out to engineer Dev Chakravarti to inquire about who was using the Events API and whether it could be

FILED UNDER SEAL

deprecated as part of the PS12n initiative. Chakravarti—apparently confused by the whole line of questioning—was directed by O'Neil to Simon Cross, who was at that time handling Facebook's effort to acquire events-related social data to bootstrap events-focused ad targeting. O'Neil then sent Chakravarti information about "Platform Simplification (PS12n)," among other links. (*See* PALM-000721698, at 701-02.)

177.    Over the next week, O'Neil and Chakravarti corresponded about technical issues regarding the Events API. O'Neil made clear that Chakravarti was to find evidence that could "[h]elp defend why we need to 'protect the graph'" so that Facebook could defensibly deprecate the Events API. However, Chakravarti reported back, after extensive technical analysis, with just the opposite: the Events API comprised a specific collection of endpoints, groups, and permissions in Graph, Rest, and FQL that were being actively used by 5,300 apps on Facebook's Platform, and "***[t]here doesn't appear to be any illegitimate activity, nor is it concentrated in any single app.***" (PALM-000721698 (*emphasis added*).)

178.    Facebook nonetheless decided to add the Events API to its Platform scheme. On March 24, 2014, Facebook's Jackie Chang told Simon Cross to deprecate the Events API as part of PS12n and attached an Excel spreadsheet with all the endpoints, groups, permissions, and other functionality the deprecation would encompass. Chang instructed Cross to "include this removal as part of PS12N being introduced at f8" and to deprecate the API on April 30, 2014, along with the Friends and News Feed APIs (PALM-000152576.)

179.    Facebook used the impending "deprecation" of the Events API to seek reciprocity deals with nearly every major player in the live events / ticketing space. From October 2013 to April 30, 2015, Facebook pursued reciprocity agreements with EventBrite, Ticketmaster, Ticketfly, Fandango, Paciolan, AEG, Flixster, LiveNation, and Stubhub. During this period, Facebook successfully entered into reciprocity agreements with Ticketfly and EventBrite in which Facebook was given access to these developers' events data in exchange for whitelisted access to Events API functionality.

180.    On February 28, 2015, Ime Archibong checked in with Simon Cross to ensure that Ticketfly and Eventbrite would be whitelisted for the Events API before the API was publicly deprecated. (PALM-003949478.)

FILED UNDER SEAL

### E. The Decision to Remove Developer Access to the Friends, News Feed, Events, and Other Crucial APIs Lacked Any Legitimate Justification

181.    The engineers tasked with implementing Zuckerberg's decision to restrict access to the APIs were baffled. The decision made no technical sense whatsoever. Indeed, there was no justification for it other than to squelch competitors who threatened Facebook's dominant position and DTBE.

182.    As Facebook engineer, David Poll, had written to all Platform Engineers earlier in 2011, the decision would mean gutting the Facebook Platform of functionality used—and needed—by some of the most important mobile apps built on Facebook's Platform:

> I was thinking about the Platform 3.0 friend list change a bit as I was using my Android phone tonight and realized that two for the apps that most impact my day-to-day mobile experience will be completely, irrevocably broken by this change . . . . In both of these cases, the apps are adding real value to my experience, and in both of those cases, I have zero expectation that any of my friends will be using the app. The fundamental problem I'm having with this change is that my friend list is my information—it's part of who I am, and for Facebook to shut down this access primarily comes across to me as FB intruding upon and shutting down my own access to my own information.

183.    Poll concluded, "No matter how you slice it, this change is going to have a significant negative impact on my day-to-day smartphone experience."

184.    Poll was correct. The change meant breaking applications that added significant value to Facebook's network and increased valuable user engagement on Facebook's core product. The decision to deliberately break these applications had only one plausible purpose—to strengthen the DTBE and to ensure that competitors could not create rival social networks that could compete with Facebook.

185.    That proposition was entirely obvious to those responsible for Facebook's Platform. In an August 2013 e-mail, senior Platform engineer Bryan Klimt wrote to Ilya Sukhar, Facebook's Head of Developer Products and Senior Engineer working on its APIs, and others working on Facebook's Platform, stating that the reason for the decision to block access to the Friends and News Feed APIs was to exclude competitors and that all other reasons were simply false and pretextual. To begin with, Klimt was clear that the removal of the APIs was "ridiculous" because they were so essential to the Facebook Platform:

I'm trying to write a post about how bad an idea it would be to remove the api that lets you get a list of user's friends from Facebook Platform. In order to illustrate my point, I'd like to satirically suggest removing some API that is so core to the developer experience and that removing it would be ridiculous on its face. For example, removing the Windows API method that lets you create a new window. Or removing the Twilio API method that lets you send a text message. Both suggestions are utterly insane. The problem is, for Facebook Platform, removing the method to let you get a list of friends literally is already that ridiculous. I can't think of an example more ridiculous to parody it with.

186.    Klimt then dispelled any notion that the APIs were being removed for any technical or functionality-driven reason:

Before we discuss in more detail, I'd like to clear up some misconceptions about the deprecations. I've heard some rumors floating around about why we are doing this. But many of them are clearly pablum designed to make engineers think this decision has solid technical reasons. It does not. 1/ This API can be abused so we can remove it. False. That is a non-sequitur. Lots of APIs can be abused. Our whole product can be abused. That's why we have one of the best teams in the industry at detecting and stemming abuse. That team, plus Unified Review, is more than sufficient to deal with any theoretical abuse coming from this API. Even if this were true, who wants to be in that classroom where the whole class is punished for transgressions of a few?

187.    Klimt also was clear that the APIs were not being removed in favor of new or different APIs providing the same features:

2/ It's okay to remove because we've provided alternatives for common uses. False. If you think that's true, then I don't think you realize why developer platforms exist. If we wanted to limit Facebook to the set of use cases we've already imagined, we could just do that ourselves, and not even have a Platform. The purpose of a Platform is to let people build new things on top of it. It's to enable the whole universe of ideas that anyone in the world could think of. Developers out there will have all sorts of crazy ideas. We want them to build those crazy ideas on top of Facebook. Do you know why Facebook was originally built for the WWW instead of being part of CompuServe or AOL's proprietary networks? It's because the web is an open and extensible platform. It lets developers make their craziest become reality.

188.    Klimt then explained that the real reason was to hurt Facebook's competitors and prevent them from competing with Facebook:

**FILED UNDER SEAL**

So, if neither of those reasons explains why we are doing this, what's driving it? The only reason I've heard that makes sense is that we are worried about people "stealing the graph", ***we are doing this as a protectionist grab to make sure no one else can make a competing social network by bootstrapping with our social graph***. Okay, so let's assume for a minute that the social graph does belong to us, and not to our users. And let's even go so far as to assume that this is a real problem, although, I'm not convinced it is. I mean, concerns that other companies will steal our friend graph may just be paranoia. But for the sake of argument, let's say it's not. Then what? ***We're removing the core API in our developer platform. Out of concerns that someone will steal our social network product.*** That sends a clear message to developers: Facebook Platform comes second to Facebook the Social Network Product. This has been a criticism all along with our Platform. When you go read the blog posts critical of our Platform, they all hit on this same point. When our APIs are subjugated to the whims of our other products, they can't be stable. And an unstable platform isn't really a platform at all. So then you are left with 2 big problems. 1/ How do you convince external developers to build on a platform where the most basic core APIs may be removed at any time? I mean, the only big value we bring to the table right now is in distribution and discovery, and that's going to encourage developers to do only the most superficial integration with Facebook. Basically, they're going to do just enough to be able to use Neko ads. 2/ How do you convince internal developers to work on Platform knowing it's only ever going to play second fiddle to the rest of the company? I mean why should any of us work on a product that could be crippled at any time to benefit another team? If I worked on Platform, I would be seriously reconsidering my options if this API gets deprecated.

(emphasis added).

189.     Klimt was clear—the decision to remove the APIs lacked any technical or business justification other than to prevent a competitor from creating a competing social network, eroding the DTBE protecting Facebook's business. Any proffered justification by anyone at Facebook to the contrary was entirely pretextual.

190.     Moreover, the decision to remove the APIs permanently destroyed the value of Facebook's Platform. If developers could not trust Facebook to maintain the APIs as stable parts of its Platform, they would not risk writing apps for the Platform in the future. The decision meant scuttling Facebook's valuable Platform for the ability to prevent a rival social network from taking hold.

191.     Sukhar responded to Klimt, noting that he agreed and that he "talks about this every single meeting." His pleas to Vernal, Purdy and Zuckerberg to reverse their decision fell on deaf ears. The decision had been made and Klimt and Sukhar would have to implement it.

192.     Facebook continued its audit of apps that relied on the APIs. Most of the Apps were important to the Facebook ecosystem. Indeed, Facebook acknowledged they "are not spammy or crap, but apps users like a lot." Nonetheless, Facebook's Papamiltiadis concluded that, among others, apps like Sunrise, Yahoo, IFTT, Friendcaster, MyLife, Sync.me, YouTube, Contacts+, and Bitly "overlap with Facebook products" and "could compromise our success in those areas."

193.     Facebook's careful monitoring of competitive apps continued well into 2013, and given its heavy reliance on data secretly collected by Onavo, Facebook purchased Onavo on October 14, 2013. Facebook used that data to determine which apps competed with its social network and thus posed a threat to the DTBE. It then targeted those companies for withdrawal of API access and coerced data reciprocity agreements.

194.     In October 2013, Facebook's Purdy reported that Facebook was dividing apps into "three buckets: existing competitors, possible future competitors, developers that we have alignment with on business model." Facebook's Eddie O'Neil believed that the "separation between those categories doesn't feel clean" and that the overlap was problematic. As O'Neil observed, "apps can transition from aligned to competitive and will ultimately make us sad that we leaked a bunch of data to them when they were aligned."

195.     Sukhar objected to the entire exercise, noting that he had been speaking to many dozens of developers "who will get totally fucked by this and it won't even be for the right reason." Sukhar explained that his "engineers think ***this plan is insane*** and I'm not going to support an all hands [meeting] to convince them otherwise." (emphasis added).

196.     As Sukhar noted, the decision to withdraw the Friends, News Feed, and Events APIs from the Platform made no technical sense whatsoever, and Sukhar could not bring himself to tell his engineers—who saw through the ruse—otherwise. It was obvious that Facebook was seeking to squelch potential competition—namely, by preventing user growth and engagement for competitive apps. As one

FILED UNDER SEAL

Facebook engineer commented about the obvious purpose of the plan to remove the APIs: "I understand we want to make it hard for a developer to grow a new app."

197. The review of apps continued and specific decisions with respect to certain highly sensitive competitors were escalated to Mark Zuckerberg. As one internal Facebook e-mail explained:

> We maintain a small list of strategic competitors that Mark personally reviewed. Apps produced by the companies on the list are subject to a number of restrictions outlined below. Any usage beyond that specified is not permitted without Mark level signoff.

198. In December 2013, Klimt complained to Sukhar about the audit and categorization process:

> So we are literally going to group apps into buckets based on how scared we are of them and give them different APIs? How do we ever hope to document this? Put a link at the top of the page that says "Going to be building a messenger app? Click here to filter out the APIs we won't let you use!"
>
> And what if an app adds a feature that moves them from 2 to 1. Shit just breaks? And messaging app can't use Facebook login? So the message is, "if you're going to compete with us at all, make sure you don't integrate with us at all."? I am just dumbfounded.

199. As Poll recognized in response to Klimt's complaint, the changes to Facebook's Platform were "more than complicated, it's sort of unethical." Klimt agreed with the assessment, noting that the API removal "feels unethical somehow . . . . It just makes me feel like a bad person."

**F. Facebook Prepares to Announce Removal of the APIs**

200. Zuckerberg decided to announce the API removal under the cover of a major change to the Facebook Platform, codenamed PS12N, which would be announced at the next Facebook F8 Developer Conference. Facebook's engineers were accordingly instructed in September 2013 to bury the changes to the API and announce them quietly along with the changes that would be announced at the conference.

201. In the run-up to its API withdrawal announcement, Facebook continued its audit of applications on its platform that were using the APIs. During that process Facebook continued to classify

potential competitors, including LinkedIn and AirBnB, as companies that would be denied access with no whitelist exception.

202.    Although Facebook knew that the APIs were going to be removed by the next F8 conference, it continued to tell developers to rely on them. As a Facebook Platform evangelist noted about one particular document frequently shared with developers, "the language in here around friend permissions is very counter to our upcoming platform simplification efforts" and "feels against the spirit of where we are headed."

203.    That was, however, precisely what Facebook wanted—to continue to entice developers to build their software and their businesses on APIs that made them dependent on Facebook. The use of the APIs meant that competitors could be abruptly shut out of the market, useful apps could be extorted for valuable social data, and the rest could simply be destroyed.

204.    By October 2013, Facebook required certain application developers it chose to whitelist to sign Private Extended API Agreements, which obligated them to purchase large amounts of advertising or to provide their own valuable social data to Facebook in exchange for continued access. That month, for example, Facebook whitelisted Royal Bank of Canada's application in exchange for the purchase of social data through Facebook's NEKO advertising platform. Additionally, October 2013 was the month in which Simon Cross and others began actively soliciting Private Extended API Agreements from Events API developers.

205.    Facebook catalogued and tracked developers on its platform that would likely complain about the decision, creating negative press. Facebook's internal employees tasked with crafting a PR message explained the undertaking in a December 2013 e-mail:

> In prep for Platform Simplification, we're putting together a list of developers who we think could be noisy and negative in press about the changes we're making: Primarily we think it will be a list of the usual suspects from past policy enforcements. We'd love to pull from your historic knowledge on the topic. Is there anybody you'd add to the list below? We're going to build plans around how we manage and communicate with each of these developers. There are also comms plans in the works for working with developers who are high ad spenders and friends of Mark/Sheryl."

**FILED UNDER SEAL**

206.    Facebook planned to manage its message carefully, as its decision likely would alienate even those developers who were making large purchases of social data from Facebook through ads and/or who were friends of Facebook's two most senior executives, Zuckerberg and Sandberg. Those developers were identified and the message to them was carefully crafted to avoid a PR disaster. For most application developers, however, the decision would result in the complete exclusion of their applications from Facebook's ecosystem—which would likely be fatal to their businesses.

207.    Facebook targeted potentially "noisy" or "negative" developers individually, including, but not limited to, the following applications and developers: iLike, Rock You, Zynga, Path, Flipboard, Slide, Social, Fixer, SocialCam, Viddy, BranchOut, Vince, Voxer, Message Me, Lulu, Anil Dash, Super Cell, Kabam, Washington Post, Guardian, The Wall Street Journal, Jason Calacanis, Cir.cl, Bang with Friends, Tinder, Social Roulette, App Wonder, Ark, Vintage Camera, and Girls Around Me.

208.    Facebook also used call-log data secretly collected by Android users to target developers and applications to be shut down.

209.    The entire process led Facebook engineer George Lee to lament:

> We sold developers a bill of goods around implicit OG [Open Graph] 2 years ago and have been telling them ever since that one of the best things they could do is to a/b/ test and optimize the content and creative. Now that we have successes. . . . We're talking about taking it away . . . . [Developers] have invested a lot of time to establish that traffic in our system . . . . The more I think about this, the more concern I have over the pile of asks were [sic] making of our developers this year. PS12N is going to require them to alter how they deal with APIs (and for limited value).

210.    Thus, as Facebook continued to prepare its API withdrawal announcement, Facebook's own executives recognized that Platform developers had been conned into relying on Facebook's APIs. Facebook knew full well that it intended to remove the APIs, but it allowed and encouraged developers to build entire businesses on and around them. As Lee put it, they were sold a "bill of goods."

211.    By 2014, it was clear that with the exception of a few apps and developers, most would be denied access entirely to the Friends, News Feed, and Events APIs.

**FILED UNDER SEAL**

212.    In January 2014, Zuckerberg debated denying API access to dating apps. Facebook decided that it would whitelist Tinder and other anointed dating apps and shut down the rest, clearing the way for the selected apps to dominate the dating market. Zuckerberg reasoned that although Facebook would ultimately create its own dating app, it would let Tinder and a select few others to survive until Facebook's competing app was ready:

> I've been thinking a lot about Tinder and other people recommendation apps since about 10% of people in many countries are using a Tinder now. People recommendations seems like something that should be right up our alley, but it's currently something we're not very good at. Tinder's growth is especially alarming to me because their product is built completely on Facebook data, and it's much better than anything we've built for recommendations using the same corpus . . . . I think this is a big and important space and it's something we should have a team working on— probably to develop people recommendation Hunch sections for now.

213.    Zuckerberg became increasingly involved in assessing whether individual apps would be whitelisted when the APIs were removed. Facebook's senior-most executives accordingly prepared recommendations for his consideration. In a January 2014 presentation entitled, "Slides for Mark," for example, Facebook employees summarized the results of the ongoing app audit. The presentation observed that the changes would make it "impossible to build" an app without a whitelist agreement with Facebook. The presentation made special recommendations for apps that purchased large amounts of social data through Facebook's NEKO platform or whose developers were friends with Zuckerberg or Sandberg. The bulk of the 41,191 apps that relied on the Friends, News Feed, or Events APIs, however, would be shut out and, as a result, completely destroyed.

214.    Although the effect on these apps was clear, Facebook continued to evangelize the APIs to developers. In January 2014, Facebook's George Lee sounded the alarm to Purdy and Vernal, which fell on willfully deaf ears:

> [P]artner managers are still selling products that we ask them to sell, so when it comes to feed integration, we're still telling people to use [Open Graph]. The last f8 was all about implicit [Open Graph], so while we may have decided amongst ourselves that this is no longer the future without an alternative we don't have anything to tell current [developers] (so partners

FILED UNDER SEAL

continue to tell them to use [Open Graph] and they continue to integrate it).

215.    The plan to quietly take away the APIs in favor of a new crippled developer platform was called the "switcharoo plan" by Facebook's engineers. It was clear to all involved that the announcement of the changes to the platform at the upcoming F8 conference was cover for the radical changes Facebook planned to make to its platform—namely, the removal of the Friends, News Feed, and Events APIs.

216.    During March 2014, Facebook's engineers and employees continued to be baffled by the upcoming decision. As one employee noted:

> It seems a bit odd that we block other developers from doing things on our platform that we're ok with doing ourselves. Do we consider ourselves exempted? That seems a little unfair especially when our stance on some of these policies is that they're about ensuring trusts and a great experience. My mental model on how platform is a level playing field could be way off though.

217.    The decision made no sense to Facebook's own employees, particularly because Facebook itself needed the APIs to make their own competing applications, including Facebook's Messenger application. Facebook's executives ignored all of the concerns raised by their employees, including their API engineers, and continued to drive towards the announcement of the removal of the APIs at F8.

218.    The real reason for the removal of the APIs was kept tightly under wraps. In April 2014, right before the announcement, Vernal warned Sukhar that if any mention was made of the competitive reasons for the removal of the APIs (as Sukhar wanted), there would be a "high likelihood of breaking into jail."

## G.    The Announcement at F8

219.    On April 30, 2014, Facebook announced "The New Facebook Login and Graph API 2.0" on Facebook's website. Facebook heralded changes to its new Login system for several pages. Buried in the announcement was a quiet statement about the Platform's most important APIs—the Friend, News Feed, and Events APIs: "In addition to the above, we are removing several rarely used API endpoints; visit our changelog for details."

**FILED UNDER SEAL**

220.     These APIs were not ***rarely used*** at all. Tens of thousands of third-party apps were actively using and building on the APIs. Internal Facebook engineers likened them to essential APIs in Microsoft's Windows and were outraged at the removal. Five of the top ten Facebook Apps surveyed in December 2012 relied heavily on them. The announcement was entirely false and was deliberately buried beneath other API announcements to avoid drawing attention to the competition-crippling effect of the decision. In fact, today, the changelog referred to in the announcement is no longer accessible on Facebook's page even though years of other changes are.

221.     When Mark Zuckerberg took the stage at F8 days later for his keynote speech, there was no mention of the removed APIs. Instead, Zuckerberg emphasized the "stability" of Facebook's mobile platform just as Facebook quietly removed some of the most heavily relied-upon and necessary APIs in Facebook's Platform.



222.     At the twenty developer sessions preceding the announcement, not one mention was made of the API removal or that the upcoming changes would simply break nearly all of the more than 40,000 third-party apps that relied on the APIs.

## IV.     THE SURVEILLANCE AND ACQUISITION OF COMPETITIVE THREATS

223.     To ensure that its scheme to maintain and expand its market power would work, Facebook had to control an important source of competition: independent social networks and producers of social

FILED UNDER SEAL

data. Although Facebook could simply destroy any competition that relied on its Platform by denying access to essential APIs, this would do nothing to stop a competitor that was growing its network of engaged users entirely independent of Facebook.

224. To detect such threats before they became too formidable, Facebook sought a way to covertly surveil millions of mobile users to determine what applications they were using, and how. Mobile applications were particularly important—and concerning—to Facebook, as desktop engagement was shrinking while mobile apps rapidly proliferated. By 2012, it was clear to Zuckerberg and to Facebook that any threat to its dominance would come from a mobile application. As explained in this section, Facebook used mobile spyware on an unprecedented scale to surveil, identify, and eventually remove from the market through acquisition competitors that independently threatened Facebook's dominance and/or the DTBE protecting its monopoly, market power and business.

## A. Facebook Relies on Onavo's Surveillance of Facebook's Competitors, and Acquires and Uses Onavo's Assets

225. Onavo was an Israeli mobile web analytics company founded by Roi Tiger and Guy Rosen in 2010. The company designed spyware designed to surveil users as they used their mobile devices. To obtain extensive information on a user's usage of mobile applications and of bandwidth, Onavo cloaked its spyware in virtual private networks ("VPNs"), data compression, and even in mobile privacy apps.

226. Onavo sold the mobile usage data it collected to Facebook, which in turn used the real-time information it received from Onavo to determine which mobile applications posed a threat to Facebook's dominance and to the DTBE protecting Facebook from new entrants and competition. Facebook used Onavo data to: (a) identify and target competitors from which Facebook could demand Whitelist and Data Sharing Agreements; (b) identify and target competitors to whom Facebook would completely deny Platform access; and (c) identify and target competitors that Facebook would remove from the competitive landscape entirely through acquisition.

227. Facebook received Onavo information in real time, which included the two most important metrics for competing mobile applications—their reach and engagement. Reach measures the size of an application's user base, and "engagement" measures the extent to which users actively engage with the

FILED UNDER SEAL

application. An application with high reach but low engagement cannot generate the sort of social data that Facebook needs to feed its advertising platform with actionable targeting data. Conversely, an application with high engagement but low reach doesn't generate social data from enough people to attract a broad base of advertisers. The greatest threat to Facebook's business would come from an application that exhibited strong reach and strong engagement—and especially one that showed rapid growth in both metrics, indicating the development of network effects.

228.   As the potential threat to its market dominance from mobile applications continued to grow, Facebook sought to obtain exclusive control over Onavo's surveillance data—and over its mobile spyware code and installed base. On October 13, 2013, Facebook acquired Onavo.

229.   On its blog, Onavo's CEO Guy Rosen and CTO Roi Tiger, announced that Onavo would continue as a standalone brand: "When the transaction closes, we plan to continue running the Onavo mobile utility apps as a standalone brand. As always, we remain committed to the privacy of people who use our application, and that commitment will not change."

230.   Facebook, however, had other plans. It immediately began integrating Onavo's applications into both its business operations and its acquisition strategy. Facebook, for example, began analyzing data secretly collected from Onavo's Protect software, which was a massive surveillance and data collection scheme disguised as VPN software. Billed as a way to "keep you and your data safe," Onavo Protect in fact monitored all web and mobile application traffic on a user's mobile device.

231.   When an Onavo Protect user opened a mobile app or website, Onavo software secretly redirected the traffic to Facebook's servers, where the action was logged in a massive database. Facebook product teams then analyzed the aggregated Onavo data to determine which apps and features people were using in real time, how frequently they used the apps, and for how long. If the data in an app was not encrypted, this information was as specific as (for example) the number of photos the average user likes or posts in a week in that app.

232.   Based on a 2017 estimate, Onavo's mobile apps were downloaded an estimated twenty-four million times, and Facebook collected, compiled, and leveraged all of the collected data. By February 2018, Onavo apps had been downloaded thirty-three million times across both iOS and Android.

**FILED UNDER SEAL**

233.    As the former chief technologist for the Federal Trade Commission remarked to the press, Onavo was being leveraged against user interests to stifle competitive innovation:

> Instead of converting data for the purpose of advertising, they're converting it to competitive intelligence . . . . Essentially this approach takes data generated by consumers and uses it in ways that directly hurts their interests—for example, to impede competitive innovation.

234.    Since 2011 and through the present, Onavo products have provided Facebook with real time data about mobile users on a breadth and scale not available through any other service or app. Using Onavo data, Facebook was able to determine which potential competitors it could target for its Whitelist and Data Sharing agreements; which competitors it could destroy by denying access to crucial APIs; and which competitors is needed to remove from the market through acquisition to preserve its monopoly position and DTBE.

235.    Moreover, by monitoring potential threats, Facebook ensured that it had no blind spot—any application that posed a threat to its dominance was dealt with through anticompetitive and unlawful Whitelist and Data Sharing Agreements, destruction by denial of access to vital APIs on Facebook's platform, or by acquisition.

236.    By acquiring Onavo, Facebook obtained exclusive access to the only real-time and high-quality source for mobile app user metrics at scale. Because of the acquisition of Onavo, Facebook strengthened the DTBE by ensuring that any threat to its dominance of the Social Advertising Market was dealt with at the earliest possible stage. Indeed, through Onavo, Facebook was able to (and did) track mobile app usage and trends essentially from launch. If a potential Facebook killer was on the rise, Facebook had a unique tool to identify it before anyone else could—and Facebook used it.

237.    In the years after it acquired Onavo, Facebook continued to aggressively leverage the company's codebase in deceptively labeled apps that facilitated maximum surveillance and data collection of mobile users. For example, Facebook placed Onavo spyware in apps whose stated purposes required privileged access to user's mobile devices (in some cases, super-user privileges), allowing Facebook to gather data on virtually every aspect of a user's mobile device usage.

**FILED UNDER SEAL**

238.    The abuses by Facebook were so flagrant that on August 22, 2018, Apple banned Facebook's Onavo app from its App Store. Apple ejected Facebook's app from its marketplace because it violated Apple's rules prohibiting apps from using data in ways far beyond what is required to run the app and provide advertising. In other words, because Onavo Protect was leveraging far more data than any VPN could conceivably need, it was clear that the true purpose of the app was to spy on Onavo users, and Apple would not allow it.

239.    Indeed, the amount of surveillance was jaw-dropping. Facebook's Onavo Protect app reported on users' activities whether their screens were on or off; whether they used WiFi or cellular data; and even when the VPN was turned off. There was simply no rational relationship between the data collected and the purported purpose of the application. Put simply, a VPN that collected data even when the VPN was off was an obvious subterfuge for blatant spying on user behavior.

240.    Undeterred, Facebook repackaged its Onavo spyware as a Facebook Research VPN app. Facebook sidestepped the App Store by rewarding teenagers and adults when they downloaded the Research app and gave it root—superuser—access to network traffic on their mobile devices. Facebook has been leveraging its Onavo code in similar ways since at least 2016, administering the program under the codename "Project Atlas"—a name suited to its goal of surveilling app usage on mobile devices in real time.

241.    When the news broke in January 2019 that Facebook's Research apps were repackaged Onavo apps designed to spy on users, Facebook immediately withdrew the programs from the Apple App store.

242.    Apple again concluded that Facebook had tried to violate its policies. Using Apple's Enterprise Developer Program, which allows the installation of a certificate or policy that provides root access to an iPhone or iPad, Facebook obtained a level of administrative privilege designed for a company's internal IT department. Thus, using a system that allowed organizations to manage their internal mobile devices, Facebook provided its spyware super user access to regular people's iPhones and iPads. Apple balked at the abuse. An Apple spokesman stated:

**FILED UNDER SEAL**

> We designed our Enterprise Developer Program solely for the internal distribution of apps within an organization. Facebook has been using their membership to distribute a data-collecting app to customers, which is a clear breach of their agreement with Apple. Any developer using their enterprise certificates to distribute apps to consumers will have their certificates revoked, which is what we did in this case to protect our users and their data.

243.    U.S. Senator Mark Warner immediately called for new legislation to prevent the sort of abuse which Facebook had engaged in. U.S. Senator Richard Blumenthal issued a fierce statement rebuking Facebook's repackaging of the Onavo spyware app as "research": "Wiretapping teens is not research, and it should never be permissible."

244.    In addition to Onavo's Protect app, Facebook has attempted to deploy its surveillance software as other forms of utility applications that require extensive or privileged access to mobile devices. For example, Facebook released the Onavo Bolt app, which locked apps behind a passcode or fingerprint while it covertly surveilled users—and sent Facebook the results. Facebook also shut that app down the very day that its surveillance functionality was discovered. The Onavo Bolt app had been installed approximately 10 million times.

245.    Facebook continues to possess Onavo's code base and is likely, as it has done before, to repackage its surveillance software into yet another app. Facebook can also easily incorporate surveillance code into any of its mobile applications that enjoy massive installed bases and reach, including Instagram and WhatsApp. If left undeterred, Facebook will likely continue leveraging the surveillance software, infrastructure, and analysis that it acquired as part of its acquisition of Onavo.

### B.    Facebook Identifies Instagram as a Threat and Acquires the Company

246.    Data from Onavo reported a significant threat on the horizon likely as early as 2011 (and certainly by 2012): a photo-sharing mobile application called Instagram. That app had its origins when founder Kevin Systrom, then 27, learned to code over nights and weekends. Systrom developed an app called Burbn, which allowed users to check in, post plans and share photos. The photo sharing feature immediately became the app's most popular.

First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

247.    After meeting venture capitalists from Baseline Ventures and Andreesen Horowitz, Systrom received $500,000 of funding. Systrom soon after met co-founder Mike Krieger—then 25 years old—who focused on the user experience of the app.

248.    Seeing the positive reception to the photo sharing aspect of the Burbn app, Krieger and Systrom decided to pivot their business to focus on that feature. They studied their rivals in the category, including an app called Hipstamatic, which included photo-editing features, including the ability to add filters to photos. Hipstamatic, however, had no social capabilities.

249.    Seeking to bridge the gap between Hipstamatic photo features and Facebook's elements, Systrom and Krieger stripped Burbn down to its photo, comment, and like capabilities. They then renamed the app Instagram, containing the words "instant" and "telegram."

250.    Systrom and Krieger worked tirelessly to polish the user experience of their new application, designing Instagram to streamline the process of taking photos on mobile devices and uploading them to a social platform. The app had a minimalist focus, requiring as few actions as possible from the user. After eight weeks of fine-tuning, the app entered its beta phase and the founders prepared to launch it on iOS.

251.    On October 6, 2010, Instagram launched on iOS. That very day it became the top free photo-sharing app on Apple's App Store, racking up twenty-five thousand downloads. Instagram's founders were stunned at the response. As Systrom noted after the launch: "First off, we have to say that we never expected the overwhelming response that we've seen. We went from literally a handful of users to the #1 free photography app in a matter of hours."

252.    By the end of the first week, Instagram had been downloaded 100,000 times, and by mid-December 2010, its total downloads had reached one million. The timing of the app was impeccable, as the iPhone 4, with its improved camera, had launched just a few months earlier in June 2010.

253.    With Instagram on the rise, investors clamored for a stake. In February 2011, Instagram raised $7 million in Series A funding from a variety of investors, including Benchmark Capital, which valued the company at around $25 million. In March 2011, Jack Dorsey, the CEO of Twitter, pursued the

**FILED UNDER SEAL**

idea of acquiring Instagram, and Twitter made an offer of approximately $500 million dollars for the company. Systrom declined.

254.    By March 2012, the app's user base had swelled to 27 million. That April, Instagram was released on Android phones and was downloaded more than one million times in less than one day. At the time, the company was also in talks to receive another $500 million funding round.

255.    Internally, Facebook carefully tracked Instagram's meteoric rise, including through the intelligence it received from Onavo's data collection. Instagram clearly posed a competitive threat to Facebook's dominant position, including in the rapidly expanding market for mobile-based social applications.

256.    Unlike Instagram's streamlined approach to photo sharing, Facebook's photo-sharing was onerous. As Facebook internally recognized, mobile devices were changing how users uploaded and shared photos and it was causing severe problems for Facebook's business. As an internal Facebook presentation explained:

> Before phones, people would take their digital cameras out for special events, vacations, etc. Then, they would post a bunch of photos at once—after uploading them to their computer. With phones, people take and share more photos more often. They share them individually (rather than waiting to upload a bunch at once).

257.    This resulted in a large drop in bulk photo uploads on Facebook's core social networking product—a 29% decline from 2012 to 2014. Facebook also observed that text posts were "tanking" 26% because of "migration to phones with cameras." The data was clear—Facebook had to shut down the looming threat from the new photo-sharing app. If Facebook did nothing, Instagram's user base would imminently eclipse Facebook's at its current growth rate, eroding and perhaps even destroying Facebook's DTBE. An independent app with no ties or reliance on Facebook, Instagram could become not only a competing mobile-based social app, but a social network unto itself that could rival Facebook in the amount of engagement and social data it could produce and monetize.

258.    In February 2012, Zuckerberg discussed the potential acquisition of Instagram with Facebook Chief Financial Officer, David Ebersman. Zuckerberg explained that he had "been thinking

**FILED UNDER SEAL**

about . . . how much [Facebook] should be willing to pay to acquire mobile app companies like Instagram . . . that are building networks that are competitive with our own." Mr. Zuckerberg told Mr. Ebersman that these "businesses are nascent but the networks are established, the brands are already meaningful and if they grow to a large scale they could be very disruptive to us."

