**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GOOGLE ADVERTISING ANTITRUST LITIGATION | Case No. 1:21-md-03010 (PKC) |

*This Document Relates To:*

| | |
|---|---|
| ASSOCIATED NEWSPAPERS LTD. and MAIL MEDIA, INC.<br><br>　　　　　　　　　　*Plaintiffs*,<br><br>　-against-<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>　　　　　　　　　　*Defendants*. | Case No. 1:21-cv-03446 (PKC) |

**DAILY MAIL'S OPPOSITION TO GOOGLE'S MOTION TO DISMISS**
**DAILY MAIL'S FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ....................................................................................................... 1

LEGAL STANDARD.................................................................................................. 4

ARGUMENT .............................................................................................................. 5

I.   Google Abuses its Search Monopoly To Fortify its Ad Exchange Monopoly ................... 5

    A.   Google Manipulates its Search Results To Punish Publishers that Make AdX Compete ........................................................................................... 6

    B.   AMP Coerces Publishers To Abandon Client-Side Header Bidding.................... 12

II.  Google Manipulates its Ad Server To Defeat Competition from Rival Exchanges .......... 17

    A.   Google Coerces Publishers To Use Exchange Bidding ......................................... 17

    B.   Google Unlawfully Hashes User IDs.................................................................... 20

III. Google's Motion Cannot Justify Precluding or Staying Discovery, Nor Dismissal With Prejudice ............................................................................................................ 24

CONCLUSION.................................................................................................................26

# TABLE OF AUTHORITIES

**CASES**                                                                                          **Page(s)**

*A.F. ex rel Fogel v. Sorin Grp. USA, Inc.*, 346 F. Supp. 3d 534 (S.D.N.Y. 2018) ...................... 26

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,
    London, England*, 136 F.3d 82 (2d Cir. 1998) ........................................................................ 22

*Aluminum Warehousing Antitrust Litig.*, *In re*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015) ................. 25

*Atlas S. S. Chartering Corp. v. Dillingham Corp.*, 314 F. Supp. 1118 (S.D.N.Y. 1970) ............ 22

*BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015) ..................................................... 24, 25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................... 2

*Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46 (2d Cir. 2016) .......................................... 4

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002)....................................... 21

*Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005)..................................... 23

*Cuoco v. Moritsugu*, 222 F.3d 99 (2d Cir. 2000)......................................................................... 26

*Davitashvili v. Grubhub Inc.*, 2022 WL 958051 (S.D.N.Y. Mar. 30, 2022) ......................... 17, 23

*Drake v. Handman*, 30 F.R.D. 394 (S.D.N.Y. 1962)................................................................... 22

*Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130 (9th Cir. 2022) ........................................ 12

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435 (4th Cir. 2011)............. 11, 16

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ................................. 15-16

*Friedman v. Bloomberg L.P.*, 884 F. 3d 83 (2d Cir. 2017) .......................................................... 11

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986) ............................................................. 23

*Gelboim v. Bank of Am. Corp.*, 574 U.S. 405 (2015) .................................................................... 5

*Graphics Processing Units Antitrust Litig.*, *In re*,
    540 F. Supp. 2d 1085 (N.D. Cal. 2007) ............................................................................... 11

*GSE Bonds Antitrust Litig.*, *In re*, 396 F. Supp. 3d 354 (S.D.N.Y. 2019)...................................... 6

*IHS Dialysis Inc. v. Davita, Inc.*, 2013 WL 1309737 (S.D.N.Y. Mar. 31, 2013)........................ 24

*Initial Pub. Offering Sec. Litig.*, *In re*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................ 18

*Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, *In re*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ..................................... 1-2, 3, 5, 10
                                      11, 16, 17, 20, 23

*Khwaja v. Jobs to Move Am.*, 2021 WL 3911290 (S.D.N.Y. Sept. 1, 2021) ............................... 11

*Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071 (N.D. Ill. 2011) .............. 11

*Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513 (S.D.N.Y. 2016) ............................................ 11

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ............................................................ 10

*Manuel v. Pepsi-Cola Co.*, 2018 WL 2269247 (S.D.N.Y. May 17, 2018) .................................. 12

*Maxon Hyundai Mazda v. Carfax, Inc.*, 2014 WL 4988268 (S.D.N.Y. Sept. 29, 2014) ............. 17

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
    468 U.S. 85 (1984) ............................................................................................................. 23

*Nat'l Prescription Opiate Litig.*, *In re*, 956 F.3d 838 (6th Cir. 2020) ........................................... 5

*Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) ........................................ 21, 22

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ..................... 3, 17,
                                        19, 21, 23

*New York Medscan LLC v. New York Univ. Sch. of Med.*,
    430 F. Supp. 2d 140 (S.D.N.Y. 2006) ............................................................................... 25

*Nielsen Co. (US), LLC v. Success Sys., Inc.*,
    2012 WL 124592 (S.D.N.Y. Jan. 17, 2012) ..................................................................... 11

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ............................... 4, 21, 22, 24

*Owoyemi v. Credit Corp Sols. Inc.*, 596 F. Supp. 3d 514 (S.D.N.Y. 2022) ................................ 26

*Rieser v. Baltimore & Ohio R.R. Co.*, 224 F.2d 198 (2d Cir. 1955) ........................................... 24

*Sacerdote v. New York Univ.*, 9 F.4th 95 (2d Cir. 2021) ............................................................... 4

*Starr v. Sony BMG Music Enter.*, 592 F.3d 314 (2d Cir. 2010) .................................................... 6

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ....................................................................... 5

*Trahan v. Lazar*, 457 F. Supp. 3d 323 (S.D.N.Y. 2020) .............................................................. 25

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ........................................ 1-2, 10

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ........................................... 10, 23

*United States v. Nat'l Soc. of Prof'l Eng'rs*, 555 F.2d 978 (D.C. Cir. 1977),
    *aff'd*, 435 U.S. 679 (1978) .................................................................................. 22

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020) ................................................. 23

*Wolf v. Time Warner, Inc.*, 2011 WL 856264 (S.D.N.Y. Mar. 3, 2011) ...................................... 10

*Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372 (S.D.N.Y. 2007) ...................... 11, 16

## RULES AND REGULATIONS

Fed. R. Civ. P. 56(a) ................................................................................................................. 25

## OTHER AUTHORITIES

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (4th ed. 2022) ........ 23

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (5th ed. 2022).......................... 12, 20, 24

## INTRODUCTION

The Court should deny Google's partial motion to dismiss Daily Mail's First Amended Complaint ("FAC"), ECF No. 400.[1]  Google does not dispute it is a monopolist in the markets for publisher ad servers and ad exchanges, and it declines to challenge more than a dozen alleged acts of unlawful monopolization.  The four allegations Google does challenge plead anticompetitive conduct.

