UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

In re GOOGLE ADVERTISING ANTITRUST
LITIGATION

: No. 21-md-3010 (PKC)
:
: P. Kevin Castel District Judge

—————————————————————— x

This Document Relates To:

*AIM Media Ind. Operating, LLC v. Google, LLC*, No. 1:21-cv-06912-PKC (S.D.N.Y.)

*AIM Media Midwest Operating, LLC v. Google, LLC*, No. 1:21-cv-06884-PKC (S.D.N.Y.)

*AIM Media Tex. Operating, LLC v. Google, LLC*, No. 1:21-cv-06888-PKC (S.D.N.Y.)

*Appen Media Group, Inc. v. Google LLC*, No. 1:22-cv-09810-PKC (S.D.N.Y.)

*Brown Cnty. Publ'g Co., Inc. v. Google, LLC*, No. 1:21-cv-06915-PKC (S.D.N.Y.)

*Capital Region Indep. Media LLC v. Google LLC*, No. 1:22-cv-06997-PKC (S.D.N.Y.)

*Clarksburg Publ'g Co., d/b/a WV News v. Google, LLC*, No. 1:21-cv-06840-PKC (S.D.N.Y.)

*Coastal Point LLC v. Google, LLC*, No. 1:21-cv-06824-PKC (S.D.N.Y.)

*Eagle Printing Co. v. Google, LLC*, No. 1:21-cv-06881-PKC (S.D.N.Y.)

*ECENT Corp. v. Google, LLC*, No. 1:21-cv-06817-PKC (S.D.N.Y.)

*Emmerich Newspapers, Inc. v. Google, LLC*, No. 1:21-cv-06794-PKC (S.D.N.Y.)

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

NEWSPAPER PLAINTIFFS' OMNIBUS
MEMORANDUM OF LAW IN
OPPOSITION TO: (1) DEFENDANT
GOOGLE LLC'S MOTION TO DISMISS
NEWSPAPER PLAINTIFFS' AMENDED
COMPLAINT; AND (2) META
PLATFORMS, INC.'S MOTION TO
DISMISS COUNT II OF NEWSPAPERS'
CONSOLIDATED AMENDED
COMPLAINT

—————————————————————— x

[Caption continued on following page.]

*Flag Publ'ns, Inc. v. Google, LLC*, No. 1:21-cv-06871-PKC (S.D.N.Y.)

*Gale Force Media, LLC v. Google, LLC*, No. 1:21-cv-06909-PKC (S.D.N.Y.)

*Gould Enters., Inc. v. Google, LLC*, No. 1:22-cv-01705-PKC (S.D.N.Y.)

*HD Media Co., LLC v. Google, LLC*, No. 1:21-cv-06796-PKC (S.D.N.Y.)

*Journal, Inc. v. Google, LLC*, No. 1:21-cv-06828-PKC (S.D.N.Y.)

*Neighborhood Newspapers, Inc. v. Google LLC*, No. 1:21-cv-10188-PKC (S.D.N.Y.)

*Robinson Commc'ns, Inc. v. Google, LLC*, No. 1:21-cv-08032-PKC (S.D.N.Y.)

*Rome News Media, LLC v. Google LLC*, No. 1:21-cv-10186-PKC (S.D.N.Y.)

*Savannah Publ'g Co., Inc. v. Google, LLC*, No. 1:22-cv-01693-PKC (S.D.N.Y.)

*Something Extra Publ'g, Inc. v. Google, LLC*, No. 1:21-cv-09523-PKC (S.D.N.Y.)

*Southern Cmty. Newspapers, Inc. v. Google, LLC*, No. 1:22-cv-01971-PKC (S.D.N.Y.)

*Times Journal, Inc. v. Google LLC*, No. 1:21-cv-10187-PKC (S.D.N.Y.)

*Union City Daily Messenger, Inc. v. Google, LLC*, No. 1:22-cv-01704-PKC (S.D.N.Y.)

*Weakley Cnty. Press, Inc. v. Google, LLC*, No. 1:22-cv-01701-PKC (S.D.N.Y.)

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    ARGUMENT ....................................................................................................5

    A.    The Newspaper Plaintiffs Plausibly Allege that Google Engaged in a
Broad Pattern of Anticompetitive Conduct................................................5

        1.    Google Imposes Coercive Fees in Conjunction with Price-Floor
and Other Components of Its Scheme to Exclude Rivals and
Restrain Trade ..............................................................................8

        2.    Google's Ad Traffic Manipulation Practices Restrain Trade for
Both Advertisers and Publishers and Competition in the Ad Server,
and Ad Exchange Markets .........................................................10

    B.    The Newspaper Plaintiffs' Leveraging Claims Are Sufficiently Pled..................12

        1.    Google Has Monopoly Power in the General Search Services, Ad
Server and Ad Exchange Markets...............................................13

            a.    The Amended Complaint Adequately Pleads that Google
Used Its Monopoly Power in General Search Services to
Monopolize or Create a Dangerous Probability of
Monopolizing the Ad Server and Ad Exchange Markets .............15

            b.    Newspaper Plaintiffs Adequately Allege that They Were
Injured by Google's Monopoly Leveraging .................................16

    C.    The Newspaper Plaintiffs' §1 Claims Are Plausible and Defendants'
Arguments to the Contrary Fail ...............................................................17

        1.    The Newspaper Plaintiffs Plausibly Allege an Agreement to
Restrain Header Bidding..............................................................17

        2.    The Newspaper Plaintiffs Plead a Plausible Market Allocation
Conspiracy ...................................................................................21

    D.    The Newspaper Plaintiffs Sufficiently Allege Harm to Competition in the
Markets for Publisher Ad Servers and General Search Services............................26

III.    CONCLUSION................................................................................................28

# TABLE OF AUTHORITIES

**Page**

## CASES

*A.I.B. Express, Inc. v. FedEx Corp.*,
   358 F. Supp. 2d 239 (S.D.N.Y. 2004)...................................................................13

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp LLC*,
   592 F.3d 991 (9th Cir. 2010) .........................................................................15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................9

*Beal Corp. Liquidating Tr. v. Valleylab, Inc.*,
   927 F. Supp. 1350 (D. Colo. 1996)................................................................25

*Bell Atl. Corp. v Twombly*,
   550 U.S. 544 (2007)..................................................................................9, 26

*City of Anaheim v. S. Cal. Edison Co.*,
   955 F.2d 1373 (9th Cir. 1992) .......................................................................5

*Colucci v. Health First, Inc.*,
   2022 WL 610573 (M.D. Fla. Jan. 24, 2022)...................................................23

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962)........................................................................................6

*DiLaura v. Power Auth. of State of N.Y.*,
   982 F.2d 73 (2d Cir. 1992).............................................................................7

*F.T.C. v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) .........................................................................9

*F.T.C. v. Staples, Inc.*,
   970 F. Supp. 1066 (D.D.C. 1997)................................................................20

*F.T.C. v. Swedish Match*,
   131 F. Supp. 2d 151 (D.D.C. 2000)..............................................................20

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
   852 F. Supp. 2d 1171 (N.D. Cal. 2012) .........................................................6

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016)..........................................................................22

4877-9586-2868.v1

**Page**

*In re Gabapentin Pat. Litig.*,
   649 F. Supp. 2d 340 (D.N.J. 2009) ..................................................................6

*In re Generic Pharms. Pricing Antitrust Litig.*,
   338 F. Supp. 3d 404 (E.D. Pa. 2018) ...............................................................22

*In re Neurontin Antitrust Litig.*,
   2009 WL 2751029 (D.N.J. Aug. 28, 2009) .......................................................6

*In re Polyurethane Foam Antitrust Litig.*,
   152 F. Supp. 3d 968 (N.D. Ohio 2015)............................................................25

*In re Propranolol Antitrust Litig.*,
   249 F. Supp. 3d 712 (S.D.N.Y. 2017)..............................................................22

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51 (2d Cir. 2012)...............................................................................21

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
   2017 WL 36371 (E.D. Pa. Jan. 4, 2017) .....................................................7, 16

*In re Surescripts Antitrust Litig.*,
   608 F. Supp. 3d 629 (N.D. Ill. 2022) ..............................................................24

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ......................................................................22, 26

*Lavoho, LLC v. Apple, Inc.*,
   232 F. Supp. 3d 513 (S.D.N.Y. 2016)........................................................19, 20

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003)...............................................................................6

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)............................................................................21

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015)........................................................................15, 17

*Olde Monmouth Stock Transfer Co., Inc. v. Depository Tr. & Clearing Corp.*,
   485 F. Supp. 2d 387 (S.D.N.Y. 2007)..............................................................13

*Oreck Corp. v. Whirlpool Corp.*,
   579 F.2d 126 (2d Cir. 1978)............................................................................24

**Page**

*Ortho Diagnostic Sys., Inc. v. Abbott Lab., Inc.*,
    822 F. Supp. 145 (S.D.N.Y. 1993) .................................................................. 27

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ....................................................................................... 9

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) .................................................. 25

*Simon & Simon, PC v. Align Tech., Inc.*,
    533 F. Supp. 3d 904 (N.D. Cal. 2021) ........................................................... 6

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ....................................................................................... 13

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
    782 F. Supp. 2d 1059 (E.D. Cal. 2011),
    *aff'd sub nom. Diesel eBooks, LLC v. Simon & Schuster, Inc.*,
    869 F.3d 55 (2d Cir. 2017) ............................................................................. 19

*Starr v. Sony BMG Music Ent.*,
    592 F.3d 314 (2d Cir. 2010) ........................................................................... 24

*Tele Atlas N.V. v. NAVTEQ Corp.*,
    2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) ............................................... 6

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998) ......................................................................... 13, 14

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ........................................................................... 21

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ....................................................................................... 14

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.D.C. Cir. 2001) ..................................................................... 13

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) ....................................................................................... 21

*Verizon Commc'ns, Inc. v. Law Offices of Curtis v. Trinko, LLP*,
    540 U.S. 398 (2004) ....................................................................................... 13

4877-9586-2868.v1

**Page**

*Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*,
224 F. Supp. 2d 657 (S.D.N.Y. 2002)...............................................................................16, 27

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§1........................................................................................................................ *passim*
§2........................................................................................................................ *passim*

**SECONDARY AUTHORITIES**

II Phillip E. Areeda, *et al.*, *Antitrust Law*, (2000)
¶310c6 ...............................................................................................................6

4877-9586-2868.v1

## I.     INTRODUCTION

Despite numerous governmental investigations here and abroad detailing Google LLC's ("Google") extensive anticompetitive actions in the digital advertising market, and despite now facing a second lawsuit brought by the United States Department of Justice challenging as anticompetitive many of the same practices at issue here, Google seeks to dismiss the Newspaper Plaintiffs' federal antitrust claims.[1]  The profound harm and decline in advertising revenues inflicted on newspapers over the past decade in the very markets Google indisputably controls and dominates is well documented.  Yet, brushing off the Newspaper Plaintiffs' allegations as "dramatic," Google begins its brief by refusing to look at itself in the mirror, instead pointing a finger at everyone else as the cause of that harm.  Defendant Google LLC's Memorandum of Law in Support of Its Motion to Dismiss Newspaper Plaintiffs' Amended Complaint (ECF 452) at 1.  Google is hardly a "scapegoat," as the Newspaper Plaintiffs will prove at trial.  In fact, it is directly responsible for the Newspaper Plaintiffs' harm, many of which have been essentially forced out of business.  Nevertheless, the ultimate issue of liability is for another day.  The only issue facing the Court today is the sufficiency

