# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| In re Google Digital Advertising Antitrust Litigation | Civil Action No. 21-MD-3010 (PKC) |
|---|---|

*This Document Relates to:*

| In re Google Digital Advertising Antitrust Litigation | Civil Action No. 21-CV-7001 (PKC) |
|---|---|

## ADVERTISER CLASS PLAINTIFFS' RESPONSE TO DEFENDANTS GOOGLE LLC AND ALPHABET INC.'S MOTION TO DISMISS <u>ADVERTISERS' CONSOLIDATED CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................ 1

II.     ARGUMENT ................................................................................................... 3

    A.      Plaintiff Hanson Has Article III Standing to Represent All Advertisers Who Used Google's Services in the Relevant Markets. ......................................... 3

    B.      Advertiser Class Plaintiffs Have Antitrust Standing. ............................................. 4

        1.      Plaintiffs Have Standing to Maintain Claims Based on Google's Monopolization of the Market for Ad-Buying Tools for Small Advertisers. .................................................................................................. 6

        2.      Advertisers Have Standing to Maintain Claims Based on Google's Monopolization of the Market for Ad Exchanges. ................... 10

        3.      Advertisers Have Standing to Maintain Claims Based on Google's Attempted Monopolization of the Market for Ad-Buying Tools for Large Advertisers. ................................................. 14

    C.      Google's Request to Dismiss Allegations Is Misplaced. ..................................... 16

    D.      Advertisers Adequately Allege that Google Unreasonably Restrained Trade in Combination with Publishers. ................................................................ 17

        1.      Unified Pricing Rules Artificially Set Bid-Pricing Levels. ...................... 18

        2.      By Capping Line Items, Google Artificially Curtailed Competition with AdX .................................................................................. 21

    E.      Advertisers' NBA Claims Are Different Than the States' Claims, Arise in a Well-Defined Market, and Should Proceed. .................................................. 22

    F.      The Court Should Deny Google's Motion to Arbitrate. ...................................... 23

        1.      Google's Arbitration Motion Is Not Ripe. ................................................ 24

        2.      All Advertisers at a Minimum May Pursue Their UCL and Cartwright Act Claims Against Google in Court ..................................... 25

            a.      California's *McGill* Rule Voids Contractual Provisions, Like Google's, That Waive Injunctive Relief Primarily Benefiting the Public ................................................................ 25

            b.      The Arbitration Agreement's Severability Clause Requires the Entirety of the California Law Claims to Proceed in this Court ................................................................ 29

III.    CONCLUSION ............................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aluminum Warehousing Antitrust Litig.*,
  833 F.3d 151 (2d Cir. 2016) .................................................................. 13, 15

*Alvarez v. Experian Info. Sols., Inc.*,
  2021 WL 2349370 (E.D.N.Y. June 7, 2021) ........................................ 24

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) .................................................................. 18

*Aryeh v. Canon Bus. Sols., Inc.*,
  55 Cal. 4th 1185 (2013) ......................................................................... 10

*Associated General Contractors, Inc. v. California State Council of Carpenters*,
  459 U.S. 519 (1983) ............................................................................... 10

*Bender v. Southland Corp.*,
  749 F.2d 1205 (6th Cir. 1984) ............................................................... 19

*Blair v. Rent-A-Center, Inc.*,
  928 F.3d 819 (9th Cir. 2019) ............................................... 25, 27, 28, 29, 30

*Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris*, Inc.,
  36 F. Supp. 2d 560 (E.D.N.Y. 1999) ...................................................... 9

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) ................................................................................. 8

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ................................................................................. 9

*California Crane School, Inc. v. Google LLC*,
  2022 WL 3348425 (N.D. Cal. Aug. 12, 2022) .................................. 25, 26

*Cannon v. Wells Fargo Bank N.A.*,
  917 F. Supp. 2d 1025 (N.D. Cal. 2013) ................................................. 29

*City of Anaheim v. S. Cal. Edison Co.*,
  955 F.2d 1373 (9th Cir. 1992) ................................................................. 3

*Clayworth v. Pfizer, Inc.*,
  49 Cal. 4th 758 (2010) ........................................................................... 28

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) .............................................................................. 3, 6

*Cottrell v. AT&T Inc.*,
  2020 WL 2747774 (N.D. Cal. May 27, 2020) .................................. 26, 28

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) ............................................................... 5

*Eastman Kodak Co. v. Henry Bath LLC*,
936 F.3d 86 (2d Cir. 2019) ................................................................. 12

*Eiess v. USAA Fed. Sav. Bank*,
404 F. Supp. 3d 1240 (N.D. Cal. 2019) ............................................. 28

*Emmis Commc'ns Corp. v. Ill. Nat'l Ins. Co.*,
323 F. Supp. 3d 1012 (S.D. Ind. 2018), *reversed on other grounds*, 929 F.3d 441
(7th Cir. 2019), *opinion withdrawn, aff'd on reh'g*, 937 F.3d 836 (7th Cir. 2019) ................ 16

*Fallick v. Nationwide Mut. Ins. Co.*,
162 F.3d 410 (6th Cir. 1998) ................................................................ 4

*Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*,
602 F.2d 1025 (2d Cir. 1979) ........................................................ 20, 21

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
711 F.3d 68 (2d Cir. 2013) ................................................................... 4

*Hidalgo v. Johnson & Johnson Consumer Cos., Inc.*,
148 F. Supp. 3d 285 (S.D.N.Y. 2015) ............................................. 4, 14

*Hodges v. Comcast Cable Commc'ns, LLC*,
12 F.4th 1108 (9th Cir.), *opinion amended and superseded on denial of reh'g*,
21 F.4th 535 (9th Cir. 2021) .................................................... 26, 27, 28

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
253 F. Supp. 2d 262 (D. Conn. 2003) ................................................ 16

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ........................................................................... 10

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ............................................................ 10

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
343 F. Supp. 3d 94 (E.D.N.Y. 2018) .................................................. 17

*In re Auction Houses Antitrust Litig.*,
193 F.R.D. 162 (S.D.N.Y. 2000) ........................................................ 10

*In re Commodity Exch., Inc.*,
213 F. Supp. 3d 631 (S.D.N.Y. 2016) ................................... 4, 5, 13, 15

*In re Currency Conversion Fee Antitrust Litig.*,
264 F.R.D. 100 (S.D.N.Y. 2010) .......................................................... 4

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009) ......................................................... 15, 16

*In re Google Digital Advert. Antitrust Litig.*,
   2021 WL 2021990 (N.D. Cal. May 13, 2021) ........................................................ 27

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   562 F. Supp. 2d 392 (E.D.N.Y. 2008) .................................................................... 14

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   340 F. Supp. 3d 285 (S.D.N.Y. 2018) ...................................................................... 9

*Isaksen v. Vermont Castings, Inc.*,
   825 F.2d 1158 (7th Cir. 1987) ............................................................................... 19

*Kassman v. KPMG LLP*,
   925 F. Supp. 2d 453 (S.D.N.Y. 2013) .................................................................... 14

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
   897 F.3d 88 (2d Cir. 2018) ............................................................................... 4, 14

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) ............................................................................... 3, 6

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014) ........................................................................................... 5

*Loeb Indus., Inc. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002) ........................................................................... 13, 16

*Lynch v. Ackley*,
   2013 WL 6732540 (D. Conn. Dec. 19, 2013) ......................................................... 17

*MacClelland v. Cellco P'ship*,
   2022 WL 2390997 (N.D. Cal. July 1, 2022) .............................................. 25, 26, 28

*McGill v. Citibank, N.A.*,
   2 Cal. 5th 945 (2017) ...................................................................... 25, 26, 28

*Mejia v. DACM Inc.*,
   54 Cal. App. 5th 691 (2020) ................................................................................. 25

*Merced Irrigation Dist. v. Barclays Bank PLC*,
   165 F. Supp. 3d 122 (S.D.N.Y. 2016) ...................................................................... 8

*Merced Irrigation Dist. v. Barclays Bank PLC*,
   220 F. Supp. 3d 412 (S.D.N.Y. 2016) .................................................................... 15

*Minnesota Mining & Mfg. Co. v. Appleton Papers, Inc.*,
   35 F. Supp. 2d 1138 (D. Minn. 1999) ...................................................................... 5

*Monroe v. Mullooley*,
   2011 WL 337333 (W.D. Pa. Feb. 3, 2011) .............................................................. 17

*Morgan v. Sundance, Inc.*,
    142 S. Ct. 1708 (2022) .................................................................................... 24

*New York Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.*,
    651 F. Supp. 802 (S.D.N.Y. 1986) ..................................................................... 6

