**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Google Digital Advertising Antitrust Litigation | Civil Action No. 21-MD-3010 (PKC) |

*This Document Relates to:*

| | |
|---|---|
| In re Google Digital Advertising Antitrust Litigation | Civil Action No. 21-CV-7001 (PKC) |

**ADVERTISER CLASS PLAINTIFFS' CONSOLIDATED
MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS
GOOGLE LLC, ALPHABET INC., AND META PLATFORMS,
INC.'S MOTIONS TO DISMISS COUNTS III AND IV OF THE
ADVERTISERS' CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    ARGUMENT .................................................................................................... 3

    A.    The Court's Prior Order Does Not Require Dismissal of the
        Advertiser Class Plaintiffs' NBA Claims. ...................................................... 3

        1.    The Court's Prior Order Did Not Consider the Advertisers'
              NBA Claims. ....................................................................................... 4

        2.    Dismissal on the Basis of the Court's Prior Ruling Would
              Undermine Underlying Antitrust Policy. .............................................. 6

    B.    Defendants Offer No Valid Reason Why Google's Final
        Clearinghouse Auction Is Not a Plausible Relevant Market. ............................ 7

        1.    The Pleading and Proof of a Relevant Market Depend on the
              Requirements of the Claim ..................................................................... 7

        2.    The NBA Claims in the CAC Require No Further Factual
              Allegations Regarding the Relevant Market. ....................................... 11

        3.    Defendants Address the Wrong Market. ............................................... 12

        4.    Defendants Ignore the Harm to Competition in the FCA
              Market Caused by the Horizontal Effects of Their Agreement. .......... 13

        5.    Defendants Fail to Explain Why Google's FCA Market Should
              Not be Subject to Antitrust Scrutiny. ................................................... 16

    C.    Advertisers' Allegations of Market-wide Competitive Harm and
        Antitrust Injury Adequately Plead Section 1 and Cartwright Act
        Violations and Support Article III Standing. ................................................... 18

    D.    The Costs of a False Positive if Advertisers Do Not Prove their NBA
        Claims Are Low in Light of the Accompanying Claims. ................................. 20

III.    CONCLUSION .............................................................................................. 21

# TABLE OF AUTHORITIES

## <u>Cases</u>

*1-800 Contacts, Inc. v. FTC*
   1 F.4th 102 (2d Cir. 2021) ................................................................................................. 10

*Am. Needle, Inc. v. NFL*
   560 U.S. 183 (2010) ...................................................................................................... 2, 14

*Apple Inc. v. Pepper*
   139 S. Ct. 1514 (2019) ...................................................................................................... 16

*Bale v. Glasgow Tobacco Bd. of Trade, Inc.*
   339 F.2d 281 (6th Cir. 1964) ............................................................................................ 13

*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007) .......................................................................................................... 20

*Board of Trade v. United States*
   246 U.S. 231 (1917) .......................................................................................................... 16

*Bowling Transp., Inc. v. Gregg*
   103 Ohio App. 3d 539 (1995) ........................................................................................... 18

*Brown Shoe Co. v. United States*
   370 U.S. 294 (1962) ...................................................................................................... 7, 17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*
   429 U.S. 477 (1977) .......................................................................................................... 19

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*
   996 F.2d 537 (2d Cir. 1993) ......................................................................................... 9, 10

*Copperweld Corp. v. Indep. Tube Corp.*
   467 U.S. 752 (1984) ................................................................................................ 2, 14, 18

*De Atucha v. Commodity Exch., Inc.*
   608 F. Supp. 510 (S.D.N.Y. 1985) ..................................................................................... 6

*Eastman Kodak Co. v. Image Tech. Servs.*
   504 U.S. 451 (1992) .......................................................................................................... 16

*Finkelman v. NFL*
   877 F.3d 504 (3d Cir. 2017) ............................................................................................. 19

*FTC v. Ind. Fed'n. of Dentists*
    476 U.S. 447 (1986) ........................................................................... 8, 9

*FTC v. Superior Court Trial Lawyers Ass'n*
    493 U.S. 411 (1990) ..................................................................... 3, 8, 11

*Gainesville Oil & Gas Co. v. Farm Credit Bank of Tex.*
    847 S.W.2d 655 (Tex. App. 1993) .......................................................... 18

*Gelboim v. Bank of Am. Corp.*
    823 F.3d 759 (2d Cir. 2016) ................................................................... 19

*Heerwagen v. Clear Channel Communs.*
    435 F.3d 219 (2d Cir. 2006) ..................................................................... 7

*In re Nexium (Esomeprazole) Antitrust Litig.*
    968 F. Supp. 2d 367 (D. Mass. 2013) ...................................................... 9

*In re Rail Freight Fuel Surcharge Antitrust Litig.*
    258 F.R.D. 167 (D.D.C. 2009) .................................................................. 7

*In re: Aggrenox Antitrust Litig.*
    199 F. Supp. 3d 662 (D. Conn. 2016) ...................................................... 9

*K.M.B. Warehouse Distribs, Inc. v. Walker Mfg. Co.*
    61 F.3d 123 (2d Cir. 1995) ................................................................. 9, 10

*Kodak Co. v. Image Tech. Servs*.
    504 U.S. 451 (1992) ............................................................................... 12

*Kramer v. Pollock-Krasner Found.*
    890 F. Supp. 250 (S.D.N.Y. 1995) ........................................................ 12

*Ohio v. American Express Co.*
    138 S. Ct. 2274 (2018) .............................................................................. 7

*Oliver v. Am. Express Co.*
    2020 U.S. Dist. LEXIS 76688 (E.D.N.Y. Apr. 30, 2020) ...................... 19

*Osborn v. Visa Inc.*
    797 F.3d 1057 (D.C. Cir., 2015) ....................................................... 18, 19

*Planetarium Travel, Inc. v. Altour Int'l Inc.*
    622 F. App'x 40  (2d Cir. 2015) ............................................................... 9

