UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>*AIM Media Ind. Operating, LLC v. Google, LLC*, No. 1:21-cv-06912-PKC (S.D.N.Y.)<br><br>*AIM Media Midwest Operating, LLC v. Google, LLC*, No. 1:21-cv-06884-PKC (S.D.N.Y.)<br><br>*AIM Media Tex. Operating, LLC v. Google, LLC*, No. 1:21-cv-06888-PKC (S.D.N.Y.)<br><br>*Appen Media Group, Inc. v. Google, LLC, et al.*, Case No. 1:22-cv-9810-PKC (S.D.N.Y.)<br><br>*Brown Cnty. Publ'g Co., Inc. v. Google, LLC*, No. 1:21-cv-06915-PKC (S.D.N.Y.)<br><br>*Capital Region Indep. Media LLC v. Google LLC*, No. 1:22-cv-06997-PKC (S.D.N.Y.)<br><br>*Clarksburg Publ'g Co., d/b/a WV News v. Google, LLC*, No. 1:21-cv-06840-PKC (S.D.N.Y.)<br><br>*Coastal Point LLC v. Google, LLC*, No. 1:21- cv-06824-PKC (S.D.N.Y.)<br><br>*Eagle Printing Co. v. Google, LLC*, No. 1:21- cv-06881-PKC (S.D.N.Y.)<br><br>*ECENT Corp. v. Google, LLC*, No. 1:21-cv- 06817-PKC (S.D.N.Y.)<br><br>*Emmerich Newspapers, Inc. v. Google, LLC*, No. 1:21-cv-06794-PKC (S.D.N.Y.)<br><br>*Flag Publ'ns, Inc. v. Google, LLC*, No. 1:21-cv-06871-PKC (S.D.N.Y.)<br><br>*Gale Force Media, LLC v. Google, LLC*, No. 1:21-cv-06909-PKC (S.D.N.Y.)<br><br>*Gould Enters., Inc. v. Google, LLC*, No. 1:22-cv-01705-PKC (S.D.N.Y.)<br><br>*HD Media Co., LLC v. Google, LLC*, No. 1:21-cv-06796-PKC (S.D.N.Y.) | Case No. 1:21-md-03010 (PKC)<br><br>**META'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF META'S MOTION TO DISMISS COUNT II OF NEWSPAPERS' CONSOLIDATED AMENDED COMPLAINT** |

*Journal Inc. v. Google, LLC*, No. 1:21-cv-06828-PKC (S.D.N.Y.)

*Neighborhood Newspapers, Inc. v. Google LLC*, No. 1:21-cv-10188-PKC (S.D.N.Y.)

*Robinson Commc'ns, Inc. v. Google, LLC*, No. 1:21-cv-08032-PKC (S.D.N.Y.)

*Rome News Media, LLC v. Google LLC*, No. 1:21-cv-10186-PKC (S.D.N.Y.)

*Savannah Publ'g Co. v. Google, LLC*, No. 1:22-cv-01693-PKC (S.D.N.Y.)

*Something Extra Publ'g, Inc. v. Google, LLC*, No. 1:21-cv-09523-PKC (S.D.N.Y.)

*Southern Cmty. Newspapers, Inc. v. Google, LLC*, No. 1:22-cv-01971-PKC (S.D.N.Y.)

*Times Journal, Inc. v. Google LLC*, No. 1:21-cv-10187-PKC (S.D.N.Y.)

*Union City Daily Messenger, Inc. v. Google, LLC*, No. 1:22-cv-01704-PKC (S.D.N.Y.)

*Weakley Cnty. Press, Inc. v. Google, LLC*, No. 1:22-cv-01701-PKC (S.D.N.Y.)

