UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE:  GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | No. 1:21-md-03010 (PKC) |

**META PLATFORMS, INC.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COUNTS III AND IV IN ADVERTISERS' CONSOLIDATED AMENDED COMPLAINT**

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Meta Platforms, Inc.*

March 31, 2023

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

I.    THE COURT'S RULING DISMISSING THE STATES' NBA CLAIM IS
      FATAL TO ADVERTISERS' NBA CLAIM..........................................................2

II.   ADVERTISERS DO NOT STATE A CLAIM UNDER SECTION 1 OF
      THE SHERMAN ACT REGARDLESS OF THE COURT'S PRIOR
      ORDER. ..........................................................................................................5

      A.    Advertisers Have Not Plausibly Pleaded A Relevant Market. ....................6

      B.    Advertisers Have Not Alleged Market Power. ..........................................10

      C.    Advertisers Have Not Plausibly Pleaded Market-Wide Harm. .................10

      D.    Advertisers Have Not Plausibly Alleged Article III Standing....................13

III.  ADVERTISERS' STATE LAW NBA CLAIM FAILS FOR THE SAME
      REASONS AS THEIR FEDERAL ANTITRUST CLAIM. ................................14

IV.   ADVERTISERS' NBA CLAIMS SHOULD BE DISMISSED WITH
      PREJUDICE. ..................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019) ........................................................................................9

*Arizona v. Maricopa County Medical Soc.*,
  457 U.S. 332 (1982) ............................................................................................7

*Bhanusali v. Orange Reg'l Med. Ctr.*,
  No. 10-cv-6694 CS, 2013 WL 4828657 (S.D.N.Y. Aug. 12, 2013),
  *aff'd in part, vacated in part*, 572 F. App'x 62 (2d Cir. 2014) ...........................11, 14

*Catalano, Inc. v. Target Sales, Inc.*,
  446 U.S. 643 (1980) ............................................................................................7

*City of New York v. Grp. Health Inc.*,
  649 F.3d 151 (2d Cir. 2011) ...............................................................................6

*Eastman Kodak Co. v. Image Technical Services*,
  504 U.S. 451 (1992) .........................................................................................9, 14

*FTC v. Indiana Federation of Dentists*,
  476 U.S. 447 (1986) ............................................................................................7

*FTC v. Superior Court Trial Lawyers Ass'n*,
  493 U.S. 411 (1990) ............................................................................................8

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
  386 F.3d 485 (2d Cir. 2004) ..............................................................................10

*In re Aluminum Warehousing Antitrust Litig.*,
  No. 13-MD-2481-KBR, 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014),
  *aff'd*, 833 F.3d 151 (2d Cir. 2016) ...................................................................8, 10

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  968 F. Supp. 2d 367 (D. Mass. 2013) ................................................................6

*Keepers, Inc. v. City of Milford*,
  807 F.3d 24 (2d Cir. 2015) ................................................................................13

*Kramer v. Pollock-Krasner Found.*,
  890 F. Supp. 250 (S.D.N.Y. 1995) .....................................................................9

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) .........................................................................................3, 7

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................................................13

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*,
    624 F. App'x 23 (2d Cir. 2015) ............................................................................8

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*,
    866 F.2d 525 (1st Cir. 1989)............................................................................5, 12

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)...............................................................................3, 7, 8, 14

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)................................................................................................5

*Rosner v. Star Gas Partners, L.P.*,
    344 F. App'x 642 (2d Cir. 2009) ..........................................................................15

*Spinelli v. Nat'l Football League*,
    903 F.3d 185 (2d Cir. 2018)...........................................................................3, 11, 14

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998)....................................................................................10

*United States v. Aiyer*,
    33 F.4th 97 (2d Cir. 2022).....................................................................................12

*United States v. Fish*,
    Case No. 3:22-cr-24 (E.D. Tenn. Mar. 16, 2022) ...................................................9

## Other Authorities

Easterbrook, Vertical Arrangements and the Rule of Reason,
    53 Antitrust L.J. 135 (1984)....................................................................................7

## INTRODUCTION

Advertisers' opposition ("Opposition") to Meta's motion to dismiss ("Motion") underscores that they are bringing nothing new to the table with their amended Network Bidding Agreement ("NBA") claims.  Superficial differences and supplemental conclusory allegations aside, Advertisers' NBA claims reiterate what the States already pleaded and what this Court already analyzed and dismissed as implausible.

