UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**IN RE: GOOGLE DIGITAL ADVERTISING
ANTITRUST LITIGATION**

No. 1:21-MD-3010 (PKC)

---

*This Motion Relates To:*

---

**IN RE: GOOGLE DIGITAL ADVERTISING
ANTITRUST LITIGATION**

No. 1:21-CV-07001 (PKC)

---

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS GOOGLE LLC
AND ALPHABET INC.'S MOTION TO DISMISS
ADVERTISERS' CONSOLIDATED CLASS ACTION COMPLAINT**

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Fax: (202) 777-4555

WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Fax: (415) 947-2099

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Fax: (212) 728-2201

*Counsel for Defendants Google LLC and
Alphabet Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

TABLE OF ABBREVIATIONS ................................................................................................... vi

INTRODUCTION .......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 1

I.      ADVERTISERS LACK ANTITRUST STANDING. ......................................................... 1

     A.      Advertisers Lack Standing in the Alleged Ad Exchange Market. .......................... 2

     B.      Advertisers Lack Standing in the Alleged Large-Advertiser Tools Market. .......... 4

     C.      Advertisers Lack Standing in the Alleged Small-Advertiser Tools Market. .......... 7

II.      GOOGLE'S REQUEST FOR DISMISSAL OF ALLEGATIONS REGARDING
CONDUCT THAT "CREATED THE CONDITIONS" FOR GOOGLE'S
MONOPOLIZATION IS PROPER. .................................................................................. 9

III.      ADVERTISERS FAIL TO PLAUSIBLY ALLEGE AN AGREEMENT
BETWEEN GOOGLE AND PUBLISHERS REGARDING UPRS OR LINE-
ITEM CAPS. ..................................................................................................................... 9

IV.      ADVERTISERS' NBA CLAIM FAILS FOR THE SAME REASONS AS THE
STATES' NBA CLAIMS. ............................................................................................... 11

     A.      Advertisers Fail to Distinguish Their NBA Allegations from the States'. ........... 12

     B.      Advertisers' Alleged Google Final Clearinghouse Auction Market Is
Insufficiently Pleaded and Implausible. ............................................................... 13

     C.      Advertisers' Argument that They Do Not Need to Allege Facts Supporting
Their Market Definition Fails. .............................................................................. 14

V.      ALL BUT ONE NAMED PLAINTIFF MUST ARBITRATE ALL CLAIMS. .............. 16

     A.      Arbitration-Related Discovery is Unnecessary to Resolve Google's
Motion. .................................................................................................................. 16

     B.      Advertisers' UCL and Cartwright Act Claims are Arbitrable. ............................. 17

VI.      HANSON LACKS STANDING TO CHALLENGE CONDUCT THAT
OCCURRED AFTER 2016 AND TO PURSUE INJUNCTIVE RELIEF. ...................... 19

CONCLUSION ............................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                **Page(s)**

*Alvarez v. Experian Info. Sols., Inc.*,
    No. 19-CV-03343, ECF No. 53 (Apr. 9, 2021) ....................................................17

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)................................................................................10

*Bender v. Southland*,
    749 F.2d 1205 (6th Cir. 1984) ............................................................................10

*California Crane School, Inc. v. Google LLC*,
    2022 WL 3348425 (N.D. Cal. Aug. 12, 2022) ...................................................18

*Chapman v. N.Y. State Div. for Youth*,
    546 F.3d 230 (2d Cir. 2008)................................................................................13

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)................................................................................................7

*Cooper v. Ruane Cunniff & Goldfarb Inc.*,
    990 F.3d 173 (2d Cir. 2021)................................................................................17

*Cottrell v. AT&T Inc.*,
    2020 WL 2747774 (N.D. Cal. May 27, 2020) ...................................................19

*Cottrell v. AT&T Inc.*,
    2021 WL 4963246 (9th Cir. Oct. 26, 2021)........................................................19

*Fadem v. Ford Motor Co.*,
    352 F. Supp. 2d 501 (S.D.N.Y. 2005)................................................................14

*Flores v. Nat'l Football League*,
    2022 WL 3098388 (S.D.N.Y. Aug. 4, 2022) .....................................................16

*FTC v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986)............................................................................................15

*FTC v. Superior Court Trial Lawyers Ass'n*,
    493 U.S. 411 (1990)............................................................................................15

*Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*,
    602 F.2d 1025 (2d. Cir 1979)............................................................................10

*Gatt Commc'ns, Inc. v. PMC Assocs.*,
    L.L.C., 711 F.3d 68 (2d Cir. 2013) ......................................................................1

*Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*,
    960 F. Supp. 701 (S.D.N.Y. 1997) ....................................................................14

*Harry v. Total Gas & Power N. Am., Inc.*,
    889 F.3d 104 (2d Cir. 2018) .................................................................................7

*Hodges v. Comcast Cable Commc'ns, LLC*,
    21 F.4th 535 (9th Cir. 2021) .......................................................................18, 19

*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d 151 (2d Cir. 2016) .................................................................................2

*In re Aluminum Warehousing Antitrust Litigation*,
    336 F.R.D. 5 (S.D.N.Y. 2020) ..............................................................................3

*In re Auction Houses Antitrust Litigation*,
    193 F.R.D. 162 (S.D.N.Y. 2000) ..........................................................................3

*In re Digit. Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011).....................................................................5

*In re Dynamic Random Access Memory Antitrust Litig.*,
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) ................................................................

*In re European Rail Pass Antitrust Litig.*,
    166 F. Supp. 2d 836 (S.D.N.Y. 2001).....................................................................15

*In re Google Digital Advert. Antitrust Litig.*,
    2021 WL 2021990 (N.D. Cal. May 13, 2021).......................................................19

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    27 F. Supp. 3d 447 (S.D.N.Y. 2014).......................................................................5

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003).....................................................................5

*In re Platinum & Palladium Antitrust Litig.*,
    61 F.4th 242 (2d Cir. 2023) ...........................................................................3, 4

*Isaksen v. Vermont Castings, Inc.*,
    825 F.2d 1158 (7th Cir. 1987) ..............................................................................10

*Kassman v. KPMG LLP*,
    925 F. Supp. 2d 453 (S.D.N.Y. 2013).....................................................................6

*Loeb Indus. v. Sumitomo Corp.*,
    306 F.3d 469,489 (7th Cir. 2002) ...........................................................................6

*Mahon v. Ticor Title Ins. Co.*,
    683 F.3d 59 (2d Cir. 2012)....................................................................................5

