UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | No. 1:21-MD-3010 (PKC) |

*This Motion Relates To:*

| | |
|---|---|
| **ASSOCIATED NEWSPAPERS LTD. and MAIL MEDIA, INC.** | |
| *Plaintiffs,* | No. 1:21-cv-03446 (PKC) |
| -against- | |
| **GOOGLE LLC and ALPHABET INC.,** | |
| *Defendants.* | |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS
GOOGLE LLC AND ALPHABET INC.'S MOTION TO DISMISS
<u>DAILY MAIL'S AMENDED COMPLAINT</u>**

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Fax: (212) 728-2201

*Counsel for Defendants Google LLC and
Alphabet Inc.*

WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Fax: (415) 947-2099

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

TABLE OF ABBREVIATIONS ......................................................................................... iv

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

    I.     DAILY MAIL FAILS TO ALLEGE THAT GOOGLE "LEVERAGED"
         A SEARCH MONOPOLY IN VIOLATION OF THE SHERMAN ACT ............. 2

         A.     Daily Mail Fails to Allege that Google "Manipulated" Daily Mail's
               Search Results or Harmed Competition ......................................................... 2

         B.     Daily Mail Fails to Allege that AMP is Anticompetitive. .......................... 7

    II.    THE COURT HAS ALREADY REJECTED SECTION 2 CLAIMS
         REGARDING EXCHANGE BIDDING AND ENCRYPTED USER IDS. .......... 9

         A.     Daily Mail Fails to Allege that Google "Coerced" Use of Exchange
               Bidding ......................................................................................................... 9

         B.     Daily Mail Fails to Allege that Encrypted User IDs Are
               Anticompetitive ........................................................................................... 11

    III.   DISCOVERY SHOULD NOT PROCEED ON THESE CLAIMS, AND
         DISMISSAL SHOULD BE WITH PREJUDICE. ............................................. 13

CONCLUSION ................................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**                                                                                                                         **Page(s)**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................................4

*Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994).......................................................................................2

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................................13

*Cal Comp. Prod. v. IBM*, 613 F. 2d 727 (9th Cir. 1979) ........................................................................8

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002)...............................................12

*Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130 (9th Cir. 2022) ............................................6, 12

*FTC v. Qualcomm*, 969 F.3d 974 (9th Cir. 2020)...........................................................................4, 12, 13

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, 2016 WL 6110565 (S.D.N.Y. Aug. 4, 2016) (Castel, J.) .......................................................................................................4

*In re Adderall XR Antitrust Litig.*, 754 F.3d 128 (2d Cir. 2014) ......................................................8, 13

*In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015) ...........................................................................................................................14

*In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007) ...........................................................................................................................4

*In re Keurig Green Mountain*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019) ..............................................5, 10

*It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016) ..................................................10

*JetAway Aviation, LLC v. Bd. of County Comm'rs*, 754 F.3d 824 (10th Cir. 2014) ..........................5

*Kinderstart.com, LLC v. Google*, 2007 WL 831806 (N.D. Cal. March 16, 2007) ..............................6

*Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071 (N.D. Ill. 2011) ...........................................................................................................................4

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) ..................................................7

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) (Gorsuch, J.)...................8, 11, 13

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998) ...............................................................................2

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ....................................................8

*Person v. Google, Inc.*, 2007 WL 1831111 (N.D. Cal. June 25, 2007).................................................6

*RSM Prod. Corp. v. FriDaily Mailan*, 643 F. Supp. 2d 382 (S.D.N.Y. 2009) ....................................7

*Search King, Inc. v. Google Tech., Inc.*, 2003 WL 21464568 (W.D. Okla. May 27, 2003) .............................................................................................................................6

*Soul Circus, Inc. v. Trevanna Entertainment, Inc.*, 249 F.R.D. 109 (S.D.N.Y. 2008) ................................................................................................................................14

*Unijax, Inc. v. Champion Int'l*, 683 F.2d 678 (2d Cir. 1982) .................................................3, 7, 10

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ......................................................5

*United States v. Grinnell Corp.*, 384 U. S. 563 (1966).....................................................................11

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ........................................................5

