UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | **No. 1:21-MD-3010 (PKC)** |

*This Motion Relates To:*

**AIM Media Ind. Operating, LLC v. Google, LLC, No. 1:21-cv-06912-PKC (S.D.N.Y.)**

**AIM Media Midwest Operating, LLC v. Google, LLC, No. 1:21-cv-06884-PKC (S.D.N.Y.)**

**AIM Media Tex. Operating, LLC v. Google, LLC, No. 1:21-cv-06888-PKC (S.D.N.Y.)**

**Appen Media Group, Inc. v. Google LLC, No. 1:22-cv-09810-PKC (S.D.N.Y.)**

**Brown Cnty. Publ'g Co., Inc. v. Google, LLC, No. 1:21-cv-06915-PKC (S.D.N.Y.)**

**Capital Region Indep. Media LLC v. Google LLC, No. 1:22-cv-06997-PKC (S.D.N.Y.)**

**Clarksburg Publ'g Co., d/b/a WV News v. Google, LLC, No. 1:21-cv-06840-PKC (S.D.N.Y.)**

**Coastal Point LLC v. Google, LLC, No. 1:21-cv-06824-PKC (S.D.N.Y.)**

**Eagle Printing Co. v. Google, LLC, No. 1:21-cv-06881-PKC (S.D.N.Y.)**

**ECENT Corp. v. Google, LLC, No. 1:21-cv-06817-PKC (S.D.N.Y.)**

**[Caption continued on following page]**

**Emmerich Newspapers, Inc. v. Google, LLC, No. 1:21-cv-06794-PKC (S.D.N.Y.)**

**Flag Publ'ns, Inc. v. Google, LLC, No. 1:21-cv-06871-PKC (S.D.N.Y.)**

**Gale Force Media, LLC v. Google, LLC, No. 1:21-cv-06909-PKC (S.D.N.Y.)**

**Gould Enters., Inc. v. Google, LLC, No. 1:22-cv-01705-PKC (S.D.N.Y.)**

**HD Media Co., LLC v. Google, LLC, No. 1:21-cv-06796-PKC (S.D.N.Y.)**

**Journal Inc. v. Google, LLC, No. 1:21-cv-06828-PKC (S.D.N.Y.)**

**Neighborhood Newspapers, Inc. v. Google LLC, No. 1:21-cv-10188-PKC (S.D.N.Y.)**

**Robinson Commc'ns, Inc. v. Google, LLC, No. 1:21-cv-08032-PKC (S.D.N.Y.)**

**Rome News Media, LLC v. Google LLC, No. 1:21-cv-10186-PKC (S.D.N.Y.)**

**Savannah Publ'g Co. v. Google, LLC, No. 1:22-cv-01693-PKC (S.D.N.Y.)**

**Something Extra Publ'g, Inc. v. Google, LLC, No. 1:21-cv-09523-PKC (S.D.N.Y.)**

**Southern Cmty. Newspapers, Inc. v. Google, LLC, No. 1:22-cv-01971-PKC (S.D.N.Y.)**

**Times Journal, Inc. v. Google LLC, No. 1:21-cv-10187-PKC (S.D.N.Y.)**

**Union City Daily Messenger, Inc. v. Google, LLC, No. 1:22-cv-01704-PKC (S.D.N.Y.)**

**[Caption continued on following page]**

**Weakley Cnty. Press, Inc. v. Google, LLC,**
**No. 1:22-cv-01701-PKC (S.D.N.Y.)**

*Plaintiffs,*

-against-

**GOOGLE LLC,**

*Defendant.*

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANT GOOGLE LLC'S**
**MOTION TO DISMISS NEWSPAPER PLAINTIFFS' AMENDED COMPLAINT**

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Fax: (202) 777-4555

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Fax: (212) 728-2201

WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Fax: (415) 947-2099

*Counsel for Defendant Google LLC*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

TABLE OF ABBREVIATIONS ........................................................................................... iv

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 1

I.      NEWSPAPERS' MONOPOLY BROTH ARGUMENT FAILS. ..................................... 1

II.     NEWSPAPERS FAIL TO ALLEGE THAT THE AUDIENCE FEE IS
        ANTICOMPETITIVE. ...................................................................................... 5

III.    NEWSPAPERS FAIL TO ALLEGE THAT SO-CALLED BYPASSING HARMS
        COMPETITION. .............................................................................................. 7

IV.     NEWSPAPERS' LEVERAGING CLAIMS INVOLVING GOOGLE'S SEARCH
        BUSINESS FAIL AS A MATTER OF LAW. ....................................................... 8

V.      NEWSPAPERS FAIL TO ALLEGE THAT THE NETWORK BIDDING AGREEMENT
        VIOLATES SECTION 1 OF THE SHERMAN ACT .......................................... 10

        A.      Newspapers Do Not Plausibly Allege an Agreement Between Google and Meta to
                Thwart Header Bidding ........................................................................ 11

        B.      Newspapers Do Not Plausibly Plead a Market Allocation Conspiracy. ............... 13

VI.     NEWSPAPERS FAIL TO ALLEGE THAT GOOGLE'S CONDUCT HARMED
        COMPETITION IN MARKETS FOR PUBLISHER AD SERVERS OR GENERAL
        SEARCH SERVICES. ...................................................................................... 16

CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*A.I.B. Express, Inc. v. FedEx Corp.*,
    358 F. Supp. 2d 239 (S.D.N.Y. 2004)...........................................................................17

*Balaklaw v. Lovell*,
    14 F.3d 793 (2d Cir. 1994).......................................................................................5

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................18

*City of Groton v. Conn. Light & Power Co.*,
    662 F.2d 921 (2d Cir. 1981)..................................................................................2, 6

