UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**IN RE GOOGLE DIGITAL ADVERTISING
ANTITRUST LITIGATION**

**No. 21-MD-3010 (PKC)**

*This Document Relates To:*

**IN RE GOOGLE DIGITAL PUBLISHER
LITIGATION**

**No. 1:21-cv-7034 (PKC)**

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS GOOGLE LLC,
ALPHABET INC., AND YOUTUBE LLC'S MOTION TO DISMISS
PUBLISHER PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Fax: (202) 777-4555

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Fax: (212) 728-2201

*Counsel for Defendants Google LLC,
Alphabet Inc., and YouTube LLC*

WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Fax: (415) 947-2099

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

TABLE OF ABBREVIATIONS ........................................................................................... vi

INTRODUCTION ...................................................................................................................1

ARGUMENT ...........................................................................................................................1

I.     PUBLISHERS CANNOT REVIVE A CLAIM REGARDING ENCRYPTING USER IDS BY LABELING THE PRACTICE A "TIE." .................................................. 1

II.    PUBLISHERS FAIL TO ALLEGE THAT GOOGLE'S MINIMUM BID TO WIN SERVICE IS ANTICOMPETITIVE. .......................................................... 5

III.   PUBLISHERS' TYING CLAIMS INVOLVING GOOGLE'S SEARCH BUSINESS FAIL AS A MATTER OF LAW. .................................................... 9

       A.     Publishers Do Not Allege Coercion. ...................................................... 9

       B.     Publishers Do Not Allege Harm to Competition. .................................. 11

       C.     Publishers Inappropriately Seek Leave to Amend After Having Already Amended Their Complaint. .................................................... 12

IV.   ALLEGATIONS BASED ON GOOGLE'S REGULATION OF "MALICIOUS CODE" FAIL AS A MATTER OF LAW. ..................................................... 12

       A.     Publishers Fail to Allege Harm to Competition ................................... 13

       B.     Publishers Make Only Conclusory Statements that Google's Legitimate Business Purpose is Pretextual ........................................ 15

V.    PUBLISHERS' MONOPOLY BROTH ARGUMENT FAILS. ..................................... 16

       A.     The Court Should Analyze Distinct Conduct Allegations Individually. .............. 16

       B.     Publishers Do Not Allege Synergistic Effects Between the Challenged and Unchallenged Claims. .................................................... 19

       C.     Publishers' Request for Relief Regarding Discovery is Inappropriate. .............. 20

CONCLUSION ......................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) ....................................................................5, 10

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010) .................................................................................6

*Am. Mfrs. Mut. Ins. Co. v. Am. Broadcasting--Paramount Theatres*,
  446 F.2d 1131 (2d Cir. 1971)................................................................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................15

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985).................................................................................................2

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................................15, 20

*Bellikoff v. Eaton Vance Corp.*,
  481 F.3d 110 (2d Cir. 2017)..................................................................................12

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)................................................................................6, 8

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)...............................................................................................13

*Cap. Temporaries, Inc. of Hartford v. Olsten Corp.*,
  506 F.2d 658 (2d Cir. 1974)....................................................................................3

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993)..................................................................................13

*Carriers v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984) ..............................................................................20

*Castro v. Sanofi Pasteur Inc.*,
  134 F. Supp. 3d 820 (D.N.J. 2015) ........................................................................8

*City of Anaheim v. S. Cal. Edison Co.*,
  955 F.2d 1373 (9th Cir.1992) ...............................................................................18

*City of Groton v. Connecticut Light & Power Co.*,
  662 F.2d 921 (2d Cir. 1981)............................................................................17, 19

*Crowder v. LinkedIn Corp.*,
  2023 WL 2405335 (N.D. Cal. Mar. 8, 2023).........................................................18

*Cung Le v. Zuffa, LLC*,
  216 F. Supp. 3d 1154 (D. Nev. 2016) ...................................................................14

*Dreamstime.com, LLC v. Google LLC,*
    54 F.4th 1130 (9th Cir. 2022) ...................................................................8

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
    504 U.S. 451 (1992) ..................................................................................7

*Fadem v. Ford Motor Co.,*
    352 F. Supp. 2d 501 (S.D.N.Y. 2005) .....................................................8

*FTC v. Facebook,*
    581 F. Supp.3d 34 (D.D.C. 2022) ............................................................5

*Hack v. President & Fellows of Yale Coll.,*
    237 F.3d 81 (2d Cir. 2000) .......................................................................5

*In re Adderall XR Antitrust Litig.,*
    754 F.3d 128 (2d Cir. 2014) ...................................................................14

*In re Apple iPod iTunes Antitrust Litig.,*
    796 F. Supp. 2d 1137 (N.D. Cal. 2011) ...................................................6

*In re EpiPen Antitrust Litig.,*
    44 F.4th 959 (10th Cir. 2022) .................................................................17

*In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.,*
    2010 WL 882989 (S.D.N.Y. Mar. 5, 2010) (Castel, J.) ...........................3

*It's My Party, Inc. v. Live Nation, Inc.,*
    811 F.3d 676 (4th Cir. 2016) ................................................................4, 9

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde,*
    466 U.S. 2 (1984) .................................................................................2, 10

*JetAway Aviation, LLC v. Bd. of County Comm'rs,*
    754 F.3d 824 (10th Cir. 2014) ...............................................................14

*Kaufman v. Time Warner,*
    836 F.3d 137 (2d Cir. 2016) .....................................................................4

*Kendall v. Visa U.S.A., Inc.,*
    518 F.3d 1042 (9th Cir. 2008) ...............................................................15

*Klein v. Meta Platforms, Inc.,*
    2022 WL 17477101 (N.D. Cal. Dec. 6, 2022) .......................................18

*N. Pac. Ry. Co. v. United States,*
    356 U.S. 1 (1958) ......................................................................................7

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.,*
    262 F.R.D. 58 (D. Mass. 2008) ................................................................8

