**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| -------------------------------------------------------- ) | |
| IN RE: GOOGLE DIGITAL ADVERTISING ) | 21-md-3010 (PKC) |
| ANTITRUST LITIGATION ) | |
| ) | |
| -------------------------------------------------------- ) | |
| ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| INFORM INC., ) | 1:23-cv-01530-PKC |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| GOOGLE LLC; ) | |
| ALPHABET INC.; and ) | |
| YOUTUBE, LLC, ) | JURY TRIAL DEMANDED |
| ) | |
| Defendants. ) | |
| ) | |
| -------------------------------------------------------- ) | |

## SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  THE PARTIES ..................................................................................................7

III. JURISDICTION AND VENUE ........................................................................9

IV.  FACTUAL BACKGROUND ...........................................................................10

    A.  Advent of Digital Advertising ...............................................................10

V.   PLAINTIFF INFORM: HISTORY, INNOVATION, AND VALUE PROPOSITION 14

    A.  The Evolution of Inform's Online Video Advertising ...........................15
    B.  Inform Competes with Google ..............................................................19
    C.  Google's Dominance Across Markets Leaves Inform and Other Competitors, Publishers and Advertisers with No Choice But to Rely on Google's Products and Services ................................................................................................20

VI.  GOOGLE BECOMES A MONOPOLY .........................................................22

    A.  Google's History: From Search Engine to Online Advertising Business ...........22
    B.  Google's Suite of Online Advertising Products and Services Consolidates Dominance Across Multiple Markets ...........................................................24
        1.  AdSense (For Publishers) .................................................................25
        2.  Google Ads (For Advertisers) .........................................................25
        3.  Double Click for Publishers (DFP) .................................................26
        4.  DoubleClick Ad Exchange ...............................................................27
        5.  Display & Video 360 (DV360) .......................................................27
        6.  YouTube ...........................................................................................27
        7.  Android Operating System ...............................................................28
        8.  Google Chrome ................................................................................29
        9.  Other Google Products and Services ...............................................30
    C.  Google Buys Control of the Key Tools that Link Publishers and Advertisers and Expands Google's Ad Tech Capabilities ...................................................30

VII. THE RELEVANT MARKETS AND GOOGLE'S MARKET POWER ...................34

    A.  Relevant Markets: Online Video Advertising, Ad Server and Ad Exchange Markets ................................................................................................35
        1.  Online Video (OLV) Advertising ....................................................35
            (a)  Online Video (OLV) and Instream Online Video (IOLV) Advertising Markets ......35
            (b)  Monopoly Power in the OLV and IOLV Advertising Markets................................37
        2.  Publisher Ad Servers ......................................................................38
            (a)  The Publisher Ad Server Market ...............................................38
            (b)  Monopoly Power In the Ad Server Market ................................41
        3.  Ad Exchanges ..................................................................................41
            (a)  The Ad Exchange Market...........................................................41
            (b)  Monopoly Power in the Ad Exchange Market ...........................43
    B.  Adjacent Markets: Web Browser, Internet Search, LMDOS ................................45

1.   *Web Browsers* ................................................................................*45*
     (a)   The Web Browser Market ...............................................................45
     (b)   Monopoly Power in the Web Browser Market.....................................46
2.   *Internet Search Services* ....................................................................*48*
     (a)   The Internet Search Market ...........................................................48
     (b)   Monopoly Power in Internet Search ................................................49
3.   *Licensable Mobile Device Operating Systems* ......................................*50*
     (a)   The LMDOS Market ......................................................................50
     (b)   Monopoly Power in Licensable Mobile Device Operating Systems.........50
C.   AMPLIFICATION OF MARKET POWER AND BARRIERS TO ENTRY ...................51

VIII.   UNLAWFUL CONDUCT.............................................................................**53**

A.   GOOGLE WIELDS ITS MONOPOLY POWER IN MULTIPLE MARKETS TO IMPAIR COMPETITION
     53
1.   *Illegal Tying and Bundling of Services* ...............................................*55*
     (a)   Tying of AdX to Google's DFP .......................................................55
     (b)   Tying of YouTube Video Ad Inventory to Use of Google Products .........58
     (c)   Google's Illegal Tying Enabled the Anticompetitive Conduct that Followed..........60
2.   *Anticompetitive Manipulation of the Ad Auction: Google Impaired and Excluded*
     *Competitors and Stole Valuable Ad Inventory Through Auctions Designed to Deceptively*
     *and Artificially Preference Its Own Exchange and Decimate Competition on the Merits....61*
     (a)   Dynamic Allocation........................................................................61
     (b)   Enhanced Dynamic Allocation.........................................................64
     (c)   Other Self Preferencing Measures: Last Look and Minimum Bid to Win...............70
     (d)   Project Bernanke ...........................................................................71
     (e)   Dynamic Revenue Sharing ..............................................................73
     (f)   Bypassing of Direct Ad Campaigns on High News Days.......................74
     (g)   Manipulation of Pacing to Undermine Competitors .............................77
3.   *Exclusionary Disablement, Technological Blocking and Systematic Interference* ......*78*
     (a)   Disabling Flash Video for Everyone Except YouTube .............................78
     (b)   Google Assumes Control of Video Advertising and Chrome Disables HTML5
           Videos from Working.....................................................................84
     (c)   Unilateral Setting and Altering of Technological Standards and Denial of
           Interoperability ...........................................................................86
     (d)   Opacity as to Pricing and Data and Hashing of User Ids ......................87
4.   *Google Affirmatively Interferes with Competitors Using Data Harvested from Its*
     *Monopolies* .......................................................................................*90*
5.   *Exclusive Dealing and Anticompetitive Contracts* .................................*92*
B.   MONOPOLISTIC LEVERAGING .........................................................93
1.   *Default Placement of Internet Search and Chrome Browser / LMDOS to control*
     *OLVAM* ............................................................................................*94*
2.   *Leveraging of Internet Search Services*................................................*96*
3.   *Leveraging Ad Server and Chrome Browser Markets to Block OLV Advertisements*
     *from Playing* .....................................................................................*97*
C.   CONCEALMENT OF CONDUCT ...........................................................98

IX.   INTERSTATE TRADE AND COMMERCE ...................................................**98**

**X.   ANTITRUST HARM AND EFFECTS** ...................................................................**98**

  A.   ANTICOMPETITIVE EFFECTS AND HARM TO COMPETITORS, PUBLISHERS, CUSTOMERS,
  COMPETITION, AND INNOVATION .....................................................................98
  B.   ANTICOMPETITIVE CONDUCT HARMS INFORM AND OTHER COMPETITORS .....................104

**XI.  CLAIMS** ..............................................................................................**105**

**PRAYER FOR RELIEF** ...............................................................................**118**

**JURY DEMAND** ........................................................................................**121**

Plaintiff Inform, Inc. ("Inform"), by and through its attorneys, hereby makes and files this Second Amended Complaint against Defendants Google LLC, Alphabet Inc., and YouTube, LLC (collectively, the "Google Defendants" or "Defendants").  Inform makes its allegations upon personal knowledge as to its own acts and upon information and belief as to all other matters, as well as based upon the ongoing investigation of its counsel.  Plaintiff respectfully shows the Court as follows:

## I.      INTRODUCTION

1.      This is an action asserting claims for violations under, inter alia, the Sherman Antitrust Act, the Clayton Antitrust Act, and Georgia's common law regarding fraud and tortious interference.  Plaintiff seeks to restrain the anticompetitive conduct of Defendants, to remedy the effects of the Defendants' past unlawful conduct, to protect free market competition from continued unlawful manipulation, and to remedy harm to consumers and competitors alike.

2.      Plaintiff Inform Inc. ("Inform") is an online video platform ("OLV") company that brought news websites to life with video clips, serving online news publishers, content creators, and online advertisers.  Inform's once-highly-successful online video platform matched news publishers' original stories with professionally created video content from content creators, incorporated those videos into stories posted on the publishers' websites, and coordinated the placement of advertisements in those videos targeted to the websites' viewers.  For example, Inform might match: (1) a newspaper publisher's website story covering California wildfires with (2) an independent content creator's video of raging west coast wildfires and (3) an advertiser's short lead-in video (or "pre-roll") clip advertising the superior rates and services of a national property insurer.

3.      Inform's technology included data collection capabilities to target specific demographics and provide significant value to the brands that advertised with Inform, making its

platform extremely desirable to publishers, professional content creators, and advertisers alike. For over a decade, Inform directly and profitably competed with Google.  By 2014, Inform had built its online advertising business into a hugely successful enterprise and was on the verge of a merger with Yahoo to displace Google as the largest online video advertising company in the world. Inform's online advertising services generated over $100 million between 2014 and 2016.  During this period, market analyst comScore ranked Inform as the No. 1 Online News & Information Property, with 27 million unique monthly viewers and 230 million videos viewed each month. But that success placed Inform squarely in Google's sights.

4.      Like Inform, Google, its YouTube subsidiary, and its parent Alphabet Inc. are in the business of online advertising, services from which they derive the vast majority of their revenues.  In 2021, Alphabet reported a staggering $258 billion in revenue, out of which $209 billion resulted from Google advertising revenue.

5.      As discussed below, Google provides services similar to Inform through a stable of advertising products and services.  But Google corrupted legitimate competition in the online advertising industry.  Among other things, Google engaged in a systematic campaign to seize control of the wide swath of high-tech tools used by publishers, advertisers, and brokers, to facilitate online advertising.  And, having inserted itself into all aspects of the online advertising marketplace, Google used anticompetitive, exclusionary, and unlawful means to eliminate or severely diminish any threat to its dominance, including a once-thriving Inform.

6.      For years, Google has willfully amassed and maintained its breathtaking monopoly power through strategic acquisitions and anticompetitive practices.  After Google's Internet Search rose to dominance, Google strategically acquired ad tech companies and competitors needed for

Google to control both (1) the tools used to access Internet websites and content and (2) the ad technology used to monetize online advertisements.

7.     Google is now the largest monopoly in the history of the U.S. antitrust laws. Google has become the world's largest and most accessed search engine, with overwhelming market dominance—representing well over 90% of the Internet Search market. Google has also acquired monopoly shares of numerous other overlapping and reinforcing markets: the **Ad Server** market (90%); the **Ad Exchange** market (60-70%); and the **Online Video Advertising** market (52%) – in which Inform is a participant, as a competitor and/or customer (collectively, the "**Relevant Markets**"); and adjacent markets that Google leverages to maintain and gain monopoly power across markets: the **Licensable Mobile Device Operating System** (LMDOS) market (74%); the **Web Browser** market (65%); (together with the **Internet Search Market** collectively the "**Adjacent Markets**").  This unrivaled monopoly power across markets gives Google practical control over every step in digital advertising.

8.     Given Google's dominance across digital advertising, Plaintiff Inform was effectively forced to use Google's products and services for the technical delivery of its video advertisements. To reach the vast majority of the potential market, Inform's video player must work with Google's monopoly ad server, which determines whether an ad is delivered, which ad is delivered, the pattern, pace and frequency of direct ad delivery, and whether ad space is subject to Google's manipulated auction processes. Likewise, Inform's video player had to be compatible with Google's dominant Chrome Browser, which determines whether a video advertisement will function properly, if at all, and can stop a particular video advertisement from playing or disable the video player from working properly.

9.      Inform, like countless others, was thus at Google's mercy: Google's ad server and its Chrome Browser had to work together to assure that Inform's ads were correctly placed and functioned as designed. But when Inform emerged as a competitive threat, Google used its dominant ad server and Chrome Browser to shut down competition by Inform.

10.      Google's DFP Ad Server interrupted delivery of Inform's video and display advertisements by failing to serve them at all or displacing them with Google's cheap programmatic ads. Google algorithms deceptively manipulated the delivery pattern, frequency, and pace at which Inform's ads were served; secretive anticompetitive programs promoted cheap Google's ads over Inform's direct ads; and Google even interfered with Inform's ability to bill its own clients. Meanwhile, Google used its DFP Ad Server to gain and use access to Inform's proprietary data for its own purposes, which Google then used to target Inform's customers, disparage Inform's product, and steal Inform's market share.

11.      Even when an Inform ad was served, Google used its Chrome Browser to block and disable Inform's video player from automatically playing the ads of Inform's customers. So, in the highly likely event that a consumer was using Google's Chrome Browser to visit a publisher's website, an Inform-placed video ad either wouldn't play at all, would not autostart, or would have no sound without further action by the consumer. All the while, Google and YouTube ensured that ads placed on YouTube and through Google's competing services worked seamlessly with Chrome; they were unblocked, autostarted, and audible.

12.      Wielding unprecedented monopoly power, Google used its position as the dominant provider of ad tech tools to, among other things:

- Throttle Inform's ability to place advertisements for its customers to make it appear as if Inform could not perform and diminish Inform's market share;

4

- ▪ Manipulate the ad auction to displace Inform's lucrative and guaranteed direct ads with cheap programmatic ads and to create unfair and undisclosed preferences for its own advertisements in the automated matchmaking process to win auctions on Google's AdX ad exchange; and

- ▪ Technologically disable Inform's video players to stop them from displaying advertisements in a certain format while permitting advertisements to be displayed on its subsidiary, YouTube.

13.     The result of all this: Inform's lucrative direct ad sales were displaced by cheap programmatic ads; Inform's video player didn't work; Inform's video advertisements were often not seen, heard or served; Inform's direct ad contracts were sabotaged; Inform could not bill its clients or access its own valuable data; and Inform falsely appeared to be unable to perform. These actions by Google put Inform out of business.

14.     But Inform was not alone: Google's anticompetitive conduct across markets excluded and eviscerated competition on the merits, putting countless other competitors, publishers and advertisers out of business, while Google stole or manipulated their market share. The significant interplay among the distinct markets reinforces and makes Google's monopolistic power in these markets more insidious.

15.     The Defendants' actions were strategic and willful. To maximize their advertising profits and to protect their valuable monopolies against competitive threats, the Google Defendants engaged in a series of inorganic strategic acquisitions, anticompetitive contracts and anticompetitive conduct - carried out through its own digital products and services - designed to thwart competition on the merits. Defendants then "wield[ed] dominance across digital markets to force more publishers and advertisers to use Google products while disrupting their ability to use competing products effectively."[1]  This conduct includes, but is not limited to:

---

[1] *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va. April 17, 2023) ¶ 5.

- Acquisitions: Strategic and inorganic acquisition of ad tech companies and online video platforms to willfully grow and maintain market power (*see e.g.,* ¶¶ 6, 75, 86, 90, 95-106);

- Anticompetitive Tactics and Conduct:

    o Tying or bundling, including technological tying, of Google products and services (*see e.g.,* ¶¶ 164, 167-188);

    o Manipulating the Ad Placement and Ad Auction Processes through, *inter alia* (*see e.g.,* ¶¶ 164, 189-239):

        - Dynamic Allocation;

        - Enhanced Dynamic Allocation;

        - Last Look and Minimum Bid to Win;

        - Project Bernanke and Its Various Versions;

        - Dynamic Revenue Sharing;

        - Bypassing Direct Ad Campaigns on High News Days; and

        - Manipulation of Pacing to Undermine Competitors;

    o Exclusionary disablement, technological blocking and systematic interference with Inform and other competitors' products and services (*see e.g.,* ¶¶ 240-273);

    o Deceptive use of Google products to gather and use market intelligence about Inform and other competitors, to disparage and disadvantage competitors, and to interfere with competitors' businesses (*see, e.g.,* ¶¶ 274-281);

- Anticompetitive Contracts: Exclusive dealing agreements and anticompetitive contracts, including requiring default setting to Google products and services (*see e.g.,* ¶¶ 282-284, 288-292);

- Monopoly Leveraging (*see e.g.,* ¶¶ 285-299).

The above-referenced improper activities will be referred to herein collectively as the "Defendants' Anticompetitive Restraints."

16. Defendants' Anticompetitive Restraints are a concerted attempt to enhance, maintain and attempt to gain monopoly power in the Relevant Markets, not by innovation or other competition on the merits, but rather by anticompetitive tactics that deter innovation, exclude

competition, and rob customers of quality products and their right to choose among competing alternatives.  And Google's anticompetitive conduct has harmed Inform in each of the Relevant Markets as a competitor, customer, and participant in these markets.

17.     As a result of Defendants' conduct, Google has been able to eliminate competitors, like Inform, and achieve significant monopoly power in the Relevant Markets.

18.     Defendants' illegal conduct has been setting off alarm bells worldwide for many years.[2]  The time has come to address these market abuses.

## II.     THE PARTIES

19.     Plaintiff Inform, Inc. ("Plaintiff" or "Inform") is a Delaware corporation with a principal place of business that was located at 3445 Peachtree Road NE, Suite 1000, Atlanta, GA, 30326.  Inform was formerly known as News Distribution Network, Inc. ("NDN").  Plaintiff is an online video platform  company that provides a platform of services to online publishers, content creators, and online advertisers.

20.     Defendant Google LLC is a Delaware Limited Liability Company with its principal place of business at 1600 Amphitheatre Parkway in Mountain View California.  Google is an online advertising company providing internet-related products, including various online advertising technologies, directly and through subsidiaries and business units it owns and controls.  Google is the world leader in general Internet search conducted on all devices.  It also is the owner

---

[2]  Google's monopolistic conduct has been the subject of numerous past and ongoing enforcement actions throughout the world.  Following the initial filing of this action, the U.S. Justice Department filed two antitrust suits against Google in just over two years specifically addressed to the conduct herein, and multiple suits have also been filed by 50 state U.S. Attorneys General as well as numerous other private parties (many of which have been joined as part of this multidistrict litigation).  Google's monopolistic conduct has also been the target of investigations and proposed legislation and regulation from the U.S. House of Representatives, the Senate, and the Federal Trade Commission ("FTC").  Additionally, Google has been charged with anti-competitive conduct by regulatory agencies in the European Union, France, South Korea, India, and Russia, resulting in billions of dollars of fines.

of the Android OS and several popular and exclusive mobile and tablet applications including YouTube, Google Maps, and Gmail.  Google maintains an office in this District at 111 8th Avenue, New York, New York 10011.

21.     Defendant Alphabet Inc. is a publicly trade Delaware corporation with its headquarters and principal place of business at the "Googleplex" in Mountain View, California. Defendant Alphabet is one of the top ten largest companies in the United States with more than $162 billion in annual revenue.  Alphabet, ranking 15th in the list of Fortune 500 companies, is traded on the NASDAQ under the symbol "GOOGL" and is included in the S&P 100 Index.

22.     Alphabet was created as a holding company for Google in late 2015, and Alphabet controls Google's day-to-day operations.  Virtually all of Alphabet's revenue comes from Google. In or around 2017, Google Inc., which was originally incorporated in California in September 1998 and reincorporated in Delaware in August 2003, changed from a corporation to a limited liability company (LLC) under the umbrella of Alphabet Inc.  Since December 2019, Alphabet and Google have had the same Chief Executive Officer. As a result of Alphabet's operational control, Google is Alphabet's alter ego.

23.     Defendant YouTube, LLC is a wholly owned subsidiary of Google LLC and headquartered in San Bruno, California.  YouTube, Inc. was originally registered as a corporation in Delaware in October 2005 and was converted into YouTube, LLC a year later.  YouTube is a wholly owned subsidiary of Google and is controlled and operated as such.

24.     Collectively, the Google Defendants are operated and controlled as a single entity, with Sundar Pichai acting as the CEO of both Google LLC and Alphabet.  Not only did Google essentially create Alphabet as a holding company in 2015, but virtually all of Alphabet's revenues come from Google.  YouTube, in turn, is a wholly owned subsidiary of Google and is controlled

and operated as such.   Alphabet filed its 10-K and 10-Q statements with the Securities and Exchange Commission, reporting consolidated revenues for all of the Google Defendants.  In fact, these statements expressly define Alphabet as "Alphabet Inc. and its subsidiaries."  *See, e.g.*, 2020 Alphabet 10-Q, July 30, 2020, at 2.  This Complaint refers to Google, Alphabet and YouTube together as the "Google Defendants", which parallels Alphabet's own reporting of the entities' revenues collectively in its own filings with the SEC.

25.     The Google Defendants and Inform compete for advertising revenue and are competitors in at least the online video advertising market.  As discussed below, Google also provides services similar to Inform through its stable of advertising products and applications including, without limitation, Google Ads, the AdSense program, DV360, Google's AdX ad exchange, its DoubleClick for Publishers (DFP) ad server and then its combined Google Ad Manager (GAM).  In addition to competing with Google, Inform is also a customer, user, and/or consumer of Google products and services, including but not limited to Google's DFP ad server and Google's AdX ad exchange; as well as Chrome Browser and Internet Search services.

## III.   JURISDICTION AND VENUE

26.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, *et seq*., and Sections 3, 4 and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15 and 26. The Court has subject matter jurisdiction over this action under 15 U.S.C. § 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.

27.     In addition to pleading violations of federal antitrust law, Inform alleges violations of state law and seeks relief thereunder. All claims under federal and state law are based upon a common nucleus of operative facts, and the entire action commenced by this Complaint constitutes a single case that ordinarily would be tried in one judicial proceeding.  This Court therefore has jurisdiction over the state-law claims under 28 U.S.C. § 1367(a). Exercising jurisdiction over the

state-law claims will avoid unnecessary duplication of actions and supports the interests of judicial economy, convenience, and fairness.

28.     The Court may exercise personal jurisdiction over the Google Defendants pursuant to Fed. R. Civ. P. 4(k) and 15 U.S.C. § 22.

29.     Venue is proper in the Northern District of Georgia (where this action was commenced), as well as in this District, under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and under 28 U.S.C. § 1391.  At all times relevant to the Complaint, Google conducted business and was found within the Northern District of Georgia and a substantial portion of the events giving rise to the claims herein occurred within the Northern District of Georgia.

30.     This action was transferred to the Southern District of New York by the Judicial Panel on Multidistrict Litigation for centralization on February 14, 2023.

## IV.     FACTUAL BACKGROUND

31.     The unlawful anticompetitive conduct at the heart of this case occurs in the display advertising marketplace, where Inform and publishers sell space on websites to advertisers either directly or through real time auctions.  In the display advertising marketplace, Google represents both sellers (Inform and other publishers) and the buyers (advertisers), while also controlling the platforms through which both sides interact (the ad exchange or ad network that sets the auction and pricing rules).  Google performs every function in the digital advertising chain that connects publishers and advertisers, and Google controls access to the vast majority of advertising volume.

### A.     Advent of Digital Advertising

32.     When the Internet started to become popular in the early 1990s, traditional print publishers established websites and began to publish their substantive content online, creating vast amounts of news and other content on the Internet and opening the door to generating advertising profits through "**digital advertising**" or "**online advertising**".

33.     Online or digital advertising consists of marketing advertisements, which are delivered through the Internet on both desktop and mobile devices and on mobile apps.  Online advertising involves the use of the Internet as a medium to obtain website traffic, and target and deliver marketing messages to the right users, customers, and consumers.

