# HERMAN JONES LLP
ATLANTA · NEWARK · SEATTLE

Serina Vash
svash@hermanjones.com

May 26, 2023

VIA ECF

The Honorable P. Kevin Castel
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street., Courtroom 11D
New York, New York 10007

>   Re: *In re Google Digital Advertising Antitrust Litig.*, No. 1:21-md-03010 (PKC); *Inform Inc. v. Google LLC*, et al. No. 1:23-cv-01530 (PKC)

Dear Judge Castel:

Plaintiff Inform Inc. respectfully submits this letter in response to Defendants Google LLC, Alphabet Inc. and YouTube LLC's (hereinafter collectively "Google" or "Defendants") pre-motion letter of May 19, 2023 (the "Ltr. Req."), seeking leave to file a motion to dismiss Inform's Second Amended Complaint (the "SAC"), No. 1:21-md-3010, ECF No. 535. There is no conference currently scheduled before the Court.

Pursuant to Your Honor's Individual Practices 3.A.ii and iv, a pre-motion letter "shall set forth in detail the legal and factual basis for the anticipated motion" so that the pre-motion letter and the response thereto may be "taken into account in deciding whether further leave to amend will be granted in the event, the motion to dismiss is granted." Indiv. Pract. 3(A)(iv). Inform therefore respectfully reserves the right to seek leave to amend the Second Amended Complaint, particularly if arguments are raised in any permitted motion that differ materially from those contained in Defendants' letter.

The Second Amended Complaint sets forth eight counts: (1) Monopoly and Monopoly Maintenance, in violation of Sherman Act, section 2; (2) Monopoly Leveraging, in violation of Sherman Act, section 2; (3) Attempted Monopolization, in violation of Sherman Act, section 2; (4) Unlawful Tying, in violation of Sherman Act, sections 1 and 2; (5) Unlawful Tying in violation of Clayton Act, section 3; (6) common law tortious interference; (7) common law fraud; and (8) a punitive damages claim under common law and O.C.G.A. § 51-12-5.1.

## I.    Google's Motion to Dismiss Inform's SAC is Without Merit

As set forth herein, because Google's proposed motion to dismiss Inform's SAC is meritless, Inform does not seek to further amend its complaint at this time. This is the fourth motion to dismiss Google seeks to file against Inform's complaint and it should be rejected. Unlike

any of the other cases in this MDL, the Eleventh Circuit Court of Appeals expressly rejected certain of the Defendants' contentions and has expressly held that Inform adequately pled antitrust injury and has therefore has antitrust standing. Opinion, *Inform Inc. v. Google LLC*, No. 21-13289, at 17 (11th Cir. Aug. 26, 2022) ("11th Cir. Opinion").

Defendants' claim that the Eleventh Circuit did not reach any of the merits of the case is belied by the Circuit Court's Opinion. Indeed, although Defendants argued both that Plaintiff's case was solely about "the industry-wide transition from Flash . . . to HTML5"[1] and that the Court should dismiss Plaintiff's claims under 12(b)(6),[2] the 11th Circuit rejected Defendants' self-serving "Flash-only" narrative and declined to dismiss Inform's case on 12(b)(6) grounds.[3]

Specifically the Circuit Court acknowledged Defendants' alleged anticompetitive conduct as pled in Inform's complaint, holding:

> Inform has alleged that it lost millions of dollars because Google excluded it from competing in the online advertising markets. The amended complaint also asserts that Google excluded all competitors from the online advertising markets by disabling and disparaging its competitors' products and services; illegally conditioning the purchase of ads on its subsidiary YouTube on Google's ad-buying tools; using its control over the dominant ad auction to preference its own offerings and disadvantage those of rivals; and purposefully rendering some of its dominant products and services incompatible with its competitors' offerings. Google allegedly did all of that to avoid and eliminate competition, rather than meet it on the merits. And in so doing, Google not only harmed its competitors, but also hurt consumers, allegedly degrading their privacy, stifling innovation, raising prices, and decreasing the quality and variety of products available to consumers. These allegations suffice to establish antitrust injury at the pleading stage.

11th Cir. Opinion at 15. The Circuit Court also found that Inform's desire to gain access to the relevant markets is "entirely consistent with increasing competition." *Id*. at 17.

## II. Inform Has Plausibly Alleged that Google Monopolized or Attempted to Monopolize the Ad Server, Ad Exchange and Online Video Advertising Markets.

