N5GVGOOC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE GOOGLE DIGITAL ADVERTISING    21 MD 3010 (PKC)
ANTITRUST LITIGATION

                                        Conference

------------------------------x

                                    New York, N.Y.
                                    May 16, 2023
                                    2:00 p.m.

Before:

                  HON. P. KEVIN CASTEL,

                              District Judge

                    APPEARANCES

KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC
     Attorneys for Associated Newspapers
BY:  JOHN THORNE

GIRARD SHARP LLP
     Attorneys for Plaintiff Advertisers
BY:  JORDAN ELIAS

HERMAN JONES LLP
     Attorneys for Direct Action Newspaper Plaintiffs
BY:  JOHN HERMAN
     SERINA M. VASH

LANIER LAW FIRM
     Attorneys for State Plaintiffs
BY:  ZEKE DeROSE III

AHDOOT & WOLFSON
     Attorneys for Advertiser Plaintiffs
BY:  HENRY KELSTON

BOIES SCHILLER & FLEXNER
     Attorneys for Publisher Plaintiffs
BY:  DAVID BOIES
     PHILIP C. KOROLOGOS

N5GVGOOC

                           APPEARANCES (continued)

KOREIN TILLERY PC
        Attorneys for Plaintiff The Nation Company LP
BY:   CHRISTOPHER M. BURKE
        WALTER W. NOSS
        KATE LV
        GEORGE A. ZELCS

ZWERLING SCHACHTER & ZWERLING
        Attorneys for Plaintiff SPX Total Body Fitness
BY:   JESSICA HERMES

UNITED STATES DEPARTMENT OF JUSTICE
        Attorneys for United States
BY:   JULIA TARVER WOOD

FRESHFIELDS BRUCKHAUS DERINGER US LLP
        Attorneys for Defendant Google LLC
BY:   ANDREW EWALT
        ERIC MAHR
        ROBERT J. McCALLUM

CRAVATH SWAINE & MOORE
        Attorneys for Defendant Meta
BY:   KEVIN J. ORSINI

N5GVGOOC

1          THE COURT:  This is *In Re Google Digital Advertising*

2     *Antitrust Litigation*.

3          If I may please have the appearances for the

4     plaintiffs.

5          MR. BOIES:  Good afternoon, your Honor.

6          David Boies of Boies, Schiller & Flexner.  With me at

7     counsel table is my partner Philip Korologos.

8          MR. KOROLOGOS:  Good afternoon.

9          THE COURT:  Afternoon to both of you.

10         MR. DeROSE:  Good afternoon, your Honor.

11         Zeke DeRose for the Lanier Law Firm, on behalf of the

12     states.

13         THE COURT:  All right.

14         MS. VASH:  Good afternoon, your Honor.

15         Serina Vash from the law firm of Herman Jones, here on

16     behalf of the direct action newspaper plaintiffs; and also

17     representing Inform, Inc., recently transferred into the MDL.

18         THE COURT:  Yes.  Okay.  Thank you very much.

19         Any other plaintiffs making an appearance?

20         MR. ELIAS:  Good afternoon, your Honor.

21         Jordan Elias with Girard Sharp LLP, for the advertiser

22     class plaintiffs.

23         THE COURT:  All right.

24         MR. KELSTON:  Henry Kelston of Ahdoot & Wolfson, also

25     for the advertising class plaintiffs.

N5GVGOOC

1          THE COURT:  All right.

2          MR. THORNE:  Afternoon, your Honor.

3          John Thorne for The Daily Mail.

4          THE COURT:  Thank you.

5          MS. HERMES:  Jessica Hermes, Zwerling, Schachter &

6  Zwerling, on behalf of the SPX plaintiffs.

7          THE COURT:  All right.

8          Anyone else making an appearance?

9          I think we have an "also present" from the Department

10  of Justice.

11          MS. WOOD:  Good afternoon, your Honor.  Very pleased

12  to be here as a guest appearance.

13          Julia Tarver Wood, on behalf of the United States in

14  the EDVA action.

15          THE COURT:  Well, thank you so much for being here.

16          MS. WOOD:  My pleasure.

17          THE COURT:  All right.

18          So I was delighted to receive the letter informing me

19  of -- oh, let me get the appearance from the defendants.  I see

20  Mr. Mahr there and -- yes.

21          MR. EWALT:  Good afternoon, your Honor.

22          Andrew Ewalt from Freshfields Bruckhaus Deringer, on

23  behalf of the Google defendants, with my colleagues Rob

24  McCallum and Eric Mahr.

25          THE COURT:  All right.

N5GVGOOC

1          Good afternoon.  Good to see you.

2          MR. ORSINI:  Good afternoon, your Honor.

3          Kevin Orsini, Cravath, Swaine & Moore, on behalf of

4   Meta.

5          THE COURT:  All right.  Good to see you all.

6          Anyone else making an appearance?

7          First of all, thanks for coming on very short notice.

8   I think the circumstances warrant prompt attention.

9          So I'm grateful to Judge Brinkema and to Magistrate

10  Judge John Anderson for the work that -- particularly the work

11  of Judge Anderson on the draft coordination order, which I have

12  reviewed.  I reviewed his order and then the draft that has

13  been provided to me since then.

14         I also have the letter from Mr. Korologos and his

15  proposed pretrial order No. 7, and I have Mr. Orsini's

16  submission on behalf of Meta, which has a mark to show changes,

17  copy of the draft submitted by Google.

18         So let me first ask Google to bring me up to date, if

19  there is a more up-to-date, on the status of the draft that was

20  tendered to me.  Has that been circulated further following

21  Judge Anderson's order?

22         MR. EWALT:  Your Honor, the version that was filed

23  last night is the most current version that we've been

24  discussing with the Virginia plaintiffs, as well as Meta; and

25  that we had shared an earlier draft with the MDL plaintiffs

N5GVGOOC

1   during the negotiations.  But I believe the first time the MDL

2   plaintiffs had seen that order would have been when we made the

3   filing yesterday.

