M8VQgoo1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   IN RE GOOGLE ADVERTISING
     ANTITRUST LITIGATION                    21 MD 3010 (PKC)
 4
                                                Argument
 5   ------------------------------x

 6
                                         New York, N.Y.
 7                                       August 31, 2022
                                         2:00 p.m.
 8
     Before:
 9
                         HON. P. KEVIN CASTEL
10
                                            District Judge
11
                            APPEARANCES
12   KELLER POSTMAN LLC
          Attorney for State Plaintiffs
13   BY:  BROOKE CLASON SMITH
          ASHLEY C. KELLER
14        JASON ALLEN ZWEIG

15   LANIER LAW FIRM PC
          Attorney for State Plaintiffs
16   BY:  W. MARK LANIER

17
     GIRARD SHARP LLP
18        Attorneys for Plaintiff Advertisers
     BY:  JORDAN ELIAS
19
     KELLOG HANSEN TODD FIGEL & FREDERICK PLLC
20        Attorneys for Associated Newspapers
     BY:  JOHN THORNE
21

22   ADHOOT & WOLFSON PC
          Attorneys for Advertising Plaintiffs
23   BY:  HENRY KELSTON

24

25
```

M8VQgoo1

1          APPEARANCES CONTINUED:

2

3    HERMAN JONES LLP
          Attorneys for Direct Action Newpaper Plaintiffs
     SERINA MARIE VASH

4

5    BOIES SCHILLER & FLEXNER
          Attorneys for Publisher Plaintiffs
6    BY:  DAVID BOIES

7    ZWERLING SCHACHTER & ZWERLING LLP
          Attorney for Advertising Plaintiffs
8    BY:  JENNIFER HERMES

9    CRAVATH SWAINE & MOORE LLP
          Attorneys for Defendant Meta
10   BY:  KEVIN J. ORSINI

11   FRESHFIELDS BRUCKHAUS DERINBGER US LLP
          Attorneys for Defendant Google LLC
12   BY:  ERIC MAHR
          ANDREW EWALT

13

14   WILSON SONSINI GOODRICH & ROSATI PC
          Attorney for Defendant Google LLC
     BY:  JUSTINA K. SESSIONS

15

16

17

18          (In open court; case called)

19          THE COURT:  If you are more than three feet away from

20   the person next to you, and you're seated in the well, and

21   you're fully vaccinated, according to the rules that I'm

22   required to follow, you're permitted, but not required, to take

23   off your face masks.

24          So appearing for the plaintiffs, please.

25          MR. KELLER:  Your Honor, would you like us to stay

M8VQgoo1

1      seated?

2                  THE COURT:  Yes, that's the protocol.

3                  MR. KELLER:  Thank you.  I'm Ashely Keller for the

4      plaintiff states.

5                  MR. ZWEIG:  Jason Zweig, your Honor, for the plaintiff

6      states.

7                  MR. LANIER:  Mark Lanier for the plaintiff states.

8                  MS. SMITH:  Brooke Smith for the plaintiff states.

9                  THE COURT:  You might get the microphone a little bit

10     closer to you.  You'll find that will work better.

11                 And appearing for the defendants.

12                 MR. MAHR:  Good afternoon, your Honor.  Eric Maher

13     with my partner Andrew Ewalt, Justina Sessions from the Wilson

14     Sonsini firm.

15                 MR. ORSINI:  Good afternoon, your Honor.  Kevin Orsini

16     from Cravath on behalf of Meta.

17                 THE COURT:  Anyone else making an appearance, we might

18     as well get the appearances from those who are not directly

19     involved in the motion but are parties to the MDL.

20                 So starting with Mr. Boies.

21                 MR. BOIES:  David Boies, your Honor, Boies Schiller &

22     Flexner representing the advertising class.

23                 MS. VASH:  Good afternoon, your Honor.  Serina Vash

24     from the law firm of Herman & Jones representing the individual

25     newspaper plaintiffs.

M8VQgoo1

1            THE COURT:  Good to see you, Ms. Vash.

2            Who else?

3            MR. THORNE:  John Thorne representing Associated

4     Newspaper.

5            MR. ELIAS:  Good afternoon, your Honor.  Jordan Elias

6     with the Girard Sharp firm for advertising plaintiffs and the

7     proposed advertising class.

8            MR. RUBIN:  Jonathan Rubin, MoginRubin LLP for the

9     advertising class, your Honor.

10           THE COURT:  Anybody else?  Any counsel in the MDL who

11    wants to make an appearance, please identify yourself.

12           MR. KELSTON:  Henry Kelston, K-E-L-S-T-O-N from Adhoot

13    Wolfson also for the advertising plaintiffs.

14           THE COURT:  Thank you, sir.

15           Anybody else?  Yes, ma'am.

16           MS. HERMES:  Jennifer Hermes, H-E-R-M-E-S of Zwerling

17    Schachter & Zwerling, also for the advertising plaintiffs.

18           THE COURT:  All right.  Wonderful.  Apologies for

19    dragging you all off the beach.  I'm sure you were all

20    luxuriating and had to fly in last night, and I'm sure you

21    flipped through your papers before you got here.

22           So, I'm going to give you time at the end of today to

23    say whatever you want to say for pretty much a reasonable

24    period of time.  I will give you some time to make your

25    thoughts known, but I'd like to start off at least with a

M8VQgoo1

1    number of questions that I have or points that I want to get

2    confirmed which will be of help to me, and then we can proceed

3    from there.

4            So, first of all, let's talk about what 12(b)(6) is

5    all about and the fact that a defendant moving under 12(b)(6)

6    gets to select the grounds on which they're moving.  They're

7    not required to raise every defense that they may wish to raise

8    in an answer or deny everything that they wanted to put in an

9    answer if they file an answer some day, but they pick the

10   issues they move on.

11           And with regard to this complaint as I read it, there

12   are certain points that the defendants have not focused their

13   motion on or raised in their motion.  In essence, they conceded

14   for the purpose of the motion, solely for the purpose of the

15   motion, but they conceded for the purpose of the motion.

16           So, it seems to me that the states have alleged six

17   distinct geographic and product markets, and I do not see

18   Google challenging the existence of these geographic or product

19   markets for the purposes of their motion.  And when I say

20   product markets, we could have a debate some day are they

21   products, are they services.  We'll call them product markets.

22   And they are publisher ad servers, ad exchanges, ad buying

23   tools for large advertisers, ad buying tools for small

24   advertisers, in app mediation tools and in app networks.  Those

25   are the six markets that the plaintiff has alleged, and I don't

M8VQgoo1

1     see Google challenging them.

2              Am I correct that Google for the purposes of this

3     motion does not challenge the existence of these separate and

4     distinct markets?

5              MR. MAHR:  You're correct, your Honor.

6              THE COURT:  And am I correct that there are these six

7     markets and none other that are relevant to the plaintiffs'

8     claim?

9              MR. KELLER:  Yes, your Honor.

10             THE COURT:  Now, it seems to me that Google has not

11    for the purpose of this motion challenged the existence of

12    monopoly power in the ad server market and the ad buying tools

13    for small advertisers market.  Is that accurate?

14             MR. MAHR:  It's hard to say, your Honor, but it is

15    accurate we concede for purposes of this motion to dismiss

16    only.

17             THE COURT:  And in terms of for the purposes of the

18    Section 2 claim, Google does not dispute that the plaintiffs

19    have plausibly alleged specific intent to monopolize and at

20    least a dangerous probability of acquiring monopoly power in ad

21    exchanges and ad buying tools for large advertisers.

22             MR. MAHR:  That one, your Honor, I don't think I can

23    concede.  I don't think we concede specific intent.  We may not

24    have had room to have a specific section on specific intent,

25    but certainly we don't believe that the complaint has anything

M8VQgoo1

1      more than broad allegations of intent to monopolize.

2                THE COURT:  Well, I'm a creature of paper here, and I

3      have a pleading, and I have the four corners of that pleading

4      and anything that is legitimately incorporated into that

5      pleading, and then I have your motion.

6                Now, your motion says a lot of things.  For example,

7      it challenges the existence of anticompetitive conduct on a

8      variety of grounds.  It argues that Project Sandbox is not

9      ripe.  It argues that other conduct has been discontinued and

10     can't form the basis for injunctive relief.  It argues that

11     laches bars much of the complaint, but I don't see -- and I'm

12     all ears, all eyes -- I don't see where there is a challenge

13     that the plaintiffs have failed to plausibly allege specific

14     intent for the purpose of the attempt to monopolize claim.

15               MR. MAHR:  I think you're right.  I just wanted to

16     make the point about we do have some disputes over intent as it

17     relates to conduct but not -- I agree with what you've said.

18               THE COURT:  All right.  Good.

19               Now, as I read it, for the purposes of the -- I guess

20     it's the Section 1 claim, you dispute the existence of market

21     power in inapt networks and also for the purposes of the

22     Section 2 claim, you dispute the existence of monopoly power in

23     the ad exchange market.  That's the way I read your brief for

24     the purposes of the Section 2 claim.  Is that accurate?

25               MR. MAHR:  That's accurate, your Honor.

M8VQgoo1

1          THE COURT:  Okay.  Now, does the plaintiff take issue

2     with what I just outlined in terms of what the defendant has

3     conceded and has disputed?

4          MR. KELLER:  We don't take issue perhaps with the

5     exception of whether you can challenge market power initially

6     in a footnote and then bring it up in reply, but to the extent

7     that your Honor thinks that they've adequately preserved it or

8     prepared to join the issue, I will answer any other questions

9     you have.

10         THE COURT:  A fair point.  Fair point.  I saw that and

11    wasn't surprised.

12             Now, a question that I have just about the market for

13    ad exchanges, now you've done a pretty good job in your

14    complaint of explaining what header bidding was, but when I get

15    deep in the complaint and I'm around paragraph 370 or so,

16    there's a new term that's introduced for the first time and

17    that's header bidding exchanges.  Where do I find what a header

18    bidding exchange is, and how does that differ from simply

19    header bidding?

20         MR. KELLER:  I assume that's us, your Honor.

21             You're right.  It's not a separately defined term.

22    What the concept is getting at is header bidding is a new

23    disruptive technology that's outlined in the complaint, and

24    header bidding exchanges are competitive exchanges to Google's

25    AdX exchange that support the header bidding technology.  So

M8VQgoo1

1   these are other exchanges that are utilizing this service, this

2   new disruptive technology to communicate bid and ask for

3   impressions.

4          THE COURT:  So they are not merely publishers who are

5   using header bidding, but they are exchanges, and they exist as

6   a marketplace, if you will, and part of in competition with AdX

7   and as part of the ad exchange market.

8          MR. KELLER:  Yes, your Honor.  Publishers do use

9   header bidding exchanges, but the exchanges are the ones that

10   are competing with AdX, that is correct.

11          THE COURT:  Okay.  So what I want to do is I want to

12   go through some of the, as I get it, I think I cataloged -- and

13   there are different ways to do the numbering, 13

14   anticompetitive categories unless you want to count the bell

15   variation of Bernanke and global Bernanke as two other

16   strategies, in which event it balloons up to 15, but it's

17   somewhere in that neighborhood.

18          MR. KELLER:  Your count and mine are the same, your

19   Honor.

20          THE COURT:  So now what the mission is for the Court

21   on the Section 2 claims is to see whether or not, for example,

22   let's take the monopolization claim to begin with, whether or

23   not if there is monopoly power in the ad server market, if it

24   has been plausibly alleged, then I'm looking to see whether --

25   not just in isolation but taken as a whole, looking at it as an

M8VQgoo1

individual component but then looking at it in a broader

context, anticompetitive conduct directed towards the ad

exchange market has been alleged, plausibly alleged.

Now, I have to think about the laches argument, for

example, but putting laches aside for a moment and any ripeness

issue aside for a moment, if I conclude that there is

anticompetitive conduct directed to that market, then the

complaint states a claim for relief for monopolization of that

market.  Is that accurate?

MR. KELLER:  From the plaintiff's perspective, yes, it

is, your Honor.

THE COURT:  From the defendant's perspective?

MR. MAHR:  Ours as well, your Honor.  We are

challenging the anticompetitive content.

THE COURT:  Understood.  But when we talk about the

anticompetitive conduct -- and, again, these are some of the

preliminaries issues I want to get out of the way -- it must be

directed towards and analyzed with respect to a specific

market.  It's not anticompetitive in the abstract; it's

anticompetitive in a particular market.  Whether it's ad buying

tools for small advertisers or publisher ad servers, it's got

to be anticompetitive conduct directed to a particular market.

