UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE: GOOGLE DIGITAL ADVERTISING
ANTITRUST LITIGATION

No. 1:21-MD-3010 (PKC)

---

*This Motion Relates To:*

---

**INFORM INC.**

                              *Plaintiff,*

          **-against-**

**GOOGLE LLC,**
**ALPHABET INC., and**
**YOUTUBE LLC,**

                              *Defendants.*

No. 1:23-cv-01530-PKC

---

**DEFENDANTS GOOGLE LLC, ALPHABET INC., AND YOUTUBE LLC'S**
**MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**
**<u>INFORM INC.'S SECOND AMENDED COMPLAINT</u>**

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
Fax: (650) 461-8276

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Fax: (212) 728-2201

*Counsel for Defendants Google LLC,*
*Alphabet Inc., and YouTube LLC*

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Fax: (415) 947-2099

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................2

LEGAL STANDARD.......................................................................................................2

ARGUMENT ..................................................................................................................3

I.     INFORM FAILS TO ALLEGE SUFFICIENT MONOPOLY POWER, DANGEROUS PROBABILITY OF MONOPOLY POWER, OR INTENT TO MONOPOLIZE IN THE ALLEGED ONLINE VIDEO ADVERTISING MARKET..............................................................................................................3

II.    GOOGLE'S TRANSITION FROM FLASH TO HTML5 DOES NOT CONSTITUTE ANTICOMPETITIVE CONDUCT. ..............................................6

      A.    Google's Switch to HTML5 Was a Lawful Design Decision. ...................7

      B.    Google's Switch to HTML5 Did Not Harm Video Advertising Competition........................................................................................8

      C.    Google's Switch to HTML5 Did Not Coerce the Use of Google Ad-Buying Products....................................................................................10

      D.    The Eleventh Circuit Did Not Rule on Inform's Flash or HTML5-related Allegations. .......................................................................................11

III.   INFORM'S CLAIMS REGARDING INTEROPERABILITY AND ENCRYPTED USER IDS DO NOT CONSTITUTE ANTICOMPETITIVE CONDUCT. ................................................................................................12

IV.   INFORM'S TYING CLAIMS FAIL AS A MATTER OF LAW. ........................13

V.    INFORM'S LEVERAGING CLAIMS FAIL AS A MATTER OF LAW. ...........16

VI.   CERTAIN OF INFORM'S AUCTION-RELATED CLAIMS FAIL AS A MATTER OF LAW. ......................................................................................18

VII.  INFORM IS NOT ENTITLED TO INJUNCTIVE RELIEF................................20

VIII. A 12(B)(6) MOTION IS THE PROPER MECHANISM FOR DISMISSING INFORM'S CLAIMS. ...........................................................................21

CONCLUSION................................................................................................21

i

# TABLE OF AUTHORITIES

## Cases

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010) .. 7

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ........................................................................................... 3

*Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994)................................................................................ 8

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ............................................................................ 3

*Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263 (2d Cir. 1979).......................... 7, 12, 15

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ................................................... 3

*Cal. Comput. Prods. v. Int'l Bus. Mach.*, 613 F. 2d 727 (9th Cir. 1979)................................. 7, 12

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc*., 996 F.2d 537 (2d Cir. 1993)
........................................................................................................................................................ 8

*Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130 (9th Cir. 2022) .................................. 13, 17

*E & L Consulting, Ltd. v. Doman Indus. Ltd*., 472 F.3d 23 (2d Cir. 2006) ................................... 13

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.,* No. 15-cv-3784, 2016 WL 6110565 (S.D.N.Y.
Aug. 4, 2016) ................................................................................................................................ 3

*In re Adderall XR Antitrust Litig.*, 754 F.3d 128 (2d Cir. 2014) ............................................ 8, 13

*In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151 (2d Cir. 2016).............................. 14

*In re Am. Express Anti-Steering Rules Antitrust Litig*., 343 F. Supp. 3d 94 (E.D.N.Y. 2018)..... 21

*In re Google Digital Advert. Antitrust Litig*., 2021 WL 2021990 (N.D. Cal. May 13, 2021) ........ 5

*Inform Inc. v. Google LLC*, No. 19-cv-05362-JPB, ECF No. 1 (N.D. Ga. Nov. 25, 2019)...... 5, 19

*Inform Inc. v. Google LLC*, No. 21-13289, 2022 WL 3703958 (11th Cir. Aug. 26, 2022)...... 2, 11

*It's My Party, Inc. v. Live Nation, Inc*., 811 F.3d 676 (4th Cir. 2016) ......................................... 11

*Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016).............................................................. 13

*N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559 (S.D.N.Y. 2004)
...................................................................................................................................................... 16

*New York v. Meta Platforms, Inc*., 66 F.4th 288 (D.C. Cir. 2023) ................................................. 5

*Nicosia v. Amazon*, 834 F.3d 220 (2d Cir. 2016) .......................................................................... 20

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ........................................... 13, 20

*NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128 (1998) .................................................................... 19

*O'Shea v. Littleton*, 414 U.S. 488 (1974) .................................................................................... 20

*PepsiCo, Inc. v. Coca-Cola Co*., 315 F.3d 101 (2d. Cir. 2002) ..................................................... 4

*Schwartz v. Eaton*, 264 F.2d 195 (2d Cir. 1959) .......................................................................... 21

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ........................................................ 4, 5

*Tomasino v. Estee Lauder Cos*., 44 F. Supp. 3d 251 (E.D.N.Y. 2014) ....................................... 20

*U.S. Football League v. Nat'l Football League*, 842 F.2d 1335 (2d Cir. 1988) ........................... 19

*Unijax, Inc. v. Champion Int'l*, 683 F.2d 678 (2d Cir. 1982) ................................................. 11, 14

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ................................................................... 3

*United States v. Microsoft Corp.*, 147 F.3d 935 (D.C. Cir. 1998) ................................................. 7

