**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| -------------------------------------------------------- ) | |
| IN RE: GOOGLE DIGITAL ADVERTISING ) | 21-md-3010 (PKC) |
| ANTITRUST LITIGATION ) | |
| ) | |
| -------------------------------------------------------- ) | |
| ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| INFORM INC., ) | 1:23-cv-01530 (PKC) |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| GOOGLE LLC; ) | |
| ALPHABET INC.; and ) | |
| YOUTUBE, LLC, ) | JURY TRIAL DEMANDED |
| ) | |
| Defendants. ) | |
| ) | |
| -------------------------------------------------------- ) | |

<u>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>
<u>**INFORM'S SECOND AMENDED COMPLAINT**</u>

# TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................................1

II.   LEGAL STANDARD ........................................................................................2

III.   ARGUMENT ....................................................................................................3

IV.   GOOGLE'S MONOPOLY POWER, MONOPOLY LEVERAGING AND ATTEMPTED MONOPOLY (COUNTS I, II, AND III) ..........................................................................4

   A.   Google Does Not Contest the Well-Pleaded Parameters of the OLV Advertising Market and Market Power Has Been Adequately Pled .............................................................. 4

   B.   The SAC Adequately Pleads Attempted Monopolization of the OLV Advertising Market ........................................................................................................................... 6

   C.   Dismissal of Specific Allegations of the SAC As Time Barred Is Improper .............. 8

V.   THE ALLEGATIONS IN PLAINTIFF'S COMPLAINT Plausibly Allege Anticompetitive Conduct..........................................................................................................9

   A.   The Court Must Consider Plaintiff's Allegations in Their Totality............................ 9

   B.   The Predatory Way In Which Google Carried Out The Flash HTML5 Transition Was Anticompetitive and Is Adequately Pled ...................................................................... 11

      1.   Defendants' Ignore the Plain Language of Plaintiff's Complaint And Are Improper 11

      2.   The Transition From Flash to HTML5 Was Undertaken to Enable Google to Control Competing Video Ad Players and Impede Competition On the Merits and Was Anticompetitive .............................................................................................................12

      3.   Exempting YouTube Undermines Defendants' Factual Design Argument................14

      4.   Inform Has Pled that the Anticompetitive Transition Devastated Competition .........15

      5.   Defendants' Standing Arguments, Recast as Concerning Market Harm, Have Already Been Decided By the Eleventh Circuit ...........................................................................15

   C.   Defendants' Attempt to Parse Out Certain Anticompetitive Auction Manipulations as Separate Claims Fails ...................................................................................................... 16

      1.   Bypassing Direct Ad Sales Was Anticompetitive.....................................................16

      2.   Enhanced Dynamic Allocation Has Already Been Found to Be Plausibly Anticompetitive..............................................................................................................18

      3.   Minimum Bid to Win Was Anticompetitive ............................................................19

      4.   Interoperability and Encryption ...............................................................................19

VI.   Inform's YouTube Tying Claim is Well-Pleaded ........................................22

VII.   Inform's Leveraging Claims are Well-Pleaded .........................................25

VIII.   CONCLUSION................................................................................................30

## TABLE OF AUTHORITIES

Cases

*A.I.B. Express, Inc. v. FedEx Corp.*,
  358 F. Supp. 2d 239 (S.D.N.Y. 2004) ............................................................ 26
*Abbott Labs. v. Teva Pharms. USA, Inc.*,
  432 F.Supp.2d 408 (D.Del.2006) .................................................................... 13
*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp LP*,
  592 F.3d 991 (9th Cir. 2010) .......................................................................... 13
*Amerinet, Inc. v. Xerox*,
  972 F.2d 1483 (8th Cir. 1992) ........................................................................ 25
*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012)...... 2, 3, 12
*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019)............................................................................... 2, 26
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... 2
*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ......................................................................................... 9
*Balaklaw v. Lovell*,
  14 F.3d 793 (2d Cir. 1994) ............................................................................. 15
*BBL, Inc. v. City of Angola*,
  809 F.3d 317 (7th Cir. 2015) .......................................................................... 10
*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 n.20 (2d Cir. 1979)
  .............................................................................................................. 13, 14
*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993) ........................................................................... 16
*Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46 (2d Cir. 2016) ..................... 2
*Cont. Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ....................................................................................... 10
*Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248 (11th Cir.
  2015) .............................................................................................................. 7
*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ........................................................................... 9, 25, 30
*Easton Rae, LLC v. Violet Grey, Inc.*,
  No. 21-CV-6234 (JPO), 2023 WL 2691459 (S.D.N.Y. Mar. 29, 2023) ............. 2
*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
  386 F.3d 485 (2d Cir. 2004) ......................................................................... 5, 6
*Heerwagen v. Clear Channel Comm.*,
  435 F.3d 219 (2d Cir. 2006) ............................................................................. 5
*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  No. 18 -CV-864, 2018 WL 6629250 (N.D. Ill. Oct. 22, 2018). .................... 4, 11
*In re Google Digital Advert. Antitrust Litig.*,
  2021 WL 2021990 (N.D. Cal. May 13, 2021)..................................................... 8
*In re IBM Peripheral EDP Devices Antitrust Litig.*,
  481 F. Supp. 965 (D.Cal.1979)................................................................. 13, 20

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) ........................................................ passim
*In re Suboxone Antitrust Litigation*,
   64 F. Supp. 3d 665 (E.D. Pa. Dec. 3, 2014) ................................................ 13, 29
*In re Visa Check/MasterMoney Antitrust Litig. v. Visa U.S.A., Inc.*,
   280 F.3d 124 (2d Cir.2001) ........................................................................ 25
*In re Wireless Tel. Servs. Antitrust Litig.*,
   385 F. Supp. 2d 403 (S.D.N.Y. Sept. 2, 2005) ............................................ 25
*In re: Zinc Antitrust Litig.*,
   No. 14-CV-3728 (KBF), 2016 WL 3167192, at *19 (S.D.N.Y. June 6, 2016)... 4,
   10
*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ........................................................................................ 22
*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ............................................. 8
*Lorain Journal Co. v. United States*,
   342 U.S. 143 (1951) .................................................................................... 7
*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) ................................................... 13, 19, 29
*New York v. Meta Platforms*, Inc.,
   66 F.4th 288 (D.C. Cir. 2023)..................................................................... 8
*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) .......................................................... 19, 21
*Olde Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.*,
   485 F. Supp. 2d 387 (S.D.N.Y. 2007) ........................................................ 26
*PepsiCo Inc. v. Coca-Cola Co.*,
   315 F.3d 101 (2d Cir. 2002) ....................................................................... 5
*Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131 (2d. Cir. 2022) ...................... 2
*RxStrategies, Inc. v. CVS Pharmacy, Inc.*,
   No. 8:18-CV-1087-T-30TGW, 2019 WL 7584729 (M.D. Fla. Dec. 4, 2019)..... 7
*Servicetrends,. Inc. v. Siemens Med. Sys. Inc.*,
   870 F. Supp. 1042 (N.D. Ga. Mar. 21, 1994) ............................................. 8
*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993) ........................................................... 7, 8, 25
*Tal v. Hogan*,
   452 F.3d 1244 (10th Cir. 2006) .................................................................. 3
*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ....................................................................... 4
*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
   142 F.3d 90 (2d Cir. 1998) ..................................................................... 4, 5
*U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*,
   7 F.3d 986, 994 (11th Cir. 1993) ............................................................... 4
*U.S. Steel Corp. v. Fortner Enters., Inc.*,
   429 U.S. 610 (1977) .................................................................................... 21
*Unijax, Inc. v. Champion Int'l, Inc.*,
   683 F.2d 678 (2d Cir. 1982) ....................................................................... 23

*United States v. Columbia Steel Co.*,
  334 U.S. 495 (1948) ........................................................................... 8
*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ...................................................................... 5, 8
*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) .................................................... passim
*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019) ............................................................... 8
*Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398, 415 n.4 (2004) ......................................................... 25
*Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*,
  224 F. Supp. 2d 657 (S.D.N.Y. 2002) ...................................... 28, 30

I.      **INTRODUCTION**

When Yahoo agreed to purchase Plaintiff Inform Inc. ("Inform") to create the largest online video advertising company in the world, Google took action to put Inform out of business.  Inform filed this action, the first ad tech monopoly case against Google, in 2019.  Since its original filing in 2019, Google has filed four separate motions to dismiss, including one that was granted but then reversed by the Eleventh Circuit Court of Appeals in 2022.  Undeterred by its legal setbacks, Google once again files a motion to dismiss based on a series of erroneous factual allegations and misconstructions of the applicable legal standards.

