**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | No. 1:21-md-3010 (PKC) |

*This Document Relates To:*

| | |
|---|---|
| INFORM INC. <br><br> *Plaintiff,* <br><br> - against - <br><br> GOOGLE LLC, <br> ALPHABET INC., <br> YOUTUBE LLC, <br><br> *Defendants.* | No. 1:23-cv-01530 (PKC) |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF**
**DEFENDANTS GOOGLE LLC, ALPHABET INC., AND YOUTUBE LLC'S MOTION**
**TO DISMISS INFORM INC.'S SECOND AMENDED COMPLAINT**

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
Fax: (650) 461-8276

*Counsel for Defendants Google LLC,*
*Alphabet Inc., and YouTube LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................ 1

I.    INFORM'S WAIVER ARGUMENTS ARE SPECIOUS GIVEN THE NEW
ALLEGATIONS IN ITS SECOND AMENDED COMPLAINT.............................. 1

II.   INFORM'S ONLINE VIDEO ADVERTISING MARKET CLAIMS FAIL .................... 3

    A.   Inform does not plead any exclusionary conduct affecting competition in the alleged
    Online Video Advertising Market. ............................................................. 3

    B.   Inform fails to allege monopoly power in the alleged Online Video Advertising
    Market.................................................................................................... 10

    C.   Inform does not state a claim for attempted monopolization........................ 13

III.  INFORM'S TYING CLAIMS FAIL ................................................................ 14

    A.   Inform's YouTube tying claim fails because the only alleged harm occurred in a market
    in which Inform did not plead and does not participate. ........................... 14

    B.   Inform's DFP/AdX tying claim fails because Inform's own allegations show there was
    no coercion. ............................................................................................ 15

    C.   Inform's invocation of "per se tying" does not aid its arguments.................. 16

IV.  INFORM'S CHROME AND SEARCH "LEVERAGING" CLAIMS FAIL ............... 16

    A.   Inform's default installation and online video blocking claims fail for the reasons that
    its other OLV claims fail. .......................................................................... 17

    B.   Inform's AMP and YouTube search preferencing claims fail because Inform fails to
    describe any effects in any alleged markets. .......................................... 17

V.  INFORM PROVIDES NO REASONS TO REVIVE CLAIMS RELATING TO
MINIMUM BID TO WIN OR ENCRYPTING USER IDS ..................................... 18

    A.   Inform's "Minimum Bid to Win" argument is incomprehensible. ................ 18

    B.   Inform pleads no facts to support its argument regarding user IDs. ............ 19

VI.  THE COURT CAN DISMISS INDIVIDUAL CLAIMS THAT ARE PREDICATED
ON CONDUCT THAT IS NOT ACTIONABLE.................................................... 19

VII.  INFORM CANNOT SEEK INJUNCTIVE RELIEF .................................... 20

CONCLUSION ............................................................................................................ 20

## TABLE OF AUTHORITIES

### Cases

*Abbott Lab'ys v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006)............................ 5

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010) .. 4

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979)...................................... 3

*Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122 (2d Cir. 1981) ...... 12

*Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537 (2d Cir.1993)............. 12

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23 (2d Cir. 2006) ............................. 8, 14

*Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) ........................................ 9

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392

   (E.D.N.Y. 2008) ................................................................................................................ 11

*In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403 (S.D.N.Y. 2005)................. 14, 16

*Inform Inc. v. Google LLC*, 2020 WL 13661857 (N.D. Ga. Sept. 25, 2020) ................................ 2

*Inform Inc. v. Google LLC*, 2022 WL 3703958 (11th Cir. Aug. 26, 2022)................................. 10

*K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.*, 61 F.3d 123 (2d Cir. 1995).............. 12

*Knutson v. Daily Review, Inc.*, 548 F.2d 795 (9th Cir. 1976)........................................................ 13

*Lektro-Vend Corp. v. Vendo Corp.*, 500 F. Supp. 332 (N.D. Ill. 1980)........................................ 13

*Maier-Schule GMC, Inc. v. Gen. Motors Corp. (GMC Truck & Bus Grp.)*, 850 F. Supp. 1095

   (W.D.N.Y. 1994).............................................................................................................. 20

*MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095 (N.D. Cal. 2012)........................... 4

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ........................ 4, 6

*PepsiCo. Inc. v. Coca Cola* 315 F.3d 101 (2d Cir. 2002) ........................................................... 11

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) .................................................................... 12

*Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir.1998) ........................................... 12

*United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) .................................... 11

*United States v. Google LLC*, 2023 WL 4999901 (D.D.C. Aug. 4, 2023) .................................. 20

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966).................................................................. 12

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)............................................ 4, 12

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256 (2d Cir. 2001)........................... 8, 18

### Treatises

5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1388 (3d. ed.)....... 2

## INTRODUCTION

Inform's Opposition to Google's Motion to Dismiss Inform's Second Amended Complaint, ECF No. 615 ("Opp'n"), conducts a shell-game to shield Inform's inadequate allegations from this Court's scrutiny behind a series of specious arguments and immaterial distractions. In this effort, Inform invokes waiver arguments from outdated complaints, stretches an Eleventh Circuit opinion beyond its holding, blurs market allegations, and asserts flatly incorrect legal standards. None of these tactics can distract from the fundamental fact that Inform has failed, for the third time now, to allege effects on competition in any alleged relevant market in which Inform participated. And despite its persistent efforts, Inform still cannot transform Google Chrome's transition from Adobe Flash to HTML5 into an antitrust violation without plausible allegations of coercion or exclusionary conduct. Nor has Inform managed to adequately plead that Google holds the market share, control over output and pricing, or other relevant "plus factors" to indicate monopoly power in the alleged online video advertising ("OLV") market, let alone demonstrated the specific intent or anticompetitive conduct necessary to allege attempted monopolization of that market. As pleaded in Inform's Second Amended Complaint ("SAC"), Inform's federal antitrust claims related to the OLV market, including those related to Enhanced Dynamic Allocation ("EDA"), direct bypassing, tying, monopoly leveraging, Minimum Bid to Win ("MBW"), and encrypting user IDs, fail to state a claim under Rule 12(b)(6), and should be dismissed.

