# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GOOGLE ADVERTISING ANTITRUST LITIGATION | Case No. 1:21-md-03010 (PKC) |
| *This Document Relates To:* | |
| GANNETT CO., INC.<br><br>*Plaintiffs*,<br><br>-against-<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>*Defendants*. | Case No. 1:23-cv-05177 (PKC) |

## GANNETT'S AMENDED OPPOSITION TO GOOGLE'S MOTION TO DISMISS

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD........................................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.     Gannett's Exchange Bidding, User ID, and AMP Allegations Plausibly Allege
Anticompetitive Conduct ........................................................................................... 3

       A.     Google Coerces Publishers To Use Exchange Bidding........................................ 3

       B.     Google Unlawfully Hashes User IDs..................................................................... 5

       C.     AMP Coerces Publishers To Abandon Client-Side Header Bidding..................... 6

II.    Gannett's Enhanced Dynamic Allocation and Minimum Bid To Win Allegations
Plausibly Allege Anticompetitive Conduct ............................................................... 7

       A.     The Court Already Has Upheld Gannett's EDA Allegations ................................ 7

       B.     Minimum Bid To Win is Anticompetitive Under the Court's Order.................... 10

III.   Gannett's Claims Regarding EDA and Line-Item Caps Are Not Time Barred............... 15

       A.     EDA and Line-Item Capping Are Continuing Violations of Law ....................... 15

       B.     Under American Pipe Tolling, Gannett Can Recover for Google's
Continuing EDA and Line-Item Capping Violations ~~for an Additional
Two Years~~ At Least from December 16, 2016 ..................................................... 18

       C.     Independent of Google's Continuing Violations, Gannett's EDA Claim Is
Timely Because Google Fraudulently Concealed It ............................................. 20

IV.   Any Dismissal Should Be Without Prejudice ................................................................. 25

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

Page

## CASES

*A.F. ex rel Fogel v. Sorin Grp. USA, Inc.*, 346 F. Supp. 3d 534 (S.D.N.Y. 2018) ...................... 25

*Aluminum Warehousing Antitrust Litig.*, *In re*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015)................. 10

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) ................................. 15, 18, 23

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979).................................... 16

*Buspirone Patent Litig.*, 185 F. Supp. 2d 363, *In re*, (S.D.N.Y. 2002) ........................................ 16

*Cathode Ray Tube (CRT) Antitrust Litig.*, *In re*,
   27 F. Supp. 3d 1015 (N.D. Cal. 2014) .................................................................................... 19

*Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46 (2d Cir. 2016) ....................................... 2-3

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)................................................... 13

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) .......................................................... 19

*Cullen v. Margiotta*, 811 F.2d 698 (2d Cir. 1987)...................................................................... 19

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ......................................... 6

*Ellul v. Congregation of Christian Bros.*, 774 F.3d 791 (2d Cir. 2014)................................ 15, 17

*Flat Glass Antitrust Litig.*, *In re*, 191 F.R.D. 472 (W.D. Pa. 1999) ...................................... 21, 22

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986) ............................................................... 5

*Gelboim v. Bank of Am. Corp.*, 574 U.S. 405 (2015) ............................................................. 3, 25

*Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016)........................................... 9, 10

*Hamilton Cnty. Bd. of Comm'rs v. Nat'l Football League*,
   491 F.3d 310 (6th Cir. 2007) ................................................................................................. 21

*Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) .................................. 15, 16, 18

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981) ............................................ 9

*Kearse v. Kaplan, Inc.*, 692 F. Supp. 2d 398 (S.D.N.Y. 2010).............................................. 22, 25

*Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, *In re*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) .............................................................. 3, 4, 5

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ................................................. 15, 16

*London Silver Fixing, Ltd., Antitrust Litig.*, *In re*, 213 F. Supp. 3d 530 (S.D.N.Y. 2016) ............ 9

*Mandarino v. Mandarino*, 180 Fed. App'x 258 (2d Cir. 2006) ................................... 24

*Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122 (S.D.N.Y. 2016) ............. 10

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212 (2d Cir. 2014) ..................... 15

*Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*,
   420 F. Supp. 2d 253 (S.D.N.Y. 2006) ................................................................. 21

*Nat'l Prescription Opiate Litig.*, *In re*, 956 F.3d 838 (6th Cir. 2020) ...................................... 3, 25

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ........................... 13

*New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir. 1988) ...................................... 20, 21

*Owoyemi v. Credit Corp Sols. Inc.*, 596 F. Supp. 3d 514 (S.D.N.Y. 2022) ................................. 25

*Platinum & Palladium Antitrust Litig.*, *In re*, 61 F.4th 242 (2d Cir. 2023) ................................. 10

*Pollis v. New Sch. for Soc. Rsch.*, 132 F.3d 115 (2d Cir. 1997) ............................................. 16, 18

*Pre-Filled Propane Tank Antitrust Litig.*, *In re*, 860 F.3d 1059 (8th Cir. 2017) .............. 15-16, 17

*Processed Egg Prods. Antitrust Litig.*, *In re*,
   2013 WL 4504768 (E.D. Pa. Aug. 23, 2013) ........................................................ 20

*Sacerdote v. New York Univ.*, 9 F.4th 95 (2d Cir. 2021) ............................................................ 2

*Tether & Bitfinex Crypto Asset Litig.*, *In re*, 576 F. Supp. 3d 55 (S.D.N.Y. 2021) ..................... 10

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ......................................................... 12, 13, 14

*Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90 (2d Cir. 1998) ................................... 11

*Turner v. McDonald's USA, LLC*, 2020 WL 3044086 (N.D. Ill. Apr. 24, 2020) ........................ 16

*United States v. Container Corp.*, 393 U.S. 333 (1969) ................................................................ 12

*United States v. Nat'l Soc. of Prof'l Eng'rs*, 555 F.2d 978 (D.C. Cir. 1977),
   *aff'd*, 435 U.S. 679 (1978) ............................................................................................ 5

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) ................................................. 12

*US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019) ....................................... 17

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010)............................... 15

*WorldCom Sec. Litig.*, *In re*, 496 F.3d 245 (2d Cir. 2007) ............................................................ 18

*Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372 (S.D.N.Y. 2007) ............................. 7

*Ying Li v. City of New York*, 246 F. Supp. 3d 578 (E.D.N.Y. 2017) ............................................. 25

**RULES**

Fed. R. Civ. P. 9(b) ........................................................................................................... 22

Fed. R. Civ. P. 12(b) .......................................................................................... 5, 14, 17, 24

**OTHER MATERIALS**

3 *Newberg and Rubenstein on Class Actions* (6th ed.)........................................................... 19, 20

## INTRODUCTION

In September 2022, the Court held that MDL Plaintiffs plausibly stated Sherman Act claims against Google for unlawful monopolization of several advertising technology markets. *See* MDL Dkt. 308 ("MTD Op."). The Court sustained allegations that Google committed at least ten anticompetitive acts over a decade. The Court also held that certain allegations did not sufficiently plead anticompetitive conduct, and Gannett filed its complaint with new allegations to resolve those identified shortcomings. *See* Dkt. 1 ("Compl.").[1] Yet Google ignores Gannett's complaint and even the Court's prior opinion, instead relitigating issues it lost last year and raising a fact-bound statute of limitations defense. As a member of the putative publisher class since 2021, Gannett has not "slept on its claims" as Google claims (at 1). Gannett's complaint is timely and alleges the same vast, unlawful, anticompetitive monopolies that the Court already held states multiple Sherman Act claims. Google's motion to dismiss should be denied.

