NB2GgooC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE GOOGLE DIGITAL
ADVERTISING ANTITRUST
LITIGATION
                                         21 md 3010 (PKC)

                                         Conference
------------------------------x
                                         New York, N.Y.
                                         November 2, 2023
                                         2:00 p.m.

Before:

                    HON. P. KEVIN CASTEL,

                                         District Judge

                        APPEARANCES

GIRARD SHARP LLP
     Attorneys for Plaintiff Advertisers
JORDAN ELIAS

KELLOG HANSEN TODD FIGEL & FREDERICK PLLC
     Attorneys for Associated Newspapers
JOHN THORNE

HERMAN JONES LLP
     Attorneys for Direct Action Newpaper Plaintiffs
SERINA MARIE VASH

BOIES SCHILLER & FLEXNER
     Attorneys for Publisher Plaintiffs
PHILIP KOROLOGOS

FRESHFIELDS BRUCKHAUS DERINGER US LLP
   Attorneys for Defendant Google LLC
ERIC MAHR
ROBERT JOHN McCALLUM
```

1           (Case called)
2           THE COURT:  Appearing for the plaintiffs, please.
3           MR. KOROLOGOS:  Good afternoon, your Honor.  Phil
4  Korologos for the publisher class.
5           MR. ELIAS:  Good afternoon, your Honor.  Jordan Elias
6  for the advertisers.
7           MS. VASH:  Good afternoon, your Honor.  Serina Vash on
8  behalf of the newspaper publisher plaintiffs.
9           MR. THORNE:  Good afternoon, your Honor.  John Thorne
10 on behalf of associated newspapers.
11          MR. KELSTON:  Good afternoon.  Henry Kelston, also for
12 plaintiff advertisers.
13          THE COURT:  And appearing for Google.
14          MR. MAHR:  Hello, your Honor.  Eric Mahr for Google.
15 I'm with my colleague, Robert McCallum.
16          In addition, you may be aware that we are not
17 participating in the Daily Mail case, we're recused from that
18 one.  I don't think we will have any Daily Mail specific
19 issues, but if we do, we are joined by the Axiom firm.
20          THE COURT:  Thank you very much.
21          So let's begin with where I think we are.  And it's
22 important that your judge get this right.  So I want to make
23 sure I understand where we are.  So at this stage of the game,
24 Google has agreed to run what it calls, quote, over 200 search
25 terms and 158 custodians.  And the plaintiffs point out that

1   fewer than a half of those search terms and only seven of the
2   custodians were specifically requested by the plaintiffs in
3   this case, recognizing that we are coordinating with the
4   litigation in Eastern District of Virginia and now the state
5   case, which has been remanded to the district court in Texas.
6   　　　　　So what I am a little bit confused about is whether or
7   not that search has been done, is in the rear view mirror and
8   that's what produced what is now a total of approximately
9   6 million documents.  Have those searches been done and have
10  productions pursuant to those searches been completed or are
11  they yet to be done, Mr. Mahr?
12  　　　　　MR. MAHR:  I believe the answer is yes for that, your
13  Honor.
14  　　　　　THE COURT:  They are done?
15  　　　　　MR. MAHR:  Yes.
16  　　　　　THE COURT:  And they are produced?
17  　　　　　MR. MAHR:  Yes.
18  　　　　　THE COURT:  So the bid and ask today is the plaintiffs
19  seek to have Google run ten additional search terms and include
20  22 additional custodians, three of the custodians identified by
21  all plaintiffs; four by Daily Mail; five Gannett; and ten by
22  Inform.
23  　　　　　Am I correct that that's what is at stake at this
24  stage?
25  　　　　　MR. KOROLOGOS:  With respect to custodians, yes, your

1  Honor, with one subpart, which is that, while those are the
2  numbers of custodians, plaintiffs' position is that for the
3  three to four -- I'm sorry -- for the four, the five and ten
4  that are specific to Daily Mail, Gannett and Inform, those
5  would be run on --
6       THE COURT:  47 of the searches, about half of the
7  searches.
