# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**IN RE: GOOGLE DIGITAL ADVERTISING**
**ANTITRUST LITIGATION**

No. 1:21-md-3010 (PKC)

---

*This Document Relates To:*

---

**INFORM INC.,**

*Plaintiff,*

- against -

No. 1:23-cv-01530-PKC

**GOOGLE LLC;**
**ALPHABET INC.; and**
**YOUTUBE, LLC,**

*Defendants.*

---

**DEFENDANTS GOOGLE LLC, ALPHABET INC., and YOUTUBE, LLC's**
<u>**FIRST SET OF INTERROGATORIES TO INFORM INC.**</u>

1

| | |
|---|---|
| **PROPOUNDING PARTIES:** | Google LLC |
| | Alphabet Inc. |
| | YouTube, LLC |
| **RESPONDING PARTY:** | Inform Inc. |
| **SET NUMBER:** | One |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants Google LLC, Alphabet Inc., and YouTube, LLC (collectively, "Google"), through their counsel, hereby request that Plaintiff Inform Inc. answer the following Interrogatories within thirty (30) days of service according to the Definitions and Instructions set forth herein and supplement its Interrogatory answers, as necessary, to comply with Federal Rule of Civil Procedure 26(e).

## INSTRUCTIONS

1.      In addition to the specific instructions set forth below, these Interrogatories incorporate the instructions set forth in Federal Rules 26 and 33, the Local Rules, the Stipulation and Order Regarding Discovery Procedure ("ESI Order") (ECF No. 508), the Confidentiality Order (ECF No. 297), and Pre-Trial Order No. 5 ("Scheduling Order") (ECF No. 394), or the operative version of those Orders in place at the time responses are served.

2.      These Interrogatories seek information available to You, or to which You may gain access through reasonable effort, including information in the possession of Your past and present attorneys, accountants, investigators, consultants, agents, or other persons directly or indirectly employed or retained by You, or anyone else otherwise subject to Your control who maintains records on Your behalf, in Your name, or otherwise under Your control. Unless otherwise specified, these Interrogatories each require a separate response.

3.      If You cannot provide a full and complete response to any Interrogatory, You should respond to the Interrogatory to the extent possible, specifying the portion of the Interrogatory You are unable to answer and providing whatever information You have regarding the unanswered portion.

4.      If You object to, or otherwise decline to answer, all or any portion of any Interrogatory, please provide all information called for by the Interrogatory to which You do not object or do not decline to answer. For those portions of any Interrogatory to which You object or otherwise decline to answer, state the reason for such objection or declination. If You object to any Interrogatory on the ground that it is too broad (i.e., that it calls for information which is not relevant), please provide such information as You concede to be not overly broad. If You object to any Interrogatory on the ground that it would constitute an undue burden to provide an answer, please provide such requested information as can be supplied without undertaking such undue burden.

5.      If You perceive any ambiguity in an Interrogatory, provide a brief statement of the nature of the perceived ambiguity and the interpretation You used to resolve it.

6.      Pursuant to Federal Rule 26(b)(5), if You believe that any Interrogatory calls for information subject to a claim of privilege, then:

    a.   Answer all parts of the Interrogatory to which You do not object;

    b.   Explain the basis for Your claim of privilege as to each part of the Interrogatory to which You object; and

    c.   Identify the general nature of the information withheld.

7.      In construing the Interrogatories:

a.  Terms not specifically defined shall be given their ordinary meaning as You understand them to be used in the trade;

b.  The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all other tenses, moods, or voices, whenever necessary, to bring within the scope of any Interrogatory all information that might otherwise be construed to be outside its scope;

c.  The use of the singular form of any word includes the plural and vice versa;

d.  Words in the masculine, feminine, or neutral gender shall include each of the other genders;

e.  The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Interrogatory all responses that might otherwise be construed to be outside of its scope;

f.  The terms "all," "any," and "each" shall each be construed as encompassing any and all.

8.  None of the Definitions or Interrogatories shall be construed as an admission relating to the existence of any evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in the Definitions or the Interrogatories.

9.  These Interrogatories are continuing in nature. In the event that You become aware of responsive information in addition to, or in any way inconsistent with, that which You previously have provided, prompt supplementation of Your responses is required.

10.  Google specifically reserves the right to seek supplementary responses to the Interrogatories before trial.

11.     Unless otherwise stated, the Interrogatories call for responsive information from the Relevant Period.

## **DEFINITIONS**

1.     To the extent the terms defined below are used in the Requests, they should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules and the Local Rules. These Definitions are provided solely for the purposes of this Subpoena.

2.     The terms **"Accelerated Mobile Pages"** or **"AMP"** shall mean the open source framework developed by the AMP Open Source Project designed to optimize mobile web browsing and intended to help mobile web pages load faster.

3.     The term **"Action"** refers to all lawsuits consolidated in the above-captioned multidistrict litigation, *In re: Google Digital Advertising Antitrust Litigation*, 21-md-3010 (S.D.N.Y.).

4.     The term **"Ad Blocking Tool"** shall mean any browser extension or software that prevents ads from being displayed to Users through their web browser.

