# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | No. 1:21-md-3010 (PKC) |

*This Document Relates To:*

| | |
|---|---|
| ASSOCIATED NEWSPAPERS LTD. and MAIL MEDIA, INC.<br><br>         *Plaintiffs*,<br><br>- against -<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>         *Defendants.* | No. 1:23-cv-03446(PKC) |

**DEFENDANTS GOOGLE LLC AND ALPHABET INC'S
<u>SECOND SET OF INTERROGATORIES TO DAILY MAIL</u>**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Local Rule 33.3(a), Defendants Google LLC and Alphabet Inc. (collectively, "Google"), through their counsel, hereby request that Plaintiffs Associated Newspapers Ltd. and Mail Media Inc. (together, "Daily Mail") answer the following Interrogatories within thirty (30) days of service according to the Definitions and Instructions set forth herein and supplement its Interrogatory answers, as necessary, to comply with Federal Rule of Civil Procedure 26(e).

## INSTRUCTIONS

1. In addition to the specific instructions set forth below, these Interrogatories incorporate the instructions set forth in Federal Rules 26 and 33, the Local Rules, the Stipulation and Order Regarding Discovery Procedure ("ESI Order") (ECF No. 508), the Modified Confidentiality Order (ECF No. 685), and Pre-Trial Order No. 5 ("Scheduling Order") (ECF No. 394), or the operative version of those Orders in place at the time responses are served.

2. These Interrogatories seek information available to You, or to which You may gain access through reasonable effort, including information in the possession of Your past and present attorneys, accountants, investigators, consultants, agents, or other persons directly or indirectly employed or retained by You, or anyone else otherwise subject to Your control who maintains records on Your behalf, in Your name, or otherwise under Your control. Unless otherwise specified, these Interrogatories each require a separate response.

3. If You cannot provide a full and complete response to any Interrogatory, You should respond to the Interrogatory to the extent possible, specifying the portion of the Interrogatory You are unable to answer and providing whatever information You have regarding the unanswered portion.

4.  If You object to, or otherwise decline to answer, all or any portion of any Interrogatory, please provide all information called for by the Interrogatory to which You do not object or do not decline to answer. For those portions of any Interrogatory to which You object or otherwise decline to answer, state the reason for such objection or declination. If You object to any Interrogatory on the ground that it is too broad (i.e., that it calls for information which is not relevant), please provide such information as You concede to be not overly broad. If You object to any Interrogatory on the ground that it would constitute an undue burden to provide an answer, please provide such requested information as can be supplied without undertaking such undue burden.

5.  If You perceive any ambiguity in an Interrogatory, provide a brief statement of the nature of the perceived ambiguity and the interpretation You used to resolve it.

6.  Pursuant to Federal Rule 26(b)(5), if You believe that any Interrogatory calls for information subject to a claim of privilege, then:

    a. Answer all parts of the Interrogatory to which You do not object;

    b. Explain the basis for Your claim of privilege as to each part of the Interrogatory to which You object; and

    c. Identify the general nature of the information withheld.

7.  In construing the Interrogatories:

    a. Terms not specifically defined shall be given their ordinary meaning as You understand them to be used in the trade;

    b. The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all other tenses, moods, or voices, whenever necessary, to bring within the

  scope of any Interrogatory all information that might otherwise be construed to be outside its scope;

c. The use of the singular form of any word includes the plural and vice versa;

d. Words in the masculine, feminine, or neutral gender shall include each of the other genders;

e. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Interrogatory all responses that might otherwise be construed to be outside of its scope;

f. The terms "all," "any," and "each" shall each be construed as encompassing any and all.

8. None of the Definitions or Interrogatories shall be construed as an admission relating to the existence of any evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in the Definitions or the Interrogatories.

9. These Interrogatories are continuing in nature. In the event that You become aware of responsive information in addition to, or in any way inconsistent with, that which You previously have provided, prompt supplementation of Your responses is required.

