# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | **No. 1:21-md-3010 (PKC)** |

*This Document Relates To:*

| | |
|---|---|
| **ASSOCIATED NEWSPAPERS LTD. and MAIL MEDIA, INC.**<br><br>*Plaintiffs,*<br><br>**-against-**<br><br>**GOOGLE LLC and ALPHABET INC.,**<br><br>*Defendants.* | **No. 1:21-cv-03446 (PKC)** |

**DEFENDANTS GOOGLE LLC AND ALPHABET INC.'s
<u>FIRST SET OF INTERROGATORIES TO DAILY MAIL</u>**

**PROPOUNDING PARTIES**:          Google LLC

                                  Alphabet Inc.

**RESPONDING PARTY**:             Daily Mail

**SET NUMBER**:                   One

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants Google LLC and Alphabet Inc. (collectively, "Google"), through their counsel, hereby request that each of the Daily Mail Plaintiffs in the above-captioned action answer the following First Set of Interrogatories within thirty (30) days of service according to the Definitions and Instructions set forth herein and supplement their Interrogatory answers, as necessary, to comply with Federal Rule of Civil Procedure 26(e).

## **DEFINITIONS**

1.      To the extent the terms defined below are used in the Interrogatories, they should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules and the Local Rules.  These Definitions are provided solely for the purposes of these Interrogatories.

2.      The term **"Accelerated Mobile Pages"** or **"AMP"** shall mean the open source framework developed by the AMP Open Source Project designed to optimize mobile web browsing and intended to help mobile web pages load faster.

3.      The term **"Action"** refers to all lawsuits consolidated in the above-captioned multidistrict litigation, *In re: Google Digital Advertising Antitrust Litigation*, 21-md-3010.

4.      The term **"Ad Buying Tool"** shall mean any third-party or in-house software, application, service, tool, or other interface (including DSPs and Ad Networks) through which an Advertiser Purchased or can Purchase Inventory.

1

5.      The term **"Ad Exchange"** or **"Supply-Side Platform"** or **"SSP"** shall mean a third-party or in-house product or service through which two or more Ad Buying Tools (at least one of which is not owned or controlled by the entity operating the Ad Exchange) placed or can place Bids in real-time auctions for Inventory offered for sale by or on behalf of two or more Publishers (at least one of which is not owned or controlled by the entity operating the Ad Exchange).

6.      The term **"Ad Network"** shall mean a third-party or in-house product or service (other than an Ad Exchange) through which two or more Advertisers (at least one of which is unaffiliated with the entity operating the Ad Network) Purchased or can Purchase Inventory offered for sale by two or more Publishers (at least one of which is unaffiliated with the entity operating the Ad Network).

7.      The term **"Ad Selling Tool"** shall mean any third-party or in-house software, application, service, tool, or other interface (including Publisher Ad Servers, Ad Exchanges, Ad Networks, SSPs, or Header Bidding) through which a Publisher sold or can sell Inventory.

8.      The term **"Ad Tech"** or **"Ad Tech Product"** shall mean a product, service, application, tool, solution or other interface that facilitates or is involved in the Purchase or sale of Inventory, including but not limited to a Publisher Ad Server, Ad Exchange, Ad Network, Header Bidding, DSP, SSP, other Ad Buying Tool, or other Ad Selling Tool. For the avoidance of doubt, this term includes In-House Ad Tech Products, as well as products or services offered by social media outlets (including but not limited to, for example, Facebook.com and Twitter.com) and certain other Publishers that enable the Purchase of Inventory on their Properties.

9.      The term **"Ad Tech Provider"** shall mean a person, firm, association, or other entity selling, reselling, licensing, or otherwise providing at least one Ad Tech Product, whether

or not for a fee or other compensation.

