# Exhibit 4

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900

FACSIMILE:
(202) 326-7999

May 27, 2024

Eva Yung
Axinn, Veltrop, & Harkrider LLP
114 W. 47th Street
New York, NY 10036

      Re:    *In re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (PKC)

Dear Eva:

      We write regarding Google's 30(b)(6) deposition notice (the "Notice") served on Gannett Co., Inc. ("Gannett").

      As we explained in our May 7 Responses and Objections to the Notice and in our meet and confer on May 13, the 22 topics listed in Google's Notice are incredibly overbroad. Google began receiving Gannett documents related to the subject matter of this case nearly a year ago. *See*, *e.g.*, Ltr. from J. Thorne to M. Evans-Aziz (July 7, 2023) (producing to Google GANNETT_GOOG_0000001 – GANNETT_GOOG_0015390). Gannett has since produced to Google over a quarter million documents. Gannett likewise has answered 30 interrogatories, five more than were permitted by the Federal Rules or the Court's orders in this case. Google's Notice fails to account for Google's access to those materials. *See Weisshaus v. Port Auth. Of N.Y. and N.J.*, 2021 WL 5847403 (S.D.N.Y. Dec. 9, 2021) (refusing to designate corporate witness "in light of the discovery [the noticing party] has already obtained"). Rather than seek non-duplicative information to supplement Gannett's large document productions and numerous interrogatory responses, Google's Notice lists 22 extraordinarily broad topics. To take just a few examples, Google's Notice seeks testimony on Gannett's "use of Display Advertising," without limitation, and likewise asks about Gannett's "use of Indirect Transactions and Direct Transactions," i.e., *all* Display Advertising transactions. *Cf. Seliger v. Breitbart News Network, LLC*, 2021 WL 707063 (S.D.N.Y. Feb. 22, 2021).

      Given that overbreadth, we asked Google to describe with particularity the information it actually wants under each of the noticed topics. Google declined to do so. We also proposed that Google identify to Gannett a reasonable number of documents it would like Gannett's 30(b)(6) designee(s) to be prepared to discuss at the deposition. This would allow the corporate designee(s) to prepare to discuss those materials about which Google is most interested. Google has not yet done so, nor has it provided us with its position on that proposal. Instead, Google asked Gannett to take on the burden of proposing the topics that Google should cover in its

Kellogg, Hansen, Todd, Figel & Frederick, p.l.l.c.

E. Yung
May 27, 2024
Page 2

30(b)(6) deposition.  Despite it being Google's obligation to "describe with reasonable particularity the matters for examination," Fed. R. Civ. P. 30(b)(6), Gannett agreed to do so.

    Attached as Appendix A to this letter is Gannett's proposal for a narrowed set of topics.  Given the time remaining in discovery, we believe this is a set of topics about which it is reasonable to expect Gannett's corporate designee(s) to testify.  Gannett agrees to reasonably prepare a corporate designee or designees to testify regarding these topics.  Unless otherwise indicated, the time period these narrowed topics cover is January 1, 2016 to the present.

    We continue to believe that it would be most efficient for Google to provide Gannett with a list of a reasonable number of documents about which Google would like testimony.  If the number of documents on that list is reasonable, Gannett would agree to prepare its corporate designee(s) to discuss those materials at the 30(b)(6) deposition.  Please provide us with Google's position on this proposal.

