# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIG. | Civil Action No. 1:21-md-03010-PKC |

**PLAINTIFFS' AMENDED NOTICE OF DEPOSITION OF GOOGLE LLC**
**PURSUANT TO RULE 30(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

TO ALL PARTIES AND THEIR ATTORNEY OF RECORD:

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the MDL Plaintiffs will take the deposition(s) of corporate representative(s) of Google LLC regarding the subject matters identified in, and based on definitions provided in, Exhibit A. The deposition(s) will take place on June 20, 2024, commencing at 9:00 a.m. EDT, at Boies Schiller Flexner LLP, 55 Hudson Yards, 20th Floor, New York, NY 10001, or as otherwise agreed to by the parties.

PLEASE TAKE FURTHER NOTICE that in accordance with Rule 30 of the Federal Rules of Civil Procedure, the deposition will be taken before an officer authorized to administer oaths, and will be recorded by stenographic means and on videotape. The MDL Plaintiffs reserve the right to use the videotape of the deposition at trial.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendant shall designate and produce for deposition one or more officers, directors, representatives or agents, or other persons most knowledgeable, regarding all information known or reasonably available to it relating to the subject matters identified in Exhibit A.

Dated: June 13, 2024

*/s/ Philip Korologos*

Philip Korologos
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-446-2390
pkorologos@bsfllp.com

Jordan Elias
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: 415.981.4800
jelias@girardsharp.com

Serina M. Vash
**HERMAN JONES LLP**
153 Central Avenue #131
Westfield, New Jersey 07090
Telephone: 404-504-6516
svash@hermanjones.com

*The MDL Plaintiffs' Discovery Steering Committee*

## EXHIBIT A

### DEFINITIONS

The following terms are defined below solely for the purpose of this notice of deposition:

1.      "Action" shall mean the above-captioned case.

2.      "Ad Auction" shall mean any auction to sell Ad Inventory.

3.      "Ad Impression" shall mean a specific advertising opportunity in a specific ad space on a Publisher's website that can be sold to an Advertiser.

4.      "Ad Inventory" shall mean the range of potential Ad Impressions Publisher has available to sell on its webpages when Users load the webpages.

5.      "Ad Tech Auction Mechanics" shall mean any and all systems and software that implement, effectuate, or modify any Ad Auction rules, preferences, designs, or features; this term includes, but is not limited to, Open Bidding (also known as "Exchange Bidding," "Jedi," "Jedi+," "Jedi++," or "Demand Syndication"), Open Auction, Dynamic Allocation, Enhanced Dynamic Allocation, Optimized Competition, Real-Time Bidding, OpenRTB, Unified Pricing Rules, First Look, Last Look, Reserve Price Optimization, Dynamic Revenue Share (also known as "Average Revenue Share"), Project Bernanke, Project Alchemist, Project Poirot, Project Elmo, or Minimum Bid to Win.

6.      "Ad Tech Products" shall mean any and all systems, platforms, and software, including predecessors and successors, used in the process of identifying, selecting, transmitting, and/or rendering Digital Advertising on a desktop or mobile device, as well as all systems and software, including predecessors and successors, that implement and/or effectuate an Ad Auction, including, but not limited to, receiving, processing, and transmitting Bid Requests, Bid Responses, or related messages. The term includes, but is not limited to, Publisher Ad Servers, Advertiser Ad Servers, SSPs, DSPs, Demand-Side Products, Ad Exchanges, and Ad Networks,

and specifically includes Your products: Your Publisher Ad Server (formerly called "DoubleClick for Publishers" or "DFP"); Your Ad Exchange (formerly called "DoubleClick Ad Exchange" or "AdX"), Google Ads (formerly called "Google AdWords" or "AdWords"), Display & Video 360 (DV360), DoubleClick Bid Manager (DBM) (also known as "Google Bid Manager"), Campaign Manager, DoubleClick Campaign Manager (DCM), Google Display Network (GDN), Google Ad Manager (GAM), DoubleClick for Publishers (DFP), Google AdSense (also known as "AdSense for Content" and "AFC"), DoubleClick for Advertisers (DFA), Google Analytics, Google AdMob, Search Ads 360 (SA360), Google Search Network, and any other product or service, however named, that You provide, have provided, or will provide for the sale or intermediation of Digital Advertising.

7.      "Advertiser" shall mean any purchaser of online Ad Inventory on a Publisher's webpage to serve ads to those internet Users who visit a Publisher's webpage.

8.      "AdX/Open Bidding dataset" means the dataset Google produced on May 30, 2023, which consist of the files Bates numbered GOOG-AT-MDL-DATA-000066537-482007; GOOG-AT-MDL-DATA-000508827-58886.

9.      "Analysis" means any analyses, evaluations, or interpretations of Your Metrics, financial performance, expenses, or revenues. It also includes any analyses, evaluations, or interpretations of the Metrics, financial performance, expenses, or revenues of third parties, such as Advertisers, Competitors, and Publishers.

10.     "Authorized Buyer" shall mean a buyer participating in Your Authorized Buyers program. *See* https://support.google.com/authorizedbuyers/answer/9070822, last visited May 7, 2024.

4

11.     "Beta" shall mean a product or service that is released to a limited number of users before it is released to the general public.

