# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GOOGLE ADVERTISING ANTITRUST LITIGATION | Case No. 1:21-md-03010 (PKC) |

*This Document Relates To:*

| | |
|---|---|
| GANNETT CO., INC. <br><br> *Plaintiff,* <br><br> -against- <br><br> GOOGLE LLC and ALPHABET INC., <br><br> *Defendants.* | Case No. 1:23-cv-5177 (PKC) |

### GANNETT'S SECOND SET OF REQUESTS FOR ADMISSION TO DEFENDANTS GOOGLE LLC AND ALPHABET INC.

Pursuant to Federal Rule of Civil Procedure 36, Plaintiff in the above-captioned matters, Gannett Co., Inc. ("Gannett"), by their counsel, hereby serve this Second Set of Requests for Admission ("Requests") upon Defendants Google LLC and Alphabet Inc. and request that Defendants answer each, under oath, within thirty (30) days.

Please note that the matters set forth herein will be deemed admitted unless within thirty (30) days of service of these Requests, Defendants serve upon Plaintiff's counsel written answers or objections addressed to the matter and signed by Defendants or their attorneys.

## DEFINITIONS

The definitions and rules of construction set forth in Rule 34 of the Federal Rules of Civil Procedure and Rule 26.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York – including, but not limited to, the definitions of "Documents" and "Person" – are hereby incorporated and apply to these Requests. These definitions apply throughout these Requests without regard to capitalization. Plaintiff reserves the right to deliver and serve additional Requests. In addition, as used in these Requests, the words set forth below shall be defined as follows:

1.      "You," "Your," "Alphabet," or "Google" shall mean Defendants Google LLC and Alphabet Inc., and their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The terms subsidiary, affiliate, and joint venture refer to any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

2.      To bring within the scope of these Requests all information that might otherwise be construed to be outside of their scope, the following rules of construction apply: (i) the singular includes the plural and vice versa; (ii) the masculine, feminine, or neuter pronoun does not exclude other genders; (iii) the connectives "and" and "or" should be read either disjunctively or conjunctively as necessary to bring within the scope of the discovery Request all responses that might otherwise be construed to be outside of its scope; (iv) the terms "any," "all," and "each" should be read to mean any and all; (v) the word "including" should be read to mean including, without limitation; (vi) the present tense should be construed to include the past tense and vice versa; (vii) references to employees, officers, directors, or agents include both current

and former employees, officers, directors, and agents; and (viii) defined terms should be given their broadest meaning regardless of whether they are capitalized in these Requests.

## **INSTRUCTIONS**

1.       Unless otherwise specified, the information requested by this set of Requests shall include information within the knowledge or possession of any of Your agents, employees, attorneys, investigators, or any other Persons, firms, or entities directly or indirectly subject to Your control in any way whatsoever.

2.       Each Request shall be answered in its entirety.  If any Request or subsection thereof cannot be answered in full, it shall be answered to the fullest extent possible with an explanation as to why a complete answer is not provided.

3.       Separate and complete responses (or, as the case may be, separate objections) are required for each Request or subpart thereof.

4.       For each Request, You must admit or deny the statement or explain in detail why the statement cannot be admitted or denied.  If You deny the statement in whole, You must explain in detail the basis for Your denial.  If You deny the statement in part, You must specify the part admitted, and explain in detail the basis for Your qualification or denial of the rest.

5.       If a claim of privilege is asserted in objecting to any Request or subpart thereof, and a full response is not provided on the basis of such assertions, You are directed to comply with all applicable rules, statutes and provisions regarding such Requests, including, but not limited to Rule 26(b)(5) of the Federal Rules of Civil Procedure relating to, among other things, the identification, protection, and disclosure of the existence of such information.  You are further directed to respond to any part of the Request which is not objectionable and furnish a statement of the claim of privilege and all facts relied upon in support thereof in the form of a log.

6.      If You find the meaning of any term in any Request is unclear, without wavier of Plaintiff's right to seek a full and compliant response to the Request, You shall assume a reasonable meaning, state what the assumed meaning is, and respond to the Request according to the assumed meaning.

7.      Unless otherwise instructed or clear from the Request, these Requests seek responsive information concerning the period from January 1, 2010 to Present.

8.      These Requests are continuing in nature and require supplemental or additional responses in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 5:**

Advertising technology ("ad tech") is software that makes it possible for digital content providers (publishers) to sell online advertising space to advertisers and for digital advertisers to buy ad space.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 6:**

Ad-tech software can facilitate an instant auction, match, and delivery of an ad from an advertiser within a fraction of a second.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 7:**

Real-time bidding makes it possible for publishers and advertisers to match and transact within a fraction of a second, showing an ad to a user in real time.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 8:**

Publishers of digital content designate space for digital ads, called inventory.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 9:**

Publishers sell their inventory in two ways:  Some inventory is offered to a particular advertiser at a guaranteed price (i.e., "guaranteed" or "reserved" line items) and the remaining inventory is offered to advertisers via auction (i.e., "remnant" line items).

