**Discovery Steering Committee**
**In re Google Digital Advertising Antitrust Litigation**

June 24, 2024

**<u>Via ECF</u>**

Hon. P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

*In re Google Digital Advertising Antitrust Litigation*
Case No. 21-md-3010 (PKC) (S.D.N.Y.)

Dear Judge Castel:

     We write to provide the Court with Plaintiffs' further revised 30(b)(6) notice and an update on the parties' negotiations regarding the notice. Despite Plaintiffs' substantial concessions to narrow the number of topics down to 18 and to increase their specificity, Google has failed to agree to designate a witness for *any* topic or sub-topic other than portions of those topics (the AdSense issues in Topics 6-10 in the attached notice) with respect to which a witness was previously scheduled to testify this Friday, June 28. Google's view is, apparently, that its meet and confer obligations consist almost entirely of saying "yes" or "no" to proposed topics without providing any further input. It has refused to provide any specific comments as to why any topic or subtopic is not sufficiently specific and made only a minimal offer to produce witnesses to answer just 20 questions that prior deponents were unable to answer during their depositions, which offer Plaintiffs rejected. Unfortunately, the parties are at impasse. Attached hereto as Exhibit A is MDL Plaintiffs' Proposed Amended Notice; a Word version of which has been transmitted to Chambers' email. Plaintiffs respectfully request that the Court order Google to designate witnesses to be deposed for a total of 12 hours (and no more than 7 hours for any single designee) on the topics not yet scheduled. No conference is currently scheduled.

***Google failed to negotiate in good faith.***

     Immediately following the June 20, 2024, conference, Plaintiffs set to work narrowing the notice further and internally discussing which topics could be further narrowed or eliminated in light existing discovery in the case. The parties met and conferred during the parties' regularly schedule meet-and-confer at 10:00am ET on June 21, 2024. Lead counsel for Google was not present, nor was any attorney with the authority to make any representations or commitments on its behalf. When asked whether it could provide any elucidation on its positions so as to provide plaintiffs guidance as to how the notice could be made more acceptable to Google, counsel for Google stated only that its positions were set forth in its letters. Among other requests, Advertiser Plaintiffs' counsel asked whether Google would provide a witness regarding GDN (Google Display Network) pricing, but Google's counsel would only agree to

Hon. P. Kevin Castel
June 24, 2024
Page 2 of 8

take that inquiry under consideration. Despite receiving no specific guidance from Google, Plaintiffs committed to provide a narrowed revised notice by noon ET on Saturday and Google agreed to a 3pm ET meet-and-confer on Sunday, June 23, 2024.

Plaintiffs engaged in a review of the topics to ensure that they covered issues for which Google's witnesses during depositions had not provided clear or certain answers and at 10pm ET Friday, June 21, sent Google a revised proposed notice consisting of 21 substantially narrowed topics, and proposed a cap of 15 hours of testimony for the 16 topics not yet scheduled.

On Sunday afternoon's discussion on the revised notice, lead counsel for Google was again absent, as was any attorney with the authority to make representations or commitments on Google's behalf. Google stated that it was "in principle" willing to designate a "buy-side" and "sell-side" witness for 4 hours each for a total of 8 hours. When pressed on which topics or sub-topics it would designate these witnesses, Google stated that it "was not willing to designate a witness for any topic in the notice as drafted."

Google contended that no topic in the notice had the requisite particularity to justify Google putting up a witness but, when presented with several highly specific sub-topics, Google provided no specific reasons why the subtopic (or any topic or subtopic) was not sufficiently specific. Despite discussion of the issue during Friday's meet and confer, Google's counsel still would not state whether Google would agree to produce a witness regarding GDN pricing.

Despite the complete lack of any specific comment to the proposed notice to assist Plaintiffs in addressing the concerns articulated by Google, Plaintiffs committed to provide a final proposed notice by 2pm ET on Monday, June 24, 2024, and to have a further meet-and-confer at 7pm ET on Monday.

Plaintiffs provided another proposed notice—the one filed here as Exhibit A—to Google at 2pm ET on Monday, June 24, and the parties met and conferred further earlier this evening. Again, lead counsel for Google was absent and again Google stated that there was no topic or sub-topic "as written" for which it was willing to designate a witness. Google proposed to provide two designees to answer only the 10 questions identified in its June 12 letter and an additional 10 "reasonable questions" previously asked and not answered in 30b1 depositions. As Google's position made clear, its view is that it will only produce witnesses to testify as to specific questions, as opposed to subject matters (regardless of the specificity of those subject matters) and regardless of Rule 30(b)(6)'s language requiring designation of witnesses with respect to "matters" that need to be described "with reasonable particularity", as the current notice does.

