# EXHIBIT A

*FOR DISCUSSION PURPOSES*
*Last Updated: 2024-06-21 9:30PM ET*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIG. | Civil Action No. 1:21-md-03010-PKC |

### PLAINTIFFS' SECOND AMENDED NOTICE OF DEPOSITION OF GOOGLE LLC PURSUANT TO RULE 30(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

TO ALL PARTIES AND THEIR ATTORNEY OF RECORD:

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the MDL Plaintiffs will take the deposition(s) of corporate representative(s) of Google LLC regarding the subject matters identified in, and based on definitions provided in, Exhibit A. The deposition(s) will take place on June 27, 2024, commencing at 9:00 a.m. EDT and continuing day to day until completed, at Boies Schiller Flexner LLP, 55 Hudson Yards, 20th Floor, New York, NY 10001, or as otherwise agreed to by the parties.

PLEASE TAKE FURTHER NOTICE that in accordance with Rule 30 of the Federal Rules of Civil Procedure, the deposition will be taken before an officer authorized to administer oaths, and will be recorded by stenographic means and on videotape. The MDL Plaintiffs reserve the right to use the videotape of the deposition at trial.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendant shall designate and produce for deposition one or more officers, directors, representatives or agents, or other persons most knowledgeable, regarding all information known or reasonably available to it relating to the subject matters identified in Exhibit A.

***FOR DISCUSSION PURPOSES***
***Last Updated: 2024-06-21 9:30PM ET***

Dated: June XX, 2024

<u>*DRAFT*</u>

Philip Korologos
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-446-2390
pkorologos@bsfllp.com

Jordan Elias
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: 415.981.4800
jelias@girardsharp.com

Serina M. Vash
**HERMAN JONES LLP**
153 Central Avenue #131
Westfield, New Jersey 07090
Telephone: 404-504-6516
svash@hermanjones.com

*The MDL Plaintiffs' Discovery Steering Committee*

*FOR DISCUSSION PURPOSES*
*Last Updated: 2024-06-21 9:30PM ET*

## EXHIBIT A

### DEFINITIONS

The following terms are defined below solely for the purpose of this notice of deposition:

1.     "Action" shall mean the above-captioned case.

2.     "Ad Auction" shall mean any auction to sell Ad Inventory.

3.     "Ad Impression" shall mean a specific advertising opportunity in a specific ad space on a Publisher's website that can be sold to an Advertiser.

4.     "Ad Inventory" shall mean the range of potential Ad Impressions Publisher has available to sell on its webpages when Users load the webpages.

5.     "Ad Tech Auction Mechanics" shall mean any and all systems and software that implement, effectuate, or modify any Ad Auction rules, preferences, designs, or features; this term includes, but is not limited to, Open Bidding (also known as "Exchange Bidding," "Jedi," "Jedi+," "Jedi++," or "Demand Syndication"), Open Auction, Dynamic Allocation, Enhanced Dynamic Allocation, Optimized Competition, Real-Time Bidding, OpenRTB, Unified Pricing Rules, First Look, Last Look, Reserve Price Optimization, Dynamic Revenue Share (also known as "Average Revenue Share"), Project Bernanke, Project Alchemist, Project Poirot, Project Elmo, or Minimum Bid to Win.

6.     "Ad Tech Products" shall mean any and all systems, platforms, and software, including predecessors and successors, used in the process of identifying, selecting, transmitting, and/or rendering Digital Advertising on a desktop or mobile device, as well as all systems and software, including predecessors and successors, that implement and/or effectuate an Ad Auction, including, but not limited to, receiving, processing, and transmitting Bid Requests, Bid Responses, or related messages. The term includes, but is not limited to, Publisher Ad Servers, Advertiser Ad Servers, SSPs, DSPs, Demand-Side Products, Ad Exchanges, and Ad Networks,

and specifically includes Your products: Your Publisher Ad Server (formerly called "DoubleClick for Publishers" or "DFP"); Your Ad Exchange (formerly called "DoubleClick Ad Exchange" or "AdX"), Google Ads (formerly called "Google AdWords" or "AdWords"), Display & Video 360 (DV360), DoubleClick Bid Manager (DBM) (also known as "Google Bid Manager"), Campaign Manager, DoubleClick Campaign Manager (DCM), Google Display Network (GDN), Google Ad Manager (GAM), DoubleClick for Publishers (DFP), Google AdSense (also known as "AdSense for Content" and "AFC"), DoubleClick for Advertisers (DFA), Google Analytics, Google AdMob, Search Ads 360 (SA360), Google Search Network, YouTube platform and any other product or service, however named, that You provide, have provided, or will provide for the sale or intermediation of Digital Advertising.

