

May 2, 2025

**VIA ECF**

Hon. P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

*In re Google Digital Advertising Antitrust Litigation*
Case No. 1:21-md-03010 (PKC)

*In re Google Digital Publisher Antitrust Litigation*
Case No. 1:21-cv-07034 (PKC)

Dear Judge Castel:

We write on behalf of the Publisher Class Plaintiffs ("Publishers") in the above-captioned matter to seek leave to move for partial summary judgment on a series of issues which we believe are not in material dispute including because Google should be precluded from re-litigating issues that were litigated and decided in *United States et al. v. Google*, 1:23-cv-00108 (E.D. Va.) (the "EDVA Case"). Publishers propose that such summary judgment motion be due June 13, with Defendants' opposition due July 14, and Publishers' reply due August 1, 2025, and propose that the Court's standard briefing limitations apply. No conference is scheduled.

## I.  Introduction

On April 17, 2025, following a three-week bench trial and the submission of thousands of pages of briefing and exhibits, Judge Leonie Brinkema found Google liable under Sections 1 and 2 of the Sherman Act for monopolizing the markets for publisher ad servers and ad exchanges, and for unlawfully tying its publisher ad server to its ad exchange. In a 115-page opinion ("EDVA Opinion" or "EDVA Op.", attached as **Exhibit A**), Judge Brinkema addressed multiple issues central to this case.

In finding Google liable for violating Section 2 of the Sherman Act, the EDVA court found:

1. "publisher ad servers for open-web display advertising constitute a distinct relevant product market." EDVA Op. at 43.

2. "ad exchanges for open-web display advertising constitute a distinct relevant product market." EDVA Op. at 50.

3. "Google possesses monopoly power in the publisher ad server for open-web display advertising market." EDVA Op. at 73.

4. "Google possesses monopoly power in the ad exchange for open-web display advertising market." EDVA Op. at 76.

5. "Google has charged durable supracompetitive prices for AdX—taking 20% of each open-web display transaction—and has exhibited an unwillingness to lower AdX's take rate even as the market matured and other ad exchanges reduced their prices." EDVA Op. at 76-77.

6. "Once DFP had obtained near-total market share, Google combined DFP and AdX under a single publisher-facing product, Google Ad Manager, which further intertwined DFP and AdX." EDVA Op. at 81.

7. "Google's tying of DFP to AdX . . . violates Section 2 of the Sherman Act because it 'contribute[d] significantly to the maintenance or creation of monopoly power'". EDVA Op. at 97 (brackets in original).

8. "Google 'artificially handicap[ped] [its] buyside ([AdWords]) to boost the attractiveness of [its] sellside (AdX),' by effectively limiting its programmatic open-web advertisers in AdWords to bidding for inventory from publishers that used AdX and DFP." EDVA Op. at 97 (citation omitted and brackets in original).

9. "First Look, which required publishers using DFP to offer AdX a first right of refusal for each impression" was an "anticompetitive polic[y]". EDVA Op. at 99. "First Look exacerbated the anticompetitive effect of the unlawful AdX-DFP tie by artificially advantaging AdX within DFP's auction logic at the expense of Google's publisher customers." EDVA Op. at 99.

10. "Google's use of its monopoly power to impose artificial technical limitations that made it harder for customers to do business with rivals, instead of competing on the merits by 'making [its ad exchange] more attractive to customers,' constituted anticompetitive conduct." EDVA Op. at 99 (brackets in original).

11. "Google's Last Look was another anticompetitive policy". EDVA Op. at 99.

12. "The anticompetitive effects of Last Look have been compounded by Google's sell-side dynamic revenue share." EDVA Op. at 100.

13. "Unified Pricing Rules constituted anticompetitive conduct". EDVA Op. at 101.

14. "Google engaged in 'willful acquisition or maintenance of [its monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident' by tying DFP to AdX and committing a series of exclusionary and anticompetitive acts to entrench its

> monopoly power in two adjacent product markets." EDVA Op. at 112 (brackets in original).

> 15. "The procompetitive justifications that Google proffers for its anticompetitive conduct are both invalid and insufficient, and any procompetitive benefits of this conduct were far outweighed by its anticompetitive effects." EDVA Op. at 112.

In finding Google liable for violating Section 1 of the Sherman Act, the EDVA court found:

> 16. "publisher ad servers and ad exchanges are 'two separate products' that are not reasonably interchangeable." EDVA Op. at 91.

> 17. "Google . . . 'condition[ed] purchase of the tying product [AdX] upon purchase of the tied product [DFP].'" EDVA Op. at 92 (brackets in original).

