## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Google Digital Advertising Antitrust Litigation | Civil Action No. 1:21-md-0301 (PKC) |

*This Document Relates to:*

| | |
|---|---|
| In re Google Digital Advertising Antitrust Litigation | Civil Action No. 1:21-cv-07001 (PKC) |

## ADVERTISER CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO CERTIFY A CLASS

**REDACTED**

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.    STATEMENT OF COMMON FACTS........................................................................ 2

    A.    Google Parlayed Its Monopoly Over Search Advertising into a
Monopoly in the Display Advertising Ad Tech Stack.......................................... 2

    B.    Google Uses Bernanke and UPR to Cement its Monopoly Position..................... 3

        1.    Bernanke .................................................................................................... 3

        2.    UPR............................................................................................................ 6

    C.    Bernanke and UPR Stifled Competition............................................................... 7

    D.    The Court Overseeing the DOJ Litigation Finds Google Guilty of
Monopolization ..................................................................................................... 8

III.   THE PROPOSED CLASS ............................................................................................ 9

IV.    ARGUMENT ............................................................................................................... 9

    A.    The Requirements of Rule 23(a) Are Satisfied.................................................... 10

        1.    The Proposed Class Is Sufficiently Numerous ......................................... 10

        2.    The Case Involves Numerous Common Questions of Law and
Fact........................................................................................................... 10

        3.    Advertisers' Claims Are Typical .............................................................. 11

        4.    Advertisers and Their Counsel Will Fairly and Adequately
Represents the Interests of the Class........................................................ 14

        5.    The Scope of Plaintiff Hanson's Use of Google Ads Is Irrelevant........... 16

    B.    The Requirements of Rule 23(b)(3) Are Satisfied .............................................. 18

        1.    Common Issues Predominate.................................................................... 20

            a.    Advertisers Will Use Common Proof to Demonstrate
Google's Monopoly Power in the Relevant Markets................... 20

            b.    Advertisers Will Use Common Proof to Demonstrate
Google's Anticompetitive Conduct ............................................. 22

        2.    Common Issues Predominate as to Antitrust Injury and Damages .......... 24

            a.    Dr. Zona's Model........................................................................ 26

i

b.      Dr. Singer's Models ..................................................................... 28

3.      A Class Action Is a Superior Means of Adjudicating these Claims ......... 31

a.      The EDVA Ruling Will Resolve Numerous Common
        Issues in the Litigation, Easing the Manageability of a
        Class Trial ...................................................................................... 32

b.      Class Members Have Little Interest in Individually
        Controlling the Litigation .............................................................. 33

c.      There Is Little Duplicative Litigation ............................................ 33

C.      Whether Absent Class Members Must Arbitrate Their Claims Does Not
        Undermine Class Certification.................................................................. 34

D.      Ascertainability Is Not an Impediment to Certification......................... 35

V.      CONCLUSION.............................................................................................. 35

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)......................................................................................... 18, 19, 31

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
568 U.S. 455 (2013)................................................................................ 10, 18, 19, 25

*B & R Supermarket, Inc. v. Visa Inc.,*
2021 WL 4408167 (E.D.N.Y. Sept. 27, 2021) ........................................................ 34

*B & R Supermarket, Inc. v. Visa Inc.,*
2024 WL 3823096 (S.D.N.Y. 2024)......................................................................... 34

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
222 F.3d 52 (2d Cir. 2000) ...................................................................................... 14

*Belfiore v. Proctor & Gamble Co.,*
311 F.R.D. 29 (E.D.N.Y. 2015)................................................................................ 10

*Charron v. Wiener,*
731 F.3d 241 (2d Cir. 2013) .................................................................................... 15

*Chen-Oster v. Goldman, Sachs & Co.,*
449 F. Supp. 3d 216 (S.D.N.Y. 2020) ..................................................................... 34

*City of Philadelphia v. Bank of Am. Corp.,*
2023 WL 6160534 (S.D.N.Y. Sept. 21, 2023).......................................................... 24

Consol. Rail Corp. v. Town of Hyde Park,
47 F.3d 473 (2d Cir. 1995) ...................................................................................... 10

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.,*
502 F.3d 91 (2d Cir. 2007) ...................................................................................... 20

*Damassia v. Duane Reade, Inc.,*
250 F.R.D. 152 (S.D.N.Y. 2008) ............................................................................. 15

*DDMB, Inc. v. Visa, Inc.,*
2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021) ........................................................ 14

*Denson v. Donald J. Trump for President, Inc.,*
2022 WL 18674802 (S.D.N.Y. Mar. 30, 2022)........................................................ 34

*Dial Corp. v. News Corp.,*
314 F.R.D. 108 (S.D.N.Y. 2015), *amended*, 2016 WL 690895 (S.D.N.Y. Feb. 9,
2016) ......................................................................................... 14, 20, 22, 26

*Discover Fin. Servs. v. Visa U.S.A. Inc.,*
598 F. Supp. 2d 394 (S.D.N.Y. 2008),
*order clarified on reconsideration*, 2008 WL 11516437 (S.D.N.Y. Oct. 1, 2008) ................. 32

*Eisen v. Carlisle & Jacquelin,*
391 F.2d 555 (2d Cir. 1968) .................................................................................... 33

*Fikes Wholesale, Inc. v. HSBC Bank U.S.A., N.A.*,
  62 F.4th 704 (2d Cir. 2023) ................................................................. 35

*Gratz v. Bollinger*,
  539 U.S. 244 (2003) ................................................................. 17, 18

*Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*,
  54 F.4th 115 (2d Cir. 2022) ................................................................. 19

*In re Actos Antitrust Litig.*,
  2024 WL 4251891 (S.D.N.Y. Aug. 9, 2024), *report and recommendation adopted*,
  2024 WL 4345568 (S.D.N.Y. Sept. 30, 2024) ................................................................. 20

*In re Am. Int'l Group, Inc. Sec. Litig.*,
  689 F.3d 229 (2d Cir. 2012) ................................................................. 19

*In re Elec. Books Antitrust Litig.*,
  2014 WL 1282293 (S.D.N.Y Mar. 28, 2014) ................................................................. 18

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
  256 F.R.D. 82 (D. Conn. 2009) ................................................................. 26

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) ................................................................. 26

*In re Kind LLC "Healthy & All Natural" Litig.*,
  337 F.R.D. 581 (S.D.N.Y. 2021) ................................................................. 17

*In re Literary Works in Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011) ................................................................. 15

*In re Magnetic Audiotape Antitrust Litig.*,
  2001 WL 619305 (S.D.N.Y. June 6, 2001) ................................................................. 26

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
  310 F.R.D. 230 (S.D.N.Y. 2015) ................................................................. 11

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  338 F.R.D. 527 (S.D.N.Y. 2021) ................................................................. 15, 20, 21, 22, 23, 32

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ................................................................. 11

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017) ................................................................. 19, 35

*In re Playmobil Antitrust Litig.*,
  35 F. Supp. 2d 231 (E.D.N.Y. 1998) ................................................................. 13, 14

*In re SunEdison, Inc. Sec. Litig.*,
  329 F.R.D. 124 (S.D.N.Y. 2019) ................................................................. 9

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) ................................................................. 19, 33

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001), *overruled on other grounds by In re Initial Public
    Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) ....................................................... 20

*Iowa Pub. Employees' Ret. Sys. v. Bank of Am. Corp.*,
    2022 WL 2829880 (S.D.N.Y. June 30, 2022), *report and recommendation adopted as
    modified sub nom.* 2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024)........................................ 25, 26

*Jensen v. Cablevision Sys. Corp.*,
    372 F. Supp. 3d 95 (E.D.N.Y. 2019) ............................................................................. 34

*Johnson v. Nextel Commc'ns. Inc.*,
    780 F.3d 128 (2d Cir. 2015) ......................................................................................... 10

*Kurtz v. Costco Wholesale Corp.*,
    818 F. App'x 57 (2d Cir. 2020) ................................................................................ 19, 25

*Langan v. Johnson & Johnson Consumer Cos.*,
    897 F.3d 88 (2d Cir. 2018) .................................................................................. 16, 17, 18

