**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE: GOOGLE DIGITAL ADVERTISING
ANTITRUST LITIGATION

No. 1:21-md-3010 (PKC)

*This Document Relates To:*

---

IN RE: GOOGLE DIGITAL PUBLISHER
ANTITRUST LITIGATION

No. 1:21-cv-07034 (PKC)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS**
**GOOGLE LLC, ALPHABET INC., AND YOUTUBE, LLC'S OPPOSITION**
**TO PUBLISHER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ................................................................................. 1

II. BACKGROUND .................................................................................................. 3

    A.  Plaintiffs Sue on Behalf of Two Classes Challenging Sixteen Acts ...................... 3

    B.  Plaintiffs Challenge Different Conduct and
        Advance New Class Definitions In Their Expert Report ......................................... 4

    C.  Prof. Elhauge Calculates Damages for the Ties Using a "Yardstick" Model ......... 5

    D.  Relying on an Unchanged Model, Plaintiffs Seek
        Certification of New Classes Based on New Legal Theories ................................. 6

III. ARGUMENT ..................................................................................................... 8

    A.  Plaintiffs Cannot Meet  Their Burden Of Showing Predominance ........................ 9

        1.  Plaintiffs Do Not Meet Their Burden of Showing
            Classwide Antitrust Impact Tied to Their Theory of Liability ................. 10

            a.  Plaintiffs Offer No Evidence of Antitrust
                Injury for the Buy-Side Ties or Non-Tying Restraints ................. 10

            b.  Plaintiffs' Attempt to Show Classwide
                Harm Attributable to the Sell-Side Ties Fails Under *Comcast* ..... 12

        2.  Plaintiffs Do Not Meet Their
            Burden of Showing Predominance Because
            Prof. Elhauge's Model is Fundamentally Flawed ..................................... 14

            a.  Prof. Elhauge's Model Fails to
                Account for Lawful Feature Differences Between
                AdX and AdSense Transactions and Yardstick Transactions ....... 15

            b.  Prof. Elhauge's Model Detects Harm Where None Exists ........... 17

        3.  Plaintiffs Do Not Meet Their Burden of Showing
            Predominance Because Prof. Elhauge Does Not Measure
            Overcharges for the "Package" of the Tying and Tied Products ............. 20

        4.  Plaintiffs Do Not Meet Their Burden of Showing
            Predominance Because Proving a Putative Class Member
            is a Direct Purchaser Requires Analysis of Individual Contracts ............. 22

          5.      Plaintiffs Do Not Meet Their Burden of
Showing Predominance Because They Offer No  Common Evidence of
Coercion for Their Tying Claims ............................................................. 25

   B.     Plaintiffs Cannot Meet Their Burden of
Showing That The Proposed Class Representatives
Can Adequately Represent The Class As Required By Rule 23(a)(4) ................ 28

   C.     Plaintiffs Cannot Expand The Classes To  Include Non-Publishers At Class
Certification ...................................................................................... 31

IV.  CONCLUSION ................................................................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Allen v. Dairy Farmers of Am., Inc.*,
  279 F.R.D. 257 (D. Vt. 2011) ...............................................................................29

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ........................................................................ *passim*

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)................................................................................17

*Boro Hall v. Metro. Tobacco Co.*,
  74 F.R.D. 142 (E.D.N.Y. 1977) ..........................................................................29

*Bowling v. Johnson & Johnson*,
  2019 WL 1760162 (S.D.N.Y. Apr. 22, 2019)......................................................31

*Capital Temps. v. Olsten Corp.*,
  506 F.2d 658 (2d Cir. 1974)................................................................................27

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)........................................................................................ *passim*

*Crutchfield v. Sewerage & Water Bd. of New Orleans*,
  829 F.3d 370 (5th Cir. 2016) ..............................................................................28

*Fernandez v. Wells Fargo Bank, N.A.*,
  2013 WL 4540521 (S.D.N.Y. Aug. 28, 2013) (Castel, J.).....................................9

*Fifth & Fifty-Fifth Residence Club Ass'n, Inc. v. Vistana Signature Experiences, Inc.*,
  2018 WL 11466157 (S.D.N.Y. Sept. 28, 2018)...................................................19

*In re Florida Cement & Concrete Antitrust Litig.*,
  278 F.R.D. 674 (S.D. Fla. 2012)....................................................................25, 28

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  407 F. Supp. 3d 422 (S.D.N.Y. 2019)..................................................................29

*Free World Foreign Cars, Inc. v. Alfa Romeo, S.p.A.*,
  55 F.R.D. 26 (S.D.N.Y. 1972) ............................................................................29

*Freeland v. AT & T Corp.*,
  238 F.R.D. 130 (S.D.N.Y. 2006) ....................................................20, 22, 25, 27

**Page(s)**

*Freitas v. Cricket Wireless, LLC*,
    2022 WL 3018061 (N.D. Cal. Jul. 29, 2022) ........................................................................17

*Halverson v. Convenient Food Mart, Inc.*,
    69 F.R.D. 331 (N.D. Ill. 1974) ...........................................................................................25

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ...........................................................................................................23

*In re Interest Rate Swaps Antitrust Litig.*,
    2023 WL 8675625 (S.D.N.Y. Dec. 15, 2023) ....................................................................25

*Kline v. Wolf*,
    88 F.R.D. 696 (S.D.N.Y. 1981), *aff'd*, 702 F.2d 400 (2d Cir. 1983).................................31

*Kronenberg v. Allstate Ins. Co.*,
    743 F. Supp. 3d 465 (E.D.N.Y. 2024) ..............................................................................11

*Kypta v. McDonald's Corp.*,
    671 F.2d 1282 (11th Cir. 1982) ........................................................................................20

*In re Lamictal Direct Purchaser Antitrust Litig.*,
    957 F.3d 184 (3d Cir. 2020).............................................................................................22

*Menking ex rel. Menking v. Daines*,
    287 F.R.D. 174 (S.D.N.Y. 2012) ......................................................................................32

*In re Namenda Direct Purchaser Antitrust Litigation*,
    331 F. Supp. 3d 152 (S.D.N.Y. 2018) ..............................................................................32

*Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527 (S.D.N.Y. 2021) ..............11, 14, 22

*Ortho Diagnostic Sys., Inc. v. Abbott Lab'ys, Inc.*,
    920 F. Supp. 455 (S.D.N.Y. 1996) ...................................................................................26

*Oscar v. BMW of N. Am., LLC*,
    2011 WL 6399505 (S.D.N.Y. Dec. 20, 2011) ..................................................................32

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2024 WL 1014159 (E.D.N.Y. Mar. 8, 2024) ....................................................................23

*In re Pharmacy Benefit Managers*,
    2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ................................................................15, 17

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) .....................................................................................14, 18

iv

**Page(s)**

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019) ........................................................................12

*In re Rail Freight Fuel Surcharge Antitrust Litig. ("Rail Freight II")*,
    292 F. Supp. 3d 14 (D.D.C. 2017),
    *aff'd sub nom.*, *Rail Freight III*, 934 F.3d 619 ...........................18, 19, 22, 24

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ..........................................................................33

*Savino v. Computer Credit, Inc.*,
    164 F.3d 81 (2d Cir. 1998) .............................................................................31

*Shillingford v. Astra Home Care, Inc.*,
    293 F. Supp. 3d 401 (S.D.N.Y. 2018) ..........................................................2, 8

*Unijax, Inc. v. Champion Int'l, Inc.*,
    683 F.2d 678 (2d Cir. 1982) ..........................................................................26

*United States et al. v. Google*,
    2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ...............................................6, 13

*Vincent v. Money Store*,
    304 F.R.D. 446 (S.D.N.Y. 2015) ...............................................................32, 33

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .........................................................................................8

*Weiner v. Snapple Beverage Corp.*,
    2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ...............................................15, 17

*Will v. Comprehensive Accounting Corp.*,
    776 F.2d 665 (7th Cir. 1985) .........................................................................20

**Statutes and Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (4th ed., 2024) ....................................21

Phillip E. Areeda, Einer Elhauge, & Herbert Hovenkamp, Antitrust Law
    (Little, Brown, 10th vol. 1996) ....................................................................20

Fed. R. Civ. P. 23 ....................................................................................... *passim*

## I.    PRELIMINARY STATEMENT

Plaintiffs are unable to support the claims they alleged in their Complaint,[1] and now seek certification of different putative classes concerning different purportedly anticompetitive conduct. But no amount of shifting theories and class definitions by Plaintiffs will allow them to satisfy the requirements for class certification under Federal Rule of Civil Procedure 23. To the contrary, Plaintiffs' ongoing search for a coherent legal theory they can advance on a classwide-basis only confirms that no class should be certified.

As Plaintiffs acknowledge, their Motion can be granted only if they can meet their burden of showing that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Their sole method of attempting to make this showing is Professor Einer Elhauge's "yardstick" model. According to Prof. Elhauge, his model measures the harm caused by six purported ties by comparing transactions for website ads on Google's AdX and AdSense products, on the one hand, to certain transactions for mobile app ads, on the other. Prof. Elhauge did not evaluate whether Plaintiffs suffered injury for *any* of the allegedly anticompetitive non-tying conduct, such as optimizations Plaintiffs challenge like Enhanced Dynamic Allocation.

