# EXHIBIT 1

# REDACTED

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | **CASE NO. 1:21-MD-3010 (PKC)** |
| **THIS DOCUMENT RELATES TO:**<br><br>**IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | |

**EXPERT REPORT OF DR. LAILA HAIDER**

**DECEMBER 13, 2024**

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Table of Contents**

I.   INTRODUCTION ............................................................................................................4

    A.  Qualifications ........................................................................................................4

    B.  Proposed Class and Conduct at Issue ...................................................................5

    C.  Assignment ...........................................................................................................7

II.  SUMMARY OF OPINIONS .............................................................................................7

    A.  There is Substantial Variation Among Advertiser Plaintiffs' Proposed Class Members .......7

    B.  Named Plaintiffs Are Differently Situated from Other Proposed Class Members ................9

    C.  Google's Product Designs Had Disparate Effects on Proposed Class Members Such That Impact Cannot Be Established Using Common Proof .............................................................10

        1.   A Substantial Proportion of Proposed Class Members Were Not Subject to Each of Google's Product Designs ...........................................................................10

        2.   Some Proposed Class Members That Were Subject to Google's Product Designs Benefited from Them ...........................................................................................11

    D.  Dr. Zona and Dr. Singer Do Not Demonstrate that Economic Injury to Proposed Class Members, If Any, Is Amenable to Common Proof .......................................................12

III. ECONOMICS BACKGROUND .......................................................................................20

IV. THERE IS SUBSTANTIAL VARIATION AMONG ADVERTISER PLAINTIFFS' PROPOSED CLASS MEMBERS DURING THE PROPOSED CLASS PERIOD ...................................................23

    A.  Presence During the Proposed Class Period .......................................................24

    B.  Transactions Occurring on Different Inventory Sources .....................................26

    C.  Variation in Display Ad Spend, Impressions, and Clicks ...................................27

    D.  Some Advertisers Are Also Publishers ..............................................................28

V.  NAMED PLAINTIFFS ARE DIFFERENTLY SITUATED FROM OTHER PROPOSED CLASS MEMBERS ..29

    A.  Named Plaintiffs Hanson Law Office and Cliffy Care Landscaping Were Not Subject to All of the Alleged Anticompetitive Conduct Applicable to the Proposed Class They Purport to Represent ...................................................30

    B.  None of the Named Plaintiffs Can Be Identified as Both a Publisher and an Advertiser ....31

    C.  Named Plaintiff Stellman Challenges Only a Single Product Design and Advertiser Plaintiffs' Experts Put Forward No Methodology for the Assessment of Impact and Damages Resulting from That Particular Product Design ...........................................................32

VI. EACH TYPE OF ALLEGED ANTICOMPETITIVE CONDUCT HAD DISPARATE EFFECTS ON MEMBERS OF THE PROPOSED CLASS SUCH THAT IMPACT CANNOT BE ESTABLISHED USING COMMON PROOF .32

    A.  Injury to All or Nearly All Advertisers in Advertiser Plaintiffs' Proposed Class Due to Buy-Side DRS, Project Bernanke, and Global Bernanke Cannot Be Established Using Common Proof ...................................................32

1

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1.  Buy-Side DRS, Project Bernanke, and Global Bernanke Did Not Apply to a Substantial Share of Advertisers Within Advertiser Plaintiffs' Proposed Class.........................................36

2.  Some Advertisers That Were Subject to Buy-Side DRS, Bernanke, and Global Bernanke Benefited from the Optimizations .................................................................................................38

3.  Empirical Evidence Indicates that There Were Disparate Price Effects Across Advertisers Following Buy-Side DRS, Bernanke, and Global Bernanke, which is Consistent with Economic Conflicts Among Proposed Class Members and Lack of Common Impact Resulting from the Optimizations ............................................................................................41

B.  Injury to All or Nearly All Advertisers in Advertiser Plaintiffs' Proposed Class Due to Unified Pricing Rules Cannot Be Established Using Common Proof ......................................44

1.  UPR Was Not Imposed on Advertisers and Could Have Only Affected a Limited Number of Publishers.............................................................................................................................47

2.  Dr. Singer's Anti-Steering-Based Theory of Harm is Based Upon a Fundamental Misunderstanding of How Ad Auctions Work .....................................................................51

3.  Dr. Zona and Dr. Singer Ignore that Some Advertisers Benefited from UPR..................52

VII.    DR. ZONA DOES NOT DEMONSTRATE THAT ECONOMIC INJURY TO PROPOSED CLASS MEMBERS, IF ANY, IS AMENABLE TO COMMON PROOF .......................................................................58

A.  Description of Dr. Zona's Overcharge Approach.................................................................58

B.  Dr. Zona Provides No Causal Link Between the Optimizations at Issue and His Alleged Overcharges for Impressions on AdSense ...........................................................................61

C.  Dr. Zona's Highly Aggregated Approach Altogether Ignores Idiosyncratic Factors that Affect the Auction-Based Prices Paid by Different Members of the Proposed Class ...............61

D.  Dr. Zona's Proposed Methodology Masks Substantial Differences Across Advertisers and Does Not Establish Class-Wide Impact ...............................................................................66

1.  Dr. Zona's Approach Masks Differences Across Advertisers in Different Verticals; His Finding of a Positive and Statistically Significant Relationship Between AdX Share and Ad Prices Does Not Hold for the Majority of Verticals ..................................................................67

2.  Dr. Zona's Approach Masks Differences Across Advertisers of Different Sizes; His Finding of a Positive and Statistically Significant Relationship Between AdX Share and Ad Prices Is Driven by a Tiny Fraction of Advertisers in the Proposed Class ..............................72

E.  Dr. Zona's Proposed Methodology Fails to Account for Relevant Economic Factors, Including Google's Costs, Rendering It Unable to Reliably Establish Economic Injury to Proposed Class Members........................................................................................................78

F.  Dr. Zona Puts Forward No Method for Proving Common Impact; He Simply and Incorrectly Assumes Common Impact ...................................................................................79

G.  The Actual and But-For AdX Win Rates Constructed by Dr. Zona Are Flawed and Unreliable ..............................................................................................................................80

VIII.    DR. SINGER DOES NOT DEMONSTRATE THAT ECONOMIC INJURY TO PROPOSED CLASS MEMBERS, IF ANY, IS AMENABLE TO COMMON PROOF .......................................................................84

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

A.  Dr. Singer's "Indirect Method" is Incapable of Establishing Economic Injury Resulting from UPR for All or Nearly All Members of the Proposed Class.................................................84

1.  Description of Dr. Singer's "Method 1: Indirect Estimation" Overcharge Model ...........84

2.  Dr. Singer's Indirect Method Offers No Opinion on Economic Injury for More than Half of Proposed Class Members ...........................................................................................86

3.  Dr. Singer's Indirect Method Masks Substantial Variation Across Advertisers in Different Verticals; My Testing of His Models Shows that UPR Did Not Result in An Increase in Impressions for Several Advertiser Verticals ...........................................................88

4.  Dr. Singer's Indirect Method Is Incapable of Distinguishing the Effect of Legitimate Economic Factors from the Effect of UPR on Impression Lift, Thereby Rendering it Incapable of Establishing Class-Wide Impact from UPR ........................................................91

5.  Dr. Singer's Finding of a Negative and Statistically Significant Relationship between Google's Revenue Share and Impressions is Driven by the Idiosyncratic Purchase Decisions of Only Two Advertisers, Rendering His Approach Unreliable for the Assessment of a But-For Revenue Share ......................................................................................................108

6.  Dr. Singer's Incidence Analyses Are Flawed and Unreliable for the Assessment of Impact for Proposed Class Members ...........................................................................................111

B.  Dr. Singer's "Direct Method" is Incapable of Establishing Economic Injury Resulting from UPR for All or Nearly All Members of the Proposed Class .....................................................119

1.  Description of Dr. Singer's "Method 2: Direct Estimation" Overcharge Model.............119

2.  Dr. Singer's Direct Method Relies on Highly Aggregated Data and Economically Unjustifiable Assumptions Rendering It Incapable of Establishing Impact for Members of the Proposed Class ..............................................................................................................122

3.  Dr. Singer's Conclusion that Advertisers on AdX Paid Inflated Prices and Won More Impressions Relative to Open Bidding is Derived Completely from DV360 and Authorized Buyer Impressions Rather than from Impressions Purchased via Google Ads ....................127

4.  Dr. Singer's Estimate of the "UPR Price Lift" is Unreliable Because He Fails to Compare Analogous Prices ...........................................................................................................134

5.  Dr. Singer's Direct Method Altogether Fails to Assess Economic Injury to Members of the Proposed Class ..............................................................................................................136

C.  Dr. Singer's Proposed "Approach" For Proving Common Impact Is Fundamentally Flawed 141

APPENDIX A ...........................................................................................................................i

APPENDIX B...........................................................................................................................i

APPENDIX C...........................................................................................................................i

1.  Appendix Exhibits for Section IV .........................................................................................i

2.  Appendix Exhibits for Section VII ........................................................................................i

3.  Appendix Exhibits for Section VIII ......................................................................................i

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# I.    INTRODUCTION

## A.    Qualifications

1.      I am an economist and Vice President at Charles River Associates, Inc. ("CRA").  CRA is a global consulting firm that provides research and analysis in a number of areas, including antitrust and competition, class certification, labor and employment, intellectual property, life sciences, and securities and financial markets, among others.

2.      Prior to joining CRA, I was a partner at Edgeworth Economics, L.L.C.  Prior to that, I was a senior consultant at NERA Economic Consulting ("NERA").  Before my time at NERA, I worked as a consultant at The World Bank.  My areas of specialization are applied microeconomics, the study of the behavior of consumers and firms, and econometrics, which is the application of statistical methods to economics data.

3.      During my career as a professional economist, I have provided economic analysis in a wide range of litigation matters involving class certification, antitrust, damages calculations, and statistics.  I have testified in federal court and at depositions on antitrust issues related to class certification, liability, and damages.  In addition, I have provided testimony and/or economic consulting services in cases involving allegations of defamation, false and misleading statements, commercial damages claims, contract disputes, and labor and employment issues.  I have published articles, given numerous presentations, and served as a referee for journals.  I am regularly invited to give presentations on the appropriate use of econometrics in litigation.  I am presently serving on the Council of the American Bar Association ("ABA") Antitrust Law Section as the economist representative.  I recently served as Co-Chair of the Economics Committee of the ABA Antitrust Law Section.  I have also served as Associate Editor of the ABA Antitrust Law Section publication, *Antitrust*.  I submitted an amicus brief to the United States Supreme Court in *Comcast v. Behrend* on the role of economic analysis in assessing the appropriateness of antitrust class certification.

4.      I received a B.A. summa cum laude in economics from Gettysburg College and a Ph.D. in economics with distinction from Columbia University.

5.      My curriculum vitae, which includes a list of my previous expert testimony and publications, is attached as **Appendix A** to this report.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

6.      CRA is being compensated for my work in connection with this litigation at my standard hourly rate of $1,050.  Neither my nor CRA's compensation is contingent upon the outcome of the case.

### B.      Proposed Class and Conduct at Issue

7.      A group of advertisers[1] (the "Advertiser Plaintiffs") seeks to represent the proposed advertiser class ("Proposed Class"), defined as follows:

> Google Ads advertisers that between January 1, 2016 to the present, placed a display ad on a website or mobile application operated by another entity via a transaction in which the impression was sold, brokered, exchanged or auctioned by Google.[2]

8.      Though Advertiser Plaintiffs' Complaint sought to represent "[a]ll persons and entities in the United States," Advertiser Plaintiffs now "bring their claim solely on behalf of advertisers [in the United States] that purchased programmatic digital display advertising from Google Ads."[3]  I note that Advertiser Plaintiffs' experts also consider "[t]he digital advertising product at issue in the Complaint" to be "display advertising on the 'open web'," thereby excluding display ads

---

[1] I understand that the remaining Proposed Class representatives named in Advertiser Plaintiffs' Complaint are Christopher Hanson d/b/a Hanson Law Office and Cliffy Care Landscaping, Inc.  *See* Consolidated Advertiser Class Action Complaint, *In re Google Digital Advertising Antitrust Litigation*, Case No. 21-MD-3010, December 2, 2022 ("Advertiser Class Complaint"); Notice of Voluntary Dismissal of Claims of Plaintiff Vitor Lindo Pursuant to Fed. R. Civ. P. 41(a), March 20, 2023, ECF No. 511; Notice of Voluntary Dismissal of Claims of Plaintiffs Raintree Medical and Chiropractic Center LLC and Rodrock Chiropractic PA Pursuant to Fed. R. Civ. P. 41(a), March 20, 2023, ECF No. 512; Stipulation of Voluntary Dismissal of Plaintiff Kinin, Inc. Pursuant to F.R.C.P. 41(a)(1)(A)(ii), September 25, 2024, ECF No. 882.  I note that Advertiser Plaintiffs' expert, Dr. Zona, also identifies Michael Stellman as an additional Named Plaintiff, but Mr. Stellman seeks to represent advertisers in a separate class action complaint.  *See* Class Action Complaint, *Michael Stellman v. Google LLC and Alphabet Inc.,* Case 5:22-cv-05273, September 15, 2022 ("Stellman Complaint").  I further note that the Stellman Complaint alleges anticompetitive harm resulting from only a single product design (*i.e.*, Reserve Price Optimization).  The time period at issue in the Stellman Complaint (January 1, 2015 to September 5, 2019) differs from that in the Advertiser Class Complaint.  *See* Stellman Complaint, ¶91.

[2] Expert Report of J. Douglas Zona, PhD, October 4, 2024 ("Zona Report"), ¶29. *See also,* Advertiser Class Complaint, ¶339.

[3] Zona Report, ¶30 ("Because no class representative plaintiff purchased advertising from Google's DSP, the large advertiser buying tool DV360, Advertiser Plaintiffs bring their claim solely on behalf of advertisers that purchased programmatic digital display advertising from Google Ads, Google's self-service display ad buying tool.") *see* also fn. 33.  Though Advertiser Plaintiffs' expert—Dr. Singer—does not include a definition of the Proposed Class in his report, he purports to assess antitrust injury (what he refers to as "impact") only to a subset of the Proposed Class, *i.e.*, "advertisers that used Google Ads to purchase open web display inventory via AdX."  Expert Report of Hal J. Singer, October 4, 2024 ("Singer Report"), ¶¶4-5. *See also,* Singer Report, ¶138 ("I understand that DV360 is used primarily by large advertisers but less frequently by smaller advertisers because of attendant DSP costs, and thus lies outside the scope of the Advertiser Plaintiffs' claims.").  Dr. Singer narrows his analysis of impact to only Google Ads advertisers that purchased open web display inventory (i) via AdX, and (ii) beginning in September 2019—over 3.5 years after the start of the Proposed Class Period. *Id.,* ¶¶4-5.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

placed on Google owned and operated ("O&O") properties (*i.e.*, "closed" or "walled garden" inventory) and in-app mobile display advertising.[4]

9. Advertiser Plaintiffs' experts—Drs. Zona and Singer—opine on antitrust injury and damages resulting from only certain display advertising product designs or optimizations challenged in Advertiser Plaintiffs' Complaint:[5] Buy-Side Dynamic Revenue Share (Buy-Side DRS), Project Bernanke, Global Bernanke, and Uniform Pricing Rules (UPR).

10. I further note that neither Dr. Zona nor Dr. Singer opines on injury or damages resulting from Reserve Price Optimization (RPO), the single product design challenged in the Stellman Complaint.[6]

---

[4] Zona Report, ¶6. *See also,* Zona Report, ¶33 ("I have only counted those advertisers with a U.S. address and only included purchasers of open web display advertising. I also exclude Google Ads advertisers that purchased only products sold in other markets, such as purchasers of display in Google's owned-and-operated properties, of in-stream and out-stream video slots, and in-app mobile display advertising."). Singer Report, ¶5 ("Plaintiffs allege that UPR harmed advertisers that used Google Ads to purchase open web display inventory via AdX"); ¶31, similarly defining open web as display ads appearing on third-party publisher websites (*i.e.*, domains not owned and operated by the platform that intermediates the transactions between advertiser and publisher)). While Advertiser Plaintiffs' experts Dr. Zona and Dr. Singer claim contradictory treatment of video ads, the workpapers of both experts indicate they consider the same set of open web display advertising impressions, which includes certain video ads, including some in-stream video ads.

[5] Zona Report, ¶68 ("I focus solely on the extent to which BS-DRS [buy-side DRS], Bernanke (and variations), and UPR [increased Google's win rate] through anticompetitive means and the extent to which those optimizations impacted and caused damages to Google Ads advertisers"); Singer Report, ¶4 ("For purposes of assessing antitrust injury ('impact') and damages in this report, I focus on one element of the Challenged Conduct—namely, the Unified Pricing Rules ('UPR') that Google implemented in approximately September 2019."). Dr. Zona also considers the competitive effects of Project Bell (a bidding optimization within Google Ads that addressed the issue of publishers sending a bid request to AdX multiple times for the same impression) and Alchemist (a bidding optimization for the first-price auction format within Google Ads) but finds "no incremental win rate effect solely attributable to [Bell v.2]" and "no evidence of a material effect on Google's win rate on AdX attributable to Alchemist… ." Zona Report, ¶¶75, 78. While Dr. Zona also assesses Google's product features Dynamic Allocation and Enhanced Dynamic Allocation, he reaches "no opinion about the competitive effects of Dynamic Allocation or Enhanced Dynamic Allocation in either of the relevant markets." Zona Report, ¶84. Dr. Singer does not assess antitrust injury or damages resulting from Project Bell, Alchemist, Dynamic Allocation or EDA. Dr. Zona refers to the conduct challenged by Advertiser Plaintiffs as Google Ads or AdX/DFP optimizations. *See, e.g.,* Zona Report, ¶¶68, 120 and generally §IV. I refer to the challenged conduct interchangeably as optimizations or product designs.

[6] The only product design at issue in the Stellman Complaint is Reserve Price Optimization (RPO), which is an AdX feature that dynamically adjusts the AdX floor price for individual queries when doing so is expected to increase publishers' revenue while preserving match rate. There is no mention of RPO in Dr. Zona's report. Dr. Singer does not identify RPO as "Challenged Conduct," and only opines on injury and damages for UPR. Singer Report, ¶63, Table 2 and ¶¶4, 57. Moreover, Dr. Singer provides no assessment of injury to putative class members during the class period alleged in the Stellman Complaint. Though the Stellman Complaint alleges a class period only from "January 1, 2015 to September 5, 2019," Stellman Complaint, ¶91, Dr. Singer "focus[es] only on the impact and damages associated with UPR" and his analysis is "limited to the post-September 2019 period." Singer Report, ¶4.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### C.    Assignment

11.    I have been asked by counsel for Google to provide an assessment of the expert reports submitted by Dr. Zona and Dr. Singer on issues related to class certification.  Specifically, I have been asked to determine whether the proposed methodology proffered by either Dr. Zona or Dr. Singer is capable of establishing economic injury to all or nearly all members of the Advertiser Plaintiffs' Proposed Class and whether it can reliably estimate damages for the Proposed Class.  I evaluate and base my conclusions on the nature of the class proposed by Advertiser Plaintiffs.

12.    In preparing this report, I, and my staff at CRA at my direction, have undertaken extensive analysis of data produced in this litigation and reviewed depositions, documents, and other evidence in the record, as well as publicly available information.  As part of my work, I have reviewed the reports of Dr. Zona and Dr. Singer along with their associated workpapers.

13.    A list of materials that I relied upon in reaching the opinions expressed in this report is attached as **Appendix B**.[7]

## II.    SUMMARY OF OPINIONS

14.    Relying on the available evidence, Dr. Zona's and Dr. Singer's reports, and documents, data, and deposition testimony that are referenced in this report, I have reached the following conclusions.

### A.    There is Substantial Variation Among Advertiser Plaintiffs' Proposed Class Members

15.    The members of the Advertiser Plaintiffs' Proposed Class exhibit substantial heterogeneity, indicating that common evidence is inadequate to determine whether all or nearly all members of the Proposed Class sustained injury resulting from the alleged conduct.  As I show below, Google's allegedly anticompetitive optimizations could not have had an effect on many advertisers in the Proposed Class.  For the advertisers that could have been affected, the optimizations in question could have different effects on advertisers, if any, depending on a

---

[7] My analysis and conclusions are based on the information available to me at present.  I reserve the right to update my opinions and analysis as appropriate if additional information or materials become available.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

number of individual characteristics. An individualized inquiry is necessary to ascertain what, if any, effect Google's optimizations had on members within the Proposed Class.

- **Presence During the Proposed Class Period.** Empirical evidence indicates that Proposed Class members purchased ad inventory at different times during the Proposed Class Period. As a result, many Proposed Class members were not subject to the optimizations that Advertiser Plaintiffs' experts allege resulted in antitrust injury. For example, as I explain further below, 60% of the Proposed Class members only had transactions after September 2019, and thus were not subject to three of the optimizations that Dr. Zona alleges resulted in antitrust injury to Proposed Class members (*i.e.*, Buy-Side DRS, Bernanke, Global Bernanke) as they were deprecated upon Google's transition into Unified First Price Auctions (UFPA) in September 2019.

- **Transactions Occurring on Different Inventory Sources.** Proposed Class members differ in the inventory sources (*i.e.*, the specific ad exchange or ad network) that intermediated their transactions. More than 50% of Proposed Class members' impressions were purchased through AdSense, another 44.4% through AdX, and the remaining 3.3% were through third-party exchanges. Some of the optimizations applied to only particular inventory sources. For example, the optimizations Buy-Side DRS, Bernanke, and Global Bernanke did not apply to impressions sold on AdSense or third-party exchanges. Moreover, there are some members of the Proposed Class who never transacted on AdX (they used Google Ads to transact exclusively on AdSense or third-party exchanges) and thus, were not subject to these optimizations.

- **Variation in Display Ad Spend, Impressions, and Clicks.** Empirical evidence shows that Proposed Class members differ substantially in size (as measured by their total display ad spend) as well as the impressions and clicks they received. Specifically, there are wide disparities among them such that some Proposed Class members account for larger overall display ad spend during the Proposed Class Period with many other Proposed Class members accounting for only limited display ad spend. This means advertisers are differently situated and an assessment of how

8

they are affected by the optimizations at issue (if at all) requires analysis of individual members of the Proposed Class.

- **Some Advertisers are also Publishers.**  Some advertisers within the Proposed Class are also publishers.  Because publishers could benefit from alleged conduct that may have harmed advertisers and vice versa, an individualized inquiry is necessary to determine the net effect on advertisers who are also publishers.  For example, as I discuss below, Project Bernanke and UPR could increase the revenues received and impressions sold by publishers transacting on AdX.  Individualized inquiries are necessary to first identify whether each advertiser in the Proposed Class had transactions as a publisher and thus benefited from Project Bernanke or UPR, and further, whether such individual advertisers benefited on net from the optimizations.

### B.    Named Plaintiffs Are Differently Situated from Other Proposed Class Members

16.    Named Plaintiffs Hanson Law Office and Cliffy Care Landscaping were not subject to all the optimizations that Dr. Zona and Dr. Singer opine resulted in antitrust injury to the Proposed Class members whom the Named Plaintiffs purport to represent.  Specifically:

- Named Plaintiff Hanson Law Office had no transactions using Google Ads while Buy-Side DRS and UPR were active.  Hanson Law Office only had ad impressions in 13 months between January 2016 and May 2017 (with 9 months of positive ad spend) during the Proposed Class period.

- Named Plaintiff Cliffy Care Landscaping had no transactions using Google Ads while Buy-Side DRS and Bernanke were active.  Cliffy Care Landscaping only had ad impressions in 14 months between November 2019 and May 2023 (with 13 months of positive ad spend) during the Proposed Class period.

17.    Moreover, none of the Named Plaintiffs can be identified as a publisher using Google products, unlike over 3,800 advertisers in the Proposed Class who are also publishers.

18.    Named Plaintiff Michael Stellman had ad impressions in 6 months between January 2015 and September 2019, *i.e.*, during the class period alleged in the Stellman Complaint.  However,

this particular Named Plaintiff's allegations relate to only a single optimization, RPO. Crucially, neither Dr. Zona nor Dr. Singer have put forward any methodology for the assessment of impact or damages related to RPO. Thus, Advertiser Plaintiffs' experts have not opined on any common proof of economic injury resulting from RPO for Named Plaintiff Stellman and the advertisers he seeks to represent.

### C.    Google's Product Designs Had Disparate Effects on Proposed Class Members Such That Impact Cannot Be Established Using Common Proof

19.    Drs. Zona and Singer fail to recognize that Google's optimizations affected individual members of the Proposed Class in disparate ways. Proposed Class members were subject to different optimizations for a number of reasons. For instance, some advertisers transacted using Google Ads only for portions of the Proposed Class Period and thus could not have been subject to optimizations that were not active during those periods. Advertisers that transacted when certain optimizations were active were subject to them to varying degrees. The optimizations applied (or did not apply) on an auction-by-auction basis, such that even for Proposed Class members who were subject to them, there were disparate effects, if any, stemming from the alleged conduct. And some members within the Proposed Class benefited from the optimizations. Because of these and other factors, an individualized inquiry is necessary to determine which members, if any, were harmed by each optimization.

### 1.    A Substantial Proportion of Proposed Class Members Were Not Subject to Each of Google's Product Designs

20.    Due to the design of the product features and optimizations that Advertiser Plaintiffs' experts allege resulted in antitrust injury to Proposed Class members and the timing of their implementation, none of them apply to every Proposed Class member. Whether a given Proposed Class member was directly subject to the alleged conduct depends on that Proposed Class member's individual circumstances.

21.    The relevant optimizations were introduced, and in some cases deprecated, at various points in time during the Proposed Class Period. For example:

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- **Buy-Side DRS**. 94% of advertisers in the Proposed Class did not acquire ad inventory between January 2013 and November 2013 and thus were not subject to Buy-Side DRS.

- **Project Bernanke**.  90% of advertisers in the Proposed Class did not acquire ad inventory between November 2013 and August 2015 and thus were not subject to Project Bernanke.

- **Global Bernanke**.  60% of advertisers in the Proposed Class did not acquire ad inventory between August 2015 and September 2019 and thus were not subject to Global Bernanke.

- **UPR**.  At least 16.4% of advertisers in the Proposed Class were not subject to UPR because they did not acquire any impressions after May 2019, when Google started implementing UPR.

### 2.     Some Proposed Class Members That Were Subject to Google's Product Designs Benefited from Them

22.     Certain members of Advertiser Plaintiffs' Proposed Class benefited from the alleged conduct.  Moreover, because each optimization applied (or did not apply) on a per-auction basis and the effect (if any) also varied based on auction-specific competitive dynamics, the impact of the alleged conduct on a given advertiser cannot be answered with common evidence.  As a result, determining how a particular Proposed Class member was impacted depends on individualized factors and requires individualized analysis.  For example, and as outlined in greater detail below:

- Buy-Side DRS, Project Bernanke, and Global Bernanke functioned to increase the competitiveness of bids from advertisers using Google Ads in the AdX auction, and, as a result, allowed Google Ads advertisers to win more auctions and get greater conversion volume.

- Unified Pricing Rules benefited at least some advertisers by allowing some Google Ads advertisers purchasing via AdX to buy more impressions at lower prices, reducing self-competition among advertisers, and promoting simplicity and

11

transparency in the ad tech platform. Further, because UPR established a level playing field for advertisers bidding through different ad exchanges by imposing the same floor price within the Unified First Price Auction, Proposed Class members that would have faced a higher floor price on AdX absent UPR were better off.

### D.     Dr. Zona and Dr. Singer Do Not Demonstrate that Economic Injury to Proposed Class Members, If Any, Is Amenable to Common Proof

23.    **Conclusions Regarding Dr. Zona's Report**: As detailed in Section VII of this report, based on my analysis of Dr. Zona's work, I have concluded that he has failed to propose a methodology capable of establishing that the alleged conduct resulted in economic injury to all or nearly all members of the Proposed Class. I have also concluded that Dr. Zona has failed to propose a reliable methodology for calculating damages on a class-wide basis for the Proposed Class. In particular:

- Dr. Zona provides no causal link between the optimizations at issue—which relate to AdX—and his alleged overcharges to advertisers for impressions on AdSense. The overcharges he calculates for impressions on AdSense, which account for more than half of the impressions that he analyzes, are not tied to the optimizations he claims are harmful. By contrast, Dr. Singer does not analyze AdSense impressions and he does not claim any economic injury to Proposed Class members resulting from UPR for impressions transacted on AdSense. Dr. Zona has no valid basis for claiming that his model for AdSense can be used for the assessment of impact or damages to Proposed Class members resulting from the alleged conduct, which relates to product designs affecting impressions sold through an entirely different sales pipeline, AdX.

- Even putting this aside, Dr. Zona's proposed methodology for establishing class-wide impact relies on highly aggregated prices. Notably, the prices paid for impressions in Dr. Zona's models are not prices that are set by Google. Rather, they are determined in auctions by idiosyncratic demand and supply factors for each impression. Instead of studying outcomes from auctions for the myriad members of the Proposed Class, Dr. Zona puts forward a highly aggregated approach that altogether ignores individual advertiser-specific variation and idiosyncratic factors that affect auction-based prices. Nonetheless, he claims that his proposed models uncover the relationship between

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Google's AdX share and those underlying idiosyncratic auction-based prices. His approach—as designed—is incapable of doing so.

- Dr. Zona's models relying on highly aggregated prices mask the substantial variation in ad prices paid by advertisers in different verticals. My testing of Dr. Zona's models shows that his masking of underlying price variation across advertisers from different verticals is critical to his conclusion of class-wide impact. When I apply each of Dr. Zona's regressions separately to prices paid by Proposed Class members in each advertiser vertical, I find no positive and statistically significant relationship between AdX share and ad prices paid by advertisers in the majority of verticals. The lack of a positive and statistically significant relationship means that Dr. Zona has no statistical proof of an overcharge for advertisers in those verticals. This means Dr. Zona is unable to establish an alleged overcharge for 42.6% of Proposed Class members, including for the Named Plaintiffs, Hanson Law Office and Cliffy Care Landscaping. In addition, Dr. Zona does not establish an overcharge for another 18.1% of Proposed Class members that he does not study. Together, this accounts for 60.7% of Proposed Class members for whom Dr. Zona has no (supposed) statistical proof of an alleged overcharge.

- Dr. Zona's models mask differences across advertisers of different sizes. His finding of a positive and statistically significant relationship between AdX share and ad prices is driven by a tiny fraction of advertisers in the Proposed Class. When I apply each of Dr. Zona's models to the pricing data for the bottom 99.9% of advertisers, I find no positive and statistically significant relationship between his AdX share and ad prices paid by this group of advertisers. The lack of a positive and statistically significant relationship for the bottom 99.9% group means that Dr. Zona has no statistical proof of an overcharge for nearly all advertisers in the Proposed Class, which includes all Named Plaintiffs. As such, his results are driven by the pricing experience of a negligible proportion of advertisers, rendering his approach biased and unreliable for the assessment of class-wide impact. Thus, Dr. Zona's conclusion that "all or substantially all Google Ads advertisers were impacted" is rejected by the data.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- Dr. Zona's proposed methodology fails to account for relevant economic factors, including Google's costs. Despite the fact that Dr. Zona acknowledges that cost is a crucial factor to include in the type of models he has constructed, he fails to do so. A failure to account for relevant factors means that Dr. Zona's models suffer from omitted variable bias, rendering them unable to reliably establish economic injury for Proposed Class members.

- Dr. Zona puts forward no methodology to establish common impact for members of the Proposed Class resulting from the alleged conduct. He simply assumes that any Google Ads advertiser that paid for at least one impression of a transaction type that is included in his regression models was impacted by the alleged conduct. He opines that because 98.7% of Google Ads advertisers paid for at least one impression of the transaction types he analyzes, all or nearly all Proposed Class members were necessarily impacted. This, however, does not establish class-wide impact. Dr. Zona simply does not assess how the four optimizations at issue affected individual members of the Proposed Class. Moreover, my testing of his own models demonstrates that Dr. Zona's assertion about class-wide impact is rejected.

- Even putting aside the fundamental problems above, Dr. Zona's approach entirely ignores the benefits that at least some advertisers received from the four optimizations at issue. In fact, Dr. Zona acknowledges that Bernanke directly benefited Google Ads advertisers in the form of allowing Proposed Class members to get more conversions on their impressions than they otherwise would have been able to obtain. He similarly acknowledges a direct benefit to Google Ads advertisers resulting from UPR, which "unlock[s] inventory" for advertisers on AdX, allowing Proposed Class members to win more impressions. By ignoring the benefits entirely and considering only the claimed harms (*i.e.*, according to Dr. Zona, a higher nominal price for impressions), Dr. Zona has no reliable basis to conclude that an advertiser was injured overall. For a given advertiser, the benefits may outweigh the alleged harms, leaving the advertiser uninjured. Dr. Zona has provided no basis or method to ascertain if this is the case.

14

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- Finally, the actual and but-for AdX win rates constructed by Dr. Zona are flawed and unreliable. He relies upon a handful of Google documents to derive these win rates and he uses them to calculate the AdX share that he claims would have prevailed absent the optimizations at issue. This in turn forms the basis for his assessment of impact and damages for the Proposed Class. First, though Dr. Zona purports to measure the overall AdX win rate, he mixes and matches win rates specific to different sets of buyers, and the documents he relies on do not always reflect win rates on AdX overall. Second, Dr. Zona incorrectly assumes that the effect of each of the optimizations at issue on AdX win rate is instantaneous and permanent for the entire duration of the optimization. Third, Dr. Zona incorrectly interprets figures in the documents he relies upon. Fourth, he ignores other Google documents that show different estimates for win rate.

24. **Conclusions Regarding Dr. Singer's Report**: As detailed in Section VIII of this report, based on my analysis of Dr. Singer's work, I have concluded that he has failed to propose a methodology capable of establishing that UPR—the only product design that Dr. Singer analyzes in his assessment of impact and damages—resulted in economic injury to all or nearly all members of the Proposed Class. I have also concluded that Dr. Singer has failed to propose a reliable methodology for calculating damages on a class-wide basis for the Proposed Class. He proposes two methods, *i.e.*, an "indirect" method and a "direct" method for the assessment of impact and damages resulting from UPR to Proposed Class members. I discuss each of his methods below.

a) Dr. Singer's "Indirect" Method

- Even taking Dr. Singer's indirect method at face value, he offers no opinion on economic injury for more than half of the Proposed Class members. Because Dr. Singer purportedly evaluates the effect of UPR on advertisers in the Google Ads-AdX pipeline from September 2019 onwards, he claims economic injury for less than half of the Proposed Class members. As such, he does not purport to assess injury or damages for 57.7% of Proposed Class members.

15

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- For the subset of Proposed Class members that Dr. Singer purports to establish economic injury using his indirect method, the estimate he derives for an impression lift resulting from UPR masks substantial variation across advertisers in the Proposed Class. I demonstrate that when I use Dr. Singer's own regression models (that make up his indirect method) and allow the effect of UPR to vary across advertiser verticals, there is no statistical proof that UPR resulted in an impression lift for advertisers in seven of thirteen verticals (46.6% of advertisers with purchases in the post-UPR period are only associated with these 7 verticals). The results contradict Dr. Singer's claims about the purported and widespread effects of UPR on Proposed Class members. This finding also means that in addition to the 57.7% of Proposed Class members for which Dr. Singer provides no opinion of economic injury, there is no statistical proof of UPR resulting in an impression lift for another 19.7% of Proposed Class members. Together, this accounts for 77.4% of Proposed Class members.

- Even putting aside the issue that Dr. Singer's models mask variation across advertisers in different verticals, his before-after approach for estimating the alleged effect of UPR is fundamentally flawed. Dr. Singer fails to follow the guidance in the literature, which states that "it is critical to account for any significant differences in other economic factors between the before and during periods" when using a before-after approach.[8] I demonstrate that advertisers in different verticals faced idiosyncratic conditions, such as COVID-19, the 2020 U.S. election, and industry expansion, that led to substantial changes in their impressions over time. Dr. Singer's approach is unable to account for these crucial factors that are specific to advertisers in different verticals. In addition, his regression model cannot account for events that occurred at the same time as UPR, including Google's transition to first-price auctions. A failure to account for these crucial factors means that his before-after methodology is incapable of distinguishing between the change in impressions caused by legitimate economic factors unrelated to UPR and any change in impressions

---

[8] ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues,* ABA Book Publishing (2nd ed. 2014) ("ABA Econometrics"), p. 312.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

caused by UPR.  My testing of Dr. Singer's model shows that his conclusion of an impression lift resulting from UPR is, in fact, driven by a few verticals that experienced a substantial increase in impressions due to factors other than UPR, such as COVID-19, the 2020 U.S. election, and industry expansion.  In sum, my findings demonstrate that Dr. Singer's indirect method yields biased conclusions, rendering it unreliable for the assessment of class-wide impact resulting from UPR.

- The inability of Dr. Singer's indirect method to account for the specific circumstances of Proposed Class members also renders his conclusion about the relationship between Google's revenue share and impressions biased and unreliable.  I demonstrate that Dr. Singer's model is incapable of accounting for the specific circumstances that affected the impressions purchased by two of the largest advertisers in the Proposed Class, Meta and Temu.  My testing of Dr. Singer's models shows that the idiosyncratic purchase decisions made by Meta and Temu are critical to his finding of a negative and statistically significant relationship between Google's revenue share and impressions.  When I apply Dr. Singer's models to the data for all advertisers but Meta and Temu, his conclusion is overturned.  This means that for all advertisers but Meta and Temu, a reduction in the revenue share does not lead to a statistically significant increase in impressions.  As such, Dr. Singer's conclusion that there would have been a 4.62-percentage-point reduction in Google's revenue share absent UPR is unreliable and incorrect.  Moreover, the fact that Dr. Singer's conclusion is sensitive to the purchases made by two of the 1.3 million advertisers in his analysis demonstrates that his approach is incapable of reliably demonstrating economic injury or damages for members of the Proposed Class.

- Finally, I show that Dr. Singer's two methods that attempt to estimate the burden on advertisers from an allegedly inflated revenue share are fundamentally flawed, which renders them unreliable for the assessment of impact on Proposed Class members.  For Dr. Singer's first method, an examination of his own calculation shows monthly incidence rates that do not make economic sense.  His analysis also fails to distinguish between prices paid for impressions by Proposed Class members from prices paid for impressions purchased by advertisers using DV360 or non-Google

17

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

buying tools.  When I apply Dr. Singer's calculation but limit the analysis to Google Ads transactions on AdX (*i.e.*, transactions relevant to the Proposed Class), his conclusion is overturned.  Further, his analysis is plagued with errors because he uses the wrong prices and revenue shares.  For Dr. Singer's second method, he acknowledges the "limitation" that his estimates for elasticity of demand and supply are based on different datasets and time periods.  His elasticity of supply estimates are based on dated Google documents, including one that he misinterprets, and they are also based on transactions outside of the Proposed Class definition (*i.e.*, they include impressions for apps).  His elasticity of demand estimates are derived from regression models that suffer from methodological problems, which render his findings unreliable.  Thus, Dr. Singer does not put forward a workable method to assess the savings in ad prices (if any) that publishers would have passed through to Proposed Class members.

**b)** Dr. Singer's "Direct" Method

- Dr. Singer's direct method relies on highly aggregated data and economically unjustifiable assumptions and is incapable of establishing impact for members of the Proposed Class.  Dr. Singer's difference-in-differences (DiD) approach does not measure the effect of UPR on AdX; rather, it is constructed only to measure the effect of UPR on Open Bidding.  And because he does not include any controls in his model, Dr. Singer erroneously attributes *any* change in prices or impressions on Open Bidding relative to AdX after UPR went into effect solely to UPR.  Thus, he fails to isolate the allegedly anticompetitive conduct from other factors differentially affecting AdX and Open Bidding, including Google's transition to first-price auctions, procompetitive benefits of UPR, or other time-varying factors.  This renders his method biased and unreliable.  Further, Dr. Singer uses only highly aggregated data to estimate a single average effect of the treatment (here, UPR) on all advertisers that masks any individual heterogenous effects.  He therefore assumes, rather than establishes, that his claimed average effect applies equally to all advertisers despite the fact that any effect of UPR on advertisers varied individually, depending not only

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

on the publishers that a given advertiser transacted with but also on the circumstances of the individual auctions that the advertiser participated in.

- Dr. Singer's conclusion that advertisers on AdX paid inflated prices and won more impressions relative to Open Bidding is derived completely from DV360 and Authorized Buyer impressions rather than from impressions purchased via Google Ads. First, I show that Dr. Singer finds an overcharge because he includes non-Google Ads buying tools in his calculation of the average AdX prices. When I limit AdX transactions to Google Ads (*i.e.*, transactions relevant to the Proposed Class), Dr. Singer's alleged overcharge is completely overturned—and turns *negative*. Second, I show that his estimate of purported AdX impression gains due to UPR is also driven entirely by DV360 rather than impressions purchased by advertisers using Google Ads. Thus, deconstructing Dr. Singer's analysis by buying tool overturns his conclusions that Google Ads advertisers purchased impressions on AdX attributable to UPR at a higher price than they would have absent UPR.

- Dr. Singer's direct method is unreliable because he fails to compare analogous prices across AdX and Open Bidding. He conducts an erroneous comparison of AdX prices that are gross of the AdX revenue share with Open Bidding prices that are net of a third-party exchange's revenue share. Dr. Singer's comparison of dissimilar prices renders his entire exercise unreliable because he does not account for advertiser's actual spend. Correcting this issue to account for gross Open Bidding prices requires individualized inquiries.

- Even putting aside these fundamental problems, Dr. Singer's direct method altogether fails to assess injury to members of the Proposed Class. He purports to measure aggregate harm as the difference between the average price advertisers paid for impressions on AdX and the average price advertisers would have paid on Open Bidding, had the additional impressions resulting from UPR transacted on Open Bidding instead. But Dr. Singer does not establish that the *same* advertisers (*i.e.*, members of the Proposed Class) as opposed to a *different* set of advertisers that includes advertisers bidding on Open Bidding and not in the Proposed Class, would

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

have bought those impressions more cheaply.  An individualized inquiry is required to assess impact, if any, for individual members of the Proposed Class.

- Dr. Singer provides no link between his direct method purporting to assess alleged harm to Proposed Class members due to UPR and his assumption, for which he provides no economic justification, that Google would have lowered its revenue share had it not implemented UPR.  Dr. Singer provides no empirical or documentary support for his assumption.  His theory of harm is therefore completely divorced from and irreconcilable with his analysis of common impact.

**c)**  Dr. Singer's Argument that Price Effects Would Be Transmitted to All Class Members

- Dr. Singer's proposed "approach" for proving common impact is fundamentally flawed.  First, he entirely ignores the benefits that at least some advertisers received from UPR.  Though Dr. Singer implicitly admits that UPR directly benefited members of the Proposed Class by allowing advertisers to win impressions they otherwise would not have been able to access and lowering prices, he provides no basis or any methodology to determine whether the benefits outweigh the claimed harms for any members of the Proposed Class.  Second, such a determination would require a series of individualized analyses into Proposed Class members and is not amenable to common proof.  Third, Dr. Singer's conclusion about class-wide impact is also based on the assertion that absent UPR, Google would have lowered its AdX revenue share, including on transactions via Google Ads.  But Dr. Singer does not attempt to establish that Google would have lowered its AdX revenue share.  He also does not establish that different advertisers in the Proposed Class would uniformly bear the burden of a change in AdX revenue share.

## III.    ECONOMICS BACKGROUND

25.    The ad tech industry facilitates transactions between advertisers (who pay to place their online ads in front of end users) and publishers (who offer inventory in which advertisers' ads can be placed).  Technologies (including advertiser buying tools, ad exchanges and ad networks, and publisher ad servers) facilitate the matching of the billions of transactions, or impressions, made each day.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

26.     The ad tech industry constitutes what economists call a "two-sided platform." As a general matter, a two-sided platform enables connections between buyers and sellers on each side of the platform.[9]  In the specific case of ad tech products, the two sides are advertisers and publishers, respectively.  Google's ad tech tools, for example, enable advertisers to connect with publishers that have advertising space, often referred to as ad inventory, available on their digital properties (such as websites, mobile apps, or connected TVs).[10]  These tools may facilitate the advertiser bidding for or purchasing ad space, facilitate efficient matching of advertisers and publishers, and/or facilitate the publisher's offer and sale of ad inventory.

27.     In assessing whether antitrust injury to all or nearly all Proposed Class members can be proven using common evidence and whether there are economic conflicts among members of the Proposed Class, it is important to account for the two-sidedness of the industry and how actions of the intermediaries can affect both sides.  A participant in the ad tech industry, such as Google, typically has the incentive to choose policies and develop product designs that serve to "balance" the two sides of the platform.[11]  This may mean implementing a product design or policy that benefits users on one side of the platform while not harming or even directly affecting some users on the second side of the platform; due to indirect beneficial effects on the second side of the platform, there may be a net benefit for many users on both sides (and an overall net benefit for the platform and competition).  In addition, a given product design may benefit some users on one side of the platform, while not harming or even directly affecting other users on the same side of the platform.  Once again, the users who were not directly affected by such a policy may receive an indirect benefit by virtue of experiencing the impact of such a policy change.  For example, as discussed in Section VI, the challenged product designs helped increase the

---

[9] *See, e.g.*, Rochet, Jean-Charles and Tirole, Jean. "Platform Competition in Two-Sided Markets." *Journal of the European Economic Association*, Vol. 1, No. 4, 2003 ("Rochet and Tirole (2003)"), pp. 990–1029.

[10] *See, e.g.*, "Inventory formats." *Google Ad Manager Help*, available at https://support.google.com/admanager/answer/9796545?; "About ad formats available in different campaign types." *Google Ads Help*, available at https://support.google.com/google-ads/answer/1722124?; "Ad formats FAQ." *Google AdSense Help*, available at https://support.google.com/adsense/answer/10734935?hl=en.

[11] *See, e.g.*, Rochet and Tirole (2003), at p. 990 ("Platform owners or sponsors in these industries must address the celebrated 'chicken and egg problem' and be careful to 'get both sides on board.'")  *See also,* Wright, Julian. "One-sided Logic in Two-Sided Markets." *Review of Network Economics*, Vol. 3, No. 1, 2004 ("Wright (2004)"), pp. 44–64, at p. 44 ("In these markets, platforms cater to both types of users in a way that allows them to influence the extent to which cross-user externalities are internalized.").

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

competitiveness of Google Ads advertisers' bids on AdX (*i.e.*, Buy-Side DRS, Project Bernanke, and Global Bernanke) and allowed Google Ads advertisers to win more impressions on AdX at a lower price (*i.e.*, UPR), providing direct benefits to advertisers.  This direct benefit to advertisers encourages further advertiser participation in Google's platform, increasing the demand for ad inventory on the platform and indirectly benefiting publishers.  The increased ability for publishers to monetize their inventory, in turn, encourages publisher participation and further (indirect) benefits to advertisers.

28.    Accordingly, any given product design or optimization introduced by Google must be evaluated not only on the basis of the users it affects directly, but also on the basis of those users that experience indirect benefits as a result of the design.  As a two-sided platform, Google has an incentive to implement product designs which, on balance, create an overall net benefit for users on both sides of the platform, whether those benefits are direct or indirect.

29.    Meanwhile, other users may have experienced no effects because a design did not apply to them at all.  As I summarize above and elaborate below in Section VI, not each product design applied to every advertiser.  These advertisers could not have experienced an effect as a result of Google implementing a product design that did not apply to them.  As I discuss below, this is the case for the product designs that Dr. Singer and Dr. Zona claim resulted in antitrust injury to Proposed Class members.[12]  Further, even when a product design did potentially apply to a particular advertiser, it would have disparate effects on a per-transaction basis depending on the specific auction dynamics of the transaction.

30.    Another important economic characteristic of a platform is that some users may participate on both sides of the platform.  This is the case with Google's ad exchange (AdX) and ad network (AdSense), where some users may participate on the platform as both advertisers and publishers.  For example, Yahoo operates both as an advertiser using Google Ads and as a publisher selling ad inventory on AdX.[13]  For a user participating on both sides of AdX, the assessment of the impact of the product designs at issue would require an inquiry into the effects

---

[12] *See* Section VI.

[13] XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235); XPP-Daily data (GOOG-AT-MDL-DATA-000559277 to 000561030, GOOG-AT-MDL-DATA-000606113 to 000606341).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

on the user as a publisher as well as the effects on the user as an advertiser.  For example, the challenged optimizations could increase the revenues received by publishers that transacted on AdX and/or allow publishers to sell impressions that would have otherwise gone unsold.  Dr. Zona and Dr. Singer fail to consider the benefits an advertiser obtained as a publisher, such as when selling impressions through AdX auctions that it would have otherwise not sold or sold to an advertiser at a lower price.

31.     Thus, the overall impact of any of the optimizations that Dr. Zona and Dr. Singer claim resulted in antitrust injury must be evaluated by accounting for and balancing all of the potential effects, which may differ across advertisers as a whole and across users on both sides of the platform.  An assessment of whether a given advertiser was harmed overall by one of the product designs depends on whether the direct and indirect effects of the product design on the advertiser net out to being positive (*i.e.*, because the advertiser benefited from the product design on balance) or negative (*i.e.*, because the advertiser was harmed by the product design on balance).

32.     For the reasons summarized below, and discussed in detail in this report, I have concluded that Dr. Zona and Dr. Singer fail to answer these questions.  Accordingly, neither Dr. Zona nor Dr. Singer demonstrates that economic injury (if any) to individual advertisers in the Proposed Class resulting from the challenged optimizations is amenable to common proof.

## IV.    THERE IS SUBSTANTIAL VARIATION AMONG ADVERTISER PLAINTIFFS' PROPOSED CLASS MEMBERS DURING THE PROPOSED CLASS PERIOD

33.     There are more than 2.5 million members in the Advertiser Plaintiffs' Proposed Class, and these advertisers differ in numerous ways.[14]  First, advertisers had transactions at different times during the Proposed Class Period such that their presence in the Proposed Class and their exposure to the challenged product designs or optimizations varies considerably.  Second, Proposed Class members had transactions on different inventory sources, which influences how (if at all) they are affected by the optimizations.  Third, there are wide disparities among advertisers with respect to their size (as measured by their total display ad spend) as well as the impressions and clicks they received.  Further, some advertisers are also publishers, which requires a determination of how the particular optimizations affected them as a publisher.  An

---

[14] Zona Report, Table 6, ¶140.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

individualized inquiry into these various dimensions is required to ascertain whether and to what extent the alleged conduct impacted the members of the Proposed Class.

### A.    Presence During the Proposed Class Period

34.    The empirical evidence demonstrates that members of Advertiser Plaintiffs' Proposed Class differ in their exposure to the challenged optimizations given the timing of individual advertiser's first and last transactions during the Proposed Class Period.  Only a tiny portion of the Proposed Class members were present during the entire Proposed Class Period.  Many advertisers were only purchasing display ad inventory in the Proposed Class Period when one or two, but not all four, of the optimizations in question were in effect.  Thus, it is inappropriate to assume a common effect of the alleged conduct across different members of the Proposed Class. Instead, the assessment of whether and how each Proposed Class member was affected by the alleged conduct necessitates an individualized inquiry that needs to be tailored to, among other dimensions, the specific product designs the advertiser was subject to.

35.    The relevant optimizations at issue were introduced, and in some cases deprecated, at different times during the Proposed Class Period.  **Exhibit 1 s**ummarizes the start and end dates (as applicable) of each optimization.

24

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 1: TIMELINE OF ALLEGED ANTICOMPETITIVE OPTIMIZATIONS[15]**



36.    The data demonstrate that many members of the Proposed Class were only present for limited portions of the Proposed Class Period.  For example, only 5,459 advertisers or 0.21% of the Proposed Class members were present throughout the entire Proposed Class Period.  419,141 advertisers or 16.4% of members in the Proposed Class only had transactions before May 2019, and thus were not subject to UPR.[16]  1,532,371 advertisers or 60% of the Proposed Class members only had transactions after September 2019, and thus were not subject to Buy-Side DRS or to Bernanke (including Global Bernanke), which was deprecated upon Google's transition into UFPA in September 2019.[17]  I also note that Buy-Side DRS started and deprecated well before the Proposed Class Period.

---

[15] Buy-side Dynamic Revenue Share launched in January 2013.  *See* GOOG-DOJ-04306227, at -227.  Bernanke launched in November 2013.  *See* GOOG-DOJ-07824949, tab "ref all 2013 launches," cell J214.  Global Bernanke launched in August 2015.  *See* GOOG-DOJ-07824949, at tab "ref all 2015 launches", cell K444.  Unified Pricing Rules (Beta) launched in May 2019 and Unified Pricing Rules (Full Rollout) launched in September 2019.  *See* GOOG-DOJ-09714662, at -663.

[16] XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).  I understand that UPR was gradually rolled out; it was introduced in May 2019 and fully launched in September 2019 alongside Google's transition to UFPA.  To be conservative, I include in my count of advertisers not subject to UPR only those that last purchased impressions before May 2019.

[17] XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).

37.     Moreover, as I discuss later in my report, even advertisers that purchased impressions when a certain alleged optimization was active were still not necessarily subject to the alleged conduct.

### B.    Transactions Occurring on Different Inventory Sources

38.     Advertisers in the Proposed Class differ in the inventory sources, *i.e.*, ad networks and ad exchanges, that intermediated their transactions.  Because the product designs at issue applied to only particular inventory sources or had disparate effects on advertisers depending on the inventory source that intermediated the transaction and auction-specific circumstances, any potential effect on Proposed Class members varies based on the intermediaries that facilitated their transactions.

39.     More than 50% of Proposed Class members' impressions were purchased through AdSense, another 44.4% through AdX, and the remaining 3.3% were through third-party exchanges.[18]  The optimizations Buy-Side DRS, Bernanke, and Global Bernanke did not apply to impressions sold on AdSense or third-party exchanges.  Meanwhile, UPR did not apply to impressions sold by publishers using AdSense or a third-party ad server (*i.e.*, UPR did not apply to impressions sold by publishers that did not use DFP), and UPR's effects varied on a per-auction basis, with disparate effects depending on the inventory source and how the publisher would have set exchange-specific price floors absent UPR.  Proposed Class members who transacted exclusively outside of AdX or with publishers not on DFP were not subject to any of these optimizations.  There are 9,428 advertisers that did not have transactions on AdX (instead, they only had transactions on AdSense or third-party exchanges) and were not subject to the challenged Google Ads optimizations (*i.e.*, Buy-Side DRS, Bernanke, and Global Bernanke).[19] Further, an individualized inquiry would be required to establish whether an advertiser was subject to UPR if, for example, the advertiser transacted via a third-party exchange with a publisher using DFP.  Advertiser Plaintiffs allege that UPR steered impressions to AdX by preventing publishers from setting higher price floors on AdX relative to third-party exchanges,

---

[18] Zona Report, Table 2, ¶130.

[19] I also note that more than 230,000 advertisers (or approximately 9% of Proposed Class members) never paid for impressions on AdX.  XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

benefiting advertisers bidding on AdX at the expense of advertisers bidding into third-party exchanges.[20] Thus, for advertisers interacting with publishers on multiple SSPs, the assessment of the effect of UPR necessitates individual inquiries.

### C.    Variation in Display Ad Spend, Impressions, and Clicks

40.    The empirical evidence shows that members of Advertiser Plaintiffs' Proposed Class differ substantially in size (as measured by their total display ad spend) as well as the impressions and clicks they received. Specifically, there are wide disparities among them such that some Proposed Class members account for larger overall display ad spend during the Proposed Class Period with many other Proposed Class members accounting for limited display ad spend. There are similarly wide disparities among them in total impressions and total clicks received in the Proposed Class Period. This means advertisers are differently situated and an assessment of how they are affected by the product designs at issue (if at all) requires analysis of individual members of the Proposed Class.[21]

41.    The data show wide variation in total display ad spend across advertisers in the Proposed Class. Total display ad spend for Proposed Class members ranges from $0 to more than ███ ███ over the Proposed Class Period.[22] Among members of the Proposed Class, 24.9% (or

---

[20] Advertiser Class Complaint, ¶266.

[21] I also note that some advertisers paid Google directly, whereas other advertisers used third-party ad agencies to place ads and transact using Google Ads, leaving the ad agency to pay Google on behalf of advertisers. The data show that among Proposed Class members, at least 15.7% only used ad agencies and did not transact directly with Google. In addition, at least 4.9% used a combination of indirect purchases through ad agencies and direct purchases. Xbridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235); XP Agency data (GOOG-AT-MDL-DATA-000558890 to 000559276, GOOG-AT-MDL-DATA-000606053 to 000606112). Dr. Zona does not discuss how the assessment of impact would differ for such members of the Proposed Class. If anything, he states that "Google Ads makes display space available to small advertisers that do not spend enough on digital advertising to support an ad agency" and offers "'self-service' buying tools suitable for use by smaller advertisers who do not or cannot depend on the assistance of an ad agency or in-house staff." Zona Report, ¶55; *see also* ¶9. This implies that Dr. Zona is unaware that some Proposed Class members use ad agencies instead of transacting directly with Google. As such, he does not consider that the assessment of impact for these Proposed Class members would differ depending on their contractual relationships with their respective ad agencies.

[22] This range is for all Proposed Class members based on Dr. Zona's data. Meanwhile, for ads acquired by Proposed Class members in the Google Ads-AdSense pipeline, total ad spend ranges from $0 to almost ████████; for ads acquired by Proposed Class members in the Google Ads-AdX and third-party exchange pipelines, total ad spend ranges from $0 to more than ██████. Dr. Zona and Dr. Singer present models that exclude advertisers that do not pay for impressions on a per-click basis (*i.e.*, a CPC-to-CPM cost model, relevant to AdX, where advertisers pay on a per-click basis and purchases are paid on a per-impression basis, or a CPC cost model, relevant to AdSense, where advertisers pay and publishers are paid on a per-click basis). Total ad spend for impressions purchased by Proposed Class

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

636,764 advertisers) paid less than $12 for display ads during the Proposed Class Period, while 3.6% (or 93,130 advertisers) paid $10,000 or greater.[23]

42.    In addition, Proposed Class members also differ substantially with respect to total impressions they received during the Proposed Class Period.  The count of total impressions for advertisers in the Proposed Class ranges from 0 to more than ███████ over the Proposed Class Period.[24]  Among members of the Proposed Class, 14.1% of Proposed Class members (or 359,152 advertisers) had fewer than 1,000 impressions during the Proposed Class Period, while 9.5% (or 243,708 advertisers) had 1 million impressions or more.[25]

43.    Further, Proposed Class members also exhibit wide variation with respect to the total clicks received during the Proposed Class Period.  The total clicks received by advertisers in the Proposed Class ranges from 0 to almost ██████ during the Proposed Class Period.[26]  Among members of the Proposed Class, 32.1% of them (or 818,458 advertisers) had fewer than 50 clicks during the Proposed Class Period, while 6% of Proposed Class members (or 152,601 advertisers) had 10,000 clicks or more.[27]

### D.    Some Advertisers Are Also Publishers

44.    Some advertisers in the Proposed Class were also publishers that used Google's sell-side products and thus potentially benefited as publishers from the optimizations at issue.  Based on

---

members who did not pay for ads on a per-click basis ranges from $0 to more than $49 million.  *See* Appendix C.1. Consistent with Dr. Zona, I include 140 Proposed Class members with ad spend indistinguishable from zero.  *See* my workpapers.

[23] *See* Appendix C.1.

[24] This range is for all Proposed Class members based on Dr. Zona's data.  Meanwhile, for ads acquired by Proposed Class members in the Google Ads-AdSense pipeline, the total impressions range from 0 to more than ███████; for ads acquired by Proposed Class members in the Google Ads-AdX and third-party exchange pipelines, the total impressions range from 0 to more than ███████  Total impressions purchased by Proposed Class members who did not pay for ads on a per-click basis range from 0 to more than ██████.  *See* Appendix C.1.  Consistent with Dr. Zona, I include 22 Proposed Class members with zero impressions.  *See* my workpapers.

[25] *See* Appendix C.1.

[26] This range is for all Proposed Class members based on Dr. Zona's data.  Meanwhile, for ads acquired by Proposed Class members in the Google Ads-AdSense pipeline, total clicks received range from 0 to almost ██████; for ads acquired by Proposed Class members in the Google Ads-AdX and third-party exchange pipelines, total clicks received range from 0 to more than █████.  For Proposed Class members who did not pay for ads on a per-click basis, total clicks range from 0 to almost ██████.  *See* Appendix C.1.  Consistent with Dr. Zona, I include 2,860 Proposed Class members with zero clicks.  *See* my workpapers.

[27] *See* Appendix C.1.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the data, 3,836 advertisers, accounting for 10.3% of total ad spend in the Proposed Class, also sold impressions using AdX or AdSense during the Proposed Class Period.[28]  For example, as I discuss further below, Project Bernanke could increase the revenues received by publishers that transacted on AdX.[29]  Additionally, UPR helped ensure that publishers' impressions sold to advertisers with the highest bid, increasing publisher revenues and allowing impressions that would otherwise have gone unsold to sell on AdX.[30]  Individualized inquiries are necessary to first identify whether each advertiser in the Proposed Class had transactions as a publisher and thus benefited from the optimization, and further, whether such individual advertisers benefited on net from the product design.

45.    In sum, members of the Proposed Advertiser Class differ in numerous ways, including (1) presence during the Proposed Class Period, (2) transactions occurring on different inventory sources; (3) variation in display ad spend, impressions, and clicks; and (4) whether an advertiser is also a publisher.  An individualized inquiry is required along these various dimensions to ascertain whether and to what extent the alleged conduct impacted members of the Proposed Class.

## V.    NAMED PLAINTIFFS ARE DIFFERENTLY SITUATED FROM OTHER PROPOSED CLASS MEMBERS

46.    Advertiser Plaintiffs contend that "Plaintiffs' claims are typical of the claims of all class members" which "arise out of a common course of conduct" and that "Plaintiffs and all class members were and will continue to be damaged in the same manner by the same wrongful conduct."[31]  They further contend that "Plaintiffs will fairly and adequately protect and represent

---

[28] XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235); XPP-Daily data (GOOG-AT-MDL-DATA-000559277 to 000561030, GOOG-AT-MDL-DATA-000606113 to 000606341).  Publisher counts exclude publishers for whom ███████████████████████████████████ are all zero.

[29] *See* GOOG-DOJ-14952787, at -787 ("GDN [Google Display Network] wins more auctions and generates more revenue at the same average 14% revshare; GDN's advertisers win more auctions and get greater click/conversion volume; and AdX publishers enjoy higher match rate and revenue.").

[30] *See* Section VI.B.3.

[31] Advertiser Class Complaint, ¶342.

the interests of the class" and that their "interests are coincident with, and not antagonistic to, those of the class."[32]

47.    Dr. Zona refers to six Named Plaintiffs in his report.[33]  Of the Named Plaintiffs that seek to represent advertisers in Advertiser Plaintiffs' Proposed Class, I understand that there are only two remaining—Chris Hanson d/b/a Hanson Law Office and Cliffy Care Landscaping, Inc.[34]  I describe below that these Named Plaintiffs are differently situated from other members of the Proposed Class for at least the following reasons: (1) the Named Plaintiffs were not subject to all of the alleged anticompetitive conduct applicable to the Proposed Class they purport to represent, and (2) unlike certain Proposed Class members, none of the Named Plaintiffs can be identified as both an advertiser and a publisher.  Dr. Zona also includes Michael Stellman among the Named Plaintiffs, but I understand that Mr. Stellman seeks to represent advertisers in a separate class action complaint, which alleges anticompetitive harm from only a single product design, RPO.  Neither Dr. Zona nor Dr. Singer have put forward any methodology for the assessment of class-wide impact or damages related to RPO.

###### A.    Named Plaintiffs Hanson Law Office and Cliffy Care Landscaping Were Not Subject to All of the Alleged Anticompetitive Conduct Applicable to the Proposed Class They Purport to Represent

48.    Named Plaintiffs Hanson Law Office and Cliffy Care Landscaping were active only during a limited portion of the entire Proposed Class Period.[35]  During this period, Hanson Law Office only had ad impressions in 13 months between January 2016 and May 2017 (with 9 months of positive ad spend).[36]  Cliffy Care Landscaping only had ad impressions in 14 months

---

[32] Advertiser Class Complaint, ¶343.

[33] Zona Report, ¶32.

[34] As noted above, the five other Named Plaintiffs in the Advertiser Class Complaint—Vitor Lindo, Kinin, Inc., Raintree Medical and Chiropractic Center, LLC, and Rodrock Chiropractic PA—have voluntarily dismissed their cases since the Complaint was filed.  Advertiser Class Complaint, ¶¶14-32.  Dr. Zona does not identify Kinin, Inc. as a Named Plaintiff.  *See* Zona Report, ¶32.

[35] A Named Plaintiff is considered active in a given month if it had non-zero spend (*i.e.*, revenue) or impressions.

[36] Hanson Law Office had total ad spend of $1,164 during the Proposed Class Period.  XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).  "Hanson Law Office used Google as an Ad Tech Provider from March 28, 2015 until September 6, 2016. It used Google Ads from March 28, 2016 to September 6, 2016."  *See* Advertiser Class Plaintiffs' Further Responses and Objections to Defendants Google LLC and Alphabet Inc.'s First Set of Interrogatories, p. 8.  The entity was dissolved on June 4,

between November 2019 and May 2023 (with 13 months of positive ad spend).[37]  As discussed in Section IV.A above, Proposed Class members were subject to different alleged product designs, depending on when they transacted during the Proposed Class Period.  For instance, Hanson Law Office did not have ad impressions after May 2017 and thus was not subject to UPR.  Hanson Law Office was also not subject to Buy-Side DRS.[38]  Accordingly, Hanson Law Office was not subject to two of the four alleged optimizations.  Similarly, Cliffy Care Landscaping did not have ad impressions prior to November 2019, and as such was not subject to three of the four alleged optimizations: Buy-Side DRS, Project Bernanke, and Global Bernanke.[39]  By contrast, 42% of Proposed Class members (or 1,070,002 advertisers) had ad impressions between January 2013 and November 2019 and could have been subject to those optimizations.[40]

### B. None of the Named Plaintiffs Can Be Identified as Both a Publisher and an Advertiser

49.    In addition, none of the Named Plaintiffs can be identified as a publisher in Google's data.  As discussed above, 3,836 advertisers in the Proposed Class were also publishers during the Proposed Class Period.  This means advertisers in the Proposed Class that are also publishers are differently situated than the Named Plaintiffs.

---

2021.  *Id.* at 4.  Additionally, I note that roughly 98% of Hanson Law Office's Google Ads impressions were purchased via an agency.  XP Agency (GOOG-AT-MDL-DATA-000558890 to 000559276, GOOG-AT-MDL-DATA-000606053 to 000606112).

[37] Cliffy Care Landscaping had total ad spend of $1,257 during the Proposed Class Period.  XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).  "Cliffy Care Landscaping, Inc. used Google as an Ad Tech Provider from November 20, 2019 until the present.  It used Google Ads from November 20, 2019 until the present."  *See* Advertiser Class Plaintiffs' Further Responses and Objections to Defendants Google LLC and Alphabet Inc.'s First Set of Interrogatories, p. 9.  Dr. Zona states that "Cliffy Care Landscaping LLC purchased display and in-app advertising through Google Ads between September 2018 and the present."  *See* Zona Report, ¶32.  I note that this statement by Dr. Zona is inconsistent with these responses and with the data.  Additionally, I note that roughly 56% of Cliffy Care Landscaping's Google Ads impressions were purchased via an agency.  XP Agency (GOOG-AT-MDL-DATA-000558890 to 000559276, GOOG-AT-MDL-DATA-000606053 to 000606112).

[38] Hanson Law office did not have ad impressions prior to April 2015.  XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).

[39] Bernanke was deprecated following the introduction of UFPA in September 2019.  *See* Section VI.A.

[40] Buy-Side DRS was launched in January 2013.  *See* GOOG-DOJ-04306227, at -227.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

C.    **Named Plaintiff Stellman Challenges Only a Single Product Design and Advertiser Plaintiffs' Experts Put Forward No Methodology for the Assessment of Impact and Damages Resulting from That Particular Product Design**

50.    Named Plaintiff Michael Stellman had transactions in 6 months between January 2015 and September 2019, *i.e.*, during the class period alleged in the Stellman Complaint.[41]  However, this particular Named Plaintiffs' allegations relate to only a single product design, RPO.  Neither Dr. Zona nor Dr. Singer have put forward any methodology for the assessment of impact or damages related to RPO.  Thus, Advertiser Plaintiffs' experts have put forward no showing of common proof of economic injury resulting from RPO for Named Plaintiff Stellman and the advertisers he seeks to represent.  I further note that Dr. Singer provides no assessment of injury to putative class members for any portion of the class period alleged in the Stellman Complaint.  Dr. Singer "focus[es] only on the impact and damages associated with UPR" and his analysis is "limited to the post-September 2019 period."[42]

VI.    **EACH TYPE OF ALLEGED ANTICOMPETITIVE CONDUCT HAD DISPARATE EFFECTS ON MEMBERS OF THE PROPOSED CLASS SUCH THAT IMPACT CANNOT BE ESTABLISHED USING COMMON PROOF**

A.    **Injury to All or Nearly All Advertisers in Advertiser Plaintiffs' Proposed Class Due to Buy-Side DRS, Project Bernanke, and Global Bernanke Cannot Be Established Using Common Proof**

51.    Buy-Side DRS, Project Bernanke, and Global Bernanke are bidding optimizations within Google Ads, which adjusted Google Ads revenue share to improve Google Ads' buyers' chances of winning in AdX auctions on a per-auction basis.  Advertiser Plaintiffs allege that "Google manipulates auctions with its secret 'Bernanke' programs and technology to increase its take rate and then uses the resulting pool of ill-gotten gains to manipulate subsequent auctions, stifling competition in the exchange market and in the small-advertiser buying tools market."[43]  Advertiser Plaintiffs further allege that "advertisers paid Google—not publishers—an artificially

---

[41] The class period alleged in the Stellman Complaint is from January 1, 2015 to September 5, 2019.  *See* Stellman Complaint, ¶91.

[42] Singer Report, ¶4.

[43] Advertiser Class Complaint, ¶10.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

inflat[ed] take rate, and in fact were paying more than the publisher would have been willing to accept."[44]

52.      Dr. Zona, for the first time, alleges that, in addition to Project Bernanke (hereafter Bernanke), its precursor product design, known as Buy-Side DRS, was also anticompetitive.[45] He claims that Buy-Side DRS "achieved greater volume and revenue for both Google Ads and AdX" but "only by knowing the floor set by the publisher" which was not available to Google Ads' rivals.[46]  Dr. Zona further states that this feature "effectively subsidize[d], and therefore encourage[d], higher publisher floor-prices on AdX."[47]  With respect to Bernanke, as well as Global Bernanke, Dr. Zona claims that both "are anticompetitive, because they achieved their goals by impairing the ability of AdX's rivals to compete in the Ad Exchange Market and Google Ads' rivals to compete in the Self-service Open Web Display Advertising Market."[48]  According to Dr. Zona, "Google Ads employs Bernanke-type algorithms to modify its bids relative to the reserve price, effectively raising the marginal costs incurred by its rival bidders."[49]

53.      Dr. Zona's theory of impact on advertisers is based on the premise that Buy-Side DRS, Bernanke, and Global Bernanke (along with UPR, which I discuss below) inflated what he terms AdX's "win rate" and "market share," which he relates to advertisers paying higher prices for ad impressions and clicks.  While Dr. Zona's claims with respect to Buy-Side DRS, Bernanke, and Global Bernanke are limited to AdX,[50] he nevertheless purports to quantify damages resulting from these optimizations to Google Ads advertisers purchasing on AdSense and third-party exchanges as well as on AdX.[51]  In his assessment of impact on advertisers, Dr. Zona ignores any

---

[44] Advertiser Class Complaint, ¶218.

[45] Zona Report, ¶118 ("I have concluded that BS-DRS, Project Bernanke, Global Bernanke and the change to Unified Pricing Rules had a detrimental effect on competition in the relevant antitrust market for self-serve programmatic display advertising.").  Advertiser Plaintiffs do not discuss Buy-Side DRS in their Complaint.

[46] Zona Report, ¶71.

[47] Id.

[48] Zona Report, ¶104.

[49] Zona Report, ¶108.

[50] When discussing the alleged anticompetitive effects of these optimizations, Dr. Zona does not mention AdSense, let alone claim any effect on AdSense.  Zona Report, ¶¶70-74, 104-108.

[51] In Section VII, I describe Dr. Zona's proposed methodology and explain why it fails to demonstrate class-wide impact resulting from these optimizations to members of the Proposed Class.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

benefits from these optimizations to Proposed Class members.  Meanwhile, Dr. Singer does not assess impact or damages resulting from Buy-Side DRS, Bernanke, or Global Bernanke.

54.     By way of background, prior to Google's move to a Unified First Price Auction in September 2019, Google Ads submitted two bids into the AdX auction based on the outcome of an internal auction amongst its advertiser customers.[52]  Before Buy-Side DRS, the bids Google Ads would submit into the AdX auction were the top two advertiser bids from the internal Google Ads auction, net of Google Ads' revenue share.[53]

55.     In January 2013, Google launched a bidding optimization within Google Ads called Buy-Side DRS, which modified how Google Ads submitted bids to AdX in order to increase the number of impressions won by Google Ads advertisers.[54]  Instead of always submitting the top two advertiser bids net of its 14% buy-side revenue share, Buy-Side DRS adjusted the revenue share for the Google Ads' high bid to be as low as 0% for some impressions.  Thus, under Buy-Side DRS, Google Ads could send bids that were higher than they would have been absent the optimization.  Under Buy-Side DRS, Google Ads did not increase its revenue share on any impressions.[55]

56.     In November 2013, over two years before the start of the Proposed Class Period, Google replaced Buy-Side DRS with Project Bernanke, which modified the net bids submitted to AdX for certain impressions.[56]  Like Buy-Side DRS, Bernanke adjusted Google Ads' revenue share on a per-auction basis, but unlike Buy-Side DRS, Bernanke kept Google Ads' overall revenue share stable for each publisher.  Bernanke used multipliers to *both* increase Google Ads' high bid and decrease its low bid for certain AdX auctions in order to improve Google Ads advertisers'

---

[52] The higher of the two bids submitted by Google Ads (the "high bid") is "the maximum bid amount on behalf of the relevant advertiser" while the lower of the two bids (the "low bid") is the "the minimum price that Google [Ads] would pay if the high bid won the AdX auction."   GOOG-AT-MDL-008842383, Declaration of Nirmal Jayaram (Aug. 05, 2023) ("Jayaram Declaration"), ¶7.  For an overall description of this process, *see* Jayaram Declaration, ¶¶2-8.

[53] GOOG-DOJ-04306227, at -227.

[54] GOOG-DOJ-04306227, at -227.

[55] GOOG-DOJ-13605152, at -153; GOOG-DOJ-04306227, at -227.  Under Buy-Side DRS, Google Ads' overall revenue share was not maintained at 14% and was expected to drop from 14% to 13.4%.  *See* GOOG-DOJ-02854344, at -350 ("Adwords effective rev-share: 13.4% (control 14%)").  I also note that the initial launch excluded video ads and budget constrained advertisers.  *See* GOOG-DOJ-15717614, at -614.

[56] *See* GOOG-DOJ-07824949, tab "ref all 2013 launches," cell J214.

chances of winning in AdX auctions.[57]  This was, in fact, the rationale for Project Bernanke—in more competitive auctions, Google Ads would increase the high bid it submits to increase its advertisers' chances of winning (ultimately allowing Google Ads advertisers to "win more auctions and get greater click/conversion volume").[58]

57.    Google introduced a new version of Project Bernanke, Global Bernanke (also known as Bell v.1), in August 2015.[59]  Global Bernanke functioned similarly to Project Bernanke, still allowing Google Ads' revenue share to vary on a per-auction basis.  While Project Bernanke preserved Google Ads' average revenue share for each publisher, Global Bernanke maintained an overall target revenue share across all publishers, thereby allowing the revenue share to vary on a publisher-by-publisher basis.[60]  Accordingly, Google Ads could charge a higher revenue share when buying inventory from some publishers on AdX, and a lower revenue share when buying from other publishers on AdX.[61]  Google changed how Global Bernanke operated when Google transitioned AdX from a second-price auction to a first-price auction in September 2019.[62]

58.    Contrary to Dr. Zona's claims, any effects of Buy-Side DRS, Bernanke, and Global Bernanke could not have been common across members of Advertiser Plaintiffs' Proposed Class. First, Buy-Side DRS, Bernanke, and Global Bernanke did not apply to a substantial share of advertisers within the Proposed Class.  Even among advertisers that the optimizations applied to,

---

[57] Jayaram Declaration, ¶9.

[58] GOOG-DOJ-14952787, at -787 ("GDN [Google Display Network] wins more auctions and generates more revenue at the same average 14% revshare; GDN's advertisers win more auctions and get greater click/conversion volume; and AdX publishers enjoy higher match rate and revenue.").

[59] Jayaram Declaration, ¶10.  Advertiser Plaintiffs allege that Bell and Global Bernanke are separate iterations of Bernanke.  *See* Advertiser Class Complaint, ¶¶223-224.  But I understand Project Bell and Global Bernanke to be the same iteration of Bernanke.

[60] *See* GOOG-DOJ-15637938, at -938 ("Global Bernanke is an extension of project Bernanke in which GDN retains a 15% margin on AdX as a whole, while deviating from 15% on individual publishers.  This deviation is algorithmic, and is based on both the conversion rate on each publisher and the potential to win incremental queries and revenue on each publisher.  Competitive publishers where we have opportunities to win new queries over reserves or competition and publishers where incremental conversions come at a high conversion rate (conversion / queries) both are likely to see lower margins.").

[61] Jayaram Declaration, ¶¶9-10.

[62] Jayaram Declaration, ¶22.  Under the new version of Global Bernanke, called Alchemist, Google Ads only submitted one bid into the AdX auction.  Advertiser Plaintiffs do not allege that Alchemist was anticompetitive. Dr. Zona states that he finds "no evidence of a material effect on Google's win rate on AdX attributable to Alchemist."  Zona Report, ¶78.  Dr. Singer does not analyze Alchemist.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

they did not apply to all bids.[63]  Second, many advertisers as well as publishers benefited from the implementation of Buy-Side DRS, Bernanke, and Global Bernanke, which is consistent with the arguments and documentary evidence that Dr. Zona and Dr. Singer themselves present.  As a result, members of the Proposed Class were affected by Buy-Side DRS, Bernanke, and Global Bernanke in disparate ways, with some benefiting and some not being harmed, such that an individualized inquiry is required to assess which members were injured.

### 1.    Buy-Side DRS, Project Bernanke, and Global Bernanke Did Not Apply to a Substantial Share of Advertisers Within Advertiser Plaintiffs' Proposed Class

59.     Members of the Proposed Class could only be subject to Buy-Side DRS, Bernanke, or Global Bernanke if they used Google Ads to place a bid on AdX while the optimization was active and if their bids were in fact adjusted by the optimization.

60.     Buy-Side DRS launched in January 2013 and ended when Bernanke launched in November 2013; thus Buy-Side DRS was not active during the Proposed Class Period.  Even looking at the time period when Buy-Side DRS was active (which is prior to the Proposed Class Period), 2,386,866 advertisers or 94% of Proposed Class members did not acquire ad inventory between January 2013 and November 2013 and thus could not have been subject to Buy-Side DRS.[64]

61.     Bernanke launched in November 2013, before being deprecated by Global Bernanke in August 2015.  Looking at the time period when Bernanke was active (prior to the Proposed Class Period), 2,291,240 advertisers or 90% of the Proposed Class members did not acquire ad

---

[63] For example, Global Bernanke was turned off under an optimization called Bell v.2 for publishers that were identified as submitting multiple ad requests to the same advertiser for the same impression (multi-calling) through AdX.  Bell v.2 was launched in 2016 on Google Ads to address the issue of publishers multi-calling AdX.  GOOG-DOJ-10924698, at -698; GOOG-DOJ-AT-02471119, at -119 ("Turn off Bernanke on mediating domains on AdX"); GOOG-DOJ-09875989, at -6009 ("Treatment 1: turn off Bernanke").  Dr. Zona "found no incremental win rate effect solely attributable to this feature of Project Bernanke."  Zona Report, ¶75.  The initial launch of Buy-Side DRS excluded video ads and budget constrained advertisers.  *See* GOOG-DOJ-15717614, at -614.

[64] I note that to the extent advertisers placed bids that were adjusted by the optimization but the advertiser never won any impressions during the period the optimization was active (and therefore is not observed in the data), the optimization would not have affected the advertiser because the outcome of all such auctions would have remained unchanged; *i.e.*, the advertiser would have lost the auctions with or without the optimization.  This is the case for each Google Ads bidding optimization (*i.e.*, Buy-Side DRS, Bernanke, and Global Bernanke).  XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).

inventory between November 2013 and August 2015, and thus could not have been subject to Bernanke.[65]

62.     Global Bernanke launched in August 2015, again before the start of the Proposed Class Period, and ended in September 2019.  1,526,593 advertisers or 60% of Proposed Class members did not acquire ad inventory between August 2015 and September 2019 and thus could not have been subject to Global Bernanke.[66]

63.     Overall, 1,504,812, or 59% of members of the Proposed Class did not acquire any ad inventory between January 2013 (introduction of Buy-Side DRS) and September 2019 (discontinuation of Global Bernanke).[67]  These advertisers could not have been subject to any of Buy-Side DRS, Bernanke, or Global Bernanke optimizations (*see* **Exhibit 2**).

**EXHIBIT 2: PROPOSED CLASS MEMBERS THAT DID NOT BUY AD INVENTORY DURING BUY-SIDE DRS, BERNANKE, AND GLOBAL BERNANKE**

|  | Buy-Side DRS (Jan 2013 – Nov 2013) | Bernanke (Nov 2013 – Aug 2015) | Global Bernanke (Aug 2015 – Sept 2019) | All Three Optimizations (Jan 2013 – Sept 2019) |
|---|---|---|---|---|
| Proposed Class members not present during the optimization | 94% | 90% | 60% | 59% |

*Notes:*
　　　Includes Open Auctions only.  All date ranges are inclusive.  Percentages are based on counts of advertisers with impressions or ad spend in the Proposed Class Period.

*Source:*
　　　XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).

64.     Even among Proposed Class members who did acquire ad impressions from AdX auctions when any of these optimizations were active, the advertiser's bids might not have been optimized by Buy-Side DRS, Bernanke, or Global Bernanke as these optimizations did not apply

---

[65] XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).

[66] I also note that 1,532,371 advertisers or 60% of Proposed Class members did not acquire ad inventory between January 2016 (the beginning of the Proposed Class Period) and September 2019 and thus were not subject to Global Bernanke during the Proposed Class Period.  XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).

[67] XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

to all bids.[68]  Hence, an individualized inquiry into each advertiser's bidding records in each auction is required to reliably determine whether a Proposed Class member was affected by the optimization.  I am not aware of any data that would allow me to identify each member within the Proposed Class who placed a Buy-Side DRS, Bernanke, or Global Bernanke-optimized bid, nor do Advertiser Plaintiffs or Dr. Zona claim to identify these advertisers.[69]  Even among advertisers that were affected, an individualized inquiry is required to determine whether such advertisers were adversely impacted by or benefited from the optimizations at issue.

### 2.    Some Advertisers That Were Subject to Buy-Side DRS, Bernanke, and Global Bernanke Benefited from the Optimizations

65.    Buy-Side DRS, Bernanke, and Global Bernanke benefited at least some Proposed Class members and each optimization's effect varied auction-by-auction and advertiser-by-advertiser during the Proposed Class Period.

66.    As described above, Buy-Side DRS adjusted multipliers affecting Google Ads' revenue share for its high bid to increase the competitiveness of Google Ads advertisers' bids in AdX auctions.  Similarly, Bernanke and Global Bernanke adjusted multipliers affecting Google Ads' revenue share for both its high and low bids.  With these optimizations, some advertisers were better off, at least in certain auctions, than they would be absent these features.[70]  For impressions that an advertiser would have won *without* Buy-Side DRS, Project Bernanke, or Global Bernanke, the advertiser paid the same amount as it would have paid absent these optimizations.[71]  On the incremental impressions, if any, that the advertiser won *because of* Buy-

---

[68] *See* fn. 63.

[69] Buy-Side DRS, Bernanke, and Global Bernanke did not apply to every bid sent into AdX, thus exacerbating the need for an individualized inquiry into each advertiser member's records.

[70] For example,

[71] GOOG-DOJ-13605152 at -153; GOOG-DOJ-02854344, at -349; Jayaram Declaration, ¶9 ("Bernanke did not change the manner in which the amount an advertiser paid Google Ads was determined.").

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Side DRS, Project Bernanke, or Global Bernanke, it paid no more than its bid.[72]  Therefore, as long as the advertiser paid less than its valuation of the impressions, winning additional impressions makes the advertiser strictly better off.[73]  I also note that publishers were also made better off if an impression would not have been sold absent these optimizations (*e.g.*, when no bids would have cleared a publisher's floor prices).  Even if an impression would have been sold absent these optimizations, they could still be better off in certain cases.[74]  Because Buy-Side DRS, Project Bernanke, and Global Bernanke benefited at least some publishers selling inventory on AdX (through more impressions sold and higher revenue), a Proposed Class member that is also a publisher could therefore benefit from these optimizations.  Dr. Zona fails to consider such a benefit for any members of the Proposed Class.

67.    Dr. Zona appears to understand the benefits of Buy-Side DRS, Bernanke, and Global Bernanke to advertisers and publishers.  Dr. Zona states that "[u]nder the BS-DRS, Google can deliver a buyer for space that otherwise would have gone unfilled or to win an auction that would have cleared on a rival exchange on which the publisher set a lower floor than on AdX."[75]  Dr. Zona further states, quoting a Google document, that "[s]hortly after its launch, Google engineers observed that 'Bernanke results in higher revenue, publisher payout, **advertiser conversion volume**, and profit,' increasing 'GDN [Google Ads'] advertiser conversion volume [by] +10.8%.'"[76]

68.    Moreover, under Global Bernanke, the Google Ads revenue share target was maintained across all publishers but varied on a publisher-by-publisher basis.  Global Bernanke resulted in

---

[72] Until April 2016, Google Ads advertisers paid their bids for incremental queries they won due to Buy-Side DRS, Project Bernanke, or Global Bernanke.  Starting in April 2016, some advertisers paid the lowest value they could have bid while still winning the impression, but no more than their actual bid.  GOOG-DOJ-AT-02467209, at -209, GOOG-DOJ-15730729, at -729.

[73] Additionally, I understand from Professor Milgrom that the optimizations increased advertiser surplus for most Google Ads advertisers, even accounting for likely reactions by publishers and advertisers.  *See* Expert Report of Paul R. Milgrom, Dec. 13, 2024 ("Milgrom Report"), §IV.C.2.

[74] The publisher could be made better off when a Proposed Class member won the impression with the help of these optimizations but would have lost to an advertiser bidding through *non-Google Ads* without these optimizations.  This is because the only reason a Proposed Class member won the impression over an advertiser on non-Google Ads is that the optimization *increased* the Google Ads advertiser's adjusted bid above the would-have-won bid from a non-Google Ads advertiser.

[75] Zona Report, ¶70.

[76] Zona Report, ¶73 (emphasis added).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

heterogeneous treatment of publishers based on the quality of conversion opportunities associated with their inventory.[77]  Publishers that had inventory less likely to lead to a conversion received a different bid adjustment via Global Bernanke than publishers with inventory more likely to lead to a conversion.  How publishers were affected under Global Bernanke is relevant to the Proposed Class members because determining the effect of Global Bernanke on individual advertisers would also require an inquiry into all publishers with whom they have transacted.

69.     Further, advertisers may have responded to Buy-Side DRS, Bernanke, and Global Bernanke by changing their behavior.  For example, Proposed Class members may have reduced their bids to take advantage of the optimizations and still won more impressions and therefore, achieved more surplus.[78]  Holding their budgets fixed, this would allow advertisers to bid in more auctions.  Whether an advertiser had the sophistication or investment in in-house or third-party optimization tools to respond in such an economically rational fashion requires an individualized inquiry.

70.     Dr. Zona opines that "selective discounting effectively subsidizes, and therefore encourages, higher publisher floor-prices on AdX."[79]  This implies that publishers could also react to incentives arising from these optimizations.  To the extent some publishers could and have indeed leveraged these optimizations to their benefit (say, to increase their revenue), it implies that advertisers that are also publishers *could* have obtained further benefits from these optimizations (and could have benefited on net).[80]  Because only some Proposed Class members are publishers and not all publishers necessarily strategically leveraged these optimizations, this

---

[77] GOOG-DOJ-15637938, at -938 ("Global Bernanke is an extension of project Bernanke in which GDN retains a 15% margin on AdX as a whole, while deviating from 15% on individual publishers.  This deviation is algorithmic, and is based on both the conversion rate on each publisher and the potential to win incremental queries and revenue on each publisher.  Competitive publishers where we have opportunities to win new queries over reserves or competition and publishers where incremental conversions come at a high conversion rate (conversion / queries) both are likely to see lower margins.").

[78] To see this, as noted above, until April 2016, Google Ads advertisers paid their bids for incremental queries they won due to Buy-Side DRS, Project Bernanke, or Global Bernanke.  *See* fn. 72.  This implies that these advertisers had the incentive to reduce their bids while still being able to win impressions.  *See* Milgrom Report, §IV.C.2.

[79] Zona Report, ¶71.

[80] Additionally, benefits to publishers could in turn provide advertisers with indirect benefits as there would be more potential sellers of ad inventory.  This could result in higher ad inventory quality, more publisher ad formats offered, and better matches for advertisers.  Dr. Zona fails to consider such bidirectional indirect network effects that could result in benefits to the platform as a whole, including to Proposed Class members.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

is yet another reason why an assessment of the effects of the product designs requires an individual inquiry.[81]

71.     According to an internal Google document, in the aggregate as a result of Project Bernanke, "GDN's advertisers win more auctions and get greater click/conversion volume; and AdX publishers enjoy higher match rate and revenue."[82]  For Global Bernanke, an internal Google document states that "[b]y removing the fixed publisher margin constraint we can increase the conversion volume for advertisers . . . . [W]e feel that overall this is a very good change for the network - particularly for our advertisers."[83]

72.     As such, advertisers benefited from Buy-Side DRS, Bernanke, and Global Bernanke, at least in certain auctions.  This means there are no common adverse effects on advertisers from these optimizations.  An individualized inquiry is therefore required into these optimizations' effects on individual Proposed Class members.

> **3.      Empirical Evidence Indicates that There Were Disparate Price Effects Across Advertisers Following Buy-Side DRS, Bernanke, and Global Bernanke, which is Consistent with Economic Conflicts Among Proposed Class Members and Lack of Common Impact Resulting from the Optimizations**

73.     Empirical evidence is consistent with my discussion above that the effect of Buy-Side DRS, Bernanke, and Global Bernanke varied auction-by-auction and advertiser-by-advertiser.

74.     Starting with Buy-Side DRS, **Exhibit 3** illustrates substantial differences in ad prices (as measured by CPC) among Proposed Class members for their Google Ads transactions on AdX during three months before and three months after the introduction of Buy-Side DRS.  The results show that 70% of advertisers bidding through Google Ads on AdX paid less per click for impressions acquired post Buy-Side DRS as compared to pre Buy-Side DRS.  Accepting Dr.

---

[81] Dr. Singer also noted the benefits of Buy-Side DRS for publishers: "Google's own experiments, which varied the buy-side fees between the 'baseline' (14 percent), 'conservative' (5 percent) and 'aggressive' (zero) levels, revealed that DRS increased its own profits from AdX auctions by three to five percent. Google indicated that **the revenue lift split evenly between itself and AdX publishers**." Singer Report, ¶186 (emphasis added).

[82] GOOG-DOJ-14952787, at -787.

[83] GOOG-DOJ-04320717, at -717-718.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Zona's argument that a higher nominal cost per click constitutes harm, these results are consistent with the proposition that some advertisers were better off because of Buy-Side DRS.

**EXHIBIT 3: CHANGE IN PRICE (CPC) PAID BY GOOGLE ADS ADVERTISERS ON ADX BEFORE AND AFTER THE LAUNCH OF BUY-SIDE DRS**

October 2012 – April 2013



*Notes:*

Includes transactions on AdX during 3-month periods before and after Buy-Side DRS was implemented, excluding the introduction month. I obtain similar results with the inclusion of the introduction month in the before period and in the after period. Limited to Proposed Class members with positive spend on Google Ads to AdX in the before and after periods. Advertisers are identified using the combination of ▮▮▮▮▮▮▮▮

*Source:*

XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).

75.     Turning to Bernanke, **Exhibit 4** illustrates substantial differences in ad prices (as measured by CPC) among Proposed Class members for their Google Ads transactions on AdX during three months before and three months after the introduction of Project Bernanke. The results show that 54% of advertisers bidding through Google Ads on AdX paid less per click for impressions acquired post-Bernanke as compared to pre-Bernanke. Again, accepting Dr. Zona's argument that a higher nominal cost per click constitutes harm, these results are consistent with the proposition that some advertisers were better off because of Bernanke.

**EXHIBIT 4: CHANGE IN PRICE (CPC) PAID BY GOOGLE ADS ADVERTISERS ON ADX BEFORE AND AFTER THE LAUNCH OF PROJECT BERNANKE**



August 2013 – February 2014

*Notes:*

> Includes transactions on AdX during 3-month periods before and after Project Bernanke was implemented, excluding the introduction month. I obtain similar results with the inclusion of the introduction month in the before period and in the after period. Limited to Proposed Class members with positive spend on Google Ads to AdX in the before and after periods. Advertisers are identified using the combination of ███████████████████
> ██████

*Source:*

> XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).

76.    Finally, **Exhibit 5** depicts the distribution of the percentage change in ad prices (as measured by CPC) among Proposed Class members for their Google Ads transactions on AdX during three months before and three months after the introduction of Global Bernanke. The results show that almost 50% of advertisers bidding through Google Ads on AdX paid less per click for impressions acquired post-Global Bernanke relative to pre-Global Bernanke. Again, accepting Dr. Zona's argument that a higher nominal cost per click constitutes harm, these results are consistent with the proposition that some advertisers were better off because of Global Bernanke.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 5: CHANGE IN PRICE (CPC) PAID BY GOOGLE ADS ADVERTISERS ON ADX BEFORE AND AFTER THE LAUNCH OF GLOBAL BERNANKE**



May 2015 – November 2015

*Notes:*

Includes transactions on AdX during 3-month periods before and after Global Bernanke was implemented, excluding the introduction month.  I obtain similar results with the inclusion of the introduction month in the before period and in the after period.  Limited to Proposed Class members with positive spend on Google Ads to AdX in the before and after periods.  Advertisers are identified using the combination of ███████

*Source:*

XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).

> **B.    Injury to All or Nearly All Advertisers in Advertiser Plaintiffs' Proposed Class Due to Unified Pricing Rules Cannot Be Established Using Common Proof**

77.    UPR refers to a feature allowing publishers to manage and configure floor prices that apply equally to all buyers (*i.e.*, exchanges and other demand sources) participating in Google's Unified First Price Auction (UFPA).  According to the Advertiser Class Complaint, "[t]hrough its DFP ad server, Google unlawfully forecloses competition in the exchange market and buying tool markets through Unified Pricing Rules first imposed on publishers in 2019."[84]  Advertiser Plaintiffs allege that as a result of UPR, publishers were forced to "set the same price floor for

---

[84] Advertiser Class Complaint, ¶254.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

different exchanges and the same price floor for different buyers."[85]  Further, Advertiser Plaintiffs allege that "[a]dvertisers were harmed because the higher volume of commerce on Google's exchange and through its ad-buying tools that resulted from these restraints reduced their choices in the ad-buying tool and exchange markets and caused them to pay more to place ads through Google."[86]

78.    Both Dr. Zona and Dr. Singer generally reiterate these claims.[87]  Dr. Zona claims that "UPR prevented the floor variation between AdX and its rivals," thereby "increasing Google's AdX win rate."[88]  While acknowledging that "[p]ublishers might have 'gained' the convenience of having to set a single reserve price for all sources of demand" he opines that "publishers objected to UPR" and "DFP publishers were no longer able to freely price their inventory."[89]  As a result, Dr. Zona opines that "UPR interferes with [publishers'] ability to competitively respond to changes in competitive conditions"[90] by "abrogating the only competitive lever available to publishers to react to relatively higher costs of selling display impressions through Google compared to alternative, less costly demand sources."[91]  Dr. Zona's theory of harm is based on the premise that UPR (along with other optimizations) inflated AdX's win rate and market share, which he relates to advertisers paying higher prices for ad impressions and clicks.  While Dr. Zona's claims with respect to UPR are limited to AdX,[92] he nevertheless purports to quantify damages resulting from UPR for Google Ads advertisers purchasing on AdSense as well as on

---

[85] Advertiser Class Complaint, ¶258.

[86] Advertiser Class Complaint, ¶266.

[87] Dr. Singer does not consider harm to the alleged ad-buying tool market.  Singer Report, ¶67 ("I focus my proof of common impact on the harms felt by advertisers using Google Ads in the Ad Exchange Market, setting aside potential harms in the related Self-Service Ad-Buying Tools Market.").

[88] Zona Report, ¶87.

[89] Zona Report, ¶86.

[90] Zona Report, ¶110.

[91] Zona Report, ¶114.

[92] When discussing the alleged anticompetitive effect of UPR, Dr. Zona does not mention AdSense, let alone claim any effect on AdSense.  Zona Report, ¶¶85-87, 109-115.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

AdX.[93]  In his assessment of impact on advertisers, Dr. Zona ignores any benefits of UPR on Proposed Class members.

79.    Dr. Singer similarly claims that "UPR restrictions prevented publishers from offering their ad space via a rival ad exchange at a price floor lower than the floor given to Google's ad exchange, AdX."[94]  He claims price floors on AdX were generally higher than on rival exchanges because "[p]rior to UPR, publishers implemented lower price floors on rival exchanges, at least in part to encourage competition among ad exchanges and to evade Google's relatively high take rate."[95]  Dr. Singer opines that the primary effect of UPR was to increase the number of impressions sold on AdX by preventing inventory from being offered on rival exchanges more cheaply than on AdX.[96]  He also opines that "Google implemented UPR to eliminate pricing pressure from Open Bidding."[97]  Dr. Singer proposes two distinct methods to assess the impact of UPR on Proposed Class members,[98] premised on the idea that absent UPR, Google instead would have chosen to lower its revenue share in order to regain the "artificial lift" in impressions or impression revenue it allegedly gained through UPR.[99]  In either case, Dr. Singer also completely ignores any benefits of UPR on Proposed Class members.

80.    By way of background, Google first introduced UPR in May 2019 as an "open beta" for publishers, and fully implemented UPR in September 2019 along with Google's transition to a UFPA.[100]  UPR created the functionality in DFP through which publishers could set a single pricing floor that applied to all ad exchanges and buying tools, including AdX, third-party ad exchanges participating in Open Bidding, and other exchanges including those participating in

---

[93] In Section VII, I describe Dr. Zona's proposed methodology and explain why it fails to demonstrate class-wide impact resulting from UPR to members of the Proposed Class.

[94] Singer Report, ¶67.

[95] Singer Report, ¶70.

[96] Singer Report, ¶¶9, 12, 65, 68.

[97] Singer Report, §II.B, ¶¶73-75.

[98] I note that UPR is the only product feature for which Dr. Singer assesses impact and damages to members of the Proposed Class.  Singer Report, ¶4.

[99] Singer Report, ¶¶9, 12, 76.  In Section VIII, I describe Dr. Singer's proposed methodology and explain why it fails to demonstrate class-wide impact resulting from UPR to members of the Proposed Class.

[100] GOOG-DOJ-09714662, at -663.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

header bidding that compete as remnant line items.[101]  Though publishers could not set differential prices for ad exchanges in the UFPA under UPR, publishers could configure up to 200 different floor prices for different advertisers, brands, inventory types, and ad sizes, among others.[102]

81.      I describe in this section that Dr. Zona's and Dr. Singer's claims of class-wide impact resulting from UPR ignore that (1) UPR was not imposed on advertisers and could have only affected a limited number of publishers (and only certain auctions of those publishers' inventory), and (2) some advertisers benefited from UPR.  Moreover, documentary evidence suggests that some publishers viewed UPR favorably, further benefiting the platform and advertisers that are also publishers.  This renders Dr. Zona's and Dr. Singer's conclusions unreliable.  Finally, I explain that Dr. Singer fundamentally misunderstands how ad auctions and price floors work, further rendering his conclusions on harm to Proposed Class members due to UPR unreliable.

### 1.      UPR Was Not Imposed on Advertisers and Could Have Only Affected a Limited Number of Publishers

82.      As an initial matter, advertisers were not directly subject to UPR because UPR was a product design facing publishers, and specifically only publishers using DFP to manage

---

[101] GOOG-DOJ-09714662, at -665 ("Unified Pricing rules will not support the following functionalities that were present in Open Auction pricing rules: Buyer-specific floors: ability to set different floors for different buyers/bidders for a given inventory targeting […] publishers will still be able to: Set per-advertiser floors in Unified Pricing rules"); Bigler, Jason. "An update on first price auctions for Google Ad Manager." *Google Ad Manager Blog*, May 10, 2019, available at https://blog.google/products/admanager/update-first-price-auctions-google-ad-manager/ ("To maintain a fair and transparent auction, these rules will be applied to all partners equally, and cannot be set for individual buying platforms."); GOOG-AT-MDL-008842393, Declaration of Nitish Korula (Aug. 04, 2023) ("Korula Declaration"), ¶40 ("Before Google implemented Unified Pricing Rules …. publishers were unable to use the Google Ad Manager user interface to set pricing floors for Open Bidding partners and other indirect sources of demand trafficked through non-guaranteed line items.").

[102] *See* Cox, Sam. "Simplifying programmatic: first price auctions for Google Ad Manager." *Google Ad Manager Blog*, Mar. 6, 2019, available at https://blog.google/products/admanager/simplifying-programmatic-first-price-auctions-google-ad-manager/; Bigler, Jason. "An update on first price auctions for Google Ad Manager." *Google Ad Manager Blog*, May 10, 2019, available at https://blog.google/products/admanager/update-first-price-auctions-google-ad-manager/; "Unified Pricing Rules," *Google Ad Manager Help*, available at https://support.google.com/admanager/answer/9298008?hl=en; Korula Declaration, ¶43.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

indirectly sold impressions.  At least 16.4% of Proposed Class members could not have been affected by UPR.[103]  Specifically,

- Advertisers using Google Ads that stopped purchasing impressions before UPR was first introduced in May 2019 could not have been affected by UPR.  There are 419,141 (or 16.4% of the roughly 2.55 million advertisers in the Proposed Class) in this group.[104]

- Even after UPR was first introduced in May 2019, advertisers that only bid into auctions of publishers that were unaffected by UPR could not have been impacted by UPR.  Groups of publishers not affected by UPR include:

    (1) publishers that sold impressions through AdX but did not use DFP to access AdX from May 2019 onwards (as these publishers would not be subject to UPR by definition).

    (2) publishers that sold impressions through third-party exchanges but did not use DFP from May 2019 onwards.[105]  I note that Google's data do not indicate whether advertisers using Google Ads purchased impressions via third-party exchanges from publishers using DFP, and therefore an individualized inquiry is required to establish whether the impressions purchased by Proposed Class members could have been impacted to UPR.

    (3) publishers that would not set different price floors absent UPR would not be affected by the product design.  Put differently, UPR cannot have been a

---

[103] I note that Dr. Singer and Dr. Zona assess impact on a non-overlapping set of Proposed Class members and identify distinct class members differently.  Specifically, Dr. Zona identifies individual advertisers based on the combination of three identification fields (Parent, Company, and Division IDs), while Dr. Singer relies only on a single field (Parent ID).  Though this difference changes the exact number of advertisers, the difference is immaterial to my opinions.  Dr. Zona also considers Google Ads advertisers that—consistent with the definition of the Proposed Class—purchased display ads since January 2016 irrespective of the sell-side platform, while Dr. Singer considers only the Google Ads-AdX pipeline since September 2019.  I consider the Proposed Class as defined by Dr. Zona.

[104] XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235).

[105] Dr. Zona attributes damages resulting from UPR to Google Ads advertisers that purchased ads via third-party exchanges.  Zona Report, Table 5, ¶138.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

binding constraint (*i.e.*, an actual restraint) on publishers who would *not* have set different price floors when given the option.  Indeed, documentary evidence suggests that many publishers had a favorable or neutral view of UPR.[106]  This would not be the case if all publishers were "restrained" by UPR.  In fact, Dr. Singer acknowledges that setting and managing price floors can be costly, suggesting that not every publisher would have the incentive or the resources to implement differential price floors.[107]

83.     Notably, neither Dr. Singer nor Dr. Zona provides any evidence as to the scope of publishers, and in turn the advertisers they transacted with, affected by UPR.  They do not identify any publishers that either set different price floors pre-UPR or would have set different price floors post-UPR (had UPR not been introduced), let alone provide any quantitative evidence of how many publishers were constrained by the product design.[108]

---

[106] Record evidence shows that, among the publishers that were subject to UPR, many had a favorable or neutral view of UPR in conflict with the apparent views of News Corp.  According to a survey conducted in 2020, 30% of the publishers that used GAM viewed UPR as having a positive effect on their business, and only 4% of the publishers viewed UPR as having a negative effect.  GOOG-DOJ-AT-00608572, at -577.  Moreover,

GOOG-DOJ-03229061, tab "LPS AMS Feedback UPR"; GOOG-DOJ-13499785, at -788 (listing, in notes from May 2019 third-party feedback session, that a "

GOOG-DOJ-03229061, tab "LPS AMS Feedback UPR."

[107] Singer Report, ¶64 ("I understand that publishers invested substantial funds in creating and maintaining such price floors.").

[108] Dr. Singer argues that publishers set different price floors for several reasons including "steering," which I discuss further below.  He similarly fails to provide any qualitative or quantitative evidence as to how many publishers set different price floors for any of these reasons.  *See* Singer Report, ¶66.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

84.    Moreover, even if a publisher would have set different price floors for certain demand sources in *some* auctions absent UPR, it does not mean the publisher would have set different price floors in *all* auctions for their inventory.  And even in auctions where a publisher would have set different price floors for particular demand sources, whether the price floors influenced the winning bid or the price paid for a given impression would vary on a per-auction basis, depending on the competitive dynamics for that auction, such as the demand sources that submitted bids for the impression, the specific price floors the publisher set for each demand source, and the extent of competition for the impression within and across each demand source.[109]  For example, for an impression to be sold on AdX that would have, absent UPR, been sold on another exchange requires a counterfactual in which (i) the publisher would have set a higher price floor on AdX as compared to other exchanges for that impression, (ii) the rival exchange would have won the auction, and (iii) the highest bid via AdX was below the AdX floor but above the winning bid on the rival exchange.[110]

85.    Instead of assessing whether all advertisers were affected by UPR, Dr. Singer claims that he is "not aware of any limitations on UPR" and that publishers "routinely" set higher price floors for AdX.[111]  He has no basis for this claim.[112]  I am not aware of any data that systematically tracks the price floor setting strategy of publishers.  Thus, an individualized inquiry is required to assess which publishers were unconstrained by UPR, which advertisers in the Proposed Class transacted with those publishers, and whether the winning bid or price paid for a given impression was ultimately affected by UPR.  Moreover, as I explain below, even

---

[109] For example, if a publisher set a $1 floor on AdX and no price floor on a non-Google exchange, and the highest net bids on these two exchanges were $2 and $3, respectively, the price floors are not binding and would have no effect on the winning bid.

[110] If the highest bid via AdX did not exceed the highest bid on the rival exchange, UPR could not have influenced the allocation of the impression—the impression would still be rewarded to the rival exchange.

[111] Singer Report, ¶¶72, 78.  Dr. Singer also ignores the fact that documentary evidence suggests that many publishers had a favorable or neutral view of UPR.  *See* fn. 106.

[112] To the extent that Dr. Singer's claim that publishers "routinely" set higher floors on AdX is related to publishers' incentive to send AdX a floor based on an inflated header bidding bid (referred to in some Google documents as "boost", *see, e.g.*, GOOG-DOJ-11406673, at -677) and/or because of incentives related to AdX running a second-price auction (*e.g.*, because advertisers pay the higher of the price floor or the second-highest bid in a second-price auction, publishers may set price floors in an attempt to get advertisers to pay closer to the highest bid), I note under UFPA such rationale for setting differential price floors were no longer relevant.  Indeed, I also understand from Professor Milgrom that UFPA eliminated an important rationale for setting differential pricing.  *See* Milgrom Report, §XIV.E.2.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

among advertisers that were affected, an individualized inquiry is required to determine whether such advertisers were adversely impacted by or benefited from the optimization at issue.

## 2.     Dr. Singer's Anti-Steering-Based Theory of Harm is Based Upon a Fundamental Misunderstanding of How Ad Auctions Work

86.     Dr. Singer likens UPR to a most-favored-nation ("MFN") clause and characterizes UPR as an anti-steering scheme.  Dr. Singer opines that "Google's UPR … prevented publishers from setting higher price floors on AdX or lower price floors on rival ad exchanges, as a means of steering traffic towards the lower-cost exchanges."[113]  He explains publishers' incentive to "steer" as follows:

> … if a third-party exchange offered a lower take rate than AdX, the publisher could earn higher revenues from a lower bid.  For example, if the highest bid from AdX were $2.00 with a 20 percent take rate, the publisher would garner $1.60 from the auction.  If the rival exchange bid were $1.90 with a 15 percent take rate, the publisher would get $1.615.[114]

87.     Dr. Singer's discussion conveys a fundamental misunderstanding of how first-price ad auctions work.  Bidders in an ad auction compete for impressions based on the bid *net of* the revenue share kept by intermediaries mediating the transaction, *e.g.*, the exchange platform.  In Dr. Singer's example, the rival exchange's $1.615 net bid (net of the hypothetically lower revenue share on the rival exchange) would always win over the lower $1.6 net bid from AdX (net of the allegedly higher revenue share on AdX).  Regardless of whether the publisher set a price floor for AdX higher than, lower than, or equal to the price floor for the rival exchange, as long as the price floor is below the highest bid, the outcome of the auction remains the same— the publisher would receive the $1.615 net bid from the rival exchange.[115]  Dr. Singer's claims are rooted in his misunderstanding that *gross* bids compete in these auctions.[116]

---

[113] Singer Report, ¶177.  *See also,* Singer Report, ¶¶72, 78.

[114] Singer Report, ¶66.

[115] For instance, setting a floor of say $1.605 on AdX and a lower floor for the rival exchange would result in the AdX bid being filtered out of the auction, but regardless of whether the bid is filtered out because it does not exceed the floor price, the rival exchange would always win the impression.

[116] Dr. Singer also mistakenly analogizes these auction-based transactions to credit card transactions.  He states that "[a] classic example would be a credit card preventing merchants from steering shoppers to lower-cost credit cards or

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

88.     Further, even if a publisher may have an incentive to steer for any (other) reasons that Dr. Singer proffers,[117] Dr. Singer cannot rule out that some publishers may in fact have the incentive to steer transactions *toward,* instead of *away from* AdX (for example, by setting a lower price floor on AdX).[118]  Dr. Singer presents no evidence that all or most publishers would always steer away from AdX when given the option to do so.  If Dr. Singer's theory were correct (and as I explained above, it is not), UPR could have benefited rival exchanges by reducing steering *towards* AdX by some publishers.  Moreover, Dr. Singer fails to recognize that if UPR prevented steering away from AdX, advertisers who bought only on AdX could not have been harmed by UPR, and in fact could have benefited.  Ambiguous effects of UPR on publishers means that the effects of UPR on Proposed Class members are similarly ambiguous and individualized, as I explain below.

### 3.     Dr. Zona and Dr. Singer Ignore that Some Advertisers Benefited from UPR

89.     Documentary evidence suggests that advertisers benefited from UPR because it allowed advertisers on AdX to buy more impressions at lower prices, reduced self-competition, and promoted simplicity and transparency.  Moreover, these effects varied not only advertiser-by-advertiser, but also auction-by-auction.  Dr. Singer and Dr. Zona both completely ignore these benefits.

---

alternative forms of payment.  If a merchant could induce a shopper to use an alternative credit card that charged (say) two percentage points less than the high-cost platform, then on every $100 of purchases, the merchant would save $2, a portion of which could be shared with the customer as an inducement to use the lower-cost card."  Singer Report, ¶69.  According to Dr. Singer, a publisher would *first* receive the total amount the winning advertiser pays ($100 in his analogy) and *then* the publisher would pay the ad exchange the revenue share.  Again, this is not how ad auctions work.  As such, Dr. Singer's anti-steering claim is based upon a fundamental misunderstanding of ad auctions work and is therefore invalid.  In any event, as I have noted above, Dr. Singer does not identify any publishers who set different price floors for the alleged steering purpose, let alone quantify how many publishers would have used a differential flooring strategy absent UPR for this reason.

[117] Dr. Singer also theorizes two other reasons why publishers may prefer a lower bid from a rival exchange to Google's higher bid, including a preference to "steer some auctions to a third-party exchange to hedge against Google's dominance" or because the "publisher may obtain some additional volume-based discounts from other exchanges."  Singer Report, ¶66.  Dr. Singer presents no support for these theories.  Moreover, even after UPR, publishers could still filter out AdX buyers if they wanted to sell their inventory only on non-Google exchanges.  Regardless, an individual inquiry would be required to determine whether such conjectures hold at all, let alone which auctions would have been affected.

[118] Dr. Singer notes that there may be other reasons that are unrelated to steering for a publisher to set different price floors.  Singer Report, fn. 61.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

90.    Both Dr. Zona and Dr. Singer repeatedly emphasize that publishers often set a *higher* floor price on AdX prior to UPR.[119]  They ignore, however, that as a result of UPR, AdX floor prices came down, at least for certain auctions, allowing advertisers on AdX—including Proposed Class members buying via Google Ads—to buy more impressions on AdX at a cheaper price than they would have been able to absent UPR.  They also fail to recognize or account for the fact that a decrease in AdX floor prices was output enhancing, allowing impressions that would have otherwise gone unsold to be sold to advertisers bidding on AdX.  Google documents, including those relied upon by Advertiser Plaintiffs' experts, confirm these effects.  For example:

- A 2020 internal Google presentation, shown below and depicted by Dr. Singer as Figure 17, explains that UPR resulted in lower price floors ("UPRs lower than AdX floors") and shows that CPM was reduced for Google Ads advertisers ("GDA") by over ██.

**EXHIBIT 6: GOOGLE PRESENTATION, AS SHOWN IN SINGER FIGURE 17**



*Source:* Singer Report, Figure 17 (citing GOOG-DOJ-11729166, at -192).

- A 2019 internal Google email providing updates on auction changes states that "[m]oving from legacy AdX pricing rules to Unified Pricing Rules… lowers floors on

---

[119] *See, e.g.*, Singer Report, ¶64 ("[UPR] ended publishers' ability to charge higher floors on AdX"), ¶67 ("UPR restrictions prevented publishers from offering their ad space via a rival ad exchange at a price floor lower than the floor given to Google's ad exchange, AdX."), ¶70 ("Prior to UPR, publishers implemented lower price floors on rival exchanges."). *See also,* Zona Report, ¶87 ("Google had determined that AdX was losing to third party exchanges too frequently, in part because its DFP publishers were setting higher floors on AdX than on rival exchanges, with the result that impressions could clear on a third-party exchange even when an AdX buyer may have been willing to pay more.").

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

AdX, providing increased access to inventory for buyers."[120]  The same document also indicates that "16.8% of impressions won by header bidding had an AdX bid higher than the HB bid, which was blocked due to a higher floor for AdX"[121] and that "for AdWords, the mean applicable publisher-configured floor price has gone down from $3.31 under the old pricing rules (which includes AdWords-specific floors) to $1.01 under the Unified Pricing Rules.  Median AdWords floors have decreased from $0.7 under the legacy pricing rules to $0.45 under Unified Pricing Rules."[122]

- A 2019 internal Google working document indicates that "[c]harts below suggests that average floor prices have declined following the full launch of 1st price auction/UPRs" with the largest effect "flowing into our lower price floor bucket containing price floors between $0.00 and $0.01" and, accordingly, "the CPM paid by advertisers is lower."[123]

91.    When UPR resulted in publishers lowering the AdX price floor relative to the legacy AdX price floor, at least some advertisers purchasing on AdX were able to purchase more impressions at a lower price.  In particular auctions, advertisers gained access to new inventory, increasing their surplus, while in other auctions, advertisers were able to purchase impressions at a lower

---

[120] GOOG-DOJ-09713317, at -318.

[121] GOOG-DOJ-09713317, at -318.  *See also,* GOOG-DOJ-11697964, at 979 ("…resulted in outcomes that aren't always market efficient," illustrating an example of the highest bid not winning the auction).  The implied inefficient allocation of impressions—in which the impression is not allocated to the bidder most willing to pay—is detrimental to the platform as a whole.  Properly matching publishers' ad impressions with advertisers who are most willing to pay benefits both advertisers as well as publishers and can encourage participation on both sides of the platform and increases network effects.  Further confirming the benefits to the platform as a whole, and thus advertisers, is evidenced by other ad tech companies and Google competitors employing similar rules.  For example, Meta Audience Network's code of conduct states the reserve price "should apply identically to all demand sources."  *See,* "Code of Conduct: Supporting Healthy Ad Ecosystems." *Meta,* available at https://www.facebook.com/audiencenetwork/partner-program/code-of-conduct. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Xandr, a Google ad tech competitor, specifies in its "Seller best practices" that publishers should "[e]stablish consistent price floors for the same inventory in all systems" and states "[e]stablishing consistent price floors minimizes bidder errors and improves bidder decisioning by eliminating ambiguity." "Seller best practices," Xandr, available at https://learn.microsoft.com/en-us/xandr/industry-reference/seller-best-practices.

[122] GOOG-DOJ-09713317, at -321.

[123] GOOG-AT-MDL-000993753, at -755.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

price.[124]  Therefore, in Dr. Singer's and Dr. Zona's but-for world (where Google did not introduce UPR), at least some Proposed Class members that bid through AdX would be worse off in such AdX transactions.  An individualized inquiry is required to identify which members of the Proposed Class won more impressions or paid less than they would have absent UPR.

92.     Moreover, Dr. Zona and Dr. Singer both emphasize that AdX gained impressions due to UPR.[125]  However, they fail to consider that additional impressions won by Proposed Class members would benefit those advertisers because they gained access to additional inventory. Neither Dr. Zona nor Dr. Singer identify which advertisers were able to purchase more impressions, and they also do not propose any methodology to weigh this benefit for individual members of the Proposed Class against any alleged harm they claim from UPR.  By lowering the AdX price floor, impressions that otherwise would have gone unsold were matched (on AdX), increasing both advertiser and publisher surplus.  Indeed, Magnite (a *rival* ad exchange) found that "[p]rice floors can often throttle demand for impressions that would otherwise go unsold" and "result in lost revenue [to publishers] through unsold impressions."[126]  Instead of accounting for any output enhancing effects of UPR, Dr. Zona and Dr. Singer incorrectly claim that UPR only resulted in anticompetitive effects.

93.     At least some of the benefits of UPR to advertisers described above also traverse to publishers.  For instance, publishers could increase their revenue as a result of selling impressions that would have gone unsold or selling impressions at higher prices when the highest AdX bid was floored despite being higher than bids from rival exchanges.  Google employees noted in the ordinary course of business "how much they [certain publishers] are leaving on the table" when they set higher floors on AdX, and indicated publishers are likely not aware of the cost of doing so.[127]  Additionally, at least some publishers benefited from the simplification of

---

[124] For example, even if an impression would have transacted on AdX under legacy price floors, lower unified price floors could drive the price down, allowing advertisers to pay less for the same impressions.

[125] Zona Report, ¶87 ("Because UPR prevented the floor variation between AdX and its rivals, it had the effect of increasing Google's AdX win rate.")  Singer Report, ¶96 ("The artificial lift in impressions owing to UPR…"), ¶125 ("I measured the lift in AdX impression attributable to UPR…").

[126] Wheeler, Ashley. "Flooring Best Practices Drive 107% Revenue Lift." *Magnite*, Oct. 04, 2022, available at https://www.magnite.com/blog/flooring-best-practices-drive-107-revenue-lift/.

[127] GOOG-TEX-00122334, at -334.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

setting a single UPR floor that applied to all demand sources rather than having to use each exchange's interface to set individual price floors.  Consistent with these benefits, according to a survey conducted in 2020, 30% of the publishers that used Google Ad Manager viewed UPR as having a positive effect on their business, and only 4% of the publishers viewed UPR as having a negative effect.[128]  As a result, advertisers that are also publishers could have obtained further benefits from UPR (and could have benefited on net).[129]  Because only some Proposed Class members are publishers and not all publishers necessarily would have been similarly affected by UPR, this is yet another reason why an assessment of the effects of the product design requires an individual inquiry.

94.    Further, Dr. Singer notes that publishers may set different price floors to "combat" "better informed" advertisers, *i.e.*, "an advertiser using Google's ad-buying tools and ad exchanges."[130] Taking his claim at face value implies that at least some advertisers could be better off when publishers cannot use different price floors to "combat" their informational advantage.

95.    Dr. Zona and Dr. Singer also fail to consider that UPR reduced advertiser self-competition.[131]  By setting different floor prices across different demand sources for the same impression, publishers could attempt to extract higher bids from advertisers by taking advantage of the fact that some advertisers bid multiple times on the same impression through different exchanges or buying tools (*i.e.*, multi-homing advertisers).[132]  Such a strategy worked as follows: an advertiser that bid into multiple exchanges could send different bids in response to the

---

[128] GOOG-DOJ-AT-00608572, at -577.  Among the publisher respondents, 55% viewed UPR as having a neutral effect on their business.  Based on the respondent profile, half of the respondents are large or medium website publishers that offer display ads.  Specifically, about half (55%) of the respondents are publishers of digital websites with the inventory type of display ads.  Remaining respondent types include online retailers, brick-and-mortar retailers, and mobile app developers.  Respondents' average revenue in the 12 months leading up to the survey was ████████.

[129] Additionally, benefits to publishers could in turn provide advertisers with indirect benefits as there would be more potential sellers of ad inventory.  This could result in higher ad inventory quality, more publisher ad formats offered, and better matches for advertisers.  Dr. Zona and Dr. Singer fail to consider such bidirectional indirect network effects that could result in benefits to the platform as a whole, including to Proposed Class members.

[130] Singer Report, fn. 61.

[131] I also understand from Professor Milgrom that UPR protected advertisers from price-fishing after the transition to UFPA.  *See* Milgrom Report, §XIV.B- XIV.C.

[132] GOOG-DOJ-12948968, at -969 ("pub[lisher]s [were incentivized] to call the same demand source multiple times through different channels with different floor prices (*e.g.*, DBM is called through AdX, EB and HB with different floor prices), to effectively fish for the highest price[]").  I note that my discussion here pertains to auctions evaluated simultaneously (such as in the UFPA), rather than sequentially (*i.e.*, in a waterfall process).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

publisher's requests on different exchanges for the same impression.  If an advertiser sends a higher bid to one ad exchange (for example, in response to the expected higher floor price on that exchange), this advertiser effectively competes against its own lower bid(s), for the same impression, on other exchanges.[133]  The implementation of UPR eliminates the possibility of publishers fishing for a higher bid by making advertisers self-compete.  Advertisers subject to this publisher strategy would, for certain impressions, pay higher prices than they would have absent a product design that protects advertisers from these schemes.

96.     In addition, UPR promotes simplicity and transparency for advertisers.  Google states in an ordinary-course document that publishers' floor price strategies created challenges for advertisers, who "struggle[d] to optimize when bidding across different channels due to a lack of symmetry: . . . different floor prices can apply for the same impression."[134]  The complexity made it "harder [for advertisers] to evaluate which impressions [were] most valuable."[135]  UPR resolved these challenges.  A publisher-centric monetization platform, AdPush, stated in a 2019 article that "[a] benefit of unified pricing rules is that it encourages transparency and keeps buyers [*i.e.*, advertisers] informed.  Given there will be constant floors across all partners and exchanges, buyers will be in a position to plan better and will know better what the publisher expects… ."[136]  As such, UPR benefited at least some advertisers in the Proposed Class.

97.     In sum, the effect of UPR on advertisers cannot be common.  As outlined above, many advertisers in the Proposed Class were not affected by UPR.  Moreover, those that were affected by the optimization may have benefited from it.  Thus, an individualized inquiry is required to determine which Proposed Class members benefited from UPR.

---

[133] Korula Declaration, ¶41 ("Before Google implemented Unified Pricing Rules, buyers bidding across different channels could face different floor prices for the same impression, leading to the possibility of self-competition and making bidding across platforms more complex.").  Google also noted that "some buyers adjust their bid when a reserve price is lower, others currently do not.  Some buyers also respond to a higher floor." GOOG-DOJ-AT-02164164, at -164.

[134] GOOG-DOJ-AT-00655825, at -827.

[135] GOOG-DOJ-13501237, at -243.

[136] Grover, Shubham. "Google Ad Manager Unified Pricing Rules Guide." *AdPushup*, Nov. 22, 2019, available at https://www.adpushup.com/blog/google-ad-manager-unified-pricing-rules-guide/.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## VII. DR. ZONA DOES NOT DEMONSTRATE THAT ECONOMIC INJURY TO PROPOSED CLASS MEMBERS, IF ANY, IS AMENABLE TO COMMON PROOF

### A. Description of Dr. Zona's Overcharge Approach

98.     Dr. Zona's approach to estimate an overcharge to advertisers resulting from Buy-Side DRS, Bernanke, Global Bernanke, and UPR is premised on the theory that the four optimizations led to an increase in AdX win rate,[137] which purportedly increased Google's AdX share in the "[a]d [e]xchange [m]arket."[138]  Dr. Zona then purports to measure "how prices paid by advertisers for [the relevant impressions] are affected by Google's market power and changes in concentration in the Ad Exchange Market."[139]

99.     Dr. Zona proposes a two-part analysis for the assessment of class-wide impact and damages.  First, Dr. Zona purports to construct the actual and but-for "win rate for Google customers on AdX" over a more than 14-year period from June 2009 to March 2024 based on a handful of documents.[140]  According to Dr. Zona's assessment of these documents, the actual win rate for Google customers on AdX is 10.8% to 31.8% higher than the but-for win rate between February 2013 and March 2024.[141]  He asserts that the difference between the actual and but-for win rates "depicts the anticompetitive inflation in Google's AdX volumes" due to the four optimizations at issue (*i.e.*, Buy-Side DRS, Bernanke, Global Bernanke, and UPR).[142]

100.     For the second part of his two-part analysis, Dr. Zona puts forward two regression models "corresponding to two different Google Ads pricing arrangements for open web display ad space"[143] or two different "cost types."[144]  He has one model for Google Ads' open web display

---

[137] Dr. Zona states that "'win rate' refers to the proportion of queries that are matched to a buyer in an auction. Technically: Win Rate = ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *100."  Zona Report, fn. 64.

[138] Zona Report, ¶¶104, 109.

[139] Zona Report, ¶122.

[140] Zona Report, ¶¶117, 119, Figures 1, 2.  *See* Dr. Zona's backup.

[141] Zona Report, Figure 2, ¶119.  *See* Dr. Zona's backup.

[142] Zona Report, ¶¶118-119.

[143] Zona Report, ¶127.  Dr. Zona states that he "partitioned the set of Google Ads' open web display transactions during the Violation Period into two predominant categories."  Zona Report, ¶128.

[144] Zona Report, ¶130.  Though Dr. Zona includes advertisers that purchased impressions with a cost type of "Other" (*i.e.*, any cost type other than the two main categories he includes in his regressions) in the Class definition, he does not

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

transactions that are subject to CPC billing; he refers to this category of transactions as "CPC product."[145]  The impressions included in this model are restricted to the Google Ads-AdSense pipeline.[146]  I hereafter refer to this model as the "AdSense model."  Dr. Zona has another model for Google Ads' open web display transactions that are subject to billing based on "expected cost per 1,000 impressions;" he refers to this category of transactions as "eCPM product."[147]  More than 90% of impressions included in this model are in the Google Ads-AdX pipeline.  The remaining 10% of impressions are mostly in the Google Ads-third-party exchange ("3PE") pipeline.[148]  For simplicity, I hereafter refer to this model as the "AdX model," though I note that not all of these impressions were actually transacted through AdX.[149]

101.    Each of Dr. Zona's proposed models purports to examine the relationship over time between AdX's share of the "ad exchange market" and monthly aggregated prices paid by all Google Ads advertisers for impressions in a given pipeline during the period from January 2016 to December 2022.[150]  Specifically, Dr. Zona constructs a single monthly aggregated price series for each pipeline, where each monthly value is an average of all prices paid by different advertisers for billions of impressions in that month.[151]  He then estimates the relationship between his AdX share variable and the single monthly aggregated price series he constructs for

---

put forward a regression model for these transactions.  He also does not calculate damages associated with these transactions.  According to Dr. Zona, there are 33,933 Proposed Class members (or 1.33%) that only had transactions of the "Other" cost type.  Zona Report, Table 6, ¶140.

[145] Zona Report, Table 3, ¶133.  In the regression model for the CPC product, Dr. Zona analyzes impressions for which advertisers are billed on a cost-per-click (CPC) basis and publishers are also paid on a CPC basis.  Zona Report, ¶¶128-129.

[146] When I refer to the "Google Ads-AdSense pipeline" in my report, this includes only impressions categorized as "CPC product."  *See* Zona Report, Table 2, column 2, ¶130.

[147] Zona Report, Table 3, ¶133.  In the regression model for the eCPM product, Dr. Zona analyzes impressions for which advertisers are billed on a CPC basis and publishers are paid on an impression or cost per-mille (CPM) basis.  Dr Zona further states that "the CPC and eCPM cost types … cover about 88 percent of the impressions identified as open web display and are used by almost all Google Ads advertiser."  Zona Report, ¶¶128-130.

[148] Zona Report, Table 2, ¶130.

[149] Similarly, for simplicity, I refer to these two pipelines jointly as the Google Ads-AdX/3PE pipeline.  Moreover, when I refer to the "Google Ads-AdX/3PE pipeline" in my report, this includes only impressions categorized as "eCPM product."  *See* Zona Report, Table 2, column 3, ¶130.

[150] Zona Report, ¶¶126, 131-133.

[151] Dr. Zona's monthly aggregated price series for each pipeline has 84 data points with a single "price" for each month.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

each pipeline.[152]  He claims that the relationship he finds applies to all advertisers in the pipeline. Dr. Zona concludes based on his models that "increases in AdX share of the exchange market is associated with higher prices" paid by advertisers for either AdSense or AdX/3PE impressions.[153] To be clear, each of his models estimates a relationship between AdX share and aggregated prices for impressions; this by itself does not yield an overcharge.

102.    Using the estimated relationship between his AdX share variable and his aggregated price variable in each model, Dr. Zona derives monthly aggregated but-for prices for the CPC product and eCPM product, respectively, that are associated with the but-for AdX win rates that he constructs.[154]  He then calculates an average monthly overcharge that varies between 3.4% and 5.0% for AdSense impressions and an average monthly overcharge that varies between 3.2% and 4.7% for AdX/3PE impressions during the period from January 2016 to December 2022.[155]  Dr. Zona applies the overcharge he derives for December 2022 to the prices paid in 2023 and early 2024.[156]  Finally, Dr. Zona claims that "[b]ecause all or substantially all Google Ads advertisers paid for a placement either using a CPC or eCPM cost model, … all or substantially all Google

---

[152] In both regression models, the dependent variable to be explained is the natural log of the monthly average ad price (in CPC) across all advertisers for a given product, and the main explanatory variable, according to Dr. Zona, is "the share of AdX impressions for the largest Google customers out of the total ad exchange sourced impressions."  Zona Report, ¶¶131-132.  Dr. Zona asserts that the share of AdX impressions is "a measure of Google's market power in the ad exchange market as proxied by the relative size of Google's ad exchange compared to other exchanges in the market."  Zona Report, ¶126.  A review of Dr. Zona's backup reveals that he does not account for the share of AdX impressions as he claims; instead, he includes the share of ad spend on AdX by "the largest Google customers" on both Google Ads and DV360 in his model.  The other explanatory variables that Dr. Zona includes in both regression models are the natural log of the monthly retail sales, an index for the "average time spend on mobile devices in the US," a "linear time trend which controls for … trends in price," and a set of indicator variables (or fixed effects) for calendar month.  In the regression model for the eCPM product, Dr. Zona also includes click-through rate as an explanatory variable, which is derived from dividing the total clicks by the total impressions in a given month across all cost types (i.e., CPC, eCPM, and other types).  In other words, the click-through rate that Dr. Zona includes as an explanatory variable for prices paid for impressions categorized as the eCPM product is not the click-through rate specific to the impressions in this model.  Zona Report, ¶¶121-132.

[153] Zona Report, ¶133.

[154] Zona Report, ¶134.  To convert the change in AdX win rate that he constructs to the change in AdX share, Dr. Zona puts forward a formula.  He states that "the change in AdXshare associated with a percentage change in AdX volumes is given by $(1 - AdXshare) \, x \, AdXshare$."

[155] Zona Report, Figure 3, ¶135.  See Dr. Zona's backup.  Dr. Zona states that his regression model analyzes the time period ending in 2022 "[b]ecause data on AdX share is available only until the end of 2022."

[156] Zona Report, ¶135.  Dr. Zona claims that "[t]his approach is conservative as the general trend line in the prior year was upwards."  Notably, there are 428,115 advertisers billed on a CPC or eCPM basis that only purchased ads after December 2022 and thus, Dr. Zona's models do not establish an alleged overcharge for them.  These advertisers account for 16.8% of Proposed Class members.  See my workpapers.

Ads advertisers were impacted" by the alleged conduct.[157]  Put differently, he claims that because all or substantially all Google Ads advertisers paid for at least one impression that is categorized as CPC product or eCPM product, his estimated overcharges for CPC product or eCPM product necessarily apply to them.

103.    As I describe below, Dr. Zona's proposed approach is fundamentally flawed, which renders it unreliable for the assessment of class-wide impact and damages.

### B.    Dr. Zona Provides No Causal Link Between the Optimizations at Issue and His Alleged Overcharges for Impressions on AdSense

104.    As an initial matter, Dr. Zona provides no rationale for why the four optimizations at issue—which relate to AdX—would have resulted in any anticompetitive effect on prices paid for impressions transacted on AdSense.  Dr. Zona puts forward a model that purports to estimate an alleged overcharge for impressions on AdSense.  Yet, he fails to explain how his estimated overcharges for these impressions are causally linked to the optimizations at issue, which he himself claims affect *win rates on AdX*.[158]  By contrast, Dr. Singer does not analyze AdSense impressions and he does not claim any economic injury to Proposed Class members resulting from UPR for impressions transacted on AdSense.[159]

105.    Dr. Zona's alleged overcharges for AdSense impressions are simply not tied to the optimizations he claims are harmful.  As such, he has no valid basis for claiming that his AdSense model can be used for the assessment of impact or damages to Proposed Class members resulting from the alleged conduct.

### C.    Dr. Zona's Highly Aggregated Approach Altogether Ignores Idiosyncratic Factors that Affect the Auction-Based Prices Paid by Different Members of the Proposed Class

106.    As I have explained above, even to the extent advertisers were subject to the optimizations at issue, their effects, if any, varied on an auction-by-auction basis and the

---

[157] Zona Report, ¶141.

[158] Dr. Zona does not mention AdSense, let alone claim any effect on AdSense, when discussing the four optimizations at issue (*i.e.*, buy-side DRS, Bernanke, Global Bernanke, and UPR).  Zona Report, ¶¶70-74, 85-87, 104-115.

[159] Singer Report, ¶¶76-77, 128.

optimizations also benefited advertisers.[160]  Dr. Zona's reliance on highly aggregated prices in his regression models does not allow for the possibility that some advertisers were unaffected or even benefited from the optimizations.  Moreover, while purporting to study the effect of Google's market share on AdX and AdSense ad prices, Dr. Zona ignores the idiosyncratic demand and supply factors that are the very basis for determining ad prices.  This renders his approach unreliable and incapable of assessing economic injury to individual members of the Proposed Class.

107.    Notably, the prices paid for impressions in Dr. Zona's models are not prices that are set by Google.  Rather, they are determined in auctions by idiosyncratic demand and supply factors for each impression.  For example, the price of an impression sold in an auction depends on a multitude of factors, such as the attributes of the impression being sold, the characteristics of the advertisers bidding on the impression, the characteristics of the user visiting the website, the demand sources that the publisher offers its ad inventory to, and the number of advertisers that participated in the auction, let alone the number of clicks actually generated by the ad to trigger any payment by advertisers.[161]  By aggregating across billions of transactions purchased by roughly 2.1 million different advertisers to form his "price" series consisting of only a single average "price" per month, Dr. Zona ignores the actual dynamics at play that determine ad prices and does not allow for any heterogenous effects on the vastly diverse array of impressions sold.[162]

108.    An examination of prices—even at the monthly level—paid by individual advertisers in the Proposed Class shows the idiosyncratic nature of auction prices.  First, ad prices paid by

---

[160] *See* Section VI.

[161] Brannman, Lance, Klein, Douglass J., and Weiss, Leonard W., "The Price Effects of Increased Competition in Auction Markets," *The Review of Economics and Statistics*, Vol. 69 (1987), at p. 24 ("Auction theory predicts that an increased number of bidders increases winning bids. … Relevant environmental factors include the type of good being sold, attributes of the bidders, and overall industry characteristics.").  *See also,* Advertiser Class Complaint, ¶4 ("An ad impression is not just space on a page; it is an opportunity to sell an advertisement 'targeted' to a specific user or type of user. … [A] single slot for a display ad can be sold to many different advertisers in millions of separate transactions at different prices.").  As noted above, Dr. Zona's models include only cost models that bill advertisers on a per-click basis.

[162] Dr. Zona's regression models are based on prices paid by 2,090,195 advertisers in the Proposed Class.  There are 428,115 advertisers that only purchased ads after December 2022 and thus, they are not included in his models.  In addition, there are 33,933 advertisers that only purchased impressions that have a cost type other than CPC or eCPM and thus, their purchases are also not included in Dr. Zona's models.  *See* my workpapers.

individual advertisers exhibit a wide range both at a given point in time and over time.  The monthly average ad prices (measured in CPC) range from ▮▮▮▮▮▮▮ for ads acquired by Proposed Class members in the Google Ads-AdX/3PE pipeline over the Proposed Class Period.[163]  Similarly, the monthly average ad prices range from ▮▮▮▮▮▮ for ads acquired by Proposed Class members in the Google Ads-AdSense pipeline.[164]  Second, as shown in **Exhibit 7**, the monthly average prices paid (as measured by CPC) by each of the top 100 advertisers (depicted by the individual grey lines) in the Google Ads-AdX/3PE pipeline exhibit wide variation over time.[165]  **Exhibit 8** similarly shows wide variation over time for the top 100 advertisers in the Google Ads-AdSense pipeline.[166]  That is, even for a given advertiser, ad prices paid fluctuate dramatically from month to month, reflecting the idiosyncratic factors affecting prices for impressions that vary on an auction-by-auction basis.[167]  The wide variation in prices paid and disparate price movements over time across individual advertisers show that the same (or common) set of factors cannot explain the different observed outcomes.  Instead, prices paid by advertisers in the Proposed Class are affected by a host of idiosyncratic factors and there is no uniform pattern in their pricing.

---

[163] I show this using the data that Dr. Zona relies upon.  The range reported here for the monthly average CPCs for individual advertisers reflects the 1st and 99th percentile values.  *See* Appendix C.2.

[164] I show this using the data that Dr. Zona relies upon.  The range reported here for the monthly average CPCs for individual advertisers reflects the 1st and 99th percentile values.  *See* Appendix C.2.  Moreover, even in a given month, the average CPCs for advertisers in the Proposed Class similarly exhibit wide variation.  I show that in September 2019, for example, average CPCs for ads acquired by Proposed Class members in the Google Ads-AdX/3PE pipeline range from $0.03 to $4.49.  *See* Appendix C.2.  Meanwhile, average CPCs for ads acquired by Proposed Class members in the Google Ads-AdSense pipeline range from $0.02 to $3.50.  Additionally, the data similarly show wide variation among advertisers in prices they paid to acquire ads as measured by CPM.  The average monthly CPMs range from ▮▮▮▮▮▮ for ads acquired by Proposed Class members in the Google Ads-AdX/3PE pipelines, and they range from ▮▮▮▮▮▮ for ads acquired in the Google Ads-AdSense pipeline.  The ranges reported here for the monthly average CPM for individual advertisers reflects the 1st and 99th percentile values.  The primary reason for advertisers not paying for ad impressions is that their ads received no clicks.  Moreover, I similarly observe wide variation in average CPMs even in a given month.  *See* Appendix C.2.

[165] To compare the price movements across individual advertisers, the monthly average price series for each advertiser is indexed to 100 in the first month of the Proposed Class Period.

[166] To compare the price movements across individual advertisers, the monthly average price series for each advertiser is indexed to 100 in the first month of the Proposed Class Period.

[167] For impressions in the Google Ads-AdX/3PE pipeline, the price range (as measured by CPC) for individual members of the Proposed Class is, on average, ▮▮▮▮.  This is substantial compared to the monthly average ad prices per click in the pipeline ranging from ▮▮▮▮▮▮ for ads acquired by Proposed Class members.  Similarly, for impressions in the Google Ads-AdSense pipeline, the price range (as measured by CPC) for individual members of the Proposed Class is, on average, ▮▮▮▮.  Again, this is substantial compared to the monthly average ad prices per click in this pipeline ranging from ▮▮▮▮▮▮ for ads acquired by Proposed Class members.  *See* my workpapers.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 7: MONTHLY AVERAGE CPC INDEX FOR TOP 100 ADVERTISERS V.
DR. ZONA'S MONTHLY AVERAGE CPC INDEX FOR IMPRESSIONS IN THE GOOGLE ADS-
ADX/3PE PIPELINE
JANUARY 2016 – DECEMBER 2022**



*Notes:*

    Advertisers are ranked based on their total ad spend in the Google Ads-AdX/3PE pipeline during the Proposed Class Period across all advertisers that purchased impressions in the given pipeline in January 2016. Dr. Zona's Monthly Average CPC is from his regression data. CPC is indexed to 100 for January 2016. CPC index values above 600 are not shown in the chart.

*Source:*

    Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 8: MONTHLY AVERAGE CPC INDEX FOR TOP 100 ADVERTISERS V.
DR. ZONA'S MONTHLY AVERAGE CPC INDEX FOR IMPRESSIONS IN THE GOOGLE ADS-ADSENSE
PIPELINE
JANUARY 2016 – DECEMBER 2022**



*Notes:*

    Advertisers are ranked based on their total ad spend in the Google Ads-AdSense pipeline during the Proposed Class Period across all advertisers that purchased impressions in the given pipeline in January 2016. Dr. Zona's Monthly Average CPC is from his regression data. CPC is indexed to 100 for January 2016. CPC index values above 600 are not shown in the chart.

*Source:*

    Dr. Zona's turnover.

109. Instead of studying outcomes from auctions for the myriad members of the Proposed Class, Dr. Zona puts forward a highly aggregated approach that altogether ignores individual advertiser-specific variation. He makes no attempt to study actual prices paid by individual advertisers. He also does not consider any advertiser-specific or idiosyncratic factors that influence prices paid for impressions, including characteristics of the different advertisers and

65

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

attributes of their impressions.[168]  Dr. Zona constructs a single highly aggregated price series for advertisers in each pipeline.  For each pipeline, he aggregates prices paid by hundreds of thousands of advertisers for all web display ads purchased in a given month to a single average price, masking the wide variation in their underlying prices.[169]  Indeed, as shown in **Exhibit 7** above, the aggregated price series that Dr. Zona uses in his AdX model (depicted by the blue line) does not resemble the prices paid by individual advertisers, which exhibit disparate price movements over time.  This is also the case for the aggregated price series that Dr. Zona uses in his AdSense model, as shown in **Exhibit 8** above.  Despite the fact that Dr. Zona's approach altogether ignores Proposed Class members' individual experiences, he claims that his proposed models uncover the relationship between Google's AdX share and those underlying idiosyncratic auction-based prices.  His approach—as designed—is incapable of doing so.

110.    As such, Dr. Zona's reliance on highly aggregated prices not only abstracts away from any auction-level dynamics and impression-specific attributes that would explain price movements over time for individual advertisers, but also ignores the wide variation in prices paid by individual advertisers.  I demonstrate below that this is a critical flaw in his approach and renders his models unreliable for the assessment of class-wide impact.

### D.    Dr. Zona's Proposed Methodology Masks Substantial Differences Across Advertisers and Does Not Establish Class-Wide Impact

111.    In each of Dr. Zona's models, he estimates the relationship between his single aggregated price series for the pipeline (which altogether ignores the substantial advertiser-specific variation in pricing) and his AdX share variable.  By construction, Dr. Zona assumes that prices paid by all advertisers in each pipeline responded in a uniform manner to changes in the AdX share.  This restrictive and untested assumption embedded in his approach ignores advertiser-level

---

[168] For example, Dr. Zona does not consider that advertisers of different sizes are differently situated.  Similarly, Dr. Zona also does not consider that prices for impressions vary substantially depending on the target audience.

[169] For the Google Ads-AdX/3PE pipeline, Dr. Zona constructs a single data point for each month, aggregating prices paid by roughly 134,000 to 304,000 advertisers in a given month.  Similarly, for the Google Ads-AdSense pipeline, Dr. Zona constructs a single data point for each month, aggregating prices paid by roughly 149,000 to 342,000 advertisers in a given month.  *See* my workpapers.  I also note that the monthly price paid by an individual advertiser reflects the average price paid across the auctions that they won.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

differences in prices paid by Google Ads advertisers.  As such, he assumes rather than establishes class-wide impact.

112.    This particular failure of the type of approach put forward by Dr. Zona—*i.e.*, relying on highly aggregated prices for the assessment of class-wide impact—has been widely discussed in the economics literature related to antitrust class actions.  According to the ABA treatise on the application of econometrics to antitrust issues:

> [E]conomists sometimes use prices averaged across customers or products to assess impact, rather than individual price data that reflect the prices that particular customers paid.  When averages are used, there is a risk that the averages may hide substantial differences among customers or products, which may be critical for determining whether there is individual impact.  The reliance on averages may be a critical flaw in the work of a plaintiffs' economics expert who concludes that price data reflect individual impact, since the underlying customer-specific pricing data may show a wide range in prices and/or changes in prices.[170]

113.    The underlying pricing data that Dr. Zona relies upon show that his use of highly aggregated prices indeed masks substantial variation in ad prices paid by individual advertisers.  I demonstrate this "critical flaw" in his approach by examining (i) advertisers associated with different industries (also known as verticals[171]) and (ii) advertisers of different sizes.  In each case, I show that Dr. Zona's masking of underlying price variation across advertisers in the Proposed Class is critical to his conclusion of class-wide impact.

### 1.    Dr. Zona's Approach Masks Differences Across Advertisers in Different Verticals; His Finding of a Positive and Statistically Significant Relationship Between AdX Share and Ad Prices Does Not Hold for the Majority of Verticals

114.    Dr. Zona's use of highly aggregated prices masks the fact that there is substantial variation in ad prices paid by advertisers in different verticals.  I demonstrate that his masking of

---

[170] ABA Econometrics, p. 360.

[171] Advertisers are categorized into different verticals depending on the specific industry or audience category they target with their ads.  For example, "if some brand … sells hiking equipment, they select a travel vertical advertising niche to reach people who're interested in travel-related stuff."  Kaplia, M, "How to Build a Vertical Strategy as an Ad Agency." *Epom*, Mar. 22, 2023, available at https://epom.com/blog/digital-advertising/ad-vertical-strategy-for-ad-agencies.  Advertisers are associated with 13 verticals in the data that Dr. Zona relies on.  They are Automotive, Business & Industrial Markets, Classifieds & Local, Consumer Packaged Goods, Education & Government, Finance, Healthcare, Media & Entertainment, Retail, Services, Technology, Travel, and Other.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the underlying price variation across Proposed Class members from different verticals is critical to his conclusion of class-wide impact. When I apply each of Dr. Zona's models separately to prices paid by advertisers in different verticals, his conclusion is overturned.

115.    The empirical evidence shows that advertisers in different verticals paid different prices and experienced disparate price movements over time.[172]  For example, the monthly ad prices (measured in CPC) paid by advertisers in the Media & Entertainment vertical are lower than the ad prices for several other verticals. For impressions in the Google Ads-AdX/3PE pipeline, the monthly average ad prices in the Media & Entertainment vertical are between █████████ and exhibit an increasing trend from 2016 to 2021 and a decline in 2022.[173]  Meanwhile, for impressions in the same pipeline, the monthly average ad prices paid by advertisers in the Automotive vertical are generally between █████████ and exhibit a declining trend.[174]  By way of another example, the monthly average ad prices paid by advertisers in the Finance vertical generally fluctuate between █████████ from 2016 to 2020, increasing to ████ in 2021, and declining to ████ by 2022.[175]  The observed price variation and disparate price trends across advertisers in the various verticals shows that Proposed Class members are situated differently.[176]  Advertisers are subject to different demand conditions and factors unique to their industry, which affect the ad prices they paid. For example, advertisers in the Retail vertical are subject to seasonal demand in the retail industry. Accordingly, the monthly average ad prices associated with advertisers in the Retail vertical exhibit strong seasonality and peak in November

---

[172] *See* Appendix C.2 for charts showing different price trends across advertisers associated with different verticals for AdSense impressions and AdX/3PE impressions separately. To compare the price movements across verticals, the monthly average ad price (in CPC) for each vertical is indexed to 100 in the first month of the Proposed Class period.

[173] *See* Appendix C.2.

[174] *See* Appendix C.2.

[175] *See* Appendix C.2.

[176] Similarly, for impressions in the Google Ads-AdSense pipeline, I also observe different prices and price movements for advertisers in different verticals. For example, the monthly ad prices paid by advertisers in the Media & Entertainment vertical are lower than the ad prices for several other verticals, and they exhibit an increasing trend from 2016 to 2021 and a decline in 2022. Meanwhile, the monthly ad prices paid by advertisers in the Automotive vertical experienced a decline from about $0.45 in 2016 to about ████ in 2020, and then rebounding to around ████ in 2021 and 2022. By way of another example, the monthly ad prices paid by advertisers in the Finance vertical generally fluctuate between $0.50 and $0.80 from 2016 to 2019, declining to below ████ in 2020, and increasing to more than ████ in 2022. *See* Appendix C.2.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of each year during the holiday shopping season.  The same pattern is not observed for other verticals.[177]

116.    This means it is inappropriate for Dr. Zona to aggregate prices across advertisers in different verticals and estimate a single uniform relationship between the AdX share and ad prices paid by all advertisers.  Such an approach incorrectly ignores differences in the economic circumstances among Proposed Class members.

117.    Next, I demonstrate that Dr. Zona's masking of underlying price variation across advertisers from different verticals is critical to his conclusion of class-wide impact.[178]  When I apply each of Dr. Zona's regressions separately to prices paid by advertisers in each vertical, his conclusion is overturned.[179]  Specifically, I find no positive and statistically significant relationship between AdX share and ad prices paid by advertisers in 10 of the 13 verticals for AdSense impressions.  Similarly, I find no positive and statistically significant relationship between AdX share and ad prices paid by advertisers in 9 of the 13 verticals for AdX/3PE impressions.[180]  The lack of a positive and statistically significant relationship between his AdX

---

[177] I note that Named Plaintiffs Hanson Law Office and Cliffy Care Landscaping are in the Classifieds & Local vertical and Named Plaintiff Stellman is in the Business & Industrial Markets vertical.  *See* my workpapers.

[178] According to the ABA treatise on the application of econometrics to antitrust issues, estimating the effect for different groups of customers "can yield additional insights into classwide impact and the existence and stability of a common method of proof."  ABA Econometrics, p. 358 ("Further estimating the average effect of the alleged conspiracy separately for different products, geographies, time periods, suppliers, or purchaser types can yield additional insights into classwide impact and the existence and stability of a common method of proof.  Estimates of average impact across groups of customers that are similar in magnitude and/or sign may suggest that the alleged misconduct resulted in common impact for all (or nearly all) members of the proposed class.  Alternatively, estimated effects that vary widely or are nonsensical would suggest that the alleged misconduct did not result in common impact for all members of the proposed class.").

[179] The regression for each vertical has the same number of observations as in Dr. Zona's regression using aggregated prices across all verticals.  *See* my workpapers.  Specifically, for impressions within a given pipeline, I use Dr. Zona's data and construct a separate monthly price series for all advertisers within each of the 13 verticals.  In keeping with Dr. Zona's methodology for constructing monthly price series, the monthly ad price for a given vertical within a given pipeline is the weighted average price across all advertisers in the vertical that purchased impressions in the given pipeline and month.

[180] I use the 5 percent level of statistical significance, which is the conventional standard.  According to the Reference Manual on Scientific Evidence, "[i]n most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at 0.05, or 5%."  Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, Reference Manual on Scientific Evidence (3d ed. 2011) ("Reference Manual on Scientific Evidence"), p. 320.  I obtain similar results using the 10 percent level of statistical significance.  Specifically, using the 10 percent level of statistical significance, I find no positive and statistically significant relationship between AdX share and ad prices paid by advertisers in 10 of the 13 verticals for AdSense impressions.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

share variable and ad prices paid by advertisers in particular verticals means that Dr. Zona has no statistical proof of an alleged overcharge for those advertisers.

118.    **Exhibit 9** below shows these results for AdSense impressions (in red) and for AdX/3PE impressions (in blue).  The estimated relationship between AdX share and ad prices is either negative or not statistically significant for advertisers in the Automotive, Classifieds & Local, Consumer Packaged Goods, Education & Government, Finance, Technology, Travel, and Other verticals for both AdSense and AdX/3PE impressions.[181]  In other words, applying Dr. Zona's own methodology to advertisers in different verticals demonstrates that, for the majority of verticals, an increase in AdX share is not associated with an increase in ad prices paid by advertisers in the vertical.  As such, 1,088,262 (or 52.1%) of the 2,090,195 advertisers in Dr. Zona's models did not sustain a positive and statistically significant overcharge when applying his own model to different verticals.[182]  These 1,088,262 advertisers account for 42.6% of the Proposed Class members.  Notably, the Named Plaintiffs, Hanson Law Office and Cliffy Care Landscaping, are associated with verticals for which there is no positive and statistically significant overcharge.  Further, Dr. Zona does not establish economic injury for another 18.1% of Proposed Class members because they only purchased ads after December 2022 or only purchased impressions that have a cost type other than CPC or eCPM and are thus not included in his regressions.  This means that in addition to the 42.6% of Proposed Class members for which Dr. Zona has no statistical proof of an alleged overcharge, he also does not establish overcharges for another 18.1% of Proposed Class members.  Together, these advertisers account for 60.7% of Proposed Class members.[183]

---

Similarly, I find no positive and statistically significant relationship between AdX share and ad prices paid by advertisers in 8 of the 13 verticals for AdX/3PE impressions.  *See* my workpapers.

[181] According to the underlying data that Dr. Zona relies upon, examples of advertisers in the "Other" vertical include ██████████████████████████████████████████████████████.  *See* my workpapers.

[182] These advertisers account for 48.9% of the total ad spend by advertisers in the data that Dr. Zona relies upon.  His regression models are based on prices paid by 2,090,195 advertisers in the Proposed Class.  There are 428,115 advertisers that only purchased ads after December 2022 and thus, they are not included in his models.  In addition, there are 33,933 advertisers that only purchased impressions that have a cost type other than CPC or eCPM and thus, their purchases are also not included in Dr. Zona's models.  *See* my workpapers.

[183] *See* my workpapers.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 9: ESTIMATED EFFECT OF AdX SHARE ON PRICES PAID BY ADVERTISERS IN DIFFERENT VERTICALS BY APPLYING EACH OF DR. ZONA'S REGRESSION MODELS SEPARATELY TO PRICES PAID BY ADVERTISERS IN EACH VERTICAL**

**JANUARY 2016 – DECEMBER 2022**



*Notes:*
> A coefficient that is statistically significant at the 5 percent level is indicated by a solid pattern. A coefficient that is not statistically significant at the 5 percent level is indicated by a shaded pattern. *** p<0.01, ** p<0.05, * p<0.1.

*Sources:*
> XBridge Google Ads data (GOOG-AT-MDL-DATA-000486626 to 000488277, GOOG-AT-MDL-DATA-000653818 to 000654235); Dr. Zona's turnover.

119.    My findings demonstrate that Dr. Zona's proposed methodology masks crucial distinctions among Proposed Class members. This renders his approach unreliable for the assessment of class-wide impact, and in fact demonstrates that there is no class-wide impact.

71

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

    **2.**    **Dr. Zona's Approach Masks Differences Across Advertisers of Different Sizes; His Finding of a Positive and Statistically Significant Relationship Between AdX Share and Ad Prices Is Driven by a Tiny Fraction of Advertisers in the Proposed Class**

120.    Dr. Zona's use of highly aggregated prices also masks the fact that there is substantial variation in ad prices paid by advertisers of different sizes. I demonstrate that his masking of the underlying price variation across different-sized Proposed Class members is critical to his conclusion of class-wide impact. When I apply each of Dr. Zona's models to prices paid by advertisers of different sizes (*e.g.*, to a tiny fraction of advertisers vs. the remaining vast majority of advertisers), his conclusion is overturned.

121.    The empirical evidence shows price variation and disparate price movements for advertisers of different sizes.[184] For example, for impressions in the Google Ads-AdX/3PE pipeline, the monthly average ad prices paid by advertisers in the bottom 25% are generally between ███████████.[185] Meanwhile, the monthly average ad prices paid by advertisers in the top 25% are generally between ██████████. Moreover, for impressions in the same pipeline, the monthly average ad prices moved in opposite directions in 2016 for advertisers in the bottom 25% and advertisers in the top 25%. Their prices converged in early 2017 and diverged again for the next several years until 2020. After paying similar prices in late 2020 and 2021, the advertisers in the bottom 25% experienced an increase in ad prices, while the advertisers in the top 25% experienced a decrease in ad prices in 2022. The observed price variation and disparate price trends for different sized advertisers show that Proposed Class members are situated differently.[186] This means it is inappropriate for Dr. Zona to aggregate

---

[184] Because Dr. Zona's weighted average price series gives more weight to advertisers that have more clicks, I use the number of clicks that an advertiser received for their impressions in a given pipeline in the data period as a measure of advertiser size. I similarly observe different prices and disparate price movements across advertisers of different sizes when using the number of impressions or total ad spend in the data period as a measure of advertiser size. *See* my workpapers. Consistent with Dr. Zona's treatment, I describe prices in terms of CPCs.

[185] *See* Appendix C.2 for a chart showing the monthly average ad prices paid by advertisers in the bottom 25% (*i.e.,* below or at the 25th percentile) and by advertisers in the top 25% (*i.e.,* above the 75th percentile) based on clicks in the Google Ads-AdX/3PE pipeline.

[186] I reach the same conclusion for advertisers that purchased impressions in the Google Ads-AdSense pipeline. *See* Appendix C.2.

prices across advertisers of different sizes and estimate a single uniform relationship between the AdX share and ad prices paid by all advertisers.

122.    The highly aggregated price series that Dr. Zona constructs for each of his two models is a weighted average monthly price, such that larger advertisers that received more clicks have a greater influence on his price series.  In other words, his single price series is skewed towards the pricing experience of the largest advertisers.  I demonstrate that Dr. Zona's masking of underlying price variation across advertisers of different sizes is critical to his conclusion of class-wide impact.

123.    When I apply each of Dr. Zona's models to the pricing data for all but the top 0.1% of advertisers, I find no positive and statistically significant relationship between his AdX share and ad prices paid by this group of advertisers.[187]  Put differently, I find no positive and statistically significant relationship for the bottom 99.9% of advertisers combined.  This is the case for both his model for AdSense impressions and his model for AdX/3PE impressions.  This means that Dr. Zona's findings are driven by the pricing experience of advertisers within the top 0.1% as measured by clicks received.[188]  Moreover, the lack of a positive and statistically significant relationship between his AdX share variable and ad prices paid by advertisers in the bottom

---

[187] This is a standard sensitivity analysis.  As Professor Wooldridge states in his econometrics textbook, "[g]ood papers in the empirical social sciences contain sensitivity analysis.  Broadly, this means you estimate your original model and modify it in ways that seem reasonable.  Hopefully, the important conclusions do not change.  ... If some observations are much different from the bulk of the sample—say, you have a few firms in a sample that are much larger than the other firms—do your results change much when those observations are excluded from the estimation?  If so, you may have to alter functional forms to allow for these observations or argue that they follow a completely different model." Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach*, Cengage Learning (7th ed. 2019) ("Wooldridge"), p. 650.  Similarly, another econometrics textbook states that "[s]ensitivity analysis consists of purposely running a number of alternative specifications to determine whether particular results are robust (not statistical flukes) … Researchers who use sensitivity analysis run (and report on) a number of different reasonable specifications and tend to discount a result that appears significant in some specifications and insignificant in others.  Indeed, the whole purpose of sensitivity analysis is to gain confidence that a particular result is significant in a variety of alternative specifications, functional forms, variable definitions, and/or subsets of the data."  Studenmund, A. H., *Using Econometrics: A Practical Guide* (7th ed. 2016) ("Studenmund"), p. 174.  Moreover, the Reference Manual on Scientific Evidence states that "[o]ne generally useful diagnostic technique is to determine to what extent the estimated parameter changes as each data point in the regression analysis is dropped from the sample.  An *influential* data point— a point that causes the estimated parameter to change substantially—should be studied further to determine whether mistakes were made in the use of the data or whether important explanatory variables were omitted."  Reference Manual on Scientific Evidence, p. 327 (emphasis in original).

[188] I find similar results when advertisers are ranked based on the total ad spend and impressions in the data period within each pipeline.  *See* my workpapers.

99.9% means that Dr. Zona has no statistical proof of an overcharge for the vast majority of advertisers.

124.    In **Exhibit 10** below, I show a comparison of Dr. Zona's results and the results I obtain when I apply each of his models to the prices paid by the bottom 99.9% of advertisers.[189]  The top panel shows results using Dr. Zona's AdSense model and the bottom panel shows results using his AdX model.   As shown in the first column of the top panel, the coefficient of the key variable of interest, AdX share, is negative and statistically significant for the bottom 99.9% of advertisers combined for AdSense impressions.  Also, as shown in the first column of the bottom panel, the coefficient of AdX share is not statistically significant for the bottom 99.9% of advertisers combined for AdX/3PE impressions.  Accordingly, my testing of Dr. Zona's own models shows no positive and statistically significant relationship between AdX share and ad prices paid by the bottom 99.9% of advertisers combined, and this is the case for both AdSense impressions and AdX/3PE impressions.[190]  This means there is no statistical proof of an overcharge resulting from the optimizations at issue to at least 99.9% of advertisers.[191]  Further,

---

[189] Specifically, for each of the Google Ads-AdSense pipeline and the Google Ads-AdX/3PE pipeline, I rank advertisers based on their total clicks in the data period (from the lowest to the highest).  I create the monthly aggregated price series using all pricing data for the bottom 99.9% of advertisers, following the same methodology that Dr. Zona uses to construct his aggregated price series.  The price series for the bottom 99.9% of advertisers in each pipeline has the same number of observations as in Dr. Zona's regression models.  Advertisers that have only missing or zero clicks in the data are not included in the analysis; most of these advertisers also have missing or zero ad spend and thus do not contribute to the aggregated prices that Dr. Zona constructs.  Accordingly, these advertisers have no effect on Dr. Zona's models; when I apply Dr. Zona's models to the data for all advertisers included in the analysis, I obtain the same result as Dr. Zona's result in Table 3 of his report.  *See* my workpapers.

[190] These 99.9% of advertisers in each pipeline together account for 39.3% of ad spend among advertisers in the Proposed Class.  This is based on the data that Dr. Zona uses in his regression models.  *See* my workpapers.

[191] In addition, I conduct two sensitivity tests and reach the same conclusion that Dr. Zona's findings are driven by the pricing experience of advertisers within the top 0.1%.  First, following Dr. Zona's methodology for constructing aggregated prices, I create monthly price series in a given pipeline for advertisers in each of the following groups, respectively: 10th percentile or below (*i.e.*, the bottom 10% of advertisers), 25th percentile or below, 50th percentile or below, 75th percentile, 90th percentile or below, 95th percentile or below and 99th percentile or below.  Similar to above, advertisers are ranked based on their total clicks in a given pipeline during the data period.  Each group of advertisers has the same number of observations for the monthly price series as in Dr. Zona's approach.  I then apply each of Dr. Zona's regression models to the monthly price series of each group.  For all seven groups, I find no positive and statistically significant relationship between AdX share and ad prices paid by advertisers in the given group.  *See* Appendix C.2.  Second, I perform the same analysis for each of the following eight distinct groups of advertisers in the bottom 99.9%: the bottom 10%, from the 10th percentile to the 25th percentile, from the 25th percentile to the 50th percentile, from the 50th percentile to the 75th percentile, from the 75th percentile to the 90th percentile, from the 90th percentile to the 95th percentile, from the 95th percentile to the 99th percentile, and from the 99th percentile to the 99.9th percentile.  Again, when I apply each of Dr. Zona's regression models to the monthly price series of each group, I find no positive and statistically significant relationship between AdX share and ad prices paid by advertisers in a

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

this group for which Dr. Zona has no statistical proof of an alleged overcharge includes the Named Plaintiffs, Hanson Law Office, Cliffy Care Landscaping, and Stellman.[192]

---

given group for all eight groups. *See* Appendix C.2. As such, my testing shows that Dr. Zona's conclusion is overturned when applying his own model to the pricing data of various groups of advertisers in the bottom 99.9%. Notably, Dr. Zona's conclusion is overturned for every single group of advertisers, which collectively comprise all advertisers in the bottom 99.9%. This implies that even if Dr. Zona were to identify a group of advertisers within the bottom 99.9% for which his regression would yield a positive and statistically significant relationship between the AdX share and prices, the finding would be at best driven by a small number of advertisers in the group; this would not refute my conclusion that Dr. Zona's findings are driven by the pricing experience of advertisers within the top 0.1%. This is because any such group would be contained in or would overlap with at least one, if not multiple, of the groups of advertisers included in my two sensitivity tests, which demonstrate no positive and statistically significant relationship between AdX share and ad prices paid by advertisers in the given group(s).

[192] *See* my workpapers.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Exhibit 10: ESTIMATED EFFECT OF AdX SHARE ON PRICES PAID BY ADVERTISERS IN THE BOTTOM 99.9% V. ADVERTISERS IN THE TOP 0.1% USING EACH OF DR. ZONA'S ADSENSE AND AdX REGRESSION MODELS**
**JANUARY 2016 – DECEMBER 2022**

| | AdSense Model | | |
|---|---|---|---|
| | **Advertisers in Different Percentiles Based on Size** | | |
| **Statistic** | **At or below 99.9th Percentile** | **Above Top 0.1 Percentile** | **All (Dr. Zona's Result)** |
| **[a]** | **[b]** | **[c]** | **[d]** |
| Estimated Effect of AdX Share | -0.587** | 1.206*** | 0.634** |
| Number of Observations | 84 | 84 | 84 |

| | AdX Model | | |
|---|---|---|---|
| | **Advertisers in Different Percentiles Based on Size** | | |
| **Statistic** | **At or below 99.9th Percentile** | **Above Top 0.1 Percentile** | **All (Dr. Zona's Result)** |
| **[a]** | **[b]** | **[c]** | **[d]** |
| Estimated Effect of AdX Share | 0.215 | 0.867*** | 0.598** |
| Number of Observations | 84 | 84 | 84 |

*Notes:*

Percentiles are defined based on an advertiser's total clicks for impressions within a given pipeline over the data period from January 2016 to December 2022, excluding advertisers with only missing or zero clicks. The AdSense model analyzes impressions in the Google Ads-AdSense pipeline or CPC product. The AdX model analyzes impressions in the Google Ads-AdX/3PE pipeline or eCPM product. Each observation in a model is the monthly weighted average price paid by advertisers for impressions in the given pipeline. *** $p<0.01$, ** $p<0.05$, * $p<0.1$.

*Source:*

Dr. Zona's turnover.

125.    Further, as shown in the middle column of both the top and bottom panels in **Exhibit** 10 above, when I apply each of Dr. Zona's models to the prices paid by the top 0.1% of advertisers, I find a positive and statistically significant relationship between AdX share and prices (similar

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

to Dr. Zona's result, which is shown in the last column).[193]  This is unsurprising because his approach relies on aggregated prices that are heavily skewed towards the pricing experience of the largest advertisers.[194]  It is economically unsound for Dr. Zona to apply a result that is heavily influenced by the largest advertisers to all other advertisers in the Proposed Class and claim that he has established class-wide impact.[195]

126.     As such, these results show that Dr. Zona's findings are driven by the pricing experience of a negligible proportion of advertisers.  This renders his approach biased and unreliable because he incorrectly applies the estimated overcharges he derives for AdSense and AdX/3PE impressions to *all* advertisers in the Proposed Class.  My findings demonstrate that Dr. Zona's conclusion that "all or substantially all Google Ads advertisers were impacted" is rejected by the data.[196]

---

[193] Importantly, these findings do not imply that Dr. Zona's methodology establishes an overcharge for the top 0.1% of advertisers.  In keeping with Dr. Zona's methodology of constructing prices, the price series for the top 0.1% of advertisers is still aggregated across numerous advertisers whose prices vary substantially over time.  The price series is a weighted average price that aggregates prices across approximately 2,000 advertisers in a given pipeline.  As discussed above, even among the top 100 advertisers, prices paid by individual advertisers exhibited substantially different price trends over time.  Moreover, for the reasons set forth in this section of my report, Dr. Zona's methodology suffers from other fundamental problems, rendering his conclusions biased and unreliable.

[194] Further, I note that any testing of Dr. Zona's model that includes the pricing data for the top 0.1% of advertisers would yield a similar result to Dr. Zona's because the aggregated prices are heavily skewed towards the largest advertisers.  Accordingly, it is misleading and incorrect to interpret the result from such testing to indicate that there is a positive and statistically significant relationship between AdX share and ad prices paid by all advertisers included in the testing.  This is because the result would still be driven by the top 0.1% of advertisers and it would be incorrect to apply it more broadly.  Such a result would still be subject to the problem that the approach in fact masks the underlying variation across advertisers of different sizes.

[195] According to the ABA treatise on the application of econometrics to antitrust issues, "when using data, one must also consider whether the data are averages or reflect individual observations.  For example, economists sometimes use prices averaged across customers or products to assess impact, rather than individual price data that reflect the prices that particular customers paid.  When averages are used, there is a risk that the averages may hide substantial differences among customers or products, which may be critical for determining whether there is individual impact."  ABA Econometrics, p. 360.  Further, the treatise explains that "[s]tandard statistical tests can be applied to test the stability of coefficients among subgroups of customers, products, time, geographies, or other subsamples, and to determine whether it is appropriate to pool potential subgroups when estimating the average effect of the alleged conspiracy."  ABA Econometrics, p. 358.

[196] Zona Report, ¶141.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

E.    **Dr. Zona's Proposed Methodology Fails to Account for Relevant Economic Factors, Including Google's Costs, Rendering It Unable to Reliably Establish Economic Injury to Proposed Class Members**

127.    Dr. Zona himself recognizes the need to account for cost in a regression model that explains prices. Yet, he fails to do so. In fact, to motivate the specification of each of his models, Dr. Zona derives an equation which "shows that the optimal price … is equal to incremental cost … plus a term that depends on competitive conditions."[197] He further states that in his models, he "specif[ies] the logarithm of the price of each of two primary Google Ads products in the relevant antitrust market as an additive function of 1) variables related to the logarithm of the (marginal) cost of each product and 2) variables related to (own and cross) price elasticities of demand and the nature of competition"[198] Dr. Zona notes that "[t]he principal variable related to Google's marginal cost for each product is the payment to publishers that they bear."[199]

128.    Despite the fact that Dr. Zona acknowledges that cost is a crucial factor in the type of model he constructs, his methodology does not account for any cost factor that explains prices paid for impressions and he does not account for any cost factor in his models.

129.    Indeed, a failure to account for relevant factors means that Dr. Zona's models suffer from omitted variable bias.[200] This renders his findings biased and unreliable. Because Dr. Zona's overcharge calculation relies on the estimated relationship between AdX share and ad prices in his models, the alleged overcharges he derives are also biased and unreliable. This renders Dr. Zona's proposed methodology flawed and unreliable for the assessment of class-wide impact.

---

[197] Zona Report, ¶124.

[198] Zona Report, ¶125.

[199] Zona Report, ¶125.

[200] The omitted variable bias problem arises when a relevant explanatory variable is excluded from the regression model and that variable is correlated with another explanatory variable in the regression model. *See* Wooldridge, pp. 84-87. As Professor Wooldridge also explains the issue in an econometrics textbook, "suppose that … we omit a variable that actually belongs in the true (or population) model. This is often called the problem of excluding a relevant variable or underspecifying the model … this problem generally causes the OLS estimators to be biased." Wooldridge, p. 84.

### F. Dr. Zona Puts Forward No Method for Proving Common Impact; He Simply and Incorrectly Assumes Common Impact

130.    Dr. Zona puts forward no methodology to establish common impact for members of the Proposed Class resulting from the alleged conduct.  He opines that because 98.7% of Google Ads advertisers paid for at least one impression that has a cost type that he studies (*i.e.*, CPC or eCPM), "all or substantially all Google Ads advertisers were impacted."[201]  Put differently, he asserts that any advertiser that purchased at least one impression is injured because the advertiser is included in the highly aggregate price series that he uses in his regression models.[202]  This does not establish class member impact.  Dr. Zona simply does not assess how the four optimizations at issue affected individual members of the Proposed Class.  Moreover, my testing of his own regression models demonstrates that his assertion about class-wide impact is overturned.[203]

131.    Even putting aside the fundamental problems above, Dr. Zona's approach entirely ignores the benefits that at least some advertisers received from the four optimizations at issue.  In fact, Dr. Zona acknowledges that Bernanke directly benefited Google Ads advertisers in the form of allowing Proposed Class members to get more conversions on their impressions than they otherwise would have been able to obtain.[204]  He similarly acknowledges a direct benefit to Google Ads advertisers resulting from UPR, which he claims helped "unlock inventory" for advertisers on AdX, allowing Proposed Class members to win more impressions, and further provided benefits to both publishers and advertisers by limiting the market inefficiencies when impressions did not go to the bidder willing to pay the most.[205]  By ignoring the benefits entirely

---

[201] Zona Report, ¶141.

[202] Further, even for the 16.8% of the Proposed Class members that Dr. Zona does not study in his regression models, he asserts that they are necessarily injured if they have at least one impression with a CPC or eCPM cost type.  *See* my workpapers.  Dr. Zona also claims that he can "compute the amount of damages for each anticompetitive cause, either Bernanke of UPR [sic], for each Google Ads advertiser" but fails to demonstrate–or even specify–how he would do so. Zona Report, ¶142.

[203] *See* Section VII.D.

[204] Dr. Zona cites a document stating that Bernanke increased "GDN [Google Ads] advertiser conversion volume [by] +10.8%."  Zona Report, ¶73.

[205] Zona Report, ¶87, fn. 96 (stating that prior to UPR, "impressions could clear on a third-party exchange even when an AdX buyer may have been willing to pay more" and "Google estimated an increase in its [AdX] win rate attributable to UPR for open web of 31.8 percent.").  Moreover, as I have discussed above, in a two-sided ad tech platform, an economically appropriate evaluation of the impact of a product design on an advertiser requires

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and considering only the claimed harms (*i.e.*, according to Dr. Zona, a higher nominal price for impressions), Dr. Zona has no reliable basis to conclude that an advertiser was injured overall. For a given advertiser, the benefits may outweigh the alleged harms, leaving the advertiser uninjured.  Dr. Zona has provided no basis or method to ascertain if this is the case.

132.    Crucially, not only did the optimizations at issue provide benefits to at least some advertisers, identifying those advertisers and the extent of the benefits each received would require a series of individualized analyses.  Thus, a common analysis based on common evidence would not be feasible.  I note that Dr. Zona has not proposed any methodology at all (whether common or individualized) for determining the benefits to a given advertiser.

### G.    The Actual and But-For AdX Win Rates Constructed by Dr. Zona Are Flawed and Unreliable

133.    Dr. Zona's calculation of AdX win rates that would have prevailed absent Buy-Side DRS, Bernanke, Global Bernanke, and UPR suffers from multiple flaws.  Dr. Zona relies on a handful of Google documents to construct these but-for AdX win rates, and he uses them to calculate the increase in impressions on AdX resulting from Buy-Side DRS, Bernanke, Global Bernanke, and UPR.  There are multiple problems with his calculation, which plague the approach he has put forward for the assessment of impact and damages for Proposed Class members resulting from the alleged conduct.

134.    Dr. Zona claims that Buy-Side DRS, Bernanke, Global Bernanke, and UPR "successfully increased Google's win rate in AdX […] through anticompetitive means and […] caused damage to Google Ads advertisers."[206]  He defines a "win rate" as the proportion of queries that are matched to a buyer in an auction.[207]  To show the effect of these optimizations, Dr. Zona compares the actual AdX win rate over time to a "baseline" AdX win rate over time.  Both series are constructed using only a handful of documents.  According to Dr. Zona, the "baseline" or but-for AdX win rate "shows the cumulative effect of the policy changes after removing the

---

considering not only the direct benefits to that advertiser, but also the benefits to publishers to the extent that they flow back to that advertiser through indirect network effects.  *See* Sections III and VI.

[206] Zona Report, ¶68.

[207] *See* Zona Report, fn. 64 ("'Win Rate' = ███████████████████████ *100").

effect of Bernanke (various versions) and Unified Pricing Rules policy changes."[208]  Dr. Zona uses the difference between the actual and the "baseline" AdX win rate to calculate the anticompetitive inflation in Google's AdX impression volumes, which according to him is "the key to assessing the effect, if any, on Google Ads advertisers."[209]

135.    First, Dr. Zona pulls figures from a handful of documents to construct his actual AdX win rate and "baseline" AdX win rate without establishing that the metric he uses from each source is actually applicable for his specific calculation.  For instance, though Dr. Zona purports to construct a "win rate," the documents refer to metrics such as "match rate" or "win queries."  Dr. Zona uses these terms interchangeably, for instance using the "match rate" as the implied "win rate," without establishing that the measures are equivalent.  For example, the Google document that Dr. Zona relies upon to measure the effect of Bernanke states that due to Bernanke, "overall match rate is up from 47% to 53%."[210]  Further, though Dr. Zona purports to measure the overall AdX win rate, he mixes and matches win rates specific to different sets of buyers, and the documents he relies on do not always reflect win rates on AdX overall.  For example, the document used by Dr. Zona to estimate the change in AdX win rates due to Buy-Side DRS refers to Google Ads transactions, not AdX.[211]  Further, for UPR, Dr. Zona uses a document stating that the 31.8% increase in impressions is attributed to DV360 and thus, is not indicative of the change in impressions for AdX overall.[212]  Importantly, it is possible for an optimization to increase the fraction of AdX auctions won by a particular buying tool, but at the

---

[208] Zona Report, ¶119.

[209] Zona Report, ¶¶119-120.  Dr. Zona then converts the change in AdX impression volumes into the change in AdX share.  He uses this to determine the AdX share that would have prevailed absent these optimizations.  *See* Zona Report, ¶134 ("The change in AdXshare associated with a percentage change in AdX volumes is given by $(1 - AdXshare) \times AdXshare$.").  As discussed above, though Dr. Zona acknowledges that assessing an increase in impressions is key to assessing the effect on Google Ads advertisers, he fails to assess the *benefits* to Google Ads advertisers from winning additional impressions and weigh the harm, if any, of the allegedly anticompetitive conduct against such benefits.  I further understand based on Professor Milgrom's work that for any optimization allowing Google Ads advertisers to win more impressions, the net effect on Google Ads' advertiser surplus is positive, even after accounting for publishers' responses.  *See* Milgrom Report, §IV.C.2.

[210] GOOG-TEX-00448132, at -135.  *See also,* GOOG-DOJ-AT-00571933, at -934 ("Last-look allows us to *win queries* that account for 7.8% of AdX revenue").  Emphasis added.

[211] GOOG-AT-MDL-002390899, at -899 ("As a result the leading bid is higher, and more competitive in the AdX auction - enabling GDN to win 4.6% more impressions.").

[212] *See* GOOG-DOJ-14549757, at -766 (showing a 38.97% increase in impressions for DBM); GOOG-DOJ-AT-00571933, at -933 (discussing DBM).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

same time not affect (or have a different effect on) the fraction of the auctions won by AdX overall.  Moreover, the document Dr. Zona relies on highlights differences in AdX win rate by CPM levels, which Dr. Zona does not consider.[213]  Thus, he does not establish a reliable basis for the inputs he uses to construct AdX win rates, and he fails to account for variation in win rates acknowledged by those very documents he relies upon.

136.    Second, Dr. Zona incorrectly assumes that the effect of Buy-Side DRS, Bernanke, and Global Bernanke on AdX win rate is instantaneous and permanent for the entire duration of the optimization.  One of the documents he relies upon shows this assumption is invalid.  According to the document, there was a decline in AdX win rates in 2014 when Bernanke was in effect, which Dr. Zona does not account for.[214]  As a result, Dr. Zona overestimates the effect of Google's conduct on AdX win rate in some periods.

137.    Third, Dr. Zona incorrectly interprets figures in the documents he relies upon.  His calculation of the "baseline" AdX win rate prior to Buy-Side DRS relies on a document stating that Buy-Side DRS enables "GDN to win 4.6% more impressions," which Dr. Zona translates into a 4.6 percentage point increase in AdX win rate and a resulting "baseline" AdX win rate of 42.4% (=47%-4.6%).[215]  However, a 4.6% increase in impressions does not translate into a 4.6 percentage point increase in AdX win rate.  For example, suppose AdX was winning 42.4 out of 100 impressions without Buy-Side DRS, and Buy-Side DRS increased its win rate by 4.6 percentage points to win 47 out of 100 impressions.  The resulting increase in impressions is equal to 10.8% (=[47-42.4]/42.4).  Thus, a 4.6% increase in impressions implies a smaller increase in the AdX win rate than Dr. Zona predicts.  Taking Dr. Zona's AdX win rate post-Bernanke as given (*i.e.*, 47%) implies a 2.1 percentage point increase and 44.9% (=47/1.046) AdX win rate pre-Bernanke instead (=44.9×1.046-44.9).  As such, Dr. Zona's "baseline" win rate is calculated incorrectly, leading him to calculate a higher volume increase on AdX from Buy-

---

[213] GOOG-TEX-00448132, at -133 ("I actually expect our overall match rates on average to get worse for publishers as more high minCPM inventory comes to AdX (and GDN) via EDA.  To ensure this doesn't scare of[f] publishers away we will be breaking out win rates by CPM levels to give them a better idea of our fill rate of high cpm EDA calls vs direct as compared to AdX competing against other remnant monetization sources.").

[214] GOOG-TEX-00448132, at -134 ("Looking at the dasnav you mentioned but changing time range to a year, shows the trend line is declining.  Clearly Bernanke helps but as the OPG slide originally claimed we aren't winning as much as before.").

[215] GOOG-AT-MDL-002390899, at – 899.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Side DRS, Bernanke, and Global Bernanke.  A 2.1 percentage point increase instead of a 4.6 percentage point increase reduces Dr. Zona's "Volume Increases" due to Buy-Side DRS from 10.8% to 4.7%, due to Bernanke from 25% to 18%, and due to Global Bernanke from 30% to 22.8%.[216]

138.    Fourth, there are other Google documents showing different estimates for win rate, which Dr. Zona ignores.  For Global Bernanke, Dr. Zona cites an "[i]ncrease in overall match rate by about 4%" leading to a 55% (=53%×1.04) win rate on AdX.[217]  However, another Google document states that Global Bernanke can result "in the AdX win rate going up to ~51% (match rate = 55%)," which is lower than Dr. Zona's win rate.[218]  Meanwhile, for Bernanke, this document states that "[t]he current Bernanke increases the AdX win rate from 37% to 44% (match rate = 50%)," which is also lower than Dr. Zona's win rate.[219]  Accordingly, Dr. Zona makes arbitrary choices with respect to the figures he chooses to rely upon.

139.    Finally, I note that for UPR, Dr. Zona uses a document stating that "[o]n AdX-web, I see +31.8% impressions, +6.1% value, +6.4% revenue."[220]  This document, however, discusses the effect of UPR from a Google experiment conducted prior to the transition to UFPA (*i.e.*, the experiment was conducted in the context of a second-price auction).[221]  Thus, it cannot be reliably used to determine the effect of UPR on AdX win rate under UFPA.  Dr. Zona further translates this increase in impressions into a 31.8% increase in the win rate relative to the "win rate" in December 2012, which includes "Last Look."[222]  All else equal, if Dr. Zona applied this increase to a period prior to "Last Look," the increase in the volume due to UPR would have

---

[216] *See* my workpapers.

[217] GOOG-DOJ-28339653, at -656.

[218] GOOG-DOJ-04320717, at -717.

[219] GOOG-DOJ-04320717, at -717.

[220] GOOG-DOJ-AT-00571933, at -933.

[221] Day 7 AM Trial Testimony of Nirmal Jayaram (Google), United States of America, et al. v. Google LLC, U.S. District Court, Eastern District of Virginia, Case No. 1:23-cv-108-LMB-JFA, September 17, 2024, at 159:21 - 161:3 (discussing GOOG-DOJ-AT-00571933 as DTX 768).

[222] *See* Zona Report, ¶87 ("On August 13, 2019, Google estimated an increase in its win rate attributable to UPR for open web of 31.8 percent."); Dr. Zona's workpapers ("Anticompetitive Conduct Win Rate.xlsx," tab "Time Series," cell B126).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

decreased from 31.8% to 22.3%. In sum, Dr. Zona's estimates of the effect of the optimizations on impressions is faulty.[223]

## VIII. DR. SINGER DOES NOT DEMONSTRATE THAT ECONOMIC INJURY TO PROPOSED CLASS MEMBERS, IF ANY, IS AMENABLE TO COMMON PROOF

140.    Dr. Singer "assess[es] antitrust injury ('impact') and damages in []his report … focus[ing] on one element of the Challenged Conduct—namely, the Unified Pricing Rules (UPR) that Google implemented in approximately September 2019."[224] Dr. Singer proposes two distinct methods for his assessment of class-wide impact and damages, which he refers to as his "indirect" and "direct" methods of estimating "inflated advertising rates owing to UPR."[225] In this section, I describe each method put forward by Dr. Singer and explain why it is incapable of establishing economic injury resulting from UPR for all or nearly all members of the Proposed Class.

### A. Dr. Singer's "Indirect Method" is Incapable of Establishing Economic Injury Resulting from UPR for All or Nearly All Members of the Proposed Class

#### 1. Description of Dr. Singer's "Method 1: Indirect Estimation" Overcharge Model

141.    Dr. Singer's indirect method to estimate the overcharge to advertisers resulting from UPR is premised on the theory that UPR steered impressions to AdX at the expense of rival exchanges, and absent UPR, Google would have instead had to decrease the AdX revenue share—with a portion of savings passed through to advertisers—to regain those impressions. Dr. Singer proposes a three-step process to estimate the "inflated total transaction costs" as a result of UPR.[226]

142.    First, Dr. Singer claims to "isolate the lift in AdX impressions … owing to UPR."[227] To do so, Dr. Singer constructs a regression model, in the form of a "before-after" analysis, in which

---

[223] I also note Dr. Zona does not demonstrate that the documents he relies upon for his AdX win rate calculations are relevant to his calculations for "advertisers conducting business in the stream of U.S. commerce." Zona Report, ¶65.

[224] Singer Report, ¶4.

[225] Singer Report, §II.C and §II.D.

[226] Singer Report, ¶¶76-77.

[227] Singer Report, ¶77.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

he compares the number of monthly impressions transacted on AdX via Google Ads before the launch of UPR as compared to after the launch, purportedly accounting for Google's total revenue share and other factors that influence the volume of AdX impressions over time.[228] Based on his primary model, Dr. Singer finds an average monthly increase in impressions due to UPR (averaged over the period from September 2019 to March 2024 and across different advertiser verticals) "of approximately 753.65 million monthly impressions."[229]  In addition to the primary model, Dr. Singer also puts forward a model that includes a linear trend.  He states that his results "are not sensitive to the inclusion of a time trend."[230]

143.    Second, after estimating the "lift" in Google Ads-AdX average monthly impressions, Dr. Singer "solves for the reduction in the AdX take rate that would produce the same lift in impressions."[231]  To do so, Dr. Singer uses the relationship between impressions and Google's revenue share estimated by his regression model, as indicated by the coefficient on his *Total Take Rate* variable.  He concludes that each percentage point reduction in Google's revenue share

---

[228] Singer Report, ¶¶80-96.  The dependent variable to be explained in this regression model is the monthly total Google Ads-AdX impressions across all advertisers within a given vertical (*i.e.*, the advertiser industry classification). The main explanatory variable ("UPR") is an indicator variable that takes the value 1 beginning in September 2019 (to indicate the implementation of UPR) and the value 0 before September 2019.  Dr. Singer's explanatory variable on revenue share ("Total Take Rate") reflects the total Google revenue share across Google Ads and AdX, rather than the AdX-specific revenue share.  Dr. Singer's other control variables "are focused primarily on accounting for additional demand-side factors" and include: "two variables to account for consumer demand… (1) real GDP per capita in the United States; and (2) a consumer sentiment index" which Dr. Singer claims also account for the COVID-19 pandemic; another "two variables that account for … complementary demand systems: (1) Google search engine activity; and (2) YouTube active users;" and "a metric that could impact advertiser demand, the click-through rate."  Singer Report, ¶¶89-90.  Dr. Singer also includes seasonality fixed effects (in the form of indicator variables for each calendar month) and advertiser vertical fixed effects "account[ing] for the fact that particular advertising verticals experience impression distribution differently than others." Singer Report, ¶¶91-92.  Dr. Singer also includes three alternative models in which, relative to his primary model, he (i) excludes seasonality fixed effects, (ii) excludes seasonality and advertiser vertical fixed effects, or (iii) adds a time trend.  Singer Report, Table 3, ¶106.  Dr. Singer's workpapers also establish that Dr. Singer limits his regression (and damages calculations) to only the subset of Google Ads advertisers that used a "cpc to cpm" cost model and transactions for which a publisher payout is recorded.

[229] Singer Report, ¶96.

[230] Singer Report, ¶96.

[231] Singer Report, ¶9; *see also,* Singer Report, ¶77.  Dr. Singer fails to establish that, absent UPR, Google would have in fact lowered its revenue share to achieve the impression gain he estimates it achieved through UPR.  Dr. Singer merely asserts that a "decline in the AdX take rate [would have been] [] a procompetitive response" and that absent UPR, "competitive forces would have required Google to reduce its AdX take rate to regain that share."  Singer Report, ¶¶68, 76.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

would increase monthly impressions by 163.26 million, and therefore Google would have had to reduce its revenue share by "4.62 percentage points in order to yield the same impression lift."[232]

144.    Third, Dr. Singer "translates that reduction in the AdX take rate into a savings for advertisers based on the advertisers' take rate burden, which [he] estimate[s] in two different ways."[233]   In essence, because "the take rate on AdX is aimed at publishers"[234] rather than advertisers, Dr. Singer purports to estimate the savings in ad prices that publishers would have passed through to advertisers.  He concludes that between 26.6% and 35.36% of savings due to a decrease in AdX revenue share would have been passed through to advertisers.[235]   Using this result and the reduction in Google's total revenue share that Dr. Singer estimates in his previous step, he concludes that UPR resulted in a 1.2% to 1.6% inflation in advertisers' ad spend (*i.e.*, gross revenue) transacted on AdX via Google Ads.[236]   Dr. Singer calculates total damages of "approximately $56.0 to $74.4 million" using this indirect method.[237]

145.    As I describe below, Dr. Singer's proposed approach is fundamentally flawed, which renders it unreliable for the assessment of class-wide impact.

### 2.    Dr. Singer's Indirect Method Offers No Opinion on Economic Injury for More than Half of Proposed Class Members

146.    As an initial matter, even taking Dr. Singer's indirect method at face value, he does not claim economic injury for more than half of the Proposed Class members.  As such, he offers no methodology to establish impact for the majority of advertisers in the Proposed Class.

147.    Based on the data that Dr. Singer utilizes for his indirect method, there are 2,529,071 Google Ads advertisers that purchased open web display ads during the Proposed Class

---

[232] Singer Report, Table 3, ¶106.  Specifically, Dr. Singer divides his coefficient on *UPR* (753.65 million monthly impressions) by his coefficient on *Total Take Rate* (-163.26 million impression change per 1 percent revenue share increase) to solve for the revenue share percentage point change necessary to achieve a 753.65 million monthly impression increase.  Singer Report, ¶106, fn. 102.

[233] Singer Report, ¶9.

[234] Singer Report, ¶1.

[235] Singer Report, ¶¶100, 104; *see also,* Singer Report, ¶109.

[236] 4.62 take rate reduction × 26.6% pass-through = 1.2%; 4.62 take rate reduction × 35.06% pass-through = 1.6%.

[237] Singer Report, ¶109.  He further states that damages to each individual proposed class member can be calculated based on each individual advertisers' ad spend.  Singer Report, ¶130.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Period.[238]  Because he purportedly evaluates the effect of UPR on advertisers in the Google Ads-AdX pipeline, Dr. Singer does not provide any opinion on economic injury for the following groups of advertisers in the Proposed Class:[239]

- Advertisers that never purchased open web display ads via AdX during the Proposed Class Period.  Approximately 230,000 advertisers using Google Ads only purchased ads from AdSense or from non-Google exchanges.

- Advertisers that only purchased open web display ads via AdX before September 2019.[240]  An additional approximately 457,000 advertisers only purchased from AdX prior to September 2019 (*i.e.*, the first month in which Dr. Singer opines on injury to Proposed Class members).

- Advertisers that did not use a "CPC to CPM" cost model or for whom the recorded payment to publishers is less than $5.[241]  An additional approximately 772,000 advertisers are excluded from Dr. Singer's indirect method and his damages assessment.  Dr. Singer does not claim an effect of UPR on impressions for these advertisers.

148.    As such, Dr. Singer's indirect method does not purport to assess injury or damages for 57.7% of advertisers in Dr. Zona's Proposed Class definition, *i.e.*, more than half of the

---

[238] As mentioned in fn. 103, Dr. Singer's identification of advertisers varies somewhat from Dr. Zona's, as does his inclusion or exclusion of a small number of advertisers based on differences in treatment of the data.  I present figures here based on Dr. Singer's identification of advertisers.

[239] *See* my workpapers for calculations of these figures.  I note that Dr. Singer claims economic injury only for "advertiser[s] for whom Google reported positive revenues between September 2019 and March 2024 (the end of the data) for Google Ads purchases through AdX."  Singer Report, ¶5, fn.3.

[240] Dr. Singer claims that he restricts his assessment of impact and damages to Google Ads-AdX transactions between October 2019 and March 2024.  *See, e.g.*, Singer Report, ¶¶84, 87, fn. 104, indicating his variable of interest (UPR) and summation of advertiser spend begins the period *after* September 2019.  However, Dr. Singer's analysis actually accounts for UPR beginning in September 2019, and his damages also are based on advertiser spend beginning in September 2019.  *See* Dr. Singer's workpapers.

[241] Dr. Singer, like Dr. Zona, only accounts for Google Ads advertisers purchasing via AdX that use a "CPC to CPM" cost model.  An additional approximately 34,000 advertisers did not use a "CPC to CPM" cost model.  Moreover, Dr. Singer excludes any transactions for which the recorded publisher payment, after aggregation to the level of data contained in his workpapers, is less than $5.  An additional approximately 738,000 advertisers for whom the recorded payment to publishers is less than $5 in each transaction are excluded from Dr. Singer's indirect method.  *See* Dr. Singer's workpapers.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

advertisers that used Google Ads to purchase open web display ads during the Proposed Class Period.

### 3. Dr. Singer's Indirect Method Masks Substantial Variation Across Advertisers in Different Verticals; My Testing of His Models Shows that UPR Did Not Result in An Increase in Impressions for Several Advertiser Verticals

149. For the subset of Proposed Class members that Dr. Singer purports to establish economic injury using his indirect method, he claims there was an average monthly increase in impressions across verticals due to UPR of roughly 753.65 million monthly impressions.[242]  His estimate of an impression lift, however, masks differences across advertisers in the Proposed Class.  Dr. Singer estimates an average effect of UPR on monthly impressions across advertisers in 13 verticals, which include various industries, such as Automotive, Consumer Packaged Goods, Finance, Healthcare, Government & Education, Retail, and Travel.  Despite acknowledging that "particular advertising verticals experience impression distribution differently than others," Dr. Singer does not investigate whether the change in impressions over time varies across advertiser verticals.[243]  Indeed, the 13 verticals in his analysis do exhibit different trends in impressions over time.  As shown in **Exhibit 11,** the underlying data show that 9 of the 13 verticals experienced a decline in monthly impression levels after UPR, while only 4 verticals experienced an increase in monthly impression levels after UPR.

---

[242] Singer Report, ¶96.

[243] Singer Report, ¶92.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 11: MONTHLY AVERAGE IMPRESSIONS IN THE PRE-UPR PERIOD VS THE POST-UPR PERIOD BY ADVERTISER VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Notes:*
    Monthly average impressions are calculated as total impressions in a period divided by the number of months in the given period.

*Source:*
    Dr. Singer's turnover.

150.    Next, I demonstrate that when I use Dr. Singer's own regression model and allow the effect of UPR to vary across advertiser verticals, I find that his conclusion of an impression lift resulting from UPR does not hold for advertisers in several verticals.[244]  I conduct this testing using both Dr. Singer's primary model and also his model that includes a linear trend.  Using Dr. Singer's primary model, I find that UPR did not lead to an increase in impressions for two advertiser verticals, *i.e.*, advertisers associated with Finance and Travel.[245]  This is consistent with the underlying data, which show that these two verticals experienced a decline of more than ▮ in average monthly impressions in the post-UPR period compared to the pre-UPR period. Additionally, using Dr. Singer's model that includes a linear trend, I find that 7 advertiser verticals (*i.e.*, advertisers associated with Automotive, Classifieds & Local, Consumer Packaged Goods, Education & Government, Finance, Technology, and Travel) did not experience a

---

[244] By estimating a single average effect for UPR, Dr. Singer's approach assumes that the effect of UPR on impressions is uniform across advertiser verticals.  This, however, is a testable assumption.  In fact, statistical testing strongly rejects Dr. Singer's assumption that the estimated effect of UPR is uniform across all advertiser verticals.  The statistical test used is an F-test of the hypothesis that the coefficients on UPR for each vertical are equal.  *See* Wooldridge, pp. 139-144.  The F-statistic is highly statistically significant.  *See* my workpapers.

[245] *See* Appendix C.3 for the charts of monthly total impressions for each vertical.

statistically significant increase in impressions as a result of UPR.[246]  Specifically, UPR led to a statistically significant decline for 2 advertiser verticals (*i.e.*, advertisers associated with Finance and Travel) and did not lead to a statistically significant increase for another 5 advertiser verticals (*i.e.*, advertisers associated with Automotive, Classifieds & Local, Consumer Packaged Goods, Education & Government, and Technology).

151.    Thus, based on my testing of Dr. Singer's model, there is no statistical proof that UPR resulted in an impression lift for advertisers in these 7 verticals.[247]  Among advertisers that purchased impressions on AdX in the post-UPR period in Dr. Singer's analysis, 46.6% of advertisers are only associated with these 7 verticals.  This means Dr. Singer is unable to establish that UPR resulted in an impression lift for a substantial proportion of advertisers that he studies.

152.    Moreover, as I noted above, Dr. Singer only claims economic injury for less than half of the Proposed Class members using his indirect method.  The advertisers that are only associated with these 7 verticals and purchased impressions on AdX in the post-UPR period account for another 19.7% of the Proposed Class members.[248]  This means that in addition to the 57.7% of Proposed Class members for which Dr. Singer provides no opinion of economic injury, he has no statistical proof of UPR resulting in an impression lift for another 19.7% of Proposed Class members, or a total of 77.4% of the Proposed Class.[249]

153.    These findings indicate that Dr. Singer's approach, which does not consider changes over time across advertiser verticals, masks substantial variation in the experience of advertisers in

---

[246] I use the 5 percent level of statistical significance, which is the conventional standard.  According to the Reference Manual on Scientific Evidence that Dr. Singer cites to support the use of regression analysis, "[i]n most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at 0.05, or 5%."  Reference Manual on Scientific Evidence, p. 320.  I note that I obtain similar results using the 10 percent level of statistical significance.  Specifically, using the 10 percent level of statistical significance, I find that UPR did not lead to an increase in impressions for two advertiser verticals using Dr. Singer's primary model and five advertiser verticals using Dr. Singer's model that includes a linear trend.

[247] Advertisers associated with these 7 verticals account for 51.3% of advertisers and 49.9% of the total ad spend in Dr. Singer's analysis.

[248] There are 21.5% of the Proposed Class members that are associated with these 7 verticals and purchased impressions on AdX in the post-UPR period.

[249] Even putting aside the advertisers for whom the recorded payment to publishers is always less than $5, Dr. Singer either provides no opinion of economic injury or has no statistical proof of UPR resulting in an impression lift for at least 48.2% of the Proposed Class.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

different verticals. The results contradict Dr. Singer's claims that UPR had a widespread effect of "decreasing [Google's] rivals' competitiveness" and "prevent[ing] publishers from steering advertiser customers to a … rival ad exchange."[250] My testing of Dr. Singer's models shows there is no such widespread effect across members of the Proposed Class. As such, his claims about the purported effect of UPR are not supported by the data. Moreover, as I demonstrate below, Dr. Singer's approach ignores the specific circumstances of Proposed Class members and thus yields biased and unreliable conclusions regarding the alleged impression lift resulting from UPR.

### 4. Dr. Singer's Indirect Method Is Incapable of Distinguishing the Effect of Legitimate Economic Factors from the Effect of UPR on Impression Lift, Thereby Rendering it Incapable of Establishing Class-Wide Impact from UPR

154. Even putting aside the issue that Dr. Singer's approach masks substantial variation across advertisers in different verticals, his model for estimating the alleged effect of UPR is fundamentally flawed. The methodology proposed by Dr. Singer for estimating an alleged impression lift resulting from UPR is a "before-after" approach.[251] Generally speaking, a before-after model compares "the values of the dependent variable in the before period to the values it took on in the during period" when the alleged conduct occurred.[252] The ABA treatise on the application of econometrics to antitrust issues explains that "[i]n making this comparison, however, it is critical to account for any significant differences in other economic factors between the before and during periods."[253] This is because any differences in the values of the dependent variable, in this case the monthly total impressions, between the two periods that are unexplained by other economic factors included in the model are attributed to the alleged conduct, in this case UPR. In fact, Dr. Singer himself acknowledges the need to "account for

---

[250] Singer Report, ¶¶69, 78.

[251] Singer Report, ¶9.

[252] ABA Econometrics, p. 312 (It is also known as the "before-during" approach which "identifies the effect of the alleged conduct by using data from a period before the alleged conduct in combination with the data from the period when the alleged conduct occurred.").

[253] ABA Econometrics, p. 312. Similarly, in another chapter of the book, the author states that "[i]n using before-and-after models, the econometrician must consider whether there are other events that took place during or outside the time period of interest that may confound the econometrician's measurement of the effects of primary interest to the analysis." ABA Econometrics, p. 71.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

other factors that might affect impressions … to isolate the impact of UPR on impressions" in his before-after model.[254]  Yet, he fails to account for important factors.

155.    I demonstrate that advertisers in different verticals faced idiosyncratic conditions that led to substantial changes in their impressions over time.  Dr. Singer's before-after approach is unable to account for these crucial factors that are specific to advertisers in different verticals.  In addition, his regression model cannot account for events that occurred at the same time as UPR, including Google's transition to first-price auctions.[255]  This means that his model is incapable of distinguishing the effect of legitimate economic factors from the allegedly anticompetitive effect of UPR on impression lift; instead, his model incorrectly attributes the increase in impressions driven by legitimate factors to the effect of UPR.  Thus, Dr. Singer's methodology yields biased results and is unreliable for the assessment of class-wide impact resulting from UPR.

156.    According to the same chapter in the Federal Judicial Center's Reference Manual that Dr. Singer cites to support his use of multiple regression analysis for the before-after approach, "when inappropriately used, regression analysis can confuse important issues while having little, if any, probative value."[256]  As I demonstrate below, a regression analysis that is "inappropriately used," like Dr. Singer's, is incapable of establishing economic injury for members of the Proposed Class.

---

[254] "Third, the symbol $X_{it}^{k}$ denotes the various control variables $k$ in the model, which account for factors that might affect impressions transacted between Google Ads and AdX across time.  By holding other factors fixed, the regression is able to isolate the impact of UPR on impressions."  Singer Report, ¶88.  Dr. Singer also cites to an article stating that "multiple regression analysis 'distinguishes among a number of competing factors … allowing the court to isolate a key relationship[.]'"  Singer Report, ¶82.  Yet, his before-after model fails to account for competing factors that explain the change in impressions over time and therefore fails to "isolate a key relationship."

[255] Dr. Singer himself acknowledges that "[o]ne potential control variable omitted from the regression is Google's near-simultaneous conversion to a first-price auction (from a second-price auction) as it implemented UPR."  Singer Report, ¶93.  Although Dr. Singer dismisses any potential effects from Google's transition to first-price auctions, his approach is unable to account for any change in impressions resulting from the transition, including any procompetitive benefits of UPR under UFPA.  For example, under UFPA, UPR led to output enhancing outcomes by clearing impressions that would have otherwise gone unsold on AdX.  *See* Section VI.B.3.  Instead, Dr. Singer's approach attributes to UPR any change in impressions on AdX from the transition.

[256] Reference Manual on Scientific Evidence, p. 308.  Singer Report, ¶82.  Dr. Singer states that "[t]he Federal Judicial Center's Reference Manual on Scientific Evidence explains that multiple regression analysis (the standard econometric tool for analyzing relationships between variables, which I employ here) is 'a well-accepted scientific methodology.'"

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**i.    Advertisers in Different Verticals Faced Idiosyncratic Conditions that Affected Their Impressions Over Time**

157.    Advertisers in different verticals faced idiosyncratic conditions that affected their impressions over time, including when UPR was in effect.  Documentary and empirical evidence show that the COVID-19 pandemic caused a major shift in the online advertising industry, resulting in disparate effects across advertiser verticals.  According to a June 2021 eMarketer report, advertisers in the Consumer Packaged Goods, Healthcare & Pharma, Retail, and Computing Products & Consumer Electronics verticals increased their digital ad spending by more than 20% in 2020 compared to 2019, exceeding the growth in spending from 2018 to 2019.[257]  In particular, the growth in ad spend for the Healthcare vertical in 2020 exceeded any other year between 2019 and 2023 by at least 10 percentage points.  Meanwhile, advertisers in the Automotive and Travel verticals cut back on their digital ad spending in 2020.  Further, according to a Statista report, "[d]igital advertising soared throughout 2020" as the "industry managed to adjust to the new normal, having implemented online and hybrid events …, and generally transferring the trade to the internet."[258]  The growth in digital advertising was driven in part by a dramatic increase in digital content consumption by consumers as a result of COVID-19, providing "ample opportunity for businesses to advertise their products and services through the display and in-app mediums."[259]

158.    The disruptive effect of the pandemic on online advertising is reflected in the data that Dr. Singer relies on.  As shown in **Exhibit 12**, impressions for the Healthcare vertical increased dramatically from less than ██████ monthly impressions before 2020 to more than ██████

---

[257] According to the report, digital advertising "includes advertising that appears on desktop and laptop computers as well as mobile phones, tablets, and other internet-connected devices on all formats mentioned." "US Digital Ad Spending Growth, by Industry, 2019-2023," *eMarketer*, available at https://www.emarketer.com/chart/249891/us-digital-ad-spending-growth-by-industry-2019-2023-change.

[258] Navarro, J. G., "Coronavirus Impact on Advertising Worldwide - Statistics & Facts," *Statista*, Dec. 18, 2023, available at https://www.statista.com/topics/7070/coronavirus-impact-on-advertising-worldwide/#topicOverview.

[259] "How Has COVID-19 Affected the Digital Advertising Space?" *Online Optimism*, available at https://www.onlineoptimism.com/blog/how-has-covid-19-affected-the-digital-advertising-space/.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

monthly impressions from early 2020 until early 2021.[260]  The number of impressions plummeted back to the pre-pandemic level in mid-2021 when the effects of COVID-19 eased.

**EXHIBIT 12: MONTHLY TOTAL IMPRESSIONS FOR ADVERTISERS IN THE HEALTHCARE VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Source:*
        Dr. Singer's turnover.

159.    Similarly, as shown in **Exhibit 13**, the monthly total impressions purchased by advertisers associated with the Education & Government vertical also had a temporary spike in

---

[260] The growth in impressions in the Healthcare vertical is consistent with a 2020 eMarketer report, which predicts that "[s]pending on display will grow 15.7% in 2020, reaching $4.04 billion, making it the fastest-growing format in healthcare and pharma."  Further, as the report explains, digital ad spend in the Healthcare vertical increased in 2020 "as public health organizations and private medical institutions raised awareness around testing, safety measures, and other pandemic-related information."  In addition, "[t]he crisis also led to an influx of marketing around medical supplies, consumer adoption of telemedicine, and regional advertising for reopening doctor's offices and medical clinics."  Droesch, Blake, "US Healthcare and Pharma Digital Ad Spending 2020," *eMarketer*, Sep. 30, 2020, available at https://www.emarketer.com/content/us-healthcare-pharma-digital-ad-spending-2020.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2020.  Several of the top advertisers in this vertical, which consist of online education platforms and political advertisers, substantially increased ad spend and impressions in 2020.  Specifically, with the rise of e-learning during COVID-19,[261] online education platforms, such as IXL Brands and AdaptedMind,[262] dramatically increased their ad spend in 2020 compared to 2019.  For example, the number of impressions purchased by IXL Brands grew from 1.3 billion in 2019 to ▇▇▇▇▇▇ in 2020 and then ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ in 2021.  In addition to the effect of COVID-19 on impressions purchased by advertisers in the Education & Government vertical, the U.S. election in 2020 also led to a surge in impressions during the post-UPR period.  Notably, the advertiser that had the highest ad spend in 2020 within the vertical was the political advertiser ▇▇▇▇▇▇▇▇▇▇ which purchased more than ▇▇▇▇▇ impressions in 2020.  Therefore, advertisers in the Education & Government vertical faced idiosyncratic conditions unrelated to UPR that resulted in a temporary increase in impressions in the post-UPR period.

---

[261] Hess, Abigail J., "Online Learning Boomed During the Pandemic – But What Happens When Students Return to Classrooms?" *CNBC*, Mar. 26, 2021, available at https://www.cnbc.com/2021/03/26/online-learning-boomed-during-the-pandemic-but-soon-students-return-to-school.html.

[262] IXL Brands is an educational technology company.  *See* "Our Story," *IXL Learning*, available at https://www.ixl.com/company/story.  Similarly, AdaptedMind is an online learning program for students in Kindergarten through Grade 6.  *See* "AdaptedMind," *AdaptedMind*, available at https://www.adaptedmind.com/.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 13: MONTHLY TOTAL IMPRESSION FOR ADVERTISERS IN THE EDUCATION & GOVERNMENT VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Source:*
Dr. Singer's turnover.

160.    Moreover, the Services vertical experienced a surge in impressions in early 2020 as a result of its largest advertiser—Meta—increasing its ad purchases by more than ███ during the onset of COVID-19.  Monthly total impressions in this vertical grew sharply from less than 2.4 billion in December 2019 to more than ███ in April 2020.  This brief spike cannot be related to UPR because impressions quickly returned to their pre-pandemic level in July 2020. **Exhibit 14** illustrates the monthly total impressions in the Services vertical, distinguishing between the impressions purchased by Meta (shown in blue) and the impressions purchased by all other advertisers in the vertical combined (shown in grey).  **Exhibit 14** shows that 98% of the impressions in this vertical were purchased by Meta, which also explains why impressions of all other advertisers combined are barely noticeable in the exhibit.  As such, the Services vertical

96

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

faced the unique situation that its impression trend is determined by the idiosyncratic decision made by a single member of the Proposed Class.

**EXHIBIT 14: MONTHLY TOTAL IMPRESSIONS PURCHASED BY META AND OTHER ADVERTISERS COMBINED IN SERVICES VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Source:*
   Dr. Singer's turnover.

161.     By way of another example, the Retail vertical also saw substantial growth in impressions between mid-2020 and early 2021 as e-commerce exploded during COVID-19.[263]  This increase was followed by a decline to its pre-pandemic level in mid-2021, with the exception of an upward trend starting in 2023.  The upward trend after 2022 is driven by a single advertiser, Temu, which entered the US retail industry in late 2022.[264]  **Exhibit 15** below illustrates the

[263] Graham, Megan, "How a Stay-at-Home Year Accelerated Three Trends in the Advertising." *CNBC*, Mar. 13, 2021, available at https://www.cnbc.com/2021/03/13/how-covid-19-changed-the-advertising-industry-.html ("eMarketer forecast in the fall that marketers would spend $17.37 billion in advertising on e-commerce sites and apps in 2020, up 38% from 2019.").

[264] Li, Jianggan, "What's behind the rise of Chinese e-commerce platform Temu in the US?" *TLDbyMW*, Apr. 11, 2024, available at https://thelowdown.momentum.asia/whats-behind-the-rise-of-chinese-e-commerce-platform-temu-in-the-us/.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

monthly total impressions for this vertical, distinguishing between impressions purchased by Temu (shown in blue) and impressions purchased by all other advertisers in this vertical combined (shown in grey). It demonstrates that the Retail vertical experienced an idiosyncratic shift due to the entry of Temu in late 2022, which drastically increased the monthly total impressions for the vertical.

**EXHIBIT 15: MONTHLY TOTAL IMPRESSIONS PURCHASED BY TEMU AND OTHER ADVERTISERS COMBINED IN RETAIL VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Source:*
    Dr. Singer's turnover.

162.    Both the examples I have shown highlight the importance of conducting inquiries into individualized advertiser-specific factors. Dr. Singer's approach ignores the specific circumstances of Proposed Class members and thus yields biased and unreliable conclusions.

163.    In addition to the four verticals discussed above, there are several other verticals, including Business & Industrial Markets, Classifieds & Local, Consumer Packaged Goods, and Media & Entertainment that experienced a temporary increase in impressions during COVID-19,

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

followed by a decline to levels prior to the pandemic.[265]  At the same time, the Travel vertical experienced a noticeable reduction in impressions during COVID-19.  Meanwhile, the impressions purchased by advertisers in the Automotive and Finance verticals in 2020 remained similar to the levels prior to the pandemic.  Thus, even analyzing the *same* event, such as COVID-19, the effect on impressions varied across advertiser verticals.

### ii. Dr. Singer's Approach Is Unable to Account for the Idiosyncratic Factors that Affected Impressions for Different Advertiser Verticals

164.    Dr. Singer's indirect method does not account for any idiosyncratic factors or events that affected the demand for impressions for different advertiser verticals.  I demonstrate below that his approach is unable to account for the effects of COVID-19 and the entry of a large advertiser; instead, his approach incorrectly attributes the increase in impressions driven by these factors to UPR.  I also show that as a result, his model yields nonsensical predictions for impressions absent UPR.

165.    Dr. Singer acknowledges that "COVID-19 affected domestic output and purchasing patterns" and purports to account for the effect of the pandemic on impressions by including a variable for GDP and a variable for consumer sentiment index in his model.[266]  His approach assumes that the effect of the pandemic on impressions follows the same pattern for advertisers across all verticals.  However, as demonstrated above, advertiser verticals were differentially affected by the pandemic.  Most verticals experienced an increase in impressions with some verticals increasing the number of impressions manyfold; by contrast, a few verticals experienced a decrease or little change in impressions during COVID-19.[267]  Further, the duration of the effect also varies across verticals, with the effects lasting longer for some verticals, such as Healthcare, as compared to others, such as Services.  Accordingly, the effect of

---

[265] *See* Appendix C.3 for the charts of the monthly total impressions for these verticals.

[266] Singer Report, ¶90.

[267] The verticals that experienced a temporary increase in impressions during COVID-19 include Business & Industrial Markets, Classifieds & Local, Consumer Packaged Goods, Education & Government, Healthcare, Media & Entertainment, Retail, and Services.  The verticals that experienced a temporary decrease or little change in impressions during COVID-19 include Automotive, Finance and Travel.  *See* Appendix C.3.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

COVID-19 on impressions does not follow the same pattern for advertisers in all 13 verticals and cannot be accounted for using common factors, such as GDP and consumer sentiment.

166.    Next, I illustrate that Dr. Singer's model is unable to capture the effect of the pandemic on impressions for different verticals.  In **Exhibit 16** below, I show the but-for impressions estimated by Dr. Singer's model (in orange), which purportedly accounts for the effect of COVID-19, compared to actual impressions (in blue) for the Services vertical.  As discussed above, the number of impressions purchased by Meta, which accounts for 98% of the impressions in the Services vertical, had a brief spike during the onset of COVID-19.  Meta drove up the number of impressions in this vertical to more than 16.6 billion in April 2020.  Yet, Dr. Singer's model predicts that the monthly impressions during the onset of COVID-19 should be less than 5 billion for the Services vertical absent UPR.  Put differently, Dr. Singer's model cannot account for the dramatic yet temporary increase in impressions during the onset of COVID-19, which occurred months after UPR was introduced.  Instead, his approach incorrectly attributes the increase that is not captured by the factors in his model to the effect of UPR.  This is the case for several other verticals, including the Healthcare vertical.[268]  In addition, I note that Dr. Singer's model yields the nonsensical result that absent UPR, the monthly total impressions for the Services vertical would have been negative in several months in late 2023 and early 2024.

---

[268] *See* Appendix C.3.  I note that Dr. Singer's model that includes a time trend suffers from the same issue.  *See* my workpapers.  An ABA treatise on the application of econometrics to antitrust issues explains that "[c]omparing the values of the dependent variable in the before period to the values it took on in the during period may serve to identify the effect of the alleged conduct. In making this comparison, however, it is critical to account for any significant differences in other economic factors between the before and during periods."  ABA Econometrics, p. 312.  A failure to account for a crucial factor that affects impressions over time means that the model suffers from the omitted variable bias.  The omitted variable bias problem arises when a relevant explanatory variable is excluded from the regression model and that variable is correlated with another explanatory variable in the regression model.  Wooldridge, pp. 84-87. As Professor Wooldridge also explains the issue in an econometrics textbook, "suppose that … we omit a variable that actually belongs in the true (or population) model. This is often called the problem of excluding a relevant variable or underspecifying the model. … [T]his problem generally causes the OLS estimators to be biased."  Wooldridge, p. 84.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 16: MONTHLY TOTAL IMPRESSIONS V. ESTIMATED BUT-FOR MONTHLY TOTAL IMPRESSIONS FOR THE SERVICES VERTICAL USING DR. SINGER'S MODEL**

**JANUARY 2017 – MARCH 2024**



*Note:*
        The monthly but-for impression is predicted by Dr. Singer's primary model.

*Source:*
        Dr. Singer's turnover.

167.    Similarly, Dr. Singer's indirect method also does not account for expansion over time for any advertiser vertical.[269]  For example, his model is unable to account for the fact that Temu entered the U.S. retail industry in late 2022 and spent more than ▮▮▮▮▮▮ on Google Ads in 2023 and early 2024, driving up the impressions in the Retail vertical in the post-UPR period. As shown in **Exhibit 17** below, the but-for impressions predicted by Dr. Singer's model (in orange) do not capture the expansion in the Retail vertical after 2022.  In fact, Dr. Singer's model predicts that absent UPR, impressions for the Retail vertical would have declined over time from

---

[269] His methodology predicts that absent UPR, there would have been a declining trend in impressions over time.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2020 onwards.  As such, Dr. Singer's proposed methodology incorrectly attributes the increase in impressions due to Temu's entry to his estimated effect of "[t]he artificial lift in impressions owing to UPR."[270]  Moreover, the comparison of but-for impressions predicted by Dr. Singer's model and the actual impressions between mid-2020 and mid-2021 also shows that his proposed methodology is unable to capture the effect of COVID-19 for the Retail vertical.



**EXHIBIT 17: MONTHLY TOTAL IMPRESSIONS V. ESTIMATED BUT-FOR MONTHLY TOTAL IMPRESSIONS FOR THE RETAIL VERTICAL USING DR. SINGER'S MODEL**

**JANUARY 2017 – MARCH 2024**



*Note:*
    The monthly but-for impression is predicted by Dr. Singer's primary model.

*Source:*
    Dr. Singer's turnover.

---

[270] Singer Report, ¶ 96.

102

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

168.    By way of another example, Dr. Singer's model estimates nonsensical but-for monthly total impressions for the "E1 N/A" vertical (or the vertical capturing "other" industries).[271]  As shown in **Exhibit 18** below, Dr. Singer's methodology yields the prediction that absent UPR, the monthly total impressions for the vertical (depicted with an orange line) would have been *negative* in 42 of the 55 months from September 2019 onwards.  In fact, the but-for monthly total impressions are estimated to be *negative* 408 million, on average, during the post-UPR period based on Dr. Singer's model.  This nonsensical result comes about because Dr. Singer's approach fails to account for time-varying demand factors that affected impressions purchased by advertisers in different verticals.  This highlights that Dr. Singer's proposed methodology and his resulting conclusions with respect to the effect of UPR are flawed and unreliable.

---

[271] Examples of advertisers in the "Other" vertical include ████████████████████████████ ████████████████████████ .

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 18: MONTHLY TOTAL IMPRESSIONS V. ESTIMATED BUT-FOR MONTHLY TOTAL IMPRESSIONS FOR THE OTHER VERTICAL USING DR. SINGER'S MODEL**

**JANUARY 2017 – MARCH 2024**



*Note:*
    The monthly but-for impression is predicted by Dr. Singer's primary model.

*Source:*
    Dr. Singer's turnover.

169.    Thus, Dr. Singer's proposed methodology fails to account for idiosyncratic factors that affect the impressions for different advertiser verticals over time.  This is crucial because any variation in impressions over time that is not explained by other factors in his model is attributed by him to the effect of UPR.  A failure to account for idiosyncratic factors that affect demand conditions for advertisers in different verticals means that his methodology cannot distinguish between the change in impressions caused by legitimate economic factors unrelated to UPR (such as COVID-19, the 2020 U.S. election, and industry expansion) and any change in

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

impressions caused by UPR. This renders his indirect method unreliable for the assessment of impact for Proposed Class members.

### iii. Dr. Singer's Indirect Method Yields Biased Results and Is Unreliable for the Assessment of Class-Wide Impact Resulting from UPR

170. My testing of Dr. Singer's model shows that his finding of an impression lift resulting from UPR is driven by a few verticals that experienced a substantial increase in impressions due to factors unrelated to UPR, such as COVID-19 and industry expansion. I illustrate this using three of the verticals that I discussed above (*i.e.*, Healthcare, Services, and Retail). When I use Dr. Singer's model and allow for the change in impressions over time for these three verticals to be different from the other ten verticals, I find that the impression lift he attributes to UPR is either substantially reduced or is not positive and statistically significant (depending on which of his regressions I test). Accordingly, my findings demonstrate that the estimated impression lift that Dr. Singer's model attributes to UPR is biased and unreliable.

171. Specifically, I use Dr. Singer's model and allow the effect on impressions that he attributes to UPR to vary for three of the verticals I discuss above (*i.e.*, Healthcare, Services, and Retail combined) as compared to the other ten verticals.[272] As I showed above, COVID-19 and industry expansion increased monthly impressions in these verticals dramatically, and Dr. Singer's model fails to account for these factors. When I use his model and allow for the possibility that the change in impressions over time for these three verticals may differ from the other ten verticals in the post-UPR period, I find that his overall conclusion does not hold. The estimated effect of UPR for the ten verticals combined is substantially reduced from 754 million impressions to 428 million impressions using Dr. Singer's primary model. Meanwhile, it is not

---

[272] I note that there are other verticals that experienced a noticeable increase in impressions during the post-UPR period due to reasons unrelated to UPR as discussed above. I focus on the three verticals in my testing to illustrate that Dr. Singer's result is driven by verticals that experienced an increase in impression for legitimate economic factors that he fails to account for. I find similar results when I conduct the same testing and account for the incremental change in impressions in the post-UPR period for the Education & Government, Healthcare, and Services verticals.

positive and statistically significant using Dr. Singer's model that includes a linear trend. I show the results in **Exhibit 19** below.[273]

**EXHIBIT 19: ESTIMATED EFFECT OF UPR USING DR. SINGER'S MODELS AND ALLOWING A DIFFERENTIAL EFFECT FOR HEALTHCARE, RETAIL AND SERVICES VERTICALS**

**JANUARY 2017 – MARCH 2024**

| Estimated Effect that Dr. Singer's Model Attributes to UPR | Dr. Singer's Primary Model | Dr. Singer's Model that Includes a Linear Trend |
|---|---|---|
| [a] | [b] | [c] |
| **Dr. Singer's Result for All 13 Verticals Combined** | 753.65*** | 473.22*** |
| **Allowing a Differential Effect for Healthcare, Retail and Services** | | |
| For Ten Verticals Combined | 427.92*** | 147.53 |
| Differential Effect for Healthcare, Retail, and Services | 1492.7*** | 1492.68*** |

*Notes:*
    *** $p<0.01$, ** $p<0.05$, * $p<0.1$. The dependent variable is the monthly total impressions (in millions) for a given vertical.

*Source:*
    Dr. Singer's turnover.

172.  Put differently, when I isolate the differential effect on impressions that he attributes to UPR for the Healthcare, Retail, and Services verticals from the other verticals, I find that Dr. Singer's models yield contradicting results. His regression that includes a linear trend does not show a statistically significant impression lift for the ten verticals. This means Dr. Singer's finding of an impression lift due to UPR is driven by the verticals that saw a noticeable increase in impressions during the post-UPR period for factors unrelated to UPR.[274] Moreover, the

---

[273] The test is conducted using Dr. Singer's model and is based on the same number of observations as he has. The only modification I make to Dr. Singer's models is to add one interaction variable that captures any difference in the change in impressions following UPR for the three verticals relative to all other verticals combined.

[274] This finding is consistent with the results of my testing of Dr. Singer's models discussed above in Section VIII.A.3. When using Dr. Singer's models and allowing the effect on impressions that Dr. Singer attributes to UPR to vary across each of the 13 verticals, I find that Healthcare, Retail, and Services have the largest effects compared to the other 10 verticals. Specifically, my testing of Dr. Singer's primary model shows that the estimated impression lift that he

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

contradictory results from his different regression specifications indicate that Dr. Singer's conclusions fail his own robustness check.

173.     Notably, even if Dr. Singer incorrectly claims that the observed increase in impressions for the three verticals (Healthcare, Retail, and Services) is solely driven by UPR, my finding still demonstrates that there is no statistical proof of an impression lift due to UPR for the other ten advertiser verticals, which account for a large majority of advertisers that he studies.[275]  Among advertisers that purchased impressions on AdX in the post-UPR period in Dr. Singer's analysis, 68.2% of advertisers are only associated with these 10 verticals.

174.     Further, as I described above, Dr. Singer studies less than half of the Proposed Class members using his indirect method.  The advertisers that are only associated with these 10 verticals and purchased impressions on AdX in the post-UPR period account for another 28.9% of the Proposed Class members.[276]  This means that in addition to the 57.7% of Proposed Class members for which Dr. Singer provides no opinion of economic injury, he has no statistical proof of UPR resulting in an impression lift for another 28.9% of Proposed Class members, or a total of at least 86.6% of the Proposed Class.[277]  As such, Dr. Singer's indirect method does not provide a reliable basis for the assessment of class-wide impact resulting from UPR.

175.     In sum, my findings show that Dr. Singer's proposed methodology cannot distinguish between the change in impressions caused by factors unrelated to UPR and the change in impressions caused by UPR.  This renders his approach biased and unreliable for the assessment of impact for Proposed Class members.

---

attributes to UPR is 1.5 billion per month for the Healthcare vertical, 2.1 billion per month for the Retail vertical, and 2.3 billion per month for the Services vertical.  Meanwhile, the other 10 verticals have an estimated effect ranging from *negative* 1.1 billion per month to 1.3 billion per month.  I find similar results using Dr. Singer's model that includes a linear trend.  Put differently, Healthcare, Retail, and Services contribute the most to Dr. Singer's finding of an impression lift due to UPR.  My findings show that his conclusion of an impression lift resulting from UPR is driven by a few verticals that experienced a substantial increase in impressions due to factors unrelated to UPR, such as COVID-19 and industry expansion.

[275] Advertisers that are associated with these 10 verticals account 71.5% of advertisers in Dr. Singer's analysis.

[276] There are 30.2% of the Proposed Class members that are associated with these 10 verticals and purchased impressions on AdX in the post-UPR period.

[277] Even putting aside the advertisers for whom the recorded payment to publishers is always less than $5, Dr. Singer either provides no opinion of economic injury or has no statistical proof of UPR resulting in an impression lift for at least 57.4% of the Proposed Class.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**5.      Dr. Singer's Finding of a Negative and Statistically Significant Relationship between Google's Revenue Share and Impressions is Driven by the Idiosyncratic Purchase Decisions of Only Two Advertisers, Rendering His Approach Unreliable for the Assessment of a But-For Revenue Share**

176.    As shown above, Dr. Singer's indirect method ignores the specific circumstances of Proposed Class members and thus yields biased and unreliable conclusions regarding the alleged impression lift resulting from UPR.  The same fundamental flaw also renders his conclusion about the relationship between Google's revenue share and impressions (estimated in the same model) biased and unreliable.  I demonstrate below that Dr. Singer's conclusion that a reduction in revenue share leads to an increase in impressions is driven by the purchases made by two of the largest advertisers.  When I apply Dr. Singer's models to the data for all advertisers but Meta and Temu, which faced idiosyncratic conditions as shown above, his conclusion is overturned. Put differently, I find no negative and statistically significant relationship between Google's revenue share and impressions purchased by nearly all advertisers based on Dr. Singer's own models.

177.    Dr. Singer opines that lowering Google's revenue share by 1 percentage point "generate[s]" an additional 163 million impressions per month on average across advertiser verticals.[278]  Based on his estimated negative relationship between revenue share and impressions, Dr. Singer asserts that Google would have had to reduce its revenue share by "4.62 percentage points in order to yield the same impression lift" that his model attributes to UPR.[279] As explained above, Dr. Singer's models are unable to account for crucial idiosyncratic factors that affected impressions purchased over time and suffer from omitted variable bias.  For example, I demonstrate that his models are incapable of accounting for the specific circumstances that affected the impressions purchased by Meta in the Services vertical and Temu in the Retail vertical.[280]  A failure to account for idiosyncratic factors that affected demand conditions for advertisers means that his methodology cannot distinguish between the change in impressions caused by idiosyncratic conditions that individual Proposed Class members faced,

---

[278] Singer Report, ¶105.  This is the result from Dr. Singer's primary model.

[279] Singer Report, ¶106.

[280] *See* Section VIII.A.4.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and any change in impressions resulting from a change in Google's revenue share, if any.  My testing of Dr. Singer's models shows that the idiosyncratic purchase decisions made by Meta and Temu are critical to his finding of a negative and statistically significant relationship between Google's revenue share and impressions.

178.    Specifically, when I apply Dr. Singer's models to the data for all advertisers but Meta (in the Services vertical) and Temu (in the Retail vertical), the estimated effect of revenue share on impressions is substantially smaller in magnitude and not statistically significant.[281]  As shown in **Exhibit 20**, this is the case for both Dr. Singer's primary model and his model that includes a linear trend.[282]  Put differently, my testing of Dr. Singer's own models finds no negative and statistically significant relationship between Google's revenue share and impressions purchased by nearly all of the 1.3 million advertisers that Dr. Singer studies in his "indirect method."  This means that under Dr. Singer's model, for all advertisers but Meta and Temu, a reduction in the revenue share does not lead to a statistically significant increase in impressions.  Accordingly, Dr. Singer's conclusion that there would have been a 4.62-percentage-point reduction in Google's revenue share absent UPR is unreliable and incorrect.[283]

---

[281] My testing uses the same number of observations as in Dr. Singer's regressions presented in Table 3 of his report. Further, I conduct a sensitivity test and reach the same conclusion that Dr. Singer's finding of a negative and statistically significant relationship between Google's revenue share and impressions purchased by Google Ads advertisers is driven by a few top advertisers.  Specifically, I apply Dr. Singer's models to the data for all advertisers but the top advertiser in each of the 13 verticals.  For each of Dr. Singer's models, my testing demonstrates that there is no negative and statistically significant relationship between Google's revenue share and impressions purchased by all but the top advertiser in each vertical.  This shows that Dr. Singer's findings are sensitive to the inclusion of just a few large advertisers.  Accordingly, his conclusion that lowering the revenue share leads to an increase in impressions does not hold.

[282] I reach the same conclusion when I apply Dr. Singer's other alternative models to the data for all advertisers but Meta (in the Services vertical) and Temu (in the Retail vertical).  *See* my workpapers.

[283] *See* Singer Report, ¶106.  This is putting aside another fundamental issue that the impression lift that Dr. Singer's model attributes to UPR is flawed and unreliable.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 20: ESTIMATED EFFECT OF REVENUE SHARE ON IMPRESSIONS FOR ALL ADVERTISERS BUT META AND TEMU USING DR. SINGER'S MODELS**

| Statistic | Dr. Singer's Primary Model | Dr. Singer's Model that Includes a Linear Trend |
|---|---|---|
| [a] | [b] | [c] |
| Estimated Effect of Total Take Rate | -16.53 | -33.93 |
| Number of Observations | 1,131 | 1,131 |

*Notes:*

    \*\*\* p<0.01, \*\* p<0.05, \* p<0.1.  The models are estimated excluding Meta from the Services vertical and Temu from the Retail vertical.  The dependent variable is the monthly total impressions (in millions) for a given vertical.

*Source:*

    Dr. Singer's turnover.

179.    Further, the fact that Dr. Singer's conclusion is sensitive to the purchases made by two of the 1.3 million advertisers in his analysis demonstrates that his approach is incapable of reliably demonstrating economic injury or damages for members of the Proposed Class.[284]  Specifically, his methodology is unable to distinguish the effect of Google's revenue share on impressions, if

---

[284] As Professor Wooldridge states in his econometrics textbook, "[g]ood papers in the empirical social sciences contain sensitivity analysis.  Broadly, this means you estimate your original model and modify it in ways that seem reasonable.  Hopefully, the important conclusions do not change.  For example, ... [i]f some observations are much different from the bulk of the sample—say, you have a few firms in a sample that are much larger than the other firms—do your results change much when those observations are excluded from the estimation?  If so, you may have to alter functional forms to allow for these observations or argue that they follow a completely different model."  Wooldridge, p. 650.  As explained above, advertisers in different verticals, including Meta and Temu, had specific circumstances that affected their impressions; they do not follow Dr. Singer's models, which are incapable of accounting for any advertiser-specific economic conditions.  Similarly, another econometrics textbook describes that "[s]ensitivity analysis consists of purposely running a number of alternative specifications to determine whether particular results are robust (not statistical flukes). … Researchers who use sensitivity analysis run (and report on) a number of different reasonable specifications and tend to discount a result that appears significant in some specifications and insignificant in others.  Indeed, the whole purpose of sensitivity analysis is to gain confidence that a particular result is significant in a variety of alternative specifications, functional forms, variable definitions, and/or *subsets of the data*."  Studenmund, A. H., Using Econometrics: A Practical Guide. 7th ed. 2016 (emphasis added), p. 174.  Moreover, the Reference Manual on Scientific Evidence cited by Dr. Singer states that "[o]ne generally useful diagnostic technique is to determine to what extent the estimated parameter changes as each data point in the regression analysis is dropped from the sample.  An influential data point—a point that causes the estimated parameter to change substantially—should be studied further to determine whether mistakes were made in the use of the data or whether important explanatory variables were omitted."  Reference Manual on Scientific Evidence, p. 327.  As I have demonstrated, the reason that Dr. Singer's finding is sensitive to the purchase decisions made by only two advertisers is that his models are unable to account for crucial idiosyncratic factors that affect impressions over time.  Accordingly, his models suffer from omitted variable bias.

any, from the effect of other factors on impressions, such as individual advertiser-specific demand conditions. This renders his results biased and unreliable for the assessment of class-wide impact.

### 6. Dr. Singer's Incidence Analyses Are Flawed and Unreliable for the Assessment of Impact for Proposed Class Members

180.    Dr. Singer puts forward two methods for calculating incidence, which he states "translates [the] reduction in the AdX take rate into a savings for advertisers based on the advertisers' take rate burden."[285] Both his methods suffer from fundamental flaws, rendering them unreliable for the assessment of impact for Proposed Class members. As such, Dr. Singer has not put forward a workable method to assess the savings in ad prices (if any) that publishers would have passed through to Proposed Class members.

### i. Dr. Singer's First Method for Estimating Incidence

181.    In the description of his first method, Dr. Singer states that "[i]n the absence of complete elasticity information, the incidence of the AdX take rate for advertisers can be estimated by comparing advertising prices under higher take rates to contemporaneous prices under lower take rates."[286] He claims that "such estimation is possible using advertising prices on AdX relative to prices under Open Bidding."[287] He calculates the incidence as "the ratio of the difference in price of the inventory to the difference in the tax borne (initially) by publishers."[288] For each month from January 2017 to September 2019, Dr. Singer calculates average prices and average fees (in dollars) across all impressions purchased on AdX,[289] and average prices and average fees for impressions purchased on Open Bidding.[290] A comparison of these gives Dr. Singer his

---

[285] Singer Report, ¶9; *see also* Singer Report, ¶¶100-104.

[286] Singer Report, ¶100.

[287] Singer Report, ¶100.

[288] Singer Report, ¶100.

[289] For his average prices and average fees for AdX, Dr. Singer includes impressions purchased by advertisers using Google Ads, DV360, and Authorized Buyers (also referred to as Real Time Bidders or "RTB").

[290] Using "actual takes [*i.e.*, Google fees] […] and eCPM pricing data on AdX and Open Bidding, [he] estimate[s] that the weighted average incidence for open web display advertising from January 2017 through September 2019 is approximately 26.60 percent." Singer Report, ¶100.

incidence rate in each month from January 2017 to September 2019.[291]  He then calculates a weighted average of the monthly incidence rates during this period to arrive at his incidence rate of 26.6%.[292]  According to Dr. Singer, advertisers in aggregate bear this proportion of a change in the AdX revenue share.

182.     As an initial matter, an examination of Dr. Singer's own calculation shows that his weighted average incidence of 26.6% is based on underlying monthly incidence rates that do not make economic sense.  **Exhibit 21** below shows the incidence rates that Dr. Singer calculates for each month.  For 13 of the 33 months in his calculation, he finds an incidence rate that is negative; meanwhile, for 8 of the 33 months, he finds an incidence rate that is above 100%.[293]  A negative incidence rate implies that a *decrease* in Google's revenue share would result in *higher* prices to advertisers.  Conversely, an incidence rate above 100% implies that a decrease in Google's revenue share would result in a decrease in prices paid by advertisers by an amount *greater* than the decrease in the revenue kept by Google.  An incidence rate that is negative or above 100% is at odds with Dr. Singer's own claim that "publishers would have shared *some* of the savings [from a lower revenue share] to the advertisers in the form of lower prices."[294]  Thus, Dr. Singer's own calculation yields results that do not make economic sense for most of the months that he studies.  This means that Dr. Singer has not put forward a methodology that can reliably determine incidence for advertisers.

---

[291] Specifically, for each month from January 2017 to September 2019, Dr. Singer calculates the average price and the average fee (in dollars) per impression, separately for AdX and Open Bidding.  He then takes the difference in the average prices between AdX and Open Bidding and divides this by the difference in the average fees per impression between AdX and Open Bidding for each month, which yields his monthly incidence rates.  *See* Dr. Singer's workpapers.

[292] *See* Dr. Singer's workpapers.  The weight is the count of total impressions across AdX and Open Bidding combined in the given month.  *See* Dr. Singer's workpapers.

[293] *See* my workpapers.

[294] Singer Report, ¶108. (emphasis added)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### EXHIBIT 21: DR. SINGER'S AVERAGE INCIDENCE RATE AND HIS UNDERLYING MONTHLY INCIDENCE RATES

### JANUARY 2017 – SEPTEMBER 2019



*Source:*
　　Dr. Singer's turnover.

183.    Dr. Singer's incidence analysis suffers from additional flaws.  First, in conducting this aggregated analysis, Dr. Singer fails to distinguish between prices paid for impressions by Proposed Class members from prices paid for impressions purchased by advertisers using DV360 or non-Google buying tools (*i.e.*, advertisers' transactions outside the Proposed Class). Thus, Dr. Singer does not consider how his aggregate measure of incidence varies for Proposed Class members' transactions (*i.e.*, for impressions purchased via Google Ads) as compared to advertisers' transactions on other buying tools.  I show that Dr. Singer's conclusion of a positive incidence rate is in fact driven by his erroneous inclusion of DV360 and non-Google RTB transactions in his calculation.  When I apply Dr. Singer's calculation but limit the analysis to Google Ads transactions on AdX, and thus transactions relevant to the Proposed Class, his conclusion is overturned.  I find his calculation yields a nonsensical negative 176.3% incidence

113

rate, meaning for a \$1 decrease in the revenue kept by Google, advertisers pay \$1.76 more.[295] Taking this result at face value, a negative incidence rate means that advertisers *benefited* from an increase in Google's revenue share. As such, this shows that Dr. Singer's conclusion about the burden of the revenue share borne by advertisers does not apply to Google Ads advertisers. This renders his incidence calculation unreliable for the assessment of impact for Proposed Class members.

184.    Second, Dr. Singer's comparison of monthly average prices between AdX and Open Bidding is fatally flawed because it compares AdX prices that are gross of the AdX revenue share to Open Bidding prices that are net of the third-party exchange's revenue share.[296] As an example, suppose that an advertiser paid \$1 for a winning bid on Open Bidding, where the third-party exchange's revenue share was 20%. In that case, Dr. Singer's analysis would use the price and AdX fees he observes in Google's data, which would show a gross price of \$0.80 (of which AdX keeps \$0.04 based on a revenue share of 5% of the \$0.80 price). However, the actual gross price in this example is \$1, with the third-party exchange keeping \$0.20 and Google (*i.e.*, AdX) keeping \$0.04, for a total of \$0.24 (and a total SSP revenue share of 24%). Thus, the results from Dr. Singer's incidence analysis are based on the wrong prices and revenue shares. His analysis does not account for actual gross prices paid by advertisers or the actual revenue shares of third-party exchanges, which vary across third-party exchanges and over time.[297] This renders Dr. Singer's comparison of prices (and revenue shares) between Open Bidding and AdX

---

[295] I use the same AdX/Open Bidding data as Dr. Singer, but additionally correct for the data patches and adjustments as indicated in the data letters provided by Google related to this production. For the reasons discussed throughout this section, Dr. Singer's proposed method is generally unreliable. My discussion of Dr. Singer's erroneous inclusion of AdX transactions purchased by demand sources outside the Proposed Class (*i.e.*, non-Google Ads buying tools) merely serves to illustrate that, even putting aside other issues, his proposed methodology derives his incidence rate due only to inclusion of these non-class demand sources in his calculation.

[296] The AdX CPMs are net of any buy-side revenue share, but they are gross of the AdX revenue share. However, the Open Bidding CPM are net of both a buy-side revenue share as well as the third-party exchange's revenue share. The revenue figures recorded in Google's data are identified as "gross" revenue because they are gross of the AdX revenue share and gross of *Google's* Open Bidding revenue share. However, the revenue observed by Google from Open Bidders is already net of any revenue share taken by the third-party exchange participating in Open Bidding (as well as the buying tool that placed the bid).

[297] *See* Singer Report, Table 8, ¶151. ████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

uninformative and incapable of assessing incidence on advertisers from changes to Google's revenue share.

185.    Finally, even if Dr. Singer's methodology were not mismeasuring prices and revenue shares for Open Bidding transactions, his methodology assumes that *any* difference in prices between AdX and Open Bidding is entirely attributable to the difference between the AdX revenue share and Open Bidding revenue share.  However, this is an incorrect assumption. Impressions sold on AdX differ from impressions sold on Open Bidding along multiple dimensions.  First, because Dr. Singer studies the period before UPR was fully rolled out across all publishers, publishers were able to set different price floors for impressions sold on AdX as compared to Open Bidding.[298]  Thus, even if the bids across AdX and Open Bidding were the same, a higher price floor on AdX than Open Bidding would, on average, result in higher winning bids, and thus, higher realized prices, on AdX as compared to Open Bidding.[299]  Second, prior to UPR and UFPA, AdX used a second-price auction while Open Bidding used a first-price auction.[300]  An assessment of how the different auction structures affected advertisers' bidding behavior requires an assessment of auction-specific dynamics, including the number of bidders and competition for the particular impression.  Finally, not all impressions were offered to AdX, nor were all offered to Open Bidding.  In fact, Open Bidding was only available to publishers that subscribed to GAM 360 (a Google ad server) during the period of analysis.[301]  Thus, even if Dr. Singer's analysis were limited to the relevant Google Ads impressions, and even if he had information on actual gross prices and revenue shares from third-party exchanges, his methodology fails to account for important differences between AdX and Open Bidding, and is thus not workable for the assessment of class-wide impact.

---

[298] UPR was introduced in May 2019 and was fully rolled out to all publishers by September 2019.  *See* Bigler, Jason, "An update on first price auctions for Google Ad Manager," *Google Ad Manager Blog*, May 10, 2019, available at https://blog.google/products/admanager/update-first-price-auctions-google-ad-manager/; GOOG-DOJ-09714662, at -662.

[299] Dr. Singer describes that "AdX floors often [exceeded] those of rival exchanges," Singer Report, ¶112, and that "prior to implementing UPR," publishers routinely set higher price floors for AdX.  Singer Report, ¶78.

[300] GOOG-DOJ-10736364, at -367.

[301] GOOG-DOJ-13409448, at -448.  Open Bidding was first made available to publishers using Google's ad server product Google Ad Manager for Small Business (GAM SB), in 2020.  *See* GOOG-AT-MDL-001974959, at -960-961.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### ii.    Dr. Singer's Second Method for Estimating Incidence

186.    In his second or alternative method, Dr. Singer calculates the incidence on advertisers based on the elasticities of supply ($E_S$) and demand ($E_D$) for impressions.[302]  For his elasticity of supply estimates, Dr. Singer relies on two Google documents: (i) a 2011 presentation, in which, according to Dr. Singer, "Google estimated [] publisher elasticity with respect to eCPM [of] approximately 0.6,"[303] and (ii) a Google spreadsheet from which he calculates "an elasticity of approximately 0.56" based on results from simulations run by Google.[304]  Dr. Singer acknowledges that these two estimates "are not limited to open web display" and include "open app display."[305]  For his elasticity of demand estimates, Dr. Singer uses regression models that seek to explain the count of impressions as a function of the price per impression "on the pre-UPR period and on all Google Ads-AdX pipeline transactions, not limited to open web display."[306]  He uses two different estimation techniques: ordinary least squares (OLS) and instrumental-variable two-stage least squares (2SLS).[307]  He states that the 2SLS models are used "to account for potential endogeneity," where "[a]s an instrument for price, [he] use[s] the log of infrastructure costs incurred by Google for AdX."[308]  Using this approach, Dr. Singer estimates that the elasticity of demand is "approximately -1.10 to -1.14."[309]  Next, using his estimates of elasticity of demand and supply, Dr. Singer arrives at an aggregate incidence of 33.03 to 35.36 percent.[310]

---

[302] Singer Report, ¶¶101-104.  The formula used by Dr. Singer is $Incidence = \frac{E_S}{E_S - E_D}$.  *See* Singer Report, ¶104.

[303] Singer Report, ¶102 and fn. 99, citing to GOOG-AT-MDL-001274396.

[304] Singer Report, ¶102 and fn. 100, citing to GOOG-DOJ-11772703.

[305] Singer Report, ¶103, fn. 101.

[306] Singer Report, ¶103, fn. 101.  For these regressions, Dr. Singer uses data for the period from January 2017 to December 2018 (for his 2SLS models) and from January 2017 to August 2019 (for his OLS models).  *See* Dr. Singer's workpapers.

[307] For each of the two estimation techniques, Dr. Singer uses two log-log regression specifications.  The first specification is a simple regression of the natural log of the count of impressions on the natural log of the price per impression, and the second specification includes indicator variables for each vertical (*i.e.*, vertical fixed effects).  *See* Dr. Singer's workpapers.

[308] Singer Report, ¶103, fn. 101.

[309] Singer Report, ¶103.

[310] Singer Report, ¶104.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

187.    As an initial matter, Dr. Singer acknowledges the "limitation" that his estimates for elasticity of demand and supply "compare numbers across distinct datasets and time periods."[311] His elasticity of supply estimates are based on two dated documents, one from 2011 and one from 2016, and they are "not limited to open web display."[312]  Thus, not only do the estimates pre-date and not match the period of study for his elasticity of demand, but they are also based on transactions outside of the Proposed Class definition (*i.e.*, they include impressions for apps).[313]

188.    In addition, the estimate of approximately 0.6 from the 2011 Google presentation that Dr. Singer relies upon does not actually reflect the elasticity of supply.  Dr. Singer misunderstands what is shown in the document, and what he describes as the elasticity of supply actually relates to the demand for ad impressions,[314] so the measure he uses is incorrect.  Thus, Dr. Singer fails to calculate the elasticity for transactions at issue in the Proposed Class, and his estimates are based on dated documents, including one that he misinterprets.  This renders his elasticity of supply estimates unreliable.

189.    Dr. Singer's estimates of elasticity of demand are also unreliable for different reasons.  As Dr. Singer himself acknowledges, his OLS models that regress quantity (the count of impressions) on price suffer from "potential endogeneity."[315]  Indeed, this issue is well known in

---

[311] Singer Report, ¶101.

[312] Singer Report, ¶103, fn. 101.

[313] For Dr. Singer's first supply elasticity estimate, he claims that "[i]n a 2011 presentation, Google estimated that publisher elasticity with respect to eCPM was approximately 0.6." *See* Singer Report, ¶102, citing to GOOG-AT-MDL-001274396.  Dr. Singer also claims that later internal simulations showed that "a 2016 model predicted that a 7.49 increase in payout would yield a publisher response of a 4.18 percent increase in impressions served, for an elasticity of approximately 0.56." *See* Singer Report, ¶102, citing to GOOG-DOJ-11772703.  Meanwhile, the period of study for his elasticity of demand estimates is from January 2017 to December 2018 (for his 2SLS models) and from January 2017 to August 2019 (for his OLS models).  *See* Dr. Singer's workpapers.

[314] The estimate of approximately 0.6 captures the average percentage change in the share of "[e]xpected auctions won" by the advertiser in response to a one percent change in their bid across "different bid prices for a given amount of inventory available at a moment in time."  GOOG-AT-MDL-001274396, at -401.  It does not capture a publisher increase in impressions in response to an increase in the publisher payout.  The chart in the Google presentation shows the cumulative percentage of impression auctions won by different bid prices for a given amount of inventory available at that time.  This is related to the demand for impressions, not the supply.

[315] Singer Report, ¶103, fn. 101.  Specifically, the two estimates Dr. Singer obtains using the OLS method are unreliable because his regression specifications violate a fundamental assumption of OLS regression estimation that the explanatory factors are not correlated with the error term.  When an explanatory variable is endogenous, the regression yields biased and unreliable results.  *See* Wooldridge, pp. 82-83.  In this case the endogeneity of the price variable in

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

econometrics.  The ABA treatise on the application of econometrics to antitrust issues states that "a classic example [of an endogeneity problem] is a demand function that specifies quantity demanded as a function of price."[316]  In those instances, the treatise cautions that "comparing average [] quantity between high-price and low-price periods does not yield a valid estimate of the elasticity of demand [] because quantity and price are jointly determined."[317]  This "implies that the OLS estimates will be biased."[318]  Thus, Dr. Singer's elasticity of demand estimates from his OLS models are subject to this problem, which renders them unreliable.

190.    To address the endogeneity issue, Dr. Singer puts forward alternative 2SLS models that "use the log of infrastructure costs incurred by Google for AdX" as an instrument for his price variable.[319]  Dr. Singer claims that this "allow[s] for unbiased estimation of the [eCPM price] variable."[320]  However, Dr. Singer's choice of instrument is, at best, a superficial attempt to fix the endogeneity problem embedded in his OLS estimates.  Using as an instrument any other variable having two distinct values for 2017 and 2018 or any two different arbitrarily selected numbers, one allocated to 2017 and the other one to 2018, yields identical results for his elasticity of demand measure.  This demonstrates that Dr. Singer's instrument for price is no better than any two different arbitrarily selected numbers.[321]  Accordingly, Dr. Singer's 2SLS models do not provide a reliable workaround for the endogeneity problem.

---

the regression equations arises from multiple possible reasons, including the simultaneous determination of prices and quantities and the omission of relevant variables (*e.g.*, demand shifters) in the demand equation.

[316] ABA Econometrics, p. 106.

[317] ABA Econometrics, p. 36.  Specifically, the treatise describes that in this case "unobserved factors that affect demand also affect price," such "that a comparison of average quantities between high- and low-price periods cannot separate out the true causal effect of price from the unobserved factors."  *See* ABA Econometrics, p. 36.

[318] ABA Econometrics, p. 107.

[319] Singer Report, ¶103, fn. 101.

[320] Singer Report, ¶103, fn. 101.  "[T]he method of instrumental variables (IV) can be used to solve the problem of endogeneity of one or more explanatory variables."  *See* Wooldridge, p. 495.  "An *instrumental variable* is one that is not included in the equation, is correlated with the endogenous explanatory variable, and is not correlated with the error term in the equation."  ABA Econometrics, p. 419.

[321] For illustrative purposes, I have used log values from annual series such as the number of child births in the USA, the number of people receiving a bachelor's degree from a 4-year institution in the U.S., as well as other arbitrary combinations of two different numbers.  *See* my workpapers.  Using any of these alternative instruments yields the same elasticity estimates as those Dr. Singer obtained because the cost variable Dr. Singer uses as an instrument only takes two values: $68 million in 2017 and $111 million in 2018.  This comes about because his instrumental variable regressions (*i.e.*, his 2SLS models) only use data from 2017 and 2018 and they include an intercept term.  *See* Dr.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

191.    In sum, Dr. Singer's attempts at estimating incidence on advertisers from an allegedly inflated revenue share are fundamentally flawed, which render them unreliable for the assessment of impact on Proposed Class members.  This means Dr. Singer has not put forward a workable method to assess the savings in ad prices (if any) that publishers would have passed through to Proposed Class members.

**B.    Dr. Singer's "Direct Method" is Incapable of Establishing Economic Injury Resulting from UPR for All or Nearly All Members of the Proposed Class**

**1.    Description of Dr. Singer's "Method 2: Direct Estimation" Overcharge Model**

192.    Dr. Singer's "direct" method to estimate the overcharge to Google Ads advertisers resulting from UPR is premised on the theory that "Google introduced UPR to prevent advertisers from acquiring the same inventory for cheaper through Open Bidding rather than AdX" and absent UPR, Google would have "needed to lower its take rate to compete for the same impressions."[322]  He purports to measure the "inflation on advertising prices owing to UPR directly" using advertising prices on Open Bidding as a comparison.[323]  Although Dr. Singer claims to employ a difference-in-differences ("DiD") model to estimate the increase in prices paid by advertisers as a result of UPR,[324] in effect, Dr. Singer simply compares the average price

---

Singer's workpapers.  In addition, Dr. Singer acknowledges that there are time-varying factors that he needs to account for in his indirect method, including the Click Through Rate, Google Search Engine Activity, YouTube Active Users, Real GDP per Capita, and Consumer Sentiment Index.  His instrument is likely correlated with the error term because his demand model fails to account for these time-varying factors.  *See* Singer Report, Table 3, ¶95.

[322] Singer Report, ¶124; *see* generally Singer Report, §II.D.

[323] Singer Report, ¶9.

[324] Dr. Singer constructs his DiD model using Open Bidding as a treated group and AdX as a control group.  His estimation compares average prices paid by advertisers in these two groups over two time periods: a before UPR time period (January 2017 – August 2019) and a during UPR time period (September 2019 – December 2022).  The dependent variable to be explained in this regression is the monthly average CPM on AdX or OB during January 2017 to December 2022.  The explanatory variables include (i) an "OB" indicator variable that takes the value 1 for Open Bidding and takes the value 0 otherwise, (ii) a "UPR" indicator variable that takes the value 1 beginning in September 2019 and takes the value 0 for the months prior, and (iii) an interaction variable of the two.  I note that Dr. Singer's workpapers confirm that he includes the month September 2019 as the first month during UPR though his report erroneously describes the period before UPR continuing through September 2019 and the period during UPR beginning in October 2019.  Singer Report, ¶¶117, 119.  Dr. Singer also presents two alternative models, one in which he uses the natural log of CPM as the dependent variable and the other in which his analysis begins in June 2017, when "Google officially introduced" Open Bidding (then referred to as Exchange Bidding or EBDA).  Singer Report, ¶123, Table 4.

119

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

paid by advertisers[325] (as measured in CPM) for impressions transacted via AdX to those transacted via Open Bidding over the period from January 2017 to August 2019—Dr. Singer's "before UPR" period.[326]  He calculates an average CPM on AdX during the "before UPR" period of \$2.15 and an average CPM on Open Bidding during the same period of \$1.65.  Dr. Singer uses the resulting difference—\$0.50 per thousand impressions—as his overcharge estimate from UPR.[327]

193.    Notably, Dr. Singer's analysis is based entirely on aggregate data that includes total monthly impressions and revenue across *all U.S. user web impressions transacted through AdX* or Open Bidding.[328]  In addition to Google Ads, the AdX transactions he considers (and the basis for his aggregate CPM comparison) include impressions purchased by DV360 and third-party buyers using non-Google tools, among others, as well as various high-CPM transaction types (such as Preferred Deals and Programmatic Guaranteed transactions)[329] those buyers transact on in addition to open auction transactions.[330]

---

[325] The AdX prices paid by advertisers used by Dr. Singer are net of the buyside (*i.e.*, Google Ads) revenue share and the Open Bidding prices paid by advertisers used by Dr. Singer are net of both the buyside and third-party sellside (*i.e.*, third-party exchange participating in Open Bidding) revenue share.  Further, the prices Dr. Singer uses in his analysis are an "effective CPM ('eCPM')" rather than actual prices paid by advertisers.  Singer Report, ¶29.  *See also,* Singer Report, ¶100 (describing "eCPM pricing data on AdX and Open Bidding").  As stated by Dr. Singer, "[a]dvertisers, particularly through Google Ads, commonly purchase display advertising on a CPC basis. … To facilitate transactions between these advertisers and [publishers that receive payment on a cost-per-mille (CPM) basis], Google translates the CPC to an effective CPM ('eCPM')".  Singer Report, ¶29.

[326] Singer Report, Figure 10.  Dr. Singer's estimate of inflated advertising rates is derived entirely from the "Before UPR" average CPMs on AdX compared to Open Bidding.  As acknowledged by Dr. Singer, the overcharge "constitutes a *component* of the DiD model" (emphasis added), namely, only one of the two "differences" in his DiD model.  Singer Report, ¶125 (step v).

[327] Singer Report, Table 7 (row F), ¶128.  Dr. Singer displays the \$0.50 difference as a more contrived version of this calculation.  Specifically, his workpapers show that he calculates this as $AdX^{AfterUPR} - (AdX^{AfterUPR} - (AdX^{BeforeUPR} - $ Open Bidding$^{BeforeUPR}))$.  His calculation equates to $AdX^{BeforeUPR} - $ Open Bidding$^{BeforeUPR}$, *i.e.*, the difference between CPMs on AdX and Open Bidding before UPR.

[328] Singer Report, ¶110.

[329] I also note that no Named Plaintiff ever used DV360 and therefore could not have had any Preferred Deals or Programmatic Guaranteed transactions using a Google buying tool.  *See, e.g.*, Zona Report, ¶30 ("…no class representative plaintiff purchased advertising from Google's DSP, the large advertiser buying tool DV360….").

[330] The aggregate data Dr. Singer relies upon have also been produced in a more disaggregated form as AdX/Open Bidding data (GOOG-AT-MDL-DATA-000066537 to 000481994, GOOG-AT-MDL-DATA-000508827 to 000558882, GOOG-AT-MDL-DATA-000561536 to 000564882, GOOG-AT-MDL-DATA-000606366 to 000653766), and Dr. Singer has in fact used the disaggregated AdX/Open Bidding data in other analyses.  Dr. Singer, for example, uses the more granular AdX/Open Bidding data in order to estimate the fraction of impressions on AdX purchased by Google Ads.  *See* Singer Report, Table 7 (row H), ¶128; Dr. Singer's workpapers.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

194.    To calculate the overcharge to advertisers in the Proposed Class, Dr. Singer first estimates the "lift in AdX impression attributable to UPR" by again using Open Bidding as a comparison.[331]  Dr. Singer assumes, with no explanation, that the ratio of average monthly impressions on AdX relative to Open Bidding "before UPR" (from January 2017 to August 2019) would have remained constant in the "after UPR" period (from September 2019 to December 2022) had Google not implemented UPR.  He finds that AdX transacted 6.3 times as many impressions as Open Bidding "before UPR," and estimates that the incremental impressions due to UPR equal the difference between (i) the actual average monthly AdX impressions after UPR, and (ii) the but-for average monthly AdX impressions had AdX continued to transact 6.3 times as many impressions as were actually transacted on Open Bidding after UPR.  Dr. Singer concludes that AdX transacted 11.2 billion more impressions per month due to UPR.[332]  Because Dr. Singer's data include transactions from all AdX impressions and not just Google Ads-AdX impressions, he multiplies this number by the fraction of AdX impressions accounted for by Google Ads advertisers, which he determines to be 45.6%.[333]  Based on his overcharge estimate of $0.50 per thousand impressions, his estimate that AdX gained 11.2 billion impressions per month due to UPR, and his estimate that 45.6% of those impressions are purchased via Google Ads, Dr. Singer arrives at "monthly estimated overcharge damages on Google Ads advertisers" of $2,559,214, which he applies to each month from September 2019 onwards.[334]  Dr. Singer acknowledges that his calculation of damages is "based on the assumption that the same average monthly impressions would persist after December 2022, the last month covered by the data that Google provided in response to RFP 21."[335]  Dr. Singer

---

[331] Singer Report, ¶125 (step iv).

[332] Singer Report, ¶¶125, 127-128, Table 7.

[333] Singer Report, ¶125, Table 7, ¶128.

[334] Singer Report, ¶125, Table 7, ¶128.  $2,559,214 = $0.50 overcharge per thousand impressions × (11.2 billion AdX impression gain × 45.6% of impressions from Google Ads) / 1000.

[335] Singer Report, ¶129.  Dr. Singer also states that his "methodology is flexible to departures from this assumption and can readily incorporate any changes."  Singer Report, ¶129.  I note that data through March 2024 (*i.e.*, the AdX/Open Bidding data I reference below throughout this section) were available to Dr. Singer but he does not use them in his estimation.

calculates total damages of "approximately $141 million through March 2023 and approximately $156 million through September 2024" using this direct method.[336]

195.    As I describe below, Dr. Singer's proposed approach is fundamentally flawed, which renders it unreliable for the assessment of class-wide impact.

> **2.    Dr. Singer's Direct Method Relies on Highly Aggregated Data and Economically Unjustifiable Assumptions Rendering It Incapable of Establishing Impact for Members of the Proposed Class**

196.    Dr. Singer's direct method for the assessment of impact on advertisers resulting from UPR is a highly aggregated approach that is not rooted in sound economics and cannot isolate the effects of UPR from other factors, let alone assess the impact of UPR on any individual advertiser.  Dr. Singer's direct method relies on two steps, which together yield his estimate of the purported "lift in AdX impression revenue from UPR."[337]  Neither step in his aggregated approach is able to assess impact for individual members of the Proposed Class.  Moreover, both steps are rooted in economically unjustifiable and erroneous assumptions.

197.    The first step in Dr. Singer's direct method involves a component of his DiD model, which he uses to purportedly estimate "the causal effect of UPR on Open Bidding [sic]" and from which he concludes that "UPR reduced the CPM difference between AdX and Open Bidding transactions."[338]  His DiD model only contains variables to identify his treatment group (Open Bidding) and the treatment at issue (*i.e.*, UPR); he does not include any additional control variables to account for factors that may explain changes in the relationship between AdX and Open Bidding prices before or after UPR.[339]  Thus, as a general matter, Dr. Singer's DiD model

---

[336] Singer Report, ¶131. Dr. Singer further states that damages for each individual proposed class member "can be apportioned based on individual impressions each Google Ads advertiser purchased through AdX."  Singer Report, ¶128.

[337] Singer Report, ¶125, Table 7.

[338] Singer Report, ¶119, 122.

[339] Among other factors, Dr. Singer ignores that the composition of impressions offered on AdX and Open Bidding, as well as the auction dynamics of impressions sold on these platforms, changes over time.  For example, publishers choose the demand sources that they offer their inventory to, including which exchanges they choose to partner with (if any) to offer their inventory via Open Bidding.  Indeed, different exchanges participate in Open Bidding to different extents (if at all) over time, depending in part on the number of publishers that partner with them.  Advertisers can choose which exchanges they bid into, including AdX and/or exchanges participating in Open Bidding.  The

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

is biased and unreliable because it is incapable of differentiating UPR's effect on CPMs from any effects on CPMs from other events that occurred at the same time, including, for example, Google's transition to first-price auctions.[340]  It is also incapable of accounting for any procompetitive benefits of UPR under UFPA (such as the output enhancing outcomes of UPR, including the clearing of impressions on AdX for impressions that would have otherwise gone unsold).  Dr. Singer himself acknowledges that "Google's implementation of UPR coincided with the termination of other conducts that depended on Google using a second price auction on AdX."[341]  Dr. Singer does not resolve the fundamental problem that his approach is unable to account for events or factors that could have contributed to the difference in prices between AdX and Open Bidding after UPR compared to before UPR.  Instead, his approach attributes those effects to UPR, and he simply asserts that other developments do not matter.  This renders Dr. Singer's conclusions biased and unreliable.[342]

198.    An examination of the average monthly CPMs on AdX and Open Bidding used by Dr. Singer in his analysis reveals that the convergence in CPMs between the two platforms—which Dr. Singer attributes to UPR—began months *before* Google implemented UPR.  As shown in **Exhibit 22** below, rather than exhibiting similar pricing movements before UPR, average monthly AdX CPMs (shown in blue) largely diverged from Open Bidding CPMs (shown in red) between May 2017 and December 2018, at which point they began to converge again.  This convergence, months prior to Google's implementation of UPR, indicates that factors other than

---

combination of these supply and demand factors influences the competition for, and the resulting CPMs of, impressions transacted through a given exchange and/or platform.

[340] Indeed, Google recognized the inefficiencies of AdX competing on a second-price basis against first-price bids on Open Bidding; even if AdX submitted the highest bid, the highest bid would not win when an Open Bidding bid exceeded the AdX *second-highest* bid.  *See, e.g.*, GOOG-DOJ-11697964, at 978 ("…resulted in outcomes that aren't always market efficient," illustrating an example of Exchange Bidding winning an auction over AdX despite the highest bid of AdX exceeding the Exchange Bidding bid).

[341] Singer Report, ¶118, fn. 110.

[342] The omitted variable bias problem arises when a relevant explanatory variable is excluded from the regression model and that variable is correlated with another explanatory variable in the regression model.  *See* Wooldridge, pp. 84-87.  As Professor Wooldridge also explains the issue in an econometrics textbook, "suppose that … we omit a variable that actually belongs in the true (or population) model.  This is often called the problem of excluding a relevant variable or underspecifying the model. … [T]his problem generally causes the OLS estimators to be biased." Wooldridge, p. 84.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

UPR (and UFPA) that Dr. Singer does not account for are important in explaining any change in the difference in average CPMs between AdX and Open Bidding transactions.[343]

---

[343] As acknowledged by Dr. Singer, a crucial assumption in a DiD model, known as the "parallel trends assumption" is that "but-for the treatment (UPR), the relationship between the treated [Open Bidding] and untreated [AdX] groups would remain the same as before UPR."  Singer Report, ¶118, fn. 111.  As depicted in the exhibit, Dr. Singer's model fails to isolate any relationship between AdX and Open Bidding CPMs before UPR.  I also note that in the "Post UPR" period, the CPM difference between AdX and Open Bidding also varies over time, further indicating that factors not accounted for in Dr. Singer's model are important in explaining differences in CPMs between AdX and Open Bidding. Google documents indicate that the effect of UFPA on bids would vary depending on, for instance, how each advertiser (or buying tool used by the advertiser) responded to the shift to a first-price auction.  *See, e.g.*, GOOG-DOJ-07782646, at -691 (indicating Google expects "volatility during the transition period [to first-price auctions] as buyers adapt and fine-tune their bidding strategies using the 1st price experiment traffic" and "[s]hort-term volatility will make it difficult to draw meaningful long-term conclusions; avoid the risk of potential bias (either positive or negative) before the market has enough time to stabilize").

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 22: AVERAGE MONTHLY CPMS ON ADX VERSUS OPEN BIDDING**

**JANUARY 2017 – DECEMBER 2022**



*Note:*
    The depicted data replicate the data shown in Dr. Singer's Figure 9, with the addition of the
    dashed green line illustrating the difference in average monthly CPMs between AdX and
    Open Bidding transactions.

*Source:*
    Singer Report, Figure 9.

199.    Dr. Singer's DiD model is also unsuitable for the assessment of impact for all or nearly
all members of the Proposed Class because it, at best, only assesses the *average* effect of the
treatment (here, UPR under UFPA).  It has long been recognized in the literature that the effect
of a treatment can be "heterogeneous" (*i.e.*, it can vary) across individuals.[344]  Dr. Singer's
reliance on highly aggregated data (*i.e.*, a single monthly average CPM)—that averages across

---

[344] *See, e.g.*, G. Imbens and J. Wooldridge, "Recent Developments in the Econometrics of Program Evaluation,"
*Journal of Economics Literature*, 2009 ("Imbens and Wooldridge"), pp. 5-86, at p. 7 ("One of the attractions of the
[treatment effects framework] is that from the outset it allows for general heterogeneity in the effects of the treatment.
Such heterogeneity is important in practice…").

billions of transactions purchased by millions of different advertisers—and a single estimated effect of a treatment variable that applies to all individuals does not allow one to estimate individual heterogenous effects.[345]  As discussed in Section VI.B above, any effect of UPR on advertisers varied individually, depending not only on the publishers that a given advertiser transacted with but also across each auction of a given publisher's inventory.  As I explain in detail below, even considering, in aggregate, differences between advertisers using Google Ads (*i.e.*, Proposed Class members) that purchased impressions via AdX and advertisers using other buying tools (such as DV360), I show that Dr. Singer has no basis to conclude that members of the Proposed Class were harmed by UPR.

200.    The second step in Dr. Singer's direct method involves an arithmetic calculation of the purported "lift in AdX impression[s] attributable to UPR."[346]  Dr. Singer relies on unfounded assumptions and his approach is not suitable for evaluating the effect (in this case, an impression lift) on any individual advertiser when effects are heterogenous.  Dr. Singer provides no justification for the assumption underlying his calculation, *i.e.*, that the number of impressions transacted on AdX relative to Open Bidding would have, absent UPR, remained at some average "pre-UPR" ratio.  He merely asserts this.[347]  As is the case with Dr. Singer's DiD model, his estimate of an AdX impression gain erroneously attributes to UPR *any* increase in the average monthly impressions transacted on AdX relative to Open Bidding after UPR.  Thus, his approach attributes to UPR any increase in impressions resulting from other factors, including UFPA, output enhancing benefits of UPR, or other AdX growth (unrelated to UPR).  Similarly, as with

---

[345] *See, e.g.*, Imbens and Wooldridge, p. 10, describing the difficulty of interpretation of a regression equation such as Dr. Singer's ("Often, researchers write down a regression function $Y_i = \alpha + \tau \cdot W_i + \varepsilon_i$. This regression function is then interpreted as a structural equation, with $\tau$ as the causal effect. Left unclear is whether the causal effect is constant or not [*i.e.*, heterogeneous], and what the properties of the unobserved component, $\varepsilon_i$, are.") and pp. 14-15 ("A key feature of the current literature, and one that makes it more important to be precise about the questions of interest, is the accommodation of general heterogeneity in treatment effects. In contrast, in many early studies it was assumed that the effect of a treatment was constant [*i.e.*, not heterogeneous], implying that the effect of various policies could be captured by a single parameter. The essentially unlimited heterogeneity in the effects of the treatment allowed for in the current literature implies that it is generally not possible to capture the effects of all policies of interest in terms of a few summary statistics.").

[346] Singer Report, ¶125 (step iv).

[347] Dr. Singer states how he performs his calculation but fails to provide any economic basis for it: "I measured the lift in AdX impression attributable to UPR by calculating the difference between actual AdX impressions minus the impression that AdX would have had if it had maintained the same 6.3 ratio to Open Bidding."  Singer Report, ¶125 (step iv).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

his DiD model, Dr. Singer's estimate of an AdX impression gain also relies on highly aggregated data that is unsuitable for assessing impact for any individual advertiser. As I explain in more detail below, his estimate produces the same outcome regardless of whether the increase in AdX impressions relative to Open Bidding impressions are attributable to some, all, or no members of the Proposed Class.

> **3.    Dr. Singer's Conclusion that Advertisers on AdX Paid Inflated Prices and Won More Impressions Relative to Open Bidding is Derived Completely from DV360 and Authorized Buyer Impressions Rather than from Impressions Purchased via Google Ads**

201.    Dr. Singer's direct method averages prices across all impressions purchased on AdX, including impressions purchased by advertisers using Google Ads, DV360, and Authorized Buyers (also referred to as Real Time Bidders or "RTB"), and compares those average prices to average prices across all impressions purchased on Open Bidding. Putting aside other issues with his method, in conducting this aggregated analysis, Dr. Singer fails to distinguish prices paid for impressions by Proposed Class members[348] from prices paid for impressions purchased via DV360 or non-Google buying tools (*i.e.*, transactions outside the Proposed Class). Dr. Singer similarly fails to account for whether his purported measure of impression gains on AdX resulting from UPR is due to increased purchases by members of the Proposed Class or from advertisers using other buying tools. As I show below, both of Dr. Singer's primary findings— that impressions were more cheaply available on Open Bidding as compared to AdX and that there was a lift in AdX impressions attributable to UPR—are driven by his erroneous inclusion of DV360 and RTB in his analysis.

202.    First, I show that Dr. Singer's per impression overcharge is attributable to his inclusion of non-Google Ads buying tools in his calculation of the average AdX CPM. When limiting AdX transactions to Google Ads, and thus transactions relevant to the Proposed Class, Dr. Singer's estimated overcharge is completely overturned, *i.e.*, it turns *negative*.[349]

---

[348] Dr. Singer clarifies that the Advertiser Plaintiffs asked him to analyze Google Ads advertisers purchasing via AdX. Singer Report, ¶¶5-7.

[349] For the reasons discussed in this section, Dr. Singer's proposed method is unreliable and insufficient to establish class-wide injury. My discussion of Dr. Singer's erroneous inclusion of AdX transactions purchased by demand

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

203.    Dr. Singer's measure of inflated prices paid by advertisers owing to UPR is based on a "component of the DiD model," and specifically the "difference in AdX and Open Bidding CPMs before vs. after UPR," which "equals $0.50."[350]  By including AdX impressions purchased via non-Google Ads buying tools, Dr. Singer inflates the AdX CPM, and thus his measure of the per impression overcharge.  This is because impressions purchased by DV360 and RTB transact, on average across all transactions for web display ads on AdX, at considerably higher prices than prices paid by Google Ads advertisers.[351]

204.    **Exhibit 23** below illustrates the difference in average prices paid across Google Ads advertisers as compared to other buyers on AdX.  The black vertical line identifies September 2019, when AdX transitioned to UFPA and UPR was fully implemented.  The dotted red and blue lines represent the overall average CPMs for transactions on Open Bidding and AdX, respectively, and are consistent with the CPMs used by Dr. Singer in his direct method.[352]  As shown in the exhibit, average monthly CPMs across Google Ads transactions (depicted in orange) are the lowest, while the average monthly CPMs for DV360 (depicted in grey) and RTB (depicted in green) are considerably higher.  The average monthly Google Ads CPM is lower

---

[350] sources outside the Proposed Class (*i.e.*, non-Google Ads buying tools) serves to illustrate that, even putting aside other issues, his proposed methodology finds an aggregate overcharge and impression lift due to the inclusion of these non-class demand sources in his comparison.

[350] Singer Report, ¶125 (step v).  Though Dr. Singer describes his calculation differently, it simplifies to the difference between the average monthly CPM before UPR on AdX ($2.15) as compared to Open Bidding ($1.65).  *See* fn. 327. *See also,* Singer Report, Figure 10, ¶121.

[351] One of the reasons why DV360 and Authorized Buyers' (*i.e.*, RTB) CPMs are, on average, higher than Google Ads CPMs is that buyers on DV360 and Authorized Buyers purchase high-value impressions through Programmatic Direct transactions, such as Preferred Deals and Programmatic Guaranteed.  It is inappropriate to include these impressions because, among other reasons, such types of transactions are (i) not relevant to Google Ads, which does not participate in these transaction types, and (ii) are not subject to UPR, and thus it is inappropriate to consider them when purporting to study the effect of UPR on prices.  Google Ad Manager Help, Unified Pricing Rules, https://support.google.com/admanager/answer/9298008?hl=en.  Similarly, DV360 and Authorized Buyers also transact for high-value impressions via Private Auctions, which Google Ads also does not participate in.  I note that Dr. Singer himself limits his consideration to Open Auction for various analyses, including in his only empirical work supporting his claim that Google's "rigid pricing structure [] would allow harm [from] UPR to propagate to all or nearly all Class Members."  Singer Report, ¶132, Figure 11.  Dr. Singer also excludes direct transactions where possible in his consideration of third-party exchange impressions, revenue, and revenue share.  *See* Singer Report, fn. 261.

[352] These CPMs are consistent with those depicted in Figure 9 in Dr. Singer's report and used in his direct method. While Dr. Singer chose to use a more aggregated data source for his calculations, the more granular data source I use to differentiate between buying sources can be used to generate Dr. Singer's exact aggregated results.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

than the corresponding Open Bidding CPM in nearly every single month.[353]  Only by combining DV360 and RTB impressions with Google Ads in his calculation of average monthly CPMs does Dr. Singer find that AdX impressions transacted at a higher price than Open Bidding (which yields him his "overcharge").

---

[353] The only exception is in December 2022, the last month in the data considered by Dr. Singer.  However, as I have described, only the months prior to UPR (*i.e.*, prior to September 2019) are used by Dr. Singer in his determination of the per impression overcharge.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 23: MONTHLY CPMS – ADX VERSUS OPEN BIDDING**

**JANUARY 2017 – DECEMBER 2022**



*Notes:*

    Buying tools are identified using the field *ad_source_type*. A small number of AdX impressions, representing less than 0.015% of impressions in any given month through late 2021, are not attributed to Google Ads, DV360, or RTBs and are thus, not depicted in this chart. The vast majority of these impressions occur starting in late 2021 and are associated with impressions won by header bidders after Google enabled header bidding trafficking in Google Ad Manager.

*Source:*

    AdX/Open Bidding data (GOOG-AT-MDL-DATA-000066537 to 000481994, GOOG-AT-MDL-DATA-000508827 to 000558882, GOOG-AT-MDL-DATA-000561536 to 000564882, GOOG-AT-MDL-DATA-000606366 to 000653766).

205.    Dr. Singer has no basis to conclude that Proposed Class members (*i.e.*, Google Ads advertisers) could have purchased the same inventory for cheaper had Google not implemented UPR. **Exhibit 24** below compares the average price before UPR on Open Bidding versus AdX across all buyers (as calculated by Dr. Singer), as well as when limiting AdX to only Google Ads transactions. Dr. Singer's estimate of a "UPR Price Lift" of $0.499 per thousand impressions is

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

overturned when comparing average CPMs for Google Ads to Open Bidding.  The results show that CPMs for AdX impressions bought by Google Ads were on average actually $0.267 *cheaper* than transactions on Open Bidding.[354]

**EXHIBIT 24: DR. SINGER'S UPR PRICE LIFT CALCULATION: CPMS FOR ADX AND OPEN BIDDING BEFORE UPR**

**Dr. Singer's UPR Price Lift: AdX vs. Open Bidding**

| | |
|---|---|
| AdX Pre-UPR CPM | $2.15 |
| Open Bidding Pre-UPR CPM | $1.65 |
| **Difference** | **$0.499** |

**Dr Singer's UPR Price Lift: Limiting to Google Ads-AdX vs. Open Bidding**

| | |
|---|---|
| Google Ads-AdX Pre-UPR CPM | $1.39 |
| Open Bidding Pre-UPR CPM | $1.65 |
| **Difference** | **($0.267)** |

*Notes:*

    Calculations based on Dr. Singer's method of comparing the monthly average pre-UPR CPMs on AdX to Open Bidding.  Dr. Singer's calculation of the difference of $0.499 between the average monthly AdX CPM and Open Bidding CPM is the basis for his UPR Price Lift.  *See* Singer Report, Tables 5 and 7.  Google Ads transactions are identified using the field ▮▮▮▮▮▮.

*Sources:*

    Singer Report, Table 5, Table 7, and Dr. Singer's workpapers; AdX/Open Bidding data (GOOG-AT-MDL-DATA-000066537 to 000481994, GOOG-AT-MDL-DATA-000508827 to 000558882, GOOG-AT-MDL-DATA-000561536 to 000564882, GOOG-AT-MDL-DATA-000606366 to 000653766).

My findings demonstrate that Dr. Singer's own method yields an alleged overcharge only as a result of his inclusion of AdX transactions that are outside of the Proposed Class definition.

---

[354] The results shown in the exhibit below are a simplification of Dr. Singer's equation.  To illustrate that they are equivalent, I also present results using Dr. Singer's original formulation as shown in Table 7 of his report.  Dr. Singer's formula for calculating his UPR Price Lift is depicted as the "Post-UPR CPM" (which his workpapers show is the Post-UPR AdX CPM) minus the "But-Post UPR CPM" (which his workpapers show is the difference between (i) the Post-UPR AdX CPM and (ii) the Pre-UPR AdX CPM minus the Pre-UPR Open Bidding CPM).  Under Dr. Singer's original calculation, this equates to $2.13 − [$2.13 − ($2.15 − $1.65)] = $0.499.  *See* Singer Report, Table 7 and Dr. Singer's workpapers.  Limiting to the Google Ads-AdX CPM, Dr. Singer's original formula equates to $1.57 − [$1.57 − ($1.39 − $1.65)] = −$0.267.  As illustrated, these equate to the UPR lift calculated in **Exhibit 24**.  Further, I note that Dr. Singer's overcharge is overturned for each of his alternative specifications as well, *i.e.*, CPMs for AdX impressions bought by Google Ads advertisers were on average *cheaper* than impressions on Open Bidding before UPR.  While each of his specifications indicates that the CPMs on Open Bidding transactions increased relative to transactions on AdX as a result of UPR, an increase in CPMs *on Open Bidding* after UPR is not relevant to transactions in the Proposed Class—by definition, impressions sold on Open Bidding were not sold on AdX to Google Ads advertisers.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Even taking Dr. Singer's direct method at face value, there is no basis for him to conclude that members of the Proposed Class paid more for inventory on AdX than they would have had they instead purchased the same inventory on Open Bidding.[355]

206.    Next, I show that Dr. Singer's other primary conclusion about his purported AdX impression gains due to UPR is also driven entirely by DV360 rather than impressions purchased by advertisers using Google Ads.  Dr. Singer calculates his AdX impression gain by comparing the ratio of monthly average impressions for AdX and Open Bidding before UPR (from January 2017 to August 2019) to impressions on AdX and Open Bidding after UPR (from September 2019 to December 2022).  He attributes to UPR any increase in AdX impressions that exceed this ratio for the period after Google implemented UPR.[356]  As shown in **Exhibit 25** below, his finding of growth in AdX impressions beyond that of Open Bidding is due to growth in DV360. The average monthly impressions on AdX in Dr. Singer's analysis before UPR as compared to after UPR for DV360 grew by over 100%, while Google Ads impressions grew by approximately 23%.  In comparison, Open Bidding impressions grew by 25%.  Rather than account for differences in the number of impressions transacted through Google Ads, DV360, and RTB over time, Dr. Singer assumes that his increase in AdX impressions is attributable proportionally to each buying sources' overall share of impressions on AdX.  For example, Dr. Singer attributes 45.6% of the lift in AdX impressions to Google Ads based on his claimed "percentage of AdX impressions from Google Ads."[357]  But by deconstructing Dr. Singer's calculation to show how each buying source influences his calculation, I demonstrate that Dr. Singer's entire AdX impression gain is actually attributable to DV360, rather than Google Ads.  I use Dr. Singer's estimation method for each of Google Ads, DV360, and all other buyers to show that of the additional 11.245 billion AdX impressions that Dr. Singer estimates are due to UPR,

---

[355] Nor does Dr. Singer have any basis to claim that, absent UPR, prices paid by Google Ads advertisers on AdX would have fallen to Open Bidding levels, as advertisers paid less per thousand impressions, on average, for impressions purchased on AdX as compared to those purchased on Open Bidding.

[356] *See* ¶194.  I note that in doing so, Dr. Singer also ignores any market expansion, rather than substitution, that could have increased AdX impressions relative to Open Bidding.  As explained in Section VI.B, UPR under UFPA was output enhancing, with impressions selling on AdX that would have otherwise gone unsold.

[357] Singer Report, ¶125 (step vii), Table 7.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

18.535 billion are due to an increase in DV360 impressions, which are offset by a negative impression gain for Google Ads and all other buyers.[358]

**EXHIBIT 25: MONTHLY AVERAGE IMPRESSIONS, ADX VERSUS OPEN BIDDING BY BUYING TOOL[1]**

**JANUARY 2017 – DECEMBER 2022**

| | AdX | | | | Open Bidding[4] |
| | Total[4] | Google Ads | DV360 | All Others | |
| | [a] | [b] | [c] | [d] | [e] |
|---|---|---|---|---|---|
| [1] Before UPR | 97,834,801,119 | 55,150,841,822 | 24,431,613,301 | 18,252,345,997 | 15,458,922,545 |
| [2] After UPR | 133,691,906,101 | 67,885,808,970 | 49,113,112,693 | 16,692,984,438 | 19,347,780,916 |
| [3] Impr. Growth (%) | 37% | 23% | 101% | -9% | 25% |
| **AdX/OB Ratio[2]** | | | | | |
| [4] Before UPR | 6.33 | 3.57 | 1.58 | 1.18 | |
| [5] After UPR | 6.91 | 3.51 | 2.54 | 0.86 | |
| **Dr. Singer's Calculated Impression Lift[3]** | | | | | |
| [6] Adx Impr. Gain | 11,245,707,640 | (1,138,820,770) | 18,535,464,078 | (6,150,935,668) | |

*Notes:*
[1] AdX buying tools are identified using the field ███████.
[2] AdX/OB Ratio is calculated as the monthly average AdX impressions divided by monthly average Open Bidding impressions in the respective Pre-UPR and Post-UPR periods.
[3] Dr. Singer's Calculated Impression Lift is the difference between Post-UPR AdX average impressions and the Post-UPR Open Bidding average impressions at the Pre-UPR AdX/OB Ratio, consistent with Dr. Singer's calculation as described in Table 7 of his report.
[4] Total and Open Bidding impressions are identical to those in Singer Report, Table 6.

*Sources:*
AdX/Open Bidding data (GOOG-AT-MDL-DATA-000066537 to 000481994, GOOG-AT-MDL-DATA-000508827 to 000558882, GOOG-AT-MDL-DATA-000561536 to 000564882, GOOG-AT-MDL-DATA-000606366 to 000653766).

207.    Finally, as I have explained above,[359] another issue plaguing Dr. Singer's DiD model and his calculation of impression gains is that his method is incapable of differentiating UPR's effect on impressions and CPMs from any effects on impressions and CPMs from other events that disparately affected auction dynamics on AdX compared to Open Bidding after versus before UPR, including Google's transition to first-price auctions.  Dr. Singer's direct method is also

---

[358] All other buyers are largely attributable to RTB.  However, Dr. Singer also includes additional impressions within his aggregate AdX figure that are associated with impressions won by header bidders.

[359] *See* Section VIII.B.3.

incapable of accounting for any procompetitive benefits of UPR under UFPA.  This renders Dr. Singer's conclusions biased and unreliable.

208.    In sum, Dr. Singer's direct method is flawed and unreliable for the assessment of impact for Google Ads advertisers.  Using his own method but analyzing impressions on Google Ads (*i.e.*, transactions that are relevant to the Proposed Class) overturns Dr. Singer's results.  As such, Dr. Singer's direct method provides no basis for him to claim class-wide impact for Proposed Class members.

### 4.    Dr. Singer's Estimate of the "UPR Price Lift" is Unreliable Because He Fails to Compare Analogous Prices

209.    Dr. Singer's comparison of average monthly CPMs between AdX and Open Bidding is fatally flawed because it compares AdX CPMs that are gross of the AdX revenue share to Open Bidding CPMs that are net of third-party exchanges' revenue share.[360]  His estimate of UPR resulting in a price lift paid by advertisers is therefore an unreliable exercise in comparing dissimilar prices that does not appropriately account for advertisers' actual spend.

210.    Suppose, for example, that an advertiser purchases an impression through a third-party exchange participating in Open Bidding (*i.e.*, OpenX).



[361]

[362]  This leads Dr. Singer to inappropriately conclude that the Open

---

[360] The AdX CPMs are net of any buy-side revenue share, but they are gross of the AdX revenue share.  However, the Open Bidding CPM are net of both a buy-side revenue share as well as the third-party exchange's revenue share.  The revenue figures recorded in Google's data are identified as "gross" revenue because they are gross of the AdX revenue share and gross of *Google's* Open Bidding revenue share.  However, the revenue observed by Google from Open Bidders is already net of any revenue share taken by the third-party exchange participating in Open Bidding (as well as the buying tool that placed the bid).

[361]

[362]

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████[364] All else equal, to the extent that UPR "steered" particular impressions from non-Google exchanges to AdX by lowering the price floor on AdX, UPR would be expected to benefit advertisers in the form of cost savings.

211.    In order to determine whether any particular advertiser could have purchased inventory more cheaply absent UPR, as theorized by Dr. Singer, requires a series of individual inquiries into at least the specific exchange (if any) through which that advertiser would have purchased impressions that Dr. Singer claims were steered to AdX, the applicable revenue share at that point in time, the change in price floor (if any) resulting from UPR for that impression, as well as auction-specific dynamics including the number of bidders and competition for the particular impression.



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 5.    Dr. Singer's Direct Method Altogether Fails to Assess Economic Injury to Members of the Proposed Class

212.    Dr. Singer's theory of harm is that "advertising prices on Open[] Bidding came up" due to UPR, and that impressions that transacted on AdX resulting from UPR would have instead been acquired "for cheaper through Open Bidding rather than AdX."[365] He purports to measure aggregate harm as the difference between the average price advertisers on AdX paid for impressions and the average price advertisers would have paid on Open Bidding, had the increase in AdX impressions that he attributes to UPR instead transacted on Open Bidding absent UPR.[366] Because his claim is in large part based on the additional "lift in AdX impressions" that Dr. Singer assumes would have instead been purchased on a non-Google exchange (*i.e.*, through Open Bidding), and therefore by advertisers including non-class members, Dr. Singer's proposed method is inadequate and largely irrelevant for assessing impact to Proposed Class members. In short, Dr. Singer's method at best assesses impact on an irrelevant group of advertisers.

213.    A showing of injury to each Proposed Class member based on Dr. Singer's direct method requires him to establish three steps. First, the Google Ads advertiser would have had to purchase additional impressions on AdX resulting from UPR. Second, absent UPR, the advertiser would have instead purchased those impressions on Open Bidding.[367] Third, the but-for price paid by advertisers for those impressions on Open Bidding would be lower than the price the advertiser actually paid for the impressions on AdX. Critically, Dr. Singer does not

---

[365] Singer Report, ¶¶9, 124, 133, fn 107. Dr. Singer makes no claim that UPR raised prices on AdX, and in fact describes UPR as having the opposite effect—advertiser prices on AdX fell under UPR as publishers lowered price floors on AdX.

[366] Singer Report, ¶125. To the extent Dr. Singer claims that he is, in fact, estimating the advertiser spend due to inflated rates *on AdX*, this contradicts his own application of his direct method. First, Dr. Singer constructs his DiD model using Open Bidding as the *treatment* group, "because Open Bidding is where the floor prices were affected by UPR." Singer Report, ¶9. As Dr. Singer acknowledges, a DiD model is designed to "seek[] to recover the average treatment effect [UPR] on the treated [Open Bidding]." Singer Report, ¶117. By construction, Dr. Singer seeks to recover the effect of UPR on Open Bidding, not on AdX, *i.e.*, his control group. Second, Dr. Singer multiplies his "UPR Price Lift" with only the *incremental* impressions he estimates were sold on AdX. If Dr. Singer was claiming that AdX prices were elevated, on average, due to UPR, there is no reason why the supposed "price lift" would apply only to a relatively small fraction of impressions sold on AdX.

[367] Dr. Singer specifies that these transactions would have come from Open Bidding, as his model is based solely on impressions and CPMs on AdX compared to Open Bidding, concluding only that "UPR reduced the gap between ad prices on AdX vs. Open Bidding." Singer Report, ¶124. Dr. Singer also claims that "Google [i]mplemented UPR to [e]liminate [p]ricing [p]ressure from Open Bidding." Singer Report, §II.B. I note that my opinions apply regardless of whether Dr. Singer claims that his analysis is relevant to rival exchanges generally or to Open Bidding specifically.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

establish that any of these steps hold true for Proposed Class members, let alone all three steps. For the reasons outlined below, Dr. Singer fails to show that Proposed Class members suffered the harm that forms the basis for his damages calculation. An individualized inquiry is required to assess impact, if any, to individual members of the Proposed Class.

214. First, under Dr. Singer's theory, a Proposed Class member could only have been harmed—by paying more for an impression on AdX than it would have paid on Open Bidding absent UPR—if the advertiser in fact purchased additional impressions on AdX resulting from UPR. Dr. Singer, however, fails to show that all or nearly all members of the Proposed Class purchased additional impressions on AdX resulting from UPR. An individualized inquiry would be required to establish *which* incremental impressions sold on AdX due to UPR, as well as which advertisers buying through which buying tool (*i.e.*, Google Ads, DV360, or third party Authorized Buyers) purchased those impressions. As explained in Section VI.B, not all publishers' inventory was affected by UPR, for instance because not all publishers had ever set or were interested in setting differential price floors. Dr. Singer's estimate of an overall AdX impression gain is insufficient to establish which specific advertisers his claimed impression gains are attributable to, including which (if any) Proposed Class members purchased additional impressions due to UPR.[368] As shown in Section VIII.B.3 above, his estimate of an AdX impression gain is derived completely from purchases on AdX via DV360. Indeed, the effect of Google Ads on Dr. Singer's AdX impression lift due to UPR is *negative*, meaning that even in aggregate, impressions purchased by advertisers using Google Ads do not contribute to Dr. Singer's estimate of an AdX impression gain. Moreover, Proposed Class members who did not buy incremental impressions on AdX—and therefore who, under Dr. Singer's theory, were unharmed—could still have benefited from UPR as a result of the downward pressure on AdX prices resulting from lower UPR price floors (*i.e.*, impressions that sold on AdX even without UPR could have sold at lower prices on AdX with UPR given lower UPR price floors).

215. Second, even among advertisers that purchased additional impressions on AdX resulting from UPR, under Dr. Singer's model, advertisers could only have been harmed if they would

---

[368] Dr. Singer's estimate of an AdX impression gain is based on the growth of AdX impressions relative to Open Bidding impressions before and after UPR. His estimate is the same regardless of whether the AdX impression growth results from an increase in impressions by all advertisers or from an increase in impressions by only some advertisers (including advertisers not in the Proposed Class, such as those buying only through DV360).

have instead purchased those impressions via Open Bidding more cheaply.[369]  Dr. Singer's approach fails to allow for *any* impressions to have been sold on AdX that would not have otherwise been sold (and thus for any output enhancing effects of UPR).  For example, by lowering the AdX price floor, additional transactions could sell on AdX that would have otherwise gone unsold, strictly *benefiting* advertisers that purchased such additional impressions resulting from UPR.  Even putting aside any output enhancing effects of UPR, Dr. Singer fails to establish that any Proposed Class member would have purchased impressions via Open Bidding or any other rival exchange, let alone that Proposed Class members would have purchased the specific additional impressions that Dr. Singer opines were effectively steered to AdX due to UPR.  He does not even attempt to establish that the same advertiser that purchased an impression on AdX due to UPR would have instead purchased that impression through another channel.  Such a determination could only be made through a series of individualized inquiries into each advertiser, and their decision to use or not use other buying tools and/or bid into other exchanges.  Indeed, Dr. Singer himself argues that Google Ads advertisers "often find a single home with Google Ads"[370] and I have seen no evidence that Google Ads participates in Open Bidding.[371]  Moreover, Proposed Class members who purchased additional impressions on AdX resulting from UPR, and who would not have otherwise purchased those impressions, were strictly better off because of UPR.  As explained in Section VI.B, such Proposed Class members were better off as a result of UPR because they were able to purchase additional impressions on AdX as a result of UPR lowering the AdX price floor and allowing them to compete for inventory they were unable to compete for under legacy price floors.

216.    Third, even if Dr. Singer did establish that some Proposed Class members purchased incremental impressions on AdX and those same Proposed Class members, absent UPR, would

---

[369] The same argument is relevant even if Dr. Singer (erroneously) claims that his method indicates that prices on AdX would have been lower absent UPR.  That is, Dr. Singer does not establish that advertisers using Google Ads that were able to purchase additional impressions on AdX due to UPR would have purchased additional impressions absent UPR at a lower price.  Among other reasons, absent UPR, a higher AdX floor price could prevent Google Ads advertisers bidding on AdX from purchasing impressions that they were able to win under UPR.

[370] Singer Report, ¶216.

[371] Some portion of Google Ads purchases through third-party exchanges may transact through Open Bidding. Regardless, many members of the Proposed Class that purchased on AdX since September 2019 (*i.e.*, those Proposed Class members that Dr. Singer purports to assess injury for) never purchased on third-party exchanges through Google Ads.  *See* my workpapers.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

have instead purchased those impressions on Open Bidding, whether the advertiser would have paid less for those impressions—and thus was harmed—still requires an individualized inquiry. For instance, individual inquiries would be necessary into what effect, if any, UPR had on the floor price the publisher would have set for the specific exchange through which that advertiser would have bid, as would inquiries into the total revenue share associated with the specific pipeline through which the advertiser competed, as well as the extent of competition for each impression. Dr. Singer has not established that advertisers bidding through Open Bidding could pay less for a given impression absent UPR, and thus has not established harm to any individual advertiser.[372]

217.    Indeed, evidence that Dr. Singer has himself put forward shows that many advertisers would not likely be able to purchase impressions cheaper through Open Bidding. For example, based on Dr. Singer's own calculation of the average revenue share of rival exchanges, ▮

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████[373] As explained in Section VIII.B.4 above, Dr. Singer's average CPM comparison between AdX and Open Bidding fails to account for the revenue shares charged by third-party exchanges. Even putting this critical issue aside, Dr. Singer's claim that AdX impressions transact at a higher price (as measured in CPM) compared to Open Bidding is irrelevant, as it fails to compare prices paid by Proposed Class members on AdX. As explained in Section VIII.B.3 above, when limiting Dr. Singer's calculation of the AdX CPM to those impressions paid by Google Ads advertisers, Dr.

---

[372] Among other issues, Dr. Singer's DiD model averages across all advertisers and impressions, and it is incapable of establishing whether the price for a particular impression would have been cheaper absent UPR.

[373] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████    See, e.g., Singer Report, Figure 11, ¶134.  For simplicity, I assume the advertiser faces the same buy-side revenue share bidding into AdX as it does bidding into OpenX.  An analysis of the buy-side revenue share would only require further individualized inquiry.

Singer's conclusion is completely overturned—Google Ads-AdX CPMs are *lower* than Open Bidding CPMs.[374]

218.    Rather than trying to establish economic injury to Proposed Class members through his model, Dr. Singer instead makes the unfounded assertion that Google "would have needed to lower its take rate to compete for the same impressions" had it not implemented UPR (resulting in savings to advertisers equal to his "lift" in impression revenue).[375] He also does not specify what the rate would be. Dr. Singer's assumption is entirely speculative and divorced from his assessment of harm. He provides no empirical or documentary support for it. Dr. Singer does not establish that Google would have lowered its AdX revenue share absent UPR,[376] and he also does not establish that the reduced costs would necessarily be borne by all or nearly all members of the Proposed Class. Accordingly, he provides no basis for his claim of class-wide impact. I also note that Dr. Singer does not establish that his assessment of impact for Proposed Class members is consistent with *any* but-for revenue share.[377]

---

[374] As explained, any reliance on the aggregate average CPMs masks variation among individual advertisers and is insufficient to establish common impact.

[375] Singer Report, ¶124. In relation to his direct method, Dr. Singer only mentions Google's revenue share (or take rate) in this single instance. I also note that because Dr. Singer's estimate of harm to Proposed Class members is based on his "lift in AdX impression revenue," it follows that in his but-for world, Proposed Class members would not have spent this amount.

[376] *See also,* Expert Report of Mark A. Israel, Dec. 13, 2024, §§ VII.A.2 and VII.D.4.

[377] It is improbable that any but-for revenue share would be consistent with Dr. Singer's assessment of impact for Proposed Class members. I note that, in his report section titled "There Exists Common Methods to Estimate Aggregate Damages and Individual Damages for Any Class Member," Dr. Singer provides no method to estimate individual damages for his second method. His only reference to his "Method 2" merely reiterates his aggregate damages calculation. Singer Report, §III and ¶131. However, in the prior section of his report, when describing damages estimated in his direct method, Dr. Singer states that "damages can be apportioned based on individual impressions each Google Ads advertiser purchased through AdX." Singer Report, ¶128. Taking Dr. Singer's description at face value, a Proposed Class member's individual damages would be proportional to its share of impressions bought on Google Ads through AdX relative to all other members of the Proposed Class. For example, █████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. *See* my workpapers. Assuming Dr. Singer's total damages of $140.8 million, and taking Dr. Singer's approach at face value, █████████████████████ ████████████████████████████████████████. However, these figures represent 2% of ████████ spend on AdX and 11% of ████████ spend on AdX. Dr. Singer provides no explanation for how some unspecified decrease in Google's AdX revenue share could result in a 2% decrease to ████████ spend but an 11% decrease to ████████ spend. Indeed, it is inconsistent with his claim of a "rigid pricing structure" stemming from Google's revenue share and his assumption that advertisers in the Proposed Class would uniformly bear the burden of a change in the AdX revenue share.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### C.    Dr. Singer's Proposed "Approach" For Proving Common Impact Is Fundamentally Flawed

219.    Dr. Singer claims that UPR resulted in a common impact on all members of the Proposed Class because Google had a "rigid pricing structure" such that a change in revenue share would result in price effects being transmitted to all members of the Proposed Class.[378]  According to Dr. Singer, this would "allow harm [from] UPR to propagate to all or nearly all Class Members."[379]  His conclusion is fundamentally flawed as a matter of economics.

220.    First, as noted above, Dr. Singer entirely ignores the benefits that at least some advertisers received from UPR.[380]  Dr. Singer implicitly states that UPR directly benefited members of the Proposed Class, in the form of preventing "publishers' ability to charge higher floors on AdX," allowing advertisers to win impressions they otherwise would not have been able to access and lowering CPMs.[381]  By ignoring the benefits entirely and considering only the claimed harms (*i.e.*, according to Dr. Singer, a higher revenue share that resulted in higher prices paid by advertisers), Dr. Singer has no reliable basis to conclude that an advertiser was injured

---

[378] Singer Report, §IV, ¶132.

[379] Singer Report, ¶132.  Though Dr. Singer estimates the AdX revenue share through Google Ads, he provides no analysis of the Google Ads buy-side revenue share to support his assertions that "Google retained approximately a 32 percent overall take rate" or that "[w]hen Google raised its fees from 14 to 15 percent, it did so on a holistic basis." Singer Report, ¶¶136-137.  Dr. Singer's own calculations of the total Google Ads-AdX take rate, as used in his indirect method regression, indicate that the total monthly average revenue share by advertiser vertical kept by Google varied between 24.3% and 44% during his damages period.  Further, his own calculations show that the total revenue share for advertisers in certain verticals (*e.g.*, "Retail") was consistently lower than the total revenue share for advertisers in other verticals (*e.g.*, "Services All Verticals" and "Technology"), varying by roughly 4 percentage points or more in certain months.  *See* my workpapers.

[380] As I have described above, Dr. Singer assumes that any AdX impression gain resulting from UPR is necessarily anticompetitive.

[381] Singer Report, ¶64.  Dr. Singer also admits that after UPR, "AdX CPMs fell in January and February 2020" Singer Report, ¶113, fn. 107) and cites many documents confirming that price floors, and accordingly, CPMs on AdX fell after UPR.  Singer Report, ¶113, fn. 107 ("General trend is that CPM has decreased a lot since UPR. … [M]ost of this is coming from low CPM inventory after the floors were taken out," quoting DM_GOOG_0058123 (PTX1633 in 1:23-cv-00108)); Singer Report, ¶78, fn. 76 (citing a Google email indicating Google's goal was to "get the AdX floors down" (GOOG-TEX-00096393, at -395 )); Singer Report, ¶93, fn. 89 (quoting a Google engineer describing a primary benefit "from lowered unified floors" (quoting GOOG-DOJ-AT-00588455, at -455)); Singer Report, Figure 17, ¶178 (showing a decrease in CPM for Google Ads and DV360 buyers, with the explanation that "UPRs lower than AdX floors").  Further, regardless of whether price floors on AdX fell, UPR helped make advertisers bidding into AdX more competitive against advertisers bidding into a non-Google exchange for those auctions in which the AdX floor would have, absent UPR, been higher than the price floor on non-Google exchanges.  *See* also, my discussion in Section VI.B.

141

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

overall.  For a given advertiser, the benefits may outweigh the alleged harms.[382]  Dr. Singer provides no basis or any methodology to ascertain if this is the case.

221.    Second, not only did UPR provide benefits to at least some advertisers, identifying those advertisers and the extent of the benefits received would require a series of individualized analyses.  Thus, a common analysis based on common evidence is not feasible.  I note that Dr. Singer has not proposed any methodology at all (whether common or individualized) for determining the benefits to a given advertiser.

222.    Third, Dr. Singer's conclusion that there was common impact is based on his assertions that (1) UPR was anticompetitive and increased AdX market share, and (2) absent UPR, Google would have lowered its AdX revenue share, including on transactions via Google Ads, in order to "regain" that market share.  Not only does Dr. Singer fail to consider any benefits from UPR, he also does not attempt to establish that Google would have lowered its AdX revenue share in the but-for world.[383]  He provides no support that Google would have lowered the AdX revenue share "to regain [ ] share" it allegedly obtained through UPR.  Moreover, Dr. Singer does not establish that different advertisers in the Proposed Class would uniformly bear the burden of a change in AdX revenue share.  Dr. Singer provides no alternative methodology for the assessment of class member impact.  Therefore, his conclusion is unreliable because it is entirely rooted in his unsupported assumptions that Google would reduce its AdX revenue share in the but-for world and the reduced costs would necessarily be borne by all or nearly all advertisers in the Proposed Class.

---

[382] Moreover, as I have discussed above, in a two-sided ad tech platform, an economically appropriate evaluation of the impact of a product design (such as UPR) on an advertiser requires considering not only the direct benefits to that advertiser, but also the benefits to publishers to the extent that they flow back to that advertiser through indirect network effects.  *See* Sections III and VI.

[383] Dr. Singer also does not consider the effect of any theorized decrease in the AdX revenue share on the Google Ads revenue share and thus, on the total revenue share for advertisers using Google Ads bidding on AdX.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this 13th day of December, 2024 in Washington, DC.

*Laila Haider*

Laila Haider, Ph.D.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# APPENDIX A

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



## Laila Haider, Ph.D.

December 2024

Vice President

## Education

Ph.D., with distinction, Economics, Columbia University, 2004

BA, *summa cum laude*, Economics, Gettysburg College, 1996

## Professional History

May 2020 to present  *Vice President*, Charles River Associates, Washington, DC

May 2012–May 2020 *Partner*, Edgeworth Economics, Washington, DC

2007–2012            *Senior Consultant*, NERA Economic Consulting, Washington, DC

2004–2006            *Consultant*

1996–1998            *Research Associate*

2000, 2001           *Research Assistant,* Department of Economics and NBER, Columbia University, New York, NY

2000, 2001           *Consultant*, South Asia Rural Development Unit, The World Bank, Washington, DC

## Honors and Professional Activities

American Bar Association

o  Antitrust Law Section, Council, Non-Lawyer (Economist) Representative, 2023–present

o  Antitrust Law Section, Nominating Committee, Member, 2024–2025

o  Antitrust Law Section, Co-Chair of Women.Connected Committee, 2021–2023

o  Antitrust Law Section, Vice Chair of Women.Connected Committee, 2020–2021

o  Antitrust Law Section, Co-Chair of Economics Committee, 2017–2020

o  Associate Editor, *Antitrust Magazine*, 2015–2017

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

  ○ Labor and Employment Section, Member

Thought Leaders USA - Competition Economist, Who's Who Legal, 2025

Thought Leaders Global Elite - Competition Economist, Who's Who Legal, 2024

Leading Competition Economist, Who's Who Legal, 2019, 2020

Dissertation with distinction, Columbia University, 2004

President's Fellowship, Columbia University, 1999–2004

Public Policy Consortium Fellow, Columbia University, 2002–2003

Wueller Teaching Award, Department of Economics, Columbia University, 2002

Graduate School of Arts and Sciences, Summer Fellow, Columbia University, 2002

Small Grant Award, Center for Children and Families, Columbia University, 2002

Phi Beta Kappa, Gettysburg College, 1995


## Testimony and Expert Reports
## (Prior Ten Years as of December 2024)

Surrebuttal Expert Report in the matter *In Re: Dealer Management Systems Antitrust Litigation*, United States District Court, Northern District of Illinois, MDL No. 2817 Case No. 18-CV-00864, May 2024.

Deposition testimony in the matter *In Re: Dealer Management Systems Antitrust Litigation*, United States District Court, Northern District of Illinois, MDL No. 2817 Case No. 18-CV-00864, March 2024.

Expert Report in the matter *In Re: Dealer Management Systems Antitrust Litigation*, United States District Court, Northern District of Illinois, MDL No. 2817 Case No. 18-CV-00864, February 2024.

Testimony at trial in the matter *Avnet Inc. v. Hitachi Chemical Co. Ltd. et al.*, United States District Court, Northern District of California, Case No. 3:17-cv-07046-JD, May 2023.

Deposition testimony in the matter *In Re: Pork Antitrust Litigation*, United States District Court, District of Minnesota, Case No. 0:18-CV-01776-JRT-HB, November 2022.

Expert Report in the matter *In Re: Pork Antitrust Litigation*, United States District Court, District of Minnesota, Case No. 0:18-CV-01776-JRT-HB, August 2022.

Testimony at trial in the matter *In Re: Capacitors Antitrust Litigation - All Direct Purchaser Actions*, United States District Court, Northern District of California, Case No. 3:17-MD-02801-JD, December 2021.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Deposition Testimony in the matter *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, United States District Court, Southern District of New York, Case No. 14-MD-02542-VSB-SLC, April 2021.

Expert Report in the matter *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, United States District Court, Southern District of New York, Case No. 14-MD-02542-VSB-SLC, December 2020.

Testimony at Concurrent Expert Witness Proceeding in the matter *In Re: Capacitors Antitrust Litigation - Direct Action Plaintiffs*, United States District Court, Northern District of California, Case Nos. 3:14-cv-03264-JD, 3:17-cv-03472-JD, 3:17-cv-07046-JD, 3:17-cv-07047-JD, 3:18-cv-02657-JD, August 2020.

Expert Report in the matter *J. Thompson, et al. v. 1-800 Contacts, Inc., et al.*, United States District Court, District of Utah, Case No. 2:16-cv-01183-TC, March 2020.

Amendment to Expert Report in the matter *In Re: Capacitors Antitrust Litigation - Avnet, Inc., v. Panasonic Corporation; Panasonic Corporation of North America; SANYO Electric Co., Ltd.; and SANYO North America Corporation*, United States District Court, Northern District of California, Case No. 3:17-MD-02801-JD, Case No. 3:19-CV-03296-JD, January 2020.

Supplemental Expert Report in the matter *In Re: Capacitors Antitrust Litigation - Jaco Electronics, Inc. et al. v. Nippon Chemi-Con Co. et al.*, United States District Court, Northern District of California, Case No. 3:17-MD-02801-JD, Case No. 19-cv-01902-JD, September 2019.

Testimony at Concurrent Expert Witness Proceeding in the matter *In Re: Capacitors Antitrust Litigation - All Direct Purchaser Actions*, United States District Court, Northern District of California, Case No. 3:17-MD-02801-JD, September 2019.

Declaration in the matter *In Re: Capacitors Antitrust Litigation - All Direct Purchaser Actions*, United States District Court, Northern District of California, Case Nos. 3:14-cv-03264-JD, 3:17-cv-03472-JD, 3:17-cv-07046-JD, 3:17-cv-07047-JD, 3:18-cv-02657-JD, June 2019.

Deposition Testimony in the matter *In Re: Capacitors Antitrust Litigation - All Direct Purchaser Actions*, United States District Court, Northern District of California, Case No. 3:17-MD-02801-JD, May 2019.

Expert Report in the matter *In Re: Capacitors Antitrust Litigation - All Direct Purchaser Actions*, United States District Court, Northern District of California, Case No. 3:17-MD-02801-JD, February 2019.

Testimony at Class Certification Hearing in the matter *In Re: Packaged Seafood Products Antitrust Litigation - End Payer Plaintiff Action*, United States District Court, Southern District of California, Case No. 15-MD-2670 JLS (MDD), January 2019.

Testimony at Class Certification Hearing in the matter *In Re: Packaged Seafood Products Antitrust Litigation - Commercial Food Preparer Plaintiff Action*, United States District Court, Southern District of California, Case No. 15-MD-2670 JLS (MDD), January 2019.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Deposition Testimony in the matter *In Re: Packaged Seafood Products Antitrust Litigation - End Payer Plaintiff Action*, United States District Court, Southern District of California, Case No. 15-MD-2670 JLS (MDD), November 2018.

Deposition Testimony in the matter *In Re: Packaged Seafood Products Antitrust Litigation - Commercial Food Preparer Plaintiff Action*, United States District Court, Southern District of California, Case No. 15-MD-2670 JLS (MDD), October 2018.

Expert Report in the matter *In Re: Packaged Seafood Products Antitrust Litigation - End Payer Plaintiff Action*, United States District Court, Southern District of California, Case No. 15-MD-2670 JLS (MDD), October 2018.

Expert Report in the matter *In Re: Packaged Seafood Products Antitrust Litigation - Commercial Food Preparer Plaintiff Action*, United States District Court, Southern District of California, Case No. 15-MD-2670 JLS (MDD), October 2018.

Deposition Testimony in the matter *In Re: Lithium Ion Batteries Antitrust Litigation*, Indirect Purchaser Actions, United States District Court, Northern District of California, MDL Docket No. 2420, July 2018.

Expert Report in the matter *In Re: Lithium Ion Batteries Antitrust Litigation*, Indirect Purchaser Actions, United States District Court, Northern District of California, MDL Docket No. 2420, June 2018.

Expert Report in the matter *In Re: Lithium Ion Batteries Antitrust Litigation*, Indirect Purchaser Actions, United States District Court, Northern District of California, MDL Docket No. 2420, June 2018.

Declaration in the matter *In Re: Lithium Ion Batteries Antitrust Litigation*, Indirect Purchaser Actions, United States District Court, Northern District of California, MDL Docket No. 2420, December 2017.

Deposition Testimony in the matter *In Re: Lithium Ion Batteries Antitrust Litigation*, Indirect Purchaser Actions, United States District Court, Northern District of California, MDL Docket No. 2420, November 2017.

Expert Report in the matter *In Re: Lithium Ion Batteries Antitrust Litigation*, Indirect Purchaser Actions, United States District Court, Northern District of California, MDL Docket No. 2420, October 2017.

Declaration in the matter *In Re: Lithium Ion Batteries Antitrust Litigation*, Direct Purchaser Action, United States District Court, Northern District of California, MDL No. 2420 Case No. 4:13-md-02420 YGR (DMR), September 2016.

Deposition Testimony in the matter *In Re: Lithium Ion Batteries Antitrust Litigation*, Direct Purchaser Action, United States District Court, Northern District of California, MDL No. 2420, July 2016.

Expert Report in the matter *In Re: Lithium Ion Batteries Antitrust Litigation*, Direct Purchaser Action, United States District Court, Northern District of California, MDL No. 2420, May 2016.

Deposition Testimony in the matter *Joseph W. Craver, III v. Leidos Holdings, Inc., et al.*, Fairfax County Circuit Court, Case No. 2014-6321, February 2015. (Note: Case subsequently moved to the Eastern District of Virginia)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Supplemental Expert Report in the matter *John Henry v. ACME MARKETS*, Inc., United States District Court, Eastern District of Pennsylvania, Civil Action No. 11-5505, January 2015.

Expert Disclosure in the matter of *Joseph W. Craver, III v. Leidos Holdings, Inc., et al.*, Fairfax County Circuit Court, Case No. 2014-6321, January 2015. (Note: Case subsequently moved to the Eastern District of Virginia)

## Publications

"Damages in Exclusionary Conduct Cases," in *Proving Antitrust Damages: Legal and Economic Issues*, ABA Section of Antitrust Law, 3rd Edition, 2017 (with Greg Leonard and Daniel Weick).

"Turning *Daubert* on Its Head: Efforts to Banish Hypothesis Testing in Antitrust Class Actions," *Antitrust*, Vol. 30, No. 2, Spring 2016 (with John Johnson and Greg Leonard).

"Sub-regressions: A Rigorous Test for Antitrust Class Cert.," *Law360*, December 5, 2014 (with Muneeza Alam).

"The Economic Underpinnings of Comcast v Behrend," *Law360*, April 4, 2013 (with John Johnson).

Brief of Economists Amici Curiae Before the United States Supreme Court, Comcast Corporation, et al. v. Caroline Behrend, et al., August 24, 2012 (with John Johnson and Gregory Leonard).

"Damage Estimation in Wrongful Termination Cases: Impact of the Great Recession," *Insights in Economics*, NERA Economic Consulting, March 2012 (with Stephanie Plancich).

"Screening and Testing for Collusive Conduct in the Absence of a Smoking Gun," *Antitrust Insights*, NERA Economic Consulting, Summer 2010 (with Graeme Hunter).

"Downstream Discovery in Antitrust Class Actions," *The Antitrust Practitioner*, July 2006 (with John Johnson and Ian Simmons).

"Unmarried Parenthood and Redistributive Politics," *Journal of the European Economic Association*, Vol. 3: No. 1, March 2005 (with Lena Edlund and Rohini Pande).

## Invited Presentations

"Expert Witness 'Hot Tub' Hearings – What Are They and How Can They Help You Win Your Case?" Participant in Panel Discussion at The Bar Association of San Francisco, Litigation Section, May 2021.

"Women in Lead Roles: First Chairs and Expert Witnesses," Moderator, ABA Antitrust Law Section Webinar, Series titled "Bar None: Women Leading in the Courtroom," February 2021.

"Women in Antitrust – A Roundtable Discussion," DC Bar Communities, February 2021.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"Antitrust Litigation 2021 Outlook," Participant in Panel Discussion at the George Mason Law Review 24th Annual Antitrust Symposium, Biden Antitrust and Beyond: Emerging Competition Issues for the 2020s, February 2021.

"Fundamentals—Economics," Moderator, ABA Antitrust Law Section Virtual Spring Meeting Part II, More Spring Blooms Series, Washington, DC, May 2020.

"Economic and Legal Issues in Indirect Purchaser Class Actions," Moderator, Panel Discussion at the 46th Annual Conference on International Antitrust Law and Policy and Antitrust Economics Workshop, Fordham Competition Law Institute, New York, NY, September 2019.

"Fundamentals—Economics," Chair and Moderator, Panel Discussion at the 66th ABA Section of Antitrust Law Spring Meeting, Washington, DC, April 2018.

"Samples and Averages—When Are They Classy?" Participant in Panel Discussion at the 65th ABA Section of Antitrust Law Spring Meeting, Washington, DC, March 2017.

"Fundamentals of Antitrust Economics Series: Econometrics," ABA Section of Antitrust Law Webinar, Washington, DC, July 2016.

"Economics Fundamentals – Econometrics," ABA Section of Antitrust Law Webinar, Washington, DC, March 2015.

"Class Action Litigation Update 2014," DC Bar Association Continuing Legal Education Program, Washington, DC, December 2014.

"Fundamentals of Antitrust Economics," ABA Section of Antitrust Law Webinar, Washington, DC, July 2014.

"Fundamentals—Economics," Participant in Panel Discussion at the 62nd ABA Section of Antitrust Law Spring Meeting, Washington, DC, March 2014.

"Economic Issues in Class Certification," Conference hosted by Navigant Economics and Research in Law & Economics on *Class Action Landscape: Yesterday, Today and Tomorrow – Perspectives in Law and Economics*, Boston, October 2013.

"The Role of Economics in Capper-Volstead Class Action Litigation," Conference hosted by Crowell & Morning, LLP on *New Antitrust Risks for Cooperatives and How to Protect Your Business in Uncertain Times*, Washington, DC, November 2012.

"Empirical Tests and Collusive Behavior," Antitrust and Trade Regulation Seminar, Santa Fe, NM, July 2010.

"Antitrust Class Actions: Downstream Discovery and the Pass-On Defense," Antitrust and Trade Regulation Seminar, Santa Fe, NM, July 2007.

"Upstream and Downstream on Concord Boat," Antitrust and Trade Regulation Seminar, Santa Fe, NM, July 2007.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"The Role of Economic Analyses in Cartel Enforcement: EU and US," ABA Brownbag Seminar, Hosted by the Economics Committee and Section 1 Committees of the ABA's Antitrust Section, March 2007.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# APPENDIX B

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

MATERIALS RELIED UPON

**Legal Documents**

Advertiser Class Plaintiffs' Further Responses and Objections to Defendants Google LLC and Alphabet Inc.'s First Set of Interrogatories

Class Action Complaint, *Michael Stellman v. Google LLC and Alphabet Inc.,* Case 5:22-cv-05273, September 15, 2022

Consolidated Advertiser Class Action Complaint, *In re Google Digital Advertising Antitrust Litigation*, Case No. 21-MD-3010, December 2, 2022

Expert Report of Hal J. Singer, October 4, 2024

Expert Report of J. Douglas Zona, Ph.D., October 4, 2024

Expert Report of Mark A. Israel, Dec. 13, 2024

Expert Report of Paul R. Milgrom, Dec. 13, 2024

Declaration of Nirmal Jayaram (Aug. 05, 2023) (GOOG-AT-MDL-008842383)

Declaration of Nitish Korula (Aug. 04, 2023) (GOOG-AT-MDL-008842393)

Notice of Voluntary Dismissal of Claims of Plaintiff Vitor Lindo Pursuant to Fed. R. Civ. P. 41(a), March 20, 2023, ECF No. 511

Notice of Voluntary Dismissal of Claims of Plaintiffs Raintree Medical and Chiropractic Center LLC and Rodrock Chiropractic PA Pursuant to Fed. R. Civ. P. 41(a), March 20, 2023, ECF No. 512

Stipulation of Voluntary Dismissal of Plaintiff Kinin, Inc. Pursuant to F.R.C.P. 41(a)(1)(A)(ii), September 25, 2024, ECF No. 882

**I incorporate by reference all materials relied upon and all materials in the turnover production from Drs. Singer and Zona.**

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Deposition Testimony**

**Trial Testimony and Exhibits**

Day 7 AM Trial Testimony of Nirmal Jayaram (Google), United States of America, et al. v. Google LLC, U.S. District Court, Eastern District of Virginia, Case No. 1:23-cv-108-LMB-JFA, September 17, 2024

DTX 0768, United States of America, et al. v. Google LLC, U.S. District Court, Eastern District of Virginia, Case No. 1:23-cv-108-LMB-JFA

PTX 1633, United States of America, et al. v. Google LLC, U.S. District Court, Eastern District of Virginia, Case No. 1:23-cv-108-LMB-JFA

**Data**

GOOG-AT-MDL-DATA-000066537 to 000481994

GOOG-AT-MDL-DATA-000481999

GOOG-AT-MDL-DATA-000482003

GOOG-AT-MDL-DATA-000482005

GOOG-AT-MDL-DATA-000482006

GOOG-AT-MDL-DATA-000482007

GOOG-AT-MDL-DATA-000482008 to 000482531

GOOG-AT-MDL-DATA-000482532 to 000482724

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

GOOG-AT-MDL-DATA-000482725 to 000486515

GOOG-AT-MDL-DATA-000486626 to 000488277

GOOG-AT-MDL-DATA-000508827 to 000558882

GOOG-AT-MDL-DATA-000558883

GOOG-AT-MDL-DATA-000558884

GOOG-AT-MDL-DATA-000558885

GOOG-AT-MDL-DATA-000558886

GOOG-AT-MDL-DATA-000558890 to 000559276

GOOG-AT-MDL-DATA-000559277 to 000561030

GOOG-AT-MDL-DATA-000561536 to 000564882

GOOG-AT-MDL-DATA-000605252 to 000605355

GOOG-AT-MDL-DATA-000605356 to 000606028

GOOG-AT-MDL-DATA-000606053 to 000606112

GOOG-AT-MDL-DATA-000606113 to 000606341

GOOG-AT-MDL-DATA-000606366 to 000653766

GOOG-AT-MDL-DATA-000653773

GOOG-AT-MDL-DATA-000653775

GOOG-AT-MDL-DATA-000653776

GOOG-AT-MDL-DATA-000653779

GOOG-AT-MDL-DATA-000653818 to 000654235


**Bates-Numbered Documents**

DM_GOOG_0058123

███████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

██████████

GOOG-AT-MDL-000993753

GOOG-AT-MDL-001274396

GOOG-AT-MDL-001974959

GOOG-AT-MDL-002390899

GOOG-DOJ-02854344

GOOG-DOJ-03229061

GOOG-DOJ-04306227

GOOG-DOJ-04320717

GOOG-DOJ-07782646

GOOG-DOJ-07824949

GOOG-DOJ-09713317

GOOG-DOJ-09714662

GOOG-DOJ-09875989

GOOG-DOJ-10736364

GOOG-DOJ-10924698

GOOG-DOJ-11406673

GOOG-DOJ-11697964

GOOG-DOJ-11729166

GOOG-DOJ-11772703

GOOG-DOJ-12948968

GOOG-DOJ-13409448

GOOG-DOJ-13499785

GOOG-DOJ-13501237

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

GOOG-DOJ-13605152

GOOG-DOJ-14549757

GOOG-DOJ-14952787

GOOG-DOJ-15637938

GOOG-DOJ-15717614

GOOG-DOJ-15730729

GOOG-DOJ-28339653

GOOG-DOJ-AT-00571933

GOOG-DOJ-AT-00588455

GOOG-DOJ-AT-00608572

GOOG-DOJ-AT-00655825

GOOG-DOJ-AT-02164164

GOOG-DOJ-AT-02467209

GOOG-DOJ-AT-02471119

GOOG-TEX-00096393

GOOG-TEX-00122334

GOOG-TEX-00448132

**Articles and Books**

ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues,* ABA Book Publishing (2nd ed. 2014)

Brannman, Lance, Klein, Douglass J., and Weiss, Leonard W. "The Price Effects of Increased Competition in Auction Markets." *The Review of Economics and Statistics*, Vol. 69, No.1 (1987), pp. 24-32

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Daniel L. Rubinfeld. *Reference Guide on Multiple Regression.* Reference Manual on Scientific Evidence (3d ed. 2011), pp. 303-357

G. Imbens and J. Wooldridge. "Recent Developments in the Econometrics of Program Evaluation." *Journal of Economics Literature*, 2009, pp. 5-86

Martin, Joyce A. et al. "Births: Final Data for 2017." *National Vital Statistics Reports,* Vol. 67, No. 8, November 7, 2018, available at https://www.cdc.gov/nchs/data/nvsr/nvsr67/nvsr67_08-508.pdf

Martin, Joyce A. et al. "Births: Final Data for 2018." *National Vital Statistics Reports,* Vol. 68, No. 13, November 27, 2019, available at
https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_13-508.pdf

Rochet, Jean-Charles and Tirole, Jean. "Platform Competition in Two-Sided Markets." *Journal of the European Economic Association*, Vol. 1, No. 4, 2003, pp. 990-1029

Studenmund, A. H. *Using Econometrics: A Practical Guide* (7th ed. 2016)

Wooldridge, Jeffrey M. *Introductory Econometrics: A Modern Approach.* Cengage Learning (7th ed. 2019)

Wright, Julian. "One-sided Logic in Two-Sided Markets." *Review of Network Economics*, Vol. 3, No. 1, 2004, pp. 44-64

**<u>Websites</u>**

"About ad formats available in different campaign types." *Google Ads Help*, available at https://support.google.com/google-ads/answer/1722124?

"Ad formats FAQ." *Google AdSense Help*, available at
https://support.google.com/adsense/answer/10734935?hl=en

"AdaptedMind." *AdaptedMind*, available at https://www.adaptedmind.com/

"Code of Conduct: Supporting Healthy Ad Ecosystems." *Meta*, available at
https://www.facebook.com/audiencenetwork/partner-program/code-of-conduct

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"How Has COVID-19 Affected the Digital Advertising Space?" *Online Optimism*, available at https://www.onlineoptimism.com/blog/how-has-covid-19-affected-the-digital-advertising-space/

"Inventory formats." *Google Ad Manager Help*, available at https://support.google.com/admanager/answer/9796545?

"Number and percentage of awards conferred and students receiving awards at Title IV degree-granting institutions, by control of institution, level of institution, gender, race/ethnicity, and level of award: United States, 2016–17." *National Center for Education Statistics,* available at https://nces.ed.gov/ipeds/search/viewtable?tableId=25003

"Number and percentage of awards conferred and students receiving awards at Title IV degree-granting institutions, by control of institution, level of institution, gender, race/ethnicity, and level of award: United States, 2017–18." *National Center for Education Statistics,* available at https://nces.ed.gov/ipeds/search/viewtable?tableId=25209

"Our Story." *IXL Learning*, available at https://www.ixl.com/company/story

"Seller best practices." *Xandr*, available at https://learn.microsoft.com/en-us/xandr/industry-reference/seller-best-practices

"Unified Pricing Rules." *Google Ad Manager Help*, available at https://support.google.com/admanager/answer/9298008?hl=en

"US Digital Ad Spending Growth, by Industry, 2019-2023." *eMarketer*, Jun. 1, 2021, available at https://www.emarketer.com/chart/249891/us-digital-ad-spending-growth-by-industry-2019-2023-change

Bigler, Jason. "An update on first price auctions for Google Ad Manager." *Google Ad Manager Blog*, May 10, 2019, available at https://blog.google/products/admanager/update-first-price-auctions-google-ad-manager/

Cox, Sam. "Simplifying programmatic: first price auctions for Google Ad Manager." *Google Ad Manager Blog*, Mar. 6, 2019, available at https://blog.google/products/admanager/simplifying-programmatic-first-price-auctions-google-ad-manager/

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Droesch, Blake. "US Healthcare and Pharma Digital Ad Spending 2020." *eMarketer*, Sep. 30, 2020, available at https://www.emarketer.com/content/us-healthcare-pharma-digital-ad-spending-2020

Graham, Megan. "How a Stay-at-Home Year Accelerated Three Trends in the Advertising." *CNBC*, Mar. 13, 2021, available at https://www.cnbc.com/2021/03/13/how-covid-19-changed-the-advertising-industry-.html

Grover, Shubham. "Google Ad Manager Unified Pricing Rules Guide." *AdPushup*, Nov. 22, 2019, available at https://www.adpushup.com/blog/google-ad-manager-unified-pricing-rules-guide/

Hess, Abigail J. "Online Learning Boomed During the Pandemic – But What Happens When Students Return to Classrooms?" *CNBC*, Mar. 26, 2021, available at https://www.cnbc.com/2021/03/26/online-learning-boomed-during-the-pandemic-but-soon-students-return-to-school.html

Kaplia, M. "How to Build a Vertical Strategy as an Ad Agency." *Epom*, Mar. 22, 2023, available at https://epom.com/blog/digital-advertising/ad-vertical-strategy-for-ad-agencies

Li, Jianggan. "What's behind the rise of Chinese e-commerce platform Temu in the US?" *TLDbyMW*, Apr. 11, 2024, available at https://thelowdown.momentum.asia/whats-behind-the-rise-of-chinese-e-commerce-platform-temu-in-the-us/

Navarro, J. G. "Coronavirus Impact on Advertising Worldwide - Statistics & Facts." *Statista*, Dec. 18, 2023, available at https://www.statista.com/topics/7070/coronavirus-impact-on-advertising-worldwide/#topicOverview

Wheeler, Ashley. "Flooring Best Practices Drive 107% Revenue Lift." *Magnite*, Oct. 04, 2022, available at https://www.magnite.com/blog/flooring-best-practices-drive-107-revenue-lift/

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# APPENDIX C

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1.    **Appendix Exhibits for Section IV**

**APPENDIX EXHIBIT C- 1: TOTAL AD SPEND BY PROPOSED ADVERTISER CLASS MEMBERS BY COST TYPE**

**JANUARY 2016 – MARCH 2024**

| Cost Type [a] | Number of Advertisers [b] | Mean [c] | Minimum [d] | 1% [e] | 5% [f] | 10% [g] | 25% [h] |
|---|---|---|---|---|---|---|---|
| CPC Ad Spend | 2,552,243 | | | | | | |
| eCPM Ad Spend | 2,552,243 | | | | | | |
| Other Ad Spend | 2,552,243 | | | | | | |
| Total Ad Spend | 2,552,243 | | | | | | |

| Cost Type [a] | Number of Advertisers [b] |
|---|---|
| CPC Ad Spend | 2,552,243 |
| eCPM Ad Spend | 2,552,243 |
| Other Ad Spend | 2,552,243 |
| Total Ad Spend | 2,552,243 |

*Source:*
　　　　Dr. Zona's turnover.


**APPENDIX EXHIBIT C- 2: SHARE OF PROPOSED ADVERTISER CLASS MEMBERS BY TOTAL AD SPEND**

**JANUARY 2016 – MARCH 2024**



*Source:*
　　　　Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### APPENDIX EXHIBIT C-3: TOTAL IMPRESSIONS BY PROPOSED ADVERTISER CLASS MEMBERS BY COST TYPE

### JANUARY 2016 – MARCH 2024



| Cost Type [a] | Number of Advertisers [b] |
|---|---|
| CPC Impressions | 2,552,243 |
| eCPM Impressions | 2,552,243 |
| Other Impressions | 2,552,243 |
| Total Impressions | 2,552,243 |

| Cost Type [a] | Number of Advertisers [b] |
|---|---|
| CPC Impressions | 2,552,243 |
| eCPM Impressions | 2,552,243 |
| Other Impressions | 2,552,243 |
| Total Impressions | 2,552,243 |

*Source:*
> Dr. Zona's turnover.

### APPENDIX EXHIBIT C-4: SHARE OF PROPOSED ADVERTISER CLASS MEMBERS BY TOTAL IMPRESSIONS
### JANUARY 2016 – MARCH 2024



*Source:*
> Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 5: TOTAL CLICKS BY PROPOSED ADVERTISER CLASS MEMBERS BY COST TYPE**

**JANUARY 2016 – MARCH 2024**



| Cost Type | Number of Advertisers |
|---|---|
| [a] | [b] |
| CPC Clicks | 2,552,243 |
| eCPM Clicks | 2,552,243 |
| Other Clicks | 2,552,243 |
| Total Clicks | 2,552,243 |

| Cost Type | Number of Advertisers |
|---|---|
| [a] | [b] |
| CPC Clicks | 2,552,243 |
| eCPM Clicks | 2,552,243 |
| Other Clicks | 2,552,243 |
| Total Clicks | 2,552,243 |

*Source:*
Dr. Zona's turnover.

**APPENDIX EXHIBIT C- 6: SHARE OF PROPOSED ADVERTISER CLASS MEMBERS BY TOTAL CLICKS**
**JANUARY 2016 – MARCH 2024**

*Source:*
Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## 2.    Appendix Exhibits for Section VII

### APPENDIX EXHIBIT C- 7: MONTHLY AVERAGE CPC PAID BY PROPOSED ADVERTISER CLASS MEMBERS BY COST TYPE

### JANUARY 2016 – MARCH 2024



| Cost Type | Number of Advertiser-Months |
| --- | --- |
| [a] | [b] |
| CPC | 24,706,760 |
| eCPM | 22,872,431 |
| Other | 1,218,293 |
| Total | 26,717,555 |

| Cost Type | Number of Advertisers |
| --- | --- |
| [a] | [b] |
| CPC | 24,706,760 |
| eCPM | 22,872,431 |
| Other | 1,218,293 |
| Total | 26,717,555 |

*Source:*
Dr. Zona's turnover.

### APPENDIX EXHIBIT C- 8: MONTHLY AVERAGE CPC PAID BY PROPOSED ADVERTISER CLASS MEMBERS BY COST TYPE

### SEPTEMBER 2019

| Cost Type | Number of Advertiser-Months | Mean | Minimum | 1% | 5% | 10% | 25% |
| --- | --- | --- | --- | --- | --- | --- | --- |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] |
| CPC | 228,787 | $ 0.70 | $ 0.00 | $ 0.02 | $ 0.08 | $ 0.14 | $ 0.27 |
| eCPM | 197,716 | $ 0.84 | $ 0.00 | $ 0.03 | $ 0.10 | $ 0.17 | $ 0.33 |
| Other | 11,482 | $ 2.87 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.14 | $ 0.86 |
| Total | 244,248 | $ 0.82 | $ 0.00 | $ 0.02 | $ 0.09 | $ 0.15 | $ 0.29 |

| Cost Type | Number of Advertiser-Months | 50% | 75% | 90% | 95% | 99% | Maximum |
| --- | --- | --- | --- | --- | --- | --- | --- |
| [a] | [b] | [i] | [j] | [k] | [l] | [m] | [n] |
| CPC | 228,787 | $ 0.50 | $ 0.88 | $ 1.44 | $ 1.95 | $ 3.50 | $ 37.94 |
| eCPM | 197,716 | $ 0.60 | $ 1.02 | $ 1.67 | $ 2.27 | $ 4.49 | $ 68.02 |
| Other | 11,482 | $ 1.93 | $ 3.41 | $ 5.98 | $ 8.69 | $ 17.73 | $ 87.64 |
| Total | 244,248 | $ 0.55 | $ 0.98 | $ 1.66 | $ 2.33 | $ 4.73 | $ 79.06 |

*Source:*
Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 9: MONTHLY AVERAGE CPM PAID BY PROPOSED ADVERTISER CLASS MEMBERS BY COST TYPE**

**JANUARY 2016 – MARCH 2024**



| Cost Type | Number of Advertiser-Months |
|---|---|
| [a] | [b] |
| CPC | 30,758,083 |
| eCPM | 30,142,768 |
| Other | 1,493,228 |
| Total | 32,080,910 |

| Cost Type | Number of Advertisers |
|---|---|
| [a] | [b] |
| CPC | 30,758,083 |
| eCPM | 30,142,768 |
| Other | 1,493,228 |
| Total | 32,080,910 |

*Source:*
Dr. Zona's turnover.

**APPENDIX EXHIBIT C- 10: MONTHLY AVERAGE CPM PAID BY PROPOSED ADVERTISER CLASS MEMBERS BY COST TYPE**

**SEPTEMBER 2019**

| Cost Type | Number of Advertiser-Months | Mean | | Minimum | | 1% | | 5% | | 10% | | 25% | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [a] | [b] | [c] | | [d] | | [e] | | [f] | | [g] | | [h] | |
| CPC | 292,127 | $ | 16.35 | $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | 0.46 |
| eCPM | 274,711 | $ | 7.46 | $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | 0.00 |
| Other | 12,728 | $ | 1.72 | $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | 0.27 |
| Total | 300,781 | $ | 14.42 | $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | 0.59 |

| Cost Type | Number of Advertisers | 50% | | 75% | | 90% | | 95% | | 99% | | Maximum | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [a] | [b] | [i] | | [j] | | [k] | | [l] | | [m] | | [n] | |
| CPC | 292,127 | $ | 2.89 | $ | 8.53 | $ | 30.22 | $ | 73.65 | $ | 247.10 | $ | 9,584.17 |
| eCPM | 274,711 | $ | 1.45 | $ | 3.69 | $ | 8.70 | $ | 19.96 | $ | 122.68 | $ | 7,563.03 |
| Other | 12,728 | $ | 0.74 | $ | 1.69 | $ | 3.66 | $ | 5.81 | $ | 13.57 | $ | 488.21 |
| Total | 300,781 | $ | 2.42 | $ | 6.63 | $ | 24.09 | $ | 65.58 | $ | 227.04 | $ | 9,584.17 |

*Source:*
Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

APPENDIX EXHIBIT C- 11: MONTHLY AVERAGE PRICE INDEX BY ADVERTISER VERTICAL IN THE GOOGLE ADS-ADSENSE PIPELINE FOR CPC PRODUCT

JANUARY 2016 – DECEMBER 2022



*Notes:*

   Ad prices are measured by cost-per-click (CPC). CPC is indexed to 100 in January 2016 for all verticals.

*Source:*

   Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

APPENDIX EXHIBIT C- 12: MONTHLY AVERAGE PRICE INDEX BY ADVERTISER VERTICAL IN THE
GOOGLE ADS-ADX/3PE PIPELINE FOR eCPM PRODUCT

JANUARY 2016 – DECEMBER 2022



*Notes:*

Ad prices are measured by cost-per-click (CPC).  CPC is indexed to 100 in January 2016
for all verticals.

*Source:*

Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C-13: MONTHLY AVERAGE AD PRICES PAID BY ADVERTISERS IN THE AUTOMOTIVE VERTICAL FOR IMPRESSIONS IN THE GOOGLE ADS-ADX/3PE PIPELINE**

**JANUARY 2016 – DECEMBER 2022**



*Notes:*
    Ad prices are measured by cost-per-click (CPC).  Monthly average ad prices are calculated by dividing the total ad spend in a given month by the total clicks in the same month.

*Source:*
    Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### APPENDIX EXHIBIT C-14: MONTHLY AVERAGE AD PRICES PAID BY ADVERTISERS IN THE FINANCE VERTICAL FOR IMPRESSIONS IN THE GOOGLE ADS-ADX/3PE PIPELINE

### JANUARY 2016 – DECEMBER 2022



*Notes:*

Ad prices are measured by cost-per-click (CPC). Monthly average ad prices are calculated by dividing the total ad spend in a given month by the total clicks in the same month.

*Source:*

Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 15: MONTHLY AVERAGE AD PRICES PAID BY ADVERTISERS IN THE MEDIA & ENTERTAINMENT VERTICAL FOR IMPRESSIONS IN THE GOOGLE ADS-ADX/3PE PIPELINE**

**JANUARY 2016 – DECEMBER 2022**



*Notes:*
    Ad prices are measured by cost-per-click (CPC). Monthly average ad prices are calculated by dividing the total ad spend in a given month by the total clicks in the same month.

*Source:*
    Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C-16: MONTHLY AVERAGE AD PRICES PAID BY ADVERTISERS IN THE RETAIL VERTICAL FOR IMPRESSIONS IN THE GOOGLE ADS-ADX/3PE PIPELINE**

**JANUARY 2016 – DECEMBER 2022**



*Notes:*
    Ad prices are measured by cost-per-click (CPC).  Monthly average ad prices are calculated
        by dividing the total ad spend in a given month by the total clicks in the same month.

*Source:*
    Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 17: MONTHLY AVERAGE AD PRICES PAID BY ADVERTISERS IN THE AUTOMOTIVE VERTICAL FOR IMPRESSIONS IN THE GOOGLE ADS-ADSENSE PIPELINE JANUARY 2016 – DECEMBER 2022**



*Notes:*
Ad prices are measured by cost-per-click (CPC).  Monthly average ad prices are calculated by dividing the total ad spend in a given month by the total clicks in the same month.

*Source:*
Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### APPENDIX EXHIBIT C- 18: MONTHLY AVERAGE AD PRICES PAID BY ADVERTISERS IN THE FINANCE VERTICAL FOR IMPRESSIONS IN THE GOOGLE ADS-ADSENSE PIPELINE

### JANUARY 2016 – DECEMBER 2022



*Notes:*

Ad prices are measured by cost-per-click (CPC).  Monthly average ad prices are calculated by dividing the total ad spend in a given month by the total clicks in the same month.

*Source:*

Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 19: MONTHLY AVERAGE AD PRICES PAID BY ADVERTISERS IN THE
MEDIA & ENTERTAINMENT VERTICAL FOR IMPRESSIONS IN THE GOOGLE ADS-ADSENSE
PIPELINE**

**JANUARY 2016 – DECEMBER 2022**



*Notes:*

    Ad prices are measured by cost-per-click (CPC).  Monthly average ad prices are calculated
    by dividing the total ad spend in a given month by the total clicks in the same month.

*Source:*

    Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 20: MONTHLY AVERAGE AD PRICES PAID BY ADVERTISERS IN THE RETAIL VERTICAL FOR IMPRESSIONS IN THE GOOGLE ADS-ADSENSE PIPELINE**

**JANUARY 2016 – DECEMBER 2022**



*Notes:*

    Ad prices are measured by cost-per-click (CPC).  Monthly average ad prices are calculated by dividing the total ad spend in a given month by the total clicks in the same month.

*Source:*

    Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 21: MONTHLY AVERAGE AD PRICES PAID BY ADVERTISERS IN THE TOP 25% VS. MONTHLY AVERAGE AD PRICES PAID BY ADVERTISERS IN THE BOTTOM 25% FOR IMPRESSIONS IN THE GOOGLE ADS-ADX/3PE PIPELINE**

**JANUARY 2016 – DECEMBER 2022**



*Notes:*
    Ad prices are measured by cost-per-click (CPC).  Monthly average ad prices are calculated by dividing the total ad spend in a given month by the total clicks in the same month. Advertisers are ranked based on the total clicks in the given pipeline during the data period.  Advertisers with only zero or missing clicks are not included.

*Source:*
    Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 22: MONTHLY AVERAGE CPC PAID BY ADVERTISERS IN THE TOP 25% VS. MONTHLY AVERAGE CPC PAID BY ADVERTISERS IN THE BOTTOM 25% FOR IMPRESSIONS IN THE GOOGLE ADS-ADSENSE PIPELINE**

**JANUARY 2016 – DECEMBER 2022**



Notes:
> Ad prices are measured by cost-per-click (CPC). Monthly average ad prices are calculated by dividing the total ad spend in a given month by the total clicks in the same month. Advertisers are ranked based on the total clicks in the given pipeline during the data period. Advertisers with only zero or missing clicks are not included.

Source:
> Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 23: ESTIMATED EFFECT OF AdX SHARE ON PRICES PAID BY ADVERTISERS OF DIFFERENT SIZES AT OR BELOW 99TH PERCENTILE USING EACH OF DR. ZONA'S AdSENSE AND AdX REGRESSION MODELS**

**JANUARY 2016 – DECEMBER 2022**

| | AdSense Model | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Advertisers in Different Percentiles Based on Size** | | | | | | |
| **Statistic** | **At or below 10th Percentile** | **At or below 25th Percentile** | **At or below 50th Percentile** | **At or below 75th Percentile** | **At or below 90th Percentile** | **At or below 95th Percentile** | **At or below 99th Percentile** |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] |
| Estimated Effect of AdX Share | -0.878 | -0.500 | -0.0865 | -0.249 | -0.455 | -0.534 | -0.639* |
| Number of Observations | 84 | 84 | 84 | 84 | 84 | 84 | 84 |

| | AdX Model | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Advertisers in Different Percentiles Based on Size** | | | | | | |
| **Statistic** | **At or below 10th Percentile** | **At or below 25th Percentile** | **At or below 50th Percentile** | **At or below 75th Percentile** | **At or below 90th Percentile** | **At or below 95th Percentile** | **At or below 99th Percentile** |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] |
| Estimated Effect of AdX Share | -0.294 | 0.0378 | 0.291 | 0.238 | 0.160 | 0.0603 | 0.104 |
| Number of Observations | 84 | 84 | 84 | 84 | 84 | 84 | 84 |

*Notes:*

Percentiles are defined based on an advertiser's total clicks within a given pipeline over the data period from January 2016 to December 2022, excluding advertisers with only missing or zero clicks. The AdSense model analyzes impressions in the Google Ads-AdSense pipeline or CPC product. The AdX model analyzes impressions in the Google Ads-AdX/3PE pipeline or eCPM product. Each observation in a model is the monthly weighted average price paid by advertisers for impressions in the given pipeline. *** p<0.01, ** p<0.05, * p<0.1.

*Source:*

Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 24: ESTIMATED EFFECT OF ADX SHARE ON PRICES PAID BY DISTINCT GROUPS OF ADVERTISERS OF DIFFERENT SIZES AT OR BELOW 99.9TH PERCENTILE USING EACH OF DR. ZONA'S ADSENSE AND ADX REGRESSION MODELS**

**JANUARY 2016 – DECEMBER 2022**

| | AdSense Model | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Advertisers in Different Percentiles Based on Size | | | | | | | |
| Statistic | At or below 10th Percentile | Above 10th and at or below 25th Percentile | Above 25th and at or below 50th Percentile | Above 50th and at or below 75th Percentile | Above 75th and at or below 90th Percentile | Above 90th and at or below 95th Percentile | Above 95th and at or below 99th Percentile | Above 99th and at or below 99.9th Percentile |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| Estimated Effect of AdX Share | -0.878 | -0.443 | -0.0474 | -0.299 | -0.559 | -0.648* | -0.702** | -0.473** |
| Number of Observations | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 |

| | AdX Model | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Advertisers in Different Percentiles Based on Size | | | | | | | |
| Statistic | At or below 10th Percentile | Above 10th and at or below 25th Percentile | Above 25th and at or below 50th Percentile | Above 50th and at or below 75th Percentile | Above 75th and at or below 90th Percentile | Above 90th and at or below 95th Percentile | Above 95th and at or below 99th Percentile | Above 99th and at or below 99.9th Percentile |
| | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| Estimated Effect of AdX Share | -0.294 | 0.266 | 0.366 | -0.328 | 0.0950 | -0.0255 | 0.125 | 0.260 |
| Number of Observations | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 |

*Notes:*

Percentiles are defined based on an advertiser's total clicks within a given pipeline over the data period from January 2016 to December 2022, excluding advertisers with only missing or zero clicks. The AdSense model analyzes impressions in the Google Ads-AdSense pipeline or CPC product. The AdX model analyzes impressions in the Google Ads-AdX/3PE pipeline or eCPM product. Each observation in a model is the monthly weighted average price paid by advertisers for impressions in the given pipeline. *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$.

*Source:*

Dr. Zona's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3.    **Appendix Exhibits for Section VIII**

**APPENDIX EXHIBIT C- 25: MONTHLY TOTAL IMPRESSIONS FOR ADVERTISERS IN THE AUTOMOTIVE VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Source:*
    Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

APPENDIX EXHIBIT C- 26: MONTHLY TOTAL IMPRESSIONS FOR ADVERTISERS IN THE BUSINESS
& INDUSTRIAL MARKETS VERTICAL

JANUARY 2017 – MARCH 2024



*Source:*
    Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### APPENDIX EXHIBIT C- 27: MONTHLY TOTAL IMPRESSIONS FOR ADVERTISERS IN THE CLASSIFIEDS & LOCAL VERTICAL

### JANUARY 2017 – MARCH 2024



*Source:*
    Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 28: MONTHLY TOTAL IMPRESSIONS FOR ADVERTISERS IN THE CONSUMER PACKAGED GOODS VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Source:*
Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 29: MONTHLY TOTAL IMPRESSIONS FOR ADVERTISERS IN THE E1 N/A (OTHER) VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Source:*
Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 30: MONTHLY TOTAL IMPRESSION FOR ADVERTISERS IN THE EDUCATION & GOVERNMENT VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Source:*
      Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 31: MONTHLY TOTAL IMPRESSIONS FOR ADVERTISERS IN THE FINANCE VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Source:*
        Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 32: MONTHLY TOTAL IMPRESSIONS FOR ADVERTISERS IN THE HEALTHCARE VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Source:*

Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 33: MONTHLY TOTAL IMPRESSIONS FOR ADVERTISERS IN THE MEDIA & ENTERTAINMENT VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Source:*
  Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 34: MONTHLY TOTAL IMPRESSIONS FOR ADVERTISERS IN THE RETAIL VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Source:*

Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Appendix Exhibit C- 35: Monthly Total Impressions for Advertisers in the Services Vertical**

**January 2017 – March 2024**



*Source:*
    Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Appendix Exhibit C- 36: Monthly Total Impressions for Advertisers in the Technology Vertical**

**January 2017 – March 2024**



*Source:*

Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 37: MONTHLY TOTAL IMPRESSIONS FOR ADVERTISERS IN THE TRAVEL VERTICAL**

**JANUARY 2017 – MARCH 2024**



*Source:*

Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 38: MONTHLY TOTAL IMPRESSIONS V. ESTIMATED BUT-FOR MONTHLY TOTAL IMPRESSIONS ABSENT UPR FOR ADVERTISERS IN THE CLASSIFIEDS & LOCAL VERTICAL USING DR. SINGER'S MODEL**

**JANUARY 2017 – MARCH 2024**



*Note:*

    The monthly but-for impression is predicted by Dr. Singer's primary model.

*Source:*

    Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**APPENDIX EXHIBIT C- 39: MONTHLY TOTAL IMPRESSIONS V. ESTIMATED BUT-FOR MONTHLY TOTAL IMPRESSIONS ABSENT UPR FOR ADVERTISERS IN THE EDUCATION & GOVERNMENT VERTICAL USING DR. SINGER'S MODEL**

**JANUARY 2017 – MARCH 2024**



*Note:*

　　The monthly but-for impression is predicted by Dr. Singer's primary model.

*Source:*

　　Dr. Singer's turnover.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Appendix Exhibit C- 40: Monthly Total Impressions v. Estimated But-For Monthly Total Impressions Absent UPR For Advertisers in the Healthcare Vertical Using Dr. Singer's Model**

**January 2017 – March 2024**



*Note:*
  The monthly but-for impression is predicted by Dr. Singer's primary model.

*Source:*
  Dr. Singer's turnover.