# EXHIBIT 66





# Proving Antitrust Damages

## Legal and Economic Issues

### Third Edition



Cover design by ABA Design.

The materials contained herein represent the opinions of the authors and/or the editors, and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the Section of Antitrust Law unless adopted pursuant to the bylaws of the Association

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

© 2017 American Bar Association. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission contact the ABA Copyrights & Contracts Department, copyright@americanbar.org, or complete the online form at http://www.americanbar.org/utility/reprint.html.

Printed in the United States of America.

21 20 19 18 17       5 4 3 2 1

ISBN: 978-1-63425-975-0

e-ISBN: 978-1-63425-976-7

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 N. Clark Street, Chicago, Illinois 60654-7598.

www.shopABA.org

# CONTENTS

*Foreword*

*Preface*

## PART I

## Chapter 1: Impact: Injury and Causation
A. Injury
B. Material Cause
C. The Standard of Proof
D. Proof of the Fact of Damage

## Chapter 2: Antitrust Injury and Standing
A. Antitrust Injury
   1. Supreme Court Precedent
   2. AGC's Consumer-or-Competitor Antitrust Injury Factor
B. Antitrust Standing and the Directness of Injury Factor
   1. Limiting Scope of the Indirect Purchaser Doctrine
   2. Exceptions to the Indirect Purchaser Doctrine
C. Duplicative Recovery, Complex Apportionment, and Better-Situated Plaintiffs
D. Class-Wide Injury Issues in Antitrust Actions

## Chapter 3: Statute of Limitations
A. Accrual of an Antitrust Cause of Action
   1. Speculative Damages
   2. Continuing Violations
B. Tolling of the Limitations Period
   1. Fraudulent Concealment

    2. Government Suits

    3. Equitable Tolling

C. Damage Calculations

    1. Period of Recovery

    2. Conduct Prior to the Limitations Period


# PART II


## Chapter 4: Quantifying Damages

A. The Standard of Proof for Proving Antitrust Damages

B. The "But-For" Premise

C. Methods for Quantifying Damages

D. Mitigation


## Chapter 5: Economic and Financial Concepts

A. Damages in Antitrust Litigation

B. Factors to Consider in Developing a Damages Model

    1. Determining the Period of Injury

    2. Historical Performance

    3. Mitigation

    4. Lost Opportunities

    5. Competitive Responses

    6. Effects of Taxes

    7. Use of Hindsight

C. Potential Sources of Data

    1. Accounting and Economic Costs and Profits

    2. Financial Statements

    3. Internal Company Data

D. Types of Costs

E. Discounting and Interest Rates

    1. Prejudgment and Post-judgment Interest

    2. Discounting and the Time Value of Money

3. Choosing a Discount Rate

4. Date of Discounting

F. Valuation Approaches to Calculating Lost Profits

1. Earnings-Based Measures: Discounted Cash Flow

2. Earnings-Based Methods: Capitalized Earnings

3. Market-Based Methods

**Chapter 6: Econometrics and Regression Analysis**

A. Legal Requirements

B. Causation and Quantification

C. Classic Regression Analysis and Hypothesis Testing

1. Basic Structure of a Regression Model

2. Multiple Regression

3. Estimation Methodology

4. Evaluating the Reasonableness of Estimation Results

5. Statistical Inference: Hypothesis Testing and Confidence Intervals

a. Confidence Intervals

b. T-statistics

c. P-values

D. Necessary Decisions and Common Areas of Expert Debate

1. Choice of Explanatory Variables

a. Too Many or Too Few Variables?

b. Multicollinearity

2. Functional Form

3. Structural Models versus Non-Structural Models

4. Estimation of Parameters Using Instrumental Variables

5. Estimation of the Standard Errors

6. Misspecification Bias and Specification Tests

E. Additional Considerations for Specific Forms of Data

1. Estimation with Large Datasets

2. Estimation with Panel Data

3. Estimation with Time Series Data

a. Tests for Stationarity

b. Modeling Market Dynamics with Stationary Time Series

c. Modeling Dynamics in Nonstationary Time Series

d. Considerations in Building a Forecasting Model

F. Before-During and Related Approaches to Damages

1. "Dummy Variable" Models Versus "Prediction" Models

2. Before-During-After Models

3. Identifying Beginning and End Points of the Damages Period

G. Benchmark and Difference-in-Differences Approaches to Damages

H. Summary of Key Points in Creating and Evaluating Econometric Models of Damages

I. Case Study—The Application of the Before-During and Benchmark Approaches

1. Background

2. Economic Model, Data and Choice of Explanatory Variables

3. Assumption of Liability and Causation

4. Stationarity of the Time Series

5. The Before-During Approach with the Dummy Variable Model

6. The Before-During Approach with the Prediction Model

7. Benchmark Approach

J. Additional Example: An Application of Structural Modeling

Chapter 7: Evaluating the Scientific Validity of a Damages Model

A. Rules Governing Expert Witness Testimony

B. Application of *Daubert* to Damages Experts in Antitrust

1. Qualifications

2. Reliability

3. Fit

C. Expert Testimony on Antitrust Damages in the Context of Class Certification
D. Best Practices for Antitrust Damages Experts

# PART III

## Chapter 8: Overcharges
A. Construction of the Economic Model
B. Estimation of the Overcharge
C. Horizontal Price Fixing
    1. Before-During-After Model
    2. Benchmark Method
    3. Difference-in-Differences Method
    4. Cost-based Method
    5. Implementation of a Damages Model
    6. Some Caveats for Overcharge Calculations in General
D. Bid-Rigging Cases
E. Other Causes of Action
    1. Single Firm Monopoly Pricing
    2. Overcharge Incident to Exclusion
    3. Umbrella Effects
    4. Vertical Price Fixing (Resale Price Maintenance)
    5. Tying Arrangements
F. Special Circumstances
    1. Non-price Collusion
    2. Regulated Prices
G. Suit by Indirect Purchasers
    1. Indirect Purchaser Standing Under Federal Law
    2. Indirect Purchaser Standing Under State Law
    3. Possibility of Duplicative Recovery
    4. Calculating Damages to Indirect Purchasers

H. Deadweight Loss

## Chapter 9: Damages in Exclusionary Conduct Cases

A. Exclusionary Practices Can Harm Both Competitors and Customers

B. The Appropriate Damages Methodology

    1. Before-During-After Method

    2. Yardstick or Benchmark Method

    3. Structural Models Involving Simulation Methods

    4. Structural Models Based on Business Projections

C. Establishing Competitor Damages from Exclusionary Conduct

    1. Legal Issues

        a. Tension in Guidance

        b. Disaggregation of Antitrust Damages

        c. Mitigation of Damages

        d. Future Lost Profits

    2. Economic Issues

        a. Quantification

        b. Distinctions Between Going Out of Business versus Failure to Enter

D. Establishing Customers' Damages from Exclusionary Conduct

    1. Consistency with Liability Theory

    2. Tying and Bundling Damages

E. Cases Involving Competitor Exclusion

    1. Masimo Corp v. Tyco Health Group

    2. ZF Meritor LLC v. Eaton Corp.

    3. Weyerhaeuser

    4. McKenzie-Willamette

    5. LePage's

## Chapter 10: Proof of Robinson-Patman Act Damages
### A. Flexible Standards of Proof
### B. Types of Harm
    1. Primary Line Damages

    2. Secondary Line Damages

        a. Damages from Sales Diversion: Basic Principles Resulting from Proving the Amount of Damages in Secondary Line Cases

        b. Damages May Be Measured by Lost Profits from Reduced Prices, Increased Costs, or Other Factors

### C. Establishing the Amount of the Plaintiff's Damages
    1. The Plaintiff Is Not Required to Prove Damages with Certainty

    2. Damages Models Must Account for Other Factors that Impacted the Plaintiff's Profits

## Chapter 11: Proving Antitrust Damages in Jurisdictions Outside the United States
### A. European Union
    1. The Types of Legal Proceedings in which Damages May Need to Be Proven

    2. Jurisdictional Issues

    3. The Nature of Available Damages

        a. Compensatory Damages

        b. Exemplary Damages

        c. Restitutionary Damages

    4. How Damages Are Proven

### B. Canada
    1. Right of Action for Damages under the Competition Act

    2. Jurisdictional Issues

    3. The Nature of Available Damages

    4. How Damages Are Proven

## Table of Cases

# FOREWORD

The American Bar Association Section of Antitrust Law is pleased to publish the third edition of *Proving Antitrust Damages: Legal and Economic Issues*, a comprehensive analysis of the issues involved in the proof of damages under Section 4 of the Clayton Act.

Like the previous editions, published in 1996 and 2010, this third edition serves both as an introduction to the various conceptual and practical issues associated with proving damages in an antitrust case and as the definitive reference to relevant case law and secondary sources.

This edition was sponsored by the Economics Committee. The Section is grateful to the many attorneys and economists who contributed to this publication. I want to extend special thanks to co-editors Tasneem Chipty and Cathy Beagan Flood, who coordinated the efforts of the edition's authors.

William C. MacLeod
*Chair*, Section of Antitrust Law
American Bar Association
2016-2017

# PREFACE

The Section of Antitrust Law of the American Bar Association is pleased to publish the third edition of *Proving Antitrust Damages: Legal and EconomicI ssues*. Like its predecessor, the third edition is designed to be an accessible introduction to the legal and economic concepts of antitrust damages for use by counsel who may be new to the area as well as to more experienced counsel. This edition has been expanded and updated to incorporate more recent case law, advances in economic thinking, and comparison with foreign jurisdictions.

The edition is organized into three parts. Chapters 1 through 3 guide the reader through the legal requirements that a plaintiff must satisfy in order to establish a right to recover damages in an antitrust private action. Chapters 4 through 6 describe the basic economic concepts that are used in calculating damages, including basic methods, financial concepts, and econometric analyses that are used to differentiate the effects of anticompetitive conduct from other influences. Before turning to specific types of conduct, Chapter 7 describes the scrutiny expert testimony is likely to receive and the standards for establishing scientific validity. Chapters 8 through 10 discuss commonly arising issues associated with estimating damages related to: (1) overcharges, which are commonly asserted by customers in price fixing cases under Section 1 of the Sherman Act, and less frequently in monopolization cases under Section 2 of the Sherman Act; (2) lost profits, which are alleged by competitors generally in the context of exclusion conduct cases; and (3) price discrimination under the Robinson-Patman Act. Chapter 11 provides a brief discussion of notable issues in proving antitrust damages in the European Union and Canada.

This book is the product of the collective efforts of numerous contributors. All chapters in this edition were revised substantially and are the result of enormous effort over two years. The following individuals contributed to the drafting of this third edition:

| | | |
|---|---|---|
| Daniel Anziska | Jeremy Gunn | Menesh Patel |
| Katherine Arnold | Laila Haider | Lawrence Reicher |
| John Asker | Mark Israel | Dov Rothman |
| Catherine Beagan Flood | Bryan Keating | Katherine Santon |
| Charles B. Casper | Sheron Korpus | Kelsey Shannon |
| Chris Cavanaugh | George Kosicki | Daniel Simons |
| Tasneem Chipty | Russell Lamb | David Smith |
| Jeff Cohen | Gregory K. Leonard | Jaime Stilson |
| Eric L. Cramer | Michael A. Lindsay | Paul Stuart |
| Matthew DeFrancesco | Divya Mathur | Romano Subiotto |
| Paul T. Denis | Sean May | Daniel P. Weick |
| David Giardina | Henry McFarland | Clarissa Yeap |
| Stuart Gurrea | Joel M. Mitnick | |

The publication of this edition also would not have been possible without the substantial efforts of Tasneem Chipty, Michael Chapman, and Sean May who edited and coordinated various chapters of *Proving Antitrust Damages*.

Finally, the book could not have been published without the outstanding editorial and production work of Emily Bala, Aaron Fix, Olga Korolev, Ben Landsberg, Ju Li, Liz Milsark, Zarina Patwa, Books and Treatises Committee former Vice Chair Andrew C. Finch, Books and Treatises Committee Co-Chair Kay Lynn Brumbaugh, Books and Treatises Committee Former Co-

Chair Stephen A. Stack, and the Section of Antitrust Law and ABA Publishing staffs.

Donald Stockdale

Joanna Tsai

*Co-Chairs*, Economics Committee

American Bar Association

2016-2017

# PART I

# CHAPTER 1

# IMPACT: INJURY AND CAUSATION

Section 4 of the Clayton Act establishes a treble damages remedy for any person who is "injured in his business or property by reason of anything forbidden in the antitrust laws."[1] While this statutory language has spawned a host of judicial elaborations and limitations, this chapter addresses the minimum requirement for recovery: whether the plaintiff can prove an injury that was caused by an antitrust violation.

Antitrust violations may inflict harm in a number of ways. Collusive or monopolistic practices may increase the price that consumers or businesses pay for what they buy. Suppliers' refusals to deal may limit or deny access to inputs that businesses purchase to use in their operations or for resale. Businesses also may suffer in their output markets because of violations that limit or foreclose access to customers, such as a competitor's exclusive contracts, or violations that force reductions in their selling prices, such as a competitor's predatory pricing or collusion among purchasers. An exhaustive list of how antitrust violations inflict private harm on consumers and commercial enterprises would be a long one.

These various types of harm produce tangible financial consequences. Paying more than they otherwise would for what they buy takes money out of consumers' pockets and cash out of firms' coffers. Disruptions in a business's input and output markets may produce lower revenues or higher expenses, which translate into lower profits and, in some cases, losses, as well as an inability to continue operations. For a start-up business, the consequences may include a failure to begin what would otherwise be profitable operations, or wasted sunk costs. Efforts to counteract or minimize the effect of a violation may entail substantial disruptions and out-of-pocket costs.

These potential financial effects of antitrust violations suggest a comparison: if the violation had not occurred, the plaintiff would be better off than it actually is. This is the familiar "but-for" proposition, and it is the central analytical approach to determining the impact of an antitrust violation.[2] The but-for principle requires one to envision exactly how the world would be different without ("but for") the challenged conduct. An antitrust plaintiff is harmed by a violation when the plaintiff would be in a better financial position but for the violation; conversely, if the plaintiff would be in the same position without regard to whether the violation occurred, the violation produced no harm.[3]

The but-for principle fuses into one inquiry the concepts of injury and causation, the subjects of this chapter, and the measurement of damages, the subject of Chapters 4 to 6. If the plaintiff's actual condition is worse than what it would have been in the hypothetical but-for world, a violation can be said to have "caused" an "injury" in but-for terms. Likewise, a damages award measures the extent of the difference in outcomes between the actual world and the but-for world to compensate the plaintiff for this injury. See Chapters 4 to 6 for a more thorough discussion of the construction of a but-for world for damages purposes. Despite this interdependence between injury, causation, and damages, courts applying Section 4 of the Clayton Act have developed discrete inquiries under the headings of injury, causation, and damages.[4]

This chapter will address: (1) the definition of the plaintiff's injury; (2) the causal test for linking an asserted injury to the alleged violation; (3) the standard of proof for establishing that the violation caused the injury; and (4) the types of proof typically offered to meet the standard. As will be seen, the determination of injury and causation sets the stage for the application of standing and antitrust injury requirements, discussed in the next chapter, and for the quantification of the plaintiff's damages, the subject of Chapter 4. In addition, some injuries, even if proven to have been caused by an antitrust violation, are not compensable under Section 4 because of standing and antitrust injury requirements, statute of limitations, or because a sufficient quantification of damages has not been supplied. Each of these issues is addressed in greater detail in later chapters. It is important to recognize that there is no need to consider those issues if the plaintiff cannot meet the first bar of showing an injury causally linked to the asserted antitrust violation.

At the outset, it should be noted that courts have not arrived at a uniform vocabulary for discussing these issues.[5] This chapter will use "injury" to refer to the detriment asserted by the plaintiff, "causation" to refer to the test for establishing the requisite connection between the injury and the violation, and "fact of damage," or its more modern equivalent "impact," to refer to the showing that the violation had a sufficient causal connection to the asserted injury.[6]

# A. Injury

If there were a Hippocratic Oath for antitrust plaintiffs seeking damages, it would be "First, prove your harm." That process starts with an identification of the injury that the plaintiff will seek to tie to the alleged violation.

In this context, an "injury" refers to a financial detriment suffered by the plaintiff, without regard to its source. The detriment may be defined in a number of ways. One is historical: the plaintiff is paying more than in the past for the product or service in question, or has suffered a decline in revenues, profits, or market share.[7] Or it had to pay a cost as a result of the anticompetitive conduct.[8] Another is more broadly comparative: the plaintiff has fared less well than it or a comparable firm has fared in similar circumstances.[9] For a firm that has attempted but failed to enter a market, the detriment is the failure to start operations, but intent and preparedness to do so must be shown to establish an injury.[10]

Proof of an actual historical or comparative detriment is not necessary. Because the ultimate test involves the but-for principle, a plaintiff whose performance has improved over the relevant period, or exceeded relevant benchmarks, may nevertheless claim it has been injured because it should have and would have done even better in the absence of the antitrust violation.[11] As proof of its disappointed expectations, the plaintiff may point to real-world projections of success surpassing what it has actually achieved.

As the foregoing suggests, an economic injury is inherently a relative, rather than an absolute, condition.[12] It is insufficient to characterize costs or prices as "high" or sales levels as "low."[13] A business that has low profits

or low market share, for example, may simply be achieving its full potential in a free market. What matters is a comparison of the plaintiff's current condition relative to some specific baseline.

Divorcing an injury from its source, which is the consequence of separating injury and fact of damage, gives "injury" a broad meaning. What the plaintiff defines as its injury may be wholly self-inflicted or the result of obvious market forces affecting all businesses.[14] The plaintiff's definition of its injury lays the foundation for consideration of such matters. As a practical matter, because the choice of the injury to assert is in the plaintiff's hands,[15] anticipation of the issues of fact of damage, antitrust injury, standing, and damages to be confronted down the road is critical even in the earliest stages of potential antitrust litigation.[16]

# B. Material Cause

Once the plaintiff has defined its injury, the next step is to link that injury to the asserted violation. "To prevail, a private party must establish some link between the defendant's alleged anticompetitive conduct, on the one hand, and its injuries and the consumer's, on the other."[17] The prevailing test of antitrust causation to satisfy Section 4 of the Clayton Act's "by reason of" requirement for private actions is "material cause,"[18] expressed by some courts in the tort language of "substantial factor" or "proximate cause."[19] It is routinely held that the violation does not have to be the sole cause of the asserted injury, but formulations of what it means to be a "material" cause vary.[20] The material cause test allows courts to avoid the difficult task of parsing and precisely calibrating the relative significance of multiple causal factors, which can be invoked in virtually every case. The plaintiff need only show "*some* damage" flowing from the violation and need not "exhaust all possible alternative sources of injury."[21]

Embedded within the material contribution standard is a but-for inquiry: there can be no contribution to the injury, much less a material one, if the same injury would have occurred in the absence of the violation.[22] As a corollary, material contribution implies that some material portion of the asserted injury would have not occurred if the violation had not occurred. It is that material portion of the injury—the difference between the plaintiff's

actual position and its position but for the violation—that must be quantified in the plaintiff's damages calculation.[23]

# C. The Standard of Proof

In the seminal case of *Story Parchment Co. v. Paterson Parchment Paper Co.*,[24] the Supreme Court established a relaxed standard for proving the amount of antitrust damages. Although the question before the Court was the quantification of damages, the Court used as a benchmark the proof that the violation had caused injury to the plaintiff, denominated "fact of damage":

> It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that [plaintiff] had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.[25]

This often-quoted passage has been read to require some level of certainty in the proof of fact of damage, an issue not before the Court in *Story Parchment*.[26] Some courts of appeals require that fact of damage be proven "as a matter of fact and with a fair degree of certainty"[27] or similar standards.[28] Other circuits apply less stringent standards.[29] The Supreme Court has not adopted a heightened proof requirement for the fact of damage in antitrust cases.[30]

# D. Proof of the Fact of Damage

The material cause standard does not yield precise formulas for determining whether the plaintiff has adequately proven fact of damage. In the usual case where multiple factors plausibly contributed to the plaintiff's injury, the materiality of the violation's contribution is inevitably a judgment call, which is frequently but not always left to the trier of fact.[31] But the

Supreme Court in *Comcast v. Behrend*[32] held that the district court may certify a class only if the plaintiff can disaggregate damages caused by the theory certified for class treatment from damages caused by uncertified theories. In other words, the district court, as a matter of law, must decide in the first instance if the plaintiff, usually through expert testimony, can tie damages to the particular anticompetitive harm the plaintiff alleges—damages that are "the certain result of the wrong."[33]

Unlawful conduct may be a material cause of an asserted injury without being the sole cause of the entire injury.[34] This basic distinction is evident in the difference between how courts address fact of damage, decided under the material cause standard, and the amount of damages, where the but-for standard prevails. As will be seen in Chapter 4, the courts require that the antitrust violation be the sole cause of the plaintiff's damages, by insisting on a but-for world that eliminates only the defendant's unlawful conduct separately from all other sources that may also have caused the plaintiff's damages.[35] Before *Comcast v. Behrend*, courts sometimes held that the material cause standard requires no such disaggregation of the plaintiff's asserted injury, but instead looks at the injury as a whole and ascertains in retrospect whether the violation materially contributed to it.[36] But *Comcastv . Behrend* would seem to combine disaggregation analysis with the material cause standard to prevent what amounts to a presumption that the conduct on which the plaintiff's theory focuses was a material cause of the harm even though other conduct for which the plaintiff may be unable to prove liability contributed to it.

The nature of the asserted violation and its likely effects are often of prime importance. As the Supreme Court noted long ago in *Bigelow v. RKO RadioP ictures*,[37]

> [I]n the absence of more precise proof, the jury [can] conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and *their tendency to injure plaintiff's business*, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.[38]

Under this "tendency" test, a showing, perhaps supported by expert testimony, that the asserted violation is likely to cause the private harm asserted as the plaintiff's injury may suffice as proof of impact.[39]

Nowadays a plaintiff must be prepared at the outset of the case to defend a method for proving the fact of damage. Under modern pleading standards, a plaintiff's allegation that anticompetitive conduct caused at least some harm must be plausible or the complaint will be dismissed.[40] Defendants are free to prove that the entirety of the plaintiff's injury is explained by the effect of factors other than the asserted violation,[41] or at least that the violation made only an immaterial contribution.[42] The *Bigelow* Court's reference to declines "not shown to be attributable to other causes" is a recognition of the ultimate but-for criterion for proving fact of damage. Equating impact with a decline in the plaintiff's fortunes after the violation constitutes fallacious post hoc reasoning.[43]

In this respect, the fact of damage threshold can be seen as allocating burdens of production. Some courts give weight to proof that the defendant intended to inflict the injury the plaintiff has suffered.[44] While intent to injure is certainly a relevant consideration, intent alone does not establish fact of damage.[45] The plaintiff may satisfy its initial burden by making a prima facie case from which it may be inferred that at least some material part of its injury was attributable to the violation. This prima facie case does not require a full-blown quantitative comparison between the plaintiff's actual experience and its experience but for the violation.[46] Defendants may rebut the plaintiff's prima facie case by invoking the but-for principle and showing that other factors independent of the violation fully explain the alleged injury.[47]

Disproving the fact of damage thus may rest on the concept of an independent sufficient cause. Proof of an independent sufficient cause means that the plaintiff would have suffered the same injury even if the defendant's violation had not occurred. For example, the violation may have preempted another cause that, if the violation had not occurred, would in any event have produced the same result. Conduct aimed at blocking entry into a market for which a requisite governmental approval could not have been obtained would fall into this category.[48] Courts have required the independent cause to be truly independent of the violation.[49]

The independent sufficient cause argument can be pushed too far, particularly where the alleged alternative sufficient cause is hypothetical. The Supreme Court long ago rejected the theory that fact of damage can be negated by an argument that the defendants could have inflicted the same injury by acting independently (and thus lawfully) rather than engaging in unlawful collusion.[50] Arguments that the defendant could have found, or even would have found (an obvious choice in hindsight), a lawful way to inflict the same harm have been deemed unpersuasive.[51]

---

1. 15 U.S.C. § 15. If liability can be established, the Clayton Act provides mandatory attorneys' fees and costs as well as damages. A settlement with one defendant that gives plaintiffs more than the damages they could recover at trial—and thus moots a claim for compensatory damages—does not impair their right to recover attorneys' fees and costs against another defendant. Funeral Consumers Alliance v. Service Corp. Int'l, 695 F.3d 330, 340-42 (5th Cir. 2012).

2. *See, e.g.*, Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433-34 (2013) (damages resulting from an antitrust injury measured by comparison to a "but-for" world that reflects conditions in the actual world in all respects except the alleged anticompetitive conduct); J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 566 (1981) (damages turn on "what plaintiff's situation would have been in the absence of the defendant's antitrust violation"); Reiter v. Sonotone Corp., 442 U.S. 330, 340 (1979) (a price-fixing conspiracy injures a consumer when it causes the consumer "to pay a higher price . . . than it otherwise would have paid"); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 561-62 (1931) (the harm of a predatory pricing conspiracy is measured by "the difference between the prices [plaintiff] actually received and what would have been received but for the unlawful conspiracy"); *In re* Cardizem CD Antitrust Litig., 332 F.3d 896, 904 (6th Cir. 2003); Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 401-02 (7th Cir. 1993); Rose Confections, Inc. v. Ambrosia Chocolate Co., 816 F.2d 381, 394 (8th Cir. 1987); Argus, Inc. v. Eastman Kodak Co., 801 F.2d 38, 41 (2d Cir. 1986).

3. *See,e .g.*, Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n, 623 F.3d 281, 285 (6th Cir. 2010) (rule changes that never went into effect did not cause or threaten any injury); MetroNet Servs. Corp. v. US West

Commc'ns, 329 F.3d 986, 1009 (9th Cir. 2003), *superseded on other grounds sub nom.* MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124 (9th Cir. 2004).

4. *See, e.g.*, *MetroNet Servs. Corp.*, 329 F.3d at 1008; Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1490 (8th Cir. 1992).

5. *See* Gelboim v. Bank of Am. Corp., 823 F.3d 759, 769-77 (2d Cir. 2016) for a discussion of the relationship among Article III standing, antitrust standing, and antitrust injury.

6. *Cf.* ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases F-2 to F-6 (2005) [hereinafter Model Jury Instructions] (employing somewhat different terminology). Some courts use "causation," "causation in fact," "injury in fact," and similar terms to describe what this chapter calls "fact of damage" or "impact." Since the Supreme Court's decision in Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477 (1977), courts on occasion have used "antitrust injury" to refer to proof of impact as well as the showing that a proven impact properly relates to the basis for antitrust liability. For the sake of clarity, however, the "antitrust injury" concept is better reserved for use only in the latter sense, which reflects the holding in *Brunswick. See* Ronald W. Davis, *Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury*, 70 Antitrust L.J. 697, 734 (2003). Also, because "a causal connection between an antitrust violation and harm to the [plaintiff]" is one of the elements of antitrust standing, *see* Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 537 (1983), a failure to prove fact of damage may be treated as a standing issue. *See, e.g.*, Jebaco v. Harrah's Operating Co., 587 F.3d 314, 320-21 (5th Cir. 2009) (loss of fees for leasing berth to riverboat casino unrelated to casino operators' anticompetitive conspiracy and confers no standing to sue for Sherman Act violation). Standing is better viewed as a prudential limitation on recovery that denies relief under § 4 even where the basic requirement of impact is shown. *See Associated Gen. Contractors*, 459 U.S. at 529-37.

7. *See, e.g.*, O'Bannon v. Nat'l Collegiate Athletic Ass'n, 802 F.3d 1049, 1067 (9th Cir. 2015) (collegiate athletes injured in fact by NCAA rules that foreclosed the market for use of their names, images, and likenesses in video games); ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 289 (3d Cir. 2012) (loss of sufficient market share to remain viable

demonstrated antitrust injury); LePage's Inc. v. 3M, 324 F.3d 141, 161-62 (3d Cir. 2003); Callahan v. A.E.V., Inc., 182 F.3d 237, 254-57 (3d Cir. 1999).

8. *See*, *e.g.*, TransWeb, LLC v. 3M Innovative Props. Co., 812 F.3d 1295, 1308-12 (Fed. Cir. 2016) (affirming award of trebled attorney's fees as damages for having to defend lawsuit aimed at reducing competition by seeking to enforce knowingly fraudulent patent).

9. *See*, *e.g.*, Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 116, 119, 122 (1969) (injury based on a comparison of plaintiff's market share in the restrained Canadian market and its higher share in the United States market); MM Steel, L.P. v. JSW Steel (USA) Inc., 806 F.3d 835, 851-52 (5th Cir. 2015) (affirming use of competing firm's higher gross-profit margin as yardstick because firm was reasonably similar to plaintiff); Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc., 213 F.3d 198, 208 (5th Cir. 2000) (reversing use of other arenas' average net revenue as yardstick for lack of evidence that their average represented performance of "closely comparable" or reasonably similar business).

10. *See, e.g.*, *Zenith Radio Corp.*, 395 U.S. at 126-29 (unsuccessful entrant made insufficient efforts to enter the restrained markets to prove injury to its "business or property" under § 4); Sanger Ins. Agency v. Hub Int'l, Ltd., 802 F.3d 732, 737-41 (5th Cir. 2015) (potential entrant showed sufficient preparedness to enter market where it had an office and experienced staff, marketed its services to trade association members, made ten sales, and incumbent viewed it as a threat)

11. *See, e.g.*, Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768, 788-90 (6th Cir. 2002) (increase in plaintiff's market share during violation does not negate injury); Chiropractic Coop. Ass'n v. Am. Med. Ass'n, 867 F.2d 270, 275-76 (6th Cir. 1989) (increase in chiropractors' incomes does not defeat proof of injury because they "may have earned much more had AMA not taken the actions in dispute"); Multiflex, Inc. v. Samuel Moore & Co., 709 F.2d 980, 991, 993-94 (5th Cir. 1983) (unsuccessful attempt to monopolize may cause injury by delaying successful plaintiff's rise in market share); Lee-Moore Oil Co. v. Union Oil Co., 599 F.2d 1299, 1304-05 (4th Cir. 1979).

12. See William H. Page, Antitrust Damages and Economic Efficiency: An Approach to Antitrust Injury, 47 U. Chi. L. Rev. 467, 469 (1980); Earl

E. Pollock, The "Injury" and "Causation" Elements of a Treble-Damage Antitrust Action, 57 Nw. U. L. Rev. 691, 693-95 (1963).

13. *See* Pollock, *supra* note 11, at 694-95.

14. *See* Suture Express, Inc. v. Owens & Minor Distribution, Inc., 851 F.3d 1029, 2017 WL 971782, at *10 (10th Cir. 2017) (affirming summary judgment for defendant distributor when plaintiff, a smaller, specialized distributor, could not prove tying arrangement harmed competition; rather, increasing competition drove down all competitors' profit margins).

15. *See*, *e.g.*, Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n, 751 F.3d 368, 376 (5th Cir. 2014) (affirming dismissal of complaint focused on plaintiff's own financial losses while its "assertions regarding market injury [injury to competition] are completely speculative").

16. On grounds of policy and practicality, antitrust courts have shaped the scope of injuries that will be compensable for certain offenses. *See* Page, *supra* note 12, at 467-89. A prime example is the remedy for unlawful overcharges, for which the injury is deemed to be the overcharge itself without regard to consequential losses or loss-reducing downstream price increases. *Seeal so* Hanover Shoe v. United Shoe Machinery Corp., 392 U.S. 481, 487-93 (1968). Similar issues have arisen concerning the definition and scope of the injury that tying arrangements inflict on purchasers. *Compare* Kypta v. McDonald's Corp., 671 F.2d 1282, 1285 (11th Cir. 1982) (injury based on the combined price of tying and tied products) *with* Crossland v. Canteen Corp., 711 F.2d 714, 722 (5th Cir. 1983) (injury based on price of tied product, with consequential losses recoverable in "extraordinary" cases). See Chapters 8 and 9 for a discussion of these matters in greater depth.

17. Novell v. Microsoft Corp., 731 F.3d 1064, 1080 (10th Cir. 2013).

18. Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 114 n.9 (1969); *see also* Gulf States Reorg. Group v. Nucor Corp., 466 F.3d 961, 965 (11th Cir. 2006) ("Antitrust law does not require that the defendant be the exclusive cause of the plaintiff's injury but only a 'material' one."); Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc., 243 F.3d 980, 990 (6th Cir. 2001) (affirming judgment as a matter of law for defendant because plaintiff introduced insufficient evidence to exclude other

possible causes and thus did not show that alleged violation was a material cause of its damage).

19. *See,e .g.*, *Inr e* Southeastern Milk Antitrust Litig., 739 F.3d 262, 284 (6th Cir. 2014) (proximate cause); Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n, 623 F.3d 281, 285 (6th Cir. 2010) ("An antitrust plaintiff bears the burden of showing that the alleged violation was a material cause of its injury, a substantial factor in the occurrence of damage, or that the violation was the proximate cause of the damage.") (quoting Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768, 788-89 (6th Cir. 2002)); Southwestern Sheet Metal Works v. Semco Mfg., 788 F.2d 1144, 1146 (5th Cir. 1986) (proximate cause). The Supreme Court has developed the same concepts under RICO, which adopted the Clayton Act's "by reason of" language. Hemi Group v. City of New York, 559 U.S. 1, 8-9 (2010) (plurality); Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992) (citing Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 532-33 (1983)).

20. *See,e .g.*, *GulfSt ates*, 466 F.3d at 965 (violation need not be "exclusive" cause of injury); MetroNet Servs. Corp. v. US West Commc'ns, 329 F.3d 986, 1009 (9th Cir. 2003) (violation must contribute significantly to the injury, even if other factors in the aggregate amount to a more substantial cause), *superseded on other grounds sub nom.* MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124 (9th Cir. 2004); Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 401 (7th Cir. 1993) (violation need not be "sole cause of the alleged injuries"); Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1497 (8th Cir. 1992) (insufficient if the violation was "one factor among many, and not a controlling or major factor"); Shreve Equip. v. Clay Equip. Corp., 650 F.2d 101, 105 (6th Cir. 1981) ("[t]o be one of several causes is not enough" (quoting Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986, 987 (9th Cir. 1979)); *see also* Model Jury Instructions, *supra* note 6, at F-3 (plaintiff may not recover if its injury "was caused primarily" by factors other than the violation).

21. *Zenith Radio Corp.*, 395 U.S. at 114 n.9. Inquiry beyond the "minimum point" of proving some damage "goes only to the amount and not the fact of damage." *Id.*; *see also* William Inglis & Sons Baking Co. v. Cont'l Baking Co., 942 F.2d 1332, 1339-40 (9th Cir. 1991), *vacated in part*, 970 F.2d 639 (9th Cir.), *amended*, 981 F.2d 1023 (9th Cir. 1992) (the

causation requirement can be satisfied by "establish[ing] that the anticompetitive activities were a material cause of some of its injury; whether [plaintiff] proved that [defendant] caused all of the claimed injury is properly an issue affecting only the amount of damages proved") (internal quotation marks and citation omitted).

This intuitive distinction between fact of damage and the amount of damages may be more difficult to apply when the plaintiff alleges a causal chain between the violation and the injury. For example, the plaintiff may allege that the violation led to the occurrence of an event that was responsible for at least a material portion of the plaintiff's injury. Because it may not be possible to allege that the violation caused some portion of the event (which would either happen or not happen), to support fact of damage the plaintiff may have to prove that the event would not have occurred but for the violation. See Chapter 2 for a discussion of the complexities of alleged causal chains, which may in some cases lead to a denial of antitrust standing.

22. *See*, *e.g.*, *In re* Publ'n Paper Antitrust Litig., 690 F.3d 51, 67 (2d Cir. 2012) (reversing summary judgment for defendant because reasonable jury could conclude that executives' agreement to follow competitors' price increases was a material and but-for cause of elevated prices even though lower-level employees who did not know of the price-fixing agreement recommended price increases to defendant's executive).

23. *See*, *e.g.*, Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1434-35 (2013); Texaco Inc. v. Hasbrouck, 469 U.S. 543, 572 (1990) (affirming judgment awarding damages for Robinson-Patman Act violation, 15 U.S.C. § 13, where "[p]roof of the specific amount of their damages was necessarily less precise"; and "[e]ven if some portion of some of respondents' injuries may be attributable to the conduct of independent retailers, the expert testimony nevertheless provided a sufficient basis for an acceptable estimate of the amount of damages"); *In re* Urethane Antitrust Litig., 768 F.3d 1245, 1260 (10th Cir. 2014) (affirming judgment for purchaser class and admissibility of their expert's testimony who used multiple regression analysis and a benchmark period to calculate prices that would have existed but for a price-fixing conspiracy); Farley Transp. Co. v. Santa Fe Trail Transp. Co., 786 F.2d 1342, 1348-52 (9th Cir. 1986) (denying recovery where plaintiff did not

provide a basis for quantifying the portion of its injury attributable to defendant's illegal activities); Discovery Fin. Serv. v. Visa U.S.A., 582 F. Supp. 2d 501, 504-05, n.4 (S.D.N.Y. 2008); *see also* 2A Phillip E. Areeda et al., Antitrust Law ¶ 338a at pp. 117-23 (4th ed. 2014) ("Thus, a plaintiff initially obtains standing by showing that the alleged violation contributed significantly to its injury. Ultimately, of course, the plaintiff must provide the jury with a reasonable basis for separating the impact of the violation from other factors." (footnotes omitted)).

24. 282 U.S. 555 (1931).

25. *Id.* at 562; *see also* Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 107-08 (1969) (recognizing plaintiff's burden to prove fact of damage).

26. *StoryP archment*, 282 U.S. at 560 (stating that injury and causation were sufficiently established and the only question remaining for consideration was whether the circuit court correctly held that damages were not recoverable).

27. *See,e .g.*, Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc., 243 F.3d 980, 990 (6th Cir. 2001) (citing Shreve Equip. v. Clay Equip. Corp., 650 F.2d 101, 105 (6th Cir. 1981)); Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 302 (5th Cir. 2003) (fact of damage must be proved with certainty; *see also* Model Jury Instructions, *supra* note 6, at F-3 ("Plaintiff must also offer evidence that establishes as a matter of fact and with a fair degree of certainty that defendant's alleged illegal conduct was a material cause of plaintiff's injury.").

28. *See* Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 401 (7th Cir. 1993) (plaintiff must establish "with a fair degree of certainty" that the violation was a material cause of the injury); Federal Prescription Serv. v. Am. Pharm. Ass'n, 663 F.2d 258, 268 (D.C. Cir. 1981) (fact of damage must be "certainly proved"); Atlas Bldg. Prods. Co. v. Diamond Block & Gravel Co., 269 F.2d 950, 958 (10th Cir. 1959) ("reasonable certainty").

29. *See* MetroNet Servs. Corp. v. US West Commc'ns, 329 F.3d 986, 1008-09 (9th Cir. 2003) ("reasonable probability"), *superseded on other grounds sub nom.* MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124 (9th Cir. 2004); Rossi v. Standard Roofing, 156 F.3d 452, 484 (3d Cir. 1998) (applying the "ordinary standard of proof" to fact of damage, which must be "reasonably proven"); Advanced Health-Care Servs. v.

Radford Cmty. Hosp., 910 F.2d 139, 149 (4th Cir. 1990) (plaintiff must show "a reasonably probable causal link between the antitrust violation and a business loss").

30. In *Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946), the Court held that a jury may find fact of damage "as a matter of just and reasonable inference." *Id.* at 264. The Supreme Court followed *Bigelow* in *Zenith Radio Corp.*, 395 U.S. at 123-25, noting "the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market" and concluding that the trial court was entitled "to infer from . . . circumstantial evidence that the necessary causal relation between the [unlawful] conduct and the claimed damage existed." *See also* Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 697-700 (1962) (finding sufficient evidence for a jury to infer the necessary causal connection between respondents' antitrust violations and petitioners' injury, although the evidence was conflicting and "different inferences might reasonably be drawn from it").

31. *See, e.g.*, *In re* Nexium (Esomeprazole) Antitrust Litig., 842 F.3d 34, 60 (1st Cir. 2016) (affirming jury verdict finding antitrust violation but no antitrust injury); Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465, 484-85 (5th Cir. 2000).

32. 133 S. Ct. 1426 (2013).

33. *Id.* at 1434 (quoting Behrend v. Comcast Corp., 655 F.3d 182, 216 (3d Cir. 2011) (Jordan, J., dissenting in part)).

34. *See Zenith Radio Corp.*, 395 U.S. at 114 n.9; Amphastar Pharm. Inc. v. Momenta Pharm., Inc., 850 F.3d 52, 2017 WL 876260, at *4 (1st Cir. 2017) ("Significantly, the antitrust violation need not be the 'sole cause' of Amphastar's injury, so long as it was a 'material cause.'") (citation omitted); *In re* Publ'n Paper Antitrust Litig., 690 F.3d 51, 66 (2d Cir. 2012) ("an antitrust defendant's unlawful conduct need not be the sole cause of the plaintiffs' alleged injuries; to prove a 'causal connection' between the defendant's unlawful conduct and the plaintiff's injury. . .") (quoting Litton Sys., Inc. v. Am. Tel. & Tel. Co., 700 F.2d 785, 823 n.49 (2d Cir. 1983)).

35. *Comcast Corp.*, 133 S. Ct. at 1433-35 (damage methodology must disaggregate damages caused by plaintiff's theory of antitrust liability from those caused by other factors); *see also* Magnetar Techs. Corp. v.

Intamin, Ltd., 801 F.3d 1150, 1160 (9th Cir. 2015) (summary judgment for defendant affirmed because plaintiff's expert failed to separate antitrust injury from alternative causes); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1054-57 (8th Cir. 2000) (verdict form must allocate damages to each type of antitrust claim or consider the damages caused by each type of violation, and expert opinion that did not incorporate all aspects of economic reality of market or separate lawful and unlawful conduct should have been excluded); Transamerica Computer Co. v. IBM, 698 F.2d 1377 (9th Cir. 1983) (even if plaintiff could establish defendant's conduct violated Sherman Act and "that the conduct caused some material part of the loss," it could not fix damages "except by guess").

[36.] See, e .g., Addamax Corp. v. Open Software Found., 152 F.3d 48 (1st Cir. 1998).

[37.] 327 U.S. 251 (1946).

[38.] Id. at 264 (emphasis added). Although proof of the amount of damages was also at issue in Bigelow, this passage addresses proof of the fact of damage. See Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 123-125 (1969) (citing Bigelow and noting that "the injury alleged by [plaintiff] was precisely the type of loss that the claimed violations of the antitrust laws would be likely to cause"); ContinentalO re, 370 U.S. at 697 (same). Cf. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 561 (1931) (although higher prices prevailing before a predatory pricing conspiracy would not "necessarily" have continued, "the natural and probable effect" of the conspiracy would be to reduce prices).

[39.] See, e.g., Affiliated Capital Corp. v. City of Houston, 735 F.2d 1555, 1564 (5th Cir. 1984). Conclusory expert testimony will not suffice. See St. Louis Convention & Visitors Comm'n v. NFL, 154 F.3d 851, 863 (8th Cir. 1998).

[40.] See Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007); Somers v. Apple, Inc., 729 F.3d 953, 963-66 (9th Cir. 2013) (affirming dismissal of overcharge claims where facts alleged were inconsistent with theory that defendant's conduct caused overcharge).

[41.] See, e .g., Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc., 243 F.3d 980, 991 (6th Cir. 2001) (affirming judgment as a matter of law for

defendant where plaintiff offered no evidence to exclude other market factors); Read v. Med. X-Ray Ctr., 110 F.3d 543 (8th Cir. 1997).

42. *See*, *e.g.*, National Ass'n of Review Appraisers & Mortgage Underwriters v. Appraisal Found., 64 F.3d 1130, 1135-36 (8th Cir. 1995); Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 402-04 (7th Cir. 1993); Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1494-98 (8th Cir. 1992).

43. *See,e .g.*, Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc., 213 F.3d 198, 208 (5th Cir. 2000); Isaksen v. Vt. Castings, 825 F.2d 1158, 1165 (7th Cir. 1987) (simply comparing profits before and during the violation period is not a valid methodology "especially when it is apparent that other causal factors are at work").

44. *See*, *e.g.*, MetroNet Servs. Corp. v. US West Commc'ns, 329 F.3d 986, 1009 (9th Cir. 2003), *superseded on other grounds sub nom.* MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124 (9th Cir. 2004); Malcolm v. Marathon Oil Co., 642 F.2d 845, 855 (5th Cir. 1981).

45. *See*, *e.g.*, Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465, 485 (5th Cir. 2000). (finding plaintiff's proof of defendant's intent to harm plaintiff was insufficient to establish fact of damage); *St. Louis Convention & Visitors Comm'n*, 154 F.3d at 863 (stating that intent of allegedly anticompetitive rule was not sufficient to establish a causal link to plaintiff's harm); *Amerinet*, 972 F.2d at 1492 n.15 (8th Cir. 1992) (stating that evidence of defendant's anticompetitive intent did not demonstrate that defendant's acts caused plaintiff-competitor's injury).

46. *See* Areeda et al., *supra* note 21, ¶338a at pp. 118-19.

47. *Id.* ¶337a at p. 102.

48. *See*, *e.g.*, RSA Media v. AK Media Group, 260 F.3d 10 (1st Cir. 2001). *Cf. In re* Canadian Imp. Antitrust Litig., 470 F.3d 785, 791-92 (8th Cir. 2006) (holding that federal prohibition on importing drugs from Canada, not the alleged conspiracy to impede importation, caused the alleged injury of higher drug prices); City of Pittsburgh v. W. Penn Power Corp., 147 F.3d 256, 264-69 (3d Cir. 1998) (holding that causal connection necessary for standing not present where agency approval needed to achieve the competition eliminated by challenged merger).

49. *See,e .g.*, City of Long Beach v. Standard Oil Co., 872 F.2d 1401, 1407-09 (9th Cir. 1989) (finding that conspiracy to depress prices paid to plaintiff may cause injury despite government price controls prohibiting

higher prices where the price ceilings would have been higher but for the conspiracy).

50. *Story Parchment*, 282 U.S. at 562 (rejecting as "unsound" the argument that low prices were not attributable to a predatory pricing conspiracy because the same prices might have prevailed if defendants had acted independently); Gelboim v. Bank of Am. Corp., 823 F.3d 759, 776 (2d Cir. 2016) (alleged horizontal competitors' agreement to fix LIBOR, an index used to set interest rates, stated claim for *per se* violation even though the victims "could have suffered the same harm under normal circumstances of free competition") (internal quotation omitted).

This issue is distinct from the inquiry used to test the presence of antitrust injury in *Brunswick Corp.*, 429 U.S. at 888. There, the Court noted that the asserted injury would be the same if different, concededly lawful events had occurred, demonstrating the disconnect between the basis for finding the defendant's conduct unlawful and the plaintiff's asserted injury. The causal link between the violation and the plaintiff's injury was not at issue. *Id.* at 484.

51. *See, e.g.*, *In re* Cardizem CD Antitrust Litig., 332 F.3d 896, 912-15 (6th Cir. 2003) (rejecting an argument that "if the defendant could have in theory caused the same injury without engaging in an antitrust violation," plaintiff may not recover, distinguishing cases where plaintiff's injury was in fact caused by lawful conduct "independent of the alleged antitrust violation"); Virginia Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d 535, 540 (4th Cir. 1998) (rejecting defendant's argument that it "could have achieved the same result through lawful means"); Irvin Indus. v. Goodyear Aerospace Corp., 974 F.2d 241, 245-46 (2d Cir. 1992) (argument that defendant could have beaten plaintiff's bid even with a nonpredatory bid ruled "too speculative" to defeat material causation); Lee-Moore Oil Co. v. Union Oil Co., 599 F.2d 1299, 1303 (4th Cir. 1979); Pacific Coast Agric. Exp. Ass'n v. Sunkist Growers, 526 F.2d 1196, 1206 (9th Cir. 1975). *But see* Valley Prods. Co. v. Landmark, 128 F.3d 398, 403-04 (6th Cir. 1997) (denying recovery to plaintiff-supplier terminated pursuant to defendant's tying arrangement because the termination would have caused the same harm even if there had been no tying). For a criticism of *ValleyP roducts* and similar Sixth Circuit cases before *Cardizem*, see Davis, *supra* note 6, at 737-44.

# CHAPTER 2

# ANTITRUST INJURY AND STANDING

It is not sufficient for a private antitrust plaintiff seeking to recover damages under Section 4 of the Clayton Act to prove that the injury suffered is causally linked to the alleged violation. A plaintiff must also show that the alleged injury constitutes an "antitrust injury" and that the plaintiff is not so far removed, or remote, from the antitrust violation as to lack "antitrust standing" to bring suit.[1]

Antitrust standing requires an examination of the "physical and economic nexus" between the individual harm and the alleged antitrust violation, i.e., whether the person alleging harm was so far removed from the injury that standing should not be recognized.[2] The related doctrine of antitrust injury limits the types of economic harm that are compensable and requires plaintiffs to demonstrate a link between the individual harm and the type of injury antitrust laws are intended to prevent in preserving competition.[3]

There is no black letter rule on antitrust standing. Instead, the Supreme Court established a comprehensive standing doctrine to determine which private parties are entitled to sue for damages or injunctive relief in *Associated General Contractors v. California State Council of Carpenters* (*AGC*).[4] In *AGC*, the Court identified certain factors that lower courts must balance to determine whether a plaintiff has antitrust standing: (1) the causal connection between the antitrust violation and the harm to the plaintiff, and whether the plaintiff's harm was intended; (2) the nature of the injury, including whether the plaintiff is a consumer or competitor in the relevant market; (3) the directness of the injury, including whether determining damages would be too speculative; (4) the danger of duplicative recovery, and whether it would be too complex to apportion the damages; and (5) the existence of a class of better-situated plaintiffs, or more direct victims.[5]

The first two of these standing elements are effectively incorporated into the doctrine of "antitrust injury." The other factors focus on whether a category of plaintiffs is too remote to the effects of the violation or whether a person with a more direct injury and a stronger incentive to file suit would be the more appropriate party to pursue a claim. The antitrust standing analysis encompasses all factors. As the Supreme Court observed in *Cargill, Inc. v. Monfort of Colorado, Inc.*,[6] "[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons."[7]

The lower courts have at times weighed the *AGC* factors differently when balancing antitrust injury with other elements in the antitrust standing analysis. The majority of courts treat antitrust injury as an essential threshold component of antitrust standing.[8] The First and Ninth Circuits appear to treat no single factor as decisive, though even they recognize the central importance of antitrust injury.[9] In addition, the courts emphasize policy considerations in assessing antitrust injury, such as the avoidance of duplicative litigation and inconsistent judgments, as well as preserving the effectiveness and efficiency of private antitrust enforcement.[10] As a practical matter, the application of the antitrust injury and standing doctrines has effectively limited private enforcement claims in federal courts.[11]

This chapter addresses the various factors of antitrust standing, giving particular emphasis to the definition and concepts underlying the requirement of antitrust injury. In discussing the remaining *AGC* factors, this chapter also examines the jurisprudence surrounding the "indirect purchaser" doctrine, which effectively limits antitrust standing in damage claims under federal law to direct purchasers of the products in the markets affected by the alleged violations.

# A. Antitrust Injury

While a showing of antitrust injury alone is not always sufficient for establishing standing under Section 4 of the Clayton Act, such a showing is required in all private antitrust actions. Antitrust offenses can have adverse consequences for a variety of market participants, including competitors, purchasers, and suppliers, but not all harms constitute an antitrust injury and

not all plaintiffs are properly situated to bring suit based on these harms.[12] Not only must plaintiffs prove that they were harmed by an antitrust violation, they must also show that their injury is proximately related to the harm and that the injury is of a type that antitrust laws are intended to prevent.[13]

# 1. Supreme Court Precedent

The Supreme Court established the antitrust injury requirement in the seminal case of *Brunswick Corp. v. Pueblo Bowl-O-Mat*.[14] In *Brunswick*, the plaintiff-owners of a bowling alley sought treble damages, alleging that the defendant's acquisition of certain failing bowling alleys that competed with the plaintiffs violated Section 7 of the Clayton Act. The plaintiffs argued that if the defendant had not unlawfully acquired the bowling alleys, the bowling alleys would have gone out of business and left the market, allowing the plaintiffs to earn higher profits. The Court assumed that the acquisition was unlawful and recognized it harmed the plaintiffs in fact, but rejected the plaintiffs' damages claim.

Explaining that the asserted injury flowed not from a decrease in competition, but from competition itself, the Court held that the plaintiffs did not suffer an antitrust injury. The Court articulated a two-part antitrust injury test, requiring injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[15] The Court determined that the plaintiffs did not suffer losses from anything that made the acquisition unlawful—they would have suffered the same losses and been denied an anticipated increase in market shares had the bowling centers been bought legally by the defendant, saved by refinancing, or purchased by another company. Instead, the Court concluded that the plaintiffs were harmed because the merger preserved competition by permitting the competing bowling alleys to remain in the market. The Court held that to allow recovery in such a case would be "inimical" to the goals of the antitrust laws.[16]

Since *Brunswick*, plaintiffs that complain of enhanced competition have been found not to have shown that they suffered an antitrust injury. In *Cargill, Inc. v. Monfort of Colorado, Inc.*,[17] the Court, applying the antitrust injury doctrine to claims for equitable relief, rejected a competitor's attempt to enjoin a merger that allegedly would have allowed the merging firms to

lower their above-cost prices to a level that would not have put the plaintiff out of business, but would have put a "price-cost squeeze" on the plaintiff's profits.[18] In seeking injunctive relief, the plaintiff was required to show at least a threat of antitrust injury. The Court held that the plaintiff's complaint of increased competition from the purportedly more efficient postmerger firm failed to meet this burden.[19] The threat of a loss of profits due to increasing competition, like preserving competition, does not cause competitors to suffer an "injury of the type the antitrust laws were intended to prevent."[20]

## 2. AGC's Consumer-or-Competitor Antitrust Injury Factor

When analyzing the antitrust injury prong of the *AGC* standing test, courts also look at the nature of the injury, including whether the plaintiff is a consumer, competitor, or other participant in the relevant market. In fact, some courts have considered a plaintiff's role in the marketplace as a way of narrowly applying standing, denying standing where the plaintiff is neither a consumer nor a competitor. These courts tend to view consumers as the prototypical plaintiffs for challenges to conduct that allegedly decreases competition.[21]

Most courts, however, have refused to adopt a bright-line rule that would permit only consumers or competitors in the relevant market to have antitrust standing.[22] The courts have emphasized that antitrust laws were implemented to protect all market participants, and that the focus should be not on the status of the plaintiff but on the directness of the injury and whether the loss falls within the type that the antitrust laws seek to prevent.[23]

In this regard, both *Brunswick* and *Cargill* support the proposition that competitors may not bring a private action against merging firms on the theory that they stand to lose profits because the postmerger firm will be more efficient or compete more aggressively to heighten competition, regardless of the market shares involved.[24] Furthermore, where harms may flow from competitors' agreements to eliminate competition among themselves, either by merging into a single firm or forming a cartel, conduct that allegedly decreases competition among firms may not result in antitrust injury to a competitor.[25] For example, a rival competitor that alleges that a

merger will reduce output and raise prices would generally not be considered to have suffered antitrust injury because these merger consequences would enable the rival to raise its own prices to match those of the offenders.[26] This theory also applies to members of horizontal price-fixing cartels or participants in bidder collusion, as a conspiracy by competitors to raise prices or to allocate customers would allow a competing firm to set prices at or below the coordinated price but above the otherwise competitive price levels (in the absence of a conspiracy).[27] Given these considerations, the circumstances in which a competitor-plaintiff is most likely to be able to establish antitrust injury and standing include those where the competitor faces predatory or exclusionary conduct.[28]

In *Atlantic Richfield Co. v. USA Petroleum (ARCO)*,[29] the Supreme Court examined the application of antitrust injury in cases involving per se violations. The plaintiff gasoline retailers claimed that *ARCO* had imposed maximum resale prices on its own retailers in violation of the per se rule of *Albrecht v. Herald Co.*,[30] thereby reducing the retail market price and damaging the plaintiffs.[31] The Court ruled that the mere fact that the conduct was unlawful did not obviate the need for the plaintiff to establish antitrust injury. The Court reasoned that because a "per se rule is a presumption of unreasonableness based on 'business certainty and litigation efficiency,'"[32] even per se violations may promote competition in some respects. Given this possibility, the requirement of antitrust injury "ensures that a plaintiff can recover only if the loss stems from [a] competition-reducing aspect or effect of the defendant's behavior."[33] Thus, the Court in *ARCO* established that every plaintiff must prove an element of harm to competition, including competitors who gain advantages from per se illegal acts.[34]

Any injury to the plaintiff competitors in *ARCO* was from lower, nonpredatory prices: "[w]hen a firm, or even a group of firms adhering to a vertical agreement, lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an 'anticompetitive' consequence of the claimed violation."[35] Indeed, a "firm complaining about harm it suffers from nonpredatory price competition 'is really claiming that it [is] unable to raise prices.'"[36] The Court added that, "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition."[37] If prices are

predatory, and rivals are harmed during this period because the price falls below the competitive level during the predatory campaign, the Supreme Court has recognized competitors may sue for that offense.[38]

*Brunswick*, *Cargill*, and *ARCO* all suggest that lost profits resulting from more effective competition do not constitute an antitrust injury because the loss results from increased competition. Expansion of market share necessarily "excludes" rivals by the extent of the expansion, but the rivals' resulting lost profits are not antitrust injury because the lost profits represent the natural consequence of competition.[39] For exclusionary harm to be anticompetitive, the injury must stem from *anticompetitive* exclusion. This sort of exclusion may occur, for example, because of an exclusive arrangement that denies access to necessary supplies or outlets, or by predatory pricing.[40] In such cases, the usual measure of harm is the amount of lost profits attributable to the exclusionary conduct. Techniques for proof of lost profits in cases involving exclusionary practices are discussed in Chapter 9.

While consumers and competitors are most likely to suffer antitrust injury, other market participants harmed by anticompetitive mergers or per se violations can suffer antitrust injury. For example, suppliers and distributors may sufficiently allege antitrust injury by pleading excessively low prices in a buyers' cartel,[41] although courts generally have held that distributors are not injured due to changes in supplier relationships post-acquisition.[42] Similarly, while employees generally are deemed not to have suffered antitrust injury based on loss of employment as a result of allegedly anticompetitive activity, the courts have analyzed the direct effect of the activity and/or termination to establish standing.[43] In a buyers' conspiracy case, a seller may sufficiently allege antitrust injury by pleading that it received excessively low prices from cartel members. The focus, as outlined in other situations above, is to prevent injury to competition and protect all market participants.[44]

# B. Antitrust Standing and the Directness of Injury Factor

# 1. Limiting Scope of the Indirect Purchaser Doctrine

Although antitrust injury is often the primary factor in establishing antitrust standing, such a showing by itself is not necessarily sufficient to demonstrate that the particular plaintiff has standing; the party may not be a proper plaintiff for other reasons. The Supreme Court first articulated an "antitrust standing" requirement in *Hawaii v. Standard Oil Co.*,[45] where it refused to recognize a state's right to sue as parens patriae for injury to the general economy of the state. The Court observed that Section 4 of the Clayton Act does not authorize the state to recover for economic injuries to its sovereign interests, and moreover, the state's alleged harm was "no more than a reflection of injuries to the 'business or property' of consumers, for which they may recover themselves under Section 4."[46] The anticompetitive effect of the violation may have caused harm to the state's economy, but the Court held that problems of proof and the availability of a more directly affected class of plaintiffs precluded the right to sue.[47]

The Court further clarified the antitrust standing doctrine in *BlueShi eldof Virginia v. McCready*.[48] In *McCready*, the Court held that Section 4 gave standing to a health insurance policyholder to bring an antitrust claim against her insurance company for conspiring with psychiatrists to exclude and boycott clinical psychologist services by refusing to reimburse the policyholder for such services.[49] A year after *McCready* was decided, the Supreme Court fully defined its initial conclusions on antitrust standing in *AGC*,[50] which considered whether a union could sue an association of construction contractors for allegedly coercing contractors and others to shift business away from union firms. In applying the multifactor *AGC* analysis to find that the unions lacked antitrust standing, the Court found their injury was "only an indirect result" of the effect on the coerced contractors.[51] Further, because direct victims could sue, such as the unionized subcontractors that were the direct victims of the alleged scheme, denying the plaintiffs' remedy was not "likely to leave a significant violation undetected or unremedied."[52] The Court emphasized that allowing the unions to sue would be adverse to the concerns it had previously identified in *Illinois Brick Co. v. Illinois*[53] regarding the complexities stemming from "pass-on" theories of damages.[54] By linking the *AGC* factors with *Illinois Brick*, the Court effectively limited antitrust standing to direct purchasers of the distribution chain's product.

Thus, indirect purchasers, or customers further removed in a production or supply chain who have had unlawful overcharges passed on to them generally have no standing to sue in private antitrust damages actions, though some courts have recognized certain exceptions to *Illinois Brick* (as discussed in the next subsection).

In *AGC,* the Court incorporated the policy elements of antitrust standing that it had previously outlined in its parallel judgments in *HanoverShoe ,I nc. v. United Shoe Machinery Corp.*[55] and *IllinoisB rick*. In these decisions, the Supreme Court limited parties' abilities to use a pass-on theory in either defending or supporting an antitrust claim. For example, if a manufacturers' cartel increased prices, the retailer (direct purchaser) has several options depending on the market structure and economic conditions: (1) incur all of the overcharge, whereby there is no effect to the consumer (indirect purchaser) downstream in the production chain; (2) absorb a portion of the overcharge when selling the product to the consumer; or (3) pass on the entire amount by raising retail prices to include all of the overcharge. *Hanover Shoe* first established that when sued by the retailers, the manufacturer involved in the price-fixing cartel could not maintain a defense that the retailer suffered little if any injury by passing on a portion or the entire overcharge to the consumer.[56] The Court held that the one situation in which this type of defense may be raised is if the defendant meets the "normally . . . insurmountable" task of proving that: (1) the plaintiff buyer raised his price in response to the overcharge; (2) there was no subsequent decline in profit margin or total sales; and (3) the retailer would not (or could not) have raised prices absent the overcharge.[57]

Nine years later, in *IllinoisB rick*, the Court limited the pass-on argument in an offensive context (compared to the defensive arguments submitted in *Hanover Shoe*). The Court found that the indirect purchaser (or final consumer) did not have standing to claim damages incurred as a result of the illegal overcharges passed down to the purchaser through the distribution chain. In doing so, the Court reaffirmed that "the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers" rather than allowing remote purchasers to bring antitrust claims.[58] The Court's rationale in denying indirect purchasers the right to sue centered on several considerations. First, if indirect purchasers were permitted to sue for the same illegal overcharges as direct purchasers,

defendants would be exposed to multiple liability and face increased risk of duplicate recovery, which potentially could cause a six-fold recovery under Section 4's mandatory treble damages. Second, the increased complexity of tracing causation and apportioning damages down the chain of distribution would cause too much uncertainty and impose too great a burden on the courts.[59] Third, the full recovery of the overcharge should be concentrated on the direct purchasers to ensure "the antitrust laws will be more effectively enforced."[60] Approximately thirty states have enacted legislation to override *Illinois Brick* by permitting indirect purchasers to sue under the states' antitrust laws, but issues raised by these state statutes are beyond the scope of this book.[61]

Since the decision in *Illinois Brick*, the indirect purchaser doctrine has been applied consistently by the federal courts in response to claims alleging anticompetitive behavior in various industries and markets.[62] Courts generally do not recognize standing where a plaintiff's injury is derivative of a more direct injury to another firm, particularly if that injured firm has a strong incentive to pursue its own antitrust claim.

For example, owners, employees, and officers of injured firms generally have been found to lack standing to sue in their individual capacity, on the ground that their injury is derivative.[63] Likewise, individual shareholders of a company are generally excluded from bringing suit as indirect purchasers even though the company, which may sue as a direct purchaser, purchased a monopolized product or incurred an overcharge directly from a defendant.[64] Merchants also have been generally unsuccessful in asserting claims against credit card companies for imposing chargeback fees, since merchants do not pay the fees to their creditors directly, but to intermediary banks, which then pay the credit card companies.[65]

Similarly, the Supreme Court has held that customers in telecommunications and entertainment markets likely fall within the indirect purchaser category and have no standing to pursue antitrust claims against alleged exclusionary conduct.[66] For example, in *Campos v. Ticketmaster Corp.*,[67] the Eighth Circuit denied standing to a class of consumer ticket buyers that had alleged overcharges because of the market monopolization by ticketing service companies in event and concert ticket sales. The court held that the plaintiffs were not direct purchasers, as ticketing service companies deal directly with venues and promoters to sell ticket contracts, rather than

selling to consumers directly. Such derivative dealings with the ticketing service companies—who negotiate directly with venues and event promoters to secure contracts and sell entertainment event tickets—are considered the "essence of indirect purchaser status."[68]

Health care payors, pension funds, and hospitals that have sought to recover overcharges and unreimbursed costs of health care provided to nonpaying patients from tobacco companies also generally lack standing based on the remoteness of their injury. Courts have dismissed their claims on the basis that the entities or similar third parties "have suffered no direct harm stemming from the tobacco industry's alleged misconduct."[69] Sometimes, however, courts have upheld antitrust injury and standing for employees who are terminated for their failure to cooperate in an antitrust offense, finding that direct harm stems from the act of termination.[70]

Finally, those producers who sell inputs (including labor) to members of a cartel or to the antitrust victims generally do not have standing even though the cartel may have the effect of reducing output, thereby requiring fewer inputs and reducing purchases from the suppliers. Courts tend to deny recovery in these instances on the ground that the injury is remote,[71] or because the plaintiffs are not competitors or consumers in the monopolized market.[72]

## 2. Exceptions to the Indirect Purchaser Doctrine

Several exceptions apply to the general rule denying indirect purchasers the ability to sue in federal court for damages. The courts have acknowledged certain limited exceptions that allow indirect purchasers to sue: (1) where a preexisting cost-plus contract controls the overcharge; (2) where the direct purchaser is owned or controlled by a member of the alleged conspiracy involved in the overcharges; and (3) where the indirect purchaser is able to prove the manufacturers and middlemen are coconspirators.[73] These exceptions, however, are available only in limited scenarios, and courts are as likely to deny standing to the indirect purchasers making these arguments as they are to agree that standing is appropriate.[74]

The cost-plus contract exception was specifically recognized in both *Hanover Shoe* and *Illinois Brick*.[75] Indirect purchasers who are able to show

that a product was bought under a fixed-quantity and fixed-mark-up contract that existed before the cartel's price overcharge ever took effect will be able to bring an action alleging the entire monopoly overcharge was passed on to them.[76] The rationale for the exception is that the direct purchaser is insulated from a reduction in sales or a reduction in mark-up as a result of the overcharge because the indirect purchaser is committed to buying a fixed quantity at a fixed mark-up. This relationship determines the effect of the overcharge in advance "without reference to the interaction of supply and demand that complicates the determination in the general case."[77] Any issues that may arise in tracing the overcharge to the indirect purchaser are eliminated due to an observable link that all portions of the sale's overcharge are placed on the indirect purchaser and no resulting overlapping liabilities occur. The courts have narrowly defined this exception and place a high burden on plaintiffs to establish the exception.[78] The exception applies only when a previously established contractual relationship with fixed quantity and mark-up terms passes on the entire overcharge to the indirect purchaser.[79] Additionally, the exception will not apply in the absence of a preexisting contract or "functional equivalent" that removes both any incentive of the direct purchaser from absorbing part of the overcharge and any question of the overcharge passing through.[80]

The ownership or control exception, also noted by the Court in *Illinois Brick*, may allow an indirect purchaser to recover damages by establishing that the defendant or indirect purchaser owns or controls the direct purchaser.[81] This exception is narrowly limited to ownership or control "relationships involving such functional economic or other unity" that the anticompetitive prices pass on in effectively one sale.[82] If the plaintiff is the next purchaser in the distribution chain and is able to prove the direct purchaser is a controlled subsidiary of a member of the alleged conspiracy, it may sue for the alleged overcharges.[83] The primary rationale for this exception is that the direct purchaser is not likely to sue a defendant by which it is effectively owned or controlled, given that all litigation decisions likely would be controlled by the parent defendant. In this situation, the *Illinois Brick* rationale that the direct purchaser is the proper party to recover for efficiency reasons may not be present.[84] The Third Circuit has applied this control exception only when the initial seller maintains a parent-subsidiary relationship through ownership of the direct purchaser.[85] Other courts have

extended the control exception beyond a wholly owned subsidiary to a "functional economic or other unity" relationship, which may include interlocking directorates, minority stock ownership, loan or trust agreements, or certain agency relationships.[86]

Finally, some circuit courts have permitted suit by indirect purchasers when a coconspirator relationship is found between the direct purchaser and the defendant, and the indirect purchaser is the first nonculpable purchaser in the distribution chain.[87] Again, the principal rationale for this exception is that a member of the unlawful conspiracy, in benefiting from the situation, would be an ineffective enforcer of the antitrust laws. For the exception to apply, however, the direct purchaser's participation in the conspiracy must be "truly complete."[88] The situations that *IllinoisB rick* explicitly attempts to prevent are not present when this exception applies, including the risk of multiple liability that would result in duplicative damage awards or complex apportionment. The Seventh Circuit outlined this rationale in finding that customers of a vertical conspiracy were the proper parties to sue as "*Illinois Brick* allocate[s] to the first non-conspirator in the distribution chain the right to collect 100% of the damages."[89] When direct purchasers are involved in the price-fixing activities, indirect purchasers are "entitled to collect damages from both the manufacturers and their intermediaries" if they can sufficiently establish a conspiracy existed between the parties, in which case the direct purchasers become conspiring defendants and the indirect purchaser doctrine would not bar the action.[90] To qualify for the coconspirator exception, an indirect purchaser must successfully prove the defendant-manufacturers and intermediaries were involved in a conspiracy and name both coconspirators as parties to the antitrust claim.[91]

The Ninth Circuit has further limited this exception to cases in which the conspiracy involves setting the price paid by the plaintiff, not merely affecting the price paid by the plaintiff in a conspiracy to fix the price of some other product. In *In re ATM Fee Antitrust Litigation*,[92] a plaintiff class of ATM cardholders alleged that banks had fixed the prices paid to ATM owners (called interchange fees) when a cardholder obtained cash from an ATM not owned by the cardholder's bank. The cardholder's bank then passed on the interchange fee in the fee that it charged the cardholder (called the "foreign" fee). The plaintiffs conceded that they had not paid the interchange fee directly but argued that the coconspirator exception should

nevertheless apply because the defendants had "conspired to fix interchange fees *for the purpose and effect of* fixing foreign ATM fees."[93] The Ninth Circuit rejected this argument, holding that the co-conspirator exception does not apply unless "the price paid by a plaintiff [has been] set by the conspiracy and not merely affected by the setting of another price."[94]

# C. Duplicative Recovery, Complex Apportionment, and Better-Situated Plaintiffs

The final three requirements applied in the *AGC* standing analysis evolve from the policy considerations in *Illinois Brick*, as outlined above. *Illinois Brick* and *AGC* both highlight the Supreme Court's concerns regarding inconsistent judgments, highly speculative damages, duplicative recovery, and undue difficulties of damages calculations if both direct and indirect plaintiffs are able to sue.[95] By allowing for the possibility of duplicative recovery or requiring a complex apportionment of damages, the underlying interests of preserving the effectiveness and efficiency of private antitrust enforcement may not be realized. As the Court emphasized in *Illinois Brick*, this element further reduces the incentive to sue by adding "the uncertainty of how that overcharge would be apportioned among the various plaintiffs" to the "uncertainty of how much of an overcharge could be established at trial."[96]

Federal courts have generally applied the *Illinois Brick* rationale that a "combination of increasing the costs and diffusing the benefits of bringing a treble damages action could seriously impair this important weapon of antitrust enforcement."[97] For example, courts have rigidly enforced antitrust standing requirements in claims brought by consumers and distributors against tobacco companies and cigarette manufacturers for allegedly conspiring illegally to suppress information about smoking dangers. Federal courts repeatedly have dismissed consumer and third-party health care payor claims, reasoning that they are duplicative of smokers' claims brought due to smoking-related illnesses.[98] The injuries alleged often are "not experienced in the nicotine delivery market, but rather in the health care market"[99] and an assessment of which of the plaintiffs' losses were attributable to the

defendant's conduct would be highly speculative and too complex in computing damage allocation.[100]

Courts also consider whether there is a more directly harmed class of victims with incentive to sue when weighing whether to recognize a putative plaintiff's standing under the antitrust laws.[101] The courts generally grant standing only to those individuals who are most likely to be harmed by the anticompetitive consequences of the antitrust violation, as direct victims have the greatest motivation to act as "private attorney(s) general" and "vindicate the public interest in antitrust enforcement."[102] If, however, the court is not able to find a more directly harmed party than the plaintiff, the risks of duplicative recoveries and complex apportionment are mitigated. In such situations, courts have recognized a plaintiff's standing to sue.[103]

# D. Class-Wide Injury Issues in Antitrust Actions

Antitrust cases are often brought as class actions.[104] Although the rules related to class action litigation (and particularly the rules and case law governing certification of a proposed class) are not themselves substantive rules of antitrust injury or standing, the application of class-certification jurisprudence can depend significantly on the substantive rules of antitrust injury and standing.

Under Rule 23 of the Federal Rules of Civil Procedure, a court can certify a class if the four prerequisites identified in Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—are satisfied. The court must also find that the tests of Rule 23(b)(3) are fulfilled. The Rule 23(b)(3) tests are (1) predominance of common over individual questions and (2) manageability of the case as a class action.

The "predominance" requirement is often at issue in indirect purchaser class actions and recent jurisprudence has clarified this requirement. In *Comcast v. Behrend*,[105] however, the Supreme Court held that the predominance requirement cannot be satisfied where "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."[106] The Court further held that individual damages issues will invariably predominate over common questions if plaintiffs fail

to establish that "damages are capable of measurement on a classwide basis."[107]

Courts have tended to apply *Comcast* strictly.[108] Post-*Comcast*, it is reversible error and an abuse of discretion to certify a class when there are individualized inquiries into damages calculations, even if those inquiries do not predominate over the common questions with respect to liability. The Eleventh Circuit in *Bussey v. Macon County Greyhound Park, Inc.*[109] reiterated that class certification requires analysis of the evidence, not just the pleadings. In *Bussey*, the lower court certified a class of individuals who had played on bingo machines. The purported class had filed an action against gaming machine owners, operators, and manufacturers alleging that operation of the machines constituted illegal gambling activity and sought recovery of all the money lost while playing on the machines. The Eleventh Circuit court reversed the lower court's certification because the district court had not conducted the rigorous analysis required under *Comcast*, including evidentiary inquiry into the method for quantifying the losses or allocating damages.[110]

Another recent post-*Comcast* decision likewise stressed the importance of scrutinizing the evidence before granting certification. In *In re Rail Freight Fuel Surcharge Antitrust Litigation*,[111] the D.C. Circuit overturned the district court's order certifying a class of direct purchasers of freight customers that brought an action against major railroads, alleging that the railroads engaged in a price-fixing conspiracy to coordinate their fuel surcharge programs as a means to impose supra-competitive total price increases on shipping customers. The district court had certified the class action based on a damages model that had produced false positives—i.e., damages where none should exist.[112] Because the damages model was not a reliable basis on which to demonstrate classwide injury and was divorced from the theory of liability, class certification was improper.[113] The D.C. Circuit clearly described the post-*Comcast* role of the district court in deciding whether to certify an antitrust class: "[i]t is now indisputably the role of the district court to scrutinize the evidence before granting certification, even when doing so 'requires inquiry into the merits of the claim.'"[114]

_____

1. The doctrine of "antitrust standing" is distinct from the constitutional doctrine of standing. Injury in fact is sufficient to satisfy the constitutional requirement of standing, but the doctrine of antitrust standing requires courts further to determine whether the plaintiff is a proper party to bring a private antitrust action). Associated Gen. Contractors v. Cal. State Council of Carpenters (*AGC*), 459 U.S. 519, 535 n.31 (1983).

2. *See* Blue Shield of Virginia v. McCready, 457 U.S. 465, 476-77 (1982).

3. *See* Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 489 (1977) (stating that "[t]he antitrust laws . . . were enacted 'for the protection of *competition*, not *competitors*.'") (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)); *seeal so* Ronald W. Davis, *Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury*, 70 Antitrust L.J. 697, 698 (2003) (noting that the doctrine of antitrust injury requires that a plaintiff's damages theory "correspond to an economic effect that the statute or case law rule invoked as the basis for liability aims to prevent"); John E. Lopatka & William H. Page, Brunswick *at 25: Antitrust Injury and the Evolution of Antitrust Law*, 17 Antitrust 20 (2002) ("In *Brunswick* the Court held that, to recover damages pursuant to Section 4 of the Clayton Act, a plaintiff must prove 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'") (quoting *Brunswick*, 429 U.S. at 489)); Jonathan M. Jacobson & Tracy Greer, *Twenty-One Years of Antitrust Injury: Down the Alley with* Brunswick v. Pueblo Bowl-O-Mat, 66 Antitrust L.J. 273 (1998) (defining antitrust injury standard as "whether the plaintiff's injury sufficiently reflected the adverse effect of the defendant's conduct on competition and consumers").

4. *AGC*, 459 U.S. at 519. *Seeal so* Atlantic Richfield Co. v. USA Petrol. Co. (*ARCO*), 495 U.S. 328, 334 (1990) (finding that the antitrust injury requirement is a distinct matter from the established statutory per se violations); American Ad Mgmt. v. Gen. Tel. Co., 190 F.3d 1051, 1054 (9th Cir. 1999) (recognizing the need for case-by-case analysis and that it is "virtually impossible" to announce a black-letter rule); SAS v. P.R. Tel. Co., 48 F.3d 39, 44-45 (1st Cir. 1995) ("[d]espite its statutory framework, antitrust law is largely the handiwork of federal judges and antitrust enforcers.").

5. *AGC*, 459 U.S. at 540-45.

6. 479 U.S. 104 (1986).

7. *Id.* at 104, 110 n.5.

8. *See, e.g.*, *In re* Canadian Imp. Antitrust Litig., 470 F.3d 785, 791-92 (8th Cir. 2006) (recognizing a potentially dispositive point in finding that absent an antitrust injury caused by defendants' conduct, plaintiff lacked standing); Kochert v. Greater Lafayette Health Servs., 463 F.3d 710, 715-19 (7th Cir. 2006) (requiring a showing of both antitrust injury and antitrust standing to proceed under § 4); Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 438 (2d Cir. 2005) ("the weight to be given the various factors will necessarily vary with the circumstances of particular cases"); Florida Seed Co. v. Monsanto Co., 105 F.3d 1372 (11th Cir. 1997) (following a two-prong approach to deciding antitrust standing, including whether plaintiff both sufficiently established "antitrust injury" and was an "efficient enforcer" of the antitrust laws); Balaklaw v. Lovell, 14 F.3d 793, 798 n.9 (2d Cir. 1994) (applying a two-prong analysis focusing first on whether a plaintiff suffered an antitrust injury and then turning to the other factors).

9. *See, e.g.*, RSA Media v. AK Media Group, 260 F.3d 10, 14 (1st Cir. 2001) ("Although we technically balance the six factors to determine if standing is appropriate . . . this Court has emphasized the causation requirements of that test."); Serpa Corp. v. McWane, Inc., 199 F.3d 6, 10 (1st Cir. 1999) (noting that courts must consider the "balance of factors in each case" to guard against "engraft[ing] artificial limitations on the § 4 remedy," but disposing of the case on "the antitrust injury factor since distributors . . . presumptively lack antitrust standing."); *American Ad Mgmt.*, 190 F.3d at 1055 (noting that a conclusion on antitrust standing does not require the court finding in favor on each factor but instead requires a balancing of the factors, although "great[er] weight to the nature of the plaintiff's alleged injury" may be given); Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc., 140 F.3d 1228, 1232 (9th Cir. 1998) (balancing the *AGC* factors of antitrust injury, directness, speculative measure of harm, risk of duplicative recovery and complexity in apportioning damages, although giving great weight to the nature of plaintiff's alleged injury); Amarel v. Connell, 102 F.3d 1494, 1508 (9th Cir. 1996) (noting that "antitrust standing involves a case-by-case analysis" in which "no single factor is decisive"); Sullivan v.

*Tagliabue,* 25 F.3d 43, 47 n.9 (1st Cir. 1994) ("We agree that the absence of antitrust injury weighs heavily against a grant of standing. We need not consider, however, whether this should be fatal to standing in every instance, because in the circumstances of this case, we conclude that the balance of factors as a whole weighs against a grant of standing.").

10. *See,e .g.*, Knevelbaard Dairies v. Kraft Foods, 232 F.3d 979, 987-88 (9th Cir. 2000) (finding all antitrust standing elements were satisfied on the face of the complaint as the overall central purpose of preserving competition was maintained); *Serpa Corp.,* 199 F.3d at 10 (restricting standing avoids overdeterrence and overburdening the judicial system, which could result from an overbroad reading of § 4); Valley Prods. Co. v. Landmark, 128 F.3d 398, 403 (6th Cir. 1997) (noting that the antitrust doctrine has become a mainstay in the courts' attempts to confine antitrust litigation to "economically rational limits").

11. *See AGC*, 459 U.S. 519, 529 (1983) (establishing that there must be appropriate limits on the scope of private damage actions, as a "literal reading of the statute [would have been] broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation"); *see also* SAS v. P.R. Tel. Co., 48 F.3d 39, 43 (1st Cir. 1995) ("The underlying problem is not unique to antitrust law . . . . From the outset, federal antitrust courts have devised counterpart limitations under various headings (e.g., standing, antitrust injury) and through a variety of subordinate rules (e.g., restrictions on suits by stockholders or indirect purchasers), metaphors (e.g., 'inextricably intertwined,' 'target area'), abstractions (direct versus remote injury), and multi-factor tests."); William H. Page, *The Scope of Liability for Antitrust Violations*, 37 Stan. L. Rev. 1445, 1483-85 (1985) (distinguishing concepts of antitrust injury and standing).

12. *See, e.g., AGC*, 459 U.S. at 535 Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 107 (1986); Blue Shield of Virginia v. McCready, 457 U.S. 465, 477 (1982); Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477 (1977); Hawaii v. Standard Oil Co., 405 U.S. 251, 262, n.14 (1972) ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.").

13. *See* Gerlinger v. Amazon.com, 526 F.3d 1253 (9th Cir. 2008) (stating that plaintiff failed to show he had paid higher prices, received poorer service, or suffered any other form of antitrust injury); Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1449 (11th Cir. 1991) (noting the limited availability of private actions, which ensures that "suits inapposite to the goals of the antitrust laws are not litigated"); In re Intel Corp. Microprocessor Antitrust Litig., 452 F. Supp. 2d 555 (D. Del. 2006) (dismissing antitrust claims that arose out of alleged foreign-related conduct that affected foreign sales for lack of standing and under the Foreign Trade Antitrust Improvements Act).

14. *Brunswick*, 429 U.S. 477.

15. *Id* . at 489. The court further clarified the definition of antitrust injury in noting that "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation"—in short, a type of loss "the alleged violations would be likely to cause." *Id.* (quoting Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 125 (1969)).

16. *Id.* at 488 (explaining that the anticipated damages would reflect "profits [plaintiffs] would have realized had competition been reduced by the demise of the Brunswick-owned centers"). See also Pool Water Prods. v. Olin Corp., 258 F.3d 1024, 1036 (9th Cir. 2001) (holding that despite an FTC finding that the acquisition under which alleged injury occurred was illegal, plaintiffs failed to show antitrust injury because reduced profits from price reductions and decreased market share were "not the type of harm Section 4 was meant to protect against"); Indeck Energy Servs. v. Consumers Energy Co., 250 F.3d 972, 977 (6th Cir. 2001) (finding injury to single competitor insufficient to show competition was harmed; plaintiff must allege exclusion of competitor "results in the elimination of a superior product or lower-cost alternative," not preservation of competition).

17. 479 U.S. 104 (1986).

18. *Id.* at 118.

19. *Id.* at 116 (emphasizing that lost profits from "competition for increased market share" and from a merger that makes rivals more efficient and effective competitors is not antitrust injury).

20. *Brunswick*, 429 U.S. 477, 489 (1977); *see also Cargill*, 479 U.S. at 116 (finding that "[t]o hold that that antitrust laws protect competitors from

the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result.")

21. *See, e.g.*, Ethypharm S.A. France v. Abbott Laboratories, No. 11-3602, 2013 U.S. App. LEXIS 1567 (3d Cir. 2013) (denying standing to exclusive licensee for decline in market share in lawsuit against licensor); SigmaPharm, Inc. v. Mutual Pharmaceutical Co., Inc., 454 F. App'x 64 (3d Cir. 2011) (affirming dismissal of pharmaceutical developer's action against manufacturer with which it entered into a development agreement); Martorano v. PP&L Energy Plus, 137 F. App'x 491 (3d Cir. 2005) (affirming dismissal of electricity broker's complaint on behalf of electricity end-users and concluding that broker was neither a customer nor competitor and injury suffered was indirect); Midwest Gas Servs. v. Ind. Gas Co., 317 F.3d 703, 710-11 (7th Cir. 2003) (claimed injury did not stem directly from purported conspiracy but was derivative to the party directly injured by the conspiracy's effect); Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178, 181-84 (3d Cir. 1997) (holding B&P was not a competitor or a consumer in the market where trade was allegedly restrained and therefore cannot demonstrate "antitrust injury").

22. *See, e.g.*, Novell, Inc. v. Microsoft Corp., 505 F.3d 302 (4th Cir. 2007) (finding that plaintiff was a member of a limited class for whom the *AGC* factors supported antitrust standing even though its products were outside the restrained operating-systems market and did not directly compete, and rejected proposed bright-line rule that only consumers or competitors in the relevant market had standing to sue); Carpet Group Int'l v. Oriental Rug Importers Ass'n, 227 F.3d 62, 76-77 (3d Cir. 2000) (declaring that limiting antitrust standing to only consumers and competitors would conflict with Supreme Court precedent), *overruled on other grounds by* Animal Science Products, Inc. v. China Minmetals Corp., 654 F.3d 462 (3d Cir. 2011); American Ad Mgmt. v. Gen. Tel. Co., 190 F.3d 1051, 1058 (9th Cir. 1999) (same); Bhan v. NME Hosp., 772 F.2d 1467, 1470 (9th Cir. 1985) (holding that "injured party [must] be a participant in the same market as the alleged malefactors," not merely a "consumer or competitor").

23. *See* Associated Gen. Contractors v. Cal. State Council of Carpenters (*AGC*), 459 U.S. 519, 538 (1983) (noting that Sherman Act was

"enacted to assure customers the benefits of price competition" and to "protect[] the economic freedom of participants in the relevant market"); Blue Shield of Virginia v. McCready, 457 U.S. 465, 479-84 & 484 n.21 (1982) ("If a group of psychiatrists conspired to boycott a bank until the bank ceased making loans to psychologists, the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists' actions."); Elliott Indus. v. BP Am. Prod. Co., 407 F.3d 1091, 1125 (10th Cir. 2005) (finding alleged injury did not stem from "competition-reducing aspect," thus plaintiff failed to demonstrate antitrust injury or standing); SAS v. P.R. Tel. Co., 48 F.3d 39, 44-45 (1st Cir. 1995) ("[t]he presumptively proper plaintiff is a customer who obtains services in the threatened market"); *see also* Davis, *supra* note 3, at 760-65 (considering the implications of limiting antitrust standing to consumers or competitors in the relevant market).

24. *See* Roger D. Blair & Jeffrey L. Harrison, *Rethinking Antitrust Injury*, 42 Vand. L. Rev. 1539, 1554 (1989) (generally maintaining that antitrust laws tend to disfavor competitor suits based on the concern that a competitor's incentive to bring a suit is not aligned with more applicable social incentives to sue); *see also Cargill*, 479 U.S. at 116 ("The kind of competition that [plaintiff] alleges here, competition for the increased market share, is not an activity forbidden by the antitrust laws."); Haynes Trane Serv. Agency v. Am. Standard, Inc., 51 F. App'x 786, 803 (10th Cir. 2002) (affirming summary judgment for failure to show anticompetitive effects resulted from defendant's conduct); George Haug Co. v. Rolls Royce Motor Cars, 148 F.3d 136 (2d Cir. 1998) (finding the amended complaint did not sufficiently allege "antitrust injury" because no facts were alleged that plaintiff's elimination from the marketplace resulted in a decrease of Rolls Royce service outlets); Elec. Commc'ns Corp. v. Toshiba Am. Consumer Prods., 129 F.3d 240 (2d Cir. 1997) (allegations that defendants conspired to reduce output of cellular phone products in the United States could not harm competition market-wide); Southaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079 (6th Cir. 1983) (finding plaintiffs lacked standing because they were neither a competing grocery store nor a customer or participant in the relevant market, and thus the antitrust injury alleged was a by-product of the anticompetitive conduct).

25. *See Brunswick*, 429 U.S. at 484-87; *Cargill*, 479 U.S. at 114-17; s*eeal so* James Cape & Sons Co. v. PCC Constr. Co., 453 F.3d 396, 399 (7th Cir. 2006) (holding that plaintiff-rival failed to show antitrust injury even though defendants' bid-rigging activities were able to underbid him and cause injury, because "activities actually increased, rather than restricted, competition"); Glen Holly Enter. v. Tektronix, Inc., 343 F.3d 1000 (9th Cir. 2003) (finding that although plaintiff was injured when a digital imaging equipment joint venture eliminated its technology, the injury differed from the merger's impact on competition and would have resulted regardless of the merger); Patel v. Midland Mem'l Hosp. & Med. Ctr., 298 F.3d 333, 346 (5th Cir. 2002) (finding plaintiff cardiologist's suspension neither eliminated plaintiff as a competitor nor permanently blocked plans to open a new hospital); Serpa Corp. v. McWane, Inc., 199 F.3d 6, 12 (1st Cir. 1999) (finding that injuries resulted from the loss of plaintiff's position as an exclusive sales representative, which was "neither connected with, nor resulted from, defendant's market power"); Levine v. Cent. Fla. Med. Affiliates, 72 F.3d 1538, 1551 (11th Cir. 1996) ("the antitrust laws are intended to protect competition, not competitors"); Bathke v. Casey's Gen. Stores, 64 F.3d 340, 344 (8th Cir. 1995) ("it is axiomatic that the antitrust laws were passed for the protection of competition, not competitors").

26. *See, e.g.*, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n.8 (1986) (holding competitors did not suffer an antitrust injury from the alleged maximum price-fixing conspiracy and could not "complain of conspiracies that, for example, set maximum prices above market levels, or that set minimum prices at any level."); Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, 433 F.3d 1024, 1031 (7th Cir. 2006) (rejecting nonunion plaintiff's allegations of antitrust injury caused by defendant's termination of plaintiff because it failed to show that its losses came from acts that reduced output or raised consumer prices; "[t]ransfer of business from one company to another without an accompanying effect on competition" cannot be an antitrust violation); Continental Airlines v. United Airlines, 277 F.3d 499, 515-16 (4th Cir. 2002) (requiring as a threshold the showing of anticompetitive effect on price or output to show antitrust injury); Big Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096, 1102 (9th Cir. 1999) (no antitrust injury where "plaintiffs stand to benefit from the fact that prices for

those services are inflated" as a result of alleged illegal price fixing); O.K. Sand & Gravel v. Martin Marietta Tech., 36 F.3d 565, 572-73 (7th Cir. 1994) (holding that as defendant's competitors, plaintiffs stand to gain from any conspiracy to raise the market price; plaintiffs must establish, with a fair degree of certainty, that the violation was a material element of or substantial factor in producing the injury).

27. *See* James Cape & Sons Co. v. PCC Const. Co., 453 F.3d 396, 399 (7th Cir. 2006) (finding that even if competitors for a construction bid colluded to raise their price, no antitrust injury occurred where the accepted bid was below plaintiff's); JTC Petrol. Co. v. Piasa Motor Fuels, 190 F.3d 775, 777-78 (7th Cir. 1999) (finding that a competitor cannot obtain relief under the antitrust laws if it cannot establish injury to itself from its competitors eliminating competition among themselves); Israel Travel Advisory Serv. v. Isr. Identity Tours, 61 F.3d 1250, 1256-57 (7th Cir. 1995); Capital Imaging v. Mohawk Valley Med. Assocs., 996 F.2d 537, 543 (2d Cir. 1993) (requiring challenged activity to have actual adverse effect on market as a whole; proof of individual competitor harm will not suffice).

28. *See Cargill*, 479 U.S. at 120-22; *seeal so* Palmyra Park Hosp. v. Phoebe Putney Mem'l Hosp. et al., 604 F.3d 1291, 1303 (11th Cir. 2010) (finding that plaintiff-competitor in acute-care hospital services was excluded from relevant market when defendant-competitor engaged in tying arrangement with insurance companies that resulted in plaintiff losing in-network status; court held that the "tying claims are the type of injury that the antitrust laws are designed to remedy"); Gulf States Reorg. Group v. Nucor Corp., 466 F.3d 961, 967-68 (11th Cir. 2006) (finding that plaintiff-competitors' injury in being excluded from the relevant market was inseparable from the alleged harm to competition); Pool Water Prods. v. Olin Corp., 258 F.3d 1024, 1035 (9th Cir. 2001) ("The Supreme Court has made clear . . . that a decrease in profits from a reduction in a competitor's prices, so long as the prices are not predatory, is not an antitrust injury.") (quoting Brooke Group v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 223-24 (1993)); Tops Mkts. v. Quality Mkts., 142 F.3d 90 (2d Cir. 1998) (recognizing antitrust standing of excluded potential market competitors); Amarel v. Connell, 102 F.3d 1494, 1508 (9th Cir. 1996) ("[l]osses a competitor suffers as a result of predatory pricing is a form of antitrust injury because

predatory pricing has the requisite anticompetitive effect against competitors."); R.C. Bigelow, Inc. v. Unilever N.V., 867 F.2d 102, 110 (2d Cir. 1989) (finding a sufficient threat of antitrust injury because through defendants' deliberate acquisition of a large market share, a presumption arose that the monopoly power would be used to eliminate competition through predatory pricing); HealthAmerica Pa. v. Susquehanna Health Sys., 278 F. Supp. 2d 423, 440 (M.D. Pa. 2003) (finding no antitrust injury when plaintiffs alleged harm that resulted from nonpredatory price competition); Bon-Ton Stores v. May Dep't Stores Co., 881 F. Supp. 860 (W.D.N.Y. 1994) (while rivals rarely have standing to challenge mergers, potential competitors may do so when the merger would exclude them from the relevant market).

29. 495 U.S. 328 (1990).

30. 390 U.S. 145 (1968), *overruledby* State Oil Co. v. Khan, 522 U.S. 3, 22 (1997) (expressly overruling *Albrecht* regarding the standard of review for vertical maximum resale price fixing and holding that such conduct should be evaluated under the rule of reason); *seeal so* Leegin Creative Leather Prods. v. PSKS, Inc., 551 U.S. 877 (2007) (refusing to apply per se rule to vertical price-fixing restraints such as minimum resale price fixing).

31. The plaintiffs did not allege in their appeal to the Supreme Court that the prices were fixed at predatory levels, but sought to recover for injuries suffered by the unlawful lower prices. On remand, a divided panel of the Ninth Circuit concluded that the plaintiff had indeed abandoned its predatory pricing claim. *See* USA Petrol. Co. v. Atl. Richfield Co., 13 F.3d 1276 (9th Cir. 1993).

32. *ARCO*, 495 U.S. at 342 (quoting Arizona v. Maricopa Co. Med. Soc'y, 457 U.S. 332, 344 (1982)).

33. *Id.* at 344 n.13.

34. *Id*. at 336-37. If, for example, *ARCO*'s pricing policies led its dealers to reduce their services, the competitor would have an advantage in non-price competition; if those policies in effect set minimum resale prices, the plaintiff would benefit because prices would be higher. The Court noted that "[a] competitor 'may not complain of conspiracies that . . . set minimum prices at any level.'" *Id*. at 337 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n.8 (1986)).

35. *ARCO*, 495 U.S. at 337.

36. *Id.* at 337-38 (citing Roger D. Blair & Jeffrey L. Harrison, *Rethinking AntitrustI njury*, 42 Vand. L. Rev. 1539, 1554 (1989)).

37. *ARCO*, 495 U.S. at 339. Even in the long run, "[r]ivals cannot be excluded . . . by a nonpredatory maximum-price scheme unless they are relatively inefficient." *Id.* at 338 n.7.

38. *See* Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 489 n.14 (1977) ("The short-term effect of certain anticompetitive behavior— predatory below-cost pricing, for example—may be to stimulate price competition. But competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened."); Brooke Group v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 223-24 (1993); Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 117-19 (1986). *See generally* Alvin K. Klevorick, *The Current State of the Law and Economics of Predatory Pricing*, 83 Am. Econ. Rev. 162 (1993).

39. *Cargill*, 479 U.S. at 116 ("The kind of competition that Monfort alleges here, competition for increased market share, is not activity forbidden by the antitrust laws. It is simply, as petitioners claim, vigorous competition."); *seeal so* Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117 (2d Cir. 2007) ("where a defendant is alleged to have acquired other firms in order to achieve monopoly power at the manufacturing level of a product market, dealers and distributors terminated in the aftermath do not have standing to assert claims."); Stamatakis Indus. v. King, 965 F.2d 469, 472 (7th Cir. 1992) (creation of competing firm by former employees and others did not cause antitrust injury); Car Carriers v. Ford Motor Co., 745 F.2d 1101, 1109 (7th Cir. 1984) ("Losing business to a competitor is an inevitable consequence of the economic system that the Sherman Act was designed to protect.").

40. *See* Pool Water Prods. v. Olin Corp., 258 F.3d 1024 (9th Cir. 2001) (holding that, without proof of a competitor's predatory pricing practices, it does not matter whether the reduced prices are the result of price fixing, illegal mergers, price discrimination, or any other antitrust violation); JTC Petrol. Co. v. Piasa Motor Fuels, 190 F.3d 775, 777 (7th Cir. 1999) (determining plaintiff sufficiently alleged its competitors had conspired with upstream suppliers to deny essential input supplies, excluding plaintiff from the market with the resulting injury).

41. Both the Supreme Court and the Seventh Circuit have upheld sellers' claims that artificially lowered prices create anticompetitive injury. *See, e.g.*, Mandeville Island Farms v. Am. Crystal Sugar Co., 334 U.S. 219, 235-36 (1948); Sanner v. Bd. of Trade of Chi., 62 F.3d 918, 927-28 (7th Cir. 1995) (finding an alleged conspiracy to depress soybean prices and benefit soybean buyers, created antitrust injury for sellers); Omnicare, Inc. v. UnitedHealth Group, 524 F. Supp. 2d 1031 (N.D. Ill. 2007) (finding allegations adequately showed plaintiffs received significantly below-market reimbursement rates as a result of a per se unlawful buyers' conspiracy); International Outsourcing Serv. v. Blistex, Inc., 420 F. Supp. 2d 860, 865 (N.D. Ill. 2006); Bellevue Drug Co. v. Advance PCS, No. 03-cv-4731, 2004 U.S. Dist. LEXIS 3627 (E.D. Pa. 2004) (order denying motion to dismiss) (same). *See also* Pace Elecs., Inc. v. Canon Computer Sys., Inc., 213 F.3d 118, 120 (3d Cir. 2000); Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co., 141 F.3d 947 (9th Cir. 1998) (analyzing supplier's antitrust injury); Caribe BMW, Inc. v. BMW AG, 19 F.3d 745, 753 (1st Cir. 1994) (finding dealer suffered antitrust injury from manufacturer's maximum price fixing); Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1041-42 (9th Cir. 1987) (finding gasoline dealers suffered antitrust injury in Clayton Act suit against oil company), *aff'd*, 496 U.S. 543 (1990); Illinois Corp. Travel v. Am. Airlines, 806 F.2d 722, 729 (7th Cir. 1986) (analyzing travel agent's claim against airline under rule of reason).

42. *See, e.g.*, Andrx Pharms. v. Biovail Corp. Int'l, 256 F.3d 799, 806-07 (D.C. Cir. 2001) (noting that potential competitors cannot achieve standing simply by demonstrating an intent to enter the market, but must also demonstrate a preparedness to do so); Florida Seed Co. v. Monsanto Co., 105 F.3d 1372, 1375 (11th Cir. 1997) (distributors who are terminated following a merger suffer no antitrust injury, and plaintiff failed to allege any nexus between the injury it suffered and a lessening of competition in the United States); General Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795 (8th Cir. 1987) (finding that a terminated brokerage firm lacked standing as a consumer or competitor because it merely solicited retail purchasers for defendant manufacturer); Indium Corp. of Am. v. Semi-Alloys, Inc., 781 F.2d 879, 882 (Fed. Cir. 1985) (no injury if plaintiff not prepared to enter markets); Risk v. Allstate Life Ins. Co., No. 04-CV-0333-CVE-FHM, 2006 U.S. Dist. LEXIS

48524 (N.D. Okla. 2006) (dismissing insurance broker's complaint because broker was neither buyer nor seller and suffered no direct antitrust injury).

43. *Compare* Sharp v. United Airlines, 967 F.2d 404 (10th Cir. 1992) (affirming dismissal of plaintiffs' claims in applying *AGC* factors and observing that "salaried employees . . . are not within the area of competitive economy protected against unlawful mergers."), *and* Feeney v. Chamberlain Mfg. Corp., 831 F.2d 93, 95-96 (5th Cir. 1987) (finding dismissed employee lacked standing under § 4 of the Clayton Act), *with* Ostrofe v. H.S. Crocker Co., 740 F.2d 739 (9th Cir. 1984) (finding standing because plaintiff was both the direct victim of a horizontal boycott and the victim of a unilateral discharge by a conspirator), *and* Fine v. Barry & Enright Prod., 731 F.2d 1394, 1397-98 (9th Cir. 1984) (finding potential game show contestant had antitrust standing to bring § 1 claim against producers and networks limiting his appearances).

44. *See, e.g.*, Morales-Villalobos v. Garcia-Llorens, 316 F.3d 51 (1st Cir. 2003) (finding that anesthesiologist alleging exclusive contract prohibited her from practicing at hospitals failed to allege sufficient antitrust injury because any adverse effects of the contract were felt by patients and she was able to practice at other sites); Association of Wash. Public Hosp. Dists. v. Philip Morris, 241 F.3d 696, 704-05 (9th Cir. 2001) (holding hospitals in the health care market did not experience their injuries in the nicotine delivery market where competition was restrained); Serpa Corp. v McWane, Inc., 199 F.3d 6, 10-13 (1st Cir. 1999) (holding that terminated distributor lacked standing to challenge acquisitions because consumers and competitors "have ample incentive to bring an antitrust claim"); Service Employees Int'l Union Health & Welfare Fund v. Philip Morris, Inc., 83 F. Supp. 2d 70, 90 (D.D.C. 1999) (holding that union health trusts did not suffer antitrust injury because their asserted "infrastructure damages" did not result from anticompetitive activity in the nicotine products market), *rev'd on other grounds*, 249 F.3d 1068 (D.D.C. 2001). *Butc f.* Doctor's Hosp. v. SE Med. Alliance, 123 F.3d 301, 305 (5th Cir. 1997) (stating "the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing."); Anaren Microwave, Inc. v. Loral Corp., 49 F.3d 62, 63 (2d Cir. 1995) (subcontractor's

injury was "derivative" and not proximately caused by the bid-winning contractor's conduct); Legal Econ. Evaluations v. Metro. Life Ins. Co., 39 F.3d 951, 953 (9th Cir. 1994) (finding that harm to competition did not give rise to injury in the market).

45. 405 U.S. 251 (1972).

46. *Id*. at 264.

47. *Id* . ("Even the most lengthy and expensive trial could not, in the final analysis, cope with the problems of double recovery inherent in allowing damages for harm" both to individuals' economic interests and the state's quasi-sovereign interests).

48. 457 U.S. 465 (1982).

49. *Id.* at 476-77.

50. Associated Gen. Contractors v. Cal. State Council of Carpenters (*AGC*), 459 U.S. 519 (1983).

51. *Id.* at 541-44.

52. *Id*. In discussing the antitrust injury issue, the Court reasoned that the union "was neither a consumer nor a competitor in the market in which trade was restrained," and observed that unions are themselves restraints of trade, albeit exempt from most antitrust liability, and damage to their labor-market organizing activities was not connected to a reduction in competition. *Id.*

53. 431 U.S. 720 (1977).

54. *See AGC*, 459 U.S. at 544 (citing *Illinois Brick*, 431 U.S. at 737-38) (finding that permitting the pass-on theories would "transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs . . . . However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble damages suits, and seriously undermine their effectiveness.").

55. 392 U.S. 481 (1968).

56. *Id.* (noting that allowing such a defense would complicate damage cases substantially and increase the plaintiffs' burden while reducing their incentive to sue).

57. *Id* . at 493. *See generally* ABA Section of Antitrust Law, Indirect Purchaser Litigation Handbook (2d ed. 2016).

58. *Illinois Brick*, 431 U.S. at 734-35; *see also* Static Control Components, Inc. v. Lexmark Int'l, Inc., 697 F.3d 387, 406 (6th Cir. 2012) *aff'd*, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014) (finding no standing because plaintiff was only an indirect purchaser and there was a high risk of duplicative recovery); Gatt Commc'ns, Inc. v. PMC Associates, L.L.C., 711 F.3d 68, 78 (2d Cir. 2013); *In re* New Motor Vehicles Can. Exp. Antitrust Litig., 533 F.3d 1 (1st Cir. 2008) (affirming that lessee-plaintiffs alleging a horizontal conspiracy among manufacturers to maintain artificially higher car prices that adversely affected dealers and ultimate consumers in the United States could not seek damages because of their indirect purchaser status); County of Oakland v. City of Detroit, 866 F.2d 839 (6th Cir. 1989) (holding counties who purchased water direct from the city, not municipalities and consumers who purchased water from the counties, were the proper parties to bring suit); *In re* Sugar Indus. Antitrust Litig., 579 F.2d 13, 18 (3d Cir. 1978) (following the *Illinois Brick* rationale in holding that the bar against recovery does not extend to the product as well as the buyer, which would otherwise "allow the price-fixer of a basic commodity to escape the reach of a treble-damage penalty simply by incorporating the tainted element into another product").

59. *IllinoisB rick*, 431 U.S. at 732 (stating that to allow the assertion of pass-on theories by indirect purchasers "would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings"); *see also* Roger D. Blair & Jeffrey L. Harrison, *Reexamining the Role of* Illinois Brick *in Modern Antitrust Standing Analysis*, 68 Geo. Wash. L. Rev. 1 (1999) (noting that in *Illinois Brick*, the Supreme Court reasoned that "suits by indirect purchasers would be too unwieldy because each downstream purchaser would attempt to show the level of damage it suffered as a result of a remove price-fixing scheme").

60. *Illinois Brick*, 431 U.S. at 734-35; *see also In re* Brand Name Prescription Drugs Antitrust Litig., 123 F.3d 599 (7th Cir. 1997) (finding wholesalers are the only parties permitted to complain about manufacturers overcharging wholesalers, even if the entire overcharge was passed on to retailers via a higher wholesale price); Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 87 (3d Cir. 2011) (finding hospital did not have antitrust standing to bring a claim against drug

manufacturer because it indirectly purchased the drugs through a wholesaler); *In re* Vitamins Antitrust Litig., No. 99-197 (TFH), 2001 U.S. Dist. LEXIS 12114, at *20 (D.D.C. 2001) (order granting motion for partial summary judgment) (purchasers of vitamins from competitors of defendants were not considered direct purchasers and lacked antitrust standing, despite claim that "prices charged by these non-defendant suppliers were artificially inflated" by the alleged price fixing).

61. *See, e.g.*, Cal. Bus. & Prof. Code § 16750(a) (enacted in 1978); D.C. Code Ann. § 28-4509 (1980); Haw. Rev. Stat. §§ 480-3, 480-14 (enacted in 1987); Idaho Code § 48-108(2) (enacted in 2000); 740 Ill. Comp. Stat Ann. 10/7(2) (1979); Kan. Stat. Ann. § 50-801(b) (enacted in 1985); Md. code Ann., Com. Law § 11-209(b)(2)(ii) (enacted in 1982); Me. rev. stat. ann. 10 § 1104 (enacted in 1989); Mich. Comp. Laws § 455.788(2) (enacted in 1984); Minn. Stat. Ann. § 325D.57 (same); N.D. Cent. Code § 51-08.1-08 (enacted in 1991); N.M. Stat. Ann. § 57-1-3 (1979); Nev. Rev. Stat § 598A, 210 (enacted in 1999); N.Y. Gen. Bus. § 340(6) (enacted in 1998); R.I. Gen. Laws § 6-36-12(g) (1979); S.D. Codified Laws § 37-1-33 (enacted in 1980); Vt. Stat. Ann. 9, § 2465(b) (1999); Wis. Stat. Ann. § 113.18(1)(a) (enacted in 1979). Other states' indirect purchaser remedies predate *Illinois Brick. See, e.g.*, Miss. Code Ann. § 75-21-9 (1972). *Illinois Brick* does not preempt those statutes. California v. ARC America Corp. (*ARC*), 490 U.S. 93, 101-02 (1989). As a result of *ARC*, state antitrust litigation has developed in a range of new areas. *FTC v. Mylan Laboratories, Inc.*, 62 F. Supp. 2d 25 (D.D.C. 1999), is illustrative of multistate indirect purchaser cases and even broadened the original reading of the indirect purchaser doctrine to allow the FTC to bring actions on behalf of indirect purchasers. For a full discussion of state antitrust law and indirect purchaser actions, see ABA Section of Antitrust Law, Report of the Task Force on the Federal Agencies 22-24 (2011)*;* ABA Section of Antitrust Law, Report of the American Bar Association Section of Antitrust Law to the Antitrust Modernization Commission 2 (2004); *Report of the Indirect Purchaser Task Force,* 63 Antitrust L.J. 993 (1995); *Report of The American Bar Association Section of Antitrust Law Task Force to Review the Supreme Court's Decision in* California v. ARC America Corp., 59 Antitrust L.J. 273 (1990).

62. *See, e.g.*, Delaware Valley Surgical Supply Inc. v. Johnson & Johnson, 523 F.3d 1116, 1121-22 (9th Cir. 2008) (holding hospital lacked standing to assert antitrust claims for medical supplies purchased through a distributor); Kloth v. Microsoft Corp., 444 F.3d 312, 320-23 (4th Cir. 2006) (denying standing to consumers who purchased personal computers with Microsoft operating system software because they were indirect purchasers of the software licenses). *Cf.* Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1145-46 (9th Cir. 2003), *as amended on denial of reh'g* (Apr. 24, 2003) (holding indirect purchasers had standing to assert antitrust claims where "there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation").

63. *See, e.g.*, Air Courier Conf. v. Postal Workers Union, 498 U.S. 517, 531 (1991) (stating that "[e]mployees have generally been denied standing to enforce competition laws because they lack competitive and direct injury"); International Raw Materials v. Stauffer Chem. Co., 978 F.2d 1318, 1327-29 (3d Cir. 1992) (supplier of terminal services to alleged soda ash cartel lacked standing); Adams v. Pan Am. World Airways, 828 F.2d 24, 28-30 (D.C. Cir. 1987) (employees lacked standing in light of existence of superior plaintiffs such as employer airline as well as transatlantic air transportation consumers); Burns v. Lavender Hill Herb Farm, No. 01-cv-7019, 2005 U.S. Dist. LEXIS 7559 (E.D. Pa. 2005) (former farm employee alleging the farm conspired to monopolize organic products by misrepresenting its product lacked standing to sue), *aff'd*, 167 F. App'x 891 (3d Cir. 2006). *But see* Rock-It, Inc. v. Futura Coatings, 74 F. Supp. 2d 420, 424 (D. Vt. 1999) ("principal employee" of a closely held corporation who "suffered direct injury from defendants' allegedly anti-competitive behavior" had antitrust standing).

64. *See* Schulz v. Pataki, 137 F. Supp. 2d 80, 82 (N.D.N.Y. 2001) (even sole shareholder of an allegedly injured corporation lacks antitrust standing in individual capacity); Sports Racing Servs. v. Sports Car Club of Am., 131 F.3d 874, 882 (10th Cir. 1997) (finding "only direct purchasers suffer injury within the meaning of § 4 of the Clayton Act."); Florida Seed Co. v. Monsanto Co., 105 F.3d 1372, 1376 (11th Cir. 1997) ("Courts uniformly have held that stockholders, even sole stockholders . . ., lack standing to bring an antitrust suit for injury to their corporations."); Lovett v. Gen. Motors Corp., 975 F.2d 518, 520-

21 (8th Cir. 1992) (shareholder of injured firm lacked standing); *Vinci v. Waste Mgmt.*, 80 F.3d 1372, 1374-75 (9th Cir. 1996) (finding plaintiff did not have standing to challenge the conduct because the injury was to the corporation, not to plaintiff-shareholder); *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 766-67 (2d Cir. 1995); *Hammes v. AAMCO Transmissions*, 33 F.3d 774, 777 (7th Cir. 1994); *Bubar v. Ampco Foods*, 752 F.2d 445, 452-53 (9th Cir. 1985) (same); *Meyer Goldberg, Inc. v. Goldberg*, 717 F.2d 290, 294 (6th Cir. 1983). *Buts ee* Finnegan v. Campeau Corp., 915 F.2d 824, 827 (2d Cir. 1990) (target corporation's shareholders determined to have standing to sue competing bidders who allegedly reached agreement to reduce acquisition price of target); John Peterson Motors v. Gen. Motors Corp., 613 F. Supp. 887, 901-02 (D. Minn. 1985) (president and sole shareholder had standing where no one else could sue).

65. *See* Kendall v. Visa U.S.A., Inc., 518 F.3d 1042 (9th Cir. 2008) (finding no direct contractual relationship existed between merchants who offer customers the convenience of paying "middlemen" banks and credit card companies); Paycom Billing Servs. v. MasterCard Int'l, 467 F.3d 283, 291-92 (2d Cir. 2006) (holding merchants lack standing to contest credit card association chargeback rules due to their indirect injuries).

66. *See, e.g.*, Verizon Commc'ns v. Trinko, 540 U.S. 398, 416-17 (2004) (holding consumers have no standing to pursue antitrust claims if the incumbent monopolist allegedly foreclosed its rivals by discouraging customers from switching to competitor telephone companies); Covad Commc'ns Co. v. BellSouth Corp., 299 F.3d 1272 (11th Cir. 2002) (permitting a competing local exchange carrier's antitrust claims to proceed), *vacated*, 540 U.S. 1147 (2004).

67. 140 F.3d 1166 (8th Cir. 1998) (denying standing to plaintiffs to pursue damage claims under § 4 of the Clayton Act, but holding that plaintiffs have standing to seek injunctive relief under § 16).

68. *Id.* at 1171. The courts have also applied this reasoning to issues arising between distributors and drug manufacturers in the pharmaceutical industry. *See, e.g.*, Delaware Valley Surgical Supply v. Johnson & Johnson, 523 F.3d 1116, 1122-23 (9th Cir. 2008) (finding the hospital lacked standing to sue the manufacturer, despite a direct contractual relationship, because it ultimately purchased products through a third-party distributor); *In re* Lorazepam & Clorazepate Antitrust Litig., 202

F.R.D. 12, 23 (D.D.C. 2001) (class of individual hospital, GPO and health maintenance organizations may make a sufficient showing of standing to be direct purchasers "to the extent that they purchased directly from [defendants] for their own account.")

69. *See* International Bhd. of Teamsters Local 734 v. Philip Morris, Inc., 34 F. Supp. 2d 656, 661 (N.D. Ill. 1998), *aff'd*, 196 F.3d 818 (7th Cir. 1999); *see also* Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429 (3d Cir. 2000) (holding that "various tobacco companies and their trade associations, seeking to recover unreimbursed costs of health care provided to nonpaying patients suffering from tobacco-related disease" lacked standing because their "injuries [were] too remotely connected in the causal chain from wrongdoing on the part of the [t]obacco [c]ompanies"); Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 925-27 (3d Cir. 1999) (finding the "sheer number of links" between a conspiracy by tobacco companies to withhold safer products, and the smoking-related costs incurred by union health and welfare funds, was too indirect and remote to find injury).

70. *Compare* Ashmore v. Ne. Petrol. Div. of Cargill, Inc., 843 F. Supp. 759 (D. Me. 1994) (upholding antitrust injury and standing), *and* Ostrofe v. H.S. Crocker Co., 740 F.2d 739 (9th Cir. 1984) (same), *and* Donahue v. Pendleton Woolen Mills, 633 F. Supp. 1423 (S.D.N.Y. 1986) (same); *with* Fallis v. Pendleton Woolen Mills, 866 F.2d 209, 211 (6th Cir. 1989) (denying standing under multifactor analysis), *abrogated by* Humphreys v. Bellaire Corp., 966 F.2d 1037 (6th Cir. 1992), *and* Bichan v. Chemetron Corp., 681 F.2d 514 (7th Cir. 1982) (denying standing), *and* Winther v. DEC Int'l, 625 F. Supp. 100 (D. Colo. 1985) (same), *and* McNulty v. Borden, Inc., 542 F. Supp. 655 (E.D. Pa. 1982).

71. *See, e.g.*, Province v. Cleveland Press Publ'g Co., 787 F.2d 1047, 1051-54 (6th Cir. 1986) (employees denied standing to challenge merger of employer); Comet Mech. Contractors v. E.A. Cowen Constr., 609 F.2d 404, 406 (10th Cir. 1980) (subcontractor denied standing to sue general contractor).

72. *See* International Raw Materials v. Stauffer Chem. Co., 978 F.2d 1318, 1327-29 (3d Cir. 1992) (supplier of terminal services to alleged soda ash cartel lacked standing).

73. *See* Illinois Brick Co. v. Illinois, 431 U.S. 720, 735-36 (1977); Hanover Shoe, Inc. v. United Shoe Mach. Co., 392 U.S. 481, 494 (1968); *In re* Beef Indus. Antitrust Litig., 600 F.2d 1148, 1163 (5th Cir. 1979); Link v. Mercedes-Benz of N. Am., 788 F.2d 918, 931-33 (3d Cir. 1986).

74. *See, e.g.*, Campos v. Ticketmaster Corp., 140 F.3d 1166 (8th Cir. 1998) (reviewing circumstances that might warrant avoidance of the direct purchaser rule); Simon v. KeySpan Corp., 694 F.3d 196, 202-04 (2d Cir. 2012) (affirming summary judgment against plaintiff for lack of standing); Mid-West Paper Prods. Co. v. Cont'l Group, 596 F.2d 573 (3d Cir. 1979) (refusing to recognize the functional equivalent of cost-plus contract); Yoder Bros. v. Cal-Fla. Plant Corp., 537 F.2d 1347 (5th Cir. 1976) (finding that plaintiff did not satisfy the burden to qualify for the cost-plus exception). Courts also have confirmed that direct purchasers may assign claims to indirect purchasers in certain situations. *See,e .g.*, *Inr e* Nexium (Esomeprazole) Antitrust Litig., 42 F. Supp. 3d 231, 297-99 (D. Mass. 2014) (allowing retailers to proceed with claims brought under an express partial assignment of wholesalers' antitrust claims against drug manufacturer); Meijer, Inc. v. Barr Pharm., Inc., 572 F. Supp. 2d 38, 64 (D.D.C. 2008) (finding plaintiffs had standing to bring assigned antitrust claims); *Inr e* K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 539 (D.N.J. 2004) (indirect purchasers who brought suit as assignees of direct purchasers do not need to plead facts supporting the assignment). *Cf.* Animal Sci. Products, Inc. v. China Minmetals Corp., 34 F. Supp. 3d 465, 509 (D.N.J. 2014) (noting assignment of antitrust claims must be express).

75. *See Hanover Shoe*, 392 U.S. at 484 (recognizing there may be situations where an overcharged buyer is more easily able to prove he was not damaged due to a preexisting "cost-plus" contract); *Illinois Brick*, 431 U.S. at 736, 745 (retaining *HanoverShoe*'s "narrow scope" against any exception to the rule barring pass-on defense).

76. *See, e.g.*, Stanislaus Food Products Co. v. USS Posco Industries, 782 F. Supp. 2d 1059 (C.D. Cal. 2011) (finding that tomato canner's action against manufacturer of tin mill products, alleging antitrust conspiracy to monopolize tin milling market and to price-fix products, was an indirect purchaser but satisfied the cost-plus exception because the contract required that the plaintiff purchase a predetermined quantity of tin-

plated cans at a price in which direct purchaser added a contractually predetermined sum to price paid to supplier).

77. *Illinois Brick*, 431 U.S. at 735-36; *see also* Simon v. KeySpan Corp., 694 F.3d 196, 202-04 (2d Cir. 2012) (finding a utility consumer lacked standing as an indirect purchaser because price increases may have resulted in decreased demand for utilities or impacted the rate increase allowed by regulators); *In re* Beef Indus. Antitrust Litig., 600 F.2d at 1163-66 (finding that cattle producers who sued supermarket chains for artificially depressing wholesale beef prices by agreeing to pay a fixed price with the middlemen processors had standing to sue, and that the fixed short-term supply conditions allowed for a simple calculation of the pass-through amount).

78. The Supreme Court restricted the scope of the cost-plus contract exception in *Kansas v. UtiliCorp United*, 497 U.S. 199 (1990), rejecting indirect purchaser claims against pipeline and gas production companies, and finding there was no commitment made by customers to purchase particular quantities of gas and that the respondent "did not sell the gas to its customers under a pre-existing cost-plus contract." *Id*. at 218; *seeal so* McCarthy v. Recordez Serv., 80 F.3d 842, 855 (3d Cir. 1996) (questioning the cost-plus exception).

79. *See,e .g.*, County of Oakland v. City of Detroit, 866 F.2d 839, 849-50 (6th Cir. 1989) (finding exception not applicable in situation where direct purchaser counties resold sewage services, bought from city at inflated prices, at fixed markups to multiple municipalities, who then attempted to pass on costs to consumers); Jewish Hosp. Ass'n v. Stewart Mech. Enters., 628 F.2d 971, 975-78 (6th Cir. 1980) (finding that a hospital association's suit alleging a horizontal conspiracy between contractors and subcontractors to fix the price of mechanical work on the hospital did not fall under the cost-plus exception as there was no preexisting relationship when the mechanical work was first incorporated into the finished addition before resale to plaintiff); Phillips v. Crown Cent. Petrol. Corp., 602 F.2d 616, 633 n.4 (4th Cir. 1979) (finding the cost-plus defense is available in "rare situations" where the intermediary had a preexisting cost-plus contract with the buyer that clearly defined the amount to be purchased); *Inr e* Lease Oil Antitrust Litig., No. C-98-048, 1998 WL 469840, at *7 (S.D. Tex. 1998) (order denying motion to dismiss) (indirect purchaser plaintiff who sufficiently alleged cost-plus

relationship survived the motion to dismiss); Technical Learning Collective v. Daimler-Benz AG, No. N-77-1443, 1980 U.S. Dist. LEXIS 9517 (D. Md. 1980) (order granting motion for partial summary judgment) (finding the alleged cost-plus arrangements did not involve a prearranged fixed quantity and rejecting the arguments for the exception).

80. *See, e.g.*, Simon v. KeySpan Corp., 694 F.3d 196, 202-04 (2d Cir. 2012) (finding exception did not apply to utility customers that are under no contractual obligation to purchase a set amount of electricity each month); McCarthy, 80 F.3d at 855 (finding plaintiffs failed to establish that the alleged cost-plus contract preexisted defendants' alleged conduct); *In re* Plywood Antitrust Litig., 655 F.2d 627, 640-41 (5th Cir. 1981) (stating that plaintiffs failed to cite any examples of a functional equivalent to a cost-plus contract and were unable to establish a preexisting relationship with their middlemen-suppliers). *But cf.* Illinois *ex rel.* Hartigan v. Panhandle E. Pipe Line Co., 852 F.2d 891, 894-97 (7th Cir. 1988) (finding that although the case for applying the cost-plus exception was strong—the public utility's natural monopoly allowed it to shift 100% of its cost increase to residential consumers— industrial consumers had competitive alternatives that were not preexisting and fixed in contractual terms; motion to dismiss was affirmed); Burkhalter Travel Agency v. MacFarms Int'l, 141 F.R.D. 144, 149 (N.D. Cal. 1991) (granting summary judgment to dismiss direct purchaser's claims after defendant demonstrated that a cost-plus contract existed, shifting all damages to the indirect purchaser); Alton Ochsner Med. Found. v. Fischbach & Moore, Inc., No. 89-cv-2353, 1990 U.S. Dist. LEXIS 10499 (E.D. La. 1990) (order denying motions to dismiss and for summary judgment) (permitting plaintiff's claims against subcontractors to proceed where the contract between them provided that 100% of subcontractor's costs would be passed along to plaintiffs by the general contractor); *In re* New Mexico Natural Gas Antitrust Litig., No. 403, 1982 U.S. Dist. LEXIS 9452 (D.N.M. 1982) (plaintiff's case sufficient to be granted summary judgment in view of 100% pass-on).

81. *See Illinois Brick*, 431 U.S. at 736 n.16 (finding "[a]nother situation in which market forces have been superseded and the pass-on defense

might be permitted is where the direct purchaser is owned or controlled by its customer").

82. *See* Jewish Hosp. Ass'n, 628 F.2d at 975 (finding plaintiff-hospital failed to allege a "functional economic or other unity" control exception that converted the two-step transaction into a single sale); Perkins v. Standard Oil Co., 395 U.S. 642, 648 (1969) (holding defendant could not avoid liability under the Robinson-Patman Act for price discrimination by simply channeling the illegal discount through its 60%-owned subsidiary); Labrador, Inc. v. Iams Co., 105 F.3d 665 (9th Cir. 1997); *Inr e* New Motor Vehicles Can. Exp. Antitrust Litig., 307 F. Supp. 2d 136, 143 (D. Me. 2004) (order granting in part and denying in part motion to dismiss).

83. *See, e .g.*, Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1145-46 (9th Cir. 2003) (holding plaintiffs had standing to sue, although plaintiffs only transacted with the corporation established by local real estate associations, based on their direct ownership of the corporation, rights to determine board appointments, and allegations that the two parties conspired together); Royal Printing Co. v. Kimberly-Clark Corp., 621 F.2d 323, 326 (9th Cir. 1980) (determining an indirect purchaser could sue based on purchases made from defendant's subsidiaries).

84. *See Freeman*, 322 F.3d at 1145-46 (stating "indirect purchasers can sue for damages if there is no realistic possibility that the direct purchaser will sue its suppler over the antitrust violation").

85. *See, e .g.*, Merican, Inc. v. Caterpillar Tractor Co., 713 F.2d 958, 968 (3d Cir. 1983) (stating that the court may recognize the exception but applies it more narrowly than other circuits); Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 424 F.3d 363, 371 (3d Cir. 2005) (finding control exception did not apply to manufacturer which did not own any interest in its dealers or exert ownership-like control over dealers); Mid-West Paper Prods. v. Cont'l Group, 596 F.2d 573, 589 (3d Cir. 1979) (holding the exception applies only if the parent dominated the subsidiary and directly caused the subsidiary's prices to be "determined in accordance with the general price-fixing conspiracy"). *But cf. In re* Linerboard Antitrust Litig., 305 F.3d 145, 158-59 (3d Cir. 2002) (holding that indirect purchaser doctrine would not bar price-fixing claim of a plaintiff who purchased a product incorporating price-fixing

product as one of its ingredients directly from the alleged conspirator, and thus concerns related to apportionment of damages were not implicated as plaintiff was direct purchaser); J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524 (3d Cir. 1990) (vacating summary judgment order that plaintiff indirectly purchased products and could not assert its claims, and finding sufficient evidence showed plaintiff acted as a purchasing agent and had identical senior executives and a centralized billing system); *In re* Sugar Industry Antitrust Litig., 579 F.2d 13, 18-19 (3d Cir. 1978) (holding parent company liable to plaintiff that alleged price fixing of sugar and who purchased candy incorporating sugar from the parent's subsidiary).

86. *See, e.g* ., *In re* West Liquid Asphalt Case, 487 F.2d 191, 199 (9th Cir. 1973) (citing evidence that defendants controlled their direct customers either by acquiring their stock or arranging to finance their purchases); *In re* Mercedes-Benz Antitrust Litig., 157 F. Supp. 2d 355, 366 (D.N.J. 2001) (extending the relationship to the contractual relationship of agency in denying motions to dismiss by defendant auto manufacturers and auto dealers in plaintiff's suit alleging horizontal and vertical price-fixing conspiracies); Dee-K Enters. v. Heveafil Sdn. Bhd., 982 F. Supp. 1138, 1153 (E.D. Va. 1997) (finding the control exception sufficient where plaintiffs were able to assert each of the rubber distributor-defendants were subsidiaries of or controlled by the manufacturer-defendants). *But cf. In re* Brand Name Prescription Drugs Antitrust Litig., 123 F.3d 599, 605 (7th Cir. 1997) (holding the control exception did not apply to the factual circumstances); *In re* New Motor Vehicles, 307 F. Supp. 2d at 143 (same).

87. *See, e.g.*, Insulate SB, Inc. v. Advanced Finishing Sys., Inc., 797 F.3d 538, 542 (8th Cir. 2015) (holding plaintiff's allegation of a conspiracy between the manufacturer of spray foam and its distributors was adequate to establish antitrust standing); Dickson v. Microsoft Corp., 309 F.3d 193, 215 (4th Cir. 2002) (declining to decide how *Illinois Brick* applies to a vertical conspiracy); Lowell v. Am. Cyanamid Co., 177 F.3d 1228 (11th Cir. 1999) (acknowledging the long-recognized theory that *Illinois Brick* is inapplicable to vertical conspiracies with no allegations of pass-on); Arizona v. Shamrock Foods Co., 729 F.2d 1208 (9th Cir. 1984) (stating that a number of courts have found *Illinois*

*Brick* inapplicable where plaintiff alleges a price-fixing conspiracy existed between the manufacturer and/or seller and direct purchasers).

88. *See* Howard Hess Dental Laboratories Inc. v. Dentsply Int'l., Inc., 602 F.3d 237, 259 (3d Cir. 2010) (class of indirect purchasers failed to satisfy requirements of "vertical conspiracy" exception to *IllinoisB rick* by naming a manufacturer's dealers as participants along with the manufacturer in an alleged conspiracy to monopolize a market for artificial teeth, where the only conduct allegedly undertaken by the dealers was their acquiescence in exclusive dealing and vertical price fixing restraints imposed upon them by the manufacturer). The Third Circuit further explained that "the plaintiffs could come within *Illinois Brick's* coconspirator exception only if the dealers were precluded from asserting claims against Dentsply because their participation in the conspiracy was 'truly complete.'"

89. *See* Paper Sys. v. Nippon Paper Indus. Co., 281 F.3d 629, 631-32 (7th Cir. 2002) (opining that when plaintiffs are "first purchasers from outside the conspiracy" they may be entitled to collect damages if the conspiracy and overcharges can be established).

90. *Id.* at 631-32; *see also* Kendall v. Visa U.S.A., Inc., 518 F.3d 1042 (9th Cir. 2008) (holding that plaintiffs failed to plead evidentiary facts to support allegations of control or coconspiracy); Insulate SB, Inc. v. Advanced Finishing Sys., Inc., 797 F.3d 538, 542 (8th Cir. 2015) (holding alleged co-conspirator dealers must be joined before the conspiracy exception can be applied); *In re* ATM Fee Antitrust Litig., 686 F.3d 741, 755 (9th Cir. 2012) (declining to apply coconspiracy exception because the alleged conspiracy did not involve fixing the price paid by plaintiff); *Inr e* Brand Name Prescription Drugs, 123 F.3d at 604 (finding that "any indirect-purchaser defense would go by the board since [plaintiffs] would then be direct purchasers from the conspirators," not the intermediaries allegedly involved in the conspiracy); Jewish Hosp. Ass'n v. Stewart Mech. Enters., 628 F.2d 971, 977 (6th Cir. 1980) (declining to apply coconspiracy exception because plaintiffs failed to prove vertical conspiracy allegations).

91. *See* Howard Hess Dental Labs. v. Dentsply Int'l, 424 F.3d 363 (3d Cir. 2005) (rejecting the coconspirator exception with respect to exclusive dealing claims because plaintiffs failed to join dealers as codefendants, but upholding the resale price maintenance claims given that plaintiffs

named substantially all of the dealer-participants as coconspirator defendants); Campos v. Ticketmaster Corp., 140 F.3d 1166, 1171 n.4 (8th Cir. 1998) (refusing to avoid the *IllinoisB rick* rule through the use of this exception unless the direct purchaser is joined as a defendant); *In re* Midwest Milk Monopolization Litig., 730 F.2d 528, 529 (8th Cir. 1984) (stating that if any coconspiracy exception existed, it cannot apply where the middlemen are not named as defendants); *Shamrock Foods Co.*, 729 F.2d at 1212-14 ("Even if the plaintiffs were claiming a two-tier conspiracy, we would hold that *Illinois Brick* is no bar to the suit.").

92. 686 F.3d 741 (9th Cir. 2012).

93. *Id.* at 752.

94. *Id.* at 754.

95. *See* Associated Gen. Contractors v. Cal. State Council of Carpenters (*AGC*), 459 U.S. 519, 540-45 (1983); Illinois Brick Co. v. Illinois, 431 U.S. 720, 745 (1977) (citing language in *Hanover Shoe* that it was impractical to apportion damages between direct and more remote purchasers).

96. *See Illinois Brick*, 431 U.S. at 745; s*ee also* Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006) ("[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [the] lost sales were the product of [defendant's] decreased prices."); Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 319 (4th Cir. 2007) (finding the *AGC* factors weighed in favor of antitrust standing, noting there was "little risk that any damages [plaintiff] might prove would need to be allocated or apportioned among any more-directly injured parties" because the allegedly anticompetitive conduct was specifically targeted at the plaintiff).

97. *Illinois Brick*, 431 U.S. at 732; *see also* Kloth v. Microsoft Corp., 444 F.3d 312, 323-24 (4th Cir. 2006) (applying *AGC* factors to find that plaintiffs' injuries were too generalized or speculative, the claims raised problems in measuring and allocating damages, and there were more direct victims in OEMs and retailers); Andrx Pharms. v. Biovail Corp. Int'l, 256 F.3d 799, 806 (D.C. Cir. 2001) (holding that *Illinois Brick*'s rationale that duplicative recovery diminishes the incentives for plaintiffs to bring treble damages actions did not apply where the manufacturer's injury did not overlap with consumers' injuries);

Sunbeam Television Corp. v. Nielsen Media Research, Inc., 711 F.3d 1264, 1272 (11th Cir. 2013) (holding plaintiff, which owned a local television broadcast station, did not have antitrust standing to challenge alleged antitrust violations by television ratings provider because it would not be an efficient enforcer under *AGC*).

98.  *See* Texas Carpenters Health Benefit Fund v. Philip Morris, Inc., 199 F.3d 788 (5th Cir. 2000) (finding fund lacked standing to recover increased expenditures for treating tobacco-related illnesses); Lyons v. Philip Morris, Inc., 225 F.3d 909 (8th Cir. 2000) (denying antitrust and RICO standing to a trust fund's ERISA plans that sought to recover for smoking-related illnesses); United Food & Commercial Workers v. Philip Morris, Inc., 223 F.3d 1271 (11th Cir. 2000) (same); Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc., 185 F.3d 957, 965 (9th Cir. 1999) (finding the damages alleged by union health and welfare trust funds were not proximately caused by the unlawful conduct, but were derivative of smokers' personal injuries and also entirely speculative in nature); International Bhd. of Teamsters v. Philip Morris, Inc., 196 F.3d 818 (7th Cir. 1999) (same); Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912 (3d Cir. 1999) (same); Laborers Local 17 v. Philip Morris, Inc., 191 F.3d 229 (2d Cir. 1999) (same); Rhode Island Laborers' Health & Welfare Fund v. Philip Morris, Inc., 99 F. Supp. 2d 174 (D.R.I. 2000) (denying standing to a labor union health fund that alleged injury in treating plan participants).

99.  Association of Wash. Public Hosp. Dists. v. Philip Morris, 241 F.3d 696, 705 (9th Cir. 2001) (holding that plaintiff hospitals asserting a conspiracy to suppress information about the health consequences of cigarettes failed to establish standing).

100.  *Id* .; *see also* Hughes v. Tobacco Inst., 278 F.3d 417 (5th Cir. 2002) (denying antitrust standing to a hospital).

101.  *See AGC*, 459 U.S. at 543-44 (holding plaintiff unions lacked standing as their injuries were derivative of any harm that may have been suffered by individuals); *seeal so* Andrx Pharms., 256 F.3d at 817 ("We are more likely to find no standing if the plaintiff's injury both derives from and is measured by another's more direct injury."); Sanger Ins. Agency v. HUB Int'l, Ltd., 802 F.3d 732, 737 (5th Cir. 2015) (including as a necessary element to establish standing "proper plaintiff status,

which assures that other parties are not better situated to bring suit"); Loeb Indus., Inc. v. Sumitomo Corp., 306 F.3d 469, 484 (7th Cir. 2002) (analyzing which purchasers in the "exceedingly complex" copper distribution chain were best situated to bring antitrust claims). *But cf.* Blue Shield of Virginia v. McCready, 457 U.S. 465, 475 (1982) (finding plaintiff-consumer was the most direct victim of defendants' anticompetitive acts).

102. *See* Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 317-318 (4th Cir. 2007) (citing *AGC*, 459 U.S. at 542); Fisher v. Aurora Health Care, Inc., 558 F. App'x 653, 655 (7th Cir. 2014) (same); *see also* Gatt Commc'n, Inc., v. PMC Associates, LLC, 711 F.3d 68, 79 (2d Cir. 2013) (holding a former participant in an alleged bid rigging scheme lacked antitrust standing because, *inter alia*, "other potential plaintiffs are in a better position to vindicate the public interest at issue"); NicSand, Inc. v. 3M Co., 507 F.3d 442, 457 (6th Cir. 2007) (applying this principle to find plaintiff had no antitrust standing where plaintiff "took advantage of the very same exclusivity it now attacks to charge prices that made it vulnerable to [defendant]'s offers [to retailers] in the first place.").

103. *See* Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1145-46 (9th Cir. 2003) (holding that "indirect purchasers can sue for damages if there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation"); *In re* ATM Fee Antitrust Litig., 686 F.3d 741, 756 (9th Cir. 2012) (affirming district court's holding that indirectly harmed plaintiff lacked standing where "there was a realistic possibility of suit by … direct purchasers"); Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 318 (4th Cir. 2007) (finding plaintiff had antitrust standing because there were no more directly harmed purchasers).

104. Class action procedures are beyond the scope of this handbook, but for additional references, see "Class Action Assertion of Indirect Purchaser Claims," ABA Section of Antitrust Law, Indirect Purchaser Litigation Handbook (2d ed, 2016); *see also* ABA Section of Antitrust Law, Antitrust Class Actions Handbook 1 (2010) ("The antitrust class action is a primary mechanism through which private actors seek to enforce the antitrust laws.").

105. 133 S. Ct. 1426 (2013).

106. *Id.* at 1433.

107. *Id.*

108. For an overview of the post-*Comcast* antitrust actions dealing with class certification issues, see *In re* Photochromic Lens Antitrust Litigation, No. 2173, 2014 WL 1338605 (M.D. Fla. 2014) (denying motion for class certification because the direct purchasers could not establish antitrust impact with generalized proof common to the class and had not produced a workable methodology utilizing common proof to calculate damages); *In re* Electronic Books Antitrust Litigation, No. 11 MD 2293 (DLC), 2014 WL 1282293 (S.D.N.Y. 2014) (granting plaintiff's motion for class certification because virtually all class members paid inflated prices for e-books as a result of a centralized price-fixing conspiracy and plaintiffs have proffered a sophisticated damages model to reliably determine damages); *In re* Skelaxin (Metaxalone) Antitrust Litigation, 2014 WL 340903 (E.D. Tenn. 2014) (denying class certification motion based on, among other grounds, inconsistency between damages model and class definition); *In re* Nexium (Esomeprazole) Antitrust Litigation, No. 12-md-02409-WGY, 2013 WL 6019287, at *12 (D. Mass. 2013) (granting motion by end-payor plaintiffs in class comprised of individual consumers, third-party payors, union plan sponsors, and insurance companies that purchased or provided reimbursements for Nexium for class certification and narrowly interpreting the holding of *Comcast* to require that a putative class must "demonstrate a linkage between its theory of liability with its theory of damages"); *In re* High-Tech Employee Antitrust Litigation, No. 11-CV-02509-LHK, 2013 WL 5770992 (N.D. Cal. 2013) (granting motion to certify a class of former employees suing their former employers for allegedly conspiring to suppress employee compensation to artificially low levels by agreeing not to solicit each other's employees because common evidence and a regression approach could be used to create a model for quantifying the estimated cost to the class members); *In re* Cathode Ray Tube (CRT) Antitrust Litigation, No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. 2013) (noting that *Comcast* does not require the plaintiffs to prove that every element of the claim is subject to classwide proof); *In re* Urethane Antitrust Litigation, No. 1616, 2013 WL 2097346 (D. Kan. 2013) (denying motion to decertify class after jury trial in class action alleging that defendant conspired with other manufacturers to fix prices for certain urethane chemical

products even though, under the model that calculated damages, a few class members did not suffer damages).

109. 2014 WL 1302658, at *6 (11th Cir. 2014).

110. *Id.* at *6.

111. 725 F.3d 244 (2013).

112. *Id.* at 253.

113. *Id.* at 253-54.

114. *Id.* at 253.

# CHAPTER 3

# STATUTE OF LIMITATIONS

Section 4B of the Clayton Act states that private causes of action under the antitrust laws are "forever barred unless commenced within four years after the cause of action accrued."[1] The limitations period serves to put old liabilities to rest and to relieve courts and parties from claims that rest on stale evidence.[2] The limitations period may also set important limits on the conduct for which damages may be awarded.

Prior to the enactment of Section 4B in 1955, courts looked to state statutes, which had varied limitations periods from one to twenty years, to determine limitations on actions brought under the Clayton Act. This practice resulted in uncertainty and forum shopping, which Congress sought to eliminate:

> The long duration of [antitrust] proceedings taken in conjunction with a lengthy statute of limitations may tend to prolong stale claims, unduly impair efficient business operations, and overburden the calendars of the courts . . . . [The Committee] does not believe that undue prolongation of proceedings is conducive to effective and efficient enforcement of the antitrust laws.[3]

Notwithstanding the four-year statutory limitation, several exceptions may extend the time for filing suit. These exceptions fall into two general categories: (1) circumstances that delay or renew the "accrual" of a cause of action and hence the running of the statute; and (2) circumstances that toll the running of the limitations period. The four-year limitation period and its exceptions each have implications for the calculation of damages in civil antitrust actions. They may affect the period of time for which damages may be assessed, the amount of damages that may be assessed, or both.

# A. Accrual of an Antitrust Cause of Action

The Section 4B limitations period generally begins to run on the date that the plaintiff first suffers an injury to its business or property from an alleged violation of the antitrust laws.[4] In some cases, a plaintiff may not discover an injury until a substantial amount of time has elapsed from the defendants' conduct. In such cases, the discovery rule postpones the beginning of the limitations period from the date of the injury until the plaintiff discovers the injury and who has caused it.[5]

There are two other key exceptions to the rule that the statute of limitations begins to run from the date of injury: (1) if determination of damages would be speculative at the time of injury; and (2) if the underlying antitrust violation involves continuing violations that renew the running of the statute of limitations.

## 1. Speculative Damages

An injury will not necessarily start the running of the statute of limitations if it is not possible for the plaintiff to ascertain the extent of the injury at the time of the injury. In *Zenith Radio Corp. v. Hazeltine Research*,[6] the Supreme Court established an exception to the "date of injury" rule in cases where the plaintiff's future damages would be too uncertain to support a cause of action. The Court explained:

> In antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter, the plaintiff may sue to recover them at any time within four years from the date they were inflicted.[7]

In *Zenith*, this exception was applied in an unusual procedural setting. Zenith filed an antitrust counterclaim against Hazeltine in 1963 based on a long-term unlawful patent-pooling conspiracy that operated prior to 1959. Zenith sought damages only for the 1959 to 1963 limitations period and

calculated its damages based on the market share it would have garnered absent the conspiracy, even though it was clear that some of the damage was caused by conspiratorial action that occurred prior to 1959. This method was proper, however, only if Zenith could establish that it was entitled to recover *all* damages that resulted from the unlawful conspiracy, regardless of when the associated unlawful acts occurred.

Zenith's damage claim raised two separate statute of limitations issues. The first issue concerned the tolling of the limitations period for acts after November 24, 1954, due to a related government antitrust action.[8] The second issue concerned damages resulting from pre-1954 conduct and led the Court to create the "speculative damages" exception to the date of injury rule. Specifically, in holding that Zenith could recover damages accrued between 1959 and 1963 due to conduct that occurred prior to 1954, the Court reasoned that it would have been impossible for Zenith to prove such damages (i.e., damages that would accrue five to ten years later) in 1954 and, therefore, its later suit was timely filed.[9]

In creating the "speculative damage" exception, the Court reasoned that it would have been unlikely "that Zenith could have convinced a District Court sitting in 1954 that, although it contemplated a free market from that time forward, it would still be suffering from provable injury more than five years later."[10] Therefore, it was proper to recover damages for conduct occurring prior to 1954, because estimates of Zenith's volume of business could be ascertained, at the time of the complaint, for a past period of time.[11] On the other hand, it would be difficult to predict "market conditions and the performance of one competitor in that market five to 10 years hence."[12] One might respond that courts are frequently called upon to evaluate prospective damages in the face of uncertainty.[13] Moreover, in allowing Zenith to recover such damages ten years later, the Court did not discuss the possibility that if Zenith had filed suit in 1954, damages accrued from 1959 to 1964 that resulted from pre-1954 conduct could have been reduced or avoided altogether. In view of analytical difficulties raised by the speculative damages exception, courts have construed it narrowly.[14] In *Brunswick Corp. v. R eigelT extileC orp.*,[15] for example, the court explained:

> [U]nless special circumstances preclude, as excessively speculative, an award of damages based on predicted as distinct

from realized losses due to the defendant's misconduct, the statute of limitations is not tolled simply in order to wait and see just how well the defendant does in the market from which he excluded the plaintiff. Otherwise it would be tolled indefinitely in a very large class of antitrust suits.[16]

## 2. Continuing Violations

In cases involving a continuing antitrust violation—that is, a violation that continues over a period of time and manifests itself in a series of overt acts—the statute of limitations runs not from the date damages initially are suffered, but from the date of the last overt act that injured the plaintiff.[17]

Although the lower courts have uniformly recognized that a continuing violation may renew the running of the statute of limitations, they have implemented this concept in a variety of ways and have not followed consistent principles. In addressing the type of conduct that will renew the limitations period, for example, several cases in the 1970s held that a plaintiff's cause of action continues to accrue so long as the defendant continues to receive the benefits of an allegedly unlawful agreement.[18] More recently, however, courts seem to have retreated from this view.[19]

In *Pace Industries v. Three Phoenix Co.*,[20] the Ninth Circuit summarized the state of the law as follows: "[The] cases establish that two elements characterize an overt act which will restart the statute of limitations: (1) it must be a new independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff."[21] The Ninth Circuit's summary of the law, however, leaves many questions unanswered, particularly, how to distinguish between a "new independent act" that renews the running of the limitation period and a mere "reaffirmation" of prior conduct. In the absence of a satisfactory test for determining the accrual date for a continuing cause of action, the courts tend to rely on prior decisions respecting the type of conduct in question.

Although accurate generalizations are impossible, the following results appear likely in most circuits:

- Receipt of payments from an allegedly anticompetitive agreement, standing alone, will not renew the running of the statute of limitations.[22]

- Filing suit to enforce an allegedly anticompetitive agreement (or to harm competition through enforcement of an invalid patent) will renew the running of the statute. Ordinary actions thereafter to prosecute the litigation, however, are not new overt acts.[23]

- Continuation of a refusal to deal that began prior to the limitations period generally will renew the running of the statute unless refusals prior to the limitations period were final and irrevocable.[24]

- Continuing to participate in a conspiracy after bankruptcy proceedings is not a new overt act giving rise to a new antitrust claim.[25]

- Contractual performance during the limitations period pursuant to an illegal contract may constitute an overt act if the resulting damages were speculative when the challenged contract was executed.[26]

- Pursuant to a related doctrine called the "new use" exception, if assets acquired via a merger are used in a different manner from the way that they were used when the initial acquisition occurred—and that new use injures a plaintiff—then the statute of limitations runs from the time that the new injury occurs.[27]

# B. Tolling of the Limitations Period

As in other areas of the law, several circumstances arising from equitable principles or statutory requirements may toll the running of the statute. The most common grounds for tolling the limitations period in antitrust cases are fraudulent concealment of the cause of action by the defendant and the pendency of related government suits. Although less frequent, the limitations period may also be tolled by virtue of pending administrative proceedings or class action certification.

To the extent that the limitations period is tolled by more than one set of circumstances, the various extensions of the limitations period may be tacked together. For example, the tolling period for fraudulent concealment may be tacked to the tolling period for the pendency of a government suit,[28] or tolling periods for criminal and civil suits instituted by the government may be tacked to each other.[29]

# 1. Fraudulent Concealment

Fraudulent concealment by the defendant may toll the statute of limitations in antitrust actions.[30] To do so, a plaintiff must prove three elements: (1) the defendant concealed the conduct that constitutes the plaintiff's cause of action; (2) the defendant's concealment prevented the plaintiff from discovering the cause of action during the limitations period; and (3) the failure to discover the cause of action was not due to the plaintiff's lack of diligence.[31] If the requirements of fraudulent concealment are met, the statute of limitations begins to run from the date on which the plaintiff discovered (or with reasonable diligence could have discovered) the illegal acts.[32]

The first of the three elements has caused the most controversy.[33] A plaintiff must prove that the defendant affirmatively acted to conceal the unlawful conduct.[34] Most federal courts have held that mere silence, nondisclosure, or denials of fraudulent conduct are insufficient to constitute fraudulent concealment, unless the defendant had a duty to speak.[35] Although courts have agreed on the need for proof of an affirmative act of concealment, they have adopted different standards in evaluating such proof.[36] The Tenth Circuit, for example, requires proof of affirmative acts of concealment that are separate from the acts underlying the claim. Under this standard, such actions as submitting false affidavits of noncollusion by bid riggers have been held insufficient.[37] In contrast, the Second Circuit has adopted the most lenient standard of proof, holding that an act committed in furtherance of a "self-concealing conspiracy" may be relied on to satisfy the first element of the doctrine of fraudulent concealment.[38] A self-concealing conspiracy is one in which "deception is an essential element for some purpose other than merely to cover up the act."[39] For example:

> To steal an antique vase is not a self-concealing wrong; the true owner knows the vase is stolen even if the owner does not know the identity of the thief. On the other hand, to sell a fake vase as if it were an antique is not only fraud, it is a self-concealing wrong. Deception is an essential element of the wrong, and one that is not intended merely to cover up the wrong itself. By contrast, to steal a vase and to replace it with a worthless replica is not self-concealing. The wrong is theft of the vase; the replacement is an

act separate from the wrong itself and aimed only at concealing the fact that the real vase has been stolen.[40]

There are two basic requirements to toll the statute of limitations on the basis of a self-concealing conspiracy: (1) the alleged violation must be inherently unknowable; and (2) the plaintiff must have exercised reasonable diligence to discover the violation under the circumstances, even if the fraud is self-concealing.[41] The different standards for proving fraudulent concealment have led to diverse approaches to applying the statute of limitations to price-fixing conspiracies. Courts in the Second Circuit, which views price fixing as a self-concealing conspiracy, have held that a plaintiff does not need to show statements by defendants denying price fixing or unrealistic price quotations to meet their burden of proving fraudulent concealment. According to that court, because bid-rigging schemes necessarily require concealment, proof of a conspiracy proves fraudulent concealment; discovery of the scheme defeats the enterprise.[42] Other courts, however, have held that fraudulent concealment is not inherent in all price-fixing or bid-rigging conspiracies and that the plaintiff must prove affirmative acts of concealment.[43]

In jurisdictions that allow plaintiffs to rely on acts of concealment occurring during the conspiracy, plaintiffs can rely on statements by the defendant denying unlawful conduct to prove fraudulent concealment; every act of concealment furthers the conspiracy by forestalling its detection.[44] With respect to bid rigging, each time a future bid is rigged, the conduct amounts to an affirmative act of concealment.[45] Plaintiffs, however, also face the delicate task of proving the existence of the price-fixing conspiracy without undermining their assertion that the conspiracy was concealed.[46] Jurisdictions requiring proof of concealment by acts separate from the underlying conspiracy may have essentially eliminated the possibility of fraudulent concealment tolling, because most acts of concealment involve the conspiracy.[47]

## 2. Government Suits

Section 5(i) of the Clayton Act suspends the statute of limitations for a private action during a civil or criminal proceeding instituted by the United

States to enforce any of the antitrust laws, and for one year after the conclusion of the government action, if the private action is based in whole or in part on any matter complained of in the government action.[48] The language in Section 5(i) raises three questions: (1) the definition of a "proceeding instituted by the United States"; (2) the extent to which the subject matter of the government suit and the private action must be related; and (3) the meaning of "pendency," or more precisely, the date on which a government proceeding will be deemed to have concluded.

On the first issue, federal courts generally have interpreted "proceeding instituted by the United States" to encompass more than suits initiated by the Justice Department. In *Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co.*,[49] the Court held that the tolling provisions under Section 5(i) should apply to a suit by the Federal Trade Commission.[50] Since that decision, numerous federal courts have tolled the statute of limitations during FTC suits.[51]

As to the degree of similarity between the government suit and the private action, Section 5(i) also requires that the private action be "based in whole or in part on any matter complained of" in the government suit.[52] Courts generally compare the two complaints to determine whether they satisfy this requirement.[53] The Supreme Court has held that the claims do not have to be identical, only substantially similar.[54]

Finally, the statute of limitations is tolled during and for one year after the pendency of the government proceeding. Pendency of the government proceeding ceases when final judgment is entered following appeal or when the appeal period expires.[55]

## 3. Equitable Tolling

The four-year limitations period also may be tolled by equitable considerations.[56] Plaintiffs often argue for equitable tolling when they have previously instituted state antitrust actions or actions before administrative agencies, or when they are members of an alleged class in a class action. Courts have uniformly rejected equitable tolling based on state antitrust actions[57] and only rarely applied the doctrine to administrative actions.[58]

However, courts have generally permitted equitable tolling during class actions for all members of the asserted class until certification is denied.[59]

# C. Damage Calculations

The statute of limitations raises two issues that affect the calculation of damages in antitrust actions: (1) to what extent does the statute limit the period for which damages may be recovered; and (2) to what extent does it limit the recovery of damages accrued during the limitation period that resulted from conduct before that time? Although these questions may dramatically affect damage recoveries, courts have not fully resolved them.

## *1. Period of Recovery*

The general rule appears to be that damages must be limited to damages accrued during the limitations period.[60] In cases in which the statute of limitations has been tolled, plaintiffs are permitted to recover damages for the entire tolling period, however long it extends the limitations period.[61] Although the courts have not explained this rule, it is consistent with the reasons for tolling the statute. For example, to limit recovery in instances of fraudulent concealment would preclude recovery for certain types of violations. In cases tolled by virtue of a pending government action, the governmental action itself assures both notice to the defendant and a preservation of evidence relevant to alleged conduct.

The courts have not, however, treated continuing antitrust violations as circumstances that toll the limitations period, nor have they permitted recovery of damages inflicted prior to the four-year statutory period. In *Imperial Point Colonnades Condominium, Inc. v. Mangurian*,[62] the Fifth Circuit explained:

> The court below thought that a holding for plaintiffs here "would not encourage the vigorous enforcement of the antitrust laws through private actions" because "any plaintiff could sit on his rights, allowing damages to accumulate . . . ." As even defendants concede, this fear is without foundation; for we adhere to the rule that plaintiffs may sue only for damages that result from acts

committed by the defendants within the four years preceding commencement of suit. . . . Under our holding, it still would have been to plaintiffs' advantage to have sued at the earliest possible moment. The fact that they did not, however, does not bar this suit.[63]

The decision to limit damages, moreover, is consistent with the Supreme Court's holding in *Zenith* that "a cause of action accrues" each time the defendant commits an overt act in furtherance of a continuing violation;[64] the Court did not hold that a continuing violation tolls the limitation period for the duration of the violation.[65]

## 2. Conduct Prior to the Limitations Period

The statute of limitations can also affect the extent to which a plaintiff may recover damages suffered during the limitation period. Specifically, questions have been raised regarding a plaintiff's right to recover damages that accrued during the limitation period, but that proximately resulted from conduct prior to that time. This question is likely to arise only in cases involving either the speculative damages exception or continuing violations. In the former case, a plaintiff can recover for all of its injury resulting from the defendant's anticompetitive acts, regardless of when they occurred.[66] In the latter case, no clear rule has emerged.[67]

As discussed above, in *Zenith*, the Supreme Court held that, in a case involving the speculative damages exception to the statute of limitations, the plaintiff could recover for all damages incurred during the limitation period, even if some of that damage proximately resulted from conduct prior to the limitation period. The Court explained that a plaintiff might otherwise be deprived of any opportunity to recover for certain anticompetitive harms.[68]

No clear rule has emerged with respect to the recovery of such damages in cases involving continuing antitrust violations. The only court to address this question has emphasized that practical questions of proof counsel against efforts to segregate damages resulting from pre-limitation period acts. In *In re Lower Lake Erie Iron Ore Antitrust Litigation*,[69] the district court explained:

Despite defendant's urging, I believe that neither *Zenith* nor its progeny announced a hard-and-fast rule that each item of damages must be traced to a specific overt act within the limitations period, especially where, as here, plaintiffs' injuries are due to the operation of a continuing conspiracy with continuing effects . . . . It cannot fairly be said that plaintiffs' damages resulted solely from pre-limitations period acts; furthermore, it would be extremely difficult, if not impossible, to determine which particular act caused which discrete amount of damage.[70]

Despite this reasoning, the court did not conclusively resolve this issue. Instead, it held that the speculative damages rule and tolling by virtue of fraudulent concealment implied that all damages were recoverable in any event.[71]

———————————

[1]. 15 U.S.C. § 15b; *see, e.g.*, Midwestern Mach. Co. v. Nw. Airlines, 392 F.3d 265, 271 (8th Cir. 2004) (challenge to airline merger under § 7 of Clayton Act was barred by statute of limitations, even though surviving airline did not begin using assets of acquired airline in an anticompetitive manner until within four years of plaintiff's lawsuit, because "it was clear at the time of the merger here that the combination of [the two airlines] could lessen competition"); *see also* Toledo Mack Sales & Serv. v. Mack Trucks, 530 F.3d 204, 218 (3d Cir. 2008) (stating that plaintiff's burden was to "present evidence sufficient to allow a rational jury to conclude that [defendant] and its dealers committed during the [four-year] limitations period overt acts in furtherance of an illegal conspiracy or conspiracies, even if the conspiracies began before the limitations period"); Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 307 (4th Cir. 2007) (dismissing monopolization claims asserted as time barred); Hamilton County Bd. of Comm'rs v. NFL, 491 F.3d 310, 315 (6th Cir. 2007) (stating that "antitrust claimants have four years from the date an action accrues to bring a lawsuit"); Kristian v. Comcast Corp., 446 F.3d 25, 43 (1st Cir. 2006) (holding that the four-year statute of limitations period which was in direct conflict with a clause in the arbitration agreements at issue did not present questions of arbitrability); *In re* Copper Antitrust Litig., 436 F.3d 782, 793 (7th Cir. 2006) (affirming the district court's granting of

summary judgment in favor of defendants because plaintiffs filed the claims too late); Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1090 (10th Cir. 2006) (holding that, although plaintiff filed suit well outside the four-year limitations period, claims were not time barred because the continuing conspiracy exception applied to defendant's decision to boycott plaintiff's business); Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 435 (2d Cir. 2005) (stating that a "compelling reason for transfer is generally acknowledged when a plaintiff's case, if dismissed, would be time-barred on refiling in the proper forum") (internal quotations omitted); Varner v. Peterson Farms, 371 F.3d 1011, 1019 (8th Cir. 2004) (stating that the four-year limitations period "commences on the date the cause of action accrues, that being, the date on which the wrongdoer commits an act that injures the business of another"); McCurdy v. Lassa, No. 98-15595, 1999 U.S. App. LEXIS 9122, at *7 (9th Cir. 1999) (holding that plaintiffs did not satisfy the four-year statute of limitations because they failed to prove that defendants' witness testified at a previous trial, in furtherance of the separate conspiracy forged between himself and defendants); Texas Grain Storage v. Monsanto Co., No. SA-07-ca-673-OG, 2008 U.S. Dist. LEXIS 53513, at *14 (W.D. Tex. 2008) (order granting in part and denying in part motion to dismiss); Geron v. Odfjell ASA (In re Parcel Tanker Shipping Servs. Antitrust Litig.), No. 04-cv-1687 (AVC), 2007 U.S. Dist. LEXIS 33687, at *16 (D. Conn. 2007) (order denying in part and granting in part motion to dismiss); In re Rubber Chems. Antitrust Litig., 504 F. Supp. 2d 777, 787 (N.D. Cal. 2007) (stating that if no tolling doctrine applies, plaintiffs' claims for injuries are limited to injuries suffered as a result of overt acts that took place within the four-year limitations period); Inr e Carbon Black Antitrust Litig., No. 03-cv-10191, 2005 U.S. Dist. LEXIS 660, at *19 (D. Mass. 2005) (order denying motion to dismiss); United Food Mart v. Motiva Enters., 457 F. Supp. 2d 1329, 1339 (S.D. Fla. 2005) (holding that defendant's establishment of a zone area pricing system did not constitute one overt act and instead each sale started a new statutory limitations period); In re Vitamins Antitrust Litig., No. 99-197 (TFH), 2002 U.S. Dist. LEXIS 25795, at *20 (D.D.C. 2002) (order granting motion to compel).

2. Of note, a five-year statute of limitations generally will apply to criminal prosecutions. 18 U.S.C. § 3282.

[3](#). *See* S. Rep. No. 619, 84th Cong., 1st Sess. (1955), *reprinted in* 1955 U.S.C.C.A.N. 2328, 2331-32.

[4](#). *See,e .g.*, Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321, 338-39 (1971); World Wrestling Entm't, Inc. v. Jakks Pac., Inc., 328 Fed. Appx. 695, 698 (2d Cir. 2009) (citing *Zenith Radio Corp* .); W. Penn Allegheny Health Sys. v. UPMC, 627 F.3d 85, 105-06 (3d Cir. 2010) (quoting *Zenith Radio Corp* .); Morton's Mkt. v. Gustafson's Dairy, 198 F.3d 823, 827 (11th Cir. 1999), *amended,* 211 F.3d 1224 (11th Cir. 2000); Berkey Photo v. Eastman Kodak Co., 603 F.2d 263, 295-96 (2d Cir. 1979); Continental-Wirt Elecs. Corp. v. Lancaster Glass Corp., 459 F.2d 768, 770 (3d Cir. 1972); *In re* Nexium (Esomeprazole) Antitrust Litig., 984 F. Supp. 2d 6, 8 (D. Mass. 2013) (quoting *Berkey Photo*); Rite Aid Corp. v. Am Express Travel Related Servs. Co., 708 F. Supp. 2d 257, 264 (E.D.N.Y. 2010) (citing *Berkey Photo*); *see also Toledo Mack Sales & Serv.*, 530 F.3d at 217 (stating that although "generally, a cause of action under § 1 accrues and the statute of limitations begins to run when a defendant commits an act that injures the plaintiff's business . . . a conspiracy's refusal to deal, which began outside the limitations period, may be viewed as a continuing series of acts upon which successive causes of action may accrue.") (internal quotations omitted); *Novell,I nc.*, 505 F.3d at 321 (holding that claims which did not overlap with the subject matter of the DOJ complaint were not tolled); *Hamilton County Bd. of Comm'rs*, 491 F.3d at 315 (holding that the alleged antitrust claims accrued in May 1997 when the parties signed the stadium lease which was the source of the injury and when the injury occurred); *Inr eC opperA ntitrustL itig.*, 436 F.3d at 789 ("Generally an antitrust cause of action accrues and continues to run when a defendant commits an act that injures Plaintiff's business."); *Champagne Metals*, 458 F.3d at 1088 (holding that, although a boycott of plaintiff's business began outside the statute of limitations period, plaintiff's claims were not time barred because the continuing conspiracy exception); *In re Carbon Black Antitrust Litig.*, 2005 U.S. Dist. LEXIS 660, at *20 (holding that plaintiffs' claim for alleged conspiracy which fell outside of the statutes of limitations period was not time barred because the claim involved an ongoing price-fixing conspiracy); *Am. Bd. of Emergency Med.*, 428 F.3d at 436 (considering whether the four year statute of limitations barred refiling of complaint if case was

transferred); *Varner*, 371 F.3d at 1019 (stating that, "the period commences on the date the cause of action accrues, that being, the date on which the wrongdoer commits an act that injures the business of another" unless an exception applied that would "permit a party to file a complaint more than four years after the events that give rise to the cause of action"); International Norcent Tech. v. Koninklijke Philips Elecs. N.V., No. 07-cv-00043-MMM (SSx), 2007 U.S. Dist. LEXIS 89946, at *66 (C.D. Cal. 2007) (holding that "because the complaint alleges that overt acts have continued through the present, the complaint pleads ongoing injury"); *United Food Mart*, 457 F. Supp. 2d at 1339 (because defendant periodically adjusted its pricing over the life of the parties commercial relationship each sale stated a new statutory limitations period); Molecular Diagnostics Labs. v. Hoffmann-La Roche, Inc., 402 F. Supp. 2d 276, 286 (D.D.C. 2005) (stating "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act . . . As to those damages, the statute of limitations runs from the commission of the act.").

5. *See, e.g.*, *In re Copper Antitrust Litig.*, 436 F.3d at 789 (applying "discovery" rule from *Zenith Radio Corp.* and holding that newspaper articles discussing loans by J.P. Morgan to foreign metals traders accused of fixing prices—without suggesting that the loans were illegal or fraudulent—did not put plaintiffs on notice that Morgan might be involved in the conspiracy); Barry Aviation v. Land O'Lakes Mun. Airport Comm'n, 377 F.3d 682, 688 (7th Cir. 2004) ("the accrual date is not determined when the injury occurs but when it is discovered or should have been discovered"); Cada v. Baxter Healthcare Corp., 920 F.2d 446, 450 (7th Cir. 1990); Amey, Inc. v. Gulf Abstract & Title, 758 F.2d 1486, 1500-01 (11th Cir. 1985) (holding that real estate purchaser's antitrust action based on allegedly inflated fees for a title search did not accrue until the purchaser became obligated to pay the fees in question, rather than when defendant issued the preliminary title opinions); Pioneer Co. v. Talon, Inc., 462 F.2d 1106, 1108-09 (8th Cir. 1972) (holding that injury from refusal to deal accrued at the time of refusal, rather than at the time of alleged conspiracy and notice of prospective refusal); S.E.C. v. Wyly, 788 F. Supp. 2d 92, 102-03 (S.D.N.Y. 2011) (holding that the claim did not accrue at the time of

defendants' filings with the SEC, because those filings effected concealment of the fraudulent activity so as not to put the Commission on inquiry notice, and in addition, that the SEC satisfied its requirement of due diligence by making specific inquiries to the defendants regarding the subject trusts); National Black Expo v. Clear Channel Broad., No. 03-c-2751, 2007 U.S. Dist. LEXIS 9783, at *12 (N.D. Ill. 2007) (discovery rule allows plaintiff to avoid the bar of the statute of limitations "if despite all due diligence she is unable to obtain vital information bearing on the existence of her claim").

6. 401 U.S. 321 (1971).

7. *Id.* at 339; *see also* Citibank v. Allied Mgmt. Group, No. 06-cv-1193 (CAG), 2006 U.S. Dist. LEXIS 84872, at *2 (D.P.R. 2006) (order denying motion for reconsideration) (holding that a cause of action for future damages accrues only on the date they are suffered); Midwestern Mach. Co. v. Nw. Airlines, 392 F.3d 265, 276 (8th Cir. 2004) (refusing to extend the statute of limitations where "[t]he total extent of the alleged damages, including future damages, was unknown at that time, but damages that could be claimed existed."); Mathews v. Kidder, Peabody & Co., 260 F.3d 239, 246 (3d Cir. 2001) (finding that appellants' damages could have been calculated at the time of their injury); Love v. Nat'l Med. Enters., 230 F.3d 765, 774 (5th Cir. 2000) (stating that "damages for future injuries for which no separate claim has yet accrued are recoverable, unless the fact of their accrual is speculative or their amount and nature unprovable.") (internal quotations omitted); Fisher v. Apostolou, 155 F.3d 876, 881 (7th Cir. 1998) ("it is hornbook law . . . that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable.") (internal quotations omitted); Meijer, Inc. v. 3M, 2005 U.S. Dist. LEXIS 13995 (E.D. Pa. July 13, 2005); Robert L. Kroenlein Trust v. Kirchhefer, 764 F.3d 1268, 1279-80 (10th Cir. 2014) (stating that the "injury-discovery rule" dictates that the limitations period begins to run when the plaintiff has actual or inquiry notice of his injury, and not when the plaintiff has discovered all elements of the claim); Bingham v. Zolt, 66 F.3d 553, 561 (2d Cir. 1995) (holding that "a continuing series of fraudulent actions . . . constituted a new and independent legally cognizable

injury"); Kabealo v. Huntington Nat'l Bank, 17 F.3d 822, 826 (6th Cir. 1994) (applying *Zenith Radio Corp.* speculative damages rule to 1982 claim); Ohio Sealy Mattress Mfg. Co. v. Kaplan, 745 F.2d 441, 450 (7th Cir. 1984) (holding future damages too speculative to permit award of damages); Blue Cross & Blue Shield of New Jersey v. Philip Morris, Inc., 113 F. Supp. 2d 345, 2000 U.S. Dist. LEXIS 13444, at *1 (E.D.N.Y. 2000) (denying recovery of some future damages because they were too speculative); Poster Exch. v. Nat'l Screen Serv. Corp., 456 F.2d 662, 667 (5th Cir. 1972) (holding that a single unlawful act can serve as the basis for later damage claims, because damages "do not 'accrue' until they can be reasonably established"); Nebula Glass Int'l v. Reichhold, Inc., No. 02-cv-60703-WPD, 2004 U.S. Dist. LEXIS 30908, at *16 (S.D. Fla. 2004) (order on postjudgment motions); *In re* Relafen Antitrust Litig., 286 F. Supp. 2d 56, 64 (D. Mass. 2003) (holding that plaintiffs' claim did not occur on the date of the alleged sham patent lawsuit filed by defendant because "plaintiffs would have been unable to plead any damages, other than those of a purely speculative variety"); *In re* Buspirone Patent & Antitrust Litig., 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002) (stating that if "future damages were too speculative to have been awarded within the original statute of limitations period, a plaintiff may sue to recover those particular damages, if any, within four years of when the injuries actually occur"); Microbix Biosystems v. Biowhittaker, Inc., 172 F. Supp. 2d 680, 697 (D. Md. 2000) ("Damages are unrecoverable if the fact of damages is speculative or their amount and nature unprovable."); Rite Aid Corp. v. Am. Express Travel Related Serv., 708 F. Supp. 2d 257, 266 (E.D.N.Y. 2010) (holding that the *Zenith Radio Corp.* speculative damages exception applies if "[t]he fact of damage is uncertain or if the nature and amount of damages cannot be reasonably estimated"); *InR e* Nexium (Esomeprazole) Antitrust Litigation, No. 12-md-20409-WGY, 2013 U.S. Dist. LEXIS 171273 , at *13 (D. Mass. 2013) (holding that a purchaser's cause of action accrues only on the date that damages are suffered because customers cannot determine their antitrust damages until a monopolist sets inflated prices).

8. *See* part B.2. of this chapter.

9. *ZenithR adioC orp.* 401 U.S. at 342.

10. Id. at 341.

11. *Id.*

12. *Id.*

13. *See, e.g.*, Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc. (In re Neurontin Mktg. & Sales Practices Ltig.), 712 F.3d 21, 49-50 (1st Cir. 2013); Raishevich v. Foster, 247 F.3d 337, 343 (2d Cir. 2001) (each case stating that defendants whose own misconduct creates uncertainty cannot complain that damages are too speculative or conjectural); RKI, Inc. v. Grimes, 200 F. Supp. 2d 916, 927 (D. Ill. 2002) (same holding).

14. *See* Indus. Burner Sys. v. Maxon Corp., 275 F. Supp. 2d 878, 891-92 (E.D. Mich. 2003) (rejecting argument that Plaintiff's damages approximations are "speculative," holding that "a plaintiff's own projections and experience during its years of operation are sufficient to provide a reasonable basis for calculating damages") (quoting *Grand Rapids Plastics, Inc. v. Kalian*, 188 F.3d 401, 405-07 (6th Cir. 1999)); Higgins v. N.Y. Stock Exch., 942 F.2d 829, 832 (2d Cir. 1991) ("The only exception to the date-of-injury rule is the rare case in which damages caused by an antitrust injury are so speculative that the court is unwilling to estimate them."); Lender's Serv. v. Dayton Bar Ass'n, 758 F. Supp. 429, 442-43 (S.D. Ohio 1991) (rejecting argument that claim should be tolled based on speculative damages exception because plaintiff failed to allege special circumstances, such as fraudulent concealment or duress, which would toll the running of the limitations period).

15. 752 F.2d 261 (7th Cir. 1984); *seeal so* Kabealo v. Huntington Nat'l Bank, 17 F.3d 822, 827 (6th Cir. 1994) (holding that "plaintiffs did not carry their burden of proving that their losses were so speculative as to excuse their failure to file this suit within the period of limitations" because [t]heir own projections and their actual experience during four years of operation would have been sufficient to provide the fact-finder with a reasonable basis for calculating their damages"); North Carolina Elec. Membership Corp. v. Carolina Power & Light Co., 780 F. Supp. 322, 330 (M.D.N.C. 1991) ("the court must determine when it was that Plaintiffs knew or should have known as a matter of fact and with a fair degree of certainty that Defendant caused Plaintiffs' injury.") (internal quotations omitted).

16. *Brunswick*, 752 F.2d at 271.

17. *See Zenith Radio Corp.*, 401 U.S. at 388 ("each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damage caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act"); *see also, e.g.*, Toledo Mack Sales & Serv. v. Mack Trucks, 530 F.3d 204, 217 (3d Cir. 2008) (the plaintiff's burden to present evidence that defendants "committed during the limitations period overt acts in furtherance of an illegal conspiracy or conspiracies, even if the conspiracies began before the limitations period"); GO Computer v. Microsoft Corp., 508 F.3d 170, 174 (4th Cir. 2007) (dismissal of continuing violation claims where assignment of claims excluded claims after 1994); Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 436 (2d Cir. 2005) (four-year statute of limitations might preclude refiling of complaint unless "plaintiffs could demonstrate a continuing wrong"); United States v. Therm-All, Inc., 373 F.3d 625, 633 (5th Cir. 2003) ("[T]he statute of limitations runs from the commission of each act that is subsequent to the original conspiracy act . . . The party bringing the antitrust action must therefore show that the conspiracy continued into the limitations period."); Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594, 598 (6th Cir. 2014) ("When a continuing violation occurs, the statute of limitations runs from the commission of the act that causes the plaintiff's damage") (internal quotation marks omitted); *Maxon Corp.*, 275 F. Supp. 2d at 893-94 (recognizing a "continuing violation" exception to the general four-year statute of limitations, and defining a "continuing violation" as one which "(1) . . . must be a new and independent act that is not merely an affirmation of a previous act; and (2) . . . must inflict new and accumulating injury on the plaintiff") (citing *Grand Rapids Plastics* and DXS, Inc. v. Siemens Med. Sys., Inc., 100 F.3d 462, 467-68 (6th Cir. 1996)); Tam Travel v. Delta Airlines, Inc. (*In re* Travel Agent Comm'n Antitrust Litig.), 583 F.3d 896 (6th Cir. 2009) ("[T]he focus [for statute of limitations purposes] is on the timing of the causes of the injury, i.e., the defendant's overt acts, as opposed to the *effects* of the overt acts") (emphasis in original) (quoting *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990); *In re* Carbon Black Antitrust Litig., No. 03-cv-10191, 2005 U.S. Dist. LEXIS 660, at *21 (D. Mass. 2005) (order denying motion to dismiss); West Penn Allegheny Health Sys. v. UPMC Highmark, Inc., 627 F.3d 85, 106 (3d Cir. 2010) (holding that the

plaintiff's conspiracy claims were not time-barred where the complaint alleged that the defendants performed "injurious acts in furtherance of the conspiracy within the limitations period"); Free Freehand Corp. v. Adobe Sys., 852 F. Supp. 2d 1171, 1188 (N.D. Cal. 2012) (holding that plaintiffs' §7 Clayton Act claim was not time-barred where the defendant allegedly performed anti-competitive post-merger acts within the statute of limitations period by, inter alia, bundling software and charging supracompetitive prices).

18. *See, e.g.*, Imperial Point Colonnades Condominium Inc. v. Mangurian, 549 F.2d 1029, 1035-37 (5th Cir. 1977); Twin City Sport Serv. v. Charles O. Finley & Co., 512 F.2d 1264 (9th Cir. 1975).

19. *See, e .g.*, Varner v. Peterson Farms, 371 F.3d 1011, 1020 (8th Cir. 2004) ("Performance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period"); Samsung Elecs. Co. v. Panasonic Corp.*,* No. 12-15185, 2012 U.S. 9th Cir. Briefs LEXIS 2313, (9th Cir. June 25, 2012) ("The broad view that a cause of action continues to accrue for as long as the defendant takes advantage of an illegal contract . . . would render the Clayton Act statute of limitations virtually inoperative.") (quoting Electroglas, Inc. v. Dynatex Corp., 497 F. Supp. 97 (N.D. Cal. 1980)); Wilson Learning Corp. v. Schlechte, No. 04-cv-4703, 2005 U.S. Dist. LEXIS 39631, at *8 (D. Minn. 2005) (order granting motion to dismiss counterclaims); *In re* Buspirone Patent & Antitrust Litig., 185 F. Supp. 2d 363, 379 (S.D.N.Y. 2002) (settlement payments made under alleged anticompetitive agreement do not restart statute of limitations). *But see* National Souvenir Ctr. v. Historic Figures Inc., 728 F.2d 503, 510 (D.C. Cir. 1984) ("In the case of a genuine tying arrangement, the 'overt act' requirement may be satisfied merely by the parties continuing to maintain contractual relationships that directly affect competition in the tied product market.").

20. 813 F.2d 234 (9th Cir. 1987).

21. *Id.* at 238; *accord V arner*, 371 F.3d at 1019; *DXS, I nc.*, 100 F.3d at 467; Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594 (6th Cir. 2014); *see al so* Morton's Mkt. v. Gustafson's Dairy, 198 F.3d 823, 828 (11th Cir. 1999), *amended,* 211 F.3d 1224 (11th Cir. 2000) (in the context of a continuing price-fixing conspiracy the court stated that "[a] cause of action would accrue with each purchase and a new statutory period would begin to

run."); U.S. v. Therm-All, Inc. 373 F.3d 615, (5th Cir. 2004) ("[A] newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, *not merely the abatable but unabated inertial consequences of some pre-limitation saction."*) (emphasis in original) (internal citations and quotations omitted).

22. *See* note 21 supra, and accompanying text; *see also* Eichman v. Fotomat Corp., 880 F.2d 149, 160 (9th Cir. 1989) ("To restart the statute of limitations in a tying situation, Eichman must show that Fotomat had the ability [to] and actually did enforce the tie during the limitations period. The mere fact that Eichman has made lease payments to Fotomat since 1968 does not establish Fotomat's ability to enforce the tie absent voluntary cooperation by Eichman.") (internal quotations omitted); *Inr e* Ciprofloxacin Hydrochloride Antitrust Litig., 261 F. Supp. 2d 188, 229 (E.D.N.Y. 2003) ("[T]he payments are contemplated by, and needed to implement, the fixed terms of the challenged agreements. Accordingly, such acts are not sufficient to extend or restart the limitations period because the performance of an allegedly anticompetitive, pre-existing contract is not a new predicate act."); *In re Buspirone Patent & Antitrust Litig.*, 185 F. Supp at 379 (option under the agreement to either pay the installment or grant a non-exclusive license "would not be an instance of conduct lying within the relevant four year statute of limitations period.").

23. *See Pace Indus.*, 813 F.2d at 239 (statute of limitations barred an antitrust suit challenging earlier suit enforcing a covenant not to compete); *see also* Al George Inc. v. Envirotech Corp., 939 F.2d 1271, 1274-75 (5th Cir. 1991) (statute barred antitrust suit challenging earlier patent infringement suit); Korody v. Colyer Corp., 828 F.2d 1572, 1578-79 (Fed. Cir. 1987) (rejected argument that defense of patent through trial constituted a continuing violation); Internet Corporative S.A. De C.V. v. Business Software Alliance, Inc. H-04-2322, 2004 U.S. Dist LEXIS 29024, at *14–15 (S.D. Tex. Nov. 15, 2004) ("The last overt act in pursuance of the allege conspiracy was [defendant's] filing of its patent-infringement suit."); Internet Corporativo S.A. de C.V. v. Bus. Software Alliance, No. H-04-2344, 2005 U.S. Dist. LEXIS 38519, at *11 (S.D. Tex. 2005) ("the damage from wrongful initiation of a lawsuit occurs when the lawsuit is filed"); *Inr e* Relafen Antitrust Litig., 286 F.

Supp. 2d 56, 62 (D. Mass. 2003) (continuing to litigate a sham lawsuit does not amount to a continuing violation of the antitrust laws).

24. Kaw Valley Elec. Coop. v. Kan. Elec. Power Coop., 872 F.2d 931, 934 (10th Cir. 1989) ("[I]f the initial refusal is final, the statute of limitations begins to run and no new cause of action is created when the victim makes subsequent futile efforts to deal with the violator and is rebuffed." (citing *Pace Indus* ., 813 F.2d at 237-39 ("[S]eparate violations within the limitations period that are not controlled by the previous act or decision and which inflict new injury will restart the statute of limitations."))); *see also* Midwestern Waffles v. Waffle House, 734 F.2d 705, 714-15 (11th Cir. 1984) ("Where rights and liabilities are finalized by a contract or by denial of a contract, and any damages are at that time provable with certainty, the statute of limitations begins to run at that time."); David Orgell, Inc. v. Geary's Stores, 640 F.2d 936, 938 (9th Cir. 1981) (subsequent refusals to sell did not restart the limitations period). *But see* Bell v. Dow Chem. Co., 847 F.2d 1179, 1187 (5th Cir. 1988) (citing Poster Exch. V. Nat'l Screen Serv. Corp., 517 F.2d 117, 127 (5th Cir. 1975) (continued refusal to deal would renew running of the statute of limitations); Hennegan v. Pacifico Creative Serv., 787 F.2d 1299, 1300-01 (9th Cir. 1986) (continued refusal to deal coupled with efforts to divert customers from plaintiff's business were overt acts that renewed the running of the statute of limitations); Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp., 546 F.2d 570, 572 (4th Cir. 1976); Florida Mun. Power Agency v. Florida Power & Light Co., 81 F. Supp. 2d 1313 (M.D. Fl. 1999) ("In a continuing refusal to deal situation, if the plaintiff can show that there had been a specific act or word of refusal (by defendant to deal with plaintiff) during the limitations period, that reiteration would have constituted an injurious act giving rise to an antitrust cause of action.")

*Bell*'s reliance on *Poster Exchange* to conclude that a continued refusal to deal, standing alone, renews the running of the statute of limitations, appears to conflict with other Fifth Circuit decisions. For example, the Fifth Circuit has separately held that mere receipt of benefits from an unlawful agreement would not renew the limitations period. *See* Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, 677 F.2d 1045 (5th Cir. 1982); Teladoc, Inc. v. Tex. Med. Bd., 2015

U.S. Dist. LEXIS 166754, at *12-13 (W.D. Tex. Dec. 14, 2015) (citing *Kaiser Aluminum & Chem. Sales*).

25. *In re* Travel Agent Comm'n Antitrust Litig., No. 03-cv-30000, 2007 U.S. Dist. LEXIS 79918, at *23 (N.D. Ohio 2007) (continuing the same policies as before Chapter 11 proceedings is not a new overt act).

26. Rite Aid Corp v. Am. Express Travel Related Serv., 708 F. Supp. 2d 257, 269 (E.D.N.Y. 2010). In this regard, the court in *Rite Aid Corp.* appeared to merge the speculative damages doctrine with the continuing violations doctrine.

27. Free Freehand Corp. v. Adobe Sys., 852 F. Supp. 2d 1171, 1188 (N.D. Cal. 2012) ("Under the 'new use' exception, if assets are used in a different manner from the way that they were used when the initial acquisition occurred, and that new use injures the plaintiff, he or she has four years from the time that the injury occurs to sue.") (internal citations and quotations omitted).

28. Detroit v. Grinnell Corp., 495 F.2d 448, 460-61 (2d Cir. 1974) (court recognized tacking of tolled periods from fraudulent concealment and government suit "only if the acts of fraudulent concealment continued into or beyond the earliest day for which recovery could be sought due to the government toll"), *abrogated on other grounds by* Goldberger v. Integrated Res., 209 F.3d 43 (2d Cir. 2000); Mt. Hood Stages v. Greyhound Corp., 616 F.2d 394, 407 (9th Cir. 1980) (plaintiff can tack related government suit tolling onto tolling arising from fraudulent concealment).

29. *In re* Scrap Metal Antitrust Litig., 527 F.3d 517, 536 (6th Cir. 2008) ("[T]he limitations period is tolled during the pendency of related criminal or civil proceedings by the government, plus an additional one-year period thereafter.").

30. *See* Grynberg v. Eni S.p.A., No. 06-cv-6594 (RLC), 2007 U.S. Dist. LEXIS 65787, at *11 (S.D.N.Y. 2007) (order denying motion for summary judgment) ("Where a defendant's fraudulent concealment gives rise to equitable tolling, the statute of limitations is tolled until 'the plaintiff either acquires actual knowledge of the acts that comprise his actions or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice." (citing *Detroit v. Grinnell*, 495 F.2d at 461)); *see also In re* Copper Antitrust Litig., 436 F.3d 782, 790-91 (7th Cir. 2006)

("Equitable estoppel [in the statute of limitations context] suspends the running of the statute of limitations during any period in which the defendant took active steps to prevent the plaintiff from suing." (quoting *Barry Aviation v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 689 (7th Cir. 2004))); *In re* Skelaxin (Metaxalone) Antitrust Litigation, No. 1:12-md-2343, 2013 U.S. Dist. LEXIS 70968, at *103–110 (E.D. Tenn. 2013) (holding that the plaintiff's claims were tolled under the fraudulent concealment doctrine even though some of the information that was allegedly concealed was publicly available); *In re* Processed Egg Prods. Antitrust Litig., 2013 U.S. Dist. LEXIS 119936 (E.D. Pa. Aug. 23, 2013) (stating that "the exercise of due diligence must be shown in the antitrust context" as a requirement of proving fraudulent concealment) (quoting *In re* Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1179 (3d Cir. 1993)) ; Jarrett v. Kassel, 972 F.2d 1415, 1428 (6th Cir. 1992) ("[A] plaintiff cannot sleep on a cause of action of which he is unaware, and the due diligence requirement prevents plaintiffs from delaying their investigation of circumstances that should put them on notice of a potential claim."); Westinghouse Elec. Corp. v. Pac. Gas & Elec. Co., 326 F.2d 575, 576 (9th Cir. 1964) (holding that the fraudulent concealment doctrine applies to claims based upon § 4 of the Clayton Act); Westinghouse Elec. Corp. v. Burlington, 326 F.2d 691, 692 (D.C. Cir. 1964) (affirming the district court's decision the statute of limitations set forth in Sections 4B and 5(b) of the Clayton Act is tolled because of fraudulent concealment.); Wyly, 788 F. Supp. 2d at n. 100 ("[A]ll federal limitation statutes are subject to the *doctrine of fraudulent concealment* . . .) (emphasis in original); Allis-Chalmers Mfg. Co. v. Commonwealth Edison Co., 315 F.2d 558, 561 (7th Cir. 1963) (holding that "fraudulent concealment does toll the period of limitation provided in Section 4B of the Clayton Act"); Kansas City v. Fed. Pac. Elec. Co., 310 F.2d 271, 284 (8th Cir. 1963) (holding "that the fraudulent concealment doctrine is to be read into the statute of limitations so that . . . the limitation period begins to run from the time that plaintiff by the exercise of reasonable diligence, discovers or should have discovered the cause of action"); Muhonen v. Cingular Wireless Emple. Servs., LLC, 802 F. Supp. 2d 1025, 1032 (D. Minn. 2011) (holding that the statute of limitations on plaintiff's claim began running at the time she knew that she would be responsible for filing the

grievance) (quoting *Fed. Pac. Elec. Co* .); Public Serv. Co. v. Gen. Elec. Co., 315 F.2d 306, 310 (10th Cir. 1963) (holding that the fraudulent concealment doctrine applies to Section 4B); Atlantic City Elec. Co. v. Gen. Elec. Co., 312 F.2d 236, 238 (2d Cir. 1962) (holding that fraudulent concealment of the existence of a cause of action under § 4 of the Clayton Act tolls the statute). The First Circuit has discussed the doctrine of fraudulent concealment in the antitrust context, but has not adopted it. *See* Berkson v. Del Monte Corp., 743 F.2d 53 (1st Cir. 1984) (plaintiff claimed fraudulent concealment, but was unable to prove its elements); *In re* Compact Disc Minimum Advertised Price Antitrust Litig., 138 F. Supp. 2d 25, 28-29 (D. Me. 2001) (rejecting plaintiffs' claim of fraudulent concealment on the grounds that they did not meet the requirement of showing that due diligence was exercised).

31. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 536; GO Computer v. Microsoft Corp., 437 F. Supp. 2d 497, 500 (D. Md. 2006), *aff'd*, 508 F.3d 170 (4th Cir. 2007); Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp., 624 F. Supp. Fed Appx. 23, 26 (2d Cir. 2003); Norton-Children's Hosps. v. James E. Smith & Sons, 658 F.2d 440, 443 (6th Cir. 1981); *In re* Beef Indus. Antitrust Litig., 600 F.2d 1148, 1169 (5th Cir. 1979); Weinberger v. Retail Credit Co., 498 F.2d 552, 555 (4th Cir. 1974); Emerson Elec. Co. v. Le Carbone Lorraine, 500 F. Supp. 2d 437, 448 (D.N.J. 2007); *Inr e* Ready-Mixed Concrete Price Fixing Litig., No. 05-cv-00979-SEB-VSS, 2006 U.S. Dist. LEXIS 71874, at *14 (S.D. Ind. 2006) (order denying motion for judgment on the pleadings). *See generally* Annotation, *Application of Fraudulent Concealment Doctrine to Statute of Limitations in Antitrust Case* (15 U.S.C. § 15b), 72 A.L.R. Fed. 430 (2014); Guido Saveri & Lisa Saveri, *Pleading Fraudulent Concealment in an Antitrust Price Fixing Case: Rule 9(b) v.R ule8* , 17 U.S.F. L. Rev. 631, 635, 637 (1983).

32. *Norton-Children's*, 658 F.2d at 445.

33. See generally Amber Davis Tanner, Antitrust Law—Affirmative Acts and Antitrust—The Need for a Consistent Tolling Standard in Cases of Fraudulent Concealment, 33 U. Ark. Little Rock L. Rev (2011); Richard F. Schwed, Note, Fraudulent Concealment, Self-Concealing Conspiracies, and the Clayton Act, 91 Mich. L. Rev. 2259 (1993).

34. *See, e.g.*, *In re* Aspartame Antitrust Litig., No. 06-cv-1732, 2007 U.S. Dist. LEXIS 16995, at *13 (E.D. Pa. 2007) (order denying motions to

dismiss) (citing Forbes v. Eagleson, 228 F.3d 471, 486 (3d Cir. 2000)); *see also In re* Cmty. Bank of N. Va. Mortg. Lending Practices Litig., PNC Bank NA, 795 F.3d 380, 400 (3d Cir. 2015) (holding that equitable tolling may be appropriate where the defendant has actively misled the plaintiff); Oshiver v. Levin, 38 F.3d 1380, 1387 (3d Cir. 1994) ("equitable tolling may be appropriate where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action").

35. *See* Thorman v. Am. Seafoods Co., 421 F.3d 1090, 1095 (9th Cir. 2005) (holding that silence or passive conduct does not constitute fraudulent concealment); *see also* Rutledge v. Boston Woven Hose & Rubber Co., 576 F.2d 248, 250 (9th Cir. 1978) ("silence or passive conduct" not fraudulent "unless the relationship of the parties imposes upon the defendant a duty of disclosure"); Rambus Inc. v. Samsung Elecs. Co., No. 05-cv-02298-RMW, 2007 U.S. Dist. LEXIS 3088, at *18 (N.D. Cal. 2007) (order granting motion to dismiss counterclaims); Hamilton County Bd. of County Comm'rs v. NFL, 445 F. Supp. 2d 835, 843 (S.D. Ohio 2006) (plaintiff must show affirmative act of concealment), *aff'd*, 491 F.3d 310 (6th Cir. 2007); General Aircraft Corp. v. Air Am., 482 F. Supp. 3, 8 (D.D.C. 1979) (same); Conway v. Bulk Petrol. Corp., 545 F. Supp. 398, 400 (N.D. Ill. 1982) (allegations of fraud insufficient). *But see* Texas v. Allan Constr. Co., 851 F.2d 1526, 1532-33 (5th Cir. 1988) (denial sufficient when "parties are in a fiduciary relationship, or where the circumstances indicate that it was reasonable for the plaintiff to rely on defendant's denial").

36. See generally Amber Davis Tanner, Antitrust Law—Affirmative Acts and Antitrust—The Need for a Consistent Tolling Standard in Cases of Fraudulent Concealment, 33 U. Ark. Little Rock L. Rev (2011); see also W. Glenn Opel, Note, A Reevaluation of Fraudulent Concealment and Section 4B of the Clayton Act, 68 Tex. L. Rev. 649, 653 (1990).

37. Colorado v. W. Paving Constr. Co., 630 F. Supp. 206, 210 (D. Colo. 1986), *aff'd en banc by equally divided court*, 841 F.2d 1025 (10th Cir. 1988).

38. Singh v. Wells, 445 Fed. Appx. 373, 378 (2d Cir. 2011) (holding that to allege fraudulent concealment, a plaintiff must either allege that "defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing.") (internal citations and quotations omitted); *see also*

New York v. Hendrickson Bros., 840 F.2d 1065, 1083-84 (2d Cir. 1988); *Inr e* Publication Paper Antitrust Litig., No. 04-md-1631 (SRU), 2005 U.S. Dist. LEXIS 19896, at *8 (D. Conn. 2005) (order granting motion to dismiss claims outside statute of limitations); *In re* Electrical Carbon Prods. Antitrust Litig., 333 F. Supp. 2d 303, 316 (D.N.J. 2004).

39. *Allan Constr. Co.*, 851 F.2d at 1530 (despite its detailed discussion, the court chose not to follow the self-concealing conspiracy theory).

40. *Id.* at 1529-30 (citing Hobson v. Wilson, 737 F.2d 1, 33 n.102 (D.C. Cir. 1984)).

41. OBG Tech. Servs. v. Northrop Grumman Space & Mission Sys. Corp., 503 F. Supp. 2d 490, 508 (D. Conn. 2007) (holding that plaintiff failed to allege facts with sufficient particularity to show why fraud was self-concealing).

42. *HendricksonB ros.*, 840 F.2d at 1084.

43. Texas v. Allan Constr. Co., 851 F.2d 1526, 1533 (5th Cir. 1988) ("[B]id rigging is not inherently self-concealing."); *see also In re* Catfish Antitrust Litig., 826 F. Supp. 1019, 1030-31 (N.D. Miss. 1993); *In re* Mercedes-Benz Antitrust Litig., 157 F. Supp. 2d 355, 371 (D.N.J. 2001) (concealment is not an essential element of a price-fixing or bid-rigging conspiracy); Pennsylvania v. Milk Indus. Mgmt. Corp., 812 F. Supp. 500, 504 (E.D. Pa. 1992) (bid-rigging conspiracies are not necessarily per se self-concealing).

44. *Texas v. Allan Constr. Co.*, at 1527. *See also In re* Bulk [Extruded] Graphite Prods. Antitrust Litig., No. 02-cv-6030 (WHW), 2004 U.S. Dist. LEXIS 29586, at *10 (D.N.J. 2004) (order denying motions to dismiss) (finding that "price-fixing conspiracy depended on concealment to function," therefore plaintiff was unable to plead facts within defendant's exclusive control).

45. *AllanC onstr.C o.*, 851 F.2d at 1530.

46. *See* Re/Max Int'l v. Realty One, 173 F.3d 995, 1009 (6th Cir. 1999) (holding that statute of limitations did not bar § 1 claim against ongoing conspiracy involving a "commission split" policy which allegedly commenced more than four years before suit filed; "Mere suspicion of a conspiracy is not enough [to trigger the limitations period], and certainly mere knowledge of the adverse-splits policy, without evidence that the defendants acted in concert, is insufficient."); *Inr e* Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144 (3d Cir. 1993) (holding

that publication of railroad ratemaking should have made plaintiffs aware of improper activity); *Milk Indus. Mgmt. Corp.*, 812 F. Supp. at 504-05 (plaintiff could have analyzed data and determined that a bid-rigging conspiracy existed).

47. *See, e .g.,* Colorado v. W. Paving Constr. Co., 630 F. Supp. 206 (D. Colo. 1986), *aff'd en banc by equally divided court*, 841 F.2d 1025 (10th Cir. 1988); *In re* Commercial Explosives Litig., No. 96-cv-709S, 1996 U.S. Dist. LEXIS 21829, at *33 (D. Utah 1996) (order denying motion to dismiss).

48. 15 U.S.C. § 16(i) reads:

Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under Section 15a of this title, the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however*, that whenever the running of the statute of limitations in respect of a cause of action arising under Section 15 or 15c of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued.

*Id.* (emphasis added); *see, e.g.*, Marine Firemen's Union v. Owens-Corning Fiberglass Corp., 503 F.2d 246, 249 (9th Cir. 1974) (finding statute of limitations was tolled during criminal proceeding charging antitrust violations); *Inr e* Refrigerant Compressors, 92 F. Supp. 3d 651 (E.D Mich. 2015 (same); *In re* Scrap Metal Antitrust Litig., No. 02-cv-0844, 2006 U.S. Dist. LEXIS 75873, at *85 (N.D. Ohio 2006) (order denying motion for new trial or for amendment of judgment) (holding that statute of limitations, "once tolled by government action under § 16(i), remains tolled until the last action against all defendants is resolved."), *aff'd*, 527 F.3d 517 (6th Cir. 2008); District of Columbia *ex rel.* Payton v. Basiliko, No. 91-cv-2518 (JHG), 1992 U.S. Dist. LEXIS 1260, at *13 (D.D.C. 1992) (order denying motions to dismiss); Pension Fund-Mid-Jersey Trucking Indus. v. Omni Funding Group, 687 F. Supp. 962, 964 (D.N.J. 1988) (holding statute of limitations was tolled during criminal litigation under RICO). *But see Morton's Mkt.*,

198 F.3d at 832 (holding that triable fact question existed as to whether plaintiff's knowledge of government investigation into school milk price fixing also put them on notice that defendants were fixing milk prices at grocery stores, for purposes of an argument that the fraudulent concealment tolled the statute of limitations), *amended,* 211 F.3d 1224 (11th Cir. 2000).

[49]. 381 U.S. 311 (1965).

[50]. The Court stated that it did not want to deprive private litigants of the benefits from the agency's lawsuit. *Id.* at 321-22.

[51]. *See,e .g.,* Wendkos v. ABC Consol. Corp., 379 F. Supp. 15, 22 (E.D. Pa. 1974) (finding that FTC proceeding to enforce both the FTC Act and § 7 of the Clayton Act tolls the statute of limitations); *In re* Evanston Northwestern Healthcare, 2008 U.S. Dist. LEXIS 42437, at *14-16 (N.D. Ill. May 29, 2008) (holding that FTC administrative proceedings also toll the Clayton Act's statute of limitations); *In re* Antibiotic Antitrust Actions, 333 F. Supp. 317, 319 (S.D.N.Y. 1971) (finding that FTC action to enforce only the FTC Act also tolls the statute of limitations); Hinds County v. Wachovia Bank N.A., 885 F. Supp. 2d 617, 627 (S.D.N.Y. 2012) ("A private action that is substantially broader than a prior Government action may still benefit from § 16(i) tolling where the allegations in the private action incorporate the subject matter of the Government action") (citing *In re Antibiotic Antitrust Actions*); *see also, e.g.*, Rader v. Balfour, 440 F.2d 469, 472 (7th Cir. 1971) (same).

[52]. 15 U.S.C. § 16(i).

[53]. *See* Chipanno v. Champion Int'l Corp., 702 F.2d 827, 832 (9th Cir. 1983) (analysis "must be limited to comparison of the two complaints on their face" (quoting Leh v. Gen. Petrol. Corp., 382 U.S. 54, 65-66 (1965))); Hinds County v. Wachovia Bank N.A., 885 F. Supp. 2d 617, 627 (holding that a private action may benefit from tolling where the allegations in that action incorporate the subject matter of a prior government action); *see also* Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 320 (4th Cir. 2007) (stating that "a significant overlap of subject matter between the two actions" must be proven by the private plaintiffs for the tolling provision to apply).

[54]. *Leh*, 382 U.S. at 62-63 (even though private suit only named six of the seven defendants and periods of alleged conspiracy differed, the

complaints were substantially similar, so statute was tolled); *Zenith Radio Corp.*, 401 U.S. at 337-38 (holding that statute is tolled against all participants in a conspiracy whether or not they are named defendants in the government suit); *see also, e.g.*, GO Computer v. Microsoft Corp., 437 F. Supp. 2d 497, 503 (D. Md. 2006) (holding that even though a time difference existed, tolling was applicable as to one product because there was an identity of defendants named, as well as an identity of marketplace identified and anticompetitive conduct alleged), *aff'd*, 508 F.3d 170 (4th Cir. 2007); Morton's Mkt. v. Gustafson's Dairy, 198 F.3d 823, 830 (11th Cir. 1999), *amended,* 211 F.3d 1224 (11th Cir. 2000) ("If there is a significant, although incomplete, overlap of subject matter, the statute is tolled even as to the differences"); *Novell, Inc.*, 505 F.3d at 321-22 (holding that the statute was not tolled in the case of four counts, which were dismissed, on the grounds that the office productivity market at issue in those counts was neither identical to nor completely encompassed by the PC operating-system market at issue in the government action); Aurora Enters. v. NBC, 688 F.2d 689, 693 (9th Cir. 1982) (holding statute not tolled because private suit alleged conspiracy but prior government suit did not); Charley's Tour & Transp. v. Interisland Resorts, 618 F. Supp. 84, 86 (D. Haw. 1985) (holding that statute not tolled because claims involved "different markets, different defendants, and different means of proof").

55. Marine Firemen's Union v. Owens-Corning Fiberglass Corp., 503 F.2d 246, 249 (9th Cir. 1974) (finding that pendency ends on "entry of judgment of conviction against the last remaining defendant in the related criminal proceeding," but declining to decide whether tolling continues through appeal); Russ Togs v. Grinnell Corp., 426 F.2d 850, 857 (2d Cir. 1970) (holding that government action continued to pend until termination of the entire controversy; therefore, appellees timely filed actions within a year of the expiration of the appeal period in the government action); New Jersey v. Morton Salt Co., 387 F.2d 94, 98-99 (3d Cir. 1967) (holding that statute was tolled during resolution on appeal); Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 194 F.2d 846, 857-58 (8th Cir. 1952) (holding that because government could seek further relief after entering a consent decree, the statute was tolled because the litigation was pending until entry of a final decree);

*In re Refrigerant Compressors*, 92 F. Supp. 3d at 665 (holding that the plain language of § 16(i) requires tolling of the private cause of action where the government's criminal action is still pending).

56. In *Burnett v. New York Central Railroad*, 380 U.S. 424 (1965), the Supreme Court recognized equitable tolling of the statute of limitations applicable to the Federal Employer's Liability Act. The court in *Eichman v. Fotomat Corp.*, 880 F.2d 149, 155-56 (9th Cir. 1989), also recognized equitable tolling "when the plaintiff seeks a different remedy for the same wrong," but tolling was denied because plaintiff was seeking the same remedy for a different wrong. In *Aikens v .I ngram*, 524 Fed. Appx. 873, 880-82 (4th Cir. 2013), the court reversed a lower holding that equitable tolling was not recognized in the jurisdiction in question, adding that it is "the mainstream view that equitable tolling— and not just equitable estoppel—may serve to extend a statute of limitations." *Id.* at 882. *But see* Johnson v. Nyack Hosp., 86 F.3d 8, 13 (2d Cir. 1996) (refusing to recognize equitable tolling where it found plaintiffs did not act with reasonable diligence).

57. *See, e.g.*, Drumm v. Sizeler Realty Co., 817 F.2d 1195, 1196 (5th Cir. 1987) (tolling during filing of a private state antitrust action does not bear any of the hallmarks of necessity which characterize a decision to effect an equitable toll); Monrouzeau v. Asociacion Del Hosp. Del Maestro, Inc., 153 Fed. Appx. 7, 9 (1st Cir. 2005) (same); *see also, e.g.*, *Eichman*, 880 F.2d at 149; Mir v. Little Co. of Mary Hosp., 844 F.2d 646, 649 (9th Cir. 1988) (holding that prior state court proceedings do not toll statute no matter how close their relationship); Pace Industries v. Three Phoenix Co., 813 F.2d 234, 240-41 (9th Cir. 1987) (federal statute not tolled pending state suit); Fox v. Good Samaritan Hosp., No. 04-cv-00874-RMW, 2007 U.S. Dist. LEXIS 77314, at *37 (N.D. Cal. 2007) (order granting in part and denying in part motion for summary judgment); Lender's Serv. v. Dayton Bar Ass'n, 758 F. Supp. 429, 442 (S.D. Ohio 1991) (statute of limitations not tolled where state court action was not identical to plaintiff's federal action, and individual defendants were not parties to the state court action).

58. In *Mt. Hood Stages v. Greyhound Corp.*, 616 F.2d 394, 396 (9th Cir. 1980), the court allowed equitable tolling during an administrative proceeding instituted by the plaintiff before the Interstate Commerce Commission. Most subsequent decisions have limited this holding by

requiring that the agency have primary jurisdiction. *See* Grimmett v. Brown, 75 F.3d 506, 509 (9th Cir. Nev. 1996) ("Subsequent cases have read *Mt. Hood* narrowly and limited its application to cases involving considerations of federal policy and primary jurisdiction.) (internal citations omitted); *see also* Higgins v. N.Y. Stock Exch., 942 F.2d 829, 833 (2d Cir. 1991) ("*Mt. Hood* is now regarded as at best a very narrow ruling, at worst a wholly anomalous decision"); *Pace Indus.*, 813 F.2d at 241 (distinguishing *Mt. Hood* because present action does not rest on primary jurisdiction and federal policy); Brunswick Corp. v. Reigel Textile Corp., 752 F.2d 261, 269-70 (7th Cir. 1984) (finding statute not tolled because Patent Office does not have primary jurisdiction, was not a "material aid" in resolving a "potentially dispositive issue," and receives only some, not great, deference from courts).

59. *See* Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 350-51 (1983) (tolling applies to both intervenors and class members filing separate actions); American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 554-56 (1974) (tolling statute is not inconsistent with legislative purpose behind statute of limitations); Barrett v. Forest Labs., Inc., 2015 U.S. Dist. LEXIS 144340 (S.D.N.Y. 2015) ("In a class action the filing of suit tolls the statute of limitations for all members of the putative class; indeed, even if class certification is later denied, the putative class members retain the tolling effect for the period until denial of certification."); Daisy Mt. Fire Dist. v. Microsoft Corp., 547 F. Supp. 2d 475, 479 (D. Md. 2008); *In re* Ciprofloxacin Hydrochloride Antitrust Litig., 261 F. Supp. 2d 188, 219 (E.D.N.Y. 2003) (class action filing tolls the statute as to all asserted members of the class); Shimazaki Commc'ns v. AT&T, 647 F. Supp. 10, 14 (S.D.N.Y. 1986) (holding that statute is tolled from time of filing).

60. *See* Airweld, Inc. v. Airco, 742 F.2d 1184, 1191 (9th Cir. 1984) (stating plaintiff only entitled to damages "incurred during the claims period"); Hanson v. Shell Oil Co., 541 F.2d 1352, 1361 (9th Cir. 1976). Both cases held that application of the "speculative damage" would not defeat the statute of limitations defenses raised therein, because all damage from the allegedly anticompetitive conduct would have accrued before the limitations period. *Airweld*, 742 F.2d at 1191; *Hanson*, 541 F.2d at 1361.

61. *See, e.g.*, New York v. Hendrickson Bros., 840 F.2d 1065, 1084-85 (2d Cir. 1988) (upholding recovery of damages for bid rigging that occurred prior to limitation period but during tolling period); King & King Enters. v. Champlin Petrol. Co., 657 F.2d 1147, 1154-55 (10th Cir. 1981) (upholding recovery of damages for price fixing that occurred prior to limitation period but during tolling period); Mt. Hood Stages, Inc. v. Greyhound Corp., 555 F.2d 687, 698-700 (9th Cir. 1977) (upholding recovery of damages for twenty-year period where statute of limitations was tolled by virtue of fraudulent concealment and later by virtue of pending governmental action), *vacated and remanded*, 437 U.S. 322, 322-23 (1978) (holding statute not tolled because ICC proceeding not "instituted by the United States" as required by statute); Benchmark Exp. Sevs. v. China Airlines, Ltd., 6 MDL 1775, 2010 U.S. Dist. LEXIS 146377, at *170 (E.D.N.Y. Sept. 22, 2010) ("Resolution of the government tolling issue may also have ramifications on damages, because if the plaintiffs' argument is accepted by the court, they would be able to recover for injuries sustained during the entire four-year period that preceded the filing of the first information on August 1, 2007.").

62. 549 F.2d 1029 (5th Cir. 1977).

63. *Id.* at 1044 (quoting Imperial Point Colonnades Condominium, Inc. v. Mangurian, 407 F. Supp. 870, 872 (S.D. Fla. 1976)).

64. *ZenithR adioC orp.*, 401 U.S. at 338.

65. *Cf.* Mitchell v. United States, 10 Cl. Ct. 63, 75 (1986) (rejecting, in case based on alleged breach of trust by the government, view that a continuing wrong tolls the statute of limitations, instead holding that "a better approach is to view the continuing wrong as a series of actionable wrongs, and allow plaintiff to sue for those wrongs which have occurred during the limitations period"); McCool v. Strata Oil Co., 972 F.2d 1452, 1466 (7th Cir. 1992) (rejecting continuing wrong theory in RICO case). *Butc f.* Page v. United States, 729 F.2d 818, 821-22 (D.C. Cir. 1984) (permitting plaintiff to recover all damages resulting from continuing tort); Taylor v. Meirick, 712 F.2d 1112, 1118-19 (7th Cir. 1983) (holding, in copyright infringement case, that continuing wrong tolls limitation period and, therefore, that plaintiff could recover damages for the entire duration of the alleged violation); Forster Music Pub. v. Price Stern Sloan, No. 93 C 4487, 1995 U.S.

Dist. LEXIS 5359 (N.D. Il. Apr. 14, 1995) ("The continuing wrong doctrine allows a plaintiff to recover damages for a series of related wrongful acts—even though the earlier acts occurred beyond the limitations period.")

66. *See Zenith Radio Corp.*, 401 U.S. at 341-42; *accord* Grand Rapids Plastics v. Lakian, 188 F.3d 401, 406 (6th Cir. 1999) ("With regard to damages that have not yet been suffered or are too speculative to be ascertained at the time a plaintiff's business is injured, the limitations period does not begin to run until the damages are ascertainable."); Harold Friedman Inc. v. Thorofare Mkts., 587 F.2d 127, 138-39 (3d Cir. 1978) (lawsuit filed timely because damages not ascertainable earlier); Meijer, Inc. v. 3M, No. 04-cv-5871, 2005 U.S. Dist. LEXIS 13995, at *12 (E.D. Pa. 2005) (order denying motion to dismiss) (damages recoverable for unlawful maintenance of monopoly power that occurred outside the statutory period); *In re* Lower Lake Erie Iron Ore Antitrust Litig., 759 F. Supp. 219, 229 (E.D. Pa. 1991) ("[D]amages resulting from anticompetitive conduct within the limitations period, but authorized by a contract entered into before the limitations period had begun to run, are recoverable."), *aff'd in part and rev'd in part*, 998 F.2d 1144 (3d Cir. 1993).

67. *Zenith Radio Corp.*, 401 U.S. at 338; *Lower Lake Erie*, 759 F. Supp. at 228. *Cf. Grand Rapids Plastics*, 188 F.3d at 406 (stating that "With regard to damages that have not yet been suffered or are too speculative to be ascertained at the time a plaintiff's business is injured, the limitations period does not begin to run until the damages are ascertainable").

68. *SeeZ enithR adioC orp.*, 401 U.S. at 340-42.

69. 759 F. Supp. 219 (E.D. Pa. 1991).

70. *Id.* at 228 (citations omitted).

71. *Id.* at 229-30. The Third Circuit affirmed this aspect of the district court's opinion by noting that the jury was adequately instructed that damages "must have been caused within the limitations period by an active, injurious conspiracy." *In re* Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1173 (3d Cir. 1993).

# PART II

# CHAPTER 4

# QUANTIFYING DAMAGES

Once a private antitrust plaintiff has shown that it has sustained antitrust injury, the law tends to be less demanding with respect to the damages methodology a plaintiff uses to quantify its damages. In practice, courts have applied a "reasonableness" standard which accommodates the reality that the quantification of damages is necessarily subject to greater uncertainty than simply proving the fact of injury. This chapter will discuss the standard of proof for antitrust damages, the but-for premise that underlies antitrust damage analysis, quantification methodologies, and mitigation.

# A. The Standard of Proof for Proving Antitrust Damages

Before being entitled to damages, the private antitrust plaintiff must establish that a violation of the antitrust laws occurred, that the plaintiff sustained antitrust injury, and that the plaintiff has "standing" under the antitrust laws to seek monetary damages.[1] Throughout this chapter, and the remainder of this handbook, the discussion will assume that these bars have been met and will refer to "violations" rather than "alleged violations." Damages experts likewise assume liability for the purpose of analysis, often before liability is in fact established. The damages analysis will come into play if and only if liability is established. While proving the existence of antitrust injury may be an exacting task, "a lesser level of proof is needed to support the amount of damages[.]"[2]

The "level of proof" needed to prove the quantum of antitrust damages suffered by a plaintiff was set in a trio of cases decided by the Supreme Court in the first half of the twentieth century: *Eastman Kodak Co. v.*

*Southern Photo Materials Co.*,[3]*Story Parchment Co. v. Paterson Parchment Paper Co.*,[4] and *Bigelow v. RKO Radio Pictures*.[5] They remain the leading cases on this point.[6] In *Eastman Kodak*, the Court was unmoved by defense contentions that "plaintiff's damages were purely speculative" and "not of an amount susceptible of expression in figures[.]"[7] The Court reasoned that "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."[8] The Court held that "[d]amages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate."[9]

The Court echoed its *Eastman Kodak* holding in *Story Parchment*, observing that "it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts."[10] Thus, while "damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."[11]

In *Bigelow*, the Court added: "[a]ny other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim."[12] To avoid the injustice of allowing the defendant to improperly retain its illicit profits, a jury is allowed to make a "just and reasonable" estimate of damages based on either direct or inferential proof.[13]

Given these circumstances, damages may be awarded despite imperfect proof. Judges must "observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries[.]"[14] A damages analysis based on assuming away the defendant's violation is inherently uncertain because "the vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation."[15] Nevertheless, courts will continue to apply a low threshold because "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."[16]

# B. The "But-For" Premise

A fundamental step in computing antitrust damages is to envision the manner in which a particular market would have developed, assuming that the antitrust violation did not occur and holding every other feature of the actual world constant. The purpose of this analysis is to isolate the effects of the challenged conduct so as to ascertain what would have happened "but for" the defendant's unlawful activities.[17] Then, antitrust damages can be quantified by comparing the plaintiff's actual profits (in a lost profits case), purchase prices (in an overcharge case), or the like, against what the plaintiff would have enjoyed absent the illegal conduct.[18]

Applying the "but-for" analysis can take a variety of forms, depending on the plaintiff bringing the claim and type of relief sought. For instance, a plaintiff who is a direct purchaser of products whose prices are artificially inflated due to anticompetitive conduct would typically seek overcharge damages, which are measured as the difference between the price the plaintiff actually paid and the price that would have prevailed in the absence of the antitrust violation (the "but-for" price), multiplied by the quantity of the product that was actually purchased.[19] This difference between the price that actually prevailed and the price that would have prevailed in the but-for world is called the "overcharge."[20] In contrast, for competitors prevented from fully competing in the marketplace by anticompetitive conduct, applying the but-for premise may require comparing the competitor-plaintiff's actual profits versus the profits the plaintiff would have earned in a world free of the market restraint—as was the case in *Eastman Kodak*, *Story Parchment*, and *Bigelow*. In addition, to the extent that an impaired competitor seeking lost profits enjoyed profits or benefits in the actual world that it would not have received but for the violation, some courts have required an offset.[21] A potentially different analysis may be required to establish the amount of overcharge paid by a plaintiff suing under state law as an *indirect purchaser* of the good in question (that is, who is suing as a purchaser of a product from an entity or person other than the claimed antitrust violator or entity in league with the antitrust violator). In such a case, the damages computation, depending upon the data available and the market or markets at issue, may involve, in part, an assessment of how much of the overcharge was "passed on" to the indirect purchaser.

The but-for premise requires some conceptualization of the actions in which the defendant might have engaged in the but-for world, instead of committing the violation. For certain types of violations, such as unlawful terminations by suppliers, the usual assumption is that the termination did not occur, leaving the supply relationship intact.[22] For other types of violations, such as overcharges caused by exclusionary conduct or cartel behavior, it is necessary to construct a but-for price that the evidence shows likely would have prevailed absent the violation.[23] Importantly, it is not relevant that the defendant or defendants could theoretically have caused the same harms through lawful means; what matters is what they did and likely would have done.[24] For instance, if the violation is cartel behavior and the claimed harm artificially inflated prices, it is not relevant that a member of the cartel could theoretically have raised prices acting alone absent the cartel, unless it could be shown that such a cartelist would have done so regardless.

# C. Methods for Quantifying Damages

Plaintiffs may rely on one or more of a number of methodologies to quantify the damages arising from anticompetitive conduct. In every case, however, courts require that the economic model used must isolate the effect of the anticompetitive conduct.[25] The process of separating out effects of the challenged conduct from other unrelated factors is typically accomplished by comparing the experience in the actual world and the experience the plaintiff likely would have had in a but-for world free of the challenged anticompetitive conduct, holding all other factors the same.

A variety of models can be used to re-construct the but-for world, including "Before-During-After" models, "Yardstick" models, Projection-based models, and Cournot or Bertrand simulation models. These are described in more detail in later chapters, but an overview is provided here.

*Before-During-After Models*. These models seek to isolate harm flowing from the challenged anticompetitive conduct by comparing the plaintiff's experience in the same market before, or after, the misconduct with its experience during the time the conduct was ongoing, which is sometimes referred to as the "damages period." The "Before-During" model acknowledges the likelihood that for a plaintiff who participated in the *same* market before or after the damages period, its actual experience in the time

period before the violation may serve as a proxy for the plaintiff's but-for experience during the damages period.[26] A similar logic applies to the "During-After" model, where, the plaintiff's actual experience after the damages period may serve as a proxy.[27]

*Yardstick Models.* These models seek to isolate harm flowing from the challenged anticompetitive conduct by comparing the experience of the plaintiff in a market subject to anticompetitive conduct to the experience of the plaintiff, or another firm, in a comparable market unaffected by the defendant's violation.[28] The yardstick employed must be comparable to the industry and firm in question.[29] The yardstick method is particularly useful where the before-during-after approach is inappropriate, for example where the plaintiff is a start-up that never began operations in the affected market,[30] or where data for the market free of the antitrust violation are not available. The yardstick approach often requires data about the proxy market participant's sales and profits, or prices paid. These data serve as a proxy to reflect what the plaintiff's experience would have been but for the illegal conduct and, as such, when compared to the plaintiff's actual experience can provide a means to measure the damages suffered.

In either the before-during-after approach or the yardstick approach issues of comparability may arise. In the former, changes in market conditions during the damages period may raise doubts about the direct comparability of the damages period prices or profits to prices and profits before or after. With respect to a yardstick approach, differences in the yardstick and the market subject to anticompetitive conduct may raise questions about their comparability. However, a perfect comparator is not required, and adjustments may be used to account for differences.[31] Thus, while in some cases the proxy may be so lacking in comparability that the court will reject it,[32] whether the proxy is reasonably comparable is usually a question for the trier of fact.[33] This is because only a reasonable approximation is necessary for damages, so a proxy can be applied even if it does not fully correspond to the plaintiffs' situation.[34]

Because the before-during-after approach looks outside the damages period in the same market, and the yardstick approach looks to a different market, one may need to examine changes in economic conditions over time or across markets, the plaintiff's circumstances, or other variables which could affect prices, sales, and profits. One tool widely used by economists to

account for such changes in economic conditions is a statistical technique known as multiple regression analysis.[35] In the context of antitrust damages, multiple regression analysis is useful because it allows an expert to control for variables *other* than the anticompetitive conduct that may change between the damages period, or the market in question, and the benchmark or yardstick used to model the but-for world. Regression analyses are discussed in greater detail in Chapter 6.

*Projection-Based Models.* Courts have also accepted internal business projections by market actors of expected prices, sales, or profits for the damages period, formulated before the violation was known or anticipated, as the basis for but-for predictions.[36] As one court has noted:

> [I]nternal projections for future growth often serve as legitimate bases for expert opinions. Businesses are generally well-informed about the industries in which they operate, and have incentives to develop accurate projections. As such, experts frequently use a plaintiff's business plan to estimate the plaintiff's expected profits in the absence of the defendant's misconduct.[37]

However, if a defendant shows that actual events and conditions during the damages period (unrelated to the violation) departed substantially from the assumptions underlying the projections, an inference that the plaintiff failed to achieve its projected performance solely because of the violation may be undermined or weakened.[38]

*Cournot and Bertrand Models.* Cournot and Bertrand models provide another means to predict the prices that would have prevailed in the but-for market, and hence damages in private antitrust actions. They can be particularly useful in cases where before-during-after models and yardsticks may be unavailable or difficult to derive. The Cournot and Bertrand models are structure-based models with assumptions made regarding non-cooperative strategic interaction among the firms absent conspiratorial behavior. The Cournot model assumes that interaction among firms sets quantities and their customers pay the prices determined by the total output.[39] The Bertrand model assumes that interaction among firms sets prices and their customers choose quantities at the prices set.[40] In the Bertrand and Cournot approaches to quantifying damages, but-for prices are simulated

based on the theoretical relationship between price and factors such as market-concentration, demand elasticity, and marginal cost.[41]

The Department of Justice and the Federal Trade Commission use Cournot and Bertrand models routinely in evaluating prospective mergers to predict what prices would exist if two firms merged.[42] These agencies rely on these techniques because, as the agencies are attempting to forecast the implications of merger that has not been consummated and whose price effects are as yet unknown, data are not available to construct a before-during-after model. Bertrand and Cournot models can similarly be used to predict but-for prices in private antitrust actions where before-during-after methods are not available.[43] As with other types of predictive constructs, Bertrand and Cournot models must be rooted in the facts of the case.[44] Indeed, because Bertrand and Cournot models are frequently based on data which is specific to the market which is subject to the misconduct, they may have an advantage over yardstick models that rely on entirely different markets.[45]

* * *

The use of any of the above models is not required, and the plaintiff may instead build its but-for world based on other relevant data and economic theory.[46] In that case, however, it may be challenging for the plaintiff to establish that the difference between the custom-built but-for plaintiff and the plaintiff's actual experience is attributable to the violation.[47] A simpler approach might be to estimate the profits the plaintiff would have made on sales to specific customers lost because of the violation.

Several courts have further held that a plaintiff must disaggregate the effects of the violation from other, lawful causes of plaintiffs' harm. If the model on its face indistinguishably includes effects of lawful and unlawful conduct, and it is impossible to distinguish the effect of each on prices and profits, then it may be vulnerable to attack.[48] Also, a defendant may attempt to show that independent causal factors other than the violation explain at least some substantial part of the difference between the but-for plaintiff's experience and that of the actual plaintiff.[49] However, the antitrust plaintiff need not prove the violation was the only cause of its damages; proof that the violation was a material cause of its damages is sufficient, as discussed in prior chapters.[50] Thus, a plaintiff is entitled to recover damages caused

jointly by lawful and unlawful means. In addition, where two or more wrongdoers cause a harm to the plaintiff that is incapable of division, then damages should not be apportioned, and each wrongdoer is liable for the entirety of the harm done.[51]

While the focus is often on whether the plaintiff's damages model has adequately isolated the effects of the violation, occasionally the plaintiff's but-for world is rejected on its face as not credible. For example, the posited but-for competitor plaintiff may be unrealistically successful, indicating that the calculated damages are inflated. Astronomical rates of return claimed by a plaintiff seeking lost profits, for example, will likely cast doubt on the reasonableness of the plaintiff's quantification, regardless of how it was derived.[52] Another potential failing of a plaintiff's damages theory may arise if, when applied in a context in which there is no misconduct, it nonetheless yields positive damages.[53]

Similarly, the quantification will be weakened if the defendant can show that it conflicts with basic economic forces. For example, an impaired competitor plaintiff may claim that absent the illegal conduct, it could have charged higher prices—prices higher than any of its competitors. Absent an explanation of how it could have maintained such high prices for a sustained period without inviting price competition, expansion, or new entry, such a damages model may defy economic theory. Moreover, an assumption that the but-for plaintiff would charge higher prices than those the plaintiff actually charged, while maintaining or increasing sales volume, would require further examination as to whether and how such a claim can conform to basic economic theory.[54]

# D. Mitigation

After an antitrust plaintiff has demonstrated the impact of the violation, some courts have held that it must take reasonable measures to minimize its damages.[55] Failure to take reasonable steps to mitigate damages may be a reason to reduce, or even eliminate altogether, damages claimed by the plaintiff.

The defendant has the burden to prove that the plaintiff did not mitigate its antitrust damages, and that the plaintiff's conduct in failing to take steps to mitigate was unreasonable and aggravated the harm.[56] The plaintiff does not

have an absolute obligation to pursue an alternative course of conduct.[57] Hindsight should not be used to gauge whether the plaintiff should have adopted an alternative that, as it turns out, would have been beneficial.[58] The test is whether it was unreasonable under the circumstances for the plaintiff to forgo the mitigation opportunity, not simply whether the opportunity was the next best alternative available.[59]

The plaintiff must be shown to have failed to take reasonable steps to avoid its damages.[60] For instance, in the case of a terminated distributor pursuing a refusal to deal theory, the plaintiff may not recover for the loss of its business if it "bypasse[d] an obviously adequate alternative supplier[.]"[61] However, in cases where the affected product was not available from another source (as is often the case for a purchaser of a product subject to a price-fixing conspiracy), the purchaser plaintiff may be relieved of a duty to mitigate.[62] Moreover, where the violators concealed their wrongdoing, the plaintiff cannot be expected to mitigate or otherwise offset damages that the plaintiff does not know it is incurring.[63]

Actual mitigation efforts by the plaintiff may affect its recoverable damages in a number of ways. Whether or not the efforts are successful, reasonable expenditures pursuing them are recoverable.[64] Even if the mitigation proves successful, the disruption suffered while the plaintiff pursued mitigation also may support a recovery of damages.[65] On the other hand, a plaintiff seeking redress for lost profits may find its damage claims barred if mitigation frees up resources that produce greater returns than would have been earned in the absence of the violation.[66]

Quantifying the effect of a failure to mitigate may produce a role reversal for the plaintiff and the defendant. To implement a failure to mitigate defense, the defendant will need to construct a new hypothetical world, one in which the plaintiff pursues the reasonable mitigation opportunity that it did not pursue in the real world.[67] The recoverable damages would be the difference between the plaintiff's hypothetical experience absent the violation and the plaintiff's hypothetical experience if it had mitigated.[68]

---

1. Associated Gen. Contractors v. Cal. State Council of Carpenters (*AGC*), 459 U.S. 519, 536 (1983) (only certain "part[ies] injured by an antitrust violation may recover treble damages"). For a fuller discussion of

antitrust injury and which plaintiffs may recover damages, see AMERICAN ANTITRUST INSTITUTE, PRIVATE ENFORCEMENT OF ANTITRUST LAW IN THE UNITED STATES 64-94 (2012).

[2]. Los Angeles Mem'l Coliseum Comm'n v. NFL, 791 F.2d 1356, 1360 (9th Cir. 1986). *See also In re* Scrap Metal Antitrust Litig., 527 F.3d 517, 533 (6th Cir. 2008) ("Once liability is established . . . a plaintiff's proof of damages is evaluated under a more lenient standard.").

[3]. 273 U.S. 359 (1927).

[4]. 282 U.S. 555 (1931).

[5]. 327 U.S. 251 (1946).

[6]. The Supreme Court has recently reaffirmed this line of precedent, observing in the antitrust context that damages "calculations need not be exact." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013) (citing *StoryP archment*, 282 U.S. at 563).

[7]. *EastmanK odak*, 273 U.S. at 378.

[8]. *Id.* at 379.

[9]. *Id*. (internal quotes omitted).

[10]. *StoryP archment*, 282 U.S. at 563.

[11]. *Id.*

[12]. *Bigelow*, 327 U.S. 251, 264 (1946).

[13]. *Id.*

[14]. Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 123 (1969).

[15]. J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 566 (1981).

[16]. *Bigelow*, 327 U.S. at 265. *See also Story Parchment*, 282 U.S. at 563-65 (holding that where violation "preclude[s] the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts"); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379 (1927) ("a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible").

[17]. *See,e .g.*, *Bigelow*, 327 U.S. at 259, 263 (referring to proof of competitor plaintiff's profits "in the absence of" the restraints, or "if the restraints had not been imposed"); LePage's Inc. v. 3M, 324 F.3d 141, 165 (3d

Cir. 2003) (damage model should "measur[e] what, hypothetically, would have happened 'but for' the defendant's unlawful activities").

18. *See, e.g.*, *LePage's*, 324 F.3d at 165; Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 107 (2d Cir. 2007) (damages could be measured as "the difference between the but-for fee and the actual fee paid"); New York v. Julius Nasso Concrete Corp., 202 F.3d 82, 88 (2d Cir. 2000) (holding, in a price-fixing case, the measure of damages is "the difference between the price actually paid by the [plaintiff] on the contracts and the price it would have paid absent the conspiracy").

19. *See* Howard Hess Dental Labs v. Dentsply Int'l, 424 F.3d 363, 374 (3d Cir. 2005) ("the standard method of measuring damages in price enhancement cases is overcharge, . . . [that is] 'the difference between the actual price and the presumed competitive price multiplied by the quantity purchased'"); PHILLIP E. AREEDA, ET AL., ANTITRUST LAW ¶ 392a (2013) (an overcharge "is the difference between the illegal price that was actually charged and the price that would have been charged 'but for' the violation multiplied by the number of units purchased"). The plaintiffs' overcharge injury is deemed complete at the time it paid the overcharge on its actual purchases. Illinois Brick Co. v. Illinois, 431 U.S. 720, 724 (1977) ("a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the full amount of the overcharge paid by it"); Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. 293, 303 (D.D.C. 2007) ("[a]ntitrust injury is considered complete when the direct purchaser pays an illegal overcharge"). Thus, overcharges are computed on products a direct purchaser actually bought at the allegedly artificially inflated price, even if the plaintiff might have made fewer purchases in the but-for world. *See In re* Niaspan Antitrust Litig., No. 13-MD-2460, 2015 WL 4197590, at *1 (E.D. Pa. July 9, 2015) (rejecting argument that damages must be offset "by the amount of any purchases . . . that would not have been made in a 'but for' world"); *Inr e* Prograf Antitrust Litig., No. 11-2242, 2014 WL 7641156, at *4 (D. Mass. Dec. 23, 2014); *In re* Skelaxin (Metaxalone) Antitrust Litig., No. 12-MD-2343, 2014 WL 2002887, at *5 (E.D. Tenn. May 15, 2014); Teva Pharm. USA, Inc. v. Abbott Labs., 252 F.R.D. 213, 230-31 (D. Del. 2008) ("[d]efendants . . . enmesh the idea of a 'but for' world with a 'but for' price . . .

plaintiffs only are required to show that they, in fact, did purchase TRICOR® at a higher price once an antitrust violation and causal relationship are established"); *In re* Relafen Antitrust Litig*,* 346 F. Supp. 2d 349, 368-69 (D. Mass. 2004).

[20]. *Illinois Brick*, 431 U.S. at 724-725; Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 489 (1968).

[21]. *See, e.g., LosA ngelesM em'lC oliseumC omm'n,* 791 F.2d at 1367.

[22]. *See, e.g.*, DeLong Equip. Co. v. Wash. Mills Elec. Minerals Corp., 990 F.2d 1186, 1203 (11th Cir. 1993), *amended per curiam*, 997 F.2d 1340 (11th Cir. 1993). The amount of damages suffered will depend on how long the wrongfully terminated relationship would otherwise have continued. *See, e.g.*, Coastal Fuels of P.R. v. Caribbean Petrol. Corp., 175 F.3d 18 (1st Cir. 1999).

[23]. *See, e.g., Cordes*, 502 F.3d at 107 (where conspiracy allegedly led to enhanced prices, overcharge damages could be measured as "difference between the but-for fee and the actual fee paid"); Berkey Photo v. Eastman Kodak Co., 603 F.2d 263, 297-98 (2d Cir. 1979) (monopolization overcharge damages are "the price increment caused by the anticompetitive conduct that originated or augmented the monopolist's control over the market").

[24]. *See*, *e.g.*, Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931). In *Story Parchment*, the plaintiff was permitted to seek damages based on the entire difference between prevailing prices before and after the alleged predation, despite defendants' claim that they could have lowered prices anyway by independent (and hence lawful) means. *See id.* at 561-62. So long as "the old prices were reasonable, and that they would not have changed by reason of any economic condition, but would have been maintained except for the unlawful acts" of the defendants, the jury might base damages on the difference between the old price and the new one. *Id.Se eal so* H.J., Inc. v. ITT Corp., 867 F.2d 1531, 1550 (8th Cir. 1989) (defendant may not challenge damage model's assumption of prices at levels before defendant's predatory price cutting by asserting that defendant could have competed with lower but non-predatory prices).

[25]. *See*, *e.g.*, Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013); *see also infra* n.45 ("a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the

plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible").

26. *See, e .g.*, Bigelow v. RKO Radio Pictures, 327 U.S. 251, 259-64 (1946) (comparison of plaintiff's profits before the conspiracy to its profits during the conspiracy); *Story Parchment*, 282 U.S. at 561-62 (comparison of plaintiff's prices before a predatory pricing conspiracy to prices during the conspiracy); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 376-79 (1927) (comparison of plaintiff's profits before its unlawful termination to profits after the termination); *In re* Mushroom Direct Purchaser Antitrust Litig., No. 06-0620, 2015 WL 5767415, at *7 (E.D. Pa. July 29, 2015) ("The purpose of separating conduct free periods and conduct periods is to create a benchmark conduct free period as an evidentiary foundation for inferring what the prices would have been in the [conduct] period[s] but for the [alleged] illegal activity.") (internal quotes omitted).

27. *See, e .g.*, Independence Tube Corp. v. Copperweld Corp., 691 F.2d 310, 330-31 (7th Cir. 1982), *rev'd on other grounds*, 467 U.S. 752 (1984).

28. *See, e.g.*, *Bigelow*, 327 U.S. at 251-52 (comparison of plaintiff's profits during the conspiracy to those of a comparable competitor not affected by the conspiracy). *See also LePage's*, 324 F.3d at 165 ("an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities."); Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768, 793 (6th Cir. 2002) (yardstick is among "generally accepted methods for proving antitrust damages").

29. Eleven Line v. N. Tex. State Soccer Ass'n., 213 F.3d 198, 208 (5th Cir. 2000) ("An antitrust plaintiff who uses a yardstick method of determining lost profit bears the burden to demonstrate the reasonable similarity of the business whose earning experience he would borrow.").

30. *See, e.g.*, Lehrman v. Gulf Oil Corp., 500 F.2d 659, 667 (5th Cir. 1974) (yardstick method available to plaintiff "who is driven out of business before he is able to compile an earnings record").

31. *See, e.g.*, Blue Cross & Blue Shield United v. Marshfield Clinic, 152 F.3d 588, 592-94 (7th Cir. 1998). A lack of comparability may cut either way: the proxy may understate the success the plaintiff would have achieved but for the violation, making the damages estimate

conservative, or may overstate the plaintiff's but-for success, inflating the damages. Defendants will naturally focus on the latter possibility to the exclusion of the former. Because a proxy methodology is a necessarily imprecise way to isolate the effects of an antitrust violation, its sufficiency, at least as an initial matter, should rest on a standard of overall reasonableness, subject to more detailed rebuttal. *See, e.g.*, National Farmers' Org. v. Assoc. Milk Producers, 850 F.2d 1286, 1294-97 (8th Cir. 1988), *amended*, 878 F.2d 1118 (8th Cir. 1989).

32. *See,e .g.*, Eleven Line v. N. Tex. State Soccer Ass'n, 213 F.3d 198, 206-09 (5th Cir. 2000) (average of plaintiff's experience in other markets not shown to be comparable is insufficient).

33. *See,e .g.*, Image Tech. Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1221 (9th Cir. 1997); *In re* Prograf Antitrust Litig., No. 11-2242, 2014 WL 7641156, at *3 (D. Mass. Dec. 23, 2014) ("[i]t was for the jury to consider [plaintiff's] arguments about the [differences between the yardstick and the but-for world] on the validity of comparison and to adjust its damage award accordingly") (internal quotes and citation omitted; alterations in original).

34. *See*, *e.g.*, *National Farmers' Org.*, 850 F.2d at 1295 (affirming use of yardsticks despite "many defects" and although they may not be "perfect").

35. *See*, *e.g.*, Conwood Co. v. U.S. Tobacco Co., 290 F.3d at 768, 793-95 (6th Cir. 2002); City of Tuscaloosa v. Harcros Chems., Inc*.*, 158 F.3d 548, 566 (11th Cir. 1998) (regression analysis is among "well-established and reliable methodologies" for proving antitrust damages); *In re* High Pressure Laminates Antitrust Litig., No. 00 MDL 1368 (CLB), 2006 WL 931692, at *1 (S.D.N.Y. Apr. 7, 2006) (refusing to exclude regression damages model).

36. *See*, *e.g.*, H.J., Inc. v. ITT Corp., 867 F.2d 1531, 1549-50 (8th Cir. 1989); MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1099, 1160-66 (7th Cir. 1983); Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 563-67 (2d Cir. 1970).

37. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 292 (3d Cir. 2012) (internal quotes and citations omitted). *See also* LePage's Inc. v. 3M, 324 F.3d 141, 165 (3d Cir. 2003) (affirming damage award that used, inter alia, projections as basis for computing extent of injuries); *Autowest,* 434 F.2d 566 (holding that damages testimony was

admissible because the financial projections on which the testimony was based "were the product of deliberation by experienced businessmen charting their future course"). *Cf. In re* Nifedipine Antitrust Litig., 246 F.R.D. 365, 371 (D.D.C. 2007) (defendants' projections that prices would have been lower for purchasers in but for world were among "powerful and compelling" proof of plaintiffs' injuries).

38. *See, e .g.*, ILC Peripherals Leasing Corp. v. IBM, 458 F. Supp. 423, 434-36 (N.D. Cal. 1978) (failure to "adjust these forecasts to reflect the results of actual experience" rendered damages evidence speculative), *aff'd per curiam sub nom.* Memorex Corp. v. IBM, 636 F.2d 1188 (9th Cir. 1980). *See also ZF Meritor*, 696 F.3d at 292 (affirming exclusion of damage model based on projection due to lack of information of circumstances under which projection was created and the assumptions it relied upon).

39. *See* Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization 161-70 (4th ed. 2005).

40. *Id.* at 171-76.

41. *See* James A. Brander and Thomas W. Ross, *Estimating Damages from Price-Fixing*, in Litigating Conspiracy 349-351 (Stephen Pitel, ed. 2006).

42. See Andrew R. Dick, Merger Policy Twenty-Five Years Later: Unilateral Effects Move to the Forefront, Antitrust 25 (Fall 2012), at 26-27.

43. *See, e .g.*, Castro v. Sanofi Pasteur Inc., No. 11-7178, 2015 WL 5770381, at *11 (D.N.J. Sept. 30, 2015) (allowing use of Bertrand model in computing damages); Ticketmaster Corp. v. Tickets.com, Inc., No. 99-7654, 2003 WL 25781900, *3 (C.D. Cal. Jan. 27, 2003) (refusing to exclude Cournot model of private antitrust damages).

44. *See, e.g.*, Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039 (8th Cir. 2000). In *Concord Boat*, the district court had upheld "the soundness of the Cournot model as a fundamental, time-tested economic tool that has been widely accepted for years by reputable economists," and noted that "the Cournot model provides the theoretical underpinnings for the Department of Justice's Horizontal Merger Guidelines and the widely used Herfindahl-Hirschman Index (the 'HHI')." Concord Boat Corp. v. Brunswick Corp. 21 F. Supp.2d 923, 934 (E.D. Ark. 1998). The Court of Appeals did not take issue with the

acceptability of Cournot models generally, but found that the specific model offered by the plaintiffs was "not grounded in the economic reality" of the market because it assumed competitors were identical and would have each have 50 percent share in hypothetical market, but ignored that competitors were not symmetric and that defendant's share exceeded 50 percent even before it began engaging in the alleged anticompetitive conduct. *ConcordB oat*, 207 F.3d at 1056-57.

45. *See, e.g.*, *Castro*, 2015 WL 5770381, at *12 (discussing ways in which Bertrand model may be superior to other damage models).

46. As the Fifth Circuit held in *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir. 1974), the plaintiff's method of proving damages may be "specially tailored" to fit its case. For examples of such damages models, see DeLong Equip. Co. v. Wash. Mills Elec. Minerals Corp., 990 F.2d 1186, 1203-06 (11th Cir.), *amended per curiam*, 997 F.2d 1340 (11th Cir. 1993); Dolphin Tours v. Pacifico Creative Serv., 773 F.2d 1506 (9th Cir. 1985) (estimated but-for market share based on survey of customers); Park v. El Paso Bd. of Realtors, 764 F.2d 1053, 1066-68 (5th Cir. 1985); Southern Pac. Commc'ns Co. v. AT&T, 556 F. Supp. 825, 1073-90 (D.D.C. 1983), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984).

47. *See,e .g.*, *SouthernP ac.C ommc'ns*, 556 F. Supp. at 1092-93 (stating that difference between financial performance of but-for and actual plaintiff "due at least in substantial part to a number of factors wholly unrelated to any conduct (lawful or unlawful) of defendants"); *In re* IBM Peripheral EDP Devices Antitrust Litig., 481 F. Supp. 965, 1019-21 (N.D. Cal. 1979) (holding that "arbitrary" adjustments to account for "other causative factors" were insufficient), *aff'd sub nom.* Transamerica Computer Co. v. IBM, 698 F.2d 1377 (9th Cir. 1983). A custom-built model survived similar attacks in *Litton Systems v. AT&T*, 700 F.2d 785, 822-25 (2d Cir. 1983).

48. *See, e.g.*, Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013) (holding plaintiffs failed to present viable classwide damages approach where the damage model was tied to multiple theories of liability, but only one theory was triable); MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1161-64 (7th Cir. 1983). *But see* LePage's Inc. v. 3M, 324 F.3d 141, 165-66 (3d Cir. 2003) (stating that given that 3M's conduct taken as a whole violated Section 2, disaggregation was "unnecessary, if not

impossible."); National Farmers' Org. v. Assoc. Milk Producers, 850 F.2d 1286, 1307 (8th Cir. 1988) (the fact that defendants' actions were "composed of lawful and unlawful conduct so tightly intertwined as to make it difficult to determine which portion of the damages claimed were caused by the unlawful conduct should not diminish the recovery" and that "the harmful consequences of certain unlawful conduct may have been exacerbated by otherwise lawful conduct," and that in that case "the fact that lawful conduct contributed to additional injury should not prohibit recovery for that injury"); Spray-Rite Serv. Corp. v. Monsanto, 684 F.2d 1226, 1242-43 (7th Cir. 1982) (defendant had not demonstrated that disaggregation was possible or necessary, and that "[w]e will not deprive Spray-Rite of this recovery merely because the jury may have found that Monsanto combined lawful conduct with unlawful conduct making it impossible to determine which portion of the total damages was caused by the unlawful conduct."), *aff'd*, 465 U.S. 752 (1983).

49. *See, e.g., SouthernP ac.C ommc'ns*, 556 F. Supp. at 1090-91.

50. *See* Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 114 n.9 (1969). *See also* Chapter 1, Section B for a discussion of the material cause standard.

51. Discover Fin. Servs. v. Visa USA, Inc., 598 F. Supp. 2d 394, 410-12 (S.D.N.Y. 2008).

52. *See* Olympia Equip. Leasing Co. v. W. Union Tel. Co., 797 F.2d 370, 381-83 (7th Cir. 1986).

53. *See, e.g., Inr e* Rail Freight Fuel Surcharge Antitrust Litig., 725 F.3d 244 (D.C. Cir. 2013). In *Rail Freight*, the court held that the presence of such "false positives" left the damages methodology subject to criticism. *Seei d*. at 253-55.

54. *See, e.g.,* Gray v. Shell Oil Co., 469 F.2d 742, 749-50 (9th Cir. 1972).

55. *See, e.g.,* Malcolm v. Marathon Oil Co., 642 F.2d 845, 863 (5th Cir. 1981) (observing that under contract law, injured party need only pursue "reasonable" efforts to mitigate damages).

56. *See, e.g., Malcolm*, 642 F.2d at 863. *See also* Litton Sys., Inc. v. AT&T Co., 700 F.2d 785, 820 n.47 (2d Cir. 1983) (mitigation is an affirmative defense which defendant must plead and prove).

57. *Cf*. RESTATEMENT (SECOND) OF CONTRACTS § 350 (1981).

58. *See,e .g.*, Veranda Beach Club v. W. Surety Co., 936 F.2d 1364, 1386 (1st Cir. 1991).

59. *See* Fishman v. Estate of Wirtz, 807 F.2d 520, 556-60 & n.34 (7th Cir. 1986) (holding that mitigation doctrine does not necessarily require plaintiff to undertake the risks of the next best alternative to an unlawfully foreclosed investment).

60. *Malcolm*, 642 F.2d at 863.

61. *Id.*

62. *SeeI nr e* TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827 SI, 2012 WL 6000154, at *3 (N.D. Cal. Nov. 30, 2012) ("the Court declines to hold that defendants may assert mitigation as a defense to Dell's horizontal price-fixing claim"); *In re* Airline Ticket Comm'n Antitrust Litig., 918 F. Supp. 283, 286 (D. Minn. 1996) ("[i]n a horizontal price-fixing case, . . . mitigation and offset generally do not affect the ultimate measure of damages."); Westman Comm'n Co. v. Hobart Corp., 541 F. Supp. 307, 314-15 (D. Colo. 1982) (refusal-to-deal case; the "argument that [plaintiff] failed to mitigate its damages . . . is ridiculous. This argument implicitly assumes that [defendant] was guilty of a continuing violation of the antitrust laws, yet attempts to place the onus of stopping that violation on [plaintiff] . . . . [A] defendant [cannot] claim immunity from damages caused by its illegal actions because a plaintiff could have stopped them . . . .").

63. *See, e.g.,* Home Indem. Co. v. Lane Powell Moss & Miller, 43 F.3d 1322, 1329 (9th Cir. 1995) ("[T]he duty to mitigate damages does not arise until the party upon whom the duty is impressed is aware of facts making the duty to mitigate necessary." (citation omitted)); Ford Motor Credit Co. v. Hairston, No. 4:06CV00004, 2006 WL 2850615, at *4 (W.D. Va. 2006) ("[I]t would be an absurd misapplication of the rule for mitigation of damages to expect the Plaintiff to minimize injury before the discovery of the breach.").

64. *See* Cont'l Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 508 (4th Cir. 2002) (costs of finding alternatives to mitigate damages qualify as antitrust injury); Lee-Moore Oil Co. v. Union Oil Co., 599 F.2d 1299, 1306 (9th Cir. 1979).

65. *See* Pierce v. Ramsey Winch Co., 753 F.2d 416, 436-37 (5th Cir. 1985).

66. *Seei d.* at 436.

67. *See* Roger D. Blair & William H. Page, *"Speculative" Antitrust Damages*, 70 Wash. L. Rev. 423, 456-57 (1995) (explaining that to account for a failure to mitigate, "the plaintiff's actual condition must be adjusted for rational mitigation efforts before it is compared with the but-for condition").

68. *See* Malcolm v. Marathon Oil Co., 642 F.2d 845, 863 (5th Cir. 1981).

# CHAPTER 5

# ECONOMIC AND FINANCIAL CONCEPTS

This chapter discusses basic economic and financial concepts used in calculating antitrust damages. It explains factors damages experts consider, data damages experts use, and calculations damages experts often make in order to determine the impact anticompetitive conduct has had on the plaintiffs' financial health. In principle, there is no single approach that can or should be used in the determination of damages; rather, the most effective approach will depend on the particular anticompetitive conduct at issue (e.g., the unilateral restraint of trade or horizontal price fixing), the specific legal claims being asserted (e.g., overcharges or lost profits), and the available evidence. Regardless of the context, however, what is common is an effort to measure the *incremental amount* by which the plaintiff's and/or defendant's financial condition has been affected by the alleged anticompetitive act(s). As introduced in Chapter 4, the framework used to undertake this incremental analysis is commonly referred to as "but-for" analysis and involves a comparison of: (1) the financial performance of the plaintiff and/or defendant in the actual world; and (2) the performance of the relevant parties in the world but for the occurrence of the anticompetitive conduct (the "but-for" world). Damages experts often rely on the subject company's financial statements and more detailed financial data obtained through the discovery process. Accordingly, this chapter also discusses corporate financial statements and certain financial calculations often made in measuring antitrust damages. Details on some related economic concepts and tools, such as regression analysis, are provided in subsequent chapters.

# A. Damages in Antitrust Litigation

The purpose of awarding damages is to compensate the plaintiff for the effects of the alleged "bad act(s)" committed by the defendant, also known as making the plaintiff whole.[1] The expert must be careful to separate the effects of the anticompetitive conduct from the effects of other events to ensure that damages flow directly from the defendant's wrongful conduct. Other events might have occurred that affect the plaintiff's business that are unrelated to the anticompetitive conduct of the defendant. Or, in many cases, the plaintiff's business could be affected by both the anticompetitive conduct committed by the defendant, as well as acts by the defendant that are part of perfectly legal competition. Moreover, if the plaintiff alleges multiple wrongful acts, the expert may need to separate the effects of different acts from one another, as the jury may decide that only some of the alleged acts resulted in antitrust injury.[2] The expert must also consider any ramifications from the anticompetitive conduct that either compound or abate the effects of that conduct.[3]

Antitrust damages often take the form of overcharges or lost profits. Damages based on overcharges (discussed in Chapter 8) correspond to the amount by which a plaintiff paid too much (was "overcharged") as a result of anticompetitive actions. Damages based on lost profits (discussed in Chapter 9) correspond to the amount that the plaintiff's profits were reduced as a result of anticompetitive actions. These forms of damages are not mutually exclusive, and both may result from any particular anticompetitive behavior. For example, overcharges and lost profits can be related depending on market structure. If a plaintiff suffered economic harm in the form of an overcharge, then the plaintiff paid too much for some purchased good. If the plaintiff who paid too much was a reseller of that good and was unable to raise its own prices, then the plaintiff also suffered lost profits. Put another way, the harm suffered as a result of the overcharge is an amount equal to lost profits.

This chapter illustrates the concepts and issues that arise in calculating damages using a fictitious case alleging exclusive dealing, entitled *Acme Widget v. DEF, Inc.* The facts of the hypothetical case are as follows:

Both Acme Widget (Acme) and DEF, Inc. (DEF) manufacture widgets. Prior to 2003, both distributed widgets through one national wholesaler (WidgetDist) and a number of smaller, regional wholesalers. In 2011, DEF entered into an exclusive distribution agreement with WidgetDist, ending

Acme's access to a number of major customers who purchased only through WidgetDist. This resulted in DEF obtaining monopoly power in selling widgets to a large subset of customers. As a result, Acme's sales of widgets were halved.

It is worth noting that this fictitious case having to do with exclusionary conduct is but one form of antitrust harm, but it will serve to highlight some basic concepts in this chapter. Collusion, monopoly leveraging, resale price maintenance, and predatory pricing are some other forms of anticompetitive behavior that may give rise to damages.

# B. Factors to Consider in Developing a Damages Model

Estimation of damages requires the expert to identify the factors that affected the plaintiff in the actual world and understand how those factors would have affected the plaintiff in the but-for world.[4] Proper consideration of these dynamics involves a number of building blocks.

## 1. Determining the Period of Injury

One of the first issues that must be addressed is to determine the start and end dates of the period of harm, or the "damages period." Modeling damages requires the identification of the specific acts that constitute the unlawful conduct and when this unlawful conduct began to affect the plaintiff's business.[5] It is reasonable to assume that the harm from unlawful conduct will affect the firm only prospectively. As such, the date on which the unlawful conduct took place (or began to take place) can provide a logical start of the damage period. However, to the extent that it takes time for the unlawful conduct to affect the plaintiff's business, the start of the damage period may be later.

Determining the end of the damage period is often more difficult than establishing the beginning. Because the negative effects of unlawful business conduct may extend beyond the end of the violation, damages often must also be assessed for a recovery period, or the period of time required for the ripples from the antitrust violation to dissipate and for the business to

recover fully from the violation.[6] The length of the recovery period and the amount of harm suffered at different times during that period depend upon the circumstances at hand.

For example, Acme's disappearance from the regional widget market for several years may have affected consumer confidence in its ability to produce quality widgets. If this happened, it might take both time and money to restore customer confidence and restore Acme's operation to its prior profitability. These lost revenues after the wrongful conduct has ended as well as any required investments in the restoration of goodwill may constitute elements of damages. In other cases, recovery may be instantaneous.

## 2. Historical Performance

Damage models based on the "Before-During-After" models discussed in Chapter 4 look at historical performance as an indicator of what might have happened absent the anticompetitive conduct.[7] Whether historical performance can provide a useful guide to future performance depends on several factors.

First, the historical period must be "clean," or unaffected by the anticompetitive conduct. For this reason, one might use a "Before-During" model—focusing on the period immediately preceding the start of the damage period—a "During-After" model—focusing on the period immediately following the damages period—or some combination of the two to establish a period when, by construction, the plaintiff's business was likely unaffected by the antitrust violation. Second, even if a "clean" period can be established, one must evaluate the extent to which—excluding the anticompetitive conduct—past conditions mirror expected future conditions, or vica versa. Competitive conditions may have evolved across time—for example, the coming and going of competitors, new technologies, or substitute goods—all of which might contribute to differences in profitability unrelated to the alleged antitrust violation. To the extent that different factors are expected to contribute to past or future performance, historical performance may not be informative. Thus, historical performance should be used with care, and it may have to be adjusted to account for events other than the anticompetitive conduct.[8]

## 3. Mitigation

In assessing damages due to anticompetitive behavior, the expert must account for actions taken by the plaintiff in response to the anticompetitive behavior that would not have been undertaken in the absence of the anticompetitive conduct. In particular, the expert must take the plaintiff's mitigation opportunities and strategies into account.[9]

For example, as Acme was foreclosed from participation in one regional market, it may have redeployed its assets and entered a different market, in which case its damages are the difference between the profits it would have earned in its preferred market less the profits it actually earned in the alternative market, plus any sunk costs (costs that cannot be recovered) it incurred as a result of its attempt to maintain a presence in the first market.[10] If Acme did not take reasonable action to pursue an opportunity to mitigate its damages, that opportunity still would have to be taken into account in estimating damages.[11] Thus, damages would not simply be but-for profits minus actual profits; rather, they would be but-for profits minus profits that would have been earned, had Acme mitigated its damages, assuming it could have done so.

## 4. Lost Opportunities

Yet another set of factors to consider in measuring damages is the value of lost opportunities that resulted from the defendants' response to the anticompetitive conduct.[12] In the case of Acme, assume that the managers of the firm had a plan for Acme's growth and development at the time of DEF's unlawful conduct. The unlawful conduct may have interrupted those plans and forced the managers to divert managerial time, effort, and other resources to counteracting the unlawful conduct. For example, the company may have planned to expand into a foreign market but was unable to do so, because DEF's conduct required Acme managers to focus on maintaining U.S. sales instead. The opportunity costs associated with this diversion of time and resources, or the forgone profits on the diverted resources, also may prove to be compensable damages,[13] provided that they can be estimated without the expert engaging in undue speculation.[14]

## 5. Competitive Responses

The damages model must account for changes in behavior of competitors that would have been made in the but-for world. The plaintiff may not be the only firm that would have behaved differently in the but-for world than it did in the actual world. Differences in the behavior of other firms would have affected the plaintiff and thus must be taken into account.[15]

For example, in the case of DEF's exclusionary conduct in which the defendant's actions blocked the plaintiff's continued sales in a market in which the defendant became a monopolist, the expert must account for the effects that Acme's re-entry would have had on market prices.[16] Using prices that customers actually paid to DEF as but-for prices could overstate damages, as prices may have fallen as a result of Acme's reentry.[17]

The same principle can also apply to other types of cases, including customer cases. For example, consider a class of retailers that seeks damages from a group of manufacturers accused of conspiracy. The basic damage model would posit that had there been no conspiracy, retailers would have been able to purchase the product at lower cost and thus earned higher margins. However, using actual retail prices in the calculation of but-for margins could overstate damage if lower retail costs were to trigger additional retail price competition. In this case, prices may fall and margins would be the differences between the lower but-for prices and but-for costs.

## 6. Effects of Taxes

Taxes are an explicit expense of a commercial firm and must be considered when calculating damages. If, as is generally the case, the plaintiff would have had to pay taxes on its profits in the but-for world, it would have received only the amount of after-tax lost profits. Generally, antitrust damage awards are considered gross income to a plaintiff and the plaintiff will owe taxes on any damages awarded. Accordingly, to make the plaintiff whole, the award will adjust after-tax lost profits to include taxes that the plaintiff will have to pay on most, if not all, of any award.[18]

For example, suppose that our example company, Acme, was driven out of business by the exclusionary conduct of DEF, and the proper measure of damages is the profit that Acme would have made absent the anticompetitive

act.[19] The question is whether Acme should be awarded these profits on a pretax basis or an after-tax basis. If the award were made on a pretax basis when, in fact, Acme would not have to remit taxes on the award to the government, then Acme would receive a windfall in the amount of the taxes. Consequently, receipt of profits on an after-tax basis would make Acme whole. If, however, the damage award is taxable, then the pretax profits must be awarded to provide sufficient funds for Acme to pay the taxes and have enough left over to replace the after-tax profits that it lost due to the exclusionary conduct. If treble damages are awarded, these additional damages are taxed as ordinary income.[20]

## *7. Use of Hindsight*

There is a theoretical dispute over whether hindsight (or knowledge that has become available since the misconduct occurred) should be used in determining what would have happened in the but-for world. One school of thought (known as the ex-ante approach) is that damages should be based solely on information known as of the time of the misconduct.[21] The other school of thought (known as the ex-post approach) is that information regarding the manner in which circumstances unfolded since the time of the misconduct should be used in evaluating damages.[22] Some courts have observed that hindsight may be used in determining damages.[23]

These issues can be seen in a simple example. Suppose that DEF's anticompetitive act completely foreclosed Acme from participating in the widget market. Suppose, further, that a year after the foreclosure, widgets were found to be hazardous to children and were removed from the market, leaving DEF with a costly recall. Under these circumstances, application of the ex ante approach would base damages on Acme's expected profits at the time of the anticompetitive act, when both Acme and DEF believed selling widgets would be profitable, while the application of the ex post approach would suggest, with the benefit of hindsight, that DEF did Acme a favor, so Acme either should not receive a damage award or, in the extreme, should pay DEF.

# C. Potential Sources of Data

To calculate damages, the damages expert will need data. Two often-used sources are audited company financial statements and internal company data detailing sales and costs or profits and losses. Both are types of accounting information and, therefore, both are retrospective: they record what has already happened, such as how profitable the firm has been in the past, but not how profitable it will be in the future. Thus, financial statements and internal sales and cost data may imperfectly reflect the economic realities that should be the focus of damages analyses.[24]

# 1. *Accounting and Economic Costs and Profits*

Accounting costs differ from economic costs in two important ways. First, unlike accounting costs, economic costs account for opportunity costs and future long-run costs. Opportunity costs represent real commitment of resources that do not generate recorded accounting costs. Consider for example the case of a business owner who does not draw a salary from his or her company. In this case, there is a clear cost to have the owner work for the company (in the form of lost wages doing something else), but those costs may not be recorded in the accounting records of the company.

Second, economic costs diverge from accounting costs when expenditures provide benefits over more than one period, such as research and development expenditures or spending on durable capital. Within an accounting context, there are specific rules that govern the manner in which such expenses are recognized and incorporated into accounting expenses that may have little to do with the economic costs associated with these expenses. For example, accounting rules may dictate that the cost of a particular piece of capital equipment be amortized over a five-year period—even if the useful life of that machine is twenty years or more.

Thus, accounting profits are measured by subtracting explicit (recorded in the accounting system) costs from firm revenues, while economic costs are measures by subtracting explicit and implicit costs (i.e., opportunity costs) from revenues. Timing and interpretation distinctions such as these matter in the calculation of damages, and adjustments to accounting data may be necessary to get the "right" measure of damages to attribute to the specific anticompetitive conduct.

## 2. *Financial Statements*

Publicly-traded companies are required to file financial statements with the Securities and Exchange Commission (SEC) on a regular basis (an annual report on Form 10-K and quarterly reports on Form 10-Q).[25] Companies are typically required to follow Generally Accepted Accounting Principles (GAAP) in preparing their financial statements.[26] GAAP principles standardize reporting and therefore provide a framework for measuring profits (and ultimately damages).

Audited financial statements provide a picture of a company's financial performance and health. But how they are used to estimate damages will depend on the case at hand. For example, a public company's quarterly reports provide financial information for the past quarter and the fiscal year to date, and may provide the most current information on the company's performance. But, quarterly reports typically provide less detail than annual reports.

Annual reports usually provide much more detailed financial information than the quarterly reports and often also discuss the company's business, the market segments in which it operates, and other information that investors would find relevant.[27] Indeed, much of what is discussed in a company's annual report will shed light on the reasonableness of the but-for world, mitigation, and other factors in the damages model.

For one-product firms, the audited financial statements are often the best information from which to calculate damages. However, in many cases, the financial statements are too aggregated to be used in a damages model. If a firm makes more than one product, this will likely be the case.

Returning to the central goal of measuring antitrust damages, the expert examines the plaintiff's financial data to assess the effect of anticompetitive behavior on the plaintiff's financial performance and financial condition. If the plaintiff was overcharged, it will tend to be reflected in a weaker balance sheet.[28] Perhaps the plaintiff paid for the overcharge with cash (in which case the statement of cash flows will also reflect higher than usual expenditures), or perhaps the plaintiff took out a loan to cover the overcharge, in which case the balance sheet would reflect greater debt. Alternatively, if the plaintiff suffered lost profits, it will be reflected in lower margins on the income statement.

There are four primary statements that together constitute the company's financial statements: the balance sheet, the income statement, the cash flow statement, and the retained earnings statement. The first three of these statements are most relevant in antitrust litigation and are briefly described below.

The balance sheet, also known as the statement of financial condition, presents a snapshot of a company's assets (resources) and the various claims on those assets (liabilities and owners' equity) at a specific time, typically either the last day of the fiscal quarter or the last day of the fiscal year. There are three sections in a balance sheet: assets, liabilities, and owners' (or stockholders') equity.

The income statement, also known as the statement of operations, presents the results of the company's activities or operations over a period of time.[29] As was mentioned above, publicly-traded U.S. companies file reports on a quarterly basis, which generally show income statements for the prior three months and for the fiscal year to date, and annual reports, which generally will provide income statements for the current and two preceding fiscal years. The income statement lists all of the revenues and expenses of the company on an accounting basis. From this the expert can derive gross income, which is usually just revenues less costs of goods sold, or net income, which typically will also subtract additional expenses incurred such as depreciation, selling, general, and administrative expenses (SG&A), interest, and taxes.

While net income measures the accounting profits generated by the activities of a business during a given accounting period, cash flow measures the actual cash generated by the business, which the company's owners can use to pay dividends and/or reinvest in the business.[30] The cash flow statement combines information from the income statement with information on changes in balance sheet accounts (changes in the composition of assets and liabilities) to show how all the activities of the business have affected the company's cash balance.[31] The cash flow statement is divided into three sections: cash flows from operating activities, cash flows from investing activities, and cash flows from financing activities. While it is possible that an anticompetitive act affects all three categories of cash flows, it is more likely that those effects will be isolated to the operating cash flows.

## 3. *Internal Company Data*

Corporate-level financial statements may not report profits separately by product line. Suppose, for example, that Acme makes widgets and gidgets, but that Acme's corporate-level financial statement does not separate out the profits earned on the widget products. Usually—especially in larger firms—there exist accounting records that are more disaggregated. In particular, many firms report their profits and losses ("P&Ls") at the division level or even the product level. In addition, firms will often track division- or product-level sales and costs data, at times with detailed information on client or supplier orders. These disaggregated data are typically not required for financial statements that follow GAAP or those filed with the SEC, but they often exist in the accounting records of the firm. Usually they are obtained through the discovery process if it is important to get the specific product-level financial performance in order to estimate damages.

As described in the next section, if this type of internal financial data is collected for the purposes of assessing the harm due to anticompetitive behavior, accounting detail can be crucial.

# D. Types of Costs

In practice, a number of measures of "costs" may be relevant in a damages analysis. Costs are often categorized as "fixed" or "variable." For example, Acme's lease costs for its facilities are fixed. They do not vary with the level of Acme's widget output. These costs would not factor into a damages calculation because in both states of the world—the actual world and the world but for DEF's anticompetitive behavior—Acme's lease expense would be the same. On the other hand, Acme's raw material cost for making widgets (i.e., its steel and plastic expenditures) vary directly with Acme's widget output. Indeed, Acme's actual out-of-pocket expenditures on raw materials are lower in the actual world in which DEF monopolized the widget market and Acme's production is lower.

Costs are sometimes categorized as "indirect" and "direct." Direct costs generally relate more closely to a specific product, while indirect costs apply to multiple product lines or firm activities. In such instances, the expert may need to make a determination as to which portion of these costs are fixed versus variable. For example, a CEO's salary may be indirect (it is not

specific to a project or product line) and variable (it can vary depending on firm performance). At the same time a lease for a facility may be a direct cost for a particular product line (only that product line is manufactured in that facility), but fixed (the lease is the same cost regardless of production volume).

It might be obvious at this juncture that there are some categories of costs that are part-fixed, and part-variable. Electricity is a good example. Some power is necessary to "keep the lights on" at Acme's facilities no matter what the output, but of course additional electricity is used when the plant is making more widgets. Determining how much of Acme's electricity expenditures differed as a result of the anticompetitive effects on Acme's business is a component of the damages expert's assignment.

# E. Discounting and Interest Rates

A measure of lost profits and/or overcharges on their own does not equal damages. The damages calculation is affected by the timing of the harm, the timing of the damages payments, and the interest and discount rates used to turn past and future lost profits and/or overcharges into a lump sum payment in today's dollars. This section briefly discusses how interest and discount rates factor into the final damages figure.

## 1. Prejudgment and Post-judgment Interest

As discussed in Chapter 2, plaintiffs do not collect prejudgment interest on damage awards under Section 4 of the Clayton Act.[32] However, the plaintiff does receive postjudgment interest at a statutory rate on the judgment from the date of the award until the award is paid. Under 28 U.S.C.A. § 1961, which governs recovery of interest in civil litigation in federal courts, the rate used to calculate postjudgment interest is the "weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."[33]

## 2. Discounting and the Time Value of Money

The damages calculation must consider that there is a difference between the value of a dollar today and the value of a dollar in the future—also called the "time value of money."[34] One intuitive reason for the difference is that typically a dollar today can be invested, earn compound interest, and result in more than one dollar next year.

Determining the lump sum value as of trial (or another date) of expected future damages is done by calculating their "present value." Present value is achieved by applying a "discount rate" to the expected postjudgment damages amount. The discount rate itself is often subject to a great deal of scrutiny (as described further below).

The method used to determine the present value of future damages and the selection of an appropriate postjudgment discount rate can significantly affect the total amount of damages received by the injured party. The bigger the discount rate and the longer the period of time, the bigger the effect there will be on cash flows. For example, consider the effect of discounting on $1 million of total future damages incurred over various lengths of time and discounted at three different annual rates. When $1 million in damages are incurred over five years and discounted at a relatively low rate of 2 percent, the present value falls only slightly—to $942,692—relative to the future value. At a higher discount rate of 10 percent and with the same $1 million in total future damages spread over twenty years, the present value falls by more than half to $425,678. Spread over 100 years and discounted at 7 percent—the historical long-term return on U.S. equities—the present value of $142,693 is less than a fifth of the future value.[35] Although the future value of $1 million is identical in each scenario, the damages period and discount rate can substantially change the present value.

## 3. Choosing a Discount Rate

As the example above illustrates, the present value of future damages can be very sensitive to seemingly small changes in the discount rate. The appropriate discount rate will depend upon the riskiness of the cash flow stream—e.g., the particular lost profits that are alleged to have resulted from the anticompetitive behavior. As a general rule, the riskier the business, the higher the discount rate, and the lower the present value of a future cash flow stream.

However, there are two important distinctions to be made about risk. First, there can be a difference between the riskiness of a business at large and the riskiness of cash flows of a particular line of business. Suppose Acme's gidgets are a much more risky product than its widgets. This fact would affect the choice of an appropriate discount rate (indeed for widgets the discount rate would be lower than Acme's discount rate as a whole), not to mention other factors such as mitigation and opportunity costs.

Second, not all risk should be incorporated into the discount rate. An investment project whose payout is determined by a coin-toss is certainly risky, but this project-specific risk (also called diversifiable risk) should not be incorporated into the discount rate, as this risk can be hedged or diversified away. Market risk (also called systemic risk) is what the discount rate incorporates.

Experts use several models to estimate market risk, including the capital assets pricing model (CAPM), arbitrage pricing theory (APT), the Fama-French Three Factor Model, and other estimates of the cost of equity, debt, or a weighted average of the two—often called the weighted average cost of capital (WACC).[36] There is no consensus in the law or in finance regarding which model correctly captures market risk, and the expert must make reasoned decisions about how to model risk in each case.

## 4. Date of Discounting

The date of discounting determines how far back damages are to be discounted. This issue is particularly important when the court does not award prejudgment interest on damages, as in antitrust cases,[37] because the further back in time damages are discounted, the smaller the award. The Third Circuit has ruled that lost profit damages should be measured on the dates the plaintiff would have realized the profits, and postjudgment lost profits should be discounted back to the date of judgment. The court found that profits measured on the date of realization should not include prejudgment interest.[38]

# F. Valuation Approaches to Calculating Lost Profits

When applied to estimating lost profits, the basic framework for calculating damages discussed up to this point relates to the difference in profitability between the actual world and the world but for the anticompetitive conduct. By extension, one can translate those differences in profitability into different valuations of the firm that was affected by the allegedly anticompetitive act.

A firm is an asset that generates profit over time. If that asset is destroyed or damaged by an anticompetitive act, the damages are equal to the present value of the lost profits.[39] Earnings-based measures and market-based valuations are the most common ways to measure the present value of the lost profits.

# 1. Earnings-Based Measures: Discounted Cash Flow

The discounted cash flow method is a versatile and well-established approach to measuring the value of lost profits.[40] The discounted cash flow approach begins with accounting profits (net income) and adjusts these accounting profits to reflect the actual cash flows generated by the firm.[41] There is no single correct measure of cash flow for a damages model, and which measure is best will depend on the particulars of the company and the type of damages being measured.

In this methodology the expert uses the plaintiff's financial statements to compare the expected future cash flows of the firm in the actual and but-for world, and then compare the discounted value of those different cash flows to arrive at the earnings lost as a result of the anticompetitive conduct.

# 2. Earnings-Based Methods: Capitalized Earnings

The capitalized earnings method can be viewed as an approximation of the discounted cash flow approach. The company's but-for value is calculated by first computing the company's "normalized" earnings *prior to* the date of the anticompetitive act. (Normalized earnings are earnings that have been adjusted to remove the influence of unusual or one-time items.) The but-for value of the company is then found by "capitalizing" these normalized earnings. Earnings are capitalized by dividing them by an appropriate discount rate.[42] The company's actual value is then calculated by

computing the normalized earnings *after* the date of the anticompetitive act and capitalizing them by dividing these normalized earnings by a capitalization rate that reflects an appropriate discount rate and expected growth rate. The difference between the company's but-for capitalized value and the company's actual capitalized value would measure antitrust damages.[43]

While this model appears to be simple to apply, a number of critical assumptions have to hold for the results to make sense. First, using normalized earnings implicitly assumes the company is at a steady-state level of operations, one where earnings will grow at a constant rate so that earnings for all future years can be approximated by one year's earnings.[44] Second, capitalizing the earnings stream implicitly assumes that the normalized earnings will continue in perpetuity.[45] Thus, this approach generally is used to calculate damages only when a company is completely destroyed by the illegal act or is expected to suffer damages forever.[46]

This method can be modified to apply to a situation where damages are sustained over a defined time period and the stream of lost profits is stable over that time period. In that situation, the analyst can perform two capitalized earnings valuations—one at the beginning of the damage period and one at the end of the damage period—and discount the second valuation back to the beginning of the damage period. The difference between these two values provides an estimate of damages.[47]

## 3. Market-Based Methods

Market-based valuation methodologies are often called market multiple valuation approaches, because they use financial multiples to estimate market values. Financial multiples are ratios of market value to a measure of revenue or profits. Examples of such multiples include "market value/sales" and "market value/EBITDA" (earnings before interest, taxes, depreciation, and amortization).[48] Financial multiples based on the experience of publicly-traded comparable businesses can be used to value the injured business.[49] These multiples are applied to both the pre-injury sales (or EBITDA) and the post-injury sales (or EBITDA), with the difference between the two values providing an estimate of damages.

Since the market value of a business is the discounted value of the business's expected future cash flows, market multiple valuations (like the capitalized earnings approach) simply provide an approximation of a full-blown discounted cash flow analysis, described earlier.[50] For this method to yield reasonable results, the comparable businesses—the businesses being used as market proxies for the injured business—must be untainted by the anticompetitive conduct and very similar to the injured business (before the injury) in every important respect, including capital structure, product mix, and (most importantly) future earnings potential. Issues of whether firms are comparable (or which firms are more comparable) are often fodder for expert testimony, as exact comparables almost never exist.[51] In addition, this method will fail if sales or EBITDA do not reliably indicate the firm's future cash flow.[52] As with the capitalized earnings method, the market multiple method is most appropriate when the injury to the plaintiff is permanent.[53] Thus, this method is more likely to be useful in cases where a business is destroyed.

Another more direct market-based methodology is occasionally available. If the plaintiff is a publicly-traded company, the change in the market value of the company may indicate the damages suffered. In an efficient market, information about a company, including the effects of an illegal act by a competitor, is quickly incorporated in the market price of the company's stock.[54] If the illegal act was discovered and made public on an identifiable date (or over a relatively short period of time), then the change in the company's stock price just subsequent to that date may indicate the market's perception about the magnitude of the act's adverse effect on the company. Finance theory and judgment must be used to separate any non-injury-related price movements in the stock in order to arrive at a credible result.[55]

---

1. Antitrust damages differ from damages awarded in other civil litigation in that a private plaintiff who demonstrates harm from an anticompetitive act receives "threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). Treble damages are awarded, in part, to induce plaintiffs to bring private suits for antitrust violations. *See* Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp., 604 F.3d 1291, 1304-1305 (11th Cir. 2010). Treble damages also serve punitive and deterrent purposes. *See* Mitsubishi

Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614, 635-636 (1985).

2. Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1435 (2013) ("Prices whose level above what an expert deems competitive has been caused by factors unrelated to an accepted theory of antitrust harm are not anticompetitive in any sense relevant here. The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." (emphasis original) (quotation marks omitted))

3. *Id* . at 1434-35 (explaining that the permutations necessary to calculate damages caused by four independent theories of anticompetitive conduct across millions of customers and over a dozen counties was "nearly endless").

4. *See, e.g.*, Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056 (8th Cir. 2000).

5. Wrongful conduct may involve a series of acts that continue over time. A damages model in that circumstance would separate the acts and their consequences. *See* Franklin M. Fisher & R. Craig Romaine, *Janis Joplin's Yearbook and the Theory of Damages*, 5 J. Acct. Auditing & Fin. 151-53 (1990). *See also* Elizabeth A. Evans, Joseph J. Galanti & David G. Lentz, *Developing Damages Theories and Models*, *in* Litigation Services Handbook: The Role of the Financial Expert, at 4-17 to 4-18, 4-23 to 4-24 (Roman L. Weil et al. eds., 5th ed. 2012); and Michele Molyneaux, *Quality Control of Economic Expert Testimony: The Fundamental Methods of Proving Antitrust Damages*, 35 Ariz. St. L. J. 1049 (2003), *reprinted in* THE ECONOMICS OF ANTITRUST INJURY AND FIRM-SPECIFIC DAMAGES 104-106 (Kevin S. Marshall ed., 1st ed. 2008).

6. *See* Stephen H. Kalos, *Antitrust*, *in* LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT 16 (Roman L. Weil et al. eds., 4th ed. 2007), and cases cited therein.

7. *Id.*

8. *Id*.

9. See Chapter 4, Section D, regarding the standard of proof for the mitigation of damages. For a more thorough discussion of mitigation of damages in the context of private antitrust litigation, see Thomas A.

Lambert, *The "Failure to Mitigate" Defense in Antitrust*, 51 ANTITRUST BULLETIN 569 (2006).

10. *Id.*

11. *See,e .g.*, Fishman v. Estate of Wirtz, 807 F.2d 520, 558 (7th Cir. 1986).

12. *See,e .g.*, William B. Tye, Stephen H. Kalos & A. Lawrence Kolbe, *How to Value a Lost Opportunity: Defining and Measuring Damages from MarketF oreclosure*, 17 RES. LAW & ECON. 83 (1995), *reprintedi n* THE ECONOMICS OF ANTITRUST INJURY AND FIRM-SPECIFIC DAMAGES 145 (Kevin S. Marshall ed., 1st ed. 2008).

13. *Id.*

14. Exactly when uncertainty becomes speculation is not well defined. For an in-depth discussion of this topic, see Roger D. Blair & William H. Page, *"Speculative" Antitrust Damages*, 70 WA. L. REV. 423 (1995). *See also* Molyneaux, *supra* note 5, at 99-102. For a discussion of mitigation issues specific to damages analyses in exclusionary conduct cases, see Part C of Chapter 9.

15. Kalos, *supra* note 6, at 8.

16. See Chapter 9 for a discussion of exclusionary conduct.

17. *See, e.g.*, Murphy Tugboat v. Crowley, 658 F.2d 1256, 1262 (9th Cir. 2001) ("The expert witness's testimony as to Murphy's expected share in the large vessel and flat tow market segment depended upon an assumption that [defendant] would not cut its prices in reaction, even to a loss of over one-quarter of its prior share of this portion of the market. Murphy argued that [defendant] had never cut its prices, and that there was no reason to believe that it would have done so under the hypothetical circumstances. A reasonable jury could not, however, indulge in the assumption that a competitor would follow a course of behavior other than that which it believed would maximize its profits.")

18. The portion of the damages award that is attributed to lost profits is taxable as ordinary income, whereas the portion of the award that is attributed to lost "goodwill" is taxable at the capital gains rate. *See* Merle Erickson & James K. Smith, *Tax Treatment of Damages Awards*, *in* LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT, at 17-7 (Roman L. Weil et al. eds., 5th ed. 2012). If tax rates have changed over time, the damages model will need to calculate lost profits on an after-tax basis, with the award being "grossed-up" at the tax rate in effect at time of trial. *See* Elizabeth A. Evans, *The*

*Economics in Accounting For Litigation*, in LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT, at 3-12 (Roman L. Weil et al. eds., 4th ed. 2007).

19. Kalos, *supra* note 6, at 11.

20. *See* Rev Proc 67-33, § 3.03, 1967-2 C.B. 659.

21. Michael K. Dunbar, Elizabeth A. Evans & Roman L. Weil, *Ex Ante Versus Ex Post Damages Calculations*, in LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT 5 (Roman L. Weil et al. eds., 5th ed. 2012).

22. *See Id.*; and Tyler J. Bowles, *Hindsight in Commercial Damages Analysis*, 14 J. Legal Econ. 1 (2008).

23. *See, e.g.*, Sinclair Refining Co. v. Jenkins Petrol. Process Co., 289 U.S. 689, 698 (1933) ("But a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within."); Fishman v. Estate of Wirtz, 807 F.2d 520, 552 (7th Cir. 1986) ("We know of no case that suggests that a value based on expectation of gain is more relevant and reliable than one derived from actual gain.").

24. For a discussion of some of the problems with accounting data, see Michael W. Maher, M. Laurentius Marais, William E. Wecker & Roman L. Weil, *Statistical Estimation of Incremental Cost From Accounting Data*, in LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT, at 7-8 to 7-17 (Roman L. Weil et al. eds., 5th ed. 2012). *See also* Pamela P. Drake & Frank J. Fabozzi, Analysis of Financial Statements 63-97, 215-216 (3rd ed. 2012).

25. According to the SEC, "Companies with more than $10 million in assets whose securities are held by more than 500 owners must file annual and other periodic reports." *See* The Laws that Govern the Securities Industry, http://www.sec.gov/about/laws.shtml. The term "securities" is used to refer to both equity and debt instruments. *See* 15 U.S.C. § 77b.

26. *See, e.g.*, Robert Libby, Patricia A. Libby & Daniel Short, Financial Accounting 20 (4th ed. 2004).

27. Companies are required to discuss in the annual report any litigation or other circumstances that might have a material impact on the firm, and annual reports generally are good sources of information about

companies and their markets, in addition to serving as sources the financial information experts require to calculate damages. For example, Microsoft Corporation's 2012 annual report discusses operating segments and their competition, research and development, customers, challenges to its business model, and legal proceedings. *See* Microsoft Corp., Annual Report for the Fiscal Year Ended June 30, 2014 (Form 10-K), at 3-24 (July 31, 2014), available at http://www.sec.gov/Archives/edgar/data/789019/00011931251428996 1/d722626d10k.htm.

28. An exception to this could be if the plaintiff was able to pass on the entire overcharge to customers with no consequent decline in revenues. Then one could not easily observe a change in the firm's profitability resulting from the overcharge.

29. LIBBY ET AL., *supra* note 26, at 10.

30. *See, e.g.*, Barron's Financial Guides, Dictionary of Finance and Investment Terms 102 (7th ed. 2006).

31. Libby et al., *supra* note 26, at 647.

32. 15 U.S.C. § 15(a). The Act does not actually say prejudgment interest should not be awarded; rather it states only that the court "may award . . . simple interest on actual damages for the period beginning on the date of service of such person's pleading . . . and ending on the date of judgment" if the court finds that the opposing party acted in bad faith to delay the trial. 15 U.S.C. § 15(a)(1)-(3).

33. 28 U.S.C.A. § 1961(a).

34. Stephen A. Ross et al., Corporate Finance 907 (7th ed. 2005).

35. Tim Koller et al., Valuation 248 (5th ed. 2010).

36. *Id*. at 235-70.

37. While being precluded from receiving the time value of money on past damages would tend to leave the plaintiff less than whole, the statutory trebling of damages is likely to balance this effect. *See, e.g.,* Nu-Life Constr. Corp. v. Board of Educ., 789 F. Supp. 103, 105 (E.D.N.Y. 1992).

38. Energy Capital Corp. v. United States, 302 F.3d 1314 (3d Cir. 2002).

39. *See,e .g.*, Tye et al., *supra* note 13.

40. Richard A. Brealey et al., Principles of Corporate Finance 18-39 (11th ed. 2014).

41. Koller et al., *supra* note 35, at 103-07.

42. This formula provides the value of a perpetual stream of earnings. See RICHARD A. BREALEY ET AL., PRINCIPLES OF CORPORATE FINANCE 39-41 (8th ed. 2006), for an explanation of how to value a perpetuity. The authors also discuss how to value a "growing perpetuity," which is essentially an infinite stream of payments that increases at a constant percentage rate per year.

43. Recall that damages are the difference between what would have been and what was, according to the Supreme Court in *Bigelow v. RKO Pictures*, 327 U.S. 251 (1946).

44. Calculation of normalized earnings begins with some variant of cash flow or net income, which is adjusted to remove any unusual income, expense or cash flow items which are not expected to recur.

45. *See,e .g.*, Ross et al., *supra* note 34, at 76.

46. This method, or the "growing perpetuity" variant, is commonly used when the analyst can forecast cash flows over a finite (10-year) horizon, but the company is expected to last for a number of years after that horizon. Essentially, the analyst performs a capitalized earnings valuation of the last period's cash flow and discounts this value back to the date of valuation. In this situation, the inaccuracy of the capitalized earnings methodology is less important, because it is only used for values several years in the future, which are heavily discounted. *See* SHANNON PRATT, VALUING A BUSINESS 219-20 (5th ed. 2008).

47. Readers familiar with corporate finance might notice that this is simply the formula for valuing an annuity, or a series of payments of equal amounts made over a specified number of periods. *See,e .g.*, Ross et al., *supra* note 34, at 80.

48. Timothy A. Leuhrman, *Corporate Valuation and Market Multiples*, HARV. BUS. SCHOOL NOTE No. 9-206-039 (June 20, 2006).

49. This method is commonly used by investment bankers in valuations of potential takeover targets. The most common valuation multiples are market value/sales, market value/earnings before interest and taxes (EBIT), and market value/EBITDA. *Seei d.*

50. Pratt, *supra* note 46, at 265-66.

51. Leuhrman, *supra* note 48.

52. According to a Harvard Business School Case Note, investors used sales and EBITDA multiples to value companies with considerable sales but

negative cash flows in the late 1990s, but these methods fell out of favor when "investors realized that sales and EBITDA were not always indicative of future cash flow." *See* Robin Greenwood & Lucy White, *Introduction to Valuation Multiples*, Harv. Bus. School Note No. 9-206-095 (Oct. 31, 2006).

53. Pratt, *supra* note 46, at 262-307.

54. *See,e .g.*, Ross et al., *supra* note 34, at 896.

55. This method is an application of an event study, which is commonly used to calculate damages in shareholder fraud litigation. *See* Nicholas I. Crew, Kevin L. Gold & Marnie A. Moore, *Federal Securities Acts and Areas of Expert Analysis*, *in* Litigation Services Handbook: The Role of the Financial Expert 24 (Roman L. Weil et al. eds., 5th ed. 2012).

# CHAPTER 6

# ECONOMETRICS AND REGRESSION ANALYSIS

Econometrics refers to a set of statistical methods or tools that economists use to assess antitrust damages. Regression analysis is the most common tool of econometrics. It enables one to uncover the relationship between a dependent variable (the outcome being modeled, such as prices) and one or more explanatory variables (the potential influences on the dependent variable, such as anticompetitive conduct, supply factors including costs or capacity, and demand factors).[1] Regressions can prove useful in answering the basic "counterfactual" question: What would market outcomes (e.g., prices) have been in the absence of the anticompetitive act? By their very nature, these but-for market outcomes are unobserved and, as such, must be estimated by the damages expert.

Market outcomes are often the result of a complex interaction among a large number of factors. For example, market prices were likely affected by a wide variety of demand and supply factors unrelated to the alleged anticompetitive act. Isolating and measuring the effect of an alleged anticompetitive act on price (or on other market outcomes) requires properly accounting for these other factors. Otherwise, one might attribute to the alleged anticompetitive act the effect of one or more of these other factors or miss the effects of the act in question by failing to control for a relevant factor.

Econometric models—particularly those involving regression analysis—are uniquely suited to isolating the effect of a single factor on the market factor of interest, while properly accounting for other relevant factors. The measured effect of an explanatory variable, controlling for other factors, is referred to as an estimate of the "partial effect" of the explanatory variables

on the dependent variable. In other words, an explanatory variable's partial effect is the change in the dependent variable that would result from a change in that explanatory variable, holding all of the other explanatory variables constant.[2] Thus, when correctly implemented, econometric techniques can isolate and measure the effect of a single explanatory factor—such as the impact of the alleged conduct—on the economic outcomes that are relevant when estimating damages.

The key role of econometrics in legal proceedings is to use the available data to provide accurate and reliable measures of the economic impact of the alleged conduct for the finders of fact (judges or juries). This chapter describes the legal requirements, the methods, and a wide range of issues in the use of econometrics and statistics in expert testimony. To begin, the damages methodology must be designed to causally determine the impact of the alleged conduct. Implementation must address issues of: data, model specification, estimation, interpretation of estimation results, and hypothesis testing. The following discussion explains the use of econometrics to implement before-during-after and benchmark analyses in general and in the specific context of a case study.[3] Not all of the tests or analyses discussed here need to be performed in every damages analysis; the ones that are important for a particular case will depend on the specific facts of the case.

# A. Legal Requirements

The legal requirements for methods used to estimate damages, including all econometric methods, fall under the rules for testimony by experts. Under Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[4]

Regression analyses have met these requirements many times in litigation for a wide range of issues, including the estimation of antitrust damages,[5] as well as showing at the class certification stage that such damages are consistent with the plaintiff's theory of liability.[6] A competent expert should be able to tell the litigant whether sufficient facts and data are available for econometric analysis, explain the types of econometric analyses that are applicable, and reliably apply these econometric techniques.

Using regression analysis does not, by itself, guarantee that an analysis will be viewed as reliable.[7] In general, econometric results will be more reliable as the amount and quality of data increase.[8] If sufficient data are available, econometric analysis has been found necessary to achieve the minimum scientific standard for establishing lost sales and price changes. For example, in *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*,[9] expert opinion and internal forecasts for sales growth were excluded because data to estimate sales growth via regression analysis were available and not used. The regression must be in a form that assists in determining a material fact, such as the amount of lost sales or the size of price changes.[10] The analysis also must be based on data "reasonably relied upon by experts in the field."[11] Because experts typically verify data for accuracy in consulting work or academic research, experts presenting regression analyses in court need to conduct similar verifications of the data that they use.[12]

The principle for reliability encompasses many factors entering the regression analysis, and a competent expert should conduct reliability checks to ensure that the results survive the rigors of litigation.[13] Part C of this chapter discusses the basic regression method, and Part D describes many of the design issues that arise in reliably implementing econometric techniques and econometric tests that a testifying expert should perform when appropriate. Moreover, econometric results typically should not change materially with minor changes to the data (e.g., deleting a few observations).[14] Note, though, that while the court decides as a matter of law whether a regression analysis is admissible under the Federal Rules of Evidence, the finder of fact is ultimately responsible for deciding the probative value of such evidence,[15] considering questions including whether the dataset used in analysis is reliable and complete,[16] and, in certain

instances, whether statistical significance provides sufficient reliability for the factfinder to base its factual conclusions on the study.[17]

# B. Causation and Quantification

Courts typically require an analysis of damages that not only quantifies the amount of damages, but also demonstrates that those damages are causally linked to the allegedly anticompetitive acts.[18] In a price-fixing case, for example, there must be an analysis that provides evidence of a clear link between the agreement to fix prices and an increase in prices that is not explained by other factors (i.e., prices would not have been as high in the counterfactual world in which the agreement had not occurred).[19]

The econometric challenge in establishing and measuring causal effects comes from the fact that most economic data are observational data, derived from observations of market outcomes, not controlled experiments. Therefore, the economist typically has no control over how the data were generated. For example, in a price-fixing case, even if there is variation over time in the existence or extent of collusion, associated variation in prices may or may not capture the *effect* of the cartel, as opposed to the effect of other factors that are changing at the same time. What makes this challenge particularly vexing is that the other changes may *cause* the changes in the existence or extent of collusion. If, for example, collusion is easier to maintain when economic conditions are good, then there will tend to be cartels when prices are high, creating a correlation between high prices and cartel existence even if cartels have little or no actual causal effect on prices.

Another way to state the problem is that identifying causal effects (or "treatment effects" as they are often called in the statistical and econometric literature) requires estimating an unobserved and unobservable counterfactual outcome. That is, determining the causal effect of an anticompetitive act requires estimating the difference between the outcomes that were actually observed (e.g., the actual prices during a cartel period) and the counterfactual, "but-for" outcomes that were not observed (e.g., prices that would have been observed absent the cartel), holding all other economic conditions fixed. But if other economic conditions were changing at the same time as the cartel—particularly if those other economic conditions were affecting the likelihood of cartel existence and success—

then observed prices in non-cartel periods (often called "clean periods") *do not* provide a good measure of prices during the cartel period but-for the cartel, because in the "clean period" other economic conditions are *not* held fixed.

In statistics, the "gold standard" for answering these kinds of causal questions is the randomized controlled trial (RCT).[20] An investigator conducting a controlled laboratory experiment can set the values of the factor of interest and apply different levels to different test subjects. For example, a sample of subjects in a pharmaceutical clinical trial can be assigned randomly to a "test" group and a "control" group, with the factor of interest (e.g., a pharmaceutical treatment) given only to the test group. Given this experimental design, if, after treatment (or conduct at issue), the outcome of interest (e.g., disease prevalence) changes in the test group in a way that is not found in the control group, then the treatment very likely caused that change and the impact of the treatment can be estimated. Effectively, the experimental design assures that all other conditions are held equal.[21]

The key problem in econometrics, then, is how to identify and measure causal relationships without the ability to use randomization in laboratory experiments, but rather based on observational data from real world marketplaces. This problem was discussed at length in a famous paper by Sir Austin Bradford Hill.[22] In this paper, Hill identifies nine criteria for identifying causal effects in observational studies in epidemiology. These nine criteria, while specific to the kind of biomedical data and models arising in epidemiology, also apply in an economic context. Broadly speaking, the Hill criteria mandate that to identify causal effects with observational data, the analysis needs to examine a broad range of implications of the proposed causation: does it make sense in terms of timing, effect size, specificity, mechanism, consistency with economic theory, etc.?

The key point of the Hill criteria is that to reach reliable causal inferences when using observational data, one cannot rely on purely statistical analyses without careful consideration of broader economic ideas. Usually, this approach requires the econometric models to be firmly grounded in relevant economic theory. This basic requirement is also emphasized in the recent work on estimating causal effects by James Heckman.[23]

Keeping these cautions about the difficulties of establishing causal relationships and the limitations of observational data in mind, it is certainly true that, if grounded in economic theory and carefully applied, econometric techniques can provide both reliable estimates of the magnitude of damages and useful information about causation. As discussed above, assuming liability has been established and a reasonable explanatory variable representing the anticompetitive act at issue has been constructed, econometric tests can often reliably be used to determine whether the data are consistent or inconsistent with the anticompetitive act having caused changes in the dependent variable.[24]

While, in principle, it might be possible to match outcomes in circumstances involving the conduct at issue (e.g. cartel behavior) with outcomes in circumstances free of the conduct at issue (e.g. non-cartel behavior) and use such comparisons to draw conclusions about the causal effects of the conduct, such an approach is generally not practical. This matching would need to compare outcomes under the same demand conditions, technology conditions, market structure conditions, and general economic environment between the cartel and the non-cartel circumstances. The possibility of such matching is typically remote because of the number of characteristics involved.

Statisticians have recently proposed an alternative approach to matching for estimation of causal effects: matching on a function (called the "propensity score") that measures the likelihood (or propensity) of receiving the treatment conditional on explanatory factors, rather than matching on all the explanatory factors themselves.[25] Once this match has been made, one can compare outcomes for treated and untreated observations that have similar predicted probabilities of receiving the treatment to infer the causal effects of the treatment.

In some cases, there may be difficulties with propensity score matching, however. For example, there may be little overlap between treated and untreated observations in estimated propensity scores: the observations corresponding to the cartel data and the observations corresponding to the non-cartel data often may not seem to match at all in terms of propensity score. In this case, this approach cannot be applied (and, indeed, estimating the causal effect of the cartel activity may be difficult using any statistical methodology).

Because laboratory experiments are generally not an option and the use of propensity scores can be limited, regression models are the more common approach to measuring causal effects of the conduct at issue. As explained above, the regression model allows one to adjust for differences in the economic conditions between the cartel observations and the non-cartel observations by "controlling for," or taking into account the impact of, these differing conditions.

However, these regression models also need to be applied with great care and close linkage to the underlying economic theory. For example, Cochran and Rubin have shown that regression controls can fail to accurately adjust for differing circumstances, if the regression model is not an accurate reflection of the true underlying economic model.[26] A particularly challenging case is when the relationship between the explanatory variables and the outcome of interest varies between the cartel and non-cartel period. Although some adjustments for such differences may be possible, the regression approach fundamentally assumes that the same basic model applies to the data for both the cartel and non-cartel observations—that is, that the economic model is stable across both periods. This may be problematic in markets that are rapidly evolving or when economic conditions are highly unstable over the study period.

In summary, econometric techniques applied to observational data can provide evidence consistent with causality and quantification of impact. The combination of: (1) a properly specified econometric model showing that an explanatory variable has a statistically significant partial effect on the dependent variable, holding constant other factors; and (2) a sound economic theory explaining why one would expect the explanatory variable to have a causal effect, can together provide evidence consistent with the existence of a causal relationship and an estimate of the magnitude of the effect.[27]

For example, suppose a properly specified econometric analysis finds a measure of the effect of the allegedly anticompetitive act on the dependent variable of interest to be statistically significant (discussed below) and of the expected sign.[28] This result would be consistent with the act resulting in damages, as long as there is a clear economic explanation of the linkage between the act and the measure of the partial effect. In this case, the econometric estimate can also provide a measure of the magnitude of the impact to estimate the amount of damages. In contrast, a finding that the

estimated impact is not statistically different from zero would not provide any statistical support for causation or positive damages, but this lack of statistical support for causation and damages could arise from either lack of actual economic causation and damages or from lack of sufficient information in the observed data.

# C. Classic Regression Analysis and Hypothesis Testing

Regression analysis is a statistical method used to analyze the relationship between a dependent variable and a set of explanatory variables based on a sample of observed data. In the context of assessing antitrust damages, the dependent variable is typically an economic outcome important in estimating any damages sustained by the plaintiff. Examples of such outcomes include price, profit margin, and sales quantity. The explanatory variables are typically the major economic factors that may explain variation in the dependent variable.[29] Examples of such economic factors can include consumer income, other consumer demographics that can affect willingness to pay for the product, and manufacturing costs.

Econometric analyses begin with a consideration of the underlying economic forces that generated the data being used to estimate the model. This knowledge should guide the construction of the econometric model, which should incorporate the underlying economic forces.[30] In building the econometric model, the economist makes initial modeling or specification choices by employing economic theory and reasoning. This modeling process identifies the likely major influences on the dependent variable and potential interactions between those influences. Within the model, the magnitude of the impact of a given economic factor on the dependent variable is typically summarized by a parameter or coefficient that can be estimated from the available data.[31]

These modeling choices are very important. Deviations of the econometric model specification from the true, underlying economic process generating the data can lead to specification error, which make the resulting parameter estimates unreliable—even if they are statistically significant.[32] Fortunately, the validity of many specification choices can be tested statistically to ensure that a model is correctly specified. This chapter

discusses the rationale for some specification choices and how the validity of specification choices can be tested statistically.

# 1. Basic Structure of a Regression Model

To understand the basics of regression analysis, consider first the relationship between one dependent and one independent variable, known as a simple regression analysis. Assume that prices are determined by cost, plus some fixed mark-up for profits. Most economic models hypothesize a direct positive relationship between cost and price.[33] For purposes of exposition assume a simple model in which price is a linear function of cost though, in practice, more explanatory variables (e.g., those measuring demand) and a more complicated relationship between cost and price can be considered. The deterministic or mathematical relationship between cost and price can be described by the simple algebraic equation of Price $= \beta_0 + \beta_1$Cost.

Here, the *regression coefficient* $\beta_1$ indicates how much price will increase with cost.[34] For example, if price (the dependent variable) increases by \$0.90 for every dollar that cost (the explanatory variable) increases, then $\beta_1 = 0.9$. A second regression coefficient $\beta_0$ is a *constantt erm* reflecting a fixed markup over changes in costs, say \$5.[35] Price will equal the sum of these two effects in this equation. That is if *COST* = \$10, then *PRICE* = \$5 + (0.9) x (\$10) = \$14. If *COST* = \$12, then *PRICE* = \$5 + (0.9) x (\$12) = \$15.80. This relationship is illustrated in Figure 1.



**Figure 1**

In econometrics, economic relationships are generally considered to be stochastic rather than deterministic. A stochastic relationship is one that has a component that is not generated from a describable systematic process.[36] A stochastic relationship does not yield a single unique value of the dependent variable (e.g., *PRICE*) for a given value of the explanatory variable (e.g., *COST*). In other words, the dependent variable is influenced, but not uniquely determined, by the explanatory variable.

To reflect the stochastic relationship between price and cost, the model can be expanded to be written as Price = $\beta_0 + \beta_1$Cost + $\varepsilon$. The variable $\varepsilon$ is known as the "error term."[37] The error term is the difference between the observed dependent variable and the portion of that value that is explained by the explanatory variable.[38] Because the error term is not observed by the econometrician, it amounts to statistical "noise" that partially obscures the underlying relationship between the dependent variable and the included explanatory variable.[39] Specifically, the statistical noise prevents us from being able to measure the regression coefficients $\beta_0$ and $\beta_1$ from the data exactly.

However, regression analysis provides a way to cut through the statistical noise and obtain *estimates* of each of the regression coefficients, although these estimates will not exactly equal the true underlying coefficients (they

are, after all, estimates). Intuitively, one may think of the regression estimate of $\beta_1$ as being the average observed impact of cost on price based on the data analyzed, recognizing it is not an exact measure.[40] Under certain conditions the coefficient estimates will have the desirable property of being *consistent*, which means they converge to the true parameter values as the size of the data sample grows.[41]

# 2. Multiple Regression

In reality, there will be multiple influences on the dependent variable or outcome of interest. For example, the price customers paid for a product (PRICE) may be related to three explanatory variables rather than one: (1) the cost of production (COST); (2) the level of industrial production in the downstream industry (one potential proxy for DEMAND); and (3) whether the customers purchased the product during the period of an alleged conspiracy (PERIOD).[42] DEMAND is included because, in addition to cost, economic models in which firms have some degree of market power predict that demand will affect price. PERIOD is included to account for the alleged anticompetitive act. For instance, the allegation in most price-fixing conspiracies is that average prices are higher during the conspiracy period, all else equal.[43]

The relationship between the dependent variable and the explanatory variables might take the following form: Price = $\beta_0 + \beta_1$ Cost + $\beta_2$ Demand + $\beta_3$ Period.

The coefficient associated with each explanatory variable indicates the amount by which the dependent variable changes when the associated explanatory variable changes, holding the other explanatory variables constant.[44] Thus, the regression coefficients ($\beta_0, \beta_1, \beta_2,$ and $\beta_3$) are interpreted as the partial effect of each explanatory variable on PRICE. In this example, $\beta_0$, as before, is the constant term; $\beta_1$ is the coefficient associated with COST; $\beta_2$ is the coefficient associated with DEMAND; and $\beta_3$ is the coefficient associated with PERIOD.[45]

Again, suppose $\beta_1$, the coefficient associated with COST, is equal to 0.90. In a multiple regression context this implies that the customer's price would be higher by \$0.90—holding DEMAND and PERIOD constant—if costs

increased by $1.[46] Further assume that $\beta_2$ equals 0.10, so that increasing DEMAND by 1 unit would increase price by $0.10, holding COST and PERIOD constant. PERIOD takes on the value of one in the alleged conspiracy period and zero at all other times (i.e., before or after the alleged conspiracy period). Similar to the other coefficients, $\beta_3$ measures the impact of PERIOD on price, holding COST and DEMAND constant. This example assumes that $\beta_3$ is 0.50, so that this impact is $0.50 for the alleged conspiracy period, meaning that, holding all other factor equal, prices were $0.50 higher during the conspiracy period than before or after the conspiracy period.

To reflect the stochastic relationship between price and the three explanatory variables, the model can be written as: Price = $\beta_0$ + $\beta_1$Cost + $\beta_2$Demand + $\beta_3$Period + $\varepsilon$. The error term $\varepsilon$ contains pure underlying statistical noise. In addition, the error term also contains the influence of other factors that may be at work but are omitted from the model. As a practical matter, the set of explanatory variables included in an econometric regression model never accounts for all of the factors that affect the dependent variable.[47] The variables that are not included in the model are collectively subsumed in the model's error term.

In this example, the unobserved factors that appear in the error term might include particular aspects of the supply and demand conditions facing the customer, such as the end uses to which the customer puts the product, the availability of substitutes for the product (which may differ across customers), the production level of the particular industry in which the customer participates (since the included demand variable DEMAND may not be industry-specific), the customer's negotiating skill if prices are individually negotiated, and many other such factors specific to the circumstances at hand.[48]

## 3. Estimation Methodology

The damages expert will have to select an appropriate methodology for estimating the model parameters and the associated standard errors (a measure of how precise the estimated parameters are, which is used in testing hypotheses about the parameters and determining the margin of error around the parameter estimates, as described in more below). The most

frequently used method for estimating the coefficients that summarize the relationship between the explanatory variables and the dependent variable is *ordinary least squares* (OLS).[49] This statistical technique minimizes the squared deviations between data points and a line passing through those data points, thus creating the line that fits the pattern of the data as closely as possible, based on this squared-deviation standard for closeness of fit.[50] This technique has the desirable property of being consistent under general conditions.[51]

Figure 1 (above) shows the regression line in relation to the actual observations of prices and costs used in the regression. Similarly, Figure 2 (below) shows the planes discussed above within the actual observations used in the regression. The coefficients of the equation are estimated by minimizing the squared errors between the data points and the plane in order to get the "best fit" of the plane to the available data.



$$PRICE = 2 + 0.1 \times DEMAND + 0.9 \times COST + 0.5 \times PERIOD + \varepsilon$$



**Figure2 :E stimatingP riceE quationf romA ctualO bservations**

Estimating the standard errors of the parameter estimates requires that the properties of the regression's error term be properly taken into account. For example, standard errors frequently are estimated assuming the error term of the regression is *independently and identically distributed* across the observations used to estimate the regression model. That is, the error for each observation is assumed to be from the same distribution (or pattern) of possible errors, and each error from each observation is statistically independent of the others (the value of the error for one observation contains no information about the distribution of the error for another observation).[52] If, instead, the error terms are not independent (e.g., correlated with each other) or not identically distributed, then the resulting standard error estimates generally will be inconsistent unless this more complicated error distribution is accounted for.[53] We discuss approaches to estimating standard errors given more complex error structures in Part D below.

# 4. *Evaluating the Reasonableness of Estimation Results*

Before using the estimation results to opine on the impact of the alleged anticompetitive conduct, experts typically subject their estimation results to some basic sanity checks. The appropriate checks will vary from case to case, depending on the circumstances. However, two types of features experts typically consider are: (1) the reasonableness of the signs of the estimated coefficients; and (2) the ability of the model to predict or "fit" the data.

Regarding the first—reasonableness of the signs—one might ask whether the cost and demand factors have the predicted signs. All else equal, economic theory predicts that as costs increase or as demand for a product increases, price should increase. Thus, theory generally predicts that the estimated coefficients on the cost and demand factors should have positive signs (i.e., take on positive values). However, with many variables in a regression model, it is not uncommon for particular coefficients to have unexpected signs; hence, while it is valuable to check whether the overall pattern of coefficient signs makes economic sense, econometric models need not be rejected simply because a small number of coefficients (out of a larger set) have unexpected signs.

Regarding the second—the ability of the model to fit the data—most regression software packages generate so-called goodness-of-fit measures. These measures describe how well a statistical model fits a set of data. This discussion concentrates on the most common goodness-of-fit measure, *R-squared* (or $R^2$). $R^2$ is the percentage of the total variance in the dependent variable that is explained by the regression model. A higher $R^2$ means that the model explains more of the variance in the dependent variable. In the extreme, if the model were a perfect fit, the $R^2$ would attain its maximum possible value of 1.[54] If the model explained none of the variation in the dependent variable, the $R^2$ would attain its minimum possible value of 0.

A very small $R^2$ may raise concern about whether the model is missing important explanatory variables.[55] However, one must not ascribe too much importance to $R^2$, because a high $R^2$ (close to 1) is not required for a regression model to be reliable. Indeed, if one is interested in estimating the partial effects of the explanatory variables on the dependent variable, $R^2$ is generally irrelevant as long as the omission of other exogenous variables does not create any bias in the estimation of the coefficient for the variable of

interest (which would occur if, for example, the omitted variables are uncorrelated with the variables included in the regression model).

In deciding whether one regression model is "better" than another at predicting the outcome of interest, one might want to compare $R^2$ across two regression models. However, one must also take care in so doing. Such a comparison can only be given any weight if the two regression models have the same dependent variable. Otherwise, the comparison is one of apples to oranges. For example, consider one model where the dependent variable is average list price and a second model where the dependent variable is the average transactional price (including discounts). Even if the first model explains a larger percentage of the variation in price, the first model is not necessarily "better" than the second model if the regression is intended to estimate the impact of an act on the prices customers pay. Moreover, even when the dependent variable is the same in two regressions, the model selection criteria discussed below are likely a better basis for comparison than $R^2$.

# 5. Statistical Inference: Hypothesis Testing and Confidence Intervals

Upon estimating the regression model, the expert will use the estimated results for statistical inference. Statistical inference refers to hypothesis testing designed to probe the validity of the allegations regarding the conduct at issue. Statistical inference relies upon the standard errors and confidence intervals associated with the regression estimates. As such, we turn here to a discussion of these topics.

The starting point for hypothesis testing is that there are economic statements or arguments that the finders of fact will want to evaluate. These are conclusions such as "the cartel had no appreciable effect on prices" or "this antitrust violation elevated prices in this market at this time." As discussed above, economists use models that simplify and focus the complex economic interactions that take place in markets to analyze such economic questions. Typically, the complex economic questions that are of interest to the finders of fact are reduced to statements about the values of parameters in these models. Thus, for example, the economic question of interest, "the

cartel had no appreciable effect on prices," is represented by the statistical hypothesis that the coefficient on the PERIOD variable is zero.

To evaluate this question statistically, the hypothesis test will consider whether the estimate of the PERIOD coefficient obtained from the data is consistent with what would be expected if in fact the true PERIOD coefficient were zero. As discussed above, the estimated coefficient for PERIOD likely would not be exactly equal to zero even if the true underlying coefficient were zero. However, the estimated coefficient should not be "far" from zero (measured relative to the parameter's standard error) if the hypothesis were true.

The usual framework used for hypothesis testing is called the Neyman-Pearson framework.[56] This framework is built on the following simple structure. Any statistical hypothesis can either be true or false, and the finder of fact can either reject the hypothesis as inconsistent with the data or accept the hypothesis (or more formally, fail to reject the hypothesis) as consistent with the data. This framework leads to two possible kinds of errors that the finder of fact can make: she can accept a hypothesis that is false or reject a hypothesis that is true. Ideally, of course, the econometrician would like to minimize the chance of either kind of error, but the essential tension is that any stringent criterion for accepting a hypothesis (i.e., a criterion that demands a high level of evidence to accept the hypothesis) will have a higher chance of rejecting the hypothesis when it is true. Similarly, a stringent criterion for rejecting will lead to a higher chance of accepting when the hypothesis is false. The Neyman-Pearson approach, which is the most widely used approach in statistics and statistics in legal settings, is to limit the chance of rejecting the hypothesis when it is true to some small number, typically 5 percent (this is called the level of the test), and then, conditional on this level, to design the statistical procedure to minimize the chance of accepting the hypothesis when it is false (that is, to maximize the power of the test).

Ideally, the economist would choose the level of the test to balance the costs of falsely rejecting a true hypothesis with the costs of failing to reject a false hypothesis. However, such an analysis is rarely carried out. Instead, statistical hypotheses are carried out at conventional levels of 5 percent, occasionally at 1 percent or 10 percent. These choices for the level of the test should be understood as conventions and not necessarily grounded in any careful balancing between the kinds of errors that can occur in practice.

This approach, as typically implemented, rejects hypotheses only if there is *substantial* evidence against the hypothesis. This approach is explained by the fact that these methods were developed to assist scientists in analyzing experimental data. Scientists may not want to reject hypotheses until there is overwhelming evidence that they are inconsistent with experimental evidence. However, care must be taken in applying these methods in other situations, such as legal proceedings. The question must be asked: Does the asymmetric nature of the hypothesis test reflect the question that the finder of fact needs to answer? Does this asymmetry in any way tilt the analysis of the data?

Implementing a hypothesis test typically requires a measure of the *statistical precision* of the estimate of the coefficient. If there is a great deal of unexplained variation in the data (referred to as statistical noise), the coefficient estimate will be highly imprecise and provide relatively little information in testing a hypothesis about the true value of the coefficient.[57] As an example, an opinion poll based on a very small sample of respondents generally would not be very precise and thus would not provide a very useful basis for testing a hypothesis concerning the percentage of the overall population who held an opinion. A larger sample of respondents would produce a more precise estimate, but getting information from the entire population is often not necessary to get a reasonably accurate estimate.

## a. Confidence Intervals

To measure the precision of a statistical estimate, econometricians and statisticians typically use what is called a standard error.[58] The standard error may be best understood by explaining how it is used to create a *95 percent confidence interval*.[59] For many statistical estimates, a 95 percent confidence interval is approximately equal to the range defined by the coefficient estimate plus and minus two times the standard error. One can be "95 percent confident" that the true underlying coefficient will lie within the appropriately constructed 95 percent confidence interval. Economists often use 95 percent confidence intervals, but (much like they sometimes use different levels for hypothesis tests) they also sometimes use intervals defined by lower or higher levels of confidence, such as 90 percent or 99 percent.[60]

When the coefficient estimate is relatively imprecise, the 95 percent confidence interval will be relatively wide, reflecting the greater uncertainty regarding the true value of the coefficient. Conversely, when the coefficient estimate is relatively precise, the 95 percent confidence interval will be narrower.[61] Returning to the opinion poll example, pollsters often report the 95 percent confidence interval, e.g., "45 percent of respondents supported the proposal with a margin of error of +/- 5 percent." That is, intervals constructed this way will contain the percentage of the population supporting the proposal about 95 percent of the time.

The margin of error (i.e., the width of the confidence interval) shrinks, all else equal, as the sample size of the poll increases and the precision of the poll increases accordingly. With a margin of error of +/-1 percent, the 95 percent confidence interval for the percentage of the population supporting the proposal would be narrower, from 44 percent to 46 percent.

## b. T-statistics

Standard errors also can be used to conduct hypothesis tests regarding coefficients of interest. Suppose the economist wishes to test the hypothesis that the coefficient on the PERIOD variable is equal to zero. To test this hypothesis, the economist could calculate the ratio of the coefficient estimate to its standard error, or "$\hat{\beta}/\text{se}(\hat{\beta})$" where $\hat{\beta}$ is the coefficient estimate and $\text{se}(\hat{\beta})$ is the standard error of the coefficient estimate. This ratio is called a *t-statistic*.[62]

If the hypothesis is correct and the true underlying coefficient is in fact zero, then the t-statistic should not be very far from zero. If the t-statistic turns out to be far from zero, it would cast doubt on the truth of the hypothesis. How do we determine whether the t-statistic is "far" from zero? We can calculate the probability that the t-statistic achieves a certain value, if the hypothesis were true. For example, if the hypothesis were true, there is about a 90 percent probability that the t-statistic will fall between 1.7 and -1.7 and about a 95 percent probability that the t-statistic will fall between 2 and -2. Thus, if the hypothesis were true, there would be only a 5 percent probability that the t-statistic we observe would be either greater than 2 or less than -2. Accordingly, if we observe a t-statistic greater than 2 or less than -2, the data would appear to be inconsistent with the hypothesis

(because such an outcome is quite unlikely if the hypothesis were in fact true).

Indeed, if the absolute value of the t-statistic that the economist calculates exceeds two, then the hypothesis that the true underlying coefficient equals zero typically would be said to be *rejected* at the 5 percent significance level and the result typically would be termed *statistically significant*.[63] This result often is also expressed by saying that the coefficient is "statistically significantly different from zero (at the 5 percent level of significance)." As noted above, the 5 percent level of significance (and the corresponding 95 percent confidence interval) is often used by economists and statisticians when conducting hypothesis tests, but other levels of significance, such as 1 percent or 10 percent, are also sometimes used.

As an example of these techniques of statistical inference, suppose that the coefficient estimate on the PERIOD variable in the price regression was 0.50, which would imply that prices were $0.50 higher during the alleged conspiracy period as compared to outside that period, holding constant the variables COST and DEMAND (and assuming correct model specification). Suppose further that the standard error of the coefficient estimate on PERIOD is 0.20. In this case, the 95 percent confidence interval would be approximately $0.10 to $0.90.

Similarly, the standard error can be used to test the hypothesis that the coefficient on the PERIOD value is zero, which implies that price was not higher during the alleged conspiracy period (holding constant COST and DEMAND). This test would be conducted by calculating the t-statistic: $0.50/0.20 = 2.50$. Since the calculated t-statistic of 2.50 is greater than two, the coefficient on PERIOD would be said to be statistically significantly different from zero at the 5 percent level of significance, and the hypothesis that the price was no higher during the alleged conspiracy period would be rejected.

## c. P-values

The results of statistical tests often appear to be a simple yes-no answer, but this may be an inadequate summary of the statistical information available in hypothesis tests and hence make it difficult for the judges and juries to appropriately weigh this evidence with the other kinds of evidence.

A more fine-grained summary of the information that measures the strength of the evidence can be helpful.

A more fine-grained summary of the information in a hypothesis test comes from the *p-value* for the hypothesis. The p-value represents the level of significance that the hypothesis can be rejected at. Thus, a p-value of 0.05 would indicate that the hypothesis could be rejected at the 5 percent level we have been discussing. In our example, if the coefficient on the PERIOD variable were 0.5 and the standard error were 0.2, as above, the t-statistic for testing the hypothesis would be 0.2/0.5 = 2.5. The details of calculating a P-value are a bit more complicated than calculating a t-statistic and cannot be performed efficiently within this text. However, a p-value will be reported by any statistical software used to run the regression and will be easily available. In this case, the p-value corresponding to the 2.5 t-statistic would be 0.012, which means that the hypothesis could be rejected using even more stringent criteria than the usual 5 percent level for testing (the 1.2% level). On the other hand, suppose that the coefficient were 0.5 and that the standard error were 0.4, then the t-statistic would be 0.5/0.4 = 1.25. In this case, the p-value would be 0.21; that is, the hypothesis would only be rejected under the less stringent criterion that the chance of wrongly rejecting a true hypothesis could be as large as 21 percent. While an economist may refer to the simple yes/no dichotomy of whether the test passes at the 5 percent level, the p-value can provide more detail about how close this test was. In general, small values of the p-value indicate that the test provides a substantial amount of evidence that is inconsistent with the null hypothesis and large values of the p-value indicate the opposite. However, it is important not to interpret the p-value as the chance that the hypothesis is true; the hypothesis itself is either true or false; in contrast, p-values are chances of observing stronger (in repeated random samples) evidence against the hypothesis, assuming that it were true.

The example of the last paragraph illustrates another important point in interpreting hypothesis tests. In both examples, the values of the estimated coefficients on the PERIOD variable have the same value: 0.5. In one case, the hypothesis that the cartel had no appreciable impact on prices is strongly rejected (p-value of 0.012), and in the other example, the hypothesis cannot be rejected at conventional levels of significance (p-value = 0.21). However, the actual best estimate of the price impact of the cartel is the same in both cases. In the model as specified, the estimated coefficient would represent an

economically significant effect of the cartel as the best estimate that prices were higher by $0.50 in both cases, even though in one case one could not say with assurance that the effect was different from zero. This stresses a critical point about hypothesis tests: they represent statistical statements about both the estimated coefficient *and* the precision with which it is estimated, not purely economic statements about the size of the measured effect.

It is also possible to test hypotheses concerning more than one estimated parameter.[64] For example, suppose that, rather than a single PERIOD variable to capture the cartel period, the model had included PERIOD1 and PERIOD2 variables that identified subperiods that might have had different overcharges. The economist could test the hypothesis that the coefficients on PERIOD1 and PERIOD2 are both zero, that is, that the cartel had no impact on prices even allowing for different effects in different subperiods. This kind of test is usually carried out by using an F-statistic, which measures how far the two estimated coefficients are from zero, again measured relative to the precision with which these coefficients are estimated. The form of this test is more complex than the t-test, but the basic testing logic is the same.

# D. Necessary Decisions and Common Areas of Expert Debate

In practice, experts will need to make a series of design decisions to build an appropriate econometric model and a series of implementation decisions to arrive at reliable estimates to answer the questions of interest. Many of these decisions will inevitably become the subject of expert debate. This section discusses some of these decisions.

## 1. Choice of Explanatory Variables

As discussed above, the explanatory variables in an econometric model represent economic factors that influence the dependent variable.[65] An important question is which explanatory variables to include in the model. Answering this question should begin with economic theory combined with knowledge of the industry. For example, if the dependent variable is price, economic theory suggests that cost factors are likely the most important

explanatory variables, with demand drivers and industry capacity as potentially important explanatory variables as well, among other things.[66] Industry knowledge would suggest specific variables that would appropriately represent these factors. If a product is used as an input by downstream industries, the level of production in those industries might drive the demand for the product.[67] For costs, there may be direct measures of production costs from firms producing in the industry (perhaps the defendants in a price-fixing case), and the prices of the inputs used to produce the product could also be useful measures of costs.

## a. Too Many or Too Few Variables?

The number of explanatory variables suggested by economic theory and industry knowledge often will be large. Is it best to include all of the explanatory variables, or should one try to pare back the number of variables in order to have a simpler model? The downside to including extraneous explanatory variables in a regression is that the coefficients may be less precisely estimated. However, these estimates will still be unbiased.[68] The effect on precision of having additional variables will often be small when the sample size is large, but the potential loss of precision for smaller samples counsels careful consideration of which explanatory variables to use in those circumstances.

Mistakenly excluding important explanatory variables in an attempt at simplicity, on the other hand, can result in an *omitted variable bias* and misinterpretation of estimated results. As an example, suppose one omits from a regression model a control for consumer income. Suppose further that during the period of conspiracy, consumer income happened to increase. In this case, the regression model will predict that prices were higher in the conspiracy period. Yet, one might falsely conclude from these results that prices were higher in the conspiracy period *because of* the conspiracy. However, some or all of the estimated conspiracy effect may be attributable to the omitted income variable.

More precisely, omitted variable bias arises when important explanatory variables that have been omitted from the regression model are correlated with included explanatory variables. Because the omitted variables are in the error term, the result will be a correlation between the included explanatory

variables and the error term.[69] In the language of econometrics, this correlation with the error term is a problem known as endogeneity.[70] This misspecification will bias the resulting coefficient estimates, and make these estimates unreliable for damage estimation. This bias does not diminish as sample size increases.[71]

To see why, suppose that in the regression model discussed above, there is a second important demand driver variable, DEMAND2, that was omitted from the regression model. Suppose further that this variable was positively correlated with the alleged conspiracy period variable PERIOD. For example, DEMAND2 might be unusually high during the period of the alleged conspiracy, so DEMAND2 and PERIOD would be highly positively correlated. All else equal, when DEMAND2 was unusually high, PRICE should be unusually high. A regression model that included PERIOD, but did not include DEMAND2 would mistakenly attribute the effects of DEMAND2 (which was omitted from the model) to PERIOD, the variable that represents the alleged anticompetitive act. As a consequence, the regression would lead to the mistaken conclusion that the alleged conspiracy represented by PERIOD was the "cause" of the high prices, when in fact the cause was the unusually high values of DEMAND2 during the alleged conspiracy period. This bias will only occur, however, if DEMAND2 is empirically important for the dependent variable PRICE and is also correlated with PERIOD.

In general, one should be more concerned with avoiding bias than with improving precision. That is, it is better to be on average right though imprecise, than to be precisely wrong. For these reasons, it is in general better to include more variables than fewer.[72] Nonetheless, no variable should be included unless there is a solid economic rationale for putting it in the model. And, in general, one should test model results to ensure that they are not overly sensitive to the inclusion of a particular explanatory variable, particularly if the economic rationale for including that variable is questionable.

When there is concern that extraneous variables could greatly affect the precision with which coefficients can be estimated, a parsimonious model may have virtue.[73] There are several model selection criteria one can use to compare models containing different sets of explanatory variables.[74] Examples are the *Akaike Information Criterion* (AIC) and the *Schwartz Criterion* (SC).[75] These criteria reward increased explanatory power of the

model, and penalize the addition of extraneous variables. When the penalty from the addition of a sufficiently weak explanatory variable exceeds the reward, the criteria will indicate that the variable should not be added. There are other sophisticated econometric methods that attempt to explicitly trade off bias against increased precision of the estimates.[76] However, these techniques should still only consider variables that economic theory and industry information identify as likely to be important, and in no case should these techniques be used in a mechanical way or in a way that substitutes for sound economic reasoning.

## b. Multicollinearity

*Multicollinearity* occurs when two or more of the explanatory variables are highly correlated with each other ("collinear").[77] When this happens, the coefficient estimates on the collinear variables may be imprecise; that is, they may have large standard errors. It then becomes difficult to make precise statistical inferences about the true underlying coefficients. The coefficient estimates may also have the wrong sign or be sensitive to small changes in model specification.

Dropping one or more of the collinear variables is sometimes argued to solve the multicollinearity "problem." This proposition is incorrect and can lead to a significant bias in the estimates of the coefficients on the retained variables.[78] Put differently, dropping one of the collinear explanatory variables does not solve the core problem that the effects of the two collinear variables on the dependent variable are hard to disentangle and thus imprecisely estimated. Rather, dropping one variable simply arbitrarily sets its coefficient to zero and assigns all of the effect to the other variable.

Dealing with multicollinearity requires recognizing several important points. First, multicollinearity is a matter of degree. Explanatory variables are almost always correlated with each other to some extent. Since multicollinearity is a characteristic of the sample of data rather than a characteristic of the underlying population, there is no rigorous statistical test for multicollinearity.[79] A number of indicators of multicollinearity have been developed, but many of these have serious shortcomings.[80]

Second, multicollinearity among a subset of the explanatory variables may affect the precision with which the coefficients on those explanatory

variables are estimated, but not affect the precision with which the coefficients on other explanatory variables are estimated.[81] Accordingly, even severe multicollinearity among a subset of explanatory variables—those that are included as "controls" but not as the main variables of interest —may not affect the coefficient estimates that are of most interest in the analysis. In a price-fixing case, for example, interest typically focuses on the coefficient on the alleged conspiracy variable. Multicollinearity that affects the precision with which the demand variable coefficients can be estimated should be of little concern if it does not affect the precision with which the alleged conspiracy variable coefficient can be estimated. For this reason, a useful indicator for multicollinearity is that proposed by Belsley, Kuh, and Welsch.[82] This indicator focuses on identifying which explanatory variable coefficient estimates are potentially affected by the multicollinearity.

Third, if the precision of the coefficient estimate on the variable of primary interest (e.g., the alleged conspiracy variable) is not substantially affected by the multicollinearity, there is no reason to drop any variables that have a strong economic rationale for inclusion. As discussed above, dropping variables that are truly important could lead to omitted variable bias. A large change in the alleged conspiracy variable coefficient estimate after dropping collinear variables could indicate omitted variable bias, which would render the estimate of the alleged conspiracy variable coefficient unreliable. Therefore, in general the best course of action in that case would be to retain the collinear variables.[83]

Now assume the variable of interest is affected by the multicollinearity. Would it now be valid to drop the other presumably economically important variable(s) with which the variable of interest is collinear? Generally no valid basis exists for choosing to retain the variable of interest as opposed to retaining the variable(s) with which it is collinear. As explained above, the multicollinearity and the imprecision of estimation that results correctly indicates that it is difficult to separate out the individual effects of the collinear variables.[84] In that situation, there may be no "solution" other than gathering more data, which often may not be feasible. With severe collinearity between the variable of interest and other economically important explanatory variables, the coefficient on the variable of interest cannot be estimated precisely, and the regression model may therefore be unreliable for estimating damages. Dropping explanatory variables to reduce

the multicollinearity without a sound economic reason amounts to assuming away rather than fixing the problem.[85]

# 2. Functional Form

The relationship in the simple examples relating prices to costs and other factors assumes that the explanatory variables have a linear (i.e., straight line) relationship with the dependent variable. In particular, a given change in the dollar value of cost translates to a fixed dollar change in price. However, economic theory, statistical evidence, or information from market behavior may indicate that a different functional form for the regression equation may be more appropriate. For example, in certain instances a given percentage increase in costs will yield a proportionate percent increase in price, rather than a fixed dollar relationship. In this case, a regression equation similar to the one described above can be estimated, but the price and cost data would be transformed into logarithms and the cost coefficient would (approximately) measure the impact of a percentage change in costs on the percentage change in price.[86] If possible, there should be an economic basis for the functional form of the regression equation that is estimated, although economics often provides only a rough guide for the appropriate functional form, in which case it may be appropriate to try alternative functional forms to ensure that the ultimate answer to the economic question of interest is relatively stable across alternatives (that is, that the results are "robust" to different functional forms).[87]

# 3. Structural Models versus Non-Structural Models

Econometric models can generally be divided into two broad types: *structural models* and *non-structural models*.[88] A structural model consists of equations reflecting the relationships between the variables in the model that are directly derived from economic theory.[89] For example, the structural model for price and quantity in an industry might consist of a demand equation—representing how customer demand for the product is determined —and a supply equation—representing how firm supply of the product is determined. Price and quantity would be the endogenous variables, since they are determined by the other variables in the model. By contrast, a non-

structural model consists of equations reflecting the relationships between outcomes (like price and quantity) and only exogenous supply and demand factors that influence the outcomes, through an economic model.

Structural models have certain advantages over non-structural models. In particular, because the structural model is derived from economic theory, the exercise of implementing the structural model requires the analyst to be explicit about the assumptions undergirding the model. Making the underlying assumptions explicit facilitates a discussion about whether those assumptions are reasonable given the question being addressed and the facts of the industry being studied. Non-structural models also require such assumptions but they are often implicit rather than explicit, which can make assessing and debating those assumptions more complicated.

The use of structural modeling confers other potential advantages. One such advantage is that the imposition of an economic structure on the econometric specification allows the analyst to directly estimate economic parameters of interest. For example, the coefficient on price in the demand equation would be related to the elasticity of demand (the percentage change in demand for a given percentage change in price holding all other drives of demand fixed). Another advantage of structural modeling is that it facilitates analysis of counterfactuals—a key consideration in the estimation of antitrust damages. For example, a structural model could be used to investigate the impact of the entry of a new competitor on economic outcomes such as price or output.

Nonetheless, structural equations can be difficult to estimate. Thus, experts often estimate a non-structural or "reduced form" model, instead of a structural one.[90] The reduced form is an algebraic rearrangement of structural models so that each equation has an endogenous variable on the left side and only exogenous explanatory variables on the right side. For example, the analysts might specify a demand model and a supply model. Each model is a function of price and quantity, both of which are endogenously determined. In addition, it can be assumed that the quantity demanded will equal the quantity supplied (though this need not be the case if, for example, regulations such as price limits interfere with the workings of the market). This setup generates three equations (the demand equation, the supply equation, and the identity equation equating quantity demanded to quantity supplied) and three unknowns (equilibrium price, quantity demanded, and quantity supplied).

Furthermore, depending on the application, the reduced form model may be more directly useful even if estimating the underlying structural model is feasible. This is because the reduced form model can provide the net effect of the conduct at issue on the outcome of interest (like price). By net effect, we mean that the estimated reduced form coefficients take into account both supply and demand side responses. By contrast, with a structural model, one would have to calculate the net effect given the estimated parameters.

To see this, we observe that one can start with an explicitly specified structural model and then solve it to obtain the reduced form model, or one can directly specify the reduced form model. In this latter case, the endogenous variables price and quantity are expressed in terms of the exogenous variables and the error terms, and the coefficients on the exogenous variables in the reduced form are functions of (depend on) the structural parameters.[91] Thus, the coefficients of reduced form models are generally a mixture of the structural parameters from the underlying structural equations (if they are derived from structural equations at all) and thus often do not have a direct economic interpretation.[92]

Should one use a structural model or a non-structural model? If the question of interest centers on the value of a structural parameter (e.g., the elasticity of demand), estimation of a structural model is generally the more appropriate way to proceed.[93] However, if the question of interest concerns determining the expected value of an outcome variable given the values of the exogenous variables, estimation of a non-structural model is generally a more straightforward way to proceed, provided sufficient data are available.[94]

For damages analysis in antitrust cases, the question of interest often involves estimating the likely "but-for" or counterfactual value of an outcome variable, such as price.[95] Accordingly, non-structural models will often be better suited to antitrust damages analyses. Even if one is going to estimate a non-structural model, however, consideration of the basic elements of the appropriate structural model can be very useful in identifying the appropriate explanatory variables to include in the reduced form model since the reduced form model is obtained by solving the structural model for the endogenous variables in terms of the exogenous variables.[96]

# 4. Estimation of Parameters Using Instrumental Variables

The estimation of structural relationships—for example, a relationship between the outcome of interest and another outcome that itself was jointly determined within an economic model—requires more information than the estimation of reduced form relationships. In such cases, the ordinary least squares or OLS method described above can yield biased and inconsistent estimates.[97] As a matter of principle, the coefficient estimates from an OLS regression will be consistent only if the error term and the explanatory variables are uncorrelated. This condition will not be satisfied if there are "endogenous" explanatory variables or, in other words, explanatory variables that are themselves jointly determined with the outcome variable.

Possibly the most famous example of such a situation arises in the context of studying the relationship between price and quantity. Because price and quantity are jointly determined within an economic model, the regression of price on quantity will not be appropriate unless one faces special circumstances. Otherwise, the simple OLS approach will not be appropriate.

More specifically, suppose one had access to observations of pairs of price and quantity across markets. Each price and quantity pair represents the equilibrium outcome in the market. The analyst would like to use the variation in price and quantity to trace out the demand relationship between price and quantity. However, without more information, this exercise would be impossible because price and quantity are jointly determined by demand *and* supply conditions. Put simply, the analyst would not know if she were tracing out a demand curve, a supply curve, or (the most likely case) some combination of the two.

For another example, consider a regression of price on market concentration as measured by the Herfindahl-Hirschman Index (HHI)—a standard measure of market concentration—designed to test the proposition that greater concentration leads to higher prices. While this regression could be estimated using OLS techniques, such an approach would not be appropriate if the concentration measure was correlated with the error term. Such correlation could arise, for example, if more concentrated industries have higher costs and sufficient data to control for those costs are unavailable.[98] Because costs are likely to impact prices in unobserved ways

and those costs are also correlated with the degree of concentration in the industry, the concentration measures will be endogenous.

To estimate the parameters of a structural model, one needs to introduce additional information. This additional information, referred to as an "instrumental variable" or "IV," must satisfy two conditions: (1) it must be uncorrelated with the error term, meaning it does not belong in the regression model; and (2) it must be correlated with the endogenous explanatory variable (after netting out the effects of the other explanatory variables).[99]

Returning to the price-concentration example above, a commonly used instrument in that context is the number of firms competing in the market.[100] Depending on the specifics of the market(s) in the study, the number of firms in the market is likely to be correlated with other measures of concentration, but uncorrelated with the error term in the pricing equation. Anything that shocks prices—such as demand or cost shocks—will also affect shares and thus concentration ratios. But as long as those shocks do not drive firms into or out of the market then they do not determine the number of firms (e.g., under certain economic conditions, the number of firms in the market may be less likely to be correlated with measures of cost). If these conditions are met, then the number of firms competing in the market is a valid instrument and an IV regression would yield consistent estimates of the coefficients.

Similarly, in the case of estimating a demand curve, IVs that shift the supply curve (e.g., exogenous cost shocks across markets) could serve as valid instruments because they will be correlated with the equilibrium price (through the supply conditions) and uncorrelated with quantity demanded. Thus, IVs that shift the supply curve help the analyst trace the demand curve.[101]

There are several econometric approaches to IV estimation. One widely used implementation technique is known as "two-stage least squares" (or 2SLS to distinguish it from OLS regressions).[102] An alternative and more general IV estimator is called the generalized method of moments (GMM).[103] Common to these methods is the requirement of a sufficient number of valid instrumental variables or IVs.

Relatively recent advances in the estimation of demand models help to further illustrate the themes discussed here. In many industries, market-level price and quantity data are available along with the characteristics of products from which consumers can choose. Product characteristics may

include price along with non-price quality characteristics. For example, an automobile may be described as a combination of a price, manufacturer (e.g., Ford, Toyota, etc.), vehicle type (e.g., sedan, light truck, etc.), fuel efficiency, and a term reflecting unobserved quality of the automobile. By making certain structural assumptions related to the functional form of consumer utility, the analyst can relate consumer choices to the aggregate product-market-level data in order to estimate the parameters of the demand model. Starting from this basic theoretical model of consumer demand, the economics literature has derived reduced form econometric specifications that relate functions of aggregate market share to linear combinations of product characteristics.[104]

The model just described introduces concerns about the endogeneity of price (and perhaps certain non-price product attributes as well). For example, the econometric error term, which represents at least in part unobserved product quality, is likely to be correlated with both prices and market shares. Products with relatively higher unobserved quality are likely to have both higher market share and higher prices, all else equal. Failing to address this issue is likely to lead to underestimates of the price elasticity of demand (i.e., the responsiveness of demand to changes in price).

Several types of IVs may be appropriate in this scenario. First, as discussed above, cost shifters, if available, typically provide valid instruments. A second set of instruments follows from an economic model of differentiated product competition. In such a setting, the product characteristics of rival products (e.g., the number and quality of rival products) may offer valid instruments.[105] This conclusion follows from the identifying assumption that rival product characteristics are uncorrelated with the unobserved product quality.[106] A third set of instruments consists of the prices of the products in other markets, which may be assumed to be correlated with prices in the market of interest through common cost structures, but uncorrelated with the market-specific product valuations.[107]

# 5. *Estimation of the Standard Errors*

As described above, correct statistical inference (hypothesis testing and formation of confidence intervals) requires not only estimates of the coefficients of the model, but also estimates of the standard errors of these

coefficient estimates.[108] For example, a t-test of whether a coefficient β is zero is conducted by forming the t-statistic "$\hat{\beta}/\mathrm{se}(\hat{\beta})$," discussed in the last section. This t-statistic can be invalid and lead to incorrect statistical inference if either the coefficient estimate *or* the standard error of the coefficient estimate, $\mathrm{se}(\hat{\beta})$, is inconsistently estimated.[109]

The textbook approach to standard error estimation is to impose the assumption that the errors of the regression are *independently and identically distributed* across the observations used to estimate the regression model. If, instead, the error terms are not independent (e.g., they are correlated with each other) or not identically distributed, then the resulting standard error estimates generally will be inconsistent unless this more complicated error distribution is accounted for.[110]

Correlation among the errors of different observations can arise in various situations. For example, suppose the data sample is a *time series*, i.e., the data were generated by observing the variables (e.g., price, cost, and demand) at various points over time (e.g., on a monthly basis).[111] In such a case, the error in one month might well be related to the errors in adjacent months, since the unobserved economic factors that appear in the error term might themselves exhibit correlation over time. This correlation of errors over time is called *serialc orrelation*.[112]

As another example, suppose the data sample is a *cross-section/time series*, or *paneldat a* set, where the variables are observed at various points of time separately for each of a number of units of observation, such as individual customers.[113] Each customer's data are a time series. Therefore, the error terms for a given customer may exhibit serial correlation. In addition, each customer may have idiosyncratic factors that affect the price it paid, but that are unobserved in the data. These factors would be present in all of the errors across time for that customer, which would be a further cause of correlation among the errors for a given customer. This effect is called an *unobserved individual-specific effect* (where the "individual" refers to the unit of observation, e.g., a customer).[114]

Importantly, the correlation among errors need not be confined to errors that pertain to the same customer. For example, the error terms for all customers within the same time period also may be correlated. Unobserved economic factors may affect all customers' prices at a given point in time and therefore these common factors will appear in the errors of all of the

customers in a given time period. Similarly, if these unobserved factors are themselves serially correlated, then the error for one customer in one month will be correlated with the error for another customer in another month. Therefore, there may be correlation among the errors both within and between units of observation in a panel data set.[115]

There can be important consequences from estimating the standard errors for the coefficient estimates as if the errors were uncorrelated when, in fact, they are correlated. In this situation, a statistical test on the coefficients may yield what appears to be a statistically significant result even though it is not.[116] To see why this is so, suppose that the estimate of the coefficient on a price-fixing conspiracy indicator variable (i.e., a variable that takes a value of one during the period of the alleged conspiracy and zero otherwise) is 0.15. Further suppose that the incorrectly estimated standard error, ignoring the correlation among the errors, is 0.05, but that the correctly estimated standard error, taking into account the correlation among the errors, is 0.15. To test the hypothesis that the alleged conspiracy had no effect, the expert should calculate a t-statistic of 0.15/0.15, using the correctly calculated standard error of 0.15. Because the correct t-statistic is less than 2, the hypothesis that the alleged conspiracy had no effect would not be rejected at conventional levels of statistical significance. However, suppose that the expert uses the wrong standard error. In this case, the (incorrect) t-statistic would then be 0.15/0.05 = 3, and the hypothesis that the alleged conspiracy had no effect on prices would be strongly rejected. Thus, use of the incorrectly calculated standard error could lead to the wrong inference.[117]

Econometricians have a variety of methods for consistently estimating the standard errors when correlation among the errors exists. In a time series context (discussed in more detail below), various non-parametric procedures (procedures that do not impose any functional form on the correlation) have become widely used.[118] In a panel data context (also discussed in more detail below) these procedures may also be used, and other methods have been proposed as well.[119] Some of these panel data procedures are easily implemented.[120]

These procedures produce consistent estimates of the standard errors even when there is no correlation among the error terms. In other words, they work well both when the error terms are independent and identically distributed and when they are not. Thus, these procedures have become used

more generally in practice.[121] When there is good reason to suspect the existence of correlation among the errors, such procedures should be used to avoid making incorrect statistical inferences.[122]

Finally, another feature of the error term—known as heteroskedasticity—can also create problems in accurately measuring standard errors. Heteroskedasticity occurs when the variance of the error term varies across observations, even if the error terms are independent.[123] This condition is another violation of the independent and identically distributed error term assumption (in this case, the error distribution is not identical across observations) that can cause the traditional standard error calculation to be inconsistent. Again a well-known and widely used technique exists for calculating standard errors that are robust to heteroskedasticity (White standard errors).[124] This technique is also readily available in many econometric packages.[125]

The standard error estimation methods discussed above all rely on mathematical models and approximations for the statistical procedures that are used to construct the coefficient estimates and for the distributions of the error terms. These mathematical models and approximations typically work well when the statistical procedures are well-behaved and the datasets are large. However, there are many situations where one or both of these conditions may not be met.

An alternative approach to the estimation of standard errors that can work quite generally has been developed recently in the statistics and econometrics literature. This method is called *bootstrapping*.[126] The basic idea behind bootstrapping is quite simple: after carrying out the estimation of the model, the econometrician constructs a large number of "replication samples" of the data by resampling from the original data. Estimating the same model using these replication samples and measuring the variability of the resulting estimates can yield accurate and reliable estimates of the standard errors. Bootstrap methods are a useful and increasingly used tool.

Bootstrapping works well in many, but not all, situations. However, for the bootstrap method to take into account serial correlation, cross-sectional correlation, or heteroskedasticity, the resampling method used to construct the replications samples needs to take these potential sources of error correlation into account. For example, if there is concern that the errors may exhibit within-customer correlation, then the replication samples should be

chosen by randomly sampling customers. Or if the data are time series data and there is concern that the errors may be serially correlated, the replication samples should be based on the block-bootstrap, in which the data are resampled as contiguous blocks of observations.

# 6. *Misspecification Bias and Specification Tests*

Regression analysis provides unbiased estimates of the regression model coefficients generally only if the regression model is correctly specified and if the error term (the unexplained component of the dependent variable) is not correlated with the explanatory variables.[127] If these conditions do not hold, the regression model may not produce reliable coefficient estimates. In such cases, the model will not reliably measure the effect of the allegedly anticompetitive act on the variable of interest. *Thus, from an economic and statistical point of view, it is important to test whether a regression model is misspecified in order to avoid drawing incorrect or unreliable conclusions.*[128]

Misspecification can arise from,[129] among other reasons, the imposition of incorrect restrictions on the regression coefficients, the assumption of an inappropriate functional form, or inclusion of endogenous variables as explanatory variables.[130] As noted above, endogenous variables are variables that are correlated with the model's error term, in some cases because they are caused, in whole or in part, by the model's dependent variable. For example, the quantity sold of a good is determined in part by its price. Thus, quantity is typically an endogenous variable in a regression model where price is the dependent variable. In other cases, endogeneity can arise from omitted variable bias, since an omitted variable is part of the model's error term and may also be correlated with one or more of the model's explanatory variables.

In many circumstances, these problems can be remedied if detected and if the appropriate data are available.[131] Fortunately, there are well-known and generally accepted econometric tests for the presence of misspecification.[132] These tests often provide an objective and scientific means to determine whether a regression model is reliable.

For example, omitted variable bias can be tested by identifying and including in the regression model additional explanatory variables that

economic reasoning and other market information suggest are likely to affect the dependent variable. If these additional explanatory variables turn out to be statistically significant, and the coefficient estimates on the previously included explanatory variables change substantially when the additional variables are added, then the regression model that omitted the additional explanatory variables likely is misspecified and its results are biased and unreliable.[133] More generally, results should be tested to make sure they are robust to reasonable changes in the set of control variables—including reasonable alternative variables used to capture similar economic concepts, such as alternative cost or demand controls. Models that yield results that are highly sensitive to particular choices of explanatory variables have a high likelihood of being affected by specification error and thus should generally not be relied upon.

Another potential misspecification is caused by imposing incorrect restrictions on the coefficients of the regression model—that is, by forcing the coefficients to take incorrect values. Forcing incorrect values on some coefficients can bias other coefficients.[134] For example, suppose that the data contain information on two different customers (A and B), and that the regression model imposes the restriction that both customers were affected in the same way by the alleged conspiracy.[135] Further assume that customer A has a perfect substitute to which it could turn in response to an anticompetitive price increase, while customer B has no substitute. In that case, even if there were a conspiracy, the alleged conspirators would be able to impose an anticompetitive price increase only on customer B. The existence of a substitute for customer A would prevent the alleged conspirators from imposing a supracompetitive price increase on customer A. If the coefficient on PERIOD were allowed to be different for the two customers, customer A would have a zero coefficient (since its price would not be higher during the alleged conspiracy period), while customer B would have a positive coefficient, reflecting say a $1 overcharge. However, a regression model that forced the PERIOD coefficient to be the same for the two customers likely would result in a positive coefficient estimate that was biased for both customers (too high for customer A and too low for customer B). For example, the estimate of the PERIOD coefficient might reflect only a $0.50 overcharge. Forcing the PERIOD coefficients to be the same for the two customers could lead to the incorrect inference that both customers were harmed by the alleged conspiracy, when in fact customer A was not harmed.

This restriction may also significantly affect the accuracy of the estimate of total damages. For example, if customer B had purchased 100 units at $11 and customer A purchased 10 units at $10, the true total damages would be ($1*100 + $0) = $100. Yet, the results from the regression model in this example would lead to a total damages estimate of approximately ($0.50*100 + $0.50*10) = $55, a substantial underestimate. The existence of bias resulting from the imposition of incorrect restrictions can be econometrically tested using standard procedures often used by economists.[136]

Another kind of misspecification that can lead to flawed conclusions is the restriction that the model be the same across different periods of time.[137] For example, if there is a pre-cartel period and a post-cartel period bracketing the cartel period, then it would be desirable to use both time periods in the damages model. However, if there were significant changes in the competitive structure of the market between the pre- and post-cartel period, the pooled estimates may form a misleading benchmark or clean period.

A standard method for detecting changes in model parameters is the Chow test.[138] The Chow test is more accurately described as a testing principle than a single test, and it describes methods to test if all the coefficients in the model have changed between two periods (or subgroups of the observations), or if some specific subset of parameters has changed, or if some particularly important combination of parameters (or function of the parameters) has changed.[139] Of course, the specific form of the Chow test should be specified in advance, so that the econometrician does not go on a data-mining exercise to find any kind of change. Such a data-mining exercise would lead to incorrect statistical inferences using the test.

One special case of "data-mining" that has been formally developed as a valid testing methodology is procedures to identify structural breaks that occur at unknown times. The idea is that the economist can perform Chow tests sequentially over the time period spanned by the data and identify the point in time at which a structural break occurred.[140]

# E. Additional Considerations for Specific Forms of Data

Different types of data can also require special consideration. This section discusses issues that tend to arise in the context of large administrative data, panel data, and time series data, respectively.

# 1. Estimation with Large Datasets

An important source of data for analyzing antitrust damages claims are the administrative records kept by firms. These can include detailed transaction-level data that can amount to millions of individual records. These records typically record information on individual transactions by customer and by specific product. Frequently, there can be hundreds or thousands of customers and hundreds or thousands of specific products, all with differing characteristics. These administrative records can potentially provide a wealth of data to assess antitrust claims, but the availability of such "big data" does not guarantee that reliable estimates of antitrust damages can necessarily be easily or readily uncovered.

There are a number of considerations in working with large administrative datasets:

1. The data were collected for business purposes, and may not include information on explanatory variables that are relevant for estimating antitrust damages.

2. The data may come from multiple administrative units that use different formats, track different information, or encode information in their data in different ways. For example, the multiple firms involved in a price-fixing cartel may use different systems to track their transactions, the same firm may change systems during the conspiracy period, or different divisions within a firm (e.g., sales department and finance department) may track information differently. In addition to the practical concerns, this can create the potential for "structural breaks" or heterogeneity unrelated to actual economic behavior.

3. Units of observation in administrative data may not align with economically relevant events. For example, invoicing data often records rebates, discounts, and returns separately from the underlying transaction in a way that makes it difficult to align these records. In such

a case, it may be difficult to compute accurate prices for these transactions.

For these reasons, the promise of "big data" available in administrative records needs to be viewed with an appropriate amount of caution, and the analysis of these data requires careful attention to both the underlying market economics generating the data and details of how the data are collected, processed, and retained.

Properly used, administrative data may allow the econometrician to study whether the data are consistent with the full gamut of economic implications of the alleged anticompetitive behavior. As emphasized by both Fisher and Hill (as referenced above), assessing whether observational data are fully consistent with theoretical predictions is an important component of identifying causal effects when using such data.

For example, data that is rich in detail on customers and on individual products would allow the estimation of models that measure anticompetitive effects at the customer and product level. The econometrician can determine if the pattern of estimated effects is consistent with the alleged violations (e.g., some customers may not have been affected by a price fixing conspiracy because the terms of their sales were determined by a contract that was agreed to before the start of the alleged conspiracy). If not, the pattern of estimated effects would suggest that the allegations in the case are incorrect or that there were no anticompetitive effects. Further, if the estimates indicate that some products or customers benefited (e.g., the estimated but-for prices are higher than the actual prices) from the alleged anticompetitive acts, again there would be concern about the validity of the allegations, assuming the model was reliably estimated.

There are, however, a number of statistical concerns when building econometric models with highly detailed and heterogeneous transaction level data including:

1. Models need to account for potential differences in economic outcomes (such as prices) across the customers, products, time periods, and so on. These differences are often modeled by the use of "fixed effects," which are discussed in a subsequent section. However, simple inclusion of such fixed effects may not account for all the heterogeneity in the data. For example, perhaps the underlying variation in the outcome is such

that including fixed effects for each customer-product combination is economically or statistically important. If so, the model may require estimation of many more parameters than is possible to estimate reliably even with a large dataset.

2. It may be difficult to estimate accurate standard errors because the patterns of potential correlations in the error terms across observations are difficult to model. While clustered standard errors may allow the econometrician to address some of these issues, if the patterns of correlations in the error terms potentially reach across all the dimensions of the data, then the required clusters may be too large to be statistically valid. In some cases, bootstrapping techniques, discussed above, can help to compute more reliable standard errors.

3. Transaction level data may be irregularly observed over time in ways that make estimation of time series or panel data models computationally intractable.

For all these reasons, it can be advantageous to aggregate administrative data before conducting econometric analyses. For example, the econometrician may aggregate sales for groups of customers together or aggregate sales for a particular customer in a month together. Of course, any such aggregation should reflect the underlying economics of the case and should be careful not to eliminate econometrically or economically important variation or heterogeneity in the underlying data. There are no bright lines in balancing the benefits of preserving this variation with the potential complications of dealing with the disaggregated data, and so using detailed administrative data effectively requires careful economic and statistical analysis to achieve this balance.

## 2. Estimation with Panel Data

Datasets can be composed of single observations over a period of time (a *time series*) or of a number of observations in single time period (a *cross section*). In general, data sets consisting of both time series and cross-sectional observations are called cross-section time series data—or panel data.[141]

Panel data allow for richer econometric specifications than either time series or cross-sectional data.[142] Consider for example, a dataset that tracks customer transactions. If there were 100 transactions in each year (corresponding to a purchase by each of 100 customers) over five years, the data would allow the econometrician to study both within-customer and across-customer behavior.

There may be reasons to believe that there are unobserved factors specific to each customer that affect the dependent variable (e.g., price) in such a model. For example, suppose some customers are better negotiators than others. Good negotiators are likely to receive better prices on each transaction than poor negotiators. Similarly, suppose some customers have better substitutes for the product in question than other customers. Then, the customers with good substitutes are likely to receive better prices on each transaction than customers with poor substitutes.

When these *unobserved individual-specific effects* are present, the error term of the regression can be represented as composed of two parts.[143] The first part represents the unobserved individual-specific effect, which is assumed to be fixed across all purchases of a given customer. The second part of the error term can change from one time period to the next for each customer. How one proceeds in this situation depends on whether the unobserved individual-specific effects are correlated with the explanatory variables.

If the unobserved individual-specific effects are correlated with the explanatory variables, ignoring them will create an endogeneity problem, which in turn will bias the regression estimates.[144] Because there are multiple observations for each customer over time in panel data (but not a cross-section), one can control for the individual-specific effects, and thus eliminate the endogeneity concern. The easiest way to do so is to include in the regression specification a set of customer indicator variables—one for each customer.[145] The dummy variable for customer $i$ will control for the unobserved individual-specific effect for customer $i$—in effect, it reflects the average value of the dependent variable for customer $i$, controlling for other observable factors, where the average value for each individual may be different. This type of analysis is called a "*fixed effects regression*," where the fixed effect for customer $i$ is equal to the regression coefficient on its unique dummy variable.[146]

For an example of how failing to control for fixed effects can bias a study's results, consider a study of the effects of education on individuals' earnings. An individual's motivation and inherent ability are difficult to measure fully with observable variables. In an earnings regression model, motivation and inherent ability therefore will appear in the error term as an individual-specific effect that will increase the individual's earnings over his or her lifetime. Yet these same factors are also likely highly correlated with the individual's education. Without including fixed effects for the individuals in the regression, a regression of earnings on education (and other explanatory variables) may well produce biased results, since the coefficient on education would then also reflect the effects of motivation and inherent ability on earnings.[147] A regression that excludes individual fixed effects will rely on variation across individuals as well as over time for specific individuals to identify the effect of education on earnings, thereby subjecting itself to the concern that education and unobserved individual characteristics may be correlated across individuals. On the other hand, a regression that includes individual fixed effects will rely only on variation over time for each individual to identify the effect of education on earnings, thereby lessening this concern.

If the unobserved individual-specific effects are not correlated with the explanatory variables, a fixed effects model still yields reliable results, but a better estimator may be available. In such cases, what is known as the "*random effects estimator*" may provide more statistically precise results than fixed effects. However, before relying on random effects results, it is critical to test the validity of the assumption of no correlation between the unobserved individual-specific effect and the explanatory variables.[148]

## 3. Estimation with Time Series Data

In a time series context, model specification and estimation proceeds differently depending on whether the time series in question have *stochastic trends* or not.[149] The term stochastic refers to the unpredictability of a random variable over time. A series with a stochastic trend not only trends upward or downward, but shocks to the series persist for a long time.[150] Economic time series that are not stochastically trending will sometimes be

referred to as *stationary,* while econometric time series that are stochastically trending will sometimes be referred to as *non-stationary*.

Stochastic trends can create problems in econometric estimation. For example, suppose a dependent variable is increasing at the same time an explanatory variable is increasing. A simple regression then could find a positive and significant relationship between the explanatory variable and the dependent variable, because both variables are independently trending upward at the same time, even if the two variables are not related. Moreover, the $R^2$ from an OLS regression has no meaning when data are not stationary. Many economic time series are thought to be nonstationary, such as a country's Gross Domestic Product or the price of a stock.[151]

The properties of many econometric estimators, such as least squares regression, are derived under the assumption that the data series defining the dependent and explanatory variables are not stochastically trending. If in fact the series are stochastically trending, a different set of econometric techniques should be employed.[152]

## a. Tests for Stationarity

A number of different methods for testing for stochastic trends in a time series have been proposed.[153] These methods generally test for what econometricians call "unit roots."[154] Because of limitations in these unit root tests, one should view the results of the tests within the context of economic theory and the dynamics of the market. For example, suppose the time series of interest are price and marginal cost. In general, it would be economically implausible that one of these series is nonstationary while the other is stationary, because standard economic models predict that price is strongly influenced by marginal cost.[155] Now, suppose the results strongly reject the null hypothesis that marginal cost is nonstationary, but do not reject the null hypothesis that price is stationary. It would be reasonable to conclude from the results of the two tests—and the fact that a statistical rejection of one hypothesis is generally a stronger result than the inability to reject another hypothesis for the reasons discussed above—along with the implication of economic theory (suggesting both series must be either stationary or nonstationary) that both price and marginal cost are stationary in this case.[156] If so, then standard regression analysis can be used.

# b. Modeling Market Dynamics with Stationary Time Series

Although the usual econometric techniques can be applied to stationary time series, particular issues may arise when attempting to model the dynamics of such series. The starting point for modeling those dynamics is studying the economics of the industry and examining why dynamic effects may arise in the first place. That is, why do the economic outcomes not adjust instantaneously to changes in economic conditions? This issue makes modeling only contemporaneous influences on the dependent variable inappropriate. There may be long-term contracts or other institutional features that slow the speed of adjustment, so understanding the economic context can be important in accurately modeling the dynamics.

Three types of dynamics may need to be modeled. First, dynamic effects may arise if the dependent variable is influenced by earlier values of itself. For example, where the dependent variable is price, the price in the current period can be affected by prices in prior periods if there are costs to firms changing their prices. These costs would discourage frequent price changes, so price changes would not occur as often and would likely be delayed until there was an accumulation of reasons to change price. Modeling this type of dynamic is often done by including lags (i.e., prior observations) of the dependent variable as additional explanatory variables.[157]

Second, dynamic effects may arise if the impact of a change in an explanatory variable plays out over two or more time periods. This can occur, for example, if long-term contracts allow for adjustments to price due to changes in costs, but only after a lag. Modeling these dynamics is often done by including not only the contemporaneous value of an explanatory variable, but also values of the variable from earlier time periods as additional explanatory variables.[158]

Finally, dynamic effects may arise if the error term includes unobserved factors that are themselves correlated over time. This induces *serial correlation* in the error term. The dynamics in this case may be limited to the error term, and can be addressed by modeling the form of the serial correlation.[159]

The economics of the industry can suggest that dynamics of one type or another are present, and the modeling should focus on that form of dynamics.

As discussed above, if there is evidence that sales are made under contracts that adjust to cost changes with a lag, then lagged costs likely should be included as an explanatory variable for estimating the impact of cost on prices. In the case where there are reasons to believe dynamics of all three types may be present, it is important that the modeling of all three types done jointly, rather than sequentially. There may be important interactions between the three types of dynamics that would be missed if the modeling were done sequentially.[160] Most basically, however, the key point is that if such dynamics are economically important they should be included in the model; otherwise results will suffer from a form of omitted variable bias due to the failure to account for the dynamic terms.

There is also an important question about the number of lags that should be included in the model. The optimal lag lengths then can be chosen by estimating the model using different combinations of lag lengths, and using model selection criteria such as the Schwartz criteria to choose between these models.[161]

Finally, it is important to recognize that specifications that include lags of the dependent variable as additional explanatory variables potentially complicate estimation of the model. In particular, such inclusion creates a correlation between the explanatory variables and the error term if the error term itself exhibits serial correlation.[162] Under this condition, least squares estimation of the model can lead to biased and inconsistent estimates, in which case other econometric methods should be used (as discussed below).

## c. Modeling Dynamics in Nonstationary Time Series

If the time series are stochastically trending, a different set of econometric techniques in general should be used to estimate the relationships between the series.[163] The simplest approach is to take the observed value of a variable in each time period observation "t" and subtract from it the value of the same variable in the previous time period "t-1." Doing this calculation for each observation creates a new time series data set of the changes in the variable from one period to the next, and this transformation is typically done for all of the variables involved in the regression.[164] This *first differences* approach frequently removes the nonstationarity from the data, although the transformed data should be tested to ensure that is in fact the case.[165] The

approach, however, will also often remove some information about the relationship between the dependent variable of interest and the exogenous variables. Thus, goodness-of-fit measures such as $R^2$ and the measured significance of the statistical tests usually will be lower than regressions based on the untransformed data.[166] This loss of information also means that one should be cautious about using first differences approaches unless there is strong reason to believe the data exhibit nonstationarity.

More sophisticated econometric techniques can be applied if the time series in question are nonstationary, but are *cointegrated*.[167] Two (or more) nonstationary series are said to be cointegrated if a linear combination of the different series is itself stationary (or put differently, if the residual from a regression of one of the variables on the other is stationary).[168] For example, consider two time series. If one series plus a constant multiplied by the second series is stationary, the two series are cointegrated. Econometric methods exist for testing whether two or more series are cointegrated.[169]

Cointegration can arise if economic forces prevent the nonstationary series from getting too far from each other, that is, if the series have a long-run equilibrium relationship. For example, again consider a price series and a marginal cost series. While price and cost may each be nonstationary and trend upward, the economic forces at play would tend to keep the gap between price and marginal cost (i.e., the margin) from becoming too large or too small, at least over a long enough time period. If the margin grew too large, entry would occur or customers would cut back their purchases and drive the margin back down. If the margin grew too small, exit would occur or customers would increase their purchases and the margin would increase again. Thus, the margin can be stationary even though price and cost are themselves nonstationary.

If the tests for cointegration indicate that the series are cointegrated, then the relationship between the series can be specified and estimated as a *vector error correction model* (VECM).[170] A VECM models both the cointegrating equations (the long-run relationships between the variables with common stochastic trends) and also the short-run dynamics of the residuals of the cointegrating equations.[171]

An important feature of these error correction models is that their estimated parameters typically have clear economic interpretations. The coefficients of the long-run economic relationships can be interpreted as

measuring the long-run equilibrium relationships between the variables. So, for example, if the estimated error correction model relates prices to demand and cost measures, the coefficients should reflect how prices and demand and cost factors move together in the long-run. Thus, the economic reasonableness of the estimated model can be judged by comparing the parameter estimates to what economic theory would predict. If the parameter estimates are not consistent with economic theory, the estimates should generally be considered to be unreliable. Furthermore, the error correction model has an estimate of the speed with which the dependent variable adjusts toward this long-run equilibrium. Again, the reasonableness of this adjustment-speed parameter estimate can be judged based on economic knowledge.

# d. Considerations in Building a Forecasting Model

Time series models may be used to make forecasts. For example, as discussed below, a time series model may be estimated using data from a competitive period, and then used to forecast but-for prices during a conspiracy period.[172] Such a forecasting model obviously will be useful only to the extent that it provides reliable forecasts. For example, the start and end of a conspiracy period may be characterized by sharp "turning points" in a price series. Accordingly, it is important that the forecasting model be able to predict turning points that occur for nonconspiracy reasons. Otherwise, turning points attributable to events unrelated to the conspiracy might be incorrectly attributed to the conspiracy.[173]

How does one tell if the forecasting model is reliable? Looking at $R^2$ is generally not a good way to assess a forecasting model. Models with lagged dependent variables or serially correlated errors often appear to track the historical data well and achieve a very high $R^2$. However, as discussed previously, such models may suffer from a form of "over-fitting."[174] That is, while they fit the historical data well, they fail to capture the true economic structure of the dynamic pricing process. The good fit may come from the inclusion of lagged dependent variables, not the inclusion other explanatory variables that predict changes in the dependent variable. Thus, when such models are used to forecast prices during an alleged conspiracy period, they may do a poor job forecasting turning points in the dependent variable.

The key criteria for assessing whether a regression model can be reliably used to make forecasts are succinctly summarized by Stock and Watson in their econometric text:

> [I]f we are to obtain reliable forecasts, the estimated regression must have good explanatory power, its coefficients must be estimated precisely, and it must be stable in the sense that the regression estimated on one set of data can be reliably used to make forecasts using other data. When a regression model is used for forecasting, a paramount concern is that the model is externally valid in the sense that it is stable and quantitatively applicable to the circumstances in which the forecast is made.[175]

Hence, an essential question that must be addressed in order to determine if a forecasting model can be used to forecast but-for prices is whether the economic model is stable between the estimation period and the anticompetitive period. The difficulty, of course, is that this is a question that involves comparing the model in the competitive period to what the model would have been in the anticompetitive period, absent the anticompetitive behavior. Thus, the forecasting approach does not avoid the fundamental problem of estimating "causal effects"—in fact, it makes the problem in some ways more complex because it requires that the stability of an entire equation be assessed.

One way to test a forecasting model is to see how well it predicts for some time period before the alleged anticompetitive act, assuming adequate data are available, or more generally to see if the forecasting model yields accurate predictions for periods assumed to be free of the allegedly anticompetitive act.[176] To implement such a test, one would divide the data from before the alleged anticompetitive act into two parts: one part is used to estimate the forecasting model, and the other part is used to assess the accuracy of the forecasts of the model. It is particularly useful to exclude from the part of the data used to estimate the model observations that contain a turning point (e.g., a substantial change in prices). If the forecasting model is reliable, then it should produce a reasonably accurate forecast for the part of the data not used in estimation. In particular, it should be able to predict any turning points. If the model does a poor job forecasting in this context,

then it is unlikely to produce a reliable estimate of but-for prices during the period of the anticompetitive act.

Another way to test a forecasting model for stability is to perform Chow tests of stability during the competitive period. The logic is that if the econometric model is not stable during the competitive period, then there is a reasonable presumption that the model is unlikely to be stable when applied to the anticompetitive period. Furthermore, if there are two or more possible regimes during the competitive period, then it will require additional, careful economic analysis to determine whether any of these models are appropriate for the forecasting in the period during which the alleged anticompetitive conduct occurred. Of course, evidence of stability during the competitive period does not imply that the model estimated on the competitive period is appropriate for forecasting during the anticompetitive period, but evidence of instability during the competitive period may create a presumption that forecasting models are unlikely to satisfy the required stability.

# F. Before-During and Related Approaches to Damages

The before-during approach identifies the effect of the alleged anticompetitive conduct by using data from a period before the alleged conduct in combination with data from the period when the alleged conduct occurred.[177] Comparing the values of the dependent variable in the "before" period to its values in the "during" period may serve to identify the effect of the alleged conduct.[178]

To establish the extent, if any, of damages, it is generally useful to begin with a simple data analysis as a prelude to performing a more sophisticated analysis. For example, it may be useful to compare average prices before and after an alleged price-fixing agreement was implemented to explore the potential magnitude of a conspiracy-related overcharge. In industries in which prices tend to be relatively stable (e.g., vitamins, hydrogen peroxide), such price comparisons can often be done via a simple comparison of price levels during and outside the alleged cartel period. However, in industries in which prices are trending up or down (e.g., the high technology industries that have been the subject of several recent cartel investigations and in which prices are often falling rapidly), the more relevant question is generally

whether, at the start or end of the alleged cartel, there is a break from the prevalent trend in prices.

In making this comparison, however, it is generally important to account for any significant differences in other economic factors between the before and during periods.[179] A basic comparison of average prices in different periods, however, does not hold constant other factors that may impact price. Thus, the initial analysis of averages is usefully supplemented with regression analysis.

# 1. "Dummy Variable" Models Versus "Prediction" Models[180]

Two methods are commonly considered to estimate the impact of alleged conduct on the outcome of interest: (1) dummy variable models; and (2) prediction models.[181] For simplicity, we compare the methods here in the context of a price fixing conspiracy, and as such in the estimation of price overcharges—though the ideas can be adapted to a broad range of outcomes and alleged conduct. Although both dummy variable and prediction models make use of data from a nonconspiracy period, they differ primarily in whether they also make use of data from the conspiracy period. The dummy variable model uses data from both the alleged conspiracy period and the non-conspiracy period to estimate the relationship between price, economic factors, and a dummy variable for the alleged conspiracy period, with the dummy variable measuring how much higher prices were in the alleged conspiracy period relative to the non-conspiracy period, after controlling for the other economic factors. The prediction model uses data from only the non-conspiracy period to estimate the relationship between price and economic factors. It then uses the estimated relationship as a basis to predict what prices would have been during the alleged conspiracy period but for the alleged conspiracy, with the gap between actual prices and the estimated but-for prices assumed to represent the effect of the price-fixing conspiracy.

For simplicity, assume that the best explanatory variable available for capturing the potentially anticompetitive effects of the price-fixing conspiracy is a dummy variable representing the time period when the alleged anticompetitive acts took place.[182] This variable will be 1 during that

period and 0 at other times (similar to the PERIOD variable discussed earlier). Other explanatory variables that affect the dependent variable may also be included in the regression. The coefficient on the dummy variable measures how much higher (or lower) the price would have been on average in the conspiracy period relative to the non-conspiracy period, controlling for other observable economic factors. Because the coefficient on the dummy variable in the regression model is an estimate of the effect of the conspiracy on the dependent variable, this type of model is often called a *dummy variablem odel*.[183]

This model typically assumes that the coefficients on the explanatory variables are the same in the conspiracy and non-conspiracy periods. This assumption may not always be valid. For example, price-fixing conspirators may react differently to changes in supply and demand factors than they would have had they not been conspiring. Thus, it is important to test whether prices react differently to the supply and demand factors in the conspiracy period than they did in the non-conspiracy period.

In more technical terms, it is important to test whether there has been a significant shift in the relationship between the explanatory variables and the dependent variable of interest.[184] In particular, one can estimate the same economic model over the conspiracy and non-conspiracy subsamples of the available data and test statistically whether the model's parameters are statistically significantly different in the two time periods. If the assumption of model stability is not rejected, then there is a statistical basis to rely on the results from the dummy variable model to estimate the cartel effect on price. If the stability assumption is rejected, the model may be unreliable.

An alternative to the dummy variable model is a *predictionm odel*.[185] The first step in implementing a prediction model is to estimate the reduced form equation on the data from the non-conspiracy period. Then, this equation is used to predict the prices that would have prevailed in the conspiracy period, given the values of the explanatory variables in that period.

The prediction model assumes that the coefficients on the explanatory variables that would have held during the conspiracy period absent the conspiracy are the same as those that actually hold in the non-conspiracy period. But, under certain conditions, this assumption may be invalid. For example, assume there was a change in the relationship between the explanatory variables and the variable of interest (e.g., price) in the

conspiracy period that had nothing to do with the alleged anticompetitive conduct (e.g., entry or exit of firms from the market) and the prediction model does not take that change into account. Under these conditions, estimates using data solely from the non-conspiracy period are unlikely to accurately predict pricing but for an alleged conspiracy or other anticompetitive act.[186] Moreover, as discussed above, a prediction model should be tested where possible to check whether it accurately predicts turning points in the data.[187]

In addition, one also could estimate the model using data from the conspiracy period and then use the resulting estimates to predict back ("backcast") into the non-conspiracy period.[188] If the backcast is above the actual prices in the non-conspiracy period, that would suggest the price-setting process in the conspiracy period produced higher prices than the price-setting process in the non-conspiracy period. This finding would be consistent with the proposition that the alleged anticompetitive behavior in the conspiracy period increased prices, and the difference between the actual and predicted prices in the non-conspiracy period could form the basis for calculating an overcharge and damages. The backcast model relies on similar assumptions as the prediction model (in effect, it is predicting prices that would have prevailed had the conspiracy been operational in the non-conspiracy period).

If the results from the prediction and dummy-variable models are significantly different, one should assess carefully whether there are sufficient data and sufficient industry stability for the prediction model to be reliable. If the conditions required for a reliable prediction model are not met, then one should test whether the stability assumptions underlying the dummy-variable model are met, and if so, rely on the results from the dummy-variable model. Importantly, there may be situations in which neither model is appropriate, in which case the value of econometric evidence in assessing damages may be quite limited.

## 2. Before-During-After Models

The previous section discussed models that assume there is a single unaffected period (the period before the conspiracy). Sometimes, data might exist on several unaffected periods. For example, data may exist not only for the before period, but also for an after period. With more than one unaffected

period, the question arises as to whether one should combine the two unaffected periods and, if not, then which of the two unaffected periods should be compared to the affected period.[189]

In general, the before and after periods should be combined, if appropriate, since that will result in a larger sample and more precise estimates.[190] However, it is appropriate to combine the periods only if the model is stable across them.[191] Although there are many ways that one might assess whether the model prediction model is stable across the two time periods (e.g., testing all or some of the coefficients for equality), the most informative test is likely to test whether a prediction model estimated using only the before period would yield the same overcharge estimates as a prediction model estimated using only the after period. If such equivalence of the before and after models cannot clearly be established, attempting to combine the before and after period to predict the path of prices "in the middle" (during the alleged anticompetitive act) is inadvisable, as predictions are likely to be unreliable.

A difficult decision arises when this test rejects combining the two periods into a single model and one must choose which unaffected period is the better basis of comparison for the affected period, assuming both are truly unaffected. Before addressing how to decide which unaffected period to use, first consider why two unaffected periods might be explained by different models. There are economic models of competition that suggest that periods of more intense competition ("price wars") will alternate with periods of less intense competition.[192] These models suggest that the relationship between price and the explanatory variables may change over time with the intensity of competition. In this case, a before period that was dominated by more intense competition might look different than an after period that was dominated by less intense competition, even though both periods were unaffected by the anticompetitive conduct at issue.[193] Alternatively, there may have been substantial differences in market conditions between the two periods (e.g., there may have been substantial new entry into the market), which are not adequately controlled for in the regression and therefore lead to economically relevant differences in the models

In the event that there are substantial differences between the before and the after periods, one needs to determine how to select which period to use. One way to answer this question is to try to model explicitly the switches

between competitive regimes, and then use this model to predict which competitive regimes would have prevailed during the affected period in the but-for world. There are econometric techniques called *switching models* that can be used to do this.[194] Although not commonly done, using a switching model of this sort may also provide a realistic picture of competition in the affected period.

An alternative approach for choosing between the before and the after periods can involve using general market information and nonquantitative evidence from the case. For example, suppose that the after and during periods were characterized by strong demand for the product, while the before period was characterized by weak demand. These factors would suggest that the after period would provide a better basis of comparison for the affected period than would the before period.

Another reasonable (albeit likely to result in lower damage estimates) approach may be to predict but-for prices for the affected period alternatively using the before- and after-period models, and then take the maximum of these two predictions. Notably, both of these predictions are consistent with competitive behavior, meaning that it may be reasonable to take the higher prediction as the price level consistent with competition with only prices above this higher level indicative of effects from the alleged conspiracy.

## 3. Identifying Beginning and End Points of the Damages Period

Recently, econometric methods have been developed that can be used to help in choosing beginning and end dates for allegedly unlawful conduct based on market data.[195] These methods involve estimating the point in time when an econometric model exhibits a *structural change*, or shift in the model parameters. In the case of alleged anticompetitive conduct that had an effect on market outcomes, a structural shift in the econometric model should have occurred when the effect of the conduct began and a second structural shift should have occurred when the effect of the conduct ended. Thus, for example, identifying when there were structural shifts in the regression model can provide useful evidence concerning the beginning and end of overcharges from a price-fixing conspiracy.[196]

However, it is statistically inappropriate to identify a structural break in a data series and use that break to define a conspiracy period unless one properly adjusts the statistical inference for how the beginning and end points are chosen. For example, it would not be appropriate to identify a price spike, define the beginning of a conspiracy period from that spike, and then "test" whether prices were higher in the period beginning with the spike than before the price increase. Indeed, the literature has shown that approaches that search for beginning or end dates without using the appropriate statistical tests are very likely to find statistical evidence of "damages" even in cases where there was no anticompetitive conduct.[197]

# G. Benchmark and Difference-in-Differences Approaches to Damages

Two additional methods are sometimes used to estimate the impact of alleged conduct on the outcome of interest: (1) benchmark models; and (2) difference-in-differences models. Both approaches to damages are based on the same basic principles and econometric tools as the before-during-after approach.

The benchmark analysis compares the outcome of interest (e.g., price) in the affected market to that same outcome in an unaffected benchmark market.[198] The benchmark market (or markets) can be a different geographic area or a different end-use market, although when using a different end-use market it can be particularly challenging to control sufficiently for all of the differences between the markets. The key is that the benchmark markets, however chosen, were unaffected by the alleged anticompetitive conduct. Further, the benchmark and affected markets should be characterized by sufficiently comparable economic conditions (at least after controlling for observable factors) such that prices in those markets would have been identical had there been no anticompetitive behavior.[199] The benchmark approach may be particularly useful if there are inadequate data for the before period, so that a before-during approach cannot reliably be performed.

The difference-in-differences model compares the differences in outcomes before and after the alleged anticompetitive conduct across the benchmark and affected markets. Under the assumption that the differences

would have been stable, controlling for observable factors, but for the alleged anticompetitive conduct, the difference-in-differences provides an alternative approach to estimating damages. (Said differently, the difference-in-differences model requires an assumption that the market outcome would have changed in the same way in both the benchmark and affected markets, after controlling for observable factors, absent the alleged anticompetitive conduct.) The difference-in-differences approach can be implemented using a regression that takes into account the various factors that differ between markets and time periods.

The difference-in-differences approach requires data for the market of interest and the benchmark market that cover both a period of time that is unaffected by the alleged anticompetitive act and the period of time when the market of interest allegedly was affected. Thus, the difference-in-differences approach combines the before-during and benchmark approaches.[200]

To take a simple example, suppose that Market A is presumed to be affected by a conspiracy and Market B is not. Suppose that prices in the non-conspiracy period in Market A are $15 and in Market B are $10. Further suppose that the prices in the conspiracy period in Market A are $40 and in Market B are $20. A basic before-during analysis, without controlling for anything else, would conclude that prices in Market A are $25 higher in the during period than the benchmark period. However, this estimate is likely to overstate the effect because prices were rising in general (e.g., in Market B). Similarly, a benchmark approach that compared Market A to Market B in the conspiracy period without controlling for anything else would conclude that prices are $20 higher in Market A than Market B. However, this estimate is also likely to overstate the effect of the conspiracy because it fails to take into account that prices in Market A are generally higher than in Market B (e.g., during the benchmark period). The difference-in-differences approach combines these two approaches by recognizing that the difference between prices in Market A and Market B was $5 in the benchmark period and $20 in the during period. Thus, it would conclude that the effective price difference was really $15.[201]

# H. Summary of Key Points in Creating and Evaluating Econometric Models of

# Damages

As can be surmised from the previous sections, a number of considerations should be taken into account when building or evaluating an econometric model used to estimate damages.[202] Model specification and estimation involve many choices: explanatory variables, functional form, dynamic specification in a time series, estimation technique, and which of the basic approaches to damages to use. In many cases, statistical tests can help guide these choices. However, the starting point for any econometric model is economic theory and knowledge of the industry, along with confidence, that there are sufficiently reliable data to perform an econometric analysis.

Economic theory provides guidance as to the general types of explanatory variables that should be included in the model. For example, for an econometric model of price, economic theory suggests that variables representing cost are likely the most important control variables, with variables capturing demand and competitive factors also potentially important types of explanatory variables.[203] Knowledge of the industry helps determine with more specificity which variables to include. For example, if the industry in question were plastics, the price of petroleum (an important input to plastics) likely would be a relevant cost variable and production levels in downstream industries that use plastics likely would be relevant demand variables. In general, to avoid "data mining" or "fishing," it is important to limit explanatory variables to those that are highly economically relevant to the industry in question.

One must be able to obtain enough sufficiently reliable data to implement any economically sound econometric model. Econometric analysis based on very few data points in general will be less reliable than econometric analysis based on a larger number of data points. There may also be issues with how accurate the data are, and whether they represent an unbiased sample of what has occurred in the market. Accordingly, the data need to be checked for accuracy and any potential selection bias. Finally, in many instances the data will need to be "cleaned" to some extent, removing obviously incorrect observations. For example, many damages analyses use data from a company's sales database. Care must be taken with such data to ensure that all significant discounts have been accounted for, and to weed out any obvious errors.[204] In some circumstances, limitations on the availability

or quality of data may make it impossible to conduct a meaningful econometric analysis.

Often economic theory and industry knowledge might suggest a large number of potential explanatory variables. While there is a benefit to parsimony (namely potentially increased precision of the estimators), there may be a greater concern with omitting a potentially important explanatory variable that can induce omitted variable bias. Again, however, the set of explanatory variables considered for inclusion should generally be limited to those that are highly economically relevant for the industry in question and testing should be done to make sure results are not overly sensitive to small changes in the set of explanatory variables included in the regression.

The relationship between the dependent variables and the explanatory variables can be expressed in various functional forms of the underlying variables, and this is another important aspect of model specification.[205] For example, the dependent variable might be the unadjusted price of the product at issue and an exogenous variable could be costs. This model would provide an estimate of how much price would go up for a dollar increase in cost. However, there may be good theoretical or industry-specific reasons to believe that the relationship of price to cost is better measured in percentage change terms for each variable. If so, then the functional form of the estimating equation may be better specified using the logarithms of price and cost as variables. Statistical tests can help determine which functional form is most appropriate for the situation at hand.[206]

In a time series context, specification of the dynamics is important. Again, the particular specification might be guided by industry knowledge and statistical tests, including those that can help make choices about (for example) the lag lengths.[207]

Care must be taken to specify correctly the structure of the error term in the estimation of the econometric model and to use estimates of the standard errors that are robust to deviations from the assumption of independent, identically distributed error terms. Only with correct standard errors will the resulting statistical inference be valid. The correct method for calculating standard errors can be determined based on the outcome of statistical tests, and in general such tests should be performed.[208]

The choice between reduced form and structural models can be of great importance. A reduced form model typically will provide the most efficient

and simplest model for damage estimation, but in some instances estimating a structural model will be a superior approach.[209]

The decision regarding which damages approach to employ also will depend on the available data and the nature of the market. Are there sufficient data to implement a before-during or before-during-after model? Is there a good benchmark? Can a difference-in-differences approach be used? In general, if reliable data are available from outside the period of the alleged anticompetitive act, then techniques that take advantage of those data will likely be the most reliable.[210]

Deciding whether to use a dummy variable or prediction model can also be important. As noted above, if the results from the predictive and dummy-variable models are significantly different from one another, then one should first assess carefully whether there are sufficient data and sufficient industry stability for each of these models to be reliable, being mindful that there may be situations in which the conditions for neither the predictive nor dummy-variable model are met.

Once the econometric model is specified and estimated, one must subject the results to a series of sanity checks and another series of statistical tests to assess the reliability and robustness of the estimates.[211] The starting place is typically examining the sign and statistical significance of the coefficients. If, for example, the coefficient on cost in a price regression is negative and statistically significantly different from zero (or very small and/or not significantly different from zero), this would cast doubt on the reliability of the model, since one would normally expect cost to have a positive effect on price. When performing this sort of check, however, one must take care that there is a clear interpretation to the coefficients; there may not be one in a reduced form model, for instance.[212]

When there is reason to question a model's specification, a variety of specification tests can and should be employed. For example, as discussed above, a model may impose potentially questionable restrictions on the coefficients, such as that the coefficients are the same during two time periods. Specifically, an econometric model of pricing at the customer level might assume that all customers have the same coefficients on the cost and demand variables. However, there may be reason to think that customers have different responses to cost and demand conditions, so there could be different coefficients on the explanatory variables across customers,

including the variable measuring damages. In this case, it may be necessary to estimate the model for different groups of customers, or otherwise to employ a more complex model that takes these differences into account.[213] Similarly, a time series model might assume that the coefficients are the same over the course of the entire time period, but there may be evidence that the structure of the model changed at some point in time. A Chow test (or a more sophisticated test for structural breaks) can be used to test whether such a change occurred.[214] If so, the appropriate model should adequately control for such a change.

There may be reasons to question the crucial assumption that the error term of the regression is uncorrelated with the explanatory variables. This assumption often can be tested using a form of the Hausman specification test. For example, if we are concerned that an explanatory variable might be endogenous (which would bias OLS regression results), then the Hausman specification test comparing the OLS results to the IV results can be used to check for this problem.[215] If such a problem is found to exist, then more complex econometric techniques can be used to correct for the bias.[216]

Finally, virtually any regression model eventually will fail one or more tests if enough tests and specifications are run, even if nothing is wrong with the model. However, failure of a test should be taken seriously, and a model should be rejected when it fails a test of a *critical* assumption, or if it fails a large number of the specification tests to which it is subjected.[217]

More important than whether the model fails one of many possible statistical results, is that the results are fairly robust to a range of reasonable, small tweaks to the model. If slight changes to the functional form of the model, the precise set of control variables used to capture relevant economic factors, or the number of lags of the dependent or explanatory variables lead to large changes in estimated damages, then the results from the model should generally be treated with substantial skepticism.

# I. Case Study—The Application of the Before-During and Benchmark Approaches

Econometric techniques can be applied in a variety of ways to estimate the impact of the alleged anticompetitive conduct on certain economic outcomes, such as estimating lost sales or price changes due to the alleged conduct. Some of the econometric techniques and tests discussed above and their applications are illustrated using the before-during and benchmark approaches to estimate the price effects of alleged collusive behavior by analyzing actual data relating to Southern Powder River Basin (SPRB) coal.

# *1. Background*

Virtually all coal produced in the United States is used for electric power generation.[218] About one-third of the coal now comes from the SPRB, which contains vast amounts of low-sulfur coal available in low-cost surface mines. SPRB coal is relatively homogeneous, with two main types: 8400 Btu/lb. coal and 8800 Btu/lb. coal. SPRB coal mining began with the 8400 Btu coal, which was closer to the surface and easier to mine. During the 1970s, many coal-powered electric generation units were constructed to burn this coal. Virtually all of these units also can burn the higher-quality 8800 Btu coal. As sulfur emissions regulations became more stringent, older electric generation units were converted from burning 12,000 Btu bituminous coals to burning 8800 Btu SPRB coals. Because these plants were already suffering capacity losses from burning lower Btu SPRB coals, they generally did not burn 8400 Btu coal.

During 1999 and 2000, the three leading SPRB coal producers conducted what economists may describe as "cheap talk." Cheap talk refers to communications between oligopolists about future intentions. Such talk can, in some circumstances, facilitate understanding of each other's goals and intentions, which can lead to collusive production and pricing.[219] The statements were of the nature that they would reduce production "until prices improved." The largest producer, Peabody Energy, closed a mine in 1999. The third largest producer, Arch Coal, Inc., closed another mine in 2000, and several other planned expansions were cancelled. The result was a spot price increase in 2001. In the aftermath of the capacity reductions, prices settled about 30 percent above the level before the shut-downs. The DOJ opened an investigation in July 2001 but ultimately took no action against the SPRB producers.

## 2. Economic Model, Data and Choice of Explanatory Variables

For the purpose of this case study, the simplest economic model hypothesizes that if the alleged collusion had an effect, then prices of SPRB coal during the damages period should be higher than before the damages period after controlling for other supply and demand influences. As will generally be the case, the most straightforward econometric models for estimating damages use a reduced form, rather than a structural form,[220] but the model still needs to include the major supply and demand influences on price that would be included in a structural model. Here, we assume a linear relationship between the relevant market forces and SPRB prices.[221] (A full analysis would investigate whether the results were robust to alternative specifications of the relationship of these factors to price, such as in percentage change terms.)

The price of SPRB coal used in the analysis is the spot price reported by the utilities that purchased the SPRB coal.[222] The utilities reported the spot price at the time of delivery instead of at the time of actual sales. As a result, there is a lag between the reported spot price and the spot price at the time of actual sales that ranges from one quarter to one year. Therefore, although the alleged collusion occurred in the first quarter of 2001, the reported spot price did not increase until late 2001. This case study defines the before-collusion period as before November 2001 and the during-collusion period as between November 2001 and May 2005.

Before one can engage in econometric analysis of the data, it is important to review the data and check whether there are potential coding errors or other issues in the data that deserve further investigation. As discussed in section A, data do not have to be perfectly accurate to be useful in econometric analysis, but it is important to ensure that the data are reasonably reliable. To illustrate the importance of initial data review before running any regression analysis, the original data on the average SPRB coal price are plotted in Figure 3.



Draft - Unaudited

**Figure3 :Average Price of SPRB Coal before Data Cleaning**

As can be seen clearly from Figure 3, something is not right with the SPRB coal price data before 1998. Further review of the data reveals that before 1998, the transportation cost from the coal mines to the utilities was in the column for the spot price and vice versa. Correcting these data and conducting some other cleaning of the data, such as estimating the spot prices that were missing, results in data on the corrected average spot price for SPRB coal, presented in Figure 4.



**Figure 4 :** Average Price of SPRB Coal

These prices represent the prices of SPRB coal delivered from January 1993 to May 2005. Through most of the 1990s, these prices display significant volatility, but they did not have any uniform trend up or down. Beginning in November 2001, prices began increasing from average levels of around $5.60/ton in the before period to over $7.00/ton in the alleged conspiracy period. The question is whether this increase in prices was caused by changes in demand, changes in costs, or changes in the behavior of mine operators.

To take into account the major demand and supply factors that potentially could affect the prices of the SPRB coal, data on these factors were obtained from public sources. Supply data include quality measures of SPRB coal (BTU content, ash percentage, and sulfur content); productivity of the mines that produce the SPRB coal as measured by the average tons of SPRB coal produced per person day; and costs of fuels that are used in the production of SPRB coal, including diesel fuel cost and electricity cost.[223] Demand was measured using data on total electric power production.[224]

## 3. Assumption of Liability and Causation

In performing a damage analysis, experts usually assume that the plaintiff has been found liable for the alleged anticompetitive conduct. Accordingly, this case study assumes that SPRB coal producers engaged in collusive behavior from November 2001 to May 2005. As discussed in section C, however, even assuming collusion did occur, one still needs to study whether the observed price increase was at least in part due to other demand or supply changes or whether it could be attributed to the collusive behavior. To help answer this question and estimate the price increase that resulted from the assumed collusion, the dummy variable model and the prediction model under the before-during approach are used to isolate the price effects of the alleged collusive behavior.

## 4. Stationarity of the Time Series

As discussed in section D, when using time series data to conduct regression analysis, one should test whether the time series are stationary. If they are not stationary, different econometric techniques should be employed. To study whether nonstationarity is an issue in the time series data, Dickey-Fuller/Augmented Dickey-Fuller unit root tests were conducted[225] on the SPRB coal price data and certain independent variables.

The unit root test results indicate that the SPRB coal price data are stationary while some of the independent variables may be nonstationary, such as the diesel price series. However, as pointed out in section D, many unit root tests have a low ability to reject nonstationarity. Therefore, one should view the results of the tests within the context of economic theory. In this case, if the dependent variable, SPRB coal price, is stationary, it is unlikely that the demand or supply factors that interact with each other to determine the SPRB coal price are nonstationary. If these demand or supply factors were nonstationary, they likely would drive the SPRB coal price to be nonstationary as well.

To further investigate the nonstationarity issue, additional tests were conducted on the residuals from an OLS regression where the SPRB coal price is the dependent variable and other demand and supply factors along with a collusion dummy variable are included as the explanatory

variables.[226] These stationarity tests indicate that the residuals from the OLS regression are stationary. Since the SPRB coal price is stationary, this result again suggests that nonstationarity of other explanatory variables is not an issue in the case study. Thus, an OLS regression analysis was conducted to assess how the assumed collusion affected the SPRB coal price.

# 5. *The Before-During Approach with the Dummy Variable Model*

The dummy variable model under the before-during approach can be used to measure how the assumed collusion changed the price of SPRB coal.[227]

If the assumed collusion led to an increase in the price of SPRB coal, the coefficient on the dummy variable should be positive and statistically significant after controlling for the demand and supply factors that affect the price of SPRB coal. As discussed in part D of this chapter, valid hypothesis testing requires consistent estimates of the standard error of the coefficient estimates. Tests for serial correlation indicate that the error terms in the regression are serially correlated. To estimate the standard errors consistently, the Newey-West procedure was used to obtain the heteroskedasticity and autocorrelation consistent Newey-West standard errors.[228] The result of the OLS regression with the Newey-West standard errors is presented in Table 1.[229]

**Table 1: Regression Results for Dummy Variable Method**

| Dependent Variable: | | | Average Price of SPRB Coal | |
|---|---|---|---|---|
| R-squared: | | | | 0.7132 |
| Adj R-squared: | | | | 0.6968 |
| Number of Obs: | | | | 149 |

| | Coefficient | Newey-West Standard Error | t-Statistic | P> \| t \| |
|---|---|---|---|---|
| Dummy variable for the alleged collusion period | 1.2362 | 0.1798 | 6.8800 | 0.0000 |
| Btu content of SPRB coal | -0.0013 | 0.0011 | -1.1300 | 0.2590 |
| Ash percentage of the SPRB coal | -1.0727 | 0.7633 | -1.4100 | 0.1620 |
| Pounds of sulfur per million Btu | -1.1665 | 1.5701 | -0.7400 | |
| Average tons of SPRB coal produced per person day | 0.0015 | 0.0024 | 0.6200 | 0.5330 |
| Price of diesel | 0.0978 | 0.3283 | 0.3000 | 0.7660 |
| Price of electricity | 0.0497 | 0.0483 | 0.2400 | 0.8080 |
| Production of electricity | 4.33E-10 | 1.78E-09 | 0.2400 | 0.8080 |
| Constant | 20.7707 | 11.0578 | 1.8800 | 0.0620 |

As can be seen from Table 1, the variables that control for supply and demand changes are of the expected signs. Individually they are not statistically significant from zero at the 5 percent level, although they are statistically significant when taken together.[230] The coefficient on the dummy variable is positive and statistically significant. The regression result indicates that on average, SPRB coal prices were $1.24/ton (or about 22 percent) higher in the period with the unlawful conduct, compared to the before period, holding constant the exogenous variables.

As discussed in part F of this chapter, the dummy variable model assumes that the relationship between the dependent variable and the explanatory variables in the during period is the same as in the before period. To test this assumption, interaction terms involving the dummy variable and each of the other explanatory variables except the intercept term were added as explanatory variables in the model specification as well.[231] The null hypothesis that all of the coefficients on the interaction terms are jointly equal to zero was tested. If this hypothesis is not rejected, then the data are consistent with the view that the relationship between the price of SPRB coal

and the demand and supply factors did not change from the before period to the during period. If the null hypothesis is rejected, it suggests that the relationship has changed, either due to the alleged behavior or because of other reasons.[232]

As shown in Table 2, the test rejected the null hypothesis that the relationship between the price of the SPRB coal and the demand and supply factors remained the same in the during period.[233] Hence, a possibility that must be investigated is that the restrictions on the coefficients of the demand and supply factors imposed by the dummy variable model may have substantially affected the model's estimate of the effect of the alleged antitrust violation. Accordingly, the next section uses the prediction model to assess the impact of the assumed collusion on the price of SPRB coal.[234]

## Table 2: Regression Results—Testing for Relationship Change in the Dummy Variable Method

| Dependent Variable: | | | Average Price of SPRB Coal | |
|---|---|---|---|---|
| R-squared: | | | | 0.7417 |
| Adj R-squared: | | | | 0.7126 |
| Number of Obs: | | | | 149 |

| | Coefficient | Newey-West Standard Error | t-Statistic | P>\|t\| |
|---|---|---|---|---|
| Dummy variable for the alleged collusion period | -57.0152 | 23.4560 | -2.4300 | 0.0160 |
| Btu content of SPRB coal | -0.0021 | 0.0016 | -1.3000 | 0.1940 |
| Ash percentage of the SPRB coal | -1.9244 | 0.8683 | -2.2200 | 0.0280 |
| Pounds of sulfur per million Btu | 0.9237 | 1.7494 | 0.5300 | 0.5980 |
| Average tons of SPRB coal produced per person day | 0.0038 | 0.0025 | 1.5300 | 0.1280 |
| Price of diesel | -0.0652 | 0.4501 | -0.1400 | 0.8850 |
| Price of electricity | 0.0296 | 0.0860 | 0.3400 | 0.7310 |
| Production of electricity | 9.85E-10 | 2.32E-09 | 0.4300 | 0.6710 |
| Interaction term for Btu content of SPRB coal | 0.0056 | 0.0025 | 2.2600 | 0.0260 |
| Interaction term for ash percentage of the SPRB coal | 2.5203 | 1.2294 | 2.0500 | 0.0420 |
| Interaction term for pounds of sulfur per million Btu | -5.2794 | 2.4693 | -2.1400 | 0.0340 |
| Interaction term for average tons of SPRB coal produced per person day | 0.0038 | 0.0081 | 0.4700 | 0.6370 |
| Interaction term for price of diesel | 0.5961 | 0.5924 | 1.0100 | 0.3160 |
| Interaction term for price of electricity | -0.0406 | 0.1036 | -0.3900 | 0.6960 |
| Interaction term for production of electricity | -6.07E-10 | 2.96E-09 | -0.2100 | 0.8380 |
| Constant | 29.8307 | 14.1026 | 2.1200 | 0.0360 |
| **Joint F test for all interaction terms are equal to zero** | $F(7, 133) = 3.09$ | | Prob>F = 0.0048 | |

# 6. *The Before-During Approach with the Prediction Model*

The prediction model assumes that the relationship between the price of SPRB coal and the demand and supply factors in the actual world before the alleged anticompetitive behavior would have remained the same but for the alleged behavior in the during period.[235] If the relationship change found in the last section is entirely due to the collusive behavior, then the prediction model still would be valid. It is important to note, however, that the prediction model assumes *all* changes in the observed relationships between the before period and the during period are due to the collusive behavior; hence, in cases where the industry is changing rapidly, prediction models may confound other changes with changes due to collusive behavior and thus may not be reliable.

To use the prediction model to estimate the impact of the assumed collusion on the price of SPRB coal, an OLS regression similar to the dummy variable model was run, but using the data in the before collusion period only and excluding the dummy variable from the explanatory variables. The result of this regression is presented in Table 3.

## Table 3: Regression Results for Prediction Model

| Dependent Variable: | | | Average Price of SPRB Coal | |
|---|---|---|---|---|
| R-squared: | | | | 0.2104 |
| Adj R-squared: | | | | 0.1540 |
| Number of Obs: | | | | 106 |

| | Coefficient | Newey-West Standard Error | t-Statistic | P>\|t\| |
|---|---|---|---|---|
| Btu content of SPRB coal | -0.0021 | 0.0015 | -1.3300 | 0.1870 |
| Ash percentage of the SPRB coal | -1.9244 | 0.8532 | -2.2600 | 0.0260 |
| Pounds of sulfur per million Btu | 0.9237 | 1.7189 | 0.5400 | 0.5920 |
| Average tons of SPRB coal produced per person day | 0.0038 | 0.0025 | 1.5600 | 0.1220 |
| Price of diesel | -0.0652 | 0.4423 | -0.1500 | 0.8830 |
| Price of electricity | 0.0296 | 0.0845 | 0.3500 | 0.7270 |
| Production of electricity | 9.85E-10 | 2.28E-09 | 0.4300 | 0.6660 |
| Constant | 29.8307 | 13.8571 | 2.1500 | 0.0340 |

Given the coefficients from the before period OLS regression, the next step is to predict the price of SPRB coal in the but-for world without collusion, using the data on the explanatory variables in the during period. Figure 5 shows the actual price of the SPRB coal, the predicted price of the SPRB coal based on relationships estimated in the before period, and the lower and upper bound of the 95 percent prediction interval for the predicted price of the SPRB coal.[236]



**Figure 5 : A verage vs . P redicted P rice of S PRB C oal—Newey
Standard E rror**

    As can be seen in Figure 5, in every month in the during period, the actual
price of the SPRB coal is higher than its predicted price. Moreover, in 28 of
the 43 months in the during period, the actual price of the SPRB coal is
higher than the upper bound of the 95 percent prediction interval for the
predicted price of the SPRB coal. The average predicted price of the SPRB
coal for the during period is $5.72/ton, while the average actual price of the
SPRB coal is $7.16/ton in the during period. Therefore, according to the
prediction model, the assumed collusion resulted in a $1.66/ton (or about a
25 percent) increase of the SPRB coal price.

    In summary, the prediction model results suggest a slightly larger impact
of the assumed collusion on the price of the SPRB coal compared to the
$1.24/ton (or 22 percent) increase of the SPRB coal price based on the
dummy variable model. But critically, the results from both of these
approaches are consistent with the alleged behavior causing higher prices.
Hence, the result that prices were higher during the collusive period is robust
across markedly different econometric methods, greatly increasing the
confidence one should have in this finding.

Given that the test shown in Table 2 above rejected the hypothesis that the relationship between the price of the SPRB coal and the demand and supply factors were the same in the before and during periods, the prediction approach would appear to be the more reliable quantification of the impact of the hypothesized conspiracy. However, to determine if the prediction approach is clearly superior, one could test the prediction approach for a portion of the period before the alleged anticompetitive behavior, as discussed above in part D. If predicted prices before the alleged anticompetitive period are close to the actual prices, then the prediction approach presumably would be more accurate in this example. If the prediction model does not predict prices before the alleged anticompetitive acts well, one may conclude that neither the dummy variable model nor the prediction model is fully accurate. In such a situation, one would do well to also consider alternative model specifications as well as other sources of evidence (e.g., a comparison of profit margins in the before and during periods) to confirm that a range of evidence reaches the same result.

## 7. Benchmark Approach

In a benchmark analysis, the first question is whether there are any products that might provide an appropriate benchmark. As discussed in part F above, the benchmark should be (1) subject to similar supply and demand factors as SPRB coal; and (2) unaffected by alleged anticompetitive acts. This illustration will use the price of bituminous coal (BIT).[237]

An econometric analysis using the benchmark approach can be implemented in several ways. To keep the illustration relatively simple, the impact of the alleged conspiracy is tested using the dummy variable model discussed above. Most of the supply and demand factors used in the before-during approaches are replaced by the benchmark BIT price, since it should be capturing those effects.[238] The model includes the same dummy variable, as well as three variables to control for the quality of SPRB coal.[239]

**Table 4: Regression Results for Benchmark Approach**

| Dependent Variable: | | | | Average Price of SPRB Coal |
|---|---|---|---|---|
| R-squared: | | | | 0.7191 |
| Adj R-squared: | | | | 0.7093 |
| Number of Obs: | | | | 149 |

| | Coefficient | Newey-West Standard Error | t-Statistic | P> \| t \| |
|---|---|---|---|---|
| Dummy variable for the alleged collusion period | 1.1527 | 0.1867 | 6.1700 | 0.0000 |
| Btu content of SPRB coal | -0.0005 | 0.0010 | -0.4800 | 0.6300 |
| Ash percentage of the SPRB coal | -1.1329 | 0.6171 | -1.8400 | 0.0680 |
| Pounds of sulfur per million Btu | -1.1130 | 1.3201 | -0.8400 | 0.4010 |
| Average tons of SPRB coal produced per person day | 0.0063 | 0.0028 | 2.2800 | 0.0240 |
| Constant | 15.7235 | 9.7266 | 1.6200 | 0.1080 |

As can be seen in Table 4, the BIT price is of the expected sign (positive) and is statistically significant. The results show a statistically significant impact on SPRB prices in the period during the alleged conspiracy, again consistent with the alleged conspiracy increasing price. This specification of the benchmark dummy variable model estimates a $1.15/ton (or about 21 percent) increase in the SPRB coal price, which is somewhat smaller than the reduced form estimates in the before-during models using either the dummy variable or prediction approaches. Although BIT should not have been directly affected by the alleged anticompetitive act related to SPRB coal, it is possible that the customers who bought BIT faced substantially different supply and demand conditions than the plants purchasing the SPRB coal. In deciding whether the benchmark approach yields a more accurate quantification of the alleged anticompetitive behavior than the dummy variable or prediction approaches, one would need to analyze in more depth the comparability of the exogenous influences on BIT and SPRB to determine how good a benchmark BIT is for SPRB. If there are substantial questions about how comparable BIT is to SPRB, then the other approaches likely would yield more accurate estimates.

# J. Additional Example: An Application of Structural Modeling

Although the before-during (and related) methods, as well as the benchmark method, can be effective methods for estimating damages in many circumstances, they require strong assumptions to produce reliable estimates of antitrust damages. In particular, as described above, assumptions regarding the stability of the economic relationship between the outcome being measured and the explanatory variables are critical for the reliable application of these methods. For these models to yield reliable predictions of economic outcomes in the absence of the alleged anticompetitive behavior (and thus reliable damage estimates), it must be true that the same economic model that applies in the before (or after) period or in the benchmark market would also have applied in the affected market in the but-for during period. In situations where an industry is undergoing large changes over time (e.g., many high technology industries) or where the benchmark market is different from the affected market in important ways, this critical stability assumption is less likely to hold.

If stability cannot clearly be established, other methods should be considered. As noted above, such methods should generally include the use of non-econometric analyses, such as an evaluation of whether there were clear breaks in the trend of prices at the start or end of the alleged anticompetitive behavior, a comparison of price-cost margins, and so on.

However, in some cases, more complicated structural econometric models may also be useful. For example by relying directly on economic theory, structural econometric methods may enable one to separate collusive from non-collusive outcomes using data entirely from within the affected market in the during period. In this way, questionable assumptions about the stability of the appropriate model in the affected period and in benchmark periods/markets can be avoided.

An excellent example of this approach—although not in the context of litigation—is found in a recent published paper by economist Aviv Nevo on the "ready-to-eat" cereal industry, which is known to have high price-cost margins.[240] A relevant antitrust question is whether these high price-cost margins reflect collusive behavior, or whether they reflect non-collusive decisions made by firms based on customer loyalty to specific brands and the

fact that firms control several such brands, with the risk of cross-brand cannibalization reducing their incentives to cut prices.[241] Nevo's paper seeks to answer this question without use of a non-collusive benchmark period or industry.

Nevo's approach is to use a structural model to predict price-cost margins in the presence or absence of collusion and then to compare these price-cost margins to those actually observed. To do so, he estimates an explicitly specified structural model of the demand for specific brands of cereal. Using a "discrete-choice" model, such as that found in the seminal work of Berry, Levinsohn, and Pakes,[242] Nevo's model describes the demand for 25 brands of cereal as a function of the prices and characteristics of those brands. He estimates the model using supermarket scanner data from roughly 65 U.S. cities over a period of 20 quarters.

The central econometric challenge that Nevo faces is that cereal prices are likely endogenous, meaning that they are correlated with unobservable factors (i.e., in the error term) that affect cereal demand. In particular, cereals for which consumers have greater demand, for reasons that are not fully observable, likely also have higher prices reflecting their greater desirability. If one does not account for this problem in estimation, the positive correlation between price and unobserved demand factors may make it appear that consumers actually prefer higher prices, or at least may bias the negative relationship between price and demand toward zero.

Nevo overcomes this problem using the instrumental variables techniques described above. As an instrument for the price of a given brand of cereal in a given city-quarter combination, Nevo uses the prices of that same brand of cereal in other cities in the same quarter. For this to be a valid instrument, Nevo must assume that the city-quarter specific demand "shocks" are uncorrelated across cities, while there are common cost shocks affecting multiple cities in a given quarter. In this way, prices in other cities are correlated with prices in a given city (due to common cost factors), but *not* correlated with the error term in the demand equation (since demand shocks are not correlated), making these prices in other cities valid instruments. Recognizing that these assumptions are restrictive (as is often the case in structural models), Nevo also considers the use of direct measures of city-specific marginal costs as instruments.

With the estimates of demand in place, Nevo then uses an explicit model of profit-maximizing price setting, under either separate competition by individual firms or collusion, to derive predicted price-cost margins. He then compares these predicted price-cost margins to actual measures of price-cost margins. He concludes that the ready-to-eat cereal industry is *not* characterized by collusion, as the price-cost margins are lower than those predicted by the collusive model and instead consistent with a model of individual price setting by the separate firms.

This example illustrates two key features of structural modeling. First, that by relying on predictions of economic theory as additional information, structural models may allow identification of collusive (or other) effects that cannot be identified purely from the data alone. Second, that making use of such predictions from economic theory—and especially applying those predictions to available data—often requires strong assumptions. As such, structural methods may be quite useful, but should be carefully tested and often paired with other, simpler methods to make sure the results are robust to a variety of approaches.

---

1. *See* Jeffrey M. Wooldridge, Econometric Analysis of Cross Section and Panel Data 3-4 (2d ed. 2010).

2. *See* William Greene, Econometric Analysis 36 (7th ed. 2010).

3. See Chapter 4, Section C for an overview of the different approaches used to quantify damages, including before-during-after and benchmark (or yardstick) analyses.

4. Fed. R. Evid. 702.

5. *See , e.g.,* Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768 (6th Cir. 2002); *In re* Urethane Antitrust Litigation, 768 F.3d 1245 (10th Cir. 2014).

6. Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013); *See also In re* Rail Freight Surcharge Antitrust Litigation, 725 F.3d 244 (D.C. Cir. 2013) (remanding in light of *Behrend* so that the district court could analyze whether the regression model proffered by plaintiffs' expert passed sufficient muster at the class certification stage).

7. *Inr e* Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305 (3d Cir. 2008); Kottaras v. Whole Food Market, Inc., 281 F.R.D. 16, 25-26 (D.D.C. 2012); *Inr e* Live Action Antitrust Litigation, 863 F. Supp. 2d 966 (C.D. Cal. 2012).

8. Roy J. Epstein, *An Econometrics Primer for Lawyers*, Antitrust, Summer 2011, at 29.

9. 395 F.3d 416 (7th Cir. 2005); *seeal soI nr e* High-Tech Employee Antitrust Litigation, 289 F.R.D. 555, 582 (N.D. Cal. 2013) (rejecting as evidence proposed factors analysis and compensation charts, but accepting that a regression analysis provided plausible support for the class-wide theory espoused by plaintiffs).

10. Daniel Rubinfeld, *Reference Guide on Multiple Regression*, *in* Federal Judicial Center, Reference Manual on Scientific Evidence 303 (3d ed. 2011), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/sciman03.pdf/$file/sciman03.pdf.

11. Fed. R. Evid. 703.

12. *See , e.g.*, Maddox v. Claytor, 764 F.2d 1539, 1552 (11th Cir.1985) ("[Multiple regression analysis] measures the probability that the calculated disparity could occur randomly—but the analysis in no way validates the calculation of the disparity itself. If the tested disparity is based on erroneous assumptions or suffers from flaws in the underlying data, then standard deviation analysis is foredoomed to yield an equally faulty result.").

13. Reed v. Advocate Health Care, 268 F.R.D. 573, 593 (N.D. Ill. 2009) ("The issue is not whether [the expert] has shown just any method for proving impact and damages on a class-wide basis; it is whether the method he proposes is a *reliable* means of common proof.") (emphasis in original).

14. Rubinfeld, *supra* note 10, at 199.

15. Cook v. Rockwell Int'l Corp. 580 F. Supp. 2d 1071, 1113 (D. Colo. 2006).

16. *See, e.g.*, Bazemore v. Friday, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *but see In re* Graphics Processing Units Antitrust Litigation, 253 F.R.D. 478 (N.D. Cal. 2008) (finding missing variables and experts' decision to average certain factors insufficient to carry plaintiff's burden at class certification stage with respect to most of proposed class).

17. Kadas v. MCI Systemhouse Corp., 255 F.3d 359, 362 (7th Cir. 2001) (finding that there is no bright line test for an acceptable significance

level, although such a factor still goes towards weight of the evidence). *See also In re* High-Tech Employee Antitrust Litigation, 289 F.R.D. 555, 581 (N.D. Cal. 2013) ("Assuming *arguendo*, that…the [ ] Regression's results are not statistically significant at the 95 percent level does not persuade the Court that the regression is inadmissible (although this failure might affect the model's probative value)."); *but see* Allen v. Dairy Farmers of America, Inc., 279 F.R.D. 257, 271 (D. Vt. 2011) (finding plaintiffs' damage model showing a statistical significance with a 99 percent confidence level insufficient to show damage results on classwide basis and denying class certification, because the model lacked a necessary price component).

18. *See, e.g.*, John E. Lopatka, *Antitrust Injury and Causation*, *in* III ABA Section of Antitrust Law, Issues in Competition Law & Policy 2299 (2008). *See also* Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013) (finding that a court must make, as part of its "rigorous analysis," a determination at the class certification stage that plaintiffs' damages theory is consistent with their theory of liability, even if this analysis overlaps with the merits of the claims).

19. Theon van Dijk & Frank Verboven, *Quantification of Damages*, *in* III ABA Section of Antitrust Law, Issues in Competition Law & Policy 2335 (2008).

20. *See* Joshua D. Angrist & Jörn-Steffen Pischke, Mostly Harmless Econometrics 9-18 (2009).

21. In practice, this is generally accomplished by randomization. The role of randomization in this experimental context is not to guarantee that the treatment group and the control group are "matched" on all factors other than the specific treatment being studied; rather, randomization seeks to ensure that there are no systematic differences between the two groups that may affect the outcome of interest other than the treatment. Randomization achieves a kind of matching that recognizes that exact matching is unlikely to be possible in complex situations such as those arising in economics—there are simply too many things that can impact economic outcomes, and it would be difficult, even in experimental settings, to match between treatment and control group on all these factors. *See* Ronald A. Fisher, The Design of Experiments (1935); Ronald A. Fisher, Statistical Methods for Research Workers (1925).

22. A.B. Hill is best known for his work establishing the causal effects of smoking on health using observational data in human populations. The Hill criteria are detailed in A.B. Hill, *The Environment and Disease: Associationor C ausation?*, 58 P. R. Soc. Med. 295-300 (1965).

23. *See* James J. Heckman, *The Scientific Model of Causality*, 35 Sociol. Methodol. 1-97 (2005). *See also* James J. Heckman, *Econometric Causality*, 76 Int. Stat. Rev. 1-27 (2008) (providing additional elucidation and extensions of the role of economic modeling in understanding economic causality).

24. Wooldridge, *supra* note 1, at 3-4.

25. Paul R. Rosenbaum & Donald B. Rubin, *The Central Role of the Propensity Score in Observational Studies for Causal Effects*, 70 Biometrika 41-55 (1983). *See also* Guido W. Imbens, *Nonparametric Estimation of Average Treatment Effects Under Exogeneity: A Review*, 86 Rev. Econ. Stat. 4-29 (2004) (providing a more recent review of the literature with a focus on economic applications).

26. *See* William G. Cochran & Donald B. Rubin, *Controlling Bias in ObservationalSt udies:A R eview*, 35 Sankhya Ser. A 417-46 (1973).

27. *See* Rubinfeld, *supra* note 10, at 184-85. An econometric test called the Granger Causality Test is designed to determine whether changes in one variable occur before changes in another variable. While this property can potentially supply some useful information (for example, one of the Hill criteria is that causal effects of a treatment should not occur before the treatment), it is not the same as causality in the sense in which this chapter uses the term. For example, as Peter Kennedy, A Guide to Econometrics 64 (6th ed. 2008), notes, Christmas cards "Granger-cause" Christmas, but obviously do not "cause" Christmas. *See also* Jerry A. Hausman, *Specification and Estimation of Simultaneous Equation Models*, *in* 1 Handbook of Econometrics 391, 435-436 (Z. Griliches & M.D. Intriligator eds., 1983) (providing additional discussion of the role of Granger causality in simultaneous equations econometric models).

28. For example, the "expected sign" would be positive if the allegedly competitive act was a price-fixing conspiracy and the dependent variable of interest was price.

29. *See* Kennedy, *supra* note 27, at 75.

30. *Id.*

31. *See* Kennedy, *supra* note 27, at 3-4.

32. *See* Wooldridge, *supra* note 1, at 54-55.

33. Jonathan B. Baker & Timothy F. Bresnahan, *Economic Evidence in Antitrust*, *in* Handbook of Antitrust Economics 1, 16 (Paolo Buccirossi ed., 2008).

34. G.S. Maddala & Kajal Lahiri, Introduction to Econometrics 59-65 (4th ed. 2009).

35. The "constant term" is sometimes also referred to as the "intercept" because it gives the value of *PRICE* when *COST* = $0 (i.e., the value at which the line Figure 1 crosses or intercepts the vertical axis). Because values of cost (or the explanatory variables included in any regression) are often far from zero, the value of the constant term itself may have little economic significance.

36. Kennedy, *supra* note 27, at 3.

37. *Id.*

38. By design, the expected value of the error term, conditional on the explanatory variables including the constant term, will typically be zero. In other words, the price of some observations will exceed the predicted price and the price of other observations will fall below the predicted price, but on average the predicted price will match the actual price. *See* Greene, *supra* note 2, at 20.

39. The error terms may be caused by unpredictable randomness in the behavior of consumers or businesses, the effect of omitted explanatory variables, or measurement error in the dependent variable. *Id.*

40. The coefficient is often assumed to be the same for each unit of observation (e.g., customer or firm). However, an economist may want to test this assumption if there is reason to believe it does not hold. See part D.7. of this chapter for further discussion.

41. *See* Wooldridge, *supra* note 1, at 56-58. Coefficient estimates from a regression will be consistent if the error term and the explanatory variables are uncorrelated. *Id.*

42. The relevant dependent variable will be determined by the nature of the antitrust allegations, the theory of causation, and specific facts of the case. For example, consider a monopolization case alleging anticompetitive exclusionary conduct through the monopolist knowingly asserting invalid patents against its existing competitors. If before the resolution of the patent cases customers reacted to the pending litigation

by switching their purchases to the monopolist (or failing to switch away from the monopolist), the damages to the competitors could in part be the profits on the sales they lost as a result. Given sufficiently reliable data, an econometric analysis of the amount of switching may be relevant both to causation issues and to the quantification of damages. Also note that a regression model used in practice often will have more than three explanatory variables. A relatively simple model is used here for expository purposes.

43. See Chapter 8 for an overview of the legal and economic issues involved in estimating damages associated with anticompetitive price increases or overcharges. As discussed below, the use of a single "dummy" variable for the conspiracy period may not be appropriate. *See* part E of this chapter.

44. Wooldridge, *supra* note 1, at 14-16.

45. Maddala & Lahiri, *supra* note 34, at 127-132.

46. This result is sometimes described by saying that the pass-through rate equals 0.9.

47. Kennedy, *supra* note 27, at 3.

48. *See*, *e.g.*, John H. Johnson & Gregory K. Leonard, *Economics and the Rigorous Analysis of Class Certification in Antitrust Cases*, 3 J. Comp. L. & Econ. 341, 346-47 (2007).

49. Other estimation techniques use different criteria to determine the coefficient estimates. Examples of other techniques include generalized method of moments and maximum likelihood estimation. *See* Wooldridge, *supra* note 1, at chs. 12-14.

50. Kennedy, *supra* note 27, at 48.

51. Wooldridge, *supra* note 1, at 56-58. OLS moreover will be *unbiased*— correct on average in small samples—under the condition that the conditional expectation of the error term given the explanatory variables is zero. *See* Greene, *supra* note 2, at 63-65. Because the concepts of consistency and unbiasedness have similar meanings for purposes of this chapter, the terms "consistent" and "unbiased" are used interchangeably.

52. *Id.* at 54-57.

53. *Id.*

54. Kennedy, *supra* note 27, at 14. R-squared can be increased by simply adding variables to a regression, even if they are not statistically

significant. To account for this problem, the *adjusted R-squared* is sometimes calculated. Adjusted R-squared increases when a new variable is added to the regression only if that new variable has a t-statistic greater than one. *Id.* at 94.

55. For a discussion, see Rubinfeld, *supra* note 10, at 179, 188, 216-17. However, even with a small $R^2$, least squares produces unbiased estimates, as long as the conditional expectation of the error term given the included explanatory variables is zero.

56. Greene, *supra* note 2, at 111.

57. Kennedy, *supra* note 27, at 67-68.

58. Wooldridge, *supra* note 1, at 44.

59. Kaye & David A. Freeman, *Reference Guide on Statistics*, *in* Federal Judicial Center, Reference Manual on Scientific Evidence 211 (3d ed. 2011), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/SciMan3D01.pdf/$file/SciMan3D01.pdf.

60. Greene, *supra* note 2, at 1061.

61. Kennedy, *supra* note 27, at 54.

62. Greene, *supra* note 2, at 115-17.

63. *Id.*

64. James H. Stock & Mark W. Watson, Introduction to Econometrics 219-223 (3d ed. 2010).

65. *See* part A of this chapter.

66. Jonathan B. Baker & Daniel L. Rubinfeld, *Empirical Methods in Antitrust Litigation: Review and Critique*, 1 Amer. L. & Econ. Rev. 386(1999), at 391.

67. Care needs to be taken that the explanatory variables used in a least squares regression are *exogenous*, or uncorrelated with the error term, to the extent possible. *See* Wooldridge, *supra* note 1, at 54-55. For example, if the intermediate product in question represents a large share of the downstream industry's costs, the amount of downstream production may be affected by the price of the intermediate good. If the impact of the price of the intermediate good on the sales of the downstream product is substantial, then downstream production could be considered *endogenous* (correlated with the error term) rather than exogenous. *See* Baker & Rubinfeld, *supra* note 66, at n.17. Methods of

detecting and dealing with endogeneity are discussed later in this chapter.

68. More specifically, ordinary least squares is still the best linear unbiased estimator as demonstrated by the Gauss-Markov Theorem, one of the more famous theorems in statistics. *See* Greene, *supra* note 2, at 60. This means that not only is least squares unbiased, but also it is the most efficient (i.e., most precise) among linear unbiased estimators.

69. Wooldridge, *supra* note 1, at 65-67.

70. We address methods to identify and deal with endogeneity below.

71. *Id.*

72. Kennedy, *supra* note 27, at 95.

73. *Id.*

74. *Id.* at 206.

75. *Id.*

76. Such techniques are often called "shrinkage" estimators. *See* Kennedy, *supra* note 27, at 198. Because these techniques lead to biased estimators, there is no consensus among economists as to whether they should be used. *Id.* at 201.

77. Correlation coefficients measure how closely two data series are related to each other. When the two series form a perfectly straight line in a positive relationship (y = αx), the correlation coefficient will be 1. When the two series form a perfectly straight line in a negative relationship (y = - αx), the correlation coefficient will be -1. More generally, when the two series do not form a perfectly straight line but have random variations from a straight line (y = (+/-)αx + ε), the correlation coefficient will be between -1 and 1. *See* Greene, *supra* note 2, at 1031-32.

78. Kennedy, *supra* note 27, at 197.

79. David A. Belsley *et al.*, Regression Diagnostics: Identifying Influential Data and Sources of Collinearity 95 (1980). Statistical tests allow one to make an inference about a population characteristic from the sample; but multicollinearity is a sample characteristic, not a population characteristic. While there may be some true correlation in the population, this true correlation is not the issue with multicollinearity. What matters with collinearity is the correlation in the particular sample that one has to work with, so testing what is "true" in the population is uninteresting.

80. Kennedy, *supra* note 27, at 195.

81. Belsley et al., *supra* note 79, at 91.

82. *See id.* Another indicator is the "variance inflation factor." *See* Greene, *supra* note 2, at 90.

83. Kennedy, *supra* note 27, at 197.

84. Jacques Dreze, Comment, *Nonspecialist Teaching of Econometrics: A Personal Comment and Personalistic Lament*, 2 Econometric Reviews 291, 296 (1983), states this view quite well when he says that omitting a variable in this situation "amounts to elevating ignorance to arrogance."

85. *Id.*

86. Kennedy, *supra* note 27, at 106.

87. *Id.* at 102.

88. *See* Kennedy, *supra* note 27, at 171-72. *Seeal so* Peter C. Reiss & Frank A. Wolak, *Structural Econometric Modeling: Rationales and Examples From Industrial Organization*, *in* Handbook of Econometrics, Vol 6A, Chapter 64, 4277-4415 (J.J. Heckman and E. Leamer eds., 2005) (providing additional discussion of the distinction between structural and non-structural models).

89. *Id.*

90. Baker & Rubinfeld, *supra* note 66, at 391-92.

91. *See* Kennedy, *supra* note 27, at 171-72.

92. *See* Baker & Rubinfeld, *supra* note 66, at 392.

93. *Id.* at 405.

94. *Id.* One can predict the endogenous variables from a structural model by solving the model given the estimated structural parameters. However, this method is generally not as straightforward as estimating the reduced form model directly. *Id.* at 414-16.

95. *Id.* at 389.

96. *Id.* at 391.

97. Wooldridge, *supra* note 1, at 89.

98. Timothy F. Bresnahan, *Empirical Studies of Industries with Market Power*, *in* Handbook of Industrial Organization, Vol II, Chapter 17, 1011-1057 (R. Schmalensee and R.D. Willig eds., 1989).

99. Wooldridge, *supra* note 1, at 89-121.

100. Craig Peters, Evaluating the Performance of Merger Simulation: Evidence from the U.S. Airline Industry, XLIX J. Law Econ. 627-649 (2006).

101. Analogously, if the analyst was interested in tracing out the supply curve, IVs that shift the demand curve would be important.

102. In the first stage, the analyst regresses the endogenous explanatory variable on all exogenous explanatory variables, including the instrumental variables. In the terminology of the structural models discussed in the prior section, this first-stage regression can be thought of as a reduced form equation. In the second stage, the fitted or predicted value of the endogenous explanatory variable is used as an explanatory variable in place of the endogenous explanatory variable itself. The second-stage model can be estimated using OLS regression techniques. *See* Wooldridge, *supra* note 1, at 89-121.

103. Wooldridge, *supra* note 1, at 207-238.

104. See, *e.g.*, Steven T. Berry, *Estimating Discrete-Choice Models of Product Differentiation*, 25 RAND J. Econ. 242-262 (1994); Steven Berry, James Levinsohn, and Ariel Pakes, *Automobile Prices in Market Equilibrium*, 63 Econometrica 841-890 (1995) [hereinafter *BLP*].

105. See Timothy Bresnahan, Departures from Marginal-Cost Pricing in the American Automobile Industry, 17 J. of Econometrics 201-227 (1981); Timothy Bresnahan, Competition and Collusion in the American Automobile Oligopoly: The 1955 Price War, 35 J. of Industrial Economics 457-482 (1987); BLP, supra note 106.

106. *Id*.

107. Such instruments would not be valid in the presence of common demand shocks across markets.

108. Wooldridge, *supra* note 1, at 57.

109. As noted above, "inconsistent" is a technical term that means, roughly, that even if the econometrician had enormous amounts of data—perfect information—the estimate would not coincide with the true value that it is purporting to measure.

110. *Id*.

111. *See* Greene, *supra* note 2, at 1048.

112. *Id*. at 903.

113. *Id*. at 1048.

114. *See* Wooldridge, *supra* note 1, at 282.

115. This problem is widely recognized in the econometrics literature. *See* Brent R. Moulton, *An Illustration of the Pitfall in Estimating the Effects of Aggregate Variables on Micro Units*, 72 Rev. Econ. Stat. 334 (1990); Marianne Bertrand et al., *How Much Should We Trust Differences-in-Differences Estimates?*, 119 Q. J. of Econ. 249 (2004).

116. *Id.*

117. Once again, this stresses the point that hypothesis testing depends on the precision of the estimates, not just the value of the coefficients. All that changed when the serial correlation was accounted for was that the precision of the estimate was revealed to be lower, with no change in the value of the estimated coefficient. Yet this change caused the estimate to become statistically insignificant, meaning that the hypothesis that its true value was zero could not be rejected.

118. See Donald W. Andrews, Autocorrelation and Heteroskedasticity Consistent Covariance Matrix Estimation, 59 Econometrica 817 (1991); Donald W. Andrews & J. Christopher Monahan, An Improved Autocorrelation and Heteroskedasticity Consistent Covariance Matrix Estimator, 60 Econometrica 953 (1992). The resulting standard errors are also consistent in the presence of heteroskedasticity (the variance of the error term differs across observations). Many statistical software packages implement the Newey-West procedure, which is one example of such a procedure to obtain autocorrelation and heteroskedasticity consistent standard errors. See Whitney Newey & Kenneth West, A Simple, Positive Semi-Definite, Heteroskedasticity and Autocorrelation Consistent Covariance Matrix, 55 Econometrica 703 (1987).

119. Bertrand et al., *supra* note 115.

120. For example, Stata, a popular econometrics software package, includes a "cluster" option for calculating standard errors assuming unspecified within-group (cluster) correlation between the error terms. *See* Stata Press, Base Reference Manual 81 (2007).

121. Greene, *supra* note 2, at 920, n.10.

122. If one is not sure, there are various tests one can run to test the hypothesis of no correlation in the error terms. *See* Wooldridge, *supra* note 1, at 130, 279, 420-449; Greene, *supra* note 2, at 922-924.

123. Greene, *supra* note 2, at 257.

124. Hal White, A Heteroskedasticity-Consistent Covariance Matrix Estimator and a Direct Test for Heteroskedasticity, 48 Econometrica 817, 838 (1980).

125. For example, Stata includes an option for calculating White standard errors. *See* Stata, *supra* note 120, at 81.

126. *See, e.g.*, Joel L. Horowitz, *The Bootstrap*, *in* Handbook of Econometrics, Vol 5, Chapter 52, 3159-3228 (J.J. Heckman and E. Leamer eds., 2001).

127. Wooldridge, *supra* note 1, at 53-58.

128. Greene, *supra* note 2, at 479-80.

129. Another source of bias, the omission of important explanatory variables from the model, is discussed in part D.5.a. of this chapter.

130. Kennedy, *supra* note 27, at 54-55.

131. Wooldridge, *supra* note 1, at 54, 55, 62-63.

132. *Id.* at 46; *see also* Jerry A. Hausman, *Specification Tests in Econometrics*, 46 Econometrica 1251 (1978) (providing additional discussion of the use of specification tests).

133. A.H. Studenmund, Using Econometrics: A Practical Guide 168-175 (6th ed. 2011).

134. *Id.* at 121-122.

135. This is an example of an assumption of "structural stability"—that the model is "stable" across the groups of customers, meaning that the same model holds for both groups.

136. Studenmund *supra* note 133, at 121-127.

137. This is another form of a structural stability assumption, in this case stability over time.

138. Greene, *supra* note 2, at 168-70.

139. Stock & Watson, *supra* note 64, at 226-228.

140. *See, e.g.*, Donald W.K. Andrews, *Tests for Parameter Instability and Structural Change with Unknown Change Point*, 61 Econometrica 821-856 (1993); Jushan Bai & Pierre Perron, *Estimating and Testing Linear Models with Multiple Structural Changes*, 66 Econometrica 47-78 (1998).

141. For a discussion of issues involved in using panel data, see part D.5 of this chapter.

[142](#). Two often-used econometric specifications for panel data are *fixed effects* and *random effects* models. *See* Wooldridge, *supra* note 1, at 321-34.

[143](#). *Id.* at 285.

[144](#). *Id.* at 300-15.

[145](#). Here, an indicator variable for customer $i$ will equal one for that customer, and zero for all other customers. *See* Maddala & Lahiri, *supra* note 34, § 8.2.

[146](#). *See* Wooldridge, *supra* note 1, at 300-315.

[147](#). *Id.* at 65.

[148](#). The Hausman Specification Test, which compares the fixed effects and random effects estimates, can be used for this purpose. If the zero correlation assumption is valid, the two sets of results should be similar. If the zero correlation assumption is invalid, then the random effects results (as well as least squares results) will be biased while the fixed effects results are still consistent, so that the two sets of results should diverge. In this case, the fixed effects model would yield more accurate results than either OLS or random effects. *See* Hausman, *supra* note 132.

[149](#). Walter Enders, Applied Econometric Time Series 181-184 (3d ed. 2010).

[150](#). Roughly speaking, a series has a stochastic trend if the variability of the series increases over time. That is, if one forecasts future values of the series, the forecast uncertainty will increase with the forecast horizon.

[151](#). *Id.*

[152](#). *Id.*

[153](#). For a brief introduction to unit root tests, see Greene, *supra* note 2, at 947-59; *seeal so* Enders, *supra* note 149, at 181-271 (providing a more extensive introduction to unit roots models and tests).

[154](#). *See* Greene, *supra* note 2, at 946.

[155](#). *See id.* at 790-91. There are some situations in which price might be non-trending while cost was trending, or vice versa. For example, cost and a third explanatory variable that affects price could both be stochastically trending, but cointegrated (discussed further below). In that situation, a more complex econometric procedure must be used.

156. Similar considerations apply when one has panel data with long time series for each unit of observation. In many circumstances, it would be implausible for the price of one customer to be nonstationary while the price of another customer is stationary. *See* J. Hlouskova & M. Wagner, *The Performance of Panel Unit Root and Stationarity Tests: Results FromaL argeSc aleSi mulationSt udy*, 25 Economet. Rev. 85 (2006).

157. Wooldridge, *supra* note 1, at 371-74.

158. *Id.*

159. *See* Greene, *supra* note 2, at 903-941. Note that, unlike failure to include appropriate lags of the dependent or independent variables, which introduces inconsistency into estimated coefficients, failure to account for the serial correlation in the error term only affects the efficiency of the estimates and the estimated standard errors, but does not lead to inconsistent parameter estimates.

160. Wooldridge, *supra* note 1, at 371-74.

161. Greene, *supra* note 2, at 139-40.

162. *Id.* at 918-19.

163. Maddala & Lahiri, *supra* note 34, 266-271, 551-578.

164. Greene, *supra* note 2, at 959. Depending on the economics of the market and the nature of the alleged anticompetitive behavior, a dummy variable may not be transformed this way.

165. *Id.*

166. George C.S. Wang & Chaman L. Jain, Regression Analysis: Modeling & Forecasting 88 (2003).

167. If two series are nonstationary, but not cointegrated, regression techniques can still be applied. However, the estimated coefficients will have nonstandard sampling distributions. *See* Peter C. B. Phillips & Steven N. Durlauf, *Multiple Time Series Regression With Integrated Processes*, 53 Rev. Econ. Stud. 473 (1986).

168. Greene, *supra* note 2, at 959.

169. *Id.* at 965-67. One of the most widely used of these tests is presented in Soren Johansen, *Estimation and Hypothesis Testing of Cointegration Vectors in Gaussian Vector Autoregression Models*, 59 Econometrica 1551 (1991).

170. Greene, *supra* note 2, at 963-64.

171. *Id.*

172. *See* part F.1 of this chapter.

173. Baker & Rubinfeld, *supra* note 66, at 396.

174. *See* part D.6 of this chapter.

175. Stock & Watson, *supra* note 64, at 329.

176. Kennedy, *supra* note 27, at 102.

177. *See* van Dijk & Verboven, *supra* note 19, at 2335-36.

178. *Id.* The before period may be considered the control period and the during period the treatment period. See the discussion in part I of this chapter.

179. *See* van Dijk & Verboven, *supra* note 19, at 2335-36.

180. Material in this section draws heavily from Gustavo Bamberger, Dennis Carlton & Mark Israel, *Economic Analysis of Cartels* (Working Paper, drafted 2012).

181. Paul E. Godek, Time-Series Models for Estimating Economic Damages in Antitrust (and Other) Litigation: The Relative Merits of Predictive versus Dummy-Variable Approaches, 1 Antitrust Chronicle (2011); Philips & Durlauf, supra note 167.

182. Depending on the nature of the antitrust allegations, the theory of causation, and specific facts of the case, there can be variables other than a dummy that may better measure the anticompetitive behavior in estimating damages. *Id.* Assume, for example, prices can only increase when existing customer contracts expire over time. The impact of the alleged conspiracy would not increase prices to all customers immediately, so average price increases related to the alleged conspiracy would be expected to trend upward over time. There could be several ways to model this effect other than using a simple dummy variable for the alleged conspiracy period, depending on the available data. *Id.* Under certain circumstances, one simple method to create a variable to approximate the conspiracy might be a "time trend" beginning at the period of the alleged conspiracy, with the value "1" in the first observation (*e.g.*, a month) of the conspiracy period, "2" in the second, "3" in the third, etc. If average prices were the appropriate dependent variable, then the coefficient on this trend variable would be interpreted as the average monthly price increase due to the conspiracy. The overcharge in any month during the conspiracy would be the corresponding time trend value multiplied by that coefficient. However, care must be used with this and any approach for creating a variable that

measures the impact of an alleged anticompetitive act. For example, at some point all contracts will have been renegotiated, so it would be inappropriate to continue to predict price increases beyond a certain number of observations.

183. See James F. Nieberding, Estimating Overcharges in Antitrust Cases Using a Reduced-Form Approach: Methods and Issues, J. Appl. Econ. 361, 367-369 (2006).

184. Greene, *supra* note 2, at 168-75.

185. *See* Maddala & Lahiri, *supra* note 34, at § 4.7; Nieberding, *supra* note 183, at 367-69.

186. In this way, the prediction model may suffer from some of the same limitations related to the dummy variable model discussed above.

187. A dummy variable model can suffer from a similar problem of failing to fit turning points well, and thus incorrectly attributing to the conduct turning points that may have nothing to do with the alleged conduct. *See* Wooldridge, *supra* note 1, at 65-67.

188. Or, more generally, one could combine both data from before and after the period of the alleged anticompetitive act, using the combined before and after data to estimate the prediction model. Such before-during-after models are discussed in the next section.

189. *See* van Dijk & Verboven, *supra* note 19, at 2336. Of course, it is important to ensure that the supposedly unaffected periods really are unaffected.

190. G.S. Maddala, Introduction to Econometrics 5, 69, 270 (3d ed. 2001); A.H. Studenmund, Using Econometrics: A Practical Guide 68 (4th ed. 2001).

191. Takeshi Amemiya, Advanced Econometrics 399-402 (1985).

192. See, e.g., Jerry Green & Robert Porter, Noncooperative Collusion Under Imperfect Price Information, 52 Econometrica 87 (1984).

193. *Id.*

194. Amemiya, *supra* note 191, at 399-402.

195. Bai & Perron, *supra* note 142. *See* Dennis Carlton & Gregory K. Leonard, *Correcting the Bias When Damage Periods Are Chosen to Coincide With Price Declines*, 2004 Colum. Bus. L. Rev. 304 (2004), for a discussion of the application of these methods to price-fixing cases.

196. Carlton & Leonard, *supra* note 195.

197. *Id.*

198. van Dijk & Verboven, *supra* note 19, at 2336.

199. *Id.*

200. Wooldridge, *supra* note 1, at 148.

201. A similar analysis could be undertaken based on percentage rather than level differences.

202. Much of the discussion here and elsewhere in this chapter can be applied to any econometric analysis. *See, e.g.*, Wooldridge, *supra* note 1; Greene, *supra* note 2.

203. van Dijk & Verboven, *supra* note 19, at 2335.

204. For example, frequently these transactions data sets include credits for returned goods, etc. It is important to use net revenue and net sales to calculate a measure of the price actually paid.

205. *See* part D.1 of this chapter.

206. *Id.*

207. *See* part E.3 of this chapter.

208. *See* part D.5 of this chapter.

209. *See* part D.3 of this chapter.

210. *See* parts F and G of this chapter.

211. *See* parts C.4 and D.6 of this chapter.

212. Baker & Rubinfeld, *supra* note 66, at 392.

213. *See,e .g.*, Johnson & Leonard, *supra* note 48, at 351-52.

214. The Chow test is a statistical and econometric test of whether the coefficients in two linear regressions on different data sets are equal. *See* Gregory C. Chow, *Tests of Equality Between Sets of Coefficients inT woL inearR egressions*, 28 Econometrica 591 (1960).

215. Hausman, *supra* note 132.

216. Wooldridge, *supra* note 1, at 89-121.

217. Kennedy, *supra* note 27, at 76-79.

218. U.S. Energy Information Administration, Annual Coal Report 2007 9 (2009), *available at* http://www.eia.doe.gov/cneaf/coal/page/acr/acr.pdf.

219. *See* Michael D. Whinston, Lectures on Antitrust Economics 20 (2006). Whether such behavior constitutes an unlawful price-fixing "agreement" is a legal question.

220. See part D.3 of this chapter for a discussion of structural form models versus reduced form models.

221. The linearity assumption is, computationally, the easiest assumption one can make. It assumes that a change in one of the relevant market forces has a proportional effect on the outcome variable, price in this case. Further, the estimated coefficients are themselves the marginal effects of changes in the explanatory variables on the outcome. By contrast, if there were non-linearities between the relevant market forces and the outcome variable, a change in one relevant market force would have a disproportional effect on the outcome, and the marginal effects of changes in the explanatory variables would have to be computed with the estimated coefficients.

222. The data source is FERC Form-423; Energy Velocity. Regulated utilities report the delivered price of their fuels in FERC Form-423. Energy Velocity estimates transportations costs and subtracts these from the delivered costs to provide a comparable FOB mine price for each utility. The average of these monthly spot FOB prices provides data for our dependent variable.

223. Time series data on capacity for SPRB coal production were not available. If the data were available, one may want to consider capacity in the analysis as well since it may affect the supply of SPRB coal.

224. The spot prices of SPRB coal were reported by the utilities at the time of delivery instead of at the time of sales, so there is a lag between the time when the prices were reported and the time when the prices were determined. This delay in reporting is not an issue for other independent variables, such as diesel cost, electricity cost, electricity production and SPRB coal productivity measurement. Therefore, in theory, one should lag these independent variables for certain periods and include these lagged variables as independent variables in the regression as well. However, this undertaking is beyond the scope of this illustration.

225. *See* Maddala & Lahiri, *supra* note 34, at 548-52. In the Dickey-Fuller/Augmented Dickey-Fuller test, the null hypothesis is that the time series is nonstationary. *Id.* For a brief introduction to stationarity tests, see Maddala & Lahiri, *supra* note 34, ch. 14.

226. The OLS regression model specification is discussed in more detail in part C.2 of this chapter. In conducting the Dickey-Fuller/Augmented Dickey-Fuller tests of the OLS regression residuals, one should use the

Engle-Granger critical values instead of the standard Dickey-Fuller critical values because the Dickey-Fuller test of the residuals is a co-integration test. For more details on the Engle-Granger critical values, see Enders, *supra* note 149, at 373-82. However, the exact Engle-Granger critical values for these tests were not available because the number of independent variables in our regression exceeds those listed in the table of Engle-Granger critical values in Enders. Therefore, the KPSS test was also performed. In the KPSS test, the null hypothesis is that the time series is stationary. See Maddala & Lahiri, *supra* note 34, ch. 14, for more details.

227. The dummy variable is constructed by creating a variable equal to 0 before November 2001 (before period) and equal to 1 from November 2001 onward (during period). Together with other explanatory variables, the model is specified as $SPRB\_price_t = \alpha + \beta_1 \cdot Btu_t + \beta_2 \cdot Ash_t + \beta_3 \cdot lbsSO2_t + \beta_4 \cdot ton\_prod_t + \beta_5 \cdot diesel\_price_t + \beta_6 \cdot electricity\_price_t + \beta_7 \cdot electricity\_production_t + \gamma \cdot dummy_t + \varepsilon_t$, where $Btu_t$ is the Btu content of the SPRB coal, $Ash_t$ is the ash percentage of the SPRB coal, $lbsSO2_t$ is the pounds of sulfur per million Btu of energy in the coal, $ton\_prod_t$ is the average tons of SPRB coal produced per person day, $diesel\_price_t$ is the price of diesel, $electricity\ price_t$ is the price of electricity, $electricity\_production_t$ is the production of electricity, $dummy_t$ is the dummy variable, and $\varepsilon_t$ is the error term.

228. *See* Jeffrey M. Wooldridge, Introductory Econometrics—A Modern Approach 410-13 (2d ed. 2003).

229. Obtaining the Newey-West standard error requires determining the maximum order of lag in advance. This illustration follows the practice of using the smallest integer greater than or equal to T1/4 where T is the sample size. *See* Greene, *supra* note 2, at 465.

230. In a more detailed analysis, other measures of supply and demand might be considered or the estimating equation might be modified to better take into account more specific demand and supply considerations for each of the utilities.

231. These interaction terms are equal to zero in the pre-collusion period and equal to the respective values of the original explanatory variables

during the collusion period. *See* Maddala & Lahiri, *supra* note 34, at 307-310.

232. *See* part E.1 of this chapter.

233. To implement the joint F test correctly, again, the Newey-West covariance matrix is used. *See* Wooldridge, *supra* note 228.

234. When one fully interacts the dummy variable with other explanatory variables, one in fact is assuming that the regression equations in the before period and in the during period are completely different. *See* Maddala & Lahiri, *supra* note 34, at 309. For example, the regression equation in the during period can have smaller intercept terms, hence a negative coefficient on the dummy variable, but higher slope terms. As a result, one cannot interpret the coefficient on the dummy variable as the measurement of the average impact of the alleged collusion anymore.

235. See the discussion in part F of this chapter.

236. See Greene, *supra* note 2, at § 6.6, for detailed discussion on how to construct a confidence interval for the predicted values. Constructing a confidence interval for the predicted value requires estimating the variances of the predicted value and the error term. The illustration uses the Newey-West standard errors in estimating the variance of the predicted value and uses the residuals from the OLS regression to estimate the variance of the error term.

237. Utilities also purchase this coal to generate electricity, and so BIT's prices likely reflect many of the same cost and demand factors. There is no allegation of the conspiracy extending to BIT. Moreover, most utilities cannot substitute SPRB and BIT, at least in the short run, so the alleged conspiracy should have no direct effect on the price of BIT. In *Federal Trade Commission v. Arch Coal, Inc.*, the court found "the relevant product market is no broader and no narrower than SPRB coal." FTC v. Arch Coal, Inc., 329 F. Supp. 2d 109, 123 (2004).

238. The supply and demand factors could still be included in the model, and if they affect the benchmark differently than the price in question, including them will generally improve the model.

239. The estimating equation is: $SPRB\_price_t = \alpha + \beta_1 \cdot Btu_t + \beta_2 \cdot Ash_t + \beta_3 \cdot lbsSO2_t + \beta_4 \cdot BIT\_price_t + \gamma \cdot dummy_t + \varepsilon_t$, where $BIT\_price_t$ is the price of BIT coal in period t. The results of this regression are shown in Table 4.

240. Aviv Nevo, *Measuring Market Power in the Ready-to-Eat Cereal Industry*, 69 Econometrica 307-342 (2001).

241. Nevo's focus is on the possibility of "tacit collusion" among cereal manufacturers, not explicit, unlawful price-fixing. However, this distinction is immaterial to the methods discussed here, which could also be used to detect explicit collusion.

242. *BLP, supra* note 104.

# CHAPTER 7

# EVALUATING THE SCIENTIFIC VALIDITY OF A DAMAGES MODEL

Expert testimony is typically used by both plaintiffs and defendants in antitrust cases to address a wide range of important economic issues, including the existence of antitrust injury and the quantum of damages. This chapter will discuss the legal standards that govern expert testimony related to antitrust damages, different ways in which an expert's damages analysis may be subject to challenge, issues that may lead to the exclusion of an expert's testimony, and best practices for experts and counsel to avoid exclusion.

# A. Rules Governing Expert Witness Testimony

The use of expert witnesses in cases brought in federal court is governed by Article VII of the Federal Rules of Evidence. Rule 702 (as amended December 1, 2011) specifies the basic criteria for the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert

has reliably applied the principles and methods to the facts of the case.[1]

Experts who are expected to testify at trial must provide a written report that discloses all of the opinions that may be offered at trial and the basis and reasons for them, including the facts or data considered in forming their opinions.[2]

The current version of Rule 702 reflects a number of changes in case law related to expert testimony that have occurred since the passage of the Federal Rules of Evidence in 1975.[3] The most important case in this area has been the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals*,[4] which emphasized that the expert's testimony must be reliable, relevant to the legal issues in the case, and fit the facts of the case. According to *Daubert*, when a party presents "scientific" evidence, the trial judge must serve a "gatekeeping role" and determine whether the evidence is indeed scientific and whether it will assist the trier of fact. The *Daubert* decision contained five criteria to guide the trial judge in the gatekeeping role:

> (1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.[5]

Under the current version of Rule 702, judges have discretion to apply any or all of the *Daubert* factors, as well as any additional factors that may be deemed relevant. These factors include, but are not limited to the following:

> (1) Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted

independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying" . . . (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion . . . (3) Whether the expert has adequately accounted for obvious alternative explanations . . . (4) Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting" . . . (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.[6]

A key aspect of Rule 702 is that it does not address the reasonableness of the expert's conclusions, but rather the steps undertaken to arrive at those conclusions. Moreover, neither *Daubert* nor Rule 702 prevents an expert from relying on new and innovative methods to reach an opinion, but they do require that these methods be grounded in sound principles that are generally accepted in the expert's field.

In *General Electric v. Joiner*,[7] the Supreme Court further clarified the gatekeeper role of the trial judge. The Court found that the determination of admissibility of expert testimony is within the trial judge's discretion and review by a higher court should occur only for abuse of this discretion. In addition, the Court stated that: "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipsedi xit* of the expert."[8] The Supreme Court's decision in *Kumho Tire Co. v. Carmichael*[9] further clarified that the factors specified in *Daubert* could also be applied to non-scientific expert testimony (e.g., testimony in social science subjects such as economics). The Court's opinions in *Daubert*, *Joiner*, and *KumhoT ire* are often referred to as the "*Daubert* trilogy." While these decisions apply to all federal cases, the extent to which individual states follow the guidance of the trilogy varies by state.[10]

When Rule 702 was amended in 2000 to incorporate the guidance from the *Daubert* trilogy, the Committee noted that: "This amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert." Nonetheless, *Daubert* challenges have become routine in antitrust cases.[11]

# B. Application of *Daubert* to Damages Experts in Antitrust

The analysis and quantification of antitrust damages typically requires the expert to combine economic theory and data to create a reasonable approximation of the market outcomes that would have occurred in the absence of (i.e., "but for") the anticompetitive conduct. Developing this evidence can be complex and time consuming. An expert must first develop a good understanding of the economic conditions in the relevant market during the damages period and any benchmark periods that may be used to isolate the impact of the antitrust offense. In addition, an expert must understand the many data and measurement issues that pertain to the economic performance of the relevant market. Existing theory and data are rarely perfectly suited to estimating damages, but experts must invest the time to fully understand the relevant economic theory and data that are available to inform the damages analysis. In developing testimony related to antitrust injury and the quantum of damages, experts must ensure that the quantitative methods they rely upon reflect the practical realities of the relevant market. In addition, their conclusions must withstand alternative plausible specifications of the theoretical model and the data analysis.

In performing their gatekeeping function with respect to expert testimony, judges typically focus on three elements: (1) whether the expert has the proper qualifications; (2) whether the testimony is reliable; and (3) whether the testimony fits the facts of the case. If any one of these elements is missing, the expert's testimony is likely to be excluded as not helpful to the trier of fact.

## 1. Qualifications

Although damages experts are rarely excluded on the basis of qualifications alone, a judge will typically assess the expert's academic and professional qualifications. Opposing counsel may attempt to show contradictions between the expert's testimony and past publications, as well as other publications by reliable authorities. In addition, counsel may attack the expert's objectivity by exploring connections between the expert's compensation (e.g., from employers, corporations, law firms) and the

positions taken by the expert. While such challenges to an expert's qualifications are unlikely to result in the expert's testimony being excluded per se, they may adversely affect how the expert's testimony is perceived by some decision-makers. In addition, courts limit expert testimony to the subject matter of the expert's qualifications and exclude testimony on other subjects.[12]

## 2. Reliability

In determining whether the testimony of a damages expert is reliable, a judge will typically assess whether the expert's conclusions were derived from a scientific method. Specific issues that are typically assessed include whether the results are reproducible, whether the method was subject to peer review and publication, whether there is a known margin of error, and whether there is general acceptance of the method in the expert's professional community. For example, in *ZF Meritor, LLC v. Eaton Corp.*,[13] the court found the expert's damages testimony to be unreliable because of the underlying data used by the expert. According to the court: "The core of [the expert's] damages analysis was one page (titled ?Five Year Product Line Profit and Loss) of ZF Meritor's Revised Strategic Business Plan (SBP) for fiscal years 2002 through 2005, which was presented to ZF Meritor's Board of Directors in November 2000." While the court acknowledged that experts rely on business plans in forming damages estimates, the expert's methodology in this case was unreliable because he did not know essential facts such as the author of the document, the circumstances under which the plans were created, or the assumptions on which the projections were based.

Similarly, when assessing the reliability of a damages analysis, a judge must examine whether the expert properly accounted for other factors that may have influenced market outcomes during the time period of the alleged anticompetitive conduct. In *Craftsmen Limousine, Inc. v. Ford Motor Co.*,[14] the plaintiff's damages expert was excluded on reliability grounds because "he assumed that defendants caused all of Craftsmen's injuries." The expert's damages methodology was based on a simple comparison of the plaintiff's profit data before and after the defendant's anticompetitive conduct, but he did not attempt to control for factors such as changes in general economic conditions or increased competition. These factors could have contributed to

Craftsmen's profits growing more slowly during the period when it was allegedly subject to anticompetitive conduct by Ford.

## 3. Fit

In assessing the issue of fit, a judge will first typically consider whether an expert's testimony is legally relevant. In particular, a judge will typically consider whether there is a conceptual linkage between the expert's damages calculations and the plaintiffs' theory of anticompetitive conduct. For example, in *Group Health Plan, Inc. v. Philip Morris USA, Inc.*,[15] the calculations of the plaintiffs' damages expert were based in part on an estimate of the higher rate at which tobacco companies would have introduced less hazardous products absent the alleged conspiracy between tobacco companies. The court expressed concern that this method for estimating damages was inconsistent with the plaintiffs' underlying theory of liability, which was that the tobacco companies "conspired to fraudulently market 'low tar' and 'light' cigarettes as allegedly healthier alternatives to normal cigarettes, while knowing that they were not safer because smokers would find ways to compensate for the decreased nicotine levels (such as puffing more frequently, increasing the duration of smoke inhalation, smoking more cigarettes per day, smoking cigarettes to a shorter length, and pinching filters to decrease their effectiveness.)"[16] Based on this inconsistency and other reservations about the expert's methodology, the court excluded the testimony of the plaintiffs' damages expert.

A second issue that a judge will typically consider in evaluating the fit of the testimony is whether the expert's methodology is appropriately calibrated to correspond with the major facts that are known about the businesses and markets in question. For example, in *Concord Boat Corp. v. Brunswick Corp.*,[17] the court determined that the Cournot oligopoly model relied upon by the plaintiff's expert was "not grounded in the economic reality" of the industry. For example, the defendant had obtained a 75% market share prior to the alleged anticompetitive conduct, yet the expert's damages model produced overcharge damages any time the defendant obtained more than the 50% market share predicted by the Cournot model in the but-for world.

# C. Expert Testimony on Antitrust Damages in the Context of Class Certification

Antitrust plaintiffs seeking to certify a class under the "predominance" requirement of Rule 23(b)(3) of the Federal Rules of Civil Procedure typically retain an expert to show that the damages are measurable on a classwide basis through use of a common methodology.[18] Whether *Daubert* applies at the class certification stage is still an open question. In *Wal-Mart Stores, Inc. v. Dukes*,[19] the Supreme Court expressed doubt about the district court's conclusion that *Daubert* did not apply at the class certification stage, but the Court did not provide any further guidance or analysis.

In evaluating the Rule 23 requirements for class certification, courts are obligated to conduct a "rigorous analysis" of the evidence and arguments.[20] *In re Hydrogen Peroxide Antitrust Litigation*, the Third Circuit emphasized that this analysis must resolve all legal and factual disputes related to class certification, even if it involves a preliminary inquiry into the merits of the case.[21] In addition, the Third Circuit stated that the district court's obligation to resolve class certification disputes "extends to expert testimony, whether offered by a party seeking class certification or by a party opposing it."[22]

The positions adopted by the Third Circuit in *Hydrogen Peroxide* have subsequently been affirmed in most of the other federal court districts.[23] As a result, the broader question of whether *Daubert* applies at the class certification stage has to some extent been overshadowed as courts have attempted to comply with *Hydrogen Peroxide* and have rigorously examined whether the expert's testimony assists the plaintiffs in meeting their burden under Rule 23.[24]

In *Comcast v. Behrend*,[25] the Supreme Court specifically addressed the issue of whether the plaintiffs' damages expert had put forward a common methodology for calculating damages on a class-wide basis. The Court found that the expert's damages methodology failed to provide sufficient grounds for class certification because it was based on four theories of antitrust harm and the trial court found that three of the theories could not support a finding of class-wide common impact through common evidence. Because the expert did not isolate the damages resulting from any one specific theory of antitrust

impact, the damages methodology was not consistent with the plaintiffs' remaining liability theory. The majority found that:

> There is no question that the model failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised. The scheme devised by respondents' expert . . . sought to establish a "but for" baseline—a figure that would show what the competitive prices would have been if there had been no antitrust violations. Damages would then be determined by comparing to that baseline what the actual prices were during the charged period. The "but for" figure was calculated, however, by assuming a market that contained none of the four distortions that respondents attributed to petitioners' actions. In other words, the model assumed the validity of all four theories of antitrust impact initially advanced by respondents: decreased penetration by satellite providers, overbuilder deterrence, lack of benchmark competition, and increased bargaining power. At the evidentiary hearing, [the expert] expressly admitted that the model calculated damages resulting from "the alleged anticompetitive conduct as a whole" and did not attribute damages to any one particular theory of anticompetitive impact."[26]

The *Comcast* decision has clear and important implications for damages experts who attempt to testify in support of class certification. Even when the damages expert is not subject to a *Daubert* challenge, the expert must put forward a methodology that is closely tied to the plaintiffs' theory of liability.[27]

# D. Best Practices for Antitrust Damages Experts

In *Kumho Tire* the Supreme Court noted that the criteria set forth in *Daubert* did not constitute a definite "checklist" for an expert's testimony to be deemed admissible.[28] Nonetheless, many antitrust practitioners have

offered practical advice for minimizing the risk that an expert's testimony will be excluded or limited.

Several commentators have noted that one of the most important responsibilities for avoiding a *Daubert* challenge rests with the attorney who retains the expert and determines the expert's assignment. In particular, the retaining attorney should give careful thought to the expert's role in the case, being sure to limit the expert's assignment to topics that are relevant to the court and clearly within the subject areas where the expert in fact has demonstrated expertise.[29]

Damages experts are responsible for using well established methodologies in economics and statistics, with multiple regression analysis being the most common statistical method used to isolate the impact of an antitrust offense.[30] An expert's assessment of damages, however, is likely to be perceived as more reliable if it is based on results derived from more than one methodology, as no economic model can ever perfectly reflect every facet of the relevant industry.[31]

Finally, if the expert's work is to be used to establish the necessary conditions for class certification under Rule 23, experts are advised in light of the *Comcast v. Behrend* decision to be cautious about submitting a methodology that calculates damages in the aggregate based on separate theories of harm.[32] In particular, antitrust experts have an obligation to monitor the plaintiff's evolving theories of harm and update their damages methodology as new developments occur in the case.

---

1. *See* Fed. R. Evid. 702. According to the Committee Notes on Rules (2011 Amendment): "The language of Rule 702 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility." Rule 702 was previously amended December 1, 2000.

2. *See* Fed. R. Civ. Proc. 26. The testifying expert must also disclose any exhibits to be used in summarizing or supporting the opinions, the expert's qualifications (including a list of publications authored in the previous ten years), a list of cases at which the expert testified at trial or by deposition in the previous four years, and the compensation to be

paid for the expert's work. Rule 26 was amended in December 2010 so that testifying experts are not required to disclose any draft versions of the report, any communications with counsel not relied upon by the expert, or any communications with other experts who will not be called as trial witnesses.

[3]. When determining whether scientific evidence was admissible, the courts for many years applied the standard from *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Under Frye, the test was whether a scientific process or principle had "gained general acceptance in the particular field in which it belongs."

[4]. 509 U.S. 579 (1993).

[5]. *See* Fed. R. Evid. 702, Committee Notes on Rules (2000 Amendment), summarizing the specific factors explicated by the *Daubert* court.

[6]. *Id.*

[7]. 522 U.S. 136 (1997).

[8]. *Id.* at 146.

[9]. 526 U.S. 137 (1999).

[10]. For a review of the decisions that apply in each state, see Eric Helland and Jonathan Klick, *Does Anyone Get Stopped at the Gate? An Empirical Assessment of the Daubert Trilogy in the States*, *in* 20 S. Ct. Econ. Rev. 1 (Ilya Somin and Todd J. Zywicki, ed., 2012). Effective July 1, 2013, the state of Florida adopted the *Daubert* standard. *See* § 90.702, Florida Statutes. In 2014, the North Carolina Court of Appeals ruled that the state's 2011 amendment to Rule 702 of the North Carolina Rules of Evidence brought the state's rule into line with federal practice, and therefore the *Daubert* standard applies in North Carolina. *See* State v. McGrady, COA13-330, 2014 WL 211962 (N.C. Ct. App. 2014).

[11]. Andrew I. Gavil, *Daubert Comes of Age*, 15 Antitrust 6 (2001). Gavil notes that "Since 1993, the preeminent role of expert opinion in antitrust analysis, fears of unreliable expert testimony, and powerful strategic incentives have combined to make *Daubert* a central feature of much antitrust litigation." For an overview of the *Daubert* motions pertaining to testimony by experts in antitrust cases between 2000 and 2011, see James Langenfeld and Christopher Alexander, *Daubert and Other GatekeepingC hallengesof A ntitrustE xperts*, 25 Antitrust 21 (2011).

12. Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 715-16 (8th Cir. 2001) (holding that it was prejudicial error to allow an expert to testify to matters outside the scope of his expertise); Logan v. Dayton Hudson Corp., 865 F.2d 789, 791 (6th Cir. 1989) (holding that the district court did not abuse its discretion in granting new trial where expert provided testimony to the jury "beyond the scope of his qualified expertise").

13. 696 F.3d 254, 290 (3d Cir. 2012).

14. 363 F.3d 761, 776-77 (8th Cir. 2004).

15. 344 F.3d 753, 758-761 (8th Cir. 2003).

16. *Id.* at 761.

17. 207 F.3d 1039 (8th Cir. 2000).

18. Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1430 (2013).

19. 131 S. Ct. 2541, 2553-54 (2011).

20. *In re* Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305, 309 n.5 (3d Cir. 2009).

21. *Id*. at 317.

22. *Id*. at 307.

23. Gregory Wrobel and Ellen Meriwether, *Economic Experts: The Challenges of Gatekeepers and Complexity,* 25 Antitrust 8, 10 (2011).

24. Ellen Meriwether, *The "Hazards" of Dukes: Antitrust Class Action Plaintiffs Need Not Fear the Supreme Court's Decision,* 26 Antitrust 18, 22 (2011). See also Steven E. Bizar and Allison Khaskelis, *Wal-Mart v. Dukes: A Non-Event for Antitrust Defendants*, 26 Antitrust 25 (2011) ("Dukes merely confirms what Hydrogen Peroxide and other earlier class certification cases had already established: that the trial court must conduct a rigorous analysis of both sides' evidence at the class certification stage even if the analysis overlaps with an inquiry into the merits of the claim.").

25. 133 S. Ct. 1426 (2013).

26. *Id.* at 1433-34.

27. Much of the legal commentary following the *Comcast* decision relates to the separate and broader issue of whether a class can be certified where liability can be proven through common evidence but individual proof of damages is required. *See* Ellen Meriwether, *Comcast Corp. v.*

*Behrend: Game Changing or Business as Usual?,* 27 Antitrust 57, 60-61 (2013).

28. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150.

29. Peter Bronsteen and Asim Varma, *Daubert Rules for Economists*, 15 Antitrust 14, 14-16 (2001).

30. John E. Lopatka and William H. Page, *Economic Authority and the Limits of Expertise in Antitrust Cases*, 90 Cornell L. Rev. 617, 689-690 (2005).

31. Gregory J. Werden, *The Admissibility of Expert Testimony, in* 1 Issues in Competition Law and Policy 801, 812 (Wayne D. Collins ed., 2008).

32. Courts have at times held that when a damages model assumes full liability on multiple allegedly anticompetitive acts but fails to specify damages attributable to each individual act, such a model cannot provide a reasonable basis for awarding damages in the event that only certain actions are found to be unlawful. *Comcast v. Behrend* solidified that view and, in addition, clarified that such an inquiry into the damages model is to be conducted at class certification. *See* MCI Communications Corp. v. AT&T, Co., 708 F.2d 1081, 1163 (7th Cir. 1983). *See also* ILC Peripherals Leasing Corp. v. IBM Corp., 458 F. Supp. 423, 434 (N.D. Cal. 1978) ("The way [plaintiff] structured its damage claim there was no basis in the record for the jury to determine what the effect on damages would be if it found one or more of the challenged acts lawful. Thus, if one of [defendant's] acts was not a violation of the antitrust laws, much of the damage claim would become invalid.").

# PART III

# CHAPTER 8

# OVERCHARGES

This chapter provides an overview of the legal and economic issues involved in estimating damages associated with anticompetitive price increases or "overcharges." Such overcharges are commonly asserted as injuries in price-fixing cases under Section 1 of the Sherman Act[1] or Section 4 of the Clayton Act,[2] and less frequently in monopolization cases under Section 2 of the Sherman Act,[3] as well as under state statutes. The overcharge usually reflects the difference between the price actually charged and the price that would have prevailed in the absence of the anticompetitive conduct (i.e., the "but-for" price under the "counterfactual"[4]). Damages, at least for a direct purchaser, would then be the overcharge times the volume of sales. Measuring the amount of this overcharge is particularly relevant when the plaintiff is a purchaser rather than a foreclosed competitor. In the latter case, which is more common under Section 2, lost profits resulting from the foreclosure present a more appropriate measure of damages.[5]

This chapter first discusses some general considerations applicable to most overcharge damages analyses: construction of the economic model and estimation of the overcharge. It then discusses the application of these principles to specific types of antitrust claims—such as price fixing, bid rigging, monopolization, and tying—highlighting the unique issues that arise in those situations. Finally, it discusses special cases that may arise in some or all of these types of situations.

# A. Construction of the Economic Model

One of the central challenges of an overcharge analysis is determining the counterfactual or but-for scenario that would have existed had the

anticompetitive conduct not occurred. While actual prices generally are known, but-for prices are not observable and thus must be estimated. Furthermore, even when the contested conduct is clearly defined, the behavior of firms and the resulting market outcomes in the absence of that conduct generally are not easy to estimate, as they are the result of complex interactions under different economic conditions than those that were actually observed. Estimating the but-for prices generally requires the construction of an economic model that accounts for the various factors that influence price, including the anticompetitive behavior. The relationship between prices and other factors usually is described in the form of a mathematical equation or set of equations.[6]

A sound economic model should be capable of distinguishing between the effects of lawful activities and events that influence supply and demand (and hence prices) from the effects of the alleged anticompetitive conduct. In doing so, the model should capture all of the essential economic relationships and factors that are likely to influence prices. For example, if costs significantly rose or government regulations materially changed during the relevant period, a sound model should account for those events because they presumably would have occurred regardless of the anticompetitive activities and influenced prices. If the model is incomplete and omits important explanatory factors, it may be unable to explain price movements or it may attribute incorrectly the effects of relevant omitted factors to the anticompetitive conduct, producing biased results.[7]

A sound economic model should also reflect a plausible relationship between liability and the calculated overcharge.[8] For example, it is necessary to articulate an economic basis for assuming industry-wide impact in the overcharge analysis if the defendants were accused of fixing prices to a single large customer because the experience of a single customer (even though large) need not be representative of all customers in the relevant market.

Additionally, a sound economic model should rely on parameters that describe the specific instances of anticompetitive behavior and its legal or regulatory context. For example, the economic model would require a delineation of the relevant product(s) and the relevant time period. These parameters may be derived from the factual record, legal or regulatory guidance (e.g., a statute of limitations), or economic analysis; alternatively,

they may be unsupported assumptions. There is not necessarily a bright line demarcating the boundaries of the relevant time period. When there are allegations of cartel behavior, for instance, it would be important to consider whether the cartel was immediately effective, whether the agreement was enforced, and the way in which the agreement broke down. In some instances, the effect of making a particular assumption may be testable in the process of estimating the overcharge—for example, by estimating the model using an alternative assumption, or through the use of econometric techniques.

# B. Estimation of the Overcharge

Most overcharge models are designed to determine the relevant product prices that would have prevailed but for the anticompetitive behavior and compare these but-for prices to the actual prices paid. The overcharge is typically calculated as the difference between the price actually charged and the but-for price, after controlling for all factors that may affect supply and demand of the relevant product.[9] The estimated overcharge is then multiplied by the relevant quantity to determine damages (before trebling, if appropriate).

Typically, the relevant quantity—or volume of commerce—to which the overcharge is applied is taken to be the actual quantity purchased, the determination of which may itself present a challenge. There are at least three potential challenges in determining the relevant volume of commerce: (1) factual questions about the scope of the anticompetitive behavior; (2) data limitations; and (3) jurisdictional issues. First, there are often questions about the breadth of the conduct. For example, the start and end dates of the conduct or the products and industry participants affected. Second, the relevant quantity may need to be inferred from imperfect data when, for example, the available data do not extend sufficiently far into the past. Third, jurisdictional issues and complications relating to where the sales were made are also possible. In the price-fixing context, the treatment of foreign sales can be the subject of particularly vigorous disputes.

A host of theoretical and practical issues arise in the course of estimating but-for prices. To begin, there may be several methods to estimate overcharges based on the substantive law governing the injury, the type of

economic model, and the nature of the available data.[10] The expert must make reasoned choices grounded in the facts of the case.

On the theoretical side, the overcharge model must make assumptions concerning what the world would have looked like in the absence of the anticompetitive behavior. For example, should the model assume that absent a cartel there would have been a "perfectly competitive" market, where each firm prices at marginal cost, prices are known to all buyers and sellers, and no single firm has much effect on market prices? Or should the model assume there would have been an oligopolistic market with relatively few firms who may strategically interact with each other, and if so, how that would differ from an actual cartel?[11] In a perfectly competitive market, but-for prices are likely to be lower (and estimated overcharges higher) than in an oligopolistic market.[12] Similarly, in a predatory pricing case, since overcharges only occur in the recoupment period, the model must consider whether and when rivals would have exited the market without the predation. Indeed, in attempted monopolization cases where the anticompetitive conduct failed or had not yet achieved its intended effect, there may be no overcharges to measure (though there may be other types of cognizable antitrust damages suffered).[13]

On a practical level, the difficulties of obtaining sufficient and reliable data complicate the process of modeling the but-for world. Even apart from the fact that there will be no data from the but-for world (which never existed), the data that exist from the actual world often have severe limitations. For models that are predicated on comparing the relevant time period to a different period that was not influenced by the anticompetitive conduct, it may be difficult to distinguish between such periods under some circumstances. Some relevant data, such as changes in certain costs or changes in capacity, might not be available or might not be measured accurately. With respect to sales data, for example, there may be time gaps in the data record, it may not be sufficiently detailed, or it may exclude relevant transactions or components of the price. Furthermore, there may be several methods to estimate the overcharge, for example, by using various econometric techniques such as multiple regression analysis. These alternative estimation methods may rely on different assumptions (which should be verified), and have different capacities to address data limitations and different degrees of accuracy and precision.

Nevertheless, most of these issues can be addressed in the construction of an appropriate economic model to estimate overcharges. Methods of constructing these models are discussed at length in Chapter 6. Typically, experts employ a "reduced form" model in which price is expressed as a function of demand and supply-side variables.[14] The explanatory (or independent) variables are assumed to represent the major influences on price. These variables can include quantitative data, such as costs, prices of substitutes, inflation, and other indicators of supply and demand. In addition, "dummy variables" (which take on the values of one or zero) also can be used to control for other significant events, such as raw material shortages, plant interruptions, seasonality, and changes in government regulations. When properly specified, the model provides an estimate of the average price given specific values of the independent variables and their estimated coefficients.[15] The following section, discusses how such an economic model might be constructed and overcharges estimated for a typical price-fixing case.

# C. Horizontal Price Fixing

The measure of damages that is commonly used in price-fixing cases is the overcharge multiplied by the relevant purchased quantity.[16] Simply put, the overcharge is the difference between the actual price paid and the competitive price, or the price that would have been charged absent the illegal agreement. Early on, the Supreme Court recognized the overcharge as the principal measure of harm in price-fixing cases.[17] Several methods are commonly used to estimate the overcharge.[18]

## 1. Before-During-After Model

The most conceptually straightforward method for estimating the cartel overcharge is through a "before-during-after" model.[19] This model is premised on the assumption that prices before and after, but not during, the relevant period were set free of any illegal cartelization. Using data from both the before and after time periods as nonconspiracy benchmarks, a model is constructed to estimate the but-for prices during the relevant period.[20] Overcharges are then estimated as the difference between the actual prices

charged and the prices the model predicts would have been charged during the relevant period.[21] As noted in Chapter 6, when sufficient data for the period after the anticompetitive behavior are not available, a variation of the before-during-after model—the before-during model—may be used, where the nonconspiracy benchmark is restricted to the period before the alleged conspiracy.[22]

The simplest form of the before-during-after model assumes that the weighted average prices from *outside* the relevant period are a reasonable approximation of the prices *during* the relevant period absent the conspiracy. Put differently, this approach assumes that the entire price difference between the conspiracy period and nonconspiracy period was due to the alleged anticompetitive conduct. While this strong assumption could hold in some circumstances, it is rarely justified, especially for lengthy conspiracy periods. First, the before-during-after model assumes that prices from the benchmark period are a good approximation of long-run equilibrium prices. It is important, however, to examine the economic conditions in the before and after periods for entry or exit, surpluses or shortages, or factors that would indicate that the market had not reached long-run equilibrium. For example, if price wars give rise to a cartel, then preconspiracy prices would not reflect long-run equilibrium prices.[23] Second, the assumption that but-for prices would have been constant during the relevant period generally implies that there were also no changes in the economic factors that normally determine prices—for example, changes in demand, changes in costs,[24] entry or exit of firms, or capacity constraints.[25] Third, the use of aggregate average prices from the benchmark period would produce inaccurate overcharge estimates for individual customers if their prices would have differed, for example, due to individualized negotiations and variation in bargaining power.

These limitations may be addressed through more rigorous methods that apply econometric techniques to estimate the but-for prices—such as dummy variable models and prediction models—while controlling for other factors that may have affected prices. Econometric techniques can be used to evaluate data relating to competing theories of the relationship between a variable of interest—such as price—and a number of explanatory variables, as well as the magnitude of the effect of the explanatory variables on the variable of interest.[26] The use of econometric techniques should be guided by

a sound economic model. Otherwise, the techniques may produce spurious results, estimates that do not reflect the counterfactual accurately or perhaps at all. Econometric techniques must also be used with appropriate data to produce reliable results.[27]

Dummy variable and prediction models are two different approaches to implement a before-during-after analysis, both of which allow one to control for factors that change over time and explain some of the observed price differences.[28] In a dummy variable model, price is related to various explanatory factors including a "dummy variable" to account for the influence of a conspiracy. A dummy variable takes on the value of one for observations during the conspiracy and zero for observations outside the conspiracy period.[29] The estimated coefficient of conspiracy period dummy variables provides an estimate of the average overcharge due to the price-fixing activity[30] on either a dollar or percentage basis.[31] The dummy variable model is an econometric technique for estimating the before-during-after model, and thus here it is also essential to address whether the benchmark period prices are a good reflection of long-run equilibrium prices.[32]

In some cases, however, the use of a dummy variable to estimate the impact of the conspiracy on prices yields a negative coefficient for the dummy variable, suggesting that collusive prices were *lower* than competitive prices.[33] This apparently surprising result does not necessarily mean that the use of the dummy variable approach was incorrect; it may be an artifact of a variety of data and other econometric issues. A negative coefficient for the dummy variable, however, may actually be consistent with the economic model and suggest that: (1) the alleged conspiracy never occurred; (2) it triggered price wars; (3) it was ineffectual; or (4) it was outweighed by other events that took place during the relevant time period that exerted downward pressure on prices. In contrast, estimated results that do not comport with the underlying economic model—such as an estimated coefficient that has the wrong sign or one that should be, but is not, statistically significant—generally could indicate problems with the econometric approach. For example, the prices of substitutes included as explanatory variables may also be influenced by the dependent variable. In such circumstances, the expert may need to rely upon more advanced econometric approaches.[34]

An alternative to the dummy variable model is the prediction (or residuals) model, which could be used, for example, where the alleged conspiracy affected prices in ways that are not captured by one or more "conspiracy" dummy variables. The prediction model involves using data from the nonconspiracy period to econometrically estimate the coefficients for the independent variables, and then applying those coefficient estimates to the actual values of independent variables during the conspiracy period to predict nonconspiracy prices during the conspiracy period. The differences or "residuals" between the predicted (nonconspiracy) prices and the actual (conspiracy) prices yield an estimate of the overcharge.[35] Unlike the dummy variable model, this model uses price data solely from outside the conspiracy period. Whether it is appropriate to pool pre- and post-conspiracy price data depends on the economic characteristics of those periods. Because pooling may have a significant effect on econometric results, it should be carefully considered.

Applying estimates of preconspiracy or postconspiracy prices to the conspiracy period is known as *forecasting*; forecasting based on post-conspiracy data alone is sometimes referred to as *backcasting*. There are many techniques for forecasting as well as many types of information that may be forecasted. Both approaches may involve assumptions that should be carefully validated, as should the performance of the regression model in forecasting outside the benchmark period. For example, it is possible to forecast the changes in prices from the pre-conspiracy period into the conspiracy period based on the underlying changes in another economic factor—such as costs—during the conspiracy period. However, this method of forecasting for use in calculating overcharges assumes that margins from the preconspiracy period are identical to those during the conspiracy period. Econometric techniques may be used to estimate the error in forecasting. The most appropriate method of forecasting the but-for prices may depend on the dynamics of the economic markets at issue as well as the available data.

## 2. Benchmark Method

An alternative method for estimating overcharges is the benchmark or "yardstick" method.[36] This method seeks to estimate the but-for prices using data from analogous geographic markets or industries that are not affected by

the conspiracy as a benchmark. More generally, the term "benchmark" is used to refer to any market, geographic area, or time period that may serve as a basis for estimating the overcharge. Thus, the term benchmark is also commonly used to describe the before or after periods in the before-during-after model described above. For example, if the plaintiffs allege a conspiracy in the Northeast, pricing trends from the Northeast could be compared with prices in other parts of the country, which presumably were not affected by the alleged cartel.[37] Regardless of the estimation approach used, however, it is important to ensure that the approach controls for any differences between the benchmark used and the relevant market and time frame under consideration.[38]

## 3. Difference-in-Differences Method

If data are available, the benchmark and before-during-after methods may be combined in a difference-in-differences model, which compares the changes in the prices in the relevant market to the changes in the benchmark market.[39] Accordingly, this method requires data for both the market of concern and the benchmark area or industry, both during the period of the conspiracy and in an unaffected period. To the extent that the benchmark market provides a valid counterfactual for how the affected market would have evolved but for the anticompetitive conduct, this method can provide a more reliable estimate than either before-during-after or benchmark models alone.[40]

## 4. Cost-based Method

Another method that has been used to estimate overcharges is the "cost-based" or "margin" method. This approach uses the difference between profit margins in the actual and but-for worlds to estimate overcharges. But-for prices are taken to be the estimated unit cost of production plus a "normal" competitive profit margin.[41] There are a number of limitations to this approach. First, it assumes that costs and price-cost margins would be constant during the relevant period. Second, if cost and profitability estimates are derived from the nonconspiracy period, the method assumes that costs and profitability would be determined in similar ways during and

outside of the conspiracy period.[42] Third, it may be difficult to determine the competitive profit margin that is appropriate for the industry of interest and reflects an economic (rather than accounting) measure of profitability. The cost-based method is often implemented in a similar fashion to before-during-after or benchmark models, thus some of the same issues raised in the context of those methods apply here as well.[43]

# 5. Implementation of a Damages Model

We provide here an illustrative example that demonstrates some of the decisions and challenges in building a damages model. The example focuses on the before-during-after method, though many of the challenges apply to all of the methods. To begin, the before-during-after approach can be conceptualized with the aid of Figure 1, which depicts hypothetical prices for the product at issue between 1980 and 2001.



**Figure 1**

The first issue that must be addressed in calculating damages under all of the methods is the definition of the relevant conspiracy period, but this is particularly important for the before-during-after method because it identifies the price effect by comparing prices during the conspiracy to prices outside of the conspiracy period. In many antitrust cases, the beginning and ending points of a conspiracy may be determined based on the extrinsic evidence establishing liability, such as evidence of meetings to set prices or testimony

by witnesses. In some cases, however, a plaintiff may simply pick a point in time, claiming that the conspiracy began "at least" that early. To the extent that the conspiracy was in operation and effective prior to that point, however, any before-during-after model will underestimate damages.

In Figure 1, we have assumed that the conspiracy began in 1990 and ended in 1995. Using these dates, the average "competitive" price was approximately $50 in both the preconspiracy and postconspiracy periods, and almost $80 in the conspiracy period. Suppose instead, however, that the cartel actually started in 1981 and did not end until 1997. Using these dates, the average competitive price remains almost $50, but the average price during the conspiracy is only approximately $60. As this example shows, before-during-after models can be highly sensitive to the designation of the beginning and ending dates.

More importantly, if the conspiracy started in 1981 and led to prices above those that otherwise would have prevailed, the large price increase that occurred in the early 1990s would no longer be "correlated" with the onset of the conspiracy, suggesting that some other factor—not explicitly accounted for by the model—was responsible for the large price increase. Alternatively, some factor not accounted by the model may explain why conspiracy prices were not above historical "competitive" prices until 1990. Thus, $50 would be unlikely to be a good estimate of the competitive price in the early 1990s.

Because the designation of the beginning and ending dates of the conspiracy is so important, courts have been careful to ensure that they are chosen based on the evidence or well-established economic theory, and not based on the normative judgments of economic experts or their counsel. For example, in *In re Aluminum Phosphide Antitrust Litigation*,[44] the court rejected the plaintiffs' expert's proposed conspiracy period, finding that there was "no scientific or theoretical basis" for the chosen ending date. The expert had acknowledged that the conspiracy had ended in late 1991, but had used only data after 1993 in building his model. The expert had sought to justify this on the grounds that a lag time was necessary for prices to return to normal levels. The court rejected this approach, noting that there was no scientific basis that would allow an expert to "opine with any reasonable degree of economic or scientific certainty that a 15-month lag time was necessary or sufficient for prices to return" to normal levels.[45]

Once the beginning and ending dates are chosen, the next step is to construct a model based on data from the nonconspiracy period that can be used to estimate prices during the conspiracy period. The simplest model would be merely to calculate the average price in the preconspiracy and postconspiracy periods and compare the result to the average price during the conspiracy period. In the example above, the average prices in the preconspiracy and postconspiracy periods were approximately $50, while the price during the conspiracy period was almost $80. It would be easy to convince a jury that the prices in the conspiracy period were significantly higher than during the preconspiracy and postconspiracy periods. But is the overcharge the entire $30 difference?

Simply comparing the average collusive price to the average nonconspiracy price may be deficient if there are other factors that influence supply or demand and, thus, explain some of the differences in prices across these periods. Suppose, for example, the cost of a significant raw material doubled during the relevant period. Or suppose that a significant competitor went bankrupt and ceased production at the start of the relevant period, greatly reducing the available supply of the product. A model that fails to account for these factors could not provide a reasonably accurate estimate of actual overcharge, and thus damages. Depending on the nature of the omitted factors, the model may overestimate or underestimate actual damages.

Some courts have excluded damages estimates that are premised on the unsupported assumption that all of the price increases during the relevant period were caused by the conspiracy.[46] Assuming that all of the price increases were caused by the antitrust violation raises two interrelated issues. First, other economic factors may be at least partly responsible for the price increase. Second, there may be lawful aspects of the defendants' conduct that contributed to the price increase. Indeed, numerous courts have held that plaintiffs must provide disaggregated damages estimates that distinguish between the effects of the unlawful conduct on the one hand and any lawful conduct on the other.[47] As the Seventh Circuit explained:

> For years we have been saying, without much visible effect, that people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence . . . . *Post hoc ergo propter hoc* will not do; nor the enduring of simplistic extrapolation and childish

arithmetic with the appearance of authority by hiring a professor to mouth damages theories that make a joke of the concept of expert knowledge. The expert should have tried to separate the damages that resulted from the lawful entry of a powerful competitor . . . from the damages that resulted from particular forms of misconduct allegedly committed by that competitor.[48]

To determine how much, if any, of the observed price increase was due to collusion, rather than legitimate supply and demand factors, economic experts generally use multiple regression models. As one court explained, a regression model is technically "an equation that seeks to account for the major independent influences on the dependent variable—the variable that is estimated or forecast by the model—in order to arrive at a reliable prediction of the dependent variable."[49] In spite of various theoretical difficulties,[50] regression analysis of overcharges in price-fixing cases, which is discussed in detail in Chapter 6, has become the standard mode of analysis used by both plaintiffs and defendants.[51]

# 6. Some Caveats for Overcharge Calculations in General

A host of potential problems are likely to arise in practice, but only a few will be discussed here. First, it is often unlikely that the conspiracy will function smoothly at all times. To the extent that there are episodes of cheating on the collusive agreement, some competitive prices will be intermingled with the collusive prices. If these outbreaks of competition can be identified clearly, they can be used to provide further information on the competitive benchmarks. If they cannot, then the sporadic competition may make damages harder to estimate or result in underestimated damages.

Second, the analyst often cannot obtain observations on the true variables of interest. For example, one may want a measure of marginal cost but have to settle for average variable cost. Marginal cost is the additional cost the firm would have to spend to make an additional unit of sales, beyond its current level. By contrast, average variable cost is calculated as total variable cost divided by sales volume. Except for special circumstances, average variable cost is unlikely to equal marginal cost. Similarly, one may

use the Consumer Price Index or Producer Price Index to control for inflation generally, when industry-specific factors are quite different. In other words, in practice one must rely on proxies for the variables of interest—variables that are correlated with the variables of interest. If the proxies are highly correlated with the variables of interest, estimation problems are reduced, but this is largely unobservable. In any event, proxies are necessarily somewhat imperfect measures of the true variables. As a result, some bias may be introduced into the estimation.[52]

Third, the values of some independent variables may have been influenced by the conspiracy. For example, the conspirators may agree on price, but compete on advertising and promotion.[53] As firms scramble for market share at the inflated collusive price, expenditures on promotion may rise above the level that they would have reached but for the collusion. Similarly, the absence of competition could lead to reduced efforts at cost control.[54] To the extent that these costs are used in predicting price, their inflation due to the conspiracy leads to a downward bias in the damage estimate.

Fourth, over time, demand and supply conditions change from what they were during the estimation period. As a result, if one uses the prediction model to estimate the but-for price, one is likely forecasting outside the sample range and, as a result, the standard error may be high. Thus, it may be hard to determine how much of any observed price differential is due to collusion and how much is due to changes in demand and supply conditions.[55]

Fifth, the variables in the model may be trending in similar ways such that the observed relationship is merely due to their similar changes over time. If this data problem, known as "nonstationarity," is not addressed, the regression results may be spurious.[56]

# D. Bid-Rigging Cases

Bid rigging is a classic price-enhancement antitrust violation that arises when competitors reach an agreement concerning the prices or terms that each will offer in a particular bidding contest or series of contests for the award of a business contract. For example, contractors typically bid for the opportunity to supply state and federal governments with goods and services.

These procurement bids can encompass a range of dimensions, including price, technical specifications, service terms, and time table for deliverables, all of which can affect the likelihood that the bid is selected. Thus, because a contract can have multiple dimensions and is typically unique, determining overcharges in bid-rigging cases can, in practice, be more difficult than determining overcharges in typical price fixing cases in commodity markets.[57]

In principle, however, determining overcharges is no different in a bid-rigging case than in a typical price-fixing case. In either situation, the goal is to estimate the but-for price as compared to the actual price of the winning contract. Bid-rigging cases specifically require an assessment of what the winning bid would have been but for the conspiracy.

One way of estimating the but-for winning bid would be to analyze the documentary evidence to determine whether the conspirators had raised their bids after reaching an agreement and the degree to which they were raised. In the absence of such evidence, however, various statistical techniques could be used to estimate the amount by which the actual winning bid exceeded the but-for winning bid.[58] There are three primary methods: (1) the yardstick method, in which prices or margins on conspiratorial bids are compared to non-conspiratorial bids; (2) the prediction model, which seeks to determine what the likely bid would have been based on cost and other variables; and (3) the cost-based method, which compares costs of similar rigged and unrigged bids. These methods, which are similar to those discussed above in the section on horizontal price-fixing, are discussed briefly below and in more detail in chapter 6.

Under the yardstick method, econometric models can be used to estimate the but-for winning bid. In this case, the explanatory variables could include at least a cost estimate, the number of bidders, and the dummy variable—which is equal to one if the job is rigged and zero otherwise—along with a disturbance term. The dependent variable is the winning bid. The model is estimated over the entire sample of rigged and unrigged bids. To estimate damages for any particular contract using this model, the dummy variable is set at zero, while the other variables remain the same, and a predicted competitive bid is generated.[59] This model allows more factors to be taken into account than does the bid-to-estimate ratio approach, but it assumes that

the structural parameters are the same across rigged and unrigged contracts, and this assumption may not always be true.[60]

A second econometric method is the prediction model. It is similar to the yardstick method, except that the dummy variable indicating whether the individual contracts were collusively determined is omitted, and the model is estimated over the subsample of unrigged jobs only. Thus, the regression explains winning bids on the basis of cost estimates, number of bidders, and possibly other relevant variables. By then substituting observed values of the independent variables on rigged jobs into the estimated equation, predicted winning bids in the absence of collusion are generated. These would be the presumed competitive prices and would be subtracted from the actual bids to determine damages.[61] This approach allows more factors to be taken into account than either of the other statistical methods, but tends to be data-intensive. Which of the two econometric methods will be better will depend upon the circumstances of the individual case.[62]

A third method of calculating damages is to conduct a cost analysis of rigged and unrigged jobs that are comparable in design. After adjustments are made for minor cost differences, the difference between the bid price on the competitive job and the bid price on the rigged job would provide a measure of damages. This approach becomes difficult as the number of rigged jobs increases, for it becomes hard to find sufficient comparable unrigged jobs and expensive to perform the analysis when comparable jobs are found.

In some instances, the contracting authority or purchaser may itself develop cost estimates that can be used to develop damages models. If these estimates were developed in a consistent way, one can calculate the average ratio of the winning bid to the cost estimate either for rigged and unrigged jobs separately, or for all jobs.[63] When unrigged jobs can be identified with confidence, it is not necessary for the jobs to be comparable, for ratios are being compared, not the jobs themselves. The damage estimate would be the ratio of winning bid to cost estimate for the rigged job minus the average ratio for unrigged jobs, multiplied by the cost estimate for the rigged work. Equivalently, the damage measure would be the cost estimate for the rigged job multiplied by the ratio for unrigged jobs, subtracted from the rigged bid.

Basing damage estimates on cost estimates of contracting authorities has certain drawbacks. Such estimates are based on historic average costs, whereas a bidder calculates its bid on the basis of its marginal cost at the

relevant time, which takes into account various fluctuating demand and supply factors, such as capacity utilization, expected number of bidders, and likelihood of winning other jobs. The marginal cost may be above or below average cost. The estimated cost generally should include the costs of production and inventories, which may affect the opportunity cost of performing the work. Thus, the economic costs may fluctuate with business cycles.[64] In addition, by basing an estimate on historic data, the estimator may be incorporating collusive price increases that pervaded the earlier period.[65]

The approach implicitly assumes that the bid-to-estimate ratio will be the same for all competitive contracts; however, that is unlikely to be true. The number of bidders and other factors besides cost estimates and bid rigging might influence bidding behavior.[66] Moreover, this method assumes that the impact of collusion is fully reflected in the bid-to-estimate ratios, when in fact the ratios may differ from one collusive bid to another.

An additional complication that may arise in bid rigging cases is the need to determine whether some or all members of the bidding conspiracy (or ring, as it is sometimes called) would have bid for the contract in the first instance. This was an issue raised by the defendants, for example, in the recent private equity litigation, where the plaintiffs alleged that the private equity defendants agreed not to outbid each other to the detriment of the shareholders of various companies involved in leverage buyouts.[67] The defendants argued that they would not have individually bid on the deals in the first instance—if anything they would have group bid because of the size of the deals.[68]

# E. Other Causes of Action

## 1. Single Firm Monopoly Pricing

The offense of monopolization requires possession of monopoly power and exclusionary conduct, or conduct that excludes rivals on some basis other than efficiency.[69] When a direct purchaser of an illegal monopolist sues, the obvious measure of damages is the monopoly overcharge. Conceptually, monopoly overcharge damages can be calculated in the same

way as cartel overcharge damages, by determining a hypothetical competitive price, subtracting it from the actual price, and multiplying the resulting price differential by the quantity purchased. The only conceptual difference between monopolization and a cartel in applying this calculation is that, instead of a group of firms conspiring to charge a supracompetitive price, a single firm charges the monopoly price.

In practice, however, the determination of a hypothetical competitive price may be more difficult in the case of monopolization than in that of a cartel. Depending upon the scope of the monopoly, a benchmark or yardstick (firm or geographic area) may be difficult to find. To the extent that monopolies are more durable than cartels, periods of competition before, after, or during the span of monopoly pricing are apt to be harder to identify, and may be less likely to yield useful data.

Moreover, the analysis is complicated when the monopolist's power is not solely derived from its impermissible exclusionary conduct. One court has held that "a purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct."[70] The court was concerned with the firm that acquired a lawful monopoly through superior efficiency or foresight, then preserved or strengthened its position by the use of exclusionary practices. The disaggregation rule assumes that part of a monopoly overcharge may be attributable to market power lawfully acquired and part to market power unlawfully obtained. In applying this rule, the task imposed on the analyst is to ascertain the price that the monopolist would have charged absent the exclusionary conduct, a price that, due to the exercise of lawful market power could be greater than the competitive price but less than the actual price.[71] If the entire monopoly overcharge could have been extracted by virtue of legitimate monopoly power, regardless of exclusionary conduct, the plaintiff would be entitled to no damages, for the antitrust violation would have caused no marginal harm.

## 2. Overcharge Incident to Exclusion

Suppose a group of suppliers conspired to drive a more efficient competitor out of the market or, equivalently, to prevent a more efficient supplier from entering the market. The excluded firm would have a claim for

antitrust damages based on lost profits, as discussed in Chapter 9.[72] Purchasers from the conspirators also would have antitrust claims if they paid higher prices as a result of the exclusionary practice.[73] The basic measure of their damages would be the same as the measure used in typical collusion cases, namely, the difference between the price actually paid and the price that would have been paid absent collusion, multiplied by the quantity purchased. However, there can be differences due to the possibility that the excluded competitors would have been more efficient than the defendants. First, unlike in the case of collusion, in the case of exclusion, the but-for price may be below the marginal cost of the actual supplier. That is because but for exclusion, the supplier might have been an entrant that is more efficient than the incumbents in the market, and the more-efficient entrant might charge prices below the incumbents' costs. Second, in the typical collusion case, but for the overcharge, the plaintiff would have purchased from the defendants at the competitive price, while in the exclusion case, but for the defendants' exclusion of more efficient rivals, purchasers would have shifted at least some of their business to these rivals.

Although these differences pose no theoretical bar to recovery in the exclusion case, they do imply unique theoretical and practical difficulties. For example, it may be difficult to prove that a supplier who did not enter the market would have done so but for the exclusionary activity. Moreover, proving how the excluded firm would have influenced the competitive price had it entered the market can be difficult. For example, a firm entering a market with a cost advantage may set a price just below that of its rivals, not necessarily at its own cost.

In the long run, as long as the cost advantage of the excluded firm could be duplicated by other firms, competition would eventually force the market price down towards the marginal cost of the more efficient firms. Indeed, the conspirators themselves might switch to the more efficient technology. New entry and switching technologies typically take time, as the capacity of the low-cost supply is ramped up to meet market demand. A theoretically sound damages calculation should take account of the fact that, even absent the defendants' unlawful conduct, the plaintiffs may not have been able to make all of their purchases immediately from low-cost, excluded suppliers. Rather, the but-for price may have decreased gradually as additional low-cost capacity entered the market.

In *In re Lower Lake Erie Iron Ore Antitrust Litigation*,[74] the Third Circuit affirmed an award of damages based on the theory that defendants conspired to exclude more efficient suppliers in three vertically related markets.[75] The court allowed the steel companies to recover damages based on the lower prices they would have paid to the truckers.[76] However, the *Keogh* doctrine was held to bar any claim that they would have paid lower rail transport rates absent the conspiracy.[77]

One can also imagine hybrid cases in which firms collude to both fix prices above their marginal costs and to exclude more efficient rivals. Overcharge calculations in such cases should reflect both the immediate effect on price that elimination of the price-fixing conspiracy would have had and the gradual effect from preventing the entry of more efficient rivals.

## 3. Umbrella Effects

In general, if a group of firms collectively has a sufficiently large share of a market and entry into the market and expansion are impeded, the group can exercise market power through express or tacit collusion even though the group does not include all of the suppliers in the market.[78] The group can raise price collusively, though not by as much as it could absent the competitive fringe. In response to such collusion, a rational nonparticipant, who was and remains a price taker, will also raise prices. This phenomenon has been called the "umbrella effect," in that the competitive firm raises its prices under the protection of the price umbrella unfurled by the cartel. A buyer that purchases from such a competitive firm in a cartelized market therefore will pay more for the product than it would have paid absent collusion. This overcharge poses two principal questions: Can nonparticipants practically be distinguished from participants when all firms in the market are charging supracompetitive prices, and may the buyer recover overcharge damages for purchases made from a nonparticipant? The first question will generally go to liability, while the second is a question solely of damages.

As to the first question, sometimes, direct evidence may indicate which firms were and were not conspiring, as when documentary evidence reveals a pattern of price communication among a distinct subset of firms in a market. Even absent such evidence, there is a theoretically simple empirical test to

distinguish participants from nonparticipants: during the period of price enhancement, the market shares of nonparticipants should increase.[79] The rationale of this test is straightforward: participating firms will increase price by reducing output. Assuming nonparticipants have upward-sloping marginal cost curves, they will increase output to the point where their marginal costs equal the new price. The shape of their marginal cost curves, or collectively the short-run supply curve of the competitive fringe, implies that nonparticipants can profitably expand output if market price increases, but only to a point. Of course, over time, long-run supply responses in the form of new entry and expansion by the competitive fringe that is only profitable in the long run may force price back to the competitive level. But the immediate effect of the differing supply actions of participants and nonparticipants will be a shift in market share from the former to the latter, and that will not only serve to distinguish between the two, but also help to identify the beginning of the collusive period.[80]

Other methods of identifying nonparticipants are no doubt possible. For example, the increase in profits should be greater for nonparticipants than for participants, and one could attempt to measure the profits of all firms directly.[81] No matter how sound an econometric test is in theory, however, its usefulness is constrained by practical problems of measurement and data availability, including the difficulties of obtaining data from nonparticipants who are not parties to the litigation. These problems may render some tests, like an analysis of profits, wholly unavailable, and they may even make a test as simple and elegant as the market shares test harder to apply than one would predict. Assuming, however, that nonparticipants can be identified, the question remains as to whether those who purchase from them may be, and ought to be, able to recover damages.

Arguably, a price increment that is paid for a product because suppliers have colluded satisfies the basic requirement of actual causation, as well as the rudiments of antitrust injury and antitrust standing, regardless of whether the seller participated in the conspiracy.[82] Determining the overcharge on purchases made from nonparticipants may be a relatively straightforward economic exercise when the participants and nonparticipants sell the same, homogeneous product. It will be more complex when the firms sell substitute or differentiated products. As the price of the cartelized product increases, demand will shift to the substitute product, causing the price of that product

to rise. Though determining the increment in price caused by a collusive increase in price of a related product is likely to require calculations that control for more variables than would be necessary in the case of a single product, the task is no different in kind. Whether the task would be prohibitively different in degree will depend upon the facts of each case.

Whatever the economic merit, courts have split on whether to allow purchasers from nonparticipants to recover from participants,[83] with the recent trend against permitting umbrella theory damages.[84] Courts that have refused to allow recovery have done so on various grounds. Some have reasoned that damages for amounts paid to third parties are inherently speculative and that determining the existence and level of overcharge paid as a result of the defendants' conspiracy would involve the litigation complexity the *IllinoisB rick* Court sought to avoid.[85] Similarly, some courts have pointed to the antitrust injury requirements of *Associated General Contractors* as prohibiting such speculative damages.[86] Others have expressed reluctance to impose liability on defendants who have received no direct benefit from the plaintiffs' purchase.[87] This concern is related to a deterrence objective of antitrust damages only in the sense that, assuming liability is certain, depriving the defendants of the fruits of their illegal activity will ordinarily be sufficient to deter it. Other courts have permitted recovery, though not often in recent years.[88] (See part G of this chapter.)

## 4. *Vertical Price Fixing (Resale Price Maintenance)*

In 2007, the Supreme Court removed resale price maintenance, which is also referred to as vertical price fixing, from the per se rule.[89] Because such claims may still be upheld under the rule of reason, however, they may still result in liability and damages.[90] Assessing potential damages from vertical price fixing under the rule of reason requires an analysis of the reasons for the restraint, which in theory can serve either to enhance efficiency or to facilitate supracompetitive pricing.[91] In general, if prices are raised, customer plaintiffs likely will suffer compensable injury that can be calculated with acceptable precision. Plaintiffs who are present or excluded participants in the restraint are less likely to be able to prove damages.

A number of reasons, some anticompetitive and some efficiency-enhancing, have been suggested for why firms might want to use resale price maintenance.[92] One often proposed anticompetitive motivation is to facilitate a dealers' cartel or a suppliers' cartel.[93] When the resale price maintenance scheme facilitates cartel pricing, a customer of a dealer would suffer overcharge damages that are analytically identical to the damages suffered by a direct purchaser from an ordinary horizontal cartel.[94] Accordingly, damages would be calculated in the same way.

The most widely accepted efficiency-enhancing explanation for resale price maintenance is the "free rider," or "special services" theory.[95] In this theory, the supplier recognizes that sales will be maximized only if dealers provide costly presale services. Some dealers provide the services, incurring the attendant costs, but others do not. Customers use the services provided by full-service dealers, then buy the product from free-riding dealers, who can afford to charge a lower price because they have not incurred the costs of service. Eventually full-service dealers refuse to incur costs that result in no return, and presale services cease to be offered. By setting a minimum resale price at the level necessary for dealers to offer presale services and make a profit, the supplier can induce the optimal amount of services. Dealers no longer have the ability to free ride on others, for if they do not provide services they will lose business to dealers who do, and the agreement prevents them from capturing sales by offering a lower price.[96]

If a customer sues a manufacturer over a vertical price-fixing arrangement that increases efficiency, such as by eliminating the free rider problem, the customer likely will not be able to assert a sensible theory of damages. Although the price will be higher than the price that would have prevailed absent the agreement, the package of product and service sold will also be different and better. Indeed, an efficiency-enhancing restriction will result in greater consumer surplus than would have been enjoyed absent the restraint. The restraint, therefore, far from causing injury, benefits the plaintiff.

Arguably a restraint that increases the level of services and thereby benefits some customers might harm other customers. The demand for services may vary among customers. Because the supplier is interested in maximizing profits, it is concerned with the demand of the marginal customer. Thus, a supplier might impose a vertical restraint that would induce a level

of service desired by the marginal consumer but not by infra-marginal consumers.[97] A consumer who did not want the services induced by a vertical restraint could be worse off. To date, no one has demonstrated that this theory of welfare loss can be used in practice to identify harmful resale price maintenance. Consumers wishing to prove damages would have to show that the value of the services to them was less than the cost of the price increase, but demonstrating the value of those services likely would be very difficult. Moreover, that consumer preferences for services differ is a necessary but not a sufficient condition for customers to be worse off due to the vertical restraint. Although some individual consumers would have preferred less service at a lower price, their losses may be less than the benefits to customers who put a higher value on service.[98] Even if a consumer could prove to have suffered this kind of individual injury, that would not prove there was an aggregate welfare loss and thus an antitrust injury.[99]

Possible plaintiffs in resale price maintenance cases include not only consumers but also dealers who refuse to comply and are consequently cut out of the distribution chain. If the system of resale price maintenance increases efficiency by eliminating free riding, then the dealer's claim amounts to an assertion that the dealer was entitled to earn whatever profits were available from free riding on the investments of others in the distribution chain. Courts have rejected the argument. As one court explained: "The prevention of free riding is not, as yet anyway, a defense to a charge of resale price maintenance; but neither is being prevented from taking a free ride on another dealer's efforts a form of antitrust injury compensable by a damage award."[100]

If instead the vertical price-fixing arrangement facilitates collusion, the premise of the injured dealer's claim is different. Suppose, for example, that the injured dealer was driven from business by the refusal to supply if it reduced prices. Under these circumstances, the dealer may have a damages claim due to the loss of profits that it would have earned in a competitive market. The usual measure of damages asserted is the profits that would have been earned had the dealer been allowed to price freely, rather than an overcharge.[101] Lost profits damages are discussed in Chapter 9. One issue concerning the calculation of those damages should be noted here. Because of the collusion, prices prevailing in the market may include an overcharge.

That overcharge should not be included in calculating the dealer's damages. The loss of profits made possible by an antitrust violation does not constitute antitrust injury.[102]

Immediately after the Supreme Court decided that resale price maintenance cases would be determined under the rule of reason, some questioned how many such cases would be brought,[103] and in fact such cases now seem rare. A Lexis search from 2007 until October 2013 found only two such cases where courts seriously considered issues of damages calculation. Both cases involved customer classes as plaintiffs. In one case, the Kansas Supreme Court considered only various methods of estimating overcharges and did not consider whether consumers had received additional services due to the restraint.[104] In the other case, the plaintiffs' economic expert argued at the class certification stage that the resale price maintenance was imposed by a dominant retailer to protect it from potential entrants and did not result in any additional services. Thus, damages could be calculated based only on the computation of the overcharge.[105] The court certified the class, and the case later settled.[106]

## 5. *Tying Arrangements*

A tying arrangement can be defined as the sale of one product (the "tying" product) on the condition that the purchaser buys a second product (the "tied" product") from the seller (or not from anyone else).[107] Tying arrangements are said to be per se illegal, although the per se rule is qualified in that it does not apply unless the seller has market power in the tying product, uses that power to force a customer to purchase a separate product, and thereby causes an anticompetitive effect in the tied product market.[108] Indeed, in *Illinois Tool Works v. Independent Ink*,[109] the Supreme Court sharply limited the application of the per se rule by making it clear that substantial market power—something that cannot be presumed even by the existence of a patent monopoly—must be shown in order to invoke the rule.[110] A full economic analysis of tying arrangements is complex, controversial, and beyond the scope of this volume.[111] The explanations for these arrangements will be noted here only as they relate to damage analysis.

A tying arrangement can injure either competitors of the defendant in the supply of the tied product or purchasers of the tied package. The former kind of injury, exclusionary by nature, is addressed in Chapter 9. Injury to purchasers, however, is in theory a type of overcharge harm, the subject of this chapter.

Courts use two basic methods to measure damages in tying cases. One method is the "tied product" approach, in which damages reflect the difference between the price actually paid for the tied product and the price for which the item could have been purchased on the open market. The second approach is the "package" measure, which would award damages only to the extent that the plaintiff overpaid for the *combination* of the tied and tying products.[112]

In many of the common explanations of tying arrangements, whatever else may be true, the tied product is sold at a price that exceeds the price at which the same or a similar product could be purchased in the absence of the tie.[113] In particular, many tying arrangements appear to be methods of price discrimination. For example, the tied product may be used to meter the intensity of use of the tying product, and the tie may allow the seller to extract higher revenue from those who place a higher value on the tying product, as demonstrated by their more intense use. When the tie is used for this purpose, the price of the tied product must exceed the competitive price, though only by a little. As a result, the purchaser might claim damages measured by the difference between the competitive price of the tied product and the actual price, multiplied by the quantity purchased.[114] The amount is likely to be easy to calculate, much easier than the amount of overcharge in a price-fixing case, because a contemporaneous market price for the tied product is likely to exist.

But, to the extent that the tying arrangement is designed to maximize profits that are available from sale of the tying product, a different and higher price would very likely have been charged for the tying product in the absence of the tie. Thus, in the but-for world of overcharge damage calculation, the simple difference between the actual and market prices for the tied product presents a skewed picture. The court realized this point in *Kypta v. McDonald's Corp.*,[115] and held that "injury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined fair market value."[116] Of course, when the

tying and tied products are complementary and used in fixed proportions, no greater profit can be extracted from use of a tie than could be earned by sale of the tying product alone at the monopoly price.[117] The implication is that a purchaser could never prove that the price of the tied package exceeded the price that would have been paid for the tying and tied products purchased separately. Even when the products are used in variable proportions, the price for the tied package may be lower than the combined price of the tying product sold at a monopoly price and the tied product sold competitively.[118]

The analysis of products used in fixed proportions does assume that the seller in practice could have extracted the same profit through pricing of the tying product absent the tie. When a tying arrangement is used as a metering mechanism, the question is whether a different metering device would have been lawful and practical.[119] Thus, for example, a piece of paper may be combined with a unit of mechanical copying service to provide one copy. A tie between the machine and paper might allow the seller to charge intense users more than light users. If the supplier could lease the machine and charge rent that varied with the amount of use, no customer could claim that he or she paid more for the tied package of machine and paper than would have been paid for the products acquired separately.

If instead direct metering is impossible or separately illegal, then the purchaser might or might not have been better off absent the tie. Moreover, a tie involving products used in variable proportions can also function to price discriminate. In any case where the tying arrangement is a method of price discrimination and the alternative to the tie is a single, monopoly price for the tying product, or at least a less perfect form of price discrimination, some consumers are likely to be made better off by the tie and others worse off.[120] The plaintiff's ability to satisfy the *Kypta* standard presumably will depend upon a showing that he or she would have fared better under the defendant's best alternative to the tying arrangement.

Whether the plaintiff can satisfy the *Kypta* standard when the tying arrangement serves some function other than price discrimination will depend upon the function involved and the plaintiff's identity and proof. Thus, for example, a tie might be used to avoid price regulation in the tying product market.[121] Though one might question whether an antitrust sanction is appropriate for regulatory evasion,[122] the plaintiff presumably would be able to show that he or she paid a higher price for the package than would have

been lawfully charged absent the tie. A tie designed to protect the supplier's goodwill by insuring the quality of technologically interdependent products is likely to result in a higher price for the package, but the package will consist of higher quality components. An appropriate calculation will adjust for quality, and the plaintiff may be unable to show harm.

# F. Special Circumstances

Certain circumstances may complicate the calculation of the overcharge. Two of these, non-price collusion and price regulation, are discussed below.

## 1. Non-price Collusion

The standard overcharge measure implicitly assumes that the product, understood to mean the bundle of product and service attributes involved, sold by the cartel is the same product that would have been sold in competition, except that the price is higher and consequently the volume smaller. A cartel, however, may agree to restrict product dimensions other than price or quantity. In situations where these product dimensions influence purchasing decisions, the agreement may harm consumers, and damages equivalent to overcharge damages can be calculated. But such agreements are not always amenable to overcharge analyses.

For instance, in *Catalano, Inc. v. Target Sales*,[123] beer wholesalers agreed to refuse to extend trade credit to retailers. Prior to the agreement, wholesalers had extended credit without interest up to the limits permitted by state law, in actual amounts that varied among individual retailers. The Court found that the agreement constituted per se illegal price fixing. If, however, wholesalers continued to compete on list price, so that lower list prices were quoted in lieu of credit, then the net price would not have been affected by the agreement; indeed, if the agreement reduced transaction costs, as by lowering retailer search costs, the agreement might have resulted in lower net prices. In that event, no overcharge could rationally be calculated.

In the absence of evidence that list prices were fixed, one might ask why a cartel would bother restricting credit terms. A cartel might be able to engage in tacit collusion with respect to list prices, and list prices may be readily ascertainable, thereby allowing the collusive price to be policed. Credit

terms may be inherently more difficult to verify, and so an agreement to eliminate credit may serve to stabilize the collusive arrangement by limiting competition to one easily verifiable dimension.[124] It is therefore theoretically possible that an agreement to restrict some dimension of competition other than price or output may result in an overcharge that can be calculated by use of conventional means. It is also possible for such agreements to result in no anticompetitive harm.

One also could imagine a horizontal agreement to restrict the variety of product attributes available in the market. For example, suppose brewers agreed to supply beer only in bottles. If the agreement facilitated collusion, one would expect the price of beer in bottles to be higher while the agreement is in effect. The overcharge can be calculated even though it would understate the true measure of lost consumer surplus, because consumers who prefer cans (and would be offered them in a competitive market) would be denied the opportunity to buy them. If price is not higher, however, a court might nevertheless hold that the agreement, by limiting the choices available, constitutes an antitrust violation. The monetary value of the harm caused by such a violation would be difficult or impossible to calculate.[125]

Limited collusion may also involve agreements that effectively raise purchasers' search costs, for example, through restrictions on advertising, hours of operation, or information about product price and quality. Although this form of collusion does not entail agreements to raise price, restrict output, or divide markets, it may reduce competition and ultimately result in higher prices.[126] For example, members of the Detroit Auto Dealers Association entered into an agreement to restrict their hours of operation by closing Saturdays and most weeknights.[127] The agreement made shopping significantly more difficult for consumers, which ultimately led to increased prices. The National Society of Professional Engineers promulgated an ethical code that forbade members from discussing price until immediately before contracts were signed.[128] Customers typically made a considerable investment of time working with the engineers to specify the project in detail. Prices, however, were not revealed until after the specification process was complete and the engineer was initially selected. Although a customer could refuse to engage the engineer after learning of her rates, the customer's

ability to comparison shop based upon the prices of engineering services was severely impaired.[129]

## 2. Regulated Prices

Collusion may occur in regulated industries. When it is not explicitly or implicitly immunized, it can constitute an antitrust violation. Overcharge damages stemming from regulated prices, in theory, can be calculated the same way they are calculated in unregulated settings, except that the analyst must assess whether the hypothetical competitive prices would have been permitted by the regulatory authority. That question involves an analysis of the agency's power to regulate rates and of any statutory constraints imposed on the agency, such as that approved rates may not be discriminatory.

Despite the theoretical possibility of calculating overcharge damages in regulated industries, whether treble damages can be recovered is uncertain. In *Keogh v. Chicago & Northwestern Railway Co*,[130] the Supreme Court held that a shipper cannot recover damages for railroad rates inflated by a price-fixing agreement when the rates are approved by the Interstate Commerce Commission.[131] Though acknowledging the validity of criticism of the *Keogh* doctrine, the Court affirmed the doctrine in *Square D Co. v. Niagara Frontier Tariff Bureau*,[132] largely based on longstanding implicit Congressional approval of it. Proper application of the "filed rate doctrine," as it is sometimes called in contexts other than motor and rail carriage, is difficult to determine. The intricacies of this area are beyond the scope of this volume.[133]

# G. Suit by Indirect Purchasers[134]

The first purchaser of a price-fixed product (the direct purchaser) will often resell that product to an indirect purchaser, which may itself resell that product to still another indirect purchaser, and on down the line until the product reaches the end consumer. In such cases, at least some of the overcharge will be passed on by the direct purchaser to the indirect purchaser(s) in the form of a higher price for the good.[135] One or more of these indirect purchasers, then, almost always can legitimately claim to have

suffered overcharge harm as a result of a successful price-fixing conspiracy. But, with some exceptions explored below, federal law will not permit these indirect purchasers any recovery. However, indirect purchasers still may play a large role in many damage actions, because state antitrust laws frequently do permit such plaintiffs to recover.

# 1. Indirect Purchaser Standing Under Federal Law

In *Illinois Brick Co. v. Illinois*,[136] the Supreme Court held that indirect purchasers may not recover under Section 4 of the Clayton Act[137] for any part of the overcharge harm sustained. The Court began its analysis by addressing its prior holding in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*[138] that an antitrust defendant may not assert against a direct purchaser plaintiff that part of the overcharge was passed on and that the plaintiffs' damages should be reduced accordingly.[139] If such defensive use of the pass-on theory was impermissible but indirect purchasers were allowed to recover through offensive use of the doctrine, the defendant would be exposed to multiple and overlapping liability. The Court also identified the basis of the *Hanover Shoe* rule as a desire to simplify and control the costs of antitrust litigation, thereby conserving judicial resources and promoting the private treble-damage action as an effective deterrent to anticompetitive conduct. The litigation complexity that was avoided by disallowing the pass-on defense was equally at stake in the offensive use context, and so the reasoning of *Hanover Shoe* similarly argued for rejecting the claim. The Court therefore was obliged either to overrule *Hanover Shoe* and allow both defensive and offensive use of the theory, or to hold in *IllinoisB rick* that offensive use, like defensive use, is impermissible.

The Court opted to reject use of pass-on in both contexts. It was concerned that an alternative rule would make antitrust litigation dramatically more complex, as all parties in a distribution chain would have to participate in the litigation, and amounts of the overcharge passed on to various levels would have to be calculated. The Court also believed that concentrating recovery in the direct purchasers, by allowing them to recover the entire overcharge regardless of the proportion passed on, would encourage private suits by increasing the potential payoff and therefore would promote the deterrence objective of antitrust enforcement.

The *IllinoisBrick* Court rejected the argument that exceptions to the pass-on rule should be carved out for particular markets where the direct purchaser is likely to pass on substantially all of the overcharge. The Court noted that classifying market situations according to the amount of pass-on likely to be involved would entail the very problems of litigation complexity that the *Hanover Shoe* rule was meant to avoid. In *Hanover Shoe*, however, the Court did "recognize that there *might* be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present."[140] And in *Illinois Brick,* the Court reiterated this potential exception to the rule precluding offensive and defensive use of passing-on arguments:

> In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.[141]

The Court also noted, "[a]nother situation in which market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer."[142] However, this exception has been narrowly construed, particularly in the absence of a parent-subsidiary relationship.

In *Kansas v. Utilicorp United*,[143] the Court reaffirmed the principle of *Hanover Shoe* and *Illinois Brick* and, without conceding that it would recognize any exception to the rule, demonstrated that any such exception would be very narrow.[144] In that case, a group of natural gas producers and a pipeline company allegedly fixed prices. The gas was resold to a regulated utility, which resold to consumers. The utility and other direct purchasers sought damages for both the amount overcharged and the decrease in sales caused by the overcharge. The indirect purchasers—consumers, who were represented by two states in their capacity as parens patriae, and the states as representatives of governmental entities who themselves purchased gas—

also sued. The defendants asserted that the direct purchasers had not been harmed because they had passed on the entire overcharge pursuant to the mandates of state rate regulation. The indirect purchasers, meanwhile, claimed that they should be allowed to recover the entire overcharge because, given regulatory strictures, they had absorbed all of it, and they argued that the direct purchasers should be allowed to recover only for lost business.

The Court rejected the defendants' argument that the direct purchasers had not been injured, and it refused to allow the indirect purchasers' suit.[145] In short, the Court declined to establish an exception to the pass-on rules for cases involving utilities, even when the demand for a product is inelastic and, because of government regulation, the direct purchaser increases the price to indirect purchasers by the exact amount of the overcharge. The Court acknowledged "the possibility of an exception for cost-plus contracts," but found that any such exception would be narrower than the one sought in that case for utilities generally.[146]

Despite this strong language, some courts have recognized exceptions to the *Illinois Brick* bar beyond those the Supreme Court decisions explicitly authorize. A string of Ninth Circuit cases, for example, has permitted indirect purchasers to sue if the supplier from which they purchase is owned or controlled by a defendant.[147] Other courts have rejected standing on similar theories.[148]

The pass-on rules of *Hanover Shoe* and *Illinois Brick* have evoked a lively scholarly debate.[149] Moreover, political opposition to that part of the doctrine that precludes indirect purchaser suits has been substantial. Bills have been introduced in Congress to overturn all or part of the rule.[150] The Antitrust Modernization Commission (AMC) recommended that Congress overrule the Supreme Court decisions in *IllinoisB rick* and *Hanover Shoe* to the extent necessary to allow both direct and indirect purchasers to recover for their injuries.[151] This would eliminate the "windfall" to purchasers who have passed on the overcharge, while providing relief to the purchasers who have actually borne the overcharge. The AMC also recommended allowing removal of state indirect purchaser actions to federal court, and consolidation of all direct and indirect purchaser actions in a single federal forum for both pretrial and trial proceedings.[152]

## 2. Indirect Purchaser Standing Under State Law

Various states have adopted rules that permit indirect purchasers to recover under state antitrust laws, so-called *Illinois Brick* repealers.[153] Indirect purchaser suits can be authorized either by explicit statutory provision or by judicial interpretation of statutes that are ambiguous on the issue. At least twenty-five states and the District of Columbia now permit indirect purchaser standing either through *IllinoisB rick* repealers or judicial decision.[154]

In *California v. ARC America Corp.*,[155] the Supreme Court held that federal antitrust law, as interpreted in *Illinois Brick*, does not preempt state rules that allow recovery by indirect purchasers.

## 3. Possibility of Duplicative Recovery

When plaintiffs at different levels of a distribution chain assert antitrust claims under state laws, whether in conjunction with federal claims or independently, the proportion of an overcharge incurred by a direct purchaser and the proportion passed on to indirect purchasers may have to be determined.[156] This presents a risk that the defendants may face multiple recovery—paying damages to a direct purchaser (who, under *Hanover Shoe* is entitled to 100 percent of any overcharge) as well as the indirect purchasers buying from that direct purchaser. The risk is potentially exacerbated because as a constitutional matter, a state may reject the symmetry the Supreme Court found compelling in *Illinois Brick* and allow the direct and indirect purchasers each to recover the whole overcharge, thereby condoning multiple liability. In *ARC America*, the Court said: "Ordinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law . . . and no clear purpose of Congress indicates that we should decide otherwise in this case."[157] As a result, theoretically an antitrust defendant could be required to pay the entire overcharge in damages to the direct purchaser in a federal action and the same amount to the indirect purchaser (or many indirect purchasers) in a state action.[158] While acknowledging that duplicative recovery may occur as a result of the patchwork of legal rights, courts have to date not offered much of an explicit remedy.[159] As discussed in the next

section, the consideration of pass-on evidence in calculating damages to indirect purchasers may be a partial solution to the problem of duplicative recovery.

## 4. Calculating Damages to Indirect Purchasers

The estimation of overcharges suffered by indirect purchasers is considerably more complex and requires significantly more information than does the estimation of direct purchasers' overcharges.[160] Analysis of pass-on requires information on downstream market dynamics, which may involve complex distribution channels and multiple stages of distribution.[161] Depending on the characteristics of demand, direct purchasers may pass on all, some, or none of the overcharges to intermediaries in the distribution chain, and those intermediaries in turn may pass on all, some, or none of their share of the overcharge to end consumers.

Generally, estimation of the damages to indirect purchasers will begin by estimation of the damages to the direct purchaser, i.e., the overcharge.[162] Then the analysis will shift to how such an overcharge was "passed on" down the distribution chain, which will often be expressed in terms of a percentage (i.e., "100 percent pass-on" or "50 percent pass-on"). The harm to any particular plaintiff can therefore be calculated as the product of the overcharge and the pass-on from those entities above the plaintiff in the distribution chain ("upstream pass-on") and, if any, below the plaintiff in the distribution chain ("downstream pass-on").

An additional complication is that in some cases the plaintiffs may be indirect purchasers in the actual world yet would have been direct purchasers in the but-for world.[163]

Several approaches have been suggested for estimating the share of the overcharge that is passed on to indirect purchasers. One approach would be to rely on the theory that because firms operate in competitive markets, they do not make economic profits, and thus need to raise price to recover any cost increase they suffer due to an overcharge. The assumption that markets are so competitive that firms must raise prices to pass on any cost increase often is questionable, however, and thus by itself may not be sufficient to establish damages.[164] Another approach, which is informed by tax incidence analysis, estimates passing on based on the price elasticities of parties in the

chain of distribution; this analysis requires estimating those elasticities and assuming that distributors and retailers do not act strategically.[165] Courts have greeted the use of tax incidence analysis with skepticism due to its assumptions and the difficulties in measuring elasticities of demand.[166]

The share of the overcharge passed on to indirect purchasers may also be estimated using econometric methods similar to those used to estimate the overcharge to direct purchasers.[167] For example, in one case, the indirect purchasers' economic expert estimated regressions using costs at the start of the distribution chain and prices at the end of the chain as variables.[168] Two approaches were used. One looked only at the cost at the start of the chain and the price to the final consumer. The other looked at the passing on of overcharges separately at each level of the distribution chain.[169] Econometric studies of the passing on of overcharges to indirect purchasers require a great deal of care as differences in the specification of the model may have a large effect on the final results.[170]

# H. Deadweight Loss

It is the fundamental law of demand that as the price of a product increases, the amount purchased decreases. A collusive price increase, therefore, will result in a reduction in the quantity of the good purchased. The reduction can take the form of smaller quantities bought by those who purchase as well as the failure to purchase any quantity by those who would have purchased positive amounts at lower prices. For the purposes of economic analysis, these categories of purchasers are indistinct, but the difference may play a practical role in proving damages, as the discussion below will illustrate. The volume not purchased because of an anticompetitive price increase represents a loss of allocative efficiency because it implies that consumers would have derived more value from having those units of the good than it would have cost suppliers to produce them. Of course, consumers who do not purchase at the anticompetitive price may purchase substitute products but the value derived from the substitutes will be less than the value they would have derived from the price-fixed product.[171]

The loss in allocative efficiency due to anticompetitive acts is in theory a component of the optimal penalty, and like the overcharges associated with

umbrella pricing, it satisfies requirements of causation and antitrust injury. In practice, calculation of private damages based on deadweight loss is problematic. First, there are obvious practical problems associated with proving what purchases would have been but were not made. In this respect, the difference between a purchaser who buys less and one who does not buy at all may be significant. Direct evidence that the volume purchased was decreased is likely to be more substantial and probative than evidence that a nonpurchaser would have purchased.

Second, the overcharge is not readily usable in theory as a measure of the loss of allocative efficiency. The difference between the price charged and the competitive price (or the price that would have been charged absent the illegal agreement), when multiplied by the quantity actually purchased, is an accurate measure of the wealth transfer from consumers to producers resulting from the violation.[172] However, the price differential multiplied by the quantity that could have been profitably supplied but was not sold overstates the deadweight loss. The reason is that if the cartel had increased its output to the efficient level, each additional unit would have been valued at a steadily decreasing rate by consumers. The price that suppliers could have charged to extract that value from consumers would have gradually fallen as production increased; the price would not have remained at the observed cartel price. Thus, even if it could be plausibly determined how much more of the product would have been sold at the competitive price, multiplying that amount by the difference between the actual price and the presumed competitive price would result in damages in excess of the deadweight loss. An accurate theoretical measure would require a downward adjustment, and that adjustment would depend upon the shape of the demand curve.[173] In the end, no tolerably precise adjustment has proven feasible.

In *Montreal Trading v. AMAX, Inc.*,[174] the court held that one who never purchases a product because the defendants limit production as part of a price-fixing conspiracy cannot recover damages. The court found three considerations dispositive. First, the *Illinois Brick* court[175] expressed the view that the treble damage remedy is designed in part to deprive violators of the fruits of their illegality, and conspirators gain no fruits on non-sales, except to the extent that volume had to decline in order to earn monopoly profits on the quantity sold. Second, a grant of standing might result in

potentially outsized recoveries by those only tenuously hurt. Third, the fact of a party's injury, as opposed to the amount, may be inherently speculative.[176] The court did comment, however, that damages might be permitted when "the nonpurchaser can show a regular course of dealing with the conspirator."[177]

Given the view that theoretically accurate damages for the quantity not sold cannot be measured,[178] the choice appears to be either to permit excessive recovery or to impose inadequate liability. This choice, however, assumes that the damage multiple simply reflects the probability of liability being incurred. If that probability is in fact greater than 33 percent, then three times the overcharge on the quantity sold may be an accurate measure of the optimal penalty. If, on the other hand, the probability is equal to or less than 33 percent, then excluding damages for the quantity not sold will result in inadequate deterrence, and permitting recovery of these damages may not be excessive.[179]

---

[1]. 15 U.S.C. § 1.

[2]. 15 U.S.C. § 4.

[3]. Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice § 17.5a (4th ed. 2011).

[4]. Robert N. Strassfeld, *If . . .: Counterfactuals in the Law*, 60 Geo. Wash. L. Rev. 339 (1992).

[5]. Roger D. Blair & Christine A. Piette, *Antitrust Injury and Standing in ForeclosureC ases*, J. Corp. L. 401, 413 (2006). *Seeal so* Chapter 9 for a discussion of damages from foreclosure.

[6]. Econometric issues involved in estimating these models are discussed in Chapter 6.

[7]. For a more extensive discussion of economic and econometric modeling, see Chapter 6. Econometric modeling is also discussed in Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in* Reference Manual on Scientific Evidence 181 (2d ed. 2000); An Introduction to Regression Analysis, in Chicago Lectures in Law & Economics 1 (E. Posner ed.) (Foundation Press: 2000); Econometrics: Legal, Practical, and Technical Issues, American Bar Association Editors, 2014; [hereinafter *Econometrics*] Franklin M. Fisher, *Multiple Regression in Legal Proceedings*, 80 Colum. L. Rev. 702 (1980); Jonathan B. Baker & Daniel L. Rubinfeld, *Empirical Methods in Antitrust Litigation*, 1

Am. L. & Econ. Rev. 386 (1999); John E. Lopatka & William H. Page, *Economic Authority and the Limits of Expertise in Antitrust Cases*, 90 Cornell L. Rev. 617 (2005).

8. This is particularly important in light of the Supreme Court's decision in *Comcast Corp. v. Behrend*. *See, e.g.*, *In re* Rail Freight Surcharge Antitrust Litig., 725 F.3d 244, 252-55 (D.C. Cir. 2013) (holding that overcharge model that "also detects injury where none could exist" cannot sustain class certification).

9. In a monopoly case, the Second Circuit defined the measure of damages as "the price increment caused by the anticompetitive conduct that originated or augmented the monopolist's control over the market" as distinguished from "the entire excess of the monopolist's price over that which would prevail in a competitive market." *See* Berkey Photo v. Eastman Kodak, 603 F.2d 263, 297-98 (2d Cir. 1979).

10. For a discussion of economic issues in estimating overcharges in antitrust matters, see James F. Nieberding, *Estimating Overcharges in Antitrust Cases Using a Reduced-Form Approach: Methods and Issues,* 9 Journal of Applied Economics 2 (2006) and Douglas Zona, *Structural Approaches to Estimating Overcharges in Price Fixing Cases,* 77 Antitrust Law Journal 2, 1011.Economic analysis may provide methods of estimating price elevation that are beyond the scope of antitrust damages under the law. *See* Robert E. Hall & Victoria A. Lazear, *Reference Guide on Estimation of Economic Losses in Damage Awards*, *in* Reference Manual on Scientific Evidence 322 (2d ed. 2000).

11. Depending on the overcharge model, it may not be necessary to make any assumptions about the structure of the market in the but-for world.

12. Timothy Bresnahan, *The Oligopoly Solution Concept is Identified*, 10 Econ. Letters 87 (1982); Hovenkamp, *supra* note 3.

13. *See, e.g.*, Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465, 474-75 (5th Cir. 2000) ("[I]n an attempt case we focus on the harm that potentially might have been caused by the conduct in light of the state of the market."); *In re* Air Passenger Computer Reservation Sys., 727 F. Supp. 564, 568-69 (C.D. Cal. 1989) ("Only when the defendants achieve a monopoly and are in a position to harm consumers by engaging in monopoly overcharging, is there harm to the consumers.").

14. A "reduced form" model is a single equation that describes prices (the dependent variable) as a function of various exogenous factors thought

to influence supply and demand (such as costs, prices of substitutes, etc.). In principle, prices (and quantities) are the solution to a system of structural equations informed by economic theory, one equation for supply and one for demand. A reduced form model combines these relationships into a simpler expression by using the equilibrium condition that supply equals demand. A drawback to using a reduced-form equation is that it makes it more difficult to separate movements along the supply curve caused by anticompetitive behavior from shifts in the demand or supply curves caused by exogenous factors. *See Econometrics,* supra note 7, Chapter 3; Baker & Rubinfeld, *supra* note 7 (discussing class certification overcharge models in *In re* Propylene Carpet Antitrust Litigation, 996 F. Supp. 18 (N.D. Ga. 1997)).

15. If the average overcharge is not the most appropriate measure of the overcharge, in some circumstances the economic model may be constructed in a manner that yields estimates of overcharges for individual plaintiffs or groups of plaintiffs and for specific subperiods.

16. The precise calculation will depend on the construction of the overcharge model, which might for example estimate the overcharge as a percentage increase or as dollars per unit.

17. *See* Chattanooga Foundry & Pipe Works v. Atlanta, 203 U.S. 390, 396 (1906) (affirming an award of damages based on "the difference between the price paid and the market or fair price that the city would have had to pay under natural conditions had the combination been out of the way").

18. Other methods have been proposed. For example, Douglas Zona proposes structural modeling to identify but-for prices and overcharges. See J. Douglas Zona, *Structural Approaches to Estimating Overchargesi nP rice-FixingC ases*, 77(2) Antitrust L. J. (2009).

19. *Seeal so* Chapter 6 for a discussion of Before-During-After models.

20. *See* Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768, 793 (6th Cir. 2002) (before-during-after and regression analyses are "generally accepted methods for proving antitrust damages").

21. Unit charges may be lower than posted prices because customers are awarded credits or qualify for discounts.

22. *See In re* Auction Houses Antitrust Litig., No. 00-cv-0648, 2001 U.S. Dist. LEXIS 1713 (S.D.N.Y. 2001) (price-fixing overcharges estimated using the period before the conspiracy as the nonconspiracy period). In

theory, the reverse may also be possible: a during-after model where the nonconspiracy benchmark is restricted to the period after the conspiracy.

23. In the lysine matter, the plaintiffs' model was challenged on the grounds that the but-for world would have reflected oligopoly pricing instead of perfectly competitive pricing, and the alleged conspiracy period may have reflected normal seasonal pricing. *See* Lawrence J. White, *Lysine PriceFixing:HowLong?HowSevere?*, 81 Rev. Indus. Org. 23 (2001).

24. The cartel may affect the price of an input, and failure to recognize this effect may lead to biased results. *See* Halbert White, Pauline Kennedy, and Robert Marshall, *The Measurement of Economic Damages in AntitrustCivilLitigation*, Economics Committee Newsletter*, American Bar Association, Section of Antitrust Law, Spring, (2006), pp. 17-22.

25. *See In re* Live Concert Antitrust Litig., 863 F. Supp. 2d 966, 976-79 (C.D. Cal. 2012) (finding expert's before-and-after model was unreliable because it failed to control for "changes in concert quality during the relevant time period."); Stein v. Pac. Bell, No. 00-CV-2915, 2007 WL 831750, at *12 (N.D. Cal. Mar. 19, 2007) ("Courts have consistently rejected 'before-and-after' models when experts failed to perform regression analysis or otherwise account for variables in the marketplace."); Blue Dane Simmental Corp. v. Am. Simmental Ass'n, 178 F.3d 1035, 1040-41 (8th Cir. 1999) (finding expert's before-and-after model was unreliable due to a failure to identify or examine other independent variables).

26. For more extensive discussions of econometric modeling, *see Econometrics;* supra note 7; Rubinfeld, *supra* note 7 and Chapter 6.

27. *See In re* Plastic Cutlery Antitrust Litig., No. 96-cv-728, 1998 U.S. Dist. LEXIS 3628, at *22-23 (E.D. Pa. 1998) (as it pertains to generalized proof of impact in class certification, "[t]he court of appeals has noted that multiple regression analysis is reliable when based upon complete and accurate data").

28. For more discussion of dummy variable and prediction models, *see* Chapter 6.

29. *See In re* Chocolate Confectionary Antitrust Litig., 289 F.R.D. 200, 212 (M.D. Pa. 2012) (describing dummy variable approach to measuring overcharge). The economic model must be built on an understanding of the product market and what variables are affected by the conspiracy.

*See*, Robert C. Marshall and Leslie M. Marshall, The Economics of Collusion: Cartels and Bidding Rings (2012).

30.  *See* Justin McCrary and Daniel Rubinfeld, *Measuring Benchmark Damages in Antitrust Litigation,* 3 Journal of Econometric Methods 1 (2014). If more than one dummy variable is used, their values may be established to distinguish different subperiods within the conspiracy period. This may provide a more accurate estimate of overcharges if the effectiveness of the conspiracy varied over time or if there would have been important changes in the economic conditions affecting prices in the but-for world that could not otherwise be captured by the model. In class action cases where class membership varies over time, estimating an overcharge for various subperiods may lead to a more accurate estimate of overcharges for specific class members than would an estimate of the average overcharge over the entire relevant time period.

31.  The coefficient of the conspiracy period dummy variable is the average overcharge expressed in the same units as the price for linear models; for example, where the price variable is expressed in dollars (often referred to as price "level"), the overcharge is also in dollars. If the price variable reflects the natural logarithm of the prices, the conspiracy dummy variable coefficient (multiplied by 100) is approximately the percentage overcharge.

32.  *See In re* Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig., 256 F.R.D. 82 (D. Conn. 2009) (order granting motion for class certification and approving use of dummy variable).

33.  *See In re* Aluminum Phosphide Antitrust Litig., 893 F. Supp. 1497, 1503 n.14 (D. Kan. 1995) (noting that for two of the four defendant companies, the dummy variable analysis indicated that "defendants' prices were actually *lower* than would have been expected during the conspiracy period."); *In re* Chicken Antitrust Litig., 560 F. Supp. 963, 993 (N.D. Ga. 1980) (noting that regression yielded negative coefficient for the collusion dummy variable).

34.  See the discussion of more advanced econometric techniques in Chapter 6. See also similar discussions in *Econometrics,* supra note 7; Zona, *supra* note 10; Fisher, *supra* note 7; William H. Greene, Econometric Analysis Chapter 8 (7th ed. 2012); ABA Section of Antitrust Law, Econometrics (2005). An alternative econometric model to the commonly used models is presented in Yuliya Bolotova, John Connor

and Douglas Miller, *The Impact of Collusion on Price Behavior: Empirical Results from Two Recent Cases*, 26(6) International Journal of Industrial Organization 1290-1307 (2008).

35. In principle, one could also estimate the equation using data from the conspiracy period and reverse the procedure as Fisher did to illustrate the problems with a different model used in *In re* Corrugated Container Antitrust Litigation, 441 F. Supp. 921 (S.D. Tex. 1977). *See* Franklin Fisher, *Statisticians, Econometricians and Adversary Proceedings*, 81 J. Am. Statistics Assoc. 394 (1986).

36. The benchmark method is also discussed in Chapters 4 and 6.

37. *See In re* Live Concert Antitrust Litig., 863 F. Supp. 2d 966, 974-75 (C.D. Cal. 2012) (describing "Yardstick" methodology of comparing damages by comparing prices charged by allegedly monopolizing defendants to prices charged by companies other than defendants); *In re* Plastic Cutlery Antitrust Litig., No. 96-cv-728, 1998 U.S. Dist. LEXIS 3628, at *23 (E.D. Pa. 1998) (the yardstick or benchmark model involves comparison of the plastic cutlery industry with the characteristics of a comparable, or "yardstick" industry that is not affected by the price-fixing conspiracy).)

38. *See In re* OSB Antitrust Litig., No. 06-826, 2007 U.S. Dist. LEXIS 56617, at *27 (E.D. Pa. 2007) (rejecting argument in class certification context that plaintiffs' expert "'didn't need to' account for any variables other than the increased cost" of the relevant product).

39. The difference-in-differences method is discussed in more detail in Chapter 6.

40. Econometric methods may be used to adjust for observable differences in the benchmark and affected markets within a difference-in-differences approach. *See* Chapter 6.

41. *See, e.g.*, *In re* High Pressure Laminates Antitrust Litig., No. 00-md-01368, 2005 U.S. Dist. LEXIS 20317, at *6 (S.D.N.Y. Apr. 27, 2005) (expert employed cost/price ratio to determine extent of overcharge).

42. *See In re* Industrial Silicon Antitrust Litig., No. 95-cv-2104, 1998 U.S. Dist. LEXIS 20464 (W.D. Pa. 1998) (order denying plaintiff's motion to preclude expert testimony); ABA Section of Antitrust Law, *supra* note 34 at 173-77 (margin model used to estimate price-fixing overcharges did not control for market factors that might influence prices and margins, and thus could not accurately predict out-of-sample prices).

43. *See I nr eH ighP ressureL aminates*, at 11-13.

44. 893 F. Supp. 1497, 1503 (D. Kan. 1995).

45. *Id.* at 1502-03. *But see In re* Mushroom Direct Purchaser Antitrust Litig., No. 06-CV-0620, 2015 WL 5775600 (E.D. Pa. Aug. 5, 2015) ("[G]enerally criticisms of potential benchmark years go to the weight of opinions and not their admissibility") (quotation and internal ellipses deleted). The choice of beginning and ending dates for the conspiracy in econometric models is discussed in Chapter 6.

46. *See Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. at 1504 (noting that an expert's assumption that "the conspiracy was the sole cause of the price difference between the conspiracy period and the normative period" is "not a scientifically valid assumption, and the economic literature on the 'before and after' model conclusively refutes it"). *Cf.* Comcast v. Behrend, 133 S. Ct. 1426, 1433 (2013) ("We start with an unremarkable premise. If respondents prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.").

47. *See In re* Rail Freight Fuel Surcharge Antitrust Litig. 725 F.3d 244, 254-55 (D.C. Cir. 2013); *Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. at 1504 ; MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1162-63 (7th Cir. 1982) ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage . . . . To allow otherwise would force a defendant to pay treble damages for conduct that was determined to be entirely lawful."). *See generally* M. Sean Royall, *Disaggregation of A ntitrustD amages*, 65 Antitrust L.J. 311 (1997).

48. Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 415-16 (7th Cir. 1992). *See also In re* Live Concert Antitrust Litig., 863 F. Supp. 2d 966, 977 (C.D. Cal. 2012) (rejecting expert's damages model because it did not "attempt to account for other probable causes" for alleged price increase).

49. *In re* Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348, 1359 (N.D. Ga. 2000).

50. *See also* Fisher, *supra* note 7 (arguing that there is no way to determine the but-for values of the regression coefficients, which theoretically would reflect the effect of the cartel, from a single set of data).

51. See *Econometrics,* supra note 7, Chapter 12.

52. The econometric techniques commonly used to address this problem are discussed in Chapter 8 of Greene (2012), *supra* note 34.

53. *See*, *e.g.*, George J. Stigler, *Price and Nonprice Competition*, 72 J. Pol. Econ. 149 (1968) and Marco A Haan and Bastiaan M. Overvest, *Price FixingandN on-PriceC ompetition*, 2 Journal of Economics Review 26 (2008).

54. See Harvey Leibenstein, *Allocative Efficiency v. 'X-inefficiency,'* 56 Am. Econ. Rev. 392 (1966), for the classic article on this issue. For a skeptical view, see George J. Stigler, *The Xistence of X-Efficiency*, 66 Am. Econ. Rev. 213 (1976).

55. *See* Fisher, *supra* note 7, at 729.

56. *See* Chapter 6 for a discussion of nonstationarity and some commonly used solutions to this problem. See also Chapter 21 of Greene (2012), *supra* note 34; Finkelstein & Levenbach, *supra* note 51, at 165-68 (taking first differences of the data, using autoregressive and moving average terms in models).

57. *See* Jeffrey H. Howard & David Kaserman, *Proof of Damages in Construction Industry Bid-Rigging Cases*, 34 Antitrust Bull. 359 (1989); John M. Kuhlman & S.R. Johnson, *Estimating Damages on Highway Construction Contracts*, 29 Antitrust Bull. 719 (1984); Martin Pesendorfer, *A Study of Collusion in First-Price Auctions*, 67 Rev. Econ. Stud. 381 (2000).

58. *See* John Asker, *A Study of Internal Organization of a Bidding Cartel*, 100 American Economic Review 724 (2010). Kenneth Hendricks and Robert H. Porter, *An Empirical Perspective on Auctions*, 2073-2143 in 3 Handbook of Industrial Organization, (M. Armstrong and R. Porter eds., 2007). *Bidding, Bid Rigging, and School Milk Prices: Ohio v. Trauth (1994)*, 211-232 in The Antitrust Revolution: Economics, Competition and Public Policy, (J.E. Kwoka, Jr. and L.J. White eds., 4th ed. 2004).

59. A variation of this method is to estimate the model over various subsamples (e.g., rigged and nonrigged bids), then to statistically test

the differences in the estimated coefficients. *See* Pesendorfer (2000), *supra* note 57, at 401.

60. *See* Howard & Kaserman, *supra* note 57, at 377-79.

61. See the application of this method in Kwon Lee & Kyungdong Hahn, *Bid-Rigging in Auctions for Korean Public-Works Contracts and Potential Damage*, 21 Rev. Indus. Org. 73, 82 (2002).

62. Howard & Kaserman, *supra* note 57, at 379-81.

63. Though not addressing damages, the court in *United States v. Anderson*, 326 F.3d 1319, 1323-24 (11th Cir. 2003), did find relevant the engineers' estimates of the project cost. It is unclear to what extent the cost estimate would account for the normal economic profit of the winning bidder in the but-for world.

64. *See* Srabana Gupta, *The Effect of Bid-Rigging on Prices: A Study of the HighwayC onstructionI ndustry*, 19 Rev. Indus. Org. 453 (2001).

65. Howard & Kaserman, *supra* note 57, at 371-72.

66. *See* Kuhlman & Johnson, *supra* note 57, at 728-31; Howard & Kaserman, *supra* note 57, at 375-77.

67. Fifth Amended Class Action Complaint for Violations of the Federal Antitrust Laws, *In re:* Kirk Dahl v. Bain Capital Partners, Lead Case No. 1:07-cv-12388-EFH (June 14, 2012).

68. *See* Declaration of Edward A. Snyder, Kirk Dahl v. Bain Capital Partners, No. 1:07-cv-12388-WGY (Jan. 24, 2014).

69. *See* United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985).

70. Berkey Photo v. Eastman Kodak Co., 603 F.2d 263, 297 (2d Cir. 1979). The holding is criticized on a number of grounds in James R. McCall, *The Disaggregation of Damages Requirement in Private MonopolizationA ctions*, 62 Notre Dame L. Rev. 643 (1987).

71. The *Berkey* court expressly declined to comment on how the burden of proving the causal relationship between misconduct and damages, or lack of it, should be allocated once the plaintiff makes a preliminary showing of persistent monopoly power and a substantial history of anticompetitive conduct. *Berkey*, 603 F.2d at 298 n.58.

72. Methods of estimating lost profits are also discussed in Chapter 5. *See also* Roger D. Blair and Christine A. Piette, *Antitrust Injury and Standingi nF oreclosureC ases,* 31 J. Corp. Law 2, (2006).

[73](#). However, if the exclusionary practice is predatory pricing, purchasers would benefit from lower prices in the short run.

[74](#). 998 F.2d 1144 (3d Cir. 1993). For a related case, see *Pinney Dock and Transport C orp.v .P ennC entralC orp.*, 838 F.2d 1445 (6th Cir. 1988).

[75](#). Specifically, the steel companies alleged that the defendant railroads, which also owned and operated docks, conspired to prevent the introduction of a more efficient method of transporting iron ore across the Great Lakes and over land to steel plants. The defendants were found to have delayed the entry of more efficient self-unloading vessels into the lake transport market, thereby preserving the need for the railroads' less efficient dock operations. They also were found to have delayed the entry of trucks into the market for land transportation of ore, thereby forcing steel companies to use less efficient rail transportation. *SeeL owerL akeE rie*, 998 F.2d at 1169-70.

[76](#). The steel companies were allowed to recover for the difference between dock handling charges actually paid and the charges that would have been paid had more efficient dock operators not been excluded. They were also allowed to recover the overcharge on lake transport caused by the exclusion of self-unloaders. See *Lower Lake Erie*, 998 F.2d at 1168-69.

[77](#). The *Keogh* doctrine is discussed *supra* note 133 and accompanying text. In *Keogh v. Chicago & Northwestern Railway Co*, 260 U.S. 156 (1922), the Supreme Court held that a shipper cannot recover damages for railroad rates inflated by a price-fixing agreement when the rates are approved by the Interstate Commerce Commission. *Id*., at 162-63.

[78](#). A residual demand curve can be calculated for the group, which represents the market demand curve minus the supply curve of the nonparticipating suppliers, and a profit-maximizing, supracompetitive price for the group can be ascertained. *See* Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization 147-149 (4th ed. 2005).

[79](#). *See* Roger D. Blair & Richard E. Romano, *Identifying Participants in a Price-fixing Conspiracy: Output & Market Share Tests Reexamined— Reply*, 12 Review of Industrial Organization 2, (1997). An equivalent test is that the output of nonparticipants will increase whereas the output of participants will contract, relative to the respective outputs of the firms in the absence of collusion. The advantage of expressing the test in terms of market share is that it is determinative even if demand is

increasing, when the outputs of both may increase, though at different rates. *Seei d.* at 291.

80. A version of this test reportedly was accepted by the court in *E.W. French & Sons v. General Portland*, Civ. No. 78-1928-TJH (C.D. Cal. Oct. 2, 1985). The decision is discussed in Roger D. Blair & Richard E. Romano, *Distinguishing Participants from Nonparticipants in a Price-Fixing Conspiracy: Liability and Damages*, 28 Am. Bus. L.J 33, (1990) at 41 & n.16.

81. *See* Blair & Romano, *supra* note 80, at 41 & n.16.

82. *See* William H. Page, *The Scope of Liability for Antitrust Violations*, 37 Stan. L. Rev. 1445, 1465-67 (1985); Roger Blair & Virginia Maurer, *Umbrella Pricing and Antitrust Standing: An Economic Analysis*, 1982 Utah L. Rev. 763 (1982).

83. *See* Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 247a, ¶ 247b (3d ed. 2006), ¶ 337.3 (hereinafter Areeda & Hovenkamp). The possibility of recovery from members of a cartel for purchases from competitors of the cartel is conceptually distinct from the issue of recovery from cartel members for purchases from coconspirators who are not named as defendants. Given that the Supreme Court has held that antitrust defendants have no right of contribution, *Texas Industries v. Radcliff Materials*, 451 U.S. 630 (1981), lower courts have had no trouble allowing recovery for purchases from nondefendant coconspirators. *See, e.g.*, Paper Sys. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002) ("If Nippon Paper was among those conspirators, then it is responsible for the entire overcharge of *all five manufacturers*—and any direct purchaser from any conspirator can collect its own portion of damages (that is, the damages attributable to its direct purchases) from any conspirator.").

84. *See In re* TFT-LCD (Flat Panel) Antitrust Litig., No. 07-1827, 2012 WL 6708866, at *6 (N.D. Cal. 2012) ("Although some federal courts have allowed antitrust claims to proceed under the umbrella theory, most federal courts in recent years have rejected these claims."); *In re* Vitamins Antitrust Litig., No. 99-cv-0197, 2001 WL 855463, at *4 (D.D.C. 2001) ("The overwhelming majority of recent court decisions that have addressed the viability of the 'umbrella' theory after Associated General have rejected 'umbrella' claims."); Garabet, M.D., Inc. v. Autonomous Technologies Corp., 116 F. Supp. 2d 1159, 1168-69

(C.D. Cal. 2000) ("[T]he weight of recent authority using the nuanced antitrust analysis outlined in Associated General Contractors, has found against allowing 'umbrella' standing to plaintiffs"); *but see In re* Arizona Dairy Products Litig., 627 F. Supp. 233 (D. Ariz. 1985) (post-*Associated General* case accepting "umbrella" theory, but relying on pre-*AssociatedG eneral* precedent).

85. *See, e.g.*, Mid-West Paper Prods. Co. v. Cont'l Group, 596 F.2d 573, 584-87 (3d Cir. 1979) ("The outcome of any attempt to ascertain what price the defendants' competitors would have charged had there not been a conspiracy would at the very least be highly conjectural."); *Inr e* Folding Carton Antitrust Litig., 88 F.R.D. 211, 220 (N.D. Ill. 1980) ("In light of the Supreme Court's overriding concern with the burdensome proof in *Illinois Brick* and the similar complications in this case . . . plaintiffs do not have standing to sue the defendants from whom they did not purchase"); *Inr e* Coordinated Pretrial Proceedings in Petrol. Prods. Antitrust Litig., 691 F.2d 1335, 1340-41 (9th Cir. 1982), *rev'd on other grounds*, 906 F.2d 432 (9th Cir. 1990). Although the *Petroleum Products* court expressly reserved the question of whether it would recognize the umbrella theory in a situation involving a "single class of direct purchasers from non-conspiring competitors of the defendants," *id*. at 1340, it expressed concern over the complexity of making the necessary determinations in umbrella pricing cases that would be germane in even that simple context. The court noted, "the result of any attempt to ascertain with reasonable probability whether the non-conspirators' prices resulted from the defendants' purported price-fixing conspiracy . . . would be speculative to some degree." *Id*. at 1341 (footnote omitted).

86. *See, e.g.*, *Flat Panel Antitrust Litig*., 2012 WL 6708866, at *6; FTC v. Mylan Laboratories, Inc., 62 F. Supp. 2d 25, 38-40 (D.D.C. 1999) (considering both pre- and post-*Associated General* precedents and ruling against "umbrella" theory liability); Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246–47 (S.D.N.Y. 1997) (rejecting "umbrella" theory based on *AssociatedG eneral*).

87. *See,e .g.*, *Folding Carton Antitrust Litig.*, 88 F.R.D. at 220. In one case, the plaintiff claimed that the defendants' conspiracy to suppress price induced the defendants' competitors to increase price, and it sought overcharge damages based on purchases from those competitors.

Reading Indus. v. Kennecott Copper Corp., 477 F. Supp. 1150, 1154 (S.D.N.Y. 1979), *aff'd*, 631 F.2d 10 (2d Cir. 1980). Though in denying standing the court called the plaintiffs' arguments "respectable," it may have been influenced by the lack of any plausible economic basis for the claim.

88. *See, e .g.*, *In re* Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144 (3d Cir. 1993) (rejecting argument that plaintiff's "damages are . . . barred . . . because these damages resulted from amounts paid to non-conspiring competitors of the defendant."); *In re* Beef Indus. Antitrust Litig., 600 F.2d 1148, 1166 n.24 (5th Cir. 1979) ("It is enough if, as alleged, the conspirators' activities caused a general depression in wholesale prices and the intermediary purchasing from a plaintiff based his pricing decision on the depressed wholesale beef price."); *In re* Uranium Antitrust Litig., 552 F. Supp. 518, 525 (1982) ("Once it is established that nonconspirators have charged more than competitive prices, the inference that the cost increase was caused by the cartel is inescapable."); *Inr e* Bristol Bay Salmon Fishery Antitrust Litig., 530 F. Supp. 36, 39 (W.D. Wash. 1981) ("Since the sales by the fishermen to conspirators and non-conspirators were all direct, the computation of damages is no more complex for one than for the other."); Strax v. Commodity Exch., 524 F. Supp. 936, 938-41 (S.D.N.Y. 1981); Pollock v. Citrus Assocs. of the N.Y. Cotton Exch., 512 F. Supp. 711, 718-19 (S.D.N.Y. 1981) ("Regardless of whether the plaintiffs ultimately purchased offsetting contracts from the defendants or from other traders with a long position, the price throughout the market allegedly rose as a result of the defendants' activities."); Wall Prods. Co. v. Nat'l Gypsum Co., 357 F. Supp. 832, 840 (N.D. Cal. 1973) ("[I]t is clear that the defendants are not only liable for overcharges sustained from purchases from them, but also for overcharges resulting from purchases made from non-conspirators"); Washington v. Am. Pipe & Constr. Co., 280 F. Supp. 802, 807 (W.D. Wash. 1968) ("[Defendant] is liable for damages sustained on all sales which were affected by the elimination of competition. The identity of the pipe seller, whether conspirator or not, is irrelevant.").

89. Leegin Creative Leather Prods. v. PSKS, Inc., 551 U.S. 877 (2007).

90. *See* Babyage.com v. Toys "R" Us, Inc., 558 F. Supp. 2d 575, 584 (E.D. Pa. 2008).

91. Paul Joskow, *Vertical Integration, in* Handbook of New Institutional Economics, (C. Menard and M. Shirley, eds., 2005).

92. Kenneth G. Elzinga & David E. Mills, *The Economics of Resale Price Maintenance, in* 3 Issues In Antitrust Law And Economics, (Wayne D. Collins, ed., 2008); Patrick Rey and Thibaud Verge, *Resale Maintenance and Interlocking Relationships,* 58 The Journal of Industrial Economics 4 (2010); and Bruno Jullien and Patrick Rey, *Resale Price Maintenance and Collusion,* 38 Rand Journal of Economics 4 (2007).

93. *See, e.g.*, Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717 (1988); Richard A. Posner & Frank H. Easterbrook, Antitrust: Cases, Economic Notes, And Other Materials 211-12 (2d ed. 1981); Pauline M. Ippolito, *Resale Price Maintenance: Empirical Evidence from Litigation*, 34 J.L. & Econ 263, 292 (1991); Pauline M. Ippolito & Thomas R. Overstreet, Jr., *Resale Price Maintenance: An Economic Study of the Federal Trade Commission's Case Against the Corning GlassWorks*, 39 J. Law & Econ. 285 (1996).

94. The parallel between resale price maintenance and cartel pricing is discussed in Frank Mathewson & Ralph Winter, *The Law and Economics of Resale Price Maintenance*, 13 Rev. Indus. Org. 57, 65-66 (1998).

95. *See* Continental TV v. GTE Sylvania, 433 U.S. 36, 49 (1977); Lester Telser, *Why Should Manufacturers Want Fair Trade?*, 3 J. Law & Econ. 86 (1960); Lester Telser, *Why Should Manufacturers Want Fair Trade II?,* 33 J. Law & Econ. 409 (1990). Though the special services theory is used in this section in the explication of damage principles, the conclusions are similar regardless of the source of the efficiency.

96. *See* Isaksen v. Vt. Castings, 825 F.2d 1158 (7th Cir. 1987).

97. *See* William S. Comanor, *Vertical Price-Fixing, Vertical Market Restrictions, and the New Antitrust Policy*, 98 Harv. L. Rev. 983 (1985).

98. The "economics literature is replete with procompetitive justifications for a manufacturer's use of resale price maintenance." *See* Leegin Creative Leather Prods. v. PSKS, Inc., 551 U.S. 877, 889 (2007) (noting the possible procompetitive benefits of resale price maintenance). The possible procompetitive benefits of resale price maintenance are also discussed in Ippolito, *supra* note 93 ; Ippolito &

Overstreet, *supra* note 93; Mathewson & Winter, *supra* note 94; Howard P. Marvel & Stephen McCafferty, *Resale Price Maintenance andQ ualityC ertification*, 15 Rand J. Econ. 340 (1984).

99. *See* Roger D. Blair & James Fesmire, *The Resale Price Maintenance PolicyD ilemma*, 60 S. Econ. J. 1043 (1994).

100. *Isaksen*, 825 F.2d at 1165.

101. For a general discussion of damages in resale price maintenance litigation, see Ippolito, *supra* note 93; Ippolito & Overstreet, *supra* note 93; Mathewson & Winter, *supra* note 94.

102. *See* Local Beauty Supply v. Lamaur Inc., 787 F.2d 1197, 1202-03 (7th Cir. 1986) *and* Frank H. Easterbrook, *Treble What?*, 55 Antitrust L.J. 95, 98-99 (1986).

103. ABA Section Of Antitrust Law, Proving Antitrust Damages 236 (2d ed. 2010).

104. O'Brien v. Leegin Creative Leather Products, Inc., (2012) 294 Kan. 318, 339.

105. McDonough v. Toys "R" Us, 638 F. Supp. 2d 461, 493 (E.D. Penn 2009).

106. *Id;* Ted Frank, *"Babies "R" Us baby products antitrust class action settlement: McDonough v. Toys "R" Us,"* Center for Legal Policy at the Manhattan Institute (April 18, 2011), *available at* http://www.pointoflaw.com/archives/2011/04/babies-r-us-bab.php.

107. *See* Northern Pac. Ry. v. United States, 356 U.S. 1, 5-6 (1958).

108. *See,e .g.*, Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 9-18, 34 (1984) (O'Connor, J., concurring); *In re* Visa Check/MasterMoney Antitrust Litig., No. 96-5238, 2003 WL 1712568, at *2-7 (E.D.N.Y. 2003).

109. 547 U.S. 28 (2006).

110. *Id.* at 45-46.

111. For a useful survey, see Keith K. Wollenberg, Note, *An Economic Analysis of Tie-In Sales: Re-examining the Leverage Theory*, 39 Stan. L. Rev. 737 (1987). The analysis of tying arrangements is also discussed in Robert H. Bork, The Antitrust Paradox: A Policy at War with Itself 375-81 (1978); Richard A. Posner, Antitrust Law: An Economic Perspective 171-84 (1976); F.M. Scherer & David Ross, Industrial Market Structure and Economic Performance 565-69 (3d ed. 1990); Carlton & Perloff, *supra* note 78, at 319-35; Ward S. Bowman,

Jr., *Tying Arrangements and the Leverage Problem*, 67 Yale L.J. 19 (1957); Ward S. Bowman, Jr., Patent and Antitrust Law 163-82 (1973); M.L. Burstein, *The Economics of Tie-In Sales*, 42 Rev. Econ. & Stat. 68 (1960); M.L. Burstein, *A Theory of Full-Line Forcing*, 55 Nw. U. L. Rev. 62 (1960); Richard S. Markovits, *Tie-ins, Reciprocity, and the Leverage Theory*, 76 Yale L.J. 1397 (1967); Louis Kaplow, *Extension of Monopoly Power Through Leverage*, 85 Colum. L. Rev. 515 (1985); Charles J. Smaistrla, Note, *An Analysis of Tying Arrangements: Invalidating the Leveraging Hypothesis*, 61 Tex. L. Rev. 893 (1983). For a more recent discussion, see Jean Tirole, *The Analysis of Tying Cases: A Primer*, 1 Competition Policy International 1-25 (2005); Dennis Carlton and Michael Waldman, *How Economics Can Improve Antitrust Doctrine towards Tie-In Sales: Comment on Jean Tirole's "The Analysis of Tying Cases"*, 1 Competition Policy International 27-40 (2005); Barry Nalebuff, *Tied and True Exclusion: Comment on Jean Tirole's "The Analysis of Tying Cases"*, 1 Competition Policy International 41-53 (2005); David Evans and Michael Salinger, *The Role of Cost in Determining When Firms Offer Bundles and Ties,* 56 J Ind Econ 143-169 (2008); Patrick Rey and Jean Tirole, Economics of Vertical Restraints*,* in Handbook of antitrust economics, ed. By Paulo Bucciorossi, MIT Press, Cambridge, 2010; Denis Carlton, Joshua Gans and Michael Waldman, *Why Tie a Product Consumers Do Not Use?* 2 Am Econ j Mic. 85-105 (2010).

112. *See* Sheet Metal Workers Nat. Health Fund v. Amgen Inc., No. 07-CV-5295 (D.N.J. Aug. 13, 2008) (recognizing circuit split while adopting package approach for purposes of case); Freeland v. AT&T Corp., 238 F.R.D. 130, 149-50 (S.D.N.Y. 2006) (same); *In re* Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 142-43 (2d Cir. 2001) (noting, but not resolving, conflict and citing cases); *see also* Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, 677 F.2d 1045, 1054 (5th Cir. 1982) (tied product approach); Bell v. Cherokee Aviation Corp., 660 F.2d 1123, 1133 (6th Cir. 1981) (tied product approach); Northern v. McGraw Edison Co., 542 F.2d 1336, 1347 (8th Cir. 1976) (tied product approach); Will v. Comprehensive Accounting Corp., 776 F.2d 665, 673 (7th Cir. 1985) (package approach); Kypta v. McDonald's Corp., 671 F.2d 1282, 1285 (11th Cir. 1982) (package

approach); Siegel v. Chicken Delight, Inc., 448 F.2d 43, 52-53 (9th Cir. 1971) (package approach).

113. Tying agreements sometimes obligate the buyer to purchase the tied product from the seller only so long as the seller charges no higher price than is available in the market. *See,e .g.*, International Salt Co. v. United States, 332 U.S. 392 (1947). These arrangements might be devices by which the seller can gather information from buyers about the prices other sellers are charging, perhaps for competitive purposes or perhaps to deter secret price cutting by members of a cartel. *See* John L. Peterman, *The* International Salt *Case*, 22 J.L. & Econ. 351, 361 (1979). If use of an inferior tied product in combination with the tying product impairs the performance of the tying product and damages the seller's reputation, the seller may insist upon purchase of high quality tied product from it. In such a case, the price of the tied product is likely to be higher than the market price of a similar product, but that similar product will be of lower average quality.

114. *See, e.g.*, Bell v. Cherokee Aviation Corp., 660 F.2d 1123, 1133 (6th Cir. 1981) (overcharge measured by difference between price of tied product and its fair market value).

115. *Kypta*, 671 at 1285. *See also Freeland*, 238 F.R.D. at 149-50 (S.D.N.Y. 2006) ("Under the tied product method, a plaintiff is deemed injured, and may recover, to the extent that the price of the tied product has increased, regardless of whether that increase was completely offset, or even exceeded, by a reduction in price of the tying product.").

116. *Kypta*, 651 F.2d at 1285.

117. *See* Bowman, *TyingA rrangements*, *supra* note 111, at 21-22.

118. For a helpful illustration, see Wollenberg, *supra* note 111, at 747 n.81.

119. For a discussion of tying and metering, see Brief of Professors Barry Nalebuff et al. as Amici Curiae in Support of Respondent, Illinois Tool Works v. Independent Ink, 547 U.S. 28 (2006) (No. 04-1329), 2005 WL 2427646, at *5.

120. In the aggregate, price discrimination is likely to increase allocative efficiency relative to a single price monopoly. This does not imply that price discrimination benefits every purchaser. *See* Jonathan B. Baker, *Competitive Price Discrimination: The Exercise of Market Power Without Anticompetitive Effects (Comment on Klein and Wiley)*, 70 Antitrust L.J. 643 (2003).

121. *See* Bowman, *TyingA rrangements*, *supra* note 111, at 19-36.

122. *See* Bork, *supra* note 111, at 381.

123. 446 U.S. 643, 648-50 (1980).

124. For a similar explanation, see Daniel L. Rubinfeld & Peter O. Steiner, *Quantitative Methods in Antitrust Liti gation*, 46 Law & Contemp. Probs. 69, 117 (1983). The authors analyze FTC and private actions challenging a basing point freight system employed by plywood producers. *Id.* at 111-26. They point out that delivered prices to buyers could be competitively determined despite an agreement among producers to charge a price for freight calculated from the same basing point if competition on mill prices is unbounded.

125. Though not a conspiracy case, the Ninth Circuit's decision in *Somers v. Apple*, 729 F.3d 953 (9th Cir. 2013), provides an example of the difficulty of establishing antitrust harm to consumers in the absence of an overcharge. In that case, the plaintiff alleged that the inclusion of digital rights management ("DRM") encoding that restricted the use of digital media files was part of an anticompetitive monopolization scheme. The Ninth Circuit agreed with the district court that the plaintiff's "diminution in value" theory was insufficient to support a claim. *Id.* at 962-63.

126. *See* Robert H. Lande & Howard P. Marvel, *The Three Types of Collusion; Fixing Prices, Rivals, and Rules*, 5 Wisc. L. Rev. 941, 941-43 (2000).

127. *See* Detroit Auto Dealers, 111 F.T.C. 417 (1989).

128. National Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679 (1978).

129. *Seei d.*; Lande & Marvel, *supra* note 126, at 941-42.

130. 260 U.S. 156 (1922).

131. *Id.* at 162-63.

132. 476 U.S. 409, 419 (1986).

133. For a recent treatment, *see* Royal Mile Co., Inc. v. UPMC, No. 10-cv-1609, 2013 WL 5436925, at *13-25 (W.D. Pa. 2013) (holding that filed rate doctrine bars antitrust claims against insurer and hospital because rates were filed with state insurance regulator); *see also* County of Stanislaus v. Pac. Gas & Elec. Co., 114 F.3d 858 (9th Cir. 1997) (discussing filed rate doctrine); Marcus v. AT&T, 138 F.3d 46 (2d Cir. 1998) (same); Texas Comm'l Energy v. TXU Energy, 413 F.3d 503 (5th Cir. 2005) (same). For a useful summary of cases, see Areeda &

Hovenkamp, *supra* note 83. For a scholarly attack on *Keogh*, see Stevan E. Bunnell, Note, *The Use of Hypothetical Rates in Antitrust Damages Calculations: Reforming the Keogh Doctrine*, 38 Stan L. Rev. 1141 (1986).

134. *See* part B of Chapter 2.

135. The overcharge will stick with the direct purchaser (or any subsequent indirect purchaser) if demand for the product is perfectly elastic, but demand curves are rarely, if ever, horizontal in practice. *See* George Kosicki and Miles B. Cahill, *Economics of Cost Pass Through and Damages in Indirect Purchaser Antitrust Cases*, 51 The Antitrust Bulletin, 599 (2006); William M. Landes & Richard A. Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of* Illinois Brick, 46 U. Chi. L. Rev. 602 (1979). For other issues that may arise in pass through, see Fei Deng, John H. Johnson, and Gregory K. Leonard, *Economic Analysis in IndirectP urchaserC lassA ctions*, 26 Antitrust 51 (2011).

136. 431 U.S. 720, 737-38 (1977).

137. 15 U.S.C. § 15.

138. 392 U.S. 481 (1968).

139. *Id.* at 488.

140. *HanoverShoe* , 392 U.S. at 494 (emphasis added).

141. *IllinoisB rick*, 431 U.S. at 736.

142. *Id.*  at n.16.

143. 497 U.S. 199 (1990).

144. *Id.*  at 208.

145.  The Court was not asked to consider the propriety of the direct purchasers' claim for damages based on lost sales.

146. *UtilicorpU nited*, 497 U.S. at 418.

147. *In re* ATM Fee Antitrust Litig., 686 F.3d 741, 756-57 (9th Cir. 2012); Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1145-46 (9th Cir. 2003); Royal Printing Co. v. Kimberly-Clark Co., 621 F.3d 323, 326 (9th Cir. 1980).

148. *See In re* Vitamin C Antitrust Litig., 279 F.R.D. 90, 100 (E.D.N.Y. 2012); *In re* Industrial Diamonds Antitrust Litig., 119 F. Supp. 2d 418, 421-22 (S.D.N.Y. 2000); *Inr e* Refrigerant Compressors Antitrust Litig., No. 09-md-02042, 2012 WL 2071767, at *4-5 (E.D. Mich. 2012).

149. *See, e.g.*, Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. Pa. L. Rev. 269 (1979); William M. Landes & Richard A. Posner, *The Economics of Passing on: A Reply to Harris and Sullivan*, 128 U. Pa. L. Rev. 1274 (1980); Landes & Posner, *supra* note 135; John Cirace, *Price-Fixing, Privity, and the Pass-On Problem in Antitrust Treble-Damage Suits: A Suggested Solution*, 19 Wm. & Mary L. Rev. 171 (1977); George J. Benston, *Indirect Purchasers' Standing to Claim Damages in Price Fixing Antitrust Actions: A Benefit/Cost Analysis of Proposals to Change the* Illinois Brick *Rule*, 55 Antitrust L.J. 213 (1986); Herbert Hovenkamp, *The Indirect-Purchaser Rule and Cost-Plus Sales*, 103 Harv. L. Rev. 1717 (1990); Jeffrey L. Harrison, *The Lost Profits Measure of Damages in Price Enhancement Cases*, 64 Minn. L. Rev. 751 (1980); ABA Section of Antitrust Law, *Report of the IndirectP urchaserT askF orce*, 63 Antitrust L.J. 993 (1995); Ronald W. Davis, *Indirect Purchaser Litigation:* ARC America*'s Chickens Come Home to Roost on the* Illinois Brick*Wall*, 65 Antitrust L.J. 375 (1997); Chris S. Coutroulis & D. Matthew Allen, *The Pass-on Problem in Indirect Purchaser Class Litigation*, 44 Antitrust Bull. 179 (1999); Andrew I. Gavil, *Federal Judicial Power and the Challenges of Multijurisdictional Direct and Indirect Purchaser Antitrust Litigation*, 69 Geo. Wash. L. Rev. 860 (2001); John E. Lopatka & William H. Page, *Indirect Purchaser Suits and the Consumer Interest*, 48 Antitrust Bull. 531 (2003); Edward D. Cavanagh, Illinois Brick*: A Look Back and a Look Ahead*, 17 Loy. Consumer L. Rev. 1 (2004); Ian Simmons & Charles E. Borden, *The Defense Perspective: The Class Action Fairness Act of 2005 and State Law Antitrust Actions*, Antitrust, Fall 2005 19; Bruce V. Spiva & Jonathan K. Tycko, *Indirect Purchaser LitigationonB ehalfof C onsumersA fterC AFA*, Antitrust, Fall 2005 12.

150. *See* Benston, *supra* note 149, at 214.

151. Antitrust Modernization Commission, Report And Recommendations vi (April 2007). The Antitrust Modernization Commission Act of 2002 authorized the creation of the AMC to conduct a comprehensive review of U.S. antitrust law to determine whether it should be modernized.

152. *Id.* at 267.

153. *See, e.g.*, Ala. Code § 6-5-50(a); Ark. Code Ann. § 4-75-212 and § 4-75-315; Cal. Bus. & Prof. Code § 16750(a); Colo. Rev. Stat. § 6-4-108;

D.C. Code Ann. § 28-4509(A); Haw. Rev. Stat. § 480-14(c); Idaho Code. Ann. § 48-108; 740 Ill. Comp. Stat. Ann. 10/7(2); Kan. Stat. Ann. § 50-161; Me. Rev. Stat. Ann. tit. 10, § 1104(1); Md. Code. Ann. Com. Law II § 11-209(b)(2); Mich. Comp. Laws Ann. § 445.778; Minn. Stat. Ann. § 325D.57; Miss. Code Ann. § 75-21-9; Neb. Rev. Stat. § 59-821; Nev. Rev. Stat. §§ 598A.160, 598A.210; N.M. Stat. Ann. § 57-1-3; N.Y. Gen. Bus. Law § 340(6); N.D. Cent. Code § 51-08.1-08; Or. Rev. Stat. § 646.775; R.I. Gen. Laws § 6-36-12(g); S.D. Codified Laws Ann. § 37-1-33; Utah Code Ann. § 76-10-919; Vt. Stat. Ann. tit. 9, § 2465; W. Va. Legis Rule 142 C.S.R. Series 9; Wis. Stat. Ann. § 133.18(1)(a).

154. Kevin J. O'Connor, *Is the* Illinois Brick *Wall Crumbling?*, Antitrust, Summer 2001, at 34-35.

155. 490 U.S. 93, 101-02 (1989).

156. For a discussion of the problem, see John Cirace, *Apportioning Damages Between Direct and Indirect Purchasers in Consolidated Antitrust Suits:* ARC America *Unravels the* Illinois Brick *Rule*, 35 Vill. L. Rev. 283 (1990); ABA Section of Antitrust Law, Indirect Purchaser Litigation Handbook 132-46 (2007).

157. *ARCA merica*, 490 U.S. at 105 (citations omitted).

158. *See* Areeda & Hovenkamp, *supra* note 83, ¶ 337.4.

159. *See,e .g.*, *Inr e* TFT-LCD (Flat Panel) Antitrust Litig., No. 07-md-1827, Dkt. No. 5795 (N.D. Cal. 2012) ("Should defendants wish to challenge any allocation of damages, they are free to do so post-trial.").

160. A predicate question is whether pass-on evidence is admissible for even indirect purchaser claims, or whether state laws will apply the general rule of *Hanover Shoe* entitling even indirect purchasers to the full amount of the overcharge. Courts have generally assumed that at least *upstream* pass-on evidence (i.e., pass-on to the plaintiff) is relevant. The question of whether *downstream* pass-on evidence can be introduced is more in dispute. *See* Clayworth v. Pfizer Inc., 165 Cal. App. 4th 209 (Cal. App.), *as amended by* 2008 Cal. App. LEXIS 1325 (Cal. App. 2008) (availability of pass-on defense to defendants accused of price fixing); *In re* TFT-LCD (Flat Panel) Antitrust Litig., No. 07-md-1827, 2012 WL 6709621 (N.D. Cal. 2012) (holding that downstream pass-on should be considered for indirect purchaser claims brought under Florida, California, New York, Minnesota, and Michigan law).

161. *See* ABA Section of Antitrust Law, *supra* note 156, at 132-33. *See also* Ronald Cotterill et al., *Beyond* Illinois Brick*: The Law and Economics of Cost Pass-Through in the ADM Price-Fixing Case*, 18 Rev. Indus. Org. (2001) (discussing plaintiffs' overcharges model for high fructose corn syrup used in carbonated soft drinks).

162. ABA Section of Antitrust Law, Indirect Purchaser Litigation Handbook 144-46 (2007).

163. This situation may arise in industries with complex distribution systems where the product of interest is sold through different distribution channels in the actual and but-for worlds. An example is matters involving retail pharmacy plaintiffs and branded pharmaceutical manufacturer defendants where wholesalers are the primary direct purchasers of the branded version of the drug in the actual world, retailers are the primary purchasers of the generic version of the drug in the but-for world, and both the branded and generic versions of the drug are purchased during the relevant period. Here, some wholesalers may be "bypassed" by retailer purchasers in the but-for world. This was an issue in several recent cases: *In re* Brand Name Prescription Drug Antitrust Litig., 123 F.3d 599, 614 (7th Cir. 1997); *In re* Relafen Antitrust Litig., 360 F. Supp. 2d 166 (D. Mass. 2005); *In re* Cardizem CD Antitrust Litig., 200 F.R.D. 297, 317 (E.D. Mich. 2001).

164. ABA Section of Antitrust Law, Indirect Purchaser Litigation Handbook 175-76 (2d ed. 2016).

165. *Id.* at 176-77.

166. *Id.*

167. *Id.* at 178-87.

168. *See In re* Cathode Ray Antitrust Litig., No. 07-5944, Dkt. No. 1950, at 10 (N.D. Cal. 2013).

169. *Id.*

170. Trial Transcript at 2810, 3058 *In re* TFT-LCD (Flat Panel) Antitrust Litig., No. 7-1827, (N.D. Cal. 2013)

171. *See* Page, *supra* note 82, at 1465.

172. *See* Thomas A. Lambert, *Tweaking Antitrust's Business Model*, 85 Tex. L. Rev. 153 (2006). For simplicity, this analysis assumes constant marginal costs. If instead the short-run supply curve is upward sloping, as the cartel restricts quantity, marginal costs drop. At the supracompetitive price, marginal cost is less than it is at the competitive

price. One could say that the wealth transfer from consumers to producers is the difference between actual price and the marginal cost of producing the restricted quantity. The associated increment of wealth, however, is not surplus that consumers would have gained in a competitive market. That increment would have been producer surplus. *See* Carlton & Perloff, *supra* note 78, at 71-73, 95-99.

173. When the demand and supply curves are linear, the difference between actual price and competitive price multiplied by the quantity not sold will equal twice the deadweight loss. *Cf.* Frank H. Easterbrook, *Detrebling Antitrust Damages*, 28 J.L. & Econ. 445, 455 (1985) (when the demand and supply curves are linear, the overcharge on the quantity sold equals twice the deadweight loss). One could imagine a rule that allowed damages before trebling equal to one half the overcharge on volume not purchased. However, such a rule would be problematic since it is difficult to prove damages for purchases that would have been—but were not—made, and the rule relies on the assumption that demand and supply curves are linear, which is often not the true.

174. 661 F.2d 864, 867-68 (10th Cir. 1981)., For a more recent treatment, *see* Lambert v. Board of Com'rs of Orleans Levee Dist., No. 05-CV-59312009 WL 152668, at *7 (E.D. La. Jan. 22, 2009) ("Allowing nonpurchasers to recover would unduly broaden the spectrum of potential plaintiffs with price fixing and monopolization claims.").

175. *See* Illinois Brick Co. v. Illinois, 431 U.S. 720, 736 (1977).

176. *See* M ontreal T rading, 661 F.2d at 868.

177. *Id.*

178. *See* Lambert, *supra* note 77. *But see* Melanie W. Havens et al., *Consumer Welfare Loss: The Unawarded Damages in Antitrust Suits*, 15 U. Dayton L. Rev. 457, 462-63 (1990) (arguing that calculating deadweight loss typically would be easy).

179. *See* Carlton & Perloff, *supra* note 78, at 639; William M. Landes, *Optimal Sanctions for Antitrust Violations*, 50 U. Chi. L. Rev. 652 (1983).

# CHAPTER 9

# DAMAGES IN EXCLUSIONARY CONDUCT CASES

In an exclusionary conduct case, the defendant has been accused of engaging in activities designed to prevent the entry of, force the exit of, or weaken its rivals with the goal of lessening the competition it faces. Examples of exclusionary conduct are predatory pricing and anticompetitive foreclosure through exclusive dealing, bundling, or tying. Assuming antitrust liability has been found, a plaintiff in an exclusionary conduct case may seek damages as compensation for injury it sustained as a result of the exclusionary conduct. For the purposes of this chapter, we assume that the conduct at issue has been found to be anticompetitive, and we refer to such anticompetitive conduct as "exclusionary conduct."

Two different types of parties may have been injured by exclusionary conduct: the defendant's rivals that were the target of the conduct and customers for whom competition in the relevant market decreased as a result of the conduct.[1] Thus, exclusionary conduct cases may be brought by either a rival or a customer (or class of customers). In this way, exclusionary conduct cases differ from price-fixing cases, in which competitors to the price-fixing conspirators typically do not have a claim to antitrust injury.[2]

In principle, the same basic methods used to calculate damages in other types of antitrust cases can be applied to exclusionary conduct cases. In practice, however, the facts of an exclusionary conduct case may present challenges to the application of some of these methods.

# A. Exclusionary Practices Can Harm Both Competitors and Customers

Although exclusionary practices can harm both competitors and customers, the nature of the harm and the nature of the damages calculation differ between these two groups. The typical way in which exclusionary conduct might harm a competitor is to cause it to lose profits. Thus, the law permits an injured competitor to recover as damages its *lost profits* caused by the unlawful conduct.[3] In contrast, the typical way in which exclusionary conduct might harm a customer is by lessening competition in the relevant market. Thus, the law permits an injured customer to recover, for example, the amount of any *overcharge* attributable to the unlawful conduct.[4]

Although two potential groups of injured economic actors with different types of harm exist, the harms flow from the same unlawful conduct. This suggests a certain level of consistency should exist in their respective theories of liability and in certain aspects of their respective damages calculations. However, conflicts may still arise. For example, a theory of liability may allege an increase in market price as a result of an alleged exclusionary conduct, which would be consistent with an overcharge theory of customer damages. This theory, however, may ultimately imply lower competitor damages because the competitor may have benefited from the higher prices within the relevant market caused by the unlawful conduct.

# B. The Appropriate Damages Methodology

There exist several recognized methodologies for calculating damages in antitrust cases, including the "before-during-after" method, the benchmark or "yardstick" method, structural models involving simulation methods, and structural models based on business projections.[5] This chapter will discuss these methodologies in the context of exclusionary conduct cases. The key issue in determining the overcharge or amount of lost profits is identifying what would have happened in the "but-for" world, in the absence of the unlawful exclusionary conduct.

## 1. Before-During-After Method

Where there is an appropriate time period before or after the period in which the exclusionary conduct occurred, that is unaffected by the exclusionary conduct (a "clean period"), a before-during-after approach can

be an appropriate approach to assess damages.[6] Under this approach, an economic outcome of interest (such as the price paid by a customer or the revenues, share, or profits of a competitor) in the unaffected period is used to estimate what that outcome would have been during the period affected by the exclusionary conduct (the "affected period") in the absence of that conduct. For example, in a pharmaceutical patent case in which a generic manufacturer enters following a period of exclusionary conduct, the actual experience following entry may be used as a proxy for an earlier but-for world in which the same entry had not been delayed.

Even where an unaffected period exists, however, there may be differences between the unaffected period and the affected period in economic conditions (other than the exclusionary conduct) that play a role in determining the economic outcome of interest. For example, costs may have been different in the unaffected period than the affected period, which suggests that prices would have been different in the unaffected period than in the affected period even absent the exclusionary conduct. Given this possibility, when modeling the affected period absent the exclusionary conduct, it may be necessary to adjust the economic outcome of interest in the unaffected period to account for differences in costs or other economic factors. Changes in regulatory conditions could also affect the reliability of a before or after comparison.

More so than in price-fixing cases, exclusionary conduct cases often present difficulties in identifying an appropriate unaffected period.[7] For example, in a case where the exclusionary conduct artificially maintained the pre-existing status quo, the before period (i.e., the status quo) may not provide an appropriate basis for modeling the affected period absent the exclusionary conduct.[8] Similarly, the before period may not provide a valid basis for assessing the affected period absent the exclusionary conduct in cases involving practices that have always been part of the defendant's strategy, such as a refusal to deal case in which there was no history of previous dealing between the plaintiff and the defendant, or a tying case where the products have always been sold together.

In markets with rapidly changing economic conditions (e.g., the high technology sector), the differences between an unaffected period and the affected period in terms of economic conditions other than the alleged conduct may be too great to be controlled for reliably. For example, in the

case of a high technology industry, the market before the exclusionary practice may have been in its infancy and thus may not provide a reliable basis to model the but-for world in a more mature phase.[9]

The after period also may be an inappropriate benchmark because the harm from successful exclusionary conduct may continue well after the practice is ended. For instance, successful exclusion may dissuade other potential competitors from entering the market and thus allow the defendant to enjoy monopoly profits after the exclusionary practice has subsided.[10] This can be the case with successful predation, for example, in which the anticompetitive harm (monopoly pricing) follows the anticompetitive practice (below-cost pricing). Moreover, the after period may not provide an appropriate benchmark whenever the alleged exclusionary practice has the enduring effect of preventing the entry or expansion of a competitor. For example, damages actions may be coincident with or lag only slightly behind a claim for injunctive relief, so the anticompetitive practice may still be in place or it may have stopped only very recently. In these circumstances, there may be no suitable after period upon which to base the damage analysis. This contrasts with many price-fixing cases, in which damages actions often lag a governmental finding of price fixing. In light of the per se illegality and criminal nature of price-fixing violations, it may be safe to assume that the beginning of a grand jury investigation marks the end of the conspiracy and the beginning of the after period. In contrast, the defendant in an exclusionary practices case where liability is uncertain may continue the challenged conduct until a violation is found or an injunction is issued.

## 2. Yardstick or Benchmark Method

In the absence of a before or after period that can serve as a valid basis for modeling the but-for world, a second approach is to look for a market or business that is free from the exclusionary conduct at issue to use as a "comparable" for the market or business at issue.[11] As with the before-during-after approach, an economic outcome of interest for the unaffected yardstick (such as the price paid by a customer or the revenues, share, or profits of a competitor) is used to estimate what would have happened in the affected market in the but-for world.

This so-called benchmark or yardstick approach, however, may be problematic if there are significant differences in economic conditions between the proposed yardstick and the market or business at issue and if it is not possible to make adjustments to account reliably for these differences. In short, any market or business selected as the yardstick must be sufficiently comparable to the market or business at issue, or reliable adjustments must be possible, to permit nonspeculative conclusions.[12]

In addition to comparability, it is important to verify that the defendant's exclusionary conduct had no effect on the market or business chosen as a yardstick. For example, if a potential yardstick company in fact benefited from the defendant's exclusionary conduct, it may not be an appropriate yardstick unless appropriate adjustments could be made.[13]

## 3. Structural Models Involving Simulation Methods

A third method recently has been proposed that potentially can be useful when no suitable unaffected benchmark exists for estimating antitrust damages from exclusionary conduct. This method involves using a structural model of the market to simulate economic outcomes in the absence of the exclusionary conduct and has its counterpart in the simulation models often used by government antitrust enforcement authorities to assess unilateral effects from a merger.[14] As with a merger analysis, where the but-for (postmerger) world cannot be observed, the structural model employs information from the current state of the market to infer basic parameters of supply and demand that can then be used to model the unobserved but-for world.[15]

Because the structural model requires information describing market supply and demand, this method may allow an expert to determine all the needed market data inputs from the period of the alleged anticompetitive acts. However, the structural model should be applied with caution, as it is predicated on the availability of sufficiently reliable market information, and can be sensitive to assumptions about the shape of the demand curve and the form of competition in the market, including whether firms compete in prices (Bertrand competition) or in quantities (Cournot competition).[16]

## 4. Structural Models Based on Business Projections

A fourth approach to assessing damages in exclusionary conduct cases is to model the but-for world based on projections or forecasts of the economic outcomes of interest that were made by a knowledgeable party under the assumption of no exclusionary conduct.[17] Such projections are sometimes available in documents produced in the normal course of business of the parties. For example, in making its strategic decision as to whether to implement the exclusionary conduct, the defendant may have made projections of the market prices and shares that would result if it did not implement the conduct. These projections may provide a reasonable basis for modeling what market prices and shares would have been in the but-for world. Of course, it may be necessary to make adjustments to projections and forecasts to account for unanticipated changes in market conditions that occurred after the projections and forecasts were made. For example, if the projections did not anticipate a subsequent economic recession that weakened demand in the relevant market, it may be necessary to decrease the projected prices to accurately reflect what would have happened in the but-for world.

# C. Establishing Competitor Damages from Exclusionary Conduct

In this section, we discuss legal and economic issues in establishing competitor damages from exclusionary conduct. Many, but not all, of these issues also arise in the context of customer damages claims, which we discuss in the next section.

## 1. Legal Issues

### a. Tension in Guidance

There is some tension in the legal standards applicable to antitrust damage methodologies. On one hand, there is a recognition that the nature of evidence in antitrust cases may introduce some uncertainty in the calculation

of damages. As the Supreme Court stated long ago in *Story Parchment Co. v. Paterson Parchment Paper Co.*,[18] a court should preclude uncertain damages only if it is unclear whether those damages, as a whole, resulted from the violation.[19] If absolute certainty with respect to the amount of damages were required, private enforcement of the antitrust laws could be curtailed because "the vagaries of the marketplace usually" could deny plaintiffs "sure knowledge of what [their] situation would have been in the absence of the defendant's antitrust violation."[20] This principle may apply to exclusionary practices cases. The Supreme Court has explained that the wrongdoer, not the victim of a violation, shall bear "the risk of the uncertainty which his own wrong has created."[21] Thus, even if the amount of damages caused by an antitrust violation is uncertain, "it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result may be only approximate."[22]

On the other hand, courts recognize that damages in exclusionary conduct cases, like all other cases, must be supported by evidence and cannot be based on "pure speculation and guesswork."[23] In this regard, the defendant does not bear the burden of disproving damages. The evidence proffered by the plaintiff must provide the jury a "reasonable basis of computation" for determining the amount of damages.[24] Otherwise, the evidence of damages is insufficient as a matter of law.[25] If there is no reasonable basis to determine the extent of the plaintiff's injury, the jury should not award any damages to the plaintiff.[26]

## b. Disaggregation of Antitrust Damages

The plaintiff's recovery of antitrust damages is also affected by the related doctrine of disaggregation, which limits the antitrust plaintiff to recovery only for harm caused by the defendant's antitrust violation, as opposed to harm caused by other factors.[27]

Where other factors contributed to the plaintiff's financial condition in the actual world besides the defendant's antitrust violation, the plaintiff must provide the jury with "a reasonable basis upon which to estimate the amount of its losses caused by other factors."[28] Put another way, the plaintiff's damages claim must include only those losses caused by the exclusionary

conduct and thus must exclude losses caused by other factors. In the context of exclusionary conduct, examples of such other factors may include: (1) the defendant's lawful practices, including the defendant's practices that the plaintiff claimed to be unlawful but that were determined by the court not to violate the antitrust laws;[29] (2) the defendant's practices that are protected under an antitrust immunity, such as the *Noerr-Pennington* doctrine;[30] (3) the plaintiff's own conduct, such as poor management or missed opportunities;[31] or (4) other marketplace factors, such as changes in customers' demand, entry by other competitors, or changes in product technology.

A damage calculation that fails to separate out losses attributable to factors other than the defendant's antitrust violation invites the jury to engage in speculation and guesswork in determining the amount of damages and is therefore insufficient for the purposes of proving the amount of damages under Section 4 of the Clayton Act.[32] Disaggregation of damages goes to the issue of causation of damages. Being required to separate losses caused by the defendant's antitrust violation from losses caused by other factors, the plaintiff cannot meet its obligations by showing an amount of losses that do not reflect the actual damages caused by the antitrust violation.[33]

Where a plaintiff fails to disaggregate damages, a court may reverse an award of damages and order a retrial on the damages issue.[34] In other cases, however, where the plaintiff's damages study is irreparable and there is no other competent evidence that could support a disaggregation of damages, courts have dismissed a plaintiff's claims.[35]

## c. Mitigation of Damages

The plaintiff's recovery of antitrust damages also is affected by the doctrine of mitigation of damages, which requires a plaintiff to use reasonable efforts to reduce the amount of damages caused to it by reason of the defendant's antitrust violation.[36] Because the plaintiff could divert resources to other lines of its business, the plaintiff's damages in such a case must be reduced by the amount by which the plaintiff's "profits from the sale of other products increased as a result of its diverted emphasis or would have increased had reasonable efforts been taken."[37]

An antitrust plaintiff has a duty to mitigate its damages, and it is not entitled to recoup any losses resulting from its own inaction in the face of anticompetitive conduct.[38] Moreover, in the context of exclusionary practices, a plaintiff is required not only to mitigate its damages in the line of business directly affected by the defendant's conduct, but also in its other lines of business.[39]

The actions required of a plaintiff to mitigate, however, must be reasonable. For example, the duty to mitigate damages does not require a plaintiff to take undue risks.[40] Additionally, a plaintiff may recover damages where it can prove some losses attributable to the period between the antitrust violation and the earliest it reasonably could have diverted its resources to an alternative line of business or new business, or where it can show that the future profits from the business from which it was unlawfully foreclosed would have been greater than the profits from the alternative to which the plaintiff diverted its resources in response to the defendant's antitrust violation.[41] In such cases, the damages must be limited to the losses that could not have been avoided through reasonable mitigation efforts.[42]

In some cases, a defendant may be able to show that the plaintiff's business improved after the violation. Such an improvement, however, may not necessarily preclude a recovery of damages for exclusionary conduct either because: (1) the plaintiff may have suffered injury before it was able to divert its business to a profitable alternative; or (2) the plaintiff might have earned even greater profits but for the alleged conduct.[43]

Related to mitigation of damages in an exclusionary conduct case is the issue of opportunity costs, which must be taken into consideration in the computation of damages.[44] For example, one court held that it was appropriate to pierce the corporate veil to determine the opportunity costs of individual investors if the plaintiff's business that was formed to purchase a new business "was not funded and has never been more than an empty shell."[45] The court maintained that, for purposes of determining the amount of an adjustment to the plaintiff's damages attributable to the opportunity cost of an alternative equity return, the plaintiff may use the same cost of equity investment as the cost of the plaintiff's debt.[46] This conclusion reflected the court's view that, while "undue risk may not be forced on a victim of wrongdoing," the plaintiff should not be permitted to understate its opportunity costs based on risk-free investments, such as treasury bills.[47]

## d. Future Lost Profits

An excluded competitor may recover for future lost profits if it can establish that, but for the defendant's violation, it would have earned profits in future periods. Generally, a cause of action for any injury, including future losses, accrues at the time of the violation causing that injury. A cause of action entitles the plaintiff to recover not only those damages suffered as of the date of accrual, but also those damages the plaintiff reasonably is expected to suffer in the future. Future damages, however, raise the prospect of speculation in the damages calculation, and the risk of speculativeness may be heightened the further into the future the plaintiff attempts to establish damages. If by the time of trial the fact of future losses is speculative or their amount and nature are unprovable, then a cause of action for those future losses has not yet accrued. Under these circumstances, a cause of action for future losses accrues only when they are suffered.[48]

Lost future profits are typically an issue when the plaintiff has been forced to exit from or prevented from entering a market because of the antitrust violation or when the violation has continuing effects on the plaintiff's business. When the plaintiff continues in business and injunctive relief is to be granted, a court must take care to ensure that the plaintiff is not awarded a recovery duplicating the benefits of the injunctive relief.[49]

Lost future profits may be calculated by the same methods for calculating lost profits in past periods. In applying a damages methodology, the damages calculation must account for reasonably foreseeable future changes in the marketplace. In addition, an award of damages for future lost profits must be discounted to present value using an appropriate risk-adjusted discount rate.[50]

As an alternative to a lost future profits calculation, an excluded competitor may seek to recover the "going concern" or "goodwill" value of its business that it would have experienced but for the defendant's anticompetitive conduct. Because the value of the plaintiff's business is based on the present value of anticipated future profits, a plaintiff may not recover both future lost profits and its going-concern value.[51] Where a plaintiff's business has been harmed by the defendant's anticompetitive conduct prior to its destruction, its profit history may be adjusted to reflect lost past profits before calculation of going concern value.[52]

## *2. Economic Issues*

The economic analysis of antitrust damages addresses the economic impact of the anticompetitive conduct. This analysis starts with the translation of the legal theory of harm into economic effects, which requires a comparison of the economic situation of the plaintiff with (the actual world) and without (the but-for world) the anticompetitive conduct.

## a. Quantification

With respect to competitors who are affected by exclusionary conduct, the difference in their economic situation between the but-for and actual worlds is determined by three elements: (1) effects on the price they could charge (P); (2) effects on their output (Q); and (3) effects on their costs (C). These damages typically are given by the following formula:[53]

$$\text{Damages} = [(P_{\text{but-for}} - C_{\text{but-for}}) \times Q_{\text{but-for}}] - [(P_{\text{actual}} - \text{Cost}_{\text{actual}}) \times Q_{\text{actual}}]$$

where the first term represents the but-for profit the plaintiff would have earned and the second term represents the actual profit the plaintiff would have earned.

Much of the difficulty of estimating damages has to do with the fact that the various effects often go in opposite directions. For example, it is common for the plaintiff to allege that the defendant has engaged in exclusionary conduct that has increased the plaintiff's cost of doing business and that this has reduced the quantity sold by the plaintiff, resulting in higher prices to purchasers. In this case, while higher costs and lower quantities tend to increase the damages to competitors, the higher prices tend to mitigate damages. These effects—price effects, quantity effects, and cost effects—are discussed in more detail below.[54]

### *(1) Price Effects*

Successful exclusion of competitors may result in higher prices to consumers. In fact, the prospect of higher prices may be the primary motivation for anticompetitive exclusionary conduct. In an antitrust case based on exclusionary conduct, the theory of harm to competition is typically that the exclusionary conduct permitted the defendant to achieve or maintain

monopoly power—i.e., the ability to price above competitive levels. Such a liability theory necessarily implies that prices in the but-for world would be *lower* than those in the real world for some customers after the point in time where the defendant's rival was forced to exit, stopped from entering, or weakened.[55] In the presence of successful foreclosure of competitors, the prevailing market price is likely to overstate the price the foreclosed competitors would have been able to charge in the but-for world. In this situation, a simple calculation of lost profits based on real-world prices would overstate the excluded competitor's damages and would be inconsistent both with the plaintiff's theory of liability and with the analysis of damages to purchasers from the same exclusionary conduct.[56] The analysis of damages to customers typically establishes higher prices to those customers—that is, an overcharge—that should be deducted from the calculation of lost profits when analyzing damages to competitors.

## (2) Quantity Effects

Similar to the price effects, one needs to consider the effect of the alleged practice on the total quantity sold in the market. A basic tenet of economic theory is that higher prices tend to result in lower quantities sold.[57] Thus, if an exclusionary practice can be shown to have raised prices, it also likely reduced output. Likewise, if an exclusionary practice reduced market output, this means that the conduct is likely to have raised prices.[58] Therefore, it is reasonable to expect that, absent the anticompetitive conduct, market sales volumes would have been higher.

Quantity effects need to be taken into account if the "market share" method is applied to estimate antitrust damages to a competitor. In the first step of this method, the lost market share caused by the defendant's exclusionary conduct is determined. In the second step, the lost market share is multiplied by the market quantity to obtain the competitor's lost sales (and the resulting loss of profit). The appropriate market quantity to use in the second step is the market quantity in the but-for world, which would have been greater than the market quantity in the actual world as a result of the lower prices in the but-for world. However, in previous cases, the actual world market quantity has been widely used in the second step.[59] The implicit assumption of doing so is that any price effect (overcharge) would not have had significant effects on total market quantity. That is, demand is assumed to be very inelastic. If,

in fact, market demand is elastic, then the application of the market share method may result in an understatement of the damages.[60]

## (3) Cost Effects

If a competitor plaintiff alleges that it lost sales as a result of the defendant's exclusionary conduct, the damages analysis should account for the incremental costs the plaintiff would have incurred in order to expand its sales in the but-for world.

In most cases, the plaintiff would have incurred greater costs at the higher sales volume it would have achieved but for the exclusionary conduct than it did at the lower volume of sales achieved in the actual world.[61] The additional costs required to make the higher but-for volume of sales are often referred to as *incremental costs*. The amount of incremental costs typically can be determined using the companies' financial information. The extent of incremental costs depends on the size of the quantity effect and the amount of time the plaintiff has to make adjustments. Variable cost categories, such as raw materials, tend to require incremental expenditures even for small quantity increases. Fixed cost categories, such as capital equipment and general and administrative costs, may require incremental expenditures only if the quantity increase is relatively large. Whether a given cost category would have required incremental expenditures is a question that depends on the facts of the case at hand.

Another important question is whether the plaintiff had sufficient capacity to make the claimed lost sales in the but-for world. Capacity in this context can refer to production capacity, marketing capacity, distribution capacity, et cetera. To the extent that the plaintiff's actual world capacity along one or more of these dimensions was insufficient to allow it to make the claimed lost sales, the plaintiff must demonstrate that it could have expanded its capacity sufficiently (and include the costs required to do so among the incremental costs) or the lost sales must be reduced to the level that the plaintiff's capacity would allow.[62] Moreover, expansion of capacity can take time. Thus, even where the plaintiff is able to demonstrate that it could have increased capacity, time may have elapsed before it would have been able to do so, limiting the amount of lost sales during the interim.

In an exclusionary conduct case, the conduct may have been directly aimed at increasing the plaintiff's costs. For example, if the defendant is

alleged to have foreclosed the plaintiff by increasing the price of an input, the plaintiff's input costs would have been lower in the but-for world than in the actual world. In this case, the cost effect compounds the price effect and is an additional source of damages to the plaintiff.

## b. Distinctions Between Going Out of Business versus Failure to Enter

In cases where a defendant's exclusionary practices damaged a competitor's business, drove a more efficient competitor out of the market, or prevented a more efficient competitor from entering the market, the excluded competitor "would have a claim for antitrust damages based on lost profits."[63]

### (1) Going Out of Business

Where the value of the plaintiff's business has diminished as a result of the defendant's unlawful exclusionary conduct, the plaintiff may recover actual lost profits and diminution in the value of its business.[64] Where a plaintiff has gone out of business by reason of the defendant's unlawful exclusionary conduct, the plaintiff may recover a "going concern" value of its business in addition to the actual lost profits.[65] "The going-concern value is what a willing buyer given all available information would have paid a willing seller,"[66] which is often based in large part on the future profits the business is expected to generate, properly discounted to present value. Going concern value must be determined reasonably close to the date when the business ceased to be a going concern.[67] Determining the value at a date far removed from the date the business stopped being a going concern may be considered too speculative.[68] Not surprisingly, the plaintiff cannot obtain *both* a going concern value of its business as of a certain date and lost profits for the period after the business ceased to be a going concern—such recovery would be duplicative because future lost profits are a major element in determining the "going concern" value.[69]

### (2) New Business Ventures

A plaintiff is entitled to recover damages if the defendant's violations thwart the plaintiff's attempt to enter into a new business venture or line of business. More is required, however, than a bona fide intent to enter. It is not sufficient that a plaintiff might, at some future time, have marshaled the resources and capacity to have entered the business. A plaintiff who claims that it was foreclosed from engaging in a new business or from expanding an existing business must prove that it had an intention to enter the business and that it had taken concrete steps to prepare to do so.[70] Some of the factors that may be relevant to determining whether or not a plaintiff has demonstrated the requisite intention and preparedness to enter include: (1) the background and experience of the principals and employees of the plaintiff; (2) the ability of the plaintiff to finance the business and to purchase the necessary facilities and equipment; and (3) concrete and discernable steps taken by the plaintiff to enter the new business.

Several courts have adopted a "futility exception" to the preparedness requirement.[71] Under this exception, an antitrust plaintiff need not take steps to show preparedness to enter a new market that had already been rendered futile by the alleged monopolist.[72] In one case, however, a court rejected the plaintiff's argument that it should be excused from performing "the most basic preparatory steps" that the defendant had not rendered futile.[73] According to the court, a more expansive view of the futility exception would eliminate the standing requirement that the plaintiff show an antitrust injury to its business or property.[74] The court noted that the plaintiff could have taken initial steps to determine whether there was a market for the product, what price the customers were willing to pay, the exact nature of its potential supply, what its cost of production would be, and whether it would be profitable to enter this business.[75] The Eleventh Circuit in *Thompson v. Metropolitan Multi-List, Inc.*[76] formulated the futility exception in terms of the reasonableness of the plaintiff's efforts to enter a new market: "As long as the plaintiff made a reasonable attempt to enter the market, our Circuit's case law recognizes that the plaintiff has standing to contest antitrust violations that create barriers to that market."[77]

# D. Establishing Customers' Damages from Exclusionary Conduct

This section discusses the claims made by *customers* that exclusionary conduct has enabled the defendant to charge prices above the competitive price. Where it is determined that a defendant has engaged in illegal exclusionary practices, customers have sought to recover any overcharges resulting from the exclusionary practices.[78]

As discussed above, a damages claim by a plaintiff should flow from the plaintiff's theory of liability. Even with a solid liability theory, however, it may be difficult as a practical matter to determine an appropriate yardstick or to identify before or after period market conditions to serve as a benchmark in estimating damages in exclusionary conduct cases brought by customers. The difficulties in overcoming these obstacles that are discussed in part C of this chapter with respect to competitor damages claims also generally apply to customer damages claims. In principle, the customer-plaintiff must develop an economically sound model of a but-for world in which competitors of the alleged monopolist are not subject to the exclusionary conduct. The prices generated by the model would be the but-for prices and the overcharge would be the difference between the actual prices and the but-for prices.

## *1. Consistency with Liability Theory*

As with competitor damages claims, the methodology for determining customer damages depends on the type of exclusionary conduct alleged in the plaintiff's liability theory. In contrast to a claim brought by an excluded competitor, a claim by a customer—or a class of customers—is likely to require an analysis of the defendant's prices in the but-for world. In some cases, these prices may be assumed to be the same as those of the excluded competitor's but-for prices. However, differences between the products sold by the defendant and the excluded competitor (as well as differences in service, branding, or other factors) may result in different but-for prices for the defendant and the excluded competitors. For example, assuming the existence of a competing generic drug in the but-for world, the manufacturer of the branded drug likely would be able profitably to charge a higher price to brand-loyal customers than the generic manufacturer would be able to charge to price-sensitive customers. In such a case, a reliable damages model should account for such price differences.

The damages analysis for a customer may differ from that of a competitor along other dimensions in exclusionary conduct cases in which the liability theory is based on pricing conduct by the defendant.[79] For example, predatory pricing cases present different damages issues for competitors and customers. If a competitor was driven from the market as a result of the defendant's predatory pricing, damages could be divided into two periods: (1) the predatory pricing period; and (2) the postpredatory pricing period when the defendant may be recouping lost profits from the predatory period. A competitor's damages expert would have to develop a model to estimate lost profits during each period.

In contrast, customers likely will not be entitled to damages during the predatory period because, under the liability theory, the price paid by the customer during that period was *below* the price that would have prevailed absent the predatory conduct. The customer generally will be entitled to damages only in the post-predatory pricing period. The but-for price for this period may be based on competitive prices that prevailed prior to the predatory period, if such a before period were available. The aggregate overcharge would be the difference between the actual post-predatory price and the but-for price, multiplied by the number of units purchased by the customer. The assessment of the but-for price should account for other factors, not attributable to the defendant's exclusionary conduct, that were determinants of price in the postpredatory period, such as input costs or supply and demand conditions that were independent of the alleged conduct.

## 2. Tying and Bundling Damages

Tying or bundled pricing claims can present particularly challenging issues to customer-plaintiffs. The tying product is the monopoly product and the tied product is the competitive product. The general presumption is that the monopolist lowers the price of the tying product by a sufficient amount to "force" the customer to buy the tied product at a price higher than the competitive price. If illegal tying has been proven, the damages expert for the plaintiff must establish the but-for price not only for the tied product but also for the tying product. In the absence of bundling, the price of the monopoly tying product may have been higher and the price of the competitive tied product may have been lower. In the but-for world, these offsetting effects

would have to be taken into account.[80] In an exclusionary conduct case in which the alleged conduct involves a reduced price as a method to exclude competitors—such as a predatory or bundled pricing case or a tying case—it is entirely possible that customers' damages could be small or even zero, even though the defendant's conduct successfully excluded competitors.

# E. Cases Involving Competitor Exclusion

Damages proceedings and awards in recent exclusionary conduct cases are instructive with respect to the application of the foregoing principles. This section will describe highlights from five such cases: *Masimo Corp. v. TycoH ealthC areG roup*;[81] *ZF Meritor LLC v. Eaton Corp*;[82] *Weyerhaeuser Co. v. Ross-Simmons Hardwood*;[83] *McKenzie-Willamette Hospital v. PeaceHealth*;[84] and *LePage's, Inc. v. 3M*.[85] In each of these cases, the plaintiff claimed that the defendant used its monopoly power illegally to foreclose the plaintiff from the relevant market. This section describes the different damages methods used and highlights damage issues that came under scrutiny.[86]

# 1. Masimo Corp v. Tyco Health Group

Masimo—a manufacturer of pulse oximetry systems—alleged that Tyco, a competing manufacturer of these systems, engaged in the following anticompetitive acts: (1) provided loyalty or market-share discounts to hospitals that did not purchase more than a specified share of pulse oximetry systems from its competitors; (2) entered into sole-source exclusive dealing arrangements with Group Purchasing Organizations (GPOs), which foreclosed its competitors from selling the products at issue to GPO hospitals; (3) offered bundled discounts whereby discounts on products at issue were tied to discounts on unrelated products sold by Tyco; (4) entered into co-marketing agreements with OEMs that prevented OEMs from manufacturing monitors that were compatible with the technology of pulse oximetry products supplied by the plaintiff and other competitors; and (5) entered into equipment financing programs that resulted in financial penalties if a hospital switched to competing monitors before the expiration of the financing agreements.

The plaintiff's expert calculated damages stemming from the anticompetitive conduct as a whole based on a yardstick approach. The yardstick was a given portion of the pulse oximetry market—specifically, oximetry monitor sales made to defibrillator manufacturers—that was not subject to the defendant's anticompetitive conduct. The expert estimated damages based on the relative performance of Tyco and Masimo in this particular segment of the market. Specifically, the expert estimated that Masimo achieved an average market share of roughly 50 percent in the yardstick segment over the first four years. Based on this information, the expert calculated that Masimo would have sold 8 percent of all new oximetry monitors in the first year of sales, 25 percent in the second year, and 50 percent in the next two years.

The defendant argued that the particular yardstick used by the plaintiff's expert was problematic. The oximetry monitor sales to defibrillator manufacturers comprised only 4 percent of the overall oximetry market, and the defendant argued that the plaintiff's expert's methodology did not account for differences in industry conditions between this particular segment and the remaining 96 percent of the market. The defendant explained that Masimo's oximetry monitor sales in the small defibrillator segment were primarily to one of two main defibrillator manufacturers in the market, Zoll Medical Corporation. The defendant's expert claimed that Masimo's success in the defibrillator segment was due to Zoll's breakthrough technological innovation during the period at issue, which was unique to the segment, and that it was inappropriate to extrapolate Masimo's experience in the small segment to the rest of the market. As such, the defendant claimed that the plaintiff's expert overstated damages.

Additionally, the defendant argued that the plaintiff's expert provided no basis for disaggregating damages to each contested business practice, and that there were problems with the proposed approach for disaggregation of damages. Defendant also argued that damages attributed to exclusive dealing arrangements were based on an erroneous conclusion about the share of sales associated with Tyco's sole source contracts.

Notwithstanding these arguments, the jury awarded the plaintiff a damages award of $140 million for four of the five alleged anticompetitive acts, $57 million of which were apportioned to Tyco's market share discount practices, another $57 million to the sole source exclusive dealing arrangements with GPOs, and the remaining $26 million to bundled discount

practices and co-marketing agreements. The jury found that the equipment financing programs were lawful. The jury also found that all damages occurred prior to July 2001.

Given the defendant's criticisms of the plaintiff's expert's damages methodology, however, the district court concluded that the damages awards for two of the four business practices "did not lie within the range sustainable by the proof."[87] Specifically, the district court sustained the jury's liability verdict with respect to only the market share discount agreements and exclusive dealing arrangements with GPOs. The court also granted the defendant's motion for a new trial on damages restricted to only these two business practices, for the period prior to July 2001.

In the new trial, the cut-off date of July 2001 for the damage calculation came under significant scrutiny. Masimo argued that damages ought to be calculated for conduct prior to July 2001, which would affect not only sales and profits prior to that date but also sales and profits after July 2001 that were tied to contracts that Tyco entered into before July 2001. As explained by Masimo, the pulse oximetry market includes sockets (monitors) and consumables, which include sensors and patient cables, and the sales of consumables flow from the placement of sockets over the lifespan of those sockets. After weighing arguments from both parties about the lifespan of the sockets and how that would affect damages after July 2001, the district court accepted the defendant's expert's opinion on the "residual life" of Tyco's installed base of sockets.

The court awarded damages in the amount of $14.5 million, $7.2 million of which were lost profits on sales of sockets and consumables prior to July 2001, and the remaining $7.3 million were lost profits after July 2001 on lost sales of consumables that stemmed from lost socket sales prior to July 2001.[88]

## 2. ZF Meritor LLC v. Eaton Corp.

ZF Meritor LLC, a manufacturer of heavy duty (HD) transmissions with plans to expand in North America, alleged that Eaton, a competing manufacturer, monopolized the market for HD transmissions and foreclosed competition through the use of de facto exclusive contracts with distributors in the market. The plaintiffs' expert's initial damage calculation of $606-$824 million was based on estimates from a ZF Meritor business plan,

which contained projections of profit, sales volume, and market share. Damages included both an assessment of lost profits over the period at issue and an assessment of lost enterprise value of the plaintiff's HD transmission business.

The plaintiffs' expert used an econometric model to estimate lost profits, which were calculated as the difference between the plaintiffs' incremental revenues absent the defendant's conduct and incremental costs that the plaintiffs would have incurred in making those sales. The plaintiffs' expert presented several damages calculations using different assumptions on but-for profit margins and market shares, from ZF Meritor's business plan. The lost profit estimate was then derived by averaging these different damages calculations.

The district court excluded the plaintiffs' expert's opinion on the basis that the data underlying his calculation—which were derived from the plaintiffs' plan for its new line of business—were not sufficiently reliable.[89] The plaintiffs then requested that their expert be permitted to submit an alternate calculation based on other data also present in his report. This alternative calculation was based on other data, such as the number of heavy-duty trucks built and sold in North America, information on consumer confidence in the US, the average wholesale price of oil in the US, and interest rates, that were used to econometrically predict market share. Specifically, the plaintiffs argued that the expert would use market share estimates derived from the econometric model contained in his report and profit margin estimates based on the plaintiff's actual sales from a "before" period. The district court did not allow the expert to amend his report and submit alternate damage calculations.[90]

The Court of Appeals held that the district court was correct in excluding the expert's damages testimony but concluded that the district court erred by not allowing the expert to submit an amended report with alternate damages calculations based on data that were already contained in the expert's initial report.[91]

The district court on remand found that the plaintiff's expert's model using a different data source was admissible. The district court rejected the defendant's claims that the plaintiffs' expert had: (1) failed to disaggregate business losses due to factors other than the anticompetitive conduct; (2) improperly projected future damages and going concern value; and (3) failed

to factor every potentially relevant variable into his econometric analysis. The district court's finding of admissibility was largely driven by the "'generous principle[s]' that apply to the calculation of damages by antitrust plaintiffs, especially those whose businesses were new when they suffered antitrust injury . . . ."[92] Eaton ultimately agreed to pay $500 million to settle the case shortly before the scheduled damages trial.[93]

## 3. Weyerhaeuser

In *Weyerhaeuser*, the jury found that Weyerhaeuser had illegally used its monopsony power in the purchase of sawlogs to foreclose Ross-Simmons Hardwood and other Weyerhaeuser competitors from the downstream sawmill market in the Pacific Northwest.[94] The jury awarded Ross-Simmons Hardwood $26.3 million in damages, which was trebled to $78.8 million. In its appeal to the Ninth Circuit, Weyerhaeuser argued that Ross-Simmons' damages analysis was speculative. The court, however, upheld the award of damages, concluding that the damages models used by the plaintiff provided a reasonable basis for calculating damages and were not speculative.[95]

The court stated that the plaintiff's damages models "properly relied upon the fundamental assumptions that Weyerhaeuser maintained artificially high costs in the sawlog market during the damages period."[96] The court concluded that the following elements of the plaintiff's damages models provided a reasonable basis for calculating damages: (1) the calculation of Weyerhaeuser's average profit margin prior to the predatory period; (2) the calculation of Weyerhaeuser's loss in profits during the damages period due to higher sawlog prices; and (3) the assumption that, through Weyerhaeuser's control of sawlog pricing, Weyerhaeuser could have maintained the same profit margin relative to the price of finished lumber during the predatory period that it maintained prior to the predatory period. In addition, the models accounted for lower demand and prices for finished lumber and other changing market conditions. The methodology described above provided a basis for calculating but-for sawlog prices during the damages period, which, in turn, provided a basis for calculating Ross-Simmons' profits during the damages period that would have occurred but for Weyerhaeuser's conduct.

Ross-Simmons' district court victory in April 2003 spurred additional suits by other Pacific Northwest sawmill competitors of Weyerhaeuser. In

2004, Weyerhaeuser settled two cases with five sawmill plaintiffs for a total of $49 million.[97] In 2005, Weyerhaeuser settled a suit by five additional sawmill plaintiffs for $13 million.[98] In settling these suits, Weyerhaeuser paid $62 million in total to ten sawmill competitors.[99] In 2005, a jury awarded plaintiff Washington Alder trebled damages of $16 million,[100] a decision that Weyerhaeuser appealed to the Ninth Circuit and that was later stayed pending the Supreme Court decision in *Weyerhaeuser Co. v. Ross-Simmons Hardwood*.[101] In 2007, the Supreme Court rejected the liability theory underlying in *Weyerhaeuser Co. v. Ross-Simmons Hardwood*.[102] Following this decision, the Ninth Circuit vacated the judgment in *Washington Alder* and remanded the case to the U.S. District Court.[103] Weyerhaeuser and Washington Alder subsequently reached a settlement that resulted in an after-tax charge of $3 million in 2007 for Weyerhaeuser.[104]

## 4. McKenzie-Willamette

In *McKenzie-Willamette*, the jury found that the defendants had violated Section 2 of the Sherman Act by the bundled pricing of their products and services.[105] The jury awarded McKenzie-Willamette $5.4 million based on its finding that PeaceHealth attempted to monopolize the hospital health care market in Lane County, Oregon in violation of Section 2 of the Sherman Act.[106] The ensuing judgment for the plaintiff was reversed on liability grounds; thus, the appellate court did not review the damage methodology.

At trial, the plaintiff's economic expert provided three damages estimates based on McKenzie-Willamette's alleged illegal exclusion from the preferred provider plans of Regence Blue Cross Blue Shield of Oregon (Regence) and the Providence Health Plan (Providence). Two of the damages estimates ($7.7 million and $5.4 million) were based on the exclusion from both plans over two different time periods. The third estimate ($5.6 million) was based on exclusion from just the Regence plan over the longer of the two time periods.[107] To estimate damages, the plaintiff's expert used a lost profits model based on McKenzie-Willamette's estimated share of 25 percent of the acute care hospital business in Lane County.

The defendant argued that the damages calculation by the plaintiff's expert was invalid because the jury had found that the defendant's preferred provider contracts were lawful. In particular, the defendant argued that the

plaintiff's damages calculation was based only on the plaintiff's exclusion from the defendant's lawful preferred provider contracts.[108] The lower court disagreed, concluding that the jury had substantial grounds for awarding damages based on the jury's finding of attempted monopolization of the hospital health care market.

> The evidence from which this conclusion could be drawn and damages could be based includes defendant employing one-third of the doctors in Lane County, the use of non-compete provisions in employment contracts; the purchase and closing of competing hospitals; entering into preferred provider contracts that are lawful but exclusionary; seeking restrictive covenants on property to deter hospital construction; and plans to locate a new hospital near a competitor's hospital.[109]

The Ninth Circuit vacated the jury's verdict that PeaceHealth had engaged in attempted monopolization of the hospital health care market and stayed further proceedings until it received a response to a question that it certified to the Oregon Supreme Court.[110] The parties later settled the dispute and the Ninth Circuit vacated its certification to the Oregon Supreme Court.[111]

# 5. LePage's

In *LePage's*, the jury found that the defendants had violated Section 2 of the Sherman Act by the bundled pricing of their products and services.[112] The jury awarded LePage's $22.8 million in damages, which was subsequently trebled to $68.5 million. The damages model in *LePage's* was a lost profits model based on lost market share and lost profit margin.[113] LePage's expert estimated damages of $36 million over the period 1993 to 2000 due to 3M's alleged exclusionary conduct. This damages estimate was based on estimates of LePage's lost sales and profit margin. Lost sales were calculated as the difference between estimated but-for sales[114] and actual sales. The estimated lost profit margin was based on LePage's actual profit margin adjusted to account for declining prices and decreased efficiency caused by reduced sales.[115]

3M did not challenge LePage's expert's methodology to calculate damages. Rather, 3M challenged the assumptions underlying the damages

model[116] and claimed that LePage's expert failed properly to disaggregate LePage's losses due to 3M's exclusionary conduct from LePage's losses due to other factors. The courts ruled against 3M on both arguments.[117]

---

[1]. *See* Ethypharm SA France v. Abbott Labs., 707 F.3d 223, 233 (3d Cir. 2013). It should be noted that in certain circumstances, courts have permitted parties other than customers or competitors to maintain claims where the injury suffered was "inextricably intertwined" with the antitrust violation. *See* Hanover 3201 Realty, LLC v. Village Supermarkets, Inc., 806 F.3d 162, 166-67 (3d Cir. 2015).

[2]. *See* Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 583, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Freedom Holdings, Inc. v. Cuomo, 624 F.3d 38, 52 (2d Cir.2010).

[3]. *See, e.g.*, ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 291-92 (3d Cir. 2012).; Palmyra Park Hosp. v. Phoebe Putney Mem'l Hosp., 604 F.3d 1291, 1305-06 (11th Cir. 2010).

[4]. This derives directly from § 4 of the Clayton Act, which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). In addition, some states permit indirect purchasers to recover damages on the basis of some measure of overcharge. *See generally* part B of Chapter 2 and part E of Chapter 8. The issues in connection with tracing overcharges to indirect purchasers, which can arise in state law claims in "*Illinois Brick* repealer" states, are generally beyond the scope of this volume, which focuses on proving antitrust damages under federal antitrust law.

[5]. Chapter 8 discusses some of these methodologies in the context of overcharges, and Chapter 6 discusses the use of econometric methods in some of these methodologies.

[6]. The before-during-after method gained acceptance in *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927). *See* Molly L. Zohn, *How Antitrust Damages Measure Up with Respect to the* Daubert *Factors*, 13 Geo. Mason L. Rev. 697, 700 (2005) for a discussion of the application of this approach with respect to share.

7. As one court explained, the before-during-after method may be used only when "there has been some showing that the market conditions in the two periods were similar but for the impact of the violation." Sun Microsystems, Inc. v. Hynix Semiconductor Inc., 608 F. Supp. 2d 1166, 1207-08 (N.D. Cal. 2009) (quoting Pacific Coast Agric. Exp. Ass'n v. Sunkist Growers, 526 F.2d 1196, 1206-07 (9th Cir. 1975)). Alternatively, as discussed in the text, it may be possible to adjust reliably for differences in other economic conditions unrelated to the exclusionary conduct.

8. In referencing a "before" period, the plaintiff is not entitled to assume "favorable aspects of an anticompetitive market," such as "limited competition from third parties because of the difficulty of entering the market." *See* Toscano v. PGA Tour, Inc., 201 F. Supp. 2d 1106, 1125 (E.D. Cal. 2002) (quoting Dolphin Tours v. Pacifico Creative Serv., 773 F.2d 1506, 1512 (9th Cir. 1985)).

9. For an analysis of the problems involved in estimating damages from exclusionary practices in high-technology industries, see John E. Lopatka, *Overcharge Damages for Monopolization of New Economy Markets*, 51 Antitrust Bull. 453 (2006).

10. *See* David Kreps & Robert Wilson, *Reputation and Imperfect Information*, 27 J. Econ. Theory 253 (1982); Paul Milgrom & John Roberts, *Predation, Reputation, and Entry Deterrence*, 27 J. Econ. Theory 280 (1982).

11. In 1946, the Supreme Court accepted this technique in *Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946). *See also* Chapter 6 (discussing benchmark approach to damages).

12. *See, e.g.*, CDW LLC v. NETech Corp., 906 F. Supp. 2d 815, 824 (S.D. Ind. 2012). ("[O]nce the plaintiff shows relative comparability between his hypothetical firm and the unaffected yardstick firm, [it] is allowed to borrow liberally from the firm's experience.") Fishman v. Estate of Wirtz, 807 F.2d 520, 555-56 (7th Cir. 1986).

13. *See,e .g.*, Farmington Dowel Prods. v. Forster Mfg. Co., 421 F.2d 61, 81 (1st Cir. 1970).

14. *See* Gregory K. Leonard & J. Douglas Zona, *Simulation in Competitive Analysis*, ABA Section of Antitrust Law, Issues in Competition Law and Policy 1405 (2008).

15. *Id.*

16. Differing assumptions about the form of the demand schedule may result in significant differences in estimated damages. This is because the types of demand schedule most frequently employed (e.g., linear, isoelastic, logit, "almost ideal demand system") tend to be more or less "curvy," and thus to result in a larger or smaller price effect for a given estimated quantity effect (or, respectively, they result in a larger or smaller quantity effect for any given estimated price effect). For a non-technical discussion, see Gregory J. Werden, Luke M. Froeb, & David T. Scheffman, *A Daubert Discipline for Merger Simulation*, Antitrust, Summer 2004, at 89. Differing assumptions about costs and the form of market competition can also have significant effects on damage estimates, as the level of the but-for prices (or quantities) depends on costs and the way firms interact and compete (e.g., on the basis of quantity, on the basis of prices, by engaging in bilateral bargaining with buyers; or by selling via auctions mechanisms). *See* Carl Shapiro, *Theories of Oligopoly Behavior*, *in* 1 Handbook of Industrial Organization 329, 343-48 (1989). These assumptions about demand, cost, and the nature of competition should be made explicit and subjected to tests of reasonableness or sensitivity analysis, and the court should exercise its gatekeeping function rigorously before permitting such a model to serve as a basis for a treble damages recovery.

17. *Compare* Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 566 (2d Cir. 1970) (allowing damages analysis based on business projections where evidence showed projections "were the product of deliberation by experienced businessmen charting their future course") *with* ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 293 (3d Cir. 2012) (affirming exclusion of damages estimate based on "one page of financial projections for a nascent company, the assumptions underlying which were relatively unknown").

18. 282 U.S. 555 (1931).

19. *Id.* at 562.

20. J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 566 (1981).

21. *Bigelow*, 327 U.S. 265.

22. *StoryP archment*, 282 U.S. at 563.

23. Eleven Line v. North Texas State Soccer Ass'n, 213 F.3d 198, 209 (5th Cir. 2000).

24. *StoryP archment*, 282 U.S. at 563.

25. *ElevenL ine*, 213 F.3d at 209.

26. *See* 5 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 3.06a, at 3-61 (2d ed. 2003). Some courts have held that the plaintiff is entitled to at least to nominal damages when it has proffered sufficient evidence establishing the fact of injury but has been unable to provide any relevant evidence allowing the jury to determine, by reasonable inference and estimation, the approximate amount of the plaintiff's damages. *See,e .g.*, Morning Pioneer v. Bismarck Tribune Co., 493 F.2d 383, 388 (8th Cir. 1974) (awarding plaintiff nominal damages where plaintiff established that it lost one-third of its grocery advertising by reason of defendant's antitrust violation, but failed to provide any evidence that could be used to calculate the amount of damages).

27. *See* Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1054 (8th Cir. 2000).

28. U.S. Football League v. NFL, 842 F.2d 1335, 1378-79 (2d Cir. 1988); MCI Commc'ns v. AT&T, 708 F.2d 1081, 1162 (7th Cir. 1983) ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage.").

29. *See,e .g.*, Image Tech. Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1224 (9th Cir. 1997) ("When a § 2 monopolization claim has been dismissed or adjudicated against a plaintiff, damages attributable to that claim must be disaggregated."); Vernon v. S. Cal. Edison Co., 955 F.2d 1361, 1371-73 (9th Cir. 1991) (affirming summary judgment where plaintiff failed to submit a damages study that disaggregated between allegedly unlawful conduct and acts that were found by the court to be lawful); *MCI Commc'ns*, 708 F.2d at 1163 (rejecting damages study premised on the assumption that all twenty-two of the acts charged were unlawful, where liability was established with respect to only seven of those alleged acts and the study did not disaggregate any losses attributable to the lawful acts); *see also* Infusion Res. v. Minimed, Inc., 351 F.3d 688, 695-96 (5th Cir. 2003) (affirming dismissal of non-antitrust claims on ground that plaintiff failed to disaggregate alleged damages attributable to those claims from damages for its antitrust claims, which were rejected on summary judgment).

30. Eastern R.R. Presidents Conf. v. Noerr Motor Freight, 365 U.S. 127 (1961); United Mine Workers v. Pennington, 381 U.S. 657 (1965).

31. *U.S.F ootballL eague*, 842 F.2d at 1378-79.

32. *See,e .g.*, Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056-57 (8th Cir. 2000) (excluding damage expert's testimony where expert's model "did not incorporate all aspects of the economic reality of the . . . market and because it did not separate lawful from unlawful conduct"); *ImageT ech.Se rvs.*, 125 F.3d at 1222 (reversing damage award in favor of one plaintiff where evidence showed that plaintiff's exit from the market was caused by factors other than defendant's conduct); Farley Transp. Co. v. Santa Fe Trail Transp. Co., 786 F.2d 1342, 1352 (9th Cir. 1985) ("Farley's utter failure to make any segregation between damages attributable to lawful competition and that attributable to the unlawful scheme to deviate from the tariff rate requires reversal of the verdict and remand for a new trial on the amount of damages."); *MCI Commc'n*s, 708 F.2d at 1163 ; Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1353 (3d Cir. 1975) ("In the absence of any guidance in the record, we cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition."). *But see* Litton Sys. v. AT&T, 700 F.2d 785, 825 (2d Cir. 1983) (upholding a damage award even though plaintiff's damage study failed to segregate damages from lawful and unlawful practices, explaining that the expert did not assume the absence of other factors—he attempted disaggregation, but found results unfruitful).

33. In contrast to the requirement that a plaintiff segregate damages flowing from the defendant's unlawful conduct from losses attributable to other factors, a number of courts have held that a plaintiff is not required to disaggregate damages flowing from separate unlawful acts. *See, e.g.*, *MCI Commc'ns*, 708 F.2d at 1161 ("Not requiring strict disaggregation of damages among the various unlawful acts of the defendant serves to prevent a defendant from profiting from his own wrongdoing and makes sense when damages arise from a series of unlawful acts intertwined with one another."); Spray-Rite Serv. Corp. v. Monsanto Co., 684 F.2d 1226, 1242-43 (7th Cir. 1982) ("A plaintiff claiming injury caused by more than one of the defendant's unlawful practices need not prove the amount of damage caused by each illegal practice if the plaintiff shows that disaggregation is impracticable.") , *aff'd*, 465 U.S. 752 (1983).

34. *See, e.g.*, *Image Tech. Servs.*, 125 F.3d at 1224 ; Blue Cross & Blue Shield United v. Marshfield Clinic, 65 F.3d 1406, 1416 (7th Cir. 1995); *FarleyT ransp.*, 786 F.2d at 1352; *MCIC ommc'ns*, 708 F.2d at 1174.

35. *See, e.g.*, Vernon v. S. Cal. Edison, 955 F.2d at 1373 (affirming district court's grant of summary judgment for defendant where "the serious flaws in the only damage study which could be proffered to the jury placed Vernon in the position of having no proper proof of damages at all"); McGlinchy v. Shell Chem. Co., 845 F.2d 802, 809 (9th Cir. 1988) (granting summary judgment for defendant where plaintiffs' damages study did not disaggregate damages attributable to the alleged antitrust violation from losses attributable to other factors, the study gave no reasonable basis for the jury to conclude that plaintiffs suffered damages, plaintiffs failed to submit additional evidence to rebut defendants' challenge to plaintiffs' damages study, and the study could not be modified to disaggregate the damages caused by unlawful acts and by other factors).

36. Borger v. Yamaha Int'l Corp., 625 F.2d 390, 399 (2d Cir. 1980); Golf City, Inc. v. Wilson Sporting Goods Co., 555 F.2d 426, 436 (5th Cir. 1977).

37. *Borger*, 625 F.2d at 399.

38. *See,e .g.*, *GolfC ity*, 555 F.2d at 436.

39. *Id.* at 436.

40. *Fishman*, 807 F.2d at 558.

41. *See, e.g.*, Pierce v. Ramsey Winch Co., 753 F.2d 416, 436-437 (5th Cir. 1985).

42. For a further discussion of mitigation of damages, see Part B of Chapter 5.

43. *See,e .g.*, *Pierce*, 753 F.2d at 436-37.

44. *Id.*

45. *Fishman*, 807 F.2d at 557.

46. *Id.* at 559.

47. *Id.* at 559-60. The court in *Fishman* concluded that the profits from risk-free investments may be used for computation of opportunity costs only for an *initialpe riod* after an investment opportunity has been foreclosed by the defendant's antitrust violations to account for a reasonable period necessary for the plaintiff to find an alternative business investment. Following this initial period, the plaintiff is expected to find an

investment yielding reasonable equity return. The *Fishman* court also noted, however, that it believed "this estimate should, if anything, err on the side of conservatism since the alternative may be to force undue risks on a victim of a wrongdoing." *Id.* at 559.

48. *See generally* Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321, 338-40 (1971).

49. *See* Los Angeles Mem'l Coliseum Comm'n v. NFL, 791 F.2d 1356 (9th Cir. 1986).

50. The concepts of discounting and present value are discussed in Chapter 5.

51. *See* Coastal Fuels of P.R. v. Caribbean Petrol. Corp., 175 F.3d 18, 27 (1st Cir. 1999) ("Where plaintiff has been forced out of business . . . it is awarded its going-concern value or its projected future lost profits, but not both.").

52. *See* Pines Chrysler-Plymouth v. Chrysler Corp., 826 F.2d 1360, 1363-64 (4th Cir. 1987).

53. This formula represents the case in which a competitor sells a single product at a single price and faces a single cost to sell incremental units (in each state of the world: *but-for* and *actual*). It can be generalized to more complex situations.

54. Other technical issues involved in estimating firms' lost profits are discussed in Chapter 5.

55. It is important to note, however, that under some types of exclusionary conduct, prices may have been higher in the but-for world than in the actual world for some customers at some point in time. For example, under a predatory pricing theory, the incumbent firm provides lower prices to some customers for a period of time in order to force the exit or deter the entry of a rival. This point can have important implications for the analysis of whether to certify a class of direct or indirect purchasers. *See*, *e.g.*, John H. Johnson & Gregory K. Leonard, *Economics and the Rigorous Analysis of Class Certification in AntitrustC ases*, 3 J. Comp. L & Econ. 341 (2007).

56. *See* Fed. Judicial Ctr., Reference Manual on Scientific Evidence 498 (3d ed. 2011), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/SciMan3D01.pdf/$file/SciMan3D01.pdf.

57. *See, e.g.*, Hal R. Varian, Intermediate Microeconomics ch. 6 (7th ed. 2005).

58. If the defendant's practice caused injury to competitors because of more efficient, output-enhancing competition, then the plaintiff has not suffered antitrust injury. *See, e.g.*, Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977).

59. Zohn, *supra* note 4, at 705-06.

60. A simple analysis of damages based on real-world prices and quantities would simultaneously have the potential to overestimate damages (because it would not consider that prices would be lower in the but-for world) and also potentially underestimate damages (because it would not consider that overall market sales would be higher in the but-for world). Although these two effects go in opposite directions, there is no reason to believe they would be similar in magnitude or that they would necessarily offset one another. *See* Zohn, *supra* note 4, at 716.

61. Fed. Judicial Ctr., *supra* note 36, at 449-450.

62. *Id.* at 489.

63. Howard Hess Dental Labs. v. Dentsply Int'l, 424 F.3d 363, 374 (3d Cir. 2005); Fishman v. Estate of Wirtz, 807 F.2d 520, 551 (7th Cir. 1986) ("It is well settled that an antitrust plaintiff is entitled to recover 'in full for the preventable and established loss sustained by reason of tortious or proscribed acts.'") (citation omitted).

64. *See, e.g.*, Coastal Fuels of P.R. v. Caribbean Petrol. Corp., 175 F.3d 18, 27 (1st Cir. 1999) (citing Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 561-67 (1931)).

65. *See,e .g.*, *CoastalF uels*, 175 F.3d at 27.

66. *CoastalF uels*, 175 F.3d at 25 n.4.

67. Farmington Dowel Prods. Co. v. Forster Mfg. Co., 421 F.2d at 81 n.46. (1st Cir. 1969).

68. *CoastalF uels*, 175 F.3d at 27.

69. *FarmingtonD owel*, 421 F.2d 61, 80-82, n.46; *CoastalF uels*, 175 F.3d at 30.

70. *See, e.g.*, Jayco Sys. v. Savin Bus. Mach. Corp., 777 F.2d 306, 314 (5th Cir. 1985); Hayes v. Solomon, 597 F.2d 958, 973 (5th Cir. 1979); Ovitron Corp. v. Gen. Motors Corp., 512 F.2d 442, 443 (2d Cir. 1975).

71. *See, e.g.*, Ashley Creek Phosphate Co. v. Chevron USA, Inc., 315 F.3d 1245, 1258-59 (10th Cir. 2003); Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566, 1572 (11th Cir. 1991); Fleer Corp. v. Topps Chewing Gum, Inc., 415 F. Supp. 176, 180 (E.D. Pa. 1976) ("It would be inconsistent with one purpose of the Clayton Act—to protect the business interests of the victims of monopolistic practices—to require an antitrust plaintiff to pay a courtroom entrance fee in the form of an expenditure of substantial resources in a clearly futile competitive gesture.").

72. *AshleyC reek*, 315 F.3d at 1258.

73. *Id.*

74. *Id.*

75. *Id.* at 1259.

76. 934 F.2d 1566 (11th Cir. 1991).

77. *Id.* at 1572.

78. In cases where a plaintiff competitor has prevailed on an exclusionary practice theory, subsequent plaintiff cases filed by customer classes based on the same liability theory are often settled without a trial. *See, e.g.*, Bradburn Parent Teacher Store v. 3M, No. 02-7676, 2005 U.S. Dist. LEXIS 5315 (E.D. Pa. 2005) (following determination of liability in *LePage's*, 3M settled the customer claims for $39.75 million); Meijer Inc. v. 3M, No. 04-5871, 2005 U.S. Dist. LEXIS 13995 (E.D. Pa. 2005) (following determination of liability in *LePage's*, 3M settled the customer claims for $28.9 million). The district court judge who presided over the *LePage's* case also presided over the *Bradburn* and *Meijer* cases. The *Bradburn* class included only commercial purchasers of branded tape from 3M whereas the *Meijer* class included commercial purchasers of both branded and private label tape from 3M. Following the district court decision against Weyerhaeuser, a class action suit was filed in 2004 on behalf of purchasers of finished alder lumber even though the jury in the Weyerhaeuser case had found that the downstream output market was broader than finished alder lumber and that Weyerhaeuser had not monopolized or attempted to monopolize this broader hardwood lumber market. *See* Morelock Enters. v. Weyerhaeuser Co., No. CV-04-583-PA, 2004 U.S. Dist. LEXIS 28270 (D. Or. 2004) (order granting motion for class certification). In April 2008, the jury awarded damages to the plaintiffs in the amount of

$27.98M. Verdict, *Morelock Enters. v. Weyerhaeuser Co.*, No. CV-04-583-PA (D. Or. Apr. 28, 2008). Weyerhaeuser moved for judgment as a matter of law or for a new trial. Renewed Motion for Judgment as a Matter of Law and, In the Alternative, Motion for New Trial, *Morelock Enters.*, No. CV-04-583-PA (D. Or. May 15, 2008). In August 2009, the court approved a settlement agreement and vacated its earlier verdict. Final Approval Order and Judgment, *Morelock Enters.*, No. CV-04-583-PA (D. Or. Aug. 10, 2009).

79. The *Bradburn* and *Meijer* cases were both based on 3M's bundled pricing of a broad range of products sold by 3M to office supply stores and other large retailers. In approving the final settlement in *Bradburn*, the court stated that the $39.75 million settlement represented between 41-48% of the damages calculated by the Plaintiff's expert and resulted in an award of more than 18.5% of the Class's transparent tape purchases from 3M during the 7-year period. Bradburn Parent Teacher Store v. 3M, 513 F. Supp. 2d 322, 327 (E.D. Pa. 2007). In approving the final settlement in *Meijer*, the court stated that the $28.89 million settlement resulted in an award of about 2% of the Class's transparent tape purchases from 3M during the Class period. Meijer, Inc. v. 3M, No. 04-5871, 2006 U.S. Dist. LEXIS 56744, at *9-10 (E.D. Pa. 2006).

80. *See .g., I nr e* Payment Card Interchange Fee and Merchant Discount, No. 05-MD-1720, 2013 WL 6510737 (E.D.N.Y.2013) (noting, in approving a settlement, that even if credit card interchange fees would have been lower in the but-for world, a damage award might need to be offset by the costs associated with the diminished value of credit cards to users.)

81. 350 Fed. Appx. 95 (9th Cir. 2009).

82. LLC v. Eaton Corp., 696 F.3d 254 (3d Cir. 2012).

83. 549 U.S. 312 (2007).

84. No. 02-6032-HA, 2003 U.S. Dist. LEXIS 16203 (D. Or. 2003), *vacated and remanded sub nom.* Cascade Health Solutions v. PeaceHealth, 515 F.3d 883 (9th Cir. 2008). The Ninth Circuit stayed further proceedings until the Oregon Supreme Court resolved a question certified to it by the Ninth Circuit concerning Oregon's price discrimination law. The parties later settled the dispute, and the Ninth Circuit vacated its certification to the Oregon Supreme Court. Cascade Health Solutions v. PeaceHealth, 542 F.3d 668 (9th Cir. 2008).

85. Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003).

86. Note that it is not the purpose of this section to evaluate the legal and economic merits of the liability theories advanced by the parties and accepted or rejected by the juries and federal courts in these matters.

87. Masimo Corp. v. Tyco Health Care Group, L.P., No. CV 02-4770 MRP, 2006 U.S. Dist. LEXIS 29977, at *40-41 (C.D. Cal. 2006).

88. Masimo Corp. v. Tyco Health Care Group, L.P., No. CV 02-4770 MRP (AJWx), 2007 U.S. Dist. LEXIS 98990, at *21 (C.D. Cal. 2007). The Court of Appeals affirmed the district court's findings. Masimo Corp. v. Tyco Health Care Group, L.P., 350 Fed. Appx. 95, 96-98 (9th Cir. 2009).

89. ZF Meritor LLC v. Eaton Corp., 646 F. Supp. 2d 663, 666-67 (D. Del. 2009).

90. ZF Meritor LLC v. Eaton Corp., 800 F. Supp. 2d 633, 637 (D. Del. 2011).

91. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 290-300 (3d Cir. 2012).

92. ZF Meritor LLC v. Eaton Corp., No. 06-623-SLR, 2013 U.S. Dist. LEXIS 178890, at *14 (D. Del. 2013).

93. *See* Press Release, Eaton Corp., Eaton and Meritor Announce Settlement of Litigation: Eaton to Pay Meritor $500 Million (June 23, 2014), *available at* http://www.eaton.com/Eaton/OurCompany/ NewsEvents/ NewsReleases/PCT_1118090.

94. Ross-Simmons alleged that Weyerhaeuser had engaged in predatory overbidding by paying more for sawlogs than necessary. In February 2007, the Supreme Court vacated the Ninth Circuit's decision upholding the verdict for the plaintiff. *See Weyerhaeuser*, 549 U.S. at 312. The Supreme Court concluded that the *Brooke Group* test for predatory pricing cases also applies to cases in which predatory overbidding is alleged.

95. *See* Confederated Tribes v. Weyerhaeuser Co., 411 F.3d 1030, 1035, 1045-46 (9th Cir. 2004). Following the remand to the district court, Weyerhaeuser and Ross-Simmons Hardwood reached a settlement which resulted in an after tax charge of $11 million in 2007 for Weyerhaeuser. *See* Weyerhaeuser Co., Annual Report (Form 10-K), at 95 (Feb. 28, 2008).

96. While the plaintiff's damages model was based on a liability theory that was ultimately rejected by the Supreme Court, the discussion in this

section focuses on the plaintiff's damages methodology assuming the liability theory was valid.

97. Weyerhaeuser Co., Annual Report (Form 10-K), at 71 (Mar. 3, 2005).

98. Weyerhaeuser Co., Annual Report (Form 10-K), at 84 (Mar. 1, 2007).

99. *See* Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 325-26 (2007) (holding "predatory bidding" theory invalid absent showing that bids brought the pricing of the alleged predator's outputs below-cost and that the predator would have a "dangerous probability of recouping" losses caused by bidding strategy and noting that the plaintiff "has conceded that it has not satisfied the [announced] standard").

100. Washington Alder LLC v. Weyerhaeuser Co., No. CV 03-753-PA, 2004 U.S. Dist. LEXIS 29851 (D. Or. 2004).

101. *See* Washington Alder v. Weyerhaeuser Co., Nos. 04-35717, 04-36125, Dkts. 33 & 37 (9th Cir. Dec. 2, 2005 & July 10, 2006).

102. 549 U.S. 312, 325-26 (2007) (holding "predatory bidding" theory invalid absent showing that bids brought the pricing of the alleged predator's outputs below-cost and that the predator would have a "dangerous probability of recouping" losses caused by bidding strategy and noting that the plaintiff "has conceded that it has not satisfied the [announced] standard").

103. Washington Alder v. Weyerhaeuser Co., Nos. 04-35717, 04-36125, 2007 U.S. App. LEXIS 12806 (9th Cir. 2007).

104. *See* Weyerhaeuser Co., Annual Report (Form 10-K), at 95 (Feb. 28, 2008).

105. In *McKenzie-Willamette*, the bundled discount pricing concerned tertiary hospital services such as intensive neonatal care and invasive cardiology surgery services that PeaceHealth combined with general acute care hospital services offered to two health plans providing coverage in Lane County, Oregon. McKenzie-Willamette offered only general acute care hospital services. McKenzie-Willamette argued that the bundled discount pricing of tertiary hospital services with general acute care hospital services was an exercise of monopoly power by PeaceHealth. *See McKenzie-Willamette*, No. 02-6032-HA, 2003 U.S. Dist. LEXIS 16203, at *16-*17. The Ninth Circuit reversed a jury verdict in favor of the plaintiff alleging that "bundled" hospital services constituted attempted monopolization under federal antitrust laws.

Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 891 (9th Cir. 2008).

106. The district court subsequently trebled this damages award to $16.2 million. The jury also awarded McKenzie-Willamette $5.4 million based on its finding that PeaceHealth violated Oregon's anti-price discrimination law and $5.4 million based on its finding that PeaceHealth tortiously interfered in McKenzie-Willamette's business relations. In addition, the jury awarded McKenzie-Willamette $9.2 million in punitive damages based on the tortious interference claim. McKenzie-Willamette Hosp. v. PeaceHealth, No. 02-6032-HA, 2004 U.S. Dist. LEXIS 21050, at *2 (D. Or. Sept. 30, 2004); *vacated and remanded sub nom.* Cascade Health Solutions v. PeaceHealth, 515 F.3d 883 (9th Cir. 2008).

107. *See* Transcript of Record at 70-71, *McKenzie-Willamette Hosp.*, 2004 U.S. Dist. LEXIS 21050 (No. 358); Transcript of Record at 30-31, *McKenzie-Willamette Hosp.*, 2004 U.S. Dist. LEXIS 21050 (No. 362). The two time periods used by plaintiff's expert were January 1998 to October 1, 2003 and February 1, 2000 to October 1, 2003. According to the defendant, these two health plans accounted for 15% of commercial lives in Lane County. In a motion for a new trial, the defendant argued that the plaintiff's expert "could not explain why plaintiff was foreclosed from competing when eighty-five percent of the commercial market was still available to plaintiff." The district court, however, concluded that there was "sufficient evidence that plaintiff was excluded from significantly more than fifteen percent of the market of patients who could pay through insurance benefits or otherwise." *See McKenzie-WillametteH osp.*, 2004 U.S. Dist. LEXIS 21050, at *16-17.

108. *Id.* at *24-26.

109. *Id.* at *26-27.

110. *See* Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 890 (9th Cir. 2008).

111. Cascade Health Solutions v. PeaceHealth, 542 F.3d 668 (9th Cir. 2008).

112. In *LePage's*, the bundled pricing concerned a broad array of products sold by 3M to office supply stores and other large retailers. LePage's primarily sold private label transparent tape to large retailers. LePage's argued that 3M's bundled discount pricing in conjunction with 3M's monopoly power in the sale of branded transparent tape was intended to

foreclose LePage's from selling private label transparent tape to large retail outlets. *SeeL ePage's*, 324 F.3d at 141.

113. *See* LePage's, Inc. v. 3M, 324 F.3d 141, 145, 164-66 (3d Cir. 2003).

114. To determine LePage's but-for sales for each year of the damages period, LePage's expert relied on the following data: (1) actual and projected total U.S. sales of transparent tape; (2) private-label tape's share of total U.S. sales of transparent tape, which was estimated to grow by 1% per year over the damages period; and (3) LePage's shares of total U.S. sales of branded-label tape and private-label tape, which were estimated to remain constant over the damages period. *LePage's*, 324 F.3d at 165.

115. For a general discussion of the estimation of lost profits, see Chapter 5.

116. For example, 3M challenged the assumption of LePage's damages expert that 3M did not want to succeed in the private-label market because it would lower the profitability of 3M's premier Scotch brand tape. The court of appeals noted that the district court had rejected 3M's argument on this point, stating that LePage's expert's "assumptions were grounded in the past performances of Scotch, Highland [a lower-priced 3M branded tape] and LePage's tapes, as well as 3M's own internal projections for future growth." *LePage's*, 324 F.3d at 165.

117. *Id.* at 165-66.

# CHAPTER 10

# PROOF OF ROBINSON-PATMAN ACT DAMAGES

The Robinson-Patman Act (the Act) generally prohibits price discrimination in the sale of commodities "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly."[1] This chapter provides an overview of basic principles regarding the proof of damages under the Act.[2]

In practice, a plaintiff may prove a violation under the Act, yet fail to recover damages under Section 4 of the Clayton Act. Courts distinguish between two basic types of Robinson-Patman Act damages claims: (1) those brought by a competitor of the defendant seller claiming that the defendant reduced its prices in a given market in order to drive the competitor out of the market or otherwise harm it (a so-called primary line claim); and (2) those brought by an allegedly disadvantaged customer of the defendant seller claiming that it has been harmed by preferential pricing provided to one or more favored buyers with whom it competes for downstream sales (a so-called secondary line claim). Other, less common, fact patterns also exist.[3]

The primary line and secondary line distinction impacts the nature of the evidence offered on issues such as liability and standing, but plays a minor role, if any, in the proof of damages. Because most Robinson-Patman cases discussing damages involve claims by a seller's customers, most of the cases discussed in this chapter are secondary line cases.

# A. Flexible Standards of Proof

In a 1948 decision in *Federal Trade Commission v. Morton Salt Co.*,[4] the Supreme Court held that in injunctive actions brought to enforce Section 2(a)

of the Act, the factfinder may infer the fact of injury to competition from proof of substantial price discrimination over time.[5] This decision followed from the specific language of Section 2(a), which does not require that actual injury be proven to sustain liability for price discrimination.[6]

Following *Morton Salt*, courts adopted two distinct approaches in applying the holding of *Morton Salt* to proof of damages in civil actions under the Act. One approach, referred to as the "automatic" or "general" damages approach, permitted damages to be inferred. In other words, once the plaintiff established discrimination, damages could be awarded based on the discriminatory price difference multiplied by the number of units sold to the plaintiff without further proof of the plaintiff's actual losses.[7] The other approach required proof of "specific" damages caused by the discrimination.[8] In other words, it required plaintiffs to provide actual proof of the harm they had suffered.

In its landmark holding in *J. Truett Payne Co. v. Chrysler Motors Corp.*,[9] the Supreme Court rejected the automatic damages theory, but acknowledged that "once a violation has been established," the plaintiff's burden to prove actual damages "is to some extent lightened."[10] The case involved a suit against Chrysler for price discrimination by Payne, a former Chrysler dealer that had gone out of business. Payne's evidence of injury consisted of the owner's uncorroborated testimony of lost sales and the opinion of an economics professor based on that testimony. A jury awarded Payne $111,247.48 in damages that were trebled, but the Fifth Circuit reversed and directed dismissal of the case. That court ruled that Payne had failed to offer sufficient evidence of lost sales and profits flowing from the alleged discrimination without reaching the question of whether Payne had offered sufficient evidence to establish that a violation had in fact occurred.[11]

On appeal to the Supreme Court, Payne argued that the automatic damages rule should apply and thus any insufficiency of the evidence should be irrelevant.[12] The Supreme Court disagreed, thus resolving the split among the courts regarding proof of damages under the Act. The Court noted that "concrete, detailed proof of injury" is rarely available in antitrust cases where a plaintiff's injury occurs in the form of a "decline in prices, profits and values."[13] Demanding rigorous proof of damages would thus protect the wrongdoer at the expense of the victim.[14] Nevertheless, the Court held that the plaintiff "is not excused from its burden of proving antitrust injury and

damages. It is simply that once a violation has been established, that burden is to some extent lightened."[15] The Court found it a "close question" whether the plaintiff's evidence supported the jury's damages award even under relaxed damages rules, but refused to consider the adequacy of that evidence absent proof that the defendant had in fact violated the Act.[16] It thus remanded to the Fifth Circuit to determine whether Payne had proven that Chrysler committed a violation and, if a violation were indeed established, to determine whether Payne had offered sufficient evidence to satisfy its burden of proof of damages.[17]

The more relaxed standard of proof for antitrust damages, of course, does not negate the requirement that plaintiffs must still prove damages caused by price discrimination. In *Stelwagon Manufacturing Co. v. Tarmac Roofing Systems*,[18] the Third Circuit held that, although the plaintiff had established a Robinson-Patman violation, it had not proven "actual antitrust damages."[19] Although Stelwagon offered sufficient proof of a substantial price difference over time, the customer statements on which it relied to show the actual damages due to the price difference were hearsay. Thus, the "the district court's reliance on them as proof of actual antitrust damages, in the form of lost sales, was in error."[20]

In addition, even under the more relaxed standard of proof applicable to antitrust damages, a plaintiff bringing claims under the Act must nevertheless prove its actual, individual damages rather than impact on a broader scale.[21] In *Drug Mart Pharmacy Corp. v. American Home Products Corp.*,[22] for example, a group of plaintiffs sought to prove that they lost sales of defendants' products by relying on a calculation that they called TSS, or "total sales shift."[23] This calculation purported to demonstrate that the percentage growth in the market shares of the favored buyers between 1985 and 1995 was caused by the defendants' alleged price discrimination. The district court observed that "[t]he TSS in the 1995 Expert Report is stated as a percentage, 5.1%, and reflects an aggregate amount of sales lost by all of the plaintiffs as a group."[24] The court explained that the plaintiffs' failure to prove actual, individual damages doomed their claims: "Fatal to plaintiffs' argument is their failure to offer any evidence to support their claim as it relates to each plaintiff."[25]

Five years later, the court granted summary judgment against the claims of the remaining non-designated plaintiffs who, in response to the earlier opinion, employed an intensive "matching process" to identify the customers whom each individual plaintiff lost to the favored buyers over a twelve year period.[26] Using electronically stored customer lists, each plaintiff identified its "lost customers" and attempted to determine whether those customers purchased the same drug from a favored buyer within six months of having bought it from the plaintiff.[27] Approximately 3 percent (5,147 of 164,501) of the plaintiffs' lost customers "matched" with a customer subsequently purchasing the same drug from one of the favored buyers.[28] Rather than conclude that the "matching process" showed proof of antitrust injury or proof of each plaintiff's damages amount, the court held that the de minimis 3 percent figure was insufficient to show substantial harm to competition and did not sufficiently match up plaintiffs' losses with favored buyers' gains to show that the plaintiffs had suffered antitrust injury.[29] The Second Circuit agreed with the district court and affirmed summary judgment.[30]

# B. Types of Harm

In *Volvo Trucks North America v. Reeder-Simco GMC, Inc.*,[31] the Supreme Court explained that a "hallmark" of injury from price discrimination is "the diversion of sales or profits from a disfavored purchaser to a favored purchaser."[32] Robinson-Patman plaintiffs generally attempt to show, for purposes of their substantive claims, that the discrimination either: (1) enabled the favored purchaser to divert sales from the plaintiff; or (2) forced the plaintiff to lower its prices to retain sales. Other theories of damages, however, have been successful as well.

## 1. Primary Line Damages

Most Robinson-Patman cases involve allegations of diverted sales. In a primary line case, the plaintiff complains that the lower prices its competitor charges to some customers caused it to lose sales and destroyed or damaged its ability to compete.[33] Thus, as in a predatory pricing case, the plaintiff must show that the low price was below the appropriate measure of the seller's cost and that it was feasible for the seller to recoup its short-term

losses after elimination of its competition.[34] There are few, if any, primary line cases resulting in reported decisions that discuss the proof of damages.

# 2. Secondary Line Damages

In secondary line cases of the Act, the plaintiff generally complains that a supplier's favorable treatment of the plaintiff's competitor allowed it to divert sales from the plaintiff. The favored customer allegedly has used its preferential treatment to lower its resale prices or to improve its offerings in direct competition with the plaintiff and thereby has drawn sales from the plaintiff.[35] Although the typical claim is that a competitor received a better price from the supplier, thus enabling the competitor to offer lower prices and divert sales, diversion of sales may also result from the supplier giving the favored customer certain promotional benefits and services covered in Sections 2(d) and (e) of the Act. Damages are not limited to lost profits from diverted sales, however; a plaintiff may also, in theory, recover damages for the profits lost in certain other circumstances.[36]

Before delving into how the courts, in practice, assess evidence on damages, it is useful to have in mind an economic framework. In a case in which the only issue is pricing, the analytical steps required to form an ideal damages model can be broken down as follows: (1) what the non-discriminatory price from the defendant supplier would have been absent the alleged violation; (2) the extent to which the plaintiff buyer passes on the defendant supplier's price to its customers; and (3) the extent to which the resulting change in the plaintiff buyer's prices would affect demand for its products. With these elements, a damages model can answer the ultimate question: if prices were non-discriminatory, how would the plaintiffs' revenues (and hence profits) have been different?

The first analytical step, regarding the level of the non-discriminatory input price, is more easily answered if a comparable market exists in which the alleged price discrimination is not occurring, or if data permit a before-and-after style of analysis. In the absence of such evidence, economic theory provides some limited guidance. Most models will generate a non-discriminatory price that lies within the range of prices offered to the least favored and most favored buyers.[37] Many of the court decisions regarding

damages grapple with exactly where this non-discriminatory price point should rest.

The second analytical step considers the pass-on of the non-discriminatory wholesale (or input) price to the plaintiff buyers' consumer price. Pass-on has been studied most often in the economic fields of international trade (in particular, exchange rate pass-on) and public finance (in particular, the pass-on of producer taxes to consumers).[38] That said, it is a concept familiar to antitrust economics as the basis for why, among other things, it is recognized that efficiencies in a merger can generate benefits for consumers. In the absence of empirical evidence from, for instance, a comparable market or a before-during-after study, economic theory gives only limited guidance on the typical extent of pass-on. Nevertheless, it is well understood that assumptions about the slope of the demand curve and the nature of market competition will heavily influence the pass-on implied by any particular model.[39]

The last analytical step, regarding the sensitivity of consumers to price changes, turns on the economic concepts of own-price and cross-price elasticity. Own-price elasticities give a unit-free measure of the extent to which a change in the price of a good impacts the quantity of it that is sold. Cross-price elasticities give a unit-free measure of the extent to which a change in the price of one good impacts the quantity sold of another.[40] Thus, the extent to which consumers are attracted to the disadvantaged firm's product, and in particular the extent to which consumers switch from a favored firm to a disadvantaged firm once prices are adjusted following a shift to non-discriminatory pricing, turns on the elasticities used, either implicitly or explicitly, in the analysis.

# a. Damages from Sales Diversion: Basic Principles Resulting from Proving the Amount of Damages in Secondary Line Cases

One common method of proving damages is to compare the plaintiff's profits across time before and after the price discrimination. Another recognized method is the "yardstick" analysis in which the plaintiff's market shares in violation-free and violation-affected markets that are otherwise

similar to each other are compared. Over the years, courts have provided some guidance regarding the nature of the analyses that may be used to prove damages in Robinson-Patman damages situations.

## (1) Defining the But-For World

As the Fifth Circuit explained in *Olympia Co. v. Celotex Corp.*,[41] a plaintiff "may not base its damage claim on calculations showing what would have occurred had it received an allegedly discriminatory price."[42] Instead, damages must be based on what would have happened had there been no lower discriminatory prices granted to the favored buyer.[43] The court elaborated:

> This is because "[r]estoration of the competitive freedom which the Sherman Act is designed to protect through elimination of the anticompetitive practice is accomplished here by disregarding the special conspiratorial price . . ., not by hypothetical broadening of the conspiracy to give [the defendant/buyer's] abnormally low price to [the plaintiff] as well."[44]

Based on this reasoning, the court held that "even if Olympia had been able to factually substantiate its claims," its theory of damages was impermissible.[45]

The Eighth Circuit examined the same basic question in *Rose Confections, Inc. v. Ambrosia Chocolate Co.*[46] The plaintiff's economist prepared a "yardstick" analysis in which he purported to compare Rose Confections' actual performance and sales in the violation-affected West Coast market to its performance in the violation-free Midwest market.[47] The court accepted this method of cross-market comparison for estimating lost market share and lost sales volume in the West Coast market. The economist testified, however, that his projections of market share and sales in the West Coast market assumed that Rose Confections had obtained the same lower discriminatory price given to the favored buyer. He explained: "[I]f the price difference were extended to all competitors, or if all competitors competed on an even basis, then one would expect that Rose would have obtained a market share similar" to that in a region unaffected by the discrimination.[48] The court, however, rejected this analysis as a basis for calculating

Robinson-Patman damages because it "assumed that Rose Confections would share in the benefit of the violation."[49] "This state of affairs cannot be said to be violation-free . . . and cannot be the basis for an award of damages under section 4" of the Clayton Act because Rose Confections and the favored buyer were not the defendant's only two potential customers in the West Coast market.[50] Although the court rejected the use of the lower discriminatory price in the "yardstick" calculation, it validated the plaintiff's second damages calculation that used Rose Confections' actual price for its best West Coast customer as the violation-free price from which to project lost profits.[51]

### (2) The Discriminatory Price May Be a Factor in the Damages Calculation in Some Circumstances

The discriminatory price, however, may be considered as a factor in calculating a damages award in certain circumstances. In *Huntsman Chemical Corp. v. Holland Plastics Co.*,[52] the Tenth Circuit held that the damages calculation may, in some circumstances, take into consideration the discriminatory price. The estimate of damages by the counterplaintiff's expert compared the profits the counterplaintiff actually obtained to the profits it would have obtained if it had received the discriminatory price— just as Rose Confections had done in its rejected damages theory. The Tenth Circuit, however, held that an expert's calculation may under some circumstances take the discriminatory price into consideration. It accepted the counterplaintiff's argument that it could be reasonable to assume that Holland would have received the discounted price absent Huntsman's price discrimination because the discriminatory price was economically viable for Huntsman, as shown by evidence that it was able to offer that price to the favored buyer and that the favored buyer was Holland's primary competitor. The court further explained, "Thus, there was arguably no danger that basing a calculation of lost profits on the lower price . . . would perpetuate an illegal discriminatory pricing scheme as proscribed by *RoseC onfections*."[53] The court noted that whether the discriminatory price was "an economically viable one that Holland could have expected to receive absent the price discrimination" was an issue of fact to be submitted to a jury.[54]

In *Texaco, Inc. v. Hasbrouck*,[55] independent Texaco gasoline retailers alleged that Texaco violated Section 2(a) of the Act by selling gasoline to two local distributors at prices that were substantially lower than those offered to the plaintiffs. The plaintiffs purchased gasoline from Texaco and sold it to motorists under Texaco's name. Two local distributors (Gull and Dompier) purchased Texaco gasoline at prices lower than the prices paid by the plaintiffs.[56] Stations supplied by Gull and Dompier undersold the plaintiffs at prices that were only slightly higher than the price paid by the plaintiffs. The market share of such stations grew while the plaintiff retailers' market share declined.

In the first trial, a jury awarded damages in accordance with the automatic damages theory then in effect in the Ninth Circuit. While the appeal was pending, the Supreme Court decided *J. Truett Payne Co.* Accordingly, the Ninth Circuit remanded *Hasbrouck* for a new trial. The plaintiffs once again won a jury verdict. The second judgment was affirmed by the Ninth Circuit and by the Supreme Court.[57]

The plaintiffs' damages theory at the second trial was based on but-for sales and profits.[58] The plaintiffs' expert offered six hypothetical scenarios, some of which eliminated the discrimination by raising the price Texaco charged to Dompier and Gull, and others of which eliminated the differential by lowering the price Texaco charged to the plaintiffs. Texaco objected, arguing that evidence of the amount Texaco had overcharged the plaintiffs for the gasoline was impermissible under *J.TruettPayne*.[59]

The district court rejected Texaco's objection, and the Ninth Circuit affirmed. The appellate court pointed out, first, that none of the six scenarios actually estimated the plaintiffs' damages by measuring the amount of the overcharge.[60] The court further explained that the various projections allowed the jury to "compare estimates of damages in different market situations," thus enabling them to estimate the plaintiffs' lost profits.[61] "Obviously, such a determination necessarily entails postulating the elimination of the price differential, either by increasing the favored buyer's price, decreasing the disfavored buyer's price, or a combination of the two."[62] The court also noted that any risk that the jury might have used an overcharge theory to award automatic damages was "offset" by the trial judge's "contrary oral admonition" as well as the jury instructions.[63] Texaco argued on appeal to the Supreme Court that the plaintiffs' amount of damages

was insufficiently precise, but the Court observed that precise quantification was not possible and that the plaintiffs' expert's estimate was a sufficient basis for estimating the amount of damages.[64]

### (3) Damages Are Not Awarded Based on the Favored Buyer's Profits

Given that damages generally must reflect what would have happened had there been no discriminatory price, it follows that damages may not be calculated based on the favored buyer's net profits gained as a result of the discrimination. In *DeLong Equipment Co. v. Washington Mills Electro Minerals Corp.*,[65] the Eleventh Circuit considered a case in which the jury had awarded damages to the plaintiff in the amount of the rebates that a favored buyer received.[66] The trial court had granted a new trial on those damages because "Robinson-Patman damages must be measured by what the disfavored buyer suffered, not by what the favored buyer gained."[67] On appeal, the defendant sought a new trial because, it asserted, the jury essentially granted the "automatic damages" rejected in *J. Truett Payne.*[68] On appeal, the court agreed with the defendant that a new trial was required, but did not agree with the defendant's theory. The court explained that, "[i]t may be that the extra money paid to [the favored buyer] corresponded, at least roughly, to DeLong's lost profits on sales [on goods] for which it was overcharged and on sales lost to [the favored buyer], and to other damage resulting from the drain on DeLong's business of competing with a distributor receiving favorable prices."[69]

### (4) Future Damages Generally Are Not Recoverable

Damages for Robinson-Patman Act violations generally do not include future lost profits; a plaintiff may only recover for profits actually lost. In *Stevens v. Zenith Distributing Corp.*,[70] the plaintiff sought damages for two types of lost profits: those lost due to price discrimination while he was a distributor of the defendant's products, and those lost in the five years after he gave up and switched to suppliers other than the defendant until he ultimately gave up his business altogether. The district court rejected the second category of damages, however. Instead, it held that a Robinson-Patman Act complaint is "directed toward actual sales transactions" and

"cannot be presented by a potential customer who *fails* to make purchases because he objects to a potential seller's pricing policies or where the lack of consummated sales is otherwise 'attributable' to the discriminatory price."[71]

Where a plaintiff did not simply switch suppliers but was forced out of business by the discrimination, however, the First Circuit held that an award of either future lost profits or the going concern value of the plaintiff's business (but not both) was appropriate. In *Coastal Fuels of Puerto Rico, Inc., v. Caribbean Petroleum Corp.*,[72] the plaintiff sought the future lost profits it would have made in a violation-free world and also sought the going concern value of its business, which the court defined as the amount "a willing buyer given all available information would have paid a willing seller."[73] The court held that the plaintiff was entitled to its lost profits only for the period in which it was in business, and that the plaintiff could recover the going concern value as of the date it went out of business.[74] "Where plaintiff has been forced out of business . . . it is awarded its going-concern value or its projected future lost profits, but not both."[75] The court explained that the choice between future lost profits and the going concern value as a basis for a damages award depended on which was less speculative.[76]

## b. Damages May Be Measured by Lost Profits from Reduced Prices, Increased Costs, or Other Factors

A plaintiff may prove damages from price discrimination using evidence of something other than diverted sales, but such evidence is generally viewed as less persuasive than proof of lost sales. The Supreme Court in *J. Truett PayneC o.* suggested but did not address this alternative approach to proof of damages: "To the extent a disfavored purchaser must pay more for its goods than its competitors, it is less able to compete. It has fewer funds available with which to advertise, make capital expenditures, and the like."[77] The Court, however, also noted that "the inability of petitioner to show that the favored retailers lowered their retail price makes petitioner's argument particularly weak . . . ."[78]

As more recent cases from the lower courts demonstrate, showing actual antitrust damage based on such broad notions of decreased competitiveness

is difficult. For example, in *Nichols Motorcycle Supply v. Dunlop Tire Corp.*,[79] Nichols sought three types of damages. First, it sought lost profits on its sales of Dunlop's products. In other words, the favored buyers lowered their prices because of the discrimination, and Nichols lost profits when it lowered its prices to be able to compete. Dunlop argued that these damages were prohibited automatic damages, but the court disagreed, noting that Nichols had offered expert economic testimony showing that Nichols's revenues would have been higher during the period of discrimination if the discrimination had not occurred. Second, Nichols sought lost profits for sales it was not able to make because of its higher costs. The court held, without detailed explanation, that these damages were permissible as long as the calculations approximated a "violation-free state of affairs."[80] Third, Nichols sought lost profits for sales of non-Dunlop products that it would have made to customers who would have been "drawn to buy" from Nichols if it had been able to offer better prices on Dunlop products.[81] The court held that Nichols could not recover these damages because it had not demonstrated a causal connection between the lost sales at issue and the price discrimination, but suggested that this type of damages might be available if supported by evidence such as the testimony of buyers who chose to buy elsewhere.[82]

A plaintiff bringing claims under Sections 2(d) or 2(e) of the Act may also establish the amount of its damages through evidence that the supplier subsidized a favored buyer's advertising or customer service and that such allowances or service played an important role in the customer's purchasing decisions. For example, in *Alan's of Atlanta v. Minolta*,[83] the plaintiff's price discrimination claim was based on Minolta's decision to provide market development funds to "key dealers" in various cities.[84] In such cases, the subsidy to the plaintiff's competitor is thus the discrimination as opposed to a discounted price, but the effect on the plaintiff is theoretically the same. Evidence that the plaintiff's market share dropped during an advertising blitz, or that the favored competitor's share showed an otherwise unexplained increase, can thus help establish competitive injury from price discrimination.[85] Nonetheless, without evidence that the plaintiff lost sales as a result of the preferential treatment given to the favored buyer, the plaintiff ordinarily is unlikely to succeed in establishing damages.[86]

# C. Establishing the Amount of the Plaintiff's Damages

## 1. The Plaintiff Is Not Required to Prove Damages with Certainty

The plaintiff need not prove damages from diverted sales with mathematical certainty. In *Allied Accessories and Auto Parts Co. v. General Motors Corp.*,[87] the Sixth Circuit considered whether General Motors (GM) had violated the Act through discriminatory pricing to competitors of the plaintiff, an oil filter supplier. The court first affirmed the district court's findings that the defendant's discriminatory pricing to favored buyers caused the plaintiff to lose a bid to supply oil filters to K-Mart Corporation.[88] The court then turned to the proof of the amount of damages. GM claimed that the damages calculation accepted by the district court was erroneous because that calculation failed to recognize that K-Mart would have negotiated a reduction in the plaintiff's asking price, pursuant to K-Mart's usual practice.[89] The court, however, rejected that theory. "GM's argument suffers from the flawed assumption that damages must be proven with mathematical precision" under the Act.[90] The court observed that there was evidence that K-Mart would have attempted to negotiate a lower price, but no evidence that K-Mart "would have *insisted* on a price reduction."[91] Thus, the court upheld the damages award of $450,000 because the award was "a reasonable one, and because the district court took obvious pains" to ensure that.[92]

## 2. Damages Models Must Account for Other Factors that Impacted the Plaintiff's Profits

Damages do not have to be proven with certainty, but courts are skeptical of speculative calculations. In *City of Vernon v. Southern California Edison Co.*,[93] the Ninth Circuit affirmed the district court's grant of summary judgment to the defendant in part because the plaintiff's damages study "was,

at best, seriously flawed."[94] The court observed that once causation of damages has been determined, the amount of damages may be estimated so long as the estimate is not the product of speculation or guesswork.[95] The study offered by the plaintiff to support its damages, however, was not a reasonable estimate because it failed to distinguish between losses that resulted from the defendant's anticompetitive acts and losses that were unrelated to those acts. The court thus affirmed summary judgment dismissing the plaintiff's claim for monetary damages.[96] The court noted that it had dealt with similar circumstances in previous cases, and in one such case had determined that although the plaintiff's damages study was flawed, the flaws could be overcome through other evidence available to the jury.[97]

Whether factors other than price discrimination contributed to the plaintiff's damages is a question that courts generally consider in connection with causation and antitrust injury.[98] The failure to account for such other factors, however, can also result in a failure of proof of damages. In *American Booksellers Ass'n v. Barnes & Noble, Inc.*,[99] the court rejected the damages model offered by the plaintiffs' expert as "entirely too speculative" to prove either causation or the amount of damages.[100] The model did not take into account the extent to which stores in the same geographic area competed with one another, ignored competition from Internet booksellers, and used arbitrarily chosen ratios to determine the extent to which sales volumes were affected by price changes.[101]

---

[1]. 15 U.S.C. § 13(a).

[2]. Although the fact of damage, antitrust standing, and antitrust injury are critical elements in establishing entitlement to damages, they are addressed in Chapters 1 and 2 of this book.

[3]. *See* Volvo Trucks N. Am. v. Reeder-Simco GMC, Inc., 546 U.S. 164, 176 (2006). Courts also recognize third and fourth line claims, which involve a disfavored purchaser who has been unable to compete with customers of the favored purchaser or with their customers. *See* Texaco Inc. v. Hasbrouck, 496 U.S. 543 (1990) (third line injury); Perkins v. Standard Oil Co., 395 U.S. 642 (1969) (fourth line injury).

[4]. 334 U.S. 37 (1948).

[5]. *Id.* at 49-50.

[6]. *Id.*

7. *See, e.g.*, Fowler Mfg. Co. v. Gorlick, 415 F.2d 1248 (9th Cir. 1969); Elizabeth Arden Sales Corp. v. Gus Blass Co., 150 F.2d 988 (8th Cir. 1945).

8. *See, e.g.*, Edward J. Sweeney & Sons v. Texaco, Inc., 637 F.2d 105 (3d Cir. 1980); Enterprise Indus. v. Tex. Co., 240 F.2d 457 (2d Cir. 1957).

9. 451 U.S. 557 (1981).

10. *Id.* at 568.

11. *Id.*

12. *Id.* at 561-62.

13. *Id.* at 565 (citing Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264 (1946)).

14. *Id.* at 566-67; *see also* Drug Mart Pharm. Corp. v. Am. Home Prods. Corp., 472 F. Supp. 2d 385, 424 (E.D.N.Y. 2007) ("The 'wrongdoer is not entitled to complain that [the damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.'") (quoting Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931)).

15. *J. Truett Payne*, 451 U.S. at 568; *see also* J.F. Feeser, Inc. v. Serv-a-Portion, Inc., 909 F.2d 1524, 1539 (3d Cir. 1990) ("[P]laintiff's proof of damages is facilitated by the rule that once the plaintiff has met its burden of proving the fact of damage, some uncertainty with respect to the amount of damages will not preclude recovery.").

16. *J.T ruettP ayne*, 451 U.S. at 567-68.

17. *Id.*

18. 63 F.3d 1267 (3d Cir. 1995).

19. *Id.* at 1269.

20. *Id.* at 1274-75.

21. *See* Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1045 (9th Cir. 1987) ("Injury to the specific plaintiff is the sine qua non of a section 4 claim, once injury to competition has been established"), *aff'd*, 496 U.S. 543 (1990); *see also J. Truett Payne*, 451 U.S. at 561-62 ("[A] plaintiff must make some showing of actual injury"); Kemp Pontiac-Cadillac, Inc. v. Hartford Auto. Dealer's Ass'n, 380 F. Supp. 1382, 1386 (D. Conn. 1974) (holding that under § 4 of the Clayton Act, a plaintiff

bringing a private suit must establish damage "to a specific individual").

22. 472 F. Supp. 2d 385 (E.D.N.Y. 2007).

23. *Id.* at 429-30.

24. *Id.* at 429.

25. *Id.* Because of the requirement that each plaintiff show actual, individualized damages, class certification is not generally available for claims under the Act. *See, e.g.*, Danvers Motor Co. v. Ford Motor Co., 543 F.3d 141, 148-49 & n.3 (3d Cir. 2008); O'Connell v. Citrus Bowl, Inc., 99 F.R.D. 117, 123 (E.D.N.Y. 1983) ("once an injury in fact has been demonstrated each class member would be required to adduce proof of the quantum of damages on an individual basis").

26. Drug Mart Pharm. Corp. v. Am. Home Products Corp., No. 93-CV-5184, 2012 WL 3544771, at *3 (E.D.N.Y. 2012).

27. *Id.* at 5.

28. *Id.*

29. *Id.* at 13, 15.

30. Cash & Henderson Drugs, Inc. v. Johnson & Johnson, 799 F.3d 202, 214 (2d Cir. 2015) ("The *dem inimis* loss of sales, as well as of customers, to the favored purchasers is a powerful indication that price discrimination did not harm competition." (citations omitted)).

31. 546 U.S. 164 (2006).

32. *Id.* at 176-77.

33. *Id.* at 176; *see al so* Bailey v. Allgas, Inc., 284 F.3d 1237, 1244 (11th Cir. 2002) ("Price cutting designed to purge competition from the market is known as primary-line injury.").

34. Brooke Group v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 221-23 (1993) (holding that a predatory pricing claim under the Robinson-Patman Act, as under § 2 of the Sherman Act, requires plaintiff to show that its competitor's prices are below an appropriate measure of competitor's costs); *see also Bailey*, 284 F.3d at 1244 (explaining that "to establish a primary-line injury, an aggrieved plaintiff must prove: (1) the prices complained of are below an appropriate measure of the predator's costs; and (2) the predator had a reasonable expectation of recouping its investment in below-cost pricing.").

35. *See, e.g.*, J.F. Feeser, Inc. v. Serv-a-Portion, Inc., 909 F.2d 1524, 1527-28 (3d Cir. 1990) (addressing allegations that plaintiff's inability to match a favored buyer's prices caused plaintiff to lose sales, profits, and goodwill); Allied Accessories & Auto Parts Co. v. Gen. Motors Corp., 901 F.2d 1322, 1324 (6th Cir. 1990) (addressing allegations that the seller's favorable pricing to a competitor enabled the favored buyer to underbid plaintiff).

36. See part B.2.b. of this chapter for further discussion.

37. For a discussion, including of instances where the non-discriminatory price will lie outside these bounds, see Mark Armstrong, *Price Discrimination*, *in* Handbook of Antitrust Economics 433 (Buccirossi ed., 2008).

38. In the trade literature see, for instance, Goldberg, P. and R. Hellerstein, *A Structural Approach to Identifying the Sources of Local-Currency Price Stability*, 80(1) Review of Economic Studies 175-210 (2013), and in the public finance literature see Besley, T. and H. Rosen, *Sales Tax and Prices: An Empirical Analysis* (NBER, Working Paper 6667, 1998).

39. *See, e.g.,* Anderson, S., A. de Palma and B. Kreider, *Tax Incidence in Differentiated Product Oligopoly*, 81 Journal of Public Economics 173–192 (2001).

40. Gregory J. Werden, *Demand Elasticities in Antitrust Analysis*, 66 (2) Antitrust Law Journal 363-414 (1998).

41. 771 F.2d 888 (5th Cir. 1985). In *Olympia*, the court held that the plaintiff had failed to prove the fact of damage, but went on to discuss the failure of proof of the amount of damages as well. *Id.* at 892.

42. *Id.* at 892 (citation omitted).

43. *Id.*

44. *Id.*, quoting M.C. Mfg. Co. v. Tex. Foundries, 517 F.2d 1059, 1065 (5th Cir. 1975).

45. *Id.*

46. 816 F.2d 381 (8th Cir. 1987).

47. *Id.* at 394.

48. *Id.*

49. *Id.*

50. *Id.* at 395 (citation omitted). The court noted, however, that the economist's analysis "might have some merit" if the plaintiff and the favored buyers were the defendants' only potential buyers. *Id.* at 394.

51. *Id .* at 394. The court ultimately remanded the case because it did not know if the jury based the damages award on the erroneous yardstick evidence.

52. No. 98-4157, 2000 U.S. App. LEXIS 3083 (10th Cir. 2000).

53. *Huntsman*, 2000 U.S. App. LEXIS 3083 at *22 (citation omitted).

54. *Id.*

55. 496 U.S. 543 (1990).

56. *Id.* at 548.

57. *Id.* at 573.

58. Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1043-44 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990).

59. *Id*.

60. *Id.* at 1043. The overcharge here is: "the excess paid by [the] disfavored buyer for the goods it purchased."

61. *Id.* at 1043-44.

62. *Id.*

63. *Id.*

64. Texaco Inc. v. Hasbrouck, 496 U.S. 543, 544-45 (1990).

65. 990 F.2d 1186 (11th Cir. 1993).

66. *Id.* at 1202.

67. *Id.* at 1206.

68. *Id*.

69. *Id*. at 1206

70. 568 F. Supp. 1200 (W.D. Mo. 1983).

71. *Id.* at 1201. *See also* Order (granting defendants' motion for summary judgment), Drug Mart Pharm. Corp. v. Am. Home Prods. Corp., No. 93-CV-5148, 2007 U.S. Dist. LEXIS 93493, at *8-17 (E.D.N.Y. 2007) (discussing cases and legislative history regarding the exclusion of future lost profits from Robinson-Patman Act claims (in context of antitrust injury rather than damages), but noting that an injunction could be sought on the basis of threatened harm).

72. 175 F.3d 18 (1st Cir. 1999).

73. *Id.* at 25 n.4.

74. *Id.* at 26.

75. *Id.* at 27.

76. *Id.* at 27-28. In *Drug Mart Pharmacy*, the court considered whether to award special damages to plaintiffs who had gone out of business allegedly as a result of the defendants' price discrimination. Drug Mart Pharm. Corp. v. Am. Home Prods. Corp., 472 F. Supp. 2d 385, 432 (E.D.N.Y. 2007). The court's decision, however, was based not on a rejection of future profits or going concern value in principle, but on plaintiffs' failure to offer evidence of a causal connection between defendants' conduct and the allegedly low value they received for their businesses. *Id.*

77. J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 565 n.4 (1981) (considering antitrust injury).

78. *Id.* at 565.

79. 913 F. Supp. 1088 (N.D. Ill. 1995) (vacated pursuant to settlement).

80. *Id.* at 1131 (citing Rose Confections v. Ambrosia Chocolate Co., 816 F.2d 381, 394 (8th Cir. 1987)).

81. *See id.* at 1132 n.38 (stating that "[t]he third measure of damages, lost sales on non-Dunlop products," required proof of causal connection with injury).

82. As discussed above, the plaintiff must show actual injury. *See, e.g.,* Drug Mart Pharm. Corp. v. Am. Home Prods. Corp., 472 F. Supp. 2d 385, 429 (E.D.N.Y. 2007).

83. 903 F.2d 1414 (11th Cir. 1990); *see also* FTC v. Fred Meyer, 390 U.S. 341, 358 (1968) (holding that "when a supplier gives allowances to a direct-buying retailer, he must also make them available on comparable terms" to the retailer's competitors).

84. *Alan's of Atlanta*, 903 F.2d at 1416.

85. *Id.* at 1427-28 (holding that plaintiff raised an issue of fact with evidence showing that the market development funds provided by defendant to plaintiff were "legally incomparable" to the funds provided to a favored buyer).

86. Crowl Distrib. Corp. v. Singer Co., 543 F. Supp. 1033, 1035 (D. Kan. 1982) (plaintiff did not identify any customers lost to favored buyer).

87. 901 F.2d 1322 (6th Cir. 1990).

88. *Id.* at 1326.

89. *Id.*

90. *Id.*

91. *Id.*

92. *Id.*

93. 955 F.2d 1361, 1372 (9th Cir. 1992) (affirming summary judgment dismissing claims on several grounds, one of which was plaintiff's failure to disaggregate antitrust damages from effects of lawful competition).

94. *Id.* at 1371.

95. *Id.*

96. *Id.* at 1372-73. The court also noted that the plaintiff's claim for injunctive relief could go forward since the only failure of the claim was in the proof of monetary damages. *See also* El Aguila Food Prods. v. Gruma Corp., 131 F. App'x 450, 452-53 (5th Cir. 2005) (unpub'd) (rejecting expert report that failed to make allowances for factors such as competition by dominant firms or new entrants, plaintiffs' failure to compete, and plaintiffs' lack of efficiency relative to other firms).

97. *Id.*

98. *See, e.g.*, Camarda v. Snapple Distrib., Inc., 346 F. App'x 690, 692 (2d Cir. 2009) (affirming grant of summary judgment for defendant because the plaintiff failed to "make some showing that the injury to its business was not caused by factors unrelated to the defendant's price discrimination").

99. 135 F. Supp. 2d 1031 (N.D. Cal. 2001).

100. *Id.* at 1042.

101. *Id.* at 1040-41.

# CHAPTER 11

# PROVING ANTITRUST DAMAGES IN JURISDICTIONS OUTSIDE THE UNITED STATES

This chapter discusses issues relating to the determination of antitrust damages in jurisdictions outside the United States. Most major economies have their own competition laws that may require the determination of antitrust damages as a result of anticompetitive behavior of companies. In this regard, more than one-third of the members of the World Trade Organization maintain their own competition laws and enforcement regimes, including Australia, Brazil, Canada, China, the European Union (individually and collectively), Japan, Mexico, the Russian Federation, and South Africa.[1]

The discussion provides a brief overview of notable issues in proving damages in competition claims in the European Union and Canada, highlighting some of the similarities and differences that are found across jurisdictions. A full discussion of the requirements for proving antitrust damages for all countries is beyond the scope of this volume.

## A. European Union

The right to claim damages for infringements of EU competition law exists under the national laws of the EU Member States as a result of the direct effect of Articles 101 and 102 of the Treaty on the Functioning of the European Union (TFEU),[2] which, in broad summary, prohibit anticompetitive agreements between undertakings and abuses by undertakings occupying a dominant position on a relevant market, and must be applied by the national courts.

Thus, in its seminal judgment in *Courage v. Crehan*,[3] which confirmed the right of individuals and companies to seek private redress for the harm caused to them by infringements of EU competition law, the Court of Justice of the European Union (CJEU) held that:

> As regards the possibility of seeking compensation for loss caused by a contract or by conduct liable to restrict or distort competition, it should be remembered from the outset that, in accordance with settled case-law, the national courts whose task it is to apply the provisions of Community law in areas within their jurisdiction must ensure that those rules take full effect and must protect the rights which they confer on individuals.

> The full effectiveness of Article [101] of the Treaty and, in particular, the practical effect of the prohibition laid down in Article [101](1) would be put at risk if it were not open to any individual to claim damages for loss caused to him by a contract or by conduct liable to restrict or distort competition.

> Indeed, the existence of such a right strengthens the working of the Community competition rules and discourages agreements or practices, which are frequently covert, which are liable to restrict or distort competition. From that point of view, actions for damages before the national courts can make a significant contribution to the maintenance of effective competition in the Community.[4]

Since *Courage v. Crehan*, and the subsequent judgment of the CJEU in *Manfredi v. Lloyd Adriatico Assicurazioni*,[5] which confirmed the approach in *Courage v. Crehan* and clarified that the right to damages for a breach of EU competition law must be subject to rules no less favorable than those governing similar domestic actions, the number of cases in EU national courts in which parties have sought to claim compensation for competition law damage has steadily increased.

However, the variation between the rules in different EU Member States applicable to such claims has led to a certain amount of "forum shopping." Claimants have sought to initiate their claims in the jurisdiction that they

believe to be most favorable to their claim, even if that is not the jurisdiction most obviously concerned by the anticompetitive conduct in question. The European Commission (Commission) estimated in 2013 that "only 25% of antitrust infringements found by the Commission in the last 7 years have been followed by civil actions from victims" and indicated that "most actions were introduced in either the UK, Germany or the Netherlands."[6]

Seeing that the growth of private damages actions has been concentrated in certain Member States and wishing to promote private actions across the EU as a whole, the EU signed into law a Directive to be implemented by the Member States in their national law over a two-year period.[7] The Directive is aimed at reducing the effects of divergent national rules, setting out certain common legal standards that would apply to damages claims across the EU Member States. The key articles set forth in the Directive are aimed at providing parties with easier access to evidence, establishing clear limitation periods, clarifying the position on "passing on," introducing a rebuttable presumption that cartels cause harm, and encouraging consensual dispute resolution.[8] In parallel, the Commission is also encouraging Member States to develop class action regimes, at least on an opt-in basis.[9]

# 1. The Types of Legal Proceedings in which Damages May Need to Be Proven

The right to bring claims for damages in EU Member States for breaches of Articles 101 and 102 TFEU is generally mirrored by a right to pursue damages claims for breaches of national competition laws. These are generally civil claims for the damage flowing from the breach; for instance, in the United Kingdom claims are generally brought for the tort of breach of statutory duty, namely the infringement of competition law.[10] The same applies in France[11] and in Germany, which provides explicitly for private damages actions in sections 33(3)-(5) of the German Act Against Restraints of Competition.[12] Competition damages claims in the EU are generally heard by judges, not juries.

As in the United States, a claimant seeking compensation for the harm caused by an infringement under EU competition law typically has to establish the breach (i.e., liability) and the quantum of harm resulting from

that infringement (i.e., the amount of harm having a causal nexus with the breach).

Regarding liability, a decision of the Commission (or, in the case of national competition rules, a decision of a national competition authority) may already have established the existence of a breach. In the case of a Commission infringement decision, the possibility to rely on the infringement decision as proof of liability arises out of the rule of EU law that a national court may not reach a decision that runs counter to a decision of the Commission.[13] A claimant may therefore wish simply to rely on this finding of infringement in order to establish liability, in which case it will be required to prove only the quantum and causation of any harm.[14] Consequently, national claims for damages generally fall into one of two categories: follow-on damages claims (where the breach of competition law is established in an administrative decision) and standalone damages claims (where there is no preceding administrative decision and the breach of competition law is to be proven as part of the claim).[15]

The need to prove antitrust damages may arise, less commonly, in other types of claims: for instance, breach of contract (where the competition infringement constitutes a breach of a contractual obligation) and fraud/conspiracy. In the United Kingdom, for example, a recent trend has seen claimants plead alternative causes of action besides breach of statutory duty in an effort to take advantage of (what they believe to be) more favorable rules regarding limitation and the scope of recoverable loss under the alternative causes of action.[16]

## 2. Jurisdictional Issues

This section discusses jurisdiction issues relating to the forum in which a claim in pursued, the question of who may sue, the question of who may be sued, and limitations that govern the time period during which an antitrust claim can be brought.

*Forum.* When pursuing a claim for damages in the EU, the first question is typically in which Member State, if any, proceedings should be initiated. The rules on jurisdiction within the EU are governed by the Recast Brussels Regulation.[17] As a general rule, claims in the EU should be commenced in the Member State where the defendant is domiciled.[18] Where several

defendants in one case are domiciled across a number of Member States, a claimant is free to sue all of them in the Member State where any one of them is domiciled, on the basis that the claims against all of the defendants "are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings."[19]

As an alternative to suing a defendant in its Member State of domicile, a claimant may commence proceedings in the Member State "where the harmful event occurred,"[20] which includes both the State where the infringer acted and the State where the claimant suffered its loss.[21]

*Who may sue.* Anybody who has suffered loss as a result of a breach of EU competition law is entitled to pursue a claim for damages. As indicated by the CJEU in *Courage v. Crehan*, this is a consequence of the principle of effectiveness under EU law, which provides that "[t]he full effectiveness of Article [101] of the Treaty . . . would be put at risk if it were not open to any individual to claim damages for loss caused to him . . . by conduct liable to restrict or distort competition."[22] Thus, in contrast to the position in the United States, there is no general rule precluding claims by indirect purchasers.[23]

The availability of class actions (and class settlements) varies between Member States. In the United Kingdom, competition class actions and settlements were introduced in October 2015.[24] In France, class actions have been available since March 2014 and, in competition cases, are available only to recognized consumer associations pursuing follow-on, not standalone, claims. In Germany, although there is no formal provision for collective proceedings in competition matters, a third party vehicle may be used to bundle individual claims that are assigned to it, in return for a share of the damages.[25] In the Netherlands, collective settlements can be certified under the Act on the Collective Settlement of Mass Damage, which allows for an agreement to pay compensation for class damages, which the court may make binding on all actual and potential claimants.

*Who may be sued.* It is widely accepted that coconspirators are jointly and severally liable for the damage caused by their joint violation.[26] Thus, a claimant is free to sue one or more coconspirators and seek to recover the entirety of its loss from them, leaving it to the coconspirators to resolve any claims for contribution among themselves.[27]

*Limitation.* The time period during which a competition damages claim can be brought is determined according to the applicable law of the forum hosting the proceedings. In France, for instance, antitrust damages claims based on tortious liability must be brought within five years "of the day when the holder of the right knew or should have known the facts which allow him/her to exercise his/her rights."[28] In Germany, the standard limitation period is three years from the end of the year in which the claim arose and in which the claimant obtained or, without gross negligence, could have obtained knowledge of its claim and the defendant,[29] but this may be suspended during the period of investigation by the Commission or German Federal Cartel Office.[30] In Italy, the limitation period for tortious damage claims is five years, running from when the claimant became aware, or ought to have become aware, of the unlawful damage. In the United Kingdom, a claim may be commenced within six years of the tortious breach (or, in the case of a concealed breach, such time as the claimant could reasonably have discovered the breach).[31] The EU is seeking a harmonized approach to limitation periods across the Member States, aimed at ensuring that a claim is not precluded because, by the time the claimant becomes aware of the infringement, the limitation period has already expired.[32]

## *3. The Nature of Available Damages*

There are typically three types of damages a claimant in an EU competition claim may be able to recover: (1) compensatory damages; (2) exemplary damages; and (3) restitutionary damages. These are discussed in turn.

### a. Compensatory Damages

Damages are generally awarded to put a claimant in the position it would have been in had the breach of competition law not occurred (so-called compensatory damages). This also implies a right to claim interest,[33] although the position on whether interest should be calculated on a simple or compound basis is not uniform across the Member States.[34]

For infringements that entail a price increase relative to the competitive price—for example, a price-fixing cartel or excessive pricing by a dominant

undertaking—calculating the amount of damages required to compensate the victim generally proceeds on the basis that the infringement led to an "overcharge."[35] Other types of infringement, such as exclusionary abuses, may require a different approach to measuring harm.[36]

The overcharge analysis generally gives rise to a host of ancillary questions, the approach to which may vary depending upon the Member State in which the proceedings are taking place. Some of these are discussed here.

*Pass-on.* Where it is alleged by a direct purchaser that it has faced an overcharge on the competitive price due to the defendant's infringement, the defendant may counter that the direct purchaser "passed on" that overcharge in the form of higher prices to the direct purchaser's own customers, and therefore did not suffer any (or substantially mitigated its) loss. This set of arguments may recur in claims by purchasers further down the supply chain (who will allege pass-on higher up the chain but deny, at least to some extent, pass-on of the overcharge to their own customers). The German Federal Court of Justice has, for instance, affirmed that the pass-on defense is available but the burden of proof is on the defendant to show not only that the direct purchaser passed on the overcharge, but also the extent of the pass-on.[37] In France, the Court of Cassation has expressly admitted the pass-on defense based on general principles of tort law,[38] adding that the burden of proof lies with the claimant to show the absence of passing on as part of the overall burden to prove the damage suffered.[39] In the United Kingdom, the Court of Appeal has implicitly recognized the pass-on defense in a number of cases, including one concerning whether a mixed class of direct and indirect purchasers could bring a representative action, and one concerning whether a cartel infringement could provide the basis for a claim in conspiracy.[40] The pass-on defense has subsequently been considered (and rejected on the facts) in a competition damages claim in the United Kindom Competition Appeal Tribunal.[41]

*Lost sales.* In response to a claim by the infringer that the purchaser passed on the overcharge, the purchaser may well respond that as a result of having to pass on the overcharge in the form of higher prices to its own customers, the purchaser made fewer sales and lost out on profits, for which the purchaser should also be compensated.[42] The burden will generally lie on the purchaser to show that the alleged lost sales were caused by the

infringer's unlawful conduct (and not, for instance, by independent decisions of the purchaser unrelated to the infringer's pricing behavior).

*Umbrella damages.* A further category of loss for which claimants might seek redress are so-called umbrella damages, that is, losses suffered due to the price increases made by noninfringing competitors of a cartelist under the "umbrella" of the increase in prices caused by the cartel. In *Kone AG and Others v. ÖBB-Infrastruktur AG*,[43] the CJEU stated that Article 101 TFEU precludes the application of domestic legislation that would exclude any "civil liability of undertakings belonging to a cartel for loss resulting from the fact that an undertaking not party to the cartel, having regard to the practices of the cartel, set its prices higher than would otherwise have been expected under competitive conditions."[44] Thus, such umbrella damages appear to be available in principle as a matter of EU law, but it is for national courts to determine their appropriateness in a particular case.

In each of these examples—pass-on, lost sales, and umbrella damages—how national courts will approach these questions is uncertain. However, the approach should be informed by the general principle of effectiveness recognized by the CJEU, that an individual should be able to claim the loss "caused to him" by the infringement of EU competition law. The causal link between the alleged loss and the infringement is thus decisive of entitlement to damages.

## b. Exemplary Damages

Availability of exemplary (or "punitive") damages—i.e., damages above and beyond the level necessary to compensate a claimant for its loss as a means of deterring and punishing the unlawful infringement—varies across members of the EU.[45] For example, in many jurisdictions, including France, Germany, Italy, and the Netherlands, exemplary damages are simply unavailable. In other jurisdictions, the courts' approach to such a claim may depend on whether the infringing conduct has already been subject to a fine by an administrative authority. In the United Kingdom, for instance, exemplary damages are not available in cases where a competition authority has already levied a fine, but exemplary damages have been awarded in cases where no such fine had been imposed.[46]

### c. Restitutionary Damages

Instead of calculating a claimant's loss based on the position it would have been in but for the infringement, a claimant may seek restitutionary damages—i.e., damages based on the gain that the infringer has obtained as a result of their wrongdoing.[47] In this connection, the English Court of Appeal has held that EU law did not preclude a restitutionary award of damages, but noted that such an award was not necessary in order to comply with the principle of effectiveness.[48]

## 4. How Damages Are Proven

The precise rules on burden and standard of proof for antitrust damages vary according to the legal traditions of the different Member States. As a general rule, however, the burden will lie on the claimant to prove not only that it has suffered loss as a result of the antitrust infringement, but also the amount of this loss.

As noted above, proof of the existence of the infringement may be established by a decision of the Commission or a national competition authority finding that there has been a breach of competition law. Issues of quantum and causation will, however, generally remain for the claimant to prove.

The availability of pretrial disclosure (termed "discovery" in the United States) varies markedly among EU Member States, and this has been widely identified as the reason why damages claims in the EU have tended to be pursued in certain Member States—such as the United Kingdom—that provide for greater pretrial disclosure. In this regard, France,[49] Italy, and Germany[50] have no discovery procedure comparable to that in the United States or the United Kingdom, which has tended to discourage the pursuit of damages in those jurisdictions. Where disclosure is available, it is generally limited by domestic rules on privilege, including legal privilege and privilege against self-incrimination, which vary across Members. For example, in-house legal privilege is recognized in only some EU Member States.[51]

A common disclosure issue across the Member States is whether claimants should be able to obtain copies of leniency statements and/or

settlement submissions given by defendants to a competition authority. In its *Pfleiderer* judgment,[52] the CJEU held that, in the absence of harmonizing provisions of EU law, it was for the national courts to decide whether to grant access to such materials in the course of national proceedings, balancing the need to protect the leniency and settlement regimes (by not automatically disclosing self-incriminating submissions) against the promotion of private enforcement of EU competition law (by making such information available to facilitate private claims). In *Bundeswettbewerbsbehörde v. Donau Chemie*,[53] it was held that a rule of national law that effectively precluded any such balancing test from being undertaken was incompatible with the principle of effectiveness under EU law.[54] Faced with this invitation to harmonize the EU rules, and in order to protect the leniency and settlement regimes that the Commission considers vital for exposing anticompetitive conduct, the EU adopted a harmonized rule that would see corporate leniency statements and settlement submissions subject to an absolute bar on disclosure in national proceedings, while granting the courts a discretion to permit disclosure of other confidential materials on the Commission's file once the administrative proceedings have ended.[55]

Other tools available to competition law claimants to try to prove their damage are those generally available to private litigants in domestic proceedings and may include witness and expert evidence aimed at establishing, for instance, the level of any overcharge, the volume of affected sales, and the extent of any pass-on.[56] Given that substantial time has often passed between the commission of the infringement and the pursuit of a private damages claim, courts are frequently faced with evidentiary challenges, such as a lack of contemporaneous materials, which can impede a claimant discharging the burden of proof.

# B. Canada

Civil proceedings seeking antitrust damages in Canada have increased exponentially over the past decade, particularly in the class action context. A recent trilogy of Supreme Court of Canada decisions[57] relating to competition class action appeals has recognized a cause of action for indirect

purchasers who can prove an overcharge was passed on to them, and has made certification of class actions easier to obtain in competition law cases.

Proceedings seeking damages typically rely upon a statutory right of action in the federal Competition Act,[58] common law tort claims, and equitable claims for restitution. The extent to which the Competition Act can be enforced indirectly through tort law or equity is currently unsettled.[59]

# 1. Right of Action for Damages under the Competition Act

Section 36 of the Competition Act is most commonly relied upon as a basis for class actions, usually for an alleged price-fixing conspiracy or sometimes for price maintenance taking place prior to 2009 when price maintenance was a criminal offence under the Competition Act.[60]

Subsection 36(1) of the Competition Act provides a right of action to any person who has suffered loss or damage as a result of a violation of the criminal provisions of the act. To succeed in such a claim, an injured party must establish that: (1) the impugned conduct is contrary to any provision of Part VI of the Act (Offences in Relation to Competition);[61] and (2) such conduct has caused loss or damage to the plaintiff. Criminal offenses under Part VI of the act include: conspiracy (section 45),[62] bid-rigging (section 47), misleading advertising (section 52),[63] and deceptive telemarketing (section 52.1). It is noteworthy that a plaintiff can only seek damages for the actual loss caused to it—treble damages are not available.

Certain other anticompetitive acts, such as refusal to deal (section 75), price maintenance (section 76), exclusive dealing, tied selling and market restriction (section 77), and abuse of dominant position (sections 78 and 79) are not criminal, but rather are reviewable by the Competition Tribunal under Part VIII of the Competition Act. Damages can only be obtained for such conduct under section 36 if: (1) the Competition Tribunal has issued an order; (2) the defendant has failed to comply with the order; and (3) the failure to comply with the order has caused loss or damage to the plaintiff.[64]

# 2. Jurisdictional Issues

This section discusses jurisdiction issues relating to the form in which a claim is pursued, the question of who may sue, the question of who may be sued, and limitations that govern the time period during which a claim can be brought.

*Forum.* Under section 36 of the Competition Act, a person who has suffered loss or damage as a result of conduct contrary to one of the criminal offense provisions can sue in either Federal Court or a provincial superior court.

Such claims are usually brought in provincial court, because those courts have broader tort jurisdiction than the Federal Court. The section 36 claims are often combined with claims for the tort of interference with economic interests (also known as the "unlawful means tort"),[65] common law conspiracy, and waiver of tort, which is an equitable remedy or potentially a cause of action under which disgorgement of profits is sought rather than damages. There may also be provincial consumer protection or franchisee protection statutory claims available to claimants, depending on the circumstances.

*Whom ays ue.* Any person who suffered loss caused by a criminal offense committed under the Competition Act is entitled to recover that loss.[66]

In *Pro-Sys Consultants Ltd. v. Microsoft Corporation*,[67] the Supreme Court of Canada recently held that indirect purchasers can sue for antitrust overcharges that were passed on to them by direct or intermediate purchasers. In Canada,[68] like in the US,[69] the fact that an overcharge was passed on is not a defense to actions brought by the direct purchaser against the party responsible for the overcharge. However, the Canadian Supreme Court decided not to follow the US Supreme Court's conclusion in *Illinois Brick* that, as a corollary, pass-on must not be available to indirect purchasers to use offensively by bringing an action alleging that an overcharge was passed down to them.[70] After considering the *Illinois Brick* decision and the legislative backlash against it, the Canadian Supreme Court preferred the dissenting reasoning of Justice Brennan in *Illinois Brick*, and agreed with his conclusion that the risk that indirect purchaser actions would lead to duplicate or multiple recoveries can be managed by the courts.

The Supreme Court of Canada recognized that proof of damage by indirect purchasers would be challenging, but found that a cause of action

will accrue if consumers are able to adduce sufficient evidence of loss, noting:

> In bringing their action, the indirect purchasers willingly assume the burden of establishing that they have suffered loss. This task may well require expert testimony and complex economic evidence. Whether these tools will be sufficient to meet the burden of proof, in my view, is a factual question to be decided on a case-by-case basis. Indirect purchaser actions should not be barred altogether solely because of the likely complexity associated with proof of damages. [71]

*Limitation.* The limitation period for commencing a private action in Canada pursuant to subsection 36(4) of the Competition Act is the later of two years from: "(i) a day on which the conduct was engaged in, or (ii) the day on which any criminal proceedings relating thereto were finally disposed of . . . ."[72] Three significant points arise from the wording of subsection 36(4).

First, the limitation period does not restrict the Crown's ability to commence criminal proceedings. Potential defendants may face criminal liability at any time and follow-on civil proceedings for two years thereafter. It is thus possible for a defendant to face a civil lawsuit more than two years after the infringing conduct ceased, if the Crown has initiated criminal proceedings. This situation can create economic and business uncertainty.

In practice, however, private competition class actions are often commenced at early stages of related criminal proceedings. This is likely aimed at preempting competing suits and improving the position of early-filing plaintiffs' firms if there is a carriage battle to decide which of a number of plaintiffs' counsel will represent the class.

Second, there has been a recent series of decisions holding that the limitation period in subsection 36(4) of the Competition Act is not subject to the doctrine of "discoverability." The applicability of this common law, judge-made doctrine to a statutory limitation provision is a matter of statutory construction.[73] Where the discoverability doctrine applies, time will not run until the plaintiff has discovered, or ought with reasonable diligence to have discovered, the material facts upon which the cause of action is based.[74]

In *Garford Pty Ltd. v. Dywidag*, the Federal Court of Appeal held that discoverability does not apply to actions brought under the Competition Act.[75] Given that subsection 36(4) of the act is expressed as running from a particular date (the date of the impugned conduct or of the disposition of criminal proceedings), the Federal Court (the trial level court) concluded that the limitation period was intended to commence on that date, regardless of the plaintiff's knowledge of a potential claim.[76] The Court granted the defendant's motion for summary judgment dismissing a claim for damages under section 36 of the Competition Act, on the basis that the limitation period had expired. That decision was affirmed on appeal.

Third, where a cause of action is based on conduct that constitutes a "continuing" practice, it may be difficult to determine when the limitation period actually ends. In *Garford*, the Federal Court of Appeal held that any ongoing effects of a conspiracy do not extend the time period established by subsection 36(4) of the Competition Act, because the offense is complete at the time of the conclusion of the conspiratorial agreement.[77]

It should be noted that any economic tort or equitable causes of action pleaded on the basis of the same facts as the Competition Act allegations may have longer limitation periods, which are determined on the basis of the law of the relevant province(s).[78] Unlike section 36 Competition Act claims, limitation periods for these common law causes of action will generally be subject to the discoverability doctrine.

## 3. *The Nature of Available Damages*

*Pass-on.* As discussed above, while "passing on" is not a defense for direct purchasers in Canada,[79] the Supreme Court of Canada has recently determined that indirect purchasers may have a claim for anticompetitive overcharges that were passed on to them by direct or intermediate purchasers.[80] The Court rejected concerns about double recovery, complexity, and remoteness, commenting that courts could manage the question of double recovery if it arises, and that the onus of demonstrating passed on overcharges will lie with the indirect purchasers. Both direct and indirect purchasers may now bring claims for overcharges in Canada.

*Lost sales.* In *Maritime Travel Inc. v. Go Travel Direct.Com Inc.*, the Nova Scotia Court of Appeal upheld an award of damages for lost sales due

to misleading advertising, brought under section 52 of the Competition Act.[81] The trial judge clarified that the recoverable losses are only those that actually result from the misleading advertising, not from the mere fact of a competitor entering the market.[82] The Court of Appeal upheld the trial judge's approach of calculating damages based on what the value of the plaintiff's market share would have been but for the defendant's misleading advertisements.

No Canadian court has considered the question of whether damages may be awarded for lost sales caused by increased prices that resulted from passing on an overcharge.

*Umbrella damages.* In a recent decision, the Ontario Superior Court of Justice held that there is no cause of action against the defendants in a class action for "umbrella damages" to those who purchased from a non-defendant.[83] The theory of umbrella liability is that non-cartel members may set supra-competitive prices under the "umbrella" created by the cartel activity. The Court held that such claims would impose indeterminable liability on defendants and would unfairly impose liability on one person for the conduct of others. The defendants could not be made liable "for the advertant, inadvertent, voluntary, or involuntary conduct of the non-Defendants in taking advantage of the price-fixing."[84]

*Restitutionary damages.* Waiver of tort is a doctrine that allows a plaintiff to give up the right to sue in tort, and elect to instead base his or her claim in restitution. In restitution, the plaintiff can recover benefits, including profits, that a defendant has obtained by its wrongdoing, instead of normal tort damages measured by the plaintiff's loss.[85]

In *Koubi*, the British Columbia Court of Appeal noted that in class actions, the doctrine of waiver of tort "has experienced a resurgence . . . since it may be used to present damages as a common issue based on benefits obtained by the defendant through its wrongful conduct, thereby avoiding individual proof of loss by each class member."[86]

The concept of waiver of tort as potentially constituting an independent cause of action gained impetus in Canada from two judgments in *Serhan*: Justice Cullity's 2004 certification decision in the Ontario Superior Court of Justice [87] and Justice Epstein's 2006 decision on appeal of the certification decision to the Ontario Divisional Court.[88]

The *Serhan* case involved an application by users of a defective blood glucose monitoring device for certification of a class action against the manufacturers and distributors. Since the plaintiffs had not purchased the monitors, nor suffered harm, their potential causes of action were limited. Cullity J. nevertheless found the claim alleged facts that, if proven, could entitle the class to a restitutionary remedy based on waiver of tort as an independent cause of action. On appeal, Justice Epstein reviewed the academic and jurisprudential debate surrounding waiver of tort and concluded that since the law as to its precise status was unsettled, the plaintiff's claim was not certain to fail. She found that the difficult issues and important policy concerns raised by this doctrine would best be resolved with the benefit of a full factual record, and accordingly dismissed the appeal.[89]

Following *Serhan*, numerous courts across Canada have certified waiver of tort as a common issue in class proceedings, largely on the basis that the uncertainty surrounding the doctrine precludes a finding that it is plain and obvious that it is not an independent cause of action.[90] However, quantification of any waiver of tort claim (as well as punitive damages) is frequently bifurcated from the other common issues, to be subject to a separate discovery process and determined at a separate common issues trial if necessary.[91]

The precise nature and scope of the doctrine of waiver of tort is controversial, and has been the subject of much academic and jurisprudential debate. The issues that remain unresolved include:

1. Whether waiver of tort is an independent cause of action, or is "parasitic," in the sense that it merely provides an alternative remedy once the plaintiff has already established an actionable wrong. The significance of this distinction lies in the fact that if waiver of tort is only remedial, a plaintiff must prove all elements of the underlying tort (including loss), before having the option of electing to waive the tort and seek an order for the benefits in the hands of the defendant instead of tort damages. However, if waiver of tort is an independent cause of action, then a plaintiff need only prove wrongful acquisition of a benefit by the defendant (without proving concomitant loss to the plaintiff) before claiming disgorgement.[92]

2. Whether the wrongful acts that may form the basis for a claim for waiver of tort are confined to tortious acts relating to property, or extend to any legal wrong by the defendant. As the British Columbia Court of Appeal explained in *Koubi v .M azda*, "[w]aiver of tort is historically rooted in 'proprietary' torts as opposed to 'personal' torts such as assault and battery, as the latter do not typically enrich the defendant."[93] Notably, in *Koubi,* the Court of Appeal conducted a detailed analysis of the waiver of tort doctrine and allowed the defendants' appeal from certification on the basis that the plaintiff's claims of waiver of tort premised on alleged statutory breaches did not disclose a cause of action. The Court of Appeal held: "[w]here the legal wrong allegedly grounding waiver of tort is limited to a statutory breach, and the legislation from which it emanates provides exhaustive or exclusive statutory remedies for that breach, longstanding principles of statutory interpretation militate against certification."[94] Following its prior decision in *Koubi*, in *Wakelam* and *Watson*, the British Columbia Court of Appeal concluded that Parliament did not intend the Competition Act to be augmented by claims for restitutionary relief based on a breach of the statute.[95] The Ontario Superior Court of Justice[96] and Saskatchewan Court of Queen's Bench[97] recently reached the same conclusion.

3. When a restitutionary claim for disgorgement of profits may be available. There is little case law interpreting when a restitutionary claim for disgorgement of profits will be appropriate.

*Punitive damages.* Punitive damages are not available for claims under subsection 36(1) of the Competition Act.[98]

For other claims in tort or equity, punitive damages remain an exceptional remedy in Canada. They are available only in cases of "'malicious, oppressive, and high-handed' misconduct . . . that represents a marked departure from ordinary standards of decent behavior."[99]

*Costs of investigation.* Under section 36 of the Competition Act, plaintiffs may, in addition to damages, recover "any additional amount that the court may allow not exceeding the full cost to him of any investigation in connection with the matter and of proceedings under this section."[100] The Alberta Court of Appeal has commented in *obiter* that the amount of such

claims would need to be specifically proven, and that "mere participation in the litigation is not compensable as part of the investigation costs."[101]

# 4. How Damages Are Proven

The traditional evidentiary standard in civil matters is the "balance of probabilities," otherwise referred to as the "preponderance of evidence" standard. Differing degrees of proof may apply depending on the subject-matter of the case. In R. v. Oakes,[102] the Supreme Court of Canada held:

> The case may be proved by a preponderance of probability, but there may be degrees of probability within that standard. The degree depends on the subject-matter. *A civil court, when considering a charge of fraud, will naturally require a higher degree of probability than that which it would require if considering whether negligence were established*. It does not adopt so high a degree as a criminal court, even when it is considering a charge of a criminal nature, but still it does require a degree of probability which is commensurate with the occasion.[103] [emphasis added]

Since section 36 of the Competition Act provides a civil remedy for damages resulting from specific criminal acts, *Oakes* would require plaintiffs to prove that criminal conduct with a higher degree of probability.[104]

Under subsection 36(1) of the Competition Act, the plaintiff must have "suffered loss or damage" to obtain recovery. Until the recent Supreme Court decision in *Pro-Sys Consultants*, plaintiffs in class actions frequently claimed that despite the wording of subsection 36(1), liability and damages could be assessed on an aggregate basis for the entire class. In *Pro-Sys Consultants*, the Supreme Court concluded that the class proceedings statutes could only be used to determine the quantum of damages once liability to the entire class had been proven; they could not be used to establish the fact of damage.[105]

With respect to waiver of tort, the British Columbia Supreme Court observed in *Koubi* that "in several cases in which waiver of tort has been

certified, there is no discussion of the methodology that will be used at trial to calculate the amount of the disgorgement or how it will be distributed among the class members."[106]

Typically (other than in Quebec),[107] discovery rules in the various provinces of Canada require the parties to produce all relevant documents that are in their possession, power, or control without the need for any specific interrogatory or request from opposing counsel.[108] Oral discoveries in Canada are more limited than in the U.S., often being restricted to one corporate representative of each party, rather than every person with knowledge of the matters in issue.[109]

Discovery of and production from a non-party requires leave of the court.[110] In the recent decision of *Imperial Oil v. Jacques*,[111] a majority of the Supreme Court of Canada upheld the decision of the Quebec Superior Court (leave to appeal to the Quebec Court of Appeal denied) ordering production of private communications intercepted by the state in the course of an investigation undergone by the Competition Bureau in the context of a civil class action. The defendants argued that disclosure was prohibited by section 29 of the Competition Act, which prevents the Competition Bureau from disclosing certain types of information in its possession except "to a Canadian law enforcement agency or for the purposes of the administration or enforcement of the Act." The majority held that the type of information at issue was not subject to the restrictions on disclosure contained in section 29 of the Competition Act because wiretap evidence is not among the specific classes of information enumerated in that section.

In addition to evidence obtained from the defendant through the discovery process, witness and expert evidence is also regularly used by plaintiffs to try to prove their damages. Furthermore, pursuant to subsection 36(2) of the Competition Act, any evidence given in prior proceedings where a defendant was convicted of an offense under Part VI or convicted of or punished for failure to comply with an order of the Tribunal or another court under the Competition Act as to the effect of his or her acts or omissions on the plaintiff is evidence thereof in the civil action.

---

1. Document of the Working Group on the Interaction between Trade and Competition Policy, *Overview of Members' National Competition*

*Legislation*, WT/WGTCP/W/128/Rev.3 (Nov. 27, 2003), *available at* http://www.wto.org/english/tratop_e/comp_e/wgtcp_docs_e.htm.

2. Consolidated Version of the Treaty on the Functioning of the European Union arts. 101-102, Sept. 5, 2008, 2008 O.J. (C 115) 47 (effective Dec. 1, 2009) [hereinafter TFEU]; Case 127/73, Belgische Radio en Televisie and Société Belge des Auteurs, Compositeurs et Éditeurs (BRT) v. SV SABAM and NV Fonior, 1974 E.C.R. 51, ¶ 16 (Eur. Ct. Justice); Case C-557/12, Kone AG and others v. ÖBB-Infrastruktur AG, [2014] All E.R. (D) 97 (Jun), ¶ 20 (Eur. Ct. Justice).

3. Case C-453/99, Courage Ltd v. Bernard Crehan, 2001 E.C.R. I-6297, (Eur. Ct. Justice) [hereinafter *Courage*].

4. *Id.* At 25-27.

5. Joined Cases C-295/04 & C-298/04, Vincenzo Manfredi v. Lloyd Adriatico Assicurazioni SpA, 2006 E.C.R. I-6619 (Eur. Ct. Justice).

6. Press Release, European Comm'n, Frequently Asked Questions: Commission proposes legislation to facilitate damage claims by victims of antitrust violations (June 11, 2013) (Memo/13/531).

7. The Directive on damages actions was signed into law on November 26, 2014 after its final adoption by the Council of the European Union on November 10, 2014: Directive 2014/104/EU of the European Parliament and of the Council of 26 November 2014 on certain rules governing actions for damages under national law for infringements of the competition law provisions of the Member States and of the European Union [hereinafter Directive], 2014 O.J. (L 349) 1 (Dec. 5, 2014).

8. *Id*. at 1-10.

9. European Comm'n, Antitrust: Actions for Damages, *Collective Redress and Actions for Damages* (June 11, 2013), *available at* http://ec.europa.eu/competition/antitrust/actionsdamages/collective_redress_en.html.

10. Garden Cottage Foods Ltd v. Milk Marketing Board, [1984] 1 A.C. 130 (H.L.) (appeal taken from Eng. and Wales).

11. Jacques Buhart, Lionel Lesur & Louise Aberg, *France*, in Private Antitrust Litigation 2015 63 (Samantha Mobley ed., 2014). ("Damages actions for competition infringements before a civil judge follow the general French rules governing civil liability. Consequently, whether in relation to tortious or contractual liability, plaintiffs must invoke both

the provisions of the French Civil Code (FCC) and the relevant antitrust provisions. These relevant antitrust provisions can be found in either (i) the French Commercial Code, if French competition law is violated; or (ii) the Treaty on the Functioning of the European Union (TFEU), if European competition law is violated.").

12. Gesetz gegen Wettbewerbsbeschränkungen [GWB] [Act Against Restraints of Competition], July 15, 2005, BGBl. I S. 1750, as last amended by Article 258 of the Tenth Competence Adjustment Ordination [Zehnte Zuständigkeitsanpassungsverordnung], August 31, 2015, BGBl. I S. 1474, [hereinafter *GWB*].

13. Council Regulation (EC) No 1/2003, 2003 O.J. (L 1) 1, 16 (explaining the implementation of the rules on competition in Articles 81 and 82 of the Treaty); Case C-344/98, Masterfoods Ltd v. HB Icecream Ltd, 2000 E.C.R. I-11369 (Eur. Ct. Justice).

14. In Germany, the binding effect of a Commission or national antitrust authority decision has been laid down in *GWB*, *supra* note 12, at § 33(4).

15. Other "hybrid" categories of claim, consisting of both follow-on and standalone elements, are also possible: for instance, a claim alleging that an infringement found in a Commission decision in fact covered a broader time period and/or geographic scope.

16. The Court of Appeal recently expressed doubt about such claims in Air Canada & others v. Emerald Supplies Limited & others [2015] EWCA Civ 1024, [2015] All ER (D) 17 (Nov) (Eng. and Wales).

17. Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012, 2012 O.J. (L 351) 1 (on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (recast)) [hereinafter Regulation (EU) No 1215/2012].

18. *Id* at Article 4(1).

19. *Id* at Article 8(1); Case C-352/13, Cartel Damage Claims (CDC) Hydrogen Peroxide SA v. Akzo Nobel NV and others, [2015] All ER (D) 50 (Jun) (Eur. Ct. Justice) [hereinafter *CDC*].

20. Regulation (EU) No 1215/2012, 2012 O.J. (L 351) 1, *supra* note 17, at Article 7(3).

21. *CDC*, *supra*, note 19. It is a matter of on-going debate whether indirect purchasers may bring a claim under this jurisdiction: see Case C-220/88, Dumez France SA v. Hessische Landesbank (Helaba), 1990

E.C.R. I-49 (Eur. Ct. Justice) and Deutsche Bahn AG & others v. Morgan Crucible Company PLC & others, [2013] CAT 18.

22. *Courage*, 2001 E.C.R. I-6297, *supra* note 3, at para. 26.

23. In Germany, for instance, the German Federal Court of Justice has confirmed that indirect purchasers may bring damages actions against the members of a cartel: Bundesgerichtshof [BGH] [Federal Court of Justice] June 28, 2011, Neue Juristische Wochenschrift [NJW] 2012, 928 [hereinafter *ORWI*] (Ger.).

24. Consumer Rights Act, 2015, c. 15, sched. 8 (Eng.).

25. However, the lawfulness of such vehicles is not settled.

26. This is expressly provided for, for instance, in the Dutch Civil Code:Burgerlijk Wetboek (Civil Code) [BW] art. 6:102. It has also been confirmed in Italy by the courts (Gruppo Sicurezza, Appello Roma, 4 September 2006; International Broker, Corte App. Roma, 31 March 2008). Note however the ruling in Case C-228/11, Melzer v MF Global UK Ltd, [2013] 3 W.L.R. 883 (Eur. Ct. Justice).

27. The EU confirmed the applicability of joint and several liability to antitrust infringements in its Directive on antitrust damages claims. Directive, 2014 O.J. (L 349) 1 (Dec. 5, 2014), *supra* note 6, at 15. The EU's acceptance of contribution claims among joint competition violators differs from the rule in the U.S. *See* Texas Indus, Inc v Radcliff Materials Inc, 451 US 630, 646 (1981) ("[N]either the Sherman Act nor the Clayton Act confers on federal courts the broad power to formulate the right to contribution").

28. Code Civil [C. Civ] art. 2224 (Fr.).

29. Bürgerliches Gesetzbuch [BGB] [Civil Code], Aug. 18, 1896, Reichsgesetzblatt [RGBL] No. 21, 195, as amended [hereinafter *BGB*], section 195 and section 199(1) (Ger.).

30. *GWB*, *supra* note 12, section 33(5).

31. Limitation Act 1980, c. 58 (Eng., Wales; partially applicable to N. Ir.).

32. Directive, 2014 O.J. (L 349) 1 (Dec. 5, 2014), *supra* note 7, at 15.

33. Joined Cases C-295/04 & C-298/04, Vincenzo Manfredi v. Lloyd Adriatico Assicurazioni SpA, 2006 E.C.R. I-6619 (Eur. Ct. Justice).

34. A party in breach of competition law must pay interest on any award of pecuniary damages. *GWB*, *supra* note 12, section 33(3). Section 289 of the German Civil Code prohibits the recovery of compound interest. *BGB*, *supra* note 29 at § 289. Compound interest is generally assumed

to be available in the United Kingdom: Sempra Metals Limited (formerly Metallgesellschaft Limited) Her Majesty's Commissioners v. Inland Revenue and another, [2007] UKHL 34, [2008] 1 AC 561 (appeal taken from Eng. and Wales).

35. See, e.g., the approach of the Italian courts (Corte App. Salerno, 20 December 2008, upheld by Cass., 2013, No. 8091; Appello Napoli, 30 March 2007, upheld by Cass., 2013, No. 8110).

36. See, e.g., the approach of the United Kingdom Competition Appeal Tribunal in 2 Travel Group PLC (in liquidation) v Cardiff City Transport Services Limited, [2012] CAT 19.

37. *OWRI*, *supra* note 23, at 928.

38. Cour de cassation [Cass.] [supreme court for judicial matters] com., 15 June 2010, Bull civ. IV, No. 09-15816 (Fr.).

39. Cour de cassation [Cass.] [supreme court for judicial matters] com., 15 May 2012, Bull civ. IV, No. 11-18495 (Fr.). As a result under French law, the passing-on defense can be a serious obstacle to the compensation of the claimant.

40. Emerald Supplies Ltd and another v. British Airways plc, [2010] EWCA (Civ) 1284, [2011] Ch. 345 (Eng. and Wales) and WH Newson Holding Limited and others v. IMI plc and others, [2013] EWCA (Civ) 1377, [2013] WLR(D) 432 (Eng. and Wales). *Seeal so* Air Canada & others v. Emerald Supplies Limited & others [2015] EWCA Civ 1024, [2015] All ER (D) 17 (Nov) (Eng. and Wales).

41. Sainsbury's Supermarkets Ltd v. MasterCard Incorporated & others [2016] CAT 11 (Eng. and Wales).

42. Section 252 of the German Civil Code, for instance, provides that the damage to be compensated for also comprises any lost profits. *BGB*, *supra* note 29 at § 252.

43. Case C-557/12, Kone AG and Others v. ÖBB-Infrastruktur AG, [2014] All E.R. (D) 97 (Jun), (Eur. Ct. Justice).

44. *Id.*, at ¶37.

45. The Directive on damages appears to exclude exemplary damages, providing that "Full compensation under this Directive shall not lead to overcompensation, whether by means of punitive, multiple or other types of damages." Directive, 2014 O.J. (L 349) 1 (Dec. 5, 2014), *supra* note 7, at 12.

46. Devenish Nutrition Ltd & Ors v. Sanofi-Aventis SA (France) & Ors, [2007] EWHC2394 (Ch), [2008] 2 WLR 637 (Eng. and Wales); 2 Travel Group PLC (in liquidation) v. Cardiff City Transport Services Limited, [2012] CAT 19.

47. This is expressly provided for, for instance in *GWB*, *supra* note 12 at § 33(3), sentence 3.

48. Devenish Nutrition Ltd v. Sanofi-Aventis SA (France) & Ors, [2008] EWCA (Civ) 1086, [2009] Ch 390 (Eng. and Wales).

49. Article 9 of the French Civil Procedure Code provides that each party bears the burden of proving the relevant facts necessary for the success of their claim: defendants have no duty to disclose documents save those they rely on to assert their arguments; it is for claimants to provide the factual evidence to support their allegations. Articles 10 and 11 as well as article 145 provide that Courts may order production of precisely identified documents held by a party, or a third party (including the French Competition Authority) if such documents may influence the outcome of the trial: Code de Procedure Civile [C.P.C.] arts. 9-11, 145 (Fr.).

50. Section 142 of the German Code of Civil Procedure [Zivilprozessordnung, ZPO] allows the judge to order the defendant or a third party to produce a specific document if it possesses it, it is relevant to substantiate the claim, and it can be specified by the claimant or the defendant has referred to the document during the proceedings.

51. For instance, in-house legal privilege is recognized in the United Kingdom and the Netherlands, but not France or Italy.

52. Case C-360/09, Pfleiderer AG v. Bundeskartellamt, 2011 E.C.R. I-5161 (Eur. Ct. Justice).

53. Case C-536/11, Bundeswettbewerbsbehörde v. Donau Chemie AG and others, [2013] All E.R. (D) (Jun) (Eur. Ct. Justice).

54. *Id.,* at 141.

55. Directive, 2014 O.J. (L 349) 1 (Dec. 5, 2014), *supra* note 7, at 13-14.

56. For instance, Article 152 of the Dutch Code of Civil Procedure provides that proof can be supplied by all means unless otherwise provided by law, the evaluation of evidence being at the discretion of the court: Wetboek van Burgerlijke Rechtsvordering [Rv] art. 152 (Netherlands).

57. Pro-Sys Consultants Ltd. v. Microsoft Corporation, 2013 SCC 57 (Can.); Sun-Rype Products Ltd. v. Archer Daniels Midland Company, 2013

SCC 58 (Can.); Infineon Technologies AG v. Option consommateurs, 2013 SCC 59 (Can.).

58. Competition Act, R.S.C. 1985, c. C-34 (Can.).

59. Wakelam v. Wyeth Consumer Healthcare et al., 2014 BCCA 36 (Can.), *leave to appeal dismissed*, [2014] S.C.C.A. No. 125 (Can.); Watson v. Bank of America Corporation, 2015 BCCA 362 (Can.); Fanshawe College of Applied Arts and Technology v. AU Optronics Corporation, 2016 ONCA 621 (Can).

60. Competition Act, R.S.C. 1985, c. C-34, s. 61 (repealed 2009) (Can.).

61. It is not necessary that criminal proceedings have been initiated before a plaintiff can sue under s. 36 of the Competition Act, although, as discussed below, any criminal proceedings will extend the limitation period under s. 36(4).

62. Certain agreements that prevent or lessen competition substantially, but do not meet the test for a criminal conspiracy, constitute reviewable conduct under Part VIII of the Act (section 90.1), discussed below.

63. Misleading advertising is both a criminal offence under s. 52 of the Act and a civil reviewable practice under Part VIII of the Act (section 74.01), discussed below.

64. A claim can also be raised under section 36 of the Competition Act for a breach of a court order made under the Act.

65. A.I. Enterprises Ltd. v. Bram Enterprises Ltd., 2014 SCC 12 (Can.).

66. Competition Act, s. 36(1) (Can.); Pro-Sys Consultants Ltd. v. Microsoft Corporation, 2013 SCC 57, para. 65 (Can.).

67. *Id.* para. 45.

68. Kingstreet Investments Ltd. v. New Brunswick (Finance), 2007 SCC 1 (Can.); British Columbia v. Canadian Forest Products Ltd., 2004 SCC 38 (Can.).

69. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968).

70. Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).

71. *Pro-Sys*, 2013 SCC 57, para. 45 (Can.).

72. Competition Act, R.S.C. 1985, c. C-34, s. 36(4)(a) (Can.).

73. Peixeiro v. Haberman, [1997] 3 S.C.R. 549, para. 37 (Can.); *see also* Ryan v. Moore, [2005] 2 S.C.R. 53, paras. 23, 24, 31 (Can.) (confirming that the doctrine will not apply where "the limitation period

is explicitly linked by the governing legislation to a fixed event unrelated to the injured party's knowledge or the basis of the cause of action.").

74. Kamloops (City) v. Nielson, [1984] 2 S.C.R. 2 (Can.); Central Trust Co. v. Rafuse, [1986] 2 S.C.R. 147 (Can.); M.(K.) v. M.(H.), [1992] 3 S.C.R. 6 (Can.); *Peixeiro*, [1997] 3 S.C.R. 549, para. 37 (Can.); Novak v. Bond, [1999] 1 S.C.R. 808 (Can.). Where the discoverability principle applies, it can create difficult issues in class actions, as different members of the class may have different dates upon which they knew or should have known of a cause of action. In an environmental class action relating to soil contamination reducing property values, the Ontario Court of Appeal commented that "discoverability is often an individual issue that will require individual adjudication after the common issues are determined." Smith v. Inco, 2011 ONCA 628, para. 165 (Can.), *leave to appeal dismissed*, 2012 CanLII 22100 (Can. S.C.C.), *reconsiderationr ef'd*, 2014 CanLII 51431 (Can. S.C.C.).

75. Garford Pty Ltd. v. Dywidag Systems International, Canada, Ltd., 2012 FCA 48 (Can.), *aff'g* 2010 FC 996 (Can.).

76. *See Garford*, 2010 FC 996, paras. 31-33 (Can.), following the same conclusion expressed in *obiter* in Laboratoires Servier v. Apotex Inc., 2008 FC 825, para. 488 (Can.), *aff'd*, 2009 FCA 222 (Can.), *leave to appeal dismissed*, [2009] S.C.C.A. No. 403 (Can.). *See also* CCS Corporation v Secure Energy Services Inc., 2014 ABCA 96, para. 4 (Can.) ("With respect to the claim under s 36 of the Competition Act . . . the time runs from the conduct, not discoverability."); *But see Fanshawe College of Applied Arts and Technology v. AU Optronics Corporation*, 2016 ONCA 621 (Can.).) (holding that s. 36(4)(a)(i) of the Competition Act is subject to the discoverability principle).

77. *Garford*, 2012 FCA 48, paras. 17-19 (Can.). *See also* Eli Lilly and Co. v. Apotex Inc., 2009 FC 991, para. 736 (Can.), *aff'd*, 2010 FCA 240 (Can.), *leave to appeal dismissed*, [2010] S.C.C.A. No. 434 (Can.): "in the Court's view, ongoing conduct can only be qualified as ongoing for the purposes of subs. 36(4) so long as it continues to constitute an offence under Part VI of the Competition Act."

78. For example, in Sun-Rype Products Ltd. v. Archer Daniels Midland Company, 2008 BCCA 278 (Can.), *leave to appeal dismissed*, [2008] S.C.C.A. No. 416 (Can.), the British Columbia Court of Appeal held

that a ten-year limitation applies to a claim for a remedial constructive trust in that province.

79. Kingstreet Investments Ltd. v. New Brunswick (Finance), 2007 SCC 1 (Can.); British Columbia v. Canadian Forest Products Ltd., 2004 SCC 38 (Can.); Pro-Sys Consultants Ltd. v. Microsoft Corporation, 2013 SCC 57, para. 29 (Can.).

80. *Pro-Sys*, 2013 SCC 57 (Can.); Sun-Rype Products Ltd. v. Archer Daniels Midland Company, 2013 SCC 58 (Can.); Infineon Technologies AG v. Option consommateurs, 2013 SCC 59 (Can.).

81. Maritime Travel Inc. v. Go Travel Direct.Com Inc., 2009 NSCA 42 (Can.).

82. Maritime Travel Inc. v. Go Travel Direct.Com Inc, 2008 NSSC 163, para. 126 (Can.), *aff'd*, *id.*

83. Shah v. LG Chem, Ltd., 2015 ONSC 6148, paras. 158-76 (Can.), *leavet o appealgr anted*, 2016 ONSC 4670 (Can). In contrast, citing EU law, the British Columbia Supreme Court (a trial level court) has concluded that umbrella purchasers have a cause of action under the Competition Act: Godfrey v. Sony Corporation, 2016 BCSC 844 (Can.). A claim on behalf of umbrella purchasers was also certified in Fanshawe College v. Hitachi, Ltd. et al., 2016 ONSC 5118 (Can.).

84. Shah v. LG Chem, Ltd., 2015 ONSC 6148, paras. 158-76 (Can.), *leavet o appealgr anted*, 2016 ONSC 4670 (Can). paras. 175-76.

85. Sun-Rype, 2008 BCCA 278 (Can.); Koubi v. Mazda Canada Inc., 2012 BCCA 310, para. 16 (Can.), *leave to appeal dismissed*, [2012] S.C.C.A. No. 398 (Can.).

86. *Koubi*, 2012 BCCA 310, para. 17 (Can.).

87. Serhan v. Johnson & Johnson (2004), 72 O.R. 3d 296 (Can. Ont. Sup. Ct. J.).

88. Serhan v. Johnson & Johnson (2006), 85 O.R. 3d 665 (Can. Ont. Div. Ct.).

89. The *Serhan* case settled, as have the vast majority of the class proceedings in which a waiver of tort has been certified, such that the uncertainty surrounding the doctrine continues.

In Andersen v. St. Jude Medical Inc., 2012 ONSC 3660 (Can.), Madam Justice Lax of the Ontario Superior Court of Justice indicated that her experience following a lengthy, 138-day common issues trial (in which expert evidence on the policy implications of recognizing waiver of tort as

an independent cause of action was adduced), suggested that resolving the nature of the doctrine of waiver of tort does not necessarily require a trial, and may be determined at a certification hearing. Ultimately, she did not resolve the issue, because the plaintiffs had failed to establish a breach of the duty of care, so she did not have to address the restitutionary claim.

90. *Koubi*, 2012 BCCA 310, para. 30 (Can.).

91. *See, e.g.*, Peter v. Medtronic, Inc.; Robinson v. Medtronic, Inc., 2010 ONSC 3777 (Can. Ont. Div. Ct.).

92. *Koubi* (B.C.C.A.), para. 18 (Can.) (citing Lord Goff of Cieveley & G. Jones, The Law of Restitution, c.36-001 (7th ed. 2007)).

93. *Id.* para. 42.

94. *Koubi*, 2012 BCCA 310, para. 80 (Can.).

95. Wakelam v. Wyeth Consumer Healthcare et al., 2014 BCCA 36, paras. 75-90 (Can.), *leave to appeal dismissed*, [2014] S.C.C.A. No. 125 (Can.); Watson v. Bank of America Corporation, 2015 BCCA 362, paras. 24, 59-61 (Can.).

96. Shah v. LG Chem, Ltd., 2015 ONSC 6148, paras. 158-76 (Can.), *leavet o appeal granted*, 2016 ONSC 4670 (Can)., *but see* Airia Brands v. Air Canada, 2015 ONSC 53010 (Can.).

97. Sandoff v. Loblaws Companies Ltd., 2015 SKQB 345 para. 49 (Can.).

98. Wong v. Sony of Canada Ltd., [2001] O.J. No. 1707, para. 17 (Can. Ont. Sup. Ct. J.).

99. Whiten v. Pilot Insurance Co., 2002 SCC 18, para. 36 (Can.); *see also* Hill v. Church of Scientology of Toronto, [1995] 2 S.C.R. 1130, para. 196 (Can.). This is the standard applied in common law provinces; in Quebec, punitive damages are only available where authorized by statute: Richard v. Time Inc., 2012 SCC 8, para. 150 (Can.).

100. Competition Act, R.S.C. 1985, c. C-34, s. 36 (Can.).

101. 321665 Alberta Ltd. v. Husky Oil Operations Ltd., 2013 ABCA 221, para. 59 (Can.).

102. R. v. Oakes, [1986] 1 S.C.R. 103 (Can.).

103. *Id* . at 137-38 (quoting Bater v. Bater, [1950] 2 All E.R. 458, 459 (C.A.)).

104. *Id.* at 137-38. *See*, *e.g.*, Maritime Travel Inc. v. Go Travel Direct.Com Inc., 2008 NSSC 163, para. 92 (Can.), *aff'd*, 2009 NSCA 42 (Can.) (holding that where an allegedly misleading advertisement "has two

possible meanings, one of which would attract criminal and heavy civil sanctions and the other which would not, I conclude the heavier burden of proof on the balance of probabilities is not met.").

105. Pro-Sys Consultants Ltd. v. Microsoft Corporation, 2013 SCC 57, paras. 131-34 (Can.).

106. Koubi v. Mazda Canada Inc., 2011 BCSC 59, para. 35 (Can.), *rev'd on other grounds*, 2012 BCCA 310 (Can.), *leave to appeal dismissed*, [2012] S.C.C.A. No. 398 (Can.).

107. In Quebec, the parties are only required to produce those documents that they intend to rely upon or that are specifically requested by opposing counsel during oral discovery.

108. *See*, *e.g.,* Rules of Civil Procedure, R.R.O. 1990, Reg. 194, r. 30.03 (Can. Ont.).

109. *See*, *e.g.*, *id.* r. 31.03.

110. *See,e .g.*, *id.*, r. 31.10.

111. Imperial Oil v. Jacques, 2014 SCC 66 (Can.).

# TABLE OF CASES

# A

A.I. Enterprises Ltd. v. Bram Enterprises Ltd., 2014 SCC 12 (Can.)., 341

Adams v. Pan Am. World Airways, 828 F.2d 24 (D.C. Cir. 1987), 39

Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co., 141 F.3d 947 (9th Cir. 1998), 32

Addamax Corp. v. Open Software Found., 152 F.3d 48 (1st Cir. 1998), 14

Advanced Health-Care Servs. v. Radford Cmty. Hosp., 910 F.2d 139 (4th Cir. 1990), 12

Affiliated Capital Corp. v. City of Houston, 735 F.2d 1555 (5th Cir. 1984), 15

Aikens v. Ingram, 524 Fed. Appx. 873 (4th Cir. 2013), 79

Air Canada & others v. Emerald Supplies Limited & others [2015] EWCA Civ 1024, [2015] All ER (D) 17 (Nov) (Eng. and Wales)., 331, 335

Air Courier Conf. v. Postal Workers Union, 498 U.S. 517 (1991), 39

Air Passenger Computer Reservation Sys., In re, 727 F. Supp. 564 (C.D. Cal. 1989), 225

Airia Brands v. Air Canada, 2015 ONSC 5352 (Can.), 348

Airline Ticket Comm'n Antitrust Litig., In re, 918 F. Supp. 283 (D. Minn. 1996), 101

Airweld, Inc. v. Airco, 742 F.2d 1184 (9th Cir. 1984), 81

Al George Inc. v. Envirotech Corp., 939 F.2d 1271 (5th Cir. 1991), 68

Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414 (11th Cir. 1990), 323

Albrecht v. Herald Co., 390 U.S. 145 (1968), overruled by State Oil Co. v. Khan, 522 U.S. 3 (1997), 29

Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429 (3d Cir. 2000), 41

Allen v. Dairy Farmers of America, Inc., 279 F.R.D. 257 (D. Vt. 2011), 127

Allied Accessories & Auto Parts Co. v. Gen. Motors Corp., 901 F.2d 1322 (6th Cir. 1990), 314, 324

Allis-Chalmers Mfg. Co. v. Commonwealth Edison Co., 315 F.2d 558 (7th Cir. 1963), 71

Alton Ochsner Med. Found. v. Fischbach & Moore, Inc., No. 89-cv-2353, 1990 U.S. Dist. LEXIS 10499 (E.D. La. 1990), 45

Aluminum Phosphide Antitrust Litig., In re, 893 F. Supp. 1497 (D. Kan. 1995), 230, 235, 236, 237

Amarel v. Connell, 102 F.3d 1494 (9th Cir. 1996), 21, 29

American Ad Mgmt. v. Gen. Tel. Co., 190 F.3d 1051 (9th Cir. 1999), 20, 21, 26

American Booksellers Ass'n v. Barnes & Noble, Inc., 135 F. Supp. 2d 1031 (N.D. Cal. 2001), 325, 326

American Pipe & Constr. Co. v. Utah, 414 U.S. 538 (1974), 80

Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483 (8th Cir. 1992), 5, 9, 15, 16

Amey, Inc. v. Gulf Abstract & Title, 758 F.2d 1486 (11th Cir. 1985), 60

Amphastar Pharm. Inc. v. Momenta Pharm., Inc., 850 F.3d 52, 2017 WL 876260 (1st Cir. 2017), 13

Anaren Microwave, Inc. v. Loral Corp., 49 F.3d 62 (2d Cir. 1995), 33

Andersen v. St. Jude Medical Inc., 2012 ONSC 3660 (Can.), 347

Andrx Pharms. v. Biovail Corp. Int'l, 256 F.3d 799 (D.C. Cir. 2001), 32, 50, 51

Animal Science Products, Inc. v. China Minmetals Corp., 654 F.3d 462 (3d Cir. 2011), 26, 43

Antibiotic Antitrust Actions, In re , 333 F. Supp. 317 (S.D.N.Y. 1971), 77

Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006), 50

Argus Inc. v. Eastman Kodak Co., 801 F.2d 38 (2d Cir. 1986), 4

Arizona Dairy Products Litig., In re, 627 F. Supp. 233 (D. Ariz. 1985), 249

Arizona v. Maricopa Co. Med. Soc'y, 457 U.S. 332 (1982), 30

Arizona v. Shamrock Foods Co., 729 F.2d 1208 (9th Cir. 1984), 47, 49

Ashcroft v. Iqbal, 556 U.S. 662 (2009), 15

Ashley Creek Phosphate Co. v. Chevron USA, Inc., 315 F.3d 1245 (10th Cir. 2003), 294, 295

Ashmore v. Ne. Petrol. Div. of Cargill, Inc., 843 F. Supp. 759 (D. Me. 1994), 41

Aspartame Antitrust Litig., In re, No. 06-cv-1732, 2007 U.S. Dist. LEXIS 16995 (E.D. Pa. 2007), 72

Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985), 243

Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519 (1983), 6, 9, 19, 20, 21, 22, 23, 25, 26, 33, 34, 35, 49, 51, 52, 87

Association of Wash. Public Hosp. Dists. v. Philip Morris, 241 F.3d 696 (9th Cir. 2001), 33, 51

Atlantic City Elec. Co. v. Gen. Elec. Co., 312 F.2d 236 (2d Cir. 1962), 71

Atlantic Richfield Co. v. USA Petrol. Co., 495 U.S. 328 (1990), 20, 29, 30 Atlas Bldg. Prods. Co. v. Diamond Block & Gravel Co., 269 F.2d 950 (10th Cir. 1959), 12

ATM Fee Antitrust Litigation, In re, 686 F.3d 741 (9th Cir. 2012), 48, 49, 52, 266

Auction Houses Antitrust Litig., In re, No. 00-cv-0648 (LAK), 2001 U.S. Dist. LEXIS 1713 (S.D.N.Y. 2001), 227

Aurora Enters. v. NBC, 688 F.2d 689 (9th Cir. 1982), 78

Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556 (2d Cir. 1970), 95, 96, 281

# B

Babyage.com v. Toys "R" Us, Inc., 558 F. Supp. 2d 575 (E.D. Pa. 2008), 251

Bailey v. Allgas, Inc., 284 F.3d 1237 (11th Cir. 2002), 314

Balaklaw v. Lovell, 14 F.3d 793 (2d Cir. 1994), 21

Barrett v. Forest Labs., Inc., 2015 U.S. Dist. LEXIS 144340 (S.D.N.Y. 2015), 80

Barry Aviation v. Land O'Lakes Mun. Airport Comm'n, 377 F.3d 682 (7th Cir. 2004), 60, 70

Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178 (3d Cir. 1997), 25

Bater v. Bater, [1950] 2 All E.R. 458, 459 (C.A.))., 350

Bathke v. Casey's Gen. Stores, 64 F.3d 340 (8th Cir. 1995), 27

Bazemore v. Friday, 478 U.S. 385 (1986), 126

Beef Indus. Antitrust Litig., *In re,* 600 F.2d 1148 (5th Cir. 1979), 42, 43, 72, 250

Behrend v. Comcast Corp., 655 F.3d 182, 216 (3d Cir. 2011), 13

Belgische Radio en Televisie and Société Belge des Auteurs, Compositeurs et Éditeurs (BRT) v. SV SABAM and NV Fonior, 1974 E.C.R. 51 (Eur. Ct. Justice), 327

Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294 (5th Cir. 2003), 12

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), 15

Bell v. Cherokee Aviation Corp., 660 F.2d 1123 (6th Cir. 1981), 256, 257

Bell v. Dow Chem. Co., 847 F.2d 1179 (5th Cir. 1988), 68, 69

Bellevue Drug Co. v. Advance PCS, No. 03-cv-4731, 2004 U.S. Dist. LEXIS 3627 (E.D. Pa. 2004), 32

Benchmark Exp. Sevs. v. China Airlines, Ltd., 6 MDL 1775, 2010 U.S. Dist. LEXIS 146377 (E.D.N.Y. Sept. 22, 2010), 81

Berkey Photo v. Eastman Kodak Co., 603 F.2d 263 (2d Cir. 1979), 59, 91, 223, 244

Berkson v. Del Monte Corp., 743 F.2d 53 (1st Cir. 1984), 71

Bhan v. NME Hosp., 772 F.2d 1467 (9th Cir. 1985), 26 Bichan v. Chemetron Corp., 681 F.2d 514 (7th Cir. 1982), 41

Big Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096 (9th Cir. 1999), 28

Bigelow v. RKO Radio Pictures, 327 U.S. 251 (1946), 12, 14, 88, 89, 93, 120, 279, 282

Bingham v. Zolt, 66 F.3d 553 (2d Cir. 1995), 62

Blue Cross & Blue Shield of New Jersey v. Philip Morris, Inc., 113 F. Supp. 2d 345, 2000 U.S. Dist. LEXIS 13444 (E.D.N.Y. 2000), 62

Blue Cross & Blue Shield United v. Marshfield Clinic, 152 F.3d 588 (7th Cir. 1998), 94

Blue Cross & Blue Shield United v. Marshfield Clinic, 65 F.3d 1406 (7th Cir. 1995), 285

Blue Dane Simmental Corp. v. Am. Simmental Ass'n, 178 F.3d 1035 (8th Cir. 1999), 228

Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982), 19, 23, 26, 34, 51

Bob Willow Motors v. Gen. Motors Corp., 872 F.2d 788 (7th Cir. 1989), 63

Bon-Ton Stores v. May Dep't Stores Co., 881 F. Supp. 860 (W.D.N.Y. 1994), 29

Borger v. Yamaha Int'l Corp., 625 F.2d 390 (2d Cir. 1980), 286

Bradburn Parent Teacher Store v. 3M, 513 F. Supp. 2d 322 (E.D. Pa. 2007), 297

Bradburn Parent Teacher Store v. 3M, No. 02-7676, 2005 U.S. Dist. LEXIS 5315 (E.D. Pa. 2005), 295

Brand Name Prescription Drugs Antitrust Litig., *In re,* 123 F.3d 599 (7th Cir. 1997), 37, 47, 48, 270

Bristol Bay Salmon Fishery Antitrust Litig., *In re,* 530 F. Supp. 36 (W.D. Wash. 1981), 250

British Columbia v. Canadian Forest Products Ltd., 2004 SCC 38 (Can.)., 342, 345

Brooke Group v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993), 29, 31, 314

Brown Shoe Co. v. United States, 370 U.S. 294 (1962), 19

Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477 (1977), 5, 17, 19, 23, 24, 25, 27, 30, 291

Brunswick Corp. v. Reigel Textile Corp., 752 F.2d 261 (7th Cir. 1984), 64, 80

Bubar v. Ampco Foods, 752 F.2d 445 (9th Cir. 1985), 39

Bulk [Extruded] Graphite Prods. Antitrust Litig., *In re,* No. 02-cv-6030 (WHW), 2004 U.S. Dist. LEXIS 29586 (D.N.J. 2004), 75

Bundesgerichtshof [BGH] [Federal Court of Justice] June 28, 2011, Neue Juristische Wochenschrift [NJW] 2012, 928 ["ORWI"] (Ger.), 332, 335

Bundeswettbewerbsbehörde v. Donau Chemie AG and others, [2013] All E.R.(D) (Jun) (Eur. Ct. Justice), 339

Burkhalter Travel Agency v. MacFarms Int'l, 141 F.R.D. 144 (N.D. Cal. 1991), 45

Burnett v. N.Y. Cent. R.R., 380 U.S. 424 (1965), 79

Burns v. Lavender Hill Herb Farm, No. 01-cv-7019, 2005 U.S. Dist. LEXIS 7559 (E.D. Pa. 2005), *aff'd,* 167 F. App'x 891 (3d Cir. 2006), 39

Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717 (1988), 251

Buspirone Patent & Antitrust Litig., *In re,* 185 F. Supp. 2d 363 (S.D.N.Y. 2002), 62, 66, 67

Bussey v. Macon County Greyhound Park, Inc., No. 13-12733, 2014 WL 1302658 (11th Cir. 2014), 54

# C

Cada v. Baxter Healthcare Corp., 920 F.2d 226 (7th Cir. 1990), 60

California v. ARC America Corp., 490 U.S. 93 (1989) ., 38, 268

Callahan v. A.E.V., Inc., 182 F.3d 237 (3d Cir. 1999), 6

Camarda v. Snapple Distrib., Inc., 346 F. App'x 690 (2d Cir. 2009), 325

Campos v. Ticketmaster Corp., 140 F.3d 1166 (8th Cir. 1998), 40, 42, 49

Canadian Imp. Antitrust Litig., *In re ,* 470 F.3d 785 (8th Cir. 2006), 17, 21

Capital Imaging v. Mohawk Valley Med. Assocs., 996 F.2d 537 (2d Cir. 1993), 28

Car Carriers v. Ford Motor Co., 745 F.2d 1101 (7th Cir. 1984), 31

Carbon Black Antitrust Litig., *In re,* No. 03-cv-10191, 2005 U.S. Dist. LEXIS 660 (D. Mass. 2005), 58, 59, 65

Cardizem CD Antitrust Litig., *In re,* 332 F.3d 896 (6th Cir. 2003), 4, 17, 270

Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104 (1986), 20, 23, 24, 25, 26, 27, 28, 31

Caribe BMW, Inc. v. BMW AG, 19 F.3d 745 (1st Cir. 1994), 32

Carpet Group Int'l v. Oriental Rug Importers Ass'n, 227 F.3d 62 (3d Cir. 2000), 26

Cartel Damage Claims (CDC) Hydrogen Peroxide SA v. Akzo Nobel NV and others, [2015] All ER (D) 50 (Jun) (Eur. Ct. Justice), 332

Cascade Health Solutions v. PeaceHealth, 515 F.3d 883 (9th Cir. 2008), 305, 306, 307

Cascade Health Solutions v. PeaceHealth, 542 F.3d 668 (9th Cir. 2008), 298, 306

Cash & Henderson Drugs, Inc. v. Johnson & Johnson, 799 F.3d 202 (2d Cir. 2015), 313

Castro v. Sanofi Pasteur Inc., No. 11-7178, 2015 WL 5770381 (D.N.J. Sept. 30, 2015), 97

Catalano, Inc. v. Target Sales, 446 U.S. 643 (1980), 260

Catfish Antitrust Litig., In re, 826 F. Supp. 1019 (N.D. Miss. 1993), 74

Cathode Ray Tube (CRT) Antitrust Litigation, In re, No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. 2013), 54, 271

CCS Corporation v Secure Energy Services Inc., 2014 ABCA 96 (Can.), 344

CDW LLC v. NETech Corp., 906 F. Supp. 2d 815 (S.D. Ind. 2012)., 280

Central Trust Co. v. Rafuse, [1986] 2 S.C.R. 147 (Can.), 343

Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073 (10th Cir. 2006), 57, 59

Charley's Tour & Transp. v. Interisland Resorts, 618 F. Supp. 84 (D. Haw. 1985), 78

Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp., 546 F.2d 570 (4th Cir. 1976), 68

Chattanooga Foundry & Pipe Works v. Atlanta, 203 U.S. 390 (1906), 227

Chicken Antitrust Litig., In re, 560 F. Supp. 963 (N.D. Ga. 1980), 230

Chipanno v. Champion Int'l Corp., 702 F.2d 827 (9th Cir. 1983), 77

Chiropractic Coop. Ass'n v. Am. Med. Ass'n, 867 F.2d 270 (6th Cir. 1989), 7

Chocolate Confectionary Antitrust Litig., In re, 289 F.R.D. 200 (M.D. Pa. 2012), 229

Ciprofloxacin Hydrochloride Antitrust Litig., In re, 261 F. Supp. 2d 188 (E.D.N.Y. 2003), 67, 80

Citibank v. Allied Mgmt. Group, No. 06-cv-1193 (CAG), 2006 U.S. Dist. LEXIS 84872 (D.P.R. 2006), 61

City of Long Beach v. Standard Oil Co., 872 F.2d 1401 (9th Cir. 1989), 17

City of Pittsburgh v. W. Penn Power Corp., 147 F.3d 256 (3d Cir. 1998), 17

City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548 (11th Cir. 1998), 95

Clayworth v. Pfizer Inc., 165 Cal. App. 4th 209 (Cal. App.), as amended by 2008 Cal. App. LEXIS 1325 (Cal. App. 2008), 269

Cmty. Bank of N. Va. Mortg. Lending Practices Litig., In re, PNC Bank NA, 795 F.3d 380 (3d Cir. 2015), 72

Coastal Fuels of P.R. v. Caribbean Petrol. Corp., 175 F.3d 18 (1st Cir. 1999), 91, 288, 293, 294, 321, 322

Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338 (3d Cir. 1975), 285

Colorado v. W. Paving Constr. Co., 630 F. Supp. 206 (D. Colo. 1986), *aff'd enbanc by equally divided court*, 841 F.2d 1025 (10th Cir. 1988), 73, 75

Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013), 4, 10, 13, 14, 53, 54, 88, 92, 98, 104, 125, 127, 215, 216, 217, 218, 222, 236, 283

Comet Mech. Contractors v. E.A. Cowen Constr., 609 F.2d 404 (10th Cir. 1980), 42

Commercial Explosives Litig., *In re*, No. 96-cv-709S, 1996 U.S. Dist. LEXIS 21829 (D. Utah 1996), 75

Compact Disc Minimum Advertised Price Antitrust Litig., *In re*, 138 F. Supp. 2d 25 (D. Me. 2001), 71

Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039 (8th Cir. 2000), 14, 97, 105, 215, 283, 284

Concord Boat Corp. v. Brunswick Corp., 21 F.Supp. 2d 923 (E.D. Ark. 1998), 97

Confederated Tribes v. Weyerhaeuser Co., 411 F.3d 1030 (9th Cir. 2004), 303

Continental Airlines v. United Airlines, 277 F.3d 499 (4th Cir. 2002), 28, 101

Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690 (1962), 12, 15

Continental TV v. GTE Sylvania, 433 U.S. 36 (1977), 252

Continental-Wirt Elecs. Corp. v. Lancaster Glass Corp., 459 F.2d 768 (3d Cir. 1972), 59

Conway v. Bulk Petrol. Corp., 545 F. Supp. 398 (N.D. Ill. 1982), 73

Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768 (6th Cir. 2002), 7, 9, 93, 95, 124, 227

Cook v. Rockwell Int'l Corp. 580 F. Supp. 2d 1071 (D. Colo. 2006), 126

Coordinated Pretrial Proceedings in Petrol. Prods. Antitrust Litig., *In re*, 691 F.2d 1335 (9th Cir. 1982), *rev'd on other grounds*, 906 F.2d 432 (9th Cir. 1990), 249

Copper Antitrust Litig., *In re* 436 F.3d 782 (7th Cir. 2006), 57, 59, 60, 70

Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91 (2d Cir. 2007), 89, 91

Corrugated Container Antitrust Litigation, *In re*, 441 F. Supp. 921 (S.D. Tex. 1977), 231

County of Oakland v. City of Detroit, 866 F.2d 839 (6th Cir. 1989), 36, 44

County of Stanislaus v. Pac. Gas & Elec. Co., 114 F.3d 858 (9th Cir. 1997), 262

Courage Ltd v. Bernard Crehan, 2001 E.C.R. I-6297, (Eur. Ct. Justice), 328, 332

Covad Commc'ns Co. v. BellSouth Corp., 299 F.3d 1272 (11th Cir. 2002), *vacated*, 540 U.S. 1147 (2004), 40

Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761 (8th Cir. 2004), 214

Crossland v. Canteen Corp., 711 F.2d 714 (5th Cir. 1983), 8

Crowl Distrib. Corp. v. Singer Co., 543 F. Supp. 1033 (D. Kan. 1982), 324

Crown, Cork & Seal Co. v. Parker, 462 U.S. 345 (1983), 80

# D

Daisy Mt. Fire Dist. v. Microsoft Corp., 547 F. Supp. 2d 475 (D. Md. 2008), 80

Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408 (2d Cir. 2005), 21, 57, 60, 65

Danvers Motor Co. v. Ford Motor Co., 543 F.3d 141 (3d Cir. 2008), 312

Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), 210, 212

David Orgell, Inc. v. Geary's Stores, 640 F.2d 936 (9th Cir. 1981), 68

Dee-K Enters. v. Heveafil Sdn. Bhd., 982 F. Supp. 1138 (E.D. Va. 1997), 47

Delaware Valley Surgical Supply v. Johnson & Johnson, 523 F.3d 1116 (9th Cir. 2008), 38, 40

DeLong Equip. Co. v. Wash. Mills Elec. Minerals Corp., 990 F.2d 1186 (11th Cir.), *amended per curiam*, 997 F.2d 1340 (11th Cir. 1993), 91, 98, 320

Detroit Auto Dealers, 111 F.T.C. 417 (1989), 261

Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by* Goldberger v. Integrated Res., 209 F.3d 43 (2d Cir. 2000), 70

Deutsche Bahn AG & others v. Morgan Crucible Company PLC & others, [2013] CAT 18, 332

Devenish Nutrition Ltd & Ors v. Sanofi-Aventis SA (France) & Ors, [2007] EWHC2394 (Ch), [2008] 2 WLR 637 (Eng. and Wales), 337

Dickson v. Microsoft Corp., 309 F.3d 193 (4th Cir. 2002), 47

Discovery Fin. Serv. v. Visa U.S.A., 582 F. Supp. 2d 501 (S.D.N.Y. 2008), 11, 99

District of Columbia *ex rel.* Payton v. Basiliko, No. 91-cv-2518 (JHG), 1992 U.S. Dist. LEXIS 1260 (D.D.C. 1992), 76

Doctor's Hosp. v. SE Med. Alliance, 123 F.3d 301 (5th Cir. 1997), 33

Dolphin Tours v. Pacifico Creative Serv., 773 F.2d 1506 (9th Cir. 1985), 98, 278

Donahue v. Pendleton Woolen Mills, 633 F. Supp. 1423 (S.D.N.Y. 1986), 41

Drug Mart Pharm. Corp. v. Am. Home Prods. Corp., 472 F. Supp. 2d 385 (E.D.N.Y. 2007), 311, 312, 322, 323

Drug Mart Pharm. Corp. v. Am. Home Prods. Corp., No. 93-CV-5148, 2007 U.S. Dist. LEXIS 93493 (E.D.N.Y. 2007), 321

Drug Mart Pharm. Corp. v. Am. Home Products Corp., No. 93-CV-5184, 2012 WL 3544771 (E.D.N.Y. 2012), 313

Drumm v. Sizeler Realty Co., 817 F.2d 1195 (5th Cir. 1987), 79

Dumez France SA v. Hessische Landesbank (Helaba), 1990 E.C.R. I-49 (Eur. Ct. Justice), 332

DXS, Inc. v. Siemens Med. Sys., Inc., 100 F.3d 462 (6th Cir. 1996), 65, 67

# E

R.R. Presidents Conf. v. Noerr Motor Freight, 365 U.S. 127 (1961), 284 E.W. French & Sons v. Gen. Portland, Civ. No. 78-1928-TJH (C.D. Cal. Oct. 2, 1985), 247

Eastman Kodak Co. v. S. Photo Materials Co., 273 U.S. 359 (1927), 88, 89, 93, 277

Edward J. Sweeney & Sons v. Texaco, Inc., 637 F.2d 105 (3d Cir. 1980), 310 Eichman v. Fotomat Corp., 880 F.2d 149 (9th Cir. 1989), 67, 79

El Aguila Food Prods. v. Gruma Corp., 131 F. App'x 450 (5th Cir. 2005) (unpub'd), 325

Elec. Commc'ns Corp. v. Toshiba Am. Consumer Prods., 129 F.3d 240 (2d Cir. 1997), 27

Electrical Carbon Prods. Antitrust Litig., *In re*, 333 F. Supp. 2d 303 (D.N.J. 2004), 74

Electroglas, Inc. v. Dynatex Corp., 497 F. Supp. 97 (N.D. Cal. 1980), 66

Electronic Books Antitrust Litigation, *In re*, No. 11 MD 2293 (DLC), 2014 WL 1282293 (S.D.N.Y. 2014), 53

Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc., 213 F.3d 198 (5th Cir. 2000), 7, 15, 93, 94, 283

Eli Lilly and Co. v. Apotex Inc., 2009 FC 991, (Can.), *aff'd*, 2010 FCA 240 (Can.), *leave to appeal dismissed*, [2010] S.C.C.A. No. 434 (Can.), 344

Elizabeth Arden Sales Corp. v. Gus Blass Co., 150 F.2d 988 (8th Cir. 1945), 310 Elliott Indus. v. BP Am. Prod. Co., 407 F.3d 1091 (10th Cir. 2005), 26

Emerald Supplies Ltd and another v British Airways plc, [2010] EWCA (Civ) 1284, [2011] Ch. 345 (Eng. and Wales) and WH Newson Holding Limited and others v. IMI plc and others, [2013] EWCA (Civ) 1377, [2013] WLR(D) 432 (Eng. and Wales), 335

Emerson Elec. Co. v. Le Carbone Lorraine, 500 F. Supp. 2d 437 (D.N.J. 2007), 72

Energy Capital Corp. v. United States, 302 F.3d 1314 (2002), 118 Enterprise Indus. v. Tex. Co., 240 F.2d 457 (2d Cir. 1957), 310

Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig., *In re*, 256 F.R.D. 82 (D. Conn. 2009), 230

Ethypharm S.A. France v. Abbott Laboratories, No. 11-3602, 2013 U.S. App. LEXIS 1567 (3d Cir. 2013), 25, 275

Evanston Northwestern Healthcare, *In re,* 2008 U.S. Dist. LEXIS 42437 (N.D. Ill. May 29, 2008), 77

Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc., 243 F.3d 980 (6th Cir. 2001), 9, 12, 15

# F

Fallis v. Pendleton Woolen Mills, 866 F.2d 209 (6th Cir. 1989), 41

Fanshawe College of Applied Arts and Technology v. AU Optronics Corporation, 2016 ONCA 621 (Can.), 340, 344

Fanshawe College v. Hitachi, Ltd. et al., 2016 ONSC 5118 (Can.), 346

Farley Transp. Co. v. Santa Fe Trail Transp. Co., 786 F.2d 1342 (9th Cir. 1986), 11, 284, 285

Farmington Dowel Prods. v. Forster Mfg. Co., 421 F.2d 61 (1st Cir. 1970), 280, 293, 294

Federal Prescription Serv. v. Am. Pharm. Ass'n, 663 F.2d 258 (D.C. Cir. 1981), 12

Feeney v. Chamberlain Mfg. Corp., 831 F.2d 93 (5th Cir. 1987), 33

Fine v. Barry & Enright Prod., 731 F.2d 1394 (9th Cir. 1984), 33

Finnegan v. Campeau Corp., 915 F.2d 824 (2d Cir. 1990), 39

Fisher v. Apostolou, 155 F.3d 876 (7th Cir. 1998), 62

Fisher v. Aurora Health Care, Inc., 558 F. App'x 653 (7th Cir. 2014), 52

Fishman v. Estate of Wirtz, 807 F.2d 520 (7th Cir. 1986), 100, 107, 111, 280, 286, 287, 293

Flat Panel Antitrust Litig., 2012 WL 6708866, 250

Fleer Corp. v. Topps Chewing Gum, Inc., 415 F. Supp. 176 (E.D. Pa. 1976), 294

Florida Mun. Power Agency v. Florida Power & Light Co., 81 F. Supp. 2d 1313 (M.D. Fl. 1999), 68

Florida Seed Co. v. Monsanto Co., 105 F.3d 1372 (11th Cir. 1997), 21, 32, 39

Folding Carton Antitrust Litig., In re, 88 F.R.D. 211 (N.D. Ill. 1980), 249, 250

Ford Motor Credit Co. v. Hairston, No. 4:06CV00004, 2006 WL 2850615 (W.D. Va. 2006), 101

Forster Music Pub. v. Price Stern Sloan, No. 93 C 4487, 1995 U.S. Dist. LEXIS 5359 (N.D. Il. Apr. 14, 1995), 82

Fowler Mfg. Co. v. Gorlick, 415 F.2d 1248 (9th Cir. 1969), 310

Fox v. Good Samaritan Hosp., No. 04-cv-00874-RMW, 2007 U.S. Dist. LEXIS 77314 (N.D. Cal. 2007), 79

Free Freehand Corp. v. Adobe Sys., 852 F. Supp. 2d 1171 (N.D. Cal. 2012), 66, 69

Freedom Holdings, Inc. v. Cuomo, 624 F.3d 38, (2d Cir.2010), 275

Freeland v. AT&T Corp., 238 F.R.D. 130 (S.D.N.Y. 2006), 256, 258

Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1145 -46 (9th Cir. 2003), *as amended on denial of reh'g* (Apr. 24, 2003), 38, 45, 46, 52, 266

Frye v. United States, 293 F. 1013 (DC Cir. 1923), 210

FTC v. Arch Coal, Inc., 329 F. Supp. 2d 109 (2004), 205 FTC v. Fred Meyer, 390 U.S. 341 (1968), 323

FTC v. Morton Salt Co., 334 U.S. 37 (1948), 309, 310

FTC v. Mylan Laboratories, Inc., 62 F. Supp. 2d 25 (D.D.C. 1999), 38, 250

Funeral Consumers Alliance v. Service Corp. Int'l, 695 F.3d 330 (5th Cir. 2012), 3

# G

G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762 (2d Cir. 1995), 39

Garabet, M.D., Inc. v. Autonomous Technologies Corp., 116 F. Supp. 2d 1159 (C.D. Cal. 2000), 249

Garden Cottage Foods Ltd v. Milk Marketing Board, [1984] 1 A.C. 130 (H.L.), 330

Garford Pty Ltd. v. Dywidag Systems International, Canada, Ltd., 2012 FCA 48 (Can.), *aff'g* 2010 FC 996 (Can.)., 344

Gatt Commc'ns, Inc. v. PMC Associates, L.L.C., 711 F.3d 68 (2d Cir. 2013), 36, 52

Gelboim v. Bank of Am. Corp., 823 F.3d 759 (2d Cir. 2016), 5, 17

General Aircraft Corp. v. Air Am., 482 F. Supp. 3 (D.D.C. 1979), 73

General Electric v. Joiner, 522 U.S. 136 (1997), 211

General Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795 (8th Cir. 1987), 32

George Haug Co. v. Rolls Royce Motor Cars, 148 F.3d 136 (2d Cir. 1998), 27

Gerlinger v. Amazon.com, 526 F.3d 1253 (9th Cir. 2008), 23

Geron v. Odfjell ASA (*In re* Parcel Tanker Shipping Servs. Antitrust Litig.), No. 04-cv-1687 (AVC), 2007 U.S. Dist. LEXIS 33687 (D. Conn. 2007), 58

Glen Holly Enter. v. Tektronix, Inc., 343 F.3d 1000 (9th Cir. 2003), 27

GO Computer v. Microsoft Corp., 437 F. Supp. 2d 497 (D. Md. 2006), *aff'd*, 508 F.3d 170 (4th Cir. 2007), 72, 78

GO Computer v. Microsoft Corp., 508 F.3d 170 (4th Cir. 2007), 65

Godfrey v. Sony Corporation, 2016 BCSC 844 (Can.), 346

Golf City, Inc. v. Wilson Sporting Goods Co., 555 F.2d 426 (5th Cir. 1977), 286

*Grand Rapids Plastics, Inc. v. Kalian*, 188 F.3d 401, 405-07 (6th Cir. 1999)), 64, 65, 83

Graphics Processing Units Antitrust Litigation, *In re*, 253 F.R.D. 478 (N.D. Cal. 2008), 126

Gray v. Shell Oil Co., 469 F.2d 742 (9th Cir. 1972), 100

Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d 391 (7th Cir. 1993), 4, 9, 12, 15

Grimmett v. Brown, 75 F.3d 506 (9th Cir. Nev. 1996), 80

Gross v. New Balance Athletic Shoe, Inc*.,* 955 F. Supp. 242 (S.D.N.Y. 1997), 250

Group Health Plan, Inc. v. Philip Morris USA, Inc., 344 F.3d 753 (8th Cir. 2003), 214, 215

Gruppo Sicurezza, Appello Roma, 4 September 2006, 333

Grynberg v. Eni S.p.A., No. 06-cv-6594 (RLC), 2007 U.S. Dist. LEXIS 65787 (S.D.N.Y. 2007), 70

Gulf States Reorg. Group v. Nucor Corp., 466 F.3d 961 (11th Cir. 2006), 9, 29

# H

H.J., Inc. v. ITT Corp., 867 F.2d 1531 (8th Cir. 1989), 92, 95

Hamilton County Bd. of Comm'rs v. NFL, 491 F.3d 310 (6th Cir. 2007), 57, 59

Hamilton County Bd. of County Comm'rs v. NFL, 445 F. Supp. 2d 835 (S.D. Ohio 2006), *aff'd*, 491 F.3d 310 (6th Cir. 2007), 73

Hammes v. AAMCO Transmissions, 33 F.3d 774 (7th Cir. 1994), 39

Hanover 3201 Realty, LLC v. Village Supermarkets, Inc., 806 F.3d 162, (3d Cir. 2015), 275

Hanover Shoe v. United Shoe Machinery Corp., 392 U.S. 481 (1968), 8, 35, 36, 42, 43, 49, 91, 263, 264, 269, 342

Hanson v. Shell Oil Co., 541 F.2d 1352 (9th Cir. 1976), 81

Harold Friedman Inc. v. Thorofare Mkts., 587 F.2d 127 (3d Cir. 1978), 83

Hasbrouck v. Texaco, Inc., 842 F.2d 1034 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990), 32, 312, 319, 320

Hawaii v. Standard Oil Co., 405 U.S. 251 (1972), 23, 34 Hayes v. Solomon, 597 F.2d 958 (5th Cir. 1979), 294

Haynes Trane Serv. Agency v. Am. Standard, Inc., 51 F. App'x 786 (10th Cir. 2002), 26

HealthAmerica Pa. v. Susquehanna Health Sys., 278 F. Supp. 2d 423 (M.D. Pa. 2003), 29

Hemi Group v. City of New York, 559 U.S. 1, 8-9 (2010), 9

Hennegan v. Pacifico Creative Serv., 787 F.2d 1299 (9th Cir. 1986), 68

Higgins v. N.Y. Stock Exch., 942 F.2d 829 (2d Cir. 1991), 64, 80

High Pressure Laminates Antitrust Litig., In re, No. 00 MDL 1368 (CLB), 2006 WL 931692 (S.D.N.Y. Apr. 7, 2006), 95

High Pressure Laminates Antitrust Litig., In re, No. 00-md-01368, 2005 U.S. Dist. LEXIS 20317, at *6 (S.D.N.Y. Apr. 27, 2005), 233

High-Tech Employee Antitrust Litigation, In re, 289 F.R.D. 555 (N.D. Cal. 2013), 125, 126

High-Tech Employee Antitrust Litigation, In re, No. 11-CV-02509-LHK, 2013 WL 5770992 (N.D. Cal. 2013), 53

Hill v. Church of Scientology of Toronto, 1995 2 S.C.R. 1130 (Can.), 349

Hinds County v. Wachovia Bank N.A., 885 F. Supp. 2d 617 (S.D.N.Y. 2012), 77

Hobson v. Wilson, 737 F.2d 1 (D.C. Cir. 1984), 74

Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992), 9

Home Indem. Co. v. Lane Powell Moss & Miller, 43 F.3d 1322 (9th Cir. 1995), 101

Howard Hess Dental Laboratories Inc. v. Dentsply Int'l., Inc., 602 F.3d 237 (3d Cir. 2010), 47

Howard Hess Dental Labs. v. Dentsply Int'l, 424 F.3d 363 (3d Cir. 2005), 46, 48, 90, 293

Hughes v. Tobacco Inst., 278 F.3d 417 (5th Cir. 2002), 51

Humphreys v. Bellaire Corp., 966 F.2d 1037 (6th Cir. 1992), 41

Huntsman Chem. Corp. v. Holland Plastics Co., 208 F.3d 226 (Table), No. 98-4157, 2000 U.S. App. LEXIS 3083 (10th Cir. 2000) (unpub'd), 318

Hydrogen Peroxide Antitrust Litigation, In re, 552 F.3d 305 (3d Cir. 2008);, 125, 216

# I

IBM Peripheral EDP Devices Antitrust Litig., In Re, 481 F. Supp. 965 (N.D. Cal. 1979), aff'd sub nom. Transamerica Computer Co. v. IBM, 698 F.2d 1377 (9th Cir. 1983), 98

ILC Peripherals Leasing Corp. v. IBM, 458 F. Supp. 423 (N.D. Cal. 1978), aff'dper curiam sub nom. Memorex Corp. v. IBM, 636 F.2d 1188 (9th Cir. 1980), 96, 218

Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), 35, 36, 37, 38, 42, 43, 45, 47, 49, 50, 90, 91, 263, 264, 273, 342

Illinois Corp. Travel v. Am. Airlines, 806 F.2d 722 (7th Cir. 1986), 32

Illinois ex rel. Hartigan v. Panhandle E. Pipe Line Co., 852 F.2d 891 (7th Cir. 1988), 45

Illinois Tool Works v. Indep. Ink, 547 U.S. 28 (2006), 255, 258

Image Tech. Servs. v. Eastman Kodak Co., 125 F.3d 1195 (9th Cir. 1997), 94, 284, 285

Imperial Oil v. Jacques, 2014 SCC 66 (Can.), 351

Imperial Point Colonnades Condominium Inc. v. Mangurian, 549 F.2d 1029 (5th Cir. 1977), 66, 81, 82

Indeck Energy Servs. v. Consumers Energy Co., 250 F.3d 972 (6th Cir. 2001), 24

Independence Tube Corp. v. Copperweld Corp., 691 F.2d 310 (7th Cir. 1982),
    *rev'd on other grounds*, 467 U.S. 752 (1984), 93

Indium Corp. of Am. v. Semi-Alloys, Inc., 781 F.2d 879 (Fed. Cir. 1985), 32

Indus. Burner Sys. v. Maxon Corp., 275 F. Supp. 2d 878 (E.D. Mich. 2003), 64

Industrial Diamonds Antitrust Litig., *In re*, 119 F. Supp. 2d 418 (S.D.N.Y. 2000), 266

Industrial Silicon Antitrust Litig., *In re*, No. 95-cv-2104, 1998 U.S. Dist. LEXIS 20464 (W.D. Pa. 1998),
    233

Infineon Technologies AG v. Option consommateurs, 2013 SCC 59 (Can.), 340, 345

Infusion Res. v. Minimed, Inc., 351 F.3d 688 (5th Cir. 2003), 284

Insulate SB, Inc. v. Advanced Finishing Sys., Inc., 797 F.3d 538 (8th Cir. 2015), 47, 48

Intel Corp. Microprocessor Antitrust Litig., In re, 452 F. Supp. 2d 555 (D. Del. 2006), 23

International Bhd. of Teamsters Local 734 v. Philip Morris, Inc., 34 F. Supp. 2d 656 (N.D. Ill. 1998),
    *aff'd*, 196 F.3d 818 (7th Cir. 1999), 41

International Bhd. of Teamsters v. Philip Morris, Inc., 196 F.3d 818 (7th Cir. 1999), 51

International Broker, Corte App. Roma, 31 March 2008, 333

International Norcent Tech. v. Koninklijke Philips Elecs. N.V., No. 07-cv-00043-MMM (SSx), 2007
    U.S. Dist. LEXIS 89946 (C.D. Cal. 2007), 60

International Outsourcing Serv. v. Blistex, Inc., 420 F. Supp. 2d 860 (N.D. Ill. 2006), 32

International Raw Materials v. Stauffer Chem. Co., 978 F.2d 1318 (3d Cir. 1992), 39, 42

International Salt Co. v. United States, 332 U.S. 392 (1947), 257

Internet Corporative S.A. De C.V. v. Business Software Alliance, Inc. H-04-2322, 2004 U.S. Dist
    LEXIS 29024 (S.D. Tex. Nov. 15, 2004), 68

Internet Corporativo S.A. de C.V. v. Bus. Software Alliance, Civ. No. H-04-2344, 2005 U.S. Dist.
    LEXIS 38519 (S.D. Tex. 2005), 68

Irvin Indus. v. Goodyear Aerospace Corp., 974 F.2d 241 (2d Cir. 1992), 18

Isaksen v. Vt. Castings, 825 F.2d 1158 (7th Cir. 1987), 15, 252, 254

Israel Travel Advisory Serv. v. Isr. Identity Tours, 61 F.3d 1250 (7th Cir. 1995), 28

# J

Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557 (1981), 4, 89, 282, 310, 311, 312, 322

J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524 (3d Cir. 1990), 46, 311, 314

James Cape & Sons Co. v. PCC Constr. Co., 453 F.3d 396 (7th Cir. 2006), 27, 28

Jarrett v. Kassel, 972 F.2d 1415 (6th Cir. 1992), 71

Jayco Sys. v. Savin Bus. Mach. Corp., 777 F.2d 306 (5th Cir. 1985), 294

Jebaco v. Harrah's Operating Co., 587 F.3d 314, 320 -21 (5th Cir. 2009), 6

Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2 (1984), 255

Jewish Hosp. Ass'n v. Stewart Mech. Enters., 628 F.2d 971 (6th Cir. 1980), 44, 45, 48

John Peterson Motors v. Gen. Motors Corp., 613 F. Supp. 887 (D. Minn. 1985), 39

Johnson v. Nyack Hosp., 86 F.3d 8 (2d Cir. 1996), 79

JTC Petrol. Co. v. Piasa Motor Fuels, 190 F.3d 775 (7th Cir. 1999), 28, 31

# K

Kabealo v. Huntington Nat'l Bank, 17 F.3d 822 (6th Cir. 1994), 62, 64

Kadas v. MCI Systemhouse Corp., 255 F.3d 359 (7th Cir. 2001), 126

Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, 677 F.2d 1045 (5th Cir. 1982), 69, 256

Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc. (In re Neurontin Mktg. & Sales Practices Ltig.), 712 F.3d 21 (1st Cir. 2013), 63

Kamloops (City) v. Nielson, [1984] 2 S.C.R. 2 (Can.), 343

Kansas City v. Fed. Pac. Elec. Co., 310 F.2d 271 (8th Cir. 1963), 71

Kansas v. UtiliCorp United, 497 U.S. 199 (1990), 44, 265

Kaw Valley Elec. Coop. v. Kan. Elec. Power Coop., 872 F.2d 931 (10th Cir. 1989), 68

K-Dur Antitrust Litig., In re, 338 F. Supp. 2d 517 (D.N.J. 2004), 42

Kemp Pontiac-Cadillac, Inc. v. Hartford Auto. Dealers' Ass'n, 380 F. Supp. 1382 (D. Conn. 1974), 312

Kendall v. Visa U.S.A., Inc., 518 F.3d 1042 (9th Cir. 2008), 40, 48

Keogh v. Chic. & Nw. Rwy. Co., 260 U.S. 156 (1922), 246, 262

King & King Enters. v. Champlin Petrol. Co., 657 F.2d 1147 (10th Cir. 1981), 81

Kingstreet Investments Ltd. v. New Brunswick (Finance), 2007 SCC 1 (Can.), 342, 345

Kirk Dahl, et al. v. Bain Capital Partners, LLC, et al., Lead Case No. 1:07-cv-12388-EFH (June 14, 2012), 243

Kloth v. Microsoft Corp., 444 F.3d 312 (4th Cir. 2006), 38, 50

Knevelbaard Dairies v. Kraft Foods, 232 F.3d 979 (9th Cir. 2000), 22

Kochert v. Greater Lafayette Health Servs., 463 F.3d 710 (7th Cir. 2006), 21

Kone AG and others v. ÖBB-Infrastruktur AG, [2014] All E.R. (D) 97 (Jun), (Eur. Ct. Justice), 327, 336

Korody v. Colyer Corp., 828 F.2d 1572 (Fed. Cir. 1987), 68

Kottaras v. Whole Food Market, Inc., 281 F.R.D. 16 (D.D.C. 2012), 125

Koubi v. Mazda Canada Inc. , 2012 BCCA 310, (Can.), leave to appeal dismissed, [2012] S.C.C.A. No. 398 (Can.), 346, 347, 348, 350

Kristian v. Comcast Corp., 446 F.3d 25 (1st Cir. 2006), 57

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), 211, 217

Kypta v. McDonald's Corp., 671 F.2d 1282 (11th Cir. 1982), 8, 256, 258

# L

Laboratoires Servier v. Apotex Inc., 2008 FC 825 (Can.), aff'd, 2009 FCA 222 (Can.), leave to appeal dismissed, [2009] S.C.C.A. No. 403 (Can.), 344

Laborers Local 17 v. Philip Morris, Inc., 191 F.3d 229 (2d Cir. 1999), 51

Labrador, Inc. v. Iams Co., 105 F.3d 665 (9th Cir. 1997), 45

Lambert v. Board of Com'rs of Orleans Levee Dist., No. 05-CV-59312009 WL 152668 (E.D. La. Jan. 22, 2009), 273

Lease Oil Antitrust Litig., In re, No. C-98-048, 1998 WL 469840 (S.D. Tex. 1998), 44

Leegin Creative Leather Prods. v. PSKS, Inc., 551 U.S. 877 (2007), 29, 251, 253

Lee-Moore Oil Co. v. Union Oil Co., 599 F.2d 1299 (4th Cir. 1979), 7, 18, 101

Legal Econ. Evaluations v. Metro. Life Ins. Co., 39 F.3d 951 (9th Cir. 1994), 33

Leh v. Gen. Petrol. Corp., 382 U.S. 54 (1965), 77

Lehrman v. Gulf Oil Corp., 500 F.2d 659 (5th Cir. 1974), 94, 98

Lender's Serv. v. Dayton Bar Ass'n, 758 F. Supp. 429 (S.D. Ohio 1991), 64, 79

LePage's Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003), 6, 89, 93, 95, 98, 298, 307

Levine v. Cent. Fla. Med. Affiliates, 72 F.3d 1538 (11th Cir. 1996), 27

Linerboard Antitrust Litig., In re, 305 F.3d 145 (3d Cir. 2002), 46

Link v. Mercedes-Benz of N. Am., 788 F.2d 918 (3d Cir. 1986), 42

Litton Sys., Inc. v. AT&T Co., 700 F.2d 785 (2d Cir. 1983), 98, 100, 285

Live Action Antitrust Litig., In re, 863 F. Supp. 2d 966 (C.D. Cal. 2012)., 125

Live Concert Antitrust Litig., In re, 863 F. Supp. 2d 966 (C.D. Cal. 2012), 228,232, 237

Local Beauty Supply v. Lamaur Inc., 787 F.2d 1197 (7th Cir. 1986), 254

Loeb Indus., Inc. v. Sumitomo Corp., 306 F.3d 469 (7th Cir. 2002), 51

Logan v. Dayton Hudson Corp., 865 F.2d 789 (6th Cir. 1989), 213

Lorazepam & Clorazepate Antitrust Litig., In re, 202 F.R.D. 12 (D.D.C. 2001), 40

Los Angeles Mem'l Coliseum Comm'n v.NFL, 791 F.2d 1356 (9th Cir. 1986), 87, 91, 288

Love v. Nat'l Med. Enters., 230 F.3d 765 (5th Cir. 2000), 61

Lovett v. Gen. Motors Corp., 975 F.2d 518 (8th Cir. 1992), 39

Lowell v. Am. Cyanamid Co., 177 F.3d 1228 (11th Cir. 1999), 47

Lower Lake Erie Iron Ore Antitrust Litig., In re, 759 F. Supp. 219 (E.D. Pa. 1991), aff'd in part and rev'd in part, 998 F.2d 1144 (3d Cir. 1993), 83, 84

Lower Lake Erie Iron Ore Antitrust Litig., *In re*, 998 F.2d 1144 (3d Cir. 1993), 71, 75, 84, 245, 246, 250

Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc., 140 F.3d 1228 (9th Cir. 1998), 21

Lyons v. Philip Morris, Inc., 225 F.3d 909 (8th Cir. 2000), 50

# M

M.(K.) v. M.(H.), [1992] 3 S.C.R. 6 (Can.), 343 Maddox v. Claytor, 764 F.2d 1539, (11th Cir.1985), 126

Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp., 624 F. Supp.Fed Appx. 23 (2d Cir. 2003), 72

Magnetar Techs. Corp. v. Intamin, Ltd., 801 F.3d 1150 (9th Cir. 2015), 14

Malcolm v. Marathon Oil Co., 642 F.2d 845 (5th Cir. 1981), 16, 100, 102

Mandeville Island Farms v. Am. Crystal Sugar Co., 334 U.S. 219 (1948), 32

Marcus v. AT&T, 138 F.3d 46 (2d Cir. 1998), 262

Marine Firemen's Union v. Owens-Corning Fiberglass Corp., 503 F.2d 246 (9th Cir. 1974), 76, 78

Maritime Travel Inc. v. Go Travel Direct.Com Inc., 2009 NSCA 42 (Can.), 345, 350

Martorano v. PP&L Energy Plus, 137 F. App'x 491 (3d Cir. 2005), 25

Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n, 751 F.3d 368 (5th Cir. 2014), 8

Masimo Corp. v. Tyco Health Care Group, 350 Fed. Appx. 95 (9th Cir. 2009), 298, 301

Masimo Corp. v. Tyco Health Care Group, L.P., No. CV 02-4770 MRP (AJWx), 2007 U.S. Dist. LEXIS 98990 (C.D. Cal. 2007), 301

Masimo Corp. v. Tyco Health Care Group, L.P., No. CV 02-4770 MRP, 2006 U.S. Dist. LEXIS 29977 (C.D. Cal. 2006), 300

Masterfoods Ltd v. HB Icecream Ltd, 2000 E.C.R. I-11369 (Eur. Ct. Justice)., 330

Mathews v. Kidder, Peabody & Co., 260 F.3d 239 (3d Cir. 2001), 61

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), 27, 30, 275

Maxon Corp., 275 F. Supp. 2d (E.D. Mich. 2003), 65

McCarthy v. Recordez Serv., 80 F.3d 842 (3d Cir. 1996), 44

McCool v. Strata Oil Co., 972 F.2d 1452 (7th Cir. 1992), 82

McCurdy v. Lassa, 1999 U.S. App. LEXIS 9122 (9th Cir. 1999), 58

McDonough v. Toys "R" Us, 638 F. Supp. 2d 461 (E.D. Penn 2009), 255

McGlinchy v. Shell Chem. Co., 845 F.2d 802 (9th Cir. 1988), 286

MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081 (7th Cir. 1983), 95, 98, 218, 237, 283, 284, 285

McKenzie -Willamette Hosp. v. PeaceHealth, No. 02-6032 -HA, 2003 U.S. Dist. LEXIS 16203 (D. Or. 2003), *vacated and remanded sub nom.* Cascade Health Solutions v. PeaceHealth, 515 F.3d 883 (9th Cir. 2008), 298, 305, 306

McNulty v. Borden, Inc., 542 F. Supp. 655 (E.D. Pa. 1982), 41

Meijer, Inc. v. 3M, No. 04-cv-5871, 2005 U.S. Dist. LEXIS 13995 (E.D. Pa. 2005), 62, 83, 297

Meijer, Inc. v. Barr Pharm., Inc., 572 F. Supp. 2d 38 (D.D.C. 2008), 42

Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. 293 (D.D.C. 2007), 90

Melzer v MF Global UK Ltd, [2013] 3 W.L.R. 883 (Eur. Ct. Justice), 333

Memorex Corp. v. IBM, 636 F.2d 1188 (9th Cir. 1980), 96

Mercedes-Benz Antitrust Litig., *In re,* 157 F. Supp. 2d 355 (D.N.J. 2001), 47, 74

Merican, Inc. v. Caterpillar Tractor Co., 713 F.2d 958 (3d Cir. 1983), 46

MetroNet Servs. Corp. v. US West Commc'ns, 329 F.3d 986 (9th Cir. 2003),

*superseded on other grounds sub nom.* MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124 (9th Cir. 2004), 4, 5, 9, 12, 16

Meyer Goldberg, Inc. v. Goldberg, 717 F.2d 290 (6th Cir. 1983), 39

Microbix Biosystems v. Biowhittaker, Inc., 172 F. Supp. 2d 680 (D. Md. 2000), 62

Midwest Gas Servs. v. Ind. Gas Co., 317 F.3d 703 (7th Cir. 2003), 25

Midwest Milk Monopolization Litig., *In re,* 730 F.2d 528 (8th Cir. 1984), 49

Mid-West Paper Prods. Co. v. Cont'l Group, 596 F.2d 573 (3d Cir. 1979), 42, 46, 249

Midwestern Mach. Co. v. Nw. Airlines, 392 F.3d 265 (8th Cir. 2004), 57, 61

Midwestern Waffles v. Waffle House, 734 F.2d 705 (11th Cir. 1984), 68

Mir v. Little Co. of Mary Hosp., 844 F.2d 646 (9th Cir. 1988), 79

Mitchell v. United States, 10 Cl. Ct. 63 (1986), 82

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614 (1985)., 104

MM Steel, L.P. v. JSW Steel (USA) Inc., 806 F.3d 835 (5th Cir. 2015), 6

Molecular Diagnostics Labs. v. Hoffmann-La Roche, Inc., 402 F. Supp. 2d 276(D.D.C. 2005), 60

Monrouzeau v. Asociacion Del Hosp. Del Maestro, Inc., 153 Fed. Appx. 7 (1st Cir. 2005), 79

Montreal Trading v. AMAX, Inc., 661 F.2d 864 (10th Cir. 1981), 273

Morales-Villalobos v. Garcia-Llorens, 316 F.3d 51 (1st Cir. 2003), 33

Morelock Enters. v. Weyerhaeuser Co., No. CV-04-583-PA, 2004 U.S. Dist. LEXIS 28270 (D. Or. 2004), 295

Morning Pioneer v. Bismarck Tribune Co., 493 F.2d 383 (8th Cir. 1974), 283

Morton's Mkt. v. Gustafason's Dairy, 198 F.3d 823 (11th Cir. 1999), *amended by* 211 F.3d 1224 (11th Cir. 2000), 59, 67, 76, 78

Mt. Hood Stages v. Greyhound Corp., 616 F.2d 394 (9th Cir. 1980), 70, 79

Mt. Hood Stages, Inc. v. Greyhound Corp., 555 F.2d 687 (9th Cir. 1977), *vacatedand remanded*, 437 U.S. 322 (1978), 81

Muhonen v. Cingular Wireless Emple. Servs., LLC, 802 F. Supp. 2d 1025 (D. Minn. 2011), 71

Multiflex, Inc. v. Samuel Moore & Co., 709 F.2d 980 (5th Cir. 1983), 7

Murphy Tugboat v. Crowley, 658 F.2d 1256 (9th Cir. 2001), 109

Mushroom Direct Purchaser Antitrust Litig., *In re*, No. 06-0620, 2015 WL 5767415 (E.D. Pa. July 29, 2015), 93, 235

# N

National Ass'n of Review Appraisers & Mortgage Underwriters v. Appraisal Found., 64 F.3d 1130 (8th Cir. 1995), 15

National Black Expo v. Clear Channel Broad., No. 03-c-2751, 2007 U.S. Dist. LEXIS 9783 (N.D. Ill. 2007), 61

National Farmers' Org., Inc. v. Assoc. Milk Producers, 850 F.2d 1286 (8th Cir. 1988), *amended*, 878 F.2d 1118 (8th Cir. 1989), 94, 95, 98

National Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679 (1978), 261

National Souvenir Ctr. v. Historic Figures Inc., 728 F.2d 503 (D.C. Cir. 1984), 66

Nebula Glass Int'l v. Reichhold, Inc., No. 02-cv-60703-WPD, 2004 U.S. Dist. LEXIS 30908 (S.D. Fla. 2004), 62

New Jersey v. Morton Salt Co., 387 F.2d 94 (3d Cir. 1967), 78

New Mexico Natural Gas Antitrust Litig., *In re,* No. 403, 1982 U.S. Dist. LEXIS 9452 (D.N.M. 1982), 45

New Motor Vehicles Can. Exp. Antitrust Litig., *In re,* 307 F. Supp. 2d 136 (D. Me. 2004), 45, 47

New Motor Vehicles Can. Exp. Antitrust Litig., *In re,* 533 F.3d 1 (1st Cir. 2008), 36

New York v. Hendrickson Bros., 840 F.2d 1065 (2d Cir. 1988), 73, 74, 81

New York v. Julius Nasso Concrete Corp., 202 F.3d 82 (2d Cir. 2000), 90

Nexium (Esomeprazole) Antitrust Litig., *In re,* 842 F.3d 34 (1st Cir. 2016), 13

Nexium (Esomeprazole) Antitrust Litigation, *In re*, No. 12-md-02409-WGY, 2013 WL 6019287 (D. Mass. 2013), 42, 53, 59, 62

Niaspan Antitrust Litig., *In re*, No. 13-MD-2460, 2015 WL 4197590 (E.D. Pa. July 9, 2015), 90

Nichols Motorcycle Supply v. Dunlop Tire Corp., 913 F. Supp. 1088 (N.D. Ill. 1995), 322, 323

NicSand, Inc. v. 3M Co., 507 F.3d 442 (6th Cir. 2007), 52

Nifedipine Antitrust Litig., *In re*, 246 F.R.D. 365 (D.D.C. 2007), 96

North Carolina Elec. Membership Corp. v. Carolina Power & Light Co., 780 F. Supp. 322 (M.D.N.C. 1991), 64

Northern Pac. Ry. v. United States, 356 U.S. 1 (1958), 255 Northern v. McGraw Edison Co., 542 F.2d 1336 (8th Cir. 1976), 256

Norton-Children's Hosps. v. James E. Smith & Sons, 658 F.2d 440 (6th Cir. 1981), 72

Novak v. Bond, [1999] 1 S.C.R. 808 (Can.), 343

Novell v. Microsoft Corp., 731 F.3d 1064, 1080 (10th Cir. 2013), 8

Novell, Inc. v. Microsoft Corp., 505 F.3d 302 (4th Cir. 2007), 25, 50, 52, 57, 59, 77, 78

Nu-Life Constr. Corp. v. Board of Educ., 789 F. Supp. 103 (E.D.N.Y. 1992)., 118

# O

O.K. Sand & Gravel v. Martin Marietta Tech., 36 F.3d 565 (7th Cir. 1994), 28

O'Bannon v. Nat'l Collegiate Athletic Ass'n, 802 F.3d 1049 (9th Cir. 2015), 6

O'Connell v. Citrus Bowl, Inc., 99 F.R.D. 117 (E.D.N.Y. 1983), 312

OBG Tech. Servs. v. Northrop Grumman Space & Mission Sys. Corp., 503 F. Supp. 2d 490 (D. Conn. 2007), 74

Ohio Sealy Mattress Mfg. Co. v. Kaplan, 745 F.2d 441 (7th Cir. 1984), 62

Olympia Co. v. Celotex Corp., 771 F.2d 888 (5th Cir. 1985), 316, 317

Olympia Equip. Leasing Co. v. W. Union Tel. Co., 791 F.2d 370 (7th Cir. 1986), 99

Omnicare, Inc. v. UnitedHealth Group, 524 F. Supp. 2d 1031 (N.D. Ill. 2007), 32

Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc., 185 F.3d 957 (9th Cir. 1999), 51

OSB Antitrust Litig., *In re*, No. 06-826, 2007 U.S. Dist. LEXIS 56617 (E.D. Pa. 2007), 232

Oshiver v. Levin, 38 F.3d 1380 (3d Cir. 1994), 72

Ostrofe v. H.S. Crocker Co., 740 F.2d 739 (9th Cir. 1984), 33, 41

Ovitron Corp. v. Gen. Motors Corp., 512 F.2d 442 (2d Cir. 1975), 294

# P

Pace Elecs., Inc. v. Canon Computer Sys., Inc., 213 F.3d 118 (3d Cir. 2000), 32

Pace Indus. v. Three Phoenix Co., 813 F.2d 234 (9th Cir. 1987), 66, 67, 68, 79, 80

Pacific Coast Agric. Exp. Ass'n v. Sunkist Growers, 526 F.2d 1196 (9th Cir. 1975), 18, 278

Page v. United States, 729 F.2d 818 (D.C. Cir. 1984), 82

Palmyra Park Hosp. v. Phoebe Putney Mem'l Hosp. et al., 604 F.3d 1291 (11th Cir. 2010), 28, 104, 276

Paper Sys. v. Nippon Paper Indus. Co., 281 F.3d 629 (7th Cir. 2002), 48, 248

Park v. El Paso Bd. of Realtors, 764 F.2d 1053 (5th Cir. 1985), 98

Patel v. Midland Mem'l Hosp. & Med. Ctr., 298 F.3d 333 (5th Cir. 2002), 27

Paycom Billing Servs. v. MasterCard Int'l, 467 F.3d 283 (2d Cir. 2006), 40

Payment Card Interchange Fee and Merchant Discount, *In re*, No. 05-MD-1720, 2013 WL 6510737 (E.D.N.Y. 2013)., 298

Peck v. Gen. Motors Corp., 894 F.2d 844 (6th Cir. 1990), 65 Peixeiro v. Haberman, [1997] 3 S.C.R. 549 (Can.), 343

Pennsylvania v. Milk Indus. Mgmt. Corp., 812 F. Supp. 500 (E.D. Pa. 1992), 75

Pension Fund-Mid-Jersey Trucking Indus. v. Omni Funding Group, 687 F. Supp. 962 (D.N.J. 1988), 76

Perkins v. Standard Oil Co., 395 U.S. 642 (1969), 45, 309

Peter v. Medtronic, Inc.; Robinson v. Medtronic, Inc., 2010 ONSC 3777 (Can. Ont. Div. Ct.)., 347

Pfleiderer AG v. Bundeskartellamt, 2011 E.C.R. I-5161 (Eur. Ct. Justice), 338

Phillips v. Crown Cent. Petrol. Corp., 602 F.2d 616 (4th Cir. 1979), 44

Photochromic Lens Antitrust Litigation, In re, No. 2173, 2014 WL 1338605 (M.D. Fla. 2014), 53

Pierce v. Ramsey Winch Co., 753 F.2d 416 (5th Cir. 1985), 102, 286, 287

Pines Chrysler-Plymouth v. Chrysler Corp., 826 F.2d 1360 (4th Cir. 1987), 289

Pinney Dock & Transp. Corp. v. Penn Cent. Corp., 838 F.2d 1445 (6th Cir. 1988), 245

Pioneer Co. v. Talon, Inc., 462 F.2d 1106 (8th Cir. 1972), 60

Plastic Cutlery Antitrust Litig., In re, No. 96-cv-728, 1998 U.S. Dist. LEXIS 3628 (E.D. Pa. 1998), 229, 232

Plywood Antitrust Litig., In re, 655 F.2d 627 (5th Cir. 1981), 44

Pollock v. Citrus Assocs. of the N.Y. Cotton Exch., 512 F. Supp. 711 (S.D.N.Y. 1981), 250

Polypropylene Carpet Antitrust Litig., In re, 93 F. Supp. 2d 1348 (N.D. Ga. 2000), 237

Pool Water Prods. v. Olin Corp., 258 F.3d 1024 (9th Cir. 2001), 24, 29, 31

Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117 (2d Cir. 2007), 31

Poster Exch. v. Nat'l Screen Serv. Corp., 456 F.2d 662 (5th Cir. 1972), 62

Poster Exch. v. Nat'l Screen Serv. Corp., 517 F.2d 117 (5th Cir. 1975), 68, 69

Processed Egg Prods. Antitrust Litig., In re, 2013 U.S. Dist. LEXIS 119936 (E.D. Pa. Aug. 23, 2013), 71

Prograf Antitrust Litig., In re, No. 11-2242, 2014 WL 7641156 (D. Mass. Dec. 23, 2014), 90, 94

Propylene Carpet Antitrust Litigation, In re, 996 F. Supp. 18 (N.D. Ga. 1997)), 226

Pro-Sys Consultants Ltd. v. Microsoft Corporation, 2013 SCC 57 (Can.), 339, 342, 345, 350

Province v. Cleveland Press Publ'g Co., 787 F.2d 1047 (6th Cir. 1986), 41

Publ'n Paper Antitrust Litig., In re, 690 F.3d 51 (2d Cir. 2012), 10, 13

Public Serv. Co. v. Gen. Elec. Co., 315 F.2d 306 (10th Cir. 1963), 71

Publication Paper Antitrust Litig., In re, No. 04-md-1631 (SRU), 2005 U.S. Dist. LEXIS 19896 (D. Conn. 2005), 73

# R

R. v. Oakes, [1986] 1 S.C.R. 103 (Can.)., 349, 350

R.C. Bigelow, Inc. v. Unilever N.V., 867 F.2d 102 (2d Cir. 1989), 29

Rader v. Balfour, 440 F.2d 469 (7th Cir. 1971), 77

Rail Freight Fuel Surcharge Antitrust Litigation, In re, 725 F.3d 244 (2013), 54, 55, 99, 125, 223, 237

Rambus Inc. v. Samsung Elecs. Co., No. 05-cv-02298-RMW, 2007 U.S. Dist. LEXIS 3088 (N.D. Cal. 2007), 73

Re/Max Int'l v. Realty One, 173 F.3d 995 (6th Cir. 1999), 75

Read v. Med. X-Ray Ctr., 110 F.3d 543 (8th Cir. 1997), 15

Reading Indus. v. Kennecott Copper Corp., 477 F. Supp. 1150 (S.D.N.Y. 1979), aff'd 631 F.2d 10 (2d Cir. 1980), 250

Ready-Mixed Concrete Price Fixing Litig., In re, No. 05-cv-00979-SEB-VSS, 2006 U.S. Dist. LEXIS 71874 (S.D. Ind. 2006), 72

Reed v. Advocate Health Care, 268 F.R.D. 573 (N.D. Ill. 2009), 126

Refrigerant Compressors Antitrust Litig., In re, No. 09-md-02042, 2012 WL 2071767 (E.D. Mich. 2012), 76, 78, 266

Reiter v. Sonotone Corp., 442 U.S. 330 (1979), 4

Relafen Antitrust Litig., In re, 286 F. Supp. 2d 56 (D. Mass. 2003), 62, 68

Relafen Antitrust Litig., In re, 346 F. Supp. 2d 349 (D. Mass. 2004), 90

Relafen Antitrust Litig., In re, 360 F. Supp. 2d 166 (D. Mass. 2005), 270

Rhode Island Laborers' Health & Welfare Fund v. Philip Morris, Inc., 99 F. Supp. 2d 174 (D.R.I. 2000), 51

Richard v. Time Inc., 2012 SCC 8 (Can.), 349

Risk v. Allstate Life Ins. Co., No. 04-CV-0333-CVE-FHM, 2006 U.S. Dist. LEXIS 48524 (N.D. Okla. 2006), 32

Rite Aid Corp. v. Am. Express Travel Related Serv., 708 F. Supp. 2d 257 (E.D.N.Y. 2010), 59, 62, 69

RKI, Inc. v. Grimes, 200 F. Supp. 2d 916 (D. Ill. 2002), 64

Robert L. Kroenlein Trust v. Kirchhefer, 764 F.3d 1268 (10th Cir. 2014), 62

Rock-It, Inc. v. Futura Coatings, 74 F. Supp. 2d 420 (D. Vt. 1999), 39

Rose Confections, Inc. v. Ambrosia Chocolate Co., 816 F.2d 381 (8th Cir. 1987), 4, 317, 318

Rossi v. Standard Roofing, 156 F.3d 452 (3d Cir. 1998), 12

Royal Mile Co., Inc. v. UPMC, No. 10-cv-1609, 2013 WL 5436925 (W.D. Pa. 2013), 262

Royal Printing Co. v. Kimberly-Clark Corp., 621 F.2d 323 (9th Cir. 1980), 46, 266

RSA Media v. AK Media Group, 260 F.3d 10 (1st Cir. 2001), 17, 21

Rubber Chems. Antitrust Litig., In re, 504 F. Supp. 2d 777 (N.D. Cal. 2007), 58

Russ Togs v. Grinnell Corp., 426 F.2d 850 (2d Cir. 1970), 78

Rutledge v. Boston Woven Hose & Rubber Co., 576 F.2d 248 (9th Cir. 1978), 73

Ryan v. Moore, 2005 2 S.C.R. 53 (Can.), 343

# S

S.E.C. v. Wyly, 788 F. Supp. 2d 92 (S.D.N.Y. 2011), 60, 71

Sainsbury's Supermarkets Ltd v. MasterCard Incorporated & others [2016] CAT 11 (Eng. and Wales), 336

Samsung Elecs. Co. v. Panasonic Corp., No. 12-15185, 2012 U.S. 9th Cir. Briefs LEXIS 2313, (9th Cir. June 25, 2012), 66

Sandoff v. Loblaws Companies Ltd., 2015 SKQB 345 (Can.), 348

Sanger Ins. Agency v. Hub Int'l, Ltd., 802 F.3d 732 (5th Cir. 2015), 7, 51

Sanner v. Bd. of Trade of Chi., 62 F.3d 918 (7th Cir. 1995), 32

SAS v. P.R. Tel. Co., 48 F.3d 39 (1st Cir. 1995), 20, 22, 26

Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410 (7th Cir. 1992), 237

Schulz v. Pataki, 137 F. Supp. 2d 80 (N.D.N.Y. 2001), 39

Scrap Metal Antitrust Litig., *In re*, 527 F.3d 517 (6th Cir. 2008), 70, 72, 87

Scrap Metal Antitrust Litig., *In re*, No. 02-cv-0844, 2006 U.S. Dist. LEXIS 75873 (N.D. Ohio 2006), *aff'd*, 527 F.3d 517 (6th Cir. 2008), 76

Serhan v. Johnson & Johnson (2004), 72 O.R. 3d 296 (Can. Ont. Sup. Ct. J.)., 346

Serhan v. Johnson & Johnson (2006), 85 O.R. 3d 665 (Can. Ont. Div. Ct.), 346

Serpa Corp. v. McWane, Inc., 199 F.3d 6 (1st Cir. 1999), 21, 22, 27, 33

Service Employees Int'l Union Health & Welfare Fund v. Philip Morris, Inc., 83 F. Supp. 2d 70 (D.D.C. 1999), *rev'd on other grounds*, 249 F.3d 1068 (D.D.C. 2001), 33

Shah v. LG Chem, Ltd., 2015 ONSC 6148 (Can.), *leave to appeal granted*, 2016 ONSC 4670 (Can), 346, 348

Sharp v. United Airlines, 967 F.2d 404 (10th Cir. 1992), 33

Sheet Metal Workers Nat. Health Fund v. Amgen Inc., No. 07-CV-5295 (D.N.J. Aug. 13, 2008), 256

Shimazaki Commc'ns v. AT&T, 647 F. Supp. 10 (S.D.N.Y. 1986), 80

Shreve Equip. v. Clay Equip. Corp., 650 F.2d 101 (6th Cir. 1981), 9, 12

Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir. 1971), 257

SigmaPharm, Inc. v. Mutual Pharmaceutical Co., Inc., 454 F. App'x 64 (3d Cir. 2011), 25

Simon v. KeySpan Corp., 694 F.3d 196 (2d Cir. 2012), 42, 43, 44

Sinclair Refining Co. v. Jenkins Petrol. Process Co., 289 U.S. 689 (1933), 110

Singh v. Wells, 445 Fed. Appx. 373 (2d Cir. 2011), 73

Skelaxin (Metaxalone) Antitrust Litig., *In re*, No. 1:12-md-2343, 2014 U.S. Dist. LEXIS 66707 (E.D. Tenn. May 15, 2014), 70

Skelaxin (Metaxalone) Antitrust Litigation, *In re*, 2014 WL 340903 (E.D. Tenn. 2014), 53, 90

Smith v. Inco, 2011 ONCA 628 (Can.), *leave to appeal dismissed*, 2012 CanLII 22100 (Can. S.C.C.), *reconsideration ref'd*, 2014 CanLII 51431 (Can. S.C.C.), 344

Somers v. Apple, Inc., 729 F.3d 953, 963-66 (9th Cir. 2013), 15, 261

Southaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079 (6th Cir. 1983), 27

Southeastern Milk Antitrust Litig., *In re*, 739 F.3d 262, 284 (6th Cir. 2014), 9

Southern Pac. Commc'ns Co. v. AT&T, 556 F. Supp. 825 (D.D.C. 1983), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984), 98, 99

Southwestern Sheet Metal Works v. Semco Mfg., 788 F.2d 1144 (5th Cir. 1986), 9

Sports Racing Servs. v. Sports Car Club of Am., 131 F.3d 874 (10th Cir. 1997), 39

Spray-Rite Serv. Corp. v. Monsanto Co., 684 F.2d 1226 (7th Cir. 1982), *aff'd*, 465 U.S. 752 (1983), 99, 285

Square D Co. v. Niagara Frontier Tariff Bureau , 476 U.S. 409 (1986), 262

St. Louis Convention & Visitors Comm'n v. NFL, 154 F.3d 851 (8th Cir. 1998), 15, 16

Stamatakis Indus. v. King, 965 F.2d 469 (7th Cir. 1992), 31

Stanislaus Food Products Co. v. USS Posco Industries, 782 F. Supp. 2d 1059 (C.D. Cal. 2011), 43

State v. McGrady, COA13-330, 2014 WL 211962 (N.C. Ct. App. 2014), 212

Static Control Components, Inc. v. Lexmark Int'l, Inc., 697 F.3d 387, 406 (6th Cir. 2012) aff'd, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014), 36

Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912 (3d Cir. 1999), 41, 51

Stein v. Pac. Bell, No. 00-CV-2915, 2007 WL 831750 (N.D. Cal. Mar. 19, 2007), 228

Stelwagon Mfg. Co. v. Tarmac Roofing Sys., 63 F.3d 1267 (3d Cir. 1995), 311, 312

Stevens v. Zenith Distrib. Corp., 568 F. Supp. 1200 (W.D. Mo. 1983), 321

Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931), 4, 11, 12, 15, 17, 88, 89, 92, 93, 282, 283, 293, 311

Strax v. Commodity Exch., 524 F. Supp. 936 (S.D.N.Y. 1981), 250

Sugar Indus. Antitrust Litig., *In re*, 579 F.2d 13 (3d Cir. 1978), 36, 46

Sullivan v. Tagliabue, 25 F.3d 43 (1st Cir. 1994), 21

Sun Microsystems, Inc. v. Hynix Semiconductor Inc., 608 F. Supp. 2d 1166, (N.D. Cal. 2009), 278

Sunbeam Television Corp. v. Nielsen Media Research, Inc., 711 F.3d 1264 (11th Cir. 2013), 50

Sun-Rype Products Ltd. v. Archer Daniels Midland Company, 2013 SCC 58 (Can.), 340, 345, 346

Suture Express, Inc. v. Owens & Minor Distribution, Inc., 851 F.3d 1029, 2017 WL 971782 (10th Cir. 2017), 8

# T

Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465 (5th Cir. 2000), 13, 16, 225

Taylor v. Meirick, 712 F.2d 1112 (7th Cir. 1983), 82

Technical Learning Collective v. Daimler-Benz AG, No. N-77-1443, 1980 U.S. Dist. LEXIS 9517 (D. Md. 1980), 44

Teladoc, Inc. v. Tex. Med. Bd., 2015 U.S. Dist. LEXIS 166754 (W.D. Tex. Dec. 14, 2015), 69

Teva Pharm. USA, Inc. v. Abbott Labs., 252 F.R.D. 213 (D. Del. 2008), 90

Texaco Inc. v. Hasbrouck, 496 U.S. 543 (1990), 10, 309, 319, 320

Texas Carpenters Health Benefit Fund v. Philip Morris, Inc., 199 F.3d 788 (5th Cir. 2000), 50

Texas Comm'l Energy v. TXU Energy, 413 F.3d 503 (5th Cir. 2005), 262

Texas Grain Storage v. Monsanto Co., No. SA-07-ca-673-OG, 2008 U.S. Dist. LEXIS 53513 (W.D. Tex. 2008), 58

Texas Indus. v. Radcliff Materials, 451 U.S. 630 (1981), 248, 333

Texas v. Allan Constr. Co., 851 F.2d 1526 (5th Cir. 1988), 73, 74, 75

TFT-LCD (Flat Panel) Antitrust Litig., In re, No. 07-1827, 2012 WL 6708866 (N.D. Cal. 2012), 249, 268, 271

TFT-LCD (Flat Panel) Antitrust Litig., In re, No. 07-md-1827, 2012 WL 6709621 (N.D. Cal. 2012), 269

TFT-LCD (Flat Panel) Antitrust Litig., In re, No. M 07-1827 SI, 2012 WL 6000154 (N.D. Cal. Nov. 30, 2012), 101

Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566 (11th Cir. 1991), 294, 295

Thorman v. Am. Seafoods Co., 421 F.3d 1090 (9th Cir. 2005), 73

3M Co. v. N.J. Wood Finishing Co., 381 U.S. 311 (1965), 77

321665 Alberta Ltd. v. Husky Oil Operations Ltd., 2013 ABCA 221 (Can.), 349

Ticketmaster Corp. v. Tickets.com, Inc., No. 99-7654, 2003 U.S. Dist. LEXIS 28059 (C.D. Cal. Jan. 28, 2003), 97

Todorov v. DCH Healthcare Auth., 921 F.2d 1438 (11th Cir. 1991), 23

Toledo Mack Sales & Serv. v. Mack Trucks, 530 F.3d 204 (3d Cir. 2008), 57, 59, 65

Tops Mkts. v. Quality Mkts., 142 F.3d 90 (2d Cir. 1998), 29

Toscano v. PGA Tour, Inc., 201 F. Supp. 2d 1106 (E.D. Cal. 2002), 278

Transamerica Computer Co. v. IBM, 698 F.2d 1377 (9th Cir. 1983), 14

TransWeb, LLC v. 3M Innovative Props. Co., 812 F.3d 1295 (Fed. Cir. 2016), 6

Travel Agent Comm'n Antitrust Litig., In re, No. 03-cv-30000, 2007 U.S. Dist. LEXIS 79918 (N.D. Ohio 2007), 65, 69

Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, 433 F.3d 1024 (7th Cir. 2006), 28

Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 194 F.2d 846 (8th Cir. 1952), 78

Twin City Sport Serv. v. Charles O. Finley & Co., 512 F.2d 1264 (9th Cir. 1975), 66

2 Travel Group PLC (in liquidation) v Cardiff City Transport Services Limited, [2012] CAT 19, 335, 337

# U

U.S. Football League v. NFL, 842 F.2d 1335 (2d Cir. 1988), 283, 284

United Food & Commercial Workers v. Philip Morris, Inc., 223 F.3d 1271 (11th Cir. 2000), 51

United Food Mart v. Motiva Enters., 457 F. Supp. 2d 1329 (S.D. Fla. 2005), 58, 60

United Mine Workers v. Pennington, 381 U.S. 657 (1965), 284

United States v. Anderson, 326 F.3d 1319 (11th Cir. 2003), 242

United States v. Grinnell Corp., 384 U.S. 563 (1966), 243

United States v. Therm-All, Inc., 373 F.3d 625 (5th Cir. 2003), 65, 67

Uranium Antitrust Litig., *In re,* 552 F. Supp. 518, 525 (1982), 250

Urethane Antitrust Litigation, *In re*, No. 1616, 2013 WL 2097346 (D. Kan. 2013), 11, 54, 124

USA Petrol. Co. v. Atl. Richfield Co., 13 F.3d 1276 (9th Cir. 1993), 29

# V

Valley Prods. Co. v. Landmark, 128 F.3d 398 (6th Cir. 1997), 18, 22

Varner v. Peterson Farms, 371 F.3d 1011 (8th Cir. 2004), 57, 60, 66, 67

Veranda Beach Club v. W. Surety Co., 936 F.2d 1364 (1st Cir. 1991), 100

Verizon Commc'ns v. Trinko, 540 U.S. 398 (2004), 40

Vernon v. S. Cal. Edison Co., 955 F.2d 1361 (9th Cir. 1991), 284, 285, 325

Vincenzo Manfredi v. Lloyd Adriatico Assicurazioni SpA, 2006 E.C.R. I-6619 (Eur. Ct. Justice)., 328, 334

Vinci v. Waste Mgmt., 80 F.3d 1372 (9th Cir. 1996), 39

Virginia Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d 535 (4th Cir. 1998), 18

Visa Check/MasterMoney Antitrust Litig., *In re*, 280 F.3d 124 (2d Cir. 2001), 256

Visa Check/MasterMoney Antitrust Litig., *In re,* No. 96-5238, 2003 WL 1712568, at *2-7 (E.D.N.Y. 2003), 255

Vitamin C Antitrust Litig., *In re*, 279 F.R.D. 90, 100 (E.D.N.Y. 2012), 266

Vitamins Antitrust Litig., *In re,* No. 99-197 (TFH), 2001 U.S. Dist. LEXIS 12114, at *20 (D.D.C. 2001), 37

Vitamins Antitrust Litig., *In re*, No. 99-197 (TFH), 2002 U.S. Dist. LEXIS 25795 (D.D.C. 2002), 58

Vitamins Antitrust Litig., *In re,* No. 99-cv-0197, 2001 WL 855463 (D.D.C. 2001), 249

Volvo Trucks N. Am. v. Reeder-Simco GMC, Inc., 546 U.S. 164 (2006), 309, 313, 314

# W

Wakelam v. Wyeth Consumer Healthcare et al., 2014 BCCA 36 (Can.), *leave to appeal dismissed*, [2014] S.C.C.A. No. 125 (Can.), 340, 348

Wall Prods. Co. v. Nat'l Gypsum Co., 357 F. Supp. 832 (N.D. Cal. 1973), 251 Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011), 215

Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n, 623 F.3d 281, (6th Cir. 2010), 4, 9

Washington Alder v. Weyerhaeuser Co., No. 03-cv-753 (D. Or. 2003), 304 Washington Alder v. Weyerhaeuser Co., Nos. 04-35717, 04-36125, 2007 U.S. App. LEXIS 12806 (9th Cir. 2007), 304

Washington Alder v. Weyerhaeuser Co., Nos. 04-35717, 04-36125, Dkts. 33 & 37 (9th Cir. Dec. 2, 2005 & July 10, 2006), 304

Washington v. Am. Pipe & Constr. Co., 280 F. Supp. 802 (W.D. Wash. 1968), 251

Watson v. Bank of America Corporation, 2015 BCCA 362 (Can.), 340, 348

Weinberger v. Retail Credit Co., 498 F.2d 552 (4th Cir. 1974), 72

Wendkos v. ABC Consol. Corp., 379 F. Supp. 15 (E.D. Pa. 1974), 77

West Liquid Asphalt Case, *In re,* 487 F.2d 191 (9th Cir. 1973), 47

West Penn Allegheny Health Sys. v. UPMC Highmark, Inc., 627 F.3d 85 (3d Cir. 2010), 59, 65

Westinghouse Elec. Corp. v. Burlington, 326 F.2d 691 (D.C. Cir. 1964), 71

Westinghouse Elec. Corp. v. Pac. Gas & Elec. Co., 326 F.2d 575 (9th Cir. 1964), 71

Westman Comm'n Co. v. Hobart Corp., 541 F. Supp. 307 (D. Colo. 1982), 101

Weyerhaeuser Co. v. Ross-Simmons Hardwood, 549 U.S. 312 (2007), 298, 303, 304

Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706 (8th Cir. 2001), 213

Whiten v. Pilot Insurance Co., 2002 SCC 18 (Can.), 349

Will v. Comprehensive Accounting Corp., 776 F.2d 665 (7th Cir. 1985), 256

William Inglis & Sons Baking Co. v. Cont'l Baking Co., 942 F.2d 1332 (9th Cir. 1991), *vacated in part,* 970 F.2d 639 (9th Cir.), *amended,* 981 F.2d 1023 (9th Cir. 1992), 10

Wilson Learning Corp. v. Schlechte, No. 04-cv-4703, 2005 U.S. Dist. LEXIS 39631 (D. Minn. 2005), 66

Winther v. DEC Int'l, 625 F. Supp. 100 (D. Colo. 1985), 41

Wong v. Sony of Canada Ltd., 2001 O.J. No. 1707 (Can. Ont. S.C.J.), 349

World Wrestling Entm't, Inc. v. Jakks Pac., Inc., 328 Fed. Appx. 695 (2d Cir. 2009), 59

# Y

Yoder Bros. v. Cal-Fla. Plant Corp., 537 F.2d 1347 (5th Cir. 1976), 42

# Z

Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594 (6th Cir. 2014), 65

Zenith Elecs. Corp. v. WH-TV Broad. Corp., 395 F.3d 416 (7th Cir. 2005), 125

Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100 (1969), 6, 7, 9, 10, 11, 12, 13, 14, 24, 89, 99

Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321 (1971), 59, 61, 63, 65, 77, 82, 83, 288

ZF Meritor LLC v. Eaton Corp., 646 F. Supp. 2d 663 (D. Del. 2009), 301

ZF Meritor LLC v. Eaton Corp., 800 F. Supp. 2d 633 (D. Del. 2011), 302

ZF Meritor LLC v. Eaton Corp., No. 06-623-SLR, 2013 U.S. Dist. LEXIS 178890 (D. Del. 2013), 302

ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254 (3d Cir. 2012) *cert. denied*, 133 S.Ct. 2025 (2013), 6, 95, 96, 214, 276, 281, 298, 302