## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| In re Google Digital Advertising Antitrust Litigation | Civil Action No. 21-MD-3010 (PKC) |
|---|---|

*This Document Relates to:*

| In re Google Digital Advertising Antitrust Litigation | Civil Action No. 21-CV-7001 (PKC) |
|---|---|

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ADVERTISERS' MOTION FOR COLLATERAL <u>ESTOPPEL AND PARTIAL SUMMARY JUDGMENT</u>

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ........................................................................................ 1

II.    OVERVIEW OF ISSUES ON WHICH ADVERTISERS SEEK PRECLUSION............. 2

III.   ARGUMENT .............................................................................................. 4

      A.     Google Possesses Monopoly Power in the Ad Exchanges for Open-Web
           Display Advertising Market...................................................................... 5

      B.     Ad Exchanges for Open-Web Display Advertising Constitute a Relevant
           Antitrust Product Market ....................................................................... 8

      C.     UPR Constituted Anticompetitive Conduct Under Section 2 .............................. 11

      D.     The Procompetitive Justifications Google Offers for UPR Are Invalid,
           Insufficient, and Outweighed by UPR's Anticompetitive Effects...................... 15

      E.     The Refusal to Deal Doctrine Does Not Apply to UPR ...................................... 17

      F.     A Collateral Estoppel Order Would Not be Unfair to Google............................. 18

IV.    CONCLUSION.......................................................................................... 19

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bifolck v. Philip Morris USA Inc.*,
    936 F.3d 74 (2d Cir. 2019)................................................................................4

*Bradburn Parent Tchr. Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*,
    No. 02-cv-7676, 2005 WL 736629 (E.D. Pa. Mar. 30, 2005) ...................................6

*Bradburn Parent Tchr. Store, Inc. v. 3M*,
    No. 02-cv-7676, 2005 WL 1388929 (E.D. Pa. June 9, 2005)..................................6, 9, 13, 15

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
    598 F. Supp. 2d 394 (S.D.N.Y. 2008)........................................................... *passim*

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
    No. 04-cv-7844-BSJ-DFE, 2008 WL 11516437 (S.D.N.Y. Oct. 1, 2008) ...............................5

*Estman Kodak Co. v. Image Tech Servs., Inc.*,
    504 U.S. 451 (1992)................................................................................5, 13

*GAF Corp. v. Eastman Kodak Co.*,
    519 F. Supp. 1203 (S.D.N.Y. 1981)..................................................................19

*In re: Google Digital Advertising Antitrust Litigation*
    No. 21-md-3010 (S.D.N.Y.) ...........................................................................7

*In re Namenda Direct Purchaser Antitrust Litig.*,
    No. 15-cv-7488 (CM), 2017 WL 4358244 (S.D.N.Y. May 23, 2017) ........................... *passim*

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015)...........................................................................16

*United States v. Google LLC*,
    No. 23-cv-0108-LMB-JFA, 2025 WL 1132012 (E.D. Va. Apr. 17, 2025) .................... *passim*

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)..................................................................................5, 8

*Verizon Commc'ns Inc. v. Law Offs. Of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)................................................................................13, 17

**Statutes**

15 U.S.C. § 2................................................................................ *passim*

**Rules**

Fed. R. Civ. P. 52(a)(1)...................................................................................................................1

## I.      INTRODUCTION

Collateral estoppel in favor of Advertisers in this MDL on issues decided in the Department of Justice litigation is straightforward, warranted, and will advance the interests of consistent rulings and judicial efficiency. On April 17, 2025, the Honorable Leonie Brinkema in the Eastern District of Virginia ("EDVA Action") found Google liable for monopolization in the ad tech stack in a thorough 115-page opinion after a three-week trial and extensive briefing and presentations from both sides. *See United States v. Google LLC*, No. 23-cv-0108-LMB-JFA, 2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ("EDVA Opinion") Because that opinion was the result of a bench trial, Judge Brinkema was required to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The EDVA Opinion does just that. The DOJ and Google actually litigated issues that are central to both the DOJ's lawsuit and Advertisers' claims in this litigation, Judge Brinkema resolved them, and these issues were necessary to her ultimate determinations as to Google's liability. There can be no serious question that the elements of collateral estoppel are met.

Many of the factual and legal conclusions in the EDVA Opinion bear directly on Advertisers' claims and are issues the parties would—absent collateral estoppel—be required to litigate before and during trial. But there is no need to (re)litigate them in this case because they were already decided in the EDVA Action. As the concurrently filed Joint Memorandum of Law submitted by all Plaintiffs ("Joint Brief") explains, collateral estoppel precludes relitigating issues that were presented in the EDVA Action and decided against Google. This brief addresses the findings in the EDVA Opinion for which Google should be collaterally estopped from relitigating with respect to Advertisers' claims and requests that the Court accordingly enter summary judgment in favor of Advertisers on those issues.

