# APPENDIX A

## GOOGLE'S VIOLATION OF SECTION 2 FOR UNLAWFUL MONOPOLIZATION

| Issue No. | Issue Decided in EDVA Opinion | Citation to Issue in Publishers' Case |
|---|---|---|
| I | "Google has violated Section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in the open-web display publisher ad server market and the open-web display ad exchange market." EDVA Op. at *1.[1] | ECF 408 (Pubs.' First Amended Complaint ("FAC")) Counts I-II |
| *Relevant product market* | | |
| 1 | "publisher ad servers for open-web display advertising constitute a distinct relevant product market." EDVA Op. at *19. | FAC ¶¶ 7, 113-15; ECF 959-1 (Elhauge Rpt.) § V.C |
| 1.1 | "Publisher ad servers for open-web display advertising are uniquely suited for managing ad inventory for large web publishers, are priced differently than other ad tech tools, and are recognized as a distinct product by ad tech industry participants. Consequently, other ad tech tools are not reasonably interchangeable with publisher ad servers." EDVA Op. at *19. | FAC ¶¶ 7, 113-15; ECF 959-1 (Elhauge Rpt.) § V.C; ECF 959-5 (Das Rpt.) § IV.G.i |
| 1.2 | "The lack of substitutability between publisher ad servers and alternative tools is evidenced by how successful Google's publisher ad server has been in maintaining dominant market share among the largest open-web publishers. Indeed, the commercial realities of the publisher ad server market suggest that a monopolist could engage in anticompetitive conduct by raising prices or degrading product quality without seeing significant diminution of its customer base." EDVA Op. at *19. | FAC ¶¶ 7, 113-15; ECF 959-1 (Elhauge Rpt.) § V.C |
| 1.3 | "publisher ad servers for open-web display advertising constitute a distinct, relevant market because they are uniquely capable of performing ad-serving functions for websites, which are essential components of news, media, and other online publishers' businesses." EDVA Op. at *20. | FAC ¶¶ 7, 113-15; ECF 959-1 (Elhauge Rpt.) § V.C; ECF 959-5 (Das Rpt.) § IV.G.i |

---

[1] Unless otherwise indicated, all quotations from the EDVA Opinion omit internal citations, quotation marks, and brackets.

| | | | |
|---|---|---|---|
| | 1.4 | "Nor can they feasibly forgo monetizing their websites and publish revenue-generating content only through alternative digital channels, such as via mobile apps or social media pages." EDVA Op. at *20. | FAC ¶¶ 7, 113-15; ECF 959-1 (Elhauge Rpt.) § V.C; ECF 959-5 (Das Rpt.) § IV.B; ECF 959-6 (Das Reb. Rpt.) § III |
| | 1.5 | "It is also infeasible for publishers to shift their users away from their websites to apps or social media pages. Many web publishers rely on users reaching their content via search engines or hyperlinks from other websites, and would only have a fraction of their current users if they required users to download mobile apps or follow them on social media in order to access their content." EDVA Op. at *20. | FAC ¶¶ 7, 113-15; ECF 959-1 (Elhauge Rpt.) § V.C; ECF 959-5 (Das Rpt.) § IV.B; ECF 959-6 (Das Reb. Rpt.) § III |
| | 1.6 | "Nor are in-house technologies developed by publishers to serve display ads on their websites reasonably interchangeable with publisher ad servers. Building an in-house ad server is incredibly sophisticated and incredibly complex, and is not within the core competencies of most organizations that publish news or other content online." EDVA Op. at *21. | FAC ¶¶ 7, 113-15; ECF 959-1 (Elhauge Rpt). § V.C; ECF 959-6 (Das Reb. Rpt.) § VI |
| 2 | | "ad exchanges for open-web display advertising constitute a distinct relevant product market." EDVA Op. at *21. | FAC ¶¶ 7, 116-18; ECF 959-1 (Elhauge Rpt.) § V.C |
| | 2.1 | "Ad exchanges play a distinct role in the open-web display ad tech stack by connecting publishers using publisher ad servers with advertisers using programmatic buying tools such as demand-side platforms and ad networks. Due to their unique ability to collect and rank ad bids from multiple buying tools in mere milliseconds, ad exchanges are involved in most programmatic open-web display transactions, are recognized as a distinct product by industry participants, and are priced differently than other ad tech tools. Accordingly, there is no other ad tech tool that is reasonably interchangeable with ad exchanges." EDVA Op. at *21. | FAC ¶¶ 7, 116-18; ECF 959-1 (Elhauge Rpt.) § V.C; ECF 959-5 (Das Rpt.) § IV.G.ii |
| | 2.2 | "The lack of substitutability between ad exchanges and alternative tools means that a monopolist could profitably raise prices significantly above competitive levels, as Google determined in a study that showed its ad exchange price changes had limited effect on its customers' behavior." EDVA Op. at *21. | FAC ¶¶ 7, 116-18; ECF 959-1 (Elhauge Rpt.) § V.C |

