# Exhibit 10

FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, et al., | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-00957-SDJ |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| | § | |
| Defendant. | § | |

## GOOGLE LLC'S MOTION FOR SUMMARY JUDGMENT
## ON PLAINTIFFS' DTPA CLAIMS

**FILED UNDER SEAL**

## TABLE OF CONTENTS

Page

Table of Contents ..................................................................................................... i

I.      Statement of Issues to be Decided. ................................................................ 2

II.     Summary of Argument. ................................................................................... 3

III.    Plaintiffs' Claims Fail at the Threshold as a Matter of Law. .......................... 5

        A.    Plaintiffs Lack Article III Standing to Assert DTPA Claims. ............................ 5

              1.    Overview of Standing Requirements. ...................................... 6

              2.    Plaintiffs Have Not Shown Harm to Any Sovereign or Quasi-Sovereign Interest. ................................................................ 7

              3.    Plaintiffs Also Lack Standing to Seek Relief for Allegedly Deceptive Practices that Ended Before They Filed Their Complaint. ................................................................................ 10

              4.    It is Undisputed That RPO, DRS, and Project Bernanke Ended No Later Than 2019, Before Plaintiffs' Complaint Was Filed. ................... 11

        B.    The Attorneys General Lack Capacity to File Deceptive Trade Practices Claims in a Texas Federal Court. ..................................................... 16

              1.    Texas Law Does Not Permit any Attorney General to Exceed Statutory Limits on their Power. ................................................ 17

              2.    The DTPAs of Foreign States Do Not Authorize their Attorneys General to Bring Claims in Texas Federal Court. ................................... 18

              3.    Texas Has Prevailed in Asserting that Its Attorney General Lacks Authorization to Pursue DTPA Claims in Federal Court. ..................... 19

IV.     Dismissal is Also Warranted Under 28 U.S.C. § 1367. .................................... 20

V.      Plaintiffs' Claims Also Fail on Their Merits. ................................................... 23

        A.    State Deceptive Trade Practices Laws Do Not Apply to Conduct that Occurred Outside the State. ...................................................... 23

              1.    The Constitution Precludes Extraterritorial Application of State Law. ................................................................................ 23

**FILED UNDER SEAL**

2.      Absent Any Evidence of In-State Conduct, the States' Claims Fail to Raise a Genuine Issue of Fact on Nexus............................................. 25

        a.      The States' Own Evidence Does Not Raise a Genuine Issue on Nexus................................................. 25

        b.      The States' Experts Do Not Raise a Genuine Issue on Nexus, Either............................................... 27

B.      The Penalties Sought by the States are Grossly Disproportionate, in Violation of the Due Process Clause. .................................................. 29

        1.      State Law Bars the States from Demanding Penalties Without Individualized Proof of Harm. .............................................. 30

        2.      The Due Process Clause Prohibits Assessment of Penalties Without Proof of Individual Harm...................................................... 31

                a.      The Penalties Have No Reasonable Relation to Any Harm Alleged by the States. ............................................ 32

                b.      The Penalties Surpass Sanctions Imposed in Comparator Cases. ........................................................ 35

                c.      The Penalties Do Not Align with Google's Alleged Culpability........................................................ 35

        3.      Plaintiffs Cannot Avoid this Federal Constitutional Issue Based on the Maximum Fines Provided for in State Statutes. ............................. 36

C.      Certain of Plaintiffs' Omission-Based Claims Fail as a Matter of Law. ........... 38

        1.      No Reasonable Jury Could Find Google Failed to Adequately Disclose RPO, Especially After May 2016.............................................. 39

        2.      No Reasonable Jury Could Find that Google Failed to Disclose DRS....................................................................................... 41

                a.      Google Disclosed DRSv1 Before Launching It............. 41

                b.      Google Disclosed DRSv2 Before Launching It............. 43

        3.      No Reasonable Jury Could Find Google Liable for Bernanke-Related Deception After the Transition to a Threshold Payment Rule....................................................................................... 46

        4.      Google Ads Had No Obligation to Disclose to Ad Sellers How It Calculated Bids Submitted on Behalf of its Ad-Buyer Customers........ 49

**FILED UNDER SEAL**

5.     Google's "Equality" and "Fairness" Representations Were Not Deceptive. ........................................................................... 51

       a.     There Is No Evidence the Equality and Fairness Representations Were False. .......................................... 51

       b.     The Equality and Fairness Statements Were Not Actionable Representations of Fact. ............................. 54

6.     Google Did Not Sell Users' Personal Information. ............................. 55

VI.     Plaintiffs' Claims Also Fail on State-Specific Grounds. ................................. 57

    A.     Five State Laws Do Not Apply to Commercial or High-Dollar Transactions. ........................................................................... 57

    B.     The Claims of 14 States are Constrained by a Statute of Limitation. ................ 59

VII.     Conclusion ........................................................................... 60

Certificate of Service ........................................................................... 62

Certificate of Sealing ........................................................................... 62

**FILED UNDER SEAL**

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
    458 U.S. 592 (1982)......................................................................................4, 7, 8, 9

*Allstate Ins. Co. v. Hague*,
    449 U.S. 302 (1981)..................................................................................................26

*Amazon.com, Inc. v. McMillan*,
    625 S.W.3d 101 (Tex. 2021)....................................................................................55

*Angell v. GEICO Advantage Ins. Co.*,
    67 F.4th 727 (5th Cir. 2023) .....................................................................................6

*Austin v. United States*,
    509 U.S. 602 (1993)..................................................................................................31

*Autohaus, Inc. v. Aguilar*,
    794 S.W.2d 459 (Tex. App.—Dallas 1990, writ denied) .......................................52

*Birdsong v. Toyota Motor Credit Corp.*,
    2002 WL 32830975 (Tex. Dist. May 15, 2002) ......................................................26

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996)........................................................................................ *passim*

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ....................................................................................11

*Bradford v. Vento*,
    48 S.W.3d 749 (Tex. 2001)......................................................................................54

*Byrd v. Estate of Nelms*,
    154 S.W.3d 149 (Tex. App.—Waco 2004, pet. denied).........................................16

*Carr v. Alta Verde Indus., Inc.*,
    931 F.2d 1055 (5th Cir. 1991) ...........................................................................11, 13

*Cliffdale Assocs., Inc.*,
    103 F.T.C. 110 (Mar. 23, 1984) 1984 WL 565319..................................................52

*CocaCola Co. v. Harmar Bottling Co.*,
    218 S.W.3d 671 (Tex. 2006)....................................................................................24

**FILED UNDER SEAL**

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*,
    532 U.S. 424 (2001)...................................................................................................30, 32

*Crutchfield v. Tyson Foods, Inc.*,
    514 S.W.3d 499 (Ark. Ct. App. 2017) ................................................................................58

*Day Land & Cattle Co. v. State*,
    4 S.W. 865 (Tex. 1887)......................................................................................................17

*Day v. Woodworth*,
    13 How. 363 (1852) ...........................................................................................................35

*Deburro v. Apple, Inc.*,
    2013 WL 5917665 (W.D. Tex. Oct. 31, 2013) ....................................................................26

*Doctors Hosp. of Augusta, LLC v. CompTrust AGC Workers' Compen. Tr. Fund*,
    636 S.E.2d 862 (S.C. 2006) ...............................................................................................24

*Doe v. Boys Clubs of Greater Dallas, Inc.*,
    907 S.W.2d 472 (Tex. 1995)...............................................................................................51

*State ex rel. Downs v. Harney*,
    164 S.W.2d 55 (Tex. Civ. App.—San Antonio 1942, writ ref'd w.o.m.).............................20

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982)......................................................................................................23, 26

*El Paso Elec. Co. v. Tex. Dep't of Ins.*,
    937 S.W.2d 432 (Tex. 1996)...............................................................................................17

*In re Elec. Books Antitrust Litig.*,
    14 F. Supp. 3d 525 (S.D.N.Y. 2014).....................................................................................6

*Enochs v. Lampasas County*,
    641 F.3d 155 (5th Cir. 2011) ..............................................................................................22

*Ford Motor Co. v. Parks*,
    691 S.W.3d 475 (Tex. 2024)...............................................................................................55

*Forever Green Athletic Fields, Inc. v. Lasiter Constr., Inc.*,
    384 S.W.3d 540 (Ark. Ct. App. 2011) ................................................................................58

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000).........................................................................................10, 11, 13, 16

*FTC v. Cyberspace.com, LLC*,
    453 F.3d 1196 (9th Cir. 2006) ............................................................................................38

## FILED UNDER SEAL

*FTC v. Neora LLC*,
    2023 WL 8446166 (N.D. Tex. Sept. 28, 2023)....................................................38

*FTC v. Zaappaaz,* LLC,
    2023 WL 5020618 (S.D. Tex. June 9, 2023) .....................................................38

*Garza v. State Farm Lloyds*,
    2013 WL 3439851 (S.D. Tex. July 8, 2013)......................................................54

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...........................................................................................27

*Golan v. FreeEats.com, Inc.*,
    930 F.3d 950 (8th Cir. 2019) .............................................................................36

*In re Google Digital Advertising Litig.*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022)...........................................................14, 16

*Gordon v. Finch*,
    2023 WL 3496427 (N.D. Ind. May 17, 2023) ...................................................58

*Gov't of Manitoba v. Bernhardt*,
    923 F.3d 173 (D.C. Cir. 2019).............................................................................7

*Green Giant Co. v. Tribunal Superior*,
    104 D.P.R. 489, 4 P.R. Offic. Trans. 682 (Dec. 19, 1975) ...............................24

*Arkansas ex rel. Griffin v. TikTok Inc.*,
    2023 WL 4744903 (W.D. Ark. July 25, 2023) ..................................................58

*Hall v. SeaWorld Enter., Inc.*,
    747 F. App'x 449 (9th Cir. 2018) ......................................................................38

*Harmelin v. Michigan*,
    501 US. 957 (1991)............................................................................................37

*Harrison v. Jefferson Par. Sch. Bd.*,
    78 F.4th 765 (5th Cir. 2023) .......................................................................4, 6, 7, 8

*Hawaii v. Standard Oil Co. of Cal.*,
    405 U.S. 251 (1972).............................................................................................6

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989)......................................................................................23, 25

*Hetman v. Schwade*,
    317 S.W.3d 559 (Ark. 2009)..............................................................................24

**FILED UNDER SEAL**

*Hollingsworth v. Perry*,
570 U.S. 693 (2013)..................................................................................6

*Howard v. Kerzner Int'l Ltd.*,
2014 WL 714787 (S.D. Fla. Feb. 24, 2014) .........................................24

*Hoyt v. Sprague*,
103 U.S. 613 (1881)................................................................................23

*Humble Nat'l Bank v. DCV, Inc.*,
933 S.W.2d 224 (Tex. App.—Houston [14th Dist.] 1996, writ denied)...........................51, 54

*Infowise Sols., Inc. v. Microstrategy, Inc.*,
2005 WL 2445436 (N.D. Tex. Sept. 29, 2005).......................................54

*In re Int'l Harvester Co.*,
104 F.T.C. 949 (1984).............................................................................38

*Ironworkers Local Union No. 68 v. Astrazeneca Pharmaceuticals LP*,
585 F. Supp. 2d 1339 (M.D. Fla. 2008) .................................................31

*Jacked Up, LLC v. Sara Lee Corp.*,
291 F. Supp. 3d 795 (N.D. Tex. 2018) ..................................................27

*James v. City of Dallas*,
254 F.3d 551 (5th Cir. 2001) ...................................................................6

*Kraft, Inc. v. FTC*,
970 F.2d 311 (7th Cir. 1992) ..................................................................38

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)............................................................................6, 11

*McCoy v. Valvoline, LLC*,
568 F. Supp. 3d 666 (N.D. Tex. 2021) ..................................................59

*McLeskey v. Morris Invest*,
2020 WL 3315996 (S.D. Ind. June 18, 2020).........................................58

*McManaway v. KBR, Inc.*,
852 F.3d 444 (5th Cir. 2017) .................................................................27

*Media Matters for Am. v. Paxton*,
2024 WL 1773197 (D.D.C. Apr. 12, 2024)............................................19

*Mendonca v. Tidewater Inc.*,
862 So. 2d 505 (La. Ct. App. 2003)........................................................24

**FILED UNDER SEAL**

*Mid-Cities Bone & Joint Surgeons, P.A. v. GE Healthcare Diagnostic Imaging*,
   2008 WL 11429502 (N.D. Tex. Sept. 22, 2008).......................................54

*Mississippi v. Becerra*,
   2024 WL 1335084 (S.D. Miss. Mar. 28, 2024) .........................................7

*MST Mgmt., LLC v. Chicago Doughnut Franchise Co., LLC*,
   584 F. Supp. 3d 923 (D. Nev. 2022) ..........................................................24

*Mullins Square, Inc. v. Source 2 Mkt., LLC*,
   2009 WL 10669887 (W.D. Tex. Dec. 14, 2009) ........................................59

*Mylonakis v. M/T GEORGIOS M.*,
   909 F. Supp. 2d 691 (S.D. Tex. 2012) .......................................................11

*Nat'l Pork Producers Council v. Ross*,
   598 U.S. 356 (2023)................................................................18, 23, 24, 28

*Nevares v. M.L.S.*,
   345 P.3d 719 (Utah 2015) ..........................................................................24

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   350 F. Supp. 2d 160 (D. Me. 2004) ...........................................................58

*New York v. Facebook, Inc.*,
   549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd*
   66 F.4th 288 (D.C. Cir. 2023) .....................................................................6

*New York v. Microsoft Corp.*,
   209 F. Supp. 2d 132 (D.D.C. 2002) .........................................................6, 8

*Pac. Mut. Life Ins. Co. v. Haslip*,
   499 U.S. 1 (1991) .......................................................................................33

*Parker & Parsley Petroleum Co. v. Dresser, Ind.*,
   972 F.2d 580 (5th Cir. 1992) .....................................................................21

*Pennsylvania v. West Virginia*,
   262 U.S. 553 (1923).....................................................................................8

*Pharm. Rsch. & Manufacturers of Am. v. Fitch*,
   2024 WL 3277365 (S.D. Miss. July 1, 2024) ............................................24

*Phillips v. Consol. Supply Co.*,
   895 P.2d 574 (Idaho 1995)..........................................................................24

*Porous Media Corp. v. Pall Corp.*,
   173 F.3d 1109 (8th Cir. 1999) ...................................................................54

**FILED UNDER SEAL**

*Reed v. Receivable Recovery Servs., LLC*,
702 F. App'x 239 (5th Cir. 2017) ..................................................................52

*Reyes v. North Texas Tollway Auth.*,
830 F. Supp. 2d 194 (N.D. Tex. 2011) ............................................................6

*Rockwell Int'l Corp. v. M/V Incotrans Spirit*,
998 F.2d 316 (5th Cir. 1993) ...................................................................30, 31

*Rodriguez v. San Antonio Indep. Sch. Dist.*,
299 F. Supp. 476 (W.D. Tex. 1969)..............................................................17

*Sable Com. of Cal., Inc. v. FCC*,
492 U.S. 115 (1989)........................................................................................23

*Safety Vision LLC v. LEI Tech. Canada*,
2024 WL 3094649 (S.D. Tex. June 20, 2024) ...............................................59

*Schanzle v. Haberman*,
831 F. App'x 103 (5th Cir. 2020) ..................................................................31

*Seargant Oil & Gas Co. v. Nat'l Maint. & Repair, Inc.*,
861 F. Supp. 1351 (S.D. Tex. 1994) ..............................................................54

*Florida ex rel. Shevin v. Exxon Corp.*,
526 F.2d 266 (5th Cir. 1976) .........................................................................17

*Sierra Club v. Nat'l Marine Fisheries Serv.*,
2024 WL 3860211 (D. Md. Aug. 19, 2024) ...................................................35

*Skalla v. Canepari*,
430 S.W.3d 72 (Ark. 2013).............................................................................58

*Smith v. Dynamic Recovery Sols. LLC*,
2019 WL 2368460 (D.S.C. June 5, 2019).......................................................52

*Sommers Drug Stores Co. Profit Sharing Trust v. Corrigan*,
883 F.2d 345 (5th Cir. 1989) ...........................................................................6

*Stanley v. Wabash, St. L. & P. Ry. Co.*,
13 S.W. 709 (Mo. 1890) .................................................................................24

*State Farm Mut. Auto Ins. Co. v. Campbell*,
538 U.S. 408 (2003)................................................................................ *passim*

*State of Ga. v. Pennsylvania R. Co.*,
324 U.S. 439 (1945).........................................................................................9

**FILED UNDER SEAL**

*State v. Delesdenier,*
   7 Tex. 76 (1851) ................................................................................................ 17

*State, by & through Caldwell v. Astra Zeneca AB,*
   249 So. 3d 38 (La. App. 1 Cir. 4/11/18) ............................................................ 29

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ....................................................................................... 10, 11

*Stonebridge Collection, Inc. v. Carmichael,*
   791 F.3d 811 (8th Cir. 2015) ............................................................................. 58

*In re Technicool Sys., Inc.,*
   896 F.3d 382 (5th Cir. 2018) ............................................................................. 11

*Texas State Troopers Ass'n, Inc. v. Abbott,*
   2014 WL 12479651 (W.D. Tex. Apr. 16, 2014) ................................................ 19

