Attachment A

Findings and Conclusions in United States of America et al v. Google LLC,
1:23-cv-00108-LMB-JFA (E.D.Va)
("EDVA Action").

I. The Relevant Markets: Publisher Ad Servers and Ad Exchanges are Markets

A. **Publisher ad servers for open-web display advertising is a relevant Product market. (EDVA Op. at 43-50)**

  1. "Publisher ad servers for open-web display advertising constitute a distinct relevant product market." EDVA Op. at 43.

  2. "Publisher ad servers for open-web display advertising are uniquely suited for managing ad inventory for large web publishers, are priced differently than other ad tech tools, and are recognized as a distinct product by ad tech industry participants." EDVA Op. at 43-44

  3. "Other ad tech tools are not reasonably interchangeable with publisher ad servers." EDVA Op. at 43-44

  4. "The lack of substitutability between publisher ad servers and alternative tools is evidenced by how successful Google's publisher ad server has been in maintaining dominant market share among the largest open-web publishers." EDVA Op. at 43.

  5. "[T]he commercial realities of the publisher ad server market suggest that a monopolist could engage in anticompetitive conduct by raising prices or degrading product quality without seeing significant diminution of its customer base." EDVA Op. at 43-44.

  6. "Publisher ad servers for open-web display advertising constitute the area of effective competition and form a relevant antitrust market." EDVA Op. at 43-44

  7. "Publisher ad servers for open-web display advertising have a distinct purpose: they help publishers manage and monetize their web ad inventory. Publisher ad servers do this by offering a number of unique product features to publishers, such as allocating ad inventory between direct sales and programmatic sales; placing ad exchange bids in competition with bids from header bidding, programmatic direct sales, and other ad exchanges; rendering an advertisement on the publisher's webpage for each impression; billing for ads rendered; and providing inventory and revenue analytics." EDVA Op. at 43-44.

  8. "Publisher ad servers, which charge publishers a flat fee per impression sold, are priced differently than ad exchanges, which charge publishers a percentage-based fee per impression sold, and demand-side platforms, which charge advertisers a percentage-

based fee per impression purchased. Moreover, publisher ad servers are much less expensive than other ad tech tools." EDVA Op. at 43-44 (citations omitted).

9. The unique purpose, features, and pricing of the publisher ad server has resulted in its being recognized as a distinct product within the ad tech industry. EDVA Op. at 45.

10. In the ordinary course of business, Google regularly identified its publisher ad server, DFP, as being a unique product, and the firm has assessed its market share in display web publisher ad serving. EDVA Op. at 45.

11. Google's market definition expert, Dr. Mark Israel, agreed that publisher ad servers are 'components' of the ad tech stack that serve different purposes from buy-side tools, ad exchanges, and in-house ad tech used by social media companies. EDVA Op. at 45-46.

12. Google decreased DFP's quality by "plac[ing] restrictions on how publishers could work with rival ad exchanges" (e.g., giving AdX advantages over third-party exchanges with First Look and Last Look) and by removing features that its publishers used (e.g., eliminating variable price floors with Unified Pricing Rules), and DFP still maintained 99 of its top 100 publisher customers in the ensuing years. EDVA Op. at 45-46. [Note: UPR not in our case]

13. "[T]he evidence in the record supports the conclusion that publisher ad servers for open-web display advertising constitute a distinct, relevant market because they are <u>uniquely capable of performing ad-serving functions for websites</u>, which are essential components of news, media, and other online publishers' businesses." EDVA Op. at 47. [emphasis supplied]

14. "It is also infeasible for publishers to shift their users away from their websites to apps or social media pages." EDVA Op. at 48.

15. Nor are "in-house technologies developed by publishers to serve display ads on their websites reasonably interchangeable with publisher ad servers. Building an in-house ad server is 'incredibly sophisticated and incredibly complex,' and is not within the 'core competencies' of most organizations that publish news or other content online." EDVA Op. at 48-49.

16. "Other technologies capable of serving display ads on open-web publishers' websites are not reasonably interchangeable with—and cannot serve as effective substitutes for—publisher ad servers." EDVA Op. at 50.

**B. Ad exchanges for open-web display advertising is a relevant product market (EDVA Op. at 50-54)**

17. "[A]d exchanges for open-web display advertising constitute a distinct relevant product market." EDVA Op. at 50.

2

18. "Ad exchanges play a distinct role in the open-web display ad tech stack by connecting publishers using publisher ad servers with advertisers using programmatic buying tools such as demand-side platforms and ad networks" EDVA Op. at 50.

