**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- )
IN RE: GOOGLE DIGITAL ADVERTISING )    21-md-3010 (PKC)
ANTITRUST LITIGATION )
  )
-------------------------------------------------------- )
  )
THIS DOCUMENT RELATES TO: )
  )
INFORM INC., )    1:23-cv-01530 (PKC)
  )
              Plaintiff, )
  )
      vs. )
  )
GOOGLE LLC; )
ALPHABET INC.; and )
YOUTUBE, LLC, )    JURY TRIAL DEMANDED
  )
           Defendants. )
  )
-------------------------------------------------------- )

## MEMORANDUM OF LAW  INSUPPORT OF PLAINTIFF INFORM'S MOTION FOR PARTIAL SUMMARY JUDGEMENT AGAINST DEFENDANT GOOGLE LLC

Contents

I.    INTRODUCTION ...................................................................................1

II.    ARGUMENT ........................................................................................3

    A.    Count One – Monopoly and Monopoly Maintenance in Violation of Section 2 of the Sherman Act ...................................................................3

        1.    Product Markets: Publisher Ad Server and Ad Exchange Markets ........3

        2.    Defendants Should be Precluded from Relitigating Monopoly Power in the Publisher Ad Server and Ad Exchange Markets ........................................6

        3.    Inform is Entitled to Partial Summary Judgment on Monopoly Power.11

        4.    Google Should be Precluded from Relitigating that Specific Google Conduct Was Anticompetitive and Entrenched Its Monopoly Power.............12

        5.    Google Should be Precluded from Relitigating Their Failed Procompetitive Justifications for Their Anticompetitive Conduct.................17

    B.    Count Three – Attempted Monopoly (Section 2 of the Sherman Act)......18

    C.    Counts Four and Five – Unlawful Tying in Violation of Sections 1 and 2 of the Sherman Act and Section of the Clayton Act...........................................19

III.    CONCLUSION......................................................................................20

## I.    INTRODUCTION[1]

Inform was once a thriving digital media company that, in Google's own assessment, had "dominance" in the video advertising market with control of a large share of the premium news video ads.[2]  Inform's video platform matched curated video content from content creators with news publisher's original stories and incorporated those videos into articles posted on newspaper, magazine, radio and television publishers' websites on the open internet.  Inform's data collection capabilities dramatically increased its ability to target specific Internet users, making its competitive platform valuable to open web publishers, content creators, and advertisers.  By 2015, Inform was ranked as the Number 1 Online News & Information Property by comScore, with 27 million unique monthly viewers and 230 million videos viewed each month.

Inform was both a customer of Google's DFP ad server and AdX ad exchange, and a competitor in online video advertising.  Inform used Google's ad exchange AdX to access advertising demand and used Google's DFP ad server to deliver ads for all of its ad inventory on publishers' websites on the open web.

Inform's success did not go unnoticed.  Yahoo initiated talks with Inform, going so far as to sign a term sheet to acquire Inform for $375,000,000.  Google, however, took a different tack.  Understanding it had to compete on publisher supply (which Inform had) and not just ad tech, Google targeted and sabotaged Inform in an effort to replace Inform as the owner of the premium news ad inventory.[3]  Google targeted Inform to contract to use Google's AdX ad exchange and then its DFP ad server, which, unbeknownst to Inform, subjected its coveted premium ad inventory

---

[1] Pursuant to the Court's Orders dated May 13, 2025 [ECF No. 991] and May 15, 2025 [ECF No. 993], Plaintiff Inform Inc. ("Inform") hereby incorporates by reference Plaintiffs' Joint Memorandum of Law in Support of Their Motion for Collateral Estoppel and Partial Summary Judgment (hereinafter "Plaintiff's Jt. Memo."), being filed concurrently herewith, and submits this individual memorandum in support of Plaintiff Inform's Motion for Collateral Estoppel and Partial Summary Judgment. Bates numbered documents referred to herein have been produced in this litigation.

[2] GOOG-AT-MDL-008175764.

[3] GOOG-DOJ-03589977; GOOG-AT-MDL-B-008046672 at 6693.

to a host of anticompetitive conduct. And, unfortunately, Google succeeded. Within a few years of Google's targeted anticompetitive actions, Inform was no longer a going concern.

As a result of Google's actions, Inform filed the first ad tech monopoly case against Google LLC and YouTube LLC on November 25, 2019. Over the next several years, the Department of Justice and nearly every state filed antitrust actions involving the same claims that Google has monopolized the digital ad industry.[4] For several years now, the parties have been heavily litigating these cases with the DOJ in a coordinated fashion, with millions of documents produced, extensive coordinated depositions and motion practice, an appeal,[5] two separate trials held to date and a third set for later this summer in Texas.

Google has now been adjudged an illegal monopolist by two different federal courts in four overlapping markets; and has thrice been admonished by federal courts for destroying chat evidence admitting antitrust wrongdoing and for improperly invoking the attorney-client privilege to shield from discovery damning evidence of antitrust violations. Having had a full and fair opportunity in the EDVA Action to litigate the same issues involved here, it is now appropriate for this Court to find as a matter of law several matters already adjudicated against Google. These findings, described in detail in Attachment A, cover five broad areas where this Court can narrow the issues for trial: (1) product market definitions - publisher ad server and ad exchange; (2) Google's monopoly power in those markets; (3) Google's willful acquisition/maintenance of monopoly power and anticompetitive conduct; (4) unlawful tying of AdX and DFP; and (5) failure of certain Google's defenses and procompetitive justifications. For the reasons set forth below, the Court should grant Inform's motion for partial summary judgment.

