**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | Case No. 1:21-md-03010 (PKC) |

*This Document Relates To:*

| | |
|---|---|
| ASSOCIATED NEWSPAPERS LTD. and MAIL MEDIA, INC.<br><br>                               Plaintiffs,<br><br>    -against-<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>                               Defendants. | Case No. 1:21-cv-03446 (PKC) |
| GANNETT CO., INC.<br><br>                               Plaintiff,<br><br>    -against-<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>                               Defendants. | Case No. 1:23-cv-5177 (PKC) |

**PLAINTIFFS DAILY MAIL AND GANNETT'S MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ....................................................................................................... 1

BACKGROUND .......................................................................................................... 2

LEGAL STANDARD ................................................................................................... 4

ARGUMENT ............................................................................................................... 5

I.  The Court Should Enter Partial Summary Judgment for Daily Mail and Gannett on
    Their Antitrust Claims ....................................................................................... 5

    A.  The Court Should Enter Partial Summary Judgment on Count I (Ad Server
        Monopolization)........................................................................................ 6

    B.  The Court Should Enter Partial Summary Judgment on Count II (Ad
        Exchange Monopolization)...................................................................... 13

    C.  The Court Should Enter Partial Summary Judgment on Count III
        (Attempted Monopolization of Ad Exchange Market) and Count IV
        (Unlawful Tying) .................................................................................... 18

II. The Court Should Grant Partial Summary Judgment on Several Google Defenses.......... 19

CONCLUSION............................................................................................................ 20

# TABLE OF AUTHORITIES

Page

## CASES

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .......................................................................... 6

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
598 F. Supp. 2d 394 (S.D.N.Y. 2008) ........................................................ 5

*E&L Consulting, Ltd. v. Doman Indus., Ltd.*,
472 F.3d 23 (2d Cir. 2006) ................................................................ 11

*F.T.C. v. Surescripts, LLC*,
665 F. Supp. 3d 14 (D.D.C. 2023) ........................................................... 5

*GAF Corp. v. Eastman Kodak Co.*,
519 F. Supp. 1203 (S.D.N.Y. 1981) .................................................... 4, 5, 8

*In re Google Digit. Advert. Antitrust Litig.*,
627 F. Supp. 3d 346 (S.D.N.Y. 2022) ............................................ 2, 6, 16, 19

*ITT Corp. v. United States*,
963 F. 2d 561 (2d Cir. 1992) ............................................................... 9

*Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont, Inc.*,
845 F.2d 404 (2d Cir. 1988) ............................................................... 19

*Trikona Advisers Ltd. v. Chugh*,
846 F.3d 22 (2d Cir. 2017) ................................................................ 19

*United Food and Com. Workers Local 1776 & Participating Emps. Health and*
*Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142 (N.D. Cal. 2017) ........ 5

*United States v. Google LLC*,
2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ......................................... *passim*

*United States v. Visa U.S.A., Inc.*,
163 F. Supp. 2d 322 (S.D.N.Y. 2001) ..................................................... 6, 8

*Univac Dental Co. v. Dentsply Int'l, Inc.*,
702 F. Supp. 2d 465 (M.D. Pa. 2010) ....................................................... 5

*Wash. Alder LLC v. Weyerhaeuser Co.*,
2004 U.S. Dist. LEXIS 9650 (D. Or. May 19, 2004) ......................................... 5

**RULES**

Fed. R. Civ. P. 56(a) .................................................................................................... 4, 19

**INTRODUCTION**

The Court should enter partial summary judgment on Daily Mail's and Gannett's antitrust claims because Google is precluded from relitigating its established violations of the Sherman Act. *See* Proposed Order. Daily Mail and Gannett bring the same antitrust claims as the Department of Justice: Google violated Section 2 of the Sherman Act by monopolizing the markets for publisher ad servers and ad exchanges, and Section 1 of the Sherman Act by tying its monopoly ad server ("DFP") to its monopoly exchange ("AdX"). Google recognized years ago that Daily Mail's and Gannett's cases and the DOJ case are "based on the same legal theories and the same alleged conduct involving the same Google products and services, relying on many of the same documents collected in parallel investigations." EDVA Dkt. No. 50 at 5.[1]

Following a three-week bench trial, Judge Brinkema issued a 115-page opinion in the DOJ case holding that Google violated Sections 1 and 2 of the Sherman Act. *See United States v. Google LLC*, 2025 WL 1132012, *1 (E.D. Va. Apr. 17, 2025) ("EDVA Op."). Just as Daily Mail and Gannett claim, Judge Brinkema held that Google willfully monopolized "the publisher ad server and ad exchange markets for open-web display advertising," and unlawfully tied "its publisher ad server and ad exchange together." *Id.* at *48. Judge Brinkema repeatedly relied on Daily Mail's and Gannett's evidence and witnesses, who testified during the trial. A Gannett employee was the first witness; a Daily Mail employee (who testified twice) was the last. Judge Brinkema's decision cites Gannett's witness 38 times and Daily Mail's witness 26 times on the core disputed issues: market definition, market power, and anticompetitive conduct. She also rejected Google's myriad defenses, all of which are sponsored by the same experts – who have filed basically the same reports – that Google has disclosed in Daily Mail's and Gannett's cases.

---

[1] References to "EDVA Dkt." are references to the docket for *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.).

Any trial in Daily Mail's and Gannett's lawsuits would feature the same witnesses, testimony, and evidence that Judge Brinkema considered.  The Court should grant partial summary judgment rather than permit Google to relitigate a case it already tried and lost.

