**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re Google Digital Advertising Antitrust Litigation** | Case No. 1:21-md-3010 (PKC) |
| *This document relates to:* <br><br> **In re Google Digital Publisher Antitrust Litigation** | Case No. 1:21-cv-7034 (PKC) |

**PUBLIC REDACTED VERSION**

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY ............................................................................ 1

II.    ARGUMENT .......................................................................................................... 1

    A.    Common Evidence Can Prove the Antitrust Violations, Including the Ties .......... 1

    B.    Plaintiffs Can Establish Class-wide Impact From the Challenged Conduct........... 4

        1.    The Yardstick accounts for supposed "feature" differences. ...................... 4

        2.    Prof. Elhauge's Yardstick only detects harm where it could exist. ............ 7

        3.    Plaintiffs appropriately measure impact and damages caused by the ties. . 8

        4.    The Yardstick appropriately measures harm from the ties. ..................... 10

        5.    Common evidence shows all Class members are injured. ........................ 13

        6.    Prof. Elhauge measures harm from the tied and tying products. .............. 13

    C.    Common Evidence Can Identify All Class Members ........................................... 14

    D.    The Proposed Class Representatives Satisfy the Adequacy Standard .................. 16

        1.    MCM relationships do not create conflicts in the AdX Class. ................. 16

        2.    The Progressive satisfies the adequacy standard. ..................................... 18

    E.    Plaintiffs Have Appropriately Clarified Their Class Definitions ......................... 19

III.    Conclusion ................................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Dairy Farmers of Am., Inc.*,
   279 F.R.D. 257 (D. Vt. 2011) ........................................................................................... 17

*Allen v. Dairy Mktg. Servs., LLC*,
   2013 WL 6909953 (D. Vt. Dec. 31, 2013) ....................................................................... 10

*Bowling v. Johnson & Johnson*,
   2019 WL 1760162 (S.D.N.Y. Apr. 22, 2019) ................................................................... 19

*Castro v. Sanofi Pasteur Inc.*,
   134 F. Supp. 3d 820 (D.N.J. 2015) ............................................................................ 11, 13

*City of Philadelphia v. Bank of Am. Corp.*,
   2023 WL 6160534 (S.D.N.Y. Sept. 21, 2023) ............................................................. 4, 15

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ............................................................................................................ 12

*Crutchfield v. Sewerage & Water Bd. of New Orleans*,
   829 F.3d 370 (5th Cir. 2016) .............................................................................................. 2

*Dial Corp. v. News Corp.*,
   2016 WL 690895 (S.D.N.Y. Feb. 9, 2016) ........................................................................ 3

*Dial Corp. v. News Corp.*,
   314 F.R.D. 108 (S.D.N.Y. 2015) ........................................................................................ 3

*Elkind v. Liggett & Myers, Inc.*,
   77 F.R.D. 708 (S.D.N.Y. 1977) ................................................................................. 19, 20

*Fifth & Fifty-Fifth Residence Club Ass'n, Inc. v. Vistana Signature Experiences, Inc.*,
   2018 WL 11466157 (S.D.N.Y. Sept. 28, 2018) ................................................................. 7

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*,
   2016 WL 3579953 (E.D. Wis. June 24, 2016) ................................................................... 9

*Freeland v. AT & T Corp.*,
   238 F.R.D. 130 (S.D.N.Y. 2006) ........................................................................................ 4

*Freitas v. Cricket Wireless, LLC*,
   2022 WL 3018061 (N.D. Cal. Jul. 29, 2022) ..................................................................... 7

*fuboTV Inc. v. Walt Disney Co.*,
   745 F. Supp. 3d 109 (S.D.N.Y. 2024) ................................................................................ 9

*Halverson v. Convenient Food Mart, Inc.*,
69 F.R.D. 331 (N.D. Ill. 1974)............................................................................................ 4

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Entm't Holdings, Inc.*,
338 F.R.D. 205 (S.D.N.Y. 2021) ........................................................................................ 18

*In re Actos Antitrust Litig.*,
2024 WL 4345568 (S.D.N.Y. Sept. 30, 2024) ............................................................ 14, 15

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014)...................................................................... 11

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ................................................................................. 8, 10, 12

*In re Broiler Chicken Grower Antitrust Litig.*,
2024 WL 2117359 (E.D. Okla. May 8, 2024) ..................................................................... 10

*In re Da Vinci Surgical Robot Antitrust Litig.*,
2024 WL 5697897 (N.D. Cal. Mar. 31, 2024) ............................................................... 7, 11

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009) ............................................................................................. 2, 3

*In re Dental Supplies Antitrust Litig.*,
2016 WL 5415681 (E.D.N.Y. Sept. 28, 2016) ..................................................................... 9

*In re Elec. Books Antitrust Litig.*,
2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) .................................................................... 10

*In re Fla. Cement & Concrete Antitrust Litig.*,
278 F.R.D. 674 (S.D. Fla. 2012).......................................................................................... 4

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
407 F. Supp. 3d 422 (S.D.N.Y. 2019) ............................................................................... 17

*In re Google Digital Advert. Antitrust Litig.*,
627 F. Supp. 3d 346 (S.D.N.Y. 2022) ..................................................................... 9, 11, 12

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) .................................................................. 9, 14

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019) ........................................................................... 3, 13

*In re Linerboard Antitrust Litig.*,
497 F. Supp. 2d 666, 675 (E.D. Pa. 2007) ........................................................................ 10

*In re Namenda Direct Purchaser Antitrust Litig.*,
  331 F. Supp. 3d 152 (S.D.N.Y. 2018) ...................................................... 19, 20

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  2022 WL 4298767 (S.D.N.Y. Sept. 19, 2022) .............................................. 15

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  338 F.R.D. 527 (S.D.N.Y. 2021) ...................................................................... 9

*In re Packaged Seafood Prods. Antitrust Litig.*,
  332 F.R.D. 308 (S.D. Cal. 2019) ...................................................................... 9

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  638 F. Supp. 3d 227 (E.D.N.Y. 2022) ............................................................ 14

*In re Pfizer Inc. Sec. Litig.*,
  282 F.R.D. 38 (S.D.N.Y. 2012) ...................................................................... 18

*In re Pharmacy Benefit Managers Antitrust Litig.*,
  2017 WL 275398 (E.D. Pa. Jan. 18, 2017)...................................................... 7

*In re Processed Egg Prods. Antitrust Litig.*,
  312 F.R.D. 171 (E.D. Pa. 2015) ...................................................................... 10

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  292 F. Supp. 3d 14 (D.D.C. 2017)............................................................. 8, 13

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013)........................................................................ 12

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  934 F.3d 619 (D.C. Cir. 2019)........................................................................ 10

*In re Restasis Antitrust Litig.*,
  335 F.R.D. 1 (E.D.N.Y. 2020)........................................................................ 10

*In re Term Commodities Cotton Futures Litig.*,
  2022 WL 485005 (S.D.N.Y. Feb. 17, 2022)................................................... 12

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981)........................................................................................ 10

*Jacobi v. Bache & Co.*,
  1972 WL 560 (S.D.N.Y. 1972)....................................................................... 17

*Kronenberg v. Allstate Insurance Co.*,
  743 F. Supp. 3d 465 (E.D.N.Y. 2024) .............................................................. 9

*Kronfeld v. Trans World Airlines, Inc.*,
    104 F.R.D. 50 (S.D.N.Y.1984) ........................................................................ 18

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) ..................................................................... 18

*Laumann v. Nat'l Hockey League*,
    105 F. Supp. 3d 384 (S.D.N.Y. 2015) ............................................................ 17

*Le v. Zuffa, LLC*,
    2023 WL 5085064 (D. Nev. Aug. 9, 2023) ................................................ 3, 11

*McCarthy v. Paine Webber Grp., Inc.*,
    164 F.R.D. 309 (D. Conn. 1995) ..................................................................... 19

*Menking ex rel. Menking v. Daines*,
    287 F.R.D. 174 (S.D.N.Y. 2012) ..................................................................... 19

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
    262 F.R.D. 58 (D. Mass. 2008) ......................................................................... 3

*New England Country Foods, LLC v. VanLaw Food Prods., Inc.*,
    17 Cal. 5th 703 (Cal. 2025) ............................................................................. 17

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015) ...................................................................... 12, 13

*Norwalk CORE v. Norwalk Redevelopment Agency*,
    395 F.2d 920 (2d. Cir. 1968) ........................................................................... 17

