**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Google Digital Advertising Antitrust Litigation | Civil Action No. 21-MD-3010 (PKC) |

*This Document Relates to:*

| | |
|---|---|
| In re Google Digital Advertising Antitrust Litigation | Civil Action No. 21-CV-7001 (PKC) |

## ADVERTISER CLASS PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

## REDACTED

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   ARGUMENT ......................................................................................................... 2

      A.    The Typicality Requirement Is Met. ......................................................... 2

      B.    The Adequacy Requirement Is Met. .......................................................... 6

      C.    Common Issue Predominate ...................................................................... 7

            1.    There Is No Dispute That Google's Antitrust Violations, the
                  Relevant Market, and Monopoly Power Are Entirely Common
                  Issues ............................................................................................... 7

            2.    When a Class Member Used Google Ads Does Not Create
                  Individualized Issues ....................................................................... 8

            3.    Google's "Net Effects" Argument Does Not Create
                  Individualized Issues ....................................................................... 9

            4.    Google's Critiques of Advertisers' Experts Are Irrelevant to
                  Class Certification and Baseless ................................................... 12

            5.    Dr. Zona and Dr. Singer Measure Damages Resulting from
                  Google's Anticompetitive Conduct ............................................... 17

      D.    Google's Arbitration Arguments Are Irrelevant to Class Certification ................ 19

III.  CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp., L.P.*,
   247 F.R.D. 156 (C.D. Cal. 2007) ................................................................. 5

*Bernstein v. Cengage Learning, Inc.*,
   2023 WL 6299506 (S.D.N.Y. June 9, 2023), *report and recommendation adopted*,
   2023 WL 6211771 (S.D.N.Y. Sept. 25, 2023) ........................................... 20

*Blades v. Monsanto*,
   400 F.3d 562 (8th Cir. 2005) ..................................................................... 15

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ...................................................................................... 4

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007) ............................................................................ 8

*Dial Corp. v. News Corp.*,
   314 F.R.D. 108 (S.D.N.Y. 2015), *amended*, 2016 WL 690895 (S.D.N.Y. Feb. 9,
   2016) ..................................................................................................... 14, 20

*Dura-Bilt Corp. v. Chase Manhattan Corp.*,
   89 F.R.D. 87 (S.D.N.Y. 1981) ...................................................................... 2

*Garcia De Leon v. New York University*,
   2022 WL 2237452 (S.D.N.Y. June 22, 2022) .............................................. 5

*Hasemann v. Gerber Prods. Co.*,
   331 F.R.D. 239 (E.D.N.Y. 2019) ................................................................. 3

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ............................................. 14

*In re Aluminum Warehousing Antitrust Litigation*,
   336 FRD 5 (S.D.N.Y. 2020) ........................................................................ 14

*In re Currency Conversion Fee Antitrust Litig.*,
   224 F.R.D. 555 (S.D.N.Y. 2004) ............................................................... 20

*In re Elec. Books Antitrust Litig.*,
   2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ............................... 10, 11, 18

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*,
   407 F. Supp. 3d 422 (S.D.N.Y. 2019) ......................................................... 11

*In re JUUL Labs, Inc., Mkt'g, Sales Pracs., and Prods Liab. Litig.*,
   609 F. Supp. 3d 942 (N.D. Cal. June 28, 2022) .......................................... 18

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) .......................................... 10, 12

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F.Supp.3d 430 (S.D.N.Y. 2018) ........................................................ 7, 11

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  338 F.R.D. 527 (S.D.N.Y. 2021) ................................................................. 10

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015) .......................................................................... 10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  827 F.3d 223 (2d Cir. 2016) ......................................................................... 6

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017) ......................................................................... 8

*In re Playmobil Antitrust Litig.*,
  35 F. Supp. 2d 231 (E.D.N.Y. 1998) ............................................................ 3

*In re Suboxone Antitrust Litig.*,
  421 F. Supp. 3d 12 (E.D. Pa. Sept. 27, 2019) .............................................. 3

*In re Sumitomo Copper Litig.*,
  194 F.R.D. 480 (S.D.N.Y. 2000) .................................................................. 4

*In re Xyrem Antitrust Litig.*,
  555 F. Supp. 3d 829 (N.D. Cal. Aug. 13, 2021) .......................................... 4

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981) ................................................................................... 17

*King v. Nat'l Gen. Ins. Co.*,
  2025 WL 1294657 (N.D. Cal. May 5, 2025) ............................................... 10

*Langan v. Johnson & Johnson Consumer Companies, Inc.*,
  897 F.3d 88 (2d Cir. 2018) ........................................................................... 4

