**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | Case No. 1:21-md-03010 (PKC) |

*This Document Relates To:*

| | |
|---|---|
| ASSOCIATED NEWSPAPERS LTD. and MAIL MEDIA, INC.<br><br>                              Plaintiffs,<br><br>    -against-<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>                              Defendants. | Case No. 1:21-cv-03446 (PKC) |
| GANNETT CO., INC.<br><br>                              Plaintiff,<br><br>    -against-<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>                              Defendants. | Case No. 1:23-cv-5177 (PKC) |

**PLAINTIFFS DAILY MAIL AND GANNETT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ........................................................................................................1

ARGUMENT ...............................................................................................................1

I.    The Court Should Enter Partial Summary Judgment on the Antitrust Claims ...................1

    A.    The Court Should Enter Partial Summary Judgment on Count I
        (Monopolization of the Ad Server Market) .............................................................1

    B.    The Court Should Enter Partial Summary Judgment on Count II
        (Monopolization of the Ad Exchange Market).........................................................8

    C.    The Court Should Enter Partial Summary Judgment on Counts III and IV
        (Attempted Monopolization & Section 1 Tying)...................................................15

II.   The Court Should Enter Partial Summary Judgment on Google's Defenses ...................15

III.  The Legal Standards Applied in Virginia are the Same as the Second Circuit's .............17

IV.   It Is Efficient and Fair To Apply Issue Preclusion .........................................................18

# TABLE OF AUTHORITIES

Page

## CASES

*Adderall XR Antitrust Litig., In re,*
  754 F.3d 128 (2d Cir. 2014) .......................................................................... 17, 18

*Akhenaten v. Najee, LLC,*
  544 F. Supp. 2d 320 (S.D.N.Y. 2008) ................................................................. 19

*American Express Anti-Steering Rules Antitrust Litig., In re,*
  2016 WL 748089 (E.D.N.Y. Jan. 7, 2016) ...................................................... 18-19

*Bifolck v. Philip Morris USA Inc.,*
  936 F. 3d 74 (2d Cir. 2019) ................................................................................. 6

*Broadcast Music, Inc. v. Hearts/ABC Viacom Ent. Svcs.,*
  746 F. Supp. 320 (S.D.N.Y. 1990) ....................................................................... 5

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962) ............................................................................................ 3

*Coleco Indus., Inc. v. Universal City Studios, Inc.,*
  1986 WL 1809 (S.D.N.Y. Feb. 3, 1986) .............................................................. 12

*Discover Fin. Servs. v. Visa U.S.A. Inc.,*
  598 F. Supp. 2d 394 (S.D.N.Y. 2008) ................................................................. 11

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC,*
  111 F.4th 337 (4th Cir. 2024) ............................................................................ 18

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992) .......................................................................................... 16

*Ezagui v. Dow Chem. Corp.,*
  598 F.2d 727 (2d Cir. 1979) .............................................................................. 19

*Ferring B.V. v. Serenity Pharms., LLC,*
  2020 WL 6165354 (S.D.N.Y. Mar. 11, 2020) ....................................................... 2

*FTC v. Surescripts, LLC,*
  665 F. Supp. 3d 14 (D.D.C. 2023) ..................................................................... 11

*FTC v. Tapestry, Inc.,*
  755 F. Supp. 3d 386 (S.D.N.Y. 2024) ................................................................. 10

*Garcia-Goyco v. Law Env't Consultants, Inc.*,
    428 F.3d 14 (1st Cir. 2005)...................................................................................... 12

*Gelb v. Royal Globe Ins. Co.*,
    798 F.2d 38 (2d Cir. 1986)...................................................................................... 19

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys, Inc.*,
    2002 WL 31159048 (S.D.N.Y. Sept. 27, 2002).................................................... 20

*Google Digital Advert. Antitrust Litig., In re*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022)................................................... 13, 14, 18

*Halpern v. Schwarz*,
    426 F.2d 102 (2d Cir. 1970).................................................................................. 19

*Hickerson v. City of New York*,
    146 F.3d 99 (2d Cir. 1998).............................................................................. 8, 9, 13

*ITT Corp. v. United States*,
    963 F.2d 561 (2d Cir. 1992)..................................................................................... 2

*Ivan F. Boesky Sec. Litig., In re*,
    848 F. Supp. 1119 (S.D.N.Y. 1994)........................................................................ 2

*Lefkowitz v. John Wiley & Sons, Inc.*,
    2014 WL 2619815 (S.D.N.Y. June 2, 2014) ........................................................... 2

*Montana v. United States*,
    440 U.S. 147 (1979)................................................................................................. 2

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
    2024 WL 2959967 (E.D.N.Y. June 12, 2024) ........................................................ 5

*Namenda Direct Purchaser Antitrust Litig., In re*,
    2017 WL 4358244 (S.D.N.Y. May 23, 2017) ................................................... 15-16

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015)................................................................................ 17-18

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ............................................................................ 16

*O.E.M. Glass Network, Inc. v. Mygrant Glass Co.*,
    2023 WL 2563689 (E.D.N.Y. Mar. 17, 2023)....................................................... 10

*Parklane Hosiery Co. v. Shore*,
    439 U.S. 322 (1979).................................................................................................. 4

*Proctor v. LeClaire*,
    715 F.3d 402 (2d Cir. 2013).........................................................................9

*Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC*,
    2019 WL 3940218 (S.D.N.Y. July 29, 2019).............................................19

*Russell-Newman, Inc. v. Robeworks*,
    2002 WL 1918325 (S.D.N.Y. Aug. 19, 2002)...............................................2

*United States v. Am. Express Co.*, 838 F.3d 179 (2d Cir. 2016),
    *aff'd sub nom. Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ..............17

*United States v. Google LLC*,
    2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ......................................*passim*

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001).......................................................................17

*United States v. Visa U.S.A., Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001)...........................................................4

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)...............................................................................16, 17

