**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Google Digital Advertising Antitrust Litigation | Civil Action No. 21-MD-3010 (PKC) |
|---|---|

*This Document Relates to:*

| In re Google Digital Advertising Antitrust Litigation | Civil Action No. 21-CV-7001 (PKC) |
|---|---|

<u>**ADVERTISER PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO AMEND COMPLAINT**</u>

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    RELEVANT BACKGROUND ....................................................................... 2

       A.     The EDVA Ruling ............................................................................ 2

       B.     Advertisers' Collateral Estoppel Motion and Google's Opposition ...................... 2

       C.     Advertisers' Proposed Amendment ................................................... 3

III.   ADVERTISERS DO NOT SEEK TO AMEND THEIR PROPOSED AD
       EXCHANGE PRODUCT MARKET ............................................................... 4

IV.    THE COURT SHOULD PERMIT THE PROPOSED AMENDMENT
       CONCERNING THE AD EXCHANGE GEOGRAPHIC MARKET ............. 4

       A.     The Proposed Amendment is Permissible Under Rule 15 .................... 4

       B.     Google Would Not be Prejudiced by the Proposed Amendment ........... 5

       C.     The Proposed Amendment Will Streamline the Litigation .................... 6

V.     THE IMPACT OF THE PROPOSED AMENDMENT ON THE
       COLLATERAL ESTOPPEL ISSUES BEFORE THE COURT ...................... 7

       A.     The Proposed Amendment Will Moot Certain of Google's Arguments ............... 7

              1.     Monopoly Power in the Ad Exchange Market ......................... 8

              2.     UPR Constituted Anticompetitive Conduct ............................. 8

       B.     The Collateral Estoppel Issues Before the Court Can Be Decided
              Regardless of the Scope of the Geographic Market ............................ 8

              1.     The Ad Exchange Product Market ........................................... 9

              2.     Monopoly Power in the Ad Exchange Market ....................... 10

              3.     UPR Constituted Anticompetitive Conduct ........................... 12

              4.     Google's Procompetitive Justifications for UPR Are Not
                     Cognizable ........................................................................... 13

              5.     The Refusal to Deal Doctrine Does Not Shield Google from
                     Liability ............................................................................... 14

VI.    CONCLUSION ................................................................................................ 14

# TABLE OF AUTHORITIES

Page

**Cases**

*Agerbrink v. Model Serv. LLC*
    155 F. Supp. 3d 448 (S.D.N.Y. 2016) ........................................................... 5

*Concord Assocs., L.P. v. Ent. Props. Tr.*
    817 F.3d 46 (2d Cir. 2016) ........................................................................... 9

*Francisco v. Abengoa, S.A.*
    559 F. Supp. 3d 286 (S.D.N.Y. 2021) ........................................................... 5

*Monahan v. New York City Dep't of Corr.*
    214 F.3d 275 (2d Cir. 2000) ........................................................................ 5

*Superb Motors Inc. v. Deo*
    776 F. Supp. 3d 21 (E.D.N.Y. 2025)
    *adhered to in part on reconsideration*, 2025 WL 2178194 (E.D.N.Y. Aug. 1, 2025) .............. 5

*United States v. Google LLC*
    778 F. Supp. 3d 797 (E.D. Va. 2025) ............................................................ 2

**Rules**

Fed. R. Civ. P. 1 ............................................................................................... 3

Fed. R. Civ. P. 15 ......................................................................................... i, 3, 4

## I.    INTRODUCTION

In accordance with the Court's August 14, 2025 Order (ECF 1106), Advertiser Plaintiffs ("Advertisers") move to make a modest amendment to their complaint to allege a worldwide geographic market for their ad exchange product market, in addition to the current United States geographic submarket.[1] While not essential, the amendments Advertisers propose will moot certain of Google's arguments and streamline the proceedings. But whether the Court grants the proposed amendment is not ultimately determinative whether the Court should grant summary judgment as to any issue on which Advertisers seek collateral estoppel in any event.

As an initial matter, many of the key issues—the relevant ad exchange *product* (as opposed to *geographic*) market, the viability of Google's procompetitive justifications, and Google's duty to deal defense—do not have any plausible relationship to the scope of the geographic market. Neither do nearly all of the underlying findings Advertisers identified concerning Google's monopoly power and the EDVA Court's conclusion that UPR is anticompetitive. Beyond that, for the reasons stated below and in Advertisers' collateral estoppel summary judgment motion, ECF 1039 ("Advertisers' MSJ"), no amendment is necessary (*i.e.* the geographic markets *do not* need to be identical) for the application of collateral estoppel as to other issues—Google's monopoly power and a finding that UPR is anticompetitive—because the EDVA Court's findings were based on direct evidence that is not tied to the geographic market.

