KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
————
(202) 326-7900
FACSIMILE:
(202) 326-7999

November 17, 2025

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

> Re:    ECF No. 1225, Google's Pre-Motion Letter to Move for Summary Judgment, *In re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (PKC) [rel. 1:21-cv-3446; 1:23-cv-5177]

Dear Judge Castel:

Plaintiffs Associated Newspapers, Ltd., Mail Media, Inc. (together, "Daily Mail") and Gannett Co., Inc., write in response to Google's renewed request for leave to move for summary judgment and its request to file motions to exclude an indeterminate set of Daily Mail and Gannett's experts. *See* MDL Dkt. No. 1223. There is no conference scheduled at this time.

Google's proposed motion for summary judgment disregards and misreads the Court's recent collateral estoppel ruling, misstates the evidentiary record, and raises factual disputes for the jury to resolve. Because the bases for Google's proposed motion are meritless, Google does not need 90 pages of briefing. Nor does Google need 74 days to file its motion. Google's 18-page pre-motion letter raises the same arguments raised in its May 2, 2025 18-page pre-summary judgment letter – indeed, large portions of Google's latest letter are copied and pasted from its prior letter. Google has had more than six months to prepare its motion for summary judgment, and it should not require another two and a half to finish it.

The Court should instead set the briefing schedule and page limits proposed by Daily Mail and Gannett below. Daily Mail and Gannett propose a unified briefing schedule for all summary judgment and related motions that will complete briefing on all such motions nearly a month quicker than Google's proposal.

## I.    Daily Mail's and Gannett's Antitrust Claims Should Proceed to Trial

The Court already has held that Google "willfully acquired and maintained its monopoly power in the ad server and ad exchange markets." Collateral Estoppel Order at 32. Judge Brinkema already found that Google' "substantially harmed [its] publisher customers," *United*

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 2

*States v. Google LLC*, 778 F. Supp. 3d 797, 873 (E.D. Va. 2025) ("EDVA Op."), including Daily Mail and Gannett.  They were two of the three publisher witnesses at the DOJ trial, and Judge Brinkema relied on their testimony 65 times in her liability opinion.  *See generally* EDVA Op.; *see also* MDL Dkt. No. 1051 at 3-4 (summarizing Daily Mail and Gannett's testimony at trial). It is now settled that Google intentionally violated the Sherman Act to enrich itself at the expense of Daily Mail, Gannett, and Google's other publisher customers.

Google contends, nonetheless, that its guilt is only partial.  Although it committed unlawful tying and other market manipulations for more than a decade – First Look, Last Look, Dynamic Revenue Share, and UPR – Google insists that its other anticompetitive conduct, undertaken at the same time, is so obviously blameless that any rational jury would have to find in its favor.  But Google ignores that the Court already found these acts to have stated a claim, *see*, *e.g.*, *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 387-89 (S.D.N.Y. 2022) ("*Google I*") (Bernanke); *id.* at 386-87 (Enhanced Dynamic Allocation); *In re Google Digital Advert. Antitrust Litig.*, 721 F. Supp. 3d 230, 258-60, 270 (S.D.N.Y. 2024) ("*Google II*") (Minimum Bid to Win), and Google does not argue that Daily Mail and Gannett failed to prove that each act operates as they alleged.  Instead, Google asserts that its conduct was not bad enough:  Daily Mail and Gannett supposedly have failed to show resulting harm to competition or injury to themselves.  *See* Ltr. at 4-7.  Google is plainly wrong; at a minimum, a jury would not be compelled to take its side.

**A.  Harm to Competition.**  Google's documents demonstrate the harm to competition from Google's unlawful acts.  For example, in internal experiments, Google found that Bernanke ███████████████████, *see* GOOG-DOJ-15724551; Li Rep. Tbl. 3 & n.793, and made it █████████████████, *see* GOOG-DOJ-15724551.[1]  It likewise found that Minimum Bid to Win ████████████████████████████.  *See* GOOG-DOJ-AT-00573492, at -495.  As to EDA, Google admitted internally that EDA gave AdX an "███████████," GOOG-DOJ-15085583 (explaining that with EDA, publishers are ████████████████████████████), allowing Google to "███████████████ ██████," GOOG-AT-MDL-C-000010779, and resulting in ████████████████ annually for Google, *see*, *e.g.*,  GOOG-DOJ-13200335.  Google offers no response to this (and other) evidence.  The arguments Google does offer lack merit.

*First*, Google asserts (at 4-5) that Daily Mail and Gannett have "abandoned" certain anticompetitive acts.  That is incorrect.  For example, Daily Mail and Gannett's market definition expert, Professor David Sibley, describes how the "restriction of Google Ads bids to AdX," Ltr.

---

[1] Because this letter references materials protected by the Modified Confidentiality Order, MDL Dkt. No. 685, Daily Mail and Gannett have filed a redacted version of this letter on the public docket and have not filed supporting materials for this response to Google's pre-motion letter publicly.  They will provide an unredacted version of this pre-motion letter to all parties and the Court under separate cover.  If the Court would like to review any of the supporting materials, Daily Mail and Gannett will be glad to provide it.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 3

at 4, is a source of Google's exchange market power and thus strengthens the tie between DFP and AdX. *See* Sibley Revised Rep. § V(b)(2), VI(b)(2)-(3), VI(c)(1). Nor have Daily Mail and Gannett "abandoned" their challenges to "Dynamic Allocation." Ltr. 4. As the Court held last month, Dynamic Allocation is unlawful as a matter of issue preclusion. *See* MDL Dkt. No. 1219 at 16, 32. "Gannett," in particular, "explained the First Look aspect of Dynamic Allocation with . . . detail and complexity." *Id.* at 16 n.10.

