UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

IN RE: GOOGLE DIGITAL ADVERTISING                    21-md-3010 (PKC)
ANTITRUST LITIGATION

--------------------------------------------------------------x
RUMBLE CANADA INC.,

                              Plaintiff,                    24-cv-9904 (PKC)

              -against-                                     OPINION AND ORDER

GOOGLE LLC and ALPHABET LLC,

                              Defendants.
--------------------------------------------------------------x

CASTEL, U.S.D.J.

                Rumble Canada Inc. ("Rumble") brings four claims against Google LLC and

Alphabet LLC (collectively, "Google") under the Sherman Antitrust Act, alleging

monopolization, attempted monopolization, unlawful tying and an unlawful agreement in

restraint of trade.  15 U.S.C. §§ 1, 2.  Rumble publishes user-submitted videos online and

generates revenue by selling display ads shown alongside these videos and also "instream" video

ads that appear within the videos themselves.  Rumble sells display ads through Google's ad

server, DoubleClick for Publishers ("DFP"), and utilizes Google's ad-exchange product, AdX.

                Google moves to dismiss Rumble's Second Amended Complaint (the

"Complaint" or "Compl't") pursuant to Rule 12(b)(6), Fed. R. Civ. P.  Rumble's allegations and

Google's arguments for dismissal mainly parallel those addressed in this Court's previous

Opinions and Orders, with the exception of allegations concerning Google's actions in the

market for online video instream advertising.  See Texas v. Google, 627 F. Supp. 3d 346

(S.D.N.Y. 2022); In re Google Digital Advertising Antitrust Litig., 721 F. Supp. 3d 230

(S.D.N.Y. 2024); Inform Inc. v. Google LLC, 2024 WL 988966 (S.D.N.Y. Mar. 7, 2024).

  The Court adheres to the reasoning of these Opinions and Order and addresses

Rumble's allegations directed to the market for online instream video advertising and its

allegations relating to unsuccessful efforts to compete with Google's ad server.  Collectively,

these allegations vary from any made by other plaintiffs in this multidistrict litigation.  For the

reasons that will be explained, Google's motion to dismiss will be granted in part and denied in

part.

BACKGROUND.

  The Court assumes familiarity with the advertising-technology components used

to sell open-web display ads, which are often referred to as the "Google ad tech stack."  They

include publisher ad servers, such as Google's DoubleClick for Publishers ("DFP"); ad

exchanges, such as Google's AdX; the ad-buying tools used by large advertisers and small

advertisers, such as Google's DV360 and Google Ads; and ad networks, including Google's

GDN.[1]  In industry parlance, open-web publishers are referred to as "sellers" of ad impressions,

and advertisers are referred to as ad "buyers" or "purchasers."

  Rumble operates an online video platform on which video creators upload their

videos to Rumble's website or mobile app.  (Compl't ¶ 16.)  Rumble licenses those videos to

third-party social media sites and video-sharing platforms, including Google's YouTube

platform.  (Compl't ¶¶ 16-17.)

  Rumble sells both display ads and instream video ads.  (Compl't ¶ 19.)  Display

ads appear on a website alongside other content, whereas instream video ads appear within the

---

[1] The relevant technology and product markets are summarized in Texas v. Google, 627 F. Supp. 3d at 360-65.

videos themselves.  (Compl't ¶ 19.)  Rumble uses Google's DFP ad server to sell its inventory of display-ad impressions on the Google AdX exchange.  (Compl't ¶¶ 19, 94.)

Rumble has also built its own publisher ad server, called Rumble Advertising Center ("RAC"), in order to avoid what it considers to be Google's supracompetitive prices. (Compl't ¶ 20.)  Rumble has made its RAC ad server available to other publishers, although RAC does not provide its users with the full benefits of Google's DFP ad server due to the high concentration of advertiser inventory on AdX.  (Compl't ¶ 20.)

Rumble asserts that Google also acquired and maintained monopoly power in the markets for ad servers, ad exchanges and ad-buying tools through practices including Dynamic Allocation, Enhanced Dynamic Allocation, Project Bernanke and Unified Pricing Rules. (Compl't ¶¶ 141-85, 235-44.)  It asserts that Google sought to maintain its monopoly power in the ad-exchange market by implementing policies to thwart header bidding, and that it fended off nascent competition from Facebook by entering into a Network Bidding Agreement with advantageous terms to Facebook, which Rumble characterizes as an "unlawful bid rigging agreement" with "secret auction quotas" for Facebook.  (Compl't ¶¶ 186-234, 260.)  Count IV of the Complaint is directed entirely to the Network Bidding Agreement, which Rumble asserts is an unlawful restraint of trade that violates section 1 of the Sherman Act.  (Compl't ¶¶ 322-25.)

