KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215

———

(202) 326-7900
FACSIMILE:
(202) 326-7999

February 24, 2026

**Via ECF**

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     *In re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010-PKC

Dear Judge Castel:

We write on behalf of Daily Mail, Gannett, and the other Premium Publishers[1] regarding class counsel's request to tax each of them up to 10% of their total recoveries from Google.  *See* MDL Dkt. No. 1400 ("Ltr.").  The class lawyers also demand the same 10% exaction from any other publisher that declines class representation and opts out of the class.  The Court should deny the proposed set aside as contrary to law and equity.  At the very least, Premium Publishers would welcome the opportunity for full briefing and more than six days to respond on this important issue.  There is a conference in the *People*, *Business Insider*, and *Slate* cases scheduled for March 18, 2026.

Premium Publishers produce the best news and entertainment content in the United States.  Their publications include *Daily Mail*, *USA Today*, *People Magazine*, *Food & Wine*, *The Atlantic*, *Business Insider*, *Slate*, *Vanity Fair*, *GQ*, *The New Yorker*, *Bon Appétit*, *The Hollywood*

---

[1] Premium Publishers are the plaintiffs in *Associated Newspapers Ltd. and Mail Media, Inc. v. Google LLC*, No. 1:21-cv-03446 (PKC) (S.D.N.Y.); *Gannett Co. Inc. v. Google LLC*, No. 1:23-cv-05177 (PKC) (S.D.N.Y.); *CMI Marketing, Inc. v. Google LLC*, No. 1:25-cv-08630 (PKC) (S.D.N.Y.); *Slate Group LLC v. Google LLC*, No. 1:25-cv-07697 (PKC) (S.D.N.Y.); *Insider, Inc. v. Google LLC*, No. 1:25-cv-07409 (PKC) (S.D.N.Y.); *Dotdash Meredith a/k/a People Inc. v. Google LLC*, No. 1:25-cv-07194 (PKC) (S.D.N.Y.); *McClatchy Media Company, LLC v. Google LLC*, No. 1:26-cv-00339 (PKC) (S.D.N.Y.); *Advance Publications, Inc. v. Google LLC*, No. 1:26-cv-00343 (PKC) (S.D.N.Y.); *Vox Media, LLC v. Google LLC*, No. 1:26-cv-00325 (PKC) (S.D.N.Y.); *The Atlantic Monthly Group LLC v. Google LLC*, No. 1:26-cv-00272 (PKC) (S.D.N.Y.); *Penske Media Corporation v. Google LLC*, No. 1:26-cv-00225 (PKC) (S.D.N.Y.); *Ziff Davis, Inc. v. Google LLC*, No. 1:26-cv-01055 (PKC) (S.D.N.Y.).

*Reporter*, *Rolling Stone*, *Miami Herald*, *PCMag*, and *Vox* – to name a few. As Judge Brinkema found in Virginia, they are Google's victims. *See United States v. Google*, 778 F. Supp. 3d 797, 873 (E.D. Va. 2025) (Google's "exclusionary conduct substantially harmed Google's publisher customers"). Google has inflicted billions of dollars in damages on these important agents of the First Amendment. While newsrooms have shuttered publications, lost journalists, and cut operations, Google reaps monopoly profits. That is wrong. And that is why the Department of Justice and 17 States have successfully established Google's liability for serial violations of U.S. antitrust law.

Premium Publishers have filed their own cases to restore competition, to recover damages for the harm Google inflicted, and to secure for the American public the media landscape it deserves. Daily Mail led the charge when it filed suit in April 2021. Gannett joined the cause in June 2023. Daily Mail and Gannett provided the lead publisher witnesses at the DOJ trial: Judge Brinkema cited them 64 times in her liability decision. Since then, ten more Premium Publishers have filed complaints modeled on Daily Mail's and Gannett's allegations.

To date, Premium Publishers have made extraordinary investments in their cases. They and their counsel have taken and defended more than five dozen depositions – with more to come. The first six Premium Publishers produced more than 830,000 documents totaling more than 5.3 million pages and over two terabytes of data. Premium Publishers' recent efforts have resulted in Google producing nearly 200,000 additional records. Daily Mail and Gannett disclosed five experts whose reports contain thousands of pages, and the recently filed Premium Publishers expect to rely in large part on that expert work (and not the expert work produced by the AdX Class). All told, Premium Publishers have spent tens of millions of dollars to pursue their claims against Google, with additional discovery, expert work, and trial still to come.

Class counsel's demand for a 10% tax is an exorbitant fee. They seek 10% of each Premium Publisher's total recovery, including for categories of damages the class lawyers never pursued. Premium Publishers' (single) damages are more than ten times what they would receive if they stayed in the class. The math speaks for itself: the class lawyers seek a set aside equaling 100% (or more) of the recovery Premium Publishers would receive if they remained class members. That is punitive, not equitable. Had Premium Publishers stayed in the AdX Class, class counsel would not be entitled to retain for themselves Premium Publishers' entire recovery.

Class counsel's request is not a good faith estimate of benefits conferred on Premium Publishers and other class members. Instead, their request is retribution and a warning. For years and continuing until last summer, class counsel, George Zelcs, solicited several Premium Publishers about representing them. Those Premium Publishers told Zelcs that they did not want him to represent them and instead chose to pursue the full measure of their damages represented by the undersigned. The class lawyers now want an opportunity to collect what they think is their due. As to the remaining class members, class counsel's set-aside request is a threat. The

Court-ordered opt-out process begins soon. Class counsel want potential opt outs to know they will claw back their entire class recovery if they exercise their right to opt out.

