**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | **Case No. 1:21-md-3010 (PKC)** |
| *This Document Relates To:* | |
| OPENX TECHNOLOGIES, INC., and OPENX LTD.,<br>*Plaintiffs*,<br>vs.<br>GOOGLE LLC, and ALPHABET INC.,<br>*Defendants*. | Case No. 1:25-cv-10817 (PKC) |
| MAGNITE, INC.,<br>*Plaintiff*,<br>vs.<br>GOOGLE LLC, and ALPHABET INC.,<br>*Defendants*. | Case No. 1:25-cv-10818 (PKC) |
| PUBMATIC, INC.,<br>*Plaintiff*,<br>vs.<br>GOOGLE LLC, and ALPHABET INC.,<br>*Defendants*. | Case No. 1:25-cv-10819 (PKC) |

| | |
|---|---|
| EQUATIV SAS, EQUATIV INC.,<br>SHARETHROUGH INC., and<br>SHARETHROUGH USA, INC.,<br><br>*Plaintiffs*,<br><br>vs.<br><br>GOOGLE LLC, and ALPHABET INC.,<br><br>*Defendants*. | Case No. 1:26-cv-00140 (PKC) |
| INDEX EXCHANGE INC.<br><br>*Plaintiff*,<br><br>vs.<br><br>GOOGLE LLC,<br><br>*Defendant*. | Case No. 1:25-cv-10477 (PKC) |
| KARGO GLOBAL LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>GOOGLE LLC,<br><br>*Defendant*. | Case No. 1:25-cv-10630 (PKC) |
| SOVRN HOLDINGS, INC.,<br><br>*Plaintiff*,<br><br>vs.<br><br>GOOGLE LLC, and ALPHABET INC.,<br><br>*Defendants*. | Case No. 1:26-cv-1587 (PKC) |

**DEFENDANTS GOOGLE LLC AND ALPHABET INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ..... 1

I. BACKGROUND ..... 3

A. Competitor Plaintiffs Are Sophisticated Ad Tech Companies Who Have Been Competing with Google for Over a Decade. ..... 3

B. Competitor Plaintiffs Predicate Some of Their Claims on Long-Ago Google Conduct that Was Well-Known to Them. ..... 7

C. Procedural History ..... 14

II. LEGAL STANDARD ..... 16

III. ARGUMENT ..... 16

A. Competitor Plaintiffs' Claims Based on Conduct that Predates the Statute of Limitations Window Should Be Dismissed. ..... 16

1. Claims Based on Alleged Ties of (1) AdWords Demand to AdX and (2) AdX Real-Time Bids to DFP Are Time-Barred. ..... 18

2. Claims Based on "First Look" Are Time-Barred. ..... 22

3. Claims Based on "Last Look" Are Time-Barred. ..... 24

4. Claims Based on Project Poirot Are Time-Barred. ..... 26

5. Claims Based on Open Bidding Are Time-Barred. ..... 30

6. Plaintiffs Cannot Combine All of Their Allegations into One Purported Continuing Violation. ..... 30

B. Competitor Plaintiffs' Claims Based on Open Bidding Should Be Dismissed for Failure to State a Claim. ..... 33

C. Group B Plaintiffs' Claims Relating to Google's Use of the Waterfall and Alleged Refusal to Share Proprietary Information with Its Competitors Should Be Dismissed for Failure To State a Claim. ..... 34

# TABLE OF AUTHORITIES

## Cases

*131 Main St. Assocs. v. Manko*,
179 F. Supp. 2d 339 (S.D.N.Y. 2002) .......... 23

*Applera Corp. v. MJ Research, Inc.*,
349 F. Supp. 2d 338 (D. Conn. 2004) .......... 31

*Aurora Enters., Inc. v. Nat'l Broad. Co., Inc.*,
688 F.2d 689 (9th Cir. 1982) .......... 22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 16

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) .......... 20, 21

*Butala v. Agashiwala*,
916 F. Supp. 314 (S.D.N.Y. 1996) .......... 25

*Chalmers v. NCAA*,
2025 WL 1225168 (S.D.N.Y. Apr. 28, 2025) .......... 18

*Connecticut v. Sandoz, Inc.*,
2025 WL 3043397 (D. Conn. Oct. 31, 2025) .......... 20

*CSX Transp., Inc. v. Norfolk S. Railway Co.*,
648 F. Supp. 3d 679 (E.D. Va. 2023) .......... 19, 31

*Dfinity Found. v. New York Times Co.*,
702 F. Supp. 3d 167 (S.D.N.Y. 2023), *aff'd* 2024 WL 3565762 (2d Cir. July 29, 2024) .......... 16

*DiFolco v. MSNBC Cable LLC*,
622 F.3d 104 (2d Cir. 2010) .......... 4

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
747 F.3d 145 (2d Cir. 2014) .......... 16

*Eichman v. Fotomat Corp.*,
880 F.2d 149 (9th Cir. 1989) .......... 19

*GEOMC Co. v. Calmare Therapeutics Inc.*,
918 F.3d 92 (2d Cir. 2019) .......... 16

*GO Computer, Inc. v. Microsoft Corp.*,
508 F.3d 170 (4th Cir. 2007) .......... 27

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
392 U.S. 481 (1968) .... 21

*Helena World Chron., LLC v. Google LLC*,
2026 WL 787882 (D.D.C. Mar. 20, 2026) .... 31

*Higgins v. New York Stock Exch., Inc.*,
942 F.2d 829 (2d Cir. 1991) .... 17, 21, 29

*Hinds Cnty. v. Wachovia Bank N.A.*,
620 F. Supp. 2d 499 (S.D.N.Y. 2009) .... 23, 25, 26

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007) .... 35

*In re Google Digital Advertising Antitrust Litig.* ("*MDL I*"),
627 F. Supp. 3d 346 (S.D.N.Y. 2022) .... passim

*In re Google Digital Advertising Antitrust Litig.*, ("*MDL II*"),
721 F. Supp. 3d 230 (S.D.N.Y. 2024) .... passim

*In re Google Digital Advertising Antitrust Litig.*, ("*MDL III*"), 2026 WL 91448 (S.D.N.Y. Jan. 13, 2026) .... passim

*In re GSE Bonds Antitrust Litigation*,
396 F. Supp. 3d 354, 367 (S.D.N.Y. 2019) .... 28

*In re Interest Rate Swaps Antitrust Litig.*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017) .... 23, 28, 29

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) .... 30, 31

*Koch v. Christie's Int'l PLC*,
699 F.3d 141 (2d Cir. 2012) .... 18, 23, 24

*Koch v. Christie's Int'l PLC*,
785 F. Supp. 2d 105 (S.D.N.Y. 2011) .... 27

*Koulkina v. City of New York,*
559 F. Supp. 2d 300 (S.D.N.Y. 2008) .... 24

*Litovich v. Bank of Am. Corp.*,
2025 WL 2521039 (S.D.N.Y. Sept. 2, 2025) .... 17

*Masters v. Wilhelmina Model Agency, Inc.*,
2003 WL 1990262 (S.D.N.Y. Apr. 29, 2003) .... 24

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
392 F.3d 265 (8th Cir. 2004) ..... 22

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ..... 35

*Phhhoto Inc. v. Meta Platforms, Inc.*,
123 F.4th 592 (2d Cir. 2024) ..... 28

*SaurikIT, LLC v. Apple, Inc.*,
2023 WL 8946200 (9th Cir. Dec. 28, 2023) ..... 20

*Sewell v. Bernardin*,
795 F.3d 337 (2d Cir. 2015) ..... 16

*State of N.Y. v. Hendrickson Bros.*,
840 F.2d 1065 (2d Cir. 1988) ..... 18

*United States v. Google LLC*,
778 F. Supp. 3d 797 (E.D. Va. 2025) ..... 9, 10, 14

*US Airways, Inc. v. Sabre Holdings Corp.*,
105 F. Supp. 3d 265 (S.D.N.Y. 2015), *aff'd*, 938 F.3d 43 (2d Cir. 2019) ..... 17, 22, 31

*Varner v. Peterson Farms*,
371 F.3d 1011 (8th Cir. 2004) ..... 19, 21

*Vitale v. Marlborough Gallery*,
1994 WL 654494 (S.D.N.Y. 1994) ..... 22

*Witt Co. v. RISO, Inc.*,
948 F. Supp. 2d 1227 (D. Or. June 7, 2013) ..... 19

*Yelp v. Google LLC*,
2025 WL 2978394 (N.D. Cal. Oct. 22, 2025) ..... 25, 29, 31, 32

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
401 U.S. 321 (1971) ..... 17

**Statutes**

15 U.S.C. § 15b ..... 17

15 U.S.C. § 16(i) ..... 2, 17

Cal. Bus. & Prof. Code § 17208 ..... 17

**Other Authorities**

Sarah Sluis, "Google Removes Its 'Last-Look' Auction Advantage," *AdExchanger* (Mar. 31, 2017), https://www.adexchanger.com/platforms/google-removes-last-look-auction-advantage/ ........................................................................................................................ 11

## INTRODUCTION

Plaintiffs OpenX, Magnite, PubMatic, Equativ, Index Exchange, Kargo (on behalf of itself and TripleLift), and Sovrn ("Competitor Plaintiffs")[1] are veteran ad tech providers who have long competed with Google and have long been aware of the conduct on which they base their claims in these cases. Despite years of cooperating with and participating in government investigations and litigations, and in some instances filing their own lawsuits against Google abroad, Competitor Plaintiffs waited until 2025 to begin filing these lawsuits against Google LLC and Alphabet Inc. (collectively, "Google"), alleging Sherman Act claims based on an assortment of alleged acts beginning as far back as 2009.

