**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | Case No. 1:21-md-3010 (PKC) |

*This Document Relates To*:

| | |
|---|---|
| OPENX TECHNOLOGIES, INC., and OPENX LTD.,<br><br>*Plaintiff,*<br><br>v.<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>*Defendants.* | Case No. 1:25-cv-10817 (PKC) |
| MAGNITE, INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>GOOGLE LLC and ALPHABET, INC.,<br><br>*Defendants.* | Case No. 1:25-cv-10818 (PKC) |
| PUBMATIC, INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>*Defendants.* | Case No. 1:25-cv-10819 (PKC) |

EQUATIV SAS, EQUATIV INC., SHARETHROUGH INC., and SHARETHROUGH USA, INC.,

*Plaintiffs,*

v.

GOOGLE LLC and ALPHABET INC.,

*Defendants.*

Case No. 1:26-cv-00140 (PKC)

INDEX EXCHANGE INC.,

*Plaintiff,*

v.

GOOGLE LLC,

*Defendant.*

Case No. 1:25-cv-10477 (PKC)

KARGO GLOBAL LLC,

*Plaintiff,*

v.

GOOGLE LLC,

*Defendant.*

Case No. 1:25-cv-10630 (PKC)

SOVRN HOLDINGS, INC.,

*Plaintiff,*

v.

GOOGLE LLC and ALPHABET INC.,

*Defendants.*

Case No. 1:26-cv-1587 (PKC)

TRUSTX DIGITAL ADVERTISING
SERVICES, INC., P.B.C.,

*Plaintiff,*

v.

GOOGLE LLC and ALPHABET INC.,

*Defendants.*

Case No. 1:26-cv-3135 (PKC)

## COMPETITOR PLAINTIFFS' OPPOSITION TO DEFENDANTS GOOGLE LLC AND ALPHABET INC.'S MOTION TO DISMISS

## TABLE OF CONTENTS

Page

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................5

I.       Plaintiffs Are Independent Ad Tech Companies That Compete with Google. .......5

II.      Google Has Conducted an Ongoing, Evolving Campaign of Anticompetitive
         Conduct.....................................................................................................................6

         A.       Google's Tying of AdWords Demand to AdX...........................................6

         B.       Google's Tying of AdX to DFP. .................................................................7

         C.       Google Reinforces Ties Through Auction Manipulation Practices ............7

                  i.       Dynamic Allocation, First Look, and Last Look............................7

                  ii.      Project Bernanke and Sell-Side Dynamic Revenue Share. .............8

                  iii.     Project Poirot....................................................................................9

                  iv.      Open Bidding...................................................................................10

                  v.       Unified Pricing Rules. ...................................................................11

LEGAL STANDARD .......................................................................................................11

ARGUMENT ....................................................................................................................12

I.       Plaintiffs' Claims Are Timely. ..............................................................................12

         A.       The Continuing-Violation Doctrine Applies. ..........................................13

                  i.       Google's Challenged Conduct Is Unilateral, Ongoing,
                           and Subject to Change by Google at Any Time. ..........................15

                  ii.      Google Has Repeatedly Reinforced and Modified Its
                           Anticompetitive Scheme Through New Overt Acts
                           Within the Limitations Period. ......................................................17

                  iii.     Google Has Continuously Enrolled New Publishers and
                           Advertisers Under the Same Tying Restrictions During
                           the Limitations Period. ..................................................................19

**TABLE OF CONTENTS (cont.)**

**Page**

B.     Plaintiffs' Monopolization Claims Are Timely Because Google Fraudulently Concealed Project Poirot.........................................................20

     i.     Google Concealed Project Poirot. .................................................21

     ii.     Plaintiffs Have Adequately Pled Lack of Notice...........................24

     iii.     Plaintiffs Have Adequately Pled Reasonable Diligence................26

C.     Google's Statute-of-Limitations Arguments Fundamentally Mischaracterize Plaintiffs' Allegations. .....................................................28

D.     PubMatic's and Equativ's Claims Are Independently Tolled by the Speculative-Damages Doctrine. ...............................................................29

II.     Plaintiffs' Open Bidding Allegations Should Not Be Dismissed.........................31

III.     Group B Plaintiffs' Claim Is Not Based on the References to the Waterfall and Refusal to Share Data and Thus There Is Nothing to Dismiss. .............................34

CONCLUSION ...............................................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...........................................................................................................11

*Aurora Enters., Inc. v. Nat'l Broad. Co.*,
688 F.2d 689 (9th Cir. 1982) ............................................................................................31

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) .........................................................................4, 28, 32, 35

*Cardwell v. Davis Polk & Wardwell LLP*,
2020 WL 6274826 (S.D.N.Y. Oct. 24, 2020).................................................................12

*Chalmers v. Nat'l Collegiate Athletic Ass'n*,
2025 WL 3628416 (2d Cir. Dec. 15, 2025).....................................................................13

*Columbia Steel Casting Co. v. Portland General Electric Co.*,
111 F.3d 1427 (9th Cir. 1996).........................................................................................15

*Connecticut v. Sandoz, Inc.*,
2025 WL 3043397 (D. Conn. Oct. 31, 2025)...............................................................3, 19

*CSX Transportation, Inc. v. Norfolk Southern Railway Co.*,
648 F. Supp. 3d 679 (E.D. Va. 2023), *aff'd*, 114 F.4th 280 (4th Cir. 2024) ...........................16

*Dodds v. Cigna Secs., Inc.*,
12 F.3d 346 (2d Cir. 1993) ..............................................................................................24

*In re Google Digital Advert. Antitrust Litig.* (*"MDL I"*),
627 F. Supp. 3d 346 (S.D.N.Y. 2022) ......................................................................*passim*

*In re Google Digital Advert. Antitrust Litig.* (*"MDL II"*),
721 F. Supp. 3d 230 (S.D.N.Y. 2024) ......................................................................*passim*

*In re Google Digital Advert. Antitrust Litig.* (*"Rumble"*),
2026 WL 91448 (S.D.N.Y. Jan. 13, 2026)................................................................*passim*

*In re GSE Bonds Antitrust Litig.*,
396 F. Supp. 3d 354 (S.D.N.Y. 2019) ........................................................................26, 27

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

**Cases**

*Hennegan v. Pacifico Creative Serv., Inc.*,
   787 F.2d 1299 (9th Cir. 1986) ....................................................................2, 15, 19

*Higgins v. N.Y. Stock Exch., Inc.*,
   942 F.2d 829 (2d Cir. 1991) .................................................................................31

*Imperial Point Colonnades Condo., Inc. v. Mangurian*,
   549 F.2d 1029 (5th Cir. 1977)..............................................................................13

*In re Int. Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017) ..................................................................25

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) .......................................................................................13, 14

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012)...........................................................................24, 25

*M.G. v. New York City Dep't of Educ.*,
   15 F. Supp. 3d 296 (S.D.N.Y. 2014) ....................................................................11

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
   392 F.3d 265 (8th Cir. 2004)................................................................................31

*In re Nine W. Shoes Antitrust Litig.*,
   80 F. Supp. 2d 181 (S.D.N.Y. 2000) ..............................................................26, 27

*Peretti v. Authentic Brands Grp. LLC*,
   33 F.4th 131 (2d Cir. 2022)..................................................................................11

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*,
   530 F. Supp. 3d 301 (S.D.N.Y. 2021) .............................................................28, 35

*Phhhoto Inc. v. Meta Platforms, Inc.*,
   123 F.4th 592 (2d Cir. 2024).........................................................................*passim*

*Reid Bros. Logging Co. v. Ketchikan Pulp Co.*,
   699 F.2d 1292 (9th Cir. 1983)..............................................................................35

*Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.*,
   708 F. Supp. 2d 257 (E.D.N.Y. 2010)....................................................4, 29, 30, 31

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

**Cases**

*SaurikIT, LLC v. Apple, Inc.*,
    2023 WL 8946200 (9th Cir. Dec. 28, 2023)..........................................................................16

*In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*,
    2022 WL 2438934 (D. Del. July 5, 2022).............................................................................20

*Sewell v. Bernardin*,
    795 F.3d 337 (2d Cir. 2015) ................................................................................................11

*Sonterra Capital Master Fund, LTD. v. Barclays Bank PLC*,
    366 F. Supp. 3d 516 (S.D.N.Y. 2018) .................................................................................12

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008) ................................................................................................24

*State of N.Y. v. Hendrickson Bros.*,
    840 F.2d 1065 (2d Cir. 1988) ..................................................................................20, 23, 26

*US Airways, Inc. v. Sabre Holdings Corp.*,
    105 F. Supp. 3d 265 (S.D.N.Y. 2015), *aff'd*, 938 F.3d 43 (2d Cir. 2019)..............................31

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ......................................................................................13, 17, 19

*United States v. Google LLC* (*"EDVA Op."*),
    778 F. Supp. 3d 797 (E.D. Va. 2025) ...........................................................................*passim*

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)........................................................................................32, 33

*Varner v. Peterson Farms*,
    371 F.3d 1011 (8th Cir. 2004) ..............................................................................................2, 20

*Vitale v. Marlborough Gallery*,
    1994 WL 654494 (S.D.N.Y. July 5, 1994)..........................................................................31

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ..................................................................................................17

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

**Cases**

*Witt Co. v. RISO, Inc.*,
   948 F. Supp. 2d 1227 (D. Or. 2013) ......................................................................................20

*Yelp Inc. v. Google LLC*,
   2025 WL 2978394 (N.D. Cal. Oct. 22, 2025) ...................................................................2, 17

**Other Authorities**

Rule 12(b)(6) ...............................................................................................................................11

**INTRODUCTION**

These cases are the fourth time this Court has been asked to apply the same statute-of-limitations doctrines to the same anticompetitive conduct by the same defendant. The Court has already rejected the very arguments Google repackages here, and it should do so again. *See In re Google Digital Advert. Antitrust Litig.* (*"MDL I"*), 627 F. Supp. 3d 346, 405–07 (S.D.N.Y. 2022); *In re Google Digital Advert. Antitrust Litig.* (*"MDL II"*), 721 F. Supp. 3d 230, 270–73 (S.D.N.Y. 2024); *In re Google Digital Advert. Antitrust Litig.* (*"Rumble"*), 2026 WL 91448, at *9 (S.D.N.Y. Jan. 13, 2026). Google offers no reason to depart from those rulings.

