# EXHIBIT I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | No. 21-MD-3010 |

*This Document Relates To:*

| | |
|---|---|
| OPENX TECHNOLOGIES, INC. and OPENX LTD., <br><br> *Plaintiffs*, <br><br> vs. <br><br> GOOGLE LLC and ALPHABET INC., <br><br> *Defendants*. | No: 1:25-cv-10817 (PKC) |
| MAGNITE, INC., <br><br> *Plaintiff*, <br><br> vs. <br><br> GOOGLE LLC and ALPHABET INC., <br><br> *Defendants*. | No: 1:25-cv-10818 (PKC) |
| PUBMATIC, INC., <br><br> *Plaintiff*, <br><br> vs. <br><br> GOOGLE LLC and ALPHABET INC., <br><br> *Defendants*. | No: 1:25-cv-10819 (PKC) |

1

<table>
<tr><td>

**EQUATIV SAS, EQUATIV INC.,**
**SHARETHROUGH INC., and**
**SHARETHROUGH USA, INC.,**

   *Plaintiffs,*

 **vs.**

**GOOGLE LLC and ALPHABET INC.,**

   *Defendants.*

</td><td>

**No: 1:26-cv-00140 (PKC)**

</td></tr>
</table>

### DEFENDANT GOOGLE LLC AND ALPHABET, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS OPENX, PUBMATIC, MAGNITE, AND EQUATIV

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendants Google LLC, through their counsel, hereby request that Plaintiffs OpenX Technologies, Inc., OpenX LTD. (collectively "OpenX"); PubMatic Inc. ("PubMatic"); Magnite, Inc. ("Magnite"); and Equativ SAS, Equativ Inc., Sharethrough Inc., and Sharethrough USA, Inc. (collectively "Equativ") answer the following document requests (the "Requests") and produce responsive documents. Documents produced must adhere to the Definitions and Instructions set forth below, the Federal Rules, and the Local Rules. Plaintiff is directed to answer within 30 days of the date these Requests are served.

### INSTRUCTIONS

1. In addition to the specific instructions set forth below, these Requests incorporate the instructions set forth in Federal Rules 26 and 34, the Local Rules, the Stipulation and Order Regarding Discovery Procedure ("ESI Order") (ECF No. 508), the Modified Confidentiality Order (ECF No. 685), or the operative version of those Orders in place at the time production is made. Subject to a valid claim of privilege, please produce the entire document if any part of that document is responsive.

2

2.      Please produce all requested documents in Your possession, custody, or control, or available to You, or to which You may gain access through reasonable effort, including information in the possession of Your past and present attorneys, accountants, investigators, consultants, agents, or other persons directly or indirectly employed or retained by You, or anyone else otherwise subject to Your control who maintains records on Your behalf, in Your name, or otherwise under Your control.

3.      Pursuant to Federal Rule 34, documents must be produced either: (a) as they are kept in the usual course of business (in which case they must be produced in such fashion as to identify the department, branch, or office in whose possession the document was found or the server or central file in which it was found, and the address of each document's custodian(s)), or (b) segregated as responsive to a specific Request enumerated herein, with such specific Request identified.

4.      If any portion of any document is responsive to any Request, a legible version of the entire document must be produced, together with all non-identical copies, versions, and drafts of that document, including all attachments and enclosures.

5.      You must retain all of the original documents for inspection or copying throughout the pendency of this Action, any appeal(s), and any related proceedings.

6.      You must produce all documents and associated metadata according to the Federal Rules, Local Rules, and the governing ESI Order for this Action. Provide instructions and all other materials necessary to use or interpret Your data compilations, such as a data dictionary, with Your production.

7.    Data and materials that are stored electronically or in machine-readable form should be produced in electronic form with sufficient information to allow counsel to readily access or read such data or materials.

8.    If You object to all or any portion of any of the below Requests, You must identify the objectionable Request or portion thereof, and the nature and basis of the objection. Notwithstanding any objection to any portion of any Request, You must produce all documents and information to which such objection does not apply.

9.    If any document responsive to a particular Request no longer exists for reasons other than Your document retention policy, describe the circumstances under which it was lost or destroyed, describe the information lost or destroyed, list the Request to which it was responsive, and list persons with knowledge of the document.

10.    If You are unable to produce a document that is responsive to a Request, describe the document, state why it cannot be produced and, if applicable, state the whereabouts of such document when last in Your possession, custody, or control.

11.    If there are no documents or information responsive to all or any portion of any Request, so state in writing.

12.    Other than redactions of privileged information, documents are to be produced in full. If any requested document cannot be produced in full, or if You withhold production of any document or portion of any document responsive to these Requests based upon any privilege, protection, or immunity, produce it to the extent possible and provide the privilege log information set forth in the governing ESI Order.

13.    In construing the Requests herein:

4

a.   Terms not specifically defined shall be given their ordinary meaning as You understand them to be used in the trade;

b.   The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all other tenses, moods, or voices, whenever necessary, to bring within the scope of any Request all information that might otherwise be construed to be outside its scope;

c.   The use of the singular form of any word includes the plural and vice versa;

d.   Words in the masculine, feminine, or neutral gender shall include each of the other genders;

e.   The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope;

f.   The terms "all," "any," and "each" shall each be construed as encompassing any and all.

14.    None of the Definitions or Requests set forth herein shall be construed as an admission relating to the existence of any evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in the Definitions or the Requests.

15.    These Requests are continuing in nature. In the event that You become aware of responsive documents or information in addition to, or in any way inconsistent with, that which You previously have produced, prompt supplementation of Your responses is required.

16.    Google specifically reserves the right to seek supplementary responses and the additional supplementary production of documents before trial.

17. Unless otherwise stated, the Requests call for the production of documents from the Relevant Period.

### DEFINITIONS

1. To the extent the terms defined below are used in the Requests, they should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules and the Local Rules. These Definitions are provided solely for the purposes of these Requests.

2. The term **"Action"** refers to all lawsuits consolidated in the above-captioned multidistrict litigation, *In re: Google Digital Advertising Antitrust Litigation*, No. 21-md-3010 (S.D.N.Y.), including: *OpenX Technologies, Inc. et al. v. Google LLC et al*, No. 25-cv-10817; *Magnite, Inc., v. Google LLC, et al.*, No. 25-cv-10818; *PubMatic, Inc. v. Google LLC et al*, No. 25-cv-10819; *Equativ SAS, et al. v. Google LLC*, No. 26-cv-00140; *Index Exchange Inc., v. Google LLC*, No. 25-cv-10477; *Kargo Global LLC v. Google LLC*, No. 25-cv-10630; and *Sovrn Holdings, Inc. v. Google LLC et al.*, No. 26-cv-1587.

3. The term **"Ad Buying Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including DSPs and Ad Networks) through which an Advertiser Purchased or can Purchase Inventory.

4. The terms **"Ad Exchange," "Supply-Side Platform,"** or **"SSP"** shall mean a third-party or In-House product or service through which two or more Ad Buying Tools (at least one of which is not owned or controlled by the entity operating the Ad Exchange) placed or can place bids in real-time auctions for Inventory offered for sale by or on behalf of two or more Publishers (at least one of which is not owned or controlled by the entity operating the Ad Exchange).

5. The term **"AdMob"** shall mean Google's mobile app monetization product described on https://admob.google.com/home/.

6. The term "**Ad Fraud**" shall mean any ad interaction that tricks an ad network into believing traffic is from real user interest. This includes, but is not limited to, showing hidden ads, auto-clicking ads, faking install attributions, showing ads outside a particular domain, or misrepresenting the domain's identity to ad networks.

7. The term **"Ad Network"** shall mean a third-party or In-House product or service (other than an Ad Exchange) through which two or more Advertisers (at least one of which is unaffiliated with the entity operating the Ad Network) Purchased or can Purchase Inventory offered for sale by two or more Publishers (at least one of which is unaffiliated with the entity operating the Ad Network).

8. The term **"Ad Selling Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including Publisher Ad Servers, Ad Exchanges, Ad Networks, SSPs, Header Bidding, or Header Bidding Wrappers) through which a Publisher sold or can sell Inventory.

9. The term "**Ad Safety**" shall refer to any actions, procedures, or policies taken to control, minimize, or eliminate Display Advertisements containing harmful, misleading, inappropriate, or illegal content, or ads placed near inventory that contains harmful, misleading, inappropriate, or illegal content.

10. The term "**Ad Spam**" shall mean Display Advertisements of poor quality (e.g., ads that are popups or have flashing or other unpleasant audio visual aspects) or objectionable content (e.g., ads that are sexually suggestive or relate to illicit activities).

11.     The terms **"Ad Tech"** or **"Ad Tech Product"** shall mean a product, service, application, tool, solution, or other interface that facilitates or is involved in the Purchase or sale of Inventory, including, but not limited to, a Publisher Ad Server, Ad Exchange, Ad Network, Header Bidding, Header Bidding Wrapper, DSP, SSP, other Ad Buying Tool, or other Ad Selling Tool. For the avoidance of doubt, this term includes In-House Ad Tech Products, as well as products or services offered by social media outlets (including, but not limited to, for example, Facebook.com and Twitter.com) and certain other Publishers that enable the Purchase of Inventory on their Properties via their own In-House Ad Tech Products. This term does not include general-purpose software or systems on which an Ad Tech Product relies.

12.     The term **"Ad Tech Provider"** shall mean a person, firm, association, or other entity selling, reselling, licensing, or otherwise providing at least one Ad Tech Product, whether or not for a fee or other compensation.

13.     The term **"Advertiser"** shall mean a person or entity that, directly or through one or more intermediaries, places one or more Display Advertisements intended to advertise or promote a good or service offered by that person or entity, or otherwise convey such person or entity's desired message, on a Publisher's Property so that it is viewed by at least one User visiting such Property. For the avoidance of doubt, Advertisers typically, but need not, pay for the placement of such Display Advertisements.

14.     The term **"AdX"** shall mean Google's Ad Exchange that was marketed as DoubleClick Ad Exchange, inclusive of all prior and subsequent iterations of the product and all variants thereof, and including, for the avoidance of doubt, the Ad Exchange functionality of Google Ad Manager and Google Ad Manager 360.

8

15.     The term **"Agency"** shall mean an advertising agency or similar consulting firm that is hired by an Advertiser to manage the Purchase of Inventory for one or more Campaigns. For the avoidance of doubt, although an Agency may use DSPs or other tools to manage such Campaigns, an entity operating a DSP shall not, solely on that basis, be deemed an Agency.

16.     The term **"Amazon"** shall mean Amazon.com, Inc., any of its current or former parents, subsidiaries, affiliates, divisions, predecessors, successors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

17.     The term **"Apple"** shall mean Apple Inc., any of its current or former parents, subsidiaries, affiliates, divisions, predecessors, successors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

18.     The term **"Apple Product(s)"** shall mean any current or former products or offerings created, designed, made available, and/or distributed by Apple, including, but not limited to, Apple News, Apple TV, Apple Watch, iPad, and iPhone.

19.     The term **"bid"** shall mean an offer, made in response to a Query, to pay a specified amount in exchange for the right to render a Display Advertisement in a unit of Inventory.

20.     The term **"Bid Data Transfer File"** shall mean the paid Feature on Google Ad Manager 360, the premium version of Google Ad Manager, that provides Publishers with non-aggregated, event-level bid data from Campaigns.

21.     The terms **"Bidder"** or **"Buyer"** shall mean an Advertiser submitting a Bid directly to an Ad Exchange or Publisher Ad Server (without an intermediary), or shall mean a DSP, Ad Network, or other person or entity submitting a Bid to an Ad Exchange or Publisher Ad Server on behalf of an Advertiser, whether known at the time or to be subsequently determined. For the

avoidance of doubt, an Ad Exchange shall not be deemed a Buyer even if it forwards a Bid it received on to another Ad Exchange or Publisher Ad Server.

22.     The term **"Brand Protection"** shall mean measures taken by Ad Tech Products to avoid or limit the display of advertisements next to objectionable content or other ads, including without limitation displaying ads next to those of a competitor, next to sexually suggestive content, or next to content related to illicit drugs.

23.     The term **"Campaign"** shall mean one or more Display Advertisements that are targeted to particular types of Inventory, Users, or objectives.

24.     The term **"Click"** shall mean an instance of a User clicking on a Display Advertisement, thereby causing the rendering of the associated landing page, but excluding instances in which the click was deemed fraudulent, inadvertent, spam, a bot, or otherwise non-genuine.

25.     The terms "**Click-Through Rate**" or "**CTR**" shall mean the frequency with which Users shown an ad click on it, calculated as Clicks divided by Impressions.

26.     The term **"Client-Side Header Bidding"** shall mean an implementation of Header Bidding in which the Queries are sent, and responsive Bids are evaluated, by code running at least in part within the User's web browser.

27.     The term **"communication"** shall have the meaning provided in Local Rule 26.3, namely, the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

28.     The term **"concerning"** shall have the meaning provided in Local Rule 26.3, namely, relating to, referring to, describing, evidencing or constituting.

29.     The term **"Connected Television"** shall mean devices or services that allow Users to watch television content served over the internet on a television screen, such as smart TVs (e.g.,

Samsung, TCL, Sony), media streaming devices (e.g., Roku Streaming Stick, Apple TV, Chromecast), or video game consoles (e.g., Xbox, PlayStation).

30. The term "**Competitor Plaintiffs**" shall mean the following entities and any of their current or former parents, subsidiaries, affiliates, divisions, predecessors, successors, officers, directors, employees, agents or representatives, and any other person acting on their behalf: OpenX Technologies, Inc., OpenX LTD., Magnite, Inc., PubMatic, Inc., Equativ SAS, Equativ Inc., Sharethrough Inc., and Sharethrough USA, Inc., Index Exchange Inc., Kargo Global LLC, Sovrn Holdings, Inc., and TripleLift, Inc.

31. The term "**Cost Type**" shall refer to the basis on which an Advertiser pays for Display Advertising, such as, but not limited to, cost-per-thousand impressions ("CPM"), cost-per-Click ("CPC"), or cost-per-action ("CPA").

32. The terms **"Demand-Side Platform"** or **"DSP"** shall mean an Ad Buying Tool, that enables an Advertiser to automatically buy Inventory sold via Ad Selling Tools in real-time on an impression-by-impression basis. For the avoidance of doubt, an Agency trading desk shall be deemed a DSP for purposes of this definition.

