# EXHIBIT J

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

**IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION**

</td><td>

No. 1:21-md-3010 (PKC)

</td></tr>
</table>

*This Document Relates To:*

<table>
<tr><td>

**OPENX TECHNOLOGIES, INC., and OPENX LTD.**

    *Plaintiffs,*

      v.

**GOOGLE LLC,**

    *Defendant.*

</td><td>

Case No. 1:25-cv-10817 (PKC)

</td></tr>
<tr><td>

**MAGNITE, INC.,**

    *Plaintiff,*

      v.

**GOOGLE LLC,**

    *Defendant.*

</td><td>

Case No. 1:25-cv-10818 (PKC)

</td></tr>
<tr><td>

**PUBMATIC, INC.,**

    *Plaintiff,*

      v.

**GOOGLE LLC,**

    *Defendant.*

</td><td>

Case No. 1:25-cv-10819 (PKC)

</td></tr>
</table>

1

|  |  |
|---|---|
| **EQUATIV SAS, EQUATIV INC., SHARETHROUGH INC., and SHARETHROUGH USA, INC.,** | |
| *Plaintiffs,* | Case No. 1:26-cv-140 (PKC) |
| v. | |
| **GOOGLE LLC,** | |
| *Defendant.* | |
| **INDEX EXCHANGE INC.,** | |
| *Plaintiff,* | |
| v. | Case No. 1:25-cv-10477 (PKC) |
| **GOOGLE LLC,** | |
| *Defendant.* | |
| **KARGO GLOBAL LLC,** | |
| *Plaintiff,* | |
| v. | Case No. 1:25-cv-10630 (PKC) |
| **GOOGLE LLC,** | |
| *Defendant.* | |
| **SOVRN HOLDINGS, INC.,** | |
| *Plaintiff,* | |
| v. | Case No. 1:26-cv-1587 (PKC) |
| **GOOGLE LLC and ALPHABET INC.,** | |
| *Defendants.* | |

**TRUSTX DIGITAL ADVERTISING
SERVICES, INC., P.B.C.,**

*Plaintiff,*

v.

**GOOGLE LLC and ALPHABET INC.,**

*Defendants.*

Case No. 1:26-cv-3135 (PKC)

## DEFENDANTS GOOGLE LLC AND ALPHABET INC.'S FIRST SET OF INTERROGATORIES TO OPENX, MAGNITE, PUBMATIC, EQUATIV, INDEX EXCHANGE, KARGO, SOVRN, AND TRUSTX

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants Google LLC and Alphabet Inc. (collectively, "Google"), through their counsel, hereby request that Plaintiffs answer the following Interrogatories within thirty (30) days of service according to the Definitions and Instructions set forth herein and supplement their Interrogatory answers, as necessary, to comply with Federal Rule of Civil Procedure 26(e).

## INSTRUCTIONS

1. In addition to the specific instructions set forth below, these Interrogatories incorporate the instructions set forth in Federal Rules 26 and 33, the Local Rules, the Stipulation and Order Regarding Discovery Procedure ("ESI Order") (ECF No. 508), the Modified Confidentiality Order (ECF No. 685), and the Scheduling Orders (ECF No. 1502 and ECF No. 1551), or the operative version of those Orders in place at the time responses are served.

2. These Interrogatories seek information available to You, or to which You may gain access through reasonable effort, including information in the possession of Your past and present attorneys, accountants, investigators, consultants, agents, or other persons directly or indirectly

3

employed or retained by You, or anyone else otherwise subject to Your control who maintains records on Your behalf, in Your name, or otherwise under Your control.

3.      Unless otherwise specified, these Interrogatories each require a separate response.

4.      If You cannot provide a full and complete response to any Interrogatory, You should respond to the Interrogatory to the extent possible, specifying the portion of the Interrogatory You are unable to answer and providing whatever information You have regarding the unanswered portion.

5.      If You object to, or otherwise decline to answer, all or any portion of any Interrogatory, please provide all information called for by the Interrogatory to which You do not object or do not decline to answer. For those portions of any Interrogatory to which You object or otherwise decline to answer, state the reason for such objection or declination. If You object to any Interrogatory on the ground that it is too broad (i.e., that it calls for information which is not relevant), please provide such information as You concede to be not overly broad. If You object to any Interrogatory on the ground that it would constitute an undue burden to provide an answer, please provide such requested information as can be supplied without undertaking such undue burden.

6.      If You perceive any ambiguity in an Interrogatory, provide a brief statement of the nature of the perceived ambiguity and the interpretation You used to resolve it.

