The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

October 6, 2026

Re: *In re Google Digital Advertising Antitrust Litig.*, No. 1:21-md-03010 (S.D.N.Y.)
*OpenX Technologies, Inc., et al. v. Google LLC*, No. 1:25-cv-10817 (S.D.N.Y.)
*Magnite, Inc. v. Google LLC*, No. 1:25-cv-10818 (S.D.N.Y.)
*PubMatic, Inc. v. Google LLC*, No. 1:25-cv-10819 (S.D.N.Y.)
*Equativ SAS v. Google LLC*, No. 1:26-cv-00140 (S.D.N.Y.)
*Index Exchange Inc. v. Google LLC*, No. 1:25-cv-10477 (S.D.N.Y.)
*Kargo Global LLC v. Google LLC*, No. 1:25-cv-10630 (S.D.N.Y.)
*Sovrn Holdings, Inc. v. Google LLC*, No. 1:26-cv-01587 (S.D.N.Y.)
*TRUSTX Digital Advertising Services, Inc., P.B.C. v. Google LLC*, No. 1:26-cv-03135 (S.D.N.Y.)

Dear Judge Castel:

No attorney representing any competitor ad exchange has yet had the opportunity to ask a single question of the seven current and former employees Google now seeks to shield from any deposition by the Competitor Plaintiffs.[1] *See* Mot. at 1 & n.1. One of the seven, [redacted], has never been deposed or questioned under oath by anyone. ECF 2044 at 1 n.1. Google argues that it is entitled to a protective order barring these depositions because *other* attorneys, representing *other* parties, questioned most of these witnesses. But Competitor Plaintiffs seek unique testimony from these witnesses on at least three topics that counsel for other parties did not—or could not—explore at prior depositions: (1) Google's fraudulent concealment of its anticompetitive conduct ***from Competitor Plaintiffs in particular***; (2) Google's anticompetitive conduct ***post-dating prior witness depositions***; and (3) anticompetitive conduct and harm ***alleged uniquely by Competitor Plaintiffs***.

Contrary to Google's insistence, this situation is not analogous to the Group 2 Publishers' dispute that the Court resolved in Order No. 1799. There, Google relied on three core arguments: (1) Group 2 Publishers' complaints "closely parallel the Daily Mail and Gannett complaints – cases that already have completed extensive fact discovery with the same counsel" (ECF 1738 at 2, quoting ECF 1200 at 3); (2) Publisher counsel had promised to "rely on that record" (ECF 1738 at 2); and (3) Publishers "already had three opportunities to obtain testimony from the disputed deponents" yet "[i]n every instance, they declined to do so." *Id.* at 12. Competitor Plaintiffs never had one opportunity, let alone three, to ask the Proposed Deponents about Google's conduct specifically directed toward competing ad exchanges. And Competitor

[1] Samuel Cox, Nitish Korula, Nirmal Jayaram, George Levitte, [redacted], [redacted], and [redacted] (together, "Proposed Deponents")

Plaintiffs' allegations include theories of injury to rival exchanges, not to Publishers, which they have a right to develop through independent discovery.

Rule 26(b)(2)(C)(ii), which Google never cites, asks whether "the party seeking discovery has had ample opportunity to obtain the information." *See generally* Mot. Competitor Plaintiffs have had no such opportunity.

Competitor Plaintiffs do not seek to revisit old discovery. They proposed four to five hours per witness, limited to unexamined subjects and custodial documents never shown to the witness before. Mot. Ex. A; ECF 2044 at 3. Those subjects include conduct that no prior party developed, including: (1) what Google told competing exchanges when they asked why demand from Google's DV360 ad buying tool collapsed; (2) conduct continuing after the last of these witnesses' depositions in 2024; and (3) how Google's programs treated specific rival exchanges and what Google's internal analyses showed about their effect on specific rivals.

Google has shown neither good cause nor duplication, and its motion should be denied.

## I. FACTUAL BACKGROUND

### A. Plaintiffs Allege Competitor-Specific Injury

The Competitor complaints[2] allege programs designed to disadvantage rival ad exchanges. They describe conduct directed at each exchange, the resulting harm, and Google's responses (or lack thereof) to inquiries.

#### 1. *Google's Anticompetitive Programs Targeted Competitor Plaintiffs*

Competitor Plaintiffs allege that, starting by at least 2013, Google ran a set of programs code-named Bernanke, Global Bernanke, Bell, and Alchemist. These programs adjusted Google Ads' bidding and take rates to move impressions toward AdX and away from rival exchanges. ECF 1543 ¶ 87. Under Bernanke, Google allegedly charged winning advertisers the second-highest price, paid publishers the third-highest, and pooled the difference to subsidize Google bids in more competitive auctions. *Id.* ¶¶ 90–92. Bell allegedly applied the third-price mechanism to publishers who did not give AdX preferential access, and used the difference to raise payouts to publishers who did. *Id.* ¶ 94. When AdX moved to a first-price auction in 2019, Google allegedly created Alchemist as "a first-price version of Project Bernanke." *Id.* ¶ 95.

Project Poirot was Google's response to header bidding, an ad tech solution that several Competitor Plaintiffs created to improve competition. ECF 1543 ¶¶ 147, 153-57; ECF 1511 ¶¶ 65, 66, 77, 90, 240-41, 246. Poirot sought to "dry out" header bidding by "bid[ding] lower" on header bidding queries. ECF 1511 ¶¶ 89, 94. The OpenX complaint quotes an internal email stating that "Poirot currently generates margins by shifting inventory to AdX." *Id.* ¶ 95. The Index complaint alleges that Poirot cut transactions on rival exchanges first by an average of 10% and later by an average of 15%. ECF 1543 ¶ 181. According to the OpenX plaintiffs, Google exempted AdX from Poirot's effects, and Google's sell-side and buy-side teams

[2] The Index Exchange, Kargo (including TripleLift), Sovrn, and, by incorporation, TrustX, complaint (ECF 1543) and the OpenX, Magnite, PubMatic, and Equativ complaint (ECF 1511).

"coordinated intimately to plan and test the interactions" between Poirot and AdX's own features. ECF 1511 ¶¶ 114, 402.

Plaintiffs allege that Google ran a companion program, Project Elmo, in tandem with Poirot. Elmo allegedly used cookies to detect impressions offered to several exchanges at once and then sharply lowered DV360 bids on those exchanges. *Id.* ¶ 368. According to internal Google documents, the two programs together caused an average 21% revenue decrease on affected rival exchanges and a 16% revenue increase for AdX in March 2018. ECF 1511 ¶ 369.