259.    In response, Ebersman asked Zuckerberg whether the goals of the acquisition would be to: (1) neutralize a potential competitor; (2) acquire talent; or (3) integrate Instagram's product with Facebook's to improve its service. Zuckerberg replied that the purpose of the transaction would be to neutralize Instagram, saying that the goals of the deal were "a combination of (1) and (3)." He explained:

> One thing that may make (1) more reasonable here is that there are network effects around social products and a finite number of different social mechanics to invent. Once someone wins at a specific mechanic, it's difficult for others to supplant them without doing something different. It's possible someone beats Instagram by building something that is better to the point that they get network migration, but this is harder as long as Instagram keeps running as a product.

260.    Zuckerberg quickly understood that Instagram's meteoric rise was a threat to Facebook's entire business. With a ready-made network of users, Instagram's dominance of one of the "mechanics" fueling Facebook's engagement would mean the disruption of the DTBE protecting Facebook. If Instagram took away engagement from Facebook, Facebook would lose some of its ability to target users for content and to advertise to them, which in turn meant less engagement. The virtuous circle would reverse itself.

261.    As Zuckerberg himself put it:

> By a combination of (1) and (3), one way of looking at this is that what we're really buying is time. Even if some new competitor springs [sic] up, buying Instagram, Path, Foursquare, etc [sic] now will give us a year or more to integrate their dynamics before anyone can get close to their scale again. Within that time, if we incorporate the social mechanics they were using, those new products won't get much traction since we'll already have their mechanics deployed at scale.

262.    It was clear to Zuckerberg that what he was "really buying is time," as eventually a competitor would emerge that threatened Facebook's DTBE and dominance over its walled garden.

Zuckerberg continued the discussion through March 2012, telling Mike Schroepfer, Facebook's Chief Technology Officer, that acquiring Instagram would provide the company with "[i]nsurance" for Facebook's main product. Schroepfer agreed, responding that "not losing strategic position in photos is worth a lot of money." He added that the "biggest risk" would be if Facebook were to "kill" Instagram "by not investing in the company and thereby opening a window for a new entrant."

263.    In a message to another Facebook employee on April 5, 2012, Zuckerberg said that "Instagram can hurt us meaningfully without becoming a huge business." In contrast, he did not view other smaller firms, such as Pinterest and Foursquare, as imminently dangerous competitive threats. As he noted, if these companies "become big we'll just regret not doing them . . . Or we can buy them then, or build them along the way." In an all-hands meeting the following day, Mr. Zuckerberg responded to a question about Instagram's rapid growth by saying that "we need to dig ourselves out of a hole." He also told employees at the company that Instagram is "growing really quickly" and that it would be "tough to dislodge them."

264.    After direct talks with Mark Zuckerberg, Facebook made Instagram an offer to purchase the company for $1 billion in April 2012, with the express promise that the company would remain independently managed. Facebook consummated the deal immediately prior to its IPO.

**FILED UNDER SEAL**

265.    Facebook's own Onavo data, which was obtained and published by Buzzfeed, made clear that Instagram posed an existential threat to Facebook. By February 2013, Instagram had grown to 34% of the total user reach among all social apps.



266.    With its Instagram acquisition, Facebook's share of mobile photo sharing app users ballooned as Facebook added Instagram's 34% user reach to Facebook's own 72% user reach.

267.    Although Instagram had not at the time of the merger meaningfully monetized its user engagement and social data, Facebook quickly did so. By the end of 2013, Facebook had begun showing ads on Instagram. Since then, Instagram has become an ever-increasing proportion of Facebook's advertising revenue and a large share of Facebook's user growth.

**FILED UNDER SEAL**

268.    In 2017, Instagram generated $2 billion, or about 15 percent, of Facebook's $13 billion in ad revenue.



Instagram's estimated share of Facebook's ad revenue and growth

269.    By the end of 2018, Instagram had a billion users and was estimated to generate $8 billion to $9 billion in revenue for Facebook in 2018.

270.    Instagram also accounts for the bulk of Facebook's new revenue since the acquisition.



Facebook and Instagram's estimated quarterly ad revenue

First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

**FILED UNDER SEAL**

271.    Instagram allowed Facebook to grow its social network as Facebook's desktop and core mobile application began to stagnate. Together, Facebook and Instagram captured and monetized the social data generated across both apps.

272.    The Instagram acquisition ensured that Instagram could not become a rival social network that could generate enough social data to erode the DTBE protecting Facebook's business. It also ensured that Instagram could not build and grow its own developer platform, which would threaten Facebook's scheme to dominate the Social Advertising Market by denying and/or leveraging social-data dependent applications' access to essential functionality. The acquisition accordingly also ensured that Facebook rivals required to enter into Whitelist and Data Sharing Agreements had no other platform choice—and thus no option but to hand over their social data to Facebook. Finally, the acquisition ensured that Instagram could not sell highly targeted advertising in the Social Advertising Market, which would mean there would be a material check on Facebook's ability to raise prices.

273.    At the time of its IPO in 2012, Facebook struggled to grow its mobile product, let alone to meaningfully monetize the social data it collected through advertising. By 2019, Facebook had achieved an 83% share of the Social Advertising Market by leveraging its Instagram mobile application and its Facebook mobile and desktop applications. No other company comes close in market share.

274.    Instagram was instrumental to Facebook's explosive growth in the Social Advertising Market. From the fourth quarter of 2010 until the first quarter of 2011, Facebook's revenue was flat. From 2011's holiday cycle to 2012's opening three months (right before its IPO), Facebook actually *shrank*. Facebook then experienced a sudden reversal after its acquisition of Instagram, as mobile revenue began to account for a significant share of revenues, and Instagram allowed Facebook to grow with the rise of mobile applications.

275.    Notably, Facebook's acquisition of Instagram also allowed Facebook to exclude third-party apps that provided photo and video sharing functionality from its Platform. If an image sharing or video app contained an important feature, Facebook cloned it, thus paving the way for excluding a competitive rival from its Platform, while simultaneously taking away that rival's share of users.

FILED UNDER SEAL

276.    For example, when Snap, the maker of the app SnapChat, rejected Zuckerberg and Facebook's $3 billion offer to purchase the company and its product, Facebook flagrantly copied key features from Snap and built it into its Instagram product. Thus, when the SnapChat's "stories" feature—which allows a user to post a connected series of images and video—rapidly grew in popularity, Instagram simply cloned it. By late 2016, Instagram had launched a product that mooted one of Snapchat's most popular features.

277.    Facebook's own clunky mobile app's clone of the "stories" feature did not have nearly the same traction with users. It was Instagram that provided Facebook the platform to compete head-on with a looming threat among social photo- and video-sharing apps. Without Instagram, Facebook would have faced direct competition. Instead, it leveraged Instagram to obtain and maintain its dominance among social mobile apps and the lucrative social data they generated.

278.    Put simply, the acquisition of Instagram dramatically increased Facebook's market share of the Social Advertising Market and strengthened the DTBE protecting Facebook's business.

C.    **Facebook Acquires WhatsApp**

279.    In February 2009, Jan Koum and Brian Acton left Yahoo and founded a new company called WhatsApp. Koum had an idea for a mobile application that displayed user statuses in an address book on a smartphone—indicating, for example, whether a user was on a call, had low battery, or was at the gym. The pair enlisted the help of a Russian developer, Igor Solomennikov, to build the app. Koum spent days writing backend code for the app to allow it to sync with any phone number in the world.

280.    Although the app—named WhatsApp—was initially unsuccessful, a June 2009 development changed everything. That month, Apple introduced "push notifications" for iPhone, allowing developers to ping app users even when they weren't using the app. Koum immediately updated WhatsApp to ping a user's entire network of friends when their status changed.

281.    The feature eventually became a form of instant messaging. Because messages sent through WhatsApp instantaneously notified other users even if the phone was not running the app in the foreground, it became ideal for broadcasting messages to connections within a user's social network, which was built on their phone's contact list.

**FILED UNDER SEAL**

282.    At the time, WhatsApp's only significant competition for this sort of instant messaging was BlackBerry's BBM—which was exclusive to BlackBerry's proprietary hardware platform. WhatsApp, on the other hand, tapped into the vast network of app-enabled consumer smartphones that had emerged, particularly Apple's iPhone.

283.    WhatsApp continued to innovate, including by introducing a double checkmark that showed when a message was read by another user. Wanting more from text messaging, including the limited MMS protocol used by cellular networks, WhatsApp set out to build a multimedia messenger system to send messages across a social network in real time to mobile devices.

284.    Because WhatsApp's messaging used the mobile phone's Internet connection rather than text messages, the app allowed users to avoid text messaging fees entirely. In some countries, text messages through cellular providers were metered. WhatsApp's ability to send messages to any user with a phone using the Internet was its most sought-after feature.

285.    In December 2009, WhatsApp updated its app for the iPhone to send photos. User growth spiked, even when WhatsApp charged users for its service. Having created a unique combination of image and messaging apps as one socially powered app, WhatsApp decided to stay a paid service and grew while generating revenue.

286.    By early 2011, WhatsApp was one of the top twenty paid apps in Apple's U.S. App Store. The company attracted the attention of venture capital firm Sequoia, and WhatsApp agreed to take $8 million of additional funding in addition to its original $250,000 seed funding.

287.    Two years later, in February 2013, WhatsApp's user base had ballooned to 200 million active users. That month, WhatsApp raised additional funds—another $50 million from Sequoia, at a valuation of $1.5 billion.

FILED UNDER SEAL

288.    Internally, Facebook had carefully tracked WhatsApp's rapid rise. Engagement data from Facebook's Onavo spyware reported that WhatsApp was rivaling Facebook's own Messenger product and held third place in terms of user reach among mobile messenger apps for iPhone in the U.S as of April 2013.





289.    The broader picture was even more threatening to Facebook. As Buzzfeed reported, Onavo had tracked messages sent through WhatsApp and the number dwarfed Fakebook's own mobile product by more than twofold.



FILED UNDER SEAL

290.    The same Onavo data reported by Buzzfeed showed massive engagement among WhatsApp users, placing it in sixth place behind Facebook's own core product; Facebook's newly acquired Instagram; Twitter; Foursquare; and Snapchat.



291.    WhatsApp, although lacking Facebook's market reach, was drawing from the same pool of limited attention. Given Facebook's own fledgling Messenger App, WhatsApp exposed a massive vulnerability in Facebook's business model. WhatsApp was built on a social network derived directly from a smartphone user's contact list. It did not require Facebook's graph network for growth and could not therefore be shut down by revoking access to Facebook's APIs. Nor could Facebook demand that WhatsApp enter into a Whitelist and Data Sharing agreement.

292.    WhatsApp posed a direct threat to Facebook's business, including the DTBE protecting its dominance. WhatsApp allowed for statuses, image sharing, and texting—all of the principal features of Facebook's core products. By 2013, the size of WhatsApp's network and the user engagement in that network made WhatsApp the most direct threat to Facebook's market dominance—and because of Onavo, Facebook knew it.

293.    To ensure that it maintained its DTBE, and thereby its dominance of the Social Advertising Market, Facebook sought to remove WhatsApp as a competitor. As the *Wall Street Journal* reported, Facebook's Vernal internally commented in 2013: "Whats App launching a competing platform is

FILED UNDER SEAL

1 definitely something I'm super-paranoid about." Vernal understood that if WhatsApp created a rival

2 platform, Facebook's own scheme to exclude rivals by leveraging its Platform would fail—developers

3 would migrate to the competing platform provided by WhatsApp.

4     294.    Internally, Facebook's management team discussed the WhatsApp threat with urgency.

5 Facebook Director of Growth Javier Olivan wrote in an internal e-mail that WhatsApp had higher levels

6 of reach and usage than Facebook in countries that it had penetrated. For example, based on Facebook's

7 internal data, WhatsApp reached 99.9% of the smartphone population in Spain, or as Mr. Olivan

8 described it, "literally everyone." By purchasing WhatsApp, Olivan suggested that they could "grow

9 Facebook even further" by exposing new users to Facebook. Additionally, by bundling free services with

10 WhatsApp and Facebook's other services, the transaction could serve as another mechanism to expand

11 Facebook's reach among WhatsApp users. Zuckerberg responded, "I really agree with this analysis."

12     295.    In an email to Facebook's CFO, David Ebersman, Olivan wrote that WhatsApp's "reach

13 amongst smartphone users is actually bigger than ours . . . we have close to 100% overlap, our user-base

14 being a subset of theirs." He explained that "in markets where they do well, they literally reach 100% of

15 smartphone users—which is a big part of the population."

16     296.    On December 13, 2013, Zuckerberg wrote to his management on competitive issues facing

17 the company. WhatsApp was among them:

18         I want to call out two competitive near term issues we face. The first is

19         WhatsApp adding a feature like this for public figures . . . If the space is
        going to move this direction, being the leader and establishing the brand

20         and network effects matters a lot. This alone should encourage us to
        consider this soon. . . . When the world shifts like this, being first is how

21         you build a brand and network. We have an opportunity to do this at scale,
        but that opportunity won't last forever. I doubt we even have a year before

22         WhatsApp starts moving in this direction.

23     297.    Using Onavo data, Facebook's data scientists modeled WhatsApp's growth, particularly

24 its engagement and reach, to determine whether it was "killing Facebook messenger," as well as how its

25 usage trends compared to Snapchat.

26

27

28

298.     Knowing about WhatsApp's size, its engagement, and its unique potential to erode the DTBE protecting Facebook market dominance, Facebook moved aggressively to remove this existential threat from the competitive landscape. In late 2013, Facebook made an initial bid of $16 billion in stock for WhatsApp. During negotiations in early 2014, Facebook raised its price to $19.6 billion—adding $3.6 billion to the original price as compensation to WhatsApp employees for staying on board at Facebook. When all was said and done, Facebook ultimately paid close to $22 billion for WhatsApp.

299.     But for the value of containing and shutting down the growth of WhatsApp's competing social network and platform, the transaction made no possible economic sense to Facebook. WhatsApp's revenues were a meager $10.2 million in 2013. Its six-month revenue for the first half of 2014 totaled $15.9 million, and the company had incurred a staggering net loss of $232 million in that same period. Facebook had paid twenty billion dollars—thousands of times WhatsApp's revenues—to acquire a money-losing company that created software functionality Facebook itself already had as part of its own products, and could easily build from scratch for a fraction of the cost of the acquisition if it wanted to.

300.     At the time of the WhatsApp acquisition, Facebook's user reach and user base and engagement was already massive—and unrivaled by any competing messaging app—but the addition of WhatsApp's user base further solidified Facebook's dominance in the Social Advertising Market. More importantly, however, Facebook had removed a serious threat to its DTBE. If WhatsApp and its nascent social platform were allowed to compete on the merits, Facebook would not have been able to leverage its Platform into continued dominance of the Social Advertising Market, including by using API access to shut down competing third-party apps and to demanding access to other apps' most valuable social data as a condition for their existence.

301.     Moreover, because the reach and engagement on WhatsApp generated (and generates) significant social data that Facebook could (and can) leverage and monetize through its mobile advertising channel, Facebook's DTBE strengthened as a result of the WhatsApp acquisition, fortifying Facebook's unrivaled dominance in the Social Advertising Market, and strengthening Facebook's ability to exclude potential entrants to this market from gaining a foothold with a rival messaging or photo-sharing app.

FILED UNDER SEAL

## V.   FACEBOOK CONTINUES TO ENTER INTO EXTENDED API AGREEMENTS AFTER THE APRIL 2015 PLATFORM CHANGES.

302.   Facebook continued to enter into Extended API agreements after the April 30, 2015 Platform changes, including in late 2016 and throughout 2017 and 2018.

### A.   Facebook Continues to Enter Into Whitelist Agreements for Events API Functionality.

303.   Many of these new agreements pertained to Facebook's Events API, which allowed developers to publish events to Facebook, view Event Pages on Facebook, and view a list of Facebook Events joined by an application's users and users' friends. Like many core Platform APIs (*e.g.*, those pertaining to friends, news feed, messaging, and media sharing), Facebook's Events API—which comprised a large, enumerated group of endpoints, groups, and permissions—was publicly deprecated in April 2015 as part of Zuckerberg's Platform scheme—despite an engineering analysis of this API concluding that it was widely and actively used (by approximately 5,300 active apps) and that "[t]here doesn't appear to be any illegitimate activity, nor is it concentrated in any single app" with respect to Events API usage. (PALM-000721698, at 699.)

304.   This was, however, the point: in early 2013, Facebook made the decision to target advertising based on events-related information, and it had been unable to cheaply acquire sufficient events-related social data to bootstrap this new business on its own. As a result, it had belatedly added the Events API to its PS12N deprecation scheme, and used the upcoming deprecation to solicit reciprocity agreements with targeted events and ticketing companies for their events-related social data.

305.   However, as of April 2015, Facebook had not entered into as many of these whitelisting agreements as it had hoped—having reached out to nine of the largest ticketing and events companies in the United States (including Ticketmaster, LiveNation, and AEG), but securing reciprocity agreements with only two events companies—Ticketfly and EventBrite.

306.   Facebook's solution was simple: it would simply keep negotiating whitelist agreements for its Events API, which it rebranded as the "Official Events API" in June 2016.

307.    Between June 2015 and August 2016, Facebook re-upped its extended API agreement with Ticketfly, and entered into new reciprocity agreements with Ticketmaster, Spectra, and TicketWeb. (PALM-003968668.)

308.    Between January 2017 and July 2017, Facebook entered into at least eight more agreements in which ticketing and events companies granted Facebook "a non-exclusive, transferable, sub-licensable, royalty-free worldwide license to use any Events Data" in exchange for access to the publicly "deprecated" Events API. The whitelisted parties to these agreements included:

- BigTree Entertainment Private Limited (Jan. 2017)
- Vendini Ticketing US LLC (Jan. 2017; Apr. 2017)
- Eventim (Feb. 2017)
- Songkick (Feb. 2017)
- SuperBoletos (Apr. 2017)
- Ticketbox Pte. Ltd. (May 2017)
- Boletia (Jun. 2017)
- eTicket (Jul. 2017)

309.    By May 2017, Facebook required Events API data reciprocity partners to install the Facebook Pixel on their websites and applications as a condition of API access. The Pixel would track ticket sale conversions off-Facebook and transfer that data back to Facebook for use in its ad targeting systems. (PALM-004839673.)

310.    From July 2017 to May 2019, Facebook entered into at least ten more Events API reciprocity agreements that required events and ticketing companies to grant a full data license to Facebook and to integrate Facebook Pixel on their website and apps in exchange for access to Events API functionality. The whitelisted parties to these agreements included:

- SeatGeek (Jul. 2019)
- Eventim (Aug. 2019)
- Ticketbooth (Sep. 2017)
- Showpass (Oct. 2017; Dec. 2017)

70

**FILED UNDER SEAL**

- ETK BOLETOS SA DE CV (Dec. 2017)

- Eventbrite (Mar. 2018)

- LiveNation (original May 2017; amended Apr. 2018)

- Big Neon (May 2019)

- Xorbia Technologies Inc. d/b/a/ Big Tickets (May 2019)

- Humantix (May 2019)

311.    Facebook's 2017-2019 whitelisting agreements for Events API access—all of which leveraged access to Facebook's "deprecated" Events API functionality to provide Facebook with event-related social data for use in Facebook's ad targeting systems—helped Facebook to fortify and maintain the DTBE surrounding its social advertising business. This conduct, which was a continuation of the specific wrongful conduct Facebook engaged in during its PS12N Platform scheme, harmed competition in the Social Advertising Market, and contributed to the anticompetitive overcharge suffered by Plaintiffs and the putative classes.

**B.    Facebook Continues to Enter Into Whitelist Agreements for Friends API Functionality.**

312.    Facebook also continued to enter into other Extended API Agreements, including for Friends API functionality, after the April 30, 2015 Platform changes.

313.    For example, between May 2015 and November 2015, Facebook entered into at least six Platform API Extension Agreements providing identified developers with access to Friends APIs and other functionality. These developers included Audi (May 2015), Microsoft Windows Phone (June 2015), Sony (July 2015), Harlem App Collective (August 2015), Microsoft Xbox Live (August 2015), and Amazon (November 2015).

314.    In August 2016, Facebook entered into an Extended API Addendum with Blizzard Entertainment for access to Friends API functionality.

315.    On December 27, 2016, Facebook entered into an Extended API Addendum with NVIDIA that provided NVIDIA with access to Friends API functionality.

FILED UNDER SEAL

## VI.   FACEBOOK'S NEED FOR "SIGNAL" FROM WITHIN ITS WALLED GARDEN AND ITS EXPANSION INTO NEW SOURCES OF SOCIAL DATA.

### A.   The Aftermath of the Platform Change and the App Vacuum.

316.   After Zuckerberg made his announcement at F8 in April 2014, Facebook continued to allow access to the Newsfeed and Friends APIs for another year. By the end of April 2015, however, Facebook had finally withdrawn general access to the APIs, destroying tens of thousands of third-party apps on its Platform.

317.   Facebook quietly exempted certain developers from its decision, hand-selecting developers from whom Facebook could obtain particularly valuable targeting data; developers that made large ad purchases, especially on Facebook's new mobile ad platform, NEKO; and developers that met both criteria.

318.   Notwithstanding these exemptions, Facebook's third-party app ecosystem had been decimated. Where thousands of apps previously performed various functions on Facebook's Platform, allowing Facebook to obtain data from a broad ecosystem of third-party apps for its ad targeting, those apps were now gone—and so was the advertising revenue and user engagement those apps generated.

319.   Facebook itself was now the principal (and for many types of user data, only) source of user data from its social network—from within Facebook's walled garden. Outside developers could, for the most part, no longer query Facebook's most valuable Graph social data through the Facebook Platform. Rather, Graph data was only available to Facebook and those that it hand-selected for access.

320.   Among the apps with high amounts of engagement, Facebook had purchased two of the most successful apps with the fastest growing user bases, WhatsApp and Instagram. Fakebook's core product also included Facebook's messaging app, Messenger. Facebook's control over these properties provided it with social data from important social networking vertical products and adjacent features—namely, mobile messaging and photo sharing.

321.   With its Platform scuttled, Facebook would have to obtain engagement and social data from its own offerings, but Facebook lacked offerings in major categories, such as travel, e-commerce, streaming video, and location-based services. Facebook could no longer rely on third-party apps to obtain social data from user interactions in those spaces.

**FILED UNDER SEAL**

322.     By April 2015, Facebook's priorities had accordingly shifted. It needed its own direct avenues of collecting user data from within its walled garden.

**B.     Facebook Relies on User Identity and Engagement to Derive Critical User Intent Data.**

323.     By the middle of 2015, Facebook's business model was increasingly reliant on machine learning ("ML") and artificial intelligence ("AI"). Facebook had to collect, structure, and mine social data to derive user intent—information about the user's intent behind her actions online, including a desire to buy or consume a good or service. To do so, Facebook maintained an "identity"—a profile—associated with each user on its social network.

324.     Facebook then appended social data collected about the user to a dossier or profile associated with that user's identity. Facebook's ability to determine whether a user had a particular interest, was seeking to buy a particular good, or engaged in monetizable activity depended on the ability to first identify the user and then to gather data from the user as she moved through Facebook's walled garden.

325.     Facebook's ML and AI did not take in raw data that was immediately actionable. Facebook had to make predictions about users and needed sophisticated models to do so.

326.     The predicate task of identifying a user was, for most of Facebook's existence through 2015, trivial. Users logged into the Facebook core product, and anything that user did using that product was carefully monitored and processed as social data. That data was then used to target advertising and content to the user.

327.     This gave Facebook a significant advertising advantage and a stranglehold over the market it came to dominate—the Social Advertising Market. Facebook was the dominant social network and the gatekeeper for advertising to its users.

328.     Facebook, however, faced a critical problem after April 2015. It could only mine user data from a limited number of contexts. That was because Facebook's product offerings, without augmentation from third-party apps, were limited to functions available on the core Facebook product, Instagram, Messenger, and WhatsApp.

**FILED UNDER SEAL**

329.    Users, however, were increasingly using the Internet for other functions, such as booking travel; buying and selling goods and other e-commerce; participating in location-based social networking and other location-based services; and streaming video.

330.    To ensure that Facebook had enough social data to derive the precious byproduct—user intent—Facebook had to derive rich, mine-able data from as many of these spaces as possible. Internally, Facebook referred to these adjacent, feature-based spaces as "sub-verticals" or "verticals." Data from these sub-verticals was necessary for Facebook to derive user intent to maintain and fortify its DTBE once Facebook's third-party app ecosystem was reduced to a handful of chosen players.

331.    As Facebook's Jon Eide, Facebook's Director and Head of Monetization Applied Research and Strategy, explained in an October 15, 2014, internal Facebook e-mail, "A BIG emphasis on the ads side of the business right now is bringing in these intent signals." (PALM-006793951.)

332.    Facebook was an ad business—first and foremost—but its ad business depended on obtaining social data from users. As a result, once the Platform app ecosystem was crippled by Zuckerberg and his lieutenants' API scheme, Facebook recognized that it would have to build its own products within its walled garden in order to obtain the "signals"—streams of user data—that it could convert into actionable user intent to maintain the DTBE and its Social Advertising monopoly.

333.    Facebook explained signals in an internal presentation, dated Oct. 8, 2018:

> 1. Signals are measurable events between a user and a business or user events that indicate commercial intent (e.g., search query, etc.).
>
> 2. There are three types of signals: onsite (native actions), offsite (pixels, app events) and offline (place-visit-detection, offline API)
>
> 3. We leverage the "consumer journey" funnel to map the signal types
>
> 4. We will focus this analysis on the value signals provides for ads ranking (vs. ads targeting, organic ranking, etc.)

(PALM-006818179, at slide 2.)

FILED UNDER SEAL

### C. Facebook Ventures into E-Commerce to Obtain Signals

334.   Some of the most valuable signals and social data came from observing users make purchases and browse for goods. By the end of 2014, Facebook began developing a product—Marketplace—that would provide users on Facebook with the ability to buy and sell goods, like on Craigslist or eBay. Facebook's plan was to collect social data as users browsed, posted, and transacted on Facebook Marketplace, then derive user intent information that could be used for precise ad targeting.

335.   Such intent signals were also necessary to make product recommendations to users. If, for example, Facebook could determine that a user was looking for a particular type of shoe, it could recommend other similar shoes to the user, increasing the chance that the user would make a Marketplace purchase. This ability was highly monetizable for Facebook, as it provided advertisers on Facebook with a direct means of targeting particular goods to particular individuals who were inclined to buy them.

336.   The Marketplace product would, however, directly compete with existing e-commerce offerings, most notably with eBay, a longtime C2C (customer-to-customer) e-commerce giant with close historical ties to Facebook.[2]

337.   Internally, as the destruction of Facebook's Platform ecosystem loomed in late 2014, Facebook recognized that it would need to derive rich targeting data from various "sub-verticals" to maintain and fortify its social data targeting dominance and the DTBE surrounding Facebook's business—and e-commerce was one of the most important of these sub-verticals. Without a rich Platform ecosystem of data sources and without the kind of competitive leverage over existing big players that Facebook was able to wield during the Platform scheme, Facebook needed a new strategy to derive social data from key sub-verticals like e-commerce. The company settled upon a new plan: it would actually

---

[2] For example, for years eBay had been the parent company of Paypal—a company founded and directed by Peter Thiel, a Facebook board member and close advisor of Mark Zuckerberg. eBay and Facebook also had direct apex-to-apex communications and longstanding business relationships. In 2007, Facebook and eBay collaborated to build an eBay app for the Facebook Platform. (PALM-007694915.) In 2008, Sheryl Sandberg met with eBay CEO John Dohonoe to solicit his help in securing a Facebook-Skype partnership. (PALM-003211348.) In 2010, Dan Rose met with eBay CTO Mark Carges at the Facebook offices to explore "deeper ways that eBay and Facebook can partner together, starting with Facebook connect." (PALM-006447517.) In 2013, Sheryl Sandberg personally negotiated private advertising purchases on Facebook with eBay. (PALM-003240712.)

enter targeted sub-verticals in earnest with Facebook-branded products, thereby capturing needed social data on its own. All that remained was for Facebook to determine exactly which sub-verticals it needed to move into to maintain its DTBE and Social Advertising dominance.

338.    In order to develop this strategy, Facebook hired more than 100 corporate strategists and put them under Eide, a Ph.D. data scientist who had previously worked at Bain & Company and was tasked with setting Facebook's long-term social data extraction and mining strategy. In particular, Eide and other strategists at Facebook analyzed the company's data targeting business and consumer data trends across the Internet and identified concrete sub-verticals that Facebook should move into.

339.    Marketplace was one of these—representing a source of rich e-commerce signals that would help Facebook maintain the DTBE, and thereby its Social Advertising market power and price premiums.

340.    As Facebook delved into the details of its new Marketplace product, its strategists realized that signals would be critical to Marketplace itself, including to develop and optimize the new product's recommendation engine, but also recognized that the flipside was true—signals from a C2C e-commerce product would be invaluable to maintain and protect Facebook's social ad targeting dominance. As Eide explained in his October 15, 2014 e-mail:

> I bet [signals] could be used for a marketplace optimization (e.g., What types of products to recommend the user). And even the other way around e.g. If we got a large marketplace, we could use their browsing/purchase history for ad targeting.

(PALM-006793951.)

FILED UNDER SEAL

341.   Facebook's Marketplace product would provide it with important user intent signals, but it would also competitively threaten e-commerce companies that bought ads from Facebook—including eBay. Internally, Facebook flagged the potential conflict:





(PALM-006799270.)

342.   As Facebook noted in an internal presentation authored by Eide, dated August 16, 2015, the "[h]ighest risk sub-verticals are those they [sic] share similar marketplace business models," and those advertisers, including Amazon, Wish, eBay, and Zalando, accounted for approximately $2 billion of Facebook's projected ad revenue in the next year. (PALM-006799270.) Moreover, mass retail, such as Nordstrom and Walmart, was expected to spend approximately $800 million in advertising on Facebook. (*Id.*)

343.   One significant source of potential tension between Facebook's e-commerce advertisers and the nascent Marketplace product was Online Behavioral Advertising ("OBA") data—data collected from users that respond to third-party ads by clicking or making purchases. Through OBA, retailers and e-Commerce companies that advertised on Facebook handed Facebook actionable data about their customers. With Facebook's Marketplace product, OBA data from third-party retail/e-commerce activity

could be fed by Facebook into its AI/ML models to further strengthen Marketplace against those same third-party retailers/e-commerce sites—and at the same time would concomitantly strengthen Facebook's Social Advertising dominance through DTBE fortification.

344.   In 2015 (and thereafter), Facebook collected OBA and other data about its users once they responded to a Facebook ad and went to an advertiser's site. Facebook continued to track the user (who was uniquely identifiable to Facebook as a specific person in Facebook's Social Graph, *i.e.*, Facebook's collection of distinct human persons within its walled garden of apps) on the external site using the Facebook Pixel.

345.   The name Pixel was given to Facebook's off-site tracking system because a third-party website embedded a single pixel (a 1x1 image) on pages throughout its site, which would then load from Facebook's servers as a user traversed the Internet, in many cases triggering cookie reads or writes. Information from the Pixel provided to Facebook a road map of a Facebook user's off-site activity across the Internet, in real time.

346.   Facebook's Pixel allowed Facebook not only to determine whether (and in what way) an identified user responded to an advertisement within Facebook's walled garden, but to see whether and in what way that advertisement resulted in a "conversion"—a targeted outcome or action, like a purchase or a user's submission of a form—or some sort of failure. This sort of rich information was fed directly back to Facebook to plug into its AI and ML models, to better target would-be conversions in the future—permitting social targeting by Facebook that could not be replicated by any other would-be Social Advertiser.

347.   Facebook's collection of OBA data offsite using Pixel was important to Facebook's maintenance of its Social Advertising dominance because it made Facebook's ad targeting more effective, which in turn compelled advertisers to use Facebook's Pixel on their sites. This created a virtuous circle—as well as a significant conflict with third parties that both competed with Facebook's Marketplace (and/or other sub-vertical products Facebook introduced after its Platform scheme sunsetted) and advertised on Facebook.

**FILED UNDER SEAL**

348.    Every bit of data these advertisers fed to Facebook, including through the Facebook Pixel, made Facebook's products better—not just its social advertising products, but its new sub-vertical products like Marketplace—which for advertisers like eBay, increased competitive pressure on those advertisers' own products. For Facebook, which cared principally about harvesting data for its ad business, the principal strategic concern was that Facebook needed to fuel its ML and AI systems, and for that, it would need precious signal data, which as the open Platform drew to a close needed to be collected from Facebook's Pixel and from advertisers.

349.    Eide, in his August 2015 presentation, succinctly laid out both the feedback loop from Pixel and the potential concerns competitors would likely have:

- Core Ads DR strategy dependent on **optimizing against business outcomes** which requires a signal (pixel, app events, etc.) and optimization against it

- This leads to **prisoner's dilemma** (vicious or virtuous cycle) e.g.,: losing OBA signals (pixel, app events, SPI) → lower performing ads due to less signal → less advertiser sharing signal and optimizing against it, etc.

- Merchants will be worried if FB uses signals to aid competitors and/or FB in the MP, **AND** if **the merchant doesn't get equal access to that opportunity**.

(PALM-006799270, at 272 (bold text in original).)

350.    As Eide observed, convincing advertisers with competing sub-vertical products to provide their data to Facebook for advertising would require assurances that Facebook would treat them equally. This meant that with Facebook's expansion into sub-verticals like Marketplace, competitive and potentially competitive advertisers (*e.g.,* eBay and other e-commerce sites) were hesitant to provide Facebook with Pixel data—a key component of Facebook's data targeting models—unless these advertisers could be assured that they would benefit from the data other similarly-situated advertisers provided to Facebook to train its models.