*First*, Google abuses its undisputed monopoly in general search services to harm the market for advertising exchanges.  As Daily Mail has experienced first-hand, Google manipulates its search results to channel inventory away from publishers that deal with rival exchanges and instead to publishers who deal with its exchange.  For instance, in June 2019, Google severely reduced search traffic for Daily Mail and other publishers whose "pages were less profitable to Google than other websites," FAC ¶ 222; *see id*. ¶ 216, because Daily Mail and similar publishers "made AdX compete more vigorously for impressions," *id.* ¶ 219.  Google inflicted similar punishments for publishers in 2017 and 2018.  *See id.* ¶ 224.  Google warned publishers that participation in client-side header bidding would harm their ability to monetize inventory.  *See id.* ¶ 163.

In its motion, Google argues that Daily Mail cannot plead coercion because Daily Mail "continue[s] to use header bidding," Google's Mem. of Law in Supp. of Mot. To Dismiss 13, ECF No. 454 ("Mem."), albeit to a lesser extent.  But "[u]nder Section 2 of the Sherman Act, it is not necessary that all competition be removed from the market" before anticompetitive conduct becomes unlawful.  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F.

---

[1] Unless otherwise noted, citations to "ECF No." refer to documents filed in *In re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010-PKC (S.D.N.Y.).

Supp. 3d 187, 236 (S.D.N.Y. 2019) (quoting *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)).  Daily Mail's allegations that Google reduces publishers' use of rival exchanges and that Google's search abuses forced Daily Mail to sell three times as much inventory through AdX at half of prior prices, *see* FAC ¶¶ 222-223, suffice to show coercion. Ultimately, Google retreats to an unsupported objection that Daily Mail's allegations are "implausible," Mem. 13, but Google's targeting of non-compliant publishers is common to many of the complaints that challenge Google's anticompetitive conduct, *see* State Pls.' Third Am. Compl. ¶ 311, ECF No. 195 ("TAC") (Google's Bernanke uses "Global Publisher Tags" to determine which publishers provide AdX "preferential access to" inventory); Compl. ¶ 214, *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va. Jan. 24, 2023), ECF No. 1 ("DOJ Compl.") (Google created "a 'white list' of publishers that did not use header bidding" and blocked bids from Google's DV360 for publishers not on that list).  All such allegations must be evaluated evenly, as "Rule 12(b)(6) does not countenance . . . dismissals based on . . . disbelief of a complaint's factual allegations."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted).

*Second*, Google uses its monopoly search engine to coerce publishers to abandon client-side header bidding for a significant portion of their inventory on mobile pages.  Since 2016, Google has permitted publishers to appear at the top of mobile search results pages if and only if they adopt the "Accelerated Mobile Pages" ("AMP") page format and reject client-side header bidding.  FAC ¶¶ 202, 206, 210.  The alternatives – Google's Exchange Bidding and "Real Time Config" (another Google product) – permit fewer than half as many exchanges to compete for impressions.  *Id.* ¶ 209.  Nonetheless, "Daily Mail must accede to whatever terms Google requires," because it "cannot forgo the significant slice of Google-referred readers."  *Id.* ¶ 203.

2

Google responds that banning client-side header bidding on AMP pages is not "coercive" because it has not eliminated non-AMP pages entirely, and its conduct is otherwise immune as a "product innovation." Mem. 11. But again, the legal test "is not total foreclosure." *Keurig*, 383 F. Supp. 3d at 236 (citation omitted). That Daily Mail must sacrifice half of demand on the most important pages for its "largest source of mobile referral traffic," FAC ¶ 202, suffices to plead coercion. And where "there is coercion," "the technological desirability of [a] product change" does not bear on "the permissibility of the defendant's conduct." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 653 n.25 (2d Cir. 2015) (citation omitted).

*Third*, through conduct this Court already held was unlawful, Google has forced publishers to use Google's Exchange Bidding rather than client-side header bidding. *See* FAC ¶ 163. Google targets header bidding because it "remains a more favorable environment for publishers and rival exchanges," which makes it a threat to Google's ad-server and exchange monopolies. *Id.* ¶¶ 161-162. Google denies any coercion, but the FAC pleads otherwise. Google caps the number of line items a publisher may use, limiting publishers' ability to accept bids from header bidding, and it redacts datasets so that publishers cannot make an informed decision between header bidding and Exchange Bidding. *See id.* ¶ 163. This Court has already recognized that these tactics for undermining client-side header bidding are unlawful. *See* Op. and Order 67-68, ECF No. 308 ("MTD Op."). Google offers no persuasive grounds for reconsideration of the Court's holding. Google observes that it has not yet forced Daily Mail to "abandon" header bidding, Mem. 5, but that again ignores the caselaw holding substantial foreclosure is sufficient to state a claim.

*Fourth*, since 2009, Google has hashed publisher-owned user IDs for sales made through any exchange other than AdX. This conduct significantly harms publishers: "When exchanges

and their DSPs cannot identify users in auctions, the prices of impressions fall by 50%" or more. FAC ¶ 111.  Google contends that Daily Mail's allegations plead nothing more than Google's unilateral refusal to "share" Google data.  That misstates the FAC.  Daily Mail's contracts with Google establish that Daily Mail "own[s] all data 'derived from the use of' DFP and AdX" – including user IDs.  *Id.* ¶ 109.  Google's hashing is therefore "affirmatively interfering with [Daily Mail's] business activities in the marketplace."  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013) (Gorsuch, J.).  Other than a drive-by assertion (in a parenthetical) that Daily Mail does not own its users' IDs, Google cannot defend such conduct.

*Finally*, merits aside, discovery into the conduct Google challenges should go forward however the Court decides Google's motion.  For example, Google does not dispute that it coerced publishers to adopt its ad server by tying it to its ad exchange.  *See* MTD Op. 17-20.  Publishers therefore have no choice but to suffer the substantial financial injury wrought by hashing user IDs, *see* FAC ¶ 111, line-item capping, *see id.* ¶¶ 182-187, and dataset redactions, *see id.* ¶¶ 177-181 – all of which are mandatory settings in Google's monopoly ad server.  These specific acts remain relevant to Daily Mail's damages under its tying claim.  Google proposes to stay or preclude discovery, but the Court should deny that request as it did before.  *See* Google Ltr. re Case Management 5, ECF No. 371 ("Google Ltr."); Pre-Trial Order No. 5, at 1, ECF No. 394 ("Pre-Trial Order No. 5").

## LEGAL STANDARD

When a defendant moves to dismiss a complaint, a court "must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor."  *Sacerdote v. New York Univ.*, 9 F.4th 95, 106-07 (2d Cir. 2021).  "[T]here is no heightened pleading standard in antitrust cases."  *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016).  Nor does the Court's analysis of any one complaint in this

4

multidistrict litigation control its analysis of another.  *See Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015) ("Cases consolidated for MDL pretrial proceedings ordinarily retain their separate identities."); *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 845 (6th Cir. 2020) ("[A] party's rights in one [MDL] case" cannot "be impinged to create efficiencies in the MDL generally.").  "[D]ismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."  *Keurig*, 383 F. Supp. 3d at 218 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.)).