---

[1]     The "Newspaper Plaintiffs" refer to Plaintiffs HD Media Company LLC, AIM Media Indiana Operating, LLC, AIM Media Midwest Operating, LLC, AIM Media Texas Operating, LLC, Clarksburg Publishing Company, d.b.a. WV News, Coastal Point LLC, Eagle Printing Company, ECENT Corp., Emmerich Newspapers, Inc., J.O. Emmerich & Associates, Inc., Delta-Democrat Publishing Company, Commonwealth Publishing Company, Inc., Delta Press Publishing Company, Inc., Newton County Appeal Inc., Marion Publishing, Company, Yazoo Newspaper, Co., Inc., Sunland Publishing, Company, Inc., Simpson Publishing Co., Inc., Montgomery Publishing Co., Inc., Franklinton Publishing Co., Inc., Charleston Publishing Co., Inc., Clarion Publishing Company, Inc., Scott Publishing, Inc., Clarke Publishing, Inc., Hattiesburg Publishing, Inc., Tallulah Publishing, Inc., Louisville Publishing, Inc., Kosciusko Star-Herald, Inc., Enterprise-Tocsin, Inc., Grenada Star, Inc., Tate Record Inc., Flag Publications, Inc., Gale Force Media, LLC, Journal, Inc., Brown County Publishing Company, Inc., Multi Media Channels, LLC, Robinson Communication, Inc., Something Extra Publishing, Inc., Rome News Media, LLC, Neighborhood Newspapers, Inc., Times Journal, Inc., Savannah Publishing Co., Inc., Weakley County Press, Inc., Union City Daily Messenger, Inc., Gould Enterprises, Inc., Southern Community Newspapers, Inc., Appen Media Group, Inc., and Capital Region Independent Media LLC.

- 1 -

of the Newspaper Plaintiffs' Amended Complaint and Jury Demand (ECF 401) ("Amended Complaint" or "AC"). And on that issue, Google's and Facebook Inc.'s n.k.a. Meta Platforms, Inc.'s (collectively, "Defendants") motions to dismiss should be denied.

At the outset, the scope of Google's motion as to Counts I (monopolization) and V (attempted monopolization) is unclear. In its introduction, Google suggests that it is seeking to dismiss these counts in their entirety.[2] In its conclusion, however, Google suggests that the relief it is seeking is much narrower, as it "requests that this Court dismiss . . . Counts I and V predicated on the [Network Bidding Agreement ("NBA")]." ECF 452 at 14. To be clear, the Newspaper Plaintiffs submit that, to the extent Counts I and V are based on the same allegations this Court already upheld, the Newspaper Plaintiffs should be permitted to proceed. In its September 13, 2022 order, this Court largely upheld the complaint brought by ten states Attorneys General (the "States"). Sept. 13, 2022, Opinion and Order (ECF 308). The Court found that the States plausibly alleged, under §2 of the Sherman Act, monopolization claims in three nationwide markets (publisher ad servers, ad exchanges, and ad-buying tools for advertisers), an attempt-to-monopolize claim, and a tying claim relating to the licensing of Google's publisher ad server. Consistent with the decision, the Newspaper Plaintiffs conformed their Amended Complaint to allege specific instances of anticompetitive conduct that survived Google's Motion to Dismiss the States' claims, and they have clearly alleged harm in the publisher ad server and ad exchange markets.

Google does not challenge these conforming allegations, but specifically takes aim at the Newspaper Plaintiffs' allegations concerning Google's imposition of audience fees in the ad server market and Google's capturing of digital advertising spend and newspaper publishers' profits on

---

[2]    Plaintiffs believe that this initial request is in error and moreover unsupported by Google's November 4, 2022 pre-motion letter. ECF 367. To the extent Google seeks relief beyond what was identified in its pre-motion letter, we respectfully request that the Court deny the same.

- 2 -

high news days, as well as the Newspaper Plaintiffs' claims against Google for monopolistic leveraging of its power in the general search services market to maintain and gain monopoly power and further establish dominance in the ad exchange and ad server markets.  The Court previously found Google's imposition of coercive fees in the ad server market to be integral to a multi-faceted scheme directed at starving competition and coercing publishers to use AdX over competitor exchanges by, for example, restricting publishers' pricing decisions in a manner that "does not appear to have a legitimate business purpose other than to restrict competition in the ad exchange market."  ECF 308 at 76.  Google's entire argument for dismissal of the Newspaper Plaintiffs' coercive fee allegations rises and falls on pretending that these fees stand alone.  That is not the Newspaper Plaintiffs' allegation, nor is that how the Court understood the role and effect of such fees, which are integral to, for example, Google's uniform price floor practices, which the Court previously found plausibly alleges antitrust violations.

Google's effort to dismiss the Newspaper Plaintiffs' bypassing ad traffic manipulation allegations likewise fail.  In short, Google, through its DoubleClick for Publishers ("DFP") ad server, manipulated the delivery of ads sold by the newspapers on high traffic news days.  Google's ad server over-delivered less valuable AdX ads on these days, and prevented the newspapers' ads from being eligible to be served on other exchanges.  This restriction on competition for placement of ads on non-Google exchanges depressed publishers' ad revenue.

The Newspaper Plaintiffs' leveraging allegations also plausibly allege actionable anticompetitive conduct.  It is not reasonably disputed that Google maintains massive monopoly power in each of the general search services, ad server, and ad exchange markets.  As explained herein, in the context of an alleged broad pattern of interrelated anticompetitive conduct, Google introduced Accelerated Mobile Pages ("AMP") (which was designed to be incompatible with header

- 3 -

bidding) in the general search services market, specifically to thwart competition in and create a dangerous probability of monopolizing the ad server, and ad exchange markets. The Newspaper Plaintiffs, thus, plausibly allege an actionable leveraging claim.

Facebook joins Google in challenging the Newspaper Plaintiffs' claim under §1 of the Sherman Act, 15 U.S.C. §1, concerning Google and Facebook's market allocation agreement.  As detailed below, the Newspaper Plaintiffs' new allegations bridge the pleading gaps the Court previously identified with respect to the NBA's effect on header bidding.  The Newspaper Plaintiffs bring two new market allocation claims – neither of which the States pursued – alleging that Facebook agreed to "cede" to Google: namely, the publisher ad server and in-app mediation tool markets, in return for preferential treatment in the in-app network market.  The Newspaper Plaintiffs outline in §II.C.2., below, the factual allegations supporting an inference of an agreement to allocate these markets, namely, that: (i) Google and Facebook shared a common motive to conspire; (ii) Facebook acted in its economic self-interest in abruptly withdrawing from entry into the ad server and in-app mediation tool markets; and (iii) there was a high level of interfirm communications and ample opportunity for Facebook and Google to reach an understanding that Facebook would abandon these markets.  Moreover, the structure and characteristics of the ad server and mediation tool markets made them conducive to agreement.  An inference of collusion is thus highly plausible. Defendants' alternative factual version of the events – that Facebook suddenly and independently decided to withdraw from entry into the ad server and in-app mediation tool markets after years of actively trying to enter each market as part of its strategy to challenge Google – is not just implausible but contradicted by the Amended Complaint's allegations that must be accepted as true. This is *per se* illegal conduct under the Sherman Act.

Defendants' motions should be denied.

- 4 -

## II.     ARGUMENT

### A.     The Newspaper Plaintiffs Plausibly Allege that Google Engaged in a Broad Pattern of Anticompetitive Conduct

Ignoring the allegations of the Newspaper Plaintiffs' Amended Complaint that detail Google's multifaceted anticompetitive scheme and its interrelated component parts, Google extricates two aspects – Google's coercive audience fee and its direct-ad campaign bypassing practices – and argues that neither, in isolation, constitutes anticompetitive conduct.  In doing so, Google sidesteps the applicable standards this Court set forth concerning the plausibility of allegations challenging Google's anticompetitive practices and the component interrelated parts thereof.  Google fails even to acknowledge the Court's prior findings upholding the plausibility of such allegations.

But neither the audience fee nor Google's auction manipulation practices exists in a vacuum.  Indeed, both are vital and interrelated aspects of extensive anticompetitive conduct.  Where alleged exclusionary and anticompetitive conduct involves the interaction and combined effects of multiple aspects of a defendant's scheme, the determination of whether a plaintiff has plausibly alleged anticompetitive conduct requires not only examination of the described aspects but also consideration "*as part of a broader alleged pattern of conduct*."[3]  *See* ECF 308 at 40; *see also City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376, 1378 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect.").

Broad patterns of anticompetitive conduct consisting of multiple activities are not uncommon.  "A monopolist bent on preserving its dominant position is likely to engage in repeated

---

[3]     Citations are omitted and emphasis is added unless otherwise stated.

and varied exclusionary practices. . . ."  II Phillip E. Areeda, *et al.*, *Antitrust Law*, ¶310c6 (2000) at 147 ("The factfinder should be permitted to consider the entire sum of unlawful exclusionary practices and their impact[,] . . . the pattern giv[ing] increased plausibility to the claim."); *Simon & Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 913 (N.D. Cal. 2021) ("Sometimes, a monopolist's singular activity will amount to an antitrust violation on its own.  But other times, a series of activities will combine to create an antitrust violation even if no one activity is sufficiently 'anticompetitive' in isolation.").[4]  In such circumstances, "[i]f a plaintiff can allege that a series of actions, when viewed together, were taken ***in furtherance and as an integral part of a plan to violate the antitrust laws, that series of actions, as an overall scheme, may trigger antitrust liability*.**"  *In re Gabapentin Pat. Litig.*, 649 F. Supp. 2d 340, 359 (D.N.J. 2009); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation"); *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012) (Any subset of this conduct can violate §2, "even if some of the activities would be lawful if viewed in isolation."); *In re Neurontin Antitrust Litig.*, 2009 WL 2751029, at *15 (D.N.J. Aug. 28, 2009) ("[i]f an antitrust plaintiff can allege that a series of actions, when viewed together, ***were taken in furtherance and as an integral part of a plan to violate the antitrust laws, that series of actions may trigger antitrust liability as an overall scheme***").[5]

---

[4]  *See also Tele Atlas N.V. v. NAVTEQ Corp.*, 2008 WL 4911230, at *2 (N.D. Cal. Nov. 13, 2008) ("To appreciate the effect of otherwise lawful acts, the jury must consider the acts' aggregate effect.") (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962) (concluding that it is improper to treat antitrust claims as "separate and unrelated lawsuits" and that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each")).