*New York Jets LLC v. Cablevision Sys. Corp.*,
    2005 WL 2649330 (S.D.N.Y. Oct. 17, 2005) ....................................................... 5

*Nguyen v. Tesla, Inc.*,
    2020 WL 2114937 (C.D. Cal. Apr. 6, 2020) ...................................................... 28

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*,
    604 F.3d 1291 (11th Cir. 2010) ......................................................................... 5

*Price v. Viking Press, Inc.*,
    113 F.R.D. 585 (D. Minn. 1986) ...................................................................... 17

*Redd v. N.Y. Div. of Parole*,
    678 F.3d 166 (2d Cir. 2012) .............................................................................. 5

Sn*arr v. HRB Tax Group, Inc.*,
    839 F. App'x 53 (9th Cir. 2020) ................................................................. 26, 27

*Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*,
    12 F.3d 609 (6th Cir. 1993) ....................................................................... 20, 21

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .............................................................................. 5

*Toscano v. Pro. Golfers' Ass'n*,
    258 F.3d 978 (9th Cir. 2001) ..................................................................... 20, 21

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ............................................................................ 19

*United States v. Blue Cross Blue Shield of Mich.*,
    809 F. Supp. 2d 665 (E.D. Mich. 2011) ........................................................... 20

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919) ........................................................................................ 20

*United States v. Delta Dental of R.I.*,
    943 F. Supp. 172 (D.R.I. 1996) ....................................................................... 20

*United States v. Paramount Pictures*,
    334 U.S. 131 (1948) ........................................................................................ 19

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*,
    156 F.3d 535 (4th Cir. 1998) ........................................................................... 19

*Vasquez v. Cebridge Telecom CA, LLC*,
  569 F. Supp. 3d 1016 (N.D. Cal. 2021) .......................................................... 29, 30

*Wineland v. Casey's Gen. Stores, Inc.*,
  554 F. Supp. 2d 915 (S.D. Iowa 2008) ................................................................ 17

*Yentsch v. Texaco, Inc.*,
  630 F.2d 46 (2d Cir. 1980) ................................................................................. 19

**Statutes**

Cal. Bus. & Prof. Code § 16726 ............................................................................ 28

Cal. Bus. & Prof. Code § 16750(a) ....................................................................... 10

Cal. Civ. Code § 3513 ............................................................................................ 25

**Rules**

Fed. R. Civ. P. 8(a) ................................................................................................ 29

Fed. R. Civ. P. 12(b) ............................................................................................. 17

Fed. R. Civ. P. 12(f) .............................................................................................. 17

Fed. R. Civ. P. 15 .................................................................................................. 30

I.      INTRODUCTION

Class Advertisers are business owners who used Google's services to place display advertisements.  These intermediation services consist of integrated platforms that load, store, broker, refine the placement, and monitor the performance of advertisements on third-party websites and mobile apps.  Advertisers allege Google monopolizes the market for, and illegally restrains the trade of, these services and that, as a result, Advertisers overpaid.  In its motion to dismiss (Doc. 447) ("Mot.") Google does not dispute its monopoly power or the relevant markets.  Advertisers have standing to pursue their antitrust claims because they allege that the violations that eliminated competition caused harm to their business or property.

Google's arguments presume that each relevant practice must cause separate harm.  But it is the *combined* anticompetitive effect of Google's practices across its interlocking monopolies that harmed advertisers.  Advertisers paid Google to place ads on its exchange.  No entity overpaid more directly or has greater incentive to hold Google accountable for this economic loss.  Google's argument seeks to strictly separate small and large advertisers, yet its practices affected Google Ads and DV360 alike.  The interlinking effects of its conduct fortified Google's power in each market, enabling it to exclude competition and overcharge both types of advertisers.  Questions of injury and causation, and regarding market definition, are also highly fact-intensive; Google's antitrust arguments implicate questions of fact not susceptible of resolution on a motion to dismiss.

Although Google also moves to dismiss in favor of individual arbitrations, it has refused to engage in arbitration-related discovery and admits that none of Plaintiff Hanson Law Firm's claims are arbitrable because Mr. Hanson placed digital ads through Google without ever agreeing to arbitrate.  His claims concern contrivances the Court already found plausibly anticompetitive, and he seeks to represent all others who placed display ads through Google

1

since May 2016, when his claims accrued.  In addition, the claims of every Plaintiff for violations of California unfair competition law (Seventh Cause of Action) and for violations of California antitrust law (Fourth and Sixth Causes of Action)[1] must proceed in this Court.  The logic that compels this conclusion follows two steps, the first based on California law, and the second, with which Google appears to agree (Mot. at 30), based on contract interpretation:

*First*, Advertisers may pursue injunctive relief in court under California's *McGill* doctrine.  That doctrine arises from the California Civil Code and prohibits a business from shielding itself from an injunction primarily benefiting the public.  Google's arbitration agreement precludes the arbitrator from issuing relief that applies beyond the individual claimant.  This provision violates *McGill* because if Google's ad-tech monopolies are enjoined, consumers across the economy will pay less for goods and services as retailers and other vendors no longer will bear monopoly overcharges for display advertising.  Breaking Google's stranglehold on such a vast portion of online commerce will result in a freer, more prolific online experience for the average American, funded by better, more efficient advertising.  The involvement of governmental entities in this litigation confirms the strong public interest at stake.

*Second*, because of Google's severability clause, no portion of Advertisers' California claims may be compelled to arbitration.  The same provision that precludes relief beyond the claimant also states that any "claim" as to which the clause is found unenforceable must be severed and may proceed in court.  Thus, Advertisers' non-arbitrable claims cannot be split between this Court for injunctive relief and arbitration for monetary relief; nor does Google advocate such claim-splitting.

---

[1] In Section II.D of this brief, Advertisers respond to Google's arguments regarding its alleged antitrust violations based on concerted action with publishers (Fifth and Sixth Causes of Action).

Google's procedural and standing arguments are addressed below.

## II.    ARGUMENT

### A.    Plaintiff Hanson Has Article III Standing to Represent All Advertisers Who Used Google's Services in the Relevant Markets.

Google concedes Hanson is not subject to arbitration but attempts to narrow the damage period by arguing, without citing any case, that Hanson lacks standing to challenge Google's anticompetitive conduct after he stopped using its services.  Mot. at 23.  The Court should decline to limit his rights by artificially segregating the various aspects of Google's scheme. Like all other advertisers throughout the damage period, Hanson paid supracompetitive charges for Google's ad-brokering services.  He alleges these injuries resulted from "Google's monopolization of the relevant markets and anticompetitive conduct"—not a particular practice or practices, considered in isolation, as Google mistakenly assumes.  ¶ 19.[2]  While Google seeks to Balkanize its "unified, long-term exclusionary strategy" (¶ 166), antitrust "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."  *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).  Thus, "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."  *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (emphasis omitted) (quoting *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992)).

Hanson's "claims arise out of a common course of conduct that gives rise to the claims of all other class members." ¶ 342.  His standing to sue cannot be limited by artificially isolating the strands of conduct that protected Google's monopolies.  *See, e.g.*, *In re Currency Conversion*

---

[2] Unless otherwise noted, "¶" citations in this brief refer to paragraphs in the Consolidated Advertiser Class Action Complaint, Doc. 399 ("CAC").

*Fee Antitrust Litig.*, 264 F.R.D. 100, 111 (S.D.N.Y. 2010) (typicality met based on evidence of "overarching" anticompetitive scheme); *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 424 (6th Cir. 1998) (named plaintiff who participated in only one ERISA plan could represent a class of participants in all of the defendant's ERISA plans, given the common course of conduct).  As the Second Circuit explained, "it rarely happens that the circumstances surrounding one plaintiff's claim end up being identical to the claims of another putative class member," and the extent to which a plaintiff can represent differently situated class members is governed by Rule 23; it is not usually an issue of standing.  *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 93 (2d Cir. 2018); *see also Hidalgo v. Johnson & Johnson Consumer Cos., Inc.*, 148 F. Supp. 3d 285, 297 (S.D.N.Y. 2015) (standing challenge failed "because the parties have not yet had the opportunity to conduct discovery about whether [the plaintiff's] injuries implicate[] the same set of concerns as the conduct alleged to have caused injury to other [class] members") (quotation marks and citations omitted).