*Reiter v. Sonotone Corp.*
   442 U.S. 330 (1979)................................................................6-7

*Smith v. Ullman*
   58 Md. 183 (1882) ................................................................ 18

*Summit Health v. Pinhas*
   500 U.S. 322 (1991)................................................................ 8

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*
   546 F.3d 196 (2d Cir. 2008)................................................ 8

*Todd v. Exxon Corp.*
   275 F.3d 191 (2d Cir. 2001)................................................ 9, 19

*Tops Mkts., Inc. v. Quality Mkts., Inc.*
   142 F.3d 90 (2d Cir. 1998)................................................ 10

*Toys "R" Us, Inc. v. FTC*
   221 F.3d 928 (7th Cir. 2000) ................................................ 8, 10

*Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.)*
   502 F.3d 47 (2d Cir. 2007)................................................ 20

*United States v. Aiyer*
   33 F.4th 97 (2d Cir. 2022) ................................................ 18

*United States v. Apple Inc.*
   791 F.3d 290 (2d Cir. 2015)................................................ 7

*United States v. Fish*
   Case No. 3:22-cr-24 (E.D. Tenn., Indict. filed Mar. 16, 2022) ................ 17

*United States v. Grinnell Corp.*
   384 U.S. 563 (1966)................................................ 17

*United States v. Sargent Elec. Co.*
   785 F.2d 1123 (3d Cir. 1986)................................................ 8

## **Statutes**

15 U.S.C. § 1 ................................................................*passim*

15 U.S.C. § 2................................................................ 3, 7, 16

## <u>Other Authorities</u>

Dept. of Justice, "Antitrust Case Filings" database, available at
    https://www.justice.gov/atr/antitrust-case-filings-alpha .......................................................... 16

Hovenkamp, *Antitrust and Platform Monopoly*, 130 Yale L. J. 1952 (2021) ....................... 17, 21

## I.    INTRODUCTION

Advertisers' claims concerning the Network Bidding Agreement ("NBA") between Defendants Google and Meta are fundamentally different from those previously asserted by the States and should survive the Defendants' motions to dismiss Counts III and IV of the Consolidated Advertiser Complaint ("CAC") (Doc. 399).[1]

Defendants first attack the States' complaint and then attempt to tie those arguments to an erroneous attack on the Advertisers' NBA Claims.[2]  Defendants assert the Court "already dismissed" "the same allegations related to the 2018 Network Bidding Agreement" (Google Mem. at 16), which Meta contends are "indistinguishable" (Meta Mem. at 1), and both Defendants voice sweeping overinterpretations of this Court's September 13, 2022 Opinion and Order ("Op. & Ord.") in an attempt to insulate the NBA from antitrust scrutiny.  Defendants ignore the fact that, although the Court indicated that its rulings on the States' complaint would be informative and provide guidance, it also clearly recognized that they could not be dispositive.[3]

In its prior ruling, the Court found that the States failed plausibly to allege, *i*) "joint or concerted action between Google and Facebook to restrict Facebook's use of header bidding" (Op. & Ord. at 22), or, *ii*) any "adverse effect on competition as a whole in a relevant market,"

---

[1] *See* Defendants Google LLC and Alphabet Inc.'s Memorandum of Law in Support of Their Motion to Dismiss Advertisers' Consolidated Class Action Complaint ("Google Mem.") at 16-19 (Doc. 447); Meta Platforms, Inc.'s Memorandum of Law in Support of Motion to Dismiss Counts III and IV in Advertisers' Consolidated Amended Complaint ("Meta Mem.") (Doc. 461).

[2] "NBA Claims," as used in this brief, means, at a minimum, all Advertiser Class Plaintiffs' Third and Fourth Causes of Action against Meta; Plaintiff Hanson Law Firm's Third and Fourth Causes of Action against Google; and all other Advertiser Class Plaintiffs' Fourth Cause of Action against Google. Advertisers respond to Google's motion to dismiss based on its arbitration agreement in their opposition to that motion.

[3] *E.g.*, 9/24/21 Hr'g Tr. at 15:24 (observing "[t]here's not a little gap, but there's a big gap," between the States' and the private plaintiffs' allegations).

*i.e.*, in either the in-app mediation tool market or the in-app network market (*id.* at 33-34).  These findings do not apply to the Advertisers' NBA Claims, which allege joint or concerted action that distorts competition in the final clearinghouse auction market for display and in-app impressions created and controlled by Google, in which Google acts both as auctioneer and as agent for the largest block of bidders, while Meta is the second-largest bidder.

By entering into the NBA, Google acquired a material interest in *Meta's* bidding performance.  The central anticompetitive *quid pro quo* of the NBA is Google's effort as Meta's principal competitor in the market to help Meta achieve a certain outcome from its bidding, as measured by performance metrics such as the "win rate" provision, the "match rate" provision, and volume discount targeting.  ¶¶ 287-90.[4]

The CAC thus alleges "[t]he NBA places advertisers who bid . . . , but who do not bid through Meta's MAN intermediary, at a competitive disadvantage and renders them worse off than they would be in the absence of the NBA."  ¶ 369.  As a result of the agreement with Meta, Google advertisers were forced "to place supra-competitive bids to win auctions against Meta's advertising customers for open display web and in-app inventory."  ¶ 370.  In sum, the NBA created a *de facto* combination of the two largest horizontal competitors in Google's final clearinghouse auctions, depriving that marketplace of the "'independent centers of decisionmaking that competition assumes and demands.'"  *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010) (quoting *Copperweld Corp. v. Indep. Tube Corp*., 467 U.S. 752, 768-769 (1984)).