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Meta Platforms, Inc.*

March 31, 2023

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................. 2

I.  THE NEWSPAPERS DO NOT PLAUSIBLY ALLEGE AN AGREEMENT TO RESTRAIN COMPETITION. ........................................................................................ 2

    A.  The Newspapers Do Not Plausibly Allege an Agreement To Restrain Header Bidding. ................................................................................................... 2

    B.  The Newspapers Do Not Plausibly Allege a Market Allocation Conspiracy. ........................................................................................................... 6

II. THE NBA CLAIM IN THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE. ............................................................................... 13

CONCLUSION ........................................................................................................................ 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AD/SAT v. Associated Press*,
 920 F. Supp. 1287 (S.D.N.Y. 1996) ................................................................................5, 8

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .............................................................................................................6

*Beal Corp. Liquidating Tr. v. Valleylab, Inc.*,
 927 F. Supp. 1350 (D. Colo. 1996) ...................................................................................12

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ................................................................................................7, 9, 11

*Colucci v. Health First, Inc.*,
 No. 6:21-cv-681-RBD-GJK, 2022 WL 610573 (M.D. Fla. Jan. 24, 2022) .......................10

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
 328 F. Supp. 3d 217 (S.D.N.Y. 2018) ..............................................................................12

*In re Elevator Antitrust Litig.*,
 502 F.3d 47 (2d Cir. 2007) .................................................................................................7

*In re Generic Pharms. Pricing Antitrust Litig.*,
 338 F. Supp. 3d 404 (E.D. Pa. 2018) .................................................................................8

*In re Ins. Brokerage Antitrust Litig.*,
 618 F.3d 300 (3d Cir. 2010) .......................................................................................11, 13

*In re Int. Rate Swaps Antitrust Litig.*,
 261 F. Supp. 3d 430 (S.D.N.Y. 2017) ..............................................................................11

*In re Nexium (Esomeprazole) Antitrust Litig.*,
 842 F.3d 34 (1st Cir. 2016) ..............................................................................................12

*In re Propranolol Antitrust Litig.*,
 249 F. Supp. 3d 712 (S.D.N.Y. 2017) ................................................................................8

*In re Surescripts Antitrust Litig.*,
 608 F. Supp. 3d 629 (N.D. Ill. 2022) ................................................................................10

*In re Text Messaging Antitrust Litig.*,
 630 F.3d 622 (7th Cir. 2010) ............................................................................................13

*Jennings v. Hunt Companies, Inc.*,
 367 F. Supp. 3d 66 (S.D.N.Y. 2019) ................................................................................10

*Litovich v. Bank of Am. Corp.*,
    568 F. Supp. 3d 398 (S.D.N.Y. 2021) ..................................................................................12

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) ...................................................................................9, 11, 13

*O'Brien v. National Property Analysts Partners*,
    719 F. Supp. 222 (S.D.N.Y. 1989) ......................................................................................10

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*,
    530 F. Supp. 3d 301 (S.D.N.Y. 2021) ..................................................................................11

*Rosner v. Star Gas Partners, L.P.*,
    344 F. App'x 642 (2d Cir. 2009) ........................................................................................14

*Spinelli v. Nat'l Football League,*
    903 F.3d 185 (2d Cir. 2018) ..................................................................................................6

*Starr v. Sony BMG Music Ent.*,
    592 F.3d 314 (2d Cir. 2010) ...............................................................................................10

**PRELIMINARY STATEMENT**

This Court already determined that the States (after four attempts) did not plausibly plead that the Google/Meta Network Bidding Agreement ("NBA") was the product of an agreement by Meta to abandon header bidding to benefit Google. (*See* Order & Opinion ("Order"), Dkt. No. 308 at 22 (finding that "the States' allegations do not plausibly allege joint or concerted action between Google and Facebook to restrict Facebook's use of header bidding").) This Court—after a careful review of the actual terms of the NBA—also already determined that those contractual terms were insufficient to support an auction manipulation conspiracy claim. (*See id.* at 31-32 (finding that "[r]ather than insulate Google's in-app network from competition, [the NBA] promotes competition with Google's in-app network by bringing in a new competing bidder").)