*First*, Advertisers' NBA claims should be dismissed for the same reasons the Court dismissed the States' NBA claim.  This is not, as Advertisers suggest, a request by Meta and Google for the Court to merely copy and paste its prior decision.  It is a recognition that the claims are substantively identical.  Advertisers offer no cogent reason for the Court to reverse itself, and it remains the case that the facts alleged lead to the plausible inference that the NBA was procompetitive, not anticompetitive.  (*See* Section I.)

*Second*, even if there are material differences between Advertisers' NBA claims and the States' NBA claims—and there are not—Advertisers nonetheless fail to plead a claim under the rule of reason.  Confronted with the reality that the sum total of their market allegations is confined to a single, conclusory paragraph, Paragraph 294, Advertisers resort to fundamental misstatements of the governing law.  The United States Supreme Court has unambiguously held that all plaintiffs asserting a vertical claim must adequately define a relevant market.  Advertisers fail to do so, and cannot find refuge in cases that—unlike this one—involve *per se* condemnation of horizontal restraints, or old, now overruled district court opinions.  Advertisers also abandon any pretext of alleging market power in a relevant market, and fail to explain how it is plausible to argue that competition was harmed by Meta negotiating favorable provisions for participating in Google-led auctions that *increased* Meta's competitiveness in those auctions.  Because Advertisers do not adequately plead a relevant market, market power,

harm to competition or antitrust injury, their Section 1 claim must be dismissed no matter how different it is from the States' claim (it is identical).  (*See* Section II.)

*Third*, Advertisers' state law NBA claim mirrors their federal NBA claim.  Both rise or fall together, and both should be dismissed for the same reasons.  (*See* Section III.)

*Fourth*, Advertisers already have had the benefit of multiple amendments, access to millions of internal Google documents and a prior Order from this Court identifying the flaws with the States' theory.  Yet Advertisers still fail to state a claim—because there is none to state.  No further leave to amend should be granted and Counts III and IV should be dismissed with prejudice.  (*See* Section IV.)

**ARGUMENT**

I.      **THE COURT'S RULING DISMISSING THE STATES' NBA CLAIM IS FATAL
        TO ADVERTISERS' NBA CLAIM.**

In an effort to avoid the same fate as the States, Advertisers argue that the Court has not previously considered the "substantive basis" for Advertisers' NBA claim.  In service of this argument, they identify certain alleged differences between their NBA claim and the States' failed NBA claim.  But try as they might, Advertisers cannot distinguish their copycat claim from the States' claim and it fails for the same reasons.

*First*, Meta explained in the Motion that Advertisers rely on the identical provisions of the NBA that the States cited in favor of their auction manipulation theory—the NBA's match rate provision,[1] the timeout provision[2] and the information provision[3] (CAC

---

[1] *Compare* States' TAC ¶¶ 432-433, *with* CAC ¶ 287.

[2] *Compare* States' TAC ¶ 429, *with* CAC ¶ 288.

[3] *Compare* States' TAC ¶ 431, *with* CAC ¶¶ 286-287, 290.  The Advertisers also cite to the NBA's minimum spend, win-rate and bid response commitment provisions, all of which also supported the States' NBA claim.