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)..................................................................................11

*McGill v. Citibank, N.A.*,
    2 Cal. 5th 945 (2017) ...........................................................................................18

iii

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*,
   866 F.2d 525 (1st Cir. 1989) ........................................................................12

*Morton v. Maplebear Inc.*,
   2016 WL 616343 (S.D.N.Y. Feb. 9, 2016) ...................................................16

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016) ........................................................................17

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) .................................................................................15

*Olsen v. Charter Commc'ns, Inc.*,
   2019 WL 3779190 (S.D.N.Y. Aug. 9, 2019) ................................................17

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) .......................................................................................5

*PepsiCo, Inc. v. Coca-Cola Co.*,
   114 F. Supp. 2d 243 (S.D.N.Y. 2000) *aff'd* 315 F.3d 101 (2d Cir. 2002) ........13

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013) ..........................................................................10

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
   22 F.4th 103 (2d Cir. 2021) ...........................................................................7

*Spinner Consulting LLC v. Bankr. Mgmt. Sols., Inc.*,
   604 B.R. 660 (D.N.J. 2019) ...........................................................................5

*Summit Health, Ltd. v. Pinhas*,
   500 U.S. 322 (1991) .....................................................................................15

*Toys "R" Us, Inc. v. FTC*,
   221 F.3d 928 (7th Cir. 2000) .......................................................................15

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) ........................................................................11

*United States v. Blue Cross Blue Shield of Mich.*,
   809 F. Supp. 2d 665 (E.D. Mich. 2011) .........................................................9

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) ..................................................................................9, 10

*United States v. Delta Dental of Rhode Island*,
   943 F. Supp. 172 (D.R.I. 1996) ...................................................................11

*United States v. Sargent Elec. Co.*,
   785 F.2d 1123 (3d Cir. 1986) ......................................................................15

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*,
   156 F.3d 535 (4th Cir. 1998) .........................................................................9

*Viacom Int'l. Inc. v. Tele-Commc'ns, Inc.*,
    1994 WL 561377 (S.D.N.Y. Oct. 12, 1994) ....................................................16

*Vigil v. Take-Two Interactive Software, Inc.*,
    235 F. Supp. 3d 499 (S.D.N.Y. 2017)...........................................................20

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*,
    549 U.S. 312 (2007)...........................................................................16

*Yentsch v. Texaco, Inc.*,
    630 F.2d 46 (2d Cir. 1980).....................................................................10

**Statutes**

15 U.S.C. § 1 .............................................................................1, 9, 10, 11, 13

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ........................................................19

## TABLE OF ABBREVIATIONS

| Term | Definition |
|------|-----------|
| AdX | Google's Ad Exchange |
| Compl. | Consolidated Advertiser Class Action Complaint, ECF No. 399 |
| DFP | DoubleClick for Publishers |
| FCA | Google's final clearinghouse auctions |
| Google | Google LLC and Alphabet Inc. |
| Mot. | Defendants Google LLC and Alphabet Inc.'s Memorandum of Law in Support of Their Motion to Dismiss Advertisers' Consolidated Class Action Complaint, ECF No. 447. |
| MTD Op. | Opinion and Order, ECF No. 308 |
| NBA | 2018 Network Bidding Agreement between Google and Facebook |
| NBA Opp. | Advertiser Class Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants Google LLC, Alphabet Inc., and Meta Platforms, Inc.'s Motions to Dismiss Counts III and IV of the Advertisers' Consolidated Class Action Complaint, ECF No. 491 |
| Opp. | Advertiser Class Plaintiffs' Response to Defendants Google LLC and Alphabet Inc.'s Motion to Dismiss Advertisers' Consolidated Class Action Complaint, ECF No. 490 |
| RPO | Reserve Price Optimization |
| Search | Google Search |
| Shadd Decl. | Declaration of Courtney Shadd, ECF No. 448. |
| States | State Plaintiffs |
| States' TAC | State Plaintiffs' Third Amended Complaint, ECF No. 195 |
| Terms or Terms of Service | Google's Advertising Program Terms of Service |
| UPRs | Unified Pricing Rules |

## INTRODUCTION

Advertisers' Opposition does not rescue their Complaint.  The three named plaintiffs who remain in this case cannot dodge threshold requirements of **antitrust standing** by borrowing injuries from other plaintiffs or claiming markets they alleged as "distinct" are now "interlinked" or "combined."[1]  Their **Section 1 claims** remain deficient; one contravenes long standing Section 1 precedent and the other is *still* indistinguishable from the failed claim of State Plaintiffs.  As to Google's request for **arbitration**, Advertisers fail to show (as they must) that discovery into arbitrability is warranted or that their California law claims invoke "public injunctive relief." Advertisers' claims should be dismissed.

## ARGUMENT

### I.   ADVERTISERS LACK ANTITRUST STANDING.

Advertisers have not plausibly alleged that they have suffered antitrust injury from, or that they are efficient enforcers of, their federal antitrust claims (Counts I and II) in any of the three alleged relevant markets.

To begin, and despite Advertisers' claim otherwise, *e.g.*, Opp. 5, antitrust standing is a threshold inquiry amenable to resolution on the pleadings.  *Gatt Commc'ns, Inc. v. PMC Assocs.*, L.L.C., 711 F.3d 68, 75 (2d Cir. 2013).  Google does not ask the Court to make factual determinations regarding causation, market definition, or otherwise, but rather to assess the sufficiency of the factual allegations in Advertisers' Complaint, taken as true.

When confronted with their own allegations, Advertisers are now reluctant to stand by them, particularly core allegations related to market definition.  They claim Google draws "artificial[]" distinctions when Google references the very market definitions they pleaded.  Opp.

---

[1] On March 20, 2023, all but three named advertiser plaintiffs voluntarily dismissed their cases.  The three remaining plaintiffs are Cliffy Care Landscaping, Kinin, and Christopher Hanson.

13.  Advertisers back away from their alleged relevant markets, arguing now that the markets are "interlinked" or "self-reinforcing," *e.g.*, Opp. 4, and even suggesting their "market definitions . . . could change." *Id.* at 5.  Yet Advertisers chose to re-plead their case with distinct markets for distinct products and services, following the Court's Opinion & Order on the States' TAC.  Having done so, they cannot establish standing by borrowing injuries from other plaintiffs or markets and must be held to the four corners of their complaint.