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ..................................................................................................................2, 8, 11

## Statutes

15 U.S.C § 1.....................................................................................................................................4

15 U.S.C. § 2..................................................................................................................4, 8, 9, 10, 11

## Other Authorities

Fed. R. Civ. P. 12(b)(6)..............................................................................................................13, 14

3 P. Areeda & D. Turner, *Antitrust Law* ¶ 737b (1978)...................................................................12

**TABLE OF ABBREVIATIONS**

| Term | Definition |
|---|---|
| AdX | Google's Ad Exchange |
| AMP | Accelerated Mobile Pages |
| Compl. | Amended Complaint, ECF No. 400 |
| Daily Mail | Associated Newspapers Ltd. and Mail Media, Inc. |
| EB | Google's Exchange Bidding |
| EDA | Enhanced Dynamic Allocation |
| Google | Google LLC and Alphabet Inc. |
| Mot. | Defendants Google LLC and Alphabet Inc.'s Memorandum of Law in Support of Their Motion to Dismiss Daily Mail's Amended Complaint, ECF No. 454 |
| MTD Op. | Opinion and Order, ECF No. 308 |
| Opp. | Daily Mail Plaintiffs' Opposition to Google's Motion to Dismiss, ECF No. 488 |
| Search | Google Search |
| States | State Plaintiffs |
| States' TAC | State Plaintiffs' Third Amended Complaint, ECF No. 195 |
| UPRs | Unified Pricing Rules |

**INTRODUCTION**

Daily Mail's claims regarding Google's leveraging of its Search business, Exchange Bidding, and encrypted user IDs should be dismissed in their entirety and with prejudice.  At best, each of these claims describes Google practices or product designs that Daily Mail would like to alter so that it might make more money.  None describes exclusionary conduct that harms competition in any alleged market.  For example, Daily Mail spins an unfounded and implausible theory that Google suddenly and temporarily "punished" Daily Mail with diminished search rankings, for conduct that Daily Mail had engaged in for years.  Daily Mail fails to plead how this alleged reduction in its own rankings—due to regular modifications to Google's search algorithm—forced anyone to use Google products or caused market-wide harm.  It also does not explain how Google's development of AMP or Exchange Bidding "coerced" publishers in any discernible way.  And Daily Mail offers no factual support to infer that Google's encrypting user IDs was "irrational" rather than for legitimate business reasons.

Instead, Daily Mail's Opposition contains empty arguments that attempt to distract from its insufficient allegations.  Daily Mail points to other complaints, unrelated conduct, and extraneous details not pleaded in its Complaint—all of which are irrelevant.  Moreover, Daily Mail mischaracterizes legal concepts such as "affirmative interference" and ignores the controlling precedent for coercion.  These deficiencies underscore that Daily Mail's allegations have no real footing.

Daily Mail should not get another chance to revive claims that this Court has already dismissed in the States' case.  Nor should discovery be allowed for claims in which Daily Mail fails to plausibly allege anticompetitive conduct.  Any further attempt to amend would be inefficient and futile.

1

**ARGUMENT**

I.   **DAILY MAIL FAILS TO ALLEGE THAT GOOGLE "LEVERAGED" A SEARCH MONOPOLY IN VIOLATION OF THE SHERMAN ACT.**

Daily Mail's leveraging claim should be dismissed.  Daily Mail pleads that Google "wields its monopoly in general search services to force publishers to sell growing shares of their ad inventory through AdX[.]"  Compl. ¶ 201.  Specifically, Daily Mail challenges Google's purported manipulation of search results, Compl. ¶¶ 213-25, and Google's introduction of AMP, *id.* ¶¶ 202-12; *see also* Mot. 9.  Daily Mail insists that its alleged decline in search traffic was part of Google's supposed campaign to "punish" Daily Mail and "other publishers."  Yet it still does not plausibly show anticompetitive conduct or market-wide harm in the ad exchange market.  As for AMP, Daily Mail does not add any new material allegations that should alter this Court's decision to dismiss the States' similar claim.  MTD Op. 70-72, ECF No. 308.