*Dreamstime.com, LLC v. Google LLC*,
    54 F.4th 1130 (9th Cir. 2022) ...........................................................................16, 18

*FTC v. Qualcomm, Inc.*,
    969 F.3d 974 (9th Cir. 2020) ...........................................................................5, 6, 7

*In re Adderall XR Antitrust Litig.*,
    754 F.3d 128 (2d Cir. 2014)....................................................................................16

*In re EpiPen Epinephrine Injection, Mktg., Sales Pracs. & Antitrust Litig.*,
    44 F.4th 959 (10th Cir. 2022) ..................................................................................2

*In re Gabapentin Patent Litig.*,
    649 F. Supp. 2d 340 (D.N.J. 2009) ..........................................................................4

*In re Inclusive Access Course Materials Antitrust Litig.*,
    544 F. Supp. 3d 420 (S.D.N.Y. 2021)....................................................................16

*In re Interest Rate Swaps Antitrust Litig.*,
    2018 WL 2332069 (S.D.N.Y. 2018).......................................................................10

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016).....................................................................17

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)....................................................................................15

*Ne. Tel. Co. v. Am. Tel. & Tel. Co.*,
    651 F.2d 76 (2d Cir. 1981)....................................................................................2, 6

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998).................................................................................................5

*Pac. Bell. Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)......................................................................................1, 2, 3, 5

*PharmacyChecker.com, LLC v. Nat'l Ass'n. of Bds. of Pharmacy*,
    530 F.Supp.3d 301 (S.D.N.Y. 2021)............................................................................15

*Simon and Simon, PC v. Align Tech., Inc.*,
    533 F. Supp. 3d 904 (N.D. Cal. 2021) ..........................................................................3, 4

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)........................................................................................................16

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) ...............................................................................12

*Tele Atlas N.V. v. NAVTEQ Corp.*,
    2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) ................................................................3

*Valassis Commc'ns, Inc. v. News Corp.*,
    2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) (Castel, J.)............................................2, 5, 6

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).........................................................................................................8

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC*,
    257 F.3d 256 (2d Cir. 2001).............................................................................................9

## STATUTES

15 U.S.C. § 1 ..........................................................................................1, 10, 12, 15, 16

15 U.S.C. § 2 ......................................................................................................1, 2, 3

iii

## TABLE OF ABBREVIATIONS

| Term | Definition |
|---|---|
| AdX | Google's Ad Exchange |
| AMP | Accelerated Mobile Pages |
| Audience fee | Google Ad Manager's fee structure |
| Chrome | Google's Chrome browser |
| Compl. | Newspaper Plaintiffs' Amended Complaint, ECF No. 401 |
| DFP | DoubleClick for Publishers |
| FAN | Facebook Audience Network |
| Google | Google LLC |
| Mot. | Defendant Google LLC's Memorandum of Law in Support of its Motion to Dismiss Newspaper Plaintiffs' Amended Complaint, ECF No. 452 |
| MTD Op. | Opinion and Order, ECF No. 308 |
| NBA | 2018 Network Bidding Agreement between Google and Facebook |
| Opp. | Newspaper Plaintiffs' Opposition to Google's Motion to Dismiss, ECF No. 489 |
| Search | Google Search |
| States | State Plaintiffs |
| States' TAC | State Plaintiffs' Third Amended Complaint, ECF No. 195 |
| UPRs | Unified Pricing Rules |

**INTRODUCTION**

Newspapers' opposition brief simply ignores (or concedes) many of Google's arguments in support of its motion to dismiss.  Instead of defending their allegations on their merits, Newspapers instead now try to provide blanket immunity to all of their antitrust claims by lumping them together into one "monopoly broth" so cloudy that they hope no one looks at the ingredients.  When each claim is left to stand on its own feet, Newspapers offer only conclusory (and sometimes unpleaded and unexplained) statements as support.

Newspapers also attempt to muddy exactly which claims Google is moving to dismiss. For the avoidance of doubt, Google moves to dismiss:

- Counts II (Section 1 NBA) and IV (Section 2 monopoly leveraging) in their entirety.

- As to Counts I (Section 2 monopolization) and V (Section 2 attempted monopolization):

  - All claims predicated on alleged harm in alleged publisher ad server or general search services markets[1]; and

  - Newly pled claims based on certain audience fees charged by Google and Google's alleged bypassing of direct-sold impressions.  Mot. 2.

**ARGUMENT**

**I.    NEWSPAPERS' MONOPOLY BROTH ARGUMENT FAILS.**

Newspapers cannot immunize their antitrust claims by now suggesting they are part of an anticompetitive "scheme" or so-called "monopoly broth."  Conduct that is not anticompetitive cannot contribute to an antitrust violation.  *See Pac. Bell. Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 459 (2009) (Breyer, J., concurring).  And, further, as the Second Circuit tells us,

---

[1] In light of the Court's prior rulings on the State Plaintiffs' complaint, Google does not contend that the portions of Counts I and V addressing the tying of Google's DFP ad server to AdX should be dismissed.  *See* Mot. 14 n.4.

"we reject the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of . . . the Sherman Act." *City of Groton v. Conn. Light & Power Co.,* 662 F.2d 921, 928-29 (2d Cir. 1981).

The Supreme Court's decision in *linkLine* underscores the point.  There, the Court held that a plaintiff failed to state a claim under Section 2 when its allegations amounted to "nothing more than an amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level."  555 U.S. at 452.  Defendant AT&T owned much of the infrastructure needed to provide "last mile" DSL internet service.  *Id.* at 442.  Plaintiffs argued that AT&T had monopolized the DSL market, refused to deal with the plaintiffs, and engaged in a "price squeeze."  *Id*. at 442-43.  In rejecting the individual claims, the Supreme Court said that the plaintiffs there could not "join a wholesale claim that cannot succeed with a retail claim that cannot succeed, and alchemize them into a new form of antitrust liability . . . . Two wrong claims do not make one that is right."  *Id.* at 457.