*Nathitoches Parish Hosp. Serv. Dist. v. Tyco Int'l Ltd.,*
    247 F.R.D. 253 (D. Mass. 2008) ..............................................................8

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015).........................................................................7, 15, 16

*Ne. Tel. Co. v. Am. Tel. & Tel. Co.*,
    651 F.2d 76 (2d Cir. 1981).................................................................................11, 17

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998).................................................................................................13

*Ortho Diagnostic Sys., Inc. v. Abbott Labs.*
    Inc.*, 920 F. Supp. 455 (S.D.N.Y. 1996) ...............................................................4

*Pac. Bell. Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009).................................................................................................17

*Reisner v. Gen. Motors Corp.*,
    511 F. Supp. 1167 (S.D.N.Y. 1981).......................................................................4

*S. California Inst. of L. v. TCS Educ. Sys.*,
    2011 WL 1296602 (C.D. Cal. Apr. 5, 2011) ........................................................7

*Seidenstein v. National Medical Enterprises, Inc.*,
    769 F.2d 1100 (5th Cir. 1985) ...............................................................................10

*Soul Circus, Inc. v. Trevanna Entertainment, Inc.*,
    249 F.R.D. 109 (S.D.N.Y. 2008) ...........................................................................16

*Tele Atlas N.V. v. NAVTEQ Corp.*,
    2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) .....................................................18

*Tucker v. Apple Comput., Inc.*,
    493 F. Supp. 2d 1090 (N.D. Cal. 2006) .................................................................5

*U.S. Steel Corp. v. Fortner Enters., Inc.*,
    429 U.S. 610 (1977)..................................................................................................5

*Ungar v. Dunkin' Donuts of Am., Inc.*,
    531 F.2d 1211 (3d Cir. 1976).................................................................................4

*Unijax, Inc. v. Champion Int'l*,
    683 F.2d 678 (2d Cir. 1982)...................................................................................9

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)..................................................................................6

*Valassis Commc'ns, Inc. v. News Corp.*,
    2019 WL 802093 (S.D.N.Y. Feb. 21, 2019)..........................................17, 18, 19, 20

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..................................................................................................2

**Statutes**

15 U.S.C. § 2..........................................................................................2, 6, 8, 14, 17

**Other Authorities**

Federal Rules of Civil Procedure 12(b)(6)...............................................................................17, 20

Federal Rules of Civil Procedure 8(a)(2).....................................................................................15

## TABLE OF ABBREVIATIONS

| Term | Definition |
|---|---|
| AdX | Google's Ad Exchange |
| Compl. | First Amended Consolidated Class Action Complaint, ECF No. 408 |
| DA | Dynamic Allocation |
| DFP | DoubleClick for Publishers |
| DRS | Dynamic Revenue Share |
| EDA | Enhanced Dynamic Allocation |
| Google | Google LLC, Alphabet Inc., and YouTube LLC |
| MBW | Minimum Bid to Win |
| Mot. | Defendants Google LLC, Alphabet Inc., and YouTube LLC's Memorandum of Law in Support of Their Motion to Dismiss Publishers' Amended Consolidated Class Action Complaint, ECF No. 450 |
| MTD Op. | Opinion and Order, ECF No. 308 |
| Opp. | Publisher Plaintiffs' Opposition to Google's Motion to Dismiss, ECF No. 483 |
| Search | Google Search |
| States | State Plaintiffs |
| States' TAC | State Plaintiffs' Third Amended Complaint, ECF No. 195 |

## INTRODUCTION

Publishers fail to plausibly allege anticompetitive conduct for the claims challenged in Google's motion.  Their Opposition offers conclusory arguments and an attempt to insulate their claims from scrutiny by labeling them a "scheme."  These labels and rhetoric do not transform previously rejected claims into valid ones, nor do they change legitimate business conduct into a platform for treble damages.  Publishers' claims relating to encrypting user IDs, Minimum Bid to Win, Search leveraging, and Google's efforts to avoid malicious code infecting its ad server should be dismissed.  As Publishers have failed to plausibly allege that any of this is anticompetitive conduct after years and reviewing over two million Google documents, they should not get yet another chance to amend.  Nor should Publishers be allowed discovery for claims that are dismissed from the case.

## ARGUMENT

I.  **PUBLISHERS CANNOT REVIVE A CLAIM REGARDING ENCRYPTING USER IDS BY LABELING THE PRACTICE A "TIE."**

Publishers' Act 2 tying claim relies on allegations that Google encrypted user IDs.  *See* Compl. ¶¶ 207-25; Opp. 6.  But this Court has already found that the States did not "plausibly allege that Google's refusal to share encrypted user IDs amounts to anticompetitive conduct" because the States had not pled facts required to state a refusal-to-deal claim.  MTD Op. 40-44. Publishers do not identify any factual allegations distinguishing their claims from the States'. *See* Mot. 10.  Indeed, Publishers admit that they "do not contend that the concealment [encrypting user IDs] was exclusionary in and of itself."  Opp. 9.  Even without the Court's prior ruling, that concession alone would be sufficient to dispose of Publishers' user ID claim.

Publishers contend that their user ID allegations should not be "equat[ed] . . . with a form of disfavored 'refusal-to-deal claim,'" arguing that doing so would "always" allow for tying

claims to be dismissed on that basis.  *See* Opp. 10.  Not so.  Valid tying claims involve a defendant foreclosing rivals by forcing customers to buy *more* from the defendant than they otherwise would (*i.e.*, buying the tied product).  *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 (1984).  By contrast, valid refusal-to-deal claims involve a defendant providing rivals with *less* than they would like to buy.  *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 593 (1985) (defendant refused to sell lift tickets to rival); *see also Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408-09 (2004) (describing *Aspen Skiing* as the "leading" refusal-to-deal case and as "at or near the outer boundary of § 2 liability").  Publishers' allegations here—that Google has provided rivals with less access to unencrypted user IDs than they would like, Compl. ¶ 217—should be analyzed and dismissed as a refusal to deal, just as the Court correctly evaluated the States' parallel allegations.