34.     There are two principal forms of digital advertising: search advertising and display advertising. "**Search advertising**" refers to digital ads on desktop or mobile search engines, such as the Google.com homepage, displayed via "search ad tech" alongside search engine results. "**Display advertising**" refers to the delivery of digital ad content to ad space on websites (desktop and mobile "web display") and mobile apps ("in-app display"), which is referred to as inventory. Display advertisements are images or videos shown to people as they browse websites, apps, social media, and devices such as TVs connected to the internet.

35.     Like other advertising media, online advertising includes: (1) a publisher, who integrates advertisements into its online content; (2) an advertiser, who provides the advertisements to be displayed; and (3) advertising agencies or intermediaries that help create and place the ads.  The goal of online advertising generally is to put an advertisement in front of the best possible audience for that ad.  A view of the ad by an Internet user is commonly referred to as an "**impression**."

36.     Today, when an internet user opens a website, a complex series of transactions—nearly instantaneous and invisible to the user—determines which ad to show to that user in each available ad space on the webpage.  The set of technological tools that connect website publishers selling advertising opportunities to the advertisers wishing to buy those advertising opportunities ("**ad inventory**") is referred to as **ad tech**.

37.     Publishers generally sell their ad space through two sales channels: the "direct" and "indirect" channels.  Direct sales of ad space are negotiated between the publisher and advertisers, including advertising campaigns sold by the publisher's internal sales staff.   Indirect (or programmatic) sales occur through electronic trading venues called "ad exchanges."   Through these exchanges, publishers auction off their ad space to the highest bidder.

38.     To facilitate the sale of impressions, all within milliseconds, publishers, advertisers and digital publishing companies, like Inform, use a chain of specialized and distinct products, commonly referred to as the "**ad tech stack**" to get an advertiser's message in front of the right consumer at the right time to maximize the chance for the advertisement to influence the consumer to take some desired action.

39.     **Ad servers** are used to make the instantaneous decisions about what ads to show on a website, and then place the ad onto that site.  Generally, the ad server: (1) determines which ads to display on the publisher's website based on collected user data and preferences across publishers; (2) serves the ad to the user; (3) collects and reports on additional data such as impressions and clicks, which is used to determine the cost to the advertiser; (4) and tracks data that generates publisher billing for direct ad sales.  Ad servers are a fee for service product designed and intended to be neutral – that is they should have no interest in the outcome of what ad inventory is sold to which advertiser, beyond facilitating the transaction.

40.     Additional technologies in the ad tech stack include **supply-side platforms** (**SSP**s), which help websites sell unused ad space (or inventory) and **demand side-platforms** (**DSP**s), which are used by advertisers to buy ad impressions from ad exchanges for the cheapest price.

41.     A "publisher ad server" is used to organize and sell ad inventory (both directly and indirectly sold ads) on all platforms: desktop, mobile web, and mobile applications.  When a user

visits a webpage through any of these channels, the publisher ad server checks whether there is a relevant directly negotiated deal related to the ad space on the webpage.  If no relevant direct deal is available, the ad server calls **ad exchanges** to auction off the ad space on the webpage being viewed by the user.

42.     Once called, each ad exchange requests participating DSPs to place bids on behalf of their advertisers.  The DSPs, based on advertiser demand and the available user information, then enter bids for the impression.

43.     Each ad exchange collects the available DSP bids, picks a winning bid, and submits the winning bid to the publisher ad server.  Then, the ad server decides which ad exchange's bid to accept.  The publisher decides the parameters and priority of acceptable bids for each competing ad exchange.  Because bids typically are presented as "Cost-Per-Mille" ("**CPM**"), or the price for one thousand impressions, publishers make money when ads are loaded on their pages rather than when users click on them.

44.     Each ad tech product exacts a fee for its services. The ad server charges the publisher monthly depending on the volume of impressions served. Exchanges, meanwhile, charge the publisher a set percentage (or "**revenue share**") of each impression's sale price. To properly account for that revenue share, exchanges submit bids to the publisher ad server on a "net" basis, *i.e.*, the winning bid submitted by its DSPs less the revenue share. Finally, the DSPs charge their advertisers a fee for their various services, including identifying relevant users and then assessing whether the ads shown were effective.

45.     Below is a schematic depicting basic ad tech tools used in online digital advertising:



## V.     PLAINTIFF INFORM: HISTORY, INNOVATION, AND VALUE PROPOSITION

46.     Inform, formerly known as News Distribution Network or "NDN," is an online video platform company.  Inform provides a platform of services to online publishers, content creators, and online advertisers.  Inform is a competitor, customer, user, and/or consumer  in each of the Relevant Markets as defined below.

47.     Inform specializes in providing data-driven technology solutions for the syndication and monetization of contextually relevant, personalized, premium video content on publisher websites.  Specifically, Inform manages the distribution and delivery of video from content creators into articles on newspaper, magazine, radio, and television websites.  In other words, Inform enables publishers to pair corresponding video with their original text content in order to enhance the user's experience and understanding of the publisher's news story.  At the same time, Inform's platform provides brands (advertisers) with an opportunity to deliver video advertisements to a highly targeted audience that is most likely to consume their products.

48.     Like Google, Inform works with both publishers (*i.e.*, newspaper, magazine, radio and television websites, and website operators, like yahoo.com or msn.com) and advertisers (like

Chase Marriott, Farmers, Sonic, Honda, Verizon, Publix), enabling publishers to monetize their websites by, among other things, selling space on their web pages to online advertisers and enabling advertisers to deliver their ads to a particular targeted audience.

### A.   The Evolution of Inform's Online Video Advertising

49.    With the evolution of online video streaming in or around 2005, there was growing demand from publishers for video content to enhance and augment their online text content and thus a growing opportunity for brands to present video advertisements to consumers.  Early on, Inform recognized that by embedding video content and video advertising into a publisher's articles, Inform could create a better user experience and help monetize website space for online publishers, the way television commercials monetized air space for cable television networks.

50.    Using the Inform platform in the context of a newspaper, magazine, radio, or television website, a typical story-level web page will likely include instream video (within the text of the article near the headline), outstream video (within the text of the article outside of the user's initial view), and right rail video (outside of the text of the article), as shown below:



51.     The video content played in these spaces are video clips, usually one to three minutes in length, that relate to the publisher's story or article.   And Inform established an extensive library of premium video content that could either be manually selected by the publisher to match the substantive text content or automatically selected for them by Inform's proprietary content matching technology.   Each substantive video clip that plays on a web page presents an opportunity for a brand, product or service (*e.g.*, Chase Marriott, Farmers Insurance, Verizon) to present the user with a video advertisement.

52.     At its peak, Inform had an inventory of ad space from a network of approximately 5,000 publishers, largely comprised of professional local and national news publishers, such as the San Francisco Chronicle, Investor's Business Daily, the Los Angeles Times and The Hill.   This aggregated digital audience allowed Inform to work with a brand (or the advertising agency representing a brand) to optimize the placement of its ads and to reach that brand's specific target demographic.

53.     Inform also provides the infrastructure, including the video player, allowing it to manage the technical delivery of both the video for the content creator and the creative from the advertiser.  This video experience is powered by Inform's end-to-end online video platform that provides a full suite of capabilities, including video ingestion and encoding, content management, and robust targeting capabilities utilizing Inform's proprietary data. Thus, like Google, Inform's infrastructure allowed it to collect third-party data regarding users,[3]  dramatically increasing Inform's ability to target specific demographics and driving a significant portion of the value of the ad to brands.

54.     Inform's platform was extremely valuable to publishers, content creators, and advertisers.  Between 2010 and 2017, Inform garnered revenue of more than $180,000,000.  In each of 2014, 2015 and 2016, Inform had annual revenue of approximately $35,000,000.  In 2015, Inform was ranked as the No. 1 Online News & Information Property by comScore based, in part, on its 27 million unique monthly viewers and 230 million videos viewed each month.

55.     Indeed, in 2014, Yahoo.com and Inform had a signed term sheet to for Yahoo to acquire Inform for approximately $375,000,000.  Media outlets, including the Wall Street Journal, reported: "Is NDN the new YouTube? Yahoo is making another stab at acquiring a video distribution system, in Marissa Mayer's effort to transform the web portal into a home for lucrative video" and that "Yahoo Inc. is in preliminary talks to acquire online-video service News Distribution Network Inc., a deal that would help Chief Executive Marissa Mayer compete with Google Inc.'s YouTube for viewers and ad dollars."[4]  Forbes announced that Yahoo "plans to

---

[3] Third-party data is information about the user and his or her online behavior that is not personally identifying.  First-party data, like name, address, and credit card numbers, is personally identifying.
[4] Douglass MacMillan, *Yahoo in Talks to Buy Video Service, NDN,* WSJ Technology, Apr. 1, 2014, https://www.wsj.com/video/yahoo-in-talks-to-buy-online-video-service-ndn/82646F3E-

launch a new video service geared to compete directly with YouTube." Moreover, Yahoo had been acquiring video ad tech capabilities and had tried and failed to acquire a stake in French video site DailyMotion the year prior, after talks stalled with its owner, France Telecom SA. Yahoo also bid to acquire Hulu, before the TV portal's owners decided not to sell it. "The industry is at a critical moment embarking on the next-generation of video consumption," CEO Marissa Mayer was quoted as saying.

56.    At the time, Google's YouTube was the number one largest video site with 12.6 billion video views, while Inform (NDN) and Yahoo ranked fourth and fifth, with 573 million and 384 million video views, respectively. If the acquisition had occurred, the resulting entity would have married Yahoo's search engine and online video site with Inform's (NDN) online video platform and presence, posing a real existential threat to Google and YouTube dominance.

57.    With Inform's success and the very real threat that the Yahoo acquisition would make Inform a more dominant player in online video advertising, Google took notice of Inform and decided to take action.  Despite years of seeking to acquire an online video platform, Yahoo abruptly abandoned the deal with Inform and its years-long effort to grow its online video platform and advertising capabilities.  Instead, shortly thereafter, Yahoo CEO Marissa Mayer announced Yahoo had brokered a deal with *Google* to assist Yahoo's floundering search engine "in an advertising pact that link[ed] the fortunes of Silicon Valley's two search engine giants."  Today, Google's YouTube enjoys 76% market share in online video platforms, while Yahoo's Flickr has less than .01% share. Inform, as discussed below, was put out of business.

---

22D7-4936-B4B5-53DA5DACF876.html (accessed Apr. 28, 2023);
https://www.wsj.com/articles/yahoo-in-talks-to-buy-online-video-service-ndn-sources-1396298294.

B.     **Inform Competes with Google**

58.     Inform and Google are competitors in the online video advertising market, offering a platform connecting publishers with advertisers and competing for both sides' business.  Inform had a national web presence that boasted over 14,000 properties, or websites.  Inform owned the ad inventory for each of these 14,000 properties (hereinafter "Inform Partner Properties") and contracted with advertisers to fill ad inventory on Inform Properties.

59.     Google provides services similar to Inform, placing paid for advertising onto third-party publishers' websites through the AdSense program, which reserves publisher ad inventory for auctioning and Google Ads, which sells publishers' ad space to advertisers through the ad auction.  These third-party publisher websites are paid by Google when users click on a particular advertisement.

60.     Inform is also a customer, user, and consumer of Google products and services, For years, like so many other publishers, Inform used DFP as its publisher ad server and AdX as an ad exchange.  Despite the fact that Google's DFP was markedly inferior to and far more expensive than other publisher ad servers, Inform was forced to use DFP in order to gain access to Google's AdX and live real-time bids.

61.     Inform's platform was free to publisher partners and Inform's revenue is generated from Direct and Programmatic ad buys.  Direct ad campaigns are purchased directly by major ad agencies which represent brands who want to reach a targeted demographic present on Inform's publisher network.  Purchases detailed objectives of the campaign, user demographic targeting, geographic focus, required completion rates, and other measures.  Inform runs the campaigns as pre-rolls for a designated period of time and submits results to the ad agency in the form of an Invoice.

62.     Programmatic ad buys are executed through the ad auction, in a real time bidding manner, through the ad tech stack, whereby ad buyers purchase or pass on the ad opportunity.

63.     Inform had a sales team dedicated to its direct ad sales with advertisers and used an ad exchange only to sell remnant inventory on Inform Partner Properties.  Every direct ad sold by Inform was one less programmatic ad opportunity for Google to sell.

64.     By selling both directly and indirectly Inform could maximize its revenue by controlling the sale of its premium ad inventory (for which it keeps 100% of a fixed premium sale price and paid only a static ad server fee) and also selling its leftover or remnant ad inventory (for which it keeps only between 50% and 65% - and sometimes less - of a substantially lower auction price after paying for the ad server and the products and services of the ad tech stack).  Whereas a $25 premium directly sold ad would garner $25 profit to Inform (less the static fee to the ad server), an $8 indirectly sold remnant ad might garner only $4 for Inform after the auction process paid the various products and services in the ad tech stack.

C.      **Google's Dominance Across Markets Leaves Inform and Other Competitors, Publishers and Advertisers with No Choice But to Rely on Google's Products and Services**

65.     As a result of Google's market dominance, competitors such as Inform have no choice but to use some of Google's intermediation services.  In addition to Inform's own video player technology, Inform relied on both Google's DFP ad server and Chrome Browser.  In order to reach the vast majority of the potential market, Inform's video player is, and must be, integrated with Google's DFP ad server through a software development kit (or SDK), which was integrated into each of Inform's video players and acted as the gatekeeper that determined whether an ad was delivered.  Inform used the Google DFP ad server to function as the delivery method for both display and online video advertisements.  Notably, other ad servers did not require this integration.

Once Google DFP's SDK was integrated into each of Inform's video players, it was next to impossible to switch to another ad server, creating an effective barrier to exit.

66.     Likewise, the web browser which enabled users to reach the website, is the key without which a video advertisement will not function properly, if at all.  The ad server and the web browser worked together to assure that an ad is properly placed (ad server) and functions as designed (browser), that is it plays and can be seen and heard.  Through *inter alia*, Google's unlawful tying of DFP and AdX and its anticompetitive default placement of Chrome (both detailed below), Inform is essentially forced to use and be compatible with these Google products.

67.     While the Google ad server delivers Informs' advertisements, Google DFP's algorithms and decision-logic are responsible for the delivery pattern, frequency and pace at which Inform's creatives are served.  Google's ad server tracks the impressions, click through rate, completion rates and other delivery metrics for Inform's billing.  Additionally, as discussed below, Google DFP's algorithms forecast the fill rate and choose whether to fill additional inventory with one of Inform's direct ads or one of Google's own less expensive programmatic ads, for which Google garners a supracompetitive profit.

68.     Inform, an innovative, cutting-edge digital advertising company, was at Google's mercy, relying on the Google search engine (92%), Android OS (74%), and Chrome Browser (65%) to direct internet users onto Inform Properties to see, hear, view, click on and interact with Inform's ad campaigns for potential profit. And then, along with 90% of publishers, Inform relied on Google's DFP ad server to fairly, honestly, and properly place the right advertisement (either the direct ad deal or the highest value winning programmatic advertisement) in front of the user. And *then*, Inform further relied on Google's Chrome Browser to in fact show viable, audible, working video advertisements to those users. Inform didn't stand a chance; by and through the

anticompetitive conduct set forth below, Google manipulated ad auctions and placement, stole Inform's valuable ad inventory and clients, and copied Inform's innovative marketing strategy, catapulting YouTube to the top of the online video advertising market and putting Inform out of business.

## VI.     GOOGLE BECOMES A MONOPOLY

### A.     Google's History: From Search Engine to Online Advertising Business

69.     Google began as a general online search engine that enabled users to search the Internet for publishers' content.  While at first it simply indexed the content of web pages, Google's key innovation, the PageRank algorithm, helped define second-generation search technology by looking at links to and from other Web pages as a way of determining relevance for users.

70.     In 2000, Google began to monetize its search engine, and launched AdWords, an online advertising service that let businesses purchase keywords ads to appear on Google's search results page.  This offering evolved to become the heart of Google's business model.  And Google turned its first profit in 2001.

71.     The multisided nature of Google's Internet Search platform, which connects distinct but interdependent demands, offers Internet users a service purportedly "free of charge." This consumer strategy (which Google employs with various products and services) attracts users, who are critical assets that allow Google to sell advertising space to companies that are interested in reaching those users on Google properties and on publishers' websites.  In this way, Google's search services connect users' demand for information, products, and services with advertisers' and publishers' demand for access to those users.

72.     As Google's dominance and market power in Internet search grew and its product and service offerings diversified, Google captured user data and critical information about users, such as: personally identifiable information, user impressions and preferences, location, browsing

history, IP address, and insight into patterns, timing, trends, and demographics.  At the same time, Google strategically acquired ad tech companies and competitors that provided the ad tech services Google needed to facilitate advertisers' placement of ads onto publishers' websites.  This combination has enabled Google to build a data set for its ad tech services utilizing the user data from its customers' websites, its competitors' information, its own search engine and other customer facing properties, such as Google Maps and Gmail, providing Google with an unparalleled ability to target ads to the right viewers.

73.     Today Google is ubiquitous across the digital economy, serving as the infrastructure for core products and services online.  It has grown and maintained its search engine dominance, such that "Googling" something is now synonymous with online search itself. The company is now also the largest provider of digital advertising, a leading web browser, a dominant mobile operating system, and a major provider of digital services such as mapping, email, cloud computing, voice assistant services, as well as dozens of other offerings.  Each of these services provides Google with a trove of user data, reinforcing its dominance across markets and driving greater monetization through online advertising.

74.     Google's ad-based revenue model generates the vast majority of the Google Defendants' revenues, yielding billions in revenue each year as reflected in the following chart:



For example, in Q3 2019, the Google Defendants' advertising revenues hit a record $33.9 billion. In Q3 2022, the Google Defendants' advertising revenues hit a new record high $54.5 billion.

**B.     Google's Suite of Online Advertising Products and Services Consolidates Dominance Across Multiple Markets**

75.     Over time, Google expanded its offerings to include a suite of advertising products and services in the ad tech stack through which Google acts as a broker between publishers and advertisers in the digital advertising marketplace.  These offerings were facilitated largely through Google's willful strategic acquisition of ad tech companies and competitors (below ¶¶ 86, 90, 95-106), which provided the ad tech services Google needed to facilitate advertisers' placement of ads onto publishers' websites. Google is now the dominant player for each of the ad-tech products, and thus controls the buying and selling of display ad inventory across most of the internet. Google's publisher ad server — "DoubleClick for Publishers" ("DFP") — controls more than 90% of the market for publisher ad serving. Its exchange — "DoubleClick Ad Exchange" ("AdX") — controls some 60-70% of the exchange market. Finally, Google offers two DSPs — "Google Ads" and "Display & Video 360" ("DV360") — that control more than 70% of the DSP market.

1.   AdSense (For Publishers)

76.   AdSense enables publishers to reserve space for the placement of Google Ads on their own website (via text, video or images) and thereby monetize their own website content. AdSense is used by publishers to sell advertising space to Google.

2.   Google Ads (For Advertisers)

77.   Google Ads (formerly AdWords) enables businesses and marketers to advertise on Google's network (search, display, etc.).   Google Ads is used to buy advertising space from Google.  Google Ads works by displaying a provider's ad when users search online for the products and services that provider offers.  Google Ads is powered by an auction bidding market.  Each time an ad is eligible to appear for a search, it goes through the ad auction.

78.   The auction determines whether the ad actually shows and in which ad position it will show on the page.  To gain the top spot in Google advertisements, advertisers have to outbid each other.  Higher bids move up the list, while low bids may not even be displayed at all.

79.   Cost per impression (or "**CPI**") is the cost or expense incurred for each potential customer who views the advertisement, while cost per thousand impressions (or "CPM" discussed above) refers to the cost or expense incurred for every thousand potential customers who view the advertisement. CPI, along with pay-per-click (PPC) and cost per order, are used to assess the cost-effectiveness and profitability of online advertising.

80.   Importantly, Google not only runs the auction, but also competes in it. While this process is held out by Google to be neutral and unbiased, as detailed below Google alone controls the processes and algorithms that generate and decide the "winning" bids and over a period of years launched a series of secret programs and anticompetitive tactics (discussed below) designed to assure that Google disproportionately and anticompetitively won the auctions.  As a result, the changing or selective application of Google's auction process and/or algorithms can effectively

box out competition and limit consumer choice on what a consumer may or may not see to be purchased, and from whom, based upon what advertisements "win" the auction.

81.    The three most common Google Ads campaign types are:

- *Search campaigns* - usually in text form, these ads show on Google Search results pages when the user searches for a particular product or service;

- *Display campaigns* - usually in image form, these ads appear on websites or apps that consumers visit; and

- *Video campaigns* – these are digital advertisements, usually 6 or 15 second videos, that show right before or during substantive video content.

82.    Google's video campaigns can run in a number of formats, including in-stream ads, video discovery ads, non-skippable in-stream ads, outstream ads, and bumper ads.  Specifically, in-stream ads run before, during, or after other videos on YouTube or across the Google network sites, games or apps.  These ads may also run on YouTube videos that are embedded on other sites. The central element of video advertising is the player, which serves as an interface between the video and the user.  In order to display video ads, the player must be able to communicate with ad servers, as well with the page or device through the browser.[5]

3.    Double Click for Publishers (DFP)

83.    Google's DoubleClick for Publishers, or DFP, is Google's ad server that enables advertisers to upload advertiser/ad network creative advertisements and tags (HTML codes that call other ad networks and exchanges for ads).  When there is an opportunity (or an ad call), DFP selects which ad will be served based upon the accumulated data and preferences of the individual user, Google DFP's algorithms and decision logic.  Thus, through DFP, Google instantaneously

---

[5] Michal Wlosik and Michael Sweeney, *Video Advertising: What Is It and How Are Video Ads Served*, ClearCode, June 7, 2022, https://clearcode.cc/blog/video-advertising-and-video-ads/ (accessed Apr. 28, 2023).

controls the vast majority of how, when, where and which ads are served to users on the Internet. A 2019 Wall Street Journal article lays out the inner workings of Google's multi-billion dollar advertising conglomerate.[6]

### 4. DoubleClick Ad Exchange

84.     DoubleClick Ad Exchange or AdX is Google's auction-based system for premium websites to be paired with premium advertisers.  Google AdX can only be accessed in two ways. First, one could obtain a Google Ad Manager account and then get Google's approval to access the AdX account.  Alternatively, AdX can be accessed by working with a Google Certified Publishing Partner, through which a publisher can obtain a subsidiary AdX account.  In both cases, only large publishers approved by Google can use AdX.

### 5. Display & Video 360 (DV360)

85.      Large ad buyers, such as major ad agencies or large businesses, frequently use a demand side platform (DSPs, discussed above). DSPs provide sophisticated and customizable tools that allow the ad agency or business to manage their advertising purchases.  Advertisers using demand side platforms have extensive control over where and how they bid for ad inventory.  They often use their own data, or data purchased from other entities, to target particular users for their ad campaign. Google owns the United States' leading demand side platform, **Display & Video 360 ("DV360")**.