Plaintiff Inform's SAC more than satisfies the pleading standard for federal antitrust cases. In Counts I, II and III, Plaintiff alleges a series of anticompetitive restraints, the majority of which this Court has already found plausibly violate federal antitrust laws in the bellwether Motion to Dismiss the States' Third Amended Complaint. September 13, 2022 Opinion and Order on State AG's Motion to Dismiss, ECF No. 308 (hereinafter the "MTD Opinion"). The SAC details how

---

[1] Appellee's Brief, *Inform Inc. v. Google LLC*, No. 21-13289, at 3 (11th Cir. Jan. 18, 2022) ("Appellee Brief")
[2] *Inform Inc. v. Google LLC*, No. 21-13289, at 38-56 (11th Cir. Jan. 18, 2022) ("Appellee Brief")
[3] "Finally, the Google defendants ask us to alternatively affirm the district court based on the merits of its Rule 12(b)(6) arguments—even though the district court has never reached those arguments. We decline." Opinion, Inform Inc. v. Google LLC, No. 21-13289, at 17 (11th Cir. Aug. 26, 2022) ("11th Cir. Opinion").

Hon. P. Kevin Castel
May 26, 2023
Page 3

Google illegally and willfully maintained, extended and attempted to extend its monopoly of the markets plead therein in violation of §2 of the Sherman Act, 15 U.S.C. §2. SAC ¶¶ 86, 89, 95-106, 163-300. Google does not dispute that Inform's SAC states claims for relief under Sections 2 of the Sherman Act.

Section 2 of the Sherman Act makes it illegal to acquire or maintain monopoly power through improper means, or attempt or conspire to do so. 15 U.S.C. § 2.  "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *see also Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293–94 (11th Cir. 2004).

**Monopoly and Attempted Monopoly (Counts I and III)**

Defendants do not dispute that Counts I and III plausibly allege monopolization and attempted monopoly of the ad server and ad exchange markets, and that the majority of the conduct alleged is likewise anticompetitive in the online video ("OLV") advertising market.  Notably, Defendants do not dispute any of the market definitions set forth by Plaintiff Inform, nor do Defendants dispute Plaintiffs' allegations of market power in five of the six markets pled. Moreover, Plaintiff Inform has expressly pled that Defendants' numerous acquisitions and alleged anticompetitive conduct demonstrate specific intent to monopolize and attempt to monopolize the relevant markets,  *see e.g.*, SAC ¶¶ 96, 106, 339-341, and Defendants have not challenged these allegations as properly demonstrating specific intent.

Instead, Defendants take aim only at the alleged *market share* of the online video ("OLV") advertising market (Ltr. Req. at 1-2) and specific instances of conduct that are part and parcel of Defendants' overarching course of conduct, referred to in the SAC as "Defendants' Anticompetitive Restraints" (SAC ¶¶15-16): (1) Defendants' acquisitions; (2) hashing of user ids; (3) default browser and search installation contracts; (4) whitelisting of YouTube and the anticompetitive transitioning from Flash to HTML5; and (5) Google's auction manipulations and bypassing guaranteed ad contracts, particularly on high volume news days.[4]  Each of these specific allegations are to be taken as true at this stage.  Rather than reviewing these specific allegations individually, Inform has defined Defendants' course of conduct as an interwoven scheme and defined it as such throughout the SAC.

---

[4] To the extent that Google's proposed motion to dismiss speaks to specific allegations in the SAC – rather than particular claims – Google's motion to dismiss is improper. "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original); *see also In re Am. Express Anti-Steering Rules Antitrust Litig.*, 343 F. Supp. 3d 94, 100 (E.D.N.Y. 2018) (explaining that "a defendant may not simply seek adjudication of facts in a complaint that are not dispositive of any of the pleas for legal redress"). Google cannot use a Rule 12(b)(6) motion to cherry pick apart Inform's antitrust claims. *See Am. Express*, 343 F. Supp. at 100-01 (defining Section 2 claim broadly to include all "monopolistic activity").

Hon. P. Kevin Castel
May 26, 2023
Page 4

Even if they prevail on their proposed motion, Defendants have conceded that Plaintiff has stated claims as to each of Counts I, II and III. Thus, if this Court determines that the allegations of conduct Defendants take issue with are not anticompetitive standing alone, they remain relevant as part of Defendants' Anticompetitive Restraints (SAC ¶¶ 15-16) and must stand at this stage of the litigation. As this Court pointed out: "In assessing whether conduct is anticompetive, it is often necessary to examine other market conduct, including practices that are perfectly lawful." MTD Opinion at 40.