4               THE COURT:  Right.

5               So seen the update following Judge Anderson's order.

6               MR. EWALT:  Yes, your Honor.

7               THE COURT:  And so what you submitted to me, tell me

8   if this is correct, this is Google's version of what it thinks

9   the order should look like following Judge Anderson's ruling,

10  or has that been signed off by the Virginia plaintiffs?

11              MR. EWALT:  It is definitely Google's view of what the

12  coordination order we would ask the Court to enter.  I don't

13  want to put words in the Virginia plaintiffs' mouths, but it's

14  my understanding that they would not object if that order were

15  entered as well.

16              THE COURT:  All right.

17              Let me inquire of our visitor from the DOJ whether the

18  Virginia plaintiffs had a chance to look at the document that

19  purports to incorporate Judge Anderson's rulings and do you

20  have a view on that?

21              MS. WOOD:  Thank you, your Honor.

22              Yes, we did have a chance to review that before it was

23  submitted to the Court last night.  We do believe that it

24  faithfully implements the discussions we've had with Google, as

25  well as the preliminary rulings we've received from Judge

N5GVGOOC

1    Anderson.  Obviously it doesn't take into account the position

2    of the MDL plaintiffs or fully take into account all the

3    positions of Meta.  But it does reflect an agreement that we've

4    made with Google and an intent to incorporate Judge Anderson's

5    order into that agreement.

6              THE COURT:  Thank you so much.

7              Let me turn for the moment to Mr. Orsini.

8              And Mr. Orsini, I don't claim to be an expert on the

9    claims in the continued litigation, I have a few other things

10   to do.  But on a cursory review, it appeared to me I could only

11   find two passing references to the network bidding agreement.

12   Is that accurate?

13             MR. ORSINI:  That is accurate, your Honor.

14             My understanding of that complaint as a nonparty I

15   think is similar to what you are describing, which is that the

16   network bidding agreement, which is the source of all the

17   claims against my client in this action, is not at least front

18   and center or even directly challenged in the Virginia action.

19             We, however, have been subject to nonparty discovery

20   in the Virginia action already, some of which we believe will

21   likely include discovery materials related to the network

22   bidding agreement.  And that then gives rise to the few

23   discrete changes that we propose to your Honor, which I can

24   address at more length if you'd like.

25             THE COURT:  Well, here is the thought that I have:

N5GVGOOC

1     There is a stay in place in the MDL --

2               MR. ORSINI:  Correct.

3               THE COURT:  -- of discovery relating to the network

4     bidding agreement.  As of the moment, there are no live claims.

5     I guess there's a claim against you relating to the network

6     bidding agreement or --

7               MR. ORSINI:  So in the MDL, your Honor, yes, there are

8     a couple of different claims against us, Meta, related to the

9     network bidding agreement.  Texas and the other states did not

10    brung any claims against us.  There are putative class actions,

11    as well as the newspaper claims, all of which, as they relate

12    to Meta, concern the network bidding agreement.  And your Honor

13    is correct that the Court has stayed those claims.  There are

14    no nonnetwork bidding agreement claims against us and,

15    therefore, no nonstayed — if that's a word — or live, to use

16    your term, claims against us in the MDL currently.

17              THE COURT:  Right.

18              Well, what set of facts revives the network bidding

19    agreement?  I suppose one set of facts that would revive it

20    would be if, in considering a motion addressed to one of the

21    live claims against Meta, I were to reverse field and uphold

22    the NBA, then discovery -- or claim based on the NBA, discovery

23    then would be appropriate.  That would be one scenario, right?

24              MR. ORSINI:  So yes, your Honor.  Our view is we have

25    two pending motions to dismiss with respect to the claims

N5GVGOOC

1    against us.  We do not believe there are any set of facts that

2    they could plead or establish that would allow them to get a

3    different result than Texas did.  But while those motions are

4    pending, that discovery is stayed; and our interest here is

5    really to make sure that third-party discovery of us in

6    Virginia doesn't sort of circumvent your Honor's stay.

7            THE COURT:  Right.

8            Well, Mr. Orsini, I view the order, coordination

9    order, as doing a pretty good job on that front.  But what I

10   understand a second leg of your concern is that if, for

11   example, the stay were lifted, that -- and this would be a

12   concern of the plaintiffs, as well, that there be a fair

13   opportunity to conduct discovery of you and of Google with

14   regard to the NBA, if we got to that part.

15           MR. ORSINI:  I agree with that, your Honor.  I think

16   Google and the Department of Justice in their discussions have

17   done a very good job of addressing our first layer of concerns,

18   which is not circumventing the stay.  Obviously, Mr. Korologos

19   has a different view of that based on their submission.

20           The other concern we had is exactly as you identified.

21   If in the event your Honor decides somehow the private claims

22   sneak by, whereas the government claims couldn't, we're back at

23   it in this case.  And we've really identified two things that

24   we want to make sure we're protected on:

25           One is the way the coordination order is drafted,

1    effectively, the second that stay would be lifted, we're then

2    on the clock to decide whether or not we want to notice

3    depositions.  And we had initially proposed three days to get

4    all of the discovery we hadn't yet received.  I understand some

5    concerns that they may not be technologically feasible, so

6    we've extended it to ten.  But the point is, we just want to

7    get the documents as quickly as we can so we can get up and

8    running.  That's issue number one.

9           Issue number two is for any depositions that have

10   already taken place in the MDL or that are deemed to take place

11   in the MDL.  We would have the chance to go back and look at

12   those and see if there's something we need to cover.  Now, I

13   don't believe we actually put this in the order, your Honor,

14   but we'd be willing to even agree that if someone has already

15   been deposed in the MDL, our ability to take a second

16   deposition would be subject to good cause.  We don't want to go

17   back and repeat depositions just for the heck of it.  But if

18   there's areas that weren't covered that are specific to us or

19   the claims against us, we just want to have a fair shake to get

20   that discovery.