And, therefore, my job as to these 13 or 15 categories is not

merely to say no or yes, it's anticompetitive conduct, but is

it anticompetitive conduct in one of the alleged markets; and,

1    if so, which one, all right?  Because it may be as to one

2    market and not as to another.  Am I right on that?

3              MR. KELLER:  Yes.  An unqualified yes.  The only thing

4    that I would add, your Honor, is that Google we allege utilized

5    market power in one market, for example, the ad server.  And

6    that market power and misbehavior that we document could be

7    directed at more than one market, so both the server and the

8    exchange, but I don't think that's inconsistent with anything

9    you just said.

10             THE COURT:  Well, I would amend what I said to include

11   that possibility.  It's not pick one.  It could be three, but

12   it must be analyzed for each market.  Agreed?

13             MR. MAHR:  We agree, your Honor.

14             THE COURT:  So I'm not looking for sympathy here, but

15   that's potentially 45 different analyses here as to the

16   anticompetitive acts, and that's not counting your Count Three

17   and your Count Four, so -- but that's what the exercise is

18   about.

19             Now, when I look at whether conduct is anticompetitive

20   directed to a particular market, if it's, for example, the ad

21   server market, I'm not looking necessarily at whether it's

22   anticompetitive conduct directed towards publishers because

23   that's not a market that's alleged in the Section 2 claims.

24   I'm looking whether it's anticompetitive conduct directed to

25   the ad server market, and there I'm looking at its potential or

M8VQgoo1

1    its tendency to harm competition between and among ad servers;

2    not whether it's hurtful to publishers or hurtful to

3    advertisers.  And the same principle would apply as to ad

4    buying tools, and the same principle would apply to ad

5    exchanges.  Correct?

6              MR. KELLER:  On that one, your Honor, we have perhaps

7    a little bit of a disagreement.  I agree with the first part

8    that you're looking at the relevant product market, as we

9    defined it, as masters of our complaint.  And so, to take your

10   Honor's example, anticompetitive conduct directed to ad

11   servers, you have to look at the ad server market, and

12   publishers are not a defined market.

13             Harm to publishers though can still be relevant in

14   your consideration of whether Google has harmed the ad server

15   market in an anticompetitive way, which makes sense because

16   publishers are the customers who purchase ad servers.  So

17   looking at what happened to publishers shouldn't be wiped away

18   from your mind, but you're right that that's not the market.

19   The publisher market is not the market that we define as the

20   one that Google monopolized in Section 2 or attempted to

21   monopolize under Section 2

22             THE COURT:  I agree.  So you look at what the conduct

23   did which may have influenced the actions of a publisher, which

24   may in turn have caused the competitive harm, not even just in

25   the ad server market but might be in the ad exchange market,

M8VQgoo1

1          for example.

2                     MR. KELLER:  Yes, exactly.

3                     THE COURT:  I got that part.

4                     Conceptually, is there a disagreement on that point?

5                     MR. MAHR:  There is not.  The harm has to take place

6          on the market alleged, as you initially said.

7                     THE COURT:  Well, this is good.  And I guess what I'd

8          like to hear is -- and I'm going to take this a little bit out

9          of order.  We are going to go through the alleged

10         anticompetitive conduct, and that's going to take some time.

11         So let me turn to something that's maybe a little bit more

12         discrete, and with regard to the Section 1 claim relating to

13         the tying between the Google ad server and the Google ad

14         exchange between, I guess, DFP and AdX.  I want to hear from

15         the defendant briefly if you'd like to address that.

16                    MR. MAHR:  Thank you, your Honor.

17                    With respect to the tying claim, we think there are

18         two key points.  One, that there is no dispute here that the

19         tying and tie products alleged in the complaint are, as you

20         just said, DFP ad server and AdX; and that AdX is the tying

21         product and DFP is the tied product.

22                    I don't think there is also any dispute that an

23         essential element of a tying claim, as you've recognized in the

24         *Time Warner* case and the Second Circuit has in *Unijax* is actual

25         coercion.  And I think there's agreement between the sides on

M8VQgoo1

1      that.

2              Plaintiffs tried to meet that standard in two ways:

3      One, arguing a contractual tie, and one arguing economic

4      coercion.  Both fail.

5              As to the contractual tie, plaintiffs themselves

6      allege that Google offered an exchange only contract until

7      2018, so the fact that you could license the exchange only or

8      DFP only up through 2018 eliminates any hope of actual coercion

9      under *Unijax*.

10             THE COURT:  They flipped that one on you, is my

11     recollection, and they say that shows that they're truly

12     distinctive products; that they can be sold separately.  And

13     then they say -- and, listen, I understand what complaints and

14     pleadings and what it's like to be in a situation that the

15     party making the allegation is bound by their allegation, and

16     you're bound by it, they use the word require; that Google

17     required users of one product to use the other, and they moved

18     everyone over to a combined contract.  They paint a picture in

19     their complaint of a lack of freedom of movement to do.

20             Now, it may be the position that's not plausibly

21     alleged or it's not relevant.  Go ahead, just tell me.

22             MR. MAHR:  That is the position.  I just wanted to

23     clear out prior to 2018.  In 2018, they say they use this

24     contract, but I think it's really important to look at the

25     allegation in paragraph 251.  They say that Google required

M8VQgoo1

1    customers to use a contract that included both AdX and DFP.

2    That verb "included" is critical, and I think it's also fatal

3    to their coercion claim.  And I don't think we can kind of just

4    gloss over and say, oh, one verb and the other verb.

5             The contract after 2018 does include the option of

6    buying either or both.  But merely including two products in

7    the same contract is not the same as coercing it.  And the fact

8    that they recognize that by using the word included is

9    important.  And I don't think we can -- in some cases, you

10   might let them off and say, oh, it's just a verb here, but this

11   is a case where they're on their fourth complaint.  They've had

12   a number of these contracts for many years now.  We've

13   specifically identified this argument in our premotion letter.

14   Then they also saw our motion itself which raised this issue.

15   You gave them another chance to amend.  They said no, we're

16   sticking with included.  I think in that situation we have to

17   assume that they knew what they meant when they wrote included.

18   And if they had contracts that they could put a provision of

19   the contract into the complaint that says, "Publisher, you're

20   required to buy both of these; you may not buy one or the

21   other," they would have put that in.  They have those

22   contracts.  They don't say that, and they didn't plead it, and

23   I think that is important.  So I don't think you can just say

24   including them together is actual coercion.  Lots of reasons to

25   do that.

M8VQgoo1

1          THE COURT:  All right.  Let me hear from the

2     plaintiffs.

3          MR. KELLER:  Thank you, your Honor.  I'll start with

4     2018, and then I'll go back to the previous conduct that we

5     still think alleges an unlawful tie.

6          Look at the last sentence of paragraph 251, which my

7     friend just referenced.

8          "With this strict contractual tie, Google no longer

9     even attempts to maintain the fiction that its exchange and ad

10    server may be purchased separately."

11         If you're drawing all reasonable inferences in our

12    favor and reading the well-pleaded complaint accepting the

13    facts as true, I think we've alleged a tie there where you

14    can't purchase the two products separately.  And as we've

15    already talked about, there is no dispute that they are in fact

16    two separate products and two separate markets.

17         So I think from 2018 on, drawing inferences the way

18    you're supposed to on a 12(b)(6), we prevail.  That's not a

19    conclusory allegation.  That's saying as a factual matter, they

20    are not available separately.  Maybe they will prove that wrong

21    with actual contracts that they put forward on a Rule 56, but

22    my friend is not correct that we have to reference those in a

23    complaint.  We're not held to some higher standard because

24    we've had investigatory time and have collected materials.  So

25    applying the normal 12(b)(6) standard, paragraph 251, helps us,

M8VQgoo1

1    not them.

2              Let's go back in time.  We think that the conduct

3    starting in 2009 when we say that the tie began is still an

4    unlawful tie because, my friend is exactly right, we agree the

5    test in the Second Circuit is coercion, and publishers were

6    absolutely coerced to accepting Google's ad server because if

7    they didn't, they wouldn't get realtime access to bidding

8    information on AdX – that's the tying product – and their

9    revenues would have dropped by 40 percent.

10             That's pretty strong coercion.  It's not a gun to the

11   head, but that's not the level of coercion that's required in

12   the Second Circuit.  And I'd point your Honor to the *Texaco*

13   case, where even verbal threats a single time can be enough to

14   coerce a customer into accepting a tie.  So, again, drawing

15   reasonable inferences in our favor, that shows that the tie was

16   actionable.

17             And the final point I'd make is there's no arguing

18   with success.  When Google first purchased DoubleClick, it had

19   a little less than half the market.  Now there's no dispute.

20   Google has 85, 90 plus percent of the server market.  So all of

21   this coercion worked if you draw the allegations in our favor.

22   They're going to want to say it's because we have such a great

23   secret sauce, and we did all of this innovation, and they're

24   going to be entitled to make those points again at a later

25   procedural posture.  But if you take all of the well-pleaded

M8VQgoo1

1    facts as true and draw the inferences as you're supposed to in

2    favor of the plaintiffs, the reason that Google grew its market

3    power from roughly half to almost a stranglehold on the entire

4    marketplace is because they engaged in an unlawful tie.

5            THE COURT:  I think we can pause on this.  And there

6    is agreement that I review the allegations of the complaint, I

7    hold the plaintiff to those allegations, and I determine

8    whether or not they plausibly allege actual coercion, which

9    both sides agree.  And there's case law on what is actual

10   coercion for these purposes, and no one has suggested that it's

11   a gun-to-the-head standard, but it is actual coercion.

12           So that's really what I need for the purposes of the

13   oral argument.  I'll give you an opportunity to very briefly

14   say what you wanted to say, but then we're going to move on to

15   the next topic because I think I know what I need to do.

16           Go ahead.

17           MR. MAHR:  I just wanted to make a point on the other

18   ground which I didn't get to address -- the economic coercion

19   argument.

20           THE COURT:  Yes.

21           MR. MAHR:  They clearly define the tying and tied

22   products as DFP and AdX, but then they add in, without defining

23   what it means, live competitive bids to augment one or the

24   other sides of the tie.  They don't say what live competitive

25   bids is.  They don't define the tying product as AdX with live

M8VQgoo1

1    competitive bids.  They don't define the tied product as DFP

2    with live competitive bids.

3           That's why I think at the end of the day, we think

4    this is nothing more than an argument that will -- two of

5    Google's products work together better with each other than

6    they work with competitive products.  And because they can't

7    identify live competitive bids as a second product, that better

8    functionality between two of Google's products on Google's own

9    platform is not enough to convert their tie into actual

10   coercion.

11          THE COURT:  Thank you.  I think I know what I need to

12   do to analyze the claim.

13          Let's talk about the NBA.  And, no, it's not

14   basketball.  Anyway --

15          MR. KELLER:  It's Star Wars.

16          THE COURT:  It's Star Wars.

17          So, briefly, I understand the claim with regard to

18   header bidding.  And then I wanted to turn to the in app

19   argument under the NBA.  But the question is, in essence, or,

20   in reality, there's an allegation here that there are certain

21   beneficial provisions to Facebook in the NBA:  Goodies,

22   wonderful things.

23          And it's alleged that Google was most unhappy, greatly

24   upset, motivated by murderous intent with regard to header