*US Airways, Inc. v. Sabre Holdings Corp.,* 938 F.3d 43 (2d Cir. 2019) ........................................ 5

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ... 12, 16, 19

*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321 (1971) .................................... 5, 19

**Statutes**

15 U.S.C. § 15b ........................................................................................................................ 5, 19

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Google LLC, Alphabet Inc., and YouTube LLC ("Google") move for an order dismissing certain federal antitrust claims in the Second Amended Complaint ("SAC"), ECF No. 535, filed by Inform Inc.  Consistent with the stay of the state law claims ordered on November 18, 2022, ECF No. 392, ¶¶ 4-5, Defendants do not currently move to dismiss Counts VI, VII, and VIII, and reserve all rights with respect to them.[1]

## INTRODUCTION

After three-and-a-half years, Inform has wedged its way into this MDL by copying the meritless claims of other plaintiffs.  In its third attempt at a complaint, Inform still fails to identify anticompetitive behavior, much less connect the alleged behavior to the demise of Inform's business.

Its primary concern—Google Chrome's transition from Adobe Flash to HTML5—is nothing more than distaste for new technology adopted by the industry.  Despite Inform's allegations of "technological blocking," adopting new technology is wholly consistent with a vibrant and competitive market that antitrust law does not condemn.  Inform also brings tying and leveraging claims, but fails to plead facts supporting the necessary elements of coercion, marketwide harm, and harm to Inform itself.  Finally, Inform includes several faulty claims of other plaintiffs, some of which have already been dismissed by this Court.

In its motion, Google seeks to dismiss all of Inform's federal claims with the exception of a few auction-related claims that the Court held as plausibly pled in other complaints in this MDL: Last Look, Dynamic Allocation, Project Bernanke, and Dynamic Revenue Share.

---

[1] Google assumes that Plaintiff's claims of common law tortious interference, fraud, and punitive damages are state common law claims and therefore does not move to dismiss them at this time.

## BACKGROUND[2]

Plaintiff Inform previously operated an online video platform that connected publishers to video clips and coordinated the placement of advertisements within those videos. SAC ¶¶ 2, 47. According to Inform, it was both a customer and competitor of Google. *Id*. ¶¶ 58-60. Inform "used the Google DFP ad server to function as the delivery method for both display and online video advertisements." *Id*. ¶ 65. It also allegedly used Google's ad exchange, AdX. *Id*. ¶ 60. Inform claims to have been a competitor of Google because Inform "owned the ad inventory" for various websites and "contracted with advertisers to fill ad inventory" on those websites. *Id.* ¶ 58. Inform states that it is now "out of business." *Id.* ¶¶ 13, 115.

Inform filed its initial complaint and First Amended Complaint in 2019 and 2020, respectively. *See* ECF No. 499 at 2 (describing Inform's procedural history). The Georgia district court dismissed both complaints on shotgun pleading grounds. Order, No. 1:19-cv-05362, ECF No. 33, at 3; Order, No. 1:19-cv-05362, ECF No. 51, at 19. As to its First Amended Complaint, the Eleventh Circuit found that Inform had alleged standing in the online advertising and online video advertising markets but did not consider Google's remaining 12(b)(6) arguments. *Inform Inc. v. Google LLC*, No. 21-13289, 2022 WL 3703958 at *6 (11th Cir. Aug. 26, 2022). With a motion to dismiss pending, Inform's action was transferred into this multidistrict litigation. Transfer Order, *In re Google Digital Advertising Antitrust Litigation*, MDL No. 3010, ECF No. 227 (J.P.M.L. Feb. 1, 2023). Inform then filed its SAC in this Court.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

---

[2] For purposes of this motion to dismiss, Google assumes the truth of the well-pleaded allegations in the Second Amended Complaint. Google expects to contest many of those allegations in the future.

*v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). To do so, the complaint must make factual allegations sufficient to "raise a reasonable expectation that discovery will reveal evidence," *Twombly,* 550 U.S. at 556, that would "allow[] the court to draw the reasonable inference that the defendant is liable." *Iqbal,* 556 U.S. at 678. It is "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (alteration in original) (citations omitted). "In assessing the sufficiency of the complaint, a court must disregard legal conclusions, because they are not entitled to the presumption of truth." *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.,* No. 15-cv-3784, 2016 WL 6110565, at *4 (S.D.N.Y. Aug. 4, 2016) (Castel, J.). Rather, the Court "must examine the well-pleaded factual allegations 'and then determine whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal,* 556 U.S. at 679).

## ARGUMENT

### I.    INFORM FAILS TO ALLEGE SUFFICIENT MONOPOLY POWER, DANGEROUS PROBABILITY OF MONOPOLY POWER, OR INTENT TO MONOPOLIZE IN THE ALLEGED ONLINE VIDEO ADVERTISING MARKET.

Inform brings claims of monopolization and attempted monopolization. A monopolization claim under Section 2 of the Sherman Act requires (1) monopoly power, which is defined as "the power to control prices or exclude competition;" and (2) anticompetitive conduct, defined as "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (internal quotations omitted). "To support an inference of monopoly power, a plaintiff typically must plead and prove that a firm has a dominant share in a relevant market, and that significant 'entry barriers' protect that market." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).

A claim of attempted monopolization requires "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

As an initial matter, Inform does not allege the requisite market share or other factors to support a claim for monopolization or attempted monopolization in the alleged online video advertising market.  In each of Inform's federal antitrust counts (Counts I - V), Inform argues that Google has monopoly power or a dangerous probability of achieving monopoly power in such a market with an alleged 52% share.[3]  SAC ¶ 116.  Without any allegations of barriers to entry in the alleged online video advertising market or Google's ability to control prices, that market share by itself cannot support either monopolization claim.  *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d. Cir. 2002) ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power.").  Unlike other plaintiffs who have plausibly alleged monopoly power by pleading a lower share coupled with other plus factors, Inform has pleaded no other factors that would support an inference of monopoly power in an online video advertising market.  Inform makes no non-conclusory allegations regarding Google's video advertising prices or barriers to entry in online video advertising.[4]  Moreover, as explained in the next section, Inform's video advertising conduct allegations fail.  Nor has Inform alleged facts to support an argument that Google's 52% share could be dangerously likely to expand to a share indicating monopoly power on its own.  *Spectrum*

---

[3] Inform claims there is a "separate component market" of Instream Online Video Advertising, SAC ¶ 109, but never claims that Google monopolized such a market nor identifies any conduct that supposedly contributed to a monopoly in such a market.  Any claim for monopolization of an alleged Instream Online Video market fails for at least the same reasons that Inform's claims relating to an Online Video Advertising market fail.