Defendants take aim at the fact-intensive issue of market power in the online video ("OLV") advertising market ("OLVAM"); seek to reargue what this Court has already found to be anticompetitive; and attempt to isolate, analyze, and cut away specific instances of conduct.  This myopic dissembling analysis ignores the well-pleaded factual allegations of Inform's Second Amended Complaint [ECF. 535] that demonstrate Google's multifaceted anticompetitive scheme and its interrelated component parts.

Defendants' mischaracterization of Inform's factual allegations have been criticized by multiple courts, yet they continue to make the same arguments.  For example, the Eleventh Circuit has already adjudicated Inform's standing; this Court has already sustained the majority of Inform's claims plausibly state a claim; Defendants' market power in the OLVAM advertising market is evident from the well-pleaded allegations of the SAC; and the additive conduct set forth by Inform is plainly anticompetitive.  What remains are questions of fact that require full discovery and are uniquely unsuited for dismissal at this early stage of litigation.  Finally, in this fourth motion to dismiss filed by Defendants, arguments have either been soundly rejected by the

Eleventh Circuit or have been waived.  The law is clear that a defendant cannot continue to make up new grounds for Rule 12(b)(6) motions and file them seriatim.[1]

The Court should deny Defendants' partial motion to dismiss Inform's Second Amended Complaint (SAC) and compel Defendants to meet the allegations on their merits once and for all.

## II.  LEGAL STANDARD

To survive a motion to dismiss under F.R.C.P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).  On a motion to dismiss, courts must "accept factual allegations in the complaint as true and draw all reasonable inferences" in the plaintiff's favor.  *Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 137 (2d. Cir. 2022) (quoting precedents).  A claim survives if, "in light of the factual allegations," that claim is at least "plausible." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012).  Notably, "there is no heightened pleading standard in antitrust cases*." Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016).

Defendants' unabashedly and inappropriately wade into factual arguments on the merits of the case (without discovery), attempt to persuade the Court to draw inferences in their favor, and ignore inconvenient factual allegations.  Such tactics have been repeatedly rejected.  *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1519 (2019).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial." *Adinolfe v. United Techs. Corp.*,

---

[1] Under Fed. R. Civ. P. 12(g)(2), "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under [Rule 12] must not make another [Rule 12 motion] raising a defense or objection that was available to the party but omitted from its earlier motion."  In short, Rule 12(g)(2) "'bar[s] successive 12(b)(6) motions containing arguments that could have been raised in earlier motions.'"  *Easton Rae, LLC v. Violet Grey, Inc.*, No. 21-CV-6234 (JPO), 2023 WL 2691459, at *3 (S.D.N.Y. Mar. 29, 2023).  Thus, Defendants' arguments regarding statute of limitations, specific intent and certain instances of conduct should be denied at this time as barred by Rule 12(g)(2).

2

768 F.3d 1161, 1168 (11th Cir. 2014) (quoting *Tal v. Hogan*, 452 F.3d 1244, 1252 (10th Cir. 2006)). "Fact-specific questions cannot be resolved on the pleadings." *Anderson News, L.L.C.*, 680 F.3d at 185. Moreover, "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 218 (S.D.N.Y. 2019)(quotations omitted).

## III.   ARGUMENT

Inform's SAC more than satisfies the pleading standard for federal antitrust cases. In Counts I, II and III, Plaintiff alleges a series of anticompetitive restraints, the majority of which this Court has already found plausibly violate federal antitrust laws in the bellwether Motion to Dismiss the States' Third Amended Complaint. September 13, 2022 Opinion and Order on State AG's Motion to Dismiss, ECF No. 308 (hereinafter the "MTD Opinion"). Google does not dispute that Inform's SAC states claims for relief under Section 2 of the Sherman Act.[2]

Notably, Defendants do not dispute the market definitions set forth by Inform, nor do Defendants dispute Inform's allegations of market power in each of the markets pled, save OLV advertising. Moreover, Inform has expressly pled that Defendants' numerous acquisitions and alleged anticompetitive conduct demonstrate specific intent to monopolize and attempt to monopolize the relevant markets, *see e.g.*, SAC ¶¶ 96-106, 339-341, and Defendants failed to challenge these allegations as demonstrating specific intent or being time barred in any of their three prior motions to dismiss.

Instead, Defendants take aim only at the alleged *market share* of the OLVAM and specific instances of conduct that are part and parcel of Defendants' overarching course of conduct, referred to in the SAC as "Defendants' Anticompetitive Restraints." (SAC ¶¶15-16). Thus, if this Court

---

[2] Defendants do not dispute that Counts I and III plausibly allege monopolization and attempted monopoly of the ad server and ad exchange markets, and that the majority of the conduct alleged is anticompetitive in the OLVAM.

determines that certain allegations of conduct are not anticompetitive standing alone, they remain relevant as part of Defendants' Anticompetitive Restraints, SAC ¶¶ 15-16, and must stand at this stage of the litigation. *In re: Zinc Antitrust Litig.*, No. 14-CV-3728 (KBF), 2016 WL 3167192, at *19 (S.D.N.Y. June 6, 2016). As to the remaining claims, the Court has already sustained the AdX-DFP tying allegations of Counts IV and V. And the tying allegations with respects to YouTube are well-pled and stand either as a Section I violation or as part and parcel of Inform's Section 2 claims. *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18 -CV-864, 2018 WL 6629250, at *8 (N.D. Ill. Oct. 22, 2018). Counts VI through VIII are not contested.

## IV.   GOOGLE'S MONOPOLY POWER, MONOPOLY LEVERAGING AND ATTEMPTED MONOPOLY (COUNTS I, II, AND III)

### A.   Google Does Not Contest the Well-Pleaded Parameters of the OLV Advertising Market and Market Power Has Been Adequately Pled

Inform has properly pled that Google has monopoly power in the uncontested OLVAM. Monopoly power is "the power to control prices or exclude competition" and may be shown either through circumstantial or direct evidence, including whether the defendant behaves like a monopolist. *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998); *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001); *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,* 7 F.3d 986, 994 (11th Cir. 1993) (monopoly power is the "*power to exclude competition* in the relevant market either by restricting entry of new competitors or *by driving existing competitors out of the market*")(emphasis added).

Where there is direct evidence that Defendants have controlled prices or excluded competition, the existence of monopoly power is clear. *See Microsoft*, 253 F.3d at 51. "If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power." *Todd v. Exxon Corp*., 275 F.3d 191, 206 (2d Cir. 2001).

Indeed, Defendants' behavior "may well be sufficient to show the existence of monopoly power." *Microsoft,* 253 F.3d at 57.  Inform has pled exclusion from the OLV advertising market.

Absent direct evidence, the "existence of [monopoly] power ordinarily may be inferred from the predominant share of the market," which acts as a proxy for monopoly power. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *Heerwagen v. Clear Channel Comm.*, 435 F.3d 219, 227 (2d Cir. 2006) ("Indirect proof of market power . . . is a surrogate for direct proof of market power"); *PepsiCo Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002).  "While market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power."  *Tops Mkts.*, 142 F.3d at 98.  Other factors relevant to determining market power include "the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand." *Id.*; *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc*., 386 F.3d 485, 501 (2d Cir. 2004) (explaining nature of pricing activities also supports an inference of monopoly power).

The SAC pleads both direct evidence of Defendants' market power,[3] as well indirect evidence of Defendants' dominant market share plus amplifying factors that evidence Defendants' market power in the OLVAM.  The SAC sets forth conduct that demonstrates Defendants' behavior as a monopolist — including in the OLVAM−behavior that *in fact* drove Inform and other competitors out of the markets.  Last Look, Dynamic Allocation, Enhanced Dynamic Allocation Project Bernanke, and Dynamic Revenue Sharing−all sustained by this Court provide direct evidence of Defendants' market power.  The astronomical rise of Google's programmatic advertising and tandem death of direct advertising for Inform and other competitors provide additional direct evidence. SAC at ¶¶313-14.

---

[3] *See e.g.*, SAC 15, 20-98, 167-322.