## ARGUMENT

## I.   INFORM'S WAIVER ARGUMENTS ARE SPECIOUS GIVEN THE NEW ALLEGATIONS IN ITS SECOND AMENDED COMPLAINT

Inform argues that Google waived certain 12(b)(6) arguments because Google did not raise them in its motions to dismiss Inform's earlier complaints. Inform is incorrect because Google's

arguments are directed at new allegations in the SAC, and thus Google is not precluded from asserting them.  When an amended complaint contains "new information or different allegations making it subject to a defense or objection that was not previously apparent [to the opposing party]," that party "may move to dismiss on the basis of the newly discovered ground even if [it] has filed a Rule 12 motion previously."  5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1388 (3d. ed.) (collecting cases).

The arguments relating to "statute of limitations, specific intent, and certain instances of conduct" that Inform claims Google waived, Opp'n at 2 n.1, pertain to new material in the SAC concerning Google's acquisitions, *see* Opp'n at 3, 8.  In its prior complaints, Inform did not point to Google's acquisitions as alleged acts of monopolization or attempted monopolization.  It failed to incorporate the paragraphs describing the acquisitions into either count.  *See* Inform's First Amended Complaint, No. 1:23-cv-01530-PKC, ECF No. 35 ("FAC") ¶¶ 176-79, 185-92 (failing to incorporate the acquisition-related paragraphs, ¶¶ 60-68).[1]

The SAC is clearly different.  In the SAC, Inform for the first time points to "acquisitions" as predicate acts in Count I ("Monopoly and Monopoly Maintenance") and Count III ("Attempted Monopolization").  SAC ¶¶ 321, 341.  The SAC is also the first time Inform alleged that acquisitions were evidence of specific intent to monopolize.  SAC ¶ 96.  Accordingly, the instant

---

[1] With respect to Inform's original complaint, No. 1:23-cv-01530-PKC, ECF No. 1 ("Original Complaint"), the district court in the Northern District of Georgia found it was "virtually impossible to know which allegations of fact are intended to support which claims of relief since each cause of action incorporates more than 190 paragraphs [i.e., all the paragraphs preceding those laying out the counts]."  *Inform Inc. v. Google LLC*, 2020 WL 13661857, at *1 (N.D. Ga. Sept. 25, 2020).  Accordingly, the district court dismissed Inform's complaint as a "quintessential 'shotgun' pleading," *id.*, and in response, Inform more specifically incorporated its allegations into its causes of action in the FAC.  Nevertheless, Inform chose *not* to incorporate the acquisition-related paragraphs into its monopolization and attempted monopolization counts.  Thus, Inform did nothing to correct the observation that Google had made in its motion to dismiss the Original Complaint: that the allegations listing Google's acquisitions had "no bearing on Plaintiff's claims."  Defendants' Memorandum in Support of Its Motion to Dismiss the Complaint, No. 1:23-cv-01530-PKC, ECF No. 16-1 ("MTD Original Complaint") at 6 n.5.

motion is the first opportunity Google has had to raise its objections and defenses related to the acquisitions as they relate to Counts I and Counts III.

## II.    INFORM'S ONLINE VIDEO ADVERTISING MARKET CLAIMS FAIL

The transition from Flash to HTML5 was not exclusionary and did not harm competition in the alleged OLV market.  Google was entitled to make the legitimate business decision to design its browser to be compatible with HTML5, as many others in the industry did.  That Google's online video advertising platform and many others adapted to this industry transition while Inform chose not to does not make Google's transition anticompetitive.  Nor does Inform's desire to have Google continue to support outdated, less-safe standards in its web browser turn a transition that may have been bad for Inform's Flash-reliant business into conduct that harmed competition in the entire alleged OLV market.  Inform's OLV claims fail for two reasons:  first, the conduct Inform complains about is not exclusionary and did not affect competition in the alleged OLV market.  Second, Inform fails to allege that (1) Google has the requisite power to monopolize or attempt to monopolize the alleged OLV market; and (2) Google's (insufficient) market share is somehow attributable to any of the conduct Inform has identified.

### A.   Inform does not plead any exclusionary conduct affecting competition in the alleged Online Video Advertising Market.