On several issues, Google's motion resists the Court's prior Order. Google asserts (at 11) that Gannett "alleges no harm to competition in any relevant market" from Enhanced Dynamic Allocation ("EDA"). But the Court held last year: "Enhanced Dynamic Allocation was anticompetitive conduct in the ad exchange market." MTD Op. 48 (cleaned up). Google also incorrectly argues (at 5-6) that Gannett "fail[s] to allege that [it] 'was improperly compelled to participate in Exchange Bidding.'" The Court upheld claims that Google abused line-item caps "to direct more transactions toward Exchange Bidding," MTD Op. 68, and redacted important datasets to "thwart[] the ability of publisher clients to assess the relative performance of auction results on Exchange Bidding and header bidding," *id.* at 67. Gannett pleads identical allegations.

---

[1] Gannet's complaint was filed in *Gannet Co., Inc. v. Google LLC*, No. 1:23-cv-05177-PKC. Citations to "MDL Dkt." refer to documents filed in *In re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010-PKC (S.D.N.Y.).

Compl ¶¶ 199-209.  Finally, Google belatedly challenges (at 12-14) Gannett's allegations

regarding Minimum Bid to Win ("MBW").  Daily Mail pleaded identical allegations two years

ago, which Google never challenged.  *See* MDL Dkts. 377, at 5; 589, at 2.  For good reason:

MBW is "functionally the same as" Google's "Last Look" advantage from Dynamic Allocation,

Compl. ¶ 189; *accord* MDL Dkt. 400 ("Daily Mail FAC") ¶ 166, which the Court held states a

claim, *see* MTD Op. 46-47.  The harm to competition is potentially even farther reaching.  *See*

Compl. ¶¶ 189-190.  The Court should decline Google's invitation to reopen its prior rulings.

The remainder of Google's motion recycles incorrect arguments it has raised before.

Google defends hashing user IDs (at 8) because Gannett supposedly "fails to establish that the

user IDs that Google's ad server generates and encrypts are somehow the publisher's."  But

Gannett had the same provisions in its Google contracts as Daily Mail:  "publishers 'own[ed]' all

data 'derived from the use of" DFP and AdX."  Compl. ¶ 130.  Likewise, for Accelerated Mobile

Pages ("AMP"), Google contends (at 10) that Gannett "does not allege coercion."  The complaint

pleads otherwise:  "Because Gannett cannot forgo . . . Google-referred readers, [it] must accede

to whatever terms Google requires."  Compl. ¶¶ 223, 225.  Gannett was forced to "adopt AMP,

reject client-side header bidding, and sell effectively all AMP ad space through AdX at reduced

prices."  *Id.* ¶ 230.  Finally, Google raises a statute of limitations defense to two aspects of

Google's conduct, but statute of limitations is a fact-specific affirmative defense that cannot be

resolved on the allegations as pleaded.  Google also ignores (or incorrectly applies) several

doctrines that make clear – even in this preliminary posture – that Gannett's claims are timely.

## LEGAL STANDARD

When a defendant moves to dismiss a complaint, a court "must construe it liberally,

accepting all factual allegations therein as true and drawing all reasonable inferences in the

plaintiffs' favor."  *Sacerdote v. New York Univ.*, 9 F.4th 95, 106-07 (2d Cir. 2021).  "[T]here is

no heightened pleading standard in antitrust cases." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016).  Nor does the Court's analysis of any one complaint in this multidistrict litigation control its analysis of another.  *See Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015) ("Cases consolidated for MDL pretrial proceedings ordinarily retain their separate identities."); *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 845 (6th Cir. 2020) ("[A] party's rights in one [MDL] case" cannot "be impinged to create efficiencies in the MDL generally.").  "[D]ismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 218 (S.D.N.Y. 2019) (citation omitted).

## ARGUMENT

### I.      Gannett's Exchange Bidding, User ID, and AMP Allegations Plausibly Allege Anticompetitive Conduct

Google recycles unsuccessful arguments it raised in its motion to dismiss Daily Mail's complaint.  Its arguments fail for the reasons articulated in Daily Mail's opposition, to which Google failed to respond before and has declined to address here*.  See* MDL Dkt. 488 ("Daily Mail Opp."), at 17-20 (Exchange Bidding), 20-24 (hashing user IDs), 12-17 (AMP).

### A.      Google Coerces Publishers To Use Exchange Bidding

As the Court required, *see* MTD Op. 64, Gannett alleges that Google "coerce[d] publishers to abandon [client-side header bidding] for Exchange Bidding," Compl. ¶ 182. Previously, the Court sustained allegations that Google abused arbitrary line-item caps and unlawful dataset redactions to "thwart[] the ability of publisher clients to assess the relative performance of auction results on Exchange Bidding and header bidding," MTD Op. 67, and to "direct more transactions toward Exchange Bidding," *id.* at 68.  Gannett pleads substantively identical allegations, *see* Compl. ¶ 199-209, and explains (consistent with the Court's Order)

why those acts were coercive.  "Google has manufactured a fait accompli:  take Exchange Bidding or use a now-degraded client-side alternative."  *Id.* ¶ 182.  There is no meaningful difference between what Gannett has alleged and what the Court has sustained.

The Court also held that "attempt[s] to mislead publishers to continue using EDA as a way for publishers to maximize yield" were plausibly anticompetitive.  MTD Op. 49.  Gannett makes the same allegation about Exchange Bidding:  "Google repeatedly represented to Gannett that Exchange Bidding would lead to higher revenue because ads would load more quickly.  For years, Gannett enabled Exchange Bidding based in part on that representation."  Compl. ¶ 183.  But "Google's Exchange Bidding promise was false," *id.* ¶ 184, as Gannett's recent experience has shown.  Since May 2023, rival exchanges have "perform[ed] substantially better when they bid through other header-bidding solutions, including client-side header bidding."  *Id.* ¶ 186.

Google asserts (at 6-7) that Gannett has not been coerced to abandon client-side header bidding because "Gannett continued to use client-side header bidding," albeit to a lesser extent.  Google also claims (at 7) that Gannett's allegations fail because they do not "relate[] to the 2016 introduction or design of Exchange Bidding."  Daily Mail's opposition rejects those arguments, *see* Daily Mail Opp. 10-11, 18-19, and Gannett will not repeat the points at length.  Suffice it to say that Google's date restriction on Gannett's complaint is arbitrary, and the Court already has upheld claims that Google "imped[ed] or prevent[ed] publishers from participating in header bidding," even though Google failed to eliminate client-side header bidding entirely.  MTD Op. 66; *see id.* at 67 (data redactions), 68 (line-item capping), 69-70 (Poirot and Elmo).  That is because the legal test "is not total foreclosure," but rather whether the challenged practices "severely restrict the market's ambit."  *Keurig*, 383 F. Supp. 3d at 236 (citation omitted).