8       MR. KOROLOGOS:  No, 47 would not run.  Take away 47
9  search terms for those custodians.
10      And then the flip side is that Google's position
11 instead of ten for Inform, six or Inform, but still the four
12 and five for Daily Mail and Gannett.  But for those four, five
13 and six, Google's position is that there should be a cap on
14 each of the four, the five and the six of 50,000 documents for
15 those additional custodians.
16      THE COURT:  Mr. Mahr, I think Mr. Korologos tried to
17 do your advocacy for you.  Do you want to take a shot at your
18 own?
19      MR. MAHR:  I didn't hear any advocacy, but I think he
20 correctly stated our bid, as you would call it.
21      THE COURT:  So let me ask a question of Ms. Vash
22 regarding custodians.  And it may be ignorance on my part, but
23 when I looked at the identity of custodians that Inform was
24 proposing, I noticed that there was a senior technical account
25 manager, an ad tech engineer.  And a question, why would they

1    be individuals who would likely have documents relating to
2    Inform?
3              MS. VASH:  Thank you, your Honor.
4              The senior ad tech engineer and the technical account
5    managers, those are the folks that dealt with my client in
6    terms of issues with respect to dynamic allocation, enhanced
7    dynamic allocation, DFP and ad ex in terms of the software
8    development kit that Google provided to Inform that was
9    integrated into each of its video players.  So those were the
10   folks that my guys went to and said, wait a minute, this
11   doesn't look like anything is right here.  And those were the
12   folks that were saying, no, no, it's fine, it's right, it's
13   okay, no problem.  And then a week later, coming back, wait a
14   minute, there was a problem, and oh, by the way, we found a
15   bigger problem.  And we need to know what happened.
16             THE COURT:  This is the failure to autoplay the
17   audibility issues and the other technical issues in integrating
18   Inform's online video platform; is that what we're talking
19   about?
20             MS. VASH:  In part.  But also, Judge, as respects all
21   plaintiffs here, issues with respect to dynamic allocation,
22   issues with respect to enhanced dynamic allocation, why do we
23   have a direct ad campaign that's pacing at 13 percent and all
24   of our ads are being billed by ad ex programmatic ads.  These
25   are the questions being asked to these folks, at the very heart

Case 1:21-md-03010-PKC   Document 665   Filed 11/13/23   Page 6 of 20      6
NB2GgooC

1    of not only our case.  But these documents, which everyone
2    would be getting in this case, would be helpful to determine
3    what happened with respect to dynamic allocation and enhanced
4    dynamic allocation in real time.
5                THE COURT:  And this is based on the fact that your
6    client's personnel had direct communications with Keston and
7    Solinki, the two individuals I'm referencing, so they actually
8    had email or voice communications or written communications
9    with them?
10               MS. VASH:  Yes, sir.  And weekly meetings and
11   sometimes daily meetings.
12               THE COURT:  Mr. Mahr.
13               MR. MAHR:  If I could step back to address that,
14   because I think it's an important point, the Inform point.
15   Because I think we're here to address problems that you have
16   already solved.  And we worked very hard to not be here, and as
17   I look back, we worked too hard.
18               Because you set up a process in PTO3 that should
19   resolve all of this.  And that process was:
20               One, get a steering committee of five and have them do
21   the negotiations intently with the plaintiffs and then they
22   come and negotiate with us.  Plaintiffs haven't done that at
23   all.  We're regularly on with ten people.
24               Second, we're supposed to come up with common
25   responses, common requests at the first wave.  As you just

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

pointed out, these are very specific, people who were talking to Inform's business people, those aren't common requests anymore.  We got 301 in our first draft of RFPs, and 50 of them were very individually specific, but we kept going, trying to get this done.  And you set up in PTO3, if an individual, like Inform, later has some discovery it needs that's unique and nonduplicative and they can show it's proportional under Rule 26, then they apply to you to do that discovery.