5.     The term **"Ad Buying Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including DSPs and Ad Networks) through which an Advertiser Purchased or can Purchase Inventory.

6.     The terms **"Ad Exchange"** or **"Supply-Side Platform"** or **"SSP"** shall mean a third-party or In-House product or service through which two or more Ad Buying Tools (at least one of which is not owned or controlled by the entity operating the Ad Exchange) placed or can place Bids in real-time auctions for Inventory offered for sale by or on behalf of two or more

Publishers (at least one of which is not owned or controlled by the entity operating the Ad Exchange).

7. The term **"AdMob"** shall mean Google's mobile app monetization product described on https://admob.google.com/home/.

8. The term **"Ad Network"** shall mean a third-party or In-House product or service (other than an Ad Exchange) through which two or more Advertisers (at least one of which is unaffiliated with the entity operating the Ad Network) Purchased or can Purchase Inventory offered for sale by two or more Publishers (at least one of which is unaffiliated with the entity operating the Ad Network).

9. The term **"Ad Selling Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including Publisher Ad Servers, Ad Exchanges, Ad Networks, SSPs, Header Bidding, or Header Bidding Wrappers) through which a Publisher sold or can sell Inventory.

10. The term **"Ad Spam"** shall mean Display Advertisements of poor quality (e.g., ads that are popups or have flashing or other unpleasant audiovisual aspects) or objectionable content (e.g., ads that are sexually suggestive, related to illicit activities, etc.).

11. The terms **"Ad Tech"** or **"Ad Tech Product"** shall mean a product, service, application, tool, solution or other interface that facilitates or is involved in the Purchase or sale of Inventory, including but not limited to a Publisher Ad Server, Ad Exchange, Ad Network, Header Bidding, Header Bidding Wrapper, DSP, SSP, other Ad Buying Tool, or other Ad Selling Tool. For the avoidance of doubt, this term includes In-House Ad Tech Products, as well as products or services offered by social media outlets (including but not limited to, for example, Facebook.com and Twitter.com) and certain other Publishers that enable the purchase of

Inventory on their Properties via their own In-House Ad Tech Products. This term does not include general-purpose software or systems on which an Ad Tech Product relies.

12.     The term **"Ad Tech Provider"** shall mean a person, firm, association, or other entity selling, reselling, licensing, or otherwise providing at least one Ad Tech Product, whether or not for a fee or other compensation.

13.     The term **"Advertiser"** shall mean a person or entity that, directly or through one or more intermediaries, places one or more Display Advertisements intended to advertise or promote a good or service offered by that person or entity, or otherwise convey such person or entity's desired message, on a Publisher's Property so that it is viewed by at least one User visiting such Property. For the avoidance of doubt, Advertisers typically, but need not, pay for the placement of such Display Advertisements.

14.     The term **"AdX"** shall mean Google's Ad Exchange that was marketed as DoubleClick Ad Exchange, inclusive of all prior and subsequent iterations of the product and all variants thereof, and including, for the avoidance of doubt, the Ad Exchange functionality of Google Ad Manager and Google Ad Manager 360.

15.     The term **"Agency"** shall mean an advertising agency or similar consulting firm that is hired by an Advertiser to manage the Purchase of Inventory for one or more Campaigns. For the avoidance of doubt, although an Agency may use DSPs or other tools to manage such Campaigns, an entity operating a DSP shall not, solely on that basis, be deemed an Agency.

16.     The term **"Amazon"** shall mean Amazon.com, Inc., any of its current or former parents, subsidiaries, affiliates, divisions, predecessors, successors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

17. The term **"Attributed Clicks"** shall mean the number of Clicks determined or estimated by an Advertiser, DSP, Ad Network, Ad Exchange, or other person or entity, in the ordinary course of its business, to have resulted from the display of one or more given Impressions to Users.

18. The term **"Attributed Conversions"** shall mean the number of instances in which an Advertiser (or a person or entity acting on behalf of such Advertiser) identifies a specific User action that it has defined as valuable to its business, such as an Online purchase or phone call, and determines or estimates that action to have resulted, in whole or in part, from the display of one or more Impressions to such User.

19. The term **"Attributed Sales"** shall mean the total amount of sales of products or services that an Advertiser determines or estimates resulted, in whole or in part, from the display of one or more Impressions to Users.

20. The term **"Attribution Model"** shall mean a rule, or set of rules, that determines how credit for sales and/or conversions are assigned to discrete actions taken by the User in the sequences of interactions (i.e., clicks/referrals) that led up to each sale and/or conversion.

21. The term **"Automated Bidding"** shall mean a Feature of an Ad Buying Tool which authorizes the Ad Buying Tool to choose how much to Bid for an Impression.

22. The term **"Bid"** shall mean an offer, made in response to a Query, to pay a specified amount in exchange for the right to render a Display Advertisement in a unit of Inventory.

23. The term **"Bid Data Transfer File"** shall mean the paid Feature on Google Ad Manager 360, the premium version of Google Ad Manager, that provides Publishers with non-aggregated, event-level bid data from Campaigns.