10. Google specifically reserves the right to seek supplementary responses to the Interrogatories before trial.

## DEFINITIONS

1. To the extent the terms defined below are used in the Requests, they should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules and the Local Rules. These Definitions are provided solely for the purposes of these Interrogatories.

2. The term **"Ad Buying Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including DSPs and Ad Networks) through which an Advertiser Purchased or can Purchase Inventory.

3. The terms **"Ad Exchange"** or **"Supply-Side Platform"** or **"SSP"** shall mean a third-party or In-House product or service through which two or more Ad Buying Tools (at least one of which is not owned or controlled by the entity operating the Ad Exchange) placed or can place Bids in real-time auctions for Inventory offered for sale by or on behalf of two or more Publishers (at least one of which is not owned or controlled by the entity operating the Ad Exchange).

4. The term **"Ad Network"** shall mean a third-party or In-House product or service (other than an Ad Exchange) through which two or more Advertisers (at least one of which is unaffiliated with the entity operating the Ad Network) Purchased or can Purchase Inventory offered for sale by two or more Publishers (at least one of which is unaffiliated with the entity operating the Ad Network).

5. The term **"Ad Selling Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including Publisher Ad Servers, Ad Exchanges, Ad Networks, SSPs, Header Bidding, or Header Bidding Wrappers) through which a Publisher sold or can sell Inventory.

6. The terms **"Ad Tech"** or **"Ad Tech Product"** shall mean a product, service, application, tool, solution or other interface that facilitates or is involved in the Purchase or sale of Inventory, including but not limited to a Publisher Ad Server, Ad Exchange, Ad Network, Header Bidding, Header Bidding Wrapper, DSP, SSP, other Ad Buying Tool, or other Ad Selling Tool. For the avoidance of doubt, this term includes In-House Ad Tech Products, as well as products or

services offered by social media outlets (including but not limited to, for example, Facebook.com and X, f/k/a Twitter.com) and certain other Publishers that enable the purchase of Inventory on their Properties via their own In-House Ad Tech Products. This term does not include general-purpose software or systems on which an Ad Tech Product relies.

7. The term **"Advertiser"** shall mean a person or entity that, directly or through one or more intermediaries, places one or more Display Advertisements intended to advertise or promote a good or service offered by that person or entity, or otherwise convey such person or entity's desired message, on a Publisher's Property so that it is viewed by at least one User visiting such Property. For the avoidance of doubt, Advertisers typically, but need not, pay for the placement of such Display Advertisements.

8. The term **"AdX"** shall mean Google's Ad Exchange that was marketed as DoubleClick Ad Exchange, inclusive of all prior and subsequent iterations of the product and all variants thereof, and including, for the avoidance of doubt, the Ad Exchange functionality of Google Ad Manager and Google Ad Manager 360.

9. The term **"Agency"** shall mean an advertising agency or similar consulting firm that is hired by an Advertiser to manage the Purchase of Inventory for one or more Campaigns. For the avoidance of doubt, although an Agency may use DSPs or other tools to manage such Campaigns, an entity operating a DSP shall not, solely on that basis, be deemed an Agency.

10. The term **"Bid"** shall mean an offer, made in response to a Query, to pay a specified amount in exchange for the right to render a Display Advertisement in a unit of Inventory.

11. The terms **"Bidder"** or **"Buyer"** shall mean an Advertiser submitting a Bid directly to an Ad Exchange or Publisher Ad Server (without an intermediary), or shall mean a DSP, Ad Network, or other person or entity submitting a Bid to an Ad Exchange or Publisher Ad Server on

behalf of an Advertiser, whether known at the time or to be subsequently determined. For the avoidance of doubt, an Ad Exchange shall not be deemed a Buyer even if it forwards a Bid it received on to another Ad Exchange or Publisher Ad Server.

12. The terms **"Demand-Side Platform"** or **"DSP"** shall mean an Ad Buying Tool, that enables an Advertiser to automatically buy Inventory sold via Ad Selling Tools in real-time on an Impression-by-Impression basis. For the avoidance of doubt, an Agency trading desk shall be deemed a DSP for purposes of this definition.