10.     The term **"Advertiser"** shall mean a person or entity that, directly or through one or more intermediaries, places one or more Display Advertisements intended to advertise or promote a good or service offered by the Advertiser, or otherwise convey such Advertiser's desired message, on a Publisher's Property so that it is viewed by at least one User visiting such Property.  For the avoidance of doubt, Advertisers typically, but need not, pay for the placement of such Display Advertisements.

11.     The term "**AdX**" shall mean Google's Ad Exchange that was marketed as DoubleClick Ad Exchange, inclusive of all prior and subsequent iterations of the product and all variants thereof, and including for the avoidance of doubt the ad exchange functionality of Google Ad Manager and Google Ad Manager 360.

12.     The term **"Agency"** shall mean an advertising agency or similar consulting firm that is hired by an Advertiser to manage the Purchase of Inventory for one or more Campaigns. For the avoidance of doubt, although an Agency may use DSPs or other tools to manage such Campaigns, an entity operating a DSP shall not, solely on that basis, be deemed an Agency.

13.     The term **"Bid"** shall mean an offer, made in response to a Query, to pay a specified amount in exchange for the right to render a Display Advertisement in a unit of Inventory.

14.     The term "**Buyer**" shall mean an Advertiser submitting a Bid directly to an Ad Exchange or Publisher Ad Server (without an intermediary), or shall mean a DSP, Ad Network, or other person or entity submitting  a Bid to an Ad Exchange or Publisher Ad Server on behalf of an Advertiser, whether known at the time or to be subsequently determined. For the avoidance of doubt, an Ad Exchange shall not be deemed a Buyer even if it forwards a Bid it received on to

another Ad Exchange or Publisher Ad Server.

15.     The term **"Campaign"** shall mean one or more Display Advertisements that are targeted to particular types of Inventory, Users, or objectives.

16.     The term **"Client-Side Header Bidding"** shall mean an implementation of Header Bidding in which the Queries are sent, and responsive Bids are evaluated, by code running at least in part within the User's web browser.

17.     The term **"Complaint"** means the Amended Complaint, Case No. 1:21-md-03010-PKC, ECF No. 400, or any subsequent operative complaint filed by Daily Mail in the Action.

18.     The term **"communication"** shall have the meaning provided in Local Rule 26.3, namely, the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

19.     The term **"Connected Television"** shall mean devices or services that allow Users to watch television content served over the internet on a television screen, such as smart TVs (e.g., Samsung, TCL, Sony), media streaming devices (e.g., Roku Streaming Stick, Apple TV, Chromecast), or video game consoles (e.g.,  Xbox, PlayStation).

20.     The term **"CPM"** or **"Cost Per Mille"** shall mean cost per thousand Impressions.

21.     The term **"Demand-Side Platform"** or **"DSP"** shall mean an Ad Buying Tool, that enables an Advertiser to automatically buy Inventory sold via Ad Selling Tools in real-time on an Impression-by-Impression basis.  For the avoidance of doubt, an Agency trading desk shall be deemed a DSP for purposes of this definition.

22.     The phrase **"describe in detail"** as used in these Interrogatories includes a request for a complete description and explanation of the facts, circumstances, analysis, opinion and other information relating to the subject matter of a specific Interrogatory.

23.     The term **"Direct Transaction"** shall mean a sale or placement of Display Advertising the price of which was determined through a contractual agreement between an Advertiser (or an Agency acting on an Advertiser's behalf) and a Publisher (without an intervening Ad Tech intermediary), including for the avoidance of doubt an agreement to set such price through an auction.

24.     The term **"Display Advertisement"** or **"Display Advertising"** shall mean Online Advertising *other than* Search Advertising, and shall include native, banner, in-app or video advertising, whether social or non-social.

25.     The term **"document"** shall have the meaning provided in Local Rule 26.3, namely, that the term shall be synonymous in meaning and equal in scope to the usage of the phrase "documents or electronically stored information" in Federal Rule 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

26.     The term **"DoubleClick for Publishers"** or **"DFP"** shall mean Google's Publisher Ad Server that was marketed as DoubleClick for Publishers, inclusive of all prior and subsequent iterations of the product and all variants thereof (e.g., Small Business, Enterprise editions, etc.), and including for the avoidance of doubt the ad server functionality of Google Ad Manager and Google Ad Manager 360.