    Respectfully,

    /s/ *Eric J. Maier*
    Eric J. Maier

# Appendix A

Gannett 30(b)(6) Topic Proposal

| | Original Topic | Narrowed Topic |
|---|---|---|
| 1. | The authenticity of all documents and data You produced relating in any way to the claims You have asserted in the above-referenced litigation including, but not limited to, in response to Google's January 27, 2023 Requests for Production to You. | N/A – Subject of negotiated authenticity stipulation |
| 2. | Your use of Display Advertising, including but not limited to why You use Display Advertising, how You use or have used Display Advertising (including without limitation Your organizational structure as it relates to Display Advertising), what alternatives to Display Advertising You use, have used, or have considered using, and your key competitors in the sale of Display Advertising. | The importance of Display Advertising to Gannett's business model and the proportion of overall revenue Gannett earns from Display Advertising. |
| 3. | Your strategic plans and decisions relating to Display Advertising and its alternatives, including the agreement or disagreement of Your employees with those strategic plans and decisions. | The importance of Display Advertising to Gannett's business model and the proportion of overall revenue Gannett earns from Display Advertising. |
| 4. | Your use of Ad Tech to sell Inventory, including but not limited to why You use Ad Tech to sell Inventory, what Ad Tech Products You use, have used, or have considered using to sell Inventory (including without limitation Google's Ad Tech Products or any In-House Products), and what alternatives to Ad Tech You use, have used, or have considered using (including Your ability to sell Inventory without using Ad Tech Products). | The time period over which Gannett has licensed GAM; The reasons Gannett license GAM; Whether there are alternative Publisher Ad Servers to GAM. |
| 5. | Your consideration, evaluation, or comparison of Ad Tech Products and/or Ad Tech Providers to sell Inventory, including details on the Features, pricing, interoperability, and effectiveness of Ad Tech Products/Providers, your actual or considered switching from one Ad Tech Product/Provider to another, or Your ability to sell Inventory without using Ad Exchange or Ad Network products. | The proportion of programmatic inventory Gannett sells through AdX as compared to other exchanges, and how that proportion has changed over time; The quality of advertising sold through AdX and how it compares to advertising sold through other Ad Exchanges; The revenue share charged by AdX and how it compares to the revenue share charged by other Ad Exchanges. |

1

| Original Topic | Narrowed Topic |
|---|---|
| 6. The advantages or disadvantages of integration or interoperability of the different Ad Tech Products You use, have used, or have considered using. | The feasibility of and impediments to integrating Ad Exchanges and Header Bidding with Google's Publisher Ad Server, GAM. |
| 7. Your consideration, analysis, and experience with using non-Google Publisher Ad Server and/or Ad Exchange products when using Google's Publisher Ad Server and/or Ad Exchange products. | (No Change) |
| 8. The factors that affect whether and why You use multiple Ad Selling Tools to sell Inventory, including but not limited to the relative performance of each Ad Selling Tool used. | The proportion of programmatic inventory Gannett sells through AdX as compared to other exchanges and how that proportion has changed over time; The quality of advertising sold through AdX and how it compares to advertising sold through other Ad Exchanges; The revenue share charged by AdX and how it compares to the revenue share charged by other Ad Exchanges. |
| 9. Your use of Indirect Transactions and Direct Transactions to sell Inventory. | The factors that impact whether Gannett sells inventory directly or indirectly. |
| 10. Your experience, analysis, commentary, and decisions with respect to Header Bidding, including Your evaluation of and decision to use, refrain from using, or change your use of Header Bidding, use of any specific Header Bidding provider, use of client-side and/or server-side Header Bidding, or use of any specific partner in connection with Header Bidding. | The advantages and disadvantages of implementing Header Bidding, including:<br><br>• The impact of Header Bidding on the price of Gannett's inventory;<br>• The impediments to implementing Header Bidding;<br>• The identities of Gannett's client-side header bidding partners and server-side header bidding partners. |
| 11. Your revenue, costs, profitability, gross profit margin, and operating profit margin for Display Advertising over time, including the impact on such amounts from the use of one or more means of selling such Display Advertising. | General trends in Gannett's revenues from Display Advertising and how those revenues have changed from 2014 to the present. |