12.     "Bid Request" shall mean an electronic message containing (directly or indirectly) information about the context of a piece of Ad Inventory (page content, URL, etc.) and the User (*e.g.*, cookie data) that can be used to solicit bids to purchase an Ad Impression, irrespective of whether the message or its contents has been modified for transmission to an Advertiser.

13.     "Bid Response" shall mean an electronic message generated in response to a Bid Request containing (directly or indirectly) a bid price and various pieces of information concerning proposed advertising content to fill an Ad Impression identified in the corresponding Bid Request.

14.     "Cost of Capital" shall mean a company's minimum required rate of return.

15.     "Competitors" shall mean any entity that offers any products or services that competes or has competed with Your Ad Tech Products or Ad Tech Services.

16.     "Demand-Side Products" shall mean Your Ad Tech Products that facilitate the purchase of Ad Inventory, including, but not limited to, AdWords, Google Ads, DoubleClick for Advertisers, Google Display Network, DoubleClick Campaign Manager, Google Campaign Manager, DoubleClick Bid Manager, DV360, Google Analytics, Analytics 360, and Google Audience Center.

17.     "Direct Sales" shall mean Ad Inventory that is sold by a Publisher without the use of open programmatic auctions, but including programmatic guaranteed line items managed by the Publisher, directly to Advertisers.

18.     "Direct Network Effect" means the phenomenon whereby a service improves across viewer engagement Metrics because the number of users or content increases.

19.     "Digital Advertising" means advertising inventory filled by way of the internet, as opposed to out-of-home, broadcast television, or print, including but not limited to video Digital Advertising, display (desktop and mobile) Digital Advertising, search Digital Advertising, in-app Digital Advertising, native Digital Advertising, rich media Digital Advertising and any other advertising categorized as Digital Advertising by You in Your ordinary course of business.

20.     "Document" or "document" shall be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A) and shall have the same meaning as provided in L. Civ. R. 26.3.

21.     "DSP" shall mean Demand Side Platform.

22.     "DVAA" means Display and Video, Apps and Analytics as used in GOOG-AT-MDL-004326981, or as otherwise used in Google documents. The DVAA business segment means the business or reporting units as defined on page -6992 in GOOG-AT-MDL-004326981.

23.     "DVAA P&Ls" mean the profit and loss statements associated with the DVAA business segment and its reporting units or products, including documents identified by Google in its corrected response to DOJ's Interrogatory 11 (GOOG-AT-MDL-019564740), identified by Google in its supplemental response to DOJ's Interrogatory 3 (GOOG-AT-MDL-019564578), identified by Google in its response to DOJ's Interrogatory 14 (at page -4541, 4542 in GOOG-AT-MDL-019564531), the periodic reports created by Google's controller, and other similar documents otherwise provided by Google. The DVAA P&Ls include but are not limited to the Ad Business Segment P&Ls (such as GOOG-AT-MDL-008928778, and similar documents), DVAA Buyside/Sellside Lens P&Ls (such as GOOG-DOJ-AT-02649859, and similar

documents), and DVAA MECE P&Ls (such as GOOG-AT-MDL-009643876, and similar documents).

24.    "General Availability" or "GA" shall mean the release of a product to the general public.

25.    "Metric" or "Metrics" mean any measures of quantitative assessment that may be used for analyzing, evaluating, or interpreting Your business, Your budgets, Your financial performance, Your revenues, or Your Projections, including the following: cost per mille (CPM), revenue per mille (RPM), cost per click (CPC), cost per impression, average advertiser yield, monthly active users (MAU), revenue split, total advertising revenue, take rate, transaction fees, total ad impressions, number of impressions, and/or daily active users (DAU). Metric also includes any measures of quantitative assessment that may be used for analyzing, evaluating, or interpreting the business, budgets, financial performance, revenues, or projections relating to third parties (e.g., Advertisers, Competitors, and Publishers), including the following: cost per mille (CPM), revenue per mille (RPM), cost per click (CPC), cost per impression, average advertiser yield, monthly active users (MAU), revenue split, total advertising revenue, take rate, transaction fees, total ad impressions, number of impressions, and/or daily active users (DAU).

26.    "Opex Reclass" is the P&L line item referenced in the "Total Ads (Ext)" tab of GOOG-DOJ-AT-02647833, or as otherwise used in Google documents.

27.    "Projections" means any forecasts or evaluations of Your or a third parties' (e.g., Advertisers, Competitors, Publishers) future or predicted Metrics, financial performance, expenses, or revenues.

28.    "Publisher" shall mean anyone who serves content on the internet that is monetized by selling Ad Inventory to Advertisers.

29.     "Real-Time Bidding" or "RTB" shall mean that process by which Advertisers submit bids for Ad Impressions in real-time Ad Auctions.

30.     "Relevant Time Period" shall mean the time period from January 1, 2010 to the present.   Unless otherwise specified, the Relevant Time Period for all Subject Matter Areas listed herein is January 1, 2010 to the present.

31.     "Return on Invested Capital," which is sometimes abbreviated to "ROIC" is defined on page -7012 in GOOG-AT-MDL-004326981 or is defined as otherwise used in Google documents.

32.     "SSP" shall mean Supply-Side Platform.