**ANSWER:**

**REQUEST FOR ADMISSION NO. 10:**

Each time a user visits the publisher's content, an impression is created, and a matched advertiser places its ad there.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 11:**

Publishers use publisher ad servers to decide which ad to serve and where the ad should be displayed.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 12:**

Publishers use ad exchanges to sell impressions in real-time auctions.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 13:**

Google Ad Manager ("GAM") is owned and operated by Google.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 14:**

GAM was introduced by Google in June 2018.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 15:**

GAM includes a publisher ad server and an ad exchange.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 16:**

Prior to the introduction of GAM, the publisher ad server in GAM was called "DoubleClick for Publishers" ("DFP").

**ANSWER:**


**REQUEST FOR ADMISSION NO. 17:**

The publisher ad server in GAM enables publishers to manage and sell their inventory of impressions.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 18:**

GAM offers publishers access to an ad exchange, called AdX.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 19:**

AdX provides real-time auction matching between advertisers and publishers in exchange

for a commission, also called a revenue share.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 20:**

Prior to the introduction of GAM, DFP and AdX were marketed as distinct services.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 21:**

AdX does not directly bid into auctions run by third-party ad servers.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 22:**

A publisher using a third party ad server would have to assign a static CPM price or

serving priority to the AdX demand.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 23:**

AdX's revenue share has remained 20% since its launch in 2009.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 24:**

In 2021 and 2022, only one ad exchange charged a higher revenue share than 20%.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 25:**

Google re-launched AdX on its own infrastructure in 2009.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 26:**

AdX integrates better with Google's publisher ad server than with third-party publisher ad servers.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 27:**

Publishers using a third-party publisher ad server may access the advertiser demand that bids into AdX by using AdX Direct tags.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 28:**

Other than by using AdX Direct tags, there is no other way for a publisher using a third-party ad server to access the advertiser demand that bids into AdX.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 29:**

Google Ads is a Demand Side Platform ("DSP") owned and operated by Google.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 30:**

Google Ads enables advertisers to bid for ad space via AdX.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 31:**

Google Ads is the buying door for Google owned and operated properties, including Search and YouTube.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 32:**

From 2009 to 2013, Google Ads bid only into AdX.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 33:**

In 2013, Google first implemented AwBid, which allows Google Ads advertisers to bid into ad exchanges other than AdX.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 34:**

AwBid is the only product design that allows Google Ads advertisers to bid into ad exchanges other than AdX.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 35:**

AwBid permits Google Ads advertisers to bid into ad exchanges other than AdX only for the purpose of remarketing.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 36:**

Ad spend for remarketing accounts for less than 10% of all ad spend made by Google Ads advertisers through Google Ads.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 37:**

Google Ads's revenue share has remained 15% since 2014.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 38:**

Display & Video 360 ("DV360") is a DSP owned and operated by Google.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 39:**

DV360 enables advertisers to manage ad campaigns and buy inventory from publishers, including inventory offered via ad exchanges and on certain Google owned and operated properties like YouTube.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 40:**

Because Google Ads and DV360 share the same cookie infrastructure as AdX, there is a 100% cookie match rate.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 41:**

Because Google Ads and DV360 share the same cookie infrastructure as AdX, there are certain impressions were Google Ads and DV360 are able to produce a better targeted ad than some third parties may be able to.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 42:**

Dynamic Allocation ("DA") is a feature of the publisher ad server in GAM that allows AdX to compete based on real-time bids.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 43:**

DA was updated in March 2014 to create Enhanced Dynamic Allocation ("EDA").

**ANSWER:**

**REQUEST FOR ADMISSION NO. 44:**

EDA was introduced to enable publishers to allow Google's own line items – including AdX line items – to compete with guaranteed reservation line items in addition to remnant line items.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 45:**

Google automatically enrolled publishers that used DFP in EDA.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 46:**

Since the introduction of GAM, publishers cannot disable EDA.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 47:**

Since the introduction of GAM, publishers cannot permit AdX to compete via DA only against remnant line items but not against guaranteed line items.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 48:**

Since at least July 2019, Enhanced Dynamic Allocation has been referred to as Dynamic Allocation.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 49:**

AdX is only eligible to compete with other ad exchanges for a given ad query if DA is enabled.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 50:**

If publishers are using the publisher ad server in GAM, then DA is applied to the request made to AdX.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 51:**

DA is a technical feature of the publisher ad server in GAM.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 52:**

It is not possible for publishers using the publisher ad server in GAM to deactivate DA within the GAM interface.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 53:**