Plaintiffs rejected that offer as unreasonable and inconsistent with Google's party obligations under Rule 30(b)(6).

Hon. P. Kevin Castel
June 24, 2024
Page 3 of 8

***The topics in the narrowed notice are non-duplicative and legally justified.***

**Topics 1-4.**  These topics bear on Google's accounting practices related to its ads business and seek relevant information on which limited discovery has been conducted in this action.  Although a deposition of a 30(b)(6) finance and accounting witness took place in the EDVA action, that deposition was limited in a number of ways.  *First*, the accounting topics center around Google's final P&Ls for the period of 2014 to present, which were not made reasonably available to MDL plaintiffs before the EDVA deposition.  The final versions of P&Ls for the years of 2014 to 2022 were first identified in an interrogatory response Google made in the EDVA action. That interrogatory response was produced to MDL plaintiffs as an exhibit to the EDVA 30(b)(6) deposition together with the final transcript provided after the deposition was taken.  Further, Google has yet to produce a complete 2023 P&L report and has only agreed to make it available by the end of fact discovery. *Second*, Plaintiffs here are pursuing damages on behalf of different kinds of market participants than the DOJ, therefore Plaintiffs need a separate chance to secure testimony on the accounting topics. Indeed, leftover questions from that deposition have informed the scope of the notice.  *Third*, the topics concerning the datasets (3-4) for the underlying data of the P&Ls were completely outside the scope of issues covered in the EDVA deposition.  Understanding how Google's used data contained in the relevant datasets to generate the P&Ls is relevant to Plaintiffs' calculation of damages.

**Topic 5.**  In every case forming this MDL, Google has asserted an affirmative defense clearly stating its contention that its conduct was "Google's conduct alleged by Plaintiffs in the Complaint was lawful, justified, procompetitive, and carried out in Google's legitimate business interests and constitutes bona fide competitive activity, the benefits of which significantly outweigh any alleged anticompetitive effects."  ECF 739 at 81; ECF 740 at 67; ECF 741 at 69; ECF 742 at 78; ECF 829 at 55; ECF 830 at 53.  Plaintiffs have attempted to probe the factual basis of this purported defense through interrogatories.  Google refused to answer.  *See, e.g.*, Google LLC Response to Interrogatory No. 1, Named Publisher Plaintiffs First Set of Interrogatories (June 4, 2024).

The topic is appropriately limited to the "factual basis" of Google's asserted defense.  "The factual bases of contentions, denials, and affirmative defenses are properly subject to questioning under Fed. R. Civ. P. 30(b)(6)."  *Woelfle v. Black & Decker (U.S.) Inc.*, 2020 WL 1180749, at *4 (W.D.N.Y. Mar. 12, 2020).  And such testimony is not exclusive to the domain of attorneys and experts.  *See, e.g.*, *All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund* 887 F. Supp. 2d 448, 456–57 (E.D.N.Y. 2012) (permitting 30(b)(6) testimony asking the witness "to substantiate [the party's] contentions as to market share percentage"); *see also Tromblee v. New York, et al.*, 2022 WL 2818222, at *25 (N.D.N.Y. July 19, 2022) (allowing a 30(b)(6) topic seeking "facts upon which [d]efendant bases its affirmative defenses").  Accordingly, Google cannot reasonably argue that testimony regarding "the underlying facts in support of" its defenses should be off limits.  *Travelers Prop. Cas. Co. of Am., LLC v. Daimler Trucks N. Am., LLC*, 2015 WL 1728682, at *4 (S.D.N.Y. Apr. 14, 2015).

Hon. P. Kevin Castel
June 24, 2024
Page 4 of 8

   Google bears the burden of demonstrating why 30(b)(6) testimony regarding its affirmative defenses is inappropriate. *Id.* ("Factual bases of a party's asserted position statements, defenses, and counterclaims are appropriate areas of Rule 30(b)(6) deposition questioning, and Defendant must provide the court with a good cause justification for protection to the contrary."). It has not met that burden and the topic should be permitted.

   **Topics 6-10.** Topics 6-10 include topics regarding AdSense for which Google previously agreed to designate a witness because more limited discovery has been conducted as to these issues. That deposition is scheduled for June 28 at 12pm London time. However, Google's position during the meet and confer process has been that it will not produce a witness to testify about the pricing of GDN, including as described in Topic 9 and specific subparts thereof such as "The process by which GDN calculates an advertisement's predicted clickthrough rate or 'pCTR.'" Google should be ordered to produce a witness to testify on the noticed topics regarding GDN pricing in addition to AdSense pricing.