7.      "Advertiser" shall mean any purchaser of online Ad Inventory on a Publisher's webpage to serve ads to those internet Users who visit a Publisher's webpage.

8.      "AdX/Open Bidding dataset" means the dataset Google produced on May 30, 2023, which consist of the files Bates numbered GOOG-AT-MDL-DATA-000066537-482007; GOOG-AT-MDL-DATA-000508827-58886.

9.      "Analysis" means any analyses, evaluations, or interpretations of Your Metrics, financial performance, expenses, or revenues. It also includes any analyses, evaluations, or interpretations of the Metrics, financial performance, expenses, or revenues of third parties, such as Advertisers, Competitors, and Publishers.

10.     "Authorized Buyer" shall mean a buyer participating in Your Authorized Buyers program. *See* https://support.google.com/authorizedbuyers/answer/9070822, last visited May 7, 2024.

11.     "Beta" shall mean a product or service that is released to a limited number of users before it is released to the general public.

12.     "Bid Request" shall mean an electronic message containing (directly or indirectly) information about the context of a piece of Ad Inventory (page content, URL, etc.) and the User (*e.g.*, cookie data) that can be used to solicit bids to purchase an Ad Impression, irrespective of whether the message or its contents has been modified for transmission to an Advertiser.

13.     "Bid Response" shall mean an electronic message generated in response to a Bid Request containing (directly or indirectly) a bid price and various pieces of information concerning proposed advertising content to fill an Ad Impression identified in the corresponding Bid Request.

14.     "Cost of Capital" shall mean a company's minimum required rate of return.

15.     "Competitors" shall mean any entity that offers any products or services that competes or has competed with Your Ad Tech Products or Ad Tech Services.

16.     "Demand-Side Products" shall mean Your Ad Tech Products that facilitate the purchase of Ad Inventory, including, but not limited to, AdWords, Google Ads, DoubleClick for Advertisers, Google Display Network, DoubleClick Campaign Manager, Google Campaign Manager, DoubleClick Bid Manager, DV360, Google Analytics, Analytics 360, and Google Audience Center.

17.     "Direct Sales" shall mean Ad Inventory that is sold by a Publisher without the use of open programmatic auctions, but including programmatic guaranteed line items managed by the Publisher, directly to Advertisers.

18.     "Digital Advertising" means advertising inventory filled by way of the internet, as opposed to out-of-home, broadcast television, or print, including but not limited to video Digital

Advertising, display (desktop and mobile) Digital Advertising, search Digital Advertising, in-app Digital Advertising, native Digital Advertising, rich media Digital Advertising and any other advertising categorized as Digital Advertising by You in Your ordinary course of business.

19.     "Document" or "document" shall be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A) and shall have the same meaning as provided in L. Civ. R. 26.3.

20.     "DSP" shall mean Demand Side Platform.

21.     "DVAA" means Display and Video, Apps and Analytics as used in GOOG-AT-MDL-004326981, or as otherwise used in Google documents. The DVAA business segment means the business or reporting units as defined on page -6992 in GOOG-AT-MDL-004326981.

22.     "DVAA P&Ls" mean the profit and loss statements associated with the DVAA business segment and its reporting units or products, including documents identified by Google in its corrected response to DOJ's Interrogatory 11 (GOOG-AT-MDL-019564740), identified by Google in its supplemental response to DOJ's Interrogatory 3 (GOOG-AT-MDL-019564578), identified by Google in its response to DOJ's Interrogatory 14 (at page -4541, 4542 in GOOG-AT-MDL-019564531), the periodic reports created by Google's controller, and other similar documents otherwise provided by Google. The DVAA P&Ls include but are not limited to the Ad Business Segment P&Ls (such as GOOG-AT-MDL-008928778, and similar documents), DVAA Buyside/Sellside Lens P&Ls (such as GOOG-DOJ-AT-02649859, and similar documents), and DVAA MECE P&Ls (such as GOOG-AT-MDL-009643876, and similar documents).