> 18. "By restricting AdX's submission of real-time bids only to DFP, and by not allowing AdX to provide real-time bids to other publisher ad servers, Google made AdX ineffective at its core function when used by publishers who did not also use DFP. . . . Google's restriction of AdX's real-time bidding to DFP required Google's publisher customers who wanted to use AdX's core feature to use DFP." EDVA Op. at 92.

> 19. "Google's publisher customers similarly understood the coercive power of the AdX-DFP tie. They 'felt locked-in by dynamic allocation in DFP, which only gave AdX [and not other exchanges the] ability to compete' with real-time bids." EDVA Op. at 94 (brackets in original).

> 20. "Google has possessed 'sufficient economic power in the tying product market to restrain competition in the tied product market.'" EDVA Op. at 95.

> 21. "the tying of AdX and DFP has had a 'not insubstantial impact on interstate commerce.'" EDVA Op. at 96.

Publishers believe there are no genuine disputes of material fact with respect to these issues including because the Court should foreclose Google from relitigating these issues under the doctrine of non-mutual offensive collateral estoppel. This doctrine allows a plaintiff who was not a party to a prior judgment to "use that judgment 'offensively' to prevent a defendant from relitigating issues resolved in the earlier proceeding." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979); *see also Montana v. United States*, 440 U.S. 147, 153 (1979) ("Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.").

Non-mutual offensive collateral estoppel may be invoked when four conditions are satisfied: "(1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits." *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 79–80 (2d Cir. 2019) (citations omitted). Further, courts assess whether application of non-mutual offensive collateral estoppel is unfair to the defendant. *See id.* at 80.

Each of these conditions are met here. Among others, the twenty-one issues identified above are identical to those in dispute here; these issues were actually litigated and decided; the years-long litigation and three-week trial in the EDVA, followed by extensive briefing, afforded Google a full and fair opportunity to litigate these issues; and each of these issues—which are central to the elements of Sections 1 and 2 claims—were necessary to the EDVA Opinion. The EDVA Opinion is also "final" under Second Circuit precedent, even though Google has stated it will appeal "adverse" portions of the decision.[1] "The law is clear that ordinarily the pendency of an appeal should not impact the collateral estoppel effect of an otherwise final and valid judgment." *Russell–Newman, Inc. v. The Robeworth, Inc.*, 2002 WL 1918325, at *1 n. 1 (S.D.N.Y. Aug. 19, 2002) (Keenan, J.).

Moreover, fairness considerations strongly favor application of the doctrine. Google has already had a full and fair opportunity to litigate these issues. Allowing Google a second bite at the apple would waste party and judicial resources and risk inconsistent outcomes. *See Montana v. U.S.*, 440 U.S. at 153-54 (collateral estoppel "protects . . . adversaries from . . . expenses and vexation" and "fosters reliance on judicial action by minimizing the possibility of inconsistent decisions").

In *Parklane Hosiery*, defendants in a private lawsuit were barred from re-litigating issues decided in a bench trial initiated by the SEC. 439 U.S. at 324-25, 336-37. Following *Parklane Hosiery*, courts have often applied collateral estoppel in the context of a private antitrust action that follows a successful government suit. *See Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 401 (S.D.N.Y. 2008), *order clarified on reconsideration*, 2008 WL 11516437 (S.D.N.Y. Oct. 1, 2008); *In re Namenda Direct Purchaser Antitrust Litig.*, 2017 WL 4358244, at *13-16 (S.D.N.Y. May 23, 2017).

In *Discover*, for example, the plaintiff asserted claims under Sections 1 and 2 of the Sherman Act against Visa and Mastercard and later moved for partial summary judgment invoking collateral estoppel based on findings entered against the defendants in a prior government antitrust action. 598 F. Supp. 2d at 396-97. The court applied collateral estoppel to several key issues, including the definition of the relevant markets, the existence of market power, and the illegality of certain restrictive bylaws. *Id.* at 401.

---

[1] *Google to Appeal Against Part of US Court's Decision in Monopoly Case*, REUTERS (April 18, 2025 11:45 AM EDT), https://www.reuters.com/sustainability/boards-policy-regulation/google-appeal-against-part-us-courts-decision-monopoly-case-2025-04-18/.

Hon. P. Kevin Castel<br>
May 2, 2025<br>
Page 5

This Court should adopt the same approach here. As discussed in detail below, all four requirements for collateral estoppel are satisfied and fairness considerations strongly favor its application.

**II.   The elements for issue preclusion are satisfied and fairness strongly favor its application.**

**A.   The issues are identical.**

The issues decided in the EDVA Opinion are identical to the ones at issue in this case. For this element, there is no requirement that the cases and causes of action are identical. *Bifolck*, 936 F.3d at 82. Rather, collateral estoppel applies where the *issues* are "in substance the same" as those previously resolved. *Montana v. U. S.*, 440 U.S. at 155.