*Madden v. Midland Funding, LLC*,
    237 F. Supp. 3d 130 (S.D.N.Y. 2017) ........................................................................... 11

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012) ......................................................................................... 18

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ......................................................................................... 24

*Parklane Hosiery Co. v. Shore*,
    439 U.S. 322 (1979)................................................................................................... 8, 32

*Pennsylvania Ave. Funds v. Inyx Inc.*,
    2011 WL 2732544 (S.D.N.Y. July 5, 2011) .................................................................. 12

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) ......................................................................................... 19

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ..................................................................................... 9, 12

*Sobel v. Yeshiva Univ.*,
    839 F.2d 18 (2d Cir. 1988) ........................................................................................... 25

*Sykes v. Mel S. Harris and Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015) ...................................................................................... 10, 19

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)...................................................................................................... 19

*United States v. Google LLC*,
    747 F. Supp. 3d 1 (D.D.C. Aug. 5, 2024) ...................................................................... 2

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)................................................................................................. 10, 11

*Weiss v. Tenney Corp.*,
47 F.R.D. 283 (S.D.N.Y. 1969) ................................................................ 32

*Westchester Indep. Living Ctr., Inc. v. State Univ. of New York, Purchase Coll.*,
331 F.R.D. 279 (S.D.N.Y. 2019) .............................................................. 17

**Other Authorities**

Advisory Committee's Notes on Fed. Rule Civ. Proc. 23, 28 U.S.C. App., p. 697 .................... 31

**Rules**

Fed. R. Civ. P. 23 ..................................................................................... 1

Fed. R. Civ. P. 23(a) ........................................................................ 1, 11, 14

Fed. R. Civ. P. 23(a)(1) ...................................................................... 9, 10

Fed. R. Civ. P. 23(a)(2) ........................................................................... 10

Fed. R. Civ. P. 23(a)(3) ........................................................................... 10

Fed. R. Civ. P. 23(a)(4) ...................................................................... 10, 14

Fed. R. Civ. P. 23(b)(3) ............................................ 1, 9, 10, 18, 19, 31

## GLOSSARY OF TERMS

| TERM | DEFINITION |
|---|---|
| Ad Exchange | An intermediary product that allows advertisers to bid for display advertising inventory in real-time |
| Ad Tech Stack | The collection of products that connect publishers and advertisers in the real-time bidding process of ad exchanges |
| Advertisers | Persons and entities that purchase display advertising space from publishers |
| AdX | Google's ad exchange platform |
| Bernanke | A program instituted by Google that inflated bids above what the advertiser would be otherwise willing to pay so that AdX would win the auction. The term "Bernanke," unless otherwise specified, refers collectively to the various iterations of Bernanke. |
| First-price auction | An auction in which the winning bidder pays the full amount of his or her own bid |
| Google Ads | Google's self-service ad-buying tool used by advertisers, formerly called AdWords and sometimes referred to as Google Display Network ("GDN"). |
| Publishers | Owners and operators of display advertising inventory (such as websites) that is sold to advertisers |
| Second-price auction | An auction in which the winning bidder pays the higher of the second-highest bid or the auction's floor price |
| UPR | Google's Uniform Pricing Rules that removed publishers' ability to set different price floors on different exchanges for a given piece of display advertising inventory |

## I.    INTRODUCTION

Advertisers' claims are well-suited for class treatment. This litigation involves anticompetitive conduct by Google that created and maintained its monopoly positions throughout the "ad tech stack"—the series of display advertising tools that connect advertisers and publishers through real-time bidding. The court overseeing the Department of Justice's parallel suit against Google recently concluded, relying on common proof, that Google's conduct in the ad tech stack was anticompetitive and amounted to unlawful monopolization. Advertisers have focused their claims and the damages they seek on two facets of Google's anticompetitive conduct: its Project Bernanke and Unified Pricing Rules ("UPR") programs. A trial of Advertisers' claims in this litigation will focus on common issues: the relevant markets, Google's monopoly power, its implementation of Bernanke and UPR, the anticompetitive effects of those auction manipulations, and the resulting overcharges borne by Google Ads users. In short, Advertisers seek certification of a class of Google Ads users harmed by Google's implementation of Bernanke and UPR.

The proposed class readily meets the requirements of Federal Rule of Civil Procedure 23. As to Rule 23(a), the class consists of hundreds of thousands or millions of Google Ads users (numerosity) whose claims involve common legal and factual questions (commonality). Plaintiff Hanson and his counsel have adequately represented the class and will continue to do so (adequacy). Lastly, Plaintiff Hanson's claims concerning Google's efforts to monopolize the ad tech stack are typical of members of the proposed class, regardless of whether those class members were impacted by Bernanke, UPR, or both.

With respect to Rule 23(b)(3), common issues concerning Google's conduct and its effects will predominate at trial. Both antitrust impact and damages are shown through economic

models that apply classwide. And the applicability of Google's arbitration provision to a portion of the class only raises another common issue that would not require any individualized inquiries (and in any event is not ripe for adjudication at this point). Lastly, given the size of the class and modest damages of most class members, classwide litigation is superior to individual proceedings. Advertisers therefore respectfully request that the Court certify the proposed class.

## II.    STATEMENT OF COMMON FACTS

### A.    Google Parlayed Its Monopoly Over Search Advertising into a Monopoly in the Display Advertising Ad Tech Stack

The "explosion of the Internet as the world's primary communications channel" has transformed commerce. Case No. 1:23-cv-00108-LMB-JFA, ECF 1410, at 5 (E.D. Va. Apr. 17, 2025) (the "EDVA Ruling"). Google enjoys a unique position in the internet economy, fueled by its power as the leading internet search engine to emerge from the internet's early days, which in turn led to Google's dominance over search advertising—an essential form of advertising for business today and for over two decades now. *Id.* at 24 ("Google's evolution into the data-driven digital advertising enterprise it is today has been powered by its flagship product, Google Search."); *United States v. Google LLC*, 747 F. Supp. 3d 1, 62-63 (D.D.C. Aug. 5, 2024) ("The big idea is that when you search for a product or service, chances are you're interested in purchasing that product or service. . . . As a result, advertisers view paid search as particularly efficient at driving conversions.") (internal quotations omitted).

Google parlayed its early monopoly over search advertising into a monopoly position with respect to open web display advertising by combining its dominance over search advertising with the strategic acquisition of key components of what today is recognized as the "ad tech stack" that brokers and delivers web display advertisements to internet users. EDVA Ruling at 25-29. Google launched AdWords in 2000, "which originated as a self-service advertising

2

platform for buying search ads" that would appear alongside Google's search results. EDVA Ruling at 24. Google later rebranded AdWords as Google Ads, which is what it is generally called in this brief. *Id.* at 13 n.7.

In 2008, Google acquired DoubleClick, and with it "the market's leading publisher ad server, DoubleClick For Publishers ('DFP')," and "a nascent ad exchange, AdX, that connected the two sides of the ad tech stack by matching advertiser bids with publisher inventory." *Id.* at 27. Thus, Google early on established control over the buy-side (Google Ads), the sell-side (DFP), and the exchange between them (AdX) through which most web display ads were, and continue to be, placed. *See id.* at 28-29.

Today, ███████████████████████████████████████████ ████████████████████████████████████████████Co-Lead Decl.[1] Ex. 8 (GOOG-DOJ-09876316) at -323, -328. This digital display advertising business is extremely lucrative. Advertisers spend billions of dollars, which generate massive profits for Google as well as the publishers who sell the online advertising space on which these advertisements run; internet users to whom such advertisements were displayed in turn spend billions of dollars buying the products and services advertised in this manner. DOJ Action, No. 1:23-cv-00108-LMB-JFA, ECF 1, at 1.

**B.    Google Uses Bernanke and UPR to Cement its Monopoly Position**

**1.    Bernanke**

███████████████████████████████████████████████ Ex. 9 (GOOG-AT-MDL-008842383) at -388. ████████████████████████████ ████████████████████████████████████████████████████

---

[1] All citations are to exhibits to the Co-Lead Declaration of Dena Sharp and Tina Wolfson unless otherwise noted.