Although Prof. Elhauge's model purports to measure the *combined* harm of *six* tying theories, Plaintiffs seek certification based on only *four* of those theories. Because Prof. Elhauge's model does not separate the alleged harm caused by each of the six ties he analyzed, there is no way to know whether or to what extent the injury his model identifies was caused by the four ties on which Plaintiffs seek class certification as opposed to the two on which they do not. Plaintiffs

---

[1] Defendants Google LLC, Alphabet Inc., and YouTube, LLC are referred to collectively herein as "Google." Plaintiffs' First Amended Consolidated Class Action Complaint, ECF No. 408, is referred to herein as the "Complaint" or "Pub. Compl."

are left with no common evidence of the harm attributable to the four tying theories for which they seek class treatment, and thus have no evidence linking their injury model to their theories of liability as required under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). This failure alone precludes Plaintiffs from meeting their "heavy" Rule 23 burden. *Shillingford v. Astra Home Care, Inc.*, 293 F. Supp. 3d 401, 418 (S.D.N.Y. 2018). So, too, does the fact that Prof. Elhauge's model on which Plaintiffs rely compares the price for the allegedly impacted transactions—web sales on AdX and AdSense—against the price for fundamentally different transactions—certain mobile app ad sales on AdX and AdMob.

Plaintiffs also fail to show that common issues predominate for three other reasons. *First*, Prof. Elhauge did not analyze the combined price of Google's allegedly tied products. Despite claiming that Plaintiffs were harmed because Google tied its ad server to its ad exchange, Prof. Elhauge's model *only evaluates injury based on pricing for the ad exchange* without regard to the pricing would-be class members paid to use the allegedly bundled ad server. As Prof. Elhauge's own treatise acknowledges, it is improper to model damages for a tie based on the price of only half of the allegedly tied products. *Second*, Plaintiffs acknowledge that numerous publishers used Google's ad tech products through intermediaries but claim the Court should gloss over this issue because they can limit the class to "direct purchasers" only. But whether a purchaser is "direct" cannot readily be answered through the evidence on which Plaintiffs rely. Without any way to determine who is a direct purchaser on a classwide basis, individualized analyses will be needed to determine who is in and out of the class. *Third*, Plaintiffs and members of the putative classes can prevail on their tying theory only if they can show that they were coerced by the purported ties. Plaintiffs claim that they were coerced based on a contractual tie, but acknowledge that not all contracts contain the provision they contend gives rise to a tie. To determine whether a given

publisher was subject to the alleged contractual tie, the factfinder will have to conduct an individualized analysis of each putative class member's contracts with Google. This too defeats predominance and precludes certification.

Beyond their failure to prove predominance, Plaintiffs' effort to cobble classes together also fails because they cannot show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Their proposed AdX Class representatives have an economic conflict with absent class members because, unlike the class representatives, some of the proposed AdX Class members have a contractual obligation to indemnify Google for any damages recovered in this case. And their proposed AdSense class representative has made repeated misrepresentations that it never used Google's DFP ad server even though it did—thereby undermining its credibility and subjecting it to a unique defense on a central issue of whether it was coerced to use the purported AdSense "ad server," as it has alleged.

For all these reasons, and as set forth below, the Court should deny Plaintiffs' Motion.

## II.    BACKGROUND

### A.  Plaintiffs Sue on Behalf of Two Classes Challenging Sixteen Acts

Genius Media Group, Inc. ("Genius"), The Nation Company, LLC ("The Nation"), and The Progressive, Inc. ("The Progressive," and together with Genius and The Nation, "Plaintiffs") filed their Complaint on December 5, 2022, challenging four purported ties and twelve other allegedly anticompetitive acts.[2] Pub. Compl. Tables 1-3, ¶ 368. Their Complaint proposes two classes of website publishers: those who "paid take rates directly to" and/or "received revenue directly from" Google for "displaying advertisements on their websites" using (1) Google's AdX

---

[2] Plaintiffs define the Class Period to be December 15, 2016 through March 31, 2024 (the "Class Period"). ECF No. 955, Pltfs.' Not. Mot. Class Cert. (hereinafter, "Pub. Not.") 1-2.

ad exchange; or (2) Google's AdSense "Ad Network." *Id.* ¶ 368. Plaintiffs' Complaint alleges four ties: namely, two pairs of two-way ties of AdX and DFP (Acts 1 and 2); and "Google Display Network" and AdSense/DFP (Acts 3 and 4). Pub. Compl. Table 1.

### B.  Plaintiffs Challenge Different Conduct and Advance New Class Definitions In Their Expert Report

Nearly two years later and after fact discovery closed, Plaintiffs served their expert disclosures, including a report from their class certification economic expert, law professor Einer Elhauge. ECF No. 959-1, Earnhardt Decl., Ex. 1 (Expert Report of Prof. Einer Elhauge) (hereinafter, "Elhauge Rep."). Unlike in the Complaint, Prof. Elhauge opined in his report on a new and broader set of ties. In particular, he asserted that Google tied (1) AdX to DFP; (2) DFP to AdX; (3) the AdSense "ad auction platform" to the AdSense "ad server"; and (4) the AdSense "ad server" to the AdSense "ad auction platform" (collectively, the alleged "Sell-Side Ties"), even though the latter two ties were never alleged in the Complaint. Elhauge Rep. ¶ 6; Pub. Compl. Table 1. Prof. Elhauge also opined on two purported ties involving the tying of products used by advertisers to buy ad space: (1) Google Ads' "ad buying tool" to a Google "ad auction platform"; and (2) the AdSense "ad auction platform" to Google Ads' "ad buying tool" via bundled pricing (collectively, the alleged "Buy-Side Ties," and, together with the Sell-Side Ties, the "Ties"). Elhauge Rep. ¶ 6.

Beyond the Ties, Prof. Elhauge opined that Google in engaged in five additional acts that restrained competition: (1) Dynamic Allocation ("DA"); (2) Enhanced Dynamic Allocation ("EDA"); (3) Sell-side Dynamic Revenue Share ("DRS"); (4) Unified Price Rules ("UPR"); and (5) Discriminatory Risk Aversion Coefficient. *Id.* ¶ 7. Despite this opinion, Prof. Elhauge only measures the harm caused by the purported Ties. ECF No. 959-3, Earnhardt Decl., Ex. 3 (Corrected Expert Rebuttal Report of Prof. Einer Elhauge) (hereinafter, "Elhauge Rebuttal") ¶¶ 599-602.

### C. Prof. Elhauge Calculates Damages for the Ties Using a "Yardstick" Model

To measure the purported harm from the Ties, Prof. Elhauge employs a "yardstick" model. *See* Elhauge Rep. § IX.A. When implemented correctly, yardstick models measure harm from the challenged conduct by comparing the relevant market against a "yardstick" market that serves as a proxy for what pricing would have been absent the alleged misconduct. *Id.* ¶ 400. In other words, as Prof. Elhauge explained in his report, a "valid yardstick for assessing but-for outcomes should be a market that is similar to the market at issue but unaffected by similar anticompetitive restraints." *Id.*; *see also* Elhauge Daubert Mot. § IV.A (collecting cases and economic literature defining proper yardsticks).

Prof. Elhauge uses as his "yardstick" price (i.e., the purportedly competitive price) the revenue share that Google charges for certain transactions in mobile app advertising. For most sales of mobile app advertising, Google has generally charged a 20 percent revenue share for AdX and █ percent for its AdMob product.[3] In selecting a yardstick, Prof. Elhauge analyzes the subset of mobile app ad sales made by publishers, through Google's AdX or AdMob products, to non-Google ad sources using third-party software development kits (the "Yardstick Transactions") and uses this yardstick to measure the purported injury caused by all of the Ties collectively.[4] *See id.* ¶¶ 404-06. Prof. Elhauge's model assumes a revenue share of no more than █ percent on Yardstick Transactions for the entire duration of the Class Period. *Id.* ¶¶ 403-05. This is the revenue share Google charged for AdX and AdMob mobile app *display* transactions via third-party software

---

[3] Elhauge Rep. ¶ 403 n.1021 (describing the revenue share AdMob pays publishers as "█%" and attributing 20 percentage points of AdMob's total █ percent revenue share to the purported AdMob "ad auction platform"). Similarly, Prof. Elhauge attributes █ percentage points of AdSense's total █ percent revenue share to the purported AdSense "ad auction platform." *Id.* ¶ 68. For present purposes only, Google accepts these allocations of the AdMob and AdSense revenue shares.

[4] *See* Elhauge Rebuttal ¶ 594 (yardstick "***not*** subject to any tying restraints that were similar to those that restrained competition with AdX and AdSense for open-web display [ads]" (emphasis in original)); Elhauge Rep. ¶¶ 6, 262-65; ECF No. 959-4, Einer Elhauge Dep. (hereinafter, "Elhauge Dep.") 178:15-178:25.

development kits ("SDKs") between November 2021 through June 2022.[5] *Id.* ¶¶ 403-04. Prof. Elhauge recognized that prior to that seven-month period in the eight-year Class Period, Google charged a 20 percent revenue for Yardstick Transactions of display advertising, *id.* ¶ 404 n.1027, but counterfactually assumed the revenue share for Yardstick Transactions was █ percent prior to November 2021. *Id.* ¶¶ 404, 442. Based on his assumed yardstick revenue share of █ percent, Prof. Elhauge calculates AdX and AdSense overcharges of ██ and ██ percentage points, respectively, on "open web" ad transactions. *Id.* ¶¶ 412-13, 455, 457. To quantify the purported classwide harm, Prof. Elhauge multiplies the overcharges by AdX and AdSense U.S. gross publisher revenues during the Class Period. *Id.* ¶¶ 4, 455, 457.