## II.     OVERVIEW OF ISSUES ON WHICH ADVERTISERS SEEK PRECLUSION

The chart below identifies the findings in the EDVA Opinion on which Advertisers seek summary judgment based on collateral estoppel. For four of these five issues, Advertisers also request that the Court enter partial summary judgment on subsidiary factual findings made in the EDVA Opinion. *See* Joint Brief at 3-4, 19-20 (discussing availability of partial summary judgment as to particular factual issues). As explained below, each of these issues were directly addressed in the EDVA Opinion and were among the bases for the court's ultimate findings on the merits as to Google's liability.

| Issue on Which Preclusion is Sought | EDVA Opinion Citation |
|---|---|
| A.  Google possesses monopoly power in the ad exchanges for open-web display advertising market. | EDVA Opinion, at *31. |
| • Google has charged durable supracompetitive prices for AdX. | *Id.* at *31, 32. |
| • Google has maintained a high share of the open-web display ad exchange market, with AdX having a market share roughly nine times greater than that of its next-largest competitor. | *Id.* at *31, 34. |
| • Google has been unwilling to lower AdX's take rate even as the market matured and other ad exchanges reduced their prices. | *Id.* at *31. |
| • There are high barriers to entry in the market for ad exchanges for open-web display advertising. | *Id.* at *31, 34. |
| • Google used its market power in supply-side and demand-side platforms to make it more difficult for customers on both sides of the ad exchange market to switch to rival exchanges. | *Id.* at *33. |
| • Google largely limited its programmatic open-web advertisers in Google Ads to bidding for inventory from publishers that used AdX and DFP, which is evidence of monopoly power. | *Id.* at *33. |

| Issue on Which Preclusion is Sought | EDVA Opinion Citation |
|---|---|
| • Google artificially handicapped its buyside to boost the attractiveness of its sellside (AdX), by effectively limiting its programmatic open-web advertisers in AdWords to bidding for inventory from publishers that used AdX and DFP. Google did this despite knowing that its advertiser customers would benefit from AdWords' bidding for open-web display ad inventory on non-Google exchanges. | *Id.* at *41. |
| B. Ad exchanges for open-web display advertising constitute a distinct relevant product market. | *Id.* at *21. |
| • All ad tech tools do not belong in a single market. | *Id.* at *21, 25-28. |
| • The display ad tech ecosystem cannot be characterized as a single, two-sided market. | *Id.* at *26. |
| • Advertiser buying tools, ad exchanges, and publisher ad servers each serve distinct functions, are priced differently, and cannot be substituted for each other. | *Id.* at *22, 25. |
| • The relevant product market for ad exchanges that facilitate the sale of open-web display advertising does not include products that facilitate instream video, mobile app, or social media advertising. | *Id.* at *23. |
| • Display advertising on closed networks (*i.e.* walled gardens) are distinct from open-web display advertising. | *Id.* at *23, 27. |
| • Ad exchanges for open-web display advertising are distinct products from ad networks. | *Id.* at *21. |
| • Direct deals between advertisers and publishers do not present a reasonable substitute for ad exchanges. | *Id.* at *22. |
| C. UPR constituted anticompetitive conduct;<br>and<br>UPR was an exclusionary and anticompetitive act to maintain Google's monopoly power in violation of Section 2 of the Sherman Act. | *Id.* at *42, 47. |
| • UPR limited Google's rivals' ability to compete in the ad exchange market. | *Id.* at *42. |

| Issue on Which Preclusion is Sought | EDVA Opinion Citation |
|---|---|
| • UPR harmed competition by depriving publishers of a choice that they had previously exercised to promote competition. | *Id.* at *42. |
| • UPR restricted Google's customers' ability to deal with its rivals, thereby reducing its rivals' scale, limiting their ability to compete, and further compounding the harm to customers. | *Id.* at *42. |
| • UPR increased the number of impressions AdX won and the revenue it received, while decreasing impressions won and revenue received by third-party exchanges. | *Id.* at *17. |
| • UPR resulted in Google's ad tech products gaining scale while rival ad tech products lost scale. | *Id.* at *17. |
| D. The procompetitive justifications that Google proffers for UPR are both invalid and insufficient, and any procompetitive benefits of this conduct are far outweighed by its anticompetitive effects. | *Id.* at *46-47. |
| • UPR cannot be justified because it purportedly levels the playing field for advertisers, simplified the bidding process for publishers, improved matches, or increased publisher revenue. | *Id.* at *46. |
| • UPR is not shielded from antitrust liability because it involved product design choices. | *Id.* at *46. |
| E. The refusal to deal doctrine does not apply to UPR. | *Id.* at *42-44. |

## III.    ARGUMENT

For non-mutual offensive collateral estoppel to apply, "(1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits." *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 79–80 (2d Cir. 2019). For the issues on which Advertisers seek collateral estoppel, each element is discussed below (in addition to the relevant discussions in the Joint Brief).