| | | | |
|---|---|---|---|
| | 2.3 | "Publishers have particularly inelastic demand for ad exchanges given their inability to turn to alternative tools for placing demand sources in competition with each other and for maximizing the monetization of their web inventory. Therefore, a monopolist for open-web display ad exchanges could likely charge supracompetitive prices without seeing customers switch to rival products in sufficient numbers to constrain the monopolist's prices." EDVA Op. at *22. | FAC ¶¶ 7, 116-18; ECF 959-1 (Elhauge Rpt.) § V.C |
| | 2.4 | "Direct deals with advertisers are also not reasonable substitutes for ad exchanges, given the distinct advantages of programmatic advertising. As an internal Google document observes, it would be highly unlikely for programmatic advertising to shift to direct deals, in part due to the efforts required to make and maintain direct connections." EDVA Op. at *22. | FAC ¶¶ 7, 116-18; ECF 959-1 (Elhauge Rpt.) § V.D.5; ECF 959-6 (Das. Reb. Rpt.) § IV |
| | 2.5 | "Supply path optimization tools also offer a way to bypass ad exchanges by connecting advertiser buying tools and publisher ad servers directly. But, unlike ad exchanges, these tools do not conduct auctions, are not focused on open-web display advertising, serve many fewer customers, and are not focused on serving publishers' interests. That is why the leading developers of supply path optimization tools do not consider them to be viable alternatives to ad exchanges for bidding on open-web display ads." EDVA Op. at *22 n.19. | ECF 959-6 (Das. Reb. Rpt.) § V; ECF 959-3 (Elhauge Reb. Rpt.) ¶¶ 55-58 |
| *Rejection of* **Amex** *two-sided market arguments* | | | |
| 3 | | "Google invokes *Amex* to contend that all ad tech tools should be placed in a single market for the purposes of this litigation because all of them exist to facilitate matches between advertisers and users viewing ads on digital platforms. In support of this position, Google cites its market expert Dr. Israel, who testified that any analysis of competition within the ad tech industry should be conducted using a single two-sided market. The Court finds this argument unpersuasive." EDVA Op. at *25. | ECF 983-18 (Israel Rpt.) § IV.I.1 |
| | 3.1 | "Defining an omnibus market to include buy-side tools built for advertisers that compete with other buy-side tools built for advertisers—and sell-side tools built for publishers that compete with other sell-side tools built for publishers—would ignore commercial realities and contradict the bedrock principle of antitrust law that any Sherman Act inquiry must focus on the protection of competition, not competitors." EDVA Op. at *25. | ECF 983-18 (Israel Rpt.) § IV.I.1 |

| | | | |
|---|---|---|---|
| 3.2 | "In contrast to credit-card networks, most of the core ad tech products at issue in this litigation do not fit within this definition of a two-sided transaction platform. For example, a publisher ad server sells transaction-related services, such as inventory management, bid evaluation, ad rendering, and sales performance tracking, only to publishers, and does not simultaneously sell any services to advertisers. . . . Google's primary competitors in the open-web publisher ad server space, such as Equativ and Kevel, do not operate two-sided transaction platforms, but rather specialize in serving only publishers and do not offer buy-side advertising tools." EDVA Op. at *26. | ECF 983-18 (Israel Rpt.) § IV.I.1 | |
| 3.3 | "The same is true for demand-side platforms, which Google contends are part of a broader two-sided market for digital advertising. Demand-side platforms are not two-sided transaction platforms because they sell transaction services, such as ad inventory search, audience targeting, centralized ad buying, and real-time bidding, to advertisers individually, and do not simultaneously sell any services to publishers. Moreover, demand-side platforms do not compete for transactions with only other two-sided platforms. Rather, demand-side platforms serve only advertisers and compete with other advertiser-facing tools." EDVA Op. at *26. | ECF 983-18 (Israel Rpt.) § IV.I.1 | |
| 3.4 | "ad exchanges differ somewhat from the credit-card networks at issue in *Amex* because ad exchanges do not merely provide technology to facilitate transactions between buyers and sellers, but also function as auction houses by evaluating multiple potential buyers and selecting the buyer with the highest willingness to pay. Indeed, ad exchanges primarily exist to place multiple buyers in competition with each other for available inventory, whereas credit-card networks primarily exist to make it easier for a buyer to pay a seller after the two parties have independently found each other and decided to conduct a transaction." EDVA Op. at *26. n.24. | ECF 983-18 (Israel Rpt.) § IV.I.1 | |
| *Relevant geographic market* | | | |
| 4 | "the worldwide market . . . is the relevant geographic market for both the open-web display publisher ad server market and open-web display ad exchange market." EDVA Op. at *28. | ECF 959-4 (Elhauge Dep.) at 50:13-18; ECF 959-1 (Elhauge Rpt.) ¶¶ 186-87; ECF 983-19 (Kroger Rpt.) ¶ 80 | |