*Texas v. Eye Level Holdings LLC,*
   No. A-11-CA-178-SS (W.D. Tex. Mar. 11, 2011) ............................................. 20

*Texas v. Google LLC,*
   No. 4:22-CV-636 (S.D. Tex.) ....................................................................... 19, 20

*Texas v. Veterans Support Org.,*
   166 F. Supp. 3d 816 (W.D. Tex. 2015) .............................................................. 20

*Texas v. Ysleta del Sur Pueblo,*
   79 F. Supp. 2d 708 (W.D. Tex. 1999) .......................................................... 17, 18

*Texas Windstorm Ins. Ass'n v. Pruski,*
   689 S.W.3d 887 (Tex. 2024) .............................................................................. 19

*Thompson v. Procter & Gamble Co.,*
   2018 WL 5113052 (S.D. Fla. Oct. 19, 2018) ............................................... 52, 54

*Timbs v. Indiana,*
   586 U.S. 146 (2019) ............................................................................... 31, 32, 37

*Town of Chester, N.Y. v. Laroe Estates, Inc.,*
   581 U.S. 433 (2017) ............................................................................................. 7

*Union Underwear Co. v. Barnhart,*
   50 S.W.3d 188 (Ky. 2001) ................................................................................. 24

*United Mine Workers of Am. v. Gibbs,*
   383 U.S. 715 (1966) ..................................................................................... 20, 22

## FILED UNDER SEAL

*United States v. Bajakajian*,
    524 U.S. 321 (1998)............................................................................................31, 32

*United States v. Dish Network LLC*,
    954 F.3d 970 (7th Cir. 2020) ...................................................................35

*Grant ex rel. United States v. Zorn*,
    107 F.4th 782 (8th Cir. 2024) ..................................................................36

*Veigel v. Dakota Tr. & Sav. Bank*,
    225 N.W. 657 (S.D. 1929)........................................................................24

*In re Vioxx Prod. Liab. Litig.*,
    2010 WL 11570867 (E.D. La. Mar. 31, 2010) (Louisiana) .............................21, 31

*Wong v. Stripling*,
    881 F.2d 200 (5th Cir. 1989) ...................................................................21

*Wright-Moore Corp. v. Ricoh Corp.*,
    794 F. Supp. 844 (N.D. Ind. 1991) ..........................................................24

*Yates v. Pinellas Hematology & Oncology, P.A.*,
    21 F.4th 1288 (11th Cir. 2021) (Newsom, J., concurring)..............................37

*In re Zyprexa Products Liab. Litig.*,
    671 F. Supp. 2d 397 (E.D.N.Y. 2009) (Mississippi) ...................................... *passim*

**Statutes**

10 L.P.R.A. § 259(i)..................................................................................29

15 U.S.C. §§ 41-58 ...................................................................................38

28 U.S.C. § 1367.................................................................................2, 20, 21

28 U.S.C. § 1367(c) ...............................................................................5, 21

31 U.S.C. §§ 3729-33 ...............................................................................36

Alaska Stat. § 45.50.551(b)........................................................................29

Ark. Code § 4-88-113(a)(3) ........................................................................29

Fla. Stat. § 501.207 .................................................................................18

Fla. Stat. § 501.2075 .............................................................................29, 39

Idaho Admin. Code § 04.02.01.030...............................................................58

**FILED UNDER SEAL**

Idaho Code § 48-606(5) .................................................................................................29

Ind. Code § 24-5-0.4 .....................................................................................................29

Ind. Code § 24-5-0.5 ................................................................................................18, 58

Ky. Rev. Stat. § 367.990(2) ..........................................................................................29

La. Stat. § 51:1418 .......................................................................................................24

Miss. Code § 75-24-19(1)(b) .........................................................................................29

Mo. Stat. § 407.100(6) ..................................................................................................29

Mont. Code § 30-14-142(2) ..........................................................................................29

N.D. Cent. Code § 51-15-11 .........................................................................................29

Nev. Rev. Stat. § 228.332 .............................................................................................29

Nev. Rev. Stat. § 598.0999(2) .......................................................................................29

S.C. Code § 39-5-110(a) ...............................................................................................29

SDCL § 37-24-27 ..........................................................................................................29

Tex. Bus. & Com. Code § 17.46(b) ........................................................................34, 39

Tex. Bus. & Com. Code § 17.47(b) ...............................................................................19

Tex. Bus. & Com. Code § 17.47(c) ...............................................................................29

Tex. Bus. & Com. Code § 17.49(f) ................................................................................58

Tex. Bus. & Com. Code § 17.49(g) ..........................................................................58, 59

Utah Code § 13-11-3 .....................................................................................................58

Utah Code § 13-11-17 ..............................................................................................18, 29

Utah Code § 78B-2-302(2) ............................................................................................59

**Other Authorities**

Clifford Krauss & John Schwartz, *BP Will Plead Guilty and Pay Over $4 Billion*,
The New York Times (Nov. 15, 2012) ....................................................................35

Fed. R. Civ. P. 12(b)(1) ..............................................................................................1, 7

Fed. R. Civ. P. 12(b)(6) .................................................................................................1

**FILED UNDER SEAL**

Fed. R. Civ. P. 17(b)(3) ................................................................................................16

Fed. R. Civ. P. 56 ..........................................................................................................6

*FTC Policy Statement on Deception* (Oct. 14, 1983), 1984 WL 565319 ...............38, 52

*Offset*, Google Dictionary ...........................................................................................45

*Offset*, Merriam Webster .............................................................................................45

*Sale*, Black's Law Dictionary (12th ed. 2024) ............................................................55

*Sale*, Merriam-Webster ....................................................................................55, 56, 57

U.S. Const. amend. VIII .................................................................................5, 22, 31, 37

U.S. Const. amend. XIV .................................................................................................31

U.S. Const. amend. XIV, § 1 ................................................................................ *passim*

U.S. Const. art. I, § 8, cl. 3 ............................................................................................23

U.S. Const. art. III ................................................................................................ *passim*

U.S. Const. art. IV, § 1 ..................................................................................................23

FILED UNDER SEAL

With total disregard for the requirements of Article III standing and statutory limits on their authority to sue, the Attorneys General of 17 states demand more than $120 billion in penalties from Defendant Google based on alleged violations of 17 different deceptive trade practices laws. They seek a short-cut, demanding these penalties despite having *no proof* of deceptive conduct or injury within each Plaintiff State or under any of the state laws at issue. Astoundingly, Plaintiffs admit that they have not shown or even alleged "harm to specific parties" and claim that they have no burden to prove "particular injuries or effects" under their laws. ECF No. 260 at 9, 15. The irreducible minimum requirements of the U.S. Constitution, and the plain language of the States' own statutes, say otherwise.

To paper over these fundamental flaws, the States seek to litigate their claims as a unified whole, erasing the unique definitions, elements, and defenses mandated by each State's deceptive trade practices act (DTPA).[1] Evading reliance on any specific law, the States seek to recover a single, aggregated civil penalty that bears no relationship either to the number of violations they allege (but cannot prove) or the (unsubstantiated) harm allegedly caused to ad buyers and ad sellers. The States urge the Court to allocate this legally unfounded and unprecedented multi-billion-dollar penalty not based on the statutory violations and harm they must prove, but instead based on their relative percentages of household *internet usage*—a factor that has no relationship to any element of any State DTPA. No part of this is authorized by law. And none of it raises any genuine issue of material fact for trial.

Google therefore moves for summary judgment as to all claims in Count VI. These varied state-law claims belong, if anywhere, in the courts of each Plaintiff State—not in this Texas federal

---

[1] While each state statute has a different name, we refer to the claims asserted in Count VI collectively as "DTPA" claims. Google files this Motion for Summary Judgment subject to and without waiver of its pending Motions to Dismiss under Rules 12(b)(1) and 12(b)(6).

court. Granting summary judgment on the DTPA claims will substantially narrow the issues for trial, eliminating the burden on the Court (and the Texas jury, if one is seated) to parse through 17 distinct state laws to assess whether each of them support a finding of liability and whether they authorize—and whether the Constitution allows—the assessment of exorbitant monetary DTPA penalties in the absence of any proof of individualized harm. Whether on a mandatory ground, such as Plaintiffs' lack of standing and capacity to sue, or the absence of any genuine issue of material fact concerning whether Google made a material misstatement or omission, or as an exercise of discretion to decline supplemental jurisdiction over novel state-law claims that predominate over the single federal antitrust claim at issue, this Court should grant summary judgment as to the DTPA claims in their entirety.

## I.     Statement of Issues to be Decided.

1.      **Article III Standing.** Whether the Court lacks subject matter jurisdiction over the claims in Count VI because they rest on hypothetical (but not actual) injuries to particular private parties that do not give the Attorneys General standing to sue under Article III.

2.      **Capacity to Sue.** Whether the Court should grant summary judgment that the Attorneys General lack capacity to pursue DTPA claims in federal court based on state statutes that authorize them to sue only in the state courts of their home states, and because the Texas Attorney General has argued that the Texas DTPA does not authorize it to sue in federal court.

3.      **1367 Dismissal.** Whether, as a matter of federalism and judicial restraint, the Court should exercise its discretion under 28 U.S.C. § 1367 to dismiss the DTPA claims because: they raise novel, untested issues of state law better suited to be resolved in the courts of each state; the relevant state legislatures specified *state courts* as the forum where each Attorney General could file DTPA claims; and retaining jurisdiction of these DTPA claims would (as the State of Texas

FILED UNDER SEAL

has argued elsewhere) open the doors of federal courthouses across the country for consumer protection cases that are bread-and-butter mainstays of state court dockets.

    4.    **No Genuine Issue of Material Fact for Trial.** Whether the Court should grant summary judgment on the merits of the claims in Count VI. Plaintiffs fail to raise a genuine issue of material fact on each element of their claims, because:

    a.    **Extraterritoriality and Nexus.** Under the U.S. Constitution, the States can obtain injunctive relief or civil penalties against Google only for conduct that occurred within each State, but the individual States have no evidence to show the required nexus of harm in each state.

    b.    **Aggregate Proof of Harm.** The U.S. Constitution and DTPAs do not permit the States to obtain penalties without proof of *actual* and *individualized* harm, but the States' proof consists only of *hypothetical* and *aggregated* harms.

    c.    **Misstatement or Omission.** The States have not raised a genuine issue of material fact as to whether Google misstated or omitted any material information about certain of its auction optimizations, much less whether Google did so "intentionally" or "willfully" as required in most of the Plaintiff States, and no evidence supports the allegations regarding Google's use of user information.

    d.    **State-Specific Issues.** There are state-specific defects as to certain States' claims, including that the laws do not permit States to recover penalties for commercial transactions, do not apply to large dollar transactions, or render the claims time-barred.

## II.    Summary of Argument.

Proof of Article III standing requires Plaintiffs to demonstrate they suffered "(1) an injury in fact that (2) is fairly traceable to the conduct complained of and (3) redressable by a favorable

**FILED UNDER SEAL**

judicial decision." *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 769 (5th Cir. 2023).[2] Here, Plaintiffs have no evidence of injury in fact and, indeed, no evidence that *even one* ad buyer or ad seller in each State was harmed by Google's actions. But even if they had evidence of harm to particular ad buyers and ad sellers, that would not give the *States* Article III standing. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982). To invoke the parens patriae doctrine, each State must (1) establish a "quasi-sovereign interest" that is "sufficiently concrete to create an actual controversy between the State and the defendant" and (2) show that "the injury to that interest affects a sufficiently substantial segment of the state's population." *Harrison*, 78 F.4th at 772 (cleaned up). The States must show both; they can demonstrate neither. They have no evidence of generalized harm to their economies. While Plaintiffs once suggested they might show consumers were "paying a couple of pennies too much for a toaster," 4/18/2024 Hrg. Tr. at 56:18-24, the record is now complete: the States have no evidence to show that any consumers—much less the substantial segment the law requires—were harmed by Google's practices. Lacking that proof, the States' experts offer only speculation that *some* unidentified ad buyers or ad sellers *could hypothetically* have been deceived by Google's actions. This theory of hypothetical harm to private parties does not establish standing. Without Article III standing, this Court lacks subject matter jurisdiction over the DTPA claims and must dismiss them.

Dismissal is also mandatory because the Attorneys General lack capacity to pursue DTPA claims in federal court. Every one of the statutes invoked in Count VI authorizes the relevant Attorney General to file claims only in the state's own courts. No statute authorizes an Attorney General to file DTPA claims in federal court, much less in a federal court in another state. Every

---

[2] Unless otherwise indicated, emphasis is added, citations have been omitted, and quotations have been cleaned up for ease of reading. Citations to the "SOF" are to the contemporaneously filed Statement of Facts, and citations to "Ex." are to the exhibits attached thereto.

one of the Attorneys General is proceeding here in violation of express limits imposed on them under the statues they invoke. As a matter of federalism and its own limited jurisdiction, this Court cannot entertain a suit that violates the state legislatures' limits on authority to sue.

Dismissal of Plaintiffs' claims under each of the seventeen state DTPA statutes is also appropriate under 28 U.S.C. § 1367(c). This Court has broad discretion to decline to exercise supplemental jurisdiction when, as here, the state-law claims substantially predominate over the federal claims, the claim raises a novel or complex issue of state law, or there are other compelling reasons for declining jurisdiction.

Even if all these hurdles could be overcome, the States' claims fail on their merits. No State may assert a claim where the transaction in question occurred outside the State's boundaries: That would be a constitutionally impermissible exercise of extraterritorial jurisdiction. No State may obtain a penalty without individualized proof of harm or without proof that the economic sanction awarded is proportional to the harm caused, if any: That would violate the Due Process and Excessive Fines Clauses of the Constitution. All DTPA claims are barred where—as here—they rest on alleged non-disclosures of facts that were, in fact, disclosed. And some State statutes exclude transactions between one business and another, or those that exceed certain monetary thresholds, and still others are barred by statutes of limitation.

For all these reasons, summary judgment should be granted as to all claims in Count VI.

## III.    Plaintiffs' Claims Fail at the Threshold as a Matter of Law.[3]

### A.  Plaintiffs Lack Article III Standing to Assert DTPA Claims.

The States seek civil penalties in their sovereign and parens patriae capacities, and injunctive relief in their parens patriae capacities only. *See* Ex. 201 (5/3/2024, 7th Am. Resp. to

---

[3] Google incorporates here, without repeating them, the legal standards for summary judgment set forth in Motion for Summary Judgment on Plaintiffs' Antitrust Claims.

**FILED UNDER SEAL**

Interrogatory No. 2). Each State also asserts it is free to demand this relief without proof of any harm to any ad buyer or ad seller in their state, and without proof that allegedly deceptive practices were ongoing when the Complaint was filed. The States are wrong. In the absence of proven harm, they have no Article III standing to sue, so their claims must be dismissed.

### 1.   Overview of Standing Requirements.

"Lack of standing is a defect in subject matter jurisdiction." *Reyes v. North Texas Tollway Auth.*, 830 F. Supp. 2d 194, 201 (N.D. Tex. 2011) (citing *Sommers Drug Stores Co. Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 348 (5th Cir. 1989)). Article III, and not any provision of state law, sets the minimum requirements for standing because "standing in federal court is a question of federal law, not state law." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013); *see also id.* (explaining that states cannot issue parties "who otherwise lack standing a ticket to the federal courthouse"). The "irreducible minimum" of Article III standing requires the States to show "(1) an *injury* in fact that (2) is fairly traceable to the conduct complained of and (3) redressable by a favorable judicial decision." *Harrison*, 78 F.4th at 768. Courts "evaluate standing 'on a claim-by-claim basis,'" so standing to assert antitrust claims, even if proven, does not establish standing to pursue deceptive trade practices claims. *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 735 (5th Cir. 2023) (quoting *James v. City of Dallas*, 254 F.3d 551, 563 (5th Cir. 2001)).[4] Here at the summary-judgment stage, Plaintiffs must come forward with "evidence" of "specific facts" demonstrating standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56). And because standing is not "dispensed in gross," Plaintiffs must "demonstrate

---

[4] The cases relied on by Plaintiffs at the 12(b)(1) stage involved standing to assert antitrust claims, not DTPA claims. *See Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 257 (1972); *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 21 (D.D.C. 2021), *aff'd* 66 F.4th 288 (D.C. Cir. 2023); *In re Elec. Books Antitrust Litig.*, 14 F. Supp. 3d 525, 531 (S.D.N.Y. 2014); *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 139 (D.D.C. 2002).

standing for each … form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).

**2. Plaintiffs Have Not Shown Harm to Any Sovereign or Quasi-Sovereign Interest.**

The Attorneys General agree they "absolutely" must prove injury in fact to have Article III standing. 4/18/2024 Hrg. Tr. at 45. But no Attorney General can show an injury in fact in either its sovereign or parens patriae capacity.

Sovereign standing requires injury to a "sovereign interest," which consists of "the power to create and enforce a legal code" or "demand for recognition from other sovereigns." *Harrison*, 78 F.4th at 770 (quoting *Snapp*, 458 U.S. at 601). Violation of state law alone does not establish sovereign standing; a state must show that attempts to enforce its law have been impeded. *Id.* at 771-72; *see also, e.g.*, *Mississippi v. Becerra*, 2024 WL 1335084, at *12 (S.D. Miss. Mar. 28, 2024) ("[A] violation of state law does not become an injury until a state brings an enforcement action against a violator to bring the violator into compliance with the law, and the violator or another entity hinders the State from doing so."). Sovereign standing does not exist here. Plaintiffs cannot show that Google's conduct "injure[d] the government in an Article III way," *Harrison*, 78 F.4th at 771, and so cannot satisfy the injury-in-fact element of standing on a sovereign basis. As the States conceded at the hearing on Google's Rule 12(b)(1) motion, they "don't have something squarely on point for sovereign standing" and believe their "safer course is parens patriae." 4/18/2024 Hrg. Tr. at 45:5-12.