19. "Due to their unique ability to collect and rank ad bids from multiple buying tools in mere milliseconds, ad exchanges are involved in most programmatic open-web display transactions, are recognized as a distinct product by industry participants, and are priced differently than other ad tech tools." EDVA Op. at 50.

20. "[T]here is no other ad tech tool that is reasonably interchangeable with ad exchanges." EDVA Op. at 50.

21. "The ad exchange is the only ad tech tool through which publishers can auction their ad inventory at scale and in real-time to the largest sources of programmatic advertising demand." EDVA Op. at 50.

22. "The discrete nature of the ad exchange market is reflected in the distinct prices that ad exchanges charge publishers. Ad exchanges typically charge publishers a percentage of the total winning bid for each impression, while publisher ad servers typically charge publishers a flat fee per impression sold and demand-side tools charge advertisers directly." EDVA Op. at 50.

23. "Because ad exchanges have unique functionality—as reflected by their distinct pricing structure and the industry's recognition of them as a distinct product—other ad tech tools are not reasonably interchangeable or substitutable with ad exchanges." EDVA Op. at 52.

24. "Direct deals with advertisers are also not reasonable substitutes for ad exchanges, given the distinct advantages of programmatic advertising." EDVA Op. at 52.

25. "[A]n internal Google study projected that a 25% decrease in the price AdX charged would have limited impact on AdX's market share, indicating customer stickiness and inelastic demand."  EDVA Op. at 52.

26. "[T] he only other products that are reasonably interchangeable with an ad exchange that facilitates the sale of open-web display ads are other ad exchanges that facilitate the sale of open-web display ads." EDVA Op. at 54.

C. **The Relevant Market is Not a Two-Sided Market Under *Ohio v. Amex*.
(EDVA Op. at 60-67)**

27. "Google's primary competitors in the open-web publisher ad server space . . . do not operate two-sided transaction platforms, but rather specialize in serving only publishers and do not offer buy-side advertising tools." EDVA Op. at 63

3

28. In analyzing whether Google had monopoly power in the ad exchange market, the Court evaluated both sides of the ad-exchange market. EDVA Op. at 64.

## II. Google's Monopoly Power (EDVA Op. at 73-84)

### A. Google Has Monopoly Power in the Ad Server Market (EDVA Op. at 73-76)

29. "Google possesses monopoly power in the publisher ad server for open-web display advertising market." EDVA Op. at 73.

30. Google's publisher ad server DFP has a durable and "predominant share of the market" that is protected by high barriers both to entry and expansion. This conclusion is reinforced by evidence that Google has acted to degrade DFP's features without fear that its customers would switch to alternative publisher ad servers. EDVA Op. at 72

31. [I]n 2022, Google had a 91% market share of the worldwide publisher ad server market for open- web display advertisers as measured by number of impressions served. At 73 next paragraph from 2018 through 2022, Google share of this worldwide market held steady between 91.0% and 93.5%, and its U.S. Market share stayed between 86.5% and 92.3%. EDVA Op. at 73.

32. Google's internal estimates assessed DFP to have between 84% and 90% market share at different points over the past decade. EDVA Op. at 73.

33. The significant barriers to entry and expansion that exist in the publisher ad server market make DFP's high market share durable. EDVA Op. at 74.

34. Publishers almost always used a single ad server for open-web display ads because operating two or more publisher ad servers would not be practical due to challenges with forecasting, integration, and latency. EDVA Op. at 74.

35. Open web publishers very rarely switched from DFP to another ad server, even when Google makes product changes with which they disagree. EDVA Op. at 75.

36. Google degraded some DFP features, such as by removing publishers' ability to set a high price floor on AdX as part of its unified pricing rules update. EDVA Op. at 75.

37. DFP's 91% share of the worldwide market "leaves no doubt" as to Google's monopoly power, particularly when viewed in light of the high barriers to entry and expansion in the publisher ad server market. EDVA Op. at 76.

### B. Google has Monopoly Power in the Ad Exchange Market (EDVA Op. at 76-84)

38. "Google possesses monopoly power in the ad exchange for open-web display advertising market." EDVA Op. at 76.

39. Google's AdX has long been the dominant exchange for facilitating open-web display advertising. For over a decade Google has charged durable supracompetitive prices for AdX -- taking 20% of each open-web display transaction --_and has exhibited an unwillingness to lower AdX's take rate even as the market matured and other ad exchanges reduced their prices. EDVA Op. at 77.