---

[4] *See, e.g., U.S. v. Google,* 1:23-cv-108 (LMB/JFA) (EDVA) (the "EDVA Action").
[5] Prior to being sent to this MDL, the Inform case actually went up to the Eleventh Circuit Court of Appeals, where Inform won a reversal and its standing to sue as an efficient enforcer of the antitrust laws was confirmed. *Inform Inc. v. Google LLC*, 2022 U.S. App. LEXIS 24107 (11th Cir. Aug. 26, 2022).

## II.    ARGUMENT

The EDVA court found that the DOJ proved every element of its Sherman Act Section 1 and Section 2 claims for Monopoly and Unlawful Tying, extensively citing the documentary and testimonial evidence supporting the court's findings of fact and conclusions of law  in a detailed and rigorous 115-page opinion.  These claims are identical to  Inform's Third Amended Complaint (ECF No. 797, hereinafter "TAC"): Counts I (Monopoly) and IV (Unlawful Tying – Sherman Act) and overlap with Counts III (Attempted Monopoly) and V (Unlawful Tying – Clayton Act). As set forth below, Google should be precluded from relitigating issues. The application of collateral estoppel demonstrates that no issue of material fact remains as to numerous elements of Inform's Claims and that Inform is entitled to partial summary judgment on Counts I, III, IV and V.

### A.    Count One – Monopoly and Monopoly Maintenance in Violation of Section 2 of the Sherman Act[6]

Collateral estoppel is warranted on elements of Count I of Inform's TAC Section 2 claim for Monopoly and Monopoly Maintenance. The DOJ's Section 2 claim challenging Google's anticompetitive conduct in the publisher ad server and the ad exchange markets was fully litigated in the EDVA. As set forth below, the (1) product markets; (2) monopoly power; (3) Google's willful maintenance and the same anticompetitive conduct; and (4) anticompetitive effects found in that case are all the identical issues Inform is required to establish in this constituent case, to which evidence has been marshalled and Inform's experts have opined. With no dispute as to Google's liability under Section 2 of the Sherman Act, Inform is entitled to partial summary judgment on the same elements of its Count I.

#### 1.    Product Markets: Publisher Ad Server and Ad Exchange Markets

The EDVA court found two relevant product markets – the publisher ad server and ad exchange markets – and that Google had monopoly power in both of these two markets. These two markets are the same as the publisher ad server and ad exchange product markets alleged by Inform

---

[6] *See* Plaintiffs' Jt. Memo. at 10-11.

and opined on by Inform's economic expert. Google should be precluded from relitigating them here.

### a. Publisher ad server for open-web display advertising is a relevant product market.

The EDVA court concluded that: "[P]ublisher ad servers for open-web display advertising constitute a distinct relevant product market." EDVA Op. at 43. The court based its decision on certain factual findings, including, *inter alia*, the distinct purpose, function and product features of publisher ad servers[7]; the cost of the publisher ad server as compared to other ad tech products[8]; and lack of substitutability of other ad tools.[9] EDVA Op. at 43-44 (citations omitted). The court found that "[o]ther ad tech tools are not reasonably interchangeable with publisher ad servers."[10] EDVA Op. at 43-4.

Inform's TAC and Inform's economic expert similarly describe and define a publisher ad server product market.[11] Inform was a customer of Google's DFP publisher ad server and used that product to service Inform's open-web publisher clients' websites. With the DFP publisher ad server, Inform provided all types of display advertising onto its open-web publishers' websites as in the EDVA Action. That Inform used the DFP publisher ad server product to deliver ads on all of its ad inventory (*e.g.*, banner, outstream video ads, instream video ads)[12] to the same Internet users, on the same open-display publisher websites that are described by and were the subject of the EDVA court's does not change the product, the product market, or the court's conclusions.

---

[7] *See* Attachment A, Findings and Conclusions in United States of America et al v. Google LLC, 1:23-cv-00108-LMB-JFA (E.D.Va) (hereinafter Att. A) ¶¶ 2, 7, 9, 10, 11, 13 and compare TAC ¶117.

[8] *See* Att. A ¶8 and compare TAC ¶¶ 44, 169.

[9] *See* Att. A ¶4, 13, 14, 15 and compare TAC ¶¶ 120.

[10] *See* Att. A ¶3, 16.

[11] TAC ¶¶ 117-23.

[12] "At its the core, and from the perspective of advertising technologies involved in the process, video advertising is not much different from non-video display advertising, except for what is displayed or rendered on the screen." https://clearcode.cc/blog/video-advertising-and-video-ads; *See* GOOG-DOJ-14190136.

Notably, while the product is the publisher ad server, the type of ad inventory that the product served was examined for the purpose of measuring market share, *i.e.*, circumstantial evidence of market power. "Relevant markets need not have precise metes and bounds. Some substitutes may be closer, and others more distant, and defining a market necessarily requires including some substitutes and excluding others. Defining a relevant market sometimes requires a line-drawing exercise around product features, such as size, quality, distances, customer segment, or prices. There can be many places to draw that line and properly define a relevant market."[13] The product is the same: Google's DFP ad server served everything on the Inform's open-web publisher's pages.[14]

**b.    Ad exchanges for open-web display advertising is a relevant product market**

The EDVA court also found that: "[A]d exchanges for open-web display advertising constitute a distinct relevant product market." EDVA Op. at 50.  The EDVA court based its decision on certain factual findings, including, *inter alia*, the distinct purpose, function and product features of ad exchanges[15]; the cost of ad exchanges as compared to other ad tech products; [16] and lack of substitutability of other ad tools.[17] The EDVA court found that "The ad exchange is the only ad tech tool through which publishers can auction their ad inventory at scale and in real-time to the largest sources of programmatic advertising demand" and that "[d]irect deals with advertisers are also not reasonable substitutes for ad exchanges, given the distinct advantages of programmatic advertising." EDVA Ad Tech Op. at 52.