## BACKGROUND

This case concerns Google's unlawful monopolization of the markets for advertising technology tools ("ad tech").  Publishers use publisher ad servers to "manage their inventory of display ads" available for sale on their websites, and they use ad exchanges to host "auctions [for that] inventory."  *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 361-63 (S.D.N.Y. 2022) ("*Google I*").  Google owns the dominant ad server ("DFP") and ad exchange ("AdX").  Advertisers use buying tools to place bids in exchange auctions.  *See id.* at 363.  Google's dominant buying tool is Google Ads (also known as AdWords), which is used by many hundreds of thousands (if not more) small- and medium-sized advertisers.  *See id*. at 365.

Daily Mail and Gannett sued Google in April 2021 and June 2023.  DOJ and several states filed their case against Google in the Eastern District of Virginia on January 24, 2023.  Across all three cases, the complaints plead identical antitrust claims:  (1) monopolization of the publisher ad server market; (2) monopolization of the ad exchange market; (3) attempted monopolization of the ad exchange market; and (4) tying of Google's ad exchange (AdX) to its ad server (DFP).  *Compare* MDL Dkt. No. 794 ("DM Compl."), ¶¶ 249-69 *and* MDL Dkt. No. 795 ("Gannett Compl."), ¶¶ 258-78, *with* EDVA Dkt. No. 1.

The DOJ suit went to a three-week bench trial on September 9, 2024.  Trial involved "testimony of thirty-nine live witnesses, deposition excerpts from an additional twenty witnesses, and hundreds of exhibits."  EDVA Op. at *2.  Judge Brinkema subsequently issued a 115-page opinion finding Google liable on the same claims pleaded in Daily Mail's and Gannett's cases:

unlawful monopolization of the ad server and ad exchange markets under Section 2 of the Sherman Act, and unlawful tying under Section 1 of the Sherman Act. *See id.* at *1.

At trial, DOJ's opening witness was Tim Wolfe, Senior Vice President of Revenue Operations at Gannett. DOJ also called Matthew Wheatland, Chief Digital Officer at Daily Mail, and then recalled Wheatland at the end of trial as its only rebuttal witness. In her opinion, Judge Brinkema cited Wolfe 38 times and Wheatland 26 times. She relied on their testimony in finding that DOJ had established each element of its Sherman Act claims.

**Market definition and power**: Judge Brinkema found two "distinct relevant product market[s]" for "publisher ad server[s]" and "ad exchange[s]." *Id.* at *19, 21. She repeatedly cited Wolfe's and Wheatland's testimony to support those findings. *See id.* at *19 ("publishers, such as Gannett," "recognize the publisher ad server as a unique product"); *id.* at *20 (citing Wheatland to exclude app-only and social media ad serving tools from market); *id.* at *22 (citing Wolfe to find "[i]ndustry participants consider ad exchanges to be a distinct product"); *id.* at *22 (citing Wheatland to find ad networks and direct deals are not substitutes for exchanges).

Judge Brinkema also found that Google had monopoly power in each market, again relying on Daily Mail and Gannett testimony. *See, e.g.*, *id.* at *30 (citing Wheatland to find that publishers use only one publisher ad server to sell their inventory); *id.* (quoting Wolfe to explain why the absence of multi-homing is a barrier to entry: "switching ad servers as a year-long process that was 'akin to . . . changing the tires on the race car mid race'"); *id.* at *32 (quoting Wheatland that Google's 20% exchange take rate "was 'around double' the take rate" of other exchanges); *id.* at *33 (citing Wolfe to find that AdX's unique access to Google Ads demand made AdX a "must-call exchange").

**Anticompetitive conduct**: Judge Brinkema next concluded that Google engaged in anticompetitive conduct to acquire and maintain its monopolies. As to ad servers, Judge Brinkema found that Google made DFP "'the only viable economic option' for publishers" by "restrict[ing] AdX's submission of real-time bids only to DFP." *Id*. at *39 (citation omitted). She relied on Wolfe's and Wheatland's testimony to support that finding and reject Google's defenses. *See id.* at *33 (citing Wolfe to find that "publishers felt they had to use DFP to obtain effective access to AdX"); *id*. at *45 (citing Wheatland to reject Google's "security or quality" justifications because "industry participants and customers testified that Google did not have lower levels of spam, fraud, or malware than other reputable ad tech providers").

As to ad exchanges, Judge Brinkema found that Google employed a series of "anticompetitive policies, practices, and technology changes . . . that were not in its publisher customers' best interest," including "Last Look," "Unified Pricing Rules" ("UPR"), and "Dynamic Revenue Share" ("DRS"). *Id.* at *41-42. Daily Mail and Gannett challenge each of these acts as anticompetitive. And Judge Brinkema relied on their testimony in so holding. For example, she relied on evidence that, for "The Daily Mail, Unified Pricing Rules . . . resulted in lower revenue per impression," and cited Wheatland's testimony to support her finding that "Unified Pricing Rules was thus targeted at enhancing AdX's control over DFP publishers' revenue streams, as opposed to simplifying publishers' decision-making." *Id*. at *17, *46.