*Oscar v. BMW of N. Am., LLC*,
    2011 WL 6399505 (S.D.N.Y. Dec. 20, 2011) ................................................ 20

*Pearlstein v. BlackBerry Ltd.*,
    2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ..................................................... 9

*Reiss v. Audible Inc.*,
    2025 WL 1654643 (S.D.N.Y. June 11, 2025) ................................................... 9

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ............................................................................ 19

*Savino v. Computer Credit, Inc.*,
    164 F.3d 81 (2d Cir. 1998) .............................................................................. 19

*SourceOne Dental, Inc. v. Patterson Co., Inc.*,
    2018 WL 2172667 (E.D.N.Y. May 10, 2018) .................................................. 9

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*,
  262 F.3d 134 (2d Cir. 2001) ................................................ 19

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ......................................................... 4

*United States v. Google LLC* ("EDVA Op."),
  2025 WL 1132012 (E.D. Va. Apr. 17, 2025) .......................... passim

*United States v. Live Nation Entm't, Inc.*,
  2025 WL 835961 (S.D.N.Y. Mar. 14, 2025) ............................. 2

*United States v. Visa, Inc.*,
  2025 WL 1740613 (S.D.N.Y. June 23, 2025) ........................... 9

*Vincent v. Money Store*,
  304 F.R.D. 446 (S.D.N.Y. 2015) ....................................... 20

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ............................................ 12

*Weiner v. Snapple Beverage Corp.*,
  2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ............................. 7

*Wilder v. Bernstein*,
  499 F. Supp. 980 (S.D.N.Y. 1980) .................................... 17

*Woe by Woe v. Cuomo*,
  729 F.2d 96 (2d Cir. 1984) ........................................... 17

**Statutes**

Cal. Civ. Code § 1668 .................................................... 18

**Other Authorities**

*Legal and Economic Issues*,
  ABA Section of Antitrust Law (3d ed. 2017) ............................ 3

Phillip E. Areeda, Einer Elhauge & Herbert Hovenkamp,
  Antitrust Law (Little, Brown, 10th vol. 1996) ....................... 14

# I.    INTRODUCTION AND SUMMARY[1]

Google's Opposition ("Opp.") to Publisher Plaintiffs' motion for class certification is an exercise in misdirection.  It misrepresents Plaintiffs' arguments, the facts, and the law.  Viewed correctly, Google's challenges highlight the overwhelming commonality of issues here:

- Google's assertion that proving the ties—as part of the challenged Scheme—would require individualized evidence (Opp. 25-28) is based on the false premise that each Class member's claim arises out of its individual dealings with Google.  In fact, all Class member claims arise out of class-wide proof that Google engaged in the identical Scheme.

- Google's challenges to Prof. Elhauge's yardstick damages model (the "Yardstick")—claiming that it fails to account for purported "lawful feature differences" (*id*. 15-17); assesses damages from too few of the challenged restraints (*id*. 10-11); or too many of them (*id*. 12-14)—are factually incorrect and misconstrue Plaintiffs' claims.  Prof. Elhauge accounted for Google's supposed "feature differences," and the Yardstick conservatively assesses harm only from key aspects of the alleged Scheme.

- Google's assertion that Plaintiffs must identify all Class members to satisfy predominance (*id*. 22-25), misstates the law, which requires no such thing and, in any event, common evidence is available to identify the Class members.

- Google's argument that the named Plaintiffs are inadequate because some absent class members may not benefit from other class members' recovery of damages in this case (*id*. 28-31) is based on mere speculation and misstates the law and the facts.

- Google's suggestion that it is prejudiced by the inclusion of Multiple Customer Management ("MCM") parent publishers in the Classes (*id*. 31-33), ignores the fact that Google maintains information relating to such entities (its own customers), and it was Google that withheld information relating to MCMs until near the end of discovery.

# II.    ARGUMENT

## A.    Common Evidence Can Prove the Antitrust Violations, Including the Ties

Plaintiffs provide class-wide evidence capable of proving that Google engaged in an exclusionary scheme, involving ties and other restraints.  Class Br. 6-12, 22-24.  Google largely concedes the point, asserting only that proof of one element of one of the restraints (coercion)

---

[1] Unless otherwise noted, all emphases are added, and internal quotation marks and citations are omitted.  Previously filed exhibits are identified by their ECF number.  Any additional supporting documents are identified as exhibits—Ex. __—to the Declaration of Izaak Earnhardt, filed contemporaneously herewith.

would be individualized.  Opp. 25-28.  Even Google's limited argument is wrong.

    ***First,*** Google's premise is that each Class member's claim turns on showing that Google directly subjected that Class member to a restraint.  But no Class member's claim emanates from its own dealings with Google.  All Class members are advancing the same Scheme claim to be proven (or refuted) using the same class-wide evidence.[2]  Plaintiffs contend they were injured, not by virtue of any restraints to which they were directly subject, but rather by Google's Scheme that as a whole foreclosed competition by "depriving rivals of the ability to compete." EDVA Op. *48; Class Br. 22.[3]  Prof. Elhauge shows that the Scheme insulated Google from competition that would have otherwise forced Google to reduce its take rates Class-wide.  Class Br. 22.[4]

    A monopolist can harm its customers by charging artificially inflated prices due to conduct that initially injures the monopolist's competitors.  *See, e.g.*, *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) ("Although the defendants' conduct at issue targeted their competitors, . . . the plaintiffs' claimed injury of higher prices was 'inextricably intertwined' with the conduct's anti-competitive effects and thus flow[ed] from that which makes defendants' acts unlawful.").[5]  Whether a monopolist has directly targeted direct

---

[2] *See* Elhauge Reb. Rpt. ¶¶709-11 (ECF 959-3); Elhauge Rpt. ¶¶259-60, 442 (ECF 959-1); Class Br. 6-12, 22-24.

[3] *See* Elhauge Rpt. ¶¶255, 257, 259-60, 273, 285-86, 302, 309, 312, 322-23, 331-32, 340-41, 363-65, 370-71, 375; Elhauge Reb. Rpt. ¶¶458-61, 471-72, 474, 491, 493-95, 500, 502, 517, 559-62, 578, 709-10.

[4] Google is also incorrect in asserting that the Scheme "affect[ed] different putative class members differently" because they used AdX and AdSense at different times.  *See* Opp. 28.  Each of the restraints in the Scheme contributed to cumulative foreclosure of Google's rivals in the auction platform markets. Elhauge Reb. Rpt. ¶¶709-11.  All Class members were injured by Google's Scheme when paying Google's supracompetitive take rates.  *Id.*  And *Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 379 (5th Cir. 2016) (Opp. 28), is an inapposite tort case in which the harms were alleged to have emanated directly from each act.

[5] *See also United States v. Live Nation Entm't, Inc.*, 2025 WL 835961, at *4 (S.D.N.Y. Mar. 14, 2025) (government plaintiffs can sue on behalf of consumers even though "consumers' injuries are 'downstream' of anticompetitive conduct perpetrated against other market actors, like venues, promoters,

purchasers with its conduct is irrelevant.  *See, e.g.*, *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 111 (S.D.N.Y. 2015), *amended,* 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016) (common evidence can establish a multi-act anticompetitive scheme that included exclusive contracts with some but not all class members because proving "any . . . of these exclusionary acts will require Plaintiffs to put forth the same evidence for all members of the class").[6]  Google's own economist, Dr. Gregory Leonard, conceded that Prof. Elhauge employs the standard means of evaluating how exclusionary conduct harms direct purchasers.[7]

*Second*, whether the ties at issue are "coercive" is a common question.  Indeed, Google relies on common evidence to argue proof of coercion fails as to the Class as a whole, asserting that "using DFP without AdX is a 'viable option'" for everyone (Opp. 26), and disputing that Google had a policy of requiring publishers to use a unified contract and platform ("GAM") for DFP and AdX (*Id*. at 25-26).  Thus, given that Google's "concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—an alleged failure of proof as to . . . the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification."  *City of Philadelphia v. Bank of Am. Corp.*, 2023

---

and rival ticketers"); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.* ("*Keurig I*"), 383 F. Supp. 3d 187, 221-22 (S.D.N.Y. 2019) ("even though the injuries to the DPPs were 'derivative of the direct harm experienced by the defendants' competitors, harming competitors was simply a means for the defendants to charge the plaintiffs higher prices.'" (quoting *DDAVP*, 585 F.3d at 688)); EDVA Op. *36 (evaluating "whether [Google's] conduct, when considered as a whole, harmed competition and therefore harmed consumers"); Class Br. 25 n.67.