*Lavoho, LLC v. Apple, Inc.*,
  232 F. Supp. 3d 513 (S.D.N.Y. 2016) ........................................................ 11

*Maroney v. Woodstream Corp.*,
  2025 WL 945874 (S.D.N.Y. Mar. 28, 2025) ................................................. 7

*Mazzei v. Money Store*,
  829 F.3d 260 (2d Cir. 2016) ......................................................................... 5

*Metcalf v. TransPerfect Translations Int'l Inc.*,
  2023 WL 9510777 (S.D.N.Y. Nov. 6, 2023) ............................................... 20

*Nat'l Convention Servs., LLC v. Applied Underwriters Captive Risk Assurance Co., Inc.*,
  2019 WL 3409882 (S.D.N.Y. July 27, 2019) ............................................. 20

*Pablo v. ServiceMaster Glob. Holdings Inc.*,
  2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) ............................................. 20

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015) ................................................................. 10, 17

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) .................................................................... 3, 4

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015) .................................................................................. 10

*United States v. Google LLC,*
    2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ......................................................... 4

**Other Authorities**

ABA Section of Antitrust Law, *Model Jury Instructions in Civil Antitrust Cases*, Ch. 6,
    Instruction B.4 (Causation and Disaggregation)....................................................... 19

**Rules**

Fed. R. Civ. P. 23(a)(1).............................................................................................. 2

Fed. R. Civ. P. 23(a)(2).............................................................................................. 2

Fed. R. Civ. P. 23(b)(2).............................................................................................. 6

Fed. R. Civ. P. 23(b)(3).............................................................................................. 6

**GLOSSARY OF TERMS**

| TERM | DEFINITION |
|---|---|
| Ad Exchange | An intermediary product that allows advertiser to bid for display advertising from a wide array of inventory sources via real-time bidding |
| Ad Networks | Ad networks provide a simple way to connect advertising demand with publisher inventory, and are now primarily used by smaller advertisers and publishers |
| AdSense | The publisher-facing side of Google's ad network, through which in-network publishers sell their inventory to Google Ads advertisers without the use of AdX or another ad exchange |
| Ad Tech Stack | The collection of products that connect publishers and advertisers in the real-time bidding process of ad exchanges |
| Advertisers | Persons and entities that purchase display advertising space from publishers. |
| AdX | Google's ad exchange platform, through which Google Ads advertisers can place ads on inventory outside of Google's ad network |
| Bernanke | A program instituted by Google that inflated bids above what the advertiser would be otherwise willing to pay so that AdX would win the auction. The term "Bernanke," unless otherwise specified, refers collectively to the various iterations of Bernanke |
| Chandler Rpt. | ECF 963-5 |
| Google Ads | Google's self-service ad-buying tool used by advertisers |
| Haider Rpt. | ECF 1033-5 |
| Mot. | ECF 965 |
| Opp. | ECF 1022 |
| Publishers | Owners and operates of display advertising space (such as websites) that is sold to advertisers. |
| Singer Rpt. | ECF 963-3 |
| Singer Reply | ECF 963-4 |
| UPR | Google's Uniform Pricing Rules that removed publisher's ability to set different price floor on different exchange for a given piece of display advertising inventory |
| Zona Rpt. | ECF 963-1 |
| Zona Reply | ECF 963-2 |
| Zona Sur-Reply | Ex. 42 to Joint Declaration of Dena Sharp and Tina Wolfson in Support of Advertiser Class Plaintiffs' Reply in Support of Motion for Class Certification and Opposition to Defendant's Motion to Exclude Expert Testimony filed concurrently with this motion |

## I.     INTRODUCTION

In its opposition, Google does not dispute that the core issues at trial—whether Google's conduct was anticompetitive, whether there is a properly defined relevant market, and whether Google had monopoly power in that market—are all common questions. Each of these questions was answered against Google by Judge Brinkema in the EDVA decision without having to make any individualized findings. The same will be true in a trial against Google in this case.

The issues that Google does address in its opposition will be resolved—now, at summary judgment, or at trial—without reference to any individual inquiries. These include (1) whether the class can include Google Ads users impacted by UPR, (2) whether the class can include AdSense transactions, and (3) whether Advertisers' experts' methodologies are fundamentally reliable. Weather the answers to these questions are "yes" or "no," they are common questions capable of classwide resolution.

None of the few instances in which Google attempts to identify individualized issues is persuasive. *First*, when class members used Google Ads and whether they had their impressions placed through different channels is irrelevant and, in any event, Google's data provides the relevant information. *Second*, Google has not pointed to any "net effects" that would result in substantial portions of the class being unimpacted. *Third*, Google speculates that differences between class members (what they paid, what industry they belong to, *etc*.) means there can be no classwide proof of injury, but Google does not support that speculation—unlike Advertisers' experts, who rely on common, classwide evidence. Google's efforts to undermine the reliability of those models are unsupported and unpersuasive.