*Visa U.S.A. Inc. v. First Data Corp.*,
    369 F. Supp. 2d 1121 (N.D. Cal. 2005) ........................................................2

*Washington State Inv. Bd. v. Odebrecht S.A.*,
    2024 WL 3616422 (S.D.N.Y. July 10, 2024)................................................2

*Winters v. Lavine*,
    574 F.2d 46 (2d Cir. 1978)..........................................................................19

## OTHER AUTHORITIES

18A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. (3d ed.)................................19

Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law* (5th ed. 2025)...................................18

## INTRODUCTION

Daily Mail and Gannett seek partial summary judgment on the same issues that were fully litigated and finally decided against Google in the Virginia Action.  There is no serious dispute that this case and the Virginia Case involve "the same legal theories and the same alleged conduct involving the same Google products and services."  EDVA Dkt. No. 50 at 5.[1]  Last month, Google sought a continuance of the trial of the Texas case, which was part of this MDL until Congress amended the JPML's venue statute.  Google argued for the continuance because "the core claims at issue" in the Texas case and the Virginia case, "the monopolization of the publisher ad server, monopolization of the ad exchange, are directly the same."  Texas Dkt. No. 874, Hr'g Tr. at 22:11-13.[2]  Judge Jordan granted the requested continuance, in part because "the resolution of the EDVA Action will streamline the issues in this case."  Texas Dkt. No. 881 at 15.  This Court should likewise streamline these cases by granting partial summary judgment on the issues Judge Brinkema decided.

## ARGUMENT

I.    **The Court Should Enter Partial Summary Judgment on the Antitrust Claims**

A.    **The Court Should Enter Partial Summary Judgment on Count I (Monopolization of the Ad Server Market)**

1.    **The Ad Server Product Markets Are Identical Across Cases**

This Court should not permit Google to relitigate the market-definition fight it lost in Virginia, where Daily Mail's and Gannett's witnesses testified on market definition and were repeatedly cited by Judge Brinkema.  *See* Mot. 3.  Google's counterarguments are meritless.

---

[1] References to "EDVA Dkt." are references to the docket for *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.).

[2] References to "Texas Dkt." Are references to the docket for *Texas v. Google LLC*, No. 4:20-cv-00957 (E.D. Tex.).

*First*, Google claims (at 71) that preclusion is appropriate only if the markets identified by Sibley and Judge Brinkema are "identical." But the question is whether the issues between cases are "substantially the same," not "textually identical." *ITT Corp. v. United States*, 963 F.2d 561, 563-64 (2d Cir. 1992). Google rejects (at 5) *ITT Corp.* and similar cases because they "involved the defensive," rather than "offensive," "use of collateral estoppel."[3] But courts apply the same test either way. *See*, *e.g.*, *Washington State Inv. Bd. v. Odebrecht S.A.*, 2024 WL 3616422, at *7 (S.D.N.Y. July 10, 2024). The only difference between offensive and defensive issue preclusion is that, for offensive issue preclusion specifically, courts "must consider whether [preclusion] would be fair," even if the traditional elements of issue preclusion are satisfied. *E.g.*, *Ferring B.V. v. Serenity Pharms., LLC*, 2020 WL 6165354, at *3-4 (S.D.N.Y. Mar. 11, 2020). That is not an opportunity for courts to demand "identical" issues, and Google cites no case where any court proceeded that way. Rather, as a matter of fairness, courts stop plaintiffs from "wait[ing] and see[ing] how the prior litigation turns out" when they could have joined the preclusive case, and they protect defendants from liability if they "had little incentive to litigate vigorously" in the first lawsuit. *In re Ivan F. Boesky Sec. Litig.*, 848 F. Supp. 1119, 1123 (S.D.N.Y. 1994). Google does not (and cannot) argue that either concern is present here.

Regardless, the markets across both cases *are* identical. Daily Mail, Gannett, and Judge Brinkema describe the function of ad servers the same way. *Compare United States v. Google*

---

[3] Google separately argues (at 73) that *ITT Corp.* applies only to "tax" cases. But the Supreme Court precedent cited in *ITT Corp.* made no such "tax" limitation, *see Montana v. United States*, 440 U.S. 147, 155 (1979), and this District applies *Montana* in several non-tax contexts. *See*, *e.g.*, *Russell-Newman, Inc. v. Robeworks*, 2002 WL 1918325, at *3 (S.D.N.Y. Aug. 19, 2002) (trade dress); *Lefkowitz v. John Wiley & Sons, Inc.*, 2014 WL 2619815, at *15 (S.D.N.Y. June 2, 2014) (copyright). Google also cites (at 72) *Visa U.S.A. Inc. v. First Data Corp.*, 369 F. Supp. 2d 1121 (N.D. Cal. 2005), but "the relevant markets in th[at] case ha[d] yet to be defined and the description of th[e] market [was] too vague to determine whether collateral estoppel [was] appropriate." *Id.* at 1125-26. That is not the case here.

*LLC*, 2025 WL 1132012, at *19 (E.D. Va. Apr. 17, 2025) ("EDVA Op.") ("Publisher ad servers for open-web display advertising have a distinct purpose: they help publishers manage and monetize their web ad inventory"), *with* Ex. 10, Sibley Rep. ¶ 80 ("Publisher ad servers . . . are tools that publishers use to sell and manage their ad inventory"); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (market includes products with "peculiar characteristics and uses").  Ad servers in both cases have the same customers:  "publishers."  EDVA Op. at *30; Ex. 10, Sibley Rep. ¶ 80; *see also Brown Shoe*, 370 U.S. at 325 (market includes products with "distinct customers").  And both markets have the same products offered by the same companies. *See* Mot. 6-7; *see also Brown Shoe*, 370 U.S. at 325 (market includes products with "specialized vendors").  The two markets are the same under black-letter antitrust law.