If, however, the Court determines that a finding of issue preclusion as to certain issues would turn on the identicalness of the geographic markets in this action and the EDVA Ruling, the proposed amendment will streamline the issues. In that scenario, the Court could grant

---

[1] Advertisers' proposed amendment also removes named plaintiffs that have dismissed their claims.

collateral estoppel with respect to the overarching issues of Google's monopoly power in a worldwide ad exchange market and the finding that UPR was anticompetitive in the context of that geographic market. Those findings could then be cited in support of a future summary judgment motion on monopoly power and anticompetitive conduct in the narrower U.S. geographic market, or by the parties' experts at trial.[2]

## II.  RELEVANT BACKGROUND

### A.  The EDVA Ruling

On April 17, 2025, the Honorable Leonie Brinkema in the Eastern District of Virginia found Google liable for monopolization under the Sherman Act after a bench trial. *United States v. Google LLC*, 778 F. Supp. 3d 797, 873 (E.D. Va. 2025) ("EDVA Ruling"). That court ("EDVA Court") held that the geographic market for the relevant product markets was worldwide. *Id.* at 848. Many of the legal and factual conclusions decided in the EDVA Ruling bear directly on Advertisers' claims.

### B.  Advertisers' Collateral Estoppel Motion and Google's Opposition

On June 20, 2025, Advertisers moved for collateral estoppel as to five issues decided in the EDVA Ruling: (a) Google possesses monopoly power in the ad exchanges for open-web display advertising market; (b) ad exchanges for open-web display advertising constitute a distinct relevant product market; (c) UPR constituted anticompetitive conduct, and it was an exclusionary and anticompetitive act to maintain Google's monopoly power in violation of Section 2 of the Sherman Act; (d) the procompetitive justifications that Google proffers for UPR

---

[2] To the extent the Court determines that Advertisers may not plead both a worldwide geographic market and a U.S. submarket, Advertisers respectfully request that the motion to amend be denied or withdrawn, and that they proceed with only a U.S. geographic market, which both Advertisers' and Google's experts have agreed is an appropriate geographic market.

are both invalid and insufficient, and any procompetitive benefits of this conduct are far outweighed by its anticompetitive effects; and (e) the refusal to deal doctrine does not apply to UPR. Advertisers' MSJ, at 2-4. Advertisers also requested that the Court enter partial summary judgment on subsidiary factual findings made in the EDVA Ruling. *Id.*

Google opposed Advertisers' motion on July 18, 2025, arguing that the product and geographic markets were not identical, certain issues and legal standards were not identical, resolving certain facts was not necessary to the EDVA Ruling, and that no motion should be decided until after the EDVA Ruling was final and Google appealed. ECF 1080 at 1-31. Advertisers replied on August 1, 2025, explaining why Google is wrong on all those points. ECF 1091. In an August 14, 2025 Order, the Court noted Google's arguments concerning purported differences between the markets at issue in plaintiffs' complaints in this litigation and the EDVA Ruling and set a briefing schedule on amendment, citing Fed. R. Civ. P. 1 and 15. ECF 1106.

### C.    Advertisers' Proposed Amendment

Advertisers propose to amend their operative complaint to allege a worldwide geographic market for their ad exchange product market, in addition to a U.S. geographic submarket (Advertiser do not propose any changes to the product market definition itself).[3] Aside from setting forth the geographic market, the proposed amendment sets forth the key facts supporting a worldwide geographic market.

---

[3] The Department of Justice likewise asserted that the United States and worldwide were both appropriate geographic markets. EDVA Ruling at 847-48. There, the parties' disagreement was over whether the broader worldwide market could and should be used. *Id.*

3

III.    **ADVERTISERS DO NOT SEEK TO AMEND THEIR PROPOSED AD EXCHANGE PRODUCT MARKET**

The Court's August 14, 2025 Order refers to Google's argument that there are "differences in the market definitions (product and geographic) between the various plaintiffs' pleadings and those utilized in the findings of fact and conclusions of law in the [EDVA Ruling]." ECF 1106 at 1.