       *Second*, Google claims (at 5, 6) that Daily Mail and Gannett's liability expert, Professor Shengwu Li, offers 1,000 pages of "circular" expert opinion, and "concedes" that Bernanke "does not meet the basic legal requirements" of a Section 2 claim. Neither claim is correct. The Court already decided that Bernanke states a claim, *see supra* p. 2, and Professor Li's report closely tracks that analysis. *Compare* Li Rep. ¶ 21 ("Google artificially subsidized the highest Google Ads bid in competitive auctions in order to divert impressions from higher-bidding competitors" and to "augment the market share of AdX.") *with Google I*, 627 F. Supp. 3d at 389 (Bernanke and its variants harmed the exchange market by leaving rival exchanges "with fewer, lower-value impressions.") As to Professor Li's methodology, comparing a "competitive counterfactual . . . with the [actual] conduct," Ltr. at 5 n.10, is textbook liability analysis in an antitrust case, *see, e.g.* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 392b (5th ed. 2023) ("The guiding principle is that the antitrust victim should recover the difference between its actual economic condition and its 'but for' condition."). In any event, the jury can decide whether Professor Li's approach is credible. *See Au New Haven, LLC v. YKK Corp.*, 2019 WL 1437516, at *17 (S.D.N.Y. Mar. 31, 2019) (holding that while "Defendants may point out several perceived flaws in [the expert's] logic . . . a reasonable jury could side with Plaintiffs' expert").

       *Third*, Google maintains (at 5-6) that its anticompetitive acts either had "*de minimis* impact," or did not harm competition in the exchange or ad server markets. But Google's documents describe substantial harm in those markets, *see supra* p. 2, and Professor Li explains how each unlawful act harms competition in either market (or both), *see, e.g.*, Li Revised Rep. 153 ("Bernanke . . . increased Google Ads' revenue and profits, and AdX's market share, at the expense of publishers, advertisers, and rival exchanges."); *id.* at 459 ("Poirot reduced publisher revenues by increasing bids (and thereby win rates) on AdX compared to rival exchanges" which "deprived [rival exchanges] of scale," and "impair[ed] their ability to compete in the exchange market."). Further, Google's experiments show ████████████████ AdX's win rate. *See supra* p. 2. That is not "*de minimis*" – and it is a jury question at the very least. *See AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 315-16 (N.D.N.Y. 2021) (there is "no magic number" for what is a "not insubstantial" amount of commerce and deferring the question to the jury on a motion for summary judgment). A jury could find that Daily Mail and Gannett have demonstrated harm to competition.

       **B. Antitrust Injury.** "[C]onsumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016). Here, there is no dispute that Daily Mail and

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 4

Gannett are consumers in the exchange and ad server markets. Judge Brinkema already found, after a bench trial, that Google's conduct "substantially harmed Google's publisher customers," EDVA Op. 778 F. Supp. 3d at 873, based on the testimony of Daily Mail and Gannett employees. A jury could find that Daily Mail and Gannett are proper plaintiffs who have sustained antitrust injury. They already have convinced Judge Brinkema of precisely that point.

Google claims (at 2, 6) that this Court, in its order on collateral estoppel, "defined . . . the relevant product markets" to include only "open-web display" transactions, thus excluding app-based and other transaction types for which Daily Mail and Gannett claim damages. That misreads the Court's order and misstates the scope of its preclusion ruling. Before it lost, Google argued (at length) that issue preclusion was improper because Daily Mail and Gannett calculated market shares using open-web and other transaction types. *See* MDL Dkt. No. 1080 at 66, 70-78. The Court rejected Google's arguments. Further, in granting Daily Mail and Gannett's motion for partial summary judgment, the Court did not order preclusion only on "open-web display" markets. Rather, the Court held that Google is precluded from relitigating "the existence of separate and distinct markets for publisher ad servers and ad exchanges," period. MDL Dkt. No. 1219 at 32. That is because, regardless which transaction types one considers, the products in the ad server and exchange markets are the same, and Google is a monopolist either way. *See* MDL Dkt. No. 1051 at 6-9, 13-15.

Google's arguments are meritless besides. Daily Mail and Gannett are consumers even in an open-web display "market" and claim damages (hundreds of millions of dollars) arising from open-web transactions. They remain proper plaintiffs regardless whether they also claim damages arising from other transactions.