Rumble asserts that Google has imposed a series of product ties in violation of the Sherman Act.  (Compl't ¶¶ 127-40.)  For publishers, Google has tied access to AdX on the publisher's use of the DFP ad server.  (Compl't ¶ 136.)  For small advertisers, Google has required the use of its Google Ads product in order to buy ad impressions on AdX or the GDN ad network.  (Compl't ¶ 130-32.)  These product ties allegedly had synergistic effects that permitted Google's AdX to accumulate inventory, which, in turn, increasingly compelled

publishers and small advertisers to use DFP and Google Ads to access that inventory.  (Compl't ¶¶ 129-40, 245-55.)

Rumble asserts that instream online video advertising is a relevant antitrust product market and that Google has monopoly power in that market.  (Compl't ¶¶ 120-25.)  It asserts that instream online video ads serve a distinct purpose for advertisers, command higher prices than display ads and are not interchangeable with outstream video ads.[2]  (Compl't ¶ 121.)  It asserts that through YouTube, Google has a 52% market share in online video advertising as a whole and a "much higher" percentage of instream video advertising.  (Compl't ¶ 124.)

According to Rumble, Google has injured competition in the markets for publisher ad servers, ad exchanges, ad networks, ad-buying tools for small and large advertisers, and online instream video advertising.  (Compl't ¶¶ 260-74.)  Rumble asserts that from 2014 through the present, it has been a consumer of Google's ad server, ad exchange and ad-network products.  (Compl't ¶ 327.)  It asserts that Google's intentionally acquired monopoly power in these markets and has charged Rumble an artificially inflated take rate.  (Compl't ¶ 327.)  It also asserts that Google's anticompetitive conduct caused Rumble to create its own competing RAC ad server at substantial expense, but that its RAC product "cannot thrive and prosper" because of Google's conduct.  (Compl't ¶ 329.)  Rumble does not assert that it has ever been a consumer of Google's ad-buying tools.

Counts One and Two alleged that Google has monopolized and attempted to monopolize relevant markets for ad exchanges, ad servers, ad-buying tools, ad networks and online instream video advertising in violation of section 2 of the Sherman Act.  (Compl't ¶¶ 292-306.)  Count Three asserts that Google unlawfully tied Rumble's use of its AdX ad exchange to

---

[2] Outstream videos automatically load and play when a web user scrolls down a publisher's website.  (Compl't ¶ 121.)

its use of Google's DFP ad server in violation of sections 1 and 2 of the Sherman Act.  (Compl't ¶¶ 307-21.)  It also asserts that Google ties advertisers' access to YouTube ad inventory to their use of Google's ad-buying tools, DV360 and Google Ads, and advertisers' access to AdX to their use of Google Ads and the GDN ad network.  (Compl't ¶¶ 313-21.)  Count Four asserts that Google entered into the Network Bidding Agreement with Facebook, which constitutes a <u>per se</u> unlawful restraint of trade in violation of section 1 of the Sherman Act.  (Compl't ¶¶ 322-25.)

RULE 12(b)(6) STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth.  <u>Iqbal</u>, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." <u>Id.</u> at 679.  "Dismissal under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" <u>Michael Grecco Productions, Inc. v. RADesign, Inc.</u>, 112 F.4th 144, 150 (2d Cir. 2024) (quoting <u>Sewell v. Bernardin</u>, 795 F.3d 337, 339 (2d Cir. 2015)).

DISCUSSION.

I.     RUMBLE HAS PLAUSIBLY ALLEGED ANTITRUST
STANDING TO ASSERT MONOPOLIZATION, ATTEMPTED
MONOPOLIZATION AND TYING CLAIMS BUT ONLY IN
THE MARKETS FOR AD SERVERS AND AD EXCHANGES.