The Court should deny the class lawyers' request for a set aside. But if the Court creates a common fund, it should allow Daily Mail, Gannett, and the other Premium Publishers to receive, not pay, common-benefit fees to recognize that their advocacy and resources have significantly benefited all publishers. It was Premium Publishers that directly contributed to the most meaningful substantive victory in this case: DOJ's victory that, this Court held, precludes Google from relitigating here the primary elements of the antitrust claims both Publisher Plaintiffs and the AdX Class alike are pursuing. Given that class counsel seek to encumber potentially hundreds of millions of dollars, Premium Publishers would appreciate the opportunity to brief these issues further.[2]

## DISCUSSION

There are several independent reasons to deny class counsel's request. It is contrary to the Clayton Act, unwarranted on the facts, ignores the common-benefit work Premium Publishers have done to date, and is punitive. The class lawyers have shown no entitlement to 100% of Premium Publishers' class recovery. Their motion should be denied.

## I. The Proposed Set-Aside Is Unlawful Under the Clayton Act

Class counsel's request fails out of the gate because it is contrary to law. Premium Publishers' central claims (as well as the AdX Class's) arise under the Clayton Act.[3] That statute provides that a prevailing plaintiff "*shall recover* threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a) (emphasis added). This language is mandatory: a court must award the specific remedies described – treble damages and costs, including attorney's fees – and lacks discretion to withhold those remedies or

---

[2] Although class counsel have litigated by Premium Publishers' side for nearly five years, they never suggested that Premium Publishers were unfairly benefiting from their work until an email at 4:15pm on Saturday, February 14, 2026 (Valentine's Day), demanding counsel for Premium Publishers consult all 12 of their clients and provide a response within 49 hours, by 5:00pm on Monday, February 16 (President's Day). When Premium Publishers pointed out that class counsel's demand was unreasonable and that their lead lawyer was occupied trying a different case through February 19, class counsel moved their deadline to 5:00pm on Wednesday, February 18 (Ash Wednesday). Premium Publishers conferred with class counsel at 3:00pm on February 18 and class counsel filed their 15-page letter three hours later.

[3] Premium Publishers also bring claims under New York's General Business Law §§ 349 and 350 as well as under common law fraud and unjust enrichment theories. Class counsel cannot credibly argue that its work benefits Premium Publishers in connection with those claims, however, because class counsel never brought similar claims.

redirect them to other claimants.  *See, e.g.*, *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354, 1357 (9th Cir. 1998) (explaining that this "award is mandatory," focusing on attorney's fees in particular); *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 411 (2d Cir. 1989) (same); *see also*, *e.g.*, *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020) (statutory language "shall" indicates "mandatory" operation).  Indeed, the express terms of the statute require the plaintiff itself to receive that award – even an award of attorney's fees, which the plaintiff may (but need not) "choose[]" to pass on to its counsel.  *Farmington Dowel Prods. Co. v. Forster Mfg. Co.*, 421 F.2d 61, 88 (1st Cir. 1969); *accord Image Tech. Serv.*, 136 F.3d 1354, 1357 (9th Cir. 1998).

As Judge Kaplan, sitting by designation on the Second Circuit, has explained, the common fund is "an equitable exception" to the ordinary American Rule that each party bears its own attorney's fees.  *In re Zyprexa Prods. Liability Litig.*, 594 F.3d 113, 128-29 (2d Cir. 2010) (Kaplan, J. concurring).  But there is no need for an "equitable exception" to that rule in Clayton Act cases – the statute already provides that a prevailing party is entitled to attorney's fees.  *Cf.* Manual for Complex Litig. § 14.13 (4th ed 2004) ("The analysis of attorney fees in a statutory-fee (or fee-shifting) case differs from that in a common-fund case.").  Accordingly, class counsel's request to tax Premium Publishers' recovery lacks a legal basis.  The Clayton Act says, in unambiguous language, that any recovery Premium Publishers receive "shall" go to Premium Publishers – not to class counsel, not to a fund, and not to anyone or anything else.[4]

## II.     Premium Publishers Vigorously Have Pursued And Continue to Pursue Their Cases

Class counsel's proposed set-aside is inappropriate because Premium Publishers have invested and continue to invest enormous resources in the prosecution of their claims.  They should not be required to pay rents to class counsel.

Common benefit funds, like the one class counsel proposes, are appropriate only upon a showing that current or future litigants would be unjustly enriched by the movant's prior work in the absence of a set aside.  *See In re Packaged Seafood Prods. Antitrust Litig.*, 2021 WL 5326517, *4 (S.D. Cal. Nov. 16, 2021) (declining set aside when movant "failed to show that their work on behalf of [a] class, including future opt-outs, will not be fairly compensated in this action or that any future opt-outs have been or will be unjustly enriched"); *see also* Ann. Manual

---

[4] The Court's inherent authority to manage MDL proceedings has permitted efficiencies that reduced counsel fees, *see*, *e.g.*, *In re Roundup Prods. Liab. Litig.*, 544 F. Supp. 3d 950, 958 (N.D. Cal. 2021); *In re General Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 189 (S.D.N.Y. 2020) (observing that "there is no statute or rule authorizing the Court to create a common benefit fund" and finding authority to do so in MDLs based on courts' "inherent powers"), but when a statute commands how and to whom attorney's fees should be awarded, there is no need for an MDL court to exercise its authority in derogation of the statutory rule.

Complex Lit. § 14.121 (4th ed.) ("[t]he common-fund exception . . . is grounded in . . . unjust enrichment").