Most of Competitor Plaintiffs' claims are time-barred. These time-barred claims are largely based on types of conduct that either were not addressed by, or are distinguishable from, this Court's earlier rulings on Google's statute of limitations arguments in prior motions to dismiss.[2] As laid out below, the conduct subject to a timeliness bar is: (1) two alleged ties—one of AdWords demand to AdX and the other of AdX real-time bids to DFP—that began when Google re-launched AdX and the DoubleClick for Publishers ("DFP") ad server in 2009, and have remained unchanged since then; (2) effects of Dynamic Allocation, which was publicized by Google in 2010—"First Look" (which ended by 2014) and "Last Look" (which ended in May

[1] For the purposes of this Motion, "Group A" refers to the consolidated amended complaint filed by OpenX, Magnite, PubMatic, and Equativ, who originally filed their complaints in the Eastern District of Virginia. Dkt. No. 1511. "Group B" refers to the consolidated amended complaint filed by Kargo, Index Exchange, and Sovrn, who originally filed their complaints in the Southern District of New York. Dkt. No. 1543.

On April 16, 2026, ad tech competitor TrustX Digital Advertising Services, Inc., filed a complaint against Google that contains allegations substantively identical to those in the complaint filed by Group B Plaintiffs. Dkt. No. 1, No. 1:26-cv-3135 (S.D.N.Y.). Counsel for the parties will confer regarding any potential consolidation.

[2] Google acknowledges that, in the Rumble case, this Court denied a motion to dismiss on statute of limitations grounds related to the tie of AdX real-time bids to DFP. *In re Google Digital Advertising Antitrust Litig.*, ("*MDL III*"), 2026 WL 91448, at *9 (S.D.N.Y. Jan. 13, 2026). Unlike Rumble, which was Google's customer and pleaded exclusion as a competitor only upon launching its ad server in 2022, here every Competitor Plaintiff pleads that it was an excluded rival sell-side provider who was injured by Google's conduct long before January 2019. *Infra* § I.A.1.

2019); (3) Project Poirot, an algorithm developed for Google's buy-side tool, DV360, in 2017 that, according to their own complaints, Competitor Plaintiffs contemporaneously observed and investigated in light of sharp decreases in DV360 bidding on their exchanges; and (4) Open Bidding, which the Complaints concede was publicly launched in 2018. Plaintiffs' allegations show that they were on notice of these matters giving rise to their claims for years: they had the capability to—and did—identify, observe, and document the time-barred Google conduct and its effects for years prior to filing suit.

No tolling doctrine saves Competitor Plaintiffs' claims based on this long-ago, known challenged conduct. The challenged conduct occurred before January 24, 2019, which is four years prior to the United States filing suit and the operative date for determining when Plaintiffs' claims accrued. *See* 15 U.S.C. § 16(i) (suspending any statute of limitations period during the pendency of the United States' antitrust claims). The two tolling doctrines Competitor Plaintiffs invoke—continuing violations and fraudulent concealment—fail to resuscitate these claims. Competitor Plaintiffs do not and cannot allege any new and independent act necessary to invoke the continuing violations doctrine; just the opposite, as the complaints make clear the at-issue conduct ended or remains unchanged. And Competitor Plaintiffs do not and cannot allege with particularity the facts necessary to plead fraudulent concealment.

At bottom, Competitor Plaintiffs ask this Court to excuse their own delay—for some claims, of over a decade—bringing suit for 6 years after the United States and Texas launched their investigations; almost 6 years after the first private plaintiff filed suit; almost 5 years after the Texas Attorney General filed suit; and over 2.5 years after the United States filed suit. Competitor Plaintiffs participated in the United States' and Texas's pre-suit investigations as well as the litigations once filed, and yet waited too long to bring their private claims. And their own

knowledge, notice, and participation—gained in the course of running their sophisticated businesses to compete vigorously with Google—make their claims different from those this Court has handled for years as part of the MDL. No tolling doctrines excuse Competitor Plaintiffs' delay.

Certain Plaintiffs also bring claims based on allegations pertaining to Google conduct similar to those this Court has previously dismissed for failure to state a claim: Open Bidding, and Google's alleged use of the "waterfall" and refusal to share proprietary information. The Court should dismiss those claims for the same reasons the Court dismissed similar claims before.

## I. BACKGROUND

### A. Competitor Plaintiffs Are Sophisticated Ad Tech Companies Who Have Been Competing with Google for Over a Decade.

According to the Complaints and as detailed below, each Competitor Plaintiff is a sophisticated and large-scale ad tech provider that has built and operated complex ad tech tools for over a decade, and has dedicated significant resources to identifying, observing, and documenting the at-issue Google conduct. *E.g.*, Group B Compl. ¶ 62 (alleging Plaintiffs invested in "significant, and expensive, data analysis efforts" dedicated to analyzing DFP and its effects on competition). Their knowledge and sophistication permitted them to participate in the United States' and Texas' investigations into this very conduct starting as early as 2019.

***OpenX.*** OpenX alleges that it "has been at the forefront of innovation transforming the ad tech industry for decades." Group A Compl. ¶ 227.[3] OpenX released its publisher ad server in 2008, followed by the OpenX ad exchange "in early 2009." *Id.* ¶¶ 234, 236. Its ad exchange was allegedly "the first ad exchange ever to offer real-time bidding into an ad server." *Id.* ¶ 236. OpenX alleges that its products were "quickly met with Google's anticompetitive ties and First

[3] With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability. All emphasis is added unless otherwise indicated.

Look." *Id.* ¶ 239. In response, in 2013, OpenX "developed header bidding" to "mitigate some of the effects of Google's anticompetitive restrictions." *Id.* ¶ 240.

***Magnite.*** Magnite is the offspring of mergers and acquisitions of various veteran ad tech companies, including the merger of Rubicon Project and Telaria. Group A Compl. ¶ 249. Rubicon Project "was one of the earliest entrants in" the "emerging ad exchange ecosystem," and launched its ad exchange in 2010. *Id.* ¶¶ 252-253. Magnite grew to process "billions of daily transactions" and manage "relationships with thousands of websites," eventually becoming "the largest open-web display exchange" after AdX. *Id.* ¶¶ 249, 257. "Magnite invested heavily in data analytics," which "became another hallmark of the company's offering." *Id.* ¶¶ 255, 275.

Magnite was also involved in header bidding: it "co-founded Prebid.org, an industry-wide open-source project that provided header bidding solutions for publishers," and has served as Prebid's Board Chair since Prebid's inception in 2017. Group A Compl. ¶¶ 65, 77.

***PubMatic.*** PubMatic was "at the forefront of the digital advertising revolution." Group A Compl. ¶ 296. In late 2008, PubMatic allegedly enabled "the first real-time transaction" in ad tech, followed by launching its "modern ad exchange" in "mid-2009." *Id.* ¶¶ 308-309.

PubMatic has long crusaded against Google's conduct. At the United States' trial against Google in the Eastern District of Virginia, PubMatic's CEO testified that PubMatic published a 2015 white paper cautioning industry participants that Dynamic Allocation "favors AdX, which reduces the competition on a publisher's inventory" because "AdX gets first look and right to win." *United States v. Google*, No. 1:23-cv-108 (E.D.V.A.) ("EDVA"), Dkt. No. 1354 (9/12/24 PM Tr. 96:10-97:4, 98:8-13, 98:19-99:22, 115:8-15 (Goel)).[4] After "many publishers complained to both

[4] Though none of the legal arguments in Defendants' motion to dismiss depend on EDVA trial testimony, the Court may consider that sworn testimony when assessing Defendants' motion to dismiss. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (at the pleadings stage, a district court may consider "documents incorporated by

PubMatic and directly to Google about the costs of First Look," PubMatic "developed the industry's first free and open-source header bidding management solution." Group A Compl. ¶¶ 65, 318. According to PubMatic, "to alleviate some of the harm posed by Google's information hoarding, PubMatic unsuccessfully sought from Google on many occasions access to valuable data typically shared in the industry." *Id.* ¶ 321.

***Equativ.*** Equativ is a "pioneer in the ad tech space" that "launched its publisher ad server" "nearly 20 years ago." Group A Compl. ¶ 362. "Over time, Equativ has diversified its business"; for example, it started to operate an ad exchange and subsequently acquired Sharethrough and its exchange. *Id.* ¶¶ 363, 366. Today, Equativ "facilitates advertising on over 100,000 websites, mobile apps, and connected TV apps worldwide." *Id.* ¶ 359.

***Index Exchange.*** Index Exchange "has been providing services related to internet advertising since its founding in 2003." Group B Compl. ¶ 9. It launched its ad exchange in 2011, and, "by 2015, the ad exchange had sufficient liquidity to become the sole focus of Index Exchange's operations." *Id.* ¶ 99.

"From its inception, Index Exchange invested heavily in technology and infrastructure," including expanding "its data centers, engineering teams, analytics function, and proprietary algorithms." Group B Compl. ¶ 101. Using these resources, Index Exchange undertook "significant, and expensive, data analysis efforts in attempts to determine the logic that DFP used to choose between competing bids," including experiments to reduce its take rate. *Id.* ¶¶ 62-63. Those efforts were directed at understanding the "principles" that DFP applied to choose winning bids, including ones Index Exchange now alleges "explicitly favored AdX." *Id.* ¶ 61.

reference in the complaint" or "integral to the complaint"); *see* Group A Compl. ¶¶ 23, 210, 212; Group B Compl. ¶¶ 199, 203 (referring to and quoting from testimony at EDVA trial).

Around 2016, Index Exchange also developed "its own proprietary header bidding wrapper" aimed at "mitigating the effects of Google's self-preferencing of AdX." Group B Compl. ¶¶ 147, 153. Index Exchange "was one of the first major programmatic exchanges to support the open-source header bidding technology developed by Prebid." *Id.* ¶ 153.

***Kargo.*** Kargo "has existed since the beginning of Internet advertising." Group B Compl. ¶ 106. In 2008, it entered the ad tech space by shifting into open web mobile advertising, and, by 2010, had built on its "long-standing relationships with premium publishers" to develop ad tech for connecting top publishers to advertisers. *Id.* ¶¶ 10, 110-111. In January 2016, Kargo launched its ad exchange. *Id.* ¶ 112.