Last year, Judge Brinkema found the heart of Google's monopolization scheme unlawful, including Google's tying scheme at issue here. *See United States v. Google LLC* (*"EDVA Op."*), 778 F. Supp. 3d 797, 810, 862–71 (E.D. Va. 2025). In that case, Google—represented by the same counsel—did not argue beyond its Answer that the Government's claims were time-barred. And Google continues to maintain its unlawful ties today, continues to deploy auction-manipulation programs that reinforce them, continues to coerce new publishers and advertisers under the same anticompetitive conduct, and thus continues to frustrate Competitor Plaintiffs' (hereinafter, "Plaintiffs") efforts to compete in the markets for ad exchanges and publisher ad servers. Plaintiffs' claims based on Google's ongoing anticompetitive conduct are timely for multiple independent reasons, and Google's arguments that Plaintiffs have failed to state a claim are without merit.

*First*, the continuing-violation doctrine applies. The Court already has ruled that the "DFP-AdX product tie is an act that 'inflicted continuing and accumulating harm.'" *Rumble*, 2026 WL 91448, at *9. Google's anticompetitive programs are unilateral, ongoing, and subject to change by Google at any time. Google admits in its own internal documents that it can "change the conditions of [its] offer suddenly and unilaterally" (Grp. A Compl. ¶ 185)—an admission that distinguishes

1

Google's authorities, which uniformly involve the implementation of bilateral contracts or static policies whose terms could not be or were not changed during the limitations period. *Cf., e.g.*, *Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004) ("Performance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period.").

Plaintiffs also allege, and Judge Brinkema found, that Google has repeatedly augmented and modified its anticompetitive programs to reinforce its ties. Grp. A Compl. ¶¶ 86–132, 187–196; Grp. B Compl. ¶¶ 161–98.[1] Within the limitations period, Google implemented Unified Pricing Rules in May 2019 (replacing Last Look), substantially redesigned Project Poirot after September 2019 to operate in a first-price auction environment, evolved Project Bernanke into the Alchemist program, and expanded the AwBid program to additional advertiser categories. Grp. A Compl. ¶¶ 179, 181, 188–89; Grp. B Compl. ¶¶ 95, 181, 191–93, 254. Judge Brinkema found that several of these programs "enhanced the power of the AdX-DFP tie." *EDVA Op.*, 778 F. Supp. 3d at 825 n.15, 862, 864, 865 n.39, 871. Such modifications restart the limitations clock. *See Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1300–01 (9th Cir. 1986) (actions "shepherding" customers away from competitor's store within limitations period were overt acts that establish continuing violation); *see also Yelp Inc. v. Google LLC*, 2025 WL 2978394, at *7–*8 (N.D. Cal. Oct. 22, 2025) (denying motion to dismiss tying claim because Google's program "updates" and "algorithm change" were "sufficient to plead a continuing violation").

Simultaneously, Google has further entrenched its monopolies by forcing new publishers and advertisers into its tying restrictions within the limitations period. Grp. A Compl. ¶¶ 182, 184–

---

[1] Google has stipulated that "TRUSTX's complaint tracks the allegations" in the Group B Complaint and that "TRUSTX's complaint is substantively similar enough to the [Group B Complaint] that this Court's decision on the pending motion to dismiss the [Group B Complaint] should apply equally to TRUSTX's complaint." MDL Dkt. 1743 at 2.

2

85; Grp. B Compl. ¶¶ 261–63. Each contract entered with publishers and advertisers is an overt act that deprives Plaintiffs of impressions and demand that would otherwise reach their exchanges. *See Connecticut v. Sandoz, Inc.*, 2025 WL 3043397, at *9 (D. Conn. Oct. 31, 2025).

*Second*, Google's statute-of-limitations argument fails as to Project Poirot for the independent reason that Google fraudulently concealed that anticompetitive conduct. Plaintiffs' allegations fall squarely within *Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592 (2d Cir. 2024), which held that anticompetitive conduct deployed through manipulation of proprietary algorithms—conduct that is inherently self-concealing, and accompanied by affirmatively misleading statements or omissions about its purpose and effects—satisfies the fraudulent-concealment doctrine. *Id.* at 605–08. That is precisely what Plaintiffs allege as to Project Poirot, Project Bernanke, and SSDRS.[2] Grp. A Compl. ¶¶ 198–207; Grp. B Compl. ¶¶ 251–58. This Court has applied the same logic to similar allegations three times in this MDL, and found that Google's conduct was fraudulently concealed because it was "opaque," "not well-understood," and accompanied by "misrepresentations" about its "effects." *Rumble*, 2026 WL 91448, at *9; *see also MDL II*, 721 F. Supp. 3d at 271–72; *MDL I*, 627 F. Supp. 3d at 406.

*Third*, Google's statute-of-limitations arguments rest on a fundamental mischaracterization of Plaintiffs' allegations. Google treats each individual auction-manipulation program (First Look, Last Look, Poirot, UPR, Open Bidding) as if they were standalone claims, each with its own limitations analyses. Mot. at 22–30. But Plaintiffs' claims are integrated tying and monopolization claims; the auction-manipulation programs are pleaded as the *means* by which Google reinforced and maintained the pernicious effect of its ties, thereby illegally maintaining its monopolies.

---

[2] Google does not move to dismiss Competitor Plaintiffs' claims relating to Bernanke and SSDRS, tacitly admitting that Competitor Plaintiffs' fraudulent concealment allegations as to those programs are sufficient. *See* Mot. at 7 n.5.

3

Grp. A Compl. ¶¶ 187, 192; Grp. B Compl. ¶¶ 263–64. The statute of limitations does not preclude proving timely claims with facts occurring before the limitations period. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979).

*Fourth*, PubMatic's and Equativ's[3] claims are independently timely under the speculative-damages doctrine. Google's monopolization scheme has been continuously reinforced and modified by shifting, dynamic auction-manipulation programs whose ultimate effects "could not have been reasonably estimated" at the time the ties first appeared in 2009. *Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 266 (E.D.N.Y. 2010). The doctrine is particularly apt here because Google could and did vary its challenged conduct over time. *Id.* at 267 (damages were speculative because defendant "Amex retained the ability to unilaterally change the discount fee"); Grp. A Compl. ¶¶ 86, 135, 139, 198, 216.

*Fifth*, Google's argument that Plaintiffs fail to state a claim regarding Open Bidding fails. Plaintiffs' allegations describe Open Bidding as one of the means by which Google reinforced its monopolies—including by forcing exchanges to route bids through Open Bidding to reach publishers and by imposing a set of concrete, discriminatory terms to disadvantage other ad exchanges vis-à-vis AdX. Grp. A Compl. ¶¶ 122–32; Grp. B Compl. ¶¶ 183–90. Those allegations do not suffer from the pleading deficiencies the Court identified in *MDL I* and *MDL II*.

*Sixth*, Google's argument for dismissal of the Group B Plaintiffs' allegations regarding the waterfall and refusal to share first-party data also misses the mark because none of Group B's claims are based on that conduct and, as this Court has found previously, such allegations are proper to show the means Google used to conceal its anticompetitive conduct and "toward the

---

[3] For purposes of this Opposition, "Equativ" includes Plaintiffs Equativ SAS, Equativ Inc., Sharethrough Inc., and Sharethrough USA, Inc.

plausibility and functioning of the claimed [AdX-DFP] tie." *MDL II* at 263.

For the foregoing reasons, Google's motion should be denied in its entirety.

## BACKGROUND

### I. Plaintiffs Are Independent Ad Tech Companies That Compete with Google.

Each Plaintiff—OpenX, Magnite, PubMatic, Equativ, Index Exchange, Kargo (on behalf of itself and TripleLift), Sovrn, and TRUSTX—operates an ad exchange (and several operate or previously operated a publisher ad server) in direct competition with Google's AdX and DFP. Grp. A Compl. ¶¶ 162–177; Grp. B Compl. ¶¶ 8–13, 220–233; TRUSTX Compl. ¶¶ 90–97. Each sells access to display ad inventory on the open web, allowing publishers to monetize their content and advertisers to reach users. Grp. A Compl. ¶¶ 28–43; Grp. B Compl. ¶¶ 22–31.

Plaintiffs have invested heavily over the past two decades to build their products and to overcome Google's anticompetitive conduct. OpenX launched its publisher ad server in 2008 and its ad exchange in early 2009. Grp. A Compl. ¶¶ 234, 236. Magnite (formed through the merger of Rubicon Project and Telaria) has operated an ad exchange since 2010 and grew to process billions of daily transactions. *Id.* ¶¶ 249, 252–53. PubMatic launched its modern ad exchange in mid-2009. *Id.* ¶¶ 308–09. Equativ launched its publisher ad server nearly twenty years ago and operated the Equativ SSP ad exchange before acquiring Sharethrough and its ad exchange in 2024. *Id.* ¶¶ 362–66. Index Exchange has provided services related to internet advertising since 2003 and launched its ad exchange in 2011. Grp. B Compl. ¶¶ 9, 98–99. Kargo entered the ad tech space in 2008 and launched its ad exchange in January 2016. *Id.* ¶¶ 10, 110–12. TripleLift was founded in 2012 and launched its ad exchange in 2014. *Id.* ¶¶ 11, 138. Sovrn was founded in 2014 and has run its ad exchange since 2014. *Id.* ¶¶ 119–20. TRUSTX was founded in 2016 and launched its ad exchange in 2017. TRUSTX Compl. ¶¶ 90–93. All Plaintiffs participate in header bidding, a key

innovation that eroded Google's monopolies. Grp. A Compl. ¶¶ 64–79; Grp. B Compl. ¶¶ 146–60; TRUSTX Compl. ¶¶ 98–108.

## II.  Google Has Conducted an Ongoing, Evolving Campaign of Anticompetitive Conduct.

Google operates an end-to-end ad tech stack consisting of, among other things: (i) DFP, the dominant publisher ad server; (ii) AdX, an ad exchange that matches publishers with advertiser demand (together with DFP, now part of "Google Ad Manager"); (iii) AdWords, an ad-buying platform that aggregates demand from millions of small and mid-size advertisers, and (iv) DV360, an ad-buying platform used by larger advertisers. Grp. A Compl. ¶¶ 44–48; Grp. B Compl. ¶¶ 27–48, 175. Starting in 2009, Google began an ongoing campaign of anticompetitive conduct designed to insulate that stack from competition. That campaign has not been static; Google has repeatedly modified and reinforced its anticompetitive scheme over time, including through new anticompetitive programs within the limitations period that neutralize each new competitive threat.