33. The term **"Device Type"** shall mean the electronic device by which the impression was served, including mobile devices, desktop or laptop computers, tablets, and Connected Televisions.

34. The term **"Direct Transaction"** shall mean a sale or placement of Display Advertising the price of which was determined through a contractual agreement between an Advertiser (or an Agency acting on an Advertiser's behalf) and a Publisher (without an intervening Ad Tech Exchange), including for the avoidance of doubt an agreement to set such price through an auction conducted by the Publisher itself or an affiliate thereof.

35.     The terms **"Display Advertisement"** or **"Display Advertising"** shall mean Online Advertising other than Search Advertising, and shall include Native Advertising, as well as banner, in-app and video advertising, whether social or non-social.

36.     The terms **"Display & Video 360"** or **"DV360"** shall mean Google's DSP described at https://support.google.com/displayvideo/answer/9059464?hl=en, inclusive of all prior iterations of this product or naming conventions, including DoubleClick Bid Manager.

37.     The term **"document"** shall have the meaning provided in Local Rule 26.3, namely, that the term shall be synonymous in meaning and equal in scope to the usage of the phrase "documents or electronically stored information" in Federal Rule 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

38.     The term **"documents sufficient to show"** means documents sufficient to provide a true and correct disclosure of the factual matter requested.

39.     The term "**Domain Spoofing**" shall mean a practice in which Inventory is misrepresented as being from a different web domain than it actually is.

40.     The terms **"DoubleClick for Publishers"** or **"DFP"** shall mean Google's Publisher Ad Server that was marketed as DoubleClick for Publishers, inclusive of all prior and subsequent iterations of the product and all variants thereof (e.g., Small Business, Enterprise editions, etc.), and including for the avoidance of doubt the ad server functionality of Google Ad Manager and Google Ad Manager 360.

41.     The term **"Dynamic Allocation"** shall mean the DFP Feature that enabled demand from AdX to compete in real-time with demand from third-party Ad Exchanges, Ad Networks, and Ad Buying Tools via a price floor for AdX in DFP.

42. The terms **"Dynamic Revenue Share"** ("**DRS**"), "**Sell-Side Dynamic Revenues Share**" ("**SSDRS**") or "**Revenue Share-Based Optimizations**" shall mean the Google Feature that dynamically adjusted the Fees Google charged Publishers to transact via AdX.

43. The term **"Enhanced Dynamic Allocation"** shall mean the modification to Dynamic Allocation first introduced in or about 2014, which enabled guaranteed and non-guaranteed Line Items to compete on a per-impression basis.

44. The term **"Environment"** shall mean the electronic environment in which an impression is served, meaning in a desktop web browser, in a mobile web browser, in a mobile app (other than a mobile web browser), or via Connected Television.

45. The term "**Express Fees**" shall mean Fees that are charged to a customer by an Ad Tech Provider, as opposed to merely being retained as a revenue share or retained profit. For example, a DSP fee calculated as a percentage of an Advertiser's gross spend, and charged to the Advertiser in addition to such gross spend, would be an Express Fee, but a profit or buyside margin earned by a DSP as the difference between what it charges the Advertiser (e.g. on a cost-per-click basis) and what it pays to Ad Selling Tools or Publishers to purchase such Impressions would not be an Express Fee. Similarly, a CPM fee charged by a Publisher Ad Server (e.g. x cents per thousand impressions served) would be an Express Fee, whereas the revenue share retained by an Ad Exchange (e.g. if the Ad Exchange remits 80% of gross revenue to the Publisher and retains a 20% revenue share) would not be an Express Fee.

46. The term **"Feature"** shall mean any design, feature, limitation, policy, mechanism, innovation, improvement, optimization, or strategy related to how Ad Tech Products buy, sell, price, bid for, or auction Inventory, how Ad Tech Products improve ad quality or Match Quality, how Ad Tech Products measure, or report on the effectiveness of Display Advertising, or how Ad

13

Tech Products integrate or interoperate with other Ad Tech Products, whether owned or operated by the same entity or different entities.

47. The term "**Fees**" shall mean any money retained by a provider of Ad Tech Products, including via Take Rates, for services related to the Purchase of Display Advertisements.

48. The term "**First-Party Data**" shall mean information a company collects directly from its own sources—such as websites, apps, or surveys—based on direct interactions with customers.

49. The term **"Floor Price"** shall mean the limitation on how low an Advertiser or Ad Buying Tool can bid for Inventory while still being eligible to win the impression.

50. The term **"Format"** shall mean the general makeup or layout of an ad. Different types of Display Advertising Formats include Native Advertising, Instream Video Advertising, Outstream Video Advertising, and Static Advertising.

51. The term **"Google"** shall mean Google LLC, any current or former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

52. The term **"Google Ads"** shall mean Google's Ad Buying Tool described on https://ads.google.com/home/, inclusive of all prior iterations or naming conventions, including AdWords.

53. The terms **"Google Ad Manager"** or **"GAM"** shall mean the product introduced by Google on June 27, 2018, which brought together DFP and AdX into a unified programmatic platform.

54. The term **"Gross Revenue"** shall mean revenue received from, or on behalf of, the Advertiser Purchasing the Inventory, before the deduction of any and all related Fees and/or revenue share.

55. The term **"Guaranteed Transaction"** shall mean a transaction where a specified amount of inventory is purchased.

56. The term **"Header Bidding"** shall mean the use by a Publisher of code that is directly or indirectly called during the web browser's processing or rendering of the HTML header of a webpage (and prior to the invocation of a Publisher Ad Server) and that causes Queries to be sent to one or more Ad Exchanges, Ad Networks, DSPs, or other sources of demand.

57. The term **"Header Bidding Wrapper"** shall mean a Header Bidding management system.

58. The term **"identify,"** when referring to a person, shall have the meaning provided in Local Rule 26.3, namely, to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

59. The term **"identify,"** when referring to documents, shall have the meaning provided in Local Rule 26.3, namely, to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

60. The terms **"impact"** and **"effect"** shall include both qualitative and quantitative, direct and indirect meanings of those terms.

61. The term **"impression"** shall mean the service of a single Display Advertisement to a single User.

62. The term **"In-House"** shall describe an Ad Tech Product created for a Publisher's, Advertiser's, or Agency's internal use.

63. The term **"including"** shall mean including, but not limited to.

64. The term **"Indirect Transaction"** shall mean a sale or placement of Display Advertising other than a Direct Transaction, including an Open Auction Transaction or Private Auction Transaction conducted by an Ad Exchange or a Purchase of Inventory by an Ad Network for resale to one or more Advertisers.

65. The term "**Instream Video Advertising**" shall mean Online Advertising in which the advertisement is displayed within a stream of video content that the User is viewing, e.g., before, in the middle of, or after the video content.

66. The term "**Invalid Traffic**" shall mean any clicks or impressions that do not come from a real user with a genuine interest. The term shall include intentionally fraudulent traffic as well as accidental clicks. The term shall also include, but is not limited to: (1) clicks or impressions generated by publishers clicking on their own live ads; (2) repeated ad clicks or impressions generated by one or more users; (3) publishers encouraging clicks on their ads (examples may include: any language encouraging users to click on ads, ad implementations that may cause a high volume of accidental clicks, and so on); and (4) automated clicking tools or traffic sources, robots, or other deceptive software.

67. The term **"Inventory"** shall mean space offered by Publishers for the sale or placement of Display Advertising.

68.    The term **"Line Item"** shall mean the Feature of a Publisher Ad Server that contains parameters for how a given Display Advertisement is intended to be served on a Publisher's Property, along with pricing and other delivery details.

69.    The term "**Match Quality**" shall mean the effectiveness of matching customer information parameters to a website event.

70.    The term "**Malvertising**" shall mean an attack that involves injecting harmful code into legitimate online advertising networks. The embedded malicious code often redirects users to harmful websites, risking their online security.

71.    The term **"Meta"** shall mean Meta Platforms, Inc., including Facebook, Inc., any current or former parents, subsidiaries (including, but not limited to, Facebook, Instagram, WhatsApp, and Threads), affiliates, divisions, predecessors, successors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

72.    The term **"Minimum Bid to Win"** shall mean the data that a Bidder receives after an auction is complete that includes the lowest value such Bidder could have bid to win that particular auction.

73.    The term **"Native Advertising"** shall mean Online Advertising that follows the natural form and function of the User experience in which it is placed (such as sponsored ads within a User's Facebook feed).

74.    The term **"Net Revenue"** shall mean revenue received from, or on behalf of, the Advertiser purchasing the impressions, excluding any and all Fees paid to Ad Tech Providers for the transaction.

75.     The terms **"Online Advertisement"** or **"Online Advertising"** shall mean advertising via the internet, including on websites, apps, and Connected Television. For example, both Display Advertising and Search Advertising are forms of Online Advertising.

76.     The term **"Open Auction Transaction"** shall mean an Indirect Transaction for which all, or substantially all, of the Buyers eligible to bid on the relevant Ad Exchange are or were eligible to submit Bids.

77.     The term **"Open Bidding"** shall mean the Google product or Feature, also known as "Exchange Bidding," on DFP, GAM and AdMob that enables Google and third-party Ad Networks and Ad Exchanges to compete in Google-run real-time auctions for Publisher Inventory.

78.     The term "**Other Direct Transaction"** shall mean a Direct Transaction other than a Programmatic Guaranteed Transaction, Preferred Deal Transaction, or Publisher-Automated Transaction.

79.     The term "**Other Indirect Transaction"** shall mean an Indirect Transaction other than an Open Auction Transaction or a Private Auction Transaction.

80.     The term "**Outstream Video Advertising**" shall mean Online Advertising, other than Instream Video Advertising, that includes a video or animation.

81.     The term **"Paid Advertising"** shall mean an advertising model whereby Advertisers pay Publishers to display their ads on a Property.

82.     The term **"person"** shall have the meaning provided in Local Rule 26.3, namely, any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

83.     The terms **"Plaintiff"** and **"Defendant"** as well as a party's full or abbreviated name or a pronoun referring to a party shall have the meaning provided in Local Rule 26.3, namely,

the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the Action.

84.    The term **"Preferred Deal Transaction"** shall mean a Programmatic Direct Transaction where the Inventory is not guaranteed. For the avoidance of doubt, the mere fact that the impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Preferred Deal Transaction.

85.    The term **"Private Auction Transaction"** shall mean an Indirect Transaction for which only a set of Buyers expressly identified by the Publisher (or an agent or employee thereof) are or were eligible to submit Bids.

86.    The term "**Programmatic Direct Transaction**" shall mean a Direct Transaction (other than a Publisher-Automated Transaction) that is or was negotiated, transacted, or finalized through an Ad Tech Product, provided that, for the avoidance of doubt, the mere fact that the impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Programmatic Direct Transaction if such transaction was not otherwise negotiated through such Publisher Ad Server.

87.    The term **"Programmatic Guaranteed Transaction"** shall mean a Programmatic Direct Transaction where the Inventory is guaranteed. For the avoidance of doubt, the mere fact that the impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Programmatic Guaranteed Transaction.

88.     The term **"Property"** shall mean a website, mobile application, or other product or service containing space that is sold or offered for sale for the placement of Display Advertising.

89.     The term **"Publisher"** shall mean a person or entity operating a Property. For the avoidance of doubt, the owner of the Property shall be deemed the Publisher, even if it has out-sourced the sale of its associated Inventory, in whole or in part, to a third party.

90.     The term **"Publisher Ad Server"** shall mean a third-party or In-House product, service, or system that is responsible for selecting (or attempting to select), on behalf of a Publisher, the Display Advertisement (or source from which such Display Advertisement shall be obtained) for a unit of Inventory. For the avoidance of doubt, a Publisher Ad Server may be owned and/or operated by a third-party Ad Tech Provider, or may be owned, developed, or operated by the Publisher or by a third-party on behalf of or under contract with the Publisher. For the further avoidance of doubt, a system that creates or manages mediation chains constitutes a Publisher Ad Server for purposes of these Requests.

91.     The term **"Publisher-Automated Transaction"** shall mean a Direct Transaction that is or was negotiated, transacted, or finalized through one or more automated services, whether or not auction-based, that is controlled by the Publisher or an affiliate thereof (other than an Ad Network, Ad Exchange, or SSP). This would include, for example, the Publisher's self-service website for Advertisers to create Campaigns or place advertisements, such as that described at https://facebook.com/business/ads. For the avoidance of doubt, the mere fact that the impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server (including one operated by the Publisher) shall not be sufficient to render such transaction a Publisher-Automated Transaction.

92.     The term **"Purchase,"** when used in connection with Inventory or impressions, shall mean to obtain, directly or indirectly through one or more intermediaries, the right to render or display a Display Advertisement in a unit of Inventory, typically but not necessarily in exchange for a monetary payment.

93.     The term **"Query"** shall mean a request to provide, or Bid to provide, a Display Advertisement to be rendered in a unit of Inventory, whether denominated as an "ad request," "bid request," or otherwise.  A Query may, but need not, request a Bid that will be considered before awarding the right to actually display a Display Advertisement to a particular Advertiser.

94.     The term **"reflecting"** shall mean illustrating or describing.

95.     The term **"Relevant Period"** shall mean January 1, 2013 to present.

96.     The term **"Search Advertising"** shall mean Online Advertising that is displayed in response to a User's search intent or search terms.

97.     The terms **"Self-Competition"** or **"Bid Duplication"** shall mean a situation in which Bids from the same Campaign, same Advertiser, or same Ad Buying Tool compete against each other in the same auction or same chain of auctions.

98.     The term **"Server-Side Header Bidding"** shall mean an implementation of Header Bidding in which the Queries are sent, and responsive Bids are evaluated, by code running on a server (even if such server code is invoked from a call from the User's web browser).

99.     The term **"Static Advertising"** shall mean Online Advertising consisting solely of static (i.e., non-moving or -changing) text, images, or graphics.

100.     The term **"Supply Path Optimization"** shall mean practices of Ad Tech Products that connect Advertisers with Publishers' Inventory in the most efficient manner (for example,

21

buying Inventory in a way that reduces the number of Ad Tech Products required for the transaction).

101.   The term **"Take Rate"** shall mean the proportion of total revenue generated from Purchased Inventory that an Ad Tech Provider collects as part of its fee arrangement in connection with the Purchased Inventory.