7.      Pursuant to Federal Rule 26(b)(5), if You believe that any Interrogatory calls for information subject to a claim of privilege, then:

       a. Answer all parts of the Interrogatory to which You do not object;

       b. Explain the basis for Your claim of privilege as to each part of the Interrogatory to which You object; and

c. Identify the general nature of the information withheld.

8.      In construing the Interrogatories:

a. Terms not specifically defined shall be given their ordinary meaning as You understand them to be used in the trade;

b. The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all other tenses, moods, or voices, whenever necessary, to bring within the scope of any Interrogatory all information that might otherwise be construed to be outside its scope;

c. The use of the singular form of any word includes the plural and vice versa;

d. Words in the masculine, feminine, or neutral gender shall include each of the other genders;

e. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Interrogatory all responses that might otherwise be construed to be outside of its scope;

f. The terms "all," "any," and "each" shall each be construed as encompassing any and all.

9.      None of the Definitions or Interrogatories shall be construed as an admission relating to the existence of any evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in the Definitions or the Interrogatories.

10.      These Interrogatories are continuing in nature. In the event that You become aware of responsive information in addition to, or in any way inconsistent with, that which You previously have provided, prompt supplementation of Your responses is required.

11. Google specifically reserves the right to seek supplementary responses to the Interrogatories before trial.

12. Unless otherwise stated, the Interrogatories call for responsive information from the Relevant Period.

13. With respect to Interrogatories served to Kargo Global LLC, per its agreement with Google, Kargo must also provide separate and complete responses on behalf of TripleLift, Inc. *See* Case No. 1:21-md-3010 (PKC), Dkt. No. 1866 at 3 n.3.

## DEFINITIONS

1. To the extent the terms defined below are used in the Interrogatories, they should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules and the Local Rules. These Definitions are provided solely for the purposes of these Interrogatories.

2. The term **"Action"** refers to all lawsuits consolidated in the above-captioned multidistrict litigation, *In re: Google Digital Advertising Antitrust Litigation*, No. 21-md-3010 (S.D.N.Y.).

3. The term **"Ad Buying Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including DSPs and Ad Networks) through which an Advertiser Purchased or can Purchase Inventory.

4. The terms **"Ad Exchange," "Supply-Side Platform,"** or **"SSP"** shall mean a third-party or In-House product or service through which two or more Ad Buying Tools (at least one of which is not owned or controlled by the entity operating the Ad Exchange) placed or can place Bids in real-time auctions for Inventory offered for sale by or on behalf of two or more

6

Publishers (at least one of which is not owned or controlled by the entity operating the Ad Exchange).

5. The term **"Ad Network"** shall mean a third-party or In-House product or service (other than an Ad Exchange) through which two or more Advertisers (at least one of which is unaffiliated with the entity operating the Ad Network) Purchased or can Purchase Inventory offered for sale by two or more Publishers (at least one of which is unaffiliated with the entity operating the Ad Network).

6. The term **"Ad Selling Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including Publisher Ad Servers, Ad Exchanges, Ad Networks, SSPs, Header Bidding, or Header Bidding Wrappers) through which a Publisher sold or can sell Inventory.

7. The terms **"Ad Tech"** or **"Ad Tech Product"** shall mean a product, service, application, tool, solution or other interface that facilitates or is involved in the Purchase or sale of Inventory, including but not limited to a Publisher Ad Server, Ad Exchange, Ad Network, Header Bidding, Header Bidding Wrapper, DSP, SSP, other Ad Buying Tool, or other Ad Selling Tool. For the avoidance of doubt, this term includes In-House Ad Tech Products, as well as products or services offered by social media outlets (including but not limited to, for example, Facebook.com and Twitter.com) and certain other Publishers that enable the Purchase of Inventory on their Properties via their own In-House Ad Tech Products. This term does not include general-purpose software or systems on which an Ad Tech Product relies.

8. The term **"Ad Tech Provider"** shall mean a person, firm, association, or other entity selling, reselling, licensing, or otherwise providing at least one Ad Tech Product, whether or not for a fee or other compensation.

9.      The term **"Advertiser"** shall mean a person or entity that, directly or through one or more intermediaries, places one or more Display Advertisements intended to advertise or promote a good or service offered by that person or entity, or otherwise convey such person or entity's desired message, on a Publisher's Property so that it is viewed by at least one User visiting such Property. For the avoidance of doubt, Advertisers typically, but need not, pay for the placement of such Display Advertisements.

10.     The term **"AdX"** shall mean Google's Ad Exchange that was marketed as DoubleClick Ad Exchange, inclusive of all prior and subsequent iterations of the product and all variants thereof, and including, for the avoidance of doubt, the Ad Exchange functionality of Google Ad Manager and Google Ad Manager 360.