Plaintiffs also challenge Open Bidding. They allege it required participating exchanges to share bid data with Google that Google did not share back. ECF 1543 ¶¶ 188–190. The OpenX plaintiffs add that a 5% Open Bidding fee lowered rivals' net bids relative to AdX. ECF 1511 ¶ 222. Finally, plaintiffs allege that the Unified Pricing Rules adopted in May 2019 functioned as a "most favored nations" clause in AdX's favor. ECF 1543 ¶ 193.

2. *Competitor Plaintiffs Allege Rival-Specific Harms About Which Google Has Not Been Questioned*

The complaints allege that the above conduct affected each exchange in its own way, and Competitor Plaintiffs have not yet had the opportunity to confront Google regarding that conduct. **Index Exchange** alleges that the Unified Pricing Rules had "a particularly pernicious impact" because many publishers had shown a preference for Index's transparency and lower take rate by setting lower floors for it. ECF 1543 ¶ 195. **Kargo** alleges that the Unified Pricing Rules were "uniquely detrimental" to its curated, brand-safe marketplace. *Id.* ¶ 197. **TripleLift** alleges that publishers could not signal a preference for it through floor pricing. *Id.* ¶¶ 145, 196. **Sovrn** alleges that Bernanke, Alchemist, and the Unified Pricing Rules took impressions away from it and left it "starved of capital" for the data investments central to its strategy. *Id.* ¶¶ 133–134. **OpenX** alleges that Google forecast Poirot 2.0 would cut OpenX's revenues by 42%, "more than any other ad exchange." ECF 1511 ¶ 246. OpenX alleges that it laid off 210 employees, nearly half its workforce, between October 2018 and March 2019, and that it shut down its ad server in mid-2019. *Id.* ¶¶ 242, 247. **Magnite** alleges that it cut more than 100 employees in 2016 and another 150 in 2017 and 2018. *Id.* ¶ 279. It also alleges that Google internally acknowledged that the Unified Pricing Rules caused a "decline in spend" on Magnite's exchange. *Id.* ¶ 291. **PubMatic** alleges a DV360 spending decline of at least 30% after Poirot was introduced, *id.* ¶ 337, forcing it to delay its initial public offering until late 2020. *Id.* ¶¶ 347, 349. **Equativ** alleges that Elmo and Poirot deprived it of revenue, volume, and scale. *Id.* ¶ 370.

3. *Competitor Plaintiffs' Complaints Allege Fraudulent Concealment*

Competitor Plaintiffs allege that Google fraudulently concealed its anticompetitive conduct. According to the OpenX complaint, internal Google communications reflect "an explicit decision to 'stonewall' OpenX" when asked about a decline in DV360 spend. ECF 1511 ¶ 200. Magnite alleges that Google's DV360 team said it did not know why spend had fallen. *Id.* ¶ 202. PubMatic alleges that it raised the decline with Google in August 2017 and was eventually told it was "due to filtration" by Google's "AdSpam team," which made no sense for the affected eBay and AOL inventory. *Id.* ¶ 341. When asked why bids were going to AdX,

Google allegedly cited a viewability feature first and a fraud-detection feature second. Disabling each feature did not change the result. *Id.* ¶ 345.

These contacts fit within broader concealment allegations. Plaintiffs allege that Google's internal guidance on Bernanke was that "the first rule about Bernanke is we don't talk about Bernanke." *Id.* ¶ 205.

4. *Google's Conduct Is Ongoing*

Plaintiffs allege that this conduct was not limited to the period covered by the earlier government proceedings. They describe each act as "new and independent" and as inflicting "new and accumulating injury." ECF 1543 ¶ 264. They allege that Alchemist was adopted in 2019 as a separate program. *Id.* ¶ 95. The OpenX complaint further alleges that Google changed Poirot's methodology several times over its life. ECF 1511 ¶ 401.

**B. No Competing Exchange Examined Any of the Proposed Deponents**

These allegations explain why the Competitor Plaintiffs' deposition topics differ from those pursued by the Publishers. The Publisher cases centered on Google's dealings with publishers. The competitor complaints, in contrast, rest on how Google's buy-side and sell-side teams designed and coordinated programs aimed at rival exchanges, how Google measured the effect of those programs on particular competitors, and what Google said to those competitors when they asked. *See* ECF 1511 ¶¶ 95, 199–204, 402; ECF 1543 ¶ 181. Nevertheless, counsel representing Competitor Plaintiffs never examined the Proposed Deponents.

**C. Competitor Plaintiffs Offered Practical Compromises for Targeted and Proportional Depositions**

On September 14, Google refused to produce any previously deposed Google witness for deposition by Competitor Plaintiffs. ECF 2044 at 2. On September 28, Competitor Plaintiffs suggested witness-specific topics and time proposals of four to five hours. Mot. Ex. A. Each was tied to "emails and documents from [the witness's] custodial files that were not used at his prior deposition." Mot. Ex. A. Google's final offer was to make available two of the seven witnesses ([redacted] and George Levitte), for two hours each, on even more limited subjects. ECF 2044 at 3; Mot. at 10–12.

## II. LEGAL STANDARD

A party seeking a protective order barring relevant discovery bears the burden of showing good cause under Rule 26(c)(1). *See Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 391 (2d Cir. 1981) (holding that when discovery is relevant, "the burden is upon the party seeking non-disclosure or a protective order to show good cause.").

The mere possibility that a witness's deposition may address issues on which the witness previously was deposed by another party is insufficient to entitle the witness to a protective order prohibiting the entire deposition. *See Cooper v. Welch Foods, Inc.*, 105 F.R.D. 4, 6 (W.D.N.Y. 1984) (denying motion for a protective order on a second round of depositions and holding that "[a]lthough it may evolve that the individuals best qualified to testify on the subjects outlined in

the notice of deposition have already testified on those subjects, the mere possibility of repetition of testimony is not by itself sufficient to justify a protective order."). To show good cause, the party seeking the protective order must make a "particularized showing of a 'clearly defined, specific and serious injury'[.]" *Authors Guild v. Nat'l Endowment for the Humans.*, 832 F. Supp. 3d 339, 349 (S.D.N.Y. 2026).

Rule 26(b)(2)(C) directs courts to limit discovery in three relevant circumstances: (1) when discovery is "unreasonably cumulative or duplicative" (Rule 26(b)(2)(C)(i)); (2) situations where "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action" (Rule 26(b)(2)(C)(ii)); and (3) when discovery is outside the scope of Rule 26(b)(1) (Rule 26(b)(2)(C)(iii)). Google's motion relies only on Rule 26(b)(2)(C) clauses (i) or (ii). It does not address good cause under Rule 26(c).