351.    If Facebook played favorites—provided one of its advertisers access to data from other advertisers or allowed large advertisers to opt out of the data pool fueling Facebook's Ad platform—it

**FILED UNDER SEAL**

would undermine the effectiveness of Facebook's social advertising products, perhaps even triggering a negative feedback loop as Eide noted. This could threaten the DTBE and potentially permit competition at scale with Facebook in the Social Advertising market, thereby killing the golden goose at the heart of Facebook's entire business: the ability to extract monopoly rents from social advertisers.

352.    Facebook continued to work on the new Marketplace product throughout 2015 and well into 2016. Facebook internally recognized the risk that the new product posed to its ad revenues—and, through potential negative network effects if large advertisers pulled out of Pixel, to Facebook's entire Social Advertising dominance. But Facebook needed rich e-commerce signals (and signals from other targeted sub-verticals) after the demise of its Platform in 2015, so simply doing nothing was not an option either. As Mary Ku—a product manager who joined Facebook after a decade at eBay/Paypal—reported to Zuckerberg on August 19, 2015:

> Impact on ads business: While we are building Marketplace for the long term, if we are not careful, we can have a short term negative impact on the ads business before we build out sustainable value. Several large advertisers are marketplaces and multi-channel retailers who may find our launch threatening to the extent that they may decide to pull ad spend or investment in key strategic ad products (e.g., dynamic product ads). The Facebook marketplace is good for partners who themselves are not marketplaces but clear messaging and value exchange will be needed to help them understand our intentions and value proposition. This situation is particularly risky during Q4 holiday season.

(PALM-006214005.)

353.    By January 2016, Facebook quietly rolled out early versions of Marketplace to certain, well-connected users, iteratively testing its product. (PALM-008624396.) The initial results were positive, prompting Facebook to move towards expanding its testing to include additional Facebook users. (*Id.*)

354.    Facebook launched Marketplace on October 3, 2016, with a focus mostly on customer-to-customer transactions. The initial product was to compete with sites like Craigslist, but Facebook expected to expand its product to encompass sales from businesses. TechCrunch reported on Marketplace the same day as its launch, heralding the new functionality:

**FILED UNDER SEAL**

> Facebook Marketplace lets you browse a relevancy-sorted feed of things to
> buy from people who live nearby, and quickly list your own stuff for sale.
> Integration with Facebook Messenger lets you haggle or arrange a meet-
> up, and you know more about who you're dealing with than on anonymous
> sites like Craigslist thanks to Facebook's profiles.

355.    Facebook's Marketplace was launched as the central feature on Facebook's mobile

product in 2016. In fact, Facebook placed an icon for Marketplace at the center of its mobile app's

navigation bar.



356.    TechCrunch noticed the prominence of the new feature. It was clear to the news outlet that

Facebook was making a large bet on Marketplace:

> Facebook is betting big on Marketplace, considering it's taking over a main
> spot in the navigation tab bar, replacing the Messenger shortcut in
> Facebook for iOS. That prime location could make Marketplace the digital
> version of impulse buys at the checkout counter.

357.    Facebook's goal was to rapidly expand Marketplace's exposure to its users. The more

Facebook users interacted with Marketplace, the more signals Facebook collected. These signals were

FILED UNDER SEAL

1   some of the most valuable social data Facebook (or any advertiser) could collect: data about its users'

2   intent as they navigated a bazaar of goods.

3       358.   What users did in Facebook's Marketplace product (buying, selling, viewing, saving, and

4   *not* buying, among other things) told Facebook's AI and ML not only what identified users wanted to

5   purchase or sell, but also what they were interested in, and how they acted in known potential-purchase

6   situations. Importantly, these signals would come from identified, logged in users, interacting with

7   Facebook's products. Facebook could append the signals and social data it collected to the identity-based

8   profiles powering its ad targeting AI and ML systems—a powerful way to maintain Facebook's DTBE

9   against any would-be Social Advertising entrants.

10      359.   On December 18, 2017, then-Facebook Vice President Deborah Liu—another

11  eBay/Paypal alum, who came to Facebook straight from nearly a decade at eBay—and her team internally

12  discussed with Eide the pressure that using signal from a competitive Marketplace product would place

13  on Facebook's ad revenue. "I worry about anti-competitive claims of trying these together as FB

14  marketplace could be seen as a direct competitor to other marketplaces," Facebook monetization principal

15  Robby Banks explained. (PALM-005186374.) A principal focus of the lengthy, multi-email discussion

16  between Liu's team and Eide was eBay. Eide wrote:

17          Imagine E-bay seeing this and realizing that all of their pixel data is now
18          being used to power our marketplace that enables others to compete
            directly with them with their data. How can we show Ebay that their data
19          is disproportionately helping Ebay? Or any other advertiser determining
            that we are using their 1st party intent data (e.g. CA inclusion, etc.) in
20          marketplace where they can't compete yet as a B2C? WSJ article will write
            itself on top of failing our principles.
21

22  (PALM-005186377.)

23      360.   In the first half of 2018, Facebook found auto and rental posts to be the most prominent

24  use cases on Marketplace. (PALM-007676555.) Facebook was harvesting powerful signals from

25  Marketplace, largely because they were based in part on a combination of user behavior, purchases, and

26  searches. This sort of social data was of great value to Facebook's ads business because it showed user

27  intent.

28

**FILED UNDER SEAL**

361.    By December 2018, Facebook was testing an extension of its Marketplace product to include full-blown e-commerce features, including purchases while within Facebook's walled garden. Deborah Liu reported on the tests on December 5, 2018:

> This past Cyber Week, Marketplace tested extending from C2C to also becoming an e-commerce destination. Even though Black Friday week is an extremely competitive time period, we used this holiday shopping season to build out new user acquisition channels, test messaging to attract new shoppers, improve our understanding of e-commerce, and strengthen merchandising to inform 2019 plans. We exited this week answering a long-term critical strategy question—whether people would trust and be willing to buy products on Facebook at scale. We did 300k transactions in a week which gave us signal that with the right products at the right price, shoppers will overcome trust concerns and buy onsite. More importantly, the platform was stable, having withstood 100+ QPS with a checkout conversion rate of 30%, and now we are closely monitoring post-transaction customer experience with shipping, returns and customer support. It is still really early as we move to e-commerce, but this holiday season proved we can drive onsite transactions and grow this business.

(PALM-002454510.)

362.    Facebook carefully monitored the "signals" it was receiving from its Marketplace product. By May 2019, Marketplace was being used a case study throughout the company for onboarding new signals to the company's ad targeting systems. As Facebook's Ashish Nayyar—another eBay/Paypal alumnus, who came to Facebook straight from eight years at eBay/Paypal—reported to Deborah Liu and others on May 17, 2019:

> Case study: lastly, Marketplace is being used a [sic] case study across the company to onboard other surfaces into the broader signals xfn to use organic signals across ig, blue, messenger and wa.

(PALM-010596356.)

363.    Marketplace signals also drove revenue from Facebook's News Feed. As an October 24, 2018, report from Brad Winters to Deborah Liu stated:

> Marketplace Signals in News Feed Ranking: We currently estimate MP signals drives +0.5% incremental News Feed revenue, and estimate it will grow to +0.75% by Q4'19. Based on conversations with the DS team, we

**FILED UNDER SEAL**

believe this is a lower bound and the ads signals team is running tests this
quarter to refine this estimate.

(PALM-003883413.)

364.     Facebook had successfully moved into the e-commerce space, pitting its business against the likes of Craigslist and eBay. However, as explained in Section VI of this Complaint, instead of simply competing on the merits in this new sub-vertical, Facebook leveraged its entry into the space to strike a series of anticompetitive deals with its longtime business partner eBay that would provide Facebook with the data and signals it needed to maintain its Social Advertising monopoly without the burden of aggressive competition with e-commerce rivals. Facebook's agreement with eBay helped to fortify Facebook's DTBE and maintain its monopoly position in Social Advertising, at the expense of competition in e-commerce sub-verticals—and to the detriment of Social Advertising consumers like the Plaintiffs and the putative classes.

### D.     Facebook Moves into Location-Based Services

365.     By the end of 2015, Facebook faced nascent competition from a growing location-based social network, Foursquare. Foursquare had expanded the concept of the social network to the physical world, allowing its users to "check in" at various locations, notifying friends of their whereabouts.

366.     In July 2014, Foursquare had split itself into two apps—Swarm and Foursquare. Swarm would focus on location-based messaging, while the Foursquare app would focus on local recommendations based on a user's location. Both apps threatened to make inroads on Facebook's social networking business through innovations in location-based services.

367.     Foursquare had laboriously developed the data required for its location-based social network, including information about places of interest, restaurants, shops, and other places frequented by its users. Foursquare provided this information to third-party integrators and apps through the Foursquare API. TechCrunch described Foursquare's data, API, and network of integrators in a May 5, 2015, article:

> Places by Foursquare, meanwhile, is the company's repository of Places, a database of about 65 million points of interest that the company says can be used as an end-to-end location solution. This is the database that is built

**FILED UNDER SEAL**

out not just through the network of developers who use Foursquare's API—which includes companies like Citymaps, Microsoft and Garmin—but also through Foursquare's own apps.

368.    Foursquare's database of Places gave it a running start against Facebook in the rapidly-developing location-based services sub-vertical, and the company had aggressively built a competing social network using that head start. In December 2015, Foursquare raised an additional round of funding based on the premise that the data it had gathered was uniquely valuable.

369.    But worse for Facebook than simply Foursquare's nascent social network was the company's rich trove and pipeline of real-time socialized location data. Such data—which could potentially be used to powerfully target social advertisements in the right hands—was imminently licensable from Foursquare through its API, and this posed a significant potential threat to Facebook's Social Advertising monopoly. If Foursquare's real-time location data repository and pipeline were provided to a potential entrant at scale in Social Advertising—or Foursquare itself grew its Social Advertising products with a valuable location-based data trove while Facebook was itself still preparing for meaningful entry into location-based services, this could significantly erode the DTBE, as location-based targeting and inferences and signals relating to location were on the verge of becoming perhaps the most valuable targeting signals for social advertising.

370.    Unfortunately, Foursquare was at least a year ahead on location-based data—and the company's expansion into social networking in earnest threatened to marry location-based services with targeted social ads, imperiling Facebook's Social Advertising monopoly.

371.    As with so many other critical competitive decisions in the months and years after the 2015 demise of the open Platform, Facebook's response was to announce its own product in the location-based services sub-vertical, then seek to cut an anticompetitive deal with a leading competitor in that sub-vertical. In location-based services, Facebook sought out Foursquare, and cut a deal to maintain its Social Advertising monopoly at the expense of its new sub-vertical product.

372.    As for Facebook's new product in the location-based services subvertical, that answer came (publicly) in the first half of 2017. Specifically, by the end of March of 2017, Facebook was preparing to launch a new product—the Places Graph. This product was an API designed to allow

**FILED UNDER SEAL**

advertisers to target customers and content by location, providing a direct competitor and replacement for Foursquare's rival location-based APIs. Its first incarnation of Facebook's Places Graph accomplished this by providing information about points of interest necessary for check-in and photo geo-tagging functionality. Facebook's Anthony D'Souza described the launch version of the Places API product in a March 10, 2017 e-mail:

> For context, this is a new API we are launching that will give third-party developers access to information about 140M+ points of interest around the world (e.g., place name, opening hours etc.). It's the data set that powers use cases such as geo-tagging on Facebook and Instagram and live location sharing on Messenger.

(PALM-003853378.)

373.    Facebook planned to leverage this new technology to create a "Local" app or feature that would allow Facebook to target advertising by location. (PALM-007188391.) Facebook launched the app on November 10, 2017. The new app provided a feed providing information about friends' locations and nearby places of interest.





**FILED UNDER SEAL**

374.    Internally, Facebook projected that it would acquire significant daily user interactions from the launch of its Local product—one that would rival TripAdvisor, Yelp, and Foursquare. Facebook's Aditya Koolwal provided the projection in a January 24, 2018 e-mail:

> **Question 1: How many people do we expect to use the Local app (in the long run)?**
>
> We are approaching this in two ways:
>
> 1. Lower bound: Assume that some percentage of Local Intentful DAP on Facebook will use the app (based on Events penetration in that country)
>
> 2. Upper bound: Assume that we can be better than competitors (TripAdvisor, Yelp, Foursquare) in markets where we have reasonable traction with Events (Europe, North America, Latin America).
>
> Preliminary numbers suggest a potential DAP in the 10-20M range, which is in line with previous estimates. If we assume that we can achieve excellent performance in APAC, our long-term potential DAP increases to ~30M.

(PALM-007374711 (bold text in original).)

375.    Notably, Facebook leveraged Onavo spyware data (described below) to determine where its new product would fit among the competition:

> We are also looking at apps more generally to see which ones exceed 100M DAP. In the Local space, only one app clears that bar: Google Maps (216M). Other mapping products are surprisingly smaller (Waze: 23.3M DAP, and Apple Maps: 7.03M DAP) based on Onavo data.

(*Id.*)

376.    Facebook planned to collect valuable social data from its new Local app—namely, information about its users' interests, whereabouts, and interactions among connected Facebook friends. This data provided much needed signal within Facebook's walled garden. Local was another property Facebook could use to collect social data that Facebook's AI and machine learning systems could convert into user intent data as well as other data that would strengthen Facebook's social ad targeting.

377.    If Facebook could build its own location database and app—as it was planning to do in 2017—it was positioned to compete against Foursquare and other location-based apps, such as Yelp. As

explained in Section VI of this Complaint, however, Facebook did not end up competing on the merits with Foursquare. Instead, Facebook entered into an anticompetitive agreement with FourSquare to end competition between the two companies—permanently.

378.    In 2018, faced with a threat to its Social Advertising monopoly from Foursquare's location-based data trove and pipeline, Facebook used its imminent entry into Foursquare's sub-vertical to cut a data deal with Foursquare that helped to fortify Facebook's DTBE and maintain its monopoly position in Social Advertising, at the expense of competition in the location subvertical—and to the detriment of Social Advertising consumers, including Plaintiffs and the putative classes.

### E.    Streaming Video and Facebook Watch

379.    Another potential source of user social data that could be mined for ad-powering targeting information was streaming video. By 2016, Facebook had included a video tab in its mobile product, but long-form and episodic videos were taking hold in the market—and formed a particularly rich source of potential social data targeting.

380.    In 2017, Netflix was the pre-eminent streaming service that specialized in long-form television and movie content. Netflix's streaming service had grown significantly, from approximately $8.8 billion in revenue in 2016 to $11.6 billion in revenue in 2017.

381.    Netflix was also a powerful source of user data. The movies, TV shows, clips, sports, and episodic videos its users watched and interacted with shed light on their interests, as well as their likely purchasing decisions.

382.    At the heart of Netflix's service was its recommendation algorithms. Netflix's recommendation algorithm tailored content to particular users. As the Wall Street Journal explained in a November 10, 2018 article: "Analytics is deeply embedded in Netflix's DNA. The company mines reams of data on its subscribers' tastes to help determine which shows to bet on and how to promote them." Moreover, Netflix uses powerful AI and ML models to determine which shows and movies to license and what original programming to create.

383.    After the demise of Platform, Facebook knew it needed a rich source of video interaction data for its AI and ML models in order to maintain the DTBE protecting its Social Advertising monopoly.

**FILED UNDER SEAL**

Too many users were spending too much time watching streaming video—especially algorithmically-recommended long form videos, which generate especially powerful signal information about user's interests and attention—for this to be a blind spot in Facebook's ad targeting models. Absent such a data source for Facebook's models, a potential Social Advertising entrant—or perhaps an existing Social Advertising participant—with access to rich long-form video interaction data could erode, or perhaps even surmount, the DTBE surrounding Facebook's social advertising business, and threaten Facebook's supracompetitive profits.

384.    Moreover, a video offering was needed to increase users' session times on Facebook. If Facebook could keep its users within its walled garden, it could readily identify them, track them, and advertise to them.

385.    Facebook's response to this was twofold: to seek out a data deal with a rich source of video interaction data, and to directly enter the long-form video market at scale with Facebook's own streaming video offering.

386.    On August 9, 2017, Facebook introduced its own streaming video product, called Watch. The new product appeared as a tab on the Facebook homepage and mobile app.



First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

**FILED UNDER SEAL**

387.   Facebook monetized Watch directly by keeping a portion of video ad revenue, but Watch's true value was the rich data Facebook would collect, mine, and feed into its AI and ML systems from users' engagement and interaction with Watch.

388.   Watch allowed video to be tailored to individual users, including based on their network of friends and their habits. Facebook also curated video to users based on what others on its network were watching. As TechCrunch explained in an article dated the same day as Watch's launch:

> Watch features personalized recommendations of live and recorded shows to watch, plus categories like "Most Talked About," "What's Making People Laugh" and "Shows Your Friends Are Watching." Publishers can also share their shows to the News Feed to help people discover them. A Watchlist feature lets you subscribe to updates on new episodes of your favorite shows. Fans can connect with each other and creators through a new feature that links shows to Groups.

389.   Watch entrenched the user on Facebook's social network. The purpose was to integrate video with the rest of its product, and to increase the time Facebook's users spent on Facebook properties—inside Facebook's walled garden.

390.   Increased watch time for videos also meant that it was more valuable to advertise on Facebook's video platform. As Facebook's Kelly MacLean noted in an internal Facebook e-mail setting out talking points for Brad Smallwood, dated July 23, 2017: "As video takes off and becomes a higher % of ad spend on our platform, duration and watch time are becoming increasingly important for many of our clients." (PALM-007979632.)

**FILED UNDER SEAL**

391.     In January 2018, Facebook began internally compiling watch-time data as well as common queries for various categories of videos. Among the various categories, TV shows, funny videos, news, and sports resulted in millions of minutes of watch time:

**Potential Video Intent Queries**

| Type | Queries | Volume (Daily) | WT (Mins) | Retention | Top Countries (Vol) | Top Countries (WT) |
|---|---|---|---|---|---|---|
| FB Shows | ball in the family | 115K | 500K | tbd | US, PH, IN | US, PH, CA |
| TV Shows | enamorandonos | 7.5M | 18.8M | tbd | PH, US, MX | PH, MX, MY |
| Movies | coco | 4.4M | 6.1M | tbd | PH, US, MX | PH, MX, MY |
| Music | ozuna criminal | 2.1M | 2.3M | tbd | PH, US, MX | PH, MX, US |
| Categorical | funny videos | 8.3M | 12.7M | tbd | MX, PH, ID | MX, PH, PE |
| Publishers | tasty | 2.0M | 1.6M | tbd | IN, US, PH | US, PH, IN |
| Creators | xander ford | 2.5M | 3.75M | tbd | PH, US, IN | PH, US, MX |
| Food / Recipes | chocolate cake | 2.3M | 1.0M | tbd | US, IN, PH | US, PH, IN |
| News | pistorius sentence increase | 27.0M | 11.5M | tbd | US, PH, IN | US, PH, MX |
| Sports | barcelona live | 3.5M | 7.1M | tbd | MX, PH, US | MX, PH, US |
| Gaming | minecraft | 1.3M | 570K | tbd | US, PH, BR | PH, US, MY |
| Beauty / How To | smokey eyes makeup | 1.0M | 315K | tbd | US, PH, GB | US, MY, FR |

(PALM-005529364.)

392.     However, as with Marketplace and Local, Facebook's entry into streaming video posed a threat to the advertisers on its ad platform that also had streaming video services, including streaming giant Netflix—whose founder and CEO Reed Hastings was a member of Facebook's Board of Directors.

393.     As explained in Section VI of this Complaint, Facebook again leveraged its entry into a sub-vertical—here, video—to cut an anticompetitive deal with a would-be competitor to maintain its Social Advertising monopoly. In particular, Facebook entered into a series of deals with Netflix—headed by Facebook's own board member—to cripple competitive aspects of the Facebook Watch product in exchange for Netflix data that could supercharge Facebook's ad-targeting systems and maintain the DTBE and Facebook's Social Advertising monopoly. This injured Social Advertising consumers, including Plaintiffs and the putative classes.

FILED UNDER SEAL

## VII.   FACEBOOK'S ENTRY AND DATA CAPTURE CONDUCT

### A.   Facebook Enters Markets to Leverage Agreements that Maintain and Fortify Its Social Advertising Monopoly

394.   Facebook's business has long relied on selling advertising targeting users that interact with its properties, including Instagram, WhatsApp, Messenger, and its core Facebook product. As users actually interact with these products—*e.g.*, a user browses Instagram; chats via WhatsApp or Messenger; or navigates Facebook's website or mobile app—their identities are readily ascertainable by Facebook. These users are logged in to Facebook, and their every move tracked, logged, and converted into structured social data to be mined by Facebook's ML and AI systems.

395.   By 2015, Facebook's users were using smartphones and web applications to perform time- and attention-consuming activities that Facebook had not made part of its owned-and-controlled product. Worse still, after the (pre-planned) demise of Facebook's open Platform in early 2015, Facebook's network of external sources of social data—the sorts of "signal"-rich activities that helped Facebook target social advertisements, and would help it build ML / AI models to even more accurately target social advertisements in the future, thereby maintaining the DTBE protecting Facebook's Social Advertising dominance—was crippled.

396.   As a result, by 2015 Facebook again faced an existential dilemma for its Social Advertising monopoly: Facebook lacked signal-rich data from particular types of online activities (*e.g.,* e-commerce; location-based services; longform streaming video) to build out its ad targeting models, and a failure to obtain such data in the near-term risked eroding the DTBE to a point where a serious competitor could enter the Social Advertising Market and check Facebook's supracompetitive ad prices.

397.   Facebook could not risk any major blind spots in its valuable "signal" of social data, or else it could not effectively track identity outside of its properties. This would lead to a negative feedback loop: poor signal meant advertisers would not be attracted to advertising on Facebook because Facebook's targeting would be inferior, and because Facebook mined the information it gleaned from advertisers and their advertisements, Facebook would lose more valuable signal to mine for its ad targeting, making its ad products even less attractive to advertisers. In short, Facebook's ability to access

**FILED UNDER SEAL**

these newly ascendant data sources meant the difference between a monopoly-maintaining virtuous circle (the DTBE)—and a death spiral in the Social Advertising Market.

398.    Facebook recognized it had two options to obtain the data it vitally needed to maintain and enhance its market power: it could personally enter markets that generated such data (Facebook called them "sub-verticals"), introducing new products at scale in e-commerce, location-based services, longform streaming video, and the like; or it could get the data from existing market leaders in those sub-verticals.

399.    As to the latter option, Facebook had been trying for years to get rich targeting data from other major Internet companies—this was one *raison d'etre* of its earlier Platform scheme—but after 2015, Facebook's leverage dried up against companies like eBay, Netflix, and Foursquare, all giant data sources that could potentially service Facebook's monopoly maintenance needs, but which as of 2015 were resistant to Facebook's entreaties.

400.    As a result, Facebook settled upon the former option—introducing directly competitive products in key sub-verticals, including e-commerce, location-based services, and longform video. Thus, between 2016 and 2018, Facebook made plans to introduce Facebook Marketplace, the Facebook Places API, and Facebook Watch.

401.    Indeed, from 2016 through the present, Facebook aggressively entered sub-verticals that contained valuable signal that Facebook could mine for actionable user intent data. It was this user intent data that advertisers found attractive.

402.    Facebook needed this data for its social advertising business because of its AI and ML models. Unlike search giant Google, which had data that directly evinced its users' intent, Facebook had to determine user intent indirectly from its users' behavior.

403.    Facebook's AI and ML systems were designed to infer user intent from "passive" signals—such as behavior characteristics associated with a particular user or from distinct user attributes and social interactions.

**FILED UNDER SEAL**

404.     A search engine, such as Google's, receives a stronger indication of a user's intent, as the user enters what she is looking for into a search bar. As Facebook recognized in a June 2019 internal presentation, its method of monitoring user behavior and interaction with Facebook features, such as the Facebook newsfeed, was a passive form of user intent. Making inferences that translated passive, behavioral signals to actionable user intent required more sophisticated models.



(PALM-008492596, at 606.)

405.     Moreover, Facebook needed what it called "identity" to make inferences about its users' intent. This was because Facebook needed a collection of a user's data to identify attributes that are predictive of their intent. An internal 2015 Facebook presentation defined identity, as used in the digital advertising context, along these lines:

> Identity is "the collection of identifiers and traits of a single person across
> devices and browsers to support advertising decisions and measurement[.]"

(PALM-011711092, at 098.)

406.     In other words, a key to making user intent predictions is the ability to ascertain a user's identity, then to associate the data collected (sometimes across devices) to that user, before feeding the user's profile into ML and AI systems.

407.     For Facebook, it is trivial to identify users within its own walled garden. After all, these users are logged into Facebook. Outside of its properties, however, Facebook must probabilistically ascertain the identity of a user, then match the identified user with her Facebook-maintained profile. In

FILED UNDER SEAL

other words, outside of Facebook's walled garden, advertisers such as Google have better insight into tracking individuals across the internet, including across websites.

408.    Facebook's goal was therefore twofold: (a) to collect social data that it can mine for user intent; and (b) to do it while the user is within its walled garden and easily identifiable.

409.    Facebook's subvertical strategy was in pursuit of these goals. By 2015, Facebook knew that it needed (or would soon need) for its advertising models rich data from users' e-commerce interactions; from location-based check-ins and movements; and from the increasing hours of active video-watching as longform, premium video content moved online with Over-the-Top (OTT) streaming. This was a competitive necessity going forward—especially for a monopolist in a network effect-based market. Moreover, by providing location-based services, an e-commerce platform, or longform streaming video, Facebook would increase the amount of time its users stayed on Facebook. For example, if users are making e-commerce purchases or watching a movie on Facebook, they are not doing so on a website from which Facebook cannot collect data.

410.    The problem, however, was that Facebook faced stiff competition in many of the sub-verticals it entered. For example, Facebook faced Foursquare and Yelp in the locations sub-vertical; eBay, Craigslist, and Amazon in e-commerce and classifieds; and streaming giant Netflix in the longform video space.

411.    But Facebook knew this. And it also knew that its alternate path to DTBE maintenance—cutting deals—could be achieved with significant leverage and the right C-suite connections. This was a lesson the company no doubt learned from its 2011-2015 Platform scheme.

412.    Accordingly, beginning in 2016, Facebook's strategy to obtain the signal needed to maintain its DTBE and Social Advertising monopoly was not necessarily to defeat its competitors in the sub-verticals it entered. Indeed, doing so would cost Facebook far more advertising revenue from these companies—many of whom were major Facebook advertisers, including eBay and Netflix—than Facebook would likely gain from ruinous competition with each company on its respective home turf.

**FILED UNDER SEAL**

413. Moreover, Facebook was (and remains) first and foremost an ad business, and it had no interest in controlling adjacent markets other than for the purpose of obtaining actionable social data—namely, intent data—or to obtain revenues for its social advertising business.

414. Instead, Facebook's strategy was to enter key sub-verticals that it did not already control or maintain a major presence in—*e.g.*, e-commerce, location services, longform video—and then threaten chosen market leaders in each subvertical with either ruinous competition or, in the alternative, collusive cooperation. The chosen parties were, generally speaking, both market-leading data sources and close corporate (and personal) familiars of Facebook and its top executives—the perfect recipe for illegal collusion.

415. Thus, between 2016 and 2018, Facebook entered into at least three anticompetitive agreements with market leaders that leveraged Facebook's entrance in respective sub-verticals to guarantee that Facebook (a) received social data that it could mine from third parties, strengthening the DTBE and Facebook's social advertising stranglehold; (b) received substantial advertising revenue that fortified its monopoly position in the social advertising market; or (c) both. In exchange, Facebook would cooperate—and even assist—the third-party it supposedly competed with in the sub-vertical.

416. Based on the documents produced thus far in this action, Facebook entered into anticompetitive agreements of the nature described above with at least Foursquare, eBay, and Netflix. In the case of the latter two counterparties, Facebook leveraged its close personal and professional connections—including the presence of Netflix's founder and CEO on Facebook's Board of Directors throughout the entire relevant period—to broker a collusive deal.

417. Put simply, beginning in 2016 (and extending to the present), Facebook used the leverage it obtained from entry into key sub-verticals—including, as presently known to Plaintiffs, e-commerce, location services, and longform video—to extract anticompetitive agreements from third parties (including, as presently known to Plaintiffs, Foursquare, eBay, and Netflix), with the intent and effect of maintaining and fortifying Facebook's DTBE and concomitant Social Advertising monopoly. For most of the companies Facebook moved against, the alternative to helping Facebook secure its dominant position in social advertising was ruinous competition from one of the world's most powerful

FILED UNDER SEAL

corporations in their own markets. Plaintiffs and the putative classes paid inflated prices for Facebook advertisements as a result of this anticompetitive conduct.

### B.     Facebook Enters into an Anticompetitive Data Agreement with Foursquare

418.    From 2015 to 2016, Facebook was in increasing competition with nascent social network Foursquare. Foursquare's competitive edge—which Facebook predicted would grow exponentially more valuable in the next few years, and potentially impact social advertising—was its laboriously created database and data stream of location data, including its users' real-time location social data.

419.    Facebook moved directly into Foursquare's location-based corner of social networking beginning in earnest on January 29, 2015, when it announced its own "Place Tips" product, directly competing with Foursquare's location-based recommendation engine.

420.    Facebook expanded further into Foursquare's territory in 2016 and 2017, putting further pressure on Foursquare—which was rapidly raising capital to compete with Facebook.

421.    At the same time, Facebook began negotiations with Foursquare to acquire its crown jewel—its Places database and location-based data stream, which Foursquare made available through its API.

422.    On September 27, 2017, Facebook and Foursquare entered into an "Inbound Data Evaluation License Agreement," which allowed Facebook to examine Foursquare's data in connection with a potential deal to acquire or license Foursquare's most valuable data. (PALM-004862134.) The agreement allowed Facebook to peer into the location database and data stream of its nascent social networking rival.

423.    On or about July 3, 2018, Facebook entered into a final agreement to license Foursquare's valuable location data. (PALM-007391984.) A June 29, 2018 e-mail from John Delacruz summarized the reasons for the deal:

> **Why are we licensing this data?**
>
> Data licensing is a key part of our strategy for improving the data quality of our Business / Places graph and for improving Local Search. The data will also benefit all the products built on top of our graph across the Family.

FILED UNDER SEAL

**What markets will we receive data for?**

Foursquare will provide us with global data. Their top 20 countries ordered by record count are US, Turkey, Brazil, Indonesia, Russia, Japan, Mexico, Thailand, Malaysia, Germany, Italy, United Kingdom, Spain, Belgium, South Korea, Canada, France, Netherlands, Philippines, and India.

**What data are we licensing?**

We will be licensing their global point-of-interest (POI) dataset. The dataset contains 100+ attributes, including business attributes, location attribute, rich attributes (e.g., accepts credit cards, has parking), tips, and tastes for 58M entities.

**What impact do we expect to see?**

We expect to see improvements to business/place data quality, PVD, and Local Search. Based on our data evaluations, in the best case scenario, we would see significant percentage point PQI improvements in coverage (+18%), best category (+17%), category relevance (+5%), hours (+5%), and price range (+10%). Note that these are best case estimates assuming we are able to choose the best attribute value for each record. Actual gains will be lower, but will improve over time as we improve our ML infra. In addition, we expect to see additional gains in Local Search metrics based on the improved category data we will receive, as well as rich attribute data and content such as tips and tastes. Note we don't expect significant against to PVD quality as the scope of this deal does not include Foursquare's Place Shapes or Pilgrim Technology.

(PALM-007391983, at 84.)

424.    The same e-mail summarized the specific terms of the deal with Foursquare:

**Deal Terms**

Data and License

- Data deliverable: global POI data for 58M entities,

- Data attributes: 100+ attributes, including business attributes, location attributes, rich attributes (e.g., accepts credit cards, has parking), tips, and tastes

- License: FB & Affiliates. Perpetual right granted upon completion of term or full payment.

- Rights: Restricted on Data as delivered. Broad rights of Conflated Data.

FILED UNDER SEAL

- Restrictions: No Resale, Distribution of Raw Data. Current FB API caching policy and rate limits remain in effect for initial term, material changes to API policy present termination option to Foursquare (FB retains existing data in perpetuity in this case)

- Delivery: Full refreshes of all datasets, monthly

Fees & Payments Terms

- Initial Term: 4 years

- Facebook License Fees: $1.9M/year (total $7.6M)

- Payment Terms: Invoiced quarterly ($475k)

(PALM-007391985.)

425.    The agreement was a capitulation by Foursquare, after Facebook's entry in the location-based services sub-vertical with the announcement and development of its own Places Graph API. Faced with potentially ruinous competition from Facebook's would-be replacement for the Foursquare location API, Facebook and Foursquare negotiated a deal by which Foursquare could live on as a location-based data company, but could no longer realistically serve as a potentially competitive social network—or use Foursquare's location data edge on Facebook to scale out a serious competitor with Facebook in the sale of Social Advertising. Instead, Facebook used its competitive leverage to extract an effective exit by Foursquare from social networking and coopted perhaps the single most dangerous source of unique targeting data that could have armed a potential new (or expanded) Social Advertising competitor—Foursquare's rich location data repository and real-time location social data stream.

426.    The ultimate terms of the Foursquare agreement were truly a capitulation: even a termination of the agreement due to a material API change left Facebook with a perpetual right to access and use Foursquare's most valuable data. The data would be refreshed monthly, and the data itself would include vital tips and tastes data, as well as other "rich attributes" that could be used by Facebook to target advertising by identity.