## ARGUMENT

## I.   Google Abuses its Search Monopoly To Fortify its Ad Exchange Monopoly

The Court should deny Google's request to dismiss the FAC's allegations that Google used its monopoly power in the market for general search services to harm competition in the market for ad exchanges.  *See* FAC § III.C.  Daily Mail alleges that Google abuses its search monopoly in two ways:  First, Google channels search traffic away from publishers who "ma[k]e AdX compete more vigorously for impressions" and to publishers that provide AdX special access to inventory.  *Id.* ¶ 219.  Second, Google permits publishers to appear at the top of mobile search rankings – publishers' most important source of referral traffic, *see id.* ¶ 202 – only if they abandon client-side header bidding for that inventory, *see id.* ¶ 206.  The object of both schemes is to force publishers to sell more inventory through AdX.  *See id.*  ¶¶ 209-210, 222, 224.  The Department of Justice recently filed a Section 2 case that likewise challenges Google's abuse of "its monopoly power in the general search market—specifically its ability to rank websites that appear in search results" to "force" publishers to forgo business with Google's exchange rivals.  DOJ Compl. ¶ 249.  Parallel federal antitrust enforcement "bolster[s]" the "plausibility" of a

Sherman Act claim.  *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 363 (S.D.N.Y. 2019)

(citing *Starr v. Sony BMG Music Enter.*, 592 F.3d 314, 325 (2d Cir. 2010)).[2]

**A.    Google Manipulates its Search Results To Punish Publishers that Make AdX Compete**

Google's search engine controls 95% of all online searches.  *See* FAC ¶ 81.  Google has

unrivaled power to direct billions of internet users to publishers' webpages.  That makes

Google's search results pages a vital source of publishers' advertising *inventory*, because each

user that visits a website creates multiple new impressions that the publisher can sell.  *See id.*

¶¶ 25-26.  As a result, publishers invest heavily in improving their performance on Google's

search results page.  For top billing on a search results page, Google charges a fee for

"sponsored" links.  Below those sponsored links are so-called "organic" search results:  links to

websites operated by publishers who do not pay Google for placement on the search results page.

*Id.* ¶ 203.  Google always has claimed that an unbiased algorithm determines its organic search

results, depending only on what a user might find "relevant" in response to a query.  *Id.* ¶ 215.

Beginning no later than 2017, however, Google has manipulated its "organic" search

results to harm competition in the market for ad exchanges.  Google uses its search results to

channel user traffic – and impressions created by those users – away from publishers that make

"AdX compete more vigorously for impressions," and to publishers who provide Google's

exchange easier access to inventory.  FAC ¶ 219.  Daily Mail has experienced this search

manipulation first hand.  In 2017, shortly after Daily Mail began applying differential price

floors to Google demand, *see id.* ¶¶ 190, 192, Google punished Daily Mail with a 20% drop in

---

[2] As to other allegations, Google agrees that the Court should credit "the United States Department of Justice's recent complaint."  *E.g.*, Google Mot. To Dismiss Advertisers' Compl. 16 n.4, ECF No. 447.

search traffic, *see id*. ¶¶ 214, 224.  In 2018, when Daily Mail rejected Google's entreaties to replace header bidding with Exchange Bidding, Google punished Daily Mail again – this time with a 40% drop in traffic.  *See id*. ¶ 214.  Daily Mail pressed Google to explain these extraordinary drops in search traffic, but Google offered only an opaque response:  "'relevance' — not revenue — was the sole driver behind search rankings."  *Id.* ¶ 225.  That explanation rang hollow – it makes no sense for the world's most popular English-language newspaper website to fare poorly on a search engine supposedly designed to promote "relevance."  *See id.* ¶ 1.  Google refused to engage with Daily Mail any further.

On June 3, 2019, Google released a "Core Algorithm Update" that diverted users (and the associated impressions) away from Daily Mail once again.  Daily Mail lost *half* of its Google search traffic *in a single day*.  *See id*. ¶ 216.  The depressed traffic persisted for three and a half months until September 24, 2019, when search traffic returned as abruptly as it had disappeared. *See id*.  Daily Mail was not the only target of Google's punishment – other publishers, "including Condé Nast, Prevention Magazine, the New York Times, [and] NFL.com," saw "significant drops" in traffic as a result of the algorithm update.  *Id*.  Daily Mail alerted Google about the precipitous and sustained drop in traffic, but Google again offered no explanation, asserting there were "no issues with the search algorithm."  *Id*. ¶¶ 218-219.  Daily Mail knew that was wrong – it studied the problem and found that even when its journalists broke a major story, websites that copied Daily Mail's reporting *verbatim* were ranked higher than Daily Mail in Google's search results.  Yet Google "assured Daily Mail that it was not being targeted among its peers."  *Id.* ¶ 219.

That assurance was false.  "Google was indeed targeting certain publishers:  those that made AdX compete more vigorously for impressions."  *Id.*  Before the Core Algorithm Update,

Google had "repeatedly complained to Daily Mail about its flooring strategy." *Id.* ¶ 221. Daily Mail explained, however, that it earned "higher revenue" by using differential floors to make AdX vigorously compete. *Id.* "Unable to convince Daily Mail, Google punished it instead." *Id.* ¶ 222. Google cut Daily Mail's search traffic in half only one week before Google began testing its "Unified Pricing Rules" ("UPR"), *id.*, which banned differential price floors, *see* MTD Op. 76 (UPR unlawful). Google then restored Daily Mail's search traffic "one day after UPR was fully effective" – by which time AdX had tripled its share of Daily Mail's impressions while paying roughly 50% less. FAC ¶¶ 222-223. Google thus drove advertising impressions away from Daily Mail because Daily Mail made AdX compete for inventory, only to "restore[] search traffic once UPR . . . forced Daily Mail to sell more inventory to Google on the cheap." *Id.* ¶ 222.

Google's abuse of its search monopoly to channel users (and impressions) away from websites where Google faces competition closely parallels conduct that the Court held unlawful in its prior order. Most notably, the Court held that Google's "Project Bell" was anticompetitive because Google "reward[ed] publishers that granted [AdX] a special priority" – "such as permitting Google to sell impressions" using Dynamic Allocation or EDA – while "punish[ing] publishers that did not." *Id.* at 52-53. The result was "harm to competition" both "in the ad-server market," *id.* at 53, and in "the ad-exchange market," *id.* at 54. AdX's "special" access to publishers' inventory "deprived other exchanges of the ability to successfully offer [higher-value] to their users," instead leaving them "with fewer, lower-value impressions," *id.* at 54.

Google's search misconduct is unlawful for the same reason: Google punishes publishers who do business with Google's exchange rivals and refuse to reward AdX with special access to their inventory by diverting user traffic and the associated impressions away from those

publishers' webpages.  Before UPR, Daily Mail's differential price floors were a defense to the Last Look and related disadvantages that Google imposed through Dynamic Allocation and other auction manipulations.  *See* FAC ¶ 190.  Daily Mail attempted to set floors for AdX so Google could not outbid rivals by "just a penny more."  MTD Op. 45 (citation omitted); *see* FAC ¶ 189. Daily Mail's efforts were far from complete, *see id.* ¶ 191, but even so, they at least modestly counteracted Google's "special priority" for Daily Mail's inventory.  With the June 3, 2019 Core Algorithm Update, however, Google punished Daily Mail and other publishers who denied Google its demanded, "special" access.  It did so to great effect.  Google tripled its share of Daily Mail's inventory, *see id.* ¶¶ 222-223, inflicting the same harm to competition at issue with Project Bell.  By abusing its search engine, and *not* by designing a "superior" exchange, Google has "deprived other exchanges of the ability to successfully offer" valuable inventory "to their users."  MTD Op. 54.