[5]  That is not to say that there are never times that an activity might be "***so innocuous*** that it adds nothing to a plaintiff's section 2 claim." *Id.*; *accord Free FreeHand*, 852 F. Supp. 2d at 1184.  But

- 6 -

The Newspaper Plaintiffs allege the specific and collective means by which Google impaired competition in the ad exchange and ad server markets and how such conduct as a whole continuously foreclosed rivals, and protected Google's monopolies therein.  In previously addressing these same activities individually and as part of a "broader alleged pattern," this Court considered and found most of these activities actionable parts of Google's alleged anticompetitive scheme.  ECF 308 at 16-20, 77-78 (upholding tying allegations), *id.* at 44-50 (upholding dynamic allocation and enhanced dynamic allocation allegations); *id.* at 50-55 (upholding Project Bernanke allegations); *id.* at 55-57 (upholding dynamic revenue sharing allegations); *id.* at 66-67 (upholding auction data and publisher line item redaction allegations); *id.* at 68-70 (upholding Projects Poirot and Elmo allegations); *id.* at 74-77 (upholding unified pricing policy allegations).[6]

In addition to the above, the Newspaper Plaintiffs plausibly allege additional practices, part and parcel of the same scheme:  Google's audience fee and its bypassing ad traffic manipulation on high news days.  *See* AC at 60-83 (under the heading "Unlawful Conduct," and specifically §A.8 (*id.*, ¶257) and A.10 (*id.*, ¶¶269-270)).

---

that is not the case here.  Nor is it a circumstance in which "a plaintiff [is] creating a new theory of antitrust liability by joining multiple claims, all of which are specifically foreclosed by existing antitrust precedent."  *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2017 WL 36371, at *8-*9 (E.D. Pa. Jan. 4, 2017).  Rather, as discussed below, this Court has already upheld the plausibility of allegations demonstrating the anticompetitive effects of the various aspects of Google's overall scheme.

[6]   "The law of the case doctrine" provides "that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case [and] . . . permits a change of position [only] if it appears that the court's original ruling was erroneous."  *DiLaura v. Power Auth. of State of N.Y.*, 982 F.2d 73, 76-77 (2d Cir. 1992).  Defendants do not argue that the Court's September 13, 2022 order was erroneous.

1.      **Google Imposes Coercive Fees in Conjunction with Price-Floor and Other Components of Its Scheme to Exclude Rivals and Restrain Trade**

The Court previously vetted and fully analyzed various components and the interrelatedness of Google's alleged anticompetitive scheme and found them plausibly alleged, part and parcel of Google's efforts to starve competition and coerce publishers to use AdX over competitor exchanges. For example, the Court's findings include detailed discussion of Projects Poirot and Elmo (ECF 308 at 68-70), and Google's uniform price floor practices (*id.* at 74-77), including how Google manipulated the bidding process to punish rival exchanges by "directing ad buys away from those exchanges to Google's own AdX exchange" (*id.* at 68), and punishing publishers by "adopt[ing] and enforc[ing] unified pricing floors in order to foreclose competition and channel transactions to AdX," not only by restraining publishers ability to set variable price floors but also by coercing publishers to transact with AdX.  *Id.* at 74-76.  The Court specifically addressed the interplay of Google's uniform price floor practices and how "instead of leveling the playing field, unified rates give a price advantage to Google ***due to the fees that it charges for transactions made on a non-Google exchange***."  *Id.* at 74-75.  In rejecting Google's arguments to the contrary, the Court found:

> Google's version of a uniform price floor does not permit publishers to adjust those floors to take account of the ***higher fees charged by Google for transactions on non-Google ad exchanges***.  Google may have the right to set its own prices (provided they are not predatory) ***but its right to restrict publishers' pricing decisions does not appear to have a legitimate business purpose other than to restrict competition in the ad exchange market***.

*Id.* at 76.  Google does not challenge the Newspaper Plaintiffs' allegations concerning these same scheme components.

Google does, however, pretend the Newspaper Plaintiffs' audience fees allegations are new or separate.  But the very fees the Court previously addressed ***are*** Google's audience fees.  AC,

- 8 -

¶¶244-248 (Projects Poirot and Elmo); *id.*, ¶¶249-256;[7] *id.*, ¶257 (describing these fees as audience

fees). A motion to dismiss must be denied where the complaint "contain[s] sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v Twombly*, 550 U.S. 544, 570 (2007)). Here, because the

Court previously addressed Google's coercive fees in their proper context – part and parcel of

Google's anticompetitive scheme and, specifically, within the context of Projects Poirot and Elmo

and unlawful uniform price floor practices – and found such conduct plausibly alleges unlawful

restriction of competition, so the Newspaper Plaintiffs, too, plausibly allege the same restriction.[8]

Moreover, Google's attempt to analogize its coercive audience fee to Exchange Bidding

compares apples to oranges. As described above, Google's ad server audience fee is not analogous

to fees charged in conjunction with Google's Exchange Bidding initiative. Google's audience fee is

---

[7]   As alleged in the Newspaper Plaintiffs' Amended complaint:  Unified rates give a price
advantage to Google *due to the fees that it charges for transactions made on a non-Google
exchange*.  For the foregoing reasons, the Newspaper Plaintiffs respectfully request the Court deny
Defendants' motions to dismiss in their entirety or grant the Newspaper Plaintiffs leave to amend.
Google's Unified Pricing rules ensure that rival exchanges and buying tools are at a price
disadvantage.  Because Google's publisher ad server imposes extra fees to serve inventory sold on
non-Google exchanges, Google's exchange can win an impression by returning a bid 5% to 10%
lower than a rival exchange.  Googles Unified Pricing rules and attendant imposition of audience
fees interfere with a publisher's ability to set prices in transactions in which Google has no interest
as buyer.  AC, ¶¶254-255.

[8]   *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc*., 555 U.S. 438 (2009) and *F.T.C. v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) are not on point.  In *linkLine*, the defendant was simply alleged to have
used lawfully maintained market power to charge its competitor in the retail market higher prices.
555 U.S. at 442.  Unlike here, nowhere was it alleged that defendant in *linkLine* engaged in any
exclusionary acts, punished customers for dealing with rivals, or entrenched its power through
coercion and tying – allegations that in this case have already been upheld as actionable claims by
this Court.  Likewise, in *Qualcomm*, unlike here, the defendant's challenged conduct did not
unlawfully impact competition.  969 F.3d at 1002.  Here, as the Court has already determined, it is
plausibly alleged that Google's conduct directly impacted competition by, for example, punishing
publishers that do not deal exclusively with Google and interfering with rivals' customer
relationships, in addition to the other exclusionary and anticompetitive aspects of Google's scheme
addressed in the Court's September 13, 2022 order.

- 9 -

forced on publishers in a market in which Google controls virtually every component of the bidding and distribution process. On the other hand, as the Court noted in its September 13, 2022 order, Exchange Bidding was Google's "response to the popularity and innovation of header bidding." ECF 308 at 63. The Court found Exchange Bidding to have "tended to increase competition for publisher ad inventory," giving publishers an option instead of header bidding if such publishers chose to participate in Google's Exchange Bidding program. *Id.* at 64-65 ("[P]articipants in the online ad market apparently remain free to participate in either [Exchange Bidding or header bidding], or both.").

This is the opposite of Google's coercive fees, which, as the Court observed, combined with Google's price floor practices, "do[] not appear to have any legitimate business purpose other than to restrict competition in the ad exchange market." ECF 308 at 76.

### 2. Google's Ad Traffic Manipulation Practices Restrain Trade for Both Advertisers and Publishers and Competition in the Ad Server, and Ad Exchange Markets

Google's attack on the Newspaper Plaintiffs' ad traffic manipulation (which Google calls "bypassing") allegations fare no better. Google's argument rests on a single demonstrably false assertion – that its manipulative conduct has no adverse effect on competition in a relevant market. This is wrong. As the Newspaper Plaintiffs' allegations detail, the challenged conduct directly affects both the ad server and ad exchange markets, as Google manipulates the distribution of publisher direct ad-sales and Google's AdX ads, which interact in both markets. AC, ¶¶269-271 (describing Google's allocation and control of both direct and indirect ads via interrelated ad server and ad exchange markets); *see also id.*, ¶203 (Google is a monopolist in the publisher ad servers and ad exchanges markets that aggressively uses its monopoly positions, and the money that flows from them, to continuously foreclose rivals and protect its monopolies through a wide variety of

anticompetitive conduct, including forcing publishers and advertisers to rely on Google's intermediation services to effectuate sales.).

Publishers like the Newspaper Plaintiffs directly sell some ad space for ads. *Id.*, ¶270. These are more lucrative ads, specifically aimed at the specific publisher, typically because the advertiser wants that publishers' ad inventory and is targeting that publisher or a publisher's specific audience. Publishers also sell space indirectly through Google's products and services, including its AdX ad exchange. Both direct and indirectly sold ads have to be served onto publisher's website and thus rely on the Google DFP ad server. *Id.* Indirect ads come to and are processed for placement through Google broadly. As relevant here, when Google's DFP ad server is used, Google controls the delivery of ads that appear on publishers' websites whether direct sale or indirect ads from Google's AdX. Also in both cases (following implementation of Enhanced Dynamic Allocation ("EDA")), Google controls – and manipulates – the auction and sale of ad inventory. *Id.*, ¶269. Using internal algorithms and then by controlling the entire process, the Newspaper Plaintiffs allege that Google intentionally over-delivered less valuable AdX ads on high traffic news days, bypassing direct ad sales been when direct ads should have been served. *Id.*, ¶¶269-271. Plaintiffs are ***newspapers*** – profits from high news days are critical to their survival. They are also critical to the newspaper's ability to afford and provide investigative journalism and to bring important – sometimes emergent – news to the public accurately and timely. Yet Google purposefully manipulated its algorithms to artificially restrict newspapers' direct ad sales from being served on newspapers' most important days. As a result, Google profited off of both the Newspaper Plaintiffs' content (interesting and compelling news stories on high news days) and their business models (offering and selling substantially more ad inventory on high news days). Google profited from the Newspaper Plaintiffs' success.

Thus, in the competition for advertisers' money, Google ensured that newspaper publishers' revenue therefrom was greatly diminished while Google's take greatly increased.  This practice directly restrains newspaper publishers' ability to fairly compete for their share of advertiser revenue.  Moreover, Google's bypassing practice directly restrains trade between publishers and direct-placement advertisers.  Direct ads are so valuable to advertisers because they are targeted directly to the selling publisher and the publisher's specific audience.  High news days equal high volume for newspaper publishers and, at the same time, high exposure for direct ad advertisers, which is the purpose of such direct ads – targeted placement to reach the highest volume of a targeted audience.