### B.    Advertiser Class Plaintiffs Have Antitrust Standing.

Advertisers adequately allege antitrust standing in each of the three advertising service markets defined in the Complaint.  Advertisers allege they suffered exactly the kind of injury the antitrust laws exist to prevent—overpayments from monopoly surcharges—and they are "efficient enforcers" because they sustained these injuries directly, through transactions with Google.  *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 651 (S.D.N.Y. 2016) (citing *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013)).  Importantly for standing purposes, Google's ad-tech monopolies are interlinked and "self-reinforcing" (¶ 166), including because the buying tool markets directly adjoin the ad exchange market (¶¶ 57-59, 68, 90, 93, 185).  Each Advertiser used Google's ad-tech services and lost money as a result of its antitrust violations.  ¶¶ 14-32, 355, 362.  Advertisers are efficient enforcers because this "harm

4

alleged has a sufficiently close connection to the conduct the statute prohibits." *In re Commodity Exch.*, 213 F. Supp. 3d at 654 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014)); *see, e.g.*, *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1303 (11th Cir. 2010) (reversing dismissal of complaint alleging tying that resulted in higher prices and fewer choices—"precisely the type of harm that we allow plaintiffs to vindicate through the antitrust laws"); *Minnesota Mining & Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138, 1147 (D. Minn. 1999).

Google asks the Court to make factual determinations not amenable to resolution on the pleadings. *See New York Jets LLC v. Cablevision Sys. Corp.*, 2005 WL 2649330, at *10 (S.D.N.Y. Oct. 17, 2005) (explaining that "existence of an 'antitrust injury' is not typically resolved through [a] motion[] to dismiss") (citation omitted).  Causation is a fact issue, *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012), and so is the viability of Advertisers' market definitions, which underpin Google's standing challenges.  *See Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (market definition is "deeply fact-intensive"); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011) (dismissals related to market definition "remain relatively rare") (citations omitted).  The DOJ's complaint defines a single market for ad-buying tools, without differentiating between small and large advertisers, demonstrating how the market definitions on which Google bases its arguments could change. *See* Compl. ¶¶ 297-303, *United States, et al. v. Google LLC*, No. 1:23-CV-00108 (E.D. Va. filed Jan. 24, 2023).

Moreover, analyzing antitrust injury in a case where the defendant monopolizes the transaction from end-to-end—controlling both the auction exchange and the tools used to bid into that exchange—requires a firm understanding of what would have occurred in the relevant

markets in the absence of Google's unlawful conduct.  *See*, *e.g.*, *New York Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.*, 651 F. Supp. 802, 811 (S.D.N.Y. 1986) (holding that plaintiff "should be given the opportunity to show that its members have suffered injury from higher prices").  In this case, Google's own internal documents reveal the anticompetitive motives of its business conduct.  *E.g.*, ¶ 168 ("Google's strategy . . . was to acquire a series of ad-tech competitors and combine products to foreclose competition . . . and capitalize on what its internal documents call 'the synergies/inter-relationships from owning all these pieces.'").

> **1.      Plaintiffs Have Standing to Maintain Claims Based on Google's Monopolization of the Market for Ad-Buying Tools for Small Advertisers.**

As a preliminary matter, the Court should reject Google's assertion that Advertiser Plaintiffs only allege that two programs (Project Bernanke and Unified Pricing) caused injury in the market for ad-buying tools for small advertisers.  Advertisers allege they sustained injury in this market from a broad array of conduct, including various anticompetitive practices directed at Google Ads, Google's primary small advertiser buying tool.  *E.g.*, ¶¶ 116, 120, 123, 124, 185. The Court analyzed what forms of conduct alleged by the States were plausibly anticompetitive under the rubric of exclusionary conduct under Section 2.  But it is unnecessary and would be inappropriate to perform a similar practice-by-practice analysis for the separate element of whether Google's antitrust violations caused injury.  Instead, the anticompetitive effects, including overcharges, that result from Section 2 monopolization must be assessed as a whole. *LePage's*, 324 F.3d at 162; *Continental Ore*, 370 U.S. at 699.

Google concedes Advertisers participate in the small advertiser buying tool market, and Advertisers allege Google harmed competition *in that market* and caused them to overpay Google.  Google, seeking improper inferences, claims that certain anticompetitive programs were good for Advertisers and that its services provide security and user safety.  But even if Bernanke

and Unified Pricing were (improperly) considered in isolation, Advertisers detail a mechanism by which each practice advantaged Google and directly harmed them.

First, Google asks the Court to find that Bernanke did not harm Advertisers despite their allegations to the contrary.  Google quotes a portion of paragraph 218 of the Complaint, which alleges that Google "surreptitiously switched AdX from a second price auction to a third-price auction, from the publishers' standpoint[.]"  Mot. at 12-13. Tellingly, Google omits the rest of the paragraph, which explains:

> the advertiser with the winning bid paid the price of the second-highest bid—but . . . the publisher received a payout equal to the third-highest bid or the publisher's floor, with Google pocketing the difference.  Thus, advertisers paid Google—not publishers—an artificially inflated take rate, and in fact were paying more than the publisher would have been willing to accept.

¶ 218.  So "Bernanke harmed advertisers by causing them to pay the price of the actual second-highest bid instead of the third-highest bid, which was the bid that Google falsely reported as the second highest and paid to publishers (after extracting its supra-competitive fee)."  ¶ 226. Google skirts these allegations and others, including that Bernanke "manipulat[ed] and inflat[ed] [advertiser] bids" (*id.*), "increased the cost of advertisers' campaign and lowered their return on investment" (*id.*), and gave "an unfair advantage to its own ad-buying tool," which in turn "thwarted advertisers' ability to use competing ad-buying tools effectively . . . and drove up their costs associated with Google Ads and AdX" (¶ 228).  These allegations of monopoly overcharging are plausible, and cannot be ignored.  And Google's assertion that publishers or any competing exchanges are better positioned to sue for manipulation of *advertisers' bids* does not follow.  Advertisers are the most efficient enforcers against violations that directly injured them, in their own market.

Second, Google insists that Advertisers must have benefited from Unified Pricing despite their allegations that Unified Pricing concretely harmed advertisers who overpaid Google for its ad-placement services.  These pricing restrictions "ensure that rival . . . buying tools are at a price disadvantage[]" (¶ 259) and cause advertisers to pay more than they would in a competitive market because the restrictions "impede the ability of competing exchanges to deliver impressions at lower prices. . . . Advertisers were harmed because . . . these restraints reduced their choices in the ad-buying tool and exchange markets and caused them to pay more to place ads through Google."  ¶ 266.  Google cites allegations that Unified Pricing benefited *Google* to contend the practice benefited *Advertisers*.  Mot. at 11-12.  Advertisers' allegations that Unified Pricing served to keep out competition, preventing lower prices, are plausible and likely.

By preventing publishers from adjusting prices to attract the advertisers or exchanges that best suited their needs, Google foreclosed price competition and was able to overcharge Advertisers, extracting monopoly rents through Google Ads, DV360 *and* AdX.  ¶ 257.  This injury is direct and not remote.  *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 477-78 (1982) (in determining whether an injury is too remote the Court looks to "the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful").  Unified Pricing, combined with its other anticompetitive practices, allowed Google to charge an inflated take rate in these markets.  Advertisers—and no one else—are motivated to recover the anticompetitive overpayments they made.  *See Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 134 (S.D.N.Y. 2016) (concluding plaintiffs were efficient enforcers because they were motivated by a "natural economic self-interest in avoiding overpaying") (internal quotations and citation omitted).

8

Google also asserts, without support and contrary to economic theory, that publishers and advertisers cannot simultaneously be harmed.  This false dichotomy—conduct harming publishers necessarily advantages advertisers—is illogical and without any support.  *See Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 330 (S.D.N.Y. 2018) (denying defendant broker intermediaries' motion to dismiss and finding plaintiffs adequately alleged defendants' conduct in the stock loan market "deprived [both buyers and sellers] of more efficient, competitive, and transparent trading options that would have increased price transparency and competition") (internal quotation marks omitted).  Google's monopoly power and anticompetitive conduct allowed Google to increase the price of placing ads using its tools, harming competition and injuring both advertisers and publishers.  ¶¶ 189, 232, 314, 320.  Google simply notes the need for apportionment but does not identify any problem with apportioning the respective inflation of the take rate borne by advertisers and publishers.  Publishers did not pay the supracompetitive portion of the take rate absorbed by the advertisers, who paid Google's buying tool and impression charges.  No party has a stronger incentive to recover the advertiser portion of the inflated take rate than the Advertisers.  The fact-based task of apportioning damages is common in complex multiparty litigation and should follow discovery.  *See, e.g.*, *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris*, Inc., 36 F. Supp. 2d 560, 576 (E.D.N.Y. 1999) (finding no problem with apportioning damages among plaintiff groups that were "not claiming the same injury").