Defendants' second line of argument acknowledges that Advertisers allege anticompetitive harm in Google's final clearinghouse auction market (as opposed to the in-app

---

[4] "¶" citations in this brief refer to paragraphs in the CAC.

network market alleged in the States' TAC), but depends on flawed legal arguments as to why this market definition "fails." These arguments are baseless, for the NBA presents a situation where "the fact of agreement defines the market." *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 435 n.18 (1990) (citation omitted). No further factual allegations concerning the relevant market are necessary to support Advertisers' NBA Claims, which arise under Section 1 of the Sherman Act and California antitrust law, as opposed to Section 2, with respect to which market definition presents a far more central issue.

Moreover, the relevant market is a question of fact not properly adjudicated on a motion to dismiss. Advertisers need not plead details such as what they would have paid to place their ads in a but-for world without the NBA. Allegations of competitive harm based on sound economic theory that can be verified after discovery and the analysis of yet-to-be-produced transaction data are sufficient. The factual issues raised by the CAC's allegations of horizontal anticompetitive effects arising from the NBA cannot be resolved on a motion to dismiss.

For these reasons, as elaborated further below, the Court should deny Defendants' motions to dismiss Counts III and IV of the CAC and permit the Advertisers' NBA Claims to proceed.

## II.    ARGUMENT

### A.    The Court's Prior Order Does Not Require Dismissal of the Advertiser Class Plaintiffs' NBA Claims.

Dismissal of the Advertisers' NBA claims by operation of the Court's previous opinion, as urged by Defendants, would be improper on substantive grounds, because the Court has not previously considered the substantive basis for liability set forth here. And procedurally, a dismissal of the Advertisers' NBA Claims without consideration separate from the States' claim

would undermine longstanding antitrust policy that relies on private litigation to promote the goals of the law.

1.    **The Court's Prior Order Did Not Consider the Advertisers' NBA Claims.**

The second portion of the Court's analysis of the States' NBA claim was narrowly tailored to the specific facts alleged in the States' TAC.  The Court concluded that the States had failed plausibly to allege that the Defendants' "challenged behavior had an adverse effect on competition as a whole" in either the in-app network market or the in-app mediation tools market.  Op. & Ord. at 33-34.  The Court made no inquiry and rendered no findings as to whether the States plausibly alleged market-wide harm in the final clearinghouse auctions to which the NBA applies.

On the basis of the States' allegations, the Court read the NBA as "principally a vertical agreement" akin to a contract between a supplier (Google) and a large customer (Meta), which the Court found promoted competition "[r]ather than insulat[ing] Google's in-app network from competition."  *Id.* at 32.  In stark contrast, the CAC alleges harm to the auction market itself— where Google and Meta submit competing bids for ad impressions on behalf of advertisers. Far from being "implausible and unsupported by the allegations" as Meta contends (Meta Mem. at 2), "the premise that Google harmed its own customers in order to benefit Meta" is not only plausible but inevitable.  Google placed itself in the conflicted position of serving simultaneously as bidder in its own auctions and as party to a contract with Meta, the performance of which depends on Meta's success in those same auctions.  Unquestionably, the NBA endowed Google with the incentive and the ability to distort competition in its own auctions.  And because bidding is a collective exercise, it is *im*plausible that Google, bound by the NBA, did not pursue a strategy that was impermissibly influenced by the agreement.  The CAC alleges that Google, in

4

doing so, caused significant, market-wide competitive harm and injury to Advertisers that the States did not allege.

The Advertisers' NBA Claims, therefore, cannot possibly be described as "substantively identical" to the States' NBA claim.  Meta Mem. at 9.  The TAC did not allege that the NBA "forc[ed] [Advertisers] to place supra-competitive bids to win auctions against Meta's advertising customers."  ¶¶ 370, 376.  Nor were the anticompetitive effects of the NBA alleged to arise in the market in which Google and Meta are *competitors* (for ad impressions in the final auctions), as opposed to supplier-and-customer.[5]  The CAC alleges harm derived from the horizontal "consequences" of what the Court characterized as "principally a vertical agreement, with potential horizontal consequences."  Op. & Ord. at 28.

These fundamental differences undermine Defendants' attempt to insulate the NBA from antitrust scrutiny by cherry-picking legal conclusions from the Court's prior ruling.  For example, Google asserts (with no supporting citation) that the prior order disposes of the Advertiser Plaintiffs' claims "on the grounds that differential treatment is not anticompetitive, a ruling grounded in bedrock antitrust principles that apply in any market."  Google Mem. at 18. Meta characterizes the Court's opinion as having categorically determined that "the terms of the NBA reflect reasonable business decisions that were 'consistent with competition,'" and that "the effect of the NBA was procompetitive."  Meta Mem. at 12 (citing Op. & Ord. at 25-26, 32). The Court only ever referred to the NBA as "procompetitive," however, in the context of the States' allegations that the NBA was an agreement to "kill header bidding."  Op. & Ord. at 21-

---

[5] ¶ 367 ("The relevant market for the purposes of this cause of action is the market for web and in-app display space sold at auction in Final Clearinghouse Auctions run by Google.").

22.  Defendants' over-interpretations of the Court's ruling on the States' TAC are no guide to the sufficiency of the allegations in the CAC.[6]

According to Defendants, then, the Court should make its decision on the Advertisers' NBA Claims not by analyzing the actual allegations of the complaint but instead by repeating its ruling on a different complaint by different parties with different interests in the litigation, alleging a different market and different anticompetitive conduct and effects.  Certainly, the Court did not and could not make any findings of fact binding upon the Advertisers on a motion to dismiss to which they were not a party.  That error would undermine the concept of separate consideration and moot the Court's order allowing the filing of the CAC in the first place.