Rather than voluntarily dismiss the NBA claim that they originally copied from the States, the Newspapers instead doubled down on each of these theories in a Consolidated Amended Complaint ("CAC", Dkt. No. 401) filed after the Court's ruling. The Newspapers have now wisely abandoned any argument that the specific terms of the NBA reflect an unlawful conspiracy (*i.e.*, the alleged auction manipulation theory),[1] but stubbornly cling to the unsupported header bidding story. Indeed, in their Opposition to Motions to Dismiss ("Opp.", Dkt. No. 489), the Newspapers ask this Court to revisit not only the phantom conspiracy alleged by the States—*i.e.*, that the NBA secured a *quid pro quo* by which Meta agreed to substantially curtail header bidding (Opp. at 17-20)—but also their argument that the NBA reflected an even *broader* conspiracy whereby Meta agreed to abandon web advertising altogether and abandon

---

[1] The Newspapers concede that their auction manipulation theory is identical to the States' already-dismissed theory and note that they "will not reargue" that theory here. (Opp. at 21 n.14.)

potential entry into the alleged in-app mediation and ad server markets (*id.* at 21-26). However, there remain no allegations that identify any direct or circumstantial evidence of any of these alleged conspiracies, and the same basic principles of common sense that the Court applied in dismissing the States' NBA claim compel the same result here.

The Newspapers' amended NBA claim (Count II) should be dismissed with prejudice.

## ARGUMENT

I. **THE NEWSPAPERS DO NOT PLAUSIBLY ALLEGE AN AGREEMENT TO RESTRAIN COMPETITION.**

  A. **The Newspapers Do Not Plausibly Allege an Agreement To Restrain Header Bidding.**

The Newspapers do not dispute that their header bidding theory is the same as the States' already-dismissed theory: both allege the NBA amounted to a *quid pro quo* agreement in which Meta agreed to abandon header bidding technology in exchange for obtaining certain benefits in Google's Exchange Bidding ad auctions. (*Compare, e.g.*, CAC ¶ 282 ("Facebook decided to dangle the threat of competition [through header bidding] in Google's face and then cut a deal to manipulate the auction."), *with* States' Third Amended Complaint ("TAC"), Dkt. No. 195 ¶ 413 ("Facebook substantially curtailed its use of header bidding in return for Google giving Facebook a leg up" in ad auctions).) Nor do the Newspapers dispute that, like the States, they have not alleged any direct evidence of conspiracy. (*See* Meta's Motion to Dismiss ("Motion" or "MTD"), Dkt. No. 463 at 5.)

Instead, the Newspapers focus on supposed circumstantial evidence and argue that the CAC contains "new allegations [that] bridge the pleading gaps" identified in the Court's Order dismissing the States' NBA claim. (Opp. at 4, 18-19.) Curiously, the Newspapers identify four pleading failures that they claim led the Court to dismiss the States' TAC, but address only

two of those supposed "pleading gaps" in their Opposition.[2] But even as to those two "gaps", the Newspapers fail to explain how the facts alleged in the CAC compel the Court to conclude that they have adequately pled the existence of the same conspiracy that the States' could not sustain on their fourth try.

*First*, the Newspapers assert that the CAC "provid[es] detail on [the] size of Facebook's advertising spend that was diverted away from header bidding", citing to paragraph 320 of the CAC. (*Id.* at 18.) But, as noted in Meta's Motion (*see* MTD at 7), that paragraph contains only the conclusory assertion that "FAN had little to no spend left to use header bidding or non-Google mediation tools" as a result of "the closure of FAN for web display, a commitment to acquire $1.5 billion from Google DFP in-app/AdMob, take rates . . . on top of Google's fee, and inventory from about 20% of developers that do not use mediation" (CAC ¶ 320). The Newspapers do not even attempt to approximate what Meta's *total* annual ad spend or potential total ad spend (given dynamic demand for FAN services) was, which is necessary to evaluate whether the Newspapers' assertation that Meta had "little to no spend left" to use for header bidding is actually plausible. (*See* Order at 25 ("It is a truism that an advertising dollar spent under the NBA is a dollar not available to be spent through header bidding, but the Complaint offers no context on the size of Facebook's annual spending on display ads or in-app impressions.").) In fact, by merely alleging the ad spend Meta "planned to purchase" from