¶¶ 286-290).  Advertisers do not disagree with this in their Opposition.  Nor do they claim that

there are other provisions in the NBA that are relevant to their claim that the Court somehow

overlooked in dismissing the States' complaint.  And, like the States, Advertisers do not

"plausibly allege the existence of side deals, winks or nods that augment the terms of the NBA

insofar as they relate to . . . [a] claim concerning bidding for in app impressions."  (Order at 32.)

There is thus no dispute that Advertisers' NBA claim turns on the very same contract provisions

as the States' failed auction manipulation claim.

*Second*, Advertisers argue that their claim is meaningfully different from the

States' because they allege harm to advertisers.  (Opp. at 11.)  But that is also what the States

alleged, claiming that the NBA gave Google's and Meta's ad networks the power to "raise the

prices at which [they] resold in-app impressions to advertisers."  (States' TAC ¶ 445.)  The Court

concluded that this theory of harm to competition failed because the NBA made Meta *more*

competitive in Google-run ad auctions.  (*See* Order at 31.)  That ruling was well-founded; it is

perverse for Advertisers to argue that *increasing* the competitiveness of auctions somehow

constitutes a harm to competition.  *See, e.g., Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,

551 U.S. 877, 878 (2007) (observing that vertical restraints enhancing interbrand competition are

procompetitive).  To the extent Meta's presence as a bidder made auctions more competitive, and

that competition led certain advertisers to pay higher prices to win ads that they valued, that is

the essence of competition rather than the basis for an antitrust claim.  (Order at 31-32); *see also*

*Spinelli v. Nat'l Football League*, 903 F.3d 185, 212 (2d Cir. 2018) ("conclusory allegation that

prices have increased will not suffice to state anticompetitive effect")); *Ohio v. Am. Express Co.*,

---

*Compare* States' TAC ¶ 426, *with* CAC ¶ 287 (minimum spend); States' TAC ¶ 438, *with* CAC ¶ 287 (win rate);
States' TAC ¶ 438, *with* CAC ¶ 287 (bid response commitment).

138 S. Ct. 2274, 2288 (2018) (explaining that courts will "not infer competitive injury" from increased prices "absent some evidence that tends to prove . . . prices were above a competitive level").

*Third*, Advertisers contend that the "CAC alleges harm to the auction market itself—where Google and Meta submit competing bids for ad impressions on behalf of advertisers." (Opp. at 4.) Advertisers claim that this is somehow a new issue for the Court. Once again, that is false. The States alleged "that Google has effectively excluded rival bidders because the NBA contains terms more favorable to Facebook than those offered to others." (Order at 26; *see also id.* at 32-34 (noting that the States' alleged harm to an "in-app network market", which was defined by the States[4] to include Meta's and Google's demand-side ad networks and other competing bidders in Google-run auctions, was implausible).)

*Fourth*, Advertisers describe Google as an "auctioneer" in an apparent effort to make their case seem more like a traditional bid-rigging claim. (Opp. at 13-15.) But the States also already tried that gambit, alleging that the NBA was the equivalent of "[b]ringing the auction house itself into the scheme" since it allowed Google to "take steps to disadvantage outside bidders by withholding information, giving them less time to bid, or charging them higher bidder fees." (States' TAC ¶ 441.)

*Fifth*, Advertisers argue that the Court should let their claim survive in service of a policy of promoting private antitrust litigation. (Opp. at 6-7.) This argument rings hollow. Meta is not arguing that the Court should dismiss this private antitrust claim for some esoteric fairness or policy reason simply because the States' claim was dismissed. Meta is arguing that

---

[4] *See* States' TAC ¶¶ 232-243.

the substantive legal reasons that compelled dismissal of the States' claim also compel dismissal of this copycat private antitrust claim.[5]