### A.  Advertisers Lack Standing in the Alleged Ad Exchange Market.

***Antitrust Injury.***  Advertisers now claim they *are* direct participants in the alleged exchange market, Opp. 10, but that is not pleaded.  *See* Mot. 7.  They do not contend with Google's argument that no named Advertiser Plaintiff alleges it (i) transacted directly with ad exchanges; or (ii) paid any ad exchange fees.  *Id.* (citing Compl. ¶¶ 14-32).  Pointing out that they dealt "with Google" does not establish that they dealt with an ad exchange.  *See id.*

Advertisers also misconstrue the *McCready* exception, conflating related markets with inextricably intertwined injury.  Opp. 13.  Advertisers do not have standing simply because they participated in a market that is "related to" the alleged ad exchange market.  For *McCready* to apply, the "putative plaintiff must be a participant in the very market that is directly restrained." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016).  Advertisers allege that Google restrained the ad exchange market by affecting the ad exchange market—not by affecting some other market in which advertisers directly participate.  *See id.* at 163 ("Unless the market dynamics force conspirators to corrupt a separate market to achieve their illegal ends, potential McCready plaintiffs do not arise.").  Advertisers offer no explanation as to how all this "interrelatedness" adds up to exchange-related antitrust injury, nor how the Court's prior finding

that the States plausibly alleged certain conduct was anticompetitive conduct in the ad exchange

market "confirm[s]" that *Advertisers'* injury in the ad exchange market is plausible.  Opp. 10.

> **Efficient Enforcer.**  Here, Advertisers again argue they *are* direct participants in the ad

exchange market, but fail to cite any part of their pleading showing it.  Advertisers instead rely

on two class certification decisions in price-fixing cases (neither discussing antitrust standing)—

*In re Aluminum Warehousing Antitrust Litigation*, 336 F.R.D. 5 (S.D.N.Y. 2020) and *In re*

*Auction Houses Antitrust Litigation*, 193 F.R.D. 162 (S.D.N.Y. 2000)—for the proposition that

Google's ad exchange "deals directly" with Advertisers.  Opp. 10-11.

Advertisers' auction house analogy is flawed because Google's ad exchange does not

function or charge customers in the same way as Christie's.  In *Auction Houses*, Christie's was

accused of conspiring to fix the "buyer's premium" that it charged directly to buyers.  *See*

*Auction Houses*, 193 F.R.D. at 163 (explaining commission structure); *see also Aluminum*, 336

F.R.D. at 46 (noting that in *Auction Houses*, the auction houses "*directly charged their customers*

*the fixed commission rates*").  Here, advertisers do not allege that they pay Google's ad

exchange directly; they still only point to the vague assertion in their Complaint that the ad

exchange "take rate" paid by publishers is "borne in part by advertisers."  Opp. 10 (citing Compl.

¶¶ 310, 314).  Advertiser's reliance on publisher pass-on confirms that advertisers are not the

proper parties to bring these claims.  It also confirms that Advertisers fail the fourth efficient

enforcer factor, which "guards against 'pass-on theories that would require a court to divide

damages from the same violation among multiple plaintiffs.'"  *In re Platinum & Palladium*

*Antitrust Litig.*, 61 F.4th 242, 261 (2d Cir. 2023).  Advertisers now claim that paragraph 82 of

their Complaint alleges that Google "withdraws" their portion of the take rate from the ad spend.

Opp. 12-13. It does not; the paragraph says only that "Google's overall take rate is approximately 30% of advertisers' spend." Compl. ¶ 82.

The Second Circuit's recent analysis in *In re Platinum & Palladium Antitrust Litigation*, which Advertisers do not address, reinforces why Advertisers fail on the directness-of-injury efficient enforcer factor. In that case, the Second Circuit affirmed the district court's holding that plaintiff KPFF was not an efficient enforcer because KPFF did not trade in the markets that the defendants allegedly manipulated; whereas other plaintiffs (the Exchange Plaintiffs) did and were therefore efficient enforcers. 61 F.4th at 260-61. By contrast, here, Advertisers do not directly bid into or transact with Google's ad exchange.

### B. Advertisers Lack Standing in the Alleged Large-Advertiser Tools Market.

*Antitrust Injury.* As to the alleged large-advertiser tools market, Advertisers do not contend with Google's core argument that no named Advertiser Plaintiff alleges it ever used a "large buyer" tool, that it would in the future, or that it even qualifies to use such a tool. Mot. 10. Instead, Advertisers attempt to blur the distinction—that they themselves alleged—between the large- and small-advertising tools markets,[2] insisting the lack of participation by named Plaintiffs in the large-advertiser tools market is "beside the point" or a matter to be left for class certification. Opp. 14. However, Advertisers' Complaint is premised on two distinct buying tools markets. *E.g.*, Compl. ¶ 101 ("[B]uying tools for small advertisers are unique and not interchangeable with the buying tools for large advertisers."); *see also id.* ¶¶ 62, 68, 75, 77, 94, 97-99, 109, 125-31. Having chosen to allege separate markets, Advertisers cannot now merge them for the purposes of standing only. *See e.g., In re Dynamic Random Access Memory*

---

[2] Advertisers implicitly concede their Complaint contains no allegations that would allow them to collapse markets pleaded as distinct; their only evidence is beyond the pleadings. Opp. 14. Advertisers also get the facts wrong regarding Google's initial disclosures. Moreover, Advertisers' incorrect observation is beside the point because the test for whether two products are in the same market is not whether a person has knowledge of both products.

*Antitrust Litig.*, 516 F. Supp. 2d 1072, 1090 (N.D. Cal. 2007) (dismissing for lack of antitrust

standing claims asserted by "participants in separate, albeit related, markets"); *see also In re*

*Digit. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 404-05 (S.D.N.Y. 2011) (finding that CD-

purchaser plaintiffs lacked antitrust standing despite pleading a market that included music

generally because "their allegations involve only conduct related to the Internet Music market").

      Advertisers' suggestion that the question of antitrust standing—and thus the question of

whether any plaintiff can state a claim for relief—should be deferred until class certification has

no merit.  Opp. 14.  The named plaintiffs must be able to plausibly state claims for relief.  *In re*

*Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003)

("[A] putative class representative must be able to individually state a claim against defendants,

even though he or she purports to act on behalf of a class."); *see Spinner Consulting LLC v.*

*Bankr. Mgmt. Sols., Inc.*, 604 B.R. 660, 678-79 (D.N.J. 2019), *aff'd*, 796 F. App'x 132 (3d Cir.