   **A.  Daily Mail Fails to Allege that Google "Manipulated" Daily Mail's Search Results or Harmed Competition.**

Daily Mail does not plausibly allege that Google's supposed "manipulation" of search results amounts to anticompetitive conduct or harm to competition.  To bring a "monopoly leveraging" claim, Daily Mail must allege anticompetitive conduct.  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004) ("[L]everaging presupposes anticompetitive conduct[.]"); Mot. 9-10.  Daily Mail must also explain how Google allegedly used its search monopoly to harm competition in and create a dangerous probability of monopolizing the alleged ad exchange market.  *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998) ("[A] simple allegation of harm . . . does not automatically show injury to competition"); *Balaklaw v. Lovell*, 14 F.3d 793, 797-99 (2d Cir. 1994) (requiring market-wide injury); *see also* Mot. 12-13.  Daily Mail has done neither.

**No Anticompetitive Conduct.**  Daily Mail does not allege how Google's regular modifications to its search results page and algorithm, Compl. ¶ 213, amount to the level of coercion or conditioning necessary to maintain a leveraging claim.  Daily Mail is essentially arguing that Google tied search rankings to uniform price floors or to the use of Google's ad exchange.  According to Daily Mail, Google "punished" it for engaging in a price-flooring strategy in the week before Google implemented UPRs, thereby "forcing" Daily Mail to stop applying differential price floors.  Compl. ¶¶ 221-22; Opp. 8-9.  Daily Mail also alleges that it was punished for using client-side header bidding rather than Exchange Bidding.  Compl. ¶ 224; Opp. 7.  Such a claim requires coercion.  *See Unijax, Inc. v. Champion Int'l*, 683 F.2d 678, 685 (2d Cir. 1982) ("Actual coercion . . . is present only if the manufacturer goes beyond persuasion and conditions [the] purchase of one product on the purchase of another product.").  Daily Mail was not required or "forced" to do anything due to Google's search rankings.  Indeed, a change in search rankings did not force Daily Mail to alter its price-flooring strategy.  Rather, Daily Mail changed its price flooring because Google implemented UPRs "across publishers' inventory" (*id.* ¶ 222).  By Daily Mail's allegations, it did not stop applying differential price floors until Google implemented UPRs (including during the week its search rankings allegedly declined).  Compl. ¶¶ 221-22.  And as to header bidding, despite multiple modifications to Google's search results page from 2017 to present, Daily Mail "continued – and continues to this day – to use client-side header bidding at higher rates than Exchange Bidding, and for an increasing number of non-Google exchanges."  *Id.* ¶ 224.

Daily Mail also fails to plausibly allege how Google coerced or otherwise harmed other publishers.  Daily Mail claims that it is beyond plausible ("obvious") that because other publishers use Google ad tools, prefer header bidding, and are restricted by UPRs, they too were

harmed by Google's alleged search manipulation.  Opp. 10-11.  That argument is not pleaded

and not supported.  The only allegation Daily Mail offers is that its own sales revenue allegedly

increased due to header bidding, a tool that is "favorable" for publishers.  Compl. ¶ 46.  Even

taking Daily Mail's allegations as true that header bidding is favorable for publishers, it is

entirely implausible to infer from that isolated fact that Google decided to change its search

algorithm just to punish *all* publishers using header bidding.  Nor does Daily Mail allege any

facts from which it could be inferred that any other publisher changed behavior as a result of this

supposed punishment.  Daily Mail is entitled to inferences only from allegations that "plausibly

give rise to an entitlement of relief."  *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, 2016 WL

6110565, at \*12 (S.D.N.Y. Aug. 4, 2016) (Castel, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

679 (2009)).  "[L]egal conclusions . . . are not entitled to the presumption of truth."  *Id*.

Daily Mail also mistakenly insists that "temporal proximity" is sufficient to infer

causation.  Neither *In re Graphics* nor *Kleen Products* support this generalization.  Both cases

involve Section 1 claims based on alleged conspiracies, not exclusionary conduct under Section

2.  *In re Graphics Processing Units Antitrust Litig*., 540 F. Supp. 2d 1085, 1095 (N.D. Cal.

2007) (finding a "pattern" of collusive behavior made "at the very same time by multiple

competitors"); *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1080 (N.D.