The "proper inquiry," in contrast, "is whether, qualitatively, there is a 'synergistic effect.'"  *City of Groton*, 662 F.2d at 929 (quoting *Ne. Tel. Co. v. Am. Tel. & Tel. Co*., 651 F.2d 76, 96 n.28 (2d Cir. 1981)); *see Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *9 (S.D.N.Y. Feb. 21, 2019) (Castel, J.).  Newspapers must demonstrate that the component parts of the supposed "scheme" operate *together* to enhance a significant restriction of the competitive process *beyond* the effects of each act individually.  *See id.*  They have not come close to doing so.

To determine whether there is some synergistic effect, a court must "analyze the various issues individually."  *City of Groton*, 662 F.2d at 928-29; *see also In re EpiPen Epinephrine Injection, Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) ("For the

2

sake of accuracy, precision, and analytical clarity, we must evaluate [the] allegedly exclusionary conduct separately.").  That is because one needs to understand each of the claims in order to determine how or whether they fit together.

Here, there is simply no synergy.  Newspapers attempt to shield their claims involving the audience fee and bypassing of direct ad campaigns on high news days by now arguing they are part of some broader pattern of conduct.  *See* Opp. 5.  But Newspapers nowhere suggest how the various challenged activities operate together to restrain competition in a manner that the individual acts do not.

Newspapers cherry-pick cases—many of which pre-date *linkLine*—in other districts and other circuits that discuss how a plaintiff may properly allege that a monopolist's activities *can* combine to create an antitrust violation.  Opp. 5-6.  None of these cases stand for the proposition that conduct which is not anticompetitive by itself and which lacks any synergistic effect with other alleged anticompetitive conduct amounts to an antitrust violation.  For example, in *Tele Atlas N.V. v. NAVTEQ Corp.*, the court allowed for tying conduct to be presented even though the individual tying claim was deficient because that conduct added *something* material to the other allegations.  2008 WL 4911230, at *3-4 (N.D. Cal. Nov. 13, 2008) (finding that the tying conduct, "when combined with the alleged foreclosure due to NAVTEQ's exclusive dealing, may have had an anticompetitive effect").  In *Simon and Simon, PC v. Align Tech., Inc.*, the court found that some of the alleged conduct did not contribute to the plaintiffs' Section 2 claim because the allegations were insufficient to raise an inference that the conduct was anticompetitive.  533 F. Supp. 3d 904, 917 (N.D. Cal. 2021).  Other conduct, which the plaintiff alleged to be de facto exclusive dealing, "raise[d] antitrust concerns" but were not on their own Section 2 violations because, considered individually, each deal did not "substantially" foreclose

competitors.  *Id*.  However, when considered in combination with related, valid, refusal-to-deal allegations, the overall degree of foreclosure was substantial.  *Id.*  Thus, *Simon and Simon* is best understood as a case where individual practices were on their own anticompetitive and the combined anticompetitive effects sufficed to state a claim.  In *In re Gabapentin Patent Litig.*, the defendant's counterclaims at issue did not assert antitrust violations on the basis of any independent activities.  649 F. Supp. 2d 340, 358 (D.N.J. 2009).  The court found that the defendant's alleged scheme—the plaintiff's prosecution of a patent, improper listing of that patent in the Orange Book, and pursuit of sham litigation—was adequately pled because the defendant "alleged in detail" how these three activities combined were designed to obtain market exclusivity for a branded drug product.  *Id.* at 359.  As discussed above, Newspapers have not made detailed allegations about how the audience fee and so-called bypassing operate together with any other challenged conduct.

Newspapers misconstrue the Court's analysis of the States' TAC.  *See* Opp. 5.  The Court's holdings demonstrate its separate analysis of allegedly interrelated practices.  As one example, the States alleged that Google's encryption of user IDs foreclosed competition in the exchange market and the buying-tool markets for small and large advertisers.  *See* States' TAC ¶ 266; MTD Op. 42.  The Court found the States' claim insufficient.  MTD Op. 44.  But the Court found that the States plausibly alleged that Google's UPRs harmed competition in those same alleged markets, MTD Op. 77, despite the States' allegations that UPRs furthered the anticompetitive effect of Google's use of encrypted user IDs, *id.* at 74.  This Court has

recognized that "it is unlikely that multiple independently lawful acts can come together to create an unlawful monopoly 'broth.'"  MTD Op. 39 (citing *Valassis*, 2019 WL 802093, at *9).

## II.   NEWSPAPERS FAIL TO ALLEGE THAT THE AUDIENCE FEE IS ANTICOMPETITIVE.

Newspapers have yet to articulate an antitrust theory under which Google's "audience fee" harms competition in any alleged relevant market.  *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998) ("[A] simple allegation of harm . . . does not automatically show injury to competition."); *Balaklaw v. Lovell*, 14 F.3d 793, 797-99 (2d Cir. 1994) (requiring market-wide injury).  Newspapers allege only that Google's audience fee lowered publishers' revenues if an ad was placed using a rival ad network or ad exchange under certain circumstances.  *See* Compl. ¶ 257.  At best, this amounts to alleged harm to newspapers as customers (not competitors), which in this context is insufficient as a matter of law.  *See FTC v. Qualcomm, Inc.*, 969 F.3d 974, 992 (9th Cir. 2020).  In their Opposition, Newspapers further characterize the audience fee as "coercive," Opp. 9-10, but this does nothing to salvage their claim.  Newspapers never explain how, why, or what the fee coerces, and their Complaint (in its three-sentence paragraph dedicated to the audience fee) does not describe the audience fee as coercive.