Even if analyzed as a tie, however, Publishers' Act 2 tying claim cannot succeed.  Despite their heavy reliance on the Act 1 tie (which Google does not seek to dismiss given the Court's prior ruling), *see* Opp. 7-8, Publishers cannot save their Act 2 tie with allegations related to a different tying theory; they must adequately allege facts showing each tie satisfies all of the elements required to state a tying claim.  While Publishers insist that "only coercion" is at issue, *id.* at 7, they acknowledge that (in addition to coercion and other elements) a tying claim requires allegations that "the sale of one product (the tying product) is *conditioned* on the purchase of a separate product (the tied product)."  Opp. 6 (quoting MTD Op. 16) (emphasis added).

Publishers' own allegations show that Google did not condition access to the Act 2 tying product (DFP) on publishers' purchase of the tied product (AdX), as the Complaint identifies at least five ways that publishers could use DFP to sell their inventory without also using AdX.  First, publishers can use DFP's "reservation-based sales technology to support [their] direct

2

sales," Compl. ¶ 113, which can occur without using AdX or any other "programmatic or automated ad auctions," *id.* ¶ 77.  Second, publishers can sell inventory through rival exchanges that participate in DFP's "waterfall" process.  *See id.* ¶¶ 21, 253-55.  Third, DFP allows publishers to use line items "to receive bids from Ad Exchanges . . . when using Header Bidding," *id.* ¶ 304, and thereby "avoiding Google's waterfall system altogether," *id.* ¶ 298. Fourth, DFP "makes [a] publisher's ad impression available for sale through Exchange/Open Bidding," which is a service through which "Google's AdX and *other non-Google Ad Exchanges* and Ad Networks compete in a real time auction."  *Id.* ¶ 81 (emphasis added).  And fifth, before 2019, publishers could configure DFP to "set higher price floors for Google's Ad Exchange . . . in order to transact with a more diverse range of competitor Ad Exchanges."  *Id.* ¶ 330.  Having admitted that Google offered all of these pathways for publishers to use DFP to sell inventory outside of AdX, Publishers cannot plausibly maintain that Google conditioned the availability of DFP on their use of AdX.  *See In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.*, 2010 WL 882989, at *5-6, *8 (S.D.N.Y. Mar. 5, 2010) (Castel, J.) (dismissing tying claim where customers could purchase tying product (Premium Cable Services) without also purchasing tied product (cable box)).

Ignoring their failure to plead the "conditioning" element of a tying claim, Publishers focus instead on the distinct requirement that they plead actual "coercion."  Opp. 7-10.  But they have also failed to demonstrate actual coercion for two reasons.

First, "no tying arrangement can possibly exist unless the person aggrieved can establish that he has been required to purchase something which he does not want to take," *Cap. Temporaries, Inc. of Hartford v. Olsten Corp.*, 506 F.2d 658, 662 (2d Cir. 1974), and Publishers concede that they want to use AdX.  Their complaint describes AdX as a "'must have' for

publishers" and asserts that one publisher would lose $1.4 million in revenue per month without AdX.  Compl. ¶ 166.  Another publisher allegedly determined that access to AdX was worth "several million dollars annually."  *Id.* ¶ 202.  These allegations show that publishers chose to use AdX because it delivered tremendous value to them, not because they were coerced.  *See Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016) ("If a consumer wants to purchase a bundle of the alleged tying and tied products, the seller is simply satisfying consumer demand and monopolization concerns are irrelevant.").[1]

Second, Publishers cannot establish coercion by alleging that a 2018 Google study reported that "when advertisers do not know the identity of the user, ad prices drop by 50+%." Opp. 9 (citing Compl. ¶ 216).  That allegation by its own terms concerns only advertisers who do not know *anything* about a user's identity, and does not speak to effects on advertisers who have access to sources of information about users apart from Google user IDs.  The date of the study (2018) further suggests that it had nothing whatsoever to do with Google's user IDs because Publishers allege Google began encrypting user IDs a decade earlier, following the 2008 DoubleClick acquisition.  *See* Compl. ¶¶ 12, 207.

But even if Publishers had pleaded sufficient facts showing they would make significantly more money if advertisers had access to unencrypted users IDs, that still would not be enough to plead economic coercion as a matter of law.  Economic coercion requires allegations that a defendant's "pricing structure makes purchase of the tying and tied products together the only viable economic option."  *Ortho Diagnostic Sys., Inc. v. Abbott Labs.*, Inc., 920

---

[1] *See also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 685 (4th Cir. 2016) ("A successful tying claim in particular needs to rule out alternative market-based explanations for why the consumer might prefer to purchase the tied product along with the tying product."); *Ungar v. Dunkin' Donuts of Am., Inc.*, 531 F.2d 1211, 1218 (3d Cir. 1976) ("If the product in the second market would be accepted anyway, because of its own merit, then, of course, no leverage is involved."); *Reisner v. Gen. Motors Corp.*, 511 F. Supp. 1167, 1175, 1177–78 (S.D.N.Y. 1981) (rejecting tying claim where plaintiff admitted that he wanted the tied product), *aff'd*, 671 F.2d 91 (2d Cir. 1982).