### 6. YouTube

86.     In October 2006, Google acquired YouTube, an online video-sharing platform, for $1.65 billion.  Launched in 2005, YouTube is a video-sharing platform that allows users to upload,

---

[6]  Keach Hagey, *How Google Edged Out Rivals and Built the World's Dominant Ad Machine: A Visual Guide*, Wall Street Journal, Nov. 7, 2019, https://www.wsj.com/articles/how-google-edged-out-rivals-and-built-the-worlds-dominant-ad-machine-a-visual-guide-11573142071 (accessed Apr. 28, 2023).

view, rate, share, add to playlists, report, comment on videos and subscribe to another users' content.  YouTube became the fastest growing online video-sharing platform.  Google acquired the company just over a year after its launch and it has now become the second largest search engine in the world — second only to Google Search.

87.     Approximately 1.3 billion people use YouTube, and it has become the second most visited website in the world. YouTube gets over 30 million visitors per day, who watch an estimated 5 billion videos each day.  Three hundred hours of video are uploaded to YouTube every minute.[7]

88.     Like most other Alphabet properties, YouTube earns the bulk of its revenue through advertisements.[8]  YouTube is estimated to generate between $16 billion and $25 billion in annual revenue, putting it in the top half of the Fortune 500.[9]  YouTube's online video advertising revenue accounts for the second largest revenue stream generated by Google next to its online advertising business.  Moreover, YouTube is steadily becoming more valuable to Google due to the growing shift of consumer viewership from television to online video.

        7.     <u>Android Operating System</u>

89.     Google understood early on that the shift from desktop PCs to mobile Internet, which started in the mid-2000s, would be a fundamental change for Google Search and would

---

[7] Danny Donchev, *40 Mind Blowing YouTube Facts, Figures, and Statistics – 2023*, FortuneLords, Apr. 23, 2023, https://fortunelords.com/youtube-statistics/ (accessed Apr. 28, 2023).

[8]  Andrew Beattie, *How YouTube Makes Money off Videos*, Investopedia, Oct. 31, 2021, *https*://www.investopedia.com/articles/personal-finance/053015/how-youtube-makes-money-videos.asp (accessed Apr. 28, 2023).

[9]  Daisuke Wakabayashi, *YouTube Is a Big Business. Just How Big Is Anyone's Guess*, The New York Times: Technology, July 24, 2019, https://www.nytimes.com/2019/07/24/technology/youtube-financial-disclosure-google.html (accessed Apr. 28, 2023).

provide access to emerging and third-world markets, where mobile devices are significantly more prevalent.

90.    In 2005, Google acquired Android, a developer of an open source mobile device operating system, for $50 million.  In 2015, the Android OS was installed on more than 80% of the world's smartphones.  Google has continued to develop Android and to acquire Android-relevant patents since that time.

91.    Google's Android is now the most-used smartphone operating system in the world. Today, over 75% of smart mobile devices worldwide run on the Android OS.[10]

92.    Because Android is a licensable smart mobile operating system, third-party manufacturers of smart mobile devices can license and run Android on their devices.  As set forth below in ¶¶ 288-292, Google's complete and total control of the Android OS has enabled Google to engage in certain anticompetitive behavior to maintain and solidify its dominance across multiple markets.[11]

8.    <u>Google Chrome</u>

93.    In 2008, Google released its Chrome web browser ("Chrome" or "Chrome Browser"), which functions to retrieve and display pages from the Internet. Google's Android OS,

---

[10]    *Mobile Operating System Market Share Worldwide*, GlobalStats:Statcounter, Mar. 2023, https://gs.statcounter.com/os-market-share/mobile/worldwide (accessed Apr. 28, 2023).

[11]    Defendants' anticompetitive conduct in regard to its Android OS has been the subject of numerous regulatory investigations in the United States and abroad.  Specifically, the FTC opened up investigations in 2011 and again in 2015. In July 2018, the European Commission fined Google a record $5.1 billion in Android antitrust case for, *inter alia*, illegally tying Google's search and browser apps; illegally making anticompetitive payments conditional on exclusive pre-installation of Google Search; and illegally obstructing the development and distribution of competing operating systems. In an April 2017 settlement with Russia's Federal Antimonopoly Service, Google agree paid US $7.8 million in fines and rewrite contracts with smartphone manufacturers under a settlement over Google's self-preference access to the Android operating system.

discussed below, requires preinstallation of the Chrome Browser under certain circumstances, including, *inter alia*, as a condition of accessing certain Google apps.

        9.    <u>Other Google Products and Services</u>

    94.    Google also has additional product and service offerings designed to attract users and harvest their data.  These services include but are not limited to Google Maps, Gmail, Google Drive, Google Photos, Google Play Store, Google Earth, Google Pay Send, Google Hang Outs, and Google Analytics.

**C.    Google Buys Control of the Key Tools that Link Publishers and Advertisers and Expands Google's Ad Tech Capabilities**

    95.    Google has steadily, systematically, and willfully grown through acquisition of corollary ad tech, web application and online video platform companies.  Since its founding in 1998, Google has acquired more than 227 companies and spending over $27 billion for its top ten acquisitions.  Rather than growing organically, Google has grown through strategic acquisitions to yield products, manpower, and patent portfolios that directly and indirectly support and maintain its Internet Search and other monopolies and feed its online advertising business revenue.

    96.    In addition to the significant acquisitions of YouTube (video) and Android (mobile) described above, Google has made numerous key acquisitions to enable expansion of its online advertising market dominance and its ad tech capabilities.  Taken together, these willful acquisitions demonstrate Google's specific intent to gain and maintain monopoly power in the Relevant Markets.

    97.    In April 2003, Google acquired **Applied Semantics** for $102 million.  This acquisition was instrumental in the creation of Google's AdSense product.

    98.    In April 2007, Google announced its intention to acquire **DoubleClick**.  Following an investigation by the FTC prompted by antitrust concerns, Google acquired DoubleClick in

March 2008 for $3.1 billion.[12]   The DoubleClick acquisition was instrumental in cementing Google's stronghold in the lucrative online advertising industry.  In addition to the DoubleClick software, Google also acquired the relationships with web publishers, advertisers and agencies, beating a host of other potential buyers like Microsoft to the acquisition.  Integrated into AdSense, DoubleClick has been enormously successful for Google, with almost 83% of Alphabet's $162 billion in revenues in 2019 coming from its advertising business.  Since the acquisition by Google, DoubleClick has further expanded with DoubleClick for Publisher (DFP) and DoubleClick Ad Exchange.

99.     When Google purchased DoubleClick, Google told Congress and the FTC that it would not combine the data collected on Internet users via DoubleClick with the data collected throughout Google's ecosystem.   In 2016, however, Google reversed this commitment, and subsequently combined DoubleClick data with personal information collected through other Google services—effectively combining information from a user's personal identity with their location on Google Maps, information from Gmail, and their search history, along with information from numerous other Google products creating super-profiles of internet users. Google had no concern for user and consumer privacy, intentionally exploiting its massive trove of user data to track user habits and further entrenching its monopoly across the digital advertising industry.[13]

---

[12]   In 2013, following the appointment of former Google outside counsel Joshua Wright as Obama's FTC Commissioner and despite a staff memo urging prosecution, the FTC issued two decisions effectively terminating the investigations into Google without any meaningful action against Google.
[13] At the time of the DoubleClick acquisition, Google's privacy policies prohibited the company from combining user data obtained from its own properties, e.g., Search, Gmail, and YouTube, with data obtained from non-Google websites. But in 2016, as part of Project Narnia, Google changed that policy, combining all user data into a single user identification that proved invaluable

100.    Setting the stage for what was to come, the DoubleClick acquisition provided Google the unilateral power to implement a series of anticompetitive restraints, using its dominance on both the publisher and advertiser sides of the market to inhibit competition across the entire ad tech stack.  Notably, on January 24, 2023, the U.S. Department of Justice filed an antitrust case against Google seeking *inter alia*, to effectively unwind this transaction by seeking divestiture of, at minimum, the Google Ad Manager suite, including both Google's publisher ad server, DFP, and Google's ad exchange, AdX, along with any additional structural relief as needed to cure any anticompetitive harm.[14]

101.    In 2010, Google acquired **AdMob** for $750 million and then began acquiring buyer services, including **Invite Media** for a reported $81 million.  Invite Media offered a demand side platform. Google subsumed Invite Media into a demand side platform it was developing, **Display & Video 360** (at the time, known as "DoubleClick Bid Manager").  By capturing an increasingly large share of bigger, more sophisticated advertisers and advertising agencies, Display & Video 360 complemented Google Ads and expanded Google's control over advertiser demand.  The combination of deals gave Google unprecedented positioning in every facet of how ads end up on websites and smartphone apps around the world.

102.    In August 2011, Google acquired **Motorola Mobility** for $12.5 billion, a mobile device manufacturer.  Google acquired Motorola's smartphone patent portfolio, with more than 20,000 patents on mobile phones and wireless technologies, for $12.5 billion.  In the same year —

---

to Google's efforts to build and maintain its monopoly across the ad tech industry. Over time, Google used this unique trove of data to supercharge the ability of Google's buying tools to target advertising to particular users in ways no one else in the industry could absent the acquisition of monopoly—or at least dominant—positions in adjacent markets such as Search.

[14] Complaint, *United States of American, et al., v. Google LLC*, No. 1:23-v-108, ECF No. 1 at ¶ 80 (E.D. Va. January 24, 2023).

prior to the Motorola acquisition — Google spent $4.9 million on the **Mondu** patent portfolio of Android-relevant technology.   These patents were largely rendered defunct to stamp out competition for its LMDOS and protect the Android ecosystem from patent litigation. Moreover, Google bought 1,029 patents related to the Android OS from IBM.  *See* MIT Technology Review, October 2011.[15]

103.    In 2011, Google purchased **Ad Meld**, one of the largest SSPs, which it integrated into AdX, Google's existing exchange. AdMeld had developed technology to provide "yield management" functionality to publishers.  Yield managers like AdMeld helped publishers manage inventory and optimize revenue by comparing offers from multiple advertiser demand sources at the same time, which enabled multi-homing across ad exchanges.  When Ad Meld was a separate company, this comparison feature made it easier for new ad exchanges and advertiser demand sources to enter the ad tech industry because it gave publishers the incentive and ability to switch between ad exchanges and advertiser demand sources in response to better prices and service. This was lost with Google's acquisition.

104.    The DoubleClick, Invite Media, and AdMeld acquisitions helped Google achieve dominant positions at each level of the ad tech stack and set the stage for Google to control and manipulate the process by which publishers sell and advertisers buy open web display inventory.

105.    In January 2019, Google acquired some of Fossil's smartwatch technology for $40 million.  On November 1, 2019, Fitbit announced agreement to be acquired by Google LLC for

---

[15]  *Google Buys Motorola Mobility for $12.5 B, Says "Android Will Stay Open,"* TECHCRUNCH (Aug. 15, 2011), https://techcrunch.com/2011/08/15/breaking-google-buys-motorola-for-12-5-billion/ (reporting that Google purchased Motorola primarily to protect the Android ecosystem from patent litigation).

approximately $2.1 billion.  This wearable technology enables significant harvesting of user data, already alarming regulatory agencies.[16]  The acquisition was completed January 14, 2021.

106.   With these and other acquisitions, Google has maintained its dominance in Internet Search, and gained dominance in related markets and market power as set forth below. Moreover, these acquisitions demonstrate Google's specific intent to dominate digital advertising, including to gain monopoly power in the ad server, ad exchange, and online video advertising markets.

## VII.   THE RELEVANT MARKETS AND GOOGLE'S MARKET POWER

107.   A relevant market is comprised of a relevant product market and a relevant geographic market.  The relevant markets in this case include: (1) the **Online Video Advertising** market (52%); (2) the **Ad Server** market (90%); and (3) the **Ad Exchange** Market (60-70%). Inform is a participant, as a competitor and/or customer in each of these markets (collectively, the "**Relevant Markets**") and has suffered antitrust injury in each of these markets. Google also enjoys monopoly power in numerous other overlapping and reinforcing adjacent markets that it leverages to maintain and further attain monopoly power across markets: (1) the **Internet Search Market** (92%); (2) the **Web Browser** market (65%); and (3) the **Licensable Mobile Device Operating System** (LMDOS) market (74%) (collectively the "**Adjacent Markets**"). This unrivaled monopoly power across markets gives Google practical control over every step in digital advertising.

---

[16]   Javier Espinoza, *EU signals deeper investigation of Google Fitbit deal*, Financial Times, July 1, 2020, https://www.ft.com/content/aba45bc9-ffc8-411e-ac29-dbb3171f4886 (accessed Apr. 28, 2023) (reporting that on August 2020, European Union authorities on announced an investigation into Google's $2.1 billion purchase of the fitness-tracking company Fitbit, as raising alarms about the health data the Internet giant would be acquiring as part of the deal.

A.     **Relevant Markets: Online Video Advertising, Ad Server and Ad Exchange Markets**

1.     Online Video (OLV) Advertising

(a)     Online Video (OLV) and Instream Online Video (IOLV) Advertising Markets

108.    Online Video (OLV) Advertising, the advertisement for a product or service featured in a video format on the Internet, is a relevant antitrust market.[17]  Online video advertising includes at least the following component submarkets: instream online video advertising and outstream online video advertising.  Instream ads occur within the video stream of a video the user is watching (e.g., a video ad run before, during, or after an Inform news video or YouTube video), while outstream ads run while the user scrolls through other content (e.g., a video ad that automatically plays when scrolling through an article

109.    The market for instream online video advertising in the United States is a separate component market and is a relevant antitrust market.

110.    Online video advertising, instream online video advertising, and outstream online video advertising are not interchangeable with other types of online advertising, like search or social media advertising.  Online video adverting and instream online video advertising typically serves distinct campaign goals for advertisers and usually commands significantly higher prices than other online display ads, suggesting that online display ads do not constrain the prices of online video adverting and instream online video ads. Instream online video advertising is also not interchangeable with outstream online video advertising both because instream online video advertising commands significantly higher prices than outstream online video advertising and because the end-user behavior differs significantly—an end-user passively watches instream video

---

[17] Used herein, references to the "online video advertising market" or "OLV advertising market" include its component submarkets.

but scrolls through outstream video—leading advertisers to view the ad spaces differently and causing the substantial cost differential between the two. Instream online video advertising is likewise not interchangeable with outstream online video advertising and is more valuable to advertisers because it captures the users attention before a video that user wants and intends to watch, while outstream online video advertising interrupts the users' browsing experience.

111.   The relevant geographic market for OLV advertising and for instream online video advertising is the United States.  Online video advertising available in other countries is not a reasonable substitute for the online video advertising available in the United States.

112.   Studies show that online video advertising is the most effective form of video advertising, including being more effective than television video ads. Studies show that between 40 and 72% of advertising agencies believe online video advertising is more effective than television ads.  This is because many video ad campaigns can track user response to an online video advertisement and demonstrate that a vast majority of viewers take some sort of action after viewing the video.  They either visit the advertiser's site, subscribe to their newsletter, make inquiries, sign up for their services, purchase their products or services, etc.  This kind of online ROI tracking is not available for television advertising, rendering television advertising less appealing to advertisers. Unlike television, online video advertising enables the advertiser to see how well its content performs, knowing the number of views, shares, likes, clicks and how long the viewer stayed engaged.

113.   OLV advertising also results in more leads for businesses and increased conversions,  making it a highly effective type of digital marketing.

114.   Another important feature of video advertising is that it involves audio and visual elements that use various effects that capture viewers' attention and are more appealing to the

viewer than other display advertising. This makes it easy for companies to tell the story of their products and services in unique and creative ways and to provide more information about the brand, making the brand more relatable to the viewer.

        (b)      Monopoly Power in the OLV and IOLV Advertising Markets

115.    YouTube and Google (through YouTube) have market power in the online video advertising market and the instream online video advertising market in the United States.  After putting Inform out of business, YouTube remains the clear leader in the online video space.[18]

116.    As per Alphabet's Q4 report, YouTube generated $8.6 billion in ad revenue in Q4 2021. For the full year, YouTube brought in $28.8 billion in advertising income. YouTube's share of the overall online video advertising market is at least 52% percent in the United States and climbing.  YouTube's share of the instream online video advertising is much higher.  Further, YouTube has immense reach amongst consumers in the United States, reaching approximately 190 million consumers. Among younger U.S. consumers, 77 percent of U.S. Internet users aged 15-25 use YouTube, as measured in Q3 2020. Even amongst older age-groups, YouTube's reach was at least  67 percent. YouTube's substantial reach among U.S. consumers makes it a "must-have" source of online video inventory for advertisers and is considered a "strategic anchor" by Google for its buying tool DV360.  Accordingly, Google wields significant market power in the OLV advertising and instream online video ads market.  As discussed below, the business model for YouTube for Publisher's was expressly modeled after Inform's business model and used Inform's scraped and stolen client data (which Google had access to through its ad server) to build

---

[18]   Andrew Hutchinson, *YouTube Generated $28.8 Billion in Ad Revenue in 2021, Fueling the Creator Economy*, SocialMediaToday, Feb. 2, 2022, https://www.socialmediatoday.com/news/ youtube-generated-288-billion-in-ad-revenue-in-2021-fueling-the-creator/618208/ (accessed Apr. 28, 2023).

this competing product, which in turn enabled YouTube to become dominant in the online video advertising market.

       2.    <u>Publisher Ad Servers</u>

       (a)    The Publisher Ad Server Market

117.    Publisher ad servers ("ad servers") are a relevant antitrust market. The relevant geographic market for publisher ad servers is the United States. To manage their inventory of display ads, publishers license a software product called an ad server.  As discussed above, an ad server allocates and routes available display ad space between direct sales per pre-arranged agreements with advertisers and indirect sales conducted through exchanges.  The ad server directly connects to the ad exchange.

118.    Ad servers are used for both direct and indirect sales of display ads.   Publishers typically use a single ad server to manage all web display inventory served on desktop and mobile websites (known as "single homing").  Using multiple ad servers would substantially frustrate a publisher's ability to effectively optimize management of their inventory and maximize revenue.

119.    Ad servers have unique customers and exhibit unique product characteristics, pricing, and entry and usage requirements. In terms of product characteristics, ad servers provide publishers with specialized features such as: (1) reservation-based sales technology to support a publisher's direct sales efforts; (2) inventory forecasting technology to help a publisher determine what inventory will be available to sell; (3) a user interface through which a publisher's sales team can input ad requirements and parameters; (4) management capabilities for direct and indirect sales channels; (5) report generation technology for inventory performance; (6) invoicing capabilities for a publisher's direct sales; (7) a decision engine for determining when and how to route a publisher's impressions between direct and indirect sales channels; (8) a decision engine for choosing between different networks and exchanges for indirect sales; (9) a decision engine for

determining what ad from the direct and indirect channels will ultimately serve on the publisher's page; and (10) yield management technology.

120.    In the market for publisher ad servers, publishers purchase the ad server services from providers, such as Google.   No other service is substitutable for, or reasonably interchangeable with, an ad server from the perspective of publishers.   In other words, if a hypothetical entity with monopoly power in the ad server market imposed a small but significant non-transitory increase in price for its publisher ad server, sufficient publishers would not replace the ad server function with another product or service so as to make the price increase unprofitable. Moreover, as discussed further herein, the publisher ad server market and ad exchange markets each represent a different service provided at a different level of the ad technology stack.   For example, a publisher ad server helps publishers track users, manage inventory and make the final decision about how to fill available inventory, while an ad exchange acts as an intermediary, matching publishers and advertisers.   These are separate functions, and thus are not substitutes for each other.

121.    Upon information and belief, Google recognizes internally that ad servers are a distinct market.   Google delineates between ad servers, exchanges, networks, and buying tools, detailing how each product performs unique functions. Google routinely calculates its share of the ad server market without accounting for exchanges or networks.   Indeed, Google identifies only competing ad servers (such as AppNexus and Sizmek) and the invention of header bidding as competing with and putting pricing pressure on Google's ad server. Google does not consider exchanges to be competitive threats to its ad server. Instead, Google compares its ad server to other ad servers and monitors other ad servers as competitive threats.

122.    Government agencies around the world recognize ad servers as a distinct product market.  In 2007, the FTC accepted Google's proposed definition of ad servers as a distinct product market in approving Google's acquisition of DoubleClick.  In connection with its efforts to avoid a challenge by the FTC of its acquisition of DoubleClick, Google represented to the FTC that its existing network (then called AdSense) and the ad server it sought to (and ultimately did) acquire DoubleClick for Publishers ("DFP") "are not direct substitutes," explaining that "[i]f the price of DFP were increased by a small but significant amount, customers would switch to other publisher-side ad serving products, such as those provided by 24/7 Real Media, Atlas/aQuantive."  Moreover, Google went even further, characterizing any suggestion that ad servers and networks are interchangeable as "seriously flawed and utterly divorced from commercial reality."  In other words, Google has long acknowledged that while ad servers are substitutes for each other, networks and other advertising marketplaces are not.[19]

123.    Market participants, standard-setting organizations, and industry trade journals also recognize ad servers as a distinct product market. The Interactive Advertising Bureau, a prominent industry standard-setting organization for display advertising, in which Google is intimately

---

[19]    The U.S. House Subcommittee on Antitrust, Commercial, and Administrative Law conducted an investigation of digital markets and released an accompanying 2020 report titled "Investigation of Competition in Digital Markets," which recognizes the functions performed by ad servers as distinct from exchanges, networks, and ad buying tools.  Furthermore, the British and Australian competition authorities—the United Kingdom's Competition and Markets Authority ("UK CMA") and the Australian Competition and Consumer Commission – recently ("ACCC")—recently conducted substantial investigations into competition in digital markets and published reports recognizing ad servers as a distinct product market. In early 2022, the French Competition Authority identified ad servers as a distinct market, comprising products that "allow publishers to manage their ad inventories by evaluating their [ad inventory] availability, based on their historical properties, and automatically select the most relevant and profitable ads available," distinct from networks, exchanges, and ad buying tools for advertisers.

involved, defines a publisher ad server as "[a] computer application that enables the delivery, tracking and management of advertising content on publisher inventory."

    (b)    Monopoly Power In the Ad Server Market

    124.    Google has monopoly power in the ad server market, where it controls approximately 90% of the market.  Google's dominance of the publisher ad server market began in 2008, when Google purchased DoubleClick, which then gave Google control of over 50% of the publisher ad server market.  Upon information and belief, by 2012, Google understood that approximately 85% of publishers in the United States licensed its ad server.  In 2018, Google measured the "breadth" of its ad server (*i.e.*, the number of publishers using the ad server) as 84% of publishers globally and a staggering 99% of large publishers in the United States.  In a 2020 report, the UK CMA found that Google had between 90% and 100% of the publisher ad server market, as measured by the total impressions served in the U.K.  Google's ad server for publishers has been known at various times as DoubleClick for Publishers or "DFP" and Google Ad Manager or "GAM."

    125.    Other providers of publisher ad servers are small and fragmented.  Indeed, the number of alternative providers has decreased recently with sellers such as OpenX, Open Ad Stream, and Verizon Media deciding to stop providing a publisher ad server product, and other sellers relegated to negligible market shares. Other ad servers have gone out of business.

    126.    Google's market power is also demonstrated by the fact that despite being a more expensive and vastly inferior product, Google charged supracompetitive fees for licensing their ad server.  Additionally, Google's DFP ad server was less desirable because its dashboard was inferior and certain required integration made changing ad servers or multi-homing nearly impossible.