### Plaintiff Adequately Pleads Monopoly Power in the Online Video Advertising Market

Monopoly power may be shown either through circumstantial or direct evidence, including whether the defendant behaves like a monopolist. *Tops Markets, Inc. v. Quality Markets, Inc*., 142 F.3d 90, 98 (2d Cir. 1998)(monopoly power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market"); *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001). Where there is direct evidence that a defendant has controlled prices or excluded competition, the existence of monopoly power is clear. *See Microsoft Corp*., 253 F.3d at 51. Absent direct evidence, the "existence of [monopoly] power ordinarily may be inferred from the predominant share of the market," which acts as a proxy for monopoly power. *Grinnell*, 384 U.S. at 571.

Plaintiff Inform has clearly set forth conduct that (1) the Court has already determined is plausibly "predatory or anticompetitive"; (2) demonstrates that Inform and other competitors were in fact excluded from the OLV advertising and relevant markets; and (3) demonstrates facts that amplify Defendants' market power in the OLV advertising market and sets forth barriers to entry (*see e.g*., SAC ¶¶ 158-161). As such, Defendants' motion would be futile.

Regarding attempted monopolization, a plaintiff need only allege that the defendant is close to achieving monopoly power in the relevant market. "[W]hether a dangerous probability of success exists is a particularly fact-intensive inquiry," and a court needs be "mindful that [this]. . . is a question of proximity and degree." *Microsoft Corp*., 253 F.3d at 80 (citations omitted); *see generally Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (to determine dangerous probability of monopolization courts consider defendant's ability to lessen or destroy competition in market). Plaintiff Inform has more than sufficiently alleged the same.

### Defendants Mischaracterize Inform's Allegations of Anticompetitive Conduct

Inform plainly alleges that Defendants "engaged in a series of inorganic strategic acquisitions, anticompetitive contracts and anticompetitive conduct - carried out through its own digital products and services - designed to thwart competition on the merits." SAC ¶15. The SAC then sets forth the acquisitions, anticompetitive tactics and conduct, anticompetitive contracts and allegations of monopoly leveraging that comprise Defendants' Anticompetitive Restraints; Defendants' intended anticompetitive course of conduct across markets. The SAC also expressly

Hon. P. Kevin Castel
May 26, 2023
Page 5

states that Defendants' conduct demonstrates willfulness and specific intent to monopolize and attempt to monopolize the relevant markets. *See e.g.*, SAC ¶¶ 96, 106, 339-341.

Google's attempt to isolate, analyze, and cut away specific instances of conduct ignores the allegations of the SAC that detail Google's multifaceted anticompetitive scheme and its interrelated component parts. Where alleged exclusionary and anticompetitive conduct involves the interaction and combined effects of multiple aspects of a defendant's scheme, the determination of whether a plaintiff has plausibly alleged anticompetitive conduct requires not only examination of the described aspects but also consideration "as part of a broader alleged pattern of conduct." *See* MTD Opinion at 40; *see also City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376, 1378 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."). Nonetheless, the specific instances of conduct set forth in the SAC are anticompetitive.

**Acquisitions Were Anticompetitive**. Plaintiffs properly plead the willful acquisition of numerous entities, including DFP and AdMeld, and that the way in which Defendants used those acquired companies to further their monopolistic goals was both anticompetitive and demonstrates specific intent to monopolize the relevant markets. SAC ¶¶ 86, 90, 95-106. These allegations are properly pled both as a history of how Google came to be the dominant player and also because the acquisitions themselves were anticompetitive. Defendants very same arguments concerning the acquisitions have already been asserted and rejected at the motion to dismiss stage by Judge Brikema in the Eastern District of Virginia.

**Hashing User Ids Is Anticompetitive.** As set forth in the SAC, hashing of user ids that belong to competitor Inform and publishers was part of Defendants' scheme to monopolize the ad server market and thwart Plaintiff's and other competitors' ability to compete. SAC ¶ 268. Inform clearly alleges that user IDs belong to Inform and publishers, and that Google's hashing of those user IDs affirmatively interferes with (1) Inform and publishers' ability to properly bill their clients, (2) advertisers' ability to understand their return on investment with competing ad tech products; and (3) parties' on both sides ability to gauge the efficacy of ad spend, understand their ROI and choose among competing products on the merits. SAC ¶ 186. The SAC also details economic harm to Inform and others. SAC ¶ 268-270. As the very purpose of hashing the user ids – as alleged – is to obscure and impede competition, the practice is anticompetitive. *Id*.