21          THE COURT:  Well, I haven't heard from the plaintiffs

22   yet, and I haven't made my mind up as to anything quite yet.

23   But it would seem to me that one solution to your specific

24   concern is an order from the Court which reflects the

25   discussion at this conference here today transcribed, and that

N5GVGOOC

```
1    provides that when, as, and if the stay is lifted, that the

2    Court, after hearing the parties, will enter an order

3    preserving and providing for discovery by all parties related

4    to the NBA.  If the NBA is in this case, if it should come to

5    that point, then the plaintiffs are entitled to take discovery

6    on that, and you are entitled to take discovery perhaps of

7    Google, perhaps of the plaintiffs, etc.  But the point would be

8    that rather than nailing down all the possibilities, it would

9    be a blanket statement that that's reserved until that point in

10   time; and then at that point in time, an appropriate order or

11   orders would be issued in the MDL providing and protecting

12   everybody's right to discovery there.

13            MR. ORSINI:  That would be entirely acceptable to us,

14   your Honor.

15            THE COURT:  Okay.  All right.  Thank you.

16            MR. ORSINI:  Thank you.

17            THE COURT:  All right.

18            Mr. Korologos, are you going to do the honors, or

19   Mr. Boies is going to do the honors?

20            MR. BOIES:  I will, your Honor.

21            THE COURT:  Listen, I appreciate the Herculean task

22   that the plaintiffs have here in terms of coordinating

23   disparate interests.  So I read the proposal through that lens

24   and with the greatest of charity.  It is pretty much a

25   noncoordination order.  It's:  Give us whatever happens in
```

N5GVGOOC

<pre>
 1   Virginia.  Give the MDL plaintiffs what happens in Virginia.
 2   Oh, if we have any interest, we'll notice a deposition,
 3   cross-notice a deposition in the Virginia action.
 4          I think Mr. Korologos's letter makes a pretty good
 5   case that that's not going to happen.  And there's a concern
 6   that Google may do that, thereby binding the parties, if Google
 7   serves a cross-notice of deposition.  And I think there's a
 8   provision in there if they do that, that that would count
 9   against their deposition limit.
10          I realize there are issues with regard to document
11   discovery, and I'm prepared to get into them today about search
12   terms, for example.  But the Eastern District of Virginia
13   action was filed in January.  Like the case with the Texas
14   plaintiffs in this case, there was a lot of pre-litigation
15   discovery, examinations taken by the Department of Justice.
16   And document production in the Eastern District of Virginia is
17   not scheduled to be substantially complete until July 7th.
18          In my case, it's scheduled to be substantially
19   complete by May 3rd.  I know that there's some back and forth
20   on whether that should be adjusted, and that's something that
21   needs to be discussed.  But there is basically -- I read in the
22   submission an antipathy to any kind of coordination beyond
23   getting whatever the plaintiffs can get out of Virginia.
24          Is that accurate or --
25          MR. BOIES:  I would put it a little bit differently.
</pre>

1          I think, first, we obviously agree that what we

2     produce here, should go there; what they produce there, should

3     come here.

4          Second, with respect to depositions, we agree that to

5     the extent we can, we ought to reduce the number of times that

6     a deponent is deposed more than once.  However, what we want to

7     be sure of is that we have a reasonable opportunity to review

8     the relevant documents prior to the time the deposition is

9     taken.  And what that means is if we have not had a reasonable

10    opportunity to get the documents before the deposition, we

11    ought not to be forced to take the deposition without the

12    documents, and we ought not to be precluded from taking that

13    deposition when we do have the documents.

14         So if we can have a situation in which if we've got

15    the relevant documents, then it's noticed down there, we have

16    to fish or cut bait.  I think that's fair.  What I think would

17    not be fair to say, if a deposition is noticed there and we

18    don't have the documents, that we should be precluded from

19    taking it when we do have the documents.

20         THE COURT:  I take your point and I agree with that

21    point.  I agree with that point.  So that's a good starting

22    place.  And there is language, you know, maybe it's -- language

23    can be imperfect at times, but that can address such a

24    situation.  And what I had in mind in that regard is that an

25    order from me, separate order in this MDL — it really doesn't

N5GVGOOC

1    relate to the Eastern District of Virginia — that the Court may

2    allow witnesses to be examined for additional time beyond the

3    limits in the coordination order if a party produces documents

4    other than in a timely fashion or other than by the deadline

5    for substantial completion of production and those documents

6    impact the deposition of the witness, so that you would have

7    additional time.

8           Now, what my thought is, is I don't want to engage in

9    a practice or a mechanism that impedes or impairs the progress

10   of the Eastern District of Virginia case.  I'm very sensitive

11   to that.  So if, for example, you were deprived of a full and

12   fair opportunity to examine because of late production of

13   documents, then I would schedule that additional time after the

14   close of fact discovery in the Eastern District of Virginia, so

15   there would not be competition for time.  Because it is an

16   ambitious schedule, there's no question about that.

17          The other thing I was thinking, and I'd be curious to

18   get your thoughts on this, that perhaps I should stay Google

19   from conducting depositions of any plaintiff until we get past

20   the Eastern District of Virginia fact discovery cutoff.  It

21   seems to me that it would be counterproductive and chaotic to

22   have the depositions running in both directions and wearing

23   anybody to a pulp on that.  Does that sound reasonable?

24          MR. BOIES:  I think that makes perfect sense, your

25   Honor.

1          THE COURT:  Let me hear from Google.

2          Any objection to that?

3          MR. EWALT:  No, your Honor.

4          THE COURT:  Okay.  So those are thoughts.

5          And so the two things that I can do that I think

6     bridge where the plaintiffs are and where I am, are, number

7     one, having an order which makes it plain that delays in

8     production that impact the deposition of a witness will enable

9     the plaintiffs to apply to the Court for additional time to

10    examine the witness.  That would be number one.