25   bidding.  Take your pick.  But they didn't like header bidding,

M8VQgoo1

| | |
|---|---|
| 1 | and the allegation is that the NBA was a payoff to Facebook to |
| 2 | get it to abandon header bidding.  And the question is whether |
| 3 | that is plausibly alleged, drawing all inferences in favor of |
| 4 | the pleader, or not plausibly alleged. |
| 5 | So with that background, and recognizing that I'm not |
| 6 | going to decide these issues today, obviously, Mr. Mahr, I'll |
| 7 | give you an opportunity to make your pitch on that, and I'll |
| 8 | give the plaintiff the same opportunity |
| 9 | MR. MAHR:  Thank you, your Honor. |
| 10 | So this claim is obviously all about an agreement, and |
| 11 | that's where we're focused in.  The NBA is in fact an |
| 12 | agreement.  It's just not an unlawful one.  There's not even a |
| 13 | restraint of competition in it. |
| 14 | The plaintiffs in their complaint suggested some kind |
| 15 | of selective cohortation and insinuation there was something |
| 16 | nefarious about the NBA.  We just gave it to you, and we think |
| 17 | it's clear on its face without any factual issues that there is |
| 18 | nothing anticompetitive about that.  Google can allow Facebook |
| 19 | to come on and bid on its platform for free.  So the fact that |
| 20 | it did under terms that it felt were commercially reasonable |
| 21 | isn't of any moment to Section 2. |
| 22 | Having provided you with the contract, and having to |
| 23 | face the fact that there is no agreement that restrains |
| 24 | competition between Google and Facebook in that agreement, they |
| 25 | pivot in their opposition to say, well, of course they didn't |

M8VQgoo1

1    write it down.  It must be some kind of secret agreement

2    outside of the four corners of the NBA.

3           Number one, while that's alleged in their opposition,

4    they can't amend their complaint through their opposition, and

5    their complaint itself has no allegation of this secret

6    agreement outside the four corners of the NBA.

7           THE COURT:  Well, I don't know whether that's

8    literally correct, but anyway, go ahead.

9           MR. MAHR:  Well, I don't think -- I don't know which

10    part you mean.

11           THE COURT:  I mean in terms of -- do they not suggest

12    that this was an agreement favorable to Facebook that Google

13    offered on condition unwritten that Facebook abandon header

14    bidding.

15           MR. MAHR:  That's the part that is completely

16    conclusory and doesn't get close under *Twombly* -- who, what,

17    where, when.

18           THE COURT:  That may be.  I'm not going to adjudicate

19    that today, but that is in the allegations purportedly in

20    support of the count.

21           MR. MAHR:  I don't see it in the allegations.  We've

22    looked all over where they say there was some agreement

23    outside.  They say it in their brief.  But even if they say it

24    in their complaint also, and I missed it, they don't say it

25    with anything close to what *Twombly* requires.

M8VQgoo1

1          THE COURT:  Let me give the plaintiffs an opportunity.

2          MR. KELLER:  Thank you, your Honor.

3          We don't have to separately plead that the agreement

4     was both the written document and what they agreed to in the

5     C-suite because we're talking about the Sherman Antitrust Act

6     which talks about agreements in restraint of trade, and case

7     law already defines the agreement as beyond the four corners of

8     the document.

9          We agree that they didn't write down exactly what your

10    Honor previously said, which is the way we couch this

11    allegation.  They didn't write down:  Google will give Mark

12    Zuckerberg a suitcase full of money in exchange for Facebook

13    agreeing to substantially curtail its support of header bidding

14    because no one wants to go to jail and wear an orange jumpsuit.

15         So they instead documented the way that they were

16    going to transfer wealth to Facebook in exchange for abandoning

17    header bidding through the network bidding agreement.  And it's

18    not just a conclusory allegation that that's true -- which I

19    agree, you don't have to accept legal conclusions under *Iqbal*

20    and *Twombly*.  The complaint goes through the timing and the

21    statements that were made by executives recognizing, for

22    example, at Facebook that we're going to publicly support

23    header bidding as this new disruptive technology, but privately

24    saying that, you know, competition is hard and then recognizing

25    that Google really doesn't like header bidding and wants it to

M8VQgoo1

1   go away.  And then close in time temporally to that we get the

2   network bidding agreement, which, by the way, Google kept

3   secret from everybody else.  It said that all of the advantages

4   that Facebook had nobody actually had, and that it was fair

5   auctions for the in app impressions where everyone is on a

6   level playing field.  Not true.  Facebook had timing

7   advantages, information advantages, all the things that we

8   document about the network bidding agreement.

9          So if you take all of those allegations together as

10  true, yes, within the four corners of the document, they were

11  smart enough not to write down their illegal behavior that

12  could have resulted in criminal sanctions, but we are well

13  above the 12(b)(6) line to plausibly allege nefarious

14  misbehavior to kill off a nascent technology that could have

15  disrupted Google's monopolies.

16          THE COURT:  I understand the argument.  I'm going to

17  give the movant the last brief word on this, and then we're

18  going to move on.

19          MR. MAHR:  Two points:  One, Mr. Keller's statement

20  just now about an agreement in C-suite is more detail about

21  this alleged agreement outside the four corners of the document

22  that isn't anywhere in the third amended complaint.

23          Number two, the third amended complaint, paragraphs

24  419, 422, 509, it provides the reason and even explains

25  Facebook was doing an 18-month strategy to appear to have -- to

M8VQgoo1

1        support header bidding in order to get better terms to what it

2        really wanted, which was access to open bidding.  That

3        explanation is in those paragraphs of the complaint.

4                When the face of the complaint shows perfectly valid

5        independent business justification for the two parties entering

6        into the written agreement, the written agreement itself has

7        nothing unlawful in it, courts don't say, well, they said there

8        might be -- in oral argument they said there might be something

9        in the C-suite without saying who, when, what.  How did they

10       even agree to say this written agreement we just entered into

11       that's completely enforceable, that in four different ways

12       preserves Facebook's ability to use competitive technology,

13       that's not really enforceable?  How can we defend that when the

14       most we've heard about it now was it was in the C-suite?

15               THE COURT:  Thank you.

16               So now let's talk about the specific provisions

17       relating to in app markets and the alleged provision that

18       restrains or guarantees, I should say, Facebook a certain win

19       rate in the auction for in app impression.

20               So let me hear from the defendant on this.

21               MR. MAHR:  Well, again, we don't think there's an

22       agreement, but do you mean the extent to -- the extent to which

23       they --

24               THE COURT:  Well, there is the NBA, and as I see it in

25       the briefing between the parties, the parties on this end of

M8VQgoo1

1    the motion each are referring to the language of the NBA to

2    support an interpretation.

3            Now, I think in fairness to the plaintiffs, they say,

4    well, there could also be a wink and a nod here as well, but

5    the principal argument is directed to the language of the NBA.

6    And maybe I didn't read this correctly, but I thought the

7    plaintiff was taking the position that there was a guaranteed

8    win rate.  It says ten percent, but it winds up being about

9    7.2, and then I think you argue it's really more like 4, 3.

10   But the bid and the ask seems to start with the language of the

11   agreement

12           MR. MAHR:  Yeah.  Well, I think we think that the

13   language of the agreement, that win rate, is not an agreement

14   not to compete.  It's an undertaking to compete; that Facebook

15   has to compete enough in the auction so that it wins about ten

16   percent of those that it bids in.

17           And there's no court that's found an agreement to

18   compete to be anticompetitive.  There's no obligation on the

19   other side of that that Google can't compete or shouldn't

20   compete.  Google when they're on that platform together

21   competing --

22           THE COURT:  Well, the plaintiff says, then they

23   shouldn't compete in excess of 92 percent because -- or 90,

24   whatever it is, percent because Facebook is supposed to win its

25   7.2 percent, and Google ought not be winning more than, I

M8VQgoo1

1    guess, 93 percent, something like that.

2              Did I mischaracterize that?

3              MR. KELLER:  No, you have that right.

4              THE COURT:  That's an argument out of their brief.

5              MR. MAHR:  But, again, the obligation is only a basic

6    obligation that if we're going to go into this agreement where

7    we're taking certain measures and putting in play certain

8    systems to get your access to this platform, we want to make

9    sure that you participate on the platform.  So we want to make

10   sure that you bid enough to win at least ten percent of the

11   auctions that come your way.

12             THE COURT:  Now, the other argument that I see is

13   there are minimum spend rates for Facebook, and the argument

14   seems to be that, well, if you've agreed with Facebook that

15   they will spend a minimum amount, whatever that is, $1 or a

16   hundred million dollars or $500 million, whatever those numbers

17   are, those are dollars that can't go into header bidding is the

18   argument.

19             How do you address that?  How do you meet that

20   argument?

21             MR. MAHR:  They would have to show that those dollars

22   are substantial foreclosure of Facebook's ability to bid on

23   other exchanges like header bidding exchanges.  They haven't

24   shown that.  They've shown the numbers.

25             THE COURT:  And the numbers are flashy.

M8VQgoo1

1          MR. MAHR:  The numbers are flashy, maybe not compared

2     to how much Facebook spends on advertising overall.  They don't

3     make that determination.  We can't just go from big numbers --

4     ten million might be an enormous number to me.

5          THE COURT:  What about 500 million?

6          MR. MAHR:  Same thing.  When you're talking about some

7     of these large companies, 500 million might not be a

8     significant percentage of the spend of the company, and that's

9     what foreclosure is.  Foreclosure isn't dollars.  Foreclosure

10    is a percentage of the market.  Just because the market is --

11    this is billions of dollars in this market.  And just because

12    it's a big market doesn't mean you can take a big number and

13    say that's substantial foreclosure.  It's the percentage

14    foreclosed.

15         Just like in your *Wellnexx* case, you talked about the

16    deal between two parties that closed off 40 percent of the

17    market was not anticompetitive because it was 60 percent for,

18    in this case, header bidding to compete for.  We're talking

19    here about ten percent and about whatever percentage the

20    minimum spend requirements are, which plaintiffs don't tell us

21    in their complaint.  And so you can't determine whether and we

22    can't determine whether there is substantial foreclosure, which

23    is the question under Section 2.

24         THE COURT:  But you have a little bit of a problem

25    with regard to the NBA in terms of you can -- you feel free and

M8VQgoo1

1    I understand why, to quote from the actual agreement because

2    the agreement is integral to the plaintiff's allegations, but

3    so can they.  That's fair for the plaintiffs to also, once the

4    defendant has come forward with the agreement, for them to also

5    rely on it.  And I take the plaintiff's point that the

6    agreement is not necessarily the final agreement with all

7    amendments.

8            But, anyway, let me hear from the plaintiff.

9            MR. KELLER:  Thank you, your Honor.

10            I do think that with respect to the conduct we're

11    talking about here, we're relying mostly on the four corners of

12    the written document as opposed to the winks and the nods that

13    we were talking about previously.

14            But a couple of things.  My friend equivocated a

15    little bit, perhaps unintentionally, where he said we want

16    Facebook to participate in the auctions, but the minimum bid

17    percentage is not about participation.  Google could have said

18    we're going to give you all these secret information

19    advantages.  We're going to let you have better timing so that

20    you have longer to bid through your network on these

21    impressions without setting a minimum win percentage.  Once you

22    start doing that -- and let's, of course, recall, in this

23    market, Google and Facebook are direct competitors.  They're

24    both bidding on the same impression, along with others who

25    don't have the same information, speed and other advantages

M8VQgoo1