[4] The Court previously found that the States' allegations of market share **plus** alleged ability to charge a take rate above other competitors was sufficient to plead monopoly power in an ad exchange market.  MTD Op., ECF No. 308 at 9-10.  By contrast, Inform does not allege any factors in addition to market share.

*Sports,* 506 U.S. at 456 (requiring a plaintiff to show a dangerous probability of obtaining monopoly power for an attempted monopolization claim).

Second, Inform does not sufficiently allege specific intent to monopolize for its claim of attempted monopolization. Inform insists that its allegations regarding acquisitions show specific intent to monopolize (and are themselves anticompetitive). ECF No. 559, at 5. Yet the only allegation related to Google's acquisitions is that Google failed to "grow[] organically." SAC ¶ 95. That is not enough to show intent to monopolize or intent to harm competition.

Like the Advertisers' allegations, Inform's acquisition-based claims are also time-barred. *Id.* ¶¶ 95-106; *see also* Advertisers' Compl., ECF No. 317-1 ¶¶ 167-71. Inform complains about acquisitions ranging from 2003 to 2011. Because Inform initiated this action on November 25, 2019, it cannot seek damages for conduct occurring before November 25, 2015. *See* 15 U.S.C. § 15b (four-year statute of limitations); *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971); *Inform Inc. v. Google LLC*, No. 19-cv-05362-JPB, ECF No. 1 (N.D. Ga. Nov. 25, 2019). And Inform cannot rely upon these allegations to extend or otherwise toll the statute of limitations: it must allege a "new and independent act that is not merely a reaffirmation of a previous act" and which "inflict[s a] new and accumulating injury." *US Airways, Inc. v. Sabre Holdings Corp.,* 938 F.3d 43, 68 (2d Cir. 2019); *see also New York v. Meta Platforms, Inc*., 66 F.4th 288, 300 n.13 (D.C. Cir. 2023) ("[W]e reject the States' argument that the Instagram and WhatsApp acquisitions remain 'subject to challenge now' because they are part of a 'course of conduct [that] remains ongoing.'"); *In re Google Digital Advert. Antitrust Litig*., 2021 WL 2021990, at *4 (N.D. Cal. May 13, 2021) ("[T]he statute of limitations poses a significant problem to Plaintiffs' acquisition-based allegations.").

## II.   GOOGLE'S   TRANSITION   FROM   FLASH   TO   HTML5   DOES   NOT CONSTITUTE ANTICOMPETITIVE CONDUCT.

In Counts I and III, Inform's main complaint is that Google's Chrome web browser phased out Adobe Flash and shifted to HTML5 technology.  As Inform alleges, Flash was Adobe's proprietary digital software for playing video on websites.  SAC ¶ 241.  In late 2014, Google began to transition to HTML5, an alternative format run based on open-source technology.  *Id.* ¶¶ 244, 255.

Inform fails to acknowledge that the entire industry—not just Google—shifted to HTML5 due to concerns with Flash technology.  In 2010, Adobe (Flash's creator) embraced the transition to HTML5, developing its own HTML5 video player, Flash-to-HTML5 conversion tool, and other HTML5 tools.[5]  Indeed, four years before Google allegedly began to transition away from Flash, Steve Jobs wrote a public letter condemning Flash's reliability, security, and performance.[6]  Thus, as of 2010, Apple "d[id] not allow Flash on iPhones, iPods and iPads."  *Id.*   In November 2011, three years before Google Chrome began the alleged transition, Adobe announced that it would discontinue development of its flash player for mobile devices.[7]  While Inform criticizes Chrome for later "automatically paus[ing] Flash content that was not 'central to the webpage,'" SAC ¶ 248, Inform fails to acknowledge that other major web browsers such as Mozilla Firefox and Microsoft

---

[5]   Michael Calore, *Adobe Releases Its Own HTML5 Video Player,* WIRED (Oct. 22, 2010), https://www.wired.com/2010/10/adobe-releases-its-own-html5-video-player/; Scott Gilbertson, *Adobe Shows Off Flash-to-HTML5 Conversion Tool,* WIRED (Oct. 28, 2010), https://www.wired.com/2010/10/adobe-shows-off-flash-to-html5-conversion-tool/; *Adobe Releases Early Preview of New HTML5 Web Motion and Interaction Design Tool*, ADOBE (July 31, 2011), https://news.adobe.com/news/news-details/2011/Adobe-Releases-Early-Preview-of-New-HTML5-Web-Motion-and-Interaction-Design-Tool/default.aspx

[6]   Steve   Jobs,   *Thoughts   on   Flash*,   APPLE   (April   2010), https://web.archive.org/web/20100501010616/https://www.apple.com/hotnews/thoughts-on-flash/; *see also* Patrick Goss,   *Opera   joins   in   Jobs   v   Flash   argument*,   TECHRADAR   (May   6,   2010), https://www.techradar.com/news/internet/opera-joins-in-jobs-v-flash-argument-687597 (reporting that Opera, another web browser, agreed with Jobs's concerns regarding Flash).

[7]   Allen   Hudspeth,   *Moving   from   Flash   to   HTML5*,   TECHNOPEDIA   (March   26,   2012), https://www.techopedia.com/2/28138/development/web-development/moving-from-flash-to-html5.