In addition to Google's substantial market share of at least 52%, the SAC plainly states that Google's market power "is amplified and demonstrated by the interoperability of the Google products within each of the markets; Google's unilateral ability to control how and on what terms market participants can interact with its products and services; Google's collection and weaponized usage of data from its products and services; Google's ability to both set pricing and maintain opacity in the fees its receives for its services; network effects; and the self-reinforcing advantages of the data it collects for each of its services in garnering additional market share."  SAC ¶¶ 158-162.[4]  Inform lays out significant barriers to entry.[5]

Defendants' bald assertion that Inform has pled no "plus factors" supporting an inference of monopoly power in the OLVAM ignores the plain language of the SAC. (Br. at 4.)  Each of the above factors amplifies Defendants' already uncontested dominant market share in the OLVAM [52%].  Coupled with Defendants' uncontested monopoly power in the intertwined digital markets[6] and fortified by barriers to market entry−including Defendants' illegal tying in the OLVAM−the SAC more than satisfies the pleading of market power in this case.  Beyond this, monopoly power is a question of fact for the jury.

### B.    The SAC Adequately Pleads Attempted Monopolization of the OLV Advertising Market

---

[4] Defendants' market share in the Online Advertising Market is further amplified by: (1) the structure of the industry itself; (2) barriers to entry; (3) products and services at issue, which technologically blocked competition in fact in the OLV advertising market; (4) minimal strength and capacity of competitors, particularly as given Google's monopoly control of the digital ecosystem; (5) the interplay of Google's monopolies, particularly as between Internet Search, the ad server, Google's Chrome Browser and the OLV advertising market; (6) Google's substantial relevant patents; (7) Google's ability to offer services for free to users; (8) the data it harvests from users and competitors; and (9) Defendants' ability to create and enforce multiple illegal ties.  *Geneva Pharms.,*386 F.3d at 501 (explaining the nature of defendant's activities also supports an inference of monopoly power)

[5] Barriers to entry include but are not limited to: (1) network effects that make platforms more valuable as they gain more users;[5] (2) the advantages of big data which enable platforms and companies to use the treasure trove of data they collect from users to improve the effectiveness of their products and services; (3) lock-in effects that cause users to avoid switching platforms or companies so as not to lose their personal contacts, history of searches, photos, apps, and other information; (4) leveraging of their monopoly power to keep competitors out; (5) illegal tying of YouTube and its display side advertising tool; and (6) purposeful denial of interoperability.  SAC ¶¶ 331, 346, 360.

[6] Internet Search (over 90%), LMDOS (74%), Web Browser (65%), Ad Server (over 90%), and Ad Exchange (60-70%) Markets.  SAC ¶ 7.

To show attempted monopoly under Section 2, a plaintiff must allege: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Keurig*, 383 F. Supp. at 219. Moreover, a company "already enjoying a substantial monopoly in its area, violates the 'attempt to monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition." *Lorain Journal Co. v. United States*, 342 U.S. 143, 154 (1951). Plaintiff need only allege that the defendant is close to achieving monopoly power in the relevant market. "[W]hether a dangerous probability of success exists is a particularly fact-intensive inquiry," and a court needs be "mindful that [this]. . . is a question of proximity and degree." *Microsoft*, 253 F.3d at 80 (citations omitted); *see generally Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

For all the reasons set forth above, the SAC pleads that Defendants have either achieved or are dangerously close to achieving monopoly power in the OLV advertising market, both through direct evidence of exclusion and circumstantial evidence of Defendants' dominant market share,[7] coupled with factors that amplify Defendants' market power and demonstrate barriers to entry. *See supra* 6-10; SAC ¶¶ 69-70.

As to specific intent, Defendants did not dispute specific intent in the 145 pages of their three prior motions to dismiss Inform's Complaint and cannot raise it now on this fourth try. *See supra* n 1. Moreover, anticompetitive intent may be inferred from the allegations of defendants' predatory conduct itself, already sustained by this Court, "essentially reducing the analysis to two

---

[7] While "'[a] dangerous probability of achieving monopoly power *may* be established by a 50% share' of the relevant market," *Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1264 (11th Cir. 2015), a lesser share is sufficient where direct evidence of a defendant's behavior makes monopolization clear or where other factors amplify defendant's market power. *See, e.g.*, *RxStrategies, Inc. v. CVS Pharmacy, Inc.*, No. 8:18-CV-1087-T-30TGW, 2019 WL 7584729, at *2 (M.D. Fla. Dec. 4, 2019) (denying dismissal where other factors combined to amplify market power of defendant CVS with 30% market share).

elements." *Servicetrends,. Inc. v. Siemens Med. Sys.. Inc.*, 870 F. Supp. 1042, at 1053–54 (N.D. Ga. Mar. 21, 1994) (citations omitted); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993)("Unfair or predatory conduct may be sufficient to prove the necessary intent to monopolize").  The SAC sets forth Google's specific intent to monopolize.[8]

### C.      Dismissal of Specific Allegations of the SAC As Time Barred Is Improper

Defendants suggest that "Inform's acquisition-based claims are time-barred."  (Br. at 5.) Defendants' acquisitions of nascent competitors go directly to the well-settled and indisputable second element of each of Inform's Section 2 claims: "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Grinnell Corp.*, 384 U.S. 563, 570–71 (1966) and (again) demonstrates Defendants' specific intent to monopolize these markets. SAC ¶¶6-7, 15.

In addition to not having raised and thus having waived this argument in each of its three prior motions to dismiss, *see supra* note 1, Google misstates the law.  "Antitrust law provides that, in the case of a continuing violation . . . each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (citations omitted).  The cases cited by Defendants are not to the contrary.[9]

---

[8] Specific intent is evidenced here by *inter alia* Defendants': (1) anticompetitive conduct already recognized as plausible by this Court and detailed in the SAC; (2) "long history of acquisitions" (*United States v. Columbia Steel Co.*, 334 U.S. 495, 532 (1948)); (3) placement of Google executives into the FTC and reversal of critical representations made to the FTC ; (4) harvesting/use of competitors' data; (5) Google's actual interference with competitors; (6) purposeful consolidation of revenues to hide market power; and (7) culture of secrecy in pricing and use of data.  SAC ¶¶ 96, 99, 106, 213, 279, 329, 339-341, 374-75, 385.

[9] *US Airways, Inc. v. Sabre Holdings Corp*., 938 F.3d 43, 68 (2d Cir. 2019)(explaining that each overt act starts the antitrust limitations period running); *see also New York v. Meta Platforms*, Inc., 66 F.4th 288, 300 (D.C. Cir. 2023) (explaining most recent acquisition in Facebook's "buy or bury" acquisition scheme occurred more than four years before suit was filed and no other predicate acts occurred during the limitations period); *In re Google Digital Advert. Antitrust Litig.*, 2021 WL 2021990, at *4 (N.D. Cal. May 13, 2021) (setting forth that plaintiffs must plead factual allegations that Google's acquisitions were made *in concert with the company's other anticompetitive conduct*)(emphasis supplied).

Here, Google also takes aim at Enhanced Dynamic Allocation ("EDA"), already found to be plausibly anticompetitive by this Court, by suggesting that the claim is untimely because of Google's own introduction of EDA more than four years before Inform filed its case.  Inform, which filed suit before the states, clearly alleges in the SAC that EDA occurred and continued during the four years before Inform filed suit.  SAC ¶¶ 198-223.  Moreover, Google's general introduction of EDA does not speak to Inform at all; and in any event Inform has specifically alleged purposeful deceit, fraud, and concealment (SAC ¶ 300); fraudulent misstatements, omissions, and outright lies as respects EDA (SAC ¶ 201); misstatements and deception in connection with the DFP acquisition (SAC ¶ 98-99); and separate claims for fraud (SAC ¶¶ 378-382) and punitive damages (SAC ¶¶ 383-386).

## V.     THE ALLEGATIONS IN PLAINTIFF'S COMPLAINT PLAUSIBLY ALLEGE ANTICOMPETITIVE CONDUCT

Predatory and anti-competitive conduct is "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482–83 (1992) (quotation omitted).  "A monopolist's conduct violates Section 2 if it (1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Keurig*, 383 F. Supp. 3d at 229 (alteration in original) (internal quotation marks omitted); *accord Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 605 (1985).  As set forth repeatedly in Inform's SAC, Defendants' conduct put Inform out of business and "harm[ed] the competitive process and thereby harm[ing] consumers." *Microsoft,* 253 F.3d at 58.