Google's decision to gradually transition from Flash to HTML5 was a legitimate design decision.  Inform has alleged no facts that would suggest that the transition coerced any customer to do anything, let alone coerced any advertiser to buy video advertising from Google to the exclusion of all other competitors.  Since Google's design choice was not coercive or exclusionary, it is unsurprising that Inform is also unable to point to any effect that design had on competition in the alleged OLV market.  Contrary to Inform's argument, the permissibility of Google's product design choice is not a "fact issue" because the law is clear that such design decisions are not

anticompetitive.  *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979) ("[A]ny firm, even a monopolist, may generally bring its products to market whenever and however it chooses."); *see also Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999 (9th Cir. 2010) ("[A] monopolist has the right to redesign its products to make them more attractive to buyers.") (internal quotations omitted); *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1108 (N.D. Cal. 2012) (dismissing claim based on product design change on the pleadings).  Because "[p]roduct innovation generally benefits consumers," courts are "very skeptical about claims that competition has been harmed by . . . product design changes," and "neither product withdrawal nor product improvement alone is anticompetitive."  *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652, 653-54 (2d Cir. 2015).  Similarly, there is no fact issue regarding anticompetitive effects because Inform asserts only harm to its individual business, and not to competition in the vast alleged OLV market.

**The transition to HTML5 did not coerce advertisers to buy from Google rather than other OLV providers.**  Inform's attempts to characterize the gradual transition to HTML5 as a so-called "hard switch" or coercion do not persuade.  Inform cites several cases that are inapposite to its Flash allegations, *see* Opp'n at 12-13, each of which involve abrupt product replacements where the court determined that the product "switch" coerced customers to use a new product *of the defendant's*.  *United States v. Microsoft Corp.*, for example, analyzed various efforts by Microsoft to coerce customers to use Internet Explorer (instead of rival browsers) and Windows (instead of other operating systems).  253 F.3d 34, 61-62 (D.C. Cir. 2001) (Microsoft introduced license restrictions that forced manufacturers to restrict access to rival browsers other than Internet Explorer); *id.* at 64 (by writing Internet Explorer software code as an "irremovable part of Windows," Microsoft prevented software manufacturers from pre-installing browsers other than

4

Microsoft's).[2]  *See also Abbott Lab'ys v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 421-24 (D. Del. 2006) (when drug manufacturer introduced a new formulation of their TriCor drug solely to block generic alternative versions of the drug, "consumers were not presented with a choice between fenofibrate formulations" and "when the introduction of a new product by a monopolist prevents consumer choice, greater scrutiny is appropriate"); *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 387, 389 (S.D.N.Y. 2007) (Xerox redesigned its own color printers solely to foreclose the use of certain patented ink sticks, a change that allegedly "serve[d] no benefit to consumers" because the prior design included key plates that already served the same function).

Inform's own SAC concedes that Chrome's transition from Flash to HTML5 bears no resemblance to this type of abrupt, coercive, and unjustified product redesign.  Crucially, Inform does not explain how gradually redesigning Chrome forced advertisers to buy online video advertising from Google *rather than any other provider* who also used HTML5.  Moreover, in contrast to the cases cited by Inform, Google transitioned Chrome away from Flash gradually and went out of its way to provide customers with choice and flexibility: Chrome offered Flash-to-HTML5 conversion tools years before changing its default settings, SAC ¶¶ 244, 249, and Chrome users retained an option to enable Flash by selecting "allow" on their browser to continue using Flash and even select "Remember this decision" to avoid future pop-ups.  *Compare* SAC ¶ 250, *with Microsoft*, 253 F.3d at 65-66 (excluding certain browsers from the "Add/Remove Programs utility" and overriding users' choice of browser).  In addition to lacking the consumer coercion common to the "hard switch" cases Inform cites, Google has proffered not only its own legitimate business justification, but an obvious justification *shared by the rest of the industry*: Flash was

---

[2] Moreover, Microsoft "proferr[ed] no justification" for these various challenged actions that indicated a valid business purpose, but instead took steps to reduce market share of rival browsers "not by making Microsoft's own browser more attractive to consumers, but, rather, by discouraging…[the distribution] of rival products." *Microsoft*, 253 F.3d at 65-66.

outdated tech that lacked functionality and needed to be replaced.  *Cf.* Opinion and Order, ECF No. 308, at 45 (Castel, J.) ("MTD Op.") (ID encryption is not alleged to be anticompetitive because the States do not explain why abandonment of cookie system in favor of encryption "was not a desirable feature to users").

Inform also attempts to save its HTML5 claim by pointing out that it also complains about "other conduct."  Opp'n at 13.  But to be actionable, the "other conduct" must combine with product withdrawal to coerce customers.  *See New York ex rel. Schneiderman*, 787 F.3d at 654 ("[W]hen a monopolist combines product withdrawal with some other conduct, *the overall effect of which is to coerce consumers rather than persuade them on the merits*, and to impede competition, its actions are anticompetitive under the Sherman Act." (emphasis added)).  Inform fails to allege how any of the other conduct in the complaint coerced customers to buy video advertising from Google rather than from others.  For example, Inform points to Google's ad buying tools helping advertiser customers convert campaigns into HTML5 format.  *See* Opp'n at 15.  But this conduct is not coercive; it is merely offering a valuable service to customers (and not offering it to non-customers).  Moreover, while this made Google's ad buying tools more attractive to customers, Inform fails to explain how making Google's *ad buying tools* more attractive would or could force anyone to buy an entirely different product (video advertising) from Google rather than from others.