### B.  Google Unlawfully Hashes User IDs

The Court rejected prior allegations regarding hashing user IDs because Google did not have an obligation "to share encrypted user IDs that Google itself generated."  MTD Op. 44. Gannett, by contrast, does not plead a unilateral refusal to deal.  Gannett owns user IDs:  "For years, Google's contracts with publishers . . . established that publishers 'own[ed]' all data 'derived from the use of' DFP and AdX."  Compl. ¶ 130.  By "hashing" user IDs owned by Gannett, Google interferes with Gannett's ability to share its data with rival exchanges to solicit competitive bids, *see id.* ¶ 132, which consolidates demand in AdX, *see id.* ¶ 88, and protects AdX's take rate from price competition, *see id.* ¶ 90.  Daily Mail's opposition explains why interfering with customers' ability to transact with rivals in that manner is unlawful.  *See* Daily Mail Opp. 20-24.  In short, Google's "prohibition of competitive bidding, by blocking the free flow of price information, strikes at the functioning of the free market."  *United States v. Nat'l Soc. of Prof'l Eng'rs*, 555 F.2d 978, 981 (D.C. Cir. 1977), *aff'd*, 435 U.S. 679 (1978).

Google repeats the arguments it made in its motion to dismiss Daily Mail's complaint, ignoring the relevant allegations and caselaw.  Google again opposes (at 8) a "duty to share" claim that Gannett does not allege.  It also asserts (at 8) that Gannett fails to allege that "user IDs . . . are somehow the publisher's" – despite the fact that it does.  And Google asserts (at 8-9) a procompetitive justification to "protect users' privacy."  The first two points warrant no further response.  As to the third, Daily Mail's opposition (at 23) explains that Google's generalized concern for "privacy" fails as a matter of law, *see FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 463 (1986) (rejecting "noncompetitive quality-of-service justifications"), and is, at best, an issue for discovery, *see Keurig*, 383 F. Supp. 3d at 239 ("[A]ny procompetitive justification . . . is not appropriately weighed on a motion to dismiss.").  Google cannot assert a fact bound defense to support Rule 12(b) dismissal.

### C.      AMP Coerces Publishers To Abandon Client-Side Header Bidding

In its prior Order, the Court rejected the AMP allegations that were (1) "far removed from the product markets and claims in th[e] case," (2) offered no explanation "about the mechanics of Google's search engine and how it ranks results for non-AMP enabled sites," and (3) failed to describe "why or how search results would direct traffic away from sites that facilitated header bidding."  MTD Op. 72.  Gannett, like Daily Mail, pleads these missing mechanics.  *See* Compl. ¶¶ 223-235; Daily Mail Opp. 13-14.  To summarize:  Google required publishers to reject client-side header bidding in order to appear at the top of a mobile search results page.  Compl. ¶ 226, 234.  For 18 months, Google permitted only AdX to bid on publishers' AMP inventory.  *Id.* ¶ 230.  Thereafter, Google allowed half as many exchanges on AMP compared to non-AMP pages, and the few rival exchanges on AMP had substantially greater difficulty accessing user data.  *See id.* ¶ 233.  Gannett had no recourse.  "Because Gannett cannot forgo the significant slice of Google-referred readers, Gannett must accede to whatever terms Google requires to appear" at the top of a search results page.  *Id.* ¶ 225.

Google (at 10) "incorporates by reference the arguments it made in its motion to dismiss the Daily Mail AC with respect to AMP."  Daily Mail's opposition responds to Google's arguments, *see* Daily Mail Opp. 14-17, so Gannett will not repeat the relevant points here.  Put simply, the Court sustained claims that Google artificially deflated bids from exchanges in header bidding, *see* MTD Op. 68 (line-item caps), and directed spending away from exchanges in header bidding, *see id.* at 69-70 (Poirot/Elmo).  AMP is worse.  Google outright banned header-bidding exchanges from competition.  Requiring customers to reject rivals as a term of dealing violates the Sherman Act.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 & n.8 (1992) ("[R]efusing to sell parts to customers" unless "they buy service from Kodak" is an antitrust violation, "not" "a unilateral refusal to deal.").  Banning exchanges "on

Gannett's largest source of mobile referral traffic," Compl. ¶ 224, to support an exchange monopoly where Google exceeds a 60% market share, *id.* ¶ 10, amply satisfies Gannett's pleading burden to show that Google "foreclose[s] a substantial share of the market," *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 390 (S.D.N.Y. 2007), "both in isolation and also as part of a broader alleged pattern of conduct," MTD Op. 40.  And Google's "rational business decision" justification (at 10) is a matter for discovery, not a basis for dismissal.  *See supra* p. 5.

## II.  Gannett's Enhanced Dynamic Allocation and Minimum Bid To Win Allegations Plausibly Allege Anticompetitive Conduct

The Court also should reject Google's belated arguments that Gannett's EDA and MBW allegations fail to state a claim.  The Court already has sustained allegations that "Google's use of Enhanced Dynamic Allocation was anticompetitive conduct."  MTD Op. 48 (cleaned up).  Google disregards that holding.  It likewise ignores (at 12) the MBW allegations in Gannett's complaint.  Gannett does not "repeat claims" from the publisher class action.  Rather, Gannett's allegations are "nearly identical" – in Google's words (at 2) – to the MBW allegations in Daily Mail's complaint.  *Compare* Compl. ¶¶ 187-192, *with* Daily Mail FAC ¶¶ 164-170.  Google properly declined to challenge Daily Mail's MBW allegations, *see* MDL Dkts. 377, at 5; 589, at 2, because MBW is plainly anticompetitive.  It is "functionally the same as" Google's "Last Look" advantage from Dynamic Allocation, Compl. ¶ 189; *accord* Daily Mail FAC ¶ 166, which the Court found plausibly anticompetitive, *see* MTD Op. 46-47.  Google's continued disagreement with that ruling is no reason to relitigate what the Court resolved 13 months ago.

### A.  The Court Already Has Upheld Gannett's EDA Allegations

The Court has explained why EDA plausibly "caused injury to competition in the ad exchange market."  MTD Op. 49.  (1) "Google used its presence in the ad-server market to

7

channel publishers' most valuable impressions exclusively to AdX." *Id.* (2) "Google automatically enrolled publisher clients into EDA and attempted to mislead publishers to continue using EDA as a way for publishers to maximize yield, when, in truth, Google internally viewed EDA as a way for AdX to 'cherry-pick' high-revenue impressions." *Id.* (3) "As a result, rival ad exchanges were excluded from publishers' high-value inventory." *Id.* (4) "AdX did not transact this inventory due to a superior product or innovation, but because its role in the market for publisher ad servers allowed it to 'g[i]ve itself access to particularly valuable inventory.'" *Id.*

Gannett's EDA allegations parallel the Court's Order. (1) Google's ad server gave "AdX exclusive access to publishers' direct-deal inventory" and "allocate[d] to AdX the most valuable impressions." Compl. ¶ 148, 150. (2) "Google induced publishers, including Gannett, to enable Enhanced Dynamic Allocation by falsely telling them it 'maximizes yield,'" even though Google knew EDA "allowed Google to cherry-pick Gannett's best impressions." *Id.* ¶ 153. "Gannett now cannot feasibly shut off Enhanced Dynamic Allocation." *Id.* ¶ 156. (3) EDA "entrenche[d] AdX's control over the exchange market" because "AdX [could] intermediate transactions that rivals could not reach." *Id.* ¶ 148. In particular, "[e]xchanges participating in header bidding . . . were not permitted to compete against direct deals for many years." *Id.* (4) EDA "created a new incentive for advertisers to bid through AdX" by "resurrect[ing] the pre-header bidding regime for publishers' direct deals — only AdX could bid in real-time." *Id.* Disabling competitive bids from rivals in that manner is not competition on the merits. *See* MTD Op. 46-47. Simply put, there is no meaningful daylight between Gannett's complaint and the Court's Order.