We thought we could get it all done together.  That hasn't happened.  But our proposal -- and this is a high level; if you want to talk about details, that's why Mr. McCallum is here -- our proposal tries to reinstate that original plan.  Let's get the ESI and search term custodian searches done with, that's our proposal, 50,000 each.  That still keeps alive the ability of individual plaintiffs to come back and apply to you for additional discovery.

But they have 6 million documents, 200 terabytes.  They haven't even loaded all the documents.  And it's at the point they ought to go see what they have before they come back and ask the Court to order more, and that's why we think it should be addressed.

THE COURT:  Mr. Mahr, I understand your last point about they have their hands full with what they have already.  But in the case of Inform -- and I focus on them -- they claim to be in a unique posture, because they claim to be also a

1    competitor of YouTube.  They have allegations which are unique.

2             And something you said crosses my mind.  If we know
3    right now that this is going to be requested, there is an
4    efficiency in getting it done now.  Yes, there's a process.
5    But in this instance, it seems to me that flexibility is
6    prudent and get this out of the way, and it's done.

7             And I know that you have approached this entirely
8    differently, as I read it -- and I may be getting this wrong,
9    that's why I want to run this by you, because maybe I'm missing
10   something here -- when you say 50,000 documents, you are
11   looking at the number of hits and then you're saying, well,
12   hits may include duplicates or near identicals, and if you
13   depopulate or deduplicate, that eventually, a number of actual
14   documents being produced should be 50,000.  But 50,000 is an
15   arbitrary number.  I mean, is there any magic to 50, rather
16   than 40 or 60 or 80 in your world?  It's a number, it's just
17   simply a number.

18            MR. MAHR:  There isn't any magic to it, other than it
19   follows your admonition that the perfect shouldn't be the enemy
20   of the good.  We have to move past this initial stage.  That's
21   why I'm worried we have been too flexible, becauase we have a
22   lot of individual discovery in this first tranche, which was
23   supposed to, by your order, be focused on common requests.  And
24   we didn't want to come in here after every meet-and-confer when
25   they were pushing individual.  At some point, we need to get

back on the track that you originally established.

THE COURT:  Well, I certainly want to do that.  That was the thrust of the order I put out on October 26th and my discussion of finality.  I share your pain and your desire for finality, but that's not necessarily how document production in any case goes.  It is possible to learn from the document production or to learn from the depositions of avenues that you did not know of at an earlier point in time.

Now, proportionality means we don't chase down every possible theoretical avenue that could exist.  But there's a recognition that things can change, so it would be unwise for a judge to throw the steering wheel out the window and say, no, nay, never, and I'm not going to say that.

MR. MAHR:  And that's not our proposal, your Honor. We don't propose to do anything to the third part of your PTO3, which is, if they come back with unique, nonduplicative, nonoverburdensome requests that go to their specific claims, of course, if they discover those in discovery or in depositions in some way, of course, as you ordered before, they could come back.  It's just trying to get this first ESI, search terms and custodians discovery done and then get to that point.

THE COURT:  Listen, I don't think today is necessarily a waste of time or briefing on this is a waste of time, because something approaching finality is highly desirable, though it can't be guaranteed.  It's certainly a strongly held aspiration

1   here.  So in that, I share it with you.  And it's fine that we
2   got together.
3        But I will give you a last shot as to why I should not
4   grant the plaintiff the relief which they seek in the proposed
5   order they tendered as Exhibit 1 to the November 1 letter, and
6   it keys off of attachments -- at least attachment B of the
7   October 20th letter.
8        MR. MAHR:  I think, running -- we started with our
9   proposal of 80 search terms.  They came back and said, we want
10  200 more.  I think we are now at -- that would be 280, I think
11  we're at 211.
12       THE COURT:  I get this.  You don't want to be
13  henpecked.  If what you are saying to me -- because I'm
14  sympathetic to this -- if you order this today, Judge,
15  tomorrow, it's going to be another 10 terms and another 12
16  custodians and then the following week, something else.  I'm
17  sympathetic to that.  But I don't think it addresses
18  specifically what I need to do here.