24.    The term **"Bid Duplication"** or **"Self-Competition"** shall mean a situation in which Bids from the same Campaign, same Advertiser, or same Buying Tool compete against each other in the same auction or same chain of auctions.

25.    The term **"Bid Shading"** shall mean the practice in which an Advertiser and/or Ad Buying Tool submits a Bid into a given auction lower than the Advertiser's maximum willingness-to-pay to reduce the risk of overpaying for a unit of Inventory.

26.    The terms **"Bidder"** or **"Buyer"** shall mean an Advertiser submitting a Bid directly to an Ad Exchange or Publisher Ad Server (without an intermediary), or shall mean a DSP, Ad Network, or other person or entity submitting a Bid to an Ad Exchange or Publisher Ad Server on behalf of an Advertiser, whether known at the time or to be subsequently determined. For the avoidance of doubt, an Ad Exchange shall not be deemed a Buyer even if it forwards a Bid it received on to another Ad Exchange or Publisher Ad Server.

27.    The term **"Brand Protection"** shall mean measures taken by Ad Tech Products to avoid or limit the display of advertisements next to objectionable content or other ads, including without limitation displaying ads next to those of a competitor, next to sexually suggestive content, or next to content related to illicit drugs.

28.    The term **"Budget Throttling"** shall mean a method by which Advertisers can manage or pace their advertising budget to distribute ad spend. This includes, without limitation, probabilistic throttling (for example, removing an Advertiser from bidding in auctions on a randomized basis).

29.    The term **"Buyer Payment"** shall mean the gross amount paid, from or on behalf of an Advertiser (including by an Agency, DSP, Ad Network, or other intermediary acting on the Advertiser's behalf), directly to an Ad Exchange, Ad Network, or Publisher, for or in connection

with the Purchase of Inventory, before the deduction of any revenue shares or other fees due to the Ad Exchange, Ad Network, or Publisher.

30.    The term **"Campaign"** shall mean one or more Display Advertisements that are targeted to particular types of Inventory, Users, or objectives.

31.    The term **"Campaign ID"** shall mean a code (such as an alphanumeric string) used to record, track, or distinguish between different Campaigns.

32.    The term **"Click"** shall mean an instance of a User clicking on a Display Advertisement, thereby causing the rendering of the associated landing page, but excluding instances in which the click was deemed fraudulent, inadvertent, spam, a bot, or otherwise non-genuine.

33.    The term **"Client-Side Header Bidding"** shall mean an implementation of Header Bidding in which the Queries are sent, and responsive Bids are evaluated, by code running at least in part within the User's web browser.

34.    The term **"Coarse Bidding Type"** shall refer to (i) manual (i.e., fixed) versus (ii) automated methods of bidding, where automated bidding refers to the practice of an Ad Buying Tool automatically setting and adjusting bids based on a Buyer-defined objective.

35.    The term **"communication"** shall have the meaning provided in Local Rule 26.3, namely, the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

36.    The term **"concerning"** shall have the meaning provided in Local Rule 26.3, namely, relating to, referring to, describing, evidencing or constituting.

37.    The term **"Connected Television"** shall mean devices or services that allow Users to watch television content served over the internet on a television screen, such as smart

TVs (e.g., Samsung, TCL, Sony), media streaming devices (e.g., Roku Streaming Stick, Apple TV, Chromecast), or video game consoles (e.g., Xbox, PlayStation).

38.    The term **"Cookie Matching"** shall mean the process of mapping a browser to internet browsing activity using a unique ID.

39.    The term **"Cost Type"** shall refer to the basis on which an Advertiser pays for Display Advertising, such as, but not limited to, cost-per-thousand Impressions ("CPM"), cost-per-Click ("CPC"), or cost-per-action ("CPA").

40.    The terms **"Demand-Side Platform"** or **"DSP"** shall mean an Ad Buying Tool, that enables an Advertiser to automatically buy Inventory sold via Ad Selling Tools in real-time on an Impression-by-Impression basis. For the avoidance of doubt, an Agency trading desk shall be deemed a DSP for purposes of this definition.

41.    The term **"Demand Partner"** shall mean a DSP, SSP, Ad Network, or other Ad Buying Tool or Ad Selling Tool.

42.    The term **"Device Type"** shall mean the electronic device by which the Impression was served, including mobile devices, desktop or laptop computers, tablets, and Connected Televisions.

43.    The term **"Direct Transaction"** shall mean a sale or placement of Display Advertising the price of which was determined through a contractual agreement between an Advertiser (or an Agency acting on an Advertiser's behalf) and a Publisher (without an intervening Ad Tech Intermediary), including for the avoidance of doubt an agreement to set such price through an auction conducted by the Publisher itself or an affiliate thereof.

44.    The terms **"Display Advertisement"** or **"Display Advertising"** shall mean Online Advertising other than Search Advertising, and shall include Native, banner, in-app or Video advertising, whether social or non-social.

45.    The terms **"Display & Video 360"** or **"DV360"** shall mean Google's DSP described at https://support.google.com/displayvideo/answer/9059464?hl=en, inclusive of all prior iterations of this product or naming conventions, including DoubleClick Bid Manager.