13. The term **"Direct Transaction"** shall mean a sale or placement of Display Advertising the price of which was determined through a contractual agreement between an Advertiser (or an Agency acting on an Advertiser's behalf) and a Publisher (without an intervening Ad Tech Intermediary), including for the avoidance of doubt an agreement to set such price through an auction conducted by the Publisher itself or an affiliate thereof.

14. The term **"Dismissed Theories"** shall mean Daily Mail's claims that the Court dismissed in its March 1, 2024 Opinion and Order, ECF No. 701, at 45-53: (1) Encryption of User IDs, *e.g.*, SAC ¶¶ 109-114; (2) Open Bidding, *e.g.*, SAC ¶¶ 165-178; (3) Line Item Caps, *e.g.*, SAC ¶¶ 190-195; (4) Google Search Services, *e.g.*, SAC ¶¶ 209-211; and (5) Accelerated Mobile Pages, *e.g.*, SAC ¶¶ 212-220.

15. The terms **"Display Advertisement"** or **"Display Advertising"** shall mean Online Advertising other than Search Advertising, and shall include Native, banner, in-app or video advertising, whether social or non-social.

16. The terms **"DoubleClick for Publishers"** or **"DFP"** shall mean Google's Publisher Ad Server that was marketed as DoubleClick for Publishers, inclusive of all prior and subsequent iterations of the product and all variants thereof (e.g. Small Business, Enterprise

7

editions, etc.), and including for the avoidance of doubt the ad server functionality of Google Ad Manager and Google Ad Manager 360.

17. The term **"Encryption of User IDs"** shall mean the practice of anonymizing the metadata associated with a particular User.

18. The term **"Google"** shall mean Google LLC, any current or former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

19. The term **"Google Ads"** shall mean Google's Ad Buying Tool described on https://ads.google.com/home/, inclusive of all prior iterations or naming conventions, including AdWords.

20. The terms **"Google Ad Manager"** or **"GAM"** shall mean the product introduced by Google on June 27, 2018, which brought together DFP and AdX into a unified programmatic platform.

21. The term **"Guaranteed Transaction"** shall mean a transaction where a specified amount of inventory is purchased.

22. The term **"Header Bidding"** shall mean the use by a Publisher of code that is directly or indirectly called during the web browser's processing or rendering of the HTML header of a webpage (and prior to the invocation of a Publisher Ad Server) and that causes Queries to be sent to one or more Ad Exchanges, Ad Networks, DSPs, or other sources of demand.

23. The term **"Header Bidding Wrapper"** shall mean a Header Bidding management system.

24. The term **"identify,"** when referring to a person, shall have the meaning provided in Local Rule 26.3, namely, to give, to the extent known, the person's full name, present or last

8

known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

25. The term **"identify,"** when referring to documents, shall have the meaning provided in Local Rule 26.3, namely, to give, to the extent known, the (i) type of document and document identification number(s); (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

26. The term **"In-App Advertising"** shall mean Display Advertising that serves ads to users within mobile applications.

27. The term **"In-House Ad Tech Product"** shall mean an Ad Tech Product created for a Publisher's, Advertiser's, or Agency's internal use.

28. The term **"including"** shall mean including but not limited to.

29. The term **"Indirect Transaction"** shall mean a sale or placement of Display Advertising other than a Direct Transaction, including an Open Auction Transaction or Private Auction Transaction conducted by an Ad Exchange or a purchase of Inventory by an Ad Network for resale to one or more Advertisers.

30. The term **"Instream Video Advertising"** shall mean Online Advertising in which the advertisement is displayed within a stream of video content that the User is viewing, e.g., before, in the middle of, or after the video content.

31. The term **"Inventory"** shall mean space offered by Publishers for the sale or placement of Display Advertising.

32. The term **"Minimum Bid to Win"** shall mean the data that a Bidder receives after an auction is complete that includes the lowest value such Bidder could have bid to win that particular auction.