27.     The term **"Feature"** shall mean any design, feature, limitation, policy, mechanism, innovation, improvement, optimization, or strategy related to how Ad Tech Products buy, sell, price, bid, auction, measure, or report on the effectiveness of Display Advertising, including integration or interoperability with other Ad Tech Products, whether owned or operated by the same entity or different entities.

28.     The term **"Format"** shall mean the general makeup or layout of an ad. Different

types of Display Advertising Formats include Native Advertising, Instream Video Advertising, Outstream Video Advertising, and Static Advertising.

29.     The term **"Google"** shall mean Defendants Google LLC and Alphabet Inc., any current or former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

30.     The term **"Google Ad Manager"** or **"GAM"** shall mean the product introduced by Google on June 27, 2018, which brought together DFP and AdX into a unified programmatic platform.

31.     The term **"Header Bidding"** shall mean the use by a Publisher of code that is directly or indirectly called during the web browser's processing or rendering of the HTML header of a webpage (and prior to the invocation of a Publisher Ad Server) and that causes Queries to be sent to one or more Ad Exchanges, Ad Networks, DSPs, or other sources of demand.

32.     The term **"identify"** when referring to a person shall have the meaning provided in Local Rule 26.3, namely, to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

33.     The term **"identify"** when referring to documents shall have the meaning provided in Local Rule 26.3, namely, to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

34.     The terms **"impact"** and **"effect"** shall include both qualitative and quantitative, direct and indirect meanings of those terms.

35.     The term **"Impression"** shall mean the service of a single Display Advertisement to a single User.

36.     The term **"including"** shall mean including but not limited to.

37.     The term **"Indirect Transaction"** shall mean a sale or placement of Display Advertising other than a Direct Transaction, including an Open Auction or Private Auction Transaction conducted by an Ad Exchange or a Purchase of Inventory by an Ad Network for resale to one or more Advertisers.

38.     The term **"In-House Ad Tech Product"** shall mean an Ad Tech Product created for a Publisher's internal use.

39.     The term "**Instream Video Advertising**" shall mean Online Advertising in which the advertisement is displayed within a stream of video content that the User is viewing, e.g., before, in the middle of, or after the video content.

40.     The term **"Inventory"** shall mean space offered by Publishers for the sale or placement of Display Advertising.

41.     The term **"Line Item"** shall mean the Feature of a Publisher Ad Server that contains parameters for how a given Display Advertisement is intended to be served on a Publisher's Property, along with pricing and other delivery details.

42.     The term **"Native Advertising"** shall mean Online Advertising that follows the natural form and function of the User experience in which it is placed (such as sponsored ads within a User's Facebook feed).

43.     The term **"Online Advertisement"** or **"Online Advertising"** shall mean

advertising via the internet, including on websites, apps, and Connected Television. For example, both Display Advertising and Search Advertising are forms of Online Advertising.

44.     The term **"Open Auction Transaction"** shall mean an Indirect Transaction for which all, or substantially all, of the Buyers eligible to bid on the relevant Ad Exchange are or were eligible to submit Bids.

45.     The term "**Outstream Video Advertising**" shall mean Online Advertising, other than Instream Video Advertising, that includes a video or animation.

46.     The term **"person"** shall have the meaning provided in Local Rule 26.3, namely, any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

47.     "The term **"Publisher"** shall mean a person or entity operating a Property.  For the avoidance of doubt, the owner of the Property shall be deemed the Publisher, even if it has out-sourced the sale of its associated Inventory, in whole or in part, to a third party.