2

| Original Topic | Narrowed Topic |
|---|---|
| 12. Your relationship with Google, including without limitation the impact of Google's alleged conduct on: Your profitability; the revenue that You receive from Display Advertising and its alternatives; Your creation, procurement, and publishing of original content; and Your decisions regarding newsroom employment. | Google's representations to Gannett regarding the impact of Google's Publisher Ad Server and Ad Exchange on Gannett's revenues from Display Advertising. |
| 13. The costs and benefits associated with Your actual or considered switching, in whole or in part, from Paid Advertising to monetizing Your Properties through sales of content, or vice versa. | The proportion of revenue Gannett earns from Display Advertising as compared with other sources. |
| 14. How You monetize Your content, including whether to make Your content available in mobile apps and/or through web browsers, and Your ability to attract advertisers or readers to Your content and to specific channels (i.e., mobile app or web browsers). | The factors that influence whether Gannett sells inventory on mobile apps or web browsers; trends regarding the proportion of inventory Gannett sells on mobile apps and web browsers; the general prices of inventory sold on mobile apps as compared with inventory sold on web browsers; the characteristics of advertisers that purchase inventory on mobile apps; and the characteristics of advertisers that purchase inventory on web browsers. |
| 15. How You determine what Ad Formats to offer to sell Inventory on Your Properties, including Your consideration of the availability or use of User or proxy identifiers or other mechanisms to track Users. | The Display Advertising ad formats Gannett makes available for sale on their websites, and the factors Gannett considers in determining whether to make particular ad formats available.<br><br>The user information Gannett makes available to Ad Exchanges. |
| 16. The extent to which You have designed or considered designing Your content to comply with Mobile Publishing Formats, and the impact of Mobile Publishing Formats on Your Properties' Impressions, conversions, revenue, profit, latency, incidence of ads containing spam or malware, and Your use of Header Bidding. | Trends in the proportion of Inventory Gannett sells on mobile web browsers and the general prices of Inventory sold on mobile web browsers as compared with desktop browsers.<br><br>The impediments to Gannett's implementing Header Bidding on Accelerated Mobile Pages. |
| 17. Your experience with spam, fraud, malware, domain spoofing, inappropriate ads, User privacy, and any other security issues related to the sale of Inventory on Your Properties, including Your consideration of relevant data protection and privacy laws. | Gannett's general experience with spam, fraud, malware, domain spoofing, and inappropriate ads.<br><br>Non-privileged information regarding Gannett's consideration of relevant data protection and privacy laws when selecting Ad Tech Products to license. |

3

| Original Topic | Narrowed Topic |
|---|---|
| 18. Your consideration, analysis, and experience with setting price floors in auctions for Display Advertising, including difficulty of setting up and maintaining price floors, use of different price floors depending on the auction and/or buyer, and mechanisms for simplifying and/or automatic the setting of price floors. | Prior to Google's implementation of Unified Pricing Rules, Gannett's methods of setting up and maintaining price floors, use of different price floors depending on the auction and/or buyer, and mechanisms for simplifying or automatically setting price floors. |
| 19. Your understanding of how the GAM auction operates and/or how it operated during the Relevant Period, including Your understanding of any changes to the operation of the GAM auction during the Relevant Period. | Google's representations to Gannett regarding:<br>• Dynamic Allocation/Last Look<br>• Enhanced Dynamic Allocation<br>• Dynamic Revenue Share<br>• Unified Pricing Floors<br>Including Google's representations regarding how each operated and its impacts on the sale Gannett's inventory. |
| 20. Whether You contend that Google made misrepresentations or omissions to You, the specific omissions or misrepresentations You contend Google made (including when and by whom they were made, and when You discovered they were omissions or misrepresentations), any diligence You exercised in investigating and retaining evidence of these misrepresentations or omissions or any of the claims You assert in this case prior to commencing the Action, and how those misrepresentations or omissions (if any) impacted any decision You made regarding Your sale of Inventory, use of Ad Tech, or selection of Ad Tech Product or Ad Tech Provider. | Google's representations and/or omissions to Gannett regarding:<br>• Enhanced Dynamic Allocation<br>• Accelerated Mobile Pages<br>• Google's use of rival bids to inform bids by AdX buyers<br>• Exchange Bidding<br>• Dynamic Revenue Share<br>• Whether Google's auction was a second-price or first-price auction<br>• Unified Pricing Floors |
| 21. Your communications with any federal or state law enforcement or regulatory agency, attorney general's office, or private litigant concerning Google's Display Advertising or Ad Tech. | N/A – factual information duplicative of other topics, or information subject to privilege. |
| 22. Your relationships with entities related to Your decisions about and use of Display Advertising, including but not limited to: FIG LLC, GateHouse Media, LocaliQ, News Media Alliance, and Wordstream.. | Communications with News Media Alliance concerning Gannett's strategy for selling Inventory.<br><br>The relationship between Gannett and FIG LLC, GateHouse Media, LocaliQ, and Wordstream, insofar as that relationship involved Gannett's strategy for selling Inventory. |

4