33.     "Supply-Side Products" shall mean Your Ad Tech Products that facilitate the sale of Ad Inventory, including, but not limited to AdSense, DoubleClick for Publishers, AdX, Google Ad Manager, Google Ad Manager 360, Google Analytics, Analytics 360.

34.     "TAC" means traffic acquisition cost as used in the P&L Glossary on page -0719 in GOOG-AT-MDL-002190713 or is defined as otherwise used in Google documents.

35.     "User" shall mean the person who is viewing a web page and to whom an Ad Impression may be displayed through use of Your Ad Tech Products and/or Ad Tech Services.

36.     "XPP-M" shall mean the dataset Google produced on July 6, 2023, which consist of the files Bates numbered GOOG-AT-MDL-DATA-000561031 to GOOG-AT-MDL-DATA-000561262.

37.     "You", "Your", "Alphabet", or "Google" shall mean Defendants Google LLC, Alphabet Inc., and YouTube, LLC ("Defendants") and their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The terms "subsidiary," "affiliate," and "joint venture" refer to

any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

38.    Any reference to Your Ad Tech Products or Your Ad Tech Auction Mechanics, individually or collectively, also shall include any successor or predecessor Ad Tech Products or Ad Tech Auction Mechanics bearing the same or similar functionality.

## SUBJECT MATTER AREAS
## RELEVANT MARKETS

1.    During the Relevant Time Period, Your tracking and analysis of Google's market share and that of its competitors in the markets for Publisher Ad Servers, Ad Exchanges, Ad Networks, Ad Buying Tools for Large Advertisers, Ad Buying Tools for Small Advertisers, and Online Search Advertising, specifically:

   a.   The size (e.g., available and/or addressable demand, supply, transaction volume, addressable revenue, or similar metrics) of those markets;

   b.   Your share of those markets;

   c.   The identity of Your competitors in those markets and their respective shares of those markets, as well as digital display advertising spend;

   d.   Products and/or services that You consider or considered to be substitutes for, or reasonably interchangeable with, Your products and/or services in these markets;

## ACCOUNTING AND FINANCIAL REPORTING

2.    Your DVAA P&Ls produced in this Action, including:

   a.   How different versions of DVAA P&Ls relate to each other and change over time;

b.  The definition(s) of each product group, and identification of the reporting units or products of each product group;

c.  The definition(s) of Served Revenue, and identification of each component category within Served Revenue;

d.  The definition(s) of Contra Revenue, and identification of each component category within Contra Revenue;

e.  The definition(s) of Cost of Sales and identification of each component category within Cost of Sales, including identification of the cost items that are included in each component and whether the cost is reported on a cash or accrual basis;

f.  The definition(s) of Operating Expense and identification of each component category within Operating Expenses, including identification of the cost items that are included in each component and whether the cost is reported on a cash or accrual basis;

g.  The methodology or process of calculating each of Served Revenue, Contra Revenue, Cost of Sales and Operating Expense line items over time, including:

   i.  How each line item is allocated, expensed, or assigned to different products within the DVAA Business Segment, including any exceptions made to the standard methodology or accounting policies;

   ii.  How each line item is allocated, expensed, or assigned between DVAA Business Segment and other business or accounting units, such as

other Ad Business Segments, including any exceptions made to the standard methodology or accounting policies.

h. Recognition of revenue on a net or gross basis and TAC as a cost of sale, including principal and agent considerations. Any and all difference(s) between the "management" and "external" views in the DVAA P&Ls such as GOOG-DOJ-AT-02647833, GOOG-AT-MDL-008928777, GOOG-AT-MDL-008928778, and GOOG-AT-MDL-009709864, including:

    i. In the treatment of machine costs and for the "external" views as stated in the above-cited documents;

    ii. Explain the basis for the Opex Reclass for each individual line item, including identifying support and/or accounting policies and documents for this change.

i. Information in the underlying data of the DVAA P&Ls, such as the "Revenue Detail" tab in GOOG-AT-MDL-009643893 and similar documents, and how that relates to the DVAA P&Ls;

j. The relationship between the DVAA P&Ls and Google's reported public financials, such as annual reports.

3.    The product metrics used to evaluate the financial performance of the DVAA products, specifically including:

a. Return on Investment Google generated from its Ad Tech Products;

b. Google's risk-adjusted Cost of Capital applicable to each of its Ad Tech Products.

4.    Information contained in the XPP-M dataset, specifically including:

a.  Definition of Gross Revenue reported in the XPP-M data;

b.  Definition and components of TAC reported in the XPP-M data;

c.  How the data or information contained within the XPP-M dataset relates to or is used to develop, construct or populate the DVAA P&Ls over time and how the relationship changes over time;

d.  The differences between the revenue and TAC reported in the XPP-M data and the DVAA P&Ls;

e.  The values in the "pub_product" field of the XPP-M data and how the values relate to the "simplified_pub_product" field of the "Revenue Detail" tab of GOOG-AT-MDL-009643893 and similar documents;

f.  The values in the "transaction_type" field of the XPP-M data and how the values relate to the "transaction_type" field of the "Revenue Detail" tab of GOOG-AT-MDL-009643893 and similar documents;

g.  The values in the "buying_door" field of the XPP-M data and how the values relate to the "front_end" field of the "Revenue Detail" tab of GOOG-AT-MDL-009643893 and similar documents.