It is technically possible for a publisher to use the publisher ad server in GAM without DA by creating a separate "AdX Direct" account, linked to a remnant line item in GAM.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 54:**

Creating a separate AdX Direct account is the only way to use the publisher ad server in GAM without DA.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 55:**

With an AdX Direct account, publishers can set an average price at which they want AdX to compete, instead of competing at the dynamic price informed by real-time bids.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 56:**

Without DA, AdX will not compete at a dynamic price informed by real-time bids.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 57:**

DA improves access to publishers' inventory for advertisers buying on AdX.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 58:**

From Google's acquisition of DoubleClick until 2016, DFP was not designed to enable other exchanges to compete with AdX in real time.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 59:**

Header bidding is code on a publisher's website that allows ad exchanges and other demand sources to compete in real-time for an impression before the publisher's ad server is called to sell it.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 60:**

The winning bid from the header bidding auction is used to target a specific line item that the publisher has booked within the publisher ad server in GAM.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 61:**

Most commonly, the winning bid from header bidding is represented as a remnant line item, the price of which reflects the winning header bidding price.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 62:**

From March 2014 until 2020, when the winning bid from header bidding was represented as a remnant line item, that remnant line item would lose to any guaranteed or reservation line item, even if the price of that remnant line item was higher than any guaranteed or reservation line item.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 63:**

From March 2014 until 2020, when the winning bid from any exchange was represented as a remnant line item, that remnant line item would lose to any guaranteed or reservation line item, even if the price of that remnant line item was higher than any guaranteed or reservation line item.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 64:**

"Last Look" is simply a description of how DA worked; it is not a separate product feature.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 65:**

For inventory sold by publishers using Google's publisher ad server, "Last Look" describes how AdX bidders bid on impressions after a header bidding auction, using the highest header bidding price as a floor price for the AdX auction.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 66:**

Last Look existed from the introduction of header bidding until September 2019, when Google transitioned AdX to a first-price auction.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 67:**

Last Look made AdX more attractive than third-party exchanges to the buyers in exchanges.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 68:**

Prior to September 2019, publishers using Google's publisher ad server could separately set price floors for each of the exchanges they were using to sell their inventory.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 69:**

Prior to September 2019, publishers using Google's publisher ad server could set a higher price floor on AdX than on third-party exchanges.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 70:**

In September 2019, Google introduced Unified Pricing Rules ("UPR").

**ANSWER:**

**REQUEST FOR ADMISSION NO. 71:**

UPR requires publishers using Google's publisher ad server to set a single price floor for all exchanges.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 72:**

With UPR, publishers using Google's publisher ad server no longer may set a higher price floor on AdX than on third-party exchanges.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 73:**

With UPR, publishers using Google's publisher ad server no longer may set a different price floor on AdX than on third-party exchanges.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 74:**

UPR benefited advertisers by lowering effective price floors.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 75:**

UPR increased impressions won by advertisers bidding through AdX.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 76:**

Multi-calling is a practice by publishers of repeatedly calling for bids for the same impression.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 77:**

Project Bell was a product design implemented by Google that prevented multi-calling.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 78:**

Search advertising is advertising related to online search services, *i.e.*, where advertisers pay to list and/or link their company site domain name to a specific search word or phrase.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 79:**

Cost Per Mille ("CPM") is the cost to the advertiser of every 1,000 impressions of an ad.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 80:**

Google has been the largest provider of search advertising since at least 2005.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 81:**

Google's revenue from search advertising in 2020 exceeded $44.5 billion.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 82:**

Google made more than 90% of the sales of online search advertising in the United States in 2020.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 83:**

Google's acquisition of DoubleClick was announced in 2007, and the acquisition was completed in 2008.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 84:**

Prior to the acquisition of DoubleClick, the internal code name at Google for its contemplated acquisition of DoubleClick was "Project Liberty."

**ANSWER:**


**REQUEST FOR ADMISSION NO. 85:**

Through the DoubleClick acquisition, Google acquired DFP.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 86**

Prior to the DoubleClick acquisition, Google did not operate an ad exchange.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 87:**

In 2010, Google acquired Invite Media, whose technology formed the basis for the

product known as DoubleClick Bid Manager ("DBM").

**ANSWER:**


**REQUEST FOR ADMISSION NO. 88:**

DBM was later rebranded as DV360.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 89:**

Google acquired AdMeld in 2011.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 90:**

Google acquired AdMob in 2009.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 91:**

The following companies stopped marketing publisher ad servers after Google acquired DFP:  WPP, Microsoft, ValueClick, Yahoo!, Verizon (previously AOL), and OpenX.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 92:**

According to a study by Google in 2013, receiving static bids from AdX instead of a dynamic price informed by real-time bids could decrease publishers' revenues by 20% to 40%.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 93:**

The publisher ad server in GAM does not permit publishers to see the user identifiers ("User IDs") that the ad server assigns to users.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 94:**

Prior to its purchase by Google, DoubleClick permitted publishers to see the User ID that DFP assigned to users.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 95:**

After Google acquired DoubleClick, Google began encrypting the User IDs that DFP assigned to users.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 96:**

During the Federal Trade Commission's consideration of Google's acquisition of DoubleClick, Google told the FTC that the "data respecting users and competitive intermediaries collected by DoubleClick on behalf of its customers currently belongs to the publishers, not DoubleClick."