   **Topic 11.** MDL Plaintiffs have modified the subtopics on DA and EDA to identify specific questions regarding how things work, including multiple questions that Google witnesses could not answer at deposition. For example, at least two witnesses could not state whether, under DA and EDA, AdX had only to meet or had to beat the reserve price from the remnant line items or guaranteed deal to win the impression. *See,* Sell-Side Engineer 1 Tr. 177:10-20 ███████████████████████████████████████████████████; Sell-Side Engineer 2 ███████████████████████████████████████████████████████████████████████████████████████.[1] The answer to this question bears on whether DA and EDA were designed merely to move impressions and market share to AdX, or as Google claims, to earn Publishers more money. The remaining topics regarding DA and EDA seek similarly specific information regarding the functioning and impact of these programs and the calculation of the EDA Price. Sell-Side Engineer 2 could not recall the impact of EDA on AdX revenue or impressions won, Tr. 44:24-45:15; whether EDA was enabled for all publishers or whether they could turn off EDA at any time, Tr. 169:24-170:9; or the precise nature of the bids included in the historical bid distribution pipeline used to calculate the EDA Price. Tr. 129:14-130:10.

   **Topic 12.** MDL Plaintiffs have modified the subtopics on DRS to focus on discrete open questions as to the scope and impact of the program, including the exclusion of GDN and DV360 demand, its reimplementation (if any) following the move to a first-price AdX auction, its interaction with Exchange Bidding, the percentage of publishers impacted, its general impact on revenue, and the impact of Truthful DRS on the reserve price. Despite leading the launch of DRS, Sell-Side Engineer 2 could not recall the impact of DRS on AdX revenue or impressions won, Tr. 43:19-44:14; could not say whether GDN and DV360 were subject to DRS, Tr. 247:5-20; and could not confirm what versions of DRS actually launched. Tr. 264:14-265:8.

---

[1] Buy-Side Engineer 1 and Sell-Side Engineer 1 are the anticipated 30(b)(6) witnesses referenced in Defendants' letter to the Discovery Steering Committee of June 7, 2024, which was previously provided to the Court as Attachment 1 to the chambers copy of MDL Plaintiffs' June 14, 2024 letter-motion to compel designation of 30(b)(6) witnesses (ECF 832).

**Topic 13.** Plaintiffs have limited the scope of the topic regarding Reserve Price Optimization ("RPO") to cover solely the impact of that auction dynamic on Google's revenues. Although the Court dismissed Sherman Act claims premised on RPO, the Court recognized that Plaintiffs' allegations regarding RPO "describe how Google exploited advertisers' understanding that Google was running a sealed, second-price auction by using advertisers' bids against them in order to manipulate [*i.e.*, raise] publishers' price floors." 627 F. Supp. 3d 346, 393 (2022). Advertisers continue to advance state law claims against Google premised on RPO, yet no deponent to date has been able to testify concerning the impact of RPO on Google's revenues — an issue which speaks directly to Advertisers' damages. Google should be ordered to produce a witness on this topic.

**Topic 14.** The Project Poirot and Elmo subtopics have been reduced to two discrete areas: (1) the collaboration of the buy-side and sell-side concerning the impact of RPO on Poirot and whether that impact prompted Google to exempt GDN and/or DV360 from RPO; and (2) the impact of Poirot and Elmo on AdX win rates and revenues. Buy-Side Engineer 1 denied recalling even the direction of Poirot's impact on impressions won by AdX and third-party exchanges, Tr. 100:9-20; and could not recall whether inventory or advertisers were exempted or allowed to opt out of Project Poirot. Tr. 283:18-284:7. Nor could he recall whether the buy-side had ever received any design documents for sell-side optimizations or whether the buy-side had ever requested that either DV360 or GDN be opted out of sell-side optimizations (which included RPO and DRS). Tr. 167:6-19.

**Topic 15(a).** The Court held that "Minimum Bid to Win" is plausibly anticompetitive because Google "use[d] bid data obtained through the publisher ad servers and the historical bids of advertisers . . . to artificially depress the bids for publisher impressions." MDL Dkt. 701 at 37; *id.* at 57 (same). Through discovery, MDL Plaintiffs have identified the algorithms (named in the Notice) that use minimum-bid-to-win data to "artificially depress . . . bids." *Id.* Plaintiffs also have undertaken document and source-code review to understand how these algorithms operate, and to determine whether and when Google transmitted minimum-bid-to-win data to other buyers in ad auctions. Informed by that review, Plaintiffs seek 30(b)(6) testimony so Google can answer several outstanding questions about "Minimum Bid to Win" that are not resolved by the documents and code, or which have not been resolved by prior 30(b)(1) deposition testimony. *See, e.g.,* Buy-Side Engineer 1, Tr. 147:14-17; 181:7-22, 215:25-216:12 (declining to answer questions about Minimum Bid to Win).