23.     "General Availability" or "GA" shall mean the release of a product to the general public.

24.     "Metric" or "Metrics" mean any measures of quantitative assessment that may be used for analyzing, evaluating, or interpreting Your business, Your budgets, Your financial performance, Your revenues, or Your Projections, including the following: cost per mille (CPM), revenue per mille (RPM), cost per click (CPC), cost per impression, average advertiser yield, monthly active users (MAU), revenue split, total advertising revenue, take rate, transaction fees, total ad impressions, number of impressions, and/or daily active users (DAU). Metric also includes any measures of quantitative assessment that may be used for analyzing, evaluating, or interpreting the business, budgets, financial performance, revenues, or projections relating to third parties (e.g., Advertisers, Competitors, and Publishers), including the following: cost per mille (CPM), revenue per mille (RPM), cost per click (CPC), cost per impression, average advertiser yield, monthly active users (MAU), revenue split, total advertising revenue, take rate, transaction fees, total ad impressions, number of impressions, and/or daily active users (DAU).

25.     "Opex Reclass" is the P&L line item referenced in the "Total Ads (Ext)" tab of GOOG-DOJ-AT-02647833, or as otherwise used in Google documents.

26.     "Projections" means any forecasts or evaluations of Your or a third parties' (e.g., Advertisers, Competitors, Publishers) future or predicted Metrics, financial performance, expenses, or revenues.

27.     "Publisher" shall mean anyone who serves content on the internet that is monetized by selling Ad Inventory to Advertisers.

28.     "Real-Time Bidding" or "RTB" shall mean that process by which Advertisers submit bids for Ad Impressions in real-time Ad Auctions.

*FOR DISCUSSION PURPOSES*
*Last Updated: 2024-06-21 9:30PM ET*

29.     "Relevant Time Period" shall mean the time period from January 1, 2012 to the present.   Unless otherwise specified, the Relevant Time Period for all Topics listed herein is January 1, 2012 to the present.

30.     "Return on Invested Capital," which is sometimes abbreviated to "ROIC" is defined on page -7012 in GOOG-AT-MDL-004326981 or is defined as otherwise used in Google documents.

31.     "SSP" shall mean Supply-Side Platform.

32.     "Supply-Side Products" shall mean Your Ad Tech Products that facilitate the sale of Ad Inventory, including, but not limited to AdSense, DoubleClick for Publishers, AdX, Google Ad Manager, Google Ad Manager 360, Google Analytics, Analytics 360.

33.     "TAC" means traffic acquisition cost as used in the P&L Glossary on page -0719 in GOOG-AT-MDL-002190713 or is defined as otherwise used in Google documents.

34.     "User" shall mean the person who is viewing a web page and to whom an Ad Impression may be displayed through use of Your Ad Tech Products and/or Ad Tech Services.

35.     "XPP-M" shall mean the dataset Google produced on July 6, 2023, which consist of the files Bates numbered GOOG-AT-MDL-DATA-000561031 to GOOG-AT-MDL-DATA-000561262.

36.     "You", "Your", "Alphabet", or "Google" shall mean Defendants Google LLC, Alphabet Inc., and YouTube, LLC ("Defendants") and their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

37.     Any reference to Your Ad Tech Products or Your Ad Tech Auction Mechanics, individually or collectively, also shall include any successor or predecessor Ad Tech Products or Ad Tech Auction Mechanics bearing the same or similar functionality.

## TOPICS

1.     During the Relevant Time Period, for each of the following of Your products, DoubleClick for Publishers (DFP) (or its predecessor or successor product(s)); AdX (or its predecessor of successor product(s)); Google Ads (or its predecessor or successor product(s)); Google Ad Manager (GAM) (or its predecessor or successor product(s)); DoubleClick Bid Manager (or its predecessor or successor product(s)); Google AdSense; Google Display Network (GDN) (or its predecessor or successor product(s)); YouTube platform (or its predecessor or successor product(s)):

    a.   The identity of the competitors who offer products in competition with Your products, including identification of the competitor's product;

    b.   Your tracking and analysis of the performance of Your products relative to those of your competitors.