Publishers allege in the First Amended Complaint, ECF 408 ("FAC"), and Judge Brinkema found in the EDVA Opinion, the following:

1. There is a relevant market for publisher ad servers for open-web display advertising. FAC ¶¶ 7, 113-15; EDVA Op. at 43.

2. There is a relevant market for ad exchanges for open-web display advertising. FAC ¶¶ 7, 116-18; EDVA Op. at 50.

3. Google possesses monopoly power in the market for publisher ad servers for open-web display advertising. FAC ¶¶ 8, 158-64; EDVA Op. at 73.

4. Google possesses monopoly power in the market for ad exchanges for open-web display advertising. FAC ¶¶ 8, 165-74; EDVA Op. at 76.

5. Google has charged durable supracompetitive prices for AdX, which are at least double the rates charged by competitors. FAC ¶ 172; EDVA Op. at 76-77.

6. In 2018, Google combined DFP and AdX into a single offering, Google Ad Manager, further cementing the tie between these products. FAC ¶ 16; EDVA Op. at 81.

7. Google's tying of DFP to AdX enhanced Google's maintenance of monopoly power. FAC ¶¶ 194, 196, 199-230; EDVA Op. at 97.

8. Google restricted access to Google Ads to publishers using DFP and AdX, coercing publishers into using DFP and AdX. FAC ¶¶ 88, 165-67; EDVA Op. at 97.

9. Google's First Look was anticompetitive. FAC ¶¶ 21, 252-68; EDVA Op. at 99.

10. Google imposed artificial technical barriers to hinder customer access to rivals; this constituted anticompetitive conduct. FAC ¶¶ 21, 297; EDVA Op. at 99.

11. Google's Last Look was anticompetitive. FAC ¶¶ 21, 252-68; EDVA Op. at 99.

12. Google's Dynamic Revenue Share was anticompetitive. FAC ¶¶ 290, 292; EDVA Op. at 100.

13. Google's Unified Price Floors are anticompetitive. FAC ¶¶ 29, 324-31; EDVA Op. at 101.

14. Google acquired its monopoly power in the markets for publisher ad servers and ad exchanges through anticompetitive conduct, including tying DFP and AdX and a series of exclusionary and anticompetitive acts. FAC ¶¶ 194-95; EDVA Op. at 112.

15. Google's purported procompetitive justifications are all invalid, insufficient, or outweighed by anticompetitive effects. FAC ¶ 366; EDVA Op. at 112.

16. Publisher ad servers and ad exchanges are two separate products. FAC ¶¶ 114, 116; EDVA Op. at 91.

17. Google conditioned the purchase of the tying product (AdX) upon the purchase of the tied product (DFP). FAC ¶¶ 15-16, 199-230; EDVA Op. at 92.

18. Google's restriction of AdX's real-time bidding to DFP required Google's publisher customers who wanted to use AdX's core feature to use DFP. FAC ¶ 203; EDVA Op. at 92.

19. Google locked publishers into DFP by giving AdX (and only AdX) the ability to compete with real-time bids. FAC ¶¶ 17, 203-04; EDVA Op. at 94.

20. Google possessed sufficient economic product power in the tying product market to restrain competition in the tied product market. FAC ¶ 8; EDVA Op. at 95.

21. Google's tying of these products involved a not insubstantial impact on interstate commerce. FAC ¶¶ 56, 61; EDVA Op. at 96.

Attached as Table 1 is a side-by-side comparison between the allegations set forth in the FAC and the twenty-one issues decided in the EDVA Opinion, for which Publishers seek issue preclusion.[2]

### B. The issues were actually litigated and actually decided.

As explained above, all twenty-one issues for which Publishers seek issue preclusion were actually decided by the EDVA court. Further, these issues, which relate directly to the elements of Sections 1 and 2, were all thoroughly contested throughout the litigation, including

---

[2] In their motion for summary judgment, Publishers will seek to preclude Google from re-litigating other factual matters related to these twenty-one issues. For purposes of this pre-motion letter, Publishers do not enumerate every factual finding by Judge Brinkema that Google should be precluded from re-litigating.

at the motion to dismiss, summary judgment, and trial phases. EDVA Case, ECF 163 (denying Google's motion to dismiss), ECF 773 (denying Google's motion for summary judgment).

### C. Google had a full and fair opportunity for litigation in the prior proceeding.

There is no question that Google had a full and fair opportunity to contest these issues in the EDVA Case. Google litigated the issues in the EDVA Case for over a year and a half. *See* EDVA Op. at 1-3. After denying Google's motion for summary judgment, the court held a three-week bench trial that included thirty-nine live witnesses, deposition excerpts from an additional twenty witnesses, and hundreds of exhibits, EDVA Op. at 3, and after trial, hundreds of pages of post-trial briefing were filed. EDVA Case, ECF 1381 (DOJ post-trial brief), ECF 1375 (Google post-trial brief).