██████████████████.[2] *See, e.g.*, Ex. 10 (GOOG-DOJ-04306227); Ex. 11 (GOOG-AT-MDL-002051655); Ex. 12 (GOOG-AT-MDL-001283154). ████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Ex. 13

(GOOG-DOJ-13469175) ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████; Ex. 6 (Milgrom Rpt.) ¶ 210 ████████████████████████████

████████████████; Ex. 12 (GOOG-AT-MDL-001283154) at -155 █████████████

██████████████████████████████████████████████; Ex. 37 (Korula

Dep.) 176:24-177:17 (Jul. 12, 2024) ██████████████████████████████

████████████████████████.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ Ex. 6 (Milgrom Rpt.) ¶ 156. ████████████████████

████████████████████████████████████████████████

---

[2] Ads bought directly from Google or from a third-party publisher using Google's AdSense ad network are not routed through AdX. EDVA Ruling at 20.

[3] Ex. 12 (GOOG-AT-MDL-001283154) ████████████████████████████████████████ ████████.

███████████████████████████████████████████████████

███████████████████████████████ *Id*. ¶¶ 156, 177(a); Ex. 16 (GOOG-DOJ-02854344)

at -346 ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ Ex. 10 (GOOG-DOJ-04306227).

█████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ Ex. 14

(GOOG-DOJ-12700489) at -491; *see also* Ex. 17 (GOOG-DOJ-AT-01130405) at -408; Ex. 11

(GOOG-AT-MDL-002051655). █████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████ Ex. 13 (GOOG-DOJ-13469175); *see also id* at -176

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████;

Ex. 14 (GOOG-DOJ-12700489) at -495 ████████████████████████████

████████████████████████████████████).

█████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ *See, e.g.*, Ex. 5 (Chandler Rpt.) ¶ 181; Ex. 7 (Israel Rpt.) ¶ 195. ████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████ *See* Ex.

35 (Milgrom Dep.) 455:2-25, 608:22-609:16 (April 18, 2025) ████████████

████████████████████████████████████████████████

████████████████████████████████████ ; Ex. 30 (GOOG-DOJ-15140608)

████████████████████████████████████████████████

███████████████████████████ .

### 2.    UPR

In 2019, Google imposed Unified Pricing Rules ("UPR")—"a policy that prohibited

publishers using DFP from setting higher price floors for AdX than for other exchanges," and

"from setting higher price floors for Google AdWords demand than for demand from other ad

networks or demand-side platforms." EDVA Ruling at 37-38; *see also* Ex. 31 (GOOG-DOJ-

02857290) at -291; Ex. 15 (GOOG-DOJ-13229710); Ex. 18 (GOOG-AT-MDL-008989727).

█████████████████████████████████████████████████

████████████████████████████████████████████ EDVA

Ruling at 38-39; Ex. 32 (GOOG-AT-MDL-B-007778984) 25:1–6, 55:1–56:20 ████████

████████████████████████████████ ; *see generally* Ex. 23 (GOOG-DOJ-AT-

01490095) █████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████



████████████████████ Ex. 24 (GOOG-DOJ-09714662) at -666; Ex. 15 (GOOG-DOJ-13229710); Ex. 19 (GOOG-AT-MDL-B-005916960); Ex. 20 (GOOG-AT-MDL-008842393) at -405.

### C.    Bernanke and UPR Stifled Competition

████ Ex. 3 (Singer Rpt.) ¶¶ 188-195; Ex. 1 (Zona Rpt.) ¶¶ 104-108, 118-119, 138; Ex. 5 (Chandler Rpt.) ¶¶ 328, 334-342, 353.

████████████████████; Ex. 24 (GOOG-DOJ-09714662) at -663 ████████████████████. "The overall result of Unified Pricing Rules was that Google's ad tech products continued to gain scale in the display advertising space while rival ad tech products lost scale." EDVA Ruling at 39 (citing Ex. 26 (GOOG-DOJ-AT-02204351) at -360) (other citations omitted). *See also* Ex. 21 (GOOG-DOJ-AT-01680260) at -261 ████████████████

---

[4] Ex. 7 (Israel Rpt.) ¶ 195 ████████████████████████████; Ex. 36 (Israel Dep.) 814:7-13; 815:17 -816:3; 828:16-20 (April 1, 2025) ████████████; Ex. 5 (Chandler Rpt.) ¶ 181.

(███████████████████████████████████████████████████████

███████████████████████████████████████████████▌

### D.   The Court Overseeing the DOJ Litigation Finds Google Guilty of Monopolization

In January 2023—roughly two and a half years after Advertisers initiated this litigation—the Department of Justice ("DOJ") and several states filed suit against Google in the United States District Court for the Eastern District of Virginia ("DOJ Action"). The Honorable Leonie Brinkema presided over a three-week bench trial in November 2024 and issued a 115-page opinion containing findings of fact and conclusion of law on April 17, 2025.

The EDVA Ruling includes numerous findings relevant to this case that further substantiate Advertisers' claims.[6] Those include:

- Google violated Section 2 of the Sherman Act, including through the imposition of UPR. *Id*. at 37-39, 100-01 ("Unified Pricing Rules constituted anticompetitive conduct"). Advertisers assert that UPR is anticompetitive for the same reasons identified by the DOJ.

- The market for "ad exchanges for open-web display advertising" is a relevant product market in which Google has monopoly power. EDVA Ruling at 50-54, 76-84. Advertisers assert that Google had monopoly power in the same market.

- UPR "increased the number of impressions AdX won and the revenue it received, while decreasing impressions won and revenue received by third-party exchanges." *Id*. at 39. Advertisers' experts draw the same conclusions about the effects of UPR.

---

[5] EDVA Ruling at 28-29 ("AdWords was a singularly powerful source of digital advertising demand. . . . [L]arge publishers were greatly attracted to the unique advertising demand offered by AdWords, and as a result viewed using DFP as essential because it was the only publisher ad server that could effectively access AdX and, consequently, AdWords demand."); *id*. at 39 ("describing the pool of advertisers that use [Google Ads] to purchase Search ads as the 'greatest source of demand in the history of advertising.'"); *see also, e.g.*, Ex. 33 (GOOG-DOJ-06852416) ████████████████████████████████████████████████████████████████████
████████; *see generally* Ex. 34 (GOOG-DOJ-06853424).

[6] Advertisers intend to seek an order that they are entitled to offensive collateral estoppel with regard to the issues decided in the EDVA Ruling. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330 (1979) (approving of the use of nonmutual offensive collateral estoppel).

These findings were not specific to the government or any individual advertiser. Instead, the EDVA Ruling found as a general matter, relying on common evidence, that Google had monopoly power and engaged in anticompetitive conduct to shield itself from competition. The EDVA Ruling compellingly demonstrates Advertisers' ability to resolve their claims on a classwide basis using common proof.

## III.     THE PROPOSED CLASS

Advertisers seek to certify the following class under Rule 23(b)(3).

All persons and entities that placed a display advertisement on a third-party website using Google Ads for the period January 1, 2016, through the present (the "Class").

Excluded from the Class are: (1) Google and its officers, directors, legal representatives, and wholly or partly owned subsidiaries or affiliated companies; (2) class counsel and their employees; and (3) the judicial officers and their immediate family members and court staff assigned to this case.

This proposed class differs from the class proposed in the Consolidated Advertiser Complaint ("CAC"), which would have included any advertiser that placed a display ad using any of Google's products (*e.g.*, DV360). ECF 399. The class proposed in this motion is limited to Google Ads users, which is narrower than the class proposed in the CAC. This difference poses no obstacle to certification given that "[a] court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly." *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 134 (S.D.N.Y. 2019) (quoting *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993)).