### D. Relying on an Unchanged Model, Plaintiffs Seek Certification of New Classes Based on New Legal Theories

After Prof. Elhauge's March 2025 deposition, on April 17, 2025, the court in the Virginia case issued an opinion regarding the federal government and several states' claims. There, the court found that "walled-garden display ads, in-app display ads, and social media ads are reasonably interchangeable with open-web display ads for many [Google Ads] advertisers." *United States et al. v. Google*, 2025 WL 1132012, at *25 n.22 (E.D. Va. Apr. 17, 2025). Accordingly, the court rejected the plaintiffs' market limited to buying tools that transact "open web" ads, *id.* at *23, as well as the claim that Google monopolized such a market, *id.* at *48.

Now, even though Prof. Elhauge's model is based on all the Ties collectively—including the alleged Google Ads-AdX buy-side tie the Virginia court rejected—Plaintiffs claim in their

---

[5] Google charged a ██ percent revenue share for AdX and ████████████████████ transactions via third party SDKs during this time period. Elhauge Rep. ¶ 404 & n.1027 (describing a reduction in the yardstick revenue share from ██ percent to ██ percent, except for instream video which remained at ██ percent). Although instream video ads are included in his Yardstick Transactions and in his defined markets, Prof. Elhauge does not use a ██ percent yardstick revenue share. Instead, as discussed below, *infra* § III.A.2, Prof. Elhauge assumes an overcharge on all transactions based on a ██ percent yardstick revenue share.

Motion that his model allows the factfinder to find classwide injury as to *only the four purported Sell-Side Ties*. *See* ECF No. 958, Memo. Supp. Pltfs. Mot. Class Cert. (hereinafter, "Pub. Memo.") 3, 25-34 (arguing Prof. Elhauge's model shows that "all members of both Classes were injured by paying Google overcharges on AdX or AdSense"); *see also id.* at 6 (claiming AdX and DFP are "contractually tied").[6] In other words, as the following chart reflects, Prof. Elhauge's analysis models injury for a different set of conduct than that which Plaintiffs now challenge:

| Challenged Conduct | Alleged in Complaint | Antitrust Injury is Measured by Prof. Elhauge's Yardstick Model According to: | |
|---|---|---|---|
| | | **Prof. Elhauge's Expert Reports** | **Plaintiffs' Class Certification Motion** |
| **Purported Tying Restraints** | | | |
| (1) DFP - AdX | Yes | Yes | Yes |
| (2) AdX - DFP | Yes | Yes | Yes |
| (3) AdSense ("ad server") - AdSense ("ad auction platform") | **No** | Yes | Yes |
| (4) AdSense ("ad auction platform") - AdSense ("ad server") | **No** | Yes | Yes |
| (5) Google Ads - a Google "ad auction platform" | **No** | Yes | **No** |
| (6) AdSense ("ad auction platform") - Google Ads ("ad buying tool") | **No** | Yes | **No** |
| **Purported Non-Tying Restraints** | | | |
| (1) DA | Yes | **No** | **No** |
| (2) EDA | Yes | **No** | **No** |
| (3) DRS | Yes | **No** | **No** |
| (4) UPR | Yes | **No** | **No** |
| (5) Discriminatory Risk Aversion Coefficients | **No** | **No** | **No** |

---

[6] Even though Prof. Elhauge's injury model does not account for the non-tying conduct Plaintiffs challenge, they continue to insist that they can pursue claims as to that conduct on behalf of a class as well. *See* Pub. Memo. 7-12 (challenging (1) DA; (2) EDA; (3) DRS; (4) UPR; and (5) Discriminatory Risk Aversion Coefficient).

In addition to changing their liability theory, in moving to certify the two classes, Plaintiffs have expanded the scope of the proposed class definitions. While Plaintiffs' Complaint limits putative class members to those that sell the ad inventory on "their [own] websites," Pub. Compl. ¶¶ 6, 368, Plaintiffs now seek to certify two classes of "persons or entities [that] directly paid Google . . . for services associated with selling advertising impressions *on websites*" via either Google's AdX ad exchange (the "AdX Class") or via "Google's AdSense Package" (the "AdSense Class"), *see* Pub. Not. 1-2 (emphasis added). This change adds to the putative classes Multiple Customer Management firms (each an "MCM firm")—which are companies that help manage the sale of a publisher's ad inventory. Pub. Memo. 13-15.

Plaintiffs propose that The Nation and Genius serve as class representatives of the putative AdX Class, and that The Progressive serve as class representative of the putative AdSense Class. Pub. Not. 2.

## III.    ARGUMENT

Because class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted), Plaintiffs bear the "heavy burden" of demonstrating each of Rule 23's requirements, *Shillingford*, 293 F. Supp. at 418. Plaintiffs cannot meet that burden here because they cannot show that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," Fed. R. Civ. P. 23(b)(3), and that "the [proposed] representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4). Beyond this, the Court should reject Plaintiffs' latest effort to modify their class definitions—this time, after fact *and* expert discovery closed—to include in their proposed "publisher" classes parties that never published any content. *See* Pub. Compl. ¶ 1.

### A. Plaintiffs Cannot Meet Their Burden Of Showing Predominance

To demonstrate predominance under Rule 23(b)(3), Plaintiffs must "show (1) that the existence of individual injury resulting from the alleged antitrust violation (often referred to as 'antitrust impact') [is] capable of proof at trial through evidence that [is] common to the class rather than individual to its members; and (2) that the damages resulting from that injury [are] measurable on a class-wide basis through use of a common methodology." *Comcast*, 569 U.S. at 30 (internal quotations omitted). Plaintiffs cannot make these showings because the sole evidence they put forth in support of them—Prof. Elhauge's yardstick model—is untethered to Plaintiffs' liability theories.

Plaintiffs assert that Prof. Elhauge's model does not measure the injury attributable to any theories other than the purported Sell-Side Ties. *See* Pub. Memo. 28 ("The yardstick effectively isolates the competitive harm flowing from the ad server-ad auction platform two-way ties."). This precludes Plaintiffs from pursuing, as a class, the other allegedly anticompetitive conduct they challenge. *See Fernandez v. Wells Fargo Bank, N.A.*, 2013 WL 4540521, at *9 (S.D.N.Y. Aug. 28, 2013) (Castel, J.) ("In order to satisfy Rule 23, plaintiffs must come forward with evidence that affirmatively demonstrates compliance with the rule." (cleaned up)); *infra* § II.A.1.a. Nor can Plaintiffs challenge the purported Sell-Side Ties on behalf of a class because Prof. Elhauge's model cannot isolate the harm, if any, caused by the Sell-Side Ties alone. *See infra* § III.A.1.b.

Additionally, as explained below, several other deficiencies independently bar certification of the two classes Plaintiffs propose:

- Prof. Elhauge's model uses an inappropriate benchmark to assess whether the allegedly anticompetitive conduct caused class members injury. *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 51 (S.D.N.Y. 2020) (rejecting predominance where plaintiffs relied on an expert's flawed model); *see also infra* § III.A.2;

9

- Prof. Elhauge's model fails to measure an overcharge on the combination of the purported tied and tying products. *See infra* § III.A.3;

- A case-by-case analysis is needed to determine whether would-be class members qualify as the "direct purchasers" whom Plaintiffs seek to represent. *See infra* § III.A.4; and

- A case-by-case analysis is needed to show that class members were coerced by the alleged ties. *See infra* § III.A.5.

For all of these reasons, Plaintiffs cannot meet their burden of showing predominance under Rule 23(b)(3).

### 1. Plaintiffs Do Not Meet Their Burden of Showing Classwide Antitrust Impact Tied to Their Theory of Liability

To meet their burden of showing a "common methodology capable of allowing the trier of fact to determine that each member of the proposed class suffered antitrust injury," *Aluminum*, 336 F.R.D. at 45 (cleaned up), Plaintiffs must present a common methodology that is "consistent with [their] liability case," *Comcast*, 569 U.S. at 35 (citations omitted). Accordingly, "[t]he first step in an injury and damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Aluminum*, 336 F.R.D. at 52 (quoting *Comcast*, 569 U.S. at 38 (emphasis in original)). Plaintiffs' motion fails at this first step because they (1) put forth *no* evidence of injury attributable to the majority of their antitrust theories; and (2) fail to show common evidence of injury that is specifically attributable to the purported Sell-Side Ties.

### a. Plaintiffs Offer No Evidence of Antitrust Injury for the Buy-Side Ties or Non-Tying Restraints

To secure class treatment for multiple theories of antitrust liability, Plaintiffs must prove predominance for *each* theory. *See Kronenberg v. Allstate Ins. Co*., 743 F. Supp. 3d 465, 487, 496 (E.D.N.Y. 2024) (denying certification where plaintiffs had not adduced common evidence for each of their "three distinct but related theories of injury"); *see also Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 553 (S.D.N.Y. 2021) (a plaintiff must prove "that common issues

predominate as to each theory" of liability). But despite advancing *eleven* antitrust theories, Plaintiffs claim in their Motion that Prof. Elhauge's yardstick model—their sole attempt to put forward classwide proof—demonstrates common harm only as to the *four* purported Sell-Side Ties they challenge. *See* Pub. Memo. 28 (asserting that Prof. Elhauge's model "*only* measures the anticompetitive effects of the ad server-ad auction platform tying restraints, *and not the effects of the additional exclusionary conduct*" (emphasis added)). As a result, Plaintiffs have no common evidence of harm for the remaining *seven* liability theories they challenge—i.e., the five purported "non-tying restraints"[7] and the two purported Buy-Side Ties. Pub. Memo. 6-12. Because Plaintiffs have not adduced *any* common evidence of antitrust injury for seven of their theories, they cannot pursue those theories on behalf of the proposed classes. *See Kronenberg*, 743 F. Supp. 3d at 496 ("Common questions cannot predominate" for a given theory where "[p]laintiffs do not even try to adduce classwide proof on this theory of injury.").