### A.     Google Possesses Monopoly Power in the Ad Exchanges for Open-Web Display Advertising Market

Judge Brinkema found that "Google possesses monopoly power in the ad exchanges for open-web display advertising market." EDVA Opinion, at *31. All of the elements of collateral estoppel are satisfied with respect to this holding, and Advertisers are thus entitled to summary judgment on this issue.

The existence of monopoly power is a threshold requirement to a finding of liability under Section 2 of the Sherman Act. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966) (the first element of a Section 2 claim is "possession of monopoly power"). Judge Brinkema accordingly identified "the possession of monopoly power in the relevant market" as one of the two elements of a monopolization claim. EDVA Opinion, at *18 (quoting *Estman Kodak Co. v. Image Tech Servs., Inc.*, 504 U.S. 451, 481 (1992)). The EDVA court's determination regarding market power in the ad exchange market was thus necessary to support its broader finding concerning Google's Section 2 liability. Given its critical importance to the case, the parties extensively litigated the issue of whether Google had monopoly power in the ad exchange market. EDVA Action, ECF 1381 at 249-64, 313 ("DOJ Post Trial Brief") and 1375-1 at 80-82 ("Google Post Trial Brief") (E.D.Va.); *see also* EDVA Opinion, at *31-35 (discussing the parties' arguments). "It is [] evident from [Google's] vigorous defense . . . that [it] ha[s] taken full advantage of very opportunity to litigate these issues, and that [it] had every incentive to do so." *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 400 (S.D.N.Y. 2008) *order clarified on reconsideration,* No. 04-cv-7844-BSJ-DFE, 2008 WL 11516437 (S.D.N.Y. Oct. 1, 2008).

As noted above, Judge Brinkema unequivocally resolved the issue and found that Google has monopoly power in the ad exchange market. That same issue is a part of Advertisers' claims.

*See* ECF 399 (Consolidated Advertiser Class Action Complaint ("CACAC")) ¶ 74 ("Google has a monopoly in the exchange market in the United States, as confirmed by both indirect and direct evidence"). Courts in other antitrust cases have granted collateral estoppel and partial summary judgment motions on the issue of the defendant's monopoly power. *See id.* at 401 ("collateral estoppel effect" as to finding that "Visa and Mastercard each had market power"); *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488 (CM), 2017 WL 4358244, at *10 (S.D.N.Y. May 23, 2017) (collateral estoppel based on prior finding that the defendant "has monopoly power"); *Bradburn Parent Tchr. Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*, No. 02-cv-7676, 2005 WL 736629, at *17 (E.D. Pa. Mar. 30, 2005), *amended on reconsideration in part sub nom. Bradburn Parent Tchr. Store, Inc. v. 3M*, No. 02-cv-7676, 2005 WL 1388929 (E.D. Pa. June 9, 2005) ("material fact" that "3M possessed monopoly power in the relevant market" established through collateral estoppel).

In the course of determining that Google had monopoly power, Judge Brinkema made numerous factual findings that directly supported her conclusion. The Court should grant partial summary judgment to these discrete factual issues as well:

- "Google has charged durable supracompetitive prices for AdX." EDVA Opinion, at *31; *see also id.* at *32 ("AdX's charging a durable 20% take rate for well over a decade is direct evidence that Google has possessed monopoly power in the open-web display ad exchange market."); *id.* at *33 ("The unique advertising demand from AdWords has helped Google maintain the power to keep charging AdX publishers a 20% take rate.").

- "Google has maintained a high share of the open-web display ad exchange market, with AdX having a market share roughly nine times greater than that of its next-largest competitor.". *id.* at *31; *see id.* at *34 ("AdX's relatively high and durable market share is consistent with the Court's conclusion that Google has monopoly power"); *id.* ("AdX's market share has remained durable over time").

- Google has been unwilling "to lower AdX's take rate even as the market matured and other ad exchanges reduced their prices." *Id.* at *31.

- There are high barriers to entry in the market for ad exchanges for open-web display advertising. *See id.* at *31 (Google's market power has been "fortified by high barriers to entry that resulted from Google's scale and network effects across the open-web display ecosystem"); *id.* at *34 (referring to "AdX's high barriers to entry and expansion" and "the high barriers to entry and expansion that protect AdX's dominant position").

- Google used its market power in supply-side and demand-side platforms "to make it more difficult for customers on both sides of the ad exchange market to switch to rival exchanges." *Id.* at *33.

- Google has largely limited programmatic open-web advertisers in Google Ads to bidding for inventory from publishers that used AdX and DFP. *See id.* at *33 ("Google has largely limited [Google Ads'] exchange bidding to Adx despite internal recognition that allowing [Google Ads] to bid on other exchanges would be valuable for [Google Ads'] advertiser customers.").