4

| | *Possession of monopoly power* | | |
|---|---|---|---|
| 5 | | "Google possesses monopoly power in the publisher ad server for open-web display advertising market." EDVA Op. at *30. | FAC ¶¶ 8, 158-64; ECF 959-1 (Elhauge Rpt.) § VI |
| | 5.1 | "Google's publisher ad server DFP has a durable and predominant share of the market that is protected by high barriers both to entry and expansion." EDVA Op. at *30. | FAC ¶¶ 8, 158-64; ECF 959-1 (Elhauge Rpt.) § VI.A.1.i, VI.A.2 |
| | 5.2 | "Google had a 91% market share of the worldwide publisher ad server market for open-web display advertising as measured by the number of impressions served. . . . From 2018 through 2022, Google's share of this worldwide market held steady between 91.0% and 93.5%, and its U.S. market share stayed between 86.5% and 92.3%." EDVA Op. at *30. | FAC ¶¶ 158-59; ECF 959-1 (Elhauge Rpt.) § VI.A.1.i |
| | 5.3 | "Industry participants perceive DFP to be the dominant publisher ad server, with some even referring to Google as having a monopoly in the publisher ad server market. Within Google, a DFP engineering manager speculated that losing some market share would have the positive effect of demonstrating to regulators that viable alternatives exist / we're not a monopoly." EDVA Op. at *30. | ECF 959-6 (Das Reb. Rpt.) § X |
| | 5.4 | "Google has acted in accordance with its dominant market position and these high barriers to entry and expansion. For example, Google degraded some DFP features, such as by removing publishers' ability to set a higher price floor on AdX as part of its Unified Pricing Rules update, despite negative publisher feedback. In estimating the impact of this change, Google was not concerned about whether publishers would switch away from DFP, and publishers did not switch despite other publisher ad servers allowing variable price floors." EDVA Op. at *31. | FAC ¶¶ 163, 326-27; ECF 959-6 (Das Reb. Rpt.) § X |
| | 5.5 | "The large difficulties that publishers face in switching ad servers are exacerbated by the lack of meaningful alternatives to DFP. It is no wonder, then, that open-web publishers very rarely switch from DFP to another ad server, even when Google makes product changes with which they disagree. Recognizing this dynamic, many once-large rival ad servers have either left the ad serving business entirely (e.g., OpenX), or sought to compete in channels other than open-web display advertising (e.g., Kevel). Even Meta shut down its project to build a publisher ad server due to the significant barriers to gaining scale in a market dominated by Google." EDVA Op. at *31. | FAC ¶¶ 160-61, 243, 359; ECF 959-1 (Elhauge Rpt.) § VI.A.2; ECF 959-6 (Das Reb. Rpt.) ¶¶ 162-64 |