But this supposedly "safer course" fails as well. In parens patriae suits, Plaintiffs "must do more than meet Article III's irreducible minimum." *Harrison*, 78 F.4th at 769 (quoting *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019)). There are "two hard-and-fast limits on the parens patriae doctrine": each State must (1) establish a "quasi-sovereign interest" that is

FILED UNDER SEAL

"sufficiently concrete to create an actual controversy between the State and the defendant" and (2) show that "the injury to that interest affects a sufficiently substantial segment of the state's population." *Id.* at 772 (cleaned up). Quasi-sovereign interests include "the health and well-being—both physical and economic—of its residents *in general*." *Snapp*, 458 U.S. at 607; *see also Pennsylvania v. West Virginia*, 262 U.S. 553, 592 (1923) (allowing standing upon proof of injury to "a substantial portion of the state's population"); *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 139 (D.D.C. 2002) (noting that parens patriae standing cannot be based on "injury to a narrowly limited class of individuals" but exists "where the direct impact of the alleged wrong is felt by a substantial majority, though less than all, of the state's citizens"). This interest cannot be "wholly derivative" of the interests of an identifiable group of citizens. *Harrison*, 78 F.4th at 773. Instead, "the State must articulate an interest *apart from* the interests of particular private parties." *Snapp*, 458 U.S. at 607; *see also id.* at 600 (states do not "step[] in to represent the interests of particular citizens," and a state attempting to do so "will not have standing under the parens patriae doctrine").

The States cannot raise a genuine issue of material fact as to harm to their residents "*in general*." *Snapp*, 458 U.S. at 607. At the dismissal stage, Plaintiffs alleged that consumers "were paying a couple of pennies too much for a toaster." 4/18/2024 Hrg. Tr. at 56. But Plaintiffs can point to no evidence that prices for consumer goods increased as a result of Google's alleged conduct. Plaintiffs have not even attempted to quantify the alleged increased costs *to advertisers*, much less proven that any individual advertiser passed on any portion of any alleged (but unproven) increase in costs to its consumers.

Plaintiffs' fallback suggestion that some consumers "are not necessarily seeing the right ad," 4/18/2024 Hrg. Tr. at 56:18-24, even if proved (and it has not been) does not show *injury*.

FILED UNDER SEAL

Viewing the "wrong" ad—meaning an ad that might not have won an auction but for Google's alleged conduct—is not a cognizable harm that establishes quasi-sovereign standing. Plaintiffs do not allege, and cannot prove, that the economic well-being of their States suffered in any concrete way merely because some unknown number of citizens allegedly saw (for example) ads for Disney on the *USA Today* homepage more frequently than ads for Chevrolet trucks. *Cf. State of Ga. v. Pennsylvania R. Co.*, 324 U.S. 439, 444, 450 (1945) (allowing Georgia to proceed parens patriae based on allegations that 20 railroad companies conspired to fix freight rates to discriminate against Georgia's products, to "*limit…Georgia's economy* to staple agricultural products," and "to prevent the full and complete *utilization of the natural wealth of the State*").

Lacking evidence of generalized harm to consumers, the States urge a new theory, sponsored by their auction expert Dr. Matthew Weinberg. He *claims* (his word), Ex. 18 (Weinberg Depo. Tr.) 144:8-145:18, that Google's auction algorithms created a deceptive "ecosystem," one he speculates "could" have deceived ad buyers, ad sellers, or both, *id.* at 143:2-144:17. But for Article III purposes, even if the States had evidence of harm to ad buyers (i.e., advertisers) or ad sellers (i.e., publishers), any such harms are mere "interests of particular private parties" who can—and have—separately asserted their own claims for relief. *See Snapp*, 458 U.S. at 607.[5] Moreover, Dr. Weinberg cannot identify even one ad buyer, *id.* at 230:22-231:12, or ad seller, *id.* at 241:8-19, that was harmed or deceived by Google's conduct, nor one that joined the so-called "Google ecosystem" because of allegedly deceptive actions, *id.* at 119:10-122:6, nor even "any

---

[5] Plaintiffs have occasionally invoked speculative injury to Google's "competitors" to try to support their antitrust claims, *see, e.g.*, 4/18/2024 Hrg. Tr. at 40-41, but this unsupported claim could not possibly sustain a DTPA claim or establish Article III standing to pursue it in this Court. Like advertisers and publishers, competitors of Google are by definition *private parties* whose interests do not equate to a quasi-sovereign interest. *Snapp*, 458 U.S. at 602. Additionally, the States have no evidence that Google's competitors either buy or sell ads using Google's tools. Accordingly, Google's actions could not—even in theory—have deceived them.

FILED UNDER SEAL

particular ad impression that I know was impacted by the deceptive elements" of Google's optimizations, *id.* at 145:11-146:19.

Plaintiffs' speculative injury theories raise no genuine issue of fact for trial. Plaintiffs have *no* evidence of generalized economic harm, or any other *actual* injury *in fact* to any State's sovereign or parens patriae interests. The States thus lack standing under Article III, and this Court lacks subject matter jurisdiction to consider any of the claims in Count VI.

### 3. Plaintiffs Also Lack Standing to Seek Relief for Allegedly Deceptive Practices that Ended Before They Filed Their Complaint.

The "very essence of the redressability requirement" is that "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). Neither the civil penalty relief—which demands payments to a sovereign, as opposed to the parties purportedly injured[6]—nor an injunction directed at past conduct meets Article III's "redressability" requirement.

When penalties are paid to a sovereign, Article III requires proof that the allegedly unlawful conduct was *ongoing* or *imminent* when the complaint was filed. A sovereign may establish redressability through civil penalties "by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue" in the future, and that "the threatened injury is certainly impending" in the absence of civil penalties. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000); *see also id.* at 185-86 (If a plaintiff "is injured or faces the threat of future injury due to illegal conduct ongoing at the time

---

[6] When civil penalties are payable *to an injured party*, they can "be viewed as a sort of compensation or redress" to that party. *Steel Co.*, 523 U.S. at 106. The penalties the States seek here will *not* be paid to any allegedly injured party; to the contrary, they will be paid to State treasuries. *See* note 16, *infra*.

of suit," civil penalties may "redress" such an injury as a "sanction that effectively abates that conduct and prevents its recurrence").

Thus, a plaintiff "lack[s] standing to seek civil penalties for violations that have abated by the time of suit." *Id.* at 187. This is an unvarying, black-letter rule: Plaintiffs "may not sue to assess penalties for wholly past violations," as opposed to violations "ongoing at the time of the complaint." *Id.* at 188.[7] The rule denying standing to seek penalties for past conduct applies squarely to the States: "state and local governments [do] not have standing to sue for past violations, as a payment to the Treasury would no more 'redress' the injury of these governments than it would redress [a citizen's] injury." *Steel Co.*, 523 U.S. at 129 (Stevens, J., concurring).

Likewise, to "seek injunctive relief," Plaintiffs "must show a continuing injury or threatened future injury, not a past one," and that "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur" in the future. *Book People, Inc. v. Wong*, 91 F.4th 318, 328-29 (5th Cir. 2024). As with any question of subject matter jurisdiction, this showing must be made "under the facts existing when the complaint is filed." *Lujan*, 504 U.S. at 569 n.4; *see also In re Technicool Sys., Inc.*, 896 F.3d 382, 386 (5th Cir. 2018) ("Standing is determined as of the commencement of the suit.").

### 4. It is Undisputed That RPO, DRS, and Project Bernanke Ended No Later Than 2019, Before Plaintiffs' Complaint Was Filed.

The three allegedly deceptive practices at the core of the DTPA claims—Reserve Price Optimization (RPO), Dynamic Revenue Sharing (DRS), and Project Bernanke—undisputedly ended by 2019, more than a year before Plaintiff filed suit. *See* ECF No. 1 (12/16/2020 Original

---

[7] *See also, e.g.*, *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991); *Mylonakis v. M/T GEORGIOS M.*, 909 F. Supp. 2d 691, 728 (S.D. Tex. 2012).

FILED UNDER SEAL

Complaint). Plaintiffs therefore lack standing to pursue civil penalties or injunctive relief related to those practices, so summary judgment should be granted on all such claims.

As Plaintiffs explained in arguing against Google's motion to dismiss, Plaintiffs' theories on RPO, DRS, and Bernanke all feature a "common starting place for [the alleged] deceit." ECF No. 260 at 9. According to Plaintiffs, "[w]ithout disclosing that it no longer operated using a sealed second-price [auction] model, Google changed the rules," such that its ad exchange no longer operated a truly "second-price" auction.[8] *Id.* Specifically, Plaintiffs claim that each of RPO (which increased the minimum reserve price in certain auctions, SOF ¶ 219), DRS (which allowed AdX to alter its revenue share to allow certain auctions to clear even if the high bid was too low to clear the reserve price adjusted for Google's fee, SOF ¶¶ 142-43), and Bernanke (which allowed Google Ads to alter its revenue share to optimize, by boosting or decreasing, its highest and second-highest bids, before submitting them to the AdX auction, SOF ¶¶ 113-14) resulted in bidders overpaying if they bid according to their actual willingness to pay (a common strategy in second-price auctions), rather than strategically endeavoring to bid only enough to win (a common strategy in first-price auctions). ECF No. 260 at 9-11, 19-27.

Plaintiffs admit each practice also had a common *ending point*: They explicitly plead that in 2019, Google "publicly migrated to a first-price auction, discarding [any] pretense of running a second-price auction." ECF No. 541 (Fourth Amended Complaint, hereinafter FAC) ¶ 346. As explained below, Plaintiffs concede that RPO, DRS, and Bernanke each made sense only in the context of a second-price auction and were therefore terminated by 2019. Plaintiffs thus have no

---

[8] In a typical second-price auction, the winning bidder pays the higher of the reserve price or the second-highest bid. As a result, bidders are incentivized to bid according to their actual values, rather than "shading" their bids (a strategy common in first-price auctions where the winner pays its bid) in an attempt to bid no more than necessary to win the auction. SOF ¶¶ 41-42.

FILED UNDER SEAL

evidence (because there is none) that any alleged "deception" associated with these optimizations was "ongoing" when they filed suit on December 16, 2020, nor do they have any evidence that these optimizations—designed to work within the construct of a second-price auction—were likely to recur in the future, after the transition to a first-price-auction. Accordingly, the States lack standing to seek relief as to any of RPO, DRS, or Bernanke.[9]

*Reserve Price Optimization (RPO).* Launched in 2015, RPO used historical data to increase certain reserve prices set by publishers, in hopes of bridging the large gap between the winning bid and the closing price in many auctions. SOF ¶ 219. When AdX ran a second-price auction—in which the winning bidder was charged the higher of (i) the second-highest bid or (ii) the reserve price—it made sense to optimize the reserve price, because it could determine the price the advertiser actually paid and the amount the publisher received. *See* SOF ¶¶ 41, 219. Plaintiffs claim (wrongly, *see* Section V(C), *infra*) that RPO was deceptive because it was not "disclosed," and if ad "buyers knew, they would change their bidding strategy," by bidding less than they are willing to pay, unlike in typical second-price auctions. ECF No. 260 at 20.

In a first-price auction, however, the only effect of an increased reserve price would be to potentially cause an auction to fail. SOF ¶ 41. As a result, as Plaintiffs' experts acknowledge, RPO "was deprecated in 2019 with the switch of AdX to the first-price auction format." Ex. 6 (Weinberg Rpt.) ¶ 274, as the change "to a first-price auction format on AdX [] effectively end[ed] the RPO program," Ex. 1 (Andrien Rpt.) ¶ 31. Plaintiffs also agree that RPO operates *only* in a second-price auction, and not in the context of the first-price auction adopted in September 2019. *See, e.g.*, *id.*

---

[9] Because Google voluntarily terminated RPO, DRS, and Bernanke before the Complaint was filed, this is a *standing* issue, not a *mootness* issue. Standing is "determined as of the date of the filing of the complaint." *Carr*, 931 F.2d at 1061. Mootness, in contrast, arises due to "compliance with the [law] *subsequent* to the filing of the complaint," and is tested under a more-stringent standard. *Id.* at 1061-62; *see also Laidlaw*, 528 U.S. at 170.

FILED UNDER SEAL

There is no dispute: RPO was not ongoing when Plaintiffs filed this lawsuit, and it was no threat to recur. SOF ¶ 224.

***Dynamic Revenue Sharing (DRS).*** Prior to 2019, Google implemented multiple versions of a DRS program to optimize the AdX second-price auction. Each addressed a common issue: to clear an auction, there had to be a bid above not just the reserve price, but above the reserve price adjusted to account for Google's fee, so the publisher could be paid at least its reserve price after deducting Google's fee from the winning advertiser's payment. SOF ¶¶ 142-43. AdX's default fee was generally 20% per impression sold via its exchange. SOF ¶ 39. That meant, for instance, that if the highest bidder bid only 15% above the reserve price, the auction would fail. DRS addressed this problem by allowing AdX to modify its fee on a particular transaction so that the auction could clear. SOF ¶¶ 144-45. Plaintiffs allege that this optimization was deceptive because "DRS meant that, contrary to Google's multiple representations, AdX did not function as a second-price auction," making the auction "untruthful." FAC ¶¶ 323-24.[10]

Plaintiffs' experts admit that DRS ended in 2019. *See, e.g.*, Ex. 6 (Weinberg Rpt.) ¶ 209 ("When AdX migrated to a first-price auction format in 2019, the DRS program was shut off."); Ex. 1 (Andrien Rpt.) ¶ 40 ("tDRS was in place from July 2018 until late 2019, when Google shifted to a first price auction format in AdX."); *see also* SOF ¶ 165. The transition to a first-price auction made DRS obsolete, foreclosing any likelihood that the alleged deception would recur. *See In re Google Digital Advertising Litig.*, 627 F. Supp. 3d 346, 403 (S.D.N.Y. 2022) ("The Complaint does not allege that … DRS [is a] program[] that [is] likely to recur."). Indeed, by definition, a

---

[10] In auction parlance, "truthfulness" means that a bidder's optimal strategy for a given auction is to bid its actual value, as opposed to strategically "shading" bids to a lower amount. SOF ¶ 42.

FILED UNDER SEAL

"first-price auction is not truthful," SOF ¶ 166 (quoting Ex. 6 (Weinberg Rpt.) ¶ 48), so following the transition to a first-price auction in 2019, the alleged DRS deception could not recur.

*Bernanke.* Google's Bernanke optimization was implemented by Google Ads, a buy-side tool for advertisers. SOF ¶ 110. The mechanics of the program are complex. *See* Section V(C)(3); *infra*; SOF ¶¶ 109-15. But relevant to standing, the issue is simple: the "deception" Plaintiffs allege is that the "Bernanke program surreptitiously switched Google's AdX exchange [away] from a second-price auction," *see* FAC ¶ 299, such that "[a]dvertisers would have shaded their bids" had they known about the program, *see* Ex. 6 (Weinberg Rpt.) p. 144.

Once again, Plaintiffs' expert admits that transition to a first-price auction "render[ed] the particular collusion mechanics of old Project Bernanke obsolete" and that, in a first-price auction, the central function of Bernanke "does not impact the auction at all." Ex. 6 (Weinberg Rpt.) ¶ 264. From September 2019 forward, Google Ads' bids into AdX were optimized by a program called Alchemist, not Bernanke. Under Alchemist, it is undisputed that bids were optimized in a manner that made advertisers' "participation in AdX's first-price auction truthful," performing on advertisers' behalf the very "bid shading" Plaintiffs allege would have happened under Bernanke absent deception. *Id.* ¶ 266; *see also* SOF ¶¶ 139-40. Once Alchemist became operative in September 2019, advertisers best responded by bidding truthfully. Ex. 18 (Weinberg Depo. Tr.) 273:2-14 (admitting that when "Alchemist was active," advertisers "would have best responded by bidding their true value"). Thus, as with RPO and DRS, not only did Project Bernanke end before the end of 2019, but the deception Plaintiffs allege Bernanke to have effectuated became impossible to recur.

\* \* \*

Google's public disclosures conclusively refute the States' omission claims, *see* Section V(C), *infra*, but for standing purposes the relevant facts are undisputed (indeed, explicitly alleged in Plaintiffs' pleading): In September 2019, when Google transitioned to a first-price auction, RPO, DRS, and Bernanke ended and the alleged deceptions related to them became impossible. *See, e.g.*, FAC ¶ 332 (alleging that deception created by RPO continued only until September 2019); *Google Digital Advertising*, 627 F. Supp. 3d at 402 ("The Complaint identifies … DRS as [a] scheme[] that concluded in 2019."); FAC ¶ 300 (alleging that the Bernanke deception occurred "[b]etween 2010 and September 2019"). Since RPO, DRS, and Bernanke were not ongoing when Plaintiffs filed this action on December 16, 2020 and could not recur in the context of a first-price auction, Plaintiffs lack standing to seek civil penalties or injunctive relief arising from these optimizations. *Laidlaw*, 528 U.S. at 170.