40. AdX's charging a durable 20% take rate for well over a decade is direct evidence that Google has possessed monopoly power in the open-web display ad exchange market. EDVA Op. at 77

41. Competitors' "inability to constrain [AdX's] pricing" constitutes direct evidence of Google's monopoly power in the ad exchange market. EDVA Op. at 78

42. AdX's relatively high market share, viewed in conjunction with high barriers to entry and expansion that exist for ad exchanges, supports the conclusion that Google has had and continues to maintain monopoly power. EDVA Op. at 84.

43. Google's AdX has long been the dominant exchange for facilitating open-web display advertising. For over a decade, Google has charged durable supracompetitive prices for AdX—taking 20% of each open-web display transaction—and has exhibited an unwillingness to lower AdX's take rate even as the market matured and other ad exchanges reduced their prices. Despite the availability of lower priced exchanges, customers generally have not left AdX due to Google's substantial market power in the ad exchange market. EDVA Op. at 76-77.

44. [Google's] market power has been fortified by high barriers to entry that resulted from Google's scale and network effects across the open-web display ecosystem. Accordingly, Google has maintained a high share of the open-web display ad exchange market, with AdX having a market share roughly nine times greater than that of its next-largest competitor. EDVA Op. at 77.

45. AdX's durable 20% take rate constituents direct evidence of monopoly power. EDVA Op. at 80

46. Another direct sign of monopoly power is that Google has used its market power in adjacent segments of the ad tech ecosystem to make it more difficult for customers on both sides of the ad exchange market to switch to rival exchanges. EDVA Op. at 80.

### III. Google's Willful Acquisition of Maintenance of Monopoly Power and Entrenching of Its Monopoly Power With Anticompetitive Conduct (EDVA Op. at 85-)

47. "Google engaged in 'willful acquisition or maintenance of [its monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident' by tying DFP to AdX and committing a series of exclusionary and anticompetitive acts to entrench its monopoly power in two adjacent product markets." EDVA Op. at 112.

48. "Google's monopolies in the publisher ad server and ad exchange markets, enhanced by the AdX-DFP tie, have enabled Google to introduce a series of anticompetitive policies, practices, and technology changes to its sell-side ad tech tools that were not in its publisher customers' best interests. These changes decreased product quality and harmed competition by further entrenching Google as the dominant company in open-web display advertising." EDVA Op. at 98.

### A. Google Illegally Tied DFP and AdX Enhancing Its Monopoly Power (EDVA Op. at 90-98)

49. Google's tying of DFP to AdX violated Section 2 of the Sherman Act because it "contribute[d] significantly to the maintenance or creation of monopoly power . . . even though it [wa]s unilaterally imposed." EDVA Op. at 97.

50. "[T]he AdX-DFP tie has violated both Section 1 and Section 2 of the Sherman Act." EDVA Op. at 98.

51. "[T]he tying of AdX and DFP has had a 'not insubstantial impact on interstate commerce.'" EDVA Op. at 96.

**Elements of Tying**

52. "Publisher ad servers and ad exchanges are 'two separate products' that are not reasonably interchangeable" EDVA Op. at 91

53. "Google marketed DFP as a distinct product until it rebranded DFP as part of the Google Ad Manager product suite in 2018. EDVA Op. at 45."

54. "Google . . . 'condition[ed] purchase of the tying product [AdX] upon purchase of the tied product [DFP].'" EDVA Op. at 92.

6

55. "Google has possessed 'sufficient economic power in the tying product market to restrain competition in the tied product market.'" EDVA Op. at 95.

56. "Google combined DFP and AdX under a single publisher-facing product, Google Ad Manager, which further intertwined DFP and AdX." EDVA Op. at 81.

57. "Google's publisher customers . . . 'felt locked-in by dynamic allocation in DFP, which only gave AdX [and not other exchanges the] ability to compete' with real-time bids." EDVA Op. at 94.

58. "By forcing Google's publisher customers to use a product they would not necessarily have otherwise used, by making it difficult for rival publisher ad servers to compete on the merits, and by significantly reducing rivals' market share, the tying of DFP to AdX has had a substantial anticompetitive effect in the publisher ad server market for open-web display advertising." EDVA Op. at 96.

B. **Dynamic Allocation – First Look and Last Look Features Were Anticompetitive (EDVA Op. at 99-100)**

59. "First Look exacerbated the anticompetitive effect of the unlawful AdX-DFP tie by artificially advantaging AdX within DFP's auction logic at the expense of Google's publisher customers." EDVA Op. at 99.

60. "First Look, which required publishers using DFP to offer AdX a first right of refusal for each impression" was an "anticompetitive polic[y]." EDVA Op. at 99.