---

[13] U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines (December 18,  2023) (hereinafter "Merger Guidelines"), at 40.

[14] Moreover, courts recognize that, under the Sherman Act, smaller or "component" markets can exist entirely within a larger market. *Brown Shoe*, 370 U.S. at 325 ("[W]ithin [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." (citing *United States v. E. I. du Pont de Nemours Co.*, 353 U.S. 586, 593-95 (1957)).

[15] See Att. A ¶ 18-19, 21, 23 and compare TAC ¶¶ (describing the purpose, function and features of ad exchanges).

[16] See Att. A ¶ 8, 22 and compare TAC ¶¶ 44.

[17] See Att. A ¶ 20, 23, 24, 26 and compare TAC ¶¶ .

Here, again, the product is the ad exchange and Inform, as a customer of Google's AdX ad exchange, auctioned off every type of inventory through Google's AdX ad exchange.

### c.    The Relevant Market is Not, as Google Argues, a Massive Single Two-Sided Market Under *Ohio v. Amex*.

In the EDVA Action, as here, Google has argued that the relevant market is a single massive two-sided ad tech stack transaction market.  But the EDVA court rejected Google's argument that this case involved a single two-sided transaction platform market and found that it was not governed by *Ohio v. Am. Express Co*., 585 U.S. 529, 546 (2018).[18]  In so holding, the court looked at Google's primary publisher ad server competitors[19] and distinguished the separate ad exchange product.[20]  Accordingly, in analyzing whether Google had monopoly power in the distinct *ad exchange market*, the court specifically evaluated both sides of that market.  *Id*.  This finding applies here as well.

### d.    Geographic Market

The EDVA court's finding of geographic market as worldwide does not preclude estoppel here. First, the EDVA court noted the both parties recognized that a U.S. market would be appropriate. EDVA Op. at 68. Second, the court cited both the United States and market share in the opinion, which likewise demonstrated monopoly power.  EDVA Op. at 73.  Finally, the court's findings were based on direct evidence of market power without reliance on the market's geographic scope.  Inform's economic and source code experts likewise rely on direct evidence of controlling prices, excluding competition and algorithm manipulation, which is not affected by the geographic scope of the market. Moreover, the coordinated evidence demonstrates that Google's market shares go up when the geographic market expends.

### 2.    Defendants Should be Precluded from Relitigating Monopoly Power

---

[18] "The nature of commercial competition also requires courts to avoid classifying products as part of two-sided transaction platforms merely because they help customers on one side of a transaction-facilitating industry improve their capacity to transact."  EDVA Op. at 66.
[19] *See* Att. A ¶27.
[20] *See* Att. A ¶28.

<u>**in the Publisher Ad Server and Ad Exchange Markets**</u>

At issue in Inform's case is Google's monopoly power in the publisher ad server and ad exchange markets – the same markets adjudicated in the EDVA Action. *See* Inform TAC, § VII.[21]

As set forth in Inform's Third Amended Complaint:

> The relevant markets in this case include … the Ad Server market and … the Ad Exchange Market.… Inform is a participant, as a competitor and/or customer in each of these markets (collectively, the "Relevant Markets") and has suffered antitrust injury in each of these markets."

Inform TAC at. ¶35. In both the EDVA case and here, Google has proffered the same economic expert Dr. Mark Israel, who's findings were rejected by the EDVA court.[22]

### a.    <u>**Market Power Generally**</u>

Monopoly power is "the power to control price or exclude competition." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 500 (2nd Cir. 2004) (quoting *du Pont*, 351 U.S. 377 at 391); *PepsiCo, Inc. v Coca-Cola Co*., 315 F.3d 101, 109 (2d Cir. 2002). Such market power can be proven directly or indirectly. *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001). Direct proof of monopoly power includes evidence of supracompetitive prices or the exclusion of competition. *PepsiCo, Inc.*, 315 F.3d at 107 (quoting *du Pont*, 351 U.S. at 391); *In re Actos Antitrust Litig.*, 2025 U.S. Dist. LEXIS 62353, at *46 (S.D.N.Y. Mar. 31, 2025) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018)); *see also Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3rd Cir. 2007). "Indirect proof is derived 'from the structure and composition of the relevant market'" (EDVA Op. p. 71 (*quoting Qualcomm Inc.,* 501 F.3d at 307)) and may be inferred from a company's dominant share of the relevant market. *See United States v. Grinnell Corp.,* 384 U.S. 563, 751 (1966). Where there is direct evidence that Defendants have controlled

---

[21] The relevant markets in this case include … the Ad Server market and … the Ad Exchange Market .… Inform is a participant, as a competitor and/or customer in each of these markets (collectively, the "Relevant Markets") and has suffered antitrust injury in each of these markets." Inform TAC ¶107.