## LEGAL STANDARD

Summary judgment is required as to any "claim or defense – or the part of each claim or defense" – on which "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

Courts grant partial summary judgment when issue preclusion bars the defendant from relitigating issues already lost in a prior case. *See GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203, 1216 (S.D.N.Y. 1981). Courts also grant partial summary judgment to plaintiffs on

elements of Sherman Act claims.  *See*, *e.g.*, *F.T.C. v. Surescripts, LLC*, 665 F. Supp. 3d 14, 36-38 (D.D.C. 2023) (entering judgment on market definition and monopoly power); *United Food and Com. Workers Local 1776 & Participating Emps. Health and Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1165-66 (N.D. Cal. 2017) (entering judgment on market definition and existence of "contract, combination, or conspiracy element[ ] of . . . Section 1 [and] Section 2 . . . claims").  And courts grant partial summary judgment to private plaintiffs after DOJ prevails in a federal antitrust enforcement action.  *See Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 401 (S.D.N.Y. 2008); *Univac Dental Co. v. Dentsply Int'l, Inc.*, 702 F. Supp. 2d 465, 474 (M.D. Pa. 2010).

## ARGUMENT

### I.    The Court Should Enter Partial Summary Judgment for Daily Mail and Gannett on Their Antitrust Claims

Judge Brinkema's opinion precludes Google from relitigating the definition of the market for ad servers and ad exchanges, the global reach of those markets, Google's power in those markets, and its acquisition and maintenance of those monopolies through anticompetitive conduct.  *See GAF*, 519 F. Supp. at 1217-18 (applying issue preclusion to findings of market definition, market power, and existence of conspiracy); *Univac Dental Co.*, 702 F. Supp. 2d at 492 (holding "issue preclusion would prevent [the defendant] from disputing" its "possession of monopoly power"); *Wash. Alder LLC v. Weyerhaeuser Co.*, 2004 U.S. Dist. LEXIS 9650, at *16 (D. Or. May 19, 2004) (holding that "Defendant will be precluded from disputing that . . . it acquired or maintained a monopoly").  Judge Brinkema's opinion also precludes Google from relitigating Google's unlawful tie between its ad server and ad exchange.  There is thus no genuine issue for trial on any of those elements of Daily Mail's and Gannett's claims.

5

**A.    The Court Should Enter Partial Summary Judgment on Count I (Ad Server Monopolization)**

Daily Mail and Gannett each allege in Count I of their complaints that Google unlawfully monopolized "the market for publisher ad servers" in violation of Section 2 of the Sherman Act. DM Compl. ¶¶ 249-53; Gannett Compl. ¶¶ 258-62.  To prevail on that claim, Daily Mail and Gannett first must establish Google's monopoly power in a relevant market for ad servers.  *See Google I*, 627 F. Supp. 3d at 378.  The relevant market is the "area of effective competition" as "determined by reference to a product market . . . and a geographic market."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).  Daily Mail and Gannett also must establish Google's "willful acquisition or maintenance" of monopoly power in that market.  *Google I*, 627 F. Supp. 3d at 378 (citation omitted).  In the DOJ case, Judge Brinkema conclusively decided each of these issues in Daily Mail and Gannett's favor.

**1.    General Publisher Ad Servers for Open Display Advertising Is a Relevant Product Market**

A relevant market includes the set "of products that have reasonable interchangeability, in the eyes of consumers, with what the defendant sells."  *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001); *see also* EDVA Op. at *18 (same).  Daily Mail's and Gannett's market definition expert, Professor David Sibley, opines that "[g]eneral publisher ad servers for open display inventory constitute a relevant antitrust market."  Ex. 1, Rep. Heading IV.A.  Judge Brinkema identified a virtually identical market for "publisher ad servers for open-web display advertising."  EDVA Op. at *19.  The markets in both cases include the same products:  ad servers that "allow[] publishers to manage web inventory."  Ex. 1, Sibley Rep. ¶ 171; *accord* EDVA Op. at *20 (market includes ad servers that are "capable of performing ad-serving functions for websites").  The chart below compares Sibley's product market to the

market proposed by DOJ's expert Professor Robin Lee, which Judge Brinkema accepted.  *See* EDVA Op. at *19-21.

| | Sibley | Lee (DOJ Expert) | |
|---|---|---|---|
| Products Included[2] | • DFP (Google)<br>• Xandr<br>• Kevel<br>• Equativ<br>• One Ad Server (Verizon/Yahoo)<br>• BRX-D (Verizon/Yahoo) | | |

Daily Mail's and Gannett's proposed market definition also excludes the same products excluded by Judge Brinkema.  Sibley excludes "specialized ad servers" from the market because they serve ads only "in individual ad formats (e.g., video) or through specific channels (e.g., in-app advertising)."  Ex. 1, Rep. ¶¶ 163-76.  Sibley also excludes tools used to sell advertising space on social media platforms.  *See id*. ¶¶ 154-56.  Judge Brinkema did the same, excluding ad servers capable of serving only "instream video ads" or advertisements shown "through alternative digital channels[] such as . . . mobile apps or social media pages."  EDVA Op. at *20. Finally, Sibley excludes "in-house general ad server[s]" from the relevant market, Ex. 1, Rep. ¶¶ 157-64, as did Judge Brinkema, *see* EDVA Op. at *21 (excluding "in-house technologies developed by publishers" from the market, because building an "in-house ad server is 'incredibly sophisticated and incredibly complex,' and is not within the 'core competencies'" of most online publishers).

---

[2] *See* Ex. 1, Sibley Rep. Fig. 16; Ex. 2, Lee Rep. Fig. 45.