[6] *See also Le v. Zuffa, LLC*, 2023 WL 5085064, at *21-22 (D. Nev. Aug. 9, 2023) (common evidence where "combined effect of the contracts' restrictive clauses" together with other anticompetitive conduct "both individually and collectively" "allowed Defendant to exercise substantial monopsony power"); *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 262 F.R.D. 58, 65 (D. Mass. 2008) (relying on Prof. Elhauge to certify class challenging a scheme wherein exclusionary contracts "in the aggregate foreclose[d] a substantial portion of the end user market from rivals"); Elhauge Reb. Rpt. ¶709 & n.1801.

[7] *See* Gregory K. Leonard & Laila Haider, Damages in Exclusionary Conduct Cases at 276, *Proving Antitrust Damages: Legal and Economic Issues*, ABA Section of Antitrust Law (3d ed. 2017) (ECF 957-33) ("the typical way in which exclusionary conduct might harm a customer is by lessening competition in the relevant market"); *id.* at 290; Leonard Rpt. ¶¶154, 220 (ECF 959-10); *see* Class Br. 25 n.66.

WL 6160534, at *10 (S.D.N.Y. Sept. 21, 2023) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016)).

*Third*, common evidence shows that Google engaged in tying (including coercion) as part of its Scheme.  *See* Class Br. 6-7, 22-23.  Judge Brinkema found that Google tied DFP and AdX through "technical and policy restrictions" that prevented publishers from accessing real-time bids from AdX using a third-party ad server.  EDVA Op. *38-39.[8]  Indeed, Google admits that "if customers want real-time bids from AdX, they have to use DFP."[9]  The coercive effect of Google's bundling of DFP and AdX together in a single product, "which further intertwined" the two products, EDVA Op. *33, is similarly a class-wide issue.  And as to the AdSense Class, whether Google only provided the AdSense basic ad server and the AdSense auction platform as a combined product, Class Br. 7, is also a common issue.[10]

### B.    Plaintiffs Can Establish Class-wide Impact From the Challenged Conduct

#### 1.    The Yardstick accounts for supposed "feature" differences.

Google criticizes the Yardstick because Google's web auction platforms offer purportedly "valuable" features and benefits not available in Yardstick mobile app transactions.  Opp. 15-17.  Google asserts that these differences—rather than the absence of ties in the

---

[8] AdX Direct does not allow Publishers to receive real-time comparative bids from AdX—an ad exchange's "core function."  EDVA Op. *39; *id*. at *12 n.16 (accessing AdX through a third-party ad server was not an "economically viable substitute"); *accord* Elhauge Rpt. ¶¶288-92, 301; Elhauge Reb. Rpt. ¶¶335-44.  Judge Brinkema therefore rejected Google's argument (Opp. 25-26) that a diminished form of AdX called "AdX Direct" defeated the tying claim.  EDVA Op. *39-41.

[9] *See* Google LLC's Proposed Findings of Fact and Conclusions of Law at 325 ¶198, *United States v. Google LLC*, 23-cv-108 (E.D. Va. Aug. 19, 2024), ECF 1177 (Ex. 1).

[10] *Freeland v. AT & T Corp.*, 238 F.R.D. 130 (S.D.N.Y. 2006), and *Halverson v. Convenient Food Mart, Inc.*, 69 F.R.D. 331 (N.D. Ill. 1974) (cited Opp. 25) are inapposite because in both, and unlike here, the plaintiffs there alleged that they were harmed by ties to which they were directly subject.  Moreover, no Class member's claim here depends upon its own contract terms, unlike in *In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674 (S.D. Fla. 2012) (cited Opp. 27-28) where analysis of each class member's contract was necessary to determine whether it suffered impact.

Yardstick—explain the higher take rates.  *Id*.  As detailed in Plaintiffs' Opposition to Google's

Motion to Exclude the Expert Testimony of Einer Elhauge ("Elhauge *Daubert* Opp."), these

arguments are meritless.  ***First***, before November 2021, despite the supposed additional value

Google brought to its web auction platforms, Google charged the exact same take rate for web

and mobile: ████.  Google only dropped its take rate in the Yardstick ████████████████

████ when it eliminated the sell-side ties for certain mobile app ads transactions (the Yardstick

transactions).  Elhauge Rpt. ¶¶404-13, 442; Elhauge Reb. Rpt. ¶¶45, 593-96, 609-10.  Indeed, the

Yardstick rate was not only lower than the ████ Google charged for web transactions, but also

lower than the ████ rate that Google continued to charge after November 2021 for mobile

transactions still subject to ties.  Elhauge Rpt. ¶¶403, 410.  These facts rebut Google's claim that

the lower Yardstick rate reflects "feature" differences.

   ***Second***, Google's contemporaneous internal documents discussing the business case for

reducing the take rate for the Yardstick transactions make clear that, with the ties no longer in

place, Google had to lower the price to meet competition from rival auction platforms.  Elhauge

¶¶406-09; Elhauge Reb. Rpt. ¶¶598, 610, 615.  None of the contemporaneous documents

justifying the price reduction for the Yardstick references Google's "feature differences."  *Id.*

   ***Third***, access to aggregated demand by publishers using AdX or AdSense for open web

transactions is *neither* a product feature of Google's web auction platforms *nor* a reflection of

any difference between product features for web versus app transactions.  Elhauge Rpt. ¶402;

Elhauge Reb. Rpt. ¶606.  Such "aggregated demand" offered by using Google's web ad tools

was simply an effect of the challenged ties, which made the use of Google's ad server and ad

platform the only way to access the Google Ads demand.  *See* Elhauge Rpt. ¶403; Elhauge Reb.

Rpt. ¶¶595, 604.  Similarly, with mobile apps outside of the Yardstick, Google required

developers to use Google's SDK (ad server analog) and auction platforms to access Google Ads. *Id.* Thus, the fact that use of Google's SDK is the only way to access "aggregated demand" is a result of the ties—and not a "feature" of Google's SDK. Elhauge Reb. Rpt. ¶¶604-07.

**Fourth**, Google's argument makes no economic sense. This aggregated demand "feature" does not provide significant additional value given that, even within the Yardstick transactions, developers can and do aggregate demand from different advertisers by programming multiple SDKs (ad server analogs) in their apps cheaply and efficiently. Das Reb. Rpt. ¶¶185-87, 197, 199 (ECF 959-6); Elhauge Reb. Rpt. ¶613; Elhauge Dep. 268:5-10 (ECF 959-4). Thus, any cost savings from Google's aggregate demand to AdX publishers could not plausibly explain publishers' willingness to pay double the Yardstick rate (or more) for web transactions. Further, Google's own documents show that whatever costs are imposed by having multiple SDKs are commonly seen to be ██████████████████████████[11]

**Fifth**, Google falsely claims that its web auction platforms provide superior reporting services and security protections supposedly unavailable on Yardstick transactions. Opp. 16. For app transactions sold via Google's auction platforms, Google asserts that Google's SDK (*i.e.*, its ad server analog) provides reporting services and protection from spam and fraud that Google does not provide when advertisers use a third-party SDK.[12] But this is an argument that *Google's SDK* (for which it does not charge) provides additional product services, not that its ad auction platforms do. Elhauge Reb. Rpt. ¶¶606, 608; Elhauge Rpt. ¶411. Further, Google's documents show that Google provided some protection from spam and malware for Yardstick transactions long after the Yardstick rate was lowered from ███ to ███ in November 2021. Das Reb. Rpt. ¶204; Elhauge Reb. Rpt. ¶612. Thus, even if Google later stopped providing such

---

[11] Elhauge Reb. Rpt. ¶613 n.1578 (quoting GOOG-AT-MDL-001967178 at -182).
[12] *See* Dfts' Mem. in Support of Mot. to Exclude the Expert Test. of Prof. E. Elhauge at 5, ECF 1031.

services, that could not explain the lowered revenue share in November 2021. *Id.* In short, Prof. Elhauge has more than satisfied Plaintiffs' burden of showing that the Yardstick and open web display ads have some "meaningful economic similarit[ies]."[13]

## 2. Prof. Elhauge's Yardstick only detects harm where it could exist.

Google erroneously claims—without expert support—that the Yardstick measures damages when no harm could exist. Opp. 17-19.[14] Google argues first that the Yardstick improperly "observes an overcharge" on Class transactions before November 2021—the date when Google removed its sell-side ties in the Yardstick. Opp. 18-19. But the Yardstick includes only those transactions in mobile app ads that are analogous to Class member ad platform transactions, *except without the ties*. *See* Elhauge Rpt. ¶¶403-05.[15] The Yardstick analysis

---

[13] *In re Da Vinci Surgical Robot Antitrust Litig.*, 2024 WL 5697897, at *12 (N.D. Cal. Mar. 31, 2024); *see also* Elhauge *Daubert* Opp. 1-2, 5, 16-17 (citing cases). Google's cases (Opp. 15, 17) are inapposite. *See Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *8 (S.D.N.Y. Aug. 5, 2010) (unlike here, the expert merely described hypothetical use of a yardstick, and "concede[d] that he ha[d] done nothing to confirm that his proposed approaches would be workable in this case"); *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *18 (E.D. Pa. Jan. 18, 2017) (expert "admitted that he could not rule out other factors as being responsible for the [price] differential because he did not consider any other factors"); *Freitas v. Cricket Wireless, LLC*, 2022 WL 3018061 (N.D. Cal. Jul. 29, 2022) (expert failed to account for obvious differences in quality, conceded the differences affected price, and simply assumed away the effects); *see* Elhauge *Daubert* Opp. 17 n.25.