Because Advertisers' claims raise common issues, and Google has not demonstrated otherwise, Advertisers respectfully request that the Court certify the proposed class.

1

## II.     ARGUMENT

Google does not dispute many of Advertisers' Rule 23 showings: the class is sufficiently numerous (23(a)(1)), there are common questions of law and fact (23(a)(2)), and large swaths of the case (Google's antitrust liability, the relevant market, and market power) are all common to all class members. Where Google does challenge Advertisers' Rule 23 showing, their arguments provide no basis deny certification.

### A.     The Typicality Requirement Is Met

Google argues that Plaintiff Hanson's claims "rest on different legal and factual issues" than the claims of other class members. Opp. at 11. This is not correct, nor is it the standard to certify a class.

*First*, Hanson's claims do not rest on different legal issues. Hanson and all class members seek to prove the same course of conduct by Google under the same legal theories. Every class member, including Hanson, will present common evidence that Google has monopoly power in the relevant markets and that it undertook a series of anticompetitive actions to maintain and enhance that power at the expense of all advertisers in the class. As described in Plaintiff's opening brief, both Plaintiff's experts, Dr. Zona and Dr. Singer, explain how Google's course of conduct, though consisting of separate actions, shared a common market effect and goal: "to artificially increase AdX transactions through means other than competition." *See* Mot. at 12-13.

*Second*, factual distinctions between the plaintiff's claims and those of some class members do not defeat typicality. Courts have rejected similar arguments construing the typicality requirement so narrowly. "[T]he typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims. . . . 'Since the claims only need to share the same essential characteristics, and need not be identical, the typicality

2

requirement is not highly demanding.'" *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 268 (E.D.N.Y. 2019) (quoting *inter alia Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)); *see also, e.g.*, *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241–42 (E.D.N.Y. 1998) (typicality established despite differences in the way defendant's anticompetitive plan was manifested). Similarly, Google's argument that the *Playmobile* court's analysis of typicality is "limited to price-fixing cases" (Opp. at 14) is not supported. The court there noted that price-fixing cases are an example of the type of cases that "generally satisfy" the typicality requirement, but did not distinguish between different types of anticompetitive schemes. *Playmobile*, 35 F.Supp.2d at 241-42.

Courts frequently certify classes that involve different conduct occurring at different times. *E.g. In re Suboxone Antitrust Litig.*, 421 F. Supp. 3d 12, 49 (E.D. Pa. Sept. 27, 2019) (typicality met in case involving an anticompetitive product switch, baseless government petitioning, and conduct during the process for approving a drug distribution system because each action arose from "the same legal theories and arise from the same 'core pattern' of alleged conduct"). Proceeding with Advertisers injured by both Bernanke and UPR in a single class is also consistent with the Supreme Court holding that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962). Hanson's claims are typical of all class members because they arise under the same monopolistic scheme. Judge Brinkema characterized Google's conduct as part of a "decade-long campaign of exclusionary conduct" and refers to them collectively as "actions [Google] took to entrench its monopoly power." *United States v. Google LLC,* 2025 WL 1132012, at *45-47 (E.D. Va. Apr. 17, 2025) ("*EDVA Ruling*"); *see also In re Sumitomo Copper*

3

*Litig.*, 194 F.R.D. 480, 482 (S.D.N.Y. 2000) ("Rather than viewing the actions or inactions of the defendants as isolated or discrete instances, this Court views them as a pattern that commonly affects all of the proposed class members that provides sufficient typicality.").[1]

Google's cramped reading of "same unlawful conduct" in *Robidoux* (Opp. at 14) also is unwarranted. As the Second Circuit observed in that case, "[e]vidence indicating that the employer discriminated *in the same general fashion* against the class representatives and against other members of the class was held sufficient to satisfy the typicality requirement[;]" even where a class representative suffered only one type of discrimination, she could represent a class of employees "suffering discrimination in advancement generally." *Robidoux*, 987 F.2d at 937 (citation omitted) (emphasis in original). Here, Google undertook both aspects of the challenged conduct, Bernanke and UPR, for the same general purpose, *i.e.*, the willful maintenance of monopoly power in violation of the Sherman Act by driving more transactions to its own ad exchange, AdX, while depriving rival exchanges of access to those same transactions. Mot. at 7, 12-13, 17-18.[2] The various aspects of Google's scheme served to reinforce each other in service of that common goal. Google's focus on the *mechanics* of its manipulations is irrelevant.