*Second*, Google asserts (at 71) that Sibley's and Judge Brinkema's markets are not "substantive[ly]" similar because, "[u]nlike in the Virginia case, the consumers in" Daily Mail's and Gannett's ad server market can use an ad server to "transact multiple types of advertising beyond just 'web.'"  But Google likewise argued that the DOJ market was "too narrow because publisher ad servers can be used to manage other ad types," EDVA Op. at *20, and Judge Brinkema rejected that argument.  Even though "DFP helps publishers manage . . . mobile app ads and instream video ads," Judge Brinkema explained, "ad servers for social media, in-app, or instream video advertising are not reasonably interchangeable with . . . publisher ad servers for open-web display advertising."  *Id.*  That is because ad servers like DFP "are uniquely capable of performing ad-serving functions for websites," even if they also work for other ad types.  *Id.* Licensing an app-*only* ad server, for example, would require a publisher to abandon its website. *See id.*  That would leave publishers with only "a fraction of their current users," as it is

"infeasible for publishers to shift their users away from their websites to apps." *See id.* (citing Daily Mail testimony that 2% of its readers are on app).

Google proposes to litigate this all over again in Daily Mail's and Gannett's cases. It asserts (at 71) there are "more available substitutes" to publisher ad servers under Sibley's market definition than under Judge Brinkema's, but it identifies only one: "mobile-app-specific publisher ad servers." Sibley rejected that alternative for the same reason Judge Brinkema did: "publishers cannot substitute a general ad server with a specialized solution without losing the ability to manage their web inventory." Ex. 10, Rep. ¶¶ 171-172. Google responds (at 71, n.68) that Judge Brinkema failed to consider whether publishers "who only sell mobile app advertising[] can use app-only publisher ad servers." But a market includes "products that have reasonable interchangeability[] *in the eyes of consumers*." *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001) (emphasis added). The consumers here – Daily Mail and Gannett – are not "app-only" publishers and so cannot use "app-only" tools. Ex. 10, Sibley Rep. ¶¶ 175-76. The same is true for any publisher with a website. *See* EDVA Op. at *48. These facts will not change in another trial with the same evidence.

*Third*, Google is incorrect (at 4-5, 72) that applying issue preclusion would "violate the Seventh Amendment." The Supreme Court rejected that argument decades ago. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 337 (1979). In the Virginia case, Google paid DOJ $2.3 million to moot its damages claim and *avoid* a jury trial, including on market definition. *See* EDVA Dkt. No. 748 at 5. Google's about-face here is legally wrong and deserves skepticism.

## 2.    The Geographic Markets Are Identical Across Cases

Google opposes (at 76) issue preclusion as to geographic market definition on the same grounds as product market definition. Google's arguments thus fail for the same reasons.

As an aside, Google observes (at 76) that Daily Mail and Gannett pleaded U.S. markets in their complaints but seek preclusion based on a worldwide market.  Google does not argue this is a reason to forgo issue preclusion – and for good reason.  A complaint does not need to "define specifically the boundaries of its purported market.  Questions of market definition can be narrowed and determined through the discovery process." *Broadcast Music, Inc. v. Hearts/ABC Viacom Ent. Svcs.* 746 F. Supp. 320 (S.D.N.Y. 1990) (citation omitted).  As Daily Mail and Gannett did here, a party may "alter[ ] its market definition" with "the benefit of fact and expert discovery." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 2024 WL 2959967, at *25 (E.D.N.Y. June 12, 2024).  Indeed, Google has been on notice of a potential worldwide market for more than a year, when Daily Mail and Gannett responded to Google's contention interrogatory by saying they "anticipate[d] the geographic scope of the relevant markets will be either the United States or worldwide less China."  Ex. 13 at 8 (Interrogatory No. 31).  Daily Mail and Gannett then identified a worldwide market in their expert reports 10 months ago.

Similarly, DOJ pleaded in the alternative both a U.S and global market, but argued that the global market was better supported with actual marketplace behavior and Google's internal experiments.  *See* EDVA Dkt. No. 1381 ¶¶ 504-14.  DOJ and Sibley relied on the same underlying evidence to define a global market.  *Compare* Ex. 10, Rep. ¶¶ 257-72 & nn. 489-90, *with* EDVA Op. at *29.  Judge Brinkema's decision on those facts is preclusive.

### 3.    The Issue of Market Power Is Identical Across Cases

Regarding market power, Google merely repeats (at 76-77) its arguments on market definition.  Google does not dispute that its market share is greater than 90% under Sibley's or DOJ's calculations.  *See* Mot. 10-11.  Its arguments therefore fail for reasons already discussed.

#### 4.    The Cases Identify the Same Anticompetitive Tie of AdX to DFP

Daily Mail and Gannett challenge the same tie identified by Judge Brinkema:  publishers must license DFP (tied product) to access real-time bids from AdX (tying product).  *See* Mot. 11-13.  Google is thus precluded from relitigating the tie.  Its contrary arguments are meritless.

*First*, Google asserts (at 11-12, 82-83) that tying law is different in the Second and Fourth Circuits because "the Second Circuit requires proof of anticompetitive effects in the tied market, and the Virginia Court did not."  But Judge Brinkema expressly found that "the tying of DFP to AdX has had a substantial anticompetitive effect in the publisher ad server market for open-web display advertising."  EDVA Op. at *41.  She did so, moreover, when sustaining DOJ's tying claim, *see id.*, meaning Google is wrong (at 12) that Judge Brinkema made this finding only in the "portion[] of the opinion addressing monopoly power."  Google's slicing and dicing of Judge Brinkema's opinion is irrelevant, in any event, as issue preclusion "does not require . . . that the two cases . . . involve the same causes of action . . . so long as the *issues* are identical."  *Bifolck v. Philip Morris USA Inc.*, 936 F. 3d 74, 82 (2d Cir. 2019).  Judge Brinkema found that each element of a tying claim under the Second Circuit's test was readily satisfied, *see* Mot. 11-13, regardless what labels the Fourth Circuit applies to describe those same elements.