With respect to Advertisers' claims, there is no difference in the ad exchange *product* market Advertisers have proposed and the ad exchange *product* market found in the EDVA Ruling. ECF 1039 at 8-11. Advertisers therefore do not seek to amend their ad exchange product market definition. Any differences related to the *geographic* market are irrelevant to whether collateral estoppel applies to the EDVA Ruling's findings concerning the relevant *product* market.

IV.    **THE COURT SHOULD PERMIT THE PROPOSED AMENDMENT CONCERNING THE AD EXCHANGE GEOGRAPHIC MARKET**

A.    **The Proposed Amendment is Permissible Under Rule 15**

Federal Rule of Civil Procedure 15 allows parties to amend its pleading with the court's leave. Fed. R. Civ. P. 15 (a)(2).[4] Here, the Court gave plaintiffs leave to move to amend their complaints to conform to the EDVA Ruling. ECF 1106.

"A court should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[A] motion to amend should be denied only if the moving party has unduly delayed or acted in bad faith, the opposing party will be unfairly prejudiced if leave is granted, or

_____

[4] Advertisers interpret the Court's order (ECF 1106) as resetting the deadline it initially set to amend the pleadings in Pre-Trial Order No. 5 (ECF 394) and therefore brief amendment under Rule 15(a)(2) as opposed to Rule 16(b)(4).

the proposed amendment is futile." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016). "The party opposing the proposed amended pleading has the burden of establishing that amendment would be prejudicial or futile." *Superb Motors Inc. v. Deo*, 776 F. Supp. 3d 21, 110 (E.D.N.Y. 2025), *adhered to in part on reconsideration*, 2025 WL 2178194 (E.D.N.Y. Aug. 1, 2025) (internal citation omitted). Prejudice occurs if the proposed amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) (internal quotations and citation omitted).

Advertisers readily meet this "liberal" standard. *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 310 (S.D.N.Y. 2021). Here, there has been no undue delay; Advertisers have worked diligently to advance this litigation. Nor have Advertisers acted in bad faith, as it was the Court itself who suggested amendment, which was brought upon by the parties' positions when briefing the impact of the EDVA Ruling. Google cannot argue amendment would be futile because collateral estoppel would be appropriate as to the worldwide market included in the proposed amendment, as well as the U.S. submarket which is identical to the ad exchange market in Advertisers' current complaint. Nor can Google claim it would be unduly prejudiced for the reasons set out in Section IV.B, *below*. The Court should grant Advertisers leave to amend.

## B.     Google Would Not be Prejudiced by the Proposed Amendment

The Court's August 14, 2025 Order directed any motion to amend to address the prejudice, or lack thereof, that the proposed amendment would have to Google. Advertisers' proposed amendment would cause no prejudice to Google. While the amendment, if granted,

may affect the issues the Court may be asked to decide during summary judgment proceedings that will occur after the Court rules on collateral estoppel, that briefing has not yet commenced.

Advertisers are not asking to re-open fact discovery in light of the amendment. Nor would there be any need for additional discovery. If the result of the proposed amendment is to establish—through collateral estoppel—Google's monopoly power in a worldwide ad exchange market, then that issue would be definitively decided and thus no discovery on it would be necessary. The entire purpose of collateral estoppel is to avoid relitigating issues previously decided, and thus there would be no need for discovery that might otherwise have been used to relitigate the issue.

### C.     The Proposed Amendment Will Streamline the Litigation

The proposed amendment, if granted, will streamline the litigation. Though, as noted below, Advertisers do not believe that alleging a worldwide market is technically necessary for the Court to grant Advertisers' MSJ as to all of the issues for which Advertisers seek collateral estoppel. But to the extent the Court does, the proposed amendments will provide a basis for the Court to grant summary judgment (based on collateral estoppel) as to all issues identified in Advertisers' MSJ, which in turn would streamline the litigation.

A finding that Google has monopoly power in worldwide ad exchange market would, for example, be relevant—both as a matter of fact and as a matter of law—to any later motion by Advertisers seeking summary judgment on the issue of monopoly power in narrower U.S. submarket. The same is true is whether UPR constitutes anticompetitive conduct under Section 2 of the Sherman Act. As another example, at trial the jury could be instructed as to monopoly power in a worldwide market, and Advertisers' experts could then testify regarding the similarities between a worldwide and a U.S. market. And Advertisers' experts also could provide

6

testimony regarding the relevance and reliability of their economic models based solely on a finding that Google had monopoly power in a worldwide market (*i.e.* that while a relevant market is worldwide, differences in the U.S. submarket warrant assessing impact and damages based on the U.S. alone).