Separately, Google argues (at 7) that the harm to Daily Mail's and Gannett's direct sales, arising from EDA, "fail the antitrust injury test because they are based on purported injury to sales occurring outside of the relevant markets." But this Court already held that EDA states a Section 2 claim in the exchange market, *see Google II*, 721 F. Supp. 3d at 270, and Daily Mail and Gannett claim damages caused by that absence of competition, *see In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 139, 141 (2d Cir. 2021) (antitrust plaintiff may claim damages whenever there is a "'direct relation' between injury and antitrust violation," which turns on "familiar principles of proximate causation" (citation omitted)). Professor Li describes how EDA defeats competition among exchanges with the result that publishers receive depressed prices for direct-deal inventory. *See* Li Revised Rep. at 335-57. For example, Google steals high-value impressions from direct-deal advertisers and allocates them to AdX, including at prices lower than what the direct-deal advertiser would have paid. *Compare id.*, *with Google II*, 721 F. Supp. 3d at 270 (Gannett stated cognizable injury with the "allegation that its revenues were artificially depressed when direct ad sales were bypassed and transacted in AdX auctions at prices lower than what direct purchasers were willing to pay."). Professor Ali Hortacsu, Daily Mail and Gannett's damages expert, then calculates the monetary damages caused by the absence of competition. *See* Hortacsu Rep. (measuring the impact on "publisher revenues" of "the

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 5

cream-skimming effect [of EDA] described in Section XII of Professor Li's report").  A jury could find that Daily Mail and Gannett have demonstrated antitrust injury.

        **C.  Actual Injury.**  Professor Hortacsu's opening and reply reports identify with specificity a "reasonably quantifiable damages" calculation for each act that caused actual injury to Daily Mail and Gannett.  *See Daniel v. Am. Bd. Of Emergency Med.*, 428 F.3d 408, 437-38 (2d Cir. 2005).  In particular, Professor Hortacsu prepares five damages models:  (1) UPR Damages, (2) Bid Depression Damages, (3) EDA Damages, (4) Auction Pressure Damages, and (5) Take Rate Overcharges.  *See* Hortacsu Rep. ¶¶ 18-26 & Tbl. Nos. 1a-1c.  Google contends (at 7) that two models – Bid Depression and EDA – do not establish "actual injury."[2]  Google's complaints about Professor Hortacsu's damages calculations are not a proper basis for summary judgment. *See*, *e.g.*, *Aventis Environmental Science USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 499, 503-04 (S.D.N.Y. 2005) (rejecting summary judgment and holding that whether or not "there is no evidence of damages" was "a question for the jury").  And in any event, Google is incorrect that Professor Hortacsu's damages models do not establish Daily Mail and Gannett's injury.

        *First*, Professor Hortacsu's Bid Depression model calculates by how much AdX depressed its bids because of several anticompetitive acts.  *See*, *e.g.*, Hortacsu Rep. ¶¶ 125-29. For example, the model calculates the difference between the depressed Last Look price – *e.g.*, a penny above a rival exchange, *see* EDVA Op., 778 F. Supp. 3d at 829 ("AdX could see all the other bids with Last Look [and] it could bid just 1 cent more, which harmed publishers by reducing their revenue" (cleaned up)) – and what publishers would have received had Google not "see[n] competing exchanges' bids," MDL Dkt. No. 1219 at 16.  Google asserts (at 7) that Professor Hortacsu "concedes that [the underlying conduct] likely increased AdX revenue for Gannett and Daily Mail," but his report says precisely the opposite.  Professor Hortacsu concludes that "AdX transacted impressions at a lower CPM that would otherwise have been transacted by AdX at a higher CPM ('the bid depression effect')."  Hortacsu Reply Rep. at ¶ 80. Google counters (at 7) that sometimes AdX *increases* its bid to outbid a rival by a penny – rather than depress its bid – and that Professor Hortacsu did not offset any revenue losses against those supposed revenue gains.  But that is because any such "gains" are illusory.  If AdX beats a rival by a penny, then the publisher is no better off selling the impression to AdX rather than a rival exchange at the same price.  *See* Hortacsu Reply Rep. at ¶¶ 80, 81, 89.  The Bid Depression model thus shows actual damage – many millions of dollars – to Daily Mail and Gannett.

        *Second*, Professor Hortacsu's EDA Damages model compares the CPMs for direct deals before and after EDA was enforced, finding a ▮▮▮ drop.  *See* Hortacsu Rep. ¶ 120.  Google is therefore plainly wrong in arguing (at 7) that "Prof. Hortacsu did no analysis of EDA's impact

---

    [2] Professor Hortacsu's EDA analysis is mentioned specifically.  Ltr. at 7.  Google otherwise refers to "several challenged auction features" and cites to the paragraphs in Professor Hortacsu's opening report discussing his Bid Depression model. *See id.* (citing Hortacsu Reply at ¶¶ 80, 89).  The "auction features" underlying Bid Depression damages are Last Look, Bernanke, DRS, and Alchemist (an updated Bernanke variant).  *See* Hortacsu Reply ¶¶ 80, 89.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 6

on Gannett's and Daily Mail's revenue."  True, Google's damages expert, Professor Judith Chevalier, claimed that the impact of EDA on revenue was ███████████████████ ███████████████████████████████.  *See* Chevalier Report ¶ 391.  Professor Hortacsu fixed her error in his reply report and found that "EDA causes a statistically significant decline in revenue."  Hortacsu Reply ¶ 58.  At her deposition, Professor Chevalier conceded that, ████████████████████████ ██████████████████████████████████████████  *See* Chevalier Tr. 138:3-7 (█████████████████████████████████████████████████████████ █████████████████████████████████████████████").  The EDA Damages model thus shows actual injury.

## II.    Google Is Not Entitled to Summary Judgment on Damages

Google does not (and cannot) argue that Daily Mail and Gannett are prohibited from recovering for their injuries from Google's antitrust violations as a matter of law.  Instead, Google attacks (at 8-11) discrete categories of damages.  These one-off challenges present issues of fact and do not warrant summary judgment on any claim.