For Rumble to have antitrust standing, it must have both suffered an antitrust injury and be an efficient enforcer of the antitrust laws.  <u>DirecTV, LLC v. Nexstar Media Grp.,</u>

Inc., 2025 WL 3637519, at *7 (2d Cir. Dec. 16, 2025); Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 76 (2d Cir. 2013) (setting forth three-part test to determine antitrust injury). Antitrust injury can be demonstrated through the payment of supracompetitive prices or by the effects of reduced output. DirecTV, 2025 WL 3637519, at *8. The Court incorporates the legal standards for antitrust standing set forth in In re Google Digital Advertising Antitrust Litigation, 721 F. Supp. 3d at 244-45, supplemented by the teachings of DirecTV.

> A. The Complaint Plausibly Alleges Rumble's Antitrust Standing for
>    Claims Directed to the Ad Server and Ad Exchange Product Markets.

Google argues that Rumble has not plausibly alleged its antitrust standing to bring claims of monopolization, attempted monopolization and tying directed to the product markets for ad servers and ad exchanges. The Court concludes that that at the pleading stage, Rumble plausibly alleges that it is a consumer of Google's DFP ad server and AdX ad exchange and is a competitor of Google's DFP ad server. It also plausibly alleges that it was injured by Google's anticompetitive conduct and is an efficient enforcer of the antitrust claims.

Google characterizes Rumble's use of display ads as "just the ads appearing in the upper-right-hand corner of its website" and points to pleadings in other actions where Rumble has described itself as either a social-media platform or a user-generated platform that typically sells ad space through advertising agencies, as opposed to the programmatic advertising sold through ad servers and ad exchanges. (ECF 61 at 10-11[3]; see also ECF 67 at 5 (factual argument by Google that "[t]he static image ads that are shown alongside Rumble videos are not the 'web display' ads around which Rumble defined its markets because Rumble is not a 'web display' publisher.").) Google also asserts, without elaboration, that when Rumble uses an ad server to

---

[3] Unless otherwise specified, docket citations, i.e., "ECF __," are to Rumble Canada Inc. v. Google, et al., 24 Civ. 9904 (PKC).

place ads on Rumble.com, it does so through a "'user-generated platform' ad server," not a "web display" ad server.  (ECF 61 at 12.)

But the Complaint alleges that Rumble sells display ads, has used the DFP ad server since at least 2015 and sells ads through AdX.  (See, e.g., Compl't ¶¶ 19, 94 ("Rumble was forced to use DFP in order to gain access to Google's AdX . . . .").)  Google seemingly acknowledges that Rumble features display ads on the upper-right corner of its website.  At the pleading stage, the Court cannot determine what significance, if any, should be afforded to Rumble's self-identification in other contexts as a user-generated platform or social-media platform.  To the extent that Google urges the Court to take judicial notice of how Rumble described its business in pleadings filed in other actions, those pleadings do not contradict Rumble's allegations in this case that it has used the DFP ad server and transacted sales through AdX.  The Complaint plausibly alleges that Rumble has been a consumer of Google's ad server and ad exchange products, sufficient to have suffered an antitrust injury caused by an artificially inflated and supracompetitive take rate for use of those products.  See Gatt, 711 F.3d at 76.

Rumble's antitrust standing to pursue claims in the markets for ad servers and ad exchanges is also established by its status as a competitor to Google's DFP ad server through the creation and use of its own RAC ad server.  See In re Aluminum Warehousing Antitrust Litig., 833 F.3d 151, 158 (2d Cir. 2016) ("Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury.") (quotation marks omitted); IQ Dental Supply, Inc. v. Henry Schein, Inc., 924 F.3d 57, 64 (2d Cir. 2019) (a competitor plausibly alleges antitrust injury when it describes how it "is worse off than it would be if the market were free of anticompetitive forces.").  Rumble alleges that its RAC ad server generates less revenue than it otherwise would because Google's ad exchange controls advertiser

demand.  (Compl't ¶¶ 20, 95, 329.)  Thus, in addition to its customer status, Rumble's role as a competitor in the ad-server market also establishes its antitrust standing to pursue claims directed to Google's alleged monopolies and product tie in the ad-server and ad-exchange markets.

In addition to suffering antitrust injury in the markets for ad servers and ad exchanges, Rumble has plausibly alleged that it can serve as an efficient enforcer of the antitrust laws as to those two product markets.  To the extent that Rumble sold ad impressions on AdX through the DFP ad server and was injured by the payment of artificially inflated take rates, it was directly and non-speculatively harmed by Google's alleged anticompetitive conduct, has a self-interest in suing Google for the alleged Sherman Act violations, and does not present any unique difficulties in apportioning damages among other similar victims.  See DirecTV, 2025 WL 3637519, at *8-12.