There is no risk that Premium Publishers will be unjustly enriched by class counsel's work because Premium Publishers have for years aggressively litigated their cases independently and will continue to do so. A set aside is inappropriate when, as here, a party is represented by counsel of its choosing and "puts their own substantial work into [the] case," including "complet[ing]" their own "fact discovery," "submit[ting] their own expert reports," filing their own briefing on dispositive motions, and independently "prepar[ing] for trial." *In re Turkey Antitrust Litig.*, 2025 WL 1155990, *1 (N.D. Ill. Apr. 15, 2025) (declining set aside in favor of class even when that class obtained "significant document production by the individual defendants and depositions"); *see also Packaged Seafood*, 2021 WL 5326517 at *3 (refusing set aside when opt-outs relied on their own counsel's "independent knowledge of the discovery record and facts in this case, and experience and judgment in prosecuting antitrust cases"). Indeed, in one of the earliest cases to discuss common-benefit funds in mass litigation, the Fifth Circuit explained that "[o]ne who hires and pays his own lawyer is not a free rider if the attorney is a contributor to the final results," and agreed that parties represented by "attorneys who continued to be active" in the litigation should be excluded from any set-aside tax. *In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1019 (5th Cir. 1977); *see also* Federal Judicial Center, *Awarding Attorneys' Fees and Managing Fee Litigation* 80 (3d ed. 2015) ("Several appellate courts have held that when [purported] beneficiaries of the common fund are represented by counsel," they should "not be [forced] to defray the plaintiff's legal costs."); 20 Am. Jur. 2d Costs § 64 ("[T]hat the other parties interested in a common fund were represented by their own counsel has been held to be a strong or fatal objection to the allowance of counsel fees . . . ."). Because Premium Publishers (among other things) investigated their own claims, filed their own complaints, conducted their own discovery, submitted their own expert reports, and will try their own cases, a set-aside is unwarranted.

### A.     Investigations and Complaints

The Premium Publishers expended significant resources investigating their claims and filed complaints reflecting that independent investigation. Prior even to filing their first complaint counsel for Premium Publishers worked extensively with the Department of Justice and multiple State Attorneys General. The documents and information they provided to government enforcers ultimately led to two separate civil enforcement actions – one filed in the Eastern District of Texas by Texas and 13 other states and territories, and another filed in 2023 in the Eastern District of Virginia by DOJ and several other states.

Daily Mail was the first publisher to file a complaint in this Court, in April 2021. The publisher class opposed creation of the MDL and wanted to stay in the Northern District of California. Ultimately, the Judicial Panel on Multidistrict Litigation agreed with Daily Mail's choice of forum because "the advertising and publishing industry around which these actions revolve have a strong presence in New York," and ordered all cases centralized in this district.

*In re Digital Advertising Antitrust Litig.*, 555 F. Supp. 3d 1372, 1379-80 (J.P.M.L. 2021). Although the Class Complaint and Daily Mail's complaint both challenged Google's anticompetitive conduct in the markets for ad servers and exchanges, a basic redline between Daily Mail's initial complaint and the then-operative class complaint shows that Daily Mail's complaint was the product of its own investigation. *See* Ex. A (redline between Apr. 20, 2021 Daily Mail Complaint and Apr. 5, 2021 Consolidated Class Complaint). Gannett's complaint, filed in 2023, was modeled on Daily Mail's allegations. And the more recently filed Premium Publisher cases are likewise modeled on Daily Mail's and Gannett's allegations and do not merely copy and paste allegations from the class complaint. *See* Ex. B (redline between Aug. 29, 2025 *People* Complaint and the Dec. 5, 2022 First Amended Class Complaint).

Throughout this litigation, both the Court and Google have treated Premium Publishers' complaints as separate from class counsel's complaints. Google moved to dismiss Premium Publishers' complaints separately, *see* MDL Dkt. Nos. 453, 623, 1249, and Premium Publishers independently drafted their oppositions to those motions. Premium Publishers neither requested nor received any assistance from class counsel to oppose and defeat those motions.

Finally, in December, class counsel abandoned most of the allegations in their complaint, save for those the Court determined Google was precluded to relitigate. MDL Dkt. No. 1249. In the months since, Daily Mail, Gannett, and the other Premium Publishers have continued to prosecute the claims that this Court approved at the motion-to-dismiss stage and for which there is strong evidence in the discovery record.

### B.     Fact Discovery

Premium Publishers have for years worked diligently to develop a robust factual record that supports their own claims, in addition to those pursued by the AdX class. Though the Court's Pre-Trial Order No. 3 ("PTO-3") directed all MDL members to propound discovery in coordination with the Discovery Steering Committee ("DSC"), the correspondence and briefing in this case demonstrates that Premium Publishers shaped the factual record all plaintiffs rely upon to support their claims.

PTO-3 directed the DSC to "draft a common set of Rule 34 requests" on behalf of all plaintiffs. However, as part of that process, Daily Mail drafted and included dozens of requests particular to its needs. Indeed, Google initially objected to 20 of the MDL Plaintiffs' initial set of Requests for Production as "specific to Daily Mail." *See* Google's Responses & Objections to Plaintiffs' First Set of Request for Production of Documents (Feb. 27, 2023) (*e.g.,* RFP Nos. 255, 256, 278, 284, 285, 286). Daily Mail and Gannett then fought hard for (and won) discovery particular to their case as part of the MDL process, including custodians, search terms, and data particular to their claims.