Kargo, too, invested in header bidding "in an attempt to compete with AdX." Group B Compl. ¶ 154. Kargo "began to work with publishers to integrate header bidding into their ad serving workflow," "primarily using Prebid and Amazon's Transparent Ad Marketplace" header bidding tools. *Id.* Additionally, to better understand DFP's logic for selecting a winning bid among competing demand sources (which allegedly favored AdX), Kargo "hired a consultant, who eventually transitioned to a full-time employee," dedicated to investigating how DFP worked, including by conducting tests to reduce Kargo's take rate. *Id.* ¶¶ 61-62, 64.

***TripleLift.*** TripleLift (who assigned its claims to Kargo for purposes of this lawsuit, Group B Compl. ¶ 16) was "founded in 2012" and launched its ad exchange in 2014. Group B Compl. ¶ 11. In February 2017, "seeing the obvious benefits of header bidding," TripleLift also launched its own header bidding technology. *Id.* ¶ 156. "From its inception, TripleLift invested heavily in technology and infrastructure," including by growing "its data centers, engineering teams, analytics function, and proprietary algorithms." *Id.* ¶ 142. Those investments allegedly enabled TripleLift to "become a leader in programmatic display advertising" that, by 2020,

handled "over 40 trillion ad transactions." *Id.*

***Sovrn.*** Sovrn was founded in 2014 through a merger of a publishing company and an ad tech company, and immediately touted having "the largest and most diverse programmatic supply-side platforms in the world, with almost 3 billion ad requests/day and 180 million U.S. monthly uniques." Group B Compl. ¶¶ 119-120. According to Sovrn, "from the beginning," it adopted a "data strategy that was a competitive differentiator from other exchanges" because it used "data superiority to facilitate placement of more effective ads." *Id.* ¶¶ 126, 132. In pursuit of its data strategy, Sovrn also made a series of four acquisitions between 2014 and 2021. *Id.* ¶ 127.

To respond to Google's alleged anticompetitive conduct, Sovrn "worked tirelessly and invested substantial resources in data analysis and testing of bid optimization techniques to try to figure out why it struggled to grow." Group B Compl. ¶ 65. Sovrn also "joined with other non-Google market participants to lead the development" of header bidding, which "helped publishers escape both the waterfall's inefficiencies and Google's domination." *Id.* ¶ 155.

### B. Competitor Plaintiffs Predicate Some of Their Claims on Long-Ago Google Conduct that Was Well-Known to Them.

Google seeks to dismiss Competitor Plaintiffs' claims based upon two alleged ties; Dynamic Allocation's alleged "First Look" and "Last Look"; Project Poirot; and Open Bidding.[5] Each is discussed in turn, and summarized in the following chart.

| Conduct | Began | Alleged By | Date of Awareness |
|---|---|---|---|
| AdX-DFP Tie | 2009 | All | 2009 |
| AdWords-AdX Tie | 2009 | All | 2009 |
| "First Look" | By 2010 (with launch of Dynamic Allocation) | All | By 2010 |

[5] Google is not moving to dismiss claims predicated on other conduct alleged in Plaintiffs' Complaints, including Project Bernanke, Sell-Side Dynamic Revenue Share, and Unified Pricing Rules.

| **Conduct** | **Began** | **Alleged By** | **Date of Awareness** |
|---|---|---|---|
| "Last Look" | 2013-2014 (due to interaction of Dynamic Allocation with header bidding) | All | 2013-2014 |
| Project Poirot | 2017 | All | 2017 and 2018 |
| Open Bidding | 2018 | PubMatic, Equativ, Index Exchange, Kargo / TripleLift, Sovrn | 2018 |

***Alleged ties.*** Competitor Plaintiffs base claims on two alleged ties involving AdX: (1) tying AdWords demand to AdX, and (2) tying AdX real-time bids to DFP. Group A Compl. ¶¶ 56, 181-185, 418, 420; Group B Compl. ¶¶ 50, 54, 261-263.[6] They allege they have been aware of the alleged ties since those alleged ties were first implemented—in 2009. They do not (and could not) allege they were ignorant of the ties or their purported effects on competitors' abilities to compete. Competitor Plaintiffs were aware of the alleged tie between AdWords demand and AdX from the beginning because competitors allegedly had no way to integrate with AdWords the way AdX did. Group B Compl. ¶¶ 50, 54, 261-262 (alleging that by 2009, Google had "made AdX the only ad exchange into which AdWords advertising demand was permitted to bid"); Group A Compl. ¶¶ 181-182 (alleging "in 2015, Google began allowing a sliver of AdWords demand to reach rival ad exchanges"). Similarly, Competitor Plaintiffs allege they were aware of the second alleged tie, between AdX real-time bids and DFP, since its implementation in 2009. Group B Compl. ¶ 249 ("competitors were aware of" the tie), 263; Group A Compl. ¶ 183 ("After acquiring DFP in 2008, Google required publishers to use DFP to access real-time bids from AdX.").

[6] Only for the latter—between AdX real-time bids and DFP—do Group A (but not Group B) Plaintiffs bring a standalone tying claim under the Sherman Act. The former tie is alleged only to be anticompetitive conduct in support of their monopolization claims.

Further, Competitor Plaintiffs claim that the two alleged ties have plagued their ability to compete in the alleged product markets for years—since long before January 2019. Group A Compl. ¶¶ 209-212; Group B Compl. ¶¶ 54-59. For example, OpenX alleges that "because of Google's tie," the market share of OpenX's ad server "had declined materially" "by 2014." Group A Compl. ¶ 242. Magnite alleges that its "opportunity for meaningful growth in open-web display" "had always been stymied" by Google's ties. *Id.* ¶¶ 258, 259. Magnite further alleges that its predecessor the Rubicon Project, prior to merging to form Magnite in 2020, "considered entering the publisher ad server for open-web display market several times," but could not due to Google's alleged ties. *Id.* ¶¶ 273-274. PubMatic alleges that the ties "severely restricted PubMatic's access to Google's enormous group of advertisers on AdWords" and "stunted" "its ability to compete" "for years," including prior to 2014. *Id.* ¶¶ 311-314. Equativ alleges that, after experiencing "years of struggling to acquire new publisher ad server customers in the face of Google's anticompetitive conduct," it launched a "Google Replacement Program" that was allegedly unsuccessful due to Google's alleged ties. *Id.* ¶¶ 376-377; *see also* EDVA, Dkt. No. 1355 (9/13/24 PM Tr. 66:9-67:21 (Creput)) (program launched in 2018). Further, Plaintiffs acknowledge that Google has kept the alleged ties intact, and unchanged, since 2009, alleging that Google "chooses to maintain the ties." Group A Compl. ¶¶ 181, 185; Group B Compl. ¶¶ 261-263.[7]

***Dynamic Allocation: "First Look."*** Prior to 2010, publishers set up their ad servers to call ad exchanges and ad networks using a "waterfall" system that offered impressions to these demand

[7] Group A Plaintiffs allege that, starting in 2018, Google also "prohibited publishers from accessing AdX" at all (*i.e.*, accessing demand from AdX without real-time bids) "without first going through DFP," and continued to renegotiate publisher contracts with that condition after January 2019. Group A Compl. ¶¶ 183, 185, 422; *see also United States v. Google LLC*, 778 F. Supp. 3d 797, 826 n.16 (E.D. Va. 2025) ("EDVA Op.") (publishers not using DFP could previously access AdX via "AdX Direct," which "did not provide access to real-time bids"). Those allegations are not the tie alleged in their claim, which is about "tying real-time bids from AdX" to DFP. Group A Compl. page 24 (heading C), ¶ 56 (tie was between "real-time bids from AdX" and DFP).

sources in a sequential order determined by the publisher based on each demand source's expected bid. Group A Compl. ¶¶ 48-49; Group B Compl. ¶¶ 66-67. By 2010, Google implemented Dynamic Allocation, an algorithm with the goal of increasing publisher revenue by more effectively determining which ad exchange or ad network would provide a higher bid for a given impression. Group A Compl. ¶ 60; Group B Compl. ¶ 76; *see also* EDVA Op., 778 F. Supp. 3d at 869 (aspects of Dynamic Allocation "did increase publishers' revenue substantially"). According to Plaintiffs' Complaints, at different times, Dynamic Allocation created either a "First Look" or a "Last Look" for Google's AdX.

As to "First Look," Competitor Plaintiffs complain that "First Look" harmed their ability to compete by "allowing AdX to cherry pick the most valuable ad requests" in the auctions in which Dynamic Allocation applied. Group A Compl. ¶¶ 60, 62-63; Group B Compl. ¶¶ 77, 80-81. Competitor Plaintiffs knew about "First Look" from the inception of Dynamic Allocation: based on that very knowledge, in 2013 and 2014 they began to develop a technical workaround called header bidding that was aimed at "negating Google's First Look advantage" by placing real-time bids from AdX and other exchanges in direct competition. Group A Compl. ¶¶ 65-66, 72-73, 240, 318; Group B Compl. ¶¶ 146-147 ("Index Exchange, Kargo, Sovrn, and TripleLift joined with other non-Google market participants to lead the development of a technological work-around called 'header bidding.'"), 152, 158; *see also* EDVA Op., 778 F. Supp. 3d at 828. Competitor Plaintiffs' header bidding solutions were developed after and in response to conversations with publishers who complained about "First Look"; as they allege, "many publishers complained to both PubMatic and directly to Google about the costs of First Look." Group A Compl. ¶ 318. In the United States action, PubMatic's CEO even testified that PubMatic published a white paper in 2015 stating that "AdX gets first look and right to win." EDVA, Dkt. No. 1354 (9/12/24 PM Tr.

96:10-97:4, 98:19-99:22 (Goel)); *see also* EDVA, Dkt. No. 1797 (10/3/25 PM Tr. 38:15-39:18 (Layser)) (witness testifying that publisher "knew about" "the functionality of First Look" when it existed).