### A.       Google's Tying of AdWords Demand to AdX.

In 2009, after acquiring DoubleClick, Google bolted two unlawful product ties onto its stack. The first—the AdWords-AdX tie—was designed to ensure that AdWords advertiser demand could flow only to AdX. Grp. A Compl. ¶¶ 49–58, 418–19; Grp. B Compl. ¶¶ 50–59, 261–62. Because AdWords aggregates the demand of millions of small and mid-size advertisers (a pool of demand unmatched anywhere else), Grp. A Compl. ¶¶ 54–59; Grp. B Compl. ¶¶ 37, 53, the tie forced publishers to use AdX (and, through the second tie, DFP) to access that demand—and starved Plaintiffs' exchanges of the demand they needed to compete. Grp. A Compl. ¶¶ 56, 181–82, 209–12; Grp. B Compl. ¶¶ 50–54, 59, 261. Judge Brinkema ultimately found the AdWords-AdX tie unlawful. *EDVA Op.*, 778 F. Supp. 3d at 810, 862–71.

The AdWords-AdX tie has evolved over time. In 2015, Google began allowing a small

6

sliver of AdWords demand bid into rival exchanges through the so-called "AwBid" program. Grp. A Compl. ¶ 181. Google has continued to adjust the program at its discretion ever since: in 2018, Google expanded AwBid to "ICM verticals"; *and after January 2019*, Google further expanded AwBid to additional targeting types known as "CIM." *Id.* Each such modification was a unilateral choice by Google that altered the operation and scope of the tie and shifted the volume of advertiser demand reaching Plaintiffs' exchanges. Throughout the limitations period, Google has also continued to sign up new AdWords advertisers and coerced them using the same tying terms—each new contract independently injuring Plaintiffs. *Id.* ¶ 182; Grp. B Compl. ¶¶ 261–62.

**B.      Google's Tying of AdX to DFP.**

In parallel, Google tied AdX to DFP by refusing to allow rival publisher ad servers to access AdX's real-time bid stream. Grp. A Compl. ¶¶ 56, 183, 418–22; Grp. B Compl. ¶¶ 50, 54, 261–63. Because AdX was the only available source of AdWords demand, the AdX-DFP tie meant publishers had to use both DFP *and* AdX to access AdWords—locking them into Google's vertically integrated stack. Grp. A Compl. ¶¶ 56–58, 183; Grp. B. Compl. ¶ 55. Judge Brinkema likewise found this tie unlawful. *EDVA Op.*, 778 F. Supp. 3d at 810, 862–71. And this Court held the "DFP-AdX product tie is an act that 'inflicted continuing and accumulating harm.'" *Rumble*, 2026 WL 91448, at *9.

**C.      Google Reinforces Ties Through Auction Manipulation Practices.**

Google has repeatedly reinforced the strength of its ties by implementing various auction manipulation practices that favor its own ad products at the expense of Plaintiffs'.

**i.      Dynamic Allocation, First Look, and Last Look.**

By 2010, Google introduced "Dynamic Allocation," which—through a program called "First Look"—gave AdX the right of first refusal on every ad impression flowing through DFP. Grp. A Compl. ¶¶ 8, 60, 62–63; Grp. B Compl. ¶¶ 76–77, 80–81. As publishers and competitor

exchanges developed header bidding to address First Look starting in 2013, Grp. A Compl. ¶¶ 65–66, 72–73, Google's First Look became Google's "Last Look": Dynamic Allocation continued to favor AdX by giving it the last chance to outbid the header-bidding auction winner, Grp. A Compl. ¶¶ 79–82; Grp. B Compl. ¶¶ 162–66. Last Look operated until May 2019, when Google replaced it with Unified Pricing Rules (UPR). Grp. A Compl. ¶¶ 82, 179; Grp. B Compl. ¶¶ 191–193. Judge Brinkema found that header bidding "failed to erode" the "dominance" of Google's ties "because subsequent Google product changes such as Last Look enhanced the power of the AdX-DFP tie" and "entrenched Google's monopoly power." *EDVA Op.*, 778 F. Supp. 3d at 862, 864–65.

### ii.        Project Bernanke and Sell-Side Dynamic Revenue Share.

Starting in 2013, Google deployed two additional auction-manipulation programs designed to reinforce its monopolies and ties, extract anticompetitive margins from advertisers, and unfairly divert more auctions from rival ad exchanges. Project Bernanke was a hidden, dynamic modification of Google's auction algorithms by which Google overcharged advertisers on a portion of bids on AdX and diverted those funds into a pool, then redistributed those funds to other AdX auctions to win impressions that AdX would otherwise have lost to rival exchanges. Grp. A Compl. ¶¶ 133–135; Grp. B Compl. ¶¶ 82–92. Bernanke went through multiple variants over the years, Grp. A Compl. ¶¶ 140–42; Grp. B Compl. ¶¶ 93–96, and after Google moved AdX to a first-price auction in September 2019, Google replaced Bernanke with the Alchemist program, which "generated the same pool of funds even though Google's auction dynamics ha[d] changed, thereby maintaining AdX's win rate at the expense of rival exchanges." Grp. A Compl. ¶ 189.

SSDRS was a parallel manipulation: Google adjusted AdX's take rate on a transaction-by-transaction basis, lowering it in competitive auctions to steal impressions from rival exchanges, then making up the difference on other auctions. Grp. A Compl. ¶¶ 82–83; Grp. B Compl. ¶¶ 168–170. Google "continually altered the structure of SSDRS, going through several versions of the

8

program over a course of years." Grp. A Compl. ¶¶ 394–95. Judge Brinkema found that SSDRS "compounded" the anticompetitive effects of Last Look. *EDVA Op.*, 778 F. Supp. 3d at 864.

Both programs were deliberately concealed. Google operated SSDRS "covertly for more than one year"; and when Google eventually publicly disclosed SSDRS in 2016, Google described it as a method to *increase* publisher yields—a false statement, because SSDRS in fact had the opposite effect. Grp. A Compl. ¶ 84; Grp. B Compl. ¶ 253. Bernanke was likewise a clandestine algorithmically driven effort that rivals had no way to detect without access to Google's internal data; its existence, purpose, and effects were therefore "unknown until litigation forced Google to reveal its hand through discovery." Grp. B Compl. ¶ 252; *see* Grp. A Compl. ¶ 205.

### iii.     Project Poirot.

In 2017, Google launched Project Poirot, a bid-shading algorithm deliberately designed to artificially suppress the value of bids sent from DV360 (Google's ad-buying tool used by larger advertisers) to Plaintiffs' exchanges. Grp. A Compl. ¶¶ 90–94, 110–17; Grp. B Compl. ¶¶ 175–82. The algorithm caused those exchanges to lose impressions and the associated revenue—while leaving Google's similar DV360 bids on AdX intact. Grp. A Compl. ¶¶ 94–95; Grp. B Compl. ¶¶ 175, 181. As with Bernanke and SSDRS, Google designed Poirot to be undetectable. Grp. A Compl. ¶ 198. When certain Plaintiffs nevertheless observed spend declines and confronted Google directly, Google purposefully rebuffed or misled each Plaintiff from discovering the truth about Project Poirot by providing knowingly false and shifting explanations:

- To OpenX, after Poirot 2.0 caused a 40% year-over-year decline in DV360 spend in late 2018, Google "blamed the European Union's General Data Protection Regulation and ads.txt—an unrelated technical standard—as reasons for the decline," while internally deciding to "stonewall" OpenX. Grp. A Compl. ¶¶ 199–200.
- To Magnite, Google employees said "that they did not know why DV360's spend was reduced on Magnite's exchange," while "internally Google acknowledged that a goal (and effect) of Project Poirot was to lower spend on exchanges like Magnite." *Id.* ¶ 202.
- To PubMatic, Google falsely attributed the declines to "filtration" by its "AdSpam team."

9

*Id.* ¶ 203.

- To the remaining plaintiffs, Google likewise concealed Poirot's role in their losses. Grp. B Compl. ¶¶ 254, 258.

Despite extensive investigation, no Plaintiff could ascertain the truth or detect the nature of Poirot until the State of Texas filed an amended complaint that disclosed its existence on January 14, 2022. Grp. A Compl. ¶ 207; Grp. B Compl. ¶ 259.

Project Poirot evolved during the limitations period. After Google moved AdX to a first-price auction in September 2019 (which meant that Google itself adopted the conduct Poirot was supposedly combating), Google "adopted a 'risk aversion' factor within Project Poirot's algorithm that further increased AdX's win rate at the expense of rival exchanges." Grp. A Compl. ¶ 188.

### iv.    Open Bidding.

In 2018, Google publicly launched Open Bidding (also known as Exchange Bidding), in which rival exchanges submit real-time bids to DFP. Grp. A Compl. ¶¶ 120–32; Grp. B Compl. ¶¶ 183–90. Google engineered Open Bidding both to coerce publishers away from header bidding (which was designed to erode Google's First Look advantage) and to inflict targeted competitive harm on rival exchanges. Grp. A Compl. ¶¶ 122–32; Grp. B Compl. ¶¶ 183–88.

Google coerced publishers onto Open Bidding by: "segregat[ing]" bid and impression data so publishers could not "understand the value of the bids submitted for each impression through header bidding," Grp. A Compl. ¶ 124; "artificially throttl[ing]" publishers' ability to receive "multiple competitive bids through header bidding" and forcing publishers to list less-granular bid amounts than they would otherwise accept, *id.* ¶ 125; and falsely telling publishers that the technical requirements of header bidding would "strain" an ad exchange's servers, *id.* ¶ 126.

Open Bidding then imposed three concrete competitive harms on the rival exchanges that participated: it charged them a 5% fee that AdX was exempt from, *id.* ¶ 128; required them to

share "proprietary and competitively sensitive bid data with Google," amplifying Google's data asymmetries, *id.* ¶ 130; and added technical restrictions and other terms designed to disadvantage and disintermediate rival exchanges from publishers, *id.* ¶¶ 128–31, 329–31; Grp. B Compl. ¶¶ 187–89. Judge Brinkema found that Open Bidding "discriminated against non-AdX exchanges, including by extracting a 5% fee from their bids, by prohibiting them from submitting any bids that originated from their own demand-side platforms or ad networks, and by requiring them to share their bid data with Google." *EDVA Op.*, 778 F. Supp. 3d at 829.

### v.     Unified Pricing Rules.

In May 2019, Google replaced Last Look with Unified Pricing Rules (UPR), under which publishers were prohibited from setting differential price floors for different exchanges. Grp. A Compl. ¶ 150; Grp. B Compl. ¶ 193. Judge Brinkema found that UPR was "another example of Google exploiting its monopoly power and tying arrangement," *EDVA Op.*, 778 F. Supp. 3d at 865, and "strong evidence" showed Google "implemented Unified Pricing Rules to enhance the AdX-DFP tie, and not for its proffered justifications of helping its publisher customers," *id.* at 871.

## LEGAL STANDARD

A complaint may not be dismissed under Rule 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing plausibility, the Court must "draw all reasonable inferences in favor of the nonmoving party." *Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 137 (2d Cir. 2022).