102.   The term **"Transaction Type"** shall mean Programmatic Guaranteed Transaction, Preferred Deal Transaction, Publisher-Automated Transaction, Other Direct Transaction, Open Auction Transaction, Private Auction Transaction, or Other Indirect Transaction.

103.   The term **"User"** shall mean an end user visiting or using a Property, or a proxy for that end user (including, but not limited to, cookie identifiers or mobile ad identifiers).

104.   The term **"Winning Bid"** shall mean the Bid in an auction that ultimately succeeded in Purchasing the relevant Inventory.

105.   The terms **"You"** or **"Your"** refers to OpenX Technologies, Inc., OpenX Ltd., Magnite, Inc., PubMatic, Inc., Equativ SAS, Equativ Inc., Sharethrough Inc., and Sharethrough USA, Inc., including their parents, predecessors, successors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing. "You" and "Your" includes each of OpenX Technologies, Inc., OpenX Ltd., Magnite, Inc., PubMatic, Inc., Equativ SAS, Equativ Inc., Sharethrough Inc., and Sharethrough USA, Inc.'s Ad Tech Products, brands or Properties, including any brand, entity, Property, or service on whose behalf Plaintiffs' claim damages in this Action.

**REQUESTS FOR DOCUMENTS**

**<u>REQUEST FOR PRODUCTION NO. 1</u>**

Documents and communications sufficient to identify all of Your Ad Tech Products and to describe their Features, policies, and restrictions on types of content and/or customer behavior.

**<u>REQUEST FOR PRODUCTION NO. 2</u>**

Documents and data sufficient to show for any Ad Tech Product that You operate or have operated since January 1, 2013, on a monthly basis, for all Display Advertising transactions involving such SSP or Ad Exchange in which the resulting impressions were rendered to Users, the (i) total Queries You received; (ii) total impressions Purchased; (iii) total Clicks; (iv) total Buyer Payments that You received for such impressions from Winning Bidders; (v) total payments that You made to Publishers for such impressions; and (vi) total express Fees collected by Your SSP or Ad Exchange in connection with such impressions; and (vii) total Fees collected by Your SSP or Ad Exchange in connection with such impressions, separately for each unique combination of the following parameters (a)-(k) below:

a. The SSP or Ad Exchange that You operate or operated at any point since January 1, 2013;

b. The Publisher;

c. The Publisher Ad Server, Header Bidding Wrapper, SSP, ad tag, or other source sending the Queries to such SSP/Ad Exchange;

d. The Ad Buying Tool and Bidder with the Winning Bid for each impression;

e. The Advertiser with the Winning Bid for each impression (if known);

f. The Transaction Type through which the impressions were Purchased;

g.  The Format of the impressions, including in the case of video, whether for Instream Video Advertising or Outstream Video Advertising;

h.  The Environment on which the impressions were displayed;

i.  The Device Type on which the impressions were displayed;

j.  The Cost Type that was specified for purchasing the impressions; and

k.  whether the impressions were displayed on social media.

Data and documents produced in response to this Request should include all jurisdictions for which You claim damages or impact. For any data and documents which You are unable to restrict by geography (for example, the geography is ambiguous or unknown), such data and documents shall be treated as responsive to this Request.

**REQUEST FOR PRODUCTION NO. 3**

For each Advertiser, Publisher, Ad Buying Tool, and Ad Selling Tool referenced in Your response to the preceding specification(s), whether by an identifier or otherwise, documents sufficient to identify such Advertiser, Publisher, Ad Buying Tool, and Ad Selling Tool.

**REQUEST FOR PRODUCTION NO. 4**

For each Ad Buying Tool that You operate or have operated, documents and data sufficient to show on a monthly basis, for all Display Advertising transactions involving such Ad Buying Tool, the (i) total Impressions purchased; (ii) total Attributed Clicks (or Clicks, if Attributed Clicks are not known) for such Impressions; (iii) total Attributed Conversions for such Impressions; (iv) total Attributed Sales for such Impressions; (v) total Gross Revenue that You received from Advertisers for such Impressions (or Clicks thereon); (vi) total Buyer Payments that You made for such Impressions; (vii) total Express Fees that You collected on such Impressions; and (viii) total Fees that You collected on such Impressions. The foregoing should be aggregated at a monthly

24

level, separately for each unique combination of the following parameters:

a. Ad Buying Tool that You operate or have operated at any point since January 1, 2013;

b. Advertiser and Ad Agency (if used) that Purchased the Impressions through such Ad Buying Tool;

c. Ad Exchange, Header Bidding Wrapper, or other Ad Selling Tool from which You received the Query that led to the Purchase of such Impressions (or otherwise through which the Impressions were purchased);

d. Publisher Ad Server that served the Impressions;

e. Transaction Type through which the Impressions were purchased;

f. Publisher of the Inventory on which the Impressions were displayed;

g. Environment in which the Impressions were displayed;

h. Format of the Impressions, including in the case of video, whether for Instream Video Advertising or Outstream Video Advertising;

i. Cost Type that was specified for purchasing the Impressions; and

j. whether the Impressions were displayed on social media.

Data and documents produced in response to this Request should include all jurisdictions for which You claim damages or impact. For any data and documents which You are unable to restrict by geography (for example, the geography is ambiguous or unknown), such data and documents shall be treated as responsive to this Request.

**REQUEST FOR PRODUCTION NO. 5**

For each Ad Buying Tool that You operate or have operated, documents and data sufficient to show for each month since January 1, 2013, for all Display Advertising transactions involving such Ad Buying Tool, the (i) total Queries You received; (ii) total responses submitted; and (iii)

total Impressions You won.

**<u>REQUEST FOR PRODUCTION NO. 6</u>**

Documents and data sufficient to show on a monthly basis, for impressions rendered to Users, the (i) total Queries, (ii) total Bids, (iii) total impressions, (iv) total Clicks, (v) total Gross Revenue earned, (vi) total Buyer Payments received, (vii) total Net Revenue earned, (viii) total Fees paid, separately for each unique combination of (1) the Header Bidding Wrapper which won the impression, (2) the Ad Selling Tool used to transact the impression, (3) the Format of the impression, and (4) the Environment in which the impression was displayed, and separately for each of the following types of impressions (a)-(e) below:

a. Impressions for which Server-Side Header Bidding was used, called, or otherwise eligible to run an auction or auctions for the particular impression;

b. Impressions for which Server-Side Header Bidding was the Winning Bid;

c. Impressions for which Client-Side Header Bidding was used, called, or otherwise eligible to run an auction or auctions for the particular impression;

d. Impressions for which Client-Side Header Bidding was the Winning Bid; and

e. Impressions for which Header Bidding was not used, called, or otherwise eligible to run an auction or auctions for the particular impression.

Data and documents produced in response to this Request should include all jurisdictions for which You claim damages or impact. For any data and documents which You are unable to restrict by geography (for example, the geography is ambiguous or unknown), such data and documents shall be treated as responsive to this Request.

**REQUEST FOR PRODUCTION NO. 7**

For all Display Advertising transactions involving each Ad Tech Product that You operate or have operated, documents and data sufficient to show on a monthly basis the (i) total Queries, (ii) total Bids, (iii) total Impressions, (iv) total Clicks, (v) total Gross Revenue earned, (vi) total Buyer payments received, (vii) total Net Revenue earned, (viii) total Express Fees paid, and (ix) total Fees paid, detailed to separately show for each unique combination of (1) the Header Bidding Wrapper which won the Impression, (2) the Ad Selling Tool used to transact the Impression, (3) the Format of the Impression, and (4) the Environment in which the Impression was displayed, and separately for each of the following types of Impressions (a)-(e) below:

a.  Impressions for which Server-Side Header Bidding was used, called, or otherwise eligible to run an auction or auctions for the particular Impression;

b.  Impressions for which Server-Side Header Bidding was the Winning Bid;

c.  Impressions for which Client-Side Header Bidding was used, called, or otherwise eligible to run an auction or auctions for the particular Impression;

d.  Impressions for which Client-Side Header Bidding was the Winning Bid;

e.  and Impressions for which Header Bidding was not used, called, or otherwise eligible to run an auction or auctions for the particular Impression.

Data and documents produced in response to this Request should include all jurisdictions for which You claim damages or impact. For any data and documents which You are unable to restrict by geography (for example, the geography is ambiguous or unknown), such data and documents shall be treated as responsive to this Request.

**REQUEST FOR PRODUCTION NO. 8**

Any documents and communications regarding any market in which your Ad Tech Products complete, including, but not limited to, the two-sided nature of any such market.

**REQUEST FOR PRODUCTION NO. 9**

Any documents and communications regarding or relating to market trends for any advertising formats, including, but not limited to, Display Advertising and search advertising.

**REQUEST FOR PRODUCTION NO. 10**

All documents and communications regarding or relating to market trends for any advertising formats, including but not limited to "open-web display advertising" (as alleged in the Complaint), to the extent not already encompassed within request number 9.

**REQUEST FOR PRODUCTION NO. 11**

All documents and communications analyzing competition among Ad Buying Tools, analyzing competition among Ad Exchanges (including, but not limited to, disintermediation of exchanges by direct deals or by Ad Buying Tools), and analyzing competition among Publisher Ad Servers.

**REQUEST FOR PRODUCTION NO. 12**

All documents and communications analyzing competition between open-web display advertising, as defined in Paragraph 188 of Your Complaint, and other forms of digital advertising, including, but not limited to, in-app ads, outstream video ads, social media ads, mobile ads, search ads, and competition from retail media networks.

**REQUEST FOR PRODUCTION NO. 13**

All documents and communications analyzing the competitive impact on Your business of Advertisers' ability to Purchase advertising directly from Publishers.

28

**REQUEST FOR PRODUCTION NO. 14**

All documents and communications relating to the competition You face from Ad Tech Products offered by Meta, Amazon, Twitter (n/k/a X), LinkedIn, TikTok, artificial intelligence products, or products offered by retail media networks. This Request includes, but is not limited to, all documents and communications concerning the effect of any of these Ad Tech Products on Your revenues from Online Advertising and shall include documents analyzing the strengths, weaknesses, Features, Fees, and effectiveness of these Ad Tech Products or Ad Tech Providers, market size and shares, competitor entry and expansion, pricing, and network effects.

**REQUEST FOR PRODUCTION NO. 15**

All documents and communications relating to the competition You face from Ad Tech Products offered by Competitor Plaintiffs. This Request includes all documents and communications concerning the effect of any of these Ad Tech Products on Your revenues from Online Advertising and shall include documents analyzing the strengths, weaknesses, Features, Fees, and effectiveness of these Ad Tech Products or Ad Tech Providers, market size and shares, competitor entry and expansion, pricing, and network effects.

**REQUEST FOR PRODUCTION NO. 16**

All Your studies of revenue for Display Advertising by Format, Environment, or publisher type, and Ad Tech Product, including but not limited to all internal studies, analyses, and communications comparing Display Advertising against all other forms of advertising, including print advertising and advertising in connection with podcasts.

**REQUEST FOR PRODUCTION NO. 17**

All documents and communications analyzing the competition You face in selling Your Ad Tech Products, including Documents analyzing the strengths, weaknesses, Features, and

29

effectiveness of Ad Tech Products or Ad Tech Providers (including actual or potential In-House Ad Tech Products), market size and shares, competitor entry and expansion, pricing, network effects, and Your competition with Google.

**REQUEST FOR PRODUCTION NO. 18**

All documents and communications analyzing the industry in which you sell Your Ad Tech Products, including documents analyzing industry output, pricing, investment, and/or innovation.

**REQUEST FOR PRODUCTION NO. 19**

Organizational charts, personnel directories, and other documents sufficient to show Your organizational structure and employees, including:

a. The organization of any division, department, unit, or subdivision of Your company that has responsibilities concerning advertising, including, but not limited to, Display Advertising;

b. The identity of any officers, directors, employees, committees, subcommittees, or working groups that have responsibilities concerning advertising, including, but not limited to, Display Advertising; and

c. Any other employee with management or supervisory authority over Your business, as well as any involved in supporting such efforts, including any secretaries or administrative assistants assigned to them.

**REQUEST FOR PRODUCTION NO. 20**

Any strategic plans, executive presentations, projections, pitches to potential investors and related communications, scenario analyses, and financial statements relating in any way to Display Advertising.

**REQUEST FOR PRODUCTION NO. 21**

All documents and communications relating to any analysis, assessment, evaluation, or discussion comparing Your Ad Tech Products to competitor Ad Tech Products, including but not limited to AdX and DFP from January 1, 2010 to present.

**REQUEST FOR PRODUCTION NO. 22**

All documents and communications relating to Your consideration or use of vendors providing Ad Tech services, including without limitation Your contracts with those vendors. Examples of third-party vendors providing Ad Tech services include firms providing advertising protection solutions, Artificial Intelligence (AI)-related services, and data brokers.

**REQUEST FOR PRODUCTION NO. 23**

All documents reflecting Your analyses of customer satisfaction and/or retention (i.e., churn), including Your wins and losses of customer accounts, spending, or sales; customers' response to changes in Your Fees or the cost-effectiveness of their Display Advertising while using Your Ad Tech Product(s); actual or perceived differences between Your customers and Your competitors' customers; and customer compliments and complaints regarding Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 24**

All documents and communications concerning complaints or feedback received by You about Your Ad Tech Products, including, but not limited to, complaints or feedback regarding: (a) Your customer service; (b) and the quality of Your descriptions or disclosures related to Your Ad Tech Products; (c) Fees and costs associated with Your Ad Tech Products; (d) the quality of Your Ad Tech Products.

31

**REQUEST FOR PRODUCTION NO. 25**

All documents and communications concerning the resolution of customer (including Advertisers, Publishers, and other Ad Tech Products) complaints in connection with Your Ad Tech Products, including documents and communications sufficient to show the length of time it took to resolve a customer's complaint and the measures undertaken to do so.

**REQUEST FOR PRODUCTION NO. 26**

Any complaints or feedback you've received from Your customers concerning Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO.  27**

All documents and communications concerning complaints or feedback received by You regarding deceptive practices by You or Your employees.

**REQUEST FOR PRODUCTION NO. 28**

All documents, communications, and data concerning business pitches to prospective customers (including Advertisers, Publishers, and other Ad Tech Products) of Your Ad Tech Products, including documents, communications, and data concerning why pitches to prospective customers succeeded or failed, and which Ad Tech Providers won the customer's business.