11.     The term **"Agency"** shall mean an advertising agency or similar consulting firm that is hired by an Advertiser to manage the Purchase of Inventory for one or more Campaigns. For the avoidance of doubt, although an Agency may use DSPs or other tools to manage such Campaigns, an entity operating a DSP shall not, solely on that basis, be deemed an Agency.

12.     The term **"Bid"** shall mean an offer, made in response to a Query, to pay a specified amount in exchange for the right to render a Display Advertisement in a unit of Inventory.

13.     The terms **"Bidder"** or **"Buyer"** shall mean an Advertiser submitting a Bid directly to an Ad Exchange or Publisher Ad Server (without an intermediary), or shall mean a DSP, Ad Network, or other person or entity submitting a Bid to an Ad Exchange or Publisher Ad Server on behalf of an Advertiser, whether known at the time or to be subsequently determined.  For the avoidance of doubt, an Ad Exchange shall not be deemed a Buyer even if it forwards a Bid it received on to another Ad Exchange or Publisher Ad Server.

14. The term **"communication"** shall have the meaning provided in Local Rule 26.3, namely, the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

15. The term **"concerning"** shall have the meaning provided in Local Rule 26.3, namely, relating to, referring to, describing, evidencing, or constituting.

16. The term **"Connected Television"** shall mean devices or services that allow Users to watch television content served over the internet on a television screen, such as smart TVs (e.g., Samsung, TCL, Sony), media streaming devices (e.g., Roku Streaming Stick, Apple TV, Chromecast), or video game consoles (e.g., Xbox, PlayStation).

17. The terms **"Demand-Side Platform"** or **"DSP"** shall mean an Ad Buying Tool, that enables an Advertiser to automatically buy Inventory sold via Ad Selling Tools in real-time on an Impression-by-Impression basis. For the avoidance of doubt, an Agency trading desk shall be deemed a DSP for purposes of this definition.

18. The term **"Direct Transaction"** shall mean a sale or placement of Display Advertising the price of which was determined through a contractual agreement between an Advertiser (or an Agency acting on an Advertiser's behalf) and a Publisher (without an intervening Ad Tech intermediary), including for the avoidance of doubt an agreement to set such price through an auction conducted by the Publisher itself or an affiliate thereof.

19. The terms **"Display Advertisement"** or **"Display Advertising"** shall mean Online Advertising other than Search Advertising, and shall include Native Advertising, as well as banner, in-app, or video advertising, whether social or non-social.

20. The term **"document"** shall have the meaning provided in Local Rule 26.3, namely, that the term shall be synonymous in meaning and equal in scope to the usage of the phrase

"documents or electronically stored information" in Federal Rule 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

21.     The term **"Feature"** shall mean any design, feature, limitation, policy, mechanism, innovation, improvement, optimization, or strategy related to how Ad Tech Products buy, sell, price, bid, or auction Inventory, how Ad Tech Products improve ad quality or Match Quality, how Ad Tech Products measure, or report on the effectiveness of Display Advertising, or how Ad Tech Products integrate or interoperate with other Ad Tech Products, whether owned or operated by the same entity or different entities.

22.     The term **"Fees"** shall mean any money retained by a provider of Ad Tech Products, including via Take Rates, for services related to the Purchase of Display Advertisements.

23.     The term **"Floor Price"** shall mean the limitation on how low an Advertiser or Ad Buying Tool can bid for Inventory while still being eligible to win the Impression.

24.     The term **"Format"** shall mean the general makeup or layout of an ad. Different types of Display Advertising Formats include Native Advertising, Instream Video Advertising, Outstream Video Advertising, and Static Advertising.

25.     The term **"Google"** shall mean Google LLC, any current or former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

26.     The terms **"Google Ad Manager"** or **"GAM"** shall mean the product introduced by Google on June 27, 2018, which brought together DFP and AdX into a unified programmatic platform.

27.     The term **"Header Bidding"** shall mean the use by a Publisher of code that is directly or indirectly called during the web browser's processing or rendering of the HTML header

of a webpage (and prior to the invocation of a Publisher Ad Server) and that causes Queries to be sent to one or more Ad Exchanges, Ad Networks, DSPs, or other sources of demand.

28. The term **"Header Bidding Wrapper"** shall mean a Header Bidding management system.

29. The term **"identify,"** when referring to a person, shall have the meaning provided in Local Rule 26.3, namely, to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

30. The term **"identify,"** when referring to documents, shall have the meaning provided in Local Rule 26.3, namely, to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

31. The term **"Impression"** shall mean the service of a single Display Advertisement to a single User.

32. The term **"In-House"** shall describe an Ad Tech Product created for a Publisher's, Advertiser's, or Agency's internal use.