## III. ARGUMENT

### A. That Separate Parties and Separate Counsel Already Deposed a Witness Does Not Constitute Good Cause or Render Discovery Cumulative

Courts in the Second Circuit allow multiple depositions of the same witness when the party requesting the deposition has not had an opportunity to question that witness on facts specific to its allegations. *See, e.g., Brennan v. Mylan Inc.*, 2023 WL 2445344, at *3 (W.D.N.Y. Mar. 10, 2023) (denying motion for a protective order regarding a second deposition in a related but separate matter and holding that "[b]ecause those defendants and the lawyers representing them were different than those who are parties to this case, they may have had different motivations, different strategies, and different legal contentions, and for that reason may not have asked questions that would reveal the information that Defendants seek here."); *Tri-Star Pictures, Inc. v. Unger*, 171 F.R.D. 94, 102 (S.D.N.Y. 1997) (compelling additional depositions of the same witness and holding that "simply because one party to a multi-party litigation raises an issue does not mean that other parties should be deemed to have had the opportunity for discovery of that issue as it relates to them."); *Bamonte v. Charatan*, 2023 WL 4201416, at *4 (S.D.N.Y. June 27, 2023) (holding that "the availability of prior testimony in another case does not establish that the sought-after testimony here would be cumulative or duplicative"). This is precisely the situation here.

No counsel for a competing ad exchange appeared in any of the prior depositions Google cites (Mot. Exs. B, E, F, J, Q, S). The DOJ investigation depositions of Mr. Cox, Mr. Korula, Mr. Jayaram, Mr. Levitte, and [redacted] were not taken "in the case" at all. They were taken under a civil investigative demand before any civil action was filed. Mot. at 4 n.4, 5 n.5, 7 n.6, 10 n.8, 11 n.10.

The DOJ and Publisher examiners pursued different claims with different goals. The DOJ and the states sought to establish general liability and obtain equitable relief. ECF 1511 ¶ 6. The Publishers sought redress for injuries to their own inventory. Competitor Plaintiffs seek testimony on concealment ***from Competitor Plaintiffs in particular***, harm ***specific to Competitor Plaintiffs***, and conduct ***directed at Competitor Plaintiffs*** about which the witnesses were never questioned.

Google suggests Competitor Plaintiffs are latecomers who "[sat] on the sidelines". Mot. at 1. But Congress built 15 U.S.C. § 16(i) on the expectation that private plaintiffs would follow government enforcement actions. ECF 1543 ¶ 246. A rule denying follow-on plaintiffs deposition discovery of previously examined witnesses would turn that structure on its head. Here, none of the prior examiners had reason to establish what transactions rival exchanges would have won but for Google's conduct, what investigation costs rivals incurred, or whether Google's explanations to rivals were sincere. ECF 1543 ¶ 277; ECF 1511 ¶¶ 194, 200, 220.

This Court has held that issue preclusion does not relieve plaintiffs of "the[ir] burden of proving antitrust injury and damages." Pub. Summary Judgment Order at 7, ECF 2041 (Sept. 30, 2026) (quoting *Google III*, 2025 WL 3012840, at *17). The Court applied that principle in the Publisher actions by granting summary judgment against Inform, because Inform had not pointed to evidence "that isolates antitrust injury or damages" attributable to the relevant conduct. *Id.* at 80–81. Competitor Plaintiffs do not seek to relitigate the conduct found unlawful, but must be allowed to prove the effect of Google's conduct on each of them. ECF 1543 ¶¶ 277–278.

The *United States v. Google* record was built to decide whether Google monopolized markets and harmed competition generally. It thus contains no findings on the injury, causation, or damages of any Competitor Plaintiffs. This Court has held that each plaintiff must still make that showing notwithstanding preclusion. *See* ECF 2041 at 7.

The existing findings also do not address several competitor-specific topics on which Competitor Plaintiffs seek testimony. These topics include:

- **Concealment from rival exchanges.** The complaints allege that Google attributed decline in spend on the OpenX Ad Exchange to GDPR and ads.txt. ECF 1511 ¶ 200. They allege that Google attributed PubMatic's decline to "filtration" by its "AdSpam team". *Id.* ¶ 341. They also allege that a Google employee told Magnite in April 2019 that DV360 would shift spend because of "pressure around antitrust concerns". *Id.* ¶ 202.

- **Effects of Unified Pricing Rules on particular exchanges.** The complaints allege distinct effects on Index Exchange, Kargo, and TripleLift. ECF 1543 ¶¶ 195–197.

Prior examinations by different parties and counsel did not reach these subjects. Testimony on them would not be "unreasonably cumulative or duplicative," Fed. R. Civ. P. 26(b)(2)(C)(i), and the prior depositions do not establish good cause. *See Bamonte*, 2023 WL 4201416, at *4; *Brennan*, 2023 WL 2445344, at *3.

### B. The Court's Prior Order on Depositions Rested on the Group 2 Publishers' Opportunity to Question

Google treats Order No. 1799 as a general rule that "later-filing plaintiffs in this MDL do not get to redo the discovery already taken". Mot. at 3. The order announced no such rule.

In briefing the issue, Google explained that the Group 2 Publishers had developed the earlier record "with the same counsel" and had promised to "rely on that record". ECF 1738 at 2. Its central argument was that the Group 2 Publishers "have already had three opportunities to obtain testimony from the disputed deponents. In every instance, they declined to do so". *Id.*

at 12. The record confirmed the overlap. The same firm appeared at the MDL depositions of the very witnesses Google offered as substitutes. Mot. Ex. F at 4; Mot. Ex. Q at 2; ECF 1745 at 15. Against that backdrop, the Court found that the Group 2 Publishers had "not made a showing" that the barred witnesses "would shed new light on any topic". ECF 1799 ¶ 1, at 2. That finding does not apply to parties whose counsel never examined a witness.

Order No. 1799 supports Competitor Plaintiffs in two further respects. The Court allowed every deposition of a witness Google had listed in its initial disclosures. ECF 1799 ¶ 1, at 1. Google's initial disclosures to Competitor Plaintiffs list Mr. Korula, Mr. Levitte, [redacted], and Mr. Jayaram. Mot. at 10 n.9. Under the order's approach, at least those four witnesses should be produced for new limited depositions. Order No. 1799 also asks whether a party can show that testimony "would shed new light" on a topic. ECF 1799 at 2. Competitor Plaintiffs make that showing witness by witness in Part D below. Their topics are tied to custodial documents never put to these witnesses and to subjects Google's own summary shows were not covered. Mot. Ex. A.

### C. Competitor Plaintiffs' Narrowed Scope Meets the Plaintiff-Specific Standard Google Itself Proposed

In the prior Publisher briefing, Google argued that deponents worth producing are those who are "publisher-facing" or a "primary point of contact" for the plaintiffs, because only they hold "information uniquely relevant" to those plaintiffs' cases (ECF 1738 at 1, 3). Competitor Plaintiffs here seek to question Google employees who operated in those specific roles in the rival ad exchange context. Each has an indisputably competitor-facing role.