427.    Facebook's entry into the location-based services sub-vertical had allowed it to extract Foursquare's data, neutralizing the threat that a rival (or Foursquare itself) could leverage Foursquare's API to build or expand a serious Social Advertising competitor. Now that Facebook had Foursquare's

valuable location data in hand—on the most one-sided of terms—a new (or expanded) entrant in the Social Advertising Market would at most have access to a subset of the data in Facebook's possession, and a subset Facebook perpetually received in updated form every month.

428.    By obtaining Foursquare's Places data in 2017-18, Facebook had not only eliminated one of its social networking rivals, it had prevented that rival's valuable store and stream of location data from being used by Foursquare or another entity to build or scale a social advertising business with a unique targeting edge against Facebook—the very type of competition that could erode the DTBE and threaten Facebook's Social Advertising dominance. To the contrary, through its deal with Foursquare, Facebook had strengthened the DTBE protecting its business by augmenting its store of location data, and further foreclosed meaningful Social Advertising competition for the near future.

**C.    Facebook Enters into an Agreement with eBay to Preserve Its Social Advertising Monopoly and to Strengthen the Data Targeting Barrier to Entry**

**1.    Facebook's Announcement of Marketplace Causes Concern for eBay, and eBay Threatens to Pull Ad Revenue Unless Facebook Siloed Data from eBay Ads.**

429.    The launch of Facebook's Marketplace in 2016 directly pitted Facebook against one of its closest historical partners—and a major Facebook advertiser—eBay.

430.    Founded in 1995 as one of the first successful dotcoms, eBay in 2002 acquired ascendant payments startup PayPal—founded by Peter Thiel, Facebook's first investor and longtime Facebook board member. The combined eBay / PayPal would exist until July 2015, when PayPal was spun out into its own company; during this period, no tech company had closer connections to Facebook than eBay. Facebook integrated PayPal as its first major payment provider, and the two companies intertwined themselves in each other's products for many years, even as Facebook outgrew its older companion in terms of active users.

431.    Indeed, even as Facebook prepared to launch its new "eBay killer" in 2016, two members of Facebook's Board of Directors had deep connections to eBay: Peter Thiel, who founded PayPal and ended up selling it to eBay, and Marc Andreesen, who served on eBay's board from 2008 until 2014.

432.    And nearly every senior member of the team tasked with launching Facebook Marketplace came to Facebook directly from eBay / PayPal—including its head, Facebook Vice President, Platform & Marketplace Deborah Liu, dubbed *The Woman Building Facebook's eBay Killer* by Forbes. Liu had joined Facebook straight from nine years at eBay, where she was given product ownership over "Marketplaces" and led a cross-functional team to complete post-acquisition backend integration of eBay and PayPal.

433.    Working under Liu on Facebook's Marketplace team were (among others), Senior Director of Product Management Mary Ku, another longtime eBay / PayPal alum who joined Facebook straight from the former company, and Data Science Director Ashish Nayyar, who was hired by Facebook in May 2015 after eight years at eBay / PayPal.

434.    Built by eBay alumni as an "eBay killer," Facebook's Marketplace product launched in October 2016 with great fanfare as a C2C e-commerce platform whose core features overlapped directly with eBay's principal line of business.

435.    This did not escape eBay's notice.

436.    When Facebook announced Marketplace in 2016, it consulted David Doctorow, a senior eBay executive and its Head of Global Growth, who expressed concern regarding Facebook's newly-competing product and flagged the companies' ongoing negotiation of a "Data usage agreement" concerning "Ads and Marketplace." (PALM-002815413, at 415.)

437.    At the time of the announcement, Facebook and eBay were in CEO-level negotiations about Facebook's access to and use of data from eBay's advertising, including from the Facebook Pixel and from eBay's apps. As Facebook Monetization Product Marketing Director Emma Rodgers recounted in a September 28, 2016 e-mail:

> We are also having some sensitive conversations with eBay right now around conversion pixel and app events data (Simon [Whitcombe] is leading those discussions with David Doctorow) so we are treading carefully here.

(PALM-002815413, at 415.)

438.    That day, Whitcombe provided an update:

FILED UNDER SEAL

> We've been working with eBay for a few weeks on an amendment to their pixel agreement that gives them assurances that their signals won't be used in Marketplace. This is something that [eBay President and CEO] Devin [Wenig] has requested and we've been working directly with David Doctorow, their Global Head of Growth. The goal is to have David share a draft of our amendment with Devin on Friday at which time he'll also update Devin on the Marketplace C2C launch.

(PALM-002815413, at 414.)

439.    After Facebook announced Marketplace, its executives and other high-level employees internally lamented the press coverage, which had immediately recognized and homed in on the fact that the product competed directly with eBay. This was not a great look for Facebook's longtime business partner—and an important source of e-commerce signals data for Facebook's advertising business, which whom Facebook was presently negotiating a data agreement. Facebook's Emma Rodgers explained in an October 3, 2016 e-mail:

> Yes, the press coverage is unfortunately heavily leaning on the competitive comparison. The competitive comparison definitely isn't an angle we proactively took with press but one they are making. While I tried to shift the press narrative to the organic activity happening on our platform, their interest in taking competitive spin isn't unexpected and was a key reason for the proactive outreach to our marketplace clients.

(PALM-002837128.)

440.    On October 3, 2016, Facebook employees Aiden Roberts and Steven Bair drafted talking points for ads executive David Fischer's drafted talking points for an upcoming conversation with eBay President and CEO Devin Wenig. (PALM-010554150.) The talking points indicated that eBay had increased its advertising spend with Facebook consistently every year, and prepared Fischer for likely blowback from Wenig for Facebook's introduction of a directly competing C2C marketplace in eBay's bailiwick:

> eBay Marketplaces Global Spend on FB
>
> 2014: $38.6M
>
> 2015: $57.8M (62% YoY growth; est. 4% of total budget)
>
> 2016 est. spend: ~ 80M+ (73% YoY growth; estl. 5% of total budget)

(*Id.*)

441.     During negotiations, Facebook agreed to ███████████████ to answer some of eBay's questions about ███████████████████. As the talking points noted:

> As part of a long term pitch, ███████████████████████
> ███████████████████ Their chief concern, directly from Devin, has
> been around . . .
>
> ████████████████████████████████
> ██████████
>
> ██████████████████████
>
> ███████████████████████
>
> In order to be able to do so, ████████████████████████
> ████████████████ that helps assuage any fears Devin and
> eBay have.
>
> - Specifically, ███████████████████████
>    ███████████████████████
>    ███████████████████████████
>    ███████████████████████████
>    ███████████████████

(*Id.* at 151.)

442.     It was clear from CEO-level conversations that eBay feared that Facebook's Marketplace would be a significant competitor—and one entering eBay's principal market at scale. The prospect of ruinous competition was on the horizon, and eBay sought to leverage its data and advertising expenditures to negotiate a competitive standstill.

## FILED UNDER SEAL

443. Facebook Senior Director of Product Management (and eBay / PayPal alumna) Mary Ku reported eBay's concerns to Facebook's Liu and other executives in an October 19, 2016, e-mail:

> eBay is really freaked out about Marketplace. We knew this was a possibility as we started building the product. Jon Eide had done an estimate of potential revenue loss and presented to a subset of m-team. And at a company level, we agreed that we were willing to take on the risk. However, of course, we would like to mitigate that risk as much as possible.
>
> eBay is most concerned about any of their data being used to help inform what Marketplace does, and we are concerned that we will lose hundreds of millions in current and potential revenue if we can't help them resolve this. From a MP performance impact perspective, we are totally fine excluding eBay data.

(PALM-005062864, at 867.)

444. Ku explained that although "the work to separate out their data into a different data source is really costly," the task was "about preserving this revenue for the entire company. . . ." (*Id.*) Facebook Director of Product Management Darshan Kantak, a computer engineer and data scientist, agreed with Ku's assessment, noting that the "work to cleanse the data and retain the model is substantial." (*Id.* at 866.)

445. Although eBay's data was not a significant percentage of all data collected by Facebook, siloing the data—particularly from trained AI and ML models—was a difficult engineering undertaking.

446. More problematic, Facebook's engineers were concerned with the precedent that would be set if Facebook permitted eBay to opt out of Facebook's data pool.

447. An October 2016 internal Facebook presentation noted that although other advertisers were concerned about the "competitive nature of Marketplace and data usage," eBay was the only advertiser requiring Facebook "to take action at this point." (0076370576, at 578.)

First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

FILED UNDER SEAL



448.     The internal presentation (reproduced above) noted that Facebook would have to filter out eBay's data before it was fed to the Marketplace Ranking model. (*Id.* at 579.) The presentation recommended that such exceptions should only be made for large advertisers that make up a significant amount of a region's revenue. (*Id.* at 580.) According to the presentation, only three of Facebook's advertisers would potentially qualify for such treatment under such a standard: "eBay, Amazon, [and] Wish." (*Id.*)

449.     By October 27, 2016, Facebook had prepared a draft term sheet for eBay's consideration. The background section of the term sheet set forth the problem:

> eBay works with Facebook today to run advertising. In that partnership:
>
> - eBay data is passed to Facebook via eBay's ad accounts and includes: product catalog content and event data from eBay's websites and apps
>
> - Facebook additionally collects FB Ads Data on Facebook users' interactions (e.g., clicks) with eBay ads on Facebook.
>
> Separately, Facebook builds Marketplace products:
>
> - Marketplaces are Facebook surfaces primarily dedicated to enabling e-commerce transactions between buyers and sellers (exclusive of Facebook advertising)

**FILED UNDER SEAL**

- Facebook utilizes Marketplace Models to optimize the delivery of sales posts in Marketplace

- For the purposes of this discussion on Marketplace, ▮▮▮▮▮▮▮▮▮▮▮▮▮

(PALM-011266761.)

450. As the term sheet recognized, Facebook received data both from eBay itself and from users that interacted with eBay's ads. (See *id.*)

451. The term sheet proposed that Facebook would do the following "[i]n response to eBay's concerns:"

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(*Id.*)

452. Internally, Facebook's marketing team balked at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. They regarded it as problematic for Facebook to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. More critically, the engineers tasked with ▮▮▮▮▮▮▮▮▮▮▮ did not think it was technically possible to do so. The team discussed the matter in an internal chat:

Emma Rodgers (10/28/2016 14:15:53 PDT):

> Hi guys—check out my email coming out of Ads XFN. There's general discomfort in ▮▮▮▮▮▮▮▮▮▮▮▮▮. Simon, this has implications for your discussion with eBay.

First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

Stephanie, I think you should circulate the proposed term sheet to Dan Rose, Fischer, Goldman to get alignment at that level on it.

Simon Whitcombe (10/28/2016 14:16:08 PDT):

> UGH

Emma Rodgers (10/28/2016 14:16:45 PDT):

> Yeah, Vlad raised a very important concern: ███████████████
███████████████████.

Emma Rodgers (10/28/2016 14:17:08 PDT):

> Of that's the case, ████████████████████████
███████████████.

Simon Whitcombe (10/28/2016 14:17:13 PDT):

> I'm afraid we are likely done with eBay then. ████████████
███████████████████████████.

Simon Whitcombe (10/28/2016 14:17:29 PDT):

> which I need to tell him

Stephanie Wang (10/28/2016 14:17:34 PDT):

> Yep I'm writing an email to you guys saying as much re: ████████
███████████████.

Simon Whitcombe (10/28/2016 14:17:41 PDT):

> 100% certain of this

Simon Whitcombe (10/28/2016 14:18:07 PDT):

This is wrong

(PALM-009478444.)

453.    Rodgers proposed escalating the team's concerns, particularly the concern that the task was impossible for the engineering team to accomplish:

Emma Rodgers (10/28/2016 14:19:21 PDT):

> K – we need to elevate the process on this one then. No one was comfortable committing to something that's not technically possible (of course). So, if this does mean we will lose eBay then we'll need 1).

107

**FILED UNDER SEAL**

> Commitment from Ads product leadership to partner with Mary's team to figure out if we can solve the technical limitation, 2) Commitment from Fischer and [Facebook Vice President] Carolyn [Everson] that this is important enough to do this.

(*Id.*)

454.   One member of the team, Associate General Counsel Susan Sher, warned that even if Facebook excluded eBay's product catalog information from the models running Marketplace, the metadata would still be incorporated: "One thing to note is that even if we agree to not directly use product catalog to inform marketplace, product catalog metadata goes into ads." (*Id.* at 446.)

455.   The matter continued to escalate, and by November 8, 2016, eBay's board was threatening to pull advertising spend from Facebook. Moreover, there were technical hurdles to removing eBay's data from the AI / ML models used for Marketplace. As Stephanie Wang explained in a November 8, 2016, e-mail to Facebook Vice Presidents Dan Rose and John Lagerling:

> As you may know, our recent launch of Marketplace featured strong Facebook vs eBay headlines and exacerbated eBay's concerns around data usage by Facebook. Their primary worry is that we will use the data they send us for advertising purposes to bootstrap our competitive Marketplace product.
>
> We believe eBay's concerns are reasonable since our teams do apply ad learnings to personalize Marketplace listings. The key challenge for us in answering their concerns, however, is technical—we have no blocks between Ads/Commerce data, and something like clicks (which we view as Facebook data) is fundamentally embedded into Facebook models.

(PALM-003227822.)

456.   Notably, Wang warned that eBay's concerns risked $150 million in ad revenue to Facebook:

> eBay CEO Devin Wenig is now asking for concrete protections in writing for Facebook and affiliates. eBay board concerns are strong enough such that their teams have intimated they will pull Q4 ad spend if we do not get to mutually agreeable terms. At stake: $150M revenue forecasted for Q416 and FY2017.

(*Id.*)

**FILED UNDER SEAL**

457. On November 8, 2016, Dan Rose asked Stephanie Wang whether Mark Zuckerberg had signed off on the company's proposals to eBay, and Wang committed to "get confirmation on where things stand with Sheryl and Mark, and update this group." (*Id.*)

458. Negotiations continued into the next year, and by February 2017, eBay and Facebook were considering specific language for a potential agreement. In a February 8, 2017, email, Wang recounted eBay's latest proposal for contractual language:

> As you may know we're in the middle of a negotiation with eBay on ███. This was triggered by the public launch of Marketplace—as you can imagine, ███████████████████████████████ .
>
> One of eBay's asks is around ███████████████████████ ████████████████████████ .

(PALM-008351146, at 648.)

459. In that same email, Wang further queried whether eBay's custom audiences data was being used by Facebook to assess a user's value. (*Id.*)

460. In response, Facebook Research Scientist Anand Bhalgat explained:

> [W]e do use all bids to decide the user-value (userAvgMonthlyEcpm, as well as some of the recent reserve price logic in feed ads) for various levers in both feed and IG (Lei, David to Confirm).

(*Id.*)

461. In other words, eBay's proposal was problematic because Facebook's ad framework used ad response data from its advertisers, including for eBay ads, to assess how much a user was likely to spend on purchases—the user's value.

462. By March 3, 2017, eBay and Facebook appeared to have reached an agreement. (PALM-011808391, at 392.)

FILED UNDER SEAL

### 2. The Facebook and eBay Agreement Not to Compete with Each Other

463. In a March 3, 2017 e-mail, Stephanie Wang reported to Deborah Liu, Mary Ku, David Fischer, and Facebook Ads Vice President Rob Goldman (another eBay alumnus), with many others copied, that eBay and Facebook had "now gotten to what both sides believe is the final agreement." (PALM-011808392.) Wang set forth a summary of the agreement, but first provided a "Context refresher" about the eBay and Facebook issues:

> Context refresher: Facebook's public launch of Marketplaces exacerbated eBay concerns around Facebook data. eBay's worry is that we will use the data they send us for ads purposes to bootstrap competitive commerce experiences across Facebook. As a result, eBay's CEO asked for concrete protections, in writing, to get to comfort with our ongoing advertising relationship while we simultaneously compete with their core business. At risk: $150M+ in spend.

(*Id.* (italics in original).)

464. Wang continued by summarizing the terms of the deal by product area:

**COMMERCE/MARKETPLACES**

[Approved: Marketplaces, IX, IW]

These are obligations for any Facebook marketplace that involves aggregated sales listings between sellers/buyers. Not included: any affiliates, Ads, NF, Pages, Groups, Profile:



110

FILED UNDER SEAL

(PALM-011808392, 92-93 (bold, underlining, and ellipses in original).)

465.    As Wang noted, the agreement prevented Facebook from

. In other words, Facebook impaired its position in Marketplace to strengthen its data targeting capabilities and models in its social ad business.

466.    Wang continued, describing restrictions as to eBay's product catalog:

**PRODUCT CATALOG**

[Approved:                                           ]

The restrictions here are purely about

(*Id.* (bold, underlining, and ellipses in original))

467.    Notably,

(*Id.*)

**FILED UNDER SEAL**

### 3. Facebook's Agreement with eBay Impaired Its Marketplace Product and Strengthened Its Core Ad Business

468.   Facebook's agreement was notable in what it exempted—███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████. As Wang explained:

> <u>Not in scope</u>: While we pushed back on many eBay asks, these stood out…
>
> ▮ ███████████████████████████████████
>
> ▮ ██████████████████████████████████████
>
> ▮ █████████████████

(PALM-011808393 (underlining in original).)

469.   In June 2019, Facebook prepared an internal presentation that, among other things, attempted to quantify the effects of the eBay agreement. Facebook's internal data made clear that the agreement had resulted in a significant decline in the number of Pixel events and share of Pixel events data that eBay contributed to Facebook's data pool:



(PALM-008915674.)

FILED UNDER SEAL

470.    It was clear that Facebook was allowing eBay to contribute comparatively less to the data pool underlying Facebook's models, including by prohibiting the use of eBay's data in the Marketplace targeting AI and ML models. (*See id.* at slide 4.) This meant that eBay would obtain the benefit of other advertisers' data, but would have to contribute very little of its own to the pool, disadvantaging other advertisers.

471.    By entering into the agreement, however, Facebook ensured that its market power in the Social Advertising Market was not just maintained, but strengthened. First, Facebook could use eBay's valuable data, including purchasing signals, to optimize ads across its business, strengthening the DTBE and helping forestall entry or expansion by any other Social Advertising source (especially one with a trove of e-commerce signals). Second, eBay continued to pump hundreds of millions of dollars in ad revenue into Facebook's core ad targeting business, directly backstopping demand and prices.

472.    The net effect of the agreement was that Facebook and eBay agreed not to compete with each other in their core businesses. Facebook would impair the data targeting for its Marketplace product—the competitive lifeblood of that nascent business—and eBay would bolster Facebook's ads product in exchange, contributing powerful signal data and hundreds of millions of dollars in ad purchases. The agreement between Facebook and eBay increased the pool of social data powering Facebook's ad business, strengthened the DTBE, and provided Facebook with increased revenue—all of which helped Facebook maintain its monopoly position in the Social Advertising Market.

**D.    Facebook Enters into an Anticompetitive Data Sharing Agreement with Netflix**

**1.    Reed Hastings and the Facebook-Netflix Relationship**

473.    eBay was not the only Silicon Valley giant with longstanding, board-level connections to Facebook.

474.    In 1997, Reed Hastings, a Stanford-trained computer scientist, left his job as CTO of a large debugging company to found Netflix, a startup that combined two emerging technologies—DVDs, which were just beginning to replace VHS cassettes, and a website to order them from. However, as

## FILED UNDER SEAL

Netflix rapidly grew and began receiving large amounts of data from its subscribers' online choices and actions, the company rapidly pivoted to a machine learning and AI juggernaut.

475.    With the growth of streaming video as a preferred method of consuming premium Hollywood-style content, Netflix rapidly scaled up both its content library and its backend ML / AI systems to form an entirely new player straddling both the Silicon Valley tech industry and Hollywood-style entertainment: a movie and television studio with a world-class ML / AI brain driving decisions both online and off.

476.    By 2016, Netflix had created a new type of tech juggernaut—the premium video streamer—that was attracting increasing amounts of online revenue, attention, and valuable signals data. Facebook, which was aggressively searching out signals for its ads business to maintain its DTBE after the demise of the Platform, took notice.

477.    However, there was a complication: Reed Hastings, Netflix's founder, Chairman, and co-CEO, was a member of Facebook's Board of Director's, and had been since 2011.

478.    Indeed, Hastings was more than just a long-term member of Facebook's Board; until 2019, he was Chair of the company's special Compensation and Governance Committee.

479.    Facebook's Compensation and Governance Committee was a closely-regulated committee charged with monitoring and approving executive compensation, evaluating conflicts of interests, and, as of July 2017, evaluating proposed changes in the Facebook's "Compliance with Laws – Competition" update to the company's Code of Conduct. (*See* PALM-011953897, at 909-11.)

**FILED UNDER SEAL**



(*Id.* at 911.)

480.     Besides Reed Hastings (who was the Committee's Chair), the other two members of the Facebook Compensation and Governance Committee between 2015 and early 2019 were Peter Thiel (the PayPal founder who sold his company to eBay) and Marc Andreesen (the former eBay board member). These three men had direct control over, among other things, corporate governance guidelines and policies, including those governing conflicts of interest and compliance with antitrust laws (*see id.*); the compensation of Mark Zuckerberg, Sheryl Sandberg, and Chris Cox (*see* PALM-011953897, at 931-49 (Hastings, Thiel, and Andreesen sole board members in compensation review for Zuckerberg, Sandberg, and others)), and a controversial 2016 plan to restructure Facebook company stock so that Mark Zuckerberg could liquidate his equity while still maintaining a controlling interest in the company (*see* PALM-01109282, at 282-93 (Apr. 22, 2016 Board of Directors Meeting re: Class C Reclassification Proposals) ("Pursuant to Delaware law, Mark Zuckerberg may have a material interest in the proposals related to the Class C reclassification . . . Neither Mark Zuckerberg nor the other employee directors will participate in the discussion and approvals of the Class C reclassification proposals.").)

**FILED UNDER SEAL**

481. Given the sensitivity of the issues overseen by the Compensation and Governance Committee, members of that Committee had to be expressly approved by the full board, with an eye toward federal legal requirements of independence for its members:



## facebook

Compensation & Governance Committee Independence and Membership

- <u>Proposal</u>: recommend that the Board re-appoint Reed Hastings (Chair), Marc Andreessen and Peter Thiel as members of the Compensation & Governance Committee, effective immediately following 2017 Annual Meeting

- <u>Proposal</u>: recommend that the Board approve the above directors as (i) independent for purposes of rules governing compensation committees, (ii) "non-employee directors" pursuant to Rule 16b-3 of the Securities Exchange Act, and (iii) "outside directors" pursuant to Section 162(m) of the Internal Revenue Code

(PALM-011953897, at 908.)

482. Additionally, Facebook's own corporate charter requires of its Compensation and Governance Committee:

> The Committee will consist of two or more members of the Board, with the exact number determined from time to time by the Board. Each member of the Committee must:
>
> - be an "independent director" as defined under the applicable rules, regulations and listing requirements of the stock exchange upon which the Company's securities are listed for trading (the "Exchange Rules") and must also satisfy the enhanced independence requirements for members of the compensation committee under the Exchange Rules;
>
> - be free from any relationship that, in the opinion of the Board and the Committee, would interfere with the exercise of independent judgment as a Committee member;
>
> - not be an executive officer or employee of the Company; and

**FILED UNDER SEAL**

- meet any other requirements imposed by applicable law, regulations or rules, including rules and regulations promulgated by the Securities and Exchange Commission (the "Commission Rules"), subject to any applicable exemptions and transition provisions.

483. The reason that members of Facebook's Compensation and Governance Committee were required to meet strict independence requirements was that the issues that this Committee was charged with governing—the Company's compliance with antitrust laws, the compensation of its top executives, and indeed the very ownership structure of the company—could not allow for even the hint of internal or external collusion or pressure. As Facebook explained in a February 2016 internal presentation:

**facebook**

## Determination of Director Independence

- Pursuant to applicable rules and regulations and Facebook's Corporate Governance Guidelines and other governing documents:
  - Majority of Board members must be independent
  - Each member of the Audit and Compensation and Governance Committees must be independent
  - Audit Committee members must meet special "super-independence" requirements under SEC rules
  - Compensation and Governance Committee members must meet special requirements

**facebook**

## Determination of Director Independence (cont.)

- Broadly consider all relevant facts and circumstances
- Consider the issue not merely from the standpoint of the director, but also from that of persons or organizations with which the director has an affiliation
- Material relationships can include commercial, industrial, banking, consulting, legal, accounting, charitable and familial relationships, among others
- The concern is independence from management. Ownership of even a significant amount of stock, by itself, is not viewed as a bar to an independence finding

(PALM-011831146, at 182-83.)

117

**FILED UNDER SEAL**

484. In fact, Facebook listed as one bright-line "disqualifying circumstance" a situation in which a would-be independent director was a "partner, controlling stockholder, or executive officer of any organization . . . to which Facebook made, or from which Facebook received, payments for property or services this year or any of the past three years that exceed the greater of 5% of the recipient's consolidated gross revenues for that year or $200,000 . . . ." (PALM-001831146, at 184.)

485. This raised internal red flags for Reed Hastings—who was the founder, Chair, and co-CEO of Netflix—as early as 2016, given Netflix's then-$73 million annual ad spend at Facebook:

## Director Independence Matrix

| Requirement | Marc Andreessen | Erskine Bowles | Susan Desmond-Hellmann | Reed Hastings | Peter Thiel |
|---|---|---|---|---|---|
| Director or family member cannot have a relationship that could interfere with the exercise of independent judgment | Board/ Committee decision | Board/ Committee decision | Board/ Committee decision | Board/ Committee decision | Board/ Committee decision |
| Director cannot be an executive officer or employee, and family member cannot be executive officer, now or within past 3 years | Ok | Ok | Ok | Ok | Ok |
| Director or family member cannot have received compensation over $120,000 in any 12 month period within the past 3 years other than for board or committee service or service by a family member as a non-executive officer employee | Ok | Ok | Ok | Ok | Ok |
| Director or family member cannot be a partner, controlling stockholder or executive officer of any organization to which Facebook made, or from which Facebook received, payments for property or services this year or any of the past 3 years that exceed the greater of 5% of recipient's consolidated gross revenues for that year or $200,000 | Ok | Ok | Ok | Netflix $73M | Ok |
| Director or family member cannot be employed as an executive officer of another entity where, at any time during the past 3 years, any of the executive officers of Facebook serve on the Compensation Committee of the other entity | Ok | Ok | Ok | Ok | Ok |
| Director or family member cannot be a current partner of Ernst & Young and has not been a partner or employee of Ernst & Young who worked on Facebook's audit at any time during past 3 years | Ok | Ok | Ok | Ok | Ok |

(PALM-011831146, at 190.)

486. The situation only got worse over the next three years, as Facebook introduced a directly competitive premium video product, Watch, and Netflix increased its annual Facebook ad spend to over $150 million. Nonetheless, Hastings remained on Facebook's Board throughout this entire period—not merely as an "independent" board member, but as Chair of Facebook's Compensation and Governance Committee, where he rewrote Facebook's antitrust guidelines; set Mark Zuckerberg's and Sheryl Sandberg's compensation for 2016, 2017, 2018, and 2019; and approved a controversial (and widely

<u>**FILED UNDER SEAL**</u>

objected-to) reclassification and restructuring of Facebook's Class C stock to give Zuckerberg majority control of the company even if he liquidated billions of dollars of equity.

487.    Hastings' position between 2016 and 2019 allowed him—and Facebook—to turn direct competition between Facebook Watch and Netflix into a collusive deal that divided markets between the companies, and bootstrapped Facebook's DTBE and its Social Advertising monopoly at the expense of its Watch product, as described below.

### 2.    Facebook's Entry at Scale Threatens Competition with Netflix

488.    When Facebook launched its Watch streaming video service in August 2017, it was immediately perceived as competitive with Netflix. Indeed, Watch's offerings appeared to fit squarely within the scope of the premium, longform content primarily consumed on Netflix.

489.    On September 8, 2017, the Wall Street Journal reported on Facebook's entry into streaming video, noting that the new offering pitted Facebook directly against video services run by HBO, Amazon, and Netflix:

> The social-media giant is willing to spend as much as $1 billion to cultivate original shows for its platform, according to people familiar with matter. The figure, which could fluctuate based on the success of Facebook's programming, covers potential spending through 2018, one of the people said.
>
> The investment would far outpace Facebook's previous outlays on video content, including its live-video deals last year. It also signals Facebook's readiness to spend more than before to become what Chief Executive Mark Zuckerberg calls a "video-first" platform.
>
> Facebook's thirst for video content pits it against traditional broadcasters such as Time Warner Inc.'s HBO and deep-pocketed tech companies such as Amazon.com Inc. and Netflix Inc., which all are banking on video to capture the fleeting attention of users and seize billions of dollars in advertising that is expected to migrate from television to digital video. Apple Inc. is preparing its own billion-dollar war chest for content.

490.    Facebook's entry into the space meant that it would have to compete with Netflix for high quality content, particularly for full length dramas and TV shows. Publicly, the immediate question was whether Facebook could obtain enough original content to compete with Netflix.

**FILED UNDER SEAL**

491. Unlike Netflix, which was subscription supported, Facebook's business model relied on ads, creating additional questions as to whether it could attract viewers away from other ad-based content providers, like cable companies. Moreover, Facebook would have to transition from short clips to full-length movies and TV shows.

492. Facebook sent its Vice President of Partnerships, Dan Rose, to interview with *Variety*. Rose told *Variety* that "hundreds of shows will be on Watch" within a week from launch and "then thousands will blossom really soon." Rose explained that Facebook planned to fund original content until advertising revenues could support the new streaming video service:

> Obviously, creating premium episodic content is expensive. Until we have a large enough audience—so the advertising revenue can cover the cost of creative—we helped fund some of them, so people see something when they go to Watch.

493. Internally, Facebook had determined that a significant expense of building a streaming video platform came from licensing content, such as popular TV shows. As an August 17, 2017, internal Facebook presentation explained:

> Licensed content. Licensed content (e.g., Friends, Seinfeld) draws more eyeballs than original content. For example, on Netflix, at any given time, more than 75% of streams are of licenses content. This is a meaningful revenue source for content owners and a meaningful cash outlay for platforms.

(PALM-006842466, at 78.)

494. Netflix was rapidly weaning itself from licensed content by investing heavily in original content. Facebook internally did a competitive analysis of Netflix and noted that the company was "burning through its cash" but was developing original content that was better than other platforms':

> Advantages [Netflix]:
>
> - **Netflix is the leading SVOD**, with more subscribers and daily WT than other subscription based competitors (including TV networks).
>
> - **Netflix's original content performs better** than the original content of other platforms.

FILED UNDER SEAL

- Netflix is growing its backlog of original content, **reducing its long-term dependency on licensing content** (which is expensive). Data helps inform what original content to create and what licensed content to buy / renew.

(PALM-006842466, at 524 (bold text in original.)

495. As Facebook's competitive analysis noted, one of Netflix's major advantages stemmed from the data it collected from its users. That data informed Netflix's content acquisition and creation strategy. User behavior would directly indicate whether licensed content was worth acquiring. Likewise, user watch time and behavior informed what sort of original content Netflix created. This was data that Facebook did not yet have as part of its nascent streaming video system.

496. Nonetheless, Jon Eide, who authored the internal August 2017 Netflix competitive analysis, recommended that Facebook invest in original content to avoid dependency on licensing content at high prices—and to better develop unique data signals around its original content that would not be shared by video competitors. (*See* PALM-006842466, at 524.)

497. Facebook noted that its new service had an additional problem—the behavior of Facebook users. Those users were accustomed to shorter clips on their news feeds, not full-length videos. Facebook, however, needed to maximize watch time in order to extract valuable user behavioral / social data for its advertising ML and AI systems. As Eide explained, Facebook user behavior would have to change for Facebook's Watch to be successful: "While almost a billion users watch video on Facebook daily, watch times and average session times are low as compared to key competitors." (PALM-006842466, at 517.)

498. Facebook's task was clear: if it was truly to compete with Netflix, it would have to move heavily into longer, feature-length films, as well as original content.

### 3. Facebook and Netflix Enter into Amended Agreements

499. There were numerous internal problems with Facebook's new Netflix-killer.

500. First, Netflix had long been a partner with Facebook. After the April 2015 public deprecation of the Friends and Newsfeed APIs, Netflix was given an exemption. Netflix also provided Facebook with sensitive customer relationship management ("CRM") data when it ran ads and Facebook needed to track ad conversions. (PALM-007621101, at 10.)

FILED UNDER SEAL

501.   Netflix also partnered with Facebook to create content promoting its shows on Facebook. For example, Netflix and Facebook collaborated to promote Netflix shows, like Narcos, an original TV show produced by Netflix about Pablo Escobar. Facebook internally described the collaboration to Sheryl Sandberg in a January 2018 brief:

> Collections + Canvas: Netflix approached our team with a challenge for Narcos S3: find innovative ways to get Pablo fans excited about the power of the new drug kings, the Cali Cartel. Leveraging our Collection + Canvas format, we pitched an interactive "trivia style" feed unit which revealed the answer (and trailer) in a single-screen canvas. Netflix produced regional versions and promoted over global launch weekend in 14 countries.

(PALM-008530032.)

502.   And, when Facebook rolled out new APIs, it hand-selected Netflix to help test them. For example, on October 15, 2017, Facebook's Konstantinos Papamiltiadis invited Netflix to integrate with Facebook using the new "Mentions" API:

> Hello team Netflix,
>
> As we look to add more capabilities to the Instagram Graph API (currently we provide comments moderation and insights), we would like to invite you to integrate future API features and provide early feedback.
>
> Starting in Q4 2017 we are building a "Mentions" API that will allow you to pull organic posts which mention your company in the caption or comments and respond to them.
>
> We're only opening it up to a handful of partners to start, and wanted to see if you'd be interested in getting early access?
>
> Let me know if you would like to set up a call to discuss this opportunity in detail.