In defending its search manipulation, Google claims that its conduct did not reach the "level of coercion or conditioning necessary" to give rise to a claim under Section 2, because "Daily Mail continued to use rather than abandon client-side header bidding."  Mem. 12, 14.  But this argument ignores that Google's search manipulation has coerced publishers in an independent way:  it forced them to stop applying differential price floors.  *See* FAC ¶ 222. Google calls that a "temporar[y] punish[ment]," Mem. 13, but Daily Mail still cannot employ differential price floors to AdX to this day, *see* FAC ¶ 193.  Further, that Google enforced unified floors with auction rules and search punishment, together, does not isolate the latter from antitrust scrutiny.  *See* MTD Op. 39 ("the Court must avoid tightly compartmentalizing the various factual components of a plaintiff's claims and wiping the slate clean after scrutiny of each") (cleaned up).

In any event, Daily Mail adequately pleads coercion.  Google misstates the law when it demands that Daily Mail must plead "abandon[ment]" of header bidding.  Mem. 14.  In its prior order, the Court sustained allegations that Google "imped[ed] or prevent[ed] publishers from participating in header bidding," even though Google failed to eliminate client-side header bidding entirely.  MTD Op. 66; *see id.* at 67 (data redactions), 68 (line-item capping), 69-70 (Poirot and Elmo).  That is because the test "is not total foreclosure."  *Keurig*, 383 F. Supp. 3d at 236 (quoting *Dentsply*, 399 F.3d at 191).  The question is whether the challenged practices "severely restrict the market's ambit."  *Id.*; *accord United States v. Microsoft Corp.*, 253 F.3d 34, 70-71 (D.C. Cir. 2001) (unlawful to foreclose "majority" of competition in "one of the two major [distribution] channels").  That is what Daily Mail pleads here.  The Court should reject Google's argument that, as a matter of law, it may steer search traffic and the related inventory away from publishers who deal with its rivals.  *See Lorain Journal Co. v. United States*, 342 U.S. 143 (1951).

Google next claims that Daily Mail fails to allege "harm [to] marketwide competition." Mem. 12.  That is incorrect.  The FAC explains that Google's search misconduct is not limited to Daily Mail, but rather targeted many other major publishers.  *See* FAC ¶¶ 216, 219.  While Google speculates that those publishers were not injured because they might not have "used any ad tech tools, let alone . . . header bidding or UPRs," Mem. 14, Daily Mail is entitled to "all plausible inferences in [its] favor," *e.g.*, *Wolf v. Time Warner, Inc.*, 2011 WL 856264, at *7 n.7 (S.D.N.Y. Mar. 3, 2011).  It is not only plausible – it is obvious – that other large publishers use "ad tech tools" to sell inventory.  *See* FAC ¶¶ 21-26.  And because more than 90% of large publishers license Google's ad server, *see id.* ¶ 63, it is equally obvious that almost all large publishers "use[]," as they must, "UPRs," Mem. 12.  Finally, as to client-side header bidding, the

FAC pleads that "[t]he results of header bidding were favorable for publishers and consumers: increased competition for publisher inventory led to higher prices and more investment in online content."  FAC ¶ 46.  To say the least, it is plausible to infer that publishers use a tool that makes them more money.  *See id.* ("Daily Mail saw a 124% increase in revenue from ad sales").  Daily Mail need not plead harm to competition with any greater specificity.  *See Keurig*, 383 F. Supp. 3d at 237; *see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 452 (4th Cir. 2011); *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 389-90 (S.D.N.Y. 2007).

Unable to identify any real pleading defect, Google retreats to an outright denial of Daily Mail's allegations.  It protests that the FAC is "utterly unsupported and implausible," and based on only "loose coincidence[s]" in 2017, 2018, and 2019.  Mem. 13-14.  That Google would use its monopoly power in one market to channel business away from publishers who deal with its rivals is not only plausible, it is a claim this Court already approved several times over.  *See*, *e.g.*, MTD Op. 53-54 (Project Bell unlawful); *id*. at 68-70 (Projects Poirot and Elmo unlawful); *see also* DOJ Compl. ¶¶ 208-230.  Regardless, denying allegations is not a basis for dismissal.  *See*, *e.g.*, *Friedman v. Bloomberg L.P.*, 884 F. 3d 83, 93 (2d Cir. 2017) (The court must "accept[ ] as true the factual allegations in the complaint"); *Khwaja v. Jobs to Move Am.*, 2021 WL 3911290, at *4 (S.D.N.Y. Sept. 1, 2021); *Nielsen Co. (US), LLC v. Success Sys., Inc.*, 2012 WL 124592, at *2 (S.D.N.Y. Jan. 17, 2012) ("Although [the defendant] may disagree with the Verified Complaint's view of the facts, these arguments are unavailing on a motion to dismiss.").  At the pleading stage, allegations of temporal proximity between acts are sufficient to raise an inference of causation.  *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1096 (N.D. Cal. 2007); *see also Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1080 (N.D. Ill. 2011) (finding "temporal proximity of price increases" to be "the most persuasive"

support for antitrust claim).  Google responds with one case decided only after discovery, *see Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513, 530 (S.D.N.Y. 2016), and another case that is completely irrelevant, *see Manuel v. Pepsi-Cola Co.*, 2018 WL 2269247, at *9-10 (S.D.N.Y. May 17, 2018) (plaintiffs cited to studies that they said proved Diet Pepsi caused weight gain, but the court explained that each cited study "expressly disclaim[ed] any generalizable causal conclusion").

Finally, Google's citation to *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130 (9th Cir. 2022), is inapposite.  There, a Romanian supplier of online stock images alleged that Google harmed the "online search advertising market" – *i.e.*, the market for the sponsored links on search results pages – by "elevating inferior stock photo websites."  *Id.* at 1138, 1142.  The Ninth Circuit observed that the alleged search manipulation could harm the "online search market for images," but concluded that demoting photo websites had no plausible effect on the market for search advertising.  *Id.* at 1142.  Here, by contrast, Daily Mail explains at length how Google's manipulation of its search rankings harmed the market for ad exchanges.  In channeling user traffic away from publisher websites where Google's exchange would face competitive pressure to those where it does not, Google uses its search monopoly to distort the competitive dynamics in the market for exchanges.  That claim "requires no extension of the Sherman Act § 2's basic coverage."  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 652c (4th ed. 2022).