The allegations are clear – these ads were not eligible to go through other ad exchanges – they went only through AdX.  Thus, Google again cherry-picked out of the hands of the newspaper publishers and out of reach of rival ad exchanges.  As with the audience fee, but for Google's chokehold on the ad markets here, with its various interconnecting components, and Google's broad pattern of manipulating these processes in a manner that restrains trade, as already identified by the Court, the very purposes of direct ad trade would operate unimpeded.  Instead, Google's monopoly of and control over the ad server and ad exchange markets, and its manipulation of ad delivery on high traffic news days, is a coup for Google and a death knell for publishers.  AC, ¶271.

## B.    The Newspaper Plaintiffs' Leveraging Claims Are Sufficiently Pled

Count Four of the Amended Complaint asserts a claim for monopoly leveraging. Specifically, the Newspaper Plaintiffs allege that Google has monopoly power in the general search market, and through the anticompetitive conduct described in the Amended Complaint, Google has leveraged its power in this market in an effort to gain monopoly power and further dominance in the ad exchange and ad server markets.

- 12 -

A claim for monopoly leveraging requires that defendant:  (1) possessed monopoly power in one market; (2) used that power to create a dangerous probability of monopolizing another market; and (3) caused injury by such anticompetitive conduct.  *Olde Monmouth Stock Transfer Co., Inc. v. Depository Tr. & Clearing Corp.*, 485 F. Supp. 2d 387, 395 (S.D.N.Y. 2007); *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 246-47 (S.D.N.Y. 2004).  The Supreme Court has recognized that such "monopoly leveraging" can violate §2 of the Sherman Act.  *See Verizon Commc'ns, Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004) (analyzing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993)).[9]  As set forth below, the Newspaper Plaintiffs have adequately plead each element and have thus established a claim for monopoly leveraging.

**1.    Google Has Monopoly Power in the General Search Services, Ad Server and Ad Exchange Markets**

Newspaper Plaintiffs have properly plead that Google has monopoly power in the general search services, ad server, and ad exchange markets.  Monopoly power is "the power to control prices or exclude competition" and may be shown either through circumstantial or direct evidence, including whether the defendant behaves like a monopolist.[10]  *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97-98 (2d Cir. 1998); *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.D.C. Cir. 2001).  Where there is direct evidence that Google has controlled prices or excluded competition, the existence of monopoly power is clear.  *See Microsoft*, 253 F.3d at 51.  Indeed, Google's behavior "may well be sufficient to show the existence of monopoly power."  *Id.* at 57.

---

[9]    Citing to treatment of §2 in *Spectrum Sports, Inc.*, 506 U.S. at 459, the *Trinko* Court noted that monopoly leveraging requires a dangerous probability of success in monopolizing a second market. *Trinko*, 540 U.S. at 415 n.4.

[10]    Newspaper Plaintiffs' assertions of market power are clear and supported by readily available and reliable statistics, as well as having been recognized in the industry and by other courts and regulatory agencies, both foreign and domestic. Moreover, Google has not disputed its market power in any of the relevant markets.

Absent direct evidence, the "existence of [monopoly] power ordinarily may be inferred from the predominant share of the market," which acts as a proxy for monopoly power. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).  As this Circuit has stated, "[w]hile market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power." *Tops Mkts.*, 142 F.3d at 97-98 (monopoly power "may be inferred from one firm's large percentage share of the relevant market").  Although market share is a predominant factor for determining circumstantial evidence of market power, other relevant factors include "the 'strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand.'" *Id.* at 98.

The Amended Complaint sets forth the relevant market shares as over 90% for general search services; 90% for Google's DFP ad server, and over 70%-80% for Google's AdX ad exchange adequately pleads circumstantial evidence[11] of Google's monopoly power in each of the general search services market (AC, ¶202), the ad server market (*id.*, ¶185), and ad exchange market (*id.*, ¶¶192-196).  This is sufficient to demonstrate monopoly power at the pleading stage under Second Circuit law.

Google's overwhelming 70%-80% (*id.*, ¶¶192-196) market share in the ad exchange market alternatively demonstrates that Google is dangerously close to achieving monopoly power in the ad exchange market.  *Tops Mkts.*, 142 F.3d at 98.  Additionally, Newspaper Plaintiffs have pled

---

[11]   In addition to asserting market share as the circumstantial proxy for Google's market power, the Amended Complaint also sets forth conduct that demonstrates direct evidence of Google's behavior as a monopolist including illegal tying and other behavior that in fact drove competing ad servers and ad exchanges out of the relevant markets.  AC, ¶¶258-268.

- 14 -

adequate facts and factors that amplify Google's probability of achieving monopoly power, if monopoly power has not already been attained in the ad exchange market.[12]

> **a.    The Amended Complaint Adequately Pleads that Google Used Its Monopoly Power in General Search Services to Monopolize or Create a Dangerous Probability of Monopolizing the Ad Server and Ad Exchange Markets**

The Amended Complaint alleges that the introduction of Accelerated Mobile Pages ("AMP") was designed to be incompatible with header bidding and therefore to thwart competition in the ad server and ad exchange markets on the merits. AC, ¶¶334, 338. Newspaper Plaintiffs further allege that Google purposefully penalized publishers that that did not adopt AMP by dropping the PageRank of the sites where Google holds undisputed monopoly power. *Id.*, ¶335.

AMP effectively was the introduction of a new product that Newspaper Plaintiffs assert was done to thwart competition on the merits. While neither product withdrawal nor product improvement alone is anticompetitive, when a monopolist combines "some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits, and to impede competition, its actions are anticompetitive under the Sherman Act." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654-55 (2d Cir. 2015). Indeed, §2 is violated when "some conduct of the monopolist associated with its introduction of a new and improved product design 'constitutes an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market.'" *Allied Orthopedic*

---

[12]   Google's dominant market share in the ad exchange market is amplified by: (1) the natural environment of the industry itself; (2) barriers to entry; (3) the speed with which obscurity can occur in the industry; (4) the unique products and services at issue in this case, which can and have physically and technologically blocked competition on the merits; (5) the minimal strength and capacity of competitors, especially given Google's control of the Internet ecosystem; and (6) the interplay of Google's monopolies with one another. AC, ¶¶158-159, 174, 186, 193-196, 280.

*Appliances Inc. v. Tyco Health Care Grp LLC*, 592 F.3d 991, 1000 (9th Cir. 2010).  "The key question is whether the defendant combined the introduction of a new product with some other wrongful conduct, such that the comprehensive effect is likely to stymie competition, prevent consumer choice and reduce the market's ambit."  *Suboxone*, 64 F. Supp. 3d at 682.

### b.  Newspaper Plaintiffs Adequately Allege that They Were Injured by Google's Monopoly Leveraging

Newspaper Plaintiffs' adequately allege that they were injured in their business and property by Google's monopoly leveraging.  AC, ¶¶389-391.  Specifically, the Newspaper Plaintiffs assert that Google maliciously rendered news sites nearly invisible to Google searches and starved publishers of the web traffic needed to create ad revenue and sustain their ad business.  *Id.*, ¶335.  The Newspaper Plaintiffs likewise allege that the use of articles in the AMP format significantly hurt their ability to convert consumers into subscribers – a key and increasingly important source of newspaper revenue.  *Id.*, ¶337.  Moreover, Google's imposition of AMP undermined publishers' ability to offer their inventory to multiple ad exchanges simultaneously before making calls to their ad servers, decreasing control by newspaper publishers, decreasing yield or fill rate, and significantly decreasing revenue to newspaper publishers.  *Id.*, ¶338.  Anticompetitive harm is detailed in the Amended Complaint.  *Id.*, ¶¶343-353.  Plaintiffs have plausibly alleged both that the ad server and ad exchanged markets are faced with the requisite threats of higher prices or reduced quality (*id.*, ¶¶347-349) and that Plaintiffs have been harmed in these markets (*id.*, ¶¶343-353).  *See Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 672 (S.D.N.Y. 2002).

Even if the introduction of AMP, which was purposefully incompatible with header bidding, did not by itself constitute anticompetitive conduct (a conclusion as respects which we respectfully disagree), Google's associated conduct in leveraging its general search services to penalize and render invisible publishers who did not adopt AMP was anticompetitive because it had the "overall

- 16 -

effect of . . . coerc[ing publishers] rather than persuad[ing] them on the merits and . . . imped[ing] competition." *Schneiderman*, 787 F.3d at 654-55.  Thus, the Newspaper Plaintiffs' allegations of monopoly leveraging (a claim not asserted by the States' Third Amended Complaint (ECF 195) ("TAC")) adequately pleads a violation of §2.  At the pleading stage, no more is required.

### C.   The Newspaper Plaintiffs' §1 Claims Are Plausible and Defendants' Arguments to the Contrary Fail

In its September 13, 2022 decision, the Court found that the States did not plausibly allege a §1 claim based on Google's agreement with Facebook, with respect to header bidding or in-app ad inventory.  ECF 308 at 20-34.  Cognizant of the Court's decision, the Newspaper Plaintiffs did not simply re-allege the States' allegations, contrary to Defendants' contention.

Eager to convince the Court that the Newspaper Plaintiffs' claims are the "same" as the States and thus should be dismissed on the same grounds, Defendants give short shrift to many of Newspaper Plaintiffs' new factual allegations and ignore some entirely.  But it is these new allegations that bridge the gap the Court previously identified, plausibly alleging a §1 claim against Facebook and Google, as discussed below, and establish plausible market allocation claims.

#### 1.   The Newspaper Plaintiffs Plausibly Allege an Agreement to Restrain Header Bidding

The Court previously held that the States did not plausibly allege an unlawful agreement between Google and Facebook to restrain Facebook's use of header bidding, which the Newspaper Plaintiffs allege was introduced in 2014 as a work-around to a number of measures Google put in place to secure its exchange, an advantage over rival exchanges.  ECF 308 at 22; AC, ¶226.  As the Court explained in its opinion, header bidding allowed publishers to insert a piece of code into the header section of a publisher's webpage, allowing the publisher to use that information to bid on multiple ad exchanges.  ECF 308 at 22.  This provided every ad buyer an equal chance to bid on the

- 17 -

same inventory at the same time, leading to greater competition between bidders and more ad revenue for publishers, fostering competition among ad exchanges and creating rivals to Google. AC, ¶226.

There is no dispute that Google and Facebook entered into an agreement that provided certain advantages to Facebook on Google's exchange.  "The question," the Court explained, "is whether the States have alleged facts that permit the plausible inference that any curtailment of header bidding by Facebook was the product of an agreement with Google."  ECF 308 at 21.  The Court found that the Jedi Blue agreement did not expressly touch upon header bidding, and that it could not infer an agreement because the States' "[c]omplaint offer[ed] no context on the size of Facebook's annual spending on display ads or in-app impressions."  ECF 308 at 25.  Without this information, it was unclear whether there was any restraint on Facebook's ability to bid on other exchanges.  In §1 parlance, the allegations did not constitute a restraint of trade.