Advertisers' injuries from overpaying for ad-buying tools are "of the type the antitrust laws were intended to prevent," and "flow from that which makes [Google's] acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Advertisers are "efficient" enforcers because of their direct, concrete, and identifiable harm from Google's

violations; no one is better situated to pursue the damages that these purchasers alone incurred. *E.g.*, ¶ 121 ("In a discussion between Google employees about Google Ads' fees, one employee asked: 'Buyers don't know that [we] take a 15 percent fee?  I didn't realize that.'  Another clarified that the fee 'is not transparent.'").

### 2.    Advertisers Have Standing to Maintain Claims Based on Google's Monopolization of the Market for Ad Exchanges.

Advertisers also suffered direct injury when they paid inflated take rates on ad placements resulting from Google's antitrust violations in the linked ad exchange market.  Each Advertiser dealt directly with Google and its "supra-competitive take rate in the exchange market . . . is borne in part by advertisers."  ¶¶ 310, 314.  They therefore suffered the type of injury the antitrust laws are intended to prevent, and the Court's findings regarding harm to competition confirm this injury is plausible.  *See* Sept. 13, 2022 Opinion & Order ("Op. & Ord.") at 34-38, 44-48, 55-57, 68-70, 74-77 (discussing anticompetitive effects in exchange market).

Advertisers are the most efficient enforcers to recover their share of Google's inflated take rate from brokering placement of display ads—which accounts for "approximately 30% of advertisers' spend."  ¶ 82.  While Google contends Advertisers do not participate in the ad exchange market, they are in fact direct participants.[3]  An intermediary/middleman market, such as the digital auction house at issue, deals directly with participants on each side of the facilitated transaction.  *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 46 (S.D.N.Y. 2020) (describing how, in *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 163-66 (S.D.N.Y. 2000), "the causal mechanism [of injury] consisted of a single step," through which defendants

---

[3] Advertisers' claims under California competition law (Fourth, Sixth, and Seventh Causes of Action) are neither subject to *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), nor to *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983).  *See* Cal. Bus. & Prof. Code § 16750(a); *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1195 (2013).

Sotheby's and Christie's "directly charged their [buyer and seller] customers the fixed commission rates").

Google's argument is akin to insisting that a bidder at Christie's would not be harmed if the auction house artificially inflated its commission on artwork because the bidder used a paddle provided by Christie's to place the bid.  The fact that advertisers use, and pay for, Google's buying tools (*i.e.*, the paddle) to access inventory and purchase ad placements on Google's exchange does not change the harm that results from Google's wrongful acquisition and maintenance of monopoly power in this auction market.  When, as here, an auctioneer successfully monopolizes an auction market, the middleman can extract monopoly rents from both sides of the transaction.  And though both buyers and sellers bear the inflated take rate, it is the buyers that pay more for placements.

As admitted in Google's Answer in *State of Texas v. Google LLC*, "Google Ads bid on Google's ad exchange on behalf of advertisers."  No. 4:20-cv-00957-SDJ, Doc. 67, ¶ 123 (E.D. Tex. Feb. 22, 2021).  Google now appears to argue that its own conduct as a placement service somehow insulated Advertisers from the effects of its connected conduct as an auction provider. But this digital-ad service causal chain is seamless.  The direct and immediate impact of Google's monopolization of the exchange market was felt by the Advertisers, who paid Google directly to broker the placement of their digital ads.  *E.g.*, ¶ 314 ("In a competitive market, advertisers and publishers would benefit from exchanges competing . . . . Competition would produce lower take rates, benefiting advertisers.  Advertisers would pay less to purchase ad space."); ¶ 82 (Google's ad-brokering take rate accounts for a substantial portion of ad spend).

On a motion to dismiss the Court "view[s] the evidence and interpret[s] the allegations in the light most favorable to the plaintiffs, drawing reasonable inferences in their favor."  *Eastman*

*Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 93 (2d Cir. 2019) (citations omitted).  Zeroing in on just one aspect of its anticompetitive conduct, Unified Pricing, Google asks the Court to make a fact-sensitive determination, based on an inference drawn from one sentence of Plaintiffs' Complaint: "Unified Pricing resulted in AdX winning nearly double the number of impressions it used to—but paying roughly half as much."  Mot. at 11-12 (citing ¶ 264).  The point is that Google, in extracting a supracompetitive take rate on impressions mediated through its buying tools and ad exchange, was "paying" *publishers* less at the same time it was *overcharging advertisers*.  Google's exchange was able to transact more impressions without having to compete on price with rival exchanges.  *E.g.*, ¶ 305 ("Google's power in the relevant markets here enabled it to raise the prices of its brokering services to supra-competitive levels. . . . [A]dvertisers now receive less for each dollar they spend, with trading costs now accounting for half the cost of every trade on average.").  Google is free to argue to the jury that its conduct had countervailing procompetitive effects.

Advertisers' injuries in the exchange market are distinct from any injuries suffered by excluded competitor exchanges, ad server companies, or publishers.  This is not a case involving multiple classes of plaintiffs that occupy successive links in a chain of distribution.  Both publishers and advertisers were "first in line" to incur economic damage from the inflated prices that Google's monopolization allowed it to maintain.  *Eastman Kodak Co.*, 936 F.3d at 89.  Advertisers are the "means by which" Google inflicts harm (Mot. at 8) because they supply the necessary demand for these markets.  Google should not benefit from the fact that its monopolization causes two distinct, simultaneous, and direct injuries: the injury incurred by advertisers for their portion of the artificially inflated take rate—which Google withdraws from

their ad spend (¶ 82)—and the injury incurred by publishers who received reduced payment from Google for making their ad space available.

The Advertisers contracted with Google and, because they transacted with Google for its services in the ad exchange market, their injury is direct and they need not invoke the "inextricably intertwined" doctrine allowing antitrust standing.  Regardless, that doctrine is satisfied because Advertisers allege Google monopolized the exchange market so it could impose a supracompetitive take rate on transactions that Advertisers paid.  Google's monopolization of the advertiser buying tool markets directly supported its concurrent monopolizing of the ad exchange market, and vice versa.  *E.g.*, ¶ 314 (quoting Google's internal documents: "the market bears the fee primarily because of the exclusive access to our [Google Ads] demand."), ¶ 213 ("Like Dynamic Allocation, EDA operated to cement Google's monopoly position in the ad exchange market and injured advertisers . . . . [and] limited advertisers' ability to use competing exchanges and competing ad servers successfully, while driving up the costs").  Hence, Advertisers' damages are intertwined with "the injury the defendant[] ultimately sought to inflict" and "the essential means by which defendants' illegal conduct brings about its ultimate injury to the marketplace."  *In re Commodity Exch.*, 213 F. Supp. 3d at 652 (citing *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016) (a firm may "corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target")); *see also Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002).

In conflict with Advertisers' allegations, Google's standing argument artificially distinguishes between the interdependent markets in which they participated.  The argument is faulty, lacks any merit, and should be rejected.

    **3.**    **Advertisers Have Standing to Maintain Claims Based on Google's Attempted Monopolization of the Market for Ad-Buying Tools for Large Advertisers.**

Google further contends that Advertisers do not have standing because they have not alleged they used DV360 specifically.  Notably, however, in its Answer in *State of Texas v. Google LLC*, Google admitted that "advertisers of all sizes use demand-side platforms" and "advertisers of all types and sizes use automated tools to bid on and purchase ad inventory, including ad inventory trading on ad exchanges and ad networks."  No. 4:20-cv-00957-SDJ, Doc. 67, ¶¶ 57, 100, 103 (E.D. Tex. Feb. 22, 2021).  In other words, Google's control of these interdependent markets affects advertisers of "all sizes."  Equally telling, every individual listed in Google's initial disclosures as a person with knowledge of Google Ads also is listed as a person with knowledge of DV360.  The overlapping responsibilities for these products suggest that Google decided on its practices for the buying tool markets adjoining its exchange as part of an integrated decision-making process, supporting Advertisers' allegation of a unified anticompetitive scheme.  Particularly in these circumstances, whether these Advertiser Plaintiffs purchased every product at issue is beside the point and whether they can adequately represent larger advertisers should be determined on class certification.  *See, e.g.*, *Langan*, 897 F.3d at 93-94; *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 464 (S.D.N.Y. 2013); *Hidalgo*, 148 F. Supp. 3d at 297; *Currency Conversion*, 264 F.R.D. at 111.