### 2. Dismissal on the Basis of the Court's Prior Ruling Would Undermine Underlying Antitrust Policy.

The Court should decline to dismiss the Advertisers' NBA Claims on the basis of its prior ruling on Count IV of the States' TAC for the additional reason that Advertisers' claims promote the public policy underlying Section 4 of the Clayton Act.  The States sought only injunctive relief for the claimed Sherman Act violations and sued as *parens patriae* on behalf of their citizens.  TAC at ¶ 31.  However, the policy and incentives embodied in Section 4 are different. "Deterrence is one of the congressional aims of Section 4 of the Clayton Act . . . by providing treble damages as an incentive to potential plaintiffs and a disincentive to would-be violators." *De Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510, 518 (S.D.N.Y. 1985) (citation omitted). Thus "[a] significant public interest exists in the vigorous enforcement of national anti-trust laws

---

[6] The Court also should disregard Defendants' references (in footnote 4 of each respective brief) to the European Commission's closure of an investigation into the NBA. Obviously, this Court is not bound by decisions of the European Commission, and the cited decision, quoted here in full, has no substantive content in any event: "On 19/12/2022, the Commission decided to close antitrust proceedings in case AT.40774 – Google-Meta (Open Bidding) agreement, initiated by the decision of 11/03/2022." Available at: https://ec.europa.eu/competition/elojade/isef/case_details.cfm?proc_code=1_AT_40774.

through the expeditious resolution of private antitrust litigation. . . . This public interest is even greater in class actions." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 258 F.R.D. 167, 174 (D.D.C. 2009) (internal citations and modifications omitted); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979) ("Congress created the treble-damages remedy of § 4 precisely for the purpose of encouraging *private* challenges to antitrust violations.") (emphasis in original).

In short, the Court's September 13 ruling dismissing Count IV of the States' TAC does not require dismissal of the Advertiser Class Plaintiffs' NBA Claims, which merit the Court's separate, *de novo* adjudication.

> **B.      Defendants Offer No Valid Reason Why Google's Final Clearinghouse Auction Is Not a Plausible Relevant Market.**

Defendants pursue several lines of argument as to why Google's final clearinghouse auction ("FCA") cannot comprise a relevant market.  None of them are valid.  In this case, the NBA *itself* specifies the FCA market where its terms control (¶ 367), rendering Defendants' "flawed" market definition argument utterly baseless.

> **1.      The Pleading and Proof of a Relevant Market Depend on the Requirements of the Claim.**

"Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962); *see also Ohio v. American Express Co.*, 138 S. Ct. 2274, 2285 (2018) (reiterating that "[t]he definition of the relevant market must correspond to the commercial realities of the industry," citing *Brown Shoe*) (internal quotation marks omitted).  Ultimately, market definition is a jury issue. *United States v. Apple Inc.*, 791 F.3d 290 (2d Cir. 2015).  Accordingly, courts have adopted a range of requirements for pleading and proof of the relevant market depending on the demands of the particular case.

For example, market definition usually plays a central role in the analysis of monopolization offenses under Section 2.  *See*, *e.g.*, *Heerwagen v. Clear Channel Communs.*, 435 F.3d 219, 229 (2d Cir. 2006) ("[A] plaintiff claiming monopolization is obligated to establish the relevant market because the power to control prices or exclude competition only makes sense with reference to a particular market."), *overruled on other grounds*, *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 201 (2d Cir. 2008).  At the opposite end of the spectrum, a detailed market definition may not be required in Section 1 cases analyzed under the *per se* standard.  *See*, *e.g.*, *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 435 n.18 (1990) (observing that "the fact of agreement defines the market" restrained by a price fixing conspiracy) (quoting R. Bork, The Antitrust Paradox 269 (1978)); *Summit Health v. Pinhas*, 500 U.S. 322, 339-40 (1991) (Scalia, J. dissenting) ("Pursuant to standard antitrust analysis, the agreement itself would define the extent of the market" affected by a price fixing conspiracy); *United States v. Sargent Elec. Co*., 785 F.2d 1123, 1127 (3d Cir. 1986) ("[A] horizontal agreement tends to define the relevant market").

Courts also have addressed the market definition requirement for claims that lie somewhere between monopolization, which inherently depends on the definition of the relevant market, and a "naked conspiracy to restrain trade," in which the agreement itself defines the extent of the market.  For example, in *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986), the Supreme Court affirmed the Commission's judgment condemning the restrictive policy of a trade association of dentists to withhold desired services despite the absence of specific findings by the Commission concerning the definition of the market in which trade allegedly was restrained.  Even though the restraint at issue was neither a naked restraint nor any other species of *per se* Section 1 violation, the Court concluded that the lack of a "detailed

market analysis is not fatal to its finding of a violation of the Rule of Reason." *Id*. at 460; *see also Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 930 (7th Cir. 2000) (condemning a market defined by "a series of vertical agreements that flunked scrutiny under antitrust's rule of reason").

Such "sliding scale" pleading and proof requirements for market definition exist because "[t]he relevant market serves merely as a proxy for market power when direct evidence of market power is unavailable." *In re Nexium (Esomeprazole) Antitrust Litig*., 968 F. Supp. 2d 367, 388 n.19 (D. Mass. 2013). "Where direct evidence of market power is available, however, a plaintiff need not attempt to define the relevant market." *Id.* The factual material required about the relevant market, therefore, depends on the extent to which a plaintiff needs to prove market power. *In re Aggrenox Antitrust Litig*., 199 F. Supp. 3d 662, 668 (D. Conn. 2016) ("It must be remembered that articulating a relevant market definition is not an end in itself, but is in the service of answering the question of market power, which in turn 'is but a surrogate for detrimental effects'") (quoting *Indiana Federation of Dentists*, 476 U.S at 460-61). Although the restraint in *Aggrenox* was evaluated under the rule of reason, the court nevertheless found "as a practical matter, the only 'relevant' market in this case, and in similar cases . . . will be the market in which the challenged settlement agreement allegedly acted as an anticompetitive restraint: that is, in this case, it will be implicitly defined by the scope of the disputed patent." *Id.* at 665-66.