---

[2] The Newspapers argue in a footnote that the CAC has added allegations to address four problems this Court identified with the States' header bidding theory: that it "(1) did not provide information on the size of Facebook's annual spend; (2) did not describe the NBA's effect on Facebook's use of header bidding; (3) did not allege that Facebook was participating in Google ad auctions immediately preceding the NBA; and (4) was absent allegation of predatory pricing, exclusionary or improper conduct." (Opp. at 18 n.13.) While the Newspapers purport to explain how they have filled the first two gaps, they point to no allegations in the CAC that purport to allege predatory pricing or exclusionary or improper conduct (and indeed, there are none). And any facts suggesting that Meta was participating in Google ad auctions prior to entering into the NBA are not new. As explained in Meta's Motion, those facts were available to the Court when it considered and dismissed the NBA claims in the States' TAC. (*See* MTD at 6-7.)

Google under the NBA, the Newspapers allegations are not substantively different than the States' conclusory factual allegation already rejected by this Court that "the practical impact of the NBA was that 'Google ensured that Facebook would not—and, economically, could not—return to support header bidding'". (Order at 25 (citing States' TAC ¶ 426).)

*Second*, the Newspapers assert that the CAC "also addresses the Court's concern that the States' complaint did not describe the [*sic*] Jedi Blue's effect on Facebook's use of header bidding". (Opp. at 19.) Again, the Newspapers cite only a single paragraph in the CAC to support this assertion. (*Id.* (citing CAC ¶ 305).) But the Newspapers merely allege in that paragraph that after executing the NBA, Meta "substantially curtailed its use and support of header bidding . . . and went from returning bids to DFP publishers indirectly through header bidding to directly bidding through Google's DFP". (CAC ¶ 305.) That is no different than the States' allegation—already rejected by this Court—that "[a]s a result of the agreement, Facebook curtailed its header bidding initiatives and instead bid through Google's tools". (States' TAC ¶ 426; *see also* Order at 26 (finding that "the States have failed to plausibly allege an agreement between Google and Facebook to restrain Facebook's use of header bidding").) The Newspapers' allegation that Facebook had previously recognized the benefits of header bidding is of no consequence. (*See* Opp. at 19 (citing CAC ¶ 305).) The States' TAC incorporated by reference the very same March 2017 Facebook blog post cited by the Newspapers on this point. (*See* States' TAC ¶¶ 414, 417.) The Newspapers have thus added nothing to address the Court's concern that the States' TAC did "not purport to describe the NBA's effect on Facebook's use of header bidding". (Order at 25.)

The Newspapers also appear to argue that Meta's deprecation of FAN's web business in February 2020—two years *after* the execution of the NBA—supports their header

4

bidding theory.  (*See* Opp. at 19-20.)  But this fact was also alleged by the States.  (*Compare* States' TAC ¶ 437 ("Although the Jedi Blue agreement originally contemplated that FAN would bid on impressions for both web and in-app display, FAN effectively left the market for web display advertising in 2020."), *with* CAC ¶ 306 ("Then, in or around February 2020, Facebook announced that it was shutting down the web display arm of FAN entirely.  Shortly thereafter, in April 2020, Facebook exited entirely by shutting down FAN for web display.").)  And, as with the rest of their header bidding theory, the Newspapers do not allege any facts "that permit the plausible inference"—contrary to the Court's prior Order—that the deprecation of FAN's web business was the "product" of a two-year old agreement with Google.  (Order at 21.)  Instead, the Newspapers wholly fail to grapple with the Court's ruling or the Southern District's similar prior decision in *AD/SAT.  See AD/SAT v. Associated Press*, 920 F. Supp. 1287, 1315 (S.D.N.Y. 1996) (finding that the facts would not allow a reasonable juror to conclude that a defendant was a member of an alleged conspiracy in part because the defendant's agreement with an alleged co-conspirator occurred eight months after its termination of an agreement with the plaintiff).