In short, after analyzing the very same contract terms that Advertisers cite in support of their claim, the Court concluded that the NBA was "*entirely consistent with competition*".  (Order at 25-26 (emphasis added).)  As the Court explained, "[o]ffering favorable terms to a large potential customer, such as Facebook, undoubtedly had the effect of diverting business from a competing service [header bidding], but this does not convert the agreement into an unreasonable restraint of trade."  (*Id.* at 26 (citing *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 529 (1st Cir. 1989) (observing there is "nothing anticompetitive in the simple fact that a seller selectively cuts its prices, or offers other favorable terms, to some of its dealers, even though such discrimination harms the non-favored dealers") (Breyer, J.)).)  Advertisers fail to distinguish their claim from the States' claim, and also fail to provide any cogent reason for the Court to reach a different result on the same issue simply because this case involves different plaintiffs.  Advertisers' NBA claim should be dismissed for this reason alone.

## II.     ADVERTISERS DO NOT STATE A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT REGARDLESS OF THE COURT'S PRIOR ORDER.

Even if the Court were to conclude that there are material differences between Advertisers' NBA claim and the States' dismissed NBA claim, Advertisers' Section 1 claim would still fail.  This Court has already concluded that the NBA is "properly scrutinized" under

---

[5] The cited cases do not even support the way in which Advertisers attempt to spin this supposed "policy", as each of those cases explains that private antitrust challenges are permitted by Congress to "provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations".  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979).  That is not a concern here, where the States and the DOJ have launched investigations and initiated antitrust litigation relating to digital advertising markets.  Notably, the DOJ's recent complaint against Google did *not* bring a claim based on the NBA, despite discussing its terms in the Complaint.  *See* Complaint ¶ 194, *United States, et al. v. Google LLC*, No. 1:23-cv-00108 (E.D. Va. Jan. 24, 2023) (Dkt. No. 1).

the rule of reason, and Advertisers do not appear to contest this ruling in their opposition.  (Order at 27-29.)  As a result, Advertisers are required to plead each of the elements of a Section 1 claim under the rule of reason.  They have not done so.

A.     **Advertisers Have Not Plausibly Pleaded A Relevant Market.**

As explained in Meta's Motion, "a plaintiff must allege a plausible relevant market in which competition will be impaired."  (Mot. at 17 (quoting *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011)).)  The sum total of Advertisers' relevant market allegations is contained in Paragraph 294 of the CAC.  In a strained effort to convince the Court that this single paragraph is sufficient to discharge their pleading obligations, Advertisers mischaracterize the law and Defendants' arguments.

*First*, Advertisers try to justify their flimsy market allegations by arguing that antitrust law recognizes a "sliding scale" of market definition pleading requirements. (Opp. at 7-10.)  They claim that "formal" market definition allegations are unnecessary here because they are relying on direct evidence of anticompetitive effects rather than a showing of market power as a surrogate for competitive harm.  (*See, e.g.*, Opp. at 8-9 ("Since the burden of pleading and proving a relevant market depends on the extent to which market power substitutes for proof of actual anticompetitive effects, it follows that an elaborate definition of the relevant market is not required in a Section 1 case if proof of the restraint's actual anticompetitive effects is available.").)  Advertisers thus argue that where "direct evidence of market power is available, however, a plaintiff need not attempt to define the relevant market," quoting the 2013 district court decision in *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 388 n.19 (D. Mass. 2013).

This notion of a "sliding scale" applicable to this case is made up, and the precise

argument that Advertisers are making was rejected by the United States Supreme Court in

*Ohio v. American Express* (years after the District of Massachusetts case Advertisers cite):