2020) (holding a putative class representative in an antitrust suit must establish its own antitrust

standing); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 481

(S.D.N.Y. 2014) (before asking whether a named plaintiff has class standing, the court must

address whether that named plaintiff satisfies Article III and statutory standing).  Otherwise,

there would be no claims on which class certification could be based.  Advertisers allude to an

entirely different issue: Class certification can at times precede determination of the Article III

standing inquiry where "class certification issues are 'logically antecedent' to Article III

concerns," *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999), such as when "resolution of

class certification obviates the need to decide issues of Article III standing" because class

certification creates the jurisdictional issue and is dispositive.  *Mahon v. Ticor Title Ins. Co.*, 683

F.3d 59, 65 (2d Cir. 2012).  This exception "does not apply where, as here, the standing of the

named plaintiffs is in question," *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 465 (S.D.N.Y. 2013), and it certainly does not obviate the need to determine whether the only plaintiffs before the Court can state a claim for relief.

 ***Efficient Enforcer.*** Advertisers again side-step the argument that named Advertiser Plaintiffs cannot be efficient enforcers of claims for harm to a market they do not participate in. Advertisers argue they suffered "separate, and sufficiently direct, injuries" to recover for Google's practices affecting the DV360 ad-buying channel.  Opp. 15.  Yet Advertisers leave unexplained *how* named Advertiser Plaintiffs could have suffered direct injuries from this conduct without ever alleging that Advertiser Plaintiffs used ad-buying tools for large advertisers.  Advertisers' assertion that DV360 customers might have been harmed in the same or similar ways as Google Ads customers does not give them standing to recover for those separate harms that they undisputedly did not suffer, whether "similar" or not.

 Advertisers' reliance on out-of-circuit *Loeb* does not help their case.  In *Loeb*, the Seventh Circuit found "a direct relation between the defendants' illegal scheme and [plaintiff's] harm[,]" because defendants' manipulations of the copper futures price "*directly and predictably had an impact* on" the copper price plaintiffs paid in the separate cash copper market.  *Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469,489 (7th Cir. 2002) (emphasis added).  Advertisers have failed to plead how Google's actions allegedly affecting a large-advertiser tools market "directly and predictably had an impact on" named Plaintiffs who did not use large-advertiser tools. Further, unlike plaintiffs in *Loeb*, named Plaintiffs here are clearly not the "only plaintiffs possibly situated" to bring these claims, *see id.* at 492, as advertisers that used large-advertiser tools are obviously better-suited to do so.  Moreover, the Second Circuit has emphasized *Loeb* was an extreme case—where an "attenuated chain of causation" was accepted based on "the

uniquely interrelated nature" of the two markets and the "lockstep link between prices" in those markets.  *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 118 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2852 (2022).

### C.   Advertisers Lack Standing in the Alleged Small-Advertiser Tools Market.

*Antitrust Injury.*  In their brief, Advertisers claim to allege injury in the small-advertiser tools market from a "broad array of conduct."  Opp. 6.  But this is not in their Complaint, which only alleges harm in the small-advertiser tool market from Project Bernanke and Unified Pricing Rules.  *See* Mot. 11.  Advertisers point to vague allegations regarding Google Ads from sections of their Complaint describing the relevant markets, supposed evidence of Google Ads' monopoly power, and background on Google.  Opp. 6.  They do not allege that any of this conduct (most of which is not described in any detail) or commentary on Google's product quality had any *anticompetitive effects* in the alleged small-advertiser tools market.

Furthermore, for purposes of antitrust standing, it is appropriate for a court to perform a practice-by-practice analysis with respect to whether the challenged actions caused injury.  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 31, 35 (2013) (where the district court accepted only one of plaintiffs' four proposed theories of antitrust impact, finding it an "unremarkable premise" that plaintiffs would be "entitled only to damages resulting from . . . the only theory of antitrust impact accepted for class-action treatment by the District Court").  In fact, the antitrust standing analysis *requires* a court to "compare the anticompetitive effect *of the specific practice at issue* to the actual injury the plaintiff alleges."  *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018) (emphasis added).

Advertisers still offer no plausible explanation of the harm they suffered from Bernanke and UPRs.  Opp. 7-8.  Advertisers argue **Bernanke** harmed them by (1) causing them to pay the price of the actual second-highest bid instead of the third-highest bid, (2) "manipulating and

inflating" advertiser bids, and (3) giving an unfair advantage to Google's own ad-buying tool, "thwart[ing]" advertisers' ability to use competing ad-buying tools and "dr[i]v[ing] up" costs of Google Ads. *Id* at 7. This harm is not plausibly pleaded. First, according to the Complaint, advertisers paid the price of the second-highest bid whether or not Bernanke was used; before and after Bernanke, AdX was a second-price auction from advertisers' standpoint. *See e.g.*, Compl. ¶¶ 215, 218-19. Second, with respect to the supposedly "manipulated" bids, advertisers do not plead or explain how this supposed manipulation actually hurt them (*e.g.*, caused them to pay more than they otherwise would), nor how Bernanke would result in their ads being shown on websites that they did not bid on (since Bernanke operated on bids). Third, Advertisers do not explain what "costs" of Google Ads were driven up, nor how their use of other ad buying tools could be "thwarted" when they allege that small advertisers use only one. Compl. ¶ 119 ("Small advertisers also almost always [used] 'single home[.]'"). Indeed, they allege Bernanke "harmed advertisers who used buying tools other than Google Ads," Compl. ¶ 227, but no named Plaintiff is such an advertiser.

As for **UPRs**, Advertisers again fail to contend with the fact that they used Google Ads and no other buying tool. They claim that UPRs disadvantaged other buying tools, but that alleged harm did not affect Google Ads customers. Opp. 8. They also point to a conclusory assertion that it cost more to place ads "through Google." Compl. ¶ 266. But Advertisers fail to detail what these increased costs were or that Advertisers directly paid them.

***Efficient Enforcer.*** Advertisers are not efficient enforcers of their claims in the alleged market for ad buying tools for small advertisers. Advertisers made no "overpayments" under their own theory of harm for Bernanke and UPRs; publishers and advertisers were not

"simultaneously" harmed by Bernanke and UPRs; and publishers are already pursuing these claims.[3]

## II.   GOOGLE'S REQUEST FOR DISMISSAL OF ALLEGATIONS REGARDING CONDUCT THAT "CREATED THE CONDITIONS" FOR GOOGLE'S MONOPOLIZATION IS PROPER.