Ill. 2011) ("[Where] price increases are consistently and closely timed soon after industry

gatherings, significant weight is lent to allegations *of a conspiracy*") (emphasis added); *see also*

*FTC v. Qualcomm*, 969 F.3d 974, 992 (9th Cir. 2020) ("proving an antitrust violation under § 2

of the Sherman Act is more exacting than proving a § 1 violation").  There is no alleged (or

apparent) reason why a short-lived drop in Daily Mail's search traffic, which was restored "as

quickly as it disappeared[,]" would be part of a targeted campaign against certain publishers. Compl. ¶ 217.

**No Harm to Competition.**  Daily Mail fails to explain how its supposed decline in search traffic constitutes market-wide harm in any alleged relevant market.  *See* Mot. 12-13.  A temporary decline in search traffic does not amount to the anticompetitive harm needed to sustain a leveraging claim.  *See JetAway Aviation, LLC v. Bd. of County Comm'rs*, 754 F.3d 824, 841 (10th Cir. 2014) ("In divining the presence of an antitrust injury, courts have disregarded temporary anticompetitive effects.").  Moreover, as explained above, Daily Mail does not sufficiently allege that other publishers were harmed by Google's alleged manipulation of search results.

Daily Mail fails to connect Google's algorithm change to some reduction in the use of header bidding.  Of course, Daily Mail does not deny that it continues to use header bidding (and in fact never alleges that it reduced use of header bidding as a result of any Google conduct). Instead, Daily Mail maintains that its search leveraging claim must survive because total foreclosure is not legally required.  Opp. 10.  That is not accurate.  Although "the test is not total foreclosure," Daily Mail must allege that "the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."  *In re Keurig Green Mountain*, 383 F. Supp. 3d 187, 236 (S.D.N.Y. 2019) (quoting *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)); MTD Op. 37; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) (requiring a "significant degree of foreclosure").  Taking Daily Mail's allegations as true, Daily Mail still fails to allege that the so-called "manipulation of search results" severely restricted *the market's* use of header bidding.  Daily Mail argues that it uses header bidding to some (un-pleaded) "lesser extent," Opp. 1, but does not allege any market-wide effect on header

bidding resulting from Google's alleged search manipulation in its Complaint.  Nor does Daily

Mail allege that other publishers responded whatsoever to Google's so-called search

manipulation; for example, Daily Mail does not allege other publishers were somehow coerced

into stopping any price flooring strategy prior to the implementation of UPRs.

Claims that Google has "punished" websites have been made in the past.  They are

regularly rejected under Rule 12.  *See, e.g.*, *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130

(9th Cir. 2022) (affirming that Dreamstime's allegedly diminished search rankings did not

plausibly harm competition in the online search advertising market); *Kinderstart.com, LLC v.*

*Google*, 2007 WL 831806, at *6-8 (N.D. Cal. March 16, 2007) ("KinderStart's allegations that

Google removed KinderStart from search results and lowered its PageRank do not suffice to

allege predatory conduct as opposed to legitimate competitive actions"); *see also Person v.*

*Google, Inc.*, 2007 WL 1831111, at *3-5 (N.D. Cal. June 25, 2007), *aff'd*, 346 Fed.Appx. 230

(9th Cir. 2009) (dismissing complaint for failure to allege anticompetitive conduct regarding

website traffic, among other reasons); *Search King, Inc. v. Google Tech., Inc.*, 2003 WL

21464568 (W.D. Okla. May 27, 2003) (dismissing the plaintiff's claim of tortious interference,

which involved Google's alleged "intentional manipulation" of search rankings).  Daily Mail

attempts to distinguish *Dreamstime* by arguing that Google "uses its search monopoly to distort

the competitive dynamics in the market for exchanges."  Opp. 12.  But as stated above, Daily

Mail fails to plausibly allege how Google's routine algorithm update was a larger effort to harm

competition in a market for ad exchanges.  Again, the only explanation it provides—that Google

supposedly punishes publishers that use rival products—is fact-free and entirely speculative.