Newspapers do not address Google's argument that it is entitled to charge others when they use its auction platform.  *See linkLine*, 555 U.S. at 452; *Qualcomm*, 969 F.3d at 1000-01. Newspapers argue that *linkLine* and *Qualcomm* are distinguishable only because, in those cases, the court had not already found the defendant's challenged conduct unlawfully impacted competition.  Opp. 9 n.8.  But in *linkLine*, the Supreme Court held that conduct that is not anticompetitive cannot contribute to an antitrust violation.  *linkLine*, 555 U.S. at 459.

*Qualcomm* demonstrates why Newspapers' claims fail.  *See* Mot. 10.  There, the Ninth Circuit rejected the FTC's theory that it was anticompetitive for Qualcomm to charge a patent

royalty when phone makers used non-Qualcomm modem chips but not when customers bought Qualcomm chips.  *Qualcomm*, 969 F.3d at 1000-01.  Qualcomm was entitled to charge a royalty when its patents were used by rivals despite the argument that doing so raised rivals' costs. Rivals were not entitled to use the patents for free, and charging for them was not an antitrust violation.  Newspapers' allegations regarding the audience fee are the same and should likewise be rejected.  *See* Compl. ¶ 257 ("Google's publisher ad server may impose an 'Audience' fee that is as much as 100% higher when advertisements are placed through a non-Google or ad exchange (e.g., a $0.05 fee for a certain number of Google-placed advertisements, but a $0.10 fee for the same number of competitor-placed advertisements).").

Newspapers effectively concede that the audience fee is not anticompetitive on its own, and so attempt to salvage it by hitching it to Projects Poirot and Elmo and Unified Pricing Rules. But their Complaint does not make this connection.  *See* Compl. ¶¶ 244-56.

The Court's holding on UPRs does not somehow turn the audience fee into anticompetitive conduct by itself.  Newspapers cite the Court's finding that UPRs allegedly restrict publishers' pricing decisions by not permitting publishers to take account of the higher fees charged by Google for transactions on non-Google ad exchanges.  Opp. 8.  Newspapers nowhere plead that audience fees are related to price floors or that audience fees alone somehow restrict publishers' pricing decisions.  Nor do they allege in their Complaint any synergistic effect between the audience fee and UPRs that would demonstrate these alleged acts operate together to enhance a significant restriction of the competitive process beyond the effects of each act individually.  *See City of Groton*, 662 F.2d at 928-29 (quoting *Am. Tel. & Tel. Co.*, 651 F.2d at 95 n.28); *see Valassis*, 2019 WL 802093, at *27.  In their brief (not their Complaint) they argue that UPRs prevent publishers from avoiding or counteracting the audience fee.  Opp. 8, 9

n.7.  That does not make the audience fee itself anticompetitive.  As the audience fee itself has no anticompetitive effect, there is no effect to combine or "synergize" with UPRs.

### III.  NEWSPAPERS FAIL TO ALLEGE THAT SO-CALLED BYPASSING HARMS COMPETITION.

Newspapers also still have not provided any explanation of how Google's so-called bypassing of direct ad campaigns on high news days harms competition in any alleged relevant market.  In their Opposition, they do not cite a single case to support their claim or respond to any of the case law cited by Google.

Newspapers allege that Google somehow replaced directly sold ads with ads served through Google's ad exchange, AdX, on high news days.  The only harm alleged from Google's so-called "bypassing" is that some unidentified newspaper publishers made less money.  *See* Compl. ¶ 271; Opp. 11 ("Google purposefully manipulated its algorithms to artificially restrict newspapers' direct ad sales from being served on newspapers' most important days.").  As a matter of law, harm to some newspapers as customers is insufficient.  *See Qualcomm*, 969 F.3d at 987, 992.  Moreover, there is no hint or suggestion that Google failed to place any direct sales in violation of its contractual obligations.

Newspapers state in passing that "these ads were not eligible to go through other ad exchanges."  Opp. 12.  Newspapers do not explain which ads they mean.  A directly sold ad is, by definition, ineligible to go through any ad exchange.  *See* Compl. ¶ 177 ("An ad server allocates and routes available display ad space between direct sales per pre-arranged agreements with advertisers and indirect sales conducted through exchanges."); *see also id.* ¶ 191 ("Google continues to recognize that direct sales, exchanges, and networks are distinct.").  Thus, there can be no harm to ad exchange competition from alleged allocation between direct sales and AdX.  Newspapers did not plead in their bypassing claim that any ads were ineligible to go through

other exchanges, nor do they anywhere explain how that would harm competition. *See* Compl.

¶¶ 269-71.

## IV.  NEWSPAPERS' LEVERAGING CLAIMS INVOLVING GOOGLE'S SEARCH BUSINESS FAIL AS A MATTER OF LAW.

Newspapers' leveraging claim hinges on their argument that Google used AMP to coerce

publishers not to use header bidding or to exclude rival ad exchanges.[2] *See* Compl. ¶ 338; Opp.

15.  Newspapers appear to have abandoned their allegations involving Google's Chrome

Browser, Compl. ¶ 341, offering no response to Google's argument that they are conclusory and

do not state a leveraging claim.  Mot. 13.  While Newspapers mention Google engaged in some

"associated conduct in leveraging its general search services," Opp. 16, Newspapers nowhere

describe what that conduct even is, let alone how it amounts to monopoly leveraging.