4

F. Supp. 455, 471 (S.D.N.Y. 1996). Because Publishers fail to plead any facts about how DFP and AdX are priced together, they fail to plausibly allege economic coercion, notwithstanding their claims that advertisers bid lower than they would have if they had access to unencrypted user IDs. *See* Opp. 9; *see also Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1179-80 (9th Cir. 2016) (rejecting tying claim where the alleged "economic imperative" arose not from how the products were priced, but "simply because [the defendant's conduct] ma[de] it less desirable to purchase from the third party").[2]

In addition to the encrypted user IDs, Publishers highlight Dynamic Allocation, Enhanced Dynamic Allocation, and Dynamic Revenue Share as other allegedly coercive practices. *See* Opp. 8. But regardless of whether those allegations show coercion, they cannot cure Publishers' failure to allege facts showing that Google conditioned access to DFP on publishers also using AdX, and that failure alone mandates dismissal of the entire Act 2 tying claim. Nor can the allegations concerning DA, EDA, and DRS justify discovery into Publishers' deficient claims regarding encrypted user IDs. *See FTC v. Facebook*, 581 F. Supp.3d 34, 60-61 (D.D.C. 2022) (barring discovery into the factual basis of legally defective allegations without dismissing the entire claim).

## II.  PUBLISHERS FAIL TO ALLEGE THAT GOOGLE'S MINIMUM BID TO WIN SERVICE IS ANTICOMPETITIVE.

Publishers criticize Google's Minimum Bid to Win service for being "designed to counter a serious competitive threat," Opp. 3, and "make [Google's] service more attractive to

---

[2] None of Publishers' cited cases support their economic coercion theory. *See* Opp. 9-10. *U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 620 (1977), held the plaintiff had failed to prove the market-power element of a tying claim and did not address the coercion element at all. Similarly, *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 85-87 (2d Cir. 2000), affirmed dismissal of a tying claim for failure to plead a plausible market and did not turn on the coercion element. *Tucker v. Apple Comput., Inc.*, 493 F. Supp. 2d 1090, 1094, 1097 (N.D. Cal. 2006), found a plaintiff had adequately pleaded coercion with allegations that Apple made it impossible for the tying product to interoperate with tied products made by rivals, but there were no allegations of economic coercion.

advertisers" by allowing advertisers to submit "win[ning] bids at the lowest possible levels." *Id.*
at 11. As Google explained in its opening brief, these allegations describe legitimate
competition, not anticompetitive exclusion. Mot. 4-5. An "attempt to develop superior products
is . . . an essential element of lawful competition" and "any firm, even a monopolist, may
generally bring its products to market whenever and however it chooses." *Berkey Photo, Inc. v.*
*Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979).

Publishers admit that their MBW allegations do not plausibly allege an antitrust violation
based on either an unlawful refusal to deal or below-cost pricing. Opp. 4, 14-15. And they fail
to allege facts that would put MBW in any other category of exclusionary conduct. Publishers
misapprehend Google's argument regarding product design. Mot. 4-5. Google does not argue
that all "conduct that can be recast as a new product feature is immune from antitrust challenge."
Opp. 2. Nor does Google raise a "factual defense" based on MBW's procompetitive benefits.
Opp. 13. Rather, by conceding that Google's MBW service made its ad buying tools "more
attractive to advertisers," Opp. 11, Publishers fail to plausibly allege that Google's design of its
MBW service was anticompetitive in the first place. *See Berkey Photo*, 603 F.2d at 286; *Allied*
*Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998-99 (9th Cir. 2010)
("[A] design change that improves a product by providing a new benefit to consumers does not
violate Section 2 absent some associated anticompetitive conduct."); *In re Apple iPod iTunes*
*Antitrust Litig.*, 796 F. Supp. 2d 1137, 1146-47 (N.D. Cal. 2011) (Apple iTunes update that was a
genuine product improvement was not unlawful).[3] The fact that Publishers would have preferred
that Google not provide to its advertiser customers a product that allowed those advertisers to bid

---

[3] Publishers incorrectly rely on the D.C. Circuit's *Microsoft* analysis addressing the integration of Windows and
Internet Explorer, where the issue of product improvement was in dispute. Opp. 13-14 (citing *United States v.*
*Microsoft Corp.*, 253 F.3d 34, 47, 64-67 (D.C. Cir. 2001)). But here, Publishers concede that Google's MBW
service was a product improvement for advertisers. *See* Opp. 11.

more efficiently does not render MBW a non-improvement or anticompetitive.  Consequently,

Publishers' MBW claims must be dismissed.  MTD Op. 15 ("Dismissal is appropriate when 'it is

clear from the face of the complaint . . . that the plaintiff's claims are barred as a matter of law.'"

(citation omitted)); *see also S. California Inst. of L. v. TCS Educ. Sys.*, 2011 WL 1296602, at *9

(C.D. Cal. Apr. 5, 2011) (dismissing monopolization claims where the "allegations, even if

accepted as true, amount to nothing more than product or service improvement as a way to

increase market share, another act that does not alone give rise to a necessary antitrust injury").

　　　To support their claim that Google's MBW service was exclusionary, Publishers

principally rely upon *Actavis*, which held that a product design can be anticompetitive when it

"*combines* product withdrawal with some other conduct, the overall effect of which is to coerce

consumers rather than persuade them on the merits."  *New York ex rel. Schneiderman v. Actavis*

*PLC*, 787 F.3d 638, 652-54 (2d Cir. 2015) (emphasis in original).[4]  The coercion at issue in

*Actavis* was the "combination of introducing [a new drug] into the market and effectively

withdrawing [the old drug]," in which the old and new drug collectively represented "100%" of

the relevant market (known as a "hard switch").  *Actavis*, 787 F.3d at 652, 654-55.  Here,

Publishers allege that by offering advertiser customers an attractive service that helped them

lower the prices they pay, Google "economically force[d]" advertisers to only bid through its

tools.  Opp. 13 (citing *Actavis*, 787 F.3d at 652).  That does not amount to a hard switch or

product withdrawal of the kind at issue in *Actavis*.  To the contrary, Publishers allege that Google

*added* an attractive service for advertisers that did not previously exist, Mot. 4-5, and nothing in

Publishers' allegations suggests that advertisers were precluded from using non-Google

---

[4] *Eastman Kodak* and *Northern Pac. Railway Co.*, are also inapposite because there the alleged conduct was tying, which Publishers do not allege with respect to Google's MBW service.  Opp. 12 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958)).

exchanges just as they had before.  Opp. 11 (noting advertisers "could have submitted through rival exchanges that did not have MBW").  Like *Berkey Photo*, in which the Second Circuit held that Kodak did not harm competition by introducing a new film that was only interoperable with its cameras, 603 F.2d at 288, Google's introduction of a service that only "optimiz[ed] results for Google's advertiser clients" does not constitute exclusionary conduct.  Compl. ¶ 346.