    3.    <u>Ad Exchanges</u>

    (a)    The Ad Exchange Market

127.     Ad exchanges are a relevant antitrust market. The relevant geographic market for ad exchanges is the United States Ad exchanges are real-time auction marketplaces that match advertisers looking to buy inventory with publishers selling inventory on an impression-by-impression basis.  Ad exchanges are typically used by large publishers and have minimum-impression requirements.

128.     Ad exchanges do not hold an inventory of display ads but act as a go-between, and charge publishers a "take-rate" or exchange fee as a commission on the clearing price of the transaction. An ad exchange auctions a publisher's inventory, as routed through an ad server, and advertisers submit bids through an ad-buying tool.

129.     No reasonable substitutes for ad exchanges exist. A hypothetical monopolist imposing a small but significant and non-transitory increase in the price of exchanges from a competitive level would not cause a sufficient number of customers to switch to other means of selling and buying display inventory such that the price increase would be unprofitable. Similarly, a hypothetical monopolist imposing a small but significant and non-transitory decrease in the quality of exchanges from a competitive level would not cause a sufficient number of customers to switch to other means of selling and buying display inventory such that the quality decrease would be unprofitable.

130.     Ad exchanges are unique and not interchangeable with ad servers. Ad servers and exchanges products have vastly different sets of features and price points.  In addition, ad networks offer fewer services than ad exchanges and are a separate product market serving a different group of customers (smaller publishers with lower web traffic).  Rather than providing all the targeting and bidding features of ad exchanges, ad network placements are made based on a pool of advertising inventory.  Because they do not have the sophisticated targeting and bidding features

inherent in ad exchanges, ad networks largely cater to smaller publishers and smaller advertisers as compared with ad exchanges.

131.    Upon information and belief, Google internally recognizes that exchanges are a distinct product market. Google analyzes market share with reference only to other exchanges (instead of accounting for ad servers or ad networks). Google measures its exchange market share in terms of share by exchange market revenue or exchange impression volume. Upon information and belief, Google identifies only other exchanges as "key competitors" to its exchange and recognizes that direct sales, exchanges, and networks are distinct.

(b)    Monopoly Power in the Ad Exchange Market

132.    Google's ad exchange is known as AdX. Upon information and belief, "By 2015, Google's internal documents demonstrate that 80% of the publishers using Google's ad server also contracted with Google's exchange. Since 90% of publishers were using Google's ad server, this means that the large majority of available publisher customers were using Google's exchange . . . ." In the four quarters preceding October 2019, AdX transacted over 60% of all display inventory sold through exchanges in the United States. Recent industry estimates show Google's market share continuing to surge, as it now has more than 70% of the ad exchange market.

133.    Google's exchange is also insulated from competition. In 2016, following widespread adoption of a competitive process known as header bidding, a price war between exchanges began, and non-Google exchanges began cutting their prices. In 2017, several exchanges revealed their recent price cuts to industry publication AdExchanger: "Less than a week after Rubicon Project slashed its take rate in half, to 10% to 12% . . . AppNexus [now Xandr] said its fees are even lower." The company revealed it charges an 8.5% average to the sellers on its platform." Despite these significant price cuts, these rival exchanges were unable to materially increase their market share. In March 2018, Rubicon Project also reported: "The ad tech market

43

is demanding more efficiency and lower cost from intermediaries like us. In an effort to be more competitive in attracting demand and capturing inventory supply, we made a strategic decision in mid-2017 to reduce the fees we charged buyers in OMP [open marketplace] transactions. In addition, in 2017 our business mix shifted to a higher proportion of header bidding transactions, and we charged lower buyer fees for header bidding transactions in order to pass higher bids to the downstream decisioning process.  Finally, in response to increasing market pressure and in an effort to be more competitive, on November 1, 2017, we eliminated our buyer transaction fees altogether."  Historically, buyer transaction fees had represented approximately 51% of Rubicon's revenue in 2016 and 49% of Rubicon's revenue for the first ten months of 2017.

134.    Meanwhile, upon information and belief, Google's exchange maintained or even increased prices, yet still increased its market share.  Upon information and belief, Google did not reduce its average exchange take rate from 2017 to 2020.  In fact, by 2019, Google had increased its exchange take rate for third-party buyers by one to two percentage points, which was a six to ten percent price increase relative to those rates in 2017. The fact that Google did not lower its exchange take rates during this time—and instead increased them without losing market share—demonstrates that Google's exchange has pricing power and is insulated from competitive market dynamics.

135.    Moreover, Google's exchange does not lose market share even though its customers perceive its exchange to be of lower quality than other exchanges on key dimensions. A 2018 survey asked publishers to evaluate exchanges across various dimensions of quality. Google trailed competing exchanges in all five of the key quality dimensions and ranked last in two of the five key dimensions.  Notably, Google ranked last in the measure of "alignment with publisher goals and needs."  In 2019, a column in AdExchanger observed that publishers continue to use Google's

exchange not because of superior quality, but because of "the demand that Google brings through its buy-side and exchange-related dominance."  According to a survey of publishers by Advertiser Perspectives (an advertising industry business intelligence agency), Google's exchange is the "dominant gateway for online advertising," Google's exchange is "always No. 1," and it has "real dominance."

**B.    Adjacent Markets: Web Browser, Internet Search, LMDOS**

1.    <u>Web Browsers</u>

(a)    The Web Browser Market

136.    Web browsers in the United States is a relevant antitrust market.  The relevant geographic market for web browsers is the United States, or worldwide. A web browser is software that retrieves and displays pages from the Internet. When a user wants to access a certain web page, the web browser fetches information from the relevant server and displays it to the user. Browsers are used to navigate and spend time on websites and to search the web. Most activities online are made possible through a browser. Web browsers can be installed on almost any device connected to the Internet.

137.    Web browsers are distinct products from search engines, as a search engine is simply a website that provides links to other websites to a user. A user must have a web browser installed in order to connect to a website's server and view its web pages. A web browser enables the user to navigate the internet, retrieves information from other parts of the web and displays it on the user's desktop or mobile device. The information is transferred using the Hypertext Transfer Protocol, which defines how text, images and video are transmitted on the web.

138.    Web browsers are unique because they enable and are critical for the proper functioning of websites, as well as interactive media such as videos and audio, and they control the users' experience both on the publisher's website and as respects digital advertising,

particularly online video advertising. No other product functions in this manner and no other products or software are interchangeable with web browsers.

         (b)      Monopoly Power in the Web Browser Market

139.    Google has monopoly power in the United States and globally in the web browser market.  There are currently only six meaningful web browsers this market. As of December 2022 the respective global market share of each browser is as follows: Google's Chrome Browser (64.68%), Apple Safari (18.29%), Microsoft Edge (4.23%), Samsung Internet (3.05%), Mozilla Firefox (3.01%) and Opera (2.25%).[20] According to public data sources, Google today dominates the market with approximately over 60% and 43% of U.S. desktop and mobile browser market share (respectively),[21] and nearly 65% market share combined worldwide. Google Chrome includes synchronization with Google products and services and is designed to work with YouTube and Gmail, amplifying market power.

140.    Chrome's monopoly power is reinforced by its purposeful integration with other Google products. By signing into the browser, Chrome automatically signs users into Gmail, YouTube, and additional Google services when users visited those sites. Automatic sign-in provides Google with additional immediate data on each user and enables Google to build more detailed user super-profiles by connecting users' daily activity data to the user's Google Account.

---

[20] *Desktop Browser Market Share in the United States of America*, GlobalStats:StatCounter, https://gs.statcounter.com/browser-market-share/desktop/united-states-of-america (accessed Apr. 28, 2023); *Mobile Browser Market Share in the United States of America*, GlobalStats:StatCounter, https://gs.statcounter.com/browser-market-share/mobile/united-states-of-america (accessed Apr. 28, 2023).
[21] *Browser Market Share United States Of America*, GlobalStats:StatCounter, https://gs.statcounter.com/browser-market-share/all/united-states-of-america (accessed Apr. 28, 2023).

141.    Internally, Google frequently referred to Chrome as part of Google's growth strategy. Google's strategy documents listed Chrome as a driver of "significant value," and former CEO Eric Schmidt gave a company-wide speech stating that the rise of cloud computing meant that the browser—the primary way users access cloud—would be increasingly critical to Google's success.[22]

142.    Chrome enables Google to control the entry points for its core markets: Internet Search and online advertising. Chrome uses Google Search as its default search engine, a default setting that market participants say Google makes it difficult to change. Chrome also provides Google with another source of user data that the company can feed into its ad business to offer behavioral ads.[23]

143.    Prior to Chrome's launch in 2008, Internet Explorer, Firefox, and Safari were the most popular browsers. Competitor Firefox, which was launched in 2002, leaned heavily on a partnership with Google Search, which enabled Google to closely track Firefox's growth prior to launching its own browser, just as it closely tracked competitor Inform.[24]

144.    Google is likely to maintain its lead in the browser market. First, Google has established Chrome as the default browser on the majority of Android devices, which make up around 75% of smartphones globally. In practice, users rarely change default browsers on Android. As the United Kingdom's Competition and Markets Authority recently found, even platforms that do provide users with options often end up using "defaults and choice architecture that make it difficult for consumers to exercise this choice."

---

[22] *See Investigation On Competition in Digital Markets Before the H. Comm. On the Judiciary*, 117th Cong., at  224 ("House Judiciary Report").
[23] House Judiciary Report, p. 224.
[24] House Judiciary Report, p. 223.

145.    Chrome also benefits from network effects. Web developers design and build for the Chrome Browser because it has the most users, and users, in turn, are drawn to Chrome because webpages work well on it. Google has leveraged the popularity of its apps to favor Chrome. Specifically, Google's documents show that the company has focused on designing Chrome features to provide a better experience of apps like YouTube and Search, advantages that other browsers lack.

2.    Internet Search Services

(a)    The Internet Search Market

146.    Internet Search services in the United States is a relevant antitrust market. Internet Search services allow consumers to find responsive information on the internet by entering keyword queries in an Internet Search engine such as Google, Bing, or DuckDuckGo.

147.    Internet Search services are unique because they offer consumers the convenience of a "one-stop shop" to access an extremely large and diverse volume of information across the internet. Consumers use Internet Search services to perform several types of searches, including navigational queries (seeking a specific website), informational queries (seeking knowledge or answers to questions), and commercial queries (seeking to make a purchase).

148.    Other search tools, platforms, and sources of information are not reasonable substitutes for Internet Search services. Offline and online resources, such as books, publisher websites, social media platforms, and specialized search providers such as Amazon, Expedia, or Yelp, do not offer consumers the same breadth of information or convenience. These resources are not "one-stop shops" and cannot respond to all types of consumer queries, particularly navigational queries. Few consumers would find alternative sources a suitable substitute for Internet Search services. Thus, there are no reasonable substitutes for Internet Search services, and an Internet

Search service monopolist would be able to maintain quality below the level that would prevail in a competitive market.

149.    The United States is a relevant geographic market for Internet Search services. Google offers users in the United States a local domain website with search results optimized based on the user's location in the United States. Internet Search services available in other countries are not reasonable substitutes for Internet Search services offered in the United States.

150.    Google analyzes Internet Search market shares by country, including the United States. Therefore, the United States is a relevant geographic market.

(b)    Monopoly Power in Internet Search

151.    Google has monopoly power in the United States Internet Search services market. There are currently only four meaningful Internet Search providers in this market: Google, Bing, Yahoo!, and DuckDuckGo.  According to public data sources, Google today dominates the market with approximately 92% market share, followed far behind by Bing with about 3% and Yahoo! with less than 2%. Moreover, Google Search is the default search engine for Google's own Chrome Browser and by contract is the default search engine for Apple Inc.'s Safari web browser. Gaining default status willfully maintains and enhances monopoly power.

152.    The visual of Google's Internet Search Market share can be seen below:



3.    Licensable Mobile Device Operating Systems

(a)    The LMDOS Market

153.    Licensable Mobile Device Operating Systems is a relevant antitrust market.  The Android OS is used on virtually all smartphones and tablets in the lower price range, which are bought by the majority of customers. Notably Apple's OS is a proprietary and not a licensable operating system.

154.    Google analyzes LMDOS shares by country, including the United States. Therefore, the United States is a relevant geographic market.

(b)    Monopoly Power in Licensable Mobile Device Operating Systems

155.    Through Android OS, Google is dominant in the worldwide market for Licensable Mobile Device Operating Systems, with a market share of approximately 75%.[25]  There are a number of barriers to entry that protect Google's position, including so-called network effects (that is, the more consumers adopt an operating system, the more developers write apps for that system).

156.    Additionally, Android users who wish to switch to other operating systems would face significant switching costs, such as losing their apps, data and contacts.

157.    Internet search and licensable mobile operating device services have been recognized as distinct markets and Google's dominance in them has been established.[26]

### C.    Amplification of Market Power and Barriers to Entry

158.    In addition to Google's substantial market share and details set forth above, Google's market power in each of the above markets is amplified and demonstrated by the interoperability of the Google products within each of the markets; Google's unilateral ability to control how and on what terms market participants can interact with its products and services; Google's collection and weaponized usage of data from its products and services; Google's ability to both set pricing and maintain opacity in the fees its receives for its services; network effects; and the self-reinforcing advantages of the data it collects for each of its services in garnering additional market share.

159.    Each of the above is a market for the purposes of antitrust law. There are no reasonable substitutes for Internet Search; web browsers; or licensable mobile operating devices systems.  And, as discussed above, there are no reasonable technological substitutes for ad servers, which work across the ad tech stack and provide particularized functionality in delivering and

---

[26]    *See* House Antitrust Report 177, 180, 183, 196, 213; *see also, e.g.*, https://ec.europa.eu/commission/presscorner/detail/en/MEMO_16_1484.

tracking online advertisements, or for ad exchanges, which conduct real-time auctions of ad inventory.

160.    Likewise, there is no reasonable substitute for online video advertising or instream online video advertising.  Online video advertising is not substitutable with traditional forms of advertising, such a print, television, radio, or billboard advertisements. Each of these forms of advertising reaches a distinct group of potential customers, and advertisers and advertising agencies view each of these forms of advertising as complementary rather than as potential replacements for each other. Online video advertising also is different in kind from traditional forms of advertising, because online video advertisements can be continuously tracked, updated and improved based on data showing how consumers are responding. Likewise, each of the component markets is not substitutable for the others as they serve and target distinct audiences. In addition, online display advertising, online search advertising and online video advertising perform different roles and are treated as distinct by advertisers. Search is intent-based advertising that seeks to induce consumers who have already shown an interest in buying a product or service to make a purchase. Display and video, by contrast, are suitable for raising awareness about a product, service, or brand and reaching new audiences that may not yet have shown an interest. Social media advertising is employed on a closed, rather than open network and targeted at users of the social network itself.  Moreover, non-video display advertising is not a substitute for video advertising because they are directed at different audiences, often delivered on different platforms and the decision as to whether to employ a video verses a non-video advertisements are driven by the desire to convey the message in the best way for the brand or advertiser.

161.    These durable markets have significant barriers to entry including, but not limited to: (1) network effects that make platforms more valuable as they gain more users; (2) the

advantages of big data which enable platforms and companies to use the treasure trove of data they collect from users to improve the effectiveness of their products and services; and (3) lock-in effects that cause users to avoid switching platforms or companies so as not to lose their personal contacts, history of searches, photos, apps, and other information. For Internet Search, additional barriers to entry include: (1) economies of scale in developing a web index; access to click-and-query data at scale; and (2) Google's extensive implementation of default positions. Also, for the LMDOS Market, there are high barriers to entry in part due to specific network effects: the more popular an OS is, the more developers write apps for that system – which in turn attracts more users. Furthermore, significant resources are required to develop and distribute a successful licensable smart mobile operating system.

162.    Defendants' Anticompetitive Restraints have restrained competition in each of the above markets. Google's conduct had the intent and effect of suppressing competition across markets and in particular in the ad server, ad exchange, and the online video advertising markets, in order to consolidate, maintain and gain dominance across markets, causing harm to Inform in each of the Relevant Markets.

## VIII.   UNLAWFUL CONDUCT

### A.    Google Wields Its Monopoly Power in Multiple Markets to Impair Competition

163.    As set forth above, Google has market or monopoly power in each of the Relevant Markets and in each Adjacent Markets. Google aggressively uses its monopoly positions, and the money that flows from them, to continuously foreclose rivals and protect its monopolies. Google has engaged in a scheme to willfully maintain and extend its monopolies through a wide variety of anticompetitive conduct, including excluding and preventing entry by competitors, raising its

rivals' costs, and forcing publishers and advertisers to rely on Google's intermediation services to effectuate sales.

164.    Google's DoubleClick acquisition and DFP's rise as the dominant ad server was a key step in monopolizing digital advertising. Through DFP, Google now overwhelmingly and instantaneously controls how, when, where, and which ads are served to users on the Internet. To fortify control over the Ad Server market, Google exploited its dominant AdX ad exchange, conditioning access to AdX on the use of its separate DFP ad server.  By illegally tying the use of DFP to access to Google's dominant AdX ad exchange, Google extended its dominance in the Ad Server market and increased its control over what advertisements are seen by users and monetized by publishers and advertisers. This tie, and Google's resulting monopoly ad server, laid the groundwork for the anticompetitive tactics that followed. Today, through its dominant ad server, ad exchange and related advertising technology, Google manipulates the ad auction process, controlling how advertisers, publishers and competitors can participate in the online advertising market; whether ad inventory is placed into auction; who wins the ad auctions; and how much money auction participants can generate.

165.    In addition to the acquisitions and anticompetitive conduct that gave Google control over the ad technology, Google also exploited its Chrome web browser to control web users' access to publisher websites and whether online video advertisements on those websites would function properly.  When Google introduced its Chrome Browser in 2008, Google leveraged its economic power to force Chrome's adoption, use, and proliferation. Contracts with equipment manufacturers and other technology companies (such as Apple) set Google Search and Google's Chrome Browser as the default services on Android and Apple mobile devices, reinforcing Google's Internet Search monopoly and cementing the dominance of its Chrome Browser. In turn, the Chrome Browser now

serves as a way for Google to control the entry points for its core markets: Internet Search and digital advertising, including online video advertising.

166.   Google's scheme includes the following anticompetitive conduct:  (1) tying and bundling of products and services; (2) manipulation of the ad placement and ad auction processes; (3) exclusionary disablement, technological blocking, and systematic interference with competitors' products and services; (4) theft of data and disparagement of competitors' products and services to steal competitors' clients, market share and copy competitors' product offerings; and (5) anticompetitive exclusionary contracts; and (6) monopoly leveraging.

1.   <u>Illegal Tying and Bundling of Services</u>

167.   Google has engaged in illegal tying or bundling, including technological tying, of Google products and services.  Specifically, Google has bundled and illegally tied: (1) the use of Google's DoubleClick Ad Server (the tied product) with the real-time bids from Google's AdX marketplace (the tying product); and (2) the purchase of ad inventory on YouTube (tying product), the world's largest video streaming website, with the use of Google's own ad buying tools – including Google Ads, DV360, AdSense, AdX and DFP (now Google Ad Manager or "GAM") (tied products).

(a)   Tying of AdX to Google's DFP

168.   Google has used and leveraged the monopoly power of its AdX ad exchange to coerce publishers to license its DFP publisher ad server by conditioning the sale of its AdX ad exchange product on the use of its separate DFP ad server product.

169.   Prior to Google's entrance into the ad server market, publishers controlled how ad servers routed publishers' inventory to exchanges and networks. Ad servers charged a low cost per impression rate or flat monthly subscription fee. As addressed below, Google's conduct

substantially changed this market, making its ad server the only alternative to gain advantages in the exchange market.

170.    Having failed in its own efforts to build an ad server, Google entered the publisher ad server market by acquiring DoubleClick in 2008.  At the time of the acquisition, DoubleClick's share of the publisher ad server market was between 48% and 57%.

171.    For years, Google's ad servers and ad exchanges were sold separately.  Beginning in 2010, however, Google restricted the ability of publishers using a non-Google ad server to trade through AdX, forcing customers and publishers to license Google's ad server if they wanted to receive live, competitive bids from AdX.  Inform was one such customer.

172.    Because Google controls such a dominant pool of advertisers through its dominant ad exchange, AdX, publishers had no choice but to do business with Google, as they depend on Google's exchange for access to the hundreds of thousands of small advertisers purchasing advertising through Google Ads and transacting exclusively on Google's exchange.

173.    In 2018, Google undertook efforts to further consolidate and build its power in both the ad server and exchange markets through the express and blatant tying of its ad server and ad exchange products.  It underwent a major "rebranding" of its ad platform, combining its ad server and ad exchange functionality into a single product: Google Ad Manager ("GAM"), and began renegotiating agreements with publishers, "requiring publishers to sign a combined contract that included both Google's DFP ad server and Google's AdX exchange."  Upon information and belief, Google's internal documents demonstrate that Google decided to contractually "jam[] DFP and AdX together to ensure that we take the best of both worlds."  This tie was not optional but was required and coercive, forcing publishers to use Google's DFP ad server in order to receive

competetive live bids from Google's AdX exchange.  By 2019, Google's share of the ad server market had grown to 90%. It has remained at least that high.

174.    Google explicitly tied its DFP Ad Server with AdX under a single tool, Google Ad Manager, as follows:

**Google Rebranding Their Advertising Platform.**



|  |  |  |
| --- | --- | --- |
| Google AdWords will become Google Ads | DoubleClick and the Google Analytics 360 Suite will become Google Marketing Platform | DoubleClick for Publishers and DoubleClick Ad Exchange are becoming Google Ad Manager |

175.    This rebranding is essentially the express tying of services to further Google products and services, forcing and coercing Inform, publishers and customers who want access to advertisers, and the real-time bids of those advertisers, who use AdX to use Google's DFP as their ad server.  By integrating and "rebranding" them into the Google Ad Manger, Google illegally and blatantly ties its stable of advertising services together to force and compel use of Google services. Customers were given no option, they were coerced and required to sign contracts that put the express tie in place for all AdX customers.

176.    Moreover, Google's DFP ad server was both inferior to competing ad servers and more expensive to use.  By way of example, Google's ad server provided for certain primary parameters that it collected for all publishers' customers, and publishers could then also set secondary or customary parameters for visitors to their specific website.  Other ad servers provided publishers a better interface (including a better reporting module) and access to all of the data

gathered by these pre-set parameters (and thus all of their website visitor's data) at no additional cost. However, Google restricted publishers to viewing only a limited number of parameters at a time (generally only two of dozens), making it difficult for publishers to understand the metrics of their own website visitors. This made Google's DFP less desirable than other ad servers that provided all of that data to publishers at no additional cost.

177.    However, as Google's former head of global strategy and commercialization explained: "When [advertiser] demand can only be found through certain sources, it compels publishers to work with that product." Google's exploitation of its control over AdX (the tying product) compelled and forced Inform and other publishers into the purchase of the DFP ad server (the tied product).

(b)    Tying of YouTube Video Ad Inventory to Use of Google Products

178.    Google and YouTube have also used and leveraged the market power in YouTube's platform, as discussed above (¶¶115-116), to coerce advertisers to license its ad buying tools by conditioning the sale of its YouTube ad inventory (tying product) on the use of Google's separate ad buying tools (tied products).