**Setting Browser Defaults Is Anticompetitive**. The SAC articulates clearly that the anticompetitive contracts that proliferated the Chrome browser on both Android, Apple and other devices was part of the overall scheme to dominate online advertising and specifically online video advertising. SAC ¶¶ 289-290 The dominant Chrome Browser now serves as a way for Google to control the entry points for its core markets: Internet Search and digital advertising, including online video advertising (SAC ¶165, 291) and is *the* piece of ad tech that controls whether video advertisements are audible, viewable and viable. SAC ¶¶ 248, 255-260.

Hon. P. Kevin Castel
May 26, 2023
Page 6

**Bypassing Direct Deals on High News Days Is Anticompetitive.** Firmly in control of ad serving, Google's DFP ad server manipulated the delivery of ads sold by Inform, particularly on high traffic news days. SAC ¶¶ 229-230. On these high traffic news days, when ads would become significantly more valuable, Google manipulated its auctions, using DFP algorithms to ignore the influx of additional publisher ad inventory for direct ad campaigns and strictly fill them using Google's AdX ad exchange. SAC ¶¶ 231-232. Neither Inform's direct ad sales nor other ad exchanges were offered an opportunity to fill this most lucrative ad inventory. SAC ¶232. Instead, Google's ad server over-delivered less valuable AdX advertisements, preventing Inform's guaranteed ads from even being eligible to be served. SAC ¶ 230.

**Google's Whitelisting of YouTube and the Way In Which It Carried Out its Flash Transition and Ad Blocking Was Anticompetitive.** Despite the fact that Google's argument has been twice rejected, including by the Eleventh Circuit, Defendants continue to falsely assert that "[t]he crux of Inform's complaint [is] Google's transition from Flash to HTML5"[5] and that the "industry-wide transition . . . does not constitute anticompetitive conduct." Ltr. Req. at 2-3. To be clear: Inform alleges that the way in which Defendants carried out the transition was anticompetitive. Specifically, Plaintiff clearly alleges that Defendants whitelisted YouTube – they exempted YouTube – from the negative effects of the transition from Flash to HTML5 and the attendant loss of revenue. SAC ¶¶ 259-260. "*YouTube was both surreptitiously prepared in advance for the transition and also whitelisted so that Flash ad campaigns and Flash creatives continued to play on YouTube while they were blocked for Inform and others.*" SAC ¶ 244. Additionally, any publisher or advertiser who migrated to a Google product or service was likewise unaffected, (SAC ¶ 253), and those who did not migrate to Google had their ads "intelligently paused" - that is their ads did not reach the user (SAC ¶ 248).

So, if an advertiser ran their ad on YouTube or a publisher or advertiser transitioned to using a Google product – rather than continuing to place ads or offer ad inventory through Inform or another competitor – Flash ads would continue to play. The Eleventh Circuit acknowledged that based in part upon Plaintiff's allegations concerning the Flash transition, Plaintiff suffered antitrust injury and had antitrust standing. 11th Cir. Opinion at 6-7, 17. Moreover, "[U]nder *Berkey Photo*, when a monopolist combines product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits and to impede competition, its actions are anticompetitive under the Sherman Act. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 (2d Cir. 2015)(citations omitted) (citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979)).

**Enhanced Dynamic Allocation.** Google takes final aim at Enhanced Dynamic Allocation ("EDA"), already found to be anticompetitive, by suggesting that the claim is untimely because

---

[5] "[T]he First Amended Complaint ("FAC") alleges only that Plaintiff was harmed by the industry-wide transition from Flash ("a proprietary technology owned by Adobe" to display videos on websites) to HTML5 (a free, competing, open-standard technology)." Appellee's Brief, *Inform Inc. v. Google LLC*, No. 21-13289, at 3 (11th Cir. Jan. 18, 2022) ("Appellee Brief").

the continuing misconduct began more than four years before Inform filed its case. As an initial matter, this Court already declined to adjudicate at the pleading stage Google's laches defense to the states' equitable claim concerning EDA. MTD Opinion at 80-87. Inform, which filed suit before the states, alleges in the SAC that EDA occurred and continued during the four years before Inform filed suit. SAC ¶¶ 198-223. Moreover, Inform has specifically alleged purposeful deceit, fraud, and concealment (SAC ¶ 300); fraudulent misstatements, omissions, and outright lies as respects EDA (SAC ¶ 201); misstatements and deception in connection with the DFP acquisition (SAC ¶ 98-99); and separate claims for fraud (SAC ¶¶ 378-382) and punitive damages (SAC ¶¶ 383-386).