11         And number two, talking today to see whether I can be

12    of assistance in breaking the logjam on the search terms, to

13    get that going also.

14         MR. BOIES:  That would be extremely helpful, your

15    Honor.

16         One other point that I'd like to raise, and that is

17    that the language that they have proposed is a little

18    ambiguous.  But one thing that we want to be sure of is that

19    we're not doing anything here that changes the Federal Rules of

20    Evidence as to when they can use depositions that we do not

21    have an opportunity to cross-examine.

22         They have many more depositions in that case than we

23    do.  They've got essentially 30 a side.  We start off with 15,

24    I think we'll probably come back to the Court, but they are

25    going to have more depositions in that case than we're going to

N5GVGOOC

1    have in this case probably.

2            THE COURT:  It didn't look that way from what I read

3    recently, unless that's changed.  And I realize things happen

4    quickly in that court, which we all appreciate.

5            MR. BOIES:  I think ten party and 20 nonparty

6    depositions per side.

7            THE COURT:  Ten party and 20 nonparty.  That's right.

8    That's what I have also.

9            MR. BOIES:  And the way you could read this order is

10   that if a deposition is taken in that case, it can be used here

11   as if it were taken in this case, even though we may not have a

12   right to examine, because we've not cross-noticed.  And we

13   don't have a number of depositions that enable us to

14   cross-notice every deposition that they are taking.  So what

15   that means is, depending on how you read their language, you

16   could have a situation in which, contrary to the Federal Rules

17   of Evidence, a deposition is usable against us when we've not

18   had an opportunity to cross-examine.

19           THE COURT:  Well, you maintain the ability to use all

20   the Google depositions in this action -- all the Virginia

21   Google depositions in this action, right?

22           MR. BOIES:  Assuming they are a party admission, your

23   Honor, yes.

24           THE COURT:  So let me hear from Google on your point

25   and see what I can find out.

N5GVGOOC

| 1 | So I think Mr. Boies raises a fair question.  A |

So I think Mr. Boies raises a fair question.  A
reading of the order — and I think maybe a fair reading of the
order, unless I missed something in there — would be that if
the deposition is cross-noticed in this MDL, then that
deposition is usable not as if taken in this action, it's
usable because it is taken in this action.  And if not so
cross-noticed, then it's a discussion for another day at maybe
in considering a motion *in limine* by one side or the other in
getting ready for trial.  Who can use the deposition and for
what purpose.  Is that a fair reading of the order?

MR. EWALT:  So, your Honor, if I could clarify one
thing.  There was an earlier version of the order that we
submitted on April 28th.

THE COURT:  Yes.

MR. EWALT:  And that version of the order had some
specific references to the Federal Rules of Evidence, the
Federal Rules of Civil Procedure, and had language along the
lines of the deposition taken in one case could be used as if
taken in another case.

This was one area where there was a disagreement
between Google's position and the Virginia plaintiffs'
position.  And Judge Anderson largely agreed with the Virginia
plaintiffs' position.  And so the order that we submitted
yesterday to this Court no longer has those provisions, and
that may be where some of the ambiguity is that the plaintiffs

N5GVGOOC

1    have picked up on, is that that language used to be there and

2    it's not on this version anymore.  So we don't read any

3    provision of the order that we submitted as deviating from the

4    Federal Rules of Evidence, the Federal Rules of Civil

5    Procedure.

6            THE COURT:  So just if I can -- if I may translate

7    that or just take that one step further.

8            Listen, getting a coordination order is no small feat

9    in the two actions, so it's close to miraculous.  But it would

10   mean, in essence, that it's only if the deposition is

11   cross-noticed in the MDL is it, as of right, usable, because it

12   was taken in the MDL.  And if not so cross-noticed, then we

13   refer to the body of law governing depositions taken in other

14   actions.

15           MR. EWALT:  We agree with that, your Honor.

16           THE COURT:  Is that accurate?

17           MR. EWALT:  Yes, your Honor.

18           THE COURT:  Mr. Boies, I think that addresses that

19   specific concern.

20           MR. BOIES:  It does, your Honor.

21           But I think that that would -- if your Honor is

22   considering entering the order, I think the last clause of 3E

23   in what I think was submitted just yesterday would need to be

24   stricken.

25           THE COURT:  Let me look.

N5GVGOOC

1          MR. BOIES:  It's 3F.  3F.  Last 14 words.

2          THE COURT:  Let me hear from Google on that.

3          Is that an internal conflict or is that -- how do you

4     read that language?

5          MR. EWALT:  Yes, your Honor.

6          I was thinking about paragraph 6, where the language

7     has changed; but I do see the provision there that now

8     plaintiffs' counsel has referenced.  And I would agree that we

9     could clean that up, your Honor.

10          THE COURT:  All right.  So the cleanup would, I take

11     it, put a period after the parenthetical, is that --

12          MR. EWALT:  If I may have a moment, your Honor.

13          THE COURT:  Yes, take a moment.

14          MR. EWALT:  Yes, your Honor.

15          THE COURT:  Okay.  I think that takes care of that

16     point.

17          MR. BOIES:  It does, your Honor.  Thank you.

18          THE COURT:  Good point.  Good point.

19          All right.  So mechanically, what I am contemplating

20     doing is issuing an order which is, I guess, something of a

21     providential or provisional approval of the draft indicating

22     that there will be three separate provisions that relate to the

23     MDL that I will add.  One of them will address the Meta

24     situation, to make it plain that if the stay is lifted, there

25     will be further orders of the Court, after hearing from the

1    parties, on what the discovery of or pertaining to the NBA will

2    look like; agreed to, in essence, have that one out when and if

3    it arises.

4            Secondly, it would provide that if there is not timely

5    production of documents, and the failure to make timely

6    production of documents impacts a witness's testimony, then the

7    Court, on application, will consider granting additional hours

8    of deposition.  But such additional hours would be after the

9    close of discovery in the Eastern District of Virginia H.