```
1    because Google concealed that from the other participants in
2    this market.
3            But once you have that dynamic whether directly
4    bidding against each other, setting a minimum percentage that
5    Facebook has to win, which is just one minus the number that
6    Google has to win, encourages both sides to bid lower.  That's
7    the only reason economically that you would put that sort of
8    percentage into the written document against two competitors.
9            So it's pretty classic bid rigging just applied to a
10   new technological context, and that's certainly the most
11   plausible inference that you can draw on a 12(b)(6).  They say
12   that there are pro competitive reasons for it, but getting
13   Facebook to participate in the auction, I could see that being
14   pro competitive.  Setting the minimum amount that Facebook has
15   to win, that's not pro competition any more.  That's just
16   depressing bids where two competitors know "I should probably
17   lay off this one because Facebook hasn't hit its minimum yet
18   and they're going to bid harder.  I'll stand back."
19           And once they have hit the threshold, Facebook starts
20   thinking, "I've already hit my minimum threshold.  Google is
21   probably going to win this one.  I don't need to bid as
22   aggressively."  That's classic depressing of prices in an
23   auction market.  And, again, on a 12(b)(6), I think we're
24   comfortably over the relevant line.
25           I think that your Honor has it exactly right, that the
```

M8VQgoo1

```
1    minimum speed and all of the other advantages is basically the
2    way or the minimum spend, excuse me, that was required of
3    Facebook is the way to take Facebook out of the header bidding
4    market.  You're right that the numbers are significant.  It's
5    not ten million.  It's orders of magnitude more than that.
6    And, again, the proof is in the pudding.  The complaint alleges
7    that Facebook substantially reduced its supportive header
8    bidding and is no longer participating nearly as much with that
9    technology.
10          And so when we go the extra step of pleading, and it
11   worked, I think, again, on a motion to dismiss drawing
12   inferences in our favor, it's fair to say that the minimum
13   spend was a mechanism to lock Facebook in into Google's
14   products so that it wouldn't support header bidding as it
15   previously said it was going to do.
16          THE COURT:  Thank you.
17          Mr. Mahr.
18          MR. MAHR:  I think Mr. Keller is jumping back and
19   forth between the minimum spend and the win rate, but with
20   respect to the win rate, he said it would be pro competitive if
21   it was an agreement to make sure Facebook bid.  Well, having
22   Facebook bid if they only bid one penny for each auction
23   doesn't serve Google's goals as the party running the auction.
24   Remember, this is a vertical contract between Google running
25   the auction and Facebook bidding on the auction.
```

M8VQgoo1

1        The benefit that the complaint itself recognizes is

2   that Facebook brings millions of advertisers in demand onto our

3   bidding platform.  And we can tell our publisher clients come

4   to Google's open bidding because we not only have Google ads,

5   we not only have all these other sources of demand, but we now

6   have Facebook demand on it.  Facebook come on and bid a penny

7   wouldn't accomplish that.  We needed them to bid hard.  That's

8   why it's so kind of upside down that plaintiffs are challenging

9   agreement -- Google's -- Facebook's obligation to compete hard.

10       Number two, Google doesn't benefit from Facebook

11   winning.  Google gets a penalty paid to it if Facebook doesn't

12   meet its win rate.  So Google has no reason to lay off.  If

13   anything -- and I don't think there's any basis for this -- if

14   anything, that would make Google bid harder because not only

15   did they get the inventory, but Facebook doesn't make its

16   number and has to pay a penalty.

17       THE COURT:  All right.  I will bear down on the

18   agreement and the allegations of the complaint.  But I'm going

19   to suggest we move on from there.

20       So let's talk now, we'll get into the catalog of

21   alleged anticompetitive behavior.  You're allowed to look at

22   your notes because, as you know from spending time with this,

23   there are certain subtle distinctions between some of the

24   strategies and, you know, I admire Mr. Keller and Mr. Mahr if

25   their heads were not spinning while they were reading or

M8VQgoo1

| | |
|---|---|
| 1 | writing this, but, anyway, let's talk about unencrypted user |
| 2 | IDs. |
| 3 | Mr. Mahr and Mr. Keller, I think you've done good jobs |
| 4 | on all of this in laying out your arguments, and it's |
| 5 | refreshing to have you in today and to hear from you because it |
| 6 | reinforces what a good job you've all done on your briefing. |
| 7 | So this is good.  But, Mr. Mahr and Mr. Keller, I'm going to be |
| 8 | familiar with what you're going to say, but I'm going to give |
| 9 | you a chance to briefly say it anyway. |
| 10 | Mr. Mahr. |
| 11 | MR. MAHR:  So, I think, first of all, there was a lot |
| 12 | of people other than me writing that brief, and I want to make |
| 13 | sure they're recognized too. |
| 14 | THE COURT:  I know that. |
| 15 | MR. MAHR:  I know you know that, but I couldn't help |
| 16 | but say it. |
| 17 | The customer data claims, and it's all of them, I |
| 18 | think -- and this plans -- I'm going to say this again and |
| 19 | again as we go through each of these categories of behavior. |
| 20 | All of the conduct that is alleged is conduct that takes place |
| 21 | on Google's platform of ad tech products.  So this is all in |
| 22 | the very narrow area of like Google Ski Mountain when you get |
| 23 | into *Trinko* and *Aspen* and *LinkLine*.  This is not Google taking |
| 24 | actions on its platform that keep people from dealing with |
| 25 | rivals outside in the marketplace.  It's just that these affect |

M8VQgoo1

1   the conditions of rivals access to Google's own platform.

2          This one in particular deals with essentially

3   plaintiffs are asking a duty to deal with customers, a duty to

4   provide customers with the data that they -- that Google

5   develops over the course of serving them so that those

6   customers can then provide it to our rivals.

7          Google is not under any obligation to deal with its

8   customers in that way any more than if I learn the proclivities

9   and preferences of a particular client and how best to serve

10  them, I have to tell another firm, oh, if you're trying to get

11  their business, here's how they like briefs written, here's how

12  they like cases stats, and those kind of things.  That's all

13  that is.

14         The allegations of the complaint make clear that the

15  data at issue, whether it's the customer ID numbers or any of

16  the other data, is data generated by Google and its tools in

17  the course of people coming using our products.

18         And Mr. Keller mentioned secret sauce.  It's our

19  secret sauce.  Our understanding of our customers is part of

20  our secret sauce.  We don't have to share that with our

21  customers.  We certainly don't have to share that with our

22  customers so they can share it with our rivals.

23         THE COURT:  Mr. Keller.

24         MR. KELLER:  Thank you, your Honor.

25         So the hashing of IDs is emblematic of lots of other

M8VQgoo1

1    things we're going to talk about.  Hopefully, I won't repeat

2    myself too much.

3           But look at paragraph 264 of the complaint.  This data

4    is owned by the publishers, according to the well-pleaded

5    allegations.  You don't have to take my word for it.  Paragraph

6    264 is quoting Google when it was talking to the FTC to explain

7    why the FTC should allow it to close on a DoubleClick

8    transaction.  So Google is essentially saying, "Publishers, you

9    can't send the data that you own that you think is crucial, and

10   is crucial, for advertisers to know what they're bidding on to

11   give you the highest possible bids.  We're going to hash the

12   IDs unless you will use our products."

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

M8VVGOO2

1          THE COURT:  Let's just hang on, because I want to make

2     sure I understand this.  The statements made to the FTC were at

3     or about the time of the acquisition of DoubleClick.

4          MR. KELLER:  Correct.

5          THE COURT:  All right.  And at that point, it was -- I

6     don't know, but reading your pleading, it sounded like it was a

7     cookie-based world.  Isn't that how it worked?  It was

8     unencrypted.

9          MR. KELLER:  Correct, your Honor.

10         THE COURT:  Okay.  So it's the publisher that

11    collected the cookie, not Google; correct?

12         MR. KELLER:  Correct.  And then provides -- sorry.

13         THE COURT:  So the statement that Google made to the

14    FTC — and you don't dispute this, you embrace it — is totally

15    accurate.

16         MR. KELLER:  I totally embrace that the publishers own

17    this data.  And that when Google monopolized the server market,

18    they provided that data to Google to help optimize how they are

19    going to communicate the impressions that they have for sale

20    for advertisers.  And then Google took that data that belonged

21    to the publishers and said, You can't share it with advertisers

22    unless you are using a Google platform.

23         And we just heard that that's Google's secret sauce.

24    Hashing IDs and preventing that information from going from the

25    publisher to the advertiser, that's not technological prowess,

M8VVGOO2

1   that's not business acumen, that's not historical accident, to

2   quote the *Grinnell* case.  That's just nakedly anticompetitive

3   behavior to prevent Google's customers from dealing with

4   rivals.

5           THE COURT:  You say in your complaint -- this is not

6   the defendants' brief, this is in your complaint.  You say that

7   Google said this was to enhance user privacy.  And you say that

8   was pretext.

9           MR. KELLER:  True.

10          THE COURT:  But the reality is that they took the data

11  of the publisher and they transformed it by encrypting it.

12  "Encrypting" is not my word, that's your word.

13          MR. KELLER:  Also true.

14          THE COURT:  And so then it's being used in connection

15  with auctions on AdX.  And I guess if you're, what, a nonGoogle

16  exchange participating, then you don't have the wherewithal,

17  the ability, to unencrypt.  And the disadvantage to that ad

18  exchange that doesn't have the encrypted information as I read

19  it from you is that they run the risk that they could have by

20  John Conner, a user, twice, because maybe John Conner is

21  reading *Field and Stream Magazine* and also *Sports Illustrated*,

22  and maybe you would wind up sending two ads to him.

23          MR. KELLER:  Yes, I think you have that exactly right.

24  And they are preventing the publisher, therefore, from using a

25  rival exchange, unless they are willing to take depressed bids

M8VVGOO2

1    because of that information asymmetry that you just talked

2    about.

3            It's not special sauce to encrypt this information;

4    it's utilizing the monopoly that Google has over ad servers

5    over 90 percent market share to tell their customers, the

6    publishers, We're not going to let you send the unencrypted

7    data unless you use us.  And then, no problem, we'll make sure

8    that the advertisers know exactly who they are bidding on.

9    That's not innovation; that's not a great Google software

10   engineer who came up with something special.  That's just

11   preventing a customer from shopping around and using other

12   competitors.  That's exactly the sort of misconduct that

13   Section 2 is looking towards.  It's preventing competitors from

14   getting access to what the publishers want to give them.

15           You would normally think, if someone had a monopoly

16   over just ad servers, they would say, Publishers, do whatever

17   you want.  We'll give the information that you want to give to

18   the advertisers, and then we'll charge you the monopoly price

19   for it.

20           But what Google is doing is it's saying, We've got

21   this monopoly, and we're going to funnel you into our exchange

22   only if you want to get the best prices.  No other exchanges

23   will be able to effectively compete.  That's not *Aspen Skiing*,

24   that's not *Trinko*, that's preventing customers from shopping

25   their business to competitors which is harming the competitive

M8VVGOO2

1      process.

2                  THE COURT:  Okay.  Mr. Mahr.

3                  MR. MAHR:  Your Honor, I have to disagree.

4                  If the publishers can provide us with information,

5      they can provide the other competitive exchanges with the

6      information or other ad servers with the information.  This

7      isn't a situation where it's a *Lorain Journal*, where we said,

8      If you provide that information to another exchange that you

9      want to search for advertising demand on, you can't deal with

10     us.  Not at all.

11                 It's when we have that information, we do something to

12     it, even if it's encrypting it; and then the customers or our

13     rivals want us to then share that information with the rivals.

14     There's no obligation there to share it either with the

15     customers or the rivals after we've done something to it.  And

16     if it was just what the publishers gave us and we didn't do

17     anything to it, well, then they could give it to anyone else

18     they wanted also.