Edge did the same thing.[8]  In addition to web browsers, other platforms such as Facebook and Amazon also moved away from Flash.[9]

Despite this industry-wide shift, Inform focuses only on Google's transition and labels it anticompetitive.  None of its allegations amount to an antitrust violation and therefore should be dismissed.

### A.  Google's Switch to HTML5 Was a Lawful Design Decision.

Inform takes issue with Google's design of its web browser to phase out one third-party technology (Flash) and rely on another (HTML5).  There are three fundamental problems with Inform's attempt to turn its unhappiness with Chrome's move away from Flash into an antitrust claim.  First, Google is generally allowed to design its own products as it sees fit.  *Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263, 286 (2d Cir. 1979) ("[A]ny firm, even a monopolist, may generally bring its products to market whenever and however it chooses."); *see also Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999 (9th Cir. 2010) ("[A] monopolist has the right to redesign its products to make them more attractive to buyers.") (internal quotations omitted); *Cal. Comput. Prods. v. Int'l Bus. Mach.*, 613 F. 2d 727, 744 (9th Cir. 1979) (same).  This principle is the very essence of the competitive process.  Courts are hesitant to oversee product design, since "any dampening of technological innovation would be at cross-purposes with antitrust law."  *United States v. Microsoft Corp*., 147 F.3d 935, 948 (D.C. Cir. 1998).

---

[8] Benjamin Smedberg, *Reducing Adobe Flash Usage in Firefox*, MOZILLA FUTURE RELEASES (July 20, 2016), https://blog.mozilla.org/futurereleases/2016/07/20/reducing-adobe-flash-usage-in-firefox/ (Firefox); Mary Jo Foley, *Microsoft to change how Window 10's Edge browser handles Flash content*, ZDNET (Apr. 7, 2016), https://www.zdnet.com/article/microsoft-to-change-how-windows-10-edge-browser-handles-flash-content/ (Edge).
[9] *Facebook turns away from Flash for video*, BBC NEWS (Dec. 21, 2015), https://www.bbc.com/news/technology-35151494 (Facebook); Todd Bishop, *Amazon starts rolling out HTML5 web video player, moving beyond Silverlight and Flash*, GEEKWIRE (July 30, 2015), https://www.geekwire.com/2015/amazon-starts-rolling-out-html5-web-player-moving-beyond-silverlight-and-flash/ (Amazon); *see also* James East, *New HTML5 player beta trial for BBC iPlayer*, TECHNOLOGY AND CREATIVITY AT THE BBC, (Sept. 29, 2015) https://www.bbc.co.uk/blogs/internet/entries/19d875b8-c966-465b-880a-e38c71900c4c (BBC's iPlayer).

Second, Inform does not plausibly allege that this design decision lacked a valid business purpose. *See In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (finding conduct to be anticompetitive if it occurs "without a legitimate business purpose" and "makes sense only because it eliminates competition" (citation omitted)). As explained above, the industry had concerns about Flash's security and performance. Inform fails to consider these legitimate reasons for moving away from Flash technology.

Third, as explained immediately below, Inform fails to allege that Chrome's transition to HTML5 harmed competition in any alleged relevant antitrust market.

## B. Google's Switch to HTML5 Did Not Harm Video Advertising Competition.

Inform fails to plausibly allege anticompetitive effects from Google's transition to HTML5. The only allegation it provides is that Google's switch away from Flash "eviscerated" Inform's direct ad sales and impacted "dozens" of its customers "virtually overnight." SAC ¶ 253. That allegation is of harm to Inform alone. But antitrust law protects competition, not competitors. Inform must allege harm to a defined market as a whole, and has not come close. *See Balaklaw v. Lovell*, 14 F.3d 793, 797-99 (2d Cir. 1994) (requiring market-wide harm); *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc*., 996 F.2d 537, 543 (2d Cir. 1993) (requiring "proof of harm to the whole market"). Inform fails to allege that this shift in technology harmed *competition* for online video advertising in any meaningful way. And even if harm to Inform's customers was relevant, any alleged impact on "dozens" of customers does not sufficiently demonstrate an effect on *competition* in the alleged online video advertising market as a whole (which presumably has tens of thousands of customers).

Inform's allegations of "virtually overnight" harm to itself are also implausible. By Inform's own account, Google phased out Adobe Flash across a few years. In September 2014,

8

Google began to offer Flash-to-HTML5 conversion tools.  SAC ¶ 244.  Inform alleges that in January 2015, YouTube announced that Flash would no longer be the default on Chrome or any other web browser.  *Id*.  The next month, Google started to convert Flash campaigns to HTML5 for advertisers that used Google products.  *Id*. ¶ 245.  In June 2015, Google Chrome paused ads supported by Flash if they were not "central to the webpage."  *Id*. ¶ 248.  In 2017—more than two years after Google's initial offering of HTML5 conversion tools—Google Chrome changed its default settings to disable Flash.  *Id*. ¶ 249.  Taking all allegations as true, that would allow advertisers and Inform ample time and means to avoid any supposed "overnight" impact.  *Id*. ¶¶ 244-49.

Nor does Inform explain how pausing (i.e., not automatically playing) Flash ads that were ancillary to the webpage or changing Chrome's default settings could shut down its entire business. As a preliminary matter, Inform could have converted its ads to HTML5 or created new ads in that format.  And Inform's Flash-based ads could still play if users were interested in seeing them. Non-central Flash ads were "paused," not removed.  *Id.* ¶ 248.  And Inform admits that Google provided Chrome users with an option to enable Flash.  Chrome users could select "allow" on the browser to continue using Flash and even select "Remember this decision" to avoid future pop-ups.  *Id*. ¶ 250.  The fact that "a vast majority of users . . . behaved as anticipated, closing and ignoring [the screen] – never seeing the video or the associated advertisement," *id*. ¶ 251, demonstrates that users did not want to play those ancillary Flash ads.  Therefore, Google's decision to move away from auto-playing pop-up Flash advertisements was a legitimate business decision.