### A.     The Court Must Consider Plaintiff's Allegations in Their Totality

Inform has alleged exclusionary and anticompetitive conduct that involves the interaction and combined effects of Defendants' Anticompetitive Restraints.   SAC ¶15. Thus, the

9

determination of whether a Inform has plausibly alleged anticompetitive conduct requires not only examination of the described aspects but also consideration "as part of a broader alleged pattern of conduct." *See* MTD Opinion at 40. "In assessing whether conduct is anticompetitive, it is often necessary to examine other market conduct, including practices that are perfectly lawful." *Id*. Plaintiffs in antitrust actions must be given "the full benefit of their proof without tightly compartmentalizing" each individual allegation, because the character and effect of an antitrust injury should not "be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont. Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 699 (1962). Nonetheless, here each specific instance of conduct set forth in the SAC is – standing alone – anticompetitive and "read in their totality" demonstrate anticompetitive behavior. *Zinc Antitrust Litig*., 2016 WL 3167192, at *19. Defendants' request that the Court parse through allegations and strike particular allegations as opposed to dismissing claims for relief is improper.[10] (Br. at 3-5.)

As in *U.S. v. Microsoft*, Inform alleges that Defendants "violated § 2 by engaging in a variety of exclusionary acts . . . to maintain its monopoly by preventing the effective distribution and use of products that might threaten its monopoly" and in an attempt to gain monopoly power in the OLV advertising market, the ad server market and the ad exchange market. *See* 253 F.3d at 58. The SAC details Defendants' inorganic strategic acquisitions, anticompetitive contracts and anticompetitive activities, all of which are designed to thwart competition on the merits. (SAC ¶¶ 60-68, 108-157, 166-70). The SAC squarely places at issue both Defendants' predatory rise to monopoly power and the anticompetitive and predatory practices Defendants' employed to gain, maintain and leverage monopoly power, all with the goal of hoarding online advertising profits.

---

[10] To the extent that Google's proposed motion to dismiss speaks to specific allegations in the SAC – rather than particular claims – Google's motion to dismiss is improper. "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original).

The SAC lays out the type of anticompetitive conduct alleged (much in the way the District Court did in the case against Microsoft), supported by the factual allegations of Defendants' conduct., including allegations relevant to Section 1. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6629250, at *8.

### B.    The Predatory Way In Which Google Carried Out The Flash HTML5 Transition Was Anticompetitive and Is Adequately Pled

#### 1.    Defendants' Ignore the Plain Language of Plaintiff's Complaint

Google's Motion to Dismiss Inform's SAC continues to focus on a characterization of Inform's allegations that has been repeatedly rejected,[11] arguing that "Inform's main complaint is that Google's Chrome web browser phased out Adobe Flash and shifted to HTML5 technology." (Br. at 6.)  Defendants again ignore the plain language of the SAC delving deeply into issues of fact regarding the switch from Flash to HTML, which Plaintiff asserts enabled the subsequent shut down of competing HTML5 videos by the mega-monopolist Defendants.  Defendants put forth the following issues of fact: (1) the transition to HTML5, which resulted in Google's control over the functioning of all video advertising, was a lawful design decision; (2) that the transition – which helped render direct ad sales all but dead – did not harm competition; and (3) Google's conduct was not coercive.

Ignoring *all* of Plaintiff Inform's allegations, Defendants brazenly argue that "YouTube's website works better in Chrome" than Inform's does (Br. at 10).  Defendants boldly claim that

---

[11] Google presented this same argument to the Eleventh Circuit on appeal and to JPML when opposing the transfer of this action to this Court.  In response, the JPML stated: "[Google's] assertion is based on the premise that Inform focuses 'primarily' on a case-specific claim concerning Google's transition from Adobe Flash to HTML5 to play video ads for users of Google Chrome and the restrictions on Flash-based ads that allegedly resulted. ***This argument ignores the plain language of the complaint.***  For example, the introduction to the Inform amended complaint is replete with allegations that Google has engaged in an array of tactics including acquisitions and amassing control of ad tech tools to dominate online advertising – without mention of the Flash/HTML5 transition.  The claims for relief under the Sherman Act also extend far beyond those arising from this transition, and overlap with the monopolization and tying claims in the MDL." *In re: Google Digital Advertising Antitrust Litigation*, MDL No. 3010, Dkt. 227 at 1-2 (JPML February 1, 2023).

blocking Inform's video ads was merely a "new technology . . . wholly consistent with a vibrant and competitive market" (Br. at 1); their conduct "did not harm competition" (Br. at 8); their designs were "lawful" and had a "valid business purpose" (*id.* at 7-8); blocking Inform's video ads was somehow "more attractive to buyers" (*id. at 7);* and Inform's well-pleaded allegations are "implausible." (Br. at 8).  Defendants ignore the plain language of the SAC arguing that losses could have been averted if everyone just migrated to Google's profit machine (Br. at 7).[12]  These "[f]act-specific questions cannot be resolved on the pleadings." *Anderson News, L.L.C.*, 680 F.3d at 185; *Xerox Corp. v. Media Scis. Int'l, Inc*., 511 F. Supp. 2d 372, 389 (S.D.N.Y. 2007).

> 2.    The Transition From Flash to HTML5 Was Undertaken to Enable Google to Control Competing Video Ad Players Was Anticompetitive

Inform alleges that the way in which Defendants carried out the transition from flash to HTML5 was anticompetitive.[13]  Plaintiff also clearly asserts that moving from privately held Adobe Flash product to "open source" HTML5 enabled Google's subsequent anticompetitive technological blocking; it meant that Google rather than publishers would now control whether video ads and video players in fact worked.  SAC ¶ 255. Once that transition occurred, Google in fact shut down Inform and other competitors competing video players and ads.  SAC ¶¶255-60.

Defendants argue that "Google's switch to HTML5 was a lawful design decision."  (Br. At 7).  However, "[j]udicial deference to product innovation . . . does not mean that a monopolist's product design decisions are *per se* lawful." *Microsoft*, 253 F.3d at 65.  "It is not difficult to imagine situations where a monopolist could utilize the design of its own product to maintain

---

[12] That other browsers may or may not have been forced to follow the monopoly browser's transition in order themselves to remain competitive is a fact question. Defendants' monopoly power (as alleged, undisputed and taken as true) demonstrates that (1) no other entity mentioned in Defendants' fact-laden argument enjoys monopoly power in any of the alleged markets -- Internet Search, LMDOS, web browser, ad server, ad exchange and OLV advertising markets -- much less *all* of them; and (2) none stood to profit so handsomely from the transition to HTML5.  .
[13] The Eleventh Circuit acknowledged that based in part upon Plaintiff's allegations concerning the Flash transition, Plaintiff suffered antitrust injury and had antitrust standing.  11th Cir. Opinion at 6-7, 17.

market control or to gain a competitive advantage . . . . [I]f those [ ] changes had no purpose and effect other than the preclusion of [competitors] . . . that use of monopoly power would be condemned." *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 1002-1003 (D.Cal.1979).  Indeed, numerous courts have found that product redesign, when it suppresses competition and is without some other justification, can violate the antitrust laws.[14]

Moreover, "under *Berkey Photo*, when a monopolist combines product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits and to impede competition, its actions are anticompetitive under the Sherman Act." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 (2d Cir. 2015)(citations omitted).  Section 2 is violated when "some conduct of the monopolist associated with its introduction of a new and improved product design 'constitutes an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market.'" *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp LP*, 592 F.3d 991, 999 (9th Cir. 2010). "The key question is whether the defendant combined the introduction of a new product with some other wrongful conduct, such that the comprehensive effect is likely to stymie competition, prevent consumer choice and reduce the market's ambit." *In re Suboxone Antitrust Litigation*, 64 F. Supp. 3d 665, 682 (E.D. Pa. Dec. 3, 2014).

Under certain facts[15] "it is not the product introduction itself, but some associated conduct, that supplies the violation." *Keurig,* 383 F. Supp. 3d  at 230 (citing *Berkey Photo, Inc. v. Eastman*

---

[14] *See Microsoft*, 253 F.3d at 65–67 (modifications to computer system to discourage distribution of rival internet browsers constituted anticompetitive conduct unless otherwise justified); *Abbott Labs. v. Teva Pharms. USA, Inc.*, 432 F.Supp.2d 408, 420–424 (D.Del.2006) (allegations that product changes and removal of old products suppressed competition were sufficient to survive motion to dismiss antitrust claim).

[15] To the extent Defendants argue that the transition itself and tech blocking competing video players and video ads by Chrome was a lawful design decision, the same at best presents a question of fact.  *See Xerox*, 511 F. Supp. 2d at 389 (purported justifications are "factual inquiry. . .not appropriate for resolution at this stage of the litigation").