Inform also points to the alleged "whitelisting" of YouTube and other websites or the fact that YouTube videos would auto-start, arguing these facts demonstrate that Google's conduct was illegitimate or pretextual.  Opp'n at 14.  This argument does not render Google's decision coercive or illegitimate.  Inform concedes that Google "whitelisted" or allowed auto-play on other websites in addition to YouTube, *see* SAC ¶ 257 ("[C]ertain Google owned *or preferred sites* . . . are

whitelisted[.]" (emphasis added)), thus undermining any suggestion that Google transitioned to HTML5 as a way to force advertisers to buy on YouTube.  Notably, in its original complaint, Inform specifically named Amazon and Microsoft as among the whitelisted websites.  Original Complaint ¶ 131.  And in its original and first amended complaints, Inform alleged that Google Chrome decided whether to auto-play videos based on how likely a user was to consume media on a particular website–and not the source of the ad.  Original Complaint ¶ 130; FAC ¶ 123.  Although Inform removed these specific allegations from the SAC, Inform's admission that other websites were also whitelisted speaks volumes.  That allegation contravenes Inform's suggestion that the transition was a pretext to preference Google, because Google whitelisted competitors as well.  Inform also suggests that the whitelisting of *any* website renders the entire transition to HTML5 irrational.  Opp'n at 14.  But Inform fails to allege any facts suggesting that the whitelisting undermined legitimate reasons for the transition.  Inform also fails to provide any details about how long the alleged whitelisting occurred or that it was done for improper reasons.  And Inform's now-deleted allegations demonstrate why Inform provided no such detail: it could allege none.

**The transition to HTML5 did not affect competition in the alleged OLV market.**  Nor did Chrome's multi-year transition to HTML5 exclude competition in the alleged OLV market.  Although Inform recites a litany of harms that it suffered from the introduction of HTML5, it fails to explain why any of these harms were caused by Google rather than the result of its own independent decision to continue using Flash rather than follow the rest of the industry.  Moreover, Inform makes no attempt to explain how allegedly putting Inform out of business affected competition in the alleged OLV market as a whole.  As this Court previously noted, "harm to competition is different than harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition."  MTD Op. at 37.  Inform's vague allusion to

unidentified "other competitors" who "could not as effectively compete," is not sufficiently specific or concrete to state a claim.  SAC ¶¶ 69, 102.

The other, non-HTML5-related conduct that Inform complains about, discussed below, also had no discernible alleged effects in an OLV market.  As this Court has made clear, a plaintiff must connect the allegedly harmful conduct to anticompetitive effects *in the relevant market*.  *See, e.g.*, MTD Op. at 47 (even if individual publishers were injured due to Google's conduct, plaintiffs fail to describe "harm to competition on the ad-server market"); *id.* at 47-48 (even if Google dominated the market for ad-buying tools, plaintiffs nevertheless fail to expressly attribute anticompetitive effects in that market to Dynamic Allocation).

**Enhanced Dynamic Allocation.**  Inform repeatedly complains about EDA and bypassing, but fails to draw any connection to this alleged conduct and competition in the alleged OLV market.  Inform's standalone "leveraging" claims based on bypassing and EDA fail for the same reason.  Notwithstanding Inform's suggestion to the contrary, the law is clear that Section 2 claims require allegations of conduct that harmed competition *as a whole*.  *See E & L Consulting, Ltd. v. Doman Indus. Ltd.,* 472 F.3d 23, 31 (2d Cir. 2006) (Section 2 claims must be predicated upon harm to competition); *see also Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 272-73 (2d Cir. 2001) (a leveraging claim requires anticompetitive effects in the target market).

Taking Inform's allegations as true, Inform claims that EDA and other unidentified "bypassing" processes sometimes resulted in an ad impression being filled through AdX rather than through one of Inform's directly negotiated deals.  Opp'n at 16-18.  Yet Inform does not allege how often this occurred or whether its direct deals in fact went unfulfilled.  More significantly, Inform fails to specifically allege that *any other* participant in the alleged OLV

market was similarly affected.[3]   Inform identifies no other OLV provider whose sales were supposedly bypassed.  Thus, at best Inform is left with harm to its own directly negotiated ad deals. But harm to Inform alone is clearly insufficient to plead a violation of Section 2.  *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) ("[H]arm to one or more competitors will not suffice" to plead a violation of Section 2) (citation omitted)).  Inform also claims that the alleged demise of direct advertising sales demonstrates harm, but Inform alleges no market for directly sold advertising.  *See, e.g.*, SAC ¶ 205.  The prevalence of direct vs. programmatic sales overall says nothing about online video advertising numbers or even the proportion of online video advertising sold directly or programmatically.  Inform has pointed to no specific allegations from which the Court could infer that EDA or bypassing affected competition as a whole in the alleged OLV market.[4]

   **Conduct relating to ad exchanges.**  The other conduct Inform complains about also has no pleaded connection to the alleged OLV market.  In its Opposition, Inform points to Last Look, Bernanke, and Dynamic Revenue Share as anticompetitive in the OLV market, Opp'n at 5, but Inform nowhere explains how this conduct had any impact whatsoever on online video advertising.[5]  That conduct supposedly benefited Google's ad exchange, but Inform alleges that ad exchanges and online video advertising are distinct.  *See* SAC ¶¶ 107-14, 127-31.  Indeed, Inform alleges that it had an entire sales team dedicated to selling online video advertising without using

---

[3] Inform invokes unidentified "other competitors" in its brief, *e.g.* Opp'n at 5, but says nothing about who they are, how they were affected, or where they fit within the alleged market.

[4] Inform alleges that DFP was used to serve both static and video ads.  SAC ¶ 10.  Inform never alleges that EDA or bypassing had anything specifically to do with video ads; thus there is no reason to assume EDA had some particular effect on video advertising.