Google's two-paragraph rejoinder ignores Gannett's complaint and the Court's prior ruling. Google asserts (at 11) that "Gannett does not even attempt to explain how [EDA] has excluded rivals" "in any relevant market." That is incorrect, as shown above. Google also

describes EDA (at 11) as "quintessential competition on the merits."  The Court rejected that

claim, too.  *See* MTD Op. 49.  And Google seeks praise (at 11) for "providing a new method for

AdX to compete for direct-deal inventory when there previously was none."  But it is no defense

that Google never before had imposed this scheme to use "its role in the market for publisher ad

servers . . . to '[g]i]ve itself access to particularly valuable inventory.'"  MTD Op. 49 (alteration

in original).  The novelty of Google's approach cuts the other way – publishers cannot track and

understand Google's evolving anticompetitive acts.  *See* Compl. ¶¶ 149, 154-155.

Google concludes (at 11-12):  "The most that Gannett alleges—that the purported

'bypassing' practice depressed its revenue—is harm to Gannett itself as a consumer.  That is

insufficient as a matter of law to plead a violation of Section 2."  Google's remark is inscrutable.

Despite Google's use of quotation marks, "bypassing" appears nowhere in Gannett's complaint.

Google confuses Gannett with other MDL plaintiffs.  *See* MDL Dkt. 401 ¶¶ 269-271.  But

Gannett's complaint is clear:  Google coerced it to sell valuable inventory into a rigged market.

Gannett may seek the resulting harm to its sales as antitrust damages.  *See*, *e.g.*, *J. Truett Payne

Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981) ("in a case involving market exclusion,"

"damages could be awarded on the basis of plaintiff's estimate of sales it could have made

absent the violation").  Those damages include the "depressed prices," Compl. ¶ 156, Gannett

received because of Google's coercion and market manipulation.  *See Gelboim v. Bank of

America Corp.*, 823 F.3d 759, 782 (2d Cir. 2016) ("it is plausibly alleged on the face of the

complaints that a manipulation of LIBOR exerted some influence on price"); *In re London Silver

Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 551 (S.D.N.Y. 2016) (plaintiffs "were harmed

by being forced to sell silver and silver derivatives at artificially suppressed prices as a result of

Defendants' manipulation").[2]  To the extent Google disputes the "net impact" of EDA or how to

calculate damages, those "are matters reserved for later."  *Gelboim*, 823 F.3d at 783; *see In re*

*Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 265 (2d Cir. 2023) (A "damages calculation

for a market manipulation scheme . . . may require expert testimony") (citation omitted).  The

EDA allegations in Gannett's complaint survived Google's motion to dismiss once before, and

they should again.

### B.  Minimum Bid To Win is Anticompetitive Under the Court's Order

The Court's prior Order also forecloses Google's motion to dismiss Gannett's MBW

allegations.  The Court sustained "theories of liability" describing how Google "undermined

exchange-market competition by secretly 'peeking' at rival exchanges in order to inflate bids

placed on AdX for the purpose of directing transactions away from Google competitors."  MTD

Op. 61.  For example, the Court identified a Section 2 claim arising from the "Last Look"

advantage Google enjoys in Dynamic Allocation:  "Google . . . used information obtained

through its DFP ad server to determine the average historical value of bids placed on rival

exchanges, then used that information to calculate a bid that the publisher would be required to

accept."  *Id.* at 46.  Similarly, the Court sustained claims arising from Dynamic Revenue Share:

"[B]y adjusting its fees only after receiving bids and reviewing the bids placed on rival

---

[2] *See also In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 443
(S.D.N.Y. 2015) ( "defendants' actions altered the normal competitive price setting dynamic of
aluminum, resulting in an abnormally high Midwest Premium; and [plaintiffs] were forced to pay
that premium as part of their purchases"); *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F.
Supp. 3d 122, 133 (S.D.N.Y. 2016) ("Merced has pled an antitrust injury causally linked to
Barclay's practices: it is a purchaser of electricity on the daily markets in which it alleges it paid
higher supra-competitive prices or received lower sub-competitive prices as a result of Barclay's
rate manipulation"); *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 93
(S.D.N.Y. 2021) ("The nature of an antitrust injury described in *Gelboim* maps easily onto
Plaintiffs' claims that they purchased cryptocommodities at prices artificially produced by
anticompetitive price manipulation.").

exchanges, Google harmed competition in the market for ad exchanges, including competition on exchanges' take rates."  *Id.* at 57.  Trading on inside information about rivals' bids to defeat competition is unlawful.

MBW's "effect on competition is functionally the same as" Dynamic Allocation and Dynamic Revenue Share.  Compl. ¶ 190.  Because Google (and others) "buy impressions by the thousands" – *e.g.*, an ad campaign – "[t]he minimum price at which a prior auction could have cleared is an incisive predictor into the minimum clearing price of the next, similar auction."  *Id.* With MBW, Google directs its ad server to identify "the second highest price that was placed in the [first] auction" of a many-thousand-impression set, *id.* ¶ 189, and then uses the rival bid information to set its bids "on thousands of immediately following, highly similar auctions," *id.* ¶ 190.  As a result, Google "outbid[s] rivals by a penny" for each succeeding impression.  *Id.* ¶ 191.  "For instance, Google can use the Minimum Bid to Win from one auction to bid on the next impression *for the same user on the same page*."  *Id.* ¶ 190.  Thus, with MBW, Google returns a nominally higher bid and takes the impression from rivals.  *Id.* ¶ 191.  What the Court explained about Dynamic Revenue Share is equally true of MBW:  "Based on information uniquely available to it through its ad-server monopoly, Google ha[s] the ability to alter bids in order to transact impressions it would have lost to rival exchanges."  MTD Op. 57.

MBW not only excludes rival exchanges from competition; it also drives down prices that exchanges return for impressions.  *See Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) ("Monopoly power . . . may be proven directly by evidence of the control of prices").  Google shares the minimum clearing price with certain "'Authorized Bidder[s],' *i.e.*, an exchange or DSP participant in Google AdX or Exchange Bidding," with the expectation they will trade on the inside information, too.  Compl. ¶ 189.  The result is that Google and others buy

ad inventory at "artificially depressed prices." *Id.* ¶ 67.  Encouraging price stabilization is unlawful.  When rivals know each other's bids, it "chill[s] the vigor of price competition." *United States v. Container Corp.*, 393 U.S. 333, 337 (1969).  Prices "stabilize . . . though at a downward level," which is "'but one form of manipulation.'" *Id.* (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)).