19       Maybe I need to say, stop it, enough, take your
20  depositions.  And if things come out as a result of the
21  millions of documents you have and the testimony in the
22  depositions, come back, talk to the other side.  I'm not
23  suggesting anyone has acted unreasonably here.  I have not been
24  shy in saying that where I thought that was true.
25       But I have read the plaintiffs' position, I don't

1  think they have acted unreasonably.  And I think the concerns
2  you have voiced are not unreasonable.
3        But what my instincts tell me is that the proposal
4  that the plaintiffs have made, which has been narrow and
5  renegotiated, et cetera, is not unreasonable and that I should
6  adopt it.  And I've delivered the message, get on with the
7  depositions, get on with the rest of discovery.  And I don't
8  expect anybody to be back here with follow-ups and not taking
9  yes as an answer from the Court.
10        Taking yes as an answer from the Court is not a
11  license to come back next month.  You've got to show me some
12  reason why, if I go down this path, this is essentially it,
13  essentially it.  Come in with something very concrete, very
14  specific and very clear, and I'll keep an open mind.  But I
15  don't want to hear that, oh, well, you know, Inform and the
16  Daily Mail got something out of this, what am I, chop liver?  I
17  have some things I want, other members of the plaintiffs bar in
18  this case.  I'm not going to stand for that.
19        MR. MAHR:  I understand, your Honor.  And I appreciate
20  that.
21        I think, with respect to this specific -- the
22  difference between 22 custodians across whatever, 160, 155
23  search terms, is potentially massive and another Google has to
24  go back to the mill and go through another massive document
25  production.  That's why we're suggesting, at this stage, if

1   they could target them so that it's 50 hit documents, that

2   would make it more reasonable.  They can always come back

3   again.

4            But these are claims where we don't even have a

5   complaint that survived a motion to dismiss yet.  And in the

6   case of Inform, we have one that's twice been dismissed by the

7   transferee court.  So they have to go back and --

8            THE COURT:  I've read those decisions.  They're unique

9   to, it seems to me, to local practice there in some respects.

10           I have a bellwether decision out there.  The concept

11  of the bellwether is it presumptively applies.  That's good and

12  bad for everyone in this room.  You're going to have to live

13  with that, unless there is some cogent reason why that ruling

14  ought not apply.  So that's water under the bridge.

15           As I understand it, I think it was with respect to the

16  individual plaintiffs that about 400,000 of the hits, if I'm

17  remembering this correctly, were just from the names of the

18  individual plaintiffs and alternative variations on that name.

19           Is that right, Mr. Mahr or Mr. Korologos, is that

20  right?

21           MR. KOROLOGOS:  That's close, your Honor.  430 of the

22  pre-deduplication hits are from the names of individual

23  plaintiffs, but also the names of the class representatives of

24  the publisher class.

25           THE COURT:  And that's 430,000 out of 500,000?

1    MR. KOROLOGOS:  Out of 642,000.

2    THE COURT:  642,000.  And that's prior to
3    deduplication?

4    MR. KOROLOGOS:  That's correct, your Honor.

5    THE COURT:  Do you agree, Mr. Mahr?

6    MR. MAHR:  I don't have any reason to dispute that.

7    THE COURT:  So going once, going twice, Mr. Mahr,
8    anything else you want to say?

9    MR. MAHR:  The only thing I'll say is just that this
10   sounds like this is just a little extra, and Google is big --

11   THE COURT:  I don't think it's a little extra.

12   MR. MAHR:  -- it's a 14 percent increase in the number
13   of custodians, the majority of them are by these individual
14   plaintiffs who weren't even supposed to be part of this
15   original common set of discovery.  And we think, in light of
16   all of that, that there should be a limited response to those,
17   as we have proposed.  And then they can come back if they
18   didn't get what they want.

19   THE COURT:  Thank you.

20   I'm going to sign the proposed order tendered by the
21   plaintiffs, with the caveats that I have made on this record.