46.    The term **"document"** shall have the meaning provided in Local Rule 26.3, namely, that the term shall be synonymous in meaning and equal in scope to the usage of the phrase "documents or electronically stored information" in Federal Rule 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

47.    The term **"documents sufficient to show"** means documents sufficient to provide a true and correct disclosure of the factual matter requested.

48.    The term **"Domain Spoofing"** shall mean a practice in which Inventory is misrepresented as being from a different web domain than it actually is.

49.    The terms **"DoubleClick for Publishers"** or **"DFP"** shall mean Google's Publisher Ad Server that was marketed as DoubleClick for Publishers, inclusive of all prior and subsequent iterations of the product and all variants thereof (e.g. Small Business, Enterprise editions, etc.), and including for the avoidance of doubt the ad server functionality of Google Ad Manager and Google Ad Manager 360.

50.    The term **"Dynamic Allocation"** shall mean the DFP Feature that enabled demand from AdX to compete in real-time with demand from third-party Ad Exchanges, Ad Networks, and Ad Buying Tools via a price floor for AdX in DFP.

51.     The terms **"Dynamic Revenue Share"** or **"Revenue Based Share Optimizations"** shall mean the Google Feature that dynamically adjusted the fees Google charged Publishers to transact via AdX.

52.     The term **"Encryption of User IDs"** shall mean the practice of anonymizing the metadata associated with a particular User.

53.     The term **"Enhanced Dynamic Allocation"** shall mean the modification to Dynamic Allocation first introduced in or about 2014, which enabled guaranteed and non-guaranteed line items to compete on a per-Impression basis.

54.     The term **"Environment"** shall mean the electronic environment in which an Impression is served, meaning in a desktop web browser, in a mobile web browser, in a mobile app (other than a mobile web browser), or via Connected Television.

55.     The term **"Express Fees"** shall mean Fees that are explicitly charged to a customer by an Ad Tech Provider, as opposed to merely being retained as a revenue share or retained profit. For example, a DSP fee calculated as a percentage of an Advertiser's gross spend, and charged to the Advertiser in addition to such gross spend, would be an Express Fee, but a profit or buyside margin earned by a DSP as the difference between what it charges the Advertiser (e.g. on a cost-per-click basis) and what it pays to Ad Selling Tools or Publishers to purchase such Impressions would not be an Express Fee. Similarly, a CPM fee charged by a Publisher Ad Server (e.g. *x* cents per thousand impressions served) would be an Express Fee, whereas the revenue share retained by an Ad Exchange (e.g. if the Ad Exchange remits 80% of gross revenue to the Publisher and retains a 20% revenue share) would not be an Express Fee.

56.     The term **"Feature"** shall mean any design, feature, limitation, policy, mechanism, innovation, improvement, optimization, or strategy related to how Ad Tech Products

buy, sell, price, bid, or auction Inventory, how Ad Tech Products improve ad quality or Match Quality, how Ad Tech Products measure, or report on the effectiveness of Display Advertising, or how Ad Tech Products integrate or interoperate with other Ad Tech Products, whether owned or operated by the same entity or different entities.

57.    The term **"Fees"** shall mean any money retained by a provider of Ad Tech Products, including via Take Rates, for services related to the purchase of Display Advertisements.

58.    The term **"First-Party Cookies"** shall mean a browser cookie created and stored by the domain to which the User navigated.

59.    The term **"Floor Price"** shall mean the limitation on how low an Advertiser or Ad Buying Tool can bid for Inventory while still being eligible to win the Impression.

60.    The term **"Format"** shall mean the general makeup or layout of an ad. Different types of Display Advertising Formats include Native Advertising, Instream Video Advertising, Outstream Video Advertising, and Static Advertising.

61.    The term **"Google"** shall mean Google LLC, any current or former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

62.    The term **"Google Ads"** shall mean Google's Ad Buying Tool described on https://ads.google.com/home/, inclusive of all prior iterations or naming conventions, including AdWords.

63.    The terms **"Google Ad Manager"** or **"GAM"** shall mean the product introduced by Google on June 27, 2018, which brought together DFP and AdX into a unified programmatic platform.

64.     The term **"Gross Revenue"** shall mean revenue received from, or on behalf of, the Advertiser Purchasing the Inventory, before the deduction of any and all related fees and/or revenue share.

65.     The term **"Guaranteed Transaction"** shall mean a transaction where a specified amount of inventory is purchased.

66.     The term **"Header Bidding"** shall mean the use by a Publisher of code that is directly or indirectly called during the web browser's processing or rendering of the HTML header of a webpage (and prior to the invocation of a Publisher Ad Server) and that causes Queries to be sent to one or more Ad Exchanges, Ad Networks, DSPs, or other sources of demand.

67.     The term **"Header Bidding Provider"** shall mean a person, firm, association, or other entity that provides Header Bidding Wrapper services to Publishers.

68.     The term **"Header Bidding Wrapper"** shall mean a Header Bidding management system.

69.     The term **"identify,"** when referring to a person, shall have the meaning provided in Local Rule 26.3, namely, to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

70.     The term **"identify,"** when referring to documents, shall have the meaning provided in Local Rule 26.3, namely, to give, to the extent known, the (i) type of document; (ii)

general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

71.    The terms **"impact"** and **"effect"** shall include both qualitative and quantitative, direct and indirect meanings of those terms.