33. The term **"Native Advertising"** shall mean Online Advertising that follows the natural form and function of the User experience in which it is placed (such as sponsored ads within a User's Facebook feed).

34. The terms **"Online Advertisement"** or **"Online Advertising"** shall mean advertising via the internet, including on websites, apps, and Connected Television. For example, both Display Advertising and Search Advertising are forms of Online Advertising.

35. The term **"Open Auction Transaction"** shall mean an Indirect Transaction for which all, or substantially all, of the Buyers eligible to bid on the relevant Ad Exchange are or were eligible to submit Bids.

36. The term **"Outstream Video Advertising"** shall mean Online Advertising, other than Instream Video Advertising, that includes a video or animation.

37. The term **"person"** shall have the meaning provided in Local Rule 26.3, namely, any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

38. The terms **"Plaintiff"** and **"Defendant"** as well as a party's full or abbreviated name or a pronoun referring to a party shall have the meaning provided in Local Rule 26.3, namely, the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the Action.

39. The term **"Private Auction Transaction"** shall mean an Indirect Transaction for which only a set of Buyers expressly identified by the Publisher (or an agent or employee thereof) are or were eligible to submit Bids.

40. The term **"Property"** shall mean a website, mobile application, or other product or service containing space that is sold or offered for sale for the placement of Display Advertising.

41. The term **"Publisher"** shall mean a person or entity operating a Property. For the avoidance of doubt, the owner of the Property shall be deemed the Publisher, even if it has out-sourced the sale of its associated Inventory, in whole or in part, to a third party.

42. The term **"Publisher Ad Server"** shall mean a third-party or In-House product, service, or system that is responsible for selecting (or attempting to select), on behalf of a Publisher, the Display Advertisement (or source from which such Display Advertisement shall be obtained) for a unit of Inventory. For the avoidance of doubt, a Publisher Ad Server may be owned and/or operated by a third-party Ad Tech Provider, or may be owned, developed, or operated by the Publisher or by a third party on behalf of or under contract with the Publisher. For the further avoidance of doubt, a system that creates or manages mediation chains constitutes a Publisher Ad Server for purposes of these interrogatories.

43. The term **"Purchase,"** when used in connection with Inventory or Impressions, shall mean to obtain, directly or indirectly through one or more intermediaries, the right to render or display a Display Advertisement in a unit of Inventory, typically but not necessarily in exchange for a monetary payment.

44. The term **"Query"** shall mean a request to provide, or Bid to provide, a Display Advertisement to be rendered in a unit of Inventory, whether denominated as an "ad request," "bid

request," or otherwise. A Query may, but need not, request a Bid that will be considered before awarding the right to actually display a Display Advertisement to a particular Advertiser.

45. The term **"Search Advertising"** shall mean Online Advertising that is displayed in response to a User's search intent or search terms.

46. The term **"Take Rate"** shall mean the proportion of total revenue generated from Purchased Inventory that an Ad Tech Provider collects as part of its fee arrangement in connection with the Purchased Inventory.

47. The terms **"Second Amended Complaint"** or **"SAC"** shall mean Daily Mail's Second Amended Complaint, ECF No. 794.

48. The term **"User"** shall mean an end user visiting or using a Property, or a proxy for that end user (including, but not limited to, cookie identifiers or mobile ad identifiers).

49. The terms **"You"** or **"Your"** refer to Daily Mail, its parents, predecessors, successors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.

## INTERROGATORIES

**INTERROGATORY NO. 26**

Identify the relevant market or market(s) in which You contend each of Google's Ad Tech Products competes and how you contend such markets are defined, including the geographic scope of those market(s).

**INTERROGATORY NO. 27**

For each market referenced in your response to Interrogatory No. 26, state whether You contend the following forms of Display Advertising are included or excluded from each alleged market: (1) In-House Ad Tech Products; (2) In-App Advertising; (3) Instream Video Advertising; (4) Outstream Video Advertising; and (5) Direct Transactions.