48.     The term **"Publisher Ad Server"** shall mean a third-party or in-house product, service, or system that is responsible for selecting (or attempting to select), on behalf of a Publisher, the Display Advertisement (or source from which such Display Advertisement shall be obtained) for a unit of Inventory. For the avoidance of doubt, a Publisher Ad Server may be owned and/or operated by a third party Ad Tech Provider, or may be owned, developed, or operated by the Publisher or by a third party on behalf of or under contract with the Publisher. For the further avoidance of doubt, a system that creates or manages mediation chains constitutes a Publisher Ad Server for purposes of this definition.

49.     The term **"Publisher-Automated Transaction"** shall mean a Direct Transaction that is or was negotiated, transacted, or finalized through one or more automated services,

whether or not auction-based, that is controlled by the Publisher or an affiliate thereof (other than an Ad Network, Ad Exchange, or SSP). This would include, for example, the Publisher's self-service website for Advertisers to create Campaigns or place advertisements, such as that described at https://facebook.com/business/ads. For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server (including one operated by the Publisher) shall not be sufficient to render such transaction a Publisher-Automated Transaction.

50.     The term **"Purchase,"** when used in connection with Inventory or Impressions, shall mean to obtain, directly or indirectly through one or more intermediaries, the right to render or display a Display Advertisement in a unit of Inventory, typically but not necessarily in exchange for a monetary payment.

51.     The term **"Private Auction Transaction"** shall mean an Indirect Transaction for which only a set of Buyers expressly identified by the Publisher (or an agent or employee thereof) are or were eligible to submit Bids.

52.     The term **"Property"** shall mean a website, mobile application, or other product or service containing space that is sold or offered for sale for the placement of Display Advertising.

53.     The term **"Query"** shall mean a request to provide, or bid to provide, a Display Advertisement to be rendered in a unit of Inventory, whether denominated as an "ad request," "bid request," or otherwise.  A Query may, but need not, request a Bid that will be considered before awarding the right to actually display a Display Advertisement to a particular Advertiser.

54.     The term **"Search Advertising"** shall mean Online Advertising that is displayed in response to a User's search intent or search terms.

55.     The term **"Server-Side Header Bidding"** shall mean an implementation of Header Bidding in which the Queries are sent, and responsive Bids are evaluated, by code running on a server (even if such server code is invoked from a call from the User's web browser).

56.     The term **"Static Advertising"** shall mean Online Advertising consisting solely of static (i.e., non-moving or -changing) text, images, or graphics.

57.     The term **"User"** shall mean an end user visiting or using a Property, or a proxy for that end user (including, but not limited to, cookie identifiers or mobile ad identifiers).

58.     The terms "**You**" or "**Your**" shall mean Associated Newspapers Ltd. and Mail Media, Inc. ("Daily Mail") and any other plaintiff named in any subsequent or operative complaint, their affiliates, predecessors, authorized representatives or agents, and all other persons acting or purporting to act on behalf of any and all Daily Mail Plaintiffs.

## <u>INSTRUCTIONS</u>

1.     In addition to the specific instructions set forth below, these Interrogatories incorporate the instructions set forth in Federal Rules 26 and 33, the Local Rules, the Stipulation and Order Regarding Discovery Procedure ("ESI Order") (to be entered), the Confidentiality Order (ECF No. 297), and Pre-Trial Order No. 5 ("Scheduling Order") (ECF No. 394), or the operative version of those Orders in place at the time responses are served.

2.     These Interrogatories seek information available to You, or to which You may gain access through reasonable effort, including information in the possession of Your past and present attorneys, accountants, investigators, consultants, agents, or other persons directly or indirectly employed or retained by You, or anyone else otherwise subject to Your control who maintains records on Your behalf, in Your name, or otherwise under Your control.

3.      Unless otherwise specified, these Interrogatories each require a separate response.

4.      If You cannot provide a full and complete response to any Interrogatory, You should respond to the Interrogatory to the extent possible, specifying the portion of the Interrogatory You are unable to answer and providing whatever information You have regarding the unanswered portion.