5.  Information contained in the Adx/Open Bidding dataset, including:

a.  Definition of "gross_rev_usd" reported in the AdX/Open Bidding data;

b.  Definition of "pub_net_rev_usd" reported in the AdX/Open Bidding data;

c.  How the data contained within the XPP-M data relates to or differs from the data provided in the AdX/Open Bidding data and how the relationship changes over time;

d.  The differences between the revenue and TAC (amounts paid to the publishers) reported in XPP-M and the AdX/Open Bidding data;

e.  The values in the "buying_door" and "adX_ad_source_type_name" fields of the XPP-M data and how the values relate to the "ad_source_type_name" field of the "Revenue Detail" tab of "GOOG-AT-MDL-009643893 and similar documents.

## AD TECH CONTRACTS AND REVENUE SHARE

6.  Your contracts with Publishers or Advertisers, specifically:

a.  After January 1, 2015, Your decision(s) to use and rollout of a single contract for DFP and AdX or any combination thereof, including efforts to move Publishers towards use of a single contract;

b.  The general features of Your contracts with Publishers related to the product known by Google as Yavin, and the number of Publishers with such contracts;

c.  The general features of Your contracts with Publishers for or related to AdX Direct, and the number of Publishers with such contracts;

d.  The Terms of Service related to arbitration for Your contracts applicable to Advertisers purchasing display or in-app Digital Advertising from You, and how those Terms of Service have changed since January 1, 2016.

7.  Your fees, margins, revenue shares or take rates for Your Ad Tech products, including:

a.  Your process for determining the percent or amount of Your margins or take-rates in Your Ad Auctions from January 1, 2010, to the present;

b.  The percent of advertising revenue paid by Advertisers that Publishers receive when selling inventory with Your Ad Server and/or through Your Exchange, Network, or Ad Buying Tools;

13

c. The revenue shares and fees that You charge in connection with Your Ad Tech business from January 1, 2010, to the present, and whether such fees were disclosed to auction participants;

d. The process for deviating from AdX's standard 20 percent revenue share for open auction transactions, and the percentage of Publishers, if any, that negotiated a revenue share lower than 20 percent.

## CONTENTION TOPICS

8. For each act or course of anticompetitive conduct alleged against You, the factual basis of Your contention that Your conduct was "justified, procompetitive, and carried out in Google's legitimate business interests and constitutes bona fide competitive activity," and that "the benefits of which significantly outweigh any alleged anticompetitive effects," as stated in Your Answers, ECF 737 at 48, ECF 738 at 46, ECF 739 at 81, ECF 740 at 67, ECF 741 at 69, ECF 742 at 78, including identification of documents or categories of documents that you intend to rely on to support this contention.[1]

## DFP, ADX, GOOGLE AD MANAGER

9. Your analysis and technical implementation of Your decisions to restrict or limit access to, or functionalities of, Your Publisher Ad Server (i.e., DFP), Ad Exchange (i.e., AdX), or any combination thereof (i.e., GAM), from 2009 to present, including:

a. Restricting AdWords or Google Ads Advertisers to purchasing Digital Advertising exclusively from the Google Display Network or AdX, other than for remarketing purposes;

---

[1] For the avoidance of doubt, Google's interrogatory responses on this issue do not provide Plaintiffs fair notice of the purported procompetitive benefits that Google asserts justified its conduct. *See, e.g.*, Response to Interrogatory No. 1 of Named Publisher Plaintiffs' First Set of Interrogatories to Google LLC (June 3, 2024) (refusing to provide answer to answer an interrogatory regarding Google's procompetitive justification defense).

b.   Encrypting User IDs that DFP assigns to Publishers' Users and restricting decryption of User IDs to Advertisers who bid through AdX or Google Display Network;

c.   Restricting Publisher's access to AdX demand through a non-DFP (or other Google) ad server and Google's analysis of actual or potential integration of AdX with third-party or publisher in-house ad servers, including AdX Direct;

d.   Your analysis or consideration of any proposal to deprecate the AdX Direct product in or after 2017, including your rationale for retaining AdX Direct.

10.   AWBid (as that term is used in Your documents, e.g., GOOG-DOJ-11765613, GOOG-TEX-00218255), including the timing and rationale of the decision(s) to launch, partially launch, or not launch AWBid or any version or iteration thereof.

11.   The costs You incurred to display an advertisement through an AdX over time, including any computing costs and any variable, fixed, or semi-fixed operating costs You incurred to display an advertisement through AdX, and the extent to which such costs are associated with operating the infrastructure of AdSense, GDN, AdX, or any other Google Ad Tech Product.

**ADSENSE AND GDN**

12.   The market in which You believe AdSense participates, any products that You consider to be competitors to AdSense (and how the availability of such products changed over time, if at all), AdSense's market share in such market, and the market share of the competitors You identify (if any).