**ANSWER:**

**REQUEST FOR ADMISSION NO. 97:**

In a statement concerning Google's acquisition of DoubleClick, the Federal Trade Commission said, "the customer and competitor information that DoubleClick collects currently belongs to publishers, not DoubleClick."

**ANSWER:**

**REQUEST FOR ADMISSION NO. 98:**

"Remarketing" or "retargeting" refers to when an advertiser targets specific users who already have interacted with the advertiser's ad or website.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 99:**

Publishers desire the ability to offer the same impression for sale in a manner that allows multiple sources of advertiser demand to submit bids concurrently.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 100:**

By the end of February 2018, Google no longer offered publishers standalone AdX contracts.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 101:**

By the end of May 2018, Google terminated any AdX-only accounts that had not signed a new GAM contract.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 102:**

Under DA, Google uses the historic bid distribution of AdX bids for the publisher and the pacing of the reservation to calculate an opportunity cost for the reservation line item, also known as the temporary CPM or EDA price.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 103:**

Under DA, when the result of the AdX auction for an impression is equal to the temporary CPM or EDA price for that impression, AdX wins the impression.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 104:**

Under DA, the price of the reservation line item plays no role in determining the temporary CPM or EDA price.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 105:**

Until 2019, under DA, the highest remnant line item price was also allowed to compete for the reservation line item, but was only allowed to win on a probabilistic basis even if the highest remnant line item price was higher than the EDA price.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 106:**

Sell-side Dynamic Revenue Share ("DRS") was launched in general availability in August 2015.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 107:**

DRS v1 adjusted AdX's revenue share downward so that the net bid (i.e., the bid submitted by the buyer minus the AdX revenue share) would be able to clear the AdX reserve price.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 108:**

DRS v1 adjusted AdX's revenue share only after AdX received the reserve price by operation of DA.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 109:**

The impact of DRS was that more auctions were won by AdX.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 110:**

Publishers were automatically enrolled in DRS v1 with no ability to opt out.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 111:**

When an auction cleared the reserve price because of the operation of DRS v1, the auction-clearing price was equal to the price of the winning bid.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 112:**

DRS v2 was launched in December 2016.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 113:**

In DRS v2, the minimum revenue share applied was 0% and the maximum revenue share applied was 40%.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 114:**

When an auction cleared the reserve price because of the operation of DRS v2, the auction-clearing price was equal to the price of the winning bid.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 115:**

DRS v2 adjusted AdX's revenue share only after AdX received the reserve price by operation of DA.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 116:**

Google told publishers that opting-out of DRS "reduces AdX yield."

**ANSWER:**

**REQUEST FOR ADMISSION NO. 117:**

Truthful DRS ("tDRS") was launched in July 2018.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 118:**

All versions of DRS adjusted AdX's take rate on an impression-by-impression basis.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 119:**

All versions of DRS applied when the AdX auction reserve price was set by the EDA

price calculated by Google.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 120:**

All versions of DRS applied when the AdX auction reserve price was set by the remnant

line-item price from DFP or the publisher ad server in GAM.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 121:**

All versions of DRS resulted in AdX winning impressions that might have otherwise

been won by third party exchanges.

**ANSWER:**


**REQUEST FOR ADMISSION NO. 122:**

More than 90% of publishers using AdX had DRS v2 enabled.

**ANSWER:**

**REQUEST FOR ADMISSION NO. 123:**

More than 90% of publishers using AdX had tDRS enabled.

**ANSWER:**


Dated:  May 29, 2024

/s/ *John Thorne*

John Thorne
Daniel G. Bird
Bethan R. Jones
Christopher C. Goodnow
Mark P. Hirschboeck
Eliana Margo Pfeffer
Eric J. Maier
Sven E. Henningson
Tiberius T. Davis
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street NW
Suite 400
Washington, DC 20036
Tel.:  (202) 326-7900
Fax:  (202) 326-7999
Email:  jthorne@kellogghansen.com
        dbird@kellogghansen.com
        bjones@kellogghansen.com
        cgoodnow@kellogghansen.com
        mhirschboeck@kellogghansen.com
        epfeffer@kellogghansen.com
        emaier@kellogghansen.com
        shenningson@kellogghansen.com
        tdavis@kellogghansen.com

*Counsel for Gannett Co., Inc.*