**Topic 15(b).** Google justified Project Poirot as a DV360 bidding optimization that maximized advertiser surplus and was applied consistently across AdX and third-party exchanges. When AdX changed to a first-price auction and Google used surplus maximization for its bidding optimization, Google introduced a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that inflated the bids on AdX and led to higher win rates. However, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Buy-Side Engineer 1, Tr. 135:1-4. While it was Buy-Side Engineer 1's "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████ *Id*. at 311:10-16. When asked whether Google uses the same bidding algorithm for GDN bidding on AdX and on third-party exchanges today, he testified: ███████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████ *Id*. at 312:5-18 (emphasis supplied). Following Buy-Side Engineer 1's deposition, Publisher Class Plaintiffs requested the source code showing the disparities in the bidding algorithms used by both GDN and DV360 on AdX as compared to third-party exchanges.  While Google's counsel has orally indicated they will try to make that source code available, they have not yet provided any commitment that it will be available for review.

      **Topic 16.**  The Court held that Project Bernanke is plausibly anticompetitive because it "channeled high-value impressions to AdX and thereby deprived other exchanges of the ability to successfully offer these impressions to their users." MDL Dkt. 301 at 54.  Project Bernanke did so by paying publishers "in amounts that reflected third-place bids," charging advertisers "as if [they] had won a second-price auction," and using that "pool" to inflate AdX's bids and "leav[e] lower-value impressions for competing exchanges."  *Id*. at 51, 55.  Through discovery, MDL Plaintiffs have identified that Google depresses and inflates bids in AdX using "alpha" and "beta" parameters.  MDL Plaintiffs also have discovered that Google deploys Project Bernanke (occasionally under a different code name) in today's first-price AdX auction.  After substantial document and source-code review, Plaintiffs seek 30(b)(6) testimony so Google can answer several outstanding questions about the calculation and application of the alpha and beta parameters, and to describe the effect of Project Bernanke on exchange-market competition.

*Inform Topics*

      **Topic 17.**  The Court found that Plaintiff Inform plausibly alleged a distinct online video advertising market, and component markets thereunder.  For over a year, Defendant objected to providing any documents or information about YouTube until after the Court ruled on Defendants' motion to dismiss Plaintiff Inform's Second Amended Complaint, and then objected to the noticing of a YouTube representative deponent, which document production remains incomplete.  After review of the documents that have been provided and source-code review, Plaintiffs seek 30(b)(6) testimony so Google can answer outstanding questions about whether or not YouTube had its own ad serving functionality (numerous witnesses indicated in substance and in part that they had heard that was the case but could not testify to it); how the YouTube ad server or ad serving logic accounted for traffic shaping on high news or high inventory days; the extent to which Chrome browser default settings for online video advertising were different for YouTube and permitted and/or whitelisted YouTube videos to play while blocking or blacklisting non-YouTube video advertising on Inform's and other sites; whether YouTube was whitelisted or exempted from and/or there was a work around that permitted online video advertising to be displayed in YouTube unimpeded while blocked on Inform sites.

      **Topic 18.**  Plaintiffs' have alleged unique claims with respect to the online video advertising market, which offers a particular kind of ad called TrueView ads that Defendants have preferenced over other video advertising. Plaintiff has alleged that Google's preferential treatment of YouTube, including how Google utilizes TrueView policy violations to enact favor

its own products at the expense of those of its competitors. Plaintiffs are seeking testimony regarding how Google implements TrueView and related policies as well as any preferential application of them to its YouTube and online video products and services

*Conclusion*

Plaintiffs are prepared to take these depositions this week and represent that much of the material sought is relevant to Plaintiffs' opening expert reports due soon in this action. Nevertheless, we recognize the potential difficulty of scheduling such depositions prior to June 28. Accordingly, Plaintiffs would be willing to take these depositions within 14 days from the close of fact discovery if so ordered by this Court.

Respectfully submitted,

*/s/ Philip C. Korologos*
Philip C. Korologos
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-446-2390
pkorologos@bsfllp.com

*/s/ Scott Grzenczyk*
Scott Grzenczyk (signing in place of Discovery Steering Committee member Jordan Elias of Girard Sharp LLP)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: 415.981.4800
scottg@girardsharp.com

*/s/ Serina M. Vash*
Serina M. Vash
**HERMAN JONES LLP**
153 Central Avenue #131
Westfield, New Jersey 07090
Telephone: 404-504-6516
svash@hermanjones.com

*MDL Plaintiffs' Discovery Steering Committee*

Hon. P. Kevin Castel
June 24, 2024
Page 8 of 8

| | |
|---|---|
| Redacted Copies w/ PDF Ex. A: | All counsel via ECF. |
| Unredacted Copies w/ Word version of Ex. A: | Chambers; counsel for the parties as indicated in transmittal email to Chambers. |