2.     With respect to Your DVAA P&Ls produced in this Action:

    a.   How different versions of DVAA P&Ls relate to each other;

    b.   The product groups whose revenues are reflected in your DVAA P&Ls, and identification of the reporting units or products of each product group;

    c.   How you use or define Served Revenue, and identification of each component category within Served Revenue;

    d.   How You use or define Contra Revenue, and identification of each component category within Contra Revenue;

e. How You use or define Cost of Sales, and identification of each component category within Cost of Sales,  the cost items that are included in each component, and whether the cost is reported on a cash or accrual basis;

f. How You use or define Operating Expense, and identification of each component category within Operating Expenses and the cost items that are included in each component category, and whether the cost is reported on a cash or accrual basis;

g. How You calculate each of Served Revenue, Contra Revenue, Cost of Sales and Operating Expense line items, specifically:

    i. How each line item is allocated, expensed, or assigned to different products within the DVAA Business Segment, including any exceptions made to the standard methodology or accounting policies;

    ii. How each line item is allocated, expensed, or assigned between DVAA Business Segment and other business or accounting units, such as other Ad Business Segments, including any exceptions made to the standard methodology or accounting policies;

h. Recognition of revenue on a net or gross basis and TAC as a cost of sale, including principal and agent considerations.

i. Difference(s) between the "management" and "external" views in the DVAA P&Ls (*see, e.g.*, GOOG-DOJ-AT-02647833, GOOG-AT-MDL-008928777, GOOG-AT-MDL-008928778, and GOOG-AT-MDL-009709864), specifically including:

    i. Differences in the treatment of machine costs in the "management" and "external views";

    ii. The basis for the Opex Reclass for each individual line item;

  j. How the underlying data of the DVAA P&Ls, such as the "Revenue Detail" tab in GOOG-AT-MDL-009643893 and similar documents, relates to the DVAA P&Ls;

  k. How DVAA P&Ls related Google's reported public financials, such as annual reports.

3. How you evaluate the financial performance of the DVAA products, specifically:

  a. Return on Investment You generated from Your Ad Tech Products;

  b. Your risk-adjusted Cost of Capital applicable to each of Your Ad Tech Products.

4. With respect to the XPP-M dataset:

  a. How You determine Gross Revenue reported in the XPP-M data;

  b. How you use and define TAC reported in the XPP-M data, including identification of the components of TAC;

  c. How the XPP-M dataset relates DVAA P&Ls;

  d. How the revenue and TAC reported in the XPP-M data relate to the DVAA P&Ls;

  e. How the "pub_product" field in the XPP-M dataset relates to the "simplified_pub_product" field of the "Revenue Detail" tab of GOOG-AT-MDL-009643893 and similar documents;

    f.   How the "transaction_type" field in the XPP-M dataset relates to the "transaction_type" field of the "Revenue Detail" tab of GOOG-AT-MDL-009643893 and similar documents;

    g.   How the "buying_door" field in the XPP-M dataset relates to the "front_end" field of the "Revenue Detail" tab of GOOG-AT-MDL-009643893 and similar documents.

5.    With respect to information contained in the Adx/Open Bidding dataset:

    a.   How you use and define "gross_rev_usd" as reported in the AdX/Open Bidding data;

    b.   How you use and define "pub_net_rev_usd" reported in the AdX/Open Bidding data;

    c.   How the XPP-M dataset relates to the data provided in the AdX/Open Bidding dataset;

    d.   The basis for differences between the revenue and TAC (amounts paid to the publishers) reported in XPP-M and the AdX/Open Bidding data;

    e.   How the "buying_door" field in the XPP-M dataset relates to the "ad_source_type_name" field of the "Revenue Detail" tab of "GOOG-AT-MDL-009643893 and similar documents

    f.   How the "adX_ad_source_type_name" field in the XPP-M dataset relates to the "ad_source_type_name" field of the "Revenue Detail" tab of "GOOG-AT-MDL-009643893 and similar documents.

6.    For each act or course of anticompetitive conduct alleged against You, the factual basis for Your contentions that (a) Your conduct was "justified, procompetitive, and carried out

in Google's legitimate business interests and constitutes bona fide competitive activity," and (b) that "the benefits of" such conduct "significantly outweigh any alleged anticompetitive effects," as stated in Your Answers, ECF 739 at 81; ECF 740 at 67; ECF 741 at 69; ECF 742 at 78; ECF 829 at 55; ECF 830 at 53, including identification of documents or categories of documents that you intend to rely on to support this contention.