Further, the bench trial—Google's choice for the proceeding, *see* EDVA Op. at 3—constituted a full and fair opportunity to litigate the issues, which were detailed in extensive findings of fact. *See Parklane Hosiery*, 439 U.S. at 324-25, 336-37 (finding issue preclusion based on four-day bench trial resulting in declaratory judgment); *Discover*, 598 F. Supp. 2d at 401 (issue preclusion on antitrust liability applied following bench trial that resulted in detailed findings of fact); *Namenda*, 2017 WL 4358244, at *14 (issue preclusion on antitrust liability following five-day preliminary injunction hearing that resulted in detailed findings of fact).

### D. The issues previously litigated were necessary to support the EDVA Opinion and that decision is "final".

Each of the issues previously litigated and decided were necessary to the EDVA Opinion. All of them relate directly to the elements of claims under Sections 1 and 2.

*Section 2*. "The offense of monopolization 'has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" EDVA Op. at 41. To conclude that Google was liable for monopolizing the markets for publisher ad servers and ad exchanges, the court necessarily had to find and did in fact find that: (i) there are relevant markets for publisher ad servers and ad exchanges (EDVA Op. at 43, 50); (ii) Google possesses monopoly power in those markets (EDVA Op. at 73, 76); (iii) Google's acquisition of monopoly power was the result of anticompetitive conduct (EDVA Op. at 112); and (iv) Google's purported procompetitive justifications were invalid, insufficient, or outweighed by anticompetitive effects (EDVA Op. at 112).

*Section 1*. "To prove a tying claim, a plaintiff must establish four elements: (1) the existence of two separate products, (2) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party), (3) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market, and (4) a not insubstantial impact on interstate commerce." EDVA Op. at 90-91. To conclude that Google violated Section 1, the court necessarily had to find and did in fact find: (i) "publisher ad servers and ad exchanges are

'two separate products'" (EDVA Op. at 91); (ii) Google "'condition[ed] purchase of the tying product [AdX] upon purchase of the tied product [DFP]'" (EDVA Op. at 92; brackets in original); (iii) Google "possessed 'sufficient economic power in the tying product market to restrain competition in the tied product market'" (EDVA Op. at 95); and (iv) Google's "tying of AdX and DFP has had a 'not insubstantial impact on interstate commerce'" (EDVA Op. at 96).

### 1. The EDVA Opinion constitutes a "final judgment".

"The Court of Appeals for the Second Circuit take[s] a broad view of the application of collateral estoppel to rulings made at an interim stage of litigation." *Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC*, 2019 WL 3940218, at *4 (S.D.N.Y. July 29, 2019) (citations omitted). Within "the Second Circuit, finality for the purposes of issue preclusion 'may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.'" *Id.* (quoting *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961)). Whether a ruling is sufficiently final" for preclusion purposes turns on "such factors as [1] the nature of the decision (i.e., that it was not avowedly tentative), the [2] adequacy of the hearing, and [3] the opportunity for review." *Lummus*, 297 F.2d at 89.

The first two *Lummus* factors are readily met. The EDVA Opinion is not tentative and the three-week trial was more than adequate.

The third factor is also satisfied, as the "opportunity for review" element does not require the exhaustion of appellate remedies. An "inability to obtain appellate review" that militates against preclusion "refers, not to cases that are temporarily unreviewable because proceedings are ongoing, but rather to decisions that are, by law, unreviewable by their very nature." *Ferring B.V. v. Serenity Pharms., LLC*, 391 F. Supp. 3d 265, 285 (S.D.N.Y. 2019). Indeed, "numerous Second Circuit cases . . . have reaffirmed *Lummus*'s fundamental holding that an interlocutory decision can be given preclusive effect." *Id.* at 286 (collecting cases).

The EDVA Opinion is not "unreviewable by [its] very nature" and Google has even stated that it plans to appeal. *See* footnote 1, above. To the extent Google appeals the decision, the pendency of that appeal does not affect the finality of the EDVA Opinion, as numerous courts in this District have explained.[3] In accordance with the Second Circuit's broad view of the application of collateral estoppel to interlocutory decisions, the EDVA Opinion is "final" for purposes of issue preclusion. *See Russell–Newman*, 2002 WL 1918325, at *4 & n.1 (issue preclusion applied even though first ruling was on appeal); *Ferring*, 391 F. Supp. 3d at 285-86 (issue preclusion applied even though there was not yet an opportunity for appeal); *Rocky Aspen Mgmt.*, 2019 WL 3940218, at *4 (same).