## IV.     ARGUMENT

Where, as here, plaintiffs seek class certification for money damages, they must affirmatively meet six prerequisites: (1) numerosity (Fed. R. Civ. P. 23(a)(1)); (2)

commonality (Fed. R. Civ. P. 23(a)(2)); (3) typicality (Fed. R. Civ. P. 23(a)(3)); (4)

adequacy (Fed. R. Civ. P. 23(a)(4)); (5) predominance (Fed. R. Civ. P. 23(b)(3)); and (6)

superiority (Fed. R. Civ. P. 23(b)(3)). *See, e.g. Amgen Inc. v. Conn. Ret. Plans & Trust*

*Funds*, 568 U.S. 455, 459 (2013) (articulating standards for class certification).

### A.      The Requirements of Rule 23(a) Are Satisfied

#### 1.      The Proposed Class Is Sufficiently Numerous

A class is certifiable if it "is so numerous that joinder of all members is impracticable."

Fed. R. Civ. P. 23(a)(1); *see also Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d

Cir. 1995) ("[N]umerosity is presumed at a level of 40 members."). Here, the numerosity

requirement is easily met, as the proposed class numbers ███████████████████████

████████ even were the class reduced to those who opted out of arbitration after certification.

*See* Ex. 38 (January 31, 2024 Letter from B. Zweifach to M. Bock); *infra* § IV.C..

#### 2.      The Case Involves Numerous Common Questions of Law and Fact

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P.

23(a)(2). It exists when "there is a common issue that 'drive[s] the resolution of the litigation'

such that 'determination of its truth or falsity will resolve an issue that is central to the validity of

the claims in one stroke.'" *Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 84 (2d Cir.

2015) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, (2011)). "Where the same

conduct or practice by the same defendant gives rise to the same kind of claims from all class

members, there is a common question." *Johnson v. Nextel Commc'ns. Inc*., 780 F.3d 128, 137

(2d Cir. 2015) (internal quotation marks omitted). "Not '*all* questions of law or fact raised' need

be 'common.'" *Belfiore v. Proctor & Gamble Co*., 311 F.R.D. 29, 61 (E.D.N.Y. 2015) (emphasis

in original) (quoting *Dukes*, 564 U.S. at 368, (Ginsburg, J., concurring in part and dissenting in part)). "Even a single common question will do." *Dukes*, 564 U.S. at 359 (cleaned up).

Many courts have held that "allegations concerning the existence, scope, and efficacy" of alleged antitrust violations "present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996). Here, such common questions include whether: (1) ad exchanges for open-web display advertising constitute a relevant antitrust market; (2) Google possesses monopoly power in the market for ad exchanges for open-web display advertising; (3) Google willfully acquired or maintained that monopoly power; (4) the market for self-service buying tools for open web display ads is a relevant antitrust market; (5) Google possesses monopoly power in the market for self-service buying tools for open web display ads; (6) Google willfully acquired or maintained that monopoly power; (7) Google's actions relating to UPR and Bernanke constituted anticompetitive conduct; (8) the EDVA Ruling has a preclusive effect; and (9) members of the Class suffered damages as a result of Google's anticompetitive conduct.

A class action is appropriate here because these questions will "generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (emphasis in original). Rule 23(a)'s commonality requirement is satisfied.

### 3.     Advertisers' Claims Are Typical

Rule 23's typicality requirement is "not demanding." *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 236 (S.D.N.Y. 2015) (quotation and citation omitted). "'[T]ypicality does not require identical facts,' . . . and also does not require that damages be identical among class members." *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 157 (S.D.N.Y. 2017) (citation omitted); *see also In re MF Glob. Holdings Ltd.*, 310 F.R.D. at 236 ("Typicality 'does

not require factual identity between the named plaintiffs and the class members.'") (quoting *Pennsylvania Ave. Funds v. Inyx Inc*., 2011 WL 2732544, at *4 (S.D.N.Y. July 5, 2011). Rather, typicality "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability[;]" it is "usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani,* 987 F.2d 931, 936-37 (2d Cir. 1993). Plaintiff Hanson's claims are typical of absent class members who were likewise impacted by Google's monopolistic conduct.

Plaintiff Hanson and each class member share the same overarching goal: to demonstrate the relevant markets, Google's monopoly power, and the anticompetitive conduct Google undertook to preserve and enhance that monopoly power. Although Bernanke and UPR are different actions, they are a part of the same overarching course of conduct to further the same anticompetitive goal. Google recognized that it sought to be ███████████████████ █████████ Ex. 25 (GOOG-DOJ-01856500) at -503. A central tenant of Google's strategy was █████████████████████████████ Ex. 28 (GOOG-DOJ-12866023-R) at -064. ████████████████████████████████████████████ ████████ Ex. 22 (GOOG-DOJ-15600216) ███████████████████████████ ██████████████████████████.

As Dr. Zona explained, Bernanke and UPR████████████████████████ ████████████████████████████████████████ Ex. 1 (Zona Rpt.) ¶ 116. Dr. Singer similarly notes that the ████████████████████ ████████████████████████████████████ ████████████████ Ex. 3 (Singer Rpt.) ¶ 19; *see also id.* ¶ 63 █████████ ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. Google's anticompetitive

conduct impacted all Class Members, and Rule 23(a)(3) does not require "named plaintiffs to be

clones of each other or clones of other class members." *In re Playmobil Antitrust Litig.*, 35 F.

Supp. 2d 231, 242 (E.D.N.Y. 1998) (internal quotations omitted).

Because all of Google's conduct contributed to its overarching scheme, the goal of which

was to advantage AdX, there is no need or benefit to conduct separate markets and monopoly

power analyses for the two aspects of Google's anticompetitive conduct at issue. Plaintiff

Hanson and all class members will establish a relevant market for ad exchanges and establish

monopoly power within that market. Both Dr. Zona and Dr. Singer provide analyses of this

market and Google's market power, and those analyses apply to their opinions concerning both

Bernanke and UPR. Dr. Zona uses a single analysis—██████████████████████████████

████████████████████████████████████████████—to establish

impact and damages for the class. Ex. 1 (Zona Rpt.) ¶¶ 116-120. Although Dr. Zona ████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████ *Id.* at ¶¶ 121-142.

Plaintiff Hanson's claims concerning the relevant market and monopoly power are thus not only

typical, but identical to, the claims of all absent class members on those issues.

In summary, Plaintiff Hanson's claims and those of absent class members all center on:

(1) Google's anticompetitive conduct to entrench its dominance in the ad exchange market, (2)

the effect of the restrictions on competition on the ad exchange market on prices paid by Google

Ads users, and (3) common economic models to measure those impacts and corresponding

damages. This is sufficient to meet Rule 23(s) typicality requirements, especially because "[t]ypicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violations by the defendants." *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998) (internal quotations omitted).

Courts often find that different types of conduct can and should be considered together when they advance a single monopolistic scheme, such as Google's maintenance of its monopoly in the ad tech stack. *See Dial Corp. v. News Corp.*, 314 F.R.D. 108, 117, 120-21 (S.D.N.Y. 2015), *amended*, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016) (class certification granted where Defendant acquired its monopoly through "the cumulative effect of a number of exclusionary acts" and "pattern of exclusionary conduct"); *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *40, 44, 50 (E.D.N.Y. Sept. 27, 2021) (class certification granted where Defendants' various restraints, including three forms of fees and rules imposed, "work together to reinforce [Defendants'] control over the pricing" to maintain monopoly power); *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241–42 (E.D.N.Y. 1998) (typicality established despite differences in the way defendant's anticompetitive plan was manifested).

### 4.    Advertisers and Their Counsel Will Fairly and Adequately Represents the Interests of the Class

Rule 23(a) permits certification if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The "adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). "The requirement ensures that any potential conflicts of interest will be uncovered, but to defeat certification, a conflict must be 'fundamental' and go 'to the very heart of the litigation.'" *In re*

*Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 548 (S.D.N.Y. 2021) (quoting *Charron v. Wiener*, 731 F.3d 241, 250 (2d Cir. 2013)). Further, "[n]ot every conflict among subgroups of a class will prevent class certification." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011).

"The fact that [a] plaintiff's claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class." *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008). First, as demonstrated above Plaintiff Hanson's claims are typical of the proposed class. Nor are there any conflicts between Plaintiff Hanson and the proposed class: Plaintiff Hanson's claims are the same as those of the proposed Class members, based on the same conduct by Google, and damages can be shown by a common class-wide methodology.