Plaintiffs cannot escape this result by claiming the seven theories for which they offer no common evidence were part of a "synergistic scheme," Pub. Memo. 6, because there is no evidence of an injury attributable to any such "scheme," let alone evidence of how such a scheme was common to all or nearly all members of the proposed class. To the contrary, Prof. Elhauge expressly acknowledges that his analysis "omits the additional anticompetitive harm created by the DRS restraints and other non-tying restraints" and "[t]hus, whether a particular class member was harmed by the [non-tying] restraints and the amount of anticompetitive harm that they suffered are not relevant to [his] analysis." Elhauge Rebuttal ¶ 505.

---

[7] The purported non-tying restraints include: (1) DA, (2) EDA, (3) DRS, (4) UPR, and (5) Discriminatory Risk Coefficients. Pub. Memo. 6-12.

### b. Plaintiffs' Attempt to Show Classwide Harm Attributable to the Sell-Side Ties Fails Under *Comcast*

Plaintiffs cannot meet their burden of showing classwide harm for the challenged Sell-Side Ties because they fail to isolate the alleged harm specifically caused by those alleged Sell-Side Ties. *See Aluminum*, 336 F.R.D. at 52 ("The first step in an injury and damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." (quoting *Comcast*, 569 U.S. at 38 (emphasis in original)).[8]

In *Comcast*, the plaintiffs initially advanced four theories of anticompetitive harm—only one of which the district court accepted as capable of class adjudication. 569 U.S. at 31. The district court certified a putative class of Comcast subscribers for the one remaining theory of liability, based on the plaintiffs' expert's model that calculated the combined antitrust impact and damages for all four of the plaintiffs' initially proposed theories. *Id.* at 30-32. The Supreme Court reversed, holding that the plaintiffs had not met their burden to demonstrate classwide impact because their expert's model could not specifically measure damages of the sole remaining liability theory. *Id.* at 35-36. As the Court explained it, this prevented the plaintiffs' model from "bridg[ing] the differences between supra-competitive prices in general and supra-competitive prices attributable to the plaintiffs' theory of anticompetitive impact and causation." *Aluminum*, 336 F.R.D. at 47 (quoting *Comcast*, 569 U.S. at 38) (cleaned up).

The same is true here. As in *Comcast*, Plaintiffs' expert's model purports to measure the combined antitrust injury for multiple theories of anticompetitive harm. 569 U.S. at 31-32, 36-37.

---

[8] Plaintiffs' unexplained suggestion that they might rely on "Google's own internal documents" to establish common impact, Pub. Memo. 22-23, fails. Indeed, courts consistently reject attempts to prove classwide antitrust impact with documentary evidence because "reliable expert modeling . . . is unavoidably necessary to secure class certification." *Aluminum*, 336 F.R.D. at 51; *see In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*Rail Freight III*"), 934 F.3d 619, 626 (D.C. Cir. 2019) (rejecting argument that "documentary evidence" was sufficient to prove classwide antitrust injury).

And, as in *Comcast*, Plaintiffs now offer that same model for only a subset of their legal theories. *Id.* at 32. Specifically, Prof. Elhauge has asserted that his yardstick model showed common impact for *all six* of Plaintiffs' tying theories. *See, e.g.*, Elhauge Rep. ¶¶ 6-9, 403-05; Elhauge Rebuttal ¶¶ 593-98, 606. In particular, as Prof. Elhauge explained it, his yardstick is "a good competitive yardstick" because it captures the effect of all six Ties—including the purported Buy-Side Ties. Elhauge Rep. ¶ 405; *see also* Elhauge Dep. 180:6-180:10 (explaining that the overcharge measured by his yardstick "includes the effect of the bundle to Google Ads").

After Prof. Elhauge served his expert report, the court in the Virginia ad tech case issued an opinion rejecting the government plaintiffs' alleged Google Ads-AdX buy-side tie. *Google*, 2025 WL 1132012, at *24. Now Plaintiffs seek classwide treatment for *four* purported Sell-Side Ties based on Prof. Elhauge's model of the *six* combined Ties. Pub. Memo. 28; Elhauge Rep. ¶ 405. They do so even though Prof. Elhauge opined that the six challenged Ties "operate together to create the overcharge" and he did not "[break] them out" to determine how each of the purported Ties contribute to the alleged overcharge. Elhauge Dep. 178:15-178:25.

As Prof. Elhauge's acknowledgment that he did not break out the Ties reflects, Plaintiffs cannot isolate and prove classwide harm for any of the four tying theories they are currently pursuing. Instead, like the expert's model in *Comcast*, Prof. Elhauge's yardstick "d[oes] not isolate damages resulting from any one theory of antitrust impact." *Comcast*, 569 U.S. at 32. Plaintiffs' "class certification . . . model [is] divorced from the plaintiffs' theory of liability," and this Court should not certify the classes that Plaintiffs have proposed. *See In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*Rail Freight I*"), 725 F.3d 244, 253 (D.C. Cir. 2013) ("Predicating class certification on a model divorced from the plaintiffs' theory of liability . . . indicates a failure to conduct the rigorous analysis demanded by Rule 23."); *see also Aluminum*, 336 F.R.D. at 53

13

(denying class certification for lack of predominance where plaintiffs' expert's model "fail[ed] to isolate the effects of the alleged conspiracy").[9]

### 2. Plaintiffs Do Not Meet Their Burden of Showing Predominance Because Prof. Elhauge's Model is Fundamentally Flawed

Plaintiffs also cannot meet their burden of establishing that common issues predominate over individual ones because Prof. Elhauge's yardstick model—their only method for showing predominance—suffers from fundamental methodological flaws. *See* Elhauge Daubert Mot. § IV.

When, as here, "an expert's model is the basis for a plaintiff's claim of classwide impact and causation, a court is obliged to rigorously examine the soundness of that model at the class certification stage" and the "court may certify a class . . . only where the Court finds the model methodologically sound." *Aluminum,* 336 F.R.D. at 46; *Namenda*, 338 F.R.D. at 554-55 (same); *see also Comcast*, 569 U.S. at 35 (directing courts to "conduct a rigorous analysis" of a class proponent's expert's model to assess predominance). Among other flaws detailed in the accompanying motion to exclude Prof. Elhauge's damages opinions,[10] Prof. Elhauge's yardstick model fails because it: (1) cannot distinguish between the alleged overcharge attributable to the purported Sell-Side Ties as opposed to lawful feature differences and competitive conditions; and (2) finds antitrust injury where none can possibly exist. *See Aluminum,* 336 F.R.D at 51 (rejecting predominance where plaintiffs relied on an expert's flawed model as proof of classwide antitrust harm).

---

[9] As described in Google's pre-motion letter, Google is entitled to summary judgment on each of the four purported Sell-Side Ties. ECF No. 949. Should this Court certify the proposed classes, and later reject any of the Sell-Side Ties, the decision to certify will need to be revisited for the same reason. *See Comcast*, 569 U.S. at 36-37.

[10] *See, e.g.,* Elhauge Daubert Mot. § IV. (describing Prof. Elhauge's failure to control for different competitive conditions in his markets for app and web transactions).

### a. Prof. Elhauge's Model Fails to Account for Lawful Feature Differences Between AdX and AdSense Transactions and Yardstick Transactions

Where class proponents rely on a yardstick model to demonstrate classwide injury, they must demonstrate that the difference in price is attributable only to the relevant challenged conduct, not lawful feature differences. *See, e.g.*, *Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *7 (S.D.N.Y. Aug. 5, 2010) (rejecting yardstick that did not "isolate the impact of the [relevant challenged conduct] from the other factors that purportedly affect the price of [the product] and its competitors"); *In re Pharmacy Benefit Managers*, 2017 WL 275398, at *18 (E.D. Pa. Jan. 18, 2017) (rejecting expert's model as common evidence of antitrust impact where it failed to "distinguish between unlawful and lawful explanations for the observed [price] differential"). Absent such a showing, "[i]ndividualized inquiries [are] . . . required in order to determine whether class members in fact paid a premium [for the relevant product], and whether any such premium was attributable to the [relevant challenged conductinst]." *Weiner*, 2010 WL 3119452, at *10.

As described above, Prof. Elhauge's Yardstick Transactions are a *subset* of mobile app transactions on AdX and AdMob between publishers and Authorized Buyers using third-party SDKs. Elhauge Rep. ¶ 404. Prof. Elhauge opined that these Yardstick Transactions were not subject to the same alleged anticompetitive conduct that affected AdX and AdSense web transactions, and therefore, the revenue share that Google charged on these Yardstick Transactions represents the competitive revenue share that Google *should* have charged on AdX and AdSense. *Id.* ¶ 411. According to Plaintiffs, Prof. Elhauge's yardstick model and the "overcharges" it yields are common proof of the "competitive harm flowing from the [Sell-Side Ties]." Pub. Memo. 27-28. But Plaintiffs are mistaken because fundamental flaws render Prof. Elhauge's model incapable of measuring any harm attributable to the purported Sell-Side Ties.