- "Google 'artificially handicap[ped] [its] buyside ([AdWords]) to boost the attractiveness of [its] sellside (AdX),' . . . by effectively limiting its programmatic open-web advertisers in AdWords to bidding for inventory from publishers that used AdX and DFP. Google did this despite knowing that its advertiser customers would benefit from AdWords' bidding for open-web display ad inventory on non-Google exchanges." *Id.* at *41 (record citations omitted).

As with Judge Brinkema's finding as to monopoly power, each of these subsidiary factual findings was actually litigated and an important component to the merits of the court's monopoly power holding. *See id.* at *31-34 (discussing the evidence and the parties' arguments relevant to each issue). They are also relevant too Advertisers' claims. *See* ECF[1] 963-3 (Singer Rpt.) ¶¶ 149-51, 247-49, 252-53 and ECF 963-1 (Zona Rpt.) ¶¶ 90, 94, 95 (Advertisers' experts' opinions regarding Google's take rate, market share, and barriers to entry); CACAC ¶¶ 75-78 (alleging that Google's control of advertisers and publishers supports its monopoly power in the exchange market), 79-80, 83 (allegations regarding Google's market share), 85 (durable and supracompetitive take rate), 89 (barriers to entry). As the EDVA Opinion recognized, monopoly

---

[1] All ECF Nos. refer to *In re: Google Digital Advertising Antitrust Litigation* Case No. 21-md-3010 (S.D.N.Y.) unless otherwise specified.

power can be shown both directly (through proof of supracompetitive prices) and indirectly
(through market structure and market share). *Id*. at *29. The court cited both types of evidence in
support of its monopoly power holding. *See id*. at *35 (referring to "direct pricing," limitations
on "functionality," "market share," and "high barriers to entry"). Each of the above subsidiary
factual findings was thus directly relevant to, and an alternative means of establishing, market
power, satisfying the requirements for collateral estoppel.

**B.    Ad Exchanges for Open-Web Display Advertising Constitute a Relevant
Antitrust Product Market**

The Court should also find collateral estoppel applies as to Judge Brinkema's relevant
product market finding. A component to a finding of monopoly power is the identification of a
relevant product market. *See Grinnell Corp.*, 384 U.S. at 570 (an element of a Section 2 claims is
the "possession of monopoly power *in the relevant market*") (emphasis added). In determining
that Google had monopoly power in the ad exchange market, Judge Brinkema was therefore also
addressed whether the ad exchanges for open-web display advertising constituted a relevant
product market. The court conducted an extensive analysis of this question and determined that
"ad exchanges for open-web display advertising constitute a distinct relevant product market."
EDVA Opinion, at *21. All of the elements of collateral estoppel are met with respect to this
finding, and Advertisers are thus entitled to partial summary judgment on the issue of the
existence of a relevant product market for ad exchanges for open-web display advertising. *See*
CACAC ¶ 57 ("Exchanges for programmatic display advertising inventory in the United States
constitute a relevant antitrust product market").

The issue was extensively litigated by the parties. DOJ Post Trial Brief at 238-49; Google
Post Trial Brief at 9-59; *see also* EDVA Opinion, at *21-23 (discussing the parties' evidence and
Google's arguments). And it was conclusively and unequivocally resolved by Judge Brinkema.

*See* EDVA Opinion, at *21 ("ad exchanges for open-web display advertising constitute the area of effective competition and form a relevant antitrust market") (internal quotation and citation omitted). As noted above, the identification of a relevant product market is a necessary prerequisite to a finding of monopoly power (and thus Section 2 liability), and the EDVA Opinion's conclusion as to the relevant product market was necessary to the determination of Google's liability in the EDVA Action.

Where courts have applied collateral estoppel as to market power, they have also found it appropriate to address the underlying issue of the relevant product market. *See Discover*, 598 F. Supp. 2d at 401 ("collateral estoppel effect" as to a finding that "general purpose credit and charge cards is a relevant market" and "general purpose credit card and charge card network services is a relevant market"); *Namenda*, 2017 WL 4358244, at *10 (collateral estoppel based on prior decision holding that the "geographic and product market for antitrust purposes in this case has been established"); *Bradburn*, 2005 WL 1388929, at *1 ("material fact" of the definition of the relevant market established through collateral estoppel).

The Court should also grant summary judgment based on collateral estoppel as to the following findings in the EDVA Opinion that were a part of the court's determination regarding the definition of the relevant product market:

- All ad tech tools do not belong in a single market. *See* EDVA Opinion, at *21 ("there is no other ad tech tool that is reasonably interchangeable with ad exchanges"); *id*. at *25-28 (rejecting Google's argument that "the digital ad tech ecosystem constitutes a single, two-sided market"); *id*. at *25 ("the distinct products that comprise the ad tech ecosystem are not reasonably interchangeable").