| | | | |
|---|---|---|---|
| | 5.6 | "To gain market share from DFP, a rival would have to convince publishers to stop using DFP and switch to the rival's publisher ad server. This, however, is very difficult to do. As the evidence showed, publisher ad servers are sticky products that take a lot of work to change. In the words of a former Google and DoubleClick executive, switching publisher ad servers takes an act of God to do and is a nightmare because nothing has such high switching costs." EDVA Op. at *30. | ECF 959-1 (Elhauge Rpt.) § VI.A.2 |
| | 5.7 | "although Google has not exercised its monopoly power to raise DFP's prices, the company has internally estimated that the market would bear a price increase and projected that a 10% to 20% increase in DFP fees could have a substantial positive impact on . . . overall profitability." EDVA Op. at *30. | FAC ¶ 163 |
| | 5.8 | "the lack of airtight direct evidence is immaterial here. DFP's 91% share of the worldwide market leaves no doubt as to Google's monopoly power, particularly when viewed in light of the high barriers to entry and expansion in the publisher ad server market." EDVA Op. at *31. | FAC ¶¶ 158-59; ECF 959-1 (Elhauge Rpt.) § VI.A.1.i; ECF 983-18 (Israel Rpt.) § V.B |
| 6 | | "Google possesses monopoly power in the ad exchange for open-web display advertising market." EDVA Op. at *31. | FAC ¶¶ 8, 165-74 |
| | 6.1 | "AdX's charging a durable 20% take rate for well over a decade is direct evidence that Google has possessed monopoly power in the open-web display ad exchange market. . . . Google employees recognized that AdX's 20% take rate was higher than that of rival ad exchanges like IndexExchange, Magnite, and Xandr, which often charged closer to 10%." EDVA Op. at *32. | FAC ¶¶ 172-73; ECF 959-1 (Elhauge Rpt.) ¶¶ 237-244 |
| | 6.2 | "Google employees repeatedly questioned the viability of AdX's take rate, often stating that the product was no longer worth 20%. Nevertheless, Google has maintained AdX's 20% take rate for over a decade and has kept a relatively steady share of the ad exchange market." EDVA Op. at *32. | FAC ¶¶ 172-73; ECF 959-6 (Das Reb. Rpt.) ¶ 94; ECF 959-1 (Elhauge Rpt.) ¶¶ 237-244 |
| | 6.3 | "Google employees have recognized the durability of AdX's pricing by describing how the exchange's market power left both publishers and advertisers with very little choice but to keep using it. . . . Google has never reduced its overall 20% take rate and has continued to deny discount requests, yet AdX's customers have not left and AdX has not lost market share." EDVA Op. at *32. | FAC ¶¶ 172-73 |
| | 6.4 | "As further evidence of Google's power in the ad exchange market, a competing ad exchange conducted experiments over the years to reduce its take rate, including at one point setting its take rate to zero, but found only a nominal, at best, effect on win rate." EDVA Op. at *32. | ECF 959-1 (Elhauge Rpt.) § VI.B |

6

| 6.5 | "Google and its market expert Dr. Israel . . . maintain that Google's long-standing 20% take rate originated well before the firm had any alleged monopoly power, and that Google's decision not to raise prices is indicative of a lack of monopoly power. . . . None of Google's arguments undermines the Court's conclusion that AdX's durable 20% take rate constitutes direct evidence of monopoly power. The steadiness with which Google has charged a 20% fee in a rapidly maturing market involving transactions with minimal variable costs, the repeated recognition by Google employees that the services AdX provided were no longer worth 20% of publisher revenue, and the strong evidence that customers were unable to switch from AdX even when other ad exchanges lowered their prices all support the finding that AdX charged supracompetitive prices." EDVA Op. at *33. | ECF 959-1 (Elhauge Rpt.) § VI.B |
| --- | --- | --- |
| 6.6 | "Another direct sign of monopoly power is that Google has used its market power in adjacent segments of the ad tech ecosystem to make it more difficult for customers on both sides of the ad exchange market to switch to rival exchanges. On the buy-side, Google's policies made AdX the only ad exchange that had exclusive access to AdWords, which publishers highly valued as 'a large and unique demand source." EDVA Op. at *33. | FAC ¶¶ 165-68; ECF 959-1 (Elhauge Rpt.) ¶¶ 269-275 |
| 6.7 | "On the sell-side, . . . Google limited AdX to send real-time bids only to DFP, thereby forgoing a desirable AdX feature for non-DFP publishers to entrench the firm's monopoly power in the publisher ad server market. . . . This was one of the reasons why publishers felt they had to use DFP to obtain effective access to AdX and, consequently, to AdWords' unique demand." EDVA Op. at *33. | FAC ¶¶ 165-68, 200, 202-04; ECF 959-1 (Elhauge Rpt.) ¶¶ 288-293 |
| 6.8 | "Once DFP had obtained near-total market share, Google combined DFP and AdX under a single publisher-facing product, Google Ad Manager, which further intertwined DFP and AdX." EDVA Op. at *33. | FAC ¶¶ 226-28; ECF 959-1 (Elhauge Rpt.) ¶¶ 297-302 |
| 6.9 | "from 2018 to 2022, AdX was the exchange for 63% to 71% of the worldwide open-web display transactions among the ad exchanges that produced data for this litigation, and . . . AdX handled between 54% and 65% of the market's total transactions. Moreover, AdX's share of the worldwide ad exchange market was roughly nine times larger than the share held by Google's next-largest competitor, which had only 6% of the market." EDVA Op. at *34. | FAC ¶¶ 169-71; ECF 959-1 (Elhauge Rpt.) § VI.A.1.ii |