## B. The Attorneys General Lack Capacity to File Deceptive Trade Practices Claims in a Texas Federal Court.

Separate from Article III standing, each Attorney General also bears the burden to show it has the capacity to pursue the claims it has filed in this federal court. Under Federal Rule of Civil Procedure 17(b)(3), the question of capacity to sue is governed by Texas law. "Whether a party has capacity to sue is a question of law" that can and should be resolved at summary judgment. *Byrd v. Estate of Nelms*, 154 S.W.3d 149, 155 (Tex. App.—Waco 2004, pet. denied).

As shown below, virtually every state Attorney General lacks capacity to file DTPA claims in this federal court. Most of the state laws invoked in Count VI authorize their Attorney General to pursue DTPA claims *only* in their own state court. And *no* state can point to any DTPA provision authorizing its Attorney General to abandon its home forum and cross state lines to try to enforce the domestic law of its home state in a *Texas* federal court. Accordingly, because the States'

FILED UNDER SEAL

legislatures have not granted their Attorneys General authority to pursue these claims in any federal court, or in any court *outside* their own state, their claims in Count VI must be dismissed.

>    1. **Texas Law Does Not Permit any Attorney General to Exceed Statutory Limits on their Power.**

Even in states where the Attorney General has common law powers, those powers may be exercised only "*in the absence of express legislative provision to the contrary*." *Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 273-74 (5th Cir. 1976). The Supreme Court of every State appearing here as plaintiff has held, uniformly, that the power of the State's Attorney General to file suit may be limited by the state's legislature. *See* Appx. A.

The law of Texas, which governs capacity here, is even stricter: it limits the power of an attorney general to sue by requiring express, statutory authorization to do so. The Texas Supreme Court held well over a century ago that:

> *The attorney general has … no authority to bring a suit in the name of and for the benefit of the State, unless specially directed to do so by some legislative enactment*. He is not the political authority of the State, nor is he its guardian to determine when its rights of property have been invaded, unless when specially directed by legitimate power to investigate those rights, and to take the necessary legal steps to preserve them.

*State v. Delesdenier*, 7 Tex. 76, 84 (1851); *see also Day Land & Cattle Co. v. State*, 4 S.W. 865, 867 (Tex. 1887) (similar). That Court remains emphatic: the Attorney General may represent the State only where "the Legislature has provided for such representation." *El Paso Elec. Co. v. Tex. Dep't of Ins.*, 937 S.W.2d 432, 438 (Tex. 1996). Texas law is "clear that the powers and duties of the Attorney General are limited to those prescribed by the Constitution and statutes of Texas." *Rodriguez v. San Antonio Indep. Sch. Dist.*, 299 F. Supp. 476, 478 (W.D. Tex. 1969); *see also, e.g.*, *Texas v. Ysleta del Sur Pueblo*, 79 F. Supp. 2d 708, 712 (W.D. Tex. 1999) ("Texas courts have consistently held that the Texas AG is powerless to act in the absence of explicit statutory or constitutional authorization."). Applying this rule of Texas law, courts permit an Attorney General

to sue only where "specific authorization could be found in a relevant act" and "dismiss[] actions in which the AG attempt[s] to rely upon implied powers without express authority from the legislature." *Ysleta*, 79 F. Supp. 2d at 713 & n.9 (collecting cases).

The same is true in the other Plaintiff States. *See* Appx. A. Accordingly, each must show its legislature authorized it to file its DTPA claims in Texas federal court. No such authorization exists for the foreign States. Texas, for its part, has prevailed in arguing that it has none.

### 2. The DTPAs of Foreign States Do Not Authorize their Attorneys General to Bring Claims in Texas Federal Court.

For 13 Plaintiff States, their DTPAs contain restrictions that deprive their Attorneys General of capacity to sue anywhere *other than* in their own state courts. *See* Appx. A. This is dispositive of their capacity to sue. It requires that their actions be dismissed because their respective legislatures have not authorized them to abandon their home forum and cross state lines to file their state DTPA claims in a Texas federal court.

As to the three remaining States, the Florida and Indiana statutes do not specify where their Attorneys General may bring suit, Fla. Stat. § 501.207; Ind. Code § 24-5-0.5-4(c), while Utah allows its Attorney General to seek relief "in a court of competent jurisdiction," Utah Code § 13-11-17(1). But in none of these states is there any statutory provision authorizing the Attorney General to cross state lines and seek to enforce their state deceptive trade practices laws in a Texas federal court. Utah, in fact, *divests* its Attorney General of any such authority, defining the Attorney General's authority as "to enforce the statute ***throughout the State***." *Id.* § 13-11-7. More important, no provision of any state's law could authorize the wholly extraterritorial exercise of authority by a state officer. *See, e.g.*, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 375 (2023) ("[T]he usual legislative power of a State" is "to act upon persons and property within the limits of its own territory."); *see also* Section V(A), *infra*.

### 3. Texas Has Prevailed in Asserting that Its Attorney General Lacks Authorization to Pursue DTPA Claims in Federal Court.

The Texas DTPA provides that an action by the Attorney General "may be commenced *in the district court of the county* in which the person against whom it is brought resides, has his principal place of business, has done business, or *in the district court of the county* where the transaction occurred, or, on the consent of the parties, *in a district court of Travis County*."[11] Tex. Bus. & Com. Code § 17.47(b). No provision of the DTPA authorizes the Texas Attorney General to sue in federal court. *Id.; see also, e.g.*, *Media Matters for Am. v. Paxton*, 2024 WL 1773197, at *18 (D.D.C. Apr. 12, 2024) ("The Texas Code authorizes the Attorney General to seek restraint of future conduct and the imposition of civil penalties of up to $10,000 per violation *in a Texas state court*[.]"); *Texas State Troopers Ass'n, Inc. v. Abbott*, 2014 WL 12479651, at *5 n.2 (W.D. Tex. Apr. 16, 2014) (The "venue for DTPA enforcement actions lies *in state court*").

In another DTPA action against Google that he filed in Texas *state* court, the Texas Attorney General prevailed in resisting removal to federal court, arguing that the Texas legislature's choice of *state* court as the proper forum for DTPA claims supported remand. According to the Texas Attorney General, "under the authority granted it by the Texas legislature in § 17.47, the State is empowered to seek injunctive relief, civil penalties, and restitution for identifiable consumers *in state district court*." *Texas v. Google LLC*, No. 4:22-CV-636 (S.D. Tex.), ECF No. 19 at 2. The Attorney General defended the legislature's decision to select a state-court forum as serving a critical purpose: "Refusing to remand this litigation would open the doors of federal courthouses across the country for consumer protection cases that are bread-and-butter mainstays of state court dockets across the country." *Id.*, ECF No. 38 at 11; *see also id.* at 17

---

[11] As this Court is aware, the district court is Texas's state "court of general jurisdiction." *Texas Windstorm Ins. Ass'n v. Pruski*, 689 S.W.3d 887, 891 (Tex. 2024).

("[T]his is a garden-variety DTPA state enforcement action, **one that belongs in Texas state court**."). Emphasizing that "[t]wo courts have previously addressed the question of whether removal of a DTPA claim brought by the Attorney General was proper, and both courts promptly remanded," the Attorney General urged the federal court to "remand this DTPA enforcement action back to the state court in which it belongs." *Id.* at 1, 8 (citing *Texas v. Veterans Support Org.*, 166 F. Supp. 3d 816, 820 (W.D. Tex. 2015); *Texas v. Eye Level Holdings LLC*, No. A-11-CA-178-SS (W.D. Tex. Mar. 11, 2011)).

The court agreed with Texas, remanding the State's DTPA action to a Texas state court. 2023 WL 113732, at *6 (S.D. Tex. Jan. 5, 2023). Because Texas itself contends it lacks legislative authorization to act in federal court under the DTPA, its DTPA claims must be dismissed. *See, e.g.*, *State ex rel. Downs v. Harney*, 164 S.W.2d 55, 56 (Tex. Civ. App.—San Antonio 1942, writ ref'd w.o.m.).

In sum, whether prohibited expressly by statute or by the lack of express authorization, each Attorney General lacks capacity to bring these DTPA claims in this federal court.

## IV.    Dismissal is Also Warranted Under 28 U.S.C. § 1367.

The Court should also exercise its discretion to dismiss the DTPA claims asserted in Count VI. A federal court's power to resolve state-law claims "need not be exercised in every case in which it is found to exist" because supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims[.]" *Id.* Federal courts may decline to exercise supplemental jurisdiction over a state-law claim if (1) "the district court has dismissed all claims over which it has original jurisdiction," (2) "the claim raises a novel or complex issue of State law," (3) "the claim substantially predominates over the claim … over

**FILED UNDER SEAL**

which the district court has original jurisdiction," or (4) "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). The grounds for dismissal in Section 1367 are disjunctive. The existence of any is sufficient. Here, all are present, so dismissal should be granted.

First, if the Court grants summary judgment against Plaintiffs' federal antitrust claims, the "general rule" in the Fifth Circuit is "to dismiss state claims when the federal claims to which they are pendent are dismissed." *Parker & Parsley Petroleum Co. v. Dresser, Ind.*, 972 F.2d 580, 585 (5th Cir. 1992); *see also Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989) (same).

Second, there is no question the novelty factor is met. Plaintiffs seek to chart an entirely new path, demanding tens of billions of dollars in DTPA penalties with *no* proof of individualized injury. Retaining these claims through trial would require this Court to resolve numerous unsettled questions of state law for 16 different foreign jurisdictions including, for example: whether each Attorney General may prosecute a DTPA action without evidence of any injured consumer in their state, how to count violations for purposes of assessing "per violation" penalties, and whether disclosed conduct can nevertheless amount to an intentional or willful violation. Such demands by States for aggregated, multi-billion-dollar penalties without proof of individualized harm has been rejected by at least two federal courts, *see In re Zyprexa Products Liab. Litig.*, 671 F. Supp. 2d 397, 459 (E.D.N.Y. 2009) (Mississippi); *In re Vioxx Prod. Liab. Litig.*, 2010 WL 11570867, at *7 (E.D. La. Mar. 31, 2010) (Louisiana). Here, it requires this Court to determine whether any of the other 15 States' laws, or the Constitution, would permit an award of penalties without any proof of individualized harm.

Third, the DTPA claims overwhelm and "substantially predominate" over the federal antitrust claims to which they are purportedly anchored, both in terms of "the scope of issues

raised" and in particular "the remedy sought." *See United Mine Workers*, 383 U.S. at 726–27. The up-to $124 billion in "per violation" DTPA penalties the States seek swamps their federal antitrust claim in scale and size. If granted, it would reflect the largest monetary judgment anywhere in the United States, ever, violating in the process the Excessive Fines and Due Process Clauses of the Constitution.

Fourth and finally, the circumstances here are extraordinary. If they proceed in this federal court, the States' novel DTPA theories would require the Court to develop expertise it does not have in the laws of 16 states spanning the entire continent from Alaska to Florida—plus the Commonwealth of Puerto Rico. This Court has no reason to expend its scarce resources to develop "substantial familiarity," *Enochs v. Lampasas County*, 641 F.3d 155, 159 (5th Cir. 2011), with the granular aspects of the DTPAs of more than a dozen foreign states when that law is already well known in those states' courts. Nor is there any justification for subjecting a jury of Texas citizens to the burden of deciding the merits of claims under the laws of 16 other states whose citizens ought, rightly, to bear that burden themselves (*if* this really *is* an issue of importance to the citizens in those states). Among other burdens, each State's claim requires proof of distinct elements, involves different definitions of unlawful conduct, applies varied limitations periods, and provides unique defenses.

There are also extraordinary implications for federalism. Each state legislature authorized its Attorney General to file DTPA claims only in the state's own courts. *See* Section III(B), *supra*. Texas has elsewhere argued that state consumer protection cases are the bread-and-butter mainstays of state court dockets. *See* Section V(A), *supra*. This admission is yet another reason this Court should not expend scarce federal judicial resources to resolve state DTPA claims that the state courts are well equipped to address.

FILED UNDER SEAL

## V.     Plaintiffs' Claims Also Fail on Their Merits.

### A.     State Deceptive Trade Practices Laws Do Not Apply to Conduct that Occurred Outside the State.

The States allege that Google's practices injured unspecified advertisers, publishers, and consumers in undisclosed locations—without identifying any specific violations that occurred in each Plaintiff State. *See, e.g.*, FAC ¶ 728 ("Google's conduct was and is directed at consumers *nationwide*, including in Nevada[.]"). Pursuant to the U.S. Constitution, however, no state has authority to regulate conduct that occurred in other states. Only violations that occurred within the borders of a particular state can be made unlawful and penalized by *that state's* laws. Accordingly, absent proof of state-specific conduct and injury, each of the DTPA claims fails.

### 1.     The Constitution Precludes Extraterritorial Application of State Law.

The Constitution "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders[.]" *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642–643 (1982) (plurality op.)). The "reach of one State's power" is constrained by the Due Process, Full Faith and Credit, and Commerce Clauses, as well as "the Constitution's structure and the principles of 'sovereignty and comity' it embraces." *Nat'l Pork*, 598 U.S. at 376. Limiting the "power of a State to act upon persons and property *within the limits of its own territory*" is "a feature of our constitutional order that allows 'different communities' to live 'with different local standards.'" *Id.* at 375 (quoting *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881); *Sable Com. of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989)). As a result, no State "may prosecute the citizen of another State for acts committed outside the first State's jurisdiction that are not intended to produce or that do not produce detrimental effects within it."

FILED UNDER SEAL

*Id.* at 375-76. At bottom, an unbroken line of cases establishes that a claim cannot proceed if it would "directly regulate[] out-of-state transactions." *Id.* at 376 n.1.[12]

Most states apply a constitutional-avoidance presumption against extraterritorial application of their laws: statutes are limited to in-state conduct absent a clearly stated intent to regulate foreign conduct. *See, e.g.*, *Pharm. Rsch. & Manufacturers of Am. v. Fitch*, 2024 WL 3277365, at *13 (S.D. Miss. July 1, 2024) ("Unless the intention to have a statute operate beyond the limits of the state or country is clearly expressed or indicated," "a Court interpreting Mississippi law applies a 'presumption that a statute is intended to have no extraterritorial effect.'"); *CocaCola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 682 (Tex. 2006) ("[A] statute will not be given extraterritorial effect by implication but only when such intent is clear."). In those states, including 14 of the 17 Plaintiff States,[13] a court first examines whether the state law was clearly intended to operate beyond the state's borders. If not, the inquiry ends there. And in all states, the U.S. Constitution constrains a state's power to penalize extraterritorial conduct.

---

[12] The Louisiana DTPA goes beyond the constitutional minimum, requiring proof that (a) "the consumer is a resident of this state [Louisiana] at the time of the consumer transaction," and (b) the transaction is "made in this state," meaning "(1) a writing signed by the consumer and evidencing the obligation is received by the merchant in this state, or when (2) the merchant negotiates in this state personally or by mail, telephone or otherwise, for a transaction with a consumer consummated outside the state." La. Stat. § 51:1418 ("Jurisdiction"). Louisiana cannot point to any evidence of specific transactions meeting these criteria.

[13] *See also MST Mgmt., LLC v. Chicago Doughnut Franchise Co., LLC*, 584 F. Supp. 3d 923, 933 (D. Nev. 2022); *Howard v. Kerzner Int'l Ltd.*, 2014 WL 714787, at *5 (S.D. Fla. Feb. 24, 2014); *Wright-Moore Corp. v. Ricoh Corp.*, 794 F. Supp. 844, 860 (N.D. Ind. 1991); *Nevares v. M.L.S.*, 345 P.3d 719, 727 (Utah 2015); *Hetman v. Schwade*, 317 S.W.3d 559, 564 (Ark. 2009); *Doctors Hosp. of Augusta, LLC v. CompTrust AGC Workers' Compen. Tr. Fund*, 636 S.E.2d 862, 863-64 (S.C. 2006); *Mendonca v. Tidewater Inc.*, 862 So. 2d 505, 509 (La. Ct. App. 2003); *Union Underwear Co. v. Barnhart*, 50 S.W.3d 188, 190 (Ky. 2001); *Phillips v. Consol. Supply Co.*, 895 P.2d 574, 577 (Idaho 1995); *Green Giant Co. v. Tribunal Superior*, 104 D.P.R. 489, 4 P.R. Offic. Trans. 682, 692 (Dec. 19, 1975); *Veigel v. Dakota Tr. & Sav. Bank*, 225 N.W. 657, 659 (S.D. 1929); *Stanley v. Wabash, St. L. & P. Ry. Co.*, 13 S.W. 709, 710 (Mo. 1890).

> **2.  Absent Any Evidence of In-State Conduct, the States' Claims Fail to Raise a Genuine Issue of Fact on Nexus.**

To obtain relief under their respective DTPA laws, each State must show that unlawful conduct occurred *in that state*. Plaintiffs here have made no effort to connect the alleged violations for which they seek penalty relief to conduct within their own borders. Absent evidence of harm in each State, there is no basis for any State to recover either the injunctive relief or civil penalties they demand.