61. "Google's Last Look was another anticompetitive policy that entrenched Google's monopoly power, disadvantaged Google's publisher customers, and harmed the competitive process." EDVA Op. at 99.

62. "Th[e Last Look] DFP feature, which gave AdX the ability to see competing exchanges' bids in an otherwise sealed auction before AdX would bid, harmed publishers, rival ad exchanges, and advertisers using non-Google ad buying technologies." EDVA Op. at 99.

C. **Sell-Side DRS is Anticompetitive (EDVA Op. at 100)**

63. "The anticompetitive effects of Last Look have been compounded by Google's sell-side dynamic revenue share." EDVA Op. at 100.

64. By using the Last Look informational advantage to vary AdX fees and win impressions that it would have lost in a fair auction, Google has further enhanced AdX's market power at the expense of rivals, thereby reducing competition and harming its publisher customers' ability to diversify their revenue sources away from Google." EDVA Op. at 100 (citations omitted).

65. "[T]he primary purpose of sell-side dynamic revenue share was to outbid rival exchanges by using AdX's anticompetitive Last Look advantage." EDVA Op. at 109.

## IV.  Google's Defenses Were Rejected by the EDVA Court

### A. Procompetitive Justification and Anticompetitive Effects (See also 52, 57 above) (EDVA Op. at 104-112)

66. "Google has failed to proffer a sufficient procompetitive justification for its AdX-DFP tie, as each procompetitive benefit it alleged was either invalid or significantly outweighed by the tie's anticompetitive effects." EDVA Op. at 105.

67. "The procompetitive justifications that Google proffers for its anticompetitive conduct are both invalid and insufficient, and any procompetitive benefits of this conduct were far outweighed by its anticompetitive effects. Therefore, Google cannot evade liability under Sections 1 and 2 of the Sherman Act." EDVA Op. at 112.

68. "Google's procompetitive justifications for the actions it took to entrench its monopoly power and strengthen the AdX-DFP tie similarly fall short." EDVA Op. at 107.

69. "Google . . . did not establish any valid and sufficient procompetitive justifications for Last Look." EDVA Op. at 112.

70. "[J]ust as with Last Look, Google's proffered procompetitive justification for sell-side dynamic revenue share was pretextual." EDVA Op. at 112.

### B. Google's Conduct Did Not Amount to a Lawful Refusal to Deal

71. "The refusal to deal doctrine in <u>Trinko</u> does not apply to Google's conduct at issue." EDVA Op. at 102.

72. "[T]he refusal to deal doctrine articulated in <u>Trinko</u> does not protect Google from antitrust liability in this civil action." EDVA Op. at 104.

### C. Google's Conduct Did Not Amount to Product Design and Improvement

73. Google's arguments that its "design choices" improved safety and privacy, countered fraud, reduced latency, promoted investment, and decreased prices as being. EDVA Op. at 104-112.

74. EDVA Court rejected Google's "overarching argument that all of these changes are shielded from antitrust liability because they involved product design choices." EDVA Op. at 111

75. "Google's decade-long campaign of exclusionary conduct, however, is not properly characterized as a series of product design choices." EDVA Op. at 111

76. "It would not be accurate to classify the tying of two separate products, or the subsequent decisions that Google made to manipulate auction rules and restrict customer choice in markets in which the firm had monopoly power, as mere choices of product design" EDVA Op. at 111

### D. Google Should be Preclude from Raising Certain Defenses, and the following Defenses Should Be Stricken as collaterally estopped by the EDVA Opinion and Order

In addition to the above, Google should be precluded from raising the following defenses set forth in their Answer (ECF. No. 741):

77. Third Defense. Plaintiff's claims are barred, in whole or in part, because the Complaint fails to allege any legally cognizable relevant product or geographic market. (ECF. No. 741 at 69).

78. Fourth Defense. Google has never had, and is unlikely to obtain, monopoly power in any properly defined relevant market for advertising services. (ECF. No. 741 at 69).

79. Fifth Defense. Google's conduct alleged by Plaintiff in the Complaint was lawful, justified, procompetitive, and carried out in Google's legitimate business interests and constitutes bona fide competitive activity, the benefits of which significantly outweigh any alleged anticompetitive effects. (ECF. No. 741 at 69).

80. Sixth Defense: Plaintiff's claims are barred, in whole or in part, for failure to allege any plausible harm to competition or consumers. (ECF. No. 741 at 69).

81. Seventh Defense: Plaintiff's claims are barred, in whole or in part, because the Complaint fails to allege a cognizable antitrust injury. (ECF. No. 741 at 69).