[22] EDVA Op. at 79-80.

prices or excluded competition, the existence of monopoly power is clear. *See Microsoft Corp.*, 253 F.3d at 51. Indeed, a defendant's behavior "may well be sufficient to show the existence of monopoly power." *Microsoft Corp.*, 253 F.3d at 57. Inform has pled and the EDVA court has found both evidence of supracompetitive prices and the exclusion of competition.

b. <u>**Google's Monopoly Power in the Publisher Ad Server Market**</u>

The EDVA court's finding that "Google possesses monopoly power in the publisher ad server for open-web display advertising market"[23] (EDVA Op. at 73), should be adopted by this Court. In finding monopoly power, the court made certain underlying findings including that DFP has a durable and predominant share of the market[24]; that its monopoly power is protected by high barriers to entry[25]; and that publishers single home and rarely switch publisher ad servers as near impossible.[26]

The court found that Google had a substantial share of the ad server market over the last ten years and that Google "assessed DFP to have between 84% and 90% market share at different points over the past decade."[27] EDVA Op. at 73; *see also id. citing* PTX254 at -238 ("we [Google] are the defacto (sic), preferred ad server of choice for 90% of publishers."); *id.* (citing plaintiff's expert Dr. Lee's finding that from 2018 through 2022, Google's share of the publisher ad server market was between 91.0% and 93.5% and between 86.5% and 92.3% of the U.S. market share).[28] The EDVA court also found that the DOJ's assessment that DFP had 91% of the market, which "leaves no doubt" as to Google's monopoly power, was "consistent with Google's internal estimates, which assessed DFP to have between 84% and 90%market share at different points over

---

[23] *See* Att. A ¶29.
[24] *See* Att. A ¶30-32.
[25] *See* Att. A ¶29 EDVA Op. at 74
[26] *See* Att. A ¶¶ 34.
[27] *See* Att. A¶¶ 31-32.
[28] *See* Att. A ¶31.

the past decade."[29]  The EDVA court specifically found that Google had in fact "degrade[d] DFP's features without fear that its customers would switch to alternative publisher ad servers."[30]

The court also held that "significant barriers to entry and expansion that exist in the publisher ad server market make DFP's high market share durable."  EDVA Op. at 74.  The court found that building a publisher ad server is a "complex, resource-intensive process, even for a large corporation," *id*. (internal citations omitted), and that simply switching servers is a substantial process.  *Id. (citing* PTX1814 at -745 (*"*switching publisher ad servers "[t]akes an act of God to do" and is a "nightmare" because "[n]othing has such high switching costs.").[31]  Moreover, it is difficult to gain ad server customers because in addition to these barriers, "publishers almost always use a single ad server for open-web display ads" because of the impracticality of operating two with regard to forecasting, integration and latency issues.  *Id.*  As a result, competition in the publisher ad space has greatly contracted.  *Id.* ("many once-large rival ad servers have either left the ad serving business entirely … or sought to compete in channels other than other open-web display advertising") (citations omitted).

The court also found that Google was able to degrade features of DFP and not alter its market dominance, despite Google receiving negative feedback from publishers: "Google was not concerned about whether publishers would switch away from DFP." EDVA Op. at 76. "[A]lthough Google decreased DFP's quality by placing restrictions on how publishers could work with rival ad exchanges (*e.g.*, giving AdX advantages over third-party exchanges with First Look and Last Look) and by removing features that its publishers used (*e.g.,* eliminating variable price floors with Unified Pricing Rules), DFP still maintained 99 of its top 100 publisher customers in the ensuing years." *Id.* at 46 (quotation and citations omitted) (emphasis in original).[32]

---

[29] *See* Att. A ¶¶ 30, 33, 34.

[30] *See* Att. A ¶¶12, 35.

[31] Indeed, Google described Inform's switching ad servers from Auditude to DFP in 2013 as a *herculean effort*, months in the making, that took several tries to get right. GOOG-AT-MDL-B-009258824.

[32] *See* Att. A ¶12. Google's Expert Dr. Israel contended that the actions that allegedly degraded DFP's product quality were not sufficient evidence of monopoly power because what DFP's

c.    **Google's Monopoly Power in the Ad Exchange Market**

The EDVA court also found that "Google possesses monopoly power in the ad exchange for open-web display advertising market." EDVA Op. at 50. *Id.* The court found that AdX's charging "a durable 20% take rate for well over a decade is direct evidence that Google has possessed monopoly power in the open-web display ad exchange market."[33] EDVA Op. at 77. Google employees recognized that AdX's take rate was higher than that of rival ad exchanges. *Id.;* EDVA Op. at 79 (*citing* PTX612- at -035 (Google executive stating "I don't think there is 20% of value in comparing two bids"). Moreover, Google maintained its 20% take rate, even when other exchanges further reduced their rates, and offered only "minimal" discounts to a "handful of large publishers." EDVA Op. at 77. Barriers to entry supported the conclusion tat Google has and continues to maintain monopoly power.[34]

The court rejected Google and Dr. Israel's contention that because the 20% figure existed prior to Google's possessing any alleged monopoly power, and Google did not raise prices, this was an indication of lack of monopoly power. EDVA Op. at 80. The court found: "[t]he steadiness with which Google has charged a 20% fee in a rapidly maturing market involving transactions with minimum variable costs, the repeated recognition by Google employees that the services AdX provided were no longer with 20% of publisher revenue, and the strong evidence that customers were unable to switch from AdX even when other a exchanges lowered their process all support the finding that AdX charged supracompetitive prices." *Id.* As a result, the court found that "competitors' 'inability to constrain [AdX's] pricing' constitutes direct evidence of Google's

---

quality would have been in a "but for competitive world" had not been shown. EDVA Op. at 76. The court rejected Dr. Isreal's contention that monopoly power had not been shown: "the lack of airtight direct evidence is immaterial here. DFP's 91% share of the worldwide market leaves 'no doubt' as to Google's monopoly power, particularly when viewed in light of the high barriers to entry and expansion in the publisher ad server market… Plaintiff's evidence that Google exercised this market power to harm its publisher customers, while not definitive in isolation, only reinforces this conclusion." *Id.* (internal citations omitted).