[3] Lee explained that ███████████████████████████████████████████
██████████████████████████████ Ex. 2, Lee Rep. ¶ 445 n.635.  Sibley does not "consider [FreeWheel to be] in the same market as DFP" but nonetheless includes its transaction volume when performing a robustness analysis of his market share calculations.  Ex. 1, Sibley Rep. ¶¶ 726-27.  Inclusion of FreeWheel and other video ad servers had almost no effect: it brought Google's market share to approximately 95%.  *See id*.

Google's counterarguments to Daily Mail's and Gannett's proposed market are identical to the arguments Google made and lost in the DOJ action.  Google disclosed the same market definition expert in all cases:  Dr. Mark Israel.  Israel testified that ███████████████ ███████████████████████████████████████████████████████.  Ex. 3, Tr. 328:7-20.  As in the DOJ case, Israel opines here that ████████████████ ██████████████████ Ex. 4, Rep. ¶¶ 53-55; *compare* EDVA Op. at *25-26.  Judge Brinkema rejected that argument, holding that Israel's proposed single two-sided market "ignore[d] commercial realities."  EDVA Op. at *25.  Relying on the "[u]ncontroverted trial testimony" of Daily Mail and Gannett witnesses, Judge Brinkema found that, as compared to other ad tech tools Israel would include in his single two-sided market, ad servers "serve distinct functions, are priced differently, and cannot be substituted for each other."  *Id*.  In Daily Mail's and Gannett's cases, Sibley reached the same conclusion.  *See* Ex. 1, Rep. ¶ 13.

The only daylight between the market definitions across cases is that Judge Brinkema calls the market "ad servers for open-*web* display advertising," EDVA Op. at *19 (emphasis added), while Sibley calls it "ad servers for open display advertising," Ex. 1, Rep. ¶ 14.  That labeling difference – the word "web" – does not create a genuine issue of material fact.  The proposed markets are substantively identical because their constituent products are the same.  *See Visa*, 163 F. Supp. 2d at 335 (a market includes "the range of [product] substitutes").  Indeed, courts apply issue preclusion and enter judgment on market definition even where the products in similar markets are *different* across cases.  *See GAF*, 519 F. Supp. at 1214 (holding there was "insufficient justification for relitigating" market definition where market in second case included additional products).  That is because the Second Circuit applies issue preclusion even when the issues between cases are not "textually identical" but only "substantially the same."

*ITT Corp. v. United States*, 963 F. 2d 561, 563-64 (2d Cir. 1992). Here, there is no material difference between the product markets proven by Daily Mail and Gannett and found by Judge Brinkema.

### 2. The Ad Server Market is Global

Daily Mail and Gannett both claim that the market for publisher ad servers is global. Sibley explains that the geographic market is worldwide with the exception of "a very small number of total open display transactions" occurring in countries where political or economic barriers limit the operation of ad tech providers. Ex. 1, Rep. ¶¶ 270-72. Judge Brinkema likewise found that the relevant geographic market for publisher ad servers is worldwide with similar, small exceptions. *See* EDVA Op. at *28 & n.26 (excluding China and Iran).

Google argues here that the geographic market should be limited to the United States, asserting that ████████████████████████████████████████████ justify a U.S.-only market. Ex. 4, Israel Rep. ¶¶ 428-37. Judge Brinkema rejected that same argument in the DOJ case, finding it "unpersuasive" and contrary to "commercial realities" showing that a global market is "the area in which buyers or sellers of the relevant product effectively compete." EDVA Op. at *28-29. There is no reason to relitigate the geographic scope of the market using the same Google expert and arguments that already lost.

### 3. Google Has Monopoly Power in the Market for General Publisher Ad Servers for Open Display Inventory

Daily Mail and Gannett allege that Google has monopoly power in the market for ad servers, as Judge Brinkema held. Sibley concludes that Google's DFP commanded, at all relevant times, a market share exceeding 90%. *See* Ex. 1, Rep. ¶¶ 274-76. He found that his market share calculation was consistent with ██████████████████████████████████████ ████████ *See id.* ¶¶ 276-77. Judge Brinkema similarly found that "Google had a 91% market

share of the worldwide publisher ad server market," EDVA Op. at *30, and determined that market share was "relatively consistent with Google's internal estimates," which "assessed DFP to have [been] between 84% and 90% market share at different points over the past decade." *Id.* In reaching their conclusions, Sibley and Judge Brinkema relied on many of the same Google documents. *Compare* Ex. 1, Sibley Rep. ¶ 276(e) n.502 (quoting Google: ███████████ ██████████████████████████████████████████), *with* EDVA Op. at *30.

Daily Mail and Gannett also prove other indicia of market power, which were likewise found by Judge Brinkema. For example, Sibley concludes that Google's monopoly market share is protected by significant barriers to entry. *See* Ex. 1, Rep. ¶¶ 289-326. Judge Brinkema found the same. *See* EDVA Op. at *30 (noting "significant barriers to entry and expansion" in ad server market). Sibley also determined that the "exit of rival publisher ad servers" reduced competitive constraints on Google. Ex. 1, Rep. ¶¶ 327-33. Judge Brinkema agreed. *See* EDVA Op. at *31 ("The large difficulties that publishers face in switching ad servers are exacerbated by the lack of meaningful alternatives to DFP"). Finally, Sibley demonstrated that Google imposed worsening terms on DFP customers – e.g., UPR – without losing their business. *See* Ex. 1, Rep. ¶¶ 187-218. Judge Brinkema reached the same conclusion: Google "degraded some DFP features," including "Unified Pricing Rules," without losing customers. EDVA Op. at *31. Ultimately, like Sibley, Judge Brinkema found that Google's market share, "when viewed in light of" other evidence of Google's market dominance, "'leaves no doubt' as to Google's monopoly power." *Id.* (citation omitted); *accord* Ex. 1, Sibley Rep. ¶¶ 15-20.