[14] Google's only cited authority, *Fifth & Fifty-Fifth Residence Club Ass'n, Inc. v. Vistana Signature Experiences, Inc.*, 2018 WL 11466157 (S.D.N.Y. Sept. 28, 2018) (cited Opp. 19 n.12), does not concern economic or legal standards applicable to yardstick selection or implementation.

[15] Google claims, without citation to any experts, that Prof. Elhauge cannot exclude transactions from the pre-November 2021 period from his Yardstick because he has not performed sufficient analyses to establish the presence of anticompetitive ties in mobile apps during that period. Opp. 18-19 n.12. Google is wrong. *First*, Google cites nothing for the proposition that an expert is required to evaluate non-yardstick transactions for the presence or absence of anticompetitive conduct. Prof. Elhauge selected a yardstick that Google concedes did not include any ties. That is sufficient. *Second*, Prof. Elhauge did, in fact, detect conduct similar to the ties at issue in mobile app ads prior to November 2021. During that period, Google required developers seeking to use Google's app ad auction platforms (AdMob and AdX) to sell in-app ads to use Google's SDK (the app analog to an ad server), and *vice versa*. This conduct, Prof. Elhauge determined, was similar to the sell-side ties in Google's open web products. Elhauge Rpt. ¶¶403-05; Elhauge Reb. Rpt. ¶596. In November 2021, Google removed these restraints for apps by allowing app developers to use SDKs offered by non-Google "Authorized Buyers" to access Google's app ad auction platforms. Elhauge Rpt. ¶404; Elhauge Reb. Rpt. ¶596. This change allowed for the first time non-Google SDKs to access the Google auction platforms—something that was not possible prior to November 2021. Elhauge Rpt. ¶¶404-11; Elhauge Reb. Rpt. ¶¶593-602.

appropriately compares the AdX and AdSense web transactions during the entire Class Period

(almost always ███; with ties) to the Yardstick transactions (███; no ties).  *Id.*  By making this

comparison, the Yardstick thus finds injury only where it plausibly exists.[16]

Further, also without support from its experts, Google argues that the Yardstick computes

overcharges on ██████████ transactions even though, according to Google, the Yardstick take

rate for ██████████ ads is ███.[17]  Opp. 19.  Google's only support for this assertion is a

parenthetical from a single Google email.  Opp. 19 n.13 (citing Elhauge Rpt. ¶404 n.1027 (citing

GOOG-AT-MDL-017562648)).  This evidence does not refute overcharges for ██████████

████ transactions given that Google's documents reflect that it maintained a ████ take rate for

██████████ only to avoid ████████████████████████████

Elhauge Decl. ¶¶2-3.  Thus, in the but-for world, where the ██████████ take rate would have

fallen to ███, the ███ rate logically would have followed.  *Id.*[18]  Moreover, in June 2022, Google

applied its ███ Yardstick take rate to ██████████████.  *Id.* ¶4.

### 3. Plaintiffs appropriately measure impact and damages caused by the ties.

Google argues that Plaintiffs must show harm emanating separately from each restraint.

---

[16] *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14 (D.D.C. 2017) (cited Opp. 18), is inapposite because the econometric model at issue there detected injury to a set of entities who could not possibly have been injured because they had contracts that locked in pre-conspiracy prices. *Id.* at 59, 126-31. Google identifies no such entities here. Google also cites *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, (S.D.N.Y. 2020), for the propositions that expert models can be rejected if they "may . . . generate false positives" or "produced 'mixed results' over different time periods." Opp. 17-19. But *Aluminum* was not a case about false positives; the quoted passage about "'mixed results' over different time periods" pertains to an analysis by the defendants' expert there that purported to show such mixed results. 336 F.R.D. at 61. Google presents no such analysis here.

[17] ██████████ ad transactions account for 8.3% of AdX Class damages and none of the AdSense Class damages. *See* Expert Declaration of Prof. Einer Elhauge, dated July 10, 2025 ("Elhauge Decl."), ¶¶6-7 & Tbl. 1 (Ex. 2). (Because Google's ██████████ argument did not appear in its expert reports, and is new, Plaintiffs submit the Elhauge Decl. to address it). Moreover, AdX Class members that sold ██████████ ads account for, at most, ████ of AdX Class members, comprising no more than ███ of the AdX Class commerce. *Id.* ¶7 & Tbl. 1.

[18] If necessary, the ██████████ transactions (constituting a small portion of AdX transactions and none of the AdSense transactions) could be readily identified and excluded. Elhauge Decl. ¶¶6-7 & Tbl. 1.

Opp. 10-11.  Google is wrong.  ***First***, the argument has no legal merit.[19]  Where, as here, the

components of an anticompetitive Scheme act synergistically to cause competitive harm,[20] the

harm need not be "disaggregated."  *In re Keurig Green Mountain Single-Serve Coffee Antitrust*

*Litig.* ("*Keurig II*"), 2025 WL 354671, at *12 (S.D.N.Y. Jan. 30, 2025).[21]  The effects "must be

considered as a whole instead of in manufactured subcategories."  EDVA Op. *35.[22]  ***Second***,

Google complains that the Yardstick measures only the harm from the challenged ties and not

any additional harm caused by the non-tying restraints.  Opp. 11.  But this simply means that the

Yardstick may understate damages.[23]  Notably, "a more conservative damages estimate" is

legally sound.  *Keurig II*, 2025 WL 354671, at *34; *see also id.* at *12 (collecting cases).[24]

---

[19] Google's cited authority (Opp. 10-11) is inapposite because it does not involve allegedly interconnected and synergistically reinforcing schemes.  *See Kronenberg v. Allstate Insurance Co.*, 743 F. Supp. 3d 465, 487-94 (E.D.N.Y. 2024) (three independent claims all arising from same conduct); *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 552 (S.D.N.Y. 2021) (plaintiffs advanced "two theories of antitrust liability" not interconnected in an overarching scheme).

[20] Prof. Elhauge noted multiple ways in which the anticompetitive effects of Google's acts were mutually reinforcing.  Elhauge Rpt. ¶¶230, 259-60, 262, 265-66, 302, 309, 330, 340-41, 367, 375; Elhauge Reb. Rpt. ¶¶333, 491, 508-09, 623, 626, 629, 709-10, 712 n.1807, 713; *see also* Class Br. 22 & n.59.  Moreover, Judge Brinkema found that the acts within Google's Scheme "exacerbated," "entrenched," and "compounded" each other.  EDVA Op. *41.

[21] *In re Google Digital Advert. Antitrust Litig.* ("*Google I*"), 627 F. Supp. 3d 346, 381 (S.D.N.Y. 2022) ("there is nothing remarkable" in an allegation that "purportedly unlawful schemes were 'more powerful' because of their 'combined effect'"); *Pearlstin v. BlackBerry Ltd.*, 2021 WL 253453, at *23 (S.D.N.Y. Jan. 26, 2021) (no requirement to disaggregate damages for each act); *SourceOne Dental, Inc. v. Patterson Co., Inc.*, 2018 WL 2172667, at *6 (E.D.N.Y. May 10, 2018) (declining to exclude an expert's damages model that "does not attempt to disaggregate damages for each of th[e] three types of conduct" because the expert "was not required to" do so "for his model to be admissible").