Google's other cases also are not on point. In *Mazzei* (Opp. at 12), the court found on a motion to decertify one of two certified classes *after trial* that the plaintiff failed to introduce sufficient evidence of privity with class members whose loans (unlike the plaintiff's) were only

---

[1] The fact that Google dismissed Hanson's individual UPR claim is irrelevant to the Rule 23 questions presented. *See In re Xyrem Antitrust Litig.*, 555 F. Supp. 3d 829, 887 (N.D. Cal. Aug. 13, 2021) (dismissing Utah antitrust claims for failure to establish individual standing, but allowing class claims under the statute to proceed while relying on *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 93 (2d Cir. 2018)).

[2] Google's description of these manipulations as designed to "address th[e] inefficiency" of transactions going "unfilled" on AdX is an admission that these manipulations were intended to, and did, deprive competing exchanges of filling such impressions instead of AdX. Opp. at 4.

serviced by the defendant, but not owned by it. *Mazzei v. Money Store*, 829 F.3d 260, 270, 272 (2d Cir. 2016). Here, Advertisers have developed evidence, including extensive and detailed experts' opinions showing that liability and damages can be established on a single, class-wide basis. *Garcia De Leon* is thus also unpersuasive, because, "in order to establish that others suffered the same injury," that court concluded it "would have [had] to undertake a searching inquiry into what each of approximately 55,000 students did and did not do during the first months of the pandemic with respect to career counseling or student health." *Garcia De Leon v. New York University*, 2022 WL 2237452, *13 (S.D.N.Y. June 22, 2022) (cited in Opp. at 13). No such individualized inquiry is necessary here.

Google also cites *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp., L.P.*, 247 F.R.D. 156, 178 (C.D. Cal. 2007) to support its argument that "[p]roof that Hanson was impacted by Global Bernanke would not prove that a different advertiser was impacted by UPR." Opp., at 14. The court in *Allied Orthopedic* found that the plaintiffs had not established a method for proving classwide impact. 247 F.R.D. at 175. But here Advertisers' experts have established a method for determining classwide impact. And their experts' reports make clear that Hanson has not limited his proof to how he was impacted by Bernanke. For example, Dr. Zona measures the damages corresponding to Bernanke and UPR, respectively, using common data and methodologies. Mot. at 13. Additionally, findings made after trial in the DOJ Action, which are relevant to Advertisers here and the same as conclusions drawn by Plaintiff's experts, demonstrate that common proof relating to UPR will be used to prove its impact on Advertisers. Mot. at 8-9.

## B.    The Adequacy Requirement Is Met

Plaintiff meets his burden of showing that he will fairly and adequately protect the interests of the class. Google's arguments to the contrary consist of nothing more than unsupported speculation. Google's claim that Hanson has "no interest" in pursuing claims after 2016 is belied by Advertisers' expert reports and evidence they have developed to show that all class members were impacted by Google's conduct, whether by Bernanke or UPR or both.

Google raises vague speculation that Hanson's interests may be "antagonistic" to other class members without presenting any evidence. The caselaw demands far more to reject the adequacy of a named plaintiff. For example, Google relies on *Payment Card Interchange Fee*, where the court identified a specific conflict in settlement negotiations between a class of merchants seeking monetary relief under Rule 23(b)(3) and a class seeking only injunctive relief under Rule 23(b)(2). The potential trade-offs in the remedies presented a conflict between two different classes. The court determined that "such divergent interests require separate counsel when it impacts the 'essential allocation decisions' of plaintiffs' compensation and defendants' liability." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 233-34 (2d Cir. 2016). Here, there is a single damages class, and all class members seek to maximize monetary relief. And Hanson certainly has no "active disincentive" to prove the claims of absent class members, as distinguished from Google's cases such as *LIBOR-Based Financial Instruments*, where the adequacy requirement was not met because some class members were found to benefit from actions that harmed other class members. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F.Supp.3d 430, 539 (S.D.N.Y. 2018) ("[N]amed plaintiffs with opposite net trading positions will have directly conflicting incentives to establish not only the existence but also the magnitude of any manipulation that occurred."); *see also Maroney v.*

6

*Woodstream Corp.*, 2025 WL 945874, *7 (S.D.N.Y. Mar. 28, 2025) (denying class certification

of subclasses because "the structure of the class places named Plaintiffs' interests at cross-

purposes with non-New York class members").

Finally, Google speculates that there are advertisers in the class who are also publishers

who may not support a theory that advertisers were overcharged. Opp. at 16-17. Google presents

no evidence of this supposed conflict, and as Google well knows, publishers' interests are

represented by separate class representatives seeking certification on behalf of publishers. In

sum, Google's conjecture about non-existent conflicts is misplaced and inapplicable to the

circumstances of this case, and advertisers have met the burden to show that Hanson is adequate.