*Second*, Google claims (at 83-84) that Daily Mail and Gannett's alleged tie is not the same tie identified by Judge Brinkema, because Sibley's tie is solely "contractual."  That is plainly wrong.  In his reports, Sibley discussed at length the "technological tie" between AdX and DFP, Ex. 10, Rep. ¶¶ 531-39, describing it (in one of several places) as follows:  "AdX's real-time bidding feature is only available for publishers that use DFP," Ex. 11, Rebuttal Rep. ¶ 448.  This is the same tie Judge Brinkema identified:  Google "restrict[s] AdX's submission of real-time bids only to DFP," and makes buying DFP "the only viable economic option' for publishers."  EDVA Op. at *39-40.  Further, Sibley, Judge Brinkema, *and even Google* agree

that Google also enforced this tie by contract.  As Google concedes in its DOJ remedies proposal, the "[Virginia] Court found" that Google imposed "'technical *and policy* restrictions that prohibited publishers from receiving real-time bids from AdX (the tying product) unless they also used DFP (the tied product).'"  EDVA Dkt. No. 1431 at 16 (quoting EDVA Op. at *38; emphasis added).  Sibley made the same observation.  *See* Ex. 10, Rep. ¶¶ 531-539; 552-558.

*Third*, Google argues (at 84) that Gannett and Daily Mail identify a different tying product than Judge Brinkema found.  This is incorrect.  Sibley identified "the tying product (AdX) and the tied product (DFP)."  Ex. 10, Rep. ¶ 569; *accord* Ex. 11, Rebuttal Rep. ¶ 448. Judge Brinkema found the same tied and tying products.  *See* EDVA Op. at *38 ("Google tied DFP, its publisher ad server, to AdX, its ad exchange").  Sibley then explained that Google enforced the tie by ensuring that "AdX's real-time bidding feature is only available for publishers that use DFP."  Ex. 11, Rebuttal Rep. ¶ 448.  Judge Brinkema found the same.  *See* EDVA Op. at *38.  There is no difference in the tying claim across cases.

*Fourth*, Google argues that because the product markets in the Virginia Case are "more restrictive" than the product markets identified in this case, Daily Mail and Gannett "cannot use the Virginia case decision to establish the tying and tied product markets," or show that Google had market power in the tying market.  This merely repackages Google's argument that Sibley and Judge Brinkema identified different product markets, which is wrong.  And it would not help Google even if they had:  Sibley calculated that Google has a *higher* percentage of the tying market (~75%) than identified by Judge Brinkema ("63%-71%").  *Compare* Ex. 10, Rep.¶ 443, *with* EDVA Op. at *34.  Under any definition of the tying market, Google has market power.

**B.    The Court Should Enter Partial Summary Judgment on Count II (Monopolization of the Ad Exchange Market)**

**1.    The Ad Exchange Product Markets Are Identical Across Cases**

Regarding ad exchanges, Google repeats (at 70-74) the arguments it made with respect to ad servers.  "But just as with publisher ad servers, ad exchanges that facilitate the sale of only instream video, mobile app, or social media ads are not helpful for publishers seeking to monetize their open-web display inventory."  EDVA Op. at *23.  A publisher that sells web *and* other ad formats, like Daily Mail and Gannett, cannot abandon ad exchanges for app- or video-specific tools.  *See* Ex. 15, Sibley Tr. 77:3-77:11 (publishers "are very loath to say I'm going to stop doing anything but video and do only video").  That would require publishers to stop monetizing their websites, Ex. 10, Sibley Rep. ¶¶ 171; Ex. 11, Sibley Rebuttal Rep. ¶¶ 339, 341.

Google's remaining arguments are meritless.  *First*, Google asserts (at 71), with no support, that Daily Mail and Gannett's exchange market "includes mobile app and instream video ad exchanges."  But Sibley defines the exchange market to include "online marketplaces" that "operate across **multiple ad formats** (like static images and videos) and across **multiple channels** (like websites and apps)."  Ex. 10, Rep. ¶¶ 84, 86.  He also identified website-based transactions for *each* exchange in his proposed market.  *See id.* ¶¶ 734-736.  Regardless, the three exchanges in Sibley's market but not in DOJ's market – assuming those are the exchanges Google intends to address – are minuscule, accounting for no more than a fraction of a percentage point in market share.  *See* Mot. 14, n.6.  Even if Google were right that they are app- or video-only exchanges, including them in the market-share calculation shows, as a sensitivity test, that AdX has durable monopoly power.  *See, e.g., Hickerson v. City of New York*, 146 F.3d 99, 112 (2d Cir. 1998) ("to render issue preclusion inapplicable, a difference in pertinent facts' must be 'sufficient to substantially change the issue'") (citation omitted).

8

*Second*, Google complains (at 74) that "[t]he Virginia Court relied on a different, narrower record to define" the ad exchange market.  But a party "cannot avoid issue preclusion simply by offering evidence in the second proceeding that could have been admitted, but was not, in the first."  *Hickerson*, 146 F.3d at 108 n.6 (citation omitted).  Preclusion applies so long as Google had a "full and fair opportunity to litigate" market definition in the DOJ case.  *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013).  It obviously did.  Google subpoenaed dozens of market participants (including Gannett and Daily Mail) and collected millions of documents and many terabytes of data.  Google could have sought yet more discovery if it so chose.

Regardless, Google overstates any difference between the MDL and DOJ records.  For MDL discovery produced during the Virginia discovery period, Google could use those materials in Virginia "for any purpose."  MDL Dkt. No. 564 ¶¶ 2(e), 6(d).  For MDL discovery produced after Virginia discovery closed, Google could use those materials for "impeachment purposes at trial," and could seek leave to use those materials for any other purpose.  *Id.*  Thus, when Google cross-examined Daily Mail's and Gannett's witnesses in Virginia, it had every MDL document, fact deposition, and data file at its disposal to impeach them.  Google could have pursued the same lines of impeachment it now hypothesizes in its brief (at 74-75).  Google could have asked, for example, about supposed "head-to-head competition" between "Facebook's ad tech tools" and "ad exchanges" reflected in Daily Mail's and Gannett's "data."[4]  Most defendants opposing preclusion *never* have the prior opportunity to secure discovery from plaintiffs, much less cross-examine them at trial.  Google's complaints about an incomplete DOJ record are baseless.