Thus, even if the Court determines that it cannot grant summary judgment based on collateral estoppel as to certain aspects of Advertisers' claims (*i.e.* monopoly power in a U.S. ad exchange market or that UPR is anticompetitive), because those claims are tied to a U.S. market, entering collateral estoppel orders concerning a worldwide market would substantially advance the litigation. The precise ramifications of those orders on Advertisers' claims would be determined in later proceedings (such as subsequent summary judgment motion practice).

## V.    THE IMPACT OF THE PROPOSED AMENDMENT ON THE COLLATERAL ESTOPPEL ISSUES BEFORE THE COURT

The Court's August 14, 2025 Order directed plaintiffs moving to amend to discuss "how the proposed amendments affect the pending summary judgment motions." ECF 1106 at 2. Advertisers below discuss (1) the ways in which the proposed amendment would moot certain of Google's arguments and (2) why the proposed amendment would not affect the vast majority of the analysis relevant to Advertisers' MSJ.

### A.    The Proposed Amendment Will Moot Certain of Google's Arguments

Advertisers' proposed amendment to allege a worldwide geographic market for the ad exchange product market, in addition to a U.S. geographic submarket, would moot Google's arguments that the dissimilarities in the geographic markets preclude the application of collateral estoppel to several of the issues identified in Advertisers' MSJ.

7

### 1.     Monopoly Power in the Ad Exchange Market

Amending to allege a worldwide geographic market would moot Google's argument that applying collateral estoppel to the EDVA Ruling's finding of monopoly power in the ad exchange market is inappropriate because the EDVA Court's findings were predicated on a worldwide market definition. ECF 1079 at 24 ("Opp."). The amendment would clear the path for the Court to grant summary judgment as to the issue of monopoly power in a worldwide market.[5] Google's arguments as to collateral estoppel being applied to the seven subsidiary factual findings based on a differing geographic market definition also would be mooted. Opp. at 25.

### 2.     UPR Constituted Anticompetitive Conduct

Google argues Advertisers should not be granted collateral estoppel as to the EDVA Court's finding that UPR constituted anticompetitive conduct because that issue was decided as to a worldwide market. Opp. at 27. As a threshold matter, Advertisers dispute that the EDVA Court's finding that UPR was anticompetitive was based on a specific geographic market at all, as Google argues. ECF 1091 at 16; *see also* Section V.B.3., *below*. But the proposed amendment would in any event moot Google's argument as to differences in the geographic market because Advertisers now also would allege a worldwide geographic market.

### B.     The Collateral Estoppel Issues Before the Court Can Be Decided Regardless of the Scope of the Geographic Market

Although granting the proposed amendment would moot certain arguments Google has made, whether the Court grants the proposed amendment is not ultimately determinative of any issue on which Advertisers seek collateral estoppel. The EDVA Court's findings on the issues

---

[5] As discussed below, a finding of monopoly power in a worldwide market—whether based on the EDVA Ruling or a separate order entered by this Court—also supports the finding of monopoly power in a narrower market such as the United States.

discussed below do not turn on the scope of the geographic market, but instead solely turn on, or can be fully supported by, factual and legal arguments unrelated to geographic market.

### 1.    The Ad Exchange Product Market

"[T]he concept of a market has two components: a product market and a geographic market." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) (internal citation omitted). Any differences in the *geographic* market between Advertisers' claims and the EDVA Ruling are not relevant to whether the *product* markets are sufficiently similar to warrant the application of collateral estoppel as to the relevant *product* market definition.

In determining that ad exchanges for open-web display advertising constitute a distinct relevant product market, the EDVA Court considered the qualities, distinctions, and intricacies of exchanges in the open-web display market (the same product market Advertisers allege), not its geographic market. EDVA Ruling at 837-39. This goes to the general nature of the products, which is an inquiry independent from the scope of the geographic market. The EDVA Court also considered the distinct way in which ad exchanges are priced as opposed to other ad tech tools, as ad exchanges charge customers a percentage of the total winning bid for each impression (unlike the flat fee charged by other tech tools) and are priced much higher. *Id.* at 838. The EDVA Court next analyzed whether other ad tech tools are interchangeable or substitutable with ad exchanges. The EDVA Court's analysis here depended on the perspective of industry participants, the distinct advantages of programmatic advertising, and Google's theoretical economic analysis showing that a monopolist of open-web display ad exchanges could charge anticompetitive prices without a significant substitution. *Id.* at 838-39. As Google charged a "durable" price for AdX across all potential geographic markets, this analysis holds for any geographic market. *See id.* at 852.