*First*, Google insists (at 8) that Daily Mail and Gannett have "abandoned damages claims" for certain anticompetitive acts.  For example, Google says (again at 8) that Daily Mail and Gannett "abandoned" damages they suffered from "the tying of AdX to DFP."  That is false: Professors Sibley, Li, and Hortacsu explain that Google's unlawful tie enabled numerous Google programs and auction manipulations that caused Daily Mail and Gannett substantial injury. Sibley Rep. Part VI.D; Li Rep.¶ 453-56; Hortacsu Rep. ¶¶ 62-66.  Daily Mail and Gannett can (and do) seek all damages "proximately caused" by that tying arrangement.  *Am. Express Anti-Steering Rules*, 19 F.4th at 140.  Further, as to other acts, several support Google's monopolization of the exchange market, and therefore AdX's take rate overcharge.  *See* Li Rep. at ¶¶ 378-85 (Last Look), 551-57 (Bernanke), 658-71 (DRS), 752 (Minimum Bid to Win), 1273-74 (ID Hashing), 1336-41 (Poirot); Hortacsu Rep. at ¶ 578 & Tbl Nos. 25, 26.

*Second*, Google asserts (at 8-9) that Daily Mail and Gannett "cannot recover foreign damages" under the Foreign Trade Antitrust Improvements Act ("the FTAIA"), because, according to Google, Daily Mail and Gannett challenge "conduct that occurs outside the United States."  But the FTAIA permits a plaintiff to recover its full measure of damages whenever "a course of conduct in the United States . . . would affect all purchasers of the target products or services, whether the purchaser is foreign or domestic," and whether the plaintiff "suffer[s] economic injury abroad."  H.R. Rep. No. 97-686, at 2 (1982) (citing *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308 (1978)).  The Act excludes from U.S. antitrust liability only a narrow class of conduct:  that which is "wholly foreign."  *E.g.*, *Lotes Co. Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413 (2d Cir. 2014); *see* 15 U.S.C. § 6a (excluding from Sherman Act "conduct involving trade or commerce with foreign nations").  Daily Mail and Gannett do not challenge "wholly foreign" conduct.  To the contrary, Daily Mail and Gannett's claims arise from Google's "course of conduct in the United States," H.R. Rep. No. 97-686, at 2:  Google's

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 7

tying its U.S.-based ad exchange to its U.S.-designed ad server, *e.g.*, MDL Dkt. No. 1196 ("DM TAC") ¶¶ 93-103; Google's manipulation of ad auctions run on its U.S.-based exchange, *e.g.*, *id*. ¶¶ 134-155; and the policies and programs Google created in the United States and enforced on its ad tech customers, *e.g.*, *id*. ¶¶ 198-210. Google concededly carried out these acts from the United States. See EDVA Dkt. No. 44-2 at 21 ("[o]utside of Mountain View, California . . . much of [Google's] ad tech business is located" in New York). The FTAIA thus does not apply to Daily Mail and Gannett's claims.

Even if the FTAIA did apply, it still would not bar Daily Mail and Gannett's claims. An exception to the FTAIA allows a plaintiff to challenge foreign misconduct if "(1) such conduct has a direct, substantial, and reasonably foreseeable effect on . . . [domestic trade or commerce]," and "(2) such effect gives rise to a claim" under the Sherman Act. *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161-62 (2004) (quoting 15 U.S.C. § 6a). Here, the record establishes that Google's antitrust violations foreclose competition from U.S. rivals, *see*, *e.g.*, Spencer. Tr. 142:3-8 ("none of the big [exchanges]" were "based in a foreign country"; "[t]hey were all U.S. companies"), which has depressed Daily Mail and Gannett's revenue worldwide. *See* DM TAC ¶¶ 249-250 (Google excluded "[U.S.] rivals from the market for ad exchanges," "reduc[ing] Daily Mail's foreign and domestic revenues").[3]

*Third*, Google persists (at 9) in its contention that this Court's collateral estoppel ruling "held that the relevant product markets" bar damages arising from Daily Mail's and Gannett's use of Google's monopoly ad server and ad exchange to sell certain forms of advertising. That is wrong for reasons already explained. *See supra* p. 4.

*Finally*, the remainder of Google's damages complaints (at 9-11) flyspeck aspects of Professor Hortacsu's damages analyses. These fact-bound arguments are for the jury, *see Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.2d 256, 267 (2d Cir. 2002), and are wrong in any event. Professor Hortacsu never opined that "bid depressive conduct" on AdX should be measured "on a publisher's overall revenue across all ad exchanges." Ltr. at 9-10. That would make no sense: AdX rigged its bids to reduce *AdX* revenue, not revenue across third-party exchanges. *See* Hortacsu Rep. ¶ 61. As discussed above, the Bid Depression model demonstrates bid depression damages. *See supra* p. 5. Professor Hortacsu also endeavored to explain this at his deposition, but Google's counsel chose to interrupt his answers and move on to other questioning. *See* Hortacsu Dep. Tr. 111-14.

Google's remaining challenges to Professor Hortacsu's damages models are likewise insubstantial. In her deposition, Google's damages expert testified ███████████████

---

[3] *Accord* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 272i5 (2025) ("For example, a firm might use tying . . . to injure or destroy an American competitor. With the American competitor out of play the firm might then charge monopoly prices to its foreign purchasers. In that case it can be said that the foreign overcharge injuries depend on, and are thus linked to, the efficacy of the exclusionary practice that injures the domestic rivals.")