Google's motion to dismiss Rumble's claims for monopolization, attempted monopolization and tying in the markets for ad servers and ad exchanges will be denied.

B.  The Complaint Does Not Plausibly Allege Rumble's Antitrust Standing for Claims Directed to Ad-Buying Tools and Ad Networks.

Rumble does not allege that it has purchased advertising or used ad-buying tools. Because Rumble does not plausibly allege that it is either as either a customer or competitor of Google's ad-buying tools or ad network, it does not have antitrust standing to pursue claims directed toward those product markets.

Rumble asserts that Google has engaged in exclusionary conduct that foreclosed competition in the markets for ad-buying tools used by both small and large advertisers, including tying its ad-buying tools to AdX, blocking non-Google ad-buying tools from accessing publishers' user IDs, manipulating ad auctions, and tying YouTube access to use of Google's ad-

buying tools.  (Compl't ¶ 270.)  Rumble asserts that these practices have harmed small and large advertisers and allowed Google to charge supracompetitive prices.  (Compl't ¶¶ 272-74.)

To plausibly allege antitrust injury, a court must consider the ways that a plaintiff claims to be in a worse position as a result of the defendant's conduct, and compare the anticompetitive effect of the specific practice at issue to the actual injury alleged by the plaintiff. DirecTV, 2025 WL 3637519, at *7; Gatt, 711 F.3d at 76.  But Rumble has not alleged facts that show how it suffered antitrust injury as a consequence of Google's alleged anticompetitive conduct in the ad-buying tools product markets, including any reduction in output as a consequence of Google's actions in these markets.  See id.; cf. In re Google Digital Advert. Antitrust Litig., 721 F. Supp. 3d at 245-46 (small advertisers who used the Google Ads ad-buying tool did not allege antitrust injury from practices affecting the DV360 ad-buying tool used by large advertisers).  It also has not plausibly alleged that it is an efficient enforcer of the antitrust laws because advertisers themselves are better-suited to bring claims arising directly from any anticompetitive acts related to ad-buying tools, as opposed to a downstream impact felt by Rumble as a publisher.  See DirecTV, 2025 WL 3637519, at *8-12.

Rumble similarly does not allege facts that describe how it was a customer of the GDN ad network or used any ad-network products.  "GDN operates as a closed marketplace accessible only by advertisers who use one of Google's products to buy publisher ad inventory." (Compl't ¶ 56.)  Ad networks purchase ad impressions on their own behalf and then re-sell them, typically matching small advertisers to small publishers.  (Compl't ¶¶ 97, 100.)  The Complaint asserts that Google foreclosed competition in the ad-network product market by routing Google Ads advertiser bids only to Google's network before deceptively re-routing them to AdX, and also by entering into the Network Bidding Agreement with Facebook, resulting in GDN charging

a supracompetitive take rate.  (Compl't ¶¶ 267, 269.)  Without explanation or elaboration, Rumble asserts that it "has been a customer" of Google's "ad-network markets."  (Compl't ¶ 327.)  But it is not apparent how this could be the case given Rumble's allegations about how ad networks function and the nature of the injury alleged.  Rumble does not allege that it has sold ad impressions through GDN or had a GDN account, or that it sold impressions to advertisers whose inventory had been re-routed to AdX without the advertisers' knowledge.  Even if it did, it is not apparent what injury Rumble suffered based on the anticompetitive practices described in the Complaint or why it would be an efficient enforcer of the antitrust laws relative to advertisers that used GDN.  See DirecTV, 2025 WL 3637519, at *8-12; Gatt, 711 F.3d at 76.

The Court therefore concludes that Rumble does not have antitrust standing to pursue claims directed to Google's alleged anticompetitive actions in the markets for ad networks and the ad-buying tools used by large and small advertisers.

Because Rumble has not plausibly alleged antitrust standing to pursue claims directed to ad networks or ad-buying tools, the Court need not and does not reach Google's arguments that Rumble has not plausibly alleged the existence of relevant markets for ad networks or ad-buying tools, or stated monopolization or tying claims in these alleged product markets.

II.    RUMBLE HAS PLAUSIBLY ALLEGED THAT
       GOOGLE UNLAWFULLY TIED ITS ADX
       ACCESS TO USE OF THE DFP AD SERVER.