For example, Daily Mail and Gannett successfully moved the court for the inclusion of nine additional custodians and several plaintiff-specific search terms to be applied across all

custodians. MDL Dkt. No. 664 (granting motion for "(a) three common custodians; (b) four custodians specific to plaintiff Daily Mail, and (c) five custodians specific to plaintiff Gannett." *Id.* at 1. Daily Mail and Gannett then took the depositions of three of those custodians and used this testimony in their own expert reports. *See, e.g.*, Revised Expert Report of S. Li ¶ 1187 (Oct. 11, 2024); Second Revised Expert Report of A. Hortacsu ¶ 778 & n. 914 (Oct. 18, 2024).

Daily Mail and Gannett made similar efforts in obtaining Google's data to use in their cases. Google initially refused to produce log-level data for impressions sold by Daily Mail or Gannett. *See* Google's Responses & Objections to Plaintiffs' First Set of Request for Production of Documents, Nos. 255-56 (Feb. 27, 2023). However, Daily Mail and Gannett engaged in extensive negotiations with Google regarding data samples and Google eventually produced a bespoke dataset of bid data, which featured heavily in Daily Mail and Gannett's expert reports. *See*, *e.g.*, Second Revised Expert Report of A. Hortacsu ¶ 1016 & n.1089 (Oct. 18, 2024).

Daily Mail and Gannett received no benefit from the publisher class in maintaining the document and data productions received from Google in this case. Indeed, for years, Daily Mail and Gannett paid, out of pocket, an *equal share* with the publisher class and advertiser class to host Google's documents. They also met weekly with the vendor team to manage the database. For some data, such as Google's log-level data productions, including third-party and expert data, Daily Mail and Gannett paid the *entire* cost to host and access the data, with the publisher class paying nothing. All this, of course, says nothing about Daily Mail and Gannett's collection and production of their own documents; they paid for all those costs, too.

Daily Mail and Gannett carried more than their own weight when it came to written discovery, too. Daily Mail and Gannett sought (and received) leave to serve their own interrogatories, in addition to the interrogatories served by the DSC. MDL Dkt. No. 813. As to Requests for Admission, a simple side-by-side comparison of Daily Mail's Second Set of Requests for Admission against the combined set served on behalf of the MDL plaintiffs demonstrates Daily Mail and Gannett carried significant water for the DSC. Of the 80 RFAs ultimately served by the MDL plaintiffs, 25 are either identical or extremely similar to the earlier set of RFAs Daily Mail propounded in its own case.

Finally, at depositions, Daily Mail and Gannett were the most active participants. As shown in Figure 1, below, Premium Publishers' counsel elicited more testimony from Google fact and expert witnesses than class counsel, even before counting the 1,000+ pages of testimony Premium Publishers have elicited thus far in depositions taken in the more recently filed cases. Daily Mail and Gannett participated separately at these depositions because they wanted to pursue their own cases – not leave themselves beholden to class counsel. *See also* Ex. C (containing detail regarding deposition participation by Daily Mail, Gannett, and class counsel).



**Figure 1.**

Legend:
- Examination by People/Insider/Slate or Raptive
- Examination by Daily Mail/Gannett
- Examination by Publisher Class

**30(b)(1) or 30(b)(6) Deponents** — 33 depositions*
- 1,339 (Examination by People/Insider/Slate or Raptive)
- 2,644 (Examination by Daily Mail/Gannett)
- 2,464 (Examination by Publisher Class)

**Expert Witnesses** — 11 depositions
- 1,415 (Examination by Daily Mail/Gannett)
- 1,245 (Examination by Publisher Class)

*33 depositions completed as of February 24, 2026. People/Insider/Slate are scheduled to take four more (DiNatali, Santana, Schneiderman, Sheffield), and Raptive is scheduled to take three more (Cassin, Dukellis, Kooverjee).

## C.     Expert Discovery

Daily Mail and Gannett also vigorously pursued their own expert discovery during the 10-month expert discovery period.  Together, they retained five experts who authored more than 2,600 pages of reports.  By comparison, the class expert work was less impressive, as Google and nearly a dozen other class members (thus far) have recognized.  The class lawyers, moreover, now have abandoned most of their expert work.  Rather than put forward a complete liability case, class counsel have decided to rely almost exclusively on the DOJ victory in Virginia – a victory that Daily Mail and Gannett helped achieve.  *See* MDL Dkt. No. 1269.  And class counsel failed to secure even one adequate class representative for the AdSense Class, *see* MDL Dkt. No. 1266 at 46-54 – despite claiming there are more than 700,000 AdSense publishers, *see* MDL Dkt. No. 958 at 15.  Due to class counsel's decisions, all expert work for the AdSense Class was a waste:  hundreds of pages of expert reports, presumably costing millions of dollars.  These class lawyers should not be permitted to charge others for their largely discarded work product.

**1. Liability.**  Daily Mail and Gannett submitted two expert reports from Professor Shengwu Li of Harvard University.  Professor Li authored more than 1,000 pages of reports analyzing over a dozen anticompetitive acts.  The class experts, by contrast, evaluated only a subset of Google's misconduct consisting of eight specific acts:  Tying, First Look, Last Look, Dynamic Revenue Share, Unified Pricing Rules, Project Bell v2, Enhanced Dynamic Allocation, and Poirot.  Daily Mail and Gannett's testimony at the DOJ trial supported liability for the first five acts.  *See* MDL Dkt. No. 1219.  The class lawyers have abandoned the remainder, electing to rely on DOJ's victory at trial.  Premium Publishers built their own liability case, and the class has benefited from those efforts.