***Dynamic Allocation: "Last Look."*** Competitor Plaintiffs allege that, after Competitor Plaintiffs and others created header bidding, Google "replaced AdX's First Look with Last Look." Group A Compl. ¶ 80; Group B Compl. ¶ 163. What Competitor Plaintiffs call "Last Look" refers to the way in which Dynamic Allocation interacted with publishers' header bidding set-ups: Plaintiffs claim Dynamic Allocation gave AdX "a last chance to outbid the winner of the header-bidding auction." Group A Compl. ¶ 80; Group B Compl. ¶¶ 162-164. According to Competitor Plaintiffs, AdX's "Last Look" thus harmed their ability to compete because it "created an unfair competitive advantage for AdX" in the auctions subject to Dynamic Allocation. Group A Compl. ¶ 444; Group B Compl. ¶¶ 165-166. At the trial in the United States' action, witnesses gave sworn testimony that the ad tech industry knew of Last Look as it was happening.[8] For example, PubMatic's CEO testified that before UPR launched in May 2019, publishers "put a higher price floor on Google AdX" because they "either knew or believed they knew that Google had certain unfair advantage." EDVA, Dkt. No. 1354 (9/12/24 PM Tr. 105:16-106:5 (Goel)); *see also id.*, Dkt. No. 1797 (10/3/25 Tr. 38:15-39:18 (Layser)) (publisher was "aware that" Last Look "was happening in the ad server when it was going on"). Google ended Last Look in 2019 when it adopted Unified Pricing Rules. Group A Compl. ¶¶ 443, 449; Group B Compl. ¶ 191.

***Project Poirot.*** In 2017, Google implemented an algorithm called Project Poirot that analyzed pricing data from all ad exchanges "to discern which were employing a first price

[8] Google's alleged "Last Look" advantage was widely publicized at the time Google launched the beta version of its response to header bidding, originally named Exchange Bidding then renamed Open Bidding. *E.g.*, Sarah Sluis, "Google Removes Its 'Last-Look' Auction Advantage," *AdExchanger* (Mar. 31, 2017), https://www.adexchanger.com/platforms/google-removes-last-look-auction-advantage/.

model,"[9] then allegedly reduced bids from Google's ad buying tool, DV360, into those ad exchanges "that had been identified as holding first-price auctions." Group B Compl. ¶¶ 179-180; Group A Compl. ¶¶ 89-90, 94. In the United States' case, Judge Brinkema concluded, relying on the testimony of the United States' expert, that "the evidence suggests that Project Poirot was a reasonable method for protecting Google's advertiser customers from third-party ad exchanges that were running unfair auctions." 778 F. Supp. 3d at 865 n.29. Nevertheless, Competitor Plaintiffs allege that Poirot "suppressed bids" placed on their exchanges, "causing them to lose impressions and the associated fees." Group A Compl. ¶¶ 117, 220; Group B Compl. ¶¶ 175, 181.

Plaintiffs observed the effects of Project Poirot in real time in 2017 and 2018 as DV360 reduced spending on Competitor Plaintiffs' exchanges—so much so that Plaintiffs raised to Google their concerns about the sudden decreases. For example, "in late 2018," Poirot "resulted in a 40% decrease in year-over-year spend from DV360 to the OpenX Ad Exchange." Group A Compl. ¶ 199. After observing this trend, OpenX "ran experiments to try to determine why DV360 had decreased its spend on the OpenX Ad Exchange" and "repeatedly" reached out to Google "for an explanation of the decline." *Id.* ¶¶ 199-200. Likewise, Magnite "worked internally to investigate why DV360's spend had dropped on its exchange," including by "reviewing its internal data on bidding," after which it "reached out to the DV360 team at Google" to inquire about the spend decrease. *Id.* ¶ 202. PubMatic "first noticed the decline in DV360 spend" in August 2017, and "contacted Google" "to try to determine what was causing the decline" and "provided reports demonstrating this decline." *Id.* ¶ 203. PubMatic continued to follow up in "late 2017 and early 2018." *Id.* Similarly, Index Exchange, Kargo, and Sovrn allege they observed, prior to January

[9] In a first-price auction, the winner is charged the amount it bid; in a second-price auction, the winner is charged a price based on the second-highest bid. Group A Compl. ¶ 96; Group B Compl. ¶ 88.

2019, that Project Poirot reduced the number of transactions on rival exchanges by up to 15% on average, "causing a significant economic shock to a number of those businesses." Group B Compl. ¶ 181 (citing EDVA Op., 778 F. Supp. 3d at 830 (Poirot 2.0 had these effects by late 2018)). As a result, they invested "substantial resources in data analysis and testing of various bid optimization techniques in an attempt to identify and solve the problem." *Id.* ¶ 182.

***Open Bidding.*** In 2018, Google publicly launched a feature called Exchange Bidding, "later rebranded as Open Bidding," as a competitive response to header bidding. Group A Compl. ¶¶ 120-121; Group B Compl. ¶¶ 183-184. Open Bidding was publicly rolled out. Group A Compl. ¶ 121; Group B Compl. ¶ 184. Open Bidding "enabled ad exchanges to submit real-time bids into DFP." Group A. Compl. ¶ 121; Group B Compl. ¶ 184. In 2022, this Court granted a motion to dismiss claims based on Open Bidding, holding that the state plaintiffs' allegations do "not plausibly allege that [Open] Bidding harmed competition in any market." *In re Google Digital Advertising Antitrust Litig.* ("*MDL I*"), 627 F. Supp. 3d 346, 395 (S.D.N.Y. 2022). The Court reasoned that Open Bidding "allowed non-Google exchanges—and indirectly those advertisers submitting bids through those exchanges—to participate in auctions," which "tended to increase competition for publisher ad inventory." *Id.* at 394.

OpenX and Magnite do not base any of their claims on Open Bidding. The remaining Competitor Plaintiffs—PubMatic, Equativ, Index Exchange, Kargo, and Sovrn—claim that Open Bidding led to "financial costs and consequent economic damages" for their rival exchanges. Group A Compl. ¶¶ 127-128; Group B Compl. ¶ 186. They allege that Open Bidding did not treat their exchanges the same as AdX: Open Bidding allegedly charged a 5% fee on transactions on their exchanges, but not AdX; added "technical restrictions" to their exchanges; gave their exchanges less data while requiring them to share their data with Google; and facilitated publisher

payment for transactions on their exchanges. Group A Compl. ¶¶ 128-131, 329-331; Group B Compl. ¶¶ 187-189. PubMatic and Equativ further allege that, despite these drawbacks, they were "forced against their interest to route bids through Open Bidding," where the "forcing" mechanism was merely that they wanted access to the publishers using Open Bidding. Group A Compl. ¶¶ 127, 332-333. These are the same kind of allegations—lacking in any specific allegations that Open Bidding actually had anticompetitive effect on header bidding[10]—that this Court previously held did not state a claim. *MDL I*, 627 F. Supp. 3d at 394.

**C. Procedural History**

The first of Competitor Plaintiffs (OpenX) filed suit in August 2025, with the most recently filed complaint in February 2026 (Sovrn). This means the first Competitor Plaintiff suit was not filed until 16 years after Google first acquired DoubleClick and launched DFP and AdX subject to the alleged ties. Competitor Plaintiffs' suits also come 6 years after the United States launched its investigation into Google; almost 6 years after the first private plaintiff filed suit; almost 5 years after the Texas Attorney General filed suit; over 2.5 years after the United States filed suit; 1 year after the liability bench trial in the United States action; and between 3 to 10 months after a liability decision was issued by Judge Brinkema. Competitor Plaintiffs were aware of and participated in the United States' and Texas's investigations (beginning in 2019) and their subsequent lawsuits[11]: all entered appearances in the United States' lawsuit, and five current or former executives of

---

[10] At the United States' liability trial, the CEO of Index Exchange testified that "almost every publisher on the open web" continues to "leverage some sort of header bidding"; agreed that "open bidding did not kill header bidding"; and testified that Open Bidding, if anything, "grew header bidding" by bringing "new publishers into the paradigm." EDVA, Dkt. No. 1351 (9/9/24 PM Tr. 23:16-24:4 (Casale)). Another witness, the former Magnite CTO and Chairman of Prebid, testified that Open Bidding was "Google's competitive response to header bidding," but "header bidding itself is alive and well today." EDVA, Dkt. No. 1339 (9/13/24 AM Tr. 31:10-23, 32:4-5 (Kershaw)). Following trial, the EDVA Court did not make any finding that Open Bidding was anticompetitive. *See* EDVA Op., 778 F. Supp. 3d at 864-65.

[11] In April 2022, following the French Competition Authority's "finding that Google abused its dominance in the ad server market in June 2021," Group A Compl. ¶ 396, Equativ sued Google in the Paris Commercial Court seeking a damages award against Google relating to ad tech competition. The resulting damages award is currently on appeal.

Competitor Plaintiffs testified live against Google in EDVA.

Originally, four Competitor Plaintiffs (OpenX, Magnite, PubMatic, and Equativ) filed individual complaints in the United States District Court for the Eastern District of Virginia, and four more (Kargo, Index Exchange, TripleLift, and Sovrn) filed in this Court. After the suits of OpenX, Magnite, PubMatic, and Equativ were transferred to this Court, this Court directed Plaintiffs to file two amended, consolidated complaints. Dkt. No. 1335 at 3. Competitor Plaintiffs subsequently filed the consolidated Group A Complaint (Dkt. No. 1511) and the Group B Complaint (Dkt. No. 1543).

The Group A Complaint asserts five claims: (1) monopolization of the worldwide publisher ad server market in violation of Section 2 (Count I); (2) monopolization of the worldwide ad exchange market in violation of Section 2 (Count II); (3) unlawful tying of AdX real-time bids to DFP in violation of Sections 1 and 2 (Count III); (4) violation of California Unfair Competition Law (Count IV, asserted by PubMatic only); and (5) attempted monopolization of the worldwide and United States ad exchange markets in violation of Section 2 (Count V, asserted by Equativ only). Group A Compl. ¶¶ 458-496. The Group B Complaint asserts a single claim: monopolization of the worldwide and United States ad exchange markets in violation of Section 2. Group B Compl. ¶¶ 266-278.

On March 16, 2026, Google filed a letter-motion seeking leave to file a motion to dismiss particular claims in the consolidated complaints as time-barred and for failure to state a claim. Dkt. No. 1553. Plaintiffs filed a letter-response on March 24, 2026, that maintained that their claims based on two alleged ties, "First Look" and "Last Look," and Project Poirot are timely, but disclaimed any standalone claims based on certain other conduct alleged in the Complaints, including Open Bidding, DFP's use of a waterfall, and the allegation that DFP operates a "black

box." Dkt. No. 1558 ("Pls.' Ltr."). On March 26, 2026, the Court granted Google permission to file this motion to dismiss. Dkt. No. 1562.