As an affirmative defense, a motion to dismiss based on the statute of limitations may be granted only if "it is clear from the face of the complaint" that the statute of limitations has run. *See Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (citation omitted); *see also M.G. v. New York City Dep't of Educ.*, 15 F. Supp. 3d 296, 304 (S.D.N.Y. 2014) ("[A] motion to dismiss based

11

on the statute of limitations must be denied unless 'all assertions of the complaint, as read with required liberality, would not permit the plaintiffs to prove that this statute was tolled.'"). Because fraudulent concealment "is intimately bound up with the facts of the case it often cannot be decided at the motion to dismiss stage." *Sonterra Capital Master Fund, LTD. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 526 (S.D.N.Y. 2018); *see also Cardwell v. Davis Polk & Wardwell LLP*, 2020 WL 6274826, at *40 (S.D.N.Y. Oct. 24, 2020) (noting the same for continuing violation doctrine).

## ARGUMENT

Google makes three arguments for why a subset of Plaintiffs' claims should be dismissed. *First*, Google argues that some of Plaintiffs' claims are time-barred. *Second*, Google argues that Plaintiffs failed to state a claim relating to Open Bidding.[4] *Third*, Google argues that the Group B Plaintiffs failed to state a claim regarding Google's use of the waterfall and refusal to share information. All three arguments fail.

## I.      Plaintiffs' Claims Are Timely.

The overall thrust of Google's motion is that Plaintiffs "waited" to file their own actions until the United States secured a liability finding against Google in 2025. Mot. at 1–3, 14. But Plaintiffs rely on the Clayton Act's statutory framework that favors the efficiency of follow-on actions to government antitrust suits. Indeed, following this Court's application of tolling from the United States's suit, *Rumble*, 2026 WL 91448, at *9, Google no longer disputes that Plaintiffs claims are tolled to at least January 23, 2019.

Instead, Google argues that Plaintiffs' "claims that are based on earlier conduct pre-dating January 2019 are time-barred." Mot. at 17. The Court should reject Google's limitations defense

---

[4] Open Bidding is alleged to be anticompetitive by PubMatic, Equativ, Index Exchange, Kargo (on behalf of itself and TripleLift), Sovrn, and TRUSTX.

for at least four reasons: (1) the continuing-violation doctrine applies to Google's anticompetitive conduct; (2) Google fraudulently concealed its anticompetitive conduct; (3) Google fundamentally mischaracterizes Plaintiffs' allegations; and (4) the speculative damages doctrine applies to Google's anticompetitive conduct.

### A.     The Continuing-Violation Doctrine Applies.

Under the continuing-violation doctrine, the statute of limitations "does not only run from a defendant's initial act—for example, the execution of an anticompetitive contract—if the defendant engages in conduct which constitutes a continuing violation of the Sherman Act and which inflicts continuing and accumulating harm." *Chalmers v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 3628416, at *3 (2d Cir. Dec. 15, 2025) (quoting *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 67 (2d Cir. 2019)). Each "overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *US Airways*, 938 F.3d at 67 (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)); *Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1035–44 (5th Cir. 1977) (agreeing with the Ninth Circuit that "an antitrust cause of action continues to accrue so long as a defendant continues to accept benefits under or assert the validity of an allegedly unlawful tying contract" (citing *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968)).

Google barely acknowledges this Court's continuing violation ruling in *Rumble* that rejected the same arguments Google makes here. Like Rumble, Plaintiffs allege that Google forced customers to use DFP to gain access to AdX. Grp. A Compl. ¶¶ 476–79; Grp. B Compl. ¶¶ 50–59 170, 261–63; Rumble SAC ¶¶ 309–14. Plaintiffs also allege the same continuing and accumulating harms, including that Google implemented UPR in 2019 to "enhance the AdX-DFP tie." Grp. A

13

Compl. ¶ 187 (quoting *United States v. Google LLC*, 778 F. Supp. 3d 797, 871 (E.D. Va. 2025));

Grp. B Compl. ¶¶ 191–98; Rumble SAC ¶ 242. Plaintiffs go further than Rumble did and allege

*additional* overt acts during the limitations period that inflicted new harms. *E.g.*, Grp. A Compl.

¶ 189 ("[A]fter September 2019, when AdX formally moved to a first-price auction, Google

modified Bernanke by launching Alchemist."); Grp. B Compl. ¶¶ 95, 261–63.

Google relegates its analysis of the *Rumble* ruling to two footnotes and a three-sentence

paragraph that does not meaningfully distinguish it from these cases. Mot. at 21 & nn. 1, 13 (citing

*Rumble*, 2026 WL 91448, at *9). Google argues that *Rumble* is differently situated than Plaintiffs

because Rumble launched an ad server in 2022, during the limitations period. Mot. at 21. That

proves too much. Rumble suffered injury within the limitations period from Google conduct that

dated back to 2009–10, but that has continually evolved and remains ongoing. So too did Plaintiffs.

That Rumble's claim was timely shows that Plaintiffs also may sue for injuries that accrued during

the limitations period. *See Klehr*, 521 U.S. at 189 ("each overt act that is part of the violation" is a

"continuing violation"). Google's only other attempt to distinguish *Rumble* is to claim that, until

2022, Rumble was a customer and not a competitor of Google. But this distinction is not grounded

in the *Rumble* decision and Google cites no caselaw to the contrary.

Setting *Rumble* aside, the continuing-violation doctrine squarely applies to Google's

conduct for three reasons: (i) Google's anticompetitive conduct is unilateral and Google has

changed it repeatedly—Plaintiffs' claims are not premised on the effects of static, contractual

policies as in Google's cited authorities; (ii) Google has repeatedly reinforced and modified its ties

and anticompetitive conduct through overt acts within the limitations period, including through

new and modified auction-manipulation programs; and (iii) Google has further reinforced the ties

by coercing publishers and advertisers into new anticompetitive contracts in the limitations period.

14

i.    **Google's Challenged Conduct Is Unilateral, Ongoing, and Subject to Change by Google at Any Time.**

Each of the overt acts described above, including the successive auction-manipulation programs and coercion of publishers and advertisers into new contracts, shares a defining feature: each is the product of Google's unilateral conduct, taken at Google's own initiative, and subject to change by Google at any time. Indeed, Google has repeatedly changed its tying restrictions and exclusionary conduct, including within the limitations period, and retains the ongoing, unilateral ability to alter them again. That Google's exclusionary conduct was not permanent and immutable renders its violation continuing and Plaintiffs' claims timely. *See Columbia Steel Casting Co. v. Portland General Electric Co.*, 111 F.3d 1427, 1444–45 (9th Cir. 1996) (applying continuing-violation doctrine even though the underlying agreement was eighteen years old, as the defendant's refusals to deal were "not a mere reaffirmation" because the agreement "was not a permanent and final decision that controlled the later act"); *Hennegan*, 787 F.2d at 1301 (applying continuing-violation doctrine because the "actions outside the limitations period did not immediately and permanently destroy the Hennegans' business, nor were they irrevocable, immutable, permanent and final"). Indeed, as discussed in Sections I.A.2–3, Google's tying scheme is not a one-time, frozen-in-place act but an ongoing course of conduct that Google is actively maintaining, modifying, and enforcing through a continuing series of overt acts. Google itself has admitted as much in internal documents: "we can decide to change the conditions of our offer suddenly and unilaterally." Grp. A Compl. ¶ 185. And Google has exercised that unilateral power repeatedly throughout the limitations period—by deploying new auction-manipulation programs and by forcing advertisers and publishers to sign new contracts after January 2019.

Plaintiffs allege Google had the ability to *unilaterally* change its conduct (and exercised that ability), distinguishing the cases Google relies on, which involved static contracts or policies.

15

Google's reliance on *CSX Transportation, Inc. v. Norfolk Southern Railway Co.*, 648 F. Supp. 3d 679 (E.D. Va. 2023), *aff'd*, 114 F.4th 280 (4th Cir. 2024), is illustrative. Google contends *CSX* held that an antitrust claim accrues once and for all when harm first begins. Mot. at 19–20. Not so. CSX itself argued that "it was economically excluded" due "to acts occurring in and around 2009," and the court accordingly found that CSX suffered only "inertial and unabated harm" flowing from "final events" in 2009. *CSX*, 648 F. Supp. 3d at 707–08. CSX simply could not point to any evidence that later events "contributed in any way" to the exclusion. *Id.* at 708. But Google's conduct here continued and evolved, causing more and new harms over time (*see infra*, Argument § I.A.2). And Plaintiffs have been injured by this recent continuing conduct—not merely from the initiation of Google's illegal tying arrangements. Each new advertiser and publisher subjected to the ties, Dynamic Allocation, and each Google-driven modification reinforcing them, inflicts the "new and accumulating harm" that was missing in *CSX*.

The only case on which Google relies regarding unilateral conduct is a non-precedential opinion from another circuit, *SaurikIT, LLC v. Apple, Inc.*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023). There, the Ninth Circuit rejected the argument that Apple "engages in an overt act . . . every time it sells a new iOS device" with a standard warranty term because the warranty governing that sale was a static, take-it-or-leave-it consumer adhesion term that had not changed since its introduction fifteen years prior. *Id.* at *1. Even if *SaurikIT* were good law, Google has repeatedly *changed* the contractual mechanisms enforcing its tying restrictions: it has modified the AdWords-AdX tie multiple times (most recently by expanding AwBid to CIM after the limitations period began in January 2019, Grp. A Compl. ¶ 181); and it has deployed an evolving series of algorithm-driven auction-manipulation programs that have augmented and reinforced the ties and Dynamic Allocation throughout the limitations period, *see infra*, Argument § I.A.2.

16

### ii. Google Has Repeatedly Reinforced and Modified Its Anticompetitive Scheme Through New Overt Acts Within the Limitations Period.

Google has changed and reinforced the ties many times, including through multiple acts after January 2019, each an independent overt act under the continuing-violation doctrine. Where a monopolist takes "a new and independent act" that "inflict[s] new and accumulating injury on the plaintiff," the act "restarts the statute of limitations." *US Airways*, 938 F.3d at 68; *see also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 106 (3d Cir. 2010) (decision to refuse to increase hospital's reimbursement rates was overt act that restarted the limitations period). The court in *Yelp* recently applied this principle to Google's tying of its search engine, holding that three design and algorithm updates within the limitations period—"Possum," the "SERP Redesign and Algorithm Update," and "AI Overviews"—were each "alone sufficient to plead a continuing violation" because they "ma[d]e [the tie] more effective." 2025 WL 2978394, at *1, *6, *8.