**REQUEST FOR PRODUCTION NO. 29**

All documents and communications sufficient to show the number and names of Your employees whose job is dedicated, in whole or in part, to customer service and customer support.

**REQUEST FOR PRODUCTION NO. 30**

All documents and communications sufficient to show the total costs You expend in connection with customer service and customer support as it relates to the use of Your Ad Tech Products.

32

**REQUEST FOR PRODUCTION NO. 31**

All documents and communications sufficient to show the total number of employees and the name(s) of the employees whose jobs entail customer service and customer support regarding the use of Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 32**

All documents, communications, and data analyzing the extent to which customers multi-home among Ad Tech Products of the same type.

**REQUEST FOR PRODUCTION NO. 33**

All documents, communications, and data analyzing switching from any type of Ad Tech Product to another advertising alternative (including other Ad Tech Products) including the reasons for switching; the costs and time involved in such switching; and the actual or potential impact from such switching on Your revenues, Your profits, Your customers' return on investment, or Your customers' return on advertising spend from Digital Advertising.

**REQUEST FOR PRODUCTION NO. 34**

All documents and communications reflecting how You promote or market Your Ad Tech Products, or any Features of Your Ad Tech Products, to customers, including, but not limited to, how You promote benefits or advantages related to:

    a.  access to Inventory, including any unique Inventory available on Your platform but not on rival platforms;

    b.  access to demand from Advertisers and Ad Buying Tools, including any "unique demand" or demand that is accessible only through Your Ad Tech Product(s);

    c.  success in delivering on customers' commercial objectives, including return on investment, return on advertiser spend, and/or Publisher yield;

33

d.   ad latency and page latency caused by ads;

e.   enhancement of the User experience;

f.   Automated Bidding;

g.   Brand Protection;

h.   ad quality, including Ad Spam;

i.   Match Quality;

j.   Viewability;

k.   Click-Through Rate;

l.   Conversion Rate;

m.   Advertiser quality;

n.   Publisher website quality;

o.   quality of Publishers' visitors;

p.   Ad Tech Product quality;

q.   fraudulent Inventory, including Domain Spoofing;

r.   privacy;

s.   customers' ability to switch between Ad Formats;

t.   customers' ability to switch among Ad Environments;

u.   proprietary Ad Formats; and

v.   scale.

## REQUEST FOR PRODUCTION NO. 35

All documents and communications reflecting and / or concerning how you describe Your

Ad Tech Product's auction and any changes to the auction, including, but not limited to,

descriptions of the auction format (e.g., first-price, second-price), auction mechanics, and auction optimizations.

**REQUEST FOR PRODUCTION NO. 36**

All documents and communications concerning Your representations to customers concerning your Ad Tech Product's access to "unique demand."

**REQUEST FOR PRODUCTION NO. 37**

Documents and communications sufficient to show the Fees You charge for Your Ad Tech Products, the factors You consider in pricing each of Your Ad Tech Products, and how the pricing of Your Ad Tech Products has changed over time or differed across customers, ad formats, or based on other factors, including documents concerning the transparency of, and Your representations concerning, such pricing, Fees, or Take Rates.

**REQUEST FOR PRODUCTION NO. 38**

Documents and communications sufficient to show any rebates, volume discounts, or other financial incentives You paid or provided to Your customers (including Advertisers and Publishers), including documents concerning the transparency of, and Your representations concerning, such rebates, discounts, or other financial incentives.

**REQUEST FOR PRODUCTION NO. 39**

Documents and communications sufficient to show any rebates, volume discounts, or other financial incentives provided to You from a Publisher, including any communications concerning, such rebates, discounts, or other financial incentives.

**REQUEST FOR PRODUCTION NO. 40**

Documents and communications discussing or analyzing Your or others' actual or considered integration of multiple Ad Tech Products and any impact, advantages, costs, or

disadvantages of integration, including the integration of Google's Ad Exchange and Google's Publisher Ad Server, and Your customers' actual or anticipated reactions to the integration.

**REQUEST FOR PRODUCTION NO. 41**

Documents and communications discussing or analyzing any similarities or differences between Your or others' actual or considered integration of multiple Ad Tech Products and the integration of Google's Ad Exchange and Google's Publisher Ad Server.

**REQUEST FOR PRODUCTION NO. 42**

Documents and communications reflecting any actual or considered interoperability between Your Ad Tech Products and Ad Tech Products offered by other Ad Tech Providers.

**REQUEST FOR PRODUCTION NO. 43**

All documents and communications reflecting any decision by You not to interoperate with another Ad Tech Product offered by another Ad Tech Provider including documents reflecting the rationale behind the decision.

**REQUEST FOR PRODUCTION NO. 44**

All documents and communications analyzing Your strategies and decisions concerning integration or interoperability between Your Ad Tech products and any Header Bidding offering or technology (such as those available from Amazon, PreBid, or other sources), including the impacts of such offering or technology on revenue, latency, Bid Duplication or Self-Competition, multiple calls for the same Inventory, privacy concerns, billing issues, ad quality or ad spam, and fraudulent Inventory.

**REQUEST FOR PRODUCTION NO. 45**

All communications, and documents relating to communications, with any Ad Tech Provider with which You interoperate concerning issues relating to integration or interoperability,

36

including documents and communications relating to revenue disparities, latency, Bid Duplication or Self-Competition, multiple calls for the same Inventory, privacy concerns, billing issues, ad quality or ad spam, and fraudulent Inventory.

**REQUEST FOR PRODUCTION NO. 46**

Documents sufficient to show, separately for each of Your Ad Tech Products and for each year from January 1, 2013 to the present, the costs that You have incurred to develop and/or improve each of Your Ad Tech Products, including documents identifying Your costs, including fixed vs. variable costs, related to research and development of Ad Tech Products and documents describing how Your total costs are allocated among Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 47**

All documents and communications relating to Supply Path Optimization, including, but not limited to, (a) any Supply Path Optimization feature(s) You offer, have considered offering, or have integrated into Your Ad Tech Products; and (b) any documents and communications relating to the impact of Supply Path Optimization on Your revenue.

**REQUEST FOR PRODUCTION NO. 48**

All documents and communications relating to potential or actual direct integrations between: (a) Your Ad Exchange and any Publisher; (b) Your Ad Exchange and any Advertiser or Ad Agency; and (c ) Your Ad Server and any Advertiser or Ad Agency.

**REQUEST FOR PRODUCTION NO. 49**

All documents related to Your use of artificial intelligence (AI) technology in connection with Your Ad Tech Products, including, but not limited to: (a) any past, existing, planned, contemplated, or future proprietary AI customer offerings and (b) any past, existing, planned, contemplated, or future integrations with AI Ad Tech technology.

**REQUEST FOR PRODUCTION NO. 50**

All documents, data, and communications relating to the effect of the external use by customers or other companies of artificial intelligence (AI) on Your Display Advertising decisions or revenue.

**REQUEST FOR PRODUCTION NO. 51**

All documents, data, and communications, including competitive analyses You have undertaken regarding the effect of the external use of artificial intelligence (AI): (a) by Advertisers, Publishers, Users, and/or Ad Tech Providers; (b) on the competitive landscape for Ad Exchanges; (c) on the competitive landscape for Publisher Ad Servers; and (d) on ad formats in digital advertising.

**REQUEST FOR PRODUCTION NO. 52**

All documents analyzing the factors that Advertisers consider in deciding to buy Display Advertising (i) in different Formats and Environments; (ii) between Direct and Indirect Transactions; (iii) among different Transaction Types; (iv) between social media and non-social media Properties; (v) between Inventory purchased using Agencies and not using Agencies; and (vi) from or through different DSPs, Ad Networks, Ad Exchanges, SSPs, Publisher Ad Servers, or Publishers.

**REQUEST FOR PRODUCTION NO. 53**

All documents analyzing how revenues, costs, profits, return on investment, return on advertiser spend, or any other commercial objectives are impacted by Advertisers' decisions to buy Display Advertising (i) in different Formats and Environments; (ii) through Direct and Indirect Transactions; (iii) with different Transaction Types; (iv) on social media and non-social media Properties; (v) using Agencies and not using Agencies; (v) from or through different Ad

38

Exchanges, SSPs, Publisher Ad Servers, or Publishers, and (vi) through multiple or a combination of different Ad Buying Tools.

**REQUEST FOR PRODUCTION NO. 54**

All documents and communications analyzing the factors that Publishers consider in deciding to sell Display Advertising (i) through different Formats and Environments; (ii) in Direct and Indirect Transactions; (iii) through different Transaction Types; (iv) through different Advertisers, DSPs, Ad Exchanges, SSPs, or Publisher Ad Servers; and (v) through multiple different Ad Selling Tools, including how Publishers choose to allocate Inventory to each of these dimensions.

**REQUEST FOR PRODUCTION NO. 55**

All documents and communications analyzing how revenues, costs, profits, return on investment, or any other commercial objectives are impacted by Publishers' decisions to sell Display Advertising (i) in different Formats and Environments; (ii) through Direct and Indirect Transactions; (iii) with different Transaction Types; (iv) from or through different Advertisers, DSPs, Ad Exchanges, SSPs, or Publisher Ad Servers, other type of intermediary, or Publisher-Automated Transactions; and (v) through multiple or a combination of different Ad Selling Tools.

**REQUEST FOR PRODUCTION NO. 56**

All documents and communications concerning the factors that Publishers consider in determining what Floor Price to set for Inventory or analyzing how revenues, costs, profits, return on investment, or any other commercial objectives are impacted by Publishers' decisions related to Floor Price.

**REQUEST FOR PRODUCTION NO. 57**

All documents and communications sufficient to show: (i) the types of User data You collect in operating Your Ad Tech Products; (ii) the methods and processes You employ to use the User data You collect to form User profiles and audience lists; (iii) what User data You transmit to any other Ad Tech Product with which you interoperate; and (iv) any complaints or feedback received about Your use or collection of this User data.

**REQUEST FOR PRODUCTION NO. 58**

All documents and communications analyzing how the availability or use of User identifiers, proxy identifiers (e.g. Apple Identifier for Advertisers (IDFA), Android AdID, Third-Party Cookies, logged-in account, etc.) or other User tracking mechanisms affect the performance, profitability, or other measures of commercial success of Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 59**

All documents and communications relating to Header Bidding's effect, if any, on Your Display Advertising decisions or revenue, including any analysis, experiments, or A/B studies (whether done by You or a third party) of Header Bidding's impact on You.

**REQUEST FOR PRODUCTION NO. 60**

All documents, data, and communications discussing or analyzing the costs of Header Bidding to You including both monetary as well as non-monetary costs (e.g., latency, or website issues).

**REQUEST FOR PRODUCTION NO. 61**

All documents, data, and communications discussing or analyzing the impacts of Header Bidding (including integrations of Your technology with Header Bidding), including documents discussing (a) latency from Header Bidding; (b) Bid Duplication, Self-Competition, or multiple

calls for the same Inventory resulting from Header Bidding; (c) the presence or absence of Brand Protection in Header Bidding; (d) the presence or absence of User privacy protections in Header Bidding; (e) billing issues with Header Bidding, including Your not receiving payment for Winning Bids; (f) fraudulent Inventory relating to Header Bidding; (g) malware related to Header Bidding; and/or (h) setup and ongoing operational costs of Header Bidding.

### REQUEST FOR PRODUCTION NO. 62

All documents, data, and communications relating to the Header Bidding implementations You have used, interoperated with, or supported.

### REQUEST FOR PRODUCTION NO. 63

All documents, data, and communications relating to Your use or consideration of Client-Side versus Server-Side Header Bidding.

### REQUEST FOR PRODUCTION NO. 64

All documents and communications concerning Your decision to participate in Header Bidding, including all analyses considering the cost and benefits of Your decision.

### REQUEST FOR PRODUCTION NO. 65

All documents, communications, and data concerning any analysis You conducted relating to Your decision to participate in Open Bidding instead of, or in addition to, Header Bidding.

### REQUEST FOR PRODUCTION NO. 66

All documents, communications, and data relating to Your involvement with Prebid. This includes, but it is not limited to, any documents, communications related to You offering, or potentially offering, a Prebid "Managed Service"; Your payment of any membership fees, or funding of any kind, to PreBid; documents reflecting any current or former employee, director, or officer of Your company serving on the Prebid Board of Directors; documents reflecting any

41

current or former employee, director, or officer of Your company serving on a Prebid Project Management Committee; documents reflecting any current or former employee, director, or officer of Your company working, consulting, or otherwise contributing to or having involvement with the update or development of an existing or new Prebid software, product, or service.

**REQUEST FOR PRODUCTION NO. 67**

Documents and communications sufficient to show: (a) the auction format Your Ad Tech Products used to determine the winning Bidder in auctions they conduct (e.g., first-price auctions, second-price auctions, hybrid auctions) since January 1, 2013; (b) how (if at all) that format(s) changed from January 1, 2013 to the present, including the dates when changes were made; (c) the reasons for making those changes; and (d) any disclosures, public announcements, or customer communications regarding auction format or changes to the auction format.

**REQUEST FOR PRODUCTION NO. 68**

All documents and communications related to actual or potential reactions by Advertisers or Ad Buying Tools to actual or potential changes to auctions conducted by Your Ad Tech Products, including documents and communications concerning bid-shading into Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 69**

All documents and communications related to any Ad Buying Tool's practice of submitting multiple bids to one exchange for the same auction.

**REQUEST FOR PRODUCTION NO. 70**

Documents and communications sufficient to show how demand sources are ranked or compared with one another in Your Ad Tech Product's process of choosing an ad to serve in response to a Query, and: (a) how an ad is selected to serve as a result of such rankings or

42

comparisons, including any changes over time since January 1, 2013; (b) how (if at all) that format(s) changed from January 1, 2013 to the present, including the dates when changes were made; (c) the reasons for making those changes; and (d) any disclosures, public announcements, or customer communications regarding auction format or changes to the auction format.

**REQUEST FOR PRODUCTION NO. 71**

All documents and communications related to Publishers' ability to set different price floors for different Bidders for the same impression in Your auctions, including policy descriptions, customer communications, or internal discussions.

**REQUEST FOR PRODUCTION NO. 72**

All documents and communications related to services, Features, or optimizations You offered to assist Publishers in setting auction floor prices.