33. The term **"including"** shall mean including but not limited to.

34. The term **"Indirect Transaction"** shall mean a sale or placement of Display Advertising other than a Direct Transaction, including an Open Auction Transaction or Private Auction Transaction conducted by an Ad Exchange or a purchase of Inventory by an Ad Network for resale to one or more Advertisers.

35.    The term **"Instream Video Advertising"** shall mean Online Advertising in which the advertisement is displayed within a stream of video content that the User is viewing, e.g., before, in the middle of, or after the video content.

36.    The term **"Inventory"** shall mean space offered by Publishers for the sale or placement of Display Advertising.

37.    The term **"Native Advertising"** shall mean Online Advertising that follows the natural form and function of the User experience in which it is placed (such as sponsored ads within a User's Facebook feed).

38.    The terms **"Online Advertisement"** or **"Online Advertising"** shall mean advertising via the internet, including on websites, apps, and Connected Television. For example, both Display Advertising and Search Advertising are forms of Online Advertising.

39.    The term **"Open Auction Transaction"** shall mean an Indirect Transaction for which all, or substantially all, of the Buyers eligible to bid on the relevant Ad Exchange are or were eligible to submit Bids.

40.    The term **"Outstream Video Advertising"** shall mean Online Advertising, other than Instream Video Advertising, that includes a video or animation.

41.    The term **"person"** shall have the meaning provided in Local Rule 26.3, namely, any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

42.    The term **"Private Auction Transaction"** shall mean an Indirect Transaction for which only a set of Buyers expressly identified by the Publisher (or an agent or employee thereof) are or were eligible to submit Bids.

43.     The term **"Property"** shall mean a website, mobile application, or other product or service containing space that is sold or offered for sale for the placement of Display Advertising.

44.     The term **"Publisher"** shall mean a person or entity operating a Property. For the avoidance of doubt, the owner of the Property shall be deemed the Publisher, even if it has out-sourced the sale of its associated Inventory, in whole or in part, to a third party.

45.     The term **"Publisher Ad Server"** shall mean a third-party or In-House product, service, or system that is responsible for selecting (or attempting to select), on behalf of a Publisher, the Display Advertisement (or source from which such Display Advertisement shall be obtained) for a unit of Inventory. For the avoidance of doubt, a Publisher Ad Server may be owned and/or operated by a third-party Ad Tech Provider, or may be owned, developed, or operated by the Publisher or by a third party on behalf of or under contract with the Publisher. For the further avoidance of doubt, a system that creates or manages mediation chains constitutes a Publisher Ad Server for purposes of these Interrogatories.

46.     The term **"Purchase,"** when used in connection with Inventory or Impressions, shall mean to obtain, directly or indirectly through one or more intermediaries, the right to render or display a Display Advertisement in a unit of Inventory, typically but not necessarily in exchange for a monetary payment.

47.     The term **"Query"** shall mean a request to provide, or bid to provide, a Display Advertisement to be rendered in a unit of Inventory, whether denominated as an "ad request," "bid request," or otherwise. A Query may, but need not, request a Bid that will be considered before awarding the right to actually display a Display Advertisement to a particular Advertiser.

48.     The term **"Relevant Period"** shall mean January 1, 2013 to present.

49.     The term **"Search Advertising"** shall mean Online Advertising that is displayed in response to a User's search intent or search terms.

50.     The term **"Static Advertising"** shall mean Online Advertising consisting solely of static (i.e., non-moving or -changing) text, images, or graphics.

51.     The term **"Take Rate"** shall mean the proportion of total revenue generated from Purchased Inventory that an Ad Tech Provider collects as part of its fee arrangement in connection with the Purchased Inventory.

52.     The terms **"You"** or **"Your"** refer to Plaintiffs OpenX Technologies, Inc., OpenX Ltd., Magnite, Inc., PubMatic, Inc., Equativ SAS, Equativ Inc., Sharethrough Inc., Sharethrough USA, Inc., Index Exchange Inc., Kargo Global LLC, Sovrn Holdings, Inc., TRUSTX Digital Advertising Services, Inc., P.B.C., including their parents, predecessors, successors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing. "You" and "Your" includes each of OpenX Technologies, Inc., OpenX Ltd., Magnite, Inc., PubMatic, Inc., Equativ SAS, Equativ Inc., Sharethrough Inc., Sharethrough USA, Inc., Index Exchange Inc., Kargo Global LLC, Sovrn Holdings, Inc., and TRUSTX Digital Advertising Services, Inc., P.B.C.'s brands or Properties, including any brand, magazine, newspaper, entity, Property, or service on whose behalf Plaintiffs seek damages in this Action.