#### 1. *Google's Communications with Competing Exchanges*

Competitor Plaintiffs seek testimony on several direct communication subjects, including: (1) communications with competitor employees; (2) internal and external communications about declining DV360 spend on competitor exchanges; (3) Exchange Bidding relationships between Google and competing exchanges; and (4) Google's strategic responses (or lack thereof) to Competitor inquiries about Project Poirot and other conduct.

Communications of this nature all inform Google's fraudulent concealment of its conduct from Competitor Plaintiffs. ECF 1511 ¶¶ 194, 199-204; ECF 1543 ¶¶ 254-255. Google responds that Competitor Plaintiffs "know their own relationships with Google" because those communications are "memorialized in their own document productions". Mot. at 10–12. That response misreads the concealment claims at issue. Competitor Plaintiffs' documents show what Google said to them, but they cannot show what Google employees knew about Google's pretextual explanations and what they said to others at Google. In the antitrust context, a defendant's outward-facing statements contrasted with internally known anticompetitive conduct can form the basis of affirmatively concealing acts. *See In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 1006 (N.D. Ohio 2015) (holding that defendants' stated reasons for a price increase were "affirmative acts of concealment," despite their accuracy, because "a portion of the announced price increase" was due to undisclosed "collusion with competitors").

2. *Conduct Continuing After the Last Depositions*

The most recent depositions of the Proposed Deponents took place in mid-2024. Mot. at 4 n.4, 5 n.5, 7 n.6, 9 n.7, 10 n.8. Competitor Plaintiffs allege conduct that continued and changed after that point. The complaints allege that Google kept its programs running and "modified, updated, and enhanced them well within the statutory limitations period." ECF 1511 ¶ 190; *see also* ECF 1543 ¶¶ 260, 264–265. Discovery has shown that Google continues to do so.

Competitor Plaintiffs allege that Google adopted Project Alchemist when AdX moved to first-price auctions in 2019. They describe Alchemist as a first-price version of Bernanke that underpays publishers to build a pool of funds "to displace higher bids from rival exchanges." ECF 1543 ¶ 95. Plaintiffs further allege that "Google to this day continues to engage in iterations of Project Bernanke." *Id.* ¶ 145. They also allege that after September 2019, Google added a "risk aversion" factor to Project Poirot's algorithm "that further increased AdX's win rate at the expense of rival exchanges." *Id.* ¶ 188.

No prior examiner could have asked about how these programs operated after mid-2024, because that conduct had not yet happened when the depositions were taken. The disputed testimony is aimed at that period. Competitor Plaintiffs seek Mr. Jayaram's testimony on his work as head of gTrade on Alchemist and [redacted] "through at least 2025." Mot. Ex. A. Competitor Plaintiffs also seek [redacted] testimony on Google's present-day bidding models. Mot. Ex. A. [redacted] still works on Google's buy-side products today. Mot. at 12. Testimony about how these programs operated after the last deposition cannot be cumulative of prior depositions.

3. *How Google's Programs Treated Rival Exchanges and Harmed Rivals*

Competitor Plaintiffs also seek testimony on how Poirot, Bernanke and Alchemist, and RPO operated against rival exchanges as opposed to AdX (Mot. Ex. A), including: (1) the coordination between AdX's Reserve Price Optimization program and DV360's Project Poirot; (2) AdX's efforts to ensure that RPO did not trigger Poirot; and (3) DV360's efforts to avoid Poirot becoming active on AdX. Notably, Judge Brinkema did not make a finding that Project Poirot was anticompetitive, and the Daily Mail and Gannett appear to argue that only the "risk aversion" iteration of Project Poirot from 2019-22 was anticompetitive. Pub. Summary Judgment Order at 26-27. Accordingly, Competitor Plaintiffs must develop their own evidence to prove the alleged anticompetitive interaction between Project Poirot and RPO. These subjects define the asymmetry at the core of the competitor claims. ECF 1543 ¶ 180; ECF 1511 ¶¶ 188–189, 334. Google's summary of the prior testimony lists no RPO–Poirot topic for Mr. Korula, Mr. Levitte, or Mr. Cox. ECF 1738 App. A at 17, 19–26. Mr. Korula and Mr. Cox have said their knowledge of Poirot's buy-side mechanics is limited. Mot. at 4–5, 8–9. Questioning of them will therefore focus on the sell-side of the interaction, RPO, and unused documents from their files. [redacted] was designated as knowledgeable regarding RPO. *Id.* at 9. His questioning will likewise focus on RPO and its interaction with Poirot. *Id.* at 9–10.

Competitor Plaintiffs' damages will be informed in part by what Google itself measured and predicted about the effect of its programs on rival exchanges. Google's internal analyses included forecasts that Poirot 2.0 would cut one rival's revenue by 42% (ECF 1511 ¶ 246) and estimates that Poirot and a related project "caused an average 21% revenue decrease on affected

exchanges". *Id.* ¶ 221. The Publisher and DOJ examinations did not probe these or similar analyses. Competitor Plaintiffs should be given the opportunity to do so.

### D. Each Proposed Deponent Is Relevant to Competitor Plaintiffs' Specific Claims

Google cannot show good cause for a blanket protective order when the targeted testimony is non-duplicative and no counsel representing a Competitor Plaintiff has had an opportunity to inquire about it. *See Seth Co., Inc. v. U.S.C.I.R.*, 2003 WL 1874738, at *3 (D. Conn. Mar. 3, 2003) (holding a party had "failed to show good cause why a protective order should be granted", even in the context of the same party re-deposing, because the party seeking the second depositions "does not seek these depositions to vex or harass the deponents, and has identified specific areas of inquiry which it did not cover (or did not cover in sufficient depth, as it did not know of the present . . . action) in the [previous] depositions.").

#### 1. *George Levitte*

George Levitte, a Director of Product Management for AdX, was significantly involved in AdX's relationship with Competitor Plaintiffs, especially Exchange Bidding, which prior depositions never explored. Google does not argue that he lacks unique information, only that it is "memorialized in their own document productions [and] available from their witnesses." Mot. at 10. But Mr. Levitte's custodial documents contain internal Google discussions about Competitor Plaintiffs. *See, e.g.,* Ex. 1, GOOG-AT-MDL-B-013868690 (internal discussion about [redacted]); Ex. 2, GOOG-AT-MDL-B-014287077 (internal discussion about [redacted]); Ex. 3, GOOG-AT-MDL-B-013518155 (internal discussion about [redacted]); Ex. 4, GOOG-AT-MDL-B-014686732 (internal discussion regarding [redacted]).