(PALM-004821849.)

503.   Second, Netflix was a major advertiser on Facebook. In a January 16, 2018, brief to Sheryl Sandberg, Facebook reported that Netflix had "invested" hundreds of millions of dollars in Facebook through advertising spend, which was expected to increase in 2018:

> FB Investment

**FILED UNDER SEAL**

- 2016: $149M, 113% YOY, ~23% of overall mktg budget

- 2017: $169M, 13% YOY, 27% of overall mktg budget

- 2018: $200M Global JBP, 19.5% YOY, ~28-30% of overall mktg
  budget

(PALM-008530031.)

504.    Finally, as noted above, Netflix's founder, Chairman, and co-CEO, Reed Hastings, sat on Facebook's board. Facebook's incursion into Netflix's core business was not lost on Hastings—or his company.

505.    Facebook took pains to assure Netflix that it was not directly competing with it. At prior earnings calls, Sheryl Sandberg had gone so far as to state that Facebook was not taking on Netflix because "we are a platform, not a video service" and that Facebook was "funding [content on Watch] to kickstart the ecosystem." (PALM-006172689.)

506.    But internally, Facebook knew better—and so did Hastings. The situation deteriorated to the point where, in January 2018, Sheryl Sandberg had to have a "Fireside Q&A" at Netflix in which she and Hastings were to "teas[e]", in front of "500 senior [Netflix] people" (with "Strict no recording") about how Sandberg had "driven [Facebook] into more direct video competition with us, was it something I said?" (PALM-003207836 (questions/script provided by Hastings to Sandberg in advance).)

### Netflix Fireside Q&A

Overall style in moving back and forth between personal get-to-know Sheryl questions and intellectual/political questions.  500 senior people.  Strict no recording.

Intro:  Disney board, Facebook board/exec, (teasing) you've driven both companies into more direct video competition with us, was it something I said?

Let's start early.  Can you tell me about middle school and high school?  What were you like?

(*Id.*)

507.    The January 2018 "Fireside Q&A" at Netflix joked that the "[o]nly topic [Hastings] wo[uldn't] ask [Sandberg] about" in front of Netflix's upper management was "FB professional video strategy . . . ."

**FILED UNDER SEAL**

**Additional questions**
- What is your earliest memory of being called Bossy?
- Only topic I won't ask you about is FB professional video strategy, OK?
- How did Lean In change your life (Ted talk and book)
- For women graduating college today how will things be different than when you graduated?

(*Id.* at 837.)

508. But behind the scenes, the two companies were doing quite a bit of talking about just that.

509. By the third and fourth quarters of 2017, Facebook and Netflix appeared to have reached a détente. The companies entered into several agreements, sometimes styled as addendums to existing agreements, that purported to limit Facebook's ability to train its AI and ML based on the information Netflix's ad campaigns generated and information Netflix provided to Facebook.

510. For example, on August 15, 2017, the companies executed an Addendum to their Advanced Measurement Beta agreement that ███████████████████████ ██████████████████████:



(PALM-008914377.)

511. Days later, on August 21, 2017, Facebook and Netflix entered into an addendum to the Offline Conversions Agreement. On November 1, 2017, Facebook and Netflix again amended their Advanced Measurement Agreement. On April 1, 2018, Facebook and Netflix amended their Terms for

**FILED UNDER SEAL**

Conversion Tracking, Custom Audiences from Your Website, and Custom Audiences from Your Mobile App" agreement.

512.    The upshot of the above agreements was that Facebook agreed to segregate its Watch product from its most powerful AI and ML systems, in order to assure Netflix that Netflix's own video data would not be used to fine-tune Facebook's new premium video product.

513.    In return, Netflix would permit Facebook to use some of its most powerful data signals in Facebook's ad-targeting systems and models, and it would continue to spend hundreds of millions of dollars on Facebok advertisements.

514.    After the execution of these agreements, Facebook flipped from potentially ruinous competition with Netflix on Netflix's home turf to overt cooperation. More conspicuously, Facebook gerrymandered its own Watch product around Netflix's core business, abandoning much of its original and feature-length content. The companies' less-than-arms-length relationship had paid off: Facebook gotten what it wanted (Netflix signals for its ad targeting systems, and continued Netflix ad spend), and Netflix had gotten what it wanted (Facebook's near-term exit from premium, longform video content). However, those paying supracompetitive prices for Facebook ads because of the DTBE were not benefitted, and indeed were harmed, by the Facebook-Netflix agreement.

### 4.    Facebook and Netflix Agree Not to Compete in Each Other's Market.

515.    What followed the series of agreements and addenda between Facebook and Netflix in 2017 and 2018 made clear the scope of the companies' agreement. Facebook cut out portions of its Watch product that competed with Netflix; Facebook agreed not to use Netflix's social data to power its streaming video business; and Facebook developed a custom advertising AI / ML system for Netflix. In exchange, Netflix pumped hundreds of millions of dollars of advertising into Facebook's Social Advertising monopoly and, with certain narrow exceptions, allowed Facebook to use its social data to power the AI and ML systems that allowed Facebook to target advertising.

FILED UNDER SEAL

516.    As explained below, the net effect of this agreement was Facebook's withdrawal from Netflix's core streaming video territory, and in exchange, Netflix helped Facebook strengthen its Social Advertising Market monopoly, including by enhancing Facebook's revenue and AI / ML technology.

517.    To begin with, Facebook entered into an agreement with Netflix to build Netflix a dynamic advertising model. (PALM-008730853.) Facebook described the model in a July 31, 2018, document entitled, Dynamic Ads (Subscriptions)—Detailed Alpha Brief for Netflix:

> Context
>
> Dynamic Ads for Entertainment and Media (DAEM) is building a product that selects which set of titles from a client's media catalog will best drive conversion events for individual users, i.e., matching the right content title for each of the right users. Our goal is to test whether our new ranking models are able to move advertiser metrics and/or streamline the existing campaign creation/management process.

(PALM-008730853.)

518.    Facebook was designing a bespoke system that targeted users with *Netflix* content such that a conversion event was likely to occur. This was precisely the sort of targeting Facebook would have needed to do to promote its supposedly competing Watch product. Instead of doing so for itself, Facebook was doing it for Netflix.

519.    Facebook, however, received something in exchange that was more valuable to its Social Advertising monopoly—user intent data (and the underlying data to make predictions)—from Netflix. As the same document explained:

> DYNAMIC Ads product value
>
> Dynamic ads leverage cross-device intent signals to automatically promote relevant products from your entire catalog with unique creative, showcasing one or more products, across Facebook. Key benefits include:
>
> - **Scale:** Generate a unique ad for each and every product automatically without having to configure each one individually
>
> - **Personalization:** Show relevant products to users, based on interests they have shown on your site or interests they've shown on Facebook.

FILED UNDER SEAL

- **Always-on:** Set up your campaigns once, and continually attract shoppers more likely to convert.

- **Cross-device:** Serve the right product to the right user across devices (mobile, desktop or tablet), based on login, not cookies.

(PALM-008730853.)

520.    The document further described how the product worked:

> DAEM tries to select the best movie/tv show title from the catalog to show to the user in the ad creative. As of now, this personalization is completely power by various ways users engage with data and entities (media and non media) on Facebook. We also learn real-time from the performance of individual titles from your catalog as your campaign delivers.

(PALM-008730853, at 56.)

521.    In short, Facebook's ad systems would target video content to users on Netflix's behalf, and in the process, Facebook's AI and ML would receive valuable social data to train on.

522.    After initial testing of its new system designed for Netflix, Facebook prepared a postmortem report on December 19, 2018. The report concluded the following about Netflix's customer intent data:

> User selection
>
> Difference between CBO and DAEM where CBO implicitly bakes in title selection during user selection powered by strong exploration
>
> Focus on identifying user's intent to subscribe to media content and use that as a signal to influence user selection
>
> Focus on closing some systematic ranking gaps between the new DAEM product and CBO/standard FB delivery.

(PALM-008731246, at 48.)

523.    Netflix continued to advertise through Facebook, and Facebook's AI and ML trained on the data obtained through the Netflix campaign. The only exception was Netflix's "title weight data," as the companies agreed that Facebook could not target advertising *solely* based on such data, but could otherwise use Netflix data to train its ML and AI:

> Current custom partnerships that need to be upheld, contractually . . .

> Netflix: No use of title weight data to (1) develop FB's own video-streaming product and (2) target ads SOLELY based on that title weight data.

(PALM-11129211, at 12.)

524.    Facebook in essence agreed to impair its Watch and other streaming video products by agreeing with Netflix not to use certain data obtained in its advertising to develop those products. (*Id.*) In exchange, Facebook was allowed to incorporate data from Netflix's ads into its ad targeting ML and AI systems.

525.    Facebook also gerrymandered its Watch product around Netflix's business. Although Facebook initially announced original content, feature length movies, and TV series, Facebook began canceling its content projects and reverted to publishing shorter clips on its platform. Facebook also scaled back on other long form content, such as news programming.

526.    In December 2018, Facebook cut the funding for its news shows on watch. In February 2019, Facebook announced that it would not be renewing most of its news programs. As *Digiday* reported on February 26, 2019:

> Last June, Facebook rolled out its first set of daily and weekly news shows from publishers such as ABC News, CNN, Business Insider and NowThis. Overall, Facebook has launched 21 news shows on Watch including CNN's "Anderson Cooper Full Circle," BuzzFeed's "Profile" and Univision 's "real America with Jorge Ramos."

> In recent months, Facebook has been telling news publishers that it will only renew about a third of the existing news shows that it has funded for Facebook Watch, according to publishing sources that have met with Facebook.

527.    Facebook also began cutting its original content, particularly its scripted series. In January 16, 2020, Facebook cut popular shows *Sorry for Your Loss* which starred Elizabeth Olsen, and *Limetown* which was headlined by Jessica Biel.

528.    By early 2020, Facebook had publicly canceled virtually every drama on its platform, including *SKAM Austin*, *Five Points*, *Sacred Lies*, *Turnt*, *The Birch*, and *Steroscope*. Facebook also cut its comedies, *Strangers* and *Queen America*. Facebook cut its docuseries, including *Humans of New York:*

*The Series*, *Bill Murray & Brian Doyle-Murray's Extra Innings*, *Tom vs. Time*, *Fly Guys*, *Behind the Wall: Bubba Wallace*, and *Inside the Madness: Kentucky Basketball*.

529.    Facebook cut its game shows, *Confetti* and *Outside Your Bubble*. Facebook also cut its animation series, *Human Kind of*, *Liverspots and Astronots*, and *Human Discoveries*. Facebook cut almost ever reality show, including *No Script with Marshawn Lynch*, *Relationshipped*, *Backourt: Wade*, *The Tattoo Shop*, *Bear Grylls: Face of the Wild*, *Help Us Get Married*, *Huda Boss*, *Sneaker Hustle*, *Troy the Magician*, *You Kiddin' Me*, *Big Chicken Shaq*, *Double Take*, and *Will Smith's Bucket List*.

530.    Although Facebook's chief monetization strategist Jon Eide had expressly recommended in 2017 that Facebook acquire original content, and despite internal presentations that made clear that Netflix's programming succeeded because its AI and ML systems allowed it to determine what viewers wanted, as soon as Facebook and Netflix concluded their negotiations over data in early 2018, Facebook promptly and consistently did the opposite.

531.    That is, Facebook abandoned the use of data derived from Netflix's ads for its video streaming service, which immediately handicapped Facebook's Watch targeting. This was because it was difficult—and perhaps impossible—to segregate that data from the rest of the data pool from which Facebook drew on to train its ad targeting models, leaving Watch with either an incomplete data set to train its targeting system on or an inferior model to do the targeting.

532.    Facebook also abandoned all of the original content it had paid for just a year prior. In fact, Facebook near-immediately canceled all Watch programming that significantly overlapped with Netflix's offerings.

533.    Moreover, although Facebook internally determined that it needed to increase watch time on Facebook for Watch to be successful, which required Facebook to add longer-form programming to its service, Facebook did the opposite, focusing instead on shorter clips. These shorter clips were outside of the scope of Netflix's programming.

534.    Facebook had fully retreated from Facebook's territory and crippled its own Watch product to do so. In exchange, Netflix allowed Facebook to train its models on its data and pumped large amounts of advertising into Facebook's coffers.

FILED UNDER SEAL

535.     Facebook had used the threat of ruinous competition from one of the world's most powerful companies to gain by agreement what Facebook would otherwise have had to compete viciously for on Netflix's home turf—an incredibly valuable trove of signals data for Facebook's ad business. In exchange, Netflix prevented another tech giant from entering its market in earnest. This helped to maintain and fortify the DTBE, secured Facebook's Social Advertising dominance, and in doing so harmed the Plaintiffs and the putative classes.

536.     On April 12, 2019—a few months after the last aspect of the Facebook-Netflix agreement not to compete was memorialized, and as Facebook had begun in earnest to pull back from its investments in Watch—Facebook announced that Reed Hastings would be leaving Facebook's Board of Directors.

## VIII.    FACEBOOK ANTICOMPETITIVELY USED ONAVO DATA TO BUILD A MASSIVE, MACHINE LEARNING-DRIVEN SURVEILLANCE SYSTEM AND TO SPY ON FACEBOOK USERS EVEN WHEN USING NON-FACEBOOK APPS.

537.     From 2016 through 2019, Facebook escalated its use of Onavo spyware to create the largest electronic surveillance system ever deployed by a private entity—and perhaps the largest surveillance apparatus ever deployed anywhere, by anyone. Facebook did so, in part, by deploying Onavo at scale against the user base Facebook had acquired through its Instagram and WhatsApp acquisitions—using data from Onavo spyware to validate machine-learning models designed to surveil user interactions with competitive apps.

538.     During this period, Facebook used deceptive applications, such as a Virtual Private Network (VPN) app, to obtain privileged access to users' smartphones. With that access, Facebook surreptitiously took voluminous, hardware-level data from user cell phones, including call and video call logs, message logs, battery logs, and sometimes even more sensitive user information. Facebook, through Onavo, used that data to determine precisely which apps users were engaging with, and for how long.

539.     In addition, Facebook used that same stream of data to match users it surveilled through Onavo with internal Facebook IDs. This matching process meant Facebook could spy on its own users as they used competitive apps.

540.     The upshot of the above—including Facebook's use of deceptively obtained Onavo information to provide a "ground truth" baseline for the training of Facebook's probabilistic identity

FILED UNDER SEAL

matching models—was that Facebook used deception to obtain a competitive edge in ad targeting between 2016 and 2019.

541.    Facebook's surveillance and matching system was derived from data secretly stolen from tens of millions of iPhone and Android devices throughout the world. By doing so, Facebook strengthened the DTBE protecting its business, not only by spying on Facebook's own users, but by surveilling outside threats to Facebook's business.

542.    This deceptive conduct, tied to a professional spyware apparatus of a scope and scale the world had never before seen, provided Facebook with a further competitive advantage against would-be entrants to the Social Advertising Market, helping to maintain the DTBE and to seal off any erosion of Facebook's Social Advertising market power—and concomitant supracompetitive ad prices—between 2016 and 2019. Plaintiffs and members of the putative classes were injured by this conduct.

A.    **Onavo's Spyware Secretly Shuttles Sensitive User Data to Facebook for Its Internal Machine Learning Models.**

543.    Onavo initially provided Facebook with analytics about competing apps. By 2016, Onavo became something far greater—a real-time surveillance system. Onavo accomplished this by designing software that appeared to provide a particular utility function, while at the same time transferring users' data from their phones to Facebook for analysis.

544.    One app Onavo leveraged was called Onavo Protect (internally referred to as iProtect for iOS and aProtect for Android). The software was billed as a means of limiting apps from using data in



First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

FILED UNDER SEAL

the background of a smartphone and as a provider of virtual private network (VPN) services, supposedly providing users with additional privacy as they traversed the Internet.

545.    However, Onavo Protect did the opposite. It was, among other things, monitoring the data packets coming in and out of the user's device, transferring device logs, and monitoring app usage. The software was available on Apple's App Store and the Google Play Store, and was designed to spy on users on either iOS or Android devices. Facebook's Onavo also put out other apps designed to allow Facebook to monitor internet traffic and device usage, including the Onavo Bolt App Lock—an app that purported to lock other apps, yet in reality secretly stole away user and device data for Facebook's models.

546.    By monitoring the data traffic in and out of the device, including through HTTP, SIP and DNS traffic, Onavo's apps allowed sensitive user data to be sent off to Facebook, where Facebook's data scientists devised machine learning models that made inferences about users and how much time they spent on various apps.

547.    By April 2017, Onavo's packet tracking had become sophisticated, allowing Facebook to determine whether a user was sending iMessages with media included, as well as whether the user was using the Apple FaceTime system to make calls. As Facebook's Kieval Patel explained in an April 26, 2017, e-mail:

> What we can detect are the media transfers since those use a unique user-agent over HTTP (samples of these can be viewed here: https://fburl.com/b3pmi7xm). . . .
>
> I didn't mention it in my talk, but for Facetime app we also have a unique detection method. We track SIP protocol packets (sadly we can't capture all of them). With that we can report usage of video/audio calls including durations. Long ago, I presented that work – slides here (https://www.dropbox.com/s/ex0ypompog5oecs/facetime_sip_detection_v3.pptx?dl=0).

(PALM-005019528.)

**FILED UNDER SEAL**

548.    By August 2017, Facebook's Onavo team was enhancing its surveillance of iMessage conversations by incorporating iOS power consumption logs with the iMessage data it was extracting. (PALM-01130706, at 714.)

549.    In January 2018, Onavo cracked the problem (*i.e.*, "sadly we can't capture all of them") completely, and was working on obtaining ***actual user messages*** from iMessage. Facebook Product Manager Erez Naveh reported on the breakthrough in a January 4, 2018 status e-mail:

> 1. iMessage – found a new way to track conversations on iMessage for iOS < 11. For these devices, we think we'll be able to see the actual messages including what type of media is shared in iMessage conversations. This will also include historical data (up to a few months) for each user we track. We are now working on collecting this data from the devices. . . .

(PALM-004988332.)

550.    Onavo had also found internal tables built into Apple's iOS that provided information about which apps were in the foreground of the device. As Naveh explained in the same e-mail:

> 2. Time spent measurement in iOS – found a new table in iOS that holds events related to apps moving to foreground – we think this will help us improve our time spent measurement. This table has some random time shift in different devices. We are working on a way to compensate this time shift to make this data usable.

(*Id.*)

**FILED UNDER SEAL**

551.     Onavo was also spying on other commonly used apps, including the YouTube app, Snapchat, Android Messages, and Twitter. A January 29, 2018 e-mail from Facebook Director of Product Management – Artificial Intelligence Larry Weyer summarized the data obtained from various apps and the methodology used to do so:

| | Confidence | | | Categories covered | Business Questions | Methodology |
|---|---|---|---|---|---|---|
| | Reach | Timespent | Actions | | | |
| YouTube | High | Medium | High | Video duration, time watched, video category | YouTube: Key Competitor Tracking - Questions | SSL bump (risk: works for iOS & Android M and below) |
| Snapchat | High | Medium | High | Discover, Maps, Snap, Stories, Chat | Snapchat: Key Competitor Tracking - Questions | SSL bump (risk: Snapchat are moving to SSL pinning in iOS) |
| Google Photos | High | Medium | High | | Google Photos: Key Competitor Tracking - Questions | Usage stats, accessibility |
| iMessage | Low | Low | Low | Messages, message types | iMessage: Key Competitor Tracking - Questions | power logs" |
| Android Messages | High | Medium | High | TBD | Android Messages: Key Competitor Tracking - Questions | Usage stats, accessibility |
| Twitter | High | Medium | High | TBD | TBD | SSL bump, Usage stats |

(PALM-004982075.)

552.     Onavo also derived data from third-party apps that used a Facebook software developer kit ("SDK"). By using Facebook code, the underlying app would automatically import the Onavo's tracking mechanisms.

553.     Onavo's apps, as well the Facebook SDK, were in fact Trojan Horses, designed to spy on user Internet traffic to determine how and how long users were using various apps on their devices. Facebook stored that data in an internal database system called, the "Hive," where the data could be queried across Facebook's organization.

554.     Onavo continued secretly hoovering user data until Apple and Google removed Onavo's primary apps from their app stores in August 2018 and February 2019, respectively. Both Apple and Google determined that Facebook's Onavo apps failed to properly inform users that their data was being transferred to Facebook and used for machine learning and other models. Even with disclosure to users,

Facebook's practice of spying on user smartphones and devices through Onavo apps violated both Apple and Google's terms and/or policies.

**B.** **Facebook Used Stolen Onavo Data Together with User Data from Its Own Apps to Build a Granular and Real-time Competitive Surveillance System.**

555.    By the end of 2016, Facebook had acquired both Instagram and WhatsApp. WhatsApp, in particular, provided Facebook a massive and global user base. Both apps provided Facebook with entry into tens of millions of smartphones and other mobile devices.

556.    At the same time, Onavo struggled to obtain validation information about the data it collected on third-party apps, such as Snapchat or YouTube. Although Onavo was able to exfiltrate highly sensitive information from the users that had installed one of Onavo's spyware apps, the data Facebook obtained was only from a subset of users of major third-party apps that Facebook sought to surveil.

557.    Onavo-collected user data, augmented by data collected through Facebook's own apps, allowed Onavo to make highly accurate inferences about the entire set of third-party app users. That is, Facebook's WhatsApp and Instagram apps not only provided Facebook with the ability to validate Onavo's data, but to build powerful machine-learning models that Facebook's data scientists could use to measure time spent on various third-party apps with unprecedented precision.

558.    Facebook accomplished this by deriving what it called the "ground truth" from its own apps, including Instagram, WhatsApp, and the Facebook Blue App, then using that data to validate models built on Onavo data stolen from cell phones through Facebook's spyware.

559.    When combined, these streams of data allowed Facebook to obtain a granular, real-time picture of precisely what apps users were spending time on and engaging with. By combining Onavo's spyware data with user data collected on Facebook's own apps, Facebook had built the largest real-time surveillance system in existence.

560.    Not only could Facebook determine how much time users spent on their own apps, but it could determine what users were doing on other apps, including as to the media sent through other apps. In some cases, Facebook could spy on the content of messages sent or media sent or received on a user's device.

**FILED UNDER SEAL**

561.    Facebook used this data to build machine-learning models that allowed it to make inferences about demographics. Specifically, Facebook could train machine learning and statistical models with high levels of precision that allowed Facebook to target users by age (which Facebook referred to as "life stage"), location, education, and other attributes. Facebook used these models to make inferences about users based on the data it collected.

562.    For example, in a March 24, 2017 presentation, Facebook described building a model that better identified younger users, including minors, ages 13-18. Facebook was using Onavo to granularly model young users and to correct any biases in its data before it was used to train machine-learning models.

# Project overview

- What we are trying to accomplish (high level):
  - Improve accuracy of estimates broken down by age and gender (user level accuracy is not a goal)
  - Align the data with the FB age affinity project
  - Provide more granularity (13-18, 19-22, 23+)
- If successful, the impact will be:
  - Better visibility into app usage behaviors of high school and college age users

(PALM-008796707, at slide 2.)

563.    Those inferences and demographic information were then stored in Facebook's Hive database, where the information could be readily queried or viewed through a portal system within Facebook.

**C.    Facebook Matched the Onavo Data It Collected from Users on Other Apps with their Facebook IDs and Stored User Data in Its "Hive" Database.**

564.    Facebook also used Onavo data to determine the precise identity of the users it was surveilling, if those users also had a Facebook account. Thus, a Snapchat user could be identified using

Onavo's spyware, and then Facebook would match that user's Onavo ID to their internal Facebook ID ("FBID").

565.    Facebook's internal documentation indicated that matching data was available by querying fields on Facebook's Hive database, explaining that "Onavo users can be matched to their fbid using the table dim_onv_fb_user_matchin." (PALM-009223604.)

566.    Not only was personally identifying information about these users stored in the Hive, a user's "clickstream" or sequence of actions on their device was also exfiltrated and stored, then associated with their Facebook ID. As Onavo's Guy Rosen explained in a November 2016 post about extracting information about what users were watching on YouTube: "On iOS we log full clickstreams so the request should be there in the Hive table and querytable if we can decompose the video URLs." (PALM-005101103.) Onavo continued to extract clickstream information from users' devices in 2017, 2018, and most of 2019.

567.    Onavo therefore provided Facebook another means to extract data from its users, even if they were not using a Facebook app. That is, Onavo's spyware could obtain information about the user when they were using an entirely different app, such as the YouTube or the Snapchat app. Onavo's spyware also allowed Facebook to exfiltrate user data derived from text messages, including on iMessage, or even from FaceTime calls on iPhones.

568.    Onavo not only acquired this information, it associated the information with a particular Facebook user. Onavo, therefore, provided Facebook even more certainty as to whether it was correctly matching user actions outside its walled garden with shadow profiles and dossiers that Facebook maintained about its users. Again, Facebook engaged in this conduct in 2017, 2018, and for much of 2019.

569.    This gave Facebook an immense advantage over competitors. While competing apps would have to obtain user data from their own apps, Facebook was able to capture user data from third-party apps in addition to its own. This directly strengthened Facebook's ability to target users for content and advertising, and it gave Facebook a real time view of potential competitive threats as well as the information and time Facebook's own users contributed to those threatening apps. This contributed to

1  and fortified the DTBE, helping maintaining Facebook's Social Advertising monopoly and injuring

2  Plaintiffs and the proposed classes.

3  **IX.    THE THREAT BEYOND FACEBOOK'S WALLED GARDEN**

4          570.    To maintain its dominant position in Social Advertising, Facebook would have to ensure

5  its ability to granularly target Facebook users. But because those users spent significant time outside of

6  Facebook, including on mobile apps and web applications, Facebook needed to effectively harvest social

7  data from them even when they were not on Facebook. And, to maintain the competitive edge it enjoyed

8  from its DTBE, Facebook would have to extend its ability to target users outside of its walled garden.

9          **A.    Facebook Audience Network**

10         571.    Facebook announced a new advertising system at the 2014 F8 conference in April of 2014

11 called the Facebook Audience Network ("FAN"). FAN allowed developers to target both standard

12 banners and custom ad units using Facebook's vast trove of personal data. Advertisers would be able to

13 buy ad space in mobile applications through FAN, and developers could purportedly monetize their apps.

14         572.    As TechCrunch reported ahead of the F8 announcement, FAN would allow advertisers to

15 use Facebook's granular targeting system to advertise in mobile applications:

16             Facebook will also bring the ad targeting muscle, allowing advertisers to
17             reach people based on biographical and interest data, and likely with
               cookie-based retargeting, too. Most other ad networks have a limited
18             amount of data regarding who someone is, and that data is often inferred
               so it's not always accurate. That makes it tougher meaning to show relevant
19             ads that get results and command high rates for publishers. *[sic]*

20             But Facebook's social network has convinced people to volunteer tons of
21             deep personal information like work history, education, and favorite
               movies, plus it can see what apps they use and where they are. Since people
22             stay logged into Facebook, FAN can recognize exactly who the viewer is
               and show them an ad matched to their profile.

23         573.    Part of Facebook's focus was on developers, as they were Facebook's largest mobile ad

24 customer because they sought new users through app installs. FAN would provide new forms of

25 advertising, including early forms of advertising "retargeting"—reengaging with a user after an ad

26 impression or other event. As TechCrunch explained:

27

28

**FILED UNDER SEAL**

> The ads themselves could promote a range of products. There's sure to be plenty of app install ads, Facebook's current cash cow, as developers are desperate for installs and willing to pay. Mobile app-reengagement ads could also be popular. You might already have Hotel Tonight installed, but have forgotten about it. If Facebook sees you like traveling, and just checked in to a restaurant in Los Angeles, it could show an ad delivered through FAN in another app that re-opens HotelTonight to a $99 hotel room in the city. Big brands and local businesses might also get in on the action, as Facebook's offline measurement tools can prove that its ads drive in-person sales.

574. Facebook was opening up an entirely new class of features—those dependent on tracking users across devices and apps.

575. FAN went live in October 2014, and what was launched was significantly broader than what Facebook had announced at F8. FAN was not released as a separate advertising stream. Instead, it was implemented as an extension of Facebook's existing advertising system. This meant that a Facebook Ad, using Facebook's granular targeting systems, could be used to target ads outside of Facebook's properties—directly in third-party, mobile apps.

576. TechCrunch covered the new functionality, explaining its significance:

> Until now, each dollar Facebook earned meant annoying its own users with more ads. This created a natural cap on Facebook's revenue unless it wanted to pester us so much that we stopped visiting. Now it can sit back and cash in on all the targeting data it's collected.

577. Facebook had created finely tuned machine-learning systems to target users by, among other things, biographical and interest-based information it had collected about them as they interacted with other Facebook users. Those machine-learning algorithms would now be turned loose outside of Facebook's walled garden, allowing them to granularly target and track Facebook's users even when they were using someone else's mobile application.

578. The value of this new functionality was not just the ability to display ads on mobile applications that Facebook did not control—it also provided Facebook more critical user data, particularly social data, which its machine-learning algorithms needed as fuel. Facebook would be able to learn more about its users, including how they interacted with other users and content outside of Facebook,

**FILED UNDER SEAL**

Instagram, or WhatsApp. This made Facebook better at serving both content and advertising to users while on Facebook-controlled apps, reinforcing the DTBE.

579.    Initially, Facebook's Login product, which it had promoted at F8 2014, was one of the ways Facebook was able to track users across applications. Users who logged into a third-party app using their Facebook login were then tracked by Facebook as they used those apps.

580.    In May 2016, however, Facebook extended FAN even further, to track Facebook users who were not even logged into Facebook. As Facebook explained in a blog article:

> Over the coming months we will expand the reach of Facebook-powered advertising on the Audience Network to include people who don't have accounts. To ensure that the ads people see in the apps and websites in the Audience Network are highly relevant, we will use information we receive from third-party sites and apps that use Facebook technology.

581.    On May 27, 2016, the *Wall Street Journal* reported that the change allowed tracking of users across the Internet, positioning Facebook to compete head-on with Google:

> To that end, the social network and online advertising company said Thursday it will now help marketers show ads to all users who visit websites and applications in its Audience Network ad network. Previously Facebook only showed ads to members of its social network when they visited those third-party properties.

> The change is a subtle one, but it could mean Facebook will soon help to sell and place a much larger portion of the video and display ads that appear across the Internet. The change will also intensify competition with Alphabet Inc. subsidiary Google, which dominates the global digital-advertising market, and a wide range of other online ad specialists.

582.    Facebook now planned to leverage its targeting systems outside its walled garden. It would monitor users who were not logged into Facebook at all, allowing FAN to extend Facebook's edge beyond the Social Advertising Market, which it had dominated by virtue of the DTBE protecting its business.

### B.    Facebook Acquires Atlas

583.    On December 6, 2012, news broke that Facebook was considering acquiring a company called Atlas from Microsoft. Atlas was a software company that both served ads and tracked ad conversions.

**FILED UNDER SEAL**

584.    For example, Atlas technology would log when a user viewed an ad that was served to them, and then if they later, for example, purchased a product (that is, the ad "converted"), Atlas technology would allow attribution of the sale to the advertisement.

585.    Google had paid $3 billion dollars for its own ad-serving product, DoubleClick, in 2007. Although Atlas lacked the sophistication of DoubleClick—particularly after Google had developed and integrated the DoubleClick software with its own—the purchase of Atlas positioned Facebook to grow and extend its capability to granularly target users with advertising well beyond Facebook's own properties.

586.    In Facebook's hands, however, Atlas and its technology was even more valuable. As Business Insider explained in December 2012:

> The value of a Facebook-powered/Atlas-supported ad network could be tremendous.
>
> Here's why.
>
> Facebook is the only company in the world that has a billion email addresses, home addresses, and phone numbers on file.
>
> This asset allows Facebook to do something no other Website can.
>
> Facebook can tell marketers whether or not a Facebook user saw, on Facebook.com, an ad for a product before going to the store and buying it.
>
> This is possible because retailers often have their shoppers' phone numbers, home addresses, or email addresses on file. (They buy them from data collection companies.)
>
> In the short term, Facebook will use this process to tell marketers exactly how much their sales increased thanks to ads on Facebook.com.

587.    Acquiring software that could track conversions of Facebook ads outside of Facebook's walled garden was a powerful extension of Facebook's targeting apparatus. It closed feedback loops for events that occurred outside of Facebook's view.

588.    This ability, however, was about much more. Facebook's DTBE stems both from the data it harvests from its users and the power of its machine-learning models, which consume that data. As users spend more time outside of Facebook's properties, those machine-learning models have less to train

**FILED UNDER SEAL**

on, reducing the effectiveness of Facebook's targeting. This in turn reduces engagement within Facebook, and as a result, the value of its targeted advertising. Facebook understood this threat in the early 2010s, with the rise of mobile apps. That is why it was—and remains—vital for Facebook to be able to track its own users when they are not using the core Facebook product, Instagram, or WhatsApp.

589.    At its purchase, Atlas already had the necessary functionality, allowing advertisers to plan campaigns, buy ads on sites across the web, and measure their impact. It handled rich media and in-stream video, display ads, and offered APIs for programmatic control.

590.    Internally, Facebook saw Atlas as a means to massively increase Facebook's targeting capabilities. As Amin Zoufonoun, Facebook's Vice President of Corporate Development, described to Sheryl Sandberg when Facebook was considering the acquisition, it gave Facebook "immediate scale to retarget, provide premium insights, do look-alike modeling, prove and measure efficacy of [Facebook] as a marketing medium, [and] enhance customer audiences and associated revenue."