### B.   AMP Coerces Publishers To Abandon Client-Side Header Bidding

Daily Mail also plausibly alleges that Google exploited AMP to defeat competition in the exchange market.  In its prior order, the Court rejected the AMP allegations in the States' TAC because they were "far removed from the product markets and claims in th[e] case," offered no explanation "about the mechanics of Google's search engine and how it ranks results for non-AMP enabled sites," and failed to describe "why or how search results would direct traffic away

from sites that facilitated header bidding."  MTD Op. 72.  Daily Mail's FAC pleads the missing

mechanics.  *See* FAC ¶¶ 77-84, 202-212.

Since 2016, Google has exploited its monopoly search engine to cut off client-side header

bidding on mobile webpages, a vital source of user traffic.  That year, Google introduced a

"News Carousel" at the top of its mobile search results pages, which is a banner that "features

news stories in response to a user's search."  *Id*. ¶ 203.  That banner "displaced the traditional

'organic' links" that previously appeared at the top of Google's mobile search results pages.  *Id*.

Users rarely scroll down past the News Carousel, meaning placement in the Carousel is critical

to obtaining user traffic.  *Id*.  If Daily Mail's pages are excluded from the Carousel, Daily Mail

loses a "significant slice" of search-derived traffic and associated impressions.  *Id*.; *see also*

¶ 202 (alleging 20% of mobile visitors to Daily Mail sites come from a Google page).  Daily

Mail therefore "must accede to whatever terms Google requires to appear in the News Carousel."

*Id.* ¶ 203.

Most importantly, Google allowed publishers to appear in the Carousel if and only if they

adopt AMP, *see id.* ¶ 204, which Google designed to be "completely incompatible with client-

side header bidding," *id.* ¶ 210.  Indeed, for the first 18 months, AMP was incompatible with *all*

exchanges other than AdX.  *See id.* ¶ 206.  Although Daily Mail briefly implemented a

workaround to introduce some header bidding, *see id.* ¶ 207, Google promptly disabled it and

forced publishers to use one of two alternatives:  Exchange Bidding or "Real Time Config"

(another Google product), *see id.* ¶ 208.  Both permit fewer than half as many exchanges to

compete for impressions, *see id.* ¶ 209, and each offers AdX systemic advantages, *see id.* ("rival

exchanges (but not AdX) are hampered by 'user sync' difficulties that make it harder for their

advertisers to identify the reader").  Limiting the number of bidders reduced competition:  "Daily

Mail generates less revenue from AMP than traditional mobile pages, and for years AdX has purchased a higher share of impressions."  *Id.* ¶ 211.

Google's AMP conduct presents an even greater competitive threat than conduct this Court already has found anticompetitive.  In its prior order, the Court held that Google's abuse of monopoly power to "impair[] publisher participation in header bidding" is "anticompetitive conduct that harm[s] competition in the exchange market."  MTD Op. 67-68.  Specifically, the Court held that Google's use of line item caps, which artificially deflate bids from client-side header bidding, unlawfully "constrain[ed] publishers' participation in header bidding, while also constraining competition on the exchange market."  *Id*. at 68.  Similarly, the Court held that Projects Poirot and Elmo were unlawful because they directed Google's spending in DV360 away from exchanges "likely participating in header bidding," for the purpose of "reduc[ing] spending on rival exchanges and 'starv[ing] them of' demand."  *Id.* at 70.

Google's conduct with AMP is far worse.  Rather than depress bids from exchanges participating in header bidding, or direct spending away from exchanges participating in header bidding, Google simply has banned client-side header bidding entirely.  *See* FAC ¶ 210.  Google drives publishers' inventory away from client-side header bidding not by competing for that inventory, but instead by "using its dominant position in general search services to force publishers to adopt a webpage format that limits competition."  *Id*.  AMP, like line-item caps and Projects Poirot and Elmo, is thus not "a product innovation," but rather a "'tool' against header bidding and a way to direct more transactions" toward Google's exchange.  MTD Op. 68; *accord id.* at 70; *see also* DOJ Compl. ¶¶ 249-55 ("Google recognized" that through AMP "it could use its monopoly power in the general search market . . . to force at least certain publishers to forgo traditional, client-side header bidding.").

The Court's prior order regarding "Enhanced Dynamic Allocation" ("EDA") is likewise instructive.  Through EDA, Google "use[s] its presence in the ad-server market to channel publishers' most valuable impressions" – those reserved for direct deals – to AdX.  MTD Op. 49. Publishers had "no choice but to participate in EDA," and the Court rejected Google's go-to argument that EDA was a "superior product or innovation."  *Id.*  Likewise here, Google abuses its search monopoly to channel a "significant slice" of publishers' high-value, mobile inventory away from client-side header bidding to an environment where Google necessarily wins a growing share of impressions at cheaper prices.  FAC ¶ 211.  Publishers also must "accede" to Google's conduct because they "cannot forgo" traffic from AMP pages.  *Id.* ¶ 203; *see also* MTD Op. 18 (upholding tying claim because publishers could not forgo "live, competitive bids from . . . hundreds of thousands of small advertisers that . . . transact exclusively through AdX"). EDA and AMP thus present the same competitive injury:  Google abuses its monopoly power to "channel" impressions away from rival exchanges.  MTD Op. 49.

Google does not offer any persuasive reason to dismiss Daily Mail's AMP allegations.  It starts with the refrain that it has "no obligation" to "include" publishers in the News Carousel. Mem. 10.  But the Court has rejected the "no duty to help" strawman at least twice:  once for line-item capping[3] and again for EDA.[4]  The Court applied settled law that requiring customers to reject rivals as a term of dealing violates the Sherman Act.  *See*, *e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 & n.8 (1992) ("[R]efusing to sell parts to customers"

---

[3] *Compare* Google Mem. Supp. Mot. To Dismiss TAC 23, ECF No. 218 ("MTD TAC") ("Google had no obligation to design its products in ways that help header bidding work better"), *with* MTD Op. 68 (line-item caps unlawful).

[4] *Compare* MTD TAC 21 ("Google had no obligation to design EDA to help its competitors win more of that business"), *with* MTD Op. 49 (EDA unlawful).

unless "they buy service from Kodak" is an antitrust violation, "not" "a unilateral refusal to deal."). At bottom, Daily Mail does not dispute Google's design of the Carousel, but rather its decision to direct search traffic away from publishers who do business with rival exchanges.