But the Newspaper Plaintiffs' Amended Complaint fills in that gap, providing detail on size of Facebook's advertising spend that was diverted away from header bidding.[13]  The Newspaper Plaintiffs' Amended Complaint alleges that Facebook planned to purchase $1.5 billion worth of inventory per year through DFP/AdMob mediation and do so within 24 months of signing the agreement to trigger the agreement's lowest 5% flat rate DFP/AdMob mediation fee.  AC, ¶320. Moreover, the Amended Complaint details the size and scope of Facebook's commitment on its web display advertising efforts, alleging that Facebook committed, by design, to divert all or virtually all

---

[13]   Specifically, the Court indicated that the States' TAC:  (1) did not provide information on the size of Facebook's annual spend; (2) did not describe the NBA's effect on Facebook's use of header bidding; (3) did not allege that Facebook was participating in Google ad auctions immediately preceding the NBA; and (4) was absent allegation of predatory pricing, exclusionary or improper conduct.  ECF 308 at 25.  The Newspaper Plaintiffs' substantially enhanced allegations addressed each of the Court's identified concerns.

- 18 -

of its ad spend away from header bidding: Facebook Audience Network ("FAN") had little to no spend to use header bidding or non-Google mediation tools.  *Id.*

The Newspaper Plaintiffs' Amended Complaint also addresses the Court's concern that the States' complaint did not describe the Jedi Blue's effect on Facebook's use of header bidding.  That effect was prompt and substantial.  The Amended Complaint alleges that, after the agreement, Facebook curtailed its use of and support of header bidding, even though Facebook had reported that header bidding was more a better and efficient product for publishers.  *Id.*, ¶305.  Such about-face raises a plausible inference that the Jedi Blue agreement played a direct role in Facebook's decision to cease its use of header bidding.

Defendants make much of the fact that Facebook did not finally shutter FAN until 2020, two years after the agreement was struck.  While true, Facebook's withdrawal began promptly after the Jedi Blue agreement was executed and long before FAN was eventually shuttered.  Shuttering FAN was merely the final act necessary to complete the withdrawal: After the agreement, Facebook stopped entry, withdrew support of non-Google competition (header bidding), and then exited the web network market entirely, ceding the network market to dominant the Google Display Network ("GDN").  *Id.*, ¶292.

Even if two years had elapsed between the agreement and Facebook's initial efforts to exit the market, Google's authorities do not support its contentions.  Neither *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059 (E.D. Cal. 2011), *aff'd sub nom. Diesel eBooks, LLC v. Simon & Schuster, Inc.*, 869 F.3d 55 (2d Cir. 2017), nor *Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513 (S.D.N.Y. 2016), held, as Google contends, that a market allocation conspiracy is implausibly pled where the exit came several years after the agreement.  In *Stanislaus*, the court "d[id] not reach [the] issue" of whether the agreement was plausible.  782 F. Supp. 2d at 1077.  And *Lavoho* says

- 19 -

nothing about whether the timing of a co-conspirator's exit can support the inference of a conspiracy.  Rather, the issue in that case was causation – *i.e.*, whether plaintiff could show that defendants' conspiracy was a materially contributing factor to its losses.  *Lavoho*, 232 F. Supp. 3d at 513.

As alleged here, the agreement knocked out Google's primary competitor – and the most vocal proponent of header bidding – leaving only a very fragmented set of competitors, each so inconsequential that they lacked any serious ability to restrain Google's market power.  AC, ¶¶295, 297 (Google acknowledging internally that Facebook is the largest competitive network across formats).  *See F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 169 (D.D.C. 2000) (finding likelihood of unilateral price increase where merger would eliminate one of the larger merging firm's "primary direct competitors," "the third largest selling" brand "that has consistently played a role in constraining the price" of the larger firm's products); *F.T.C. v. Staples, Inc.*, 970 F. Supp. 1066, 1083 (D.D.C. 1997) (finding anticompetitive effects where the "merger would eliminate significant head-to-head competition between the two lowest cost and lowest priced firms in the . . . market").  With no significant competitor remaining in the web display market, Google regained its pricing power: As a result of less network competition, publishers' web CPMs dropped drastically in 2020, from 2019, by approximately 34%.  AC, ¶¶292, 308 (GDN no longer had to compete against FAN bids in publishers' display auctions, which resulted in lower CPMs to publishers); *id.*, ¶¶309-310 (the year-over-year decrease in CPMs was widespread and experienced by two-third of publishers in the market publisher CPM's for display inventory dropped drastically in 2020 from prior year, by 33%).  Following the adoption of header bidding, publisher revenue increased significantly, as costs per thousand impressions increased by 25% to 50%.  *Id.*, ¶226.

- 20 -

### 2. The Newspaper Plaintiffs Plead a Plausible Market Allocation Conspiracy

Facebook and Google correctly state that the Newspaper Plaintiffs allege two market allocation theories not alleged by the States; however, their arguments that the Newspaper Plaintiffs' claims are not plausible should be rejected.  ECF 452 at 2, 8.  The Newspaper Plaintiffs' allegations make clear that Google and Facebook were engaged in market allocation, which is a *per se* violation of §1 of the Sherman Act.  *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972); *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012).  Under §1 of the Sherman Act, plaintiffs can plead an unlawful market allocation or price-fixing agreement by asserting either (1) "direct evidence" of an unlawful agreement, *or* (2) "circumstantial facts supporting the *inference* that a conspiracy existed."  *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (emphasis in original).[14]

Plaintiffs need not plead direct evidence of an illegal scheme; they may "'present circumstantial facts supporting the *inference* that a conspiracy existed.'"  *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (emphasis in original).  "There is no requirement that the terms of an unlawful agreement be expressed in any particular manner or in written form."  ECF 308 at 21.  A conspiracy "'may be inferred on the basis of conscious parallelism . . . accompanied by circumstantial evidence and plus factors.'"  *Citigroup*, 709 F.3d at 136.  "Plus factors" include allegations that: (1) the competitors shared "'"a common motive to conspire;"'"  (2) "'"the parallel

---

[14]   Although set forth as a basis for §1 liability in their Amended Complaint, the Newspaper Plaintiffs will not reargue here the States' claim that the agreement expressly includes a naked restraint on in-app impressions, including its claim that: (i) Google and Facebook agreed in the NBA to "'fix[ ] a minimum share of impressions that Facebook will win in developer auctions'" and create a "'hard limit on contractually acceptable auction outcomes,'"; and (ii) Google has effectively excluded rival bidders because the NBA contains terms more favorable to Facebook than those offered to others.  *See* ECF 308 at 26.  Newspaper Plaintiffs respectfully note and preserve any such arguments should they take an appeal.

acts were against the apparent individual economic self-interest of the alleged conspirators;'"" and (3) there was ""a high level of interfirm communications."" *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016).  These "'plus factors . . . serve as proxies for direct evidence of an agreement,'" and "'show that the . . . wrongful conduct . . . was conscious and not the result of independent business decisions.'" *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 440-41 (E.D. Pa. 2018).  The Court "need not decide whether the circumstantial evidence that we have summarized is sufficient to ***compel*** an inference of conspiracy; the case is just at the complaint stage and the test for whether to dismiss a case at that stage turns on the complaint's 'plausibility.'" *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) (emphasis in original).

In their Amended Complaint, the Newspaper Plaintiffs allege that, in return for preferential treatment that would secure a slice of the in-app network market for Facebook, Facebook "ceded" two markets to Google: (i) the publisher ad server; and (ii)  in-app mediation tool markets.  AC, ¶¶291-294.

***Common Motive to Conspire***:  The Amended Complaint alleges facts "specific to the market[s] at issue, [that] suggest[] that the defendants had an incentive to [conspire]."  *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 719 (S.D.N.Y. 2017).  As Google described its counterparty internally, "FAN is the largest competitive network across formats" (AC, ¶297), and competition in the web market, driven by FAN, had resulted in higher prices for publishers (and lower prices for Google).  *Id.*, ¶¶286-287.  This reduction in profits gave both parties a common motive to conspire.  *Propranolol*, 249 F. Supp. 3d at 720.  As economics and common sense dictate, "'[d]eclining prices or profits in a market "make price competition more than usually risky and collusion more than usually attractive.'"  *Generic*, 338 F. Supp. 3d at 448.  Here, the Amended

- 22 -

Complaint alleges the additional circumstantial evidence widely accepted to support motive, including: downward pricing pressure (*id.*, ¶¶286-287); high barriers of entry (*id.*, ¶159); high degree of concentration made more potent due to strong network effects (*id.*, ¶¶160, 280); and lack of available substitutes (*id.*, ¶180).

*Facebook Acted Against Apparent Self-Interest*:  Defendants claim that Facebook's abrupt decision to withdraw from entry into the ad server and in-app mediation tool markets was "natural" and consistent with the unilateral – not concerted – action.  ECF 452 at 5; Meta Platforms, Inc.'s Memorandum of Law in Support of Motion to Dismiss Count II of Newspapers' Consolidated Amended Complaint (ECF 463) at 9.  But the Amended Complaint alleges otherwise.

The Amended Complaint alleges that Facebook was poised to execute a digital advertising coup against Google and its DoubleClick empire, and was partnering with other ad tech companies. AC, ¶289.  Facebook had opened its own ad network (FAN) and begun efforts to establish its ad serving capability, which it needed to build out its ad tech stack in the ecosystem, and thus challenge Google's dominance.  *Id.*, ¶¶292, 302 ("Prior to the NBA between Google and Facebook, Facebook was actively trying to enter and compete in the publisher ad server market and mediation tool market by building or acquiring a competitive product.").  If it wanted to seriously compete with Google, Facebook needed to cover every part of the digital advertising ecosystem by not only providing scale, but also every mechanism, including ad servers and mediation tools, required of the ad-tech stack.  Absent a conspiracy, it was in Facebook's self-interest to enter the ad server and mediation tool markets as soon as possible and ensure the majority of their digital ad buys across the web go through its respective network.  *Colucci v. Health First, Inc.*, 2022 WL 610573, at *2 (M.D. Fla. Jan. 24, 2022) (allegation that "despite aggressive expansion in the recent years, Adventist has declined to enter Brevard" supported the existence of an illegal market allocation conspiracy).

- 23 -

Defendants offer an alternative factual explanation for Facebook's exit from the ad server market – that Facebook was interested as a "potential customer" in the in-app market due to its growth.  ECF 452 at 5.  But the Newspaper Plaintiffs allege that Facebook was already actively competing in the in-app market.  Facebook was one of the two largest bidders in that market, winning more impressions than any other non-Google buyer.  AC, ¶¶297, 299.  Horizontal restraints involve "agreements between competitors at the same level of market structure."  *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir. 1978).  Moreover, it is unclear how exiting the web display ad server market would boost Facebook's growth in the in-app market; if anything, the opposite is true, as deciding not to provide a competing ad server meant Facebook offered less value for its publisher and developer clients than Google.  In any event, at the motion to dismiss stage, plaintiffs need not "offer evidence that tend[s] to rule out the possibility that the defendants were acting independently."  *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010).  Instead, plaintiffs "need only 'allege enough factual matter (taken as true) to suggest that an agreement was made.'"  *Id.*; *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 650-51 (N.D. Ill. 2022) (allegation that a co-conspirator was "being paid by [a competitor] with a cut of [the] monopoly profits to sit on the sideline rather than compete and drive down prices" was sufficient to plausibly allege an antitrust conspiracy).