    In fact, moreover, Advertiser Class Plaintiffs' injuries are neither speculative nor remote from Google's anticompetitive practices affecting the DV360 ad-buying channel.  Google's Unified Pricing Rules, for example, harmed competition in the markets for ad-buying tools for advertisers "of all sizes"—to use Google's description—and in the same way, by locking them into AdX and Google's connected ad-server platforms.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 401 (E.D.N.Y. 2008) (denying motion to

dismiss where defendant forced customers to "accept a series of rules that effectively insulate its interchange fees from competition."). Poirot and Elmo harmed large advertisers in the same way that Dynamic Allocation harmed small advertisers, including by steering the advertisers to AdX. *Compare, e.g.*, ¶¶ 273-74 (discussing Poirot's and Elmo's mechanism of harm), *with* ¶ 213 (describing how Dynamic Allocation and EDA harmed small advertisers). Contrary to Google's standing arguments, these practices cannot be separated out for purposes of determining their combined effect. Google's anticompetitive policies and practices in the overlapping buying tool markets coerced advertisers of "all sizes" to use AdX, enabling Google to charge inflated take rates. Advertisers were directly harmed by this conduct and thus are efficient enforcers. *See, e.g.*, *Merced Irrigation Dist. v. Barclays Bank PLC*, 220 F. Supp. 3d 412, 418 (S.D.N.Y. 2016) ("Merced has sufficiently alleged that Barclays manipulated the price of electricity and electricity-related contracts to increase its own profits and that Merced suffered injury as a result of Barclays's actions. Although there may be other potential plaintiffs whose injuries may be more direct because they interacted directly with Barclays, that does not preclude Merced from having standing to enforce the antitrust laws.").

Further, as noted above, because viable antitrust plaintiffs are "not strictly limited to participants in the defendants' market," *Aluminum Warehousing*, 833 F.3d at 158-61, "the potential existence of more direct plaintiffs does not necessarily defeat Plaintiffs' standing to the extent that Plaintiffs suffered separate, and sufficiently direct, injuries." *In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 657 (citing *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009)). For example, in *Loeb*, copper purchasers had antitrust standing to bring claims against defendants who manipulated the price of copper futures, even though the

plaintiffs never dealt with the defendants, because "different injuries in distinct markets may be inflicted by a single antitrust conspiracy."  306 F.3d at 481.  This doctrine squarely applies.

Google's internal documents confirm that it sought to achieve "the synergies/inter-relationships from owning *all* these pieces [of the ad tech stack]."  ¶ 168 (emphasis added).  It accomplished this by controlling the display ad services markets from end to end with "continuous and self-reinforcing monopolies in multiple markets."  ¶¶ 170, 166.  There is no risk of duplicative recovery.  These are exactly the circumstances in which standing should *not* be decided on the pleadings.  *See, e.g.*, *In re DDAVP*, 585 F.3d at 689; *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 274 (D. Conn. 2003) ("[T]he antitrust laws do not limit standing to only that class of purchasers with the most direct injury.").

Google's standing challenges fall short for all of these reasons.

## C.    Google's Request to Dismiss Allegations Is Misplaced.

The Court should likewise reject Google's request to dismiss particular allegations as opposed to claims for relief.  Mot. at 19-22.  Section VI.A of the Complaint frames the allegations about Google's harmful practices that follow by describing how most digital advertisers came to rely on Google for their campaigns.  *See* ¶ 199 (Section VI.A "provides background on how advertisers have been coerced to place display ads using only Google's services").  Google's acquisitions of nascent competitors, dominance of web search, and control of consumer data are relevant to advertisers' increasing use of Google's services.  *See* ¶¶ 167-98.  Plaintiffs may set forth this relevant background regardless of whether it directly addresses a particular claim element.  *See, e.g.*, *Emmis Commc'ns Corp. v. Ill. Nat'l Ins. Co.*, 323 F. Supp. 3d 1012, 1027 (S.D. Ind. 2018), *reversed on other grounds*, 929 F.3d 441 (7th Cir. 2019), *opinion withdrawn, aff'd on reh'g*, 937 F.3d 836 (7th Cir. 2019) (noting "reasons for including far more than the necessary facts in a complaint," such as "to give the reader context"); *Monroe v.*

*Mullooley*, 2011 WL 337333, at \*4 (W.D. Pa. Feb. 3, 2011) (denying motion to dismiss allegations unrelated to the defendant, as "Plaintiff is entitled to include appropriate surrounding and background facts"); *Wineland v. Casey's Gen. Stores, Inc.*, 554 F. Supp. 2d 915, 921 (S.D. Iowa 2008) (directing plaintiff to place factual allegations within background section of complaint when they did not independently state a claim); *see also Price v. Viking Press, Inc.*, 113 F.R.D. 585, 588 (D. Minn. 1986) (permitting discovery of background facts where defamation claims could "only be understood in a larger context").

Google does not move to strike the factual allegations in Section VI.A of the CAC or contend they are redundant, immaterial, or scandalous.  *See* Fed. R. Civ. P. 12(f).  Rule 12(b) "does not provide for the dismissal of particular *allegations* in support of a claim."  *Lynch v. Ackley*, 2013 WL 6732540, at \*2 (D. Conn. Dec. 19, 2013) (emphasis added).  Google therefore "may not simply seek adjudication of facts in a complaint that are not dispositive of any of the pleas for legal redress."  *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 343 F. Supp. 3d 94, 100 (E.D.N.Y. 2018).  Accordingly, there is no basis to "dismiss" the factual allegations highlighted by Google, including those related to Reserve Price Optimization ("RPO").[4]

### D.   Advertisers Adequately Allege that Google Unreasonably Restrained Trade in Combination with Publishers.

Advertisers assert a Section 1 claim (Fifth Cause of Action) and a parallel claim under the Cartwright Act (Sixth Cause of Action), based on the restraints that Google imposed through combinations with publishers that enforced "Unified Pricing" rules and restricted itemized line-item bids.  The Court found each of these restraints plausibly anticompetitive (Op. & Ord. at 66-

---

[4] Google's footnote 3 improperly seeks the dismissal of "allegations," as opposed to causes of action. Mot. at 7 n.3.  Google's footnote also overlooks that Reserve Price Optimization has not been dismissed from the case.  Op. & Ord. at 57-61.  RPO is one of the deceptive practices that Plaintiffs allege renders Google liable under California competition law.  ¶¶ 239-53, 403; *see also infra* note 8.

68, 74-77), and each depended on publisher acquiescence pursuant to contract.  The vehicle for these abuses was Google's exercise of rights under its agreements with publishers.  These claims are cognizable.

### 1.    Unified Pricing Rules Artificially Set Bid-Pricing Levels.

Unified Pricing restrains competition by fixing prices and coercing parties to transact on Google's exchange.  Publishers historically set different price floors on different exchanges, permitting competition between Google and non-Google exchanges and ad-buying tools.  But Google's "Unified Pricing Rules"—introduced with the 2019 revision of Google Ad Manager's pricing rules—ended that competition.  ¶¶ 81, 254-66.  They prevented publishers from routing their ad space to *another* exchange at a price floor *different* than the floor given to Google's exchange, and from allowing one bidder a lower price floor than another bidder.  ¶¶ 258-59.  The resulting price maintenance served to discourage advertisers and publishers from using any competing service provider, advancing Google's extraction of monopoly rents from both sides of the market.  ¶¶ 259, 263, 266.

Google does not dispute that it entered into agreements with the publishers using its services, and that any publisher wishing to transact business with Google had to accept its terms of service, including any changed terms.  ¶¶ 258, 387.  Google, instead, claims there was no "meeting of the minds or common design between Google and publishers" regarding Unified Pricing.  Mot. at 14.  At the motion to dismiss stage, Advertisers need only allege a plausible agreement.  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184-85 (2d Cir. 2012).  They do:

> Each publisher that accepted Unified Pricing Rules knew that other publishers were also accepting these rules, as the change was imposed across Google's electronic systems.  Publishers also knew that the Unified Pricing Rules were suboptimal for their bottom line and likely to increase Google's share of the relevant markets. . . . Publishers were coerced to accept and acquiesced to

18

Google's Unified Pricing Rules, which have reduced competition among exchanges.

¶¶ 386-87.  It is a "basic proposition that use of coercion that achieves actual price-fixing is illegal." *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 52 (2d Cir. 1980).  Google's argument contradicts this long-established rule that "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948).  Nor is there any requirement that agreeing parties share a common goal to restrain competition.  *See, e.g.*, *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1163 (7th Cir. 1987) (reversing j.n.o.v. for defendant and holding that "an agreement procured by threats is still an agreement for purposes of section 1."); *Bender v. Southland Corp.*, 749 F.2d 1205, 1213 (6th Cir. 1984) (reversing summary judgment based on evidence of coercion).  All that is required is that Google restrained trade via agreements with others.  *Va. Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*, 156 F.3d 535, 541 (4th Cir. 1998) ("[I]t is sufficient that HGSI, regardless of its own motive, merely acquiesced in the restraint with the knowledge that it would have anticompetitive effects.").