The Second Circuit thus "has not made a showing of market power a prerequisite for recovery in all § 1 cases." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co*., 61 F.3d 123, 129 (2d Cir. 1995); *accord Todd v. Exxon Corp*., 275 F.3d 191, 206-07 (2d Cir. 2001) ("In this Circuit, a threshold showing of market share is not a prerequisite for bringing a § 1 claim."); *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs*., 996 F.2d 537, 546 (2d Cir. 1993)

("Nor have we embraced the view that market power is the *sine qua non* of antitrust liability."); *Planetarium Travel, Inc. v. Altour Int'l Inc.*, 622 F. App'x 40, 41 (2d Cir. 2015) ("[Plaintiff's] initial burden . . . can be discharged in two different ways: alleging an 'actual adverse effect on competition, such as reduced output,' or 'indirectly by establishing that [the competitor] had sufficient market power to cause an adverse effect on competition.'") (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc*., 142 F.3d 90, 96 (2d Cir. 1998)) (second alteration in original).

Since the burden of pleading and proving a relevant market depends on the extent to which market power substitutes for proof of actual anticompetitive effects, it follows that an elaborate definition of the relevant market is not required in a Section 1 case if proof of the restraint's actual anticompetitive effects is available. *K.M.B.*, 61 F.3d at 129 ("If a plaintiff can show an actual adverse effect on competition, such as reduced output . . . we do not require a further showing of market power.") (citation omitted); *see also 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 117 (2d Cir. 2021) ("Direct evidence of anticompetitive effects establishes a prima facie case of a Sherman Act Section 1 violation and obviates the need for a detailed market analysis or showing of market power.") (citation omitted); *Toys "R" Us*, 221 F.3d at 937 (concluding upon "sufficient proof of actual anticompetitive effects that no more elaborate market analysis was necessary"). Moreover, where, as here, a vertical agreement has horizontal consequences, it is error to focus solely on the vertical relationship between the parties. *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 539 (2d Cir. 1993) ("certain 'horizontal' aspects of the defendants' practices improperly were not considered"); *see also Toys "R" Us*, 221 F.3d at 936 ("the essence of the [vertical] agreement network TRU supervised was horizontal").

**2.      The NBA Claims in the CAC Require No Further Factual Allegations Regarding the Relevant Market.**

The foregoing legal principles rebut the Defendants' motions to dismiss the Advertisers' NBA Claims on the grounds that the alleged relevant market is "legally insufficient."  Meta Mem. at 17.  The NBA Claims arise out of the horizontal effects of the NBA in Google's FCA market, the extent of which is defined by the agreement itself.  Defendants are direct horizontal competitors in this market as the largest and second-largest bidders (Op. & Ord. at 33), and the Advertisers allege market-wide anticompetitive harm in the market subject to the agreement. ¶ 370 ("Defendants' conduct restrained trade in the market in which Plaintiffs and class members made their purchases.  In paying anticompetitive overcharges as a result of Defendants' conduct, Plaintiffs and class members suffered an injury of a type which the antitrust laws were designed to redress.").  Google is incorrect that the FCA market definition "fails" because "no facts regarding reasonable interchangeability, substitutability, or cross-elasticity of demand" were alleged "to support [the] Google FCA market definition."  Google Mem. at 18.  Given the circumstances of the agreement, the competing positions of Defendants in the market, the "commercial realities of the industry" and the present lack of discovery, no more elaborate market definition is necessary than what Advertisers allege.

Even though the NBA *itself* specifies its provisions operate in the FCA market, Meta nonetheless argues for dismissal based on the absence of allegations explaining why auctions of open display and in-app ad impressions should be in the same relevant market, or why the relevant product market should not also include non-Google final clearinghouse auctions, or the geographic scope of Google's FCA market.  Meta Mem. at 18.  Meta's argument incorrectly presumes that Rule 8 requires a detailed economic analysis of the substitutability of open display and in-app ad impressions and of Google-run auctions and auctions run by others, ignoring how

11

the NBA presents the situation where "the fact of agreement defines the market."  *Superior Court Trial Lawyers Ass'n.*, 493 U.S. at 435 n.18 (citation omitted).

### 3.  Defendants Address the Wrong Market.

More fundamentally, Defendants willfully ignore the relevant market actually alleged. For example, like Meta, Google contends that the CAC fails to explain why advertisers cannot turn to non-Google platforms "and that failure dooms their proposed market definition."  Google Mem. at 19.  But these criticisms focus on the wrong market.  Non-Google platforms compete against Google in a market for mediation (auction) services, not in the massive market for *impressions* traded in Google's final clearinghouse auctions.  The Google FCA market focuses on competition (or the lack thereof) *within* the auctions sponsored by Google, not *between* auctions sponsored by Google and auctions sponsored by others.

So Defendants misapprehend the alleged relevant market by focusing on the broader market for auction services rather than on the auction market actually alleged.  For instance, Meta cites *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250 (S.D.N.Y. 1995) for the broad proposition that "courts have made clear in auction cases that the standard market definition rules still apply."  Meta Mem. at 20.  But the plaintiff in *Kramer* alleged a relevant market ("Jackson Pollock paintings sold at auction") in which only Sotheby's and Christie's competed.  The market definition failed because it excluded dealers, galleries, and private sales through which the same paintings could be sold.  As Judge Baer put it, the plaintiff "has alleged no support for his contention, and I would find it most interesting to know, that owners of Pollocks can only sell them at auction, much less only through Sotheby's or Christie's."  890 F. Supp. at 256.

By contrast, sellers (publishers) and purchasers (advertisers) of ad impressions traded on Google's FCAs cannot purchase or sell that inventory anywhere else.  Once a publisher or advertiser commits to trading through Google's ad auctions, the existence of *other* markets they

12

might have chosen, but did not choose, is irrelevant.  In this sense, participation in an auction

market shares the same "lock-in" quality as the single-brand market approved in *Eastman Kodak*

*Co. v. Image Tech. Servs*., 504 U.S. 451 (1992).  The Court in *Kodak* sustained a relevant market

consisting of parts and services for Kodak-brand copiers because, once a Kodak copier is

purchased, no other brand is substitutable; so the availability of parts and services for other

brands of copiers has no competitive effect.  *Id.* at 481-82 ("The relevant market for antitrust

purposes is determined by the choices available to Kodak equipment owners.").