        In short, the Newspapers do nothing to undermine the Court's conclusion that there was nothing "inexplicable or suspicious in the parties entering into the NBA for reasons that go no further than the four corners of that agreement".  (Order at 22.)  Like the States' assertions, the Newspapers' allegations are fundamentally (and incorrectly) premised on the notion that there must have been a conspiracy if Google was willing to give Meta favorable business terms.  As the Court explained in its Order, this flawed logic fails to take into account "Facebook's motivation to use its economic clout as an advertiser to drive the hardest bargain it could with Google" as well as Google's "legitimate, procompetitive desire to obtain as much business as possible from Facebook."  (*Id.*)

B. **The Newspapers Do Not Plausibly Allege a Market Allocation Conspiracy.**

The Newspapers' *broader* conspiracy theory—that the NBA was not *only* part of a conspiracy to kill header bidding, but *also* part of a more wide-ranging conspiracy pursuant to which Meta agreed to abandon entry "in the publisher ad server market and mediation tool market" (CAC ¶ 302) and "cede[] the web markets to Google" (*id.* ¶ 291)—is no more plausible than the already-rejected header bidding story.

As explained in Meta's Motion, the Newspapers do not allege any direct evidence to support this theory. (*See* MTD at 8-10.) There is no evidence from any internal Meta or Google document that they allege to support this theory even though they have had access to millions of documents produced by Google. Indeed, the Newspapers offer only unsupported assertions like the statement that, prior to the NBA, "Facebook was actively trying to enter and compete in the publisher ad server market and mediation tool market by building or acquiring a competitive product". (CAC ¶ 302.) But conclusory assertions such as this cannot defeat a motion to dismiss. *See Ashcroft v. Iqbal,* 556 U.S. 662, 681 (2009) (holding that conclusory allegations are "not entitled to be assumed true"); *Spinelli v. Nat'l Football League,* 903 F.3d 185, 212 (2d Cir. 2018) (same).[3] As a result, the Newspapers are forced to concede that there is no direct evidence of this alleged conspiracy either. (*See* Opp. at 21 (arguing that they need not plead direct evidence of an alleged scheme).)

This market allocation theory is also implausible given the explicit terms of the NBA. Just as the NBA does not "touch upon or purport to restrict Facebook's use of header bidding", it does not touch upon or purport to restrict Meta from building or operating its own ad

---

[3] As noted in Meta's Motion (*see* MTD at 8), these allegations are also not new; even though the States alleged a narrower conspiracy, the TAC still included similar allegations (*see* States' TAC ¶¶ 422 (noting that Meta was considering building or buying its own ad tech tool), 437 (noting that Meta left the market for web advertising in 2020)).

server or in-app mediation tool. (Order at 24.) The NBA similarly says nothing about Meta "ceding the web markets" to Google. In fact, it suggests the exact *opposite:* there are detailed provisions in the NBA about how it would *apply* in the alleged web market that the Newspapers now claim Meta agreed to abandon in return for Google signing the NBA. (*See* MTD at 8-9 (citing relevant NBA provisions).) The notion that the parties secretly negotiated a deal for Meta to abandon the alleged web market by signing an agreement that provided terms for Meta's participation *in that very market* makes no sense. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (holding that for a claim to survive a motion to dismiss, plaintiffs must allege enough facts to "nudge[] their claims across the line from conceivable to plausible" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).).

The various so-called "plus factors" that the Newspapers discuss in their Opposition do nothing to nudge this theory over the plausibility line. (*See* Opp. at 21-26.)

***Common motive to conspire.*** In their Opposition, the Newspapers argue that "competition in the web market, driven by FAN, had resulted in higher prices for publishers (and lower *prices* for *Google*) . . . This reduction in *profits* gave *both parties* a common motive to conspire". (*Id.* at 22 (citing CAC ¶¶ 286-287) (emphasis added).) In other words, the Newspapers argue that Meta's support for header bidding was sufficiently effective that it gave both parties a motive to allocate markets, and that *this* is the plausible conspiratorial explanation for the NBA. This argument fails for several reasons.