> ***The plaintiffs argue that we need not define the relevant market in this case because they have offered actual evidence of adverse effects on competition—namely, increased merchant fees.*** *See* Brief for United States 40–41 (citing *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), and *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) (*per curiam*)). ***We disagree. The cases that the plaintiffs cite for this proposition evaluated whether horizontal restraints had an adverse effect on competition.*** See *Indiana Federation of Dentists, supra,* at 450–451, 459, 106 S.Ct. 2009 (agreement between competing dentists not to share X rays with insurance companies); *Catalano*, *supra*, at 644–645, 650, 100 S.Ct. 1925 (agreement among competing wholesalers not to compete on extending credit to retailers). ***Given that horizontal restraints involve agreements between competitors not to compete in some way, this Court concluded that it did not need to precisely define the relevant market to conclude that these agreements were anticompetitive.*** *See Indiana Federation of Dentists*, *supra*, at 460–461, 106 S.Ct. 2009; *Catalano*, *supra*, at 648–649, 100 S.Ct. 1925. But vertical restraints are different. *See Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 348, n. 18, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 888, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007). ***Vertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market.*** *See id.*, at 898, 127 S.Ct. 2705 (noting that a vertical restraint "may not be a serious concern unless the relevant entity has market power"); Easterbrook, Vertical Arrangements and the Rule of Reason, 53 Antitrust L.J. 135, 160 (1984) ("[T]he possibly anticompetitive manifestations of vertical arrangements can occur only if there is market power").

138 S. Ct. 2274, 2285 n.7 (2018) (emphases added).  Advertisers cannot escape the Supreme

Court's ruling in *American Express* by arguing that this case is somehow different because the

vertical agreement at issue has "horizontal effects"; the primary harm to competition claimed in

*American Express* was the reduction in horizontal price competition between credit card

networks. *Id.* at 2289.[6]

> *Second*, when the proper legal framework is applied, there is no credible argument

that Advertisers adequately alleged the contours of the relevant market in Paragraph 294. While

Advertisers clarify in opposition that they are alleging only one market rather than multiple

markets (*see* Opp. at 16), "simply naming a potential market is only the first step in defining the

relevant market," *In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481-KBR, 2014

WL 4277510, at *37 (S.D.N.Y. Aug. 29, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016). Advertisers

are also required to plead at least: (1) why the auctions for web display and in-app ad

impressions are substitutable (and should therefore be in the same relevant product market);

(2) why the relevant product market should not include non-Google final clearinghouse auctions;

and (3) the geographic boundaries of Advertisers' proposed relevant market. *See id.* at *14, *32

(plaintiffs failed to "allege a plausible market" where purported market definitions were not

"accompanied by allegations regarding product interchangeability, elasticities, or geographic

boundaries"); *Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 29

(2d Cir. 2015) (plaintiff's "attempt to carve up the New York City hotel labor market into an

artificially small 'Marriott-only' submarket is sufficiently 'implausible,' to render dismissal

appropriate at the pleading stage"). Those allegations simply do not exist.

> *Third*, Advertisers assert that Meta and Google "ignore the relevant market

actually alleged" and "focus on the wrong market". (Opp. at 12.) But it is Advertisers, not

---

[6] Advertisers' argument that the "NBA presents the situation where 'the fact of agreement defines the market'" is likewise unavailing. (Opp. at 11-12 (quoting *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 435 n.18 (1990)). *Superior Court Trial Lawyers* addresses the applicability of *per se* rules in boycott and price fixing cases, not the requirements for pleading a relevant antitrust market in a case involving a vertical agreement subject to the rule of reason. (MOT. at 18.)

Defendants, who are missing the point.  To be sure, Advertisers allege in conclusory fashion in

Paragraph 294 that the relevant market is limited to Google-run auctions.  Meta and Google

simply pointed out that this conclusory allegation is insufficient for the reasons noted above;

Plaintiffs have to actually allege facts that would support a plausible inference that auctions run

by other companies are not interchangeable with Google-run auctions.  They have not done so,

and they therefore failed to carry their burden even at the motion to dismiss stage.  (Mot. at 20

(citing *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 254-55 (S.D.N.Y. 1995)).)[7]

   *Fourth*, it is simply not true that Defendants have taken the position that "a firm's

digital 'platform' cannot itself constitute a valid Section 1 market on the grounds that other

digital platforms offer alternative markets for the same category of products."  (Opp. at 17.)