Advertisers now claim they included allegations regarding Google's acquisitions, Search business, and encrypting of user IDs as "background" only, arguing Google cannot move on facts that "are not dispositive of any of the pleas for legal redress."  Opp. 17.  Advertisers should be held to their description of these allegations as "background" that does not "directly address[] a particular claim element."  Opp. 16.  Google moves on these claims "[t]o the extent that Advertisers intend [them] to form a basis for liability."  Mot. 19.

## III.   ADVERTISERS FAIL TO PLAUSIBLY ALLEGE AN AGREEMENT BETWEEN GOOGLE AND PUBLISHERS REGARDING UPRS OR LINE-ITEM CAPS.

Advertisers acknowledge that, to survive dismissal of their Section 1 claims in Count V, Compl. ¶¶ 295-96, 386-88, they must plausibly allege an agreement between Google and publishers regarding UPRs and line-item caps.  Opp. 18.  They fail to do so, relying exclusively on an allegation that publishers assented to Google's policies by using Google's products.  Opp. 18, 22.  Advertisers cite no case upholding a Section 1 claim based solely upon assent by a counterparty to contractual terms, much less based solely on assent inferred from the counterparty's use of a product as Advertisers allege here.  Instead, Advertisers' cases demonstrate that something more than acquiescence to a unilateral policy is required to establish an agreement under Section 1—a longstanding principle dating back to the Supreme Court's decision in *United States v. Colgate & Co.*, 250 U.S. 300, 304-07 (1919).  Mot. 14-15.[4]

---

[3] Google does not concede Bernanke or UPRs are anticompetitive, regardless of the plaintiff bringing these claims.
[4] Plaintiffs' citations to *Va. Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*, 156 F.3d 535, 541 (4th Cir. 1998) and *United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 669 (E.D. Mich. 2011) are inapposite. *Vermiculite* addressed the issue of whether a non-profit organization is exempt from the antitrust laws, whereas *Blue*

Each of the cases that Advertisers cite involved something more than a customer continuing to use a product or service after the provider unilaterally imposed a policy. Each involved one party securing an agreement to fix prices through threats or coercion that went beyond merely offering a product on certain terms. In *Yentsch v. Texaco*, Texaco "went beyond *Colgate's* safe harbor of announcement plus mere refusal to deal by creating a coercive business climate," including "threats of termination" toward its dealers who did not lower their prices and a "policy of price surveillance." *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 52-54 (2d Cir. 1980). In *Isaksen v. Vermont Castings, Inc.*, a supplier directed the dealer to "raise his prices or [the supplier] would mix up [the dealer's] orders." 825 F.2d 1158, 1162-63 (7th Cir. 1987). In *Bender v. Southland,* there were "threat[s] to terminate their franchises or establish competing franchises nearby," and store visits "during which the [defendant's] representatives forced the plaintiffs to change their prices." 749 F.2d 1205, 1213-14 (6th Cir. 1984). *Anderson News, L.L.C. v. Am. Media, Inc.* did not involve acquiescence to a policy at all. There, the plaintiffs alleged that the defendants actively planned and agreed to a horizontal market allocation among competitors. 680 F.3d 162, 187-89 (2d Cir. 2012). Advertisers make the conclusory allegation (with no additional detail) that Google "coerced" publishers to agree to its policies. Opp. 18-19. The Court need not credit "conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

Similar to the defendants in *Colgate* and its progeny, *see Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1030-33 (2d. Cir 1979) (citing *Colgate*), Google allegedly made a unilateral change to its policies, which publishers were free to accept (by continuing to use DFP) or not. Compl. ¶¶ 254-66, 279-84. Far from illustrating a conspiracy, it made "perfect business

---

*Cross Blue Shield* addressed only the unreasonableness of the alleged conduct under Section 1, as the defendants did not challenge that an agreement had been made.

sense" that publishers allegedly continued to use DFP, which gave them access to "demand produced by hundreds of thousands of advertisers."  Mot. 15-16 (citing *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 138 (2d Cir. 2013) and Compl. ¶ 7).  This case is thus unlike *United States v. Apple, Inc.*, in which the Second Circuit held that, through its contracts with book publishers, Apple orchestrated a horizontal conspiracy among book publishers because it "understood that its proposed Contracts were attractive to the Publisher Defendants *only* if" the publishers acted collectively and "consciously played a key role in organizing their express collusion."  791 F.3d 290, 316-18 (2d Cir. 2015).  Nor is it like *United States v. Delta Dental of Rhode Island*, where dentists actively participated in dental insurer Delta's conspiracy by "refus[ing] to accept any fees lower than Delta's fee schedule," which Delta "careful[ly] monitor[ed]."  943 F. Supp. 172, 175-76 (D.R.I. 1996).  Here, by contrast, Google simply offered a popular and useful product to publishers.  That many customers chose to use a product cannot form the basis of a Section 1 "agreement."

## IV.   ADVERTISERS' NBA CLAIM FAILS FOR THE SAME REASONS AS THE STATES' NBA CLAIMS.

Nothing Advertisers put forth in their (second) Opposition brief can salvage their Section 1 claim based on the Network Bidding Agreement.  Advertisers' NBA claim fails, just like the States' NBA claim, because Advertisers' allegations that other bidders in Google's auctions were disadvantaged as a result of Google granting Meta more favorable terms in the NBA does not turn the NBA into an unreasonable restraint of trade.  As this Court held, it is "entirely consistent with competition" to offer "a large potential customer" like Facebook favorable terms, and there is "nothing anticompetitive in the simple fact that a seller selectively cuts its prices, or offers other favorable terms, to some of its dealers, even though such discrimination harms the non-

favored dealers."  MTD Op. 25-26 (quoting *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 529 (1st Cir. 1989)).

Advertisers make much of the fact that Google and Meta are competing bidders in Google's auctions, suggesting the NBA must be treated as a purely horizontal agreement for purposes of evaluating their pleading requirements.  *See* NBA Opp. 13-15.  However, none of these allegations and arguments are new.  The States made the same allegations and arguments, characterizing the NBA as a bid-rigging agreement.  *See* MTD Op. 27-28.  This Court rightly rejected those arguments, concluding that the NBA, including the contract terms raised in Advertisers' Complaint, is "principally" vertical in nature and therefore warrants rule of reason analysis.  MTD Op. 28.  And while Advertisers, like the States, argue that the NBA reduces competition in Google's auctions, Advertisers similarly fail to explain "why inducing Facebook to actively participate in the Google-run auctions—and endeavor to win a designated percentage of auctions—does not promote rather than harm competition."  MTD Op. 31.