Finally, Daily Mail points to other conduct and complaints to try to rescue its faulty

claims.  First, it draws a flawed connection between Google's alleged manipulation of its search

algorithm and Project Bell.  Opp. 8.  But Project Bell rests on an entirely different set of factual

allegations unrelated to Google's search engine.  Project Bell relates to auction mechanics and

allegedly deflated bids, which is separately pled conduct and a distinct claim.  Compl. ¶¶ 136-37.

Second, Daily Mail cites to the Department of Justice's untested complaint and others.  *See* Opp.

2.  Yet Daily Mail cannot rely on the existence of other complaints to satisfy its pleading

requirements.  *See RSM Prod. Corp. v. FriDaily Mailan*, 643 F. Supp. 2d 382, 403 (S.D.N.Y.

2009) (finding that allegations relying on complaints otherwise not resolved are immaterial)

(citing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir. 1976)).

### B.  Daily Mail Fails to Allege that AMP is Anticompetitive.

Nothing in Daily Mail's complaint suggests that it was "forced" to adopt AMP, and this

failure to allege coercion warrants dismissal of the claim for that reason alone.  To the extent

Daily Mail asserts a tying-as-leveraging claim involving AMP, Daily Mail entirely ignores

*Unijax*, which requires "actual coercion . . . that in fact forces the buyer to purchase the tied

product[.]"  683 F.2d at 684.  In its Opposition, Daily Mail argues that it relies on the News

Carousel for a "significant slice" of search traffic, Opp. 13, but that is not pleaded and otherwise

unexplained.  Rather, Daily Mail pleads that 70% of its page views are mobile, and that 20% of

its mobile page views come from Google.  Compl. ¶ 202.  Therefore, according to Daily Mail,

less than 15% of Daily Mail's traffic is potentially affected by AMP.  Clearly, Daily Mail was

not required to use AMP.  And, even if Daily Mail had been required to use AMP for some

webpages, Daily Mail fails to allege that its use of AMP for some of its own websites had an

effect on competition market-wide.

Essentially, Daily Mail argues that Google should have made AMP compatible with

header bidding, thus helping a rival product.  Daily Mail states that "no duty to help" is a

"strawman" previously rejected by the Court, Opp. 15, but that is simply untrue.  "No duty to

deal" is a well-established antitrust doctrine that the Court has expressly recognized. *See* MTD

Op. 42 ("The Supreme Court has warned against a reading of section 2 that would require a

monopolist to provide information or assistance to its competitors."); *see also id.* (quoting

*Trinko,* 540 U.S. at 408 ("[C]ompelling negotiation between competitors may facilitate the

supreme evil of antitrust: collusion")); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S.

438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they

will deal, as well as the prices, terms, and conditions of that dealing."); *Novell, Inc. v. Microsoft*

*Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.) ("Even a monopolist generally has no

duty to share (or continue to share) its intellectual or physical property with a rival.").  Because

there is no requirement to develop a product compatible with rival products, Google has no duty

to incorporate third-party scripts or include non-AMP sites in its News Carousel. *See Cal Comp.*

*Prod. v. IBM*, 613 F. 2d 727, 744 (9th Cir. 1979) ("[IBM] was under no duty to help CalComp or

other peripheral equipment manufacturers survive or expand."); *see also* Mot. 10-11.

Finally, Daily Mail acknowledges that AMP pages load faster but then dismisses that,

with no facts at all, as "pretextual."  Compl. ¶ 212.  Anticompetitive conduct is "conduct without

a *legitimate business purpose* that make[s] sense only because it eliminates competition." MTD

Op. 37 (quoting *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (emphasis

added).  Daily Mail does not and cannot allege that AMP pages do not in fact run faster, and thus

cannot plausibly assert that Google's design of AMP is anything other than a legitimate, rational

business decision. *See* Mot. 11.  Such design is nothing more than normal business activity that

"fosters commercial success."  *See* MTD Op. 37 (citing *In re Adderall*, 754 F.3d at 133-36).