Newspapers attempt to differentiate their AMP allegations from the States' allegations

that were dismissed by this Court, *see* MTD Op. 70-72, solely on the grounds that Newspapers'

claim is pled in the context of monopoly leveraging, rather than as a standalone claim.  But now

that they have abandoned their faulty Chrome allegations, their AMP allegations provide the

only basis for their "monopoly leveraging" claim.  As described in Google's opening brief,

Newspapers fail to allege that AMP is anticompetitive, *see* Mot. 12, and a monopoly leveraging

claim cannot stand without underlying anticompetitive conduct. *Verizon Commc'ns Inc. v. Law*

---

[2] Newspapers also recite their allegation that Google purposefully dropped the PageRank of sites that did not adopt AMP.  Opp. 15; *see* Comp. ¶ 335.  However, they have still yet to explain the extent to which this occurred. *See* Mot. 12.  This allegation, previously made by the States, adds nothing to Newspapers' claim. *See* MTD Op. 71 ("The statement in context does not enable the reader to definitively discern its meaning.  If true, it would mean that all publishers—or at least all publishers using DFP who did not adopt AMP—would have all or some Google search rankings suppressed.").

*Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004); *see Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 272 (2d Cir. 2001).

Newspapers further do not address or explain how AMP could have created a dangerous probability of monopolizing the alleged ad server or ad exchange markets.  Newspapers rely on AMP having been a new product, which they argue when combined with some other unidentified conduct somehow turns AMP anticompetitive.  Opp. 15-16.  For this assertion, they rely on entirely inapposite, so-called "hard switch" case law in the context of generic drugs.[3]  Whether taking AMP by itself or even when combining it with some other conduct, Newspapers never explain the mechanism by which AMP could have created a dangerous probability of monopolizing the alleged ad server or ad exchange markets.

The supposed harms that Newspapers recite—none of which they allege any individual plaintiff newspaper suffered—only illustrate the holes in their AMP claim.  Newspapers never allege that anyone had to use AMP.  Newspapers complain about their inability to convert consumers into newspaper subscribers, but they do not allege this has anything to do with competition in the alleged ad server or ad exchange markets.  *See* Opp. 16.  They also complain about the alleged inability to use header bidding with AMP, but they offer no explanation of the proportion of websites or revenue affected by AMP, even while they admit that AMP does not

---

[3] "Hard switch" cases involve the introduction of an extended release drug product coupled with the withdrawal of the immediate release version before generic entry, which is alleged to risk harm to competition in the generic market.  The key in these cases is the *withdrawal* of a valuable product, forcing customers to switch to the new product.  There is nothing like that alleged here.

*apply to all websites.* Compl. ¶ 334; *see* Opp. 16. It thus could not have caused marketwide harm.

Because Newspapers fail to allege that AMP was anticompetitive, their monopoly leveraging claim (Count IV) should be dismissed in its entirety.

## V.   NEWSPAPERS FAIL TO ALLEGE THAT THE NETWORK BIDDING AGREEMENT VIOLATES SECTION 1 OF THE SHERMAN ACT.

Nothing in the Newspapers' Opposition addresses the fatal defects in their Network Bidding Agreement claims. Newspapers' conspiracy theories that Meta Platforms, Inc. (formerly known as Facebook, Inc.) agreed to stop support for header bidding and not to enter certain ad tech markets in exchange for certain terms in the NBA are contradicted by the actual terms of the NBA. The NBA is explicitly non-exclusive and also expressly allows Meta to use or develop ad tech products that compete with Google's, including header bidding. The NBA also expressly contemplates that Meta may bid on web ad inventory, contradicting Newspapers' theory that Meta agreed as part of the NBA to exit the web advertising business. Mot. 6; MTD Op. 21.

In the face of an express written agreement, Newspapers face a high hurdle to allege facts from which conspiracies outside and contrary to that agreement can be inferred. *See, e.g.*, *In re Interest Rate Swaps Antitrust Litig.*, 2018 WL 2332069, at *14 (S.D.N.Y. 2018) ("discount[ing]" and "disregard[ing]" Section 1 allegations that were contradicted by the agreement's "plain terms"). Like State Plaintiffs, Newspapers fail to put forth such facts. While Newspapers add new conspiracy theories beyond what State Plaintiffs put forth, the theories largely hinge on the same factual allegations State Plaintiffs made and the Court already rejected as a basis to infer an agreement under Section 1. MTD Op. 20-26.

10

## A. Newspapers Do Not Plausibly Allege an Agreement Between Google and Meta to Thwart Header Bidding.

This Court already dismissed State Plaintiffs' carbon-copy claim that Meta agreed to stop support for header bidding in exchange for alleged bidding advantages in Google's auctions granted under the NBA.  MTD Op. 21-22 (finding that the NBA did not expressly "refer to or restrict [Meta's] use of header bidding," and that there was nothing "inexplicable or suspicious" in the parties entering the NBA based on the terms of the NBA itself).

Newspapers latch onto the Court's finding that State Plaintiffs "offer[ed] no context on the size of [Meta's] annual spending on display ads or in-app impressions," MTD Op. 25, arguing that they have offered that context.  *See* Opp. 18-19.  Newspapers' argument is both irrelevant and wrong.  Newspapers seem to suggest that State Plaintiffs' failure to provide context on the size of Meta's annual spending was the reason why their header bidding conspiracy claim failed.  Not so.  Instead, the Court held State Plaintiffs' allegations (like Newspapers') showed that both Meta and Google had independent self-interests to enter the NBA without any agreement to curtail Meta's support for header bidding.  *See* MTD Op. 22.  In any event, Newspapers do not make any material new allegations that provide context around what percentage of Meta's total Meta Audience Network (then known as "Facebook Audience Network" or "FAN") spending was required to be in Google's auctions under the NBA.

Newspapers allege that Meta "***planned*** to purchase $1.5 billion worth of inventory per year through DFP/AdMob mediation."  Compl. ¶ 320 (emphasis added).[4]  However, that says nothing about whether Meta was *required* to do so under the NBA.  In fact, Newspapers allege only that Meta *planned* to spend that amount to take advantage of the discount offered in the

---

[4] State Plaintiffs' alleged similar facts.  *See* TAC ¶ 426 (the NBA imposed minimum spend requirements that reach "hundreds of millions of dollars a year").