Publishers try to salvage their MBW claim by arguing—for the first time in their Opposition—that Google "coerce[d] Publishers to divulge their own confidential bidding data." Opp. 13.  But Publishers cannot point to any allegation in their Complaint detailing such "coerc[ion]," nor any allegation that MBW involves Publishers' data.  *See* Compl. ¶ 343 (MBW "assemble[d] bidding data from advertisers" and "required the cooperation of participating advertisers who supplied their bids"); *see also Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005) ("It is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs."), *aff'd*, 157 F. App'x 398 (2d Cir. 2005). Nor do they cite a single case holding that the disclosure of allegedly confidential customer information is anticompetitive.[5]  *See Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1142 (9th Cir. 2022) (holding that Google's "captur[ing]" of user and advertiser data is not anticompetitive).  Their Opposition also contains the conclusory argument, with no support in their Complaint, that Google's MBW service involved "deception."  Opp. 14.  But "misleading or deceptive statements to market participants standing alone do not amount to anticompetitive conduct for the purposes of section 2."  MTD Op. 38.  Because they do not plausibly allege any mechanism of anticompetitive exclusion, Publishers' MBW claim must be dismissed.

---

[5] Instead, Publishers devote a lengthy footnote to discussing inapposite cases addressing class certification and the exclusion of expert testimony.  Opp. 14 n. 2 (citing *Nathitoches Parish Hosp. Serv. Dist. v. Tyco Int'l Ltd.*, 247 F.R.D. 253, 266-73 (D. Mass. 2008); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847-49 (D.N.J. 2015); *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 262 F.R.D. 58, 70 (D. Mass. 2008)).

### III.   PUBLISHERS' TYING CLAIMS INVOLVING GOOGLE'S SEARCH BUSINESS FAIL AS A MATTER OF LAW.

#### A.  Publishers Do Not Allege Coercion.

Publishers fail to address the coercion elements of a tying claim articulated in *Unijax* and *It's My Party*.  Google's opening brief explained that coercion is an "indispensable" element of a tying claim and that "strong persuasion, encouragement, or cajolery" do not amount to actual coercion.  Mot. 11 (citing *Unijax, Inc. v. Champion Int'l*, 683 F.2d 678, 685 (2d Cir. 1982)).  Publishers make no allegation that Google's behavior was anything more than strong persuasion or encouragement.  They argue coercion exists based on allegations "that Google made Search+ the default and Smart Campaigns precluded advertisers from opting out of display."  Opp. 16.  However, neither operated as a requirement for Search advertisers to purchase display advertisements through Google.  *See Unijax*, 683 F.2d at 684 (requiring "[a]ctual coercion . . . that in fact forces the buyer to purchase the tied product").  Google's opening brief further explained that where the tying product was sold without the tied product, there can be no coercion.  Mot. 12 (citing *It's My Party, Inc.*, 811 F.3d at 685).  Publishers admit that the products were sold separately—advertisers could see other campaign types that did not combine search and display ads.  Compl. ¶ 341.  Publishers' lack of allegations addressing these "indispensable" elements of a tying claim is fatal.

*Default-on.*  Publishers no longer argue the presence of a contractual tie.  *See* ECF No. 379, at 6.  Instead, Publishers now argue a de facto tie exists because Google had Search+ as "default-on" for all advertisers, Opp. 15-16, and that advertisers "initially saw only Smart Campaign" but admittedly could see other campaign types, too.  Compl. ¶ 341.  This does not constitute a de facto tie for three reasons.

First, Publishers do not even address Google's argument that advertisers did not need to purchase any quota of display advertising through Google as a condition of buying Google search ads.  *See* Mot. 11-12.  Publishers do not allege that there existed a minimum spend requirement between display advertising and search ads.  Without any allegation that Search+ or Smart Campaigns forced any advertiser to buy unwanted display advertising, Publishers' tying claim fails.  *See Aerotec Int'l, Inc.*, 836 F.3d at 1179 (finding plaintiff's claim did not support an implied tying theory because there was no evidence of a requirement to use defendant's services only or forego services from an independent service).

Second, advertisers were not prevented from buying display advertising on non-Google services if they purchased Google search ads.  *See* Mot. 12.  Publishers make no allegations that advertisers were prevented, either contractually or otherwise, from buying display advertisements from competitors.  The fact that some advertisers might *choose* to use a single provider for search and display ads does not mean that they were required to do so.

Third, providing a default campaign type does not constitute a de facto tie because convenience is not coercion.  *See Seidenstein v. National Medical Enterprises, Inc.*, 769 F.2d 1100, 1106 n.2 (5th Cir. 1985) (describing *Jefferson Parish* as stating that "preference for convenience was not to be construed as coercion to purchase the tied services") (citing *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984)); *see also Am. Mfrs. Mut. Ins. Co. v. Am. Broadcasting--Paramount Theatres*, 446 F.2d 1131, 1137 (2d Cir. 1971) ("[T]here can be no illegal tie unless *unlawful coercion* by the seller influences the buyer's choice." (emphasis added)).  Publishers do not allege that advertisers were prevented from changing a campaign from Search+ or Smart Campaigns to another type that did not include display ads.  Indeed, they admit that advertisers could "'escape' to see other campaign accounts."  Compl. ¶ 341.  These

10

allegations demonstrate that advertisers were given options—whether or not advertisers used these options is not a basis for liability.