179.    YouTube is now the world's largest video streaming platform. When Google initially purchased YouTube, its ad inventory was available for all DSPs to access and use. Then, in 2015, Google closed YouTube and made it accessible only by Google DSPs. As advertisers use a single DSP for a given campaign in order to manage frequency, this tying forced any advertiser that wanted to include YouTube in its ad campaigns to use a Google's DSP buying tools for the entire campaign and forgo other advertising avenues.

180.    As the YouTube platform is now at a dominant 76% market share, Google forces advertisers to use its services Display & Video 360 and Google Ads in order to buy YouTube ads

and the video ad inventory on YouTube is only available if an advertiser uses one of Google's own ad buying tools – including Google Ads, DV360, AdX and now Google Ad Manager.

181.    YouTube's substantial reach among U.S. consumers makes it a "must-have" source of online video ad inventory for advertisers and, upon information and belief, Google itself considered YouTube a "strategic anchor" for its buying tool DV360.  This tie is coercive because it forces advertisers to use Google's ad buying tools if they want to access the world's largest video streaming website.  YouTube boasts: (1) 2.6 billion monthly active users; (2) 122 million daily active users; (3) 1 billion hours of videos viewed per day; (4) and reach the substantial viewership on the world's second-most visited website with 22.8 billion monthly visits.[27]  YouTube also boasts the following statistics: (1) 81% of U.S. adults use YouTube; (2) 95% of 18-29 year-olds in the U.S. use YouTube; (3) 91% of 30-49 year-olds in the U.S. use YouTube; (4) 49% of 65+ year-olds in the U.S. use YouTube; (5) 62% of U.S. of YouTube users say they visit the site daily.  The prospect of foreclosing from advertisers this colossal magnitude of viewership forces and coerces advertisers to use Google's ad buying tools, including Google Ads, DV360 as well as Google Ad Manager.

182.    This illegal tying agreement harms Inform and other competitors by making platforms like Inform and rival tools for placing ads in video streams less attractive to advertisers who can only access smaller audiences.  This harmed Inform's ability to compete for advertising spend on its digital media and advertising platform.  Google also leveraged control over YouTube to further foreclose competition by excluding competing ad servers from having access to YouTube.[28]  Google's exploitation of its control over YouTube ad inventory (the tying product)

---

[27] Salman Aslam, *YouTube by the Numbers: Stats, Demographics & Fun Facts*, Omnicore, Mar. 15, 2023,  https://www.omnicoreagency.com/youtube-statistics/ (accessed Apr. 28, 2023).
[28]  House Antitrust Report at 211.

compelled and forced advertisers into using each of the separate tied products (Google Ads, DV360, DFP and AdX) for the purchase of video advertising through Google ad buying tools and diverted ad spend away from Inform and other competitors, whose offerings were made less attractive by the illegal tie..

183.    Remarkably admitting the illegal tie, in June 2022, Defendant Alphabet reportedly offered to open up YouTube ad inventory and allow rival ad intermediaries to place ads on YouTube in an attempt to settle to an antitrust investigation into the practice by the European Union, on the condition that the EU investigation be settled without a fine.

(c)    Google's Illegal Tying Enabled the Anticompetitive Conduct that Followed

184.    Obtaining monopoly power in the ad server market was a lynchpin to the anticompetitive conduct that followed.  The illegal tying of Google's AdX with the ad server enabled Google's ad server to rise to dominance, entrenched its monopoly power, and furthered the anticompetitive conduct set forth herein.

185.    As stand-alone products, ad servers were intended to be neutral; they should neither care nor take a position on which ad to serve – be it a directly sold ad or an ad being placed through auction – beyond maximizing publisher revenue. It is the ad server that controls, among other things: (1) the insertion of ads/promoted content into publishers' websites, including direct-sold ads, programmatic ads, and house (internal) ads; (2) the storage and management of the ads that will appear; (3) the setting of rules to determine what ads appear when and where (including targeting, priorities, and pacing); (4) the selection of the best ad to show using an ad decision engine; and (5) the tracking and reporting of the campaigns for billing, monetization and strategic decision-making.

186.    Once Google's DFP ad server became the monopoly ad server (through *inter alia* its illegal tying of its AdX), Google was able to carry out a host of other anticompetitive conduct

that maximized Google revenue including but not limited to: Dynamic Allocation; Enhanced Dynamic Allocation; and Dynamic Revenue Sharing, each described below. It was also Google's ad server that began to encrypt and hash user identifications so that (1) publishers could not properly bill their clients, (2) advertisers could not understand their return on investment with competing ad tech products; and (3) parties on both sides had no way to gauge the efficacy of ad spend.

187.    Likewise, the illegal tie between YouTube's video ad inventory and Google's ad buying and other tools fortified Google's monopoly power and galvanized Google's anticompetitive conduct specific to online video advertising, as set forth below.

188.    These illegal ties were exclusionary and foreclosed competition in the ad server, ad exchange, online video advertising markets as well as the markets for ad buying tools.

    2.    Anticompetitive Manipulation of the Ad Auction: Google Impaired and Excluded Competitors and Stole Valuable Ad Inventory Through Auctions Designed to Deceptively and Artificially Preference Its Own Exchange and Decimate Competition on the Merits

        (a)    Dynamic Allocation

189.    Traditionally, bidding for impressions was done sequentially in a "waterfall" auction–that is, a publisher passes its inventory from ad exchange to ad exchange in descending order of importance (as ranked by the publisher) until all impressions are sold.  The ad exchanges are usually ranked by publishers according to the average historic yield they have produced for the publisher.  This means that an ad exchange where premium inventory (*i.e.*, higher priced inventory) has been sold in the past will then get first chance on further impressions from the same publisher.  Waterfall auctions worked to the relative disadvantage of Google, as publishers gave Google's AdX ad exchange a lower ranking because other exchanges offered higher prices to publishers.  Inform ranked AdX last or close to last.

190.    Through its DFP ad server, Google foreclosed competition in the market for ad exchanges, with the 2010 introduction of a program called "Dynamic Allocation." With Dynamic Allocation, Google's DFP ad server terminated impartial exchange order routing and gave Google's AdX exchange a first right of refusal at depressed prices, all the while deceiving publishers into believing that their set sequencing for ad exchanges was being carried out as they had dictated.

191.    Before 2009, a publisher using Google's DFP ad server that wanted to sell its impressions through multiple exchanges needed to determine which exchanges would be called in which order.  When a publisher's impression became available for sale, the waterfall would be initiated and Google's ad server would offer the impression through the exchange the publisher wanted to call first; the impression would then pass to subsequent exchanges in sequential order, calling each subsequent exchange only if all prior higher-ranked exchanges failed to clear the impression.

192.    This system of allocation of publisher's inventory across multiple exchanges did not favor one exchange over another, rather it gave publishers the choice.  Once a publisher established the sequence for the relevant exchanges, Google's ad server ostensibly carried out those instructions in a neutral manner.  If an exchange performed well for a publisher (e.g., because it attracted advertisers willing to bid top dollar for impressions on that publisher's site, or because the publisher wanted to be associated with advertisers on that exchange), then the publisher would be incentivized to reward it with a higher place in their waterfall.  Conversely, if an exchange's bid prices or quality performance failed to justify its place in the waterfall, the publisher would be incentivized to demote it. Publishers benefited from exchanges competing over time to earn their place in each waterfall.

193.    Starting around 2009, however, exchanges started to compete by submitting real-time bids for publishers' inventory.  In this new era, a publisher could put an impression up for sale and have exchanges compete at the same time for the impression by returning live, competitive bids.  As the concept of real-time bidding began to gain popularity, Google strategized to use its control of the ad server market to inhibit competition among exchanges.  Opting to foreclose competition rather than compete on the merits, Google incorporated new decisioning logic—a new program it called Dynamic Allocation—into DFP in 2010.  Dynamic Allocation marked an end to DFP ad server order-routing impartiality. Under this program, Google used the dominance it held with its DFP ad server to impart a substantial new unearned and anticompetitive advantage to its own AdX exchange: a right of first refusal.

194.    Rather than sequentially calling a publisher's preferred exchanges and allocating the impression to the first exchange able to clear its respective price floor, Google's Dynamic Allocation program instead had DFP permit AdX to peek at the average historical bids from rival exchanges and then transact the publisher's impression if AdX could return a live bid for just a penny more than the highest of these historical bids.  Of course, Google's AdX was the only exchange with an unprecedented backdoor right of first refusal on publishers' inventory in DFP.

195.    Dynamic Allocation ultimately reduced publishers' revenues by shielding AdX from real-time competition and by permitting AdX to transact impressions at depressed prices. Publishers ranked exchanges to reflect the historical average prices paid by each exchange.  But those very prices were artificially depressed by Google.  Shortly before introducing Dynamic Allocation, Google cut off much of publishers' ability to share information about their inventory with the advertisers using non-Google products, which led to a less-informed pool of advertisers using non-Google products, which in turn led to lower bids from that pool of advertisers.

196.     Google seized the opportunity it created.  With Dynamic Allocation, Google used DFP to allow AdX to swoop in and buy inventory at just a penny more than the depressed average historical bids returned by non-Google exchanges to DFP.  Indeed, at the very moment DFP was giving AdX an unparalleled right to bid ahead of the publisher's established waterfall, DFP also gave AdX the information it needed to beat out competing exchanges without paying the higher prices it otherwise would have paid because of its information advantages.  In other words, Google used its ad server monopoly to let its ad exchange view a publisher's valuable impression—like a box seat at a baseball game—and transact that impression for just a penny more than the average price that a non-Google exchange sold any old impression for—like the average price for any seat in the stadium.  That is not competition on the merits, and it was certainly not in the best interest of publishers.  And on high volume news days, this self-dealing by Google was particularly lucrative.

197.     Because publishers license ad servers for the express purpose of maximizing their inventory yield, Dynamic Allocation did not serve the interests of Inform and Google's other DFP customers (i.e., publishers), and but for Google's dominance in ad serving, publishers would have switched to a rival ad server. Google's deliberate steps to degrade the quality of its ad server—in particular by giving its own AdX exchange preferred access to publishers' inventory and information— furthered Google's aspirations for monopolization. Dynamic Allocation was exclusionary and successfully foreclosed competition in the ad server and ad exchange markets. It was also anticompetitive in the online video advertising market where video ad inventory transacted at artificially low depressed rates and Inform and publishers could not compete.

(b)     Enhanced Dynamic Allocation

198.     Five years later, in and around 2014, Google expanded and further entrenched its artificial advantages by introducing "enhanced" dynamic allocation, which remains in place today.

This update allowed Google's ad exchange to obtain the benefits of dynamic allocation over inventory potentially covered by direct contracts between Inform (and other publishers) and advertisers.  Historically, this inventory was not offered to ad exchanges at all because qualifying inventory was set aside to fill the direct contract. Only after the direct contract was filled did otherwise qualifying inventory become available for auction. Enhanced dynamic allocation afforded Google's ad exchange a right of first refusal over direct ad inventory regardless of whether Inform or the publisher had yet fulfilled the terms of the direct contract.

199.    Enhanced dynamic allocation allowed Google's ad exchange to win the impression as long as it was willing to pay more than a "value" Google assigned to a direct contract, which Google calculated through an opaque process that deceptively degraded and discounted the actual direct ad guaranteed price and predicted the likelihood the publisher could still be able to satisfy the terms of the direct contract through future impressions even if Google's exchange filled the one currently available.  At the same time, Google ensured that "[i]t [was] not possible for publishers . . . to deactivate Enhanced Dynamic Allocation" within the publisher ad server.  Google artificially lowered the direct ad sale contracted price in order to permit Google to "win" the auction.  For example, Inform would have a contracted price for $24 per CPM and Google would unilaterally devalue Inform's contract to $6.32 and then take the business itself for $6.33.

200.    Using Enhanced Dynamic Allocation, Google weakened and handicapped Inform and other publishers' direct sales channels and drove more advertisers to programmatic channels, where Google could steal an impression that it should never have had access to and extract profits from that impression.  In this manner, Google stole Inform's most valuable impressions and drove Inform's business into the ground.  It also made Google falsely appear to have access to higher-quality advertisers (who had directly contracted with *Inform* and other publishers) and deceptively

gave Google higher-quality impressions; in both instances falsely entrenching the network effects Google already enjoyed.

201.    Inform repeatedly reached out to the Google Team with its concerns. And Google would respond dishonestly or deceptively in an attempt to cover up its illegal behavior.  A graphic depicting how Dynamic and Enhanced Dynamic Allocation worked against Inform is depicted below:



202.    Whereas Dynamic Allocation (depicted with the red line) allowed Google to jump the line over other ad exchanges prioritized by Inform, Enhanced Dynamic Allocation (depicted with the green line) enabled Google to access all of Inform's inventory and to falsely place cheap programmatic Google ads ahead of Inform's substantially more lucrative direct ad sales.

203.    With Enhanced Dynamic Allocation, Google exploited its monopoly in the ad server market to harm competition in the markets for ad servers, ad exchanges and online video advertising by channeling the most high-value inventory of Inform and other of Google's publisher clients to its ad exchange, which starved rival exchanges of scale and liquidity.  It also harmed competition in the online video advertising market by deceptively assigning a lower value to a

guaranteed, known price for an already sold direct ad and then purporting that a cheap programmatic ad had won the "auction" and, in turn, failing to place Inform's directly sold ads. This resulted in the false appearance that Inform and other publishers of directly sold ads were not performing and could not perform, in fact driving advertisers to spend more on programmatic ads and less on direct sold ads with Inform.

204.    In addition to harming competition in the ad exchange market, EDA harmed competition in the ad server market by exposing Inform's direct deals to Google's AdX at depressed prices.  Inform and other publishers who invested years building internal ad sales teams and relationships with advertisers were deprived of their choice of a neutral ad server to fairly and properly deliver their contracted for ad campaigns, harming competition in the ad server market.

205.    Google's anticompetitive conduct has all but destroyed direct ad sales.  In 2014, when Google first began EDA, programmatic ad spend was approximately 20%.[29]   By 2018, programmatic ad spend accounted for 80% of revenues.[30] In 2022, over 90% of all digital display ad dollars were estimated to transact programmatically.[31] Today, direct ad sales are all but dead.

206.    Google automatically enrolled its publisher clients into Enhanced Dynamic Allocation and attempted to mislead publishers to continue using Enhanced Dynamic Allocation as a purported way for publishers to maximize yield and as a way to solve ad delivery problems. Internally, however, Google viewed Enhanced Dynamic Allocation as a way for AdX to "cherry-pick" high-revenue impressions.

---

[29] https://www.iab.com/wp-content/uploads/2015/07/PwC_IAB_Programmatic_Study.pdf
[30] https://www.iab.com/wp-content/uploads/2019/05/Full-Year-2018-IAB-Internet-Advertising-Revenue-Report.pdf
[31] https://www.insiderintelligence.com/insights/programmatic-digital-display-ad-spending/

207.    EDA was exclusionary and, because it impacted both programmatic and direct ad sales, successfully foreclosed competition in  the ad server market, the ad exchange market and the online video advertising market. Now operating the only exchange with access to this new pool of ad inventory, Google caused even more harm to competition between exchanges and siphoned even more advertisers away from rival exchanges; advertisers wishing to purchase from the new pool of high-value impressions through exchanges had to purchase through AdX. This foreclosed competition in the exchange market, especially because the vast majority—80%—of web publishers' ad revenue is generated from a much smaller percent—just 20%—of impressions, according to Google's review of revenue and impressions on AdX in the United States. Google refers to this dynamic as "cookie concentration."

208.    Google accomplished this through its ad server (DFP)—a product publishers reasonably expected to further their interests in maximizing yield—but none of it was in the interests of Google's DFP customers. Rather, EDA hurt publishers' yield by foreclosing competition from exchanges (most particularly, exchanges that charged lower take rates than AdX). A $10.00 transaction in AdX would cost the publisher a ~20% exchange fee. The same transaction clearing through a non-Google exchange could cut that cost in half.

209.    EDA hurt publishers' yield by permitting AdX to transact publishers' impressions for depressed prices and before substantially more lucrative direct deals. DFP permitted AdX to transact high-value impressions for one penny more than a price floor that Google set for itself—despite Google's obvious conflicts of interest. Google's exchange could transact the impression if an advertiser returned a net bid greater than both (a) the price Google set for itself and called the "EDA reserve price" and (b) the average historical bids belonging to rival exchanges. Google also

falsely calculated pacing of direct deals to deflate the value it assigned to direct ad impressions purportedly "competing" in the auction.

210.    Today, publishers have no choice but to leave EDA turned on in DFP; if a publisher turns off EDA, then AdX will not return live, competitive bids for their impressions.

211.    In summary, Google's conduct at issue—including overriding publisher control of exchange routing through Dynamic Allocation, and effectively terminating Inform and publishers' ability to carry out direct ad sales through EDA—constituted an exclusionary and unlawful scheme to exclude competition. Each set of conduct standing alone foreclosed exchange competition and competition for directly sold ads in the online video advertising market. However, the combined effect of this conduct was even more powerful. Indeed, the synergistic effect of Google's anticompetitive conduct in the ad server market significantly increased the number of transactions flowing through Google's exchange. As a result of Google's behavior, non-Google exchanges could not as effectively compete on quality (valuable impressions), liquidity (volume), or take rate. As a result, even otherwise large and powerful companies such as Microsoft and Yahoo!, which Google identified internally as offering better-quality and lower-priced exchanges, exited the exchange market in 2011 and 2015 respectively. By foreclosing competition, Google's exchange can charge a supra-competitive 19% to 22% commission on transactions. Moreover, through EDA and the discounting and downgrading of direct ad prices, Inform and other competing OLV advertising companies were excluded from competing on the merits, and were decimated and driven out of the market when their guaranteed direct ad sales did not deliver.

212.    Enhanced Dynamic Allocation continues today. Even though Google modified the way dynamic allocation operated in late 2019, the effects of the decade-long program persist and have a continuing, present adverse effect.

      (c)      Other Self Preferencing Measures: Last Look and Minimum Bid to Win

213.　In 2014, Google introduced another feature, called "Last Look," that adjusted the way in which bids were accepted and further distorted the ad auction process. Last Look was a feature that allowed Google the opportunity to bid on every impression and consequently always outbid other publishers. The DoubleClick ad exchange would wait for other exchanges to submit their bids before making its own, a dynamic that left Google always in a position to outbid its rivals. By having the "Last Look," Google's exchange could simply bid $5.01 when the highest bid for a particular user from another exchange was $5.00. Google would effectively be first in line and would assess whether the impression was a valuable user or instead a low-value impression. This has been enabled by Google's monopoly control over publisher ad servers, artificially and anticompetitively distorted the ad server's bid selection process with the intent to exclude rival ad exchanges as a means to maintain and expand Google's dominance in the ad exchange market. After intense criticism, and years of economic harm to publishers, Google eventually relinquished the feature in 2019.

214.　Google's "last look" preferenced its own products and services by providing Google customers who use Google's AdX with a second opportunity to outbid competing advertisers (who are using non-Google marketplaces).

215.　Similarly, through Google's market dominance, Google Ads has engaged in a practice of setting unreasonably high minimum bids targeted only at competing products or services in order to foreclose them from meaningful participation in the Google Ads auction system, a practice known as "Minimum Bid to Win." In doing so, Google has foreclosed participation by its competitors, illegally restrained trade, and stifled competition.

216.     Last Look and Minimum Bid to Win were exclusionary and successfully foreclosed competition in the exchange market and the online video advertising market. Last look has a continuing present adverse effect.

(d)     Project Bernanke

217.     In 2013, Google's gTrade team devised and launched a secret program, which they codenamed "Project Bernanke" (after the quantitative easing policy of the former Federal Reserve Chairman Ben Bernanke).

218.     Through this program, Google manipulated the prices paid by auction winners. Auctions are sometimes structured as "first-price," "second-price" or "third-price" auctions.  In a first-price auction, the winning advertiser pays the exact price they bid on the impression.  In a second-price auction, the winning advertiser-bidder is the bidder who bid the highest price, but, instead of paying the amount of its bid, it pays the amount of the second-highest bid.  For instance, if the two highest bids are $15.00 and $12.00, the advertiser with the $15.00 bid will win, but will pay only $12.00.  Bidders remain incentivized to submit the highest bid, but they do not know the precise amount that they will pay.  In a "third-price" auction, the winning advertiser pays the amount of the third-highest bid.

219.     In a second-price auction, publishers also are permitted to set a price floor, reflecting the minimum amount that they will accept for a transaction.  If only the highest bid exceeds the price floor, the price floor acts as the second-highest bid, and the winner will pay an amount equal to the price floor.

220.     Google's secret Project Bernanke program surreptitiously switched AdX from a second-price auction to a third-price auction on billions of impressions per month.  Project Bernanke dropped the second-highest bid from the AdX auction when the two highest bids were

above the floor and from Google Ads advertisers. The price to be paid, then, was the lower third-place bid. With Project Bernanke, AdX ran third-price auctions rather than second-price auctions.

221.   As a result, Inform and publishers were unwittingly paid in amounts that reflected third-place bids rather than second-place bids, and, consequently, suffered revenue declines of as much as 40%. At the same time, Google Ads, its ad-buying tool for small advertisers, continued to charge the winning advertiser as if it had won a second-price auction. Unbelievably, Google skimmed the spread and simply retained the difference between the second- and third-place bids. In other words, under Project Bernanke, the advertiser with the winning bid paid the price of the second-highest bid, but Inform and other publishers would receive a payout equal to the third-highest bid, with Google retaining the difference. Google then placed the price differential into a pool, which it used to increase the bids of client advertisers using Google Ads in order to help those advertisers win impressions on AdX that might have gone to advertisers that used non-Google ad-buying tools. The implementation of Project Bernanke increased the number of impressions transacted through AdX and the win rate of Google ad-buying tools.

222.   Google later implemented two other iterations of Project Bernanke: Global Bernanke and Bell. In a version called Bell, Google pre-determined whether a publisher provided AdX with an opportunity to bid on inventory prior to other exchanges, such as permitting Google to sell impressions using Dynamic Allocation or EDA. If the publisher did not give preferential access, the Bell version of Project Bernanke switched the auction from a second- to third-price auction, again, unbeknownst to Inform, publishers and advertisers, thereby decreasing Inform or other publisher's AdX revenue. Bell then used the differential to inflate the bids returned to publishers who gave preferential access to AdX. In other words, Bell penalized publishers who did not grant AdX preferential access by paying them based upon the third-place bid rather than a

second-place bid, while using the difference to increase the bids made to publishers who allowed preferential access.  In short, Google coercively used its power in the ad-server market to reward publishers that granted it a special priority and punish publishers that did not.

223.    Project Bernanke increased Google's annual AdX revenue by $230 million, with the Bell version generating an additional $140 million.  In addition to being fundamentally dishonest and fraudulent, Project Bernanke and its iterations were exclusionary and successfully foreclosed competition in the ad server, ad exchange markets and online video advertising markets.