### III. Inform Has Adequately Pled Monopoly Leveraging (Count II)

Defendants do not dispute Inform's leveraging claims insofar as they relate to the ad server and the Chrome browser, but dispute allegations of leveraging concerning the Internet Search market. Ltr. Req. at 4 (citing SAC ¶¶ 293-298). Thus, even if Defendants' proposed Motion is granted, Count II for Monopoly Leveraging would remain intact.

"A claim for monopoly leveraging requires that 'defendant: (1) possessed monopoly power in one market; (2) used that power to create a dangerous probability of monopolizing another market; and (3) caused injury by such anticompetitive conduct.'" *Olde Monmouth Stock Transfer Co., Inc. v. Depository Tr. & Clearing Corp.*, 485 F. Supp. 2d 387, 395 (S.D.N.Y. 2007) (quoting *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 246-47 (S.D.N.Y. 2004). The Supreme Court has recognized that such "monopoly leveraging" can violate § 2 of the Sherman Act. *See Verizon Commc'ns, Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004) (analyzing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993)).

As respects the allegations Defendants dispute, Plaintiff alleges that Google leveraged the Internet Search market to coerce publishers to use accelerated mobile pages (AMP) and preference their online advertising inventory on YouTube. As set forth in the SAC, AMP was specifically designed to be incompatible with Flash advertisements. SAC ¶ 265. To coerce publishers to adopt AMP, Google conditioned premium treatment in Google Search on publishers' migration to AMP. SAC ¶ 297. Google purposefully dropped the PageRank of sites that did not adopt AMP, maliciously rendering such sites nearly invisible to Google searches and starving publishers of the web traffic needed to create ad revenue and sustain their ad business. *Id.* This coerced use of AMP further forced publishers off of Flash (where the publishers could control the audibility, viewability and thus viability of the advertisements) and onto HTML5, where Google controlled both audibility and viewability of the advertisement through its Chrome browser; further forcing use of Google products and services as the only viable option. SAC ¶297. These actions are anticompetitive under the Sherman Act. *See Actavis,* 787 F.3d at 654.

### IV. Inform Has Adequately Pled Unlawful Tying (Counts IV and V)

In Counts IV and V, Inform plausibly alleges illegal tying, in violation of Sherman Act sections 1 and 2 (Count IV) and Clayton Act section 3 (Count V). "The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 11 (1984).

"To state a valid tying claim under the Sherman Act, a plaintiff must allege facts plausibly showing that: (i) the sale of one product (the tying product) is conditioned on the purchase of a separate product (the tied product); (ii) the seller uses actual coercion to force buyers to purchase the tied product; (iii) the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product; (iv) the tie in has anticompetitive effects in the tied market; and (v) a not insubstantial amount of interstate commerce is involved in the tied market." *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016); *accord E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006).

**The Unlawful Tying of YouTube Ad Inventory.** Defendants acknowledge that Inform properly alleges both coercion (SAC ¶¶ 178-83) and that Defendants' illegal tie foreclosed and restrained competition on the merits for online video advertising and its component markets and instream online video advertising. SAC ¶¶ 182, 188, 302, 308. Defendants' focus on the fact that their coercion is of the *advertisers* (Ltr. Req.at 3) is of no moment. Section 4 of the Clayton Act provides that anyone injured "in his business or property by reason of anything forbidden in the antitrust laws" may bring a claim. Moreover, illegal tying arrangements can be challenged both by the buyers who are forced to buy the tied product to obtain the tying product, and by the competitors whose businesses are restrained from entering or foreclosed from competing. *See e.g.*, *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249 (10th Cir. 2006). As set forth in the SAC, "Inform and Google are competitors in the online video advertising market, offering a platform connecting publishers with advertisers and competing for both sides' business." SAC ¶ 58; 11th Cir. Opinion at 15.