10           The third provision would be staying not discovery,

11   but staying depositions of plaintiffs until after the close of

12   fact discovery in the Eastern District of Virginia.

13           So that's what I would do.  And then I would await, on

14   notice to all parties, a signature copy of the coordination

15   order.  That would be my plan.

16           I've read as much as I can possibly absorb on the

17   search terms.  And this is what I hear.  And I realize that a

18   judge can get the wrong impression from correspondence.  I

19   might have missed something.  But the way this reads to me,

20   there were original search terms used in the DOJ

21   investigations.  There were search terms used in the Texas

22   pre-litigation investigation.  There have since been search

23   terms proposed by the DOJ, as I understand it, in the Virginia

24   action or maybe it's all the Virginia plaintiffs, and that

25   there's been agreement to include them.

N5GVGOOC

1          There is an expression of unhappiness.  We like happy

2     people.  We don't often get them in litigation, but this was a

3     decidedly unhappy description of efforts to sit down and

4     negotiate the search terms.  What plaintiff was looking for in

5     terms of search terms, and that these meetings go back to

6     March.  And these unhappy people are claiming that there really

7     wasn't -- there weren't specific proposals that they could yay

8     or nay on.  Now, that's the impression I was left with.

9          Let me first ask Google, is that accurate, from your

10    standpoint?  Then I'll find out where the plaintiffs disagree.

11         MR. EWALT:  It's accurate, your Honor, in the sense

12    that we're sort of midstream in the meet-and-confer process

13    here, where we've made a very comprehensive proposal on

14    February 27th, in response to the plaintiffs' 301 requests for

15    production of documents.  That proposal included 80 search

16    terms that we would propose to apply to 119 custodians for a

17    period of ten years.  When we ran those, we pulled in an

18    additional two million documents on top of the roughly three

19    million documents that the plaintiffs have already received,

20    which is 2.25 million, plus the 800,000 that we'll be producing

21    by the end of May.  So two million documents by -- our

22    additional documents on top of that three million that were

23    pulled in by the search terms and custodians that we had

24    proposed on February 27th.

25         Then we waited for a few weeks.  And on April 2nd, the

N5GVGOOC

1    plaintiffs proposed that we add additional custodians — I think

2    it was 75 additional custodians — and add additional search

3    terms, I believe it was 188 additional search strings, rather,

4    not just words, but strings.  And when you apply those, that

5    would yield an additional corpus of documents of eight million,

6    on top of the two million, plus the three million that I just

7    talked about a moment ago.  So it would greatly magnify the

8    total corpus of documents to be reviewed.

9         Now, I should say, your Honor, there's a footnote

10   there.  That eight million doesn't include deduplication.

11        THE COURT:  I understand.

12        MR. EWALT:  I just want to flag that.

13        But it is an enormous expansion of the corpus of

14   materials.  And we started -- our original proposal started

15   with the custodians and terms that were used during the DOJ's

16   investigation and the investigation by the Texas Attorney

17   General's office.  And they are extremely experienced antitrust

18   investigators.  They know what they need, and they got it in

19   their investigations.  And so we're not saying that we're just

20   going to have to rest on that; we're willing to do more.  We

21   proposed to review an additional two million more documents on

22   top of that.  But to do an additional eight million, your

23   Honor, we think is disproportional and not necessary here.

24        MR. BOIES:  Your Honor, with the Court's permission,

25   Mr. Korologos would -- if I could just make a brief point on

1     this.

2                 We have enormous respect for all the states and DOJ

3     investigations.  But this case has different -- some different

4     issues.  We have things that we have to try that they don't

5     have to try.  We have to try class certification, we have to

6     try the publishers' damages.  So we have things that we need to

7     do that even if we had exactly the same point of view on

8     liability, we would need to do some additional things.

9                 The second thing is that while I appreciate Google

10    picking out the 80 search terms that they think are helpful, we

11    think that we need to have some role in deciding what we would

12    like to have produced.

13                THE COURT:  All right.

14                MR. KOROLOGOS:  Good afternoon, your Honor.

15                I obviously agree with my partner.

16                THE COURT:  Wise decision.

17                MR. KOROLOGOS:  And with respect to some of the

18    specifics, your Honor, I heard Google just now say they are

19    willing to do more.  But what they are saying they are willing

20    to do more of is just those search terms that they choose.

21    What we've had trouble on is getting past their saying, Our

22    terms are too much.  Our custodians are too much.  And not

23    engaging in a back-and-forth to narrow those, to tell us which

24    of our strings are producing too many that we can try to narrow

25    them.  We've not been able to get that detail from them so that

1    we can work with them on a set of search terms that is not just

2    theirs, but is collectively the negotiated search terms that

3    both sides agree will be run, which will come out somewhere

4    between two million and eight million additional documents.

5         And the reason I focus on this, willing to do more,

6    they are just saying they are updating what they gave DOJ and

7    the states by running the same terms that they ran before,

8    terms for which, by the way, we have not been able to get and

9    we have an understanding are not agreed to by DOJ but, instead,

10   were run by Google in response to the requests, despite desires

11   by DOJ to have additional terms.

12        So even with respect to that production and that

13   collection, we believe those are more in line with what Google

14   wants to produce, rather than what those plaintiffs want to do,

15   which is still, as Mr. Boies says, a step away from what we

16   believe should be produced.

17        THE COURT:  Mr. Korologos, I'm really distant from the

18   search terms; I haven't looked at any of them or the strings of

19   search terms or any of the like or the list of custodians.  But

20   do they correlate with the need for the plaintiffs in this case

21   to prove money damages or are they liability oriented?