19                 MR. KELLER:  Can I stay one thing about that?

20                 THE COURT:  Sure.

21                 MR. KELLER:  I'm sorry to try and steal the last word.

22                 We just heard him say that they could provide it to

23     other ad servers.  There are no other ad servers.  Google has

24     over 90 percent of the market, 99 percent of large publishers.

25     There's no one else.  And the complaint documents in detail why

M8VVGOO2

1   this particular market is one where publishers only use one

2   server.  It doesn't make sense to have more than one server

3   because of the optimization that goes into these auctions that

4   are happening billions of times a day every nanosecond.  So

5   there's no one else for them to give it to; it's just Google on

6   the server side.

7           MR. MAHR:  Which, your Honor, takes us to *LinkLine* and

8   *Trinko*.  Even an alleged monopolist doesn't have any duty to

9   support its rivals by providing them with this kind of

10  information.

11          THE COURT:  Okay.  I have the arguments.

12          Let's talk about dynamic allocation.  And in addition,

13  I want to hear about where this -- what market, if any — and I

14  guess this is a question that the plaintiff will have to get

15  to.  Where is it anticompetitive, in what market?

16          But let me hear from the defendant first as to your

17  pitch as to why it's not anticompetitive conduct at all.

18          MR. MAHR:  It's not anticompetitive conduct at all

19  because dynamic allocation is a feature, one going back a

20  decade, that brought static demand that existed on an ad server

21  and competed that demand with AdX's live bidding, real-time

22  bidding.  And so the only time that static -- let me put it

23  this way:  That's only increasing the amount of demand for an

24  individual piece of ad inventory.  Increasing the amount of

25  demand increases the price that the publisher gets, increases

M8VVGOO2

1      the monetization the publisher gets, and is a positive thing.

2              Even if it weren't a positive thing, which it clearly

3      is, it all takes place on Google's ecosystem of ad tech

4      products.  And so the idea that because Google allows --

5      increases the amount of demand for a particular piece of

6      inventory by putting AdX in, doesn't mean it has to let all the

7      competitors in as well.

8              MR. KELLER:  Thank you, your Honor.

9              This is funneling publisher inventory into AdX, where

10     that's one of the markets that this is foreclosing competition

11     in and allowing Google to win impressions for a penny more than

12     stale bids.  And so it's not comparing apples to apples when

13     you put the competitors at a disadvantage in these auctions

14     that are happening so quickly.  And you don't explain to

15     publishers that these are the rules of the auction, because if

16     they had known --

17             THE COURT:  This is a world -- let me interrupt.  This

18     is a world where other ad exchanges are permitted to bid,

19     right?

20             MR. KELLER:  Correct.

21             THE COURT:  Okay.  So they're bidding in a dynamic

22     allocation world.  And what you say is Google is looking at the

23     historical average bids and declaring the impression to have

24     been sold if Google's -- is it Google's customer ad buying

25     tool, is that what it is, bids one penny more, is that what

M8VVGOO2

1    you're alleging or --

2            MR. KELLER:  Yes.  So let's take Google as a good

3    example.  Imagine that you, your Honor, were looking at a

4    real-time price of Google stock, and it's trading at $100 a

5    share.  And a bunch of old 15-minute stale pricing information

6    put in bids for $98.  And then you could just come along and

7    say, Well, I know it's already trading at 100.  I'll bid 98 and

8    a penny, and you win the auction.  Yeah, you've increased the

9    price over those stale bids that aren't competing on a level

10   playing field.

11           THE COURT:  Is this going on before the other

12   exchanges present their bids or is it after they present their

13   bids?  How does that work?

14           MR. KELLER:  Dynamic allocation occurs in the server.

15   So it's a manipulation of the auction that's occurring in the

16   server based on historical data, and then funneling the ad

17   impression into Google's exchange.  So my understanding is then

18   the other exchanges are being deselected by Google because of

19   that stale information.

20           THE COURT:  So the publisher, of course, under your

21   explanation, never sees what might otherwise have been a higher

22   bid from a rival exchange.

23           MR. KELLER:  That is correct.  Google touted this to

24   publishers as increasing their yield and profitability, but it

25   had the opposite effect, according to the complaint.

M8VVGOO2

1      THE COURT:  I think I understand your argument as to

2    the ad exchange market and the impact on competitors in the ad

3    exchange market.  But how is this harm to competition in the ad

4    server market or harm to competition in one of the ad buying

5    tools markets?

6      MR. KELLER:  It's in the ad buying tools market in

7    addition to the exchange, because Google's ad buying tools get

8    these privileges when bidding on Google's exchange.

9      THE COURT:  So competitors in the ad buying tool

10   market do not get this.  Now, are you contending this is for

11   both small and large or small or large or what are you

12   contending?

13     MR. KELLER:  It's definitely for small, where we

14   allege that Google has market power; but it's also for large,

15   where they don't necessarily have a monopoly.

16     THE COURT:  Right.  Okay.

17     Yes, Mr. Mahr.  Go ahead.

18     MR. MAHR:  Sorry, your Honor.  If I may, I'll try to

19   simplify this.

20     There's the static bid in the ad server.  The winning

21   bid is $8.  Prior dynamic allocation, it went for $8.  Through

22   dynamic allocation, Google found a way to say, Hey, we have all

23   this demand over in AdX.  Why don't we take this winner and see

24   if we can beat it; see if there's someone else -- and it's not,

25   you know, deciding then.  This is all preprogramed.  Let's see

M8VVGOO2

1    if there's an existing willingness to pay more than that $8.

2    If there is, then it goes to that.

3          THE COURT:  But what the complaint is telling me, it

4    may or may not be true, is there is another participant in the

5    ad exchange market that has a bid from an ad buying tool or

6    from somewhere, has a bid that is a higher bid, one higher than

7    the historical bids.  And they're ready, willing, and able and

8    desirous of presenting that bid and, if presented, it will be

9    the highest bid.  But Google, though, claiming to allow the

10   rival exchange to compete, is pushing them aside and causing

11   the transaction to clear on the basis of a penny more than the

12   historical average bid, without consideration of the higher

13   bid.  Right?

14         MR. MAHR:  So that argument is that when Google found

15   a way to get more for the bid, the static bid, by introducing

16   its ad server through dynamic allocation, it shouldn't have

17   been allowed to do that, until it found a way to have the same

18   capability with every other rival ad server.

19         So you've got this great innovation --

20         THE COURT:  It's not the same way with every other ad

21   server.  The other ad server says, Let me just submit a bid.

22   Maybe my bid won't be the highest bid, but if it's the highest

23   bid, then it clears.

24         MR. MAHR:  That all happens now.  But this is back in

25   ten years ago, 2007, 2009 when dynamic allocation came around.

1    And it was just the beginning of taking this static world and

2    bringing it to real time.  We figured out how to do it between

3    our static at server and our real-time exchange before we

4    figured out how to do it with everyone else.  And we're under

5    no obligation to figure out how to do it with everyone else.

6              THE COURT:  All right.

7              Speaking of new and improved, how about enhanced

8    dynamic allocation?

9              MR. MAHR:  It's the same thing.  It just applies to a

10   broader category of the static demand.  It does the same thing

11   but brings in guaranteed demand, and brings it into a situation

12   where it can be compared against real-time bidding in AdX.

13   It's just a little different because you can't judge guaranteed

14   demand just by the price it's willing to pay; you have to also

15   factor in that it's guaranteed.  So if you've already made your

16   guarantee amount, well, then you can just treat it as a bid.

17   If you're woefully short of the guaranteed amount, even if that

18   bid is lower, it might win anyway because you need to --

19             THE COURT:  Publisher's price floor.

20             MR. MAHR:  Yes.

21             THE COURT:  Okay.

22             MR. MAHR:  So it's the same idea.

23             And again, the idea that when Google found a way to

24   introduce real competitive -- real-time bidding from its own ad

25   server to increase the amount that publishers were getting from

M8VVGOO2

1    the ad server alone, I mean it's on its own ad exchange and

2    introduces real-time bidding to increase the amount of

3    monetization that publishers were getting on the ad server

4    before, the argument that the state attorneys general are

5    making is, Oh, you can't come up with that innovation until you

6    figure out how to do it for all your rivals, too.  And that's

7    just not the law under *Trinko, LinkLine*, or any case.

8              THE COURT:  All right.

9              Let me hear from Mr. Keller.

10             Mr. Keller, one of the things you can straighten out

11   for me is there is a lot of discussion about cherry-picking the

12   higher value ads through enhanced dynamic allocation.  And

13   maybe I'm missing why -- I mean, I understand what the

14   consequence of that would be; I understand higher value or big

15   percentage of revenue, but doesn't this -- doesn't what you're

16   describing work equally, whether it's a high impression or a

17   low impression, isn't that it -- is that a *non sequitur*?

18   Please explain that to me.

19             MR. KELLER:  I hope it's not a *non sequitur*.  You're

20   right, the one thing I was going to recommend that your Honor

21   take away from the enhanced dynamic allocution is that

22   identification and forcing publishers to put their highest

23   value inventory through AdX.

24             THE COURT:  Where does that come from that it's the

25   highest value they have to put through?

M8VVGOO2

1            MR. KELLER:  From the server.

2            THE COURT:  Yes.

3            MR. KELLER:  The server identifies it, and then

4     essentially forces them to put it on Google's exchange.

5            The reason it's not a *non sequitur*, your Honor is

6     correct that it would be anticompetitive, whether they did it

7     for the most valuable impressions, the least valuable

8     impressions, or everything in between.  But it obviously

9     forecloses more competition on the merits when you take the

10    most valuable inventory that publishers have and force it onto

11    the exchange.  You can do more damage with fewer forced

12    impressions, so to speak, when you're taking the highest value

13    ones.  And like in a lot of industries, there's an 80/20 rule

14    of thumb where your most valuable 20 percent of impressions

15    produce the lion's share of your revenue.  And so zeroing in on

16    that is a way to make it seem like you're not necessarily

17    engaged in that much foreclosure of competition, but you really

18    are, because you focused on the inventory that matters most to

19    the publishers and therefore to the advertisers.

20            THE COURT:  So how is competition in, let's say, ad

21    tools affected by this, if at all?  It may not be your

22    allegation, but --

23            MR. KELLER:  The answer is similar to the garden

24    variety, as opposed to the enhanced dynamic allocation, the

25    advantage that the bidding tools get.  And telling the

M8VVGOO2

1    publishers that AdX is the only way that you're going to get

2    access to the must-have Google Ads small buyer purchases from

3    advertisers.  Google Ads is the small buying tool.

4              THE COURT:  But can you not participate on AdX if you

5    use a nonGoogle ad buying tool?

6              MR. KELLER:  You can participate on AdX, but not on

7    the same auction terms.  There are privileges that Google gives

8    to its own buying tools.

9              THE COURT:  How does that factor in specifically here

10   with this item -- if you want to go back to dynamic allocation,

11   either dynamic or enhanced dynamic, how does any restriction on

12   the ad buying tools -- or how does that factor in?

13             MR. KELLER:  You've got to use the exchange.  But in

14   terms of the ad buying tools, the access to Google Ads

15   purchasers is part of the way that publishers are forced to put

16   their inventory on AdX.

17             THE COURT:  You'll have to forgive me.  Maybe it's the

18   hour, but I'm getting a little lost here.

19             So rival exchanges can participate, in addition to

20   AdX, right?

21             MR. KELLER:  To bid on publisher inventory?

22             THE COURT:  Yes.

23             MR. KELLER:  Yes.

24             THE COURT:  And rival ad buying tools for large and

25   small advertisers can also participate, right?

M8VVGOO2

1           MR. KELLER:  On AdX?

2           THE COURT:  On AdX.