Inform also vaguely suggests that YouTube received some special treatment, but fails to allege what this was, how long it occurred, or how it could have an effect on competition in the

alleged video advertising market as a whole.  Inform alleges that "YouTube was exempted from the change during the change-over, and both content and online video advertising on the YouTube site remained unaffected."  *Id.* ¶ 252.  Inform fails to explain what change or change-over it is referring to, or from what YouTube was "exempted."  Inform also alleges that Google allow[ed] "autoplay for YouTube and advertisements that run on YouTube," (failing to note that such advertisements are within the central webpage content) and that "certain Google-owned or preferred sites such as YouTube are whitelisted, and thus algorithmically exempt from the restrictive Chrome Browser settings [regarding autostart and sound]."  *Id.* ¶¶ 256-57.  Inform utterly fails to explain what this "whitelisting" relates to – Flash advertisements, Flash content, HTML5 content, or something else.  Thus, it amounts to an allegation that YouTube's website works better in Chrome than some unidentified website littered with Inform video ads outside the central content.  That is not harm to competition.  Moreover, Inform admits that other, non-YouTube websites ("certain Google [ ] preferred sites") were also "whitelisted."  *Id.* ¶ 257.  Without any explanation of the proportion of websites or online video advertisements that were "whitelisted" vs. not, Inform fails to explain how this unexplained whitelisting practice could have affected competition as a whole.

### C.  Google's Switch to HTML5 Did Not Coerce the Use of Google Ad-Buying Products.

Inform alleges that Google phased out Flash and designed its web browser, Google Chrome, "to force advertisers to migrate" to Google advertising products.  *Id.* ¶ 243.  Inform alleges that Google did this by offering conversion tools to customers that used the Google Display Network or DoubleClick Campaign Manager, *id.* ¶ 244, and automatically converting ad campaigns to HTML5 if the customer used Google ad buying tools, *id.* ¶¶ 245-46.  This is not coercive or anticompetitive.  "Actual coercion . . . is present only if the manufacturer goes beyond

persuasion and conditions [the] purchase of one product on the purchase of another product." *Unijax, Inc. v. Champion Int'l*, 683 F.2d 678, 685 (2d Cir. 1982); *see also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684-88 (4th Cir. 2016). Nothing in the Complaint suggests that Inform (or anyone) was required to use Google products in order to create video advertising in the HTML5 format. Inform admits that HTML5 is "open source" technology not owned or otherwise controlled by Google. SAC ¶ 255. In other words, advertisers could create HTML5 content without using a Google product or service.

Inform's complaint appears to be that Google helped its own customers make the transition to HTML5 but did not give out free assistance to non-customers. *Id.* ¶¶ 244-45. Google helping its customers avoid an otherwise "manual[ ] and laborious[ ]" conversion process, *id.* ¶ 246, is competition on the merits—not coercion. Moreover, Inform admits that video creators could convert their own content without Google. *Id.* Inform's allegations do not plausibly suggest that the industry switch was coercive, or that Inform could not use any of the other myriad Flash-to-HTML5 conversion products available at the time or develop its own alternatives.[10]

### D. The Eleventh Circuit Did Not Rule on Inform's Flash or HTML5-related Allegations.

Contrary to Inform's argument, the Eleventh Circuit did not previously decide the validity of Inform's Flash arguments. Inform contends that by declining to reach the merits of Google's 12(b)(6) arguments, the Eleventh Circuit accepted Inform's Flash to HTML5 narrative as plausibly anticompetitive. ECF No. 559, at 2. Not so. The appellate court specifically stated that it would leave Google's 12(b)(6) arguments for the district court's consideration on remand. *Inform Inc. v. Google LLC*, No. 21-13289, 2022 WL 3703958 at *16 (11th Cir. Aug. 26, 2022). In fact, Inform

---

[10] *See, e.g.*, Joseph Labrecque & Andrew Wagner, *Convert Flash Ads to HTML5*, ADOBE (Aug. 1, 2018), https://helpx.adobe.com/animate/how-to/convert-flash-ads-to-html5.html (offering a conversion tool within the program Adobe Animate).

even admits that the Eleventh Circuit did not reach Google's 12(b)(6) arguments and only decided that Inform had alleged standing.  ECF No. 559, at 2 n.3.

## III.   INFORM'S CLAIMS REGARDING INTEROPERABILITY AND ENCRYPTED USER IDS DO NOT CONSTITUTE ANTICOMPETITIVE CONDUCT.

In addition to its Flash and HTML5-related claims, Inform argues in Counts I and III that Google engaged in "technological blocking" by failing to make Chrome compatible with Inform's chosen video specifications and encrypting user IDs.  SAC ¶¶ 262-73.

**Denial of Interoperability**.  Inform claims that Google set standards for its web browser. *Id*. ¶¶ 262-66.  Inform complains again about the Flash to HTML5 transition (which is not anticompetitive for the reasons discussed above) and claims that Google denied interoperability by setting limits on the size of video players in Chrome.  *Id.* ¶ 255.  Inform makes broad, boilerplate allegations about how setting reasonable product standards affected competition, yet fails to substantiate these legal conclusions.  Google is not required to make its products similar to, or compatible with, other offerings.  *Berkey Photo*, 603 F.2d at 286-88; *Cal. Comput. Prods*., 613 F. 2d at 744.  The Second Circuit's opinion in *Berkey Photo* is instructive.  There, the court determined that Kodak did not harm competition by making a new film that was only interoperable with its own cameras.  603 F.2d at 288; *see also Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004) (maintaining that the Sherman Act imposes "no duty to aid competitors").  Google's supposed "standard-setting" and lack of interoperability with every size of video player does not amount to exclusionary conduct.