*Kodak Co.*, 603 F.2d 263, 286 n.20 (2d Cir. 1979)).  Inform's SAC is "filled with allegations of 'associated conduct' . . . the overall effect of which is to coerce customer . . . rather than compete on the merits." *See id*.  The imposition of the standard by Google; the timing of the transition; exemption of YouTube and whitelisting of others; the "pausing" of flash ads; the blocking, rendering inaudible and failure to autostart competing videos and video players (again exempting YouTube) post-transition; the offer to fix these issues both during the transition and (in turn) following the tech blocking only upon condition that publishers and advertisers alike migrate to Google's programmatic auction tools – clearly demonstrates coercion "rather than compet[ition] on the merits" for Google's products and services. *Id*.

      3.     Exempting YouTube Undermines Defendants' Factual Design Argument.

Inform alleges that Defendants whitelisted YouTube, exempting YouTube from the negative effects of the transition from Flash to HTML5 and the attendant loss of revenue.[16]  SAC ¶¶ 259-260.  Additionally, any publisher or advertiser who migrated to a Google product or service was likewise unaffected, (SAC ¶ 253), and those who did not migrate to Google had their ads "intelligently paused"−that is their ads did not reach the user (SAC ¶ 248).  These allegations demonstrate that Defendants' conduct was "not intended to benefit consumers, but rather … to harm competition" and are sufficient to defeat Defendants' Motion.  *See Keurig*, 383 F. Supp. 3d at 231. Likewise, they demonstrate that Defendants' purported purpose was pretextual, that Defendants' purported "design decision lacked a valid business purpose," and that it "makes sense only because it eliminates competition" (Br. at 8).  That Defendants whitelisted *any* websites undermines their factual argument concerning a "valid business purpose" and highlights pretext.

---

[16] While Defendants argue that Inform "vaguely alleges that YouTube received some special treatment, but fails to allege what it was,"(Br. at 9) the SAC plainly states: "*YouTube was both surreptitiously prepared in advance for the transition and also whitelisted so that Flash ad campaigns and Flash creatives continued to play on YouTube while they were blocked for Inform and others.*"  SAC ¶ 244.

So do the allegations that Google (who imposed the standard) offered to transition advertisers ads from Flash to HTML5 *for free*. "Converting to HTML5 was a lengthy and costly process, requiring the transcoding of all files and reaching out to each and every one of an advertiser's 100s or 1000s of vendors who had been issued flash tags to change and convert the affected content"−a cost that Defendants could have garnered substantial revenue from. SAC ¶246. Instead, Defendants chose to provide the costly conversion for free; but only if publishers abandoned their *direct ad customers* and advertisers abandoned *other ad buying tools* and all switched to Google. As a result, "Google syphoned off customers from Inform and other competitors and hundreds of online advertisers and publishers withered and died, while Google and YouTube plundered valuable video advertisements that had supported publishers' websites" (SAC ¶ 247), garnering substantial long-term market share in the OLV advertising market.

4.   Inform Has Pled that the Anticompetitive Transition Devastated Competition

Direct ad sales, more lucrative for publishers, better for advertisers and more targeted for users, were eviscerated and publishers and advertisers alike were thrown into the Google-controlled ad auction that is the subject of these MDL cases. SAC ¶253. As for anticompetitive effects, the SAC alleges that in 2014 programmatic ad spend was 20% and that by 2022 "over 90% of all digital display ad dollars were estimated to transact programmatically, rendering, direct ad sales all but dead." SAC ¶ 313.

5.   Defendants' Standing Arguments, Recast as Concerning Market Harm, Have   Already   Been   Decided   By   the   Eleventh   Circuit

Defendants rely on summary judgment cases concerning antitrust standing[17] to reargue on this motion to dismiss that "[A]ntitrust law protects competition, not competitors." Br. at 8.

---

[17] *See Balaklaw v. Lovell*, 14 F.3d 793, 797-99 (2d Cir. 1994) (explaining that in a summary judgment case, standing requires market-wide harm); *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc*., 996 F.2d 537, 543

However, the Eleventh Circuit has already decided: "[B]ased on the allegations in its complaint, Inform enjoys standing to pursue its antitrust claims."  Specifically, the Eleventh Circuit held:

> Inform has sufficiently alleged both requirements to establish antitrust standing in its amended complaint. As for antitrust injury, Inform has alleged that it lost millions of dollars because Google excluded it from competing in the online advertising markets. The amended complaint also asserts that Google excluded all competitors from the online advertising markets by disabling and disparaging its competitors' products and services; illegally conditioning the purchase of ads on its subsidiary YouTube on Google's ad buying tools; using its control over the dominant ad auction to preference its own offerings and disadvantage those of rivals; and purposefully rendering some of its dominant products and services incompatible with its competitors' offerings. Google allegedly did all of that to avoid and eliminate competition, rather than meet it on the merits. And in so doing, Google not only harmed its competitors, but also hurt consumers, allegedly degrading their privacy, stifling innovation, raising prices, and decreasing the quality and variety of products available to consumers. These allegations suffice to establish antitrust injury at the pleading stage.

11th Cir. Op. at 15-16.

### C.   Defendants' Attempt to Parse Out Certain Anticompetitive Auction Manipulations as Separate Claims Fails

#### 1.   Bypassing Direct Ad Sales Was Anticompetitive

Inform sets forth in detail how Google manipulated its ad auction on high news days to preference itself.  By bypassing Inform's direct deal high-quality ads worth more to the Inform and publishers than Google's cheap programmatic ads, Google preferenced cheaper lower quality ads that enriched itself over Inform and others' higher quality, direct ad campaign – and thus more valuable – ads.  SAC ¶¶229-235.  Most importantly for Inform, Google's bypassing practice directly restrains trade between publishers and direct-placement advertisers, both of whom are Inform clients.  Direct ads are valuable to advertisers because they are targeted directly to the

---

(2d Cir. 1993) (explaining that in summary judgment for Section 1 claim, stating "Ultimately, it remains for the factfinder to weigh the harms and benefits of the challenged behavior").  Notably, the conduct alleged here - regarding the switch from Flash to HTML and the subsequent shut down of competing HTML videos by the Defendants in Counts I and III is alleged to be *Section 2* conduct.  Defendants' citation to Section 1 cases here−the elements of which are entirely different - is not only misconstrued, but also misplaced.

selling publisher and the publisher's specific audience. High news days equal high volume for Inform and its newspaper properties and, at the same time, high exposure for direct ad advertisers, which is the purpose of such direct ads – targeted placement to reach the highest volume of a targeted audience.

Inform's direct ad sales were its most lucrative, aimed at its specific publishers, and enabling the advertiser to target Inform's specific audience. While Inform also sold space indirectly through Google's products and services, including its AdX ad exchange, this was for left over or remnant inventory. SAC ¶ 63-64. As detailed, both direct and indirectly sold ads have to be served onto the publisher's website and thus rely on the Google DFP ad server.  SAC ¶ When Google's DFP ad server is used, Google controls the delivery of ads that appear on Inform's publishers properties whether direct sale or indirect ads from Google's AdX. SAC ¶ 229. Using internal algorithms and then by controlling the entire process, Inform alleges that Google intentionally over-delivered less valuable AdX ads on high traffic news days, bypassing Inform's direct ad sales (and competing ad exchanges) when direct ads should have been served. SAC ¶ 231-32. This further harmed Inform and its competitors by giving publishers the false impression that their ad campaigns were not being properly executed due to ineptitude rather than Google's deliberate thwarting of that intended ad placement. SAC ¶ 233. By failing to operate an ad server and ad exchange that operated neutrally, and  instead placing a thumb on the scale for Google products to the detriment of competition, Google harmed competition in the OLVAM and the ad exchange market.  As Inform pled, Google profited from Inform and its clients' success. Thus, in the competition for advertisers' money, Google ensured that Inform's Properties revenue therefrom was greatly diminished while Google's take greatly increased. This practice directly restrained Inform, competitors and publishers'  ability to fairly compete for their share of advertiser

revenue.  SAC ¶¶233-235.  Contrary to Google's contention (Br. at 18), the allegations concerning Google's harmful conduct on high traffic news days have been well pled and certainly demonstrate harm to competition in the markets pled.