[5] Inform attempts to save its allegations, which are inadequate on their own, by arguing that the Court must consider Google's various types of conduct in their totality.  *See* Opp'n at 9-11.  But such analysis is inappropriate, as Inform has failed to allege other conduct that affected the OLV market that may be considered in combination.  *See also* Part VI, *infra*.

any ad exchange at all.  SAC ¶ 63.  Thus, the SAC provides no basis to infer that conduct allegedly affecting ad exchanges had any effect on competition for online video advertising.

Inform attempts to excuse its failure to plead any anticompetitive effects in the alleged OLV market by hiding behind the Eleventh Circuit's decision.  The Eleventh Circuit expressly declined to address any of Google's 12(b)(6) arguments and therefore has no bearing on the motions pending before this Court.  *Inform Inc. v. Google LLC*, 2022 WL 3703958 at *6 (11th Cir. Aug. 26, 2022) ("Finally, the Google defendants ask us to alternatively affirm the district court based on the merits of its Rule 12(b)(6) arguments—even though the district court has never reached those arguments. We decline.").  The Court of Appeals only resolved the issue of antitrust standing, as Inform is well aware and has previously admitted, *see* Inform's Response to Google's Pre-Motion Letter, ECF No. 559, at 2 n.3, a question which turned on whether Inform had alleged an injury in fact to itself.  The Court of Appeals did not consider whether Inform had adequately alleged exclusionary conduct or anticompetitive effects.

## B. Inform fails to allege monopoly power in the alleged Online Video Advertising Market.

Although Inform acknowledges that Google's alleged 52% market share, standing alone, is insufficient, *see* Opp'n at 6, it pleads no additional "plus factors" that would amplify a 52% market share into plausible monopoly power.  Instead, Inform points to a series of generic paragraphs from its complaint that invoke phrases like "interoperability," "network effects," and "weaponized usage of data." *Id.* (citing SAC ¶¶ 158-62).[6]  But none of these conclusory allegations purports to describe the alleged OLV market, as opposed to any of the other alleged markets invoked by Inform or a generic amalgamation of all alleged markets.  In particular, Inform fails to

---

[6] Inform's inclusion of additional purported "plus factors" in its brief is no less superficial, listing terms like "lock-in effects," "leveraging of monopoly power," and "barriers to entry."  Opp'n. at 6 n.4-5 (citing SAC ¶¶ 331, 346, 360).

allege what the barriers to entry might be for the OLV market or reckon with the entry and exit of other market participants (except itself).  Indeed, Inform's generic invocation of "entry barriers" to online video advertising is implausible, as it fails to reckon with the entry of wildly successful companies that sell online video ads, including TikTok, Snapchat, Meta (including Facebook and Instagram), Netflix, and any other website showing video advertisements.

Inform attempts to argue that it has shown direct evidence of monopoly power, but has pointed to no such allegations.  The core element of a monopolization claim is significant market power, which is defined as "the ability to raise price by restricting output."  *PepsiCo. Inc. v. Coca Cola* 315 F.3d 101, 107 (2d Cir. 2002); *see also United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 392 (1956) ("Monopoly power is the power to control prices or exclude competition . . . It is inconceivable that price could be controlled without power over competition or vice versa."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 399 (E.D.N.Y. 2008) ("A company has monopoly power if it can sell a product or service for a supra-competitive price untroubled by market forces; in other words, if it is able to exert power to insulate its prices from competition.").  Inform has alleged nothing whatsoever about the price of Google video advertising (or anyone else's).  Nor has Inform made any allegations about output, the entry or exit of competitors (other than Inform itself), or any other factors that would suggest that Google might have the power to control prices or exclude competition.  This is unsurprising, again, as any such allegations would need to contend with the entry and success of video advertising competitors like Meta, Netflix, and TikTok.

Inform's suggestion that its conduct allegations suffice to plead direct evidence of monopoly power misstates the law.  To support its proposition that "[w]here there is direct evidence that Defendants . . .excluded competition, the existence of monopoly power is clear,"

Opp'n at 4, Inform cites *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001). Setting aside the fact that *Microsoft* is outside the Second Circuit, Inform deploys the citation misleadingly, as the *Microsoft* court was stating that the power to charge supracompetitive prices is what defines clear monopoly power. *See Microsoft*, 253 F.3d at 51 ("[A] firm is a monopolist if it can profitably raise prices substantially above the competitive level. ***Where evidence indicates that a firm has in fact profitably done so, the existence of monopoly power is clear***.") (citations omitted) (emphasis added)). *Microsoft* does not hold that conduct complaints can substitute for evidence of monopoly power. Rather, a Section 2 plaintiff must plead *both* monopoly power and exclusionary conduct. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

Inform's reliance on *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001) is similarly misplaced. In holding that adverse effects "on competition" *may* indicate market power, *Todd* relies upon a series of authorities that emphasize indicators like output reduction, control of prices, and market share.[7] Inform thus misconstrues the case law by confusing harm to market-wide competition (where there are signals like reduced output) with harm to a single competitor such as Inform. "Isolated instances of anti-competitive conduct will rarely suffice to show that a defendant's market power is substantial enough to be monopoly power." *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 130 (2d Cir. 1981).