In *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) (Sotomayor, J.), the Second Circuit expanded *Container Corp*'s analysis.  In *Todd*, employers exchanged salary offers made to managerial employees in the petrochemical industry.  Wages stabilized at subcompetitive rates – what the Court called "a portrait of market stabilization." *Id.* at 214.  The Second Circuit sustained the employees' complaint under the Sherman Act.  The Court articulated when access to rival bids likely will cause unlawful stabilization toward subcompetitive prices:

(1)    Bid information must be shared among a "high[] concentrat[ion]" of market participants, *id.* at 209;

(2)    Products in the market are easily "fungible" or "comparable," such that tacit coordination on pricing is easier to evaluate and "police," *id.* at 209-210;

(3)    Supply is inelastic, which means that suppliers have limited ability to "withhold[] some output in the market in hopes of higher prices" in the future, *id.* at 211;

(4)    Bid information relates to current rather than prior transactions, because exchange of current data has greater potential to affect future prices, *id.*;

(5)    Bid information identifies "particular . . . transactions" rather than averages, *id.* at 212; and

(6)    Bid information is not "publicly available," *id.* at 213.

These factors are present here.  (1) Because Google controls publisher ad serving, *see* Compl. ¶ 103, it knows what each exchange bids on a per-impression basis, *see* MTD Op. 46, 57, 61.  (2) Impressions are fungible because advertisers target classes of Internet users who are found on many different webpages and generate many comparable impressions.  *See* Compl.

¶¶ 41-42.  (3) The supply of impressions is inelastic because "publishers sell high volumes of impressions in milliseconds" and have "only one chance to accept and assess bids."  *Id.* ¶ 53.  An unsold impression "can never be recovered."  *Todd*, 275 F.3d at 211 (citation omitted). (4) MBW informs bids on "thousands of immediately following, highly similar auctions," Compl. ¶ 190, and has a direct effect on "future prices," *Todd*, 275 F.3d at 211.  (5) MBW is transaction-specific, and (6) not available to all market participants – or even to publishers. Compl. ¶ 189; *see id.* ¶ 202 ("publishers cannot even be sure whether the demand source that ultimately wins an impression was the highest bidder").  In short, under *Todd*, MBW has the same price depressive effect this Circuit and the Supreme Court long have condemned.

The only difference is that Google achieves this result on its own, while the defendants in *Container Corp.* and *Todd* had to coordinate.  Google's anticompetitive ingenuity is not a mark in its favor.  *See, e.g.*, *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015) ("determining when a product change violates § 2 [is] based on the rule-of-reason test articulated by the Supreme Court in *Standard Oil* . . . and generally applied to antitrust claims"); *id.* n.22 ("the analysis under section 2 is similar to that under section 1 regardless whether the rule of reason label is applied per se") (citation omitted); *see also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 760 (1984) (Sherman Act "is aimed at substance rather than form"). Google does not have to ask rivals for their prices because its "ad-server monopoly" gives it the "unique[]" ability to "review[] the bids placed on rival exchanges."  MTD Op. 57.  With full knowledge of rival pricing, Google can inflict the same harm to competition.

For more than two years, Google recognized that MBW states a valid antitrust claim. That is why Google never challenged identical allegations from Daily Mail's complaint.  *See* MDL Dkts. 377, at 5; 589, at 2.  Google's belated arguments in its motion are meritless.  It

asserts (at 12-13) that MBW is "legitimate competition" that offers "better inform[ation]" and "entic[es] advertisers with a superior product that improves their return on ad spend."  Google also observes (at 13) that it "provides MBW data to non-Google buyers participating in AdX."  Google is playing a labeling game.  The supposedly "better" or "superior" information is *inside* information about rivals' bids.  Trading on inside information to exclude rivals is unlawful.  *See supra* pp. 10-11.  And even if "non-Google buyers" participate in AdX, that is beside the point. It is still *Google's* exchange, AdX, that benefits from MBW at the expense of rivals.  *See* Compl. ¶ 192.  Encouraging other buyers in AdX to trade on inside information is also independently anticompetitive, as discussed.  *See supra* pp. 11-13.  Gannett alleges monopolization of an exchange market, *see* Compl. Count 2, and it is no response, particularly on a motion to dismiss, that Google can name two "non-Google" companies that allegedly compete against it in a different market, *see* MTD Op. 10-11 (describing markets for "ad buying tools").

Google's assertion that MBW increases "return on ad spend" is likewise no defense. Google's "improve[d] . . . return" is a euphemism for paying lower prices because it knows "the next highest price to beat."  Compl. ¶ 189.  That simply describes the harm that results from trading on rivals' bids.  *See supra* pp. 12-13.  To the extent Google argues (contrary to fact) that MBW "can enhance competition," that merely introduces "a question of fact that cannot be resolved on this Rule 12(b)(6) motion."  *Todd*, 275 F.3d at 214.  As in *Todd*, "the economic effects of [MBW] is an appropriate matter for discovery," not summary dismissal.  *Id.*

Google also raises (at 13) the tired refrain that Gannett's MBW allegations fail as a matter of law because they do not state "any facts that would support a refusal-to-deal claim." That is a strawman.  MBW is not a refusal-to-deal claim; it is a market-manipulation claim that closely parallels claims the Court already has held plausibly anticompetitive.  *See supra* pp. 10-

14

11.  Indeed, MBW would not make any sense as a refusal-to-deal claim.  If Google encouraged all exchanges to return bids at or near the minimum clearing price, that would stabilize prices yet lower.  In that case, Google would be both a monopolist and the ringleader of a cartel.

## III.    Gannett's Claims Regarding EDA and Line-Item Caps Are Not Time Barred

The defendant must show that a claim is untimely "on the face of the complaint" before a court may order dismissal on statute-of-limitations grounds.  *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014); *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 230 (2d Cir. 2014) (defendant's burden to show untimeliness).  Gannett's EDA and line-item capping allegations are not facially untimely.  *First*, they are "continuing violations" that persist well into the limitations period.  *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968).  *Second*, Gannett's EDA and line-item capping allegations are tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).  *Third*, Gannett's EDA allegations are tolled under the doctrine of fraudulent concealment.

### A.    EDA and Line-Item Capping Are Continuing Violations of Law

A "continuing violation" is one that "inflict[s] continuing and accumulating harm" on a plaintiff.  *Hanover Shoe*, 392 U.S. at 502 n.15.  "[E]ach overt act . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (citation omitted).  In *Hanover Shoe*, the plaintiff filed suit in 1955 challenging a "lease only policy" that had persisted since 1912.  392 U.S. at 502, n.15.  The suit was timely because the unlawful policy "inflicted continuing and accumulating harm."  *Id.*  Likewise, in cases of price suppression, *see W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 106-07 (3d Cir. 2010), and price fixing, "each sale to the plaintiff starts the statutory period running again," *Klehr*, 521 U.S. at 189; *In re*

*Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1065-66 (8th Cir. 2017) (collecting cases).  EDA and Google's line-item caps are "continuing violations" for limitations purposes.