22   And I really don't think you want to test that.

23   MR. KOROLOGOS:  We don't, your Honor.  And we hear you
24   loud and clear.

25   THE COURT:  Anything further?

1           Yes, Ms. Vash.

2           MS. VASH:  Thank you, your Honor.

3           No, sir, we do not want to test that.

4           I do want to point out that the Court did issue an
5   order with respect to Inform on October 19th, and we will be
6   providing those search terms to this Court, those RFPs to this
7   court within a week.  I will provide to the Court an
8   appendix --

9           THE COURT:  Explain this to me, now.  Refresh my
10  recollection.  I might have screwed up badly here, so tell me
11  what order I did and what I said.

12          MS. VASH:  Your Honor, on October 19th, the Court
13  ordered that Inform may draft separate RFPs that do not
14  overlap, that are unique to Inform's status as an online video
15  platform, that in its view competes with YouTube and meets the
16  proportionality and other requirements of Rule 26, with a
17  letter explaining why the RFPs satisfy these three
18  requirements.

19          THE COURT:  Well, why don't I just carve you out of
20  this order, carve your custodians out, carve your requests out,
21  and I'll take all the Inform requests up in context.

22          MS. VASH:  I don't have an objection to that, Judge.

23          THE COURT:  Mr. Mahr.

24          MR. MAHR:  That would be excellent, your Honor.

25          THE COURT:  That's what will be done.

1           And when is that due?

2           MS. VASH:  There was no specific due date, Judge.

3           With respect to our custodians, though, Judge, we

4  would anticipate that all of the requests would be run, both

5  the MDL requests that were the 301 MDL requests, and in

6  addition the requests that we're going to provide to the Court.

7           THE COURT: No.  No.  I want this done.  The reason

8  I'm doing this, the reason I had you come in today is I want to

9  get this done.  I don't want this holding up in the air while

10 we have an additional round on what Inform gets.  Inform is not

11 content with the additional search terms and the additional

12 custodians which I just said I was prepared to give them.  You

13 want to do a whole different round.  We'll carve you out of

14 this, and we'll take you in due course.

15          MS. VASH:  What the Court has previously ordered,

16 Judge, are nonduplicative pursuant to PTO3, which is how we

17 were putting them forth before the Court.  And we are prepared

18 to give the Court a chart that demonstrates that everything

19 that's being requested is absolutely nonduplicative.

20          THE COURT:  Ms. Vash, it's much more important that

21 you give that to opposing counsel and you sit down and you

22 thrash it out, and you come up with a proposed resolution.

23 Google has to recognize -- started off, quite appropriately,

24 with relying on PTO3, which acknowledges that individual

25 plaintiffs may have individual requests.  And I'm not going to

1  listen to Google saying, oh, they're individual requests.
2  That's the route that we went down and the route that Mr. Mahr
3  is correctly relying on in his presentation today.
4            But your first order of business is put together your
5  requests, send them to the other side, get a dialogue going,
6  and I hope and trust that you come to a resolution.  If not,
7  you are going to be back in this courtroom, and this is going
8  to get hashed out.  And this is going to get a little old and
9  tiring for everybody concerned with this.
10           MS. VASH:  Most respectfully, your Honor, on
11 August 8th, we sent a letter requesting of the defendants to
12 please let us know whether or not they were willing to accept
13 those or whether or not we should come to the Court, and we
14 didn't get a response.
15           THE COURT:  So you have already tendered your RFPs to
16 Google?
17           MS. VASH:  We have not tendered them to Google.  We
18 provided them to the discovery steering committee.  They
19 determined they were nonduplicative.
20           THE COURT:  Well, get them to Google.  Get the ball
21 rolling, see what you can do.  And I trust that, as senior
22 members of the bar, you'll get this resolved.