72.    The term **"Impression"** shall mean the service of a single Display Advertisement to a single User.

73.    The term **"In-House Ad Tech Product"** shall mean an Ad Tech Product created for a Publisher's, Advertiser's, or Agency's internal use.

74.    The term **"including"** shall mean including but not limited to.

75.    The term **"Indirect Transaction"** shall mean a sale or placement of Display Advertising other than a Direct Transaction, including an Open Auction Transaction or Private Auction Transaction conducted by an Ad Exchange or a purchase of Inventory by an Ad Network for resale to one or more Advertisers.

76.    The term **"Instream Video Advertising"** shall mean Online Advertising in which the advertisement is displayed within a stream of video content that the User is viewing, e.g., before, in the middle of, or after the video content.

77.    The term **"Inventory"** shall mean space offered by Publishers for the sale or placement of Display Advertising.

78.    The term **"Line Item"** shall mean the Feature of a Publisher Ad Server that contains parameters for how a given Display Advertisement is intended to be served on a Publisher's Property, along with pricing and other delivery details.

79.    The term **"Linear Television"** shall mean television delivered in a live broadcast, as opposed to Connected Television.

80.    The term **"Malicious Ad"** shall mean an ad, when clicked on, that spawns a forced redirect to an unintended destination or loads a secondary, or tertiary, payload for malicious purposes (including without limitation phishing scams).

81.    The terms **"Marketing Mix Model"** or **"Media Mix Model"** shall mean a rule or set of rules that measures the incremental benefit to profits per dollar spent across various forms of advertising, taking account of the possibility that the effectiveness of one form of advertising might depend on the level of spending on another.

82.    The term **"Match Quality"** shall mean the effectiveness of matching customer information parameters to a website event.

83.    The term **"Meta"** shall mean Meta Platforms, Inc., including Facebook, Inc., any current or former parents, subsidiaries, affiliates, divisions, predecessors, successors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

84.    The term **"Minimum Bid to Win"** shall mean the data that a Bidder receives after an auction is complete that includes the lowest value such Bidder could have bid to win that particular auction.

85.    The term **"Mobile Publishing Formats"** shall mean the various methods by which Publishers make their Properties or content available or more accessible on mobile devices, including Accelerated Mobile Pages, Facebook Instant Articles, and Apple News.

86.    The term **"Native Advertising"** shall mean Online Advertising that follows the natural form and function of the User experience in which it is placed (such as sponsored ads within a User's Facebook feed).

87.     The term **"Net Revenue"** shall mean revenue received from, or on behalf of, the Advertiser purchasing the Impressions, excluding any and all fees paid to Ad Tech Providers for the transaction.

88.     The terms **"Online Advertisement"** or **"Online Advertising"** shall mean advertising via the internet, including on websites, apps, and Connected Television. For example, both Display Advertising and Search Advertising are forms of Online Advertising.

89.     The term **"Open Auction Transaction"** shall mean an Indirect Transaction for which all, or substantially all, of the Buyers eligible to bid on the relevant Ad Exchange are or were eligible to submit Bids.

90.     The terms **"Open Bidding"** or **"Exchange Bidding"** shall mean the Google product or Feature on DFP, GAM and AdMob that enables Google and third-party Ad Networks and Ad Exchanges to compete in Google-run real-time auctions for Publisher Inventory.

91.     The term **"Other Direct Transaction"** shall mean a Direct Transaction other than a Programmatic Guaranteed Transaction, Preferred Deal Transaction, or Publisher-Automated Transaction.

92.     The term **"Other Indirect Transaction"** shall mean an Indirect Transaction other than an Open Auction Transaction or a Private Auction Transaction.

93.     The term **"Outstream Video Advertising"** shall mean Online Advertising, other than Instream Video Advertising, that includes a video or animation.

94.     The term **"Paid Advertising"** shall mean an advertising model whereby Advertisers pay Publishers to display their ads on a Property.

95.    The term **"Payment Type"** shall refer to the basis on which a Publisher receives payment for the sale of Display Advertising, such as, but not limited to, cost-per-thousand Impressions ("CPM"), cost-per-Click ("CPC"), or cost-per-action ("CPA").

96.    The term **"person"** shall have the meaning provided in Local Rule 26.3, namely, any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

97.    The terms **"Plaintiff"** and **"Defendant"** as well as a party's full or abbreviated name or a pronoun referring to a party shall have the meaning provided in Local Rule 26.3, namely, the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the Action.

98.    The term **"Plaintiff State"** shall mean each of the States of Texas, Alaska, Arkansas, Florida, Idaho, Indiana, Louisiana, Mississippi, Missouri, Montana, Nevada, North Dakota, South Carolina, South Dakota, Utah, and the Commonwealths of Kentucky and Puerto Rico, and any other state or territory of the United States that later joins this Action as a Plaintiff.