**INTERROGATORY NO. 28**

To the extent You contend that any of the Dismissed Theories are relevant following the Court's dismissal of certain of Your claims, ECF No. 701 at 45-53, identify the bases for Your contentions; the legal claim(s) for which You contend the Dismissed Theories are legally actionable; and all facts and evidence on which You intend to rely in support of those legal claim(s).

**INTERROGATORY NO. 29**

Identify the facts and evidence on which You base Your allegation that "Daily Mail would not use DFP as currently offered by Google but for the tie with AdX. It is not in Daily Mail's interest to employ an ad server that does not promote competition among exchanges," and that AdX is a "must-have exchange for Daily Mail." SAC ¶¶ 88-89.

**INTERROGATORY NO. 30**

Identify the facts and evidence on which You base Your allegation that "it remains the

13

responsibility of the publisher, and not Google, to obtain the right for Google to use any data — including data on readers — in connection with providing ad-serving and exchange services." SAC ¶ 110.

**INTERROGATORY NO. 31**

Identify the facts and evidence on which You base Your allegation that "Daily Mail relied on Google's misrepresentations and enabled Enhanced Dynamic Allocation, which Daily Mail now cannot feasibly shut off." SAC ¶ 131.

**INTERROGATORY NO. 32**

Identify all facts or evidence to support Your allegation that You sustained damages due to Google's alleged conduct, including all data used to claim that Google's alleged conduct caused harm and all data to be used to calculate damages (e.g., estimate of revenue share overcharge, estimate of revenue loss by channel, including programmatic, direct, and any other channels or form of damages) during the damages period.

**INTERROGATORY NO. 33**

Identify all facts or evidence You allege shows that You were harmed by Google's alleged conduct, the extent to which You were harmed by the alleged conduct, and the countries in which You allege You were harmed by Google's alleged conduct.

**INTERROGATORY NO. 34**

Identify the facts and evidence on which You base Your allegation that "header bidding [is] a more favorable environment for publishers and rival exchanges." SAC ¶ 168.

**INTERROGATORY NO. 35**

Identify the facts and evidence, including document identification numbers where applicable, on which You base Your allegation that "[t]here is no technological reason for

Google's caps on line items. DFP would allow for more line items but for Google's artificial caps."

SAC ¶ 194.

**INTERROGATORY NO. 36**

Identify the facts and evidence on which You base Your allegation that "[t]he result [of Last Look, Unified Pricing Rules, and Minimum Bid To Win] is less Daily Mail content and fewer, lower quality impressions for advertisers to purchase on Daily Mail's webpages." SAC ¶ 235.

| | |
|---|---|
| Dated: May 28, 2024 | /s/ Craig M. Reiser |
| | Craig M. Reiser |
| | Daniel Bitton |
| | Denise L. Plunkett |
| | Eva H. Yung |
| | Claire L. Haws |
| | AXINN, VELTROP & HARKRIDER LLP |
| | 114 West 47th Street |
| | New York, New York 10036 |
| | Telephone: (212) 728-2200 |
| | Fax: (212) 728-2201 |
| | creiser@axinn.com |
| | dbitton@axinn.com |
| | dplunkett@axinn.com |
| | eyung@axinn.com |
| | chaws@axinn.com |
| | |
| | Bradley Justus (*pro hac vice*) |
| | AXINN, VELTROP & HARKRIDER LLP |
| | 1901 L Street NW |
| | Washington, DC 20036 |
| | Telephone: (202) 912-4700 |
| | Fax: (202) 912-4701 |
| | bjustus@axinn.com |
| | |
| | Caroline P. Boisvert (*pro hac vice*) |
| | AXINN, VELTROP & HARKRIDER LLP |
| | 90 State House Square |
| | Hartford, Connecticut 60103 |
| | Telephone: (860) 275-8100 |
| | Fax: (860) 275-8101 |

cboisvert@axinn.com

*Counsel for Defendants Google LLC and Alphabet, Inc.*