5.      If You object to, or otherwise decline to answer, all or any portion of any Interrogatory, please provide all information called for by the Interrogatory to which You do not object or do not decline to answer.  For those portions of any Interrogatory to which You object or otherwise decline to answer, state the reason for such objection or declination.  If You object to any Interrogatory on the ground that it is too broad (i.e., that it calls for information which is not relevant), please provide such information as You concede to be not overly broad.  If You object to any Interrogatory on the ground that it would constitute an undue burden to provide an answer, please provide such requested information as can be supplied without undertaking such undue burden.

6.      If You perceive any ambiguity in an Interrogatory, provide a brief statement of the nature of the perceived ambiguity and the interpretation You used to resolve it.

7.      Pursuant to Federal Rule 26(b)(5), if You believe that any Interrogatory calls for information subject to a claim of privilege, then:

a.      Answer all parts of the Interrogatory to which You do not object;

b.      Explain the basis for Your claim of privilege as to each part of the Interrogatory to which You object; and

c.      Identify the general nature of the information withheld.

8.      In construing the Interrogatories:

a.      Terms not specifically defined shall be given their ordinary meaning as You understand them to be used in the trade;

b.      The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all other tenses, moods, or voices, whenever necessary, to bring within the scope of any Interrogatory all information that might otherwise be construed to be outside its scope;

c.      The use of the singular form of any word includes the plural and vice versa;

d.      Words in the masculine, feminine, or neutral gender shall include each of the other genders;

e.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Interrogatory all responses that might otherwise be construed to be outside of its scope;

f.      The terms "all," "any," and "each" shall each be construed as encompassing any and all.

9.      None of the Definitions or Interrogatories shall be construed as an admission relating to the existence of any evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in the Definitions or the Interrogatories.

10.     These Interrogatories are continuing in nature. In the event that You become aware of responsive information in addition to, or in any way inconsistent with, that which You previously have provided, prompt supplementation of Your responses is required.

11.     Google specifically reserves the right to seek supplementary responses to the Interrogatories before trial.

12.     The relevant time period for these Interrogatories, unless otherwise specified, is January 1, 2013 to the present.

## INTERROGATORIES

### INTERROGATORY NO. 1

Identify and describe each business or legal entity under Your control, including the dates of operation, its purpose or line of business, all locations in which You conducted business and associated time periods for each.

### INTERROGATORY NO. 2

State what Your revenue was in each year, including all sources of that revenue and amount of revenue by each source, and including all Digital Advertising revenue by Format (e.g., video, banner).

### INTERROGATORY NO. 3

Identify all ad-supported, whether in-whole or in-part, websites You maintain, maintained, control, controlled, own, or owned and, for each, identify the time period during which each website has operated, and the identity of all of Your employees or agents involved in selling advertising space offered on such website.

### INTERROGATORY NO. 4

Identify each of Your Google digital advertising accounts including, for each: the date the account was opened; the dates during which the accounts were in use; any account IDs associated with the account, including Google customer IDs; which business entity or entities has owned the account (and associated time period); and which individual(s) has used or accessed the account on behalf of You (and associated time period).

**INTERROGATORY NO. 5**

Identify Your communications with Google upon which You rely for any of Your claims, including identifying the dates of such communications, the relevant individuals from You and Google who participated in the communications, the subject matter of such communications, and all documents related thereto.

**INTERROGATORY NO. 6**

Identify all contracts for Your Google digital advertising accounts that You entered into, including, but not limited to, all contracts for Google Ad Tech products and services, including all DoubleClick for Publishers/Google Ad Manager contracts, and all terms of service including all revised or updated terms of service, and including, for each contract, identifying the date on which You entered into the contract, identifying the person who accepted the contract on Your behalf, and identifying all of Your communications relating to the contract.

**INTERROGATORY NO. 7**

Identify each Ad Tech Provider and Ad Tech Product You used (whether from Google, any other Ad Tech Provider, or developed in-house), including the associated time period in which You used each Ad Tech Provider and Ad Tech Product, and the amount in fees paid monthly to each Ad Tech Provider by Ad Tech Product used.