13.   The process and formula by which an ad was selected to be displayed through AdSense over time, specifically:

a.   Any preferences, settings, or functions available to publishers through AdSense's user interface;

b.   Any functions performed by AdSense, AdX, GDN, and/or Google's CAT2 mixer, Supermixer, and CAT2 Supermixer in deciding which advertisement is displayed through AdSense;

c.   The extent to which auctions for inventory available from Publishers using AdSense or other processes performed by You in connection with the sale of ad impressions by Publishers using AdSense differed from the auctions for inventory available from Publishers using DFP and AdX (or later, Google Ad Manager's successor product functions for DFP and AdX); and

d.   The sources of advertising demand bidding on inventory offered for sale by Publishers using AdSense over time, including whether and to what extent GDN, DV360, Authorized Buyers, and Certified Google Ad Networks could bid on ad impressions offered by Publishers through AdSense.

14.   Concerning the functions You provided to Publishers displaying advertisements through AdSense over time, including the margins, take rates, percentage fees, flat fees, or any other charge that You levied for functions performed by AdSense, GDN, AdX, DV360, or the Authorized Buyers program (including any functions performed on the CAT2 mixer, Supermixer, and/or CAT2 Supermixer) in the process of displaying an advertisement through AdSense:

a.   The prices You charged for these functions;

b.   The factors You considered in setting those prices for these functions;

    c.   Any analysis You conducted for the purpose of deciding whether to change the prices You charged for any or all of these functions or change the pricing structure, including the margins, take rates, percentage fees, flat fees, and/or whether to charge based on Cost-Per-Click, Cost-Per-Mille, and/or Cost-Per Action; and

    d.   The costs You incurred in providing AdSense's services to Publishers over time, including any computing costs and any variable, fixed, or semi-fixed operating costs You incurred to display an advertisement through AdSense, the extent to which such costs are associated with operating the infrastructure of AdSense, GDN, AdX, or any other Google Ad Tech Product, and how such costs related to the prices You charged.

15.    GDN's processes for bidding on and buying ad inventory through AdSense, AdX, and/or a third-party Ad Exchange, including:

    a.   The process by which GDN determines whether to submit a bid in any auction or ad-selection process conducted by AdSense, AdX, or third-party Ad Exchange over time;

    b.   The process by which GDN calculates an advertisement's predicted clickthrough rate or "pCTR";

    c.   The information You use to calculate an advertisement's predicted clickthrough rate or pCTR, including any signal or other information collected by AdSense and transmitted to GDN, and any information collected by Google Ads and transmitted to GDN; and

    d.   The extent to which GDN's click-prediction or pCTR calculation process varied depending on whether GDN submitted the advertisement to AdSense, AdX, or a third-party Ad Exchange.

16.    Publishers' ability (or potential ability) to use AdSense to sell impressions to ad networks, ad exchanges, demand-side platforms, or any sources of advertising demand other than GDN, including:

    a.   Any analysis You conducted studying AdSense publisher's consumer demand for the ability to sell impressions to networks, demand-side platforms, or any sources of advertising demand other than GDN;

    b.   Any analysis considering whether to market AdSense as a bundled product with GDN, AdX, and/or Your other ad tech products or as a standalone product; and

    c.   Features, functions, or settings that You considered, planned, or implemented for AdSense with the purpose of allowing Publishers to manage their inventory to achieve higher revenue, including any yield management functions, price floors or line items, integrations with third-party ad exchanges, third-party ad networks, third-party demand-side platforms, header bidding, exchange bidding, or open bidding services, or the ability to designate ad impressions for sale to specific advertisers or third-party ad networks.

17.    Any analysis You conducted of the open-web advertising buying patterns of Google Ads customers, including any analysis of the proportion of advertisers that used Google Ads as their exclusive means of purchasing open-web ad inventory, and any analysis of the

extent to which web publishers perceived Google Ads to offer demand from advertisers that used Google Ads as their exclusive means of open-web digital advertising.

## DYNAMIC ALLOCATION AND ENHANCED DYNAMIC ALLOCATION

18.    With respect to Dynamic Allocation ("DA") and Enhanced Dynamic Allocation ("EDA"):

   a.   Your decision and/or practice to allow AdX to outbid non-Google Ad Exchanges after reviewing their submitted bids (*i.e.*, "Last Look") as well as Your decision to discontinue this conduct, if such a decision was made;

   b.   The automatic enrollment of Publishers in DA and/or EDA;

   c.   Your decision and/or practice to restrict non-Google Ad Exchanges' ability to access DA or EDA;

   d.   Your decision and/or practice to use remnant line items, including line items representing average historical bids or live bids from Header Bidding Exchanges, to set Your price floor in DA or EDA;

   e.   Publishers' ability to customize the priority of various line items, including line items corresponding to bids from Header Bidding, and any changes restricting or expanding such ability;

   f.   Any changes You made over time to how the reserve price and/or the "Temporary CPM" and/or the "Value CPM" and/or the "opportunity cost" and/or the "eCPM" of direct-sold Impressions were calculated;

   g.   Any and all versions of the components, including the pacing algorithm, pricing algorithm, and population of the bidding distribution pipeline, relating to computation of the EDA Price, also known as the EDA opportunity cost;

h. All decisions and/or practices that You undertook if a Publisher turned off DA or EDA, including Your decision and/or practice of AdX not offering live, competitive bidding;

i. Whether under DA or EDA, the AdX auction was required only to meet, or to beat (and if so by how much), the reserve price in order to win the impression.