7.      The market in which You believe AdSense participates, any products that You consider to be competitors to AdSense (and how the availability of such products changed over time, if at all), AdSense's market share in such market, and the market share of the competitors You identify (if any).

8.      The process and formula by which an ad was selected to be displayed through AdSense over time, specifically:

    a.   Any preferences, settings, or functions available to publishers through AdSense's user interface;

    b.   Any functions performed by AdSense, AdX, GDN, and/or Google's CAT2 mixer, Supermixer, and CAT2 Supermixer in deciding which advertisement is displayed through AdSense;

    c.   The extent to which auctions for inventory available from Publishers using AdSense or other processes performed by You in connection with the sale of ad impressions by Publishers using AdSense differed from the auctions for inventory available from Publishers using DFP and AdX (or later, Google Ad Manager's successor product functions for DFP and AdX); and

    d.   The sources of advertising demand bidding on inventory offered for sale by Publishers using AdSense over time, including whether and to what extent

*FOR DISCUSSION PURPOSES*
*Last Updated: 2024-06-21 9:30PM ET*

GDN, DV360, Authorized Buyers, and Certified Google Ad Networks could bid on ad impressions offered by Publishers through AdSense.

9.     Concerning the functions You provided to Publishers displaying advertisements through AdSense over time, including the margins, take rates, percentage fees, flat fees, or any other charge that You levied for functions performed by AdSense, GDN, AdX, DV360, or the Authorized Buyers program (including any functions performed on the CAT2 mixer, Supermixer, and/or CAT2 Supermixer) in the process of displaying an advertisement through AdSense:

a.   The prices You charged for these functions;

b.   The factors You considered in setting those prices for these functions;

c.   Any analysis You conducted for the purpose of deciding whether to change the prices You charged for any or all of these functions or change the pricing structure, including the margins, take rates, percentage fees, flat fees, and/or whether to charge based on Cost-Per-Click, Cost-Per-Mille, and/or Cost-Per Action; and

d.   The costs You incurred in providing AdSense's services to Publishers over time, including any computing costs and any variable, fixed, or semi-fixed operating costs You incurred to display an advertisement through AdSense, the extent to which such costs are associated with operating the infrastructure of AdSense, GDN, AdX, or any other Google Ad Tech Product, and how such costs related to the prices You charged.

10.     GDN's processes for bidding on and buying ad inventory through AdSense, AdX, and/or a third-party Ad Exchange, including specificallyp:

14

a. The process by which GDN determines whether to submit a bid in any auction or ad-selection process conducted by AdSense, AdX, or third-party Ad Exchange over time;

b. The process by which GDN calculates an advertisement's predicted clickthrough rate or "pCTR";

c. The information You use to calculate an advertisement's predicted clickthrough rate or pCTR, including any signal or other information collected by AdSense and transmitted to GDN, and any information collected by Google Ads and transmitted to GDN; and

d. The extent to which GDN's click-prediction or pCTR calculation process varied depending on whether GDN submitted the advertisement to AdSense, AdX, or a third-party Ad Exchange.

11. Publishers' ability (or potential ability) to use AdSense to sell impressions to ad networks, ad exchanges, demand-side platforms, or any sources of advertising demand other than GDN, including:

a. Any analysis You conducted studying AdSense publisher's consumer demand for the ability to sell impressions to networks, demand-side platforms, or any sources of advertising demand other than GDN;

b. Any analysis considering whether to market AdSense as a bundled product with GDN, AdX, and/or Your other ad tech products or as a standalone product; and

c. Features, functions, or settings that You considered, planned, or implemented for AdSense with the purpose of allowing Publishers to manage their

inventory to achieve higher revenue, including any yield management functions, price floors or line items, integrations with third-party ad exchanges, third-party ad networks, third-party demand-side platforms, header bidding, exchange bidding, or open bidding services, or the ability to designate ad impressions for sale to specific advertisers or third-party ad networks.