---

[3] *See, e.g.*, *Ferring*, 391 F. Supp. 3d at 286 ("a judgment should be given collateral estoppel effect where it is 'firm and stable,' i.e., the 'last word' of the rendering court on a particular issue, even if it is not yet appealable'") (quoting Restatement (Second) of Judgments § 13, cmt. a); *Russell–Newman*, 2002 WL 1918325, at *1 n. 1 ("The law is clear that ordinarily the pendency of an appeal should not impact the collateral estoppel effect of an otherwise final and valid judgment.").

**E. It would be unfair to allow Google to re-litigate these issues.**

None of the discretionary bases to deny collateral estoppel are applicable in this circumstance. Those bases are where (1) the "plaintiff could easily have joined the earlier action," (2) the defendant had "little incentive to defend vigorously [the prior suit]," (3) "the judgment relied upon as a basis for estoppel is itself inconsistent with one or more previous judgments in favor the defendant," or (4) the "second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Parklane*, 439 U.S. at 331-32.

First, Publishers could not have "easily joined" the DOJ case. "A private party generally will not be permitted to intervene in Government antitrust litigation absent some strong showing that the Government is not vigorously and faithfully representing the public interest." *United States v. Hartford-Empire Co.*, 573 F.2d 1, 2 (6th Cir. 1978); *see also U.S. Commodity Futures Trading Comm'n v. Efrosman*, 2012 WL 2510338, at *4 (S.D.N.Y. June 26, 2012) ("Courts are reluctant to allow private parties to intervene in government enforcement actions.") (collecting cases). The DOJ vigorously and faithfully represented the public interest and there is no "strong showing" to the contrary. *Cf.* Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1909 (3d ed.) ("in the absence of a very compelling showing to the contrary, it will be assumed that the United States adequately represents the public interest in antitrust suits").

Second, Google was strongly incentivized to defend itself in the EDVA Case, which exposed Google to injunctive relief that could significantly alter Google's ad tech business. Google had even greater incentive to litigate the EDVA Case vigorously, knowing that findings from that case could carry preclusive effect here and expose it to potentially billions of dollars in damages.

Third, there are no inconsistent judgments. Only one liability ruling has been issued—the EDVA Opinion.

Fourth, this action does not present any procedural opportunities that were unavailable in the first action and that could readily produce a different outcome. Google has had in the EDVA and has had or will have in this case the opportunity to contest liability at the motion to dismiss, summary judgment, and trial stages. The only material difference here is the class certification process, but that procedural mechanism does not impact Google's liability. Regardless of how the class certification motion is decided, Publishers will still be able to proceed to trial to establish Google's liability—either as a certified class or through numerous individual actions.[4]

Finally, as noted above, a pending appeal does not render the application of issue preclusion inappropriate.[5]

---

[4] For the reasons set forth in Publishers' motion for class certification, this Court should certify Plaintiffs' two proposed Classes pursuant to Rule 23(b)(3) as all elements of Rule 23 are satisfied.

[5] If the Fourth Circuit reverses the EDVA Opinion in whole or in part, Google has a clear remedy: it can seek to amend any issue preclusion order under Rule 60(b). *See Sherman v. Jacobson*, 247 F. Supp. 261, 270 (S.D.N.Y.

### III. Publishers' Position on Summary Judgment Briefing

Publishers propose that their issue preclusion motion for summary judgment, if permitted by the Court, be due on June 13, that Google's opposition be due on July 14, and Publishers' reply be due August 1, 2025. Publishers propose that the Court's standard lengths of briefs apply—25 pages for opening and opposition motions, and 10 pages for reply.

\* \* \*

Publishers respectfully request that the Court permit them to file a motion for summary judgment on issues identified herein for which no genuine dispute of material fact exists including because the Court should preclude Google from re-litigating issues that were already fully and fairly litigated and decided in the EDVA Case utilizing the above schedule and page limitations. To the extent necessary to resolve these issues, Publishers respectfully request a conference.

Respectfully submitted,

David Boies
dboies@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200

*Lead Counsel for the Publisher Class*

/s/ *Philip Korologos*
Philip Korologos
pkorologos@bsfllp.com
Robert J. Dwyer
rdwyer@bsfllp.com
James Keyte
jkeyte@bsfllp.com
Luke Williams
lwilliams@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor

---

1965) ("Should the Iowa decision ultimately be reversed, defendant will not be without remedy, Fed. R. Civ. P. 60(b), even if an appeal is pending in this circuit or has already resulted in affirmance."). Because this remedy is available, the mere possibility that the EDVA Opinion could later change does not render the application of issue preclusion unfair. *See id.* (issue preclusion applied even though first ruling was on appeal); *Russell–Newman*, 2002 WL 1918325, at \*4 & n.1 (same).