Second, Plaintiff's counsel are experienced class action attorneys that have vigorously litigated the case on behalf of the proposed Class for five years. *See* Case No. 20-cv-03556, ECF 1 (N.D. Cal.) (Plaintiff Hanson's original complaint). This work has included extensive discovery and motion practice, including participating in numerous depositions of Google's fact and expert witnesses; defending Plaintiff's deposition; issuing written discovery and subpoenas; participating in countless meet-and-confers on discovery issues; and reviewing the vast quantities of documents and data produced by Google and third parties. Plaintiff's counsel engaged experts who have developed opinions on complex issues regarding market definition, monopoly power, antitrust impact, and damages. Plaintiff Hanson, too, has been actively participated in this case, and understands the duties that remaining a class representative will entail. In sum, both Plaintiff Hanson and his counsel will adequately represent the class.

### 5.    The Scope of Plaintiff Hanson's Use of Google Ads Is Irrelevant

The fact that Plaintiff Hanson used Google Ads for a limited period does not preclude him from serving as a representative of the proposed class. In its motion to dismiss order, the Court held that Plaintiff Hanson lacked individual standing to pursue "conduct that post-dates September 6, 2016" because he did not "use[] any Google ad-buying tools or services after" that date. ECF 701 at 22. The Court did not, at that time, address any questions related to the scope of a class that Plaintiff Hanson could represent. The Court's order does not materially limit the scope of the class that Plaintiff Hanson can represent for several reasons.

*First*, the Court's order was premised on the notion that Plaintiff Hanson only had individual standing with respect to "conduct" that personally impacted him. *Id*. Plaintiff Hanson used Google Ads through September 2016, during which time Bernanke was in effect. As a result, Plaintiff Hanson has individual standing with respect to any claims related to Bernanke. *See supra* § II.B.1.

*Second*, the scope of the claims that Plaintiff Hanson has individual standing to pursue is irrelevant to the scope of the claims that can be included within the proposed class. The Second Circuit has recognized that "it rarely happens that the circumstances surrounding one plaintiff's claim end up being identical to the claims of another putative class member, let alone all of the others." *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 94 (2d Cir. 2018). Whether a plaintiff has individual Article III "standing to sue the named defendants" (which no party disputes is the case for Plaintiff Hanson), is different from "whether it is proper for a class to include" class members with claims that the named plaintiff does not have individual standing to pursue. *Id*. at 93-95 (holding that a plaintiff with purchases under one state's laws could represent a class that included "out-of-state, nonparty class members with claims subject to

16

different state laws"). The Second Circuit has held that "class action plaintiffs are not required to have individual standing to press any of the claims belonging to their unnamed class members." *Id*. at 95. That approach, it explained, is consistent with "the Supreme Court's preference for dealing with modest variations between class members' claims as substantive questions, not jurisdictional ones." *Id*. It also accords with Rule 23 "acknowledg[ing] the obvious truth that class actions necessarily involve plaintiffs litigating injuries that they themselves would not have standing to litigate." *Id*.; *see also Gratz v. Bollinger,* 539 U.S. 244, 262-63 (2003) (named plaintiff could represent a class of individuals denied admission even though the university's "use of race in undergraduate transfer admissions differs from its use of race in undergraduate freshman admissions"); *In re Kind LLC "Healthy & All Natural" Litig.*, 337 F.R.D. 581, 595 (S.D.N.Y. 2021) (plaintiff could represent a class even though he did not see all of the advertisements at issue); *Westchester Indep. Living Ctr., Inc. v. State Univ. of New York, Purchase Coll.*, 331 F.R.D. 279, 294 (S.D.N.Y. 2019) (class sufficiently cohesive where a general policy of defendant alleged led to disability discrimination at multiple locations); *c.f. Langan*, 897 F.3d at 94 (claims are too dissimilar when the defendant did not actually injure the named plaintiff).

The claims for which Plaintiff Hanson has individual Article III standing—*i.e.*, harm resulting from Bernanke—are sufficiently similar to the claims of absent class members flowing from Google's imposition of UPR for them to be included in the class. As discussed above, both Bernanke and UPR (1) were implemented by Google, (2) to advantage AdX over rival exchanges (or to prevent other exchanges from having advantages over AdX), (3) with the common purpose and effect of maintaining AdX dominance, (4) with the effect of raising prices for Google Ads users, and (5) are alleged violations of Section 2 of the Sherman Act. Both manipulations involve

restrictions on competition within the ad exchange market, and Dr. Zona uses the same methodologies to measure the effects of those restrictions on the amounts paid by Google Ads users. Ex. 3 (Singer Rpt.) ¶¶ 57-63; Ex. 1 (Zona Rpt.) ¶¶ 102-120.

Plaintiff Hanson's representation of a class comprised of those impacted by Bernanke and/or UPR is even more appropriate because Advertisers assert a single cause of action for monopolization, of which Bernanke and UPR are both a part. *See* ECF 399 ¶¶ 350-357. Given these overlaps, Plaintiff Hanson's claims and those of class members impacted by UPR are "injuries of the same general character" that can be litigated together as part of a single class with Plaintiff Hanson as the class representative. *Langan*, 897 F.3d at 94. That some class members were injured by a different component of Google's monopolistic scheme does not "raise such a 'fundamentally different set of concerns' as to defeat class standing." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 164 (2d Cir. 2012) (quoting *Gratz,* 539 U.S. at 264); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (considering "whether proposed classes are sufficiently cohesive to warrant adjudication by representation").

### B.      The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) is satisfied if common issues predominate in the case. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013). "The essential inquiry for predominance is whether the proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *In re Elec. Books Antitrust Litig.,* 2014 WL 1282293, at *13 (S.D.N.Y Mar. 28, 2014) (quoting *Amgen*, 568 U.S. at 469). "Predominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the

issues subject only to individualized proof.'" *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d

Cir. 2015) (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013)).

*See also In re Petrobras Sec.*, 862 F.3d 250, 268 (2d Cir. 2017).

Rule 23(b)(3) "'does not require a plaintiff seeking class certification to prove that each

elemen[t] of [her] claim [is] susceptible to classwide proof'" and "[t]he mere existence of

individual issues will not be sufficient to defeat certification." *Sykes v. Mel S. Harris & Assocs.*

*LLC,* 780 F.3d 70, 81, 87 (2d Cir. 2015) (quoting *Amgen*, 568 U.S. at 469). The predominance

analysis therefore is a "comparative inquiry" that considers "the nature and significance of the

material common and individual issues in the case." *Petrobras*, 862 F. 3d at 268, 271. The

analysis is "more [ ] qualitative than quantitative." *Id.* at 271. *See also Haley v. Tchrs. Ins. &*

*Annuity Ass'n of Am.*, 54 F.4th 115, 121 (2d Cir. 2022) ("[P]redominance is not simply an

exercise in tallying up issues."). The analysis "'ask[s] whether the common, aggregation-

enabling, issues in the case are *more prevalent or important* than the non-common, aggregation-

defeating, individual issues.'" *Petrobras,* 862 F.3d at 270 (quoting *Tyson Foods, Inc. v.*

*Bouaphakeo*, 577 U.S. 442, 453 (2016) (emphasis in original)). "Plaintiffs need not prove,

however, that the legal or factual issues that predominate will be answered in their favor." *Kurtz*

*v. Costco Wholesale Corp.*, 818 F. App'x 57, 61 (2d Cir. 2020) (summary order) (citing *Amgen*,

568 U.S. at 468).

The predominance requirement is "'readily met in certain cases alleging . . . violations of

the antitrust laws.'" *In re Am. Int'l Group, Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012)

(quoting *Amchem*, 521 U.S. at 625). That is the case here. Advertisers will rely on evidence

common to the Class to establish each element of their claims: (1) Google's violation of Section

2 of the Sherman Act, which requires showing monopoly power and anticompetitive conduct, (2)

19

the violation's impact on the Class members, and (3) aggregate damages. *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104-05 (2d Cir. 2007) (identifying violation, impact, and damages as elements of all putative class members' claims) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001), *overruled on other grounds by In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006)).