15

As Prof. Elhauge acknowledged, Google provides valuable services and functionalities to publishers on AdX and AdSense web transactions that Google does *not* provide on the Yardstick Transactions. For example, as explained in greater detail in the accompanying motion to exclude Prof. Elhauge's damages opinions, unlike what Google provides to publishers on Yardstick Transactions, Google provides web publishers using AdX and AdSense with: (a) access to aggregated demand, (b) reporting, and (c) more advanced security protections.

*(a) Access to Aggregated Demand.* Google provides publishers on AdX and AdSense web transactions with access to aggregated demand that Google does not provide on Yardstick Transactions. Publishers value—and are willing to pay more for—access to a wide variety of demand sources without needing to individually integrate with ad buying tools. Elhauge Daubert Mot. § IV.B. In contrast, on Yardstick Transactions, Google does not provide publishers with access to aggregated demand and instead charges publishers a lower revenue share. *Id*. For mobile app transactions that rely on Google's SDK to integrate demand from multiple buyers, mobile app publishers pay the same ▮ percent revenue share that they do on web transactions for AdX and AdSense. *Id*.

*(b) Reporting.* Google provides advanced reporting services to publishers on AdX and AdSense web transactions that it does not provide on Yardstick Transactions. *Id*. In contrast to AdX and AdSense web transactions, where Google provides publishers with a variety of reports covering all buyers, on Yardstick Transactions, third-party SDKs—not Google—are responsible for providing reporting services, and they do so in a more limited capacity. *Id*.

*(c) Security Protections.* Google provides a heightened level of security protections on AdX and AdSense transactions—including more malware and spam blocking—than it provides on Yardstick Transactions. *Id*. This is consistent with the documentary record, in which Google

describes its role in Yardstick Transactions as "a lot more hands off," as there are "'loose' creative requirements and inventory policies" due to the "assumed . . . relationship and trust between the buyer and the pub."[11]

Despite these significant differences, Prof. Elhauge made no attempt to measure the extent to which the price difference he observes between Yardstick Transactions, on the one hand, and AdX and AdSense transactions, on the other, was driven by the purported Sell-Side Ties as opposed to these various feature differences. Moreover, while Prof. Elhauge opined that competitive conditions were different for web and mobile app transactions, he did nothing to control for this difference in constructing his benchmark. Elhauge Daubert Mot. § IV.C. Failure to control for competitive conditions risks punishing lawfully obtained market power. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297-98 (2d Cir. 1979); *see also In re Pharmacy Benefit Managers*, 2017 WL 275398, at *18.

As a result, Prof. Elhauge's yardstick model fails to "isolate the impact of the [Sell-Side Ties] from the other [lawful] factors that purportedly affect the price of [the product] and its competitors." *Weiner,* 2010 WL 3119452, at *7. His model is thus incapable of demonstrating classwide harm, as required to show predominance. *See, e.g.*, *Freitas v. Cricket Wireless, LLC*, 2022 WL 3018061 at *5-6 (N.D. Cal. Jul. 29, 2022) (decertifying class where expert's model did "not even attempt to control for confounding variables," like differences in services, that "may have contributed" to the price differential).

### b.  Prof. Elhauge's Model Detects Harm Where None Exists

Plaintiffs also cannot meet their burden of showing predominance because Prof. Elhauge's model detects antitrust injury where none can exist. *See Aluminum*, 336 F.R.D. at 49 (rejecting

---

[11] Sessions Decl., Ex. 27 (GOOG-AT-MDL-018798953) at -972 & Ex. 28 (GOOG-AT-MDL-018800394) at -398.

expert's model that "may blame the defendants for pricing harm that they did not cause, and/or generate false positives" (internal citations omitted)); *see also Rail Freight I*, 725 F.3d at 252-53 (plaintiffs' methodology that "detects injury where none could exist . . . would shred the plaintiffs' case for certification").

*In re Rail Freight Fuel Surcharge Antitrust Litig. ("Rail Freight II"),* 292 F. Supp. 3d 14 (D.D.C. 2017), *aff'd sub nom.*, *Rail Freight III*, 934 F.3d 619, is instructive. There, railway freight customers brought an antitrust class action alleging defendant-rail freight shippers conspired to add a fuel surcharge, and, as here, the plaintiffs proffered an expert's model as their proof of classwide antitrust injury. *Rail Freight II,* 292 F. Supp. 3d at 127. The court rejected the model, however, because it ascribed an injury to even those plaintiffs who had negotiated "legacy" contracts, which were entered into before the alleged conspiracy period and guaranteed they would not be subject to the later fuel surcharges. *Id*. at 126. Because there was no explanation grounded in economic theory to substantiate the model's detection of overcharges for those plaintiffs, the court found the model to be flawed and concluded the plaintiffs could not establish classwide injury. *Id*. at 128-31.

Here, too, there are two ways in which Prof. Elhauge's model detects overcharges that cannot exist.

*First*, Prof. Elhauge's model observes an overcharge on AdX and AdSense web transactions for the first five years of Plaintiffs' proposed Class Period even though Prof. Elhauge indicated that, during this time, the revenue share that Google charged for the AdX and AdSense web transactions *was the same* ███ *percent as the revenue share Google charged on the Yardstick Transactions*. Elhauge Rep. ¶¶ 399, 404 n.1027.[12] Given that the ████████████████████

---

[12] Prof. Elhauge asserts that he used ███████ as the revenue share for the first five years of the Class Period even though the actual revenue share was ███████ because there was "an anticompetitive tie" in "the mobile app ad

█████████████████████████████████████, there is no basis for Prof. Elhauge's conclusion that there was an injury—much less a classwide injury. [13] Rather, as in *Rail Freight II*, these pre-November 2021 overcharges are "unexplainable." 292 F. Supp. 3d at 119; *see also Aluminum*, 336 F.R.D. at 61 (expert's model which produced "mixed results" over different time periods "exacerbate[d] concerns that [the expert's] analysis [was] not reliable common evidence of unitary impact across the entire class period").

*Second*, Prof. Elhauge's model detects an overcharge on ███████████████ where no such overcharge can exist. Prof. Elhauge acknowledges that, throughout the Class Period, Google charged a ████████████████████████████████████████████████



████████████████████████████████████████. Prof. Elhauge nevertheless assumes, without any basis, an overcharge on *all* AdX and AdSense transactions—including ██ ██████████████████████████████████████ as on AdX and AdSense. This, too, is "unexplainable." *Rail Freight II*, 292 F. Supp. 3d at 119.

---

market" before the revenue share was changed. Elhauge Rep. ¶ 403. But Prof. Elhauge does not define the "mobile app ad market" he references, let alone *any* market that includes mobile app transactions. *See* Elhauge Dep. 15:22-16:16 (defining three markets limited to "open web," i.e., excluding mobile apps). Because Prof. Elhauge has not made a finding that "two separate product markets [for mobile app ads] exist and a determination of precisely what the tying and tied products markets are," there is no basis for Prof. Elhauge's *ipse dixit* that there is or was an "anticompetitive tie" in any market that includes mobile app ads. *Fifth & Fifty-Fifth Residence Club Ass'n, Inc. v. Vistana Signature Experiences, Inc.*, 2018 WL 11466157, at *13 (S.D.N.Y. Sept. 28, 2018) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 443 (3d Cir. 1997)).

[13] *See* Elhauge ¶¶ 403, 404 & n.1027 (citing Sessions Decl., Ex. 25 (GOOG-AT-MDL-017562648) at -648 (█████ ████████████████████████████████████████████████████████████ .")).

### 3. Plaintiffs Do Not Meet Their Burden of Showing Predominance Because Prof. Elhauge Does Not Measure Overcharges for the "Package" of the Tying and Tied Products

In an alleged tying arrangement, a plaintiff suffers injury only when the plaintiff overpays for the combined price (i.e., "package" price) of the tied and tying products. *Freeland v. AT & T Corp.*, 238 F.R.D. 130, 150 (S.D.N.Y. 2006); *see also Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir. 1982); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 673 (7th Cir. 1985). Prof. Elhauge's own treatise explains this principle: "[T]he plaintiff who cannot show increased prices or lower quality in either product *and in the package* has not suffered injury." Sessions Decl., Ex. 67 (Phillip E. Areeda, Einer Elhauge, & Herbert Hovenkamp, Antitrust Law ¶ 1769c (Little, Brown, 10th vol. 1996)) (emphasis added); *see id.* (noting it would be "quite wrong" for a court to award damages based on overcharges in only one product of an alleged tie because "a premium price on the tied product *must generally be accompanied by a reduction in the price of the tying product*" (emphasis added)).

Eschewing his prior writings, Prof. Elhauge's model in this case measures purported overcharges only on the "ad auction platform" half of the purported ties without accounting for discounts that Google offered on the ad server half. Pub. Memo. 24-31. But there is no dispute that DFP's fees are competitive, and even free for many publishers. Elhauge Rep. ¶ 27.[14] By ignoring the ad server side of the bundle in his analysis, Prof. Elhauge's model incorrectly calculates an overcharge. Moreover, AdSense charges no fee for the purported "ad serving" functionality.[15]

---

[14] Prof. Elhauge has testified that DFP's (average) fees are "competitive." *See* Elhauge Dep. 61:4-61:9 ("Q. In your reports, do you analyze the competitive price level of advanced ad servers? A. Yes. I conclude that it would be no higher than the 1 to 2 percent that DFP already charges.").