- The display ad tech ecosystem cannot be characterized as a single, two-sided market. *Id*. at *26.

- "[A]dvertiser buying tools, ad exchanges, and publisher ad servers each serve distinct functions, are priced differently, and cannot be substituted for each other." *Id*. at *25; *see also id*. at *22 (referring to the "distinct prices" for ad exchanges); *id*. (referring

to the "unique roles that ad exchanges play" and the "unique functionality" of ad exchanges); *id.* (distinguishing "ad networks" from "ad exchanges").

- The relevant product market for ad exchanges that facilitate the sale of open-web display advertising does not include products that facilitate instream video, mobile app, or social media advertising. *See id.* at \*23 (rejecting Google's argument that the DOJ's proposed relevant market is too narrow because it focuses on open-web display advertising); *id.* ("ad exchanges that facilitate the sale of only instream video, mobile app, or social media ads are not helpful for publisher seeking to monetize their open-web display inventory"). (record citation omitted).

- Display advertising on closed networks (*i.e.* walled gardens) are not in the same market as products that facilitate open web display advertising. *See id.* ("the only other products that are reasonably interchangeable with an ad exchange that facilitates the sale of open-web display ads are other ad exchanges that facilitate the sale of open-web display ads); *id.* at \*27 (discussing the "distinctions between direct deals, ad network advertising, programmatic advertising, and walled-garden advertising").

- Ad exchanges for open-web display advertising are distinct products from ad networks. *See id.* at \*21 ("there is no other ad tech tool that is reasonably interchangeable with ad exchanges"); *id.* ("Although there are ways for advertising demand to circumvent ad exchanges, such as only buying ads from a closed ad network, the majority of programmatic ad spending flows through ad exchanges.").

- Direct deals between advertisers and publishers do not present a reasonable substitute for ad exchanges. *Id.* at \*22.

Each of these issues was actually litigated by the DOJ and Google. DOJ Post Trial Brief at 189-305; Google Post Trial Brief at 9-59. They were also clearly resolved by Judge Brinkema after considering the parties' positions and were critical components of the court's relevant market determination. *See* EDVA Opinion, at \*21-23 (discussing the evidence at trial and the parties' competing arguments). The EDVA court could not have defined a relevant market limited to "ad exchanges" without determining that ad exchanges are distinct products from ad networks, advertiser buying tools, and publisher ad servers. It likewise could not have found a product market for ad exchanges that facilitates "open-web display advertising" without finding that walled gardens (and other closed networks), instream video, mobile app, or social media advertising were distinct from open-web advertising. The factual findings above were therefore

necessary to the EDVA court's relevant product market determination. They are also directly relevant to Advertisers' claims. *See* ECF 963-3 (Singer Rpt.) ¶¶ 45, 201-210 (opinions regarding the differences in tools used in the ad-tech stack and between open-web and other types of display advertising); CACAC ¶¶ 58-62 (discussing the unique characteristics of ad exchanges that make them distinct from other tools), 64 ("Other forms of digital advertising, such as in-stream video, social media, search, and inapp, are not substitutes for programmatic real-time bidding"); 146 ("display advertising placement services are not interchangeable with services that place advertising on closed-ended or "walled garden" websites."); 151 ("The markets for brokering of programmatic display ads also are distinct from the much smaller market for unbrokered direct display-ad placement.").

### C.    UPR Constituted Anticompetitive Conduct Under Section 2

Advertisers also seek a finding that Google is collaterally estopped from contesting, and Advertisers are thus entitled to summary judgment regarding, two closely related issues pertaining to UPR. The first issue, which is an unambiguous finding in the EDVA Opinion, is that "Unified Pricing Rules constituted anticompetitive conduct." EDVA Opinion, at *42. The second issue, which incorporates Judge Brinkema's finding about the anticompetitive nature of UPR, is that UPR is an act to maintain Google's monopoly power through anticompetitive practices in violation of Section 2 of the Sherman Act.[2]

---

[2] Advertisers seek collateral estoppel findings—and thus partial summary judgment—on the anticompetitive nature and legality of Google's conduct. Because their Section 2 claims also require a finding of antitrust injury to the class—something not directly addressed in the EDVA Opinion—Advertisers do not seek summary judgment at this time as to the entirety of their Section 2 claim. *See Namenda*, 2017 WL 4358244, at *16-17 (granting summary judgment based on collateral estoppel on the issue of the legality of the defendants' conduct, but not the entire cause of action).