| | | | |
|---|---|---|---|
| | 6.10 | "Google argues that AdX's market share is insufficiently high to establish monopoly power, particularly given that its market share is lower when calculated by its percentage of total fees received instead of by its percentage of transactions processed, or when based on U.S.-only instead of worldwide data. This argument fails because, as previously explained, worldwide, not U.S., market share is the appropriate geographic market for measuring the area of competition. Moreover, transactions processed (i.e., the number of impressions sold on the exchange), not fees received, are the best measure of market share and power because they speak to scale advantages from data and indirect network effects that different exchanges have." EDVA Op. at *34. | ECF 983-18 (Israel Rpt.) § V.B |
| *Willful acquisition or maintenance of monopoly power and anticompetitive effects* | | | |
| 7 | | "Google's tying of DFP to AdX . . . violates Section 2 of the Sherman Act because it contributed significantly to the maintenance or creation of monopoly power". EDVA Op. at *41. | FAC ¶¶ 194, 196, 199-230 |
| | 7.1 | "Google artificially handicapped its buyside (AdWords) to boost the attractiveness of its sellside (AdX), by effectively limiting its programmatic open-web advertisers in AdWords to bidding for inventory from publishers that used AdX and DFP. . . . Google limited where its advertisers could bid to protect DFP's position as the dominant operating system for publishers globally and to disincentivize publishers from switching away from DFP." EDVA Op. at *41. | FAC ¶¶ 88, 165-67; ECF 959-1 (Elhauge Rpt.) ¶ 269-275; 302. |
| | 7.2 | "By forcing Google's publisher customers to use a product they would not necessarily have otherwise used, by making it difficult for rival publisher ad servers to compete on the merits, and by significantly reducing rivals' market share, the tying of DFP to AdX has had a substantial anticompetitive effect in the publisher ad server market for open-web display advertising." EDVA Op. at *41. | FAC ¶¶ 205-230; ECF 959-1 (Elhauge Rpt.) ¶¶ 303-309 |
| 8 | | "Google's monopolies in the publisher ad server and ad exchange markets, enhanced by the AdX-DFP tie, have enabled Google to introduce a series of anticompetitive policies, practices, and technology changes to its sell-side ad tech tools that were not in its publisher customers' best interests." EDVA Op. at *41. | FAC ¶¶ 194, 196, 199-230 |
| 9 | | "The first of these anticompetitive policies was First Look, which required publishers using DFP to offer AdX a first right of refusal for each impression." EDVA Op. at *41. | FAC ¶¶ 21, 252-68; ECF 959-8 (Cramton Rpt.) ¶¶ 132-135 |
| | 9.1 | "First Look exacerbated the anticompetitive effect of the unlawful AdX-DFP tie by artificially advantaging AdX within DFP's auction logic at the expense of Google's publisher customers." EDVA Op. at *41. | FAC ¶¶ 17, 21, 252-68 |

| | | | |
|---|---|---|---|
| | 9.2 | "Google's bundling of its AdX and DFP products … reinforced the exclusionary effect of First Look." EDVA Op. at *41. | FAC ¶¶ 17, 21, 252-68 |
| | 9.3 | "By giving AdX an advantage in winning the transaction, First Look made it difficult for other exchanges to compete on a level playing field with AdX, thereby impeding their ability to enter the market, grow, and compete." EDVA Op. at *14. | FAC ¶¶ 265-268; ECF 959-9 (Cramton Reb. Rpt.) ¶¶ 22-31 |
| 10 | | "Google's Last Look was another anticompetitive policy that entrenched Google's monopoly power, disadvantaged Google's publisher customers, and harmed the competitive process. This DFP feature, which gave AdX the ability to see competing exchanges' bids in an otherwise sealed auction before AdX would bid, harmed publishers, rival ad exchanges, and advertisers using non-Google ad buying technologies." EDVA Op. at *42. | FAC ¶¶ 21, 252-68; ECF 959-9 (Cramton Reb. Rpt.) ¶¶ 32-36 |
| | 10.1 | "This advantage, which Google was only able to implement because of AdX and DFP's market power, reduced publisher revenue, decreased rivals' scale, dampened ad exchange price competition, and further entrenched Google's market power in the two adjacent product markets." EDVA Op. at *45. | FAC ¶¶ 264-268; ECF 959-1 (Elhauge Rpt.) ¶¶ 316-323 |
| 11 | | "The anticompetitive effects of Last Look have been compounded by Google's sell-side dynamic revenue share. By using the Last Look informational advantage to vary AdX fees and win impressions that it would have lost in a fair auction, Google has further enhanced AdX's market power at the expense of rivals, thereby reducing competition and harming its publisher customers' ability to diversify their revenue sources away from Google." EDVA Op. at *42. | FAC ¶¶ 290-92; ECF 959-1 (Elhauge Rpt.) ¶¶ 334-341; ECF 959-8 (Cramton Rpt.) ¶¶ 209-210; ECF 959-9 (Cramton Reb. Rpt.) ¶ 36 |
| 12 | | "Unified Pricing Rules is another example of Google exploiting its monopoly power and tying arrangement to restrict its customers' ability to deal with its rivals, thereby reducing its rivals' scale, limiting their ability to compete, and further compounding the harm to customers. Under these circumstances, Unified Pricing Rules constituted anticompetitive conduct". EDVA Op. at *42. | FAC ¶¶ 29, 324-31; ECF 959-1 (Elhauge Rpt.) ¶ 367 |
| *Rejection of refusal to deal defense* | | | |
| 13 | | "The refusal to deal doctrine in *Trinko* does not apply to Google's conduct at issue." EDVA Op. at *43. | ECF 450 (Motion to Dismiss FAC) at 5-6, 10-11; ECF 949 at 5, 7; ECF 983-18 (Israel Rpt.) § VI.C, VII.D.1 |
| | 13.1 | "Google has engaged in tying that effectively has compelled its publisher customers to use DFP if they want to use AdX and receive real-time bids from AdWords advertisers." EDVA Op. at *43. | FAC ¶¶ 200, 202-04 |