Illustrative of the problem, the Complaint correctly states that Google is a Delaware corporation headquartered in California. FAC ¶ 32. It then imagines a transaction in which Disney, also a Delaware corporation headquartered in California, purchases ad space on the website of *USA Today*, which is owned by a Delaware corporation headquartered in Virginia. *Id.* ¶ 42. Assuming that transaction flowed through Google products, the Complaint alleges injury to the advertiser and publisher as well as competitors Microsoft (incorporated and headquartered in Washington) and Yahoo! (incorporated in Delaware and headquartered in California). *Id.* ¶ 294. Plaintiffs' own example proves the insurmountable hurdle they face: *None* of the Plaintiff States has any connection to this transaction or to any hypothetical injury that might have arisen from it. There is no legally permissible basis for the Attorneys General to apply their home-state laws to conduct that occurred "wholly outside" the boundaries of their states. *Healy*, 491 U.S. at 336.

> **a.  The States' Own Evidence Does Not Raise a Genuine Issue on Nexus.**

After the close of discovery, the States have no proof of nexus at all, much less the nexus required to support the multi-billion dollar penalties they demand. The States point to *no* complained-of conduct that actually occurred within their individual borders.[14] Pressed to explain

---

[14] Evidence of some in-state effect is not sufficient. *See Healy*, 491 U.S. at 336-37 ("[T]he Commerce Clause…precludes the application of a state statute to commerce that takes place

the nexus to Alaska, for example, the State's 30(b)(6) representative testified only that "what became apparent was that the Google conduct that we focused on in the ad tech matter was *national in scope* and therefore impacted Alaskans." Ex. 176 (Pickett Depo. Tr.) at 21:7-11. "The State of Alaska has not talked to a specific advertiser based in Alaska or a specific publisher based in Alaska. As part of our investigation, *we have not done that.*" *Id.* at 42:18-22. Ultimately, Alaska admits there are *no* facts specific to Alaska that support its state-law claims. *Id.* at 44:24-45:3, 64:15-20. In fact, every State admitted in its deposition that it cannot connect its penalty demand to evidence of in-state conduct or harm. SOF ¶¶ 238-255.

Plaintiffs' assertion that Google's conduct is "nationwide," and their *assumption* that there must have been some in-state impact, do not meet their burden to *prove* that deceptive transactions occurred in each State. In one analogous case, a Massachusetts resident was not permitted to invoke the Texas DTPA to sue Apple, a California company, for alleged misleading representations related to a computer he purchased in New York. *See Deburro v. Apple, Inc.*, 2013 WL 5917665, at *5 n.5 (W.D. Tex. Oct. 31, 2013). That Apple sells its computers nationwide, including in Texas, was not enough to allow application of Texas law to this purely extraterritorial transaction. Texas's DTPA "is directed at Texas consumers" and requires that a transaction be "*connected to* the state of Texas." *Id.* "The DTPA does not extraterritorially apply to acts occurring outside of Texas." *Id.* (quoting *Birdsong v. Toyota Motor Credit Corp.*, 2002 WL 32830975, at *4

---

wholly outside of the State's borders, *whether or not the commerce has effects within the State*."); *Edgar*, 457 U.S. at 642–43 (same); *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 310–11 (1981) ("[I]f a State has only an insignificant contact with the parties and the occurrence or transaction, application of its law is unconstitutional."); *Deburro v. Apple, Inc.*, 2013 WL 5917665, at *5 n.5 (W.D. Tex. Oct. 31, 2013) ("The DTPA does not extraterritorially apply to *acts occurring outside of Texas*."). In any event, the States have not even identified proof of in-state effects related to the violations for which they seek relief.

FILED UNDER SEAL

(Tex. Dist. May 15, 2002) ("Because TMCC's activity occurred exclusively in Wisconsin and Illinois, the DTPA does not apply to any TMCC acts.")).

### b. The States' Experts Do Not Raise a Genuine Issue on Nexus, Either.

Because they have no evidence of specific transactions that occurred *in each state* to show nexus as the law requires, the States now rely on expert opinions. But these opinions do not raise a genuine issue of material fact for trial on nexus, either. Separately, Google has moved to exclude the relevant opinions of Dr. Weinberg and Mr. Andrien. Our point here is that, even if admissible, this "evidence" fails to raise an issue of fact for trial.

At summary judgment, courts must "look to the basis of the expert's opinion, and not the bare opinion alone." *McManaway v. KBR, Inc.*, 852 F.3d 444, 449 (5th Cir. 2017). Courts should not accept opinions that are "connected to existing data only by the ipse dixit of the expert" and that have "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also McManaway*, 852 F.3d at 449 ("A claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness."). An expert's "assumptions must have some factual basis in the record and an underlying rationale." *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 806–07 (N.D. Tex. 2018). Plaintiffs' experts fail these tests.

**Dr. Weinberg.** The States' auction expert, Dr. Weinberg, admits he has *no* proof of injury as to *any* particular transaction. SOF ¶ 256; page 9, *supra*. His testimony provides *no* evidence of nexus as to any State and cannot raise a genuine issue of material fact for trial.

**Mr. Andrien.** Rather than proving wrongful conduct in each state, as the Constitution requires, Plaintiffs offer Mr. Andrien to support their demand for *aggregate* penalties. We set Mr. Andrien's method out below, not because it is admissible (it is not), but rather to demonstrate

**FILED UNDER SEAL**

that—even if deemed admissible for some purpose—it does not raise a genuine issue of material fact as to the required nexus between conduct *in each state* and the penalties the States seek.

Plaintiffs urge the Court to allocate multi-billion dollar penalties based not on proof of transactions or harm, but rather based on data reflecting *household internet usage* in each state. Specifically, Mr. Andrien "estimate[s]" Google's "advertising revenue and profit associated with each state" by using Census data to approximate what percentage each state represents of the nation's total *internet usage*. Ex. 1 (Andrien Rpt.) ¶¶ 94, 97-98. This does not prove misconduct or harm within any individual state. To state the obvious, the extent of household internet usage in a given state is not proof that actual ad purchases or sales, or actual use of Google's ad tech tools, occurred in any particular State (much less *each* of them, from Alaska to Puerto Rico).

Mr. Andrien suggests, at most, a small percentage *chance* that any particular transaction occurred in any particular state. *See* Ex. 1 (Andrien Rpt.) at Ex. 1 (showing "state internet populations" ranging from 0.22% in Alaska to 9.04% in Texas). This is no evidence of which—or indeed whether any—transactions *in fact* occurred in a given state and are therefore subject to Alaska's or Texas's law. In effect, Plaintiffs seek to apply Alaska law to 0.22% of all alleged violations, no matter where those transactions *actually* occurred. Plaintiffs' back-of-the-envelope guesstimates do not raise a genuine issue of fact to show conduct or even harmful effects "within the limits of [a State's] own territory." *Nat'l Pork*, 598 U.S. at 375.

Even worse, Mr. Andrien's rebuttal report abandons any pretext of calculating the number of violations per state. This renders the States' penalty demand unrecoverable as a matter of law: Each state's law authorizes only civil penalties *paid to the state* upon proof of conduct violating

**FILED UNDER SEAL**

*that state's* statute. *See, e.g.*, Tex. Bus. & Com. Code § 17.47(c).[15] Mr. Andrien's rebuttal report ignores this strict proof requirement. In its place, he substitutes a lawless, "holistic" approach to determining penalties, Ex. 10 (Andrien Rebuttal Rpt.) ¶¶ 7, 11, 41, 70, 84, asserting that the "the [penalty] amount per violation will not necessarily linearly change should the number of violations change," *id.* ¶ 20. This "holistic" framework erases the individual definitions, elements, and tests unique to each state law, all of which Mr. Andrien took pains to set forth in his opening report. *See id.* ¶¶ 56-75.

Among its many other fatal flaws, Plaintiffs' approach to penalties, as sponsored by Mr. Andrien, obliterates the nexus requirement. Plaintiffs have no proof that Mr. Andrien's claimed "penalties" bear any nexus at all, much less the sufficient nexus that each State must prove, to demonstrate liability and obtain an award of penalties under each State's individual DTPA.

Absent any proof that Google engaged in unlawful conduct in a particular State, that State's claims must fail.

### B. The Penalties Sought by the States are Grossly Disproportionate, in Violation of the Due Process Clause.

In response to the Court's order requiring them to clarify "precisely what remedies Plaintiffs request in this action," ECF No. 314 at 2, the States waived any claim for *damages*. Now, the only monetary relief they seek consists of *penalties* against Google. *See* ECF No. 366 at 1-2. Depending on which of Plaintiffs' "penalties experts" one looks to, Plaintiffs claim entitlement to

---

[15] *See also* Alaska Stat. § 45.50.551(b); Ark. Code § 4-88-113(a)(3); Fla. Stat. § 501.2075; Idaho Code § 48-606(5); Ind. Code § 24-5-0.4(g); Ky. Rev. Stat. § 367.990(2); *State, by & through Caldwell v. Astra Zeneca AB*, 249 So. 3d 38, 45–46 (La. App. 1 Cir. 4/11/18); Miss. Code § 75-24-19(1)(b); Mo. Stat. § 407.100(6); Mont. Code § 30-14-142(2); Nev. Rev. Stat. § 598.0999(2), §228.332; N.D. Cent. Code § 51-15-11; 10 L.P.R.A. § 259(i) (Puerto Rico); S.C. Code § 39-5-110(a); SDCL § 37-24-27; Utah Code § 13-11-17(4)(b).

<u>FILED UNDER SEAL</u>

between $22 billion[16] and $124 billion[17] for Google's alleged violations of their respective DTPAs—penalties they claim they can recover without any proof of, or even reference to, *actual harm* caused by Google's conduct. Neither the applicable state laws nor the Constitution permits this.

Abstract judgments about the possible scale and range of an appropriate punishment belong in the first instance to the legislature, but the constitutional prohibition on the *application* of excessive penalties operates as a restraint on every State's legislative judgment. Ultimately, it is for the Court to decide what penalty is proportional to the alleged offense. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 437 (2001); *see also State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (Proportionality is an "application of law."). The purely legal nature of this question makes resolution of a request for limitations of punitive damages and penalties appropriate for summary judgment. *E.g.*, *Rockwell Int'l Corp. v. M/V Incotrans Spirit*, 998 F.2d 316, 317 (5th Cir. 1993) (affirming partial summary judgment capping damages).

> **1. State Law Bars the States from Demanding Penalties Without Individualized Proof of Harm.**

The States' demand for aggregated penalties, without proof of individualized harm, fails as a matter of law. In *Zyprexa*, the court comprehensively considered the Mississippi statute invoked here, and ruled it did not permit Mississippi to recover penalties without proof of individualized harm. Specifically, the court granted summary judgment after finding that Mississippi "has not offered the kind of individualized information relating to each [transaction] that is needed to enable the requisite inquiry by the court in imposing discretionary penalties." *Zyprexa*, 671 F. Supp. 2d at 459. Courts have also held that aggregate proof is insufficient under

---

[16] Ex. 1 (Andrien Rpt.) ¶ 11(h).
[17] Ex. 200 (DeRamus Rpt.) ¶ 117.

Louisiana law, *see In re Vioxx Prod. Liab. Litig.*, 2010 WL 11570867, at \*7 (E.D. La. Mar. 31, 2010), and Florida law*, see Ironworkers Local Union No. 68 v. Astrazeneca Pharmaceuticals LP*, 585 F. Supp. 2d 1339, 1344-45 (M.D. Fla. 2008). And under the plain language of the statutes, aggregate proof of penalties without proof of individualized harm should be insufficient under the law of every state. *See Zyprexa*, 671 F. Supp. 2d 458-59 (although Mississippi's "statute does not specify what factors are to inform the court's [penalty] determination," "proper assessment of the claimed penalties would require individualized consideration of the circumstances of each prescription alleged to be in violation of the statute").

### 2. The Due Process Clause Prohibits Assessment of Penalties Without Proof of Individual Harm.

The Due Process Clause also prohibits an award of penalties against Google without proof of individualized harm. Bedrock constitutional principles dating back to the Magna Carta limit state authority to impose any "economic sanctions" that are grossly disproportionate to actual harm caused. *Timbs v. Indiana*, 586 U.S. 146, 151 (2019); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996) ("The Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor.").[18] This alone forecloses any award of penalties because Plaintiffs have no proof of individualized harm.

---

[18] The Eighth Amendment's Excessive Fines Clause, which is incorporated against the States by the Due Process Clause, also prohibits imposition of excessive penalties. *See Timbs*, 586 U.S. at 151. The Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" *United States v. Bajakajian*, 524 U.S. 321, 327-28 (1998) (quoting *Austin v. United States*, 509 U.S. 602, 609-10 (1993)). Google reserves and does not waive its ability to make an Excessive Fines Clause argument if partial summary judgment is not granted on its Due Process claims. Google does not fully brief this issue at this stage solely because "challenges under the Excessive Fines Clause are not ripe before a 'final forfeiture order or judgment has been entered.'" *Schanzle v. Haberman*, 831 Fed. App'x 103, 108 (5th Cir. 2020). Partial summary judgment limiting damages and penalties, by contrast, is an appropriate form of prejudgment judicial relief, *e.g., Rockwell*, 998 F.2d at 317, and here, it would prevent a potentially catastrophic violation of Google's constitutional right to be free of excessive fines.

The prohibition on excessive fines applies whether the monetary penalty comes in the form of punitive damages or a civil penalty. *Cooper*, 532 U.S. at 434–35 (citing *United States v. Bajakajian*, 524 U.S. 321, 336 (1998) (holding civil forfeiture of $357,144 in currency would be grossly disproportionate and constitutionally excessive where the only offense was failure to report the currency when attempting to leave the United States with it for an otherwise lawful purpose)); *see also Timbs*, 586 U.S. at 151 (The Constitution constrains excessive "economic sanctions" and requires that they be "proportioned to the wrong."). In both contexts, the Supreme Court has "focused on the same general criteria": (1) "the relationship between the penalty and the harm to the victim caused by the defendant's actions," (2) "the sanctions imposed in other cases for comparable misconduct," and (3) "the degree of the defendant's reprehensibility or culpability." *Cooper*, 532 U.S. at 435; *see also Gore*, 517 U.S. at 574–75 (same). Under these guideposts, the DTPA penalties sought by the States are unconstitutional. At a minimum, Google is entitled to partial summary judgment limiting any penalties imposed, consistent with Supreme Court precedent, to no more than four times the dollar value of actual damage—if any—that the States can prove at trial.

### a. The Penalties Have No Reasonable Relation to Any Harm Alleged by the States.

The "most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the *actual harm* inflicted on the plaintiff." *Gore*, 517 U.S. at 580. This dooms Plaintiffs' penalty claims outright. Without *proof* of actual harm there is *no ratio* to which an award of penalties could ever be proportional or constitutional.

The Supreme Court's constitutional analysis is informed by the legal history and tradition "dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S.

FILED UNDER SEAL

408, 425 (2003). That longstanding history "demonstrate[s] what should be obvious: ***Single-digit multipliers are more likely to comport with due process***, while still achieving the State's goals of deterrence and retribution," rather than awards with ratios of dozens, hundreds, or thousands to one. *Id*. (invalidating $145 million punitive damage award where compensatory damages were only $1 million); *see also Gore*, 517 U.S. at 582 (invalidating $2 million punitive penalty that had 500 to 1 ratio against actual harm). Applying this principle, the Supreme Court has held that "an award of more than ***four times*** the amount of compensatory damages might be close to the line of constitutional impropriety." *State Farm*, 538 U.S. at 425 (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991)).

The States' claims fail to raise a genuine issue of fact on two grounds: there is no proof of any harm, and the States make no effort to show the penalties they demand are proportional to any harm caused.

***No Evidence of Harm.*** The States have long since abandoned any attempt to show actual harm. In defending their Complaint, the States admitted they did not "lay out harm to specific parties," and trumpeted their belief that a "public DTPA enforcement action does *not* require reliance, injury, [or] damages," ECF No. 260 at 9, 15; *see also* 4/18/2024 Hrg. Tr. at 80-81. Under the Constitution, this is flatly wrong; Plaintiffs must prove actual, individual harm *so that* the Court can assess the proportionality of the penalties they demand. The States have produced no evidence that ad buyers or ad sellers were actually injured, within each state boundary, by Google's actions. *See* Section V(A), *supra*. Their liability expert disclaims any knowledge of actual injury— admitting it was not even "part of [his] assignment to identify specific advertisers or publishers who were deceived," if any. Ex. 18 (Weinberg Depo. Tr.) 243:8-20. Neither did their supposed penalties expert, who instead opined that the relevant metric for his calculation was not harm, but

rather the "benefit" to Google, which he defines to include *all* of "Google's display advertising profit," Ex. 1 (Andrien Rpt.) ¶¶ 118-19, without showing or calculating harm to anyone, much less harm caused by the *deception* Plaintiff allege.[19]

Plaintiffs' extreme position leaves them with *no* evidence of harm. The reason Plaintiffs elected not to prove the purported "harm" caused by Google's ad tech optimizations is apparent: any such calculation would show that Google's customers were *better off* as a result of the optimizations underlying Plaintiffs' DTPA claims. *See, e.g.*, SOF ¶¶ 159, 162-64, 116, 122-28.