[33] *See* Att. A ¶¶ 39, 40, 43, 45.

[34] *See* Att. A ¶¶ 42, 44.

monopoly power in the ad exchange market."[35]  *Id.* at 78 (*quoting McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015).

The court likewise found direct evidence that Google used its market power in adjacent segments of the ad tech ecosystem to make it harder for its customers on either side of the ad exchange market to switch to rival exchanges[36]; that Google disadvantaged its own clients[37]; that publishers had to use DFP if they wanted access to AdX's unique demand[38]; and that GAM "further intertwined DFP and AdX."[39]  The court determined that these practices on the buy- and sell-side of its platform are *direct evidence* that Google could set terms "without considering rivals and constituted behavior that is difficult to explain unless Google had monopoly power."  *Id.* (*quoting Microsoft*, 253 F.3d at 57-58).  Thus, "the totality of evidence is consistent with substantial and sustained market power on the part of AdX."  *Id.* at 84 (internal quotation omitted).

While the EDVA court found circumstantial evidence of market power in the two markets, the EDVA court relied heavily on *direct evidence* in finding Google's monopoly power in the publisher ad server and ad exchange markets.

### 3.    Inform is Entitled to Partial Summary Judgment on Monopoly Power

Inform is entitled to partial summary judgment on the issue of monopoly power, which is central to Inform's Section 2 Claims alleged in Count I (Monopoly and Monopoly Maintenance), Count III (Attempted Monopoly), and Counts IV and V (Tying under the Sherman Act and the Clayton Act respectively) of Inform's TAC. *See Discover Fin. Servs. v. Visa U.S.A. Inc.,* 598 F. Supp. 2d 394, 397-98 (SDNY 2008).  Google had a full and fair opportunity to litigate these issues with the same witnesses, the same experts and the same coordinated discovery and should now be

---

[35] *See* Att. A ¶ 41.

[36] See EDVA Op. at 80.

[37] Google limited AdWords' exchange bidding to AdX, despite recognition inside Google that allowing AdWords to bid on other exchanges would be beneficial to AdWords' advertiser customers in order to make and keep AdWords a "must call" exchange and solidify what it touted as AdX's unique demand.  *Id.* at 80-1.

[38] *Id.* at 81.

[39] EDVA Op. at 81.

collaterally estopped from disputing its monopoly power in the publisher ad server and ad exchange markets.

### 4.   Google Should be Precluded from Relitigating that Specific Google Conduct Was Anticompetitive and Entrenched Its Monopoly Power

The EDVA court held that "Google engaged in 'willful acquisition or maintenance of [its monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident' by tying DFP to AdX and committing a series of exclusionary and anticompetitive acts to entrench its monopoly power in two adjacent product markets. The procompetitive justifications that Google proffers for its anticompetitive conduct are both invalid and insufficient, and any procompetitive benefits of this conduct were far outweighed by its anticompetitive effects. Therefore, Google cannot evade liability under Sections 1 and 2 of the Sherman Act." EDVA Op. at 112.  These findings parallel the allegations in Inform's TAC.[40]

The court further found that "Google's monopolies in the publisher ad server and ad exchange markets, enhanced by the AdX-DFP tie, have enabled Google to introduce a series of anticompetitive policies, practices, and technology changes to its sell-side ad tech tools that were not in its publisher customers' best interests. These changes decreased product quality and harmed competition by further entrenching Google as the dominant company in open-web display advertising."  EDVA Op. at 98.

---

[40] *See* TAC ¶15("The Defendants' actions were strategic and willful. To maximize their advertising profits and to protect their valuable monopolies against competitive threats, the Google Defendants engaged in . . . anticompetitive conduct - carried out through its own digital products and services - designed to thwart competition on the merits") and ¶ 300 ("Google willfully came to dominate the ad server [and] ad exchange . . . markets by: . . . (2) illegally tying distinct products together and coercing the use of tied products to further unlawfully gain market share and create barriers to entry in ad server and OLV ad markets; (3) engaging in a series of deceptive and anticompetitive tactics (enabled by the unlawful tying); . . . rather than competing on the merits.")

As set forth below, these issues are identical issues in the Inform Action, have been litigated in fact and conclusively decided in the EDVA Action, and were necessary to support a valid and final judgment on the merits in the EDVA Action.[41]

### a. Google Illegally Tied DFP and AdX Enhancing Its Monopoly Power in Violation of Sherman Act Sections 1 and 2

The EDVA court concluded that Google's tying of DFP to AdX violated Section 2 of the Sherman Act because it "contribute[d] significantly to the maintenance or creation of monopoly power . . . even though it [wa]s unilaterally imposed." EDVA Op. at 97. The court found that "By forcing Google's publisher customers to use a product they would not necessarily have otherwise used, by making it difficult for rival publisher ad servers to compete on the merits, and by significantly reducing rivals' market share, the tying of DFP to AdX has had a substantial anticompetitive effect in the publisher ad server market for open-web display advertising. Accordingly, the AdX-DFP tie has violated both Section 1 and Section 2 of the Sherman Act." EDVA Op. at 98. The court also held that "the tying of AdX and DFP has had a 'not insubstantial impact on interstate commerce.'" EDVA Op. at 96.