The only difference between Daily Mail's and Gannett's showing of monopoly power, compared to DOJ's proof at the EDVA trial, is a slight variation in the methodology used to calculate market shares. DOJ's expert calculated DFP's market share looking only at "open-web

display" advertising transactions, *i.e.*, Lee ████████████████████████████████

██████████    *See* EDVA Op. at *20; Ex. 2, Lee Rep. ¶ 443.[4]  Sibley includes those advertising

types.  *See* Ex. 1, Rep. ¶ 274.  That difference is immaterial because DFP is a monopoly product

either way.  With Sibley's approach, DFP's market share *increases* from 91% (DOJ's

calculation) to 96%.  *See* Ex. 1, Rep. Fig. 16.  Google therefore cannot expect to do any better

than it did before – in fact, it could do only worse – in Daily Mail's and Gannett's cases.

### 4.    Google Acquired and Maintains its Ad Server Monopoly Through Anticompetitive Conduct

Daily Mail and Gannett allege that Google monopolized the market for ad servers by

tying its ad exchange (AdX) to its ad server (DFP), which forced publishers to license DFP

rather than a rival's ad server.  A tying claim has five elements:  (1) separate "tying and . . . tied

product[s]"; (2) "sufficient economic power in the tying product market to coerce purchaser

acceptance of the tied product"; (3) "actual coercion by the seller that forced the buyer to accept

the tied product"; (4) "anticompetitive effects in the tied market"; and (5) "the involvement of a

'not insubstantial' amount of interstate commerce in the 'tied' market."  *E&L Consulting, Ltd. v.

Doman Indus., Ltd.*, 472 F.3d 23, 31-32 (2d Cir. 2006).  Daily Mail and Gannett show that each

of these elements is satisfied, as Judge Brinkema likewise found.

**(1) Separate products**:  Sibley shows that "separate demand exists for AdX and DFP."

Ex. 1, Rep. ¶ 43.  Judge Brinkema made the same finding.  *See* EDVA Op. at *38 ("publisher ad

servers and ad exchanges are 'two separate products' that are not reasonably interchangeable"

(citation omitted)).

---

[4] Instream video ads are advertisements that play before, during, or after video content; in-app ads are ads shown within a mobile application; and native ads are ads designed to look like the non-advertising content on a website (e.g., an advertisement that looks like an article on a news website).  *See* Ex. 1, Sibley Rep. ¶¶ 71-72.

**(2) Tying market power**:  Sibley demonstrates that Google has "market power in the tying market (ad exchanges for open display)," in part due to AdX's near-exclusive access "to unique demand" from Google Ads.  Ex. 1, Rep. ¶¶ 571-80; *see infra* pp. 16.  Judge Brinkema agreed.  *See* EDVA Op. at *40 (Google "has possessed 'sufficient economic power in the tying product market to restrain competition in the tied product market,'" because Google "restrict[ed] the unique advertising demand offered by AdWords [i.e., Google Ads] advertisers to AdX").

**(3) Coercion**:  Sibley finds that Google denies access to AdX's "core feature," i.e., "real-time bidding," unless a publisher uses DFP.  Ex. 5, Rebuttal Rep. ¶ 448.  Judge Brinkema identified the same tie-in.  *See* EDVA Op. at *39 (Google "restrict[s] AdX's submission of real-time bids only to DFP," withholding AdX's "core function" from publishers unless they use DFP).  According to Sibley and Judge Brinkema, with the tie, Google "economically coerces publishers to use DFP."  Ex. 5, Rebuttal Rep. Heading IV.A.4; *accord* EDVA Op. at *39-40 (tying made purchase of DFP "'the only viable economic option' for publishers").

**(4) Anticompetitive effects in tied market**:  Sibley and Judge Brinkema each found that Google's tying arrangement harmed competition in the market for publisher ad servers.  *Compare* Ex. 1, Rep. Heading VI.C.4 ("[t]he tie caused harm to competition in the" ad server market), *with* EDVA Op. at *41 ("the tying of DFP to AdX has had a substantial anticompetitive effect in the publisher ad server market for open-web display advertising").

**(5) Interstate commerce**:  There is no dispute in either case that "the AdX-DFP tie, which facilitates the billions of dollars of revenue that AdX generates annually, has a large and substantial impact on interstate commerce."  EDVA Op. at *40.

Google asserts here the same defenses of its tying arrangement that lost in the DOJ action.  Google first claims that ████████████████████████

12

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Ex. 4, Israel Rep. ¶ 636.  Judge Brinkema rejected

that argument.  *See* EDVA Op. at *43.  Google also asserts that ▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Ex. 4, Israel Rep. ¶ 637.  Judge Brinkema rejected

that argument, too, quoting testimony from a Daily Mail witness.  *See* EDVA Op. at *12 n.16

(AdX Direct is "not an 'economically viable substitute to accessing AdX through DFP'").

Sibley agrees.  *See* Ex.5, Rebuttal Rep. ¶¶ 449-64.  Finally, Google asserts that ▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.  *See* Ex.