[22] *See Google I*, 627 F. Supp. 3d at 381 (S.D.N.Y. 2022) ("the Court must avoid tightly compartmentalizing the various factual components of a plaintiff's claims and wiping the slate clean after scrutiny of each."); *see also United States v. Visa, Inc.*, 2025 WL 1740613, at *10 (S.D.N.Y. June 23, 2025) (same); *Reiss v. Audible Inc.*, 2025 WL 1654643, at *7 (S.D.N.Y. June 11, 2025) (same); *fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 136 (S.D.N.Y. 2024) ("exclusionary efforts [must] be considered in their totality"); *In re Dental Supplies Antitrust Litig.*, 2016 WL 5415681, at *1 (E.D.N.Y. Sept. 28, 2016) (declining to "disassemble plaintiffs' theory").

[23] Elhauge Reb. Rpt. ¶599; *see also id.* ¶¶505, 510, 593-98, 600; Elhauge Rpt. ¶¶404-406; Elhauge Dep. 173:9-18, 174:13-175:11; Class Br. 28.

[24] *See also In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 327 (S.D. Cal. 2019) ("even if the Court were to assume that the benchmark period was not perfectly competitive, Dr. Mangum's damages calculation actually becomes a more conservative estimate."); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, 2016 WL 3579953, at *9 (E.D. Wis. June 24, 2016) (finding predominance

Google's demand for a more precise damages estimate is also contrary to the law providing that because of "the inherent difficulty of identifying a but-for world, antitrust damages need not be measured with certainty." *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 32 (E.D.N.Y. 2020) (cleaned up).[25]   ***Third***, Google's assertion that Plaintiffs "have no common evidence of harm" arising from the non-tying restraints (Opp. 11) is also false. While Prof. Elhauge does not compute the contribution to damages from the non-tying restraints, he does conclude—based on extensive common evidence—that each act "was exclusionary and contributed to the suppression of rival market share."[26]

### 4.  The Yardstick appropriately measures harm from the ties.

Google argues that the Yardstick is flawed because it supposedly does not "isolate the alleged harm specifically caused by" Google's "Sell-Side" ties.  Opp. 12-13.[27]  The premise of

---

where the expert's regression model included "some anti-competitive conduct [that] occurred in the benchmark period" because "it would only render his overcharge estimate conservative" which "would benefit defendants"); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 195 (E.D. Pa. 2015) (finding predominance where the expert's "benchmark period" was "allegedly also tainted by some anticompetitive conduct" because "if anything, any anticompetitive activity during the benchmark period would make [the] results conservative"); *Allen v. Dairy Mktg. Servs., LLC*, 2013 WL 6909953, at *15 (D. Vt. Dec. 31, 2013) (that plaintiffs' expert's benchmark market was "not wholly competitive . . . [it] would merely render [the] calculation of damages more conservative");  *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 675, 683-84 (E.D. Pa. 2007) ("assuming that the benchmark period was not perfectly competitive, [the] damages calculation actually becomes a more conservative estimate.").

[25] *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *16 (S.D.N.Y. Mar. 28, 2014) ("the Supreme Court has long taught that 'damage issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.'") (quoting *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981)).

[26] Elhauge Reb. Rpt. ¶710; *see also id.* ¶¶458-61, 466-74, 491, 493-97, 500, 502, 508-09, 517, 543-45, 559-62, 574, 578, 709-11; Elhauge Rpt. ¶¶322-23, 330-32, 334, 336, 340-41, 363-65, 367, 370-71, 375; EDVA Op. *14, 42; EDVA Op. *41-42 (finding most of the alleged acts anticompetitive).

[27] Google's suggestion that Plaintiffs are improperly relying on "documentary evidence" to establish class-wide impact (Opp. 12 n.8) is false.  Plaintiffs establish class-wide antitrust impact through both documentary evidence and Prof. Elhauge's economic analysis.  Class Br. 24-28.  Google's cited cases are inapposite because, unlike here, plaintiffs there attempted to establish class-wide impact *exclusively* through the use of documentary evidence, without any reliable expert analysis.  *In re Aluminum Warehousing Antitrust Litig.,* 336 F.R.D. at 49-51; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 626 (D.C. Cir. 2019) (rejecting plaintiffs' use of documentary evidence after their expert's class-wide impact model had already been excluded); *see also In re Broiler Chicken Grower Antitrust Litig.*, 2024 WL 2117359, at *22 (E.D. Okla. May 8, 2024) (distinguishing *Aluminum* because "Plaintiffs

this argument—that Plaintiffs are no longer asserting the conduct constituting the buy-side ties (between Google Ads and Google's auction platforms)—is false. Plaintiffs, in fact, continue to assert that that buy-side restraints are part of Google's exclusionary Scheme. *See* Class Br. 7, 23.[28] The conduct underlying the ties between Google Ads and Google's auction platforms— *i.e.*, making Google's "must have" ad demand exclusively available to publishers through Google's ad platforms—is part of the sell-side tying conduct. *See* FAC, ECF 408 ¶¶16, 165-67, 202, 236; *Google I*, 627 F. Supp. 3d at 368; EDVA Op. *12-13, 40.[29] This Court and Judge Brinkema have both recognized that the Google Ads exclusive demand bolstered the sell-side ties—publishers used Google's ad server tools because that was the only way to access Google's ad auction platforms; and publishers used Google's ad auction platforms because that was the only way to access Google's unique Google Ads advertiser demand.[30] Regardless of whether

here do no[t] rely solely on documentary evidence"); *Le*, 2023 WL 5085064, at *39 ("Plaintiffs' statistical evidence of common impact is buttressed by documentary evidence, which *separately and independently* establishes class-wide impact"); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *43 (E.D.N.Y. Oct. 15, 2014) ("expert testimony . . . should be viewed in conjunction with the plaintiff's other evidence"). Here, Prof. Elhauge appropriately analyzes internal Google documents, as antitrust economics experts routinely do in assessing class-wide antitrust impact and damages. *See, e.g.*, *In re Da Vinci Surgical Robot Antitrust Litig.*, 2024 WL 5697897, at *10 (N.D. Cal. Mar. 31, 2024) (defendant's internal documents "serve as a reliable basis to conceive of the discounts that may have existed in the but-for world"); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 835 (D.N.J. 2015) (endorsing Prof. Elhauge's opinion that defendants inflated prices based in part on the defendant's "internal documents and testimony"). And Prof. Elhauge's yardstick "should be viewed in conjunction with" evidence of Google's executives' widely held belief that ███ represented a competitive take rate for AdX. *See* Class Br. 24-26 & n.68.

[28] *See also* Elhauge Rpt. ¶6 & n.12 (analyzing Google's "[t]ying the Google Ads ad buying tool . . . to use of a Google ad auction platform" and "[t]ying Google's AdSense ad auction platform to use of the Google Ads ad buying tool"); *id.* ¶¶269-86; Elhauge Reb. Rpt. ¶252 ("tying advertiser access to the Google Ads ad buying tool to a requirement that those advertisers had to purchase auctioned ads from one of Google's ad auction platforms" and "bundled pricing that tied its AdSense ad auction platform to the use of Google Ads ad buying tool"); *id.* ¶¶254-331; Elhauge Dep. 82:8-17.

[29] *See* Elhauge Dep. 178:19-180:14; Elhauge Rpt. ¶¶276, 283, 302; Elhauge Reb. Rpt. ¶¶253, 366.

[30] *See Google I*, 627 F. Supp. 3d at 368; EDVA Op. *12-13, 40; *see also* Elhauge Dep. 178:19-179:13 ("it would still be the case that this arrangement linking" Google's auction platforms "to must-buy Google Ads, demand is part of what makes the tie of AdX and AdSense to their ad servers effective. . . . [Such] conduct can still contribute whether or not we independently call it an illegal tie"); Elhauge Rpt. ¶¶276, 283; Elhauge Reb. Rpt. ¶¶253, 366.

Google's restriction of its Google Ads advertiser demand is viewed as a standalone restraint, or as conduct that reinforced or enabled Google's ties between its ad servers and auction platforms (as part of the Scheme), the Yardstick appropriately measures harm due to the Scheme.