### C.     Common Issue Predominate

#### 1.     There Is No Dispute That Google's Antitrust Violations, the Relevant Market, and Monopoly Power Are Entirely Common Issues

At trial, the primary questions (and the first questions the jury will be asked to answer on

the verdict from) will relate to the definition of the relevant market, whether Google has

monopoly power, whether Google's conduct was anticompetitive, and whether that conduct

helped Google create or maintain its monopoly power. Google does not dispute that these

questions are common to all class members. Instead, it appears to take the position that the

common nature of these questions is irrelevant in the face of what Google claims to be

individualized issues. Google's view is incorrect.

The Second Circuit has explained that predominance is a "comparative standard" that

"must account for the nature and significance of the material common and individual issues in

the case." *In re Petrobras Sec.*, 862 F.3d 250, 271 (2d Cir. 2017) (citations and internal quotation

marks omitted)). And it has reversed a district court's denial of certification, holding that "[e]ven

if . . . injury-in-fact presents individual questions . . . it does not necessarily follow that they

predominate over common ones." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007). Google ignores what the Court should not: that the most important questions at trial—those that will predominate with respect to the evidence presented—are unquestionably common.

### 2. When a Class Member Used Google Ads Does Not Create Individualized Issues

Against the common issues that will be the central focus of any trial, Google offers what it characterizes as individualized issues: that not all class members were impacted by both Bernanke and UPR or had impressions placed through AdX. Google argues that these differences create a "substantial number of uninjured class members" and cites to out-of-circuit cases for the unremarkable proposition that a class should not be certified if the defendants' conduct did not cause injury to a great many class members. Opp. at 19.

Google's argument has nothing to do, however, with whether class members were injured. Whether class members were injured by Bernanke or UPR, or by overcharges for impressions placed through AdX or elsewhere, does not change the fact that they were injured by Google's monopolistic conduct. Nor do these differences create any obstacles to establishing impact or damages on a classwide basis. Dr. Zona applies a single model to the entire class, and Dr. Singer applies a single set of models to the subset of the class that he provides an analysis for. Ex. 1[3] (Zona Rpt.) ¶¶ 116-120; Ex. 2 (Zona Reply) ¶¶ 5, 99; Ex. 3 (Singer Rpt.) ¶ 9(1); Ex. 4 (Singer Reply) ¶ 1. But even if the jury were to determine, for example, that Bernanke was not anticompetitive or that Advertisers cannot show cognizable impact for transactions through

---

[3] Exhibit numbers refer to Joint Declaration of Dena Sharp and Tina Wolfson in Support of Class Certification No. 21-MD-3010 (PKC) ECF 963 ("First Joint Decl.") and Reply Joint Declaration of Dena Sharp and Tina Wolfson in Support of Class Certification and Opposition to Motions to Exclude filed concurrently with this motion ("Second Joint Decl.") unless otherwise noted.

AdSense, Dr. Zona's impact and damages model could account for that result. *See* Ex. 2 (Zona Reply) ¶¶ 100 █████████████████████████████████████ ; *Id.* at ¶ 104 █████████████████████████████████████████. That is all that is required under *Comcast* and other cases.

Google's assumption that any differences among class members necessarily creates individualized issues is incorrect, as illustrated by the total lack of *evidence* offered to suggest those differences would matter, which it has not done here. And as Dr. Zona explains, Google's assumption ████████████████████████████████████████████ █████████████████████████████████████████ Ex. 2 (Zona Reply) ¶ 97.

### 3.    Google's "Net Effects" Argument Does Not Create Individualized Issues

Next, Google assumes that its conduct had significant procompetitive effects, but speculates that determining whether the "net effect" of a manipulation resulted in harm is an individualized question. *First*, Google is incorrect that determining "each advertiser's presence during the proposed class period and the inventory source used by that advertiser" create individualized issues. Google's data provides classwide answers to both of these issues, and Google has never suggested otherwise. *See* Mot. at 13, 28.