---

[4] Specifically, Google cites (at 75 n.72) tables from Hortaçsu's report identifying Daily Mail and Gannett's as-produced revenues, which Google had long before the DOJ trial.

*Third*, the claimed "contradiction[s]" (at 74-75) between Gannett's and Daily Mail's Virginia trial testimony and the testimony of their MDL damages expert, Professor Ali Hortaçsu, are nonexistent. Daily Mail explained at trial that it cannot substitute direct deals, social media tools, or ad networks for ad exchanges. *See* Ex. 20, Tr. at 131, 156-57, 188. Hortaçsu did not offer a contrary opinion that those tools are "competitive alternatives" to ad exchanges. Opp. 74. As Google concedes (at 75 n.72), Hortaçsu "quantified damages in the product markets defined by Prof. Sibley." That is why he "exclude[d] transactions which do not fall under the market definition which Professor Sibley established." Ex. 14, Rep. ¶ 883. The issue here is one of market definition, about which Hortaçsu concededly did not opine.[5]

Google's citation (at 75) to deposition testimony from a Gannett employee, Damien Long, also proves nothing. As Judge Brinkema (and Sibley) found, "[d]irect deals with advertisers are also not reasonable substitutes for ad exchanges." EDVA Op. at *22; *see also* Mot. 14-15. Long did not testify otherwise. That direct deals are priced at a premium over exchange-based deals does not mean publishers can forgo exchanges and sell their inventory directly. Higher pricing for direct deals indicates they are *not* substitutes for exchanges. *See* Ex. 10, Sibley Rep. ¶¶ 349-58; *FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 416, 439 (S.D.N.Y. 2024) ("price . . . differences may play an important role in defining market boundaries").

---

[5] To the extent Google now claims (at 75 n.72) that Hortaçsu used revenue from excluded products to calculate "'auction pressure' damages," it raises an argument its own expert disclaimed. *See* Ex. 17, Chevalier Tr. 257:12-258:2 ███████████████████████████████████████████████████████████

██████████████████████████████████████ ). Google's criticism of EDA damages (again at n.72) is also meritless, as Daily Mail and Gannett may seek damages for harm to direct sales caused by Google's exchange monopoly. *See O.E.M. Glass Network, Inc. v. Mygrant Glass Co.*, 2023 WL 2563689, at *23 (E.D.N.Y. Mar. 17, 2023). But more to the point, Daily Mail and Gannett do not seek issue preclusion on the calculation of damages.

### 2.    The Geographic Markets Are Identical Across Cases

Judge Brinkema found that the market for ad exchanges operates globally, and Google does not argue that ad exchanges and ad servers operate in different geographic markets.  The exchange market is therefore global for reasons described above.  *See supra* I.A.2.

### 3.    The Issue of Market Power Is Identical Across Cases

Similarly, Google's arguments (at 76-77) that it does not have market power in the exchange market are largely identical to those regarding the ad server market and thus fail for the same reasons.  *See supra* I.A.3.  Google's remaining arguments are meritless.

*First*, in a footnote (at 77 n.73), Google suggests without explanation that monopoly power over the ad exchange market "is not an issue that should be resolved under Rule 56."  But courts regularly grant partial summary judgment as to market power, *e.g.*, *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 401 (S.D.N.Y. 2008) (giving "collateral estoppel effect to finding of "market power"); *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 37-38 (D.D.C. 2023) (summary judgment on market definition and monopoly power).

*Second*, Google asserts (at 77) that its expert, Dr. Mark Israel, calculated AdX's market share "below 40 percent in 2022 on a worldwide basis," "even assuming the validity of Gannett and Daily Mail's" exchange market.  But Israel did so by calculating market shares ███ ███████████████████████████████.  *See* Ex. 18, Rep. Figs. 41-42.  Judge Brinkema already rejected this precise maneuver by Israel.  *See* EDVA Op. at *34 ("transactions processed (i.e., the number of impressions sold on the exchange), not fees received, are the best measure of market share and power because they 'speak to scale advantages' from data and indirect network effects 'that different exchanges have'").  Sibley rejects revenue-based market shares for the same reason.  *See* Ex. 11, Rebuttal Rep. ¶¶ 346-61 (████████████████████████

██████████████████████████████████████████████████████).

Google should be estopped from repeating the same failed argument here.

*Third*, Google argues (at 78) that Daily Mail's "reporting" reflects declining AdX market share.  But Google's cited article describes Google's share of all "U.S. digital ad revenue" – not transactions, and regardless of source (*e.g.*, direct or indirect).  Yung Decl. Ex. 18 (DM_GOOG_1065758) at -763.  That is irrelevant to Google's share in the exchange market.

### 4.    The Cases Challenge the Same Acts:  DRS, Last Look, and UPR

Google objects (at 78) to affording preclusion to the "Virginia Court's finding of anticompetitive conduct as to DRS, UPR, and Last Look," because Judge Brinkema supposedly "addresses[d] different conduct than Gannett and Daily Mail challenge here."  She did not.

As an initial matter, Google asserts (at 78-79) that the Court cannot consider Judge Brinkema's findings on anticompetitive conduct if it does not first apply preclusion to market definition.  But the "issues which may be subject to collateral estoppel include not only the ultimate conclusions of law which settle the particular claims asserted[,] but also any underlying legal issues and factual findings which were necessary to support the ultimate conclusions." *Coleco Indus., Inc. v. Universal City Studios, Inc.*, 1986 WL 1809, at *5 (S.D.N.Y. Feb. 3, 1986); *see also Garcia-Goyco v. Law Env't Consultants, Inc.*, 428 F.3d 14, 19 (1st Cir. 2005) ("a single judgment can preclude further litigation of particular issues, while still permitting further litigation on other issues and the underlying claim itself").  Thus, even if Google may relitigate market definition, Judge Brinkema's findings on anticompetitive conduct – which were "necessary to support [her] ultimate conclusions" – are preclusive.