9

## 2.     Monopoly Power in the Ad Exchange Market

The EDVA Court determined that Google had monopoly power in the ad exchange product market with a worldwide geographic market. That holding should have issue preclusive effect for Advertisers' claim that Google has monopoly power in the ad exchange product market—regardless of whether Advertisers' geographic market is limited to the United States (*i.e.* regardless of whether the proposed amendment is granted)—for several reasons.

*First*, as explained in Advertisers' MSJ Reply (ECF 1091), while collateral estoppel generally may not apply when the market in the second action is *broader* than the proposed market in the first action, the same concerns do not apply where—as here—the market in second action is *narrower*. *Id.* § III.A. Here, Advertisers' proposed U.S. geographic market is a narrower subset of the worldwide market, and the Court can therefore apply collateral estoppel on the issue of monopoly power as to a U.S. submarket, in addition to or separately from monopoly power in a worldwide market.

*Second*, when determining that Google possessed monopoly power in the ad exchange product market, the EDVA Court considered various direct evidence of monopoly power that did not depend on market share in specific geographic markets. The EDVA Court emphasized Google's take rate and its changes in policy and conduct—which are consistent worldwide, and therefore, could apply to any potential geographic market—as direct evidence of its monopoly power. *See* EDVA Ruling at 848, 852. Google's AdX take rate, which has been a "durable 20% take rate for well over a decade," and is higher than those of other rival exchanges, is direct evidence that Google possesses monopoly power in the exchange market and charges supracompetitve fees. *Id.* at 852. The EDVA Court also cited Google's refusal to negotiate AdX's take rate with almost all of its customers as evidence of monopoly power. *Id.* at 853.

Google's internal documents demonstrate that decreasing the take rate would have limited impact on customer retention and would not help them win more deals. *Id.* Google was able to maintain this durable take rate despite other ad exchanges decreasing their take rate, and Google employees recognized that the services AdX provided were "no longer worth 20%." *Id.* at 852-53.

The EDVA Court also analyzed Google's uniform policies and practices that made it more difficult for consumers of its ad exchange to switch to a rival ad exchange, such as making AdX the only ad exchange with "exclusive access" to the must-have demand generated by AdWords advertisers. *Id.* at 854. These policies and practices were implemented worldwide, so this analysis would be relevant in any geographic submarket. *Id.* at 848. AdX's unique position as an intermediary to create matches between two groups of customers on both sides of the platform also maintained high barriers to entry in the market for ad exchanges, as AdX took advantage of economies of scale and network effects. *Id.* at 856. These economies of scale were created in part from having large groups of consumers on both sides of the platform, which allowed Google to run experiments and train machine learning algorithms with auction and targeting data obtained from customers. *Id.*

The EDVA Court noted that market share was insufficient to determine whether Google had monopoly power, emphasizing that Google's durable and supracompetitive prices were necessary to its finding of monopoly power. *Id.* at 855-56. In other words, direct evidence of monopoly power can be found simply by analyzing Google's 20% take rate, which it charged worldwide. *Id*. Given the EDVA Court's findings of market power based on direct evidence, Advertisers' geographic market amendment is not determinative as to Google's monopoly power.

11

In addition, many of the subsidiary findings for which Advertisers also seek collateral estoppel have nothing to do with the geographic market, such as the durable and supracompetitive price for AdX, Google's unwillingness to lower that price in response to competition, high barriers to entry, that Google's conduct made switching more difficult, and how Google limited the inventory Advertisers in Google Ads could bid on. *See* Advertisers' MSJ at 2-3, 6-7 (identifying issues).

### 3.    UPR Constituted Anticompetitive Conduct

Because Google implemented UPR worldwide and uniformly, the EDVA Court's findings regarding UPR were not tied to a geographic market definition, but instead focused on how UPR operates. In analyzing whether UPR constituted anticompetitive conduct, the EDVA Court considered (1) how UPR worked and (2) Google's rationale for implementing UPR, which would not change depending on geographic market. In analyzing how UPR worked, the EDVA Court also found that UPR deprived publishers of a choice that they had previously exercised to promote competition. EDVA Ruling at 865. As such, UPR restricted publishers' ability to deal with Google's rivals, reducing its rivals' scale and limiting their ability to compete. *Id.* UPR took away publishers' ability to maintain revenue diversity and mitigate Google's dominance of the ad exchange market by having the ability to set higher price floors on AdX than on other exchanges. *Id.* These findings relate to the very nature of UPR's terms, which are anticompetitive in and of themselves. This conclusion is divorced from any specific geographic market.