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 8

█████████████████████████████████████████, Chevalier Dep. Tr. 183:24-185:20, and ████████████████████████ *id.* at 186:14-18. Professor Hortacsu also *does* "identify the set of conduct underlying his Take Rate model." Ltr. at 10; *see* Hortacsu Reply Rep., at 402 (identifying conduct). But, as with Bid Depression, counsel for Google was disinterested in the answer. *See* Hortacsu Dep. Tr. 19:16 ("Q. So to give an accurate answer, you would need to consult Professor Li's report; correct? A. Well, to give a precise answer for the record, I would – I will need to refer to Professor Li's report. Q. We can move on professor."). Finally, Professor Hortacsu never "conclud[ed] that Gannett lost more revenue from the operation of EDA on AdX than it would have lost had Gannett simply stopped using AdX." Ltr. at 10-11. Among other things, Google ignores that EDA distorts competition in the exchange market even when AdX does not bid. Google also misstates the relevant counterfactual. In a competitive market, publishers would sell impressions via AdX *and* develop a fair process to allocate impressions among direct and indirect advertisers. *See* Li Rep. at ¶¶ 957-61; Hortacsu Rep. at ¶ 86. It therefore makes no sense to conclude, as Google would, that a publisher may collect EDA damages only if it forgoes revenue from AdX. A competitive market would permit a publisher to collect both.

### III.    Google Is Not Entitled to Summary Judgment on Daily Mail's and Gannett's State-Law Claims (Counts V-VII)

Google's proposed summary judgment motion raises a host of fact-bound complaints regarding Daily Mail's and Gannett's state law claims that are for a jury to decide. Like their antitrust claims, Daily Mail's and Gannett's state law claims should proceed to trial.

*First*, Google argues (at 12) that Daily Mail and Gannett are "sophisticated" entities that did not reasonably rely on Google's misrepresentations because they could have "verif[ied]" Google's misstatements on their own. But a "sophisticated business person or entity . . . should not be denied recovery merely because hindsight suggests that it might have been possible to detect the fraud when it occurred." *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 154 (2010). In this case, moreover, there is overwhelming evidence that Daily Mail and Gannett *never* could have discovered Google's acts. *See JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 410 (S.D.N.Y. 2004) (noting that "a plaintiff is not precluded from claiming reliance if the facts allegedly misrepresented are 'peculiarly within the [defendant's] knowledge.'") (quoting *Mallis v. Bankers Tr. Co.*, 615 F.2d 68, 80 (2d Cir. 1980)). For example, Google went to great lengths to hide Project Bernanke: "██████████████████████," Google employees explained internally, "█████████████████████." GOOG-DOJ-15445734. In all events, "[t]he question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive." *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d. Cir. 1997). The reasonableness of Daily Mail's and Gannett's reliance is not proper for summary judgment. *See STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011) ("[R]easonable reliance is often a question of fact for the jury rather than a question of law for the court.").

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 9

Google also suggests that its conduct was not "consumer oriented" for the purposes of Daily Mail's and Gannett's claims brought under New York's deceptive trade practices act, N.Y. Gen. Bus. Law §§ 349, 350.  But these statutes apply whenever "the defendant's allegedly deceptive act or practice is directed to the consuming public and the marketplace." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 177 (2021).  Conduct qualifies as consumer-oriented when it is "not unique to the parties" or "limited to a single transaction," but rather "has 'a broader impact on consumers at large.'" *Id.* at 177-78 (quoting *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*,  85 N.Y.2d 20, 25 (1995)).  Just so here – Google's conduct here undisputedly had a broad impact on publisher consumers at large, as Judge Brinkema found.  It is no defense to suggest that Google's conduct was directed to a particular market or class of consumers.  *See id.* (rejecting argument that conduct was not consumer oriented simply because it was "oriented towards legal professionals," which the court considered "a subclass of consumers").

*Second*, Google claims (at 12-13) that there is no evidence of causation, suggesting that Professor Hortacsu only "purportedly" calculates the damages caused by the deceptive conduct he analyzes and offers "no opinions regarding the appropriate but-for worlds" against which to measure.  But Professor Hortacsu does in fact offer an opinion on the damages caused by Google's deceptive acts and practices, including an opinion on the appropriate counterfactual. *See*, *e.g.*, Hortacsu Rep. ¶ 776 ("[T]he relevant counterfactual for damages is a world without the identified deceptive conduct.").  Google's apparent disagreement with his methodology does not entitle it to summary judgment.  Google also challenges (at 13), without citation to legal authority, Gannett's and Daily Mail's ability to recover for "non-U.S. damages."  But American companies do not get to defraud foreign customers without consequence.  The general rule is that "[i]n the context of a commercial tort, where the damage is solely economic, the situs of commercial injury is where the original critical events associated with the action or dispute took place, not where any financial loss or damages occurred." *CRT Invs., Ltd. v. BDO Seidman, LLP*, 925 N.Y.S.2d 439, 441 (App. Div. 2011).  As explained above, here, there is no dispute that Google carried out its anticompetitive acts from the United States.