Rumble has plausibly alleged that Google tied its access to the AdX ad exchange to its use of the DFP ad server, in violation of Sherman Acts section 1 and 2.  (Compl't ¶¶ 133, 308-12.)

- 10 -

Rumble's claim of an unlawful product tie is materially similar to the tying claims upheld by this Court in this multidistrict litigation.  See Texas v. Google, 627 F. Supp. 3d at 367-70, 402; see also In re Google Digital Advert. Antitrust Litig., 2025 WL 3012840, at *8-10, 14-15 (S.D.N.Y. Oct. 27, 2025) (applying issue preclusion principles to claims that Google tied publisher access to AdX to their use of the DFP ad server).  Rumble asserts that "Google monopolized the exchange and ad server markets by forcing publishers to license Google's ad server and trade through Google's exchange in order to receive bids from the more than one million advertisers using Google's buying tool, Google Ads."  (Compl't ¶ 133.)  It asserts that "Google programmed its exchange to return real-time bids only to those publishers using Google's new publisher ad server."  (Compl't ¶ 133.)

Google latches onto the Complaint's reference to "real-time bids" and attempts to recast the tying claim as asserting that real-time bids from ad exchanges are the tying product identified by Rumble.  (ECF 61 at 21.)  Google then argues that the Complaint does not plausibly allege Google's monopoly power in a product market for real-time bids.  (Id.)  But a fair reading of the Complaint reveals that Rumble's tying claim essentially mirrors the tying claim of other publisher plaintiffs in this multidistrict litigation: that Google required publishers to use its DFP ad server as a condition for accessing the ad inventory concentrated on its AdX ad exchange.  Google's strained attempt to reframe the tying claim as one directed to a narrower supposed product market for "real-time bids" is without merit.

The Court concludes that the Complaint plausibly alleges that Google tied Rumble's access to the AdX ad exchange to its use of the DFP ad server.

III.    RUMBLE HAS NOT PLAUSIBLY ALLEGED A
        MONOPOLIZATION, ATTEMPTED MONOPOLIZATION OR
        UNLAWFUL TYING CLAIM DIRECTED TO THE MARKET
        FOR INSTREAM ONLINE VIDEO ADVERTISING.

Counts One and Two assert that Google unlawfully monopolized and attempted to

monopolize the market for instream online video advertising.  Count Three asserts that Google

tied advertisers' access to its YouTube online video inventory to advertisers' use of Google's ad-

buying tools.

"The offense of monopoly under [Section 2] of the Sherman Act has two

elements: (1) the possession of monopoly power in the relevant market and (2) the willful

acquisition or maintenance of that power as distinguished from growth or development as a

consequence of a superior product, business acumen, or historic accident."  United Food & Com.

Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co. Ltd., 11

F.4th 118, 137 (2d Cir. 2021).  The Second Circuit has described anticompetitive conduct as

"conduct without a legitimate business purpose that make sense only because it eliminates

competition."  In re Adderall XR Antitrust Litig., 754 F.3d 128, 133 (2d Cir. 2014) (quotation

marks omitted).  "'The test is not total foreclosure, but rather whether the challenged practices

bar a substantial number of rivals or severely restrict the market's ambit.'"  New York ex rel.

Schneiderman v. Actavis PLC, 787 F.3d 638, 656 (2d Cir. 2015) (quoting United States v.

Dentsply Int'l, Inc., 399 F.3d 181, 191 (3d Cir. 2005)).  "To safeguard the incentive to innovate,

the possession of monopoly power will not be found unlawful unless it is accompanied by an

element of anticompetitive conduct."  Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko,

LLP, 540 U.S. 398, 407 (2004) (emphasis in original).

In Inform, 2024 WL 988966, at *3-5, the Court concluded that plaintiff Inform

plausibly alleged a product market for online video advertising and that Google willfully

acquired monopoly power in that market.  It concluded that Inform plausibly alleged that Google engaged in anticompetitive conduct when its widely-used Chrome browser abruptly transitioned from Adobe Flash software to HTML5, a measure that allowed YouTube to syphon off video advertisers from YouTube's competitors during the transition period.  Id. at *4-6.  The Court also concluded that Inform alleged that Google required advertisers to use its ad-buying tools in order to advertise on YouTube, which diverted ad spend away from Inform while strengthening the market power of both YouTube and Google's ad-buying tools.  Id. at *5.