Google's experts treated Daily Mail and Gannett's liability case as more sophisticated than that put forward by the class lawyers. Google's liability expert, Professor Paul Milgrom, addressed Professor Li more than 200 times in his report. MDL Dkt. No. 913 at 3. Nearly half of his report responds exclusively to Daily Mail and Gannett's experts. *See id.* Google proposed that "Daily Mail and Gannett alone" should have deposed Professor Milgrom. MDL Dkt. No. 911 at 4-5. During his deposition, Professor Milgrom described Professor Li's academic work as "very innovative and . . . important," Milgrom Dep. Tr. 216:2, and agreed that Professor Li is an "expert in economic theory and behavioral economics," *id.* at 220:11-19.

**2. Damages.** Daily Mail and Gannett submitted two expert reports from Professor Ali Hortacsu of the University of Chicago. Professor Hortacsu authored more than 700 pages of expert reports and created six damages models. Those models calculate damages from take rate overcharges, depressed prices, and reduced output for all publisher-sold ad inventory. The class lawyers pursued a fraction – less than 10% – of those damages. Their expert offered one opinion: that AdX's 20% take rate should have been 10%. The Court excluded that opinion in part, finding that the class did not provide competent evidence of an overcharge on instream video impressions. *See* MDL Dkt. No. 1266 at 38-40. Accordingly, even for its minimal damages case, class counsel lost millions of dollars of damages for class members.

As with liability, Google's experts treated Daily Mail and Gannett's damages case as the more serious one. Google's damages expert, Professor Judith Chevalier, devoted 220 pages of her 384-page report (excluding appendices), exclusively to Daily Mail and Gannett's damages analyses. *See* MDL Dkt. No. 913 at 3. Google demanded extra time to depose Professor Hortacsu because he developed "at least six distinct damages methodologies that purport to justify billions of dollars in total damages." MDL Dkt. No. 911 at 5. Additionally, now ten major publishers have filed their own cases that parallel Daily Mail and Gannett's. Many other major U.S. publishers may opt out of the publisher class, as well. Publishers nationwide are rejecting the class lawyers' damages case.

**3. Market definition and power.** Daily Mail and Gannett submitted two expert reports from Professor David Sibley of the University of Texas. Professor Sibley wrote almost 700 pages of reports supported by more than 60 empirical analyses. His market definitions match precisely the markets identified by Judge Brinkema. *See* MDL Dkt. No. 1051 at 8. Class counsel, by contrast, misdescribed the relevant markets. Class counsel's expert declined to commit whether the relevant geographic markets are the United States or worldwide – contrary to Judge Brinkema's decision. *See United States v. Google LLC*, 778 F. Supp. 3d 797, 847-48 (E.D.Va. 2025). The AdX Class expert also calculated market shares using revenue rather than sales volume. Google's expert, Dr. Mark Israel, made the same choice, which Judge Brinkema rejected. *See id.* at 842-44. Daily Mail and Gannett properly defined the markets.

Google's experts once again treated Daily Mail and Gannett's as the more substantial expert presentation. In addition to his principal report – 794 pages that applied to all cases – Dr.

Israel "served a *second*, *separate report* of nearly 100 pages directed solely at issues raised by Daily Mail and Gannett." MDL Dkt. No. 913 at 2. As with Professor Hortacsu, Google demanded an overlength deposition of Professor Sibley because his report "offers expansive opinions that cover industry background, market definition, market power, and alleged tying conduct, all involving complex economic analyses." MDL Dkt. No. 911 at 5-6.

**4. Source code.** Daily Mail and Gannett submitted two expert reports from Professor James Mickens of Harvard University. Professor Mickens conducted several dozen hours of source code review and evaluated, among other things, the technical architecture of Google's ad tech products; Google's supposed justifications for tying and other conduct; and the algorithms behind the Bernanke and Minimum Bid to Win manipulations. Notwithstanding their claims now to have conducted source code review, *see* Ltr. at 10, class counsel did not submit a source code report.

**5. Accounting.** Daily Mail and Gannett submitted an expert report from Mr. Ned Barnes, a certified forensic accountant with more than three decades of experience and successful, prior testimony in cases involving Google. Mr. Barnes determined that Google's break-even take rate for operating AdX was lower than the competitive counterfactual rate proposed by Professor Hortacsu. The AdX Class's accounting expert, by contrast, did not provide an opinion useful for the class's damages calculation. The class's liability expert used one calculation from the class accounting report to inform his opinion about market power. Daily Mail and Gannett testified regarding Google's market power at the DOJ trial, *see infra* pp. 12-13, which is now a precluded issue due to their efforts.

**6. Depositions.** Daily Mail and Gannett took a leading role during expert depositions. They took a 7-hour deposition of Judith Chevalier (damages); a 5-hour deposition of Mark Israel (market definition and power); an almost 6-hour deposition of Paul Milgrom (liability); a 4.5-hour deposition of Jonah Berger (news industry); and a 4-hour deposition of Martin Rinard (source code). The class lawyers demanded to go first at the Israel and Milgrom depositions but never even introduced Google's expert reports as exhibits. Class counsel appeared remotely for an hour of the Berger deposition and did not participate during the Rinard deposition. During the Chevalier deposition, class counsel went last and started their examination by piggybacking Daily Mail and Gannett's questioning. Daily Mail and Gannett did their own work.[5]

**D.     Summary Judgment**

As it did during the motion-to-dismiss phase, the Court has permitted Daily Mail and Gannett to seek summary judgment separately from the AdX Class. *See* MDL Dkt. No. 990.

---

[5] The class lawyers also deposed Mr. Douglas Skinner and Dr. Gregory Leonard. Neither expert disclosed an opinion in Daily Mail and Gannett's cases.