## II. LEGAL STANDARD

"Dismissal under Fed. R. Civ. P. 12(b)(6) is appropriate when a defendant raises a statutory bar, such as lack of timeliness, as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015). Though, at the motion-to-dismiss stage, courts "accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor," they do not credit mere "legal conclusions" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Dfinity Found. v. New York Times Co.*, 702 F. Supp. 3d 167, 173 (S.D.N.Y. 2023), *aff'd* 2024 WL 3565762 (2d Cir. July 29, 2024). To survive a motion to dismiss, a plaintiff is still required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In addition, "although factual allegations of a complaint are normally accepted as true on a motion to dismiss, that principle does not apply to general allegations that are contradicted by more specific allegations in the Complaint." *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151-152 (2d Cir. 2014).

## III. ARGUMENT

### A. Competitor Plaintiffs' Claims Based on Conduct that Predates the Statute of Limitations Window Should Be Dismissed.

"A court may dismiss a claim as untimely at the Rule 12(b)(6) stage 'when the complaint shows on its face that the limitations period has run.'" *In re Google Digital Advertising Antitrust Litig.*, ("*MDL II*"), 721 F. Supp. 3d 230, 271 (S.D.N.Y. 2024) (quoting *GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 101 (2d Cir. 2019)). The statute of limitations for federal antitrust

claims bars any action unless brought "within four years after the cause of action accrued." *Higgins v. New York Stock Exch., Inc.*, 942 F.2d 829, 831 (2d Cir. 1991) (quoting 15 U.S.C. § 15b).[12] "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Id.* at 832 (*quoting Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)).

"The Sherman Act's four-year statute of limitations can be equitably tolled in rare and exceptional circumstances." *Litovich v. Bank of Am. Corp.*, 2025 WL 2521039, at *17 (S.D.N.Y. Sept. 2, 2025). Competitor Plaintiffs allege that their claims are equitably tolled by the United States' action because their claims are based on matters the United States alleged in its complaint filed January 24, 2023. Pursuant to 15 U.S.C. § 16(i), which suspends the statute of limitations for the duration of a civil proceeding instituted by the United States, Competitor Plaintiffs assert that claims that accrued on or after January 24, 2019, are timely.

The government action tolling doctrine, as Plaintiffs acknowledge, Group A Compl. ¶¶ 178-179, does not save all their claims, and Google is not moving to dismiss based on conduct that began after January 24, 2019. Under the four-year statute of limitations, Plaintiffs' other claims that are based on earlier conduct pre-dating January 2019 are time-barred unless an additional tolling doctrine applies. Plaintiffs attempt to invoke two more tolling doctrines: continuing violations and fraudulent concealment. Neither doctrine applies to toll these claims.

First, under the "continuing violations" doctrine, the statute of limitations period is restarted only by "a new and independent act that is not merely a reaffirmation of a previous act"; the new and independent act must also inflict "new and accumulating injury on the plaintiff." *US*

[12] PubMatic's California Unfair Competition Law ("UCL") claim, Group A Compl. ¶¶ 480-488, is similarly subject to a four-year statute of limitations, Cal. Bus. & Prof. Code § 17208, and should be dismissed to the extent it is based on time-barred conduct.

*Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68 (2d Cir. 2019). The continuing violation doctrine is "heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances." *Chalmers v. NCAA*, 2025 WL 1225168, at *8 (S.D.N.Y. Apr. 28, 2025).

Second, to invoke fraudulent concealment, a plaintiff must plead with particularity: "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *MDL II*, 721 F. Supp. 3d at 271 (quoting *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988)). To plead the third factor, a plaintiff must allege what investigation it pursued and why that investigation could not, with reasonable diligence, have uncovered the claim within the limitations period. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) (affirming dismissal for failure to plead due diligence).

As explained below, Plaintiffs have failed to sufficiently allege that the continuing violations or fraudulent concealment doctrines toll their claims based on allegations concerning: (1) a tie of AdWords demand to AdX; (2) a tie of AdX real-time bids to DFP; (3) "First Look"; (4) "Last Look"; (5) Project Poirot; and (6) Open Bidding.

#### 1. Claims Based on Alleged Ties of (1) AdWords Demand to AdX and (2) AdX Real-Time Bids to DFP Are Time-Barred.

Competitor Plaintiffs assert that the alleged ties of (1) AdWords to AdX and (2) AdX real-time bids to DFP started in 2009, and harmed Plaintiffs' ability to compete in the relevant markets since 2009. *Supra* pp. 8-9. Claims based on these alleged ties thus accrued long before January 2019. Though Plaintiffs assert an assortment of theories of continuing violations, Plaintiffs do not allege (as they must) any new, independent, and overt act by Google.

First, Plaintiffs argue that Google engages in continuing violations when it "chooses to maintain the ties" and continues to facilitate ad transactions (up to "billions of auctions" "daily") that are subject to the ties. Group A Compl. ¶¶ 181-185; Group B Compl. ¶¶ 261-263. Fatally, this allegation does not state a new and independent overt act. What Plaintiffs describe is Google's maintenance of the same policy, since 2009, that it would not share AdWords demand with competitor exchanges or AdX real-time bids with competitor ad servers. This is "a repeated manifestation of the same overt act," not a "new and independent" act as required to trigger tolling. *MDL II*, 721 F. Supp. 3d at 272-73. "Performance of an alleged illegal contractual tie-in provision does not satisfy the continuing violation requirements." *Witt Co. v. RISO, Inc.*, 948 F. Supp. 2d 1227, 1236-37 (D. Or. 2013) (citing circuit court cases).

Second, allegations that Google continues to "prevent AdWords from submitting the vast majority of bids into non-AdX exchanges" and "continues to prevent rival ad servers from putting RTBs from AdX in competition with RTBs from other ad exchanges" fail to plead new and independent acts after 2009. Group B Compl. ¶¶ 261, 263; Group A Compl. ¶¶ 181, 183. This, too, amounts to Google continuing its long-followed course of not dealing with its competitors; continued manifestations of Google's 2009 decision not to share AdWords demand or AdX real-time bids with its competitors do not restart the statute of limitations period. *Witt*, 948 F. Supp. 2d at 1236-37; *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) (continuing receipt of benefits does not restart limitations period); *Varner v. Peterson Farms*, 371 F.3d 1011, 1019-20 (8th Cir. 2004). Moreover, an "excluded rival" "is injured <u>as soon as the exclusion begins</u>." *CSX Transp., Inc. v. Norfolk S. Railway Co.*, 648 F. Supp. 3d 679, 701-03 (E.D. Va. 2023) (rejecting continuing violations argument based on "key distinction" that "the lone theory of recovery of antitrust damages is that CSX was harmed as <u>a competitor to NSR</u>" (emphasis in

original)); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979) ("the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs").

Third, allegations that Google is "signing up new advertisers for AdWords and subjecting them to the same tying arrangement" or signing up new publishers to DFP "subject to the same tying arrangement," do not allege a new and independent overt act. Group A Compl. ¶¶ 181-185; Group B Compl. ¶¶ 261-263. The Ninth Circuit correctly rejected this line of argument in *SaurikIT, LLC v. Apple, Inc.*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023). There, the plaintiff, an app store competitor to Apple, alleged that it was injured by an Apple warranty term "that requires iOS users to use only the App Store." *Id.* at *1. The plaintiff contended that "Apple engages in an overt act that resets the statute of limitations every time it sells a new iOS device with a warranty agreement" containing the contract term that first came into existence in 2008. *Id.* The Ninth Circuit affirmed the dismissal of the plaintiff's claims as untimely, holding that the plaintiff "does not allege that the term has changed since" 2008, and "thus failed to allege that the new warranty agreements constitute anything more than 'a reiteration or extension of' prior ones." *Id.* The court emphasized that "permitting new unchanged warranty agreements to establish continuing violations would vitiate the purpose of the statute of limitations." *Id.* So too here: Plaintiffs do not allege restrictive changes to the alleged ties made after January 2019, only that Google continued to subject existing and new customers to the ties after that date. Group A Compl. ¶¶ 181-185; Group B Compl. ¶¶ 261-263.

*Connecticut v. Sandoz, Inc.*, 2025 WL 3043397 (D. Conn. Oct. 31, 2025), which Plaintiffs cite in their pre-motion letter response, Dkt. No. 1558 at 5 ("Pls' Ltr."), is inapposite. There, "the pertinent overt act" for a price-fixing conspiracy "was each sale at a supracompetitive price because it was the Defendant's sale—not the alleged underlying act of fixing the price—that

injured the purchaser." *Id.* at *9 (citing *Berkey Photo*, 603 F.2d at 295-96). By contrast, a claim of continuing injury from an alleged ongoing tying arrangement that pre-dates the limitations period stems from conduct outside the limitations period. *Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004) ("When a complaining party was fully aware of the terms of an agreement when it entered into the agreement, an injury occurs only when the agreement is initially imposed; thus, the limitations period typically is not tolled by the requirements placed on the parties under the agreement."). Even if that were not the case, Competitor Plaintiffs are also not like the purchasers in *Sandoz* (or the purchasers in any antitrust case) because they claim injury based on exclusion as a competitor. *Supra* pp. 19-20.

For similar reasons, Competitor Plaintiffs are different from Rumble, whose tying claim was not dismissed by this Court. Rumble was not an "excluded rival" until it "launched its RAC ad server in 2022, which falls within the limitations period." *MDL III*, 2026 WL 91448, at *9.[13] By contrast, according to their allegations, Competitor Plaintiffs have competed with Google and have allegedly been excluded from relevant markets by Google's conduct since long before January 2019. *Supra* §§ I.A, I.B.