The same is true here. As Judge Brinkema has already found, and as Plaintiffs allege, each of Google's successive auction-manipulation programs reinforced the AdX-DFP tie. Grp. A Compl. ¶¶ 187, 192; Grp. B Compl. ¶¶ 241–42, 263–64. "First Look exacerbated the anticompetitive effect of the unlawful AdX-DFP tie by artificially advantaging AdX." *EDVA Op.*, 778 F. Supp. 3d at 864. When header bidding threatened Google's monopolies, Google rolled out Last Look, which "enhanced the power of the AdX-DFP tie." *Id.* at 862; *see also id.* at 864. SSDRS then "compounded" Last Look's effects through at least May 2019. *Id.* at 865. This Court likewise found that Project Bernanke and its variations were plausibly pleaded as "anticompetitive measures that harmed competition in the ad-exchange market." *MDL I*, 627 F. Supp. 3d at 389.

Those changes and reinforcements also make Plaintiffs' claims different from Gannett's claim that Google consistently enforced a fixed cap on header bidding line items, which this Court dismissed. *MDL II*, 721 F. Supp. 3d at 272–73. Google's cap was a static policy of enforcement—

17

not alleged to have been changed or enhanced over time—that applied repeatedly to Gannett as an individual customer and was akin to a policy in a bilateral contract. *See id.* Plaintiffs, by contrast, do not allege that Google's conduct was frozen in time, nor is their relationship with Google governed by a static contract.

Critically, Google's reinforcement of the ties did not stop at the limitations boundary. At least the following overt acts post-date January 2019:

- **AwBid expansion to CIM (after January 2019).** Google expanded AwBid—a program that augments the AdWords-AdX tie—by extending it to CIM targeting after the limitations period began in January 2019. Grp. A Compl. ¶ 181.[5]

- **UPR (May 2019).** Google implemented Unified Pricing Rules in May 2019 as "another example of Google exploiting its monopoly power and tying arrangement to restrict its customers' ability to deal with its rivals." *EDVA Op.*, 778 F. Supp. 3d at 865; Grp. A Compl. ¶ 179; Grp. B. Compl. ¶¶ 193–98.

- **Project Poirot's "risk-aversion" factor (after September 2019).** Google modified its bid shading programs after AdX's transition to first-price auction and added a "risk aversion" factor to Poirot's algorithm "that further increased AdX's win rate at the expense of rival exchanges" in order to adapt Poirot to Google's new first-price environment. Grp. A Compl. ¶ 188; Grp. B Compl. ¶¶ 180–81.

- **Alchemist (after September 2019).** Google "modified Bernanke by launching Alchemist," which "maintain[ed] AdX's win rate at the expense of rival exchanges" and adapted Bernanke to Google's new first-price environment. Grp. A Compl. ¶ 189; *see also* Grp. B Compl. ¶ 95.

---

[5] EDVA trial testimony showed that slightly loosening the restrictiveness of the AdWords-AdX tie through the AwBid program actually served to augment the durability of the tie. Google originally launched AwBid to allow AdWords to send "remarketing" demand to non-AdX exchanges. Grp. A Compl. ¶ 181. "Remarketing" occurs when a user views an ad for a product on one site, then navigates to a second site and is shown a second ad for the same product. AdWords's inability to show a second ad to users who navigated to websites that did not show ads from AdX risked a loss of advertisers to other ad-buying platforms and thus challenged the effectiveness of tying AdWords demand to AdX. *See United States v. Google*, No. 1:23-cv-108 (E.D. Va.), Dkt. No. 1337 (9/11/24 AM Tr. 38:20–40:1, 85:1–8 (Bender) (acknowledging that rival Criteo was "very competitive in their remarketing space"); Dkt. No. 1342 (9/17/24 AM Tr. 116:9-117:1 (Jayaram) (testifying that AdWords advertisers would benefit from "having access to more inventory" through remarketing); *see also* Mot. at 4 n.4 (noting that the Court may consider EDVA trial testimony when considering Google's motion to dismiss (citing *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010))).

Case 1:21-md-03010-PKC    Document 1815    Filed 05/27/26    Page 28 of 48

Each of these post-January 2019 anticompetitive acts was a unilateral anticompetitive program by Google that either altered the scope of the ties or otherwise shifted demand and profits away from rival exchanges. Each is an overt act, and each independently makes Plaintiffs' claims timely.

### iii.	Google Has Continuously Enrolled New Publishers and Advertisers Under the Same Tying Restrictions During the Limitations Period.

Plaintiffs allege further overt acts due to Google's continuous coercion of publishers and advertisers to enter new contracts, which imposed the tie upon additional market participants and steered otherwise competitively contestable ad supply and demand towards Google and away from Plaintiffs' exchanges. Each new and renegotiated contract constitutes an overt act that restarts the limitations period because entering a new contract is not merely a "reaffirmation of a previous act." *US Airways*, 938 F.3d at 68; *see also Hennegan*, 787 F.2d at 1300–01 (continuing violation established because "overt acts include . . . shepherding [customers] away from the [plaintiff's] shop"). Courts within the Second Circuit have held the same. For instance, in *Connecticut v. Sandoz*, the court found a continuing violation where "the Defendants continued to sell drugs to both new customers and to existing customers pursuant to new agreements," as each sale furthered "an illegal conspiracy." 2025 WL 3043397, at *9.

Plaintiffs' allegations fit well within that framework. Google has signed up "thousands of new advertisers to AdWords during the limitations period," each of whom was subjected to Google's tying scheme that prohibits advertisers from submitting most of their bids to rival exchanges. Grp. A Compl. ¶ 182; Grp. B Compl. ¶ 261. Google has signed up new publishers to DFP during the limitations period, each of whom was subjected to the same tying arrangement requiring use of DFP to access AdX real-time bids. Grp. A Compl. ¶ 184; Grp. B Compl. ¶ 263. Each new contract is an independent overt act that injures Plaintiffs by diverting demand and supply away from their exchanges.

Google's authorities are inapposite. Google cites *Varner v. Peterson Farms*, 371 F.3d 1011, 1019–20 (8th Cir. 2004), and *Witt Co. v. RISO, Inc.*, 948 F. Supp. 2d 1227, 1236–37 (D. Or. 2013), to argue that its only overt act was initiating the tying arrangement, and that coercing new publishers and advertisers into tying contracts are not themselves overt acts. *See* Mot. at 19, 21. But both cases were brought by plaintiffs who were parties to the challenged tying contracts and merely hold that performance of the original contract between the parties themselves does not constitute a continuing violation. *See Varner*, 371 F.3d at 1020; *Witt*, 948 F. Supp. 2d at 1236.

In sharp contrast, Plaintiffs are Google's competitors, not parties to any tying contract— and their claims do not rest on performance of any pre-existing agreement. *See In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, 2022 WL 2438934, at *8 (D. Del. July 5, 2022) (distinguishing cases like *US Airways* and *Varner* by explaining that the plaintiffs "were not parties to the agreements. Nor were they third-party beneficiaries of the agreements; on the contrary, they are alleged victims of the agreements.").

### B.    Plaintiffs' Monopolization Claims Are Timely Because Google Fraudulently Concealed Project Poirot.

Plaintiffs' claims are also timely because Google fraudulently concealed Project Poirot, thereby tolling the statute of limitations as to that conduct.[6] Fraudulent concealment applies when a plaintiff alleges: "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

This Court has applied the fraudulent-concealment doctrine to Google's anticompetitive

---

[6] The same reasoning applies to Project Elmo, alleged by Equativ to be anticompetitive. Grp. A Compl. ¶¶ 368–70.

conduct three times in this MDL, holding each time that Google concealed its conduct. *Rumble*, 2026 WL 91448, at *9 (Plaintiffs "plausibly alleg[ed]" that the auction-manipulation practices "were opaque and not well-understood outside of Google"); *MDL II*, 721 F. Supp. 3d at 240 (plaintiff "plausibly alleged that Google fraudulently concealed the anticompetitive effects" of its conduct); *MDL I*, 627 F. Supp. 3d at 406 (Plaintiffs plausibly alleged Google's auction-manipulation practices "lacked transparency, occurred out of the public eye, and had effects that were not immediately obvious or well understood"). Plaintiffs make materially identical allegations here that satisfy all three elements of fraudulent concealment.

Google's only direct engagement with this Court's prior fraudulent-concealment rulings concerns Enhanced Dynamic Allocation—a program Google publicly announced. Other MDL plaintiffs alleged that "the anticompetitive effects of EDA were not known," even though the existence of the program itself was public knowledge. *MDL II*, 721 F. Supp. 3d at 271–72. But here, Plaintiffs allege "Google did not disclose Project Poirot" to customers or competitors. Grp. A Compl. ¶ 115; Grp. B Compl. ¶ 254. Google's argument that "Competitor Plaintiffs were immediately on notice of any harm to them caused by Poirot," Mot. at 28, ignores that Plaintiffs did not know Poirot existed. All Plaintiffs knew was that DV360 spend had declined; they had no notice that Google "caused the decline through anticompetitive means." *Phhhoto*, 123 F.4th at 609. And Google does not challenge Plaintiffs' allegations that Bernanke and SSDRS were fraudulently concealed as those programs were also hidden within Google's systems. *See* Mot. at 7 n.5.

### i.       Google Concealed Project Poirot.

A plaintiff plausibly pleads concealment by identifying either "affirmative steps" taken by the defendant to conceal the plaintiff's claim, or by showing that the defendant's misconduct was inherently "self-concealing." *Phhhoto*, 123 F.4th at 604–05. Affirmative steps include false or misleading statements that "downplay[] the significance of" or "allay[] any possible

21

*anticompetitive* suspicion about" the challenged conduct. *Id.* at 605–06 (emphasis added). Conduct is "self-concealing" where, by its nature, its *anticompetitive* character cannot be detected through ordinary investigation by outside parties. *Id.* at 608 (the anticompetitive nature of Meta's algorithm was self-concealing because it "is not discoverable through laboratory testing"). Plaintiffs plausibly allege that Google concealed Project Poirot in both ways.

Plaintiffs plausibly plead self-concealment. The very nature of Google's auction-manipulation conduct—proprietary algorithms embedded inside Google's internal systems—rendered it impossible to detect through ordinary investigation. Project Poirot was a bid-shading algorithm to which Plaintiffs had no access. Plaintiffs could not inspect the algorithm's parameters, could not observe its outputs in real time, and could not conduct tests that would identify precisely what was causing Plaintiffs to suffer declined spend from DV360—let alone determine that Google was using Project Poirot for the anticompetitive purpose of boosting AdX instead. *See* Grp. A Compl. ¶ 198; Grp. B Compl. ¶ 254.