**REQUEST FOR PRODUCTION NO. 73**

All documents and communications related to actual or potential differences in Floor Prices set by Publishers for Your Ad Tech Product and other Ad Tech Products, including internal discussion or analysis of differences in Floor Prices and communications with Publishers regarding setting different Floor Prices.

**REQUEST FOR PRODUCTION NO. 74**

All documents and communications related to actual or potential differences in Floor Prices between Inventory accessed through Header Bidding, Inventory accessed through Open Bidding, and/or Inventory accessed through any other supply path.

**REQUEST FOR PRODUCTION NO. 75**

All documents and communications related to advising Publishers on setting up or working with Your Ad Tech Products, including recommendations, instructions, advice, or discussion about

configurations, code snippets, line item priority and/or CPM settings, Floor Prices, and header bidding wrappers.

**REQUEST FOR PRODUCTION NO. 76**

All documents and communications related to the revenue share charged to Publishers, including the ways in which those revenue shares may vary on a per impressions basis, the amount by which You vary Your revenue share, the reason for varying Your revenue share, the information You take into account in deciding the amount by which to vary Your revenue share, and any public disclosures or communications regarding Your decision to vary the revenue share.

**REQUEST FOR PRODUCTION NO. 77**

All documents and communications related to the revenue share charged by other Ad Tech Products to Publishers, including the ways in which those revenue shares may vary on a per impressions basis.

**REQUEST FOR PRODUCTION NO. 78**

Documents and communications discussing or analyzing any similarities or differences between Your revenue share charged to Publishers and Google's revenue share charged to Publishers.

**REQUEST FOR PRODUCTION NO. 79**

All documents and communications related to the post-auction information You provided to Bidders which had submitted a bid for an individual impression into Your Ad Exchange,

including, but not limited to, any post-auction Minimum Bid to Win data that You provided to Bidders.

### REQUEST FOR PRODUCTION NO. 80

All documents and communications discussing how Your Ad Exchange demand sources competed with a Publisher's pre-existing Publisher Ad Server demand sources, including whether Your Ad Exchange set a floor price based on the revenue a Publisher might expect to receive from other demand sources and how Your Ad Exchange interacted with other sources of demand in the waterfall.

### REQUEST FOR PRODUCTION NO. 81

All documents and communications related to proposed or actual Features You offered that allowed remnant demand and guaranteed demand to compete directly or indirectly in the same auction or for the same Inventory, including any algorithm or feature related to determining how to allocate an impression between remnant demand and guaranteed demand.

### REQUEST FOR PRODUCTION NO. 82

All documents and communications relating to any feature, tool, or component of Your Ad Tech Products that is similar in functionality to Google's Dynamic Allocation or First Look, Sell Side Dynamic Revenue Share, Bernanke (including Global Bernanke, Project Bell, and Project Alchemist), Poirot, Exchange Bidding, Uniform/Unified Pricing Rules, and Project Elmo from January 1, 2008 to present.

### REQUEST FOR PRODUCTION NO. 83

Without regard to any time period, all documents, communications, and data that You relied upon for the allegations in Your Complaint.

**REQUEST FOR PRODUCTION NO. 84**

Without regard to any time period, any documents and communications relating to the conduct You allege in Your Complaint and/or Your understanding, knowledge, and contentions regarding the Complaint's alleged conduct, including, but not limited to:

a. Google's alleged conduct, including when You first became aware or otherwise were put on notice of the conduct alleged in Your Complaint or any aspect thereof;

b. the relevant antitrust markets You allege;

c. Google's alleged monopoly power or market power in the alleged relevant markets;

d. the alleged anticompetitive effects of Google's alleged conduct; and

e. all relief You are seeking, whether monetary, injunctive, and/or structural.

**REQUEST FOR PRODUCTION NO. 85**

All documents, communications, and data reflecting Your decision whether or not to participate in Open Bidding, including, but not limited to, the pros and cons of doing so.

**REQUEST FOR PRODUCTION NO. 86**

All documents, communications, and data related to Your use of Open Bidding, including, but not limited to, data showing all Open Bidding sales and any associated fees paid by You.

**REQUEST FOR PRODUCTION NO. 87**

All documents, communications, and data comparing Open Bidding with Header Bidding.

**REQUEST FOR PRODUCTION NO. 88**

All documents and communications related to Your understanding of how Google's DV360 bid into non-Google Ad Exchanges; including, but not limited to:

a. Google's alleged reduction of DV360's Advertiser bids submitted to rival Ad Exchanges;

46

b.  Google's purported manipulation of DV360 traffic to AdX away from competing Ad Exchanges.

## REQUEST FOR PRODUCTION NO. 89

All documents and communications related to Your efforts to understand how DV360 interacted with Google's AdX and how DV360 bid into non-Google Ad Exchanges, including all inquiries made to Google on these topics.

## REQUEST FOR PRODUCTION NO. 90

All documents and communications related to Your understanding of Google Ad's interaction with Google's AdX, including, but not limited to, how Google Ads bids into Google's AdX and all inquiries made to Google on this topic.

## REQUEST FOR PRODUCTION NO. 91

All documents and communications related to Your awareness of alleged efforts to increase Google's Ad Exchange win rate for Google Ads' demand.

## REQUEST FOR PRODUCTION NO. 92

All documents and communications related to Your efforts to understand Google's application of variable revenue shares on a per impression basis.

## REQUEST FOR PRODUCTION NO. 93

All Your communications, studies, analyses, reports, presentations, and records on Programmatic Direct Transactions.

## REQUEST FOR PRODUCTION NO. 94

All Your communications, studies, analyses, reports, presentations, and records on remnant sales.

47

**REQUEST FOR PRODUCTION NO. 95**

Documents or data sufficient to show Your expenses associated with Programmatic Direct Transactions, by month.

**REQUEST FOR PRODUCTION NO. 96**

All documents and communications for the time period January 1, 2008 to present relating to when You first learned of (a)-(h):

a. Tying AdWords Demand to AdX;

b. Tying AdX Real Time Bids to Google's DFP;

c. Dynamic Allocation (including so called "First Look" and "Last Look");

d. Sell Side Dynamic Revenue Share;

e. Bernanke (including Global Bernanke, Project Bell, and Project Alchemist);

f. Poirot;

g. Exchange Bidding;

h. Uniform/Unified Pricing Rules; and

i. Project Elmo.

**REQUEST FOR PRODUCTION NO. 97**

All documents and communications for the time period January 1, 2008 to present concerning Your participation in, interaction with, or consideration of Dynamic Allocation, Enhanced Dynamic Allocation (including any extension to apply to sponsorship Line Items), Optimized Competition, Project Bernanke, Dynamic Revenue Share, Viewable CPMs, Project Poirot, Project Elmo, Redaction of Auction Data, Line Items (or caps or limitations thereof), Unified Pricing Rules, Open Bidding, Bid Data Transfer File (or redactions thereto), Minimum Bid To Win, and tying between DFP and AdX, including the associated timeframe in which each

48

of these designs or features were encountered by You.

**REQUEST FOR PRODUCTION NO. 98**

All documents and communications for the time period January 1, 2008 to present concerning the effects of Dynamic Allocation, Enhanced Dynamic Allocation (including any extension to apply to sponsorship Line Items), Optimized Competition, Project Bernanke, Dynamic Revenue Share, Viewable CPMs, Project Poirot, Project Elmo, Redaction of Auction Data, Line Items (or caps or limitations thereof), Unified Pricing Rules, Open Bidding, Bid Data Transfer File (or redactions thereto), Minimum Bid To Win, and tying between DFP and AdX on Your revenue, CPM, Impressions, and Clicks, including any of Your internal studies or analyses.

**REQUEST FOR PRODUCTION NO. 99**

All documents and communications for the time period January 1, 2010 to present concerning Your participation in Google's AwBid, including any beta testing participation and documents concerning the costs and technical work of integration required to participate in AwBid.

**REQUEST FOR PRODUCTION NO. 100**

All documents and communications for the time period January 1, 2010 to present between You and Google concerning Your participation in Google's AwBid, including any communications regarding rates of Invalid Traffic on Your Ad Exchange(s).

**REQUEST FOR PRODUCTION NO. 101**

All documents, data, and communications concerning resources, trainings, initiatives, betas, or programs provided by Google to You.

**REQUEST FOR PRODUCTION NO. 102**

All documents and communications about Your working relationship with Google, including, but not limited to: (a) any documents and communications reflecting potential projects or initiatives with Google, regardless of whether they actually happened; and (b) any documents, communications, and data showing any and all resources received from Google beyond the contractual provision of Ad Tech Products to you.

**REQUEST FOR PRODUCTION NO. 103**

Documents sufficient to show each of Your Google digital advertising accounts including, for each: any account IDs associated with the account, including Google customer IDs and which business entity or entities has owned the account (and associated time period).

**REQUEST FOR PRODUCTION NO. 104**

All documents and communications relating to Google's role in Display Advertising including, but not limited to: (a) all Your contracts with Google; (b) all communications from or with Google; (c) any internal or external feedback or commentary about Google's conduct or Ad Tech Products; (d) all communications with any governmental agency concerning Google; and (e) financial, technical, or other support that Google provides to You, including, but not limited to, pilot or beta programs related to new Features of Ad Tech Products, requests You made to Google regarding potential Features of Ad Tech Products, or other services or integrations.

**REQUEST FOR PRODUCTION NO. 105**

All documents and communications relating to Your contracts and negotiations with, and evaluations of, the participants (and their products) in the "ad tech stack" (including Publisher Ad Servers, DSPs, SSPs, Ad Exchanges, and Ad Networks, and any Plaintiffs in this Action).

50

**REQUEST FOR PRODUCTION NO. 106**

All documents and communications (including any and all studies, analyses, reports, presentations, and records) shared by You with advertising consultants or agencies and any and all information shared by advertising consultants or agencies with You.

**REQUEST FOR PRODUCTION NO. 107**

All documents and communications (including any and all studies, analyses, reports, presentations, and records) relating to efforts to attract DSPs, Ad Buying Tools, and other Advertisers to Your Ad Tech Products, including all assessments of the value of Your Ad Tech Products to DSPs and to the Advertisers they represent.

**REQUEST FOR PRODUCTION NO. 108**

All documents and communications (including any and all studies, analyses, reports, presentations, and records) relating to efforts to attract Publisher Ad Servers and Publishers to Your Ad Tech Products, including all assessments of the value of Your Ad Tech Products to Publisher Ad Servers and to the Publishers they represent.

**REQUEST FOR PRODUCTION NO. 109**

All documents, communications, and data regarding Your ad security measures, programs, and policies supporting Your Ad Tech Products. Ad security measures include any and all programs, procedures or policies relating to Ad Spam, Ad Fraud, Invalid Traffic, Domain Spoofing, and Malvertising detection and prevention, as well as any and all programs, procedures or policies relating to Ad Safety.

**REQUEST FOR PRODUCTION NO. 110**

All documents and communications sufficient to show the number and names of Your employees whose job is dedicated, in whole or in part, to ad security measures, including all measures related to Ad Spam, Ad Fraud, Invalid Traffic, Domain Spoofing, Malvertising, and Ad Safety.

**REQUEST FOR PRODUCTION NO. 111**

All documents, communications, and data regarding criticisms, weaknesses, or failures in Your ad security measures, programs, and policies supporting Your Ad Tech Products. Ad security measures include any and all programs, procedures or policies relating to Ad Spam, Ad Fraud, Invalid Traffic, Domain Spoofing, and Malvertising detection and prevention, as well as any and all programs, procedures or policies relating to Ad Safety.

**REQUEST FOR PRODUCTION NO. 112**

All documents, communications, and data regarding instances in which other Ad Tech Providers, Publishers or Advertisers stopped using Your Ad Tech Products as a result of security concerns, including concerns relating to Ad Spam, Ad Fraud, Invalid Traffic, Domain Spoofing, Malvertising, and Ad Safety.

**REQUEST FOR PRODUCTION NO. 113**

Documents sufficient to show any restrictions on or exclusions from the type or content of Advertising that You allow on Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 114**

All documents and communications relating to User privacy in the context of Your ad Tech Products.

**REQUEST FOR PRODUCTION NO. 115**

All documents and communications concerning complaints or feedback received by You about personal data collection, personal data usage, data privacy, and User tracking.

**REQUEST FOR PRODUCTION NO. 116**

All documents, data, and communications concerning the list or negotiated pricing, Fees, or discounts of that You charge, including documents concerning the transparency of, and the Your representations concerning, such pricing, Fees, Take Rates, or discounts. This Request includes all documents, data, and communications concerning any negotiated pricing, Fees, or discounts of which You are a beneficiary.

**REQUEST FOR PRODUCTION NO. 117**

All contracts with Your customers, including other Ad Tech Providers, Publishers, and Advertisers, including documents and communications relating to the negotiations of the contracts.

**REQUEST FOR PRODUCTION NO. 118**

All source code for Your Ad Tech Products, including, but not limited to, the most recent source code for Your Ad Tech Products and snapshots of the source code for Your Ad Tech Products on January 1 of every other year during the Relevant Period.

**REQUEST FOR PRODUCTION NO. 119**

All documents and communications relating to the design, implementation, and launch in the code for Your Ad Tech Products of any feature, tool, or component that is or was similar in functionality, purpose, or objective, or that was or was intended to be competitive with or responsive to, Google's Dynamic Allocation or First Look, Sell Side Dynamic Revenue Share, Bernanke (including Global Bernanke, Project Bell, and Project Alchemist), Poirot, Exchange Bidding, Uniform/Unified Pricing Rules, and Project Elmo from January 1, 2008 to present

53

(regardless of your knowledge of such Google feature or algorithm at the time), including but not limited to, specifications, product requirement documents, design documents, architectural diagrams, product or feature descriptions, technical documentation, results or summaries of pre-launch testing, simulations, experiments, launch readiness assessments, post-launch reports, post-mortem analyses, and/or internal presentations.

**REQUEST FOR PRODUCTION NO. 120**

All documents and communications relating to any internal or third-party reports or audits assessing the code quality of Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 121**

All documents and communications relating to any post-mortem or analysis of system outages, service degradations, security incidents, data integrity issues, or performance malfunctions of Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 122**

Any documents and communications relating to any instances in which Your Ad Tech Products have been offline or un-operational in the Relevant Time Period, including when, how long the product was offline or un-operational, the cause, and the solution thereto.