## INTERROGATORIES

## INTERROGATORY NO. 1

Describe Your Ad Exchange's auction process and any changes to the auction process during the Relevant Period, including, but not limited to, descriptions of the auction format (e.g., first-price, second-price); auction mechanics; and auction optimizations, including those auctions

14

that automatically adjust the Bid amounts entered into auctions, the Take Rates charged by Your Ad Exchange including any variations in Your Take Rate on a per-Impression, per-Publisher, per-Property, or any other basis, or Floor Prices applied.

**INTERROGATORY NO. 2**

Identify each Publisher during the Relevant Period with whom You have or have had a contract related to Display Advertising, including the time period covering the contract(s) with each Publisher identified.

**INTERROGATORY NO. 3**

Identify each Ad Tech Product or Ad Tech Provider with which You have or have had a contract relating to Display Advertising, including the time period covering the contract(s) with each Ad Tech Product or Ad Tech Provider identified.

**INTERROGATORY NO. 4**

Describe each occurrence in which You undertook layoffs of Your employees during the Relevant Period, including, but not limited to, the financial and strategic analysis that prompted the decision to undertake layoffs, the number and type of job roles that were laid off, and the percent of Your workforce laid off.

**INTERROGATORY NO. 5**

Identify each person at Your company with knowledge concerning Your alleged damages purportedly caused by Google's conduct, including lost revenue, lost sales, lost profits, lost market share, lost business opportunities, increased costs, workforce reductions, lost enterprise value, lost customers, decreased market valuation, decreased market capitalization, loss of goodwill, and reputational harm.

**INTERROGATORY NO. 6**

Identify any instance(s) in which You lost sales, revenue, customers, contracts, or other business to any Ad Tech Provider, including the identity of the Ad Tech Provider to which You lost the business, when You lost the sales, revenue, customers, contracts, or other business, the Fees and Impression volume of the sales, revenue, customers, contracts, or other business lost, and the reasons provided to You for why You lost the sales, revenue, customers, contracts, or other business.

**INTERROGATORY NO. 7**

Provide a computation, and date range for the computation, of the alleged damages You seek as purportedly caused by Google's conduct, including a description of the methodologies used to calculate Your alleged damages, for each category of damages You seek as set forth in Your initial disclosures, including: lost revenue, lost sales, lost profits, lost market share, lost business opportunities, increased costs, workforce reductions, lost enterprise value, lost customers, decreased market valuation, decreased market capitalization; loss of goodwill, and reputational harm.

**INTERROGATORY NO. 8**

Describe all steps You took to investigate or analyze any decreases in DV360 bidding into Your Ad Exchange during the Relevant Period.

**INTERROGATORY NO. 9**

Describe the data You share with Ad Tech Products, Ad Tech Providers, or customers, including for each entity with whom You share data: (a) the type(s) of data that You share (e.g., first-party data, third-party data, bidding data, targeting data, other data signals that can be used to evaluate the value of an Impression, etc.); (b) the scope of the data shared (e.g., all of the data that

16

You maintain or some subset of it); (c) the frequency at which you share the data (e.g., in real time, daily, weekly, monthly, etc.); and (d) a description of an agreement (if any) concerning the sharing of such data.

Dated: June 26, 2026

Respectfully Submitted,

*/s/ Martha L. Goodman*
Jeannie S. Rhee
Karen L. Dunn
William A. Isaacson
Martha L. Goodman
(MG5624)
Jessica E. Phillips
Amy J. Mauser
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004-2637
Telephone: (202) 240-2902
jrhee@dirllp.com
kdunn@dirllp.com
wisaacson@dirllp.com
mgoodman@dirllp.com
jphillips@dirllp.com
amauser@dirllp.com

Erin J. Morgan (EM1694)
DUNN ISAACSON RHEE LLP
11 Park Place
New York, NY 10007
Telephone: (202) 240-2900
emorgan@dirllp.com

Bradley Justus
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
Telephone: (202) 912-4700

17

Email: bjustus@axinn.com

*Counsel for Defendants*
*Google LLC and Alphabet*
*Inc.*

18

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true copy of the foregoing instrument was served on counsel for Plaintiffs via email on June 26, 2026.


*/s/ Martha L. Goodman*

Martha L. Goodman
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004-2637
Telephone: (202) 240-2902

19