Further, in neither prior deposition did Mr. Levitte testify about Project Poirot despite his involvement in and knowledge of Poirot, including the coordination between AdX's RPO program and Project Poirot. *See, e.g.*, Ex. 5, GOOG-AT-MDL-B-012893054 (Levitte providing input on [redacted]); Ex. 6, GOOG-AT-MDL-B-014686142 at -151 (Levitte authored [redacted]); Ex. 7, GOOG-AT-MDL-B-014133826 [redacted]).

Google listed Mr. Levitte in its initial disclosures to Competitor Plaintiffs and made him a custodian for Competitor-specific search terms, which have yielded numerous new documents.

Mr. Levitte has also been specifically referenced by Competitor Plaintiffs' witnesses in their depositions. During Index Exchange's Rule 30(b)(6) deposition, its representative, Mike McNeeley, testified regarding his interactions with Google's product teams, stating:

> I've talked with Google's head of products for its ad technologies and, you know, I've given them a hard time about, you know, like, Hey, what other advantages are there and specifically with George Levitte the conversation that I remember George saying, There are no more advantages that AdX has. I know. I personally removed them all as part of a project. So, you know, I hope you can forgive me for not necessarily trusting 100 percent that, you know, they're all gone and that -- you know, that I can take that for face value.

Ex. 8, Index Exchange Dep. 206:15-207:02. Competitor Plaintiffs should be able to confront Mr. Levitte with this testimony.

Competitor Plaintiffs should be able to examine Mr. Levitte on these documents, his interactions with Competitor Plaintiffs, and RPO–Poirot coordination. Google's two-hour proposal is inadequate; Competitor Plaintiffs propose four hours. *See United States v. Prevezon Holdings, Ltd.*, 320 F.R.D. 112, 115 (S.D.N.Y. 2017) (granting the same party a second limited-scope deposition to question a witness on issues found in newly produced documents).

2. [redacted]

[redacted] is a current Google employee who testified only once, in November 2020, under a pre-complaint "civil investigative demand issued to Google in connection with a Department of Justice investigation." [redacted] Dep. 13:3-7; *see* Mot. at 11 n.10. That deposition occurred over two years before the DOJ even filed its complaint and several years before any Competitor Plaintiff filed suit. It was taken by a government investigator, with investigative aims, before any claims had been framed or subject to full discovery.

[redacted] has unique, first-hand information that is directly relevant to Competitor Plaintiffs' claims and held key leadership roles involving the challenged conduct specific to Competitor Plaintiffs. Google downplays [redacted] as a "Product Manager." Mot. at 11. But he was a Group Product Manager and a [redacted] including for a 17-month period post-dating his DOJ deposition. Ex. 9, [redacted] LinkedIn at 2.

Notably, he [redacted] Google's AwBid tool that allowed Google to [redacted] Ex. 10, [redacted] Dep. 29:3–14, 35:3–25, 76:12–20, 104:25–105:3. He also testified that he developed [redacted] *Id.* at 200:1–201:8, 203:19–204:3.

Competitor Plaintiffs should be able to fully examine [redacted] on these programs that specifically sought to undermine competition from rival exchanges, including the implementation of these programs, their underlying rationale, and their continuing effects.

[redacted] was also directly involved with Google's relationship with Competitor Plaintiffs. Discovery documents show that [redacted] had significant interactions and involvement with Competitor Plaintiffs both before and after his deposition. Yet the DOJ's investigative questioning only briefly covered Competitor Plaintiffs, [redacted] (Ex. 10, [redacted] Dep. 250:8-251:11) and [redacted] (*id.* at 88:9-23) in passing; the DOJ never questioned him about [redacted]. Indeed, [redacted] name appears approximately 7,900 times in documents discussing rival exchanges that Google, Competitors, Publishers, and other third parties have produced to date, including in connection with inquiries that Competitor Plaintiffs and publisher customers made about Google's auction dynamics that are at issue. Other than the passing reference to Index Exchange, [redacted] has never been questioned about any of the competitor-related issues in those documents.

3. [redacted]

[redacted] is a critical witness regarding how Project Poirot interacted with RPO. Google's Project Poirot was a secret program in which Google's DV360 ad buying tool lowered bids into third-party ad exchanges. ECF 1511 ¶ 94. Project Poirot ostensibly sought to benefit advertisers by reducing bids into "all exchanges that deviated from second price auctions". *Id.* ¶ 111.

Following that principle, Project Poirot should have reduced DV360 bids into AdX. That is because AdX's Reserve Price Optimization ("RPO") program caused AdX to "deviate[] significantly from a pure second-price auction". *Id.* However, the AdX team responsible for RPO secretly colluded with the DV360 team responsible for Project Poirot to ensure that Project Poirot never affected AdX. *Id.* ¶ 113. Competitor Plaintiffs allege that Project Poirot was anticompetitive principally because Google's RPO team colluded with Project Poirot's designers to adjust the design of RPO so that DV360 lowered bids ***only*** into third-party ad exchanges—but never into AdX. *Id.* ¶¶ 105-07; *see also* Publisher Summary Judgment Order, ECF 2041 at 27 (finding, with respect to Project Poirot's risk aversion parameter, "evidence that would permit a reasonable jury to find that Google's implementation of Poirot caused competitive harm in the ad-exchange market").

[redacted] Ex. 19, GOOG-TEX-00098497. [redacted] Ex. 21, [redacted] Dep. 256:18-257:10, [redacted] *Id.* 240:20-241:06.

Documents produced in this litigation reveal that [redacted] led him to secretly collude with the designers of Project Poirot to adulterate RPO so that Project Poirot would not target AdX. In short, [redacted] is a crucial witness in establishing that Project Poirot was anticompetitive because Project Poirot's designers and AdX's RPO team colluded to allow AdX—but no third-party exchange—to dodge Project Poirot.

[3] Google listed [redacted] in its initial disclosures to Competitor Plaintiffs. Mot. at 10 n.9.

Despite [redacted] central role in Google's anticompetitive scheme to exempt AdX from Project Poirot, Google seeks to shield him from deposition by Competitor Plaintiffs on the basis that he previously was deposed. Mot. at 9. Specifically, Google argues that [redacted] already testified about "the interaction of RPO and Poirot". *Id.*

Google omits that during his deposition, [redacted]. Google also omits that [redacted] was questioned about the relationship between RPO and Poirot for less than ten pages of deposition testimony. [redacted] Dep. 288:21-297:12. It would be unjust to limit Competitor Plaintiffs' deposition discovery from the very [redacted] to a few pages of deposition testimony taken by a different plaintiff about the very conduct that Competitor Plaintiffs allege to be the centerpiece of Google's anticompetitive scheme—collusion between RPO and Project Poirot.