591.    Most importantly, it gave Facebook the ability to use identity-based targeting through Facebook Identity—Facebook's unique identifier for Facebook users across all browsers and devices—to serve highly targeted ads. Indeed, Facebook had described the value of Facebook Identity as the ability to "target people across browsers and devices" and to "[a]ctivate offline data to enrich online targeting," among other features.

592.    On February 28, 2013, Facebook acquired Atlas for approximately $100 million. In its summary of the deal at the time of the transaction, Facebook noted that the transaction was an opportunity to become the "buy-side desktop tool that media planners fire up first thing in the day" and to acquire "a deep installed base of pixels which we can immediately turn on to power conversion tracking and attribution across offerings."

593.    The latter was the most important. By pixels, Facebook was referring to embedded web resources that would automatically pull information from a Facebook server when a user visited a non-Facebook site. Sometimes, this would be done though an invisible, single-pixel image, which would download from a centralized server. When the single-pixel image appearing on a third-party site was

**FILED UNDER SEAL**

downloaded by a user, Facebook would immediately know and would have the user's browser information, IP address, and device information as a result.

594. On September 29, 2014, Facebook announced through a blog post by Atlas's Managing Director Erik Johnson that Facebook had rebuilt Atlas "from the ground up," meaning that it had integrated it with its Facebook advertising systems. Facebook made the announcement ahead of Advertising Week in New York City.

595. Although Facebook removed the blog post and announcement from its site, *Wired* magazine contemporaneously recounted the focus of the announcement: unlike Google, Facebook would not need Cookies to identify users; it had its own data and targeting systems, which it had trained and honed using user interactions with its own properties:

> In an apparent dig at Google, Johnson writes that the method advertisers have traditionally used to track consumers—cookies—is flawed, because consumers are no longer using one device at all times. "Cookies don't work on mobile, are becoming less accurate in demographic targeting and can't easily or accurately measure the customer purchase funnel across browsers and devices or into the offline world," Johnson writes. He offers "people-based marketing," that is, marketing based on Facebook's data, as the solution. It can not only track users between devices, but it can also connect online campaigns to offline sales to determine how effective a given campaign really was.

596. Johnson spoke at the Web Summit 2014 convention on its first day, November 4, 2014 (pictured below).



**FILED UNDER SEAL**

597.    The focus of Johnson's Web Summit talk was identifying users across devices and throughout the Internet by using Facebook's user targeting technology:

> If that email address corresponds to an email address you use on Facebook, we can now stitch together ads you've seen anywhere on the internet with a purchase you made in a store. Facebook has had this functionality for some time now, but with Atlas, we're able to take the cross-device, and the people-based and the offline-to-online story that Facebook has and move it to the rest of the internet.

598.    Atlas gave Facebook the ability to leverage and extend its DTBE. Facebook could not only target users as they interacted on Facebook-controlled applications, but when they interacted with other apps and websites. This sharpened Facebook's own targeting across its properties.

C.    **Facebook Positions Itself Against Google by Combining Atlas, Audience Network, and Other Technology**

599.    By December 10, 2014, Facebook had acquired several key systems that positioned it to extend its targeting advantage beyond Facebook's products. In addition to Facebook Atlas and FAN, Facebook had also acquired LiveRail for approximately $400-500 million.

600.    LiveRail connected marketers to publishers on web and mobile to target seven billion video ads to visitors per month. It provided for real-time bidding, meaning that it dynamically matched advertisement inventory with bids from marketers to optimize both revenue and effectiveness of that advertising.

601.    The technology Facebook acquired from LiveRail and Atlas, coupled with FAN, together positioned Facebook to expand its dominance beyond its walled garden (Facebook's three primary products—Facebook itself, Instagram, and WhatsApp). Facebook's advertising could reach beyond those apps, tracking users across mobile devices and websites, and using information it gleaned from that tracking to sharpen Facebook's targeting algorithms within its own products.

602.    The press likened the combined assets to an "AdTech Voltron," a cartoon robot that assembled a powerful robot out of smaller pieces:

> Here's how the pieces come together.

Facebook brings its 1.35 billion users and massive engagement with the News Feed where it shows its ads. Because its huge user base stays logged in across web and mobile, it has a unified understanding of people's identities in a way most platforms don't. Facebook's wealth of personal data means it can target ads more accurately. For instance, it says it can target gender with 90 percent accuracy compared to the online ad industry average of 50 percent.

603. The combination of these properties reinforced Facebook's primary form of leverage in the Social Advertising Market—its ability to granularly target users and to do so with significantly more accuracy than any other competing product. By tracking Facebook users both inside and outside of its walled garden, Facebook's targeting system was poised to span the Internet, mobile applications, and Facebook's social applications, including Instagram and WhatsApp.

604. Through a combination of these assets, Facebook was able to create "Lookalike Audiences," a new product announced in March 2013 that allowed Facebook to use its combined tracking information to train its machine learning algorithms to serve ads more likely to "convert" or otherwise result in desired feedback. Facebook could use a tracking pixel on a third-party site to find users within its own applications similar enough to likewise convert on the same site.

605. Facebook itself provides an example on its website:

Say you're an online florist that wants to reach people similar to those that made purchases on your website. Now you can use data from your Facebook pixels (Facebook Conversion Pixel or the Custom Audiences for Websites Pixel) to reach people who are most similar people who previously made purchases on your website.

606. Facebook boasted that e-commerce company Shopify "saw a 2x decrease in cost per lead when using lookalikes of their website visitors."

607. The new method of targeting advertisements meant that Facebook's machine learning was becoming more powerful—capable of self-tuning ad campaigns to maximize their effectiveness. After Facebook's ads had run for a while, they would become more effective without the need for manual user input. Facebook's machine-learning algorithms would optimize not only the ad, but Facebook's revenue. All the while, Facebook's algorithms would harvest more information from the users it tracked, allowing

FILED UNDER SEAL

it to further train its machine-learning models. This created a virtuous circle, expanding Facebook's targeting and trove of social data. The net result was a further strengthening of the DTBE.

### D.     Shadow Profiles and Identifying Users Outside of Facebook's Apps

608.    Facebook's new strategy hinged on identifying its own users outside of Facebook's apps. By tracking those users outside of Facebook's walled garden, Facebook became better at targeting them within.

609.    That is, by becoming better at serving content to users based on their web browsing or mobile app usage, Facebook could lock users into its own apps, reducing the need for them to leave Facebook apps while on the internet, which in turn made Facebook ads served to its own users significantly more effective than other forms of advertising.

610.    Facebook needed a way to keep track of what users did across mobile applications, its own applications, and across the web. It did so by maintaining "shadow profiles" on users.

611.    On April 16, 2018, after significant scrutiny before Congress, Facebook revealed the sources of the shadow profile data it collects:

> **When does Facebook get data about people from other websites and apps?**
>
> Many websites and apps use Facebook services to make their content and ads more engaging and relevant. These services include:
>
> - Social plugins, such as our Like and Share buttons, which make other sites more social and help you share content on Facebook;
>
> - Facebook Login, which lets you use your Facebook account to log into another website or app;
>
> - Facebook Analytics, which helps websites and apps better understand how people use their services; and
>
> - Facebook ads and measurement tools, which enable websites and apps to show ads from Facebook advertisers, to run their own ads on Facebook or elsewhere, and to understand the effectiveness of their ads.

**FILED UNDER SEAL**

When you visit a site or app that uses our services, we receive information even if you're logged out or don't have a Facebook account. This is because other apps and sites don't know who is using Facebook.

612.     Facebook confirmed its information gathering in its written answers to the United States Senate on June 11, 2018, admitting that Facebook collects extensive data even if a user is not logged into a Facebook account.

613.     All of this meant that Facebook was uniquely poised to expand and leverage its position in the Social Advertising Market to challenge Google directly in online search and display advertising, where Google had long established a dominant position. As explained in the next section, Facebook never did so. Instead, it made an anticompetitive bargain with Google to preserve the Social Advertising Market—and Facebook's dominance within it.

## X.     FACEBOOK AND GOOGLE AGREE NOT TO COMPETE AND TO FORTIFY THE FACEBOOK-DOMINATED SOCIAL ADVERTISING MARKET

614.     Although Facebook was poised to expand its advertising and targeting business beyond its social networking apps, it never meaningfully did so. Instead, as explained below, it made a bargain with Google that would help Facebook sharpen its machine-learning algorithms so that it could maintain its superior ability to target its own users. In exchange, Facebook never challenged Google's dominance outside of the Social Advertising Market.

### A.     Google's Dominance Over Ad Exchanges and Ad Servers and the Looming Facebook Threat

615.     As Facebook was taking its first steps outside of its walled garden, Google had already achieved longstanding dominance in a form of advertising that allowed dynamic matching of display ad inventory on websites and apps with marketers seeking to advertise to particular demographics.

616.     Publishers provided their advertising inventory to Google's Ad Manager ("GAM"), which would then either match that advertising inventory with a purchaser who had made a direct deal for advertising or serve the available inventory to an ad exchange, where marketers bid for the inventory in real time.

617.     As an example, an online newspaper might have a space available on its site for an advertisement. It would convey that information to an ad server, which would in turn find a buyer for the

FILED UNDER SEAL

space. In some cases, the ad server would send the available space to ad exchanges, which would sell the ad space to the highest bidder.

618.    By the mid-2010s, Google's ad server had become ubiquitous. Publishers, such as USA Today, ESPN, CBS, Time, Walmart, and Weather.com, used (and still use) GAM. Today, GAM controls over 90 percent of ad inventory from publishers.

619.    Because most publishers use GAM to sell their inventory, Google serves as a middleman to all the advertising exchanges, where bids from marketers are matched in real time with available advertising inventory.

620.    In addition to controlling the dominant ad server, Google also runs its own ad exchange, called Google Ad Exchange or "AdX." Google charges an exchange fee for matching purchasers with ad inventory, much of which comes through Google's dominant GAM.

621.    Google's unique vantage point provides it with the ability not only to control the inventory provided to exchanges, but to win bids against other ad exchanges.

622.    That is, Google tracks website use through its analytics product. It tracks users on its Gmail product. It tracks users when they use Google News. It even provides free DNS servers, resolving IP addresses and web addresses for users across the internet. Google also has a unique vantage point because of its mobile operating system, Android.

623.    In recent years, Google's unique tools and properties have made it increasingly better-suited to do what no other advertising exchange can do: identify who the person that visited a publisher's website actually is, *i.e.*, their true, unique identity. Google's ad server and exchange are provided with basic information about the person visiting the publisher's site, such as IP address, device identification information, or browser information. Google's other tools and properties have increasingly positioned it to do make granular identity determinations from this data.

624.    In short, by the mid-2010s Google's advertising ecosystem was getting better and better at doing something that Facebook had built its entire ad business upon, but could not outside of its own properties—ascertain identity. (And, of course, Google could not, and cannot, serve ads to Facebook's users on its properties.) By late 2016, with the rise of new technology and carefully targeted information

**FILED UNDER SEAL**

gathering properties like Android, Google's ad products threatened to encroach upon Facebook's identity-focused ad targeting products—and indeed threatened to superset the Social Advertising Market itself by allowing user and identity targeting outside of Facebook's social network.

625.    As Google's capabilities increased, the prospect of a new, highly targeted form of advertising emerged—one that could rival the effectiveness of buying advertising in the Social Advertising Market, where Facebook was dominant and had unrivaled information about its users.

626.    At the same time, Facebook became increasingly better in the mid-2010s at identifying user identities and demographic information even outside of its own apps. Through Facebook's series of acquisitions, it was able to target users with its advanced machine-learning, even if the users were not logged into Facebook.

627.    By 2018, Facebook was a threat to leverage its technology into Google's territory, including by selling advertising in real-time in mobile applications and on the web. And Google's rapidly growing prowess in discerning identity was an existential threat to Facebook's DTBE.

628.    The two solved their problem by coming to an anticompetitive agreement code-named "Jedi Blue," as explained later in this Complaint. However, to properly understand the true stakes and context of the once-looming clash of advertising titans, it is critical understand the role of AI and machine learning tools in online advertising—and how these tools were differently wielded by Google and Facebook in the run-up to their 2018 agreement to divide markets.

### B.    Google's AI Dominance

629.    Unlike Facebook, Google spent the 2010s becoming preeminent in machine learning and artificial intelligence. For example, Google acquired groundbreaking AI technology when it purchased UK-based DeepMind in January 2014 for more than $500 million. And Google has leveraged this and other bleeding-edge machine learning technology throughout its entire ecosystem ever since.

630.    Google's machine-learning dominance has allowed it to leverage its large cross-section of user data across the Internet and mobile applications in increasingly powerful ways. For example, on December 14, 2016, Google announced that it had used DeepMind technology to make recommendations

on its Google Play Store—Google's mobile app store for Android devices. Google explained the problem and its AI-based solution on its AI blog:

> Providing useful and relevant app recommendations to visitors of the Google Play Apps Store is a key goal of our apps discovery team. An understanding of the topics associated with an app, however, is only one part of creating a system that best serves the user. In order to create a better overall experience, one must also take into account the tastes of the user and provide personalized recommendations. If one didn't, the "You might also like" recommendation would look the same for everyone.
>
> Discovering these nuances requires both an understanding what an app does, and also the context of the app with respect to the user. For example, to an avid sci-fi gamer, similar game recommendations maybe of interest, but if a user installs a fitness app, recommending a health recipe app may be more relevant than five more fitness apps. As users may be more interested in downloading an app or game that complements one they already have installed, we provide recommendations based on app relatedness with each other ("You might also like"), in addition to providing recommendations based on the topic associates with an app ("Similar apps").
>
> One particularly strong contextual signal is app relatedness, based on previous installs and search query clicks. As an example, a user who has searched for and plays a lot of graphics-heavy games likely has a preference for apps which are also graphically intensive rather than apps with simpler graphics. So, when this user installs a car racing game, the "You might also like" suggestions includes apps which relate to the "seed" app (because they are graphically intense racing games) ranked higher than racing apps with simpler graphics. This allows for a finer level of personalization where the characteristics of the apps are matches with the preferences of the user.

631.    Google thus tackled a problem Facebook had solved socially (with actual social data), but did so in a different way—by using complex machine learning that did not require social signals to make social evaluations and recommendations. Rather than collecting actual friend recommendations and activity, Google used machine learning—*i.e.*, deep neural network models—to study a user's decisions and preferences, then identified that other apps that might interested that user.

632.    Facebook, on the other hand, had monetized app installs for years—Facebook's "cash cow"—by using its social targeting systems to traverse its network and coax other users to install apps

FILED UNDER SEAL

using social connections. Facebook used social data, data about its users' interactions within its social network, to devise and train machine-learning algorithms that would make predictions about who would be interested in installing an app.

633.    It was this "recommendation engine" technology that was at the center of Zuckerberg's concerns about Tinder during Facebook's early 2010s API scheme. Indeed, in January 2014, Zuckerberg was concerned that "recommendations seems like something that should be right up our alley," but was "something we're not very good at." He found Tinder's growth "alarming" because its recommendation engine was "built completely on Facebook data" and was "much better than anything we've built for recommendations using the same corpus."

634.    But as Facebook sought to expand its machine-learning capability outside of its walled garden, it faced a Google that was far ahead of it in the field of artificial intelligence and machine learning. This meant that Google was better at identifying users, and if left unchecked, would be better at targeting Facebook's own users throughout the Internet, including on mobile applications.

### C.    The Rise of Header Bidding and Facebook's Threat to Compete with Google

635.    By 2016, a competitive collision between Facebook and Google looked imminent. Facebook was well positioned to move into the ad exchange business, and Google was poised to break Facebook's dominance over granular, identity-based ad targeting, including within long-siloed social networks such as Facebook, Instagram, and WhatsApp.

636.    The threat of competition heightened in 2015 and 2016 when publishers began to adopt a practice called "header bidding." Header bidding routed ad inventory to multiple neutral exchanges each time a user visited a web page in order to return the highest bid for the inventory.

637.    That is, publishers could send a standardized header to several exchanges, which included information about the advertising slot and the visiting user, and bidders on the exchanges could within milliseconds place bids for that advertising slot.

638.    The new header-bidding technology threatened to cut Google out of the picture. Not only did header bidding undermine Google's ad server, which had routed advertisements to the exchanges, it

also eroded Google's ability to front-run third-party ad exchanges by giving its own ad exchange an information advantage.

639. Google created its own alternative to header bidding, called Open Bidding, which among other things, allowed Google an advantage over other exchanges, including by charging a penalty fee when an ad was sold on a non-Google exchange.

640. Google aggressively sought to quell the threat of header bidding, but the threat became existential when Facebook threatened to adopt header bidding. In March 2017, Facebook publicly announced it would support header bidding, including in connection with FAN. At that time, when bidding into Google's ad server, networks such as Facebook's FAN had to bid into exchanges and pay exchange fees. By adopting header bidding, Facebook would let web publishers, mobile app publishers, and advertisers avoid Google's exchange fees altogether. They could simply header bid to the exchanges, including through Facebook's valuable FAN.

641. This was viewed as a direct attack on Google's supremacy. Ad Age reported as much on March 22, 2017:

> Facebook just executed what might best be described as a digital advertising coup against rival Google and its DoubleClick empire.
>
> The social media power said Wednesday that it's bringing advertiser demand from its Audience Network to mobile web publishers that use header bidding.
>
> Mobile publishers have been able to tap demand from Facebook Audience Network until now so long as they didn't use header bidding technology, a system that allows them to take bids from multiple buyer pools all at once. But if they wanted to capitalize on header bidding, they had to forgo any demand in FAN.
>
> Now publishers that used header bidding and want to tap advertisers coming through FAN can do so through Facebook technology partners Index Exchange, Sonobi, Amazon Publisher Services, AppNexus, Media.net and Sortable. They can also access FAN through open-source solutions PreBid and PubFood, the company said.

642. As Ad Age observed, the move meant that Facebook's preeminent, identity-based targeting system could now be leveraged across the internet:

**FILED UNDER SEAL**

> Publishers like the Washington Post, Daily Mail and Forbes have been quietly working with Facebook to introduce the offering, which gives them the ability to plug into FAN and receive ads bought through Facebook's sophisticated data and targeting technology.

643. Facebook's move had been part of a long-term strategy to draw in Google. Facebook's gambit worked, and Google reached out to Facebook to broker a deal.

### D. Google Agrees to Help Facebook Identify Facebook's Own Users Outside of Its Walled Garden, and Facebook Backs Off of Programmatic and Exchange-Trade Advertising

644. Within months of Facebook's official header bidding announcement, Google and Facebook began formal negotiations. By August 2018, the companies were in heated negotiations, with each company internally evaluating contingencies and strategies if no deal could be reached.

645. In September 2018, the companies finally reached an agreement—an anticompetitive one. The agreement was code-named Jedi Blue.

646. Facebook agreed to back off its support of header bidding, leaving Google's dominant position over exchange-based advertising intact.

647. In exchange, Google agreed to give Facebook what it needed—a means to track its own users when outside of Facebook-controlled apps.

648. As part of the agreement, Facebook would pay Google a 5 to 10% transaction fee and would be locked into spending $500 million annually on Google's exchange-based systems.

649. Facebook, in return, would keep its control over the Social Advertising Market. In fact, because of the agreement, Facebook was able to ensure that Google's targeting would not target Facebook's users, solidifying Facebook's preeminence over advertising to users on its social networks. In short, Facebook's agreement with Google shored up Facebook's DTBE within its walled garden at a time when the very existence of a differentiated, Facebook-dominated Social Advertising Market was under threat from advancements in programmatic advertising and tracking technology.

650. As reported by the *Wall Street Journal*, Google provided Facebook a series of concessions to Facebook as part of Jedi Blue that ensured this. For example:

**FILED UNDER SEAL**

- Google would help Facebook recognize mobile and web users, particularly Facebook's own users as they used websites and third-party applications.

- Facebook would receive the right to show ads to 90% of the users it recognized as its own.

- Facebook would receive a 300 millisecond "timeout" to recognize its users and bid. Other participants would receive a shorter, 160 millisecond timeout.

651.    The threat of Facebook leveraging its targeting systems in Google's space was quelled—by agreement. In exchange, Google propped up the Social Advertising Market. Because Facebook could identify its own users outside of its apps, Facebook could maintain a price premium when it sold advertisements to those users. Facebook also received preference over those users, meaning bidders on other exchanges would only get the remaining 10% of inventory, and even then, would have half the time Facebook had to bid on that inventory.

652.    Google handed Facebook control over advertising targeting Facebook users and users of other Facebook-controlled apps. This meant that Facebook became the most valuable means of reaching these users, including while using third-party apps or websites.

653.    Without the agreement, Google's machine-learning and AI dominance would allow it to identify users, including Facebook's own users, and target them, eventually based on granular criteria. This would erode the DTBE protecting Facebook's Social Advertising Market and reduce the price premium Facebook could charge (and did charge) for reaching its users.

654.    Because of Jedi Blue, Facebook's users remained uniquely Facebook's to advertise to. As a result, advertisers had to pay Facebook (at a premium) to advertise to those users using granular targeting, including demographic-based targeting. By reason of the Jedi Blue agreement, no fungible level of targeted advertising could (or did) emerge that could rival Facebook's ad products for its walled garden users.

655.    The agreement also neutralized (or at least substantially delayed) the AI and machine-learning threat posed by Google. Although Google was able to determine the identity of users based on publisher-provided information and its own data collected throughout the Internet, it would not leverage that data to poach advertising sales from Facebook. Rather, Facebook would receive priority over

FILED UNDER SEAL

advertisements to its own identified users—and would receive Google's help to identify those users. Instead of turning its technology against Facebook, Google used it to bolster Facebook's dominant position in the Social Advertising Market.

656. Put simply, Google and Facebook agreed to divide and segment markets, allowing Facebook to continue charging a significant price premium for its targeted advertising sold in the Social Advertising Market. The agreement also staved off competition that threatened Google's control over exchange-traded advertising throughout the Internet. Both competitors benefited. Competition did not.

## XI. FACEBOOK ANTICOMPETITIVELY INTEGRATES THE BACKENDS OF INSTAGRAM, WHATSAPP, MESSENGER, AND ITS CORE FACEBOOK PRODUCT

657. Facebook had entered into an agreement with Google to identify Facebook users as they interacted with websites and apps outside of Facebook's walled garden. With its resources freed up, Facebook turned inward to finally seal off any competition in the Social Advertising Market, significantly and irreversibly strengthening the DTBE.

658. Facebook had for years operated its WhatsApp and Instagram applications as separate businesses. Indeed, Facebook pledged to regulators to keep the companies and their massive data stores separate. By the end of 2018, shortly after Facebook entered into the Jedi Blue agreement with rival Google, Facebook abruptly began considering the integration of the backend software of Facebook, Messenger, WhatsApp, and Instagram, which would create the largest aggregation of social data in the world. The purpose of this integration was not (legitimately) technical; rather, the entire plan was an attempt to irreversibly commingle Facebook's various data sources, products, and models so that regulators could not eventually break up, divest, or otherwise cleanly enjoin or monitor the company after a year of growing, worldwide concern about Facebook's data practices and market power.

659. However, regulatory scrutiny heated up even faster than Zuckerberg had anticipated. By March 2019—just months after Zuckerberg first decided to integrate Facebook's back end, and as the company was just starting to grapple with the massive technical and product resources the integration would require—numerous U.S. Senators, including Presidential candidate Elizabeth Warren, had expressly and publicly called for the company to be broken up.

FILED UNDER SEAL

660.    Zuckerberg and Facebook scrambled to proceed with the backend integration, specifically discussing Warren and other regulators' concerns. In order to distract and delay regulators, Zuckerberg and Facebook's Vice President of Global Affairs, Nick Clegg, internally prepared and then aggressively promulgated a smokescreen—a pretextual claim that the integration was in fact a push to implement end-to-end encryption across Facebook's apps. In reality, end-to-end encryption was a solved problem—it had already been successfully implemented by Facebook in WhatsApp product years earlier—and was wholly tangential to Facebook's back-end integration plans. However, the smokescreen worked: regulators and the media extensively argued about the propriety of end-to-end encryption (which implicates serious law enforcement concerns, among other policy issues) in Facebook's products, while the integration itself was all but forgotten.

661.    This was a problem, because Facebook's back-end integration was not only a means of sealing of competition and strengthening the DTBE, but also a means to prevent regulators from divesting Facebook of WhatsApp and Instagram—or otherwise disaggregating the company's distinct products and data sources.

662.    Facebook's back-end integration lacked any legitimate technical justification, but was instead solely a means to prevent the regulatory breakup of Facebook, Instagram, and WhatsApp and to cement Facebook's dominance over the Social Advertising Market.

## A.    Facebook's Social Data Refinement, Signal Extraction, Data Structuring, and Feature Creation Process.

663.    Facebook's social advertising business required extraction of social data from users as they interact with Facebook's products and services. Facebook refines this social data into "signals": inputs to its ML and AI models that could be used to derive a user's intent and to predict user behavior, including their response to advertising or content.

FILED UNDER SEAL

664.    As an internal Facebook presentation explained, "signals" are actions such as a user viewing content or a pixel on a third-party site firing. A signal can also be the context for an event that occurs either online or offline, such as the time something occurs, or the device used to access something. The associated content accessed by the user is also a signal.  (*See* PALM-006784826, at slide 26.)



(*Id.*)

665.    Additionally, Facebook determines a user's identity based on interactions and social data it receives through its properties. Although signals from a user change, or as Facebook puts it, are "constantly in flux" (*id.*), identity is for the most part fixed. It consists of a user's key attributes, such as the user's name, phone number, or list of contacts. Facebook defined "identity" in an internal presentation as follows:

> **Definitions: 2. FB identity**
>
> Connection of entities, with each entity representing a person with attributes (such as name, demographic, contact), that rarely change (relative to pixels which are a constant flow of data) and often, but not always, is inputted by the user (vs. inferred)

(PALM-006784826, at slide 27.)

666.    For Facebook, "identity" was always baseline information Facebook's own users provided when they signed up for an account and interacted with Facebook's products. Within Facebook's walled

**FILED UNDER SEAL**

garden, identity was a tractable problem—sometimes even a trivial one. A user that logs into Facebook or logs into an app using Facebook's "Login" product would essentially self-identify. Facebook could then pull that user's profile and append streams of signals to it so that predictions or inferences could be made about the user.

667.    Outside of Facebook's walled garden, identity was significantly more difficult, which is why Facebook relied on Google after its "Jedi Blue" agreement to identify Facebook's own users across the World Wide Web and in mobile apps.

668.    Facebook uses identity and signal data together to extract and refine data so that it can be used by Facebook's ML and AI. This transforms the data that Facebook collects at the top of the purchase "funnel" (further away from the user purchase or conversion) into predictions about a user's intent. Facebook internally provided a diagram of this refining process:



(PALM-006784826, at slide 25.)

669.    The next step in Facebook's process is to analyze the underlying data from the signals—namely, the content the user has interacted with—such that the content can be turned into quantitative or structured data. In other words, Facebook next makes sense of the content that the user has viewed,

**FILED UNDER SEAL**

shared, liked, or even lingered on while browsing. Facebook calls this process "semantic extraction" and maintains software tools to perform that extraction:

> **Definitions: 3. Semantic Extraction Tech**
>
> Tools used together information from online and offline surfaces (e.g. web crawler, GPS, Lumos data collection tool), extract semantic understanding from content (e.g., image processors like x-ray and optical character recognition), and map content in a structured way.

(PALM-006784826, at slide 28.)

670. Facebook next structures the data it has extracted by creating "entities," then mapping the entities together. As the internal Facebook presentation explains, an entity can be anything in the real world that has descriptive attributes:

# Definitions: 4. Entity



Real-world things (e.g., celebrities, places, products, concepts) that have descriptive attributes (e.g., brand, version, price). Represented by FB object (e.g. Page or keyword) with properties.

(PALM-006784826, at slide 29.)

671. Facebook prepares a "knowledge graph" that maps various entities together, creating structured data about the relationships among entities. This allows an ML or AI system to traverse the graph to determine relationships between or among things. Facebook describes the "Knowledge Graph" as a "relationship map[]" that describes entities using the "attributes that connect them." (PALM-006784826, at slide 29.)

**FILED UNDER SEAL**

## Definitions: 5. Knowledge Graph



Entity ↔ Entity relationship mapping with attributes that connect them. The connections (or edges) are explicitly named. E.g. Menlo Park "located in" California, outdoor enthusiast "interest in" hiking boots. The Knowledge Graph aims to represent the real world.

(*Id.*)

672.    Facebook also structures the data it receives into a "taxonomy"—a hierarchical structure, like a tree of concepts / entities. This essentially categorizes the data. As Facebook explained in an internal presentation:

## Definitions: 6. Taxonomy



Human-defined categories in a <u>tree-like structure</u>. Each node is an aggregation of nodes below. The leaf nodes cover all entities

(PALM-006784826, at slide 30.)

First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

**FILED UNDER SEAL**

673.    From there, Facebook maps a user to entities. This may include predictions about a user's "intent"—such as whether they are likely to buy a particular good or service. This mapping is one of the essential precursor inputs to Facebook's ML and AI models. In the same internal presentation, Facebook defined the "Intent-People Graph" as follows:

> Mapping of people's (accounts) interactions with entities. More advanced versions can map a prediction for intent to people (accounts) e.g. "in the market for hiking boots". Intent will be a function of ordering of events, actions against the entities, and spatial components (e.g., how long ago was action)

(PALM-006784826, at slide 32.)

674.    Once structuring has occurred, Facebook refines the signals it obtains into "features" using ML and AI. These features are used in conjunction with ML and AI models to make predictions about the user. Facebook's models generally provide rankings to match users with advertising or with recommended content. As Facebook explains:

> **Definitions: 8. Ranking Models**
>
> ML models, features, and utility functions used to leverage Person-Entity Graphs for a specific use-case (e.g. recommendations for ads/search/feed stories/etc., targeting in ads, transparency & control tools)

(PALM-006784826, at slide 33.)

First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

FILED UNDER SEAL

675.    Facebook's internal presentation provided an example of this data refinement pipeline in the context of a Facebook Pixel that fires on a third-party site or app:



(PALM-006784826.)

676.    As Facebook explained, its ML and AI models facilitate the retrieval of ads and then the ranking of users and ads with respect to each other. (*See id.*)

677.    For years, Facebook maintained user "intent" information on what it called the "Intent Platform." This allowed Facebook, Instagram, and WhatsApp to build AI and ML models based on user intent information collected and refined from social data.

678.    Moreover, Facebook internally matched user profiles across its applications. Beginning from the acquisitions of WhatsApp and Instagram, Facebook was able to determine the identity of users across its apps.

FILED UNDER SEAL

### B.    Facebook and Identity

679.    Facebook occupies a different position in what it refers to as the advertisement "funnel" than other Internet advertisers. An advertising or purchase funnel is a way to describe the narrowing number of advertising targets remaining as one sorts for likelihood to act—or to "convert."

**The Purchase Funnel**



680.    Under this model, the further one gets from the point of action or conversion, the more prospective purchasers there are. Far fewer of those prospective purchasers will ever make a purchase than those that have an interest in, or even a desire to purchase, the product.

681.    Facebook, unlike search-engine Google, collects its data higher up the funnel—that is, further away from the point of conversion. This is because when a user interacts with a search engine, she essentially communicates what she is looking for to the search bar.

682.    As an internal Facebook presentation explained:

> FB Inc.'s position of strength today is at the top of the consumer journey (discovery, navigation, inquiry***). More specifically we own large portions of the top of the funnel. (e.g. FB app, IG, Messenger, WA, etc.)***, and also some "commerce enablement" tools focused on what we own (e.g., our business facing tools for the FB family). The broader "commerce enablement infrastructure" we are outlining here goes beyond our internally focused solutions and into market-wide solutions (e.g.,

FILED UNDER SEAL

SEO/SEM on Google, integration into Amazon Marketplace, etc.), down funnel in the consumer journey (e.g. fulfillment, payment platform across channels, etc.) and operations (that are not directly part of the funnel).

(PALM-006782242, at 44 (emphasis added).)

683.    Facebook understood that the intent data enjoyed by search or e-commerce sites was a more direct form of user intent data than its stock in trade. Facebook, on the other hand, derives and infers user intent from the social data it gathers.

684.    The bulk of Facebook's revenue has historically come from the top of the funnel (*e.g.*, from follows, swipes, and clicks in its products), while its lower funnel revenue has come from "offsite" signals, meaning after a Facebook user clicks an ad and is directed to a third-party site. Facebook derives those "offsite" signals from means such as its Pixel or from the use of its Login product with a third-party app or website.

685.    By the last quarter of 2018, Facebook had all but abandoned "offsite" signals such as user activity entirely outside of its walled garden (*i.e.*, on the open Internet or in the physical world). Facebook had handed off its targeting in that space to Google by agreement, therefore doubling down on targeting its own users inside its walled garden.

686.    With Google protecting Facebook's down-funnel position by identifying Facebook users on the open Internet, Facebook could focus its efforts towards the top of the funnel, where Facebook had to first identify users, then, using user attributes and social data, target them with advertising and content.

687.    Facebook has long excelled toward the top of the funnel. This is where Facebook, Instagram, and WhatsApp provide the most social data, which is used to infer user intent and to target advertising or content. By the end of 2018, Facebook's business model relied on social data from the top of the funnel (and what Facebook got from Google), and its WhatsApp and Instagram products greatly augmented Facebook's core products, such as Messenger and Facebook Blue.