Google also argues that Daily Mail fails to plead adequate coercion and foreclosure because Daily Mail continues to use client-side header bidding on non-AMP mobile pages. *See* Mem. 11-12. This argument fails for reasons already discussed. *See supra* at 10-11. The Court rejected Google's argument that Projects Poirot and Elmo were lawful because they did not eliminate client-side header bidding entirely,[5] and it should reject that same argument here. The FAC alleges that 20% of mobile visitors "arrive at Daily Mail content from a Google page," meaning Google is "Daily Mail's largest source of mobile referral traffic." FAC ¶ 202. Google has similar power over other publishers. *See id.* Foreclosing competition on a "significant slice" of publisher inventory, *id.* ¶ 203, amply satisfies Daily Mail's pleading burden, *see Xerox*, 511 F. Supp. 2d at 389-90 (sufficient to allege rivals were "exclud[ed] from much of the market"). That is particularly true where, as here, Google declines to challenge a dozen other anticompetitive acts designed to monopolize the exchange market. *See* MTD Op. 39 ("the Court must avoid tightly compartmentalizing the various factual components of a plaintiff's claim and wiping the slate clean after scrutiny of each") (cleaned up). Google's remaining demand for additional allegations about the "magnitude" of anticompetitive injury is misplaced, *see* Mem. 12, because, "[a]t the motion to dismiss stage, such specific mathematical pleading is unnecessary," *Keurig*, 383 F. Supp. 3d at 237; *see Kolon*, 637 F.3d at 452 n.12 (cannot reject antitrust claim based "solely on th[e] basis" that plaintiff "did not allege a specific percentage of market foreclosure").

---

[5] *Compare* MTD TAC 24 (arguing Projects Poirot and Elmo were insufficiently coercive because they did not "limit[] advertisers' choices"); *with* MTD Op. 70 (Projects Poirot and Elmo unlawful).

Google's final argument is that coercing publishers to adopt AMP is a "product innovation."  Mem. 11.  This is not the appropriate time to litigate Google's pro-competitive justifications.  As an affirmative defense, "any procompetitive justification . . . is not appropriately weighed on a motion to dismiss."  *Keurig*, 383 F. Supp. 3d at 239; *see Davitashvili v. Grubhub Inc.*, 2022 WL 958051, at *6 (S.D.N.Y. Mar. 30, 2022).  Google "will later have the opportunity to show" any "procompetitive effects" of AMP.  *Maxon Hyundai Mazda v. Carfax, Inc.*, 2014 WL 4988268, at *9 (S.D.N.Y. Sept. 29, 2014).  That will be a difficult showing to make – where "there is coercion," "the technological desirability of [a] product change" does not bear on "the permissibility of the defendant's conduct."  *Actavis*, 787 F.3d at 653 n.25 (citation omitted).  For now, at the pleading stage, Daily Mail has alleged sufficiently that AMP harms competition in the market for ad exchanges.

## II.   Google Manipulates its Ad Server To Defeat Competition from Rival Exchanges

The Court also should deny Google's request to dismiss Daily Mail's allegations regarding Exchange Bidding, *see* FAC ¶¶ 158-164, and user IDs, *see id.* ¶¶ 108-113.  The FAC pleads additional facts that directly respond to the shortcomings that the Court identified in the States' TAC.  Indeed, for Exchange Bidding, Daily Mail alleges the same conduct that the Court already held to be unlawful in its prior order.  Google does not address the Court's prior order, much less explain why reconsideration is warranted.

### A.   Google Coerces Publishers To Use Exchange Bidding

The FAC pleads two sets of allegations regarding Exchange Bidding.  First, since 2018, Google has "coerce[d] publishers to abandon [header bidding] for Exchange Bidding."  FAC ¶ 163.  Second, in 2019, Google introduced a "Last Look analog to Exchange Bidding" called "Minimum Bid to Win."  *Id.* ¶¶ 165-166.  Google moves to dismiss Daily Mail's allegations only

regarding its efforts to coerce publishers to use Exchange Bidding.  *See* Mem. 3 ("Google's Introduction of Exchange Bidding Did Not Coerce Publishers to Abandon Header Bidding").

Google offers no basis to dismiss Daily Mail's allegations.  The FAC pleads what the Court required in its prior order:  allegations that Google "improperly compelled" publishers to use Exchange Bidding and forgo client-side header bidding.  MTD Op. 64.  Indeed, Daily Mail alleges conduct this Court already has found unlawful.  The Court sustained allegations that Google abuses line-item caps "to direct more transactions toward Exchange Bidding," *id.* at 68, and unlawfully redacts datasets to "thwart[] the ability of publisher clients to assess the relative performance of auction results on Exchange Bidding and header bidding," *id.* at 67.  The FAC pleads similar allegations.  By capping line items to "limit[] DFP's ability to accept bids from client-side header bidding, and by redacting datasets so that publishers [cannot] fully compare the performance of client-side header bidding against Exchange Bidding, Google has manufactured a fait accompli:  take Exchange Bidding or use a now-degraded client-side alternative."  FAC ¶ 163.  There is no basis to dismiss these allegations from the FAC, particularly where they arise from conduct this Court already determined is anticompetitive.

Google offers no persuasive reason to conclude otherwise.  Its primary complaint is that Daily Mail's allegations "have nothing to do with the introduction or design of [Exchange Bidding]."  Mem. 5; *see also id.* at 6.  But Google must "take the Complaint[] as [it is] written." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 333 (S.D.N.Y. 2003).  Daily Mail does not focus on Exchange Bidding's "design," but on how line-item capping, redacted datasets, and AMP undermine client-side header bidding.  As the Court recognized, and Daily Mail alleges, Google used line-item caps and redacted data sets to undermine client-side header bidding and coerce publishers to use Exchange Bidding.  *See* MTD Op. at 67-68.

Google's remaining points are unavailing.  It asserts that Exchange Bidding is a "new product" that "benefit[s] publishers."  Mem. 4.  The FAC pleads otherwise.  *See* FAC ¶ 159 ("Exchange Bidding is designed to maintain AdX's ad-server and ad exchange monopolies"), ¶ 160 (rival exchanges' "performance is significantly reduced in Exchange Bidding"), ¶ 161 ("client-side header bidding remains a more favorable environment for publishers and rival exchanges").  Google's internal documents confirm otherwise, too.  *See id.* ¶ 161("A Google executive cautioned the company's employees:  'I would suggest being very careful here what we say to publishers.  Remember, [Exchange Bidding] negatively impacting header bidding is a Google desired outcome.  Publishers are likely fine with header bidding, they make more money with it.'").  And regardless, where "there is coercion," "the technological desirability of [a] product change" does not bear on "the permissibility of the defendant's conduct."  *Actavis*, 787 F.3d at 653 n.25 (citation omitted).  "[T]he market," not Google, "can determine whether one product is superior to another."  *Id.* at 654-55.  That Google believes Exchange Bidding should be a "plausible choice" for publishers, Mem. 4, is not an adequate reason to dismiss the FAC.

Finally, Google complains that Daily Mail has not yet been "coerced to abandon client-side header bidding in favor of [Exchange Bidding]."  Mem. 5; *see also id.* at 6.  Again, total abandonment is not the law.  *Supra* at 10-11.  The Court held as much when it sustained the identical allegations that Daily Mail now pleads.  *See supra* at 18.  But, regardless, the FAC pleads coercion under the proper standard.  Client-side header bidding is the most competitive environment for rival exchanges to challenge Google's dominance.  *See* FAC ¶ 161.  "Server-side" header bidding alternatives are not as effective.  *See id.* ¶ 160 ("Exchanges perform better client side because, *inter alia*, client-side header bidding is an auction hosted on the reader's browser that does not present the same user sync issues as a server-side connection.").  Partially

foreclosing header bidding, even without killing it or other competitors, therefore violates Section 2.  *See Keurig*, 383 F. Supp. 3d at 239 (unlawful to foreclose "alternative channels [that] provide effective means of competition," even if "viable" distribution channels technically remain available) (cleaned up)   "[T]he law has never required complete market exclusion as a prerequisite to suit."  Areeda & Hovenkamp, *Antitrust Law* ¶ 651b5.