Defendants largely sidestep the Newspaper Plaintiffs' allegation concerning the in-app mediation market by claiming that the Newspaper Plaintiffs do not offer any factual allegations that Facebook would forego entry into that market.  ECF 452 at 8.  But that is exactly what Newspaper Plaintiffs allege.  The Amended Complaint plainly alleges that prior to the NBA between Google and Facebook, Facebook was actively trying to enter and compete in the in-app mediation tool

- 24 -

market by building or acquiring a competitive product and that it withdrew consideration of entry into that market following the Jedi Blue agreement.  AC, ¶302; *see also id.*, ¶¶292-293, 320.

***Defendants' High Level of Interfirm Communications***:  While the Jedi Blue agreement itself may not have expressly provided that Facebook would withdraw from these markets, the negotiation of the agreement provided ample opportunity for Facebook and Google to reach an understanding that Facebook would abandon these markets. *Beal Corp. Liquidating Tr. v. Valleylab, Inc.*, 927 F. Supp. 1350, 1366 (D. Colo. 1996) (the amount of direct contact between the co-conspirators and a licensing agreement entered shortly after the alleged scheme was purportedly hatched provided circumstantial evidence of a market allocation scheme).  The Amended Complaint alleges that Facebook and Google engaged in "regular meetings" regarding their digital advertising business.  AC, ¶323.  And these were far from informal meetings that occur at trade shows or other industry events, where the parties are surrounded by rival firms; rather, they were private, one-on-one meetings.  This suffices to plead an inference of conspiracy.

Google contends that the allegation that the agreement was kept "secret" is of no moment, because they provided a copy to the Court.  ECF 452 at 8.  But the agreement only recently came to light after numerous government investigations.  The agreement, which expressly provided for cooperation between the parties in case of antitrust allegations, purposefully remained undisclosed for many years, and Defendants' disclosure of the agreement was done only under pressure once these lawsuits were filed.  Long after-the-fact disclosure does not undermine the existence of a conspiracy; to the contrary, "secret meetings and the use of code words lends credence to the plausibility of the conspiracy itself." *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *50 (E.D.N.Y. Jan. 4, 2011); *cf. In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 985 (N.D. Ohio 2015) ("A direct and secret price discussion between

- 25 -

competitors is more probative of a conspiracy than are indirect and public communications, ostensibly undertaken by the conspiring competitors to 'signal' to one another.").

*Other Factors*:  In addition, the structure and characteristics of the ad server and mediation tool markets made them conducive to agreement.  The barriers to entry were high, and there were only two big players (Google and Facebook).  Google controls 90% of the ad server market.  AC, ¶185.  As a result, new or smaller competitors have limited ability to increase market share once Facebook had bowed out.  *Text Messaging*, 630 F.3d at 627-28 ("[A]n industry structure that facilitates collusion constitutes supporting evidence of collusion.").

Taken together and viewed holistically, these allegations are more than sufficient to allege a plausible conspiracy and more than satisfy the requirements of *Twombly*.  Newspaper Plaintiffs have presented significant "factual enhancement" sufficient to "nudge[] their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 557, 570.

### D.   The Newspaper Plaintiffs Sufficiently Allege Harm to Competition in the Markets for Publisher Ad Servers and General Search Services

Finally, Google makes an odd argument that the Newspaper Plaintiffs fail to allege that Google's conduct harmed competition in the markets for publisher ad servers and general search services.  If what Google means by this is that the Newspaper Plaintiffs do not allege any competitive harm in the publisher ad server market, it is wrong.  As noted above, the Court already found that the States sufficiently alleged that a number of Google's practices harmed competition in the publisher ad server market, and Newspaper Plaintiffs conformed their allegations to the upheld claims.  *Compare* ECF 308 at 50 (the Amended Complaint plausibly alleges that Project Bernanke and the Bell variation was anticompetitive in the ad-server market); *id*. at 66 (the Amended Complaint plausibly alleges that Google's redaction of auction data and limitations on publisher line items was anticompetitive conduct in the ad server market.); *id*. at 77 (the facts underlying the §1

- 26 -

tying claim are anticompetitive conduct in the publisher ad server market in support of the §2 claims) *with id.*, ¶¶228-234 (Project Bernanke and Bell); *id.*, ¶¶240-243 (redaction of auction data and limitation on publisher line items); *id.*, ¶¶258-268 (tying); *id.*, ¶¶343-348 (detailing anticompetitive harms of Google's practices in the ad server market).

If what Google means by its argument is that the Newspaper Plaintiffs do not plead competitive harm as to the practices specifically challenged in its motion (*i.e.*, the audience fee, bypassing, and monopolistic leveraging), it is also wrong. Google's audience fee was implemented in and restrained the publisher ad server market. *Id.*, ¶257. Google's practice of bypassing higher value direct sale ads for less valuable Google AdX ads on high traffic news days also restrained competition in the ad server market. *Id.*, ¶¶269-271. With respect to monopolistic leveraging, Newspaper Plaintiffs allege that Google's conduct affect competition in the publisher ad server market. *Id.*, ¶¶336, 338-339 (several rival ad servers were foreclosed from the ad server market due to Google's leveraging).

With respect to Google's claim that the Newspaper Plaintiffs fail to allege any misconduct that affected competition in the general search services market, Google ignores the Second Circuit's decision in *Berkey Photo, Inc. v. Eastman Kodak Co.*, where the court held that leveraging condemns the use of monopoly power "to the detriment of competition, in *either* the controlled market or any other." 603 F.2d 263, 275 (2d Cir. 1979); *see also Ortho Diagnostic Sys., Inc. v. Abbott Lab., Inc.*, 822 F. Supp. 145, 153 (S.D.N.Y. 1993) ("Monopoly leveraging is where a party uses its monopoly power in one market to distort or affect competition in another market."). Using monopoly power in market A to place a rival in market B at a competitive disadvantage, including by raising their costs or making their offerings less attractive, is a cognizable monopoly leveraging claim which survives a motion to dismiss. *Yankees*, 224 F. Supp. 2d at 672.

The Newspaper Plaintiffs allege that Google used its power in the general search services market (market "A") to distort the ad server and exchange markets (markets "B" and "C").  AC, ¶¶330-342.  Google's imposition of AMP harmed rival exchanges because it undermined publishers' ability to offer their inventory to non-Google exchanges before making calls to their ad servers.  *Id.* As detailed in the Newspaper Plaintiffs' Amended Complaint, the businesses providing header services to publishers, such as rival ad exchanges and ad servers, were ultimately foreclosed in these markets, and several large ad tech firms offering ad server bidding solutions closed as a result of Google's actions.  *Id.*, ¶339.

## III.   CONCLUSION

For the foregoing reasons, the Newspaper Plaintiffs respectfully request the Court deny Defendants' motions to dismiss in their entirety or, in the alternative, grant the Newspaper Plaintiffs leave to amend.

DATED:  March 3, 2023            Respectfully submitted,

                                 ROBBINS GELLER RUDMAN
                                   & DOWD LLP
                                 DAVID W. MITCHELL (admitted *pro hac vice*)
                                 STEVEN M. JODLOWSKI (admitted *pro hac vice*)


                                        s/ David W. Mitchell
                                 ———————————————————
                                     DAVID W. MITCHELL

                                 655 West Broadway, Suite 1900
                                 San Diego, CA  92101
                                 Telephone:  619/231-1058
                                 619/231-7423 (fax)

- 28 -

4877-9586-2868.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER (admitted *pro hac vice*)
STUART A. DAVIDSON (admitted *pro hac vice*)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

FARRELL & FULLER, LLC
PAUL T. FARRELL, JR. (admitted *pro hac vice*)
MICHAEL J. FULLER, JR. (admitted *pro hac vice*)
1311 Ponce De Leon, Suite 202
San Juan, PR 00907
Telephone: 939/293-8244
939/293-8245 (fax)

FITZSIMMONS LAW FIRM PLLC
ROBERT P. FITZSIMMONS (admitted *pro hac vice*)
CLAYTON J. FITZSIMMONS (admitted *pro hac vice*)
1609 Warwood Avenue
Wheeling, WV 26003
Telephone: 304/277-1700
304/277-1705 (fax)

HERMAN JONES LLP
JOHN C. HERMAN (admitted *pro hac vice*)
SERINA M. VASH
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA 30326
Telephone: 404/504-6555
404/504-6501 (fax)

- 29 -

4877-9586-2868.v1

Attorneys for Plaintiffs HD Media Company LLC,
AIM Media Indiana Operating, LLC, AIM Media
Midwest Operating, LLC, AIM Media Texas
Operating, LLC, Clarksburg Publishing Company,
d.b.a. WV News, Coastal Point LLC, Eagle Printing
Company, ECENT Corp., Emmerich Newspapers, Inc.,
J.O. Emmerich & Associates, Inc., Delta-Democrat
Publishing Company, Commonwealth Publishing
Company, Inc., Delta Press Publishing Company, Inc.,
Newton County Appeal Inc., Marion Publishing,
Company, Yazoo Newspaper, Co., Inc., Sunland
Publishing, Company, Inc., Simpson Publishing Co.,
Inc., Montgomery Publishing Co., Inc., Franklinton
Publishing Co., Inc., Charleston Publishing Co., Inc.,
Clarion Publishing Company, Inc., Scott Publishing,
Inc., Clarke Publishing, Inc., Hattiesburg Publishing,
Inc., Tallulah Publishing, Inc., Louisville Publishing,
Inc., Kosciusko Star-Herald, Inc., Enterprise-Tocsin,
Inc., Grenada Star, Inc.,  Tate Record Inc., Flag
Publications, Inc., Gale Force Media, LLC, Journal,
Inc., Brown County Publishing Company, Inc., Multi
Media Channels, LLC, Robinson Communication, Inc.,
Something Extra Publishing, Inc., Rome News Media,
LLC, Neighborhood Newspapers, Inc., Times Journal,
Inc., Savannah Publishing Co., Inc., Weakley County
Press, Inc., Union City Daily Messenger, Inc.,  Gould
Enterprises, Inc., Southern Community Newspapers,
Inc., Appen Media Group, Inc., Capital Region
Independent Media LLC

4877-9586-2868.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on March 3, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ David W. Mitchell
DAVID W. MITCHELL

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  davidm@rgrdlaw.com

4877-9586-2868.v1

## Mailing Information for a Case 1:21-md-03010-PKC In re: Google Digital Advertising Antitrust Litigation

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Robert Ahdoot**
  rahdoot@ahdootwolfson.com,3559819420@filings.docketbird.com,tmaya@ahdootwolfson.com,bking@ahdootwolfson.com,filings@ahdootwolfson.com