Google presented the Unified Pricing Rules as a condition of publishers' continued use of its monopoly ad server.  ¶ 258.  These price-setting rules, combined with the fees Google charges for transactions that occur off its exchange, impede the ability of competing exchanges to deliver impressions at lower prices.  ¶¶ 257, 259-60.  Because of these pricing restrictions, Google intermediated an even higher volume of display-ad business, and formerly competing exchanges lost business.  ¶¶ 254-66, 386-87.  These anticompetitive restrictions imposed on publishers thus bolstered Google's monopolies and increased the financial costs borne by advertisers, causing actionable harm.  ¶¶ 266, 390.  *See, e.g.*, *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) (upholding verdict of liability based on Apple's pricing restrictions imposed on

publishers); *United States v. Delta Dental of R.I.*, 943 F. Supp. 172, 175 (D.R.I. 1996) (denying motion to dismiss Section 1 claim where Delta Dental "ma[de] it abundantly clear to participating dentists that the only way to avoid the risk of [receiving] lower Delta fees [wa]s to refuse to accept any fees lower than Delta's fee schedule" from other reimbursement programs); *United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 669 (E.D. Mich. 2011) (denying motion to dismiss Section 1 claim based on Blue Cross' agreements that "purchased protection from competition" by coercing downstream hospitals to provide services to Blue Cross' competitors at the same or higher prices).

Google fails to cite any decision on this issue that came on a motion to dismiss. Instead, its authorities include a criminal indictment (*United States v. Colgate & Co.*, 250 U.S. 300, 304-07 (1919)), an appeal from a jury verdict (*Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1030-31 (2d Cir. 1979)), an appeal from a grant of summary judgment (*Toscano v. Pro. Golfers' Ass'n*, 258 F.3d 978, 984 (9th Cir. 2001)), and an appeal from a grant of judgment as a matter of law after a jury verdict (*Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 617-18 (6th Cir. 1993)). These cases indicate that the nature and effect of Google's restrictive agreements should be evaluated after discovery.

Google's cases are distinguishable on their facts as well as their procedural posture. Each involves a relationship between a manufacturer and its distributor or reseller. In *Colgate*, the defendant was charged with violating Section 1 by instructing wholesale and retail purchasers of its products to resell the products at certain prices or Colgate would no longer sell to them. 250 U.S. at 303-04. The Supreme Court held that Colgate's actions did not violate the Sherman Act because its resellers still could choose to sell at whatever price they wished, despite Colgate's requests, and the indictment never alleged an intent to form a monopoly. *Id.* at 306-07. *Fuchs*

*Sugars & Syrups* similarly concerned a change to a distribution system by a sugar refiner and the termination of its former sugar brokers.  602 F.2d at 1027.  The court noted that while it would be unlawful to change a distribution system if doing so would "exact some collateral competitive advantage," that was not what had occurred.  *Id.* at 1030-31.  Instead, the sugar refiner's change was not intended to coerce distributors to accede to anticompetitive conduct and so was permissible.  *Id.* at 1032-33.  *Tarrant*, 12 F.3d 609, also involves a policy change by a manufacturer regarding brokers and their rights to resell certain products.  In *Toscano*, a pro golfer alleged a Section 1 violation arising out of local tournament sponsors' agreements with the PGA to run tournaments under PGA rules that prevented PGA golfers from participating in non-PGA events.  258 F.3d at 983.  The court found no evidence of "concerted action," likening the relationship to that between a manufacturer (the PGA) and its distributors (the local sponsors).  *Id.* at 983-84.

In all of these cases, courts found no illegal restraint when the upstream seller of a product unilaterally changed its sales or distribution policies in a manner that did not coerce any distributor or reseller to engage in anticompetitive conduct.  But Google's Unified Pricing Rules *were* coercively imposed on customers subject to its monopoly power and *are* anticompetitive.  In contrast to the facts presented in Google's cases, the relevant conduct here harms competition far beyond the choice of whom to do business with.  Like the publishers in *Apple*, the dentists in *Delta Dental*, and the hospitals in *Blue Cross Blue Shield of Michigan*, publishers assented to Google's anticompetitive conduct: the Section 1 claim should proceed.

### 2. By Capping Line Items, Google Artificially Curtailed Competition with AdX.

Also accomplished through Google's exercise of rights under its agreements with publishers, Google's restrictions on publishers' ability to offer line items excluded competition

in the exchange market.  This Court described how a line item allows a publisher to set a to-the-penny price for bids that it will accept through header bidding.  *See* Op. & Ord. at 66-67.  As Google intended, capping line items induced publishers to transact on AdX and foreclosed discounts and other deals that could pit Google against its rivals.  ¶¶ 279-84, 388-89.  Fewer line items prevented publishers from capturing a live, competitive bid placed through a competing exchange because if a line item is lower than a bid made by an advertiser, the bid is rounded down to the lower line-item price.  ¶¶ 280, 282.  Thus, by limiting the number of line items available to publishers, Google reduced publishers' incentives to participate in the alternative header-bidding technology that threatened Google's ad-tech systems.  ¶¶ 281-84.

Google neither denies that it contracted with publishers nor that these restrictions were carried out in combination with publishers, who, after having particularized line-items for bids, relinquished that competitive activity.  "Each publisher that accepted Google's line-item restrictions knew that other publishers were also accepting these rules, and publishers also knew that the restrictions would damage their bottom line and likely increase Google's share of the exchange market."  ¶ 388.  The consequence for advertisers was higher prices in the exchange market.  ¶ 389.  These restraints were carried out in combination with publishers, violating Section 1 under the principles and case law set forth in the preceding Argument section.

### E.   Advertisers' NBA Claims Are Different Than the States' Claims, Arise in a Well-Defined Market, and Should Proceed.

Google also contests the plausibility of Plaintiffs' Third and Fourth Causes of Action concerning its Network Bidding Agreement with Meta.  Mot. at 16-19.  Because Meta also moved to dismiss those claims, for convenience, Advertisers respond to Google's NBA arguments in their separate brief responding to Meta's motion, and incorporate it here by reference.

### F.     The Court Should Deny Google's Motion to Arbitrate.

All state-law claims in this MDL remain stayed (Doc. 392 at ¶ 5) and the Court only permitted Google to "move to dismiss each of the federal claims" (*id*. at ¶ 3). Nonetheless, Google seeks wholesale dismissal in favor of arbitration of *all* claims—federal and state—of all Advertisers except Hanson, while at the same time refusing to participate in arbitration-related discovery.

It follows, first, that arbitration should be decided after arbitration-related discovery is complete. Regardless, all of Hanson's claims must remain in this Court. Furthermore, substantive California law entitles all Advertisers to pursue their requested relief in this forum. There can be no reasonable dispute about the fact that an injunction to restore competition in the relevant markets will have the primary effect of benefiting the public—but Google's arbitration agreement prevents an arbitrator from entering this relief, in violation of clearly established California law. Therefore, at the very minimum, Google's arbitration clause is void as contrary to public policy in relation to Advertisers' claims under California law: their Seventh Cause of Action for violations of the Unfair Competition Law, and their Fourth and Sixth Causes of Action under the Cartwright Act.[5] Google's severability clause also precludes the Court from severing remedies sought by Advertisers (*i.e.*, litigating injunctive relief in court but damages in arbitration) because the plain meaning of the provision is that an entire claim (and "only that claim") must be severed to remain in court, if the clause is found unenforceable as to that claim. Doc. 448-1 at p. 7 of 8; 448-4 at p. 7 of 8; Doc. 448-5 at p. 7 of 8.

---

[5] With regard to the NBA—the subject of Advertisers' Third and Fourth Causes of Action—Google should be enjoined from giving special advantages to potential competitors in its Final Clearinghouse Auctions, for the reasons set forth in Advertisers' accompanying NBA-focused response brief.

### 1.      Google's Arbitration Motion Is Not Ripe.

The Court need not reach the arbitration issues at all at this time.  Google has conceded that Hanson's claims are not arbitrable, and, as demonstrated below, no Advertiser's California claims are subject to arbitration.  Thus there is no question that Advertisers' claims will proceed in this Court.  And the Supreme Court recently clarified that "federal policy is about treating arbitration contracts like all others, not about fostering arbitration."  *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022).