### 4.     Defendants Ignore the Harm to Competition in the FCA Market Caused by the Horizontal Effects of Their Agreement.

Defendants also ignore the horizontal effects of the concerted action that results from the

NBA's commitments between the two largest competitors in Google's FCA market and how that

concerted action harms competition.  Google attempts to distinguish *Bale v. Glasgow Tobacco*

*Bd. of Trade, Inc*., 339 F.2d 281 (6th Cir. 1964), and the other cases analyzing competition

within auction markets cited by the Advertiser Class Plaintiffs in their Motion for Leave to

Amend (Doc. 317), by insisting that "Advertisers are challenging what this Court has already

held is a predominantly vertical agreement between an auctioneer and bidder . . . ."  Google

Mem. at 17 n.5.  Meta insists that the allegations in the CAC only "confirm[] the vertical

relationship between Google and Meta, without transforming the NBA into a horizontal

agreement between competitors."  Meta Mem. at 16.

Counterfactually, had Google served solely as the auctioneer under the NBA, the

horizontal effects of the arrangement may have been *de minimis*.  But the commercial reality is

that Google is both the auctioneer *and also the largest bidder* in this market.  By entering into

the NBA with Meta, the second-largest bidder, Google acquired a substantial interest in *Meta's*

performance as a bidder in those same auctions.  Indeed, the central *quid pro quo* of the NBA is

a guaranteed outcome from Meta's bidding as measured by performance metrics such as the "win rate" provision, the "match rate" provision, and volume discount targeting.  ¶¶ 286-90.

In an auction setting, the outcome of the bidding by one bidder depends entirely on the behavior of other bidders.  It is, therefore, implausible for Defendants to assert that Google's bidding behavior in the FCA market was not affected by the commitments it made to Meta in the NBA to the achievement of a certain level of performance in the FCA market.  Put another way, it is implausible that Google's pursuit of profit-maximizing behavior as an auction bidder on behalf of advertisers disregarded the inevitable impact of that behavior on the objectives and commitments of the NBA or, *vice versa*, that Meta's bidding performance under the NBA, to which Google and Meta were jointly committed, was entirely disregarded by Google when it bid on behalf of class members.  Given the nature of an auction marketplace, Google's decisionmaking in the FCA market necessarily ceased to be independent after entering into the venture with Meta.  This contamination of Defendants' independent decisionmaking as bidders in the same FCA market is precisely the type of competitive harm addressed by Section 1, because "it 'deprives the marketplace of independent centers of decision making that competition assumes and demands.'"  *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010) *quoting Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-769 (1984).  Advertisers were entitled to expect that bids submitted in the FCA market on their behalf were not calculated by Google with one eye on Meta's performance in the same auctions.  And other bidders were entitled to expect that they were bidding against independent bidders, not a joint enterprise of Google and Meta.

Further, the supplier-dealer scenario emphasized by Meta is more misdirection. Paragraph 291 of the CAC differentiates the economics of the NBA from a conventional vertical

14

"volume discount" contract.  The cost of a legitimate discount offered by a seller is borne by that seller, with the effect of reducing per unit margins that the seller hopes to make up in higher volume.  But as the auctioneer, Google was able to bestow additional contractual benefits on Meta (beyond the volume discount), the costs of which Google extracts from a competitive surplus that rightly belongs to non-Meta bidders, including Google's own customers (the class members).  As the CAC alleges: "Google does not itself pay for these benefits, but instead extracts them from Meta's competing bidders by impairing their position relative to Meta." ¶ 291.

Moreover, even though the NBA may not explicitly prevent Google from offering the same terms to other bidders, as Meta argues (Meta Mem. at 24-25), there is no indication that Google actually did so, and it stands to reason that if Google were to offer the same or similar advantages to other bidders, the value of the NBA to Meta would decrease as each additional bidder similarly was advantaged.  A legitimate discount does not hinge on the supplier withholding the same discount from the recipient's competitors.

Google and Meta did not devote several paragraphs of the NBA to the joint defense of any "antitrust action" (*e.g.*, NBA, ¶ 7.1, Doc. 180-1) because the NBA is a conventional vertical agreement.  The antitrust problem arises because the NBA is a structurally anticompetitive arrangement that besets Google with conflicted competitive interests that unavoidably restrain the bidding competition between Google and Meta.  These provisions contradict the *post hoc* effort made by Defendants in their motions to train attention on the "vertical" nature of the NBA while ignoring its intentional horizontal effects.  Conventional vertical contracts have no need to provide for contingencies in the event of governmental antitrust probes.

**5.      Defendants Fail to Explain Why Google's FCA Market Should Not Be Subject to Antitrust Scrutiny.**

There is no confusion over the allegations in the CAC regarding the description of Google's FCA market, contrary to Meta's argument.  Meta Mem. at 19.  Nothing in paragraph 294 of the CAC suggests that "each individual Google Final Clearinghouse Auction is its own relevant product market."  *Id.*  Paragraph 294 states:

> As the agreement itself indicates, the market in which the NBA unreasonably restrains trade is the market for open display and in-app ad inventory traded in Google's Final Clearinghouse Auctions, in which Meta competes with other demand-side  intermediaries for publishers' and developers' inventory.

Unambiguously, this market definition encompasses *all* inventory sold through Google's FCAs after the NBA took effect—inventory that cannot not be purchased elsewhere in any other market.  The NBA *systematically* renders price formation in that market less competitive than it would have been without the agreement.  ¶ 369.  There is a long history, dating back at least to *(Chicago) Board of Trade v. United States*, 246 U.S. 231 (1917), of private auction markets serving as the market in which competitive harm has been found from a Section 1 violation.  *See* Advertiser Class Plaintiffs' Mem. of Law in Support of Motion to Amend, at 5 *et seq.* (Doc. 317).