First, there is no support in the CAC for this alleged "declining profits" theory. The CAC includes allegations that *publisher* revenues rose after header bidding was adopted, but nowhere do the Newspapers allege that *Google's* profits decreased.[4] (*See* CAC ¶¶ 286-87.)

---

[4] The Newspapers cannot rely on allegations such as "high barriers of entry", "high degree of concentration" and "lack of available substitutes" in the Opposition to show a common motive to conspire. (Opp. at 23 (citing

7

Second, the Newspapers do not allege that Meta saw lower profits as a result of header bidding, and fail to explain how such claimed lower profits might motivate Meta to entirely forego entry into lucrative alleged markets and/or simply give up on all web advertising two years after the NBA was signed. *See AD/SAT*, 920 F. Supp. at 1315 (finding that a defendant's agreement with an alleged co-conspirator appeared to be "a legitimate, independent business reason" because it occurred eight months after the defendant's termination of an agreement with the plaintiff). Third, Plaintiffs cite to various cases to support the proposition that declining profits make collusion more "attractive", but each of those cases concerns alleged conspiracies to raise prices, not market allocation allegations. (*See* Opp. at 22-23 (citing *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 719 (S.D.N.Y. 2017) (discussing a price-fixing scheme); *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 448 (E.D. Pa. 2018) (discussing a common motive to "set drug prices")).) The reason why decreasing profits would make a conspiracy to raise prices more attractive is obvious; that same rationale does not obviously apply here and the Newspapers make no effort to suggest why it would.[5]

*Action against self-interest.* The Newspapers' market allocation theory is premised on the same flawed logic as their (and the States') header bidding theory, namely, that Google would not have offered Facebook the favorable terms in the NBA absent some anticompetitive side agreement (here, to forgo entry in the ad server and in-app mediate tool

---

CAC ¶¶ 159-60, 180, 280).) These cherry-picked allegations referring to different markets (*see* CAC ¶¶ 159-60 (general digital advertising market), 180 (publisher ad server market), 280 (exchange and buying tool markets)) can hardly piece together a cohesive picture supporting the Newspapers' theory that Meta agreed to forego entry to the publisher ad server and in-app mediation tool markets and shut down FAN for web display.

[5] Moreover, in *Propranolol*, the court found a common motive to conspire among drug manufacturers to fix prices when plaintiffs alleged that federal law requires each generic to be readily substitutable and provided data showing that competition under the federal law has caused prices to near manufacturers' marginal costs of production. 249 F. Supp. 3d at 719. Similarly in *Generic*, the court noted a regulatory regime that could reduce the manufacturer' profits by driving down generic drug prices over time. 338 F. Supp. 3d at 448. The Newspapers allege no similar facts here.

8

markets and to exit the web markets). But this Court has already expressly ruled that the NBA was consistent with both Meta and Google's economic self-interest. (*See* Order at 22 (finding the NBA "made perfect business sense" in light of "Facebook's motivation to use its economic clout as an advertiser to drive the hardest bargain it could with Google, and that Google was motivated by the legitimate, pro-competitive desire to obtain as much business as possible from Facebook").) Just as the States' header bidding theory "fail[ed] to adequately account for Facebook's motivation to use its economic clout as an advertiser to drive the hardest bargain it could with Google, and that Google was motivated by the legitimate, pro-competitive desire to obtain as much business as possible from Facebook", so too does the Newspapers' market allocation theory. (Order at 21-22 (citing *Twombly,* 550 U.S. at 566 ("there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway . . . ."); *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 138 (2d Cir. 2013) ("An inference of conspiracy is not supported by acts that 'made perfect business sense.'").)