Neither Defendant made that argument.  Instead, the point here is the same as in the preceding

paragraph:  if Advertisers wanted to proceed with a claim based on the market alleged in

Paragraph 294, they were required to actually plead facts to support its existence by reference to

customer demand and interchangeability (or lack thereof).  Advertisers' reliance on two cases

involving online sales platforms—*Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019), and *United

States v. Fish*, Case No. 3:22-cr-24 (E.D. Tenn. Mar. 16, 2022)—is misplaced as those cases

involved factual allegations to support the alleged relevant market that the Courts found to be

sufficient.  Neither stands for the proposition that all single-brand platform markets must be

cognizable, even at the motion to dismiss stage, simply because a plaintiff says the market exists.

---

[7] Equally unavailing is Advertisers' claim that those advertisers who "commit[] to trading through Google's ad auctions . . . share[] the same 'lock-in' quality as the single-brand market approved" in *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451 (1992).  *Kodak* involved allegations of a tying arrangement between products, in a tying market, and an aftermarket for parts and services, in a tied market, where "[i]f the cost of switching is high, consumers who already have purchased the equipment, and are thus 'locked in,' will tolerate some level of service-price increases before changing equipment brands."  *Id.* at 476.  Nowhere do Advertisers allege high switching costs for advertisers to use a non-Google ad auction that undergirds the "lock-in" *Kodak* argument, nor do Advertisers allege a tying arrangement.  *Id.*

*Fifth*, Advertisers try to obfuscate their failure to plead a relevant market by accusing Defendants of requiring a "detailed economic analysis" of the relevant market at the motion to dismiss stage. (Opp. at 11.) The problem for Advertisers is that there is a lot of space between what they have alleged in Paragraph 294 and a "detailed economic analysis", and the governing precedent establishes that simply naming the market is insufficient for pleading purposes. *See In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at \*37.

### B. Advertisers Have Not Alleged Market Power.

As the Court explained in the Order, a "plaintiff alleging harm to competition may, in lieu of showing actual harm, allege that defendants possess 'market power' in the relevant market". (Order at 30 (quoting *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97 (2d Cir. 1998)).) Advertisers do not include *any* allegations of market power in the CAC concerning the market they allege in Paragraph 294. Advertisers do not argue otherwise in their Opposition. They cannot, therefore, rely on the market power approach to satisfy their burden of pleading a claim under the rule of reason.

### C. Advertisers Have Not Plausibly Pleaded Market-Wide Harm.

Having disclaimed any need to allege market power, Advertisers place all of their eggs in the basket of pleading direct evidence of harm to competition. That was a mistake; Advertisers have also not pleaded that "defendants' challenged behavior had an *actual* adverse effect on competition as a whole in the relevant market.'" (Order at 30 (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 507 (2d Cir. 2004)).)

In the Motion, Meta explained that Advertisers rely on conclusory allegations that the NBA resulted in Meta's rivals placing inflated bids to win Google-run auctions. (Mot. at 22.) In their Opposition, Advertisers continue to make this broad assertion of competitive harm without *any* factual support:

10

> Moreover, even though the NBA may not explicitly prevent Google from offering the same terms to other bidders, as Meta argues (Meta Mem. at 24-25), there is no indication that Google actually did so, and it stands to reason that if Google were to offer the same or similar advantages to other bidders, the value of the NBA to Meta would decrease as each additional bidder similarly was advantaged.

(Opp. at 15.) But such conclusory allegations—even if contained in the CAC rather than the Opposition—are insufficient to survive a motion to dismiss. *See, e.g.*, *Spinelli*, 903 F.3d at 212 (where plaintiff "cite[s] no examples, data, or other facts to support their assertion, [] a conclusory allegation that prices have increased will not suffice to state anticompetitive effect"); *Bhanusali v. Orange Reg'l Med. Ctr.*, No. 10-cv-6694 CS, 2013 WL 4828657, at *10 (S.D.N.Y. Aug. 12, 2013), *aff'd in part, vacated in part*, 572 F. App'x 62 (2d Cir. 2014) ("conclusory allegation (unsupported by a single fact or example) that the price of orthopedic surgical services has increased by the elimination of a *single* orthopedic surgeon from the relevant market is likewise implausible").