## A.  Advertisers Fail to Distinguish Their NBA Allegations from the States'.

Advertisers argue that their NBA claim is different from the States' claims for three reasons, but the allegations on which they rely are actually no different.  First, they allege that the NBA created a conflict of interest for Google affecting competition.  NBA Opp. 4.  The States claimed the same.  TAC ¶ 440 (alleging that Google's conflict of interest (to favor Meta) disrupted the competitive bidding on Google's auctions).  Second, they allege that the NBA "forced [Advertisers] to place supra-competitive bids to win auctions against Meta's advertising customers."  NBA Opp. 2.  So did the States.  TAC ¶¶ 518-19 (alleging that advertisers had to pay more to win auctions because of the NBA).  Third, they allege that the NBA had anticompetitive effects that "ar[ose] in the market in which Google and Meta are *competitors*."  NBA Opp. 5.  The States made that allegation as well.  TAC ¶ 439 ("Google and Facebook are

direct, horizontal competitors in the in-app network market and compete to purchase in-app inventory from developers."); *see also* MTD Op. 31-32 (the States alleged anticompetitive effects in the in-app networks market). The Court dismissed identical allegations by the States as insufficient to support a Section 1 claim, *see* MTD Op. 30-34, and should also do so here.

### B. Advertisers' Alleged Google Final Clearinghouse Auction Market Is Insufficiently Pleaded and Implausible.

Advertisers make much of the fact that they plead a different relevant market than the States, *see*, *e.g.*, NBA Opp. 1-2, but for the reasons discussed above, their allegations fail to state a Section 1 violation regardless of market definition. In any event, Advertisers' purported market for open web and in-app ad inventory sold in Google's Final Clearinghouse Auctions is both insufficiently pleaded and implausible given Advertisers' own allegations. Advertisers have not made any factual allegations to support a purported relevant market confined to only ad impressions sold in auctions run by Google. *See* Mot. 18 (citing Compl. ¶¶ 54 n.1, 294). Meanwhile, Advertisers' own allegations show that web and in-app ad impressions are also sold through auctions or other sales processes run by competitors of Google, such as header bidding auctions and rivals' app mediation platforms. *See* Mot. 18-19 (citing Compl. ¶¶ 52, 282). Advertisers fail to explain why ad impressions sold through other auctions or processes are not substitutes belonging in the same market as ad impressions sold through Google's FCAs. *See* Mot. 19. Failing to explain why self-admitted alternatives are not substitutes is a fatal defect. *See id*. 18 (an alleged market is "legally insufficient" if it fails to include substitute products (quoting *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008))).[5]

---

[5] Advertisers argue that Google's point about substitutability between ad impressions sold in its auctions and others' auctions focuses on the wrong market. But that argument assumes that Advertisers' market definition is correct, rather than grappling with admitted sources of competition. Opp. 12-13. That is not how market definition works. *See*, *e.g.*, *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 249 (S.D.N.Y. 2000) (rejecting plaintiff's market definition argument where the plaintiff "chose[] to define the elements of the relevant market" to reach a favorable market share calculation "rather than letting the market define itself") *aff'd* 315 F.3d 101 (2d Cir. 2002). Just

Advertisers attempt to fix their pleading defect by arguing unpleaded facts.[6]  They now argue there are no substitutes for ad impressions sold through Google's FCAs because "[o]nce a publisher or advertiser commits to trading through Google's ad auctions, the existence of other markets they might have chosen, but did not choose, is irrelevant."  NBA Opp. 12-13.  Not only do Advertisers not allege this in their Complaint, but they allege contrary facts by recognizing that an ad impression can be sold through multiple tools and auctions at once (such as through header bidding).  *See* Compl. ¶¶ 52, 282, 313.  Moreover, Advertisers do not allege that—much less explain why—advertisers could not buy ad inventory through other auctions the moment they become dissatisfied with their ad inventory purchases through Google's auctions.  Advertisers' attempt to analogize their alleged single-brand Google FCA market to the aftermarket for Kodak copier parts and services of Kodak copiers therefore fails.  NBA Opp. 12-13.  Advertisers have not alleged (nor could they) any "lock in" effect that forces advertisers to continue to use Google's auctions to purchase ad impressions that is comparable to a consumer being forced to buy parts and services for a Kodak copier once they have purchased a Kodak copier.[7]

### C.  Advertisers' Argument that They Do Not Need to Allege Facts Supporting Their Market Definition Fails.

Advertisers argue they need not allege facts regarding substitutability and other relevant market definition factors to support their alleged market "[g]iven the circumstances of the agreement, the competing positions of Defendants in the market, the 'commercial realities of the

---

because there is competition to buy ad impressions within Google's auctions does not mean there is not also competition to buy ad impressions across Google and other auctions. *See*, *e.g.*, Compl. ¶¶ 49, 51-52, 93 (describing how advertisers can buy ad impressions through various ad tech channels).

[6] Advertisers cannot cure their Complaint by alleging facts in opposition to a motion to dismiss.  *See Fadem v. Ford Motor Co.,* 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005), *aff'd*, 157 F. App'x 398 (2d Cir. 2005).

[7] *See*, *e.g.*, *Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (distinguishing consumer "preference" for a product from the "compulsion by the product" described in *Kodak*).

industry,' and the present lack of discovery."   NBA Opp. 11.  As an initial matter, Advertisers'

lack-of-discovery excuse is invalid, given that they had access to a massive collection of Google

documents before they amended their complaint.  Advertisers rely on *FTC v. Superior Court

Trial Lawyers Ass'n*, 493 U.S. 411 (1990), *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447

(1986), and other related cases.  *See* NBA Opp. 7-12.  None of these cases—which involved

horizontal agreements among competitors that were inherently suspect or *per se* unlawful—

relieves Advertisers of the obligation to allege a plausible relevant market.  *See, e.g.*, *Superior

Court Trial Lawyers Ass'n,* 493 U.S. at 436, 436  n.19 (horizontal group boycott and price-fixing

scheme)[8]; *Indiana Fed'n of Dentists*, 476 U.S. at 459 (horizontal group boycott).[9]

By contrast, as this Court has already held, the NBA and its terms are principally vertical

arrangements, MTD Op. 27-29, that do not restrict competition but instead are likely to promote

competition by inducing Meta to compete more aggressively.  *See*, *e.g.*, *id.* at 31 (concluding that

the NBA terms encouraged Meta to submit "competitive" bids).  Accordingly, the rule of reason

applies, which means Advertisers must define a market.[10]  *See Ohio v. Am. Express Co.*, 138 S.