In a last-ditch effort to save its claim, Daily Mail equates AMP to conduct that is

irrelevant to its search leveraging claim: line-item caps, Project Poirot and Elmo, and Enhanced

8

Dynamic Allocation.  Opp. 14-15.  Those are distinct claims resting on different sets of factual

allegations.  Regarding line-item caps, Daily Mail alleges that Google limited the number of line

items available to publishers, hindering publishers' ability to "capture a live, competitive bid

coming from a rival exchange."  Compl. ¶¶ 183-87.  Daily Mail also alleges that under Projects

Poirot and Elmo, Google offered depressed bids on non-Google exchanges, forcing publishers to

abandon header bidding.  *Id.* ¶¶ 171-76.  And for EDA, Daily Mail alleges that Google gave

AdX "exclusive access to publishers' direct deal inventory."  *Id.* ¶¶ 125-29.  Each of these

practices involve auction mechanics entirely unrelated to Google's search engine and AMP.

Nowhere does Daily Mail plead that these practices are related or operate together.  The Court

need not accept Daily Mail's forced analogies to other conduct.  Indeed, the Court has already

decided AMP, as alleged by the States also alongside line-item caps, Projects Poirot and Elmo,

and EDA, is not anticompetitive.  MTD Op. 70-72.

## II.     THE COURT HAS ALREADY REJECTED SECTION 2 CLAIMS REGARDING EXCHANGE BIDDING AND ENCRYPTED USER IDS.

The Court previously dismissed the States' claims regarding Exchange Bidding and

encrypted user IDs.  MTD Op. 40-44, 61-66.  None of Daily Mail's allegations fix the States'

prior insufficiencies.  Daily Mail cannot plausibly explain how Google "forced" publishers to use

EB, nor how encrypted user IDs are anticompetitive.

### A.  Daily Mail Fails to Allege that Google "Coerced" Use of Exchange Bidding.

Daily Mail claims it cured the defects from the States' TAC with allegations that Google

"improperly compelled" publishers to use EB and forgo header bidding.  Opp. 18.  Not so.  Daily

Mail ignores the standard for coercion and the fact that publishers, including Daily Mail itself,

continue to use header bidding.

Coercion requires a manufacturer to go "beyond mere persuasion."  MTD Op. 18 (quoting *Unijax*, 683 F.2d at 685); Mot. 5.  As explained in Google's motion, Daily Mail offers no plausible support for its so-called "coercion" claim.  Mot. 3-6.  In its Opposition, Daily Mail claims it pleads coercion "under the proper standard," Opp. 19, but does not cite which standard it supposedly satisfies.  It does not even cite *Unijax*, a leading and controlling precedent.  Daily Mail only refers to its allegations about line-item capping, redacted datasets, and AMP—all of which are unrelated to its EB claim.  Opp. 14.

EB is not coercive.  Publishers have a "voluntary" choice between EB and header bidding.  *See* MTD Op. 63-64 (finding that EB was a "voluntary venture" with traits that may appeal to customers).  Daily Mail concedes publishers can (and do) use header bidding or EB, both of which are viable options.  Compl. ¶ 224 ("Daily Mail continued—and continues to this day—to use client-side header bidding at higher rates than Exchange Bidding, and for an increasing number of non-Google exchanges").  And EB itself allows non-Google exchanges to compete.  *Id.* ¶ 158 (alleging that EB allowed non-Google exchanges to compete for publisher ad inventory).  As a matter of law, this falls short of coercion.  *See It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 685 (4th Cir. 2016) (finding no coercion for a tying claim where "Plaintiff's own analysis reveals that the tying product was sometimes sold without the tied product.").

Publishers choosing to use EB is evidence of competition, not coercion.  Daily Mail argues that "partially foreclosing" header bidding amounts to coercion and violates Section 2.  Opp. 19-20.  The so-called "partial foreclosure" that Daily Mail points to is simply publishers choosing to use an attractive product (EB) while still also using header bidding as well.[1]  Where

---

[1] Daily Mail's citation to *Keurig* is inapposite.  The portion of the opinion that Daily Mail cites concerned exclusive dealing, and whether exclusive deals foreclosed a "substantial" amount of competition.  *Keurig*, 383 F. Supp. 3d at

"foreclosure" occurs because customers choose an attractive product, there has clearly been no coercion, but rather competition.  The Sherman Act seeks to protect, not hinder, attempts to win business.  *See Trinko*, 540 U.S. at 407 (Section 2 requires willful maintenance of monopoly power, which is distinguished from "growth or development as a consequence of a superior product, business acumen, or historic accident.") (quoting *United States v. Grinnell Corp.*, 384 U. S. 563, 570-571 (1966)); *see also* MTD Op. 63-64 (describing EB as "a move that tended to increase competition for publisher ad inventory.").