NBA. *See* Compl. ¶¶ 320, 325. And offering a large customer a non-predatory discount to secure business is procompetitive. *See* MTD Op. 25-26. As the Court has observed (and Newspapers acknowledge), the Annual Minimum Spend Commitment in the NBA is much lower than $1.5 billion per year. MTD Op. 25; Compl. ¶ 325. And, importantly, Newspapers do not allege anything about Meta's FAN total spend. Without this context, it is impossible to tell whether Meta's post-NBA FAN spend on Google's auctions was a significant portion of its total FAN spend, such that Meta could no longer support header bidding.[5] *See, e.g., Spinelli v. Nat'l Football League,* 96 F. Supp. 3d 81, 116-17 (S.D.N.Y. 2015) (demonstrating that changes to the composition and size of the alleged market can affect whether a practice was exclusive and unlawful under Section 1).

Newspapers point to their allegation that the NBA left FAN "little to no spend to use header bidding or non-Google mediation tools." Opp. 19. This claim is not only unsupported given the lack of allegations about FAN's total spend, it is also essentially the same as the State Plaintiffs' failed allegation. *See* TAC ¶ 426 ("Google ensured that [Meta] would not—and, economically, could not—return to support header bidding by imposing significant minimum spend requirements . . . ."). Newspapers' allegations purporting to show the impact of the NBA on FAN's use of header bidding, Opp. 19, likewise are indistinguishable from the State Plaintiffs'. *Compare* Compl. ¶ 305 ("[Meta] then [after the NBA] substantially curtailed its use and support of header bidding . . .") *with* TAC ¶ 426 ("As a result of the agreement, [Meta] curtailed its header bidding initiatives and instead bid through Google's tools."). Newspapers'

---

[5] Elsewhere in their Complaint Newspapers allege that "[Meta] garnered over $70 billion in revenue in 2019," with "over 98%" of Meta's total revenue coming from "selling digital advertisements." Compl. ¶ 278.

header bidding conspiracy claim is nothing more than the previously dismissed States' claim and should therefore receive the same treatment.

**B.  Newspapers Do Not Plausibly Plead a Market Allocation Conspiracy.**

Newspapers claim that in exchange for the "preferential" NBA terms, Meta agreed not to enter the alleged publisher ad server and in-app mediation tools markets.[6]  *See* Opp. 22.  Just like the Newspapers' NBA claim regarding header bidding, Newspapers' market allocation conspiracy claims are contradicted by the express terms of the NBA.  *See* MTD Op. 21-26. Their market allocation conspiracy theories also are conclusory, and devoid of any facts that would rebut the Court's conclusion that "[t]here is nothing inexplicable or suspicious in the parties entering into the NBA for reasons that go no further than the four corners of that agreement."  MTD Op. 22; *see also* Mot. 4.

Newspapers argue that they allege "plus factors" that, if proven, would warrant an inference of the market allocation conspiracies they have alleged despite contrary provisions in the NBA.  *See* Opp. 21-22.  But the Court's dismissal of State Plaintiffs' NBA conspiracy claim shows Newspapers' allegations do not establish plus factors.

No Common Motive to Conspire Alleged: Newspapers argue they have alleged that Google and Meta shared a common motive to conspire because "competition in the web market, driven by FAN, had resulted in higher prices for publishers (and lower prices for Google)," and reduced profits for both parties.  Opp. 22 (citing Compl. ¶¶ 297, 286-287).  Newspapers do not

---

[6] Newspapers also halfheartedly repeat their claim that Meta agreed to exit a web ad network market in exchange for the allegedly preferential terms in the NBA.  They argue that the fact that FAN exited web advertising *two years* after the NBA was entered does not undercut their theory.  Opp. 19.  However, Newspapers fail to address that (i) their conspiracy theory is contrary to the terms of the NBA (which contemplates web advertising purchases by FAN) and that (ii) Meta had an obvious independent self-interest to discontinue FAN's participation in web advertising given how unattractive that business had become according to Newspapers' own allegations.  Compl. ¶¶ 291, 296.

13

explain this new argument, nor do the allegations from their Complaint support this argument.[7] In any event, similar allegations already were rejected by the Court.  The Court considered State Plaintiffs' allegations that (i) header bidding caused publisher revenue to jump overnight, (ii) Google feared the threat of header bidding and Meta's FAN, (iii) Meta announced its support for web publishers using header bidding, and (iv) Meta knew Google allegedly wanted the NBA deal to kill header bidding, and concluded that none supported the inference of a conspiracy between Meta and Google outside of the NBA.  MTD Op. 22-24.

Newspapers' theory that Google and Meta had a common motive to conspire to eliminate competition between them does not make sense because, as the Court has observed, the NBA actually "promotes competition" between Google and Meta's FAN by enabling them to bid against each other in the same auctions.  *See* MTD Op. 32.[8]  Meanwhile, Newspapers' own allegations show Meta had independent reasons for discontinuing FAN for web advertising as the web advertising market was "mature" and "entrenched and occupied."  Compl. ¶¶ 291, 296.

Parties Acted Consistent with Independent Self-Interest: Newspapers argue that, but for the alleged conspiracies, it would have been in Meta's self-interest to build its own publisher ad server and in-app mediation platforms to "seriously compete" with Google.  Opp.23.  But this Opposition argument lacks support.

Newspapers cite the allegation in their Complaint that "[b]efore the agreement, with respect to web display, Facebook was considering entry in publisher ad servers and was

---

[7] Two of the three paragraphs of the Complaint that Newspapers cite for this argument (¶¶ 285-86) are only about the impact of header bidding on prices publishers receive, not about FAN's impact on publisher prices or Google's prices or profits.  The other paragraph of the Complaint that Newspapers cite for their argument (¶ 297) describes how Google and Meta have the largest ad networks bidding in Google's auctions for in-app ad impressions.  None of these allegations in Newspapers' Complaint say anything about FAN's impact on publisher prices or Google's prices in the "web market."  That is a new allegation Newspapers present in their Opposition.