### B. Publishers Do Not Allege Harm to Competition.

Google's opening brief explained that Publishers' tying claim also fails for lack of alleging harm to competition or potential foreclosure.  Mot. 12.  In response, Publishers argue "Google used its monopoly power in Search and Ad Buying Tools to drive market share to its own Ad Network at the exclusion of rivals."  Opp. 16.  Publishers further argue this behavior "locked" advertisers into Google's ad-buying tools and thus harmed competition.  Opp. 16.  Neither of these statements amount to harm to competition.

First, as just explained, Publishers do not allege that there was a requirement for advertisers to buy display advertising through Google rather than non-Google services.  Publishers attempt to skirt past this distinction by alleging that "these advertisers do not 'multi-home[.]'"  Opp. 16.  This allegation is immaterial—advertisers might *choose* not to multi-home, but Google did not *require* advertisers to buy display advertising only through Google.  It cannot be a basis for liability that advertisers, in asserting their own choice and preference, prefer not to multi-home and to use Google's services instead.  Further, Publishers fail to demonstrate that any money would have otherwise been spent with rivals or plead any facts indicating that rival ad networks lost any dollars because of Search+ campaigns.

Second, even if Google drove market share to its own ad network, driving one's market share is what competition is all about.  *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 93 (2d Cir. 1981) ("[A] monopolist's right to compete is not limited to actions undertaken with an altruistic purpose.  Even monopolists must be allowed to do as well as they can with their business.").  Publishers do not address Google's argument that the alleged conduct enhanced output in the relevant markets to the benefit of Publishers.  Search+ campaigns caused money

11

that otherwise would not have been spent at all to be spent on display advertising. Mot. 13.

Publishers cannot turn a product that increased display advertising spend and made it easier for

advertisers to spend money on Publishers' websites into a basis for antitrust liability.

### C.  Publishers Inappropriately Seek Leave to Amend After Having Already Amended Their Complaint.

Publishers' attempt to get another bite at the proverbial apple should fail.  Publishers

have had multiple opportunities to cure the deficiencies in their complaint, and there is no reason

to believe that any amendment could cure the defects identified in Google's motion.  Publishers

filed their initial complaint on December 15, 2020, and amended nearly two years later on

December 5, 2022, after being given more than 2 million Google documents and after reviewing

the Court's Opinion and Order on the States' TAC.  Additional leave to amend would be futile

and Publishers are not "entitled to an advisory opinion from the Court informing them of the

deficiencies in the complaint and then an opportunity to cure those deficiencies." *Bellikoff v.*

*Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2017).  Publishers seek to "[recycle] versions of

claims which [have] already fallen victim to a motion to dismiss" making leave to amend

"especially inappropriate." *Id.*

## IV.  ALLEGATIONS BASED ON GOOGLE'S REGULATION OF "MALICIOUS CODE" FAIL AS A MATTER OF LAW.

Publishers' claim regarding malicious code fails for two reasons.  First, Publishers do not

and cannot allege that one instance where Google asked that malicious code be removed caused

market-wide harm to competition.  At most, they describe temporary exclusion of one or a small

number of competitors, which is insufficient.  Second, they fail to acknowledge that the practice

is benign on its face.  Publishers attempt to manufacture a factual dispute by characterizing

Google's argument as a "procompetitive justification," but that is incorrect.  Publishers have the

initial burden to allege facts supporting their allegation that this obviously legitimate practice is, as they say, a "pretext" for anticompetitive exclusion.  They have not done so.

### A.  Publishers Fail to Allege Harm to Competition.

Publishers do not and cannot allege that patrolling problematic code amounted to market-wide harm.  Publishers only allege "harm" to individual ad networks, not the ad server market nor the ad network market.  Opp. 17 (heading D).  Specifically, Publishers allege that some rival ad networks' relationships with publishers were harmed and that the affected ad networks temporarily could not compete for impressions.  *Id.* at 17-18.  But harm to individual competitors is not sufficient; harm must be alleged as to the market as a whole.  *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993).  And a temporary pause in an ad network's activity to protect users is not harm to competition at all.

Publishers say nothing about the extent of Google's "practice" or how long rival ad networks were unable to compete.  Instead, Publishers depend on the conclusory statement that Google prevented competitors from "competing [. . .] *at all* until they completed an arduous process."  Opp. 18.  There is no allegation as to what this "arduous process" constituted nor how long or how many ad networks were paused because of the code-fixing process.  Publishers must demonstrate that the competitive process as a whole was harmed while ad networks were allegedly prevented from competing.  *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *see also* MTD Op. 37-38 ("Harm to competition is different than harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition." (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977))).  Additionally,

13

as argued in Google's opening brief, Publishers cite only one example of an ad network that was allegedly "harmed," which is insufficient to demonstrate harm to competition.  Mot. 8.

Publishers also argue that their Act 16 allegations "are cognizable under well-established antitrust precedent" because they allege "reduced output, increased prices and decreased quality."  Opp. 18 (citing MTD Op. 30).  Citing to their conclusory allegations of harm does not help Publishers because these allegations do not establish that the supposed reduced output, etc. was caused by anticompetitive conduct or a reduction in competition.  As this Court recognized, anticompetitive conduct "must represent something more than business activity that occurs in the normal competitive process or fosters commercial success."  MTD Op. 37 (citing *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133-36 (2d Cir. 2014)).  Ensuring the safety of a product is a core business activity that fosters commercial success because it ensures that the product is viable.  Moreover, even if Publishers were correct, they make no allegations as to how the alleged reduced output, increased prices, or decreased quality resulted from Google's efforts to protect users.  Pointing to a bare, general allegation of these effects does not establish causation.

At most, Publishers allege temporary exclusion of one or a few market participants, which occurred only during the (undefined) time the ad network revised the malicious code and is insufficient under Section 2.  Such temporary effects do not rise to the level of harm to competition.  *See JetAway Aviation, LLC v. Bd. of County Comm'rs*, 754 F.3d 824, 841 (10th Cir. 2014) ("In divining the presence of an antitrust injury, courts have disregarded temporary anticompetitive effects."); *see also Cung Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1162 (D. Nev. 2016) ("[T]here must be a preliminary showing of significant and more-than-temporary harmful

effects on competition (and not merely upon a competitor or customer) before these practices can rise to the level of exclusionary conduct.").