(e)    Dynamic Revenue Sharing

224.    In 2014, Google launched a program called Dynamic Revenue Sharing.  Dynamic Revenue Sharing dynamically adjusted Google's exchange fee on an impression-per-impression basis after soliciting bids in the auction to let Google's AdX exchange win impressions it would have otherwise lost.

225.    In "a true second-price auction," AdX could transact an impression only if a bid cleared Inform's pre-set floor after accounting for Google's exchange fee.  For instance, if Inform set a $10.00 bid floor, a bid would clear only if the amount of the bid, minus Google's exchange fee, exceeded $10.00.  A $12.00 bid with a 20% exchange fee would net $9.60 to Inform, thus failing to clear the $10.00 floor.  In this situation, however, Google would then make a downward adjustment to its own exchange fee in order to clear Inform's bid floor.  For instance, in the above-discussed example, instead of charging a 20% fee on a $12.00 bid, Google would charge a lower fee in order to clear the $10.00 floor.  At the same time, Dynamic Revenue Sharing would secretly increase AdX's publisher fees on impressions where an advertiser bid was significantly above the publisher's floor.

226.    By overriding the floors publishers had set to maximize yield and return high quality advertisements, Dynamic Revenue Sharing harmed publishers.  Dynamic Revenue Sharing

allowed lower quality advertisements to win through the Google auctions, when a higher quality advertisement should have won through a competitor's exchange.

227.    Not surprisingly, Google concealed Dynamic Revenue Sharing from Inform and publishers.  Google started opting publishers into Dynamic Revenue Sharing starting in 2014 without disclosing anything about the program to Inform and publishers.  By the fall of 2015, Google had opted all publishers into Dynamic Revenue Sharing, still without disclosing the program.  In the summer of 2016, without referring to the program's real name, Google told publishers it was launching a "revenue share-based optimization" that increased a publisher's yield.  Google was referring to Dynamic Revenue Sharing, which plainly did not increase publisher yield.

228.    Dynamic Revenue Sharing manipulated Google's exchange fee after soliciting auction bids and "peeking" at bids on rival exchanges.  Dynamic Revenue Share was exclusionary and successfully foreclosed competition in the ad exchange and online video advertising markets.

(f)    Bypassing of Direct Ad Campaigns on High News Days

229.    Google's DFP ad server and its algorithms controlled the pacing, forecasting, and delivery of ads. The Google DFP ad server delivers both direct ads and programmatic ads, and Google's DFP algorithms are responsible for the delivery pattern, frequency and pace at which the ads or creatives are served. Google's DFP ad server also tracks the impressions, click through rate, completion rates and other delivery metrics for publishers' billing.  Additionally, Google's algorithms forecast the inventory and choose whether to fill additional inventory with one of the publisher's directly sold ads or one of Google's own less expensive programmatic AdX ads, for which Google garners a large profit.

230.    On high traffic news days, Google would capitalize on and profit from the  news content on Inform's Properties.  An increase in web traffic on high news days meant that Inform

had more ad space for to fill and should have seen a corresponding increase in ad revenue. However, it was Google's AdX that capitalized on the increased number of daily impressions generated because of the higher traffic on Inform's Properties by overdelivering lower CPM ads from AdX in place of Inform's directly sold high CPM ads.

231.    Inform operated so that their directly sold ad campaigns would pace at 100% – meaning that by the end of the month 100% of the impression goal would be met and 100% of the contracted for campaign would be delivered.  To assure that this would occur and that Inform would never underdeliver, Inform overbooked its direct ad deals, meaning they set to pace at well over 100% and thus should have been substantially over 100% on high news days.  However, on high traffic news days, direct ad campaigns that were pacing as low as 13% (meaning that they were on track to fill only 13% of the contracted for impression goal by the end of the month) would be bypassed by Google's DFP ad server in favor of cheaper AdX ads. Rather than properly pacing the campaigns at 100%, Google's ad server would serve cheaper AdX ads in place of the higher CPM directly sold ads.  Thus, high news days saw impressions worth significantly more to Inform routinely get bypassed in favor of cheaper AdX ads for which Google would take a substantial cut. By way of example, Google would bypass an Inform ad worth $25 to the publisher for a $6 programmatic ad for which Google would  take a fee of upwards of between 20% and 40%.  This under-delivery was a death knell Inform and other publishers and resulted in loss of direct ad sales for direct ad campaigns that did not deliver; all of which was controlled by Google's DFP. Moreover, the ads were not passed through other exchanges for bidding – they went directly through and only to Google's AdX ad exchange.

232.    On these high  traffic news days, DFP algorithms would ignore the influx of additional ad inventory for direct ad campaigns and strictly fill them using Google's AdX ad

exchange.  Neither Inform's direct ad sales nor other ad exchanges were offered an opportunity to fill this most lucrative ad inventory. Advertisers, receiving daily reports from both Inform and Google were able to see on a *daily basis* that Google was performing daily and Inform appeared not to be.  This damaged Inform's relationships with advertisers and lost Inform critical ad spend. Inform's sales team was repeatedly notified by its advertiser clients when campaigns were underpacing. This also resulted in loss of trust and good will and undermined Inform's ability to monetize the overwhelming success of its platform.

233.    The result was that Google artificially made it appear as if Inform could not perform as contracted when, in fact, performance could have and would have been completed well in advance of the month's end.  Had the impressions been served without Google's manipulation, Inform would have served all impressions and performed early, thereby enabling Inform to garner more of the advertisers' spend.  In fact, Inform routinely had excess inventory that went unsold month after month as a result of Google's manipulations.  But for Google's throttling its business, Inform would have had significantly higher sales for which they had signed contracts.

234.    By way of example, if an advertiser that had contracted to spend $50,000 over a month with Inform had been able to place all $50,000 of their ad spend on high value ad space in the first week, that advertiser would view Inform as overperforming and would allocate more of their budget to Inform.  However, if only $25,000 worth of that ad spend was placed by the Google ad server over that same month, Inform would falsely appear to be underperforming. A reasonable advertiser would not contract for more inventory through Inform and would decrease their ad spend with Inform.  In this manner Inform and other competitors in fact lost advertising ad spend, lost the opportunity to show their value proposition, and lost the ability to compete for additional ad spend. Additionally, other ad exchanges were foreclosed from competing for these direct ad

deals, again falsely making it appear that Google products were superior in their ability to deliver the most lucrative ads.

235.    Bypassing of direct ad campaigns on high news days was exclusionary conduct carried out by Google's ad server and successfully foreclosed competition in the ad exchange and online video advertising markets. Moreover, due to Defendants' anticompetitive conduct, Inform and other publishers were deprived of their choice of a neutral ad server to fairly and properly deliver their contracted for ad campaigns, harming competition in the ad server market.

(g)    Manipulation of Pacing to Undermine Competitors

236.    Google's ad server also manipulated and stalled the pacing of Inform's guaranteed line items and jumped over contracted for direct ad sales with cheap programmatic Google ads. Google falsely and manipulatively appeared to outperform Inform, resulting in advertisers' ad spend being diverted away from Inform and other competitors and to Google. Google destroyed Inform's value in the marketplace by destroying Inform's ability to perform and compete.

237.    The false underperformance of Inform and other competitors is one of the many ways Google in fact diverted advertisers' ad spend away from Inform and other competitors and into Google coffers.  Google's manipulation, carried out by the ad server on direct ad sales, caused Inform to lose advertising ad spend and made it appear that Inform and other competitors could not keep up with Google, undercutting Inform and other competitors' ability and opportunity to compete and win additional advertising ad spend.

238.    Performance was critical to Inform's business model.  Thus, Inform routinely overbooked its ads to assure 100% placement well before the end of the month.  Once the contracted for amount had been placed, Inform could demonstrate its performance and garner additional ad spend from the advertiser.  By purposefully manipulating and slowing the pacing of Inform's direct ad sales to pace woefully far below 100%, Google made it appear as if Inform

could not perform.  This directly harmed Inform and other competitors and led to a loss of advertisers.  Other ad exchanges were also foreclosed from competing for these direct ad deals, again falsely making it appear that Google products were superior in their ability to deliver the most lucrative ads. Inform and other publishers were deprived of their choice of a neutral ad server to fairly and properly deliver their contracted for ad campaigns, harming competition in the ad server market.

239.    Anticompetitive manipulation of pacing was exclusionary conduct carried out by the ad server and successfully foreclosed competition in the ad server, ad exchange and online video advertising markets.

3.    Exclusionary Disablement, Technological Blocking and Systematic Interference

240.    To compete for digital advertising revenue, and particularly to compete for online video advertising market, a company's services must be compatible with Google's ad products and services and Google's Chrome Browser.  Importantly, this enables Google to surreptitiously disable and block competitors' products and services.  Google has in fact used its monopolies and its dominance to disable and block Inform and other competitors' products, particularly video advertising video players, and to set pro-Google and anti-competitive rules by which video content and video advertisements are enabled, viewable and audible in ways that stymie competition and falsely elevate Google, YouTube and Google's products and services.  In short, Google blocked Inform's video player from working properly and stole its share of the online video advertising market.

(a)    Disabling Flash Video for Everyone Except YouTube

241.    Flash is a proprietary digital software developed by Adobe.  For more than a decade, Flash was the standard for playing video on websites.  As such, content and creatives were developed in Flash and online advertisers' infrastructure was based on Flash.  Moreover,

publishers preferred using Flash on their websites because it gave them significant control and flexibility over the user experience, including how and when videos played. With Flash, the publishers controlled whether a video would start automatically when the web page loaded. This feature is commonly referred to as "autostart." It also gave publishers control over whether the video would be accompanied by audio and over the audio volume.

242. Flash was superior in many respects and Google's primary reason for wanting to marginalize Flash was Google's lack of control over Abode's proprietary product. With Adobe Flash enabled in the web browsers settings, the publishers (as opposed to Google) controlled how and when the video content and advertising was delivered to the user.

243. Through the use of its ad server and Chrome Browser, Google disabled Flash advertisements in an effort to steal online video market share. Google's Chrome Browser initially came with Flash pre-loaded. But in or around 2014, Google rolled out changes to Chrome designed to force advertisers to migrate to the Google Display Network (Google's dominant DSP) and further fortify its dominant pool of advertisers.

244. In September 2014, Google began offering Flash-to-HTML5 conversion tools for the Google Display Network[32] and DoubleClick Campaign Manager that would create a backup HTML5 video advertisement to run when Flash was disabled or otherwise not supported. On January 27, 2015, Google-owned YouTube announced that it would no longer be using Adobe Flash by default, but would instead be using its HTML5 video player by default in Google's Chrome and other browsers and thus would not support flash-based ads. However, YouTube was

---

[32] The Google Display Network has over 2 million sites and reaches over 90% of people on the Internet, enabling ads to appear across a large collection of Google-preferred websites, mobile apps, and video content. https://support.google.com/google-ads/answer/117120?hl=en

both surreptitiously prepared in advance for the transition and also whitelisted so that and Flash ad campaigns and Flash creatives continued to play on YouTube while they were blocked for Inform and others.

245.     By February 2015, Google started to automatically convert Flash campaigns, both existing and new, to HTML5 but only when the advertiser used or switched to Google's ad buying tools and uploaded their ads through Google's AdWords, AdWords Editor, or third-party tools that contracted through Google's ad platform.

246.     As a result, advertisers that had creatives supported by Adobe Flash were faced with the Hobson's choice of manually and laboriously converting their content to HTML5 or, alternatively, switching to Google products instead and migrating to the Google network. Converting to HTML5 was a lengthy and costly process, requiring the transcoding of all files and reaching out to each and every one of an advertiser's 100s or 1000s of vendors who had been issued flash tags to change and convert the affected content.   This combination of product withdrawal of Flash coupled with conversion to HTML5 only if an advertiser switched to Google products had the overall effect of coercing advertisers to use Google products, rather than persuading them to use Google products and services on the merits and impeded competition in the online video advertising market.

247.     At the same time, to continue to monetize their websites with advertising revenue, publishers were required to wait until advertisers had either migrated their creatives to Google products and services or had manually converted the advertising content to HTML5, both of which meant forgoing substantial revenues.   Alternatively, the publisher themselves could suspend or sever prior lucrative direct relationships with advertisers and utilize Google's programmatic platform to fill their inventory with Google's HTML5-ready creatives. Again this had the effect of

coercing publishers to transition to Google rather than choose Google products and services on the merits and impeded competition in the online video advertising market.   Once this was accomplished, publisher's video ad inventory was further subject to Google's manipulation of the ad auction set forth above.   In this way, Google syphoned off customers from Inform and other competitors and hundreds of online advertisers and publishers withered and died, while Google and YouTube plundered valuable video advertisements that had supported publishers' websites.

248.    Also, in June 2015, Google Chrome began to "intelligently pause" ads that were supported by Adobe Flash.   Specifically, Chrome introduced features to automatically pause Flash content that was not "central to the webpage" while keeping central content playing without interruption.   For example, the main video that a user wanted to watch was unaffected while animations on the side, such as video advertising, were paused.   Google admitted knowing that the feature would pause a lot of plugin content, including "many Flash ads."   At the time there was considerable concern that HTML5 was not as versatile for users as Adobe Flash.   According to one commentator:

> The Flash-pause feature can be seen as yet another move by Google designed to increase digital dominance under the guise of a user benefit. Google wants to maintain web monetization dominance . . . . In the past, Google dealt with threats to its dominance by forcing publishers into exclusive deals. Now, Google found a more subtle means to the same end: developing features to 'protect' users who don't understand how the web works. [33]

249.    In 2017, Google changed Chrome's default settings to disable Flash entirely.

250.    Notably, most creatives were built to run on Adobe Flash.   Because the vast majority of users never change the default settings on their web browser (and Google enjoyed

---

[33] *See* Google's New Flash Pause Tool — Are Video Ads Crippled? https://www.linkedin.com/pulse/googles-new-flash-pause-tool-video-ads-crippled-vincent-meyer/

dominance and monopoly power with Chrome), Google's decision effectively meant that a video (and the associated video advertisement) presented in Flash would not be seen by an overwhelming majority of consumers. Instead, users would see a screen similar to the following:





251.    A vast majority of users presented with a screen similar to the above behaved as anticipated, closing and ignoring it – never seeing the video or the associated advertisement. Google's decision to disable Flash in its Chrome's default settings had the immediate effect of foreclosing a very significant portion of online advertisers from reaching users and target audiences.

252.    The only place this did not occur was if advertisers or publishers migrated to Google's dominant DSP, DV360 and uploaded their ads through AdWords, AdWords Editor, or third-party tools that worked with Google's ad platform.  YouTube was exempted from the change

during the change-over, and both content and online video advertising on the YouTube site remained unaffected.  This had the effect of coercing advertisers and publishers to transition to Google rather than choose Google products and services on the merits and impeded competition in the online video advertising market.

253.    Google's restrictions on Flash, and the way in which Google and YouTube implemented them, dramatically and anticompetitively impacted Inform, competing online advertising platforms and digital publishers, eviscerating direct ad sales and securing a larger share of the online video advertising market for Google and YouTube.  Competitors like Inform, and dozens of digital advertisers and publishers were severely impacted overnight, including many of Inform's Properties, sending Inform's business plummeting.   Importantly, the online video advertising market share that had been garnered by Inform and competing online advertising platforms went directly to Google.  That Google was able to impact so many competitors, digital advertisers and publishers virtually overnight simply reinforced Google's dominance and made digital advertisers and publishers all the more vulnerable to Google's illegitimate and anticompetitive conduct, forcing them to migrate to Google products and services or likewise faced extinction and shut down.[34]   Again, the result was that dozens of previously profitable competitors, ad networks, publishers and advertisers were forced into bankruptcy or fire sales, while Google's revenue and market share markedly increased.

254.    Disabling flash and pausing video content and the way that they were  carried out by Google and YouTube was exclusionary conduct that successfully foreclosed competition in the ad exchange and online video advertising markets.

---

[34] "All website owners live in constant fear of Google's algorithm updates. Without explanation or recourse, Google can deliver a fatal blow to a website's search ranking visibility." Submission from Celebrity Net Worth, to H. Comm. on the Judiciary, 10 (Oct. 14, 2019) (on file with Comm.).

(b)     Google Assumes Control of Video Advertising and Chrome Disables HTML5 Videos from Working

255.    The alternative to using Flash to play video content on websites is HTML5. Because Adobe Flash was a proprietary technology owned by Adobe, Google had no control over how it functioned.  HTML5, by contrast, is an "open source" technology, enabling Google to use its monopoly powers to not only set the rules for how HTML5 will function, but to be the self-declared enforcer of how HTML5 operates.  When HTML5 is used to present video content, Google, through its Chrome Browser, has significantly more control over how, when, and what videos are played.  For example, Google controls whether a video will "autostart" and whether a video will play with or without the sound on or off.  Google also controls the allowable size of the video player to enable compatibility and interoperability with Chrome Browser.

256.    Through its Chrome Browser, Google also determines whether to allow media playback on autoplay.  This enabled Google to allow autoplay for YouTube and advertisements that run on YouTube, when it serves Google, and to effectively shut down Inform's and other competitors' video players and video advertising, making Inform and other competitors' offerings less viable and less attractive.

257.    Moreover, certain Google-owned or preferred sites such as YouTube are whitelisted, and thus algorithmically exempt from the restrictive Chrome Browser settings.  Thus, Google and YouTube allow the autostart feature and sound features to remain unrestricted for YouTube videos and online video advertising placed on YouTube.  Effectively, video advertising on YouTube reaches the Internet user uninterrupted. This favorable treatment by Google and YouTube cannot be overstated – as the very purpose of video advertising is to be seen and to be

heard by the end user. Advertisers and brands will necessarily pay to go where they are sure to been seen and heard by prospective customers.[35]

258.    Google's DFP ad server monopoly is programed to control how, when, where and to whom advertisements are served.  Through Google's products and services, including its DFP ad server and Chrome Browser, Google manipulates how, when and where ads are placed; how, where and whether they are seen or heard; and how efficiently and effectively they are delivered. Coupled with its unparalleled user data, Defendants have used these tactics to unfairly and anticompetitively advantage Google and YouTube over Inform and other competitors.

259.    Moreover, Google's restrictive rules are not in place for the video advertisements on Google's own YouTube platform.  In fact, when asked how YouTube accomplished delivery, Google admitted to Inform that YouTube had none of the same restrictions placed on publishers using DFP.  Advertisers, tracking the efficacy of their ad spend, can tell where their video advertisements are seen, thus driving traffic to Google and YouTube and driving out competitors like Inform, whose video advertising was disabled and whose offerings were thus less attractive.

260.    Just as Google used EDA to make it appear that Inform could not deliver on its guaranteed direct ad sales, by selectively blocking Inform and other competitors' video players from working, Google used its dominant Chrome Browser to make it appear to advertisers that Inform could not deliver working video advertisements.  At the same time, online video advertisements placed on YouTube worked seamlessly.  Google's anticompetitive conduct in the ad server and web browser markets had an anticompetitive effect in the online video advertising

---

[35] In the House Antitrust Report, it was noted that certain anticompetitive activity by Google could have a "network effect in reverse." That is, reduction in traffic led to fewer consumers, which led to fewer listings, and less revenue, reduced investment and further decline. Id. at 190. In video advertising, a network effect in reverse means: if it doesn't work customers stop using it.

market.  Inform was directly harmed when its video advertisements did not play properly and could not reach users due to Google's exclusionary disablement.

261.    Technologically blocking and disabling Inform and other competitor's, publisher and advertisers' videos from playing by Google and YouTube was exclusionary conduct carried out by Google's ad server and Chrome Browser and successfully foreclosed competition in the ad exchange and online video advertising markets.

(c)     Unilateral Setting and Altering of Technological Standards and Denial of Interoperability

262.    By virtue of its dominance in the web browser market, Google can effectively set standards for the industry through changes to Chrome's functionality creating *de facto* standards (as set forth above).  Market participants must adhere to these standards or risk their technology no longer being compatible with most websites.[36]

263.    Google set the standard for online video viewability by deceptively phasing out and/or disabling Adobe Flash in favor of HTML5, while simultaneously coercing the use of Google products and services by providing the antidote to online advertisers who uploaded their ads through AdWords, AdWords Editor, or third-party tools that work with Google's ad platform.

264.    Google has forced publishers and advertisers to comply with a host of arbitrary, unilaterally-imposed rules to allow their online videos to be enabled, viewable and audible for consumers who use Google's dominant Chrome Browser, while effectively preventing competitor advertisements to be enabled.  The reverse network effect caused when Google products work while others do not, harms Inform and other competitors.

265.    Google sets standards and purposefully denies interoperability with competitors' products and services to purposefully render certain of its products and services incompatible to

---

[36]  House Antitrust Report at 229.

exclude entry by competitors, raise their costs and/or coerce the use of Google products and services. By way of example, Google made video players incompatible unless they met certain restrictions including as to size of video player. Additionally, as discussed below, through implementation of AMP on mobile devices and the LMDOS monopoly, Google made Flash ads unrenderable on mobile devices to cement Google's dominance in online video advertising.

266.    These rules, standards, and purposeful denial of interoperability, individually and taken together, had the effect of coercing advertisers and publishers to transition to Google rather than choose Google products and services on the merits and impeded competition in the online video advertising market. This was exclusionary conduct carried out by Google's ad server and Chrome Browser and successfully foreclosed competition in the online video advertising and ad exchange markets.

> (d)    Opacity as to Pricing and Data and Hashing of User Ids

267.    Through a culture of secrecy as to pricing and data collection, Google deprives competitors, advertisers and publishers of key market and pricing information, maintaining market opacity and inhibiting their ability to compete.  Advertisers and publishers, the key players in this market, have had scant visibility into the scope and extent of Google's anticompetitive conduct. As the lone conflicted representative of both buyers and sellers, Google has created a deliberately-deceptive black box where Google sets the auction rules to its own advantage.  Diminished competitive pressure has reduced Google's incentive to innovate, and Google's control of these key ad tech tools has inhibited rivals' ability to introduce efficiency-enhancing innovations. Publishers and advertisers suffer from reduced competition for both ad tech products and advertising inventory.  Google's conduct undermines the very purpose of digital advertising in the first place: to achieve optimum terms and pricing for digital advertisements so website publishers

can continue to serve their vital purposes in society. Upon information and belief, Google has siphoned off ***thirty-five cents*** of each advertising dollar that flows through Google's ad tech tools.

268.     Google has purposefully structured its various products and services to hide the ability of publishers and advertisers to understand and compare pricing and determine the efficacy of the ad spend, undercutting Inform and rivals' ability to compete even with their own data.  After the DoubleClick acquisition, Google "hashed" (i.e., encrypted) the user identifiers that publishers previously were able to share with other ad technology providers to improve internet user identification and tracking, impeding their ability to identify the best matches between advertisers and publisher inventory in the same way that Google Ads can. These identifiers come largely from Inform and publishers' own clients' data and had historically been available for free and are still available with other ad servers.  Google takes Inform's data, from Inform, scrambles it and gives it back – unintelligible and unusable, purposefully undercutting part of Inform's value proposition and hurting Inform financially. Becoming the dominant ad server (through the illegal tie with AdX) and hashing user ids were two steps Google took on the same road to dominating online advertising.