**The Unlawful Tying of DFP to AdX.** This Court has already determined that the allegations concerning Google "requiring publishers to sign a combined contract that included both Google's DFP ad server and Google's AdX exchange" are proper at this stage. MTD Opinion 16, 18. Despite their aversion to "hashing" allegations, Google does just that pulling from distinct allegations concerning historic bidding practices and later-developed advancements to mischaracterize Plaintiff's allegations. As the SAC makes clear, in order to receive live competetive bids offered by AdX alone, a customer also had to purchase DFP. Plaintiff alleges both. SAC ¶¶ 7, 25, 60.

Hon. P. Kevin Castel
May 26, 2023
Page 9

### V. Within Its Broad Powers, The Court Can Fashion Relief

Defendants assert that Inform is not entitled to injunctive relief because Defendants' anticompetitive conduct has put Inform Inc. out of business and stolen its market share. However, it is beyond dispute that the Court has broad power to fashion relief as it sees fit. *See Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972); *see also Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 131-33 (1969). Accordingly, when Inform prevails, it should be free to seek a remedy within the Court's broad remedial powers.

### VI. Failure to Move to Dismiss Tortious Interference, Common Law Fraud and Punitive Damages Claims (Counts VI, VII and VIII)

Unlike its Motions to Dismiss the Advertiser and Newspaper Plaintiffs cases, Defendants do not seek to move to dismiss Plaintiff's claims for common law tortious interference, fraud, and punitive damages. Pleadings in each of the matters before this Court are still being settled, and Inform respectfully submits that to the extent this Court determines any claim is inadequately pleaded, Inform will seek to amend its complaint to conform to this Court's Order and to rectify any perceived deficiency, particularly in light of Defendants' position.

### VII. The Court Should Lift the Stay: Google Should Not Be Permitted to Thwart Coordination of the Inform Matter

As this Court noted, the Inform Matter is squarely within the ambit of the ad tech cases before the Court. In order to assure the coordination anticipated by the JPML and the parties, the stay should be lifted and discovery by and from Inform should begin forthwith.

First, the Eleventh Circuit has already reversed Defendants on their motions to dismiss. 11th Cir. Opinion at 18. Secondly, issues concerning YouTube and Search overlap with numerous other MDL Complaints. The Publisher Class action specifically names YouTube as a defendant and concerns advertising related to YouTube. ECF No. 408. Additionally, the 2.25 million documents already produced to all Plaintiffs in this MDL (with exception of Inform) concern a "multi-pronged . . . digital advertising investigations . . .[into] online advertising, online search, and mobile operating systems," which was coordinated with DOJ's own multifaceted investigation. (January 31, 2022 Letter from Justina Sessions, Dkt. 239-1). The same is true of the additional 800,000 set to be produced next week. To date, the ad tech investigation and the search investigation have included all relevant documents and references to YouTube, the online video advertising market and the instream online video advertising market.[6]

Discovery on claims concerning leveraging are moving forward for the Daily Mail and the Direct Action Newspaper Plaintiffs and should likewise move forward for Inform. Finally, Google's mischaracterization of Inform's Flash allegations aside, these are but a single instance of

---

[6] Please recall that the State AG's Second Amended Complaint pled anticompetitive conduct in online video advertising markets. ECF 81, 152.

Hon. P. Kevin Castel
May 26, 2023
Page 10

anticompetitive conduct in the overall scheme.  There are many differences among the plaintiffs in this MDL, with many asserting one or more anticompetitive acts that do not overlap.  Inform should be treated no differently.

For the reasons set forth above, Plaintiff Inform believes that Defendants' motion is meritless and that the stay of discovery should be lifted immediately to permit the coordination that the JPML ordered when it transferred the Inform Action here and the coordination that Google itself sought in the first instance when it filed to have these cases placed into this coordinated multidistrict litigation.  Plaintiff likewise requests an opposition brief of 30 pages.

We thank the Court for its consideration of this matter.

                                                                       Respectfully submitted,

/s/ *Serina M. Vash*

SERINA M. VASH
New York Bar No.: 2773448
svash@hermanjones.com
**HERMAN JONES LLP**
153 Central Avenue, # 131
Westfield, NJ 07090
(404) 504-6516

JOHN C. HERMAN (admitted *pro hac vice*)
jherman@hermanjones.com
**HERMAN JONES LLP**
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA 30326
(404) 504-6555
(404) 504-6501 (fax)

Counsel for Plaintiff Inform Inc.

cc: All Counsel of Record