22        MR. KOROLOGOS:  They are some of each, your Honor.

23   And let me give an example.

24        It appears that in connection with the DOJ and the

25   states' productions that Mr. Ewalt was talking about, they did

1     not run a lot of searches, if any, on centrally stored

2     locations.  Your Honor may recall the discussion we had when

3     Ms. Vash talked to the plaintiffs about the linked documents.

4     Those links go off to centrally stored locations where

5     documents are stored and kept.  We believe those need to be

6     produced.  Those are going to relate to the different steps and

7     things that Google did in response to, for instance, header

8     bidding, or response to other competitive activity in the

9     marketplace that we believe show the liability with their

10    anticompetitive conduct.

11            Those will also go, in some respects, to establish

12    what the damages are; though with respect to damages, we

13    believe there needs to be substantial production of data that

14    was not provided to the states or to DOJ.  And that is

15    additional not just in terms of searches to get that and find

16    out what data they used, but then data from those databases

17    themselves, which of the two million documents, I don't believe

18    any of those are productions from databases.

19            And your Honor may recall the last time we were here,

20    they talked about some of the data they gave to DOJ, which was

21    that one-week period that they say took them a long time to

22    get.  So maybe that's one area that they have that.  But for us

23    to establish damages as a class, we're going to need samples of

24    that kind of data for a lot longer than one week, your Honor.

25    This is a case that spans a number of years of anticompetitive

1    activity.

2              THE COURT:  All right.  Let me ask you, Mr. Korologos,

3    what's your suggestion for resolving this?

4              MR. KOROLOGOS:  Well, we're going to have an in-person

5    meet-and-confer in two days, your Honor, here in New York with

6    Google, in which we hope to make some progress on these issues.

7    I believe, in order to make that progress, we need to get data

8    from them about our search terms and our custodians.

9              Where are these eight million documents coming from?

10   If you've got a string that turns out to be over-inclusive

11   because of the way Google uses certain terms, we can work on

12   narrowing that.  So I think that we need to get that kind of

13   data and have an actual back-and-forth specific to the search

14   terms and specific to the custodians, where we can provide them

15   information, as I believe we've provided some already, at

16   least, as to why these additional custodians need to be

17   included.  Also, why the centrally stored locations need to be

18   included, and to have the same search terms run on them.  I

19   believe if we engage in that back-and-forth over the next week,

20   two weeks, we ought to be able to narrow those lists so that

21   they can be run very promptly.

22             THE COURT:  I feel the singe of the protective order

23   back and forth, which is something I hope never to repeat, not

24   just in this case, but in any other case I ever have.  That was

25   most regrettable.  And when I hear, We'll just keep negotiating

1     for a couple of weeks and hope for the best, I now have been

2     taught to consider that with great skepticism.

3                  MR. KOROLOGOS:  Understood, your Honor.

4                  Here's what I suggest to address that:  I suggest we

5     set another conference with the Court out some number of days,

6     maybe it's ten days, maybe it's two weeks.

7                  MR. BOIES:  One week.

8                  MR. KOROLOGOS:  One week.

9                  THE COURT:  Well, I'm going to be on trial.  I'm on

10    trial next week.  So, I mean, I'm on trial for the next two

11    weeks.  And then I'm on trial two weeks in June, so --

12                 MR. KOROLOGOS:  Perhaps we could have a date by which

13    we have to report to your Honor on where we are in negotiated

14    search terms.  And if there are some number of search terms

15    that we believe should also be run, we will make an application

16    to the Court.  And they can oppose those with a very detailed

17    description as to why we believe those search terms should be

18    run and relate to our case.  And that way, I believe what that

19    will do, your Honor, is maximize — I can't say it will

20    eliminate, but I think it will maximize the opportunity that we

21    do not have to come back to court; that the parties will have

22    the discipline to get together and actually get it done, rather

23    than have what happened with the protective orders before.

24                 THE COURT:  Thank you, Mr. Korologos.

25                 Let me hear from Google.

N5GVGOOC

1          MR. EWALT:  Thank you, your Honor.

2          I just wanted to make a few points here.

3          First, Mr. Korologos raised the issue about providing

4   detailed statistics about the search terms and how many

5   documents are returned by them.  This is something that we've

6   offered to provide the plaintiffs, as long as they are willing

7   to reciprocate and provide similar statistics about the search

8   terms that are being negotiated to be applied to their document

9   collections.  So we just think it should be reciprocal.

10          THE COURT:  Mr. Korologos, how does that sound?

11   Mr. Boies?

12          MR. BOIES:  We agree, your Honor.

13          THE COURT:  Okay.  So you've got agreement there.

14          MR. EWALT:  Excellent.

15          Thank you for helping us, your Honor.

16          THE COURT:  All right.

17          MR. EWALT:  One other point I wanted to raise is that

18   I omitted in the initial point that there were 188 search

19   strings that plaintiffs originally proposed.  Google has

20   already agreed to apply 59 of them.  So we are making progress

21   here, your Honor, and we do think that continuing to meet and

22   confer is the way to go.

23          THE COURT:  Look, there's an incentive for Google to

24   get this done.  If your goal here is to avoid your witnesses

25   getting examined time and time again, over and over, then the

N5GVGOOC

1      incentive is to wrap this up.  Let's get this done.

2                  By the same token, that same incentive applies to the

3      plaintiffs in this case.  Because I don't think anybody would

4      be too thrilled if the outcome here is this case gets tried in

5      the Eastern District of Virginia in the first quarter or second

6      quarter of 2024, before fact discovery has closed in this case.

7                  And with the exception of certain damage discovery,

8      you can throw your discovery out the window.  Because you're

9      all going to be fighting over collateral estoppel if the

10     plaintiffs win, and the defendants are going to be moving for

11     summary judgment if they should happen to win.

12                 So this is the time.

13                 And I am not interested in delay and volume for the

14     sake of a lodestar.  I'll just knock that down.  We're not

15     playing that game for definite sure.  And I'm not saying that

16     anyone is.  But I am going to be vigilant to make sure that

17     discovery that is conducted — and for which somebody, if they

18     are lucky enough to tag the defendant with liability, seeks to

19     recover attorneys' fees or have some kind of a settlement — is

20     not based on ballooning numbers for the sake of ballooning

21     numbers to say, Well, I have eight million -- 12 million

22     documents.  I need 100 associates.  Look at what that does,

23     yippee, to my lodestar.  I'm not impressed.  I'm not impressed

24     now and I won't be impressed then.  And if the plaintiffs avoid

25     coordination because they'd rather do it their way, there still

1    remains the question of the numerical limits on depositions.