3           MR. KELLER:  Or just for the publisher inventory?

4           Yes.

5           THE COURT:  All right.  And so where is the -- now,

6    you're going to say that the way this is set up, those in the

7    ad server market, it's hurting competition because AdX keeps

8    winning these auctions the way they have it structured to the

9    detriment of competition in the ad server market.

10          MR. KELLER:  Correct.

11          THE COURT:  I'm not saying I'm buying anything here

12   today, I'm window shopping everything, but I understand that

13   argument.  But I'm saying to you I don't understand it with

14   regard to the ad buying tool there.

15          MR. KELLER:  I see.

16          I believe the answer is if you use a Google ad buying

17   tool, you have the full panoply of information that you need to

18   submit the bid on that most valuable inventory.  You don't have

19   that information if you're bidding with a different tool.

20          THE COURT:  But that's what Google is selling, I

21   guess.  What's inherently wrong with that?

22          MR. KELLER:  This goes back to our discussion about

23   hashing of IDs.  The publishers own the information about the

24   impressions that they are giving and they should be able to

25   communicate that freely, particularly for the 20 percent of

M8VVGOO2

1   impressions that are the most valuable and that mean the most

2   to them in terms of revenue.

3          And so these things are all interlocking forms of

4   anticompetitive behavior.  You have the hashing of IDs, which

5   gives information disadvantages, and then you have a

6   manipulation that forces the best inventory of the publishers

7   onto Google's exchange where only the Google ecosystem can see

8   it.  And so that's how this builds on top of the previous

9   misconduct that we talked about.

10          THE COURT:  Where am I getting from your complaint

11   that if I use a different ad buying tool and I participate in

12   an AdX auction, that there's some item of information that I'm

13   not getting?  I will confess, I missed that.  So if you could

14   point me to that, I would appreciate it.

15          MR. KELLER:  I hopefully can in a minute.

16          THE COURT:  Sure.

17          MR. KELLER:  Let me get paragraph numbers for you.

18          THE COURT:  Sure.

19          In the meantime, let me invite Mr. Mahr if he wants to

20   respond.

21          MR. MAHR:  I don't think it has anything to do with

22   the ad buying tools.  The only way AdX wins under DA or EDA is

23   if it has the highest bids.  So nobody is being forced.  It's

24   just the but-for world, before dynamic allocation and enhanced

25   dynamic allocation, is the inventory would have been sold at

M8VVGOO2

1    the static price.  Google just said, We have this reservoir of

2    real-time bids over here.  Shouldn't we see if there's a way to

3    just check that before we sell it, because there might be a

4    higher bid in the real-time reservoir.

5              THE COURT:  I get that argument.  Let's not look at

6    what the rival exchanges are bidding, because they could be

7    higher than a penny more than the historical.  Let's just look

8    at the historical.  I got it.

9              MR. MAHR:  We figured out to do ours first.  It's not

10   let's not look at our competitors.  It's not surprising that we

11   figured out how to do that with our own ad exchange.  To figure

12   out how to make these connections with other ad exchanges — and

13   this is why forced sharing and forced duty to deal is so

14   harmful — would require us to understand, How does your ad

15   server work?  How can we get more communication between your

16   tools and our tools?

17             We figured out how to do it first with our tools.  To

18   say we had to hold back that innovation until we figured out

19   how every competitor out there could do it with their tools

20   also I don't think is required under the antitrust laws.

21             THE COURT:  I've got the argument.  Go ahead.

22             MR. KELLER:  I won't respond, I'll just give you

23   paragraph numbers.  Paragraphs 261 and 266.

24             THE COURT:  Okay.  Thank you very much.

25             Now we're going to take three at once:  Project

M8VVGOO2

1   Bernanke, the Bell variation of Project Bernanke, and Global

2   Bernanke.  And if you haven't read the complaint lately, they

3   actually are three different things, or at least Bell seems to

4   be different than Project Bernanke.  But, in any event, let me

5   hear from the defendant first.

6       MR. MAHR:  So, your Honor, there may be three

7   different things, but they are three different ways of doing

8   the same thing, which is essentially a buy-side bidding

9   optimization.  It's a pricing tool.  It helps Google optimize

10  bids that it is placing on behalf of its advertisers on its

11  exchange to try to get more transactions to go through at

12  higher monetization rates, at higher prices.  It's internal

13  pricing on Google's tools; and it only affects the price of the

14  auction on Google's tools.  And it only has an effect if it

15  gets the publisher more money.

16      This is essentially an internal pricing algorithm

17  internal to Google's tools.  It works for Google's products.

18  There's no obligation to make it work with respect to rivals.

19      This is *LinkLine* again, where Chief Justice Roberts

20  said, If there's no duty to deal in the first place, there's no

21  duty to deal under the terms and conditions or preferences of

22  the rivals if you do invite them onto your platform.

23      THE COURT:  All right.

24      MR. KELLER:  So if you zoom out for just a second,

25  when you manipulate auctions and your marketplace is built

M8VVGOO2

around auctions, and you don't tell people the rules of the
auctions, it's going to stifle competition.  It's, again, not
about opening up your secret sauce, the recipe for your secret
sauce to your rivals; it's making sure that customers have the
ability to conduct these auctions in a way that is going to
maximize their needs and wants, revenue on the publisher side
and access to the right advertisements on the advertiser side.
And all three of these programs introduce a year apart are
classic auction manipulation, just like in the *Merced* case, for
example, or the *Barclays* case.

     So the Bernanke program, named for Helicopter Ben, as
he was sometimes called, for dropping money out of helicopters,
is essentially Google saying, Where we can get away with it,
we're going to change from a second price to a third price
auction without telling the participants in the auction.  And
we're going to give that third price to the publishers and keep
the second price for ourselves, which could be a very big
delta.  That's going to essentially be our slush fund so that
in other auctions where our advertisers on our tools aren't
necessarily going to win the auction, we'll top them up a
little bit to make sure that the competitor doesn't win the
auction.

     And you might say on that isolated auction, that one
particular auction, Hey, we did our advertisers a favor.  We
actually made them win when they would have lost.  But when you

M8VVGOO2

1    multiply the effects of this over billions of auctions where

2    you're taking over here, where you can get away with it, and

3    building a fund with your customers' own money to make sure the

4    competitors don't win auctions over here, and they don't know

5    that they've actually lost on these unfair terms, they just

6    think Google somehow is always winning these auctions, it must

7    be a better product, when that's not true, it's just this

8    manipulation that's transpiring.

9            Dynamic revenue share is another form of auction

10   manipulation.  You're adjusting your fees after the auction is

11   over, but you're privileging yourself to be the only one to do

12   that.  So if a different rival would have won the auction, when

13   you account for the commission that's charged — and Google

14   charges a super-competitive price commission that's four times

15   above what rivals are able to charge, which demonstrates its

16   market power over the exchange — Google then says, after the

17   auction is done and all the bids are in, We'll adjust our price

18   so that we can win this and our rival won't.  But we're not

19   going to make that known; we're not going to tell the rivals,

20   Hey, if you want to adjust your price, you'll have another

21   chance to do so and maybe win this impression.  And again, you

22   multiply the effects of that over all of these billions of

23   auctions, and rivals start to think, Man, we can't compete.

24   We're not winning enough of these transactions.

25           Same thing with preserved price optimization, which

M8VVGOO2

1   was the third version of Bernanke that you wanted to talk

2   about.  It's just overriding the publisher's own choices about

3   what they're willing to accept for their own inventory.  Why

4   would any monopolist just in the server market do that?  You

5   wouldn't.  You'd say, Set whatever reserve price you want.  You

6   know best what you're able to sell this for.  It's to

7   manipulate, once you're in the exchange, once again, so that

8   rivals aren't able to compete.

9           Publishers got wise to what Google was doing.  They

10   couldn't totally figure it out; Google stifled the information

11   that was provided to publishers.  But they started to realize,

12   something is fishy here.  So we're going to send our reserve

13   prices out in different ways to different exchanges, because we

14   have a sense to maximize our own revenue that this is going to

15   be best for us.  And Google's artificially — unbeknownst to

16   them — saying, No, we're going to change your reserve prices

17   for our own benefit.  Once again, harm to competition not by

18   Google refusing to share Google's innovations with its rivals,

19   preventing its customers from choosing whether to work with

20   rivals.

21           THE COURT:  Talk to me about *Merced* and *Barclay*.

22           MR. KELLER:  Classic auction manipulation.  It was in

23   the electricity market.

24           THE COURT:  This is *Merced* now or *Barclay*?

25           MR. KELLER:  *Merced*, sorry.  I think those are the

M8VVGOO2

1       same case that --

2                   THE COURT:  *Merced*.

3                   MR. KELLER:  I gave you both sides of the V without

4       saying that there was a V.

5                   THE COURT:  I see.

6                   MR. KELLER:  Barclays is the defendant.

7                   THE COURT:  Okay.

8                   MR. KELLER:  And it was a manipulation of the

9       electricity market.  And essentially, Barclays was submitting

10      bids that would lose Barclays' money in particular auctions for

11      electricity in order to help swap contracts that they had on

12      the side, and foreclosing competitors who would have actually

13      bid on the electricity for legitimate purposes.  And that was

14      found to be actual misconduct under Section 2.

15                  This I think is actually far, far worse misconduct in

16      terms of auction manipulation.  It's far more sophisticated,

17      and the scheme is more difficult to detect by competitors,

18      which is what you need to have the price transparency that

19      would allow effective auctions to function.

20                  MR. MAHR:  If I can address *Merced*, your Honor.

21                  First of all, it's not an auction case, it's an index

22      case.  And it's not about the operator of the index making

23      changes to the way the index works.  It's about a third party

24      to the index, Barclays, making what Mr. Keller just admitted

25      were predatory transactions on it in order to manipulate the

M8VVGOO2

1     index.

2            Our case involves Google making changes to its own

3     algorithms, it's own AI on its own exchange in order -- as

4     Mr. Keller said it, think about adjusting your fees to win the

5     auction.  That's the essence of price cutting, and that's what

6     we're doing.  We found these algorithms that can do it in a

7     billionth of a second.  There's nothing wrong with that.  And

8     if there were, the remedy would have to be -- and I really do

9     think remedy in Section 2 cases is a good way of seeing kind of

10    how hollow the claim is.

11           The remedy would be either, Google, you can't cut your

12    price, you can't cut your take rate in order to win that

13    transaction and give the publisher more money for its product.

14    You have to keep your price static, or you have to figure out

15    how the innovations that you used through Bernanke can apply to

16    your competitors when those competitors are visiting your

17    auction, which you don't have to let them there in the first

18    place.

19           THE COURT:  Okay.  Thank you.

20           I think we're talking about much the same stuff,

21    dynamic revenue sharing.  This is a downward adjustment to the

22    fees to cause a bid to clear, but would increase AdX's fees if

23    the bid was significantly above the publisher's floor.

24           And again, this may be an overlapping question, where

25    do you claim the harm is?  I want to start with the plaintiff

M8VVGOO2

1   on this.  What market do you claim the harm is in?

2            MR. KELLER:  These are manipulations happening in the

3   exchange.  So it's definitely harm to rival exchanges.

4            I'm going to do the same thing I did before and get

5   you the paragraphs for the small buying tools where we also

6   allege anticompetitive harm.  Sorry, to be very clear, only

7   with respect to Bernanke.

8            THE COURT:  So in Bernanke, you're claiming it's --