**Encrypted User IDs**.  Like many private plaintiffs and the States, Inform says that Google encrypted user IDs, thereby depriving publishers of user-identifier data.  SAC ¶¶ 267-73; *see also* Daily Mail Am. Compl., ECF No. 400 ¶¶ 108-13; Advertisers' Compl., ECF No. 399 ¶¶ 184-86; Publishers' Am. Compl., ECF No. 408 ¶ 217; States' TAC, ECF No. 195 ¶ 257.  This Court

previously held that encrypting user IDs is not anticompetitive because Google has no duty to share unencrypted user IDs with rival ad exchanges or other alleged competitors. *See* MTD Op., ECF No. 308 at 42-43; *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.) ("Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival."); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1142 (9th Cir. 2022) (finding that Google's "captur[ing]" of user and advertiser data is a lawful competitive advantage). The Court's holding also applies here. Google has no obligation to share user data with alleged competitors like Inform.

Inform also fails to seriously consider Google's privacy consideration, a legitimate business reason for encrypting user IDs. *See In re Adderall*, 754 F.3d at 133 (requiring anticompetitive conduct to be "without a legitimate business purpose" (citation omitted)). Instead, it repeats previously rejected faulty and conclusory allegations that Google's privacy justification is pretextual. *See* MTD Op., ECF No. 308 at 41.

## IV. INFORM'S TYING CLAIMS FAIL AS A MATTER OF LAW.

Counts IV and V, which contain Inform's tying claims, should be dismissed entirely. The portion of Count I predicated on tying should be dismissed as well. *See* SAC ¶ 321. Inform claims that Google tied (1) YouTube ad inventory to Google's ad buying tools, and (2) DFP and AdX. Both of Inform's tying claims fail to plausibly allege coercion, marketwide harm, or the requisite harm to Inform as a customer or competitor.

A tying claim requires the plaintiff to allege that "the seller uses actual coercion to force buyers to purchase the tied product[.]" *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016); *see also E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31-32 (2d Cir. 2006) (requiring coercion for Section 2 tying claim). "Actual coercion . . . is present only if the

manufacturer goes beyond persuasion and conditions [the] purchase of one product on the purchase of another product." *Unijax,* 683 F.2d 678 at 685.  For a tying claim (as well as any other antitrust claim), a plaintiff must also allege that it suffered an antitrust injury.  "Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury."  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016).

**YouTube ad inventory/ad buying tools**.  Inform alleges in conclusory fashion that Google "coerce[d] advertisers to license its ad buying tools by conditioning the sale of its YouTube ad inventory (tying product) on the use of Google's separate ad buying tools (tied products)." SAC ¶ 178.  Inform's attempt at this claim fails because it suffered no antitrust injury from this alleged tie.  It was not forced to use Google's ad buying tools nor did it lose out on ad buying tool sales (because it sells none).  The Complaint mentions advertisers but fails to allege that Inform itself was "forced" to use any Google ad buying tool to access YouTube ad inventory. *Id*. ¶ 179.  *Inform never even claims to have bought YouTube inventory* in the first place.

The only harm Inform claims is that the so-called tie made rival tools "less attractive" to advertisers, allegedly harming "Inform's ability to compete for advertising spend on its digital media and advertising platform."  *Id.* ¶ 182.  But Inform did not offer rival ad buying tools that were supposedly foreclosed by Google's decision to make its inventory available only through proprietary buying tools.  The fact that YouTube was a popular place to advertise (and therefore that Inform's "platform" was "less attractive") had nothing to do with the alleged tie.  Inform's YouTube tying claim fails because Inform alleges no harm caused by any anticompetitive aspect of the alleged tie.

**AdX/DFP**.  Inform's tying claim related to AdX and DFP also fails to plausibly allege coercion.  Inform alleges that Google "used and leveraged the monopoly power of its AdX ad

exchange to coerce publishers to license its DFP publisher ad server" by "forcing customers and publishers to license Google's ad server if they wanted to receive live, competitive bids from AdX." *Id.* ¶¶ 168, 171.  By Inform's own allegations, this practice was not coercive *upon Inform*. Coercion means that the customer was indeed forced to use or purchase the tied product.  *See Unijax,* 683 F.2d 678 at 685 (requiring "[a]ctual coercion by the seller that in fact forces the buyer to purchase the tied product").  But Inform alleges that it "ranked AdX last or close to last" among exchanges, and that "other exchanges offered higher prices to publishers."  SAC ¶ 189.  If that is true, Inform has not alleged that it individually needed to receive live, competitive bids from AdX. Moreover, Inform itself was never contractually "coerced"—it never alleges that it signed a "required" contract that "included both Google's DFP ad server and Google's AdX exchange." *See id.* ¶ 173.  Inform's admission that it did not need bids from AdX, that it in fact preferred other exchanges, and that it was not contractually forced to take DFP differentiates its tying claim from those pled by other plaintiffs who claimed that receiving bids from AdX was an economic imperative which coerced them to also take DFP.

Inform was also not plausibly harmed by this so-called tying arrangement.  Inform claims with no support that the alleged tie "foreclosed competition in the ad server, ad exchange, online video advertising markets as well as the market for ad buying tools."  *Id.* ¶ 188.  Regarding an alleged ad server tie, Inform complains that Google's DFP ad server was more expensive and had an "inferior interface" that supposedly made it difficult for publishers to understand full metrics of their websites.  *Id.* ¶ 176.  But those complaints do not adequately allege harm to Inform, as Inform did not pay for its use of DFP, but its products were merely "integrated with Google's DFP ad server."  *Id.* ¶ 65.  And purported deficiencies in product quality are not cognizable harms.  *See Berkey Photo*, 603 F.2d at 287 (declining to consider product quality as part of the plaintiff's harm,

as "[a] product that commends itself to many users [as being] superior in certain respects may be rendered unsatisfactory to others by flaws they considered fatal."). As for the other supposedly affected markets, Inform makes no connection whatsoever between the alleged ad exchange and online video advertising markets, or the markets for ad buying tools and the alleged AdX/DFP tie.