      2.     Enhanced Dynamic Allocation Has Already Been Found to Be Plausibly Anticompetitive

     This Court has already determined that EDA is plausibly anticompetitive in the ad exchange market.  In addition to properly alleging the same, Inform has set forth sufficient facts to maintain a claim for Google's anticompetitive practices with regard to the OLV advertising and ad server markets.  The allegations concerning how EDA affected direct ad sales demonstrates that EDA was anticompetitive in the OLV advertising market by weakening direct ad sales channels, deceptively assigning a lower ad value to guaranteed direct ad sales, accessing all of Inform's video ad inventory, making it falsely appear as if Inform and other competitors could not compete, and leaving Inform direct ads unsold.[18]  SAC ¶¶199-204, 312.  Additionally, misleading publishers to induce them to choose and then continue to use DFP instead of using other ad servers, deprived Inform and others of a better ad server product, which standing alone, harmed the ad server market. Had Inform and other publishers been made aware of Google's deceit, they would have chosen another ad servers.  As Google was deceptively inducing Inform and other customers to use its ad server and forgo use of unconflicted ad server rivals, other ad servers lost critical revenue and most went out of business, helping fortify Google's DFP as the 90% monopoly ad server.  As a result, the anti-competitive conduct achieved one of Google's goals: it permanently drove rival ad server providers out of the marketplace.  "Misleading others," as Inform has pled that Google did here,

---

[18] Inform nowhere suggests Defendants had a "duty to help." (Br. at 18). What Defendants cannot do is cut the legs out from under competitors before the competition.

"can at least conceivably harm competition as much as profit-sacrificing maneuvers."[19]  Moreover, marketwide harm has adequately been pled. SAC ¶¶205, 313.

### 3.      Minimum Bid to Win Was Anticompetitive

Google does not dispute that its Last Look feature adjusted the way in which bids were accepted and further distorted the ad auction process and allowed Google the opportunity to bid on every impression and always outbid other publishers.[20]  Similar to how the Last Look feature enabled Google to "peek" at the bids of rival exchange users to defeat their bids, MBW allowed Google to see publishers' bidding data, of which Google had exclusive access through its monopoly Ad Servers.  Google then gave that inside information to the advertisers who used its Ad Buying Tools.  By revealing this valuable publisher data, Google enabled its advertiser customers to win impressions through lower bids on AdX than they could have submitted through rival exchanges that did not have MBW, not via a superior product, but through this cheat enabled through Google's coercion of its publisher users.  *See Actavis*, 787 F.3d at 652.  Publishers were thus left with a Hobson choice: lose the ability to pursue the advertisers driven to Google's ad platform because of this thumb on the scale, or maintain the ability to compete for those advertisers by ceding valuable proprietary data to Google and enabling Google to unfairly exploit the same and enhance its monopoly power.  Google's conduct was not lawful under the Sherman Act.[21]

### 4.      Interoperability and Encryption

Inform separately asserts that: (1) Defendants disabled Inform's video advertisements and blocked non-Google video players from functioning properly on its dominant Chrome browser

---

[19] *See Novell, Inc. v. Microsoft Corp.,* 731 F.3d 1064, 1076 (10th Cir. 2013) (Gorsuch, J.).
[20] This practice−widely criticized and now defunct−was enabled by Google's monopoly control over publisher ad servers and anticompetitively distorted the ad server's bid selection process.
[21] To the extent that Google claims that MBW was a true product improvement rather than the improper monopolistic conduct Inform contends, such an argument is one on the merits and not appropriate for a Rule 12(b)(6) motion. *See Microsoft,* 253 F.3d at 66-67.

and (2) Google purposefully thwarted an integral part of Inform's value proposition by stealing Inform's own user data, undermining Inform's proprietary technology by encrypting that data, and then selling that data back to Inform. *See* SAC ¶ 213.

**Interoperability.** [22]The issue of interoperability here is likewise a design issue. As discussed above, numerous courts have found that product redesign, when it suppresses competition and is without some other justification, can be violative of the antitrust laws. *See supra note14.*

Inform's allegations that Defendants have designed their monopoly Chrome browser "to maintain market control [and] to gain a competitive advantage" by precluding competitors' video players and video platforms from competing are sufficient to survive a motion to dismiss as demonstrating both anticompetitive conduct and evincing a barrier to entry controlled and manipulated by the Defendants. *In re IBM Peripheral EDP Devices Antitrust Litigation,* 481 F. Supp. 965, 1003 (D.Cal.1979). Any purported justifications by Defendants are a "factual inquiry . . . not appropriate for resolution at this stage of the litigation." *Xerox*, 511 F. Supp. 2d at 389.

**Theft of Inform's Data and Encryption of the Same.** As to encryption, the allegations set forth in Inform's SAC are substantially different than those asserted by the States. This Court focused on the fact that the TAC alleged that Google collected data "on behalf of publishers." Importantly, here Inform's stands both with the other MDL Plaintiffs (Publishers and Daily Mail) and also separately as a competitor whose technology Defendants purposefully undermined through hashing of user data *collected by Inform*. The encrypted data was Inform's data – not Google's. SAC ¶ 268-270. Moreover, Inform alleges that it had its own proprietary method of

---

[22] Interoperability promotes competition and innovation and is essential for enabling an open internet in which competition thrives. *See* House Judiciary Report at 384. Without it, "dominant carriers can foreclose new entrants from offering lower prices or better services, reinforcing their monopoly power while harming consumers and competition." *Id*. at 383.

collecting its user's data that was an integral part of Inform's value proposition to publishers and advertisers.  Google took Inform's data and scrambled it, effectively neutralizing and rendering useless this part of Inform's competing platform. Google then offered to sell Inform its own proprietary data back to Inform at a steep price (SAC ¶¶ 270), imposing "burdensome terms that could not be exacted in a completely competitive market."  *See U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 620 (1977).

Defendants' reliance on refusal to deal cases is misplaced.[23]  "Refusal to deal doctrine targets only a discrete category of section 2 cases attacking a firm's unilateral decisions about with whom it will deal and on what terms.  It doesn't seek to displace doctrines that address a monopolist's more direct interference with rivals."  *Novell*, 731 F.3d at 1076.  As a rival, Inform "is always free to bring a section 2 claim for affirmatively interfering with its business activities in the marketplace."  *Id.*  A monopolist cannot steal a competitor's proprietary information, take affirmative steps to render it defunct, and then claim it's not required to "share" it.

Defendants also incorrectly assert that Inform "fails to seriously consider Google's privacy consideration." (Br. at 13). To be sure, Inform's SAC is replete with allegations that demonstrate pretext: Google completely lacks concern for user privacy.[24]  The SAC alleges that Google presents a far greater threat to personal privacy than any publisher, that Google intentionally

---

[23] See MTD Op., ECF No. 308 at 42-43.  Defendants' selectively delete the most important words from *Dreamstime.com, LLC v. Google LLC*, 54 F. 4th 1130, 1142 (9th Cir. 2022).  The court's holding therein stated that "standing alone" and "on its own"  "[c]ollecting user data . . . is not unlawful under the Sherman Act."  Of course the allegation here doesn't stand alone, its coupled with encrypting data belonging to Inform, thereby undermining a key Inform value proposition.

[24] The SAC details how Google captures user data and critical information about users, such as: personally identifiable information, user impressions and preferences, location, browsing history, IP address, and insight into patterns, timing, trends, and demographics; that Google acquired *wearable technology* that accessed user *health data*–alarming regulatory agencies worldwide; that Google in fact collects and combines user data from its customers' websites, its competitors' information, its own search engine and other customer facing properties; and that Google lied to Government regulators by promising not to combine this data–all in an effort to create user super-profiles for its own unbridled advertising profit.  SAC ¶¶ 72, 99, 140, 142, 270-71.

exploited its massive trove of user data to track user habits, and that Google in fact uses combined (and stolen!) data from DFP, YouTube, Gmail, Google Maps and user search habits to fuel its algorithms, exposing ever-increasing amounts of highly personal and personally identifiable information of Internet users. SAC ¶¶ 270-71.  These allegations, that must be taken as true, demonstrate that Google's purported privacy "concern" is pretextual.

## VI.    INFORM'S YOUTUBE TYING CLAIM IS WELL-PLEADED

This Court has already addressed the relevant law of tying, and that "[t]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of the tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."   MTD Opinion at 16 (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)).  "When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Par.*, 466 U.S. at 12.

**The Unlawful Tying of YouTube Ad Inventory.**   In an attempt to challenge the sufficiency of Inform's claims for illegal tying contained in the SAC, Google incorrectly suggests that Inform cannot bring an action for tying because it suffered no antitrust injury.[25]  (Br. at 14). However, the Eleventh Circuit has ruled on that issue in Inform's favor.  11ᵗʰ Cir. Op. at 15-16.