In any event, the conduct that Inform points to does not indicate power in the alleged OLV market. Inform asserts that a laundry list of conduct "provide[s] direct evidence" of Google's

---

[7] *Todd* relies upon: *K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995) ("If a plaintiff can show an actual adverse effect on competition, such as reduced output ... we do not require a further showing of market power."); *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 546 (2d Cir. 1993) (explaining that plaintiff may avoid a "detailed market analysis by offering 'proof of actual detrimental effects, such as a reduction of output") (internal citations omitted); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir.1998) (stating that market power "may be proven directly by evidence of the control of prices ... or it may be inferred from one firm's large percentage share of the relevant market").

market power.  Opp'n at 5.  But, as described above, none of this alleged conduct actually excluded competition in the alleged OLV market and certainly does not suggest any ability to control it.

### C.  Inform does not state a claim for attempted monopolization.

To side-step its failure to plead the requisite specific intent to monopolize the alleged OLV market, Inform claims that the collage of alleged conduct in its prolix complaint–"for all the reasons set forth above"–exhibits the necessary specific intent.  Opp'n at 7.  That comes nowhere close to meeting Rule 12's pleading standard.  In the SAC, the only conduct that Inform actually identifies as evidencing specific intent to monopolize the alleged OLV market is acquisitions.  *See* ECF No. 559, at 5 (citing SAC ¶¶ 96, 106, 339-341, which mention the acquisition of Android, Fitbit, Fossil, and other unnamed companies as exhibiting Google's "specific intent to monopolize and attempt to monopolize the relevant markets").  But Inform never connects these acquisitions to the alleged OLV market, nor explains how acquiring a mobile operating system, fitness tracker, or watch company could possibly show a specific intent to monopolize an entirely different alleged market.  Inform also mentions Google's YouTube acquisition but provides no detail about how that acquisition was in any way improper or evidences an intent to monopolize any market rather than simply participate in it.  *See Knutson v. Daily Review, Inc.*, 548 F.2d 795, 815 (9th Cir. 1976) (noting that the mere fact that the defendant acquired numerous newspapers "does not in itself lead to an inference of an intent to acquire a monopoly"); *Lektro-Vend Corp. v. Vendo Corp.*, 500 F. Supp. 332, 359 (N.D. Ill. 1980) (holding that specific intent to monopolize could not be inferred from acquisitions without evidence of harm to competition or injury to other competitors).

Moreover, Inform's attempted monopolization claim is time-barred because it relies solely on long-completed acquisitions.  *See* Google's Motion to Dismiss Inform's Second Amended

Complaint ("Mot.") at 5 (arguing that Inform's complaints about acquisitions dating from 2003 to 2011 are time-barred).[8]

## III.   INFORM'S TYING CLAIMS FAIL

### A.   Inform's YouTube tying claim fails because the only alleged harm occurred in a market in which Inform did not plead and does not participate.

Inform complains that Google makes YouTube advertising inventory available only through Google's ad buying tools and alleges this is an illegal tie. Inform's claim fails for the simple reason that the alleged tie had no conceivable effects in any of the markets in which Inform participates or even pleads.

Tying arrangements impair competition when they foreclose competitors from competing to sell the tied product. *See In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 413 (S.D.N.Y. 2005). In the case of Inform's YouTube claim, YouTube advertising is the alleged tying product. The allegedly tied products (that which competitors are supposedly foreclosed from selling via a tie) are ad buying tools. *See* SAC ¶ 179 ("[T]his tying forced any advertiser that wanted to include YouTube in its ad campaigns to use a Google's DSP buying tools [sic] . . . ."). But Inform does not allege an antitrust market for DSP buying tools.[9] Nor does Inform allege that it even provided competing buying tools. All it alleges is that the promotion of Google buying tools somehow made Inform's platform "less attractive." SAC ¶ 182. This does not amount to foreclosure in an alleged ad buying tools market. *See E & L Consulting*, 472 F.3d at 32 (requiring "some specificity as to the conduct alleged to be coercive, the customers who would have purchased a product elsewhere but for the coercion, the particular products sold as a result of the

---

[8] The remaining conduct that Inform identifies in its brief, *see* Opp'n at 8 n.8 (e.g. "placement of Google executives into the FTC") has no discernible or alleged connection to the OLV market.

[9] The Eleventh Circuit did not resolve this claim either. Inform never alleged an ad buying tools market, *see* Original Complaint and FAC, so the Eleventh Circuit's antitrust standing ruling says nothing about whether Inform was harmed in an ad buying tools market.

coercion . . .").  Inform's assertion that it competes in the alleged OLV advertising market is immaterial, as there is no allegation that the alleged tie foreclosed competition in an OLV market as a whole.  It is difficult to understand how it could, as Google DSPs like DV360 could be used to buy video ads on other platforms in addition to YouTube.  *See* SAC ¶ 85 ("Advertisers using demand side platforms have extensive control over where and how they bid for ad inventory.").  Thus, making Google DSPs more popular does not reduce competition for or spending on any video ad provider.  Without allegations that Inform or any other competitor in a relevant market was foreclosed from competing because of the tie, Inform's tying claim fails.

Inform also mentions in passing that ad servers were "exclud[ed] . . . from having access to YouTube."  SAC ¶ 182.  It is not clear how this observation relates to the alleged tie, as the specific conduct that Inform complains about had nothing to do with ad servers.  Nor is the import of this allegation clear, as Inform fails to explain why or how a non-Google ad server should have "access" to a Google website.