    **1. EDA.**  Since 2014, Google has imposed EDA on each high-value impression that publishers make available for sale through a direct deal.  *See* Compl. ¶ 32.  Google identifies the impression, calculates the temporary CPM, sends the CPM to AdX as a price floor, and then AdX takes the impression if it bids one penny higher than the Google-calculated, "temporary" price.  *Id.* ¶ 147; MTD Op. 48-49.  "As a result," over millions of ad auctions, "rival ad exchanges [are] excluded from publishers' high-value inventory."  MTD Op. 49.  To this day, Gannett must "accept depressed prices" for each auction subject to EDA.  Compl. ¶ 156.

    Each time EDA manipulates the "sale" of an impression, *Klehr*, 521 U.S. at 189, Google inflicts a "continuing and accumulating harm" that restarts the statute of limitations.  *Hanover*, 392 U.S. at 502 n.15; *see also Pollis v. New Sch. for Soc. Rsch.*, 132 F.3d 115, 118 (2d Cir. 1997) (a plaintiff "may recover on the basis of an ongoing policy or practice of illegal activity initiated prior to the limitations period").  With EDA, Google has "maintain[ed] market control and overcharge[d] [Gannett] for a period longer than four years," and so Gannett "maintain[s] a right of action for any overcharges paid within the four years prior to [its] filing[]."  *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002); *see also Turner v. McDonald's USA, LLC*, 2020 WL 3044086, at *4 (N.D. Ill. Apr. 24, 2020) ("each time plaintiff was paid a depressed wage for her labor, she was injured and the four-year statute of limitations for that injury began").  "So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide."  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979).

*US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019), does not counsel otherwise.  There, the Second Circuit held that supracompetitive prices paid over several years pursuant to a one-off contract outside the limitations period did not trigger *Hanover Shoe*.  *Id.* at 68-69.  Here, by contrast, there is no EDA "contract."  It is a market manipulation imposed by Google on an impression-by-impression basis.  *See* MTD Op. 48-49; *see also In re Pre-Filled Propane Tank Antitrust Litigation*, 860 F.3d at 1067 (contrasting price fixing cases from contract cases).  Indeed, Google unilaterally refines EDA from time to time to further cement its control over the exchange market – as recently as 2020.  *See* Compl. ¶ 147 ("Optimized Competition"). EDA in its current form is, at most, three years old.  And, regardless, it is not clear "on the face of the complaint," *Ellul*, 774 F.3d at 798 n.12, that Gannett's current GAM agreement is more than four years old.  Google imposes new agreements from time to time.  *See* Compl. ¶¶ 120, 274.  So, to the extent *US Airways* applies, dismissal under Rule 12(b)(6) remains unwarranted.

**2. Line-Item Caps.**  Like EDA, Google's line-item cap policy is ongoing and distorts millions of auctions for Gannett's inventory.  As Gannett explains, rather than allowing publishers to submit the winning bid from client-side header bidding directly into the ad server, Google requires publishers to pre-set numerous "line items" that correspond to potential bids.  *Id.* ¶ 205.  In order to capture accurate bids from header bidding exchanges, a publisher must create line items for each potential bid (*e.g.*, $4.20, $4.21, $4.22, etc.).  *Id.*  If there is no line item that corresponds with the winning header bidding bid, that bid is "rounded *down* to the nearest line item," hindering the exchange's ability to compete with AdX.  *Id.*

In 2017, Google instituted a policy limiting the number of line items a publisher could create, meaning publishers like Gannett could not configure line items to account for all winning bids from header bidding exchanges.  *Id.* ¶ 206; MTD Op. 68.  So long as AdX can beat the

rounded-down rival bid by a penny, it wins the impression, even if the true header bidding bid is higher.  *Id.*  Google enforces line-item caps to this day.  Otherwise, publishers would configure their ad servers to maximize the value of the bids they receive through header bidding.  Compl. ¶ 209.

Line-item capping is an "ongoing policy" that manipulates millions of auctions for Gannett's inventory.  *Pollis*, 132 F.3d at 118.  Each auction with a header-bidding exchange now includes an artificial discount imposed by Google – either in the form of a lower header bidding price or a lower price from Google to beat it.  That Google began imposing line-item caps in 2017 does not insulate the policy from scrutiny today.  Line-item caps inflict a "continuing and accumulating harm" that restarts the statute of limitations.  *Hanover Shoe*, 392 U.S. at 502 n.15.

**B.      Under *American Pipe* Tolling, Gannett Can Recover for Google's Continuing EDA and Line-Item Capping Violations ~~for an Additional Two Years~~At Least from December 16, 2016**

In addition, because Gannett has been a member of ~~the~~proposed publisher ~~class~~classes that brought EDA and line-item-capping claims in ~~2021~~2020,[3] Gannett may recover damages related to EDA and line-item capping under a continuing-violations theory ~~for an additional two years~~ at least from ~~April 5, 2017~~December 16, 2016.  Under *American Pipe*, 414 U.S. 538, the filing of a class action tolls the statute of limitations for opt-out plaintiffs.  *See also In re WorldCom Sec. Litig.*, 496 F.3d 245, 254-256 (2d Cir. 2007).  Despite Gannett's raising the doctrine in its pre-motion letter, Dkt. 589 at 4, Google ignores it entirely.  Gannett's EDA and line-item-capping claims satisfy each of the requirements for *American Pipe*.  *See WorldCom*,

---

[3] *See* Complaint, ~~*In re Google Digital Publisher Antitrust Litigation*,~~*Genius Media v. Alphabet Inc.,* No. 20-cv-~~08984~~9092 (N.D. Cal. ~~Apr. 5, 2021~~Dec. 16, 2020), ECF No. ~~64~~1 ("Publisher Class Compl.~~")~~.."); *see also* Class Action Complaint, *Devaney v. Google LLC*, No. 20-cv-4130 (N.D. Cal. June 22, 2020), ECF No. 1.  In this posture, the Court need not decide the precise date when *American Pipe* tolling begins to run.

496 F.3d at 246, 255 (explaining *American Pipe* applies when a "putative class member[ ]" later separately brings the "same claims" after the "initiation of a class action put[ ] the defendants on notice of the claims against them"); *see also* 3 *Newberg and Rubenstein on Class Actions* § 9:56 (6th ed.).

*First*, Gannett was a member of the asserted ~~class in *In re Google Digital Publisher Antitrust Litigation*.~~classes.  *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983) ("Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied."); *see also Newberg and Rubenstein on Class Actions* § 9:56.  For example, Gannett is a "person[ ] that received revenue ~~directly~~ from Google for displaying advertisements using Google's Ad Exchange services from ~~December 15, 2016~~four years prior to the date of this Complaint's filing through the present (~~"~~(the Class ~~Period"~~Period)."  Publisher Class Compl. ¶ ~~192~~101.

*Second*, the ~~Publisher Class Complaint~~publisher classes asserted the same causes of action as Gannett's complaint.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1015, 1021 (N.D. Cal. 2014) (*American Pipe* requires "the same cause of action subsequently asserted"); *Newberg and Rubenstein on Class Actions* § 9:56.  Whether two causes of action are the same is a "[f]unctional" inquiry, *Cullen v. Margiotta*, 811 F.2d 698, 720 (2d Cir. 1987), to determine whether a defendant "was . . . fairly placed on notice by the class suit" and "will not be prejudiced" by tolling, *Crown Cork*, 462 U.S. at 355 (Powell, J. concurring).  If subsequent individual claims "involve the same evidence, memories, and witnesses as were involved in the initial putative class action," *American Pipe* tolling applies.  *Cullen*, 811 F.2d at 720.