23           You can probably figure out, I think, on a lot of
24 discovery disputes how a judge is going to rule -- not just
25 this judge, but most judges -- you can figure that out.  That's

part of the skillset you come to court with. You can predict that. And so make the prediction, come to the resolution, get your discovery and let's get these cases ready for -- if it's going to be a summary judgment motion, so be it and, if something survives the summary motion, a trial. And let's have at it. And let's get out of the quagmire that we're in.

Anybody want to give me an update on what is going on, in terms of discovery, coordinated with the Eastern District of Virginia?

MR. KOROLOGOS: Yes, your Honor.

The fact discovery period in Eastern District of Virginia, I believe, ends November 17th. There are still a few depositions that the government is taking; one notice came in last night. We have, as the plaintiffs, cross-noticed --

THE COURT: How many depositions have taken place?

MR. KOROLOGOS: I believe they've gotten ten party depositions and maybe it's 20 third-party depositions per side. And the government is up against that limit, in terms of taking Google witnesses. There's still a couple, maybe three or four depositions to occur in that case, some of which we have cross-noticed.

The cross-noticing has been a little bit difficult for us, because we have seen that there were not a lot of documents for some of the witnesses, we chose not to notice them, then we learned in part why, because of this ingestion site issue, that

1  resulted in millions of documents not showing up until very
2  recently.  But there are some depositions that we have
3  cross-noticed and participated in.  Those are being reopened
4  for a brief period of time, consistent with the Eastern
5  District of Virginia ruling, and Google has agreed to give us
6  some participation in that, for those we cross-noticed.  And
7  there are still a few depositions yet to occur in that case,
8  again, some of which we have cross-noticed and will participate
9  in.
10            THE COURT:  Anything else from anyone?
11            MR. ELIAS:  Your Honor, at the risk of testing the
12  Court's patience, given the tenor of this discussion, there is
13  one issue unique to the advertiser class that may or may not
14  come before the Court with respect to discovery, and that's the
15  issue of arbitration.  As you know, they have asserted their
16  clause with respect to the named plaintiffs.  Now, when the
17  time comes for class certification, we understand that they
18  intend to assert the same defense towards the class, as an
19  affirmative defense, the burden would be on Google to establish
20  that.
21            We think that since they have to prove that up,
22  ultimately, that there's information that we're entitled to and
23  we would be entitled to test during the main period of fact
24  discovery, which includes, for example, the number of
25  advertiser class members who opted out of this arbitration

1    provision.  So along the lines of what your Honor was saying,
2    we have tendered to them recently a few, essentially,
3    interrogatory requests.  We're in negotiations over that.  If
4    need be, we will bring that up before the Court.
5            THE COURT:  Thank you.  That's perfectly appropriate,
6    and I hope it's resolved.
7            MR. ELIAS:  We hope so too.
8            THE COURT:  Mr. Mahr.
9            MR. MAHR:  Your Honor, just so the record is clear --
10   Mr. Korologos is not in the EDVA case, so I understand, I'm not
11   faulting him, but discovery is over, other than Google first
12   producing all the documents that it had previously not
13   produced, that is done.  The only depositions that are left --
14   and there's a couple more than four -- are Google depositions.
15   Everything else is as he said.
16           THE COURT:  Is there a trial date?
17           MR. MAHR:  There's not a trial date.
18           There's a pretrial conference in March -- it's not a
19   pretrial conference, even -- it's a post discovery conference,
20   I think she called it.
21           THE COURT:  That's just wonderful.  Thank you.
22           MR. THORNE:  Your Honor, speculators on the DOJ case
23   estimate the end of May.
24           THE COURT:  I hope that's true.  I take my hat off in
25   admiration to my colleagues in the Eastern District of

1  Virginia, and I've admired their work and recall days as a
2  practicing lawyer when I was -- trying to find the right
3  word -- I was maybe the subject of that work.  So it is
4  remarkable to see.
5           Good to see everybody.  Have a good Thanksgiving.  And
6  please don't take offense at my saying I hope I don't see you
7  real soon.
8           (Adjourned)