99.    The term **"Preferred Deal Transaction"** shall mean a Programmatic Direct Transaction where the Inventory is not guaranteed. For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Preferred Deal Transaction.

100.    The term **"Private Auction Transaction"** shall mean an Indirect Transaction for which only a set of Buyers expressly identified by the Publisher (or an agent or employee thereof) are or were eligible to submit Bids.

101.   The term **"Programmatic Direct Transaction"** shall mean a Direct Transaction (other than a Publisher-Automated Transaction) that is or was negotiated, transacted, or finalized through an Ad Tech Product, provided that, for the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Programmatic Direct Transaction if such transaction was not otherwise negotiated through such Publisher Ad Server.

102.   The term **"Programmatic Guaranteed Transaction"** shall mean a Programmatic Direct Transaction where the Inventory is guaranteed. For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Programmatic Guaranteed Transaction.

103.   The term **"Programmatic Transaction"** shall mean a Display Advertising transaction, other than a Publisher-Automated Transaction, that is or was negotiated, transacted, or finalized through Ad Tech Products.

104.   The term **"Property"** shall mean a website, mobile application, or other product or service containing space that is sold or offered for sale for the placement of Display Advertising.

105.   The term **"Publisher"** shall mean a person or entity operating a Property. For the avoidance of doubt, the owner of the Property shall be deemed the Publisher, even if it has out-sourced the sale of its associated Inventory, in whole or in part, to a third party.

106.   The term **"Publisher Ad Server"** shall mean a third-party or In-House product, service, or system that is responsible for selecting (or attempting to select), on behalf of a

Publisher, the Display Advertisement (or source from which such Display Advertisement shall be obtained) for a unit of Inventory. For the avoidance of doubt, a Publisher Ad Server may be owned and/or operated by a third-party Ad Tech Provider, or may be owned, developed, or operated by the Publisher or by a third party on behalf of or under contract with the Publisher. For the further avoidance of doubt, a system that creates or manages mediation chains constitutes a Publisher Ad Server for purposes of this Subpoena.

107.   The term **"Publisher-Automated Transaction"** shall mean a Direct Transaction that is or was negotiated, transacted, or finalized through one or more automated services, whether or not auction-based, that is controlled by the Publisher or an affiliate thereof (other than an Ad Network, Ad Exchange, or SSP). This would include, for example, the Publisher's self-service website for Advertisers to create Campaigns or place advertisements, such as that described at https://facebook.com/business/ads. For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server (including one operated by the Publisher) shall not be sufficient to render such transaction a Publisher-Automated Transaction.

108.   The term **"Publisher Partner"** shall mean a person, firm, association, or other entity that sells Display Advertising on behalf of Publishers, other than Publisher Ad Servers, Ad Exchanges, and Ad Networks.

109.   The term **"Purchase,"** when used in connection with Inventory or Impressions, shall mean to obtain, directly or indirectly through one or more intermediaries, the right to render or display a Display Advertisement in a unit of Inventory, typically but not necessarily in exchange for a monetary payment.

110. The term **"Query"** shall mean a request to provide, or Bid to provide, a Display Advertisement to be rendered in a unit of Inventory, whether denominated as an "ad request," "bid request," or otherwise. A Query may, but need not, request a Bid that will be considered before awarding the right to actually display a Display Advertisement to a particular Advertiser.

111. The term **"Query Throttling"** shall mean any mechanism that limits how many Queries are sent to an Ad Buying Tool or how many Queries an Ad Buying Tool receives.

112. The term **"reflecting"** shall mean illustrating or describing.

113. The term **"Relevant Period"** shall mean January 1, 2013 to present.

114. The term **"Remarketing Campaign"** shall mean one or more Display Advertisements that are targeted to particular Users in whole or substantially in part based on their prior visits to or behavior on a Property.

115. The terms **"Reserve Price Optimization"** or **"Optimized Pricing"** shall mean the Google product or Feature, or any past iteration of the product or Feature, that dynamically changed the Floor Prices for each Query using historical Bid data in AdX or GAM auctions of Inventory.

116. The term **"Search+"** shall mean the Google Feature that enables advertisers to use their Search Advertising budgets to purchase Display Advertisements.

117. The term **"Search Advertising"** shall mean Online Advertising that is displayed in response to a User's search intent or search terms.

118. The terms **"Self-Competition"** or **"Bid Duplication"** shall mean a situation in which Bids from the same Campaign, same Advertiser, or same Ad Buying Tool compete against each other in the same auction or same chain of auctions.

119. The term **"Server-Side Header Bidding"** shall mean an implementation of Header Bidding in which the Queries are sent, and responsive Bids are evaluated, by code running on a server (even if such server code is invoked from a call from the User's web browser).

120. The term **"Static Advertising"** shall mean Online Advertising consisting solely of static (i.e., non-moving or -changing) text, images, or graphics.

121. The term **"Supply Path Optimization"** shall mean practices of Ad Tech Products that connect Advertisers with Publishers' Inventory in the most efficient manner (for example, buying Inventory in a way that reduces the number of Ad Tech Products required for the transaction).