**INTERROGATORY NO. 8**

Identify for each year the amount of advertising revenue You received, including by Digital Advertising and print advertising, and identifying revenue generated in connection with Your use of Google's Ad Tech tools to fill ad space on Your websites, and identifying revenue

generated in connection with Your use of any other Ad Tech tools from other Ad Tech Providers besides Google.

**<u>INTERROGATORY NO. 9</u>**

Identify all Direct Transactions You have sold to fill ad space on Your websites, including the customers, dates, prices (including by CPM or other basis) at which You sold the advertising, the terms of such sale, all advertising Campaigns and individual advertisements You ran or continue to run as a result of these Direct Transactions, including the dates associated with each; and the revenue You received from these Direct Transactions.

**<u>INTERROGATORY NO. 10</u>**

Describe in detail all factors that influence or influenced Your advertising selling decisions, including but not limited to factors influencing Your decisions to sell Display Advertising, Your objectives for selling Display Advertising, and all factors that influence Your decisions regarding number, size, and placement of advertising spaces to sell on Your website(s).

**<u>INTERROGATORY NO. 11</u>**

Describe in detail all factors that influence or influenced Your choice of Ad Tech Products, including Your decision to use Google Ad Tech Products vs. Ad Tech Products of any other Ad Tech Provider, including Ad Tech Products developed in-house, to sell advertising spaces on Your website(s), and any other products or technology that You chose or considered choosing instead of Ad Tech Products to sell advertising spaces on Your website(s).

**<u>INTERROGATORY NO. 12</u>**

For the time period January 1, 2010 to present, describe Your use or consideration of each of Dynamic Allocation, Enhanced Dynamic Allocation, Project Bernanke, Dynamic Revenue Share, Viewable CPMs, Project Poirot, Project Elmo, Redaction of Auction Data, Line Items (or

caps or limitations thereof), Unified Pricing Rules, Open Bidding, Bid Data Transfer File, and Minimum Bid To Win, including the associated timeframe in which each of these designs or Features were in use by You.

**INTERROGATORY NO. 13**

For the time period January 1, 2010 to present, describe the effects, if any, of each of Dynamic Allocation, Enhanced Dynamic Allocation, Project Bernanke, Dynamic Revenue Share, Viewable CPMs, Project Poirot, Project Elmo, Redaction of Auction Data, Line Items (or caps or limitations thereof), Unified Pricing Rules, Open Bidding, Bid Data Transfer File, and Minimum Bid To Win on Your revenue, CPM, impressions, and clicks.

**INTERROGATORY NO. 14**

Describe whether and how the amount of content (including the number of web pages, the number of apps, and the amount of content per web page/app) on Your website(s) is impacted by the advertising revenue You receive, or the Ad Tech fees that You pay.

**INTERROGATORY NO. 15**

Describe Your use of Accelerated Mobile Pages (AMP) including Your decision to adopt AMP and the effect that adopting AMP has had on Your websites, including the speed with which Your websites load, the amount of traffic on Your websites, and Display Advertising revenues.

**INTERROGATORY NO. 16**

Describe the settings in Your Google Ad Manager accounts over time, including any changes that You have made from the default settings including enabling or disabling certain Features, the associated time period in which You made these changes, and Your reasons for doing so.

**INTERROGATORY NO. 17**

Identify any differential price floors You set for Inventory available on more than one Ad Exchange for different demand sources before Unified Pricing Rules, including the time period in which these differential price floors were in effect, and the reasons for setting such differential price floors.

**INTERROGATORY NO. 18**

Identify the number of line items You used prior to Google capping Line Items, including identifying any changes to the number of Line Items You used over time.

**INTERROGATORY NO. 19**

Without regard to any time period, identify whether You ever enabled Header Bidding and, if so, describe the kind(s) of Header Bidding You enabled and the time period in which You enabled each kind of Header Bidding.