### SELL-SIDE DYNAMIC REVENUE SHARE ("DRS")

19. With respect to Sell-Side Dynamic Revenue Share ("DRS"):

a. How all iterations of DRS operate, including how all iterations of DRS operate with Dynamic Allocation and/or Enhanced Dynamic Allocation, and how DRS pools are managed, including any constraints on these pools;

b. Your decision to implement DRS, including all iterations thereof;

c. Whether Google currently dynamically alters the revenue share of any of its Ad Tech Products, including where and how such revenue shares are altered, and if not, whether Google plans to implement any dynamic revenue share altering programs or features;

d. Any program or feature that dynamically adjusted margins, revenue share, take rates or the fees Google charged to transact via AdX;

e. The effects of each version of DRS on prices paid for impressions to Publishers, Your exchange fee, margin, revenue share, or take rate including the time at which DRS adjusted Your exchange fee, revenue share, margin, or take rate in relation to the time at which bids were solicited;

f.  Whether You ever dynamically altered the AdX take rate below 0% to be negative, so as to boost or subsidize bids in the AdX auction, and in what circumstances You did so;

g.  Your decision to opt Publishers into DRS v1 or any successor thereof and whether and to what extent You opted Publishers into DRS v1 or any successor thereof and whether and how, if at all, Google disclosed to Publishers their enrollment therein;

h.  Advertisers' or DSPs' awareness or knowledge of the implementation of each version of DRS, and any studies analyzing the impact of each version of DRS on Advertisers' or DSPs' bidding strategies;

i.  The ability of a Publisher to opt out of DRS v1 (or any later version) and Your communications internally and externally relating to the same;

j.  Your exclusion of DBM and GDN from any version(s) of DRS and the reason for such exclusion;

k.  Your analysis of the impact of this practice on Your market share, Your competitors' market share, and the share of impressions won;

l.  The "revenue opportunity" for each iteration of DRS over time, and the number of publishers who had DRS applied to the sale of their inventory on AdX over time, as a percentage of this "revenue opportunity," as used in, e.g., GOOG-TEX-00520742 at -868;

m.  The "adoption by revenue" of each iteration of DRS over time, as used in GOOG-AT-MDL-019521348 at -349;

n. The impact of DRS on Your Metrics, Publishers' and/or Advertisers' Metrics, and Your competitors' Metrics;

## BERNANKE

20. With respect to Bernanke (also known as dynamic buy-side revenue share):

a. how Project Bernanke, Bell (v.1 and v.2), Global Bernanke, and Alchemist operate, including: any data inputs to the Bernanke and Alchemist algorithms and the relevant source code; the parameters that these programs are trying to optimize; how often Bernanke operated to depress or inflate a GDN bid; how Bernanke calculated GDN bids; any constraints imposed on the Bernanke optimizations; and how You allocated any pools or kept track of adjustments and constraints on these pools;

b. Your decision to implement Project Bernanke, Bell (v.1 and v.2), Global Bernanke, and Alchemist, and any plans, discussions or attempts to implement any of these programs for other Google Ad Buying Tools such as DV360;

c. The impact of Project Bernanke, Bell (v.1 and v.2), Global Bernanke, and Alchemist on Your Metrics, Publishers' and/or Advertisers' Metrics, and Your competitors' Metrics;

d. Your analysis of the impact of this practice on Your market share, Your competitors' market share, and the share of impressions won;

e. The time periods in which Project Bernanke, Bell (v.1 and v.2), Global Bernanke, and Alchemist were operational, including:

i. The date of the launch of the Beta versions;

ii. The date of the launch of the GA versions;

       iii.  Date the products were deprecated.

## REDACTING AUCTION DATA

21.     Your practice(s) of redacting or removing data fields from Publishers' consolidated auction records, including:

    a.  All data fields You redacted from Publishers' consolidated auction records, including the fields "Key Part" and "TimeUsec2";

    b.  The reasons or justifications for Your decision to redact certain data fields from Publishers' consolidated auction records, including Your analysis of alternative means or mechanisms of achieving those reasons or justifications;

    c.  Your analysis of the impact of this practice on Your market share, Your competitors' market share, the share of impressions won through Header Bidding, Your Metrics, Publishers' and/or Advertisers' Metrics, and Your competitors' Metrics;

## UNIFIED PRICING RULES ("UPR")

22.     With respect to Unified (or Uniform) Pricing Rules ("UPR"),:

    a.  How UPR operate;

    b.  Your decision to implement UPR;

    c.  Your understanding of Publishers' use of differential price floors (e.g., per-Ad Exchange or per-ad buying tool), including using price floors to increase revenue, diversify sources of revenue, and improve quality of advertisements prior to the implementation of UPR;

d.  Attempts by any Publisher, SSP, or Publisher ad network to circumvent UPR, and all exceptions to or accommodations or variations of UPR requested by Publishers and Your decision whether to approve or reject such requests;

e.  Internal tests, experiments, simulations, or studies, which measure, forecast, predict, study, or research the impact that Your decision to adopt UPR would have or has had on the sale of Ad Inventory through Third-Party Exchanges or the adoption of Header Bidding;

f.  Internal tests, experiments, simulations, or studies, which measure, forecast, predict, study, or research the impact that Your decision to adopt UPR would have or has had on the floor prices experienced by GDN and/or DV360 advertisers in the AdX auction;

g.  The quantitative differential in the floor prices experienced by GDN and/or DV360 advertisers in the AdX auction before and after the implementation of UPR;

h.  The impact of UPR, separate from the move to the Unified First Price Auction, on Your market share, Your competitors' market share, the share of impressions won through Header Bidding, Your Metrics, Publishers' and/or Advertisers' Metrics, and Your competitors' Metrics.