12.     With respect to Dynamic Allocation ("DA") and Enhanced Dynamic Allocation ("EDA"):

    a.  Your decision and/or practice, and the reasons behind the decision and/or practice, to allow AdX to outbid non-Google Ad Exchanges after reviewing their submitted bids (*i.e.*, "Last Look") as well as Your decision to discontinue this conduct, if such a decision was made;

    b.   Your decision and/or practice, and the reasons behind the decision and/or practice, to enable by default any version(s) of DA or EDA, including whether and how Publishers were able to opt out of or disable DA or EDA;

    c.  Your decision and/or practice, and the reasons behind the decision and/or practice, to limit the functionality of DA or EDA to AdX only, preventing the DFP Ad Server from enabling DA or EDA for non-Google Ad Exchanges;

    d.  Publishers' ability to customize the priority of various line items, including line items corresponding to bids from Header Bidding, and any changes restricting or expanding such ability;

    e.  The method used to calculate what has been called "the EDA Reserve Price" or the "EDA Opportunity Cost", including specifically the composition of and

data included in the historical bidding distribution pipeline; the frequency with which the EDA Reserve Price was updated; the use and method of determining the Satisfaction Index, and the method of converting any metric used for the EDA price to CPM.;  and all modifications to the method of calculating the EDA Reserve Price, including the reason for and impact of such modifications;

f.   Any policy or common practice that Google implemented with respect to a publisher that turned off DA or EDA;

g.   Whether under DA or EDA, the AdX auction was required only to meet, or to beat (and if so by how much), the reserve price in order to win the impression.

h.   Your analysis of the impact of  DA or EDA on Your gross revenue, net revenue, DV360 spend AdX versus third-party exchanges, and number of impressions won by AdX versus third-party exchanges.

13.   With respect to Sell-Side Dynamic Revenue Share ("DRS"):

a.   Your decision and/or practice, and the reasons behind the decision and/or practice to exclude or remove DBM and GDN from any version(s) of DRS and the reason for such exclusion;

b.   The extent to which DRS was applied across publishers over time, whether as a percentage of publisher revenue or impressions;

c.   Your analysis of the impact of DRS on Your gross revenue, net revenue, DV360 spend AdX versus third-party exchanges, and number of impressions won by AdX versus third-party exchanges;

    d.   The operation of Truthful DRS ("tDRS"), including how Google modified the reserve price(s) sent to buyers in the AdX auction.

14.    With respect to Reserve Price Optimization (also known as "Dynamic Reserve Price Optimization" and "Bulbasaur," collectively "RPO"):

    a.   How RPO operated, including in both second-price and first-price auctions; and

    b.   Your analysis of the impact of this practice on Your market share and Your competitors' market share.

15.    With respect to Project Poirot and Project Elmo:

    a.   The ability of AdX buyers to opt out of Project Poirot and data on how frequently buyers opted out;

    b.   Your decision and/or practice, and the reasons behind the decision and/or practice to preemptively opt GDN and/or DV360 out of Poirot;

    c.   How DV360 adjusted bids for impressions under Poirot and/or Elmo;

    d.   Your analysis of the impact of Poirot and/or Elmo on win rates, match rates, or price trends for AdX;

    e.   Your analysis of the impact of Poirot and/or Elmo on Your gross revenue, net revenue, DV360 spend on AdX versus third-party exchanges, and number of impressions won by AdX versus third-party exchanges.

16.    With respect to GDN's and DV360's bidding algorithms:

    a.   The use of "minimum bid to win" as an input to the "predicted Highest Other Bid" algorithm and/or Google's "surplus maximizer";

    b.  The differences between the bidding algorithms used for GDN bidding on AdX and GDN bidding on third party exchanges, and the differences between bidding algorithms used for DV360 bidding on AdX and on DV360 bidding on third party exchanges, specifically including the use of risk-adjustment factors and the coefficients used for such risk adjustment factor(s) over time to the present day.

17.    With respect to Project Bernanke and Project Alchemist:

    a.  The modification of GDN's bids before bidding in the AdX auction, including the calculation and application of "alpha" and "beta" multipliers; and

    b.  Your analysis of the impact of Bernanke and Alchemist on Your gross revenue, net revenue, GDN spend on AdX versus third-party exchanges, and number of impressions won by AdX versus third-party exchanges.