New York, NY 10001
Telephone: (212) 446-2300

Mark C. Mao
mmao@bsfllp.com
Sean P. Rodriguez
srodriguez@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293-6820

Sabria A. McElroy
smcelroy@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 377-4216

Izaak Earnhardt
iearnhardt@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave NW, 11th Floor
Washington, DC 2005
Telephone: (202) 237-2727

George A. Zelcs
gzelcs@koreintillery.com
Randall P. Ewing
rewing@koreintillery.com
Marc A. Wallenstein
mwallenstein@koreintillery.com
Ryan A. Cortazar
rcortazar@koreintillery.com
**KOREIN TILLERY LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Fax: (312) 641-9751

Stephen M. Tillery
stillery@koreintillery.com
Michael E. Klenov
mklenov@koreintillery.com
Carol L. O'Keefe

cokeefe@koreintillery.com
Andrew M. Ellis
aellis@koreintillery.com
Ian Moody
imoody@koreintillery.com
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Fax: (314) 241-3525

Eric L. Cramer
ecramer@bm.net
Michael C. Dell'Angelo
mdellangelo@bm.net
Caitlin G. Coslett
ccoslett@bm.net
Patrick F. Madden
pmadden@bm.net
Jeremy Gradwohl
jgradwohl@bm.net
**BERGER MONTAGUE PC**
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000

Robert E. Litan
rlitan@bm.net
**BERGER MONTAGUE PC**
1001 G Street, NW
Suite 400 East
Washington, DC 20001
Telephone: (202) 559-9740

*Interim Co-Lead Counsel for the Publisher Class*

Copies to: All Counsel (via ECF)



### Table 1: Comparison of FAC allegations to issues decided in EDVA Opinion

| No. | Allegations from Publishers' FAC | Issue Decided in EDVA Opinion |
|---|---|---|
| 1 | "This case involves three 'Relevant Markets' [including] Publisher Ad Servers". FAC ¶ 7; *see also* FAC ¶¶ 113-15. | "publisher ad servers for open-web display advertising constitute a distinct relevant product market." EDVA Op. at 43.[6] |
| 2 | "This case involves three 'Relevant Markets' [including] Ad Exchanges". FAC ¶ 7; *see also* FAC ¶¶ 116-18. | "ad exchanges for open-web display advertising constitute a distinct relevant product market." EDVA Op. at 50. |
| 3 | "Google maintains monopoly power in each of the three publisher-facing Relevant Markets. Google maintains . . . the dominant publisher Ad Server products, with approximately 90% of the Ad Server market". FAC ¶ 8; *see also* FAC ¶¶ 158-64. | "Google possesses monopoly power in the publisher ad server for open-web display advertising market." EDVA Op. at 73. |
| 4 | "Google maintains monopoly power in each of the three publisher-facing Relevant Markets. Google maintains . . . the dominant Ad Exchange, with transactions accounting for more than 70% of impressions in the Ad Exchange market". FAC ¶ 8; *see also* FAC ¶¶ 165-74. | "Google possesses monopoly power in the ad exchange for open-web display advertising market." EDVA Op. at 76. |
| 5 | "Since at least 2016, Google's exchange has charged supracompetitive prices, with an average take rate of 20% of the transaction value per ad impression. Google charges much more—at least double—than its closest Ad Exchange competitors." FAC ¶ 172. | "Google has charged durable supracompetitive prices for AdX—taking 20% of each open-web display transaction—and has exhibited an unwillingness to lower AdX's take rate even as the market matured and other ad exchanges reduced their prices." EDVA Op. at 76-77. |

---

[6] Publishers likewise limit their allegations of relevant markets and market power to open display advertising. *See* FAC ¶ 111.