### 1.    Common Issues Predominate

An analysis of whether the conduct alleged violates antitrust laws focuses on the defendant's conduct, where "common evidence generally predominates over individualized evidence[.]" *Namenda*, 338 F.R.D. at 551 (predominance satisfied where the analysis of the antitrust violation included the geographic market definition, the product market definition, the defendant's monopoly power, and the extent of the alleged anticompetitive conduct); *see also Dial Corp.*, 314 F.R.D. at 113 (issues relevant to proving a violation of the antitrust laws, including geographic market definition, product market definition, defendant's monopoly power, and the extent of defendant's exclusionary conduct, could be proven through classwide, common evidence because they focus on defendant's conduct, not on the actions of putative class members). Similarly, the central issue to this case—whether Google violated the Sherman Act— will be proven by classwide, common proof to establish both monopoly power in the relevant markets and anticompetitive conduct.

### a.    Advertisers Will Use Common Proof to Demonstrate Google's Monopoly Power in the Relevant Markets

Evidence to establish Google's monopoly power focuses on Google's conduct and market shares in relevant markets. This evidence "will be the same for each putative class member." *In re Actos Antitrust Litig.*, 2024 WL 4251891, at *19 (S.D.N.Y. Aug. 9, 2024), *report and recommendation adopted*, 2024 WL 4345568 (S.D.N.Y. Sept. 30, 2024). Because this inquiry

focuses on the defendant's conduct—whether Google had monopoly power in the ad exchange market and the self-service ad buying tools market and whether Google's conduct demonstrates this monopoly power—"common evidence . . . predominates over individualized evidence with regard to this element." *Nameda*, 338 F.R.D. at 551.[7]

Advertisers will present documents and expert testimony that show monopoly power in the ad exchange and self-service ad buying tools markets, ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████ Ex. 3 (Singer Rpt.) ¶¶ 56, 149-151, 173-179, 180-195, 232-235, 238-242; Ex. 1 (Zona Rpt.) ¶¶ 88-101, 104-115. The evidence will also include Google's market share in the relevant markets and that the relevant geographic market is the United States. Ex. 3 (Singer Rpt.) ¶¶ 245-46, 248-251; Ex. 1 (Zona Rpt.) ¶¶ 65, 94. Both Dr. Zona and Dr. Singer also analyze Google's ad tech manipulations as evidence of monopoly power, *i.e.* that Google would not have been able to implement those programs absent monopoly power. Ex. 3 (Singer Rpt.) ¶¶ 164-195; Ex. 1 (Zona Rpt.) ¶¶ 88-115. Advertisers will also put forward the expert report of Professor John Chandler. Professor Chandler has 25 years of experience in teaching and practicing marketing, with a primary focus on digital marketing. Ex. 5 (Chandler Rpt.) ¶ 1. He has extensive experience working with publishers and advertisers, as well as coding, implementing, and testing ad exchanges. *Id*. ¶¶ 4, 8, 10, 13. Dr. Chandler explains the different components of the ad tech stack and the unique features of real-time, open-web display

---

[7] Although Advertisers advance two relevant markets, for ad exchanges and for self-service ad-buying tools, their damages theories depend only on the former, which the EDVA Ruling held constitutes a valid antitrust market in which Google has monopoly power.

advertising. *Id.* ¶¶ 38-50, 144-195. Classwide evidence will also support the proposed relevant markets and the existence of monopoly power in those markets.

Documents and expert testimony will focus entirely on Google's behavior and the actions of other rivals in the relevant markets through common evidence that is equally applicable to any class member. In finding that there is a relevant market for ad exchanges, and that Google had monopoly power in that market, the EDVA Ruling relied on common evidence of the type Advertisers will rely on here. *See* EDVA Ruling at 50-54, 76-84. If each class member were to pursue their own claims individually, they would use the same documents and expert testimony to demonstrate the above-mentioned direct and indirect evidence of Google's monopoly power in the two relevant markets. *Dial Corp.*, 314 F.R.D. at 114. Therefore, proving monopoly power is achieved through common proof for all class members. *See id.*

> **b.    Advertisers Will Use Common Proof to Demonstrate Google's Anticompetitive Conduct**

Advertisers will prove that Google's conduct was anticompetitive and violated the Sherman Act through common evidence of Google's uniformly implemented policies and conduct that pursued a single, overarching strategic goal: artificially increasing AdX transactions through anticompetitive means. Advertisers allege that two of Google's policies—UPR and Bernanke—amount to anticompetitive conduct used to maintain Google's monopoly. The inquiry of whether this conduct would violate antitrust laws involves common evidence that predominates over individualized evidence, as the determination primarily focuses on the defendant's conduct. *Nameda*, 338 F.R.D. at 551.

Through UPR, Google implemented restrictions that prevented publishers from using different price floors on rival ad exchanges, forcing them to use one price floor for all ad exchanges. EDVA Ruling at 37-38. Determining whether this conduct is anticompetitive focuses

on the circumstances surrounding implementation of this rule, which ███████████████
████████████████████████████████ Ex. 27 (GOOG-DOJ-09713317) at -318.

Advertisers will prove that UPR is anticompetitive with evidence ████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████ *See id*. (stating that UPR ███████████████████

████████████████████████████████████████████████████). This evidence
is common to every class member, as it relates to Google's conduct and universally applicable

economic concepts. In concluding that UPR "constituted anticompetitive conduct[,]" the EDVA

Ruling similarly looked to the nature of UPR itself— that it "took away publishers' ability to set

higher price floors on AdX than on third-party exchanges." EDVA Ruling at 100-01. It held that

the "overall result" of UPR was to allow "Google's ad tech products [] to gain scale in the

display advertising space while rival ad tech products lost scale." *Id*. at 39. Google described this

internally as █████████████████████████████████████████████

██████ Ex. 26 (GOOG-DOJ-AT-02204351) at -360; Ex. 39 (PUBMATIC_DOJ-00012158)

████████████████████████████████████████.

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ *See supra* § II.B.1. Common questions predominate

here because determining whether this conduct violates the Sherman Act will solely focus on

Google's internal policies and will be proven by common evidence centering on Google's

motivation, implementation, and utilization of these policies. *See Nameda*, 338 F.R.D. at 551.

Google's conduct, taken both as individual policies and as part of an overarching

anticompetitive strategy to monopolize the relevant markets, will be proven through evidence

common to advertisers centering on Google's conduct, and therefore, common questions predominate as to the central issue of Google antitrust liability. *Id.*

### 2.    Common Issues Predominate as to Antitrust Injury and Damages

Through Bernanke and UPR, Google maintained and exploited its dominance in the ad tech ecosystem, ████████████████████████████████████████████

████████████████████. Ex. 1 (Zona Rpt.) ¶¶ 73, 87, 107, 117-120; Ex. 3 (Singer Rpt.) ¶¶ 78-79, 173-179, 256; *see also* EDVA Ruling at 39 ("Unified Pricing Rules increased the number of impressions AdX won and the revenue it received, while decreasing impressions won and revenue received by third-party exchanges."). Using regression analyses, both Dr. Zona and Dr. Singer then explain how these anticompetitive effects in the ad exchange market—specifically increases in Google's dominance in that market—████████████████████████████

████████████ Ex. 1 (Zona Rpt.) ¶¶ 121-142; Ex. 3 (Singer Rpt.) ¶¶ 80-131. The DOJ similarly recognized that the result of UPR was "consistent with what one Google employee said was the 'primary objective' of the 2019 changes to DFP: 'to help the buyside' of Google's ad tech products, namely [Google Ads] and DV360." EDVA Ruling at 39. As explained below, Dr. Zona and Dr. Singer's analyses are based on common evidence and economic models that apply equally to all class members and demonstrate antitrust injury and damages on a classwide basis. The use of regression analyses is commonplace, and it is well-recognized that such models "can test and isolate the extent to which the actual prices paid by plaintiffs are higher because of a defendant's collusive behavior." *City of Philadelphia v. Bank of Am. Corp.*, 2023 WL 6160534, at *4 (S.D.N.Y. Sept. 21, 2023) (quoting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 671 (9th Cir. 2022) (cleaned up)).