[15] Plaintiffs' own industry expert concedes AdSense is not a publisher ad server. *See* ECF No. 959-6, Earnhardt Decl., Ex. 6 (Rebuttal Expert Report of Anand Das) (hereinafter, "Das Rebuttal") ¶ 35 ("Ad servers manage direct deals and other guaranteed transactions . . . ."); Elhauge Rep. ¶ 24 ("AdSense does not support direct sale ads"). As Google will explain in its summary judgment briefing, this fact alone dooms the AdSense tying claims.

By contrast, Google's economics expert, Dr. Gregory K. Leonard, analyzed the "package" price of AdX and DFP for proposed AdX Class members during the proposed Class Period. ECF No. 959-10, Earnhardt Decl., Ex. 10 (Expert Report of Dr. Gregory Leonard) (hereinafter, "Leonard Rep.") Ex. 7. His conclusion—unrebutted by Prof. Elhauge—was that the value of free ad serving equaled or exceeded the purported "ad auction platform" overcharges for 14.2 percent to 22.6 percent of putative AdX Class members, depending on which DFP fees were used. *See* Leonard Rep. ¶ 197 & Ex. 7. Dr. Leonard conducted a similar analysis for AdSense and found that the value of the free "ad serving" provided exceeded the supposed AdSense "ad auction" overcharge for 12.1 percent to 21.3 percent of putative AdSense Class members. *See* Leonard Rep. ¶ 210 & Ex. 8.

Plaintiffs have not proposed a common method to show in Prof. Elhauge's proposed but-for world (i.e., where the purported Sell-Side Ties are absent), which AdX or AdSense Class members—if any—would continue to receive free ad serving for a standalone ad serving product. Yet, as Dr. Leonard's analysis reflects, the elimination of this free ad serving would actually cause many class members to *pay more in the but-for world* when the cost of ad serving is added to the cost of exchange functionality. *See* Sessions Decl., Ex. 68 (Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 395f (4th ed., 2024)) ("[A]ny time that there is an overcharge on the tied good, *there must be* an undercharge on the tying good." (emphasis added)); *see also* Leonard Rep. ¶¶ 191-94, 197, 210 (opining that the integrations that would be required in Prof. Elhauge's but-for world to end the purported ties would create additional costs); Elhauge Rebuttal ¶ 396 (opining that in the but for world—where Google provides additional integrations to end the purported ties—Google would not be "require[d]" to provide "third-party integrations to publishers free of charge").

In other words, Plaintiffs have no basis for showing on a classwide basis that the *package price* of the allegedly tied products was above competitive levels because Prof. Elhauge did not analyze the DFP ad serving fees as part of his yardstick analysis.[16] Instead, there are numerous uninjured class members who did not "pay above-market prices for the sum of the tying and the tied products" because they received substantial amounts of free ad serving—a fact that defeats predominance. *Freeland,* 238 F.R.D. at 150 (internal quotation marks and citation omitted); *see also Namenda*, 338 F.R.D. at 563 ("[A] class may be certified so long as a *de minimis* number of class members were uninjured or, conversely, virtually all class members were injured." (cleaned up)); *Rail Freight II*, 292 F. Supp. 3d 14, 137 (D.D.C. 2017) (finding predominance requirement not satisfied where the number of uninjured class members exceeded the "5% to 6%" that "constitutes the outer limits of a *de minimis* number of uninjured class members").

### 4. Plaintiffs Do Not Meet Their Burden of Showing Predominance Because Proving a Putative Class Member is a Direct Purchaser Requires Analysis of Individual Contracts

Common issues do not predominate and Plaintiffs cannot show classwide antitrust impact because they have put forth no evidence that "virtually all" putative class members are direct purchasers who fall within their newly minted class definitions. *See Namenda*, 338 F.R.D. at 563. Under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), courts are required to "identify which entity is the seller and which the direct purchaser." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 1014159, at *11 (E.D.N.Y. Mar. 8, 2024) (quoting *Marion*

---

[16] Prof. Elhauge describes DFP fees as a percentage of a publisher's gross ad revenue, like a revenue share. *See, e.g.*, Elhauge Rep. ¶ 73; Elhauge Rebuttal ¶ 18 (asserting DFP's fee is "1-2%"). But DFP fees are flat fees (e.g., $▮ per thousand impressions), not percentage-based revenue shares. *See* ECF No. 959-5, Earnhardt Decl., Ex. 6 (Expert Report of Anand Das) (hereinafter, "Das Rep.") ¶ 51; Elhauge Rep. ¶ 67. Expressing DFP fees as an average revenue share ignores the variation in ad serving fees across publishers. Leonard Rep. Ex. 6; *see also Aluminum*, 336 F.R.D. at 56-57 (finding expert's use of "averaging" to be "particularly troubling" and denying certification); *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184 194 (3d Cir. 2020) (district court abused discretion by finding, "absent a rigorous analysis, that averages are acceptable").

*Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 838 (7th Cir. 2020); *Illinois Brick Co.*
*v. Illinois*, 431 U.S. 720 (1977).[17] This analysis cannot be conducted on a classwide basis here
because many of the putative class members have used Google's Multiple Customer
Management program.

The MCM program "allows entities to sell publishers' inventory through AdX on their
behalf." Das Rebuttal ¶ 166. A publisher who uses a MCM firm in this manner is known as a
"child"; the MCM firm that manages the publisher's inventory is known as the "parent." Pub.
Memo. 14; Leonard Rep. ¶ 44. There are two types of MCM relationships. Under a Manage
Inventory relationship, Google pays the parent (i.e., the MCM firm) for the sale of the ad inventory
sold by the child (i.e., the publisher) through AdX or AdSense, and the parent is responsible for
any payment to the child. Leonard Rep. ¶ 44. Under a Manage Account relationship, Google
sometimes pays the parent MCM firm, other times pays the child publisher, and sometimes pays
both. *Id.*; Elhauge Rebuttal Table 6.

Plaintiffs claim they can use "Google[] data" to determine the "publishers that have made
sales through [Google's] auction platforms" during the Class Period. Pub. Memo. 12. They further
assert that disentangling whether the parent MCM firm or child publisher should be treated as the
direct purchaser is as simple as determining who Google paid. *Id.* at 13 n.36. Based on this
"methodology," Plaintiffs conclude that the direct purchasers in their putative classes are (1) the
child publishers in a MCM Manage Account relationship, and (2) the parent MCM firms in a
Manage Inventory relationship. *Id.* at 13. Plaintiffs are mistaken.

---

[17] *Illinois Brick* recognized two exceptions to the rule against recovery for indirect purchasers: where there is a pre-existing, cost-plus contract or "where the direct purchaser is owned or controlled by its customer." *Id.* at 736 & n.16.

*First*, for AdSense MCM relationships, "the data does not identify which AdSense publishers are children and which are parents" and identification "would require additional data." Elhauge Rebuttal ¶ 745. Accordingly, as Prof. Elhauge acknowledged, his yardstick model cannot show whether the purported AdSense MCM entities he indicates paid overcharges are actually one of the two entity types—Manage Account child publishers or Manage Inventory parent MCM firms—that Plaintiffs assert are class members. Pub. Memo. 13-15. These entities account for approximately five percent of the putative AdSense Class by revenue.[18] Given the magnitude of the putative AdSense Class (Prof. Elhauge identifies over 700,000 putative class members, Elhauge Rebuttal Table 8), even sifting through five percent (over 35,000 AdSense accounts) to determine whether they are in or out of the class would overwhelm this case. *See Rail Freight II*, 292 F. Supp. 3d at 137 (considering the absolute number of uninjured—over 2,000 uninjured class members—in finding predominance was not satisfied).

*Second*, Plaintiffs argue that the child publisher in a Manage Account relationship "is the Class member" because "Google pays the child publisher." Pub. Memo. 14. Manage Account child publishers account for approximately two percent of the putative AdX Class by revenue. Elhauge Rebuttal Table 6. The amount of revenue a child publisher receives in Manage Account relationships varies based on the contracts between the child publishers and parent MCM firms. *See id.* ¶ 734 & n.1856 (child publisher receives a "pre-agreed upon revenue share"), Table 6 (child revenue share can vary from 0-100%). Not all Manage Account child publishers have any "direct payment relationship" with Google. Pub Memo 14. Instead, for Manage Account relationships,

---

[18] *See* Elhauge Rebuttal Table 7. Before taking into account MCM status, Prof. Elhauge's model shows that three percent of the putative AdSense Class (21,628 putative class members) are uninjured because they paid a revenue share of ▉ percent or less. Elhauge Rebuttal Table 8. Accordingly, the total number of uninjured class members would require combining the three percent Prof. Elhauge's model shows are uninjured to the number of uninjured on account of their MCM status, i.e., the five percent of the putative class by revenue.

Google may pay the parent MCM firm only. *Id*.; Leonard Rep. ¶ 44 & n.53. For child publishers in Manage Account relationships, Plaintiffs have offered no common methodology for determining the type of Manage Account relationship used by each child. To answer that question, one would have to ultimately analyze the contracts of *each* parent MCM firm used by putative child class members—an individualized analysis that would overwhelm common issues in this case.[19] *See In re Florida Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 685-86 (S.D. Fla. 2012) (denying certification where expert conceded examining "every individual contract" was required to assess whether contractual provision was implemented).