The first issue was clearly decided by Judge Brinkema; the language of the requested finding comes directly from the EDVA Opinion. *Id*. The second issue was likely unambiguously resolved by the EDVA Opinion, which held that UPR was an example of Google "exploiting its monopoly power" to unlawfully limit competition. *Id*. Judge Brinkema further held that "Google engaged in willful acquisition or maintenance of [its monopoly] power" through "a series of exclusionary and anticompetitive acts to entrench its monopoly power" in violation of Section 2 of the Sherman Act. *Id*. at *47 (citation and internal quotation marks omitted). The "anticompetitive acts" that gave rise to Section 2 liability include UPR. *See id*. at *42 (finding UPR was "anticompetitive conduct"), *41-42 (discussing UPR as one of the "series of anticompetitive policies, practices, and technology changes" that Google engaged in). The findings in the EDVA Opinion are thus identical to those on which Advertisers seek collateral estoppel. *See* CACAC ¶¶ 254 ("Google unlawfully forecloses competition" through UPR); 353 (alleging that through Bernanke and UPR "Google wrongfully acquired and unlawfully maintained monopoly"); *Discover*, 598 F. Supp. 2d at 400 ("it is clear that Discover's first claim challenges the same conduct challenged by the DOJ in its action against Visa and MasterCard, and that these determinations were actually litigated and decided in the DOJ action").

Both issues were also actually and extensively litigated by the parties in the EDVA Action. The DOJ complaint asserts claims for monopolization of the ad exchange market through, among other things, "Google's veiled introduction of so-called Unified Pricing Rules that took away publishers' power to transact with rival ad exchanges at certain prices." EDVA Action, ECF 1 ¶ 319 (E.D.Va. Jan. 24, 2023). The DOJ's proposed findings of fact and conclusions of law argued that "Unified Pricing Rules Harm Competition." *Id*., ECF 1381 at 329 (E.D.Va. Nov. 5, 2024). Google's proposed conclusions of law likewise directly addressed UPR.

*See id.*, ECF 1375-1 at 115-117 (E.D.Va. Nov. 4, 2024). The EDVA Opinion extensively

discusses the evidence the parties presented at trial and Google's argument related to UPR. *See*

EDVA Opinion, at *16-17, 42, 46.

Judge Brinkema's findings as to UPR were also necessary to her determination on the

merits. The EDVA Opinion described liability under Section 2 as requiring a plaintiff to prove

that "the company engaged in 'the willful acquisition or maintenance of [monopoly] power'"

that is "accompanied by an element of anticompetitive conduct." EDVA Opinion, at *35

(quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) and *Verizon*

*Commc'ns Inc. v. Law Offs. Of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)). The two issues

on which Advertisers seek a collateral estoppel finding—that UPR constitutes anticompetitive

conduct and that UPR was an effort to maintain Google's monopoly power through

anticompetitive means—were thus unquestionably necessary to Judge Brinkema's finding of

Section 2 liability. The fact that UPR was one of several anticompetitive acts that Google

undertook to maintain its monopoly power does not change this conclusion. *See* Joint Brief at 11-

12 (explaining that independently sufficient grounds for a particular finding may each be subject

to collateral estoppel). Courts have granted collateral estoppel motions on similar issues in other

cases. *See Discover*, 598 F. Supp. 2d at 401 ("collateral estoppel effect" as to finding that

"Bylaw 2.10(e) and the CPP were each unlawful restraints of trade"); *Namenda*, 2017 WL

4358244, at *11 (collateral estoppel as to finding that the conduct at issue was "both coercive

and anticompetitive"); *Bradburn*, 2005 WL 1388929, at *17-18 ("material fact" that "3M

willfully maintained such monopoly power by predatory or exclusionary conduct" established

through collateral estoppel).

In addition to these broad findings that directly establish Google's Section 2 liability, Judge Brinkema also made specific factual findings regarding the nature and effects of UPR. Thus, even if the Court does not grant summary judgment that Google violated Section 2 through its implementation of UPR, the Court should still grant summary judgment on the following issues that would directly relate to the anticompetitive nature and effects of UPR:

- UPR limited Google's rivals' ability to compete in the ad exchange market. EDVA Opinion, at *42 (UPR had the effect of "limiting [Google's rivals'] ability to compete").

- UPR harmed competition by depriving publishers "of a choice that they had previously exercised to promote competition." *Id*.; *see also id*. ("But in implementing Unified Pricing Rules, Google simultaneously took away publishers' ability to set higher price floors on AdX than on third-party exchanges, which was a primary tool that publishers had used to maintain revenue diversity and to mitigate Google's dominance of the ad exchange market.").

- UPR restricted Google's "customers' ability to deal with its rivals, thereby reducing its rivals' scale, limiting their ability to compete, and further compounding the harm to customers." *Id*.

- "[UPR] increased the number of impressions AdX won and the revenue it received, while decreasing impressions won and revenue received by third-party exchanges." *Id*. at *17.