9

| | | | |
|---|---|---|---|
| | 13.2 | "Google sacrificed short-run benefits because it was more interested in reducing competition ... over the long run by harming its smaller competitors. For example, after acquiring Admeld, Google shut down its feature of providing real-time bids to third-party exchanges. . . . Google also refused to implement real-time bidding outside of its ad tech infrastructure despite its buy-side team emphasizing the benefits that doing so would have for its advertiser customers." EDVA Op. at *43. | ECF 959-6 (Das Reb. Rpt. ¶ 121 & n. 211); FAC ¶¶ 165-68, 200, 202-04, 317 |
| *Rejection of procompetitive justifications* | | | |
| 14 | | "The procompetitive justifications that Google proffers for its anticompetitive conduct are both invalid and insufficient, and any procompetitive benefits of this conduct were far outweighed by its anticompetitive effects." EDVA Op. at *47. | FAC ¶¶ 366, 406; ECF 740 (Answer to FAC) at 67; ECF 983-18 (Israel Rpt.) § VI |
| 15 | | "Google has failed to proffer a sufficient procompetitive justification for its AdX-DFP tie". EDVA Op. at *44. | FAC ¶¶ 366, 406; ECF 740 (Answer to FAC) at 67; ECF 983-18 (Israel Rpt.) § VI |
| | 15.1 | "Google contends that the integration of its products across the ad tech stack, including the AdX-DFP tie, reduced spam, fraud, malware, latency, and other quality issues; however, Google documents show that the buy-side AdWords team, which was responsible for ensuring its advertiser customers had their ads published without undue latency on high-quality websites that were not fraudulent, internally advocated for AdWords to buy on most other ad exchanges because those exchanges had acceptable levels of spam and fraud, that were comparable to the spam and fraud levels on AdX. These other exchanges submitted real-time bids to third-party publisher ad servers, just as AdX would have if AdX and DFP were not tied. And so Google's buy-side team did not like the idea of AdWords being given a disadvantage compared to the other buyers in order to strengthen the publisher pitch (e.g. uphold the 20% margin on AdX). But the sell-side managers within Google shut down the plan to let AdWords bid on third-party exchanges for fear that it would undermine AdX and DFP's dominance among publishers. . . . Instead of reducing spam, fraud, and malware for its customers, the AdX-DFP tie greatly weakened AdWords' position in the market' to entrench AdX as the dominant ad exchange and DFP as the dominant publisher ad server." EDVA Op. at *44. | ECF 959-1 (Elhauge Rpt.) ¶¶ 272-275; ECF 959-3 (Elhauge Reb. Rpt.) ¶¶ 271-272; 297-308; 389-398; ECF 959-6 (Das Reb. Rpt.) §§ X-XI |