***No Connection Between Penalties and Harm.*** The States also make no attempt to tie the calculation of penalties to any actual harm purportedly caused by Google's allegedly deceptive conduct. Dr. DeRamus's improper "rebuttal" report on penalties should be stricken, *see* ECF No. 613, but he too adopts Plaintiffs' harm-is-irrelevant-to-penalties approach. Though he admits "a defendant's benefit … may *not* equal the harm to the plaintiff … or other parties," Ex. 200 (DeRamus Rpt.) ¶ 22, Dr. DeRamus never purports to quantify the harm to anyone. Instead, he adopts (unreliable) estimates of Google's expected benefit from the programs at issue, considers the purported "probability of detection," and discusses what he claims is the performance of *Google's* stock. *See* Daubert Motion, Section IV. All of these opinions about the purported *benefits* to Google miss the mark entirely: state penalties are recoverable only where they are proportional to the *harm* (if any) caused to their residents. Proportionality is not shown by calculating the

---

[19] Mr. Andrien would count literally "all" auctions on AdX from 2013 through the present— ▮▮▮▮▮▮▮▮—as DTPA violations. Ex. 1 (Andrien Rpt.) ¶ 11(d). He claims that "regardless of whether the specific auction was directly touched by [an allegedly deceptive] conduct," because auction participants were "in the dark" about the conduct, every auction violated the DTPA. Ex. 10 (Andrien Rebuttal Rpt.) ¶ 130. That's wrong. *See, e.g.*, Tex. Bus. & Com. Code § 17.46(b)(24) (nondisclosure is actionable only if "intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed").

FILED UNDER SEAL

alleged benefits to Google; it cannot start "from the defendant's wealth rather than harm." *United States v. Dish Network LLC*, 954 F.3d 970, 980 (7th Cir. 2020).

### b. The Penalties Surpass Sanctions Imposed in Comparator Cases.

The next guidepost is the "disparity" between the amounts awarded in a particular case with the "civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 428. Here, the penalty sought by the States is as much as ***$124 billion***. This staggering sum is more than ***27 times larger*** than the penalties assessed against BP in the Deepwater Horizon oil spill, which killed 11 people and contaminated over 43,000 square miles of surface waters.[20]

### c. The Penalties Do Not Align with Google's Alleged Culpability.

That the States seek penalties purely for economic harm also matters. "As the Court stated nearly [172] years ago, exemplary damages imposed on a defendant should reflect 'the enormity of his offense.'" *Gore*, 517 U.S. at 575 (quoting *Day v. Woodworth*, 13 How. 363, 371 (1852)). "This principle reflects the accepted view that some wrongs are more blameworthy than others." *Id.* In *Gore*, the Supreme Court analyzed BMW's culpability for a deceptive trade practice in which BMW was repainting new cars that had been damaged during shipping and then selling the cars as new. *Id.* at 563–64. The plaintiff in *Gore*—who purchased one such car—proved only $4,000 in actual damages but received $2,000,000 in punitive damages, based largely on allegations that BMW had sold nearly 1,000 similar cars in the state. *Id.* at 564. Despite the repeated, intentional nature of the alleged violations which represented "a nationwide pattern" of misconduct, the Supreme Court held that "none of the aggravating factors associated with particularly reprehensible conduct is present." *Id.* at 576. As the Court explained, the harm "was purely

---

[20] Clifford Krauss & John Schwartz, *BP Will Plead Guilty and Pay Over $4 Billion*, The New York Times (Nov. 15, 2012); *see also Sierra Club v. Nat'l Marine Fisheries Serv.*, 2024 WL 3860211, at *2 (D. Md. Aug. 19, 2024).

economic in nature," and "BMW's conduct evinced no indifference to or reckless disregard for the health and safety of others," so it was not "sufficiently reprehensible to justify a significant sanction in addition to compensatory damages." *Id.* The Court was "fully convinced that the grossly excessive award imposed in this case transcends the constitutional limit." *Id.* at 585–86. Since *Gore*, courts have repeatedly emphasized that economic harms are categorically less reprehensible than violations that involve "physical" injury or a threat to "health and safety." *State Farm*, 538 U.S. at 419; *see also, e.g.*, *Grant ex rel. United States v. Zorn*, 107 F.4th 782, 800 (8th Cir. 2024) (vacating a punitive sanction in a False Claims Act case because, even though the sanction was "within the FCA's and IFCA's statutory limits," the reprehensibility of the defendants was lowered by the fact that they caused only "economic loss").

Here, as in *Gore*, the only harms the States have ever claimed are purely economic. The States have not alleged that the purported DTPA violations involved violence, physical harm, or a threat to anybody's safety. The purely economic nature of Google's unproven and unquantified harm lowers Google's alleged culpability.

### 3. Plaintiffs Cannot Avoid this Federal Constitutional Issue Based on the Maximum Fines Provided for in State Statutes.

The States may argue the exorbitant penalties they seek are constitutionally permissible because, on a per-violation basis, they fall below the statutory caps of $1,000 to $25,000 per violation. *See* Ex. 1 (Andrien Rpt.) ¶ 102, tbl. 3. Courts have squarely rejected that argument, for the unsurprising reason that states cannot legislate around the federal Constitution. It is the "absolute *amount* of the award, not just the amount per violation, [that] is relevant to whether the award is 'so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.'" *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 963 (8th Cir. 2019) (holding that "$1.6

**FILED UNDER SEAL**

billion is a shockingly large" penalty to generate from a statute that allows only $500 in penalties per violation).

The mere fact that a state legislature has authorized a penalty does not shield the penalty from constitutional review. To so hold would be "like letting the driver set the speed limit." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1318 (11th Cir. 2021) (Newsom, J., concurring). The constitutional limit on state power is a crucial bulwark of liberty because "fines may be employed 'in a measure out of accord with the penal goals of retribution and deterrence,' for '***fines are a source of revenue***.'" *Timbs*, 586 U.S. at 153 (quoting *Harmelin v. Michigan*, 501 US. 957, 979 n.9 (1991)). The Supreme Court has specifically warned that states may try to use their penalty powers to overstep their regulatory role. *See Gore*, 517 U.S. at 585 ("While each State has ample power to protect its own consumers, none may use the punitive damages deterrent as a means of imposing its regulatory policies on the entire Nation.").

Concerns about fines as a source of revenue are well placed here. The States make no pretext: they hope to extract billions of dollars in penalties from Google and then deposit Google's money into the States' own treasuries. The States do not demand penalties to reimburse any injured ad buyer or ad seller because they have no proof of such injuries. In similar circumstances, the Court in *Zyprexa* held that Mississippi's attempts to impose "per violation" penalties untethered to proof of harm—the same demand Mississippi and other State Plaintiffs make here—was unconstitutional under the Due Process and Excessive Fines Clauses. Such an approach, the Court held, "would result in a multibillion dollar cumulative penalty grossly disproportionate to both the injury Mississippi has suffered and the seriousness of [Defendant's] alleged misconduct." 671 F. Supp. 2d at 463. In addition to granting summary judgment because Mississippi had no individualized proof of harm, *id.* at 459, the *Zyprexa* Court wrote starkly to explain why

FILED UNDER SEAL

Mississippi's attempt to impose massive, per violation penalties under its DTPA could not be countenanced, under the Constitution or otherwise:

> If allowed to proceed in their entirety, the State's claims could result in serious harm or bankruptcy for this defendant and the pharmaceutical industry generally. … For the legal system to be used for this slash-and-burn-style of litigation would arguably constitute an abuse of the legal process. Constitutional, statutory, and common law rights of those injured to seek relief from the courts must be recognized. But courts cannot be used as the engine of an industry's unnecessary destruction.

*Id.* at 463-64. For all these reasons, summary judgment on the States' penalty claims is more than warranted: it is required to avoid a grave violation of Google's constitutional rights.

### C. Certain of Plaintiffs' Omission-Based Claims Fail as a Matter of Law.

For a nondisclosure to be actionable under the DTPA, the information omitted must have been "material." Appx. B. Information is "material" if it would be important to a reasonable customer in deciding whether to transact on the offered terms.[21] In addition to the materiality requirement, at least six Plaintiff States (hereinafter the "Intent States") require that an actionable omission have been "intended" to mislead a customer into a transaction, and six others (hereinafter the "Willfulness States") require that any deceptive act, including an omission, have been "willful" for their Attorneys General to obtain civil penalties. Appx. B. Thus, in addition to proof that the

---

[21] As Plaintiffs acknowledge, the "State DTPAs are modeled after Section 5 of the FTC Act." ECF No. 260 at 16. Under the FTC Act, the "basic question is whether the act or practice is likely to affect the consumer's conduct or decision with regard to a product or service." *FTC Policy Statement on Deception* (Oct. 14, 1983), 1984 WL 565319; *see also FTC v. Neora LLC*, 2023 WL 8446166, at *27 (N.D. Tex. Sept. 28, 2023) ("A representation, omission or practice is material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'" (quoting *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006)); *see also Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992) (same). Thus, facts "are material when they pertain to the central characteristics of the products or services." *FTC v. Zaappaaz*, LLC, 2023 WL 5020618, at *13 (S.D. Tex. June 9, 2023); *see also Hall v. SeaWorld Enter., Inc.*, 747 F. App'x 449, 453 (9th Cir. 2018) (same, and quoting *In re Int'l Harvester Co.*, 104 F.T.C. 949, 1057 (1984)).

omitted information was "material" to consumers, Plaintiffs must show (i) as to the Intent States, that Google "intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed," *e.g.*, Tex. Bus. & Com. Code § 17.46(b)(24), and (ii) as to the Willfulness States, that Google "knew or should have known" that customers were being "dece[ived]" by the nondisclosure, *e.g.*, Fla. Stat. § 501.2075.

As to two of the alleged omissions—RPO and DRS—no reasonable jury could find that Google failed to disclose material information because those programs *were in fact disclosed*. And as to a third allegedly undisclosed program, Project Bernanke, no reasonable jury could find that Google's buying tool, Google Ads, deceived its advertiser customers after it transitioned to a "threshold payment rule," at which point Plaintiffs' experts admit Bernanke was no longer capable of the alleged deception. At a minimum, given the undisputed public disclosures and the undisputed benefits to customers, no reasonable jury could find the mens rea required in the Intent States and Willfulness States.

### 1. No Reasonable Jury Could Find Google Failed to Adequately Disclose RPO, Especially After May 2016.

Plaintiffs allege that RPO—which in some auctions automatically increased the price floor designated by the publisher to bring it closer to the expected winning bid, SOF ¶ 219—deceived advertisers because it stripped the auction of its "second-price" nature. FAC ¶¶ 331-51. Their theory is that "[b]y falsely representing that its AdX exchange was a second-price auction, Google induced advertisers to bid their true value, only to override publishers' pre-set AdX floors and use advertisers' true value bids against them." *Id*. ¶ 338. Despite acknowledging the public disclosure of RPO, Plaintiffs allege that RPO was a "secret program," and thus advertisers were incapable of adjusting their bidding strategies. *Id.* ¶ 116. Because RPO was anything but a "secret," the Court should grant summary judgment on the RPO-based claims.

FILED UNDER SEAL

As early as August 2014, before RPO launched in 2015, Google's Help Center stated plainly that the "Ad Exchange may run limited experiments designed to optimize the auction" and that such experiments "may include … modifying the min CPM set by the publisher for an impression." SOF ¶ 220; Ex. 42. Modifying the minimum CPM (the publisher's designated minimum "cost per mille" price) means modifying the reserve price. SOF ¶ 220. That is precisely what RPO did.

If that weren't enough, Google put the issue to rest in a May 2016 blog post on its website. That post further explained that Google had implemented RPO (referred to as "optimized pricing"), an automated process that "use[d] historical data" to increase the reserve prices set by publishers, in hopes of bridging the "more than [] 50% price gap between bid and closing prices in many cases." SOF ¶¶ 219, 221; Ex. 46. The announcement explained that RPO would "help publishers set price floors … that more closely reflect the value of their inventory," by using historical data to "automate" the process of "updating floor prices," determining optimal floors according to "signal[s] like ad unit and device," as well as "audience-based floors." Ex. 46. The adequacy of this disclosure is undisputed: Plaintiffs' experts concede that "Google announced the [RPO] program to its customers under the name 'optimized pricing' on May 12, 2016." Ex. 6 (Weinberg Rpt.) ¶ 274; *see also* Ex. 1 (Andrien Rpt.) ¶ 31 (same).

The May 2016 disclosure is particularly conclusive in the Intent and Willfulness States. No reasonable jury could find that Google "intended to mislead" its customers into an unwanted transaction or "willfully" omitted information after explaining RPO in a blog post made available to the world. There is no evidence that Google intentionally or knowingly omitted material information from the announcement. All evidence is to the contrary. *See* SOF ¶ 223; Ex. 109 (Google's "plan [was] to announce" RPO in May 2016, through a "[d]etailed blog post"); Ex. 52

FILED UNDER SEAL

(Google "announced new optimizations for DoubleClick Ad Exchange" that included "optimized pricing in the Open Auction (aka RPO)")).

Thus, Plaintiffs' RPO claims fail: Google announced an intent to experiment with publishers' price floors in 2014, before implementing RPO, and it explained the feature in detail, once implemented, on May 12, 2016. At a minimum, Plaintiffs' RPO claims based on transactions after May 12, 2016 must be dismissed—which forecloses claims asserted by Plaintiff States where statutes of limitations do not allow their Attorneys General to reach back more than four years before the Complaint was filed. *See* Section VI(B), *infra*.

### 2. No Reasonable Jury Could Find that Google Failed to Disclose DRS.

Plaintiffs take issue with two versions of DRS, each of which addressed a common issue: for an auction on AdX to clear (i.e., for an impression to be sold and an ad displayed), at least one bid had to exceed not just the reserve price set by the publisher, but also the reserve price adjusted to account for Google's fee (sometimes called its "revenue share"). SOF ¶ 143. AdX's default fee was generally 20% per impression sold. SOF ¶ 39. So, for instance, even with a bidder willing to pay 11 cents on an impression with a publisher reserve of 10 cents, an auction would fail. Google implemented DRS solutions to address this inefficiency. SOF ¶¶ 142-44. Plaintiffs erroneously complain that Google "never disclosed DRS to publishers or advertisers (who would have changed their strategy had they known)," ECF No. 260 at 10 (citing FAC ¶ 326), or alternatively disclosed "that it would only lower Google's exchange fee," without also disclosing that a later version of DRS (DRSv2) would offset those overpayments by increasing the fee on other transactions, FAC ¶ 547. Both grievances are incorrect as a matter of undisputed fact.

#### a. Google Disclosed DRSv1 Before Launching It.

The first version of DRS, "DRSv1," was launched during the last week of August 2015. SOF ¶ 141. It allowed AdX to charge less than a 20% fee on some impressions, in order to "clear[]"

FILED UNDER SEAL

queries when the highest bid is above the publisher floor, but not quite high enough above the floor." Ex. 116; *see also* SOF ¶ 145.

The undisputed facts show that Google disclosed DRSv1 before launching it. On August 5, 2015, weeks before launching DRSv1, Google amended its AdX Help Center article to explain that "[i]n some cases," (i) DRSv1 would cause an auction to clear that otherwise would have failed, at a closing price "lower than the reserve price applied, due to auction optimizations," but (ii) publishers would still receive "no less than the min CPM applied to the auction." Ex 43. This was possible only because Google reduced its fee—that is, because of DRSv1. SOF ¶ 146. Plaintiffs' auction-theory expert admits this: "In the event that the auction closes at a price lower than the reserve price applied and sellers are paid at least their min CPM, I agree that can only happen by adjusting Google's revenue share." Ex. 18 (Weinberg Depo. Tr.) 202:11-203:15. Again, that adjustment to Google's revenue share is the definition of DRSv1.

Plaintiffs have protested that Google's disclosure does not expressly state that in auctions cleared as a result of DRSv1, the winning buyer will pay their full bid. But no reasonable factfinder could determine this was a material omission: if Google is reducing its fee for the auction to clear, no reasonable buyer would expect to pay *less* than its bid. In a second-price auction and as explained in the Help Center article, the winning buyer (i.e., the highest bidder) pays the higher of (i) the second-highest bid or (ii) the reserve price. SOF ¶ 41. If the auction clears despite the highest bid (net of AdX's usual 20% fee) being *below* the reserve price, it would be absurd to conclude that the winning buyer would pay something less than their bid and thus less than the reserve. Indeed, even if that conclusion were not apparent, Google's Help Center disclosure states plainly that "the winning buyer will never be charged more than the bid it submits"—in other words, that

the winning buyer could be charged up to that amount if its bid did not exceed the reserve price after accounting for Google's fee. Ex. 44.

### b. Google Disclosed DRSv2 Before Launching It.

With DRSv2, Google allowed AdX to not only reduce its fee to allow certain auctions to clear (as with v1), but also to increase its fee on other auctions, to offset discounts and maintain an average fee of 20% (or whatever figure the publisher negotiated) across each billing period. SOF ¶¶ 148-50; *see also* Ex. 53 (DRSv2 "adjust[ed] Google's revenue share more aggressively [than DRSv1], by decreasing and increasing the Google share on different impressions, to increase the number of AdX auctions with a winning buyer while always achieving the publisher's contracted revenue share (typically 80%) or higher for each billing period.").