In connection with its finding of illegal tying,[42] the court made a number of findings that the Court should adopt and not force the parties to relitigate. These detailed findings at Paragraphs 49-58 of Attachment A. The issue before the Court here is identical to that considered by the EDVA court. Specifically, in Counts IV and V of Inform's TAC alleges illegal tying by Google of AdX and DFP and as an anticompetitive act under Count I.[43]

---

[41] Four of the five experts that Google has proffered in the Inform case were the same experts that rendered opinions and were rejected in the EDVA Action. These experts testified that substantial portions of their reports in this case came from their DOJ reports. The opinions of those who testified in the EDVA Action were considered and rejected by that court.

[42] The elements of a tying claim under the Sherman Act, which are set forth in Plaintiff's Jt. Memo, demonstrate that the EDVA findings were necessary to support a valid and final judgment on the merits in the EDVA Action. As enumerated above, Judge Brinkema's decision makes each one of these findings.

[43] *See* Att. A¶¶ 57-58 and compare TAC at ¶168, 173 including that ("Google has used and leveraged the monopoly power of its AdX ad exchange to coerce publishers to license its DFP publisher ad server by conditioning the sale of its AdX ad exchange product on the use of its

The issue of Google's illegal tying of AdX and DFP was actually litigated and decided by the court in the EDVA decision. Likewise, Google had a full and fair opportunity to litigate the issue in the EDVA Action. Indeed, the EDVA court expressly found that the tying by Google of its DFP publisher ad server with its AdX ad exchange is what technologically enabled Google's anticompetitive conduct.[44] These allegations are the core underpinning of Inform's TAC in which Inform has alleged that, "Obtaining monopoly power in the ad server market was a lynchpin to the anticompetitive conduct that followed. The illegal tying of Google's AdX with the ad server enabled Google's ad server to rise to dominance, entrenched its monopoly power, and furthered the anticompetitive conduct set forth herein" and that "[o]nce Google's DFP ad server became the monopoly ad server (through *inter alia* its illegal tying of its AdX), Google was able to carry out a host of other anticompetitive conduct that maximized Google revenue including but not limited to: Dynamic Allocation; Enhanced Dynamic Allocation; and Dynamic Revenue Sharing, each described below."[45]

### b. <u>Dynamic Allocation – First Look and Last Look Features</u>

The EDVA court also made clear determinations regarding the anticompetitive nature of Google's Dynamic Allocation algorithms, including the First Look and Last Look components. The court held that "First Look, which required publishers using DFP to offer AdX a first right of refusal for each impression" was an "anticompetitive polic[y]" and that "First Look exacerbated the anticompetitive effect of the unlawful AdX-DFP tie by artificially advantaging AdX within

---

separate DFP ad server product."); TAC at ¶173 (the "tie was not optional but was required and coercive, forcing publishers to use Google's DFP ad server in order to receive competitive live bids from Google's AdX exchange.")

[44] "Google's monopolies in the publisher ad server and ad exchange markets, enhanced by the AdX-DFP tie, have enabled Google to introduce a series of anticompetitive policies, practices, and technology changes to its sell-side ad tech tools that were not in its publisher customers' best interests. These changes decreased product quality and harmed competition by further entrenching Google as the dominant company in open-web display advertising." EDVA Op. at 98.

[45] *See* TAC III.A.1.(c) entitled: "*Google's Illegal Tying Enabled the Anticompetitive Conduct that Followed*" and ¶¶ 184-188; *see also* TAC III.A.1(a) ("*Illegal Tying and Bundling of Services: Tying of AdX to Google's DFP*") and ¶¶ 166-177.

DFP's auction logic at the expense of Google's publisher customers." EDVA Op. at 99.   These findings parallel Inform's allegations as in the TAC and are central to Inform's Section 2 Claims.[46]

Likewise, the court concluded that Google's Last Look "feature" was "another anticompetitive policy that entrenched Google's monopoly power, disadvantaged Google's publisher customers, and harmed the competitive process. This DFP feature, which gave AdX the ability to see competing exchanges' bids in an otherwise sealed auction before AdX would bid, harmed publishers, rival ad exchanges, and advertisers using non-Google ad buying technologies." EDVA Op. at 99.[47] These allegations are likewise parallel to the anticompetitive conduct alleged in the TAC and are central to Inform's Section 2 Claims.[48]

Google's Dynamic Allocation—including its First Look and Last Look algorithms—was alleged to be anticompetitive in Inform's TAC, with the TAC describing how "[u]nder [Dynamic Allocation], Google used the dominance it held with its DFP ad server to impart a substantial new unearned and anticompetitive advantage to its own AdX exchange: a right of first refusal" and how Google self-preferenced by making its "AdX [] the only exchange with an unprecedented backdoor right of first refusal [a "First Look"] on publishers' inventory in DFP." TAC at 193-94.  The TAC also described in detail how Last Look allowed Google own ad exchange to "wait for other exchanges to submit their bids before making its own, a dynamic that left Google always in a position to outbid its rivals."[49]  This functionality is described in exactly the same way as it was by the EDVA court.  *See, e.g.*, EDVA Op. at 29 ("Google required publishers using DFP to offer AdX a first right of refusal for each impression … In other words, a publisher using DFP had to give AdX the opportunity to buy the publisher's impression before any rival exchanges were permitted to bid for that impression."); EDVA Op. at 35 ("AdX would then have the unique opportunity to adjust its bid in response to the highest bid from rival ad exchanges.").