4, Israel Rep. ¶ 637.  But Judge Brinkema found that any Google Ads demand outside AdX was

immaterial:  AdX remains "the 'nearly exclusive' source" of Google Ads demand.  EDVA Op. at

*12 n.15.  Sibley likewise concludes that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉.  *See* Ex. 1, Rep. ¶ 542.  Google's meritless defenses do not warrant relitigation.

## B.    The Court Should Enter Partial Summary Judgment on Count II (Ad Exchange Monopolization)

As with Count I, the Court should enter partial summary judgment on Count II because

Judge Brinkema already decided that ad exchanges are a relevant market, Google has monopoly

power, and it acquired and maintained that monopoly through anticompetitive conduct.

### 1.    Ad Exchanges for Open Display Inventory Are a Relevant Product Market

Sibley opines that "[a]d exchanges for open display inventory" is a relevant antitrust

product market.  Ex. 1, Sibley Rep. Heading V.A.  Judge Brinkema agreed:  "ad exchanges for

open-web display advertising constitute a distinct relevant product market."  EDVA Op. at *21.

In so holding, Judge Brinkema repeatedly relied upon the trial testimony of Daily Mail and

Gannett witnesses.  *See id.* at *21-23 (citing testimony of Wheatland and Wolfe).

The two markets contain the same products.  Daily Mail and Gannett include those

exchanges that "enable publishers and advertisers to transact ad impressions in real-time."  Ex. 1,

13

Sibley Rep. ¶ 396.  Judge Brinkema also found that the market included "exchanges"

"connecting publishers . . . with advertisers . . . in mere milliseconds."  EDVA Op. at *21.  The

table below lists the products included in Sibley's and DOJ's proposed exchange markets.

| | Sibley | Lee (DOJ Expert) | |
|---|---|---|---|
| Products Included[5] | • AdX<br>• Rubicon (AKA Magnite)<br>• Xandr<br>• Pubmatic<br>• Index<br>• Yahoo<br>• OpenX<br>• Sovrn<br>• Yieldmo<br>• Equativ<br>• Sharethrough<br>• TrustX (DCN)<br>• SpotX<br>• AdColony<br>• Digital Turbine[6] | | |

Daily Mail and Gannett also exclude the same products from the ad exchange market as

Judge Brinkema did.  Sibley excludes (1) ad networks, *see* Ex. 1, Rep. ¶¶ 359-74; (2) tools used

to sell "only . . . specific ad formats" like "in-app or video advertisements," *id*. ¶ 425 & n.838, or

ads on social media platforms, *see id*. ¶¶ 375-78; and (3) direct deals, *see id*. ¶¶ 338-58.  Judge

Brinkema made the same exclusions.  *See* EDVA Op. at *22 (excluding "ad networks); *id.* at *23

(excluding "ad exchanges that facilitate the sale of only instream video, mobile app, or social

media" advertisements); *id.* at *22 (excluding "[d]irect deals").

---

[5] *See* Ex. 1, Sibley Rep. ¶ 440 n.853 & Fig. 28; Ex. 2, Lee Rep. Fig. 47.

[6] SpotX, AdColony, and Digital Turbine are small exchanges that have no bearing on Google's power in the market for ad exchanges.  Between 2019 and 2023, for instance, SpotX and AdColony never achieved a market share greater than 0.2%.  *See* Ex. 1, Sibley Rep. at 406.  Digital Turbine likewise is very small.  *See id*. at 211 n.853.

[7] Sibley performed a robustness analysis on his ad exchange market share calculations in which he included AdSense Backfill.  *See* Ex. 1, Rep. Figs. 63-64.  Even including this additional source of advertising impressions, Sibley concludes that "AdX still maintains a high share (at least above 60%)."  *Id*. at ¶ 449.

Google's objections to Daily Mail's and Gannett's exchange market definition are the same objections Judge Brinkema already rejected.  Israel argues that ███████████████ ████████████████████████████████████████████████████████████████████ ███████████████████  Ex. 4, Rep. ¶ 327.  As with ad servers, Judge Brinkema found this argument defied commercial reality.  *See* EDVA Op. at *25.  She also rejected Israel's claim that ███████████████████████████  *Compare* Ex. 4, Rep. ¶¶ 209-17, *with* EDVA Op. at *22.  There is no reason to relitigate these same failed arguments in this MDL.

Finally, as with the market for ad servers, the only difference between the exchange markets across cases is the focus on "web"-based transactions in DOJ's definition.  *See supra* pp. 8-9.  But the products in each market are the same, meaning any difference is immaterial.

### 2.      The Ad Exchange Market is Global

Daily Mail and Gannett propose, and Judge Brinkema found, a global market for ad exchanges.  *See* EDVA Op. at *28.  Google has not argued that a different relevant geographic market applies for ad exchanges as compared to ad servers.  *See* Ex. 4, Israel Rep. ¶¶ 428-37.  Judge Brinkema's finding of a global ad exchange market is thus entitled to preclusive effect for the same reasons described above.  *See supra*, Part I.A.2.

### 3.      Google Has Monopoly Power in the Market for Ad Exchanges for Open Display Inventory

Daily Mail and Gannett allege that Google is a monopolist in the ad exchange market, as Judge Brinkema found.  Sibley shows that Google's "maintain[ing] its take rate at 20% while three close rivals reduced their[ ]" take rates is direct evidence of monopoly power.  Ex. 1, Sibley Rep. ¶ 478.  Judge Brinkema likewise found that AdX's "durable 20% take rate for well over a decade is direct evidence that Google has possessed monopoly power."  EDVA Op. at *32.