Google's reliance on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) (Opp. 12-13), is misplaced.[31]  *Comcast* stands for the proposition that where there are multiple distinct theories of antitrust injury, but only one remains viable, the damages model must filter out the theories no longer in the case.  569 U.S. at 36-38.  Given that Plaintiffs allege and measure damages from a single Scheme, and none of the components of the alleged Scheme has been excluded, the Yardstick satisfies *Comcast*.  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (*Comcast* satisfied despite not disaggregating harms).  Moreover, the Yardstick satisfies *Comcast* even if a jury does not find the buy-side conduct to be anticompetitive standing alone.  An exclusionary scheme can include individual acts that would not have been illegal or anticompetitive standing alone.  *See Google I*, 627 F. Supp. 3d at 381 ("In assessing whether conduct is anticompetitive, it is often necessary to examine other market conduct, including practices that are perfectly lawful."); *see also New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 (2d Cir. 2015).[32]

---

[31] Google's other authority is inapposite.  In *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013) (cited Opp. 13), plaintiffs' expert there conceded that the model produced "false positives" because it attributed damages to proposed class members who could not have been affected by the alleged conspiracy.  *See id.* at 252-53.  As explained above, *see supra* § II.B.2, the Yardstick produces no false positives.  *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5 (cited Opp. 13-14) is also inapposite.  *Aluminum* identified three "*Comcast* problems": (1) some of the alleged anticompetitive effect was caused by conduct not alleged to be part of the illegal conduct (*id.* at *52-53); (2) some of the alleged harm flowed from conduct the complaint disclaimed (*id.* at *53-55); and (3) the conduct that allegedly restricted supply, actually enhanced it (*id.* at *55-57).  Google does not even allege that these factors are present here, and none are.  *See In re Term Commodities Cotton Futures Litig.*, 2022 WL 485005, at *5 (S.D.N.Y. Feb. 17, 2022) (distinguishing *Aluminum* because the "issue . . . was whether the defendants['] conduct had *any* effect at all on each of the pricing in plaintiffs' contracts").

[32] Further, as discussed above, even if the strict requirements for a tie are not met, the restraints between Google Ads and Google's auction platforms could nonetheless be deemed anticompetitive standing alone given that they "coerce[] consumers and impede[] competition."  EDVA Op. *46 (quoting *Actavis*, 787

### 5. Common evidence shows all Class members are injured.

Google argues erroneously (in a footnote) that Prof. Elhauge's analysis reveals that a handful of entities in the AdSense Class, who exclusively paid take rates below ██ were uninjured. Opp. 24 n.18. Prof. Elhauge in fact shows that *all* members of both Classes suffered injury because even those few who paid heavily discounted take rates in the actual world would continue to receive comparable discounts in the but-for world—albeit now off of the much lower baseline ██ take rate.[33] Google's expert in fact conceded that Dr. Elhauge's Yardstick analysis, if believed, would demonstrate that all Class members were injured.[34]

### 6. Prof. Elhauge measures harm from the tied and tying products.

Google argues that Plaintiffs' proof of injury fails because Prof. Elhauge purportedly only assesses harm on ad auction platforms and not the "package" that includes the ad servers. Opp. 20. But Prof. Elhauge not only computed overcharges for the ad platforms, Elhauge Rpt. ¶¶71, 398-413, he also found that the Scheme increased Google's monopoly power in ad serving

---

F.3d at 654); *Keurig I*, 383 F. Supp. 3d at 230 (same). Finally, the Yardstick plausibly reflects only the absence of the sell-side ad server and ad auction platform ties—Google's revenue share remains inflated at ██ where the buy-side tie is eliminated but the sell-side tie remains in place, *i.e.*, where authorized buyers use Google's SDK. Elhauge Dep. 180:6-14.

[33] *See* Elhauge Rpt. ¶453; Elhauge Reb. Rpt. ¶¶707, 739; *see also Castro*, 134 F. Supp. 3d at 848 ("The economic logic of Sanofi's pricing structure would not change in the but-for world, so Sanofi would be likely to reduce price across the board"); Class Br. 29-30 & nn.76, 81.

[34] *See* Leonard Dep. 207:1-21 (ECF 959-11); *id.* 208:19-209:15; Leonard Rpt. ¶217; Elhauge Reb. Rpt. ¶692; Class Br. 30. Even under the flawed, conservative assumption that Google would not offer any of its actual-world discounts in the but-for world, only 3% of the members of the AdSense Class would be "uninjured." Elhauge Reb. Rpt. ¶765 & Tbls. 8, 11, 16; *see* Class Br. 30-31. These purportedly "uninjured" Class members are mostly entities with insignificant damages. Among "economically significant" AdSense Publishers—*i.e.*, those that earned over $100 in ad impression sales over the Class Period—██ paid an average revenue share greater than ██. Elhauge Rpt. ¶451 & Errata (ECF 959-2). Second Circuit courts frequently certify classes despite the presence of uninjured class members. Class Br. 24 n.64 (citing cases). Finally, it would be "straightforward to mechanically identify" and remove transactions with take rates below ██. Elhauge Reb. Rpt. ¶739. Google's cited authority, Opp. 24-25, is unavailing. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, is inapposite because the share of uninjured was at least 12.7%, and *Rail Freight* required individualized analysis to "segregate the uninjured from the truly injured." 292 F. Supp. 3d at 137-38.

and thus either had no effect on ad server prices (as in AdSense where the price was zero) or increased those prices.  Elhauge Reb. Rpt. ¶¶388, 392, 399-402; Elhauge Rpt. ¶¶67, 70, 73, 78, 80, 401-02, 411; Elhauge Dep. 60:3-61:9.  Thus, he determined that Google charged artificially inflated prices for the package as a whole.  Class Br. 33.[35]  Prof. Elhauge's decision to exclude the ad server overcharges just makes his aggregate damage calculations more conservative.  Elhauge Reb. Rpt. ¶¶401-02.  Google's argument also fails because Google provides no evidence that Google offset its artificially inflated ad platform prices with ad server discounts.  Dr. Leonard's speculation that Google would have offset higher ad platform prices with lower ad server prices in the but-for world[36] is irrelevant to proof of impact and damages.[37]

### C.    Common Evidence Can Identify All Class Members

Google argues that predominance is not satisfied because individualized evidence is necessary to identify Class members.  Opp. 22-25.  But there is no requirement that Plaintiffs identify class members with common evidence.  *See, e.g.*, *In re Actos Antitrust Litig.*, 2024 WL 4345568, at *9 (S.D.N.Y. Sept. 30, 2024).  Google's concern—that Plaintiffs may not be able to

---

[35] Google's argument that Prof. Elhauge's antitrust treatise recognizes that when a company sells two products in a package, it can offset an increased price on one with a discount on the other, Opp. 20, omits a key exception: the price reduction may not occur when a restriction prevents "the use of substitute inputs."  Opp. 20 (citing Sessions Decl., Ex. 67 (Phillip E. Areeda, Einer Elhauge & Herbert Hovenkamp, Antitrust Law ¶1769c (Little, Brown, 10th vol. 1996))).  Here, as Prof. Elhauge has found, *e.g.*, Elhauge Rpt. ¶¶290, 311; Elhauge Reb. Rpt. ¶¶366, 415, the Scheme prevents such substitution through the ties— a fact the government already proved at trial.  EDVA Op. *41.

[36] *See* Leonard Rpt. ¶197 ███████████████████████████████████████████████ ███████████████████████████████ (emphasis added); *id.* & Ex. 7 ███████████████ ███████████████████████████████████████████████ ; Leonard Dep. 245:2-9 ███████████████████████████████████ ; *id.* 249:1-250:17 (same).

[37] *Keurig II*, 2025 WL 354671, at *38 (denying a *Daubert* motion premised on argument that expert did not account for asserted economic benefit where there was "simply too much speculation and conjecture inherent in the development of any such but-for world to require that it be included as an offset in [the] model"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 315 (E.D.N.Y. 2022) ("[A]n antitrust defendant may not alter this well-settled measurement of [overcharge] damages by speculatively raising potential offsets.").

establish the precise identity of the Class members entitled to recover damages—"is an administrative feasibility argument dressed up in predominance clothing." *City of Philadelphia*, 2023 WL 6160534, at *12.