*Second*, Google is fundamentally wrong on the law. An "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 557 (S.D.N.Y. 2021) (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015)). Any "net effects" arguments are therefore misplaced. Google's arguments are also based on speculation about procompetitive aspects of facially anticompetitive restraints. It cannot defeat class certification where it has "proffered little reliable evidence in support of any pro-competitive benefits flowing from its

illegal conduct." *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *16 (S.D.N.Y. Mar. 28, 2014) ("[A]n antitrust defendant may not alter this well-settled measurement of damages by speculatively raising potential offsets, even when those offsets are directly related to the goods at issue."); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *58 (S.D.N.Y. Jan. 30, 2025) ("[A] challenge based on the failure to [account for procompetitive conduct] cannot survive unless it is specific and makes a particular showing of relevance. . . . [G]eneralized assertions about the failure to account for procompetitive conduct are [] insufficient.") (quotation omitted). Nor can Google undermine class certification "on the basis of [its] construction of [a] hypothetical class plaintiff." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 91 (2d Cir. 2015); *see also King v. Nat'l Gen. Ins. Co.*, 2025 WL 1294657, at *25 (N.D. Cal. May 5, 2025) ("Defendants offer no evidence that any such class member actually exists.") (internal quotation omitted). And to the extent any procompetitive effects are relevant to individual damage determinations, that would not defeat certification. *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 409 (2d Cir. 2015).

The cases Google cites in support of its "net effects" argument are inapposite. Two of the cases stand for the unremarkable provisions that where a plaintiff has only benefitted from the conduct at issue, it is not harmed. *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 407 F. Supp. 3d 422, 439 (S.D.N.Y. 2019); *Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513, 525 (S.D.N.Y. 2016). And in *LIBOR* the court found netting appropriate because class members paid more for some trades affected by defendant's conduct and paid less for other trades (299 F. Supp. 3d at 539); here, class members did not pay less for advertisement because of Google's conduct.

*Third*, Google points to ███████████████████████████████████ ███████████████████████████████ Opp. at 21. But all Dr. Haider showed ████████████

10



Courts have rejected the same oversimplification Google relies on: "where an e-book's price was inflated due to Apple's conduct but declined for an independent reason . . . the decline is irrelevant to the proper calculation of damages and has been accounted for in the regression analysis." *Ebooks*, 2014 WL 1282293, at *19 (S.D.N.Y. Mar. 28, 2014).

*Fourth*, Google's suggestion that many advertisers

Opp. at 22 (emphasis added).

Ex. 1 (Zona Rpt.) ¶¶ 107, 110; Ex. 3 (Singer Rpt.) ¶¶ 70-71; Ex. 27 (GOOG-DOJ-09713317 at -318); Ex. 45 (GOOG-DOJ-AT-01815458 at -463 and -477.) This is exactly what Judge Brinkema concluded. *See EDVA Ruling*, at *17 ("[UPR] increased the number of impressions AdX won and the revenue it received, while decreasing impressions won and revenue received by third-party exchanges."). Google has provided no evidence that

*See* Ex. 2 (Zona Reply) ¶ 70

; Ex. 35 (Milgrom Dep.) 609:7-11



. Judge Broderick rejected a similar argument, holding that "Keurig's broader argument that McClane must reduce its damages estimate to account for only net harms by subtracting out benefits from increased sales due to anticompetitive conduct must be rejected as unduly speculative." *Keurig*, 2025 WL 354671, at *37.

*Fifth*, Google speculates that there may be a large number of advertisers  might be needed for these class members. But Google has provided no analysis as to how much of the class might fall into this category. ECF 1032-1 (Haider Rpt.) ¶ 30

As noted above, such speculation is insufficient to defeat certification. Aside from being speculative, Google's argument is also irrational:

### 4. Google's Critiques of Advertisers' Experts Are Irrelevant to Class Certification and Baseless

Google raises a series of critiques of Advertisers' experts, but none shows that Advertisers' models are incapable of demonstrating classwide impact.

**Dr. Zona's Model Does Not Rely on** ███████████████ :
Google's claims that Dr. Zona assumes classwide impact without any basis is incorrect. *First*,

 Ex. 2 (Zona Reply) ¶ 86 n.71. This is a reasonable control measure and still allowed for the model to include ████████

███████ which is sufficient to draw conclusions about advertisers generally. *See* Ex. 42 (Zona Sur-Reply) ¶ 9.

*Second*, Dr. Zona does not ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ Ex. 2 (Zona Reply) ¶¶ 83, 98, 99. He thus provided a sound economic basis for his approach and explained why it would not ████████████████

███████████████████████████████████████████████ On the other hand, Google has not identified any class members or group of class members for whom there is a reason to believe ██████████████████. Instead, Google speculates that the ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ Ex. 2 (Zona Reply ¶¶ 5, 85-89). This robustness check confirmed that his ████████████████████████████

███████████████████████████████████████████ "capable of proof on a class-wide basis." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 116 (S.D.N.Y. 2015), *amended*, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016).