**DRS**:  Google concedes (at 79) that Judge Brinkema held DRS v2 to be anticompetitive. DRS v2 "allow[ed] AdX to adjust its take rate . . . on an impression-by-impression basis," "[s]electively lowering its take rate on competitive impressions" and "compensat[ing] for such

12

temporary losses in revenue by charging a take rate above 20% for impressions where its advertisers faced less competition."  EDVA Op. at *16; *accord In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 391 (S.D.N.Y. 2022) ("*Google I*").  Daily Mail and Gannett's liability expert, Professor Shengwu Li, reached the same conclusion.  *See* Ex. 12, Rep. ¶ 29 (█████████████████████████████████████████████████████ ████████████████████████████████).

Google attempts (at 79) to distinguish a subsequent version of DRS – "truthful DRS" or "tDRS" – on the ground that tDRS never "raised AdX's take rate above 20 percent."  That is incorrect:  Google's 30(b)(6) witness stated that █████████████████████████ █████████████ Google would █████████████████████████████████████████ Ex. 19, N. Korula 30(b)(6) Tr. 148:7-149:4.  Li also explained that under tDRS, AdX ████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Ex. 12, Rep. ¶ 604.  Because tDRS is unlawful for the same reasons as DRS v.2, Judge Brinkema's findings are preclusive for both versions of DRS.  *See Hickerson*, 146 F.3d at 112.

**Last Look**:  Google is also incorrect (at 81) that "Gannett and Daily Mail challenge a different Last Look conduct than the conduct the Virginia Court evaluated."  As Judge Brinkema explained, with "Last Look," Google passed the "winning bid of a header bidding auction . . . as a price floor in DFP," affording AdX the "unique opportunity to adjust its bid in response to the highest bid from rival exchanges."  EDVA Op. at *15.  Daily Mail and Gannett challenge that identical anticompetitive act:  "Google's 'Last Look' conduct allowed AdX to peek at competing bids from other demand sources, prior to AdX bidders submitting their own bids" by passing the winning header "bid as a floor price in its second-price auction."  Ex. 12, Li. Rep. ¶ 14.

Contrary to Google's retelling (at 81), Gannett and Daily Mail do not challenge Last Look because Google "fail[ed] to develop technology integrations with rivals."  Rather, Li explained that by allowing "AdX bidders" to "peek at [rival] bids" and "strategically bid . . . just above the highest competing bid," "Last Look placed bidders on other exchanges at a strategic disadvantage" and "discourage[ed] participation on other exchanges."  Ex. 12, Rep. ¶ 18.[6]  That is the same theory of harm articulated by Judge Brinkema:  AdX could "see competing exchanges' bids in an otherwise sealed auction before AdX would bid," thus "disadvantag[ing] Google's publisher customers, and harm[ing] the competitive process."  EDVA Op. at *42; *accord Google I*, 672 F. Supp. at 384-86 (sustaining allegation that AdX's "right of first refusal on publisher bids" constituted "anticompetitive conduct in the market for ad exchanges").

UPR:  Google incorrectly maintains (at 79-80) that Daily Mail and Gannett assert a different theory of anticompetitive harm than the theory sustained by Judge Brinkema.  Judge Brinkema found that UPR undermined publishers' ability "to maintain revenue diversity and to mitigate Google's dominance of the ad exchange market," "thereby reducing its rivals' scale, limiting their ability to compete, and further compounding the harm to customers."  EDVA Op. at *42; *see also Google I*, 627 F. Supp. 3d at 400-402 (sustaining allegation that "Google's adoption of uniform price floors . . . constrain[ed] competition between ad exchanges").  Daily Mail and Gannett identify the same harm to competition:  UPR deprived publishers of the ability "to preserve a diversity of demand sources and reduce reliance on any single exchange or buying tool," inhibiting rival exchanges' ability to achieve "scale."  Ex. 12, Li Rep. ¶¶ 1095, 1101; *see*

---

[6] Li said the same during his deposition.  *See*, *e.g.*, Ex. 16, Tr. 192:8-22 (describing Google's "choice to treat header bids as static line items, a choice they affirmed repeatedly over ordinary course documents over many years," to protect its "Last Look advantage"); *id.* at 197:25-198:13 (noting that "Google caused the Last Look" and that "[n]othing in the system makes it inevitable that a header bid is passed on as a reserve price").

*also* Ex. 20, Tr. 143:10-146:4 (Daily Mail testimony that the "impression share that Google AdX was winning from [its] inventory" increased from 20 to 60% after UPR, with a corresponding "decrease from non-Google . . . exchanges"). True, to calculate damages, Daily Mail and Gannett calculate how UPR reduced output, caused in part by the proliferation of bad ads that occurred after Google imposed UPR. *See* Ex. 14, Hortaçsu Rep. § VI.B.iii. But Google's objections to Daily Mail's and Gannett's damages are no reason to forgo preclusion on liability.

Google further argues (at 80) that "[t]he Virginia Court did not assess whether UPR had any impact on the scale for competitors *included in Open Display Markets here*," but this merely repeats the arguments about market definition addressed above. Sibley and Judge Brinkema identified the same ad exchange rivals harmed by UPR. *See supra* I.B.1. Google already lost in Virginia on the same claims of anticompetitive conduct alleged here.[7]

### C. The Court Should Enter Partial Summary Judgment on Counts III and IV (Attempted Monopolization & Section 1 Tying)

Google declines to address Daily Mail and Gannett's claims for attempted monopolization (Count III) and tying under Section 1 (Count IV). *See* Mot. 18-19. The Court should enter partial summary judgment as to these Counts for the reasons given above.