The EDVA Court also found that Google's rationale for implementing UPR was to enhance the tie between Google's ad exchange and its publisher ad server. *Id.* at 871. Google knew that publishers had rational reasons to set higher price floors for bids coming through AdX

than for bids coming through other exchanges. *Id.* 870-71. UPR prohibited publishers from doing just this. This analysis focuses on Google's rationale to implement a worldwide policy and this rationale is the same in both a worldwide and U.S. geographic market.

In addition, none of the subsidiary findings that Advertisers identified has a relationship to the geographic market: UPR limited rivals' ability to compete, UPR deprived publishers of a choice that they could have used to promote competition, UPR restricted its customers' ability to deal with Google's rivals, UPR increased the number of impressions won on AdX, and UPR resulted in Google's products gaining scale. These findings would be unaffected by the proposed amendment.

### 4.    Google's Procompetitive Justifications for UPR Are Not Cognizable

The EDVA Court rejected Google's defense that its challenged conduct has procompetitive justifications and that Google is shielded from antitrust liability because the conduct involved product design choices. EDVA Ruling at 871. In rejecting Google's proffered procompetitive justifications, the Court pointed to evidence showing Google knew that publishers preferred setting higher price floors for bids coming through AdX, as opposed to other ad exchanges. *Id.* at 870-71. A different geographic market would not change Google's knowledge of publishers' preferences or the analysis of whether this knowledge disproved Google's procompetitive justification. Further, the EDVA Court's rejection of Google's "product design choices" defense relied on an overview of caselaw and an analysis of whether Google's conduct was undertaken to "significantly reduc[e] usage of rivals' products" by "discouraging," "deterring," and "preventing" customers from using alternative products. *Id.* at 871. In deciding that Google's conduct did not qualify as "product design choices," the EDVA Court relied on Google's motivations and knowledge about publishers' preferences. *Id.* Google's motivations for

implementing UPR are independent from the geographic scope of the market, and Advertisers' proposed amendment would not affect this determination.

### 5.    The Refusal to Deal Doctrine Does Not Shield Google from Liability

The "refusal to deal" doctrine is a legal defense that the EDVA Court held was inapplicable. The EDVA Court surveyed relevant caselaw and determined that the doctrine does not apply to anticompetitive restraints that a monopolist places on its customers, as opposed to competitors. EDVA Ruling at 866. Because Google's challenged conduct places restraints on its customers, as opposed to its competitors, the EDVA Court held this doctrine does not apply. *Id.* The nature of Google's challenged conduct and the legal interpretation of the "refusal to deal" doctrine does not depend on the geographic market. In determining the applicability of the doctrine to Google's conduct, the EDVA Court characterized Google's restraints as compelling publishers to use Google's publisher ad server if they want to use AdX and receive real-time bids from AdWords advertisers, limiting publisher choice. *Id.* at 867. This analysis focuses on the overarching effects of Google's restraints, which limit publisher choice regardless of the geographic market.

## VI.    CONCLUSION

For the foregoing reasons, Advertisers respectfully request that the Court grant Advertisers leave to amend their complaint as described above and set out in the proposed amended complaint attached as Exhibits 1 (clean version) and 2 (redlined version).

14

Dated: August 28, 2025

Respectfully submitted,

/s/ Dena C. Sharp
Dena C. Sharp (*pro hac vice*)
Scott Grzenczyk (*pro hac vice*)
Mikaela Bock (*pro hac vice*)
Isabela Velez (*pro hac vice*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
scottg@girardsharp.com
mbock@girardsharp.com
ivelez@girardsharp.com

/s/ Tina Wolfson
Tina Wolfson (TW-1016)
Theodore W. Maya (*pro hac vice*)
Bradley K. King (BK-1971)
**AHDOOT & WOLFSON, PC**
2600 West Olive Ave., Suite 500
Burbank, California 91505
Tel.: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
bking@ahdootwolfson.com

*Interim Co-Lead Counsel for Advertiser*
*Plaintiffs and the Proposed Advertiser Class*

15