In a footnote, Google claims that Daily Mail and Gannett may not "pursue claims pertaining to Alchemist" because the word "Alchemist" does not appear in Daily Mail's and Gannett's complaints.  *See* Ltr. at 13 n.37.  That exalts form over substance.  All that is required is that the complaint "contain[s] sufficient detail in terms of the actions, dates, and circumstances alleged, as well as the legal basis for plaintiff's claims, for defendant to be fairly apprised of the claims against it." *Vaden v. Lantz*, 459 F. Supp. 2d 149 151 (D. Conn. 2006) (internal quotation and citation omitted) (denying motion for more definite statement).  Google's own experts,[4]

---

[4] *E.g.*, Milgrom Rep. ¶ 146(d) ( ▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇ ); *id.* Section IV(C)(1)(c) (" ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇ ").

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 10

made-for-litigation declarations,[5] and discovery responses[6] refer to Alchemist as ███████
███████████████. Nor has Google identified any prejudice: Alchemist was a *secret* program hidden from publishers, ████████████████████████████████. *See* Milgrom Dep. Tr. 631-32 (admitting that "███████████████████████████████████ ██████████" and that he could not remember "██████████████████████████"); Milgrom Rep. 172 (█████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████"). Alchemist came to light only after extensive discovery.

 *Third*, Google claims (at 13-14) that "undisputed evidence demonstrates that Google did not make material misrepresentations or omissions of fact as required for Gannett's and Daily Mail's fraud and GBL claims." But there is overwhelming evidence that Google both misrepresented and concealed fundamental features of its products. For example, it never disclosed Bernanke and instead maintained, without qualifications, that it was running a second-price auction. *See* GANNETT_GOOG_0674877 (noting the "second price auction model"). Regardless, the "issue[] of material misrepresentation" in a fraud claim is "not subject to summary disposition" and is "more properly left to jury to resolve." *Brunetti v. Musallam*, 783 N.Y.S.2d 347, 349 (App. Div. 2004) (citation omitted). Google's attempt to downplay its misleading statements as non-material "puffery" is similarly misguided. "While statements containing simple economic projections, expressions of optimism, and other puffery are insufficient, defendants may be liable for misrepresentations of existing facts," *Novak v. Kasaks,* 216 F.3d 300, 315 (2d Cir. 2000) (citation omitted)), which is what Daily Mail and Gannett claim here. For example, Google specifically misrepresented the amount of revenue uplift provided by EDA. *See* GANNETT_GOOG_0125276, -291 (███████████████████ ██████████████████████████████████████████████████"). Google also ignores that it made material omissions (or misleading partial disclosures) by failing to disclose important features of how its products work. For example, Google never told Daily Mail and Gannett how Bernanke and Alchemist use information from the ad server to inform Google's buy-side bidding to publishers' disadvantage. Under New York's "special facts" doctrine, a transaction is inherently unfair when the defendant has superior knowledge and fails to disclose it. *See Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993) (citations omitted) ("New York recognizes a duty by a party to a business transaction to speak . . . where one party possesses superior knowledge, not readily available to the other, and knows that the other is

---

[5] Decl. of N. Jayaram ¶ 22 (Aug. 5, 2023), GOOG-AT-MDL-008842383, (█████ ████████████████████████████████████████████████████████████████████████ .'").

[6] *E.g.*, Google Resps. and Objs. To Publisher Pls. First Set of Interrogatories at 16 (June 3, 2024) ("██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.")

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 11

acting on the basis of mistaken knowledge."). Given Google's undisputed lack of transparency, questions of materiality are properly reserved for the jury.

*Fourth*, Google takes (at 15) a passing shot at Gannett's claim for unjust enrichment. Tellingly, nowhere does Google argue that the elements of unjust enrichment are not met. There is extensive evidence that Google was enriched, at Gannett's expense, and that it is against equity and good conscience for Google to retain its benefit. *See Farina v. Bastianich*, 984 N.Y.S.2d 46, 49 (App. Div. 2014). Instead, Google contends that Gannett's claim is duplicative of other claims and precluded by its contracts with Google. But the mere existence of a contract on some subject matter does not insulate a party from all unjust enrichment claims. *See Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 288 (S.D.N.Y. 2021) (explaining that a contract, to preclude an unjust enrichment claim, must govern the "same . . . particular subject matter"). And the fact that Gannett is pursuing a fraud claim does not preclude a claim for unjust enrichment. *See Pramer S.C.A. v. Abaplus Int'l Corp.*, 907 N.Y.S.2d 154, 160 (App. Div. 2010) (allowing "the fraud and the unjust enrichment claims" to go forward). Here, a jury may readily conclude that Google's conduct, even if not fraudulent, still satisfies the standard for unjust enrichment and entitles Gannett to restitution. Finally, while Google claims (at 15) that "Gannett offers no evidence of damages related to its unjust enrichment claim," Gannett calculates the damages from Google's deceptive conduct, which is sufficient. *See Empire Fin. Servs., Inc. v. Bellantoni*, 861 N.Y.S.2d 898, 900 (App. Div. 2008) (noting that "[i]n determining the extent of recovery in an unjust enrichment cause of action, courts will generally consider factors surrounding the benefit received by the defendant," including "whether the defendant's conduct was tortious"); *see also Mayer v. Bishop*, 551 N.Y.S.2d 673, 675 (App. Div. 1990) ("In situations where the defendant receives a benefit, but the plaintiff's loss is difficult to measure, proper restitution is the amount by which the defendant is enriched[.]") (citation omitted).