Rumble's allegations differ from Inform's because they do not include any allegations about the Google-mandated transition from Adobe Flash to HTML5.  Instead, Rumble relies solely on allegations that Google forced advertisers to use Google's ad-buying tools in order to access YouTube inventory.

Rumble's allegations do not describe the willful monopolization of the market for online instream video advertising and instead describe harm to competition in the markets for ad-buying tools.  (See Compl't ¶¶ 249-55.)  Rumble's allegations about Google's monopoly power in the instream online video advertising recites the same market-share figures alleged by Inform, and then states in a conclusory fashion that requiring advertisers to use Google's ad-buying tools "strengthen[ed] Google's market power in the video advertising market while diverting ad spend away from other online video ad buying tools."  (Compl't ¶¶ 124-25 (emphasis added).)  The only references to instream online video advertising in Rumble's monopolization and attempted monopolization counts relate to harm in the market for ad-buying tools.  (Compl't ¶¶ 296 ("Google has willfully maintained and abused its monopoly power in the instream online video advertising market to force advertisers to use Google's ad buying tools for both small and large advertisers."), 304 ("Google has monopolized, maintained its monopoly, or attempted to

monopolize the online video advertising market to force advertisers to use Google's ad buying tools for both small and large advertisers.").)  They do not describe the willful acquisition or attempted acquisition of monopoly power in the market for instream online video advertising.

Inform's pleading, by contrast, plausibly described how Google's product ties in the markets for ad servers and ad-buying tools diverted ad spend toward YouTube and away from Inform and other competitors.  (See Inform Second Amended Compl't ¶¶ 178-83 (21-md-3010, ECF 535).)  In combination with Inform's allegations about the transition from Adobe Flash to HTML5, its complaint plausibly alleged that Google intentionally acquired and maintained monopoly power in the market for online video advertising.  Inform, 2024 WL 988966, at *3-5.

Unlike Inform's pleading, Rumble's allegations about Google's monopolization of the online instream video advertising market turn solely on the market for Google's ad-buying tools and competitive harm in those product markets, as opposed to harm in a video advertising market.  Rumble does not allege competitive harm caused by Google's conversion from Adobe Flash to HTML5, nor does it describe a product tie that harmed competition in the market for online instream video advertising (the tying product) as opposed to the ad-buying tool product markets (the tied products).

Rumble's claims directed to the market for online instream video advertising will be dismissed.

## IV.    RUMBLE DOES NOT PLAUSIBLY ALLEGE THAT THE NETWORK BIDDING AGREEMENT WAS A RESTRAINT OF TRADE.

Count IV alleges that the Network Bidding Agreement entered into by Google and Facebook is an agreement in restraint of trade that is per se unlawful under section 1 of the Sherman Act.  For the reasons explained in this Court's previous Opinions and Orders, Count IV

will be dismissed.  See <u>Texas v. Google</u>, 627 F. Supp. 3d at 370-77; <u>In re Google Digital</u>

<u>Advertising Antitrust Litigation</u>, 721 F. Supp. 3d at 248-50, 255-57.  Rumble's purportedly new

allegations about the effects of Facebook's failure to participate in header bidding (Compl't ¶¶

206, 212) do not materially distinguish Count IV from the previously-asserted claims about the

Network Bidding Agreement or plausibly state a claim for relief.

   Count IV will be dismissed.

   V. RUMBLE'S ALLEGATIONS ABOUT RESERVE
     PRICE OPTIMIZATION, USER ID ENCRYPTION
     AND EXCHANGE BIDDING DO NOT PLAUSIBLY
     ALLEGE ANTICOMPETITIVE CONDUCT.

   Under the heading of anticompetitive conduct, Rumble's complaint recites

allegations that describe Google's implementation of a publisher-side price-floor manipulation

practice called reserve price optimization, Google's encryption of user IDs and a suite of

initiatives marketed as "Exchange Bidding" that were allegedly an attempt to thwart the nascent

competition presented by header bidding.  (Compl't ¶¶ 159, 147-57, 197-201.)

   In <u>Texas v. Google</u>, the Court concluded that plaintiffs failed to plausibly allege

that these practices were anticompetitive conduct that independently could support a claim of

monopolization or attempted monopolization under section 2 of the Sherman Act.  627 F. Supp.