For issue preclusion, Daily Mail and Gannett offered to draft the all-Plaintiff brief, but the class lawyers demanded to do it themselves. In their separate briefs, Daily Mail and Gannett thoroughly addressed the relevant issues in 51 pages of briefing, *see* MDL Dkt. Nos. 1051, 1094, and the Court granted their motion for partial summary judgment, *compare* MDL Dkt. No. 1219, *with* MDL Dkt. No. 1049-1. Class counsel, in contrast, sought summary judgment on 25 issues and 54 sub issues. *See* MDL Dkt. Nos. 1040-1, 1043. The Court denied class counsel's request for relief on that unfocused set of issues. *See* MDL Dkt. No. 1219. Premium Publishers derived no benefit from that work.

For the remaining summary judgment issues, Daily Mail and Gannett are briefing summary judgment separately from the AdX Class. They filed a motion for partial summary judgment on two of Google's affirmative defenses. *See* MDL Dkt. No. 1257. Google abandoned its unclean hands defense in response, *see* MDL Dkt. Nos. 1272, 1285, and the motion otherwise awaits decision. The class lawyers failed to challenge Google's defenses. Daily Mail and Gannett's opposition to Google's motion for summary judgment is due on March 6, and it too will be separate from anything class counsel files.

### E.     The Class Lawyers Have Provided No Benefit to Premium Publishers

Almost three years ago, the Court instructed class counsel: "I am not interested in delay and volume for the sake of a lodestar. I'll just knock that down. We're not playing that game for definite sure." 5/16/23 Tr. 29:13-15. Yet, in contrast to Daily Mail and Gannett's contribution to the AdX Class's progress to date, class counsel's years of litigation have achieved nothing for Premium Publishers.

Class counsel's self-congratulatory letter ignores the basic facts. Their damages case achieves less than 10% of each Premium Publisher's full damages if they opt out. That is because the class lawyers focused on a modest rebate for Google's ad exchange – the 20% take rate should have been 10% – at the exclusion of all else. Aggregating enough claims, the class lawyers still hope they can achieve a substantial result. But for publishers nationwide, the recovery is meager compared to the harm they have suffered at Google's hands. Class counsel have failed to approach this case with the seriousness Premium Publishers deserve.

It is no wonder the leading U.S. publishers have charted a course apart from the class. Ten Premium Publishers have filed suit since Judge Brinkema's decision. All have joined Daily Mail and Gannett's case. None has signed up for what class counsel is offering – even though class counsel directly approached many Premium Publishers to solicit them to join the case. It is a striking rebuke of class leadership from a broad and deep cross-section of U.S. publishers.

### III.     Premium Publishers Did Much of the AdX Class's Work for Them

In addition to litigating their own cases, Premium Publishers have done much of the class lawyers' work for them. Daily Mail and Gannett were the lead publisher witnesses at the DOJ

trial on every issue for which the Court accorded preclusion.  Neither the class lawyers nor their class representatives had any role – much less a meaningful one – in the DOJ case.  Meanwhile, in the MDL, counsel for Premium Publishers have been ghostwriting DSC filings for years.  Indeed, in early 2024, Premium Publishers asked class counsel to formally recognize the substantial time and resources Premium Publishers had committed to the success of all plaintiffs in the MDL by seeking an order modifying the structure of the DSC and adding a Kellogg Hansen partner.  Rather than do so formally, class counsel instead invited Kellogg Hansen to attend and participate in all DSC meetings.[6]  Premium Publishers also appeared on behalf of the DSC on several occasions.  Repeatedly, class counsel turned to Premium Publishers when they were unprepared to do the work of the committee.

### A.  Daily Mail and Gannett Helped Secure Issue Preclusion for the AdX Class

In September 2024, Judge Brinkema presided over a three-week bench trial in the DOJ action.  Tim Wolfe, Senior Vice President of Revenue Operations at Gannett, was DOJ's opening witness.  Matthew Wheatland, Chief Digital Officer of Daily Mail, testified twice:  once during DOJ's case in chief and again as its sole rebuttal witness.  Judge Brinkema cited them 64 times in her 115-page opinion.  *See Google LLC*, 778 F. Supp. 3d 797.  She relied on their testimony regarding every issue for which this Court granted partial summary judgment.

**1. Market definition.**  Judge Brinkema found two "distinct relevant product market[s]" for "publisher ad servers" and "ad exchange[s]." *Id.* at *19, 21.  She repeatedly cited Wolfe's and Wheatland's testimony to support those findings.  *See id*. at *19 ("publishers, such as Gannett," "recognize the publisher ad server as a unique product"); *id*. at *20 (citing Wheatland to exclude app-only and social media ad serving tools from market); *id*. at *22 (citing Wolfe to find "[i]ndustry participants consider ad exchanges to be a distinct product"); *id*. at *22 (citing Wheatland to find ad networks and direct deals are not substitutes for exchanges).

**2. Market power.**  Judge Brinkema also found that Google exercised monopoly power in each market.  In reaching that conclusion, she again relied on Wolfe's and Wheatland's testimony.  *See, e.g.*, *id.* at *30 (citing Wheatland to find that publishers use only one publisher ad server to sell their inventory); *id.* (quoting Wolfe to explain why the absence of multi-homing is a barrier to entry: "switching ad servers as a year-long process that was 'akin to . . . changing the tires on the race car mid race' "); *id.* at *32 (quoting Wheatland that Google's 20% exchange take rate "was 'around double' the take rate" of other exchanges); *id.* at *33 (citing Wolfe to find that AdX's unique access to Google Ads demand made AdX a "must call exchange").