Finally, only PubMatic and Equativ make the additional argument that their claim is timely based on the speculative damages exception. The speculative damages exception is for "the rare case in which the damages caused by an antitrust injury are so speculative that a court is unwilling to estimate them." *Higgins v. New York Stock Exch., Inc.*, 942 F.2d 829, 832 (2d Cir. 1991). "Generally, uncertain damages, which prevent recovery, are distinguishable from the uncertain

[13] To the extent the Court held that Rumble had adequately alleged timeliness of the AdX-DFP tie for additional reasons, Google understands that analysis to have been based on Rumble's claim as a <u>customer</u> of Google's ad tech products. *See MDL III*, 2026 WL 91448, at *9 (citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n.15 (1968), which analyzed the claim of a customer seeking to purchase machines from the defendant instead of leasing them); Second Am. Compl., *Rumble v. Google*, No. 24-cv-09904 (S.D.N.Y.), Dkt. No. 55, ¶¶ 19, 94 (alleging that "Rumble has been a customer of Google's ad server since at least 2015").

extent of damage, which does not prevent recovery" and is insufficient to invoke the exception. *Vitale v. Marlborough Gallery*, 1994 WL 654494, at *6 (S.D.N.Y. 1994). PubMatic and Equativ allege no basis for concluding that, had they timely brought suit, their damages "could not be reasonably estimated" by a court. *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 277 (S.D.N.Y. 2015), *aff'd*, 938 F.3d 43 (2d Cir. 2019); *Aurora Enters., Inc. v. Nat'l Broad. Co., Inc.*, 688 F.2d 689, 694 (9th Cir. 1982) (rejecting invocation of speculative damages exception based on "mere uncertainty as to the extent or amount of damage"). Instead, PubMatic and Equativ argue that, had they "attempted to bring suit regarding the ties" in 2013, they "would have had no way to predict the damages that tie would cause many years later." Group A Compl. ¶¶ 357, 390. That argument is unavailing because, had PubMatic and Equativ filed suit earlier "and won equitable relief on the merits," they "would have incurred no future damages." *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 275-76 (8th Cir. 2004) (rejecting plaintiff's argument that, because it "could not forecast future damages" at an earlier time, it could not have brought suit earlier on the basis that plaintiff "could have precluded future damages from occurring" by timely bringing suit).

**2. Claims Based on "First Look" Are Time-Barred.**

Competitor Plaintiffs' claims relating to "First Look" are time-barred. Plaintiffs appear to acknowledge as much: in their pre-motion letter response, no Competitor Plaintiff articulated any basis on which their "First Look" claims would be tolled. The Complaints, too, fail to allege any facts that would make a tolling doctrine apply. Group A Plaintiffs did not allege any facts to support application of any tolling doctrine to their claims related to "First Look."

Group B Plaintiffs allege, summarily (Group B Compl. ¶ 251), that Google fraudulently concealed "First Look." Those allegations fail to plead the elements of fraudulent concealment with the requisite particularity. *Hinds Cnty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520-21

(S.D.N.Y. 2009) (dismissing for failure to plead with particularity); *Koch*, 699 F.3d at 157.

As to concealment (prong one), the Group B Complaint alleges only that Google's "initial release information" for Dynamic Allocation described the entire algorithm as one that "maximizes revenue by enabling publishers to open up their ad space to bids from multiple ad networks." Group B Compl. ¶ 251. Plaintiffs do not allege that it was false that Dynamic Allocation enabled publishers to open up their ad space to bids from multiple ad networks, or that Google's statement explicitly concealed the existence of "First Look." Rather, Plaintiffs complain that the assertion that Dynamic Allocation "maximizes revenue" was "false" because "First Look actually reduced publishers' yields." Group B Compl. ¶ 251. That statement is at best inactionable puffery, and is not sufficient to plead concealment with particularity. *Litovich v. Bank of Am. Corp.*, 2025 WL 2521039, at *17 ("communications to the community at large will not generally support a finding of fraudulent concealment").

With respect to ignorance (prong two), the relevant question is whether plaintiffs were on inquiry notice of their claims. They were. "All that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing." *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 489 (S.D.N.Y. 2017); *131 Main St. Assocs. v. Manko*, 179 F. Supp. 2d 339, 348 (S.D.N.Y. 2002) (courts "equate suspicion with knowledge in the context of fraudulent concealment"). Plaintiffs allege that they, along with others in the industry, collaborated to develop header bidding for the express purpose of mitigating "First Look," which directly conflicts with any notion of Plaintiffs being kept in the dark about "First Look." Group B Compl. ¶¶ 146-147 ("disruptive innovation found a way to partially solve the problem" of "First Look" "by mitigating the effects of Google's self-preferencing of AdX"), 157 (referring to Index Exchange's header bidding tool as "a means of overcoming AdX's First Look

advantage"); *see also* Group A Compl. ¶¶ 65-66, 72-73, 239-240. These allegations, which describe Plaintiffs' vigorous competition with Google, establish that Plaintiffs were on inquiry notice of "First Look" and its competitive effects by no later than 2013 or 2014. *Koch*, 699 F.3d at 155 (when "circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry . . . knowledge of the fraud will be imputed to him"); *see also Koulkina v. City of New York,* 559 F. Supp. 2d 300, 329-30 (S.D.N.Y. 2008) (rejecting allegations "contradicted by other matters asserted or relied upon or incorporated by reference").

As to diligence (prong three), even had Plaintiffs adequately alleged lack of notice, the complaints fail to plead any facts showing that Plaintiffs' "continuing ignorance" of their claims based on "First Look" "was not due to the lack of diligence." *Masters v. Wilhelmina Model Agency, Inc.*, 2003 WL 1990262, at *1-*2 (S.D.N.Y. Apr. 29, 2003) (dismissing for failure to plead due diligence where "plaintiffs make no allegations of the inquiries, if any, they made, when such inquiries were made, to whom those inquiries were directed, what those inquiries were in regard to, and what response was obtained").

**3. Claims Based on "Last Look" Are Time-Barred.**

Competitor Plaintiffs invoke the continuing violations doctrine to argue their "Last Look" claims are tolled, again pointing to the fact that Google continued to run auctions subject to "Last Look" until May 2019 (when "Last Look" ended). Pls.' Ltr. at 5. But here, too, running additional auctions subject to "Last Look" did not constitute "new and independent acts," but "a repeated manifestation of the same overt act." *MDL II*, 721 F. Supp. 3d at 272-73. This Court previously analyzed the timeliness of claims relating to line-item caps in the same way: after the enforcement of line-item caps "went into effect" in 2017, the statute of limitations period did not restart each time that Google subsequently ran an auction subject to the line-item cap. *Id.*; *see also Yelp v.*

*Google LLC*, 2025 WL 2978394, at *7 (N.D. Cal. Oct. 22, 2025) (Plaintiffs' cited case reaffirming that "to allow Yelp to state" "that, every time a user uses Google to search" subject to certain algorithms, "a new violation occurs, would effectively swallow the statute of limitations rule").

Plaintiffs' reliance on Project Poirot and Sell-Side Dynamic Revenue Share ("SSDRS") as continuing violations of "Last Look" also fails, as both are distinct from "Last Look" and were implemented before January 2019. *Supra* pp. 11-13 (Poirot began in 2017); Group A Compl. ¶¶ 82, 195 (SSDRS began in 2014); Group B Compl. ¶ 229 (SSDRS "publicly disclosed" in 2016).

Additionally, as with "First Look," only Group B Plaintiffs appear to allege that fraudulent concealment tolls claims based on "Last Look," Group B Compl. ¶ 252, but Group B Plaintiffs abandoned that allegation in their pre-motion letter response—for good reason. Group B Plaintiffs do not plead with particularity the elements of fraudulent concealment. *Hinds*, 620 F. Supp. 2d at 520-21. As to concealment (prong one), Group B Plaintiffs allege only that "the concept of Google's "Last Look" advantage was not disclosed publicly until after Google had ceased employing it" and that "full details" were unknown publicly prior to the United States' lawsuit. Group B Compl. ¶ 252. Group B Plaintiffs do not identify any affirmative misrepresentation by Google or any specific act of concealment, as is required. *E.g.*, *MDL II*, 721 F. Supp. 3d at 271; *Butala v. Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996) (no fraudulent concealment where plaintiffs "merely state in a conclusory fashion that the defendants' fraud was self-concealing" and did not sufficiently plead "the defendants took affirmative steps to conceal their fraud").

Nor does the Group B Complaint sufficiently plead Plaintiffs' ignorance of their claims based on "Last Look" (prong two). Competitor Plaintiffs were on inquiry notice before January 2019, including because they saw in real time that publishers using header bidding "had to inject the winning bid from that header-bidding auction into DFP as a price floor." Group B Compl. ¶¶

162-164. And even had they alleged their ignorance of "Last Look," Group B Plaintiffs have made only generalized allegations that they exercised diligence that are insufficient to plead with particularity that they diligently investigated their claims (prong three). *See id.* ¶¶ 252, 258; *Hinds*, 620 F. Supp. 2d at 522 ("a brief reference to 'reasonable diligence,' coupled with general allegations of secrecy and deception," is insufficient to plead diligence prong).

**4. Claims Based on Project Poirot Are Time-Barred.**

Competitor Plaintiffs invoke fraudulent concealment to toll claims based on Project Poirot, but their Complaints fail to allege with particularity the elements of fraudulent concealment.

First, the Complaints do not adequately allege concealment, as they do not identify with particularity <u>any</u> specific false statement on which a Plaintiff relied or details explaining any purported omission. *MDL II*, 721 F. Supp. 3d at 271 (complaint must allege "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through fraud"). The Group B Complaint makes no non-conclusory allegations to satisfy the concealment element.[14] The Group A Complaint alleges generalized concealment of Poirot through "gradual" ramp-up of bid-shading (Group A Compl. ¶ 198) and Google's failure to disclose Poirot's mechanics (*id.* ¶¶ 199-204), but still fails to identify with particularity any specific false statement or omission by any Google employee to any particular Plaintiff on which that Plaintiff relied.[15]

[14] The Group B Complaint alleges only in conclusory terms that Google "concealed [Poirot] even from its impacted customers," Group B Compl. ¶¶ 175, 182, without identifying any Google speaker, any specific statement to any Group B Plaintiff, or reliance by any Plaintiff. *MDL II*, 721 F. Supp. 3d at 271.