Google deliberately reinforced that self-concealing nature by, among other things, "gradually" ramping up Poirot's bid shading and "dynamically varying" the amount of shading to "ma[ke] it impossible for competing exchanges to determine whether the decrease in DV360 spend was due to Google's manipulation or exogenous factors." Grp. A Compl. ¶ 198; Grp. B Compl. ¶ 254. The Second Circuit confronted analogous algorithmic concealment in *Phhhoto* and held it was self-concealing because "Phhhoto did not receive—and presumably had no way to obtain, as Meta's elusive algorithm is not discoverable through laboratory testing—a quantitative assessment of the likelihood that Instagram's new algorithmic feed was anticompetitive." 123 F.4th at 608.

Plaintiffs also allege that Google took affirmative steps to conceal its anticompetitive conduct when "Google purposefully rebuffed or misled each Plaintiff from discovering the truth

22

about Project Poirot." Grp. A Compl. ¶ 199. For example, after Project Poirot caused significant year-over-year decline in DV360 spend on Plaintiffs' exchanges, Google internally decided to "stonewall" Plaintiffs' inquiries, claim ignorance, or provide false explanations, including "blam[ing] the European Union's General Data Protection Regulation and ads.txt" or "filtration" by Google's "AdSpam team." *Id.* ¶¶ 199–200, 202–03; Grp. B Compl. ¶ 254. Google further concealed Poirot's role in Plaintiffs' losses by gradually ramping up the algorithm and dynamically varying its parameters to mask the cause of any observable decline. *See, e.g.*, Grp. B Compl. ¶ 254. This was all done even though Google acknowledged internally that the goal (and effect) of Project Poirot was to lower spend on Plaintiffs' exchanges and bolster AdX. Grp. A Compl. ¶ 202. Google's repeated misdirection is precisely the kind of "affirmative step[]" that is sufficient to plead concealment. *Phhhoto*, 123 F.4th at 605–06.

Moreover, Google "appeared to continue to collaborate" with Plaintiffs in other projects or business areas, *Phhhoto*, 123 F.4th at 607—including in Open Bidding and, in OpenX's case, in cloud services. Grp. A Compl. ¶¶ 201, 132, 438; Grp. B Compl. ¶¶ 184, 187. That shows that Plaintiffs "reasonably could have believed that [Google] had a sincere interest in the companies' continued collaboration, making it unlikely—and certainly not 'probable'—that [Google's] true intent was anticompetitive." *Phhhoto*, 123 F.4th at 607.

Google argues that Plaintiffs fail to plead fraudulent concealment because they allege no "specific false statement on which a Plaintiff relied or details explaining any purported omission." Mot. at 26. Google is mistaken. Plaintiffs need not allege reliance on a false statement because they allege that the anticompetitive nature of Google's conduct was inherently self-concealing. *See supra*; *Hendrickson Bros.*, 840 F.2d at 1083. In any case, Plaintiffs also plead that in addition to misrepresentations, Google took affirmative steps to conceal the anticompetitive nature of Project

23

Poirot by gradually rolling it out to make it difficult to detect relative to legitimate bid shading. Grp. A Compl. ¶ 198; Grp. B Compl. ¶ 254. That pleads fraudulent concealment.

### ii. Plaintiffs Have Adequately Pled Lack of Notice.

Plaintiffs plausibly plead that before January 2019 they had neither actual nor inquiry notice of Google's anticompetitive conduct. *See Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993). As discussed, Plaintiffs did not have actual notice of Google's manipulations. And to find inquiry notice on a motion to dismiss, there must be "uncontroverted evidence clearly demonstrat[ing] when the plaintiff should have discovered the [challenged] conduct." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008). No such evidence exists here.

To find inquiry notice, it must be established that Plaintiffs had enough information that they (1) should have considered it probable that the nexus between the injury and the conduct was anticompetitive in nature and (2) should have uncovered a factual basis to bring an antitrust claim "with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss[.]" *Phhhoto*, 123 F.4th at 608 (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 95 (2d Cir. 2018)); *see also Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012). "[K]nowledge of an injury—and the person or entity responsible for it—is distinct from knowledge that the injury was part of an anticompetitive or otherwise illegal scheme." *Phhhoto*, 123 F.4th at 608. Being able to identify even the fact of some injury and the entity responsible is not enough to put a plaintiff on notice of an anticompetitive scheme. For example, the plaintiff in *Phhhoto* knew the company behind its declining engagement (Meta/Instagram) and knew it was being harmed, but the Second Circuit nevertheless held it had adequately pled ignorance because it had not discovered that the injury "was part of an anticompetitive or otherwise illegal scheme." *Id.*

This Court has applied that distinction to Google specifically in finding concealment to be adequately pled. In *MDL II*, the Court held that Gannett's awareness "that EDA was not operating

as promised" did not defeat concealment, because Google's representations "suggest[ed] an implementation problem as opposed to a deliberate anticompetitive measure." 721 F. Supp. 3d at 271–72. The same pattern is alleged here: Google hid its manipulations and represented that any decline in impressions was the result of implementation issues (GDPR, ads.txt), third-party regulatory developments, or innocuous technical filtration (AdSpam)—rather than the truth that Google was running internal algorithms specifically engineered to suppress bids on rival exchanges. Grp. A Compl. ¶¶ 198–204; Grp. B Compl. ¶ 254. Plaintiffs lacked critical facts establishing that Google deployed an undisclosed algorithm that deliberately and systematically leveraged Google's market power to unlawfully suppress DV360 bids of rival ad exchange, while simultaneously unfairly shielding AdX from that same algorithm.

That information became publicly available only after Texas filed an amended complaint on January 14, 2022, and the operation and effects of Poirot were further detailed in the DOJ's January 24, 2023 complaint and the EDVA liability trial in late 2024. Grp. A Compl. ¶ 207; Grp. B Compl. ¶ 259. Each Plaintiff timely filed suit after acquiring that information.

Google's inquiry-notice cases are distinguishable. *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430 (S.D.N.Y. 2017), found inquiry notice because the plaintiffs themselves alleged that the market's failure to develop along expected lines was "unnatural and contrary to expectations, suggesting conspiratorial manipulation," giving plaintiffs "every basis, in real time, to smell a rat." *Id.* at 489. Plaintiffs here had no basis to suspect wrongdoing because Google rolled out Project Poirot in a way that concealed its anticompetitive cause and told anyone who asked that declined DV360 spend was due to innocuous factors. Google's other cited case, *Koch v. Christie's*, is also distinguishable. That case involved an art-fraud plaintiff who had received multiple independent expert reports questioning the authenticity of the wine he had purchased—

25

classic warning signs of fraud. 699 F.3d at 154. Here, Google *dismissed* inquiries with affirmatively misleading explanations. Grp. A Compl. ¶¶ 200, 202, 203.

### iii.        Plaintiffs Have Adequately Pled Reasonable Diligence.

To satisfy this final element, a plaintiff must plead that its "continuing ignorance" of the asserted claim "was not attributable to lack of diligence on [its] part." *Hendrickson*, 840 F.2d at 1083. Plaintiffs have satisfactorily alleged diligence.

The diligence inquiry examines whether a plaintiff responded with reasonable diligence to the facts before them. *In re Nine W. Shoes Antitrust Litig.* ("*Nine West*"), 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000). But where a defendant's concealment is so complete that a plaintiff is not even on inquiry notice, the law does not require a plaintiff to undertake the impossible. Under these circumstances, a plaintiff satisfies its duty of diligence by suing within the limitations period once the anticompetitive nature of the conduct becomes public. *Id.* (citation omitted); *In re GSE Bonds Antitrust Litig.* ("*GSE Bonds*"), 396 F. Supp. 3d 354, 367–68 (S.D.N.Y. 2019).

In *Nine West*, the defendants' anticompetitive conspiracy was so completely concealed that the plaintiffs were ignorant of the conspiracy until it was publicized by a media exposé. 80 F. Supp. 2d at 193. The plaintiffs sued once they were alerted by the media reports; the court found this adequate diligence because they could not have reasonably been expected to act when ignorant of the anticompetitive nature of the defendants' conduct. *Id.* Similarly, in *GSE Bonds*, the court addressed allegations of a bond price-fixing conspiracy. Because the self-concealing conspiracy was secret until public reports of a government investigation emerged, the plaintiffs satisfied their duty of diligence by suing within the four-year limitations period of those public reports. *Id.* at 367. The court rejected the defendants' argument that the plaintiffs should have nevertheless sought to uncover the conspiracy through exhaustive analysis of public data: "[R]equiring potential plaintiffs to conduct exhaustive statistical analysis of millions of transactions, just on the off

chance that it would reveal some suspicious behavior, would be absurd." *Id.*

Like the plaintiffs in *Nine West* and *GSE Bonds*, Plaintiffs were ignorant of the anticompetitive nature of Google's concealed manipulations. Grp. A Compl. ¶¶ 199–204, 400–03; Grp. B Compl. ¶¶ 254–65. After Google's conduct was publicly exposed by government investigations, Plaintiffs each brought suit within the limitations period.

Further, certain Plaintiffs took specific, repeated, and unsuccessful investigative efforts:

- OpenX "ran experiments to try to determine why DV360 had decreased its spend on the OpenX Ad Exchange," reached out to Google's DV360 and Cloud teams, and sent an unanswered email from then-CEO Tim Cadogan demanding an explanation. Grp. A Compl. ¶¶ 199–200.

- Magnite "worked internally to investigate why DV360's spend had dropped on its exchange," reviewed its internal bidding data, and reached out to the DV360 team at Google, but could not determine what was causing the declined spend. *Id.* ¶ 202.

- PubMatic noticed the decline by August 2017, contacted Google, provided reports demonstrating the decline, followed up repeatedly through 2018, and in 2019 ran a controlled experiment in which it directed certain campaigns only to its own exchange, but could not discover the cause of the decline. *Id.* ¶¶ 203–04.

- Index Exchange, Kargo, TripleLift, and Sovrn invested "substantial resources in data analysis and testing of various bid optimization techniques in an attempt to identify and solve the problem," including by repeatedly reducing their take rates (in Index Exchange and Kargo's case, all the way to zero) without success. Grp. B Compl. ¶ 258; TRUSTX Compl. ¶¶ 202–03 (same).

But "because Google took so many steps to conceal Poirot," Plaintiffs were "unable to determine the real reason for the decline." Grp. A Compl. ¶ 200.