**REQUEST FOR PRODUCTION NO. 123**

Documents sufficient to show the flow of data, including but not limited to user data, advertiser bidding data, ad data, bid request data, and impression data, through all systems for Your Ad Tech Products during the Relevant Time Period, including documents such as data flow diagrams, system interaction documentation, data processing workflows or presentations (e.g., "lifecycle of a bid request" walkthroughs), and relevant engineering documentation describing

how data is collected, stored, processed, anonymized, protected with respect to privacy and/or fraud detection, and transmitted across systems.

**REQUEST FOR PRODUCTION NO. 124**

Documents sufficient to show metrics for scale, performance, reliability, security, integrity, latency, efficacy, optimization, and technical debt of Your Ad Tech Products during the Relevant Time Period, including but not limited to system or infrastructure diagrams, system performance reports, benchmark analyses, infrastructure documentation, and latency and efficiency evaluations.

**REQUEST FOR PRODUCTION NO. 125**

All documents and communications relating to any benchmarking or comparison of the scale, performance, reliability, security, integrity, latency, efficacy, optimization, or technical debt of Your Ad Tech Products against other ad tech tools or products, including but not limited to any internal engineering or sales materials.

**REQUEST FOR PRODUCTION NO. 126**

Documents sufficient to show the performance, reliability, security, integrity, and supportable scale of the software and hardware infrastructure, whether proprietary or third-party, upon which Your Ad Tech Products currently rely and have relied during the Relevant Period, including: (1) any cloud providers (e.g., Microsoft Azure, Google Cloud Platform, Amazon Web Services) supporting Your Ad Tech Products and any contracts with such providers; and (2) any hardware infrastructure supporting Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 127**

All documents and communications relating to any internal audits, post-mortems, retrospectives, or incident reports identifying non-compliance with engineering standards for Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 128**

All documents and communications relating to the explanations provided to Your engineering employees, including but not limited to software or site reliability engineers, of the software architecture, deployment, and file or directory structure of the code for Your Ad Tech Products, including but not limited to presentations, diagrams, architecture walkthroughs, internal documentation or wiki pages, onboarding documents, and design documents that describe the general architecture of Your Ad Tech Products and interactions between the services that are used by Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 129**

Technical service level agreement (or SLA) contracts, including any original, modified, and renewed contracts referenced in such contracts, entered into with the five largest customers for Your Ad Tech Products that include technical requirements, including but not limited to uptime, availability, and resolution time requirements, for each calendar year of the Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 130**

Documents, including organizational charts, sufficient to show reporting structures, personnel biographies, job function descriptions, allocation of personnel, and distribution of physical and engineering resources for engineering teams that worked on or are working on Your Ad Tech Products during the Relevant Period, including but not limited to teams responsible for frontend and backend software development of systems, deploying and monitoring performance, and server architecture and infrastructure.

**REQUEST FOR PRODUCTION NO. 131**

Documents sufficient to show the number and personnel profiles of engineers who were working on Your Ad Tech Products during the Relevant Period.

**REQUEST FOR PRODUCTION NO. 132**

All documents and communications that relate or refer to damages or harm that You contend You suffered.

**REQUEST FOR PRODUCTION NO. 133**

All documents sufficient to show Your right to recover damages in this Action, including documents relating to any assignment, transfer, delegation, or conveyance of rights to assert, recover, or receive damages, restitution, or disgorgement, or any other monetary relief arising out of the claims in this Action.

**REQUEST FOR PRODUCTION NO. 134**

Without regard to any time period, all documents summarizing, describing, or referring to Your calculation of, and the factual basis for, any damages that You allege resulted from Google's conduct.

**REQUEST FOR PRODUCTION NO. 135**

All documents and communications sufficient to show, separately for each of Your Ad Tech Products and for each year from January 1, 2013 to the present, the costs that You have incurred to develop and/or improve each of Your Ad Tech Products, including documents identifying Your costs related to research and development of Ad Tech Products and documents describing how Your total costs are allocated among Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 136**

Your regularly prepared internal and external quarterly, monthly, and annual financial statements (including balance sheets and income statements) for the last 10 years for each of Your divisions and/or subsidiaries operating Your Ad Tech Products and the corresponding audit reports.

**REQUEST FOR PRODUCTION NO. 137**

Any documents and communications discussing or analyzing Your revenue, costs, profitability, gross profit margins, and operating profit margins, both generally and for each of Your Ad Tech Product(s), including but not limited to profit and loss statements, budget vs. actual reports comparing budgeted performance to actual results (including explanations for variances), profitability analyses, cost assessments, and tax analyses.

**REQUEST FOR PRODUCTION NO. 138**

Documents and communications discussing or analyzing Your revenue, costs, profitability, gross profit margins, and operating profit margins for all forms of advertising other than Display Advertising, overall and separated by product, including, but not limited to, profit and loss statements, budget vs. actual reports comparing budgeted performance to actual results (including explanations for variances), profitability analyses, cost assessments, and tax analyses.

**REQUEST FOR PRODUCTION NO. 139**

Documents and communications to the Board of Directors, Chief Executive Officer, or Chief Financial Officer regarding Your financial performance and capital allocation.

**REQUEST FOR PRODUCTION NO. 140**

Documents and communications to regulators, auditors, and other external stakeholders regarding Your financial performance, long-term strategic plans, and capital allocation, including

58

but not limited to capital raises documentation, loan applications, communications with the Securities and Exchange Commission (and other market regulators), and presentations to shareholders, creditors, credit/equity analysts, and other market participants.

## REQUEST FOR PRODUCTION NO. 141

Documents, communications, and data regarding Your financial performance, long-term strategic plans, and capital allocation that You prepared as part of completed or contemplated mergers and acquisition transactions, including but not limited to proforma financial statements and integration costs analyses.

## REQUEST FOR PRODUCTION NO. 142

Documents, communications, and data underlying Your financial statements and internal management reports, including, but not limited to, trial balances, general ledger exports, cost of goods sold and cost of sales breakdowns, and documentation providing details about rationale, structure, and methodologies for current and historical internal management reporting.

## REQUEST FOR PRODUCTION NO. 143

Documents and communications to external stakeholders regarding Your current and past methodologies for allocating costs, including, but not limited to, documents showing how You allocate shared overhead costs across business segments and individual Ad Tech Products, and how and why Your cost allocation methodologies changed.

## REQUEST FOR PRODUCTION NO. 144

Documents and communications pertaining to Your current and historical policies and procedures for complying with Generally Accepted Accounting Principles ("GAAP"), International Financial Reporting Standards ("IFRS"), and other relevant regulations and

59

standards, including but not limited to policies and procedure manuals for making accounting determinations under GAAP or other relevant regulations and standards pertaining to revenue recognition and Accounting Standards Codification ("ASC") 606, cost allocation and expenses classification, and capitalization of software development costs and other intangible assets.

## REQUEST FOR PRODUCTION NO. 145

Documents and communications pertaining to changes in Your policies and procedures for complying with GAAP, IFRS, and other relevant regulations and standards, including, but not limited to, changes in policies and procedure manuals for making accounting determinations under GAAP or other relevant regulations and standards pertaining to revenue recognition and ASC 606, cost allocation and expenses classification, and capitalization of software development costs and other intangible assets.

## REQUEST FOR PRODUCTION NO. 146

For each ad tech product owned and operated by You, produce financial data compiled by You, regardless of the methodology used to allocate revenues, profits, and costs across each ad tech product. Financial data includes, but is not limited to, information pertaining to booked revenue, total revenue, gross revenue, net revenue, gross margin, gross profit, operating profit, net profit, as well as costs of sales, costs of goods sold, traffic acquisition costs, and operating expenses such as labor, infrastructure, operating overhead, corporate overhead, marketing, advertising, staffing, research and development, capital purchases, depreciation, and inventory.

## REQUEST FOR PRODUCTION NO. 147

All documents and communications relating to Your projected and actual Display Advertising market share, demand forecasts, budgets, and internal or external markets studies performed during the Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 148**

All documents, data, and communications relating to Your profits and losses, including without limitation documents, data, and communications addressing potential or actual impediments to Your profitability, including, but not limited to, impediments based on: (a) labor issues; (b) management issues; (c) industry developments; (d) economic downturns; (e) new regulations; (f) the impact of COVID-19 on Your revenue; or (g) issues affecting the quality of your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 149**

All documents and communications relating to management decisions alleged to have had a negative impact on Your Ad Tech Products, including, but not limited to, documents and communications relating to management decisions that were raised by: (a) labor unions whose members include Your employees or (b) Your employees.

**REQUEST FOR PRODUCTION NO. 150**

Without regard to any time period, documents summarizing, describing, or referring to Your calculation of, and the factual basis for, any reduction in revenue You contend You received as a result of Google's alleged conduct.

**REQUEST FOR PRODUCTION NO. 151**

All documents, communications and data relating to Your decision to undertake layoffs of Your employees, including, but not limited to, financial and strategic analysis of the factor(s) that prompted this decision.

**REQUEST FOR PRODUCTION NO. 152**

All documents, communications, and data relating to business decisions that resulted in financial losses, including documents sufficient to show the nature and expenditures related to each business decision.

**REQUEST FOR PRODUCTION NO. 153**

All documents and communications that relate or refer to the diligence, if any, You exercised in investigating the claims You assert in this case prior to commencing the Action.

**REQUEST FOR PRODUCTION NO. 154**

Without regard to any time period, all documents and communications known to You that weigh against or tend to refute any of Your allegations in the Complaint.

**REQUEST FOR PRODUCTION NO. 155**

All non-privileged documents and communications that relate or refer to any steps You took to discover the facts alleged in the Complaint that You contend support any of the claims You asserted in this Action.

**REQUEST FOR PRODUCTION NO. 156**

Without regard to any time period, all affidavits or declarations given or signed by You, or given to You, that relate to the subject of this Action.

**REQUEST FOR PRODUCTION NO. 157**

All documents and communications reflecting, relating, or referring to the actual or potential financing or funding of the prosecution of this Action by any individual or entity that is not a party to this Action.

**REQUEST FOR PRODUCTION NO. 158**

Documents reflecting Your document retention policies, including the retention policies instituted in connection with this Action and any documents and communications concerning Your retention policies or practices for electronic chat, instant messaging, or direct messaging applications used by Your employees.

**REQUEST FOR PRODUCTION NO. 159**

All documents and communications between You and any non-party, including, but not limited to, recipients of subpoenas or voluntary requests for production, concerning the subject matter of this Action or any investigations by governmental entities regarding Ad Tech.

**REQUEST FOR PRODUCTION NO. 160**

All communications between You and any Plaintiffs in this Action concerning this Action.

**REQUEST FOR PRODUCTION NO. 161**

All documents and communications You provided or received from any entity in response to subpoenas, informal discovery requests, or other means in preparation for or connection with this Action, including any declarations You received. This Request includes all documents You provided to or received prior to the filing of Your Complaint from other plaintiffs in *In Re: Google Digital Advertising Antitrust Litig.*, No. 1:21-md-3010 (PKC), persons or entities named as plaintiffs in prior complaints that are part of or have been a part of *In Re: Google Digital Advertising Antitrust Litig.*, No. 1:21-md-3010 (PKC), and Plaintiffs in *United States et al. v. Google LLC*, No. 23-cv-00108 (LMB-JFA).

**REQUEST FOR PRODUCTION NO. 162**

All documents and communications You or Your agents or attorneys provided to or received from any third parties, including, but not limited to, other plaintiffs who have brought suit against Google, concerning the subject of this Action.

**REQUEST FOR PRODUCTION NO. 163**

All documents and communications You provided to or received from any entity in connection with any of the following actions: (i) *United States v. Google LLC*, No. 1:20-cv-03010 (D.D.C.), (ii) *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.), (iii) *The State of Texas v. Google LLC*, No. 4:20-cv-00957 (E.D. Tex.), and (iv) any other case against Google alleging antitrust violations related to Ad Tech. This Request includes all documents You produced in any action included in the foregoing list.

**REQUEST FOR PRODUCTION NO. 164**

All communications with any publication, reporter, blogger, or commentator, including Adweek, AdExchanger, and Digiday, regarding the subject of this Action, Ad Tech, and/or Google.

**REQUEST FOR PRODUCTION NO. 165**

Any communications with any of the following individuals regarding the subject of this Action, Ad Tech, and/or Google: Jason Kint, Ari Paparo, Ken Blom, Bo Bradbury, Brian Bumpers, Timothy Wolfe, Joshua Lowcock, James Avery, Stephanie Layser, Susan Schiekofer, Omri Farber, Jay Friedman, John "Jed" Dederick, Tom Kershaw, Luke Lambert, Brian Boland, Brian O'Kelley, Tim Cadogan, Jason Taylor, Grant Whitmore, Michael Racic, Erich Hochberger, Ben John, Todd Parsons, Jay Glogovsky, Jeremy Helfand, David Minkin, Ryan Pauley, Tim Wolfe, Felix Zhang, Krishan Bhatia, Henry Crum, and Matthew Wheatland.

**REQUEST FOR PRODUCTION NO. 166**

For any expert that You intend to offer as a witness in this Action, all documents, data, or information that the expert could use, will use, or has used, to support the expert's opinions.

**REQUEST FOR PRODUCTION NO. 167**

All documents reflecting Your employees' non-privileged communications about this Action or (i) *United States v. Google LLC*, No. 1:20-cv-03010 (D.D.C.), (ii) *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.), (iii) *The State of Texas v. Google LLC*, No. 4:20-cv-00957 (E.D. Tex.), (iv) *In re: Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (S.D.N.Y.) (including any of its current or former member cases), or (v) any other case against Google alleging antitrust violations related to Ad Tech.

**REQUEST FOR PRODUCTION NO. 168**

All documents, communications, and data concerning crashes, outages, or other glitches associated with Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 169**

All documents, communications, and data concerning any system outages or failures associated with You and Your Ad Tech Products, including any failure associated with any cloud providers or other software or physical infrastructure upon which your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 170**

All documents and communications sufficient to show any data or security incidents concerning You or Your Ad Tech Products, including, but not limited to, phishing attacks, denial of service attacks, ransomware attacks, malware attacks, hacking incidents, and data leaks/breaches.

**REQUEST FOR PRODUCTION NO. 171**

All documents, communications, and data relating to experiments You conducted in connection with Your Ad Tech Products, including, but not limited to, experiments conducted as beta testing for new products or features with customers.