Competitor Plaintiffs' complaint alleges, over ***twenty-five paragraphs***, that Project Poirot was anticompetitive because it did not apply to AdX in light of RPO. ECF 1511 ¶¶ 90-114. The complaint even includes a heading titled "Project Poirot Did Not Target AdX, Despite Reserve Price Optimization". *Id.* at p. 48. The complaint includes quotes from numerous internal Google documents showing the extent of the RPO-Poirot collusion. *See* ECF 1511 ¶ 113 (quoting document showing that the "AdX and DV360 teams at Google collaborated to design 'less aggressive' auction strategies for AdX 'to avoid things like Poirot'"); *id.* (quoting document showing that "Google considered launching a new version of RPO on AdX that 'show[ed] significant scope for surplus [difference between value and cost] improvement' for advertisers"); *id.* ¶ 114 (quoting document stating that "[i]f AdX is going further down RPO, DBM [DV360] will refine Poirot"). [redacted] was the [redacted], but he was not asked at his prior deposition about ***any of these documents quoted in Competitor Plaintiffs' complaint***—most of which expressly reference [redacted]. Moreover, [redacted] custodial documents include several other key documents about collusion between RPO and Poirot. He was never questioned about those documents either.

Google argues that Competitor Plaintiffs can look to the testimony of other witnesses about the interaction between RPO and Poirot. Mot. at 9-10. While superficially appealing, this argument suffers from two key flaws. *First*, it ignores that, as Google admits, the very witness that Google points to as having knowledge about the relationship between Poirot and RPO in addition to [redacted], Nitish Korula (*see* Mot. at 5), disclaimed relevant knowledge, testifying, "I don't really know the details about how Poirot was implemented". *Id.* at 4. *Second*, it ignores that [redacted] has unique knowledge about Poirot-RPO collusion in his role as the [redacted].

[redacted] was deposed once and did not testify at the liability trial. Competitor Plaintiffs offered to limit his deposition to five hours, which minimizes burden while allowing meaningful testimony from the key witness to the alleged collusion.

4. *Samuel Cox*

Samuel Cox enjoys the unique distinction of having worked at OpenX before switching sides and working for Google. Mr. Cox worked at OpenX until 2014, and claims to have been an original inventor of header bidding, which allowed Competitor Plaintiffs' exchanges a fairer

shot against AdX's dominance. Nevertheless, Mr. Cox left OpenX and began working for Google in 2016. Documents show that one of his first jobs was to craft Google's "response" to header bidding. For example, Mr. Cox authored a strategy paper [redacted]. Ex. 11, GOOG-TEX-00097138 at -138. And Mr. Cox gave key presentations to Google executives calling for [redacted] *See, e.g.*, Ex. 12, GOOG-AT-MDL-007387750 at -758. The proposals offered by Mr. Cox crystallized into Project Poirot a year later.

How Mr. Cox leveraged his knowledge from OpenX to help Google retaliate against header bidding has never been explored at deposition. Across the transcripts of Mr. Cox's two depositions and trial testimony, Project Poirot is discussed on just three pages from his 2024 deposition.

Google argues that Mr. Cox testified that he had only a "vague recollection of Poirot." Mot. at 8. Although Mr. Cox offered his understanding of Project Poirot, the deposition immediately moved on to other topics. *See* Mot. Ex. K, Cox (2024) Dep. 285:4–287:19. Mr. Cox's files reveal that [redacted] almost none of which he was asked about at his prior deposition. Competitor Plaintiffs are entitled to question Mr. Cox about those documents to explore the nexus between Mr. Cox and Google's strategy of retaliation.

*First*, Google argues that Mr. Cox should not be deposed because he is in an executive position at a new company. But as explained, Mr. Cox possesses unique knowledge about Google's strategy to respond to header bidding because he was one of header bidding's designers. Moreover, Competitor Plaintiffs offered to limit his testimony to five hours to limit the burden on Mr. Cox. And OpenX sought similar treatment for its own witness serving as an executive. Specifically, Mr. Tim Cadogan is currently Chief Executive Officer of a third party, GoFundMe. Yet OpenX offered a compromise where Mr. Cox and Mr. Cadogan would each sit for five hours of deposition time. Google rejected that compromise. *See* Mot. Ex. A.

*Second*, Google maintains that Competitor Plaintiffs cannot depose Mr. Cox because he is not listed on Google's initial disclosures. Google's decision to omit from its disclosures an employee who testified in the Virginia trial cannot shield that employee from deposition. In any event, Competitor Plaintiffs included Mr. Cox on ***their*** initial disclosures as a witness with key knowledge of their case. *See Pal v. New York Univ.*, 2008 WL 2627614, at *4 (S.D.N.Y. June 30, 2008) ("The purpose of this disclosure is to alert an opposing party of the need to take discovery of the named witness.").

*Third*, Google claims that Competitor Plaintiffs already have testimony from Mr. Cox about Exchange Bidding, a program at Google that Mr. Cox led and that continues today. But that prior testimony was taken by Publisher plaintiffs who were focused on the harm ***they*** experienced from Exchange Bidding as customers. Competitor Plaintiffs, who are the direct participants in Exchange Bidding, experienced and experience their own unique harm from that program because they pay a fee directly to Google (which in turn lowers their bids so they are not competitive against AdX's bids). That distinction weighs in favor of affording Competitor

Plaintiffs an opportunity to ask about their own harm. *See Unger*, 171 F.R.D. at 102 ("[S]imply because one party to a multi-party litigation raises an issue does not mean that other parties should be deemed to have had the opportunity for discovery of that issue as it relates to them.").

*Fourth*, Google cites two documents from OpenX's materials reflecting conversations with Google to suggest that Mr. Cox's own testimony about OpenX's investigation into Project Poirot is unnecessary. But Google fails to consider that Competitor Plaintiffs seek to question Mr. Cox about conversations internal to Google regarding the decreased spend on the OpenX Ad Exchange in 2018. As one example, shortly after receiving outreach from OpenX with concerns about a decline in DV360 spend, Mr. Cox [redacted]. *See* Ex. 20, GOOG-DOJ-07832481 at -483. Mr. Cox's effort to stymie Competitor Plaintiffs' investigation into Project Poirot is a valid subject of inquiry at a deposition, rests within his unique knowledge, and has never been explored.

5. [redacted]

[redacted] has never been deposed. He is a [redacted] where his work since at least 2019 has directly affected how Google buyers' spend is distributed between AdX and rival exchanges. [redacted] current work continues to shift spend away from other exchanges to AdX through projects such as [redacted], Alchemist, and [redacted].