688.    At the same time, Facebook had retreated from expending resources to gather offsite signals by cutting a deal with Google. This meant that by the beginning of 2019, Facebook could turn its attention entirely toward its own ability to maintain dominance over the top of the funnel. If Facebook lost control over surveillance-based advertising targeting—ad targeting based on a user's observed

**FILED UNDER SEAL**

behavior toward the top of the funnel—it risked losing the DTBE protecting its business and, accordingly, its Social Advertising monopoly.

689.    In order to further protect its DTBE and maintain its Social Advertising market power after the Jedi Blue deal, Facebook turned in 2019 to an anticompetitive product integration.

### C.    Facebook Begins a Rapid Back-End Integration Effort in Response to Antitrust Scrutiny

690.    At the time of the Instagram and WhatsApp acquisitions, Facebook had promised regulators that it would operate Instagram and WhatsApp as separate businesses from its core applications, Facebook and Messenger.

691.    For example, Facebook had represented to the European Commission's competition regulator that it was unable to match user profiles across WhatsApp and Instagram. The EC regulator relied on those statements as part of its 2014 merger review process.

692.    On May 17, 2017, the EC regulator fined Facebook €110 million and explained its reasons for the fine in the following press release:

> The European Commission has fined Facebook €110 million for providing incorrect or misleading information during the Commission's 2014 investigation under the EU Merger Regulation of Facebook's acquisition of WhatsApp . . . .
>
> When Facebook noticed the acquisition of WhatsApp in 2014, it informed the Commission that it would be unable to establish reliable automated matching between Facebook's users' accounts and WhatsApp users' accounts. It stated this both in the notification form and in a reply to a request for information from the Commission. However, in August 2016, WhatsApp announced updates to its terms of service and privacy policy, including the possibility of linking WhatsApp users' phone numbers with Facebook users' identities.
>
> On December 2016, the Commission addressed a Statement of Objections to Facebook detailing its concerns.
>
> The commission has found that, contrary to Facebook's statements in the 2014 merger review process, the technical possibility of automatically matching Facebook and WhatsApp users' identities already existed in 2014, and that Facebook staff were aware of such a possibility.

**FILED UNDER SEAL**

693.    Facebook had lied to regulators to push its acquisitions through anticompetition review by EC regulators. Facebook was always able to match user identities.

694.    In fact, Facebook had built a dominant position higher up the funnel by positively identifying users across Facebook, Messenger, WhatsApp, and Instagram. Match rates across these apps were extremely high, particularly relative to offsite match rates to user profiles.

695.    Facebook had begun building matching infrastructure almost immediately after it completed both acquisitions and after it had eliminated competition from its platform in April 2015.

696.    By 2018, Facebook's practice of matching users across applications had infuriated the founders of Instagram and WhatsApp. In March 2018, WhatsApp's founder Brian Acton quit in protest, stating on Twitter: "It is time. #deletefacebook."



697.    Zuckerberg had reneged on his promise to limit the monetization of WhatsApp for five years, and had almost immediately began to monetize WhatsApp by matching WhatsApp's massive user base with Facebook's existing user profiles in order to target advertising and to collect social data.

698.    Acton left behind $850 million in stock when he quit in protest.

699.    WhatsApp's other co-founder, Jan Koum, left in April of 2018. Likewise, Instagram's founders Kevin Systrom and Mike Krieger followed suit shortly after, resigning from Facebook in the Fall of 2018.

700.    By the end of 2018, Facebook's dominance over top and mid-funnel social data collection and advertising targeting was well established. Facebook's probabilistic matching system did the job and did the job well. Facebook was extracting massive amounts of revenue from the signals and social data it collected from WhatsApp, Instagram, and Facebook with the infrastructure and matching systems in use at that time.

FILED UNDER SEAL

### D.    The Call to Break Up Facebook, WhatsApp, and Instagram

701.    On March 20, 2018, the Washington Post reported that the Federal Trade Commission had opened an investigation after Facebook's infamous Cambridge Analytica scandal. In the run-up to the 2016 United States Presidential election, Facebook had allowed Cambridge Analytica to pull massive amounts of user information through Facebook's APIs, affecting tens of millions of Facebook's users. The scandal was surprising, as Facebook had been telling developers and the public that it was no longer allowing third-party apps to access to a user's friends and feed information. The FTC immediately began looking into whether Facebook had violated its 2011 consent decree with the agency.

702.    On April 10, 2018, Mark Zuckerberg was called to testify before the United States Senate. Senators' questions pointedly turned to Facebook's monopoly position, particularly during questioning by Senator Lindsey Graham of South Carolina. Graham repeatedly questioned Zuckerberg about Facebook's competitors, and directly asked him if the company had a monopoly.

703.    By the end of 2018, there was widespread public sentiment, including in Washington D.C., that Facebook had become an anticompetitive monopolist. Several United States Senators introduced measures to reduce Facebook's market power, including by proposing modifications to statutory provisions under the Communications Decency Act that have been interpreted to provide Facebook with broad legal immunities that many other companies did not and do not enjoy. As a September 5, 2018, article in The Verge recounted:

> In some ways, Facebook is the most urgent case. It's inescapable, opaque, and wields immense power over the fundamental functions of our society. More than any other tech giant, Facebook's power feels like an immediate threat and the most plausible first target for congressional action. Sen. Mark Warner (D-VA) has already laid out 20 different measures that would rein in Facebook and other tech giants, ranging from GDPR-style data portability requirements to more carveouts of Section 230.
>
> But while Warner's measures focus on nudging Facebook toward more responsible behavior, a growing number of critics see the problem as Facebook itself. It may be that a social network with more than 2 billion users is simply too big to be managed responsibly, and no amount of moderators or regulators will be able to meaningfully rein the company in. For those critics, social networks are a natural monopoly, and no amount

167

FILED UNDER SEAL

of portability requirements will ever produce a meaningful competitor to Facebook or a meaningful check on its power.

If that's true, *a classical antitrust breakup (as some have suggested) would seem like the only option*.

(emphasis added).

704. Cries to break up Facebook were becoming more common. Professor Tim Wu, known for his work on "net neutrality"—in fact, for coining the phrase—had called for Facebook's breakup. His focus was Instagram and WhatsApp. A September 2018 article in The Verge explained Wu's position:

I think if you took a hard look at the acquisition of WhatsApp and Instagram, the argument that the effects of those acquisitions have been anticompetitive would be easy to prove for a number of reasons, says Wu. And breaking up the company wouldn't be hard, he says.

705. On March 8, 2019, Senator Elizabeth Warren—then running for President of the United States—directly called for the breakup of Facebook. Warren's focus was on the Instagram and WhatsApp acquisitions. As Warren stated in a blog post, she believed several big tech mergers should be unwound, including Facebook's WhatsApp and Instagram acquisitions:

Current antitrust laws empower federal regulators to break up mergers that reduce competition. I will appoint regulators who are committed to using existing tools to unwind anti-competitive mergers, including:

- Amazon: Whole Foods; Zappos

- Facebook: WhatsApp; Instagram

- Google: Waze; Nest; DoubleClick

Unwinding these mergers will promote healthy competition in the market—which will put pressure on big tech companies to be more responsive to user concerns, including about privacy.

E. **Zuckerberg Decides to Integrate Facebook, Instagram, and WhatsApp, and Plans a Pretextual Smokescreen to Avoid Backlash from Antitrust Regulators**

706. By the beginning of 2019, as calls to break up Facebook reached a fever pitch, Zuckerberg had internally ordered the integration of the backends of WhatsApp, Instagram, and Facebook. Zuckerberg's mandate would set in motion an extensive, largely irreversible process that required

thousands of Facebook engineers and other employees to reconfigure WhatsApp, Instagram, and Facebook, as well as Facebook's ad and content targeting infrastructure.

707.   As Zuckerberg quietly pushed the process forward, Elizabeth Warren's call to break up Facebook got Zuckerberg's and other C-suite executives' immediate attention. On March 8, 2019, the day of Warren's blog post about breaking up Facebook, Zuckerberg wrote to Sheryl Sandberg, Facebook VP for Global Affairs and Communication Nick Clegg, Facebook VP for Global Communications, Marketing, and Public Policy Elliot Schrage, and Facebook VP for Communications Caryn Marooney (previously the founder and CEO of the OutCast Agency):

> I'm sure you've all seen the news today that Warren is making antitrust and breaking up the tech companies a centerpiece of her campaign. I worry we're miscalibrated on the sensitivity and severity of these issues.

(PALM-006205414, at 15.)

708.   Zuckerberg was rightly worried: his recently-deployed plan to integrate WhatsApp, Instagram, Facebook, and Messenger was a giant technological and strategic undertaking specifically designed to prevent divestiture a few years down the road, in case antitrust scrutiny on Facebook increased and an agency such as the FTC (or even the Department of Justice) sought an injunction to break up the company. But the plan would take months, even years, and require the work of thousands of Facebook engineers and other personnel—and it had to look like something other than an anti-regulatory measure.

709.   Warren's public statement was sure to place the public (and perhaps, regulatory) eye on Zuckerberg's incipient integration plan. And under scrutiny, the truth about Facebook's hastily-planned back-end integration—that it had no legitimate technical justification besides making Facebook more resistant to government-ordered divestiture or similar injunctive relief—would likely come out sooner rather than later.

710.   Zuckerberg needed a smokescreen to hide the true purpose and intent of the integration. So he went immediately to his top public relations executives—Sandberg, Clegg, Schrage, and Marooney—and the brainstorming session did not disappoint.

**FILED UNDER SEAL**

711.   The answer, familiar to anyone at Facebook who had weathered the earlier Platform scheme, was to claim that the just-announced back-end integration of WhatsApp, Instagram, Facebook, and Messenger was to protect users' privacy. And the person who thought of this idea—and clearly framed it as just pretext—was Zuckerberg himself.

712.   Just hours after sending his e-mail about Warren's call to breakup the company, Zuckerberg had an idea that would provide a privacy smokescreen while the company anticompetitively integrated its products to prevent divestiture:

> Here's another way of thinking about this. If you asked any democratic presidential candidate whether Facebook should be able to integrate Instagram and WhatsApp, the politically popular answer would clearly be no. It wouldn't even be a tough decision. But if you asked whether we should have end-to-end encryption, that would put them in a much tougher position. I bet in the end they'd say yes with a bunch of dithering, but even if they came out at no, it would be much tougher for them. One of these issues is clearly more popular and sensitive than the other.

(PALM-006205414, at 15-16.)

713.   In short, Zuckerberg realized that if he framed the back-end integration as about implementing end-to-end encryption (sometimes called "E2EE"), and therefore user privacy, instead of its actual purpose—preventing divestiture—the public, and perhaps even regulators, would be more likely to let Facebook go ahead with its plans.

714.   The problem, of course, was that the back-end integration—the irreversible commingling of user data and processing architecture (among other things) from previously separate WhatsApp, Instagram, Facebook, and Messenger products—was totally distinct from end-to-end encryption. End-to-end encryption was (and is) the process of using hardware and/or software to convert certain communications into unreadable data (encryption) at a sending user's device, then using hardware and/or software to make that data readable again at a receiving user's device (decrypting)—and not decrypting that data at any point in between. This was a solved problem, even at Facebook: as the New York Times reported on April 5, 2016, citing WhatsApp's own company blog—

> SAN FRANCISCO – WhatsApp, the messaging app owned by Facebook and used by more than one billion people, on Tuesday introduced full

FILED UNDER SEAL

encryption for its service, a way to ensure that only the sender and recipient can read messages sent using the app.

Known as "end-to-end encryption," it will be applied to photos, videos, and group text messages sent among people in more than 50 languages across the world . . . ."

715.    In short, Facebook had long already possessed the technology, the know-how, the resources, and indeed the business experience to introduce end-to-end encryption in any of its other messaging services, and to its photo, video, and group text functions across its various products. Indeed, ***Facebook had already done so in 2016, with WhatsApp.***

716.    Moreover, encryption was, simply, a completely separate technical issue from integration. Encrypting communications would not "integrate" anything (indeed, Facebook had chosen to end-to-end encrypt WhatsApp, and nothing else, in 2016); and integrating multiple products would not suddenly encrypt anything. The two technical concepts were—indisputably—totally distinct, and Zuckerberg knew it.

717.    However, using the phrase "end-to-end encryption" in any context did always bring one predictable result: it immediately distracted from and overwhelmed any other technical issue in the conversation, as law enforcement and civil libertarians would immediately fill the room with competing views of electronic privacy at the mere mention of E2EE. The April 2016 New York Times article announcing WhatsApp's new end-to-end encryption was a case in point:

The move thrusts WhatsApp further into a standoff between tech companies and law enforcement officials over access to digital data, one that pits Silicon Valley's civil libertarian ideals against the federal government's concerns over national security. Increased encryption will make it more difficult, if not impossible, for the authorities to intercept WhatsApp communications for investigations. . . .

End-to-end encryption for WhatsApp is of particular concern to the F.B.I., considering the service's huge subscriber base and large international footprint. With increasing amounts of communications now sent across messaging services, encrypted texts, video, photos and the like may end up being more problematic for law enforcement than locked devices. The encryption on WhatsApp will be turned on by default, so users will not be required to enable it themselves.

**FILED UNDER SEAL**

718.     So when Facebook's back-end integration—a completely distinct technical concept that would irreversibly commingle the data and architecture of four different Facebook products to prevent divestiture—was about to be thrust into the spotlight by Elizabeth Warren in March 2019, Zuckerberg quickly realized what smokescreen would best mask the truth: E2EE.

719.     Nick Clegg responded favorably to Zuckerberg's idea:

> Are you suggesting we should lead with E2EE and not interoperability? You may be right that—as a matter of political practicality—the latter is easier to block/hinder than the former.
>
> Where E2EE has a huge advantage over interoperability in the political debate is that it is very easy to explain why it is helpful to users—it protects their privacy—whereas integrating our messaging apps looks as much (if not more so, at least to our critics) as a play for our benefit, not necessarily users.
>
> That is why handling the safety issues re: E2EE are so crucial—if we're seen to be cavalier or careless, the first principle privacy argument will be swamped by controversy around the effect on public, partic child, safety.

(PALM-006205415.)

720.     Meanwhile, as Zuckerberg directed his senior lieutenants to disseminate the newly-concocted privacy / encryption pretext for integration, he simultaneously pushed the end-to-end encryption narrative in the news and on his blog.

721.     And virtually every news outlet reported near-exclusively on the propriety and background of end-to-end encryption and what it would mean for Facebook's products.

722.     Congress and the U.S. Department of Justice also focused almost exclusively on Facebook's announcements about end-to-end encryption. As Engadget reported on October 3, 2019:

> The Department of Justice is set to ask Facebook to pause plans for end-to-end encryption across all of its messaging services. It will urge the company not to move forward "without ensuring that there is no reduction to user safety."
>
> Attorney General William Barr is set to make the request in an open letter to Facebook CEO Mark Zuckerberg on Friday. Acting Homeland Security Secretary Kevin McAleenan, UK Home Secretary Priti Patel and Australian Minister for Home Affairs Peter Dutton also signed the draft letter . . .

**FILED UNDER SEAL**

723.    Facebook had successfully shifted the public and regulatory narrative away from competitive concerns—and indeed, away from the actual details of the back-end product integration itself. Attorney General William Barr and other regulators were almost entirely focused on serious problems raised by Zuckerberg's announced end-to-end encryption plans—namely, the risk that encryption could hamper law enforcement efforts or facilitate child exploitation.

724.    Internally, Facebook was executing on a plan far broader than end-to-end encryption—one directed solely at making WhatsApp, Instagram, Facebook, and Messenger data, ML, and AI systems indistinguishable—and inseverable—from each other before any regulator could act.

F.    **Facebook Anticompetitively Integrates Its Products' Back Ends, Creating Unified Data Stores and AI/ML Systems**

725.    Facebook's integration plans internally were quite different than what Zuckerberg and others at the company had publicly represented. In addition to building an end-to-end encryption smokescreen, Facebook was frantically working to integrate AI and ML systems, as well as "features" extracted from signals and social data.

726.    The reason to integrate these systems was not to enhance Facebook's technology. In fact, the integration efforts made Facebook's products less effective, less transparent, more expensive, less flexible, and more difficult to debut and maintain. And, there was nothing wrong with the systems that had existed prior to the integration; in many ways, those systems were superior.

727.    The real reason for the integration was to inextricably intertwine the AI and ML systems used across Facebook's products, as well as the highly refined social data—the signals—used as inputs to those systems. Facebook accomplished this in two primary ways: first, forcing the organization to build AI and ML models from "features" rather than signals and raw social data; and second, pigeonholing engineers and data scientists into a handful of AI and ML model architectures to be used across the organization. Both of these things not only required Facebook and its affiliated businesses to abandon technology that was bespoke to each product—technology that was immensely profitable and well functioning—but also reduced the flexibility and efficacy of the AI and ML models powering Facebook's products. The sole and real (and the only rational or plausible technological) reason was to intertwine

173

First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

FILED UNDER SEAL

data sources and AI/ML models across Facebook's businesses, making them impossible to disaggregate or operate independently. This was the ultimate defense to the looming threat of an antitrust breakup or invasive regulatory oversight.

1.  **Facebook Forces Its Products to Use Features Instead of Signals and Raw Social Data to Build AI and ML Models, Making the Company's Social Data Impossible Disaggregate by Source or Line of Business.**

728.     As part of Facebook's integration push, the company created a massive aggregation of "features," with plans to require the entire organization to draw from the common features extracted from features from different applications.

729.     Facebook had already centralized "intent" data extracted from social data and signals, with a central gatekeeping system to ensure that only appropriate systems could use particular social data and signals that Facebook had extracted from social data.

730.     This system was called the "Intent Platform," and Facebook required authorization for various groups at Facebook to use the "intent" data that was part of the platform. Importantly, the data stored in the Intent Platform was rawer than what was ultimately extracted and used by Facebook's AI and ML systems.

731.     If Facebook could force its businesses to use data that was the *composite* of less refined social data, then it would obfuscate the ingredients of that composite and the source of the underlying data. That is precisely what a focus on "features" rather than signals and social data would mean. Facebook planned to force its organization to share features, meaning the raw signals and underlying social data would be pre-processed and combined into features ready for processing by AI and ML models across the organization.

732.     Forcing data scientists and engineers across the organization had a massive downside: it reduced their flexibility. An important part of developing an AI or ML model is selecting the features that matter to inferences and predictions. That process requires significant trial and error—most importantly, with varied sources of data. Ultimately, a particular model will be most effective with a given set of "features"—which are extracted patterns in the underlying data. That process, including the

FILED UNDER SEAL

process of validating AI and ML models, often requires access to directly collected data, such as unprocessed social data from user Instagram feeds.

733.    Features could be combined pieces of information from across Facebook's apps. Once combined or refined into "features," which Facebook internally described as a "superset" of "signals" collected from its apps, disaggregating the data to determine source would be in many cases impossible.

734.    By February 2019, Facebook's plan had been given a name: the "Facebook Feature Framework" or "F3."

735.    Although Facebook had maintained a database of "intent" information, which it internally referred to as the "Intent Platform," Facebook planned to migrate to F3 across the organization. This would allow WhatsApp, Instagram, Facebook, Messenger, and other Facebook apps to consume features for machine learning from a unified, integrated source.

736.    Jon Eide described the transition in a February 19, 2019, e-mail:

> **Data consumption through single interface:** As discussed in <u>data use principles</u> proposal, we request all organic products to consume offsite data through single data source. Currently that is Signals Intent platform, later in 2019 will likely migrate it to F3—new Facebook Feature Framework, being implemented by Ads Infra, AI infra and Signals team and is meant to be company-wide platform for ML/intent data consumption. F3 will also have transparent privacy controls built in to manage which data is used for which scenarios.

(PALM-010434436.)

737.    This migration would be incredibly disruptive to Facebook's existing business. As such, Facebook engineers had to incrementally build the new F3 system and in many cases generate work that would be entirely wasted as a result.

738.    Moreover, Facebook's existing systems needed continued access to rawer social data sources, particularly through Facebook's massive database called "Hive" and Facebook's existing "Intent Platform."

739.    As Facebook was removing AI and ML training flexibility from its various divisions, internal demand for custom AI and ML systems was growing significantly. As a Facebook "XFN" (or

FILED UNDER SEAL

1  Cross-Facebook) March 14, 2019, presentation showed, custom AI and ML demand, particularly for

2  Instagram and Facebook's Ad targeting systems had exploded:

3  (PALM-010619603, at 07.)

4      740.    At the same time, "feature engineering"—the process of determining what patterns in



underlying signals and social data were meaningful for AI and ML models—was "a major driver of

revenue," accounting for "45~55% of ads score contribution" in the first half of 2018. (*Id.* at 24.)

    741.    Facebook's push to centralize feature engineering directly clashed with the massive

growth in demand for custom AI and ML models. Facebook's back-end integration would require

Facebook's AI and Data infrastructure teams to become bottlenecks for the creation of new models.

    742.    Put simply, the centralization of "features" made no sense other than massively

intertwining and obfuscating data sources across Facebook's products. Of course, the purpose of doing it

was just that—irreversible commingling to avoid divestiture or invasive regulation. If Facebook

succeeded in its feature integration efforts, it would become virtually impossible to break the company

up or meaningfully regulate it.

**FILED UNDER SEAL**

### 2.    Facebook Centralizes AI and ML Model Architectures and Testing

743.    As part of its integration plans, Facebook also forced its organization to centralize the creation and testing of new AI and ML models. Facebook began the creation of a new system called "Mastercook," which required Facebook's AI infrastructure teams to pre-train ML and AI components for use across the company.

744.    Mastercook required the completion of significant F3 milestones before it could be completed and tested. Facebook again created a massive internal bottleneck as the internal demand for custom AI had increased. Rather than allow Facebook's businesses to build custom AI as needed, Facebook stalled them out, opting to instead create pre-trained systems and AI and ML architectures that would not necessarily fit uses across the entire organization.

745.    Moreover, Mastercook forced Facebook to rely on a concept called "transfer learning," where a model trained for one application can be adapted to another without the need for retraining. In other words, rather than allow Facebook's products to build their own bespoke models suited to particular applications and datasets, Facebook impaired and impeded their ability to do so.

746.    Again, the centralization of AI and ML model creation and testing in the Mastercook system did not make sense technically. In fact, Mastercook cost significantly more than the *status quo*, resulted in weaker and less predictive AI models, and made the AI models actually used more opaque to each division.

747.    Critically, once an AI or ML model has been trained, it is almost impossible to determine what the model found significant to its predictions in the underlying data provided to it. This is called the "black box" problem, and Facebook's migration to a centralized AI and ML creation and testing system exacerbated it. Now, Instagram engineers would, for example, be relying on models potentially pretrained on data they had never seen—and once those models were trained and adapted, it would be impossible to tell what data mattered most to predictions or where the underlying data came from. All of this was technically worse, not better, for Facebook.

748.    However, combining this AI and ML centralization with the F3 initiative meant that the underlying data, signals, and AI / ML at Facebook would be inextricably intertwined. Although there was

**FILED UNDER SEAL**

no legitimate technical advantage to F3 and Mastercook—and indeed, obvious technical *disadvantages* to Facebook's engineers and data scientists—from both, requiring F3 and Mastercook across the entire Facebook organization meant that divestiture would not be as simple as splitting up legacy companies and products. Rather, Facebook's entire AI and Feature Engineering infrastructure would break if separated—that is, if separation was even possible after such integration.

749.    Facebook's Mastercook initiative, particularly in the face of explosive demand for custom AI, made no technological sense. This was especially so if implemented alongside F3. Instead, Facebook's real reason for pushing the AI and ML centralization initiative alongside F3 as part of its product integration was to prevent divestiture and regulation.

### G.    Zuckerberg's End-to-End Encryption Smokescreen Was Pretextual and Lacked a Legitimate Technical Justification

750.    As part of its integration efforts, Facebook sought to combine the underlying data stores for its messaging applications, including WhatsApp, Instagram, and Facebook's Messenger. The underlying user messages were to be mined for user "intent" information, then fed—in "feature" form— to F3. Again, the purpose was to obfuscate the source of the data, particularly from invasive mining of user conversations.

751.    Facebook needed to mask this invasive aspect of its integration, so it relied on its battletested playbook—pretending there was a privacy-based reason for the change. As Zuckerberg recognized in his conversations with Nick Clegg and others, it was difficult to explain how creating a massive store of intent-rich user data from private conversations was pro-competitive, particularly in light of Facebook's Cambridge Analytica scandal and the public calls to break up the company.

752.    Facebook and Zuckerberg had to add something ostensibly privacy-related to the integration so that it could sell the move to the public. To do that, Facebook ordered its engineers to implement end-to-end encryption across certain parts of Facebook's business as part of its integrated messaging-based data mining system.

753.    Of course, the integration and the end-to-end encryption had nothing in particular to do with one other. Facebook could easily integrate its messaging systems and harvest data from them for its

F3 and Mastercook systems without implementing any form of encryption. In fact, the addition of end-to-end encryption alongside F3 and Mastercook *more* difficult. It made Facebook's existing systems less efficient, and it increased both engineering and real-time computation costs.

754.    And, likewise, end-to-end encryption could have been implemented at the application level without integrating the back-ends of the messaging systems or the feature extraction from the messaging apps.

755.    In fact, WhatsApp already had end-to-end encryption features as part of its messaging Platform. As the WhatsApp website stated in April 2016:

Security by Default

> WhatsApp's end-to-end encryption is available when you and the people you message use the latest versions of our app. Many messaging apps only encrypt messages between you and them, but WhatsApp's end-to-end encryption ensures only you and the person you're communicating with can read what is sent, and nobody in between, not even WhatsApp. This is because your messages are secured with a lock, and only the recipient and you have the special key needed to unlick and read them. For added protection, every message you send has its own unique lock and key. All of this happens automatically: no need to turn on settings or set up special secret chats to secure your messages.

756.    Again, WhatsApp posted about this on its company blog. The New York Times wrote an article about it. Facebook knew how to implement end-to-end encryption within its products—and it had already done it, years prior.

757.    Indeed, WhatsApp had implemented end-to-end encryption in 2016, and nothing about that feature required any form of integration with Instagram or Facebook Messenger. The purported addition of "end-to-end encryption" in 2019 was not, as Facebook suggested, part and parcel with the back-end integration. To the contrary, it had nothing to do with it.

758.    Moreover, the implementation of back-end integration alongside Facebook's feature and AI/ML obfuscation measures like F3 and Mastercook only further impaired Facebook's existing systems and made integration efforts more technologically challenging, particularly because end-to-end

encryption could have easily been implemented on each app separately without injecting additional complexity in the integration process.

759. In reality, the end-to-end encryption had been tacked onto Facebook's back-end integration to disguise the true reasons for Facebook's scramble to intertwine its applications, their underlying data, and Facebook's machine learning model.

760. However, the end-to-end encryption discussion paired with reports of Facebook's back-end integration was nothing more than a pretext, devised by Mark Zuckerberg and his public relations taem to mask Facebook's anticompetitive scramble to prevent divestiture and regulation.

761. There was no legitimate technical (or non-anticompetitive) justification for the integration, the simultaneous cross-app addition of end-to-end encryption, Facebook's transition to centralized "feature" systems, and Facebook's insistence on pre-trained and pre-designed AI and ML systems and models.

762. At the same time, these Facebook product changes that occurred in early 2019 and continue (as far as Plaintiffs can discern based on limited discovery) to this day unquestionably strengthened and fortified the DTBE and helped to maintain Facebook's dominance in the Social Advertising Market, irreversibly bringing together massive quantities of social data for mining and targeting by Facebook.

763. Facebook's integration-related product changes had an anticompetitive effect in the Social Advertising Market because, among other things, these product changes indivisibly commingled data and models from the previously distinct WhatsApp, Instagram, Facebook, and Messenger products in a way that fortified the DTBE and further sealed of meaningful competition in the Social Advertising Market, both (i) by creating the largest aggregation of social targeting data the world has ever known, and (ii) by preventing or substantially limiting the divestiture or separation (including court-ordered divestiture pursuant to regulatory decree—and the Federal Trade Commission is currently seeking just this) of discrete social data from WhatsApp, Instagram, and Facebook / Messenger.

764. But the above was an intended feature, not a bug. As explained in the previous sections, these anticompetitive product changes by Facebook beginning in 2019 were expressly intended to

FILED UNDER SEAL

commingle previously distinct data and models in such a way that Facebook could not be divested or meaningfully disaggregated by a court or regulator, thereby sealing off potential competition and maintaining Facebook's Social Advertising Monopoly. Moreover, as explained in the previous sections, these anticompetitive product changes lacked a legitimate technical (or non-anticompetitive) justification.

## XII.   THE RELEVANT MARKET

765.    Plaintiffs are consumers and purchasers in the relevant market at issue in this case—the Social Advertising Market. Plaintiffs are direct purchasers of advertising products from Facebook and were anticompetitively harmed as participants in the Social Advertising Market.

### A.    The Social Advertising Market

766.    The Social Advertising Market is a submarket of online advertising, the latter of which includes banner ads, search-based ads, and advertising on social networks. Social advertising, however, is not fungible or interchangeable with these other forms of online advertising. Indeed, social advertising allows advertisers to granularly target groups of users for ads by their attributes, including by the attributes of their networks.

767.    Thus, because of the extensive ability to target advertisements to users on social media sites like Facebook, search and banner advertising are not reasonable substitutes.

768.    Several relevant factors indicate that the Social Advertising Market is a distinct submarket of online advertising and more general advertising markets:

769.    ***Industry or public recognition of the submarket as a separate economic entity.*** Social advertising is broadly considered to be distinct from other forms of advertising by market and industry participants. For example, the advertising company Outbrain describes the differences between social ads on its blog as follows:

> Paid social ads are served via algorithms that define what the user might be interested in, based on past activity in their social accounts, such as likes, shares, and comments. Unlike search, which is a focused, goal-oriented activity, browsing on social is more relaxed. Think cat memes, vacation snaps, and fun quizzes. Nevertheless, the social platform has accumulated masses of data about every specific user, which can be leveraged to target specific audiences with ads that are likely to be of interest to them.

FILED UNDER SEAL

770.    Outbrain explains that social ads are considered useful for a distinct purpose:

> Social ads are best for targeting audience segments who may be interested in your product or services, based on a range of targeting criteria—location, age group, gender, hobbies, interests. Social networks, such as Facebook, have advanced targeting capabilities, which means you can fine-tune your targeting criteria to reach a very specific, high-quality audience.

771.    Outbrain explains that search ads are different, as they "are great for targeting customers when they are already looking for you (*i.e.*, they search your company name or product), or if they are searching for a specific product, service, or piece of information that you can provide." Outbrain also distinguishes social advertising from other forms of online advertising, like discovery advertising.

772.    Moreover, providers of business statistics such as statista.com also provide information as to social media advertising as a distinct submarket of online and general advertising.

773.    As another example, in March 2015, leading advertising publication AdAge referred to Facebook's Custom Audience targeting, which is unique to social advertising, as "potentially different and more special because they have this richer level of data."

774.    Likewise, industry publication Marketing Land reported in an October 14, 2019 article that media agency Zenith, which is owned by Publicis Media, predicted growth in the social media advertising segment as distinguished from search and television advertising, with social media ads coming in third behind television and paid search advertising.

775.    On an October 23, 2012 earnings call, Facebook's COO Sheryl Sandberg said, "On the question of where advertisers are, as I've said before, we are a third [thing]. We're not TV, we're not search. We are social advertising, and I would say our clients are on different parts of that adoption curve." Later, on a May 1, 2013 earnings call, Sandberg explained: "As I said before, the thing about brand advertisers is that they got very used to TV, then they got very used to search, and we are a third thing."

776.    Even academic articles, including those published in the Journal of Advertising, have analyzed the market for social media advertising as a distinct segment, with well-defined engagement characteristics.

FILED UNDER SEAL

777. ***The product's peculiar characteristics and uses.*** Social advertising has a distinct purpose from other forms of advertising. Social advertising has different applications than other forms of online advertising. Namely, social advertising allows granular targeting based on user attributes, user interests, and group attributes. Moreover, because of the detailed amount of information that can be collected about users as they engage on social media platforms, social advertising can seek out other users with similar behavioral characteristics.

778. Facebook, for example, describes its own targeting capabilities as follows:

> Facebook ads can be targeted to people by location, age, gender, interests, demographics, behavior and connections. You can also use more advanced targeting tools like Lookalike Audiences, which lets you target people similar to the people who already engage with your business, or you can layer your targeting options to select a more specific audience.

779. Facebook allows advertisers to create Lookalike audiences. Thus, unlike search or other forms of advertising where the ad is created and placed to reach a preexisting audience, Facebook is able to algorithmically combine a subset of its users to fit an advertisement. This capability is unique to social advertising.

780. As Facebook explains on its website:

> When you create a Lookalike Audience, you choose a source audience (a Custom Audience created with information pulled from your pixel, mobile app, or fans of your page). We identify the common qualities of the people in it (for example, demographic information or interests). Then we deliver your ad to an audience of people who are similar to (or "look like") them.

781. Because of the level of granular data Facebook collects from its users, it can provide targeting flexibility like no other advertising medium. As Facebook explains:

> You can choose the size of a Lookalike Audience during the creation process. Smaller audiences more closely match your source audience. Creating a larger audience increases your potential reach, but reduces the level of similarity between the Lookalike Audience and source audience. We generally recommend a source audience with between 1,000 to 50,000 people. Source quality matters too. For example, if a source audience is made up of your best customers rather than all your customers, that could lead to better results.