      **B.**     **Google Unlawfully Hashes User IDs**

      Since 2009, Google affirmatively has interfered with publishers' ability to do business with rival exchanges by " 'hashing' (*i.e.*, encrypting) the user IDs that publishers had been using to solicit targeted ads from advertisers."  FAC ¶ 110.  Yet Google "permit[s] *itself* to use the very same user IDs when setting its own bids" through AdX.  *Id.*  In its prior order, the Court held that the States' TAC did not plausibly allege that selectively hashing user IDs was anticompetitive. MTD Op. 43-44.  The Court found the States pleaded a unilateral refusal to deal by alleging that Google failed "to provide information or assistance to its competitors."  *Id.* at 42.  Those allegations did not state a claim because they did not plead "why it would have been in Google's economic self-interest to share encrypted user IDs that Google itself generated."  *Id.* at 44.

      Daily Mail does not argue that Google's hashing of user IDs is an unlawful refusal to "share [un]encrypted user IDs."  *Id.*  Rather, the FAC alleges that user IDs belong to publishers (not to Google), and that hashing is interference with publishers' ability to communicate their information about their inventory to buyers in other exchanges.  The FAC pleads specific facts demonstrating Daily Mail's ownership of user IDs:  "For years, Google's contracts with publishers . . . established that publishers 'own[ed]' all data 'derived from the use of' DFP and AdX.'  For that reason, it remains the responsibility of the publisher, and not Google, to obtain the right for Google to use any data — including data on readers — in connection with providing ad-serving and exchange services."  FAC ¶ 109.  Where Google's contracts expressly provide

that publishers own user data, and where publishers acquire consent from users to collect that data, the fair inference is that user IDs belong to publishers.  A senior Google executive also testified to Congress that ad server "data is owned by the customers," *i.e.*, "publishers."  *Id*. ¶ 108.  Daily Mail thus does not allege that Google refuses to "provide information or assistance to its competitors," MTD Op. 42, but rather that Google interferes with publishers' ability to share their own data with Google's rivals.

Affirmative interference with customers' ability to transact with rivals is a recognized antitrust violation.  *See Novell*, 731 F.3d at 1076 ("a rival is always free to bring a section 2 claim for affirmatively interfering with its business activities in the marketplace").  Among other prohibited acts, a monopolist cannot "deprive[] the customer of the ability to utilize and compare prices in selecting services," *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692-93 (1978) (cleaned up),[6] including by manipulating rivals' bids, *cf. Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002) (using market power to provide "misleading information" about rival goods is unlawful).  Likewise here, the Court sustained allegations that Google redacted datasets to "render [bids from] header bidding less effective than bids submitted through Exchange Bidding."  MTD Op. 66.

Hashing user IDs presents the same harm to competition:  Google encrypts publishers' data to render bids from rival exchanges less effective than bids submitted through AdX.  An advertiser will bid twice as high through AdX for the same impression, solely because Google has prohibited publishers from transmitting their own data through rival exchanges.  *See* FAC

---

[6] *National Society of Professional Engineers*, while a Section 1 case, still provides a governing standard for identifying anticompetitive conduct in a Section 2 case.  *See Actavis*, 787 F.3d at 652 n.22 ("the analysis under section 2 is similar to that under section 1") (citation omitted).

¶ 111 (with hashed user IDs, "the prices of impressions fall by 50%").  Rival exchanges could return more competitive bids if only Google did not interfere with publishers' ability to communicate their information about their inventory.  Google thus consolidates demand in AdX, *see* FAC ¶ 72, and protects AdX's take rate from price competition, *see id.* ¶ 74.  Google's "prohibition of competitive bidding, by blocking the free flow of price information, strikes at the functioning of the free market."  *United States v. Nat'l Soc. of Prof'l Eng'rs*, 555 F.2d 978, 981 (D.C. Cir. 1977), *aff'd*, 435 U.S. 679 (1978).

Google offers no defense of the "affirmative[ ] interfere[ence] with [Daily Mail's] business activities" alleged in the FAC.  *Novell*, 731 F.3d at 1076.  Instead, Google recasts Daily Mail's allegations as a "claim that Google advantaged itself by refusing to share un-encrypted user IDs."  Mem. 6.  But, again, Daily Mail does not plead a unilateral refusal to deal.  Google purposefully degraded Daily Mail's own data.  *See supra* at 20-21.  On that actual, pleaded claim, Google says nothing, other than to object in passing that the FAC "provid[es] incomplete quotations from unidentified contracts."  Mem. 8.  Google has ready access to those contracts but did not attach them to its motion.  *Compare* Decl. of Andrew J. Ewalt, Ex. A, ECF No. 221-1. Google is incorrect to assert that Daily Mail has mischaracterized its contracts, but more to the point, "[t]he materiality of omitted terms of an alleged agreement is . . . a question of fact."  *Atlas S. S. Chartering Corp. v. Dillingham Corp.*, 314 F. Supp. 1118, 1120 n.10 (S.D.N.Y. 1970); *see also Drake v. Handman*, 30 F.R.D. 394, 396 (S.D.N.Y. 1962) ("Whether the writing in this case was assented to by the parties as the complete and accurate 'integration' of the terms of their contract is an ordinary question of fact").  The same is true of many other contract disputes.  *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998) (if a contract is "susceptible to different reasonable

interpretations," its "meaning becomes an issue of fact"); *see also* 10B Charles Alan Wright &

Arthur R. Miller, Federal Practice and Procedure § 2730.1 (4th ed. 2022).  Google cannot obtain

dismissal with bald assertions of fact to refute Daily Mail's allegations.

Google also claims that Daily Mail "does not seriously contend with Google's plausible

aim to protect user information."  Mem. 7.  That is incorrect:  Users find no comfort in giving

identifying information to Google.  *See* FAC ¶ 112.  That is why Google contracts with

publishers for the publishers to obtain users' consent.  *See id.* ¶ 109.  But, regardless, it is

premature to litigate Google's privacy defense, as already explained.  *Keurig*, 383 F. Supp. 3d at

239; *see Davitashvili*, 2022 WL 958051, at *6.[7]  After discovery, Google will shoulder "a heavy

burden of establishing an affirmative defense which competitively justifies th[e] apparent

deviation from the operations of a free market."  *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents

of Univ. of Oklahoma*, 468 U.S. 85, 113 (1984).  A general concern for user "privacy" will not

suffice.  *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 463 (1986) ("noncompetitive

quality-of-service justifications are inadmissible").  A monopolist cannot deny "consumers . . .

access to [ ] information" because it purports to worry they will "make unwise and even

dangerous choices."  *Id.*  Instead, Google will have to prove that hashing user IDs is a form of

"competition on the merits" in the ad server market.  *Microsoft*, 253 F.3d at 59; *see Actavis*, 787

F.3d at 652 (adopting "the *Microsoft* framework").  That is a tall order, because publishers,

exchanges, and advertisers value access to user IDs.  *See* FAC ¶¶ 111, 113.  Hashing IDs makes

ad servers less valuable.  *See id.*

---

[7] This would remain the case even if Daily Mail did plead a unilateral refusal to deal.  *See
Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 460-61 (7th Cir. 2020); *Covad Commc'ns Co. v.
Bell Atl. Corp.*, 398 F.3d 666, 676 (D.C. Cir. 2005).