- **Aden Martin Allen**
  aallen@wsgr.com

- **Elin S Alm**
  ealm@nd.gov,lemoch@nd.gov

- **Peter T Barbur**
  pbarbur@cravath.com

- **Brian W Barnes**
  bbarnes@cooperkirk.com

- **Scott Leroy Barnhart**
  scott.barnhart@atg.in.gov

- **Patrick Montgomery Barrett , III**
  pbarrett@barrettlawofficetn.com

- **Zina Bash**
  zina.bash@kellerpostman.com

- **Kate M. Baxter-Kauf**
  kmbaxter-kauf@locklaw.com,atajagbusi@locklaw.com,lgn-kmbaxter-kauf@ecf.courtdrive.com

- **TerriAnne Benedetto**
  tbenedetto@dugan-lawfirm.com,cbarnes@seegerweiss.com,klaukaitis@seegerweiss.com,cchoe@seegerweiss.com

- **Daniel G Bird**
  dbird@kellogghansen.com,hwallace@kellogghansen.com,etripodi@kellogghansen.com,ecf-d43d0fc62774@ecf.pacerpro.com

- **Daniel S. Bitton**
  dbitton@axinn.com

- **Mikaela M. Bock**
  mbock@girardsharp.com

- **David Boies**
  dboies@bsfllp.com

- **Kip T. Bollin**
  kip.bollin@thompsonhine.com,ECFDocket@thompsonhine.com

- **Jamie L Boyer**
  jboyer@koreintillery.com

- **Alex Jerome Brown**
  alex.brown@lanierlawfirm.com,3511928420@filings.docketbird.com,audrey.moore@lanierlawfirm.com

- **Joseph M. Bruno**
  jbruno@brunobrunolaw.com

- **Christopher M. Burke**
  Cburke@KoreinTillery.com

- **Bryce L Callahan**
  bcallahan@yettercoleman.com

- **Johnathan R Carter**
  johnathan.carter@arkansasag.gov

- **Solomon B. Cera**
  scera@cerallp.com,jrl@cerallp.com,cdirksen@cerallp.com,kgantan@cerallp.com

- **Mark A. Colantonio**
  mark@fitzsimmonsfirm.com

- **Mark A. Colantonio**
  mark@fitzsimmonsfirm.com,jaclyn@fitzsimmonsfirm.com,mark_096@ecf.courtdrive.com,leslie@fitzsimmonsfirm.com

- **Timothy Patrick Conroy**
  timothypconroy@gmail.com

- **Charles J Cooper**
  ccooper@cooperkirk.com,johlendorf@cooperkirk.com,ccarroll@cooperkirk.com,ktroilo@cooperkirk.com

- **Andrew Dieter Cordo**
  acordo@wsgr.com

- **Ryan Z. Cortazar**
  rcortazar@koreintillery.com

- **Caitlin G. Coslett**
  ccoslett@bm.net,sleo@bm.net

- **Caitlin Goldwater Coslett**
  ccoslett@bm.net

- **Shawn Cowles**
  shawn.cowles@oag.texas.gov

- **Eric L. Cramer**
  ecramer@bm.net,sleo@bm.net,dgiovanetti@bm.net,emagnus@bm.net

- **Mary Csarny**
  Mary.Csarny@ThompsonHine.com

- **Stuart A. Davidson**
  sdavidson@rgrdlaw.com,jdennis@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com,sdavidson@ecf.courtdrive.com,khanson@rgrdlaw.com

- **Brett Talmage DeLange**
  brett.delange@ag.idaho.gov,lynn.mize@ag.idaho.gov

- **Zeke DeRose , III**
  zeke.derose@lanierlawfirm.com

- **Michael C Dell'Angelo , IV**
  mdellangelo@bm.net,csimon@bm.net,jgionnette@bm.net

- **Michael C. Dell'Angelo**
  mdellangelo@bm.net,eyork@bm.net,clozano@bm.net,csimon@bm.net,jgionnette@bm.net

- **James Peter Denvir , III**
  jdenvir@bsfllp.com

- **James R. Dugan , II**
  jdugan@dugan-lawfirm.com,dscalia@dugan-lawfirm.com,dplymale@dugan-lawfirm.com,bonnie@dugan-lawfirm.com

- **Marc Howard Edelson**
  medelson@edelson-law.com

- **Vadim Egoul**
  vegoul@wsgr.com

- **Kara A. Elgersma**
  kae@wbe-llp.com,wbe-ecf@ecf.courtdrive.com

- **Jordan Elias**
  jelias@girardsharp.com,5261237420@filings.docketbird.com,avongoetz@girardsharp.com

- **Julie Elmer**
  julie.elmer@freshfields.com

- **Julie S Elmer**
  julie.elmer@freshfields.com,6188914420@filings.docketbird.com

- **Mikaela Elizabeth Evans-Aziz**
  mevansaziz@wsgr.com,ageritano@wsgr.com

- **Andrew Ewalt**
  andrew.ewalt@freshfields.com,Nicholas.Vockrodt@freshfields.com

- **Randall P. Ewing , Jr**
  REwing@KoreinTillery.com,gkaminsky@koreintillery.com

- **Paul T. Farrell , Jr**
  paul@farrellfuller.com,andrea@farrellfuller.com,lora@farrell.law

- **Paul T. Farrell, Jr**
  paul@farrellfuller.com

- **Andrew William Ferich**
  aferich@ahdootwolfson.com

- **Clayton J. Fitzsimmons**
  clayton@fitzsimmonsfirm.com,kendra@fitzsimmonsfirm.com,kait@fitzsimmonsfirm.com,christy@fitzsimmonsfirm.com,leslie@fitzsimmonsfirm.com

- **Robert Patrick Fitzsimmons**
  bob@fitzsimmonsfirm.com,kendra@fitzsimmonsfirm.com,kait@fitzsimmonsfirm.com,christy@fitzsimmonsfirm.com,leslie@fitzsimmonsfirm.com

- **Isaac Ralston Forman**
  iforman@hfdrlaw.com

- **Michael Jay Fuller**
  mike@farrellfuller.com

- **Michael Jay Fuller , Jr**
  mike@farrellfuller.com,edna@mchughfuller.com

- **Michael Jay Fuller , Jr**
  mike@farrellfuller.com

- **Paul J Geller**
  pgeller@rgrdlaw.com

- **Paul Jeffrey Geller**
  pgeller@rgrdlaw.com

- **Christopher Goodnow**
  cgoodnow@kellogghansen.com

- **Max C. Gottlieb**
  mgottlieb@hfdrlaw.com

- **Joshua H. Grabar**
  jgrabar@grabarlaw.com

- **Robert J. Gralewski , Jr**
  bgralewski@kmllp.com

- **Robert Gralewski, Jr**
  bgralewski@kmllp.com

- **Benjamin M. Greenblum**
  bgreenblum@wc.com

- **Philip Lawrence Gregory**
  pgregory@gregorylawgroup.com

- **Parrell D Grossman**
  pgrossman@nd.gov

- **Scott M Grzenczyk**
  scottg@girardsharp.com,7488696420@filings.docketbird.com,avongoetz@girardsharp.com

- **Daniel E. Gustafson**
  dgustafson@gustafsongluek.com

- **John David Harkrider**
  jharkrider@axinn.com

- **Jason S. Hartley**
  hartley@hartleyllp.com

- **Rebecca M Hartner**
  rhartner@scag.gov

- **Caleb Hayes-Deats**
  chayes-deats@mololamken.com,caleb.hayes-deats@usdoj.gov

- **Daniel C. Hedlund**
  dhedlund@gustafsongluek.com,jholzer@gustafsongluek.com

- **Philip R Heleringer**
  philip.heleringer@ky.gov,sarah.telle@ky.gov

- **John C. Herman**
  jherman@hermanjones.com

- **Brianna S. Hills**
  bhills@bsfllp.com

- **Mark Hirschboeck**
  mhirschboeck@kellogghansen.com

- **Michael B. Hissam**
  mhissam@hfdrlaw.com

- **Stephen M. Hoeplinger**
  stephen.hoeplinger@ago.mo.gov

- **Stephen Mark Hoeplinger**
  stephen.hoeplinger@ago.mo.gov

- **Fred Taylor Isquith**
  fisquith@zsz.com,isquithlaw@gmail.com

- **Frederick Taylor Isquith , Sr**
  ftisquith@zsz.com

- **Lee Istrail**
  lee.istrail@myfloridalegal.com

- **Jonathan M. Jacobson**
  jjacobson@wsgr.com,ageritano@wsgr.com,lalmeida@wsgr.com,cstavros@wsgr.com

- **Rachel Annie Jarvis**
  jarvislawgroup@gmail.com

- **Steven M Jodlowski**
  sjodlowski@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christopher Chad Johnson**
  chadj@rgrdlaw.com,e_file_ny@rgrdlaw.com,chadj@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,dwatts@rgrdlaw.com,ckopko@rgrdlaw.com

- **Bethan R Jones**
  bjones@kellogghansen.com

- **Carlton R. Jones**
  cjones@rgrdlaw.com

- **Peter M. Jones**
  pjones@rgrdlaw.com,geubanks@rgrdlaw.com

- **Mary Gibson Jowers**
  mfjowers@scag.gov

- **Bradley Justus**
  bjustus@axinn.com,gteamaxinn@axinn.com

- **Lauren Kaplin**
  lauren.kaplin@freshfields.com

- **Ashley C. Keller**
  ack@kellerpostman.com,docket@kellerlenkner.com

- **Bradley K. King**
  bking@ahdootwolfson.com,twolfson@ahdootwolfson.com,rahdoot@ahdootwolfson.com,filings@ahdootwolfson.com,1946088420@filings.docketbird.com

- **Michael E. Klenov**
  mklenov@koreintillery.com,ldunn@koreintillery.com

- **Philip C. Korologos**
  pkorologos@bsfllp.com,jkramer@bsfllp.com,eresnicow@bsfllp.com,NYC_Managing_Clerk@bsfllp.com,tshort@bsfllp.com,mlebron@bsfllp.com,philip-korologos-7041@ecf.pacerpro.com

- **David H. Kramer**
  dkramer@wsgr.com,dgrubbs@wsgr.com

- **Tim LaComb**
  tlacomb@moginrubin.com

- **Benjamin Labow**
  blabow@wsgr.com

- **Yvette K Lafrentz**
  yvette.lafrentz@state.sd.us

- **April D Lambert**
  alambert@radicelawfirm.com

- **April Dawn Lambert**
  alambert@radicelawfirm.com

- **Jeffrey A. Lamken**
  jlamken@mololamken.com

- **W Mark Lanier**
  jrm@lanierlawfirm.com

- **W. Mark Lanier**
  jrm@lanierlawfirm.com,catherine.heacox@lanierlawfirm.com,audrey.moore@lanierlawfirm.com,sadie.turner@lanierlawfirm.com

- **Vanessa Allen Lavely**
  vlavely@cravath.com,abahri@cravath.com,mamiller@cravath.com,dphillips@cravath.com