Against that backdrop, Google has objected to and refused to produce discovery relevant to arbitration issues, while simultaneously relying on the self-serving declaration of an employee to compel arbitration.[6]  Google should not be allowed on the one hand to object to discovery into the pertinent facts while on the other hand urging the Court to adjudicate them.  Plaintiffs acknowledge that certain claims against Google held by portions of the proposed Advertiser Class may be arbitrable, but the specific parameters of such a group and development of the facts underlying the potential arbitrability of any such claims will advance the parties' understanding of those issues and ultimately will allow the Court to resolve any remaining issues on a more developed record.  *See, e.g.*, *Alvarez v. Experian Info. Sols., Inc.*, 2021 WL 2349370, at *1 (E.D.N.Y. June 7, 2021) (noting "the Court denied Defendant's motion to compel arbitration without prejudice to allow for discovery related to arbitration").

---

[6] On January 27, 2023, Plaintiffs propounded their First Set of Requests for Production upon Google. Request Nos. 294 through 297 seek production of documentary evidence in support of Google's assertion that some Advertisers may be obliged by contract to arbitrate certain claims.  On February 27, Google responded with a blanket objection to producing any of this discovery whatsoever, stating in response to each request: "Because this Request is specific to Advertisers' arbitration agreements, it does not comply with PTO-3."

2. **All Advertisers at a Minimum May Pursue Their UCL and Cartwright Act Claims Against Google in Court.**

a. **California's *McGill* Rule Voids Contractual Provisions, Like Google's, That Waive Injunctive Relief Primarily Benefiting the Public.**

"Under California law, a contractual provision purporting to waive the right to seek public injunctive relief in any forum is unenforceable." *MacClelland v. Cellco P'ship*, 2022 WL 2390997, at *8 (N.D. Cal. July 1, 2022) (citing *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 952 (2017) (applying Cal. Civ. Code § 3513)). This "*McGill* rule" is a generally applicable contract defense that is not preempted by the FAA. *See Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 827-28 (9th Cir. 2019). Because Google's arbitration agreement contains a California choice-of-law clause, the agreement is subject to *McGill* for every Advertiser who accepted Google's terms. Doc. 448-1 at p. 7 of 8; Doc. 448-4 at p. 7 of 8; Doc. 448-5 at p. 7 of 8.

Google's arbitration clause impermissibly purports to shield itself from an injunction benefiting the public, providing that an arbitrator may award injunctive relief "only to the extent necessary to provide relief warranted by that party's individual claim *without affecting other Google users or other customers or advertisers*." Doc. 448-1 at p. 7 of 8; Doc. 448-4 at pp. 6-7 of 8; Doc. 448-5 at p. 7 of 8 (emphasis added). *See, e.g.*, *Mejia v. DACM Inc.*, 54 Cal. App. 5th 691, 702-03 (2020) (affirming denial of arbitration motion under *McGill* because clause would have precluded the arbitrator from making "an award for the benefit of, or against, anyone other than a named party," in dispute alleging unfair competition).

Google cites *California Crane School, Inc. v. Google LLC*, but that court declined to apply *McGill* because the plaintiffs asserted no claim under California law. 2022 WL 3348425, at *4 (N.D. Cal. Aug. 12, 2022) ("Plaintiff's novel attempt to invoke the *McGill* rule fails at the threshold because none of Plaintiff's claims authorize it to seek public injunctive relief in the

first place.").  By contrast, in *Snarr v. HRB Tax Group, Inc*., the plaintiffs sought a public

injunction and the court applied the *McGill* rule to affirm the denial of an arbitration motion.

Like Google's provision here, the provision in *Snarr* stated that relief "must be individualized to

you and will not affect any other client."  839 F. App'x 53, 54 (9th Cir. 2020); *see also, e.g.*,

*Cottrell v. AT&T Inc.*, 2020 WL 2747774, at *5 (N.D. Cal. May 27, 2020) (declining to enforce

an arbitration clause with the same operative language as Google's clause).  Similarly, in *Blair*,

the court affirmed denial of a motion to arbitrate under *McGill* where the arbitrator was barred

from issuing "relief that would affect . . . account holders other than you."  928 F.3d at 823.  As

that court recognized, "The California Supreme Court found that public injunctive relief

available under the UCL" is "by definition . . . primarily for the benefit of the general public."

*Id*. at 824 (quoting *McGill*, 2 Cal. 5th at 961) (internal quotation marks and alterations omitted).

Google claims that structural relief quashing its monopolies would not primarily benefit

the public.  Mot. at 29.  Google "is mistaken.  To qualify as public injunctive relief, an injunction

must be for the benefit of the general public as a whole, as opposed to a particular class of

persons."  *MacClelland*, 2022 WL 2390997, at *9 (internal quotation marks and alterations

omitted) (citing, *inter alia*, *Hodges v. Comcast Cable Commc'ns, LLC*, 12 F.4th 1108 (9th Cir.),

*opinion amended and superseded on denial of reh'g*, 21 F.4th 535, 542 (9th Cir. 2021)).

Advertisers allege that injunctive relief in this case will have "[t]he primary purpose and effect of

. . . benefit[ing] the public from the lower prices and greater innovation that will prevail in

competitive digital advertising markets in the absence of Google's monopoly."  ¶ 405; *see*

¶¶ 319-20, 356 (factual allegations regarding Advertisers' public injunction request).

The nature of the public injunction requested here, and the broad sweep of Google's

control over digital advertising that the injunction would reverse, readily distinguish *California*

*Crane*, 2022 WL 3348425, at *4 (where no California claims were asserted), and *Hodges*, 21 F.4th at 549 (where the requested injunctive relief would "benefit only Comcast 'cable subscribers'").  Unlike in those situations, virtually every American sees display ads delivered via Google and uses and relies on content funded by those advertisements.  Considering the breadth of online activity and commerce affected by Google's monopoly, an injunction to allow competition will result in more effective, informative advertising and lower-priced goods and services.  ¶¶ 314, 319.

That government enforcers are now vigorously challenging Google's ad-tech monopolies confirms the strong public interest at stake.  The United States, California, and several other states have made clear that Google's "conduct hurts all of us."  Compl. ¶ 9, *United States, et al. v. Google LLC*, No. 1:23-CV-00108 (E.D. Va. filed Jan. 24, 2023).

Consumers pay monopoly overcharges because advertisers' choices are constrained by Google's power.  In *Blair*, the court "similarly held that relief was public when it enjoined future violations of the UCL and CLRA related to pricing."  *Snarr*, 839 F. App'x at 55 (citing *Blair*, 928 F.3d at 831 n.3).  The court in *Hodges* opined that California's "*McGill* rule refers to prospective injunctive relief that aims to restrain future violations of law for the benefit of the general public as a whole, rather than a discrete subset of similarly situated persons, and that does so without requiring consideration of the individual claims of non-parties."  12 F.4th at 1120.  Plaintiffs' requested relief satisfies that standard, as Judge Freeman previously noted in this case: "The Court is unpersuaded that the injunctive relief Plaintiffs request pursuant to their UCL claim . . . falls outside the scope of conduct prescribed by *McGill*" including because "antitrust [aims] to protect and promote competition to properly allocate economic resources."  *In re Google Digital Advert. Antitrust Litig.*, 2021 WL 2021990, at *6 (N.D. Cal. May 13, 2021).

Google claims that *Hodges* supports its position that enjoining its display advertising monopoly would not primarily benefit the public; yet the panel majority in *Hodges* specifically recognized that injunctive relief stopping a defendant "from using an unlawful pricing structure" *does* constitute public injunctive relief under *McGill*.  *See Hodges*, 21 F.4th at 544 (citing *Blair*, 928 F.3d at 822-23).[7]  The "unequivocal holding" of *McGill* is that an injunction against unfair or deceptive trade practices, as requested here, "generally benefits the public."  *Nguyen v. Tesla, Inc.*, 2020 WL 2114937, at *4-5 (C.D. Cal. Apr. 6, 2020) (internal quotation marks and alterations omitted); *see also MacClelland*, 2022 WL 2390997, at *9.