To the extent Defendants contend that a "walled" auction operated by a private party cannot constitute a relevant market for Section 1 purposes, they are wrong—the most obvious proof of which is the prevalence of Section 1 cases based on collusion between competing bidders, *i.e.*, "bid rigging."  Of the 1,131 criminal cases filed by the Antitrust Division from 1992 to 2022, 567 charged defendants with bid rigging in an auction market.  *See* Dept. of Justice, "Antitrust Case Filings" database, available at https://www.justice.gov/atr/antitrust-case-filings-

alpha; *see also Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451 (1992) (sustaining single-brand product market definition).

Nor can Defendants maintain that a firm's digital "platform" cannot itself constitute a valid Section 1 market on the grounds that other digital platforms offer alternative markets for the same category of products.  In *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019), plaintiffs, developers of mobile applications for the iPhone, successfully alleged under Section 2 (in which the requirement to plead and prove the relevant market is far more rigorous) a claim for overcharges in a market defined as the "retail market for the sale of apps" *in Apple's App Store*. *Id.* at 1520.  Apple allegedly maintains a monopoly in that market by prohibiting the sale of iPhone apps through alternative retail outlets.  Neither the definition of that market as a "single-brand" market, nor the availability of alternative smartphone operating systems with their own retail outlets for a different set of mobile applications, precluded pleading the monopolization claim.

Similarly, in *United States v. Fish*, Case No. 3:22-cr-24 (E.D. Tenn., Indict. filed Mar. 16, 2022), defendants pleaded guilty to a scheme to "suppress and eliminate competition for the sale of DVDs and Blu-Ray Discs sold in the Amazon Marketplace . . . , an e-commerce platform owned and operated by Amazon.com, Inc."  *Id.*  Clearly, e-commerce platforms such as Apple's App Store or the Amazon Marketplace are subject to the same antitrust scrutiny as any other line of commerce (or relevant market[7]).[8]  So too for Google's FCA market.

---

[7] Reference to restraints in "trade or commerce" in the text of Section 1 signify the same notion as the "relevant market." *See, e.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 298 (1962) (referring to the "relevant line of commerce"); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 573 (1966) ("We see no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act.").

[8] *See generally*, Hovenkamp, *Antitrust and Platform Monopoly*, 130 Yale L. J. 1952, 2002 (2021) ("Within the antitrust framework, there is no reason to think that digital platforms are unicorns whose

C.  **Advertisers' Allegations of Market-Wide Competitive Harm and Antitrust Injury Adequately Plead Section 1 and Cartwright Act Violations and Support Article III Standing.**

The CAC contains plausible allegations of market-wide competitive harm that adequately state a Section 1 cause of action and a particularized, redressable injury caused by Defendants that establishes Article III standing.  Contrary to Defendants' contentions (*e.g.*, Meta Mem. at 26), the CAC plausibly alleges the NBA inflicts market-wide competitive harm in Google's FCA market that injured Advertisers because it "restrained trade in the market in which Plaintiffs and class members made their purchases," and "force[d] them to place supra-competitive bids to win auctions against Meta's advertising customers for open display web and in-app inventory." ¶ 370.

"Concerted activity inherently is fraught with anticompetitive risk," *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984), and "an auctioneer must conduct a sale openly and fairly, so as to provide 'full and free competition among all prospective bidders.'"  *Bowling Transp., Inc. v. Gregg*, 103 Ohio App. 3d 539, 544 (1995) (citation omitted).  Naked "bid rigging—which is simply another form of horizontal price fixing—is a *per se* violation of the Sherman Act."  *United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022) (internal quotation omitted).  Defendants' arguments and conduct contravene the long-recognized principle forbidding "any corrupt bargain or combination between the parties for the purpose of preventing a fair competition among bidders."  *Smith v. Ullman*, 58 Md. 183, 189 (1882); *accord Gainesville Oil & Gas Co. v. Farm Credit Bank of Tex.*, 847 S.W.2d 655, 659-60 (Tex. App. 1993).  This case involves "a novel marketplace with rapidly changing technology that can alter

---

rules as a class differ from those governing other firms. Every market has its distinct features, but the ordinary rules of antitrust analysis are adequate to consider them.").

the nature of relationships between market participants[.]"  Op. & Ord. at 29.  Under these circumstances the Court should be reluctant to adjudge, without a developed factual record, the lawfulness of concerted action by two powerful firms that agreed to engage in concerted market conduct by agents competing to bid in auctions on behalf of advertisers.

Allegations that a restraint caused supra-competitive market pricing based on economic theory are common in antitrust litigation.  For example, in *Osborn v. Visa Inc*., 797 F.3d 1057 (D.C. Cir., 2015), allegations that a "non-discrimination" policy adopted by bankcard networks insulated the defendant networks from competition and thereby enabled them to charge supra-competitive fees were sufficient to state a plausible claim under Section 1 and demonstrate Article III standing.  The court noted that "[e]conomic harm, such as that alleged here, is a classic form of injury-in-fact."  *Id.* at 1064 (internal quotation omitted); *see also Oliver v. Am. Express Co.*, No. 19-CV-566 (NGG) (SMG), 2020 U.S. Dist. LEXIS 76688 (E.D.N.Y. Apr. 30, 2020) ("Plaintiffs adequately allege an injury-in-fact: that they 'pa[y] more for goods and/or services purchased from merchants . . . than they otherwise would and will pay in the absence of Amex's restraints'") (quoting the complaint); *Gelboim v. Bank of Am. Corp*., 823 F.3d 759, 772 (2d Cir. 2016) ("Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'") (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Allegations grounded in economic theory are plausible because they are verifiable.  Here, as in *Osborn*, "Plaintiffs' theories . . . *are* susceptible to proof at trial."  797 F.3d at 1065 (emphasis in original).  Empirical data are readily available to test the Advertisers' allegations of the effects of the NBA on bidding patterns and clearing prices in Google's FCA market;

however, the relevant transactional data reflecting the anticompetitive effects of the NBA has not yet been produced.  Advertisers are not obligated at this stage to specify in their pleading "what rivals would have had to pay" in a but-for world without the NBA.  Meta Mem. at 14.  As the *Osborn* court recognized, "[a] Rule 12(b)(1) motion . . . is not the occasion for evaluating the empirical accuracy of an economic theory."  *Id.* at 1065-66; *see also Finkelman v. NFL*, 877 F.3d 504, 513 (3d Cir. 2017) (plaintiff "not required to prove his economic theory in his complaint," citing *Osborn*); *Exxon*, 275 F.3d at 214 (allegations that salary levels across the oil industry were artificially depressed due to information exchange and reduced competitive incentives "is a question of fact that cannot be resolved on this Rule 12(b)(6) motion").