Nothing the Newspapers argue compels a different outcome. As an initial matter, the Newspapers argue that they allege Meta was participating in Google ad auctions and competing in the in-app market prior to entering into the NBA. (*See* Opp. at 24.) However, as explained in Meta's Motion, those facts are not new and were before the Court when it considered—and dismissed—the States' NBA claim. (*See* MTD at 6-7.) The Newspapers also point to a publication stating that Meta was poised to execute a "digital advertising coup" against Google. (Opp. at 23 (citing CAC ¶ 289).) But the publication itself does not indicate this alleged "coup" would be in the ad server and mediation tool markets, so it says nothing about what Meta did or did not abandon as a result of the NBA. (*See* CAC ¶ 289.) Similarly, while the Newspapers argue in the Opposition that Meta had "begun efforts" to establish its ad serving

9

capability before the NBA, none of the cited paragraphs actually contains that factual allegation. (Opp. at 23 (citing CAC ¶¶ 292, 302).)  Finally, the Newspapers claim that to "seriously compete with Google, Facebook needed to cover every part of the digital advertising by not only providing scale, but also every mechanism, including ad servers and mediation tools . . . as soon as possible". (*Id.*)  Again, that factual allegation appears nowhere in the CAC.  The Newspapers cannot add these allegations through their Opposition.  *See Jennings v. Hunt Companies, Inc.*, 367 F. Supp. 3d 66, 70 (S.D.N.Y. 2019); *O'Brien v. National Property Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t axiomatic that [a] [c]omplaint cannot be amended by the briefs in opposition to a motion to dismiss.").

The only case cited by the Newspapers on this point underscores the insufficiency of their own allegations.  (*See* Opp. MTD at 7 (citing *Colucci v. Health First, Inc.*, No. 6:21-cv-681-RBD-GJK, 2022 WL 610573, at *2 (M.D. Fla. Jan. 24, 2022)).)  The *Colucci* court found an inference of an agreement to divide services in the relevant market based in part on one defendant's pattern of aggressive expansion in the nearby geographic area.  2022 WL 610573, at *2.  By contrast, the CAC contains no factual allegation that Meta had an established pattern of aggressive entry into other parts of the ad tech markets or that any such entry stopped because of the alleged conspiracy.  The *Colucci* court also relied on other facts not alleged here, including a written agreement between the parties discussing partnership in the relevant market and one defendant restricting a particular group of customers to receiving services from the other defendant.[6]  *Id.*

---

[6] The Newspapers also cite to *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 650-51 (N.D. Ill. 2022). (*See* Opp. at 24.)  But that case is irrelevant:  it discussed whether plaintiffs plausibly alleged specific intent to support a Section 2 monopolization claim.  *See Surescripts*, 608 F. Supp. 3d at 648-51.

10

In short, the Newspapers acknowledge that it is their burden to "allege enough factual matter . . . to suggest that an agreement was made." (Opp. at 24 (citing *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010)).) They have failed to carry that burden, and cannot deflect from that fact by claiming that Defendants are impermissibly offering alternative factual explanations on a motion to dismiss. (*See id.*) *Twombly* and its progeny compel the Court to assess the plausibility of plaintiffs' theories by comparing them to other plausible explanations that can be drawn from the facts alleged in the relevant complaint. *See Twombly*, 550 U.S. at 566-67 (finding no inference of conspiracy when there are "obvious alternative explanation[s]", because "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway"); *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 462 (S.D.N.Y. 2017) (noting that following *Twombly*, an inference of conspiracy will not arise when the conspirators' parallel conduct "made perfect business sense" or "there are obvious alternative explanations for the facts alleged" (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 138; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-23 (3d Cir. 2010))). That is precisely what the Court did in dismissing the States' NBA claim, and the same exercise dooms the Newspapers here.

**High level of interfirm communications.** All the Newspapers can offer here are allegations that there were "regular meetings" between Google and Meta employees concerning the implementation of the NBA *after* it was signed. (CAC ¶ 323.) These post-NBA meetings do not constitute plausible evidence of a conspiracy. *See PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 336 (S.D.N.Y. 2021) ("Alleged meetings are a sufficient plus factor only where they occur shortly *before* the alleged parallel action.").