Meta also explained in the Motion that Advertisers' theory of harm made no sense for a variety of reasons, including: (1) if other "[b]idders in Google's final ad auctions had no knowledge of the superior information that Google secretly provided to Meta" (CAC ¶ 292), then it is not clear how other bidders would know that they would need to bid higher to win an auction (*see* Mot. at 23); (2) Advertisers are complaining that Meta's customers—also advertisers—were receiving valuable information under the NBA that allegedly allowed them to bid higher for ad impressions that they valued, which is hardly anticompetitive (*id.* at 23-24); and (3) Advertisers' claim that certain competitors to Google and Meta were harmed by being "disadvantaged" could at most constitute harm to a competitor rather than a harm to competition (*id.* at 24).

Rather than address any of these issues in their Opposition, Advertisers make two broad arguments. *First*, Advertisers cite a series of cases involving "big rigging" and assert that the Court should be wary of "adjudging" a claim involving "concerted market conduct by agents competing to bid in auctions on behalf of advertisers" at the motion to dismiss stage. (Opp. at 12, 16-19.) But, as the Court has already ruled, this case does not involve "bid rigging" between horizontal competitors. (Order at 31-32); *see also United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022) ("[B]id rigging—which is simply another 'form of horizontal price fixing'— is a *per se* violation of the Sherman Act."). Advertisers also have not plausibly alleged concerted activity by Google and Meta that would harm competition. Even their new theory—debuted in the Opposition—that Google might compete less vigorously in ad auctions in service of the NBA is not based on any allegations in the CAC, conclusory or otherwise. (Opp. at 14.) The only inference from the facts alleged is the one the Court already identified: the NBA "promote[s] rather than harm[s] competition in the in-app network market." (Order at 31.)

*Second*, Advertisers take issue with the Court's prior ruling that there is "nothing anticompetitive in the simple fact that a seller selectively cuts its prices, or offers other favorable terms, to some of its dealers, even though such discrimination harms the non-favored dealers." (Order at 26 (quoting *Monahan's Marine*, 866 F.2d at 529).) Advertisers argue that Google has "extract[ed]" a "surplus" that "rightly belongs" to non-Meta bidders and that this case is different from a "conventional" volume discount vertical agreement. (Opp. at 15.) But this is just another way of saying that *increasing* competition between Meta and Google in Google-run auctions is somehow anticompetitive. Advertisers also admit that there is nothing in the NBA that prohibits Google from sharing the same information and benefits it provided to Meta with other bidders. (*Id.*) While they go on to speculate that a "legitimate discount does not hinge on the supplier

12

withholding the same discount from [the recipient's competitors]" (*id.*), there is no factual

allegation anywhere in the CAC that suggests that either Meta or Google believed the NBA

would work only if Google refused to provide the same terms to other bidders (or that either

party actually believed the same terms could not be offered to other bidders).

   In short, rather than respond to Meta's arguments about why the claimed harm to

competition is insufficient pled, Advertisers resort to citations to inapposite cases about

horizontal restraints condemned as *per se* unlawful and essentially ask the Court for a "pass" by

claiming there is no risk of "false positives" here.  (Opp. at 20-21.)  The United States Supreme

Court and the Second Circuit have articulated clear standards for pleading a conspiracy under

Section 1 of the Sherman Act.  Advertisers have had every chance to meet that standard.  They

have failed.  The only claims asserted against Meta in this action relate to the NBA, and those

claims must be dismissed even if other claims against Google will continue.