Ct. 2274, 2285 n.7 (2018).  Advertisers have failed to do that.

Advertisers also argue that they need not define a relevant market or allege market power

because they have alleged direct evidence of anticompetitive effects.  *See* NBA Opp. 9-11.  That

is incorrect; a plaintiff challenging a vertical agreement must define a market and allege market

power even when purporting to offer direct evidence.  *Ohio v. Am. Express Co.*, 138 S. Ct. at

---

[8] Market definition is not required in *per se* price-fixing cases.  *See In re European Rail Pass Antitrust Litig.*, 166 F. Supp. 2d 836, 844 (S.D.N.Y. 2001).

[9] The Court viewed the boycott at issue as inherently suspect with no obvious redeeming procompetitive benefit, such that analysis of competitive effects in the relevant market was not necessary.  *See Indiana Fed'n of Dentists*, 476 U.S. at 458-59.

[10] The other cases cited by Advertisers also involve horizontal conspiracies.  *See* Opp. 7-9 (citing, *e.g.*, *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 327 (1991) (horizontal group boycott conspiracy); *United States v. Sargent Elec. Co.*, 785 F.2d 1123, 1125 (3d Cir. 1986) (horizontal bid rigging); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 930 (7th Cir. 2000) (horizontal agreement among toy manufacturers).

2285 n.7.  Moreover, their "direct evidence" is deficient.  This Court has already held there is "nothing anticompetitive" in Google offering favorable terms to a large buyer like Meta regardless of any adverse impact of that on other bidders, s*ee* MTD Op. 26, and Advertisers' supposed anticompetitive effects are in fact describing likely procompetitive effects.  Advertisers complain that, as a result of the NBA, they had to bid more in Google's FCAs to win because of competition from Meta.  *See* NBA Opp. at 5 (citing Compl. ¶¶ 370, 376).  As the Court has already recognized, if anything, this is evidence of procompetitive effects resulting from an increase in competition in Google's FCAs because Meta is participating.  *See* MTD Op. 32 ("Rather than insulate Google's in-app network from competition, [the NBA] promotes competition with Google's in-app network by bringing in a new competing bidder."); *see also Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 323-24 (2007) (determining that a firm bidding up prices "is essential to competition and innovation on the buy side of the market"); *Viacom Int'l. Inc. v. Tele-Commc'ns, Inc.*, 1994 WL 561377 at *4-5 (S.D.N.Y. Oct. 12, 1994) ("[T]o hold that antitrust laws protect competitors from paying too much . . . in a competitive auction would render all such auctions illegal" because "every losing bidder will raise its rival's costs.").

## V.  ALL BUT ONE NAMED PLAINTIFF MUST ARBITRATE ALL CLAIMS.

### A. Arbitration-Related Discovery is Unnecessary to Resolve Google's Motion.

Advertisers do not deny that two of the three remaining named Plaintiffs entered a valid arbitration agreement with Google.  Opp. 24.  Instead, they claim that Google's request for arbitration is not ripe and seek unspecified discovery to "develop[] the facts underlying the potential arbitrability of [Advertisers'] claims[.]"  *Id*.  Advertisers fail to "carry their burden" to show discovery is necessary to evaluate the question of arbitrability.  *See Flores v. Nat'l Football League*, 2022 WL 3098388, at *2 (S.D.N.Y. Aug. 4, 2022) (quoting *Morton v.*

*Maplebear Inc.*, 2016 WL 616343, at *5 (S.D.N.Y. Feb. 9, 2016)).  Moreover, Advertisers could have sought leave from the Court to seek such discovery months ago, *see* PTO-3, or raised the request even earlier prior to transfer when the same issues were raised.  They did not do so.

Arbitrability depends on only two inquiries: (1) "whether the parties agreed to arbitrate," and (2) "whether the scope of that agreement encompasses the claims at issue."  *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 (2d Cir. 2021) (citation omitted).  Google's Terms of Service and the related documents attached to the Declaration of Courtney Shadd resolve these questions.  *See* Shadd Decl.  No further factual development is necessary.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) ("[W]hen it is apparent . . . that claims are subject to arbitration, a district court may dismiss in favor of arbitration without the delay of discovery.").  Advertisers reference no facts that discovery could possibly reveal that would bear upon either issue.  Nor do Plaintiffs' cited Requests for Production.[11]  *See* Plaintiffs' First Set of Requests for Production, Request Nos. 294-297 (Jan. 27, 2023), *available upon request*.  Unlike the plaintiffs in *Alvarez v. Experian Info. Sols., Inc.*, who sought three specific pieces of information and explained why each was necessary to their waiver-of-arbitration argument, No. 19-CV-03343, ECF No. 53 (Apr. 9, 2021), Advertisers here point to nothing specific.  They "cannot avoid arbitration" based on only the "unsubstantiated hope that discovery may turn up something."  *See Olsen v. Charter Commc'ns, Inc.*, 2019 WL 3779190, at *6 n.7 (S.D.N.Y. Aug. 9, 2019).

### B.  Advertisers' UCL and Cartwright Act Claims are Arbitrable.

Advertisers insist their claims under California's Unfair Competition Law and Cartwright

---

[11] Google did not make a "blanket objection" to producing discovery related to arbitration, *contra* Opp. 24 n.6.  Indeed, Google already provided the relevant documents with Google's Motion to Dismiss.  Shadd Decl.  Plaintiffs' arbitration-related Request Nos. 294 through 297 violated PTO-3, and Google objected on that basis.

Act are not arbitrable under *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017).  However, *McGill* does not apply because Advertisers do not seek "public injunctive relief" via either claim.  *See* Mot. 29-30.  Advertisers' attempts to distinguish *California Crane School* and *Hodges* fail, and their other cited authority is unavailing.

First, Advertisers misconstrue *California Crane School*, arguing the "court declined to apply *McGill* because the plaintiffs asserted no claim under California law."  Opp. 25 (citing *California Crane School, Inc. v. Google LLC*, 2022 WL 3348425, at *4 (N.D. Cal. Aug. 12, 2022)).  Yet in *California Crane School*, the court expressly concluded an amendment adding a Cartwright Act claim would "not change [its] conclusion" for two reasons.  *Id.*  First, the court found no court had interpreted the Cartwright Act to authorize public injunctive relief under *McGill*.  *Id.*  Second, even if the Cartwright Act *did* authorize such relief, *McGill* would still not apply because "public injunctive relief cannot be sought in pursuit of representative claims or for the benefit of a discrete subset of similarly situated persons."  *Id.* (citing *McGill*, 2 Cal. 5th at 959-60 and *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 548 (9th Cir. 2021)).