### B.  Daily Mail Fails to Allege that Encrypted User IDs Are Anticompetitive.

Daily Mail alleges no plausible reason why Google's encryption of user IDs is unlawful. It argues that publishers would like to use this information to compare Google against rival exchanges, and that Google's encryption of user IDs is "irrational" if not for the anticompetitive effect of gaining monopoly profits.  Compl. ¶¶ 108-113.  As this Court determined in the States' case, there is no duty to deal with rivals, and Google's decision to encrypt user IDs is a legitimate business strategy.  MTD Op. 40-44.  Daily Mail's arguments amount to the contention that Google should design products or deal with rivals in the way that Daily Mail would find most advantageous to its business.  The antitrust laws do not require Google to maximize Daily Mail's profits at the expense of all other business considerations.

Daily Mail argues that, by "purposefully degrading" user data, Google is "affirmatively interfering with Daily Mail's business activities in the marketplace."  Opp. 4.  According to Daily Mail, affirmative interference is a "recognized antitrust violation."  Opp. 21 (quoting *Novell*, 731 F.3d at 1076 ("a rival is always free to bring a section 2 claim for affirmatively interfering with its business activities in the marketplace")).  Daily Mail mischaracterizes the

---

234-40.  Here, Daily Mail does not allege any conduct akin to exclusive deals (which could in some circumstances be coercive) and also does not allege any foreclosure whatsoever.

concept of "affirmative interference," which involves a pattern of business torts and fraudulent

misrepresentations that have an effect on competition as a whole.  *See Conwood Co., L.P. v. U.S.*

*Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002) ("Isolated tortious activity alone does not

constitute exclusionary conduct for purposes of a § 2 violation, absent a significant and more

than a temporary effect on competition, and not merely on a competitor or customer."); *see also*

3 P. Areeda & D. Turner, *Antitrust Law* ¶ 737b at 278 (1978) (same).  Failing to share data with

customers or rivals is not a business tort, let alone a pattern of tortious activity.  Moreover, Daily

Mail's authority involves "affirmative interference" claims brought by rivals, not customers like

Daily Mail.  Interference with a rival may, in limited circumstances, affect competition, but harm

to a single customer does not.  *See Dreamstime.com LLC v. Google LLC*, 54 F.4th at 1141

("Harm to a single customer does not, by itself, constitute 'harm [to] the competitive process'

that 'thereby harm[s] consumers' as a whole.") (quoting *Qualcomm*, 969 F.3d at 987).

In any event, Google does not "affirmatively interfere" with Daily Mail's business

activities by encrypting data that Google itself generates.  First, Daily Mail claims it owns the

data being encrypted.  Compl. ¶¶ 108-110; Opp. 20.  But as explained in Google's motion, the

data at issue are from Daily Mail's use of *Google's* ad tech.[2]  Mot. 8.  Second, there is no

suggestion that data from Google's rivals is being suppressed in any way.  Nor is there any

suggestion that Google prevents Daily Mail from using data on transactions on Google's ad tech,

or that it inhibits Daily Mail from using data developed on or by rival ad tech platforms.

Daily Mail argues that Google's justification of user privacy is premature at this stage

and too general to be an affirmative defense.  Opp. 23.  Consideration of Google's legitimate

business reason is not premature because Daily Mail fails to plead that Google's encryption of

---

[2] Daily Mail rebukes Google for not attaching contracts with publishers to its motion.  Opp. 20-21.  Yet it is Daily Mail who supposedly relies on the contract terms yet does not attach or quote them.

user IDs was "irrational but for its anticompetitive effect." *Novell*, 731 F.3d at 1075.  Nor was it

premature in the States' case.  The Court reasoned that the States' TAC did not consider the

possibility that encrypting user IDs was "an immediately profitable business strategy that also

presented the perception or reality of enhanced consumer privacy."  MTD Op. 44.  Daily Mail

states that "users find no comfort in giving identifying information to Google."  Opp. 23.  That

statement is conclusory and irrelevant.  Daily Mail fails to seriously engage with Google's

privacy justification.