[8] Newspapers also include unsupported allegations that market characteristics in digital advertising and the lack of substitutes for publisher ad servers somehow make a common motive to conspire more likely.  *See* Opp. 21-23.

competing in the ad network market."  Compl. ¶ 292; Opp. 20.  But that allegation is conclusory and does not support the argument that it would have been in Meta's interest to enter the web publisher ad serving business.  Indeed, as noted, Newspapers have alleged that the web advertising business was not attractive, *see* Compl. ¶¶ 291, 296, which suggests that entry into that business was not in Meta's self interest.  Newspapers also make allegations regarding Meta's 2017 announcement to support header bidding and news coverage about that. Compl. ¶ 282.  This Court already rejected such allegations as insufficient to support inference of a conspiracy.  MTD Op. 24.

Notably, Newspapers do not argue that Google acted against its independent self-interest, which also cuts against an inference of conspiracy.  *See* Opp. 23; *PharmacyChecker.com, LLC v. Nat'l Ass'n. of Bds. of Pharmacy*, 530 F.Supp.3d 301, 335 (S.D.N.Y. 2021) (finding the alleged actions against self-interest not to be a strong plus factor when the "acts contrary to self-interest were done *by just one Defendant,* and not in coordination with competitors") (emphasis added).

No Specific Interfirm Communications Alleged: Despite having access to over 2 million documents produced by Google, Newspapers cannot identify specific interfirm communications between Google and Meta that support an inference of conspiracy.  Rather, Newspapers claim there were "regular meetings" without further detail.  Opp. 25.  That kind of conclusory pleading of legal elements cannot support a Section 1 claim.  *See*, *e.g.*, *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136, 139-40 (2d Cir. 2013) (holding that "two vague references" to discussions between defendants was insufficient to plausibly allege a "high level of interfirm communications").

* * *

15

Newspapers' failure to plead sufficient plus factors makes any inference of conspiracy implausible, especially in the face of an actual written agreement contrary to their conspiracy allegations.[9]  *See Inclusive Access*, 544 F. Supp. 3d at 435-46 (plaintiffs failed to plausibly plead conspiracy where they failed to establish any plus factors).  Newspapers' market allocation claims should be dismissed.

## VI.   NEWSPAPERS FAIL TO ALLEGE THAT GOOGLE'S CONDUCT HARMED COMPETITION IN MARKETS FOR PUBLISHER AD SERVERS OR GENERAL SEARCH SERVICES.

As explained in Google's opening brief, Newspapers fail to allege that any of Google's conduct harmed competition in either a general search services market or a publisher ad server market.  Mot. 13-14.

Newspapers respond principally by citing allegations that Google "used its power" in one market (market "A") to "distort" competition in other markets (markets "B" and "C").  *See* Opp. 28.  But that concedes the point.  To state a claim that Google has monopolized market B, Newspapers would have to allege facts showing that Google (1) possessed monopoly power in market B; and (2) obtained or maintained that power by engaging in anticompetitive conduct that harmed competition in market B.  *See In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014).[10]  Courts reject monopolization claims where plaintiffs attempt to mix and match *monopoly power* in market A with *competitive harms* in market B, as Newspapers try to do here. *See Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1143 (9th Cir. 2022) (affirming

---

[9] Newspapers' reference to the "structure and characteristics" of the market, Opp. 26, without more, is also insufficient to allege a Section 1 conspiracy.  *See In re Inclusive Access Course Materials Antitrust Litig.*, 544 F. Supp. 3d 420, 436 (S.D.N.Y. 2021) (after rejecting presence of other plus factors, holding that high level of concentration in industry is insufficient to plead horizontal conspiracy).

[10] To state a claim for attempted monopolization, a plaintiff must allege that the defendant (1) had a specific intent to monopolize; (2) a dangerous probability of achieving monopoly power; and (3) engaged in anticompetitive conduct. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993).

dismissal where conduct did not plausibly harm competition in the market that was allegedly monopolized); *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 249 (S.D.N.Y. 2004) (dismissing monopolization claim because "anticompetitive conduct alleged by [plaintiff] is not relevant to the market [defendant] is accused of monopolizing"); *cf. In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 380 (S.D.N.Y. 2016) (dismissing claim where "plaintiffs' alleged injury does not arise directly from [defendant's] dominance of the market allegedly monopolized").

Newspapers' claim regarding monopolization of a general search services market illustrates the flaws in their reasoning.  That claim depends on the allegation that "Google leverages its power in the general search market [(i.e., market A)] to coerce publishers of mobile ads to use the AMP format," Compl. ¶ 329, but Newspapers never claim that Google's alleged promotion of AMP had any effect on competition within an alleged general search market.  For instance, they do not allege that AMP harmed competition between Google's search engine and any search-engine rival.  Their (faulty) assertions that AMP harmed competition in the separate alleged markets for ad exchanges and ad servers (markets B and C) simply do not support the claim that Google monopolized a general search services market.

Newspapers also fail to plausibly allege that any of Google's conduct harmed competition in the alleged ad server market.  For each type of conduct cited in their brief, Opp. 26-27, Newspapers' complaint highlights harm to rival ad exchanges, not rival ad servers:

- Project Bernanke allegedly "increased the number of impressions transacted through *AdX*" and Bell allegedly "penalized publishers who did not grant *AdX* preferential access."  Compl. ¶¶ 232-33 (emphasis added).

- Redacting auction data allegedly "prevented publishers from measuring the performance of *different exchanges* and foreclosed the competition brought by header bidding."  *Id.* ¶ 241 (emphasis added).