Finally, Publishers cannot rely on Rule 8(a)(2) as a means to base their claim on alleged harm to a single rival ad network. *See* Mot. 17. While it is true that Rule 8(a)(2) only requires a short and plain statement, that plain statement must "possess enough heft," and mere "labels and conclusions" will not be sufficient. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-57 (2007). Publishers must provide actual facts that, if ever proven, would demonstrate harm to the ad server or the ad network market. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). They have not done so.

### B. Publishers Make Only Conclusory Statements that Google's Legitimate Business Purpose is Pretextual.

Publishers improperly try to flip the burden to Google by asserting that Google's articulated business purpose is pretextual. But it is Publishers' burden to plead facts showing a business practice that is legitimate on its face is somehow a pretext or otherwise exclusionary. Publishers do not cite a single instance in which valid code was suppressed at all, let alone in a manner that harmed competition. Their allegations of pretext are entirely conclusory.

Publishers argue that any attempt to argue business justifications is to be taken up at the fact stage. Opp. 19 (citing *Actavis*, 787 F.3d at 652-63). This is a misrepresentation of the conclusion in *Actavis*, which involved a preliminary injunction where the defendant had a peculiar patent-based monopoly, a wholly different position than the present case. *Id.* at 643 (recognizing that the case relates to an issuance of a preliminary injunction, relates to novel issues, and relates to an idiosyncratic market). In *Actavis*, the court recognized that "courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes." *Id.* at 652. Product redesign is only anticompetitive, the court added,

where it "coerces consumers and impedes competition." *Actavis*, 787 F.3d at 652. Publishers make no allegations that Google's regulation of malicious code coerced customers. If anything, Google's regulation of code increased customer satisfaction and prevented harm to both consumers and ad networks. *See id.* ("Product innovation generally benefits consumers and inflicts harm on competitors, so courts look for evidence of exclusionary or anticompetitive effects in order to distinguish between conduct that defeats a competitor because of efficiency and consumer satisfaction and conduct that impedes competition through means other than competition on the merits.").

Publishers' request for leave to amend by citing additional documents is inappropriate. As discussed, *see supra* Section III.C, Publishers already had the chance to amend their complaint after receiving over two million documents. Additional opportunities to plead these issues would unnecessarily burden the court, delay progression of the case, and raise the expense of this litigation. *See Soul Circus, Inc. v. Trevanna Entertainment, Inc.*, 249 F.R.D. 109, 110 (S.D.N.Y. 2008) (considering "the duplicative expense of relitigation," among other factors).

## V.   PUBLISHERS' MONOPOLY BROTH ARGUMENT FAILS.

### A.   The Court Should Analyze Distinct Conduct Allegations Individually.

Publishers argue that even if all the challenged conduct is lawful, or if just one element is unlawful on a standalone basis, everything else—no matter how benign or procompetitive—can be challenged as part of an unlawful "scheme." *See* Opp. 21. That is not the law. As the Second Circuit stated, "we reject the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of . . .

the Sherman Act." *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981).

The Supreme Court's decision in *linkLine* underscores the point.  There, the Court dismissed under Rule 12(b)(6) a Section 2 claim that was "nothing more than an amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level."  *Pac. Bell. Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 452 (2009).  Defendant AT&T owned much of the infrastructure needed to provide "last mile" DSL internet service.  *Id.* at 442.  Plaintiffs argued that AT&T had monopolized the DSL market, refused to deal with the plaintiffs, and engaged in a "price squeeze."  *Id.* at 443.  In rejecting the individual claims, the Supreme Court said that the plaintiffs there could not "join a wholesale claim that cannot succeed with a retail claim that cannot succeed, and alchemize them into a new form of antitrust liability . . . . Two wrong claims do not make one that is right."  *Id.* at 457.

The "proper inquiry," in contrast, "is whether, qualitatively, there is a 'synergistic effect.'"  *City of Groton*, 662 F.2d at 928-29 (quoting *Ne. Tel. Co.*, 651 F.2d at 95 n.28 ); *see Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, *9-10 (S.D.N.Y. Feb. 21, 2019) (Castel, J.).  Plaintiffs must demonstrate that the component parts of the supposed "scheme" operate *together* to enhance a significant restriction of the competitive process *beyond* the effects of each act individually.  *See* 2019 WL 802093, at *9-10.  They have not come close to doing so.

To determine whether there is some synergistic effect, a court must "analyze the various issues individually."  *City of Groton.*, 662 F.2d at 928; *see also In re EpiPen Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) ("For the sake of accuracy, precision, and analytical clarity, we must evaluate [the] allegedly exclusionary conduct separately.").  That is because one needs to understand each of the claims in order to determine how or whether they fit together.  Here, there

is simply no synergy.  Nothing in Publishers' "Additional Act" allegations suggests how the various challenged activities operate together to restrain competition in a manner that the individual acts do not.  And even if there were "a finding of some slight wrongdoing in certain areas," that "need not by itself add up to a violation."  *Crowder v. LinkedIn Corp.*, 2023 WL 2405335, *3 (N.D. Cal. Mar. 8, 2023) (quoting *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir.1992)); *Valassis*, 2019 WL 802093, at *9-10.

      *Klein v. Meta* does not allow Publishers to tack their allegations on to conduct the Court has held to plausibly be anticompetitive by way of general conclusory statements and references to a "scheme."  Opp. 21.  Rather, *Klein* holds that a monopoly broth argument may be brought where the ingredients are well-pleaded, non-conclusory, specific allegations of individual actions and deceptive practices that fit *together* to restrain competition in a manner that individually they do not.  *See Klein v. Meta Platforms*, *Inc.*, 2022 WL 17477101, at *2 (N.D. Cal. Dec. 6, 2022). Publishers fail to present any of these ingredients— there is no explanation as to how each Act contributes to a scheme, and the brief explanations provided are all conclusory.  *See* Opp. 20-21.