269.     In order to sell an impression at a price reflective of its true value, publishers need to be able to adequately identify the user who will view the impression.  User IDs permit publishers and their exchanges to understand the value of inventory, cap the number of times users see the same ad, and effectively target and track online advertising campaigns.  When exchanges and their DSPs cannot identify users in auctions, the prices of impressions fall by 50%, according to one Google study.   As detailed by other news organizations, advertisers pay over 60% less for impressions when user IDs are unavailable.

270.    The harm was even greater to Inform, which not only had a more mature and affluent user audience, but also had its own proprietary method of collecting its user's data that was an integral part of Inform's value proposition to publishers and advertisers.[37]   Google's hashing of user data effectively neutralized and rendered useless this part of Inform's platform. Google then scrambled Inform's user data and then offered to sell Inform's own proprietary data back to Inform at a steep price.

271.    Google's publicly stated reason for DFP eliminating publishers' ability to share their user IDs with non-Google exchanges is the protection of user privacy.  But that justification is pretextual and belied by Google's self-dealing.  Google prevents others from doing what it does itself: passing user IDs to its exchange and DSPs.  In fact, Google presents a far greater threat to personal privacy than any publisher.  Among many reasons, only Google can combine publisher's data stored in DFP with data from its owned and operated properties, including YouTube, Gmail, and Google Maps.  Google's access to data at such scale is unmatched, and Google uses that data to fuel algorithms that glean and expose ever-increasing amounts of information about users, including highly personal data.  Google told publishers and regulators before the DoubleClick acquisition that it never would combine DoubleClick with Google data, but that also was a false promise. Google began combining the datasets in 2016.

272.    Additionally, in January 2020, Google announced that it plans to phase out third-party cookies in Chrome, which will likely have the effect of reinforcing Google's power and harming rivals, shifting more advertisers toward Google.  In particular, while Google phases out

---

[37] *See Stacking the Tech: Has Google harmed competition in online advertising? Subcommittee on Antitrust, Competition Policy, and Consumer Rights of the United States Senate Judiciary Committee*, Testimony of David C. Dinielli Senior Advisor, Beneficial Technology Omidyar Network September 14, 2020.

third-party cookies needed by *other* digital advertising companies to collect data and effectively compete, Google can still rely on data collected throughout its digital ecosystem and the super-profiles that it renders therefrom.  Google is seeking to eradicate cookies because cookies are necessary for non-monopolists to compete.

273.    Hashing of user IDs is exclusionary conduct carried out by Google's ad server and successfully foreclosed competition in the online video advertising and ad exchange markets. Inform and other publishers were deprived of their choice of a neutral ad server to fairly and properly deliver their contracted for ad campaigns, harming competition in the ad server market.

4.    <u>Google Affirmatively Interferes with Competitors Using Data Harvested from Its Monopolies</u>

274.    Google has touted that "Our tools and platforms make it easy for advertisers and publishers of all sizes to choose whom they want to work with in this open, interconnected ad system."  In reality, Google collects market intelligence on its competitors and engages in anticompetitive conduct by directly interfering with its competitors' contracts and business relationships.

275.    By way of example, on or about April 4, 2016, Google contacted one of Inform's customers, sending them a screenshot to give them a "heads up" when Inform's floating video player with that client's advertisement appeared next to content that Google misleadingly characterized as objectionable.  Google surreptitiously obtained information about Inform's customer through Inform's use of Google's Ad Server, took this information to Inform's customer and used it in an attempt to convince Inform's customer that Google offered superior services. Google's malicious conduct caused purposeful interference with Inform, its customers and business relationships.  Inform eventually lost this customer relationship.

276.   Similarly, Google account managers routinely, and without authorization, accessed Inform's proprietary custom targeting values to break out Inform's inventory, create informational charts with Inform's proprietary information and pitch increasing Google's AdX opportunities with Inform.  These discussions were unsolicited and Google was not authorized to use Inform's proprietary information to advantage, tailor and advance its own AdX opportunities.

277.   On more than one occasion, Inform was contacted by its own customers and told that – unbeknownst to Inform and without Inform's consent – the customers had been contacted by Google and/or YouTube pitching an "NDN-like model"[38] for monetization of YouTube content and advertising.  To do this, Google used Inform's list of clients as well as Inform's proprietary pricing, targeting, data harvesting and business information, which Google had access to through Inform's use of the DFP ad server, AdX and Chrome Browser, to construct a competing business model for YouTube and further capture not only Informs' client base but a larger share of the online video advertising market. Upon information and belief, both Google and YouTube employees were involved.

278.   Additionally, for its remnant inventory at certain times, Inform had AdX inventory restricted to Flash-based video ad inventory, such that only Flash-based inventory was eligible for auction by Google's AdX, Google deceptively and anticompetitively went into Inform's systems and changed the available inventory, removing the inventory block placed by Inform and opening Inform's  HTML ad inventory to auction on AdX without Inform's consent and without Inform's knowledge, essentially stealing ad inventory for auction.  This action was willful and purposeful. Because of Google's exclusionary disablement of Flash-based ads, Google knew that Inform's Flash-based content (which was not whitelisted) would not play and did not want it to be offered

---

[38] Inform was formerly known as News Distribution Network, Inc. or "NDN."

through Google's AdX ad exchange.  Here again Google falsely and deceptively made it appear that its products functioned better than Inform's platform and video player.

279.    Given the nature and timing of Google's affirmative actions and Google's vast online power, these were not isolated incidents.  Google's purposeful trolling of competitors' services and content demonstrates not only specific anticompetitive intent and an unethical effort to wrongly discredit Google's competitors and steal market share, but is also a show of Google's market power.

280.    By using market intelligence from its DFP ad server, AdX and Chrome Browser, and Internet Search on competitors and competing online video platforms, Google both directly and surreptitiously interfered with Inform and other competitors' businesses and contracts and garnered additional market share for Google.  Google's "near-perfect market intelligence" has been recognized as enabling Google to covertly set up programs to more closely track its potential and actual competitors.[39]

281.    Collecting and using competitive market data by Google and YouTube was exclusionary conduct carried out by Google's ad server and Chrome Browser and successfully foreclosed competition in the online video advertising and ad exchange markets.

　　　　5.    Exclusive Dealing and Anticompetitive Contracts

282.    Google is the default search provider on 87% of desktop browsers and the vast majority of mobile devices.  Specifically, Google has used its search dominance to promote the use of its Chrome Browser on laptops, personal computers, and workstations, which sets Google Search as its default.

_____

[39]  House Antitrust Report at 15.

283.    Google also pays Apple an undisclosed amount, estimated to be $12 billion per year, to secure the search default across iOS devices.  This self-preference favors Google because users tend to stick with the default presented.  Moreover, Google takes steps to hamper and dissuade even those users that do attempt to switch search engines on Chrome. Combined, Google's conduct significantly impedes other search providers from reaching users at scale—and further expands and entrenches Google's dominance.[40]

284.    These exclusive dealings and anticompetitive contracts were exclusionary conduct and successfully foreclosed competition in the online video advertising, Internet Search and web browser markets.

### B.    Monopolistic Leveraging

285.    Not only has Google abused its monopoly power in the Relevant Markets, Google has leveraged its monopoly power in the Adjacent Markets of Internet Search, LMDOS and Chrome Browser and in the ad server market to suppress competition and harm publishers.  While anticompetitive conduct by the Google Defendants with respect to a single market in which Google wields monopoly power runs afoul of the antitrust laws, the totality of the Google Defendants' illegal and anticompetitive conduct across multiple, inter-related markets is more insidious.

286.    Monopoly leveraging is often used to describe the way in which a monopolist in one market uses its power to monopolize or attempt to monopolize a second market. In digital markets, the Department of Justice has noted that monopolistic leveraging and relationships between markets is as important as dynamics within the market, such as barriers to entry and market power.[41]  Leveraging may be achieved through many anticompetitive practices including

---

[40]  House Antitrust Report at 178.

[41]  In a December 10, 2019 address to the National Association of Attorneys General, U.S. Attorney William Barr warned: "In addition to understanding the dynamics within a market, like barriers to

but not limited to contractual and/or technological tying, bundling, exclusive dealing, and predatory or below cost pricing.

287.    The Google Defendants have illegally leveraged their overlapping monopolies as follows:

- Google has leveraged the Adjacent Markets to further dominate and across markets;

- Google has leveraged its monopoly power in the Adjacent Markets and particularly the Internet Search Market in an attempt to gain monopoly power in the ad exchange and online video advertising markets; and

- Google has leveraged its monopoly power in the ad server market and in the web browser market in an attempt to gain monopoly power in the ad exchange and online video advertising markets.

1.    Default Placement of Internet Search and Chrome Browser / LMDOS to control OLVAM

288.    Google has obtained default placement of both its Google Search and Chrome Browser across the mobile and desktop ecosystem through both integration and contractual arrangements. Through its ownership and complete control of Android LMDOS, Google has been able to ensure that Google Search remains dominant even as mobile replaced desktop as the critical entry point to the Internet.[42]

289.    Google has required that any smartphone manufacturer seeking to license Android preinstall Google Search and Google Play Store, alongside a host of other apps selected by Google. Google has also offered mobile device manufacturers revenue-share agreements, under which smartphone manufacturers would receive a cut of the search advertising revenue that Google made

---

entry and market power, we also need to look at relationships between markets. This is especially important because today's digital platforms frequently operate across multiple areas. A dominant firm may seek to leverage its monopoly power in one market to gain an unfair advantage in another." https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-national-association-attorneys-general
[42]  House Antitrust Report at 181.

from the use of Google's apps on their devices, as well as a cut of Play Store revenues. In return, however, manufacturers had to not only carry Google's apps, but also ensure that Google Search was the default *and* exclusive search app pre-installed on the manufacturers' devices.[43] Moreover, Google has established Chrome as the default browser on the majority of Android devices. This further feeds Google's preestablished rules and parameters for enabled, viewable, and audible online video advertisements and use of HTML5 and disadvantages Inform and other competitors.

290.    The illegal ties, restrictive agreements, self-preference and promotion of Chrome and Google Search through its Android OS and contractual agreements with Apple and others, maintains and enhances Google's ability to provide preferential placement of its own advertising products and services to the detriment of Inform and other competitors.

291.    In turn, Chrome Browser now serves as a way for Google to control the entry points for its core markets: display advertising and online video advertising.[44] Moreover, both Chrome Browser and Google's ad server control the delivery, functioning and operability of display advertising, including online video advertising and competing online video advertising technology, like Inform's video player.

292.    The October 5, 2020 House Antitrust Subcommittee found that Google repeatedly leveraged its monopoly power to maintain and gain dominance across related markets.[45] Specifically, the House Antitrust Subcommittee found that "Google used its search engine dominance and control over the Android operating system to grow its share of the web browser market and favor its other lines of business. *Reciprocally*, Chrome's dominance in the browser

---

[43]  House Antitrust Report at 213 (referencing documents provided by Google including the March 2011 Mobile Application Distribution Agreement).
[44]  House Antitrust Report at 224.
[45]  House Antitrust Report at 15, 183-187, 193, 211, 215, 217, 246.

market gives it significant gatekeeper power over managing and monitoring users' browsing activity—power Google can wield to shape outcomes *across markets* for search, mobile operating systems, and digital advertising. These advantages across markets feed back into and reinforce one another, advantages that [competitors] lack."[46]

2.    Leveraging of Internet Search Services

293.    Google leverages its power in the general Internet search market to: (1)  coerce publishers of mobile ads to use the accelerated mobile pages (AMP) format and (2) preference YouTube, both in an attempt to monopolize the online video advertising market.

294.    Google faced an emerging threat to its online video advertising market and YouTube platform from Inform and other online video advertising competitors.

295.    Google responded to this threat of competition through a series of anticompetitive tactics – including notably, all but requiring publishers to use a new software development framework, accelerate mobile pages or "AMP."  Google developed and launched AMP in 2015, as a format sometimes described as a "website on a diet."  AMP makes use of a stripped-down version of HTML that purportedly prioritizes loading speed (latency) simultaneously with dozens of proprietary extensions.  Latency however was pretextual.

296.    Notably however, AMP was purposefully designed (1) to block and be otherwise incompatible with Flash advertisements; and (2) to render websites built on the framework with competitive header bidding incompatible with its applications.  This created a *de facto* requirement for publishers to use AMP and forced advertisers to transfer to HTML5 either manually or by migrate to Google products, as discussed above.

---

[46]  House Antitrust Report at 225 (emphasis supplied).

297.    To coerce publishers to adopt AMP, Google conditioned premium treatment in Google Search – where it has over 90% market share – on publishers' migration to AMP.  Google purposefully dropped the PageRank of sites that did not adopt AMP, maliciously rendering such sites nearly invisible to Google searches and starving publishers of the web traffic needed to create ad revenue and sustain their ad business.  This had the effect of coercing publishers to transition to Google's AMP rather than choosing to adopt it on the merits and impeded competition in the online video advertising market.

298.    By contrast, YouTube was given premium placement in search results. In July 2020, the *Wall Street Journal* reported that Google gives preferential treatment to Defendant YouTube. Tests conducted by the *Journal* found that searching Google for videos delivered YouTube in results much more prominently than competing video providers, even when competitor videos had more engagement. Reflecting interviews with those familiar with the matter, the piece stated that Google engineers: "[M]ade changes that effectively preference YouTube over other video sources. Google executives in recent years made decisions to prioritize YouTube on the first page of search results, in part to drive traffic to YouTube rather than to competitors, and also to give YouTube more leverage in business deals with content providers seeking traffic for their videos."[47]

3.    Leveraging Ad Server and Chrome Browser Markets to Block OLV Advertisements from Playing

299.    As set forth in detail above, Google also leverages its power in its dominant ad server and Chrome Browser markets to render online video players incompatible with Google's

---

[47]  Sam Schechner, Kristen Grind & John West, *Searching for Video? Google Pushes YouTube Over Rivals*, WALL ST. J. (July 14, 2020), https://www.wsj.com/articles/google-steers-users-to-youtube-over-rivals-11594745232.

Chrome Browser and disable online video advertisements in an attempt to monopolize the online video advertising market.

### C.     Concealment of Conduct

300.     Defendants took steps to conceal their illicit and harmful conduct, both by failing to disclose the wrongful acquisition and maintenance of monopoly and market power through exclusionary acts in the relevant markets, and by affirmatively denying that it was engaged in such conduct. Affirmative statements and omissions, and Defendants' nondisclosure that it had acted to forestall competition, served to fraudulently conceal Defendants' anticompetitive conduct and unlawful monopoly in the relevant markets.

## IX.     INTERSTATE TRADE AND COMMERCE

301.     The Defendants' conduct as alleged herein has had a substantial effect on interstate and intrastate commerce. At all material times, the Defendants participated in the conduct set forth herein in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

## X.     ANTITRUST HARM AND EFFECTS

### A.     Anticompetitive Effects and Harm to Competitors, Publishers, Customers, Competition, and Innovation

302.     Defendants' conduct goes far beyond aggressive competition.     Defendants' anticompetitive and predatory actions intend to, and in fact do, exclude, substantially foreclose and impair rivals and harm the competitive process in the Relevant Markets.  The conduct is not competition on the merits or otherwise privileged.  Moreover, the conduct has been systematically planned and thoroughly executed over many years; it is willful.

303.     Defendants' conduct harms consumers by depriving customers of valid competitive choice, degrading consumer privacy, degrading quality and variety of products and services

offered to consumers, stifling innovation and ultimately raising the prices of goods and services in the marketplace.

304.    Defendants' conduct harms competition, by artificially and unlawfully reducing and foreclosing competition, foreclosing competitors from meaningfully participating in purportedly neutral and unbiased competitive processes, including the serving of ads by a neutral ad server, and the ad auction and bidding processes, which are in fact skewed and rigged to favor Google and Google products and services; and surreptitiously altering algorithms and compatibilities with competing platforms.

305.    Defendants' conduct adversely affects competition and innovation, including by:

 i.    Raising prices paid by publishers for Google's ad server;

 ii.    Impairing the incentive of Google's competitors and potential competitors in the ad server, ad exchange, online video advertising and other relevant markets to undertake research and development, because they know that Google will be able to limit the rewards from any resulting innovation;

 iii.    Degrading or failing to deliver publishers' direct sold ads, particularly on high news days, which garner a significantly higher price for publishers and for which Google receives no take rate, and instead delivering cheaper AdX impressions resulting in the loss of revenue and the loss of direct ad campaigns for purposeful underdelivery and failure to properly serve of direct sold campaigns;

 iv.    Impairing the ability of Googles' competitors and potential competitors to obtain financing for research and development;

 v.    Impairing and excluding rivals from the ad server, ad exchange and online video advertising markets alleged herein by raising rivals' costs, blocking entry and expansion, and through other anticompetitive means;

 vi.    Inhibiting Google's competitors that nevertheless succeed in developing promising innovations from effectively competing in the relevant markets and marketing their improved products to customers;

 vii.    Reducing the incentive and ability of publishers and advertisers to directly deal with one another and contract for much more lucrative direct ad sales with a great ROI;

      viii.    Reducing the incentive and ability of advertising platforms, web application developers, and other competitors to innovate and differentiate their products in ways that will appeal to customers;

      ix.    Artificially inflating "take rates" paid by publishers and advertisers for ad exchanges;

      x.    Degrading the quality of ad server services;

      xi.    Reducing output in all of the Relevant Markets; and

      xii.    Reducing competition and the spur to innovation by Google and others that only competition can provide.

306.    In addition to economic harm in fact to customers and competitors, the exclusion of competitors from competing on the merits, and harm to consumers from thwarting competition on the merits, the Defendants' Anticompetitive Restraints also increase costs in distribution of products and services in the Relevant Markets; abuse Google's gatekeeping function and increases cost of market access across markets; and cause reverse network effects that result when Google's products and services are prominent and properly functioning, while those of competitors are downgraded and unlawfully shut down by Google.

307.    The Defendants' Anticompetitive Restraints lack any procompetitive justification. Moreover, the harm to competition in the ad exchange, ad server, and online video advertising markets from the Defendants' unlawful conduct more than offsets any pro-competitive benefits or justifications the Defendants offer.

308.    The purpose and effect of Defendants' conduct has been, and if not restrained, will be:

      i.    To preclude competition on the merits between competing online advertising platforms, advertisers seeking advertising space and publisher websites offering their "real estate" for ad placement;

      ii.    To preclude competition on the merits between Google's ad tech products and services and competing products and services;

iii.    To preclude potential competition between Google's Android OS and competing operating systems, other companies, and software apps whose use is facilitated by bundled Google products and services, which systems could otherwise choose to offer competing Internet and advertising platforms;

iv.    To maintain and extend Google's numerous monopolies including Internet Search, web browser, LMDOS, ad server, ad exchange, and online video advertising monopolies;

v.    To move toward and attain monopoly power in the colossally lucrative display advertising market, including the online video advertising, to the extent not already achieved; and

vi.    To transform the free and open architecture of the Internet and create a walled garden so that Google and YouTube can control and monetize publishers' news and other content.

309.    In light of the synergistic effect that Defendants have acquired from their antitrust activities in the Relevant Markets and the Adjacent Markets — all connected by an Internet platform that enables Google to gather and monetize massive consumer and competitor data for its targeted and location-specific advertising — Google's conduct has resulted in real harm to competition, consumers, and innovation.

310.    In the ad server market, Google has foreclosed competition by tying its DFP ad server to its ad exchange and steering auctions to Google's services and away from the other service providers. Google's practices have allowed it to charge supracompetitive prices for its ad servers, even though the servers are of lower quality than ad servers offered by competitors. Indeed, as noted above, Google has frequently degraded its ad server by limiting publishers' flexibility in how to set up their ad stack. Google has also stifled innovation by, for instance, blocking competition from other exchanges and killing header bidding, which had substantially increased publishers' yields. Moreover Inform, and others who invested years building internal ad sales teams and relationships with advertisers were deprived of their choice of a neutral ad server

to fairly and properly deliver their contracted for ad campaigns, harming competition in the ad server market. *See, e.g.*, ¶¶ 204, 229-239, 267-273.

311.    In the ad exchange market, Google's practices have increased the commission rate/fees publishers are paid in the ad exchange market and excluded exchanges from meaningful competition for high-value impressions. While Google's exchange competitors have lowered their take rates in response to competitive pressure, Google's has maintained or increased its take rate over time. Some of Google's competitors lowered their prices to 25% of what Google charged; meanwhile, Google increased its take rate from 20% in 2017 to 22% in 2019. Google's closest competitors charge between 5% and 15%. *See, e.g.*, ¶¶ 133-135.

312.    In the online video advertising market, Defendants' have excluded Inform and other competitors from the competing, effectively putting Inform out of business and wiping out competition on the merits. Google has foreclosed competition with direct ad sales through its use of, among other practices, Enhanced Dynamic Allocation. Destroying Inform and publishers' ability to carry out direct ad sales through EDA—constituted an exclusionary and unlawful scheme to exclude competition. As a result of Google's behavior, non-Google online video advertising platforms could not as effectively compete on quality (valuable impressions were appropriated for AdX), liquidity (volume was appropriated to AdX), or take rate. Through EDA and the discounting and downgrading of direct ad prices, Inform and other competing OLV advertising companies were excluded from competing on the merits, and were decimated and driven out of the market when their guaranteed direct ad sales did not deliver. Likewise as discussed above, the technological blocking, disabling and denial of operability of Inform and competitors' products excluded Inform and competitors in the online video advertising market from competing on the merits and drove them out of the market. *See, e.g.*, ¶¶ 240-273.

313.     As discussed above (¶ 205), Google's anticompetitive conduct has all but destroyed direct ad sales.  In 2014, when Google first began EDA, programmatic ad spend was approximately 20%.     In 2022, over 90% of all digital display ad dollars were estimated to transact programmatically, rendering, direct ad sales all but dead.

314.     Google's practices have also allowed it to take more money from advertisers for lower quality inventory and advertisers have paid higher prices to Google for lower quality ad inventory through Google's brokering services. A 2018 study by eMarketer, that focused on programmatically purchased ads across the open internet, found that programmatic ad prices have risen meaningfully across all major display categories: desktop, mobile, mobile app, and video. In 2018, the average digital advertisement sold for 12% more than it did in 2016, an increase approximately five times the prevailing rate of inflation. These price increases resulted in substantial part from Google's consolidation of the intermediation services market and Google's price increases for those services, and were largely borne by advertisers who paid Google for those services to broker the placement of their display ads on websites of lesser quality, rather than transacting with the direct ad sales teams like the one once established by Inform that were able to guarantee placement onto the high-value ad inventory of high-value websites, in fact maximizing advertisers ROI through Inform.

315.     Google's practices have also degraded the quality of the services in the ad exchange market, by allowing its own exchange to win more high-value impressions and lowering the quality of matches that competing exchanges can provide. What was once a highly competitive market over a decade ago has now become a market dominated by one firm. As a direct result of Google's anticompetitive conduct, several ad exchanges have left the ad exchange business, including

adBrite, Yahoo!, and the ADSDAQ exchange. Among the remaining major competitors, Rubicon has consistently lost money and been barely profitable.