2              I heard Mr. Boies loud and clear.  Judge, you may need

3    to think about increasing that limit.  Not an unreasonable

4    thought to have or to express.  But certainly any such

5    application is going to be measured through the lens of how

6    opportunities for efficiencies and coordination have been

7    utilized.  And now we have a transcript of this which somebody

8    will quote back that day.  So I'm not making any rulings, but I

9    am pointing a few things out.

10             So if somebody wants to blow up coordination, I guess

11   fighting about search terms would be a halfway decent way to do

12   it.  And I'll be looking to see who's trying to blow up

13   coordination, if that's what this is about.  So it behooves

14   everybody to get in a room, perfect is the enemy of the good,

15   work this out, and get it done.

16             Now, one other subject.  I issued a stay with regard

17   to Inform, Inc.  And at the time I did that, I did not have

18   their second amended complaint.  Their second amended complaint

19   has been filed.  I'll briefly hear from Ms. Vash and from

20   anyone who wants to respond from Google as to whether or not

21   that stay should remain in place or should be now lifted.

22             MS. VASH:  Thank you, your Honor, on behalf of Inform,

23   Inc.

24             At this juncture, your Honor, Google is going to be

25   filing their letter brief to the Court with respect to our

N5GVGOOC

1    second amended complaint.  And I believe that we are going to

2    be briefing the issue of the stay in their letter and our

3    response, which the Court had previously indicated.

4            THE COURT:  Well, here's the thought I had, because I

5    looked at it.  I looked at it.  And I understand from Google's

6    initial submission, they have questions regarding standing, for

7    example, whether Inform, Inc. can be subjected to antitrust

8    injury in this case.

9            But the stay question I look at through a somewhat

10   different lens.  And that lens is this:  If discovery

11   propounded by Inform or propounded by Google of Inform is going

12   to expand discovery in this case into new vistas, so instead of

13   X million, it's X squared million documents we're going to be

14   looking at, then that counsels in favor of perhaps waiting.

15           But it appeared to me that the underlying claims are

16   not dissimilar — the *Ad Tech* claims in the Texas complaint, I

17   saw Project Bernanke has been added and a few familiar terms.

18   But I don't see that the scope of discovery would be materially

19   different than the discovery that would otherwise go on in this

20   MDL, recognizing that it could stop on a dime if the Court

21   granted the motion to dismiss.  It would come to an end as to

22   Inform; but it wouldn't mean that new vistas of document

23   production would now be part of the case.

24           Tell me if I'm right or I'm wrong or where you stand

25   on that.

1          MS. VASH:  You're right, Judge and.

2          You're right, to the extent that -- first of all, the

3    Eleventh Circuit has already determined that Inform does have

4    antitrust standing in the Northern District of Georgia case.

5    So with respect to antitrust standing, that's been --

6          THE COURT:  Well, I think there's a dispute as to what

7    the meaning of the reversal order was on the — whatever they

8    call it — shotgun pleading, etc.  And that will be something

9    I'll decide at some point.  But go ahead.

10          MS. VASH:  Of course.  Of course.  Thank you, Judge.

11          But as respects discovery, yes, this is the *Ad Tech*

12    case.  There's tying alleged, there's dynamic allocation,

13    enhanced dynamic allocation, revenue share optimization,

14    there's Project Bernanke.  It's all in our complaint.

15          Keep in mind, your Honor, respectfully, our complaint

16    was filed November 2019, as the state's investigation was just

17    getting underway, as the DOJ's investigation was just getting

18    underway.  So, yes, it is the *Ad Tech* investigation and.

19          The "and" part, Judge, is that these are video

20    advertisements.

21          THE COURT:  Yes.

22          MS. VASH:  And that YouTube is a defendant here, and

23    the video ads are also relevant.  And so discovery that I

24    believe has actually been held back in this case -- because

25    Google has taken the position that the video advertising is not

1   relevant and YouTube is not relevant, so I believe they held

2   back certain discovery that was given to the DOJ.  That is

3   relevant and that should come over to us.

4          So we have here the *Ad Tech* case and the video

5   advertising and YouTube and intelligent pausing of the video

6   ads, etc., interference in other ways.  But, by and large, it

7   is the same case, plus YouTube and video advertising.

8          THE COURT:  All right.  Thank you.

9          Let me see whether I can find out from Google, what

10  does that "plus YouTube" mean?

11         MR. EWALT:  Well, your Honor, we agree with what you

12  said earlier.  We think that discovery with respect to the

13  Inform claims could proceed to the extent that those claims are

14  coextensive with the claims that your Honor has already held to

15  be sufficiently pled in the Texas AG complaint.  For the plus,

16  the "and," we think it would be appropriate to continue the

17  stay, for the stay to remain in effect with respect to those

18  additional claims until your Honor has decided as to whether

19  those claims can proceed.

20         THE COURT:  How would -- and I'm going to ask the same

21  question of Ms. Vash.  How would either of you describe that

22  plus?  What English words would you use to describe it?

23         MR. EWALT:  Your Honor, I have to admit that I am not

24  an expert on the *Inform* complaint; I'm not today prepared to

25  delineate with precision all of what the plus is.

N5GVGOOC

1          MR. HERMAN:  John Herman of Herman Jones for Inform,

2     Inc.  I'm better known around here as Ms. Vash's partner.

3          THE COURT:  Okay.

4          MR. HERMAN:  And forgive me, Ms. Vash, for stepping

5     in.