9   yes, you're claiming it's anticompetitive in the market for ad

10  buying tools for small advertisers.

11           MR. KELLER:  Correct.

12           That's paragraph 315, your Honor.

13           THE COURT:  And dynamic revenue sharing.

14           MR. KELLER:  The exchange.

15           THE COURT:  In the exchange.  Okay.  Thank you.

16           All right.

17           MR. MAHR:  May I speak on dynamic revenue share?

18           THE COURT:  Sure.

19           MR. MAHR:  Important point.  "Dynamic" means changing,

20  "revenue share" means what Google charges the publisher.  It

21  means we change our price depending on the transaction.  There

22  is nothing in antitrust law that compels a competitor, even an

23  alleged monopolist, to price in any particular way.  You cannot

24  cut your price here, you cannot raise your price here.  There's

25  nothing in antitrust law.  It's a made-up claim, and there's

M8VVGOO2

1     nothing anticompetitive about dynamic revenue share in the

2     first place.

3          THE COURT:  Reserve price optimization.  This is

4     increasing the price paid by an advertiser by allegedly

5     artificially raising the publisher's floor price.  And the

6     claim is that dynamic revenue sharing and reserve price

7     optimization work together and had a synergistic effect.

8          What can you tell me about reserve price optimization

9     that you haven't already told me about as to the other markets?

10    Which is fine, if that's the answer.

11         MR. MAHR:  There is a common theme here, but reserve

12    price optimization is just doing the same thing.

13         The reason Google is in this business is to get more

14    money to publishers.  Publishers have money because they

15    monetize their content; they keep their websites open, they

16    don't go behind paywalls.  Google likes an open internet

17    because it has a search engine that relies on an open internet.

18         Reserve price optimization, like all of these other

19    optimizations, are just ways in which Google makes more

20    transactions clear at a higher level on its own exchange.  It

21    doesn't affect anything that happens on competing exchanges.

22    They can run their exchanges any way they want.  When they are

23    on our exchange, we have certain algorithms and we have certain

24    bidding strategies that help our advertisers buy inventory from

25    publishers at a higher rate.  That's a good match for everyone.

M8VVGOO2

1      THE COURT:  Well, it may not be so great for the

2  advertiser, right?

3      MR. MAHR:  Well, I would say it's a balance, right,

4  and that's probably why there are advertisers who want to sue

5  us and publishers who want to sue us, because they say, He

6  charged us too much money.  We want to pay less.  Advertisers

7  want to pay less for ads, publishers want to pay -- get more

8  for ads.  Google tries to balance it and runs its auction in a

9  certain way.

10      THE COURT:  Yes, but you're artificially --

11  "artificially" meaning it wasn't done by the publisher.  You,

12  Google, are raising the publisher's floor price.  And if you

13  left it the heck alone, the advertiser wouldn't be paying as

14  much as it's paying.

15      Now, you might say, Well, that's harm to an

16  advertiser; it's not harm to competition, and I'm all ears.

17  But the advertiser is paying more because Google has

18  artificially raised the publisher's floor, according to the

19  allegation.  Again, it could be a pack of whatever, but that's

20  what it says.

21      MR. MAHR:  The advertiser is not paying more than it

22  identified it was willing to pay for that piece of inventory.

23  So through our ad tools, Google advertisers say, Here's the

24  kind of ads I want to buy and how much I'm willing to pay for

25  them, and publishers do the same thing.  We try to match the

M8VVGOO2

1    publisher to give them the highest amount of money for their

2    inventory with the advertiser that values it highest.  This is

3    basically, in very simple terms, saying, I think this publisher

4    is undervaluing this piece of inventory.  On our auction, we're

5    going to see if we can't get it at a higher price, which

6    will -- is still within the advertiser's willingness to pay and

7    get more money to the publisher.

8              THE COURT:  I don't know.  This may be a crazy

9    question, but wouldn't that advertiser's bid clear anyway if

10   you left the publisher's floor alone?

11             MR. MAHR:  It would clear the lower price and the

12   publisher would get --

13             THE COURT:  Yes.

14             MR. MAHR:  -- less.

15             THE COURT:  Yes.  And the advertiser --

16             MR. MAHR:  No, the advertiser pays what it said it

17   would pay.  Google can get more.

18             THE COURT:  No, no.  The advertiser put in a bid.

19   They put in a bid.  And if Google — not you.  You guys are --

20             MR. MAHR:  I couldn't figure out how to do it.

21             THE COURT:  -- just lawyers.

22             But if Google had left the price floor alone, that

23   advertiser's bid may have cleared.  That's what I'm not

24   understanding.  How did it even cause more transactions to

25   clear?  It just caused more money to go into the publisher's

M8VVGOO2

1   pocket, which, coincidentally, if I've read this all correctly,

2   means higher exchange fees for Google.

3          MR. MAHR:  I think that's all correct.

4          The kind of transaction we're involved in is you say,

5   I want to buy a couch.  I'll give you $200.  Go out and find me

6   this kind of couch.  I want it to be red, whatever.

7          I say, All right, I'll go out and look.  It will be

8   $200 no matter what.

9          If I can find it for 60, and it's exactly what you

10  want, I say, Here's your couch for $200.  And that's my

11  commission.  If I can't get one for but 199, well, I only make

12  a dollar on that deal.  There's nothing wrong with that.

13         THE COURT:  Okay.  But then I'm missing something in

14  my reading here because I thought that the advertiser submitted

15  a bid.  They submitted a bid.  They had a number.  They had

16  their number.  And that the bid would have cleared maybe if the

17  publisher's floor wasn't raised, but the floor was raised and,

18  therefore, the bid got adjusted.  Am I misunderstanding what's

19  going on or --

20         MR. MAHR:  I don't think it's like -- you know,

21  *Cranberry Auction* is one of the cases they use.  It's not where

22  people raise their hand and say, Oh, I'll go up a dime, I'll go

23  up a dollar.  They put in a willingness to pay and a

24  willingness to accept.

25         This is a matching market.  All these allegations

M8VVGOO2

1    about the stock exchange, it's a matching market trying to find

2    the advertiser who most highly values the product and match

3    them with the publisher who wants to get the most that they can

4    for the product -- for the ad inventory.  And it's matching.

5         There might be some exchanges that say, We're only

6    going to try to get the lowest price.  That's going to be the

7    whole idea of our exchange, we're going to get the lowest

8    prices for advertisers.  I don't think that many publishers

9    would go there.

10        There might be another exchange that say, All we're

11   going to do is try to maximize what advertisers pay.  I don't

12   think that many advertisers would go there.

13        It's a tricky balance.  Google comes up with its way

14   of balancing through these various -- internal to its exchange

15   only, its various algorithms, it's various optimizations.

16   There are other exchanges, they can do it another way, and

17   publishers can go to those, advertisers can go to those.  But

18   on Google's own auction, this is just the way it runs its

19   auction.

20        THE COURT:  Mr. Kelly.

21        MR. KELLER:  So I want to take the couch example,

22   because your Honor is not misunderstanding.

23        The allegations in the complaint are, to take that

24   example, the advertiser bids 200, but the advertiser doesn't

25   say, I'll pay 200 no matter what, even if you can go find it

M8VVGOO2

for $10.  It's supposed to be a second price auction.  And so
if the best price is his $200, and the next best price was $50,
the advertiser should get it for 50.

But Google secretly, deceptively, without telling
either side of the transaction, says, Well, because we can get
away with it in this auction, we're going to raise the price
all the way up to $200.  So, yeah, you paid what you were
willing to, the absolute maximum that you were willing to, and
Google pockets a fat exchange fee because of that, but that's
not a fair auction.

The deceptive conduct that runs throughout all of
these Bernanke versions that we have been talking about I think
is pretty powerful evidence that this isn't on the up-and-up.
If you normally have a better product for advertisers and
publishers, you tout it to them.  You'd say, Look at what great
technological progress we've made to develop an auction system
that both of you want to use.  Instead, they are not telling
them what they are doing, which is essentially this simplified.
They are engaging in maximum auction manipulation and price
discrimination where they can; and then, when a particular
auction comes along where they might lose it to a rival, they
lower the price, they adjust things so that the rival doesn't
get it.

So every time they can get away with taking the
maximum price from the advertiser or the lowest possible value

1    to the publisher, they'll do it and they'll charge a fat

2    exchange fee that only a monopolist can charge.  And if they

3    can't get away with it for a particular auction, we'll kill the

4    competition, make sure that they are not going to continue to

5    be in the marketplace successfully and keep going on our merry

6    monopolistic way.

7            THE COURT:  I'll give Mr. Mahr the last word.

8            MR. MAHR:  So I should say, particularly on this one,

9    it's true for all of them, Google contests that any of this is

10   the way these optimizations work, but we have to take what we

11   have in the complaint for what it is.

12           But I think what is happening now is that the claim is

13   morphing into one of deception.  And that is a completely

14   different standard under the Second Circuit.  It is a standard

15   where there's a presumption of minimal harm.  If an advertiser

16   feels deceived by this, then they could bring a contract case

17   or some other kind of case.  But for it to harm competition,

18   it's presumed to be *de minimis*.  I should also point out, as we

19   do in our briefs, they dropped deception as one of their

20   Section 2 claims.

21           THE COURT:  I understand.

22           MR. MAHR:  You have the briefing, your Honor.

23           THE COURT:  But I think there's a D.C. Circuit case

24   which is cited, which kind of, in a rather pithy way, says

25   deception is not actionable unless it harms competition.  If it

1    harms competition, it's actionable under Section 2.  If it

2    doesn't harm -- if it might harm market participants, that's a

3    different story.  But if it harms competition, then it is

4    actionable.  That's kind of a simple summary of what I think

5    the law is.

6                MR. MAHR:  That's the law in the D.C. Circuit, and I

7    think it's the summary of the law in general, except that in

8    the Second Circuit there's a presumption that deception is *de*

9    *minimis*.  The burden is on the plaintiff to plead with 9(b)

10   particularity the deception at issue and to show how it

11   actually harms competition, and done none of those things.

12               THE COURT:  And that case is?

13               MR. MAHR:  *Michael Anthony Jewelers*, cited in our

14   briefs.  That's an S.D.N.Y. --

15               THE COURT:  I'll find it.

16               It's a Second Circuit or --

17               MR. MAHR:  S.D.N.Y.

18               THE COURT:  All right.

19               So one of my pals down the hall had that thought.

20   I've had a lot of dumb ideas along the way and I've probably

21   put some of them in writing, too.  But I'm going to take a look

22   at it.

23               MR. MAHR:  This is one of the brightest.

24               THE COURT:  This is a brilliant one.

25               Pardon me?

M8VVGOO2

1          MR. MAHR:  This was one of the brightest.

2          THE COURT:  That's what I thought.

3          I'll take a look at it.

4          All right.  Anything from the plaintiff in response to

5     the last comment?

6          MR. KELLER:  The only thing I'll say on deception,

7     your Honor, is even if it's not separately actionable as a

8     standalone Section 2 claim, the deceptive behavior can still be

9     taken into account to show that this isn't competition on the

10    merits; it's not superior business acumen and skill and

11    historical accident.  So you can still look at these

12    allegations even if you think your colleague down the hall is

13    the most brilliant jurist ever to grace Article III.

14         THE COURT:  All right.

15         Okay.  Now, I'm going to give you all an option.

16    We're going to give you the opportunity on redaction of auction

17    data and limitations on publisher line items, Projects Perot

18    Elmo, mobile web page development, anything, Mr. Mahr, that you

19    want to bring fresh to the table as to any of them?

20         MR. MAHR:  Well, none of them are anticompetitive

21    conduct.

22         THE COURT:  Okay.

23         MR. MAHR:  I can go through each of them.

24         I think, again, with the exception of accelerated

25    mobile pages, which it isn't even what we are doing with our

M8VVGOO2