## V. INFORM'S LEVERAGING CLAIMS FAIL AS A MATTER OF LAW.

Count II of Inform's complaint, which involves claims of monopoly leveraging, should be dismissed in its entirety, as should the portion of Count I predicated on leveraging. Inform claims that Google leveraged its power in alleged markets for internet search services, browsers, and ad servers to monopolize the online video advertising market. SAC ¶¶ 287-99.

Leveraging presupposes anticompetitive conduct. *Trinko*, 540 U.S. at 415 n.4. To bring a monopoly leveraging claim, a plaintiff must establish (i) monopoly power in one market; (ii) to create a dangerous probability of monopolizing a second market; and (iii) antitrust injury. *N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559, 572-73 (S.D.N.Y. 2004).

**Browser and Search defaults**. Inform claims that the default installation of Google Search and Chrome on Android devices somehow allowed Google to advance its alleged monopoly in digital advertising.[11] Like the Newspaper Plaintiffs, Inform argues that Chrome "controls" some advertising market(s). *Compare* SAC ¶ 291 ("Chrome Browser now serves as a way for Google to control the entry points for its core [advertising] markets"), *with* Newspapers' Am. Compl. ¶ 341 ("Chrome Browser now serves as a way for Google to control the entry points for its advertising products."). Yet Inform fails to plausibly explain how Google's installation of

---

[11] Apart from its leveraging claims, Inform also asserts that Google's search default on Apple iOS devices "foreclosed competition in the online video advertising, Internet Search and web browser markets." SAC ¶¶ 282-84. Inform offers no plausible argument that it was injured as a result of this business deal.

Chrome or Google Search caused anticompetitive harm to the alleged relevant markets for ad servers, ad exchanges, and online video advertising.  Inform argues that Chrome is "*the* piece of ad tech that controls whether video advertisements are audible, viewable and viable."  ECF No. 559 at 5.  Again, Inform has not connected its Chrome-based allegations to foreclosed competition in any alleged market.  Inform also seems to ignore other browsers (Internet Explorer/Edge, Safari, Firefox, etc.), some of which serve as defaults on non-Android devices.[12]

**AMP**.  Inform claims that Google required publishers to use AMP, a software development that was supposedly incompatible with Flash advertisements and header bidding.  SAC ¶¶ 293-97. The Court already dismissed similar allegations in the States' case.  MTD Op., ECF No. 308 at 70-72.  Inform fails to add any material allegation to alter that conclusion. Inform also does not plausibly explain how Google allegedly "dropp[ing] the PageRank of sites that did not adopt AMP" could have affected competition as a whole in the alleged market for online video advertising.  *See* SAC ¶ 297.

**YouTube Search Results**.  Inform briefly references Google's so-called "premium placement" of YouTube in search results.  *Id.* ¶ 298.  Inform fails to allege that YouTube's high search ranking is in any way harmful to competition.  *See Dreamstime.com*, 54 F.4th at 1141-42 (determining that Google's top placement of Google Images in search results does not plausibly harm competition in an online search advertising market).  Inform does not explain at all how YouTube's search ranking was an "attempt to monopolize the online video advertising market." SAC ¶ 293.

---

[12] Edge is the default on Windows 10 and 11, and Safari is the default on Apple devices.  *See* Lance Whitney, *How to Change Your Default Web Browser*, PCMAG (Apr. 18, 2022), https://www.pcmag.com/how-to/how-to-change-your-default-web-browser.

**Blocking Online Video Ads**.   In one passing allegation, Inform claims that Google leveraged its power in the alleged ad server and browser markets to disable video advertisements in an attempt to monopolize the alleged online video advertising market.   SAC ¶ 299.   As previously explained, disabling Flash in a web browser was not anticompetitive.   Inform fails to make any coherent allegation connecting any alleged conduct relating to ad servers with harm to competition in the alleged online video advertising market.

## VI.   CERTAIN OF INFORM'S AUCTION-RELATED CLAIMS FAIL AS A MATTER OF LAW.

In Counts I and III, Inform brings the following auction-related claims: bypassing direct deals on high news days, Enhanced Dynamic Allocation (EDA), and Minimum Bid to Win.   These claims were brought by other MDL plaintiffs and also fail here for similar reasons.

**Bypassing direct deals on high news days**.   Like the Newspaper Plaintiffs, Inform asserts that Google bypassed direct ad campaigns on high news days to favor cheaper programmatic ads. *Compare* SAC ¶¶ 229-35, *with* Newspapers' Am. Compl., ECF No. 401, ¶¶ 269-271.   Inform asserts that Inform "and other publishers" were "deprived" of a "neutral" ad server.   SAC ¶ 235. That allegation does not constitute harm to competition in any relevant market, and fails anyway because there is no detailed or specific claim that any direct contract went unfulfilled.   *See id.* Inform's allegations amount to the tautology that if Inform could have filled more impressions with higher priced, directly sold ads, it would have made more money.   That is not harm to competition in any alleged market.   Inform also complains that Inform and "other competitors" were shut out from "lucrative ad inventory" and "lost the ability to compete for additional ad spend."   *Id.* ¶¶ 232-34; ECF No. 559 at 6.   These arguments at best are vague and conclusory. Even if true, Google has no duty to help these supposed "other competitors" access direct ad campaign inventory that Inform never claims they had access to in the first place.   *Cf.* MTD Op.,

ECF No. 308 at 36 (citing *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1360 (2d Cir. 1988) for the proposition that "a firm with lawful monopoly power has no general duty to help its competitors."); *Trinko*, 540 U.S. at 407-08 ("Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law.").

**Enhanced Dynamic Allocation**.  Inform's EDA claim is time-barred and otherwise insufficient.  According to Inform, Google used EDA to access ad inventory "potentially covered by direct contracts between Inform (and other publishers) and advertisers."  SAC ¶ 198.