As this Court stated, "[a]ctual coercion supporting a finding of a tying violation is present only if the manufacturer goes beyond persuasion and conditions [the buyer's] purchase of one

---

[25] As Inform has set forth, it is a competitor of Google with regard to its YouTube platform and OLV advertising as respects *both advertisers and publishers* competing for both sides' business (SAC ¶58) and is thus, "presumptively the proper plaintiffs to allege antitrust injury." *In re Aluminum Warehousing Antitrust Litig.,* 833 F.3d 151, 158 (2nd Cir. 2016) (internal citations omitted) ("competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury… [c]ourts have also recognized the antitrust claims of market participants other than consumers or competitors.").  Google's repeated contention that Inform did not "lose out on ad buying 'tools'" because it does not sell them misses the mark.  Br. at 14.

product on the purchase of another product." MTD Opinion at 22 (quoting *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685 (2d Cir. 1982)).   Defendants acknowledge that Inform properly alleges both coercion (SAC ¶¶ 178-183) and that Defendants' illegal tie foreclosed and restrained competition on the merits for OLV advertising and its component markets and instream OLV advertising.  SAC ¶¶ 182, 188, 302, 308.  Defendants' focus on the fact that their coercion is of the *advertisers* is of no moment.  Section 4 of the Clayton Act provides that anyone injured "in his business or property by reason of anything forbidden in the antitrust laws" may bring a claim. Moreover, illegal tying arrangements can be challenged both by the buyers who are forced to buy the tied product to obtain the tying product, and by the competitors whose businesses are restrained from entering or foreclosed from competing.  *See e.g.*, *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1266 n. 10 (10th Cir. 2006). "Inform and Google are competitors in the OLV advertising market, offering a platform connecting publishers with advertisers and competing for both sides' business."  SAC ¶ 58; 11th Cir. Opinion at 15.  The SAC specifically asserts that the illegal ties "diverted ad spend away from Inform and other competitors'" ad buying platforms and tools.  SAC ¶ 182.

With regard to its You Tube platform – the world's largest video streaming website – Google excluded from its lucrative advertising market any advertiser who failed to also use Google ad tools, foregoing additional profits, which makes sense only because it excludes competition. SAC ¶¶ 254, 259-260. In doing the same, Google in fact "impaired the opportunity of rivals," causing Inform and other competitors to lose ad spend and impacting competition on the merits." Keurig, 383 F. Supp 3d at 229.

Google states that its conceded tying of its ad tools to YouTube was not a violation of the law because "YouTube was a popular place to advertise."  (Br. at 14).  But the same did not support

the significantly more lucrative direct ad sales that benefitted publishers, the highly targeted audience advertisers got with direct ad sale and the benefit to consumers that resulted when they saw desired relevant advertising. Inform has set forth myriad reasons in its complaint why Google's publisher and advertiser customers would make different choices, but for Google's coercive tying. *See, e.g.*, SAC ¶¶ 199-200, 205-206. In short, the online advertising market would be more competitive, with better value for advertisers, better pricing for publishers, superior online advertising tools and opportunity for innovation, as well as more market participants, but for Google's illegal tying.

**The Unlawful Tying of DFP to AdX.** This Court has already determined that the allegations concerning Google "requiring publishers to sign a combined contract that included both Google's DFP ad server and Google's AdX exchange" are proper at this stage. MTD Opinion 16, 18. Google hashes the allegations–pulling from distinct allegations concerning historic bidding practices and later-developed advancements to mischaracterize Plaintiff's allegations. As the SAC makes clear, in order to receive live competitive bids offered by AdX alone, a customer also had to purchase DFP. Plaintiff alleges both. SAC ¶¶ 7, 25, 60.

Defendants falsely and recklessly assert that "Inform did not pay for its use of DFP."[26] Br. at 15. In possession of all of the relevant documents that prove otherwise, Defendants know that this is a baldly false statement made to this Court in their fourth attempt to dismiss this case. Moreover, Defendants again simply "ignore[] the plain language of the complaint."[27]

---

[26] Notably, Defendants made similar reckless assertions in the Northern District of Georgia, which resulted in the full reversal and remand of the District Court's dismissal of Inform's complaint.

[27] To the extent Defendants' argument suggests that certain competitors and customers got DFP for free, Inform was not one of them. SAC ¶ 317 ("With control over each ad-tech product market, Google exacted supra competitive fees for inferior products and services from Inform, publishers and advertisers alike — for the sale of each impression. In fact, *Google charged Inform at least three separate fees that Inform was aware of*: (1) for the use of its dominant DFP ad server, by default, Google charges Inform and other publishers a fee to serve the impression; (2) Google charges a second revenue share fee for AdX (typically between 20% and 40% of the sale price) to manage the auction in its

**Per Se Violation Alleged.**  Where a tying arrangement is illegal *per se,* a plaintiff need not establish the anticompetitive effects element. *See In re Visa Check/MasterMoney Antitrust Litig. v. Visa U.S.A., Inc.,* 280 F.3d 124, 133 n. 5 (2d Cir.2001); *In re Wireless Tel. Servs. Antitrust Litig.,* 385 F. Supp. 2d 403, 414 (S.D.N.Y. Sept. 2, 2005) ("Analysis under the *per se* rule is, by definition, without inquiry into actual market conditions.") (internal quotation omitted). "If a plaintiff succeeds in establishing the existence of sufficient market power to create a *per se* violation, the plaintiff is also relieved of the burden of rebutting any justifications the defendant may offer for the tie." *In re Wireless,* 385 F. Supp. 2d at 414. While Inform has properly set forth the unreasonable anticompetitive effect of Google's tying, Inform also has sufficiently pled *per se* violations of the Sherman Act here.[28]   Inform adequately pleads tying.

## VII.   INFORM'S LEVERAGING CLAIMS ARE WELL-PLEADED

Count II of the SAC asserts monopoly leveraging.  Inform alleges that Google has uncontested monopoly power in the general search, web browser, LMDOS and ad server markets. Inform further asserts that, through the anticompetitive conduct described in the SAC, Google has leveraged its power in these markets in an effort to gain monopoly power and further dominance in the OLV advertising, ad exchange and ad server markets.

The Supreme Court has recognized that "monopoly leveraging" can violate Sherman Act Section 2.  *See Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004) (analyzing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993))[29]; *Eastman Kodak*

---

exchange; and (3) Google charges a third fee for the use of Inform's own customer data. On the advertiser side, Google charges a fee for its DSP service and then other fees for data analytics."); *see also* SAC ¶ 60, 64, 171, 318.

[28] Inform has set forth, in a non-conclusory manner, that there are (1) two distinct products or services at issue; (2) there is an agreement, express or implied, that establishes a tie (and with regard to YouTube, Google has conceded the same); (3) Google's power in the tying product's market is capable of restraining competition in the tied product's market (and in fact did), and (4) the amount of interstate commerce in the tied product's market "is not insubstantial." *Amerinet, Inc. v. Xerox*, 972 F.2d 1483, 1499 (8th Cir. 1992) (internal citations omitted).

[29] Citing to treatment of Section 2 in *Spectrum Sports, Inc*, 506 U.S. 447, 459 (1993), the *Trinko* Court noted that monopoly leveraging requires a "dangerous probability of success" in monopolizing a second market.

*Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 479 n. 29 (1992) ("The Court has held many times that power gained through some natural and legal advantage . . . can give rise to liability if a seller exploits his dominant position in one market to expand his empire into the next."). A claim for monopoly leveraging requires that defendant: (1) possessed monopoly power in one market; (2) used that power to create a dangerous probability of monopolizing another market; and (3) caused injury by such anticompetitive conduct. *Olde Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.*, 485 F. Supp. 2d 387, 395 (S.D.N.Y. 2007) (quoting *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 246–47 (S.D.N.Y. 2004)). Precedent suggests that the key distinction between monopoly leveraging and attempted monopoly is use of monopoly power in the first market to carry out the alleged anticompetitive conduct.

As set forth above, Plaintiff has adequately pled that Defendants have monopoly power in the OLV advertising market or are dangerously close to achieving the same. *See supra* at 8. Moreover, Inform has identified ample anti-competitive conduct by Google with regard to each of the markets set forth above that harmed the digital ad marketplace. *See, e.g.,* SAC ¶¶ 163-300. In short, Plaintiff Inform has adequately pled each element of, and have thus established a claim for, monopoly leveraging.