### B. Inform's DFP/AdX tying claim fails because Inform's own allegations show there was no coercion.

Inform agrees that it must allege coercion as a part of its tying claim, yet its own allegations demonstrate that there was none.  The Court previously considered two possible types of coercion associated with the States' DFP/AdX claim: contractual and economic.  *See* MTD Op. at 18-20.  The States alleged that Google required publishers to sign combined DFP/AdX contracts and alleged that publishers could not afford to lose access to live bids from AdX.  *See* States' Third Amended Complaint, ECF No. 195 ("TAC") ¶ 247.  Here, Inform alleges neither type of potential coercion.  Inform does not dispute that it makes no allegation it was forced to or did in fact sign a "combined contract."  With respect to economic coercion, Inform has pleaded itself out of court.  While Inform states it was "forced to use DFP in order to gain access to Google's AdX and live

real-time bids" in a conclusory fashion, SAC ¶ 60, Inform's allegations directly undermine the notion that Inform itself needed this access.

First, Inform claims that direct sales, which did not go through ad exchanges, *see* SAC ¶ 37, were far more "lucrative." *See id.* ¶ 13. Inform suggests that it relied heavily on direct sales (arguing it was "decimated" when its "guaranteed direct ad sales did not deliver," *id.* ¶ 211). Inform claims to have used AdX or other exchanges only to sell "leftover" or "remnant" inventory that it could not sell through direct deals. *Id.* ¶¶ 63-64. Given Inform's stated reliance on directly sold ads for its revenue, Inform cannot plausibly argue that access to bids from one ad exchange (AdX) is such an economic imperative that it was coerced to use DFP. Further, Inform alleges that it "ranked AdX last or close to last" among exchanges for fulfillment of its "leftover or remnant ad inventory," and that "other exchanges offered higher prices to publishers." *Id.* ¶¶ 64, 189. If other exchanges offered higher prices, this further undermines the suggestion that accessing real-time bids from AdX was an economic imperative. Instead of responding to either of these arguments, Inform asserts that it paid for DFP. *See* Opp'n at 24. That is beside the point.

### C. Inform's invocation of "per se tying" does not aid its arguments.

Inform omits the fact that a per se tying claim still requires "evidence of actual coercion." *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d at 414 (quoting *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000)). It also requires some plausible allegation that a not insubstantial amount of commerce in the tied market was affected. *See id.* Therefore, Inform's styling of its tying claims as "per se" claims does nothing to rescue them. Inform failed to allege coercion, a necessary element of a per se tying claim, with respect to both tying claims here. *See* Mot. 14-15.

## IV. INFORM'S CHROME AND SEARCH "LEVERAGING" CLAIMS FAIL

### A. Inform's default installation and online video blocking claims fail for the reasons that its other OLV claims fail.

Inform argues that (1) Google "leveraged" its monopoly power in the web browser and internet search, and Licensable Mobile Device Operating System (LMDOS) markets to "control" the OLV advertising market via default Chrome and Search installations, and (2) Google "leveraged" its monopoly power in the ad server and web browser markets to "block" OLV advertisements. Opp'n at 26-28, 30. As explained above, Inform does not plead any *exclusionary* conduct affecting competition in the alleged OLV advertising market. Without pleading anticompetitive effects in this market, Inform cannot maintain a monopoly leveraging claim. Even if Google had monopoly power in the alleged web browser, internet search, LMDOS, and ad server markets, Inform has not adequately alleged how Google's use of that power resulted in anticompetitive effects in an OLV advertising market. Inform spills much ink complaining about the alleged effects of default installation on so-called Internet Search and "online advertising" as well, but since Inform brings no claims regarding Internet Search or "online advertising" as a whole, these arguments are immaterial. Opp'n at 27.

### B. Inform's AMP and YouTube search preferencing claims fail because Inform fails to describe any effects in any alleged markets.

Google argued in its opening brief that Inform failed to allege anticompetitive effects caused by AMP or the ranking of YouTube in search results. With respect to AMP, Inform responds that publishers were supposedly coerced to adopt AMP. *See* Opp'n at 28. Even if that suggestion were true, it would not aid Inform's claim. Inform still fails to connect its use of AMP to any alleged anticompetitive effects in any alleged market. Specifically, Inform fails to explain how supposedly coercing a publisher to use AMP–a format for *mobile websites*, SAC ¶¶ 293, 295– could possibly have excluded competition in online video advertising or any other alleged market. With respect to Google Search results, Inform asserts that YouTube showed "more prominently"

17

in search results than other websites and argues in its brief that Google has "power in fact to wipe

a given competitor/publisher off the map on a given day."  Opp'n at 29.  But Inform never alleges

Google's supposed power over third party websites, that it actually exercised such power, nor that

*any* competitor (let alone a substantial number of them) was improperly excluded from the alleged

OLV market merely because of YouTube's ranking on Google's Search website.  Inform's attempt

to rescue its insufficient pleading is unavailing.  *Cf. Virgin Atl. Airways*, 257 F.3d at 273

(explaining that plaintiff must allege "specific facts" concerning anticompetitive effects in the

target market to support a monopoly leveraging claim).