~~The~~For example, the Publisher Class Complaint put Google on notice that it needed to preserve evidence regarding EDA and line-item caps.  The Class Complaint~~, by its terms,~~

~~mirrored the suit filed by "a number of attorneys general . . . in Texas to remedy Google's~~ ~~unlawful conduct with respect to display advertising."  Publisher Class Compl. ¶ 19.  The States'~~ ~~suit—filed months earlier,~~ *see* ~~Complaint,~~ *Texas v. Google LLC,* ~~No. 20-cv-00957 (E.D. Tex.~~ ~~Dec. 16, 2020), ECF No. 1—specifically alleged that EDA and line-item caps are unlawful,~~ *see* ~~id.~~ ~~¶¶ 144-52 (EDA), 205 (line-item caps).  The Class likewise~~ pleaded allegations regarding ~~EDA,~~ *see* ~~Publisher Class Compl. ¶¶ 88, 106-09, 150, and~~ Google's unlawful efforts ~~"to slow down~~to "impose[ ] anticompetitive rules," *id.* ¶ 2, "award[ ] more winning bids to Google's Ad Exchange," *id.* ¶ 4, "impede[ ] . . . header bidding," *id.* ¶ ~~13.~~¶ 6, and give Google's exchange "first-in-line privilege," *id.* ¶ 50.  The Class also identified EDA in its April 5, 2021 consolidated complaint[4] and line-item caps as an "anticompetitive response[ ] to Header Bidding" in its December 5, 2022 amended complaint. ~~MDL Dkt. 108 ¶¶ 296-309.~~[5]  Given the substantial overlap between the ~~two complaints~~Class Complaint and the State-led complaint filed in December 2020, Google understood its discovery obligations to be identical in each case.  Days after the Class filed ~~suit~~its consolidated complaint, Google asked the JPML to create this MDL because the States' and Publisher Class's allegations supposedly required "discovery into the same Google products" and "production of the same documents and depositions of the same witnesses."  Br. Supp. Mot. to Transfer at 9, *In re Digital Advertising Antitrust Litig.*, MDL No. 3010 (J.P.M.L. Apr. 30, 2021), Dkt. 1-1.  The "same" discovery necessarily included EDA and line-item caps.

[4] *See* Complaint ¶¶ 106-109, *In re Google Digital Publisher Antitrust Litig.*, No. 20-cv-08984 (N.D. Cal. Apr. 5, 2021), ECF No. 64.

[5] MDL Dkt. 408 ¶¶ 296-309.

*Third*, Google is the defendant both here and in the class complaint.  *See In re Processed Egg Prods. Antitrust Litig.*, 2013 WL 4504768, at *7 (E.D. Pa. Aug. 23, 2013); *see also Newberg and Rubenstein on Class Actions* § 9:56 (noting that the plaintiff "must press that claim against an individual whom the purported class action named as a defendant").  Thus, Gannett may recover damages related to EDA and line-item caps incurred at least since ~~April 5, 2017~~December 16, 2016.

### C.     Independent of Google's Continuing Violations, Gannett's EDA Claim Is Timely Because Google Fraudulently Concealed It

Separately and additionally, Gannett's EDA claim was tolled because Google fraudulently concealed material facts underlying that claim.  *See* Compl. ¶¶ 147-55.  Fraudulent concealment requires an antitrust plaintiff to show:  "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence."  *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

Google purports to agree with this standard (at 16), but analyzes only whether Google "fraudulently concealed *alleged injuries*," *id.* (emphasis added).  The relevant question is whether the plaintiff is aware of "the existence of the cause of action," *Hendrickson Bros.*, 840 F.2d at 1083, or "the nature of the claim," *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 265 (S.D.N.Y. 2006) – of which injury is just one part.  *See Hendrickson Bros.*, 840 F.2d at 1083 (analyzing whether the defendant "took affirmative steps to prevent the plaintiff's discovery of his claim *or* injury") (emphasis added); *see also Hamilton Cnty. Bd. of Comm'rs v. Nat'l Football League*, 491 F.3d 310, 315 (6th Cir. 2007) (explaining that, for fraudulent concealment of a § 2 claim, the "material facts underlying [the] antitrust

claim" are "evidence of . . . potential monopoly power and its use of that power").  As the Court explained 13 months ago, "publishers would have quickly been aware that EDA existed, but [would] not . . . have been able to readily observe its anticompetitive effects or purpose."  MTD Op. 85-86; *cf. In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 488 (W.D. Pa. 1999) ("the issue is not whether plaintiffs knew that the prices paid were higher than they should have been, rather . . . kn[owledge] of the alleged conspiracy among defendants").

Gannett's allegations satisfy the elements of fraudulent concealment.  *First*, the complaint alleges that Google concealed Gannett's cause of action with respect to EDA.  For example, "Google never has given publishers insight into" key elements of EDA, including "how DFP calculates the temporary CPM it sends as a price floor, or how Optimized Competition adjusts that temporary CPM."  Compl. ¶ 149.  Because of Google's lack of transparency, Gannett could not "verify whether the temporary CPM understate[d] the value of a direct deal for any particular impression."  *Id.*  Gannett could not know the extent to which (or how) it was being harmed by EDA – much less whether EDA gave rise to an actionable antitrust claim.  *See id.* ¶ 154 (noting that, to this date, despite "repeated requests, Google never has made available any data or analytics that would allow Gannett to track how AdX competes with direct deals with Enhanced Dynamic Allocation (*e.g.*, how DFP calculates 'temporary' CPMs.)").

In a similar vein, Google "represented to Gannett that Enhanced Dynamic Allocation would not cause Gannett to under deliver on its direct deals with advertisers" and "assured Gannett that a certain subset of the most valuable direct deals, called 'sponsorships,' would be completely immune from Enhanced Dynamic Allocation."  *Id.* ¶ 152.  Indeed, "Google even commissioned a study" to assure Gannett that it was not being harmed by EDA.  *Id.* ¶ 151; *see also id.* (Google claimed EDA "maximizes yield" and "promis[ed] higher revenue" if Gannett

enabled EDA).  These claims and statements were false, and again worked to conceal that

Gannett had a valid EDA claim.  These allegations go far beyond the "entirely conclusory"

allegations of active concealments found insufficient in *Kearse v. Kaplan*, Inc., 692 F. Supp. 2d

398, 401 (S.D.N.Y. 2010), which Google cites (at 16).  And the references to specific

misrepresentations by Google – including Google's *commissioning of a study* that falsely

claimed EDA "increased revenue by 19%" – satisfy the requirements of Rule 9(b).