122. The term **"Take Rate"** shall mean the proportion of total revenue generated from Purchased Inventory that an Ad Tech Provider collects as part of its fee arrangement in connection with the Purchased Inventory.

123. The term **"Targeting Type"** shall mean the criteria upon which an ad is displayed to specific audiences of Users, or in the context of specific content (including but not limited to keywords and topics). Examples of audience targeting include but are not limited to demographic targeting, remarketing, life events, or affinity.

124. The term **"Third-Party Cookie"** shall mean a browser cookie created and stored by a domain other than the domain to which the User navigated.

125. The term **"Transaction Type"** shall mean Programmatic Guaranteed Transaction, Preferred Deal Transaction, Publisher-Automated Transaction, Other Direct Transaction, Open Auction Transaction, Private Auction Transaction, or Other Indirect Transaction.

126. The term **"Unified First Price Auction"** shall mean the process, effective beginning September 10, 2019, by which Google Ad Manager determines which Advertiser's Display Advertisement to display to a User based on the highest actual or estimated price for a unit of Inventory and subject to a Publisher's defined constraints.

127. The term **"User"** shall mean an end user visiting or using a Property, or a proxy for that end user (including, but not limited to, cookie identifiers or mobile ad identifiers).

128. The term **"Value of Media"** shall mean the total US dollar value (or the fair market value, if the Impressions are not provided on a monetary basis) of the Inventory Purchased net of any and all fees paid.

129. The term **"Winning Bid"** shall mean the Bid in an auction that ultimately succeeded in Purchasing the relevant Inventory.

130. The terms **"You"** or **"Your"** refer to Inform Inc., its parents, predecessors, successors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing. "You" and "Your" includes NDN, News Distribution Network Inc., and Bright Mountain Media, Inc.

## INTERROGATORIES

## INTERROGATORY NO. 1

Identify and describe each business or legal entity under Your control or each entity for which You are seeking damages, including the dates of operation, its purpose or line of business, all locations in which You conducted business and associated time periods for each.

**INTERROGATORY NO. 2**

State what Your revenue was in each year, including all sources of that revenue and amount of revenue by each source, and including all Digital Advertising revenue by Format (e.g., video, banner).

**INTERROGATORY NO. 3**

Identify all websites You partnered with for the purposes of buying or selling digital advertising, maintain, maintained, control, controlled, own, or owned and, for each, identify the time period during which each website has operated, and the identity of all of Your employees or agents involved in selling advertising space offered on such website.

**INTERROGATORY NO. 4**

Identify each of Your Google digital advertising accounts including, for each: the date the account was opened; the dates during which the accounts were in use; any account IDs associated with the account, including Google customer IDs; which business entity or entities has owned the account (and associated time period); and which individual(s) has used or accessed the account on behalf of You (and associated time period).

**INTERROGATORY NO. 5**

Identify Your communications with Google upon which You rely for any of Your claims, including identifying the dates of such communications, the relevant individuals from You and Google who participated in the communications, the subject matter of such communications, and all documents related thereto.

**INTERROGATORY NO. 6**

Identify all contracts for Your Google digital advertising accounts that You entered into, including, but not limited to, all contracts for Google Ad Tech products and services, including

all DoubleClick for Publishers/Google Ad Manager contracts, and all terms of service including all revised or updated terms of service, and including, for each contract, identifying the date on which You entered into the contract, identifying the person who accepted the contract on Your behalf, and identifying all of Your communications relating to the contract.

**INTERROGATORY NO. 7**

Identify each Ad Tech Provider and Ad Tech Product You used (whether from Google, any other Ad Tech Provider, or developed in-house), including the associated time period in which You used each Ad Tech Provider and Ad Tech Product, and the amount in fees paid monthly to each Ad Tech Provider by Ad Tech Product used.

**INTERROGATORY NO. 8**

Identify for each year the amount of advertising revenue You received, including by Digital Advertising, including video advertising, and identifying revenue generated in connection with Your use of Google's Ad Tech tools to fill ad space on Your publisher partner websites, and identifying revenue generated in connection with Your use of any other Ad Tech tools from other Ad Tech Providers besides Google.

**INTERROGATORY NO. 9**

Identify all Direct Transactions You have entered into to fill ad space on Your publisher partner websites, including the customers, dates, prices (including by CPM or other basis) at which You sold the advertising, the terms of such sale, all advertising Campaigns and individual advertisements You ran or continue to run as a result of these Direct Transactions, including the dates associated with each, and the revenue You received from these Direct Transactions.

**INTERROGATORY NO. 10**

Describe in detail all factors that influence or influenced Your advertising selling decisions, including but not limited to factors influencing Your decisions to sell Display Advertising, Your objectives for selling Display Advertising, and all factors that influence Your decisions regarding number, size, and placement of advertising spaces.

**INTERROGATORY NO. 11**

Describe in detail all factors that influence or influenced Your choice of Ad Tech Products, including Your decision to use Google Ad Tech Products vs. Ad Tech Products of any other Ad Tech Provider, including Ad Tech Products developed in-house, to sell advertising spaces on Your publisher partner websites, and any other products or technology that You chose or considered choosing instead of Ad Tech Products to sell advertising spaces.