**INTERROGATORY NO. 20**

Without regard to any time period, describe all reasons for deciding to enable each kind of Header Bidding, including reasons for enabling Client-Side Header Bidding instead of or in addition to Server-Side Header Bidding.

**INTERROGATORY NO. 21**

Without regarding to any time period, describe Header Bidding's impact on Your business including impact, if any, on Your revenue or CPM from Display Advertising.

**INTERROGATORY NO. 22**

Identify all communications in which You asked to purchase DFP separately from AdX including, for each: the date of such communication; the form of the communication; the content of the communication; the individual(s) who participated in the communication on behalf of

You; the individual(s) who participated in the communication on behalf of Google; and all documents related thereto.

**INTERROGATORY NO. 23**

Identify all steps You have ever taken to "diversify [Your] demand partners" as set forth in Paragraph 198 of Your Complaint.

**INTERROGATORY NO. 24**

Describe in detail the diligence, if any, You exercised in investigating the claims You assert in this case prior to commencing the Action including any steps You took to discover the facts alleged in the Complaint.

**INTERROGATORY NO. 25**

Without regard to any time period, identify each civil action, excluding this Action, in which You have participated or are currently participating, including all instances in which You provided deposition, trial, or other testimony in a civil or criminal action, including without limitation the date, location, and case number of the action in which the testimony was provided.

## Local Rule 33.3(a) Interrogatories

**33.3(a) INTERROGATORY NO. 1:** For each business or legal entity under Your control identified in response to Interrogatory No. 1, state whether You have possession, custody, and/or control over documents concerning the use of Display Advertising or Ad Tech Products by that business or legal entity.  If so, include in Your answer the locations, custodians, and general description of such documents.  If not, identify all person(s) with possession, custody, and/or control of such documents.

**33.3(a) INTERROGATORY NO. 2:** Identify all persons with relevant knowledge concerning Your claims in Your Complaint.

**33.3(a) INTERROGATORY NO. 3:** Identify all persons with relevant knowledge concerning the use of Display Advertising or Ad Tech Products by each of Your businesses or legal entities.

**33.3(a) INTERROGATORY NO. 4:** For each category of monetary relief that You seek in Your Complaint, provide a computation of the amount of each category of monetary relief sought for each count.

**33.3(a) INTERROGATORY NO. 5:** With respect to each harm or injury for which You seek relief in this Action, identify each person with knowledge of that harm or injury.

Dated: January 27, 2023

*/s/ Justina K. Sessions*
Justina K. Sessions
Jonathan Jacobson
Jessica Lonergan
Mikaela Evans-Aziz
Vadim Egoul
**WILSON SONSINI GOODRICH
& ROSATI**
**Professional Corporation**
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000
jsessions@wsgr.com
jjacobson@wsgr.com
jlonergan@wsgr.com
mevansaziz@wsgr.com
vegoul@wsgr.com

John Harkrider
Daniel Bitton
Bradley Justus
Koren Wong-Ervin
**AXINN VELTROP & HARKRIDER LLP**
114 West 47th Street
New York, NY 10036
(212) 728-2200
jharkrider@axinn.com
dbitton@axinn.com
bjustus@axinn.com
kwongervin@axinn.com

*Counsel for Defendants Google LLC
and Alphabet Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon the attorneys listed below via email on January 27, 2023.

*/s/ Mikaela Evans-Aziz*
Mikaela Evans-Aziz

**List of Attorneys:**

**John Thorne**
KELLOGG, HANSEN, TODD, FIGEL &
 FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, DC 20036
(202) 326-7900
jthorne@kellogghansen.com

**Eric Maier**
KELLOGG, HANSEN, TODD, FIGEL &
 FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, DC 20036
(202) 326-7900
emaier@kellogghansen.com

*Counsel for Associated Newspapers, Ltd.*
*and Mail Media, Inc.*

21