## MINIMUM BID TO WIN

23.  With respect to Minimum Bid to Win (MBW):

a.  How MBW operates, how MBW is calculated, how MBW is shared with Google and non-Google buyers, what information and data fields are passed on as part of MBW, and how the foregoing has changed over time;

b.  Your decision to provide MBW to certain auction participants, including the role of Your buy-side team in making that decision, and Your decision to initially not provide MBW to Header Bidders;

c.  Your decision to define MBW information as including the highest other bid for winning bidders and the winning bid for losing bidders, and specifically, Your decision to refrain from providing the highest other bid to losing bidders;

d.  The percentage and absolute daily number of AdX auctions for which GDN and/or DV360 receive MBW information that identifies the highest other bid in the AdX auction and, for the DSPs receiving the next 5 highest percentages of MBW information that identifies the highest other bid in the AdX auction, the identity of each DSP, the percentage of AdX auctions for which they receive MBW information that identifies the highest other bid in the AdX auction, and the average number of daily impressions for which they receive MBW information that identifies the highest other bid in the AdX auction;

e.  For each of the DSPs identified in subpart (e), the extent to which Your prediction of Highest Other Bid in Your bidding algorithm would be degraded if You were limited to the number of daily impressions for which those DSPs receive MBW information that identifies the highest other bid in the AdX auction;

f.  Whether all pricing information, including the MBW field, is provided to all auction participants or whether certain pricing information is only provided to Google;

g.   Your use of MBW information, including in developing bid-shading algorithms (*e.g.*, pHOB);

h.   How quickly Google and non-Google buyers receive MBW information, and how quickly Google and non-Google buyers can use MBW information to predict the highest other bid for a successive auction;

i.   The impact of MBW on Your market share, Your competitors' market share, the share of impressions won through Header Bidding, Your Metrics, Publishers' and/or Advertisers' Metrics, and Your competitors' Metrics;

j.   The data inputs to the pHOB model, and the definitions of the pHOB outputs and inputs.

## POIROT AND ELMO

24.   With respect to Project Poirot and Project Elmo:

a.   How Project Poirot and Elmo operate;

b.   The design, development, and operation of each version of Project Poirot and Project Elmo;

c.   Ability of buyers to opt out and data on how frequently buyers opted out;

d.   The reasoning behind the decision to preemptively opt buyers out of Poirot;

e.   How Poirot and Elmo were used to identify which Ad Exchanges were likely participating in Header Bidding;

f.   How DV360 adjusted bids for impressions under Poirot and/or Elmo;

g.   The impact of Poirot and/or Elmo on win rates and price trends of AdX, match rate, or revenue share (and the amount of any such impact in each calendar quarter);

26

    h.   The impact of Poirot and/or Elmo on Your market share, Your competitors' market share, the share of impressions won through Header Bidding, Your Metrics, Publishers' and/or Advertisers' Metrics, and Your competitors' Metrics.

25.    The use or application of risk-adjustment factors in Google's bidding algorithms for bidding on third-party ad exchanges and/or AdX, including specifically, any risk adjustment factor(s) used and the coefficients used for such risk adjustment factor(s) for:

    a.   DBM/DV360 fixed price bidders;

    b.   DBM/DV360 optimized bidders.

26.    The general distinctions between the bidding algorithms used for GDN bidding on AdX and GDN bidding on third party exchanges.

## RESERVE PRICE OPTIMIZATION

27.    With respect to Reserve Price Optimization (including "Dynamic Reserve Price Optimization" and "Bulbasaur," collectively "RPO"):

    a.   How RPO operated, including in both second-price and first-price auctions;

    b.   Your decision to implement RPO;

    c.   The impact of RPO on Your Metrics, Publishers' and/or Advertisers' Metrics, and Your competitors' Metrics;

    d.   Your analysis of the impact of this practice on Your market share and Your competitors' market share; and

**HEADER BIDDING**

28.     Contracts between You and any third-party Ad Exchange, third-party SSP, or Publisher that contains any provision that requires such entity to make Ad Inventory available through Open Bidding if it also sells that inventory through Header Bidding.

29.     Your decision to charge a fee to Ad Exchanges that participated in Open Bidding or Exchange Bidding and the impact of that fee on third-party Ad Exchange's ability (or lack thereof) to win impressions against AdX.

**INFORM-SPECIFIC TOPICS**

30.     How, if at all, any Ad Tech Auction Mechanics functioned differently for online video advertising, any competing online video platform, and/or any YouTube video advertising from 2012 through 2019.

31.     All actions taken by Google against Inform, Inform's video ad technology, or Inform's video ad inventory, including but not limited to any blacklisting, refusal to serve, throttling, and/or pacing of ad campaigns that affected:

        a.   the serving of any video ad on any Inform publisher property;

        b.   the valuation of Inform's ad inventory;

        c.   the playing of any Inform video advertisement;

        d.   the function and/or operation of any Inform video ad player;

        e.   the fulfillment of any Inform ad campaign; and

        f.   Payment to Inform.