18.    How, if at all, any Ad Tech Auction Mechanics functioned differently for: (a) online video advertising; (b) any competing online video platform; and/or (c) any YouTube video advertising, from 2012 through 2019.

19.    Any difference of treatment, whitelisting of, or plan to whitelist YouTube and/or ads served on the YouTube platform as respects:

    a.  Any policy, practice, standard, process, rules, protections, controls and settings regarding DFP or imposed by DFP;

    b.  Any policy, practice, standard, process, rules, protections, controls, and settings regarding AdX or imposed by AdX;

    c.  Any policy, practice, standard, process, rules, protections, controls, regarding Chrome Browser;

    d.      Any Chrome Browser default setting;

    e.      Any ad server and ad serving logic specific and/or unique to YouTube;

    a.      any Flash to HTML conversion implemented by Google for video advertisements on YouTube, in its Chrome browser, or as part of any of its Ad Tech Products;

20.     Google's internal policies, procedures, or practices related to the usage of data it collects from customers of its Ad Tech Products, including:

    a.      whether and how Google utilizes the data to contact and/or solicit business from other customers of its Ad Tech Products or third parties;

    b.      how such data is accessed, stored, and used and with which of Your Ad Tech Products such data is shared;

    c.      the function of the Revenue Intelligence Group; and

    d.      the use of DFP clients' data or set ups to change or solicit changes to the client's settings in DFP in order to preference AdX or to de-prioritize competitors.

21.     Any rules or policies concerning online video advertisements and/or TrueView ads including but not limited to:

    a.      what types of violations Google identifies;

    b.      how such rule or policy violations are enforced, tracked and maintained;

    c.      whether and how such rules or policies differ for Your Ad Tech Products;

    d.      where such rule or policies, their implementation and the effect of any purported violation are listed;

e.      how alleged rule or policy violations are disclosed to publishers and

advertisers;

f.      any appeals or challenge process for claimed violations;

g.      the consequences of rule or policy violations;

h.      any way that Your Ad Tech Products (including the YouTube platform)

are exempted or whitelisted in part or in full from any rules, policies or

violations;

i.      any internal or external communication of the IAB or IAB Tech Lab

drafted by Google; and

j.      how the above affected any named Plaintiff.

*FOR DISCUSSION PURPOSES*
*Last Updated: 2024-06-21 9:30PM ET*

## <u>CERTIFICATE OF SERVICE</u>

I, Philip Korologos, hereby certify that on, June XX, 2024, I caused the foregoing Amended

Notice of Deposition to be served via email on the following counsel:

Eric Mahr
Julie Elmer
Andrew J. Ewalt
Jan Rybnicek
Lauren Kaplin
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
eric.mahr@freshfields.com
julie.elmer@freshfields.com
andrew.ewalt@freshfields.com
jan.rybnicek@freshfields.com
lauren.kaplin@freshfields.com

Robert J. McCallum
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
3 World Trade Center
175 Greenwich Street
New York, NY
(212) 284-4910
rob.mccallum@freshfields.com

Justina Sessions
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
Silicon Valley
855 Main Street
Redwood City, CA
Telephone: (650) 618-9250
justina.sessions@freshfields.com

Daniel S. Bitton
**AXINN, VELTROP & HARKRIDER LLP**
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
dbitton@axinn.com

David R. Pearl
Bradley Justus
Allison M. Vissichelli
**AXINN, VELTROP & HARKRIDER LLP**
1901 L Street NW
Washington, DC 20036
Telephone: (202) 912-4700
dpearl@axinn.com
bjustus@axinn.com
avissichelli@axinn.com

*Counsel for Defendants Google LLC, Alphabet Inc., and YouTube LLC*

Julia Tarver Wood, Senior Litigation Counsel
Aaron M. Teitelbaum, Senior Litigation Counsel
Jeffrey G. Vernon, Senior Litigation Counsel
Milosz Gudzowski, Trial Attorney
Michael E. Wolin, Trial Attorney
**United States Department of Justice**
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Julia.Tarver.Wood@usdoj.gov
Aaron.Teitelbaum@usdoj.gov
Jeffrey.Vernon@usdoj.gov
milosz.gudzowski@usdoj.gov
Michael.Wolin@usdoj.gov

*Attorneys for the United States*

Dated: June XX, 2024                    *DRAFT*