| No. | Allegations from Publishers' FAC | Issue Decided in EDVA Opinion |
|---|---|---|
| 6 | "In 2018, Google cemented this tying arrangement, and its impairment of competition in both the Ad Exchange and Ad Server markets, by bundling AdX and DFP into a single product called Google Ad Manager."  FAC ¶ 16; *see also* FAC ¶¶ 226-30. | "Once DFP had obtained near-total market share, Google combined DFP and AdX under a single publisher-facing product, Google Ad Manager, which further intertwined DFP and AdX."  EDVA Op. at 81. |
| 7 | "Google has engaged in a Scheme using a series of actions to obtain, maintain, and enhance that monopoly power in each of those markets."  FAC ¶ 194.<br><br>"Google's Scheme has included . . . 'two-way' tying arrangements. . . In combination, these tying arrangements have enabled Google to acquire and maintain monopoly power in the three publisher tools markets: the Ad Server, Ad Exchange, and Ad Network markets. . . . To summarize these . . . illegal ties:<br>- Act 1: Tying of Google's Ad Exchange (AdX) (the tying product) to its Ad Server (DFP) (the tied product);<br>- Act 2: Tying its Ad Server for large publishers (DFP) (the tying product) to its Ad Exchange product (the tied product)".<br><br>FAC ¶ 196; *see also* FAC ¶¶ 199-230. | "Google's tying of DFP to AdX . . . violates Section 2 of the Sherman Act because it 'contribute[d] significantly to the maintenance or creation of monopoly power'".  EDVA Op. at 97 (brackets in original). |
| 8 | "because Google restricts access to its advertiser pool only to those publishers using Google's Ad Server, publishers have no choice but to use Google's publisher Ad Server." FAC ¶ 88; *see also* FAC 165-67 ("The significance and uniqueness of Google Ads demand render Google's Ad Exchange a 'must have' for publishers."  "'AdX is the only platform with direct access to the entirety of [Google Ads] demand'"). | "Google 'artificially handicap[ped] [its] buyside ([AdWords]) to boost the attractiveness of [its] sellside (AdX),' by effectively limiting its programmatic open-web advertisers in AdWords to bidding for inventory from publishers that used AdX and DFP." EDVA Op. at 97 (citation omitted and brackets in original). |

| No. | Allegations from Publishers' FAC | Issue Decided in EDVA Opinion |
|---|---|---|
| 9 | "Dynamic Allocation . . . rigg[ed] the Google Ad Server waterfall . . . Google did this by giving its Ad Exchange both a ***first-in-line privilege*** and a last look". FAC ¶ 21 (emphasis added); *see also* FAC ¶¶ 252-68. | "First Look, which required publishers using DFP to offer AdX a first right of refusal for each impression" was an "anticompetitive polic[y]". EDVA Op. at 99. "First Look exacerbated the anticompetitive effect of the unlawful AdX-DFP tie by artificially advantaging AdX within DFP's auction logic at the expense of Google's publisher customers." EDVA Op. at 99; *see also* EDVA Op. at 108 ("the anticompetitive aspect of Dynamic Allocation was First Look").[7] |
| 10 | "Google used its monopoly power in Ad Servers to rig its 'waterfall' decision-making process to artificially advantage Google's AdX Ad Exchange, thereby contributing to and helping to maintain Google's monopoly power in the Ad Exchange market." FAC ¶ 21; *see also* FAC ¶ 297 ("Google's waterfall system, as implemented through its Dynamic Allocation and Enhanced Dynamic Allocation processes (Act 5 and Act 6) was both inefficient for publishers and erected artificial barriers to competition from rival Ad Exchanges and Ad Networks."). | "Google's use of its monopoly power to impose artificial technical limitations that made it harder for customers to do business with rivals, instead of competing on the merits by 'making [its ad exchange] more attractive to customers,' constituted anticompetitive conduct." EDVA Op. at 99 (brackets in original). |
| 11 | "Dynamic Allocation . . . rigg[ed] the Google Ad Server waterfall . . . Google did this by giving its Ad Exchange both a first-in-line privilege and a ***last look***". FAC ¶ 21 (emphasis added); *see also* FAC ¶¶ 252-68. | "Google's Last Look was another anticompetitive policy". EDVA Op. at 99.[8] |

---

[7] Like Publishers, the DOJ alleged that the "First Look" advantage was conferred through Google's Dynamic Allocation program. EDVA Case, Amended Complaint, ECF 120 ¶ 124.

[8] Like Publishers, the DOJ alleged that the "Last Look" advantage was conferred through Google's Dynamic Allocation program. EDVA Case, Amended Complaint, ECF 120 ¶ 256

| No. | Allegations from Publishers' FAC | Issue Decided in EDVA Opinion |
|---|---|---|
| 12 | "DRS operates in conjunction with Dynamic Allocation and Enhanced Dynamic Allocation[.]" FAC ¶ 290. "DRS could manipulate Google's Ad Exchange take rate after an auction-clearing bid from another Ad Exchange in the waterfall has taken place, in order to win ad impressions it would have otherwise lost with a fair process." FAC ¶ 292; *see also id.* (explaining how DRS operated with the last look advantage). | "The anticompetitive effects of Last Look have been compounded by Google's sell-side dynamic revenue share." EDVA Op. at 100. |
| 13 | "[Google] imposed a uniform price floor across all Ad Exchanges. This change in policy . . . had the effect of artificially impairing Google's Ad Exchange rivals, thereby impairing competition and maintaining and enhancing Google's monopoly power in the Ad Exchange market." FAC ¶ 29; *see also* FAC ¶¶ 324-31. | "Unified Pricing Rules constituted anticompetitive conduct". EDVA Op. at 101. |
| 14 | "Google has engaged in a Scheme using a series of actions to obtain, maintain, and enhance that monopoly power in each of those markets." "Google used illegal two-way ties to acquire and maintain monopoly power in each of the Ad Server, Ad Exchange, and Ad Network markets" "Google augmented its ties with additional [anticompetitive] acts". FAC ¶¶ 194-95. | "Google engaged in 'willful acquisition or maintenance of [its monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident' by tying DFP to AdX and committing a series of exclusionary and anticompetitive acts to entrench its monopoly power in two adjacent product markets." EDVA Op. at 112 (brackets in original). |
| 15 | "Google's Scheme lacks any procompetitive justification. Moreover, the harm to competition—particularly to publishers—in the Ad Exchange, Ad Network, and publisher Ad Server markets from Google's unlawful conduct more than offsets any pro-competitive benefits or justifications Google may offer." FAC ¶ 366. | "The procompetitive justifications that Google proffers for its anticompetitive conduct are both invalid and insufficient, and any procompetitive benefits of this conduct were far outweighed by its anticompetitive effects." EDVA Op. at 112. |