Defendants' experts have, unsurprisingly, offered a number of criticisms of Dr. Zona's and Dr. Singer's models. But Google's experts' general criticisms of the models do not "demonstrate[] that there exists 'some fatal dissimilarity among class members that would make use of the class-action device inefficient or unfair. Instead, what [Defendants] allege[ ] is a fatal similarity—an alleged failure of proof as to an element of the plaintiffs' cause of action.'" *Kurtz*, 818 F. App'x at 62 (quoting *Amgen*, 568 U.S. at 470, 133 S.Ct. 1184). As to criticisms of the parameters of a regression, for example, "[a] factfinder may ultimately agree. But if that is the case, then the class claims will fail as a unit." *Id*. These critiques thus only support the argument that common issues predominate.

Google's experts also point to purported differences among class members, such as the amount of their spending or the types of advertising they engaged in. But "the well-settled precedent in this Circuit [holds] that factual differences in the amount of damages, date, size, or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class." *Iowa Pub. Employees' Ret. Sys. v. Bank of Am. Corp.*, 2022 WL 2829880, at *23 (S.D.N.Y. June 30, 2022) (internal quotation omitted), *report and recommendation adopted as modified sub nom*. 2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024). And Google's experts' attacks generally hypothesize that other factors or considerations *could* undermine Dr. Zona or Dr. Singer's models, but they make no efforts to actually show this is the case. The Second Circuit has held that "such an attack should be specific and make a showing of relevance for each particular variable it contends plaintiffs ought to include." *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 34 (2d Cir. 1988); *see also In re*

*Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *17 (S.D.N.Y. Jan. 30, 2025) (same).

At this stage of the proceedings, the relevant question is "whether the method by which plaintiffs propose to prove class-wide impact *could* prove such impact, not whether plaintiffs in fact can prove class-wide impact." *In re Magnetic Audiotape Antitrust Litig.*, 2001 WL 619305, at *4 (S.D.N.Y. June 6, 2001) (emphasis added); *see also Iowa Pub. Employees' Ret. Sys.*, 2024 WL 5004632, at *13 ("[T]he Court finds that [plaintiff's model] is methodologically sound and capable of proving class-wide impact. That is all that is required at this stage."); *Dial Corp.*, 314 F.R.D. at 118–19 (finding that dispute between experts about appropriate methodology and benchmarks did not undermine plaintiffs' showing that their "damages model [was] sufficient to show that damages are measurable through use of a common methodology"); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009) ("The real question before this court is whether the plaintiffs have established a *workable* multiple regression equation, not whether plaintiffs' model actually *works*, because the issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a class-wide measure of damages through generalized proof.") (emphasis in original). As explained below, Dr. Zona and Dr. Singer's models reliably apply well-settled methodologies and rely on common proof, and as a result, common issues predominate as to classwide impact and damages.

### a.    Dr. Zona's Model

Dr. Douglas Zona is an economist whose work focuses on antitrust economics and industrial organization. Ex. 1 (Zona Rpt.) ¶ 1. He has been qualified as an expert in dozens of antitrust cases. *Id*. ¶ 2, App'x A. Dr. Zona was tasked with offering opinions regarding "the

extent to which impact can be shown through common evidence" and using "standard and reliable economic methods and analyses for computing aggregate damages." *Id*. ¶ 25.

In conducting this analysis, Dr. Zona focuses ███████████████████████ *Id*. ¶¶ 103-15. In the first step of his analysis, Dr. Zona cites Google's ███████████ ████████████████████████████████████ ████████████████ *Id*. ¶ 117. He then determines what █████████████ ████████████████████████████ *Id*. ¶ 119.

Dr. Zona's model then shows █████████████████████████ ████████████████████████ *Id*. ¶ 134. Dr. Zona focuses on how █████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████ *Id*. ¶¶ 128-30. He concludes that ████████████████████ ████████████████████████████████ *Id*. ¶ 133. Dr. Zona then evaluates ██████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ *Id*. ¶ 141. All of the evidence Dr. Zona relies on, primarily ████████████████ █████████████████, is common to the class.

Finally, Dr. Zona provides a ██████████████████████████ ████████████████████████████████

██████████████████████████████████████ *Id*. ¶ 138; Ex. 2 (Zona Reply) ¶ 104. And

based on the level of granularity of the underlying data, ████████████████████████

████████████████████████ Ex. 1 (Zona Rpt. ¶ 142); *see also* Ex. 2 (Zona Reply) ¶

105 ██████████████████████████████████████.

### b.    Dr. Singer's Models

Advertiser Plaintiffs also retained Dr. Hal Singer, who provides, among other things, an

assessment of classwide impact and damages related to UPR. Dr. Singer is a professor of

economics at the University of Utah where he teaches graduate and undergraduate courses on

antitrust economics. Ex. 3 (Singer Rpt.) ¶ 16. He is also the director of the Utah Project, a cross-

disciplinary institute that focuses on antitrust and consumer protection law and policy. *Id*. He has

twice received the award for antitrust economist of the year from the American Antitrust

Institute. *Id*. ¶ 17. Dr. Singer has testified as an expert in many state and federal courts, and

before the House Judiciary Subcommittee on Antitrust and the Senate Judiciary Subcommittee

on Competition Policy, Antitrust, and Consumer Rights. *Id*. ¶ 18.

In this matter, in addition to his opinions on the relevant market and market power

discussed above, Dr. Singer provides economic analyses and models to demonstrate the

existence of classwide impact and damages resulting from Google's implementation of UPR in

two alternative ways (described below). Dr. Singer's analyses and results are consistent with

Judge Brinkema's conclusion that "Unified Pricing Rules increased the number of impressions

AdX won and the revenue it received, while decreasing impressions won and revenue received

by third-party exchanges." EDVA Ruling at 39.

*Indirect Method*: Dr. Singer's first method determines ████████████████████

██████████████████████████ Ex. 3 (Singer Rpt.) ¶¶ 68, 80-96. He then estimates the

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

*Id*. ¶¶ 105-109. The final part of this model uses ████████████████████████

██████████████████████████████████████████

████████ *Id*. ¶¶ 97-104. In his reply report, Dr. Singer shows that his results hold even when

accounting for the (incorrect) critiques of Google's experts. As an initial matter, Google's expert

██████████████████████████████████████████████

██████████████████████████████ Ex. 4 (Singer Reply) ¶ 102.

Beyond that, Dr. Singer explains that while ███████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████ *Id*. ¶¶ 106-11. As Dr. Singer explained, ████

██████████████████████████████████████████████

██████████████████████████████████████████████

████ *Id*. ¶ 107. When Dr. Singer tests his models by modifying them to account for Google's

unfounded criticisms, ████████████████ *Id*. ¶¶ 108

███████████████████████ ; 123 ██████████████████████

█████████████████████████████ . But in any event, these criticisms go to

Google's views of the reliability of Dr. Singer's model, not whether the model would serve as

classwide proof if accepted by the jury.

      Dr. Singer also explains ███████████████████████████

████████████████████████████████████████████

██████ Ex. 3 (Singer Rpt.) ¶ 130. Every step of Dr. Singer's indirect method is based on common proof: █████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ *Id.* ¶¶ 76-109.

*Direct Method*: Dr. Singer's direct method is based on ███████████████████ ███████████████████████████████████████████ *Id.* ¶¶ 115-17.

█████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* ¶¶ 118-124; Ex. 4 (Singer Reply) ¶¶ 139-41, 176-77. ███████████████████████████████████████

██████████████████████████████████████████████

█████████████████ Ex. 3 (Singer Rpt.) ¶¶ 118-129; Ex. 4 (Singer Reply) ¶¶ 131-38. In his reply report, Dr. Singer noted that ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ *Id.* ¶¶ 148-83. The model would also naturally ███████████████████████████████████████████

██████████████████████████ *Id.* ¶ 142.

The direct method is also supported by ███████████████████████████ ██████ *Id.* ¶¶ 128-30. In particular, █████████████████████████████████

███████████████████████████████████████████

██████ *Id.* ¶ 130 (citing internal Google document).