### 5. Plaintiffs Do Not Meet Their Burden of Showing Predominance Because They Offer No Common Evidence of Coercion for Their Tying Claims

Plaintiffs' proposed classes also cannot be certified because Plaintiffs cannot show common evidence of "actual coercion" for the alleged Sell-Side Ties. *See In re Interest Rate Swaps Antitrust Litig.*, 2023 WL 8675625, at *6 (S.D.N.Y. Dec. 15, 2023) ("Plaintiffs must demonstrate that the elements of their underlying claims can be proven by common evidence."); *Freeland*, 238 F.R.D. at 154 ("actual coercion" can be "subject to generalized proof" where "a contractual provision applicable to all members of the class requires the tie"); *Halverson v. Convenient Food Mart, Inc.*, 69 F.R.D. 331, 336 (N.D. Ill. 1974) (proof of "economic coercion" required an individualized "factual determination").

AdX publishers can and do use non-Google ad servers. Elhauge Rep. ¶ 95; *see also* Leonard Rep. ¶ 163 (produced data identify 785 putative class members used AdX Direct, which is a way to use AdX without DFP). Similarly, Prof. Elhauge conceded both that there is no "absolute requirement" for DFP publishers to use AdX and that "Google's DFP ad server was sold separately

---

[19] *See, e.g.*, Sessions Decl., Ex. 22 (GOOG-AT-MDL-009111583) (" ████████████████████████ ████████████████ ).

from its AdX ad auction platform 38% of the time,"[20] meaning using DFP without AdX is a "viable option."[21] In fact, it is undisputed that publishers using DFP for ad serving do not have default access to AdX, and those DFP publishers approved to use AdX can turn AdX off. Leonard Rep. ¶¶ 157, 170, nn.311-12. During the Class Period, at least 5,538 publishers used DFP without using AdX, *id.* at ¶ 170, which exceeds the number of proposed AdX Class members,[22] Pub. Memo. 15 (5,000 putative class members). As for putative AdSense Class members, at least 14,417 have used AdSense with the DFP ad server or other non-Google publisher ad servers.[23] The fact that many customers did not purchase the purportedly tied product establishes that they could not have been subject to a coercive tie. *See Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685 (2d Cir. 1982) ("Actual coercion by the seller *that in fact forces the buyer to purchase the tied product* is an indispensable element of a tying violation." (emphasis added)).

Putative class representative The Progressive is an example of why Plaintiffs' claims of coercion are nonsensical. The Progressive, despite using the purported AdSense "ad auction platform" has ████████████████████████████████████████████████████████████ ██████████████████████.[24] Where it has sold web advertising through AdSense, it has done so

---

[20] Prof. Elhauge calculates 38 percent unbundled usage despite significantly undercounting use of DFP with non-Google ad exchanges. *See* Elhauge Rep. ¶ 95 n.274 (omitting 400 million non-Google ad exchange transactions).

[21] Elhauge Rep. ¶¶ 96, 301. Prof. Elhauge opines that 10-14% is the "threshold" level, below which taking the products separately is "not a viable option." *Id.* at ¶ 301.

[22] Even for those putative AdX Class members that did use both DFP and AdX, they used AdX in varying amounts, with over 25 percent using AdX for less than 30 percent of their ad exchange sales. Leonard Rep. ¶ 170 & C-4.

[23] *See* Leonard Rep. ¶¶ 170, 180; Sessions Decl., Ex. 10 (GOOG-AT-MDL-C-000073682) at ¶ 5.

[24] Sessions Decl., Ex. 61 (PROGRESS_PUB_0000007357) (Nov. 2016), Ex. 62 (PROGRESS_PUB_0000008864) (Apr. 2017), Ex. 58 (PROGRESS_PUB_0000006796) (July 2018), Ex. 56 (PROGRESS_PUB_0000006503) (June 2019), Ex. 55 (PROGRESS_PUB_0000005979) (Sept. 2020), Ex. 63 (PROGRESS_PUB_0000023374) (Sept. 2020); Ex. 54 (PROGRESS_PUB_0000005404) (Aug. 2021), Ex. 53 (PROGRESS_PUB_0000004657) (Nov. 2022); *see also* Pub. Memo. 4 (claiming "advanced ad servers" are for "large publishers").

exclusively or almost exclusively ██████████████. [25] And ████████████ and the purported DFP-AdX tie, The Progressive has *not* used AdX. Elhauge Rebuttal Table 14.

Nor can Plaintiffs adduce common evidence that "a contractual provision applicable to all members of the class requires the tie." *See Freeland*, 238 F.R.D. at 154. While Plaintiffs assert that DFP and AdX were subject to contractual ties, they do not—and cannot—point to any provision in Google contracts that *requires* the use of AdX and DFP. *See id.*; *see also Capital Temps. v. Olsten Corp.*, 506 F.2d 658, 665-66 (2d Cir. 1974) (including multiple products in the same contract is not an express tie). The only contract clause Plaintiffs assert was coercive is the "minimum ad serving fees" in *some* contracts. Pub. Memo. 6 (citing Elhauge Rep. ¶¶ 294-300). But it is undisputed that not all contracts had these clauses.[26] Moreover, as Prof. Elhauge acknowledged, Google was "open to waiving [such provisions] during negotiation." Elhauge Dep. 139:11-139:23.

Under these circumstances, evaluating whether these contractual terms could constitute "actual coercion" requires an individualized inquiry. Indeed, as Prof. Elhauge has admitted, the "method" to identify whether any putative class member had such a provision in their contracts "is just to look at their contracts." Elhauge Dep. 139:24-140:22. Beyond that, where such a provision is identified, one must determine whether the provision was bargained for. *See In re Florida Cement*, 278 F.R.D. at 685-86 (S.D. Fl. 2012) (denying certification where expert conceded

---

[25] *See* Sessions Decl., Ex. 57 (PROGRESS_PUB_0000006779) at -779 ("████████████████████████████████████████████████████████████ ██████████████████████████████████████████████"). AdSense "backfill" refers to using AdSense with the DFP ad server. Sessions Decl., Ex. 10 (GOOG-AT-MDL-C-000073682) at ¶ 4.

[26] *See, e.g.*, Sessions Decl., Ex., 33 (GOOG-AT-MDL-C-000012050) (███████████████████████████ ███████████). Prof. Elhauge has conceded as much, Elhauge Rebuttal ¶ 348, backtracking from his opening report, in which he opined that minimum ad serving fees were "common evidence" of the purported tie. *See* Elhauge Rep. ¶¶ 262, 294.

examining "every individual contract" was required to assess whether contractual provision was implemented).

The need for individualized inquiry is compounded because other non-contractual and purportedly coercive acts comprising the purported Sell-Side Ties did not exist during the entire Class Period—thus affecting different putative class members differently. Prof. Elhauge opined that multiple acts, together, form the purported AdX and DFP ties. *See, e.g.*, Elhauge Rebuttal ¶¶ 404 (describing "four features that tied DFP access to various restraints"). But half of putative AdX Class members only used AdX after September 2019, Leonard Rep. ¶ 71, when the purportedly coercive aspect of the non-contractual acts ended—or, as Prof. Elhauge puts it, were "lessened," *see* Elhauge Rebuttal ¶ 488; Elhauge Rep. ¶¶ 43, 307, 330. For this reason too there can be no common evidence of actual coercion. *Cf. Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 379 (5th Cir. 2016) (affirming finding that individual issues predominated where plaintiffs sought to recover damages for "different acts" committed "at different times" over a five year period).

### B. Plaintiffs Cannot Meet Their Burden of Showing That The Proposed Class Representatives Can Adequately Represent The Class As Required By Rule 23(a)(4)

As set forth above, Plaintiffs' Motion fails under Rule 23(b)(3). Plaintiffs' Motion should also be denied because Plaintiffs cannot meet their burden to show that any of their proposed Class representatives can "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4).

<u>Putative AdX Class Representatives</u>: Plaintiffs propose that Genius and The Nation serve as class representatives of the putative AdX Class. Both Genius and The Nation are ██████████ ███████████████████████████████████████████████████████████████████████ . Elhauge Rebuttal ¶ 752.

28

Genius and The Nation have interests antagonistic to the ███████████ in the putative

AdX Class because ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████. *See Boro Hall v. Metro. Tobacco Co.*, 74 F.R.D. 142, 144 (E.D.N.Y. 1977)

("[C]ourts have denied class action where the representative class member has interests potentially

antagonistic to the class."); *cf. In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp.

3d 422, 439 (S.D.N.Y. 2019) (named plaintiffs inadequate due to "opposite incentive[s]" where

proving injury to absent class members would decrease named plaintiffs' damages). Indeed, unlike

the Genius and The Nation—████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████,"[27]

Because these ██████████████ "may suffer harm which will not be shared by [Genius

and The Nation]," the putative AdX Class's interests "clearly diverge, and [Genius and The

Nation] cannot adequately represent all members of the class." *Allen v. Dairy Farmers of Am.,

Inc.*, 279 F.R.D. 257, 273-74 (D. Vt. 2011); *see id.* at 274 (finding "fundamental conflict" where

damages would be "paid to some extent" by absent class members); *see also Free World Foreign

Cars, Inc. v. Alfa Romeo, S.p.A.*, 55 F.R.D. 26, 29 (S.D.N.Y. 1972) (class representative whose

---

[27] *See, e.g.*, Sessions Decl., Ex. 52 (GOOG-TEX-00990294) at -296 & Ex. 21 (GOOG-AT-MDL-009111522) at -524-25.