- "The overall result of Unified Pricing Rules was that Google's ad tech products continued to gain scale in the display advertising space while rival ad tech products lost scale." *Id*.

The above findings formed the underpinnings of the Judge Brinkema's overall conclusion that UPR was anticompetitive and were actually litigated by the parties. DOJ Post Trial Brief at 130-140, 329-331; Google Post Trial Brief at 115-117, 130-131. They are also directly relevant to Advertisers' claims and feature prominently in disputes among Advertisers and Google. Drs. Zona and Singer, for example, both conclude UPR increased the impressions won on AdX at the expense of rival exchanges (ECF 963-1 at ¶¶ 116-139 and ECF 963-3 at ¶¶ 177-179), whereas Google's experts have disputed both that UPR increased impressions and that any increase came

at the expense of other exchanges (as opposed to increasing the total number of impressions throughout the market generally) (ECF 963-6 at ¶ 735). The EDVA Opinion clearly addresses this issue and resolves it in Advertisers' favor. The other proposed factual findings are likewise at issue in this litigation. *See* CACAC ¶¶ 257 ("Google's intent in imposing Unified Pricing floors was to foreclose competition by preventing cost savings on other exchanges and shifting transactions to AdX."); 259 ("Google's Unified Pricing Rules ensure that rival exchanges and buying tools are at a price disadvantage."), 262 ("Unified Pricing Rules disrupt publishers' routine use of floors to increase competition and yield."), 265 (UPR also "result in AdX winning more"); 254-266 (discussing how UPR disadvantages Google's rivals).

The issues were also sufficiently necessary to Judge Brinkema's ultimate finding of Section 2 liability because they go to the necessary elements of anticompetitive conduct and effects and are thus appropriate for collateral estoppel. *See Discover*, 598 F. Supp. 2d at 401 ("collateral estoppel effect" as to finding that the defendants' conduct "harmed competition" through various means, such as "restricting Discover's competitive strength" and "foreclosing Discover from competing to issue off-line debit cards"); *Namenda*, 2017 WL 4358244, at *12 (adopting prior findings concerning the anticompetitive effects of the challenged conduct); *Bradburn*, 2005 WL 1388929, at *17-18 ("material fact" that "3M's predatory or exclusionary conduct harmed competition" established through collateral estoppel).

### D. The Procompetitive Justifications Google Offers for UPR Are Invalid, Insufficient, and Outweighed by UPR's Anticompetitive Effects

In the EDVA Action, Google offered numerous procompetitive justifications for UPR. Those justifications included: (1) that UPR "established a level playing field for advertisers", (2) "simplified the ad tech bidding landscape for publishers", (3) "improved matches", and (4) "increased publisher revenue." EDVA Opinion, at *46. Google is poised to raise these defenses

in this matter as well, meaning that there is a sufficient identity of the issues and that the issues were actually litigated in the EDVA Action. *See* ECF 963-6 at ¶¶ 731-756.

Judge Brinkema, citing extensive record evidence, directly addressed Google's proffered procompetitive justifications and rejected them, holding that "Google implemented Unified Pricing Rules to enhance the AdX-DFP tie, and not for its proffered justifications of helping its publisher customers simplify their decision-making, receive better matches, and increase revenue." EDVA Opinion, at *46 (citation omitted). The court's holding as to Google's procompetitive justifications was necessary to its overall finding of Section 2 liability. The court began its discussion of Google's proffered justifications by stating that "[a] defendant shown to have engaged in exclusionary conduct to maintain a monopoly may avoid Section 2 liability by proving that the conduct was done for valid business reasons." *Id*. (internal quotation omitted). Judge Brinkema thus viewed the resolution of Google's purported justifications as necessary to final judgment on the merits as to Google's Section 2 liability.

Judge Brinkema also considered and rejected Google's "overarching argument that all of these changes [including UPR] are shielded from antitrust liability because they involved product design choices." EDVA Opinion, at *46. The court held that Google's "decade-long campaign of exclusionary conduct . . . is not properly characterized as a series of product design choices." *Id*. Relying on Second Circuit precedent, Judge Brinkema concluded that "'product redesign is anticompetitive when it coerces consumers and impedes competition,' which Google's actions did here." *Id*. (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015).

The record thus demonstrates that Google's procompetitive justifications for UPR were actually litigated by Google, resolved in the EDVA Opinion, and necessary to a determination on

the merits. And assuming Google intends to put forward similar defenses in this matter, or preserve the ability to do so, the identify of issues requirement for collateral estoppel will also be met. *See Namenda*, 2017 WL 4358244, at *12 (relying on prior findings that the "procompetitive justifications for withdrawing [Namenda] IR are pretextual").