10

| | | | |
|---|---|---|---|
| | 15.2 | "Nor were any security or quality concerns on the sell-side sufficient to justify the AdX-DFP tie. Numerous industry participants and customers testified that Google did not have lower levels of spam, fraud, or malware than other reputable ad tech providers. This evidence, therefore, showed that the proffered spam, fraud, latency, and other quality justifications of the AdX-DFP tie were either pretextual or, at best, incidental to the primary purpose of the tie, which was to acquire and maintain market power in the open-web ad exchange and publisher ad server markets. To the extent these quality justifications have any validity, they were significantly outweighed by the anticompetitive effect of the AdX-DFP tie, through which Google has driven nearly all competitors out of the publisher ad server market and secured a durable market share of over 90%." EDVA Op. at *45. | ECF 959-3 (Elhauge Reb. Rpt.) ¶¶ 389-398; ECF 959-6 (Das Reb. Rpt.) ¶¶ 152-155 |
| 16 | | "Google's procompetitive justifications for the actions it took to entrench its monopoly power and strengthen the AdX-DFP tie similarly fall short . . . the anticompetitive aspect of Dynamic Allocation was First Look". EDVA Op. at *45. | FAC ¶¶ 366, 406; ECF 740 (Answer to FAC) at 67; ECF 983-18 (Israel Rpt.) § VI; ECF 959-8 (Cramton Rpt.) ¶¶ 132-135; ECF 959-9 (Cramton Reb. Rpt.) ¶¶ 22-31 |
| | 16.1 | "First Look . . . resulted in less revenue for publishers, fewer impressions going to the advertisers who were willing to pay the most for them, enhanced AdX market power, and reduced competition in the ad exchange market." EDVA Op. at *45. | FAC ¶¶ 366, 406; ECF 740 (Answer to FAC) at 67; ECF 983-18 (Israel Rpt.) § VI; ECF 959-8 (Cramton Rpt.) ¶¶ 132-135; ECF 959-9 (Cramton Reb. Rpt.) ¶¶ 22-31 |
| 17 | | "Google . . . did not establish any valid and sufficient procompetitive justifications for Last Look." EDVA Op. at *45. | FAC ¶¶ 366, 406; ECF 740 (Answer to FAC) at 67; ECF 983-18 (Israel Rpt.) § VI |
| | 17.1 | "Last Look, which was implemented after Google had established dominance in the ad exchange and publisher ad server markets, similarly did not provide publishers with as much revenue as they would have received in a fair auction." EDVA Op. at *45. | FAC ¶¶ 366, 406; ECF 740 (Answer to FAC) at 67; ECF 983-18 (Israel Rpt.) § VI |

11

| 18 | | "The exclusionary nature of sell-side dynamic revenue share similarly cannot be shielded by the proffered procompetitive justifications . . . Google's proffered procompetitive justification for sell-side dynamic revenue share was pretextual." EDVA Op. at *46. | FAC ¶¶ 366, 406; ECF 740 (Answer to FAC) at 67; ECF 983-18 (Israel Rpt.) § VI |
|---|---|---|---|
| | 18.1 | "the primary purpose of sell-side dynamic revenue share was to outbid rival exchanges by using AdX's anticompetitive Last Look advantage. That is why a Google engineer stated that sell-side dynamic revenue share was just yet another way for AdX to exploit the last look advantage". EDVA Op. at *46. | FAC ¶¶ 290-295; ECF 959-1 (Elhauge Rpt.) ¶¶ 334-341; ECF 959-8 (Cramton Rpt.) ¶¶ 209-210 |
| 19 | | "Google implemented Unified Pricing Rules to enhance the AdX-DFP tie, and not for its proffered justifications of helping its publisher customers simplify their decision-making, receive better matches, and increase revenue." EDVA Op. at *46. | FAC ¶¶ 366, 406; ECF 740 (Answer to FAC) at 67; ECF 983-18 (Israel Rpt.) § VI; ECF 959-8 (Cramton Rpt.) ¶¶ 270-275; ECF 959-9 (Cramton Reb. Rpt.) ¶ 140; ECF 959-1 (Elhauge Rpt.) ¶¶ 361-367 |
| | 19.1 | "Unified Pricing Rules was thus targeted at enhancing AdX's control over DFP publishers' revenue streams, as opposed to simplifying publishers' decision-making. That is why Google's publisher customers concluded that Unified Pricing Rules was not in their best interest and challenged its implementation." EDVA Op. at *46. | ECF 959-8 (Cramton Rpt.) ¶¶ 263-275, 279-283; ECF 959-1 (Elhauge Rpt.) ¶¶ 356-360; ECF 959-3 (Elhauge Reb. Rpt.) ¶¶ 523-541 |
| *Rejection of product design defense* | | | |
| 20 | | "Google's decade-long campaign of exclusionary conduct . . . is not properly characterized as a series of product design choices." EDVA Op. at *46. | ECF 959-3 (Elhauge Reb. Rpt.) § VI |
| | 20.1 | "It would not be accurate to classify the tying of two separate products, or the subsequent decisions that Google made to manipulate auction rules and restrict customer choice in markets in which the firm had monopoly power, as mere choices of product design." EDVA Op. at *46. | ECF 959-3 (Elhauge Reb. Rpt.) § VI, ¶¶ 695-696 |
| | 20.2 | "The AdX-DFP tie, for example, had the effect of significantly reducing usage of rivals' products' (i.e., publisher ad servers) by discouraging, deterring, and preventing publisher customers from using alternatives to DFP." EDVA Op. at *46. | ECF 959-1 (Elhauge Rpt.) ¶¶ 287-302; ECF 959-3 (Elhauge Reb. Rpt.) ¶ 664 |