Plaintiffs allege that DRSv2 deceived publishers "under the false pretense that it would only lower Google's exchange fee and net publishers more revenue, while knowing all along that DRS would ultimately only benefit Google by recollecting on the lowered fee." FAC ¶ 547. But the undisputed evidence that Google publicly disclosed this information forecloses this claim. For instance, in June 2016, six months before launching DRSv2 in December 2016, Google added to the Help Center article describing the AdX rules, explaining:

> To optimize the auction, Google may choose to close an auction at a price lower than the reserve price that would otherwise have been applied. In such cases, the winning buyer may pay a price below the reserve and therefore receive a discount on its bid. A buyer that has received discount(s) on its bid(s) *may face higher reserve prices in subsequent transactions to offset such discounts*.

SOF ¶ 152 (quoting Ex. 44). The article also supplemented its disclosures as to sellers and reserve prices, noting that "the Seller may receive more than its contracted revenue share on the transaction. In subsequent transactions, the *Seller's revenue share may then be reduced to offset the prior earnings in excess of the contracted revenue share.*" *Id.* By disclosing that AdX would

"offset" buyers' "discounts" and "offset" sellers' "excess earnings" by adjusting future prices, Google disclosed all material aspects of DRSv2. Unsurprisingly, the evidence reflects that Google's purpose in supplementing the Help Center article was "to disclose the mechanism" of "[i]ncreasing and decreasing revenue share per query as in DRS v2." SOF ¶ 153 (quoting Ex. 53).

The Help Center article was not the only disclosure of DRSv2. Google also announced DRSv2 through a public-facing release note, which made clear that the new "optimization" allowed AdX to "increase or decrease revenue per query," and highlighted that publishers could *opt out* of DRSv2 if they preferred that AdX "apply your contracted revenue share on every query" instead. SOF ¶ 154 (quoting Ex. 40). Google then disclosed DRSv2 in the AdX User Interface itself. The opt-out feature was added through a "toggle" on the "Admin" page, which explained: "When selected, each ad request from this network to Ad Exchange will pay at least contracted revenue share. When not selected, contracted revenue share is applied as an average over a billing period." SOF ¶ 155 (quoting Ex. 35). In addition, for the last two weeks of June 2016, the AdX User Interface featured a "butter bar"—a banner announcement or "feature flag"—explaining to publishers that "You can now control whether or not revenue share is applied per-query for Ad Exchange," complete with links to the above-described release note and the opt-out toggle. SOF ¶ 155 (quoting Exs. 35, 89). Tellingly, Plaintiffs' experts acknowledge that "Google announced DRSv2 (under a different name) when it was launched and allowed publishers to opt out of the program." Ex. 1 (Andrien Rpt.) ¶ 39; *see also* Ex. 6 (Weinberg Rpt.) ¶ 197 (same).

Undaunted, Plaintiffs contend that "Publishers were led to believe that DRS would only lower Google's exchange fee." FAC ¶ 543. But the release note said, verbatim, that "we may increase *or decrease* revenue per query," SOF ¶ 154 (quoting Ex. 40), and the Help Center article said, verbatim, that a "Seller's revenue share may then be reduced," SOF ¶ 152 (quoting Ex. 44).

FILED UNDER SEAL

Next, Plaintiffs allege that DRS "deceived and harmed publishers by convincing them that DRS actually increased publisher revenue" when in reality, Google was recouping its own revenue-share losses. FAC ¶ 546. But publisher revenue and Google's revenue are not zero-sum: the evidence unanimously reflects that DRS *did* increase publisher revenue because maintaining AdX's average fee while increasing the number of auctions that cleared can only increase publisher revenue. *See* SOF ¶¶ 159, 162-64.

Finally, Plaintiffs claim it was inaccurate to state that "the winning buyer will never be charged more than the bid it submits," and the seller "will receive no less than the min CPM they specified for the auction." SOF ¶ 152. It is undisputed, however, that as to any particular auction, no advertiser was charged more than its maximum bid, and no seller was paid less than its reserve price. SOF ¶ 160. Plaintiffs have theorized that a publisher paid its minimum CPM while also being subject to a higher-than-average Google revenue share on a later transaction incurs a "debt" that makes the net payment, on the first transaction, less than the minimum CPM. FAC ¶¶ 544, 546. But the so-called "debt" feature of DRSv2 was no secret. The Help Center article explicitly disclosed it: Buyers "may face higher reserve prices in subsequent transactions to *offset* such discounts," and a seller's "revenue share may then be reduced to *offset* the prior earnings in excess of the contracted revenue share." SOF ¶ 152 (quoting Ex. 44).[22]

In sum, the undisputed evidence shows that Google disclosed all material facts regarding both challenged versions of DRS. At a minimum, DRS-related claims brought by the Intent States and Willfulness States fail because no evidence supports an inference that Google *intended* to

---

[22] The plain meaning of "offset" is to "counteract," by way of a "consideration or amount that diminishes or balances the effect of a contrary one." Google Dictionary, Offset, available by searching "define: offset" on google.com; *see also* Merriam Webster*, Offset* (to "balance," as in "credits offset debits"; "to serve as a counterbalance for: compensate").

FILED UNDER SEAL

mislead advertisers and publishers, or that it *knew or should have known* that buyers would be mislead. The evidence uniformly reflects that Google intended—by way of the Help Center article, the release note, and the user interface disclosures—to "announce" DRS and "inform [publishers] about the new functionality." SOF ¶ 156 (quoting Ex. 89). And as to the debt-versus-offset allegation, Google understood and intended the statement "Buyers are never charged more than their bid, sellers are always paid at least their reserve," to be truthful, even including that statement in its "internal only" description of "features" of DRSv2. SOF ¶ 160 (quoting Ex. 89).

### 3. No Reasonable Jury Could Find Google Liable for Bernanke-Related Deception After the Transition to a Threshold Payment Rule.

Project Bernanke was implemented on Google Ads in November 2013 to allow Google Ads advertisers to win impressions they otherwise would not have. SOF ¶¶ 110-11. As Plaintiffs acknowledge, before Bernanke, "among auctions won by [Google Ads] advertisers, [Google Ads] also submitted the second highest bid 80% of the time," effectively "second-pricing" its own customers. Ex. 6 (Weinberg Rpt.) ¶ 233. This presented an opportunity to increase the number of auctions won by Google Ads advertisers. Bernanke worked by adjusting, in some cases, one or both of the high bid and the low bid submitted by Google Ads into the AdX auction. SOF ¶¶ 112-14. Similar to DRSv2, but for the buy-side, Bernanke allowed Google Ads to adjust its fee across impressions (sometimes higher, sometimes lower) to maximize the impressions won by its advertiser customers. SOF ¶ 115.

In some auctions, Bernanke "boosted" the highest bid submitted into the AdX auction, often allowing an advertiser customer to clear a reserve price that its bid would otherwise have fallen below. SOF ¶ 113. Bernanke also lowered certain of the second-highest bids Google Ads submitted into the AdX auction, thereby lowering the payment owed by the winning advertiser. SOF ¶ 114. The Bernanke algorithm was constrained such that, after accounting for the boosts to

the highest bids and decreases to the second-highest bids, Google Ads' average per-impression fee remained the same. SOF ¶ 115.[23]

Plaintiffs claim that Google did not disclose Bernanke and thereby deceived advertisers because, had they been aware of how Bernanke worked, they would have "shaded" their bids to some amount below their actual values. Ex. 6 (Weinberg Rpt.) p. 144. If a bid won because it was boosted by Bernanke, Google Ads still did not charge the winning advertiser more than the per-impression value it submitted for that impression (i.e., the advertiser was charged less than the "boosted" bid). SOF ¶¶ 116-17. Plaintiffs theorize, however, that such an advertiser may have been charged even less if it submitted a lower value into Google Ads, unlike when participating in a "truthful" auction, where a higher bid does not result in a higher payment. *See* Ex. 6 (Weinberg Rpt.) ¶ 258; Ex. 1 (Andrien Rpt.) ¶ 46.[24]

By February 10, 2017, however, Google Ads implemented a truthful pricing rule for advertisers using its auto-bidding tools, including when they won auctions as a result of Bernanke. SOF ¶ 133.[25] Under the new "threshold" payment rule, the winning auto-bidder was charged according to the minimum bid necessary, in retrospect, to have won the auction—without regard to the actual bid that won. SOF ¶ 131. Because it does not depend on the value of the winning bidder's bid, such a threshold (or minimum-bid-to-win) payment rule is "bidder truthful," meaning

---

[23] Google Ads later modified the Bernanke program—renaming it "Global Bernanke"—to widen its potential for optimizing bids, but with the mechanics relevant to this Motion otherwise identical. SOF ¶¶ 129-30.

[24] If this case reaches trial, Google will show that this theory fails as to any and all time periods, including because most advertisers did not submit per-impression "bids" into Google Ads, instead submitting *goals* like return-on-investment, cost-per-click, or cost-per-sale, relying on Google Ads to calculate optimal per-impression bids based on the advertiser's designated goal.

[25] "Auto-bidding advertisers" are those inputting values into Google Ads through a "cost per action" metric (i.e., payment per conversion/sale attributed to advertising), a "return on ad spend" metric, or an "enhanced cost per click" metric. *See* SOF ¶ 133.

FILED UNDER SEAL

that a bidder's optimal strategy is to bid according to its actual value. *Id.* As a result, auto-bidding advertisers on Google Ads would, if acting optimally, submit their actual values into Google Ads—precisely what Plaintiffs and their experts claim the non-disclosure of Bernanke deceived them into not doing. Plaintiffs' auction expert admits that it is "commonly known within auction theory" that "in an auction that uses threshold payments, advertisers are not better off bid shading" and instead "are best off bidding truthfully." Ex. 18 (Weinberg Depo. Tr.) at 263:25-264:18; *see also id.* at 270:12-271:8 ("[W]hen Global Bernanke used threshold payments, it is in [Google Ads'] advertisers' best interest to bid their true value."); Ex. 8 (Milgrom Rpt.) ¶ 143 ("[C]harging a winning advertiser its threshold price—that is, an amount equal to the lowest value it could have reported while still winning the impression," resulted in "a bidder-truthful process for Google Ads advertisers.").

Summary judgment is therefore appropriate on DTPA claims related to Bernanke (and its successor Global Bernanke), to the extent they allege deception as to Google Ads advertisers using its auto-bidding tools, and to the extent based on transactions after February 10, 2017. From that date forward, there is no evidence that nondisclosure of Bernanke was deceptive to auto-bidding advertisers.

It is also undisputed that when AdX transitioned to a first-price auction in September 2019, Google Ads replaced Bernanke with Alchemist. SOF ¶ 137. From its inception, Alchemist applied a threshold payment rule to *all* advertisers (auto-bidding or otherwise). SOF ¶ 140. As Plaintiffs' auction expert agrees, under Alchemist, advertisers would optimally have submitted their actual values into Google Ads (as opposed to "shaded" values), thus obviating the theory of deception Plaintiffs raise as to Bernanke and its successors. Ex. 18 (Weinberg Depo. Tr.) at 272:21-273:14 ("[D]uring periods where Alchemist was active and using a threshold pricing rule, which I believe

**FILED UNDER SEAL**

to be all of the periods that Alchemist was active, [Google Ads] bidders would have best responded by bidding their true value into Alchemist."); *see also* Ex. 6 (Weinberg Rpt.) ¶ 266 (describing Alchemist's "bid optimizer for [Google Ads] users that makes their participation in AdX's first-price auction truthful"). In sum, there is no evidence Google failed to disclose material information about Bernanke (or its successors Global Bernanke and Alchemist) (i) to Google Ads advertisers using auto-bidding from February 10, 2017 forward; or (ii) to any Google Ads advertisers from September 1, 2019 forward.

### 4. Google Ads Had No Obligation to Disclose to Ad *Sellers* How It Calculated Bids Submitted on Behalf of its Ad-*Buyer* Customers.

Plaintiffs also suggest that not disclosing Bernanke—an optimization to the way Google Ads bid into the AdX auction on behalf of *advertisers*—deceived *publishers*. But Google had no obligation to disclose advertiser-bidding optimizations to publishers simply because they would be useful to publishers in setting reserve prices (or for any other reason). Obviously, "if the highest bid is $20," a publisher would love to know that, so it could "set a reserve at exactly $20." *See* Ex. 6 (Weinberg Rpt.) ¶ 59. But telling publishers what bids Google Ads intends to submit on behalf of advertisers would defeat the whole purpose of an auction. Not even Plaintiffs contend that their laws impose duties to disclose bidding strategies to the other side of the bargaining table. In fact, Plaintiffs allege the opposite, that using "advertisers' true value bids against them" in such a way would *itself* violate the DTPA. FAC ¶ 532; *see also* Ex. 11 (Gans Rebuttal Rpt.) ¶ 377 ("[A]n ad buying tool should serve the best interest of advertisers.").

Moreover, the States' deceptive trade practices laws regulate deception *in connection with specific transactions*. That is what it means to proscribe deception "in the conduct of any trade or commerce," with "trade" and "commerce" defined as acts comprising a "sale," "lease," or "distribution" of goods or services. *See* Appx. B. But there is a mismatch between the specific

**FILED UNDER SEAL**

transaction Bernanke affected—Google Ads' submission of bids on behalf of advertiser customers, in exchange for a share of the bid value if the bid wins—and the publishers that transact and interface with the *other* side of the AdX platform, by submitting requests for bids and paying AdX a percentage of the ultimate clearing price. *See* SOF ¶ 110.

Recognizing that the law imposes no obligation to disclose bidding strategies to sellers, Plaintiffs instead describe Bernanke as an auction rule change, i.e., a change to the AdX rules, not to Google Ads bids. *See* FAC ¶ 560. That is flat wrong. To be sure, Bernanke *affected* the AdX auction, but it did not change the rules by which a winner or the clearing price was declared by AdX—the highest bid into AdX (whether or not from Google Ads) still won, and the higher of the second-highest bid or the reserve set the clearing price. SOF ¶ 121. It is undisputed that Google Ads adjusted the high and low bids **before** they were submitted into AdX's auction. SOF ¶ 110; *see also* FAC ¶¶ 552-53. It is further undisputed that Google Ads did not use any AdX data in formulating its optimizations—Google Ads respected the "AdX firewall," utilizing only Google Ads data to optimize bids. SOF ¶ 119. And because no change to the AdX rules was required to implement it, "any AdX buyer," not just one affiliated with Google or its publisher-side functionality, could have implemented a program identical to Bernanke. SOF ¶ 120 (quoting Ex. 57); *see also, e.g.*, SOF ¶ 135 (describing non-Google buying tools' own bid-multiplier optimizations).

In any event, even if Bernanke were a feature of AdX, rather than Google Ads, AdX openly disclosed its "discretion" to "adjust" bids once submitted into the auction. As early as August 2014, Google's Help Center article on AdX included the following:

> DoubleClick Ad Exchange determines the winning bidder based on the highest net bid submitted. Such net bid reflects any ***adjustments Ad Exchange may, at its discretion, have made to the bid submitted by the buyer*** for the purpose of optimizing the auction.

SOF ¶ 152 (quoting Ex. 44). Thus, even if it were material to any publisher whether Google had the right to decrease some bids or boost others before submission to the AdX auction (a premise for which there is no evidence), Google informed its customers that it could do so. With respect to the Intent States and Willfulness States, at a minimum, no reasonable jury could read this disclosure and believe that Google meant to deceive publishers regarding the possibility that certain bids would be reduced or increased before AdX declared the winner and the clearing price.

### 5. Google's "Equality" and "Fairness" Representations Were Not Deceptive.

According to Plaintiffs, in connection with Google's September 2019 transition to a unified first-price auction, Google represented (i) in a Help Center article that, going forward, "all participants in the unified auction, including Ad Exchanges, and third-party exchanges, [would] compete equally for each impression," and (ii) in a blog post, that the unified first-price auction would be a "fair and transparent market for everyone." ECF No. 260 at 29; *see also* SOF ¶¶ 226-27 (providing full statements). These statements are neither false nor actionable.

#### a. There Is No Evidence the Equality and Fairness Representations Were False.

"Absent evidence that the defendant's statement was false, a DTPA action for misrepresentation cannot survive summary judgment." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 480 (Tex. 1995). The truth or falsity of a "general statement" within a larger communication cannot be examined by reference to the statement in isolation, but instead must be examined "in the context of its particular fact situation," *Humble Nat'l Bank v. DCV, Inc.*, 933

**FILED UNDER SEAL**

S.W.2d 224, 230-31 (Tex. App.—Houston [14th Dist.] 1996, writ denied),[26] including the "context of the entire communication," *Reed v. Receivable Recovery Servs., LLC*, 702 F. App'x 239, 240-41 (5th Cir. 2017).

The undisputed historical context is important. Plaintiffs acknowledge that the statements Google made in 2019 updates to its Help Center, describing the new, unified first-price auction, were made against a backdrop of criticism regarding Google's so-called "last look," which referred to AdX's ability, under Dynamic Allocation and Enhanced Dynamic Allocation, to see the header bidding clearing price before submitting their own bid. *See* SOF ¶ 107 (describing so-called "last look"). On Plaintiffs' own telling, when Google "represented that it would run 'a fair and transparent market for everyone,'" Google was "announc[ing] that exchanges in Exchange Bidding [*i.e.*, those working with Google] would no longer be able to trade ahead of header bidding exchanges." FAC ¶ 379. The reference to bidders "competing equally" in the unified first-price auction self-evidently responds to the concerns about one exchange having an advantage over others. Thus, Google reported in the same communication that all bids "are compared at the same time," and the "highest net bid always wins," emphasizing the point with an example involving both Google's exchange and a third-party exchange. SOF ¶ 227.