---

[46] *See* TAC III.A.2.(a): "*Dynamic Allocation*" and ¶¶ 189-197; TAC III.A.2.(c) ¶¶ 213-216
[47] *See* Att. A ¶¶59-62.
[48] *See* TAC III.A.2.(c): *Other Self-Preferencing Measures: Last Look []*and ¶¶ 213-216.
[49] TAC ¶213.

In making the determination that Google violated Section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in the relevant markets, Judge Brinkema necessarily made a finding that Google's conduct was anticompetitive. *See* EDVA Op. at 109 ("the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.") (citation and internal quotations omitted). Moreover, in reaching these determinations, Judge Brinkema also concluded that First Look "artificially advantage[ed] AdX within DFP's auction logic at the expense of Google's publisher customers," EDVA Op. at 99, and that Last Look "harmed publishers, rival ad exchanges, and advertisers using non-Google ad buying technologies" and also "harmed the competitive process." EDVA Op. at 99.

### c.    Sell-Side DRS is Anticompetitive

The EDVA court also recognized that Google's Sell-Side Dynamic Revenue Share algorithm was anticompetitive, noting both its "exclusionary nature"[50] as well as its synergistic effects with Last Look: "[T]he primary purpose of sell-side dynamic revenue share was to outbid rival exchanges by using AdX's anticompetitive Last Look advantage." EDVA Op. at 109. "The anticompetitive effects of Last Look have been compounded by Google's sell-side dynamic revenue share. By using the Last Look informational advantage to vary AdX fees and win impressions that it would have lost in a fair auction, Google has further enhanced AdX's market power at the expense of rivals, thereby reducing competition and harming its publisher customers' ability to diversify their revenue sources away from Google." EDVA Op. at 100 (citations omitted).[51]

The EDVA court's findings concerning sell-side DRS mirror Inform's allegations and Inform's economic expert's opinions.[52] As above with respect to the First Look and Last Look

---

[50] EDVA Op. at 109.

[51] *See* Att. A ¶¶ 62, 64.

[52] For example, in its TAC, Inform alleged that "Dynamic Revenue Share was exclusionary and successfully foreclosed competition in the ad exchange and online video advertising markets" and noted—as did the EDVA Order—that it was designed to allow google to win over rival exchanges. *See, e.g.* TAC ¶ 226 ("Dynamic Revenue Sharing allowed lower quality advertisements to win

algorithms, collateral estoppel applies to the issue of the anticompetitive natures of Google's Sell-side DRS as it was litigated and decided in the EDVA case and necessary to the EDVA court's decision.

### 5.    Google Should be Precluded from Relitigating Their Failed Procompetitive Justifications for Their Anticompetitive Conduct

For the conduct found to be anticompetitive, the EDVA court also held that Google failed to present any valid or sufficient procompetitive justification for its conduct. For its AdX-DFP tying, the EDVA court thoroughly addresses and rejects each of Google's purported procompetitive justifications from both the buy-side and sell-side perspectives, including its various purported quality, performance, and security justifications.  *See* EDVA Op. at 105-7.

The EDVA court considered and rejected Google's purported revenue increase justification for its First Look and Last Look algorithms—recognizing that, although "[s]ome aspects of Dynamic Allocation…did increase publishers' revenue substantially," First Look and Last Look actually "resulted in less revenue for publishers" and "did not provide publishers with as much revenue as they would have received in a fair auction."  EDVA Op. at 108.  And she went on to find that that Google's argument that "sell-side dynamic revenue share helped create matches for impressions that would not have sold to any advertisers without it" was merely "pretextual." EDVA Op. at 108.

For similar reasons, certain of Google's defenses should also be adjudicated now.  In this case, as in the EDVA Action, Google has argued that (1) its conduct amounted to a lawful refusal to deal[53]; and (2) that its conduct amounted to legitimate design or product improvements, and that as to each it is therefore immune from antitrust scrutiny.[54] The EDVA court squarely rejected both

---

through the Google auctions, when a higher quality advertisement should have won through a competitor's exchange."); ¶ 228 ("Dynamic Revenue Sharing manipulated Google's exchange fee after soliciting auction bids and 'peeking' at bids on rival exchanges").

[53] *See* Google LLC's Memorandum of Law in Support of Its Motion for Summary Judgement (at 19-21); SJ Denied ECF 771 ("MOTION for Summary Judgment – DENIED").

[54] *See* Google LLC's Memorandum of Law in Support of Its Motion for Summary Judgement (at 21-22); SJ Denied ECF 771 ("MOTION for Summary Judgment – DENIED").

of these defenses.[55] In doing so, the district court rejected as pretextual and unsubstantiated Google's arguments that its "design choices" improved safety and privacy, countered fraud, reduced latency, promoted investment, and decreased prices as being. EDVA Op. at 104-112.EDVA Op. at 104. Collateral estoppel compels the same result here.