For indirect evidence of market power, Sibley and Judge Brinkema both found that AdX has a high market share protected by barriers to entry. According to Sibley, between 2019 and 2023, Google's market share hovered around 75%. *See* Ex. 1, Rep. ¶ 443. Similarly, Judge Brinkema credited DOJ's estimate of an AdX market share between "63% to 71%." EDVA Op. at *34. Both Sibley and Judge Brinkema further concluded that AdX derives substantial market power from its near-exclusive access to Google Ads demand. *Compare* Ex. 1, Rep. ¶¶ 454-72, *with* EDVA Op. at *33. Finally, Sibley, like Judge Brinkema, found that Google's market share is protected by high barriers to entry and expansion – including, for example, "[s]cale" and associated "network effects." EDVA Op. at *34; *accord* Ex. 1, Rep. ¶ 493.

As with ad servers, Daily Mail's and Gannett's proposed market differs only in the transaction types used to calculate Google's exchange market share. *See supra*, Part I.A.3. But Sibley's inclusion of additional transactions only *increases* Google's share of the ad exchange market compared to what Judge Brinkema found. *See* Ex. 1, Rep. ¶ 448. Google is therefore estopped from arguing that its "63% to 71%" share of the ad exchange market found by Judge Brinkema is insufficient to support a finding of monopoly power. EDVA Op. at *34. Sibley's higher market share calculations cannot undo Judge Brinkema's preclusive finding.

### 4.     Google Acquired and Maintains its Ad Exchange Monopoly Through Anticompetitive Conduct

Daily Mail and Gannett claim that Last Look, DRS, and UPR foreclosed competition among exchanges. *See*, *e.g.*, DM Compl. ¶¶ 115-25 (Last Look), ¶¶ 144-53 (DRS), ¶¶ 196-208 (UPR); Gannett Compl. ¶¶ 138-48, 175-84, 216-28.[8] Judge Brinkema held that *each* of these

---

[8] Daily Mail and Gannett claim Google monopolized the market for ad exchanges through additional, independently anticompetitive acts, including Enhanced Dynamic Allocation, Project Bernanke and its variants, and Minimum Bid to Win. This Court previously held that Daily Mail and Gannett have stated plausible claims that each is anticompetitive. *See generally Google I*, 627 F. Supp. 3d at 381-402. Because those acts were not at issue in the DOJ case, Daily Mail and Gannett do not seek partial summary judgment regarding those specific unlawful acts.

programs or policies was an independently unlawful act of monopolization in the exchange market.  EDVA Op. at *41-42.  Judge Brinkema did not find, as Google suggests, that any of the challenged conduct was "immune from antitrust scrutiny" when considered independently but somehow unlawful when considered in the "aggregate."  MDL Dkt. No. 976 at 4.

**Last Look**:  Daily Mail and Gannett allege that Last Look was anticompetitive.  As demonstrated by their liability expert, Professor Shengwu Li, AdX's ability to "rig [its] bids after viewing bids from rival exchanges . . . foreclosed competition in the exchange market."  Ex. 6, Rep. § VII.B.  Judge Brinkema reached the same conclusion:  Last Look "gave AdX the ability to see competing exchanges' bids in an otherwise sealed auction before AdX would bid," which "diminish[ed] the competitiveness of rivals in the ad exchange market."  EDVA Op. at *42.  Judge Brinkema also rejected the defense from Google's liability expert, Professor Paul Milgrom, that ███████████████████████████████████████████.  *See* Ex. 7, Rep. ¶¶ 345-47.  She held that "Google [] did not establish any valid and sufficient procompetitive justifications for Last Look," which did "not provide publishers with as much revenue as they would have received in a fair auction."  EDVA Op. at *45.  Google mounts the same losing defense in the MDL, again sponsored by Milgrom.  *See* Ex. 8, Rep. ¶¶ 487-89; Ex. 9, Milgrom Tr. 483:6-10 (Milgrom ██████████████████████████████████).

**DRS**:  Daily Mail and Gannett also describe how Google used DRS to "exploit[] Google's Last Look advantage."  Ex. 6, Li Rep. § IX.B.  Google would ███████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████  *Id.* ¶ 31.  This is precisely what Judge Brinkema found:  DRS "us[ed] the Last Look informational advantage to vary AdX fees and win impressions that [Google] would have lost in a fair auction," thereby "enhanc[ing]

AdX's market power at the expense of rivals." EDVA Op. at *42. Judge Brinnkema also rejected Google's argument – again offered here – that DRS "create[d] matches for impressions that would not have sold to any advertisers without it." *Id.* at *46; *see also* Ex. 7, Milgrom Rep. § XII (DRS ███████████████████████████). She found that "the primary purpose of sell-side dynamic revenue share was to outbid rival exchanges by using AdX's anticompetitive Last Look advantage." EDVA Op. at *46.

      **UPR**: Daily Mail and Gannett claim that "UPR reduced competition in the exchange market." Ex. 6, Li Rep. § XIII.B. Li finds that "UPR increased . . . AdX's win rate and impression share," because publishers no longer could use "differential price floors" "to preserve a diversity of demand sources and reduce reliance on any single exchange or buying tool." *Id.* ¶¶ 1095, 1120. Likewise, Judge Brinkema held that setting different prices across exchanges "was a primary tool that publishers had used to maintain revenue diversity and to mitigate Google's dominance of the ad exchange market," but that UPR "deprive[d] publisher[s] of a choice that they had previously exercised to promote competition." EDVA Op. at *42. She rejected as pretextual Google's "proffered justifications of helping its publisher customers simplify their decision-making, receive better matches, and increase revenue." *Id.* at *46. Google repeats the pretextual defenses here. *See* Ex. 8, Milgrom Rep. ¶ 734 (████████████ ████████████████████████████████████████████████████████ ███████████████████). This Court should not relitigate Google's liability or proffered justifications, both of which Judge Brinkema already resolved.