As to the AdSense Class, Prof. Elhauge analyzes impact and damages using Google's own publisher data. Elhauge Reb. Rpt. ¶¶738-39 & n.1863; Class Br. 14 n.40. Google does not claim that this data (which reflects, *inter alia*, the take rates paid to Google) was an impediment to computing impact and damages accurately. Class Br. 29-31, 33-35. When it comes time to allocate any funds from a settlement or judgment, the data will be available either from Google (which maintains customer records) or the Class members themselves to determine the identity of each Class member. Elhauge Reb. Rpt. ¶¶745, 747, 749.[38]

Google also claims falsely that Plaintiffs cannot identify the direct purchasers in Multiple Customer Management ("MCM") Manage Account transactions, *see* Opp. 24-25,[39] which represent small fractions of each Class's damages. *See* Elhauge Reb. Rpt. Tbl. 6 (█ of AdX Class damages); *id.* Tbl. 7 (█ of AdSense Class damages). In Manage Account transactions, the child publisher maintains the auction platform account and directs Google to pay some of the ad revenue to the MCM parent publisher as a commission. Elhauge Reb. Rpt. ¶741 & n.1867;

---

[38] Even without Google's data, AdSense publishers can "identify themselves" as members of the proposed AdSense Class. *Actos*, 2024 WL 4345568, at *11 (rejecting argument that "too much individual inquiry is required" because putative class members would be required to submit their own data"); *see also In re Namenda Indirect Purchaser Antitrust Litig.*, 2022 WL 4298767, at *10 (S.D.N.Y. Sept. 19, 2022) ("the fact that each individual class member will at some point have to present personalized proof in order to receive any money does not defeat predominance").

[39] In Google's MCM program, "parent publishers" manage the sale of ad inventory on the websites of "child publishers." Elhauge Reb. Rpt. ¶734 & Tbl. 6; Elhauge Dep. 190:4-16. There are two types of relationships in the MCM program: "Manage Inventory" and "Manage Account." *See* Class Br. 14. In Manage Inventory, the parent publisher maintains the auction platform account and is paid directly by Google. *Id.*; Elhauge Reb. Rpt. n.1855. In Manage Account, the child publisher maintains the auction platform account and instructs Google to pay some revenue to the MCM parent publisher as a commission. *See* Class Br. 14 & n.42; Elhauge Reb. Rpt. n.1856.

Elhauge Dep. 192:2-4, 194:24-195:11; Class Br. 14.  Thus, the child is the direct purchaser in Manage Account transactions regardless of whether the child directs Google to pay some or all of the ad revenue to the MCM parent.  *See* Class Br. 14 & n.43 (citing cases).[40]  And contrary to Google's contention (Opp. 25), individual contracts need not be evaluated because Google has common databases identifying its own customers and/or whom it pays.  Elhauge Reb. Rpt. ¶¶746-47 & Tbls. 8, 10.

      **D.**      **The Proposed Class Representatives Satisfy the Adequacy Standard**

            **1.**      **MCM relationships do not create conflicts in the AdX Class.**

      Google argues that Plaintiffs Genius and The Nation—both of which were ███████ ███████ on some of their AdX transactions—are inadequate AdX Class representatives because they purportedly "have interests antagonistic to the ██████████████████ in the putative AdX Class."  Opp. 28-29.[41]  According to Google, ████████████████████



Opp. 29.  Google argues that ██ ██████████████████████████████████████ ████████████████████████ ██████████████████████ Opp. 29.  This argument is without merit.

      ***First***, Google's speculation that some absent class members *might* prefer that Google's

---

[40] In the alternative, in Manage Account relationships, the Class member is the entity to whom Google directly deposits funds into its bank account (even if at the direction of the child publisher account holder).  Elhauge Reb. Rpt. ¶746.  In that instance, both the child and parent publisher would be in the Class and harmed in proportion to the amounts Google deposits into their respective bank accounts directly.  *Id.*  Whether the child publisher is always the ad platform account holder, or whether Class membership is determined by whom Google pays, would make a difference only as to Class member identity.  Elhauge Dep. 198:14-200:4.

[41] Genius and The Nation were ██████████████████████████ on only a small subset of their respective AdX transactions.  Elhauge Reb. Rpt. ¶752.

antitrust violations go unremedied does not create fundamental conflicts that defeat adequacy.

*See, e.g., Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 400 (S.D.N.Y. 2015) (no fatal

conflict even if "certain class members would prefer the status quo to persist").[42]  **Second**, the

alleged conflict is speculative.[43]  Class Br. 16-17 (citing cases providing that conflict must be

fundamental and non-speculative).[44]  As applied to antitrust violations by Google, ██████

████████████████████ are void as against public policy.[45]  Further, Google's ██████████

████████████████████████████████ for antitrust damages attributable

to Google's own intentional conduct—particularly in the absence of any evidence ██████████

██████████████████████████—is implausible.[46]

---

[42] *See also Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920, 937 (2d. Cir. 1968) ("The fact that some members of the class were personally satisfied with the defendants' [challenged conduct] is irrelevant."); *Wilder v. Bernstein*, 499 F. Supp. 980, 993 (S.D.N.Y. 1980) ("The fact that some members of the class may be personally satisfied with the existing system and may prefer to leave the violation of their rights unremedied is simply not dispositive of a determination under Rule 23(a)."); *Jacobi v. Bache & Co.*, 1972 WL 560, at *2 (S.D.N.Y. 1972) ("the fact that some members of the class may differ as to the desirability of a particular remedy for the anti-trust violation, or even desire the maintenance of the status quo, does not preclude their being included within the class bringing the action").

[43] *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422 (S.D.N.Y. 2019) (cited Opp. 29) is inapposite.  There, class members were on opposite sides of zero-sum futures contracts and thus increased damages for one counterparty resulted in decreased damages for the other.  *Id.* at 439. Here, (a) all Class members' recoveries are based on the same overcharge calculation, (b) in no circumstance would a damages award to one class member reduce damages to another (or *vice versa*), and (c) the purported conflict is based on speculation, not a zero-sum mathematical model.

[44] Google does not dispute that MCM publisher parents—and never their publisher children—are Class members under Manage Inventory relationships.  Class Br. 14.  And under Manage Account, only the child publisher is the Class member.  *Id.*  Thus, the hypothesized conflict exists only if an MCM Manage Inventory parent in one of the Classes also maintains Manage Account arrangements with child publishers in the Classes.  Google provides no evidence that this situation ever occurred.

[45] California law governs Google's form contracts with Class Members.  *See, e.g., Google Platform Services Terms & Conditions*, Google, https://www.google.com/intl/en_us/platforms/terms/ (Ex. 3). Under California law, contracts that "directly or indirectly" limit liability for concurrent or future intentional violations of the law are void.  *New England Country Foods, LLC v. VanLaw Food Prods., Inc.*, 17 Cal. 5th 703, 712-15 (Cal. 2025); Cal. Civ. Code § 1668.  Further, that ██████████ will never bear the cost of damages Google caused ██████████ distinguishes *Allen v. Dairy Farmers of Am., Inc.*, 279 F.R.D. 257 (D. Vt. 2011), where some dairy farmers in the proposed class were members of and funded the cooperatives they were suing.  *Id.* at 274-75.  Unlike here, *Allen* also involved injunctive relief that would fundamentally alter the way the cooperatives operated to benefit their members.  *Id.*

[46] If the Court were to find a cognizable conflict, ██████████████ could easily be excluded if necessary.  *Cf. Woe by Woe v. Cuomo,* 729 F.2d 96, 107 (2d Cir. 1984).

## 2. The Progressive satisfies the adequacy standard.

Google contends that The Progressive is an inadequate AdSense class representative because of a purported inaccuracy in its interrogatory response that omitted the DFP ad server from the list of ad tech products it has used. Opp. 30-31 & n.28. The Progressive correctly answered that it used "Google AdSense," the auction platform, "exclusively since 2016." *Id.* 30 n.28. But The Progressive sometimes used the DFP ad server to sell impressions through AdSense via DFP's "backfill functionality." *Id.* 27 n.25.[47] Google's supposed proof of The Progressive's intent to "deceive" is that The Progressive itself produced documents evidencing its own minor DFP usage. *See id.* at 26 n.24, 30 nn.29-30. That's not deception, that's disclosure. That in a separate answer The Progressive mistakenly answered otherwise is hardly so significant as to tarnish its ability to represent the AdSense Class. Here, the discrepancy was minor given that (a) The Progressive only used DFP occasionally, and (b) the information was already known to Google. Courts deny certification based on inadequacy "only in flagrant cases" where representatives "are so lacking in credibility that they are likely to harm their case." *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 51 (S.D.N.Y. 2012).[48]