*In re Aluminum Warehousing Antitrust Litigation* is readily distinguishable because some of the pricing contracts there did not even incorporate the premium plaintiffs allege resulted in the overcharge, and defendant pointed to specific "false positives" created by the model. 336 FRD 5, 63 (S.D.N.Y. 2020). Google's assumption that the use of average overcharges is always

problematic is misplaced. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *61 (E.D.N.Y. Oct. 15, 2014) (certifying class based on the use of an "average overcharge" and a "just and reasonable inference that the percentage overcharge").

**Dr. Haider's Tests Are Irrelevant and Do Not Undermine Dr. Zona's Models**:

Google argues that various tests run by Dr. Haider in which she ███████████████████ █████████████████████ Opp. at 26-28. ████████████████████ ██████████████████████████████

   *First*, Dr. Haider (1) ████████████████████████████ ██████████████████████████████ Opp. at 26-27. But Dr. Haider provides no basis for manipulating the data in this way. There is not, for example ████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ Ex. 4 (Singer Reply) ¶ 111. Whether marketwide effects of challenged conduct are driven by a portion of the class is irrelevant where the evidence shows ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ Google's experts provide no basis for their assumption that such events would impact Dr. Zona's analysis.

   Instead of manipulating the data as Dr. Haider did, Dr. Zona conducted a much more useful exercise: the specifications of his reply regression ████████████████████ ████████████████████ Ex. 2 (Zona Reply) ¶ 96. ███████

14

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

*Second*, Google assumes that because ███████████████████████

████████████████████ Opp. at 27-28. ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ Ex. 2 (Zona Reply) ¶¶ 86, 87. This distinguishes Dr. Zona's

analysis from the one in *Blades v. Monsanto*, where plaintiffs' expert sought to establish a single

"but-for" price and did not ███████████████████████████████ F.3d

562, 570 (8th Cir. 2005). Google fails to explain why ███████████████████

███████████████████████████████████████████████

██████████████████████████████████

**Dr. Zona's Models Show** ███████████████████████ : Google criticizes Dr.

Zona's reply model because it █████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

15

██████████████████████████████████████████████████████████

██████████████████████████████ █

**Dr. Singer's Model Is Common Evidence of Injury and Damages Related to UPR**:

Dr. Singer's models provide further evidence of classwide impact—in addition to Dr. Zona's

models—for Google Ads users who ████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

    Google's other arguments do nothing to undermine Dr. Singer's models and all relate to

disputes among the experts about common, not individualized, issues. *First*, █████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████.

    *Second*, Dr. Singer's model *does* distinguish between the █████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

---

[4] Google also asserts that in his opening report, Dr. Zona ████████████████████████████
████████████████████ That is incorrect. Ex. 42 (Zona Sur-Reply) ¶ 6.

*Third*, Google claims Dr. Singer's indirect method fails because ██████████████



████████████████ *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981) (citation and quotation marks omitted) (it "does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted").

### 5. Dr. Zona and Dr. Singer Measure Damages Resulting from Google's Anticompetitive Conduct

Google claims that Dr. Zona and Dr. Singer's models do not measure damages flowing from Advertisers' "theory of injury." Opp. at 31-32 (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407). As to Dr. Singer, Google simply restates its critiques of the reliability of his model, but those critiques have nothing to do with whether Dr. Singer's model seeks to measure damages resulting from Advertisers' theory of injury.

As to Dr. Zona, Google first repeats its contention that there is ████████████████ ████████████████ Opp. at 28-30. But this goes to the question of whether Advertisers can show injury for AdSense-only Google Ads users, not whether Dr. Zona's measure of damages for AdSense is tied to his theory of injury. Next, citing a page of Dr. Zona's deposition, Google

states that Dr. Zona "concedes" ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████ ECF 1032-5 (Zona Dep.)166:23-167:8;

*see In re JUUL Labs, Inc., Mkt'g, Sales Pracs., and Prods Liab. Litig.*, 609 F. Supp. 3d 942, 967-

68 (N.D. Cal. June 28, 2022) (citing counsel's questions and purported admissions on topics that

were not addressed is "decidedly unhelpful"). Google then cites to Dr. Zona's testimony about

*DRS*, not Bernanke or UPR. Ex. 43 (Zona Dep.) 165:11-166:16. █████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

     In addition, if the jury determines that Bernanke and/or UPR were anticompetitive and

Advertisers were injured, then the measure of damages would be what advertisers would have

paid absent those manipulations in their entirety. "[T]he jury's task in assessing damages [is]

confined to multiplying the relative overcharge by the actual purchase prices of [the products]

during the class period. Unless they are part of this calculation, none of [defendant's] proposed

offsets are relevant to that damages calculation." *EBooks*, 2014 WL 1282293, at *17. ███████████

███████████████████████████████████████████████████████ Ex. 1

(Zona Rpt.) ¶¶ 116-120. It is the effects of "defendant's antitrust violation" on the whole that is

relevant for assessing damages. *See* ABA Section of Antitrust Law, *Model Jury Instructions in

Civil Antitrust Cases*, Ch. 6, Instruction B.4 (Causation and Disaggregation).