## II. The Court Should Enter Partial Summary Judgment on Google's Defenses

Google argues (at 84) that Judge Brinkema did not "necessarily decide[]" its defenses were meritless. But a finding of antitrust liability "necessar[ily]" implies a finding that the defendant's conduct "lacked any non-pretextual procompetitive justifications." *In re Namenda*

---

[7] Google also asserts (at 81) that output either increased after UPR, or it decreased because of "the decline in the quality of Daily Mail and Gannett's *own content*." But Google's damages expert disclaimed any opinion on ███████████████████████████████ Yung Decl. Ex. 20 ¶ 573 & n.1222. And Google's drive-by smear is meaningless, in any event, as its only example of purported low-quality content is from 2015 – four years before UPR. *See* Yung Decl. Ex. 29 (Mickens Tr.) at 336:8-13.

*Direct Purchaser Antitrust Litig.*, 2017 WL 4358244, at \*15-16 (S.D.N.Y. May 23, 2017). And Judge Brinkema *expressly* rejected Google's defenses regarding (1) DOJ's markets, *see* EDVA Op. at \*18-29; (2) Google's monopoly power, *see id.* at \*29-35; (3) harm to publishers, *see id.* at \*36; and (4) procompetitive justifications for the alleged anticompetitive acts, *id.* at \*44-47. Google asserted these same failed defenses in Daily Mail's and Gannett's cases.[8]

Google also argues (at 6-9, 85) that all of its defenses should survive because Judge Brinkema misapplied *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). But as Judge Brinkema recognized, Google's conduct involved tying and exclusive dealing, rather than the "simple refusal to deal" at issue in *Trinko*. EDVA Op. at \*33, \*44 (citation omitted). She rejected Google's argument, raised again here (at 7-8, 84-85), that DOJ's tying claim was simply a "conditional refusal to deal" – i.e., that Google "refused to deal" with publishers unless they licensed DFP as their ad server. EDVA Op. at \*43 (cleaned up). "Rather," she explained, "as the Supreme Court reasoned in *Kodak*, even if the refusal to sell a product to rivals could 'be characterized as a unilateral refusal to deal,' the sale of a tying product to 'third parties' on the 'condition that they buy' a tied product does not fit within the ambit of the refusal to deal exception to antitrust liability." *Id.* (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 n.8 (1992)); *see also id.* (courts "'contrast[ ]' the '[r]efusal to deal doctrine'" from "'exclusive dealing'" and "'tying'" (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072, 1076 (10th Cir. 2013) (Gorsuch, J.)). Google also faults (at 8-9) Judge Brinkema's purported "application of the *Aspen Skiing* exception." But she *declined* to apply *Aspen Skiing* – finding it "unsuitab[le]" here – even though there was evidence

---

[8] *Compare* EDVA Dkt. No. 208 at 53-54 (defenses of failure to allege markets, monopoly power, and harm to competition or consumers, and procompetitive benefits) *with* MDL Dkt. No. 829 at 55-57 (same) *and* MDL Dkt. No. 830 at 52-54 (same).

that "Google sacrificed 'short-run benefits because it was more interested in reducing

competition.'" EDVA Op. at *43 (quoting *Trinko*, 540 U.S. at 409).

### III.    The Legal Standards Applied in Virginia are the Same as the Second Circuit's

Google identifies no differences between Second and Fourth Circuit law. Its arguments

regarding tying law and *Trinko* fail for reasons already discussed, *see supra* at I.A.4 & II, and its

remaining arguments are meritless.

*First*, Google argues (at 9-10) that Judge Brinkema incorrectly accounted for the two-

sided aspects of the ad exchange market. But in line with Second Circuit and Supreme Court

precedent, Judge Brinkema "evaluated both sides" of the ad exchange market and analyzed

"practices on both the advertiser buy-side and publisher sell-side." EDVA Op. at *26 (cleaned

up); *see also United States v. Am. Express Co.*, 838 F.3d 179, 184 (2d Cir. 2016), *aff'd sub nom.

Ohio v. Am. Express Co.*, 585 U.S. 529 (2018). Specifically as to market definition, consistent

with this Circuit's emphasis that "the relevant market definition must encompass the realities of

competition," *Am. Express Co.*, 838 F.3d at 197 (citation omitted), Judge Brinkema found that ad

exchanges had "unique functionality—as reflected by their distinct pricing structure and the

industry's recognition of them as a distinct product," EDVA Op. at *22. And as to competitive

effects, as Google concedes, Judge Brinkema found that Google's conduct "harmed publishers,

rival ad exchanges, and advertisers using non-Google ad buying technologies," as well as the

"competitive process" more generally. EDVA Op. at *42, 48.

*Second*, Google claims (at 10-11) that *In re Adderall XR Antitrust Litigation*, 754 F.3d

128 (2d Cir. 2014), is inconsistent with *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir.

2001), which Judge Brinkema applied. *See* EDVA Op. at *44-47. But the Second Circuit has

adopted the "*Microsoft* framework" in Section 2 cases, holding that a plaintiff, when confronted

with procompetitive justifications, may "either rebut those justifications or demonstrate that the

anticompetitive harm outweighs the procompetitive benefit." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015). When *Adderall* says anticompetitive conduct is "conduct without a legitimate business purpose," 754 F.3d at 133 (citation omitted), "[w]hat this means is that if the dominant firm marketed or structured its product in a way that made it more difficult for rivals or potential rivals to sell their product and if this marketing or restructuring . . . produced *more harm than reasonably necessary*, then the dominant firm has violated §2." Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law* ¶ 651c. (5th ed. 2025) (emphasis added). Monopolists do not get a free pass just because they can identify a business justification.