## IV.    Daily Mail and Gannett's Claims Are Not Time-Barred (All Counts)

Google concludes with the suggestion (at 15-17) that some aspects of Daily Mail's and Gannett's claims are time-barred. But determining when a cause of action accrued and the application of Google's statute of limitation defense requires resolution of disputed material facts. *See, e.g.*, *Collins v. Davirro*, 76 N.Y.S.3d 277, 279 (App. Div. 2018) (noting that "a statute of limitations defense" is "generally a question of fact") (citation omitted). For example, Google's defense fails if Daily Mail and Gannett show that Google "concealed . . . the existence of [their] cause of action[,] . . . that [they] remained in ignorance of that cause of action until some point within the four years of the commencement of [their] action, and . . . that [their] continuing ignorance was not attributable to lack of diligence on [their] part." *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988); *see also Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) (quoting *Doe v. Holy See (State of Vatican City)*, 17 A.D.3d 793, 794 (3d Dep't 2005) (similar under New York law)). This Court has already held that Google's alleged auction-manipulation practices "lacked transparency, occurred out of the public eye, and had effects that were not immediately obvious or well understood." *In re Google Digital Advert.*

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 12

*Antitrust Litig.*, 627 F. Supp. 3d 346, 406 (S.D.N.Y. 2022).  That lack of transparency has been confirmed through discovery, as additional details of Google's auction manipulations – and failures to disclose – have come to light.  *See*, *e.g.*, GOOG-AT-MDL-003995286 ( ████████████ ████████████████████.").  Google's intentional omissions hid Daily Mail's and Gannett's causes of action, thus tolling the statute of limitations on their claims.

Google's central argument assumes that Google's mere disclosure of the name of the program (for example, the "public launch" of DRS, *see* Ltr. at 16) is sufficient to trigger the accrual of a publisher's cause of action.  But this Court has already rejected that argument.  *See Google II*, 721 F. Supp. 3d at 272 (finding fraudulent concealment adequately alleged when "the anticompetitive effects of EDA were not known by affected publishers" and EDA's "true nature and effect" were concealed by Google).  Despite Google's suggestion (at 16-17) that suspicion related to Google's alleged conduct is sufficient, the case law is clear that "mere suspicion will not suffice as a ground for imputing knowledge of the fraud." *K & E Trading & Shipping v. Radmar Trading Corp.*, 570 N.Y.S.2d 557, 558 (App. Div. 1991) (internal quotation marks and citations omitted).  Indeed, whether plaintiffs had knowledge of their causes of actions is a classic question of fact.  *See*, *e.g.*, *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 168 (App. Div. 2003) ("A clear question of fact exists as to whether plaintiffs could reasonably have inferred from the April 1994 letter, or from public documents relating to the foreclosure sale, that a fraud was perpetrated upon them").  Google also recognizes that *American Pipe* tolling may apply, extending the applicable statute of limitations.  *See* Ltr. at 15 n.46 (acknowledging that earlier-filed "publisher class complaint[s]" would "toll the statute of limitations").  And Google does not even mention the continuing violation doctrine, another barrier to Google's statute of limitations defenses that precludes summary judgment.  *Harvey v. Metro. Life Ins. Co.*, 827 N.Y.S.2d 6, 6 (App. Div. 2006) (applying continuing violations doctrine to General Business Law § 349 claim where plaintiff "continued to pay" money to insurer within three years of filing suit).  Google's deceptive auction manipulations and other practices continued well into the applicable limitations period – even if they began before it – and impacted hundreds of thousands of Daily Mail's and Gannett's daily advertising transactions.  At the very least, Daily Mail and Gannett may recover for the damages caused within the limitations period.  *Id*.

**V.    The Court Should Set A Unified Schedule for All Summary Judgment And Related Motions**

Daily Mail and Gannett propose a unified schedule for all summary judgment motions (including their own, *see* MDL Dkt. No. 1222) and related motions, as the Court did with respect to class certification briefing in Pre-Trial Order No. 17.  MDL Dkt. No. 944.  Specifically, the schedule should permit (1) summary judgment motions; (2) motions to exclude experts to the extent a summary judgment movant asserts that exclusion of the expert renders summary judgment appropriate ("SJ Motions to Exclude"); and (3) the adverse inference motion the Court already granted plaintiffs leave to file, MDL Dkt. 1019.  A unified schedule will facilitate the

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 13

court's decision on summary judgment by ensuring that all issues that bear on the propriety of summary judgment are briefed simultaneously.