3d at 381-83 (plaintiffs did not plausibly allege a refusal-to-deal claim based on the encryption of

user IDs), 391-92 (allegations about reserve price optimization "describe a practice that misled

Google's publisher clients" but not anticompetitive conduct in the ad-server market), 393-95

(allegations about exchange bidding described "a voluntary venture . . . that tended to increase

competition for publisher ad inventory" and any "inadequate[ ] or deceptive [ ]" descriptions by

Google were not themselves actionable under section 2).

However, in deciding the motion to dismiss certain claims brought on behalf of the putative publisher class, this Court declined to dismiss factual allegations about Google's encryption of user IDs, explaining that these factual allegations merely described functions of the claimed DFP-AdX product tie, as distinguished from anticompetitive conduct that states a claim for monopolization or attempted monopolization. In re Google Digital Advertising Antitrust Litigation, 721 F. Supp. 3d at 381-83.

Google urges that Rumble's claims regarding these practices should be dismissed for the reasons set forth in Texas v. Google, whereas Rumble argues that the allegations merely describe aspects of how the DFP-AdX product tie functioned. (See Compl't ¶¶ 308 (asserting that "Google's contractual arrangements and other conduct force[d] publishers" to use DFP in order to access AdX); 154 (asserting that ID encryption incentivized publishers to transact on AdX through DFP); 159 (asserting that reserve price optimization exploited Google's "exclusive access" to DFP and AdX data); 200-01 (describing role of DFP and AdX in exchange bidding).)

For the reasons explained in Texas v. Google, Rumble does not plausibly allege that these auction practices amount to distinct and separately actionable anticompetitive conduct. See 627 F. Supp. 3d at 381-83, 391-95. But Rumble's factual allegations about the encryption of user IDs, reserve price optimization and the exchange bidding initiative purport to describe features, methods or aspects of the DFP-AdX product tie and Google's monopolization and attempted monopolization of the markets for ad servers and ad exchanges. They therefore are appropriate factual allegations in the context of these actionable claims. Accordingly, the motion to dismiss these allegations will be denied.

VI.    RUMBLE'S ALLEGATIONS ABOUT "NONTRANSPARENT PRICING" DO NOT ALLEGE ANTICOMPETITIVE CONDUCT.

Rumble makes certain allegations about Google's lack of transparency in its ad exchange, ad server and ad-buying tools products, asserting that Google "excludes competition by purposefully keeping its auction mechanics, terms, and pricing, opaque and 'nontransparent.'" (Compl't ¶¶ 229-34.)  This includes allegedly obfuscating the take rate that Google charges to publishers.  (Compl't ¶ 231.)  Rumble asserts that Google's nontransparency decreases competition in "the supply chain" and allows "for rent-seeking and arbitrage," meaning that Google can raise prices as needed in areas where it does not face competition.  (Compl't ¶ 232.) It also asserts that Google's lack of transparency prevents actual and potential competitors from knowing what their own returns on investment might be.  (Compl't ¶ 233.)

Rumble's allegations concerning lack of transparency described in the Complaint do not plausibly amount to distinct anticompetitive conduct sufficient to alone support a monopolization or attempted monopolization claim.  "Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities."  Trinko, 540 U.S. at 407-08. Courts are "ill suited" to act as "central planners" of enforced sharing, which also runs the risk of competitor collusion.  Id. at 408.  Rumble does not point to any principle of antitrust law or other authority that would require Google to disclose the mechanics, terms or pricing of its auctions. Moreover, the Complaint does not identify examples of "rent-seeking and arbitrage" that occurred due to the claimed lack of transparency.

Rumble does not plausibly allege that any lack of transparency by Google is, itself, actionable conduct, but Google's claimed lack of transparency may be helpful in understanding certain of its auction practices.  The allegations will stand as explanations and context for other allegations encompassed in Counts One, Two and Three.[4]  Google's motion to dismiss the allegations will be denied.

### VII.    GOOGLE'S MOTION TO DISMISS ON TIMELINESS GROUNDS WILL BE DENIED.

Google urges that Rumble's claims are untimely under the Sherman Act's four-year limitations period, 15 U.S.C. § 15b.  Rumble filed its initial complaint on May 13, 2024.  (ECF 1.)  Google urges that any claim premised on acts that occurred before May 13, 2020 should be dismissed as untimely.