**3. Anticompetitive conduct in the ad server market.**  Judge Brinkema concluded that Google engaged in unlawful tying:  it made DFP " 'the only viable economic option' for

---

[6] Separately, Kellogg Hansen was designated as a member of Plaintiffs' Privilege Committee pursuant to Paragraph 12(c) of the then-operative Confidentiality Order.  *See* MDL Dkt. No. 297.

publishers" by "restricting AdX's submission of real-time bids only to DFP." *Id*. at \*39 (citation omitted). She relied on Wolfe's and Wheatland's testimony to support that finding and reject Google's defenses. *See id.* at \*33 (citing Wolfe to find that "publishers felt they had to use DFP to obtain effective access to AdX"); *id*. at \*45 (citing Wheatland to reject Google's "security or quality" justifications because "industry participants and customers testified that Google did not have lower levels of spam, fraud, or malware than other reputable ad tech providers").

4. **Anticompetitive conduct in the ad exchange market.** As to ad exchanges, Judge Brinkema found that Google enforced "anticompetitive policies, practices, and technology changes . . . that were not in its publisher customers' best interest." *Id.* at \*41-42. Those acts included "Last Look," "Unified Pricing Rules," and "dynamic revenue share." *Id.* Daily Mail and Gannett witnesses testified at length about these unlawful acts. For example, Judge Brinkema relied on evidence that, for "The Daily Mail, Unified Pricing Rules . . . resulted in lower revenue per impression." *Id.* at \*17. She also cited Wheatland's testimony to support her finding that "Unified Pricing Rules was . . . targeted at enhancing AdX's control over DFP publishers' revenue streams, as opposed to simplifying publishers' decision-making." *Id*. at \*46.

In DOJ's liability trial, Kellogg Hansen represented all of DOJ's live publisher witnesses. DOJ's first trial witness was Gannett's Tim Wolfe. DOJ's final and only rebuttal witness was Daily Mail's Matt Wheatland. Judge Brinkema's opinion holding in favor of DOJ repeatedly cited Kellogg Hansen's witnesses. Matt Wheatland (Daily Mail) is cited 27 times in her opinion. Tim Wolfe (Gannett) is cited 38 times. Steph Layser (Daily Mail/News Corp) is cited 36 times. Google referred to Kellogg Hansen counsel in its proposed findings of fact relating to trial witnesses. Google PFOF Relating to Trial Witnesses at 1-2, ECF No. 1375 (E.D.Va. Nov. 4, 2024) ("Plaintiffs called only three publisher witnesses live, all represented by the same outside counsel: . . . John Thorne.").

In short, class counsel have much to thank Daily Mail and Gannett for in connection with the entry of partial summary judgment in their cases.

B. **Premium Publishers Contributed to Much of the DSC's Work**

For years, Daily Mail and Gannett shouldered the burden of DSC work. Early in the MDL, counsel for Premium Publishers led the effort to require Google to turn over materials it had already produced in separate investigations by the State of Texas and the DOJ. *See*, *e.g.*, Hr'g Tr. (9/24/21) at 28:19-29:1 (undersigned explaining that DOJ was currently investigating Google's ad tech practices and that, to the extent DOJ had "collected useful things" they should be produced in the MDL); MDL Dkt. No. 241 (letter drafted by counsel for Premium Publishers alerting the Court to Google's disobeying its order to produce materials previously produced to Texas); *see also* MDL Dkt. No. 244 (ordering Google to comply).

Class counsel tout their review of certain Google source code, *see* Ltr. 10, but it was Premium Publishers who first proposed and led negotiations over a source code addendum to the

MDL confidentiality order that ensured such source code would be produced. Google's position was that source code was irrelevant to these cases and that no provision should be included in the confidentiality order. Premium Publishers drafted MDL Plaintiffs' proposed source code provisions, conducted all relevant research regarding the propriety of source code productions in cases like this one, and diligently pursued the addition of a source code provision to the confidentiality order. The Court ultimately agreed that a source code provision was necessary and ordered Google to include one. Hr'g Tr. (4/19/22) at 22:22-23 (The Court: "[W]e're going to get a source code provision in here.").

Premium Publishers also did substantial work to coordinate the various parties' discovery requests. Although PTO No. 3 required the DSC to "draft a common set of Rule 34 requests" for production, with only a few days before the requests were due, class counsel's draft contained close to 400 requests, dozens of which were duplicative, vague, or both, and which included a byzantine set of definitions and instructions. Premium Publishers took the lead on rationalizing the MDL Plaintiffs requests for production and the parties ultimately served nearly 100 fewer requests.

Premium Publishers likewise drafted in the first instance or provided substantial edits to dozens of filings. Class counsel's own letter provides another example. They assert that they drafted and negotiated Rule 30(b)(6) notices that Premium Publishers have benefited from, *see* Ltr. 9, but they ignore the fact that their 30(b)(6) negotiations with Google were ineffective. Class counsel sought 30(b)(6) testimony on over 200 discrete topics – many of which the Court noted would have been better served as interrogatories – causing the Court to intervene. *See* 6/20/24 Tr. 3:10-19:14. In the end, Premium Publishers drafted the 30(b)(6) notices that underlaid Google's 30(b)(6) depositions. Class counsel's work burdened Premium Publishers; Premium Publishers' counsel, in contrast, did work that directly benefited the AdX Class.