[15] Plaintiffs allege Google gave them pretextual explanations for the decline in DV360 bids (such as GDPR, ads.txt, and AdSpam filtration, Group A Compl. ¶¶ 200, 203), but the Complaint does not allege that any Plaintiff relied on those explanations; to the contrary, Plaintiffs characterized Google's responses as "terse, inconsistent," "vague," and as statements that "made no sense," Group A Compl. ¶¶ 200-204. *MDL II*, 721 F. Supp. 3d at 271 (Rule 9(b) requires alleging "the manner in which" the omission "misled the plaintiff.").

Second, the Complaints do not adequately allege ignorance; they allege the opposite. Plaintiffs are sophisticated ad tech competitors who, according to their own allegations, quickly detected and analyzed the effects of Project Poirot in 2017 and 2018. *Supra* pp. 11-13.[16] Plaintiffs so suspected that Google had engaged in wrongdoing that, contemporaneously, they implemented technological solutions to investigate that wrongdoing, and repeatedly confronted Google about the decline in DV360 spending. *Supra* pp. 11-13. Plaintiffs thus acknowledge that the effects of Poirot could have been (and were) detected from Plaintiffs' own data. Group A Compl. ¶¶ 198-203; Group B Compl. ¶¶ 181-182. With this "multiplicity and specificity" of information, Plaintiffs were not ignorant of their claims. *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 178-79 (4th Cir. 2007); *Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105, 117 (S.D.N.Y. 2011) (rejecting fraudulent concealment where "Plaintiff has pled no facts to allege that he did not have enough information to sue before 2004").

As this Court has reasoned, the relevant significant fact for purposes of whether a plaintiff was ignorant of its claim is that Competitor Plaintiffs were "able to readily observe its anticompetitive effects." *MDL I*, 627 F. Supp. 3d at 406-07. That distinguishes Competitor Plaintiffs from the Court's motion-to-dismiss decision concerning publisher plaintiff Gannett. As the Court wrote, Gannett sufficiently pleaded it was ignorant of its claim based on enhanced dynamic allocation ("EDA") because "the <u>anticompetitive effects</u> of EDA were not known by affected publishers. . . . Given the secretive nature of EDA's implementation and the alleged unwillingness of Google to disclose sales data," Gannett did not have "information that could have alerted Gannett to EDA's <u>anticompetitive effects</u>." *MDL II*, 721 F. Supp. 3d at 271-72; *see also*

[16] Plaintiffs also allege that Google concealed Poirot by "gradually" increasing the magnitude of Poirot's bid shading, Group A Compl. ¶ 198; Group B Compl. ¶ 254, but do not dispute that they were nonetheless able to observe noticeable and sudden decreases caused by Poirot.

*MDL III*, 2026 WL 91448, at *9.[17] Here, Competitor Plaintiffs were immediately on notice of any harm to them caused by Poirot.

Further, Plaintiffs argue that even if they suspected Google's wrongdoing, they were not on sufficient notice that it was "probable that Google had engaged in wrongdoing," including because they were allegedly "unable to determine the cause of declined DV360 spend on their exchanges." Pls.' Ltr. at 7. Inquiry notice does not require that Plaintiffs know the precise scope of their claims, such as the details of how Google implemented its conduct. For example, in *In re Interest Rate Swaps Antitrust Litigation*, 261 F. Supp. 3d 430, 489 (S.D.N.Y. 2017), the court explained in granting a motion to dismiss that "plaintiffs' express claim as to this period is that the failure of the IRS market to move towards all-to-all anonymous exchange trading in this period was unnatural and contrary to expectations, suggesting conspiratorial manipulation," so that "class plaintiffs had every basis, in real time, to smell a rat. At a minimum, they were on inquiry notice."

Competitor Plaintiffs' reliance on *Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592 (2d Cir. 2024), highlights that they were on inquiry notice. In *Phhhoto*, a competitor to Meta alleged that Meta actively misled the plaintiff and the public about an algorithmic change that had the alleged effect of suppressing Phhhoto's content on Instagram. *Id*. at 605-06. Phhhoto made numerous allegations about acts of alleged active concealment by Meta that kept Phhhoto in ignorance of the algorithm's anticompetitive effects. *Id.* at 607-09 (Meta exchanged emails showing "a sincere interest in the companies' continued collaboration"; "offered plausible, non-exclusionary justifications for some of its adverse acts"; and issued a press release suggesting Meta's change was "implemented for reasons of efficiency and consumer satisfaction"—all of

[17] Unlike in Plaintiffs' cited case, *In re GSE Bonds Antitrust Litigation*, 396 F. Supp. 3d 354, 367-68 (S.D.N.Y. 2019), Competitor Plaintiffs do not allege that they needed to "conduct exhaustive statistical analysis" to detect Poirot's effects—as Plaintiffs allege, they observed the effects in real time.

which "lowered the probability that Meta's acts were anticompetitive"). Plaintiffs make no such allegations here. For example, they do not identify any statements by Google that misled them into believing alternative reasons for the decreases in DV360 bidding. If anything, Plaintiffs complain that, in response to their inquiries about Poirot, Google was "terse, inconsistent," "vague," "silent for weeks," "simply ignoring" Competitor Plaintiffs, and offered an explanation that "made no sense." Group A Compl. ¶¶ 200-204.[18]

Competitor Plaintiffs' claims also are not saved by the continuing violations doctrine. In their pre-motion letter response, Plaintiffs invoke the continuing violations doctrine to urge tolling, pointing to the fact that Google made a single "post-2019 modification to Poirot's mechanisms." Pls.' Ltr. at 5-6. Only the Group A Complaint contains any allegation about the alleged post-2019 modification, and even then just barely: "after September 2019," Google purportedly "adopted a 'risk aversion' factor within Project Poirot's algorithm that further increased AdX's win rate at the expense of rival exchanges." Group A Compl. ¶ 188. Even taking that allegation as true, the alleged modification resembles a "fine-tuning," "refinement," or "progression" of the Poirot algorithm, which would not restart the statute of limitations. *Yelp*, 2025 WL 2978394, at *7-*8 (rejecting continuing violation based solely on mere "algorithm-tweaking that reaffirms Google's (alleged) prior acts"). As to Group B Plaintiffs, their Poirot claims cannot be saved by an argument made for the first time in a pre-motion letter response and not in their complaint.[19]

---

[18] As to the third prong, diligence, Group B Plaintiffs and Equativ make no specific factual allegations relating to their diligence. *See* Group A Compl. ¶¶ 198-204; Group B Compl. ¶ 254. The other Plaintiffs had sufficient notice of their Project Poirot claims, making any efforts to allege diligence irrelevant. *See Interest Rate Swaps*, 261 F. Supp. 3d at 490 (where other elements of fraudulent concealment resolved in defendants' favor, court need not reach whether diligence was sufficiently alleged).

[19] Only Equativ additionally argues that the speculative damages exception applies because "Project Poirot's mechanisms and impacts were so complex and ineffable" that Equativ could not "begin to evaluate and quantify the harm it suffered" until years later. Group A Compl. ¶¶ 402-403. But Equativ has not alleged facts showing that its damages from Poirot were "so speculative that a court is unwilling to estimate them." *Higgins*, 942 F.2d at 832. If anything, other Competitor Plaintiffs allege that they observed and quantified the effects of Poirot. *Supra* pp. 11-13.

**5. Claims Based on Open Bidding Are Time-Barred.**

Open Bidding was publicly launched in 2018. *Supra* p.13. PubMatic, Equativ, Index Exchange, Kargo, and Sovrn (the only Competitor Plaintiffs to assert standalone claims based on Open Bidding) make no attempt to allege facts to plead continuing violations specific to Open Bidding or that Google fraudulently concealed Open Bidding. And Plaintiffs' pre-motion letter response does not argue that either tolling doctrine applies to Open Bidding. Claims based on Open Bidding are time-barred.

**6. Plaintiffs Cannot Combine All of Their Allegations into One Purported Continuing Violation.**

Competitor Plaintiffs cannot salvage their time-barred claims by sweeping all of Google's alleged conduct into one decade-long "continuing violation." Pls.' Ltr. at 4. According to Plaintiffs, all programs "made to achieve the same result—eliminate competition"—are part of one continuing violation. Group A Compl. ¶ 193; Group B Compl. ¶¶ 264-265. Under Plaintiffs' reasoning, so long as any conduct occurred during the limitations window, all claims based on prior, time-barred anticompetitive acts would be timely. That is not the law. Plaintiffs' approach would enable antitrust plaintiffs to routinely circumvent the statute of limitations by asserting that historical conduct was part of the same anticompetitive scheme as more recent conduct.

As the Supreme Court stated, in "antitrust cases, the plaintiff cannot use an <u>independent</u>, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997). Courts, including this Court, have therefore parsed the timeliness of antitrust claims separately and for each distinct act, including in monopolization cases like this one. *E.g.*, *MDL II*, 721 F. Supp. 3d at 270-73 (this Court analyzing timeliness of EDA and line item caps separately despite allegation they were part of Google's overarching scheme); *MDL III*, 2026 WL 91448, at *9

(analyzing timeliness for Dynamic Allocation and SSDRS separate from the tie between AdX and DFP); *Applera Corp. v. MJ Research, Inc.*, 349 F. Supp. 2d 338, 351-353 (D. Conn. 2004) (separately analyzing timeliness of pre-1994 tie and post-1994 activity); *CSX Transp.*, 648 F. Supp. 3d at 697-98 (applying the "anti-bootstrapping rule in *Klehr*"); *Helena World Chron., LLC v. Google LLC*, 2026 WL 787882, at *17 (D.D.C. Mar. 20, 2026) (post-acquisition acts "are not continuing violations of the acquisition").