Google's argument that Plaintiffs' "sophistication" defeats concealment lacks merit. Google cites no case law (nor are Plaintiffs aware of any) holding that the fraudulent-concealment doctrine is unavailable to sophisticated plaintiffs. In fact, this Court rejected the same argument as to Gannett—"the largest news media publisher in the United States," *MDL II*, 721 F. Supp. 3d at 268—holding that even Gannett "plausibly alleged that Google fraudulently concealed the anticompetitive effects" of its conduct, *id.* at 241. Google also implicitly recognizes that

27

sophistication is not enough: Google does not move to dismiss Plaintiffs' allegations regarding Project Bernanke or SSDRS, both of which Plaintiffs allege were also concealed. Mot. at 7 n.5. If sophistication alone defeated concealment, Google would have moved to dismiss those claims too.

## C. Google's Statute-of-Limitations Arguments Fundamentally Mischaracterize Plaintiffs' Allegations.

Google's arguments that Plaintiffs' claims are time-barred suffer from an additional, fundamental defect: they treat Plaintiffs' allegations about Google's unlawful ties and each auction-manipulation program (First Look, Last Look, SSDRS, Bernanke, Poirot, Open Bidding, UPR) as if they were standalone Section 1 or Section 2 claims, each with its own accrual date and limitations analysis. *See* Mot. at 22 ("Claims Based on 'First Look' Are Time-Barred"); *id.* at 24 ("Claims Based on 'Last Look' Are Time-Barred"); *id.* at 26 ("Claims Based on Project Poirot Are Time-Barred"). They are not.

Plaintiffs' actionable claims are integrated tying and monopolization claims under Sections 1 and 2 of the Sherman Act. Grp. A Compl. ¶¶ 458–96; Grp. B Compl. ¶¶ 266–78. The various auction-manipulation programs are pleaded as the anticompetitive *means* through which Google reinforced its unlawful ties and entrenched its monopolies. Group A Compl. ¶ 187 (Google "employed practices such as First Look, Last Look, SSDRS, Open Bidding, and UPR to complement the ties"); *id.* ¶ 192 (programs "acted as reinforcements to the DFP-AdX tie"); Grp. B Compl. ¶¶ 263–64. The statute of limitations bars time-barred claims; it does not operate to preclude reliance on pre-limitations acts to prove timely claims. *Berkey Photo*, 603 F.2d at 296 ("The taint of an impure origin does not dissipate after four years if a monopolist continues to extract excessive prices because of it."); *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 350 (S.D.N.Y. 2021) ("Evidence of claims which cannot give rise to liability because of a statute of limitations may be introduced to show the nature of the

transactions under scrutiny and to establish a continuing course of conduct."). Google itself concedes the point. *See* Mot. at 33 n.22 (acknowledging that, where allegations are not pleaded as "distinct and separately actionable anticompetitive conduct," Google "is not moving to dismiss those mere factual allegations" (quoting *Rumble*, 2026 WL 91448, at *8)).

Two consequences follow. *First*, the Court need not decide at the pleading stage whether each program independently violates the antitrust laws. It is enough that the programs are pleaded as overt acts demonstrating the continuing course of Google's tying and monopolization conduct. *Second*, the programs operating within the limitations period—the AdWords-AdX tie (operative throughout), the DFP-AdX tie (operative throughout), Last Look (until May 2019), SSDRS (operative throughout), Project Poirot (operative throughout and substantially redesigned in September 2019), Open Bidding (rolled out beginning 2018 with continuous onboarding of new exchanges and publishers under restrictive terms), SSDRS (operative throughout), and UPR (beginning May 2019)—are themselves overt acts that, as explained, restart the limitations clock. *Cf. Rumble*, 2026 WL 91448, at *8 (treating analogous Google auction-manipulation conduct as "appropriate factual allegations in the context of" actionable Section 2 claims).

### D.    PubMatic's and Equativ's Claims Are Independently Tolled by the Speculative-Damages Doctrine.

PubMatic's and Equativ's claims are also timely under the speculative-damages doctrine. This doctrine applies where "the fact of damage is uncertain or if the nature and amount of damages cannot be reasonably estimated" at the time the cause of action would otherwise have accrued. *Rite Aid*, 708 F. Supp. 2d at 266 (citing *Ansul Co. v. Uniroyal, Inc.*, 448 F.2d 872, 885 (2d Cir. 1971)). Google cursorily argues that PubMatic and Equativ "allege no basis for concluding that, had they timely brought suit, their damages 'could not be reasonably estimated.'" Mot. at 22. But Google does not engage with the pleadings on this point, and rather asks the Court to simply ignore

what PubMatic and Equativ have alleged.

*Rite Aid*, 708 F. Supp. 2d 257, illustrates the circumstances that give rise to speculative damages tolling—the same sorts of circumstances alleged here. In *Rite Aid*, the plaintiff merchants brought Sherman Act claims against credit card company Amex based on the merchant agreements that governed sales to customers using Amex cards. *Id.* at 261–62. The *Rite Aid* court canvassed Second Circuit caselaw to hold that because Amex unilaterally varied its fees during the relevant period and the volume of transactions each plaintiff would process was unclear, the harms "could not have been reasonably estimated" at the outset. *Id.* at 266–67.

PubMatic and Equativ have alleged facts supporting speculative damages tolling for their monopolization claims far beyond what was claimed in *Rite Aid*. As in *Rite Aid*, PubMatic and Equativ allege that Google unilaterally imposed dynamic, overlapping, varying manipulations such as Bernanke (and its iterations), SSDRS, and Poirot that compounded and shifted the ways Plaintiffs were harmed. *E.g.*, Grp. A Compl. ¶¶ 357, 390, 392–99, 402–03. But more than in *Rite Aid*, the existence and effects of Google's auction manipulations that favored AdX over competing exchanges and reinforced the AdX-DFP tie were wholly unknowable at their outset.

Unlike Amex in *Rite Aid*, Google concealed its shifting auction mechanics and rates. *Id.* ¶¶ 393–94, 398–99, 403. Google also designed Bernanke, SSDRS, and Poirot to achieve Google's target take rates and self-preferencing only in the aggregate over an extended period of time. *Id.* ¶¶ 395, 399. Because these programs were dynamic—varying from transaction to transaction, achieving their manipulations only in the long term—it would have been impossible for PubMatic and Equativ to contemporaneously detect, quantify, or understand the anticompetitive end goal or effect of these programs. *Id.* ¶¶ 395, 399, 403. With respect to SSDRS, Google believed that the information imbalance would render competing ad exchanges powerless to recognize the conduct

and respond. *Id.* ¶ 393. And because Poirot's overlapping buy-side manipulations interacted unpredictably with Google's auction algorithms, its impact was "so complex and ineffable that even Google faced challenges in understanding the results of its bid manipulations in real time." *Id.* ¶ 402. Google was forced to task its own internal teams with testing and understanding Poirot's effects. *Id.* ¶ 402. Even more than in *Rite Aid*, PubMatic and Equativ have alleged that, as a result of Google's unilateral, shifting, and unpredictable manipulations, it would have been impossible for them to have estimated the nature or amount of their damages resulting from these programs and the AdX-DFP tie before government enforcement shone light on this anticompetitive conduct.

Google's cited cases do not call for a different result. Each case involves fundamentally different fact patterns involving only one transaction or anticompetitive act: a single sale of broadcasting rights, *Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 691 (9th Cir. 1982); the sale of a single painting, *Vitale v. Marlborough Gallery*, 1994 WL 654494, at *1 (S.D.N.Y. July 5, 1994); a single act of refusing telephone privileges, *Higgins v. N.Y. Stock Exch., Inc.*, 942 F.2d 829, 831 (2d Cir. 1991); and a single public merger, *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 269 (8th Cir. 2004). In fact, *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 277 (S.D.N.Y. 2015), *aff'd*, 938 F.3d 43 (2d Cir. 2019), even relies on *Rite Aid* in a way that supports speculative-damages tolling here. In rejecting speculative damages tolling, the *US Airways* court considered allegations of an agreement where transaction volumes and prices were fixed at the outset—but contrasted its situation with one, like the case at bar, where a defendant can vary the challenged conduct over time. 105 F. Supp. 3d at 277.

## II.     Plaintiffs' Open Bidding Allegations Should Not Be Dismissed.

Google argues that the Open Bidding allegations of PubMatic, Equativ, and the Group B Plaintiffs fail to state a claim. Mot. at 33–34. The argument fails for two reasons. First, as explained

in Argument § I.C, Plaintiffs did not plead Open Bidding as a standalone Section 1 or Section 2 violation; Plaintiffs have alleged Open Bidding is part of Google's continuing monopolization scheme. *Berkey Photo*, 603 F.2d at 296; *Rumble*, 2026 WL 91448, at *8 (allegations of Open Bidding "appropriate factual allegations in the context of [broader monopolization] claims"). But further, Plaintiffs' allegations regarding Open Bidding as an independent anticompetitive act do not suffer the pleading deficiencies the Court identified in *MDL I* and *MDL II*.

In its Motion, Google repeats that the Open Bidding allegations should be dismissed because Plaintiffs do not adequately describe the "'anticompetitive effect' Open Bidding had on the popularity or profitability of header bidding." Mot. at 33–34. But Google's focus on harms to header bidding sets up a straw man. Plaintiffs do not bring claims for harms to header bidding. Plaintiffs bring claims based on harms they themselves suffered when Google used deceptive and anticompetitive tactics to divert publishers to Open Bidding, then imposed onerous and discriminatory terms on Plaintiffs to maintain an unfair advantage for AdX as a condition for Plaintiffs to vie for those publishers' impressions. Grp. A Compl. ¶¶ 120–32.

Further, PubMatic, Equativ, and the Group B Plaintiffs have remedied any pleading deficiencies Google has identified in other plaintiffs' complaint. First, Plaintiffs concretely allege how Google took deceptive and anticompetitive steps to divert publishers from header bidding to Open Bidding. Google artificially segregated bid and impression data in a way that made it impossible for publishers to understand the value of bids submitted through header bidding. *Id.* ¶ 124. Google also artificially limited the range of bids that publishers could receive through header bidding, which resulted in rounding bids from header bidding down—intentionally undermining the value publishers would receive from header bidding in contrast with Open Bidding. *Id.* ¶ 125; *cf. United States v. Microsoft Corp.*, 253 F.3d 34, 76 (D.C. Cir. 2001)

32

("Microsoft's tools included certain keywords and compiler directives that could only be executed properly by Microsoft's version of the Java runtime environment for Windows.") (cleaned up). Google also simply lied to publishers by telling them that the technical requirements of header bidding would "strain" an ad exchange's servers. Grp. A Compl. ¶ 126. Google was fully aware that it was lying to and undermining the value of its own publisher customers' impressions to move them over to Open Bidding against the publishers' own interests, likening this manipulation to a "jedi mind trick." *Id.* ¶ 120. Google's manipulations succeeded in moving publishers to Open Bidding, which in turn forced non-Google ad exchanges like Plaintiffs to route bids through Open Bidding to submit bids for those publishers' impressions. *Id.* ¶ 127. This is exactly the type of conduct that amounts to unlawful monopoly maintenance. *See Microsoft Corp.*, 253 F.3d at 77 (deception of Java developers to push them to use Microsoft's own competing alternative "served to protect its monopoly of the operating system in a manner not attributable either to the superiority of the operating system or to the acumen of its makers, and therefore was anticompetitive").