**REQUEST FOR PRODUCTION NO. 172**

All documents, communications, and data relating to customer consent and/or knowledge related to the experiments You conduct and have conducted in connection with Your Ad Tech Products, including, but not limited to, experiments conducted as beta testing for new products or features.

**REQUEST FOR PRODUCTION NO. 173**

All documents and communications relating to experiments conducted by Publishers, Advertisers, or other Ad Tech Providers in connection with Your Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 174**

All documents and communications, whether prepared by You or a third party, evaluating or discussing the quality (including factors such as security, Fees, transparency, yield, Brand Protection, fraud protection, audience targeting, or vertical integration) of any Ad Tech Product.

**REQUEST FOR PRODUCTION NO. 175**

All documents and communications relating to the benefits or effects, including with respect to product quality and cost efficiency, of vertical integration across multiple tools in the ad tech stack.

**REQUEST FOR PRODUCTION NO. 176**

All communications between You and any non-party, including but not limited to recipients of subpoenas or voluntary requests for production, concerning the subject matter of this Action or any investigations by governmental entities regarding Ad Tech.

**REQUEST FOR PRODUCTION NO.  177**

All documents and communications concerning the First-Party Data You retain concerning Users accessing Publishers' webpages, and any and all policies You have concerning sharing that data with other Ad Tech Providers.

**REQUEST FOR PRODUCTION NO. 178**

All documents and communications concerning any mergers or acquisitions You have undertaken since 2007, including any due diligence, competitive analyses, financial projections, or integration plans associated with any such acquisitions and the competitive analyses and rationale behind the acquisition.

**REQUEST FOR PRODUCTION NO. 179**

All documents and communications related to Your allegation that Google "began opting its Publishers into SSDRS without disclosing anything about the program to Publishers or advertisers" starting in 2014, as stated in Paragraph 195 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 180**

All documents and communications related to Your allegation that Google, by the fall of 2015, "opted all its Publishers into [SSDRS] without disclosing any information about it," as stated in Paragraph 195 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 181**

All documents and communications related to Your allegation that in the summer of 2016 Google told Publishers it was launching a "'revenue share-based optimization' that increased Publishers' yields" and Your allegation that this statement was false as stated in Paragraph 195 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 182**

All documents and communications related to Your allegation that Google professed ignorance and/or gave pretextual or affirmatively misleading responses to inquiries about Poirot, DRS, and Bernanke, as stated in Paragraph 194 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 183**

All documents and communications related to Your allegation that DV360 "included a generic toggle labeled 'bid optimization' without explaining that it involved systemic bid suppression targeted at rival exchanges" as stated in Paragraph 116 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 184**

All documents and communications related to Your allegation that "after the launch of SSDRS in 2016, Google misrepresented on its website and elsewhere" that the purpose of SSDRS was "to provide a yield benefit to publishers, even while acknowledging internally that if they ran SSDRS well, it would likely 'result in lower publisher overall revenue,'" as stated in Paragraph 393 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 185**

All documents and communications related to Your allegation that Google personnel "acknowledged internally that because of the data that AdX accessed through DFP, competing ad

68

exchanges would be powerless to respond to the advantage SSDRS conferred on AdX" as stated in Paragraph 393 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 186**

All Documents and data supporting Your specific allegations regarding the impact of UPR in Your business, including but not limited to:

a. "As a result of UPR, Google again shifted more transactions onto AdX, winning many transactions that one of the Plaintiffs would have won but for UPR," as stated in Paragraph 225 of Your Complaint.

b. "As a result of UPR, even more transactions that would have occurred on PubMatic's exchange shifted to AdX [...]. Indeed, following the introduction of UPR, PubMatic's revenue decreased by a significant margin as more advertising transactions were funneled away from PubMatic and to AdX. In October 2019 alone, PubMatic estimated that UPR decreased PubMatic's overall platform spend by roughly 10% and decreased the spend on particular PubMatic tools by roughly 16% to 28%," as stated in Paragraph 355 of Your Complaint.

c. "[B]ecause of the restrictions Google placed on auctions in UPR, ad exchanges still direct some bids into DFP via waterfall, for example for premium inventory or certain curated advertising deals," as stated in Paragraph 438 of Your Complaint.

d. "The impact of UPR on the Plaintiffs has been devastating. UPR increased the number of impressions AdX won and the revenue it received, while decreasing impressions won and revenue received by third-party exchanges," as stated in Paragraph 456 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 187**

All documents and communications related to Your allegation that Google disclosed SSDRS in the summer of 2016 and "said nothing about Google's ability to change AdX's take rate on a transaction-by-transaction basis," as stated in Paragraph 84 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 188**

All documents and communications related to Your allegation that Plaintiffs and other market participants "had no reason to know of, and could not reasonably discover, SSDRS's manipulation of AdX's take rate on an impression-by-impression basis," as stated in Paragraph 85 of Your Complaint.

**REQUESTS FOR PRODUCTION FOR PLAINTIFF OPENX ONLY**

**REQUEST FOR PRODUCTION NO. 189**

All documents and communications concerning any decision by You to shut down, deprecate, cease or limit operation or sale of, not update, or no longer market Your Publisher Ad Server, including the rationale for Your decision and any expected or actual impact it has had on Your business.

**REQUEST FOR PRODUCTION NO. 190**

All documents and communications related to how Publishers configured Header Bidding to interoperate with Your ad server product, including whether that configuration changed over time.

**REQUEST FOR PRODUCTION NO. 191**

All documents, communications, and data concerning or relating to OpenX's decision to undergo layoffs between October 2018 and March 2019, including, but not limited to, financial and strategic analysis of the factor(s) that prompted this decision.

70

**REQUEST FOR PRODUCTION NO. 192**

Documents and communications sufficient to show how Your ad server would select the demand to fill a given impression, including how Your Ad Exchange interacted with other sources of demand in the waterfall, whether and how that logic varied over time, any actual or perceived advantages that Your ad server afforded to Your Ad Exchange and/or other Ad Tech Products, and any similarities or differences between how Your ad server would select the demand to fill a given impression and how Google's ad server would select the demand to fill a given impression.

**REQUEST FOR PRODUCTION NO. 193**

Documents and communications sufficient to show how Your ad server would select the demand to fill a given impression when a Publisher had both guaranteed Line Items and remnant Line Items in their ad server that qualified for the impression, including whether and how that logic varied over time.

**REQUEST FOR PRODUCTION NO. 194**

All documents and communications relating to Your allegation that OpenX "ran experiments to try to determine why DV360 had decreased its spend on the OpenX Ad Exchange," as stated in Paragraph 200 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 195**

All documents and communications relating to Your allegation that Google "stonewall[ed]" OpenX from discovering the truth about Project Poirot, as stated in Paragraph 200 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 196**

All documents and communications relating to Your allegation that "by December 2018, OpenX had experienced a 40% decrease in year-over-year DV360 spend on the OpenX Ad Exchange," as alleged in Paragraph 246 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 197**

All documents and communications relating to Your migration of infrastructure for Your Ad Exchange to Google Cloud Platform.

**REQUEST FOR PRODUCTION NO. 198**

All documents and communications relating to any analysis, assessment, evaluation, or discussion of the decline in the market share of Your Publisher Ad Server alleged in paragraph 242 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 199**

All documents and communications relating to Your allegation in paragraph 242 of Your Complaint that You reduced investment in Your Publisher Ad Server.

**REQUEST FOR PRODUCTION NO. 200**

All documents and communications relating to Your allegation in paragraph 245 of Your Complaint that You shifted "from employing second-price auctions to first-price auctions in late 2017."

**REQUEST FOR PRODUCTION NO. 201**

All documents and communications, including but not limited to any draft or final presentations, agendas, or meeting minutes, relating to any meeting discussing a decline in market share or loss of customers from Your Publisher Ad Server between January 1, 2010 to January 1, 2020.

**REQUEST FOR PRODUCTION NO. 202**

All documents and communications, including but not limited to, any draft or final presentations, agendas, or meeting minutes, relating to any meeting discussing a decline in market share or loss of customers from Your Ad Exchange.

72

**REQUEST FOR PRODUCTION NO. 203**

All documents and communications relating to AI capabilities, tools, features, or components in Your Ad Tech Products, including but not limited to Results by OpenX and the AI-powered performance suite described in https://www.openx.com/press-releases/the-future-of-curation-is-ai-results-by-openx-improved-cost-per-acquisition-in-ad-campaigns-by-11x/.

**REQUEST FOR PRODUCTION NO. 204**

All documents and communications relating to Your decision to shut down Your Publisher Ad Server.

**REQUEST FOR PRODUCTION NO. 205**

All historical snapshots, revisions, and versions of the source code for Your Publisher Ad Server from January 1, 2010 to January 1, 2020.

**REQUEST FOR PRODUCTION NO. 206**

All documents and communications relating to any instances in which Your Publisher Ad Server was offline or un-operational from January 1, 2010, to January 1, 2020, including when, how long the product was offline or un-operational, the cause, and the solution thereto.

**REQUEST FOR PRODUCTION NO. 207**

All documents and communications relating to any customer support inquiries, help desk tickets, or user complaints received by You concerning Your Publisher Ad Server from January 1, 2010 to January 1, 2020.

**REQUEST FOR PRODUCTION NO. 208**

All documents and communications relating to Your allegation in paragraph 24 of Your Complaint that OpenX innovated header bidding, "including several covered by patents issued to OpenX."

73

**REQUEST FOR PRODUCTION NO. 209**

All documents and communications relating to Your allegation that Your Ad Exchange "performed better on OpenX's ad server than on DFP" in paragraph 243 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 210**

Documents and communications sufficient to show the data available to a Publisher using Your Publisher Ad Server.

**REQUESTS FOR PRODUCTION FOR PLAINTIFF PUBMATIC ONLY**

**REQUEST FOR PRODUCTION NO. 211**

All documents and communications analyzing any decision by You to shut down, deprecate, cease or limit operation or sale of, not update, or no longer market Your Publisher Ad Server, including the rationale for Your decision and any expected or actual impact it has had on Your business.

**REQUEST FOR PRODUCTION NO. 212**

All documents, communications, and data relating to PubMatic's decision to reduce its workforce between November 2015 and November 2016, including, but not limited to, financial and strategic analysis of the factor(s) that prompted this decision.

**REQUEST FOR PRODUCTION NO. 213**

All documents, communications, and data relating to the impact on PubMatic, including the impact on PubMatic's revenue and profits, of the bankruptcy of DSP customer MediaMath in 2023.

**REQUEST FOR PRODUCTION NO. 214**

All documents, communications, and data relating to Your decision to acquire Revinet in 2011, including all documents and communications concerning any competitive analyses used to inform PubMatic's acquisition of Revinet.

**REQUEST FOR PRODUCTION NO. 215**

All documents, communications, and data relating to Your decision to acquire Mocean Mobile in 2014, including all documents and communications concerning any competitive analyses used to inform PubMatic's acquisition of Mocean Mobile.

**REQUEST FOR PRODUCTION NO. 216**

All documents, communications and data relating to Your decision to acquire Martin in 2022, including all documents and communications concerning any competitive analyses used to inform PubMatic's acquisition of Martin.

**REQUEST FOR PRODUCTION NO. 217**

All documents and communications related to how Publishers configured Header Bidding to interoperate with Your ad server product, including whether that configuration changed over time.

**REQUEST FOR PRODUCTION NO. 218**

Documents and communications sufficient to show how Your ad server would select the demand to fill a given impression, including how Your Ad Exchange interacted with other sources of demand in the waterfall, whether and how that logic varied over time, any actual or perceived advantages that Your ad server afforded to Your Ad Exchange and/or other Ad Tech Products, and any similarities or differences between how Your ad server would select the demand to fill a given impression and how Google's ad server would select the demand to fill a given impression.

75

**REQUEST FOR PRODUCTION NO. 219**

Documents and communications sufficient to show how Your ad server would select the demand to fill a given impression when a Publisher had both guaranteed Line Items and remnant Line Items in their ad server that qualified for the impression, including whether and how that logic varied over time.

**REQUEST FOR PRODUCTION NO. 220**

All documents and communications related to Your allegation of "Google's affirmative concealment of Project Poirot," as stated in Paragraph 340 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 221**

All documents and communications related to Your allegation in Paragraphs 341 and 342 of Your Complaint that PubMatic reached out to Google multiple times in 2017 and 2019 to determine the root cause of declining DV360 spend.

**REQUEST FOR PRODUCTION NO. 222**

All documents and communications related to Your allegation that in response to PubMatic's inquiries, Google "fell silent and ignored PubMatic's follow-ups in late 2017 and early 2018," as alleged in Paragraph 203 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 223**

All documents and communications related to Your allegation that in response to PubMatic's inquiries, "Google simply ignored PubMatic," as alleged in Paragraph 204 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 224**

All documents and communications related to Your allegation that in 2019 Google "obfuscated" in response to one of PubMatic's Advertiser partner's outreach on Poirot, including,

76

but not limited to, Google's alleged response that a "viewability" solution and fraud detection caused the issue, as stated in Paragraph 345 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 225**

All documents, communications, and data related to the experiment(s) described in Paragraph 204 and Paragraph 342 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 226**

All documents, communications, and technical specifications related to PubMatic's "private cloud," including: (a) the technical specifications concerning PubMatic's proprietary infrastructure; (b) All documents and communications concerning the operating costs associated with PubMatic's proprietary infrastructure; and (c) Any internal analyses concerning efficiencies associated with PubMatic's proprietary infrastructure, including the internal cost savings and performance benefits.

**REQUEST FOR PRODUCTION NO. 227**

All documents, communications and data related to Your allegation that "starting in around 2009, PubMatic repeatedly sought API (Application Programming Interface) access to Google's DFP," as stated in Paragraph 321 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 228**

All documents and communications, including all documents and communications between You and AHC, regarding Your allegation that "PubMatic and AHC discovered that, despite AHC preferencing PubMatic's exchange within the DV360 platform, the vast majority of AHC's bids were going through AdX," as stated in Paragraph 344 and as described in Paragraphs 343, 345, and 346 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 229**

All documents, communications, and data regarding PubMatic's header bidding solution, OpenWrap, including:

   a.  All source code and technical specifications concerning OpenWrap;

   b.  All analyses, studies, and reports concerning OpenWrap's adoption and implementation amongst PubMatic's customers;

   c.  Your customer list concerning OpenWrap from 2016 to present;

   d.  All analyses, studies, and reports concerning OpenWrap's performance;

   e.  All customer feedback concerning OpenWrap, including all customer complaints; and

   f.  All internal analyses assessing OpenWrap's market success.