At Google, [redacted] is the self-described [redacted] Ex. 13, GOOG-AT-MDL-B-014176434 at -434. As Google prepared to transition to a unified first-price auction in 2019, [redacted] led the creation of Alchemist to adapt Bernanke for the first-price framework. In 2021, [redacted] began leading the development of Project Alph, which later augmented Alchemist and may be gTrade's current overarching bid optimization framework. [redacted] Ex. 14, GOOG-AT-MDL-B-014146038 at -039.

In Q4 2023, [redacted] believing that [redacted]. Ex. 14, GOOG-AT-MDL-B-014146038 at -038.

In asserting that [redacted] testimony on first-price bidding optimizations would be unduly burdensome, cumulative, and duplicative, Google points to Nirmal Jayaram's July 10, 2024 testimony as an example of a deposition in which "buy-side products" and "bidding optimizations" were thoroughly explored. Mot. at 12. Yet, in the course of that deposition, Project Alchemist arose in passing only one time (Mot. Ex. S, Jayaram Dep. 156:2-4), and Jayaram was not asked a single question about Projects [redacted] or [redacted]. Notably, the [redacted].

Projects [redacted], Alchemist, and [redacted] are relevant to ongoing harm that Google has caused to Competitor Plaintiffs. Project [redacted]

[redacted]. Bernanke, Alchemist, and [redacted] have enabled Google to further manipulate advertisers' bids in favor of AdX and to the detriment of rival ad exchanges. Projects [redacted], Alchemist, and [redacted] have not been adequately explored, or explored at all, in prior depositions of other Google employees, and [redacted] has played an instrumental and ongoing role in the development of all three of them. [redacted] testimony would therefore be uniquely relevant and narrowly tailored to the remaining evidentiary needs of Competitor Plaintiffs' cases.

6. *Nirmal Jayaram*[4]

Mr. Jayaram led Google's buy-side engineering teams for more than a decade, until April 2025, including work on Bernanke, Poirot, and their iterations. Many details uniquely relevant to Competitor Plaintiffs remain underexplored or unaddressed in his prior testimony.

Most crucially, Jayaram oversaw Google's adaptation of its bidding tools available through DV360 and Google Ads to the first-price auction through a combination of tactics that, according to Jayaram, [redacted] *See* Ex. 15, GOOG-DOJ-AT-00576443 at -444. However, Jayaram has provided little to no testimony concerning how such adaptations proceeded after the initial transition. After 2019, Jayaram's teams not only adapted programs like Poirot to the first-price world, but also reconstructed much of the architecture of Google's buy-side systems. Jayaram has not been examined about these infrastructural changes. These renovations of Google's buy-side serving architecture directly relate to the impact of the first-price iterations of programs like Poirot and Bernanke on competing ad exchanges after 2019.

Similarly, other parties have previously questioned Jayaram concerning his team's uses of highest-other-bid ("HOB") data, but Jayaram has offered no relevant testimony concerning his efforts to predict the HOB on third-party exchanges, including those operated by Competitor Plaintiffs. Nor has Jayaram discussed his team's development of [redacted] *See* Ex. 16, GOOG-DOJ-AT-00582771.

Jayaram's testimony concerning these and other developments after the 2019 shift to first-price auctions is crucial for Competitor Plaintiffs to understand how Google's conduct has unfairly advantaged its tools across the ad tech stack since 2019 and thereby contributed to and compounded their injuries.

7. *Nitish Korula*[5]

Mr. Korula has worked for Google for nearly 15 years, including five critical years—from 2017 through 2021—in which he served as an engineering leader for Google Ad Manager. Colleagues recognized Korula as [redacted] Ex. 17, GOOG-AT-MDL-006688136 at -138.

---

[4] Google listed Mr. Jayaram in its initial disclosures to Competitor Plaintiffs. Mot. at 10 n.9.
[5] Google listed Mr. Korula in its initial disclosures to Competitor Plaintiffs. Mot. at 10 n.9.

Indeed, while Korula left the ads organization in December 2021, his work on several projects continues to influence Google's practices on both the sell-side and the buy-side to this day. Moreover, many such projects were underexplored in Korula's prior testimony or unaddressed entirely.

For example, while Korula discussed in prior testimony the shift to first-price auctions and provided basic information concerning Google's use and conveyance of "minimum-bid-to-win" ("MBTW") or HOB data, numerous questions remain unanswered concerning how Google adapted its anticompetitive programs to the first-price environment. For example, documents from as early as [redacted] *see* Ex. 18, GOOG-DOJ-32348444 at -444, yet Korula testified that [redacted] Ex. 22, Korula Dep. 245:7-19, Nov. 3, 2023. Moreover, because he was the former leader of GAM's ad serving team, Competitor Plaintiffs have reason to believe that Korula can testify to how HOB and other GAM data is logged and used by the ads organization.

Moreover, Enhanced Dynamic Allocation's ("EDA") impact on Competitor Plaintiffs has been only minimally explored. While Korula has in prior testimony [redacted], *see* Ex. 23, Korula Dep. 74:14-16, July 12, 2024, he was not asked to elaborate on its indirect effects. Namely, EDA increased AdX's ability to win the highest-value impressions, which previously may have been transacted through direct deals. EDA degraded advertisers' and publishers' incentives to transact through traditional direct deals, thereby pushing both sides of the ecosystem to "Programmatic Guaranteed" deals. But, for reasons Korula is well-positioned to explain, Google only allows GAM publishers to transact Programmatic Guaranteed deals with advertisers using DV360. Korula can discuss the rationale and functions underlying EDA, RPO, and Google's uneven sharing of data in first-price auctions, including topics and details unaddressed or underexplored in his prior testimony. These topics are highly relevant to Competitor Plaintiffs' claims and any deposition will accordingly be narrowly tailored.

## IV. OPPORTUNITY TO QUESTION IS RELEVANT TO EACH CROSS-MOTION AND FAVORS COMPETITOR PLAINTIFFS IN BOTH

Google may argue that Competitor Plaintiffs cannot seek to depose Google's witnesses while opposing depositions of their own. But both positions turn on the principle Google invoked against the Group 2 Publishers: whether the party seeking the deposition already had an opportunity to examine the witness. ECF 1738 at 12. For Google's witnesses, the answer is no; no Competitor Plaintiff ever examined any Proposed Deponent. ECF 2044 at 2–3. For Competitor Plaintiffs' witnesses, the answer is yes. Google deposed Adam Soroca (Magnite), Michael Shaughnessy (Kargo), and Andrew Casale (Index Exchange) in the DOJ action. ECF 2044 at 2 n.2. Google cross-examined Rajeev Goel (PubMatic), Tim Cadogan (OpenX), and Mr. Casale at the liability trial. *Id.* Google deposed OpenX's former CEO about the same DV360 decline at issue here, and relies on that testimony in this motion. Mot. at 8 & Ex. M. Google shaped those examinations to serve its own defense. ECF 2044 at 4.