782.    Social advertising is also marked by the ability to algorithmically refine advertising targeting as users interact with the ads. For example, Facebook allows users to place a pixel on their website that is pulled off Facebook's servers when the site is accessed. Facebook is thus able to determine the efficacy of ads run on Facebook once the user transitions to an advertiser's own website. Over time, Facebook's advertising becomes more targeted and more effective in terms of particular advertising goals, such as lead generation or online purchases.

783.    Other social networks, such as Twitter, provide similar targeting abilities. Twitter, for example, allows targeting based on location, language, device, age, and gender, but also allows for the targeting of audience types, including algorithmically tailored and custom-created audiences.

784.    These targeting features, which are available on social advertising platforms, are not comparably available as part of other forms of online advertising, such as display and banner ads or search ads.

785.    ***Unique production facilities.*** Social advertising requires data collected from users on an inherently social application. A user's search history, for example, will not provide enough data to create highly targeted advertising features, such as Facebook's Lookalike Audiences. Likewise, passive advertising, such as banner ads, or even general magazine or publication ads, provides little granular data that can then be used to further refine the targeting of advertising.

786.    Providers of social advertising require specialized means of production because they must rely on data harvested from engagement among networks of users to facilitate highly targeted advertising. Platforms capable of delivering social advertising must therefore provide functionality such as image and video sharing, messaging, matchmaking, content sharing, and other inherently social features in order to obtain the data needed to allow for granular user and user network targeting.

787.    Because social advertising allows iterative refinement of target audiences, a provider of social advertising must employ machine-learning or artificial intelligence algorithms that are trained on data collected from users as they interact and engage with content and advertising. As Facebook's head of its Applied Machine Learning Group, Joaquin Quiñonero Candela, told *Wired* magazine (emphasis in original):

FILED UNDER SEAL

> *Facebook today cannot exist without AI.* Every time you use Facebook or Instagram or Messenger, you may not realize it, but your experiences are being powered by AI.

(emphasis added).

788.    Other forms of advertising generally do not require sophisticated machine learning or artificial intelligence. For years prior to the advent of modern machine learning techniques, search engines such as Yahoo and Google used far less sophisticated algorithms to match user searches with suggested websites and, in turn, advertisements. Traditional advertising, such as magazine or television ads, require no algorithms at all, let alone artificial intelligence.

789.    *Distinct customers.* Social advertising customers are distinct from search advertisers and passive display advertisers. Moreover, social advertising is generally more effective at targeted advertising rather than reaching a massive number of people.

790.    Customers advertising on search engines are generally seeking priority among the search results returned given a particular keyword. Customers advertising on social media platforms are searching for users that fit a particular, predefined profile or set of characteristics. Small businesses that do not generally have the budget to bid on coveted search results are nonetheless able to bid on granularly defined audiences on a social media platform like Facebook.

791.    *Distinct prices and sensitivity to price changes.* Social advertising prices are distinct from other forms of advertising. In search-based advertising, certain search keywords are bid up by many advertisers seeking to have their ads displayed as part of search results. This means that prices in certain categories, such as legal or home improvement, will be significantly higher on search-based platforms than on social advertising platforms like Facebook. For example, legal ads are on average $1.32 on a cost-per-click basis on Facebook, whereas they are $6.75 on a cost-per-click basis on the Google Ads platform. Likewise, consumer services ads are on average $3.08 on a cost-per-click basis on Facebook's platform vs. $6.40 on Google Ads.

792.    Because bidding on Google Ads and other search-based advertising is zero sum, meaning only a certain number of ads can be coupled with a particular set of search keywords, pricing is more sensitive to changes in demand.

793.     Social advertising, however, allows granular targeting, avoiding much of the zero-sum nature of other forms of advertising bidding. Moreover, social advertisers like Facebook can tailor audiences, reducing the likelihood that advertisers will have to compete for the same display opportunity at any given point in time.

794.     Other general forms of advertising such as television and print are even more zero-sum, as there are limited time slots or available pages in a newspaper or magazine. Pricing is thus more sensitive to demand in these forms of advertising.

795.     Social advertising is thus entirely distinct. Because of the ability to target audiences to advertising, pricing is proportional to the generality of the targeting, not simply to the general demand for a limited search term, key word, or periodical placement.

796.     Moreover, Facebook has been able to consistently raise its prices in almost every year it has sold advertising without facing price pressures from competitors. On a cost per mille (CPM)—or cost per thousand advertising impressions—basis, Facebook's advertising prices grew 90 percent year over year according to a report at the end of 2019. In 2018, Vox reported that CPM prices on Facebook had increased 122 percent year over year. In 2017, Facebook's CPMs increased 171%. Facebook raised prices in prior years as well.

797.     ***Specialized vendors.*** The Social Advertising Market has its own distinct and specialized vendors, namely advertising agencies such as Lyfe, Thrive, Volume Nine, Sociallyin, and Firebelly Marketing, all of which boast a specialization in social media advertising and provide specialized social media management products. There are many such specialty advertising agencies that specialize in creating social media advertising campaigns. Moreover, specialized social media analytics vendors also exist, such as Socialbakers, which provides aggregated analytics across social media platforms. There is an entire ecosystem of vendors specializing in social advertising—an indicator that the Social Advertising Market is its own distinct submarket of online advertising, requiring its own unique tools and expertise.

**FILED UNDER SEAL**

798.    Facebook's revenue share of the Social Advertising Market is approximately 80%. Its share has been above 70% since 2015. It remains above that threshold to this day.



799.    Facebook's advertising revenue has steadily grown both in the United States and globally. Facebook reported advertising revenues totaling $17.383 billion as of Q3 2019. Approximately $8.3 billion of that advertising revenue came from the United States.



**FILED UNDER SEAL**

800. From 2014 to 2016, Facebook's advertising revenues grew from $2.9 billion to $6.436 billion. During that period, and even before then, Facebook was one of the few social networks that significantly monetized its network by selling advertising. Other competitors did not come close, and Facebook established unrivaled dominance in the Social Advertising Market and maintains that dominance to this day.

801. Twitter, one of Facebook's only competitors to sell significant social advertising during the same period Facebook generated revenue in the Social Advertising Market, has never exceeded $800 million in advertising revenues. Revenues in Q1 2012 were approximately $45 million, growing to $432 million in Q4 2014, and standing at $702 million as of Q3 2019.

802. LinkedIn, another competitor that sells social advertising, generated roughly $2 billion in overall annual revenue by the end of 2018, with some portion of that coming from advertising.

803. Considering the revenue generated by LinkedIn and Twitter, Facebook's advertising revenue accounts for approximately 86% of the total revenue share across the three largest firms competing in the Social Advertising Market. Excluding the contributions from minor competitors that monetize their social networks, the HHI of the Social Advertising Market is approximately 7,685, well beyond what the DOJ considers a highly concentrated market.

### B. Barriers to Entry

804. The Social Advertising Market is protected by the Data Targeting Barrier to Entry that prevents Facebook's competitors from entering the market. Without a critical mass of social data and machine-learning / AI technology, market participants in the Social Advertising Market cannot generate revenue.

805. Moreover, without adequate social data and engagement with the social network, market participants cannot display content to users that would provide enough value to generate engagement and additional social data.

806. Likewise, without a critical mass of social data, advertising targeting will not be possible or will be substantially diminished in effectiveness, thus reducing revenues in the advertising sales in the Social Advertising Market.

**FILED UNDER SEAL**

807. A firm's market power in this market therefore depends on obtaining a critical mass of social data and the technology to mine it. Because of network effects, users will not use a social network that lacks enough social data to provide targeted content or to provide valuable connections to other users. However, once a certain amount of social data is obtained by a market participant, a feedback loop may form as a result of network effects, further increasing the amount of social data generated by the social network.

808. A new entrant must therefore expend significant amounts of investments in capital, technology and labor to create a network large enough to create the network effects necessary to compete with dominant firms in the market.

809. Because of the large amount of capital and social data required to successfully enter the Social Advertising Market, the DTBE effectively excludes entry by a new competitor, even a well-funded one. Indeed, the DTBE prevented Google from successfully entering the market for social data and the Social Advertising Market with its Google+ social networking product.

810. Although Google+ had successfully replicated Facebook's core functionality and even added additional functionality to its software, its entry failed because it lacked the critical mass of social data that is required to reverse the network effects protecting Facebook. Without that critical mass, users will not incur the costs of switching from Facebook's social network to a new entrant's social network. That is, a new entrant will not be able to provide a valuable network of engaged users upon entry to justify a Facebook user to change social networks.

811. That is precisely what happened to Google. Although it had a massive user base, it lacked engagement, which meant it did not provide a sufficient amount of social data that could be used to target content and advertising to users. This, in turn, reduced the value of the entrant social network and accordingly the attraction of switching from Facebook's social network to Google's.

812. The DTBE continues to reinforce Facebook's dominant position. In fact, by excluding rivals and potentially competing social networks through the anticompetitive scheme described in this Complaint, Facebook strengthened the DTBE, providing it a larger share of social data and a stronger

FILED UNDER SEAL

monetization channel through social advertising. The additional amount of social data increases the value of its network, and the revenue from social advertising increases the cost of entry for a new rival.

813.    Other barriers to entry in the Social Advertising Market include, but are not limited to, the high cost of development, data management, talent acquisition and retention, server infrastructure, development infrastructure, software technology, software libraries, and a brand and marketing presence sufficient enough to attract an engaged user base.

### C.    Relevant Geographic Market

814.    The relevant geographic market is the United States Social Advertising Market.

815.    For the social data that fuels a social advertising product, social data must be compatible with the customers purchasing that data. Thus, social data about a foreign market may be of little use for a U.S.-based advertiser. The data may be collected in a different language, may involve interests more pertinent to a particular geographic region (*e.g.*, American Football vs. Rugby), and may contain a demographic of users that share a common culture or merely a close proximity.

816.    The same is true for the Social Advertising Market. An advertiser seeking to sell products designed for consumption in the United States may not have any use for a platform's advertising targeting capabilities outside of the United States. In the U.S., Facebook enjoys a higher market share of the Social Advertising Market than it does worldwide (which is already very high, as described in subsection VI.A). In short, Facebook enjoys an even more dominant share of the U.S. Social Advertising Market than it does globally.

817.    In the U.S., Facebook's market share of the social data generated by users is even greater than its global market share. Services such as WeChat are geared towards Asian markets, particularly China, and do not generally compete in the U.S. market with Facebook's Messenger, Instagram, and core social networking product. Thus, Facebook's U.S.-based market share is even higher than its global market share referenced above in VI.A, which is already a dominant share of the Social Advertising Market.

## XIII.  HARM TO COMPETITION AND ANTITRUST INJURY

818.  Facebook's anticompetitive scheme had the purpose and effect of monopolizing the Social Advertising Market in the United States. Facebook's conduct allowed it to maintain the monopoly and market power it had obtained by 2010 in the Social Advertising Market, and/or Facebook intended and attempted to acquire such a monopoly through its anticompetitive scheme.

819.  Specifically, Facebook engaged in a series of acts in furtherance of its scheme, including, but not limited to:

- the targeting of competitors for coercive Whitelist and Data Sharing Agreements on pain of denial of access to Facebook's Platform and APIs, including Facebook's Events APIs;

- entering into targeted "sub-verticals" including e-commerce (Marketplace), location-based services (Places API), and streaming video (Facebook Watch), to obtain signal for data targeting, then leveraging the threat of competition from these subvertical products to enter into anticompetitive agreements with eBay, Foursquare, and Netflix that collusively weakened Facebook's sub-vertical products while fortifying the DTBE around Facebook's Social Advertising monopoly, and further protecting that monopoly against actual or potential competition in the Social Advertising Market;

- using deceptively-obtained Onavo data to identify and surveil competitive threats, train AI / ML models using information not reasonably available to potential Social Advertising competitors and/or entrants, thereby maintaining the DTBE and Facebook's Social Advertising monopoly;

- entering into an anticompetitive agreement with Google to bolster and reinforce Facebook's dominant position in the Social Advertising Market; and

- anticompetitively integrating AI/ML Models and features from across distinct products and data sources in a manner that reinforced the DTBE and maintained Facebook's Social Advertising monopoly.

820.  This conduct, each individually, and together as a whole, harmed competition in at least the following ways:

821.    *First*, Facebook's conduct resulted in the exclusion of actual and potential competitors from the Social Advertising Market. By entering into a series of anticompetitive whitelist and data sharing agreements after scuttling its Platform, Facebook was able to obtain a superset of the social data collected by third-party apps. Facebook leveraged deprecation decisions, including as to the Events APIs, to obtain social data and signals from third parties. Facebook also entered into anticompetitive deals with Netflix, eBay, and Foursquare that allowed Facebook to capture additional social data it could use as part of its advertising targeting without having to engage in fierce competition to get it. Facebook fended off the threat beyond its walled garden with an anticompetitive agreement with Google. Facebook used deception to obtain through Onavo spyware user information that ordinary competitors would not have access to—and used that information to surveil competitive threats and to train Facebook's ML and AI models. And, Facebook scrambled to integrate AI and ML "features" and forced its organization to use pre-trained and pre-packaged AI/ML models in order to inextricably intertwine data and AI/ML from its WhatsApp, Instagram, Messenger, and Facebook businesses. This conduct collectively ensured that a rival Social Advertising Platform could not enter the market and that regulators could not break up Facebook or otherwise regulate its conduct.

822.    *Second*, Facebook's conduct reduced consumer choice / welfare. Facebook's conduct ensured that there would be no competition by a rival social advertising platform on non-price bases, such as, for example, increased privacy, more features, higher quality features, new features, more valuable social connections, reduced advertising to users, or new use cases. The scheme also foreclosed new or alternate business models by competitors or potential competitors.

823.    Additionally, Facebook's Onavo surveillance system exfiltrated personal and sensitive data from user devices, then stored that data in Facebook's massive database, the "Hive." Facebook was able to take user data from users even if they were not using Facebook's apps. Facebook deceived users about its Onavo Apps, including Onavo Protect. Facebook used all of the exfiltrated data to build Machine Learning and AI systems as well as other statistical models that provided it real-time insights into competition and user behavior. Users were not given a choice as to how their data was collected, the extent of data collected, and how their data was ultimately used by Facebook. Moreover, this stolen

Onavo data was not available to rivals or potential entrants in the Social Advertising Market, ensuring that there would be no competitive price check to Facebook's supracompetitive social advertising prices.

824.    Likewise, user data was incorporated into Facebook's advertising targeting systems by virtue of anticompetitive agreements with Foursquare, Netflix, and eBay. The net result was to strengthen Facebook's position in the Social Advertising Market, reducing the ability of other firms to enter the market, particularly without access to the social data streams and signals Facebook obtained by threatening competition with, and capturing data from, these companies.

825.    Facebook also reduced advertising consumer choice. Because of Facebook's conduct, Facebook's targeting ability vastly increased and the ability of a potential competitor to access a meaningfully unique store of social data was sealed off, preventing other social advertising companies from entering the Social Advertising Market. This resulted in fewer Social Advertising choices for advertisers and left only Facebook's monopoly rents as available prices in the Social Advertising Market.

826.    *Third*, Facebook's conduct allowed it to raise prices. Facebook's anticompetitive scheme has allowed it to raise prices for social advertising during and the execution of the scheme and Facebook's course of conduct, including across both class periods. Facebook continues to be one of the only sources for targeted social advertising in the United States and in most of the world. As evidence of its market power in the Social Advertising Market, Facebook has raised prices without sacrificing any demand.

827.    For example, Facebook's requirement that developers purchase advertising as a condition of maintaining access to Platform features artificially created demand for Facebook's advertising products, particularly its mobile advertising product. This had the purpose and effect of directly inflating advertising prices.

828.    Similarly, Facebook's anticompetitive deals with eBay and Netflix—in which Facebook pulled back on competition in those companies' principal markets in return for large, nine-figure ad purchases—inflated demand for Facebook's Social Advertising products, with the purpose and effect of inflating advertising prices in that market. Moreover, these same agreements—and Facebook's agreement with Foursquare—provided Facebook with valuable signal data that bolstered and maintained the DTBE around Facebook's social advertising business, prevented meaningful competition by a would-be

**FILED UNDER SEAL**

competitor armed with those companies' social data, and ultimately allowed Facebook to maintain and raise prices in the Social Advertising Market with little or no competitive check in the months and years following those agreements.

829.    In addition, Facebook's anticompetitive agreement with Google allowed Facebook to track Facebook, Instagram, and WhatsApp users outside of those applications and gave Facebook priority when advertising to them. As a result of that agreement, Facebook did not meaningfully compete with Google in programmatic and display-based advertising product markets and sub-markets, and Google did not leverage its ability to identify and target Facebook users, which would diminish Facebook's dominance over targeted advertising to those users while on Facebook's social network. Because Google bolstered and reinforced Facebook's dominant position and market power in the Social Advertising Market, Facebook was able to maintain and raise prices with little or no competitive check.

830.    Next, by strengthening the DTBE, eliminating competition and preventing competitive entry, and by capturing user social data from various sources through the conduct set forth in this Complaint, including by entering into a series of anticompetitive whitelist agreements with targeted developers after scuttling its Platform; entering into anticompetitive deals with Netflix, eBay, and Foursquare that allowed Facebook to capture additional social data for its advertising targeting; entering into an anticompetitive agreement with Google; using deception to obtain data competitors did not have access to, which data was used to surveil competitive threats and train Facebook's ML and AI models; and scrambling to integrate AI and ML "features" and forcing a backend integration to inextricably intertwine data and AI/ML from its WhatsApp, Instagram, Messenger, and Facebook businesses, Facebook was able to charge supracompetitive prices without any meaningful check.

831.    *Fourth*, Facebook's conduct strengthened the DTBE, creating a protective moat around Facebook's monopoly. Facebook's conduct fortified and expanded Facebook's access to vital social data, including signals from what Facebook described as "sub-verticals." Facebook entered into a series of anticompetitive agreements that provided it with data and AI/ML that allowed it to prevent entry by rivals. Facebook's strengthening of the DTBE was calculated to ensure that any rival entering the Social Advertising market would have to obtain a critical mass of social data, AI / ML infrastructure, and real-

FILED UNDER SEAL

time surveillance capabilities in order to viably compete with Facebook upon entry, making such an entry effectively cost-prohibitive.

832.    Each of Facebook's exclusionary acts lack any procompetitive benefit / justification, let alone any justification that could outweigh the anticompetitive effects of the acts. For example, Facebook's agreements with Netflix, eBay, and Foursquare are anticompetitive agreements to cease competing in the streaming video, e-commerce, and location sub-verticals, respectively, in exchange for obtaining user data (and, for Netflix and eBay, substantial ad purchases) from each company.

833.    The anticompetitive effects of these agreements, including the strengthening of Facebook's DTBE, far outweigh any procompetitive effects of dividing markets with each company (and the facts as alleged in this complaint demonstrate that there are none). There are likewise no procompetitive effects that outweigh the anticompetitive effects of Facebook's extended API agreements and other Platform conduct, including its Events API conduct. There is also no legitimate, non-pretextual technical justification for Facebook's backend integration.

834.    The net effect of Facebook's anticompetitive conduct was to inflate advertising prices, including the prices paid by Plaintiffs and the Classes. In the alternative, Facebook's conduct described in this complaint had the purpose and effect of achieving a dangerous probability of a monopoly in the United States Social Advertising Market.

835.    All of this has resulted in sustained and increasing supracompetitive prices for Facebook advertisements. Each of the Plaintiffs (and the persons, entities, and companies in the proposed Classes) bought Facebook advertisements at supracompetitive prices inflated by Facebook's anticompetitive scheme.

836.    Plaintiffs therefore were, and are, harmed in their business and property: they were overcharged for advertising as a result of unlawful, anticompetitive conduct by Facebook.

## CLASS ACTION ALLEGATIONS

837.    The Classes' claims all derive directly from a course of conduct by Facebook. Facebook has engaged in uniform and standardized conduct toward the class. Facebook did not materially differentiate in its actions or inactions toward members of the class. The objective facts on these subjects

**FILED UNDER SEAL**

are the same for all class members. Within each Claim for Relief asserted by the class, the same legal standards govern. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

### The Pre-2018 Nationwide Advertiser Class

838.     Between October 1, 2012, and April 3, 2018, Facebook advertisers, including Plaintiffs Affilious, Jessyca Frederick, Joshua Jeon, and 406 Property Services were governed by materially common terms of service, which applied generally to both commercial and non-commercial Facebook accounts during this period.

839.     Plaintiffs Affilious, Jessyca Frederick, Joshua Jeon, and 406 Property Services bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and a Pre-2018 Nationwide Advertiser Class defined as follows:

> All persons, entities, and/or corporations in the United States who purchased advertising from Facebook between December 1, 2016, and April 3, 2018, but not after April 3, 2018, and were thereby injured by anticompetitive price inflation in the Social Advertising Market (the "Pre-2018 Class Period").

840.     Excluded from the Pre-2018 Nationwide Advertiser Class is the Post-2018 Nationwide Advertiser Class, Facebook, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The Post-2018 Nationwide Advertiser Class

841.     Between April 4, 2018, and the present, Facebook advertisers, including Plaintiffs Mark Berney, Mark Young, and Katherine Looper, have been governed by materially common terms of service, which applied specifically to "commercial" Facebook accounts during this period.

**FILED UNDER SEAL**

842.     Plaintiffs Mark Berney, Mark Young, and Katherine Looper, bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and a Post-2018 Nationwide Advertiser Class defined as follows:

> All persons, entities, and/or corporations in the United States who purchased advertising from Facebook between April 4, 2018, and the present, and were thereby injured by anticompetitive price inflation in the Social Advertising Market (the "Post-2018 Class Period").

843.     Excluded from the Post-2018 Nationwide Advertiser Class is the Pre-2018 Nationwide Advertiser Class, Facebook, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

**Numerosity and Ascertainability**

844.     Each class in this action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). Thousands of persons, entities, and/or companies nationwide purchased advertising from Facebook in each of the Pre-2018 and Post-2018 Class Periods. Individual joinder of all Class members is impracticable.

845.     The Classes are ascertainable because their members can be readily identified using Facebook accounts, Facebook Ads registrations, and other records and information kept by Facebook or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to the certified Classes, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Predominance of Common Issues**

846.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each Class predominate over questions affecting only individual Class members.

847.     Common issues include, without limitation, the following questions of law and fact for both the Pre-2018 and Post-2018 Nationwide Advertiser Classes:

**FILED UNDER SEAL**

a.  Whether Defendant monopolized the Social Advertising Market.

b.  Whether Defendant, its employees or affiliates, intended to monopolize the Social Advertising Market.

c.  Whether Defendant attempted to monopolize the Social Advertising Market.

d.  Whether Defendant possessed monopoly or market power in the Social Advertising Market.

e.  Whether user data and data obtained by third parties created a Data Targeting Barrier to Entry that protected Facebook's market position and/or monopoly, reduced competition or entry in the Social Advertising Market, and/or increased prices for products in that market, including, but not limited to, advertising sold to members of the proposed Classes.

f.  Whether Defendant's agreements with whitelisted developers violated Section 2 of the Sherman Act, including whether the agreements restrained trade or strengthened the Data Targeting Barrier to Entry.

g.  Whether Defendant's "entry and capture" conduct, as described and alleged in this complaint, violates Section 2 of the Sherman Act;

h.  Whether Defendant's "entry and capture" agreement with Netflix, as described and alleged in this complaint, violates Section 1 of the Sherman Act;

i.  Whether Defendant's "entry and capture" agreement with eBay, as described and alleged in this complaint, violates Section 1 of the Sherman Act;

j.  Whether Defendant's agreement with Google to reinforce and bolster Facebook's dominance in the Social Advertising Market violated Sections 1 and 2 of the Sherman Act.

k.  Whether Defendant's back-end integration is anticompetitive and violates Section 2 of the Sherman Act;

l.  Whether Defendant's conduct harmed competition in the Social Advertising Market.

First Amended Consolidated Advertiser Class Action Complaint – Case No. 20-CV-08570-JD

**FILED UNDER SEAL**

m.  Whether Defendant's conduct caused price increases or the reduction of consumer or developer choice in the Social Advertising Market.

n.  Whether Defendant's unlawful conduct was a substantial contributing factor in the injury to members of the Classes.

**Typicality**

848.  This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because for each proposed Class, the identified Plaintiffs' claims are typical of the claims of other Class members and arise from the same course of conduct by Defendant. The relief that each Class's named Plaintiffs seek is typical of the relief sought for the absent Class members.

**Adequate Representation**

849.  Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting antitrust and consumer class actions.

850.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

**Superiority**

851.  This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendant has acted and refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to the Classes as a whole.

852.  This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. For each proposed Class, the common questions of law and fact regarding Defendant's conduct and responsibility predominate over any question affecting only individual Class members.

853.  Because the damages suffered by each individual Class member may be relatively smaller than the costs of litigation, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such

FILED UNDER SEAL

that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A) for each of the proposed Classes.

854. For each of the proposed Classes, the conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

855. Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide, and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any class into subclasses.

## REALLEGATION AND INCORPORATION BY REFERENCE

856. Plaintiffs reallege and incorporate by reference all the preceding paragraphs and allegations of this Complaint, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Classes.

**FILED UNDER SEAL**

## CLAIMS FOR RELIEF

### COUNT I
### Section 2 Sherman Act:
### Monopolization

857.   Defendant has willfully acquired and maintained monopoly power in the relevant market for Social Advertising.

858.   Facebook possesses monopoly power in the relevant market for Social Advertising. Facebook has the power to control prices or exclude competition in the relevant market.

859.   Facebook's revenue share of the Social Advertising Market is approximately 80%; its share has been above 70% since 2015.

860.   Defendant has willfully acquired and maintained monopoly power for Facebook in the relevant market for Social Advertising. As alleged in this Complaint, Defendant has accomplished this by means of predatory, exclusionary, and anticompetitive conduct, including but not limited to:

- the targeting of competitors for coercive Whitelist and Data Sharing Agreements on pain of denial of access to Facebook's Platform and APIs, including Facebook's Events APIs;

- entering into targeted "sub-verticals" including e-commerce (Marketplace), location-based services (Places API), and streaming video (Facebook Watch), to obtain signal for data targeting, then leveraging the threat of competition from these subvertical products to enter into anticompetitive agreements with eBay, Foursquare, and Netflix that collusively weakened Facebook's sub-vertical products while fortifying the DTBE around Facebook's Social Advertising monopoly, and further protecting that monopoly against actual or potential competition in the Social Advertising Market;

- using deceptively-obtained Onavo data to identify and surveil competitive threats, and to train AI / ML models using information not reasonably available to potential Social Advertising competitors and/or entrants, thereby maintaining the DTBE and Facebook's Social Advertising monopoly;

- entering into an anticompetitive agreement with Google to bolster and reinforce Facebook's dominant position in the Social Advertising Market; and

**FILED UNDER SEAL**

- anticompetitively integrating AI/ML Models and features from across distinct products and data sources in a manner that reinforced the DTBE and maintained Facebook's Social Advertising monopoly.

861. Defendant's conduct alleged here has had an anticompetitive effect in the relevant market for Social Advertising.

862. Defendant's conduct alleged here has no legitimate business purpose or procompetitive effect.

863. Defendant's conduct alleged here has had a substantial effect on interstate commerce.

864. Plaintiffs and the Classes have been and will be injured in their business or property as a result of Defendant's conduct alleged in this Complaint.

865. Plaintiffs and the Classes have suffered and will suffer injury of the type that the antitrust laws were intended to prevent by reason of Defendant's conduct. Plaintiffs and the Classes have been and will be injured by the harm to competition as a result of Defendant's conduct.

**COUNT II**
**Section 2 Sherman Act:**
**Attempted Monopolization**

866. As alleged in this Complaint, Defendant has engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to:

- the targeting of competitors for coercive Whitelist and Data Sharing Agreements on pain of denial of access to Facebook's Platform and APIs, including Facebook's Events APIs;
- entering into targeted "sub-verticals" including e-commerce (Marketplace), location-based services (Places API), and streaming video (Facebook Watch), to obtain signal for data targeting, then leveraging the threat of competition from these subvertical products to enter into anticompetitive agreements with eBay, Foursquare, and Netflix that collusively weakened Facebook's sub-vertical products while fortifying the DTBE around Facebook's Social Advertising monopoly, and further protecting that monopoly against actual or potential competition in the Social Advertising Market;

**FILED UNDER SEAL**

- using deceptively-obtained Onavo data to identify and surveil competitive threats, and to train AI / ML models using information not reasonably available to potential Social Advertising competitors and/or entrants, thereby maintaining the DTBE and Facebook's Social Advertising monopoly;

- entering into an anticompetitive agreement with Google to bolster and reinforce Facebook's dominant position in the Social Advertising Market; and

- anticompetitively integrating AI/ML Models and features from across distinct products and data sources in a manner that reinforced the DTBE and maintained Facebook's Social Advertising monopoly.

867. Defendant's conduct alleged here has had an anticompetitive effect in the relevant market for Social Advertising.

868. Defendant's conduct alleged here has no legitimate business purpose or procompetitive effect.

869. Defendant has engaged in this conduct with the specific intent of monopolizing the relevant market for Social Advertising.

870. Defendant has engaged in this conduct with a dangerous probability of monopolizing the relevant market for Social Advertising.

871. Defendant's conduct alleged here has had a substantial effect on interstate commerce.

872. Plaintiffs and the Classes have been and will be injured in their business or property as a result of Defendant's conduct alleged in this Complaint.

873. Plaintiffs and the Classes have suffered and will suffer injury of the type that the antitrust laws were intended to prevent by reason of Defendant's conduct. Plaintiffs and the Classes have been and will be injured by the harm to competition as a result of Defendant's conduct.

**COUNT III**
**Section 1 Sherman Act:**
**Restraint of Trade**

**FILED UNDER SEAL**

874. As alleged in this Complaint, Facebook knowingly and intentionally entered into an agreement to restrict trade in order to preserve the DTBE and protect Facebook's control of social advertising. This agreement, by bolstering and reinforcing Facebook's market power and dominance in the Social Advertising Market, had the purpose and effect of maintaining market divisions and/or segmentation, allowing Facebook to continue charging a significant price premium for its targeted advertising sold in the Social Advertising Market. Because of this agreement, no fungible level of targeted advertising would emerge that could rival Facebook's ad products.

875. Defendant's conduct alleged above is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs therefore do not need to allege a relevant market. To the extent a market must be alleged, Facebook's restraint of trade has had an anticompetitive effect in the relevant market of Social Advertising in the United States.

876. Defendant's conduct alleged here has no legitimate business purpose or procompetitive effect.

877. Defendant's conduct has had a substantial effect on interstate commerce.

878. Plaintiffs and the Classes have been and will be injured in their business or property as a result of Defendant's conduct alleged here.

879. Plaintiffs and the Classes have suffered and will suffer injury of the type that the antitrust laws were intended to prevent by reason of Defendant's conduct. Plaintiffs and the Classes have been and will be injured by the harm to competition as a result of Defendant's conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgment be entered against Defendant and that the Court grant the following:

A. Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Classes, and declare Plaintiffs as the representatives of the Classes;

B. Enter a judgment against Defendant in favor of Plaintiffs and the Classes;

**FILED UNDER SEAL**

C.      Award the Classes damages (i.e., three times their damages) in amount to be determined
        at trial;

D.      Award actual, compensatory, statutory, and consequential damages;

E.      Award equitable monetary relief, including restitution and disgorgement of all ill-gotten
        gains, and the imposition of a constructive trust upon, or otherwise restricting the
        proceeds of Defendant's ill-gotten gains, to ensure an effective remedy;

F.      Award pre-judgment and post-judgment interest at the highest rate allowed by law;

G.      Award Plaintiffs and the Classes their costs of suit, including reasonable attorneys' fees
        as provided by law; and

H.      Award such further and additional relief as the case may require and the Court may deem
        just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

**FILED UNDER SEAL**

Dated: February 28, 2022

Respectfully submitted,

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**

/s/ Kristen M. Anderson
Kristen M. Anderson (CA 246108)
kanderson@scott-scott.com
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY  10169
Tel.: (212) 223-6444
Fax: (212) 223-6334

Christopher M. Burke (CA 214799)
cburke@scott-scott.com
David H. Goldberger (CA 225869)
dgoldberger@scott-scott.com
Kate Lv (CA 302704)
klv@scott-scott.com
Hal D. Cunningham (CA 243048)
hcunningham@scott-scott.com
Daniel J. Brockwell (CA 335983)
dbrockwell@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA  92101
Tel.: (619) 233-4565
Fax: (619) 233-0508

Patrick J. McGahan (*pro hac vice*)
pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT  06415
Tel.: (860) 537-5537
Fax: (860) 537-4432

*Interim Co-Lead Counsel and Executive Committee
for the Advertiser Class*

**BATHAEE DUNNE LLP**

/s/ Yavar Bathaee
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
Andrew C. Wolinsky
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
Tel.: (213) 462-2772

**LEVIN SEDRAN & BERMAN LLP**
Keith J. Verrier (*pro hac vice*)
Austin B. Cohen (*pro hac vice*)
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
Tel.: (215) 592-1500
Fax:  (215) 592-4663
kverrier@lfsblaw.com
acohen@lfsblaw.com

**AHDOOT & WOLFSON, PC**
Tina Wolfson (CA 174806)
Robert Ahdoot (CA 172098)
Theodore W. Maya (CA 223242)
Henry J. Kelson (*pro hac vice*)
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585
twolfson@ahdootwolfson.com
rahdoot@ahdootwolfson.com
tmaya@ahdootwolfson.com

FILED UNDER SEAL

## ATTESTATION OF YAVAR BATHAEE

This document is being filed through the Electronic Case Filing (ECF) system by Yavar Bathaee, who attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the signature block.


Dated: February 28, 2022       /s/ Yavar Bathaee
                Yavar Bathaee