Google's final ground for dismissal is that "Daily Mail fails to allege that encrypting user IDs involves profit sacrifice by Google or is otherwise not a rational business strategy."  Mem. 8. Google offers no reason why the FAC must meet this pleading standard.  But in any event, Daily Mail *does* plead that "Google's hashing of user IDs is irrational but for its effect on rival exchanges."  FAC ¶ 113.  As the FAC explains, a "profit-oriented operator of a publisher ad server would want to maximize the volume and value of impressions that are served," because "[s]erving more, higher value impressions means more money for the ad server."  *Id*.  Yet, by hashing user IDs, Google "depresses the price for publishers' inventory, undermines investment in additional online content, and thereby reduces the number of impressions available for sale."  *Id*.  That sacrifice of short-term profits in the ad-server market makes sense only if Google seeks to "handicap its exchange rivals," *id.*, and consolidate a larger share of impressions within AdX, *id.* ¶¶ 107, 235.  It is thus no defense, as Google evidently intends it to be, that hashing user IDs "allow[s] AdX to increase profits."  Mem. 9.  "[A]n offered justification does not succeed merely because it is profitable, for one can profit from both competitive and monopolistic acts."  Areeda & Hovenkamp, *Antitrust Law* ¶ 658f.  Daily Mail plausibly pleads the latter.  As alleged in the FAC, Google's conduct has "little or no value beyond the capacity to protect [its] market power."  *Novell*, 731 F.3d at 1072.

## III.    Google's Motion Cannot Justify Precluding or Staying Discovery, Nor Dismissal With Prejudice

The Court independently should deny Google's motion because it is procedurally improper.  Rule 12(b)(6) permits dismissal of a "claim," not "parts of claims."  *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015); *accord Rieser v. Baltimore & Ohio R.R. Co.*, 224 F.2d 198, 204 n.8 (2d Cir. 1955) ("part only of a single claim cannot be adjudicated with finality"); *IHS Dialysis Inc. v. Davita, Inc.*, 2013 WL 1309737, at *7 (S.D.N.Y. Mar. 31, 2013)

24

(challenge to "particular categor[ies] of conduct" did not "provide a basis for dismissing any of the individual causes of action"); *New York Medscan LLC v. New York Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 149 (S.D.N.Y. 2006) (declining to dismiss Sherman Act claims where defendant "selectively refer[red] to allegations in the complaint"). That is why the Court denied, in its entirety, Google's motion to dismiss the States' TAC's Section 2 claims, despite holding that certain allegations did not plead anticompetitive conduct. *See* MTD Op. 87. A court "narrow[s] the individual *factual* issues" in a case only at summary judgment. *BBL*, 809 F.3d at 325; *see also* Fed. R. Civ. P. 56(a) (parties must "identif[y] each claim or defense—*or the part of each claim or defense*—on which summary judgment is sought") (emphsis added).

Google seeks to preclude discovery on these topics. *See* Mem. 16; *but cf.* Google Ltr. 5 (requesting a discovery stay on these topics); Pre-Trial Order No. 5, at 1 (Court denying that request). That would be inappropriate. Absent Google's unlawful tie between its ad server and exchange, Daily Mail would use an alternative server that allowed it to, for instance, communicate its unencrypted user IDs with non-Google exchanges and obtain unredacted transaction datasets. Unified Pricing Rules, together with Exchange Bidding, also allow Google to enforce a surcharge on rival exchanges. *See* FAC ¶ 198. The allegations Google targets in its motion are thus relevant to Daily Mail's injuries from the tying and other claims this Court has already approved. *See* MTD Op. 16-20; *see also*, *e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 455 (S.D.N.Y. 2015) (antitrust plaintiff can collect all damages "proximately related to" defendant's anticompetitive conduct). Google can argue otherwise at summary judgment and eventually trial. *See Trahan v. Lazar*, 457 F. Supp. 3d 323, 352 (S.D.N.Y. 2020) ("Issues of proximate cause are often fact-laden, requiring a fully developed factual record, and not a bare-bones motion to dismiss.") (cleaned up).

In any event, any dismissal of the four challenged sets of allegations should be without prejudice to Daily Mail's filing an amended complaint.  The Court has not previously addressed Daily Mail's search-ranking allegations, and "the Second Circuit has instructed courts not to dismiss a complaint without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *A.F. ex rel Fogel v. Sorin Grp. USA, Inc.*, 346 F. Supp. 3d 534, 545 (S.D.N.Y. 2018) (cleaned up).  As for the remaining allegations Google challenges, any dismissal should be without prejudice because Google has not argued, much less shown, that "amendment would be futile."  *Owoyemi v. Credit Corp Sols. Inc.*, 596 F. Supp. 3d 514, 521 (S.D.N.Y. 2022) (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).  Google contends only that Daily Mail fails to plead facts regarding coercion, *see*, *e.g.*, Mem. 4-5, 11, procompetitive justifications, *see*, *e.g.*, *id.* at 7, 10, and the "magnitude" of foreclosure, *see*, e.*g. id.* at 12.  Because these purported defects "could be cured by amendment," any dismissal should be without prejudice.  *Owoyemi*, 596 F. Supp. 3d at 521.

## CONCLUSION

For the foregoing reasons, Google's motion to dismiss should be denied.  In the alternative, any dismissal should be without prejudice.

Dated:  March 3, 2023

Jeffrey A. Lamken
Caleb Hayes-Deats
MOLOLAMKEN LLP
600 New Hampshire Avenue NW
Washington, DC 20037
Tel: (202) 556-2000
Fax: (202) 556-2001
Email:  jlamken@mololamken.com
          chayes-deats@mololamken.com

/s/ *John Thorne*
John Thorne
Daniel G. Bird
Bethan R. Jones
Christopher C. Goodnow
Mark P. Hirschboeck
Eliana Margo Pfeffer
Eric J. Maier
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street NW
Suite 400
Washington, DC 20036
Tel.:  (202) 326-7900
Fax:  (202) 326-7999
Email:  jthorne@kellogghansen.com
          dbird@kellogghansen.com
          bjones@kellogghansen.com
          cgoodnow@kellogghansen.com
          mhirschboeck@kellogghansen.com
          epfeffer@kellogghansen.com
          emaier@kellogghansen.com

*Counsel for Plaintiffs Associated Newspapers Ltd.*
*and Mail Media, Inc.*