- **Karen M. Lerner**
  klerner@kmllp.com,karen-lerner-7246@ecf.pacerpro.com

- **Matthew Levinton**
  Matthew.Levinton@oag.texas.gov

- **Chelsea C. Lewis**
  chelsea.lewis@formanwatkins.com

- **John Christian Lewis**
  christian.lewis@ky.gov

- **Jason M Lindner**
  lindner@hartleyllp.com

- **Robert E Litan**
  rlitan@bm.net,csimon@bm.net

- **Richard Lombardo**
  rlombardo@sls-law.com,jwelker@sls-law.com,bwilmoth@sls-law.com

- **Jessica Lonergan**
  jlonergan@wsgr.com,ageritano@wsgr.com

- **Kate Lv**
  klv@koreintillery.com

- **Patrick Fanning Madden**
  pmadden@bm.net,jgionnette@bm.net

- **Eric Mahr**
  eric.mahr@freshfields.com

- **Eric J. Mahr**
  eric.mahr@freshfields.com

- **Eric J. Maier**
  emaier@kellogghansen.com

- **Hsiao C. Mao**
  mmao@bsfllp.com

- **Mark C. Mao**
  mmao@bsfllp.com,lfrance-gorn@bsfllp.com

- **Sara Ellen Margolis**
  smargolis@mololamken.com

- **Pamela A. Markert**
  pmarkert@cerallp.com

- **Hart Martin**
  hart.martin@ago.ms.gov

- **Marie W.L. Martin**
  mwmartin@agutah.gov,dpotnar@ag.nv.gov,mhodges@ag.nv.gov

- **Steven A. Martino**
  stevemartino@taylormartino.com

- **Mark W Mattioli**
  mmattioli@mt.gov,renee.franks@mt.gov,edoj@mt.gov

- **Theodore W. Maya**
  tmaya@ahdootwolfson.com

- **Robert John McCallum**
  rob.mccallum@freshfields.com,6188914420@filings.docketbird.com,Tyler.CLARKSON@freshfields.com,mark.goldberg@freshfields.com

- **Derriel Carlton McCorvey**
  derriel@mccorveylaw.com

- **David A.F. McCoy**
  david@dafmccoy.com,matilda.benson@arkansasag.gov

- **Sabria McElroy**
  smcelroy@bsfllp.com

- **Sabria McElroy**
  smcelroy@bsfllp.com

- **Matthew Alan Michaloski**
  matthew.michaloski@atg.in.gov

- **Mint Rose Day Spa LLC**
  Mintrosedayspa@gmail.com

- **David W. Mitchell**
  DavidM@rgrdlaw.com,slandry@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David W. Mitchell - PHV**
  davidm@rgrdlaw.com

- **Daniel Jay Mogin**
  dmogin@moginrubin.com,jchatfield@moginrubin.com,sbuack@moginrubin.com,ngeraci@moginrubin.com,jsidhwa@moginrubin.com,carmijo@moginrubin.com

- **Jason Blake Mollick**
  jmollick@wsgr.com,ageritano@wsgr.com

- **Dianne M. Nast**
  dnast@nastlaw.com

- **Michelle C Newman**
  mnewman@ag.nv.gov,dpotnar@ag.nv.gov,mhodges@ag.nv.gov

- **Daniel Jay Nordin**
  dnordin@gustafsongluek.com

- **Walter W. Noss**
  wnoss@koreintillery.com

- **Carol L. O'Keefe**
  cokeefe@koreintillery.com

- **Carol Lee O'Keefe**
  cokeefe@koreintillery.com,jwitteried@koreintillery.com,llucas@koreintillery.com

- **John K Olson**
  john.olson@ag.idaho.gov,lynn.mize@ag.idaho.gov

- **Kevin J. Orsini**
  korsini@cravath.com,mao@cravath.com,FBADTechAssociates@cravath.com,pbarbur@cravath.com,Antitrust_Paralegals@cravath.com

- **Jesse Michael Panuccio**
  jpanuccio@bsfllp.com

- **Eliana M. Pfeffer**
  epfeffer@kellogghansen.com,edawson@kellogghansen.com

- **Daniel J. Pfefferbaum**
  dpfefferbaum@rgrdlaw.com,dpfefferbaumRGRD@ecf.courtdrive.com

- **Jeffery G Pickett**
  jeff.pickett@alaska.gov

- **Tara W Pincock**
  tpincock@agutah.gov

- **Adam E Polk**
  apolk@girardsharp.com,avongoetz@girardsharp.com,3768906420@filings.docketbird.com

- **Warren D Postman**
  wdp@kellerlenkner.com

- **Carol Joan Pruski**
  cpruski@wc.com,carol-pruski-7367@ecf.pacerpro.com

- **John D. Radice**
  jradice@radicelawfirm.com

- **Tiffany Ray**
  tiffany@taylormartino.com

- **Tiffany N. Ray**
  tiffany@taylormartino.com

- **Harold S. Reeves**
  hreeves@cooperkirk.com

- **Martha Reiser**
  mreiser@cravath.com

- **Sophia Marie Rios**
  srios@bm.net

- **Sophia Marie Rios**
  srios@bm.net

- **Sean P. Rodriguez**
  srodriguez@bsfllp.com,sphan@bsfllp.com,sean-rodriguez-4625@ecf.pacerpro.com

- **Thaizza M Rodriguez**
  trodriguez@justicia.pr.gov

- **David Evan Ross**
  dross@seitzross.com

- **Peter Frederic Rottgers**
  prottgers@sls-law.com,ctraffis@sls-law.com

- **Jonathan Rubin**
  jrubin@moginrubin.com,jchatfield@moginrubin.com,sbuack@moginrubin.com,tlacomb@moginrubin.com,ngeraci@moginrubin.com,jsidhwa@moginrubin.com,dmo

- **Jonathan Laurence Rubin**
  jrubin@moginrubin.com

- **Franklin M Rubinstein**
  frubinstein@wsgr.com

- **Jan Rybnicek**
  jan.rybnicek@freshfields.com

- **John E. Schmidtlein**
  jschmidtlein@wc.com,john-schmidtlein-5892@ecf.pacerpro.com

- **Justina K. Sessions**
  jsessions@wsgr.com,ageritano@wsgr.com

- **Justina Kahn Sessions**
  jsessions@wsgr.com

- **Dena C. Sharp**
  dsharp@girardsharp.com,avongoetz@girardsharp.com,8388361420@filings.docketbird.com

- **Dena C. Sharp**
  dsharp@girardsharp.com

- **Heidi M. Silton**
  hmsilton@locklaw.com,lgn-hmsilton@ecf.courtdrive.com,hnpotteiger@locklaw.com,sljuell@locklaw.com

- **William Nelson Sinclair**
  bsinclair@mdattorney.com

- **SkinnySchool LLC**
  info@mariamarquesfitness.com

- **Brooke Clason Smith**
  brooke.smith@kellerlenkner.com

- **Michael S Sommer**
  msommer@wsgr.com,ageritano@wsgr.com

- **Dennis Stewart**
  dstewart@gustafsongluek.com

- **Christopher Eric Stiner**
  cstiner@ahdootwolfson.com

- **Daniel Strunk**
  daniel.strunk@kellerpostman.com

- **Brittany Lynn Sukiennik**
  bsukiennik@cravath.com,mao@cravath.com

- **Michael E. Sumner**
  sumnerpc@numail.org

- **Archana Tamoshunas**
  atamoshunas@tcllaw.com

- **David H Thompson**
  dthompson@cooperkirk.com,elizza@cooperkirk.com,abailey@cooperkirk.com,ktroilo@cooperkirk.com

- **John Thorne**
  jthorne@kellogghansen.com,awhite@kellogghansen.com,sthorne@kellogghansen.com,csella@kellogghansen.com

- **Stephen M. Tillery**
  stillery@koreintillery.com,ldunn@koreintillery.com,leckhardt@koreintillery.com

- **Katielynn Boyd Townsend**
  ktownsend@rcfp.org

- **Lucas J Tucker**
  ltucker@ag.nv.gov,dpotnar@ag.nv.gov,mhodges@ag.nv.gov

- **Jonathan K Van Patten**
  jonathan.vanpatten@state.sd.us,lynell.erickson@state.sd.us

- **Serina M. Vash**
  svash@hermanjones.com

- **Serina Marie Vash**
  svash@hermanjones.com

- **Jeffrey M. Wakefield**
  jwakefield@fsblaw.com

- **Daniel John Walker**
  dwalker@bm.net

- **Marc Alfred Wallenstein**
  mwallenstein@koreintillery.com

- **Michaela Wallin**
  mwallin@bm.net

- **Clarence Webster , III**
  cwebster@babc.com

- **Amanda J. Wentz**
  amanda.wentz@arkansasag.gov,Heather.Jones@ArkansasAG.gov

- **Gregory F Wesner**
  gwesner@hermanjones.com

- **Kenneth A. Wexler**
  kaw@wbe-llp.com,wbe-ecf@ecf.courtdrive.com

- **James A. Wilson**
  jawilson@vorys.com

- **Tina Wolfson**
  twolfson@ahdootwolfson.com,bking@ahdootwolfson.com,filings@ahdootwolfson.com,hkelston@ahdootwolfson.com,hliivamagi@ahdootwolfson.com,rahdoot@ahd

- **Koren Wong-Ervin**
  kwongervin@axinn.com

- **Stephen Yelderman**
  stephen.yelderman@kellerlenkner.com

- **R Paul Yetter**
  pyetter@yettercoleman.com

- **Trevor Young**
  trevor.young@oag.texas.gov,stephen.craig@oag.texas.gov

- **George A. Zelcs**
  gzelcs@koreintillery.com,ldunn@koreintillery.com,7556444420@filings.docketbird.com,leckhardt@koreintillery.com,gkaminsky@koreintillery.com,mbannester@kor

- **Jason Allen Zweig**
  jaz@kellerpostman.com,docket@kellerlenkner.com

- **Peter Bradford deLeeuw**
  brad@deleeuwlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Kimberly          Joanne Broecker
Williams & Connolly
680 Maine Avenue SW
20024
Washington, DC 20005

Erin              K Dickinson
Crueger Dickinson LLC
4532 N Oakland Ave
Whitefish Bay, WI 53211

Paul              T. Farrell
Greene, Ketchum, Farrell, Bailey & Tweel, LLP
P.O. Box 2389
419 - 11th Street
Huntington, WV 25724-2389

Steven            A. Martino
Taylor Martino & Hedge
61 St. Joseph Street
1600 SouthTrust Bank Building
Mobile, AL 36602
```

**Eric          P Schroeder**
Bryan Cave Leighton Paisner LLP - ATL
One Atlantic Center, 14th Floor
1201 West Peachtree St., N.W.
Atlanta, GA 30309-3471

**Brian          McKinley Underwood**          , Jr
Bryan Cave Leighton Paisner LLP - ATL
One Atlantic Center, 14th Floor
1201 West Peachtree St., N.W.
Atlanta, GA 30309-3471

**Carlynne       A Wagner**
Ahdoot & Wolfson, PC
201 King of Prussia Road
Suite 650
Radnor, PA 19087