The Supreme Court of California explained that the public injunctive relief available under California's Unfair Competition Law "benefits the public directly by the elimination of deceptive practices"[8] so a waiver of "the right to seek public injunctive relief under these statutes would seriously compromise the public purposes the statutes were intended to serve."  *McGill*, 2 Cal. 5th at 955, 961 (internal quotation marks omitted).  Likewise, the "main purpose of" California's "anti-trust laws is to protect *the public* from monopolies and restraints of trade." *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 783 (2010) (emphasis added) (citations and internal

---

[7] Moreover, sitting in diversity this Court is not bound by the interpretation of state law offered by the panel majority in *Hodges*.  The dissenting Judge in that case correctly set forth the California doctrine. 21 F.4th at 549-54.  The injunctive relief can benefit the public in addition to—and not "rather than"— a discrete subgroup.  *Cf. id*. at 548.  Contrary to *Hodges'* restrictive interpretation, the Supreme Court of California has never limited *McGill* to injunction cases that refrain from seeking an injunction that would also benefit a defined class, and plaintiffs who seek an injunction to restore competition commonly sue on behalf of a discrete class of purchasers.  Therefore, the fact that Plaintiffs "*also* seek[] other relief more narrowly tailored to a similarly situated class is immaterial."  *Cottrell*, 2020 WL 2747774, at *8; *see, e.g.*, *Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1258 (N.D. Cal. 2019) (UCL plaintiff "clearly" sought public injunctive relief even where only military personnel and their relatives would directly benefit from the injunction).

[8] This Court characterized allegations of RPO as describing a "secretive process that misled publishers and advertisers and increased publishers' price floors."  Op. & Ord. at 61; *see also supra* note 4.

quotation marks omitted).[9]  And the *McGill* rule is not limited to claims of consumer fraud.  *See, e.g.*, *Blair*, 928 F.3d at 823 (applying *McGill* to sever from arbitration claims under California's anti-usury law and Karnette Act as well as under the UCL and the Consumers Legal Remedies Act).  Thus, under a straightforward application of *McGill*, the Court should preserve all Advertisers' UCL and Cartwright claims for adjudication in this forum.

> **b.**     **The Arbitration Agreement's Severability Clause Requires the Entirety of the California Law Claims to Proceed in this Court.**

Google's arbitration agreement provides that if it is held enforceable as to any claim, the "claim" is to remain in court.  So here: Advertisers' UCL and Cartwright claims must remain in this Court.  Google even concedes that "if the Court found certain claims under California law non-arbitrable, the appropriate remedy is to sever those claims . . . ."  Mot. at 30.

In *Blair*, the Ninth Circuit held that a contractual provision for severance of a "claim for relief" required the court to sever the claim as a whole—not just the remedy.  928 F.3d at 830-31.  The agreement in that case included a severability clause that, like Google's, provided for:

> severance of 'that claim' . . . to allow it to be brought in court.  A 'claim for relief,' as that term is ordinarily used, is synonymous with "claim" or "cause of action."  *See, e.g.*, Fed. R. Civ. P. 8(a) (interchangeably using "claim" and "claim for relief," and using "demand for relief sought" to refer specifically to requested remedy); . . . *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1031 (N.D. Cal. 2013) ("[E]quitable relief is not a claim for relief but rather only a remedy.").  We read the clause, as did the district court, to provide that the entire claim be severed for judicial determination.

928 F.3d at 831-32.  Similarly, the district court in *Vasquez v. Cebridge Telecom CA, LLC*, 569 F. Supp. 3d 1016, 1029 (N.D. Cal. 2021), denied an arbitration motion in its entirety because the clause both contravened *McGill* and precluded claim-splitting by providing for severance of a claim and only a claim.

---

[9] Meta did not move to arbitrate Plaintiffs' claims against it arising from NBA, and the Cartwright Act overtly declares "against public policy" an illegal trust like that established between Google and Meta. Cal. Bus. & Prof. Code § 16726.

Google's arbitration provision, including its severability provision, is analogous to the arbitration provision in these cases. First, the "no class or representative arbitration" provision prohibits Advertisers from seeking public injunctive relief because the agreement limits the arbitration to "individualized damages and relief," and the arbitrator is only permitted to award "relief warranted by that party's individual claim without affecting other Google users or other customers or advertisers." Doc. 448-1 at p. 7 of 8; Doc. 448-4 at pp. 6-7 of 8; Doc. 448-5 at p. 7 of 8. Second, Google's severance clause is similar to *Blair* and identical to *Vasquez*:

> If . . . applicable law precludes enforcement of any of this subsection's limitations as to a particular claim for relief, then ***that claim (and only that claim)*** must be severed from the arbitration and may be brought in court.

Doc. 448-1 at p. 7 of 8; 448-4 at p. 7 of 8; Doc. 448-5 at p. 7 of 8 (emphasis added); *see Vasquez*, 569 F. Supp. 3d at 1029. In sum, "[c]laims, not specific forms of relief, are severable." *Id*.

As discussed, Plaintiffs seek public injunctive relief under California competition law and are entitled to do so by the Civil Code. Google's provision that would bar public relief is therefore unenforceable as applied to Plaintiffs' UCL and Cartwright Act claims. Plaintiffs also seek private remedies that flow from these same state-law claims. Under the arbitration agreement, the parties "must litigate the entirety of each of those claims before this Court, including . . . requests for restitution, declaratory relief and injunctive relief for . . . the putative class." *Vasquez*, 569 F. Supp. 3d at 1029 (citing *Blair*, 928 F.3d at 831). Thus, the arbitration agreement precludes dismissal of any portion of Advertiser Class Plaintiffs' claims under California law.

## III.    CONCLUSION

For the foregoing reasons, Advertiser Class Plaintiffs respectfully submit that the Court should deny Google's motion to dismiss and lift the stay. If the Court finds the CAC deficient in any respect, Plaintiffs respectfully request leave to amend under Rule 15.

Dated: March 3, 2023                    Respectfully submitted,

                                        /s/ *Dena C. Sharp*
                                        Dena C. Sharp (*pro hac vice*)
                                        Jordan Elias (*pro hac vice*)
                                        Scott M. Grzenczyk (*pro hac vice*)
                                        Mikaela Bock (*pro hac vice*)
                                        **GIRARD SHARP LLP**
                                        601 California Street, Suite 1400
                                        San Francisco, CA 94108
                                        Tel: (415) 981-4800
                                        Fax: (415) 981-4846
                                        dsharp@girardsharp.com
                                        jelias@girardsharp.com
                                        scottg@girardsharp.com
                                        mbock@girardsharp.com

                                        Tina Wolfson (TW-1016)
                                        Theodore W. Maya (*pro hac vice*)
                                        Bradley K. King (BK-1971)
                                        **AHDOOT & WOLFSON, PC**
                                        2600 West Olive Ave., Suite 500
                                        Burbank, California 91505
                                        Tel.: (310) 474-9111
                                        Fax: (310) 474-8585
                                        twolfson@ahdootwolfson.com
                                        tmaya@ahdootwolfson.com
                                        bking@ahdootwolfson.com

                                        *Interim Co-Lead Counsel for Advertiser*
                                        *Plaintiffs and the Proposed Advertiser Class*

                                        Jonathan L. Rubin (*pro hac vice*)
                                        **MOGINRUBIN LLP**
                                        1615 M Street, NW, Third Floor Washington,
                                        D.C. 20036
                                        (202) 630-0616
                                        jrubin@moginrubin.com

                                        Daniel J. Mogin (*pro hac vice*)
                                        Jennifer M. Oliver (*pro hac vice*)
                                        Timothy Z. LaComb (*pro hac vice*)
                                        **MOGINRUBIN LLP**
                                        600 West Broadway, Suite 3300
                                        San Diego, CA 92101
                                        (619) 687-6611

31

dmogin@moginrubin.com
joliver@moginrubin.com
tlacomb@moginrubin.com

*Counsel for Plaintiffs Cliffy Care, Kinin,
Rodrock, and Raintree*

Archana Tamoshunas (AT-3935)
**TAUS, CEBULASH & LANDAU, LLP**
123 William Street, Suite 1900A
New York, NY 10038
Tel.: (212) 931-0704
Fax: (212) 931-0703
atamoshunas@tcllaw.com

April D. Lambert (*pro hac vice*)
John D. Radice (JR 9033)
**RADICE LAW FIRM, PC**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
alambert@radicelawfirm.com
jradice@radicelawfirm.com

*Counsel for Plaintiff Hanson Law Office, as
successor in-interest to Hanson Law Firm, PC*

Richard F. Lombardo (*pro hac vice*)
Peter F. Rottgers (*pro hac vice*)
**SHAFFER LOMBARDO SHURIN**
2001 Wyandotte Street
Kansas City, MO 64108
(816) 931-0500
rlombardo@sls-law.com
prottgers@sls-law.com

*Counsel for Plaintiffs Cliffy Care, Rodrock,
and Raintree*

Jason S. Hartley (*pro hac vice* forthcoming)
Jason M. Lindner (*pro hac vice* forthcoming)
**HARTLEY LLP**
101 W. Broadway, Ste 820
San Diego, CA 92101
(619) 400-5822
hartley@hartleyllp.com

32

lindner@hartleyllp.com

*Counsel for Plaintiff Kinin*