As there is no obligation at this stage of the litigation to offer empirical evidence supporting the economics of how the NBA distorts the auction dynamics in Google's FCA market, the Court should reject Defendants' argument for dismissal of the NBA Claims on standing grounds.  "[T]he economic effects of the [challenged] arrangement . . . is an appropriate matter for discovery."  *Id.*

### D.     The Costs of a False Positive if Advertisers Do Not Prove their NBA Claims Are Low in Light of the Accompanying Claims.

In what has become known as a concern over "false positives," the Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007), admonished courts when adjudicating motions to dismiss not to "forget that proceeding to antitrust discovery can be expensive."  *See also Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.)*, 502 F.3d 47, 50 n. 4 (2d Cir. 2007) (stating that, "while judges should 'be cautious before dismissing an antitrust complaint in advance of discovery,' they must also keep in mind that 'proceeding to antitrust discovery can be expensive'") (quoting *Twombly*).

Such concerns are greatly attenuated if not totally absent here.  Dismissing the Advertisers' NBA Claims at this stage would do nothing to mitigate or avoid the substantial burdens of discovery that the parties will bear in the course of litigating Advertisers' other claims and the claims of the other party plaintiffs, now including the federal government.  Moreover, the Court did not deem the NBA totally irrelevant to this litigation; on the contrary, separate from the States' Section 1 claim, the NBA is one of the anticompetitive acts supporting the States' monopolization and attempted monopolization claims.  TAC at ¶¶ 529(e), 534(e).

Accordingly, the costs of a false positive in the event the Advertiser Class Plaintiffs are unsuccessful in proving their NBA Claims are far less than would be the case if no other antitrust claims were pending.  Allowing these NBA Claims to proceed may actually simplify or streamline the litigation.[9]

## III.    CONCLUSION

For the foregoing reasons, the Advertiser Class Plaintiffs respectfully submit that the Court should preserve their NBA Claims and deny Defendants' Motion to Dismiss Counts III and IV of the CAC.  If the Court finds these claims deficient in any respect, Advertisers respectfully request leave to amend under Rule 15.


Dated: March 3, 2023                         Respectfully submitted,


                                             /s/ *Dena C. Sharp*
                                             Dena C. Sharp (*pro hac vice*)
                                             Jordan Elias (*pro hac vice*)
                                             Scott M. Grzenczyk (*pro hac vice*)
                                             **GIRARD SHARP LLP**
                                             601 California Street, Suite 1400

---

[9] *See* Hovenkamp, *supra*, n. 8, at 2007 (estimating that "at least three-quarters of the conduct described in" antitrust enforcers' recent complaints against Google and Meta "involves some kind of agreement. Normally it would be much easier to establish a violation of section 1 than of section 2").

San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
scottg@girardsharp.com

Tina Wolfson (TW-1016)
Theodore W. Maya (*pro hac vice*)
Bradley K. King (BK-1971)
**AHDOOT & WOLFSON, PC**
2600 West Olive Ave., Suite 500
Burbank, California 91505
Tel.: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
bking@ahdootwolfson.com

*Interim Co-Lead Counsel for Advertiser
 Plaintiffs and the Proposed Advertiser Class*

Jonathan Rubin (*pro hac vice*)
**MOGINRUBIN LLP**
2101 L Street, NW, Ste. 300
Washington, D.C. 20037
(202) 630-0616
jrubin@moginrubin.com

Daniel J. Mogin (*pro hac vice*)
Timothy Z. LaComb (*pro hac vice*)
**MOGINRUBIN LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
(619) 687-6611
dmogin@moginrubin.com
joliver@moginrubin.com
tlacomb@moginrubin.com

*Counsel for Plaintiffs Cliffy Care, Kinin,
 Rodrock, and Raintree*

Archana Tamoshunas (AT-3935)
**TAUS, CEBULASH & LANDAU, LLP**
123 William Street, Suite 1900A
New York, NY 10038
Tel.: (212) 931-0704

22

Fax: (212) 931-0703
atamoshunas@tcllaw.com

April D. Lambert (*pro hac vice*)
John D. Radice (JR 9033)
**RADICE LAW FIRM, PC**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
alambert@radicelawfirm.com
jradice@radicelawfirm.com

*Counsel for Plaintiff Hanson Law Office, as
 successor in-interest to Hanson Law Firm, PC*

Richard F. Lombardo (*pro hac vice*)
Peter F. Rottgers (*pro hac vice*)
**SHAFFER LOMBARDO SHURIN**
2001 Wyandotte Street
Kansas City, MO 64108
(816) 931-0500
rlombardo@sls-law.com
prottgers@sls-law.com

*Counsel for Plaintiffs Cliffy Care, Rodrock,
 and Raintree*

Jason S. Hartley (*pro hac vice* forthcoming)
Jason M. Lindner (*pro hac vice* forthcoming)
**HARTLEY LLP**
101 W. Broadway, Ste 820
San Diego, CA 92101
(619) 400-5822
hartley@hartleyllp.com
lindner@hartleyllp.com

*Counsel for Plaintiff Kinin*