In their Opposition, the Newspapers argue based on facts *not* alleged in the CAC that the negotiations of the NBA also provided an opportunity to conspire. But even aside from the fact that this appears nowhere in the CAC, it is also pure speculation. The mere fact that two prospective business partners met to negotiate a lawful agreement cannot support an inference that they also negotiated an unlawful agreement in restraint of trade. *See Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398, 434 (S.D.N.Y. 2021) (finding no conspiracy when the complaint did not contain any plausible allegation that any legitimate interfirm communications is relevant to the alleged conspiracy). Indeed, various courts have found that communications between two companies that have legitimate business relationships are not indicative of a conspiracy; instead, interfirm communications are most likely to give rise to an inference of conspiracy when there is no legitimate reason for the companies to be speaking. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 56–57 (1st Cir. 2016) (explaining that companies' legitimate business communications do not themselves establish a plausible antitrust conspiracy); *cf. In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 328 F. Supp. 3d 217, 228 (S.D.N.Y. 2018) (ruling that information sharing among competitors "without a legitimate purpose" is "good evidence of a conspiracy"). *Beal Corp. Liquidating Tr. v. Valleylab, Inc.*, 927 F. Supp. 1350, 1366 (D. Colo. 1996), is inapposite. (*See* Opp. at 25.) In *Beal*, the court was considering cross motions for summary judgment where the parties had pointed the court to specific deposition testimony about the meetings supporting the conspiracy allegations and the *specific subjects* discussed at those meetings. *Id.* Here, the CAC does not even allege that the alleged market allocation scheme was discussed at any meeting between Google and Meta.

**Structure and characteristics of the ad server and mediation tool markets.** The Newspapers' final contention is that because Meta and Google were two major participants (or

potential participants) in the alleged relevant markets, it was harder for smaller competitors to increase market share. (*See* Opp. at 26 (citing CAC ¶ 185).) As an initial matter, the CAC only includes allegations about Google's market power in the alleged *ad server market*. (CAC ¶ 185.) Nowhere in the CAC do the Newspapers even mention Google's market power in the *in-app mediation tool market*.

In any event, market structure is generally a relevant "plus factor" in the price-fixing context, where plaintiffs often argue that the presence of only a few competitors along with high barriers to entry makes it easier for the existing participants to set artificially high prices. Indeed, that was precisely the situation in the one case cited by the Newspapers. (Opp. at 26 (citing *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-28 (7th Cir. 2010)).) Those same dynamics are not relevant here. To the contrary, the Newspapers' contention hinges on this Court inferring the existence of a conspiracy from the alleged oligopolistic nature of the relevant market or markets. But numerous courts have correctly rejected that very argument. *See, e.g.*, *Mayor & City Council of Baltimore*, 709 F.3d at 139 ("As our sister circuit has helpfully explained, 'evidence that the defendant had a motive to enter into a[n antitrust] conspiracy ... may indicate simply that the defendants operate in an oligopolistic market, is that, may simply restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism.'" (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 322)).

For these reasons, none of the cited "plus factors" supports a strong inference that Meta and Google entered into a market-allocation conspiracy.

## II. THE NBA CLAIM IN THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

In drafting the CAC, the Newspapers had the opportunity to review the extensive briefing on the States' NBA claim, the Court's Order dismissing that claim, Meta's Opposition to

the Newspapers' Motion to Amend (Dkt. No. 356) and tens of thousands of documents Google already produced in this MDL. They have nonetheless failed to plead a cognizable claim. Amendment would be futile at this point, and the Newspapers do not argue otherwise. Accordingly, the Court should dismiss the Newspapers' NBA claim with prejudice. *See, e.g.*, *Rosner v. Star Gas Partners, L.P.*, 344 F. App'x 642, 644 (2d Cir. 2009) (affirming district court's dismissal with prejudice where plaintiff had prior opportunity to amend pleading after being informed of defendants' arguments in favor of dismissal).

## CONCLUSION

For the foregoing reasons, Meta respectfully requests that the Court dismiss with prejudice the Newspapers' Section 1 claim based on the NBA (Count II).

Dated: March 31, 2023

CRAVATH, SWAINE & MOORE, LLP

by   /s/ *Kevin J. Orsini*
Kevin J. Orsini

Worldwide Plaza
825 Eighth Avenue
New York, NY
(212) 474-1000
korsini@cravath.com

*Attorneys for Meta Platforms, Inc.*

14