  **D.**  **Advertisers Have Not Plausibly Alleged Article III Standing.**

   Meta explained in the Motion that Advertisers have failed to establish Article III

standing because every member of the putative class is an entity that purchased impressions

directly from Google.  (Mot. at 26-28.)  As a result, these plaintiffs were bidding for ads using

the same alleged advantages that they claim were provided unlawfully to Meta.  (*Id.*)  Because

no Named Plaintiff purchased ads at the "competitive disadvantage" that non-Meta and non-

Google bidders allegedly suffered as a result of the NBA, there is no Named Plaintiff whose

purported injury is "fairly traceable" to the NBA.  *See Keepers, Inc. v. City of Milford*, 807 F.3d

24, 42 (2d Cir. 2015) ("The injury-in-fact requirement demands not only the existence of a

legally cognizable injury, but also that the plaintiff itself be 'among the injured.'" (quoting *Lujan

v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992) (internal quotation marks and citation omitted))).

Advertisers all but ignore these arguments in their Opposition, relegating the

discussion of Article III standing to a single paragraph in which they argue that "[a]llegations

that a restraint caused supracompetitive pricing based on economic theory are common in

antitrust litigation". (Opp. at 19.) That is as true as it is irrelevant. Of course well-pleaded

allegations of supracompetitive prices paid by a particular plaintiff can be sufficient to establish

Article III standing. The problem for Advertisers is that they have not pleaded any facts, or

provided any cogent reason to infer, that *these plaintiffs* paid supracompetitive prices. At most,

they are arguing that they would have paid lower prices if Meta had not participated in the

Google-led auctions. This claim that they were damaged by the presence of an additional

competitor is insufficient to establish either harm to competition or antitrust injury sufficient to

confer Article III standing. *See, e.g.*, *Am. Express*, 138 S. Ct. at 2288 (internal citation and

quotation marks omitted) (explaining that courts will "not infer competitive injury" from

increased prices "absent some evidence that tends to prove . . . prices were above a competitive

level"); *Spinelli*, 903 F.3d at 212 ("conclusory allegation that prices have increased will not

suffice to state anticompetitive effect"); *Bhanusali*, 2013 WL 4828657, at *10 ("conclusory

allegation (unsupported by a single fact or example) that the price of orthopedic surgical services

has increased by the elimination of a *single* orthopedic surgeon from the relevant market is

likewise implausible").

## III.    ADVERTISERS' STATE LAW NBA CLAIM FAILS FOR THE SAME REASONS AS THEIR FEDERAL ANTITRUST CLAIM.

Meta explained in the Motion that Advertisers' NBA-focused state law claim

(Count IV) is substantively identical to their NBA-focused federal antitrust claim (Count III).

Advertisers do not contest this in Opposition. Count IV should therefore be dismissed for the

same reasons as Count III.

## IV.     ADVERTISERS' NBA CLAIMS SHOULD BE DISMISSED WITH PREJUDICE.

Advertisers already have had extensive opportunities to refine their NBA claims with the benefit of this Court's rulings on the States' complaint and their review of the more than two million documents that Google produced in this MDL.  (Mot. at 30.)  Any further attempt to plead an NBA claim would be futile, and the Advertisers do not even bother to argue otherwise. The CAC should be dismissed with prejudice.  *See Rosner v. Star Gas Partners, L.P.*, 344 F. App'x 642, 644 (2d Cir. 2009) (affirming dismissal with prejudice where plaintiff had prior opportunity to amend after being informed of defendants' arguments in favor of dismissal).

### CONCLUSION

For the foregoing reasons, Meta respectfully requests that the Court grant Meta's motion to dismiss Advertisers' NBA claims (Counts III and IV) with prejudice.

Dated: March 31, 2023

CRAVATH, SWAINE & MOORE, LLP

by        /s/ *Kevin J. Orsini*
Kevin J. Orsini

Worldwide Plaza
825 Eighth Avenue
New York, NY
(212) 474-1000
korsini@cravath.com

*Attorneys for Meta Platforms, Inc.*

15