The "nature" of the relief requested in *California Crane School* is no different than that sought by Advertisers.  As here, the plaintiff in *California Crane School* sought relief on behalf of itself and a class of people and entities who paid Google for advertising services[12] "on the ground that those individuals and entities paid inflated prices . . . and therefore [were] entitled to recoup their past losses."  2022 WL 3348425 at *4.  Advertisers have pointed to no fact that would disrupt the court's conclusion in *California Crane School* that "these are paradigmatic 'representative claims' that would primarily benefit a discrete set of similarly-situated persons— namely, individuals or entities that have paid to advertise on Google's services."  *Id*.

---

[12] The ad services in *California Crane School* were related to Google Search, *id.*

Advertisers' attempt to distinguish *Hodges* also fails.  In *Hodges*, plaintiff brought class action claims, including a UCL claim, challenging Comcast data-collection practices.  *Hodges*, 21 F.4th at 538.  That plaintiff's requested relief was labeled as "public" and "s[ought] forward-looking prohibitions against future violations" was not "public injunctive relief" because the requests "on their face st[ood] to benefit only . . . a group of individuals similarly situated to plaintiff" (Comcast cable subscribers).  *Id*. at 548-49.  Here too, Advertisers' requested relief purportedly benefits individuals similarly situated to plaintiffs (advertisers who use Google's ad tools), with Advertisers' claimed benefits to the public only incidental.

Advertisers' other cited authority does not change the analysis.  Several predate *Hodges*, including *Cottrell v. AT&T Inc.*, 2020 WL 2747774, at *5 (N.D. Cal. May 27, 2020), which was reversed by the Ninth Circuit, finding the decision "foreclosed by our intervening decision in *Hodges*."  2021 WL 4963246, at *1 (9th Cir. Oct. 26, 2021)).  Further, Advertisers' citation to Judge Freeman's May 2021 order is misleading as Judge Freeman did not ultimately make any holding on this issue and dismissed the Advertisers' complaint on other grounds.  *In re Google Digital Advert. Antitrust Litig.*, 2021 WL 2021990, at *7 (N.D. Cal. May 13, 2021).

Google agrees that if an advertiser's request for injunctive relief under the Cartwright Act or UCL is non-arbitrable, that entire claim is non-arbitrable.[13]

## VI.    HANSON LACKS STANDING TO CHALLENGE CONDUCT THAT OCCURRED AFTER 2016 AND TO PURSUE INJUNCTIVE RELIEF.

Christopher Hanson, the only named Advertiser Plaintiff for whom Google is unable to locate an arbitration agreement, lacks standing to assert claims based on any alleged conduct that

---

[13] Advertisers fail to state California law claims, and Google would move to dismiss Advertisers' UCL and Cartwright Act claims under 12(b)(6) if they are not dismissed in favor of arbitration.  Moreover, discovery has revealed that named plaintiff Kinin, Inc. (who must arbitrate) lacks standing to pursue injunctive relief because it ceased using Google advertising tools in 2019.  Therefore, Kinin's plea for injunctive relief (public or otherwise) cannot excuse its failure to arbitrate.

occurred after Hanson Law Firm stopped "pay[ing] Google directly to broker the placement of its display advertisements" on September 6, 2016.  Compl. ¶¶ 14-15.

Advertisers do not contend that Hanson suffered harm after 2016, nor that there is any threat of any future injury to him.  Instead, they label Google's actions as a "course of conduct" and a "scheme," and assert this warrants deferring the question of Hanson's standing until after class certification.  Opp. at 3.  But Hanson himself must have standing to bring the claims he wishes to assert; he cannot borrow the standing of some unnamed other class member.  *Vigil v. Take-Two Interactive Software, Inc.*, 235 F. Supp. 3d 499, 508 (S.D.N.Y. 2017) ("In a class action, a court must analyze the injuries allegedly suffered by the named plaintiffs, not unnamed members of the potential class, to determine whether the plaintiffs have Article III standing."), *aff'd in part, vacated in part, remanded sub nom. Santana v. Take-Two Interactive Software, Inc.*, 717 F. App'x 12 (2d Cir. 2017).  Hanson suffered no injury from any part of a "scheme" occurring after 2016, and has no standing to sue for injunctive relief.

Thus, in the event the Court declines to dismiss Advertisers' federal antitrust claims in their entirety, or dismisses only the claims of named Advertiser Plaintiffs subject to arbitration, Google requests the Court also dismiss for lack of standing Hanson's claims for injunctive relief and those based on conduct occurring after 2016, namely claims premised on line-item caps, redaction of auction data, and UPRs (alleged in Counts I, II, and V), and claims premised on the Network Bidding Agreement (alleged in Count III).  *See* Mot. 23.

## CONCLUSION

For the foregoing reasons, Google respectfully requests that this Court dismiss the Consolidated Advertiser Class Action Complaint in its entirety or, in the alternative, the federal antitrust claims (Counts I through III and V).

Dated: March 31, 2023                                     Respectfully Submitted,

_/s/ Justina K. Sessions_
Justina K. Sessions
Jonathan Jacobson
Jessica Lonergan
Mikaela Evans-Aziz (admitted _pro hac vice_)
Vadim Egoul
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
(415) 947-2000
jsessions@wsgr.com
jjacobson@wsgr.com
jlonergan@wsgr.com
mevansaziz@wsgr.com
vegoul@wsgr.com

Eric Mahr
Julie Elmer
Andrew J. Ewalt (admitted _pro hac vice_)
Jan Rybnicek (admitted _pro hac vice_)
Lauren Kaplin
Robert J. McCallum
FRESHFIELDS BRUCKHAUS DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
julie.elmer@freshfields.com
andrew.ewalt@freshfields.com
jan.rybnicek@freshfields.com
lauren.kaplin@freshfields.com
rob.mccallum@freshfields.com

John Harkrider
Daniel Bitton
Bradley Justus (admitted _pro hac vice_)
Koren Wong-Ervin (admitted _pro hac vice_)

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
jharkrider@axinn.com
dbitton@axinn.com
bjustus@axinn.com
kwongervin@axinn.com

*Counsel for Defendants Google LLC and Alphabet Inc.*