Finally, Daily Mail reasserts that Google sacrifices short-term profits to handicap rivals,

Opp. 24, yet fails to contend with the legitimate possibility that encrypting user IDs would allow

AdX to increase profits.  *See Qualcomm*, 969 F.3d at 993-94 (finding no sacrifice of short-term

benefits because the defendant's purpose "was greater profits in both the short and long terms");

*see also* Mot. 8-9.  Encrypting user IDs may also be necessary to comply with privacy laws

inside and outside the U.S, which is a plausible "business purpose."  *See In re Adderall*, 754 F.3d

at 133.

## III.    DISCOVERY SHOULD NOT PROCEED ON THESE CLAIMS, AND DISMISSAL SHOULD BE WITH PREJUDICE.

Daily Mail states that discovery on the acts at issue should proceed regardless of how the

Court decides Google's motion because the topics are somehow intertwined with, and relevant

to, damages under the tying claim.  Opp. 25.  Discovery on dismissed claims would contravene

the very purpose of a 12(b)(6) motion, which is to narrow the scope of litigation.  *See Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (cautioning against forgetting that antitrust

discovery is expensive).  That course of action would improperly give Daily Mail free rein over

areas where it failed to plausibly allege anticompetitive conduct.  For example, discovery

13

concerning Google's Search business would be expansive and too remote from the core conduct at issue. *See* Ltr. from E. Mahr and T. Sessions to J. Castel 5, ECF No. 371.

Daily Mail's references to "proximate cause" do not support discovery into non-actionable conduct. *In re Aluminum Warehousing* requires a plaintiff to allege that the defendant's conduct is "proximately related to plaintiffs' injuries." *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 455 (S.D.N.Y. 2015). That requirement of antitrust standing in no way gives a plaintiff license to explore all conduct that may be tangentially related to its alleged injuries. If conduct is not anticompetitive, then the injuries it proximately causes are not recoverable under the antitrust laws and should not be the subject of discovery. To delay this issue until after discovery would moot the benefits of 12(b)(6) procedure.

Daily Mail also argues that dismissal should be without prejudice because the defects can be cured with amendment. Opp. 26. But Daily Mail already had the chance to amend its complaint after receiving substantial discovery from Google, and nowhere explains how an amendment would even help. It filed its initial complaint on April 20, 2021 and amended on December 2, 2022, nearly 19 months later and after reviewing the Court's decision on the States' TAC with access to over 2 million documents produced by Google. Any further attempt to plead these issues would unnecessarily burden the Court and the parties. *See Soul Circus, Inc. v. Trevanna Entertainment, Inc.*, 249 F.R.D. 109, 110 (S.D.N.Y. 2008) (considering "the duplicative expense of relitigation," among other factors). Daily Mail should not be rewarded with a third try.

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that this Court dismiss the

claims in Count II of Daily Mail's Amended Complaint regarding leveraging of Google's Search

business, Exchange Bidding, and encrypted user IDs, in full and with prejudice.

Dated: March 31, 2023                                   Respectfully Submitted,

*/s/ Justina K. Sessions*
Justina K. Sessions
Jonathan Jacobson
Jessica Lonergan
Mikaela Evans-Aziz (admitted *pro hac vice*)
Vadim Egoul
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
(415) 947-2000
jsessions@wsgr.com
jjacobson@wsgr.com
jlonergan@wsgr.com
mevansaziz@wsgr.com
vegoul@wsgr.com

John Harkrider
Daniel Bitton
Bradley Justus (admitted *pro hac vice*)
Koren Wong-Ervin (admitted *pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
jharkrider@axinn.com
dbitton@axinn.com
bjustus@axinn.com
kwongervin@axinn.com

*Counsel for Defendants Google LLC and Alphabet Inc.*

15