- Limiting line items allegedly "made bids from *header-bidding exchanges* less competitive than those made through *AdX*."  *Id.* ¶ 243 (emphasis added).

17

- Charging an audience fee allegedly made it more expensive for publishers to sell "through a *non-Google* or [sic] *ad exchange*."  *Id.* ¶ 257 (emphasis added).

- The so-called leveraging with AMP allegedly "undermined publishers' ability to offer their inventory to *multiple ad exchanges* simultaneously."  *Id.* ¶ 338 (emphasis added).

- Bypassing direct sales on high-traffic news days allegedly resulted in "cheaper *AdX* ads" being served "in place of the higher CPM directly sold ads," *id.* ¶ 271 (emphasis added), but those alleged harms to publisher customers fail to show harm to competition in any market.[11]

These allegations of harm to competing *ad exchanges* fail to show that Google's conduct harmed competition among *ad servers*, and thus cannot support claims that Google monopolized (or attempted to monopolize) an ad server market.

Allegations that Google's conduct harmed header bidding do not state a claim for monopolization of the ad server market because Newspapers have not alleged facts showing that header bidding promoted competition among ad servers.  Newspapers allege that publishers use header bidding to "facilitate competition between *exchanges*" by enabling "a user's browser to solicit live, competitive bids from multiple *exchanges*."  Compl. ¶ 284 (emphasis added); *see also id.* ¶ 285 ("With header bidding, AdX was forced to compete with other exchanges' live, competitive bids for particular impressions.").  But their complaint contains no factual allegations explaining how header bidding fostered competition among *ad servers*.  And in the absence of such allegations, Newspapers' conclusory references to ad servers cannot salvage their ad server monopolization claims.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions . . . .").[12]

---

[11] *See Dreamstime.com*, 54 F.4th at 1141 (explaining that alleged mistreatment of customers did not constitute anticompetitive conduct because such conduct would lead customers to give more business to competitors).

[12] Although Newspapers reference the exit of OpenX from the alleged ad server market in the portion of their complaint discussing Google's alleged limitations on line items, they do not allege any connection between the line-

Although Newspapers lean heavily on prior rulings concerning the States' claims about Bell,[13] redaction of auction data, and limitations on line items, Opp. 26-27, this Court has not yet considered Google's arguments about how those practices do not harm competition in an alleged ad server market because Google's motion to dismiss the States' federal antitrust claims did not address that issue. *See* Mot. to Dismiss State Pls.' Compl., 16-27, ECF No. 218.   In light of the multiplicity of issues raised by plaintiffs' pleadings, Google's decision to focus its arguments in the States' case on reasons why certain conduct was not generally anticompetitive should not be deemed a waiver of its right to argue that Newspapers have failed to allege that such conduct harmed competition in an ad server market in particular.   Google respectfully suggests, however, that just as the Court is now considering additional claims that Newspapers have advanced with the benefit of the Court's prior rulings, it would be fair to consider Google's additional arguments for why Newspapers have failed to state claims for monopolizing (or attempting to monopolize) an ad server market.

For all of these reasons, Counts I and V should be dismissed to the extent that they purport to state claims for monopolization (or attempted monopolization) of markets for general search services and ad servers.

---

item limits and OpenX's exit.   *See* Compl. ¶ 243.   Moreover, under Newspapers' theory, Google's line-item limits should have helped OpenX compete in the ad server market because OpenX's ability to "allow[] publishers to capture bids on header bidding through a single line item" would have been a selling point over Google's DFP.   *Id.*
[13] Newspapers wrongly contend that the Court determined that the States' complaint "plausibly allege[d] that Project Bernanke and the Bell variation was anticompetitive in the ad-server market."   *See* Opp. 26 (citing MTD Op. 50). The Court held that "allegations about the Bell iteration of Project Bernanke plausibly allege[d] harm to competition in the ad-server market," but the Court "further conclude[d] that [the] Complaint does *not* plausibly allege that other aspects of Bernanke were anticompetitive as to the market for publisher ad servers."   MTD Op. 53 (emphasis added).

## CONCLUSION

For the foregoing reasons, Google respectfully requests that this Court dismiss Counts II and IV in their entirety, in full and with prejudice.  Google also respectfully requests that, as to Counts I and V, this Court dismiss all claims predicated on alleged harm in alleged publisher ad server or general search services markets, and the newly pled claims based on audience fees and bypassing of direct-sold impressions, in full and with prejudice.

Dated: March 31, 2023                                    Respectfully Submitted,

*/s/ Justina K. Sessions*
Justina K. Sessions
Jonathan Jacobson
Jessica Lonergan
Mikaela Evans-Aziz (admitted *pro hac vice*)
Vadim Egoul
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
(415) 947-2000
jsessions@wsgr.com
jjacobson@wsgr.com
jlonergan@wsgr.com
mevansaziz@wsgr.com
vegoul@wsgr.com

Eric Mahr
Julie Elmer
Andrew J. Ewalt (admitted *pro hac vice*)
Jan Rybnicek (admitted *pro hac vice*)
Lauren Kaplin
Robert J. McCallum
FRESHFIELDS BRUCKHAUS DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005

(202) 777-4500
eric.mahr@freshfields.com
julie.elmer@freshfields.com
andrew.ewalt@freshfields.com
jan.rybnicek@freshfields.com
lauren.kaplin@freshfields.com
rob.mccallum@freshfields.com

John Harkrider
Daniel Bitton
Bradley Justus (admitted *pro hac vice*)
Koren Wong-Ervin (admitted *pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
jharkrider@axinn.com
dbitton@axinn.com
bjustus@axinn.com
kwongervin@axinn.com

*Counsel for Defendant Google LLC*