      Nor does Publishers' citation to *Tele Atlas N.V. v. NAVTEQ Corp*. aid their case.  There, the court allowed tying evidence to be presented even though the individual claim was deficient because it added *something* material to the other allegations.  2008 WL 4911230, *3-4 (N.D. Cal. Nov. 13, 2008).  Publishers fail to demonstrate the *something*.  Publishers' Complaint, and Opposition, only provide conclusory statements, leaving the Court to fill-in-the-blanks as to how the Additional Acts contribute to other conduct the Court has previously ruled on.

      Last, Publishers remarkably try to argue that this Court has recognized that courts should not separately analyze claims that form part of a single "scheme."  Opp. 20.  Yet that is just what the Court did with the States' TAC.  Doing so is a practical necessity simply to understand the

allegations and the conduct alleged.  *See City of Groton*., 662 F.2d at 928-29.  As one example, the States alleged that Google's encryption of user IDs foreclosed competition in the exchange market and the buying-tool markets for small and large advertisers.  States' TAC ¶ 266; MTD Op. 42.  The Court found the States' claim insufficient.  MTD Op. 44.  But the Court found that the States plausibly alleged that Google's Unified Pricing Rules harmed competition in those same alleged markets, *id.* at 77, despite the States' allegations that UPRs furthered the anticompetitive effect of Google's use of encrypted user IDs, *id.* at 74.  This Court has recognized that "it is unlikely that multiple independently lawful acts can come together to create an unlawful monopoly 'broth.'"  *Id.* at 39 (quoting *Valassis*, 2019 WL 802093, at *9).

### B.  Publishers Do Not Allege Synergistic Effects Between the Challenged and Unchallenged Claims.

Publishers attempt to argue "synergistic effects" with respect to two of the three Acts that Google seeks to dismiss: allegations regarding the MBW program and the Act 2 tying claims.  Opp. 20-21.  Nothing in these allegations suggests any synergistic effect.

**MBW.**  Publishers assert the MBW program had synergistic effects with Google's UPRs.  Opp. 20.  Publishers allege UPRs prevented Publishers from "working around" the effects of MBW and prevented publishers from having an "even playing field."  *Id.*  Although this Court allowed the States' claim pertaining to UPRs to proceed through discovery, *see* MTD Op. 74-77, the presence of UPR allegations does not automatically create synergistic effects with Publishers' MBW allegations.  *See City of Groton*, 662 F.2d at 935 (finding even if plaintiffs' price-squeeze claims were valid, there was no "synergistic effect" with plaintiffs' other allegations because of deficiencies in the individual claims).  Rather, these allegations indicate that MBW lowered prices for advertisers and UPRs prevented Publishers from raising those prices.  *See* Opp. 20 ("Publishers responded . . . by increasing the acceptable price floors on

19

Google exchanges.").  The "effects" of MBW that Publishers allege are not effects on competition, and are therefore immaterial to the overall analysis.

**Search+.**  Similarly, Publishers allege there was a "feedback loop" involving Search+. Opp. 20-21.  Again, Publishers fail to allege any specific synergistic effects beyond general, unspecific references to the "two sides of the Ad Tech Stack."  Opp. 21.  Their cited Complaint paragraphs include general statements about "Google's Scheme," but they do not explain how any single act relates to each other.  Because the underlying conduct has no anticompetitive effect, Publishers' conclusory assertions of synergies do not protect their claims from dismissal. Bare invocation of the term "scheme" or the phrase "synergistic effects" is not sufficient.  *See Valassis*, 2019 WL 802093, at *10.

### C.  Publishers' Request for Relief Regarding Discovery is Inappropriate.

Publishers inappropriately request that discovery continue on the challenged conduct regardless of the Court's ruling on the merits.  Allowing discovery on conduct that has been dismissed would significantly raise litigation costs and has no basis in precedent.  *See Twombly*, 550 U.S. at 558 (recognizing the extensive cost of discovery in antitrust litigation).  Allowing Publishers to continue discovery on dismissed claims would be "tantamount to providing antitrust litigation with an exemption from Rule 12(b)(6)."  *Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1106-07 (7th Cir. 1984)).  Publishers provide no authority for their request that discovery continue on dismissed, non-actionable claims.

### CONCLUSION

For the foregoing reasons, Google respectfully requests that this Court dismiss Publishers' claims regarding encrypted user IDs and Acts 14, 15, and 16, with prejudice.

Dated: March 31, 2023

Respectfully Submitted,

*/s/ Justina K. Sessions*
Justina K. Sessions
Jonathan Jacobson
Jessica Lonergan
Mikaela Evans-Aziz (admitted *pro hac vice*)
Vadim Egoul
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
(415) 947-2000
jsessions@wsgr.com
jjacobson@wsgr.com
jlonergan@wsgr.com
mevansaziz@wsgr.com
vegoul@wsgr.com

Eric Mahr
Julie Elmer
Andrew J. Ewalt (admitted *pro hac vice*)
Jan Rybnicek (admitted *pro hac vice*)
Lauren Kaplin
Robert J. McCallum
FRESHFIELDS BRUCKHAUS DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
julie.elmer@freshfields.com
andrew.ewalt@freshfields.com
jan.rybnicek@freshfields.com
lauren.kaplin@freshfields.com
rob.mccallum@freshfields.com

John Harkrider
Daniel Bitton
Bradley Justus (admitted *pro hac vice*)
Koren Wong-Ervin (admitted *pro hac vice*)

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
jharkrider@axinn.com
dbitton@axinn.com
bjustus@axinn.com
kwongervin@axinn.com

*Counsel for Defendants Google LLC,
Alphabet Inc. and YouTube LLC*