316.    Google's systematic and predatory conduct across markets threatens to change the trajectory of digital and online competition permanently.  As has been recognized: "because it can be so difficult for courts to restore competition once it has been lost, the true cost of exclusion to consumer welfare — and its benefit to dominant firms — are likely to be understated."[48]

### B.    Anticompetitive Conduct Harms Inform and Other Competitors

317.    With control over each ad-tech product market, Google exacted supra competitive fees for inferior products and services from Inform, publishers and advertisers alike — for the sale of each impression. In fact, Google charged Inform at least three separate fees that Inform was aware of: (1) for the use of its dominant DFP ad server, by default, Google charges Inform and other publishers a fee to serve the impression; (2) Google charges a second revenue share fee for AdX (typically between 20% and 40%of the sale price) to manage the auction in its exchange; and (3) Google charges a third fee for the use of Inform's own customer data. On the advertiser side, Google charges a fee for its DSP service and then other fees for data analytics.

318.    While Inform used Google's DFP ad server for both direct and programmatic ads, Google's AdX ad exchange was intended only to sell Inform's remnant (leftover) ad inventory. Through the anticompetitive and deceptive acts set forth above, Google opened up all of Inform's ad inventory to Google's AdX, not only charging supra-competitive prices for remnant inventory but stealing Inform's most valuable lucrative direct ads and funneling them through Google's AdX ad exchange.  Only Google's monopoly power in the ad server and across markets made this

---

[48]  Andrew I. Gavil,  *Exclusionary Distribution Strategies by Dominant Firms: Striking a Better Balance*, 72 Antitrust L.J. 3, 33 (2004).

possible.  The harm to Inform was thus not only a supracompetitive take-rates from Google's AdX ad exchange, but in many instances it was theft of placement and the difference between 100% of a high-value direct ad and the shared revenue (50% or less) of a cheap programmatic ad. And, Inform was severely harmed when its products were degraded and did not function and when it was put out of business.  Thus, as a direct and proximate result of the Defendants' conduct, Inform's damages were *at least*: (1) the damages when a lucrative direct ad was replaced by a cheap programmatic ad; (2) a supracompetitive take-rate on programmatic ads; (3) the depressed rates at which Inform's direct and remnant ad inventory was sold; (4) the artificially inflated prices Inform paid for Google's services; (5) the loss of market share and opportunity to garner additional market share when Google falsely made Inform appear as if it could not perform; and (6) the loss of contracted for relationships due to Defendants' interference.  Inform also has enterprise damages for having been put out of business by Defendants' anticompetitive conduct. These same damages were suffered by competitors and customers in the Relevant Markets.

## XI.    CLAIMS

### COUNT I - VIOLATION OF SHERMAN ACT SECTION 2

(Monopoly and Monopoly Maintenance)
Against the Google Defendants

319.    Plaintiff repeats and incorporates by reference paragraphs 1 through 318 as if fully set forth herein.

320.    The Relevant Markets as defined herein are valid antitrust markets. As detailed above, Google has monopoly power in the Relevant Markets.

321.    The Google Defendants have willfully acquired, maintained and extended monopoly power through anticompetitive conduct in the markets for (1) publisher ad servers; (2) ad exchanges; (3) online video advertising as described above, including by (1) strategic

acquisitions of ad tech companies and online video platforms; (2) illegally tying separate products and services; (3) impeding competition through manipulation of the ad placement and ad auction through (i) processes such as Dynamic Allocation, Enhanced Dynamic Allocation, Last Look, and Minimum Bid to Win, (ii) secret programs such as Dynamic Revenue Share, Project Bernanke (and its variants), and (iii) deceptive algorithms that manipulate pacing and bypass direct ads on high news days; (4) exclusionary disablement and technological blocking of competitors' video players and other products and services; (5) deceptive use of Google products and services to gather and use market intelligence against competitors (6) exclusive dealing agreements and anticompetitive contracts; and (7) monopoly leveraging.

322.     Through the Defendants' Anticompetitive Restraints described in ¶ 15 and set forth above, the Google Defendants have willfully maintained, and unless restrained by the Court, will continue to willfully maintain and extend that power by anticompetitive, illegal, deceptive, and unreasonably exclusionary conduct.  The Google Defendants have acted with the intent illegally to maintain and extend their monopoly power in each of the Relevant Markets, and their illegal conduct has enabled them to do so in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

323.     There is no valid procompetitive business justification for the Defendants' anticompetitive conduct, and to the extent Defendants purport to offer one, it is pretextual and not cognizable.  Any procompetitive benefits of Defendants' conduct do not outweigh the anticompetitive harms.

324.     As a direct and proximate result of the Defendants' Anticompetitive Restraints, as defined above, competition and consumers will continue to be immediately and irreparably injured through the following:

    i.     Loss and degradation to competition in each of the relevant markets;

     ii.     Degradation of the quality of products and services offered to the consumer;

     iii.    Degradation of data protection and the privacy rights of consumers; and

     iv.    Curtailing and stifling of innovation by would-be competitors.

325.    As a direct and proximate result of Defendants' Anticompetitive Restraints, Plaintiff has suffered injury to its business and property. Defendants' Anticompetitive Restraints have directly caused significant monetary damages to Plaintiff's business and property.  The precise amount of damages Plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

326.    In addition, the Google Defendants' monopolization of the Relevant Markets are ongoing wrongs that cause incalculable and irreparable injury for which there is no adequate remedy at law.  Unless the Google Defendants are enjoined by appropriate Order of this Court, the asserted harm will continue unabated.

## COUNT II - VIOLATION OF SHERMAN ACT SECTION 2

(Monopoly Leveraging)
Against the Google Defendants

327.    Plaintiff repeats and incorporates by reference paragraphs 1 through 318 as if fully set forth herein.

328.    The Adjacent Markets as defined herein are valid antitrust markets. As detailed above, Google has monopoly power in the Adjacent Markets.

329.    Through the anticompetitive conduct described herein, the Google Defendants have used and leveraged their power in each of the Adjacent Markets and in the ad server market in an effort to gain monopoly power and further dominance in the ad exchange, ad server and online video advertising markets..  The Google Defendants have done so willfully, and unless restrained by the Court, will continue to willfully leverage that power by further anticompetitive, illegal,

deceptive, and unreasonably exclusionary conduct as described above. The Google Defendants have acted with the specific intent to illegally maintain and gain monopoly power in each of these markets, and their illegal conduct has enabled them to do so in violation of Section 2 of the Sherman Act, 15 U.S.C. §2 .

330. Defendants have the power to raise prices and exclude competition in the Adjacent Markets and the ad server market and have used that power in an attempt to monopolize the ad exchange and the online video advertising market.

331. The Google Defendants have used and leveraged their monopoly power and dominance in the Adjacent Markets and the ad server market to anticompetitively and illegally disadvantage and harm Inform and other competitors in the ad server, ad exchange, and online video advertising markets by raising their costs, making their product offerings less attractive, interfering with their product performance, illegally erecting barriers to entry into these markets, and quashing competition on the merits in these markets.

332. As a result of their illegal monopoly leveraging, the Google Defendants have monopoly power, or in the alternative have a dangerous probability of acquiring monopoly power, in the ad server, ad exchange and online video advertising markets.

333. As a direct and proximate result of Defendants' Anticompetitive Restraints and monopoly leveraging, and as set forth above, competition and consumers will continue to be immediately and irreparably injured through the following:

     i.     Loss and degradation to competition in each of the relevant markets;

     ii.     Degradation of the quality of products and services offered to the consumer;

     iii.     Degradation of data protection and the privacy rights of consumers; and

     iv.     Curtailing and stifling of innovation by would-be competitors.

334.     As a direct and proximate result of Defendants' Anticompetitive Restraints and monopoly leveraging, Plaintiff has suffered injury to its business and property. The Google Defendants' illegal conduct has directly caused significant monetary damages to Plaintiff.  The precise amount of damages Plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

335.     In addition, the Google Defendants' monopolization of the Relevant Markets and monopoly leveraging are ongoing wrongs that cause incalculable and irreparable injury for which there is no adequate remedy at law.  Unless the Google Defendants are enjoined by appropriate Order of this Court, the asserted harm will continue unabated.

## COUNT III - VIOLATION OF SHERMAN ACT SECTION 2

(Attempted Monopolization)
Against the Google Defendants

336.     Plaintiff repeats and incorporates by reference paragraphs 1 through 318 as if fully set forth herein.

337.     As detailed above, Google has monopoly power, or in the alternative, a dangerous probability of acquiring monopoly power, in the Relevant Markets.  To the extent Defendants contend Google does not have monopoly power for ad exchanges and/or online video advertising (through YouTube), Plaintiff asserts in the alternative that Defendants have attempted to monopolize the ad exchange and the online video advertising markets.

338.     The Defendants' Anticompetitive Restraints, as described in above, have created a dangerous probability that they will achieve monopoly power in the ad exchange market and the online video advertising market.

339.     The anticompetitive conduct set forth herein demonstrates that Defendants have a specific intent to achieve monopoly power in the ad exchange market and the online video advertising market.

340.     Defendants' Anticompetitive Restraints, including their unlawful practices in restraint of trade, are exclusionary with respect to competitors in the markets for ad exchanges and online video advertising.

341.     Defendants' numerous acquisitions set forth above likewise demonstrate specific intent to monopolize the markets for ad exchanges and online video advertising, as well specific intent to monopolize the ad server market.

342.     Plaintiff has been injured, and will continue to be injured, in its business and property by way of Defendants' conduct, including by way of overpaying for goods and services, being shut out of meaningful and fair participation in advertising exchange, having their products and services disabled and blocked from competing in the online video advertising market, having diminished and inferior choice of ad server and ad exchange, and being foreclosed from competing in the online video advertising market on the merits.

343.     There is no business necessity or other pro-competitive justification for Defendants' conduct.

COUNT IV - VIOLATION OF SHERMAN ACT SECTION 1 AND 2

(Unlawful Tying)
Against the Google Defendants

344.     Plaintiff repeats and incorporates by reference paragraphs 1 through 318 as if fully set forth herein.

345.    As detailed above, the Google Defendants have monopoly power in the ad exchange market and the online video advertising market through YouTube, including the power to control prices and exclude competition.

346.    Google has willfully and intentionally entered into anti-competitive, exclusionary, and unjustified agreements with publishers, advertisers, original equipment manufacturers, and others creating high barriers to entry and unreasonably excluding competition in the attendant markets as set forth above.

347.    Google tied its AdX ad exchange to its DFP ad server, thereby coercing publishers to enter contracts to license its DFP ad server.

348.    Google's DFP and Google AdX are separate and distinct products in separate product markets.

349.    Google AdX has monopoly power or, in the alternative, sufficient market power in the exchange market to coerce publishers to license DFP, thus restraining competition as to the DFP ad server.

350.    Google's tying arrangement affects a substantial volume of commerce in the ad server market and has substantially foreclosed competition in the publisher ad server market.

351.    Google's tying arrangement has excluded competition in the publisher ad server market and caused competing ad servers substantial damages as a direct and proximate cause of this unlawful conduct because Google has foreclosed other ad servers from competing for potential publishers and has deprived ad servers of other business for reasons having nothing to do with the merits of Google DFP or other ad server products.

352.    Google also tied its ad buying tools to its YouTube ad inventory, thereby coercing advertisers to purchase ads through Google's ad buying tools.

353.    Google and YouTube platform's  ad inventory and Google's ad buying tools are separate and distinct products in separate  product markets.

354.    Google and YouTube have monopoly power or, in the alternative, sufficient market power in the online video advertising market and the instream online video to coerce advertisers to purchase online video advertising through Google's ad buying tools, thus restraining competition in the markets for ad buying tools.

355.    Google's tying arrangement affects a substantial volume of commerce in the market for ad buying tools and has substantially foreclosed competition in the market for ad buying tools. This same tying arrangement has also foreclosed competition in the market for online video advertising by, forcing advertisers and publishers into using Google ad YouTube products and services and directing advertisers ad spend away from Inform and competing online video advertising platforms.

356.    Google's tying arrangement has excluded competition in the market for ad buying tools and caused competing ad buying tools and online video advertising platforms substantial damages as a direct and proximate cause of this unlawful conduct. Google has foreclosed other ad buying platforms from competing for potential publishers and has deprived ad buying tools and platforms of other business for reasons having nothing to do with the merits of Google's ad buying tools or other ad server products.

357.    For the reasons set forth above, Google has violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

## COUNT V - VIOLATION OF CLAYTON ACT SECTION 3

### (Unlawful Tying )
### Against the Google Defendants

358.   Plaintiff repeats and incorporates by reference paragraphs 1 through 318 as if fully set forth herein.

359.   As detailed above, the Google Defendants have monopoly power in the ad exchange market and the online video advertising market through YouTube, including the power to control prices and exclude competition.

360.   Google has willfully and intentionally entered into anti-competitive, exclusionary, and unjustified agreements with publishers, advertisers, original equipment manufacturers, and others creating high barriers to entry and unreasonably excluding competition in the attendant markets as set forth above.

361.   Google tied its AdX exchange to its DFP ad server, thereby coercing publishers to enter contracts to license its DFP ad server.

362.   Google's DFP and Google AdX are separate and distinct products in separate product markets.

363.   Google AdX has monopoly power or, in the alternative, sufficient market power in the exchange market to coerce publishers to license DFP, thus restraining competition as to the DFP ad server.

364.   Google's tying arrangement affects a substantial volume of commerce in the ad server market and has substantially foreclosed competition in the publisher ad server market.

365.   Google's tying arrangement has excluded competition in the publisher ad server market and caused competing ad servers substantial damages as a direct and proximate cause of this unlawful conduct because Google has foreclosed other ad servers from competing for potential

publishers and has deprived ad servers of other business for reasons having nothing to do with the merits of Google DFP or other ad server products.

366.    Google also tied its ad buying tools to its YouTube ad inventory, thereby coercing advertisers to purchase ads through Google's ad buying tools.

367.    Google and YouTube platform's online video ad inventory and Google's ad buying tools are separate and distinct products in separate product markets.

368.    Google, through YouTube, has monopoly power or, in the alternative, sufficient market power in the online video advertising market to coerce advertisers to purchase online video advertising through Google's ad buying tools, thus restraining competition in both the markets for ad buying tools and the market for online video advertising

369.    Google's tying arrangement affects a substantial volume of commerce in the market for ad buying tools and has substantially foreclosed competition in the market for ad buying tools. This same tying arrangement has also foreclosed competition in the market for online video advertising by forcing advertisers and publishers into using Google ad YouTube products and services and directing advertisers ad spend away from Inform and competing online video advertising platforms.

370.    Google's tying arrangement has excluded competition in the market for ad buying tools and caused competing ad buying tools and online video platforms, including Plaintiff Inform, substantial damages as a direct and proximate cause of this unlawful conduct. Google has foreclosed other ad buying platforms from competing for potential publishers and has deprived ad buying tools and platforms of other business for reasons having nothing to do with the merits of Google's ad buying tools or other ad server products.

371.     For the reasons set forth above, Google has also violated Sections 3 of the Clayton Act, 15 U.S.C. § 14.

## COUNT VI - TORTIOUS INTERFERENCE

### Against Defendants Google and YouTube

372.     Plaintiff repeats and incorporates by reference paragraphs 1 through 318 as if fully set forth herein.

373.     Plaintiff has had customer contracts and customer relationships with various advertisers and publishers for more than a decade.   These customer contracts and customer relationships are valuable assets of Plaintiff.

374.     Without privilege, and without permission, authorization or even notice, Defendants Google and YouTube acted improperly and wrongfully by, *inter alia*, (1) approaching Plaintiff's customers with the intent to divert those customers from Plaintiff to Google and YouTube as described in ¶¶10, 274-281; (2) deceptively and falsely pacing Plaintiffs' ads to underperform; (3) impeding the delivery of Plaintiffs' direct ad sales through EDA; (4) disabling Plaintiffs' video advertisements from playing; (5) stealing Plaintiffs' proprietary data, pricing, and client lists to offer publishers, advertisers and creators an "NDN-like" offering for YouTube to steal Plaintiff's clients; and (6) interfering with Inform's business relationship with Yahoo and Yahoo's purchase of Inform.   In so doing, Google and YouTube used information, including confidential and proprietary information that Defendants had access to through the DFP ad server and Chrome Browser, and derived from its algorithms, which Plaintiff is forced to use to deliver advertisements, in order to make false or misleading claims to Plaintiff's customers and to falsely make it appear that Plaintiff could not perform and/or was struggling to perform under its contracts.

375.     Google and YouTube's actions were done with malice and with the specific intent to injure Plaintiff, by *inter alia* stealing Plaintiff's market share in online video advertising.

Google and YouTube's actions have disrupted Plaintiff's customer relationships and future business with such customers.

376.     Google and YouTube's illegal conduct has directly caused significant monetary damages to Plaintiff.  The precise amount of damages Plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

377.   Google and YouTube's actions show willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which would raise the presumption of conscious indifference to consequences.

COUNT VII – FRAUD

Against Defendants Google and YouTube

378.     Plaintiff repeats and incorporates by reference paragraphs 1 through 318 as if fully set forth herein.   Google and YouTube made a series of misrepresentations and material omissions to Plaintiff Inform related to how its DFP and AdX services operated with the intent to mislead Inform and with the intent for Inform to rely upon its misstatements and omissions to Inform's detriment.   These fraudulent statements and omissions include that various features of DFP and AdX would serve Inform's interests and maximize Inform's revenue when in fact Google was manipulating the results to take business away from Inform and divert it to YouTube.  Google also falsely represented that Google's products were working properly and that in order to understand and/or troubleshoot problems that Plaintiff believed it was experiencing, Google's products needed to be turned on and active when in fact such actions would harm Inform's business and benefit YouTube.   Google also falsely represented to Plaintiff Inform that its discussions and communications with Plaintiff Inform and access to Plaintiffs' client data and Inform's products were undertaken for the purposes of serving Inform's interests and maximize Inform's revenue. Google knew these representations were false.

116

379.    Google also withheld information material from Plaintiff Inform, materially omitting and failing to inform Plaintiff, *inter alia*, that it artificially structured the ad auction to preference itself and YouTube; that its algorithms deceptively and artificially lowered Inform's direct ad deals in order to permit Google's cheaper programmatic prices to win auctions; that it throttled Inform's direct ad sale and manipulated the pacing of Inform's direct ad sales; that it was using Inform's proprietary information to compete with Inform; and that it was cheating Inform out of earned revenue.

380.    Google and YouTube intended to induce Inform to rely on its misrepresentations and omissions.

381.    Inform in fact relied on Google's misrepresentations and omissions to enact and keep in place various features of DFP and AdX. Inform was unaware that Google was using its DFP, AdX, Chrome Browser and other products and services to, *inter alia*: (1) compete with and "outbid" Inform in the ad auction process; (2) open all of Inform's direct ad deals to auction against Inform's express instructions and misrepresent to Inform what was truly occurring; (3) artificially lower Inform's bids on already-sold direct ad deals; (4) purposefully slow the pacing of Inform's direct ad campaigns to make it appear that Inform could not perform; (5) steal Inform's client lists; (6) use Inform's client data, pricing and proprietary information to create offerings for YouTube to compete with Inform; (7) use Inform's client data, pricing and proprietary information to interfere with Inform's contracts; and (8) shut down Inform's video player and Inform-sold video advertisements.

382.    As a result of that reliance, Inform has sustained and continues to sustain significant revenue losses.

## COUNT VIII – REQUEST FOR PUNITIVE DAMAGES UNDER COMMON LAW AND O.C.G.A. § 51-12-5.1

### Against Defendants Google and YouTube

383.    Plaintiff repeats and incorporates by reference paragraphs 1 through 318 as if fully set forth herein.

384.    The actions of Defendants Google and YouTube against Inform establish willful misconduct, malice, fraud, wantonness, and/or oppression and an entire want of care, which demonstrate conscious indifference to the consequences of the Defendants' actions.

385.    Defendants Google and YouTube set out with the specific intent to cause harm to Inform and to put Inform out of business through, *inter alia*, their tortious conduct and fraud set forth herein. Punitive damages should be awarded to punish, penalize and deter Defendants Google and YouTube from future tortious conduct directed at competitors.

386.    Absent Defendant Google and Defendant YouTube's willful, malicious, fraudulent, wanton, and/or oppressive conduct, and an entire want of care, Plaintiff Inform's trajectory and the trajectory of online video advertising sales demonstrate that Plaintiff Inform would be a Multi-Billion dollar company today.  Under O.C.G.A. § 51-12-5.1(f) there is no limit to the amount which may be awarded as punitive damages against Defendant Google and Defendant YouTube, both of which were active tortfeasors.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter a final judgment against each Defendant as follows:

1.  A declaratory judgment finding that the Google Anticompetitive Restraints constitute unreasonable restraints of trade and are illegal under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act;

2.  A preliminary, and thereafter permanent, injunction as follows:

   a.  prohibiting each Defendant from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out or renew any of the Google Anticompetitive Restraints as alleged herein or any other similar restraint having a similar purpose or effect in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, *et seq.* and Section 3 of the Clayton Act, 15 U.S.C. § 14;

   b.  imposing certain affirmative obligations on Google regarding aspects of its corporate governance and corporate mandate, including requiring Google to sell to, or provide interconnection with, rivals in the relevant markets in order to lower entry barriers;

   c.  imposing necessary structural relief against Defendants including unwinding the 2008 Double Click acquisition and requiring that Defendants be legally separated into independent corporations to include, but not be limited to: (1) one separate and independent corporate entity for its flagship General Internet Search business; (2) one separate and independent corporate entity for its Internet AdX advertising exchange; (3) one separate and independent corporate entity for its Android mobile operating systems business; (4) one separate and independent corporate entity for its DFP Ad Server business; and (5) one separate and independent corporate entity for its Web Browser business;

   d.  requiring that a Corporate Monitor be put in place to assist in the breakup or allocation of business activities between and among the resulting entities designed to maximize competition and benefit to the consuming public *en masse*; that the Corporate Monitor be empowered to advise the Court as to further divestiture or reallocation of Google assets or further corporate governance changes or board membership changes;

3.  An award of monetary damages, including treble damages, punitive damages, enterprise damages, the costs of this action and reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

4.  An award of pre-judgement and post-judgement interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

5.  An award of such other relief as may be appropriate and as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues herein.

Respectfully submitted, this 28th day of April , 2023.

HERMAN JONES LLP

*/s/ John C. Herman*
John C. Herman
  (Ga. Bar No. 348370)
Peter M. Jones*
  (Ga. Bar No. 402620)
Carlton R. Jones*
  (Ga. Bar No. 940540)
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia  30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501
jherman@hermanjones.com
pjones@hermanjones.com
cjones@hermanjones.com
(*to be admitted *pro hac vice* in SDNY)

Serina M. Vash
  (NYS Bar No. 2773448)
HERMAN JONES LLP
153 Central Avenue #131
Westfield, New Jersey  07090
Tel:  (404) 504-6516
Fax:  (404) 504-6501
svash@hermanjones.com

Counsel for Plaintiff
INFORM INC.

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2023, I electronically filed the above document with the Clerk of Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By:   /s/ *Serina M. Vash*
      Serina M. Vash
       (NYS Bar No. 2773448)
       svash@hermanjones.com