6          The *Inform* case is different in the respect that

7     Inform was a direct competitor of Google.  Inform had meetings

8     regularly with Google people.  So they have a whole set of

9     discovery related to how Google manipulated the ad auction that

10     I don't think the other parties have, and that's part of the

11     claims in our complaint.

12          THE COURT:  All right.

13          So how would you describe the plus?

14          MR. HERMAN:  I would describe it as Ms. Vash correctly

15     pointed out, it's the YouTube and it's the direct evidence

16     related to the ad auction manipulation.

17          THE COURT:  Well, why isn't direct evidence related to

18     the ad market manipulation evidence that would be discoverable

19     in this MDL?

20          MR. HERMAN:  As it relates to when Inform was placing

21     ads through the ad exchange with Google, those ads were being

22     artificially depressed by Google.  Now, if we can collect that

23     in the context of the MDL, we would certainly welcome that

24     opportunity.

25          THE COURT:  Listen, Mr. Herman, what I'm trying to

N5GVGOOC

1    decide is there's a stay in place.  And what I said originally

2    was I was going to wait until I got all the premotion letters

3    in and then I would decide what to do.

4        The thought occurred to me that if I could lift the

5    stay, in whole or in part, it would be a prudent thing to do,

6    recognizing that once it's lifted, I could turn around and

7    dismiss the entire complaint, if the motion to dismiss

8    prevails.  But at least it would not expand the universe of

9    discovery in this MDL.

10        I get the impression from the three people who have

11    spoken on this subject, yourself included, that there is a

12    YouTube component that is not covered by anybody else's

13    pleading and that would require additional discovery.

14        So I can do one of two things:  Just leave the stay in

15    place, or you can tell me or Ms. Vash can tell me or Google can

16    tell me what is this added component; how would one go about

17    describing it.

18        MR. HERMAN:  I certainly think it has to do with the

19    video ads that Inform placed through the Google system.  I

20    think that's different than what has been contemplated and

21    what's been produced in the case so far.

22        MR. EWALT:  Your Honor, if I could suggest, we do have

23    a premotion letter that will be filed in the next few days.  If

24    we could address this question in the letter, that might be of

25    assistance.

N5GVGOOC

1        THE COURT:  All right.  I'll go along with it.

2        My inclination is, in areas where there would not be

3    an expansion of discovery, to lift the stay so that Inform is

4    invited to the party, so to speak.  And perhaps if there's a

5    great volume of other material, just keep the stay in place on

6    that until the motion to dismiss is decided or the premotion

7    letters are fully in, etc.  Okay.

8        MR. EWALT:  Thank you, your Honor.

9        MR. BOIES:  Your Honor, we can address this in a

10    letter.  But I just want the Court to be aware, YouTube is a

11    defendant in our case and we do have allegations about YouTube.

12        THE COURT:  That's why I'm a little bit surprised that

13    this would be an addition in scope of discovery.  I would have

14    thought it would be within your discovery demands or search

15    terms or other things.  That's what I would have thought.

16        MR. BOIES:  I did too.  And I was a little surprised

17    to see all three of the people talking before sort of taking a

18    contrary view.

19        THE COURT:  Okay.  Well, that would be helpful also.

20        MS. VASH:  Apologies, your Honor.

21        Just to clarify, YouTube was in the second -- the

22    Texas second amended complaint.  There was a market pled and

23    those documents were turned over.  They were also turned over

24    to the DOJ within the scope of what was turned over to the DOJ.

25        They are not being turned over here in the MDL because

N5GVGOOC

| | |
|---|---|
| 1 | Google has said it's not relevant here.  And I believe that it |
| 2 | is.  So I don't think we're taking a different position than |
| 3 | Mr. Boies is as respects much of this has covered YouTube. |
| 4 | THE COURT:  Well, all right.  So somebody is going to |
| 5 | sort this out to me, for me, and I'll await further word on |
| 6 | that. |
| 7 | Okay.  So you have a negotiating session for Friday, |
| 8 | right? |
| 9 | MR. EWALT:  Thursday. |
| 10 | MR. KOROLOGOS:  Thursday. |
| 11 | THE COURT:  Thursday. |
| 12 | So when is the next one after the Thursday session? |
| 13 | Or are you going to get together on Thursday and decide when |
| 14 | you'll meet after Thursday, and that's just going to pull |
| 15 | out -- extend the period. |
| 16 | MR. KOROLOGOS:  We've scheduled two Thursdays.  The |
| 17 | next two Thursdays we have meetings, your Honor.  Thursday the |
| 18 | 18th and Thursday the 25th. |
| 19 | THE COURT:  And you're going to be at the meeting? |
| 20 | MR. KOROLOGOS:  I'm going to be there this Thursday. |
| 21 | I have a pretrial conference in San Francisco on the 25th, your |
| 22 | Honor.  But my colleagues, who are well-versed in the |
| 23 | specifics, publisher classes -- |
| 24 | THE COURT:  This is not good news.  Listen, maybe you |
| 25 | could do it on Friday or Wednesday or some such thing, but |

N5GVGOOC

1   let's get this done.

2           MR. KOROLOGOS:  We'll get it done and we'll move the

3   date, your Honor.

4           THE COURT:  All right.  Thank you.

5           What else?

6           MR. EWALT:  Nothing from Google, your Honor.

7           MR. BOIES:  Nothing from the plaintiffs, your Honor.

8           THE COURT:  All right.

9           MS. VASH:  Nothing further, Judge.  Thank you.

10          MR. ORSINI:  Nothing further from Meta, your Honor.

11          THE COURT:  All right.

12          And thank you to my friend from the Department of

13  Justice who has come up.  And my best wishes to everyone in the

14  Eastern District action.

15          MS. WOOD:  Much appreciated, your Honor.

16          THE COURT:  Including Google, who is also there, I

17  guess.

18          Anyway, thank you all for coming in.  And this has

19  been helpful and productive and I appreciate it.

20          So we're adjourned.

21                          *    *    *

22

23

24

25