```
1    own ad tech platform, it's what we're doing with a search

2    loading function.  And the idea that Google has to figure

3    out -- when they come up with something like accelerated mobile

4    pages that allow mobile pages to add -- to load faster on your

5    phone and iPad, they have to say, Hold on a second.  Before we

6    put this in, how does this work with header bidding?  Because

7    we want to make sure that those folks aren't disadvantaged in

8    the ad tech market.  Google does not have to design any of its

9    products to take into account the interests of its rivals.

10               I don't know if there are other ones that you are

11   particularly interested in.  Perot -- I think Perot and Elmo

12   are interesting.  I mean, a big point here is that the

13   plaintiffs have kind of laid out the entire history of Google's

14   ad tech business, 15 years, and everything that Google has

15   done, including things it hasn't done yet, like Project

16   Sandbox.  It says, It's all anticompetitive, Judge.  We're not

17   going to tell you exactly what legal framework to look in, but

18   it's all anticompetitive.  You got to let us through to

19   discovery.

20               Perot and Elmo are functionalities that help Google

21   decide where its ad buying tools will bid, outside of Google.

22   Google's ad buying tools don't have to bid in any other

23   auctions at all.  And so we're certainly allowed to figure out

24   which -- well, Perot doesn't like these ones because they say

25   they are second price, but they are not.  Elmo doesn't like
```

M8VVGOO2

these ones because they allow repeated bidding against

themselves.  We could decide who we're going to bid on by what

letter the name of the exchange starts with, but we have a

sophisticated way of doing it in order to decide where we want

to put our -- the publisher -- the advertiser demand we

represent.  And there's nothing anticompetitive about it.

          MR. KELLER:  Thank you, your Honor.

          I was accused of not giving you a legal framework, so

I'm going to give you a legal framework.

          The Section 2 legal framework is straightforward.  Do

they have monopoly power?  I think it's undisputed that at

least for some of the markets that we talk about, they do.  And

then, do they obtain or retain that monopoly power not through

superior skill, business acumen, or historical accident, that's

the *Grinnell* case, but through behavior that's designed to

squelch competition on the merits.  That's *Berkey Photo*.

          And I think with respect to this last category of

misconduct aimed at killing header bidding, once again, we're

showing that it's not superior skill and business acumen, based

on the facts pleaded in the complaint and the inferences that

should be drawn in our favor, but actual behavior designed just

to kill competition.

          They may be able on a Rule 56 to point to

pro-competitive justifications for some of the things that

they've done and say it's not really designed to quash

M8VVGOO2

1    competition on the merits.  But at this procedural posture, we

2    get the benefits of all of the inferences under that test.

3            And take just one example, capping line items so you

4    can't get the full price information from header bidding when

5    your customer wants to receive that, that's not them saying, We

6    don't want, you know, to help out our rivals; that's them

7    saying, We've got a monopoly and we're going to make sure you,

8    our customers, can't go to a disruptive new technology that

9    could displace our monopoly.  That's classic behavior designed

10   not to compete on the merits, but to make sure that your

11   competitors don't have a fair shake to steal business away.

12           THE COURT:  Mr. Mahr, anything you want to add?

13           MR. MAHR:  Just one point on line item capping, since

14   Mr. Keller brought it up.

15           THE COURT:  Sure.

16           MR. MAHR:  The line item cap policies that are

17   challenged in the complaint, the complaint admits in paragraph

18   391 that they were in place prior to header bidding, and they

19   just stayed in place.  So this isn't any action against header

20   bidding.  The more line items, the slower the product, the more

21   burden on Google.  It just enforces something it had already in

22   place.  And Google, again, is not obligated to take the expense

23   of additional line items in order to make it easier for header

24   bidding to win auctions on Google's tools.

25           THE COURT:  All right.  I think I understand the

M8VVGOO2

1    arguments from both sides on Project Sandbox and also the

2    question of whether conduct that is not alleged to be

3    continuing can or cannot be the basis for injunctive relief.

4            What I would like to hear the parties on is with

5    regard to laches, which is an affirmative defense.  Why is it

6    appropriate to adjudicate laches on this 12(b)(6) motion?

7            MR. MAHR:  It's appropriate, your Honor, because it's

8    plain on the face of the complaint that goes back to conduct

9    that the complaint itself admits was open and notorious and

10   announced in 2009, 2012, 2014.  So you don't have to get any

11   further discovery; they provided it for you.

12           There's no basis for a continuing conduct exception.

13   They don't argue that there is -- they don't provide detail

14   sufficient to allege fraudulent concealment.  There's no reason

15   to wait when the complaint itself lays out all the bases for

16   laches.

17           THE COURT:  Mr. Keller?

18           MR. KELLER:  Thank you, your Honor.

19           I'm obliged to say because my colleagues from OAG are

20   here, our principal argument is that laches can't apply against

21   sovereigns pursuing parens patriae authority.  You have

22   conflicting district court decisions, neither of which are

23   binding.  We think the Russell Stover case is the better one.

24           Even if you put that to one side or you decide you

25   don't want to resolve that, we believe you are correct, you

M8VVGOO2

1    should not be resolving an affirmative defense like laches on

2    the face of this 12(b)(6) motion because, contrary to my

3    friend's statement just now, there's no way that you can say on

4    the face of the well-pleaded complaint that they've established

5    all of the elements necessary for this affirmative defense.

6          It is true that we document when the conduct first

7    began, but under *Berkey Photo*, that's not when the cause of

8    action accrues.  This is very different than the *Facebook* case

9    from your colleague in the District of Columbia, where it's

10   challenging a merger and an acquisition.  The anticompetitive

11   conduct obviously accrues the moment the transaction closes.

12   With a tying claim, for example, it doesn't obviously accrue

13   from the moment the transaction closes because accrual under

14   the antitrust laws depends on when there's been a substantial

15   enough foreclosing of the marketplace.  So you can't see that

16   from the face of the well-pleaded complaint.

17         Continuing violations, you can see from the face of

18   the well-pleaded complaint.  I'm sticking with tying as just

19   the example.  But if you want to move to some other conduct,

20   I'm happy to do so.  As we discussed at the outset of this oral

21   argument, we allege that they started their tie in 2009, but it

22   continued with contracts that formalized the tie all the way

23   through 2018.  Those are continuing violations that would

24   restart any statute of limitations clock.

25         I also think it's worth noting we're dealing with a

M8VVGOO2

statute that Congress passed that has an express four-year

limitations period with respect to money damages, that's a

statute of limitations.  There is no textual statute of

limitations with respect to equitable relief; so you're drawing

on the common law.

          If you look at the *Conopco* case from the Second

Circuit, which is a Lanham Act case that they reference, it

looks to the common law of the states to borrow the principles

of laches that would be imported into the federal statutory

regime.  If you do that here, at least with respect to the

state of Texas, it is undisputed under the law of Texas, laches

cannot apply to the sovereign.

          So in addition to all of the other points, they can't

establish prejudice for this equitable affirmative defense,

because at least with respect to one state, they are going to

have to go forward under the federal regime, if you borrow

Texas law for the common law of laches, and they also

indisputably have to go forward on Texas's state antitrust

claims, which the Texas Supreme Court informs you mirror the

federal antitrust laws; that we're going to be seeking the

exact same equitable relief under that state law.

          So, again, Rule 56 is going to be a different

procedural posture, and I'm sure they are not going to drop

this affirmative defense in their answer, we'll hear about it

again, but it's not appropriate for a 12(b)(6).

M8VVGOO2

1          THE COURT:  All right.  Mr. Mahr, last word on that.

2          MR. MAHR:  We're happy for you to read *Conopco* and

3     *American Stores* and we trust your ability to handle that.

4          The one thing I would say about *Berkey* is it makes the

5     distinction between when it runs for equitable relief and when

6     it runs for damages.  Damages can be continuing; equitable

7     relief is when the event occurred.  Here, as we list in our

8     brief, there are many events that occurred well, well before

9     the presumptive laches period of four years.

10          THE COURT:  Well, certainly I've enjoyed, and perhaps

11     some members of the audience have enjoyed hearing Mr. Mahr and

12     Mr. Keller in their excellent presentations today.  Really,

13     it's a pleasure to have you and have you so well-prepared.

14          But as I said, one of my opening comments were that I

15     was going to give you an opportunity to say what you wanted to

16     say that I might have cut you off at some point for some

17     reason.  So if there's anything else you want to say with

18     regard to the motion or the opposition to the motion, I'll give

19     you a chance to say it.

20          MR. MAHR:  Thank you, your Honor.

21          I'll try not to overstate my welcome in that.

22          You mentioned the 45 different analyses you would have

23     to go through given all of the machinations in this complaint.

24     I don't think you need to, and I'll give you the three main

25     reasons.

M8VVGOO2

1          First, as I've said repeatedly, all the conduct

2     alleged under Section 2 here — and I'm focusing on Section 2

3     now — takes place on Google's integrated ad tech platform.  And

4     all of the claims of anticompetitive exclusion are based not on

5     rivals being excluded from the market at large, but from them

6     being excluded from Google's ad tech -- integrated ad tech

7     platform.

8          This is critical because the second point, the Supreme

9     Court in *Verizon* explained in words that could be used to

10    describe this case, "Firms may acquire monopoly power by

11    establishing an infrastructure that renders them uniquely

12    suitable to serve their customers."

13          Now, if this case were to proceed to discovery, we

14    will contest both that Google has monopoly power and that

15    Google's infrastructure is somehow unique.  But the reason the

16    case should not proceed past the motion to dismiss stage is

17    even if those things were true, the Supreme Court in *Trinko*

18    tells us that just because a competitor builds an attractive

19    infrastructure doesn't mean it can be compelled to share that

20    infrastructure, to share its competitive advantage with its

21    rivals.

22          Third, building on *Trinko*, Chief Justice Roberts

23    explanation in *Pac. Bell v. LinkLine*, that where, as here, an

24    antitrust defendant has no duty to deal in the first place —

25    and you've heard me say this several times before — it has no

M8VVGOO2

1     duty to deal under the terms and conditions preferred by its

2     rivals or to provide its rivals with a sufficient level of

3     service.  In other words, if Google makes the decision for

4     business reasons to invite other exchanges onto its open

5     bidding platform, it's under no obligation to provide that

6     access under any particular terms at all.

7           But that's exactly what plaintiffs are asking you to

8     do in this case.  They want the Court to force Google to give

9     its competitors better access to Google's products; they want

10    the Court to force Google to share its technology to make sure

11    its optimizations work as well with their products as they do

12    with Google's own products; they want to essentially turn

13    Google into an ad tech utility, where all of its innovation and

14    investment over the last 15 years, they can come -- and instead

15    of coming up with their own innovations, come to a court and

16    say, We want access to theirs.  Nothing under Section 2 or

17    anywhere in the Sherman Act allows that.

18          It's only in the very narrow circumstances of *Trinko*

19    and *Aspen Ski* where there can be any kind of duty to deal

20    imposed.  There's none of the circumstances like prior course

21    of dealing or profit sacrifice are alleged here.  In fact, they

22    go out of their way to say, We do all this because we make more

23    money.  Again, we contest that.  We also have the goal of

24    making publishers more money, but they don't say anywhere that

25    we were sacrificing profits.

M8VVGOO2

1          Rather than address these issues and these legal

2     impediments head-on, plaintiffs kind of hide through this

3     702-page third amended complaint that, as I said, gives a

4     15-year history of -- skewed history of Google's ad tech

5     business and sprinkles in some conclusions about exclusion here

6     and there.  And the hope appears to be that the Court throws up

7     its arms and says, There must be something in there.

8          We are so appreciative today of the care with which

9     you've gone through the complaint and the motion.  It's really

10    very appreciative.  But instead of -- I mean, they've kind of

11    made you do the work.  Instead of saying a plain, short

12    statement of their claim, they've done everything to avoid

13    committing to a claim.  They say, Don't cost or refuse it a

14    deal.  We don't want that law because we know where that heads.

15    And don't cause product design or exclusive dealing because we

16    know where that goes, too.

17         And instead, I think they're proposing some kind of

18    freewheeling I'll-know-it-when-I-see-it standard for

19    anticompetitive conduct.  And the case law just doesn't do

20    this.  *LinkLine* and *Trinko*, they make clear that forcing a

21    competitor, even an alleged monopolist, to deal with its

22    competitors, to share its competitive advantage with its

23    rivals, is the narrowest slice of Section 2 law.  And the

24    preconditions for it just aren't here.

25         And my last point will be I mentioned earlier that the

M8VVGOO2

1    way I look at Section 2 to figure out is this kind of a valid

2    claim, one of the things that gives guidance to me when I do

3    that is, What would the remedy be here?

4            So in paragraph 396 -- 369, the plaintiffs say, Well,

5    now that you've invited us on to open bidding, and we can bid

6    on your tools on the inventory that you've assembled together,

7    and with the demand you've assembled together, we object that

8    you charge us five percent to be on there.

9            And the remedy, I guess, would be for either the Court

10   to say, Oh, no, you have to allow them in for free, which would

11   make them a utility, or the Court will decide what the price

12   is, and the Court will become a price regulator of Google.

13           The same thing, and we talked about it under dynamic

14   revenue share.  That's a situation where Google is adjusting

15   its price up or down as it sees fit based on the particular

16   circumstances of a transaction.  Price cutting is the essence

17   of competition.  But companies, including alleged monopolists,

18   are allowed to raise their prices as well.  And Section 2

19   doesn't have anything to say about that.

20           So, again, presumably the only remedy there would be

21   for the Court to say, Oh, you can't cut your prices or you

22   can't raise your prices; you have to have a price menu that

23   you're stuck to.

24           No one has ever been sued on these facts.  And as I

25   say, the result, if plaintiffs were to be allowed to prevail or

M8VVGOO2

1    go forward, would be to turn Google into a public advertising

2    utility, and that's just not permitted under the Section 2 case

3    law.

4              Thank you.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M8VQgoo3

1            THE COURT:  Mr. Keller.

2            MR. KELLER:  Thank you, your Honor.

3            The ad tech space is a complex and interlocking set of

4    markets.  I appreciate you saying that we didn't have to have

5    sympathy for you, but I do.  I know that the complaint has a

6    lot of materials.

7            So I'm going to take less time, 90 seconds, to just

8    step back and hopefully synthesize the story that we think

9    transpired here over the period of time that's documented in

10   the complaint.

11           It starts with the tie.  Google acquires DoubleClick

12   and then gains a stranglehold through the tying arrangement

13   over the ad server market.  And it did that strategically.

14   Because having that choke point, that access point that

15   publishers have to utilize, is an extremely important tool that

16   Google used through all of the series of misconduct that we

17   allege to funnel publisher inventory into the exchange.

18           That's really important for Google because that's

19   where they charge the richest fee that have the highest super

20   competitive price, and they engaged in a series of

21   manipulations that we talked about at length today in order to

22   maximize that price.

23           It is true, as my friend just said, charging the

24   monopoly price for even engaging in price discrimination by

25   itself is not illegal.  But as you look at all of the

M8VQgoo3

|    |                                                                                   |
|----|-----------------------------------------------------------------------------------|
| 1  | misconduct that we allege, ask yourself, is that really                           |
| 2  | innovation?  Is that a better mousetrap?  A secret sauce?  Is                      |
| 3  | that superior business acumen or sales tactics or skills?                         |
| 4  |          It's none of those things.  It's just naked                              |
| 5  | anticompetitive behavior to make sure that others can't disrupt                   |
| 6  | the monopoly profits that Google is enjoying.  And the header                     |
| 7  | bidding story is where that comes into focus.  They've worked                     |
| 8  | so hard to gain a monopoly in servers and to monopolize the                       |
| 9  | exchange and small buying tools, and they have this ecosystem                     |
| 10 | working well where they're charging extremely super competitive                   |
| 11 | pricing.  And along comes, as often happens in the technology                     |
| 12 | space, a new disruptive technology that threatens them, that                      |
| 13 | could just disintermediate them, which is just fancy tech speak                   |
| 14 | for saying they are not going to be as important to the                           |
| 15 | publishers and the advertisers in this ecosystem.                                 |
| 16 |          And what do they do?  They set out to kill it.  More                      |
| 17 | manipulations and a horizontal agreement with Facebook, a                         |
| 18 | massive, well-capitalized competitor who actually could have                      |
| 19 | gotten this nascent technology off the ground and thriving, and                   |
| 20 | they buy them off to make sure that they're not going to do so.                   |
| 21 | That is a classic series of Section 1 and Section 2 misconduct                    |
| 22 | that on a 12(b)(6) is more than sufficient to survive the                         |
| 23 | motion to dismiss.                                                                |
| 24 |          And I'll just close with this, your Honor.  It's not                      |
| 25 | legally dispositive, but I think it provides some color.  My                      |

M8VQgoo3

```
 1  friends previously answered an older version of the complaint:
 2  All the horrors of discovery that they were talking about, they
 3  were ready to go forward if this case were still in Texas.  But
 4  now all of a sudden that's a problem?  I think the new
 5  complaint --
 6           THE COURT:  That doesn't impact my thinking here.
 7           MR. KELLER:  Fair enough.  I will leave you --
 8           THE COURT:  We are where we are, and that's all that's
 9  relevant at this stage.
10           MR. KELLER:  I'll leave you with that thought, and I
11  appreciate your time and attention to this complex set of
12  issues.
13           THE COURT:  Mr. Mahr, anything else?
14           MR. MAHR:  Nothing else, your Honor.
15           Thank you very much.
16           THE COURT:  Well, thank you again for working hard.  I
17  know there is a lot of work that goes into getting ready for
18  this, and I appreciate it.  It was helpful.  And I'm glad that
19  we were able to spend more than the time that you get at the
20  podium in certain appellate courts, because maybe I'm not going
21  to absorb it that quickly.  So this was very helpful.
22           Thank you very much.  I appreciate it.
23           (Adjourned)
24
25
```