Inform alleges that Google developed EDA in or around 2014, and Inform was on notice about the practice.  *Id.* ¶¶ 198, 201.  Indeed, "Inform repeatedly reached out to the Google Team with its concerns."  *Id.*  This claim is time-barred because the alleged misconduct occurred before November 25, 2015 (four years before Inform filed its first complaint).  *See* 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971); *Inform Inc. v. Google LLC*, No. 19-cv-05362-JPB, ECF No. 1 (N.D. Ga. Nov. 25, 2019).

Moreover, Inform claims that EDA harmed competition in the alleged ad server and online advertising markets without any plausible explanation.  The Court found that the States sufficiently alleged that EDA affected only the alleged *ad exchange* market—not the ad server market or any other alleged markets.  MTD Op., ECF No. 308, at 49-50.  Inform fails to connect EDA to any supposed harm to competition for ad servers or online advertising.  Moreover, with respect to the alleged online advertising market, Inform claims that EDA caused customers to spend less on ads with Inform.  SAC ¶ 203.  Alleged harm to a single alleged competitor is insufficient to establish marketwide harm.  *See NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 135 (1998) (requiring harm "not just to a single competitor, but to the competitive process").

**Minimum Bid to Win**.  Similar to the Publisher Plaintiffs, Inform briefly criticizes Google's practice of providing advertisers with a "Minimum Bid to Win."  It offers nothing but conclusory allegations that the practice "foreclosed participation by [] competitors, illegally restrained trade, and stifled competition."  SAC ¶ 215.  Because Inform fails to offer any factual support, this claim should be dismissed.

Even if Inform offered sufficient detail regarding Minimum Bid to Win (which it does not), the practice is not exclusionary for the reasons explained in Google's motion to dismiss the Publishers' Amended Complaint.  ECF No. 483 at 11-15.  Inform complains that Google set "unreasonably high minimum bids targeted only at competing products."  SAC ¶ 215.  That conduct is entirely lawful under antitrust law, as Google has no general obligation to support its competitors.  *See Novell*, 731 F.3d at 1072 (no duty to "lend smaller rivals a helping hand").

## VII.    INFORM IS NOT ENTITLED TO INJUNCTIVE RELIEF.

Inform inappropriately seeks an injunction against Defendants.  SAC, Prayer of Relief, ¶ 2. A plaintiff cannot seek injunctive relief based only on past injury.  *See O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.").  Rather, a plaintiff must "demonstrate that [they are] likely to be harmed again in the future in a similar way."  *Nicosia v. Amazon*, 834 F.3d 220, 239 (2d Cir. 2016); *see also Tomasino v. Estee Lauder Cos.*, 44 F. Supp. 3d 251, 256 (E.D.N.Y. 2014) (finding that the plaintiff "has not alleged a sufficient future injury to establish standing to assert her claims for injunctive relief because she has demonstrated that she is, in fact, unlikely to purchase [the products in question] again.").  By its own account, Inform is "out of business."  SAC ¶¶ 13, 115.  Assuming that

allegation is true, Inform cannot establish future injury and therefore is foreclosed from injunctive relief.

## VIII.   A 12(B)(6) MOTION IS THE PROPER MECHANISM FOR DISMISSING INFORM'S CLAIMS.

Inform has recycled the same faulty arguments about dismissing claims as other MDL plaintiffs.  Like Daily Mail and other MDL plaintiffs, Inform argues that it alleges an "interwoven scheme," and that Google cannot "cherry pick apart" Inform's antitrust claims.  ECF No. 559 at 3 n.4.  Google is challenging distinct claims, which is proper use of a 12(b)(6) motion.  A claim is "a set of facts giving rise to one or more legal rights[.]"  *Schwartz v. Eaton*, 264 F.2d 195, 196 (2d Cir. 1959); *see also In re Am. Express Anti-Steering Rules Antitrust Litig.*, 343 F. Supp. 3d 94, 100 (E.D.N.Y. 2018) (defining claim as a "set of facts that can support liability for the defendant under a cause of action").

In ruling on Google's motion to dismiss the States' complaint, the Court followed this approach and considered standalone claims in each alleged relevant market.  *See* MTD Op., ECF No. 308.  Inform cannot evade a 12(b)(6) motion by grouping all of its claims into an overarching "scheme."  *In re Am. Express*, 343 F. Supp. 3d at 100 (a plaintiff cannot "collapse all of his distinct claims into one central 'count,' thereby proofing his complaint from a partial motion to dismiss").  A 12(b)(6) motion is entirely appropriate to challenge Inform's claims.

## CONCLUSION

For the foregoing reasons, Inform's Second Amended Complaint should be dismissed with respect to all federal claims except Last Look, Dynamic Allocation, Project Bernanke, and Dynamic Revenue Share.

Dated: July 31, 2022                                    Respectfully Submitted,


                                                        */s/ Justina Sessions*
                                                        Justina K. Sessions (admitted *pro hac vice*)
                                                        FRESHFIELDS BRUCKHAUS
                                                        DERINGER US LLP
                                                        855 Main Street
                                                        Redwood City, CA 94063
                                                        (650) 618-9250
                                                        justina.sessions@freshfields.com

                                                        Eric Mahr
                                                        700 13th Street, NW
                                                        Washington, DC 20005
                                                        (202) 777-4500
                                                        eric.mahr@freshfields.com

                                                        Mikaela Evans-Aziz (admitted *pro hac vice*)
                                                        WILSON SONSINI GOODRICH &
                                                        ROSATI
                                                        Professional Corporation
                                                        One Market Plaza, Spear Tower
                                                        Suite 3300
                                                        San Francisco, CA 94105
                                                        (415) 947-2000
                                                        mevansaziz@wsgr.com

                                                        Daniel Bitton
                                                        AXINN VELTROP & HARKRIDER LLP
                                                        114 West 47th Street
                                                        New York, NY 10036
                                                        (212) 728-2200
                                                        dbitton@axinn.com

                                                        *Counsel for Defendants Google LLC,*
                                                        *Alphabet Inc., and YouTube LLC*

22