**Default Placement of Internet Search and Chrome Browser on LMDOS to control OLVAM.** The SAC shows how Google's default browser and search settings and installation contracts, including those relating to Google's Android and with Apple and others, have been instrumental to Google's gaining and wielding power across multiple markets. SAC ¶¶ 288-292. Google uses its search engine dominance and control over the Android operating system to grow its share of the web browser and favor its other lines of business. SAC ¶ 292. *See supra* at 11.

The SAC further sets forth that default settings to Google's apps, operating system and other products are a key component to Google's strategy to gain, maintain and further dominance. Market participants say that Google makes it difficult to change the default settings for search. SAC ¶ 142.  In practice, users rarely change default browser settings on Android.  SAC ¶ 144. Even platforms that do provide users with browser options often end up using "defaults and choice architecture that make it difficult for consumers to exercise this choice."  *Id.*  Thus Google's "default" settings typically become permanent settings.

Defendants mischaracterize their role with regard to default placement of Chrome and Google Search as mere "installation."  Br. at 16-17.  However, as Inform pled, "Chrome's dominance in the browser market gives [Defendants] significant gatekeeper power over managing and monitoring users' browsing activity−*power Google can wield to shape outcomes across markets* for search, mobile operating systems, and digital advertising . . . advantages across markets feed[ing] back into and reinforc[ing] one another."  SAC ¶ 292.[30] (emphasis added). Chrome and Google Search default placement enable, if not ensure, Google's control of the entry points for its core markets, Internet Search and online advertising, as well as the rules and parameters for OLV advertisements and their functionality.  SAC ¶¶ 289, 291.  Because of its monopoly power through Chrome (as well as its Android OS monopoly), Google is able to control the OLV market and dictate whether ads are placed and where (including whether they are low or high in search); whether those ads are direct ads or programmatic; how video ads will play; and whether those ads can be seen and/or heard.  SAC ¶ 291.

The SAC clearly sets forth that, because of its monopoly power gained and expanded through its default settings, Defendants were able to−and in fact did−set rules to disadvantage

---

[30] Quoting Investigation On Competition in Digital Markets Before the H. Comm. On the Judiciary, 117th Cong., at 151 ("House Judiciary Report") at 225.

Inform and other competitors in the OLVAM in order to coerce them to adopt HTML5, a tool Google could control and use as another coercive lever.  Because of its monopoly power in the Internet Search and browser markets, competitors in the OLVAM such as Inform were forced to either comply with Google's dictates regarding HTML5, no matter how unfavorable, or be all but shut out of the OLVAM.  *See Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 672 (S.D.N.Y. 2002).

**Leveraging Internet Search.**  The SAC pleads that Defendants leveraged their monopoly power in internet search by, *inter alia*, introducing accelerated mobile pages (AMP) and preferencing YouTube over competitor Inform.  SAC ¶¶ 293-298.  AMP was designed to block and otherwise be incompatible with flash advertising (and header bidding) and to thwart competition in the OLV advertising market, ad server and ad exchange markets on the merits. SAC ¶ 296.  Plaintiff alleges that Google conditioned premium treatment in Google Search−where it has over 90% market share−on migration to AMP.  SAC ¶ 297.  Conversely, Google punished publishers that did not adopt AMP by purposefully dropping their PageRank.  *Id.*

Defendants claim that Inform failed to explain how lowering the rankings of non-adopters of AMP affected competition.  Br. at 17.  As Inform states: by purposefully dropping the PageRank of sites that did not adopt AMP, Google "maliciously render[ed] such sites nearly invisible to Google searches and starv[ed] publishers of the web traffic needed to create ad revenue and sustain their ad business.  This had the effect of coercing publishers to transition to Google's AMP rather than choosing to adopt it on the merits and impeded competition in the OLV advertising market." SAC ¶ 297. Google has conceded the importance of premium search placement: "Google executives in recent years made decisions to prioritize YouTube on the first page of search results,

in part to drive traffic to YouTube rather than to competitors, and also to give YouTube more leverage in business deals with content providers seeking traffic for their videos." *Id.*

AMP effectively was the introduction of a new product that Inform asserts was done to thwart competition on the merits.[31]  As discussed in Section V. C. above, Inform states a leveraging claim against Defendants because "combin[ing] the introduction of a new product with some other wrongful conduct, such that the comprehensive effect is likely to stymie competition, prevent consumer choice and reduce the market's ambit." *In re Suboxone*, 64 F. Supp. 3d at 682.

**YouTube Search Results.**  Defendants again disingenuously claim that Inform has not shown the import of search ranking to competition. Br. at 17.  Inform alleges that Defendants stated that they "[M]ade changes that effectively preference YouTube over other video sources" in order to "drive traffic to YouTube rather than to competitors" and "give YouTube more leverage in business deals with content providers."  SAC ¶ 298 (internal citation omitted).  Indeed, Google delivered YouTube in user search results more often and more prominently than competing video providers "even when competitor videos had more engagement."  *Id*.  *See* SAC ¶40, n.19.[32]

Ad inventory is created when users visit a web page (SAC ¶ 41); thus Google has the power in fact to wipe a given competitor/publisher off the map on a given day for any reason or no reason at all.  By downgrading Inform and other OLV platforms to self-preference and amplify YouTube−even when users prefer competitors−Defendants leveraged search to impair Inform and other competitors' opportunities (not on the merits) and falsely entrenched network effects by

---

[31] Even if the introduction of AMP did not by itself constitute anticompetitive conduct (a conclusion as respects which we respectfully disagree), Google's associated conduct in leveraging its general search services to penalize and render invisible publishers who did not adopt AMP was anticompetitive because it had the "overall effect of . . .coerc[ing publishers] rather than persuad[ing] them on the merits . . impeding competition . . . " *Actavis PLC*, 787 F.3d at 654.
[32] *See* House Judiciary Report at 152 (noting that documents showed that Google built certain search features "through aggressive tactics that exploited its search dominance . . . conduct [that] helped maintain its monopoly in online search and search advertising while . . . undermining innovation and harming users and business alike.").

manipulating content creators into choosing YouTube under fabricated premises over better-performing competitors.   *See Eastman Kodak,* 504 U.S. at 483; *Keurig*, 383 F. Supp. 3d at 229

**Ad Server and Chrome Browser Markets Block OLV Advertisements.**   Hardly "one passing allegation" (Br. at 18), the SAC details at length how Defendants used its uncontested monopoly ad server and its uncontested monopoly Chrome browser to selectively and punitively disable video advertisements. *See, e.g.* SAC ¶¶ 8, 11-12, 240-261, 299.  For the reasons set forth above, this conduct likewise constitutes monopoly leveraging under Section 2.

**Injury.**  Inform also adequately alleges that it was injured in its business and property by Google's monopoly leveraging.[33]   SAC¶¶ 107, 325-326, 329-335, 342.  Anticompetitive harm is detailed in the SAC.  SAC¶¶ 302-318, 338-348.  Had Google simply had monopoly power in the ad server or the web browser, the anticompetitive harm described in the SAC would have been significant.   As Google had monopoly power in both, and as Inform has pled, the impact of Google's disabling rivals' video advertisements was devastating.  That Google was able to impact so many competitors, digital advertisers and publishers virtually overnight simply reinforced Google's dominance and made digital advertisers and publishers all the more vulnerable to Google's illegitimate and anticompetitive conduct, forcing them to migrate to Google products and services or otherwise face extinction and shut down. *See Yankees*, 224 F. Supp. 2d. at 672.

## VIII.   CONCLUSION

For the foregoing reasons, Inform respectfully request the Court deny Defendants' motions to dismiss in their entirety or, in the alternative, grant Inform leave to amend. Oral argument is requested.

---

[33] Defendants' anticompetitive conduct has put Inform Inc. out of business and stolen its market share.  However, it is beyond dispute that the Court has broad power to fashion relief as it sees fit. *See Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972*); see also Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 131-33 (1969). Accordingly, when Inform prevails, it should be free to seek a remedy within the Court's broad remedial powers.

Respectfully submitted, this 1st day of September, 2023.

HERMAN JONES LLP

/s/ *Serina M. Vash*

Serina M. Vash
(NYS Bar No. 2773448)
John C. Herman
  (Georgia Bar No. 348370)
HERMAN JONES LLP
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Telephone:  (404) 504-6500
Facsimile:  (404) 504-6501
jherman@hermanjones.com
svash@hermanjones.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on September 1, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

By:  /s/  *Serina M. Vash*

Serina M. Vash
(NYS Bar No. 2773448)

32