## V.   INFORM PROVIDES NO REASONS TO REVIVE CLAIMS RELATING TO MINIMUM BID TO WIN OR ENCRYPTING USER IDS

### A.  Inform's "Minimum Bid to Win" argument is incomprehensible.

Inform alleges that Minimum Bid to Win ("MBW") has "foreclosed participation by its

competitors, illegally restrained trade, and stifled competition."  SAC ¶ 215.  To support this

sprawling assertion, it provides one vague sentence: "[T]hrough Google's market dominance,

Google Ads has engaged in a practice of setting unreasonably high minimum bids targeted only

at competing products or services in order to foreclose them from meaningful participation in the

Google Ads auction system, a practice known as 'Minimum Bid to Win.'"  *Id.*  Inform fails to

explain anything about these allegedly "unreasonably high minimum bids" and how they

operate, let alone how their use caused anticompetitive effects.  Nor does Inform explain how

supposed foreclosure of competitors from participating in "the Google Ads auction system"

could have effects in the markets that Inform alleges.  Inform's allegations are paltry even

compared to other plaintiffs' deficient allegations concerning MBW.  *Cf.* Publishers' Amended

Complaint, ECF No. 408, ¶¶ 343-48; Gannett's Complaint, No. 23-cv-05177, ECF No. 1 ¶¶ 65-

66, 189.

Inform's argument cannot be squared with its own allegations.  Inform argues that "Google enabled its advertiser customers to win impressions through lower bids on AdX than they could have submitted through rival exchanges that did not have MBW," Opp'n at 19, but Inform's Complaint contains no allegations about MBW enabling anyone to bid low–it discusses only "unreasonably high minimum bids."  SAC ¶ 215.  Nor does Inform's Opposition add anything to the MBW theories advanced by other plaintiffs and already rejected by the Court.

### B.  Inform pleads no facts to support its argument regarding user IDs.

Inform attempts to distinguish its claim concerning the encryption of user IDs from the States' dismissed allegations by arguing that Inform owned the encrypted data.  Opp'n at 20.  But this is not pleaded, and Inform's Opposition fails to add any clarity.  To the extent that Inform is referring to user IDs generated by the ad server, Inform never alleges that it owned such data.  *See* SAC ¶ 268.  In fact, Inform's own allegations undercut that assertion, as Inform alleges that Google uses other publishers' data, in part, to create these user IDs.  *Id.*  The SAC does not explain why Inform would enjoy ownership over this data provided by other publishers to Google.  To the extent that Inform is referring to some other data (Inform alleges that it had its "own proprietary method of collecting its users' data"), Inform never alleges what this data is or how, if Inform collected it, Google could have possibly taken it and rendered it unusable to Inform.  *See* SAC ¶ 270.

## VI.  THE COURT CAN DISMISS INDIVIDUAL CLAIMS THAT ARE PREDICATED ON CONDUCT THAT IS NOT ACTIONABLE

Inform breezily invokes *Microsoft* to bolster its assertion that the Court "must consider Plaintiff's allegations in their totality."  Opp'n at 9-10 (citing *Microsoft*, 253 F.3d at 58).  However, per *Microsoft*, courts must evaluate the anticompetitive effect of each type of alleged conduct separately, and only if that type of conduct is deemed to have an anticompetitive effect,

may a court aggregate that conduct with other anticompetitive practices.  *United States v. Google LLC*, 2023 WL 4999901, at \*12 (D.D.C. Aug. 4, 2023) (citing *Microsoft*, 253 F.3d at 67-71).  In other words, once a court determines that a type of alleged conduct does not have an anticompetitive effect standing alone, then the court should dismiss the relevant individual claim.  Indeed, this Court took that exact approach with respect to Google's motion to dismiss the States' TAC, *see generally* MTD Op., and there is no reason to change course here.

## VII.   INFORM CANNOT SEEK INJUNCTIVE RELIEF

Inform does not dispute that it is "out of business," Opp'n at 1, 9, 30, and therefore cannot possibly show that it is currently harmed or will be harmed in the future by any alleged Google conduct.  Inform's only response is to assert that "the Court has broad power to fashion relief as it sees fit."  Opp'n at 30 n.33.  However, that power does not extend to situations where "[the] plaintiff no longer exists as an operating entity" and "the passage of time and intervening circumstances [have] rendered injunctive relief impracticable"—even when the plaintiff "has gone out of business, allegedly due to [the defendant's] actions."  *Maier-Schule GMC, Inc. v. Gen. Motors Corp. (GMC Truck & Bus Grp.)*, 850 F. Supp. 1095, 1101-02 (W.D.N.Y. 1994), *aff'd sub nom. Maier-Schule GMC Inc. v. Gen. Motors Corp.*, 62 F.3d 1412 (2d Cir. 1995) (citing *USAchem, Inc. v. Goldstein*, 512 F.2d 163 (2d Cir. 1975)).  As it is no longer in business, Inform simply cannot seek injunctive relief here.

## CONCLUSION

For the foregoing reasons, Google respectfully requests that this Court dismiss in their entirety and with prejudice the portions of the federal antitrust claims related to the OLV advertising market (including those related to EDA and direct bypassing), tying, monopoly leveraging, Minimum Bid to Win, and encrypting user IDs.

Dated: September 25, 2023    Respectfully Submitted,

*/s/ Justina Sessions*
Justina K. Sessions
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
Fax: (650) 461-8276
justina.sessions@freshfields.com

Eric Mahr
Robert J. McCallum
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Fax: (202) 777-4555
eric.mahr@freshfields.com
rob.mccallum@freshfields.com


*Counsel for Defendants Google LLC,*
*Alphabet Inc., and YouTube LLC*