*Second*, the complaint alleges that Gannett remained unaware of its EDA-related cause of

action until 2020 (at the earliest).[6]  That was when antitrust enforcers "recognized . . . Google's

unlawful monopolization" and began filing antitrust cases against Google for its ad-tech-related

conduct.  Compl. ¶ 16; *see also id.* (detailing variety of government enforcement actions brought

in 2020, including the Texas-led state complaint filed on December 16, 2020).  The facts

underlying Gannett's valid antitrust claim – including Google's market power and, as relevant

here, how EDA affected competition in the market for exchanges – has been revealed only due to

the efforts of government investigators.  *See id.* ¶ 153 ("as investigations from domestic and

foreign antitrust enforcers recently have revealed, Google knew that Enhanced Dynamic

Allocation improved only its yield, not publishers' bottom line").

---

[6] To be sure, Gannett recognized that EDA specifically was causing harm in 2018.  *See*
Compl. ¶ 155 ("In 2018, Gannett discovered that Enhanced Dynamic Allocation had permitted
AdX to steal inventory from Gannett's sponsorship deals.").  But again, awareness of one injury
in the abstract does not establish awareness of the material facts giving rise to an antitrust cause
of action.  *See Flat Glass Antitrust Litig.*, 191 F.R.D. at 488.  Regardless, if the Court finds that,
based on this allegation, Gannett's EDA claim ceased to be tolled by fraudulent concealment at
that point (*and* is not subject to a continuing violation theory), then it was tolled in ~~2021 by the
filing of the Publishers Class Action Complaint~~2020 under *American Pipe*.  *See supra* Section
III.B.  In that case, Gannett would be permitted to recover beginning ~~on April 5, 2017.~~ no later
than December 16, 2016.

*Third*, the complaint adequately alleges that Gannett's ignorance of its claim was not due to a lack of diligence.  As the complaint demonstrates, Gannett repeatedly sought additional information from Google about DFP and why it appeared to be underperforming.  For example, "Gannett complained that DFP was not delivering on direct deals, despite Google's explicit assurances otherwise."  *Id.* ¶ 154.  Gannett also made "repeated requests" for "data or analytics that would allow Gannett to track how AdX competes with direct deals with Enhanced Dynamic Allocation (*e.g.*, how DFP calculates 'temporary' CPMs)" – but to no avail.  *Id.*  Google affirmatively misled Gannett in response to these inquiries.  *See id.* ¶ 154 ("Google initially denied there was a problem, then later claimed to have fixed the problem[.]"); *id.* ¶ 155 ("Google claim[ed] to have resolved" the issue regarding sponsorship deals).  Google's puzzling suggestion (at 18) that Gannett "complain[ed] once in 2014" and then did not do "anything further to investigate or follow up" is false.

This Court already has recognized the allegedly underhanded nature of Google's EDA-related conduct in its prior Order.  The Court noted that Google's alleged conduct "lacked transparency, occurred out of the public eye, and had effects that were not immediately obvious or well understood."  MTD Op. 84.  "Google's rollout of EDA was opaque, and accompanied by misrepresentations about its intent and effects" meaning publishers could not "observe its anticompetitive effects or purpose."  *Id.* at 85-86.  The Court specifically noted that Google's conduct "complicates the question of whether the States' claims accrued prior to December 16, 2016, or sometime thereafter," and found that "[t]he issue is more properly revisited on a more developed record following discovery."  *Id.* at 85.  Those same observations apply here.

*        *        *

Google's motion mischaracterizes Gannett's allegations and either misapplies or ignores relevant doctrines that demonstrate Gannett's claims are timely.  At the very least, dismissal under Rule 12(b)(6) is improper because there are numerous factual disputes about the application of the statute of limitations.  The Court should reject Google's invitation to resolve fact-specific statute of limitations inquiries at this early stage.  *Cf. Mandarino v. Mandarino*, 180 Fed. App'x 258, 261 (2d Cir. 2006) ("the District Court should not have resolved the fact-specific equitable tolling issue on defendants' motion to dismiss" because when "facts are disputed, the best practice is to analyze" the question "in the context of summary judgment").[7]

## IV.   Any Dismissal Should Be Without Prejudice

If the Court decides to grant Google's motion in any part, dismissal should be without prejudice.  "[T]he Second Circuit has instructed courts not to dismiss a complaint without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *A.F. ex rel Fogel v. Sorin Grp. USA, Inc.*, 346 F. Supp. 3d 534, 545 (S.D.N.Y. 2018) (cleaned up); *see Ying Li v. City of New York*, 246 F. Supp. 3d 578, 646 (E.D.N.Y. 2017) (dismissing with prejudice only after the "Court already permitted Plaintiff the opportunity to amend the complaint").  Consolidation in an MDL does not change that rule.  *See Gelboim*, 574 U.S. at 413 ("Cases consolidated for MDL pretrial proceedings ordinarily retain their separate identities."); *In re Nat'l Prescription Opiate Litig.*, 956 F.3d at

---

[7] That is especially true when, as here, resolution of the question would not meaningfully impact the scope of discovery.  As explained above, EDA and Google's line-item capping policy are inalterable features of Google's ad server.  The complaint alleges, and Google's motion does not dispute, that Gannett was coerced to license Google's ad server through an unlawful tie.  *See* Compl. ¶¶ 108-22.  Even if the Court determines that Gannett's claims are untimely, Gannett still would require discovery into EDA and line-item caps to understand how Google's unlawful tie damaged Gannett.

845 ("[A] party's rights in one [MDL] case" cannot "be impinged to create efficiencies in the MDL generally").  Gannett has not yet amended its complaint.

Google has not shown that "amendment would be futile."  *Owoyemi v. Credit Corp Sols. Inc.*, 596 F. Supp. 3d 514, 521 (S.D.N.Y. 2022).  Like its motion to dismiss Daily Mail's complaint, Google contends only that Gannett fails to plead facts regarding coercion (at 6-7, 10), procompetitive justifications (at 8-10, 13), and the scope of foreclosure (at 6, 9-10).  These supposed defects "could be cured by amendment."  *Owoyemi*, 596 F. Supp. 3d at 521.  And, contrary to Google's insinuation (at 19), dismissal with prejudice on timeliness grounds is disfavored.  *See*, *e.g.*, *Kearse*, 692 F. Supp. 2d at 402 (dismissing without prejudice because court could not "exclude the possibility that plaintiff could sufficiently allege fraudulent concealment").

## CONCLUSION

For the foregoing reasons, Google's motion to dismiss should be denied.

26

Dated:  October 616, 2023

/s/ *John Thorne*
John Thorne
Daniel G. Bird
Bethan R. Jones
Christopher C. Goodnow
Mark P. Hirschboeck
Eliana Margo Pfeffer
Eric J. Maier
Sven E. Henningson
Tiberius T. Davis*
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street NW
Suite 400
Washington, DC 20036
Tel.:  (202) 326-7900
Fax:  (202) 326-7999
Email:  jthorne@kellogghansen.com
        dbird@kellogghansen.com
        bjones@kellogghansen.com
        cgoodnow@kellogghansen.com
        mhirschboeck@kellogghansen.com
        epfeffer@kellogghansen.com
        emaier@kellogghansen.com
        shenningson@kellogghansen.com
        tdavis@kellogghansen.com

* Not admitted in the District of Columbia.  Practice
  supervised by members of the firm.

*Counsel for Plaintiff Gannett Co., Inc.*

27