**INTERROGATORY NO. 12**

For the time period January 1, 2010 to present, describe Your use or consideration of each of Dynamic Allocation, Enhanced Dynamic Allocation, Project Bernanke, Dynamic Revenue Share, and Minimum Bid To Win, including the associated timeframe in which each of these designs or Features were in use by You.

**INTERROGATORY NO. 13**

For the time period January 1, 2010 to present, describe the effects, if any, of each of Dynamic Allocation, Enhanced Dynamic Allocation, Project Bernanke, Dynamic Revenue Share, and Minimum Bid To Win on Your revenue, CPM, impressions, and clicks.

**INTERROGATORY NO. 14**

Identify any direct contracts that went unfulfilled as a result of Enhanced Dynamic Allocation and any "contracted for direct ad sales" that were "jumped over" as alleged in Paragraph 236 of Your Complaint.

**INTERROGATORY NO. 15**

Identify any in-app advertising Inventory that You sell, including the time period in which You have sold that Inventory.

**INTERROGATORY NO. 16**

Describe the settings in Your Google Ad Manager accounts over time, including any changes that You have made from the default settings including enabling or disabling certain Features, the associated time period in which You made these changes, and Your reasons for doing so.

**INTERROGATORY NO. 17**

Identify any differential price floors You set for Inventory available on more than one Ad Exchange for different demand sources before Unified Pricing Rules, including the time period in which these differential price floors were in effect, and the reasons for setting such differential price floors.

**INTERROGATORY NO. 18**

Identify the number of line items You used prior to Google capping Line Items, including identifying any changes to the number of Line Items You used over time.

**INTERROGATORY NO. 19**

Without regard to any time period, identify whether You ever enabled Header Bidding

and, if so, describe the kind(s) of Header Bidding You enabled, the identity of the demand sources You called, and the time period in which You enabled each kind of Header Bidding.

**INTERROGATORY NO. 20**

Without regard to any time period, describe Header Bidding's impact on Your business including impact, if any, on Your revenue or CPM from Display Advertising.

**INTERROGATORY NO. 21**

Identify all communications in which You asked to purchase DFP separately from AdX including, for each: the date of such communication; the form of the communication; the content of the communication; the individual(s) who participated in the communication on behalf of You; the individual(s) who participated in the communication on behalf of Google; and all documents related thereto.

**INTERROGATORY NO. 22**

Identify all communications in which You asked to purchase AdSense or DFP separately from Google Display Network including, for each: the date of such communication; the form of the communication; the content of the communication; the individual(s) who participated in the communication on behalf of You; the individual(s) who participated in the communication on behalf of Google; and all documents related thereto.

**INTERROGATORY NO. 23**

Describe in detail the diligence, if any, You exercised in investigating the claims You assert in this case prior to commencing the Action including any steps You took to discover the facts alleged in the Complaint.

## INTERROGATORY NO. 24

Describe Your business model regarding digital advertising sales, including the fees, commission or take rate charged on advertising You facilitated and how that commission was charged, including when the commission was charged and which parties to the relevant transaction(s) were charged.

## INTERROGATORY NO. 25

Identify with particularity each and every act, practice, or statement by Google that You allege to have been fraudulent. As part of Your response, identify all documents on which You relied on to respond to this Interrogatory.

## **Local Rule 33.3(a) Interrogatories**

**33.3(a) INTERROGATORY NO. 1**: For each business or legal entity under Your control identified in response to Interrogatory No. 1, state whether You have possession, custody, and/or control over documents concerning the use of Display Advertising or Ad Tech Products by that business or legal entity. If so, include in Your answer the locations, custodians, and general description of such documents. If not, identify all person(s) with possession, custody, and/or control of such documents.

**33.3(a) INTERROGATORY NO. 2**: Identify all persons with relevant knowledge concerning Your claims in Your Complaint.

**33.3(a) INTERROGATORY NO. 3**: Identify all persons with relevant knowledge concerning the use of Display Advertising or Ad Tech Products by each of Your businesses or legal entities.

**33.3(a) INTERROGATORY NO. 4**: For each category of monetary relief that You seek in Your Complaint, provide a computation of the amount of each category of monetary relief sought for each count.

**33.3(a) INTERROGATORY NO. 5**: With respect to each harm or injury for which You seek relief in this Action, identify each person with knowledge of that harm or injury.


Dated: August 23, 2023                          */s/ Justina Sessions*
                                                Justina K. Sessions
                                                FRESHFIELDS BRUCKHAUS
                                                DERINGER US LLP
                                                855 Main Street
                                                Redwood City, CA 94063
                                                Telephone: (650) 618-9250
                                                Email: justina.sessions@freshfields.com

                                                Eric Mahr
                                                Robert J. McCallum
                                                700 13th Street NW, 10th Floor

Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com
rob.mccallum@freshfields.com

*Counsel for Defendants Google LLC,
Alphabet, Inc., and YouTube, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2023, I served the foregoing to all counsel of record

via email.

/s/ Robert McCallum
Robert McCallum
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
601 Lexington Avenue,
31st Floor
New York, NY 10022

# EXHIBIT A