32.     Any difference of treatment, whitelisting of, or plan to whitelist YouTube as respects:

a.      Any policy, practice, standard, process, rules, protections, controls and settings regarding DFP or imposed by DFP;

b.      Any policy, practice, standard, process, rules, protections, controls, and settings regarding AdX or imposed by AdX;

c.      Any policy, practice, standard, process, rules, protections, controls, regarding Chrome Browser;

d.      any Chrome Browser default setting;

e.      or any different treatment that ads served on YouTube received during the relevant period;

f.      Any video ad rule, rules or policies not included above.

33.     Any transition by Google away from the buying, selling, auction, serving, or display of Flash video advertisement for YouTube, in its Chrome browser, or as part of any of its Ad Tech Products, including for each:

a.      the reasons and internal decision-making surrounding the transition;

b.      any profit or revenue considerations or analyses related to the transition;

c.      any of Google's Ad Tech Auction Mechanics involved in the transition;

d.      when Google began the process internally;

e.      when Google announced changes externally;

f.      Any Flash to HTML conversion implemented by Google for video advertisement on YouTube, in its Chrome browser, or as part of any of its Ad Tech Products the difference between internal and external communications; and

g.      how each of the above changed over time.

34.     Google's internal policies, procedures, or practices related to the usage of data it collects from customers of its Ad Tech Products, including:

      a.     whether and how Google utilizes the data to contact and/or solicit business from other customers of its Ad Tech Products or third parties;

      b.     how such data is accessed, stored, and used and with which of Your Ad Tech Products such data is shared;

      c.     the function of the Revenue Intelligence Group; and

      d.     the use of DFP clients' data or set ups to change or solicit changes to the client's settings in DFP in order to preference AdX or to de-prioritize competitors.

35.     Any Google program, project or algorithm implemented during, triggered by, or designed to account for high internet traffic, high news days, news spikes, or days when impression inventory on the Internet spiked or markedly increased between 2012 and 2019.

36.     Your design and implementation of algorithms concerning ad pacing, traffic shaping, satisfaction index, delivery and/or any other metric or measure used to track the serving of ad campaigns, including:

      a.     Changes to any such algorithms after the merger of DFP and AdX;

      b.     Changes to any such algorithms as between DART, XFP, DRX, and GAM;

      c.     How these algorithms changed over time.

37.     Whether and how Google's Chrome Browser operated to or was involved in disabling, pausing, muting, throttling, pacing below another ad or campaign, or otherwise restricting or limiting video ads and video ad campaigns.

38.    Any policies concerning online video advertisements including but not limited to:

    a.    what types of violations Google identifies;

    b.    how such policy violations are enforced;

    c.    whether and how such policies differ for Your Ad Tech Products;

    d.    where such policies, their implementation and the effect of any purported violation are listed;

    e.    how alleged policy violations are disclosed to publishers and advertisers;

    f.    any appeals or challenge process for claimed violations;

    g.    the consequences of policy violations;

    h.    any way that Your Ad Tech Products and YouTube are exempted in part or in full from any of the policy violations policies; and

    i.    any internal or external communication of the IAB or IAB Tech Lab drafted by Google.

## <u>CERTIFICATE OF SERVICE</u>

I, Philip Korologos, hereby certify that on, June 13, 2024, I caused the foregoing Amended

Notice of Deposition to be served via email on the following counsel:

Eric Mahr
Julie Elmer
Andrew J. Ewalt
Jan Rybnicek
Lauren Kaplin
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
eric.mahr@freshfields.com
julie.elmer@freshfields.com
andrew.ewalt@freshfields.com
jan.rybnicek@freshfields.com
lauren.kaplin@freshfields.com

Robert J. McCallum
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
3 World Trade Center
175 Greenwich Street
New York, NY
(212) 284-4910
rob.mccallum@freshfields.com

Justina Sessions
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
Silicon Valley
855 Main Street
Redwood City, CA
Telephone: (650) 618-9250
justina.sessions@freshfields.com

Daniel S. Bitton
**AXINN, VELTROP & HARKRIDER LLP**
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
dbitton@axinn.com

David R. Pearl
Bradley Justus
Allison M. Vissichelli
**AXINN, VELTROP & HARKRIDER LLP**
1901 L Street NW
Washington, DC 20036
Telephone: (202) 912-4700
dpearl@axinn.com
bjustus@axinn.com
avissichelli@axinn.com

*Counsel for Defendants Google LLC, Alphabet Inc., and YouTube LLC*

Julia Tarver Wood, Senior Litigation Counsel
Aaron M. Teitelbaum, Senior Litigation Counsel
Jeffrey G. Vernon, Senior Litigation Counsel
Milosz Gudzowski, Trial Attorney
Michael E. Wolin, Trial Attorney
**United States Department of Justice**
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Julia.Tarver.Wood@usdoj.gov
Aaron.Teitelbaum@usdoj.gov
Jeffrey.Vernon@usdoj.gov
milosz.gudzowski@usdoj.gov
Michael.Wolin@usdoj.gov

*Attorneys for the United States*

Dated: June 13, 2024                    */s/ Philip Korologos*
                                        Philip Korologos