| No. | Allegations from Publishers' FAC | Issue Decided in EDVA Opinion |
|---|---|---|
| 16 | "No other service is substitutable for, or reasonably interchangeable with, an Ad Server from the perspective of publishers." FAC ¶ 114. "[Ad exchanges] provide a service like a clearinghouse or auction house that is distinct from the publisher Ad Server product." FAC ¶ 116. | "publisher ad servers and ad exchanges are 'two separate products' that are not reasonably interchangeable." EDVA Op. at 91. |
| 17 | "[Google] requires large publishers to use Google's AdX Ad Exchange and DFP Ad Server together". FAC ¶ 15. "In 2018, Google . . . bundl[ed] AdX and DFP into a single product called Google Ad Manager." FAC ¶ 16; *see also* FAC ¶¶ 199-230. | "Google . . . 'condition[ed] purchase of the tying product [AdX] upon purchase of the tied product [DFP].'" EDVA Op. at 92 (brackets in original). |
| 18 | "Google deliberately restricted the ability of publishers using a non-Google Ad Server to sell ad impressions through Google's Ad Exchange." "Google allowed only AdX to return live, competitive bids to publishers that used Google's DFP Ad Server. Google's restriction operates as a tie that coerces publishers, all of whom need to receive live, competitive bids from AdX, to license Google's DFP Ad Server." FAC ¶ 203. | "By restricting AdX's submission of real-time bids only to DFP, and by not allowing AdX to provide real-time bids to other publisher ad servers, Google made AdX ineffective at its core function when used by publishers who did not also use DFP. . . . Google's restriction of AdX's real-time bidding to DFP required Google's publisher customers who wanted to use AdX's core feature to use DFP." EDVA Op. at 92. |

| No. | Allegations from Publishers' FAC | Issue Decided in EDVA Opinion |
| --- | --- | --- |
| 19 | "Google allowed only AdX to return live, competitive bids to publishers that used Google's DFP Ad Server. Google's restriction operates as a tie that coerces publishers, all of whom need to receive live, competitive bids from AdX, to license Google's DFP Ad Server." FAC ¶ 203; *see also* FAC ¶ 17 ("Google used its monopoly power in its DFP Ad Server (the tying product) to require the use of Google's AdX (the tied product). Google did this through several forms of conduct, including by giving its Ad Exchange the opportunity to prevent other Ad Exchanges or Ad Networks from bidding at all if Google could beat such other Ad Exchanges' and Ad Networks' static, historical bids ([Dynamic Allocation] and [Enhanced Dynamic Allocation], discussed infra)."). | "Google's publisher customers similarly understood the coercive power of the AdX-DFP tie. They 'felt locked-in by dynamic allocation in DFP, which only gave AdX [and not other exchanges the] ability to compete' with real-time bids." EDVA Op. at 94 (brackets in original). |
| 20 | "Google maintains monopoly power in each of the three publisher-facing Relevant Markets. Google maintains (1) the dominant publisher Ad Server products, with approximately 90% of the Ad Server market [and] (2) the dominant Ad Exchange, with transactions accounting for more than 70% of impressions in the Ad Exchange market". FAC ¶ 8. | "Google has possessed 'sufficient economic power in the tying product market to restrain competition in the tied product market.'" EDVA Op. at 95. |
| 21 | "[Google] engage[s] in interstate commerce and in activities substantially affecting interstate commerce including, without limitation, providing ad tech services to publishers based throughout the United States and globally." FAC ¶ 56. "[Google's] acts at issue here were within the flow of, were intended to have, and did, in fact, have a substantial effect on the interstate commerce of the United States." FAC ¶ 61. | "the tying of AdX and DFP has had a 'not insubstantial impact on interstate commerce.'" EDVA Op. at 96. |