Dr. Singer explains that the damages from the direct method 

Ex. 3 (Singer Rpt.) ¶ 128.

*Pricing Structure*: In addition to his economic model, as further evidence of classwide impact, Dr. Singer explains that Google uses a

*Id*. ¶ 132. The take rate Google charges *Id*.

*Id*. ¶¶ 133-35.

*Id*. ¶ 136.

*Id*. ¶¶ 132, 137.

### 3.    A Class Action Is a Superior Means of Adjudicating these Claims

Rule 23(b)(3) requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority exists when "a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (citing Advisory Committee's Notes on Fed. Rule Civ. Proc. 23, 28 U.S.C. App., p. 697).

Rule 23(b)(3) provides four non-exhaustive factors to evaluate superiority: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

31

### a.     The EDVA Ruling Will Resolve Numerous Common Issues in the Litigation, Easing the Manageability of a Class Trial

A trial in this matter will be eminently manageable, including because the proceedings will be streamlined by the EDVA Ruling, which settles numerous common issues that go to the heart of this litigation. *See Parklane Hosiery*, 439 U.S. at 330-32 (setting forth standard for collateral estoppel). In a similar circumstance, Judge Jones found that collateral estoppel applied to the finding made after a bench trial in an action brought by the DOJ against Visa and Mastercard. *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 400-01 (S.D.N.Y. 2008), *order clarified on reconsideration*, 2008 WL 11516437 (S.D.N.Y. Oct. 1, 2008). Based on the findings in the DOJ action, the court gave "collateral estoppel effect" to numerous key issues, including the definitions of the relevant markets, the existence of market power, and a finding that the alleged conduct was an unlawful restraint that harmed competition. *Id*. Judge Jones concluded that applying collateral estoppel to these issues "would serve judicial economy while remaining fair to Defendants." *Id*. at 400. The same is true here, and a trial in this matter will largely focus on establishing classwide impact and the amount of aggregate damages.

Manageability also concerns whether there is a viable alternative to class litigation—for instance, "a class action must be deemed the only practical method of litigating these issues when the complex nature of the litigation and the comparatively small individual financial interests are considered." *Weiss v. Tenney Corp.*, 47 F.R.D. 283, 291 (S.D.N.Y. 1969). Here, as in other antitrust class actions, "whatever difficulties in managing this class action are dwarfed by the extraordinary difficulty (if not practical impossibility) of bringing the likely thousands of individual cases against Defendants if a class were not certified." *Namenda*, 338 F.R.D. at 576. Like the other class claims pending before the Court in this action, nothing suggests that Advertisers' claims on a class-wide basis would be unmanageable.

32

### b.    Class Members Have Little Interest in Individually Controlling the Litigation

Class actions are superior where individual litigation would be impractical due to the costs of litigation exceeding the potential recovery. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 130. Here, the amount that each class member likely would receive is low in comparison to the vast resources required to litigate against a company like Google. Ex. 3 (Singer Rpt.) ¶¶ 109, 129; Ex. 1 (Zona Rpt. ¶ 135).

### c.    There Is Little Duplicative Litigation

If there has been limited or no prior litigation, class treatment is often seen as more efficient and less burdensome for the judicial system than individual litigation. *See Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 560 (2d Cir. 1968) ("By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation."). This Court granted Google's motion to compel arbitration as to two of the (non-moving) Plaintiffs and, as a result, individual arbitrations may be filed on behalf of similarly situated class members, and litigation initiated in California state court may find that California class members can litigate their claims there,[8] but Plaintiff is not aware of any duplicative litigation that possibly could suggest that class treatment is anything other than the best way to resolve the claims of individual advertisers who are not forced to pursue their claims through arbitration.

---

[8] Google has removed this action and currently is attempting to have it coordinated before this Court. *See* MDL No. 3010, ECF 278-79 (J.P.M.L.) (Notice of Potential Tag-Along Action and Conditional Transfer Order re same).

**C.** **Whether Absent Class Members Must Arbitrate Their Claims Does Not Undermine Class Certification**

The Second Circuit has not specifically addressed the requisite timing of a motion to compel arbitration in class litigation. *See, e.g.*, *B & R Supermarket, Inc. v. Visa Inc*., 2021 WL 4408167, at *4 (E.D.N.Y. Sept. 27, 2021). However, "courts routinely hold that 'the earliest time to move to compel arbitration is after class certification.'" *Id.* (quoting *Chen-Oster v. Goldman, Sachs & Co*., 449 F. Supp. 3d 216, 234 (S.D.N.Y. 2020) (emphasis added)). Courts have held that an arbitration ruling pertaining to absent class members before class certification is improper. *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 123 (E.D.N.Y. 2019) ("This Court will not compel absent putative class members . . . to binding arbitration or issue a ruling regarding the enforceability of the provision. Any such ruling is procedurally improper and analogous to an advisory opinion."); *see also Denson v. Donald J. Trump for President, Inc.*, 2022 WL 18674802, at *7 (S.D.N.Y. Mar. 30, 2022) ("[A]ny determination as to the arbitrability of the putative class members' claims would be premature. Moreover, any motion to compel arbitration will be addressed after class discovery and certification is resolved."). This conclusion is based, in part, on the fact that the parties can then go through the opt-out procedure and determine which remaining class members are subject to arbitration. *See*, *e.g.*, *B & R Supermarket, Inc. v. Visa Inc*., 2024 WL 3823096, at *5 (S.D.N.Y. Aug. 14, 2024). Here, to the extent that Google argues that the possibility of some absent class members being subject to arbitration undermines class certification, (1) Google has already confirmed that there are ███ ████████████████████████████████████████████ and (2) those issues are properly addressed following certification. Ex. 38 (January 31, 2024 Letter from B. Zweifach to M. Bock).

### D.    Ascertainability Is Not an Impediment to Certification

In the Second Circuit, Rule 23 includes an implied ascertainability requirement, which requires only that "a proposed class is defined using objective criteria that establish a membership with definite boundaries." *Fikes Wholesale, Inc. v. HSBC Bank U.S.A., N.A.*, 62 F.4th 704, 716 (2d Cir. 2023) (quoting *Petrobras*, 862 F.3d at 269). The requirement is a "modest threshold[.]" *Petrobras*, 862 F.3d at 269.

Here there can be no dispute that "determinations as to class membership are 'objectively possible'" and, indeed, membership can be ascertained from Google's and class members' records of class members' Google Ads accounts. *Fikes*, 62 F.4th at 717 (quoting *Petrobras*, 862 F.3d at 270). The proposed class is based on only a few objective criteria: (1) paying for display advertising on Google Ads; (2) during a defined time period. The exclusions are equally definite. Whether a Google Ads user is subject to arbitration is an objective determination based on whether that user paid for Google Ads after accepting a version of the terms of service containing an arbitration provision and whether that user opted out of the arbitration provision. Although not a required showing for ascertainability, the record also demonstrates ██████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ *See* Ex. 29 (GOOG-AT-MDL-C-000058277) at -281 ██████████████ ████████████████████████████████████████████████████ ██████████████████

## V.    CONCLUSION

For the foregoing reasons, Advertisers respectfully request that the Court certify the proposed Class.

Dated: May 2, 2025

Respectfully submitted,

*/s/ Dena C. Sharp*
Dena C. Sharp (*pro hac vice*)
Scott Grzenczyk (*pro hac vice*)
Mikaela Bock (*pro hac vice*)
Isabela Velez (*pro hac vice*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
scottg@girardsharp.com
mbock@girardsharp.com
ivelez@girardsharp.com

*/s/ Tina Wolfson*
Tina Wolfson (TW-1016)
Theodore W. Maya (*pro hac vice*)
Bradley K. King (BK-1971)
**AHDOOT & WOLFSON, PC**
2600 West Olive Ave., Suite 500
Burbank, California 91505
Tel.: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
bking@ahdootwolfson.com

*Interim Co-Lead Counsel for Advertiser*
*Plaintiffs and the Proposed Advertiser Class*