"sole interest [was] in the recovery of damages" could not adequately represent absent class members whose interests "may be adverse").

<u>Putative AdSense Class Representative</u>: Plaintiffs propose that The Progressive serve as class representative of the putative AdSense Class. The Progressive's ad tech use is directly contrary to the theories of harm being pursued by Plaintiffs. As described in Section III.A.5, *supra*, The Progressive has used the DFP ad server—not the purported AdSense "ad server"—throughout the Class Period. Nonetheless, The Progressive has denied its use of DFP throughout discovery.

In particular, The Progressive's Norman Stockwell has testified and certified interrogatory responses, under penalty of perjury, averring that during the proposed Class Period, The Progressive (1) has *only* used AdSense, (2) has *not* used DFP, (3) was forced to use the AdSense "ad server," and (4) that DFP ad server is not suitable for small publishers.[28] These statements are false, and the evidence in this case reflects that Mr. Stockwell was aware of The Progressive's DFP usage. For example, Mr. Stockwell regularly emailed fellow employees about using the DFP ad server, stating in one such communication that he had "███████████████████████████ ████████████████████."[29] He even ████████████████████████ a few months before he certified The Progressive's interrogatory responses disclaiming The Progressive's use of DFP.[30]

---

[28] *See* Sessions Decl., Ex. 12 (Progressive Am. Resps. & Objs. First Interrogs.) at 10 (Apr. 5, 2023) (in response to an interrogatory regarding the identity of each ad tech product The Progressive has used, The Progressive responded "Plaintiff has used Google Ad Sense exclusively since 2016," omitting reference to DFP); ECF No. 957-48, Norman Stockwell (The Progressive) Dep. 25:17-25:19 ("Q. What is the ad server that you use? A. We use AdSense."), 120:8-120:11 ("[W]e perceive the Google AdSense/Google Ad Network union to be the only game in town for a small publisher like ourselves."), 161:23-162:12 ("I believe that [DFP is] for larger publishers and so it's not something that works with the environment that we are in as a small publisher. . . . I believe that we looked at Google DoubleClick [i.e., DFP] and realized that it would not work with what we needed because of our size.").

[29] Sessions Decl., Ex. 60 (PROGRESS_PUB_0000007309) at -309 & Ex. 59 (PROGRESS_PUB_0000006896) at -896.

[30] Sessions Decl., Ex. 53 (PROGRESS_PUB_0000004657).

Class representatives are inadequate where there are questions as to the representative's "honesty and trustworthiness." *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998). Because The Progressive will be forced to "devote considerable time" to rehabilitating its credibility on these central issues, it cannot adequately represent the putative AdSense Class. *See Bowling v. Johnson & Johnson*, 2019 WL 1760162, at *6 (S.D.N.Y. Apr. 22, 2019) (plaintiff inadequate due to "substantial credibility issues" arising from testimony that she purchased a product at Walmart that was never sold there); *Kline v. Wolf*, 88 F.R.D. 696, 700 (S.D.N.Y. 1981), *aff'd*, 702 F.2d 400 (2d Cir. 1983) ("[T]he unique defenses to which each plaintiff is subject, could become, as they already have, the focus of the litigation and upon a trial, divert attention from the substance of the basic claim.").

### C. Plaintiffs Cannot Expand The Classes To Include Non-Publishers At Class Certification

Finally, the Court should reject Plaintiffs' attempt to expand the proposed class definitions to include non-publisher MCM firms.

Plaintiffs have consistently represented their case to be about "online publishers" that "produce and publish [ ] websites" and sell *their* ad space on those websites. *See* Pub. Compl. ¶¶ 1, 6. The Complaint limited the putative classes to publishers that transacted directly with Google "for displaying advertisements on their websites." Pub. Compl. ¶ 368. After fact discovery closed and Google's experts submitted reports, however, Plaintiffs indicated that they "intend[ed]" to propose an "alternative" class definition. Elhauge Rebuttal ¶ 735. Under Plaintiffs' new theory, a publisher need not create digital content or own websites that are monetized with ads, Pub. Compl. ¶¶ 1, 6,[31] but instead can simply help a website owner sell ad inventory to qualify for the putative

---

[31] *See also* Elhauge Rep. ¶ 426 (opining that the challenged conduct "reduced publisher incentives to hire the number and quality of staff needed to do more investigation, write more or better stories, and do better editing and factchecking").

"publisher" class, Elhauge Rebuttal ¶ 735. As a result of this eleventh-hour change in their class definition, parent MCM firms—which putative class representatives Genius and The Nation characterized in their interrogatory responses as "ad tech products" or "ad tech providers"—are now part of the putative AdX "publisher" class.[32]

Courts in this district have rejected similar attempts to artificially expand a class definition after discovery closed. In *Vincent v. Money Store*, as here, the plaintiffs' motion for class certification included a revised definition more expansive than the one in their complaint. *See* 304 F.R.D. 446, 453 (S.D.N.Y. 2015). Recognizing that it would be "improper" to expand the class at certification, the court explained that, as here, "discovery has already been completed with the scope of the class limited . . . as stated in the [complaint]." *Id.*; *see also Oscar v. BMW of N. Am., LLC*, 2011 WL 6399505, at *6 (S.D.N.Y. Dec. 20, 2011) (rejecting expanded class definition where amendment would require "substantial additional discovery"). The court further reasoned that even if no additional discovery were necessary, expanding the class would be a "problem" because—also as here—the defendants' "notice of the nature and scope of the claims asserted against them" was based on the class definition of the complaint, which was silent on the added class members. *Vincent*, 304 F.R.D. at 453 (internal quotations omitted).

Plaintiffs cite to *In re Namenda Direct Purchaser Antitrust Litigation* in support of their attempt at expansion, but *Namenda* only confirms why the Court should reject it. 331 F. Supp. 3d 152 (S.D.N.Y. 2018).[33] As an initial matter, the *Namenda* court recognized that "[f]ar fewer cases support the converse proposition that the court may approve the expansion of the class as it was

---

[32] *See* Sessions Decl., Ex. 13 (Genius Am. Resps. Objs. First Interrogs.) at 11 (including Primis on list of "Ad Tech Providers or Ad Tech Products" it has used) & Ex. 14 (The Nation Am. Resps. Objs. First Interrogs.) at 10 ("[The Nation] has worked with third-party providers, such as Freestar . . . that offer various Ad Tech Products.").

[33] The other cases Plaintiffs cite in support of expanding the class at this stage are also inapposite. *See Menking ex rel. Menking v. Daines*, 287 F.R.D. 174, 181 (S.D.N.Y. 2012) (defendants did not object to the expanded definition); *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) (*narrowing*—not expanding—the class definition).

defined in the complaint." *See id.* at 210. More importantly, the circumstances in *Namenda* that led the court to conclude that expanding the class definition was appropriate are not present here.

*First*, unlike in *Namenda*, the Complaint here is completely silent on the new putative class members and omits any reference to the MCM program or parent MCM firms. *Id.* at 211-12. *Second*, unlike in *Namenda*, there has been no fact discovery in this case focused on parent MCM firms, ██████████████████████████████, as MCM firms were never at issue in this case. Indeed, Plaintiffs first mentioned MCM only in response to Google's expert indicating that Prof. Elhauge had improperly included parent MCM firms that did not meet the class definition in his damages calculations. *See* Elhauge Dep. 189:23-189:25; Leonard Rep. ¶¶ 9, 47. Because Plaintiffs' expanded class definition would "necessitate substantial new fact and expert discovery"—including discovery regarding Plaintiffs' position that the very companies they previously called "ad tech products" or "ad tech providers" are now "publishers"—*Namenda* does not support Plaintiffs' proposed expansion. *Namenda,* 331 F. Supp. 3d at 211.

While Plaintiffs' cannot meet their burden of establishing that *any* class should be certified, the Court should not allow Plaintiffs to add ad tech providers to their class. *See Vincent*, 304 F.R.D. at 453 ("[F]or purposes of the Rule 23 motion, the Court will consider [the] class [as defined in the complaint].").

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion and decline to certify any publisher class.

Dated: June 16, 2025

Respectfully submitted,

/s/ Justina K. Sessions

Justina K. Sessions
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: 650-618-9250
Email: justina.sessions@freshfields.com

Eric Mahr
Andrew J. Ewalt
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4545
Email: eric.mahr@freshfields.com
andrew.ewalt@freshfields.com

/s/ Craig M. Reiser

Craig M. Reiser
Daniel S. Bitton
Denise Plunkett
Eva H. Yung
Christopher Erickson
AXINN, VELTROP & HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, New York 10111
Telephone: (212) 728-2200
Email: creiser@axinn.com
dbitton@axinn.com
dplunkett@axinn.com
eyung@axinn.com
cerickson@axinn.com

Bradley D. Justus
Allison M. Vissichelli
AXINN, VELTROP & HARKRIDER LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 469-3532
Email: bjustus@axinn.com
avissichelli@axinn.com

*Counsel for Defendants Google LLC,
Alphabet Inc., and YouTube, LLC*

34