### E.    The Refusal to Deal Doctrine Does Not Apply to UPR

Google argued in the EDVA Action that its conduct "cannot result in antitrust liability under the 'refusal to deal' doctrine." EDVA Opinion, at *42. During closing arguments, Google asserted that "plaintiffs' claims all fail because they challenge lawful refusals to deal. And this is, obviously, a very important argument for us." EDVA Action, Trial Tr. at 94:20-22, Nov. 25, 2024 (ECF 1390). Google's refusal to deal argument addressed the conduct alleged by the DOJ, including UPR specifically. *Id*. at 95:18-96:2 (arguing that the court cannot "compel, in the case of UPR, a change in our platform terms and conditions"). The record thus establishes that the validity of Google's refusal to deal defense as applied to UPR was litigated fully by Google without limitation.

The record is equally clear that the issue was actually resolved by in the EDVA Opinion. Judge Brinkema recognized that Google's defense applied to all of the DOJ's claims, including its conduct to "preference Google products over rival products," which would include UPR. EDVA Opinion, at *42. The EDVA Opinion then broadly held that "the refusal to deal doctrine articulated in *Trinko* does not protect Google from antitrust liability in this civil action." *Id*. at *44; *see also id*. at *43 ("The refusal to deal doctrine in *Trinko* does not apply to Google's conduct at issue"). Thus, the same issue—the validity of Google's refusal to deal defense as applied to UPR—was resolved in the EDVA Opinion.

Lastly, the issue was necessary to determination on the merits. Google described its defense as "very important" and Judge Brinkema recognized it as "[o]ne of the primary defenses that Google has raised in this litigation." EDVA Action, Trial Tr. at 94:21-22, Nov. 25, 2024; EDVA Opinion, at *42. Both Google and Judge Brinkema thus recognized that the DOJ could not have prevailed without overcoming that defense, which it did. Resolution of Google's defense was thus necessary for the EDVA Opinion's finding of Section 2 liability as to Google.

### F.    A Collateral Estoppel Order Would Not be Unfair to Google

As set forth in the Joint Brief, collateral estoppel also requires a determination that its application would not be unfair to the defendant. Joint Brief at 3, 14-19. Here, as noted above, Google vigorously contested each issue on which Advertisers seek collateral estoppel. And it did so after repeatedly acknowledging the similarities between the EDVA action and the claims in this MDL. *See id*. at 1, 5, 17. The issues on which Advertisers seek collateral estoppel have been at the forefront of the parties' disputes in this litigation for years. *See generally* ECF 701 (Motion to Dismiss Order). Google cannot, therefore, credibly claim any unfairness through the application of collateral estoppel in these circumstances.

In a similar case, the court in *Discover* granted collateral estoppel as to nearly identical determinations as those at issue here after a bench trial concerning claims brought by the DOJ. 598 F. Supp. 2d at 400-01. It held that "application of collateral estoppel as to these determinations would serve judicial economy while remaining fair to Defendants." *Id*. at 400. This determination was based in part of the on the fact that, like Google here, the *Discovery* defendants took "full advantage" of their ability to contest the claims against them. *Id*. The court also rejected the notion that granting collateral estoppel as to liability would unfairly prejudice the jury in a resulting damages trial. *Id*. at 400-01. *Discover* is one of several examples cited by

plaintiffs of courts giving preclusive effect to findings made during a successful government

action. Joint Brief at 14-15.

On the other end of the scale, applying collateral estoppel would save party and judicial

resources, facts that weigh in favor of the requested relief. *See GAF Corp. v. Eastman Kodak*

*Co.*, 519 F. Supp. 1203, 1218 (S.D.N.Y. 1981) ("Application of collateral estoppel to the

[Section] 2 issues of relevant market definition and monopoly power and the [Section] 1 issues

of the illegality of the . . . conspiracies will promote the public interest by preventing needless

and repetitious litigation and by conserving the resources of the Court and the parties.").

## IV.    CONCLUSION

For the foregoing reasons and those set forth in the Joint Brief, Advertisers respectfully

request that the Court enter the attached proposed ordering granting partial summary judgment

based on collateral estoppel concerning certain findings in the EDVA Opinion.

Dated: June 20, 2025                    Respectfully submitted,

/s/ *Dena C. Sharp*
Dena C. Sharp (*pro hac vice*)
Scott Grzenczyk (*pro hac vice*)
Mikaela Bock (*pro hac vice*)
Isabel Velez (*pro hac vice*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
scottg@girardsharp.com
mbock@girardsharp.com
ivelez@girardsharp.com

/s/ *Tina Wolfson*
Tina Wolfson (TW-1016)
Theodore W. Maya (*pro hac vice*)
Bradley K. King (BK-1971)

**AHDOOT & WOLFSON, PC**
2600 West Olive Ave., Suite 500
Burbank, California 91505
Tel.: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
bking@ahdootwolfson.com

*Interim Co-Lead Counsel for Advertiser*
*Plaintiffs and the Proposed Advertiser Class*