**GOOGLE'S VIOLATION OF SECTIONS 1 AND 2 FOR UNLAWFUL TYING**

| Issue No. | | Issue Decided in EDVA Opinion | Citation to Issue in Publishers' Case |
|---|---|---|---|
| II | | "Google . . . has unlawfully tied its publisher ad server (DFP) and ad exchange (AdX) in violation of Sections 1 and 2 of the Sherman Act." EDVA Op. at *1. | FAC Count I |
| 21 | | "publisher ad servers and ad exchanges are two separate products that are not reasonably interchangeable." EDVA Op. at *38. | FAC ¶ 394; ECF 959-1 (Elhauge Rpt.) ¶¶ 81-89; 92-96; ECF 959-3 (Elhauge Reb. Rpt.) ¶¶ 50-74 |
| 22 | | "Google . . . conditioned purchase of the tying product [AdX] upon purchase of the tied product [DFP]." EDVA Op. at *39 (brackets in original). | FAC ¶ 393; ECF 959-1 (Elhauge Rpt.) ¶¶ 287-300; ECF 959-3 (Elhauge Reb. Rpt.) ¶¶ 332-334 |
| 23 | | "By restricting AdX's submission of real-time bids only to DFP, and by not allowing AdX to provide real-time bids to other publisher ad servers, Google made AdX ineffective at its core function when used by publishers who did not also use DFP." EDVA Op. at *39. | FAC ¶¶ 165-68, 200, 202-04; ECF 959-1 (Elhauge Rpt.) ¶¶ 287-293; ECF 959-3 (Elhauge Reb. Rpt.) ¶¶ 332-344 |
| | 23.1 | "Google staff understood the coercive power of the AdX-DFP tie. For example, a Google sell-side manager told his leadership that AdX can serve as a tool to pull publishers onto DFP. Google decided against giving AdX to non-DFP partners, and instead worked to lock in impressions by offering DFP to publishers with full AdX dynamic allocation (i.e., real-time bidding), id., so that Google could maintain a key differentiator for DFP." EDVA Op. at *39. | ECF 959-1 (Elhauge Rpt.) ¶¶ 287-293; ECF 959-8 (Cramton Rpt.) ¶¶ 146-147; ECF 959-9 (Cramton Reb. Rpt.) ¶ 44 |
| | 23.2 | "Google's publisher customers similarly understood the coercive power of the AdX-DFP tie. They felt locked-in by dynamic allocation in DFP, which only gave AdX and not other exchanges the ability to compete with real-time bids." EDVA Op. at *39. | FAC ¶¶ 165-68, 200, 202-04; ECF 959-1 (Elhauge Rpt.) ¶ 44 |

13

| | | | |
|---|---|---|---|
| | 23.3 | "In practice, therefore, Google's restriction of AdX's real-time bidding to DFP required Google's publisher customers who wanted to use AdX's core feature to use DFP. This coercive policy made purchasing DFP, the tied product, together with AdX, the tying product, the only viable economic option for publishers who wanted to gain effective real-time access to AdWords, which they could only accomplish by using AdX." EDVA Op. at *39. | FAC ¶¶ 199-204; ECF 959-3 (Elhauge Reb. Rpt.) ¶¶ 335-338 |
| | 23.4 | "Google argues that publishers who used AdX were free to use a publisher ad server other than DFP, and those that used DFP did not necessarily have to use AdX. But by prohibiting publishers that used a non-DFP ad server from having access to the essential AdX feature of real-time bidding by AdWords advertisers, Google effectively has coerced the abdication of publishers' independent judgment as to the tied product's merits and insulated it from the competitive stresses of the open market." EDVA Op. at *40. | FAC ¶¶ 199-204; ECF 959-1 (Elhauge Rpt.) ¶¶ 288-293; ECF 959-3 (Elhauge Reb. Rpt.) ¶¶ 335-344 |
| 24 | | "Google has possessed sufficient economic power in the tying product market to restrain competition in the tied product market." EDVA Op. at *40. | FAC ¶ 395; ECF 959-1 (Elhauge Rpt.) ¶¶ 206-212; ECF 959-3 (Elhauge Reb. Rpt.) ¶ 228 |
| | 24.1 | "By effectively restricting the unique advertising demand offered by AdWords advertisers to AdX, Google has ensured that publishers would lose significant revenue if they did not use AdX." EDVA Op. at *40. | FAC ¶¶ 165-68, ECF 959-1 (Elhauge Rpt.) ¶¶ 269-275, 302; ECF 959-3 (Elhauge Reb. Rpt.) ¶¶ 268-271 |
| 25 | | "the tying of AdX and DFP has had a not insubstantial impact on interstate commerce." EDVA Op. at *40 | FAC ¶ 399 |