No reasonable publisher or advertiser[27] would interpret the Help Center article to mean anything more than that all bidders would compete in real time, with the highest net bid winning,

---

[26] *See also, e.g.*, *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 464 (Tex. App.—Dallas 1990, writ denied) (same); *Thompson v. Procter & Gamble Co.*, 2018 WL 5113052, at *3 (S.D. Fla. Oct. 19, 2018) (under Florida DTPA, court must determine whether statements "viewed in their full context[] are false or deceptive"); *Smith v. Dynamic Recovery Sols. LLC*, 2019 WL 2368460, at *4 (D.S.C. June 5, 2019) (rejecting misrepresentation claim "because read in context, the language is not misleading").

[27] *See* Fed. Trade Comm'n, *Policy Statement on Deception*, 103 F.T.C. 110, 1984 WL 565319, at *46 (Mar. 23, 1984) ("The act or practice must be considered from the perspective of the reasonable consumer … under the circumstances.") (appended to *In re Cliffdale Assocs., Inc.*).

without any "last looks." And it is undisputed that after Google transitioned to the unified first-price auction, Google did not restore a "last look" advantage over other exchanges, nor did it allow bids other than the "highest net bid" to win auctions. SOF ¶¶ 81, 108; Ex. 6 (Weinberg Rpt.) ¶ 161 n.234 ("Last Look advantage was removed in 2019 during the implementation of Unified Pricing Rules and AdX's switch to the first-price auction format.").

As to the blog post Plaintiffs complain of, Google's statement regarding "fairness" and "transparency" is tied explicitly to the transition to a unified first price auction: "***By switching to a single first price auction***, we can help reduce complexity and create a fair and transparent market for everyone." SOF ¶ 226. The transition would achieve "transparency," according to the blog post, because it would replace a world with multiple exchanges using different rules to declare winners and clearing prices, which had made it "operationally very difficult, even for experts, to determine what's going well and what needs to be improved." *Id.* And it would achieve "fairness" because the existing system of mixed exchanges with different rules made it so that the highest bid does not necessarily win.[28] Google assured nothing more than that it would soon transition to a "single first price auction," which would itself—as compared to a world with multiple exchanges running different auction rules—"reduce complexity and create a fair and transparent market for everyone." It is undisputed that, in September 2019, Google indeed transitioned Ad Manager to a unified first-price auction. SOF ¶¶ 41, 137. There is therefore no evidence that this communication was false.

---

[28] For instance, if the two highest bids in a second-price auction are $3 and $1, it clears at $1. If that auction then competes against another exchange that runs a first-price auction and receives a high bid of $2, the overall auction-of-auctions clears at $2, despite a bidder that was willing to pay up to $3. SOF ¶ 227.

FILED UNDER SEAL

b. **The Equality and Fairness Statements Were Not Actionable Representations of Fact.**

In any event, Google's statements regarding a "fair and transparent market for everyone," in which all bidders compete "equally," are not actionable misrepresentations of fact. If a statement is "too vague to provide a standard for the jury to use to measure the accuracy of the representation, it is [] nonactionable." *Bradford v. Vento*, 48 S.W.3d 749, 759 (Tex. 2001). Whether called "puffery," "opinion," or otherwise, it is recognized throughout the Plaintiff States that subjective marketing talk cannot give rise to liability, and that claims premised on such statements should be dismissed on the pleadings or on summary judgment. Appx. B. The fairness-and-transparency statements on which Plaintiffs rely are "vague and highly subjective," not "specific and measurable," and thus are non-actionable. *Thompson v. Procter & Gamble Co.*, 2018 WL 5113052, at *2 (S.D. Fla. Oct. 19, 2018); *see also, e.g., Seargant Oil & Gas Co. v. Nat'l Maint. & Repair, Inc.*, 861 F. Supp. 1351, 1362 (S.D. Tex. 1994) (granting summary judgment and noting that the key metric is "the specificity of the statement"); *Humble Nat'l Bank*, 933 S.W.2d at 230 ("an imprecise or vague representation constitutes a mere opinion").

Whether the unified first price auction was sufficiently "fair," "equal," or "transparent" is too subjective a question, too open to interpretation and divergent conclusions, for a factfinder to test its accuracy. "[T]he word 'fairly' is highly subjective and indicative of a statement of opinion," so its use cannot support liability under the DTPA. *Garza v. State Farm Lloyds*, 2013 WL 3439851, at *5 (S.D. Tex. July 8, 2013); *see also Infowise Sols., Inc. v. Microstrategy, Inc.*, 2005 WL 2445436, at *3 (N.D. Tex. Sept. 29, 2005) (granting dismissal, as assurance of "fair revenue" had the "indefiniteness characteristic of puffery"). The same goes for "equally." *See Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1124 (8th Cir. 1999) (representation of "equal quality" was nonactionable "puffery at most"); *Mid-Cities Bone & Joint Surgeons, P.A. v. GE Healthcare*

FILED UNDER SEAL

*Diagnostic Imaging*, 2008 WL 11429502, at *3 (N.D. Tex. Sept. 22, 2008) (granting summary judgment on grounds that a "same as new" representation was "undoubtedly statement[] of opinion and puffing that [is] simply not actionable under the DTPA").

### 6. Google Did Not Sell Users' Personal Information.

According to Plaintiffs, Google deceived internet users by representing "that it does not sell users' personal information." FAC p. 196. This fails for at least two reasons: First, after years of discovery, Plaintiffs cannot point to any evidence that Google sells users' personal information—because it does not. Second, Google disclosed to internet users how, and under what conditions, it would share (not sell) certain information, including with advertisers and publishers.

At no point in the ad tech auction process does Google sell any internet user's "personal information." The simplest reason is that Google does not *sell* any information in connection with display ads at all. "*Sale* means the transfer of title or property for a price." *Ford Motor Co. v. Parks*, 691 S.W.3d 475, 481 (Tex. 2024); *see also, e.g.*, *Amazon.com, Inc. v. McMillan*, 625 S.W.3d 101, 108 (Tex. 2021) ("[T]he common meaning of seller [is] someone who parts with title for a price."); Black's Law Dictionary, *Sale* (12th ed. 2024) (the "transfer of property or title for a price"); Merriam-Webster, *Sale* (same). There is no evidence that Google ever exchanged user information (much less personally identifying information) for a price. To the contrary, the evidence is clear that Google made certain user information available to advertisers for free. SOF ¶ 228. It is further undisputed that the winning advertiser paid a price for an ad, regardless of the amount or quality of the data shared in the request for bid. *Id.*

Further, there is no evidence that the information *shared* (again, as opposed to *sold*) was "personal" information. It is undisputed that in 2019, when Google's complained-of statements were made, "personal information" was defined in Google's Privacy Policy. *See* FAC ¶ 579 (quoting "Google's privacy policy" as where "Google defines personal information"). That policy

defined personal information as "information that you provide to us which ***personally identifies you***, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account." SOF ¶ 229. Plaintiffs can point to no evidence that Google shared (let alone sold) personally identifying information, like a user's "name, email address, or billing information," with publishers or advertisers on Google's ad tech platforms. Rather, as the Privacy Policy detailed, Google "may share non-personally identifiable information publicly and with our partners—like publishers, advertisers, developers, or rights holders," meaning "information that is recorded about users so that it no longer reflects or references an individually-identifiable user." SOF ¶¶ 229-30.

To be clear, certain information about the user does play a role in display advertising. *See* SOF ¶ 228. But the advertisers bidding on an impression do not know any ***personally identifiable*** information about the internet user who is loading the webpage containing the impression; they instead may know via a pseudonymous ID that the user recently visited a sporting goods website, is a man, lives in a given zip code, or is using a mobile device. *See id.*

As noted, Google's publicly available Privacy Policy explains the distinction between "selling" information (which Google does not do) and "sharing" it: "Google *does not sell* your personal information. We *only share* your information as described in this policy," including "to provide advertising." SOF ¶ 229. While Plaintiffs would have the jury blur the line between "selling" and "sharing," Google's disclosures were explicit regarding the fact that information *would indeed be "shared"* in connection with targeted advertising. In fact, the statement "Google does not sell your personal information" is immediately followed by the explanation that Google does "share your information as described in this policy," including "online identifiers and

information about your interactions with advertisements, to provide advertising." *Id.* The Policy made clear that Google collected and shared with advertisers, in an anonymized fashion, data that included browsing history, prior interactions with ads, demonstrated interests, and general locations. *Id.* It also provided a link for users of Google's services to change their settings to limit information sharing. SOF ¶ 231. There was, therefore, no misrepresentation.

Plaintiffs' theory is that Google was prohibited from distributing (again conflated with "selling") any data that Google could *internally* link to personally identifying information. *See* ECF No. 260 at 30-31. This is nonsensical. Google provides email, calendar, and payment platforms to users, among many other things. That Google could link non-personally identifying data to personally-identifying information for users of Google's products (like an "@gmail.com" email address) is immaterial. Google's hypothetical ability to *internally* combine personal information with non-personal information has nothing to do with what Google may share with (much less *sell* to) third parties. The only fair reading of the Privacy Policy is that Google may not *disclose* personally identifying information to third parties, regardless of whether Google could theoretically link information to other personally identifiable information. Again, the Privacy Policy itself explains this: "We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to." SOF ¶ 229.

## VI.    Plaintiffs' Claims Also Fail on State-Specific Grounds.[29]

### A.  Five State Laws Do Not Apply to Commercial or High-Dollar Transactions.

To prevail on claims under the laws of Arkansas, Idaho, Indiana, and Utah, the States must demonstrate a deceptive act or practice that caused harm in connection with a "consumer"

---

[29] To the extent the States' claims survive summary judgment, we will brief the elements required to establish liability separately, as suggested by the Court at the November 6 status conference.

**FILED UNDER SEAL**

transaction.[30] But the publishers and advertisers with which Google had contractual relationships are not consumers, and the Google platforms and software at issue are not consumer-oriented within the meaning of these laws. Under the law of Indiana, for example, a "consumer transaction" is defined as a transaction "for purposes that are primarily personal, familial, charitable, agricultural, or household." Ind. Code § 24-5-0.5-2(a)(1). Any deceptive practices in connection with "transactions for commercial purposes," as opposed to "personal" purposes, are not subject to the state deceptive trade practices law. *Gordon v. Finch*, 2023 WL 3496427, at *8 (N.D. Ind. May 17, 2023). A transaction "to make money" is "a commercial transaction, not a consumer transaction," and thus "not covered." *McLeskey v. Morris Invest*, 2020 WL 3315996, at *6 (S.D. Ind. June 18, 2020).[31] For this reason alone, the claims asserted by these four States fail. Google is entitled to summary judgment on those claims, and dismissing them will streamline the trial by limiting the number of distinct state statutes the Court and the jury must analyze.

Similarly, under Texas law, any "transaction," "project," or "set of transactions" that arose out of a written contract and involved more than $100,000, or more than $500,000 if not arising out of a contract, is entirely outside the DTPA. Tex. Bus. & Com. Code §§ 17.49(f), (g); *see also,*

---

[30] *See Arkansas ex rel. Griffin v. TikTok Inc.*, 2023 WL 4744903, at *5 (W.D. Ark. July 25, 2023) (quoting *Forever Green Athletic Fields, Inc. v. Lasiter Constr., Inc.*, 384 S.W.3d 540, 552 (Ark. Ct. App. 2011)); Idaho Admin. Code § 04.02.01.030; Ind. Code § 24-5-0.5(3)(a); Utah Code §§ 13-11-3, 13-11-4(2).

[31] *See also, e.g.*, *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015) (Arkansas DTPA did not apply to claims between manufacturer and distributor when consumers were not affected); *Crutchfield v. Tyson Foods, Inc.*, 514 S.W.3d 499, 503 (Ark. Ct. App. 2017) (allegation that Tyson treated growers with which it contracts for production of chickens unequally was not a "consumer-oriented act or practice" under the Arkansas DTPA); *Skalla v. Canepari*, 430 S.W.3d 72, 82 (Ark. 2013) (farming business did not involve consumer-based acts under the Arkansas DTPA); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 183–84 (D. Me. 2004) (analyzing claim under Idaho law and holding that plaintiff did not allege "services" under the Act because defendants provided services to automobile dealers, not consumers); Utah Code § 13-11-3(2)(a) (defining a "consumer transaction" as one entered for "primarily personal, family, or household purposes").

FILED UNDER SEAL

*e.g.*, *Safety Vision LLC v. LEI Tech. Canada*, 2024 WL 3094649, at *7 (S.D. Tex. June 20, 2024). Texas courts have "broadly construed" this exemption, mindful that its purpose is to focus the DTPA on "relief for consumers in small transactions." *McCoy v. Valvoline, LLC*, 568 F. Supp. 3d 666, 676 (N.D. Tex. 2021) (citation omitted). In looking at the collective value of a set of transactions, courts do not treat multiple transactions between a buyer and seller as "separate transactions that stood on their own." *Mullins Square, Inc. v. Source 2 Mkt., LLC*, 2009 WL 10669887, at *4 (W.D. Tex. Dec. 14, 2009). Instead, such a series of transactions "is a perfect example of the type of case intended to be exempt under § 17.49(g)." *Id.*; *see also McCoy*, 568 F. Supp. 3d at 677. Between 2013 and 2023, ███████████████████████████████ ██████████ respectively participated in more than $500,000 in AdX transactions. SOF ¶ 257; Exs. 197-99. The Court should grant summary judgment as to these transactions, which are exempt from the DTPA and cannot support an award of penalties.

### B. The Claims of 14 States are Constrained by a Statute of Limitation.

The applicable statutes of limitations range from one to six years. *See* Appx. B. Claims based on conduct prior to certain dates—ranging from December 16, 2019 to December 16, 2014—are therefore untimely and cannot result in a liability finding or civil penalty award. For example, it is undisputed that *all* of the conduct challenged in connection with the deceptive trade practices claims ended by September 2019. *See* Section III(A)(4), *supra*. As a result, Utah's one-year limitations period for actions by the state seeking civil penalties precludes *any* recovery under that State's law. *See* Utah Code § 78B-2-302(2). Similarly, undisputed evidence shows that Google adopted a "threshold payment rule" by February 2017, foreclosing certain claims of deception related to the Bernanke optimization from and after that date. *See* Section V(C)(3), *supra*. Accordingly, claims and related demands for penalties asserted by states with limitations periods of three years or less—namely, Missouri, Montana, Nevada, South Carolina, and Utah—are

barred. *See* Appx. B. Likewise, the undisputed disclosure of RPO by May 2016, *see* Section V(C)(2), bars claims asserted by those five states as well as Florida, Idaho, North Dakota, Puerto Rico, and South Dakota. *See* Appx. B. Further, while *all* States demand penalties for alleged violations dating back to 2013, Ex. 1 (Andrien Rpt.) ¶¶ 11(d)-(f), 98, *none* of the limitations periods reach back that far. *See* Appx. B. As a result, for each Plaintiff State with an applicable statute of limitations, proof may be presented, and penalties may be awarded, only to the extent that conduct was timely challenged.

## VII. Conclusion

For the foregoing reasons, the Court should grant summary judgment on Plaintiffs' DTPA claims and dismiss Count VI of the Complaint in its entirety. Google respectfully requests oral argument on its Motion for Summary Judgment on Plaintiffs' DTPA Claims.

Dated: November 18, 2024      Respectfully submitted,

GIBBS & BRUNS LLP

*/s/ Kathy D. Patrick*
Kathy D. Patrick
Texas Bar No. 15581400
KPatrick@gibbsbruns.com
Robin C. Gibbs
Texas Bar No. 07853000
RGibbs@gibbsbruns.com
Caitlin A. Halpern
Texas Bar No. 24116474
CHalpern@gibbsbruns.com
Michael R. Davis
Texas Bar No. 24109793
MDavis@gibbsbruns.com
Connor E. Burwell
Texas Bar No. 24131297
CBurwell@gibbsbruns.com
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: (713) 650-8805

<u>**FILED UNDER SEAL**</u>

Eric Mahr (*pro hac vice*)
eric.mahr@freshfields.com
Gayle Klein (*pro hac vice*)
gayle.klein@freshfields.com
Andrew Ewalt (*pro hac vice*)
andrew.ewalt@freshfields.com
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4545

Daniel S. Bitton (*pro hac vice*)
dbitton@axinn.com
AXINN, VELTROP & HARKRIDER LLP
55 Second Street
San Francisco, CA 94105
Telephone: (415) 490-1486

Bradley Justus (*pro hac vice*)
bjustus@axinn.com
James K. Hunsberger (*pro hac vice*)
jhunsberger@axinn.com
David R. Pearl (*pro hac vice*)
dpearl@axinn.com
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW Washington, DC 20036
Telephone: (202) 912-4700

ATTORNEYS FOR DEFENDANT GOOGLE LLC

**FILED UNDER SEAL**

**CERTIFICATE OF SERVICE**

I certify that on November 18, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and notice was thereby served on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A). In addition, this sealed filing will be promptly served by email on counsel of record for all parties.

*/s/ Kathy D. Patrick*
Kathy D. Patrick

**CERTIFICATE OF SEALING**

I certify pursuant to Local Rule CV-5(a)(7)(B) that, on November 18, 2024, a motion to seal this document was filed, separately and immediately before this document was filed under seal.

*/s/ Kathy D. Patrick*
Kathy D. Patrick