In addition, Google should be precluded from raising the following defenses set forth in their Answer (ECF. No. 741) as collaterally estopped by the EDVA Opinion: (1) Third Defense (that the Complaint fails to allege any legally cognizable relevant product or geographic market (ECF. No. 741 at 69); (2) Fourth Defense (that Google does not have monopoly power) (*id*.); (3) Fifth Defense (that Google's conduct was lawful, justified, procompetitive, and carried out in Google's legitimate business interests) (*id.* ); (4) Sixth Defense (for failure to allege any plausible harm to competition or consumers) (*id*.); and (5) Seventh Defense (Plaintiff's claims fails to allege a cognizable antitrust injury) (*id*.). As set forth above, these defenses were raised by Google, have been litigated in fact and conclusively decided in EDVA Action and were necessary to support a valid and final judgment on the merits in the EDVA Action.[56]

## B.     Count Three – Attempted Monopoly (Section 2 of the Sherman Act)

Count III of Inform's TAC asserts a claim for, *inter alia*, attempted monopoly of the ad exchange server and online video advertising markets. To show attempted monopoly under Section 2, a plaintiff must allege: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.,* 383 F. Supp. 3d 187, 219 (S.D.N.Y. 2019). A company "already enjoying a substantial monopoly in its area,

---

[55] *See* Att. A. 71-76. EDVA Op. at 111 (finding "Google's decade-long campaign of exclusionary conduct, however, is not properly characterized as a series of product design choices").

[56] *See FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (summary judgment appropriate where there "is an absence of evidence to support an essential element of the non-moving party's case." (internal citations omitted)); *see also U.S. Bank Nat'l Ass'n v. Dexia Real Est. Cap. Mkts*., 2014 U.S. Dist. LEXIS 93543 at *33-34 (S.D.N.Y. July 9, 2014), rev'd on other grounds, 643 F. App'x 48 (2d Cir. 2016)(dismissal of affirmative defense is also appropriate where defendant is collaterally estopped to raise defense).

violates the 'attempt to monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition." *Lorain Journal Co. v. United States*, 342 U.S. 143, 154 (1951).

The findings above as to (1) market definition, (2) monopoly power, and (3) anticompetitive conduct are likewise applicable to Inform's attempted monopoly claim in Count III of the TAC.[57] Specific anticompetitive intent may be inferred from the defendants' predatory conduct itself "essentially reducing the analysis to two elements." *Servicetrends, Inc. v. Siemens Med. Sys..*, 870 F. Supp. 1042, at 1053–54 (N.D. Ga. 1994) (citations omitted); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ("Unfair or predatory conduct may be sufficient to prove the necessary intent to monopolize"). As this Court recognized, specific intent "may be proven through the nature of the anticompetitive actions that have been taken. . ." [and] also "can be derived from [defendants'] words or a stated goal. Moreover, [a] dangerous probability of success may exist where the defendant possesses a significant market share when it undertakes the challenged anticompetitive conduct." *Google I*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022)(quotations omitted). Thus, the findings of as to the ad exchange market definition, monopoly power in that market and anticompetitive conduct as to any properly pled and relevant are likewise applicable to Inform's Count III claim for Attempted Monopoly.[58]

### C. <u>Counts Four and Five – Unlawful Tying in Violation of Sections 1 and 2 of the Sherman Act and Section of the Clayton Act</u>

In addition to asserting tying as anticompetitive under Section 2 of the Sherman Antitrust Act, plaintiff in form has likewise plead violations of Section 1 of the Sherman Antitrust Act and Section 3 of the Clayton act. The elements of establishing a Claton Act tying claim are identical or substantially similar to the Section 1 tying claim found against Google in the EDVA action. *See Airweld, Inc. v. Airco, Inc*., 742 F.2d 1184, 1189 n.2 (9th Cir. 1984) (applying same elements to analyze whether tying arrangement "violated . . . section 1 of the Sherman Act . . . and section 3

---

[57] *See* TAC ¶¶ 366-73.

[58] *See* TAC ¶¶ 96, 99, 106, 213, 279, 329, 339-341, 374-75, 385. Inform's allegations of specific intent include but are not limited to Defendants' anticompetitive conduct already recognized as plausible by this Court and detailed in the TAC.

of the Clayton Act"); *see also Mozart v. Mercedes-Benz of N. Am.*, 833 F.2d 1342, 1352 (9th Cir.

1987) (noting "the elements for establishing a Sherman Act § 1 claim and a Clayton Act § 3 claim"

based on an illegal tying arrangement "are virtually the same").

## III.    CONCLUSION

For the foregoing reasons, Inform respectfully requests that the Court GRANT partial

summary judgement against Google as to the facts and judicial findings set forth in Attachment

A and described above. Oral argument is requested.

Respectfully submitted, this 20th day of June, 2025.


HERMAN JONES LLP

/s/ *Serina M. Vash*
_____

Serina M. Vash
(NYS Bar No. 2773448)
John C. Herman
  (Georgia Bar No. 348370)
HERMAN JONES LLP
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Telephone:  (404) 504-6500
Facsimile:  (404) 504-6501
jherman@hermanjones.com
pjones@hermanjones.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 20, 2025, I authorized the electronic filing of the above document with the Clerk of Court using CM/ECF which will send electronic notification of such filing to all registered counsel.


<u>  /s/ Serina M. Vash    </u>
Serina M. Vash
(NYS Bar No. 2773448)