      **C.**    **The Court Should Enter Partial Summary Judgment on Count III (Attempted Monopolization of Ad Exchange Market) and Count IV (Unlawful Tying)**

      The Court should enter partial summary judgment on Daily Mail's and Gannett's remaining antitrust causes of action – attempted monopolization (Count III) and unlawful tying

under Section 1 (Count IV) – for reasons already discussed.  Attempted monopolization has three elements:  "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Google I*, 627 F. Supp. 3d at 380 (citation omitted).  Judge Brinkema already found the first and third elements:  Google's conduct was anticompetitive, *see supra* Part I.B.4, and its 60-70% market share indicates monopoly power, *see supra* Part I.B.3, or at a minimum a dangerous probability of achieving it, *see Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont, Inc.*, 845 F.2d 404, 409 (2d Cir. 1988) (55% market share sufficient to show dangerous probability of monopoly).

As to tying, Daily Mail and Gannett plead and prove the same tying arrangement identified by Judge Brinkema.  *See supra* Part I.A.4.  Judge Brinkema held that the "AdX-DFP tie has violated both Section 1 and Section 2 of the Sherman Act."  EDVA Op. at *41.  That is because a tying claim under Section 1 has the same basic elements as a tying claim under Section 2, though without the additional requirement of showing that the tie "contributed significantly to the maintenance or creation of monopoly power."  *Id.* (cleaned up).  Because Google is precluded from relitigating its liability for tying under Section 2, issue preclusion also warrants partial summary judgment for Daily Mail and Gannett on their tying claim under Section 1.

## II.     The Court Should Grant Partial Summary Judgment on Several Google Defenses

The Court should also grant Daily Mail and Gannett partial summary judgment on several of Google's asserted defenses.  *See* Fed. R. Civ. P. 56(a) (allowing partial summary judgment on a "defense" or "part of" a defense); *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 32 (2d Cir. 2017) (applying issue preclusion to "defenses [that] were necessarily resolved").

*First*, three of Google's defenses merely assert that Daily Mail and Gannett have failed to prove elements of their antitrust claims.  These include the "defenses" that:  (1) Daily Mail and

Gannett "fail[] to allege any legally cognizable relevant product or geographic market"; (2) Google "has never had, and is unlikely to obtain, monopoly power"; and (3) Daily Mail and Gannett "fail[] to allege any plausible harm to competition or consumers." MDL Dkt. No. 829 at 55-57; MDL Dkt. No. 830 at 52-54. These defenses fail for reasons discussed above.

*Second*, Google claims its conduct was "lawful, justified, and procompetitive," and that its "benefits . . . significantly outweigh any alleged anticompetitive effects." MDL Dkt. No. 829 at 55; MDL Dkt. No. 830 at 53. Google tried the same arguments before Judge Brinkema – specifically, "that its challenged actions improved safety and privacy, countered fraud, reduced latency, promoted investment, and decreased prices." EDVA Op. at *44. Judge Brinkema rejected these arguments, as well as Google's "overarching argument" that all of its product changes were "shielded from antitrust liability because they involved product design choices." *Id.* at *44-46. As a result, Google is precluded from relitigating its failed procompetitive defenses of the AdX-DFP tie, Last Look, DRS, and UPR. The Court should dismiss Google's defense to the extent it relies on proof that such conduct was procompetitive or lawful.

**CONCLUSION**

For the foregoing reasons, the Court should enter partial summary judgment on Daily Mail's and Gannett's antitrust claims as described in the attached Proposed Order.[9]

---

[9] Daily Mail and Gannett respectfully request that the Court grant their motion for partial summary judgment without waiting to resolve the class plaintiffs' pending motions for class certification. Daily Mail's case is more than four years old; Gannett's case turns two today. As the Court noted, there are efficiencies to be gained from the court's resolution of this motion. *See* MDL Dkt. No. 990 (noting that a "ruling by this Court on the preclusive effect of" Judge Brinkema's decision would "provide greater clarity as to unresolved issues on which the parties may then seek summary judgment or trial" and "may have some bearing on superiority and manageability" under Rule 23). There are no efficiencies to be gained from waiting.

Date:  June 20, 2025

Respectfully submitted,

*/s/ John Thorne*

John Thorne
Daniel G. Bird
Bethan R. Jones
Christopher C. Goodnow
Mark P. Hirschboeck
Eliana Margo Pfeffer
Eric J. Maier
Sven E. Henningson
Jonathan I Liebman
Kyle B. Grigel
KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, DC 20036
Tel.: (202) 326-7900
Fax: (202) 326-7999
Email: jthorne@kellogghansen.com
        dbird@kellogghansen.com
        bjones@kellogghansen.com
        cgoodnow@kellogghansen.com
        mhirschboeck@kellogghansen.com
        epfeffer@kellogghansen.com
        emaier@kellogghansen.com
        shenningson@kellogghansen.com
        jliebman@kellogghansen.com
        kgrigel@kellogghansen.com

*Counsel for Associated Newspapers, Ltd.,*
*Mail Media, Inc., and Gannett Co., Inc.*