---

[47] Google's assertion that The Progressive's use of DFP "is directly contrary to the theories of harm being pursued by Plaintiffs" (Opp. 30) is false. That The Progressive was able to use DFP to transact through AdSense does not mean that the AdSense server tag was not tied to the AdSense auction platform—either for The Progressive or for other users. *See* GOOG-DOJ-09238836 at -904 (Ex. 4) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Das Reb. Rpt. ¶¶45-46, ¶95.h; ¶133; *see also* Elhauge Reb. Rpt. ¶448. Indeed, The Progressive's deponent correctly testified that AdSense was the "only game in town for a small publisher," Opp. 30 n.28, a view shared by Google itself, GOOG-AT-MDL-019586925 at -930 (Ex. 5) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[48] *See Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Entm't Holdings, Inc.*, 338 F.R.D. 205, 212-13 (S.D.N.Y. 2021). Credibility issues must be "serious," go "to the heart of their claims," and be "so sharp as to jeopardize the interests of absent class members." *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177-80 (S.D.N.Y. 2008) ("minor discrepancy" between plaintiff's statements did "not impugn Plaintiff's credibility in any meaningful way") (collecting cases); *Kronfeld v. Trans World Airlines, Inc.*, 104 F.R.D. 50, 52 (S.D.N.Y.1984) (minor discrepancies between testimony and documents "hardly serve to disqualify … a class representative" because they do not "unduly burden the class by diverting attention from the substance of the [class's] basic claim"). Google's cited cases, Opp. 31, are inapposite due to severe credibility issues going to the heart of the litigation. *E.g., Savino v. Computer*

### E.    Plaintiffs Have Appropriately Clarified Their Class Definitions

Contrary to Google's argument (Opp. 31-33), Plaintiffs' clarification to the proposed

Class definitions is appropriate.  "It is well-established that a court 'is not bound by the class

definition proposed in the complaint.'"  *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F.

Supp. 3d 152, 210 (S.D.N.Y. 2018) (quoting *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir.

1993)); *see* Class Br. 12 n.35.  The Court has broad discretion to modify the class at class

certification.  *See Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d

Cir. 2001).  *First*, the proposed change clarifies but does not change the identity of Class

membership.  Plaintiffs' Complaint alleged two classes of publishers who "paid take rates

directly to . . . or received revenue" from Google "for displaying advertisements on their

websites."  FAC, ECF 408, ¶368.  The new definitions omit "their."  *See* ECF 955.  As a matter

of economics, MCM parent publishers and child publishers form joint ventures when they sell

impressions on the child publishers' websites.  Elhauge Reb. Rpt. ¶742; Elhauge Dep. 203:13-

204:16; 204:24-205:16.  Thus, when MCM parents purchase auction platform services to sell

impressions, the MCM parent publishers are in fact selling impressions on "their"—*i.e.*, the joint

ventures',—"websites."  FAC, ECF 408, ¶368.  So the MCM parents would be in the Classes

even under the prior definitions.

   *Second*, even if the change had altered the classes to include MCM parent publishers, the

law would allow that amendment.[49]  Courts evaluate whether modifying the class definition is

inconsistent with Rule 23(a) or would cause prejudice to the defendants, such as by raising

---

*Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (finding plaintiff "repeatedly changed his position … about
letters that form the very basis for his lawsuit"); *Bowling v. Johnson & Johnson*, 2019 WL 1760162, at *6
(S.D.N.Y. Apr. 22, 2019) (multiple instances of inconsistent or incredible testimony on key issues).
[49] *E.g.*, *Namenda*, 331 F. Supp. 3d at 210; *Menking ex rel. Menking v. Daines*, 287 F.R.D. 174, 181
(S.D.N.Y. 2012); *McCarthy v. Paine Webber Grp., Inc.*, 164 F.R.D. 309, 311 (D. Conn. 1995); *Elkind v.
Liggett & Myers, Inc.*, 77 F.R.D. 708, 712 (S.D.N.Y. 1977); Class Br. 12 n.35.

"notice and discovery issues." *Namenda*, 331 F. Supp. 3d at 211. Here, while Google claims that including MCM parent publishers in the classes would require additional discovery, Opp. 33, Google has not identified any specific information that it claims to need, or any defenses that it was unable to develop.[50] Given that the MCMs are all known to Google and operate according to Google's own rules and programs, Elhauge Reb. Rpt. ¶734 & n.1853, Google has all of the information it could possibly need.[51] Its claims of prejudice, therefore, ring hollow. Further, Prof. Elhauge's analysis showed that MCM parent publishers are not situated in a meaningfully different position than any other class members with respect to Google's take rate overcharges. Elhauge Reb. Rpt. ¶¶739, 753 & Tbl. 8.[52] There is no dispute that MCM parents and children pay the same prices on the same terms, and are overcharged in the same way. *Id.*[53]

## III.    Conclusion

For the foregoing reasons, the Court should grant Plaintiffs' Motion.

---

[50] *Elkind*, 77 F.R.D. at 712 ("defendant has not suggested how its defense would have been any different had the [new class members] been in the case from the outset of the trial").

[51] Moreover, it is Google who sandbagged Plaintiffs regarding the role of the MCMs, and not the other way around. Google's experts are the ones who have attempted to manufacture MCM relationships as a class certification issue. The "Multiple Customer Management" dataset on which Google's experts relied was initially produced in response to the Department of Justice's RFP 57 ███████████████████ ███████████████████████████████████████ on September 8, 2023. *See* Letter from D. Pearl to M. Freeman at 1 (Sept. 8, 2023) (Ex. 6); DOJ's Second Set of Requests for Production at 7 (April 13, 2023) (Ex. 7). Google waited over six months to produce that data to Publishers despite similar requests in MDL fact discovery. *See* Letter from D. Pearl to W. Noss at 1-2 (Feb. 15, 2024) (Ex. 8).

[52] That some proposed Class representatives have previously identified parent publishers as ad tech "providers" is irrelevant. Opp. 32 & n.32. Google itself refers to MCM parent publishers as "publishers." *See* Elhauge Reb. Rpt. ¶739 ("calculations of common impact and damages" were based "on the fields in Google's databases that Google described as indicating the 'publisher.'").

[53] Google's cited caselaw (Opp. 32) is inapposite. In *Vincent v. Money Store*, 304 F.R.D. 446 (S.D.N.Y. 2015) unlike here, the "proposed class differ[ed] in both the time period identified, and the precipitating event," and therefore required additional discovery. *Id.* at 453. And in *Oscar v. BMW of N. Am., LLC*, 2011 WL 6399505 (S.D.N.Y. Dec. 20, 2011), the proposed change would have "substantially overhaul[ed] the class definition and theory of damages" by adding products from five additional manufacturers, which would have necessitated new expert discovery—which the plaintiffs requested—as well as additional fact discovery, including complex consumer surveys. *Id.*, at *1, 5.

Dated: July 16, 2025

Respectfully submitted,

David Boies

dboies@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200

*Interim Co-Lead Counsel*
*for the Publisher Class*

*/s/ Philip C. Korologos*
Philip C. Korologos
pkorologos@bsfllp.com
Robert J. Dwyer
rdwyer@bsfllp.com
James Keyte
jkeyte@bsfllp.com
Luke Williams
lwilliams@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone: (212) 446-2300

Mark C. Mao
mmao@bsfllp.com
Sean P. Rodriguez
srodriguez@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293-6820

Sabria A. McElroy
smcelroy@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 377-4216

Izaak Earnhardt
iearnhardt@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave NW, 11th Floor
Washington, DC 2005
Telephone: (202) 237-2727

George A. Zelcs
gzelcs@koreintillery.com
Randall P. Ewing
rewing@koreintillery.com
Marc A. Wallenstein
mwallenstein@koreintillery.com
Ryan A. Cortazar
rcortazar@koreintillery.com
**KOREIN TILLERY LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Fax: (312) 641-9751

Stephen M. Tillery
stillery@koreintillery.com
Michael E. Klenov
mklenov@koreintillery.com
Carol L. O'Keefe
cokeefe@koreintillery.com
Andrew Ellis
aellis@koreintillery.com
Ian Moody
imoody@koreintillery.com
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Fax: (314) 241-3525

Eric L. Cramer
ecramer@bm.net
Michael C. Dell'Angelo
mdellangelo@bm.net
Caitlin G. Coslett
ccoslett@bm.net
Patrick F. Madden
pmadden@bm.net
Jeremy Gradwohl
jgradwohl@bm.net
**BERGER MONTAGUE PC**
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000

Robert E. Litan
rlitan@bm.net
**BERGER MONTAGUE PC**
1001 G Street, NW
Suite 400 East
Washington, DC 20001
Telephone: (202) 559-9740

*Interim Co-Lead Counsel
for the Publisher Class*