### D.     Google's Arbitration Arguments Are Irrelevant to Class Certification

The Court should also reject Google's argument that its arbitration defense precludes class certification. Google does not dispute that its data allows Google to readily identify the class members it claims are subject to arbitration. And it fails to explain how—given that Google's data would identify who is subject to arbitration—the question of arbitration creates individualized issues or makes any aspect of the case unmanageable going forward given that Google's own data identifies who is subject to arbitration.

The Court can certify the proposed class and thereafter determine at summary judgment whether a portion of the class should be subject to arbitration. At that point the parties can present their positions on issues that will impact the scope of any order compelling arbitration.[5] *See* Mot. at 34 (collecting cases deferring rulings on classwide arbitration until after class certification). In this way, Google's arbitration defense functions like many other affirmative defenses or summary judgment issues: if granted, the class would be narrowed. But that possibility is no reason not to certify the class in the first place.

Google's position is particularly untenable because, as Google acknowledges, a large number of class members are not subject to arbitration and Google would have their claims thrown out because other class members are potentially subject to arbitration. There is no valid basis for this unjust result, and Google fails to explain how—if it succeeds in compelling some of the class to arbitration—a class action comprised of Google Ads users not subject to arbitration would not be superior to those same users proceeding in individual lawsuits.

---

[5] Such issues include (1) the effect of a Google Ads user opting out after it previously did not do so, (2) whether users who agreed to arbitrate after commencement of the litigation can be compelled to arbitration, and (3) whether Google's interpretation of the requirements of the arbitration clause renders the provision procedurally and substantively unconscionable as it denies reasonable access to the arbitration forum.

Courts frequently certify classes where a portion of the class is or may be subject to arbitration. *E.g. In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 570 (S.D.N.Y. 2004). Classes can also later be defined to exclude those subject to arbitration. *E.g. Bernstein v. Cengage Learning, Inc.*, 2023 WL 6299506, at *17 (S.D.N.Y. June 9, 2023), *report and recommendation adopted*, 2023 WL 6211771 (S.D.N.Y. Sept. 25, 2023) ("presence of such clauses does not defeat predominance"); *Dial*, 314 F.R.D. at 121 (class definition limited to purchasers that "were not subject to mandatory arbitration clauses").

The cases Google cites are inapposite. In *Metcalf v. TransPerfect Translations Int'l Inc.*, the fact that the arbitration clause at issue required arbitrators to determine arbitrability meant that "the timing of the resolution of this matter will hinge on the timing and decision of multiple outside arbitrators," which would prejudice those that did not sign arbitration agreements. 2023 WL 9510777, at *14-15 (S.D.N.Y. Nov. 6, 2023). No similar circumstance is present here and, in any event, the *Metcalf* court did not deny certification, it redefined the class to exclude those subject to arbitration. *Id*. In *Nat'l Convention Servs., LLC v. Applied Underwriters Captive Risk Assurance Co., Inc.* the *entire* class either signed a class action waiver and/or agreed to Nebraska forum selection clause, meaning that *nobody* could proceed in a class action in New York. 2019 WL 3409882, at *3-4 (S.D.N.Y. July 27, 2019). Lastly, because Google's data readily identifies those it says are subject to arbitration, this case is unlike *Pablo v. ServiceMaster Glob. Holdings Inc.*, where much of the litigation would be "devoted to discovering which class members signed [arbitration] agreements." 2011 WL 3476473, at *2 (N.D. Cal. Aug. 9, 2011).

## III.    CONCLUSION

Advertisers respectfully request that the Court certify the proposed Class.

Dated: July 16, 2025

Respectfully submitted,

*/s/ Dena C. Sharp*
Dena C. Sharp (*pro hac vice*)
Scott Grzenczyk (*pro hac vice*)
Mikaela Bock (*pro hac vice*)
Isabel Velez (*pro hac vice*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
scottg@girardsharp.com
mbock@girardsharp.com
ivelez@girardsharp.com

*/s/ Tina Wolfson*
Tina Wolfson (TW-1016)
Theodore W. Maya (*pro hac vice*)
Bradley K. King (BK-1971)
**AHDOOT & WOLFSON, PC**
2600 West Olive Ave., Suite 500
Burbank, California 91505
Tel.: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
bking@ahdootwolfson.com

*Interim Co-Lead Counsel for Advertiser*
*Plaintiffs and the Proposed Advertiser Class*