*Third*, Google erroneously suggests that Judge Brinkema's citation of *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337 (4th Cir. 2024), was inconsistent with Second Circuit law. Judge Brinkema cited *Duke Energy* for the black-letter propositions that anticompetitive conduct "comes in many different forms" and requires "a holistic assessment." EDVA Op. at *35 (collecting Supreme Court caselaw). This Court already has held much the same. *See Google I*, 627 F. Supp. 3d at 381 (sustaining alleged "synergistic effect to certain of Google's anticompetitive conduct"). At no point did Judge Brinkema endorse a "monopoly broth" theory, and this Court has recognized that the Texas complaint did not, either. *See id*.

## IV.    It Is Efficient and Fair To Apply Issue Preclusion

This is a textbook case for applying issue preclusion. Not only are the legal standards and core disputed issues identical, Google already cross-examined Daily Mail's and Gannett's witnesses at trial. Judge Brinkema found them credible and cited their testimony dozens of times. Google's contrary efficiency arguments are insubstantial.

*First*, Google seeks (at 18) reconsideration of the Court's decision to decide issue preclusion first. But the Court already considered Google's lead case (*In re American Express*

*Anti-Steering Rules Antitrust Litigation*, 2016 WL 748089 (E.D.N.Y. Jan. 7, 2016)), and appropriately decided to resolve this issue now.  *See* MDL Dkt. Nos. 948, 990.

*Second*, Google frets (at 17) over potential reversal of Judge Brinkema's decision on appeal.  Again, Google raised this concern in its pre-motion letters and lost; it remains the case that proceeding with preclusion now is more efficient than waiting for the Fourth Circuit to affirm Judge Brinkema.  Google in essence argues that preclusive effect should be given only to decisions that have survived appeal, but that is not Second Circuit law, which "takes a broad view of the application of collateral estoppel to rulings made at an interim stage of litigation." *Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC*, 2019 WL 3940218, at *4 (S.D.N.Y. July 29, 2019); *see also* 18A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 4433 (3d ed.) ("[d]espite the manifest risks of resting preclusion on a judgment that is being appealed, the alternative of retrying the common claims, defenses, or issues is even worse.").

*Third*, Google asserts (at 15) that Judge Brinkema did not engage in "vigorous review" of its conduct because Google engaged in too many independently unlawful acts.  But the "general rule in the Second Circuit" is that "alternative, independently sufficient grounds" are "each . . . good estoppel."  *Akhenaten v. Najee, LLC*, 544 F. Supp. 2d 320, 332 (S.D.N.Y. 2008) (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 45 (2d Cir. 1986)).  Google's purportedly contrary case, *Halpern v. Schwarz*, 426 F.2d 102 (2d Cir. 1970), predates *Gelb* and is limited to bankruptcy, *see Winters v. Lavine*, 574 F.2d 46, 67 (2d Cir. 1978).  Google also argues (at 15 n.2) that courts give preclusive effect to alternative holdings only for *defensive* issue preclusion, but that is incorrect.  *See Ezagui v. Dow Chem. Corp.*, 598 F.2d 727, 733 (2d Cir. 1979).

*Fourth*, Google invokes (at 19) Judge Jordan's recent decision to postpone trial in the related Texas case, but that *supports* applying preclusion here.  Each Court should apply issue

preclusion when the law allows it. Consistent with Fifth Circuit precedent, Judge Jordan is planning to give the liability decision preclusive effect upon a final remedy decision. *See* Texas Dkt. No. 881 at 12, 14 (noting "the direct overlap between this case and the EDVA Action" and that "[t]here is every reason to anticipate that the resolution of the EDVA Action will streamline the issues in this case."). In the Second Circuit, by contrast, this Court may give preclusive effect to Judge Brinkema's decision now, as Google itself recognized in front of Judge Jordan. *See* Texas Dkt. No. 874, Hr'g Tr. at 26:11-17 (Google's counsel conceding "Judge Castel" is already "able to consider any collateral estoppel effects" given Second Circuit law).

*Fifth*, Google argues (at 85) that preclusion on the federal claims will simplify nothing because Daily Mail and Gannett are still litigating state-law claims. A jury would surely disagree. It is not credible that resolving major antitrust claims – which are notoriously complex to litigate – will not streamline the presentation of issues for trial. *See Geneva Pharms. Tech. Corp. v. Barr Lab'ys, Inc.*, 2002 WL 31159048, at *4 (S.D.N.Y. Sept. 27, 2002) (resolution of "antitrust claims will facilitate settlement" and "clarify what issues, if any, remain in the case").

*Finally*, redressing publishers' mounting harms caused by an adjudged monopolist is an important countervailing consideration.[9] The entrance to the Eastern District of Virginia reads: "Justice Delayed, Justice Denied." This Court should enter partial judgment so that it, with the court in Virginia, brings this long-running antitrust case closer to its just resolution.

---

[9] Gannett, for example, is implementing $100 million in cost reductions and offering voluntary severance packages. *See Gannett Announces Second Quarter 2025 Results, Updated Business Outlook & $100 Million Cost Reduction Program* (July 31, 2025), available at http://bit.ly/4fmNohN; *Gannett Offers Voluntary Buyouts as Nation's Largest Newspaper Publisher Grapples With Declining Sales* (July 24, 2025), available at http://bit.ly/3IUZnHg.

Date:  August 1, 2025

Respectfully submitted,

*/s/ John Thorne*

John Thorne
Daniel G. Bird
Bethan R. Jones
Christopher C. Goodnow
Mark P. Hirschboeck
Eliana Margo Pfeffer
Eric J. Maier
Sven E. Henningson
Jonathan I Liebman
Kyle B. Grigel
KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, DC 20036
Tel.: (202) 326-7900
Fax: (202) 326-7999
Email: jthorne@kellogghansen.com
        dbird@kellogghansen.com
        bjones@kellogghansen.com
        cgoodnow@kellogghansen.com
        mhirschboeck@kellogghansen.com
        epfeffer@kellogghansen.com
        emaier@kellogghansen.com
        shenningson@kellogghansen.com
        jliebman@kellogghansen.com
        kgrigel@kellogghansen.com

*Counsel for Associated Newspapers, Ltd.,*
*Mail Media, Inc., and Gannett Co., Inc.*