Consistent with the Court's prior practice in PTO No. 17, Daily Mail and Gannett propose that no pre-motion letters be required for any motion to exclude expert testimony. PTO No. 17 ¶ 1. Also as in PTO No. 17, Daily Mail and Gannett propose that no replies be permitted in support of expert-related motions. *Id*. ¶ 3. The summary judgment motions and related motions should follow the below page limits:

| Brief | Opening/Responsive Briefs | Replies |
|---|---|---|
| Summary Judgment | 35 Pages | 15 Pages |
| Motions to Exclude | 15 Pages Per Expert | No replies |
| Joint Adverse Inference Motion | 25 Pages | 10 Pages |

Daily Mail and Gannett propose the following briefing schedule for all summary judgment and related motions:

| Date | Briefs Due | Number of Days |
|---|---|---|
| January 9, 2026 | • Summary judgment motions<br>• SJ Motions to Exclude | 54 days (from pre-motion letters for summary judgment) |
| March 10, 2026 | • Oppositions to summary judgment motions<br>• Oppositions to SJ Motions to Exclude<br>• Adverse inference motion | 60 days |
| April 24, 2026 | • Replies in support of summary judgment motions<br>• Opposition to adverse inference motion | 45 Days |
| May 4, 2026 | • Reply in support of adverse inference motion | 10 Days |

### A.    The Adverse Inference Motion Should Be Briefed Now

The Court previously granted plaintiffs leave to file a motion for adverse inference based on Google's notorious spoliation of evidence. MDL Dkt. No. 1014. As Plaintiffs explained, Google's destruction of evidence bears directly on (indeed, precludes) summary judgment in Google's favor. MDL Dkt. No. 1004 at 5, 8; *See Kronisch v. United States*, 150 F.3d 112, 128

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 14

(2d Cir. 1998) ("[T]he intentional destruction of relevant evidence by the opposing party may push a claim that might not otherwise survive summary judgment over the line.  In the absence of such a result, as noted above, the purposes of the adverse inference are eviscerated."); *Buskey v. Bos. Mkt. Corp.*, 2006 WL 2527826, at *9 (E.D.N.Y. Aug. 14, 2006) ("[D]enial of summary judgment is a warranted sanction" for "spoliation of evidence.").  For that reason, the adverse inference motion should be briefed in parallel with Google's motions for summary judgment, as Daily Mail and Gannett propose.

Google's alternative proposal – that the adverse inference motion should wait until after the Court decides Google's motions for summary judgment – makes no sense.  *See* MDL Dkt. No. 1238 at 3-4.  Google does not dispute that Plaintiffs' motion, if granted, could preclude entry of summary judgment.  *See Kronisch*, 150 F.3d at 128 (rejecting the idea that "having been deprived of evidence that may have been crucial to making their case," a plaintiff should be "held to precisely the same standard of proof before they may present their case to a jury").  It would be inefficient (if not impractical) for the Court to resolve Google's motions, first, only to hear additional arguments why they should be denied.  The better course is to brief all arguments relevant to summary judgment at the same time.

Google responds that "two courts have deferred ruling on an adverse inference against Google until trial."  MDL Dkt. No. 1238 at 3.  It also points out (at 3-4) that those two courts "declined to impose an adverse inference."  But Google neglects to mention that a third court *did* sanction it for its destruction of evidence.  *In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981, 993-94 (N.D. Cal. 2023) ("The Court concludes that Google intended to subvert the discovery process, and that Chat evidence was 'lost with the intent to prevent its use in litigation' and 'with the intent to deprive another party of the information's use in the litigation.'").  And the other two courts "declined to impose" sanctions only because Google lost those cases even without an adverse inference.  Both courts suggested that an adverse inference otherwise would have been appropriate.  *See* EDVA Op., 778 F. Supp. 3d at 873 (holding that "Google's systemic disregard of the evidentiary rules regarding spoliation of evidence and its misuse of the attorney-client privilege may well be sanctionable" but "Google [was] liable under Sections 1 and 2 of the Sherman Act" even without an adverse inference); *United States v. Google, LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024) (Google Search) (addressing the same behavior, and holding that although "Google avoided sanctions in this case," "[i]t may not be so lucky in the next one.").  Google's close escapes from sanctions are no basis to delay briefing the adverse inference motion in parallel with summary judgment.

### B.    The Court Should Prohibit Multiple Motions to Exclude the Same Expert

To avoid seriatim motions to exclude the parties' experts, Daily Mail and Gannett propose that each party should have the right to file only one *Daubert* motion against each expert.  Thus, if a party files a motion to exclude a particular expert at this juncture, no future motion to exclude that expert be permitted.  Whether an expert's opinions are competent evidence is governed by the same standard – Federal Rule of Evidence 702 – regardless of

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable P. Kevin Castel
November 17, 2025
Page 15

whether a motion to exclude is filed at the summary judgment or pre-trial phase.  To the extent a party believes that the exclusion of an expert's testimony bears on the forthcoming summary judgment motions, they should be allowed to file a motion to that effect.  But the parties should not then be permitted to file another pre-trial motion that asks the Court to undertake the same Rule 702 inquiry concerning the same expert a second time pre-trial.

*      *      *

Daily Mail and Gannett have attached as Exhibit A to this letter a proposed order reflecting their briefing proposal.  They respectfully request that the Court enter that order.

Respectfully submitted,

/s/ *John Thorne*

John Thorne
Daniel G. Bird
Bethan R. Jones
Christopher C. Goodnow
Mark P. Hirschboeck
Eliana Margo Pfeffer
Eric J. Maier
Sven E. Henningson
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Tel.:  (202) 326-7900
Fax:  (202) 326-7999
Email:  jthorne@kellogghansen.com
        dbird@kellogghansen.com
        bjones@kellogghansen.com
        cgoodnow@kellogghansen.com
        mhirschboeck@kellogghansen.com
        epfeffer@kellogghansen.com
        emaier@kellogghansen.com
        shenningson@kellogghansen.com

*Counsel for Associated Newspapers, Ltd., Mail Media, Inc., and Gannett Co., Inc.*

cc:   All Counsel of Record via ECF