A court may dismiss a claim as untimely at the Rule 12(b)(6) stage "when the complaint shows on its face that the limitations period has run . . . ."  GEOMC Co. v. Calmare Therapeutics Inc., 918 F.3d 92, 101 (2d Cir. 2019).  The Court summarized legal authority governing the Sherman Act's limitations period, fraudulent concealment, the role of continuing violations and tolling principles in In re Google Digital Advertising Antitrust Litigation, 721 F. Supp. 3d at 270-73, and incorporates those standards here.

In addition, the Sherman Act contains a broad tolling provision that goes into effect when the United States brings a civil proceeding under the antitrust laws.  15 U.S.C. § 16(i) ("Whenever any civil . . . proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws . . . the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency

---

[4] The Court does not rule at this juncture on the relevance of any category of evidence for admissibility purposes.

thereof and for one year thereafter . . . ."); see also Discover Financial Servs. v. Visa U.S.A. Inc.,
598 F. Supp. 2d 394, 403-04 (S.D.N.Y. 2008) (applying section 16(i) tolling even though private
plaintiff brought claims directed to a product market not "specifically identif[ied]" in the
government's complaint).  On January 24, 2023, the United States Department of Justice (the
"DOJ") commenced a civil action against Google in the Eastern District of Virginia that brought
claims substantially overlapping with those asserted by Rumble.  United States v. Google, 23-cv-
108 (E.D. Va.) (LMB/JFA).  Under section 16(i), Rumble's claims are "based in whole or in
part" on those brought by the DOJ, meaning that the limitations period for Rumble's claims is
tolled to January 23, 2019.

At the pleading stage, where every reasonable factual inference is drawn in favor
of the plaintiff, Rumble's complaint plausibly alleges that the auction-manipulation practices
alleged by Rumble as features, methods or aspects of its section 2 claims were opaque and not
well-understood outside of Google, including by customers of both the DFP ad server and AdX,
and points to misrepresentations by Google about the effects of Dynamic Allocation and
Dynamic Revenue Sharing.  (Compl't ¶¶ 279, 283.)  The Court previously denied a motion to
dismiss claims directed toward Google's implementation of Enhanced Dynamic Allocation
because the plaintiff described misrepresentations about its functions.  In re Google Digital
Advertising Antitrust Litigation, 721 F. Supp. 3d at 272.  In Texas v. Google, this Court also
observed that many of Google's auction-manipulation practices "lacked transparency, occurred
out of the public eye, and had effects that were not immediately obvious or well understood."
627 F. Supp. 3d at 406.

The motion to dismiss the tying claim on timeliness grounds will also be denied.
Rumble launched its RAC ad server in 2022, which falls within the limitations period, and the

Complaint asserts that RAC is at a competitive disadvantage due to Google's control of demand on AdX.  (Compl't ¶¶ 94, 20.)  At the pleading stage, Rumble also has adequately alleged that the DFP-AdX product tie is an act that "inflicted continuing and accumulating harm" on Rumble. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 502 n. 15 (1968).

       The motion to dismiss on timeliness grounds will therefore be denied.

CONCLUSION.

       The motion to dismiss is GRANTED as to those portions of Counts One, Two and Three that assert claims directed to the product markets for ad networks, online instream video advertising, and the ad-buying tools used by small advertisers and large advertisers.  The motion to dismiss Count Four, relating to the Network Bidding Agreement, is GRANTED in its entirety.

       The motion to dismiss is DENIED as to those portions of Counts One, Two and Three that assert claims directed to the product markets for publisher ad servers and ad exchanges.  The Court concludes that the purported anticompetitive conduct described in Sections V and VI of this Opinion would not independently support a monopolization or attempt to monopolize claim.  The Court further concludes, as described in Section VII, that no claim of Rumble should be dismissed as untimely.

       On January 12, 2026, Rumble filed a letter-motion seeking leave to file a Third Amended Complaint to allege a worldwide geographic market for ad servers and ad exchanges, excluding certain countries that restrict internet access or are subject to U.S. sanctions. Consistent with the Court's prior decisions, Rumble is granted leave to file a Third Amended Complaint solely to amend its allegations with respect to geographic market definition no later than January 30, 2026.  Google shall answer the Third Amended Complaint within 21 days thereafter.  Google need not answer the Second Amended Complaint.

The Clerk is respectfully directed to terminate the motions. (21-md-3010, ECF 1087, 1334; 24-cv-9904, ECF 60, 68.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
          January 13, 2026