### C. Class Counsel Declined to Pursue Anything that Premium Publishers Did Not Already Win For Them

Last December, the class lawyers jettisoned most of their case in favor of what Daily Mail and Gannett already helped DOJ achieve. Class counsel abandoned eight anticompetitive acts and all state-law claims: Enhanced Dynamic Allocation, Project Bernanke, Line-Item Capping, Redaction of Auction Data, Project Poirot, Project Elmo, Minimum Bid to Win, discriminatory risk aversion coefficients, and their claims under California's Unfair Competition Law and the Cartwright Act. *See* MDL Dkt. No. 1269 at 2. Their case is now based solely on the precluded conduct. *See id.*[7] As the class is aware – because they now have reviewed Daily Mail's and Gannett's expert reports – certain of these now-abandoned acts caused hundreds of

---

[7] The class lawyers claim to pursue a tying claim opposite from what Judge Brinkema found – i.e., that Google tied AdX (tied good) to DFP (tying good). *See* MDL Dkt. No. 1269 at 2. But they insist that "Google's exposure to overcharge damages to the AdX Class does not depend upon Publishers' proving [that tie] as a distinct act." *Id.*

millions of dollars in damages (if not more). But, having given up on those damages, the class lawyers determined it was not worth the effort to continue litigating the underlying liability. They met the low bar they set for themselves, and they met it by piggybacking on Premium Publishers' work.

**IV.      Class Counsel's Proposed Set-Aside Is Inequitable and Seeks to Punish Publishers Who Declined Class Counsel's Representation**

The class lawyers' request for a "10-percent set-aside from any gross" recovery is punitive and inequitable. Ltr. at 13. They would confiscate 100% of Premium Publishers' recovery had they remained in the class. In other words, they propose to more than triple the 33% contingent fee they are likely to request from the Court when they settle their case. *See supra* pp. 2-3. Class counsel cite no case permitting a 100% set aside under any circumstances – much less the circumstances here. Premium Publishers are responsible for class counsel's success to date. *See supra* pp. 12-13. More than that, the class lawyers asked many Premium Publishers years ago to serve as class representative. All declined. They should not have to pay more for rejecting class representation than accepting it.

Setting aside the marked disparity in class versus opt-out damages, the class lawyers' request remains extreme. Set aside orders are rare in antitrust cases: the *Newberg* treatise identifies only "two antitrust cases" with common benefit funds. 5 *Newberg and Rubenstein on Class Actions* § 15:117 (6th ed.). "[T]he normal mass tort set-aside range," where such orders are most common, "is around 3% to 6%." *In re Zetia (Ezetimibe) Antitrust Litig.*, 2022 WL 18108387, at *7 (E.D. Va. Nov. 8, 2022). There are outlier cases where court-appointed counsel must coordinate thousands of individual actions. That is a far cry from this case. These class lawyers participated in a Discovery Steering Committee with two to four other lawyers. The only MDL parties not on the committee were Daily Mail and Gannett, which did much of the committee's work, in any event. *See supra* pp. 12-13. Class counsel have not earned any set aside fee – and certainly not double the average.

Class counsel insist it does not matter whether the set aside reasonably reflects whatever they might be owed, as they will not draw down any money from the fund until later. *See* Ltr. 13. But "[i]mposing too large a set-aside is not without consequence even if the actual amount of compensation is determined later." *Zetia*, 2022 WL 18108387, at *8. "The excess withholding may be an impediment to settlement," *id.* – including if the parties cannot agree on a settlement amount because neither wants to pay the class take rate. The class lawyers' cited cases do not instruct the Court to ignore this commonsense reality. *In re Bard IVC Filters Products Liability Litigation*, 603 F. Supp. 3d 822 (D. Ariz. 2022), involved an opt-out plaintiff that "agreed at the outset of this MDL" to "the fixed percentage assessments to be applied." *Id.* at 839. That case also involved "thousands of settlements." *Id.* at 840. Likewise, in *In re General Motors LLC Ignition Switch Litigation*, 477 F. Supp. 3d 170 (S.D.N.Y. 2020), the plaintiff conceded that lead counsel "performed a remarkable amount of work on behalf of plaintiffs in the Common Benefit Actions," and acknowledged it was able to settle its cases

despite doing "minimal substantive legal work." *Id.* at 179, 191 (cleaned up). This case is precisely the opposite. Premium Publishers have done their own work.

\* \* \*

For the foregoing reasons, Premium Publishers respectfully request that the Court deny class counsel's request or set the issue for full briefing. If the Court is inclined to establish a common-benefit fund, Premium Publishers respectfully submit the Court should structure it to allow Premium Publishers to receive, not pay, common-benefit fees to compensate them for the resources they have expended to the benefit of all publishers.

Respectfully submitted,

/s/ *John Thorne*

John Thorne
Daniel G. Bird
Daniel S. Severson
Christopher C. Goodnow
Eliana Margo Pfeffer
Eric J. Maier
Mark P. Hirschboeck
Jonathan I. Liebman
Sven E. Henningson
Kyle B. Grigel
Jared M. Stehle
Reno G. Varghese
KELLOGG, HANSEN, TODD, FIGEL
 & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Tel.:  (202) 326-7900
Fax:  (202) 326-7999
Email:  jthorne@kellogghansen.com
     dbird@kellogghansen.com
     dseverson@kellogghansen.com
     cgoodnow@kellogghansen.com
     epfeffer@kellogghansen.com
     emaier@kellogghansen.com
     mhirschboeck@kellogghansen.com
     jliebman@kellogghansen.com
     shenningson@kellogghansen.com
     kgrigel@kellogghansen.com
     jstehle@kellogghansen.com
     rvarghese@kellogghansen.com

*Counsel for Associated Newspapers, Ltd., Mail Media, Inc., Gannett Co., Inc., Dotdash Meredith Inc., Meredith Operations Corporation, Insider, Inc., The Slate Group LLC, CMI Marketing, Inc., Penske Media Corporation, The Atlantic Monthly Group LLC, Vox Media, LLC, McClatchy Media Company, LLC, Advance Publications, Inc., and Ziff Davis, Inc.*