These cases show that a later act restarts the limitations period for a time-barred claim only if it is a continuing violation, not a mere "reaffirmation of a previous act" or entirely separate conduct. *US Airways*, 938 F.3d at 68; *Klehr*, 521 U.S. at 189; *Applera*, 349 F. Supp. 2d at 352-53 & n.16 (conduct starting in 1994 analyzed separately from pre-1994 licensing tie, and pre-1994 conduct could not "prove the existence of post–1994 exclusionary conduct" even where both acts supported the same monopolization theory). That is why, in *CSX*, the court refused to allow the plaintiff to use "a single act illustrating the continuance of the conspiracy or monopoly during the limitations period to broadly restart the limitations period." 648 F. Supp. 3d at 697. In *Helena*, post-acquisition acts were deemed "independent violations of other antitrust laws" rather than continuing violations of the original acquisition. 2026 WL 787882, at *17 ("The consequences of the acquisition alone cannot constitute the continuing violations of such acquisition.").

Plaintiffs' cited case, *Yelp v. Google*, Pls.' Ltr. at 4 n.3, 6, does not support their maximalist argument. In *Yelp*, the court assessed continuing violations allegations relating to a single tying claim, not (as here) multiple alleged anticompetitive acts supporting a monopolization claim. The court found that the three acts identified by Yelp were continuing violations of the alleged tie because each was a "'new and independent act' that inflicts 'new and accumulating injury'" "<u>related to tying</u>." *Yelp*, 2025 WL 2978394, at *7-*8 (rejecting argument that the three acts were

"not alleged to increase the degree to which users were coerced" into the tie). In contrast, the court found that other acts for which Yelp made "no allegations as to how" they "impacted Yelp's tying claim" did not restart the statute of limitations for the tie. *Id.* at *8.

Here, Plaintiffs make no allegation as to how each subsequent act they challenge reinforced the only tying claim they bring.[20] Neither Complaint alleges that any acts altered the terms or mechanics of either tie,[21] as in *Yelp*. *Yelp*, 2025 WL 2978394, at *8 (continuing violations where there were "actions to expand its pre-existing contract, not merely providing the same product in an unchanged manner" or actions to make the tying mechanism "more effective" (emphasis in original)). All Plaintiffs do is allege generally that each anticompetitive act was part of one scheme, which is not sufficient.

Moreover, Plaintiffs could not allege that Google's other acts reinforced the tying claim, as their numerous allegations of purported anticompetitive effects show the other challenged conduct had nothing to do with increasing the coercion of the tie. Just the opposite: Plaintiffs allege that First Look, Last Look, SSDRS, and UPR allegedly coerced publishers to use AdX, not—as their only tying claim alleges—that AdX users were coerced to use DFP. *E.g.*, Group A Compl. ¶¶ 215-217, 218, 225; Group B Compl. ¶¶ 76, 165, 174, 194. And Project Poirot concerned an entirely different product, DV360, that is not a part of either alleged tie. Group A Compl. ¶ 246; Group B Compl. ¶ 175.

---

[20] As noted, only the Group A Complaint contains a distinct legal tying claim regarding the alleged "tying of AdX and Google's Ad Server." Group A Compl. ¶ 476. Group A and Group B Plaintiffs' allegations concerning the AdWords-AdX tie are not independent legal claims, but instead describe one of several alleged anticompetitive acts underlying their monopolization claims. Group A Compl. ¶¶ 462, 471, 492 (Equativ only); Group B Compl. ¶ 270.

[21] *See* Group A Compl. ¶¶ 8 ("First Look" as "a right of first refusal" within DFP auctions), 80 (Last Look as a "last chance to outbid" header-bidding auction winners), 220; Group B Compl. ¶¶ 175, 180 (Project Poirot as a bid-shading algorithm inside DV360, separate from DFP and AdX), 264 (alleging that each of the alleged acts "built on each other to exploit Google's monopoly power and compound harm").

**B. Competitor Plaintiffs' Claims Based on Open Bidding Should Be Dismissed for Failure to State a Claim.**

OpenX and Magnite do not join other Plaintiffs in basing their claims on Open Bidding. For good reason. This Court dismissed a similar claim by state plaintiffs in 2022 because they did not "describe the anticompetitive effect, if any, that Exchange Bidding has had on the popularity or profitability of header bidding." *MDL I*, 627 F. Supp. 3d at 395; *see also MDL II*, 721 F. Supp. 3d at 264-65, 268-69 (dismissing claims based on Open Bidding brought by Daily Mail and Gannett for similar reasons). Under this Court's prior rulings, the claims of PubMatic, Equativ, and Group B Plaintiffs based on Open Bidding should be dismissed.

In their pre-motion letter response, these Plaintiffs changed course and asserted that they "do not bring a standalone claim on the basis of Google's Open Bidding." Pls.' Ltr. at 8.[22] At the same time, however, Competitor Plaintiffs contradicted themselves by continuing to argue that Open Bidding was "one of the many methods by which Google attempted and achieved its monopolies of the ad server and ad exchange markets." *Id.* Plaintiffs cannot have it both ways. Any continued attempt to bring claims based on Open Bidding should be dismissed.

This Court's holding in dismissing the state plaintiffs' claims on Open Bidding applies here. *MDL I*, 627 F. Supp. 3d at 395 (citing as insufficient and "conclusory" allegations that "Exchange Bidding is exclusionary and successfully forecloses competition" and "substantially suppressed the adoption and growth of header bidding"). As the Court noted, "if a non-Google exchange, which presumably would be sophisticated in the nature and operation of an ad exchange, chose to participate in Exchange Bidding, this benefitted publishers, the non-Google ad exchange,

[22] Consistent with the Court's prior order, to the extent that Plaintiffs do not allege that Open Bidding "amounts to distinct and separately actionable anticompetitive conduct," but instead describe Open Bidding in order to make "appropriate factual allegations in the context of" other "actionable claims," Google is not moving to dismiss those mere factual allegations. *MDL III*, 2026 WL 91448, at *8.

and the users of the non-Google exchange." *Id.* at 394. Similarly, in dismissing the Daily Mail's claim based on Open Bidding, the Court held that the continued use of header bidding by that publisher "belied" any allegation that it had been coerced by Google into using Open Bidding. *MDL II*, 721 F. Supp. 3d at 264-65. Plaintiffs' allegations relating to Open Bidding suffer from the same deficiencies. Competitor Plaintiffs make only conclusory allegations of anticompetitive effect. *See* Group A Compl. ¶ 132; Group B Compl. ¶ 190. Notably absent from the Complaints is any specific factual allegation describing the purported "anticompetitive effect" Open Bidding had on the popularity or profitability of header bidding.

Consistent with prior plaintiffs' complaints, Plaintiffs' allegations suggest the opposite: header bidding has remained popular. Group A Compl. ¶¶ 72, 74 ("header bidding's success" was a "meaningful competitive threat to Google's dominance"), 241 ("header bidding technology was quickly adopted by the vast majority of publishers"); Group B Compl. ¶¶ 152 (header bidding "grew in popularity and importance over the following years"), 162 (header bidding became "widely adopted"). "Today, nearly every major industry participant is a member of Prebid"—an industry-wide open-source header bidding project that Google is not part of—"including exchanges, DSPs, and publishers." Group A Compl. ¶ 77.

**C. Group B Plaintiffs' Claims Relating to Google's Use of the Waterfall and Alleged Refusal to Share Proprietary Information with Its Competitors Should Be Dismissed for Failure To State a Claim.**

The Group B Complaint alleges that Google "unlawfully protected and further exploited its monopoly power" by "maintaining DFP's use of a waterfall"; "maintaining black-box secrecy over the logic used by DFP"; "refusing to share first-party data about users" "with publishers or competitor exchanges"; and "refusing to share data generated by the enormous volume of advertising transactions" with competitors. Group B Compl. ¶ 244(v)-(viii). In their pre-motion letter response, Group B Plaintiffs again appear to disclaim any intent to bring standalone claims

based on that conduct. Pls.' Ltr. at 8 (these acts are not included among "the anticompetitive acts" supporting their monopolization claim, citing Group B Compl. ¶ 270).

To the extent Plaintiffs seek to bring standalone claims based on the above acts, they must be dismissed as time-barred. The relevant acts began in 2008, after Google acquired DoubleClick. Group B Compl. ¶¶ 60-62, 66, 70, 82, 85-86. Plaintiffs do not allege that any tolling doctrine applies, and seemingly acknowledge in their letter-response that these acts "cannot give rise to liability because of a statute of limitations." Pls.' Ltr. at 8.

Allegations based on this conduct also fail to state a claim. Claims based on Google's decision not to share its own data or the inner workings of its own algorithms with competitors fail to allege exclusionary conduct because they challenge lawful refusals to deal. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.) (a firm has "no duty to share (or continue to share) its intellectual or physical property with a rival"); *see also MDL I*, 627 F. Supp. 3d at 382-83 (dismissing allegations that "Google's refusal to share unencrypted user IDs amounted to anticompetitive conduct" because "the Supreme Court has warned against a reading of section 2 that would require a monopolist to provide information or assistance to its competitors"). And Plaintiffs have not alleged that Google "terminated any prior course of dealing—the sole exception to the broad right of a firm to refuse to deal with its competitors." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007).

Dated: April 29, 2026

Respectfully submitted,

/s/ *Martha L. Goodman*

Martha L. Goodman (MG5624)
Jeannie S. Rhee (*PHV forthcoming*)
Karen L. Dunn (*PHV forthcoming*)
William A. Isaacson (*PHV forthcoming*)
Jessica E. Phillips (*PHV forthcoming*)
Amy J. Mauser (*PHV forthcoming*)
**DUNN ISAACSON RHEE LLP**
401 Ninth Street, NW
Washington, DC 20004
Telephone: (202) 240-2900
mgoodman@dirllp.com
jrhee@dirllp.com
kdunn@dirllp.com
wisaacson@dirllp.com
jphillips@dirllp.com
amauser@dirllp.com

Erin J. Morgan (EM1694)
**DUNN ISAACSON RHEE LLP**
11 Park Place
New York, NY 10007
Telephone: (202) 240-2900
emorgan@dirllp.com

Bradley D. Justus
Allison M. Vissichelli
**AXINN, VELTROP & HARKRIDER LLP**
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 469-3532
bjustus@axinn.com
avissichelli@axinn.com

*Attorneys for Defendants Google LLC and Alphabet Inc.*