Plaintiffs also allege the various ways that Open Bidding harmed them. When Plaintiffs had to route bids into Open Bidding to access impressions offered by publishers through Open Bidding, Google assessed a 5% fee on them that was not assessed to AdX. Grp. A Compl. ¶ 128. This arbitrary 5% fee had the effect of lowering net bids for Plaintiffs' exchanges by that amount, putting them at a disadvantage to AdX. This "immediate[ly] reduc[ed]" the "revenue and volume of impressions" non-Google ad exchanges could obtain. *Id.* Google similarly prohibited competing ad exchanges from routing bids from their own DSPs into open bidding, further reducing the revenue and data competitors could glean from each transaction. *Id.* ¶ 130. Google also forced competing ad exchanges who submitted bids through Open Bidding to share "proprietary and competitively sensitive bid data with Google," which "amplified Google's ill-gotten data

33

asymmetries" that Google further "leveraged to disadvantage competing exchanges." *Id.* These measures "had no legitimate business justification, and rather were the means that Google designed to insulate AdX from the forces of competition and ensure that it remained the dominant ad exchange." *Id.*; *EDVA Op.*, 778 F. Supp. 3d at 828–29 ("In moving rival ad exchanges' bidding to Open Bidding, Google sought to mitigate the competitive pressure those rival exchanges could exert on AdX and DFP . . . [and] discriminated against non-AdX exchanges . . . .").

Google's response—that the Court's prior decisions in *MDL I* and *MDL II* require dismissal—misses the mark. Plaintiffs' specific allegations of dishonest and anticompetitive practices distinguish their allegations from those in *MDL I* and *MDL II*, where the Court rejected allegations of harm from Open Bidding as conclusory. *MDL I*, 627 F. Supp. 3d at 394–95; *MDL II*, 721 F. Supp. 3d at 264–65. The Court's observation in *MDL II* that publishers' continued use of header bidding "belied" coercion, 721 F. Supp. 3d at 264–65, does not apply here because Plaintiffs allege specific mechanisms by which Google sabotaged header bidding stifle competition on the merits and push publishers toward Open Bidding. Plaintiffs' claim is not that Open Bidding eliminated header bidding, but that it injured competition in ad exchange markets and inflicted concrete harms on rival exchanges through anticompetitive means. For these reasons, Google's motion to dismiss should be denied as it pertains to Open Bidding.

## III.  Group B Plaintiffs' Claim Is Not Based on the References to the Waterfall and Refusal to Share Data and Thus There Is Nothing to Dismiss.

The anticompetitive acts supporting Group B's single claim for monopolization are specifically enumerated in the claims section of the Complaint and do not include Google's waterfall or data encryption conduct. Grp. B Compl. ¶ 270. The Group B Plaintiffs do not bring "standalone claims" regarding this conduct. The Group B Complaint points to DFP's black box to "la[y] the foundation" for Google's "campaign against rival ad exchanges," providing context for

the ongoing nature of the anticompetitive tie between DFP and AdX, and identification of means that Google used to conceal some of its anticompetitive conduct from its competitors and its customers. *Id.* ¶ 59; *see Berkey Photo*, 603 F.2d at 296 ("The taint of an impure origin does not dissipate after four years if a monopolist continues to extract excessive prices because of it."); *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1305 (9th Cir. 1983) (affirming judgment against alleged monopolist and holding that "[i]t is well-settled that a plaintiff may introduce background evidence to establish a continuing course of conduct or to cast light on the character of an existing conspiracy" and that "a plaintiff is entitled to a full recovery of damages suffered during the limitations period even though some undetermined portion of those damages was the proximate result of conduct occurring more than four years prior to the filing of the complaint.") (quotations and citations omitted); *PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 350 (S.D.N.Y. 2021) ("Evidence of claims which cannot give rise to liability because of a statute of limitations may be introduced to show the nature of the transactions under scrutiny and to establish a continuing course of conduct.").

As this Court previously found in denying Google's similar arguments in the MDL, Group B Plaintiffs merely "point to encrypted IDs as one of several practices that reinforced the purported tie between the DFP ad server and AdX" and argue that such "allegations about the use of encrypted IDs goes toward the plausibility and functioning of the claimed tie." *MDL II*, 721 F. Supp. 3d at 263. The references provide the same context exists here and thus there are no claims specific to the waterfall and data sharing conduct to dismiss.

## CONCLUSION

For the foregoing reasons, Competitor Plaintiffs respectfully request that the Court deny Google's motion to dismiss in its entirety.

Dated:    May 27, 2026                                        Respectfully submitted,


/s/ *Yonatan Even*                                          /s/ *Christina V. Rayburn*

Yonatan Even                                                John C. Hueston
Lauren M. Rosenberg                                         Joseph Aronsohn
Jonathan Mooney                                             **HUESTON HENNIGAN LLP**
**CRAVATH, SWAINE & MOORE LLP**                             1 Little West 12th Street
Two Manhattan West                                          New York, NY 10014
375 Ninth Avenue                                            Telephone:  (646) 930-4046
New York, NY 10001                                          jhueston@hueston.com
Telephone:  (212) 474-1000                                  jaronsohn@hueston.com
Facsimile:  (212) 474-3700
yeven@cravath.com                                           Doug J. Dixon
lrosenberg@cravath.com                                      Christina V. Rayburn
jmooney@cravath.com                                         Joseph A. Reiter
                                                            Justin M. Greer
Benjamin H. Diessel                                         **HUESTON HENNIGAN LLP**
Nathan E. Denning                                           620 Newport Center Drive, Suite 1300
Colleen M. Kozikowski                                       Newport Beach, CA 92660
**WIGGIN AND DANA LLP**                                     Telephone:  (949) 356-6412
437 Madison Avenue, 35th Floor                              ddixon@hueston.com
New York, NY 10022                                          crayburn@hueston.com
Telephone:  (212) 551-2600                                  jreiter@hueston.com
Facsimile:  (212) 551-2888                                  jgreer@hueston.com
bdiessel@wiggin.com
ndenning@wiggin.com
ckozikowski@wiggin.com                                      *Counsel for Plaintiff PubMatic, Inc.*


*Counsel for Plaintiffs OpenX Technologies,*
*Inc., and OpenX Ltd.*

*/s/ Brandon Kressin*
Brandon Kressin
**KRESSIN POWERS LLC**
400 7th St. NW, Unit 300
Washington, DC 20004
Telephone: (202) 464-2905
brandon@kressinpowers.com
*Counsel for Plaintiff Magnite, Inc.*

*/s/ Nicolas Stebinger*
Nicolas Stebinger
Victoria Sims (*Pro Hac Vice*)
**SIMONSEN SUSSMAN LLP**
1629 K Street NW, Suite 300
Washington, DC 20006
Telephone:  (202) 384-3130
nicolas@simonsensussman.com
victoria.sims@simonsensussman.com

Shaoul Sussman
Nico Gurian
Paul Goodrich (*Pro Hac Vice*)
**SIMONSEN SUSSMAN LLP**
307 West 38th Street, 16th Floor
New York, NY 10018
Telephone:  (718) 510-5495
shaoul@simonsensussman.com
nico.gurian@simonsensussman.com
paul.goodrich@simonsensussman.com

Catherine Simonsen (*Pro Hac Vice*)
Thomas Mattes (*Pro Hac Vice*)
**SIMONSEN SUSSMAN LLP**
418 Bamboo Lane, Suite C-18
Los Angeles, CA 90012
Telephone:  (917) 747-5196
catherine@simonsensussman.com
thomas.mattes@simonsensussman.com

*Counsel for Plaintiffs Equativ SAS,
Equativ Inc., Sharethrough Inc., and
Sharethrough USA, Inc.*

/s/ Ian B. Crosby
Ian B. Crosby, (WA 28461)
Edgar Sargent, (WA 28283)
Steve M. Seigel, (WA 53960)
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
icrosby@susmangodfrey.com
esargent@susmangodfrey.com
sseigel@susmangodfrey.com

Davida Brook, (CA 275370)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
dbrook@susmangodfrey.com

Emily Portuguese, (NY 5920327)
Tom Boardman, (NY 4838074)
**SUSMAN GODFREY L.L.P**.
One Manhattan West New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
eportuguese@susmangodfrey.com
tboardman@susmangodfrey.com

*Counsel for Plaintiffs Index Exchange Inc.
and Kargo Global LLC*

/s/ Ryan M. Sandrock
Paul A. Williams (Admitted SDNY)
Eric J. Hobbs (Pro Hac Vice)
**SHOOK, HARDY AND BACON L.L.P.**
1660 17th Street, Suite 450
Denver, CO 80202
Telephone: (303) 285-5300
Facsimile: (303) 285-5301
pwilliams@shb.com
ehobbs@shb.com

Riley C. Mendoza (Admitted SDNY)
**SHOOK, HARDY AND BACON L.L.P.**
111 S. Wacker Drive, Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7700
Facsimile: (312) 558-1195
rmendoza@shb.com

Ryan M. Sandrock (*Pro Hac Vice*)
**SHOOK, HARDY AND BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 544-1900
Facsimile: (415) 391-0281
rsandrock@shb.com

Erin M. Fishman (*Pro Hac Vice*)
**SHOOK, HARDY AND BACON L.L.P.**
2555 Grand Boulevard
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
efishman@shb.com

David M. Liu (*Pro Hac Vice*)
**SHOOK, HARDY AND BACON L.L.P.**
1800 K Street NW, Suite 1000
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211
dliu@shb.com

*Counsel for Plaintiff Sovrn Holdings,
Inc.*

*/s/ Adam M. Acosta*

Adam M. Acosta
**PIERSON FERDINAND LLP**
601 Pennsylvania Ave NW, Suite 900
Washington, DC 20004
(771) 244-2815
adam.acosta@pierferd.com

Matthew C. DeFrancesco
**PIERSON FERDINAND LLP**
1270 Avenue of the Americas
7th Floor—1050
New York, NY 10020
(475) 284-2005
matthew.defrancesco@pierferd.com

*Counsel for Plaintiff TRUSTX Digital
Advertising Services, Inc., P.B.C.*