**REQUEST FOR PRODUCTION NO. 230**

All documents and communications concerning PubMatic's integrations with other header bidding software frameworks, including PreBid and Amazon's Transparent Ad Marketplace.

**REQUEST FOR PRODUCTION NO. 231**

All documents and communications concerning PubMatic's Supply Path Optimization program, including PubMatic's tool Activate, including:

   a.  All customer agreements related to the program, whether active or inactive, including all customer agreements with Advertisers and Agencies;

   b.  All documents and communications reflecting Activate's share of PubMatic's platform activity from 2019 to present;

   c.  All analyses, studies, and reports concerning Activate's performance;

   d.  All customer feedback concerning Activate; and

   e.  All internal analyses assessing Activate's market success.

**REQUEST FOR PRODUCTION NO. 232**

All documents and communications concerning PubMatic's acquisition of Martin, including all documents and communications concerning any competitive analyses used to inform PubMatic's acquisition of Martin.

**REQUEST FOR PRODUCTION NO. 233**

All documents and communications concerning PubMatic's proprietary bid shading technology, as described in PubMatic's blog post: https://pubmatic.com/blog/first-price-auctions-auction-dynamics/, including:

a.  All documents and communications reflecting the technical specifications of the bid shading technology;

b.  All source code supporting PubMatic's bid shading technology; and

c.  All documents and communications concerning customer adoption and use of PubMatic's bid shading technology.

**REQUEST FOR PRODUCTION NO. 234**

All documents and communications, including internal strategy documents and plans, concerning PubMatic's announcement in February 2018 about its shift to a First-Price Auction, as featured in PubMatic's blog post: https://pubmatic.com/blog/first-price-auctions-auction-dynamics/, including, but not limited to, PubMatic's self-identification and/or signaling to DSPs, including DV360, regarding its auction mechanics (i.e., as a first or second-price auction).

**REQUEST FOR PRODUCTION NO. 235**

All documents and communications concerning the convergence of Supply-Side Platforms and Demand-Side Platforms.

79

**REQUEST FOR PRODUCTION NO. 236**

All documents and communications concerning the impact of Supply Path Optimization on the convergence of Supply-Side Platforms and Demand-Side Platforms.

**REQUEST FOR PRODUCTION NO. 237**

All documents and communications concerning AI-chat based interfaces and their impact on digital advertising.

**REQUEST FOR PRODUCTION NO. 238**

All documents and communications concerning PubMatic's AI-powered monetization platform, including but not limited to all AI-powered features in:

a. PubMatic for Buyers, PubMatic's generative AI media buying solution;

b. PubMatic Assistant;

c. Predictive diagnostics that detect yield anomalies in real time and surface optimization opportunities via agentic AI workflows to improve publisher monetization;

d. PubMatic Connect; and

e. A dynamic floor yield module that uses live auction signals to adjust pricing per impression.

**REQUEST FOR PRODUCTION NO. 239**

All documents and communications concerning PubMatic's decision to shut down its publisher ad server, Unified Ad Server.

**REQUEST FOR PRODUCTION NO. 240**

Documents and communications sufficient to show the data available to a Publisher using Your Publisher Ad Server.

**REQUESTS FOR PRODUCTION FOR PLAINTIFF MAGNITE ONLY**

**REQUEST FOR PRODUCTION NO. 241**

All documents, communications, and data relating to Your decision to undergo layoffs in 2016, 2017, and 2018, including, but not limited to, financial and strategic analysis of the factor(s) that prompted this decision.

**REQUEST FOR PRODUCTION NO. 242**

All documents, communications, and data related to any analyses You have undertaken to inform investments in your Publisher Ad Server comparing "open-web display advertising" (as alleged in the Complaint), to Connected Television in terms of return on investment for Advertisers, and revenue generation for You.

**REQUEST FOR PRODUCTION NO. 243**

All documents, communications, and data relating to Your consideration of whether to enter the Publisher ad server market for open-web display over the past decade.

**REQUEST FOR PRODUCTION NO. 244**

All documents and communications related to Your allegation that since 2018 Magnite "worked internally to investigate why DV360's spend had dropped on its exchange" and could not determine the cause of this drop as stated in Paragraph 202 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 245**

All documents and communications related to Your allegation that Magnite "reached out to the DV360 team at Google in an attempt to determine the cause of DV360's reduced spend into their exchange," as stated in Paragraph 202 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 246**

All documents and communications related to Your allegation that "no one at Google would tell Magnite the cause of the reduced spend or reveal Project Poirot," as stated in Paragraph 202 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 247**

All documents and communications related to Your allegation that "Google employees told Magnite that they did not know why DV360's spend was reduced on Magnite's exchange," as stated in Paragraph 202 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 248**

All documents and communications related to Your allegation that "internally Google acknowledged that a goal (and effect) of Project Poirot was to lower spend on exchanges like Magnite," as stated in Paragraph 202 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 249**

All documents and communications related to Your allegation that "in April 2019, a Google employee admitted in a conversation with a Magnite employee that DV360 would soon shift more spend to independent exchanges as a result of reduced bid-shading because Google was facing pressure around antitrust concerns," as stated in Paragraph 202 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 250**

All documents and communications related to Your acquisition of SpotX and SpringServe in 2021, as alleged in Paragraphs 249 and 270 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 251**

All documents and communications related to the merger of the Rubicon Project with Telaria as alleged in Paragraphs 264, 266-269 of Your Complaint.

82

**REQUEST FOR PRODUCTION NO. 252**

All documents and communications related to Your allegations that "Magnite is a likely entrant and nascent competitor in the worldwide market for open-web display publisher ad servers," "the Rubicon Project considered entering the publisher ad server for open web display market several times before and after its merger with Telaria," and "Telaria had been forced to scale back its operations in open-web advertising because of Google's dominance," as stated in Paragraphs 271-274 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 253**

All documents and communications related to how Publishers configured Header Bidding to interoperate with Your ad server product, including whether that configuration changed over time.

**REQUEST FOR PRODUCTION NO. 254**

Documents and communications sufficient to show how Your ad server would select the demand to fill a given impression, including how Your Ad Exchange interacted with other sources of demand in the waterfall, whether and how that logic varied over time, any actual or perceived advantages that Your ad server afforded to Your Ad Exchange and/or other Ad Tech Products, and any similarities or differences between how Your ad server would select the demand to fill a given impression and how Google's ad server would select the demand to fill a given impression.

**REQUEST FOR PRODUCTION NO. 255**

Documents and communications sufficient to show how Your ad server would select the demand to fill a given impression when a Publisher had both guaranteed Line Items and remnant Line Items in their ad server that qualified for the impression, including whether and how that logic varied over time.

**REQUEST FOR PRODUCTION NO. 256**

Documents and communications sufficient to show the data available to a Publisher using Your Publisher Ad Server.

**REQUEST FOR PRODUCTION NO. 257**

All documents and communications concerning Magnite's Supply Path Optimization program, including Magnite's product ClearLine, including: (a) All customer agreements related to the program, whether active or inactive, including all customer agreements with Advertisers and Agencies; (b) All documents and communications reflecting ClearLine's share of Magnite's platform; (c) All analyses, studies, and reports concerning ClearLine's performance; (d) All customer feedback concerning ClearLine; and (e) All internal analyses assessing ClearLine's market success.

**REQUEST FOR PRODUCTION NO. 258**

All documents and communications concerning Magnite's integration between its Publisher Ad Server and SSP, as described in Magnite's press release: https://www.magnite.com/press/next-generation-of-springserve/. Magnite's production shall include all documents and communications concerning the cost and performance benefits of this integration for customers.

**REQUEST FOR PRODUCTION NO. 259**

All documents and communications concerning Magnite's bid shading technology, including Magnite's proprietary bid shading algorithm, "Estimated Market Rate," including: (a) All documents and communications reflecting the technical specifications of the bid shading technology; (b) All source code supporting PubMatic's bid shading technology; and (c) All

documents and communications concerning customer adoption and use of PubMatic's bid shading technology.

**REQUEST FOR PRODUCTION NO. 260**

All documents and communications concerning Magnite's dynamic price floor features, including DV+'s "Intelligent Price Floors" feature, including: (a) All documents and communications reflecting the technical specifications of the dynamic price floor features; (b) All source code supporting the features; and (c) All documents and communications concerning customer adoption and use of the features.

**REQUEST FOR PRODUCTION NO. 261**

All documents and communications concerning Magnite's Demand Manager's Automated Wrapper Management tool including: (a) All documents and communications reflecting the technical specifications of the feature; (b) All source code supporting the technology; and (c) All documents and communications concerning customer adoption and use of the feature.

**REQUEST FOR PRODUCTION NO. 262**

All documents and communications concerning Magnite's Ad Context Protocol (AdCP) framework.

**REQUEST FOR PRODUCTION NO. 263**

All documents and communications concerning Magnite's work with the Ad Context Protocol (AdCP) framework.

**REQUESTS FOR PRODUCTION FOR PLAINTIFF EQUATIV ONLY**

**REQUEST FOR PRODUCTION NO. 264**

All documents and communications related to Your awareness of alleged efforts by Google to reduce DV360's bids on third-party exchanges using cookies to detect when an impression was being routed to multiple exchanges at the same time.

**REQUEST FOR PRODUCTION NO. 265**

All documents, communications, and data related to Your contention that Project Elmo "starved [Equativ] of revenue, volume, and scale," as stated in Paragraph 370 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 266**

All documents, communications, and data supporting Your contention that Equativ offers a "superior alternative[]" to "Google's ad server product," as stated in Paragraph 374 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 267**

All documents and communications related to the "major publisher customer" described in Paragraph 375 of Your Complaint, including documents and communications related to that Publisher's switching "from DFP to Equativ's ad server" and that Publisher's "return[] to Google" as described in that paragraph.

**REQUEST FOR PRODUCTION NO. 268**

All documents and communications related to Your "Google Replacement Program," as described in Paragraph 376 of Your Complaint, including all documents and communications related to the "over 25 large publishers" referenced in that paragraph.

**REQUEST FOR PRODUCTION NO. 269**

All documents and communications related to Your contention that You "sought to persuade Google to make real-time bids from AdWords advertisers available to users of Equativ's ad exchange and ad server" and Google's response, as described in Paragraph 378 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 270**

All documents and communications related to how Publishers configured Header Bidding to interoperate with Your ad server product, including whether that configuration changed over time.

**REQUEST FOR PRODUCTION NO. 271**

Documents and communications sufficient to show how Your ad server would select the demand to fill a given impression, including how Your Ad Exchange interacted with other sources of demand in the waterfall, whether and how that logic varied over time, any actual or perceived advantages that Your ad server afforded to Your Ad Exchange / other Ad Tech Products, and any similarities or differences between how Your ad server would select the demand to fill a given impression and how Google's ad server would select the demand to fill a given impression.

**REQUEST FOR PRODUCTION NO. 272**

Documents and communications sufficient to show how Your ad server would select the demand to fill a given impression when a Publisher had both guaranteed Line Items and remnant

87

Line Items in their ad server that qualified for the impression, including whether and how that logic varied over time.

**REQUEST FOR PRODUCTION NO. 273**

Documents and communications sufficient to show the data available to a Publisher using Your Publisher Ad Server.

**REQUEST FOR PRODUCTION NO. 274**

All documents and communications related to any actual or potential differences between how Your Ad Tech Products interoperate with Your other Ad Tech Products and how Your Ad Tech Products interoperate with other Ad Tech Providers' Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 275**

All documents and communications related to how Your Ad Buying Tools determine the amount to bid in a given auction, including documents and communications concerning bid-shading and concerning whether bid determination varies by Ad Exchange and/or auction format.

**REQUEST FOR PRODUCTION NO. 276**

All documents and communications related to differences in Floor Prices faced by Your Ad Buying Tools when bidding into different Ad Exchanges.

**REQUEST FOR PRODUCTION NO. 277**

All documents and communications related to the "customer survey data" referenced in Paragraph 364 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 278**

All documents, communications, and data related to Equativ's acquisition of Sharethrough, including the Sharethrough Exchange, in 2024, as described in Paragraph 366 of Your Complaint. Such documents, communications and data should include materials related to the "process of merging into a single ad exchange," as stated in Paragraph 367 of Your Complaint.

**REQUEST FOR PRODUCTION NO. 279**

All documents, communications, and data related to Equativ's acquisition of or merger with any other Ad Tech Product or Ad Tech Provider (including Sharethrough, LiquidM, DynAdmic, Nowtilus, and Kamino Retail), including any materials related to financial aspects of the transaction, Equativ's reasons for undertaking the transaction, and how the acquired Ad Tech Product interoperates with Equativ's other Ad Tech Products.

**REQUEST FOR PRODUCTION NO. 280**

All documents and communications related to Your decision to operate multiple types of Ad Tech Product, including all analysis of efficiencies from operating multiple Ad Tech Products and consideration of additional acquisitions.

Dated: March 24, 2026

/s/ Erin J. Morgan
Erin J. Morgan
DUNN ISAACSON RHEE LLP
11 Park Place
New York, NY 10007
Telephone: (202) 240-2900
emorgan@dirllp.com

Jeannie S. Rhee (*Pro hac vice forthcoming*)
Karen L. Dunn (*Pro hac vice forthcoming*)
William A. Isaacson (*Pro hac vice forthcoming*)
Martha L. Goodman (MG5624)
Jessica E. Phillips (*Pro hac vice forthcoming*)
Amy J. Mauser (*Pro hac vice forthcoming*)
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004-2637
Telephone: (202) 240-2902
jrhee@dirllp.com
kdunn@dirllp.com
wisaacson@dirllp.com
mgoodman@dirllp.com
jphillips@dirllp.com
amauser@dirllp.com

Bradley Justus
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
Telephone: (202) 912-4700
Email: bjustus@axinn.com

*Counsel for Defendants Google LLC and
Alphabet Inc.*

90

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served on counsel for Plaintiffs via email on March 24, 2026.


*/s/ Erin J. Morgan*

Erin J. Morgan (EM1694)
DUNN ISAACSON RHEE LLP
11 Park Place
New York, NY 10007
Telephone: (202) 240-2900
emorgan@dirllp.com

91