Google says some of its earlier examinations of Competitor witnesses were limited, arguing that Mr. Shaughnessy and Mr. Casale were deposed as third parties, without their

internal documents; that Index's take-rate experiments were not produced before Mr. Casale's DOJ deposition; and that Mr. Soroca was not deposed in his individual capacity. Mot. Ex. A.

Where Google's earlier opportunity was genuinely incomplete, the same principle supports additional deposition time here confined to the newly available documents, interim time periods, and subjects not previously examined.

## V. IN THE ALTERNATIVE, DEPOSITION TIME SHOULD BE LIMITED

If the Court has concerns about burden or duplication, the practical remedy is to limit the depositions, not to forbid them outright. Competitor Plaintiffs propose the following, in addition to adherence to the applicable elements of already existing CMOs and deposition protocols:

1. **Topic Limits.** Questioning confined to the competitor-specific subjects, using documents not previously shown to the witness and a commitment not to repeat questioning from prior examinations.

2. **Time Limits.** Four to five hours of testimony for each previously deposed witness, and a standard seven hours of testimony for Mr. [redacted].

3. **Coordination.** A single coordinated examination of each witness on behalf of all Competitor Plaintiffs.

## VI. CONCLUSION

For the reasons detailed above, Google cannot show good cause to deny Competitor Plaintiffs their sole opportunity to question its witnesses about conduct specific to their allegations and clients. The Court should deny Google's motion for a protective order. In the alternative, it should permit the depositions subject to the limits in Part V.

Respectfully submitted,

/s/ *Yonatan Even*
Yonatan Even
Lauren M. Rosenberg
Helam Gebremariam
Jonathan Mooney
**CRAVATH, SWAINE & MOORE LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
yeven@cravath.com
hgebremariam@cravath.com
lrosenberg@cravath.com
jmooney@cravath.com

Benjamin H. Diessel
Nathan E. Denning
Colleen M. Kozikowski
**WIGGIN AND DANA LLP**
437 Madison Avenue, 35th Floor
New York, NY 10022
Telephone: (212) 551-2600
Facsimile: (212) 551-2888
bdiessel@wiggin.com
ndenning@wiggin.com
ckozikowski@wiggin.com

*Counsel for Plaintiffs OpenX Technologies, Inc., and OpenX Ltd.*

/s/ *Brandon Kressin*
Brandon Kressin
**KRESSIN POWERS LLC**
400 7th St. NW, Unit 300
Washington, DC 20004
Telephone: (202) 464-2905
brandon@kressinpowers.com

*Counsel for Plaintiff Magnite, Inc.*

/s/ *Joseph Aronsohn*
John C. Hueston
Joseph Aronsohn
**HUESTON HENNIGAN LLP**
1 Little West 12th Street
New York, NY 10014
Telephone: (646) 930-4046
jhueston@hueston.com
jaronsohn@hueston.com

Doug J. Dixon
Christina V. Rayburn
Joseph A. Reiter
Justin M. Greer
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone: (949) 356-6412
ddixon@hueston.com
crayburn@hueston.com
jreiter@hueston.com
jgreer@hueston.com

*Counsel for Plaintiff PubMatic, Inc.*

/s/ *Nicolas Stebinger*
Nicolas Stebinger
**SIMONSEN SUSSMAN LLP**
1629 K Street NW, Suite 300
Washington, DC 20006
Telephone: (202) 384-3130
nicolas@simonsensussman.com

Shaoul Sussman
Nico Gurian
Paul Goodrich (*Pro Hac Vice*)
**SIMONSEN SUSSMAN LLP**
307 West 38th Street, 16th Floor
New York, NY 10018
Telephone: (718) 510-5495
shaoul@simonsensussman.com
nico.gurian@simonsensussman.com
paul.goodrich@simonsensussman.com

Catherine Simonsen (*Pro Hac Vice*)
Thomas Mattes (*Pro Hac Vice*)
**SIMONSEN SUSSMAN LLP**
418 Bamboo Lane, Suite C-18
Los Angeles, CA 90012
Telephone: (917) 747-5196
catherine@simonsensussman.com
thomas.mattes@simonsensussman.com

*Counsel for Plaintiffs Equativ SAS, Equativ Inc., Sharethrough Inc., and Sharethrough USA, Inc.*

/s/ *Ian B. Crosby*
Ian B. Crosby (*Pro Hac Vice*)
Edgar Sargent (*Pro Hac Vice*)
Steve M. Seigel (*Pro Hac Vice*)
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
icrosby@susmangodfrey.com
esargent@susmangodfrey.com
sseigel@susmangodfrey.com

Davida Brook (*Pro Hac Vice*)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
dbrook@susmangodfrey.com

Emily Portuguese (NY 5920327)
Tom Boardman (NY 4838074)
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
eportuguese@susmangodfrey.com
tboardman@susmangodfrey.com

*Counsel for Plaintiffs Index Exchange Inc. and Kargo Global LLC*

/s/ *Paul A. Williams*
Paul A. Williams
Eric J. Hobbs (*Pro Hac Vice*)
**SHOOK, HARDY AND BACON L.L.P.**
1660 17th Street, Suite 450
Denver, CO 80202
Telephone: (303) 285-5300
Facsimile: (303) 285-5301
pwilliams@shb.com
ehobbs@shb.com

Riley C. Mendoza
**SHOOK, HARDY AND BACON L.L.P.**
111 S. Wacker Drive, Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7700
Facsimile: (312) 558-1195
rmendoza@shb.com

Ryan M. Sandrock (*Pro Hac Vice*)
**SHOOK, HARDY AND BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 544-1900
Facsimile: (415) 391-0281
rsandrock@shb.com

Erin M. Fishman (*Pro Hac Vice*)
**SHOOK, HARDY AND BACON L.L.P.**
2555 Grand Boulevard
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
efishman@shb.com

David M. Liu (*Pro Hac Vice*)
**SHOOK, HARDY AND BACON L.L.P.**
1800 K Street NW, Suite 1000
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211
dliu@shb.com

*Counsel for Plaintiff Sovrn Holdings, Inc.*

/s/ *Adam M. Acosta*
Adam M. Acosta
**PIERSON FERDINAND LLP**
601 Pennsylvania Ave NW, Suite 900
Washington, DC 20004
(771) 244-2815
adam.acosta@pierferd.com

Matthew C. DeFrancesco (JD1427)
**PIERSON FERDINAND LLP**
1270 Avenue of the Americas
7th Floor—1050
New York, NY 10020
(475) 284-2005
matthew.defrancesco@pierferd.com

*Counsel for TRUSTX Digital Advertising Services, Inc., P.B.C.*

cc: All Counsel of Record via ECF